

DLA Piper LLP (US)
One Liberty Place
1650 Market Street
Suite 5000
Philadelphia, Pennsylvania 19103-7300
www.dlapiper.com

Raymond M. Williams
raymond.williams@us.dlapiper.com
T  215.656.3368
F  215.606.3368

June 28, 2024

The Honorable Karen S. Marston
United State District Court for the
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

Re:   Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Product Liability Litigation – ESI Protocol

**Dear Judge Marston:**

The Parties have engaged in extensive negotiations to reach agreement on an ESI protocol that addresses the reasonably anticipated needs of the Parties in this litigation. After exhaustive discussions and close collaboration, the Parties reached agreement on all but two provisions: (1) email threading and (2) hyperlinked documents. Defendants' proposal for each of these provisions (i) are in line with other courts' decisions on these issues; (ii) focus discovery on information that is both "proportional to the needs of the case" and "truly necessary to resolve the litigation" (Policies and Procedures, § II.C.); and (iii) work to "secure the just, speedy, and inexpensive determination" of the case by ensuring that the "burden or expense of the proposed discovery [does not] outweigh[] its likely benefit." Fed. R. Civ. P. 1 and 26(b). In contrast, Plaintiffs seek to impose significant, unnecessary costs and burdens on Defendants. As such, Defendants respectfully ask the Court to enter Defendants' proposed versions of both provisions. *See* Exhibit A, Proposed ESI Protocol.

1. <u>Use of Email Thread Suppression Will Increase Efficiency Without Depriving Plaintiffs of Relevant Information</u>

Email thread suppression is a widely accepted eDiscovery tool that reduces cost and burden by reducing the volume of documents that must be reviewed, redacted, and produced while still providing the receiving party with the same substantive information. In fact, email thread suppression has become so well accepted that some federal district courts have made it the default in their model ESI Orders.[1] Email thread suppression is a de-duplication process that identifies (a) documents containing portions of email chains with unique information (frequently referred to as "most inclusive" or "last-in-time" versions of the email chain), and (b) documents containing portions of email chains that are entirely duplicative of other documents (frequently

---

[1]   *See, e.g.,* W.D. Wash., Model ESI Agreement, https://www.wawd.uscourts.gov/sites/wawd/files/ModelESIAgreement_CLEAN_2.1.23.pdf (last visited Feb. 8, 2024).



June 28, 2024
Page Two

referred to as "lesser-inclusive" or "earlier-in-time" versions).[2]  The technology then suppresses, or removes from review, redaction, and production workflows all documents with portions of email chains that are entirely duplicative of other documents (*i.e.* the "lesser-inclusive" or "earlier-in-time" versions). Email thread suppression is commonly used to facilitate a more efficient review and production process and reduce costs for both producing and receiving parties.  Although the data regarding the savings achieved through email thread suppression is often anecdotal, analyses that have quantified its impact on review burden and cost report a reduction of 18-45% in review volumes and as much as a 65% reduction in cost.[3]

Plaintiffs' proposal with respect to email thread suppression frustrates the very purpose of the process.  While suggesting that Defendants can use threading to assist their review, Plaintiffs insist that every responsive segment of an email chain be produced separately regardless of whether they contain unique information or whether such production would require repetitive redaction of the same duplicative content in multiple copies.  Defendants respectfully ask the Court to reject Plaintiffs' provision for three reasons: (1) email threading is consistent with Federal Rules, specifically Rule 34; (2) email threading will not, as Plaintiffs suggest, deprive them of relevant information; and (3) Plaintiffs' other objections to email threading demonstrate a fundamental misunderstanding of the process.

*First*, use of email thread suppression is consistent with Rule 34, which permits parties to produce electronically stored information in "a reasonably usable form" and expressly states that a party is not required to "produce the same electronically stored information in more than one form."  Fed. R. Civ. P. 34(b)(2)(E)(ii)-(iii).  Courts routinely recognize that threaded emails are not only a reasonably usable form, but they are the most usable and efficient form of email production, particularly in cases with large volumes of email.  *See*, *e.g.*, *Iannone v. AutoZone, Inc.*, No. 19-CV-2779, 2022 WL 4122226, at *2 (W.D. Tenn. Sept. 9, 2022) ("The parties agreed to apply two **standard** procedures to their production: de-duplication and email threading") (emphasis added); *Compass, Inc. v. Real Estate Bd. of New York, Inc.*, No. 21-CV-2195, 2022 WL 2256290, at *4 (S.D.N.Y. June 23, 2022) (permitting "email thread suppression…which reduces duplicative production of email threads through use of industry standard techniques"); *Sierra Club v. United*

---

[2] Defendants are prepared to provide declarations supporting the technical details of email threading and hyperlinked documents described in this letter brief should the Court deem it necessary.

