IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | : : : : : : : | CIVIL ACTION<br><br>MDL No. 3094<br>24-md-3094 |
| THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS/ALL CASES* | : : : | HON. KAREN SPENCER MARSTON |

**MEMORANDUM**

**Marston, J.**  **October 23, 2025**

This MDL involves personal injury actions stemming from the use of glucagon-like peptide-1 (GLP-1) receptor agonists and GLP-1/glucose-dependent insulinotropic polypeptide (GIP) dual receptor agonists (collectively, "GLP-1 RAs") manufactured by the Novo Nordisk Defendants ("Novo")[1] and the Eli Lilly Defendants ("Lilly")[2]. (*See generally* Doc. Nos. 1, 481.) The Court previously ordered early, limited discovery and motion practice on three issues: (1) diagnosing gastroparesis, (2) preemption/adequacy of warnings, and (3) general causation (the "Cross Cutting Issues"). (Doc. Nos. 235, 282.) Discovery on issues two and three is slated to end on October 24, 2025, for the claims against Lilly, and November 21, 2025, for the claims against Novo.

Before the Court is Plaintiffs' request that Defendants be required to "produce animal histopathology slides (the 'Slides') for 22 studies that they conducted related to the GLP-1 RA pharmaceuticals at the center of this MDL." (Doc. No. 490 at 1.) For each study, they request

---

[1] The Novo Nordisk Defendants are Novo Nordisk A/S and Novo Nordisk Inc. (*See* Doc. No. 294 at ¶¶ 15–17.)

[2] The Eli Lilly Defendants are Eli Lilly and Company and Lilly USA, LLC. (*See* Doc. No. 294 at ¶¶ 20–21.)

five types of tissue from three animal species.  (*Id.* at 2.)  Defendants oppose the request, arguing that Plaintiffs fail to meet their burden to demonstrate the specific relevance of the Slides and that the request is disproportionate to the needs of the case.  (*Id.* at 5.)  The parties brought their dispute to Special Discovery Master Judge (Ret.) Lawrence F. Stengel, who recommends denying Plaintiffs' request because although the Slides are marginally relevant to issues two and three, their production would be disproportionate to the needs of the case.  (*See generally* Doc. No. 490.)  Plaintiffs object to the R&R's conclusions on proportionality.  (Doc. No. 491 at 2–6.)  The Court considers the challenged portions of the R&R de novo.  *See* Fed. R. Civ. P. 53(f)(3)–(4).

## I. LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ."  Fed. R. Civ. P. 26(b)(1).  Although the scope of discovery allowed under Rule 26 is broad, *Fort Wash. Resources, Inc. v. Tannen*, 153 F.R.D. 78, 79 (E.D. Pa. 1994), it is not limitless, *Druding v. Care Alternatives*, No. 08-cv-2126(JBS/AMD), 2017 WL 11461795, at *3 (D.N.J. June 21, 2017).  The party seeking discovery bears the burden of showing the relevance of the requested information.  *Morrison v. Phila. Housing Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001); *see also Brewer v. Berks Cty. Sheriff*, No. 5:13-cv-5763, 2015 WL 13620425, at *2 (E.D. Pa. Oct. 5, 2015) ("The party seeking discovery has the burden of showing that the information sought is relevant to the subject matter of the action and may lead to admissible evidence.").  If the requesting party satisfies its burden, "[t]he burden then shifts to the party resisting discovery to justify withholding it."  *Morrison*, 203 F.R.D. at 196.

## II.   DISCUSSION

The Court agrees with Special Master Stengel that Plaintiffs have shown the histopathology slides are relevant, albeit only minimally so. (*See* Doc. No. 490 at 7 ("[U]nderstanding what the Defendants knew from the Slides and how they then described that information to the FDA could conceivably relate to several issues in the litigation, including preemption defenses and causation.").) Because Plaintiffs have satisfied their burden, the burden shifts to Defendants to show that requiring production would not be proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 18-cv-1215, 2019 WL 117555 (3d Cir. Jan. 7, 2019) ("The court may limit discovery to ensure its scope is proportional to the needs of a case . . . ."). Rule 26(b)(1) identifies six factors relevant to proportionality: (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

In the R&R, Special Master Stengel concludes that these factors, when considered collectively, weigh against production. (Doc. No. 490 at 9–11.) His conclusion rests primarily on a finding that the fifth and sixth factors—"the importance of the discovery in resolving the issues" and the "the burden or expense of the proposed discovery," Fed. R. Civ. P. 26(b)(1)—

3

"dramatically outweigh the others."[3] (Doc. No. 490 at 9.) The Court considers these two factors in turn.

