**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAs) PRODUCTS LIABILITY LITIGATION** | **CIVIL ACTION**<br><br>**MDL No. 3094**<br>**2:24-md-03094-KSM** |
| **THIS DOCUMENT RELATES TO:**<br><br>***ALL ACTIONS / ALL CASES*** | **HON. KAREN SPENCER MARSTON** |

**NOVO NORDISK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DAVID METZ, M.D. THAT GLP-1 RA USE CAN CAUSE GASTROPARESIS FOLLOWING DISCONTINUATION AND WASHOUT OF THE MEDICATION**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

I. Plaintiffs' Gastroparesis Experts, Dr. David Metz and Dr. Ma Somsouk. .......... 3

II. Overview of Clinical Data and Epidemiological Literature .......... 5

ARGUMENT .......... 6

I. Legal Standard .......... 6

II. Dr. Metz's Opinion that GLP-1 RA Use Can Cause Gastroparesis to Persist for Six Months or More After Washout Fails Under Rule 702. .......... 8

A. Dr. Metz's opinion that symptoms of gastroparesis can persist for six months after discontinuation is unsupported and arbitrary .......... 8

B. Dr. Metz's opinion that a differential diagnosis can be used to conclude that GLP-1 RA medications caused gastroparesis that persisted for more than six months after treatment cessation fails for similar reasons. .......... 12

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**

*Cavallo v. Star Enters.*,
892 F. Supp. 756 (E.D. Va. 1995) .......... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).......... 7

*Feit v. Great W. Life & Annuity Ins. Co.*,
271 F. App'x 246 (3d Cir. 2008) .......... 12

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997).......... *passim*

*Heller v. Shaw Indus., Inc.*,
No. 95-7657, 1997 WL 535163 (E.D. Pa. Aug. 18, 1997) .......... 2, 13, 14

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999).......... 12

*Higgins v. Koch Dev. Corp.*,
794 F.3d 697 (7th Cir. 2015) .......... 12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).......... 7, 10, 14

*Leake v. United States*,
843 F. Supp. 2d 554 (E.D. Pa. 2011) .......... 11

*In re Paoli Railroad Yard PCB Litigation*,
35 F.3d 717 (3d Cir. 1994).......... *passim*

*Pugh v. Cmty. Health Sys., Inc.*,
No. 5:20-cv-00630, 2023 WL 3361166 (E.D. Pa. May 10, 2023).......... 11

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000).......... 10

*Perry v. Novartis Pharms. Corp.*,
564 F. Supp. 2d 452 (E.D. Pa. 2008) .......... 2, 11, 12

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) .......... 11

*Schneider ex rel. Estate of Schneider v. Fried*,

320 F.3d 396 (3d Cir. 2003) ........ 8, 15

*Soldo v. Sandoz Pharms. Corp.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003) ........ 2, 13, 14

*In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*,
176 F. Supp. 3d 483 (E.D. Pa. 2016) ........ *passim*

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,
579 F. Supp. 3d 675 (E.D. Pa. 2021) ........ 12

**Rules**

Fed. R. Evid. 702 ........ *passim*

**Other Authorities**

Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law*
64 Law & Contemp. Probs. 107 (2001) ........ 13

## INTRODUCTION

Plaintiffs' causation expert, Dr. David Metz, opines that use of GLP-1 RA medications can cause temporary gastroparesis during use of the medicine[1] but that the "causality of" gastroparesis for more than 6 months following cessation of GLP-1 treatment "cannot be supported."[2] He concedes that "there simply is no reported literature of any kind" investigating "prolonged or permanent gastroparesis injury with these medications."[3] He concedes there is "no literature that reports on a potential mechanism for prolonged injury."[4] But despite these admissions, Dr. Metz offers two opinions that directly contradict his own analysis: first, that GLP-1 RAs can cause gastroparesis and its symptoms to persist for up to six months after the medication has left the system; and second, that in a specific patient, a differential diagnosis might nonetheless establish GLP-1 treatment caused gastroparesis or its symptoms to persist for more than six months after discontinuation.[5] Both opinions rest on no data, no literature, no mechanism, and no relevant clinical experience—"connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). These two opinions should be excluded in their entirety.

