# EXHIBIT 24D



Binu John, MD

3/12/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------)
In Re:  Glucagon-like          )
Peptide-1 Receptor             )    MDL No. 3094
Agonists (GLP-1 RAs) Products)
Liability Litigation           )
-------------------------------)
                               )
                               )    2:24-md-03094-KSM
THIS DOCUMENT RELATES TO:      )
ALL ACTIONS/ALL CASES          )
                               )
-------------------------------)


**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

DEPOSITION OF JOHN V. BINU, MD

VOLUME 1

MIAMI, FLORIDA

THURSDAY, MARCH 12, 2026


Reported by:

MAIRELYS ALBO, RPR

JOB NO. 3136

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

March 12, 2026

9:04  a.m.

Deposition of JOHN V. BINU, MD, held at the offices of Morgan & Morgan, 703 Waterford Way, Suite 1000, Miami, Florida 33126 before MAIRELYS ALBO, RPR, a Notary Public of the State of Florida.

A P P E A R A N C E S:


GOZA HONNOLD

Attorneys for MDL Plaintiffs and Witness

9500 Nall Avenue, Suite 400

Overland Park, Kansas 66207

BY:   BRADLEY D. HONNOLD, ESQUIRE




DLA PIPER LLP (US)

Attorneys for Novo Nordisk A/S and Novo

Nordisk Inc.

1251 Avenue of the Americas, 27th Floor

New York, New York 10020

BY:   LUCAS PRZYMUSINSKI, ESQUIRE

ANTONIOUS E. SADEK, ESQUIRE




KIRKLAND & ELLIS LLP

Attorneys for Eli Lilly & Company and

Lilly USA, LLC

333 West Wolf Point Plaza

Chicago, Illinois 60654

BY:   DIANA WATRAL, ESQUIRE

SARAH DONNELL, ESQUIRE

ALSO PRESENT:


ASHLEY TAYLOR, VIDEOGRAPHER

EXAMINATIONS

Deposition of                                            Page

BINU JOHN, MD
DIRECT EXAMINATION BY MR. PRZYMUSINSKI               10
CERTIFICATE OF OATH                                 404
CERTIFICATE OF REPORTER                             405

EXHIBITS

| Exhibit | Description | Page |
| --- | --- | --- |
| Defendant's No. 1 | Defendant's Notice to Take the Videotaped Deposition of Binu John, MD, and Requests for Production of Documents | 14 |
| Defendant's No. 2 | Statement of Compensation for Binu V. John, MD MPH | 17 |
| Defendant's No. 3 | Article, Weight Gain and Antipsychotic Medications | 18 |
| Defendant's No. 4 | Article, Anticholingeric Symptoms in a patient with bupropion overdose successfully managed with physostigmine: a case report | 19 |
| Defendant's No. 5 | PowerPoint, Association of GLP-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use:  A Target Trial Emulation Study | 19 |

| | | |
|---|---|---|
| Defendant's No. 6 | Rule 26 Expert Witness Disclosure, and Rule 26 Expert Report of Binu John, MD, MPH regarding Defendant Novo Nordisk | 30 |
| Defendant's No. 7 | Rule 26 Expert Witness Disclosure, and Rule 26 Expert Report of Binu John, MD MPH regarding Defendant Eli Lilly | 30 |
| Defendant's No. 8 | Rebuttal Expert Report of Binu John, MD MPH | 31 |
| Defendant's No. 9 | Article, Association of glucagon-like Peptide-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use: A Target Trial Emulation Study | 78 |
| Defendant's No. 10 | Article, 768-P: Glucagon-like Peptide 1 Receptor Agonists and the Risk of Motility-Related Gastrointestinal Adverse Events-A Cohort Study | 225 |
| Defendant's No. 11 | Article, Association between therapy with dipeptidyl peptidase-4 (DPP-4) inhibitors and risk of ileus: a cohort study | 247 |
| Defendant's No. 12 | Article, Risk of Gastrointestinal Adverse Events Associated with glucagon-like Peptide-1 Receptor Agonists for Weight Loss | 259 |

Defendant's No. 13    Article, Incretin-Based Drugs and Risk of Intestinal Obstruction Among Patients with Type 2 Diabetes    271

Defendant's No. 14    Handwritten document    275

Defendant's No. 15    Glucagon-like Peptide-1 Receptor Agonists and Gastrointestinal Adverse Events: A Systematic Review and Meta-Analysis    283

Defendant's No. 16    Agent- and Dose-Specific Intestinal Obstruction Safety of GLP-1 Receptor Agonists and SGLT-2 Inhibitors: A Network Meta-Analysis of Randomized Trials    316

Defendant's No. 17    Evaluating bowel obstruction and ileus events in patients on GLP-1 receptor agonists: A system review and meta-analysis    350

Defendant's No. 18    Article, Gastrointestinal and Hepatobiliary Safety of glucagon-like Peptide-1 Receptor Agonists in Patients with Type 2 Diabetes    370

Defendant's No. 19    Article, The inhibitory mechanism of GLP-1, but not glucagon, on fasted gut motility is dependent on the L-arginine/nitric oxide pathway    394

Defendant's No. 20        Article, GLP-1                394
                    suppresses
                               gastrointestinal
                    motility and inhibits
                               the migrating motor
                    complex in healthy
                               subjects and patients
                    with irritable bowel
                               syndrome

Thereupon,

the following proceedings began at 9:04 a.m.:

THE VIDEOGRAPHER:  We are now on the record.  Today's date is Thursday, March 12th, 2026, and the time is 9:04 a.m. My name is Ashley Taylor.  I'm the legal videographer for Hartford Reporting & Technology.  This deposition is being taken in the matter of In Re:  Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Products Liability Litigation.

The deponent today is Dr. Binu John.

Will counsel please announce their appearances for the record and who they represent?

MR. HONNOLD:  Bradley Honnold for the MDL plaintiffs here today with the witness.

MR. PRZYMUSINSKI:  Lucas Przymusinski, DLA Piper, on behalf of Novo Nordisk.

MR. SADEK:  Tony Sadek from DLA Piper, on behalf of Novo Nordisk.

MS. WATRAL:  Diana Watral for Lilly.

MS. DONNELL:  Sarah Donnell for

Lilly.

Thereupon,

BINU JOHN, MD,

having been first duly sworn or affirmed, was

examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. PRZYMUSINSKI:

Q.    Okay.  Good morning, Dr. John.

A.    Good morning, sir.

Q.    We met this morning; right?  My name
is Lucas Przymusinski.  I'm an attorney with
DLA Piper, and we represent Novo Nordisk in
this litigation.

May I ask you a -- just a couple
quick questions to make sure we're on the same
page.  Have you ever been deposed before?

A.    I have not.

Q.    You have not?  Okay.  So I don't
want to spend a lot of time on it, but just get
a few of the basic ground rules that you and I
both need to make sure we follow just to mostly
make sure the court reporter is able to get the
testimony down, but also to make sure we have a
good record for the court.  Okay?

A.   Yes.

Q.   Okay.  So the first thing is I'm going to ask you questions throughout the day, and you will be answering those questions.

Do you understand that?

A.   Correct.  Yes.

Q.   Okay.  And so in order for that to work, just let me ask my question fully, try not to start answering until I finish my question.  Is that okay?

A.   Yes.

Q.   Okay.  And then after I finish my question, just make sure you understand what the question is.  If you don't or if you feel like you're confused by any of the words, just ask me, I'm happy to clarify.  Is that okay?

A.   Yes.

Q.   Okay.  But if you answer the question, I'm going to assume that you understood my question, and then I'm going to try and give you the courtesy of letting you finish your answer; is that fair?

A.   Yes.

Q.   Okay.  And we really have to make sure we don't talk over each other, otherwise

we're going to have a problem with the court reporter because she can't do two things at the same time.

Does that make sense?

A.    Yes, it does.

Q.    Okay.  Great.  The other thing is, because it's a written record, right -- there's a video, too, as you know, but it's a written record -- we really have to have verbal answers for everything.  So even though normally sometimes we nod our head or shake our head in conversation, for this we really do have to say "yes," "no," or whatever your answer is verbally.  Is that okay?

A.    Yes, it is.

Q.    Okay.  Very good.

All right.  So you said never deposed before; correct?

A.    That is correct, Counsel.

Q.    Okay.  Have you ever testified in court?

A.    I have not.

Q.    Okay.  And prior to this matter, have you ever served as an expert witness in any case?

A.   Yes, I have.

Q.   Okay.  And how many times?

A.   Approximately 15 times.

Q.   Okay.  And in those 15 cases, they just didn't end up going to deposition; is that correct?

A.   That is correct, Counsel.

Q.   In those cases, did you prepare expert reports?

A.   In some of them I did.  In many of them I did not.

Q.   Okay.  And those 15 cases, were those medical malpractice cases, insurance cases, product liability cases like this?  What kind of cases were they, just generally speaking?

A.   It was a mix of them.  So some were medical malpractice cases, some were, you know, again, a mix of what you said.

Q.   Okay.  Have you done any expert witness work in a product liability case like this, meaning a case where there's an allegation that the plaintiff suffered an injury as a result of taking a particular medication and the manufacturer of that

medication is being named as the defendant?

A.    No, I have not.

Q.    Okay.  All right.

MR. HONNOLD:  Dr. John, speak up just a bit.  You have a microphone, but just speak up so your voice is loud and clear.  Thank you.

MR. PRZYMUSINSKI:  So let's mark as Exhibit 1 -- remind me how I'm doing this. I'm handing this to Dr. John?

THE STENOGRAPHER:  I will mark it and then pass it to the witness.

MR. PRZYMUSINSKI:  Perfect.

(Defendant's No. 1, Defendant's Notice to Take the Videotaped Deposition of Binu John, MD, and Requests for Production of Documents, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    Okay.  This is Exhibit 1.  It's a document titled Defendants' Notice to take your -- to Take the Videotaped Deposition of Binu; is that right?

A.    Binu.

Q.    Binu -- Binu.  Sorry.  I'll get

that -- John, MD, and Requests for Production of Documents.

Do you see that?

A.    Yes, I do.

Q.    Is this a document that you've seen before, Doctor?

A.    Yes, I have.

Q.    Okay.  And, Doctor, since you have seen the document, I assume that you had an opportunity to look at Exhibit A, which begins on page 4 and goes on to pages 5, 6, and 7?

A.    I don't recall the details of the document, so if you want me to ask you [sic] questions about this, I'm happy to look at it now.

Q.    Well, okay.  And I'm trying -- I'm not trying to confuse you at all.

A.    Right.

Q.    I'm just asking a simple question.

On pages 4, 5, 6, and 7 there is a section with a heading Exhibit A.

Do you see that?

A.    I do see that.

Q.    Okay.  You told me a little bit earlier that you've seen this document before;

Binu John, M.D.   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

correct?

A.    Yes, I have.

Q.    When you looked at the document before, did you go through Exhibit A, including the portion of it titled Requests for Production that starts on page 5 and has ten numbered items underneath it?

A.    Yes, I have.

Q.    Okay.  Very good.

MR. HONNOLD:  Lucas, here's some responsive materials.  I should have mentioned it to you before, too.

MR. PRZYMUSINSKI:  Oh, that's --

MR. HONNOLD:  That may help you a little bit.

MR. PRZYMUSINSKI:  Okay.

BY MR. PRZYMUSINSKI:

Q.    So it looks like after going through that together with counsel, you identified some documents that are responsive to those requests; is that correct?

A.    That is correct.

Q.    And I guess I received these documents right now.

Are these documents that you

provided to counsel to provide to us?  Can you tell me where these came from?

A.    Well, Counsel, I don't know what's on that file.

Q.    That's --

A.    So if you show me the file, I can tell you.

Q.    That's totally fair.

All right.  So it looks like, for the record, I've received four separate items in response to our Deposition Notice and Requests for Production.

We can mark as Exhibit No. 2 what's been identified as Statement of Compensation for Binu John -- say it again.  Binu?  Binu?

A.    Binu.

Q.    Binu?

A.    Like new.  Binu.

Q.    Okay.  Dr. Binu John, MD MPH.

MR. PRZYMUSINSKI:  Let's mark that as Exhibit 2, please.

(Defendant's No. 2, Statement of Compensation for Binu V. John, MD MPH, was marked for identification.)

MR. HONNOLD:  Yeah.  So what you

have marked as Exhibit 2, I think you will find out that Dr. John hadn't yet invoiced us or sent us any billing, so this was our best attempt to at least capture his spent and general descriptions and amounts. So that's why Exhibit 2 was created.

MR. PRZYMUSINSKI: That's fine. I appreciate that.

BY MR. PRZYMUSINSKI:

Q. The second thing we received -- can't quite tell -- it looks like it's just a single copy, I could be wrong, of an article titled Weight Gain and Antipsychotic Medications.

Maybe there's more copies. I can't tell. I think there are more copies.

Why don't we mark this as Exhibit 3.

(Defendant's No. 3, Article, Weight Gain and Antipsychotic Medications, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q. And then there looks to be copies of an article titled Anticholingeric Symptoms in a patient with bupropion overdose successfully managed with physo- -- sorry --

physostigmine:  a case report.  I'll mark this as Exhibit 4.

                (Defendant's No. 4, Article, Anticholingeric Symptoms in a patient with bupropion overdose successfully managed with physostigmine: a case report, was marked for identification.)

BY MR. PRZYMUSINSKI:

        Q.    And then last but not least it looks like we have a presentation or there's a PowerPoint entitled Association of GLP-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use:  A Target Trial Emulation Study.  And we can mark this as Exhibit 5.

                (Defendant's No. 5, PowerPoint, Association of GLP-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use:  A Target Trial Emulation Study, was marked for identification.)

BY MR. PRZYMUSINSKI:

        Q.    Okay.  So I don't want to --

                THE STENOGRAPHER:  Just one second, Counsel.

Binu Jose, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI:  Oh, sorry.

BY MR. PRZYMUSINSKI:

Q.    I don't want to spend a lot of time on this right now but let me just ask you a couple of questions.

The first exhibit, which we marked as -- was it Exhibit 2, which was your invoice or at least some of your invoices?

A.    I don't believe I have submitted an invoice.

Q.    So what - what is that document that's in front of you?

A.    So I believe this -- the amounts there in the initial three lines are retainers I received --

Q.    Okay.

A.    -- from the firm.

Q.    Okay.

A.    And the next three lines might be based on a summary of -- I made in a Word document with my time efforts.

Q.    Uh-huh.

A.    And I've sent that to the counsel --

Q.    Uh-huh.

A.    -- and they might have estimated

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

based on that -- the last three lines.

Q.    Okay.  So you received some retainers initially; is that correct?

A.    That is correct.

Q.    And then you provided counsel with some documents that might reflect some of the time you spent so far on this litigation; correct?

A.    That is correct.

Q.    And you did not put this document together, what is Exhibit 2; correct?

A.    That is correct.

Q.    Okay.  But your assumption is counsel might have put together some of the information that they had to provide the best summary they could of the time you spent; is that correct?

A.    That is correct.

Q.    Okay.  Now, just looking at that document, and it sounds like from what Mr. Honnold said, there may have been some additional time beyond what's invoiced there; is that correct?

A.    I cannot say that for sure because I only received retainers for the first three.  I

submitted that, but I did not do the addition or the math so I'm not able to say that.

Q.    Okay.  When's the last time you submitted an invoice?

A.    Like I mentioned earlier, I have not submitted an invoice.

Q.    Okay.  So when you expect to get paid next for whatever additional work you have done, how is that going to happen?

A.    I believe at the end of the completion of the work I will tally what I received as retainer and the amount that is still outstanding, and I assume that's how it's going to be settled.

Q.    Okay.  That's your retainer that you received initially, once the work is fully completed you will tally all your hours, send that to counsel, they will see what the amount is in excess of the retainer and you except to receive the rest of that; is that correct?

A.    That is correct.

Q.    All right.  And right now, sitting here, you can't tell me how many hours you spent to date?

A.    I can only give you an approximate

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

idea.

Q.    Give me an approximate idea.

A.    It would be somewhere between 150 and 200 hours, that's -- that's my best guess.

Q.    And all that time is related to this report; is that correct?

A.    That's the time I spent on this case, which includes the time -- you know, I have done research in the material, meeting with the attorneys, preparing the report, meeting with the counsels, doing this deposition.  That's all the work I have done so far.

Q.    No -- and I understand.  So just -- just for clarification, and my question was bad.

So I understand there's lots of different activities that go into you being here with this report; right?  Some of that is report drafting, some of that is reading literature, doing whatever research you need to do, talking to attorneys, doing preparation, but all of that work would have been -- that 150 to 200 hours relates to the opinions you're offering in this report; is that correct?

A.      That's correct.

Q.      Okay.  Very good.

All right.  Let's look at the next thing, Doctor, which is, I think this Letters to the Editor which we've marked as Exhibit 3.

Am I correct on that?

A.      Correct.

Q.      What is this document and how did it come to us?

A.      So one of the questions that we discussed was about the comparative group.  As we go through the day, I presume we will discuss about comparison of GLP-1 RAs, what -- where is comparative groups.  And one of the comparative groups was bupropion.

As part of a combination of a drug for weight loss is bupropion naltrexone and this -- these case reports are to indicate that bupropion itself has anticholinergic properties.  And so like some of the anticholinergic drugs, they can cause ileus.

(Stenographer clarification.)

A.      They can cause ileus, i-l-e-u-s.

BY MR. PRZYMUSINSKI:

Q.    Okay.  So --

A.    And the drug is bupropion, b-u-p-r-o-p-i-o-n.

Q.    Okay.  So these case reports relate to the potential effect of bupropion on intestinal motility; correct?

A.    That's correct.

Q.    And are these case reports reflected on the reliance or materials considered list on your report or is this something new you're adding to that?

A.    This is something I'm adding to that.

Q.    So this is something you reviewed after you completed your report; is that correct?

A.    That is correct.

Q.    And the next thing I have, which I did mark as Exhibit 4, is the article by Kalmar, K-a-l-m-a-r.

What is this article, Doctor?

A.    So this is an article in the journal Acta, A-C-T-A, Anaesthetic Belg, A-n-a-e-s-t-h B-e-l-g, they're three words, published in 2020 that describes a patient who had

anticholinergic symptoms after they received an overdose of the medication bupropion, b-u-p-r-o-p-i-o-n. And it's manifested by the fact that the patient presented with typical classical features of anticholinergic overdose, and then was successfully treated with a drug called physostigmine, p-h-y-s-o-s-t-i-g-m-i-n-e, which is an antidote for anticholinergic.

And you will see that one of the drug classes that can cause ileus or functional obstruction or delayed motility are drugs that have these class effect of anticholinergic. And this tells you that bupropion, again, can cause that anticholinergic symptom, not only can it cause it, that can be reversed by an antidote which you normally use to treat patients with anticholinergic syndrome which is physostigmine.

Q.    So, again, this relates, this article indicates -- that relates to the relationship between bupropion and intestinal motility?

A.    That is correct.

Q.    And -- and I assume this also was

something new, you looked at after you completed your report?

A.   That is correct.

Q.   This is not on your materials considered list that's in the report that you submitted originally; correct?

A.   That is correct.

Q.   Okay.  Very good.

Put that aside.

All right.  This last document is a presentation that you gave, it looks like, along with some of your coauthors on a publication related to the effects of GLP-1 Receptor Agonist Medications on a Liver Function or Liver Outcomes in Patients with a History of Alcohol Use; correct?

A.   That is correct.  In patients with history of harmful alcohol use.

Q.   And the reason you produced this is pursuant to our request or was there some other reason that you chose to produce this document?

A.   It is pursuant to your request.

Q.   Very good.  We may go through that later.  You can put that aside.

Okay.  There was one other item on

page 6, if you go back to the first exhibit, which is the deposition notice.

Let me know when you're there.

A.   Yes.  I am here.

Q.   Okay.  So under Number 6, at the very top of page 6, there's a second bullet saying:  Teaching Materials for, quote, "Intensive Review of Gastroenterology and Hepatology."

Do you see that?

A.   Yes, I do.

Q.   Were you able to collect any of those materials?

A.   So I want to explain that a little bit, Counsel.

Q.   Sure.

A.   So this Intensive Review of Gastroenterology and Hepatology was a board-review course that I started when I was faculty at Cleveland Clinic in Cleveland, Ohio.

So after I completed my training, my chief identified me as someone who had interest in expertise in teaching trainees and other doctors in how to prepare for the gastroenterology board review course, the exam.

You know, physicians have to appear for the board review exams to be certificated in gastroenterology. And so I was asked to create this board review course, which I did. And I selected speakers from all over the country and I assigned topics to them and these speakers then gave topics on various -- of their expertise or of their interest at the course.

And I ran this course as the course director as long as I was on faculty at the Cleveland Clinic. And I ran that as a director for four years.

And then once I left them I did not have access to any of the material. It was developed as part of the course, it is owned by the Cleveland Clinic because they conducted the course and so I did not have access to that.

Q. Okay. Very good.

We could put Exhibit 1 at side. We're not going to need that, I don't think, anymore.

Okay. So, Doctor, we are I think on Exhibit 6. And Exhibit 6, I'm going to mark three things and then we will talk about them.

Exhibit 6 is going to be the

original report that you filed or served in this case directed at Novo Nordisk, that is -- or was signed by you on January 2nd, 2026.

So this is Exhibit 6.

(Defendant's No. 6, Rule 26 Expert Witness Disclosure, and Rule 26 Expert Report of Binu John, MD, MPH regarding Defendant Novo Nordisk, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    Exhibit 7 is your original report that you served or filed in this case.  Again, signed, I believe, on January 2nd.  This one, however, was directed specifically at Lilly. So we're going to mark that as Exhibit 7.

(Defendant's No. 7, Rule 26 Expert Witness Disclosure, and Rule 26 Expert Report of Binu John, MD, MPH regarding Defendant Eli Lilly, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    And then last, but not least, Exhibit 8 we're going to mark what you served as rebuttal expert report dated February 23rd, 2026.

(Defendant's No. 8, Rebuttal Expert Report of Binu John, MD, MPH, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q. Okay. Let me just make sure, Doctor. Have I covered the waterfront of the reports you've served in this litigation?

A. Counsel, can you repeat that question?

Q. Let me try it differently.

I have given you copies of all three reports you filed in this litigation?

A. Yes. I have -- yes, you have.

Q. Okay. And sitting here today -- I know you brought a couple of additional studies which we talked about already and we may talk about a little bit later, beyond those studies -- beyond those studies are there any changes or corrections you would like to make to any of the three reports that are sitting in front of you right now?

A. No.

Q. Okay. And I understand obviously there may be context around things, but can I

assume that these reports reflect all of the opinions you currently intend to offer in this litigation?

A.    Well, it depends on the questions you ask me, Counsel.  I cannot say.  It depends on the context, and it depends on the question, and it depends on how the discussion goes.

Q.    Well -- okay.  Let me back up and maybe --

MR. HONNOLD:  We'll certainly represent and stipulate that in terms of the affirmative opinions that Plaintiffs anticipate providing through Dr. John, that the report does set forth those, as well as their bases, but -- subject to your conversation about context questions and things like that.

But as an affirmative representation, the answer is, yes, his opinions are fully set forth in the report. I don't know if that's helpful to you.

MR. PRZYMUSINSKI:  It is, Brad.  I appreciate that.

BY MR. PRZYMUSINSKI:

Q.    And let me explain what I'm saying.

So obviously we'll have that conversation, there'll be questions, there'll be answers. You'll get tired of me. It's going to be fun. But, you know, part of what happens, the reason that you prepare these expert reports is so that us, as the defendants, have an understanding of the opinions, the categories of opinions you're planning to offer so that when I come here today I know what to ask you questions about. All right?

So it's not that I don't expect some context around things you said, but if you had a whole different opinion, say, oh, I'm actually going to offer opinions now about gastroparesis or about something else that doesn't appear anywhere in your report, that would be a surprise to me.

So I'm asking on that way. And it sounds like Mr. Honnold represented that the opinions that you intend to offer in terms of scope are provided in your report; is that accurate?

A.    That is accurate.

Q.    Very good.

Now, in your own report -- and let's use the Novo one which is Exhibit 6 only because that's my client, there is a section that I conveniently tabbed, which is Appendix A, and it's the materials considered list.

Can we just go there.

So you see that materials considered list, Doctor?

A.    Yes, I do, Counsel.

Q.    Okay.  So other than the two additional -- one is, I think, a group of case reports, and then there's a single case report related to bupropion that you brought today, what we marked as Exhibits 3 and 4, does this materials considered list reflect the literature you considered and relied on in forming your opinions in this case?

A.    Yes, it does.

Q.    So I can assume if an article or a document appears in that list, it's something you at least looked at and considered; is that fair?

A.    I would say I have at least looked at it and considered it.

Q.    Okay.  And if it's not on the list,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I can assume you have not considered it; is that correct?

A.    Again, I have read a wide variety of cases, literature around it, and I have included anything that I've considered on there.

Q.    So if it's not on this list, the presumption is you have not looked at it, considered it for this report?

MR. HONNOLD:  Lucas, can I just interpose an objection that to the extent there may be things related to his overall training, education, and experience that could relate to medical school lectures, to textbooks, I guess those things may be out there not specifically listed, that that would influence him in general.  But that's just for the record.

BY MR. PRZYMUSINSKI:

Q.    And that's fair.

With that caveat, is that fair?

A.    I think so, yes.

Q.    Now, Doctor, there's a couple of different sections on materials considered. The first one is literature, and then a few

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

pages back, there's websites.  Then there's FDA drug labels.  And then, if I keep going back, there's other FDA documents.  And then lastly are a section on produced documents.

Do you see that?

A.    Yes, I do.

Q.    Okay.  And I want to just ask a few quick questions about the produced documents.

Based on these documents being listed here and our conversation, I assume you at least reviewed these documents before completing your report; correct?

A.    I reviewed them.

Q.    Sitting here today, can you tell me generally speaking what topics these documents covered?

A.    I would have to review the documents.  Again, you can see from this list, Counsel, I have reviewed numerous documents.  And it's hard to look at this description and say what each document is.

Q.    And that's totally fair.

And in my review I didn't see you specifically reference any of these produced documents in the body of your report.  So what

I really would like to know, as you're sitting here today, understanding there are a lot of documents, do you specifically recall relying on these produced documents in any way for the body of your opinions?

A.    Counsel, I just told you that I'm not sure what these documents are.  So if I don't know what these documents are, how can I answer that question?  I cannot.

Q.    Well, you put me in a little bit of a pickle, and I'll tell you why; right?  Because I need to know the bases for your opinions; right?  What information you relied on to form your opinions; right?

And there's a very long list of produced documents.  Some of them look like they came from Lilly.  They start with LLY lettering.  Some of them came from Novo that presumably reflect internal documents or communications or whatever that were produced to Plaintiffs and then shared with you; correct?

A.    Again, that's your assumption.  I can't -- I don't -- I can't independently verify that.

Q.    Well, let me ask it differently.

Do you recall any specific Novo or Lilly internal document that you looked at that you considered as important for the opinions you're offering in this case?

A.    I have looked at some documents that I requested the attorney for, especially in relation to the FDA labels, and they provided me the details as what I requested.

Q.    You're answering a different question.

I understand you requested documents, attorneys gave you documents, they're listed.

My question:  Do you recall any specific document that was produced to you or produced in this litigation by either Novo or Lilly that you looked at and then you said, ah, this particular document is important, significant, makes a difference in the opinions that I'm offering in my report?  Because I don't see them cited in the body of your report so I want to understand that context.

Does that make sense?

A.    Again, unless I review the documents

I'm not able to answer that question.  If I can look at the document, then I can tell you which of those documents I relied on and which of those were internal and I can answer that question better, Counsel.

Q.   Can we agree that, sitting here, you don't recall one way or another on that issue?

A.   Again, all I can say is based on these names, it's hard for me to decide what is the document content because, like you said, you know, it has some -- like you can see here, there's a combination of alphabets and numbers that you might be familiar in your field, but in my field I'm not familiar with what those documents mean.

Q.   Well -- and I don't want to belabor the point; right?  But obviously I know that these are numbers that label documents.  I have no idea what each of these -- I mean, I don't memorize documents any more than you do.

But, you know, the whole objective of me asking you questions is to understand -- because we have a reference list of literally hundreds of documents; right?  And presumably the documents or the information that you

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

thought was most important was the information that's cited actually in the body of your report; is that fair?

A.    That is fair.

Q.    Okay.  And I don't see that you cited any of these documents anywhere in the body of your report.  So if that is correct, can I at least make the assumption that they didn't make that highest threshold of most important information you relied on?

A.    I would say that if I did not cite any of these documents inside my report, then I did not -- I might have looked at it, but I did not consider those important enough, potentially, to include in the report.

Q.    I think we got to where we needed to go.  Okay.  Very good.

All right.  Now let's go to the front of your report, to page 1.  And if you look at the document, there's actually a disclosure.  You can bypass that.  And I'm really talking about page 1 of your report. It's got that "In the United States District Court" heading on top.

Are you with me?

A.    Yes, I am, Counsel.

Q.    Now, you have a section that says Introduction, right underneath that, the first sentence you have there says:  "I have been retained to examine whether there is a causal relationship between use of GLP-1 Receptor Agonists, GLP-1 RAs, and the development of ileus and bowel obstruction."

Do you see that?

A.    Yes, I do.

Q.    Just for housekeeping, can you tell me who retained you?

A.    I was first approached by Attorney Parvin Aminolroaya.

(Stenographer clarification.)

A.    Attorney Parvin, P-a-r-v-i-n, and I believe her last name is spelled A-m-i-n-r-o-l-o-y-a, but I may not be accurate with the last name.

And she reached out to me and we discussed the case and she was the person who initially retained me.

BY MR. PRZYMUSINSKI:

Q.    Very good.

And when was that approximately?

A.    I believe it was approximately in October of 2025.

Q.    Okay.  And we're sitting now in March of 2026, so five months ago roughly?

A.    Approximately.

Q.    Okay.  All right.

Now, this question that you reflect in the first sentence under Introduction that you were asked to examine, is that a question that you considered prior to being retained in this litigation?  Meaning, is that a question you'd considered independently in your own clinical research or work?

A.    Yes, Counsel.

Q.    And prior to becoming involved in this litigation, had you reached an opinion on that question?

A.    Prior to retaining, I had not done this level of research and so I had not reached opinion on the question.  I was aware that there was a concern about this, but I had not done a detailed literature search that I did for this report.

Q.    Okay.  So before you spoke to Ms. Aminolroaya, before you became retained in

this litigation, you had heard concerns about a potential relationship, but you hadn't done the full research and hadn't reached a conclusion one way or the other on the question of causation; is that correct?

A.    That is correct.  And I also want to say I was aware of the FDA label, and so I was aware of that.

Q.    Okay.  Now, prior to being retained in this litigation, or, frankly, at any point, have you published any papers or research articles specifically addressing the relationship between GLP-1 receptor agonists use in either ileus or intestinal obstruction?

A.    I have not.

Q.    Outside of this litigation, meaning outside of this report or anything you've said in this litigation, have you ever written anywhere -- in a publication, a presentation, a journal, whatever it may be -- that GLP-1 RA medications cause ileus or intestinal obstruction?

A.    I have not.

Q.    And can I assume you have never presented on that topic either?

A.    I have not presented on the topic of GLP-1 RAs and ileus or obstruction.

Q.    Very good.

Okay.  So let's stick with that first sentence.

You have the term "causal relationship" in that sentence; right?

A.    Correct.

Q.    Can you define to me what you mean by causal relationship in the way that you use the term in this sentence?

A.    A causal relationship is to determine whether these class of medications, the GLP-1 RAs, can cause ileus or functional obstruction.

Q.    You're kind of answering my question for a definition with the same word.  You say causal relationship is caused.  I'm asking what the term "causal relationship" actually means to you as a scientist and an epidemiologist and a physician.

MR. HONNOLD:  I'll just object to the form.  It's argumentative.

Go ahead.  You can answer.

A.    Again, I'm not sure how else I can

put it in different words.  It's -- it's pretty obvious from the phrase is there a causal relationship, does the drug cause bowel obstruction or ileus.

BY MR. PRZYMUSINSKI:

Q.    Well, let me ask it maybe a different way.

Are you familiar with the concept of association?

A.    Yes, I am.

Q.    Can you tell me, in your view what is the difference between an association and causation?

A.    So association is based on the epidemiological evidence, based on observational studies typically, and you look at patients who have been on the medication, you look at outcomes, and you see if there's increase in the outcomes that you are looking for in patients who are on the medications compared to a group of patients who are not on the medication, who are otherwise similar, and then you see if there's an association between the medication used and the outcome that developed.  So based on epidemiological studies

you determine associations.

Q.    And how is that different from causation?

A.    Just because a medication use is associated with an outcome is not enough to justify causation.  To do causation, you need more than just an association.

Q.    So an association is a necessary predicate, but not sufficient to establish causation; is that a fair statement?

A.    I think that's a fair statement.

Q.    Now, when you look at an individual study, all right, and that study reports an association, am I correct that as an epidemiologist, a physician, or a scientist, one of the things you have to consider is that association may be a product of random error or chance?

A.    Can you repeat that question, Counsel?

Q.    Sure.

If a study reports an association, finds an association, when you're reviewing that as a scientist, physician, epidemiologist, one of the things you need to consider in

evaluating that association is whether that association is a product of random error or chance?

A.    That is correct.

Q.    Okay.  Another thing you have to consider is that the association could be the product of a systematic error or bias; correct?

A.    Yes.  There are many factors you consider when you evaluate a study, and this is one of them.

Q.    Okay.  And another of those factors you have to consider is confounding; correct?

A.    That is correct.

Q.    All right.  So associations, among other things, can be caused by random error, systematic error, or confounding; correct?

A.    That is correct.

Q.    Okay.  Now, have you heard the term valid association?

A.    I have heard it.  I'm not familiar with its use.

Q.    The way I have heard the term used is a valid association is one that cannot be attributed to chance by a certain confound.

Are you familiar with that?

A.   I'm not familiar with that definition.

Q.   Okay.  How would you describe an association that in your interpretation as an epidemiologist, physician, and scientist cannot be or should not be attributed to chance, bias, or confounding?

MR. HONNOLD:  I'm just going to object to the form of the question that it's overbroad and vague.

Go ahead.  You can answer.

A.   Can you please repeat that question, Counsel?

BY MR. PRZYMUSINSKI:

Q.   Sure.

How would you describe an association that you observe in a study where after looking at it you've concluded that association is not due to chance, bias, or confounding?

MR. HONNOLD:  Same objection.

You can answer.

A.   I would say to me that is a study that I would give greater weightage to.  That is a study I would consider likely -- more

likely represents the truth.  As an epidemiologist, my goal is to look at the evidence and examine each study.

And like you said, I have to look at what the exposures are, whether the exposures were actually accurately captured, look at what the outcomes are, and whether the study accurately captured those outcomes, look at potential confounders, look at potential biases, look at the study populations.  So there are a number of factors that go into.

So just these three factors are likely not the only considerations I look to to see, but ultimately as scientist and epidemiologist, and including what I'm assigned here today, my goal is to see how do you interpret the science, the studies, and do they represent the truth.

And so among the factors I considered to see if an association is representing the actual relationship are some of the factors you mentioned, confounding, bias, but there may be others.

BY MR. PRZYMUSINSKI:

Q.    Okay.  And so let's take that apart

a little bit because I understand that when you look at -- and we will talk about this in detail later, study quality criteria in your report --

A.    Yes.

Q.    -- and we'll talk about those.

But I'm not even talking about the studies in this case.  I'm talking about epidemiology generally.  Okay?  And specifically I'm asking the question:  If I looked at a study or you look at a study more specifically and the study reports an association, right, at least some of the things you will do is ask yourself the question is this due to random error, is this due to bias, is it due to confounding; correct?

A.    Some of the questions, yes.

Q.    And if you find that the association to your view is due to chance, bias, or confounding, you draw the conclusion, you as an epidemiologist, that wouldn't be a valid association that would provide a predicate for a causation opinion, would it?

MR. HONNOLD:  Let me object to the form, overbroad.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

You can answer.

A.    Again, just the caveat that there are many criteria I examine, not just what you listed.  And so when I examine and I find that some of those principles are violated, I think that the study findings might be due to bias.

On the other hand, when I find that the principle that we examine are all honored or validated or valid, then you think that that association is real.

BY MR. PRZYMUSINSKI:

Q.    And I understand that.

And I am not limiting your analysis to these three factors, but I am focusing on these three for now.  And I think you used the statement at the very end of that last response you viewed the association to be real; right?

Do you recall saying that?

A.    I did say that in the context saying among other factors, if it's all honored, I will view the association as real.

Q.    Can we agree that an association that in your evaluation is driven by either random error, bias, or confounding you would not treat that as a real association?

MR. HONNOLD:  Object -- object to the form.  It's -- it's vague and overbroad, lacking in any factual specificity.

You can answer.

A.    Part of that challenge is it's really hard, Counsel, to say whether an effect is from random error or not.  That is really hard to say; right?  All you can do is look at the factors, right, that -- that you can control for in a study.  But knowing that random error is a possibility, but it's hard to say a specific case the findings are due to a random error or not.

So I think you're adding factors which I would consider, including confounding and bias, with random error, which there's no way I can consider, and you're combining all of that into a single question.  I cannot answer that.

Q.    Let me try to simplify.

One of the things you said to me was that an association is a necessary predicate but not sufficient for causation; correct?

A.    That's correct.

Binu Jose, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    So assuming that starting point, you need to first determine an association exists and then ask the question if it's causal; right?

A.    That's correct.

Q.    So now I gave you a study; right? And the study reports an association.  As a scientist, an epidemiologist, a physician, when you look at that study would you ask yourself a question, okay, is the association reported in the study real, meaning is it a product of whether it's chance, whether it's bias, whether it's confounding or whatever other factors, or is it in your view, to the best of your abilities, a real association that could then be a predicate --

MR. HONNOLD:  Form.

