# EXHIBIT 25D



Binu John, MD Volume II

3/13/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability
Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

IN THE SOUTHERN DISTRICT OF PENNSYLVANIA


IN RE: GLUCAGON-LIKE PEPTIDE-1
RECEPTOR AGONISTS (GLP-1 RAs)
PRODUCTS LIABILITY LITIGATION                CIVIL ACTION

                                             MDL 3094

                                             2:24-md-03094-KSM

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS/ALL CASES:

_____/


       **CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**


          CONTINUED VIDEO DEPOSITION OF BINU JOHN, M.D.

                        VOLUME 2

                      MIAMI, FLORIDA

                  FRIDAY, MARCH 13, 2026

                       9:10 A.M.




REPORTED BY:

TAMARA MASCI TANNEN, RPR, FPR-C
STENOGRAPHIC COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA

JOB NO. 3137

APPEARANCES:

BRADLEY D. HONNOLD, ESQ.
GOZA & HONNOLD, LLC
9500 NALL AVENUE
SUITE 400
OVERLAND PARK, KANSAS  66207
BHONNOLD@GOHONLAW.COM
     COUNSEL FOR PLAINTIFFS


LUCAS PRZYMUSINSKI, ESQ.
ANTONIOUS E. SADEK, ESQ.
DLA PIPER LLP
1251 AVENUE OF THE AMERICAS
27TH FLOOR
NEW YORK, NEW YORK  10020-1104
(312) 324-1000
LUCAS.PRZYMUSINSKI@US.DLAPIPER.COM
TONY.SADEK@US.DLAPIPER.COM
          COUNSEL FOR NOVO NORDISK A/S AND NOVO NORDISK INC.


DIANA WATRAL, ESQ.
SARAH DONNELL, ESQ.
KIRKLAND & ELLIS LLP
ATTORNEYS FOR ELI LILLY & COMPANY AND
LILLY USA, LLC
333 WEST WOLF POINT PLAZA
CHICAGO, ILLINOIS 60654
(312) 862-7015
DIANA.WATRAL@KIRKLAND.COM
SARAH.DONNELL@KIRKLAND.COM
          COUNSEL FOR ELI LILLY


ALSO PRESENT:

ASHLEY TAYLOR, VIDEOGRAPHER

MICHAEL BACHMANN, LEGAL ANALYST, SEEGER WEISS

NOA, MORGAN & MORGAN

Case 2:24-md-03094-KSM    Document 691-25    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

* * * * * * * * *

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties, and the deponent, that the reading and signing of the deposition are hereby reserved.

INDEX

WITNESS                                                            PAGE

BINU JOHN, M.D.

Direct Examination by Ms. Watral                                   410

Cross Examination by Mr. Przymusinski                              519

E X H I B I T S

DEPOSITION                    DESCRIPTION                    PAGE

Exhibit Number 21  Blank sheet of paper with seven    411
                   lines

Exhibit Number 22  Hurwitz Study                      430

Exhibit Number 23  "Incretin-based drugs and          513
                   intestinal obstruction: a
                   pharmacovigilance study"

Exhibit Number 24  Binder with studies                529

P R O C E E D I N G S

* * * *

THE VIDEOGRAPHER:  We are on the video record. Today's date is Friday, March 13th, 2026.  And the time is 9:10 A.M.

My name is Ashley Taylor.  I'm the legal videographer for Hartford Reporting and Technology.

This deposition is being taken in the matter of In Re: Glucagon-Like Peptide-1 Receptor Agonist GLP-1 Product Liability Litigation.  The deponent today is Dr. Binu John.

The court reporter today is Tamara Masci Tannen and will now swear in the witness.

THE REPORTER:  Raise your right hand, please.  Do you swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE REPORTER:  Thank you.  You may proceed.

BINU JOHN, M.D.,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. WATRAL:

Q.  Hi, Dr. John.  We met off the record yesterday. I'm Diana Watral.  I represent Eli Lilly in this litigation.

A.   Good morning, Counsel.

Q.   It's nice to -- nice to see you on the record formally.

A.   Nice to meet you.

Q.   I want to start with the seven studies that you identified yesterday as the highest quality studies.  Do you remember talking about those seven studies?

A.   Yes, Counsel.

Q.   Okay.  And the seven studies that you consider to be the high quality studies are Faillie, Sodhi, Alkabbani, Bennett, Hurwitz, Sarwal and Ueda; is that right?

A.   That is correct.

Q.   I'm going to hand you what I'm marking as Exhibit 21.

(Deposition Exhibit Number 21 marked for identification.)

BY MS. WATRAL:

Q.   And for the record, Exhibit -- for the record, Exhibit 21 is a sheet of paper that has seven numbers, one through seven with blank lines.

MS. WATRAL:  And I have an extra copy if anyone wants to have a copy of it.

BY MS. WATRAL:

Q.   Dr. John, do you have Exhibit 21 in front of you?

A.   Yes, Counsel.

Q.   Okay.  Here's what I want you to do:  Can you rank those seven studies that I just mentioned, those high quality studies in terms of your criteria in your report from one through seven, with one being the highest quality study?  Can you go ahead and write those down each of those study names?

A.   So Counsel, I want to take a minute to clarify. When I look at these studies, each of those studies I weighed the exact same way.  I look at the -- the factors that I gave the highest weightage to, including the seven we discussed yesterday.  And we are looking at seven different studies with seven different outcomes.  And so you can imagine the number of permutations and combinations that is.

So I will need some time to do that.  I don't think I can do that in the setting of the deposition.  If I have to rank them, I can't do that on the fly.  I would have to give it heart.

I would say that I was able to separate out the higher quality studies versus the lower quality studies that I would not consider.  But if you want to rank them against each other, that needs a lot more thought into that process since that is not something I've done in my work.

Q.   Okay.  So let -- let me just break that down a little bit to make sure I understand.  So as part of your work in this case, you have not ranked those seven studies

that you identify as the highest quality studies; is that fair?

A.   I ranked the higher quality studies, which are these seven.  And I've identified the lower quality studies which are the rest.  But I did not rank them against each other.  I have ranked them in terms of each of the specific factors I considered.  And I can discuss each of those studies in the light of their strengths and weaknesses in light of the factors that I cited.

But I did not create a formal list ranking the seven studies against each other in a -- using that kind of methodology.

Q.   I understand.

So what you did is you used each of the seven criteria you have, and you figured out how does each of those studies stack up based on -- let me -- let me restart that question --

A.   Yes.

Q.   -- just so I give you a better question, if you don't mind?

A.   Sure.

Q.   So what you did is you evaluated each individual study based on your seven criteria; is that right?

A.   That is correct.

Q.   What you did not do then, is rank or compare each

study as to how one another compares with each other based on how they performed under your seven criteria; is that right?

MR. HONNOLD:  Object to -- object to form.  It's vague and overbroad.

You can answer.

THE WITNESS:  And Counsel, this venue evaluates studies.  It's -- it's -- there is an art to it.  You apply the principles.  It is -- there is no standard specified format in my mind where you can weigh them easily.  My -- my point being, with every study, I consider strength and limitations.

But my goal was not to compare one versus the other because every study has strengths.  Every study has limitations.

And so, as long as I'm able to discuss the strengths and limitations of each study, I did not see a reason why I should say one is two versus one is three versus one is four.  Because I'm looking at the strengths of two, I'm looking at the strengths of three and four.

And so, anything I would do to rank them against each other, other than the fact that I can identify high quality features would be arbitrary in some ways. I was able to identify the high quality features and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the low quality ones.  But again, it was not my goal to rank them against each other.

BY MS. WATRAL:

Q.   Okay.  Are you able to tell me now which of these studies is the best design in the field?

MR. HONNOLD:  Object to the form.

THE WITNESS:  Again, could you repeat that question, Counsel?

BY MS. WATRAL:

Q.   Sure.  Could you tell me which of these seven studies is the best designed in the field?

A.   Again, like I mentioned, I did not look at each of those studies comparing one against the other.  I looked at each individual study looking at the strengths and weaknesses of each.

And then, I did a holistic approach looking at the strengths, and I discussed the strengths, weaknesses of each, and then I weigh all of that together when I do my consideration.

Because there is no study that has only strengths and no weaknesses.  All studies have strengths and weaknesses here.  And so when you look at that, you have to put it in context and weigh all these factors against another.

Q.   That's fair.  And so, because you're weighing

seven different factors and the studies are performing differently on each of those various factors, is it fair to say that if another doctor came in with the right background, the right expertise, he could look at these studies and say, actually, I think there is a different ranking than what Dr. John thinks is the right ranking? That's a fair thing that could happen, right?

MR. HONNOLD:  Object to the form.  Vague.

THE WITNESS:  So Counsel, I want to clarify that I'm not ranking, right?

BY MS. WATRAL:

Q.   Mm-hmm.

A.   I identified the high quality studies.

Q.   Mm-hmm.

A.   And the lesser quality studies.  I would believe that any person, any scientist with a similar background as mine.

Q.   Mm-hmm.

A.   In other words, someone who has experience doing epidemiological research, who is a scientist, who publishes research like this, someone who is very familiar with the GI aspect of that who sees patients with these conditions, and does the ICD coding for these conditions, so someone with a background not just in pharmacologic epidemiology or biostatistics, or not just in gastroenterology.

I feel like to have a holistic view of this topic, it is ideal for the person to have backgrounds in all aspects of this. And I do believe that any objective person who comes in and looks at this research objectively like I have done, I believe will come to the same conclusion of identifying these higher quality studies and the lower quality studies.

Q. I'm asking about something a little different, though.

A. Yes.

Q. I -- I want to focus just on the seven studies.

A. Yes, Counsel.

Q. And so for the seven studies, because there was different performance under the various factors, if there was another physician who came in and looked at them, if they were to rank, is it fair to say you're not sure they would give the same ranking within those seven as if you sat down and did that ranking within the seven?

MR. HONNOLD: Object to the form. Calls for speculation.

THE WITNESS: Again, I cannot speculate on that. My sense is, if they apply the same principles that I believe are critical here, I believe they would come to the same conclusions.

But again, statistically when you look at that,

you have seven different studies, just by chance there is a likelihood that experts may differ slightly, you know. Because they may say this is three and this is four. And another person may say, then three is four. Just based on the statistical probability. You have so many permutations and combinations.

Having said that, in general I -- I believe that any expert who has the same amount of -- the degree of -- of background as I do, will likely rank these in a very similar fashion.

I cannot say it would be identical, but I would like to think that based on these objective factors, which most epidemiologists consider when we look at the quality of studies --

BY MS. WATRAL:

Q.   Mm-hmm.

A.    -- I believe that someone with the same background would rank them in a very similar fashion.

Q.   Okay. And just to close out this exhibit, can you write at the top, Dr. John's ranking, just so we have clear what this document is?

A.   Okay.

Q.   And as you sit here today --

MR. HONNOLD:  I -- I just --

MS. WATRAL:  Yeah.

MR. HONNOLD:  I just want to interpose an objection in terms of the -- the useability or function of this exhibit.  As it marked -- as it's marked, it would suggest the exhibit that he had no response or anything because there is nothing that he wrote on this, but he gave significant testimony that went on for several pages.

So I just want to make sure that this exhibit by intention incorporates everything that he said about the question that you posed leading to the objection, leading to the exhibit.

MS. WATRAL:  Sure, no problem.

MR. HONNOLD:  Okay.

MS. WATRAL:  That's no problem.

BY MS. WATRAL:

Q.  Okay.  Going back to your seven studies, Dr. John, do you know which of those seven studies involved dulaglutide?

A.  If you let me refer to my materials, I can look at that and tell you.

Q.  As you sit here today, do you know which of those studies involved Lilly's medicines, dulaglutide or tirzepatide?

A.  So, Counsel, as you know, I considered 23 papers or 22 manuscripts in my --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q. Mm-hmm.

A. -- and over 50 in -- in my materials considered list. So I did not commit to memory which study looked at which drug. But if I'm given a chance to look at it, I can tell you. Because I did look at the individual drugs and that was -- and I do mention it in my report.

Every time, again, the same factors go into my report. Every time the drugs are mentioned, I mention it in my report. Have I committed it to memory and can I tell you? Again, I wasn't -- my understanding was this was not a memory test. So I did not try to commit that to memory.

Q. Yeah, not a memory test. So I want to go to your report. Let's look at your report then. And your report, with respect to Lilly is Exhibit 7. Let's take a look at your Bradford Hill analysis, which is Pages 46 through 55. Okay? Let me know once you're there.

A. Thank you, Counsel. I'm on Page 46 now.

Q. Great. And I want to start with the Consistency step of your Bradford Hill analysis. Okay? That's on Page 50. And you'll see you have -- you define consistency, and then you have a paragraph right underneath that. Do you see that?

A. Yes, Counsel.

Q. Okay. Did you discuss any Lilly data, any Lilly specific data in your Consistency section of your Bradford

Hill analysis?

A.   So, Counsel, this is -- thank you for raising that.  It's an -- it's an important point.  I considered all GLP-1 Receptor Agonists as a class.  And the reason I did that is because these drugs in my mind work exactly the same way, especially at the outcome we are looking for.

In other words, all of these medications are GLP-1 Receptor Agonists.  They are agonists on the GLP-1 receptors.  There is no difference in what site of these receptors they work.  They all work on all of the GLP-1 receptors, including the vagal nerve that supplies the GI tract, the afferent nerves.  It's -- including the muscles, the smooth muscle in the GI tract.

And so when it comes to ileus, I see no reason why these medications should behave in any different fashion compared to the other.  The way I think about it is when we look at opioids causing constipation.

Q.   Mm-hmm.

A.   It is a well known fact that opioids cause constipation.  We don't say, oh, did Percocet cause constipation?  Or does morphine cause constipation?  We treat opioids as a class.  We consider them the same mechanism.  They all work on the same receptor.  They all work even though their chemical structure may be different.  And the affinity they work at might be different.  And they

Binu John, MD - Volume I   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

may lead to different degrees of weight loss or different degrees of diabetic control.  They all work on the same receptors at the same sites working in the exact same mechanism.

And so, Counsel, I considered them as a class.  So I did not do a Bradford Hill for each separate drug individually.

Q.   Okay.  Let me just break that down a little bit. For dulaglutide, you did not do a separate Bradford Hill analysis separate from the other GLP-1 medicines, correct?

A.   Counsel, like I said, I considered GLP-1 RAs as a class and I did for Bradford Hill of all GLP-1 RA medications as a class.

Q.   So the answer to my question is "yes"?

A.   Yes.

Q.   For tirzepatide, did you do a separate Bradford Hill analysis for tirzepatide separate from the other GLP-1 medicines?

A.   Again, as I mentioned before, I did not.

Q.   Okay.  Same answer for the Novo medicines?

A.   Again, if you are talking about semaglutide and liraglutide?

Q.   Yes.

A.   The answer is the same.

Q.   Okay.  Now, within your -- I want to go back to my

original question a few ago.  Within your "Consistency" section, you don't discuss any dulaglutide specific information, correct?