[3] *See*, *e.g.*, Barclay J. Blair, "Getting Smart with Email in E-Discovery – How Email Threading Can Lower Costs and Increase Speed: A Case Study with Perkins Coie and Discovia", https://ccbjournal.com/articles/getting-smart-email-e-discovery---how-email-threading-can-lower-costs-and-increase-sp (last visited on June 26, 2024) (email threading reduced review volume by up to 45%); Alix Partners, "Global FCPA Investigation", https://www.alixpartners.com/what-we-do/case-studies/global-fcpa-investigation/ (last visited on June 26, 2024) (reduced review population by 30%); Lighthouse, "Global Law Firm Partners with Lighthouse to Save Millions During Government Investigation, https://www.lighthouseglobal.com/case-study/global-law-firm-partners-with-lighthouse-to-save-millions-during-government-investigation (last visited on June 26, 2024) (1.1 million documents removed through email threading saving $1.1 million).



June 28, 2024
Page Three

*States Env't Prot. Agency*, No. 18-CV-03472-EDL, 2018 WL 10419238, at *5 (N.D. Cal. Dec. 26, 2018) (explaining how "the standard technique of 'threading' emails to reduce duplicate content in emails chains…reduces the time and complexity of reviewing emails"); *Martinelli v. Johnson & Johnson*, No. 215CV01733MCEEFB, 2016 WL 1458109, at *5 (E.D. Cal. Apr. 13, 2016) ("removal of wholly-included, prior-in-time, or lesser-included versions from potential production will reduce all parties' costs").

*Second*, Plaintiffs' objection that the use of email thread suppression would deprive them of metadata is misguided. All of the information contained in the email conversation is present in the most-inclusive email, including the text of the original email header fields of earlier emails within the chain (email addresses, dates, etc.).[4] Plaintiffs' position is that despite such information appearing in the documents Defendants would produce, they are entitled to also receive that same information as fielded metadata and separate documents for each part of the email chain. That is, in addition to the face of the document showing that a particular part of an email chain was sent by John Smith, Plaintiffs assert they also need a separate metadata field showing that John Smith was the sender of that portion of the chain and a separate copy of the email chain showing John Smith's email on top.  Plaintiffs' demand is inconsistent with Rule 34, which expressly states that a producing party is not required to "produce the same electronically stored information in more than one form."  Fed. R. Civ. P. 34(b)(2)(E)(ii)-(iii).  Plaintiffs insist that they are entitled to production of the same information about every single part of a responsive email chain in two forms.  The added burden of producing this information twice–up to a 45% increase in review burden and 65% in costs—is not proportional to the needs of the case or justified in light of the fact that the same information is already being produced to the Plaintiffs.

Third, Plaintiffs' other objections to the use of email thread suppression are equally insufficient to justify the huge increase in burden imposed by their approach.  For example, Plaintiffs have erroneously suggested that they will be disadvantaged because "attachment names…get dropped" by threading and, accordingly, it may make it impossible to determine which attachments appeared at which points in the email thread. But this assertion reflects a fundamental misunderstanding of how email threading works. Each email with a unique attachment is considered a "most-inclusive" email and will be reviewed and produced independently (if part of a responsive family). In other words, email threading does not affect the production of versions of emails that have attachments – such emails are unique and so will not be suppressed. Therefore, all unique attachments that appear in email chains that are responsive will remain separate and unsuppressed and produced as part of a responsive family with the email to which they are attached.  Likewise, Plaintiffs have contended that they need every version of an email produced individually so that they can confront witnesses with a specific email without the reply messages in the chain in the same document.  This is a wholly insufficient reason to increase the cost and burden of review and production of all productions for all parties throughout

---

[4] To the extent Plaintiffs identify specific unique information that might not be captured by industry-standard email thread suppression techniques, Defendants are willing to meet and confer regarding such information. To date, Plaintiffs have not identified for Defendants any such unique information that might be lost.