### A. Importance of the Discovery

The fifth factor—the "importance of the discovery in resolving the issues"—asks whether the requested discovery "goes to a central issue or a side one." *Penn Eng'g & Mfg. Corp. v. Peninsula Components, Inc.*, No. 19-cv-513, 2021 WL 4037857, at *5 (E.D. Pa. Sept. 3, 2021); *see also Lakeview Pharm. of Racine, Inc. v. Catamaran Corp.*, No. 3:15-cv-290, 2019 WL 587296, at *4 (M.D. Pa. Feb. 13, 2019) ("In considering this factor, the court looks to whether the discovery request goes to a central issue in the case and the importance of the discovery in resolving the issue at hand."). Although the burden of proof as to overall proportionality rests with Defendants, Plaintiffs, as the "'party claiming that [their] request is important to resolve the issues,'" is expected to explain why. *Penn Eng'g & Mfg. Corp.*, 2021 WL 4037857, at *5 (quoting Fed. R. Civ. P. 26, adv. comm. n. to 2015 am.).

Here, Special Master Stengel concludes that the "importance of the Slides to this litigation has not been demonstrated." (Doc. No. 490 at 9.) He notes that Defendants have already produced the study reports that they submitted to FDA, which summarize the information shown on the Slides, and he rejects Plaintiffs' argument that the underlying samples are nevertheless "relevant because [they] might show that Defendants knew something that they did not report to the FDA." (*Id.*) He compares Plaintiffs' request to the "snipe hunt" that the court found inappropriate in *In re Gardasil*, emphasizing that he has "nothing before [him] . . .

---

[3] As to the other factors, the Special Master found that the "first three factors favor production," and the "fourth factor (the Parties' resources)" was "split." (Doc. No. 490 at 9.) Neither party challenges these findings.

that sets forth why the Slides had any particular importance to the FDA's analysis or that suggests they are likely to contain an inconsistency." (*Id.* at 9–10.) Last, Special Master Stengel finds the "Plaintiffs' delay in seeking the Slides until the end of the discovery period" suggests "the Slides are less important to the litigation" than other discovery sought during the last year. (*Id.* at 10.) Plaintiffs object to this conclusion, arguing that the Special Master's reliance on *In re Gardasil* is misplaced because it ignores other cases granting this type of discovery; that the Special Master's conclusions place a burden on "Plaintiffs that is essentially impossible to meet without having the benefit of the discovery sought"; and that the Special Master's belief that Plaintiffs delayed raising the issue is incorrect. (Doc. No. 491 at 3–6.) The Court addresses each issue in turn.

1. **Reliance on *In re Gardasil***

First, Plaintiffs argue that Special Master Stengel erroneously compares this case to *In re Gardasil Prods. Liab. Litig.*, No. 3:22-md-03036 (W.D.N.C. July 18, 2024) (hearing transcript filed in this case at Doc. No. 497-1). The Court disagrees. In that case, the plaintiffs moved for an order compelling the defendant pharmaceutical company, Merck, to produce archived animal pathology tissue, histopathology slides, and color copies of the histopathology/microscopic pathology performed in 13 preclinical animal studies of the Gardasil vaccine. (Doc. No. 497-1 at 44:15–25, 51:23–52:3; *see also id.* at 47:9–12 (explaining that the plaintiffs later "whittled it down to 13 studies that [they] thought were really critical").) The plaintiffs argued that because Merck did not test autoimmune and ovarian issues during its human clinical trials, the animal slides represented the "best evidence" as to what "Merck knew" about those issues when it submitted its study reports to FDA and were necessary to place the parties on "equal footing." (*Id.* at 46:2–48:3.) Merck opposed the motion to compel, arguing that production of the slides