The first opinion, that gastroparesis can persist in users for a period of six months following cessation, is unsupported and arbitrary. The pharmacology is simple: GLP-1 RA medications work by binding to receptors; when the molecule disconnects, "it turns it off."[6] Once the medication leaves the body—within days for liraglutide, weeks for semaglutide—its effect on gastric

---

[1] Novo agrees with the methodological issues highlighted by Lilly, but Novo does not challenge Dr. Metz's opinion on temporary, drug-induced gastroparesis because it reflects the well-documented mechanism of action that GLP-1 RAs delay gastric emptying and the potential associated symptoms, both of which are prominently discussed in the product labeling.

[2] Exhibit 13D to Declaration of Lucas Przymusinski ("L.P. Ex. 13D"), January 2, 2026, Expert Report of David C. Metz, M.D. to Novo ("Metz Novo Rep.") at 133, 137.

[3] *Id.* at 135.

[4] *Id.* at 136.

[5] *Id.* at 133-137.

[6] Transcript of the March 24, 2026, Deposition of David Metz ("Metz Tr.") (L.P. Ex. 33D) at 154:9-17.

emptying ends.[7] For symptoms to persist beyond washout, there would have to be lasting damage to the stomach or its function. No such evidence exists. Dr. Metz admits there is no evidence that GLP-1 RAs injure any component of gastric motility—not the nerves, not the muscles, not the connective tissue, not the interstitial cells of Cajal, not the brain stem, not the central nervous system.[8] The four "theoretical" mechanisms he floated at deposition—functional bowel disease, trauma-induced gastroparesis, microbiome changes, and injury to interstitial cells of Cajal—are, by his own admission, untested "possibilit[ies]" that have never been "established scientifically."[9] And the six-month window itself rests on nothing more than Dr. Metz's say-so: he "arbitrarily came up with six months" and cannot cite a single study supporting it.[10] The "courtroom is not the place for scientific guesswork, even of the inspired sort." *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 468 (E.D. Pa. 2008).

The second opinion, that a differential diagnosis might nonetheless establish causation in an individual that has gastroparesis symptoms for more than six months beyond discontinuation, is not a general causation opinion, and, in any event, is equally untenable. A differential etiology cannot "rule in" a suspected cause unless general causation has first been established. *See In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 494 (E.D. Pa. 2016), *aff'd sub nom. In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017) ("A differential diagnosis assumes that general causation has been established.") (citing *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005)); *Heller v. Shaw Indus., Inc.*, No. 95-7657, 1997 WL 535163, at *6 (E.D. Pa. Aug. 18, 1997), *aff'd*, 167 F.3d 146 (3d Cir. 1999); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524–25 (W.D. Pa. 2003). Dr. Metz

---

[7] *Id.* at 289:4-9.
[8] *Id.* at 233:16-234:11.
[9] *Id.* at 138:1-139:18.
[10] *Id.* at 51:4-53:19.

tried—and failed. His own Bradford Hill analysis found no support across any of the factors he examined: no temporality data, no statistically significant associations, no dose-response relationship, no biological plausibility, no experiment, no consistency, no specificity, and no analogy to any other medication.[11] He accordingly concluded that the evidence does not support a finding that GLP-1 RAs can cause gastroparesis beyond six months after treatment cessation.[12] Having failed to establish general causation through his own chosen methodology, Dr. Metz cannot resort to differential etiology to supply what his Bradford Hill analysis could not. Nor has he ever applied the methodology he now proposes—he has "never concluded that a patient's gastroparesis symptoms that persist after a medication is stopped and the washout period is done, that those symptoms were caused by a GLP-1 RA medication."[13]

## BACKGROUND

### I. Plaintiffs' Gastroparesis Experts, Dr. David Metz and Dr. Ma Somsouk.

Plaintiffs proffered two expert witnesses who opine on a potential link between GLP-1 RA use and gastroparesis: Dr. David Metz and Dr. Ma Somsouk.[14] Dr. Metz, a retired gastroenterologist whose board certification lapsed in 2021, is the only one offering a causation opinion.[15] Dr. Somsouk, a board-certified gastroenterologist and trained epidemiologist, "was not asked to evaluate causation through a review of all available relevant evidence, but only whether there is an association."[16]

---

[11] L.P. Ex. 13D, Metz Novo Rep. at 133-137.