BY MR. PRZYMUSINSKI:

Q.    -- for a causation analysis?

Does that make sense?

MR. HONNOLD:  Object to the form, vague.

Go ahead.

A.    Yes, it does.

Binu Jacob, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MR. PRZYMUSINSKI:

Q.    And do you agree with that?

A.    I agree with that.

Q.    Okay.  Great.

Now, you said it's difficult to rule out random error or chance.  But we do do statistical significance testing; correct?

A.    Yes.

Q.    And that's something you certainly do in your own research; correct?

A.    That is correct.

Q.    Okay.  And you differentiate between study results or outcome results that are statistically significant and those that are not; correct?

A.    Among other factors, I do.

Q.    Okay.  And we'll look at some of your publications later, but I assume you would never report in a published publication, a published paper that you found an association between an exposure or an outcome if the actual statistics showed that it was not significant; correct?

A.    That is not necessarily true because I would acknowledge limitations in the way I

examine the data.  And if there are limitations

that examine the data and the way we classify

the outcome, I would acknowledge that

limitation.

So just because I found an

association does not mean the association is

real, like you said.  On the other hand, just

because you did not find an association in an

epidemiology study does not mean that that

association is not there.  So you have to look

at the holistic literature, you look at the

picture.  Every study, you have to examine it

individually.  You have to examine its

strengths and limitations and you have to put

that in context.

Q.    So I get that.  And we will look at

your studies.  But there's a difference between

acknowledging limitations of a study and

drawing actual conclusions in a peer-reviewed

publication.

Do you appreciate that?

A.    Say that again, Counsel.  Repeat

that.

Q.    Let's talk about peer-reviewed

publications.  There's a difference in the

conclusions you draw in that publication and the limitations you acknowledge in that publication; correct?

A.   Well, the conclusions can be contingent on the limitations, so they are very closely related.

Q.   Okay.  We will get to that in a moment.  We will do that later.

Fair to say that in order to assess causality as we were discussing it, it is important to do your very best to review the totality of relevant evidence?

A.   That is correct.

Q.   And -- okay.  Let's -- let's go actually to page 46 in your report.

See the section on Bradford Hill there, Doctor?

A.   Yes, Counsel.

Q.   Okay.  If you look at the last full paragraph -- actually, before I do that, let me ask you this.

In performing your analysis for this case and for this report and drawing your conclusions about causation, am I correct to understand that you applied the Bradford Hill

methodology?

A.    That is correct.

Q.    Okay.  And is that something,
meaning the application of Bradford Hill, you
do in your own clinical research practice
outside of litigation?

A.    So we do not call it Bradford Hill,
but we apply these same principles in our
association.

Q.    I thought I understood until you
said, "We apply the same principles --

A.    In the epidem- -

Q.    -- "in our associations."

A.    In the epidemiological studies.

Q.    How do you apply the same principles
in epidemiological studies?

A.    So, for example, if you're examining
the outcomes, say, of, let me just use the
example of my GLP-1 receptor agonist and what
are the outcomes, which is study that I did;
right?  So we look at several of these factors
so when you apply this, you -- first you
describe the association.  So that's the first
thing, you describe the association.  And then
you try to see if that association might

represent causality.

So just as an example of one of the things we might do is if -- for example, in that particular study I found that use of GLP-1 RAs in patients with harmful alcohol use was associated with reduction in liver-related outcomes, and then we did additional things, like a subgroup analysis in that setting we looked at semaglutide and then we looked at those response. So those responses weren't all a gradient as one of the Bradford Hill criteria. So we looked to see is there a difference in association between using semaglutide at .25 versus .5 versus 1 mg. So does a higher dose, is that associated with even better outcomes?

And if you see that then you establish that principle of a dose response or a dose gradient. So that's -- in fact, that's exactly what we did in that study. So that's an example of using a Bradford Hill principle in one of my papers.

Q. Okay. I think that's helpful.

Tell me, in the study you just referred to, that you did with GLP-1 RAs, I

Binu Jose, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

think it was published in 2025, you said you did an analysis for GLP-1 overall and then a subanalysis or a secondary analysis for semaglutide; is that correct?

A.   That is correct.

Q.   Why did you do the secondary analysis for semaglutide?

A.   In that setting we did that because we actually wanted to do the dose response. And so although we believe that the association of GLP-1 RAs with reduction in liver-related outcomes was a class effect, we wanted to look at one specific drug so that we could look at the dose.

Because otherwise if you wanted to look at doses, I would not be able to compare one dose of liraglutide to another dose of semaglutide to yet another dose of a third drug. If we have to look at those response, we had to pick one drug. And so that was the intent of doing that.

Q.   Okay. Your assumption that the effect was a class effect was not proved out in that study; correct?

A.   I -- I have to look at that study

again.

Q. We will look at it in just a second.

Let's talk about the dose response.

So you specifically did an arm for semaglutide so you could, as you said, assess dose response because that's part of the causality criteria that you considered; is that right?

A. That is correct.

Q. It's also known as biological gradient?

A. Correct.

Q. Okay. Now, and -- and that's one of the factors you have here, we'll get to it a little bit later, in your Bradford Hill analysis.

How important is biologic grading -- gradient in your view in terms of crossing that line from association to confirmed causality?

A. I would say it's one of the different factors that we consider. It is not required, it's not a prerequisite to make that conclusion, but it supports it if it's there. It's not possible in every study; in fact, the large body of literature, if you look at

epidemiological studies, don't do that. Because quite oftentimes it's very challenging to get that data from most epidemiological data sources, and so many studies in epidemiology don't examine that.

So it's something that is nice to have. It's not a critical prerequisite.

Q.    Outside of this litigation, can you identify for me any example of where you personally concluded there's a -- cause-and-effect relationship exists between drug exposure and an outcome without evidence of dose response?

A.    I would have to double-check. We have done other pharmacoepidemiological studies looking at different medications. For example, we have published a paper looking at statins and liver outcomes, which was published in Gastroenterology. We examined a study that looked at metformin, which is one of the medications used to treat diabetes and we looked at liver outcomes there. We have examined -- so we have done several pharmacoepidemiological studies.

Now, I have not reviewed them

recently so I cannot tell you whether we specifically looked at those response in those -- in those studies.

Q.    My question is a little bit different.

So here's the challenge; right?  We have a certain amount of hours and I would love to get you out of here sooner rather than later; right?  So it's going to help if we're asking and answering the same question.

I didn't ask whether you looked at dose response in your study.  The question I asked, Dr. John, was whether in your work outside of this litigation, did it ever conclude that a cause-and-effect relationship existed between the use of a medication and a safety or other outcome in the absence of evidence of dose response?  And if you don't remember, that's okay.  But I want to understand that question.

A.    Yes.  I believe I have.

Q.    And when was that with?

A.    I believe one of them -- again, I would have to double-check that, but there's a large body of literature examining statins with

Binu Jacob, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

liver-related outcomes and the worst majority of those cases -- in fact, I'm not sure if there are -- even a finite numbers of cases that we can count that have that dose gradient.

So even without that, there's a fair amount of acceptance in the GI and liver community that statins are associated with a reduction in harmful liver-related events.

Q.   How certain are you that there's not evidence of dose response in the relation between statins, liver endpoints?

A.   Again, this is not something I worked on in this litigation and it's not the literature that I have looked at recently.  So to answer your question I would have to look at the literature.

Q.   And, look, that's a really good point, right, because this is not -- first of all, this is not a memory test, and second of all, it's not a test of things outside of this.

But I have to understand what you have done in your real work, which is not in litigation, not in a courtroom, what you actually do in the clinic and the lab and your research, all those sort of things.

So what I want to make sure is -- and if don't remember, you don't remember. The question is do you remember -- can you say to me to a reasonable degree of certainty that you recall actually reaching a conclusion that a cause-and-effect relationship exists between a drug exposure and a clinical outcome without evidence of a dose response? And if you believe that's true for the liver outcomes, that's fine. I just want to make sure that you understand my question.

A. I understand your question. And I believe that there are instances where we've reached that conclusion without showing the dose response. I cannot tell you specifically with the statin example and in that paper which we published a few years ago, I cannot recall if we examined dose response in that paper.

Q. Okay. Very good.

Flip to page 17 in your report, Doctor, and I know sometimes there's a lot of jumping around here, so I'm going to try and make sure I guide you to where we're going.

And if you look at the very bottom sentence on that page, let me know when you're

there.

A.    Yes, I am.

Q.    Page 17?

A.    Uh-huh.

Q.    You wrote:  "Just as a statistical association does not by itself prove a causal relationship."

Do you see that?

A.    Yes.

Q.    And that's what we said earlier; right?  Finding an association even if you conclude it's valid, is not enough to reach causality; correct?

A.    That is correct.

Q.    And then you go on to say:  "The absence of a statistically significant association in a specific study does not definitively rule out a cause."

Do you see that?

A.    Yes, I do.

Q.    Okay.  Now, I want to make sure I understand.

I think what you're saying is that if a single study does not find an association, this does not definitively prove that a

cause-and-effect relationship does not exist?

A.    Can you repeat that, Counsel?

Q.    Sure.

MR. HONNOLD:  And where are you reading from, Lucas?  I lost track.

MR. PRZYMUSINSKI:  Sorry.  So the sentence that I was reading went from the bottom of page 17 --

MR. HONNOLD:  Oh.  17.

MR. PRZYMUSINSKI:  -- to the top of page 18.

MR. HONNOLD:  Thank you.

BY MR. PRZYMUSINSKI:

Q.    So in that sentence that we just read, what I'm trying to understand, I'm trying to understand what you're saying.  I think what you are saying is that if a single study does not find an association, that does not definitively prove that a cause-and-effect relationship does not exist; correct?

A.    That is correct.

Q.    Okay.  It simply means that that particular study, they did not find an association.  A statistically significant association itself does not support causation;

correct?

MR. HONNOLD:  Object to the form.

You can answer.

A.    Can you please repeat that, Counsel?

BY MR. PRZYMUSINSKI:

Q.    Sure.

The fact that you found a study that did not find a statistically significant association, what that means, at least what you're saying, I think, is that what that means is that individual study itself does not support causation but causation can still exist in theory; is that right?

MR. HONNOLD:  Object to the form.  It's overbroad.

You can answer.

A.    That is correct.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Good.

Now, if we go back to page 46 -- sorry for the jumping -- back to the Bradford Hill criteria.

Now, I know that you said it, and I think it's generally accepted that the Bradford criteria are neither exclusive nor all

required; correct?

A.    That is correct.

Q.    Probably the only one that truly is required is temporality; right?

A.    That is correct.

Q.    Okay.  Now, of the others besides temporality, do you personally have a view -- and if you don't, that's okay -- as to which other remaining Bradford Hill criteria for you are most important when you are looking at the question of causation?

A.    I would look -- again, depends on the individual setting.  It depends on the specific case.  And different factors could be more important in certain cases.

Q.    Okay.  So you don't have a general view of "I consider these set of factors to be the most important -- I considered all of them, but these are the ones that --

A.    I would say that some are less important.

Q.    Which ones are less important?

A.    So at least I would say specificity is something you probably may not see with a lot of situations.

Q.    Yeah.

A.    And so I would say that's one which would probably be less important.

Q.    Any others?

A.    That's the one that comes to mind at this time.

Q.    And for the remaining factors, setting aside temporality, which is a requirement, you don't have, as you sit here, a specific view of which ones, in your analysis, generally speaking, for causality are the most important?

A.    Counsel, that's not what I said.  I said it depends on the situation and it depends on the setting and it depends the case.  There might be factors that are more important than others, what it depends on that set.

Q.    And that's my fault.  I meant to ask you that question, I just probably phrased it poorly.

A.    No problem.

Q.    So I did not mean to misstate what you were saying.

Okay.  Now let me ask you a couple of questions.  We've talked about your work

outside of litigation, and I asked you about the dose response question.

Do you recall that?

Have you ever found causality without dose response, do you remember those questions?

A.    Yes, I do.

Q.    Let me ask you another one.

Outside of litigation, have you ever concluded that the causal relationship exists based purely and solely on the presence of a biologically plausible mechanism?

A.    I have not.

Q.    That's not something you would do?

A.    Again, Counsel, I can't say that absolute certainty.  Again, it depends on the context.  So you have to tell me in the context of what situation and we can look at it.

Q.    But not something you've ever done so far?

A.    Again, I can't recall right off the top of my head whether that's something I've ever done.  I cannot.

Q.    You cannot recall having done that?

A.    Again, Counsel, I do a lot of

research, as you know, and it -- I can't recall every study that I've done or been part of or I've reviewed or I've come across, whether there were any of those studies that examined that ever.  So I can't -- I cannot say that for certainty.

Q.    Let's just make sure we just don't mix things.

Again, I'm not asking whether studies considered particular issues, I'm asking whether a conclusion was made, right, that a cause-and-effect relationship exists based purely on the fact that a biologically plausible mechanism exists absent evidence of a valid association and other Bradford Hill factors.

A.    Again, like I said, Counsel, I cannot think of a situation, but I cannot recall every possible situation I've encountered.

Q.    Okay.  Let me read you a couple of statements and just ask you whether you agree with these or not.

"Generally researchers are conservative when it comes to assessing causal

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

relationship, often calling for stronger evidence and more research before a conclusion of causation is drawn."

Do you agree with that statement?

MR. HONNOLD: Object to the form, vague. It's overbroad.

A. I need you to repeat that, please.

BY MR. PRZYMUSINSKI:

Q. Sure.

"Generally researchers are conservative when it comes to assessing causal relationship, often calling for stronger evidence and more research before a conclusion of causation is drawn."

A. It depends on the situation. I don't think you can make a broad statement like that.

Q. "Rarely, if ever, does a single study persuasively demonstrate a cause-and-effect relationship."

A. I, again, disagree with that. It depends on the situation. Depends on the strength of the study. Depends on a lot of other factors.

Q. Last one.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

"Consistency of the findings of multiple investigations is an important factor in making a judgment about causation."

A.    Again, Counsel, it is one of the factors that I examine, it is --

Q.    You don't consider it important?

A.    Again, it depends on the --

MR. HONNOLD:  Object to the form.

It's argumentative.

Go ahead.

A.    It depends on the situation, like I said.

BY MR. PRZYMUSINSKI:

Q.    In this situation do you consider consistency to be important to the causation analysis you did in this case?

A.    So, Counsel, in this situation I looked at the totality of evidence, and consistency is one of the things I looked at.

Q.    That's not my question.

I asked did you consider that to be an important factor?

A.    Again, it's one of the factors I considered.

Q.    Is there something about the word

"important" that is troubling to you?

A.   There's nothing that's troubling to me, Counsel.  It is -- because, again, we cannot make a situation -- again, it's all relative whether something is important or not.  You put everything in context and you never put an undue importance to any one factor.  I think that's the critical thing.

Q.   I didn't say "undue importance."  But we can move on.

MR. HONNOLD:  We're about an hour and ten in, so when you get to a convenient point.

MR. PRZYMUSINSKI:  Two more questions?

MR. HONNOLD:  Thank you.  Sure.  Yeah.  I just wanted to raise the issue for my own personal requirements.

MR. PRZYMUSINSKI:  I've lost track so it's okay.

BY MR. PRZYMUSINSKI:

Q.   One of the things you talk about in your report -- and we'll talk about it a little bit -- well, maybe quite a bit more later -- is the concept of power in a study.

Do you recall that?

A.    Yes, I do.

Q.    Okay.  And power, from an epidemiology perspective, right, is the ability of a study to detect effect -- to detect an effect if one is, in fact, present; right?

A.    The power is the ability of a study to detect an effect if -- if one is present. Correct.

Q.    Okay.  Right.

And I think you discussed in a number of places in your report that certain studies, in your view, were underpowered.

Do you recall that?

A.    I cannot recall that.  If you point out where in the report, I can look at it.

Q.    We can do that a little bit later. But can you tell me, the term "underpowered," from a perspective of epidemiology, that would suggest that the study itself is not large enough to provide reliable information about the nature of the effect; is that right?

A.    I would say the number of outcomes, for example, might not be large enough to appropriately study the association.

Case 2:24-md-03094-KSM    Document 691-24    Filed 05/19/26    Page 78 of 407

Q.    Last question, I promise, before we stop.

If a study reports a risk ratio of 1.0, exactly on 1, right, but is underpowered, meaning it has relatively few subjects or few events, what conclusion can you draw based on that result?

MR. HONNOLD:  Just going to object to the form that it's overbroad, lacking in any factual specificity.

Go ahead.

A.    Again, could you repeat that question, Counsel?

BY MR. PRZYMUSINSKI:

Q.    Sure.

If a study reports a risk ratio of 1, just right on -- but it's underpowered in terms of size or events, what conclusions can you draw based on that result as an epidemiologist?

A.    You cannot draw a firm conclusion whether there's an association or not.

Q.    Okay.  Can you assume that the study would support a decreased risk if the power was higher?

A.    You cannot base it just on that. You cannot.

Q.    Could you assume that increased risk was present if the power was higher?

MR. HONNOLD:  Same objections.  It's vague.  It's overbroad.  No factual specificity.

Go ahead.

A.    Again, Counsel, when you interpret that has a ratio like that or an association like that or an odds ratio like that, you have to put that in context of several other factors.  So you do not look at just the hazard ratio in isolation to try to make conclusions.

You look at potential bias, you look at potential confounders, you look at how the study was designed.  So you have to look at all of those factors before you can say whether that, if the study was larger it would have been protective or harmful.  You cannot base it just on that single point of the hazard ratio.

MR. PRZYMUSINSKI:  Okay.  Let's stop there and take a break.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We're going off

the record.  The time is 10:16 a.m.

(A brief recess was taken from 10:16 a.m. to 10:28 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:29 a.m.

BY MR. PRZYMUSINSKI:

Q.    Welcome back, Doctor.

A.    Thank you, Counsel.

Q.    All right.  So we talked a little bit about your paper on GLP-1 liver-related outcomes in patients with harmful alcohol use before.

Do you recall that?

A.    Yes, we did.

Q.    Okay.  We're going to mark as Exhibit No. 9 that publication.  It is titled Association of Glucagon-Like Peptide-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use: A Target Trial Emulation Study.

(Defendant's No. 9, Article, Association of glucagon-like Peptide-1 Receptor Agonists with Liver-Related Outcomes and All-Cause Mortality in Patients with Harmful Alcohol Use: A Target

Trial Emulation Study, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.   You're the first author, and it was published in 2025 in The American Journal of Gastroenterology.

Doctor, first of all, just can you confirm that this is the paper you were talking about earlier?

A.   Yes, I can.

Q.   Okay.  All right.

So looking at the abstract, Doctor, on the first page, it looks like under Results you had in the study a cohort of 8,040 patients with what you refer to as a positive audit-C that were initiated on a GLP-1 RA, and then a second group of 8,040 noninitiators that were propensity score matched; is that correct?

A.   Counsel, can you give me a minute to look over it?  It's been a while since I looked at this.

Q.   Sure.

You ready, Doctor?

A.   Not yet, Counsel.

Q.   Doctor, it was a pretty simple

question.  We can't read the entire study right now or we'll be here for the rest of the week.

A.    But, Counsel, if you're going to ask me about the question, I need to familiarize myself with the paper.

MR. HONNOLD:  Why don't you read -- can you read the question or have it read back?

Doctor, you may be able to see that the scope of his question was fairly limited.

So maybe just refresh his recollection by reading it back.

MR. PRZYMUSINSKI:  Do you want to reread the question, please.

(A portion of the record was read by the stenographer.)

BY MR. PRZYMUSINSKI:

Q.    Let me do it.  It's okay.

So let's try again clean.

If you look at the results section of your abstract, you describe in your own publication that you matched a cohort of 8,040 patients, with what you described as a positive audit-C, that were initiated on GLP-1 RA

medications, and compared those to a separate cohort of 8,040 noninitiators; is that correct?

A.    That's correct.

Q.    And those two groups were propensity score matched; correct?

A.    That is correct.

Q.    Okay.  Perfect.

And if you look just below that -- well, actually right above that, in Methods, you say:  "The primary outcomes were the time to a composite outcome of decompensation, hepatocellular carcinoma, liver-related death, and all-cause mortality."

Do you see that?

A.    Yes, I do.

Q.    Okay.  Great.

Now, if you look at the last section of the abstract, the discussion, what you found in the trial, at least as you described it, was that GLP-1 RA use was associated with a lower risk of liver outcomes, death, and harmful alcohol use; am I correct?

A.    You are correct.

Q.    Okay.  Now, if you turn the page and go to the introduction and you look at the very

first paragraph, you write:  "Glucagon-like peptide-1 receptor agonists (GLP-1 RA) primarily used in type 2 diabetes and obesity have gained attention for their potential role in treating harmful alcohol use and alcohol-associated liver disease."

Do you see that?

A.    Yes, I do.

Q.    You go on to say:  "The rationale stems from an anecdotal" -- sorry -- "from anecdotal findings of an association between GLP-1 RA use and decreased craving for alcohol and other substances."

Do you see that?

A.    Yes, I do.

Q.    This term "anecdotal findings," can you define that for me?  What does that mean?

A.    "Anecdotal findings" means that people have reported that in trial case series potentially or studies likely patients might have self-reported that when they are on these medications they have noticed a decreased -- the sentence here is the rationale is anecdotal finding in association between GLP-1 RA and decreased craving for alcohol and other

substances, so patients have self-reported that when they are on these medications they have a decreased craving for alcohol.

Q.    Got it.

So these anecdotal findings are information that may be gathered from case reports, patient reports, adverse event data that may raise hypotheses that you attest in a study like this; is that correct?

A.    Well, in this situation, Counsel --

Q.    Okay.

A.    -- those anecdotal cases were sufficient to raise a hypothesis.

Q.    And in other cases they may not be sufficient?

A.    Or they may be more.  So it depends on the anecdotal case.  They could provide even more evidence.  And, again, it depends on the case.

Q.    Is it your opinion that an anecdotal case can provide evidence of causation?

A.    Not by itself.  But it could support an association, anecdotal cases could.  Again, it all depends on the context, Counsel.

Binu John, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   And I get that.  And I'm trying to get some general principles; right?

A.   But in general anecdotal cases might be hypothesis generating, but could also, depending on the case, could -- could provide stronger support than that.  It all depends on the context.

Q.   And anecdotal cases alone provide evidence of association?

A.   In general --

MR. HONNOLD:  Just object to -- just object to the form.  It's vague and overbroad.

You can answer.

A.   In general, that alone oftentimes is not adequate to causal.

BY MR. PRZYMUSINSKI:

Q.   And, look, I get it.  Like, I know that there's always context about everything, but we're just trying to say in general epidemiological principles so that we can frame our conversation.

Does that make sense?

A.   No.  I understand.  But, again, I want to answer it in a way that I put that in

context.

Q.    And that's fine.  And I appreciate that.

So if you drop down past the next sentence, it's the sentence that starts with "although a randomized."

Do you see that?

After reference to --

A.    Yes.  Uh-huh.

Q.    You wrote:  "Although a randomized double-blind placebo-controlled study showed that exenatide, a relatively weak GLP-1 agonist, did not significantly reduce the number of heavy drinking days, there was a significant reduction in heavy drinking days and total alcohol intake in patients with BMI, or body mass index, greater than 30 kilograms per meter squared."

Do you see that?

A.    Yes, I do.

Q.    You go on to say:  "Furthermore, exenatide reduced functional MRI alcohol cue reactivity in the ventral striatum and septal area.  Clinical trials are being planned to examine the effects of more potent GLP-1

agonists on alcohol use disorder."

Do you see that?

A.    Yes.

Q.    Okay.  So what do you mean when you use the phrase in your publication "more potent GLP-1 agonists"?

A.    I -- again, I can't recall that exact context in which I wrote it.  I can't think of what I was thinking at that point, but I can say that in general I might have referred to medications that have a different half-life, maybe, potentially.

Q.    What GLP-1 agonists, sitting here today, do you consider being more potent than exenatide?

A.    Again, I would have to refer to the pharmacology of each of these medications to know that.

Q.    Because each of these medications does have a different pharmacology; correct?

MR. HONNOLD:  Object to form of the question.

A.    In general, each of these medications work with the same mechanism and --

BY MR. PRZYMUSINSKI:

Q.    Not my question.

A.    Again, I'm -- I'm putting that in context, Counsel.

Each of the drug works with the same mechanism, and they may have different pharmacodynamics, pharmacokinetic effects, and so -- and they might be different affinities for the GLP-1 RA receptors, but as a class they all work the same way.  It's the affinity of the receptors may be different.

Q.    Now I heard the context, and I would like an answer to my question.

Each individual GLP-1 has its own unique pharmacology; correct?

MR. HONNOLD:  Object to the form. It's vague.

A.    Again, I -- I believe it's -- it's broad because depends on what aspect of the pharmacology.

BY MR. PRZYMUSINSKI:

Q.    Okay.

A.    Again, because pharmacology includes the mechanism of action, it includes the receptor on which it works, it includes the pharmacokinetics, it includes the

pharmacodynamics.  So when you say an overly broad sentence that each drug has different pharmacology, that's not specific to me.

Q.  So we agree for now, we will talk about it some more later, that each GLP-1 RA is a unique chemical compound?

A.  Yes, we can agree to that.

Q.  Can we agree that each GLP-1 RA has a unique chemical compound, has a unique safety and efficacy profile?

MR. HONNOLD:  Object to the form.

It's vague and overbroad.

A.  Again, it depends on the context. It depends on the situation, it depends on the context.  There may be situations where they may work similarly, there may be situations where they work differently.

BY MR. PRZYMUSINSKI:

Q.  Okay.  Now let me ask you a question.

Let's say that -- go back in time. Victoza, right, was approved in the United States in 2010.

Do you know that?

A.  I don't recall the exact year in

which that medication was approved.

Q.   Take my word for it.  I'm not --

A.   I -- I guess, yes, I will.

Q.   Victoza is on the market, a new GLP-1 drug is being developed and is submitted to the FDA.  And the manufacturer says, look, we don't need any data on our drug, we're -- we are a GLP-1, we work just like Victoza.  We have the same safety and efficacy profile.

What would the FDA say to that?

MR. HONNOLD:  What did they or what would they?

BY MR. PRZYMUSINSKI:

Q.   What would.  What would the FDA say in that situation?

MR. HONNOLD:  Just object to the form.  Calls for speculation.  No foundation.  It's argumentative.

A.   For FDA approval?

BY MR. PRZYMUSINSKI:

Q.   Yeah.

A.   The requirement is that each drug undergoes its own clinical trial for FDA approval.

In the context of FDA approval, an

individual clinical trial is required for all --

Q.    And why is that?

A.    The reason for that, again, is there might be -- there might be similar effects or there might be subtle differences between medications.

Q.    There could be nonsubtle differences too; right?

A.    Again, it depends on the context and it depends on the medication.

Q.    All right.  Let's go down to the Methods section.

Do you see that at the bottom of page 2?

A.    Yes, I do.

Q.    Actually, you know what, let's skip that part.

Let's go instead to where you have your discussion.

You write on page 10 under -- let me know when you're there.

A.    Uh-huh.

Q.    You see it?

A.    (Nodding head.)

Q.   Okay.  The first paragraph you write:  "In this national cohort of Veterans with harmful alcohol use, GLP-1 RA exposure was associated with a 30 percent decrease in composite liver outcomes and 59 percent decrease in all-cause mortality."

Do you see that?

A.   Yes, I do.

Q.   You go on to say:  "A comparison of semaglutide and other GLP-1 RA indicate that the reduction in liver-related outcomes and all-cause mortality was driven by semaglutide but not the other GLP-1 RAs.  In fact, there was an increase in liver-related outcomes in the non-semaglutide GLP-1 RA arm, with no change in all-cause mortality."

Do you see that?

A.   Yes.

Q.   All right.  So you told me earlier that you came into this study with a hypothesis that all the GLP-1 RA medications would have a potentially beneficial effect on liver outcomes in patients with harmful alcohol use; correct?

A.   Correct.

Q.   And that hypothesis in part was

based upon anecdotal reports that we discussed earlier; correct?

A.    Correct.

Q.    And then you did your study, 8,000 patients in one arm, 8,000 patients in the other arm, propensity score matched, the best design you could do and overall you found that in GLP-1 RA users, as you expected in your hypothesis, there, in fact, was an improvement in both liver outcomes and in mortality; correct?

A.    Correct.

Q.    Okay.  But then you decided to do a specific analysis on semaglutides, which I think you said you did for the purpose of evaluating dose response; correct?

A.    That was the primary reason we did that.  That was not the only reason, but that was the primary reason we did that.

Q.    And I think you explained to me that you needed a single medication arm to do the dose response because you couldn't really reliably compare doses of liraglutide to semaglutide or GLP-1s to other GLP-1s to assess dose response; correct?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Could you please repeat that, Counsel?

Q.    Yes.

I think you told me that you needed a unique arm for the dose response assessment because you couldn't compare the liraglutide dose to a semaglutide dose and really measure dose response on two different molecules; correct?

A.    That's correct.

Q.    Okay.  Great.

So when you did the semaglutide analysis, what you found out was that, in fact, semaglutide reduced liver-related outcomes and all-cause mortality; correct?

A.    Again, let me double-check the results really quick, Counsel.

Q.    Go ahead.

And I don't mean to be a pain --

A.    But, Counsel, you're going to ask me about specific subgroups, so I need to look at the results but --

Q.    But you literally have the sentence just --

A.    No.  I have to look -- Counsel, if

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

you're going to put up paper out of context, I have to look at the results before I can discuss my findings.

Q.    How -- how is it out of context?

A.    You're going to ask me things between semaglutide and other drugs, I have to look at the numbers on my results.  I can't look at -- I cannot look at one sentence on a paper and give you -- I have to look at it in the context of the study.

Q.    So when you wrote in your discussion:  "Comparison of semaglutide and other GLP-1 RA indicate that reduction of liver outcomes in all-cause mortality was driven by semaglutide but not the other GLP-1 RAs, in fact, there was an increase in liver-related outcomes in a non-semaglutide GLP-1 RA arm with no change in all-cause mortality," that -- that sentence --

A.    I need to look at it in context of what the sample sizes were.

Q.    Okay.

A.    Right.  I cannot answer that question just without looking at the results. Those discussions, that sentence was based on

my results and I am writing that sentence for a reader who is going through the paper, reading the introduction, the methods, the results, and the discussion.

So I cannot take that discussion out of context of the results.

Q.    Can we just agree that's what you said on this page?  That sentence is in your --

A.    I agree that is the sentence that's on the page.

Q.    And can we agree that your analysis, as you did it for semaglutide, for dose response and what other additional reasons, found different results than your analysis for the other GLP-1 RAs; correct?

MR. HONNOLD:  Object to form.

A.    Yes, I did.  But, again, in this situation, looking at the results, you can see that the overwhelming number of patients in the study, so if you look at table 2, the total number of patients in the overall sample was 16,080; right?  8,040 in the GLP-1 RA arm and 8,040 in the comparator.  The total number of patients in the semaglutide subgroup analysis was 14,442, that is approximately

90 percent of the total sample.

And then if you look at table 1, you're seeing that the number of patients that receive exenatide is 14.

The number of patients who received dulaglutide is 237.

The number of patients who received liraglutide is 481.

And patients who received multiple GLP-1 RAs, other than semaglutide, is 87.

So in the overall sample, 90 percent of the patients received GLP-1 RAs, the number of patients -- with semaglutide.  And the number of patients who received non-semaglutide GLP-1 RAs alone is only approximately 10 percent of the total sample.

Q.   Okay.  But in that 10 percent, with the other drugs, you actually found the opposite.  Instead of founding a decrease in liver outcomes you found an increase; correct?

A.   That is correct.

Q.   And I will read what -- the next sentence you say in the discussions.  Now, you don't say in the next sentence the numbers were small.  You say that:  "The paradoxical

increase in liver-related outcomes in the non-semaglutide group needs further evaluation; however, the greater benefit of semaglutide compared with others is consistent with the stronger GLP-1 R agonism on this drug and improved cardiovascular outcomes shown with this agent in clinical trials that have not been demonstrated with other GLP-1 RAs."

Do you see that?

A.    Yes, I do.

Q.    Okay.  So what you actually say in your paper is, first of all, this needs to be evaluated further; right?

A.    I mean --

Q.    Just answer my question.

A.    Counsel, again, my response is for that specific subgroup of non-semaglutide group of patients, which is highly underpowered, it needs to be explored further.

Q.    That's what I just said.

A.    No.  That's not what you said.  You just said does it need to be explored further.

And I'm saying it in context, it is specifically talking about the non-semaglutide subgroup patients.

Binu John, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Let me say the question better then.

A.    Okay.

Q.    You say:  "The paradoxical increase in liver-related outcomes in the non-semaglutide group needs to be further evaluated."

It's the first thing you say; correct?

A.    Agree.

Q.    And then you say it may -- the difference that you observed -- may be due to the fact that GLP-1 is a stronger GLP-1R agonist and has shown improved CV outcomes that have not been shown with the other GLP-1s in this study; correct?

A.    Yes.

Q.    So you're acknowledging in that statement, aren't you, Doctor, that there are actually substantial differences in the activity and eff- -- efficacy of these different GLP-1 medications, aren't you?

MR. HONNOLD:  Object to the form. It's overbroad.

A.    I believe that sentence has to be put in context with the previous sentence.

So there are two things here that are happening.  One is, it's a highly underpowered subgroup analysis; right?  And it needs to be further evaluated because it's very hard to draw firm conclusions.

It is possible that one of the reasons that could be, may be the association of semaglutide with cardiovascular outcomes, which at the time, at the best of our knowledge, was not shown with the other medications.  It doesn't mean that it may not exist.  It was not shown with that.  It's likely possibly that the studies were not even done.

But we do know that there were studies done that looked at semaglutide with cardiovascular outcomes, so at that point you just hypothesizing that it could be one of these things.

It could be that it's underpowered, it could be that it needs further evaluation, it could be that semaglutide subgroup was the one which had adequate numbers to show that effect.  And it's hard to make firm conclusions on a very small number of patients within that

whole study.

Q.   And it could be that semaglutide's effect is different from that of the other drugs; right?

A.   It is possible.  But also it is -- it is also possible that they may not.

Q.   You don't know?

A.   In this situation we don't know.

Q.   Okay.  Have you done any further analysis of this since 2025?

A.   So since then we are planning a randomized controlled trial examining this. But, again, at this point I cannot divulge any information because it's part of a grant application and it's confidential.

Q.   It hasn't been completed yet; correct?

A.   That is correct.

Q.   So you don't know what that trial is going to show if you continue to do it; correct?

A.   At this point I do not.

Q.   Do you know if you're going to have a single GLP-1 arm or a multiple arm --

A.   I cannot divulge that, Counsel.

Q.    Figured you'd say that.

Okay.  Let's go to page 2 of your publication document.  There's a lot of good stuff in here.  Nice paper.

The section titled Covariates, exposures, and outcomes, bottom right-hand corner.

A.    Oh, yes.

Q.    If you look at the second paragraph, you write:  "The primary outcome was composite liver-related outcomes, including HCC, hepatic decompensation or LRD."

Do you see that?

A.    Yes, I do.

Q.    You go on to say:  "Patients who required liver transplantation were censored at the time of transplant."

Do you see that also?

(Stenographer clarification.)

BY MR. PRZYMUSINSKI:

Q.    "Patients who required liver transplantation were censored at the time of transplant."

Do you see that?

A.    Yes, I do.

Bingham, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    And you go on to say:  "HCC diagnosis, hepatic decompensation, and LRD were identified based on ICD 9/10 codes which have been extensively validated and shown to have a high positive predictive value."

Do you see that?

A.    Yes, I do.

Q.    So actually what you're saying there, I think, Doctor, the ICD 9/10 codes you used to identify the outcome for -- in part to identify the outcomes of hepatocellular carcinoma, decompensation liver-related disease, were codes that had been studied, validated, and shown to be highly specific for identifying those outcomes; correct?

A.    That is correct.

Q.    Why is that important?

A.    So validation of ICD-9 and 10 codes may not be done in all settings, but in situations -- in some situations where it's done, it reassures other investigators that the ICD codes are representative of the outcome. But, again, it has to be looked at in the context.

So, for example, if there's a

certain ICD 9/10 code that is very highly likely to be associated with the actual outcome, it does not have to be validated.

But, for example, in this situation, one of the codes that was used was hepatocellular carcinoma. And hepatocellular carcinoma sometimes we find can be miscoded when patients have metastatic cancer; so they have cancer from another site that then goes to the liver, we sometimes find that patient's miscoded. And therefore, in this situation, it is important that this was validated.

Additionally, when we looked at liver-related death, liver-related death is a very -- normally when we look at cause of death, we look at the National Death Index and examine the primary cause of death. But that does not tell us if it's liver related or not.

So you have to look at -- I'm sorry. I apologize.

You have to look at that in context and you have to go through individual ICD codes to see what is liver related and what is not.

So validation is useful in some settings, especially when there's confusion or

Binu Jose, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

a possibility that's misclassification based on that situation.

And in this case, hepatocellular carcinoma was a diagnosis where there could be misclassification.  And similarly liver-related death needed to be validated because there is no ICD code for liver-related death.  It has to be something that is derived based on other ICD 9/10 codes.

Q.    That's a long explanation, but let's get some basics out.

You, in your publication, make a point of pointing out that the ICD 9/10 codes were validated and had a strong positive predictive value for the outcomes in interest; correct?

A.    In my paper, I did.

Q.    Okay.  And what's showing that ICD 9/10 codes have a strong positive predictive value means is reassuring the readers, other scientists, other physicians, whoever that may be that they, when you look at those ICD 9/10 codes and you use them to identify outcomes, you are likely to be identifying really hepatocellular carcinoma or liver-related death

as opposed to something else; correct?