A.    I would have to go back into the individual studies to see whether there were any dulaglutide specific studies.

Q.    Mm-hmm.

A.    And I can't remember, dulaglutide -- D-U-L-A-G-L-U-T-I-D-E.  I can't tell you, again, like I mentioned earlier, Counsel, I don't -- I haven't committed that to memory, so I can't say that for sure whether any of those drugs are dulaglutide.

Q.    Okay.  And in your Consistency section, I don't see you discussing any dulaglutide specific findings or end points or anything like that; is that fair?

A.    That is fair, Counsel.

Q.    Okay.  And same thing for tirzepatide?

A.    That is fair, Counsel.

Q.    Same things for the Novo medicines, semaglutide and liraglutide?

A.    That is correct, Counsel.

Q.    Okay.  And how about for your discussion of the association or Strength of Association?  Same thing that you don't have a discussion of any dulaglutide specific information in your Strength of Association discussion?

A.    Are we talking about the Biologic Grading, correct, Counsel?

Q.    No, I'm talking about Strength of Association which is Factor A?

A.    Okay.  Got it.

Q.    Starts on Page 48.

A.    Again, we are talking about dulaglutide, Counsel?

Q.    Yes.

A.    Yes, there is no -- again, does not appear to be any specific discussion on the Strength of Association for dulaglutide.

Q.    And for dula- -- dulaglutide specific end points or data or anything like that, right?

A.    Again, like I mentioned, Counsel, I discussed GLP-1 RAs as a class.  I did not do it separately for each drug.

Q.    And -- and even within your discussion as the class, you didn't discuss the dulaglutide specific information in your Strength of Association discussion, true?

A.    Correct.  Again, I discussed the medications as a class.

Q.    Understood.

Same answer for tirzepatide?

A.    Yes, Counsel.  I did not discuss tirzepatide

associated specific -- information in this section.

Q.   Okay.  And let's zoom out to your whole Bradford Hill analysis.  At anywhere in your Bradford Hill analysis, did you discuss the dulaglutide specific data from those 21 studies anywhere in your Bradford Hill analysis?

A.   Let me -- let me just double-check.

Q.   Go ahead.

A.   In the Experiment section, Counsel, this is Page 53 of my report.

Q.   Mm-hmm.

A.   If you go to the -- the paragraph from the bottom, the -- the one paragraph "About."

Q.   Mm-hmm.

A.   So in that I'm just reading that for your information.  In one of the dulaglutide cases, a 65-year-old male patient was initiated on dulaglutide, dulaglutide for diabetes.

Q.   I -- I see that.  I just want to -- I just want to stop you there.

A.   Yes.

Q.   So that is referring to a case report.  That is not referring to one of your 21 studies, fair?

A.   It is not one of the 21 studies, but it is in my Materials Considered, Counsel.

Q.   Understood.

A.    Yeah.

Q.    My question was a different one though.  I was asking in your Bradford Hill analysis, did you discuss any dulaglutide specific information from your 21 studies?  That was my question.

A.    Oh.

MR. HONNOLD:  Is that the way you asked it?

MS. WATRAL:  It was, yeah.

MR. HONNOLD:  Okay.  I missed that.

THE WITNESS:  I missed that as well.  So not from those 21 studies, Counsel.

BY MS. WATRAL:

Q.    Same answer for tirzepatide?

A.    That is correct.

Q.    Same answer for semaglutide?

A.    That is correct.

Q.    Same answer for liraglutide?

A.    Let me double-check that.

Q.    Sure.

A.    So if you go to Page 49, Counsel, this is under the Section A of my report under the heading:  "Strength of Association," if you look at the second paragraph from the top, about two, three, four, five, six, seven, eight, nine lines down, we -- I discuss the paper, the research letter published in JAMA by Sodhi, et al.

And in that study, they examined patients who are newly started on GLP-1 Agonists. And they used dulaglutide or semaglutide. And I -- they compared it against an active comparator -- an active comparator, which is bupropion-naltrexone. And they found an increase in terms of bowel obstruction among patients on dulaglutide.

Now, it was the instance was 8.1 per 1000 person-years compared to people on bupropion, which was 1.9 per 1000 person-years.

So I do discuss that information, which is from one of my 21 studies in that section of the report.

Q. Understood.

So what you have identified is an instance where you are discussing data specific to liraglutide in your Strength of Association section?

A. Again, this was done as part of overall discussion.

Q. Mm-hmm.

A. The focus on that section is not individual drugs, which like I mentioned before, I considered them as a class. But in that particular study, the number of patients on semaglutide were very low.

Q. Mm-hmm.

A. And additionally, the study ended in I believe 2020 where shortly after the drug was approved, and so there

was a very short followup.  And therefore in that particular study, semaglutide had no events.

And so in that context, I discuss liraglutide and semaglutide separately.  But I considered the overall Bradford Hill analysis for that section as a class.

Q.   Okay.  You -- other than your discussion here of the Sodhi article, any other discussion in your Bradford Hill analysis of liraglutide specific information?

A.   No, Counsel.

Q.   You agree with me?

A.   I agree that there was no discussion specifically to liraglutide other than that section I mentioned with regards to any of the Bradford Hill discussion.

Q.   Thank you.  Let's go to your Methodology on Page 4 of your report.  We talked through your seven factors yesterday.  Do you remember that?

A.   Yes, Counsel.

Q.   Let me know once you're there.

A.   Yes, Counsel.

Q.   Okay.  Do you agree with me that whether a study involves a Lilly medicine versus a Novo medicine is not one of your seven criteria upon -- oh -- through which you evaluated the studies; is that fair?

A.   That is fair to say.

Q.   Okay.  And in your report, you don't explain how

you weighed Lilly specific data versus GLP-1 class
information.  Is that fair?

A.   Correct.  Again, I considered these medications as
a class and I evaluated them together.

Q.   I want to -- I want to ask you about the Hurwitz
study.  If you turn to Page 35 of your report.

A.   Okay, Counsel.

Q.   And so now that you have your report in front of
you --

A.   May I also pull the Hurwitz paper?

Q.   You know what, I can mark it as an exhibit.  But
let's just start with your -- let's just start with your
report.

A.   Okay, Counsel.

Q.   And you let me know if you need the exhibit, I'm
happy to mark it.

A.   Okay, Counsel.

Q.   Looking at your report, which GLP-1s were included
in the Hurwitz study?

A.   Counsel, can I have a copy -- do you mind if I
look?

Q.   Let me ask you a question first.

A.   Yes.

Q.   Does your report say which GLP-1 medicines were
studied in the Hurwitz study?

A.    It does not.

Q.    Okay.  As you sit here today, do you know which GLP-1 medicines were -- let me just, I'll start with this preface.  I'm going to get to the study.  I just want to know what you know now versus looking at the study.

As you sit here now, do you know which GLP-1 medicines are included in the Hurwitz study?

A.    Again, Counsel, like I mentioned earlier, it was not my effort to commit to memory which drug was in which study specifically because I considered these medications as a class and I evaluated them together.

Q.    Okay.  Let's mark as Exhibit 22 the Hurwitz study.

MR. HONNOLD:  Thank you.

MS. WATRAL:  Mm-hmm.

(Deposition Exhibit Number 22 marked for identification.)

BY MS. WATRAL:

Q.    And I'm going to ask you very specific narrow questions.  But when I ask my question, if you think you need to look at the study, let me know, okay?

A.    Okay.

Q.    If you look at -- let's turn to Table S-2A.  It's on Page 4 of 24 where the numbering in the back is a separate numbering system because it's the supplement.  Do you see that?

Binu John, MD - Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I do.

Q.    Okay.  And Table S-2A has a list of the GLP-1 medicines that were included in the study, right?

A.    Correct.

Q.    The Hurwitz study included patients taking dulaglutide, right?

A.    Correct.

Q.    The Hurwitz study included patients taking tirzepatide, right?

A.    That is correct.

Q.    The Hurwitz study included patients taking both injectable and oral semaglutide, right?

A.    That is correct.

Q.    And the Hurwitz study included patients taking liraglutide, correct?

A.    Yes, that's correct.

Q.    The Hurwitz study also included albiglutide, exenatide, lixisenatide; is that right?

A.    That's correct.

Q.    Going back to your report for a moment, your report describes the results of the Hurwitz study, so I want to ask you about that.

The Hurwitz study -- and are you on that page of your report, Page 35?

A.    Yes, Counsel.

Q.   Okay.  So there is a section that's titled: "Results."  Do you see that?  That's where I'm going to be focused.

A.   Okay.

Q.   You indicate in the Type 2 diabetes cohort GLP-1 Receptor Agonist showed significantly higher rates of overall gastrointestinal hospitalizations than c -- SGLT2 inhibitors; do you see that?

A.   I see that.

Q.   Okay.  And then, you say:  "GLP-1 users trended towards a higher likelihood of hospitalizations for bowel obstruction that did not reach statistical significance as indicated by a lower limit of 95 confidence interval just below 1.0, rate ratio 1.09, 95 percent confidence interval 0.98 to 1.21."

Do you see that?

A.   I do see that.

Q.   And so -- the -- for chronic -- oh, sorry, for diabetes, the Hurwitz study found that GLP-1 medicine use was not associated with bowel obstruction, right?

A.   So Counsel, I need to refer --

MR. HONNOLD:  Let me just object to the form.  Or I guess the question.  Were you reading verbatim in what you just said there or were you summarizing something?  I lost track of where you were reading

from.

MS. WATRAL:  I was reading from -- for my latest question?

MR. HONNOLD:  Yes.

MS. WATRAL:  I was not reading.

MR. HONNOLD:  Okay.

THE WITNESS:  Counsel, you asked me if I want to refer to the report, the actual manuscript, I can.  And I'd like to do that --

BY MS. WATRAL:

Q.  Go ahead.

A.  -- just to double-check.

Q.  And I'll direct you to speed things up here.

A.  Okay.

Q.  To go to Table 2 on Page 6 of the study. Obviously, feel free to look elsewhere if you need to.  But Table 2 has the results.

What section are you reading from there, just so I can follow along?

A.  The Results, I'm looking at the Results.

Q.  Which page are you on?

A.  I'm on Page 4 of 14.

Q.  Okay.  Thank you.

A.  Now, I'm on page -- Table 2.  Also, I'm looking really quick at what the outcomes were in the "Methods"

section.  And this is going to be in Page 3.

Q.    Thank you.

A.    Yes, Counsel.  And could you please repeat the question?

Q.    Absolutely.  The -- for Type 2 diabetes, the Hurwitz study did not find a statistically significant increased risk of hospitalization for bowel obstruction, right?

A.    Yes.  So I want to clarify that.  In the study, the -- they describe bowel obstruction, later hospitalization.  But the ICD-9/10 codes for bowel obstruction are not pre-specified.  And so, we did not know to what degree this likely -- just by the terminology bowel obstruction, there is likely a nondifferential bias here of the outcome.

And so with that caveat not knowing what the specific ICD-9/10 codes are, it -- there was an increase hazard, but it was not statistically significant with the lower end of the confidence interval being .98.

Q.    Okay.  So to answer my question, the Hurwitz study did not find a statistically significant increased risk of hospitalization for bowel obstruction, right?

A.    Bowel obstru- -- yes, as defined by the investigators, which we did not know on what criteria.

Q.    Okay.  Let's look at the results for chronic

weight management, which are also in Table 2.  For chronic weight management for hospital -- for bowel obstruction hospitalization, the results were a rate ratio of 1.88 with a confidence interval of 0.63 to 5.60.  Is that right?

A.    That is correct.

Q.    The Hurwitz study did not find a statistically significant increased risk of hospitalization for bowel obstruction for the chronic weight management cohort, correct?

A.    So I wanted to clarify that again here.  It's an important point.  If you look at Table 2, and you look at the headers of the diabetes cohort and the weight loss, chronic weight loss cohorts, the top and the bottom part of that page, Number 6, you'll see that the GLP-1 RA number of participants were 330,684 and 264,277 for the GLP-1 RA and SGLT2 cohorts respectively.  If you look at the cohorts in the weight management, it's 25,296 in the GLP-1 RA.  And only 5,019 in the Naltrexone bupropion cohort -- bupropion cohort, again, telling you how significantly lower the power is of that analysis.

And so, with that caveat, I would say that likely because of that low sample size, and significantly lower compared to what we see before, it was not statistically significant.  It tended to be higher than one.  But there was no statistical significant difference.

Q.   Okay.  I understand your view is that these results were underpowered; is that fair?

A.   That is fair to say.

Q.   Okay.  And when I say these results, I mean, the chronic weight management results.  I want to focus on that first.  Is -- is that what you were just talking about?

A.   Yes, Counsel.  To also further clarify, within the chronic weight management cohort, there were two cohorts. There was a direct comparison of GLP-1 RAs with bupropion-naltrexone.

Q.   Mm-hmm.

A.   That's the number you read.  There is an additional cohort they did where they compared another drug called PhenTop -- I'll just say PhenTop for ease.  It's actually Phentolamine TrophAmine.  That was a separate comparison, which again showed a hazard ratio that is higher than 1, but was not statistically significant.  I believe that both cohorts, the numbers were low and it was not adequately powered.

Q.   Okay.  And you're going where I was going.  So I was going to show you those results next.  But there is a third data set in the Hurwitz study that also shows that there was not a statistically significant increased risk for bowel obstruction for the chronic weight management patient population studied here, correct?

Binu Jacob, MD 4 Volume 01    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.  Can you point it out to me, Counsel, where that is?

Q.  So I think you just flip to the next page, the rest of Table 2.

MR. HONNOLD:  Page 7?

MS. WATRAL:  Page 7, correct.

THE WITNESS:  Yeah, you're -- I believe that's what I was talking about, correct?

BY MS. WATRAL:

Q.  Exactly.

A.  Okay.

Q.  So -- so let me -- let me just -- let me just do a clean question then.

A.  Yes.

Q.  For both the -- the NalBup and the PhenTop comparisons, there was not a statistically significant increased risk for bowel obstruction hospitalization for the chronic weight management cohort, correct?

A.  Correct.  Again, with the caveat that the numbers are significantly lower, small numbers, there was no statistically significant difference.

Q.  I noted that in your report, and here today too, you indicated that you thought the chronic weight management numbers were underpowered.  But you didn't say that you thought the diabetes number was underpowered?

Binu Jose, MD - Volume 1    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   I did not believe the diabetes numbers were underpowered, the numbers are significantly higher.

Q.   Okay.  So -- okay.  And just so the record is clear, for the diabetes cohort in Hurwitz study, you did not think that that was underpowered, fair?

A.   Yes, to the specific question of power --

Q.   Correct.

A.   -- in the diabetes cohort, I do not believe it is underpowered.

Q.   When -- let's go back to your report for a moment.

A.   Yes, Counsel.

Q.   To the Hurwitz discussion, which is on Pages 35 on to the top of 36.  Are you there?

A.   Yes, I am.

Q.   When you -- you have your discussion after your results and that's two paragraphs on the bottom of 35 on to the top of 36.  Do you see that?

A.   I see that, Counsel.

Q.   When you are discussing the Hurwitz study, is there anywhere in this discussion that you describe it as one of the best design studies?