June 28, 2024
Page Four

the litigation.  Plaintiffs' counsel are talented lawyers and are more than capable of directing a witness to the relevant portion of an email chain during examination.  Moreover, confronting a witness with an isolated communication when there are later portions of the same conversation omitted from the portion Plaintiffs choose to use is misleading and can cause a witness to be unfairly confused.

Ultimately, email thread suppression is an industry-standard tool that has been repeatedly shown to reduce the burdens and costs of document productions by limiting review, redaction, and production workflows to only those parts of an email chain with unique information, while also ensuring that receiving parties are provided with the unique information to which they are entitled (including sender, recipient, date, and time metadata and attachments).  Plaintiffs' opposition to use of this practice here is based exclusively on convenience.  Plaintiffs believe Defendants should be required to undertake the substantial additional burden so that Plaintiffs can receive productions that are more convenient for them to use for certain purposes, which are served just as effectively through Defendants' proposal.  Imposing such significant, unnecessary burdens is inconsistent with Rule 34 and not proportional to the needs of this case.  *See* Rule 26(b)(1).[5]

2. <u>Hyperlinked Documents are Not Attachments, As-Sent Versions Cannot be Collected Accurately or Cost-Effectively, and Most Recent Versions Create Significant Evidentiary Issues</u>

Hyperlinked documents are documents that are referenced by a hyperlink in an email or other document.  Unlike a traditional email with an attachment—where the message and the attachment are forever bound together within the same digital file and source—hyperlinked documents have their own, independent existence, and are stored separately from any email or other document that contains a hyperlink to it.  Accordingly, hyperlinked documents are not attachments.  Despite this fact, Plaintiffs' proposed ESI Protocol not only would require Defendants to treat such documents as attachments, thereby creating false family relationships between documents, it would also require Defendants to either (i) undertake extremely burdensome steps to manually link documents or (ii) collect the latest version of a document and treat it as an attachment regardless of whether it is the same as the document that existed when the link was sent.  Plaintiffs' request is inconsistent with Rule 34, creates significant evidentiary problems, and imposes unduly burdensome and costly requirements on Defendants.  Defendants respectfully ask the Court to reject Plaintiffs' proposal.

a. *Rule 34 Does Not Require Defendants to Treat Hyperlink Documents as Attachments.*

---

[5] Should Plaintiffs continue to insist on the additional cost and burden of reviewing and producing documents without email thread suppression for their convenience, the Court should consider whether the related expenses should be allocated to Plaintiffs pursuant to Fed. R. Civ. P. 26(c)(1)(B).



June 28, 2024
Page Five

  First, hyperlinked documents are not attachments. Rule 34 is clear that a responding party is permitted to produce documents "as they are kept in the usual course of business" and "in a form or forms in which [they are] ordinarily maintained." Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii). In Defendants' usual, ordinary course of business, documents containing hyperlinks and the documents to which those hyperlinks point are not maintained or kept together. The fact that they are not attachments is a point that has been repeatedly recognized by courts. *See In re Insulin Pricing Litig.*, No. 23-MD-3080 (BRM) (RLS), 2024 WL 2808083, at *7 (D.N.J. May 28, 2024) ([t]he Court agrees with Defendants: hyperlinks are not the same as traditional attachments"); *In re Uber Techs., Inc.*, *Passenger Sexual Assault Litig.*, No. 23MD03084CRBLJC, 2024 WL 1772832, at *2 (N.D. Cal. Apr. 23, 2024) ("a hyperlinked document…is not readily available for production in the same manner that traditional email attachments could be produced"); *In re Meta Pixel Healthcare Litig.*, No. 22CV03580WHOVKD, 2023 WL 4361131, at *1 (N.D. Cal. June 2, 2023) ("the ESI protocol should make clear that hyperlinked documents are not treated as conventional attachments"); *Nichols v. Noom Inc.*, No. 20CV3677LGSKHP, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) ("the Court does not agree that a hyperlinked document is an attachment"); *In re StubHub Refund Litig.*, No. 20-MD-02951-HSG (TSH), 2024 WL 2305604, at *7 (N.D. Cal. May 20, 2024) ("the whole issue is that the linked-to documents are *not* attachments") (emphasis in original). Because hyperlinked documents are not attachments, Rule 34 does not require that they be produced as if they were.