5

was disproportionate to the needs of the case given that: (1) the plaintiffs had copies of "the reports that Merck made to the FDA" about each of the requested studies, not to mention extensive after-market epidemiological data on the side effects of the vaccine (*id.* at 49:18–50:5), and (2) although Merck did not know how many slides there were for each study, it would nevertheless be burdened by having to sort through the archived records and find the slides (*id.* at 53:13–54:25). The Honorable Kenneth D. Bell sided with Merck, finding the "material [wa]s just too far afield and too much of a snipe hunt" for him to order production. (*Id.* at 64:15–17.)

Here, Plaintiffs argue that *In re Gardasil* is distinguishable because the "injuries alleged in the Gardasil MDL were autoimmune in nature," but there is no evidence that the animal slides sought in that case would have "provide[d] information about the autoimmune injuries alleged." (Doc. No. 491 at 5 n.8.) Not so. The plaintiffs in *In re Gardasil* argued before Judge Bell that "part of the theory of [their] case is that many of [the] plaintiffs have fertility issues tied to autoimmune issues," and two of the sought after animal studies "specifically were looking into fertility issues." (Doc. No. 497-1 at 48:3–7.) It is, therefore, wrong to suggest that Judge Bell denied the plaintiffs request because the underlying animal studies were unrelated to the alleged injuries in that litigation.

The Court likewise rejects Plaintiffs' argument that *In re Gardasil* is distinguishable because unlike that case, here, Defendants' study reports to the FDA noted, and disregarded, "treatment-related effects in the gastrointestinal system[s]" of the subject animals. (Doc. No. 491 at 5.) Again, not so. Although the animal studies in *In re Gardasil* ultimately showed no fertility issues in rats (Doc. No. 497-1 at 20–22), the plaintiffs emphasized before Judge Bell that the underlying data was nevertheless relevant because Merck's FDA study reports identified "certain treatment-related effects in the tissue" samples, but failed to "describe what those issues

6

[we]re," such that the plaintiffs did not "have a way of understanding" the nature of the "confirmed . . . treatment-related effects" (*id.* at 51:18–25). In other words, "treatment-related effects" were also noted in the study reports at issue in *In re Gardasil*, but Judge Bell nevertheless denied the plaintiffs' motion to compel the underlying slides.

Last, Plaintiffs argue that Special Master Stengel's reliance on *In re Gardasil* is misplaced because there are numerous other cases where "production [of histopathology slides] was ordered." (Doc. No. 491 at 5.) But a closer look at the cited cases belies Plaintiffs' description. As Defendants' note, three of the four cited cases "merely note that some [histopathology] slides were produced" in those cases "without discussing why or what precipitated that production (or even if it was opposed)." (Doc. No. 497 at 5); *see also In re Proton Pump Inhibitor Prods. Liab. Litig.*, No. 2:17-md-2789 (CCC) (LDW) (MDL 2789), 2022 WL 18999830 at *42 (D.N.J. Dec. 5, 2022) (noting that the proposed expert "reviewed pathology from animals in preclinical studies submitted to FDA"); *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *11 (E.D. Pa. Feb. 1, 2011) (excluding expert analysis as unreliable because the expert "has not adequately explained how or why he can reliably extrapolate the results of the rat study to human beings"); *In re Accutane - Trial*, No. 271, 2008 WL 5611668 (N.J. Super. Ct. Nov. 6, 2008) (expert testimony explaining how animal toxicology studies are performed). And in the fourth case, *In re Roundup Products Liability Litigation*, the court ordered a far more limited production of slides which were of greater importance than those being sought here. No. 2741, Case No. 16-md-02741-vc, Doc. Nos. 257, 297 (N.D. Cal. 2017) (ordering production of kidney tissue slides from a single study where the plaintiffs (1) argued that the slides' importance was "immense to the question of general causation" in that they "played a critical role in the EPA's decision to re-categorize" the chemical at issue, and

(2) emphasized that the defendant's "repeated reliance upon the original and re-cut kidney tissue slides of BDN-77-420 necessitates granting Plaintiffs access to the same slides").