[12] *Id.* at 137.

[13] L.P. Ex. 33D, Metz Tr. at 275:2-9.

[14] Novo proffered one expert on the subject of gastroparesis: Dr. Linda Nguyen, a board-certified gastroenterologist and leading expert in the field of gastroparesis. *See* February 13, 2026, Expert Report of Linda Nguyen, M.D. ("Nguyen Rep.") (L.P. Ex. 22D); Transcript of the March 12, 2026, Deposition of Ma Somsouk ("Somsouk Tr.") (L.P. Ex. 39D) at 62:1-10.

[15] L.P. Ex. 13D, Metz Novo Rep. at 1.

[16] January 2, 2026, Expert Report of Ma Somsouk, M.D. ("Somsouk Rep.") (L.P. Ex. 19D) at 1, 3-4; *see also* L.P. Ex. 39D, Somsouk Tr. at 34:9-13. The sole opinion that Dr. Somsouk offers in this case is that the use of GLP-1 RA is associated with "increased risk of drug-related gastroparesis" "the exact magnitude of" which "is uncertain due to residual confounding, detection bias, and outcome misclassification that cannot be fully addressed." L.P. Ex. 19D,

Despite over 50 years of combined experience in gastroenterology, Drs. Metz and Somsouk have little to no experience with GLP-1 RA medications. Dr. Metz has never prescribed a GLP-1 RA to a patient.[17] When asked if he had ever treated a patient taking a GLP-1 RA, he responded, "I must have, but I don't recall definitively."[18] When pressed, Dr. Metz conceded he has never "treated a patient [he] suspected of having drug-induced gastroparesis as a result of taking a GLP-1 RA medication," and in fact, has never "treated a patient [he] suspected of having any GI event as a result of taking a GLP-1 RA medication."[19] Dr. Somsouk has likewise never prescribed a GLP-1 RA and has only consulted on a "handful of patients . . . who were on a GLP-1 who had a GI issue."[20] Nor has he ever published any research or given a talk on gastroparesis or GLP-1 RAs.[21]

Dr. Metz's opinions address two questions: First, can GLP-1 RAs, as a class, "cause drug induced gastroparesis in some patients?"[22] Second, can GLP-1 RAs, again as a class, cause "gastroparesis in some patients after the drug has been withdrawn" from the system?[23] Dr. Metz answers the first question in the affirmative, opining that GLP-1 RA medications can cause "drug-

---

Somsouk Rep. at 20. Novo is not moving to exclude this opinion at this stage of the litigation because it is not relevant to the question of whether the medications can have any effect after washout and is not sufficient in and of itself to establish general causation.

[17] L.P. Ex. 33D, Metz Tr. at 150:8-10.

[18] *Id.* at 104:1-10.

[19] *Id.* at 150:11-18.

[20] L.P. Ex. 39D, Somsouk Tr. at 184:13-23.

[21] *Id.* at 33:4-11.

[22] L.P. Ex. 13D, Metz Novo Rep. at 17.

[23] *Id.* By way of background, drug-induced gastroparesis is "a term often used to describe the clinical symptoms associated with a temporary delay in gastric motility resulting from treatment with certain medications or drugs." L.P. Ex. 22D, Nguyen Rep. at 3; *see also* L.P. Ex. 33D, Metz Tr.15:11-13 ("essentially, drug-induced gastroparesis is taking a medication that causes the stomach muscles to weaken and to delay its emptying"). It is used interchangeably with the term "drug-induced delayed gastric emptying." L.P. Ex. 22D, Nguyen Rep. at 3. "Drug-induced gastroparesis is different from the other subsets of gastroparesis in that it is temporary and should cease when the patient stops taking the medication at issue." Dkt. 467 at 5-6. Chronic gastroparesis, unlike "drug-induced gastroparesis," "is a condition characterized by permanent impairment of gastric motility without mechanical obstruction and is the result of damage or injury to nerves, muscles, cells, and/or connective tissue involved in gastric motility." L.P. Ex. 22D, Nguyen Rep. at 3; *see also* L.P. Ex. 33D, Metz Tr. at 233:7-14 (Dr. Metz agreeing that "the condition of chronic gastroparesis, for example, as a result of having longstanding uncontrolled diabetes, one of the characteristics is you end up having damage to either muscles, nerves, or connective tissues involved in gastric emptying").