A.    That's correct.

Q.    It reassures them that you're not introducing errors in outcome identification; correct?

A.    In this case, yes.

Q.    And errors in outcome identification can bias a study; correct?

A.    That is correct.

Q.    All right.  Very good.

Let's move on.  You can put that aside.

Doctor, are you familiar with a concept of a hierarchy of scientific evidence?

A.    In general, yes.

Q.    Okay.  Is that something you apply or use in your clinical research practice?

A.    Yes, I do.

Q.    Okay.  Is that something that -- I don't know to what extent you teach, but is that something you might teach residents or fellows in the context of an evidence-based medicine discussion?

A.    Yeah.  So I am involved in teaching medical students, medical residents, and

fellows both at the University of Miami and FIU. And so this is something that I would potentially teach them.

Q. If you look at page 22 of your report, Doctor.

A. I am.

Q. You have a selection on a study called Alfehaid, A-l-f-e-h-a-i-d.

A. That is correct.

Q. And underneath that you have a selection on Background, and then one Study Design and Methods.

Do you see that?

A. Yes, I do.

Q. In the second paragraph under Study Design and Methods, the second sentence of that paragraph, you wrote: "A randomized controlled trial randomly assigns participants to receive either the treatment or placebo and is considered the gold standard for evaluating interventions."

Do you see that?

A. I do see that.

Q. Is that an accurate statement?

A. So I want to put that in context,

just want to make sure.

A randomized controlled trial is the gold standard if you decide on a primary outcome and then your goal is to establish whether that primary outcome is related to this -- is caused by the drug or is decreased by the drug. Yes, for that primary outcome, it is the gold standard.

Q. Okay. What are some advantages of randomized controlled trials when compared to observational studies?

A. A randomized controlled trial generally is you have two groups, oftentimes. You have the active drug you are examining, and then you have a comparator, which is a placebo. These are patients who are not on the drug. They are randomly allocated. So in other words, patients who agree to participate in a trial, first of all, it's prospective, which means you do it -- you plan the study, and you do it from the time you plan it, unlike some of the observational which are retrospective -- which may be retrospective.

And second, once you have a participant who signs up for the clinical

Binu John, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

trial, you randomize them into either the drug or a placebo, and then there are very clear protocols on -- looking at what your primary outcome is.  And oftentimes there might be a primary outcome, possibly a secondary outcome.

You predefine how long the patients are followed, and then you -- oftentimes they may or may not be blinded.  In other words, the participants may know they're on the drug, oftentimes they do not know whether they're on the drug or the placebo.  And investigators may or may not know they're on the drug or the placebo.  And they are followed prospectively and the outcome of interest is examined.

Q.    One of the advantages of randomization, right, is that it mitigates the risk of confounding it; correct?

A.    That is one of the advantages.

Q.    Another advantage of RCTs, at least well-designed ones, right, are that you have pretty accurate exposure ascertainment; correct?

A.    You have pretty good primary outcome exposure ascertainment -- exposure ascertainment, yes.  Yes.  Yes.  Absolutely.

Q.    And one of the other advantages of well-designed clinical trials is you have regular follow-up with patients; correct? Patients are coming in for visits or being seen, you're having lab work done, all that kind of stuff; correct?

A.    That is correct.

Q.    So in RCTs you actually may have more frequent, more regular contact between patients in the study and their physicians than you would in the real world; correct?

A.    That is correct.

Q.    Okay.  So, in fact, your chances of identifying adverse events, if they occur, may actually be higher in RCT in the sense that you are more frequently seeing your patient and have an opportunity to evaluate them for any untoward effects?

A.    I disagree, Counsel.

Q.    You disagree.  Okay.  We'll come back to that.

A.    Yes.

Q.    Okay.  Let me ask you one more question about RCTs.

Would you agree with me that for any

individual RCT -- talking about any individual study -- in order to evaluate its specific strengths and weaknesses, you would have to review the protocol and the results?

A.    Could you repeat that, please?

Q.    Sure.

Would you agree with me that for any individual randomized controlled clinical trial, in order to evaluate the specific strengths and weaknesses, you have to review the protocol and the results?

MR. HONNOLD:  Object to the form. It's overbroad.

You can answer.

A.    I am not sure I completely agree with that because I don't have to read every word of the protocol to evaluate the -- the randomized controlled trial.  In general I need to know that the principles of randomization are upheld, I need to know that some of the principles we evaluate these studies are upheld.

So in answer to your question, if I have the information that I'm looking for, I may not have to read the entire, but definitely

I would need to know the results.

BY MR. PRZYMUSINSKI:

    Q.    We need to know the results.  Right.

But in order to know whether the design of the study, what its strengths and weaknesses are, you would need to know things like how is exposure ascertained, how often are patients seen, how are primary and secondary outcomes collected, are they validated in some way, is there some sort of, you know, review committee.  You'd want to know how adverse events are collected.  You'd want to know how they're reported.  You'd want to know how frequently the patients are being followed.  You'd want to know how long they're being followed.  All those factors, right, and probably many others, would inform your analysis of how good the study is.

It doesn't mean you have to read every word of the protocol, but you would need that information to really be truly able to opine on how strong or weak a particular RCT is; correct?

    MR. HONNOLD:  Object to the form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

It's compound.

You can answer.

A.    I think it depends on the individual trial.  If the information you're looking for is on the body of the paper, you may not have to read the full protocol.  If the information you're looking for is not in the body of the report and there are specific concerns about it, you may have to consult the protocol.  So I don't think I can make a broad general statement like that, Counsel.

BY MR. PRZYMUSINSKI:

Q.    That's a really good point.

But at minimum you have to be able to read the manuscript, the publication; right?

A.    Yes.

Q.    Okay.  All right.

A.    Again, I would put that in context.  To get a full understanding of the randomized controlled trial, I would need to.  I can get a fairly good understanding from a summary of the study.  I might be able to get a fairly -- a good understanding from the abstract.  It all depends on what the concerns are with the specific RCT.  But each of that gives

information to evaluate the randomized controlled trial.  The abstract will give you information, other paperwork, maybe a summary of the relevant aspects would.  Sometimes you may have to look at the protocol.  So it all depends on the context.

Q.    So minimally you would need an abstract, and maximum you need a protocol, and somewhere in there, depending on the study, is where you would stop?

A.    Yes.

Q.    Okay.  Got it.

Now, there's a document that's produced for federal judges when they look at scientific evidence that's put out by the Federal Judicial Center, and it's got a single statement that I'm going to read to you about the hierarchy of evidence.

And all I'm interested in is if you agree, disagree, have a modification on it, just tell me whatever it is.  Okay?

What they write in that document:

"When ordered from strongest to weakest, a systematic review of randomized trials, or meta-analysis, is at the top,

followed by single randomized trials, systematic reviews of observational studies, single observational studies, physiological studies, and unsystematic clinical observations."

            Agree or disagree?

        A.    So I have to put that in context.

        Q.    Sure.

        A.    So if that randomized controlled trial or the meta-analysis of randomized controlled trial is specifically looking at your outcome of interest, so the primary endpoint of that study was the outcome you're looking at, then, yes, the meta-analysis -- the hierarchy of meta-analysis of all studies, of all randomized controlled trials that are looking at that specific outcome of interest is the highest weighted evidence, followed by -- followed by individual randomized controlled trial.

            And, again, I did not follow your entire sentence, but it sounds like many -- it follows the general principle of hierarchy.

        Q.    Do you agree that --

            MR. HONNOLD:  Lucas, can I, just for

reference, is that from the Manual on Scientific Evidence?

MR. PRZYMUSINSKI: Fourth edition.

MR. HONNOLD: Fourth. Okay. Thank you.

BY MR. PRZYMUSINSKI:

Q. Just for -- so at the bottom of that, the two last things they list are physiological studies and unsystematic clinical observations.

Do you generally agree that those types of studies fall at the lower end of the hierarchy?

A. Again, it's a general statement. But there might be specific cases where a specific case report might have higher relevance. There might be specific cases where physiological studies might have higher relevance.

Q. But generally speaking?

A. Generally speaking it is true, again, in that caveat that I mentioned before.

MR. PRZYMUSINSKI: All right. How much time are we in on this session?

THE VIDEOGRAPHER: I was going to

ask for a media change.

MR. PRZYMUSINSKI:  Okay.  Well, let's take a break then.

THE VIDEOGRAPHER:  This ends Media 1.  We're off the record.  The time is 11:11 a.m.

(A brief recess was taken from 11:11 a.m. to 11:30 a.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 11:30 a.m.

BY MR. PRZYMUSINSKI:

Q.    Welcome back, Doctor.

A.    Thank you.

Q.    Let's go back to your report and go with me to page 14.

A.    Okay.

Q.    Let me know when you're there.

A.    I'm there, Counsel.

Q.    Okay.  The second full paragraph begins "because these."

Do you see that?

A.    Yes, Counsel.

Q.    Okay.  So what you wrote on page 14:

"Because these drugs have the same mechanism of action that can result in

intestinal dysmotility, I consider the literature regarding GLP-RAs" -- I guess it should be GLP-1 RAs together?

A. Yes.

Q. Okay. And you say: "This decision is supported by studies that compared the effects of each on gastrointestinal adverse events, including bowel obstruction in some, and found similar rates."

Do you see that?

A. Yes, I do.

Q. Okay. "For these reasons, I consider all GLP-1 receptor agonists together as a class in this report."

Do you see that?

A. Yes, I do.

Q. And that's accurate, that's what you did; right?

A. That's what I did.

Q. Okay. All right.

Now, let me ask you a few questions because I want to make sure I know what you did and did not do.

So as part of your review and analysis, did you perform any analysis specific

to any individual medication?

A.    I considered the data on subgroup analysis, but I did not do as part of my report as an individual medication because I considered them as a class.

Q.    Yeah.  And I understand that you did, but I -- what you actually did, so let me make sure I understand.

So you did a Bradford Hill analysis in your report; right?  And that Bradford Hill analysis is as a class; correct?

A.    That is correct.

Q.    Did you do a specific individual Bradford Hill analysis based on individualized data for any of the specific medications?

A.    So thank you, Counsel, for explaining.  I did not.

Q.    Okay.  All right.

Did you specifically look to see whether there was evidence of a valid association for any individual medication as opposed to the class?

A.    Like I mentioned, I considered the medications as a class and I looked at it as a class.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    So is the answer no?

A.    The answer is no.

Q.    Okay.  Now, given that I think I'm going to know what the answers are, but I just want to make sure to give you an opportunity.

Did you make an effort to compare the relative risk of ileus or bowel obstruction among the different GLP-1 RAs at issue?

A.    So I -- any study that did a subgroup analysis of the medication was information I considered.  However, in many of those cases -- well, first of all, it is -- we -- I believe it's a class effect.  But second, in many of those cases individual medications were underpowered to examine outcomes.

Q.    Okay.  And that's fine.  I just want to understand.  Did you formally do a comparison asking the question of how does the risk for semaglutide compare to risk for liraglutide or any other medication?

A.    I did not outside of the data that was already provided, which I cite in my report.

Q.    Okay.  And sitting here today, could

you tell me to a reasonable degree of would you say medical and scientific certainty whether the magnitude of risk is the same for each of the drugs at issue?

A.    I believe that the magnitude of risk is similar across the medication class.

Q.    Similar and the same are not the same.

A.    When you look at epidemiology, Counsel, I can't say the risk is identical for each of the drugs.  There will be subtle differences between it.

But I believe that as a class the medications cause GI functional obstruction from GLP-1 RAs as a class.

Q.    So I understand the class opinion. We will talk about that, I promise.  But I'm asking now individually.

So you told me you did not formally evaluate or compare the relative risk for individual drugs; correct?

A.    That is correct.

Q.    If you didn't formally evaluate the risk for individual drugs, how can you know to a reasonable degree of medical certainty that

the risk for semaglutide is similar to the risk

for tirzepatide?

      A.    Again, based on the fact that I

examined them as a class, and I see no reason

that I believe any one specific GLP-1 RA would

differ in any way.  Again, based on the fact

these are medications that work on the same

receptor, they work on the receptors at the

same sites, they work in exactly -- the studies

that I have examined, the way they work, the

mechanism would be very similar; and therefore

I considered them as a class.  I did not look

at individual drugs as separate outcomes.

      Q.    And that's an assumption; right?

The assumption is that because of the things

you said, the effect would be similar, but you

didn't actually do an analysis to evaluate

whether the risk for these individual

medications is the same, different, or

otherwise; correct?

          MR. HONNOLD:  Object to form,

compound.

          You can answer.

      A.    Like I mentioned, Counsel, any time

a study examined the effect by subgroup, I

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

looked at that and I considered that.  There were times when it did not look at subgroup. And in those situations I looked at them as a class, but overall I considered GLP-1 RAs as a class in this analysis.  I did not compare each individual drug and association with obstruction and ileus against another one.

Q.    All right.  So although you can assume or you make the assumption that they are similar, you did not do the actual comparison; correct?

MR. HONNOLD:  Object, vague.

Go ahead.

A.    I did not do the actual comparison.

BY MR. PRZYMUSINSKI:

Q.    Now, do you know whether the magnitude of the risk is affected by the specific dose of the individual medications, meaning, what the magnitude of risk is, let's say for semaglutide at a dose of 1 mg versus what the risk is for semaglutide at a dose of 2.4 mg?

A.    The studies that I examined did not look at the dose response here in the situation.

Binu Jacob, MD
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    So you don't know based on the data you looked at, you don't have information to offer an opinion as to how dose affects the risk of the clinical outcome of ileus or --

A.    No.  That is incorrect, Counsel. What I meant was -- what I said was in the studies, the epidemiological studies that I looked at, they did not examine the dose with outcomes.

But there is data looking at dose and how these medications work with several animal models with basic science data showing there is a dose response.  But looking purely at the epidemiological studies that we did, there was no study that looked at those --

Q.    The animal studies -- and we'll look at those, you talk about the mechanistic studies -- they don't look at the outcome of ileus or intestinal obstruction; right?

A.    They don't look at it primarily because that's not how they're designed and that's not what they're examined for.  It is these studies are meant to look at the mechanism of medications to see if there's varying degrees of dysmotility with weighting

drugs, and ileus is a part of that spectrum. So if there's -- if there's delayed motility and then there's worse delay in motility and then there's ileus, it is all part of that spectrum.

Q.    Okay.  Which of the animal studies you cited compared the motility effects of different drugs, GLP-1 drugs?

A.    Can I look at my report?

Q.    We will get there later.  It's okay.

Okay.  Let me ask you this question.

On epidemiological studies you talked about, okay -- are you with me -- do you know how many of those studies specifically provide a risk assessment for either ileus or bowel obstruction for semaglutide?

A.    I would have to look at individual studies to say that.  I can't -- you know, I -- I can't remember it from my memory.

Q.    Okay.  We will look at them later, I promise.  I'm just asking what you know right now.

Sitting here can you tell me whether any of these studies that you looked at, epidemiological studies that support a

statistically significant association for

semaglutides specifically?

          A.    Again, I cannot look at it -- unless

I look at the studies, I cannot tell you.

          Q.    Same question for statistically

significant decreased risk, same response?

                (Stenographer clarification.)

BY MR. PRZYMUSINSKI:

          Q.    Yeah.  That's terrible.

                Would that response also apply if I

asked the question for semaglutide which

studies reported or how many a significantly

decreased risk?

          A.    Correct.  I cannot -- if the

answer -- if the question is can I recall from

my memory which of those studies did, I cannot.

          Q.    Okay.  Would your answer be the same

if I instead of asking about semaglutide, let's

say liraglutide or dulaglutide or tirzepatide?

          A.    My answer would be without looking

at my report or the studies, I would not be

able to tell you which of those studies looked

at these.

          Q.    Okay.  Now, as part of your review

did you look at the results of any individual

Binder, John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

randomized controlled clinical trials?

Q.    A.    I might have considered it, but mostly I looked at randomized controlled -- meta-analysis of randomized controlled trials. I don't recall if I looked at each of these drugs specifically individually.

Q.    Well, just right now I just ask do you recall looking at individual randomized controlled trials specifically?

A.    I don't recall that.

Q.    Okay.  And so I'd assume you also don't know if you looked at any individual RCTs involving semaglutide specifically?

A.    Can I look at my materials considered list?

Q.    Absolutely.

A.    Thank you, Counsel.

Q.    But if you're going to take a long time, let's just pause that and move on.

A.    No.  I would just look at the -- you know, at the meta just to see if there's an RCT that I considered.

Counsel, I did not look at individual randomized controlled trials.

Q.    And is that true regardless of

whether I say of semaglutide or dulaglutide or liraglutide or tirzepatide?

A.    That is correct.

Q.    It applies across the board?

A.    That is correct.

Q.    All right.  Okay.

I'm assuming the answer is going to be no, but I'm going to ask it anyway.  Do you know how many randomized controlled clinical trials have been done with semaglutide to date?

A.    I would not know the answer to that, Counsel.

Q.    Any idea how many patients were enrolled in those trials?

A.    Again, I would not have an answer to that.  I do not recall.  Right off the top of my head, I cannot.

Q.    And you didn't review the trials; correct?

A.    I did the review of the meta-analysis of the randomized controlled trials.

Q.    But we will agree the meta-analysis does not include every single trial of semaglutide ever conducted; correct?

Binu John, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   That is correct.

Q.   Okay.  Do you know how many patient -- years of -- patient years of exposure to semaglutide have been collected in completed clinical trials?

A.   I cannot say that, Counsel, without checking the dates.

Q.   I understand.

Sitting here right now do you know if any individual randomized controlled trial of semaglutide found an increased risk of either ileus or bowel obstruction?

A.   So I want to clarify.  I want to clarify that a little bit.

I'm not aware of any randomized controlled trial of semaglutide that was conducted with a primary outcome of ileus or bowel obstruction.  I'm only aware of randomized controlled trials of semaglutide done for indications of like diabetes, obesity, and MASH.  And so I'm not aware there was any study of semaglutide looking outcomes of bowel obstruction or ileus.

Q.   You understand that when clinical trials are conducted safety data is collected?

A.    I understand that.

Q.    And that's collected both in the treatment group and the placebo group?

A.    I understand that.

Q.    Okay.  And so even if that's not the primary outcome, you can certainly look at the incidence rates of different adverse events, including for ileus or intestinal obstruction within the context of any clinical trial conducted of semaglutide?

A.    I disagree, Counsel.  And I'll tell you why.

So first of all, there are major differences between how a population of a randomized controlled trial and the real world evidence of observational studies.

Randomized controlled trials are the healthiest of patients.  So I do randomized controlled trials --

Q.    This has nothing to do -- I'm sorry, I don't mean to cut you off.

A.    Yes.

Q.    But I asked whether you can look at the incidence of adverse events.  I didn't ask whether the populations were different.

A.    Yes.

Q.    It's a simple, narrow question.

A.    Let me -- let me answer that.

For example, if you are doing a randomized controlled trial of a GLP-1 RA with placebo, looking at the primary outcome of weight loss, these patients are like you mentioned, Counsel, they're very closely followed in randomized controlled trials.  They are not like real-world evidence.

So if a patient starts to develop nausea and vomiting, this clinical trial is not going to say, oh, wait, keep taking the medication because I want to see what the incidence of ileus is.  Hold on, don't stop because we want to see how many patients get ileus.  Hold on, I want to see how many patients get bowel obstruction.

What happens -- and I do clinical trials -- as soon as the patient reports an early symptom of a side effect, they're reporting that right away to me, or to my coordinator, and we tell them, listen, go to the emergency room or to stop taking the medication or we treat them symptomatically or

prophylactically.  So we anticipate side effects early when we do clinical trials.

Q.    Let me make sure we're talking about the same thing.  I understand what you're saying, which is that because of the nature of the followup, a patient may be less likely to experience ileus, intestinal obstruction.

My question simply was:  You understand that if you look at it -- results from a clinical trial, you can look at the number of adverse events that were reported as ileus, intestinal obstruction by the investigators in the placebo arm and compare that to the number of events in the treatment arm; yes or no?

MR. HONNOLD:  Object to form.  No -- no foundation as to how those studies actually look at that data and not how it is collected or followup of hospital records -- that's just for the record.

You can answer.

A.    Again, it all depends on the individual trial.  There are many randomized controlled trials that I evaluated as part of the meta-analysis where ileus or obstruction

was not even one of the factors that was reported on the clinical trial. So in the meta-analysis --

BY MR. PRZYMUSINSKI:

Q. I thought you didn't look at the individual trials.

A. No. In the meta-analysis only a small number of trials reported the adverse event of ileus or obstruction, the other studies don't even discuss it.

Q. Do you know what a clinical study report is?

A. I'm -- I'm not certain.

Q. Clinical study report is an internal document that the company prepares when it does a sponsored trial and that it provides to the FDA that is the full analysis data from the clinical trial.

Does that make sense?

A. That -- that makes sense.

Q. Okay. Are you aware that those clinical study reports were produced to plaintiffs in this litigation --

A. Again --

Q. -- for every clinical trial

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

conducted with semaglutide and liraglutide?

A.    I'm not aware.

Q.    Did you look at those?

A.    Again, I don't -- I don't know exactly what that report looks like.  So if it is one of the materials I considered, I did not identify it by name, so -- so I can't answer the question.

Q.    If it's not on the list you did not look at it?

A.    That is correct.

Q.    Now, you're not going to tell me, right, that -- well, so let me back up and say this better.

You said one of the things that can happen in a clinical trial is a patient may be identified early with symptoms and be taken off the medication so they don't progress to ileus or intestinal obstruction; right?

A.    That is correct.

Q.    You're not saying though that across all the clinical trials that have been done with GLP-1 RAs, there have been no cases of ileus or intestinal obstruction reported by the study investigators and counted as adverse

events, are you?

A.    I am not saying that.

Q.    Okay.  So some patients do actually develop ileus or intestinal obstruction and are counted as adverse events in those clinical trials?

A.    I would say --

MR. HONNOLD:  Object to form.

Go ahead.

A.    I would say a small number.  And it will be a smaller number than patients in the real world because of this.

BY MR. PRZYMUSINSKI:

Q.    Yeah.  So but -- but there's obviously no reason that that effect would be differential, meaning that if it's a lower rate, it would be a lower rate in both the placebo and the -- correct?

A.    Actually that might not be correct. And the reason for that is, Counsel, you have to understand there's a lot of patient motivation when they're on a GLP-1 RA and they perceive that they're on a medication and they are losing weight.  So a patient in a randomized controlled trial who is receiving a

medication and has lost 40 pounds, compared to a patient in the placebo arm that's taking shots every week and has lost two pounds, they don't have the same motivation.

It's very clear to the patient, individual patient, in a very short amount of time, whether they're on the drug or whether they're on a placebo, and I would -- I would -- again, it all depends, but a patient who is on the medication may not want to come off the medication and may be willing to tolerate side effects greater than a patient who thinks they're on a placebo.

Q.    Fair to say that's speculation?

A.    I would say that's not speculation, that's my experience in clinical practice and doing clinical trials.

Q.    But not your experience because you've never actually done a clinical trial with GLP-1, have you?

A.    Not with GLP-1 RA, but with medications where patients know that -- I do clinical trials -- just for context, I do clinical trials of liver cancer.  And when we do those clinical trials and these are immune

checkpoint inhibitors, patients start taking these medications and the cancer gets dramatically better, they don't know what treatment arm they're assigned, but it's very clear to the patients they're on an immune checkpoint inhibitors.  And let me tell you, Counsel, they will tolerate a lot of side effects because they're perceiving that they are getting better.

So, yes, not in the specific case with a GLP-1 RA, but I have plenty of experience doing clinical trials and I don't see any reason why, as a general rule, patients who perceive or figure out that they're on the actual trial are more motivated than patients who think they're on a placebo to continue taking the medication.

Q.    Have you ever done a clinical trial, of all these clinical trials you have done, where the treatment arm is not a specific individual medication or combination therapy, but rather it's, we're going to treat our patients with one of a class of medications as the treatment arm?

A.    Can you repeat that, Counsel?

Q.     Sure.

MR. HONNOLD:  As a comparator, you mean?

MR. PRZYMUSINSKI:  Yeah.  As a treatment.

MR. HONNOLD:  Okay.

BY MR. PRZYMUSINSKI:

Q.     Let's say you're doing a clinical trial, right, you have a treatment -- let's -- placebo control; right?  You have a treatment arm, a placebo arm.  Have you ever seen a clinical trial, been involved in a clinical trial where the treatment arm, right, the thing you're trying to assess is not a specific medication or combination therapy in the context of maybe cancer, but is like these patients will receive one of the class of the GLP-1 RA medications or one of the class of the statin medications.

Have you ever seen that happen?

A.     No.  Well, not one of the class, but I have seen where patients are randomized to different combinations.

Q.     Sure.

A.     So, for example, on an immune

checkpoint inhibitor study, I have done a three-arm comparator, where one group is on a placebo or on a standard of care; a second arm is on a single checkpoint inhibitor; and the third arm is on a combination of two immune checkpoint inhibitors.

Q.   No one would ever do a clinical trial, right, where the treatment arm says patients will be randomized to treatment of one of a number of different GLP-1 RAs depending on which one they get assigned to; right?

A.   People do clinical trials comparing two different GLP-1 RAs, so you could have a trial where you are combining one GLP-1 RA against another.

Q.   Comparing?

A.   Comparing.

Q.   But not where one group -- one group compares a group -- is a mixture of different GLP-1s; right?

A.   That is correct.

Q.   You would never do that?

A.   Well, I don't -- I can't -- well, I can say for myself I probably would not do

that.  Again, it depends on the context and it depends on the drug.  But in my current practice that's not something I've done.

Q.    Let's go back to those randomized trials of semaglutide; right?

And accepting what you said about the fact that the number of events may be lower due to the way patients are being monitored, are you aware of any individualized randomized controlled trial of semaglutide that found an increase incidence of adverse events of ileus or intestinal obstruction?

A.    Like I mentioned, Counsel, I did not look at individual randomized clinical trials.

Q.    Do you know, Doctor, what the largest clinical trial of semaglutide ever was -- ever conducted was?

A.    Counsel, I wouldn't know that.

Q.    Have you heard of the Select trial?

A.    If I -- I can't recall off the top my head.

Q.    Okay.  Do you know how many patients were in that trial?

A.    Well, if I can't recall the trial, then I can't clearly recall the number of

patients.

Q.    Do you know how long the followup was on that trial?

A.    Again, Counsel, I said the same thing.  I can't recall the trial so I can't recall the followup.

Q.    And you don't really know what the trial study design was for that trial in terms of collecting information of GI adverse events, do you?

A.    Again, in the specific example that you quoted, I cannot tell you what it was.

Q.    Now, the questions I asked were about semaglutide.  And without wasting time, same answers if I said liraglutide instead of semaglutide?

MR. HONNOLD:  Hold on.  Let me just object.

MR. PRZYMUSINSKI:  Sure.

MR. HONNOLD:  Objection.  Confusion. Could you just make it a little more clear what you're saying there?  Sorry.

BY MR. PRZYMUSINSKI:

Q.    I asked you questions about whether you reviewed individual trials of semaglutide,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

whether you identified any trials of semaglutide where there was an increased risk or incidence of adverse events of ileus or intestinal obstruction. I asked you if you could tell me what the largest clinical trial was of semaglutide.

If I were to ask you those same three questions but I substituted liraglutide, would your answers be the same?

A. Correct, Counsel.

Q. What about if I said dulaglutide?

A. Again, it will be the same.

Q. And tirzepatide?

A. Yeah.

Q. All right. Doctor, now you did review some meta-analysis; correct?

A. I did. Correct.

Q. And I think there were two that you reviewed initially. One, I think, was a Chiang meta-analysis, and then another one was called Alfehaid, I believe.

Do you recall that?

A. Again, I would have to go into my materials considered to my report.

Q. Do you know, sitting here, whether

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

any of the meta-analyses of randomized controlled trials found a statistically significant increased risk of ileus or intestinal obstruction for semaglutide?

A.    Counsel, that's a very specific question.  I would have to look at the meta-analysis.

Q.    And we will look at them.

But sitting right here, don't recall one way or the other?

A.    Again, I can't say one way or the other without looking at the report.

Q.    Okay.  Very good.

All right.  Now, let's talk about your decision to consider, as you wrote in your report, all GLP-1 receptor agonists together as a class.  Okay?

Okay.  Sitting here right now, do you know how many GLP-1 RA medicines are approved for use in the United States by FDA?

A.    I believe it's in my report and -- I believe it's in my report, and if you allow me to refer, I can tell you the number of medications.

Q.    Do you have any idea off the top of

your head or no?

A.   Again, if you allow me to refer to my report, I can tell you.

Q.   It's not important.  Okay.

Will you agree with me on the following:  That each of those GLP-1 RA compounds that's approved -- or medications that's approved for use in the United States is a unique compound with its own chemical properties and clinical data?

A.   I agree.

Q.   Okay.  In your opinion, do all GLP- --

MR. HONNOLD:  Can I just do a late objection just to preserve the issue of clarification on Wegovy versus Ozempic and any distinction where it's different drug names, whether they're the same compound?

Did you ask your question in terms of drug or compound?

MR. PRZYMUSINSKI:  I actually didn't.  So it's fair enough.

So let me make sure --

MR. HONNOLD:  I don't mean to hold you up.

MR. PRZYMUSINSKI:  No, it's fine.

MR. HONNOLD:  But you know what I mean, those drugs are both --

BY MR. PRZYMUSINSKI:

Q.    So obviously semaglutide, there's different medications with semaglutide so it is the same compound, but setting aside that, like, semaglutide, liraglutide, exenatide, tirzepatide, dulaglutide, lixisenatide, those are all different chemical compounds with their own chemical properties and clinical data?

A.    I believe even among those trial -- even among those drugs -- for example, I believe exenatide might have different formulations.  And so there are differences between dosages and formulations, but if you look at the specific medication, they have the same structure, which is different from other medications with a different pharmacological name.

Q.    So there may be different formulations of -- like semaglutide may be used for obesity treatment under the name Wegovy and may have a different dosage, and that may have its own clinical data, but it's the same

molecule as is used in Ozempic, which is used for diabetes with different doses and its own clinical data; is that right?

A.    There are trials where they have its own data and situations where the data may be combined in different clinical trials.

MR. HONNOLD:  Did your question mean to combine delivery way too between SubQ and oral?

MR. PRZYMUSINSKI:  Just scratch that question.

MR. HONNOLD:  Do you know what I mean?

MR. PRZYMUSINSKI:  Yeah.  It doesn't matter.

MR. HONNOLD:  Okay.

MR. PRZYMUSINSKI:  You can strike that.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Now, in your opinion, Doctor, do all GLP-1 RA medicine have the same efficacy profile?

MR. HONNOLD:  I'm just going to object to the form.  It's vague and overbroad.

You can answer.

A.   I would think there may be differences, subtle differences between the medications.  Again, it all depends on the context.  For some indications, they may behave similar; for other indications, they may behave differently.

BY MR. PRZYMUSINSKI:

Q.   Okay.  Let's drill down on that.

Is the weight loss the same with liraglutide as it is with semaglutide?

A.   Again, I have not examined the weight loss data for these medications, and I don't treat patients for obesity.

Q.   So same answer if I said comparing exenatide to semaglutide?

A.   Again, I have not looked at specific clinical trials for exenatide and semaglutide for weight loss.

Q.   So -- and you couldn't tell me whether the weight loss was the same for exenatide and tirzepatide, could you?

A.   I have a general idea that tirzepatide might have a greater weight loss, but I can't tell you what the degree of weight

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

loss was.  I do not know if there was a head-to-head comparison of the trial.

So in general I know the weight loss may not be the same, but I cannot tell you what the degree was and what the difference was.

Q.   So you can't tell me how much more on average patients on tirzepatide lose in terms of weight in clinical trials versus those on exenatide?

A.   Counsel, I believe there's differences from clinical trial to clinical trial, and you cannot generalize that based on the patient population, based on the indication.  So --

Q.   The weight loss with these drugs is different; right?

A.   The weight loss, I believe is different.  Again, I cannot recall.  I did not look specifically at the weight loss for this deposition.

MR. HONNOLD:  Let me just interpose a late objection.

Weight loss, when you were using it, you just mean the amount of weight lost?

MR. PRZYMUSINSKI:  Yes.

Binu John, MD                   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. HONNOLD:  Not whether it's fat or muscle or anything like that, you just mean amount; right?  Percentage?  Okay.

MR. PRZYMUSINSKI:  Sorry.

MR. HONNOLD:  Okay.

BY MR. PRZYMUSINSKI:

Q.    Let's talk about the diabetes side. Is the effect on hemoglobin A1c the same for liraglutide as it is with semaglutide?

A.    Again, Counsel, it was outside the scope of my mandate to look at the effect of these medications on diabetes.  I'm not an endocrinologist and that is not something I am familiar with the data.

Q.    And you don't prescribe the medications either for diabetes or for obesity; right?

A.    That is correct.

Q.    Correct.

So, again, in terms of A1c effects, you couldn't tell me how exenatide compares to semaglutide?

A.    Again, like I mentioned before, this was not within my scope so I did not look at this data.

Q.    Same for exenatide and tirzepatide?

A.    Like I mentioned, Counsel, that was not within my scope and I did not look at that.

Q.    All right.  Now, I think you mentioned the concept of half-life before; right?

A.    I can't -- I don't recall.

Q.    Okay.  You know what half-life is?

A.    I do know what half-life is.

Q.    So half-life is the amount of time, right, it takes after a medication is taken before half of that medication is out of the system; right?  On average.

A.    On average.  Half-life is the time for the medication -- for the levels to drop down by half.

Q.    Okay.  And you're aware that, generally speaking, somewhere between four and five half-lives is the time it takes for a medication to be considered completely out of the system; right?

A.    Well, with one half-life, 50 percent of the medication are out of the system.  With two half-lives, it's 25 percent.  And with three half-lives, there's 12.5 percent.  With

four half-lives, it's 6.25 percent.  With five half-lives, it's 3.125 percent.  So it all depends on what you would qualify as being out of the system.  Even with six half-lives, there's 1.575 percent that's still in the system.

Q.    Fair enough.  That's a better answer than the question I gave you.  Thank you.

Do all GLP-1 RA medications have the same half-life?

A.    I don't believe they do.

Q.    Okay.  What is the half-life of exenatide?

A.    Again, that was not within my scope here so I did not examine that.

Q.    What is the half-life of liraglutide?

A.    Again, that was not within my scope here and I did not look at that.

Q.    What's the half-life of semaglutide?

A.    Again, I do not know the half-life off the top of my head.

Q.    What's the half-life of tirzepatide?

A.    The same thing, I do not know the half-life.  Again, if you're asking me a memory

test of what the half-life is, I wouldn't be able to tell you that.

Q.    Well, let's not do a memory test.

Can you tell me which one has the longest half-life?

A.    I believe it might be tirzepatide, but I am not positive.

Q.    Which has the shortest?

A.    Again, I am not positive.  I could look at my report and see if it's there and I can explain.

Q.    Okay.  But that's not something you focused on for your opinions?

A.    I have a general idea that the medications may have different half-life, and I do have a general idea that the half-life of many of these GLP-1 RAs -- especially the long acting --

(Momentary Zoom technology interruption.)

A.    -- that many of the GLP-1 RAs have a lot -- half-life of several days.  So that is something I'm aware of.

BY MR. PRZYMUSINSKI:

Q.    You know that some GLP-1 RAs are

considered short-acting, while some are considered long-acting?

A. Yes, I am aware.

(Momentary Zoom technology interruption.)

MR. PRZYMUSINSKI: Why don't we just go off for a second?

THE VIDEOGRAPHER: We're going off the record. The time is 12:03 p.m.

(A brief recess was taken from 12:03 p.m. to 12:04 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:04 p.m.

BY MR. PRZYMUSINSKI:

Q. Thank you. Sorry about that interruption.

We were talking about short-acting versus long-acting GLP-1s.

Do you recall that?

A. Yes, I do.

Q. Do you know which GLP-1 RAs are considered short-acting?

A. I believe that exenatide and liraglutide may be considered short-acting.

Q. All right. And which ones are

considered long-acting?

A.    I believe dulaglutide, semaglutide. Dulaglutide, d-u-l-a-g-l-u-t-i-d-e. Semaglutide is s-e-m-a-g-l-u-t-i-d-e. And tirzepatide is t-i-r-z-e-p-a-t-i-d-e.

So I believe these three are long-acting.

And then for the short-acting, exenatide is e-x-a-n-e-t-i-d-e. And liraglutide is l-i-r-a-g-l-u-t-i-d-e.

So those are short-acting; the other three are long-acting.

Q.    Okay.  Are there differences in the safety and efficacy profile of short-acting versus long-acting GLP-1 RAs?

A.    Again, Counsel, that was not within my scope outside of the specific outcome we are looking at.

Q.    Do you know if there's differences in terms of impact on gastric emptying between short- and long-acting GLP-1 RAs?

A.    Counsel, that was not within my scope here, gastric emptying, and so I did not look at that.

Q.    Gastric emptying is not part of GI

Binu John, MD          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

motility?

A.   It's part of GI motility, but by association between GLP-1 RAs and gastric emptying in relation to this and whether individual drugs work differently, I did not examine that.

Q.   Okay.  Do you know whether short-acting or long-acting GLP-1 RAs have different effects in terms of magnitude of effect on intestinal motility?

A.   Could you repeat that question, Counsel?

Q.   Sure.

Do you know whether short-acting versus long-acting GLP-1 RAs have differences in effect on intestinal motility in terms of magnitude of the effect?

A.   I'm so sorry.  Can you -- again, I need you to say that one more time.  Can you --

Q.   Yeah.

A.   Yes.

Q.   Do you know whether short-acting versus long-acting GLP-1 RAs have different effects of -- on intestinal motility in terms of the magnitude of the effect?