A.   I did not specifically say that, Counsel.  And again, in all fairness, I did not use that term uniformly across my results -- all studies, not because I did not consider it, I just did not put it.  Regardless, I weighed

it as one of the higher better design studies.

Q.   Is there anywhere in your report where you indicate that the Hurwitz study is one of the top seven in your view?

A.   Again, I will have to go through my report to see whether I specifically say that, because I can't recall every word of that report.  If you want me to, I can go through the report to see that --

Q.   No, I just wanted to know if you recalled anything?

A.   I did not recall, Counsel.

Q.   Okay.  And I just want to take a step back and make sure I understand something about your method and how it worked.  So I understand that what you did, is you applied your seven criteria to all of the 21 studies, right?

A.   That's correct.

Q.   You then determined that there were seven that were higher quality.  The remainder were lower quality.  Is that fair?

A.   That is fair to say.

Q.   When you then went and did your Bradford Hill analysis, did you do a Bradford Hill analysis including only the seven higher quality standards or did you use the total population of all 21?

MR. HONNOLD:  Just want to object to the form.

Case 3:24-md-03094-KSM   Document 691-25   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26

Assumes facts not in evidence.

But go ahead.

THE WITNESS:  So Counsel, like I mentioned before, every study has its own strengths and limitations and I know that because I do them.  There is no perfect study.  And there is a lot of work and effort that goes into making -- doing these studies.

So I did not discount the study completely.  I consider every study.  So when I do my Bradford Hill, if there are strengths of any specific study, even if it's not in the seven, I include it.  The strengths might be fewer in the strengths, in the studies that I did not consider as high, but there was -- if there was a specific criteria that where the study was designed well, then I would include it.

So in other words, I did not do my Bradford Hill based on only these seven studies, I considered all 21 studies.  I considered the seven that were better designed as higher quality than the 14 that were not as well designed.  But there are aspects of each study which there are strengths and weaknesses, and if there was particular strengths, I considered that.  If there was specific weaknesses, I considered that.  And I applied that same principle across all the studies that I examined.

BY MS. WATRAL:

Q.   Understood.

So all 21 studies were eligible to be considered or factored into your various Bradford Hill criteria; is that fair?

A.   Again, with the caveat that if it was poorly designed or if there was something that disqualified it in a specific way.  For example, pharmacovigilant studies, those studies that look at the Ferris database, would I -- did I include those specific studies?

Again, both those studies for the record showed that GLP-1 RAs were associated with the increased risk of bowel obstruction, but I did not consider that high quality studies.  Did I consider them?  Yes, I did.  Did I include every one of them in the Bradford Hill?  I did not.  So there were -- if there were weaknesses that I felt precluded any deep analysis of that study, I did not include them.

But it's not only the seven that I listed as high quality that I included.  Any of the studies which had relative strengths which I thought were worth mentioning I did consider that.

Q.   I see.  So it sounds like there were a small number of cases that were in a bucket of being so low in terms of quality that those were not part of your Bradford Hill analysis, but more than seven were what was included in

your Bradford Hill analysis; is that fair?

A.    I think that's fair to say, Counsel.

Q.    Okay.

A.    You said it way more eloquently than I did.

Q.    What is the criteria or the dividing line so I know what makes something qualify as the so low quality versus the studies that were included?

A.    So let's use an example --

Q.    Mm-hmm.

A.    -- of the -- the pharmacovigilance study.  So let me quickly pull that up here.  And I can just highlight to you --

Q.    But I just want to take a step back, though --

A.    Right.

Q.    -- now doing it in a specific example.

A.    Right.

Q.    What are the specific criteria that allows me to understand which are the studies that are so low that are not included in the Bradford Hill criteria versus the ones that are included?  What -- outline for me what those criteria are.

A.    Yes, Counsel.  I'm referring to Page 4 in my report.

Q.    Mm-hmm.

A.    In that I discuss the study quality criteria

applied.  So the first one is outcome specificity, so studies that had ileus-related counts, or what I believe would adequately reflect what we are looking for, which is ileus, would qualify -- would count higher than studies that did not.

I look for confounded adjustment.  So studies that had a better quality of confounded adjustment, I -- I considered them higher than studies that would -- did not adjust for confounders or did not have as good a confounder adjustment.

I looked at comparator selector.  So for example, if you compared GLP-1 RAs with patients on insulin, that's not a fair comparison.  Because generally patients on insulin, have higher blood sugars, longer duration of diabetes and were diabetic control than patients on GLP-1 RAs.  And so, by intrinsically those patients may have more autonomic neuropathy and more likely to have ileus.

Similarly, if you're on DPP-4 inhibitors, that's a class of drugs that could potentially cause ileus, so --

Q.   Let me ask you a question on this.  So what you're describing here are your seven criteria, right?

A.   That is correct.

Q.   But you're -- right.  But I'm asking you a different question.  So you're obviously ranking all 21 studies by these seven criteria, right?

Case 2:24-md-08094-KSM   Document 691-25   Filed 05/19/26   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    That is -- that is correct.

Q.    But what I want to know is you've now done all the permutations.  So you've done 21 studies, seven criteria.  How many data points is that?  You're probably better at math than I am.

A.    I don't think I can calculate that.  I would say Counsel Lucas may tell us --

MR. PRYZMUSINSKI:  Total of 147.

BY MS. WATRAL:

Q.    So we're better at math -- so there are 147 different permutations that are --

A.    Yes.

Q.    -- or different data points that are coming out, right?  So you're now sitting down with 147 data points. You've now done the work on your seven factors, what's the cutoff?  How do I know whether something falls in that lower quality bucket or in the higher quality bucket that you at least consider it for the Bradford Hill criteria?

A.    So for example, the studies did not consider any of these factors, I did not consider them at all.  So the pharmacovigilance studies.  And again, just with the caveat that when you do comparator selector, there are limitations on -- on pharmacovigilance because it's not the actual comparison.  It's comparison of patients who report adverse events, so --

Q.   Okay.  So meaning, zero criteria would mean it is out of your Bradford Hill criteria analysis?

A.   In general, zero criteria meant they would be out of the Bradford Hill analysis.

Q.   Okay.  Anything else, anything other than zero --

I'm so sorry.

Anything else?  Anything other than zero criteria, that would fall in the lower quality bucket that doesn't get considered?

A.   In general, if something used a database that I believe was highly inadequate.  If, for example, if something used a -- there were two things, Counsel.  One is if a study used a database that are so significant, such significant limitations that it precludes the meaningful analysis, I did not consider those studies in the Bradford Hill.  And that specifically, in general, that includes the TriNetX studies --

Q.   Mm-hmm.

A.   -- which are the one by Garg, G-A-R-G, the one by Liu, L-I-U, the one by NIU, N-I-U, and there is one more which I can't tell you right off.  So that is one set of studies that I did not consider.

The other set of studies that I did not consider, Counsel, was when the study population was in a very limited cohort of patients, which is not generalizable to the

overall population.

Now, examples of that -- one example of that is a study called Nielsen -- Nielsen, N-I-E-L-S-E-N -- Nielsen cohort was one study where the entire cohort of the study population were patients with IBD or inflammatory bowel disease, so I did not consider that specific study.

Another one I did not consider, just to give you an example -- I'm just double-checking to make sure.  For example, another one is the study by Gmehlin, G-M-E-H-L-I-N, titled:  "Impact of Glucagon-Like Peptide-1 Receptor Agonists Exposure on Gastrointestinal Outcomes Among ICU Patients.  A Multi-Center Matched Cohort Study."  This is a study that was done exclusively in patients in the ICU.  And it did not include patients who are ambulatory or who are outside of that setting.  So in that -- that is one example of another example of a study which I felt was not generalizable.

Additionally --

Q.   Can I -- can I just ask one followup there?

A.   Yes.

Q.   So if a study in your view was not generalized --

MS. WATRAL:  I'll go back to letting him finish his answer.

MR. PRYZMUSINSKI:  Okay.  I just want to make sure.  I think he might have lost his train of thought.

MS. WATRAL:  I'm sorry, I'm going to give him a full opportunity to go through this.

MR. HONNOLD:  Okay.  Let me -- let me just object to that.

MS. WATRAL:  Sure.

MR. HONNOLD:  But I think there was an interruption there.  And to the extent you've now promised and said you're going to allow him to go back, that might take a moment for him to kind of refresh his recollection as to where we were on that.  But I understand how things go.  That's fine.

MS. WATRAL:  Go ahead.

BY MS. WATRAL:

Q.   Your -- in your view, if a study's population is not generalizable, that would put it in the criteria of a study that you would not consider; is that fair?

A.   I would say that is certainly a study that is considered a low quality study.  So --

Q.   Is it in the bucket of the ones you wouldn't consider though?  That's what I want to understand.

A.   In general, yes.  It depends on the situation. But in general, I would say yes.  Again, without going through specific examples and thinking through each of those studies, I cannot tell you whether there were any aspects of the studies that did not meet inclusion.  But that was a

general principle, Counsel.

Q.   So I want to give you a full opportunity.  But why don't we just do this in a more systemic way of looking through your report.  Can you just look through your report and tell me for each of the studies in your report, we'll go one by one, whether it was included in your Bradford Hill analysis or was not included.

A.   So Counsel --

Q.   Go ahead and finish.

A.   Thank you.  So can I go back to my train of thought there?

Q.   Please.

A.   Before when we were talking about the generalizable studies.  Another example of a study that I did not consider, which was I felt was not generalizable, was the study by Weng, et al., W-E-N-G, titled: "Glucagon-Like Peptide-1 Receptor Agonist Therapy Does Not Increase Gastrointestinal Adverse Events in Patients with Inflammatory Bowel Disease."

And so, this again, was exclusively in a population of patients with IBD.

Q.   Mm-hmm.

A.   And I believe this was done in a single academic medical system.  In general, because of that population included, I did not consider that as a high quality study or

Binubiase, MD / Volume 1    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I did not believe I included that in my Bradford Hill.

Q.    Understood.  Thank you.

So let's go through each of the studies quickly, one by one.  So we start on Page 22 of your report. Alfehaid.  Is that something that you included in your Bradford Hill analysis?

A.    I did not believe I considered that in the Bradford Hill.

Q.    Alkabbani on Page 24.  Is that something that you --

A.    And Counsel, do you mind if I take one quick look at my Bradford Hill just to refresh my memory?

Q.    Absolutely.

A.    Just to make sure that I know which studies are included there and just to confirm.

Q.    Mm-hmm.

A.    Thank you.

Q.    I'm going to give you a clean sheet of paper just so that we can -- if you want to write anything down.

A.    Sure.  I have a clean sheet of paper here.

Q.    Perfect.  That's great.

A.    Thank you.  Thank you, Counsel.

Q.    Sure.  So going back to my question --

A.    Yes.

Q.    -- did you consider the Alkabbani study as part of

your Bradford Hill analysis?

A.    So if you go in my Bradford Hill section, Counsel --

Q.    Mm-hmm.

A.    -- there are two sections there where I discuss it.  One is Section 6 on Page 46 and the other is Section 7 where I do the -- a more detailed analysis on Page 48.

Q.    Ah.  So to short circuit this --

A.    Yes.

Q.    -- if there is a study that's not cited in your Bradford Hill section of your report, can I assume that you didn't consider that for your Bradford Hill analysis?

A.    I would say that I considered it in the sense, I considered whether I should include it.  Everything in my Materials Considered list was considered.

Q.    Ah.  Can I -- can I ask a better question then?

A.    Yes.

Q.    Let me ask a better question.  If a study is not cited in your Bradford Hill section of your report can I assume that it didn't make the cutoff to be analyzed as part of the Bradford Hill criteria?

A.    Counsel, I would say if you look at the Sections of 6 and 7.  And if -- if a study did not meet that criteria, it is possible I might have considered it.  It's also possible I might have considered a specific study and

not included it or mentioned it specifically there, but again, all the Materials Considered were considered for the Bradford Hill.

Regardless of everything that's in the Materials Considered was included in that section or not. This was a holistic analysis. Every -- every bit of material that I considered for this case, for this question weighed into my decision whether I put Bradford Hill, whether I applied it or not. And regardless of whether I mention it or not. Every material that I considered went into my thought process to formulate it.

Q. I understand that. You told me earlier that there was a bucket of cases that were -- or sorry, there was a bucket of studies that were so low quality that you didn't consider them as part of Bradford Hill, as part of your analysis. I'm trying to understand what's the scope of that bucket?

A. Again, Counsel, there might be -- my point is just because something is not mentioned by name in that section in Bradford Hill, in Section 6 or 7, does not mean I did not consider it.

Q. Right. And so you just read through your Bradford Hill section of your report. Can you identify for me which were those studies that were so low quality that you didn't analyze them as part of your Bradford Hill analysis?

Binu Jacob, MD - Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   Again, I want to clarify, Counsel.  It is possible that I analyzed it.  And it is possible that some might not have been specifically mentioned in that section.  The bottom line is every study that I reviewed went into my thought process for Bradford Hill.  And I cited it when it either met the situation where the quality was low strength that were significant.  I also cited it when there were limitations that were significant.

And my point is, it has to be also read in conjunction with the rest of my report.  I did not -- in other words, if I mention in my section in the discussion of that individual study about the strengths and limitations, it is possible that that weighed into my decision, but I may not have put it in as many words inside the Bradford Hill section.

In other words, I did not go into every study, every strength, every limitation and make sure that's all there in the Bradford Hill does not mean I did not consider it.  Every study that I considered in my materials went into my thought process.  But I did not cross check, go back, oh, let's look at study one, Alkabbani, did I mention that in the Bradford Hill as not considered?  I did not mention that specifically.

Did I think about that study when I created the Bradford Hill and I drafted it?  I certainly did.

Another example would be, for example, the study by Chang et al., RCTs. Yesterday we discussed with Counsel about the significant limitations about the meta-analysis RCTs. Did I consider that study when I created the Bradford Hill? I certainly did. Did I -- would I have necessarily mentioned that specific study in the Bradford Hill? Perhaps not.

The bottom line is it doesn't mean I did not consider it. The point is, where I looked at everything in my report, and all Materials Considered before I drafted my Bradford Hill. Whether every single aspect that I thought about found its way in Section 6 or 7, I cannot conclusively say.

Q. I see. So you're saying that there was more behind the scenes in terms of your thought process that wasn't necessarily translated into what was written down in your Bradford Hill criteria; is that fair?

A. I would say, Counsel, because if I have to reproduce everything that I did until that point back into the Bradford Hill, it would be another report by itself.

But suffice to say that every study that I reviewed went into the thought process of Bradford Hill.

Q. Gotcha. So do you agree with my question, that there was more behind the scenes in terms of what your thought process that didn't necessarily translate into

everything that was written down in your Bradford Hill criteria?

MR. HONNOLD: Object to form. It's vague as to what behind the scenes means.

Go ahead.

THE WITNESS: Again, it is possible. All I'll say is everything that I considered in my Materials Considered list, were in the thought process when I formulated it. Everything I did as part of this analysis went into there. Whether every single study with strengths and limitations were discussed specifically in that section, I cannot say for sure. But they were considered.

BY MS. WATRAL:

Q. It sounds like you're saying though that there was more to your thought process than was necessarily written down in your Bradford Hill criteria discussion; is that fair?