  The dispute over this provision hinges on the significant technical distinction between traditional attachments and hyperlinked documents. A traditional attachment is a static document or file that is stored within the sending email or message file in the ordinary course. Standard eDiscovery workflows collect and process emails or message files containing traditional attachments as a single "family." In contrast, a document referenced by a hyperlink in an email or message is not static and is not maintained or stored within the email or message in the ordinary course. The hyperlink is literally a pointer to a different storage location where the referenced document was located at the time of sending. In other words, the hyperlinked document referenced in an email or message is not an attachment at all, but a signpost directing the message recipient to a document in a separate physical location. Like a website referenced by a hyperlink, documents referenced by a hyperlink may change over time, as the content or location of the document may be modified, deleted, or moved. In other words, even if the signpost (hyperlink) stays the same, what the signpost points to (the hyperlinked document) might not. *See*, *e.g.*, *In re StubHub Refund Litig.*, 2024 WL 2305604 at *1 ("one of StubHub's major arguments for why the hyperlink requirement is broadly impossible to comply with is that many of the hyperlinks do not work anymore"); *Nichols*, 2021 WL 948646 at *4 (recognizing the many different uses of hyperlinks that differ from traditional attachments). As such, even if *a* document still exists at the location referenced by a hyperlink, it does not necessarily represent *the* document or information that was available or intended by the author or recipient at the time the email or message was sent.

  The consequence of this technical distinction is critical to how the Federal Rules of Civil Procedure apply to the collection and production of documents referenced by hyperlinks in emails



June 28, 2024
Page Six

or messages. Plaintiffs' proposal would require that Defendants produce documents containing hyperlinks along with a copy of the document referenced by the hyperlink in the same "document family," in effect creating an artificial "family" relationship where none exists. Enacting such a requirement would be akin to forcing a party that produces a hard-copy document, such as an annual report, that contains an internal reference to separate information, such as government economic data, to locate the government data and staple the two documents together (or link them together as a family) before producing them. Nothing in Rule 34 or otherwise requires this.

> b. *Defendants Have No Practical Automated Method for Collecting Contemporaneous Versions of Hyperlinked Documents and the Burden of the Manual Collection Proposed by Plaintiffs Would Be Enormous.*

Second, and most importantly from a practical standpoint, for previously sent emails or messages there is no automated way to identify and collect contemporaneous, as-sent versions of hyperlinked documents[6] in the Microsoft M365 environment used by Defendants. *See*, *e.g.*, *In re Meta Pixel Healthcare Litig.*, 2023 WL 4361131 at *1 ("[t]he Court is persuaded that the commercially available tools…for automatically collecting links to non-public documents have no or very limited utility in [Microsoft Exchange, SharePoint and OneDrive] data environments or systems"). Defendants are not aware of, nor have Plaintiffs been able to propose, a feasible technical solution to the current limitations of the Microsoft 365 environment to recover as-sent hyperlinked documents for previously sent emails. The inability to collect contemporaneous hyperlinked documents in the Microsoft M365 environment has been confirmed by cases that have explicitly considered the issue. *See, e.g.*, *Id.*; *In re Insulin Pricing Litig.*, 2024 WL 2808083 at *7-8 (finding that tools that would enable Defendants to collect contemporaneous version of hyperlinked documents "are either not feasible or unduly burdensome").

Because no technology exists to automatically identify and collect "as sent" versions of hyperlinked documents in previously sent emails, Plaintiffs' proposal would require Defendants to either manually attempt to locate an "as sent" version of the document (an incredibly laborious and expensive process that would have to be done on a document-by-document basis) or "instead collect and review only the most recent version of the hyperlinked document." Neither solution is reasonable or workable.