Accordingly, the Court rejects Plaintiffs' argument that *In re Gardasil* is distinguishable and that Special Master Stengel erred when he looked to Judge Bell's ruling in that case as opposed to the other cases cited by Plaintiffs.

### 2.    Evidence of Wrongdoing

Next, Plaintiffs argue that Special Master Stengel's conclusions on importance are erroneous because he placed a burden on "Plaintiffs that is essentially impossible to meet without having the benefit of the discovery sought." (Doc. No. 491 at 4.) Special Master Stengel found Plaintiffs failed to show the importance of the Slides in part because:

> What the Slides will add to the doublechecking process other than one more opportunity to capture a potential inconsistency is unknown—this is the "snipe hunt" referred to in *Gardasil*. I have nothing before me . . . that sets forth why the Slides had any particular importance to the FDA's analysis or that suggests they are likely to contain an inconsistency.

(Doc. No. 490 at 9–10.) Plaintiffs read this finding as a mandate that they show "there was something said wrong or incorrectly to the FDA," a burden they cannot meet without access to the underlying Slides. Sept. 30, 2025 Hr'g Tr. at 31:17–20; *see also id.* at 17:12–19 ("First, it is quite a catch-22 for . . . Judge Stengel to have found that we needed to point out discrepancies between what was told to the FDA by Novo, for example, and what actually appeared in the Slides. . . . I mean, that's literally impossible for us to do unless there is a writing within the company that admits [as much]."). But this takes an overly narrow view of Special Master Stengel's finding, which is more general: the slides are not of great importance in this litigation because they are only nonduplicative to the extent they "could show information was withheld

8

from the FDA," and even then, "Plaintiffs offer no reason to suggest that occurred." (Doc. No. 490 at 7.)

The Court agrees with this reasoning. Defendants have produced "hundreds of thousands of pages of materials related to more than 600 animal studies—including protocols, study reports with extensive appendices of specific findings, and communications with FDA about those studies." (Doc. No. 497 at 3.) And more broadly, Defendants "have produced tens of millions of pages relating to the safety of the products at issue here, including animal and clinical studies conducted over more than 20 years and *more than a decade of real patient use*." (Doc. No. 497 at 2 (emphasis added).) In short, Plaintiffs have already received voluminous discovery about the safety of the GLP-1 RAs generally and the animal studies at issue specifically, including the FDA study reports that summarize what the challenged Slides revealed.

Consistent with this extensive production, Plaintiffs do not argue that they need the Slides to understand the effects these drugs have on humans (or animals). Instead, they argue that the Slides in particular—as opposed to the study reports—are important because they may show that Defendants (purposefully or inadvertently) withheld information from the FDA when they created those reports. (Doc. No. 491 at 4.) But, as Special Master Stengel found, Plaintiffs have not put forth any evidence to support this theoretically possible conclusion. The issue is not merely whether Plaintiffs can point to Slides that contain information not shared with the FDA— a feat the Court concedes Plaintiffs could not accomplish without access to the Slides at issue. Instead, Special Master Stengel's finding reflects a broader expectation that Plaintiffs show their assumption is founded in evidence as opposed to conjecture that Defendants necessarily withheld information from FDA. In other words, Plaintiffs have not shown that there is reason to question the findings discussed in the study reports. They have not, for example, identified any studies

9

that found the GLP-1 RAs have a greater effect on the Interstitial Cells of Cajal or on Brunner's glands (mucus-secreting glands in the duodenum) than is suggested in Defendants' peer reviewed study reports. Neither have Plaintiffs identified other instances when Defendants relayed inaccurate or incomplete study results to the FDA.[4]

Given this lack of evidence and the limited relevance of the Slides in light of the substantial discovery exchanged in this case, the Court agrees with Special Master Stengel that Plaintiffs have failed to show their request is more than just a "snipe hunt" for hypothetical miscommunications to a federal agency. (*See* Doc. No. 497-1 at 64:15–17.)