induced gastroparesis,"[24] which he defines as "taking a medication that causes the stomach muscles to weaken and to delay its emptying."[25] To the extent the opinion is limited to an effect that can occur while a patient is on a GLP-1 RA, Novo does not move to exclude it; delaying gastric emptying is a well-documented mechanism of action of all GLP-1 RA medicines and both the mechanism and its potential symptoms are prominently discussed in the product labeling.

In response to the second question, Dr. Metz concludes that "causality of" gastroparesis "after cessation of a GLP-1 drug cannot be supported."[26] Yet paradoxically, he opines that GLP-1 RA users may continue to experience gastroparesis and/or its symptoms for up to six months after stopping the medication, and that even beyond six months, "a careful and detailed evaluation of individual patients might lead to a conclusion" that GLP-1 RA use caused continued gastroparesis.[27] It is these two internally contradictory opinions that Novo seeks to exclude.

## II. Overview of Clinical Data and Epidemiological Literature

While litigants and their experts rarely agree on dispositive scientific questions, all parties and experts in this case agree on one critical point: there is no evidence that GLP-1 RA medicines can cause gastroparesis or any associated symptoms following discontinuation and washout of the medication. As Dr. Metz himself concedes: "there simply is no reported literature of any kind that has investigated the question of prolonged or permanent gastroparesis injury with these medications."[28] Dr. Nguyen agrees with "Dr. Metz's opinion that 'causality of prolonged symptoms of gastroparesis after cessation of a GLP-1RA drug cannot be supported.'"[29] As Dr. Nguyen reports:

---

[24] L.P. Ex. 13D, Metz Novo Rep. at 21-133.
[25] L.P. Ex. 33D, Metz Tr. at 15:11-13.
[26] L.P. Ex. 13D, Metz Novo Rep. 137.
[27] *Id*. at 133-137.
[28] *Id*. at 135.
[29] L.P. Ex. 22D, Nguyen Rep. at 12 (quoting L.P. Ex. 13D, Metz Novo Rep. at 137).

> The efficacy and safety of GLP-1RA medications have been assessed for over two decades in hundreds of clinical trials, epidemiological studies, and published case reports. Despite this extensive evaluation, I am not aware of any clinical data, peer-reviewed study, or published case report that suggests—much less establishes—that the use of a GLP-1RAs can cause chronic gastroparesis or prolonged symptoms following treatment cessation.[30]

Dr. Metz further concedes that "there is no literature that reports on a potential mechanism for prolonged injury."[31] This concession follows naturally from the underlying pharmacology. GLP-1 RA medications delay gastric emptying by binding to GLP-1 receptors located throughout the body.[32] The mechanism is straightforward: when the molecule connects to the receptor, "it turns it on," and when it disconnects, "it turns it off."[33] "[O]nce the receptor is occupied, its downstream effect on whatever that particular cell is will be persistent and when the agent is disconnected, the effect should go away."[34] In short, when the medication stops binding to the receptor, its effect on gastric emptying ceases because "the drug itself is not continuing to cause those symptoms beyond washout."[35]

## ARGUMENT

### I. Legal Standard

Federal Rule of Evidence 702 ("Rule 702") imposes a judicial gatekeeping obligation to ensure that expert testimony is both relevant and reliable. As amended, Rule 702 requires the proponent of the testimony to demonstrate, by a preponderance of the evidence, that the expert's specialized knowledge will help the trier of fact, that the testimony is based on sufficient facts or

---

[30] *Id*. at 10.
[31] L.P. Ex. 13D, Metz Novo Rep. at 136.
[32] L.P. Ex. 33D, Metz Tr. at 48:14-23, 154:2-8; L.P. Ex. 39D, Somsouk Tr. at 43:14-23.
[33] L.P. Ex. 33D, Metz Tr. at 154:9-17.
[34] *Id*. at 155:16-19.
[35] *Id.* at 154:9-17; 289:4-9; *see also* L.P. Ex. 39D, Somsouk Tr. at 48:5-49:7 ("Q. It would be fair to say that there is no evidence that GLP-1 RA medications have durable effects on the GLP-1 receptor; correct? A. I am not aware of that evidence.").