A.    I'm not aware of any study that compared the magnitude of effect in intestinal motility.

Q.    So you don't know?

A.    I do not know.

Q.    Okay.  All right.

Setting aside short- versus long-acting and just talking generally about GLP-1 RAs, do you know whether the magnitude of effect on intestinal motility is the same for each individual GLP-1 RA drug that you're considering in your report?

A.    In terms of the magnitude of intestinal dysmotility with each of these medications, I'm not aware of a direct comparison of these.

Q.    You don't know one way or the other?

A.    I do not know one way or the other.

Q.    And I'm assuming based on what you just said, but let me confirm, you're not aware of any head-to-head studies comparing the effect of one GLP-1 versus another on the magnitude of impact on intestinal motility?

A.    In several epidemiological studies that I examined authors tried to do subgroup

analysis by separate medications, but if you're looking at randomized controlled trials that, for example, did a head-to-head comparison of different GLP-1 RAs on its effect on GI motility, there are none to the best of my knowledge.

Q.   Well, and I appreciate that, but that's -- I'm asking a little bit different question.  I wasn't asking for randomized trials.  I mean, it could be an animal model, it could be anything; right?  And I'm not asking about in terms of ileus or intestinal obstruction, I'm asking about how much, if at all, the different GLP-1 RAs affect intestinal motility, and in that context whether you're aware of any studies that compared one GLP-1 to another to see how their effect on motility were the same or different?

MR. HONNOLD:  Just I'm going to object to the form.  I think it's compound.

But you can answer.

A.   So thank you, Counsel.

So I would want to refer to the animal studies that I put in my report because it is possible that there might be studies

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

there.  I cannot recall.  But if you let me look at it I can answer that question by referring to it.

Q.    I will make you a promise we will go through those studies later, so let's put a pin in it.  Okay?

A.    Okay.

Q.    Fair enough?

A.    Very good.

Q.    All right.  Is it possible, Doctor, that some of the GLP-1 RA medication that you considered as part of your report may actually have a favorable effect on intestinal motility?

A.    Could you repeat that again?

Q.    Sure.

Is it possible that some of the GLP-1 RA medicines that you looked at in the context of your report may actually have a favorable or positive effect on intestinal motility?

MR. HONNOLD:  Object to the form.

A.    So I did see some studies in the literature where they found a decrease association of GI outcomes in patients on GLP-1 RAs with other comparators, but those were

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

deeply flawed and I did not -- and, again, I looked at the totality of evidence when I looked at it.

And some of the trials -- some of the studies were better conducted than others. Several of the studies that you described where GLP-1 RAs were, quote/unquote, protective were deeply flawed.

Again, I looked at -- I considered every single study, but I do not believe that after considering the totality of the evidence of these studies, I did not believe that any of them substantiate the point that GLP-1 RAs are associated with protection against GI ileus or obstruction.

BY MR. PRZYMUSINSKI:

Q. It's going to make us do a lot better if you listen to my question.

I wasn't asking about clinical trials, I wasn't asking about epidemiological studies looking at ileus or intestinal obstruction, and I wasn't even suggesting or talking about any specific study showing anything.

I asked the question do you -- is it

possible that one or more of the GLP-1 RA medicines that you discuss in your report may have a favorable, meaning a positive, impact on the speed of intestinal motility?

MR. HONNOLD:  I'm just going to object to the form.  It's argumentative. Any such conclusion would have to be based on data so you are arguing with him.

MR. PRZYMUSINSKI:  I'm not arguing data, I'm just -- his question was -- the question wasn't asking about ileus and intestinal obstruction at any point.

BY MR. PRZYMUSINSKI:

Q.    I'm talking about the speed of motility through the bowel, the movement of the bowel.

Are you aware -- is it possible -- let me try again -- that the individual medications that we're talking about here can have actually a positive or a favorable effect on bowel motility as measured in terms of transit through the bowel?

A.    You're asking is it possible?  I mean, it -- I can say it is possible. Everything is -- anything could be possible.

Is it something that I've seen?  It's not something that I've encountered.

Q.    Have you seen any studies in your review that actually report a decrease in intestinal transit time with any of the GLP-1 RA medications that you're discussing in your report?

A.    A decrease in intestinal transit time?  Again, I would have to go back to the materials considered.  I can't recall off the top of my head.

MR. PRZYMUSINSKI:  All right.  Let me ask you this question.

MR. HONNOLD:  Sure.

MR. PRZYMUSINSKI:  I have a bigger section coming up.

MR. HONNOLD:  Uh-huh.

MR. PRZYMUSINSKI:  Do you want to take a break now and do lunch, or do you want me to keep going?

MR. HONNOLD:  Well, what's your preference?  I think erring on the side of going to lunch would be fine because it's in the lunch hour, so I don't think there would be any downside to that.  So --

MR. PRZYMUSINSKI:  All right.  Then let's do it.  Let's go off the record, please.

THE VIDEOGRAPHER:  We're going off the record.  The time is 12:12 p.m.

(A luncheon recess was taken from 12:12 p.m. to 12:52 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 12:52 p.m.

BY MR. PRZYMUSINSKI:

Q.    Doctor, welcome back.

A.    Thank you, Counsel.

Q.    Did you have a good lunch?

A.    Yes, it was great.

MR. PRZYMUSINSKI:  Brad, thanks for getting lunch for us.  I appreciate that.

MR. HONNOLD:  You're welcome.  I owe you ten times over.

BY MR. PRZYMUSINSKI:

Q.    All right.  So let's go back to your report, Doctor.

And let's go to page 4.

A.    Did you say 4, Counsel?

Q.    4.  Yes, please.

And specifically, Doctor, on page 4,

at the bottom there, you have the discussion of what you refer to as Study Quality Criteria Applied.

Do you see that?

A.    Yes.

Q.    Okay.  Now, below that you have eight numbers, and I think there's actually seven criteria because you, I think, have an extra number under comparator selection where you talk about SGLT-2s specifically; is that right?

Number 4, I think it's really part of comparator selection; is that right?

A.    Yeah.  I would agree.

Q.    Okay.  So it's really -- it should be seven total criteria; is that correct?

A.    Uh-huh.

Q.    Okay.  And so those are in specificity --

A.    Well, I just want to clarify that, Counsel, a little bit.  I think 3 says studies that use an active comparator with no known effect were given weightage compared to comparator.  So it looks at the quality of the drug that is the comparator, right --

Q.    Uh-huh.

A.    -- and the other one, it just says drugs that are used at a similar stage.  So one looks at the actual drug, right, of this thing and then the other one refers to -- again, it's a comparator, but of the same stage of the disease --

Q.    So it's --

A.    -- or the --

Q.    -- another aspect of comparator selection?

A.    I would say that, yes.

Q.    And we can treat that as -- comparator selection, as one category together --

A.    I think that's pretty simple --

Q.    -- for simplicity?

A.    Yes.

Q.    So the 7 are outcome specificity --

A.    Yes.

Q.    -- and founder assessment -- or, sorry, cofounder adjustment.  Pardon me. Comparator selection, exposure verification, study design, population generalizability, and statistical power; correct?

A.    Correct.

Q.    Okay.  Now this list, is this a list that is published somewhere, or this list a criteria or is this a list that you put together based on your own experience and your own work?

A.    So first of all I want to clarify, these are the principle criteria I used, it's not an exhaustive list of all criteria I used for this analysis; that's one.  And, two, this is something I do in my daily research, in my practice.

So I treated this exactly like I would answer this question in my research or in my practice or when I teach, and I apply the same principles.  So these are the principles that I use to evaluate quality of the research.

Q.    Makes sense.

But just to -- to close out my question, it's not something that's published somewhere in a specific format that I can look up; right?  It's something that maybe relies on other information and reflects what you do; is that correct?

A.    It is -- none of this is anything I

made up.  It's from different literature.  I did not lift the whole thing from one single paper.  They were all likely taken from multiple sources and put together in that format, in my own words.

Q.    Okay.  So it's not like I can pull up a book and there's the seven -- the exact seven criteria listed?

A.    That is correct.

Q.    Okay.  Good.

Now, among these seven criteria -- and now let's put some specificity on it.  I'm talking about, in the analysis you did of GLP-1 RAs as a class, first is ileus and intestinal obstruction, which of these seven criteria, if any, did you put the most weight on in terms of your analysis?

A.    Counsel, I -- it depends on the study and it depends on the situation.  But in general I applied them to more or less the same standards.  Each of them were important.  The other one -- was not like one was not important or one was more important.  They were all important.  And in the context of the studies, some were more important than others, but in

general these principles apply to every study I examined and -- for example, just to give you an example, in some studies the outcome specific study might not be exactly what I might do if I were to design the study, for example. But maybe it's not totally off. There might be minor differences, right, as opposed to that same study might have confound this in order just to -- and in that study confound the selection may be more important a factor because it's not done to the same degree as others.

So I couldn't say, oh, confound the selection is more important as a general principle than outcome specificity. But for another study -- for example, I reviewed a study of where the outcomes were so out of what they were trying or what they think they said they're trying to examine, the outcomes were so out of tune with what they were looking, it was such a major red flag, so me, in that study, outcome specificity was key.

But I have considered all of these in varying studies to be of varying degrees of importance in that context.

Q.    Okay.  Let me make sure I understood that.

First of all, acknowledging you said this is not an exhaustive list of the criteria -- to consider; right?

A.    Thank you, Counsel.

Q.    Okay.  But amongst these criteria, in terms of the weighting, you don't have a specific weighting generally; correct?

A.    It's not the same weighting.  I apply all these factors --

Q.    Right.

A.    -- to every study.

Q.    I get that.

A.    Yes.

Q.    But there's not like a general, this one is given higher weight than this one, it's more in the context of an individual study, you review that study and then based on your review you make determinations and you may put different weight on different criteria in individual studies; is that right?

A.    Yes.  Again, you're saying objective methods.  So I don't just decide, oh, this study, I feel like this should be the greater

weighted.  I look at the study, I look at the design, I look at how each of these were done and then I compare with how they were done to what I consider may have been --

Q.    I understand.

A.    -- the other way to do it.

Q.    No.  I'm not trying to say --

A.    Yes.

Q.    What I'm saying, in terms of your application of, as you said, the weight of the -- each factor may depend on the study.  So when you are looking at an individual study you may determine in that context that for your evaluation in that study this particular factor carries more weight than another one, but you might reach a different decision when you are looking at a different study; is that correct?

A.    It depends on how that specific issue was handled in that study.  That's -- just based on how each of these factors -- because, again, there could be varying ways in which each of these factors are handling study.

For some, it might be a very minor deviation from what I consider would

be --

Q.   Okay.

A.   -- a well done study.

Q.   All right.

A.   For -- for another factor it might be a significant deviation.  And so it's -- there's no rule saying, oh, with every study outcome specificity is the most important, if they got everything except one, then that kills the study.

Q.   So the specific weight you apply to these different criterias within the set considering the others -- other criteria may also be considering, may be different in different studies depending on the design of the study and impact the view that criteria has on the study itself; is that fair?

A.   That is fair -- fair to say.

Q.   All right.  Now let's focus on these seven criteria.  And on page -- page 22 through 45, you go through 21 epidemiological studies that you reviewed as part of your analysis; right?

A.   Counsel, do you say page 22?

Q.   22, where you have Number 1 for

Alfehaid --

A.    Okay.

Q.    -- A-l-f-e-h-a-i-d, all the way to page 45 where you have Number 21 which is Weng, W-e-n-g.

A.    You say page -- I would say page 46.

Q.    Carries over on to 46, but in those pages you have 21 epidemiological studies that, I think on page 22, at the beginning of the section say are the most relevant that you reviewed; is that fair?

A.    That is fair to say.

Q.    Okay.  Now, so for those 21 studies, in applying these criteria which you said you applied to every study; correct?

A.    I applied these criteria to every study.

Q.    Okay.

A.    And I just want to clarify, I applied these criteria to every study and I made a conscious effort to include it, but I -- regardless of whether it's mentioned there, I applied these criteria to every study.

Q.    You're assuming criticisms I have not made.

A.    And I am just telling you what --

Q.    Let me just have a conversation with you.  I promise you, I'm not trying to trick you.  You're going to get your chance.

So -- okay.  So if you look at -- for each of the studies, each of the 21 studies, I assume you systemically reviewed each of those studies; right?

A.    That is correct.

Q.    Now, did you assign a score, like a numerical score for each of the individual of the seven criteria for each study?

A.    I did not.  But in my mind I weighted them based on -- so even though I did not put an individual numeric score there, in my discussion I tried to weigh the strengths and limitations of every study, regardless of which way they fall, regardless --

Q.    Okay.

A.    -- of what -- what the outcomes were, I applied the same criteria to all the studies and I applied the same principles to every study regardless of what the outcome was.

Q.    But you didn't assign a specific score, write that down anywhere where we can

look at it?

A.   Counsel, I don't do that in my research, in my practice, in my science, even in the papers I write.  And I've also been a journal reviewer.  I review for almost 25 papers.  I have never seen any author rate these scores on a number of 1 to 7 -- again, in my field, I have not come across.

Q.   You've never seen scoring criteria, like grade criteria --

A.   That's not what I -- that's not what I said, Counsel.  What I said was, looking at these factors that I outlined, looking at the quality of epidemiological studies, I have not seen a review article, for example, where the author said, oh, it's a seven on outcome specificity, it's a five on adjustment of confounded.

There are studies that look at study quality in general.

Q.   Yeah.

A.   But not exactly in the way -- and we discuss positives and negatives.

Q.   Okay.

A.   There might be ways -- and I did not

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

say there are no studies that do weighted criteria, but among these criteria that I listed, and the way I listed, I have not seen studies that have examined that.

Q.    Totally fine.

Okay.  So are you able -- let's say I started with the criteria of outcome specificity, the first one, are you able to rank for me in order the studies out of those 21 that performed best on that criteria in your view versus ones that are the worst?

A.    If you give me the time I can review each study and I can give you an approximate ranking.  Again, it's not a perfect science.

Q.    Uh-huh.

A.    And the reason for that is, for example, one study might have five of which three are associated with the outcome and two are not.  Another might have six of which three are associated, three are not.  Yet another study might have three with two associated, one is not.

There are numerous combinations here, and as you know, there are several studies that looked at multiple outcomes.

There is not just the primary outcome, there is secondary outcomes, there is subgroup analysis.

So I could try to make an attempt to do that, it may not be a perfect science, but I could try and do that if I'm given --

Q.    Have you --

A.    -- the chance to review each one.

Q.    Have you done it to this point?

A.    I did not put a -- like I mentioned earlier, I did not put a numerical score to each study.

Q.    Okay.  Let me ask it maybe a different way.

Can you tell me which study or studies you think are the best on outcome specificity?  Can you name me any studies, without going through the -- all 21 for half an hour, which of the studies do you think perform best on outcome specificity?

A.    I would have to --

MR. HONNOLD:  Just going to object -- let me -- let me object to the form.

MR. PRZYMUSINSKI:  Yeah.

MR. HONNOLD:  That it's vague as

to -- "best criteria" is -- is -- is vague.

MR. PRZYMUSINSKI:  Fair enough.

A.    Counsel, I would have to go through the studies, and if I'm allowed a chance to go through the studies, I -- I can tell you which one it is.

Again, I did not realize this was a memory test so I did not commit all of these outcomes and ICD codes to memory.  There are 23 studies listed here as you mentioned -- or 20-something studies, there are numerous other studies I considered.  Each of them have combinations of -- 1, 2, 3, 4, 5, 6, 7 -- as many as 10 ICD codes, and then there are codes for primary outcomes, there are codes for secondary outcomes.

I don't think it's practical for me to memorize the ICD code for every study --

BY MR. PRZYMUSINSKI:

Q.    It's okay.

A.    -- and answer a general question.

Q.    It's okay.  I'm just asking the question.

A.    Yes.  Again --

Q.    So --

A.    -- thank you, Counsel.  I'm just answering the best I can.

Q.    -- can we say fairly that that same answer would apply regardless of which of these criteria I picked, the seven?

A.    Counsel, just to be clear, I can look at each report and I can tell you which one performs better, but not as a memory test.

Q.    I understand.

A.    Without looking at it, I cannot.

Q.    I'm just -- I'm just saying --

A.    Correct.

Q.    -- the answer you just gave me --

A.    Correct.

Q.    -- that applies to all these criteria?

A.    Yes.  Again, I can't say that for sure, there might be some studies where I might remember where one specific outcome was so egregious, I could tell you maybe a specific case, but --

Q.    Can you?

A.    If you allow me to look at it.

Q.    Okay.  You're saying that you may be able to tell me off the top of your head.  Can

you tell me any example like that off the top of your head?

A.    Again, for example, there were a subgroup analysis on one of the studies we looked at, was by Faille et al., and this was a paper that was published in Clinical Gastroenterology and Hepatology.  It was --

Q.    We will go through Faille in just a moment.

A.    You specifically asked me what I recall.

Q.    That's totally fine.

A.    So this was the paper by Faillie, F-a-i-l-l-i-e, and the name of the paper is Incretin, I-n-c-r-e-t-i-n, Based Drugs and Risk of Intestinal Obstruction Among Patients With Type 2 Diabetes.

And in that specific study, one of the analysis that they perform was looking at factors they considered to be associated with decreased GI motility.  And there, what we found was that that sensitivity analysis did not show significance, but the overall analysis showed that there was a statistically significant increase in incidence in the

Binu John, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

association of GLP-1 RAs with bowel obstruction and ileus.

(Stenographer clarification.)

A.    Between -- there was a statistically significant association between GLP-1 RAs and bowel obstruction or ileus.

But when they did that subgroup analysis, some of the ICD codes they considered were not included in what I would consider. For example, one of the ICD codes they looked at was neurogenic bowel, which is not something I would consider as associated with GLP-1 RAs.

So it is one of them, and there might be other cases, you know, once I review the journals.  But there's no question that I can tell you, with one look at the article, about what the ICD codes they used because it's a major method by which I evaluate a study. It's one of the significant ways.  Not saying it was more important than the others, I'm saying it was one of the significant ways I evaluated study quality.

BY MR. PRZYMUSINSKI:

Q.    So on the Faillie study -- I'm trying to understand the point you're making --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

is that primary analysis, secondary analysis,
you disagreed with their code selection.  So
are you saying that study stands out for you as
having bad outcome specificity?  Like, what's
the point of that conversation?

A.    No.  You just asked me whether I
recall any study.

Q.    No.  I asked you whether you recall
any studies that, on these criteria, you'd be
able to tell me where they rank in terms of
their quality; the best or the worst or
something in the middle.

A.    Oh, no.  Then I misunderstood the
question.  I thought your question was whether
I recalled any specific aspects of any study
where the ICD codes were not specific or
specific.

Q.    I understand.  Totally understand.

Okay.  Let's skip the individual
criteria.  Okay?  Let's talk about the overall
review of the quality of the study.

Ultimately you're looking at
numerous factors then you make an overall
determination.  Did you, in preparing your
report, in any way formally rate or rank the

studies in terms of their quality?

Once you did all the totality, you weighed the criteria in whatever way you thought was appropriate, did you then come out and say, okay, these are the highest quality studies, these are the next highest, these are the next highest, these are the lowest?

A.    Yes, I did.

Q.    Okay.  And where is that in your report?

A.    I discuss each of that in each individual part of each -- each study.  What I say, these are significantly limited or I'm not able to use this data because of these limitations.  And then ultimately I summarize -- even including, as part of Bradford Hill, I summarize some of the studies. I summarize the studies with the strongest evidence.

For example, I mention, in page 46 of my report, a prerequisite to performing a Bradford Hill analysis is that there be an observed association between an exposure and outcome.  The strongest evidence for an associations come from Faillie et al.;

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Alkabbani et al.; Sodhi et al.; and Bennett et al. These studies share several methodological strengths.

Two of the studies, Faillie et al --

Q.    I don't need you to read me an entire paragraph. I know that's there. I've read your report.

So let me ask you about those four studies.

The naming of those four studies, do you consider those four studies to be the highest quality studies based on your review of these seven criteria that are listed?

A.    I would not say that. There were other studies.

In this context I used those studies because they are of good quality. They have several strengths.

First of all, Counsel, I want to say when we look at epidemiological studies, every study has its strengths and every study has its limitations. I do these studies, I review these, I'm a journal reviewer, I'm an editor.

If I only insisted on perfect studies, my journal wouldn't have any articles;

right?  At the same time --

Q.    I didn't ask about perfection.

A.    Yes.  And --

Q.    I asked whether those four studies were the ones, out of the 21 you reviewed, you consider to be of highest quality.

A.    My point, Counsel, is there are studies which have strengths, there are studies which have limitations, there are -- these are among the studies that have relative strengths more than weaknesses.  But every study has strengths, every study has weaknesses.

There are studies in here which are of good quality.  I also outline certain studies that are of poor quality or relatively weaker strength of association or quality in my description of each of the studies.

Q.    And I appreciate that.  Okay?  But it's a really long narrative to answer a fairly short question.  All right?

So I understand that all studies have strengths and weaknesses.  All right?  I also understand that you reviewed all those studies.  All right?

If you pick out and identify, as you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

pointed out, four studies -- and we'll talk about them -- as having the strongest evidence to support an association -- and I just want to understand from a totality of -- considering their strengths and considering their weaknesses, are those 4 the highest quality studies of all the 21 you reviewed or no?

A. I would not say they are.

Q. Okay.

A. They are among the higher quality studies.

Q. Okay.

A. I wouldn't say they are absolutely the highest quality studies. There might be studies that also -- there are other studies besides what's listed here that are also of --

Q. What other studies come into that group of higher quality studies in addition to those four?

A. Do you mind if I look at my report really quickly? Because I have to --

Q. How long is that going to take?

A. Again, just enough --

Q. Well, because if it's going to take a long time -- we're going to go through all

these studies together.  So like --

A.    No.  No.  It's not going to take a long time.

Q.    Okay.  Go ahead.

A.    But I have to refer to my report here.

So it would be easier to tell you straight up what are the studies that I considered lower quality.

Q.    But, see, that's not my question.

A.    And, again, what that means is the other studies that are not included here are the ones with relatively higher quality.

Q.    Okay.  But -- so, look, I'm trying to -- imagine a world where there is another group of scientists, epidemiologists following behind you; right?  And they read your report and they say, okay, I want to go through these studies and I want to review them myself and apply these criteria to see if I get the same results or different results.

Are you with me?

A.    Yes, I am.

Q.    Okay.  I assume you would agree with me, right, that those scientist would each

review each study individually based on totality through their own eyes; right?

A.    I would presume, yes.

Q.    Yeah.  And they will have some degree of assessment in each of these qualities and an overall assessment of each study and rank -- or not rank them, but somehow organize them into the ones they think are highest quality and lowest quality; right?

A.    I think that's reasonable to say.

Q.    Okay.  So for me to be able to provide an opportunity for someone else to do that I have to understand how you did this.

A.    All right.

Q.    And part of understanding how you did this is to understand whether you can tell me -- I thought that the four studies that you said provided strongest evidence would be the ones you say are the highest quality.

A.    No, I would not say that.

Q.    If that's not the case, I just want to know, like, are there other highest -- studies that you consider on the same level of quality as those four, can you tell me that?

MR. HONNOLD:  Let me just object to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the form of the question.

I think it's woefully confusing, and it's compound on multiple levels.

But if you understand where you're at, go ahead and answer.

A.    Counsel, so I can tell you the studies that I consider are higher quality.

BY MR. PRZYMUSINSKI:

Q.    Okay.

A.    Bennett.

Q.    Okay.  But that's in your four.

A.    Yeah.  Well, you asked me to list the studies that are higher quality.  Or do you want me to say just the ones that are not in the four?

Q.    So, first of all, are the four already -- do you consider the four high quality?

A.    I would consider the four high quality.

Q.    Okay.  I'll take that --

A.    Again, "high quality" is a relative term, Counsel, because the word "high quality" is very subjective.  I would say is they are better quality than the studies that I

Binu Jose, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

considered not so good quality.

Q.    So you ranked -- the studies you consider, based on your review, to qualitatively be better than the others, so let's assume that we count the four already because I got that.  What else?

A.    Right.  Would be Sarwal.

Q.    Sarwal.  Okay.

A.    Ueda.

Q.    Okay.

A.    And Hurwitz.

Q.    Okay.  So those seven studies?

A.    Correct.

Q.    Now, why do you, in your report, say Bennett, Faillie, Sodhi, and Alkabbani provide the strongest evidence of an association, but not refer to Sarwal, Ueda, and Hurwitz, which you also -- since they are high-quality studies or better quality studies, whatever is the right word for it?

A.    So, Counsel, like I mentioned earlier, there are -- when you look at the epidemiology studies here, there are two major issues here.  There are several issues, but you have to look at the issues with each of the

studies and kind of weigh what the weight of and how it would distort the truth.  Because essentially we're trying to find the truth, and we want to see what studies represent -- that represent the truth the closest; right?

Every study in this group has significant -- has limitations.  And there are some studies which have such severe limitations that you just cannot -- they're almost non-interpretable.

And there are other studies where there are limitations, but you can -- you can say, oh, the confounding is not perfect, but there are limitations.

One of the major things I find with all the studies that I examined is a misclassification bias in the outcome that -- that we looked at specifically in these studies.  So there's clearly many studies where they're looking at a large number of ICD codes which are all-inclusive, including bowel obstruction and ileus.

And we know -- and presumably there is no reason for us to hypothesize, in my opinion, that GLP-1 RAs cause conditions like

volvulus.  Volvulus is v-o-l-v-u-l-u-s.

Now, volvulus is a twisting of the bowel.

Q.    No.  What does this have to do with my question of why Sarwal, Ueda, and Hurwitz are not included in your list of the four studies?

A.    Because I'm talking about the misclassification bias here, how that influences these studies in different ways.

Q.    But, Doctor, at this point, like, we're going to be here forever.

You list four studies as having the strongest evidence of an association, you then identify three additional studies that you say are of a better level of quality similar to those four.

What is it about those three that caused you to leave them out of that statement?

A.    No.  You asked me the -- the question -- the statement there is the studies that showed the association.

Q.    Right.

A.    Those studies are better quality studies that did not show an association.

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    I see.

So there were, in your view, seven studies that you felt were better quality as opposed to the other 14 that may have been lower quality?

A.    And even among those seven, there are differences in the quality of each of these studies.  It's not like all 7 are the exact same level of rigor, and all 14 are the exact same level that --

Q.    Each study is individual.

A.    Not only is each study individual, each study quality has to be individualized based on unique factors that vary significantly widely from study to study.

So it's really like, for many of the studies you are comparing all of these factors and then you're trying to see where is it that the bias, all the confounding, all the exposure misclassification, all the study design, all the study population is truly representing the question we are asking, whether GLP-1 RAs is associated with ileus.  And there are some studies that answer that better than others, but there are limitations in most of the

studies.

Q.   So sounds to me like you're looking at these studies and there's kind of an arch to this process where you're looking at all this study criteria in the context of the question being asked to make a determination of how much weight you assign these studies depending on the various strengths and limitations of these studies; is that fair?

A.   That is fair to say.  Using established principles in epidemiology, I have tried to weigh these various factors and apply them to each of these studies.

Q.   But some of the criteria you're assigning in those, right, and whether it's the specific ICD 9/10 codes you think are appropriate, or the specific confounders you think are appropriate, or the method of exposure assessment, those things are criteria you are laying and you're deciding on and then making a determination for each individual study how much does it affect the results and where does it -- how does that affect the ultimate weight I'm putting on the study; correct?

A.    Let me just clarify that a little bit.

As someone who practices gastroenterology and sees these patients, I have a very deep understanding of the kind of the ICD codes that an gastroenterologist would use to look at these outcomes --

Q.    I'm not questioning your ability.

A.    -- and so my point being I'm not using any random selector --

Q.    I didn't say it was random.

A.    -- points at all.

Q.    I said --

A.    I'm saying based on my experience as a gastroenterologist and my experience as a researcher and my experience of these different databases, I have used criteria to explain why I provide greater weightage to some studies --

MR. HONNOLD:  Can I intervene just helpfully for a second?

For the past few minutes you've all been kind of talking at the same time and talking over each other.  So when I notice it, I know our reporter does.  So I just -- I'd just ask you both to be conscious of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

that.

MR. PRZYMUSINSKI:  Thank you.

THE WITNESS:  Thank you.

BY MR. PRZYMUSINSKI:

Q.    Okay.  So, look, we're talking about different things and I'm trying to get to kind of a core issue, which is within this report you go through 21 studies; correct?  Epidemiological studies?

A.    Correct.  Well, I went through several more, these were the ones I described in detail in my report.  But there were several more in my materials considered list.

Q.    The ones you describe as most relevant, the 21 studies; correct?  Page 22.

A.    21?

Q.    22.  The page 22 is where you say most relevant, and there's 21 studies.

A.    Oh, correct.

Q.    In evaluating these studies, there are seven criteria that you outline, plus maybe some other things you considered; correct?

A.    Correct.

Q.    And for each study you say you systemically reviewed that study, you didn't

assign any specific score on the criteria, you didn't assign any overall score, you don't have a chart of that kind of information, but you're able to say that there were, in your view, certain studies that were better and certain studies that were worse; correct?

A.    Even though I don't apply a specific score, in discussion of every single study I outline the positives and the negatives, and I try to make a case of how that could be applicable to how we interpret the study.

Q.    I understand that.

But what you explain in each study, what strengths and weaknesses you identify, what you don't say is how much weight you put on that study.

A.    But I didn't -- if you say by what you mean by how much weight, if you mean a numerical score, I did not do that.  But I do consider the studies -- it would be -- it is obvious from my discussion that studies which have literally stronger methods are given greater weight than studies that have not.

Q.    That's what I'm trying to understand.  Because if I -- if someone else is

trying to go behind you to try to validate what you did, the question I want to understand is which studies did you put the most weight on?

A.    Counsel, I believe I answered that.

Q.    Which ones?

A.    I told you --

Q.    Is it the seven?

A.    The seven, yes.

Q.    Okay.  So those seven studies are the ones you put the most weight on?

A.    Again, with the caveat that there are differences between the studies in -- in how I put each weight to.  So it's not that I put equal weightage to all seven, but I would say these seven overall are of higher quality than the other 14 or 15 studies that I described in detail in my report, which I attribute less weightage to.

Q.    Now, if I was to ask someone else to go behind you and replicate your analysis, do all the same things that you did, how likely do you think it is that they would arrive at the exact same conclusion?

MR. HONNOLD:  Object to the form.
Calls for speculation.

A.    I would say depends on who does the review and I will tell you why.

BY MR. PRZYMUSINSKI:

Q.    Okay.

A.    It's very important when you look at these studies, it is very important to see who is -- who is doing the studies and how much they understand about the ICD-9 and 10 codes. So for many of the studies these studies are done by pharmacoepidemiologists, epidemiologists or by statisticians.  They did not see patients, they did not see patients with bowel obstruction, they're not gastroenterologists.  They did not use these codes.  They did not see patients with ileus. They do not fully understand the difference between, say, gallstone ileus, volvulus, and ileus.

So if you give that to a person who has no or limited understanding of the specific ICD 9/10 codes and also general knowledge about gastroenterology, what are the potential confounders that could lead to these -- associations, would -- did these studies adjust for these confounders?

So there are huge factors here on who does the review, a person who has the knowledge of clinical gastroenterology where they see patients, a person who has knowledge in reviewing literature, who writes, ideally does some of this work, does these papers, who is familiar with the database, who knows the difference between a study that's done purely in patients with IBD versus not, who knows the difference between, for example, a study done in patients with immune check metastatic cancer, with immune checkpoint inhibitors versus not, or someone who knows the difference between a study done in postoperative patients versus not.

There are experts who may have specific knowledge of a certain aspect of pharmacoepidemiology, but if you don't combine that with a holistic view of gastroenterology, with a knowledge of these different databases, what these ICD 9/10 codes mean, then there will be limitations on how they do an analysis.

So with that caveat, I would say for someone who does -- who works in this field, who evaluates -- who evaluates -- who does

research along these lines, who is involved in evaluating papers like this as part of their work, I would assume -- I think I believe they would come to the same conclusion that I do.

Q. Including that these seven studies you named should carry the highest weight out of the totality of literature that's out there?

A. Again, I cannot speak for a hypothetical expert who may do that, but I believe that if you apply the weight of evidence and weigh that carefully, these would be -- again, they might never be -- there might not be perfect overlap between two clinicians, two researchers. If I give -- if there's myself and a colleague and we are asked to weigh the papers, we might overlap on some papers and we might agree on some, we might disagree on the same, and there might be one or two papers where we might have a difference of opinion, and it's some things sometimes we discuss to reconcile.

So the statistical probability that two reviewers will review the same set of papers and come up with the exact same papers as the most weightage and the exact same

page -- papers that are not, that's a very unlikely statistical event.

Q. And I suspect that you would agree with me that just by reading your report no one could really go back and look at it and say, okay, this is how much weight he gave this study, this is how much weight he gave this study, this is how much weight he gave this study. That couldn't be done; right?

A. I disagree.

MR. HONNOLD: Object to the form.

BY MR. PRZYMUSINSKI:

Q. You disagree?

A. I disagree. I believe I have clearly laid out the strengths and weaknesses of each study, and I have laid out why I give greater weightage to some studies than not. So I think -- I believe that any reasonable clinician, physician, scientist who has the background and subject matter knowledge should be able to look at that and my -- would agree with the reasonable likelihood that these do represent the higher quality studies.

Q. Okay. We will come back to that later.

Let's look at outcome specificity
real quick.

I'm on page 4 onto 5.

Do you see that?

A.    Yes.

Q.    Okay.  Under outcome specificity you
say:  "Studies that examined paralytic ileus,
ICD-10 Code K56.0; ileus unspecified, K56.7;
fecal impaction, K56.41; severe constipation,
K59.0X; or drug-induced constipation, K59.03,
as discrete outcomes were given greater
weight," do you see that?

A.    Yes, Counsel.  And can we go and
read the whole sentence?

Q.    We will.

A.    Yeah.

Q.    I just want to --

A.    Yes, I see the question.  Yes.

Q.    It gets long --

A.    Okay.

Q.    -- and then it's hard to follow.

A.    I just want to make sure that we
put the whole -- the sentence in --

Q.    We will get the whole sentence.

MR. HONNOLD:  I'm writing down your

promises that you make.

MR. PRZYMUSINSKI:  Keep them.

MR. HONNOLD:  Okay.

MR. PRZYMUSINSKI:  Yeah, I'm going to write down those codes just because we're going to look at them a lot later and I want you to have them in front of you.

BY MR. PRZYMUSINSKI:

Q.   Now, let's go to the second part of the sentence.

"They were given greater weight than studies that combine these outcomes with unrelated conditions that cause mechanical obstructions such as intussusception, K56.1; volvulus, K56.3; gallstone ileus, K56.3; and adhesive obstruction K56.5."

Do you see that?

A.   "Or adhesive obstruction."

Q.   Okay.  Thanks.

All right.  So greater weight --

A.   Correct.

Q.   -- lower weight if included.

This is a cheat sheet for later.

All right.  So now --

A.   This is for me, Counsel, or for her?

Q.    For you.

A.    Oh, okay.  Thank you.

Q.    Just because we're going to be going through studies and I don't want you to have to jump back and forth so you have all the codes in front of you.

A.    Well, I do have the codes in my report and --

Q.    Right.  But you're going to be looking at your report while you're doing that.

A.    Okay.

Q.    So I want to make it easier for you.

A.    Got it.

Q.    Okay.  That's all.

Now -- and, again --

MR. HONNOLD:  Do you want to mark that?

MR. PRZYMUSINSKI:  No.

MR. HONNOLD:  No?  Okay.

MR. PRZYMUSINSKI:  I'm good.

A.    And I do believe, again, you're reading that specific part of the report. There are other codes that are not listed here that I might not -- I did not give as much weightage, I gave lower weightage.  This is not

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

an exhaustive list --

BY MR. PRZYMUSINSKI:

Q.    Okay.

A.    -- of all the codes that I gave greater or lesser weightage.

Q.    Okay.

A.    I just wanted to make sure --

Q.    This is what you said in your report though; right?

A.    I'm sorry?

Q.    This is what you say in your report; right?

A.    This is where I say in that part of the report.  There are other part -- parts of the report where I -- I say "include other codes as well."

Again, Counsel, there are, I believe there are about 15 --

Q.    Okay.

A.    -- account -- codes here and I couldn't list all of those that are greater weighted and all of that that are lower because there were so many inappropriate codes.  So --

Q.    Okay.  For the ones that are

Bind Rao, MD     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

there --

A.    Yeah.

Q.    -- that is still accurate; correct?

A.    I would say among the -- among these ten, nine codes, I would say the ones that are given greater weightage are listed here and the ones that are given lesser weightage are listed on the right side --

Q.    Fantastic.

A.    -- of the page.

Q.    Okay.  Now, I think I know the answer to this, but I want to make sure.

So before you performed your literature research and did your analysis, did you look to see if there were any studies that actually looked at ICD-9 and 10 codes and validated those ICD-9 and 10 codes or attempted to validate them for outcomes such as ileus or intestinal obstruction?

A.    Yes, Counsel, I did.  And I was unable to identify any such studies in the literature.

Q.    So you looked for it, but you couldn't find any?

A.    I looked for it, I couldn't find it

Bin Jamali, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

for these specific outcomes.

Q.    Now, in identifying the codes that you list here and other parts of your report that you give greater weight or lesser weight to, can you point me to any specific reference that you relied on to make that determination or is that based upon your own clinical expertise and opinion?

A.    I would say it's not based on my personal experience and opinion alone, I would say this would be very much consistent with what most gastroenterologists would consider as what is examining the outcome we're trying to look at.