A. That would be fair to say, Counsel.

MS. WATRAL: Why don't we go ahead and take a break. We've been going for a little bit over an hour.

THE VIDEOGRAPHER: We are going off the record. The time is 10:15 A.M.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on record. The

time is 10:29 A.M.

BY MS. WATRAL:

Q.   Dr. John, I want to turn back to your report.  I want to go to Page 19.

A.   Yes, Counsel.

Q.   This is a section of your report where you talk about bias. I'm going to ask you about something a little bit different.  But I wanted you -- I want to ask you about something specific you said in here.  So I want to go to the paragraph that starts with -- this background in mind.  Are you there on Page 19?

A.   With the second paragraph on top?

Q.   Exactly.

A.   Okay.

Q.   And about halfway down there is a sentence that starts with, "Understanding this bias."  Do you see that?

A.   Yes.

Q.   And you say:  "Understanding this bias is essential because it explains why studies that combine ileus with mechanical obstruction, which is unrelated to GLP-1 RAs systematically underestimate the true association."  Do you see that?

A.   Yes, I do.

Q.   Do you agree with me that mechanical obstruction is unrelated to use of GLP-1 medicines?

A.   So, Counsel, I want to put that in context. Mechanical obstruction is where there is the mechanical blockage of the bowel.  And there are many causes for that. The most common cause is adhesions, which is -- typically happens in a postoperative setting.  Other causes include things like volvulus -- V-O-L-V-U-L-U-S -- intussusception, I-N-T-U-S-S-U-S-C-E-P- -- C-E-P-T-I-O-N -- strictures which are narrowing of the gut, but also conditions like fecal impaction where there is impaction of the stool.

Now, conditions like postoperative ileus, intussusception, volvulus, stricture, cancer, there is no reason to believe that there is an increased association of GLP-1 RA medications with these causes of mechanical obstruction.

On the other hand, there is reason based on the mechanism of how these drugs work, when they slow down the GI tract and GI motility to believe that these medications can cause ileus, I-L-E-U-S, which is functional obstruction.

Now, in some patients when the gut motility does slow down because of ileus, there can sometimes be a condition called "fecal obstruction" or fecal -- but if you look at the overall picture of mechanical bowel obstruction, that's a very uncommon cause of mechanical bowel obstruction.

So in summary, do these medications cause

mechanical obstruction, not the worst majority of causes of mechanical obstructions are associated with GLP-1 RAs. Could it ever be -- could -- are there any potential reasons why there could be an increase incidence?  Very specific causes typically that are associated with ileus could cause that.

Now, I'll also say one more thing, Counsel. Sometimes, and I highlight this in my report, patients who present with mechanical obstruction, present with very similar symptoms as patients who present with ileus.  They all have nausea.  They typically have nausea, vomiting, abdominal distension, constipation, obstipation, where they are not able to pass gas.  And these symptoms match for both bowel obstruction and ileus.

And in many cases, when you do an X-ray, you can see the difference or when you do a CAT scan, CT scan, you can see what we call a "transition point" that differentiates the two conditions.  But there might be some instances of bowel obstruction where the imaging findings are not clear.

So in that situation, it is possible that a patient who presents with ileus is misdiagnosed with bowel obstruction.

So overall when you look at bowel obstruction, there are two possibilities why patients in GLP-1-RA could

have higher likelihood of mechanical obstruction, but I believe that in the overall context of all costs of mechanical obstruction, that is a less common factor.

Q. Okay. Let me break this down. Do you agree with the statement in your report that mechanical obstruction is unrelated to GLP-1 RAs?

A. And just like I clarified now, Counsel, I need to put that in context.

Q. I just want to know. Do you agree without -- because let me ask a different question.

Without giving additional context or qualifiers, do you agree with the statement mechanical obstruction is unrelated to GLP-1 RA?

A. Counsel, can you tell me where exactly you're reading that?

Q. Yeah, I'm starting with the sentence that I read to you. "Understanding this bias is essential because it explains why studies that combine ileus with mechanical obstruction, which is unrelated to GLP-1 RAs systematically underestimate the true association."

A. Again, I do mention at other parts of my report, what I just told you, that there are cases where functional bowel obstructions can be associated with fecal stasis and fecaloma and could cause mechanical obstruction. And I also mention at other places in my report that there could be a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

misdiagnosis of patients who are bowel obstruction could be misdiagnosed as ileus.  So --

Q.   Right.  And my question is just a little narrower.

A.   Yeah.

Q.   I just want to know -- and I -- I promise you that I'm going to get to fecal impact.  I want to know for now though, yes or no, do you agree with the statement without any qualifiers, mechanical obstruction is unrelated to GLP-1 RAs?

MR. HONNOLD:  Just object to the form.  Misstates prior testimony.

Go ahead.

THE WITNESS:  I would say, with those qualifiers, I would agree.

BY MS. WATRAL:

Q.   And without those qualifiers you would not agree?

A.   Overall as a class, the likelihood that GLP-1 RAs cause an increase in mechanical bowel obstruction is very minimal.  The likelihood that you could have a fecal impaction or these conditions that I mentioned, is so small that I don't think it tips the needle.

But again, if you read that sentence in isolation, I would add that qualifiers.

Q.   Okay.  Let's break it down and be more specific here.  Do you agree with me that GLP-1 medicines do not

cause intussusception or intussusception that leads to mechanical obstruction?

A. So it's very interesting you say that. I did not believe that to be the case. However, I found a few case reports and there are people postulating there are an increase. I do not believe that it is associated.

But having that caveat that it is possible that we may find out mechanisms in the future with the current knowledge we have, I do not believe that GLP-1 RAs are associated with intussusception.

Q. Let me ask that again. Based on your current understanding of the -- of the state of the science, do you agree with me that GLP-1 medicines do not cause, in your view, intussusception or intussusception that leads to mechanical obstruction?

A. With the caveat that I mentioned before, that there -- that the science may be -- there are case reports that suggest it, but overall, I don't believe that GLP-1 RAs increase the likelihood of intussusception.

Q. Do you think case reports are sufficient to show a causal link?

A. No, Counsel. But case reports are hypothesis generating.

Q. Sure. And so I'm -- I'm now focused on causation, not hypothesis generating. Okay?

A.    Okay.

Q.    And so do you agree with me that for causation purposes, GLP-1 medicines do not cause intussusception or intussusception that leads to mechanical bowel obstruction?

A.    I -- I would agree with that, Counsel.

Q.    Do you agree with me that GLP-1 medicines do not cause volvulus or volvulus that leads to mechanical obstruction?

A.    Counsel, I would agree with that.

Q.    Do you agree with me that GLP-1 medicines do not cause adhesions that lead to mechanical bowel obstruction?

A.    If your question is whether GLP-1 RAs cause adhesions from bowel obstruction, they do not.

Q.    And they also do not cause adhesions that lead to bowel obstructions, right?

A.    Sorry, Counsel --

Q.    I -- I feel like you were --

A.    -- wasn't that the same question you said?

Q.    Yeah, I -- I thought you were maybe drawing a distinction between what I was drawing.  I'm just getting at you described earlier that one of the types of mechanical obstruction is adhesions.  And you agree with me that adhesions, like you were describing earlier, are not caused by GLP-1 medicines.  Is that fair?

A.    That is fair to say.

Q.   And you had a few other things on your list. Cancer and strictures.  Do you agree that those are also not caused by GLP-1 medicines?

A.   I would agree, Counsel.

Q.   Do you agree with me that GLP-1 medicines do not cause gallstone ileus?

A.   So I would like to put a caveat there.  I do critique the ICD code.

Q.   Mm-hmm.

A.   So let me take a step back.  Let me explain what gallstone ileus is.  So gallstone ileus, what happens when a patient has a gallstone in their gallbladder, which goes down the common bile duct, slips into the small bowel, and causes an obstruction from the stone.  Although the term says, "gallstone ileus," there is no ileus there.  It's actually a mechanical obstruction.

So it is a misnomer.  However, I critique that because many studies here considered that as part of the evaluation when they -- when they're looking at the association between GLP-1 RAs and obstruction.

Q.   Can I ask a better question then?

A.   Yes.

Q.   Yeah.

A.   No, but let me --

Q.   Yeah, sure.

Binu Jacob, MD - Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   Let me finish, Counsel, if you don't mind.

Q.   Yeah.

A.   However, because you asked me that, I'm specifically saying, there is some data to show that GLP-1 RAs are associated with increased gallstones.  I did not go into the literature because that was outside my scope.

Having said that, so there is possibility that in patients, if GLP-1 RAs are associated with increased gallstones, it is -- it is possible, plausible that it could be associated with increased gallstone ileus.  But that was not my scope.

But having said that, I would say -- I wouldn't say it is completely unrelated.  It's possible.

Q.   Okay.  Let me ask a better question then.  That was helpful.

You're not offering an opinion in this case that GLP-1 medicines cause gallstone ileus; is that fair?

A.   That is fair to say, Counsel.

Q.   And you're not offering an opinion in this case that GLP-1 medicines cause diverticulitis; is that fair?

A.   That is fair to say, Counsel.

Q.   You're not offering an opinion that GLP medicines cause bowel ischemia or bowel perforation.  Is that fair?

A.   I would caution there.  The reason being sometimes patients with severe ileus can end up with bowel ischemia.

Case 2:24-md-03094-KSM    Document 691-25    Filed 05/19/26    Page 61 of 131

But in the absence of ileus, I do not believe so.

Q.    Okay.  So let me ask a different question then. You're not offering an opinion that GLP-1 medicines cause bowel ischemia in the absence of ileus, fair?

A.    That is fair to say.

Q.    And you're not offering an opinion that GLP-1 medicines cause bowel perforation, fair?

MR. HONNOLD:  Let me just object to the form of the question.  It assumes facts not in evidence.  Vague and overbroad.

THE WITNESS:  So I'm not offering an opinion that GLP-1 RAs are associated with bowel perforation in the absence of ileus.

BY MS. WATRAL:

Q.    You're not offering an opinion that hernias or colonic pseudo obstruction are caused by GLP-1 medicines, fair, outside the scope of your report?

A.    I am not offering the opinion that GLP-1-RAs are associated with hernias.  With colonic pseudo obstruction, it is a form of colonic ileus.  So in other words, it is -- ileus is -- typically involves the small bowel.  It can also involve the colon.  But in the same process of hypermotility involves the colon, that's called colonic ileus.  It can be acute, which we call ogilvie syndrome.  It can be chronic, it's called idiopathic pseudo-obstruction.

Case 2:24-md-08094-KSM    Document 691-25    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

So I -- I have to -- so it is plausible that GLP-1 RAs could cause colonic pseudo-obstruction.  However, that was not in the scope of my -- my report.

Q.   That's fair.  So I just want to know what's in your scope and what's out.

A.   Okay.

Q.   So why don't I phrase my question a little more neutrally.

A.   Okay.

Q.   You're -- it was not within -- or let me restart.

You're not offering an opinion about whether GLP-1 medicines cause colonic pseudo obstruction; is that fair?

A.   That is fair.

Q.   Okay.  And what if I change my questioning the same way for bowel ischemia and bowel perforations?  Even in the context of ileus, you're not offering an opinion about whether GLP-1s cause bowel ischemia or bowel perforation. Is that fair?

MR. HONNOLD:  Object to form of the question. Misstates his prior testimony.  Vague.

You can answer.

THE WITNESS:  Counsel, I do offer the opinion that GLP-1 RAs are associated with an increase in ileus. And among the complications of ileus in patients who do not respond to nonoperative therapy, it includes

perforation and ischemia.

Now, these outcomes are not specifically examined in the studies. So no one examined it. But it is very plausible that those events, if -- if ileus is more common in -- in -- with these medications, it stands to reason that the complications of ileus may also be more common with these medications.

Having said that, it was not systemically studied in the literature.

But -- so to answer your question, does the literature support that? It doesn't because it was not studied. Is there a biological possibility to that? Is it -- is it possible that could happen? Absolutely it is possible that could happen.

So I cannot say I do not offer the opinion that there could be an increased risk. It is possible. So I -- that could happen.

BY MS. WATRAL:

Q. Let me clarify. That's helpful. You're not offering an opinion about causation though, whether GLP-1 medicines cause bowel ischemia and bowel perforation in the context of ileus; is that fair?

MR. HONNOLD: Just want to object to the form. It's vague, it's overbroad. It misstates his prior testimony. He's already pointed out --

Binu John, MD - Volume 1   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. WATRAL:  Please don't testify.

MR. HONNOLD:  Don't ask him the same question and try to misstate what he said.

MS. WATRAL:  I'm not.  I'm not.

MR. HONNOLD:  Okay.  You are.  You are.  Because you're trying to get him to say --

MS. WATRAL:  I'm not trying to get him --

MR. PRYZMUSINSKI:  -- that patients can't -- can't get obstruction or can't have those same patient specific basis if they have ileus, but they can have perforation and have those things.

MS. WATRAL:  Let me ask my question again.

MR. HONNOLD:  It just misstates what he -- what he said.

MS. WATRAL:  No, no.  Let me ask my question again.

BY MS. WATRAL:

Q.   I want to know what you're offering an opinion on.  Okay?  I want to know in the context of ileus for bowel ischemia and bowel perforation whether you're offering a causation opinion that GLP-1 medicines cause bowel ischemia and bowel perforation?

A.   Counsel, like I already mentioned before, I do believe that GLP-1 RAs cause ileus.  And as I mentioned before, it is a complication, a well described complication

Binu Jose, MD - Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

of ileus that patients can develop perforation and ischemia as a complication of that.

So therefore, it's an extension that if GLP-1 RAs are -- can cause ileus, it can also cause the complications of ileus.

Q.   You agree with me that you don't identify a study that shows a -- an increased risk of bowel ischemia or bowel perforation in GLP-1 users, true?

A.   Counsel, to the best of my knowledge, such studies have not been performed that I know of for obvious reasons. This is a very core principle in epidemiology.

THE REPORTER:  A very?

THE WITNESS:  Core, C-O-R-E.  Principle in epidemiology.  We -- we show an association between the exposure and the outcome.  We necessarily are unable to show the association between the exposure and every single possible complication of that outcome.  And that is not something that we do in our field.

BY MS. WATRAL:

Q.   I want you -- I want you to answer my question.

You don't identify a study --

MR. HONNOLD:  You -- you just interrupted him.  He wasn't done answering.

BY MS. WATRAL:

Q.   Did you have more to answer?

A. I would, again, I want to -- I want to complete that by saying it -- to my -- in my mind, GLP-1 RAs cause ileus. And therefore, it is my opinion that it causes complications of ileus, based on the biological plausible data, based on the fact that it causes increased ileus, based on the principles of Bradford Hill that I describe between GLP-1 RAs and ileus.

So I believe that it causes ileus. I believe that it causes ileus and its complications.

Q. I want you to answer my question. Do you identify a study that shows an increased risk of bowel ischemia or bowel perforation in GLP-1 users?

MR. HONNOLD: Object to form. Asked and answered.

Go ahead.