Requiring Defendants to "collect and review a contemporaneous version of the hyperlinked document" in the absence of automated technology would be oppressive and bring discovery in this case to a standstill. Essentially, Defendants would be required to review every

---

[6] The contemporaneous or "as sent" versions of a hyperlinked document would be the version of a document exactly as it existed at the time a hyperlink was included in an email or other message. Other versions of the document would not necessarily reflect what a sender of the email or message with the hyperlink intended or had access to or what the recipients of the message with the link received. Indeed, available versions could consist of an entirely different document.



June 28, 2024
Page Seven

document that is collected regardless of responsiveness to determine if it has a hyperlink. For every document that has a hyperlink to another document, before applying search terms or reviewing for responsiveness, Defendants would have to go back to their information technology systems to try to manually locate the hyperlinked document, manually determine which version of the document was the "contemporaneous" or "as sent" version of the document, and then manually load that "as sent" version of the document into its eDiscovery database and manually associate it with the email or message containing the hyperlink. And all this assumes that an "as sent" version of the document exists or is ascertainable as such, when it may not be. Only then would Defendants be allowed to run search terms or review for responsiveness. This process would take hours to complete for each hyperlink identified, and, depending on the scope of Defendants' Rule 34 collection burden, this manual process could be required for hundreds of thousands of documents, or more. Given the nearly non-existent benefit of this process—again it would be required of all documents collected, including huge volumes of documents that have no relevance to this litigation—the exorbitant cost of such a process greatly outweighs any such benefit and is not authorized under the Rules. *See* Fed. R. Civ. P. 26(b)(1) (only permitting discovery that is proportional to the needs of the case).

Plaintiffs' alternative—requiring Defendants to falsely associate "the most recent version" of a hyperlinked document as a family member with an email or other document—would create more problems than it would solve. The "current version" of a hyperlinked document may have been modified since the email or message was sent. Indeed, a completely different document from the one referenced in the document with the hyperlink could now be in its place. Creating an artificial family relationship that literally never existed would require technical evidence to authenticate the family under Rule 901. Such evidence would be required to establish whether the hyperlinked document included with the family was, in fact, the version of the hyperlinked document referenced in the email or message, or if the hyperlinked document associated was changed. More practically, using such a falsely constructed family with a witness—in a deposition or at trial—would be problematic as the witness would have no way of knowing whether the false "attachment" was the equivalent to what existed at the time the email or message was sent or something entirely different. Moreover, given the technical complexity involved in these issues, it is also likely that at some point in time in litigation of this size, a witness or an attorney will inadvertently misrepresent the nature of such a false attachment, creating a substantial risk of injecting significant avoidable error into testimony or decisions.

c. *Defendants Propose a Practical and Efficient Alternative Consistent with Prior Court Rulings.*

Third, although not required by the Rules, Defendants have proposed an efficient and practical solution endorsed by virtually every court that has considered this issue: under Defendants' proposal, Plaintiffs may make reasonable, particularized requests for up to 400 hyperlinked documents per Producing Party that they believe to be material to their preparation of the case. For those documents, Defendants will undertake the burdensome manual process of attempting to identify the "as sent" version of the hyperlinked document. Defendants will either



June 28, 2024
Page Eight

produce the version of the hyperlinked document closest in time and predating the message with the identified hyperlink, explain their inability do so, or make an objection with a supporting explanation. This is the solution adopted by most courts that have considered the issue. *See, e.g.*, *l In re StubHub Refund Litig.*, 2024 WL 2305604 at n.9 ("As a compromise, StubHub offers in its motion that Plaintiffs may provide a list of up to 400 additional hyperlinked documents that StubHub will devote all reasonable resources to manually retrieve and produce . . . The Court holds StubHub to this offer"); *In re Uber Techs., Inc.*, 2024 WL 1772832 at *4, n.4 (expressing concerns "regarding the difficulty of securing the version of a document that is contemporaneous with the email that hyperlinked it," recognizing "only a fraction of documents produced in discovery are material to the litigation," and allowing plaintiffs to identify "up to 200 hyperlinks for which they seek the contemporaneous referenced document"); *In re Meta Pixel Healthcare Litig.*, 2023 WL 4361131 at *1 ("the parties should consider reasonable requests for production of hyperlinked documents on a case-by-case basis"); *Nichols*, 2021 WL 948646 at *4 (ordering that plaintiffs could identify "a need for an additional targeted pull or production or clarifying information about a hyperlinked document's identity").