### 3.     Delay in Raising the Issue

Last, Plaintiffs argue that Special Master Stengel incorrectly found that "Plaintiffs delayed in seeking the slides until the end of discovery." (Doc. No. 490 at 10; Doc. No. 491 at 6.) A party's delay in seeking discovery can suggest the discovery is of limited importance to the issues in the case. *See Cropper v. Stanley Black & Decker, Inc.*, No. 21-cv-2201, 2022 WL 11471100, at *3 (E.D. Pa. Oct. 20, 2022) (finding requested depositions were not proportional because "Plaintiffs have already deposed six corporate defendants' representatives and little

---

[4] After the close of briefing before Special Master Stengel, Plaintiffs sought leave to supplement the record to include an expert report, which states that the Slides are relevant because "they will show the underlying detailed information that went into Defendants' study reports." (Doc. No. 4940 at 5; *see also* Doc. No. 491-2 at 2 (Dr. Kevin M. O'Brien opining that he "must have access to the underlying study pathology to evaluate important . . . questions" including whether the "companies' animal studies showed evidence of gastrointestinal injury in treated animals; whether . . . the companies appropriately assessed the potential risks of these drugs in the nonclinical setting; whether there are biologically plausible mechanisms by which this class of drugs induces gastrointestinal injury in the gastrointestinal organs of test animals").) Although Special Master Stengel allowed Plaintiffs to supplement the record, he noted that the expert report did not move the needle because neither it, nor any of Plaintiffs' other evidence, explained "why the Slides had any particular importance to the FDA's analysis or . . . suggest[ed] they are likely to contain an inconsistency." (Doc. No. 490 at 9–10.)

probative value is expected to result from the deposition requested given Plaintiffs waited until the eve of the close of discovery to notice this deposition").

Here, Special Master Stengel found that "Plaintiffs first raised the production of the slides with [him] in December 2024, and while the parties engaged in some small back and forth between January and July on these issues, Plaintiffs did not raise the issue of their production again until nearly six months later." (Doc. No. 490 at 10.) Plaintiffs seem to agree with this timeline, but they nevertheless argue that Special Master Stengel mischaracterizes their actions as "delayed." (Doc. No. 491 at 6.) Plaintiffs emphasize that they were actively discussing the issue with Defendants between December 2024 and April 2025, and Defendants do not dispute that representation. That said, as Special Master Stengel notes, when discussions stalled in April, Plaintiffs waited at least two months before raising the issue again with Defendants, and when it was finally raised with the Special Master, more than six months had passed since the parties' initial discussions with him. *See* Sept. 30, 2025 Hr'g Tr. at 35:25–36:2 (Plaintiffs' counsel conceding that "we did hit a hiatus in sort of the discussions surrounding this in mid-April"); *id.* at 36:17–22 ("There was a hiatus starting around mid-April. And that lasted up until about mid-June when the entire issue was put back on the table as something that had to be addressed and finalized. And that's how we got to the July—sort of the early July finalization that we had to go to the Special Master."). Given this, the Court does not find that Special Master Stengel erred when he noted that Plaintiffs exhibited some "delay" in raising the issue. Nevertheless, the question of delay has little bearing for this Court on the importance factor because, for the reasons discussed in the previous two sections, even if Plaintiffs had not delayed raising the dispute, we would nevertheless find the Slides are of only limited importance to resolving the issues at this stage of the litigation.

11

* * *

For the reasons discussed above, the Court agrees with Special Master Stengel that the fifth proportionality factor weighs against production.

**B.     Burden Versus Likely Benefit**

That leaves Plaintiffs' arguments as to the sixth proportionality factor, which requires the Court to weigh the "burden or expense of the requested discovery" against its "likely benefit." *Penn Eng'g & Mfg. Corp.*, 2021 WL 4037857, at *6. For this factor, the "party opposing discovery must 'specifically demonstrate' the burden or expense that responding to discovery would impose, and the party seeking discovery 'should show the benefit coming from the request.'" *Id.* (quoting *Arrow Enter. Computing Sols. Inc. v. BlueAlly, LLC*, No. 5:15-cv-37-FL, 2017 WL 876266, at *5 (E.D.N.C. Mar. 3, 2017)); *see also Lakeview Pharm. of Racine, Inc.*, 2019 WL 587296, at *4.