data, that it is the product of reliable principles and methods, and that the expert's opinion reflects a reliable application of those principles and methods to the facts. Fed. R. Evid. 702. The 2023 amendments confirm that these are threshold admissibility questions for the court, not questions of weight for the jury. The committee notes for the 2023 amendment highlight that:

> Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

Fed. R. Evid. 702 Committee Notes on Rules–2023 Amendment.

The Supreme Court's seminal decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), establish the framework governing this gatekeeping function. *Daubert* requires the trial court to assess whether the expert's reasoning or methodology is scientifically valid by reference to factors including testability, peer review and publication, known or potential error rate, the existence and maintenance of standards controlling the technique's operation, and general acceptance within the relevant scientific community. 509 U.S. at 580. *Joiner* makes clear that a court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, and that a court may exclude testimony where there is "simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. *Kumho Tire* confirms that the gatekeeping obligation applies to all expert testimony and that the court must ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152.

The Third Circuit incorporates these principles into a demanding reliability inquiry. *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994), identifies eight non-

exhaustive reliability factors, and Rule 702 embodies "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The reliability prong that requires that an expert's opinion be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" is the most relevant for this motion. *Paoli*, 35 F.3d at 742.

## II. Dr. Metz's Opinion that GLP-1 RA Use Can Cause Gastroparesis to Persist for Six Months or More After Washout Fails Under Rule 702.

Dr. Metz's post-washout opinions must be excluded because they rest on speculation, unsupported theoretical mechanisms, and an acknowledged absence of supporting evidence. Dr. Metz concedes that his selection of a six-month window for symptom resolution is arbitrary[36] and that no evidence supports continued effects following washout.[37] An expert who concedes that his own methodology cannot support his conclusion may not then offer that very conclusion as admissible opinion. *See Joiner*, 522 U.S. at 146 (court need not credit expert testimony "connected to existing data only by the *ipse dixit* of the expert"); *Paoli*, 35 F.3d at 742 (expert opinion must rest on "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'"). Dr. Metz's post-washout opinions must therefore be excluded under Rule 702.

### A. Dr. Metz's opinion that symptoms of gastroparesis can persist for six months after discontinuation is unsupported and arbitrary.

The evidentiary record is unequivocal: there is not "any study, any data, any actual scientific evidence that patients can experience symptoms of gastroparesis related to their GLP-1 RA use after the period of washout."[38] "There are no observational or other studies that have directly examined the issue of prolonged gastroparesis following cessation of GLP-1 use and

---

[36] L.P. Ex. 33D, Metz Tr. at 51:4-53:19.
[37] *Id*. at 279:24-280:13.
[38] *Id*. at 279:24-280:13.

therefore there are no reported statistically significant associations."[39] Dr. Metz's own words confirm the point: there is no "reliable evidence that GLP-1 RA medicines can cause delayed gastric emptying or delay gastric emptying after they're washed out."[40]

"[A]fter five half-lives, it's accepted that a medication will have left the body and typically effects of that medication will have abated."[41] The half-life of liraglutide is approximately 13 hours, and the half-life of semaglutide is approximately one week; accordingly, the effects of liraglutide on gastric emptying should resolve approximately three days after cessation, while the effects of semaglutide should resolve approximately five weeks after cessation.[42]

Dr. Metz does not dispute these timelines, nor does he offer any evidence that GLP-1 RA use can cause gastroparesis or its symptoms to persist for up to six months after washout. To the contrary, he testified that he "arbitrarily came up with" the six-month period and could not cite "any sort of study that would test whether that six-month cutoff is more likely than not to be correct."[43] He acknowledged that "there [is] no known data at this point that a drug effect for GLP-1 RAs can persist for up to six months after the medication has left the system,"[44] relying solely on his "30 years of exposure to patients and their symptoms."[45] *See also* (admitting no awareness of any literature or evidence supporting post-discontinuation gastroparesis);[46] (conceding no awareness of any studies showing symptoms can persist following washout);[47] (admitting no evidence that GLP-1 RA medicines can delay gastric emptying after washout).[48]