Q.    So let me get this straight.  You believe you can testify to what most gastroenterologists would believe would be the appropriate ICD-9 or 10 codes to select and more specifically identify the points of ileus and intestinal obstruction?

A.    No.  No, Counsel.  What I mean is, I could say what are the codes that most gastroenterologists who see these patients are more likely to do compared to not -- again, what I mean by that is, the field, you know,

when you look at -- for example, let me just clarify this better.

If you are a gastroenterologist, right, we have a code for gallstone ileus here; right?  I believe it is K- --

Q.   K- --

A.   -- 31 --

Q.   -- 56.3, that's what it says in the report --

A.   56 -- gallstone ileus?

Q.   That's what you have on page 5.

A.   Oh, K56.3.  Correct.

Q.   That's what I said.

A.   Okay.  Thank you.

The word "gallstone ileus" contains the word "ileus."  But I can say with reasonable certainty that most gastroenterologists do not confuse the term "gallstone ileus" with "paralytic ileus" or "ileus."

Similarly, if you're looking at motility associated with the medication, I can say it with reasonable confidence that most gastroenterologists would not consider volvulus or intussusception where the bowel is twisting

on each other or the bowel telescopes into another segment as associated with hypo- --

Q.    I appreciate that you're giving me your opinion on what other gastroenterologists would do.  Pretty sure that's -- that would outside your knowledge as an expert, I'm simply asking a simpler question:  Is there a specific reference you can point to me that says these ICD-9 and 10 codes are the preferred codes for identifying ileus or intestinal obstruction when performing epidemiological analysis?  Yes or no.

MR. HONNOLD:  Let -- let me object to the form of the question.

First, the misstatement is a misstatement, it's not correct.  Healthcare providers speak to what other healthcare providers might think or do and how they should act under different circumstances all the time, that's what the standard of care is about.

And what practitioners think or do and how they interpret things goes part and parcel with his training and education,

consistent with what others do.

So the misstatement is inappropriate and it's argumentative and I object to the form.  And it's compound.

BY MR. PRZYMUSINSKI:

Q.    Great.  Let's go back to the question.

Is there a specific reference that I can go to anywhere that says these particular ICD 9/10 codes, which you say you gave greater weight to, are the appropriate codes to look at to identify ileus or intestinal obstruction when looking at an epidemiological study based on administrative data?

A.    Counsel, I would have to go back into the literature and specifically look at that to identify a reference if there is.

Q.    Haven't done that so far?

A.    If I did, I did not systemically document it.

Q.    Okay.  Now, we talked previously in the context of your own study, about the concept of validation and a positive predictive value; right?  Which is a -- a positive predictive value is a calculated number; right?

It's a -- an estimate of how likely it is that if you use a certain surrogate, like an ICD-9 code, you will correctly identify the outcome you're looking for; correct?

A.    That is correct.

Q.    Do you know what the positive predictive value is of the -- using the ICD 9/10 criteria you identify as giving greater weight?

A.    I do not believe the validation studies have been done like I mentioned earlier.

Q.    So you don't know?

A.    I do not know.

Q.    You know what the error rate, so that methodology, how often would those criteria identify an outcome that's actually not relevant?

A.    Again, that study has not been done. And I also want to clarify, just because -- again, we do epidemiological studies on a number of outcomes.  It's only a very small fraction of the outcomes that we study that have been validated.  It's not like it's -- studies have -- that every study done or the

majority of studies done have outcomes that are validated.

It is definitely a good thing to have, and it adds robustness to the data, but the fact that the validation has not been done, does not, by itself, take away from it.  And additionally, there are some terms, for example, where a validation might be less crucial.

For example, if you have an ICD code for ileus, at least you can be reasonably certain that patients who have ileus get that coding; again, as opposed to if you have a code for unspecified bowel obstruction where it has nothing to do with ileus.  So you can estimate that the likelihood of a positive predictive value may be different based on what codes you use and validation is probably more important in some studies than others.

So, for example, what I did for the liver cancer, HCC, I mentioned is very common, or it is reasonably common, or there is a certain amount of doubt in reviewers' and journal editors' minds that metastatic cancer could be coded for hepatocellular carcinoma.

And so in that situation it's important to do the validation.  Maybe it's less important to do that validation in some other settings.

Q.    Okay.  Appreciate the context.  All right.

For these codes that you selected, that validation has not been done, and we do not know the positive predictive value -- correct?

A.    You're correct.

Q.    So we're relying on your opinion that those are the right codes to use; correct?

A.    I would argue and say, Counsel, that this is not purely my subjective opinion.  I believe that many of these codes are something I commonly see used in my practice by other physicians, so it's not just the knowledge of my personal or my personal bias; what I see is also what is commonly done in my practice.

Q.    I understand that.

But of course the authors that did these studies, right, and published these studies -- actually in peer-reviewed publications, some of them -- they made different choices on what codes to use;

Binu John, MD     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

correct?

A.   They did.  You're right.

Q.   Okay.  So you disagree with their choices; correct?

A.   I disagree with some of their choices, depending on the study and the paper.

Q.   But you don't have any data, validated data, error rates, positive predictive value data to show that your preferred terms are better performing than the ones that they have; correct?

MR. HONNOLD:  Let me just object to the form of the question as to "better performing."  That's vague.  It's overbroad and no foundation as to "better performing."

BY MR. PRZYMUSINSKI:

Q.   You can answer.

A.   Counsel, I would say there's no formal validation -- if the question you're asking is are the ICD 9/10 codes used in the study been formally validated in an epidemiological setting, the answer is no.

Q.   My question is a little bit different.  The authors of these studies, in

Binu John, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

pretty much every case, shows different ICD 9 over 10 codes than you identify as those giving greater weight; correct?

A.    I'm not certain that's the case. There might be cases where there might be a fair amount of overlap with what I identified.

Q.    I agree there's some overlap.  But they're not identical; correct?

A.    Again, unless I look at each specific case --

Q.    But there are studies where there are differences; right?

MR. HONNOLD:  Hold on.  Okay.  Now we've got to stop because now we're jeopardizing the sanctity of this record. You are both talking over each other. You're both doing -- you're making statements that aren't questions, and you're trying to keep up with him and you're giving answers that aren't full answers.

I would just really caution both of you just to try to ask a question, everybody take a breath, you take a breath, and answer.

MR. PRZYMUSINSKI:  I'm getting very long answers.  Very.

MR. HONNOLD:  No.  I know.  But you're exacerbating it with kind of argumentative comment along the way that he's trying to respond to.  It's just an observation.  We're going to have a record that's just going to be a real mess and none of us are going to be happy about that.

MR. PRZYMUSINSKI:  We'll figure it out.

MR. HONNOLD:  Okay.  Well -- okay.

BY MR. PRZYMUSINSKI:

Q.    So, Doctor, there are 21 epidemiological studies that you've referenced in your report in that section discussing the most relevant studies; right?

A.    Correct.

Q.    The authors of those individual studies, to the extent they use ICD 9 or 10 codes, made choices about which codes to use; correct?

A.    Correct.

Q.    All right.  And in many cases, you

disagree with those choices; correct?

A.    In several cases I disagree with the choices.

Q.    Okay.  But just to close this out -- and we'll take a break after this -- you don't have any direct comparison that says, look, I looked at their ICD 9/10 codes, and look how good they are predicting the outcomes of interest, and I looked at my codes, and I show that mine are actually performing better; correct?

A.    Counsel, let me just say this.  You don't have to do that when, in some situations, it is so clear and obvious.

For example, it's very common knowledge that intussusception is not associated with hypomotility.  So if you're looking at a drug that causes decreased motility, it makes no sense to have intussusception.

So, again, when you apply common sense, you -- you can do that comparison when something -- there is a fair case to be made that all these codes could be applied, but when something is so clearly not related to

hypomotility, we don't have to have data.

For something that lacks common sense, people don't do studies that look at those. Like, I would not look at a study that says, oh, is intussusception associated with hypomotility because that question makes no sense to me as a gastroenterologist.

Q. I asked you a simple question. I understand the context you told me over and over; right?

But I asked you whether you agree that it should be done or shouldn't be done and whether you have any direct data comparing the codes chosen by the authors of the study as opposed to the ones you say should be used and given greater weight in terms of how they perform in identifying the outcomes of interest, whether that's based on positive predictive value, error rate, or any other metric.

What's the answer to that?

MR. HONNOLD: Just object to the form. It's argumentative.

He gave you an answer that was based upon his years of experience in practicing

gastroenterology which is based upon data --

MR. PRZYMUSINSKI:  Brad -- Brad --

MR. HONNOLD:  Well, I know, but you're --

MR. PRZYMUSINSKI:  But now you're testifying for him.

MR. HONNOLD:  Well, okay.  But -- I just object to the form.

MR. PRZYMUSINSKI:  That's fine.  And that's fine.

MR. HONNOLD:  It's argumentative and it misstates his prior testimony grossly.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Do you still recall my question?

A.    No, Counsel.  Sorry.

Q.    We're going to be here forever.

It was a simple question.  I understand that you don't think -- maybe you don't think that it's necessary to do the comparisons because you believe it's obvious, but my question simply was where the ICD 9 or 10 codes chosen by the authors of these studies differ from the ones you believe are

appropriate and are given greater weight, are you aware of any data that actually compares how those -- selecting those different choices, your choice versus the author's choice, performs in terms of parameters used for validations such as positive predictive value or error rate?

A.    I'm not aware --

MR. HONNOLD:  Just object to form. It's vague.

You answered.

A.    I'm not aware of any such data.

MR. PRZYMUSINSKI:  Okay.  Want to take a break?

THE WITNESS:  It's up to you.  I can go on.

MR. HONNOLD:  Sure.

MR. PRZYMUSINSKI:  I can tell.

THE VIDEOGRAPHER:  Going off the record at 1:50 p.m.

(A brief recess was taken from 1:50 p.m. to 2:15 p.m.)

THE VIDEOGRAPHER:  This begins Media 3.  We're back on the record.  The time is 2:15 p.m.

BY MR. PRZYMUSINSKI:

Q.   Welcome back.

A.   Thank you, Counsel.

Q.   I want to do one other question on the study quality criteria and then I'll move on.  And it's pretty quick.

So on the bottom of -- actually, sorry.  On the top of page 6 is what's -- I guess the last of the seven, statistical power.

A.   What page is this, Counsel?

Q.   Page 6.  It's the very last bullet on your list.

A.   Yes.

Q.   Okay.  So you say:  "Studies with adequate sample sizes and event counts to detect clinically meaningful differences were given greater weight than studies that were underpowered, as reflected by very" -- I'm guessing it's "very few participants and few events"; is that right?

A.   Yes, that's correct.

Q.   Okay.  All right.  Now, in terms of --

A.   And, just to clarify, you were reading that.  I just want to put that in

context again.  It's one of the eight factors that -- seven factors I looked at to examine study quality.  It is one of them.  All things equal, all other things being equal, this is what I would do.

Q.    Okay.  Just asked whether you wrote that sentence there.

A.    Thank you, Counsel.

Q.    All right.  So now in terms of sample size, understanding it's only one of the criteria, all that other stuff, what sample size, what quantity of patients, subjects, would a study need to have for you to conclude that a study was sufficiently powered to detect clinically meaningful differences?

A.    So it depends on numerous factors. It's very difficult to answer that in isolation.

The sample size of a study would depend on the event rate, the population where it's drawn from, the event rate of what happens, and then what is the event rate in the comparator arm.

Q.    Well, can you --

A.    Counsel, I'm sorry.  Can I complete

my answer?

Q.    Oh, I'm sorry.  I thought you stopped.

A.    I just wanted to -- so my point being you asked me about the power and I'm saying that the power of each study depends on a number of factors, including not -- including where the -- the -- where the population is drawn from.  For example, does that population have an intrinsically different rate of GLP-1 RA-associated ileus compared to not?  What is the rate in that -- what is the comparator?  Because is the comparator something that can cause ileus by itself?  What's the event rate in that comparator?  And the absolute difference you see in that population, if that effect size of what you see is larger, the power you need to estimate a difference is not as much if the event rate in one group is higher than the other, then the power is higher to see the difference.  If the event rates are very similar then the power to detect a difference is much lower.

So it depends on a number of factors.  So it's really hard for me to say

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

what's the sample size needed to calculate a certain power.

Q.    But clearly, in going through the 21 studies, you, I would assume, determined that some were adequately powered and some were not; am I right?

A.    Correct.

Q.    Okay.  So for those studies that were -- you found to be adequately powered, was that based upon event counts, was it -- like, what did you see in that study that you said, aha, based on this, I know it's adequately powered?

A.    So, Counsel, to answer your question, like I mentioned before, the power depends on the event rate in the exposed, the event rate in the unexposed, the differences, and so it's not a certain specific number.

But having said that -- for example, let's go to a specific example.  In Sodhi, Sodhi is the paper published in Journal of American Medical Association, JAMA.  And specifically in that I don't want to misquote myself, so I'm going to refer to that paper to make my point here.

In that specific study we find that there were 4,144 patients on liraglutide; there were 613 patients on semaglutide; and 654 patients on bupropion naltrexone.  So relatively speaking, compared to some of the other studies, the sample size there is smaller.  But at the same time, if you look at the hazard ratio that you found, despite that sample size, it is statistically significant.

So, in other words, regardless of the sample size there, that study was adequately powered to detect a difference there.

Q.    So is your assessment of power a post-hoc assessment, meaning you look to see if it's a significant result, and if it is then it's powered, and if it's not, then it's not?

A.    At least in when you look at post-hoc power analysis, what we look at is if a study is negative, then you look back at the post-hoc analysis to see, was that power -- what was the event outcome, and what sample size would you have needed to detect a power difference?

Q.    But a study can find no effect and

still be adequately powered; right?

A.     Again --

Q.     If there's no relationship.

A.     That -- that is true.

Q.     Okay.  So looking at the -- whether the result is statistically significant is not an indicator of power, it's simply a reflection of what the study found?

A.     Well, in that situation, based on the event rate, that study -- because of the difference in event rate that study was adequately powered to answer that question there.

Q.     But if the study had the exact same number of events and found no statistical difference, you would have concluded it was not adequately powered?

A.     Was likely not adequately powered. At least when I do a post-hoc analysis, what -- I can calculate the power of that study and say this was the power that was calculated based on that.

Q.     So let me ask you that question.

For the studies that you determined were not adequately powered, did you do

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

a post-hoc power calculation?

A.    It depends on the setting.  So for the --

Q.    I'm asking for this report.

A.    Again, what I'm saying is it depends on the study and the setting.

If doing that analysis would not change my conclusion, if the statistical methods that were done are in such a way that changing that -- regardless of what power we found, the study is so flawed that I cannot make an assumption based on that study, I did not do a power calculation there.

Q.    For any of these studies that you found or concluded that were underpowered, did you do a power calculation?

A.    I did not do a formal power calculation.

MR. PRZYMUSINSKI:  All right.  Let's go to -- I have it.  This is going to be Exhibit 10.

(Defendant's No. 10, Article, 768-P: Glucagon-like Peptide 1 Receptor Agonists and the Risk of Motility-Related Gastrointestinal Adverse Events-A Cohort

Study, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    What I want to do now, I want to talk to you about the four studies that you say provide the strongest evidence of an association.  Okay?

A.    Okay.

Q.    We talked about there's Alkabbani, there's -- sorry -- Alkabbani, Faillie, Sodhi, and Bennett; correct?

A.    Could you repeat that, Counsel?  The four studies.

Q.    Alkabbani, Faillie, Sodhi, and Bennett.  I'm correct?

A.    Uh-huh.

Q.    Okay.  And I'm going to start with Alkabbani.

So, Alkabbani, I'm going to mark this as Exhibit 10 for the record.

So, Doctor, this is -- what I handed you is a two-page document, and it's a conference abstract; correct?

A.    This is correct.

Q.    Okay.  And this is the Alkabbani study, A-l-k-a-b-b-a-n-i, entitled

Glucagon-Like Peptide-1 Receptor Agonists and the Risks of Motility-Related Gastrointestinal Adverse Events-A Cohort Study; correct?

A.    Correct.

Q.    Now, if you look at -- and if you want, if it's helpful for you, you discuss this study in your report, right, because it's one of the 21, and you can find that discussion, we've been talking about it, on page 24 going onto page 25, just so I'm not limiting you to the abstract, but to whatever you have in your report.

And, you know, you actually did a nice job in the report.  When you look at page 24, you actually mention that's a conference abstract right next to it in the heading.

Do you see that?

A.    Yes, I do.

Q.    Okay.  Now, do you know -- as a conference abstract, do you know whether this has gone through peer review?

A.    So, just to clarify that, I serve on numerous conference review committees --

Q.    Yeah.

A.    -- for a number of years.  In fact,

I have chaired for the medical gastroenterology associations, the conference abstracts, and every abstract that's submitted to our conference, the largest GI conference in the world, that is Disease Week --

Q.    Okay.

A.    -- is reviewed by a committee.  And we go through it.  Each individual member of the committee reviews each abstract and we score it.

Q.    Okay.

A.    And then as a committee we meet together and discuss our scores and we reach a consensus scores, and then we -- and then we decide based on merit whether an abstract should be a presidential plenary, which is of the highest merit, or should be an oral presentation, which is a high honor, usually given to 5 or 10 percent of the top abstracts, or it is a posture of distinction, which is among the posters, the highest quality, and then if it's a regular poster or if it's rejected.

So in answer to your question, there is a peer-review process to abstracts for

submitted for the GI meetings.

Now, this specific conference abstract was submitted to an endocrinology meeting, but to the best of my knowledge these follow a similar pathway, but since I'm not a member of that committee and I've never submitted an abstract to that specific conference, I do not know what their process is, but I have to presume in general that most conference abstracts go through some form of a review by peers.

Q.    So it's a very long answer, again, but I appreciate that.

You assume it was, but you don't know for sure?

A.    The specific case --

Q.    This one?

A.    This specific case, in this specific case I do not know for sure.  But I can tell you based on my experience -- again, Counsel, based on my experience in submitting papers, numerous conferences, I have not yet come across a conference where there is no peer review of abstracts.  So I can say with my experience I have never come across a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

conference like that.

Q.    All right.  Now, the abstract which you have in front of you is pretty short.  It's got one page and then a data table on the back of that; correct?

A.    It's got a full page and a full, very detailed table with a lot of information on the backside.

Q.    Okay.  You yourself state in your report that the abstract does not contain -- or you say it differently.  You say full methodological details are not available; correct?

A.    That is correct.

Q.    So you acknowledge that this abstract does not have a full discussion of the methodology used in this study; correct?

A.    I would say this abstract has some information and it is a fair amount of information.  It does not have all the information needed for a methodologic evaluation.

Q.    In your report you say:  "However, as a conference abstract, full methodological details are not yet available."

Yes?

A.    Yes.  The word "full" is important.
I agree.  Yes, Counsel.

Q.    Now, you go on to say in your report
on page 47 that the full publication of this --
this abstract is pending.

Do you recall that?

A.    I do not.  But I need to -- I need
to check that.  I need to double-check that.

Q.    Double-check if it helps you, just
to move things along, page 47, it is the third
line from the top.  It starts:  "Alkabbani et
al conference abstract from the same research
group with full publication pending."

Do you see that?

A.    Correct.

Q.    Okay.  Do you know if this abstract
has been published?

A.    This abstract has been published.
This abstract has been published.

Q.    Whether the full publication has
been published?

A.    No, I'm not aware.

Q.    Okay.  All right.

So you don't know whether -- first

of all, you don't know if it's going to get published, but if it does get published, whether the full publication will have the same results or not; correct?

A.    Again, I can only go by my experience.  In my experience of having submitted abstracts, including the abstract you discussed today with the GLP-1, the information I presented at the -- at the oral presentation at DDW was exactly the same information I presented for a manuscript submission.  So there was no difference there.

In my experience of doing clinical research, I have never submitted one set of information for an abstract and then taken it out and submitted a completely unrelated information or different information in the paper.

Q.    I'm not suggesting that.  What I am saying is that a paper that is submitted for full publication will include the full methodology, will undergo peer review, and what is finally accepted by the peer reviewer is then published, and when it is published it may differ in the content conclusions or could have

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

different data than what is in the abstract after the peer review process is completed; correct?

MR. HONNOLD: Let me just object to the form. Assumes facts not in evidence based upon whether peer review was done initially or not and whether data was submitted. So I think that's still an open question. So assumes facts not in evidence.

A. So, again, I can only tell you from my experience, Counsel, as a researcher, as a scientist, as someone who has sat on many of these committees, it has not been my experience that the primary analysis and the primary outcome of a study changes from the time -- from the -- could it happen ever? Has it ever happened? Yes. Does it happen generally? No. Is it possible that additional information is added to a paper after peer review? Absolutely. There might be more clarification. There might be more subgroup analysis. There might be more clari- -- there might be more information out and about the methods.

But in general it's very unusual in

my experience to see the primary analysis of a paper completely changed when the manuscript has undergone peer review.

Q. Certainly if there's more information provided about the methods, potentially that could change your evaluation of the actual quality of the study based on your criteria; correct?

A. I -- again, I have to say, Counsel, I do have a -- again, remember my statement is -- and I want to read it out just so that there's no issue here.

Q. Can I help you find something?

A. Yeah. Again, that statement you said: "However, as a conference abstract, full methodological details are not available."

That doesn't mean I don't have enough details here in this abstract to evaluate it. For example, it's clear the study design, it's a cohort study. It tells here it's a proportion of patients with type 2 diabetes. It gives me information about the data source, its Optum Clinformatics market scan. This information is not going to change based on a full publication with data extending

from October 2016 to August 2024.  The number of patients are 313,342 GLP-1 RA initiators and 313,342 SGLT-2 inhibitor initiators.  Patients were followed for a median of 6.5 months.  None of that is changing.  Propensity score matching was used to adjust for more than 150 potential confounders.  Propensity score matching, I explained what that method is, the hazard ratio.  So there is a fair amount of information in here in the abstract.

Q.    I get that.

Let me ask you some specific questions.

A.    Thank you, Counsel.

Q.    Let's talk about your first criteria of outcome specificity.

Do you recall that criteria?

A.    Yes, I do.

Q.    If we look at your -- on the report on page 24, at the bottom, you state in the last line, which it starts on the -- I guess two lines from the bottom:  "Additionally, the ICD codes used to define bowel obstructions are not disclosed."

Page 24 of your report; right?

Binu John, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Yes.

Q.    So, first of all, the study is looking at bowel obstruction, not ileus; correct?

A.    We don't know that.  That is not -- I disagree with that, Counsel.  Because, again, in a lot of the papers that people look at authors have used the term "bowel obstruction" and "ileus" interchangeably, and that is one of the major limitation I point out in the field.

A lot of the papers, people -- the folks who do these studies are not gastroenterologists, they are pharmacoepidemiologists.  And so they use these ICD codes interchangeably, but almost the vast majority of studies when they talk about bowel obstruction, they're using the ICD codes for both bowel obstruction and ileus.

So in answer to your question, does this not include ileus, I -- I cannot say that for sure.

Q.    Okay.  We're going to be here -- this -- we got to try and focus on my question.  All right?

The authors --

Binu John, M.D.     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. HONNOLD:  That was right on your question.

BY MR. PRZYMUSINSKI:

Q.     The authors describe their end point, the primary outcome, composite of severe constipation, gastroparesis, and bowel obstruction; correct?

A.     Correct.

Q.     All right.  Great.

You acknowledge in your own report that you don't know what ICD-9 codes are used to define the endpoint of bowel obstruction; correct?

A.     That is correct.

Q.     Okay.  In other words, you have no idea based on this information, whether the study satisfies your outcome specificity criteria or it does not because you have no idea what ICD-9 codes were used?

A.     Okay.  I'm glad you asked that question, Counsel.

Q.     Okay.

A.     And that brings me to a very important point in my discussion on nondifferential bias or non -- differential

misclassification bias of the outcome.

And this is a very critical point that we need to discuss, and without that, the discussion on this is incomplete.

Q.    Can you answer my question first?

A.    Counsel, I -- I am trying my best to explain and I have to answer your question in the context of what I know is a significant bias in how you interpret that answer.

So I have to give you that background before I give you the -- and essentially what it is is one differential misclassification bias of the outcome here is, there are multiple studies that are looking, that are combining mechanical bowel obstruction along with ileus.

Now, what happens is, you did not have a reasonable expectation that mechanical bowel obstruction is any likelihood to be higher in patients who are on GLP-1 RAs.

Now, there's a possibility that sometimes severe constipation and ileus due to the medications may result in fecal impaction which can then cause a mechanical bowel obstruction.  However, this is a relatively

uncommon cause of mechanical bowel obstruction.

And the most common cause of mechanical obstruction, including adhesions, hernia, bowel inflammation or tumors are occurring in equal numbers among patients taking GLP-1 RA medications and those who did not. Therefore combining mechanical obstruction --

Q. You're reading your report to me right now.

A. Counsel, this is --

Q. You're literally reading -- I don't need you to read your report --

A. Counsel, again --

Q. Just answer my question.

A. Counsel, I was trying --

Q. I can read your report. I have read it countless times.

A. Again, we -- we said this again, you have to allow me to answer the question. You are repeatedly interrupting me. I'm answering the question.

Q. Dr. John, the problem is you're not actually answering my question. You are now reading an excerpt from your report for the

last five minutes.

MR. HONNOLD:  Well --

MR. PRZYMUSINSKI:  It has nothing to do with my question.

MR. HONNOLD:  -- why don't we -- why don't we have the reporter read the question back.

Dr. John, listen to the question and see if you can answer, at least answer the question as it's asked and then say, but you would need to provide some further explanation.  And then counsel can decide whether he wants to hear your explanation or not.

THE WITNESS:  Okay.

MR. HONNOLD:  Is that kind of a fair, a fair resolution?

MR. PRZYMUSINSKI:  Totally fair.

A.    My point here, Counsel, is when -- when studies are talking about bowel obstruction, they're including mechanical bowel obstruction and ileus, which is effected by a nondifferential misclassification bias.

So what I'm telling you is when there's an association of using composite

outcomes, including outcomes that are related to the exposure and outcomes that are not related to the exposure, the hazard ratio, the observation you see is a bias towards the known and the true association of the exposure to the outcome is greater than what you observed with the study findings.

In other words --

BY MR. PRZYMUSINSKI:

Q. Okay. Dr. John, please, like even your counsel said try and answer my question and, like, this has nothing to do with my question. Let me --

MR. HONNOLD: Let's do this. Just to be fair, do -- do you want her to --

MR. PRZYMUSINSKI: Let me just ask --

MR. HONNOLD: -- madam reporter --

MR. PRZYMUSINSKI: Let me ask the question, maybe it's a simpler question.

MR. HONNOLD: Okay.

MR. PRZYMUSINSKI: All right?

MR. HONNOLD: Okay.

BY MR. PRZYMUSINSKI:

Q. I will try. Like, I get that

there's context and nondifferential bias is all over your report, so I appreciate that.  Okay?

But here's my question.  I'll break it down to pieces, let's see if we can do it that way.

This abstract does not identify what ICD-9 or ICD-10 codes were used to identify the outcome of bowel obstruction; correct?

A.    That is correct.

Q.    All right.  Now, in your report when you talk about outcome specificity and you have -- we wrote down a list in front of you, of these specific ICD 9/10 codes that when -- those are the ones you considered -- you give greater weight to a study, versus when others are included, you would give lesser weight; correct?

A.    In general, yes.

Q.    Okay.

A.    In general, yes.

Q.    Okay.  Since you do not know which ICD-9 or 10 codes were used in the study, you cannot tell me or tell the court whether the ICD-9 codes these authors used to detect the outcome were the ones you claim should get

greater weight or the ones you claim would result in a study getting lower weight; correct?

        A.    So I need to provide this context.

              Counsel, you're not allowing me to answer the question and provide that context here.  My point --

        Q.    Can you just answer my question first and then provide a context?

        A.    No.  I cannot --

        Q.    Can you tell which of the codes are --

        A.    No.  I -- even though I cannot say which of those codes are used in this specific study, the point is regardless of what we find, if there's a mix of codes that are associated with mechanical and ileus and you're still seeing an association, the true association is greater than what you observed in the results.

              So in answer to your question, do I have the specific ICD 9/10 codes for the study, I do not.  Does that completely remove my ability to make a conclusion from that abstract?  It does not because of this explanation.

Q.    So, look, your conclusion -- so let me ask one more question on that topic.

The weight you gave to this study with respect to the criteria of outcome specificity, was it all effected by the fact that you did not know which ICD-9 codes or 10 codes were used?

A.    It would -- for that specific criteria, it was lower, the weight associated with that study was lower than some of the other codes we used.

Q.    Because you don't know what specific codes were used?

A.    That is correct.

Q.    All right.  Now, another thing you say at the bottom of page 24, is -- and this is four lines up:  "The specific confounders adjusted for are unclear."

Do you see that?

A.    Yes, I do.

Q.    So although there's a list of items on the baseline characteristics, this manuscript doesn't tell you which of those characteristics were used to adjust or adjusted for in their risk estimates; correct?

Bind John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    So I want to clarify that again.

Again, this is my practice.  When we look at specific confounders in an analysis, we list those confounders in our table 1.

And once we have information on those confounders, they are generally used in the outcome -- in the confounder list.

And so if -- the reason why that table lists those factors that it does, is highly likely, means that listed items are included in the adjustment for confounds.

Now, are there others?  Of course. Because you cannot list all 151 cofounders within the limits of that table.  But I would say, based on my experience, the ones listed there are likely to be included in that -- in that list of confounders they adjusted for and of course there may be several more in addition to that list.

Q.    Likely or certain that they adjusted for those?

A.    Again, I can only say that based on my experience in both writing, reviewing these articles, it's very unusual for someone to put these in a table 1 and then not adjust for that

as confounders.

Q.    All right.  One more thing on this two-pager.

You say at the very bottom, again at page 24 of your report:  "Whether and how the authors confirm drug exposure and duration is not provided."

Do you see that?

A.    Yes.

Q.    So would you at least agree with me that this study does not meet your exposure verification criteria, at least you can't tell if it does?

A.    I agree with you.  I cannot say that for sure.

Q.    And based on this abstract, we actually don't know whether any or how many of the subjects who developed intestinal obstruction or bowel obstruction were actually taking a GLP-1 medication at the time; correct?

A.    No.  I can't say that for certain.  So -- because there are some database where I could say that for sure.  For example, TriNetX, if this study was run in TriNetX, I could tell you that it was not done.

But in this is a more granular database, and it is very possible it was done, I just cannot say for certain it was done. I can only make the educated guess based on my experience about other studies from this database.

Q. And the court doesn't want you guessing. We don't want you guessing.

The question I had was based on the nature of this abstract information there, is information you can say to a reasonable degree of medical and scientific certainty we don't know how many of the patients in the GLP-1 cohort who developed ileus or intestinal obstruction or whatever falls into that bowel obstruction category actually were on the drug at the time; correct?

A. Correct.

Q. Thank you.

All right. Let's go to -- this is the Bennett study.

And -- thank you. This is going to be Exhibit No. 11.

(Defendant's No. 11, Article, Association between therapy with dipeptidyl

peptidase-4 (DPP-4) inhibitors and risk of

ileus: a cohort study, was marked for

identification.)

BY MR. PRZYMUSINSKI:

Q. And, again, for this one, Dr. John,

on page 25 of your report, you have your

discussion of that?

So looking at your report, Doctor,

on page 25, under the section Study Design and

Method, you state that this was a retrospective

cohort study using the Medical Data Vision,

MDV, database in Japan; is that correct?

A. That is correct.

Q. And slightly below that, two

paragraphs down, you identify the GLP-1

medications that were used in this study as

exenatide, lixisenatide, exenatide-LAR, or

liraglutide.

Do you see that?

A. Correct.

Counsel, I do want to get my actual

paper also so that I can -- do you have that?

Q. The exhibit is the paper.

A. Oh, okay. Got it. Sorry.

Q. That reminds me, let me just ask you

one quick question.

Can you go back to Exhibit 10 for a second, Doctor, the Alkabbani abstract?

A.    Sure.

Q.    Is there any information in this Alkabbani abstract to identify which specific GLP-1 RAs were -- the patients in that cohort were receiving?

A.    Again, Counsel, this abstract does not do that.  But, again, as I mentioned earlier, I consider GLP-1 RA as a class, and so I did not consider that significant to include in my report.

Q.    I didn't ask you whether --

A.    Yes.  Does not mention.

Q.    So we don't know if any patients in this study took dulaglutide; correct?

A.    Based on this information, we don't.

Q.    We don't know if any took semaglutide?

A.    No, we do not know that information.

Q.    We don't know if any took liraglutide?

A.    Well, we know that they took one of the four -- one of these drugs.  We just don't

know which one and in what numbers.

Q.    All right.  So we don't know if any took liraglutide; correct?

A.    Again, they have to have taken something.  We just don't which drug they took.

Q.    Okay.  Same for tirzepatide?

A.    Again, the same thing.

Q.    Okay.  All right.

Now, sorry to distract here, I went a little bit out of order there.

So we're on the Bennett paper, Exhibit 11.  And in your report -- and you can verify in the study if you want -- but the three drugs that were -- sorry -- the four drugs that were included were exenatide, lixisenatide, exenatide-LAR, or long-acting release, and liraglutide; right?

A.    Correct.  That's correct.

Q.    And those were the -- there's also DPP-4 inhibitors, but those were the GLP-1 drugs in the study; correct?

A.    That is correct.  There were DPP-4 inhibitors in the study.

Q.    Now, just to be clear, no semaglutide in the study?

A.    That is correct.

Q.    No tirzepatide in the study?

A.    That is correct.

Q.    No dulaglutide in the study?

A.    That is correct.

Q.    Got it.

A.    And I also wanted to add, Counsel, that there is a drug called voglibose.  That's the other comparator, so just to add that.

Q.    And what kind of drug is that?

A.    It's an alpha-glucose-based inhibitor that's used for the treatment of diabetes.

Q.    Okay.  Now, if you look at your report -- or you can look at the study, but it's faster in your report -- the next line further up on page 25, you list the ICD-10 codes that were used to identify the primary outcome of ileus.

Do you see that?

A.    I do see that.

Q.    And you list that as K56 and K56.7; right?

A.    It's K56.0 and K56.7.

Q.    And those two outcomes, if you look

at page 26 -- actually, if you flip over in your report, Doctor, with me for a second, you see section on discussion on the Bennett study?

A.    Yes.

Q.    On 26, the first sentence, you say: "This study has the strength of specifically examining paralytic ileus using ICD-10 to indicate K56.0 and K56.7, the outcome most directly relevant to drug-induced slowing of the gastrointestinal tract."

Do you see that?

A.    I see that.

Q.    So you consider that a strength of this particular study?

A.    Again, I want to clarify that.

Those two ICD codes are highly likely to be specific to that outcome.  But there are also other codes which I mention which is on your list here, Counsel, just to remind you, in your own handwriting.

Yeah.  So those -- I just want to remind you that those codes were not on there. But two of the codes that are listed here in this study are on that list.

Q.    Well, look, you wrote:  "The study

has the strength."

A. Correct. And I'm just telling you --

Q. And I'm just trying to -- so it is correct that you consider the use of these two codes, maybe not perfect, but as a strength of this study?

A. That is exactly what I wanted to point out, Counsel. Thank you.

I want to say that those two codes, having them are good, but that's not exclusive. It's still good.

Q. Do you know of -- okay. I'll ask you this question now and as we get through it, we can -- can you think of any other study besides Bennett that used codes for identification of the outcome in a manner that was more comprehensive and they included this K56.0 or K56.7 but also included some of the others you thought were appropriate without including codes that you considered to be inappropriate, therefore lower than what -- in other words, are there studies who have a better outcome specificity than this, to your knowledge?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I believe there might be.  I cannot answer that question without looking through the codes for each individual study.

Q.    So right now you don't remember, but we can look it up?

A.    I would say without looking it up, I cannot answer that question, Counsel.

Q.    Okay.  If I told you that there were at least two studies, one by Garg, G-a-r-g, and one by N-i-u, Niu, that use the exact same codes K56.0 and K56.7, would you assume that that was also a strength of those studies?

A.    So, Counsel, I want to clarify those two studies.  It's very important that we clarify.

Those are both studies that looked at the same database.  Okay?  So, yes, they are two separate studies, but they both looked at the exact same database, along with one or two additional studies, they all looked at the same database.  It's called TriNetX.

Now, as a reviewer and as a journal editor, that is not a database I give a great deal of importance to or respect to.  It's very unusual for me to consider a manuscript based

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

on that alone because there are major limitations of that database.  And so a lot of studies that are generated, in my experience, generated from the TriNetX database -- so they could use the more specific codes, the point is some of the outcome exposure verifications, the duration at which they take the medication, the fact that, as a researcher we have no access to what's happening behind the scene, it's a complete black box.  You just submit some information to them.  We don't know what kind of propensity score matching they do.  We don't know whether the patients stay in the system, go out.

There's major limitations to TriNetX that those studies that I do not give weightage, regardless of what the ICD 9/10 codes are, there is no way that a respectable epidemiologist who knows the field would give weightage to studies that arise from TriNetX.

Q.    I appreciate that.

Now, my question, now that you've given all the context about the database which I didn't ask about, was whether you considered the fact that they used the same codes, 56.0

and 56.7, a strength of that study, regardless of the overall evaluation of that study?

A.    I would say, again, what I mentioned before, it does not include all the codes that I considered associated with hypomotility, but the fact that it includes two of those codes is a relative strength of that study, among numerous weaknesses.

Q.    Now go back to Bennett.

You agree with me, Doctor, that in this study, after the authors adjusted for confounders, they did not find a statistically significant increased risk of ileus with GLP-1 RAs medications; correct?

A.    Again, I want to clarify this, Counsel.

What happened here was the confounders they adjusted for were inappropriate.  The correct confounders were not adjusted for.