THE WITNESS: Like I mentioned earlier, Counsel. These events are uncommon. And these complications are uncommon. So I'm not aware of a study that was designed to answer that question. So I did not find a specific study that showed that association with that specific complication.

BY MS. WATRAL:

Q. Thank you. And in your Bradford Hill analysis, did you do a specific analysis for bowel ischemia or bowel perforations?

A. No, I did not, Counsel.

Q.    Are you familiar with the phrase, GLP-1 RA associated mechanical obstruction?

A.    I am not familiar with that phrase.

Q.    It's not a phrase you'd ever use?

A.    I would say it is not a phrase I commonly use. Like I mentioned before, there are very rare occasions where GLP-1 RAs can be associated with mechanical obstruction.  I have to say in my practice, it's not something that I have seen.

I have seen patients with GLP-1 associated ileus who got admitted to the hospital.  I have not encountered a patient with GLP-1 RAs associated mechanical obstruction.

So I have not had the context to use something like that because it's not something that I have seen in my practice.

Q.    Okay.  You mentioned that you've seen patients with ileus after taking GLP-1s.  Did any of those patients take a Lilly medicine, to your knowledge?

A.    I can't remember now, Counsel.

Q.    I want to go to Page 2 of your report.  At the very top of Page 2, you say:  "Moreover, it is my opinion after conducting a Bradford Hill analysis, that GLP-1 RAs including Trulicity, dulaglutide, Mounjaro, tirzepatide, and Zepbound, tirzepatide, cause ileus and bowel obstruction." Do you see that?

A.   Would you repeat that, Counsel?  That's not what I'm seeing here.

Q.   I'm looking at your Lilly report.

A.   Oh, sorry.  I'm sorry.

Q.   Okay.  So you've -- let me just ask this.  Is your report between the --

A.   I have both.

Q.   -- Lilly report and the Novo report any different in terms of substance in your view?

A.   Only the -- only the medications, only the medications and the name of the company.

Q.   So other than -- and when you say the medications, you mean other than changing the name of the medications and changing the names of the company, the reports are otherwise the same?

A.   That is correct, yes.

Q.   So if I've been asking you -- if you've been looking at your report for Novo, same answers?

A.   If I'm look- -- looking at the report and know it's the same answers.

Q.   Okay.  So I'm looking at the Lilly report --

A.   Yes.

Q.   On the top of Page 2.

A.   Yes, Counsel.

Q.   And so you're saying that the Lilly medicines

Binu Jose, MD - Volume 01    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

cause ileus and bowel obstruction; do you see that?

A.    I see that GLP-1 RAs, including the Lilly medicines, cause bowel obstruction and ileus.

Q.    Understood.  I wasn't trying to draw a distinction there, but thank you.

I want to focus on the cause of ileus and bowel obstruction.  Okay?

Do you -- what do you mean by bowel obstruction here?

A.    And in this case, I mean functional bowel obstruction.

Q.    You mentioned earlier fecal impaction.  Do you remember that?

A.    Yes, Counsel.

Q.    I want to ask you some questions about that.

A.    Sure.

Q.    You described a mechanism by which a patient who has ileus can go on to develop fecal impaction.  Is that right?

A.    That is correct.

Q.    Are you offering any opinion that GLP-1 medicines cause fecal impaction?  And I'm saying cause here.

MR. HONNOLD:  Objection to form.  It's vague.

THE WITNESS:  So if -- if the question is whether I did a separate Bradford Hill analysis looking

specifically at fecal impaction, I did not.

Having said that, I did a Bradford Hill analysis looking at the association between GLP-1 RAs and ileus and fecal impaction is well known to be associated with ileus.

So similar to what you asked me previously about perforation and peritonitis, I believe that if GLP-1 RAs cause ileus, which I believe they do, they would also cause complications of ileus, which include fecal impaction.

BY MS. WATRAL:

Q.    Let's go to your Bradford Hill analysis starting on Page 48.  Do you discuss fecal impaction in your Bradford Hill analysis?

A.    Counsel.  No, Counsel, I do not.

Q.    You don't include any data about fecal impaction in your Bradford Hill analysis, right?

A.    I did not include that specifically in that section.  However, I did consider it because I believe that there were outcomes of fecal impaction examined in some of the studies.  And I believe I have considered that.  I believe I may have mentioned that in the individual discussion of the studies.

But like I mentioned earlier, not everything that's considered found its way in the Bradford Hill, not

because I didn't consider it, but because I did not put it in there.

Q.   Do you know whether any of the studies that you looked at found an increased risk of fecal impaction in patients taking GLP-1 medicines?

A.   Counsel, I would have to go in and look at the subgroup analysis because a lot of those studies it was not the primary outcome.  Some of the studies broke out the outcomes by subgroup analysis looking at specific ICD 9/10 codes and I would have to go back and review that to see if there was any study that showed that association.

Q.   So without rereviewing the papers, can you identify any studies that found an increased risk of fecal impaction in patients taking GLP-1 medicines?

A.   Again, like I mentioned before, these are not things I committed to memory looking at what ICD 9/10 codes were used in which study.  On an average, 5 to 10 codes were used in each of the studies, and I reviewed 21 studies.  So, if you're talking about a few hundred ICD-9/10 codes, some of the studies looked at subgroup analysis and some did not.

So if you're asking me if I committed it to memory which of the ICD 9/10 codes are fecal impaction showed an association with GLP-1 RAs, the answer is I do not recall.

Q.   You just read through your Bradford Hill analysis in your Lilly report.  After reading through your Bradford

Binu John, MD - Volume II   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Hill analysis, can you identify any study that found an increased risk of fecal impaction in patients taking GLP-1 medicines?

A.   Again, Counsel like I mentioned before, I considered all of that factors in my report.  And if a individual study reported that outcome, I discussed it either with the out -- with that study discussion or I considered it.

Like I mentioned before, not everything that I considered found its way into the Bradford Hill part of the report.  Which is like, maybe six, seven pages.

Q.   Mm-hmm.

A.   And -- eight pages.  And so, did I consider it? Yes.  Did it find a specific mention in that part of the report?  I don't find that.

Q.   Okay.  Let me ask it a different way.  That's helpful.

You just read through the Bradford Hill section of your Lilly report, right?

A.   I skimmed through it.

Q.   Sure.

A.   I didn't read the whole thing.

Q.   Sitting here today, I want to know your current understanding.  Can you identify sitting here today any studies that found an increased risk of fecal impaction in

patients taking GLP-1 RA medicines?

A.   Again, Counsel, I said that before.  The -- we are talking about numerous studies with few hundred codes.  I cannot -- I have not committed to memory which ICD 9/10 codes were used for which study where that subgroup analysis was done, but if you give me the time, I can find that in the report.  And I know that I examined it.  I know that I -- I saw it, subgroup analysis.

I believe most were underpowered because there were small numbers there.  But most were underpowered because of small numbers.  But again, if you want me to tell you a specific citation based on it, I would have to refer to the materials, Counsel.

Q.   Can you identify any study that found an increased risk of bezoars in patients who take GLP-1 medicines?

A.   Again, it's the same answer, Counsel.  I did examine that and I do believe that bezoars, and bezoars essentially undigested plant or material that's because of dryness desiccation and slowed motility, can accumulate in the GI tract and cause solid stool or solid material that blocks the bowel and can cause mechanical obstruction.

Based on the -- on how these medications work and based on the fact that I believe these medications cause ileus, I believe that they're more likely to cause bezoars.  Having said that, I cannot tell you based on my memory which

Binu Jacob, MD - Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

of the studies specifically looked at it.  And what those results were.

Q.   And you just read through your Bradford Hill section of your report or skimmed through it.

Is there anywhere in your Bradford Hill discussion that you discussed bezoars?

A.   Again, Counsel, like I mentioned before, everything that went into the report was considered for the Bradford Hill criteria.  And if there was a mention, there is -- I may not have specifically mentioned in that part of the report.  But it was considered.  And if there was any study that examined it, I did consider that.

It did not -- I did not find a mention of that word "bezoar" in that seven pages of the report referring to the Bradford Hill analysis.

Q.   Let me just make sure I'm clear on that.  In the section of your report where you discuss Bradford Hill criteria, you don't discuss bezoars; is that fair?

A.   Again, in the context of what I just described --

Q.   Sure.

A.   -- in those seven pages of my report which discusses the Bradford Hill analysis, I do not mention bezoar.

Q.   Okay.

A.   It does not mean I did not consider it.  It's not

Case 2:24-md-03094-KSM   Document 691-25   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26

mentioned there.

Q.   And like fecal impaction you didn't do a separate Bradford Hill analysis for bezoars, fair?

A.   That is fair to say.

Q.   You talked about the concept of biasing to the null in your report, and -- yesterday.  I understand that and accept how you explained it yesterday.  I just want to ask you a few specific followups, okay?

A.   Okay, Counsel.

Q.   Do you agree with me that whether bias to the null is present in a particular study is something that can be determined by math?

A.   Could you repeat that question, Counsel?

Q.   Sure.  Do you agree that whether bias to the null is present in a particular study can be determined by math?

A.   And so, that is a very vague question.  I'm sorry, I can't -- because I'm -- I want to know, are you talking about bias to the null because of nondifferential misclassification of the outcome?  Which is what I describe in my report.

Q.   That's what I'm talking about.

A.   Or are you talking about bias to the null from any bias?

Q.   Let me clarify.  I'm talking -- my questions here are about the bias to the null that you're offering in your

report, okay?

A.   So just --

Q.   With that clarification.  Do you agree that whether bias to null is present is something that can be determined with math?

A.   So -- so I want to clarify that.  Because that question is, and just to give a little more specificity to that question, the bias we are talking about here is nondifferential misclassification bias of the outcome. That's what I discuss in my report here.  There are numerous other biases which can be bias to the null, which can be bias away from the null.  But we are specifically talking about this one bias.

In that situation, depending on the -- on the situation, there are possible ways that you can predict the extent to which something bias is evaluation.  But without having the primary dataset, it is -- I don't believe you can calculate the bias hazard ratio.

So again, let me take a step back to explain this clearly.

Q.   You did though.

A.   We are talking about composite outcomes here. Composite outcomes are when a study examines mechanical bowel obstruction, for example, with ileus.  If one does not tell in the -- in the results how many patients are from

specific ICD 9 or 10 codes, it is not possible, it's -- in my mind, it's not possible to calculate the hazard ratio without having all that data.

Based on the data, and if there is preliminary data provided about the distribution of ICD 9/10 codes, you could hazard an estimate of which way it would go, but I do not believe you can actually calculate that without having the full dataset and without granular data that's available.

Q. Okay. Let me ask you a few followup questions to that.

If you have the full dataset behind a study, you could calculate using math whether bias to the null of the type you are describing is present; is that fair?

A. So I am -- I just -- again, can you repeat that question?

Q. Sure.

A. I just want to make --

Q. If you have the full dataset behind a study, you can calculate whether bias to the null is present in that study, right?

A. Considering nondifferential misclassification of outcome.

Q. Okay.

A. Yes, you can, depending on what data is available for the specific ICD-9/10 codes, you can recalculate it.

Q. Okay. And if the ICD-9 and 10 codes show the distribution of patients between the codes, you'd be able to calculate whether there is bias to the null of the type you're describing; is that fair?

A. Not -- not -- not overall, Counsel. So if you give me an overall sense of what the ICD-9/10 codes are, I would not -- it would have to be specific to each individual patient. You would need patient level granular data.

Q. That's what I meant.

A. Yes.

Q. So let me ask a better question. If a dataset has patient specific data about which ICD code applies to them, you'd be able to calculate whether bias to the null that you're describing here is present in that study; is that fair?

A. I would add the caveat that one would need all the ICD-9/10 codes that are relevant to the outcome you're examining.

In other words, if it gives you -- if there are five ICD-9/10 specific codes that you want to examine and it gives you only two or three, then no. But if it gives you all the ICD codes that are relevant, then yes, you can calculate it.

Q. Okay. In your report, you did a hypothetical calculation to explain how the bias to the null that you're

Binu Jacob, MD - Volume II   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

describing in this case works.  Is that fair?

A.   Yes, Counsel.

Q.   And am I correct that that was a hypothetical that was not based on any actual study data, true?

A.   That is correct, Counsel.

Q.   You didn't do an actual calculation based on any study data to determine whether there is any bias to the null in any particular study; is that fair?

A.   Could you repeat that question, please?

Q.   Sure.  I just want to understand what work you did and you didn't do, okay?

A.   Yes.

Q.   You didn't do a calculation using data from any particular study to know whether there is actually bias to the null in that particular study; is that fair?

A.   Oh, so I want to clarify that, Counsel.  This principle that a nondifferential misclassification of the outcome, biases your estimate towards the null, is an accepted principle regardless of what the data shows.  It -- it is an accepted principle in epidemiology that if a nondifferential misclassification of bia- -- of outcome differs it will bias it towards it.  If there are only two groups it always biases it towards the null.

I did not have to show that in an actual study dataset.  Regardless of what the study dataset shows, if

that bias is present, that bias is always towards the null. As long as there are only two exposure groups.

Now, the caveat to that is if there are multiple exposure groups. So for example, if you are doing a study comparing DPP-4 inhibitors with GLP-1 RAs, with SGLT2 inhibitors, now we have 33 group comparisons there. Then the intermediate group could bias away or towards the null.

As long as there are only two comparator groups as we are examining in all these studies, it is a core principle of epidemiology that that bias is always towards the null. I do not have to do that math for individual studies to calculate what -- whether that bias will move towards the null. That is the core principle.

Q. Okay. I asked you a different question. And will you please focus on my specific question here. Did you do a calculation for any particular study to determine for that study whether the bias that you are describing is present in that study?

A. Again, Counsel, like I said, I did not need to do that because once there is a nondifferential misclassification of the bia- -- of the outcome, the bias is always towards the null. And I did not have the full dataset for any of these studies, so I clearly cannot redo the analysis because these are all published papers. They do not share their full dataset.

Having said that, again, I just want to clarify regardless of whether I -- the point is, I don't have the -- like you mentioned earlier, unless you have the granular dataset, you cannot do the calculations.  But regardless, it is a core principle that that bias will be towards the null if there is a nondifferential misclassification of the outcome.

Q.    Just a really narrow question here.  Do you agree that you did not do a calculation for any particular study to determine whether bias to the null that you are describing was present in that study; is that right?

A.    Again, to clarify, I did not do that, but again, I did not feel there was a need to do that, and I don't believe that is something that's commonly done in epidemiology that people -- once there is a core principle, we don't have to reinvent the wheel.  It is an accepted principle.  It's not something people do just to prove a core principle that's widely accepted.

Q.    Did you review the literature in the context of GLP-1 RAs to see whether any studies discussed whether bias to the null is present in any of these particular studies?

A.    I did review the literature.  And I do -- and I'm glad you asked that question, Counsel.

Because I want to put a little bit of context as to why this happens.  It is not --

Q.   I'm asking a different question, though.

A.   Right.

Q.   And we are -- we are short on time, so I just want to be really specific with my questions.

A.   Okay.

Q.   I'm focused on the 21 studies.  In the 21 studies that you analyzed, did you review those studies to see whether any of those studies discussed whether bias to the null is present in this body of literature?