In light of excessive burdens and problems created by Plaintiffs' proposed hyperlinked document provision, Defendants respectfully ask the Court to enter Defendants' alternative.

June 28, 2024

*/s/ Raymond M. Williams*

Raymond M. Williams (PA Bar No. 90771)
Ilana H. Eisenstein (PA Bar No. 94907)
**DLA PIPER LLP (US)**
1650 Market Street, Suite 5000
Philadelphia, PA 91903
Telephone: (215) 656-3351
Facsimile: (215) 656-3301
ilana.eisenstein@us.dlapiper.com
raymond.williams@us.dlapiper.com

Loren H. Brown (admitted *pro hac vice*)
Lucas P. Przymusinski (admitted *pro hac vice*) **DLA PIPER LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
Telephone: (212) 335-4846
Facsimile: (212) 335-4501
loren.brown@us.dlapiper.com
lucas.przymusinski@us.dlapiper.com



June 28, 2024
Page Nine

                            Matthew A. Holian (admitted *pro hac vice*)
                            Katherine W. Insogna (admitted *pro hac vice*)
                            **DLA PIPER LLP (US)**
                            33 Arch Street, 26th Floor
                            Boston, MA 02110
                            Telephone: (617) 406-6000
                            Facsimile: (617) 406-6100
                            matt.holian@us.dlapiper.com
                            katie.insogna@us.dlapiper.com

                            *Attorneys for Defendants Novo Nordisk A/S, Novo Nordisk North American Operations A/S, Novo Nordisk US Holdings, Inc., Novo Nordisk US Commercial Holdings, Inc., Novo Nordisk, Inc., Novo Nordisk Research Center Seattle, Inc., and Novo Nordisk Pharmaceutical Industries LP*

June 28, 2024                   */s/ Samuel W. Silver*
                            Samuel W. Silver (PA Bar No. 56596)
                            Catherine M. Recker (PA Bar No. 56813)
                            Bruce P. Merenstein (PA Bar No. 82609)
                            Abigail T. Burton (PA Bar No. 334450)
                            **WELSH & RECKER, P.C.**
                            306 Walnut Street
                            Philadelphia, PA 19106
                            (215) 972-6430
                            ssilver@welshrecker.com
                            cmrecker@welshrecker.com
                            bmerenstein@welshrecker.com
                            aburton@welshrecker.com



June 28, 2024
Page Ten

        James F. Hurst, P.C. (admitted *pro hac vice*)
        Renee D. Smith (admitted *pro hac vice*)
        Diana M. Watral, P.C. (admitted *pro hac vice*)
        Mark Premo-Hopkins (admitted *pro hac vice*)
        **KIRKLAND & ELLIS**
        333 West Wolf Point Plaza
        Chicago, IL 60654
        Telephone: (312) 862-2000
        Facsimile: (312) 862-2200
        james.hurst@kirkland.com
        renee.smith@kirkland.com
        diana.watral@kirkland.com
        mark.premohopkins@kirkland.com

        Jonathan M. Redgrave (admitted *pro hac vice*)
        Erica B. Zolner (admitted *pro hac vice*)
        Martin T. Tully (admitted *pro hac vice*)
        **REDGRAVE LLP**
        4800 Westfields Blvd. | Suite 250
        Chantilly, VA 20151
        (703) 592-1155
        jredgrave@redgravellp.com
        ezolner@redgravellp.com
        mtully@redgravellp.com

        *Attorneys for Defendant Eli Lilly & Company*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 28, 2024, a true and correct copy of the foregoing Letter Brief regarding ESI Protocol was electronically filed with the Clerk of the Court using the CM/ECF system, causing a notification of the filing to all counsel of record.

                                         */s/ Raymond M. Williams*
                                         Raymond M. Williams (PA Bar No. 90771)
                                         **DLA Piper LLP (US)**
                                         1650 Market Street, Suite 500
                                         Philadelphia, PA 91903
                                         Telephone: (215) 656-3351
                                         raymond.williams.@us.dlapiper.com