Special Master Stengel found the "burden associated with [the Slides'] production is great" because it is not "simply a matter of handing over digitally collective evidence." (Doc. No. 490 at 10.) Instead, for each study, Defendants must locate the files in their archives and review those files for the specific subsets of Slides being sought by Plaintiffs.[5] To the extent Defendants turn over the physical Slides, they must follow specific protocols and hire vendors to ensure the specimens at issue are properly packaged, transported, and stored. (Sept. 30, 2025 Hr'g Tr. at 45:18–46:21.) And even if Defendants only turn over images of the Slides, each of

---

[5] Plaintiffs seek Slides related to 22 studies, 11 for each Defendant, going back to 2005. For each study, they request five types of tissue from three animal species. This means each Defendant is being asked to produce thousands of Slides. (*See* Doc. No. 490 at 10 (referencing Defendants' representation that Plaintiffs' request could implicates as many as 10,000 pathology slides); Sept. 30, 2025 Hr'g Tr. at 45:18–13 (counsel for Lilly testifying that they are "in the roughly 8,000 range" in terms of number of Slides just for Lilly).)

the thousands of Slides at issue would need to be photographed at a particular resolution before being shared with Plaintiffs. (*Id.*; *see also id.* at 56:17–24.) Finally, under either format, the parties would need to negotiate a protocol that maintained the integrity of the Slides.

Plaintiffs argue that Special Master Stengel overstated the burden to Defendants, because Defendants have "electronic repositories and archival policies" that would lessen the difficulties associated with production. (Doc. No. 491 at 4–5; Sept. 30, 2025 Hr'g Tr. at 23:22–25:12 (Plaintiffs' counsel identifying Novo's standard operating procedure for archiving, storing, photographing, and transporting tissue samples and other specimens).) But Defendants' standard operating procedures are not the saving grace Plaintiffs' think they are. (*See* Sept. 30, 2025 Hr'g Tr. 42:5 (arguing that "there is no realistic burden" to Defendants given Novo's standard operating procedure).) For one, Plaintiffs have identified a standard operating procedure only as to Novo, not Lilly. (*See id.* at 23:22–25:12.) For another, even assuming both Defendants have standard operating procedures covering this exact type of production, that does not minimize the substantial burden of implementing those procedures, i.e., the time and resources needed to find, sort, photograph, and produce the tens of thousands of Slides at issue. *Cf. In re Diisocyanates Antitrust Litig.*, MDL No. 2862, 2020 WL 7427040, at *4–5 (W.D. Pa. Dec. 18, 2020) (finding searching and producing additional documents was not "as simple as Plaintiffs suggest," because it was not "just a re-run [of prior search terms], but a search for new and different items (PU Systems), not to mention the translation of foreign language documents. There is no doubt that such a document search would exponentially increase the burden on Defendants").

Viewed as a whole, the Court does not find that Special Master Stengel overstated the burden of production. And when that substantial burden is weighed against the minimal

relevance of the Slides, the Court agrees the sixth proportionality factor also weighs against production.

### III.  CONCLUSION

For the reasons discussed above, the Court agrees with Special Master Stengel's conclusion that production of the Slides would not be proportional to the needs of the case. *See In re Diisocyanates Antitrust Litig.*, 2021 WL 4288362, at *3 (finding discovery requests were not proportional where the company argued that "the expense and burden of answering these requests, when they have already responded to 56 other jurisdictional discovery requests, is substantially outweighed by the highly speculative relevance and usefulness of such information"); *cf. Wood v. Borough of Woodlynne*, No. 21-cv-20738 (RMB/EAP), 2024 WL 2974239, at *3 (D.N.J. June 13, 2024) (finding production of files proportional where the "burden to produce the files is small, particularly because the Woodlynne Defendants are in possession of the IA files, and the potential evidentiary value of the IA files to Plaintiff is high"). Plaintiffs' objections to Special Master Stengel's R&R are overruled, and the R&R is approved and adopted in its entirety.  An appropriate order follows.