---

[39] *See* L.P. Ex. 13D, Metz Novo Rep. at 135.
[40] L.P. Ex. 33D, Metz Tr. at 291:16-20.
[41] *Id*. at 52:17-21. Dr. Somsouk similarly testified that there is no evidence that "drug-induced gastroparesis" can persist following discontinuation and washout of the medication. L.P. Ex. 39D, Somsouk Tr. at 48:5-49:13.
[42] L.P. Ex. 22D, Nguyen Rep. at 7 (Table 1).
[43] L.P. Ex. 33D, Metz Tr. at 51:4-53:19.
[44] *Id.* at 62:22-63:10.
[45] *Id.* at 53:15-19.
[46] *Id*. at 63:17-64:1.
[47] *Id*. at 279:24-280:13.
[48] *Id*. at 291:16-20; *see also id*. at 292:15-20.

Yet even the clinical experience Dr. Metz invokes provides no support: he has never treated a patient suffering from gastrointestinal adverse effects caused by a GLP-1 RA and cannot identify a single case from his clinical experience where he concluded GLP-1 RA use caused gastroparesis—let alone that such condition persisted after the medication was stopped.[49] An expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and clinical experience devoid of any application to the causal question at issue cannot satisfy that standard. *Kumho Tire*, 526 U.S. at 152; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (expert's methodology must have verifiable grounding, not merely credentials) (citing *Paoli*, 35 F.3d at 742).

Moreover, any persistent effect on gastric emptying would necessarily require a mechanism beyond receptor activation—which Dr. Metz admits ends at washout—that could cause some lasting damage or injury to the stomach or its function. No such mechanism exists. Dr. Metz acknowledged: "[t]here is no literature that reports on a potential mechanism for prolonged injury."[50] At deposition, he confirmed that there is no data suggesting GLP-1 RAs cause injury or damage to any component of gastric motility, including the myenteric nerves, the muscles of the stomach, connective tissues in the stomach, interstitial cells of Cajal, the brain stem, or the central nervous system.[51] Dr. Somsouk echoed this conclusion, stating that he is not "aware of any evidence that a GLP-1 RA medication can cause permanent damage to the nerves, muscles, cells, and/or connective tissue involved in gastric motility."[52]

---

[49] *Id.* at 274:16-275:9.
[50] L.P. Ex. 13D, Metz Novo Rep. at 136.
[51] L.P. Ex. 33D, Metz Tr. at 233:7-234:11.
[52] L.P. Ex. 39D, Somsouk Tr. at 20:19-23. Dr. Nguyen similarly opines that "no reliable evidence exists that GLP-1 RA medications can cause chronic gastroparesis and/or continued adverse GI symptoms following cessation and washout of the medication," noting that there is no "clinical data, peer-reviewed study, or published case report that suggests—much less establishes—that the use of a GLP-1RAs can cause chronic gastroparesis or prolonged symptoms following treatment cessation" despite the assessment of the "safety of GLP-1RA medications" "for over two decades in hundreds of clinical trials, epidemiological studies, and published case reports." L.P. Ex. 22D, Nguyen Rep. at 10.

At deposition, Dr. Metz proposed several "theoretical" mechanisms that could cause effects after washout—triggering of functional gastrointestinal symptoms, trauma-induced gastroparesis, changes to the microbiome, and potential injury to interstitial cells of Cajal. But he admitted that each of these are simply "possibilit[ies]" that have not been "established scientifically"[53] (explaining that "there are no firm data on this, as I point out in my report. But it is certainly not beyond the realm of possibility").[54] Such unsupported hypotheses cannot satisfy Rule 702. *See Joiner*, 522 U.S. at 146 (excluding testimony where there is "simply too great an analytical gap between the data and the opinion proffered"); *Paoli*, 35 F.3d at 742.