But in answer to your question, among the confounders they adjusted for, after they did the adjustment, the hazard ratio was not significant.  The code ratio was significant, but after they adjusted for

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

factors, including confounders, and missed major ones, the adjusted hazard ratio was not significant.

Q. All right. So aside from the problems from the confounders that you're raising, the actual finding that the authors report, if you look at the abstract under Conclusions is: "Independent risk of ileus among new users of alogliptin did not significantly differ compared with new users of other DPP-4 inhibitors or GLP-1 receptor agonists but was significantly lower than the new users of voglibose."

Do you see that?

A. Where are you reading, Counsel?

Q. Conclusion in the abstract document.

A. Okay.

Q. Did not significantly differ; correct?

A. Okay. Yes.

Q. That's correct.

So this study, whatever limitations you're raising, did not find a significant association between GLP-1 use and ileus; correct?

A.    The adjusted analysis did not show a significant difference between GLP-1 RA use and ileus.

Q.    Doctor, one of the other categories you have in your quality criteria is generalizability.

Do you recall that?

A.    Yes.

Q.    If you look at page 381 --

A.    You said 381?

Q.    -- of the publication --

A.    Oh, okay.

Q.    381 of the publication.

And you look at the right lower corner, the author writes:  "The results of this study can only be generalized to new initiators of DPP-4 inhibitors, GLP-1 receptor agonists, voglibose therapy in Japanese healthcare settings and not to other healthcare settings and populations."

Do you see that?

A.    Yes, I do.

Q.    Okay.  So at least according to the authors, this study is not generalizable to U.S. population; correct?

A.    Again, that's the opinion of the authors.  And you're asking me whether that's the opinion of the authors.  That is.  Again, do I necessarily agree with that?  I may not.  But that's what the authors say.

Q.    Okay.  Let's go to the next study.

MR. PRZYMUSINSKI:  And give me tab 11, please.

BY MR. PRZYMUSINSKI:

Q.    All right.  We're going to mark this, Doctor, as Exhibit No. 12 to your deposition.

(Defendant's No. 12, Article, Risk of Gastrointestinal Adverse Events Associated with Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    And just for you, again, 42 is the page where you talk about this study in your report if you want to have that in front of you.  It's actually mostly on 43, but you have the title on the bottom of page 42.

So this is the Sodhi study.  And it's what's described, at the top of this

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

document, as a research letter; correct?

A.    That is correct.

Q.    Doctor, just out of curiosity, because I don't really know -- this is also two pages long -- is there a difference between a research letter and full publication, or are they the same thing?

A.    So it depends on what you refer to in terms of similarities and differences.

There are many similarities between a full paper and a research letter, and there are some differences.

Q.    What are the differences?

A.    So the differences are that the research letter might have a shorter word count than a full paper.  And sometimes -- and there's a limitation in the number of tables or figures.  There's also a limitation in whether a journal might allow supplementing material.

Having said that, this is equally peer-reviewed.  It's peer-reviewed by the same set of editors of -- this is one of the world's premier journals, Journal of American Medical Association, with an impact factor of 55.  It is a very prestigious journal, very hard to get

published in this journal.  It's an outstanding group of editors and outstanding group of reviewers.  I have reviewed for this journal. It's a very, very high level of peer-review process that goes in there.  And I would say the peer-review process that goes in there is similar to a full paper.

The differences are only in terms of the length of the paper.

Q.    Okay.  Good.

So authors get a little less room?

A.    I'm sorry.  Could you repeat that?

Q.    The authors get a little less room to present their information?

A.    Again, on the paper, yes.  But a lot of times, a lot of that information comes out through peer-review, which you may not be able to see, but a lot of times the authors are asked to give additional information through the peer-review process.

Q.    And you haven't seen whatever additional materials, if there were any, that were provided through the peer-review process?

A.    Unfortunately, JAMA is not one of the journals, I believe, that publishes their

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

peer-review.  There are other journals that do it.  JAMA is not one of them.

Q.    So the answer is no?

A.    The answer is I don't have any information beyond what's in here, if that's your question.

Q.    Okay.  Now, in your report, Doctor, on page 43, section on Study Design and Methods, you state that:  "This was a new user, active comparator cohort study using a random sample of 16 million patients between 2006 and 2020 using the PharMetrics Plus for Academics database, IQVIA, a large U.S. health claims database."

Do you see that?

A.    I do see that.

Q.    Okay.  And if you look at the next sentence, you note that there are 613 subjects with semaglutide; correct?

A.    Correct.

Q.    4,144 with liraglutide; correct?

A.    Correct.

Q.    And 654 taking the combination of bupropion naltrexone; correct?

A.    That's correct.

Q.    Okay.  Now, no dulaglutide in this study?

A.    That is correct.

Q.    No tirzepatide in this study?

A.    That is correct.  This was -- this study was done in 2020 before, I believe, the availability of tirzepatide.

Q.    Now, you note, under Results, in the second sentence, that a statistically significant increased risk for bowel obstruction was identified in the study in patients treated with GLP-1 RAs.

Do you see that?

A.    I do see that.

Q.    Now, this is not a study where they had a specific analysis limited to either ileus or paralytic ileus; correct?

A.    That is correct.

Q.    Great.

Now, if you look at the Discussions paragraph a little further down, the last sentence says:  "The zero bowel obstruction events amongst semaglutide users may reflect insufficient follow-up time rather than the absence of risk."

Do you see that?

A.    I do see that.

Q.    And I understand the explanation. But, factually, there were no bowel obstruction events in patients taking semaglutide in this study; correct?

A.    Counsel, yes.  Factually there were also only 613 patients for a drug that was just approved before the study was completed.  So, yes, they had both low numbers of patients and low follow-up.

Q.    But you at least agree with me that for semaglutide specifically this one study doesn't provide any evidence of an association?

A.    Again, Counsel, I would say that GLP-1 RAs as a medication class, including semaglutide, I believe are associated with an increased risk of ileus.

Now, in the specific -- specific -- specific report -- specific study there were no cases, but I don't believe that excludes semaglutide from having -- again, your question was, would that exclude semaglutide.  Again --

Q.    I did not say that.  My question -- we'll try it again.

You would agree with me that this study does not provide evidence that semaglutide, this individual study provides evidence directly that semaglutide increases the risk of ileus or intestinal obstruction?

MR. HONNOLD: Object to the form.

You can answer.

A.    I would say that under this highly underpowered study where there was very inadequate number of patients on semaglutide, with a very low duration of treatment response, there were no events; therefore, there could not be any conclusions about association of semaglutide with bowel obstruction or ileus in this study.

BY MR. PRZYMUSINSKI:

Q.    And of course assume same answer would be for dulaglutide or tirzepatide given that there were no patients in the study taking those drugs; right?

A.    Again, the same answer I would give to semaglutide with a -- again, I can study these medications as a class, but in this specific study, given the absence of liraglutide and tirzepatide in the study

population, I cannot conclude that there was an association between use of either drug with bowel obstruction or ileus.

Q. Okay. The next paragraph down in your report: "The specific ICD codes used for bowel obstructions were not recorded and the study did not distinguish between ileus and mechanical bowel obstruction."

Do you see that?

A. I do see that.

Q. So without rehashing, but like the discussion we had of Alkabbani, you don't know what ICD-9 or 10 codes were used to identify in this case bowel obstruction; correct?

A. Again, Counsel, I want to reiterate what I said there with that same caveat. I believe it's the same misclassification, nondifferential bias here that affects the study as well.

We didn't -- but in answer to your question, we did not know what specific ICD 9/10 codes were used in the study.

Q. And the other question I asked you on that topic on the other study was whether the fact that you don't know specific codes,

whether that in any way effected the weight you gave to the study, for the last let me say it may have decreased the weight some, is that also true here?

A.    That specific criteria, it is -- I did give less weightage to the study based on that specific criteria.  You're absolutely correct, Counsel.

Q.    Now, Doctor, if you look a little further down the paragraph:  "The sample sizes were small resulting in wide confidence intervals, and the study did not adjust for opioids, antihistamines, or other medications known to cause ileus."

Do you see that?

A.    You're talking from my report; correct?

Q.    Yes.  I'm on page 43.

A.    Okay.

Q.    In that same paragraph we just read about the ICD codes, about halfway through.

A.    Yeah.  Yes, I see that.

Q.    So in terms of confounder adjustment, the study did not certainly do a particularly good job of adjusting for

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

confounders, including things like opioids that you believe are an important confounder to adjust for; correct?

A.    Well, I would say the study does mention the confounders they adjust for.  And so I just want to mention that, again, from the manuscript of the paper you showed, the exhibit you shared, I'm -- I'm just looking for the exact location.

So the confounders, the model -- it says the hazard ratios from the Cox model were adjusted for age, sex, alcohol use, smoking, hyperlipidemia, abdominal surgery in the previous 30 days, and geographic location, which are identified as a common cause variable of risk factors.

And then additionally, they found that patients with hyperlipidemia were more common on the GLP-1 RA arm, so they did a sensitivity analysis that excluded patients with hyperlipidemia which still showed that -- because most semaglutide users have hyperlipidemia, which showed the same findings as what we did in the primary analysis.

So, yes, they did adjust for

confounders, but they did not adjust for confounders including opioid use.

Q. Let's back up. So now you introduced something different. Okay?

Opioids were not adjusted for in the study?

A. That is correct.

Q. Okay. Nor -- nor were anticholinergics?

A. That is correct.

Q. Or antihistamines?

A. Again, as far as we know from this information here, it was not adjusted for.

Q. And you mention that because there was an imbalance in hyperlipidemia at baseline, the authors did a sensitivity analysis excluding persons with hyperlipidemia; is that correct?

A. That is correct.

Q. I think you said they got the same result, but that's not actually accurate, is it?

A. They had similar results.

Q. Well, no. They found no significant association for GLP-1 RAs for bowel

obstruction, right, when they adjusted?

A.    Well, I meant -- I was reading out from here.

Q.    Okay.

A.    And I believe they said they found similar in some of the outcomes but not specifically in bowel obstruction.

Q.    So bowel obstruction was -- they actually addressed hyperlipidemia, which was an imbalance in the groups.  They found no significant effect; correct?

A.    That is correct.  Again, the hazard ratio was 3.63.  The 95 percent confidence was 0.87 to 15.10 because it has a ratio of class 1, it was not --

Q.    You don't mention that in your report, do you?

A.    I don't recall if I did.  But I certainly considered that in -- in my -- in my evaluation of the study.

Q.    Ready to do the last of your four studies and then we'll take a break after that?

A.    Okay.

MR. PRZYMUSINSKI:  So this is going to be Exhibit 13.

(Defendant's No. 13, Article,

Incretin-Based Drugs and Risk of Intestinal

Obstruction Among Patients with Type 2

Diabetes, was marked for identification.)

MR. PRZYMUSINSKI:  Brad.

MR. HONNOLD:  Thank you.

BY MR. PRZYMUSINSKI:

Q.    So now page 28 is where you have your own discussion in your report about this, so I get you oriented.

All right.  So this is the Faillie study which you've talked about before.

And if you look at page 28 and 29 of your report, and if you look at specifically page 29, you note at the very main first paragraph there that there were two cohorts in the study.

The first sentence of the first full paragraph.

A.    Correct.

Q.    And one of the cohorts was a GLP-1 cohort and the other one was a SGLT-2 -- sorry -- and the other one was a DPP-4 cohort; correct?

A.   So there were two comparisons in the study, one was a comparison of GLP-1 RA users with SGLT-2 inhibitor users.

Q.   Okay.

A.   And another was a comparison of DPP-4 inhibitors versus SGLT-2 inhibitors.

Q.   You did that way better than I did.

Now, within the GLP-1 RA group, right, the drugs that were included were dulaglutide -- I'm on the second sentence there, second line -- exenatide, liraglutide, excluding the weight loss formulation; right?

A.   Uh-huh.

Q.   Lixisenatide and semaglutide?

A.   And I just want to clarify that's the same information on the paper.  Correct, Counsel.

Q.   So tirzepatide was not in this study?

A.   That is correct.

Q.   Okay.  Now, the outcome of interest, as you explained in this next paragraph, was intestinal obstruction; right?

A.   So the outcome of interest, again, just to clarify, was defined as hospitalization

with a primary or secondary diagnosis of intestinal obstruction, which included the following ICD codes.  It included K56.0, which is paralytic ileus; K56.2, volvulus; K56.4, other impaction of intestine; K56.6, other and unspecified intestinal obstruction; K56.7, ileus unspecified; K31.5, obstruction of the duodenum; K59.2 neurogenic bowel, not otherwise classified; and K59.3, megacolon, not otherwise classified.

Q.   That was going to be my next question, so thank you for doing that.

A.   Okay.

Q.   So among the codes that these authors chose to include, right, ICD-9 codes or 10 codes -- I guess it's 10 -- there were numerous codes that you said earlier are associated with, in your view, with conditions that are not likely to be related with ileus related to drug use; correct?

A.   That is correct.  It's a mix of codes; some of which may be related to drug-induced ileus, some of which might not.

Q.   So they included K56.2, which is volvulus?

A.    Correct.  So that included, you're saying, the codes that are not specific; right, Counsel?

Q.    The ones that you said are not specific.

A.    Yes.

Q.    56.4, other impaction of intestine?

A.    That is correct.

Q.    K56.6, other unspecified intestinal obstruction; right?

A.    Correct.

Q.    K31.5, obstruction of the duodenum?

A.    Correct.

Q.    K59.2, neurogenic bowel?

A.    Correct.

Q.    And K59.3, megacolon; correct?

A.    Correct.  And I want to mention that those codes are not here, but I just want to say they're all in the report.

Q.    Okay.  Now --

MR. HONNOLD:  Do you care if we mark that just because we've been over it for two or three times today?

MR. PRZYMUSINSKI:  Yeah.  So why don't we --

MR. HONNOLD:  That way just so it's clear and we can say --

MR. PRZYMUSINSKI:  14, let's go ahead and mark it as Exhibit 14.

MR. HONNOLD:  We can say on the record that whenever the witness has grabbed the piece of paper and said they're not here or on your list or on the left or on the right, that we're referring to what we're going to mark as Exhibit Number 14. Thank you.

(Defendant's No. 14, Handwritten document, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    All right.  So --

MR. HONNOLD:  Thanks for doing that.

MR. PRZYMUSINSKI:  Thank you, guys. I appreciate that.

BY MR. PRZYMUSINSKI:

Q.    So the authors of this study, all right, Jean-Luc Faillie and his coauthors, right, who included people that -- like Romain Altwegg, who is in the department of gastroenterology; right -- an epidemiologist and endocrinologist?

A.    I'm sorry, Counsel.  Where are you reading that from?

Q.    Sorry.  So first page --

A.    Okay.

Q.    -- on it, and if you look at the author, each author has got little --

A.    Okay.

Q.    -- next to their name --

A.    Uh-huh.

Q.    -- marks and then you can look at the bottom to see what their affiliations are.

A.    Okay.

Q.    So they are medical pharmacologists, diabetic epidemiologists, clinical epidemiologist, endocrinologist, surgeons, gastroenterologists, neurologist, epidemiologists and oncologist included in this study; correct?

A.    Incorrect.  You said there were gastroenterologists with an "S," there was only one gastroenterologist that I see, is the middle author and that is Author Romain Altwegg, he's the only person that I see here with the -- and who is a middle author.  He's author number -- 1, 2, 3, 4 -- 5 out of 7

authors.

Q.    Well, you at least agree that there is a gastroenterologist as one of the authors?

A.    I would say there's a gastroenterologist as a middle author, number 5 of 7.

Q.    Correct.

All right.  Their decision of what ICD codes should be used to identify their outcome of interest is different than yours; correct?

A.    The study authors outcomes of interest for the primary outcome are different from mine.  Correct.

Q.    Now, for this primary analysis, all right, the authors found a significant association between GLP-1 RAs and the nonspecific endpoint they described as intestinal obstruction; correct?

A.    That is correct.

Q.    Okay.  Now -- but as you note on page 30 of your report, and you can see this under -- in the second paragraph on page 30, the authors also did a secondary analysis; right?

A.   That is correct.

Q.   And that's something you actually mentioned earlier today when we were talking; right?

A.   That is correct.

Q.   And for that analysis, as you had described it, the authors limited the outcome to the codes that they believe are most related to slowed intestinal motility; correct?

A.   Correct.

Q.   Okay.  So the authors in this first -- broader look based on ICD-9 or 10 codes -- or I guess ICD-10 codes that were different from yours and they found an association; right?

A.   They found an association between the multiple ICD codes they used in the primary analysis.

Q.   And then they said let's do a sensitivity analysis looking at the specific codes that we think are most closely related to slowed intestinal motility; correct?

A.   Again, the highlighting, what they think is most likely.  Correct.

Q.   Well, this is their paper; right?

Binu John, MD   Case 3:24-md-03094-KSM   Document 691-24   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26   Page 281 of 407   Page 279

A.    Absolutely it is.

Q.    Okay.

A.    But we are the ones critiquing it, so our input is also important.

Q.    Well, I don't know if we're peer reviewers, but -- but I think we're the ones reading it.  But let's -- let's just keep going.

So now if you look at the publication, there's a table S4, which is in the supplemental materials, and it's got a page 9 at the very bottom of it.

Do you -- do you see that?

A.    One second.

Correct.

Q.    So now this is -- table S4 is titled Hazard Ratios for Intestinal Obstruction Comparing GLP-1 RAs and DDP-4 Inhibitors with SGLT-2 Inhibitors, restrict the outcome to the ones that are more related to decreased intestinal motility.

Do you see that?

A.    Yes, I do.

Q.    So this is where the authors base on their determination of what they believe the

**www.hartfordreporting.com**

codes are that are most related to the decrease in intestinal motility, repeated their analysis, this time comparing in cohort 1, the GLP-1 RAs to SGLT-2s and you can see that there were 25,617 patients in the GLP-1 RA cohort and 67,261 in the SGLT-2 cohort; correct?

A.    Correct.

Q.    Okay.  Now what they found, after waiting -- using propensity score stratification was that the hazard ratio was 0.96 -- or the confidence interval that goes -- well, cross 1, meaning it's no -- nonsignificant; right?

A.    That is correct.

Q.    So in the authors' view, their analysis, which was more specific to decreasing intestinal motility, not only did not find a significant association, it actually found a risk that was below 1 suggesting a decreased risk; correct?

A.    Again, there was no statistically significant difference.  It was 0.96.  It was very close to 1.

Q.    So no effect?

A.    No effect.

Q.    Okay.

A.    No effect on the outcome where they thought was more likely to later -- ileus.

Q.    Now let's go to table S2 which is on page 7.

Do you have that, Doctor?

A.    S2?

Q.    Yes.  It's just two pages towards the front.

Now, this is another supplemental analysis the authors did looking at the individual products; right?

A.    Uh-huh.

Q.    Did you review this also as part of your --

A.    Yes, I did.

Q.    Okay.  For dulaglutide, which is on the first line, the authors found no significant association; correct?

A.    The hazard -- weighted hazard ratio was 1.65 with a 95 percent confidence to develop 0.78 to 3.47.

Q.    So no significant association?

A.    No significant association.

Q.    For liraglutide, the authors found

no significant association; correct?

A. Again, here, the hazard ratio, Counsel, was 1.74 with a 95 percent confidence level but it was just below 1, 0.97. And an upper limit of confidence in level that was 3.14, so because it crossed 1, it was not statistically significant.

Q. And for semaglutide, in this study, there were no events?

A. That appears to be the case. Correct.

Q. So among 998 subjects taking semaglutide, not a single one of them had an intestinal obstruction event; correct?

A. Again, yes. Putting that in context out of 25,000 patients, I believe, there were only 998 patients on semaglutide so similar to what we mentioned earlier, this highly underpowered for semaglutide but within that -- those limits, no -- within that short, small number of patients, no events.

MR. PRZYMUSINSKI: Let's take a pause. I think we finished your four strongest evidence studies, a little break and come back. Ten minutes.

THE VIDEOGRAPHER:  Going off the record the time is 3:22 p.m.

(A brief recess was taken from 3:23 p.m. to 3:36 p.m.)

THE VIDEOGRAPHER:  We're back on the record the time is 3:36 p.m.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Welcome back.

A.    Thank you, Counsel.

Q.    Let's talk a little bit about meta-analysis.

So I think we mentioned earlier that one of the meta-analysis that you discussed in your expert report was the Chiang meta-analysis.  So we're going to mark that, it looks like, Exhibit 15, please.

(Defendant's No. 15, Glucagon-Like Peptide-1 Receptor Agonists and Gastrointestinal Adverse Events: A Systematic Review and Meta-Analysis, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    All right.  So just, again, for consistency, page 26 in your report is where you start, going onto 27, in your discussion of

this meta-analysis.

So, Doctor, the first author is Cho, C-h-o-H-u-n-g Chiang, C-h-i-a-n-g.  And the title of this meta-analysis is Glucagon-Like Peptide-1 Receptor Agonists in Gastrointestinal Adverse Events: A Systematic Review and Meta-Analysis that was published in the journal Gastroenterology in 2025.

Do you see that?

A.    Yes.  It is published in the journal Gastroenterology.  There's another journal called Journal of Gastroenterology.

Q.    See?  This is why you're smarter than I am.

Okay.  So now looking at your -- and feel free either way, but I often go off of your report because you did a nice job of extracting the key points.

But under Study Design and Methods on your report on page 27, you note in the last sentence that:  "55 RCTs involving 106,395 participants were ultimately included" in the meta-analysis.

Do you see that?

A.    I do see that, yes, Counsel.

Q.    All right.  Now -- and if you look at your Results section, which is right below that, third line, you say:  "GLP-1 receptor agonists were not associated with increased risk of paralytic ileus, RR of 0.89 and a confidence interval that crosses 1"; correct?

A.    Correct.

Q.    Okay.  And similarly, if you look two more lines down, you say:  "GLP-1 receptor agonists were not associated with increased risk of intestinal obstruction, RR of 0.82 and, again, a confidence interval that crosses 1"; correct?

A.    That is correct.

Q.    So limitations, whatever they may be -- we'll talk about this in a second -- this study did not find a significant association either for ileus or for intestinal obstruction; correct?

A.    That is correct.

Q.    Okay.  Now, if you look at the second paragraph under Discussion, that's where you discuss some of the limitations of the study.

Do you see that?

A.    Yes.

Q.    Okay.

A.    And also, to be fair, Counsel, the lines above that I discuss the strength.  So like in every paper, I -- I offer a balanced view here.

Q.    I'm sorry.  I didn't mean to imply that --

A.    No.  I just wanted to highlight that I applied that same principle to every study.

Q.    And I wanted to highlight that I'm giving you the opportunity to talk about limitations.

A.    Thank you, Counsel.

Q.    All right.  Very good.

So you say:  "Several limitations affect its applicability to detect GLP-1-induced ileus."

Do you see that?

A.    I do see that.

Q.    So the first thing you say is: "RCTs are designed primarily for efficacy, not rare adverse event detection, and gastrointestinal adverse events were not primary endpoints in most trials."

Do you see that?

A.    Yes, I do.

Q.    Okay.  Now, let me just make some basic questions.

So now I assume you're not saying that clinical trials -- randomized clinical trials, placebo-controlled clinical trials -- cannot inform our understanding of the safety of medication unless the specific safety issue is a primary endpoint?

MR. HONNOLD:  Let me just object to the form.  I think it's overbroad.

You can answer, Doctor.

A.    Counsel, could you repeat that question?

BY MR. PRZYMUSINSKI:

Q.    Sure.

As a general principle -- I want to make sure I'm not over-interpreting myself -- I assume you're not suggesting that data from randomized controlled clinical trials, right, that are not -- individually, that trial is not designed for a primary outcome related to safety cannot inform our understanding of the safety of the medication.

A.    Okay.  So, again, there are multiple negatives here, so I need to clarify to make sure I fully understand what you're saying.

Q.    Let me make it positive.

A.    You could stick -- it's up to you. Yeah.  If you can simplify or say it in a different way, I would appreciate it.

Q.    Would you agree with me that even if a randomized controlled trial does not have a primary outcome focused on safety, that, nonetheless, the results of that study can inform our understanding of the safety of the medication involved?

A.    Depending on what the adverse event is, it can.

Q.    Okay.  Now, you also mention in that statement that GI adverse events were not primary endpoints in most trials.

Do you see that?

A.    Correct.

Q.    Okay.  You know which trials GI adverse events were the primary endpoints?

A.    I would say, given a chance to correct that, I would say in all trials because none of the trials had GI primary as an

endpoint.

Q.   Okay.  You sure about that?

A.   To the best of my knowledge.  Again, if you want me to clarify, I can go back to the papers and look at it.  But I'm not aware of whether any of the studies were designed to look at GI primary endpoints.

Q.   And let me ask it and make sure I -- because remember when you say you didn't look at individual RCTs; correct?

A.   So I wanted to clarify that.

If it's included in the meta-analysis, I specifically looked for the names of it, for example, because there were other meta-analyses of randomized controlled trials, and so when I was examining my material, I looked at the randomized controlled trials that were included in this paper.  I looked at the randomized controlled trials that were included in some of the other papers.  And if there was a substantial overlap of trials, going by the name of the trial, I did not include smaller meta-analysis or randomized controlled trials.

So to that extent, I did go through

the meta-analysis to look to see what trials were included, but I did not go through the full data on individual randomized controlled trials to look to see.

Q. You're trying to guess my questions, and that wasn't really my question.

What I really, Dr. John, was asking was you earlier told me you didn't go through systematically identifying individual RCTs and reviewing those RCTs for each of the GLP-1s to see if they had information. If it was intestinal obstruction, you relied primarily on your review of these meta-analyses; is that correct?

A. That is correct.

Q. All right. And so when you make the statement that the gastrointestinal adverse events were not primary endpoints in most trials -- now you say in all trials -- are you referring to the trials including in the meta-analysis or in trials conducted with these medications at large?

A. So that, I applied my general awareness and knowledge about GLP-1 RAs in the field. As a gastroenterologist, I am aware of

where GLP-1 RA medications are used as primary outcomes in my topic. It was in my field.

Now, treatment of diabetes, as gastroenterologist, is not my primary area of expertise. Treatment of obesity, there are some gastroenterologists who treat obesity, but that's not part of my practice.

But treatment of MASH, for example, metabolic dysfunction-associated steatohepatitis, is part of my practice. So I'm very familiar with GLP-1 RA medications used in my field. If there was a clinical trial that examined GLP-1 RAs as an outcome of a GI outcome in my field, I would generally be aware of that.

So I'm basing that based on my general awareness of the literature and my knowledge of the literature. Did I look specifically to see whether there was any paper in these meta-analyses or if there was ever a study done? I did not specifically look there.

Q.    If I told you that there were more than 200 clinical trials conducted with these medications, can we agree that you don't know whether any of those trials assessed GI adverse

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTED ORDER

events as the endpoint of the study?

A.    Not the endpoint, Counsel.  I said primary endpoint.

Q.    Or the primary endpoint.

A.    Right.  Again, in my field I'm not aware of any clinical trial where the GI outcome was the primary endpoint of a randomized controlled trial involving GLP-1 RAs.

Q.    All right.  We'll leave that for now.  Okay.

Now, for the -- the studies that were -- the RCTs, the clinical trials that were included in this Chiang meta-analysis, in performing your review, did you actually look at the underlying data, meaning did you pull the peer-reviewed publications from those studies to assess the methodology that was used, the endpoints that were defined, the manner in which adverse events were collected, that whole thing?

A.    Did I go through each individual RCT of the 55 clinical trials that are included in the meta-analysis?

Q.    Yeah.

A.    I did not.

Q.    So you really don't know what specific protocols, design specifications, adverse event monitoring, events of special interest, or any of that were included in these trials, do you?

A.    Well, I can tell you, Counsel, from what the authors themselves explain -- so if you look at the paper, let me tell you the exact cite source here.

Q.    Go ahead.

A.    Only a small number of studies actually reported these as outcomes.  So I'm just looking at the specific place in the paper.

So out of the meta-analysis of 55 randomized controlled trials, most trials did not report on ileus or obstruction -- this is from my report.  Only 8 of 55 clinical RCTs mentioned paralytic ileus, and only 19 mentioned intestinal obstruction.

Q.    That's helpful, but that's not really my point, Doctor.

My point is that you don't know, for any of those trials, whether we're talking

about the 8, the 19, or the 55, what specifically the design was of the studies, what the primary endpoints were of those studies, what the secondary endpoints were, what the safety and special interests were, what the methods for collecting adverse events were, what the methods for adjudicating adverse events were, what the follow-up was, the frequency of follow-ups, or, frankly, virtually anything about the design; correct?

A. I would disagree about the last part of "frankly, anything about the design" because the authors themselves give a fair amount of detail about clinical trials.

Q. Where?

A. So, for example, they -- you asked me you don't know what these indications of these clinical trials were. So let me give you the information, Counsel.

Q. I didn't ask you about indication. I said "primary outcome."

A. The primary- --again. No, you didn't -- you mentioned and you ultimately said "or, frankly, anything about these clinical trials"; right? I disagree that we don't know

anything about these clinical trials from the RCTs.

So let me tell you.  Under Results, under Study Characteristics --

Q.    So where are we?

A.    Page 3.

Q.    Of the?

A.    Of the Chiang article, C-h-i-a-n-g, et al., article, under Study Characteristics: "Among the 55 studies, 30 studies were conducted on patients with type 2 diabetes mellitus, 18 on patients with overweight or obesity, 1 on MASH/MASLD, 4 on patients with both overweight/obesity and type 2 diabetes mellitus, and 2 on patients with both overweight/obesity and MASH/MASLD.

"Within the type 2 diabetes mellitus" --

Q.    Doctor, are you going to read me the whole paragraph?

A.    Counsel, you asked me that we don't know anything about the meta-analysis -- RCT studies included in the meta-analysis, and I'm telling you we have a lot of information --

Q.    But you're reading the entire

paragraph.

MR. HONNOLD:  Yeah.  But you indicted his state of knowledge or understanding by making a very broad, kind of accusatory, almost, yeah, and argumentative question, and he's saying that you're wrong.  And so you have opened the door to this response.

MR. PRZYMUSINSKI:  But that doesn't --

MR. HONNOLD:  As well as everything that's about all of these trials that that's in all his supplemental tables.

MR. PRZYMUSINSKI:  Okay.  Well, now you're testifying, Brad.  And I love you, but please stop.

MR. HONNOLD:  Yeah.  Okay.

I'll just say I object to the form of the question and it's argumentative.

BY MR. PRZYMUSINSKI:

Q.    Okay.  I understand.

So I will give you, completely agree that there's information under Study Characteristics on a number of factors; right? So without reading, we can agree that they talk

about indications for the studies; right?
There is also discussion about the study
population size.  There's table 1, to
Mr. Honnold's comment, that include information
about enrollment periods, number of patients,
types of GLP-1 RAs, treatment durations, and
there's also information on the next page about
which drugs were in most of these studies, and
then there's some discussion about exclusion
criteria at a high level; is that fair?

MR. HONNOLD:  And everything in the
supplemental tables.  I mean, if your list
is going to be complete, there's --

BY MR. PRZYMUSINSKI:

Q.    Sure.  Include that.  Include that.

But here's what I want to know.  All
right?  And you're right, my question wasn't
exactly fair.  So let me state it differently.

Without reviewing, whether it's the
abstracts or the studies, publications or the
clinical study reports, you really don't know,
beyond these limited information, for each
individual trial, the specifics of their
design, meaning, for example, how often the
patients see their physicians; how often were

they evaluated; what laboratory studies were done; what adverse events were collected; what adverse events were collected; whether -- what events were defined as events of special interest; what events were adjudicated; what events were not adjudicated?

And I'm not in any way indicting you, I'm just trying to make sure that that's correct. And if it's not, then tell me that it's not and explain to me how you know that.

A.    And, Counsel, all I can say is we have a fair amount of information about these trials in this, and there are aspects of the trials that we don't have information about.

So for things like how often are patients seen in trials, oftentimes even the original manuscript of the RCT sometimes may not mention that information.

And I still use RCTs, oftentimes RCTs that are looking at outcomes, in my practice. My point is not all the points that you explained may not be relevant always for me to interpret a meta-analysis. Some of them are and some of them aren't.

But the answer to that is do we have

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

information, exhaustive information about every single RCT included in this meta-analysis of followup, data collection, how it's adjudicated?  No.  I mean, there is no meta-analysis or study that would have the space to accommodate that information.

Q.    Right.  But you could have looked at the studies, the trials that are relevant for the ones that you identify for paralytic ileus and the 19 with intestinal obstruction, obtain the manuscripts and look at them, saw what information was there, and assessed specifically how much information and in what manner these investigators were collecting information on adverse event data and how that was done; right?

A.    Well, there are many things one could potentially do, if that's what you're asking me.  Do I think it adds more to the interpretation of the paper?  I don't think so.

Q.    Okay.

A.    So I can't imagine putting all that effort in if I don't believe that it's going to add much to the way I interpret that study.

Q.    The next thing you say in your

report, Doctor, is that:  "The overall sample was not large enough to detect less common events such as bowel obstruction."

Do you see that?

This is on your report on page 27 in the middle of the Limitations paragraph.

A.    Correct.

Q.    Okay.  Now, so we're, again, talking about statistical power?

A.    Correct.

Q.    All right.  Now, if you look at figure 2 on page 1275 of this publication --

A.    1275?

Q.    Page 1275 of the manuscript.  And figure 2 is at the very top.

A.    I don't see a 1275.

Q.    Upper right-hand corner, 1275.  If you use the exhibit that I gave you, that's the final version.

A.    Oh, okay.  Sorry.

MR. HONNOLD:  Oh, yeah, use this one.

A.    Okay.  Okay.

MR. HONNOLD:  I think there may be a couple different ways the printout appears.

MR. PRZYMUSINSKI:  I think one is,
like, a prepub, and the last one has the
four-page pagination.

MR. HONNOLD:  There it is.

BY MR. PRZYMUSINSKI:

Q.    So 1275, it should look like this,
Doctor.  It's fairly early on.

A.    Yes, I see.

Q.    So do you see, at the top of page
1275, figure 2, which has Forest plot
summarizing the association of GLP-1 RAs and
the gastrointestinal or biliary outcomes in all
studies?

Do you see that?

A.    I'm looking.

Yeah, I see that, Counsel.

Q.    Okay.  For intestinal obstruction,
if you look at the chart, in patients taking
GLP-1 RAs, the cohort at risk was 39,830;
correct?

A.    Correct.

Q.    And for paralytic ileus, it's
34,100.

A.    Correct.

Q.    And the total number of subjects at

risk in this meta-analysis -- and you can confirm if you like -- is more than in the Bennett study, the Faillie study, and the Sodhi study combined; right?

A.    Well, I would have to confirm that, Counsel.

Do you want me to do that?

Q.    You can take my word for it.  We can figure it out later.  Or you cannot take my word for it.

But you remember we talked about -- the record will show what it shows.  Okay?

In terms of the number of events, if you look at the events of intestinal obstruction, there were 80 events reported in these studies together; right?

Do you see that?  It's in the second column.

A.    Yes, Counsel.

Q.    Maybe you will accept my representation or not, but that's many more events than were in the Bennett study, which had 6; the Faillie study that had 70; and the Sodhi study that was 73.

Now, my question is -- and you don't

Bindusan, MD                    CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

have to accept my representation if you don't want to, but I promise you I'm not lying -- despite all that, you still believe this study was underpowered?

          A.    So, again, can I provide some context, Counsel?

          Q.    Please.

          A.    Okay.  Because, again, I want to say there are fundamentally significant differences between RCTs and real-world observational studies.

          With RCTs, one, the duration of treatment is highly variable.  Some of those are very short studies and some of those might be longer.

          Q.    Sure.

          A.    Two, we had mentioned earlier subjects who participate in a randomized controlled trial are not representative of patients who take the drug in the real world.

          Because you have very stringent inclusion and exclusion criteria to participate in a clinical trial so if a patient has numerous comorbidities, they oftentimes -- that precludes the patient from participating in the

clinical trial.  So there is a bias towards taking healthier patients in a randomized controlled trial.

And three, we had mentioned earlier, these patients are very closely scrutinized. And you also mentioned, Counsel, they're very closely followed in a randomized controlled trial, way more than a real world when I see a patient, for example.

And oftentimes when patients are very early manifestations of side effects, they are taken off these medications very commonly because, you know, you do not wait for a full-blown side effect to develop or for the patient to end up in the ER or for the patient to get hospitalized or the patient to get up in the ICU.

And so the -- the degree of monitoring, the selection of patients, the overall comorbidities, the duration of these trials are completely different from observational studies we are looking at.

So I don't think, Counsel, it's fair to compare.  These are apples to oranges. These are not fair comparisons of apples to

apples.  You cannot compare an RCT where the primary outcome is diabetes or weight loss and where GI side effects may or may not be systematically captured where the patients might be of a different mix compared to people who really take these drugs in the real world.  You cannot compare these studies.

So you -- if you are asking me to compare this Chiang meta-analysis with the studies that I mentioned, I'm sorry, Counsel, that's not a direct comparison.  It's really hard for me to compare those comparisons.

Q.   We were talking about power.  Power is a statistical concept.  It has nothing to do with comparability studies.

A.   Power is statistical concept that depends, like I mentioned, on the event rate in the exposed arm.  It depends on the event rate in the nonexposed arm.

Q.   Okay.

A.   And in this situation where you have very low number and similar event rates in the two arms, for whatever reason, some of which might be explained by the points I raised, the power analysis calculation may be different.

Again, because the two groups will be very similar, the post -- post-hoc power number may not be as much or it may be higher, depending on the starting number.

Q.    I will take your word for it.

Let's look at the outcomes here for intestinal obstruction and paralytic ileus.