A.   And again, I just want to give context and you're talking about the same nondifferential misclassification --

Q.   I am.

A.   -- bias of the outcome.  And I am trying to explain that, Counsel.  If the investigators knew that that bias is happening in their dataset, this is something they can avoid.  So in other words, this is not an intentional omission by the investigators.  The reason this occurs is because the group of investigators potentially are not familiar with the ICD-9/10 codes associated with ileus and they're not familiar with the concept that GLP-1 RAs cause ileus.

        And so, unintentionally they include it, they go into the ICD-9/10 codes, you look for obstruction, and you put all the codes that fall under k56.0 and you put all of those codes as your outcome.  This is because they're not

intentionally doing it, they do not know the difference.

So in other words, the reason this is not mentioned in any of the reports I saw is not surprising. It's because it's not something they recognize when they do the study. If they recognized that they were doing this and there is a potential for nonmisclassification bias, they can -- this is something they could avoid by choosing the most appropriate ICD-9/10 codes.

Q.   Okay.  I want you to focus on my specific question.  In the 21 studies that you analyzed, did you review those studies to see whether any discussed whether bias to the null of the type you're describing is present in this body of literature?  Did you do that analysis?

MR. HONNOLD:  Let me object to form.  Asked and answered.

Go ahead.

THE WITNESS:  So --

BY MS. WATRAL:

Q.   I just want to know if you did the analysis?

A.   I examined every study to see that.  But again, at this point, we are looking at over a thousand pages, I do not recall if there was any one specific study that might have mentioned it in the discussion.  But I specifically did look for it.  I cannot recall whether there was mention in any one study.

Q.    Is it your opinion that none of the authors of the 21 studies was sufficiently qualified to identify bias to the null?

A.    I would not say that, Counsel.  In fact, first, let me explain this.  Doing clinical research is very hard. And I know that because I do it.  I have great respect for the authors who do this work.  And I won't for a single minute say that any of those are not qualified.  They're all highly qualified in whatever fields they're doing.  These are all bright people who are trying to find the truth.  And none of these are intentional.

Now, when you say whether they're qualified, they're all qualified to do this work.  This is hard science.  The amount of statistics and analysis and thought that goes into this work is immense.  I have great respect for them.  And I would never, ever say that these people are not qualified.

Having said that with the caveat, being qualified has several aspects to it.  It is possible that you might be a highly qualified pharmacoepidemiologist and you can do a really brilliant analysis of the pharmacology epidemiology part and do a great job, they just might not have that clinical insight of what ICD-9/10 codes that doctors would code in that setting.  They might be gastroenterology doctors who are very good at that GI part of the knowledge

who might not have the knowledge about ICD-9/10 codes that they then use in their studies.  They're all qualified in their own ways.

But sometimes you need a combination of talent. You need someone with that background in gastroenterology. You need someone who sees these patients and has an understanding of what ICD-9/10 codes will be used when they see patients with this condition.  You need pharmacoepidemiologists to do the data.  You need biostatisticians to do the analysis.

So I would not say they're not qualified, I would just say each of them are qualified in different aspects. And to the best of their scope.  I'm sure they were qualified in what they did.

Q.    Absolutely qualified in what they did.  But for the particular aspect of selecting ICD codes, is it your view that the authors of these studies were not qualified just with that particular task of the studies?

MR. HONNOLD:  Object to the form.  Asked and answered.

THE WITNESS:  That also is not something I would say because there are some studies that specifically looked at some of the codes that were closer to the outcome than others.

So just an example would be Bennett, et al, right?

Binu John, MD - Volume I    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Again, Bennett, et al. specifically looked at two codes.  Again, they did not use all of the codes that I believe would be associated with the outcome here, but they specifically looked at ileus, which is k56.0 and particularly k56.7.

There are other researchers that looked at more appropriate codes in their analysis.  So yes, there are -- I would not make that statement at all, Counsel.

MS. WATRAL:  Let's go ahead and take a break.  Actually, how long have we been -- we actually haven't been going for an hour.  Let me do a little bit more to try and get through a few odds and ends if you don't mind.

THE VIDEOGRAPHER:  Do you mind if we change the tape?

MS. WATRAL:  Oh, sure, go ahead.

THE VIDEOGRAPHER:  This ends Media Unit 1.  We are going off the record.  The time is 11:18 A.M.

(Recess was taken.)

THE VIDEOGRAPHER:  This is Media 2.  We are back on record.  The time is 11:18 A.M.

BY MS. WATRAL:

Q.  Dr. John, we are going to go back to your report.  I want to go to Page 10.  I'm just going to do some odds and ends here, if you don't mind?

Case 2:24-md-03094-KSM    Document 691-25    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10 of your report underneath the picture cites:  "Sleisenger and Fordtran's Gastrointestinal and Liver Disease, Pathophysiology, Diagnosis, Management 11th Edition."  Do you see that?

A.  Yes, Counsel.

Q.  Do you view that source as an authoritative source in your field?

A.  There are several authoritative sources in my field.  I believe this is one of them.

Q.  Okay.  I want to understand if -- I'm going to ask you a few questions to understand if any of the following is in the scope of what you did of your report or outside the scope.  So if you'll just first tell me inside the scope or outside the scope, then I can decide whether to follow up on -- on any of them, okay?

A.  Okay.

Q.  Was it inside or outside the scope of your report to analyze discontinuation rates in clinical trials?

A.  And you're talking, Counsel, of discontinuation rates of medications in general?

Q.  Let me ask a different question.  As part of your work, did you analy- -- analyze discontinuation rates of medicines in the Lilly or Novo clinical trials?

A.  Counsel, I might have considered it or I might have looked at it not from individual RCTs.  I did not

examine individual RCTs.

When I looked at clinical trials, it was in the context of a meta-analysis and I did not believe the meta-analysis gave that information.

So I do not believe I examined the discontinuation rates specifically in the context of individual RCTs.

Q.   Okay.  Did you, as part of the scope of your work, consider whether rat or animal findings for other injuries other than intestinal injuries translates to effects in humans?  Is that something you considered?

A.   So Counsel, in -- within the scope of this work, that is not something I considered.  That was not within the scope of this.

Q.   Did you consider how strongly individual GLP-1 medicines bind to the GLP-1 receptor?

A.    I have a general understanding of how they work. Again, I would have to go back to the specific source to confirm that.  But I have a general understanding of how -- of the affinity.  So I do recognize them to a point that the medications have different affinity to it.

If you're asking me if I did a detailed analysis of individual medications and their specific affinity to the receptors, I did not.  But I did consider that among -- among the things I did for this report.

Q.   Did you consider how strongly tirzepatide binds to

the GLP-1 receptor?

A.   I did consider that medications work on GLP-1 receptors.  And I have a general idea of how they work.  But again, I -- if I'm allowed to go into my source, that's something I could look at.  It was not a focus of my report.  But it did go into my thought process when I formulated my report.

Q.   Sitting here today, do you know how strongly tirzepatide binds to the GLP-1 receptor?

A.   In general, when there is a GLP-1 to GIP-1 Receptor Agonist ratio for many of these combinations, I believe that it binds more avidly to the GIP than GLP, but it also binds to the GLP-1 receptors.

Q.   So there is a less strong of a binding to the GLP-1 receptor for tirzepatide as compared to other medicines; is that what you're saying?

A.   That is not what I'm saying, Counsel.

Q.   Okay.

A.   What I'm saying is for the drug tirzepatide, it binds more avidly to GIP receptors than it does to GLP.

Q.   I see.  And you're not comparing how the binding for the tirzepatide compares to the binding for other GLP-1 receptors; is that fair?

MR. HONNOLD:  Object to the form.  No foundation.

Go ahead.

THE WITNESS:  I would say there are differences.
And I considered the differences.  But if you ask me
what the ratio is, for example, I cannot tell you off
the top of my head.

BY MS. WATRAL:

Q.   That's what I was wondering, thank you.

Do you know what biased agonism is?

A.   I'm not familiar with that.

Q.   So I assume you're not giving an opinion on that;
is that fair?

A.   That is correct.

Q.   Do you agree that GLP-1 medicines have different
molecular structures?

A.   Could you repeat that question?

Q.   Sure.  Do you agree that GLP-1 medicines have
differing molecular structures?

A.   I'm assuming you mean GLP-1 Receptor Agonists,
right?

Q.   GLP-1 RA medicine has different --

A.   Yes, they do have different -- I do believe they
have different chemical structures.

Q.   And I'll -- I'll ask you again, just so the record
is clear.  Do you agree that GLP-1 RA medicines have
differing molecular structures?

A.   I believe that they have different molecular

structures.  Again, with the caveat that, for example, semaglutide, whether it's in the Wegovy form or whether it's in the form for diabetes called Ozempic, it's the same medications, has the same chemical structure, whether it's oral form, which is marketed as an oral pill, has the same chemical structure.

Again, similarly, tirzepatide is marketed in different forms.  They're all the same structure, but between different medications with different pharmacological names, there are chemical differences.

Q.   Do you agree that the GLP-1 RA medicines across the different molecules have different molecular sizes?

A.   Counsel, that was not a focus of my exam, so I cannot -- I did not look at the molecular sizes of different medications, so I do not know that.

Q.   Can you let me know if you agree with the following:  Differing molecular structures and sizes across agents within the GLP-1 RA class lead to different profiles in terms of their effects on glycemic control, weight loss, side effects and cardiovascular effects?

MR. HONNOLD:  Object to the form.  It's overbroad. You can answer.  Go ahead.

THE WITNESS:  Could you repeat that question, please?

BY MS. WATRAL:

Q.    Sure.  Differing molecular structures and sizes across agents within the GLP-1 RA class lead to different profiles in terms of their effects on glycemic control, weight loss, side effects and cardiovascular effects?

A.    So I would like to clarify that.  I believe that as a class, these medications all have effects on the outcomes you mentioned.  They all are associated with weight loss.  They're all associated with diabetic control, they all have similar side effects because they all work on the same receptors.  They work on all of these receptors located throughout the body at different sites.

So there are differences to the extent they cause weight loss.  But that's also true of each individual drug. My patient A who takes tirzepatide might not lose the same amount of weight as my patient B who takes tirzepatide at the exact same dose.

So in biology, there are differences in terms of how individual patients respond.  And there might be differences to the extent at which -- to which these medications cause the amount of weight loss or diabetes.

But in my mind, all of these medications, they all help to treat diabetes.  All of these medications, they help to -- for obesity, they help to reduce weight.  They all work on the same receptors.  And they have similar side effect profile.

So I believe that as a class, they work on -- they have similar effects on obesity, similar effects on diabetes. Might be varying degrees, but I do not agree that they work differently based on what I said.

Q. Okay. Let me break that down though just so we can talk about each component. Do you agree that the differing molecular -- let me strike that.

Do you agree that the differing molecular structures and sizes across agents within the GLP-1 class lead to different profiles in terms of their effects on glycemic control?

A. Counsel, I believe that they all help with glycemic control.

Q. Okay. Do you agree that differing molecular structures and sizes across agents within the GLP-1 RA class lead to different profiles in terms of weight loss?

A. I do not --

MR. HONNOLD: Let me just object. Sorry, I should have objected before. I just think it's vague in terms of profiles. Do you mean in terms of efficacy of weight loss, like this study showed 42 percent over so long or this showed 28? When you say profile, I just object that it's just vague on that. Sorry.

MS. WATRAL: He can answer if he wants to answer.

BY MS. WATRAL:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   So let me -- let me ask you the question and I want to see if you agree.

MR. HONNOLD:  Okay.  I just -- I just think profile is just vague, so I'm not sure what you're talking about.

MS. WATRAL:  You can -- you can object.

MR. HONNOLD:  I did.

BY MS. WATRAL:

Q.   Differing molecular structures and sizes across agents within this class lead to different profiles in terms of weight loss?

A.   And Counsel, can you clarify what you mean by profile here?

Q.   What do you understand profile to mean?

A.   I don't know what profile means.

Q.   Okay.

A.   It's not a term I use in my clinical practice.

Q.   Okay.  Differing molecular structures and sizes across agents within the class can lead to differences in terms of weight loss?

A.   I believe that as different medications in the GLP-1 RA class, they all lead to weight loss.  Perhaps as a class, they do lead to weight loss.

So I do not believe that there are some medications that don't cause weight loss and some

medications that do cause weight loss.  I believe that weight loss, just like diabetic control, is a class effect that works across all medications, Counsel.

Q.   Okay.  Do you agree that differing molecular -- molecular structures and sizes across agents within the GLP-1 class lead to differences in side effects?

A.   I do not agree.  Like I did before, I believe that all of these medications work on the same receptors at all of the sites that these receptors are present and they all have the similar side effect profile as a class.

Q.   Do you agree that differing molecular structures and sizes across agents within the GLP-1 RA class lead to differences in cardiovascular effects?

A.   Again, like I mentioned before, I do not -- they are all medications that work on the same receptors; and therefore -- and they all have favorable profiles on the cardiovascular outcomes, again, assuming what you mean as cardiovascular outcomes.  And I would say as a class, they all have -- they work the same, to varying degrees, but the same cardiovascular efficacy.

MS. WATRAL:  Okay.  Let's go ahead and take a break.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:30 A.M.

(Recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:49 A.M.

BY MS. WATRAL:

Q.  Dr. John, I want to zoom out on your ileus opinion.  Okay?

A.  A --

Q.  I want to ask you a few questions about your ileus opinion, okay?

A.  Okay.

Q.  I'm going to start specifically about dulaglutide, Lilly's medicine.

Sitting here today, can you identify a study that looked at dulaglutide specifically and found a statistically significant positive association between dulaglutide specifically and ileus?

A.  Counsel, I would have to refer to my Materials Considered list.  I'm looking at Faillie's.

Q.  Just for the record, you're now looking at the Faillie article in your binder?

A.  I'm looking at the Faillie article.  And I forget what exhibit it is, Counsel.

THE WITNESS:  F-A-I --

BY MS. WATRAL:

Q.  What are you writing down there?

A.    I'm writing down the hazard ratio of dulaglutide there.

Q.    Which was?

A.    And I can tell you in this case, there was a subgroup analysis on Supplementary Table 2 looking at dulaglutide where there were only 5,867 patients with 13 events.  The weighted incidence rate was 2.1 per 1,000 person-years and the crude hazard ratio was 2.38 on adjustment, the weighted hazard ratio, 1.65 with a 95 percent confidence interval of .78 to 3.47.

So Faillie did look at that and it showed an increase rate that was not significant.  Crude rate was significant, but the adjusted hazard ratio was not significant.

Q.    Dr. John, I'm going to ask you the same question about tirzepatide next.  So if you see anything --

A.    Okay.  Thank you.

Q.    Yes.

A.    Thank you.  That saves me time.

MR. HONNOLD:  Diana, the way you asked your question did you say ileus or did -- just ileus?

MS. WATRAL:  Let me just ask a full question so we are all clear on what the question is.

MR. HONNOLD:  Okay.

BY MS. WATRAL:

Q.   Can you identify a study that found a statistically significant positive association between dulaglutide specifically and ileus obstruction or an ileus obstruction combination?  Okay.  That's what my question is.