Nor does the absence of evidence give Dr. Metz license to speculate. Courts in this District have consistently excluded expert opinions grounded in precisely this kind of evidentiary vacuum, holding that "the non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science" because the "courtroom is not the place for scientific guesswork, even of the inspired sort." *Perry*, 564 F. Supp. 2d at 467–68 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)); *see also Leake v. United States*, 843 F. Supp. 2d 554, 560 (E.D. Pa. 2011) (excluding causation opinion where plaintiff conceded "there are no published studies" supporting the theory); *Pugh v. Cmty. Health Sys., Inc.*, No. 5:20-cv-00630, 2023 WL 3361166, at *14 (E.D. Pa. May 10, 2023) (excluding opinion as "unsupported speculation" where the expert left "simply too great an analytical gap between the data and the opinion proffered" (quoting *Joiner*, 522 U.S. at 144)).

---

[53] L.P. Ex. 33D, Metz Tr. at 138:1-139:18, 275:19-276:2. Dr. Somsouk similarly testified that any opinion regarding the possibility of a "durable effect" of a GLP-1 RA medication "on the receptor" would be "speculative," and that he did not "have the evidence or the data to say that one way is true or the other." L.P. Ex. 39D, Somsouk Tr. at 48:22-49:3.

[54] L.P. Ex. 33D, Metz Tr. at 61:20-22.

In sum, Dr. Metz's opinion is unsupported and instead relies on precisely the speculative *ipse dixit* that Rule 702 was designed to exclude. *See Perry*, 564 F. Supp. 2d at 467-68; *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 579 F. Supp. 3d 675, 679 (E.D. Pa. 2021).

**B. Dr. Metz's opinion that a differential diagnosis can be used to conclude that GLP-1 RA medications caused gastroparesis that persisted for more than six months after treatment cessation fails for similar reasons.**

Dr. Metz further opines that "a careful and detailed evaluation of individual patients might lead to a conclusion of causality of" gastroparesis after six months following cessation through a "differential diagnosis."[55] That opinion fares no better under Rule 702.

A properly performed differential diagnosis requires the expert to both "rule in" potential causes and "rule out" alternatives. *See Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154–56 (3d Cir. 1999) (establishing the Third Circuit's framework for evaluating differential diagnosis testimony and requiring that the expert reliably "rule in" the suspected cause); *Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 254 (3d Cir. 2008) ("To properly perform a differential diagnosis, an expert must perform two steps: (1) 'Rule in' all possible causes . . . and (2) 'Rule out' causes through a process of elimination…."). Critically, "a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be *capable* of causing the injury. . . . [T]he expert must 'rule in' the suspected cause as well as 'rule out' other possible causes." *Cavallo v. Star Enters.*, 892 F. Supp. 756, 771 (E.D. Va. 1995), *aff'd in relevant part*, 100 F.3d 1150 (4th Cir. 1996) (emphasis in original). Thus, before a competing cause should be considered relevant to a differential etiology, there must be adequate evidence that it *is* a cause of the disease, i.e., that general causation exists. *See In re Zoloft*, 176 F.

---

[55] L.P. Ex. 13D, Metz Novo Rep. at 137. Although Dr. Metz refers to his proposed process as a differential diagnosis, he is in fact referring to a differential etiology. "'Differential diagnosis' actually refers to a method of *diagnosing* an ailment, not determining its cause;'" "'Differential etiology,' on the other hand, is a causation-determining methodology." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (emphasis in original).

Supp. 3d at 491; *Heller,* 1997 WL 535163, at *6; *Soldo*, 244 F. Supp. 2d at 524–25; *see also* Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law,* 64 Law & Contemp. Probs. 107, 122–25 (2001) (L.P. Ex. 102D) (discussing cases rejecting differential diagnoses in the absence of other proof of general causation and contrary cases).