A.    Okay.

Q.    You have both of those found no significant effect with the point estimate being below 1, and .82 for intestinal obstruction and .89 for paralytic ileus?

A.    That is correct, Counsel.

Q.    So that's not an association in this study?

A.    That is not an association in the study.

Q.    Now, one of the things you just said to me a second ago was that studies were short. And you actually say that in your report to some extent.

You say:  "Trial durations varied widely from 24 to 277 weeks, and shorter trials may not capture delayed onset events."

Do you see that?

A.    Are you reading from my report or the --

Q.    Page 27.  Let's keep going through your limitations.

A.    Okay.

Q.    Do you see it?

A.    Yeah.

Q.    Now, those numbers vary, the duration of the trials.  I'm assuming that's from the last column on table 1; is that correct?

A.    That is correct.

Q.    How long does a trial need to be to be long enough, in your view, to capture delayed onset events in this context?

A.    I mean, there is no specific number here, Counsel, because you -- you can get an adverse event with a shorter trial or a longer trial.  You are more likely to capture an event with a longer trial.  So I don't think there's a significant, specific number where I can say, oh, below this magic number the ileus doesn't occur because you have to realize the side effect can occur even in patients who start the medication shortly after you initiate it.  At

the same time, the longer you follow patients,
the more likely you are to capture it.

Q.    All right.  But the point you made
here is that shorter trials may not capture
delayed onset events; right?

A.    That is correct.

Q.    So the longer the duration of the
trials, the more likely they would be to
capture delayed onset events; correct?

A.    That is correct.

Q.    Now, let's go back to that 24 to 277
number that is a number that --

A.    I'm sorry.  Say that again.

Q.    The 24- to 277-week range that you
report for trial duration, that's the range
when you look at the shortest, the duration in
table 1 and the longest duration in table 1,
that lists all 55 clinical trials included in
this meta-analysis; right?

A.    That's correct.

Q.    Okay.  But as you pointed out, the
analyses for ileus, intestinal obstruction were
only based on a subset of those studies;
correct?

A.    Correct.

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Only eight of those studies were on ileus and 19 on intestinal obstruction?

A.    That is correct.

Q.    Now, would it surprise you if I told you -- and you can feel free to verify -- that the duration of the eight clinical trials included in the event analysis for paralytic ileus ranged from 72 to 281 weeks, which is 1.4 to 5.4 years of exposure?

A.    I would have to confirm that myself.

Q.    Okay.  If that is true, would that in any way change your opinion that the trial duration was too short to capture delayed onset events?

A.    Again, it's a hypothetical situation.  I do not know if that's true or not.  But if that was true, then I would say that that duration is longer than the 24 weeks I said, and it's more likely to capture a delayed onset than otherwise.

Q.    So if that's correct, you would change that aspect of your report there?

A.    If that is correct, yes, I would.

Q.    Okay.  Okay.  That's helpful.

Do you know how -- for the moment --

and I promise you that Brad, if he finds out that I'm misleading you, which I promise you I'm not, will correct me.  But if the duration of the eight trials that were included for the endpoint of paralytic ileus was from 1.4 years to 5.4 years, do you know how that compares to the duration of followup in the four studies that you identified as providing sort of the strongest evidence of association?  Is that in the same range, is that longer, is that shorter?

A.    I would have to look at individual studies to tell you, but I can do that.

Q.    Well, we may do that later.

But if the -- set that aside.

Now, let's go to page 51 of your report, Doctor.

A.    You said 51?

Q.    51.

And you see the section there on biological gradient?

A.    Uh-huh.

Q.    And we talked about that a little bit earlier.

A.    Yes, we did.

Q.    And if you look at the first sentence of the second paragraph under that, you say:  "The epidemiological studies reviewed did not examine the association between the dose of GLP-1 RA and bowel obstruction because researchers assessing" -- sorry -- "accessing most epidemiological databases did not have access to the dose of the medication on individual patients."

Do you see that?

A.    I see that.

Q.    All right.  Now -- and you mentioned that earlier; right?  You said that you really couldn't assess dose response because you didn't have that data on epidemiological studies?

A.    That's correct.

Q.    All right.  Now, does that statement also apply to the clinical trials?

A.    No.  With the clinical trials they do not.  I'm talking about the large epidemiological studies, meaning the observational studies.

Q.    And this meta-analysis right here, the one we're talking about, Chiang, did they

do an analysis of dose?

A. I would have to double-check that.

Q. How about you go to figure 41 -- 42, Doctor, in supplemental materials.

A. I'm sorry. Which one?

Q. 42 in supplemental materials.

And if you look at that figure, the title is Forest plot summary of an association between GLP-1 RAs and paralytic ileus and subgroup analysis.

Do you see that?

A. I do.

Q. And if you look, there is a category of dose, where there's no dose, a high dose, and then if you look at the p-value on the right side, it's .42, showing no interaction, meaning no effect of dose on endpoint; correct?

A. Well, that's what it says on there. You are just reading it, and I agree with that part.

Q. And, in fact, the actual risk ratio at the higher dose is lower than the risk ratio at the low dose?

A. It's too small for me to read, but I am going to have to take your word on it.

Q.    1.46 versus 0.72.  1.46 on low, 0.72 on high.

A.    Okay.

Q.    Now, that's not evidence of a dose response, is it?

A.    So let me clarify that, Counsel.

Q.    Yeah.

A.    So when I look at dose response, we generally do the level of dose and look at outcomes based on individual dosages, so as you -- as you can imagine, dose of a medication is a continuous variable.

Q.    Okay.

A.    So you can be on .25, you can be on 0.5, you can be on 1 mg.  You can be on 1.75 mg, 2.4 mg of semaglutide, you have oral medications, again, you have -- the oral medications have different doses, so then at -- so you are now converting a continuous distribution of medication dosages to a categorical, right, and when you do that you lose a lot of information, when you convert that.

So that's not the way I would do the analysis, to look at those response, but first

of all, I would not do it in the setting of an RCT, like I mentioned to you previously, this is not a study, an RCT where the primary outcome is weight loss or diabetes, it's not the kind of study I would rely on to look at association with GI side effect.

But having said that, if you were to do it, I would treat the dose as a continuous rate, not have the authors, on their own, make an assumption of what is a lower dose, what is a high and then combine different dosages into high and into low.

Q.    Okay.  The authors of this study, which was published in the journal called -- Gastroenterology?

A.    Thank you.

Q.    All right.  Which is a respectable journal?

A.    It's a respectable journal.

Q.    Okay.  Did it this way; right?

And they did not find evidence of a dose response based on the way they looked at it; correct?

A.    That's correct.

Q.    And you don't mention that in your

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

report anywhere, do you?

A.   I do -- I do not.

Q.   Okay.  Now, when you say that doing it as a -- instead of a continuous variable of doses, you make a dichotomous variable, a low versus high, right, you lose some specificity, you said that -- or some accuracy; right?

A.   That's correct.

Q.   Would you not agree with me that the same kind of criticism would apply to combining all the GLP-1 RAs together as opposed to looking at each plan individually?

A.   I would not.  It's completely --

Q.   Because they're not different?

A.   No.  That's a completely unrelated question.  How can you compare -- how can you the -- I'm sorry.  I'm so sorry.  No.  No.  No.  I'm not -- I'm not -- I mean no disrespect.  I'm just saying --

Q.   None taken.

A.   -- that it is a completely unrelated question, the dose versus the type of GLP-1 RAs.

Q.   Okay.

A.   Thank you, Counsel.

Q.    Not a problem.  Let's go to the next study.

Now, Doctor, this is going to be marked Exhibit 16.

(Defendant's No. 16, Agent- and Dose-Specific Intestinal Obstruction Safety of GLP-1 Receptor Agonists and SGLT-2 Inhibitors: A Network Meta-Analysis of Randomized Trials, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q.    And this is actually a network meta-analysis that I fully acknowledge came out after your report was completed and I saw that you responded to it in your rebuttal report. So this is Exhibit No. 16.

All right.  So -- so this is that network meta-analysis that you addressed in your rebuttal report in response to some of the defense experts; correct?

A.    I need to double-check that to make sure.  Again, this was not in my materials considered list so I just want to make sure.

Q.    Do you want to pull out your rebuttal report and --

A.    No.  Let me just look at the paper.

Q.    Okay.

A.    Since you're talking about a specific paper.

Q.    Are you ready, Doctor?

A.    So I have to put a caveat here, Counsel, that I have not looked at it in detail for this -- for this review.  I had four days in between receiving your expert report and a chance to review this.  So I mentioned it briefly in my response, but not to a point that I have done a very detailed review of this manuscript.

Q.    Your rebuttal report -- that's okay.  I mean, I looked at it, I didn't -- let's -- let's just try and talk about it a little bit.

So I'm assuming that since you did discuss it, Doctor, in your rebuttal report, you did at least look at it before you submitted that opinion?

A.    Yeah.  Absolutely.

Q.    And in your rebuttal report, if you look at page 4, which is where you provide a response -- should be Exhibit No. 4.

A.    Oh.

Q.    But you can look at your own if you have it.

A.    Okay.  And which page, Counsel?

Q.    4.

A.    4.

Q.    Do you see under 3, Response:  "As explained above, as it relates to Chen et al 2026?

A.    Yes.

Q.    That's the study we're talking about.

A.    Okay.

Q.    -- "this study was not available" --

A.    That's correct.

Q.    -- "at the time my report was submitted."

A.    Correct.

Q.    "Additionally, as explained above, patient's selected for RCTs do not reflect the real-world use of these drugs.  There are stringent inclusion and exclusion criteria where only the healthiest patients find themselves selected into a RCT.

"In summary, even after reviewing the report, I would not consider Chen et al as

significantly different from Chiang et al, and it does not change my conclusion in any way."

Do you see that?

A.    Correct.

Q.    So I'm assuming since you offered an opinion that Chen was not any different or didn't change anything, compared to Chiang, at least you reviewed it to some extent?

A.    It's reasonable to say, I reviewed it to some extent, not at the level I reviewed the full manuscript I discussed in my report.

Q.    Okay.  So a network meta-analysis, right, this is what they did, it's an advanced statistical method that combines direct evidence and indirect evidence to obtain network estimates.

You're familiar with that?

A.    Yes, I am.

Q.    Okay.  And network meta-analysis or NMAs, as sometimes they're called, are often helpful to determine the comparative effectiveness of interventions and when those interventions of not being directly compared; right?

MR. HONNOLD:  Object to form.  It's

overbroad.

A.    Well, NMAs can be used to make a hypothesis between drug dose combinations across multiple drugs and multiple dosages.

BY MR. PRZYMUSINSKI:

Q.    And in this particular network meta-analysis, if you will turn to page 2 in the abstract, kind of right in the middle, you can see the author state that they included 50 RCTs, including 192,359 participants.

Do you see that?

A.    I do see that.

Q.    Now --

A.    Counsel, question for you.

Q.    Yeah.

A.    I just wanted to double-check that there are no SGLT-2 I, alone, randomized trials here.

How many of those trials are only on a SGLT-2?

Q.    Well, it's a beautiful question, I was going to ask you that.

So when you discussed in your report some of the other meta-analysis, not this one, but the ones that are probably before

you where you said, well, I didn't include those because this study basically overlapped with the ones that were in the Chiang study, so I wanted to know whether you made an effort before responding on this meta-analysis to compare the studies in this meta-analysis, to see whether they overlap with the studies in the Chiang meta-analysis and to determine how many of those studies are on GLP-1s and how they effect your opinion?

A.    So, again, this is not -- first of all, this study came out after I submitted my report.

Second of all, I don't recall -- I don't recall the fine details so if you want me to ask you about specific details, I have to go into the paper because it's not fair for you to --

Q.    But I am asking if you did it.

A.    No.  My question is I might have looked at it, I don't recall right now.  All I recall now is you mentioned the number 55.  But those 55 clinical trials, RCTS are -- I don't recall they were all GLP-1 RAs.

And so that -- I believe that was a

combination of GLP-1 RAs and SGLT-2.

Q. So that may be right, but remember, this not you asking me questions; it's me asking you questions.

So the question I really asked -- and it was very simple -- is did you go through this study -- understanding that it came out after your publication, but it was raised in the defendants' reports. Did you go through this study to look to see what RCTs involving GLP-1 RAs were included, to what extent those GLP-1 RA RCTs overlap with the ones in Chiang and to what extent they do not before reaching the conclusion that this doesn't really change your opinion?

A. I recall that I took a look at it, but I don't recall exactly what the details of what I found.

Q. All right. One of the things you say --

A. I do remember some of that information is in figure 3A.

Q. Okay. Figure 3A.

Can you point me to where I am?

A. Figure S3A, supplemental table 3A.

Q.   Okay.

A.   And so that does go by medication and go by the name of the clinical trial.

And if I recall right, there was a significant overlap between the studies included in Chiang and the network analysis. But I can't tell you --

Q.   Where do you see the clinical trial listed?

A.   So are we looking at the same page, Counsel?

Q.   You said figure 3A?

A.   Figure S3A.

Q.   Oh, S3A.

Now I've got to find what you're talking about.

A.   Let me give you the page number.

What I have is 8.  I don't know if that's what you have.

Q.   I don't have a page S3A.  I have a table S3 and a table S4.

What page number do you have it on?

A.   Page 8, Counsel.  Page 7.  Page 7. 7 and 8.

Q.   All right.  So you're saying that

this particular -- okay.  I gotcha.  All right.

And so you're saying you went through these studies and compared the studies that are listed here against the studies in the Chiang meta-analysis, and you concluded they largely overlap; is that correct?

A.    Again, Counsel, like I told you before, this study came after my report.  I had four days to examine these studies before I had time to submit my rebuttal.  So -- and I cannot recall, off the top of my head, what the degree of overlap was.  But I do recall that I looked at this.

Q.    Okay.  You understand that the fact that something came out after your report when we are currently in the process of determining what the evidence is doesn't change its relevance; right?

A.    I agree.

Q.    Okay.  All right.

Now, one of the things you say -- if you go back to rebuttal report -- and now I am also getting -- I have too many papers in front of me.  But it's still on that page 4 where you talk about the Chiang study.

A.    Yes.

Q.    One of the things you said is that one of the limitations of clinical trials if there are stringent inclusion and exclusion criteria where only the healthiest patients find themselves selected into an RCT.

Do you see that?

A.    Correct.

Q.    Okay.  Now, I'm assuming, per our discussion earlier, you did not go through the individual clinical trials that are part of this meta-analysis; correct?

A.    Correct.

Q.    Okay.  So you couldn't tell me right now what the inclusion/exclusion criteria were for any individual trial in this set?

A.    Again, Counsel, if you look at that sentence, that is a general statement about RCTs.  That's not a specific statement about RCTs included in Chiang et al.

Q.    That makes complete sense.

So we don't know, within the context of this particular meta-analysis, how limiting the inclusion criteria were and to what extent they limited the participants to healthy

subjects?

A.    Again, Counsel, this is based on my experience, my clinical experience doing clinical trials.  I have not yet found a clinical trial where we are allowed to enroll sicker patients than what we find in the real world.  Almost every clinical trial that I have enrolled patients in there are very strict.  So that rule applies to virtually every trial I have been involved in, which is my patients in a clinical trial have generally been healthier than the patients I actually do administer the drug eventually once the drug is approved.

So it's a general statement and it's based on my experience doing gastroenterology in clinical trials.

Q.    Do you know whether a history of having gastroparesis was an exclusion criteria in these trials?

A.    I'm not specific which trial excluded which.  Like I mentioned to you, I did not look at individual RCTs, inclusion or exclusion criteria.

Q.    Do you know whether a history of ileus or intestinal obstruction would make such

a criteria in any of these clinical trues?

A. Again, Counsel, I mentioned to you before I did not look at individual specific inclusion/exclusion criteria.

Q. Do you know if having uncontrolled type 2 diabetes was an exclusion criteria in these trials?

A. Again, it all depends on the trial; right? If the clinical trial is for the treatment of type 2 diabetes, I'm assuming that there were patients there with uncontrolled clinical diabetes. But, again, I -- like I mentioned to you before, I did not look at that.

Q. All right. Now, let's go back to the abstract from the Chen authors themselves. And if you look --

A. Did you say Chiang?

Q. Chen. Chen. This network meta-analysis we're looking at.

A. Oh, okay. Thank you. Chen. Thank you.

Q. They're very close, Chiang and Chen.

A. I agree, Counsel. Thank you for spelling it out.

Q.    And it's late in the day too.

A.    No, I appreciate you spelling it out.

Q.    If you look under where we talked about the 50 RCTs, which you pointed out may not all be from GLP-1 RAs.

A.    And which page are we on, Counsel?

Q.    Page 2 in the abstract, and the sentence that starts "high-dose canagliflozin."

A.    Canagliflozin, yeah.

Q.    Canagliflozin, okay, at 300 milligrams per day showed the clearest signal, odds ratio 34 -- 3.42.  In contrast, liraglutide was associated with a lower risk of intestinal obstruction, odds ratio 0.44 with a confidence interval that does not cross 1; correct?

A.    Correct.

Q.    "With an absolute risk reduction of .34 percent and number needed to treat of 295.  No other GPL-1 receptor agonist or SGLT-2 inhibitor demonstrated a statistically significant increase in obstruction risk."

Do you see that?

A.    Yes, I do, Counsel.

Q.   All right.  So in this meta-analysis, whatever limitations it may have, what the authors found was that GLP-1 RAs was not associated with intestinal obstruction; correct?

A.   That is correct.

Q.   And, in fact, for liraglutide specifically, they found that it significantly decreased the risk of patients having intestinal obstruction; right?

A.   Again, with the caveat that I do not know what they're talking about with intestinal obstruction.  But it appears that whatever they defined it as was found to have a decreased association.

Q.   Let's go to page 12, which is the Discussion section.

A.   Okay.

Q.   And right at the top there, the authors write:  "To our knowledge, this is the first network meta-analysis to systematically evaluate intestinal obstruction risk across individual GLP-1 receptor agonists and SGLT-2 inhibitors incorporating dose-stratified nodes within each agent.

"By leveraging RCT data, we provide a randomized trial-based perspective on a safety signal that was thus far superior to the case reports and spontaneous pharmacovigilance observations."

Do you see that?

A.    Yes, I do.

Q.    Okay.  So what the author is saying is that they believe that they are the first ones to conduct an analysis looking at intestinal obstruction risk by GLP-1 receptor agonists that they actually look at dose specifically, and they leverage randomized clinical trial data to evaluate a safety signal in the manner they believe is superior to prior data; correct?

A.    I'm not sure where you found that, Counsel.

Q.    Okay.

A.    I don't know how you reach that conclusion.

Q.    Well, let's read the first sentence.

"This is the first network meta-analysis to systematically evaluate intestinal obstruction risk across

individual" --

(Stenographer clarification.)

MR. PRZYMUSINSKI:  Yeah.  Sorry.

MR. HONNOLD:  And where are you reading from now, because I'm lost --

MR. PRZYMUSINSKI:  So we're still on Discussions, the first sentence.  I'm just going to go through --

MR. HONNOLD:  Oh, you're going back.  Okay.  Thank you.

BY MR. PRZYMUSINSKI:

Q.    "To our knowledge, this is the first network meta-analysis to systematically evaluate intestinal obstruction risk across individual GLP-1 receptor agonists."

Do you see that?

A.    Yes, I do.

Q.    So they're saying that to their knowledge, this is the first network meta-analysis that looked at the issue intestinal obstruction across individual GLP-1 receptor agonists.

That's correct; right?  That's what they're saying.

A.    That's what they're saying.  That's

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

correct.

Q. Do you know of any other meta-analysis --

A. Again, I do not know.

Q. Okay. All right.

And they go on to say -- "and SGLT-2 inhibitors, incorporating dose-stratified nodes within each agent."

Do you see that?

A. I'm sorry, Counsel. Where are you reading that?

Q. Continuing with the same sentence, "and SGLT-2 inhibitors, incorporating dose-stratified nodes within each agent."

Do you see that?

A. Yes, I do.

Q. So they also looked at dose; correct?

A. It appears that they -- again, Counsel, I just want to say this. You're reading lines from the Discussion; right? And I have not reviewed the results. So I cannot -- all I can tell you is what you are reading is what I see. I cannot --

Q. That's fine.

A.    All I'm saying is I cannot verify what they claim in the discussion is based on the results and is justifiable.

Q.    Totally understand.  But that's what the authors are saying their study showed; correct?

A.    You're correct.

Q.    Okay.  All right.

Now, if you go down to the last paragraph on this page?

A.    Okay.

Q.    Still on page 12.

"In contrast, our pooled RCT results do not corroborate a generalized increase in obstruction risk for GLP-1 receptor agonists."

Do you see that?

A.    That is correct.

Q.    So these authors, who just published their paper in January of this year, conclude that their results do not corroborate an increased risk in obstruction -- sorry -- a generalized increase in obstruction risk for GLP-1 receptor agonists.

Do you see that?

A.    Yes, I do.

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    You disagree with that?

A.    I do not disagree with what the authors say is their conclusion.

Q.    Understood.

But you disagree in the sense that you believe that there is a generalized increase in obstruction risk with GLP-1 receptor agonists?

A.    So, Counsel, when you look at this evidence, you look at the totality of evidence. You look at all the papers. You looked at the papers that showed association. You look at the methods. You look and see how they review the data. You look at the studies that show no association. You look at the strengths. You look at the weaknesses. And then you put them all together and you have to look at the totality of evidence.

And that's why every paper I review, I give the strengths, the weaknesses in the same way, same manner for every paper.

So in this paper the authors are saying they did not find an association.

Now, does that apply to the general truth that is no association? I do not believe

it does.

Q.   The next sentence says:  "None of the GLP-1 receptor agonists in the network were associated with excess obstruction events, and liraglutide was linked to a statistically significant reduction in risk."

Do you see that?

A.   I do.

Q.   All right.  So they actually found in this meta-analysis that the risk for the individual GLP-1 RAs was not the same, and, in fact, for all GLP-1 RAs except liraglutide, there is no effect, and for liraglutide there was actually a significant decrease in risk; correct?

A.   Counsel, let me just say this.  The outcome here is intestinal obstruction.  It's not ileus.

Q.   Okay.

A.   So -- and, again, when you think about the way these medications work, that is not the outcome one would expect to look at when you design these studies.

So if I were to look at a study that tries to answer the question whether it causes

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

functional bowel obstruction, I would

specifically look for that outcome.  This is

not the outcome that we're looking for.

So maybe they found a decrease in

bowel obstruction, maybe they found an

increase.  The question is really did they find

a decrease in ileus, or did they find an

increase in ileus?

Q.    How many of the four studies you say

provide the strongest evidence of an

association specifically looked at ileus as

opposed to bowel obstruction?

A.    Again, what I mean by ileus is all

ICD 9/10 codes.

So the data -- the way you collect

that data is different when you collect it in

an RCT versus when you collect it from

real-world evidence.

So let me explain that.

In an RCT, if a patient developed

ileus, if the patient end up doing it, it will

be coded as ileus or paralytic ileus.  You're

not coding it as ICD 9/10 codes; right?  You

are coding it as that event.

In a observational study, you're

trying to guess, from the ICD 9/10 codes they've used which are the ones that are closely linked to ileus or a functional obstruction.

So what this study is saying is they found no evidence of obstruction.  They're not talking about ileus here.

Q.   What events did the authors count as intestinal obstruction in this study?

A.   So, again, Counsel, you have to give me a minute to review the study.

THE VIDEOGRAPHER:  Can we go off the record for a media change?

MR. PRZYMUSINSKI:  Sure.

THE VIDEOGRAPHER:  This ends Media 3.  We're going off the record.  The time is 4:33 p.m.

(A brief recess was taken from 4:33 p.m. to 4:33 p.m.)

THE VIDEOGRAPHER:  This begins Media 4.  We're back on record.  The time is 4:33 p.m.

BY MR. PRZYMUSINSKI:

Q.   The outcome definition is on page 15 if you want to read it.

A.    Thank you.

So: "For the purpose of this NMA, "intestinal obstruction" encompassed both small bowel obstruction and large bowel obstruction, including colonic and rectal involvement, as recorded in individual trial reports."

Q.    Keep reading.

A.    "Given that these clinical entities commonly form a continuum and are often aggregated in adverse event tables, we pooled them into a composite endpoint.

"Most source trials did not clearly distinguish mechanical obstruction from functional ileus, nor did they provide consistent radiologic or operative confirmation; therefore, these subtypes were not analyzed separately.

"All study -- all-cause study withdrawal, regardless of reason, was extracted as a secondary safety endpoint reflecting overall treatment acceptability."

Q.    So their endpoint includes ileus.

A.    So this is -- again, Counsel, I know you don't want to hear this.

Q.    So now it's a limitation?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    No.  It is a limitation.

Q.    Before the problem is we're looking at the wrong endpoint, now the problem is we're looking at still the wrong endpoint because --

A.    Counsel, I have to call it the way it is.

Q.    Okay.

A.    They are clearly telling you they do not know if this is mechanical obstruction or a functional obstruction.  That is the very definition of a misclassification nondifferential bias.  That is the very definition.  That's exactly the textbook description of a misclassification nondifferential bias of the outcome.

They do not know if this is obstruction.  They do not know if this is intussusception.  They do not know if this is volvulus.  They do not know it's ileus.

And so when you find no association, anytime you have a nondifferential bias, it moves your estimate towards no.  So the fact that --

Q.    They didn't just find no association, they found a statistically

significant reduction in risk.

A.    That is not true.  If you look at the primary endpoint --

Q.    For liraglutide, there is no primary endpoint.

A.    Counsel, you said they did not find an association between GLP-1 RAs and a bowel obstruction, and that is true.

But you asked me to look at the endpoint at that common point, and let me tell you what the finding was.

Again, there was no association. When they looked at subgroup -- in the liraglutide, there was a decrease, you're right.

Q.    The primary outcome of all this analysis -- and you can read this for yourself later -- was individual for each drug not -- but it doesn't matter.

A.    Okay.

Q.    What I'm trying to make sure we understand is, I asked you a second ago, the four studies that you say provide the best evidence, strongest evidence, how many of those studies specifically identified ileus as the

endpoint as opposed to a broader category of ileus/bowel obstruction or bowel obstruction?

A.   Okay.  So --

Q.   How many?

A.   -- if you look at Sodhi, Faillie, well, all of them did composite endpoints.  For some of them we do not know the primary ICD codes.

Q.   Well, there's one exception, which is Faillie, which did a sensitivity analysis, that did an endpoint that pretty closely overlaps with what you believe is -- say -- that would not --

A.   I disagree.  I disagree.  I disagree.

Q.   So none?

A.   None.

Q.   All right.

A.   And my point there again is if you still include studies with outcomes of both bowel obstruction and ileus, and you find an association that means because of the nondifferential misclassification bias the association would have been greater.  If you do not find an association, it doesn't mean

anything, but if you find an association, the association is greater.  It biases it towards the no.

So my point again is you cannot compare these studies together.  If you had Faillie, for example, you still have the nondifferential misclassification bias, and you still found an association, meaning the true association is likely greater.

Q.    Okay.  Let's go to page 7.

A.    Page 7 of the same paper?

Q.    Of the same paper.  And you should see figure 3 here.

A.    Figure 3?

Q.    Figure 3.  Do you see it?

A.    There's an A and a B, is that what you're looking at?

Q.    Yeah.  So I'm looking at B.

A.    Okay.

Q.    And if you read underneath the table, figure 3B, it's described as:  "Forest plot of primary outcome, intestinal obstruction events" -- an aspect of -- do you see that?

A.    Are you looking at the legend for 3B?

Q.    Yeah.  Do you see that?

A.    Could you read that again, please?

Q.    "Forest plot of primary outcome, intestine obstruction events in aspect of various dosage subgroups."

Do you see that?

A.    I see that, Counsel.

Q.    So they're showing you now results broken down by different doses for different drugs; right?

A.    Yes.

Q.    Okay.  Let's look at 6, 7, and 8, which are three tirzepatide groups, one with medium, one with low, and one with high dose.

Do you see those?

A.    I do.

Q.    Okay.  The odds ratio for each one of those is 0.34; correct?

A.    6, 7, and 8, Counsel?

Q.    Yeah.

A.    Yes, 0.34.

Q.    So whether tirzepatide is taken in a low dose, a medium dose, or a high dose, you found a nonsignificant 66 percent lower risk; correct?

A.    That's not the way I would interpret it, Counsel.

Q.    How would you interpret it?

A.    The 95 percent confidence interval spans zero -- 1.  And so there is no significant association between low dose, medium dose, or high dose tirzepatide with a composite outcome of bowel obstruction and ileus.

Q.    Right.  And the point estimates were identical; correct?  The point estimates were identical?

A.    That is correct.

Q.    That's not evidence of a dose response, is it?

A.    I do not believe that is.

Q.    Okay.  Now look at Number 10, which is injectable semaglutide, which is Ozempic; right?

Item Number 10.  Do you see it?

A.    Yes.

Q.    Okay.  And there's a high dose at 10 and at 20 there's a low dose.

Do you see that?

A.    Yes, I do.

Q. For the high dose, the risk estimate is 0.95, which is nonsignificant?

A. Correct.

Q. For the low dose, the risk assessment is 1.48, which is also nonsignificant?

A. Correct.

Q. Okay. So the point estimate is actually higher for the low dose than for the high dose?

A. Again, there's no significant difference between the two. So, Counsel --

Q. There's no evidence --

A. -- any time there's -- any time there is no statistical significance, you cannot make a statement that one is stronger relationship than the other. Both of them are not significant.

Q. I'm with you.

But it's not evidence of a dose response; right?

A. I can't say that, Counsel --

Q. So when the --

A. -- again, because of the limitation --

Bind Jahn, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Does it --

A.    -- because of the limitations we mentioned --

Q.    Does it provide any evidence of --

MR. HONNOLD:  Hey.  Hey.  Hey, you guys are -- hold on.

MR. PRZYMUSINSKI:  You're right. You're right.

MR. HONNOLD:  Okay.

MR. PRZYMUSINSKI:  It's getting late in the day.  You're right.

MR. HONNOLD:  Wow.  You're really interrupting him.  He's trying to answer a question and you've --

MR. PRZYMUSINSKI:  To be fair, he asked for a --

MR. HONNOLD:  Here's what I'm doing prim- -- primarily.  I'm just trying to call a brief timeout.

MR. PRZYMUSINSKI:  Yeah, you're right.

MR. HONNOLD:  It's a pause. Everyone take a breath.

MR. PRZYMUSINSKI:  Let's stretch.

MR. HONNOLD:  And then maybe we need

Binder, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

to come back with a clean question --

MR. PRZYMUSINSKI:  It's a --

MR. HONNOLD:  -- and an answer.  I think whatever happened over the last kind of minute and a half got really choppy and --

MR. PRZYMUSINSKI:  Okay.

MR. HONNOLD:  -- and I'm not sure it's meaningful at all.

MR. PRZYMUSINSKI:  It's okay.

MR. HONNOLD:  Okay.

MR. PRZYMUSINSKI:  We'll straighten it out.  And it's a fair point.  It's late in the day.

BY MR. PRZYMUSINSKI:

Q.    So I understand what you're saying, which is that regardless of whether the point estimate is .95 for the high dose or 1.48 for the low does, both are nonsignificant, showing no effect; correct?

A.    That's correct.

Q.    Okay.  But what I'm asking is, when you look at those two data points, do they provide any affirmative evidence of a dose response relationship?

A.    Again, Counsel, there are -- we have discussed numerous limitations here.  One is we don't know what's low does, what's high dose here.  Two, we are looking at limitations of -- we're looking at RCT, which we have mentioned earlier is not a reflection of the real world.

We don't even know what the outcomes are, it's a composite outcome.

Now, in -- is it possible that in the high dose whatever events that happened were mostly ileus, and is it possible that in the low dose whatever happened were mostly bowel obstruction?  It's very possible.  And so you cannot make an assumption like that when you don't know what happens in each of these groups.

Q.    Okay.  Let's do one more and we'll take a break, unless you want to take a break now.

A.    It's up to you, Counsel.

MR. HONNOLD:  No, you can --

THE WITNESS:  No, I'm -- I'm -- I can keep going.

MR. PRZYMUSINSKI:  Let's do one more.  Let's do number -- tab 16.

BY MR. PRZYMUSINSKI:

Q.    Can I ask you really quickly -- and if it's a longer discussion, we'll -- we'll do it later.

The two pharmacovigilance studies that you list, one is by Gudin, G-u-d-i-n, and one is by Shu, obviously we didn't include them in the higher seven in terms of quality; right?

A.    That is correct.

Q.    Okay.  Generally speaking, would you agree that those studies are -- these two specific studies are generally hypothesis-generating, they're not studies that provide evidence of association?

A.    I would say in general pharmacovigilance are hypothesis-generating, and that is the reason why in my objective evaluation of the evidence I did not consider them to influence my decision either way.

Q.    So in this context, those two studies did not influence your decision in either way?

A.    Counsel, just like I mentioned with the TriNetX studies, just like I mentioned with the pharmacovigilance studies, I chose studies

that were low quality and I chose not to consider them heavily in my discussion.

Q. Those two, just for the record, I thought you said you did not -- they did not influence your decision either way?

A. That is correct. You're absolutely correct.

MR. PRZYMUSINSKI: All right. This is going to be Exhibit 17.

(Defendant's No. 17, Evaluating bowel obstruction and ileus events in patients on GLP-1 receptor agonists: A system review and meta-analysis, was marked for identification.)

BY MR. PRZYMUSINSKI:

Q. So, Doctor, this is the other meta-analysis that you discuss in your report. And it's on page -- I want to say 22 of your report if you want to look there, but obviously you should have the full study also.

A. One second.

Q. Yeah. Go ahead.

A. Yes, Counsel.

Q. So this is a paper titled Evaluating bowel obstruction and ileus events in patients

on GLP-1 receptor agonists: a systematic review and meta-analysis.

Do you see that?

A.    Yes, Counsel.

Q.    And I don't know, you didn't tell me where this paper -- did it fit in those higher quality studies, lower quality studies, or is it somewhere else?

A.    Again, I chose -- I told you the higher quality studies, and so this did not fit in those higher quality studies.

Q.    Now, unlike the Chiang study -- sorry, the Chiang study, C-h-i-a-n-g, study that you reviewed, this is not exclusively a meta-analysis of RCTs, it actually includes observational data too; correct?

A.    That is correct.

Q.    In some way it's a little bit of an unorthodox meta-analysis; is that fair to say?

A.    I would say that is true.

Q.    Okay.  And within the context of the study, given the much larger size of the observational studies, the majority of the subjects really came from observational studies; correct?

A.    That is correct.

Q.    Okay.  Now, if you look at page 23, under Results, you say:  "The overall pooled analysis show" --

A.    Hold it, Counsel.  Page 23 in my report or --

Q.    Sorry.  Your report.

A.    Oh.

Q.    I'm sorry.

Under the Results section.

A.    Okay.

Q.    You say:  "The overall pooled analysis showed no statistically significant increased risk of bowel obstruction and ileus in GLP-1 RA use compared to control with an odds ratio of 1.95 that was nonsignificant"; correct?

A.    That is correct.

Q.    So the primary analysis in this study did not find a significant association; correct?

A.    That is correct.

Q.    Now, you note a little bit lower in the next paragraph that:  "Sub-analysis by comparator type, meaning if the comparison

group was DPP-4, SGLT-2, bupropion naltrexone or placebo showed no significant difference between GLP-1 receptor agonists and other active medications with low heterogeneity.".

Do you see that?

A.    I do see that.

Q.    So if I'm understanding that correctly, in their subanalyses, when they tried to look at this by study based on the comparator, regardless of what the comparator was, they did not find an association?

A.    That is true.

And I would like to point out that it's -- it's a very unorthodox method like you mentioned and you're combining different comparators, which have completely different effects in the setting of this question we're trying to answer.

So it's -- it is not conventional but also it's -- that's the weakness of the study.

Q.    But SGLT-2 inhibitors, which you did consider an appropriate comparator, there was no difference between GLP-1 RAs and this SGLT-2 inhibitors in this analysis; correct?

A.    I do not recall if they did a subgroup analysis there, because as it is, they only included six --

Q.    Well, it says -- sorry.  It says: "Sub-analysis by comparator type, meaning if the comparison group was DPP-4 inhibitors, SGLT-2 inhibitors, bupropion or placebo showed no significant difference between GLP-1 RAs and other active medications," is that not indicating that they did a comparison to SGLT-2s?

A.    I'm sorry, Counsel.  Where are you reading that?

Q.    Your sentence, your paragraph --

A.    Okay.  Where?

Q.    -- which I just read, "Sub-analysis by comparator type," that second paragraph under Results, do you see that in your --

A.    Uh-huh.

Q.    -- report?

A.    Uh-huh.

Q.    Meaning, if the comparison here was DPP-4, SGLT-2, bupropion naltrexone or placebo, showed no significant difference between -- and other active medications --

(Stenographer clarification.)

(Brief discussion was held off the record.)

BY MR. PRZYMUSINSKI:

Q.    So back to that paragraph.

A.    Counsel, do you mind -- should we -- should I share my copy with you or --

Q.    Go back to that paragraph --

A.    Okay.

Q.    Okay.  Focus -- so:  "Sub-analysis by comparator type, meaning if the comparison group was DPP-4 inhibitors, SGLT-2 inhibitors, the bupropion naltrexone or placebo showed no significant difference between GLP-1 receptor agonists and other active medications."

Do you see that?

A.    Yes.

Q.    All right.  Now, does that not suggest that they didn't find a difference between GLP-1s and SGLT-2s in this --

A.    No.  That's --

Q.    That's a different interpretation.

A.    Let me explain to you --

Q.    Sure.  Go ahead.

A.    -- what that interpretation is.

Bindra, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

So in this meta-analysis, you have different comparisons, you have comparisons between GLP-1 RAs and SGLT-2.  Your GLP-1 RAs and DDP-4s, your GLP-1 RAs, and bupropion naltrexone, and in addition, there are trials where your comparison is a placebo.