A.   Okay.  Thank you.

MS. WATRAL:  Thanks, Brad.

BY MS. WATRAL:

Q.   We will just have a clear record this way.  Which study are you looking at?

A.   I'm looking at Garg, with all the caveat limitations that we discussed.  But I still want to examine if they did a subgroup analysis.

I do not believe they did a subgroup analysis there.  I am not going to look through Gmehlin because I did not consider that.  So again, with the caveat that I discussed about Gudin, which is a pharmacovigilance database and it has its own limitations, I do want to point out they do have the statement here:  "The disproportionate reporting was statistically significant for all incretin-based drugs individually (except for albiglutide, lixisenatide and semaglutide for which the ROR was not computable because of too few exposed cases) with a greater signal for -- "

THE REPORTER:  Wait.  With the greater?

THE WITNESS:  " -- signal for DPP-4 inhibitors."

BY MS. WATRAL:

Q.   And which medicines were reviewed in Gudin?

A.   Let me -- exenatide, there were 185 GLP-1 incretin-based drugs, to the GLP-1 RAs, including 115 exenatide, 66 patients on liraglutide, 34 patients on dulaglutide, two patients on lixisenatide, one patient on albiglutide, and one patient on semaglutide.  So they do mention that, except for the ones, lixisenatide, albiglutide and semaglutide, there was a significant ROR for that.

So again, we have discussed the limitations of that study.  So with that caveat, I do observe that.

Counsel, I'm now looking at Hurwitz.

Q.   Mm-hmm.

A.   With Hurwitz, they do mention the name of medications used, but they do not do a separate subgroup analysis.

So this is Liu -- L-I-U, Counsel, and they do look at separate medications with each of the outcomes they looked at.  And in Figure 2, in the lower panel, they break it down by semaglutide and liraglutide -- ooops, I'm sorry, I don't know if it's -- so that study did not have dulaglutide, Counsel.

With Nielsen, I'm not going to go into that.  I'm now reading Niu.

So referring to Niu.  And Counsel, so let me just remind you that Niu is the TriNetX study where there were

Case 3:24-md-03094-KSM    Document 691-25   Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

two groups of comparators, one was a GLP-1 RA and the other was oral diabetic medication that includes DPP-4 inhibitors. And we discussed earlier the limitations of that, which is that DPP-4 inhibitors by itself can cause ileus. So it's not a perfect comparator. In fact, the comparison group likely has an invalid level of ileus.

With that caveat, if you look at specific analysis in Supplementary Table 1 examining ileus, with -- well, it examines both, bowel obstruction and ileus. Bowel obstruction, there were 786 cases of bowel obstruction out of 103,552 patients on dulaglutide. There were 993 events in 103,309 patients in the control with the hazard ratio of .728, which was less than 1.

I'm sorry, bowel obstruction was 786 versus 1,113, with the hazard ratio of .682 with the 95 percent confidence interval from .622 to .747, which is less than 1.

Similarly with ileus, the hazard ratio, 748 events in the dulaglutide arm, 993 events in the control arm, which includes GL -- DPP-4, and the hazard ratio was .728, with a 95 percent confidence interval of .662 to 0.800. We discussed major limitations with this.

So this data suggests that dulaglutide showed a decrease in mechanical obstruction and ileus compared to control, which we know it was faulty in terms of there are major limitations with TriNetX. But this is a study that

looks specifically at dulaglutide.

Q. So there is -- just so to be clear, there is a study that shows a statistically significant decreased risk of ileus and obstruction when looking at dulaglutide specifically, right?

A. So Counsel, I want to clarify this. When we discussed our data earlier and yesterday when I spoke to Counsel Lucas as well, we had discussed that there are major limitations with Niu to a point that I did not include this in my Bradford analysis. I did not consider them as one of the high quality studies. There are major limitations in the control arm. The control arm has a medication that causes ileus. That violates the basic principle of epidemiology. And so, to say that I would place any weightage on this is not true.

However, I mention it because I considered this in my Material Considered list. And then, because of all the limitations that I outlined, I did not believe this to be true. I believe the biases and the fallacies and the limitations weigh -- outweigh any way we can take a controlship.

But yes, this study with significant limitations did show a decrease likelihood of bowel obstruction and ileus from which I cannot make any conclusions.

Q. Okay.

A.    So that was Niu.  Now I'm looking at Sarwal.

Q.    Mm-hmm.

A.    So Counsel, I don't see that discussion in Sarwal. I'm not even looking through Scholten because I don't -- that is just an abstract.  I don't believe that will have that information.

I'm now looking at Shu.  It only has semaglutide. So --

Q.    What study are you looking at?

A.    I'm looking at Sodhi.  Sodhi does not mention it. I'm now looking at Ueda.

Just to mention Supplementary Table 7 gives the information about the number of patients in the study.  And there were 8,843 patients on dulaglutide, which forms 7.3 percent of the cohort.  There were no patients on tirzepatide.  I don't -- I don't see an individual drug level analysis in Ueda.

Next, I'm looking at Weng -- W-E-N-G.  The study also has dulaglutide and tirzepatide, 28 percent of patients were on dulaglutide and 14 percent of patients were on tirzepatide.

Again, this is the study only in patients with IBD.  It's a study only at a single large academic medical center, so because of that, we did minimize the significance of those studies.  I don't see any subgroup analysis there.

We are now looking at Yin -- Y-I-N -- because again, it was not in my -- it was on my Materials Considered, but it's not something I went through. It's essentially a meta-analysis of RCTs.

Q.    It's not one of your 21 studies?

A.    It is not one of my 21 studies. I believe that this meta-analysis only examined semaglutide. I don't see any patients on either tirzepatide or dulaglutide.

I'm looking at Wang -- W-A-N-G. So in -- I'm looking at Wang, et al. And in -- in figure -- Supplementary Figure 29, there is meta-analysis of SGLT2 inhibitors --

THE REPORTER: In?

THE WITNESS: SGLT2 inhibitors. GLP-1 RAs and DPP-4 inhibitors separated out based on Fecaloma. And you had asked earlier before. There is no -- I don't see tirzepatide included here, but I do see dulaglutide included.

And there is a clinical trial there called REWIND, which is a comparison of dulaglutide with placebo. And we discussed the limitations of RCTs to examine outcomes like ileus. And we -- especially in individual RCT.

Having said that, it does mention here that there was no statistically significant association between

dulaglutide and placebo in that subgroup analysis for that one single RCT.

Counsel, Supplementary Figure 49 -- and I don't have a page number -- I don't know if you do, Counsel -- in Wang, et al.

But in that, there is -- in this figure, it's a final plot and there is GLP-1 RAs versus placebo controls, placebo. And again, there is the REWIND trial that compared dulaglutide versus placebo, randomized control trial. It showed a risk ratio of 0.50 with a 95 percent confidence interval of 0.05 to 5.52. It appears there was one patient out of 4,943 who developed paralytic ileus. And there were two patients in the control out of 4,949 patients -- 4,949 patients; and therefore, the difference was not statistically significant. But clearly, it's an underpowered trial. We discussed limitations of RCTs to examine these outcomes.

So I believe we have looked at those two outcomes for this trial. I'm looking at Wang -- W-A-N-G -- 2024. This is also, I believe this is a meta-analysis of RCTs.

I don't believe they break it down by -- by drug. I am not going to consider Klonoff because it's a surgical perioperative study that's not -- I don't

believe it's relevant to this search.

I'm also not going to consider Rashid -- R-A-S-H-I-D.  Because again, the reason this is in here is because of some of the experts on the side that raised it.  This is not something I would consider at all.  So I'm not even going to discuss that.

Then I'm at Chen -- C-H-E-N -- 2026.  I believe this study looked at both dulaglutide and tirzepatide.  It's a network meta-analysis.  And this is a study we examined yesterday in detail and we discussed how the outcome was so inconsistent.  It was unclear.  It was a -- they don't mention the ICD codes and they just say bowel obstruction and ileus.

And in fact, in the Limitation section of this paper they actually have a discussion about how the clinical trials, many of them were not adjudicated.  The side effects were not adjudicated.  Many of the cites did not even clearly mention whether there was bowel obstruction or ileus.  Many patients -- subjects did not present CT scans or any imaging.

So there was a very detailed discussion in how there were major limitations in this network meta-analysis of RCTs.

And in that, I'm now referring to Figure 3, Counsel.  And under -- on the -- on the upper part of

that, which is Section A, there is a Forest plot comparing both dulaglutide and tirzepatide. Dulaglutide, the odds ratio was 0.55 with a 95 percent confidence interval of 0.29 to 1.02.  With tirzepatide, the odds ratio was 0.80 with a 95 percent confidence interval of 0.16 to 3.88.

And then, at the bottom part of that same figure, it goes by dosages, but it does not break that down for dulaglutide.  It only does it for tirzepatide.  And therefore, the odds ratio for dulaglutide remains the same as 0.55 with a 95 percent confidence interval of .29 to 1.02.

With tirzepatide, there is a low, medium and high dose.  The low dose has a ratio with 0.34 with a 95 percent confidence interval of 0.01 to 8.35.  For the medium dose, again the odds ratio was .34 with a 95 percent confidence interval of 0.01 to 8.28.  And with the high dose, the odds ratio was 0.34 with a 95 percent confidence interval of 0.01 to 8.35.  So they all cross 1.

BY MS. WATRAL:

Q.   That does not show a statistically significant increased risk, correct?

A.   For -- again, with the limitations we discussed yesterday --

Q.   Sure.

A.   -- that RCTs are not powered to examine this outcome, many patients who are on these medications are closely watched.  They do not represent the real world of patients who are on these medications.  They are healthier.  They're closely monitored.  Within all of those limitations, when they did a subgroup analysis of that network meta-analysis, they did not find a significant increase within that subgroup.

Q.   Okay.  Which study are you looking at now?

A.   I'm still looking here.  There is another Figure S2.  I just wanted to check if there is any information there.  This is the same Chen we are looking at the figure here.

This is the outcome of dropout rate.  I know you had mentioned that earlier.  I might have considered that, but I did not specifically discuss it in my report.

And then, there is the results of individual trials looking at intestinal obstruction.  Again, same paper, Figure -- Supplementary Figure 3A.

Q.   So do any of those show a statistically significant increased risk?

A.   These are three studies of tirzepatide.  And all three of them are varying -- widely varying confidence interval, some less than 1, some more than 1, but all of

them cross 1.

Q.   So they do not, right?

A.   They -- in that -- in this -- in this subgroup analysis of three trials, none of the three trials of tirzepatide were associated with what they call bowel obstruction.  And they do this with -- also with dulaglutide.

So let me see what figure this is.  This is Figure 3C.

Q.   Sure.

A.   Supplementary Figure 3C.

Q.   And we are short on time here, so --

A.   Yes --

Q.   -- just tell me if it shows a significantly increased risk or not.

A.   One of them does.

Q.   Okay.

A.   Shows a borderline significant decreased significance.  That is the Gerstein REWIND study, where the hazard -- where the odds ratio was 0.52 with a 95 percent confidence interval of 0.27 to 0.99.  With Wang and Weinstock, the hazard ratio crossed 1, so it was not significant, so --

Q.   And that's a significant decreased risk, correct?

A.   Correct.  Again, I think the number of event rate

Binu John, MD Volume 3    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

appears low because the confidence interval is very wide.

Q.   Mm-hmm.

A.   But they don't disclaim how many patients there. And that's one of the three trials.

Q.   Okay.

A.   And then finally, we are at Chang, et al.  I do not believe that study was related to dulaglutide or tirzepatide.

Q.   Well, let me start with tirzepatide then.  Can you identify a single study that found a statistically significant positive association between tirzepatide specifically and ileus obstruction or an ileus obstruction combination?

A.   Again, Counsel, it's important to highlight that in this analysis I did, the vast majority of studies are done prior to 2024, or even the studies that are published later did not include.  Tirzepatide was approved later in the process, so many of these studies did not include tirzepatide.

Again, I consider this as part of a class; and so, I did not focus on specific drugs.  And I know the limitations there because this is the medication that was approved later.  And so in many of the studies, it's not included.  In some of the studies where it's included, the sample size is small.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   Okay.  We are really, really short on time, so please just stick with my question.

A.   Okay.

Q.   I recognize that you have limitations you've discussed in your report throughout these two days.  That's going to be a baseline for my question, okay?

A.   Okay.

Q.   Understanding that.  Can you identify a study that found a statistically significant positive association between tirzepatide specifically and ileus obstruction or an ileus obstruction combination?

A.   Again, with the limitations we discussed before, there was no specific study that showed an increased association specifically with tirzepatide.

Q.   Okay.  You mentioned the Gudin study.  I want to talk about that just very briefly.

MS. WATRAL:  I'm going to mark that as Exhibit 23.

(Deposition Exhibit Number 23 marked for identification.)

BY MS. WATRAL:

Q.   And I'm going to ask you very specific questions about that.  Okay?  Can you stick with my very specific questions?

A.   Yes, Counsel.

Q.   And Gudin is a pharmacovigilance study, correct?

A.    That is correct.

Q.    Pharmacovigilance studies are hypothesis generating; is that fair?

A.    That is fair to say.

Q.    Okay.  And you point -- you pointed to something in the results that talked about disproportionate reporting was statistically significant for all incretin-based drugs individually except for albiglutide, lixisenatide and semaglutide.  Do you remember that?

A.    Yes, Counsel.

Q.    Okay.  And from that, you were saying that there was dulaglutide-specific information of an increased risk. Did I understand that correctly?

A.    The ROR, the Reporting Odds Ratio, associated with dulaglutide was higher than 1.  It was significant.

Q.    Okay.  And you're relying on an odds ratio of 3.05 with a confidence interval from 2.4 -- 2.54 to 3.66 for that; is that right?

A.    Counsel, where are you reading that, Counsel?

Q.    I'm under, "Results," under the heading of: "Disproportionality Analyses of Intestinal Obstructions."

A.    Okay.

Q.    You can use the version that I have marked so we are on the same page.

A.    Okay.

Q.    It's on the fifth page of what I've marked.  It's under "Results."

A.    On -- on Page 5?

Q.    Yeah.  They don't have page numbers, unfortunately.

A.    Okay.  So is it under this page, Counsel?

Q.    It is, yeah.

A.    Okay.

Q.    Under the second underlined heading.

A.    Okay.

Q.    The Disproportionality reporting.  It's that sentence; do you see that?

A.    Yes, Counsel.

Q.    The ROR that you were relying on there was a 3.05 with a confidence interval of 2.50 to 3.66, right?

A.    That is correct.  But that is, again, for all the GLP-1 RAs.

Q.    That's my point.  So if you looked at Table 2, Table 2 reports data for all GLP-1 RAs together when it's reporting the ROR, correct?  It's at the very end.

A.    Yeah, Table 2 looks at the ROR of all GLP-1 RAs.

Q.    So there is no data specific to dulaglutide in the Gudin study?

A.    So let me explain where I got that.  So Counsel, on that same Results page that you read before, under the

Binu John, MD - Volume 3   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

heading, "Disproportionality Analyses of Intestinal Obstructions Associated with Incretin-Based Drugs," on the third line it says:  "The disproportionate reporting was statistically significant for all incretin-based drugs individually (except for albiglutide, lixisenatide and semaglutide for which ROR was not computable because of too few exposed cases) and with a greater signal for DPP-4i compared to GLP."