Dr. Metz has no evidence of general causation—and he knows it. His own Bradford Hill analysis led him to conclude that the evidence does not support a finding that GLP-1 RA medicines can cause gastroparesis symptoms to persist more than six months after treatment discontinuation.[56] Each of the Bradford Hill factors Dr. Metz examined confirmed the absence of supporting evidence:

- **Temporality. "**There are no cases reported in the literature and therefore an analysis of temporality cannot proceed at this time."[57]
- **Strength of associations: "**There are no observational or other studies that have directly examined the issue of prolonged gastroparesis following cessation of GLP-1 use and therefore there are no reported statistically significant associations."[58]
- **Biological gradient:** "[T]here has been no evaluation in the literature of whether or not higher doses are implicated in patients with prolonged injury."[59]
- **Biologic Plausibility:** "There is no literature that reports on a potential mechanism for prolonged injury."[60]

---

[56] L.P. Ex. 13D, Metz Novo Rep. at 137.
[57] *Id.* at 134.
[58] *Id.* at 135.
[59] *Id.* at 136.
[60] *Id.*

- **Specificity:** "There is no evidence that a prolonged effect would be specific to GLP-1 agents."[61]
- **Analogy:** "There are no medications that are reported to cause or potentially cause a prolonged gastroparesis injury after drug cessation."[62]

Because Dr. Metz has failed to establish—and indeed concedes that the evidence does not support—general causation, no basis exists to "rule in" GLP-1 RAs as a potential cause of any patient's gastroparesis or other GI symptoms persisting more than six months after treatment cessation. Without general causation, the differential diagnosis collapses at the threshold. *See Joiner*, 522 U.S. at 146; *In re Zoloft*, 176 F. Supp. 3d at 491; *Heller*, 1997 WL 535163, at *6; *Soldo*, 244 F. Supp. 2d at 524–25.

Dr. Metz's lack of real-world application of his proposed methodology underscores its unreliability. He has never personally employed a differential etiology to conclude that any patient's gastroparesis was caused by a GLP-1 RA medication, let alone that the medication caused an effect persisting after treatment cessation.[63] He conceded that he has "never concluded that a patient's gastroparesis symptoms that persist after a medication is stopped and the washout period is done, that those symptoms were caused by a GLP-1 RA medication."[64] Indeed, Dr. Metz has never even treated a patient who suffered from gastroparesis or any gastrointestinal side effects as a result of GLP-1 RA use.[65] An expert who has never applied the very methodology he proposes—and who lacks any clinical experience with the specific causal relationship at issue—cannot reliably opine that the methodology would yield a causation finding in individual cases. *See Kumho*

---

[61] *Id.* at 137.
[62] *Id.*
[63] L.P. Ex. 33D, Metz Tr. at 274:16-25.
[64] *Id.* at 275:2-9.
[65] *Id.* at 274:16-25.

*Tire*, 526 U.S. at 152 (requiring that an expert employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Schneider*, 320 F.3d at 404 (Rule 702 embodies "a trilogy of restrictions on expert testimony: qualification, reliability and fit"); *Paoli*, 35 F.3d at 742.

**CONCLUSION**

For the foregoing reasons, Novo Nordisk respectfully requests that the Court grant this motion and exclude Dr. Metz's opinions and testimony that GLP-1 RA medications can cause gastroparesis and/or its symptoms persisting after treatment cessation and washout. These opinions are untethered from scientific evidence, rest on admittedly arbitrary assumptions, and reflect precisely the kind of speculative *ipse dixit* that Rule 702 is designed to exclude.

Dated: May 19, 2026 By: */s/ Loren H. Brown*

Loren H. Brown (admitted *pro hac vice*)
Lucas P. Przymusinski (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Telephone: (212) 335-4846
loren.brown@us.dlapiper.com
lucas.przymusinski@us.dlapiper.com

Ilana H. Eisenstein (PA Bar No. 94907)
Raymond M. Williams (PA Bar No. 90771)
**DLA PIPER LLP (US)**
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
ilana.eisenstein@us.dlapiper.com
raymond.williams@us.dlapiper.com

Katherine W. Insogna (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110
Telephone: (617) 406-6000
katie.insogna@us.dlapiper.com

*Attorneys for Novo Nordisk A/S and Novo Nordisk Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2026, a true and correct copy of the foregoing Memorandum of Law in Support of Novo Nordisk's Motion to Exclude the Opinions and Testimony of David Metz, M.D. that GLP-1 RA Use Can Cause Gastroparesis Following Discontinuation and Washout of the Medication was electronically filed using the Court's CM/ECF System, which will send notification of such filing to all counsel of record.

*/s/ Loren H. Brown*
Loren H. Brown