So that subgroup analysis excludes patients who are on the placebo and includes all patients who are an active comparator.  So that .64 is not an association with SGLT-2. That's association with all trials that combine DPP-4, SGLT-2, and all of these drugs together which, again, like, you mentioned earlier, really unconventional, and arguably not reliable, highly faulty analysis, if you will.

Q.    Totally with you.  Makes sense.

Let's keep going.

You go on to say, two paragraphs down:  "Sub-analysis by specific drug showed divergent results."

Do you see that?

A.    Again, report or the paper, Counsel?

Q.    Sorry.  Your report.

A.    My report.

Q.    Yeah.

A.    Okay.

Q.    Same page, same section.

A.    Okay.

Q.    "Sub-analysis by specific drug showed divergent results."

Do you see that?

A.    Correct.

Q.    So in this study, again, they found different results for different GLP-1 RAs?

A.    That is correct.

Q.    All right.  Now, further down the page --

A.    And hold on just a minute there, Counsel.  I want to clarify something there.

Q.    Go ahead.

A.    Go ahead, Counsel.  Yes.  Thank you. I appreciate the time.

Q.    Not a problem at all.

So now further down the page, about halfway down page 23, Discussion section, halfway down, in that big paragraph, do you see where it says, "the authors thought" -- "the authors though," do you see that?

A.    Yes.

Q.    So you wrote:  "The authors though

did conduct a subgroup analysis of ileus.  The ileus-specific subgroup analysis was driven largely by underpowered RCTs, Gudbergsen included 156 participants and Lundgren included 195 participants with minimal events and wide variation in ileus event rates across studies."

Do you see that?

A.    That's correct.

Q.    Okay.  Now, can we turn to -- now go back to the actual study and let's go to Supplemental Figure 4.

Let me know when you're there.

A.    Yes.

Q.    Okay.  So this is that subanalysis we were talking about; right?

A.    This is the subgroup subanalysis between ileus and bowel obstruction.  Correct.

Q.    So now the bottom part is the bowel obstruction; correct?  On this chart.

A.    That's what the author states.

Q.    And for their subanalysis focused on bowel obstruction, they report an odds ratio of 2.13, and then based on the upper and lower limit and the p-value is nonsignificant;

correct?

A.    Okay.  Counsel, I just want to point out one thing there.

Q.    Yeah.

A.    If you look at the bowel obstruction, that is the composite endpoint, it's not bowel obstruction, because it includes Sodhi, and Ueda.  So I just want to point out that the bowel obstruction composite and ileus appears to be the subgroup analysis.

Q.    Fair enough.

Can you answer my question now, though?

A.    Yes, please.

Q.    Which was:  The odds ratio they found for the endpoint bowel obstruction was 2.13, with a lower limit and upper limit and p-value consistent with no significant association?

A.    That is correct.  That's correct.

Q.    Let's look at the top now, for ileus; right?

A.    Uh-huh.

Q.    The odds ratio the authors reported, 0.571, and again, with a lower and upper limit

that was crossing 1, meaning it's nonsignificant; correct?

A.    That's correct.

Q.    All right.  So no effect again?

A.    No effect there.

Q.    Now, in your report you say that this finding was driven by the underpowered Gudbergsen and Lundgren studies.

Do you see that?

A.    Correct.

Q.    Now, look at the right-hand column.

Fair to say that in terms of this analysis, in the meta-analysis itself, the greatest weight was put on the Ueda study, which you actually I believe you said was a high-quality study?

A.    Correct.

Q.    The second greatest weight was put on the Bennett study which you said was a high-quality study?

A.    Yes.

Q.    And only very limited weight was given to the RCTs, the combined total of under 15 percent of the total effect; correct?

A.    Correct.

Q.    So it's actually not correct that those studies drove this analysis, is it?

A.    I agree that the RCTs were not the overwhelming number of patients in that subgroup analysis of ileus.

Q.    In fact, the -- the driver of that ileus result were the Bennett and Ueda studies, which you said were two of the higher quality studies you reviewed?

A.    Again, let me -- let me clarify that, Counsel.

We mentioned that there is major significant biases in both of these studies in how ileus was -- was examined.

So the meta-analysis does not consider any of those into account. In fact, they take the authors at face value, and the authors says, oh, this is ileus, regardless of what the ICD 9/10 codes are, they said, ah, this is ileus. And when the authors said this is ileus in Bennett, they included those ICD codes.

So, again, we always say in epidemiology, the quality of a meta-analysis is equal to the quality of the studies that go

into it.  Or, in other words, we say garbage in, garbage out.

Q.    Right.

A.    So this is a classic example of garbage in, garbage out.

You mentioned it, Counsel, that this was a very unconventionally performed meta-analysis.  You mentioned the faulty methodologies in this manuscript, but when there is an outcome there, you know, I don't think we can rely on that outcome just because the methods here are so faulty.

Q.    You said "garbage in, garbage out." I've heard that before.  The problem is the garbage that you're calling garbage is the Bennett and Ueda studies, which are the two studies that you claim are the higher quality studies in your report.

A.    Again, Counsel, it all depends on the setting.  I never said -- I have never said that every study and every aspect of every study that I considered a high quality is great.  They've taken the aspect of the study which I did not like -- right? -- which is ileus, the way they adjudicated ileus, and I've

clearly explained that, and they take that to do a subgroup analysis.

So, yes, that aspect of the analysis is garbage in, garbage out.

Does that mean everything about that study is garbage?  It's not.  And I believe I explained that clearly.

Q.    So, just to close this out and we'll take a break.  Garbage or not, the odds ratio reported from the Bennett study is 0.271, which is actually a statistically significant reduction in risk; correct?

A.    That's what it says here in that final plot.  But I don't believe that is an accurate use of the facts there because I don't recall seeing that in the actual Bennett study.

Q.    Well, we'll defer.

A.    And this is not the only place where we found that.  There were other parts in this meta-analysis.  So, for example, there was another figure where they put the hazard ratio -- I believe it was Faillie.  Let me just double-check that.

Counsel, I believe this was figure 2.

Q.    Figure 2?

A.    Uh-huh.

Q.    Hold on.  Let me get there.

Okay.  I'm there.

A.    Are you there, Counsel?  Figure 2?

The legend of the figure says:  "The overall risk of GLP-1 RA associated bowel obstruction or ileus."

Q.    Yeah.

A.    And in that, if you look at the second study from the top, that is Faillie, F-a-i-l-i-e, et al., 2022, the odds ratio there is 26.33 with a 95 percent confidence interval of 12.10 to 57.26.

Now if you look at the paper by Faillie, I do not believe we saw a relative risk anything close to that number.  And the odds ratio, in general, they are not the exact same number, but is often a reasonably -- it's in the ballpark of a relative risk.  And when you find that an odds ratio is 26.33, that does not appear to be consistent with the facts.

So my point there is just there appears to be several methodological flaws in this meta-analysis, the way it was done.  And

the odds ratio at multiple points, not just the one you pointed out, appears to be inconsistent with the actual data from the individual studies.

Q.    Okay.

MR. HONNOLD:  Dr. John, just so the record is clear, can you -- can you state what exhibit you're reading from and what page you were -- just so it's very, very clear on the record what you were referring to.

THE WITNESS:  Thank you, Counsel.

What I was referring to here is Exhibit 17, the paper by Alfehaid, A-l-f-e-h-a-i-d.  Looking at page 6 in figure 2, the second bullet point from the top on that funnel plot, and the estimate of the study by Faillie, F-a-i-l-i-e et al.

MR. HONNOLD:  Thank you.  I just wanted to make it clear.  When you went to it on the record it wasn't perfectly clear what was happening, I just wanted that to be clearly laid out.  Sorry to interrupt.

MR. PRZYMUSINSKI:  Let's take a break.

THE VIDEOGRAPHER:  We're going off the record.  The time is 5:01 p.m.

(A brief recess was taken from 5:01 p.m. to 5:19 p.m.)

THE VIDEOGRAPHER:  We're back on record the time is 5:19 p.m.

BY MR. PRZYMUSINSKI:

Q.    All right.  Dr. John, I think we're approaching the end of our first day which hopefully is good news.

I want to talk a little bit about -- well, let me ask you this, remember I made the mistake of saying the sentence journal Gastroenterology earlier and you corrected that and you said you got to be careful --

A.    I believe you said Journal of Gastroenterology.  That's what I misheard.

Q.    Well, either way it doesn't matter. And you made the clarification that there's a journal called Gastroenterology, and then there's a different journal called The American Journal of Gastroenterology.

A.    And there's also one called Journal of Gastroenterology.

Q.    Even better, so there's three.

American Journal of Gastroenterology, where does that rank in terms of quality publications?

A.    Well, I -- Counsel, I mentioned that in my -- in my discussion of each article.  So in every manuscript that I described, I mentioned if it's a published manuscript or a conference abstract, and then I try to include the impact factor of a journal which kind of gives you an idea about the impact --

Q.    Yeah.

A.    For example, JAMA is 55; right?

Q.    Right.

A.    American Journal of Gastroenterology is 7.5.  So that's greater than 5.  It's not JAMA, but it's a respectable journal.

Q.    And is it one that, as a gastroenterologist, is it a journal that you get?

A.    The journals I get are journals published by the GI societies in general because our society memberships include a complimentary copy of the journal.  So it has nothing to do necessarily with the quality of the journal, it's whether the journal is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

published by a society or not.  And in answer to your question, I am a member of the American College of Gastroenterology so I do get that journal.

Q.    But it's at least a journal that you would say was a respectable --

A.    Yes, Counsel.  In fact, the paper that you mentioned that I wrote, which you -- which we discussed today was published in the same journal.

Q.    And presumably it's got a strong peer-review process, I presume?

A.    That is correct.  It has.

Q.    You wouldn't have submitted your paper into it if you didn't think it was a reputable paper?

A.    Again, Counsel, we have to put it in context; right?

If a randomized controlled trial that you do multicenter ends up in The American Journal of Gastroenterology, then there are major limitations with that starting.

Q.    Okay.

A.    If a paper -- and, again, having experienced both reviewing for this journal as

well as being on the editorial board of journals, there are many factors that go into what journal paper gets accepted.  And one of them is whether the topic is of interest to the audience.  And then -- so it's a compromise between the interest of the topic to the audience, with -- and then you look at the strengths, you look at the limitations, and then you say, is the topic of such great interest that you would accept a paper with limited strengths.  On the other hand, if the topic is of not great interest you would insist on methodological rigor.

So there's many factors that go into journal acceptance so it's hard to make a general statement like that.

Q.    But -- okay.  That's fine.

So now on page 38 of your report, Doctor --

A.    Yes.

Q.    -- you talk about a study, Dr. Niu, N-i-u, do you see that?

A.    Yes, I do, Counsel.

Q.    And we -- and the discussion goes on to page 39.  I think you briefly talked about

that study earlier.  It talks about the TriNetX

database that's used in that study; correct?

        A.    That is correct.  I used a database

called TriNetX.

        Q.    Okay.  I thought you said you used

it?

        A.    No.  What I meant is I was referring

to the platform TriNetX.  I was just repeating

for the reporter.

        Q.    Great.  All right.

                So we're going to mark that study as

Exhibit 18.

                (Defendant's No. 18, Article,

        Gastrointestinal and Hepatobiliary Safety

        of Glucagon-Like Peptide-1 Receptor

        Agonists in Patients with Type 2 Diabetes,

        was marked for identification.)

BY MR. PRZYMUSINSKI:

        Q.    Okay.  So if we just look at -- and

you can keep them both out whichever place you

want to look, the report or the study.  But

looking at the bottom of page 38 in your

report, you write that this was retrospective

cohort study using the TriNetX database

to evaluate the risk of among other outcomes

bowel obstruction.

Do you see that?

A.    I do, Counsel.

Q.    And now if you look on the next page, page 39, you identify the GLP-1 RA medications that were included in that study, and your list has dulaglutide, exenatide, liraglutide, lixisenatide, and semaglutide.

Do you see that?

A.    I do see that, Counsel.

Q.    No tirzepatide?

A.    I do not see that in my report.

Q.    And the comparator was a group of other oral antidiabetic drugs; correct?

A.    So I wanted to clarify that.

The comparator is a group of a number of drugs with varying different mechanism of action.

So some of those medications include empagliflozin.  Empagliflozin is e-m-p-a-g-l-i-f-l-o-z-i-n, and then other is a drug called metformin, m-e-t-f-o-r-m-i-n.  And then you also have DPP-4 inhibitors, like alogliptin, a-l-o-g-l-i-p-t-i-n.  And so the comparison group is highly -- very unusual,

very unorthodox way of looking at it.

Q.    Okay.  In your report on the next paragraph you state that after propensity matching there were 230,415 subjects in each cohort; correct?

Page 39 of your report, the last sentence of the second paragraph.

A.    Yes.  Yes, Counsel.  Thank you.

Q.    So that means there were 230,415 people receiving one of the GLP-1 medications and a similar propensity match cohort of patients receiving one of the or more of the other oral antidiabetic drugs you just described; correct?

A.    That is correct.

Q.    Now, if you look at page 3 of the manuscript itself, in the left-hand column bottom paragraph, the author described the covariance they included in their propensity matching process.

Do you see that kind of in the middle of that last paragraph on the left-hand side?

A.    Yes, I do.

Q.    So they list age, sex, race, and

ethnicity, BMI, tobacco use, alcohol-related

disorders, hemoglobin A1c, and comorbidities

such as gastroesophageal reflux or disease,

cirrhosis, dyslipidemia, and hypertension.

Do you see that?

A.    I do, Counsel.

Q.    They also say they considered

medication use including proton-pump inhibitors

and opioids; right?

A.    They mention those two specific

drugs, yes, Counsel.

Q.    And if you look at the right-hand

column under Study Outcomes on that same page,

Doctor, still on page 3 of the manuscript,

right-hand column under Study Outcomes, do you

see that outcome measurements -- end of the

first paragraph -- were confined to a

predefined time window, beginning one day after

the index date and extending to 1,825 days or

five years?

A.    Correct.

Q.    So followup was up to five years of

time; correct?

A.    Correct.

Q.    Okay.  All right.

Now, if you go to page 5, do you see table 2 at the bottom?

A.    Yes, I do.

Q.    There is a line for bowel obstruction and a line for ileus.

Do you see those?

A.    I do.

Q.    Both of those endpoints when comparing GLP-1 RAs as a group to the other antidiabetic medications as a group, reported statistically significant decreased risk; correct?

A.    Correct.  And I want to put that in context.

So, Counsel, one of the drugs that is used in the comparator drugs is drugs from the class DDP-4 inhibitors.

Now, DDP-4 inhibitors work by breaking down -- the DDP-4 is an enzyme that breaks down GLP-1, the endogenous GLP-1 of the body.  So when you have a DDP-4 inhibitor, what it does is it prevents the breakdown of GLP and increases the level of GLP-1.  So, in other words, it has a very similar mechanism that way in terms of GLP-1 in the sense that it augments

GLP-1 receptor agonist, it's a similar mechanism.

And, additionally, if you look at some of the papers, including some of those we have discussed, other studies have shown that DDP-4 inhibitors are associated with an increased incidence of ileus and bowel obstruction.

And so that is a faulty comparator. Any time you're comparing GLP-1 RA, which you are looking to see if it causes bowel obstruction, the comparator group you want to include is not DDP-4 inhibitors, because then it's a bias towards the -- and if there are a significant number of DDP-4 inhibitor patients, it could show an increased risk with DDP-4 inhibitors.

So that's a significant limitation of that paper, in addition to the multiple limitations we discussed with TriNetX, including the fact that it is very difficult, impossible, if -- to ascertain the exposure of the medication.

You know, you mention the followup up to five years, but there's no way to

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

adjudicate or based on TriNetX's data how many patients are truly taking the medication of the GLP-1 RA, or the comparator for that duration of five years.

So all of these have a tendency to bias your estimate towards the null or it -- in DDP-4, as a comparator, it actually biases it the opposite way.  It actually shows that GLP-1 RAs are protector because you're comparing with another drug that also causes ileus.  So it's a highly faulty comparison.

So I want to put that in context, very important to put that in context.

Q.    Let me ask you a couple of followups.

A.    Sure.

Q.    Has a cause-and-effect relationship been established between DDP-4 inhibitor use and ileus or intestinal obstruction?

A.    Counsel, that was outside the scope of what I did.  And so I did not examine specifically the Bradford Hill criteria for DDP-4 inhibitors.

Q.    Well, and that's fair.  But I was asking more broadly, not just whether you have

established it, but whether that's something that's been established externally through the medical and scientific community.

A. Again, Counsel, I did not do research on that specific class of drugs because that was not my focus.

Q. Just generally speaking do you know kind of as a little bit of an aside if any medical, scientific, or regulatory organization has concluded that GLP-1 RAs cause -- not are associated, but cause ileus or intestinal obstruction?

A. So I would have to go back and refer to the FDA label. I do mention -- I do note that I believe it's on Section 6.2, but I would have to go back and refer to it. I know that there's a warning specifically about ileus and bowel obstruction, that's my recollection. But I would have to go back.

So in answer to your question, is there a regulatory agency that has mentioned the relationship or advised caution? Yes. I don't believe that regulatory association -- regulatory agencies are in the business of assessing causation. So I'm not sure, even if

they found an association, they would necessarily go in to seek causation.

Q.    Well, let's set regulatory aside then.  What about scientific or medical organizations?

A.    I'm not aware.

Q.    All right.  Now let's go back to your point about DDP-4 as a comparator here.

Fair to say that in the comparator in the Bennett study which you cited as one of your higher quality studies was DDP-4 inhibitors?

A.    That is correct.

Q.    Got it.

Now, exposure ascertainment --

A.    And just to followup on that, Counsel.  That is a limitation of -- that study and, in fact, that is, again, a bias that shows no relationship with the rest so just wanted to clarify that.

Q.    Appreciate that.

Now, you also said that within the TriNetX database -- I hope I'm saying that correctly -- that it's impossible to determine exposure ascertainment, really like know when

they were taking the drugs for how long; is that correct?

A.    So there are two aspects there, Counsel.

Q.    Yeah.

A.    So TriNetX is a series of hospitals that agreed to put up, share their data with this external resource, this external organization, and what they do is they take that data, they de-identify that data, and it's -- it's kept centrally, and then all the research institutions that contribute data to that database is allowed to access it.  But when they access it there are two things -- there are two major limitations we should be aware of.

One, patients go in and out of these institutions.

So, for example, if they are at the University of Miami, they may be having one insurance for a year, they may be on with the -- they might be a preferred provider for a year, they may move out to a different insurance and then they move out of the system of a hospital that has TriNetX.

So one limitation is patients go in and out of that system.  So when I do research on epidemiological database, I have very granular data on my patients.  I could go specifically into individual patients and see when they started the drug, what dose they took, and then they stopped.

With TriNetX you get nothing.  You don't get any of that information; right?  You submit the variables you want to examine, the exposures you want to look at, the potential confounders you want to adjust for, and then all you get is a summary report, you know, of -- of the outcome or analysis.

So you don't know exactly what they're doing behind the scenes.  You -- it's very hard or almost impossible to ascertain exposure in that database.

Q.    Appreciate that long answer, but I think just so I make sure I can have a clean question, my question was, and I think you're answering it, just it was very long so I want to make sure I get the bottom line.

In terms of the TriNetX database, one of the criticisms you have of it is it's

got limited ability to confirm exposure ascertainment, which is one of the criteria for study quality you consider; is that fair?

A.    That is fair.

Q.    That same issue we discussed not within the context of the database used, but lack of information on the Alkabbani study, which you listed as one of your higher quality studies, were not because of the database, but just because there was no information in the abstract on whether exposure ascertainment could be done or how it was done; correct?

A.    Can I double-check that, please, Counsel?

Q.    It's the -- it's the conference abstract; right?

A.    The conference abstract, yes. Correct.  That is correct.

Q.    All right.  Let's go back to this page if we can, that table 2 we were talking about before we got into a conversation about the limitations.  Okay?

A.    Okay.

Q.    Just one more thing on this table.

In terms of the event counts, right, in the GLP-1 RA group, that risk estimate with all the limitations you discussed was based on 1,847 events in the GLP-1 RA group and 2,366 in the oral antidiabetic group for bowel obstruction; correct?

A.   For bowel obstruction, that's correct.

Q.   And for ileus, those numbers were 1,617 for the GLP-1 group and 2,093 for the oral antidiabetic groups?

A.   That's correct, Counsel.

Q.   That's a large number of events?

A.   A large number of events, yeah.

Q.   Okay.

MR. HONNOLD:   Where are you?   Where was that, table 2?

MR. PRZYMUSINSKI:   Table 2.

MR. HONNOLD:   Thanks.

THE WITNESS:   Table 2, page 5.

MR. HONNOLD:   Yeah.

THE WITNESS:   Of Niu, N-i-u et al.

MR. HONNOLD:   Thank you.   I've got it.

BY MR. PRZYMUSINSKI:

Q.    All right.  Let's go to the supplementary materials, and specifically if you can turn to supplementary table 1, let me know when you're there.

A.    Yes, Counsel.

Q.    So this supplementary table provides similar data, but it's limited to a single medication dulaglutide; correct?  You can see that in the title.

A.    Yes.  It appears to be, yes.

Q.    Okay.  So these authors, all limitations notwithstanding, independent analyses for each of the individual drugs as well.  And for dulaglutide, if you look, for bowel obstruction and ileus, again, it has the ratios are below 1, significant, indicating a significant reduction in risk of both bowel obstruction and ileus; correct?

A.    Again, to put it in context, Counsel, we are comparing dulaglutide with a series of oral medications, a combination, each of which have a completely different mechanism of action, including a class of drugs called GPT4 inhibitors which potentially can cause ileus.  So, yes, compared to that faulty

comparator, it shows a decreased rate.  You're correct.

Q.    And even for dulaglutide, if you look at the number of events that are included for bowel obstruction is 783 -- sorry, 786, and for ileus it's 748; correct?

A.    That is correct.

Q.    So a substantial number of events?

A.    A substantial number of events.

Q.    Turn with me now to table -- to the supplemental table.  This table is the same except now it's liraglutide specifically; correct?

You can see that on the top?

A.    Yes.

Q.    And, again, acknowledging all of the limitations you have stated for liraglutide, for bowel obstruction and ileus the risk ratios were below 1.0, were statistically significant, indicating a significant reduction in risk in both bowel obstruction and ileus in this comparison; correct?

A.    Again, comparing with a group of drugs that can potentially cause ileus, liraglutide in this analysis shows a decrease

in bowel obstruction and ileus.

Q. Let's go to supplemental table 5.

A. And I also want to point out it shows a decrease in conditions like intussusception. It also shows a decrease -- or in volvulus and again where mechanical obstruction, which is something you would not anticipate what you are seeing that.

Q. Okay. I appreciate that.

A. Counsel, which one?

Q. Table 5. Supplemental table 5.

A. Supplemental table 5.

Q. This one is now for semaglutide; correct?

A. This is semaglutide.

Q. And again here we have for bowel obstruction and for ileus significant reduction of risk for both endpoints; correct?

A. Let me check this.

Yeah. That is correct.

Q. Okay. And so this time slightly fewer events, but still 313 for bowel obstruction and 206 for ileus and a sufficient number of events to result in a statistically significant result; correct?

A.    Yes.  Again, comparing -- comparing with this group, absolutely.

Q.    All right.  Now, I think this is the last table we're going to look at here.  It's table 6, supplemental table 6.

Now, the authors in this study actually looked at dose response, and they looked at the question of whether each individual medication had an increased risk when comparing it to other oral antidiabetic agents and different dose ranges.

Summary table 6 looks at semaglutide at doses under 1 mg, 1 through 2 mg, and 2 mgs.  Do you see that?

A.    Counsel, give me a minute because it appears to be out of line in my supplement -- the way this is printed out.

Q.    It's printed the same way for all of us.

A.    No.  I'm wondering whether in my report it might be printed --

Q.    If you have a better one, that's great.

A.    Yeah.  Again, I just want to double-check.

Okay.  Counsel, remind me again what -- what figure is that.

Q.    Supplemental table 6.

And I will be the first one to admit that the formatting of this table is difficult.

A.    It's really hard to make out what is in which line.

Q.    Yeah, I agree.  And what I really was going to ask you is in preparing your opinion I know you reviewed this study, did you look at supplemental table 6 specifically and look to see whether there was any evidence there of dose response in this epidemiological study?

A.    I believe I did, but I can't recall. But my point is, again, because of the major methodological limitations of the study, I did not give as much weightage, especially to the subgroup analysis, including those response that you mention.

Q.    Makes complete sense to me.

A.    And I also just noted again with your -- you had mentioned about the dose analysis, if you look at the actual paper --

Q.    Yeah.

A.    -- so I'm looking at -- let me see which page is this, because I have a paper here.

Q.    Yeah.

A.    It's the page of the discussion.

Q.    Okay.  I'm there, I think.  Page 5 on mine.

A.    I believe page 5.  So if you go --

Q.    Above table 2?

A.    I'm sorry?

Q.    Above table 2?

A.    Above -- no.  Above table 2, correct.

Q.    Yeah.

A.    So if you go above that in the results, they're talking about the subgroup analysis, and I'm going to read that.

"When analyzed by dosage, patients receiving 1 to 2 mg of semaglutide showed a significant increase risk of gastro-" -- oh, scratch that.  Let me go back to the next one.

No.  No.  It's the line after that.

So conversely, GLP-1 agonists associated with lower risk of bowel obstruction and ileus across BMI in drug subgroups, an

exception was bowel obstruction with lixisenatide has a ratio point of 653 95 percent confidence level .421 to 1.014, which did not reach statistical significance, and it says no clear dose dependent trend was observed.  So I'll qualify that.

Q.    So -- and, you know, understanding the limitations of the study, but would you at least agree with me that this is an epidemiological study that attempted to assess dose response and found no evidence of that?

A.    Counsel, you said attempted to?

Q.    Yeah.

A.    And that's a good way of putting it. I would say unfortunately attempt is different from being successful, and in this situation it was a bad attempt, unfortunately.

Q.    But as we discussed -- and let's go to page 51 of your report where you have your section on biological gradient.

A.    Yes.

Q.    And we read the sentence earlier at the very beginning where you say:  "The epidemiological studies reviewed did not examine the association between the dose of

GLP-1 RA and bowel obstruction."

Do you see that?

A.    Yes.

Q.    Okay.  Can we at least agree that with whatever limitations this Niu study did, they did assess dose response; correct?

A.    Again, when I'm referring to that discussion there, I'm talking about the manuscripts with adequate quality enough to review it.

To me, this is -- you know, Counsel, you asked me previously about what I thought about pharmacovigilance studies and if you have seen my report, I -- like you correctly pointed out, I barely discuss it.  I don't give it any weightage; right?

I talk about it, I considered it, but I did not use that to base my discussion.  And, again, it's the same principle and those showed an increase risk of bowel obstruction in patients on GLP-1 RAs, at least within the limitation of what they said.

But, again, the methodology was so flawed that I would not include that in my consideration and I would say for something

like Niu, and it's not just Niu, there are multiple studies which use the same database. So, for example, Niu, Gark, I believe Liu, and there is one more, there are four papers, you know, so -- that are looking at the same database.

So -- and some of it are overlapping time and -- when you're looking at multiple studies, looking at the same flawed database with overlapping intervals and then again in here with a very faulty comparator, similar to the pharmacovigilance studies, I dismiss these trial studies.

Q.    That's fair.

The statement written where it says, "the epidemiological studies reviewed did not examine the association between the dose of GLP-1 RAs and bowel obstruction," is not correct?

A.    Again, I would like to clarify that by saying that the epidemiological studies of adequate quality, in other words, for example, I would not - if pharmacovigilance studies showed an association, I would not.  Right.

Q.    Yeah.

A.    And so when I'm talking about that statement, I am talking about state- -- about studies that I would consider in my report.

Q.    So we would correct your report by adding that context?

A.    I would clarify that a little better to add that.

Q.    And we talked earlier also about the Chiang 2025 meta-analysis and showed where they did a dose-response analysis update by low versus high.

Do you recall that?

A.    Yes, I recall that.

Q.    And we talked about the Chen 2026 studies which looked at different doses of tirzepatide, semaglutide, and also didn't find an effect dose response?

A.    Again, we discussed -- just as well, we discussed the limitations of both -- all of those studies, yes.

Q.    Okay.

A.    Correct.  And to answer your question, did they look at those response? Yes, they did.

Q.    So there are three epidemiological

studies, clinical studies, clinical data studies, two meta-analyses, one observational study that looked at dose response, but you didn't include them here because the limitations of those studies and you didn't view them as really contributing reliable information on that topic; is that right?

A.    I would say that's correct.

Q.    Now -- so, instead, though, you point to two studies, which are conducted -- so if you read, you continue to say in that paragraph:  "However, there's a clear dose response observed in animal studies performed by Tolessa et al 2001.

And then in the next sentence, you also talk about, similar trends in human in studies performed by Hellstrom et al, where different doses of GLP-1 RA already have varying effect on small bowel assessed by -- do you see that?

A.    I see that.

Q.    All right.  So these three studies, which we just talked about, Chiang, Chen, and Niu didn't meet the criteria, so instead you looked at an animal study by Tolessa, and then

another study by Hellstrom for the dose response issue; is that right?

A.    Correct.  That's correct.

Q.    All right.  So we don't have a lot of time, I'm going to try to do this without -- I'm happy to give you the abstract on Tolessa, I'll give you the one, Hellstrom, in a second. But Tolessa is a rat study; right?

A.    I cannot, without looking at the paper, I cannot talk about it.

Q.    I will give you both so we can shorten this process.

A.    I want to get a chance to review it. Thank you, Counsel.

Q.    No.  It is totally fine.

(Defendant's No. 19, Article, The inhibitory mechanism of GLP-1, but not glucagon, on fasted gut motility is dependent on the L-arginine/nitric oxide pathway, was marked for identification.)

(Defendant's No. 20, Article, GLP-1 suppresses gastrointestinal motility and inhibits the migrating motor complex in healthy subjects and patients with irritable bowel syndrome, was marked for

Binu John, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

identification.)

A.    And, Counsel, I'm just finding that in my report if you give me a second.

BY MR. PRZYMUSINSKI:

Q.    Sure.

A.    Okay.  Counsel, this, the Tolessa 2000 study, not the Tolessa 1998 study; correct?

Q.    Well, you cited 2001 here.

A.    Okay.  This is the --

Q.    This is the 2001 study.  If you look at your -- if you want to confirm.

A.    Yeah, I just want to make sure because there are two Tolessas.

Q.    If you look at your reference list, there's a Tolessa study described that's got the same title.

A.    Okay.

Q.    So if you want to look at it, it's in your report.

A.    Yeah.

Q.    But you got a copyright date of 2001 at the bottom which I think is where the 2001 comes from.

A.    Let me quickly refresh my memory,

Counsel.

Q.    I promise you, these will be very easy questions.

A.    Okay.  And so I --

Q.    I'm not -- no.  No.  I'm not pushing you, I'm just saying, I'm not an animal study expert so it's going to be pretty high level.

A.    But, again, this is a very dense study, I just want to make sure I review it before I --

Q.    Yeah.

A.    -- respond to your questions.

Q.    That's fine.

I mean, I -- let me tell you what my first question is and --

A.    Okay.

Q.    My first question really was, this was a study conducted on rats?

A.    That is correct.

Q.    And rats are different from humans; correct?

A.    That's correct.

Q.    Okay.  And you would agree with me that findings in rats do not always translate to equivalent findings in human beings?

A.    I would say it oftentimes does, and sometimes it does not.  So -- but very oftentimes, what we're trying to do is identify the underlying mechanisms and that translates fairly well to humans.  Again, the basic underlying path of physiology, the underlying mechanism, that is why we do these animal studies; in fact, a lot of medications are identified based on animal studies.

Q.    I'm not in any -- any -- any sense dismissing them.

A.    I respect --

Q.    Animal studies are important, but --

A.    They are very important.

Q.    But you cannot make the assumption that what is seen in an animal study will be seen in a human study without further verification; correct?

A.    I would say that the underlying mechanism often that we derive and that we -- the -- our -- our understanding of human biology for many conditions is based on animal studies.  It's very unusual for us to do basic science work on human muscle.  For example, I cannot imagine taking out the smooth muscle in

the humans and doing some of these experiments that they do on rats.

So, ultimately, a lot of the biology we understand is best done in animal models, and we acknowledge and we accept that oftentimes as the mechanism in human studies.

So in answer to your question, depends on the context.  In many cases, it's not possible to replicate these studies in humans.

Q.    And it's not a question of replication, it's simply understanding that animal studies, be that in rats, be that in pigs, be that in monkeys, right, individually have to consider the fact that even though there are similarities, there are also differences in the biology of those animals that may impact the way the medications actually act in a rat or a pig or a monkey, that may or may not fully translate to a human being; is that fair?

A.    Again, it depends -- it depends on the context, it depends on the situation.  I don't think we can make that general statement.

Q.    Okay.  Let's leave that there.

If you look at page 34 of this publication, there's a section on,-- it says 2.3 --

A.    So, Counsel, you started the section saying I'm going to ask you a very straightforward question --

Q.    This is a really straightforward --

A.    Right.  But -- but I need to look at that.  If you are going to ask me to look at --

Q.    So look at this section, Drugs and Chemicals, please.  I promise, it's a very easy question.

A.    But, Counsel, I -- you need --

Q.    Can you -- will you listen to my question and then decide if you need to read more, and if you do, I'll -- go ahead?

A.    Okay.

Q.    Okay.  And here it says: "Glucagon-like peptide-1 was purchased from PolyPeptide Laboratories Group, Wolfenb ttel, Germany."

Do you see that?

A.    I do.

Q.    Now -- now feel free to read as much as you want.

A.     Thank you.

Q.     That GLP-1 peptide that was purchased, that is not identical to any of the GLP-1 medication at issue in this litigation?

MR. HONNOLD:  Object to form of the question.  No foundation.

A.     The -- in terms of mechanism, they are virtually identical because the way that GLP-1 RAs works is once they act on the receptors, they increase the levels of GLP-1. And so when you administer GLP-1, mechanistically, it has the same effect.  So when you are trying to -- here you're trying to assess the effect of GLP-1 RAs on the muscle.

And so whether you give a GLP-1 RAs or GLP-1, it depends on the question you're answering, and here they work just the same.

Q.     Okay.  Can we agree to maybe a simpler question.

None of these rats were treated directly specifically with the medications at issue in this litigation?

A.     That is correct.

Q.     Okay.  Now, if you look at the doses that were used in these rats, right -- and feel

free to look at that, I think if you look right above section 2.3, that's where they discuss it.

Do you know whether the doses of GLP-1 that were used in these rats or maybe not whether, how they compare to the doses of the GLP-1 RAs medicines that are used on human beings in terms of equivalent higher, lower, don't know?

A.    So can I review this?

Q.    Sure.  Absolutely.

A.    Okay.  Thank you.

So can you repeat the question one more time?

Q.    In terms of the infusion doses of this GLP-1 compound that those -- the study in these rats, in the study that we're talking about, do you know how those doses, how those levels of GLP-1 compare to the pharmaceutical doses of the medications at issue used, are they higher, are they lower, are they different, do we not know?

A.    I do not know.  I wouldn't say "we" do not know.  I do not know.

Q.    Okay.  That's perfectly fine.

And last question, any animals in this study, any of the rats develop ileus or intestinal obstruction?

A.    I do not believe that's what they were looking at and so it was not specifically reported.

Again, these are mechanism studies and so ileus would not be something they would typically examine.  In fact, even if they develop ileus, I wouldn't know if they would know how to diagnose ileus on a rat.

MR. PRZYMUSINSKI:  I've got a question for the court reporter, I have one more study to do or I can hold it off until tomorrow or I can get through it and finish it and turn it over to other counsel tomorrow?

Is -- what's your preference?  You want me to finish?  You guys okay with that, like ten more minutes max?

MR. HONNOLD:  Let's see.

You good?

THE WITNESS:  I was wondering if we could take a break?

MR. HONNOLD:  Oh, okay.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI:  So --

MR. HONNOLD:  -- let's call it then.

MR. PRZYMUSINSKI:  Then let's just pick it up --

MR. HONNOLD:  Let's do tomorrow morning.

MR. PRZYMUSINSKI:  That's totally fine.

MR. HONNOLD:  Thank you.  Let's just do that.

MR. PRZYMUSINSKI:  That is totally fine.

THE VIDEOGRAPHER:  This concludes today's deposition.  6:04 p.m.

(Thereupon, the proceedings concluded at 6:04 p.m.)

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF MIAMI-DADE )

I, the undersigned authority, certify that BINU JOHN, MD personally appeared before me and was duly sworn on the 12th day of March, 2026.



MAIRELYS ALBO, RPR

Notary Public - State of Florida
My Commission No. HH 623942
My Commission Expires: 01/27/29

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

                CERTIFICATE OF REPORTER


THE STATE OF FLORIDA )

COUNTY OF MIAMI-DADE )


     I, MAIRELYS ALBO, RPR, Registered Professional

Reporter, certify that I was authorized to and did

stenographically report the foregoing deposition of

BINU JOHN, MD, pages 1 through 403; that a review

of the transcript was not requested; and that the

transcript is a true and complete record of my

stenographic notes.

     I further certify that I am not a relative,

employee, attorney, or counsel of any of the

parties, nor am I a relative or employee of any of

the parties' attorneys or counsel connected with

the action, nor am I financially interested in the

action.


          DATED this 13th day of March, 2026.

          _____
          MAIRELYS ALBO, RPR


**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**