So it does mention it's individual, but they don't provide ROR for each individual drug in the table.

Q.   So you can't tell me what ROR was for dulaglutide; is that fair?

A.   Not based on this paper, Counsel.

Q.   And this was not one of the seven studies that you considered to be the well designed studies, true?

A.   That is correct.

Q.   Okay.

A.   Yes.

Q.   So let's go back to my question.  For -- recognizing all the limitations that we've discussed in your report over the last two days, can you identify a study that has found a statistically significant positive association between dulaglutide specifically and ileus obstruction or an ileus obstruction combination?

A.   Like I mentioned earlier, Counsel, I considered

GLP-1 RAs as a class.  And I believe that GLP-1 RAs as a class is associated with ileus or ileus obstruction.

But none of the studies which examine specifically the subgroup analysis showed the association specifically with dulaglutide with limitations, including many were underpowered, some studies just didn't have it.  Yes.

Q.   Okay.  And fair that you're not offering an opinion about causation at any historic point in time?  So for instance, you're not saying there was or there wasn't causation in 2015, 2016; is that fair?

MR. HONNOLD:  I just want to object to the form.

I just think it's vague as to --

BY MS. WATRAL:

Q.   Yeah, let me ask you a better question.

MR. HONNOLD:  You mean in terms of what data it did or didn't show?

MS. WATRAL:  Yeah.

BY MS. WATRAL:

Q.   So you're not offering an opinion or saying, I'm going to go back in time and tell you for any particular point in time was there enough evidence to show a positive association, causation for dulaglutide, tirzepatide, GLP-1s as a class?  Is that fair that that's outside the scope of what you did?

A.   I don't -- I'm sorry, I don't understand the

question.

Q.   Yeah.  Let me --

A.   Yeah, because are you saying that GLP-1 RAs as a class was associated with ileus and obstruction in 2020 but not in 2021?  Is that what you're asking me?

Q.   No, I'm just -- the point of time that you're doing this analysis is the present point in time.

A.   Correct.

Q.   Is that fair?

A.   That is correct.

Q.   And you didn't do additional analyses for any historic point in time to say if somebody picked a year, 2022, what was the state of the evidence at that time?  You're not doing that sort of analysis; is that fair?

A.   I don't specifically mention that kind of analysis, but it's kind of built into the nature of how I do it.  For example, when I am discussing Faillie --

Q.   Mm-hmm.

A.   -- we know that Faillie was done almost five-plus years ago.  And so, the data that Faillie discusses was applicable to the medications.

Again, I believe that the GLP-1 medications are a class, but if you're asking did it apply at that time, it -- the data that Faillie shows would apply to all the medications that were available and used in that study in

that period of time.

So to that extent, every study I analyzed I looked specifically at what the years were of exposure, what the drugs were.  I don't see any reason why the same medications would change its association with obstruction over time.

Having said that, I did factor when the studies were done, what studies, what drugs were available into my analysis.

Q.   Got it.

You didn't do a separate Bradford Hill analysis for any particular point in time, though.  That's what I'm getting at.

A.   Yeah, thank you for explaining.  I did not, Counsel.

MS. WATRAL:  Let's take a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 12:44 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  We are back on record.  The time is 1:03 P.M.

CROSS EXAMINATION

BY MR. PRZYMUSINSKI:

Q.   Getting close, Doctor.  Page 51 of your report, please.

A.   Yes.

Q.    Section on Biological Gradient.  Remember yesterday right at the end of the day we were talking about this section and we had finished looking at the Tolessa 2001 study; do you recall that?

A.    I do recall we discussed Tolessa 2001.

Q.    Okay.  And what we didn't get time to do is to talk about the next sentence in the study discussed there.  And that's the sentence that reads:  "Additionally, we see similar trends in humans in studies performed by Hellstrom, where different doses of GLP-1 RAs have a vary -- varying effects on small bowel assessed by duodenal manometry, via different mechanisms.  Do you see that?

A.    I see that, Counsel.

Q.    My -- my question to you, first of all, Doctor, and we marked it yesterday, Exhibit 20, the Hellstrom study, and as you can see on this page, you don't have an actual reference cited here.  You say Hellstrom, but you didn't actually have a footnote with the name of the study.

So what I want to first of all confirm is this the correct study?  This is what I found on your reliance list, but most importantly, for the record, I want to make sure that we have the right study.

A.    Okay.  Thank you.  Let me double-check.

Q.    Yeah.

MR. HONNOLD:  What time did we go on?

THE VIDEOGRAPHER:  1:04.

MR. HONNOLD:  Thank you.

THE WITNESS:  Correct, Counsel.  This is the correct paper I'm referring to.

BY MR. PRZYMUSINSKI:

Q.   Okay.  So this is the Hellstrom study you mentioned in the Biological Gradient section on Page 51 of your report, correct?

A.   This is the paper I'm talking about, yes.

Q.   And that's Exhibit 20, the title of which is: "GLP-1 suppresses gastrointestinal motility and inhibits a migrating motor complex in healthy subjects in patients with irritable bowel syndrome."  And that was published in 2008, correct?

A.   That is correct.

Q.   All right.  Now, I know we don't have a lot of time.  So I want to just ask you, I promise you, some pretty high-level questions.

First of all, Doctor, if you look at -- let's see here.  If you look at the Abstract on the first page, the authors write:  "Our aim was to study the effects of GLP-1 on gastrointestinal motility in healthy subjects in patients with irritable bowel syndrome."  Do you see that?

A.   You're talking about the abstract?

Q.   Correct.  Do you see that sentence?

Case 2:24-md-03094-KSM      Document 691-25      Filed 05/19/26      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A. Not in the abstract.

Q. In this. Do you have the right paper, GLP-1 suppresses?

A. This is the --

Q. Right there where I marked --

A. Okay, Counsel. Thanks.

Q. Do you see the sentence starting: "Our aim"?

A. Mm-hmm.

Q. Okay. After that, the authors write: "Antro-duodeno jejunal manometry was carried out during a four-hour control period with saline followed by a four-hour period with contributing GLP-1. And then, there is healthy subjects at two different doses for a total of 16.

A. That is correct.

Q. And IBS subjects at two different doses with a total of 14, correct?

A. That is correct.

Q. So 30 subjects in the study that were treated?

A. Based on the abstract, it appears to be the case.

Q. Okay. And if you look at the next page, Doctor. Sorry, Page 651, actually. Under: "Compounds," it says: Glucagon-Like Peptide-1 was purchased from PolyPeptide Laboratories Wolfenbuttel, Germany; do you see that?

A. I do.

Q. Looks like the same compound that Tolessa was

using that we talked about yesterday?

A.    That is correct.

Q.    Okay.  Again, these subjects did not receive any of the specific GLP-1 medications at issue in this litigation, correct?

MR. HONNOLD:  Object to the form.  No foundation.

You can answer.

THE WITNESS:  So Counsel, I want to put it into context.  So this is a mechanistic study.  When we do a mechanistic study, we are looking at the physiology whether the agonist directly influences the outcome we are looking at in animals.  So when we do mechanistic studies, we are looking at whether the higher levels of GLP-1 causes this GI motility that we are looking for.

And so for the purpose of this animal study in this context, GLP-1 used is a surrogate for a GLP-1 RA in the physiological study.

BY MR. PRZYMUSINSKI:

Q.    Understood.

But for the clear record, none of the people in the study were treated with any of GLP-1 medications specifically at issue in this litigation?

A.    That is correct.

Q.    Okay.  Last thing on the study, Page 657.  Are you there, Doctor?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Yes, yes, Counsel.

Q.    Left column.

A.    Mm-hmm.

Q.    Last full paragraph in that column it starts: "Using motility."  Do you see that paragraph?

A.    Mm-hmm.

Q.    If you go about halfway down that paragraph.  Do you see a sentence that starts with:  "We were"?

A.    Yes.

Q.    The authors write:  "We were not able to obtain any dose response relationship for GLP-1, which might be due to the small group study."  Do you see that?

A.    I see that statement.  But I -- I want to clarify that.

MR. HONNOLD:  Let him ask you a question.

THE WITNESS:  Sorry, my apologies.

MR. HONNOLD:  Thank you.

BY MR. PRZYMUSINSKI:

Q.    So what the authors are saying there, irrespective of the clarification, which you can offer, is that their conclusion was that they did not find a dose response relationship with GLP-1, correct?

A.    All I would say, Counsel, there is that's what the statement says.  But I hope to clarify that a little bit.

If you look at the abstract, Counsel, so this is

on Page 649 --

Q.    Mm-hmm.

A.    -- you see that, like you mentioned, you're doing antroduodenal jejunal manometry in healthy patients and in IBS patients.  So let's focus on the healthy patients first.

Q.    Mm-hmm.

A.    When patients who are healthy were given the .7 and 1.2, what you find is the GLP-1 RAs reduce the migration more to complexes from reading of 2 to 0.5 and motility index from 4.9 to 4.3 In Sigma.  While GLP 1.2, that's the higher dose, produced MMC from 2 to 1.5 and the motility index from 5.2 to 4.4.

The point there is at the lower dose of GLP-1 at the dose of .7 picomoles, the reduction in motility index is 0.6 divided by 4.9.  Do you see that difference?  So it comes down from 4.9 to 4.3.

Q.    The difference is 0.6?

A.    The difference is 0.6.  And if you divide that by 5, it's about a 12 percent decrease.

Q.    Mm-hmm.

A.    Right?  And then, if you look at the motility index in the higher dose in healthy -- healthy subjects, you see that it -- the motility index drops from 5.2 to 4.4. It's a .8 difference.  Right?

Again, I don't know what the statistical analysis

there was, but numerically -- they don't show a P-value there.  But numerically, the motility index seems to drop at a greater level than in the 1.2 picomoles per minute arm compared to the .7 in healthy individuals, so --

Q.   Two followups.  I appreciate --

MR. HONNOLD:  It's 1:12.

MR. PRZYMUSINSKI:  What's that?

MR. HONNOLD:  1:12.  You said you had eight minutes.

MR. PRYZMUSINSKI:  It's been 12?  Give me two more minutes.

MR. HONNOLD:  Have you ever given me two more minutes?

MR. PRYZMUSINSKI:  Yeah.

MR. HONNOLD:  Have you?

MR. PRZYMUSINSKI:  Me?

MR. HONNOLD:  Tell me when.

MR. PRZYMUSINSKI:  Have I ever said no to you --

BY MR. PRZYMUSINSKI:

Q.   The authors, their conclusion based on that data was they did not find evidence of dose response, correct?

A.   With the caveat that I'm not sure whether they're talking about the MMC or whether they're talking about the motility index.

If you look at the MMC, based on the numbers they

provide, I don't see a significant difference.

But based on the motility index, I see that difference. I do not know which one they were talking about.

Q. And you don't know if the motility index change was significantly different, correct?

A. We do not know what the P-value there was, Counsel.

Q. And last question --

MR. HONNOLD: That's three. You really owe us now. Okay, come on, let's go.

MR. PRZYMUSINSKI: You gave me two minutes, dude. Come on, bud.

MR. HONNOLD: Okay.

BY MR. PRZYMUSINSKI:

Q. On MMCs, which you just mentioned --

A. Yes.

Q. -- at the lower dose 0.7, the difference between MMCs before and after was a change of 1.5?

A. That's correct.

Q. At the higher dose, it was a change of 0.5?

A. That is correct.

Q. All right. So if anything, the use of that medication at the higher dose had less effect on MMCs than the lower dose, correct?

A.    So I just want to clarify one more thing there. When we look at these motility studies, we look at the amplitude of the MMCs, the frequency, and then we use the amplitude and the frequency to calculate motility index.

So what you're saying there with MMC is the number of MMC.  Doesn't talk about the amplitude.  So we are only talking about frequency there.  When we calculate the motility index, it includes both the frequency and the amplitude.  So it's a superior way to measure the MMC because you're looking at both factors.

So the part that you talk about with the frequency of MMC is part of the -- what goes into the motility index. And so, between the two, I would give greater weightage to that.

Having said that, what you said is correct.  MMCs frequency, the -- I don't know whether it's statistically significant, but the difference was greater with the higher -- or was greater with the lower dose.

MR. PRZYMUSINSKI:  Thank you.

MR. HONNOLD:  Thanks, gang.  Why don't you give us three minutes.  I need to call my boss.

MR. PRZYMUSINSKI:  You have a boss?  Who is your boss?

MR. HONNOLD:  Well --

THE VIDEOGRAPHER:  Going off the record.  The time

is 1:15 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  We are back on record.  The time is 1:26 P.M.

MS. WATRAL:  For the record, we are marking as Exhibit 24, Dr. John's binder of studies that he's been referring to during the course of his deposition.

(Deposition Exhibit Number 24 marked for identification.)

MR. HONNOLD:  I agree with that.  The court reporter will handle that for copying purposes.  And for the record, it will be returned to me personally and I'll make sure that it gets back to Dr. John.

And then, other than that, I have no questions.  So thank you, everybody.

MS. WATRAL:  Thank you.

THE VIDEOGRAPHER:  This concludes the deposition.  We are going off the record.  The time is 1:27.

THE REPORTER:  You have a standing order, Diana?

MS. DONNELL:  We get a rough, yes.  And we get a final.

(Deposition concluded at 1:27 P.M.)

Case 3:24-cv-03094-KSM    Document 691-25    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, TAMARA MASCI TANNEN, RPR, Notary Public, State of Florida, certify that BINU JOHN, M.D. personally appeared before me on the 13th day of March, 2026, and was duly sworn.

Signed this 13th day of March, 2026.


_____
TAMARA MASCI TANNEN, RPR, FPR-C
Notary Public
State of Florida
My Commission #HH 621542

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA       )

COUNTY OF PALM BEACH)

I, TAMARA MASCI TANNEN, Registered Professional Reporter, certify that I was authorized to and did stenographically report the video deposition of BINU JOHN, M.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 406-529, is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 15th day of March, 2026.

TAMARA MASCI TANNEN, RPR, FPR-C
Notary Public
State of Florida
My Commission #HH 621542

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the Errata Sheet for any corrections that are made.

After doing so, please sign the Errata Sheet and date it. You are signing same subject to the changes you have noted on the Errata Sheet, which will be attached to your deposition.

It is imperative that you return the original Errata Sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I
have read the foregoing pages and that the same is a
correct transcription of the answers given by me to the
questions therein propounded, except for the
corrections or changes in form or substance, if any,
noted in the attached Errata Sheet.


_____
Witness Signature                    Date


Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____
Notary Public

E R R A T A   S H E E T

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES

IN RE:          GLP-1
CASE NO:        2:24-md-03094-KSM
DATE:           MARCH 13, 2026
DEPONENT NAME:  BINU JOHN, M.D.


PAGE/LINE        CORRECTION                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

            (Use other side if necessary)

     Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated are true.


_____                  _____
BINU JOHN, M.D.                               DATE