# EXHIBIT 26D



David A. Kessler, M.D.

3/31/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

20260513_123-000000018

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE: GLUCAGON-LIKE           :     CIVIL ACTION
PEPTIDE-1 RECEPTOR             :
AGONISTS (GLP-1 RAs)           :     MDL NO. 3094
PRODUCTS LIABILITY             :
LITIGATION                     :     2:24-md-03094
                               :     -KSM
This Document Relates          :
to:                            :
                               :
All Actions/All Cases          :

VOLUME I

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

- - -

March 31, 2026

- - -

Videotaped deposition of DAVID A. KESSLER, M.D., taken pursuant to notice, was held at the law offices of Morgan & Morgan, 20 M Street, SE, Washington, D.C., beginning at 9:10 a.m., on the above date, before Michelle L. Ridgway, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public.

- - -

20260513_123-000000018

APPEARANCES:

SEEGER WEISS, LLP
BY:   PARVIN K. AMINOLROAYA, ESQ.
(In person)
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100
Paminolroaya@seegerweiss.com

        - and -

WAGSTAFF & CARTMELL
BY:   SARAH RUANE, ESQ.
BY:   HANNAH PFEIFLER, ESQ.
(In person)
BY:   ERIC D. BARTON, ESQ.
(Zoom)
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
816.701.1123
sruane@wcllp.com
hpfeifler@wcllp.com
ebarton@wcllp.com

        - and -

MORGAN & MORGAN
BY:   NICOLE LOVETT, ESQ.
(Zoom)
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
813.275-5263
nlovett@forthepeople.com
Representing the Plaintiffs

LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
BY:   DANIEL E. SELTZ, ESQ.
(Zoom)
250 Hudson Street, 8th Floor
New York, New York 10013
212.355.9500
Dseltz@lchb.com
Representing the Plaintiffs

20260513_123-000000018

APPEARANCES:   (Cont'd.)

DLA PIPER LLP (US)
BY:   LOREN BROWN, ESQ.
BY:   CHRISTOPHER GISMONDI, ESQ.
(In person)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
loren.brown@us.dlapiper.com
christopher.gismondi@us.dlapiper.com

        - and -

DLA PIPER (US)
BY:   BRENNA D. KELLY, ESQ.
(In person)
BY:   STEPHANIE GUMABON-GREAVER, ESQ.
(Zoom)
One Liberty Place
1650 Market Street
Suite 5000
Philadelphia, Pennsylvania 19103
raymond.williams@us.dlapiper.com
brenna.kelly@us.dlapiper.com
Stephanie.gumabon-greaver@us.
dlapiper.com

        - and -

DLA PIPER (US)
BY:   ERIC GOODHEART, ESQ.
(Zoom)
4141 Parklake Avenue
Suite 300
Raleigh, North Carolina 27612
919.786.2000
eric.goodheart@us.dlapiper.com
Representing the Defendant, Novo
Nordisk

20260513_123-000000018

APPEARANCES:    (Cont'd.)


KIRKLAND & ELLIS LLP
BY:   DIANA M. WATRAL, ESQ.
(In person)
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.2000
Diana.watral@kirkland.com
Representing the Defendant, Eli
Lilly


VIDEOTAPE TECHNICIAN:

    David Campbell
      (Hartford Reporting) - in person

ALSO PRESENT:

Adam Tolin - inhouse counsel
(Novo Nordisk) - zoom


    Mike Bachmann - in person
    MacKenzie Perkins - in person
      (Legal Analysts - Seeger Weiss)




                - - -

- - -

I N D E X

- - -

Testimony of:

DAVID A KESSLER, M.D.
(Volume I)

By Mr. Brown                    10

20260513_123-000000018

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Kessler Exhibit 1 | Expert Report David A. Kessler 1/2/26 | 15 |
| Kessler Exhibit 2 | Errata Sheet for 1/2/26 Expert Report (Kessler) | 16 |
| Kessler Exhibit 3 | Invoices for Dr. Kessler | 17 |
| Kessler Exhibit 4 | Produced Documents Novo Nordisk | 25 |
| Kessler Exhibit 5 | Transcription YouTube Katie Couric | 138 |
| Kessler Exhibit 6 | Victoza GI Stenosis and Obstruction Health Canada July 2013 Novo GLP MDL CAN -000125893-14 | 151 |

- - -

E X H I B I T S

- - -

NO.                DESCRIPTION                    PAGE

Kessler
Exhibit 7        Information Request    151
                 Letter
                 Novo_GLP_MDL_000959412-14

Kessler
Exhibit 8        Victoza                       151
                 Assessment of Adverse
                 Drug Reactions
                 Denmark

Kessler
Exhibit 9        Pharmacovigilance     151
                 Review
                 Novo_GLP_MDL_002147735-85

Kessler
Exhibit 10       A Threat to              191
                 Evidence-Based Vaccine
                 Policy
                 (Califf)

Kessler
Exhibit 11       Analysis of GI          256
                 Adverse Events in the
                 Pooled GLP-1 Clinical
                 Table
                 (Madigan)

- - -

20260513_123-000000018

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

PAGE     LINE   PAGE LINE      PAGE LINE
None.

Request for Production of Documents

PAGE     LINE   PAGE LINE      PAGE LINE
None.

Stipulations

PAGE     LINE   PAGE LINE      PAGE LINE
None.

Questions Marked

PAGE     LINE   PAGE LINE      PAGE LINE
None.

20260513_123-000000018

- - -

THE VIDEOGRAPHER:  We are now on the record.

Today's date is March 31, 2026, and the time on the video monitor is 9:10 a.m.

My name is David Campbell, I'm the legal videographer for Hartford Reporting & Technology.

This deposition is being taken in the matter of In Re: Glucagon-like Peptide-1 Receptor Agonists (GLP-1 RAs) Products Liability Litigation.  Case Number 2:24-md-03094-KSM.

This is in the United States District for the Eastern District of Pennsylvania.

The court reporter today is Michelle Ridgway, also with Hartford.

All counsels' appearances will be noted on the stenographic record.

If the court reporter

please swears in the witness, we can proceed.

                    -   -   -

... DAVID A. KESSLER, M.D., having been first duly sworn, was examined and testified as follows:

                    -   -   -

EXAMINATION

                    -   -   -

BY MR. BROWN:

Q.     Good morning, Dr. Kessler. Good to see you again.

A.     Good morning, Mr. Brown.

Q.     I know you've done this a number of times.  I'll just ask upfront that if I ask you any question that you do not understand, please stop me and tell me that so I can try to rephrase the question.  Is that fair?

A.     Thank you, sir.

Q.     I see, Dr. Kessler, that you've brought a number of materials with you today that are, I think -- I believe spread out on a table next to you; is that right?

A.    A few tables, I think, is probably more accurate.

Q.    Okay.

A.    And then the answer is yes.

Q.    Okay.  So behind you to your right and to your left, you have a number of binders and a number of other documents that are spread out; is that right?

A.    Correct, sir.

Q.    Okay.  Can you describe for me what you have with you today?

A.    Maybe it's best described as my file --

Q.    Okay.

A.    -- on this matter.  I don't mean any technical aspect to that.

You had a -- there was some -- there was a notice of deposition, general documents, so I think this has -- I mean, I'm happy to go through each binder.  I'm happy to describe it more specifically, more generally.

Basically these are

handwritten sheets, typewritten notes that I've done, over the course -- course of time.

Then there are -- there's -- as you know, there are redacted reports to different defendants here. These -- these notebooks have titles, everything from case reports to books on mechanism, books on science, books on epi.

Most of the -- those on the wall are documents that are cited in footnotes and the actual documents. So there is studies. There's case reports.

I can go on and be more specific binder by binder and sheet by sheet, if you would like.

Q. That -- that helps me for now, thank you.

To the best of your knowledge, are the documents behind you part of the set of documents that you listed on your materials considered list in this case?

A. Or things I've used in

either I've -- well, not only for -- so the answer is yes, this stuff.

But there's -- this stuff is really in preparation for deposition. As I said, there are notes that are not specifically listed.

There are -- but I think the MCL probably should have, I mean, every -- all the published stuff. All the Bates stuff that's here.

I think that's -- would be -- you know, again, besides for my own notes, I think majority would be on the MCL list.

Q. Okay. Thank you.

A. To give you a sense of --

Q. Yeah, for now I'm just trying to get a general understanding of what you have brought with you and I think you've answered that question.

Assuming your counsel permits us to do that, may we look at those materials during one of the breaks?

A. Of course --

                    MS. AMINOLROAYA:

          Absolutely.

BY MR. BROWN:

          Q.    Okay.  And the notes and highlighting that you have, for what purpose did you do that?

          A.    For -- I can't remember everything.

          Q.    Yep.

          A.    I mean, there are a lot of documents in this.  There are a lot of different aspects to this.

                    So, this is -- you know, in the course of either preparing for this, or, I mean, as I work through certain issues, whether it's on regulations-type certain things, or to be able to remember them and go back to them.

          Q.    Thank you.  We'll take a look at the materials during our breaks today.

                    So you completed an expert report in this case; is that right?

          A.    I did.  I think it was served in January, early January of this

year.

Q. And I believe we've already marked that expert report as Defendants' Exhibit 1.

(Document marked for identification as Kessler Exhibit 1.)

BY MR. BROWN:

Q. Could you just take a look at that, Dr. Kessler?

A. Yeah, I have it in front of me.

Q. And can you verify for me that that is a true and accurate copy of the expert report that you served in this case?

A. I have no reason to dispute that. Having turned every page here.

I do note that some of the pages are redacted. And when you say the report that I served, just for the record, I mean, there is -- let me see if I can do it this way.

There is one report, but because there are two main defendants

here, certain things were redacted for -- on one, certain things are redacted.

But if you redact everything and include my schedules, that would be my report.

The version that you gave me here has certain pages that I note are redacted, but my report, you know, again, with regard to Novo, I think this is probably accurate what you gave me.

But the report in this case involves the unredacted stuff too.

Q. Okay. And I was handed this morning an errata sheet which we've marked as Exhibit 2. Do you have that in front of you?

A. You gave me -- yes. I have that.

(Document marked for identification as Kessler Exhibit 2.)

BY MR. BROWN:

Q. And did you put together an errata sheet related to your expert

report?

A. It was done under my direction. These are primarily, in the course after the report when, you know, pulling certain documents, seeing certain, you know, citations were wrong. But the answer is, with assistance, but under my direction.

Q. Okay. And who assisted you?

A. Different counsel at different points in time.

Q. And Exhibit 3, I believe, is a copy of at least one of your invoices in this case; is that right?

A. Correct. Or for -- I'm sorry, the answer is yes to that. I think it's the only invoice in this matter.

(Document marked for identification as Kessler Exhibit 3.)

BY MR. BROWN:

Q. Can I see a copy of that?

A. Of course. Thank you.

Q.    And this is your invoice through January 5, 2026; is that correct?

A.    Correct.

Q.    And that invoice is in the amount of $468,000 -- $468,975.36; is that right?

A.    You just took it in front of me, but I will agree with you. Whatever it says on that.  I think it says 300-plus hours should be on that sheet from memory.

Q.    374.5 hours at $1,250 per hour.

A.    Yes.  Sorry.

Q.    Is that right?

A.    Yes, sir.

Q.    And expenses of $850.36; is that right?

A.    Whatever it says on the sheet, sir.  You have it in front of you.

Q.    And is $1,250 an hour your standard hourly rate for your expert services in this case?

20260513_123-000000018

A.    It's been that way for several years.

Q.    Okay.  Now, have you done work in the matter between January 5th of this year and today?

A.    I have.

Q.    And have you submitted an invoice to counsel for that yet?

A.    I have not.

Q.    Okay.  Can you estimate for me the amount of time that you've spent or the dollar value of that time between January 5th and today?

A.    I have not totaled it.  So I don't -- I don't have -- I don't have a total of that amount.

Q.    Can you estimate it?

A.    Yeah, I mean, maybe three months.  If you figure, maybe about -- I don't know.  I'm estimating, speculating maybe it was 60 hours a month or something of that kind of magnitude over three months, something like that, is my guess.  That's a guess.

Q.    Understood.  And you will

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

be submitting an invoice for that time; am I right?

A.    I'll submit an invoice after this deposition.

Q.    I see.

And can you kind of describe the type of work that you've been doing since January 5th on this case?

A.    I mean, it's been continuous, I mean, in some ways.  I have access to the database, the database is vast.  I continue to search the database, you know, and I continue to study the issue.

Q.    What database are you referring to?

A.    The -- the record.  There was -- the record of all discovery documents I have access to.

Q.    And can you tell me anything in particular about what you've been studying?

A.    I've been studying -- continued to study the issues that are,

you know, relevant within the four corners of this report.

Q.   Okay.

A.    It's the issues that were identified in the report.

Q.    And I know it's sometimes hard to separate the time spent preparing for a deposition and the time spent studying the record.  But can you estimate the time for me that you've spent preparing for this deposition today?

A.    You know, I don't know, I'm sure you'll call on knowledge that I've learned at different points in times. You know, I mean, the actual preparation for the deposition to me is a more recent, you know, over the last couple of weeks probably, days.  But, you know, I've looked at documents and -- I mean, since January.

Q.    And have you had meetings with counsel in preparation for your deposition today?

A.    Yes.  I think that would be

fair.

Q.    And can you tell me what meetings you've had?

A.    So I think there was one in-person meeting yesterday.  And there were likely -- they were Zoom.  Zoom, if you consider Zoom a phone call or phone calls prior to that.

Q.    Okay.  And who was present at the meeting yesterday?

A.    The three counsel that are sitting next to me, with staff.

Q.    Okay.  And was that an all-day meeting yesterday?

A.    No.  I kicked them out at a certain point.

Q.    Was that meeting here at Morgan & Morgan or someplace else?

A.    No, that was somewhere else.

Q.    Okay.  Okay.  Now, with your expert report, you provided a materials considered list of almost -- that consists of almost 3,000 pages; is that right?

A.    Yeah.  I'm happy to explain that.

Q.    Please go ahead.

MS. AMINOLROAYA:  Sure. We served an updated materials considered list yesterday.  And we have a copy of it, I believe, if you don't have it.

MR. BROWN:  Yeah, I think we received it by e-mail yesterday.

THE WITNESS:  I have a -- I have a copy of yesterday's, if you want to mark that.

MS. AMINOLROAYA:  You have a copy.

BY MR. BROWN:

Q.    Okay.  So, Dr. Kessler, as best you can, why don't you continue explaining these materials considered lists to me.

A.    So, I had asked that an updated one with the assistance of counsel be prepared, because the first one was a little unwieldy.  The first

one was the result, in part, of the way the administrative record is, in regulatory submissions, and the way that those are marked.

So this gives you, by heading, for example, the PSURs, the NDAs, and gives you the first pages and it doesn't list every single page. So this is more manageable.

There -- there are -- there are a few additional documents since January that are added to this. But this is -- this is --

It was just the NDAs, as you know, are millions of pages. And the way those were recorded, just were -- led to the sort of exorbitant list of the MCL. And this basically does it just with the first page of the document and gives it to you by category.

So if you -- you see the regulatory documents, those are really correspondence. You'll see a heading that says Labeled CDS. You'll see a

heading that says PSURs.  You'll see standard operating.  So this is by category and with the first page.  And these are then broken down by defendant.

So what probably was several thousand pages, probably gets -- gets down to a total of about 80, 88 pages.

Q.    Okay.  So just for the record, maybe we'll mark what you've referred to as "this," as Exhibit 4.

(Document marked for identification as Kessler Exhibit 4.)

BY MR. BROWN:

Q.    Do we have an extra copy of that, or do you need mine?

A.    I have a copy.

MS. AMINOLROAYA:  We have a copy for the court reporter.

MR. BROWN:  Yeah, why don't we --

MS. AMINOLROAYA:  Yeah.

BY MR. BROWN:

Q.    Okay.  So the document

you've just been describing to me, Dr. Kessler, we marked as Exhibit 4. I don't want to put words in your mouth, but can you give me a concise kind of description of what this document is for the record?

A. This is -- this should be the -- what's called an MCL, materials considered list. These are the -- I think, the things that I considered in forming my opinions in this matter.

Q. Okay. Now, going back to your expert report, Exhibit 1, did you draft that entire expert report on your own?

A. So, all these words, these are my words. This is my report.

There are certain points where certain things are, you know, certain quotes, et cetera, that I may have had assistance putting together.

But these are -- this is my report, and these are my words, and I think it's fair to say, you know, this is mine.

Q.    Okay.  Has anyone other than your counsel assisted with the creation of your expert report?

A.    No.

Q.    Are all of the opinions you intend on offering in this case contained in your expert report?

A.    It -- if this deposition ends right now, the answer is yes.

If you ask me questions today, I would -- I may have opinions that come out in answer to your question.  And then there's always what's an opinion, but is it a sub-opinion to an opinion.

Q.    Okay.

A.    So there may be new things that come out today depending on what you ask me if I have an opinion.  But if we stop now, that was my intent, to be comprehensive in this report.

Q.    Okay.  And are all of the changes or corrections to your report as of today contained in the errata sheet that we marked as Exhibit 2?

A.    This is an extensive report.  It's -- I mean, it's almost book length.  I'm sure there are typographical errors that go beyond this that I haven't caught.  But I tried, you know, I try to fact-check this, side-check this, and, you know, caught a lot of typographical errors.

Q.    Sitting here today, are there any changes -- additional changes or corrections that you would like to make to your report?

A.    No, sir.

Q.    And are the contents of your report true and accurate to the best of your knowledge?

A.    Sure.  With the exception that, you know, I mean, again, it's book length and I may read something.  We've all written stuff and then we re-read it and say, hey, that's not exactly what I meant.  I'm sure there's still errors in anything of this length.

Q.    Okay.  Now, as I mentioned a few minutes ago, I believe that the

20260513_123-000000018

original materials considered list that you submitted in the case is close to 3,000 pages; is that right?

A.    Correct.

Q.    And it lists, you know, hundreds of different studies and thousands of other documents; is that right?

A.    I don't have a -- I don't have a count.  I'll take your representation or whatever.

Q.    Yeah.  There are -- the materials are voluminous that are part -- that are part of the list; is that right?

A.    The record is very long.

Q.    Yeah.  And did you read everything that you have cited in your materials considered list?

A.    Every word, no.  I mean, but I -- I mean, as you know, we have the privilege of having -- able to search materials, and I do -- you know, I do my own research.

As we talked a little

earlier, you know, I searched the database, so these are documents that I may have searched or scanned also.

Q.    And when you say --

A.    Scanned through.

Q.    When you say you have people to search the materials --

A.    I didn't --

MS. AMINOLROAYA: Objection.  I don't recall hearing that.

BY MR. BROWN:

Q.    When you say you have people to search, is that anyone other than counsel?

A.    I don't think I said people to search.

MS. AMINOLROAYA:  Yeah, that's not what's on the realtime.

THE WITNESS:  I think I meant to say I search.  I do my own research.  That's not -- I mean -- I mean, there is counsel that I may have had search and

20260513_123-000000018

say, hey, can you find this for me.  But it's counsel.

BY MR. BROWN:

Q.    Okay.  How did you go about identifying the documents that you ultimately cited in your expert report?

A.    So I start with the record and, you know, ask -- form certain -- understand what the four corners of the questions that I'm being asked, and then go through the record, again, recognizing that the record is vast and there's millions of pages, but try to -- try to analyze the record.

And, Counsel, I'm happy -- I certainly don't want to represent that I have found every document, or everything that is relevant.  As we know, regulatory submissions are vast. They can fill -- one can fill the size of this room.  So if you have other documents that I've not considered, I'd be happy to consider them.  My goal is to look at everything.

Q.    Yeah.

A. But no one can look at -- it's humanly not possible. I mean, unless we want to spend the rest of our lives, and then, to read everything.

Q. Dr. Kessler, what do you understand to be the main purpose for which you've been asked to testify in this case?

A. I think two major areas. If I can -- I'm not here as a specific -- specific facts about an individual plaintiff. I mean, I'm not even aware at this point in time. I've asked, you know, are there bellwethers, et cetera. And I don't believe -- I just have a general sense.

But that -- I am not here on specific causation or even -- I think the two general areas include did defendants adequately warn about safety and certain pharmacovigilance practices. I think those are the two areas.

Obviously the first is more -- is, you know, adequacy of the label, adequacy of warnings, and

pharmacovigilance.  I think that's within the scope.

I think, again, not to play lawyer here, but I think they would be viewed as the liability issues of a matter which is, you know, vast as...

Q.    Thank you.  That makes sense to me.

Are you familiar with the term "general causation"?

A.    I am.

Q.    Okay.  Is it fair to say that you're not offering general causation opinions in this case?

A.    Yes and no.  I think that would -- I think there are specific other witnesses that I will yield to on general causation.

As you know, the regulatory standard goes -- search through the definitions, a reasonable possibility of a causal association.

To the extent that that causation is implied in a regulatory sense, I think we probably -- I mean,

the report touches on that. But it's not in the legal sense of an element of a total.

Q. Thank you. And what other witnesses would you yield to on general causation in this case?

A. I have not. I may have at different points in time looked at certain reports, but I know there are -- well, let me just see if I can do this in categories.

I think there are witnesses that are talking about gastroparesis. I think there are witnesses that are talking about ileus and obstruction. Those are the gastroenterologists if I could label -- you know, put that as one bucket.

There are witnesses that are going to talk more specifically about epidemiology.

Obviously the regulatory interface brings all those together. So, I mean, and I'm -- I'm card carrying. You know, I took my obesity

medicine boards.  I mean, I -- I know the clinical -- and that's important, as it relates to why I'm here, I mean for the court, for you, because, to be able to put those clinical, you know, research, and the data things together in the regulatory context, that's the interface.

Q.    Okay.  You are a medical -- trained as a medical doctor; is that right?

A.    I am licensed -- I'm currently licensed, active in two states.  And inactive in several other states in the past, but...

Q.    And when was the last time that you practiced medicine?

A.    I probably practiced medicine, in the practice of medicine -- I've probably consulted on patients, you know, in the last month.

Q.    Okay.  When was the last time that you treated a patient?

A.    Probably relatively recently.  Again, I don't have -- I

mean, I'm a professor of pediatrics.  I don't have an office.  I mean, I don't attend the hospital wards anymore, but I get -- I get consulted on many patients.

Q.    Okay.

A.    Which I think would fall into the practice of medicine.

Q.    Okay.  And was there a point in time where you were actually in active practice and pediatrician?

A.    Well, I would still consider myself, I'm still board certified, I maintain my certification.  My MOC is up to date and is effective, so I consider myself still -- I don't attend on the hospital wards anymore.  I gave that up a number of years ago.  But I still will get consulted constantly on cases.

Q.    Okay.  And you are trained as a pediatrician; is that right?

A.    I'm trained, I'm dual board certified in both -- that are active and up to date, both in pediatrics and in obesity medicine.

Obesity medicine covers both. I had to take -- I take those boards, those are both adult and pediatric obesity medicine.

Q. Do you consider yourself to be a gastroenterologist?

A. I am not -- I am not specialty boarded in gastroenterology. Obviously both a good deal of expertise in pediatric GI, as part of the board certification.

I think that to the extent that obesity medicine, I think, covers a good deal of gastroenterology that is relevant to those obesity and metabolic conditions.

Q. Have you ever treated a patient for ileus, internal obstruction, or gastroparesis?

A. Sure.

Q. When was the last time you did that?

A. I have to go back and remember, but I've certainly had patients who have been obstructed.

Q.    Approximately how many years ago was the last time that you treated a patient with either ileus, intestinal obstruction, or gastroparesis?

A.    I would say more when I was attending on the hospital wards.  It was maybe a decade ago.  But I certainly have some memory of being involved in cases more recently than that.

Q.    Okay.

A.    On a more consultant basis.

Q.    Have you diagnosed patients with ileus, internal obstruction or gastroparesis?

A.    Sure.  I've -- in the course of my, you know, clinical career and as a hospitalist, we didn't call them hospitalists, but as an attending, sure.

Q.    And I know I used ileus, intestinal obstruction, and gastroparesis in the same sentence.  But have you personally diagnosed patients with each of those conditions?

20260513_123-000000018

A.    I don't -- certainly obstruction.  I'm sure I've written, you know, a diagnosis of those two.

I have -- I have not diagnosed -- clinically I've not done scintigraphy on gastroparesis, to the extent that obstruction and ileus is more common is what I've dealt with.

Let me just -- I'm happy to answer all your questions clinically. I'm here as your -- I'm here as the regulatory expert, and obviously, but have a clinical background which is essential for the regulatory world.

Q.    And is it fair to say that on conditions such as ileus, intestinal obstruction, and gastroparesis, you would defer to the gastroenterologists that have been retained by the plaintiffs in this case?

A.    No.  Not -- not on the -- not when you're dealing -- well, so -- not when it comes to the regulatory questions.

Q.    Okay.

A.    You understand?

I certainly don't want to -- if you want to -- at that interface --

Q.    Yes.

A.    -- right, with regard to safety, safety of drugs with the conditions that they cause, I mean, I'm happy to -- you know, I feel very confident with, you know, my knowledge is, you know, is extensive as it takes that clinical knowledge and, you know, puts it together with the regulatory framework.

Q.    For what, if anything, would you defer to the gastroenterologists for?

A.    If you want to -- if you want to argue whether the definition of gastroparesis is best -- whether it's 175 minutes or 150 minutes, I will yield to maybe one or two gastroenterologists in this country, right, I mean, who have that expertise.

Q.    For what, if anything,

would you defer to the epidemiologists in this case for?

A. So I'm a professor of epidemiology and biostat. I'm comfortable in that. Schedule 3, I believe, gives you a summary of epi. I'm happy to sit here and discuss at length with you the epi.

But I think when you get into depth, and, again, I'm very comfortable with the epi as it relates to what we know about the regulatory standards and warning.

If you want to get into all different types of bias and, you know, optimal design of observational studies, I teach it, you know, but others have studied it more in this case and are focusing on that. So if you want to go in depth and just on the epi, I certainly don't want -- don't want to contradict anything they've done.

Q. Have you comprehensively evaluated the available epidemiology in this case?

A.    Comprehensive.  You can make -- other people can make -- I mean, I've tried to look very seriously at the epidemiology in this -- I mean I've -- you know, I'm certainly happy to engage with you on that.

But, again, I think there are other -- just as a matter of time, I mean, you know, there are others who are just focused on that.

Q.    And when you say others just focused on that, you mean other plaintiffs' experts in this case; is that right?

A.    And defendant experts --

Q.    Yes.

A.    -- in this case.  I mean, I have --

Q.    Okay.  Have you conducted any peer reviewed research on GI outcomes, such as ileus, intestinal obstruction, or gastroparesis?

A.    I have not conducted that kind of peer reviewed research myself on those endpoints.

20260513_123-000000018

Q.    Have you conducted any peer reviewed research --

A.    Well -- I'm sorry.  So I've written in this area, you understand.  I have not carried out the -- I have spent, you know, a considerable period of time studying and researching and talking, but I have not done -- as you would say, I mean, I have not conducted an observational study or a clinical trial on this matter to be precise.

I've spent -- I've gone deep into the matter and into the data, and I've researched questions, but I've not conducted clinical trials or observational studies myself.

Q.    That was my question.  Thank you.

Have you conducted any peer reviewed research on the topic of GLP-1 RAs?

A.    Again, my answer would be the same I think.  I've not conducted -- I've spent, you know, both before and after I was retained in this matter, I

mean, I have researched questions on this matter de novo. But I have not done the observational clinical trials myself.

Q. Have you ever prescribed a GLP-1 RA?

A. I believe I have.

Q. Can you describe for me how often or how many times that you've prescribed a GLP-1 RA?

A. Not frequently. I mean, I've been -- I've been consulted. I have talked to other docs. I've -- I think it's fair to say I've put patients on certain GLP-1 RAs. I may not have written the script, I may have written the script.

But most of the time I don't. Most of the time you can view me as consulting on this matter.

Q. And which medications have you prescribed?

A. I probably have prescribed Mounjaro and Zepbound, is what I've -- I...

Q.    And approximately how many occasions did you prescribe one or both of those medications?

A.    Occasionally.  I mean, not -- I don't have any office where I'm doing this every day.

Q.    And did your patients have favorable experiences on those medications?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  Yeah. I'm -- so as any medicine, you know, these are complex medicines.  There are -- there are risks and benefits associated.  I'm happy to go through and give you my sense of that.

It's not a simple favorable benefit.  There are benefits, and there are risks and I've been -- and I've seen both.  I mean, I -- and you aggregate those.

BY MR. BROWN:

Q.    Have you diagnosed any patient with an adverse event stemming from his or her use of a GLP-1 RA?

A.    I've identified, you know, certain events in certain patients, I believe, yes.

Q.    What events?

A.    I think I've dealt with the gastrointestinal.  I'm trying to think if there's anything besides gastrointestinal events associated. They're probably in the GI system the ones that I've seen, but I have to refresh my memory.

Q.    Okay.  Can you be more specific in terms of the gastrointestinal events that you're talking about?

A.    They are the events that occurred with delayed gastric emptying and impaired gastric emptying.

Q.    What events are you talking about?

A.    The events that are

associated -- these are a continuum of events.  You know, there's -- you know, there is nausea.  There is constipation.  There's severe constipation.  There's abdominal pain.  I'm familiar with all of that.

Q.    And when you say you're familiar with that, is that you're familiar with that through patients to whom you've prescribed a GLP-1 RA?

A.    Both -- yes, I mean, I'm familiar with it both in real-world practice as well as the record.

Let me just be clear here.  I am sitting here -- I mean, my opinions specifically -- I don't want to say we're not informed by our total clinical experience.  I am -- my opinions here, just to see if I can make this helpful, is based on the record.

Okay.  So I have deliberate -- I've worked hard to make sure my opinions are cited, everything is cited and should be in the record.

Others can come into this

court and talk about their clinical experience, but I would be misleading if I didn't tell you that that clinical obviously has some shape on my thinking. But it's -- I think it's well reflected in the -- in the record in this matter.

Q.    Okay.    And when you say your opinions are based on the record, those are -- what you're talking about are the documents that you reviewed in this case as opposed to any personal clinical experience that you have with GLP-1 RAs; is that fair?

A.    Correct.    That's what I've tried to do, that's what I thought was appropriate.    Obviously my experience always brings to bear.    I mean, I read the record, perhaps, differently than somebody who didn't have that clinical experience.

Q.    Thank you.    You are saving me some time, Dr. Kessler.    Thank you.

A.    Yeah.

Q.    Now, I know you were the commissioner of the FDA from 1990 to

1997; is that correct?

A. Through certain -- yes.

Q. Okay. So you last served as the FDA commissioner almost 30 years ago; is that right?

A. The day I walked out of the agency.

Q. Which was 1997?

A. That's correct.

Q. Which presidential administrations did you serve?

A. Two. Bush 1. Clinton.

Q. Okay. And then I believe you have gone back to government since serving as the FDA commissioner at least once; is that right?

A. Only once.

Q. Okay. And what position did you hold in the government?

A. I was chief scientific officer of United States COVID response. I was probably, you know, co-lead of Operation Warp Speed stationed -- you know, headquartered in the office of the secretary of HHS.

Q.    Okay.  During your time with the FDA, did you have any experience with GLP-1 RAs?

A.    No.

Q.    They weren't invented yet; is that right?

A.    The RAs?  Late '90s were probably the first -- there was no active moieties when I was FDA commissioner.

Q.    Okay.  And when you last served in the Department of Health & Human Services, that job was related to the rollout of the COVID-19 vaccine; is that right?  Vaccines.

A.    And therapeutics.  So it included the monoclonals.  It included the small molecules.  So it was all the drugs and their vaccines that were used -- it was all active moieties, drugs and biologics and vaccines, used against -- used in the pandemic.

Q.    Okay.  And is it fair to say that during that period of time you had no responsibilities related to the

regulation of GLP-1 RA medications?

A.    I think that would be fair.

Q.    Now, you are also a trained attorney; is that right, Dr. Kessler?

A.    No.

Q.    You have a law degree?

A.    Yes.

Q.    Have you ever practiced law?

A.    No.

Q.    Why did you get a law degree?

A.    My wife came back one day from first year of law school.  She started talking about the Federal Rules of Civil Procedure and I found it interesting.

I went, she would say, to join her in law school.  So we were in law school.

I think the -- I'm sorry, for being a little flip.

Q.    That's okay.

A.    A little -- I think a number of us ask why we went to law

school, right?

Q. Everybody at this table.

A. That question. I think healthcare was becoming increasingly complex. I think the regulation -- food and drug regulation is complex. I don't think I could have done the jobs that I've done without having been trained but I deliberately didn't take a bar, so I was never -- I'm fully licensed and active in medicine. I don't see myself as an attorney. I just went for some legal training, but got my JD degree.

Q. Okay. Now, I noted that in Appendix B of your expert report, that you listed cases, law cases in which you've provided testimony at trial or deposition over the last 12 years; is that right?

A. Let's go -- I think probably -- probably is a little longer. Probably 2010 or so. It tries to be all cases that I've been involved.

Q. Okay. And if you need to refer to the documents, please just tell

me you need to do that.

I counted up that you've testified at trial, or that you've been deposed in 58 cases over the last 12 years. Does that make sense to you?

A. That makes sense. I mean, I've not counted, but I take you at your word. I would have said a little over 50. So thank you for counting.

Q. And I believe that you listed another four cases where you've provided only a sworn expert statement. Does that sound right?

A. That sounds right.

Q. And is it true that you've been retained by the plaintiff in all of these cases?

A. No.

Q. Okay. In how many of those cases were you retained by one or more of the defendants?

A. I'd have to count them up, but I think it would be fair to say the majority, the vast majority, I mean, are plaintiff. There are some that are

defendants.

Q.     Okay.  The vast majority are on the plaintiff's side, wouldn't you agree?

A.     Yes.  I mean, that's the public health side, as I view it.  The public health, the kind of questions.

Q.     Have you ever testified in a deposition or in court that a product manufacturer's warnings were adequate?

A.     I believe there were -- it depends on the definition of warnings. I think I testified in California on the coffee roasters case, that was more Prop 65.  There was carcinogen warnings.

I'm not sure how you phrased your question, but I testified on behalf of the defendants there with -- on the cancer warnings for defendants there.

Q.     Are there any other examples that come to mind where you've testified that a product manufacturer's warnings were adequate?

A.     It was on the coffee one

20260513_123-000000018

that's the one that comes to mind right now. There have been other cases for defendants, but that's the one that I remember.

Q. Okay. Have you ever testified that a manufacturer's product is safe and effective?

A. Sure. I mean, there have been cases where that has come -- and I think I've not questioned the safety and effectiveness of the product. There have been matters that have involved antitrust, other matters. And I think I'm pretty sure that I've said that the product is safe and effective.

Q. Okay. And just so I understand you correctly, there are cases where you've served as an expert witness for the plaintiff, but your testimony has been on other topics other than the safety and effectiveness of the product?

A. Well, I was asked about the safety and effectiveness. But it may have been plaintiff, but it -- where

20260513_123-000000018

that issue came up where I testified that it was safe and effective.

Q. Okay. And are there cases where you've testified about the adequacy or inadequacy of warnings, but found the product to be safe and effective?

A. So there's certainly -- there's certainly -- I've got -- ask your question -- I think I got your question exactly.

I mean, I think there are -- there are cases where I've testified that the risk balance quite literally goes -- there's deficiencies in labeling, but there's not a deficiency in risk -- where the risks are acceptable in light of the benefits.

Q. You've answered my question. Thank you.

A. Thank you, sir.

Q. In your opinion, do the risks -- well, in your -- strike that.

In your opinion, do the benefits of GLP-1 RA medications

outweigh the risks of those medications?

A.    If you add to that, if you just made clear the earlier caveat that you gave, the answer would be yes, but that doesn't mean that the warnings should not be improved or the warnings were not deficient.

Q.    In your opinion, are all of the GLP-1 RA medications at issue in this case safe and effective medications?

A.    So, again, just add for the intended conditions of use, right.  I mean, we talk about safety and effectiveness absence.  So that's the intended conditions of use.

Again, let's just be -- I just want to be exact.

I am not questioning FDA's ultimate decision that these drugs should be marketed, right.  The question is just what should be warned about.

You said all GLP-1s.  I wouldn't go that far.  I mean, there's many GLP-1s that are -- you know, I

mean, that's broader -- you know, the ones that FDA has made those decisions, I'm not questioning that decision.  The question is what's on the label.

Q.    Yeah.  And to be clear, I'm talking about the FDA approved medications that are at issue in this litigation.

A.    That was my only point. Yes.  Of those, I think I've answered your question.

Q.    Of those, you don't question the safety and effectiveness of those medications?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  So, those medicines are safe -- well, let's -- you're using the word "safety and effectiveness."

So those medicines are safe if patients have adequate directions for use, which means that they are adequately warned about it.

So, I mean, I think that I have questions about whether there was adequate warning of this question. And if without adequate warnings that goes to patient safety, right.

So you're using the word "general safety." I think with regard to an ultimate approval decision, I'm not questioning the ultimate approval decision. I'm questioning the -- but warnings do go to safety.

BY MR. BROWN:

Q. I'll talk more about warnings with you over the course of the day, Dr. Kessler. But I just want to get back to your testifying experience for a second, okay?

A. Happy to.

Q. So can you estimate for me how -- how much money you've made in the last 12 or so years from testifying as an expert witness in court cases?

A. I don't have a number.

Over the last 12 years, there are certain years, as you know, that we'll go back to government service where I didn't testify at all.  And the answer is zero.  There are other years where it's a significant amount, yeah.

Q.    And in -- you agreed with me that you've been retained as an expert witness in more than 60 cases, at least more than 60 cases that have been listed in your materials in this case.

A.    I think the 58 is testifying.  And then you added those four.  So maybe, you know, let's say 50-plus.

Q.    Okay.

A.    Let's use your 58 number I'm comfortable with.

Q.    Okay.  And in those 58 cases, is it fair to say that you've likely made more than $10 million?

A.    I've not added it up.  And I would not want -- I would be speculating.  But, I mean, over -- again, I think the first case -- let's

20260513_123-000000018

just go back.

Q. Yeah.

A. I believe the first case, if I'm right, on that list was Neurontin which I think is 2008, 2009, if I'm right. So the heading may be wrong.

So this is probably closer -- if it's 2008 to 2026 -- somebody help me, that's -- do my math. That's 18 years; is that fair?

Q. Yeah.

A. So over the 18 years, you have 50 cases. And, again, you can't do this, but if you -- so over the last 20 years, the number is significant.

I'm not going to disagree that there are millions -- that I've made millions, but I don't know whether 10 million -- I don't know what the number is.

Q. Okay. In this case, your fees have been almost $500,000 up until the time that you're being deposed. Is that an average amount for your services across the different cases that you

testify in, or is it more or less than
the average?

A.    I think I --

MS. AMINOLROAYA:  Object
to form.

THE WITNESS:  Yeah.  I
mean, so, I don't think you can
take this as the average.  This
report is 262 pages, not
including appendices, not
including -- I mean, you can see
the material is vast.

I couldn't do -- I mean,
you know, I couldn't do this
in -- this has been very
comprehensive.

BY MR. BROWN:

Q.    Yeah.

A.    I think it's fair to say
that this was a very comprehensive
report.  The fact that you raised a
materials considered list, whether it's
90 pages or 2,000 pages, this is -- this
is a deep dive.

So this is -- I mean, there

have been several extensive cases, right.  But, yes, the vast -- average case is not like this.

Q.    Would you agree with me that serving as an expert witness has been your primary source of income over the last 12 or so years?

A.    No.

Q.    It's not?

A.    I've written books that have been on the New York Times bestseller list.  I've been private -- I've been a senior advisor to TPG.  I have academic.  I have multiple streams of income.

Q.    Approximately how many lawsuits are you working on at the present time?

A.    Let me think.  I think there are two matters.  There's one sort of minor matter.  Yeah, I think right now, I think, I'm working on two matters.

Q.    Okay.

A.    And I think there's one

other minor matter that I'm testifying.

Q.    I don't want to know about matters that you've only been retained as a consultant.  But as far as cases where you are a testifying expert, what are those other cases today?

MS. AMINOLROAYA:  And, Dr. Kessler, I think you understand the question, but you should not disclose any case where you haven't served an expert report.

THE WITNESS:  Thanks, Counsel.

So as of today, I'm just trying to think.  Right now I am involved -- well, I've been involved in talc litigation, right.  And I -- I think it's fair talc litigation is active, and there's one matter that I'm testifying just briefly for an hour in a couple of weeks.

There are cases that I've been deposed in, in the past, or

I've testified in the past, and I don't -- I have no idea what the future actually holds.

BY MR. BROWN:

Q.    Okay.

A.    And there may be a matter that's under -- that falls into --

Q.    I see.

A.    -- counsel's suggestion not to raise that I've not been disclosed.

Q.    I see.  And to the best of your knowledge, are the cases that you are a testifying expert in, listed in the materials that you submitted in this case?

A.    I'm sorry?

Q.    Are they listed in the list of 58 cases?

A.    Yeah, there's nothing -- there shouldn't be anything -- except there's maybe one matter I've not been disclosed, that I don't think has come to disclosure.

Or actually I think everything -- I think I probably have

been disclosed in everything.  You should have everything.

Q.    Let's go back to the record in this case, Dr. Kessler.

I know there's many -- many different medical terms in your expert report.  Is that fair to say?

A.    Sure.

Q.    I'm going to ask you to define some of them for me as best you can.  Okay?

A.    As far as medical terms?

Q.    Yes.  Yeah.

A.    Okay.

Q.    What is gastroparesis?

A.    You want the Camilleri definition, or you want the -- whose definition do you want?

Q.    Well, the definition that you accept.

A.    Yeah.  So that -- that's a -- it's a thoughtful question.  And even I've learned over the time, in, you know, talking to people who conduct that question.

If you -- so I would have said, right, being more of a generalist in this, not spending my life just on gastroparesis as some people have, that impaired gastric emptying, right, would have been a definition.  That's what I had accepted, right.

I think that if you look at -- there's two clinical guidelines, I believe, I mean, on gastroparesis, that gastroenterologists would look at.  I think they would go to impaired gastric emptying plus symptoms, right, is the way they would define gastro -- delayed gastric emptying plus symptoms.

I think that Camilleri and that group, I mean, again, who have published extensively and who have studied this, they have certain laboratory standards, whether it's 100 TIT one-half rate retention at, I think -- is it -- 175 minutes or 150 minutes with symptoms.  Right.

I think the injury in this matter, I would define as drug-induced,

impaired gastric emptying, consistent with the symptoms of gastroparesis.

I mean, so there are multiple -- there's a lot of nuance in the answer to your -- to your question. I'll stop there.

Q.   What is delayed gastric emptying?

A.   I think the -- I mean, it's basically -- delayed gastric emptying is the failure to pass -- there are certain standard deviations of -- pass food through the stomach that results in feelings of nausea, bloating, vomiting, due to certain effects on the pathophysiology of motility mechanisms of the gastric tract.

Q.   To the best of your knowledge, how is gastroparesis diagnosed?

A.   Depends who you -- who you ask and whose laboratories and what the standards are.  Right.  I mean, I can -- I want to pull up -- I think each of the studies, I pull up the consensus

guidelines.

I'm going to, as I said, you know, on the matter of the precise -- I mean, to me it's impaired gastric emptying -- for the space --

For the court I think -- I think we've -- you said delayed gastric emptying? What was the last question you asked? Not gastroparesis -- or did you ask gastroparesis or did you ask delayed gastric emptying in your last question?

Q. I asked how gastroparesis is diagnosed.

A. Yeah. Again, there are -- there's laboratory measurements of scintigraphy plus symptoms, I think, is the general way to diagnose that.

Q. What is gastrointestinal hypomotility?

A. So I think there are -- that refers both to delayed gastric emptying and decreases in intestinal motility. Obviously different physiological mechanisms depending on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

where we are in the myotatic plexus, et cetera, which is involved.  But there's delays in the normal transit of food in the GI tract.

Q.    What is ileus?

A.    Ileus is the condition where -- I mean, in the -- in the intestines, where there's a decrease in peristalsis that does not move contents through the GI tract.

Q.    What is intestinal obstruction?

A.    Well, again, I think that gets to the central matter in this case. Right.

Intestinal obstruction is when, for a period of time, there is something that is apparent that movement of -- depending on where we are in the GI tract -- of contents, there's something that is impairing that -- that movement and obstructing that movement that can be both external complications that are impinging on the GI tract or can be associated with the GI tract

itself.

So you can have a tumor, you can have a volvulus.  You can have an exception that impinges on -- you can have a tumor, volvulus, or you can have a mechanical force.

You can have decreased intestinal motility that leads to severe constipation and where you can have stool that's obstructing the GI tract that gives rise.

I think that -- so you can have -- there's a world of functional intestinal obstruction, and mechanical intestinal obstruction, and then you can get into, you know, certain bezoars, et cetera, phytobezoars, where is that functional or is that mechanical.  And I think that's where people got confused over the years here.

MS. AMINOLROAYA:  We've been going a little over an hour here.  I don't want to interrupt your flow.  Whenever you're at a good stopping point.

MR. BROWN: Yeah. Can we go for five or ten more minutes, or do you want to -- would you rather stop? You tell me.

MS. AMINOLROAYA: We can go for five minutes.

MR. BROWN: You okay? Okay. If you need to stop, tell me.

MS. AMINOLROAYA: Sure. No, yeah, that will be later.

BY MR. BROWN:

Q. Okay. So you just made a distinction between functional and mechanical, Dr. Kessler.

What is relevant to you here in this case?

A. I think -- again, I think the literature has those words. It's not my use of those words. I think -- I think what is relevant here is -- what I see here is we know that the mechanism -- a significant part of the mechanism of action of these drugs involve motility, both gastric and

intestinal, through the gut-brain access.  That is the mechanism of action.

Whenever you have powerful agents that affect motility, both gastric and intestinal, you're going to slow down movements to -- there's great variability, right.  I mean, there is a spectrum of -- so just if you do the -- you sit back and you think, and say, okay, I'm going to slow down movement of food in the gastric -- gastrointestinal tract, right.  I mean, I can tell you what the -- I can -- I can theorize, right, and I can look at what the symptoms and conditions are, right.

So, I mean, if you have -- and those symptoms, if I delay food in the -- I mean these drugs work in significant part by delayed gastric emptying, which induces nausea, which is -- and NTS, the area of the brain -- the delayed gastric emptying through vagal afferents, right, you know, that affect appetite.

And it may affect reward. It is part of the verse of circuits in the brain we are designed with. The reason that people don't want to eat is because we trigger the aversive circuits of the brain, we make people -- we push people, you know, toward that aversive circuit. We increase, you know, that spectrum of, you know, satiety, fullness, Thanksgiving fullness.

I'm sick, I'm now -- you know, I mean, we've all experienced these in various conditions, whether you get flu or you get food poisoning. So by titrating the dose, you're able to push people along that spectrum. And there's great variability.

There are people -- but -- so you get nausea, meaning, you can get bloating. You can get those symptoms, if I just keep food in the gastric -- in the stomach.

And you can, for a number of reasons, okay, when you slow intestinal motility, when you have

20260513_123-000000018

weight loss, you can -- you're going to decrease movement through the small bowel and through the colon, and you're going to get a range of constipation, right, or a range of delayed, you know, accumulation of food contents that can obstruct the GI tract.

So if you just think for a second, and say, hey, I'm going to -- I'm going to have a drug that works by slowing motility, you could predict you're going to get a range of symptoms, I think, right, that it's going to be from nausea, that bloating, to obstruction of the -- you know, severe constipation.  Severe constipation.  We all tend to think constipation, that's everyday life.  But I've actually seen people die of constipation, right, through intestinal obstruction.  It can be serious, there can be obstruction.

And I think what you're seeing is in that range of that spectrum, that hypomotility.  You would expect to get a range of these

conditions from -- everything from, you know, mild nausea to severe nausea, to intestinal obstruction.  I think that's the essence.

And in fact, that's what I think the record shows.

MR. BROWN:  I think we took our five minutes on that question and answer, so let's just take a break.

MS. AMINOLROAYA:  Sounds good.

THE VIDEOGRAPHER:  Off the record at 10:23.

(Short break.)

THE VIDEOGRAPHER:  Back on the record at 10:43.

BY MR. BROWN:

Q.    Dr. Kessler, before the break, we were talking about functional and mechanical obstruction.  Do you recall that?

A.    Yes.

Q.    Is functional obstruction another term for ileus?

A.    You in theory --
Wittgensteinian philosophy?  You're
dancing on heads of pins.  It's going to
depend on who you ask and what people
understand at different points in time.

Q.    And is that true for the
distinction between ileus and intestinal
obstruction?

A.    No.  I think intestinal
obstruction is different than ileus.  I
think that if I suspect an intestinal
obstruction, and I'm the ER doc, I'm
going to mobilize a degree of resources
that are much more extensive, right.

I think you're dealing with
a potentially emergent -- I mean, you're
dealing with a medical emergency because
you're worried about, you know,
perforation and sepsis and potentially
even death.

So, and I think that's
the -- that is the -- I mean, I think
that's the complexity here that should
have been anticipated, right.  When you
interfere with that pathophysiological

Case 3:24-md-03094-KSM   Document 691-26   CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26

mechanism, you could end up with something that is a real medical emergency. And you can have certain things that -- I don't want to use -- well, seem like -- I don't want to use the word "masquerade." It's almost a medical -- things that -- things seem -- I think if you present on -- to an ER with the symptoms of intestinal obstruction, you're going to mobilize the surgeons. You're going to say, you know, am I taking this patient to the OR, is this going to resolve, what's the -- you know, I mean, because you're worried about perforation.

So, because this -- these are drug-induced symptoms and adverse reactions, you know, they -- they are -- again, there's drug-induced ileus. There's drug-induced function -- the kind of functional -- I don't think we've quite -- I don't want to speak for the gastroenterologist.

I don't think we've quite seen the degree of functional intestinal

obstruction that could lead -- that could be severe constipation, it could be food contents, undigested food contents, the result of the change in pathophysiology that are leading to that picture of obstruction, right.

But it's not -- in some ways it's the same as, you know, we've seen in the past, but it's different because it's drug induced.

Q.    Clinically, what distinguishes ileus from intestinal obstruction?

A.    So ileus doesn't -- ileus does not mean that there's a blockage, right.  Intestinal obstruction, there is a blockage.  Something is not passing, and you're going to -- I mean, the risk of -- when there's obstruction, you're dealing with potential necrosis and perforation and sepsis.

Q.    Throughout your report you use the term "gastrointestinal motility-related adverse events"; is that right?

A.    Yes.

Q.    Okay.  How do you define a gastrointestinal motility-related adverse event?

A.    Yeah, I think that that's -- I mean, there's a whole subspecialty of gastroenterologists that deal with motility, I mean, in different parts of the intestinal tract.

I am dealing -- well, I think that in this context, we are talking about the drug-induced effects on the contractility of both the stomach and the intestine that leads to the range of symptoms that I identify in this report.

It's a direct -- it's a direct effect on the motility mechanisms of the GI tract.

Q.    Where did the phrase "gastrointestinal motility-related adverse event" come from?

A.    In my report?

Q.    Yes.

A.    I mean, it was a -- well,

20260513_123-000000018

where did it come from?  I mean, I wrote that.  But I wrote that in light of the mechanism of action of the GLP-1s that are both gastric and intestinal.  It was to summarize the mechanism of action, I mean, of the -- I think there's no question that these drugs reduce both gastric and intestinal motility, and it's meant to summarize the composite of the effects of the GL-1 receptor, I mean, with the -- I mean, again, with the gut-brain access.  It's the net result of that.

I mean, I -- it's certainly been -- I've been to umpteen medical meetings and conferences on GLP-1 drugs, on obesity, and it's a term that is used.

Q.    So, in the record that you've reviewed, have you seen anyone else use the term "gastrointestinal motility-related adverse events," whether that be a regulatory, scientific, or medical body of any kind?

**Redacted - Confidential**

# Redacted - Confidential

20260513_123-000000018

# Redacted - Confidential

Q.    Is there a validated composite endpoint, to the best of your knowledge, that's known as gastrointestinal motility-related adverse events?

A.    Validated by whom?

Q.    By any medical or scientific body.

A.    Well, you certainly -- you see -- you see composites used. Crisafulli used it, Lilly used it in its clinical trials. I mean, I think they use atonic hypomotility, we can pull it, as an endpoint in its clinical trials. So they've used that. Crisafulli used it. But I've seen -- Lilly has used it.

Q.    Well, on Footnote 182 of your expert report, you can take a look at that, if you need to.

A.    What paragraph, please?

Q.    I believe it's Page 79 of your expert report.

A.    Right.

Q.    So you refer to severe gastrointestinal motility-related adverse events, and then you list, you know, 15 or more different clinical outcomes as part of that definition.

Do you see that?

A.    Correct.

Q.    Are you aware of any researchers that have lumped together all of these clinical outcomes into a single endpoint called severe gastrointestinal motility-related adverse events or anything similar?

A.    So, in preparation of this report, I mean, I think if you go to -- if you go to GI textbooks, you'll find these are all symptoms that can be associated, if you search hypomotility,

that can be related.  Right.

So I think you can find this -- let me just finish the -- none of these terms are surprising.  They all can be related to hypomotility.

I specifically, in preparation of this report -- I mean, I am aware, you know, in obesity medicine, and just -- that all these terms can be related to hypomotility-related symptoms.

But I -- I also consulted with -- I mean, through counsel -- one of the GI experts and asked to confirm my understanding that all these can be related to the GI hypomotility-related adverse events.

Q.    Which GI expert are you talking about?

A.    Dr. John.  I had a conversation specifically with -- that's why I gave Madigan those two separate endpoints.  And I -- but I went to the gastroenterologist to confirm my understanding.  And my -- there isn't

20260513_123-000000018

much controversy.  These are -- these are related -- these are all acknowledged as related to hypomotility.

Q.    Such that you could lump them together into a single composite endpoint?

A.    Well, I've -- sure.  I mean, if you want to -- if you're looking for -- if you have a drug -- if you have a receptor, right, that goes throughout the GI tract that affects motility, and you go to the literature and you say, what are those things that are consistent with reduction in motility, just think for a second, right, what -- what could occur if you're messing around with those receptors that affect motility.

I mean, I don't think this is very controversial at all.  These are all -- these symptoms are standard bread-and-butter effects of motility that I think every gastroenterologist would tell you could occur if you're -- if you're interfering with motility of

the GI tract.

Q. In the peer reviewed epidemiology that you reviewed in this case, did you find that any researchers listed -- lumped all these conditions together in a single endpoint to evaluate the effects of the medications?

A. Yeah, so -- what I think you see is Crisafulli -- we can pull that up -- has his -- has a composite of hypomotility disorders. I think there was severe constipation. Let me -- let me pull it to be exact.

You can look up the definition literally used when they talk about atonic motility. Again, I think this is -- you know, this -- this is not complicated.

Q. Nope.

A. This is very simple. If you just say -- if you just think for a second, I'm going to interfere with motility of the GI tract, through the GI receptors, what could occur. All these are well-known symptoms of effects on

intestinal motility.  And I'm struck that, you know, people didn't recognize it.  It took a decade to actually get there.

And I think, you know, that's why the label today includes this range of conditions.

Q.    Where in the peer reviewed medical literature can I find a single GI composite endpoint that lumps together the 15 or more GI outcomes that you have listed in Footnote 182?

A.    Well, you can look at any textbook of GI -- look at any aspect of GI motility.  Those are symptoms that are all associated.

Q.    My question, Dr. Kessler, is, is that a valid endpoint to study in any of the clinical research that you're available -- aware of?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  If you're looking for -- if you're mucking around with the motility of the

GI tract, you want to anticipate that.  It is -- it could not be more simple than that.

I mean, and I think, to be honest, it's the failed recognition of something as simple as this, right, that, I mean, if you're -- if you're waiting for a validated endpoint to warn of a -- of symptoms, then we have a missed opportunity for a number of years.  And, you know, you're finally recognizing that these symptoms can occur and it's on the label.

BY MR. BROWN:

Q.    What is a composite endpoint?

A.    Composite endpoint -- composite is just a collection of symptoms.

Q.    And what is a validated composite endpoint?

A.    Validated, it depends on

whose definition of -- of validation.

Once you have mechanism of action, right, and you have -- does it make -- again, people will have different definitions.  Engineers will have different definitions.  Different biostatisticians will have different definitions.

I think once you deal with the mechanism of action, the biological plausibility, none of this -- I mean, all this is is 100 percent consistent with the biological plausibility.  So it is validated, I will tell you, based on the biological plausibility, that this is not a composite that I -- you know, I dreamt up at all.

That is, if you asked yourself what's the mechanism of action, and you know the mechanism of action and you look for the symptoms, and affected the mechanism of action, all these symptoms are associated.  So I think this is validated by the biological mechanism.

Q.    So what I've tried to determine is if you are aware of any peer reviewed studies that have lumped together the conditions you have listed in Footnote 182 as a single composite endpoint to study the effects of any exposure?

A.    So, again, please understand, I didn't pick these, right. I mean, I picked these off your 2025 label.

Okay.  So the first endpoint that I used was the label of your company in 2025.  So I didn't -- it's not that I picked random symptoms. I picked the symptoms that are on the label and say, I mean, are -- we know the mechanism of action.  We know the symptoms that Novo has currently listed, right.  So I didn't -- this isn't -- this isn't a collection that I made. This is your own company's collection of symptoms.

Q.    Well, nausea, vomiting, abdominal pain, and constipation are all

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

nonspecific symptoms; isn't that true?

A.    That's a general vague question.

Q.    Well, you can have nausea, vomiting, abdominal pain, and constipation as a result of things other than gastric motility problems; isn't that true?

A.    There are other -- there are other toxins that can also cause those symptoms.  Those are all symptoms can be the result of motility disturbances.

Q.    They can all be associated with things other than hypomotility; isn't that -- is that correct?

A.    I'm not sure that you're going to vomit if you don't -- you're going to require certain motility effects on the GI musculature that are going to affect -- I mean, they are going to go through in part that motility.

The effect -- well, not necessarily the result of GLP RA

receptors.  But I think if you're going to vomit, you're going to have certain motility of the GI tract and through that mechanism.

Q.    In your opinion, Dr. Kessler, are all the conditions in Footnote 182 caused by gastrointestinal dysmotility?

A.    They can be.  I mean, it's not just -- again, I think they can be -- I've talked -- again, I note in my report, I went out to confirm that with gastrointestinal expertise.

Q.    And many of these conditions can be caused by other things besides gastrointestinal dysmotility; isn't that right?

A.    Yeah, so, again, I think this is the yes and no.

I mean, I think that they can be caused by that, but what you have is -- and I think this is where Novo got confused, right.  I mean, for example, define constipation as a confounder, right.  I mean, if you go look, that was

20260513_123-000000018

David A. Kessler, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the mistake, right.  It wasn't the confounder.  Constipation could be caused by the drug and that constipation can cause intestinal obstruction.  And the drug can cause both constipation and intestinal obstruction.

**Redacted - Confidential**

You can be -- you can be both, you know, there are individual causes and then certain things can cause that.

Q.    I believe you said a moment ago that Footnote 182 is the list of conditions that you provided to Dr. Madigan for his analysis; is that right?

A.    Well, I'm not sure which footnote.  I think I'm very specific on what -- there are two endpoints I did. I'd have to just match footnotes.  I was very specific in what conditions in the two endpoints.

20260513_123-000000018

One was just straight off the label, and one was a set of conditions that I've -- that I asked GI expertise to confirm was a little broader. So both were given to Madigan.

Q. Okay. So step back for a second and tell me what information you provided to Dr. Madigan and why.

A. I provided two sets of endpoints and asked him to look.

I took the conditions -- let me just go to that. If someone can tell me the actual paragraph where I say it, I'll be -- let me just find that. It's well laid out.

Q. I think it's Section 3.1 of your expert report. I don't have the page number.

A. If someone can just give me the exact paragraph --

MS. AMINOLROAYA: Paragraph 415.

THE WITNESS: 415, thanks. I apologize. I just want to -- I can search for it. But I want

20260513_123-000000018

to make sure that I'm there.

Okay.  So this is very specific.

So I took terms off the label, off Section 5 and 6, off the October 14, 2025, label.  I didn't make these terms up.  And I asked him whether these terms -- I gave him those terms as an endpoint straight off the label, company designated terms.  I didn't pick them.

BY MR. BROWN:

Q.    But you chose to combine those terms clinically and you asked Dr. Madigan to use that composite.  Am I right about that?

A.    For one of the factors, maybe one of the -- the analysis, right.

I mean, it's -- that -- there was one thing I did, again, using the company's -- others have used -- again, we've talked in the literature of other composites.

But I chose Novo's use of

the terms in Section 5 and 6 in the label.

Q.    But you chose to lump them together for Dr. Madigan to analyze?

A.    I just gave -- I gave him those terms.

Q.    And they were, in fact, lumped together for purposes of Dr. Madigan's analysis?

A.    Among other things. Because they are all -- they are all -- they are all symptoms associated with hypomotility.

I mean, again, they all have a biological ancestor. There is a biological cause that's well established and well validated, that cause all these. There's no question about that.

Q.    Okay. Now, the second -- you made reference to the second factor. What are you talking about?

A.    Second factor is 415.2, which is just a different set of preferred terms, right. And those are a little more expansive. Again, all are

well established symptoms and conditions associated with hypomotility, right, and, again, associated with the biological mechanism of the drug.

It's well established that all these things can be, and, in fact, I think the evidence shows that all these things are, in fact, related to the drug and are all in -- you know, you're seeing adverse events, I think, with all of these.

And again, I just -- I also ran this by, you know, Dr. John, that all these could be expected with a drug that causes gastrointestinal motility-related conditions.  And I don't think there's any disagreement to that.

Q.    Did Dr. John approve of lumping all of these different medical outcomes together to study the effect of these medications?

A.    He said it made enormous sense.  And there was no controversy, I mean, in -- you can get into -- there

are a couple of conditions, I think we talked about.

You know, you can -- you know, when you look at searching preferred terms, because that's what this is, whether GE reflux should be included or not.  That wasn't on the label, right.  So I asked for expertise in that area in coming up with that.

Q.    I'll confess, I've seen many clinical trials where researchers lump together different medical outcomes, particularly clotting mechanisms, and in the cardiovascular community I've seen that used quite frequently.

In all the research that you've cited in your expert report, I haven't seen any clinical researchers or epidemiologists do anything like what you asked Dr. Madigan to do in terms of lumping together all these medical outcomes in a single endpoint.

A.    Yeah.

MS. AMINOLROAYA:

20260513_123-000000018

Objection to the form of the question.

THE WITNESS:  So, again, I hear you exactly.

I think if you saw your -- again, you have redacted certain composites by Lilly, whatever they're called, atonic hypomotility.  Your MedDRA terms by definition.

One of the -- one of the complexities of this was that the MedDRA terms were broken out into different high groupings where they were done before GLP -- the mechanism of GLP-1s. Right.

If you today said, okay, what is the mechanism of action of the GLP-1s, you would put together a high-level group term that had all of them together. They are now split over two high -- high-level group terms. And that's why the epidemiology

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

is so, you know, complex and gets such different results, because your high-level terms weren't designed with the GLP-1 receptor agonist.

I'm absolutely, you know, Counsel, just so you know, I am absolutely -- the one thing I know is we know how these -- we know these drugs work on certain receptors. We know these receptors are -- affect motility.

We -- I can assure you here, right, that, again, there may be some -- whether it's GE reflux or one or two of these which I didn't include and you can argue, these are all related to motility. All you had to do was think about this and you would get this -- I mean, you would see the effect on the GI tract.

BY MR. BROWN:

Q.    When the Food and Drug Administration evaluated whether the GLP-1 RA medications may be causally related to ileus or intestinal obstruction, did they use a composite endpoint?

A.    We can -- let's -- we'd have to pull up the pharmacovigilance review in 2022.

I think -- I mean, there are sentences in there -- I mean, again, we need to pull it -- talks -- they talk about the range of symptoms that can be associated with those conditions.  So they certainly look at those -- those conditions -- I mean, they look at those symptoms as a composite, I believe, I mean, at certain points in that document.

Q.    Is it true that a GLP-1 RA user can have GI adverse symptoms without delayed gastric emptying because of the effect of the medication on the central nervous system and the brain?

A.    Yeah.  And that "yeah" was

not meant -- that was a -- so I've studied this for several -- extensively.

I think you can -- I think I was very careful in this.  But I think -- you know, I think this is -- to point out these GI symptoms are the result of a gut-brain axis.  I think the majority of the effects on delayed gastric emptying -- these drugs don't -- I know some of my colleagues would love to, you know, say there's some magic to these drugs, they work on some areas of the brain that decrease appetite.

The reality is there's a complex gastrointestinal-CNS interaction.  So delayed gastric emptying itself, you know, is probably vaguely remediated.  Much of the nausea is through the area postrema.  These are all gut-brain interactions.

So your -- the effect on one is the effect on both.

So I don't -- so your question is, can you have -- which one, you're saying just -- just the brain is

working?  This is the result of the interaction of the stomach and the brain together.

I don't think you can -- you're not going to get -- I think that's -- I mean, in my opinion is that it's the result of the interaction of the gut-brain axis.  It's not one or the other.

Q.    Based on the data, you don't believe that GI symptoms can occur as a result of CNS effects independent of any effects on gastric emptying?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  With these drugs or --

BY MR. BROWN:

Q.    Yes.

A.    -- are you talking about with other toxins?

Q.    With these -- with these medications?

A.    No.  I think if you talk to Matt Hayes, you talk to the people

who've studied this, who are the real experts on motility, this is -- this is not -- this is -- the area postrema, the NTS, work through this complex interaction of the gut-brain interaction.

I don't think it's just the brain. I think these drugs are -- I think a primary mechanism, not the only mechanism, is delayed gastric intestinal motility. That's why these drugs -- I mean, I mean, there's some question, okay. And I think that's great controversy about this, whether these drugs actually will make it up to the ventral -- VTM areas in the mesolimbic dopaminergic system.

I think that these are all -- there's not solid evidence that, you know, they work. You know, they don't cross the blood-brain barrier, except where the blood-brain barrier really leaks. And there's an effect on the area postrema.

I know there's some binding

studies that show affect on hypothalamus. But I think when you study this, you see these drugs are getting in through the leaky areas and it's a complex interaction.

And I think that the -- I think that the people who really understand the pulse of these worlds, who were involved in the development of this, understand that if you look at the delayed gastric glucose effects, I mean, the appetite effects, I think we understand these complex -- getting to understand, this is the result of both GI and brain together. That if you -- any fence that it's one versus the other is probably inaccurate.

Q.    So is it fair to say you do not believe that various of these GI outcomes can be caused by one of these mechanisms as opposed to the other?

MS. AMINOLROAYA:  Object to form.  Vague.

THE WITNESS:  I think I -- I think I just -- I think you

20260513_123-000000018

get that I think it's a gut-brain axis.

When we talk about nausea, we're talking about both.  When we talk about vomiting, we're talking about both.  Yes, your -- I mean, these drugs trigger the vomit center of the brain.  But the vomit center of the brain is the result, I mean, of those vagal afferents.

We know there's GL receptors in both the periphery and central.  And we know there's communication with the --

THE VIDEOGRAPHER:  Sorry, Doctor.  Just make sure you line up with the tape there.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  No, sir.  Move an inch to your right.

THE WITNESS:  Sorry.

BY MR. BROWN:

Q.    So if you could just refer back to, on Footnote 182, for a second, Dr. Kessler.  You refer to these events in the aggregate as severe gastrointestinal motility-related adverse events.

Do you see that?

A.    Right.

Q.    To your mind, what distinguishes a severe outcome from a nonsevere outcome?

A.    There is regulatory definitions.  And we can -- we can pull -- they're severe, they are serious.  I'd want to pull the guidances up.

I think, in general, let's for the moment -- FDA -- FDA differentiates, but then we're getting into the weeds, serious versus severe.

But in the common sense, anything that can, one, lead to hospitalization, or a medical intervention, would be that you would have to do something about, I think is

the general definition of -- severe has to do -- yes, you can have severe that's not serious.  FDA makes that distinction.

But, again, that's relatively nuanced.  I think for most of the purposes, I'll -- I think you can use serious and severe.  I mean, you can have severe pain that is not serious, for example.

And serious is generally defined as may require medical intervention.

Q.    Put serious aside for a second.  Is it your understanding that the term "severe" is defined by regulatory standards?

A.    Yes.  I mean, there is, again, relatively -- there are guidances on -- that talk about severe and intensity of symptoms and distinguishes that.  But I think for -- I mean, we don't have to -- we don't have to dispose of the ordinary meanings of those terms.

I'm using that as something that is not ordinary also.

Q. Dr. Kessler, how long have you known that the effects of GLP-1 RA medications could cause GI effects that lead to hospitalization or medical intervention?

A. I don't remember the day I -- that -- where I -- where I knew that.

Q. Well, you've -- being board certified on the topic of obesity and as a public health scientist who has studied these drugs, how long have you known that the effects of GLP-1 medications could cause GI effects that could lead to hospitalization or medical intervention?

A. Yeah, I mean, we -- I could think through that in my head.

It's -- the answer is immaterial for the reasons I'm here, because what I knew or what a doctor knows is not what the regulatory standard is. And I think that's the

important point.

I mean, what doctors know is maybe interesting to certain people, and I don't want to minimize that.  But that's not the regulatory standard or by which I issued my opinions.

I -- the issue is what had to be in the warnings and what had to inform doctors.

Q.   You -- you've known, since GLP-1 medications have come to market, that they could be associated with GI effects that could lead to hospitalization or medical intervention in some patients; isn't that true?

MS. AMINOLROAYA:  Object to form.  Assumes facts.

THE WITNESS:  So, first of all, please don't assume what I knew, right.  I mean, I don't think you meant that.  But I -- but -- in any means.

I think that that -- I mean, I've sat in enough medical meetings and conferences, and

the usual mantra by clinical investigators that are paid -- that have received funding, the general terminology that are used, I mean, just in sitting in those audiences, and we can go back to how long I've sat in those audiences, is, certainly for the last several years, was that the GI symptoms are mild to moderate.  And tachyphylaxis. If you go to a medical meeting, that is what is said.

Okay.  I have not heard, and I've been to multiple medical meetings, by multiple medical investigators, that have said, in fact, in discussing the safety profile of the drug, and there's people who get up and talk about the efficacy profile, and they split it up, and, you know, when the company presents, the efficacy, the safety, the risk/benefit, right.

I have not heard anybody get up and say, hey, this drug is going to -- can -- you're going to tell people this drug is going to -- are going to end up in the hospital with GI symptoms.  I never heard that.

Everyone from the company says it's mild to moderate. Yeah, they may -- they may add, in most cases -- if you go back and look at the transcript, in most cases, the tachyphylaxis at X weeks, that it gets -- it's only at dose escalation, sure, there are -- there will be presentations about pancreatitis, there will be presentations about, let's see, pancreatitis.  There may be presentations about cholecystitis.  Right.  And trying to think about the safety proposed.

No one has gotten up and

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 116 of 326

said, hey, this drug can land you in the hospital with intestinal obstruction, you've got to be careful about that, because severe constipation can be serious.  I have not heard that.

So -- and if I've not heard that, and I've been paying attention, writing in the area and studying it, I can assure you that the average doctor doesn't know that.

BY MR. BROWN:

Q.    Well, you mentioned a minute ago that you weren't speaking to what average doctors know, and you were focusing on the regulatory standards.

A.    Right.  But you just -- you asked me a question to which I'm --

Q.    Okay.

A.    -- you asked me a question directly on it.

Q.    Fair enough.

A.    And I think -- so I'm

20260513_123-000000018

answering your question.

Again, what doctors know is not what --

Q.    Okay.

A.    -- that's not a factor in assessing whether something should be a Section 5 or a Section 6 warning.

I think we can probably agree that what doctors know, right, I mean, there is -- there is an arcane provision that you can ask a waiver from Section 5 or 6, if you petition the commissioner because something is so widely known.

But that was not done here. And that's -- I have not seen that ever done, to be honest.

Q.    Yep.  But the labeling that you're talking about, which is created pursuant to regulatory standards is meant for prescribing doctors, right?

A.    Yeah.  And fail to warn about things that are serious intestinal obstruction, and that -- I mean, it wasn't until 2025 when both companies

finally put that fecal impaction can lead to intestinal obstruction and that was a mistake.

Q.    What other severe outcomes besides intestinal obstruction do you believe should have been warned about earlier?

A.    I think my report is very -- we can go through exactly what I think is -- I think that earlier compared to what -- well, we know that ileus should have been warned before 2022 when FDA required that.

I think that the Section 5 warning, correct me if -- we have to look at it.  Is it delayed gastric emptying, or impaired gastric emptying leading to pulmonary aspiration?  I mean, that is also Section 5, warnings.

So I think it's -- my -- the only reason I'm here, I think -- the overall point is, these drugs can result in severe GI events, can end up in the hospital.  You have to be aware of them.  You can have fecal

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

impaction leading to -- or certain undigested food, certain phytobezoars, leading to intestinal obstruction, as well as consequences of impaired gastric. That's my -- that's the sum and substance of my opinion.

Q. You have mentioned that you have gone to various medical meetings. Could you elaborate on that and tell me what medical meetings you're talking about?

A. I've probably been to two dozen over the last several years. I have been -- I'm happy to -- let me just -- I don't have a list, I didn't prepare a list.

But I can tell you on -- I have been to medical meetings in Korea. I've been to medical meetings -- I've been to -- I've either attended, in person or virtually, the European Society of -- the European Congress on Obesity. I've dealt -- the European Association For the Study of Diabetes. I've done the European -- ESC meetings.

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

The cardiology -- I'm talking -- anything -- any of the key meetings, because these GLP drugs are used in the intersection of cardiac, obesity, and diabetes, I've been to the cardiology -- I've been to the cardiology, obesity meetings and diabetes, both in Europe and in this country.

I'm not saying that I've been to absolutely every one, but I have --

Q.    And at those meetings, are the presenters researchers who regularly prescribe the medications?

A.    They are a range of -- I mean, I have -- I mean, I have friends and colleagues that I've talked to that will have done the clinical trials, that were involved in the discovery of these medicines, and are the ones that are active prescribers.

So I have the full range. I've heard from -- from all those doctors.

Q.    And do they describe the

range of experiences that they've observed with their patients?

A.    Yeah.  And the company -- when there are people who -- what is striking here, okay, again, no -- nothing wrong with this, right.

What I find -- I mean, there is not a doc -- that is an overstatement, because there are, there are a few.  But they are far between where they haven't received funding from Novo.  Novo has paid an enormous number of docs at these meetings.

Q.    How do you know that?

A.    They disclose -- there's disclosure on the -- and I am struck, and I've even raised at the obesity medicine associations, that everybody is talking about these are funded.  I mean, I -- that's not true when I use everybody.  I mean, I will find -- you know, and again, there's nothing wrong with that, right.

But that means that in general, you can -- you know when to

talk -- when you listen to these talks, when the slides have been vetted by the company. And when the doc is just talking from their clinical experience and independent of the company.

And, again, these docs are good docs. I'm not -- I'm not questioning their integrity or anything else like that.

But the mantra that's used with these drugs is the GI symptoms are mild -- in most cases are mild to moderate and tachyphylaxis.

Q. When did you learn for the first time that the GI effects of the GLP-1 RA medications could include serious GI outcomes or -- serious or severe?

A. So you're asking outside of the record?

Q. Yeah.

A. Outside of my --

Q. Yeah. When --

A. When did I actually --

Q. Yeah. Let me restate it.

Let me restate it.

Dr. Kessler, when did you learn for the first time that the GI effects of the GLP-1 RA medications could include some patients who experience severe GI outcomes?

MS. AMINOLROAYA: Object to form. Asked and answered.

THE WITNESS: So there are -- there were -- and I have a notebook, I think, with them.

I certainly became aware -- there was the rare abstract when you go to a meeting, right. If you go -- if you go hunt for it, not in the overall presentation, but you go -- you go -- sometimes there are abstracts and posters that are presented at these meetings where I may have seen a poster or an abstract or a case report in the literature.

That's -- that's when -- I mean, it was through those case

reports and abstracts and posters, I mean, that were presented.  But that's my going, walking around, you know, there's a thousand posters where I see the poster.  That's probably where I learned about this.

BY MR. BROWN:

Q.    Okay.

A.    I can't tell you exactly where --

Q.    Isn't it true that the labeling for Novo's GLP-1 RA medications has always made reference to the possibility that some patients could experience a severe GI outcome while using the medication?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Could someone just do me a favor?  I have sheets called Set 1 labeled -- could someone just get me that?

20260513_123-000000018

                    They are here.  I just
          want to get -- can I just grab
          this for a second?  I'm sorry, I
          apologize for being off camera.
                    Can you ask the question
          again once?
BY MR. BROWN:
          Q.    Yeah.
                    So Ozempic came to market
in 2017; is that right?
          A.    Correct.
          Q.    Okay.  And isn't it true
that the label for Ozempic has always
referenced the possibility of GI --
severe GI outcomes while taking the
medication?
                    MS. AMINOLROAYA:  Object
          to form.
                    THE WITNESS:  We're
          talking -- so we are talking
          about the Novo label, per se?
BY MR. BROWN:
          Q.    Yes.
          A.    Okay.  I just want to make
sure.

20260513_123-000000018

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 126 of 326

Q.    Yes.

A.    You are talking about the Ozempic 2017 label?

Q.    Yes.

A.    So let me just give you -- no, I don't think that's a well -- I don't think that's a fair -- I wouldn't -- wouldn't agree with that for the following reasons.

The 2017 label does not communicate the severity and specificity of, you know, all the risks associated with slow GI motility.

Nowhere in the label is there a warning for GI events that is so severe that they can result in hospital -- potential hospitalization and potential surgery.

Putting in events -- if you put in nausea, vomiting, abdominal pain, constipation, I think, you know, as adverse events in the clinical trials section, I don't think that it forms people -- the prescribing physician of developing -- of the risk of developing

more severe symptoms.

My major beef with the label is that you have -- is that you have things like nausea, vomiting, constipation, that even at medical meetings, these sound like things that we've all experienced, and yet, there is -- there's a spectrum here that can be severe that can lead you in the hospital.

Instead of saying they are mild to moderate in most cases. The label should start with the severity of the cases that could land -- land you in the hospital, and in other cases they could be mild and moderate.

Nausea and vomiting does not equal an ileus or intestinal obstruction. Constipation does not equal obstruction.

Some saying that some patients had acute kidney injury and directing those patients to monitor renal function who had GI effects is not the same thing as saying that ileus and

CONFIDENTIAL - PERSONAL PROTECTIVE ORDER

intestinal obstruction can occur.

And it basically doesn't put together the fact that -- to the average doc, that the GLP-1s can affect the gastrointestinal tract that slows down the movement in the stomach and the intestines and can cause ileus, functional intestinal obstruction, fecal impaction, leading to intestinal obstruction resulting in hospitalization and surgery.

That's the problem with the label.

Q.     What were you just reading from --

A.     My notes.

Q.     -- Dr. Kessler?

Your notes?

A.     Because I knew you would ask that question, and I wanted to give you a comprehensive answer.

These are -- these are my notes that I've drafted that just -- and, again, the label in 2025, I mean, is getting there.  Right.  But it wasn't

20260513_123-000000018

there in 2017.

Q.   Well, let's talk about the current label for a moment.

Is the current label for Novo's GLP-1 RA medications -- let me strike that.

Are the current labels for Novo's GLP-1 RA medications adequate in your opinion?

A.   For who?

Q.   For the -- for the doctors that are interpreting those labels and prescribing the medications?

A.   They are certainly better than the 2017 label.  They are improved. There is no question.

Q.   In your opinion, are they adequate today?

A.   I have not studied the -- I have focused on the gastrointestinal effects.  I have not discussed there are other effects, that -- iothalamic effects that I've not studied the record on, so I can't comment on.

Q.   Let's just focus on the

information related to gastrointestinal effects.

In your opinion, are the GLP RA labels for Novo's products adequate in relation to what they disclose about the GI effects potentially associated with the use of these medicines?

A.    Let me just -- so I think -- I think they are better -- better.  I don't have an opinion right now whether they are optimal.  I think that had they had the label as they are written today, we probably wouldn't be sitting here.

Q.    Okay.  And do you have an opinion as to whether or not Novo's GLP-1 RA labels are adequate today?

A.    Tell me how that differs from the prior question.

Q.    You used the word "optimal."  And I want to know whether, in your opinion, whether the labels for these medications, at least insofar as we're talking about potential GI

outcomes, are adequate today?

A.    I don't think I give an opinion specifically of that.

Q.    Okay.

A.    I mean, whether they are -- they are -- I think they are improved.

Q.    Okay.  With respect to the GI information disclosed in Novo's GLP-1 RA labels today, do you have any criticisms?

A.    Yeah, I mean, again, I think, again, I have not -- I've not given an opinion exactly on that -- I've not given an opinion on the 2025 label.

I'm -- I think that -- I think that -- I think they are much improved.  I don't think they basically convey the -- I mean, I think you -- I'd have to think about this.

I don't think they -- I mean, these labels should basically -- the fundamental point is that these labels can affect GI motility and cause a range -- and cause severe conditions and lead you into the hospital.

And these conditions, most importantly, need to be assessed. So you're presenting with abdominal pain. That doc knows that he may be dealing with intestinal obstruction. He may be dealing with severe constipation. It looks that it is, you know, intestinal obstruction.

It doesn't quite put it together, maybe optimally, but, again, I think it's much improved.

Q. In your opinion, are the current warnings related to the potential GI effects of Novo's medications deficient in any way?

A. Yeah, again, I don't give a specific opinion on the 2025 label. I don't believe I've given -- again, I think it's -- I think it's much improved.

I think that the -- I mean, I take it -- and I'm happy to live with FDA -- you know, FDA splits the -- puts together a composite 5-6. It cross-references 5-6, whether it should

all be in 5.  I think that, you know, those are points that I'd have to think about, if you want to talk about what's optimal.

I think the label is, I mean, with fecal impaction, intestinal obstruction, ileus on the label, and with severe GI disorders.

I think, again, I mean, I will give credit and say it's much improved.

MR. BROWN:  How are we on time?

MS. AMINOLROAYA:  We've been going an hour.  I just sent a text to see if lunch is here.  But it would be good to break in the next 15 minutes or so.

MR. BROWN:  Okay.  Okay.  Good.  Thank you.

BY MR. BROWN:

Q.    So, Dr. Kessler, I believe you've written at least one book where you talk about your own experience on GLP-1 RA medications; is that right?

A.     Correct.

Q.     And --

A.     Wait.  Again, with the caveat that I'm only too happy to comply with -- answer your questions.  You can probably ask me any questions you want.

Q.     Yeah.

A.     But the reason I'm sitting here today is based on the record, not what docs know, not what my experience was.

Q.     Yeah.  Yep.

A.     I based my opinions on the record, but you are factually correct where I have publicly stated in multiple forums what I had done.

But, again, I don't think -- it's not the basis of my opinion, sir.

Q.     Thank you for that.  I'm going to ask you just some questions about various public statements you've made about GLP-1 RA medications, okay?

A.     Sure.

Q.     Now, I believe you've

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

written, in your book, that you personally took a GLP-1 RA medication for seven or eight months; is that right?

A.    Yeah -- no, no, no.  Let me just -- again, you want to -- you could assume, if it's written in my book and I've authored it, I've written it.  I mean, I'm not going to dispute anything that you want to quote out of the book.  If it's a quote, I'm sure, whether I will say it's in context or not.

But the important thing is no one should think that that is what -- that that was the basis of the opinion.  I worked hard, whether it's 88 pages or 2,000 pages, depending on how -- which MCL list you look at, that is what I base the opinions on.

Q.    I understand.  And one of the reasons I'm asking you these questions is I would like to understand whether I am taking any of your statements out of context, and I assume you will tell me that if I am, okay?

A.    Well, you could assume -- then just assume that the book is -- what was frightening is my report was 264 pages -- my report is 262 pages. And the book, I think, is 260 -- the report is almost as long as the book.

Q.    Yeah.

A.    Right?  So you can assume that everything is out -- has to be -- everything is out of context, any excerpt, just assume.

Q.    Well, according to what you've written in your book, you lost a lot of weight on a GLP-1 RA medication; isn't that true?

A.    I think I've identified the exact amount of weight that I lost in the book.

Q.    And in your own opinion, the medication improved your health; is that right?

A.    Show me an exact quote, an exact quote, if you're quoting the book.

Q.    I can get it.

A.    Thanks.  So, again, let me

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

just give you the context about --

Q.    Yes.

A.    It doesn't sound like something I would write exactly that way.  Maybe it is.  I mean, you know.

Q.    Why don't you -- why don't you tell me, in your own words, your experience on the medication.  I don't want anything out of context.

A.    I think these -- I think I've been very clear on my public statements, right.  I think the -- I think the drugs -- there's no magic on how these drugs work, okay.

I think these drugs work through an interaction of the gut-brain axis where they trigger the aversive systems of the body, right, both delayed gastric emptying and the hind mooring.  And they condition you to eat less, right.

They are -- they are a useful tool in the management of weight.  They are not a panacea, right.  I think they do cause significant adverse events

20260513_123-000000018

that lead to nausea and -- different gradations of nausea, and abdominal pain, and symptoms, and I think you see discontinuation.

And I think we haven't -- but I -- what leads to the improvement in weight is a change in -- do these drugs give you the opportunity to lose -- to eat better because of the aversive system, have feelings of satiety, better -- is the food you're eating contribute to the health or is it the drug.

I mean, these are tools, they are not magic cure-all.

Q. You also gave an interview to Katie Couric regarding GLP-1 medications and your experience with them; isn't that true?

A. I did so when the book came out. It's...

Q. And one of the things that you told Katie Couric is that GLP-1 RA medications are an important tool and an important addition in fighting obesity;

isn't that true?

A.    That sounds like me. Again, risks and benefits.  And, again, nothing in that statement -- nothing -- they are very complex tools, very complex tools.  And because they have important powerful actions, they need to be used well and thoughtfully and have adequate directions for use and safety warnings.

Q.    I believe you also told Katie Couric, during that same interview, that the GLP-1 RA medications are an important tool to reclaim our health; isn't that true?

MS. AMINOLROAYA:  Do you have a document to make sure that's precise?

THE WITNESS:  Do you have the -- do you have the transcript?

BY MR. BROWN:

Q.    Yeah.

A.    We can play the video.

Q.    We do have the video.

20260513_123-000000018

A.     I'm not --

Q.     We do have the video.

(Document marked for identification as Kessler Exhibit 5.)

THE WITNESS:  I'm happy to stand by anything in the transcript if you show me.

MS. AMINOLROAYA:  Where is this from?

MR. GISMONDI:  This is from the YouTube transcript of the video that was played.

MS. AMINOLROAYA:  There is no...

MR. BROWN:  Just mark it. We can debate that later.  I have no -- no worries about the authenticity of this.

THE WITNESS:  Are these your headings, or is this Katie Couric's staff --

MR. GISMONDI:  These are from the transcript that was pulled from YouTube.

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 141 of 326   CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

THE WITNESS:  This is a YouTube transcript?

MS. AMINOLROAYA:  Okay. For the record -- for the record, there's no source on this document.  It's a transcript --

MR. BROWN:  Either I show the transcript or I ask questions without the transcript.

THE WITNESS:  No thanks, I appreciate it.

MR. BROWN:  Either one.

THE WITNESS:  It's fine.

MR. BROWN:  Either one.

THE WITNESS:  Yeah, that's fine.  Just show me where you're pulling from.

BY MR. BROWN:

Q.    So if you go to the top of Page 14, Dr. Kessler.

A.    Thanks.

Yeah.  So you read the first sentence.  Thanks for giving me

20260513_123-000000018

the transcript.  I think, you know, you accurately read the first sentence.

But you didn't read the second sentence.  Right.  And the third sentence.  And the -- and the fourth sentence.

So -- so, I think if you read all four of those, I stand behind what I say there.

But, again, to understand that in context, they need to be done under care, under good care.  If you have a dietician, nutritionist, physical activity.  They're not a panacea. They're not magical.  It's hard work.

But you can have an enormous effect on your health.  I understand that's different in the first sentence.  But they're an important -- you can have an enormous effect on your health.

Q.     With all that context, you still agree today, that these medications are an important tool to reclaim our health, right?

A.    They are -- they are one tool, but they need to be done under good care.  Right.

They are not a panacea. They have serious complications associated with, and you have to be -- for the individual patient, you have to have a risk/benefit.  It may not be for everybody.

Q.    And you've referred to them as powerful tools.

A.    These are very -- you decrease appetite.  Right.  I mean just think about it.

I mean, this is forced anorexia.  Right.  This is starvation. So anything that can -- that can -- let me just finish the answer.

So, one of -- one of the criticisms that I have of the company, which is not necessarily in the report, but you asked about this, is that you have not tracked the number of calories that people are eating, right, in the clinical trials.  And that many people

20260513_123-000000018

are eating less than a thousand calories when they are on these drugs. That's how people lose weight. Because these drugs make you nauseous. These drugs have aversive symptoms. They do affect the brain. They get you to eat less than a thousand calories. Thousand calories -- the average is between 600 and 800, right, calories that people are eating. I mean, that some people are eating. That is semistarvation.

So to your question, that is powerful. These are powerful medications that can cause someone to eat 600 and 800 calories. And we have a conundrum. How -- people -- the companies want -- so you're not -- how long can you maintain somebody through their life eating that decreased number of calories? And I'm happy to go on.

Because it -- the companies say we want people to be on these drugs for life. But, I mean, you're going to eat less than a thousand calories to maintain your weight.

So, I mean, these are -- these are important tools, but awfully complicated and very powerful and potentially very dangerous at semistarvation levels.

Q. Dr. Kessler, you believe that Medicare should cover these drugs for patients who are indicated for them; isn't that true?

A. I have told Mehmet Oz that he should do that. I think, again, these are powerful tools. I think that they -- people should have access to them, as well as should have safety information and be adequately warned.

Q. Yeah. You believe the government should reimburse for the use of these medications under Medicare; isn't that true?

A. Only if -- only if it's part of a deal where people are adequately warned.

Q. And you --

A. Which is also part of the system.

I mean, you know, I hope -- Mr. Brown, there's nothing I'm saying here that you disagree with.

Q. Right --

A. We can disagree. Government -- I think these are powerful drugs. And I think they should be warned about. And we should, you know -- we should use these tools to improve health.

Q. And you also believe, Dr. Kessler, that failing to reimburse for these medications by the government is a form of discrimination against people who struggle with obesity; isn't that true?

A. Correct. And I'm willing to serve -- I mean, if -- I mean, I'll put the offer. I'm happy to sit as an expert and testify to that in the denial of insurance coverage.

Q. Yeah. And --

A. But I've not done that, but I've specifically made that point.

Q. You believe pretty strongly

that the United States government should provide access to GLP-1 medications for patients who don't have their own insurance or can't afford them?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  As long as the company adequately warns and will use these drugs well.

Putting it altogether, I'm all -- I'm in full agreement with you, sir.

MR. BROWN:  Thank you. Let's take a break.

THE VIDEOGRAPHER:  Off the record at 11:57.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

A F T E R N O O N  P R O C E E D I N G S

- - -

THE VIDEOGRAPHER:  Back on record at 12:50.

- - -

20260513_123-000000018

CONTINUED EXAMINATION

- - -

BY MR. BROWN:

Q.    Dr. Kessler, I believe you wanted to say something on the record.

I also want to make a comment on the record just about the documents that we've received today.

A.    Do you want to go first?

Q.    Yeah.  I'll just note that Dr. Kessler has brought with him a large number of binders and loose documents, some of which are enlarged and tabbed and labeled and highlighted and with various notes of different kinds.

We're doing our best to go through what's here today, but given the time constraints that we have, we're going to need time to review all of these documents more carefully and just reserve our right to ask further questions, if needed, at a later time, based on a review of the documents that have been brought with Dr. Kessler today.

20260513_123-000000018

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 149 of 326

MS. AMINOLROAYA:  And these documents have been made available since this morning. I'm happy to walk you through what is directly from the report and the documents appended there, which Novo produced themselves, and have had, presumably, for a long period of time.

Dr. Kessler's sheets over here, I think, have been the subject of review.  There are a couple of sheets, maybe three or four, that have been looked at over the breaks.

So if -- if there's -- and we're happy to -- you know, for you to take pictures.  We have, you know, no problem with that.

And I think you have been doing that.

So if you have any questions, based on what you're seeing here, and this is, you

20260513_123-000000018

know, largely from his report,
you know, they should be asked
today, is our position.

MR. BROWN:  We'll agree to
disagree on that.  But we'll do
our best to get through them and
just reserve the right to ask
additional questions, if and
when we see the need to do that.

MS. AMINOLROAYA:  Okay.
And we would object to that.

THE WITNESS:  Now two
things to begin.

Thank you for that.

Just one request.  There
is a deposition, and this is two
parts, if you could just work
out so I can have access to my
materials.

MR. BROWN:  Yes.

THE WITNESS:  If you take
them away and I don't get them
back, that would be -- I just
need to have access to this
stuff.

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

MR. BROWN:  No problem. We will coordinate with Lilly's counsel and as a team and figure out how best to handle all these documents and get them back to you as soon as possible.

THE WITNESS:  Great. That's --

MR. BROWN:  I think we have a space in time between now and the next deposition, am I right?

MR. GISMONDI:  Yes.  It's not until the 14th.

MR. BROWN:  Yeah, so we have approximately two weeks.

THE WITNESS:  I mean, maybe you can even take them after -- just so I have access to them.

MR. BROWN:  Yeah, we will absolutely do that, Doctor.  Let us figure that out.

THE WITNESS:  Thank you. I'll leave that to counsel.

20260513_123-000000018

MS. AMINOLROAYA:  And just to clarify for the record, the majority of the binders here are the paragraphs in the report and the documents that are cited there which were served on January 2nd.

THE WITNESS:  A substantive point if I may?

MR. BROWN:  Sure.

THE WITNESS:  You had inquired about methodology, the cumulative putting together of terminology in the methodology that I then asked Madigan to run.

MR. BROWN:  Yes.

THE WITNESS:  Let me just give you four documents.  I alluded to, in the answer to that question, FDA, for example, pharmacovigilance review and the putting together of MedDRA terms.  There are four documents that I just pulled.

Case 2:24-md-03094-KSM    Document 691-26    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER    Filed 05/19/26    Page 153 of 326

MR. BROWN:  Can we mark them one by one, Dr. Kessler, so when you're referring to them, you can refer to them by the exhibit number?

THE WITNESS:  Yes, of course, sir.  May I hand these to -- and these are out of my notebook.  So there are some tabs -- just to clarify, there are some tabs that refer to other issues in these that are not related to the specific question.  There is aspects of this that relate to your question.

(Document marked for identification as Kessler Exhibit 6.)

(Document marked for identification as Kessler Exhibit 7.)

(Document marked for identification as Kessler Exhibit 8.)

20260513_123-000000018

        (Document marked for identification as Kessler Exhibit 9.)

        MR. BROWN:  I may take them after he's done.

        THE WITNESS:  Sure.

BY MR. BROWN:

    Q.    But let's go through them and identify what you're talking about, Dr. Kessler.  And if you could, again, just make reference to the exhibit number and what the document is.

    A.    Happy to do that, sir.  Thanks.

# Redacted - Confidential

# Redacted - Confidential

20260513_123-000000018

# Redacted - Confidential

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

# **Redacted - Confidential**

```
The -- maybe you're
```

misinterpreting -- maybe I'm talking -- we're talking past each other.

My opinion is that it went to serious GI adverse events, serious GI hypomotility adverse reactions, and I gave a range of those, that included those terms.  That's all my report did.

And I should also add, for the record, you know, I mean, I think that my goal was to be comprehensive in this, to look at factors from a lot of different directions.

Once you have mechanism, you have the pharmacovigilance cases, dechallenge, you have enough.  You don't -- none of this was mandated to do a Factor V warning.

But the -- the Madigan stuff goes to the hypomotility as a set of terms, not just ileus or intestinal obstruction, as your question seems to imply.

Q.    Am I understanding you correctly that you believe that evidence of mechanism of action alone is enough

to support a warning for either ileus or intestinal obstruction?

A.    One of my most favorite questions that I talk about, that I teach about.

The answer is no, but mechanism is very important.

So, mechanism plus. Mechanism plus reality is -- I think, being trained by among the best in pharmacovigilance, if you talk to them, if you have mechanism, and then you start seeing adverse events that match that mechanism, that's where you -- the pharmacovigilance will go reasonably possible of causal association.

Here you have -- leave aside even if -- even though I didn't run this, okay. Again, I was trying to be comprehensive.

If I have mechanism plus dechallenge, rechallenge, and adverse events, and pharmacological class, right, I think you're there, right.

Mechanism is highly, highly

important of what I teach and what I've been taught to teach, is nothing is more -- if you don't have mechanism, you're not -- you know, I mean, it's -- I mean it's much harder.

You need all this clinical -- when you don't -- when you can't make biological sense, but if you can make biological sense and you start seeing these cases, right, then you have reasonable possibility of a causal association.

Q.    In the composite endpoints that you gave to Dr. Madigan, is it true that nausea and vomiting are the most common events by far?

A.    I think --

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Along with nausea and constipation, I would agree with that.

BY MR. BROWN:

Q.    Did you investigate what the results of Dr. Madigan's analysis

would look like if the data on nausea, vomiting, and constipation were removed from the analysis?

A.    Yes.  But the way I did that, though, I think if you look at Crisafulli.  I think Crisafulli, if I'm right, looks at severe constipation. Crisafulli, does, against the SGLT-2s, looks at it without nausea, vomiting, and those common terms, and sees statistical significance.

Okay.  And I'll leave aside these -- the data.  Crisafulli has -- I think severe constipation is one of the terms of Crisafulli -- actually let me get it.  Let me be exact.

Can someone just tell me what paragraph Crisafulli is in my report?  And I have a table from there. Can someone do me a favor and just search?  I can do it but --

MS. AMINOLROAYA:   I believe it's 473.

THE WITNESS:  Thank you, Nancy.

Yeah.  So Crisafulli uses the acronym of bowel obstruction, gastroparesis, and severe constipation.  So that's without nausea and vomiting.

And it's, in fact, entitled Sensitivity Analysis in Supplement Table 11.

BY MR. BROWN:

Q.    Okay.  Dr. Kessler, do you believe it's valid to infer a potential causal relationship between Novo's GLP-1 RAs and ileus or intestinal obstruction based on a composite endpoint that's largely driven by nausea and vomiting events?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  So I think -- well, first of all, I think let me say with the reasonable possibility of a causal association, you asked the question about causation. Okay?

I think it is -- you can -- you can conclude severe GI from a composite.  Severe GI hypomotility.  I think that is fair to do, okay, to get to severe GI from a composite.  And that's what I did.

I think -- let me just stop there.

BY MR. BROWN:

Q.    Okay.  You made a distinction between reasonable probability of a causal association --

A.    Reasonable possibility. I'm sorry.

Q.    -- and causation.

A.    Sure.

Q.    What is the distinction?

A.    Well, one is -- one is -- well, I am here as a regulatory expert and asking whether there should have been a warning, right.

I mean, I don't want to play lawyer here, but as I understand the elements, there's an issue of --

there's an element of liability, right, which is what -- you know, a failure to warn.

There was also -- in tort law, something called a general causation. Others are talking about general causation. I obviously am just dealing with this reasonable possibility or a possibility of a causal association. I hope that's --

Q. It helps very much, thank you.

When you provided these composite endpoints to Dr. Madigan, did you assume that the nausea and vomiting events in the GLP-1 user groups were caused by delayed gastric emptying?

A. No, I -- this was -- there wasn't any assumption made nor need for any assumption made.

I took in Endpoint 1, I took Novo's list -- I mean, list of adverse events, looked to see if they were severe, and see if they were in the clinical trials that that severe set was

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

statistically significant to justify a severe GI warning. They were all GI adverse events.

I mean, I don't want to -- and also, for the record, I think these are all hypomotility-related events -- adverse events from the gut-brain axis.

I mean, I'm fine -- if you want to label this as severe -- Section 5 as severe GI adverse events, I don't have a problem with that, versus -- I mean, I'm being a little more nuanced on hypomotility. I think it justifies a -- severe GI adverse events.

Q. I may have misunderstood you, Dr. Kessler. I thought you said earlier today that you believe that all of these events in the -- contained in the composite endpoints provided to Dr. Madigan share a common biological mechanism. I thought that's what you said earlier today.

A. Yes. I do agree with that. There's a biological mechanism. You

have a drug that accents specific receptors, that's a biological mechanism.  And I think that's -- these adverse events flow from that biological mechanism on those receptors the GI drug is acting.  I think that's only logical, right.

Q.    Did you assume that all of these events are due to delayed gastric emptying effects of the drug?

A.    No.  I just -- first of all, some of these are intestinal effects on intestinal motility.

Q.    Yes.

A.    I was not -- in one I used the terms that were already listed on the label, and I asked whether they were severe and whether they were statistically significant or they would justify a serious -- severe serious warning.

Q.    In Novo's clinical trials, do you know if ileus or intestinal obstruction events in the control group outnumbered the user groups?

A.    I did look at them, and I don't believe they are statistically significant in Novo's.

Again, let me underscore Novo.

I think the answer is different in -- well, we can discuss Lilly separately.

Q.    And when you say you don't believe they are statistically significant, what you're saying is you did not see a statistically significant difference comparing events in the control group to those events, ileus and intestinal obstruction events, in particular, to those GLP-1 users; is that right?

A.    That's correct.  Because if you salami slice this, you're getting small numbers.  And ileus has its own set of constraints.

Q.    Yeah.

A.    Intestinal obstruction, I mean, again, you're dealing with preferred terms that are not precise

Case 2:24-md-03094-KSM     Document 691-26     Filed 05/19/26     Page 168 of 326 CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

enough to deal with drug-induced MedDRA terms.  We didn't do the MedDRA classification or the ICD-9 codes to match the drug's physiology.

Q.     Yeah.  Yeah.  Yeah.

My understanding is that there isn't even a numerical imbalance; is that true?

A.     You're asking me for which intestinal obstruction and/or?

Q.     Ileus compared to the occurrence of those events in the control groups used in Novo's clinical trials.

A.     I do not -- when I looked at the clinical trials, I didn't see it.

Again, let's just put an asterisk there.  I don't agree with that answer.  There is an imbalance when it comes, but I'll leave -- let's leave that for the second day.

Q.     Okay.  Is there a difference between gastric motility and intestinal motility?

A.     Sure.

20260513_123-000000018

Q.    What is the difference?

A.    Well, again, you know, first of all, I can't get into everyone's mind in how they are using this.  But they are certainly -- there are motility mechanisms in place in the -- that are gastric, and there are certainly mechanisms that are in play throughout the small and large bowel, and those are not -- those are not identical.

Q.    If you can turn to Page 173 of your expert report, please?

A.    Sure.

Q.    I believe it's Section 4.

A.    Page 173.

Q.    I'm sorry, Dr. Kessler, it's Paragraph 173.

A.    Sure.

THE WITNESS:  Can you pull my studies binder?

MS. AMINOLROAYA:  Is it this one?  No?

THE WITNESS:  Can I have that?

20260513_123-000000018

BY MR. BROWN:

Q.    Now, are you with me, Dr. Kessler?

A.    I'm with you.

Q.    Okay.  On Page 173 you state that a substantial body of evidence demonstrates that GLPs exert effects across the entire gastrointestinal tract, including the duodenum small intestine, and colon. "These effects reflect alterations in coordinated whole-gut motility rather than isolated changes confined to the stomach."

Do you see that?

A.    Correct.

Q.    Okay.  And the substantial body of evidence you relied on in support of this statement is listed in Paragraphs 173 to 181; is that right?

A.    This is -- well, hold on a second.  Let me just see that -- see for a second.

I think there may be some earlier paragraphs that relate to this.

20260513_123-000000018

I'm not sure everything is exactly in this section.  I'd have to go through in turn whether there's any data on intestinal elsewhere.

Q.    Your intent in this section was to discuss the substantial body of evidence supporting what you have in Paragraph 173.  Am I right about that?

A.    Hold on a second.

Let me just search for one term, and then I'll tell you.

No.  So if you go, for example, to Page 95.  And I may -- the heading may not be -- for example, this is what I was just doing.

Let's just see, let's just see.

So I believe there is -- for example, if you take -- headings may not be perfect.  But take, for example, Paragraph 95.  You see work by Tolessa, Tolessa and colleagues.

You're talking about effects on migrating motor complex and myoelectric quiescence.  Those also

involve the intestinal.

So it's not -- you've got to read the whole mechanism section. There may be basic science studies that are earlier, that talk about -- I think if you look at -- and I can identify them for you.

But there's -- let's see. Yeah, so Paragraphs 117, 118, 119, 120, 121, 123, 124, 125, 126, 127, 128. There's a whole section through 133, that also, I think, affects both small bowel -- evidence of small bowel and large bowel in colonic time.

Q.    Tolessa is an animal study, right?

A.    Sure.

Q.    Now, in Paragraph 178, you cite five animal studies; is that right?

A.    I take your -- I think that's right.

Q.    You can confirm.

A.    Yeah, I think that's right.

Q.    And in Paragraphs 179 and 180, you cite two case reports; is that

20260513_123-000000018

right?

A.    I'm sure that's right.

Q.    And I believe you also discuss three mechanism studies that discuss the impact of GLP-1 RAs on intestinal motility: Thazhath, Nakatani, and Cymbal; is that right?

A.    I believe that's correct.

Q.    And each of these studies are of only a small number of subjects; is that right?

A.    That's fair.  But, again, there's a lot of studies in the earlier section of this report.

Q.    Can you cite to any meta-analyses that support the statement that you have in Paragraph 173?

A.    Meta-analysis, why would you look at epidemiology, sir, if you're dealing with biological mechanism?

Q.    Well, I wanted to know whether you have any clinical evidence that would be part of the substantial body of evidence that demonstrates what you've described in paragraph --

A.    I think you're mixing up epidemiology with the biological mechanism.

With -- I mean, again, earlier, if you look at -- I'm not going to pronounce these right, but Wettergren is a human physiology study.  That's before and after they got any -- that's a human study.  There's an animal study.

There's a Schirra that's an endogenous GLP-1 study that is a human physiology study.

Hellstr m, Paragraph 125, looked at GLP effects on both individual -- healthy individual effects and IBS patients, and looked at antro-duodeno-jejunalregion and migrating motor complexes.

There's a neurophysiology study by -- I'm not going to pronounce it right.  B-U-C-I-N-S-K-A-I-T-E, it's a vagal afferent study.  There's a cholinergic pathway study, again, by Schirra, that's a human physiology study.

So there is -- you know, Hellstr m, there's a review in 2009 that shows GLP-1 exerts profound inhibitory effects on gut motility through the vagal neural pathways.

And I can go on. But there's -- there's a whole set. Sorry if this section doesn't put everything there.

Q. Are you aware of studies that did not show evidence of small intestine delay?

A. I'd have to go back. I think -- I mean, I try to -- I try to -- I believe there's variability there. And I'd have to go back and review the record.

I tried to put every study -- I tried to put all studies that showed every -- everything there. There was variability, and I think we're all humbled by the degree of variability, but I try to be comprehensive.

And I try to -- I certainly -- what I did do is I looked

at -- in fact, I did this deliberately. I went back and looked at defendants' expert reports and tried to make sure that I included -- I think I've included everything here -- I've tried to make sure that I've included all studies that they've cited. Again, no one gets everything.

Q. Yeah.

A. I mean, it's -- if there's anything that I'm missing, I'm happy to consider it.

Q. Well, I know there's a lot of studies here, but I just want to know whether you recall any studies that evaluated the issue and did not show evidence of small intestine delay.

A. Yeah, I mean, for example, if you take Wegeberg -- again, I'm not going to pronounce that word. I apologize.

Q. 220?

A. And also 132, I believe. If I'm right. Page 43.

You had -- there was

shortened colonic time, but no change in small bowel transit time. I think the report lays this out.

I think on balance -- I mean, there are enough statements from your -- from the company, that I think show that intestine may not be as profound as the gastric changes, I mean, but they do exist.

Q. Okay. There are also studies that show accelerated colonic transit; isn't that true?

A. Yes, sir. As you would -- as you would expect. As I mentioned, I think I cite that -- those. Again, you would expect certain variability, but I think when you look at the totality of evidence, you have to -- you know, I mean, there's delayed gastric emptying.

Q. You mentioned Wegeberg a minute ago. I believe that was the 220 paper.

Did you also review Camilleri 2012 on this issue?

A. Who is first author?

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

Q.    I don't know that -- it's Camilleri is the first author.

A.    I have -- I have reviewed almost -- not all, I have to go back and look.

I've spoken at length to Michael and, you know, I've gone through -- I mean, I have sheets on -- I'm happy to discuss Michael's stuff with you, if you want.

I mean, in fact, if someone could just pull my Camilleri sheet.  If someone could just reach that.  I mean, I think the Camilleri stuff is very significant for the fact that -- and I think -- I mean, if you look at his data -- and I guess it's really not Camilleri.  I'm using that term.  He does the review, but it's really Maselli.  I'm looking at the data here.

Again, this is gastric -- this is gastric emptying.  Is that what you're -- and if you look -- I'm looking at delays.  At 16 weeks, you see an increase in patients at 16 weeks.  If

you look at his -- you know, at his curves, you can see certainly the gastric emptying with liraglutide.  In certain patients, you have curves all over the place.  These are individual patient curves.

But you certainly see that at 16 weeks it's still increasing in certain patients and does impact in fact.

Q.    Do you find Dr. Camilleri to be an authoritative expert on this topic?

A.    I certainly respect Michael greatly.  Which topic?  You know, I think he's dealt with the world of gastroparesis.  I think -- is he an expert on GLP-1 drugs?  No -- let me strike that.

Everybody -- everybody is learning a lot about these drugs.  I think he is -- I certainly respect him enormously.

Q.    Yes.  And you said you have spoken to Dr. Camilleri at length.

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 180 of 326

Regarding GLP-1s?

A.    Again, I want to distinguish, and, again, I leave it to the lawyers --

Q.    Yeah.

A.    -- on what -- I mean, I've written about this in my book, I've spoken to Michael when I was researching the book.  I spoke to Michael, again, about gastroparesis and definitions of gastroparesis, and the persistence of gastroparesis.

Q.    Yeah.

A.    So, I mean, he should speak for himself.  I don't want to speak for him.  But I think -- I mean, I'm very clear on certainly what he has told me. I'm happy to discuss that.

But, again, we should base it on the record, not just my conversations.

Q.    Is it fair to say that the body of literature on gastric motility is more robust than the body of literature on intestinal motility?

20260513_123-000000018

A.    I think that's a fair statement, but I don't -- I think the existence of GLP receptors throughout the GI tract, you know, is real.

Q.    GLP-1 RA medications are designed to mimic naturally occurring GLP-1 hormone; isn't that true?

A.    Well, if -- not exactly.  I mean, as you know, the half-life of those -- if you mimic it, the half-life would be in hours.

So you have persistence of that effect over longer periods of time. That's not a mimic.  Right.  That was an amplification.

The other thing that I think is profound and that we don't realize, I mean, and I think this is in some ways, you know, what your client did, and I think certainly appropriate.

What your company did, it amplified the dose very considerably, right.

And it -- so it amplified in magnitude the effects of the natural

20260513_123-000000018

GLP-1.  So I don't like to use the word "mimic."  I think you've amplified, expanded, exploded, what's the right word, you took -- so you took that mechanism and put it on steroids and -- and it got you endpoints that, you know, we're here talking about.

Q.    The only reason I use that term is that you wrote on page -- on Paragraph 237 of your report, that GLP-1 RAs are mimetics of the naturally occurring hormone.

A.    Yeah, so -- what paragraph?

Q.    237.

A.    But -- but -- that's true, but everything I just said was also true.

Q.    Now, the GLP-1 hormone and GLP-1 RA medications delay gastric emptying by binding to GLP-1 receptors; is that true?

A.    I think so.

Q.    Okay.  And did you do a comprehensive review of the literature regarding the location of GLP-1

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

receptors in the body?

A.    I have -- the answer is not for this report, but I have studied that extensively and I've read that literature, and -- but that's beyond the scope of this report.

Q.    When a patient stops taking a GLP-1 RA medication, it stops working on the GLP-1 receptors; isn't that right?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  Your question is great.  So, of course, a drug is going to stop working.  I mean -- right.

So -- but -- so, that doesn't mean the drug's effects -- I mean, if you -- you know, so what we see -- again, people stop taking these drugs, and a lot of people stop taking these drugs.

And one of the problems we have is there's a high

20260513_123-000000018

discontinuation and a high dropout rate, and that goes to efficacy which is beyond the scope.

But what you see is -- is if you stop taking these medicines, weight doesn't -- weight comes back in about two-thirds, but not a third, and it comes back slowly over a period of time.

So, I mean, again, beyond the scope of this report, but just for your question about it stops at the receptor.

That is -- those effects on the GI affect -- I mean, this drug's mechanism of action -- the way these drugs work is through its adverse events, in my opinion.  Right.

But those adverse effects also condition other circuits. So when you're taking these drugs, if you find certain food

aversive while you take these drugs, you're going to condition the body to continue to experience those effects even when you're no longer affect on the receptor. Let me stop there.

BY MR. BROWN:

Q. Let me limit my questions to gastrointestinal motility. Assuming no underlying problems at baseline, will gastrointestinal motility return to normal once someone stops taking a GLP-1 RA medication?

MS. AMINOLROAYA: Object to form.

THE WITNESS: Probably -- first of all, no opinion on that.

Probably should talk to the other gastroenterologists, saying that -- well, let me -- gastroenterologists, I'm happy to opine, but let the other gastroenterologists opine.

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 186 of 326

BY MR. BROWN:

Q.    Fair enough.

How -- based on your review of the record, how long has it been known in the medical community that GLP-1 RA medications delay gastric emptying?

MS. AMINOLROAYA:  Object to form.  Beyond the scope.  And vague.

THE WITNESS:  You want to know how long Juul Holst knew it?  You want to know Joe Smith on the corner who is prescribing this?  Who is the medical community in your question, and why is that relevant to what's on -- it's not relevant to what's on the label.

I mean, Juul Holst or the average doc?

BY MR. BROWN:

Q.    Let's start with yourself.

How long have you known that GLP-1 RA medications can delay

gastric emptying?

MS. AMINOLROAYA:  Object to form.  Vague.

THE WITNESS:  So -- so my knowledge is -- my knowledge has evolved over time.

It was -- I mean, I didn't come to understand it delayed gastric emptying was, in fact, both the mechanism of action and the adverse event until sometime -- when did I know it? Probably 2024 was when I came to understand that the mechanism of action of delayed gastric emptying was both the way this drug worked and an adverse reaction, and this drug worked through its adverse reactions.

It was 2024, probably.  I can't tell you exactly when.

BY MR. BROWN:

Q.    What information at that time led you to conclude that delayed gastric emptying was linked to the

adverse events that you are talking about?

A.    I was reading everything and going to every medical meeting and hearing every presentation on this drug that I could find.

Q.    So you didn't know until 2024 that there was a potential link between a delayed gastric emptying and nausea or vomiting?

A.    You've now changed the question a little bit to whether there's a potential link.

And what -- I will admit that for a period of 2020 -- 2020 to 2023, I was preoccupied, not thinking a lot about GLP-1s.  Right.  So count me out for those -- count me out for those years for better or worse.

I don't recall what I -- what I understood before 2020, I don't have a clear recollection.

I can tell you from '23 on, I mean, I -- I spent a lot of time talking to the groups at UCSF, the

20260513_123-000000018

groups in Philadelphia, the -- all the people who were the basic scientists. And I've talked to all of them to try to understand collectively how this worked. This was in 2024, that I came to understand.

Q.    I mean, hasn't it been widespread knowledge -- hasn't there been widespread knowledge in the medical and scientific community that these medications can delay gastric emptying since the day that they were all approved?

MS. AMINOLROAYA:  Object to form.  Vague.

THE WITNESS:  So, others can testify what they knew at certain points in time.

None of that -- none of that gets you out of having to warn.  Because I don't believe the seriousness, right, then go listen to anyone who's talked, everyone says this is mild to moderate GI adverse events.  Had

they just said, hey, there's serious stuff that can cause a spectrum of GI events leading to intestinal obstruction, that's not what was said.  So I don't think that latter was what was said.

I think, again, these are specialists.  These are the obesity medicine docs.  These are the diabetologists, these are the people who -- I mean, these are the people who are part of the development of this class of compounds.

The mantra has been mild to moderate, right.

And, again, just to be fair, they say most, right, which implies, when you think about it, well, maybe there's some, there are others.

But from a regulatory point of view, you have to talk about the serious stuff.  And

people ended up in emergency rooms with abdominal pain and evidence of obstruction, and docs didn't know what was going on, nor knew how to manage it.

BY MR. BROWN:

Q.    But aren't you speculating that docs didn't know what was going on?

A.    No.    I've talked to enough docs that it just -- you're sitting here and asking me how much is known about intestinal motility and there's more known on gastric motility.

I don't believe that your company put this out clearly as it should to meet regulatory standards.

Q.    Well, delays in gastric emptying have been in all of Novo's labels since day one.    And the peer reviewed medical literature is full of references to how these medications work, and that's been the case since they all came to market.

Isn't that true, Doctor?

MS. AMINOLROAYA:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Objection to form.  Lacks foundation.  Vague.

THE WITNESS:  I don't believe you -- you meaningfully conveyed the serious adverse events in the label, because it wasn't in the warning parts.

It wasn't in -- conveyed as warnings to -- it wasn't in 5 and 6.  It just -- it wasn't there.  You didn't warn.  I think that was reckless.

BY MR. BROWN:

Q.    Let's go to -- let's change subjects for a minute.

MR. BROWN:  Before we start, how are we doing?

MS. AMINOLROAYA:  We've been going almost an hour.  If we break at around 1:50, that will get us back here around 2.

MR. BROWN:  What time is it?

MS. AMINOLROAYA:  It's 1:37.

20260513_123-000000018

MR. BROWN:  Okay.  So I'm going to mark this article, and we'll take a break after that.

(Document marked for identification as Kessler Exhibit 10.)

BY MR. BROWN:

Q.    We've marked that as --

A.    I'm looking forward to this part of questions, thank you very much.

Q.    I'm sure.

A.    And I'm -- go ahead, please.

Q.    No problem.  I'm going to try to stay on topic here.

So I've marked as Exhibit 10, Dr. Kessler, a New England Journal of Medicine article that was authored by you and a number of other former commissioners of FDA.

Do you have that in front of you?

A.    I do.

Q.    Just very briefly, what was the purpose of this article?

A.    I think collectively there was significant concern that 35-plus years of strong regulatory vaccine policy at FDA was being undermined by erratic regulatory decisionmaking.

Q.    Sure.  And you authored this article, I believe, with -- as one of 12 former FDA commissioners, if I have my math right?

A.    I'm sure either FDA commissioners or probably acting FDA commissioners to be precise.

Q.    And if we go to the last page of this article, first full paragraph, do you see where it says, "The reanalysis relied on adverse event reports filed in the Vaccine Adverse Event Reporting System (VAERS), a passive postapproval surveillance system that collects unverified reports of any series of events occurring after vaccination VAERS reports."

Do you see that?

A.    I do.

Q.    And you say that by

themselves they cannot be used to determine whether a vaccine caused a particular event.

Do you see that?

A.    I see that.

MS. AMINOLROAYA:    Yeah, I'll object to this document as -- and this line of questioning as beyond the scope, and we're not -- Dr. Kessler does not opine on the Vaccine Adverse Event Reporting System in this report.

BY MR. BROWN:

Q.    By the way, Dr. Kessler, you reviewed and approved this article before it was submitted to The New England Journal of Medicine; is that right?

A.    Yeah, I mean, the -- who holds -- as you can imagine, you know, I don't know 12 lawyers to write a document or 12 FDA commissioners who holds the pen, right.  I didn't hold the pen, but I'll stand by things said in

20260513_123-000000018

this document.

Q.    Okay.  And you -- and with respect to the statement that the reanalysis relied on adverse event reports filed in VAERS, a passive postapproval surveillance system that collects unverified reports from any source of events occurring after vaccination, you stand by that statement, right?

A.    It's nuanced.  But keep on going.

Q.    Yeah.  Well, the same is true of the FAERS system for adverse event reporting; isn't that true?

A.    So it's a little more complex.  These are different systems.  These are different -- your job -- your client's job, okay, was to verify adverse events in VAERS and do follow-up.  And I think that's what your client was criticized for.  Right.

If you take VAERS -- are you talking about the line listing in VAERS?  Are you talking about the CIOMS

20260513_123-000000018

reports?  Are you talking about the company investigation after the review?

So it becomes -- it's just more -- it's -- again, VAERS has become a very political -- politicized system with many case reports being put in where there is not -- you know, again, it's a completely different system than VAERS.

Q.    They are both adverse event reporting systems, right?

A.    Right, correct.

Q.    And adverse event reports are unverified reports from any source as well; isn't that true?

A.    Not --

MS. AMINOLROAYA:  I'll object again to this line of questioning.  Vaccines have nothing to do with GLP-1s. Certainly not vaccines that have been on the market for decades.

And VAERS is also not anything that Dr. Kessler --

MR. BROWN:  It's a long

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 198 of 326    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

speaking objection.  Just object to form.

MS. AMINOLROAYA:  Object to form.  I'm surprised that counsel is using his time this way.  Representing that they need a lot of time with Dr. Kessler to talk about something that has nothing to do with his report.

THE WITNESS:  So, if you take just a report, I mean, that is a line listing, if you -- but that -- that is unverified until it becomes verified.  Okay.  And there's a -- there's a process that happens, that good pharmacovigilance requires certain number of follow-up attempts to validate certain information, to gather certain information, and that can be done.

I think the VAERS is notorious for that information

at this point because it became politicized to contain information that isn't -- I would hope that your company understands and takes serious, if it has an adverse event reported, it has a duty to investigate, to follow up, to validate or not validate, I mean, so that's critically important information that your company should benefit, and could -- and as we've seen, one of two FAERS cases, right, it has changed the label in and of itself.

I mean, if you validate and you investigate, and there's reason to believe, right, and it meets the regulatory standard. So, again, this is complicated.

BY MR. BROWN:

Q. So I'll just bring your attention back to the final statements where you say, "VAERS reports, by

themselves, cannot be used to determine whether a vaccine caused a particular event.  The system's primary purpose is to flag potential safety signals that must then be evaluated in carefully designed investigations.  VAERS data have well-recognized challenges, including reporting bias and a lack of control groups.  The FDA, therefore, relies on many other data systems and methods as well, including medical record review, active surveillance programs, and independent peer review."

Do you see that?

A.    I see that.  I hope that your company understands and takes seriously adverse event reports, and the

**Redacted - Confidential**

It's very important information, right, that your company has, when it gets this information, as with a vaccine company.  You can't use

the information if your company doesn't do its part.

Q. All of the limitations that you've cited here with respect to VAERS reports apply equally to FAERS reports; isn't that true?

MS. AMINOLROAYA: Object to form.

THE WITNESS: I pray, okay, that, again, I don't want to -- I don't want to go too far afield here. But I pray that the politicization of vaccines in the VAERS system does not carry over to how we treat other medicines in the other systems.

BY MR. BROWN:

Q. I'm not trying to politicize this at all, Dr. Kessler.

What I'm getting at here is, you've listed a number of limitations related to the interpretation of VAERS reports. And my question is the exact same limitations apply to FAERS reports; isn't that true?

Case 2:24-md-03094-KSM   Document 691-26   Filed 05/19/26   Page 202 of 326
CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

MS. AMINOLROAYA:  Object to form.  Lack of foundation.

THE WITNESS:  But they -- those limitations get removed from the -- if your company is carrying out its responsibilities.  Right.

You have the ability to verify by medical records and conduct certain follow-up and verify whether those adverse events occurred.

You didn't do that.

BY MR. BROWN:

Q.    A company doesn't have the ability to invent a control group in relation to interpretation of an adverse event report, Dr. Kessler.

A.    Well, you -- you know, I mean, as -- again, sorry for -- I don't mean to -- you know this field, sir.  I respect that.

But, you know, as I teach, okay, the -- knowledge is not only from controlled clinical trials.  You are

well aware of that.  Controlled clinical trials, right, have limitations -- have limitations of their own, and in certain instances -- I mean, the pharmacovigilance and causal association can be determined if you have strong mechanistic action, and you have -- and you have adverse events and challenge and dechallenge outside of controlled clinical trials, and it may actually be better if your controlled clinical trials are using MedDRA terms that are -- lead to misclassification.

So this notion that you can only get knowledge from controlled clinical trials, it depends what -- you know, you're mixing that up when it comes to the analysis of safety.

Your company knows -- the sophisticated people at your company know that adverse events have to be taken seriously, and they have to be analyzed to be sure to see what we can learn from them, you know, and can be highly important if they are consistent

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

with mechanism of the drug.

Q.    Do spontaneous adverse event reports have limitations?

A.    All -- all reports have -- any report will have limitations.

Q.    What is -- what are the limitations of spontaneous adverse event reporting?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  What are the limitations of spontaneous adverse events?  It depends on the actual facts of the -- of the report, right.

It is the truthfulness of the information.  The accuracy of the information.  The -- whether the information was followed up, whether they -- it was verified.  Whether -- how they analyzed the clinical judgment that was brought.  But they can be -- they are highly important.

20260513_123-000000018

Again, with some drugs, based on a handful of adverse event reports, which you know well if you talk to the Office of Safety and Surveillance, they will cite certain adverse event reports that led them to change the warning because they were followed up and verified and -- so there's strengths and limitations.

BY MR. BROWN:

Q.    What about when you're talking about an event that is common in the background population?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  So the -- again, there is -- the senior FDA officials have said it requires -- the analysis requires very significant clinical judgment to be brought to that case.

There are -- there are

20260513_123-000000018

events that even though they are not rare, and here we're dealing with not necessarily -- some nausea and vomiting, on that spectrum, I mean, is common. There are other events that are more less common.

It's -- they are going to require clinical judgment and the information in that case.

I mean, you go -- I mean, you basically look at, you look at temporality. You look at challenge/dechallenge in there. You look at confounders.

There are a lot of things you can bring both from -- that are part of the clinical judgment of whether that association -- whether there is a reasonable possibility of a causal association.

There are case reports here that I have read that are, in and of themself, in my

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 207 of 326
CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

clinical judgment, and in those who published it, there are convincing, there are other reports that are not as convincing.

BY MR. BROWN:

Q.    For what medical outcomes did you find the reports to be convincing?

A.    I saw, I mean, there are -- I have a book, but I think there are cases of certain -- certain cases -- I'm happy to go through, there's a notebook.

I think you can see drug-induced -- drug-induced severe constipation, fecaloma, phytobezoars, undigested food, in non -- you know, without significant confound -- you know, cases without confounders, some with some confounders, that certainly rise to the level of a possibility of an association or a reasonable possibility of a causal association.

Q.    Did you evaluate and compare the incidence of those events in

Novo's clinical trials particularly evaluating whether there's any difference between the incidence of those events in the treatment groups compared to the control groups?

A.    So, again, I didn't -- I didn't -- I didn't have -- the specific question, just say it again.  What studies did I -- what was the study did I do.

Q.    Let me rephrase it.

Did you evaluate Novo's clinical trials to compare the incidence of those events in the treatment groups to the incidence of those events in the control groups?

A.    For what endpoints?

Q.    The endpoints that you mentioned in your previous answer.

A.    I apologize.  So we certainly know that we looked at severe GI events as a composite.  And that was done, again, not necessary for the opinion, but I did do that.

I looked at the existing

clinical trial reports through multiple Novo trials. And I think, as we talked earlier, I didn't see an imbalance when you salami slice it to that particular event, in part, because, again, we have complexities in the MedDRA terms that are going to the issue of power.

Q. Well, why is power a problem if there's no imbalance in the first place?

A. Well, I mean, if you're -- if you have intestinal obstruction, and nine of those cases are caused by tumor or volvulus, right, and one of those is only drug-induced and you're looking at the -- you know, that whole group, you're going to not see an imbalance, because you don't have enough power to detect the drug-induced ones because you're mis-classifying. You're lumping everything together.

We're certainly high in the post-it notes.

Q. Is power relevant for adverse event reporting?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  You're mixing up, you know, I -- you know, you're -- you're asking me power of clinical trial design versus adverse event reporting. They are different methodologies in pharmacovigilance.

BY MR. BROWN:

Q.    If you're trying to infer causation from a single event, why isn't power a problem?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Because you have mechanism.  And because if there's biological mechanism, if you have biological mechanism, and you have the event occurring and you have Koch's postulates that you stopped the drug, and it goes away, I mean, that's the whole field of pharmacovigilance.

Please understand, I mean, I am not -- all we had to do was to get to either an association that there was reason to believe to get to a Section 6 and to a Section 5, a reasonable possibility of a causal association.

So if you -- you asked me about clinical trials.  And in clinical trials, you can ask whether the clinical trials are powered to see an effect on drug-induced gastroparesis when you are not measuring that specifically and you're just measuring intestinal obstruction, their power is relevant.

Pharmacovigilance reporting has nothing -- I mean, I don't see your question and understand the power.

MR. BROWN:  Let's take a break.

20260513_123-000000018

THE VIDEOGRAPHER:  Off the record at 1:58.

(Short break.)

THE VIDEOGRAPHER:  Back on the record at 2:11.

BY MR. BROWN:

Q.    Dr. Kessler, if we can turn to Page 207 of your expert report.

A.    Is this page number?

Q.    Page number.

A.    Thanks.  I just -- I just need to pull a couple of pages.  Let me just pull.

Just give me one second. Thank you, sir.

Q.    Are you on Page 207?

A.    I am, sir.

**Redacted - Confidential**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted - Confidential

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

# Redacted - Confidential

# Redacted - Confidential

# Redacted – Confidential

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

20260513_123-000000018



# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER



# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted – Confidential

# Redacted - Confidential

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted - Confidential

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

20260513_123-000000018

**Redacted – Confidential**

20260513_123-000000018

# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER



# Redacted – Confidential

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER



# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER



**Redacted – Confidential**

20260513_123-000000018

# Redacted – Confidential

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

20260513_123-000000018

CONFIDENTIAL – PERSONAL – PROTECTIVE ORDER

# Redacted – Confidential

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

# Redacted - Confidential

Q.    You understand that litigation cases alone can cause a stimulation in reporting; isn't that true?

MS. AMINOLROAYA:  Object

to form.  Lacks foundation.

THE WITNESS:  So, you know, it's interesting, in the answers -- in the discussion -- we're having two somewhat surreal conversations.  I mean, you're having one conversation with me.  The answer to your question is yes.

**Redacted - Confidential**

You're sitting here, asking me, saying that controlled clinical trials, there's no imbalance, but you've put intestinal obstruction on the label.

**Redacted - Confidential**

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

**Redacted - Confidential**

BY MR. BROWN:

Q.    I'm not saying anything, Dr. Kessler --

MS. AMINOLROAYA:    Please let -- Dr. Kessler, are you done?

BY MR. BROWN:

Q.    -- I'm just asking questions.

A.    I understand.  But you've implied that that adverse event is not -- adverse event reporting is not serious this morning.  You showed me that article.  You said that those reports are useless.

**Redacted - Confidential**

Q.    Sir, I know.  I think you're putting words in my mouth, Dr. Kessler.

A.    I'm sorry if I am.  I don't mean to do that, sir.

Q.    So all I asked you is isn't it true that a recent spike in adverse event reporting could be due, in part, to a stimulated reporting environment caused by litigation?

MS. AMINOLROAYA: Objection.  Calls for speculation.  Lacks foundation.

THE WITNESS:  Yeah, I mean, litigation, but we can -- we can look specifically at that question and that, you know, we can see whether the lawyers are determining -- your company knows how to do that.

# Redacted - Confidential

20260513_123-000000018

# Redacted - Confidential

David Kessler, M.D.     CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER     Page 236

# Redacted - Confidential

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted - Confidential

# Redacted - Confidential

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Redacted - Confidential

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted - Confidential

CONFIDENTIAL - PERSONAL PROTECTIVE ORDER

# Redacted - Confidential

Q.    Have you read Dr. Keller's deposition in this case?

A.    No, I've not.

Q.    Have you spoken to her?

A.    Only at my request -- at --

there was a time when I made the request.  I have not spoken to her since.

Q.    Okay.  Are you aware of whether or not Dr. Keller has reviewed the PSURs for any of Novo's medications?

A.    I would -- I would think -- I mean, I didn't -- I can't speak for Dr. Keller.  She testified herself.  I mean, she's not the regulatory expert.

You know, I'm happy to tell you -- I mean, I can tell you what's in the PSURs.  It would be more in my

# Redacted - Confidential

MR. BROWN:  How are we on time?

MS. AMINOLROAYA:  3 if that works for you.

BY MR. BROWN:

Q.    Let's go back to your

report, Dr. Kessler, to Paragraph 488, Page 191.

A.     Sorry, Paragraph 488?

Q.     Paragraph 488, Page 191.

A.     All right.  Just give me a second.

Okay.  Thank you.

Q.     Okay.  And do you see where you state based on the totality of evidence, it's your opinion that Novo should have added a Section 5 warning for severe gastrointestinal motility-related adverse events in or around 2014 for liraglutide and 2018 for semaglutide?

A.     Just give me one second. I do, sir.

Q.     Okay.  And then in 481.i, I believe you state that there should have been a cross-reference to Section 6 to include, among other conditions, a warning about ileus, impaired gastric emptying, and intestinal obstruction; is that right?

A.     Yeah.  There was a

reasonable association with those.

Q.    Ozempic was originally approved in December of 2017; is that right?

A.    Correct, sir.

Q.    Okay.  Why do you state that semaglutide should have had a severe GI warning in 2018 and not at the time of the drug approval?

A.    So I think that there are -- again, I think that if you go through, you can see that there are -- go back to -- in the events what you're starting to see, as I've said, there are adverse events that are coming in.  You have experience with the drug and it's those adverse events.  You look at the reports.

But, again, there is evolving adverse event profiles, challenge/dechallenge information.

Q.    Do you have an opinion as to whether or not semaglutide should have had a severe GI warning at the time of approval?

20260513_123-000000018

A.    I mean, I gave the 2018 date, that's what I -- that was my opinion.

Q.    Okay.  And the additional information that you just referenced after 2017 approval are adverse event reports?

A.    Well, there's continuing -- I mean, there's a continuing evolution of information, literature, et cetera, that is -- that was continually coming in.

Q.    In 2014, what information was Novo in possession of that would have required the company to include a warning related to ileus?

A.    So I have -- there are a number of things.  Well, again, I believe what I -- correct me if I'm wrong, the way I read 488 and 488.i, you're asking ileus, I'm saying there should have been Section 5, in my opinion, warning for severe gastrointestinal motility-related drug reactions.

20260513_123-000000018

Q.    In 2014?

A.    Correct.  For liraglutide, right.  And that should have had a cross to what those potentially are, to that range of spectrum at least being one of them I think.

So it's 2014.  I think there was enough information for serious gastrointestinal motility-related adverse events.  Right.

I think -- but you asked me, I think about ileus, right?

**Redacted – Confidential**

Hartford Reporting & Technology, LLC
www.hartfordreporting.com

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

**Redacted – Confidential**

Q.    And the reasons that you just stated are set forth, I believe, in Paragraphs 482 to 484 of your expert report; is that right?

A.    I'd have to -- no, I think it's also included in the paragraph that I cited also; 4 -- for this 417, 419, 275, 276, 306.1, and 313.1, plus others.

I think you have to look at the report.

Q.    Okay.  Did you -- as part of your analysis, did you evaluate the clinical trial data and any observational data that evaluated the relationship between liraglutide and ileus before 2014?

A.    Yeah.  So the clinical trial data, I think, again we discussed

earlier.  I think that, because, of, again, their power or, you know, how you define these -- what, you know, how you define these terms and the limitations to the preferred terms, that -- I mean, I looked at it.  I had Madigan look at it.  He came up with the, I think, statistical significance for the GI motility-related adverse events.

If you look at it individually you're not going to see that because it's not powered.

Q.    And to the best of my knowledge, Dr. Madigan didn't conduct that analysis, did he?

A.    Well, which analysis?  By specific terms?

Q.    Yes.

A.    I asked him to look at --

# Redacted - Confidential

# **Redacted - Confidential**

and there are other clinical trials we can talk about next time.

Q.    Are you aware of any clinical trials or observational studies that showed a statistically significant association between liraglutide use and ileus before 2014?

A.    I'm not.  I'm not aware of that, no.

And I think that, to be fair, if someone can pull the -- there's a quote in the pharmacovigilance review of 2022, where FDA says, now what would you have expected.

Q.    Are you aware of any epidemiological literature from 2018 or earlier that found a statistically significant association between semaglutide use and ileus?

A.    Do me a favor.  I need to look at my epi binder.  I'm sorry.  The afternoon is getting -- I need to just review.

Let me just ask again.  So you asked specifically with regard to semaglutide; is that --

Q.    Correct.

A.    Right.  And you asked -- so the studies that I show, showing a positive association, and you asked what was the date, sir?

Q.    2018 or earlier.

A.    So the studies that I see a positive association are 2020, 2022, '23, and '24, '25.  So the answer is no.

But, again, because of the limitations of the epidemiology and the confusing cat -- how you define these terms, and the limitation of the MedDRA terms, I wouldn't expect it unless you specifically, you know, were looking for it.

Q.    You mentioned a moment ago that intestinal obstruction existed on foreign labels earlier than they existed on the FDA approved labels; is that right?

A.    So, hold on one second.

20260513_123-000000018

Let me just get this right.

THE WITNESS:  Hannah, can you just see if there's -- I have a sheet on foreign labels, I believe.  I may have it.

Can you just see if you can -- Hannah, can you see if there's a -- I think I have somewhere exactly what the -- I'm blocking right now -- what -- what it is, the sheet on foreign labels.

I would -- I'd need to pull my notes just to refresh.

We certainly -- you asked about intestinal obstruction?

BY MR. BROWN:

Q.    Yeah.

A.    So we know, for example, 2013 PRAC required it.

THE WITNESS:  Do I have -- I have -- I have a chart and a table.  Yeah, thanks so much.

Thank you so much.

**Redacted - Confidential**

# Redacted - Confidential

20260513_123-000000018

**Redacted - Confidential**

Q.    And based on your experience in the field, you would expect FDA to be aware of changes to foreign labels; isn't that right?

20260513_123-000000018

A.     You know, I -- you know, I sort of live that -- I live very close to FDA in foreign labels on vaccines and discuss that.

You know, the answer is yes and no.

# Redacted - Confidential

I'm not sure FDA is fully aware of everything around the globe.

MR. BROWN:  What time do we have?

MS. AMINOLROAYA:  It's 3:05.

MR. BROWN:  Let's take a break.

THE VIDEOGRAPHER:  Off the

20260513_123-000000018

record at 3:07.

(Short break.)

THE VIDEOGRAPHER:  Back on the record at 3:39.

MR. BROWN:  Let's mark the Madigan report, Tab 6.

(Document marked for identification as Kessler Exhibit 11.)

BY MR. BROWN:

Q.    Dr. Kessler, do you have Exhibit 11, which I believe is Dr. Madigan's expert report in this case?

A.    I do, sir.

Q.    Okay.  And I know we were talking earlier today about two different composite endpoints that you provided to Dr. Madigan; is that right?

A.    Two composite sets of -- yes.

Q.    And one of those endpoints included more terms or medical outcomes than the other; is that right?

A.    Correct.  One was taken

straight from the label.  One, I used my clinical judgment, and then went to -- looked at the record and then went to Dr. John to confirm.

Q.    And Endpoint 2 included the terms from Endpoint 1 plus ileus paralytic, small intestinal obstruction, intestinal pseudoobstruction, intestinal perforation, bezoar -- if I pronounced that right?

A.    Exactly, sir.

Q.    Fecalith, gastrointestinal obstruction, and gastrointestinal hypomotility; is that right?

A.    And fecaloma -- well, I guess fecaloma was also -- yes, I think that's exactly right, sir.

Q.    Are you aware that when you removed the Endpoint 1 events from Endpoint 2, there's actually a statistically higher percentage of events in the placebo than the controls?

A.    Show me in Dr. Madigan's report where that is.

Q.    I believe if you go to

Page 6, 4.1.1.

A.    4.1.1.  So I have 4.6 --
4.1.1?

Q.    I believe so.

A.    I see he has a random effects, right.  Gives similar results.  Endpoint 2.  Show me where that --

Q.    Compare 4.1 to 4.1.2.

A.    4.1 is Appendix 10.  Is that what you're referring to --

Q.    Yeah --

A.    -- line 26.  Appendix 10.

Q.    4.1.1 on Page 6, to 4 point --

A.    I'm sorry, 4.1.1, or?

Q.    Yeah.  Yeah.

A.    4.1.1.

Q.    Yeah.

A.    I see what he has as the event counts and the rates.  And he has a relative risk of 2.6 in odds ratio, right.  And a confidence interval of two to three, pretty tight, and an I squared of 22 percent.  That's what I see for Endpoint 1.

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

20260513_123-000000018

And then, right, he does it by year, his odds ratio. And then Endpoint 2, I see the relative risk of 2.49. I see a tight confidence interval. I see a highly statistical P-value, and I certainly see a heterogeneity of below 50 percent.

So tell me how you get --

Q. Yeah.

A. Tell me what the --

Q. So if you take the event counts from Endpoint 2, of 215 --

A. Let me do this. Let me set up a table.

Q. On 4.1.2.

A. So you've done -- you've done your own calculation.

Q. All I've done is simple subtraction --

A. And you've done your own -- your own odds ratio.

Q. No, I haven't done an odds ratio. I just -- what I'm -- well, are you able to determine whether -- what -- what the results are when you remove

Endpoint 1 events from Endpoint 2?

A.    I'll let -- I'll let Dr. Madigan do any of the calculations. I don't want to -- although I'm a professor of biostats, we can sit here. But, I mean, I'm going to let Dr. Madigan deal with the actual calculations here, if that's okay.

Q.    Okay.  Fair enough.

A.    Unless it's something I can easily answer.  I mean...

Q.    Well, if you looked at the event counts and comparator in GLP-1 in both tables, and normalized for the denominators, I think it's pretty easy to tell that the events on placebo are actually statistically higher than the events on the GLP-1.

A.    If you --

MS. AMINOLROAYA:    Objection to form.

BY MR. BROWN:

Q.    But if you're not comfortable doing that calculation, that's fine.

20260513_123-000000018

A.    Yeah.  Let me let Dr. Madigan do any calculations, so I don't --

Q.    Okay.  Okay.

I want to talk about dose-response for a moment.

A.    Sure.

Q.    Another factor you considered in your analysis on labeling was dose-response; is that right?

A.    Sure.

Q.    Okay.  And if you could turn to Paragraph 448 of your expert report.  I don't have the page number handy.

Yeah, beginning on 177 and continuing on 178.

A.    Yeah.  I'll be there in a second.  Yeah.  Thank you.

Q.    Okay.  And you wrote, "For this factor, I considered whether there is evidence of a dose-response relationship between Severe Gastrointestinal Motility-Related Adverse Events and GLP-1 RA use."

                    Do you see that?

          A.     Right.

          Q.     And you considered gastrointestinal motility-related adverse events as a composite; is that right?

          A.     Including -- I mean, I wrote it, it's the way I wrote it, yes.

          Q.     You did not, you know, separately review dose-response for ileus and GLP-1 RA use; isn't that right?

          A.     I'd have to go back and look at all the evidence.

                    I think this is -- you know, I mean, I think -- I'd have to go back and double-check that.  I think I looked at it in aggregate.  I think there's been a general assumption.  I think -- not assumption.  I think it's well established that his dose-response effect -- that's why -- that's why the titration had to be done, to minimize the adverse events, on the GI tract. And we know, I think, from receptor

20260513_123-000000018

binding, et cetera, that that's all consistent with the biology.

Q.    Do you know if, in fact, there's evidence of a dose-response for GLP-1 RA use and the specific outcome of ileus?

A.    I'd have to go back and look to that.  I don't think I -- you know, I don't know -- I don't know if the science is well established on that.

I'd have to go back.  If you saw me slice it like that, that's why I -- again, I feel very comfortable -- just for the record, I feel very comfortable that the effects on motility are dose-response and that's what I said should be in the warning label.

Q.    Did you specifically review dose-response for intestinal obstruction and GLP-1 RA use?

A.    I don't think that would be -- I don't think you have -- you have it dealing with a rare event.  You are not going to be able -- I think I may

20260513_123-000000018

have looked -- I have to go back through the reports and the narratives to see when in the course of administration and dose titration, exactly at what dose, at what escalation points these were occurring. I'm not sure that is in the literature.

Q. Okay. Sitting here today, do you know if, in fact, there's evidence of dose-response for GLP-1 RA use and the specific outcome of intestinal obstruction?

A. I don't think there's enough power available -- in the clinical trial stuff I saw -- we can talk about the next time -- there was no dose-response -- I'd have to go back and look at the dose-response in those clinical trials. I don't know.

Q. If you turn to Page 181 of your expert report, Paragraph 456.

A. Yeah.

# Redacted – Confidential

CONFIDENTIAL - PERSONAL PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

And -- and -- well, what is a disproportionality analysis?

A.    So it's a tool in pharmacovigilance to simply put whether you would get -- you're getting more adverse events than you would expect, I mean into the database, compared to some comparator.

So are you getting more, what was the -- I forget which comparator they used here.  But it's certainly elements -- I mean, usually EB05 can give you a signal.

Q.    Okay.  And in a disproportionality analysis of adverse event reports, you're comparing reports to reports, not incidence rates to incidence rates, right?

A.    Correct.

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 269 of 326

Q.    You can't --

A.    There's not -- well, there are a number of different tools.  You don't have a denominator.  You don't have a denominator here.

Q.    Yeah.  And for all spontaneous adverse event reports, isn't it true that, because you don't have a denominator, you're unable to calculate risk on a population basis?

A.    You can get a signal.

Q.    Yeah.  A reporting signal.

A.    You get a signal that should raise a red flag that lets you look at -- the question is, this factor, it's interesting, is frequency.

I mean, if you ask the FDA reviewers, I mean, these are just -- are you getting -- like what's coming into the adverse event.  It's interesting.

They don't -- they don't cite the epidemiology.  They actually look at what's in FAERS.

And, sorry, let me just turn this off.  I apologize.  So it's

20260513_123-000000018

not -- it's off, but it's still ringing.
I apologize.

You're getting a signal.
Again, this is just one factor.

Q.    Yes.

A.    I don't think it's --
again, it's not, like, mechanism.  I
mean, it's not -- to me it's not a --
it's not the most significant factor.

Q.    Yeah.

A.    But it's listed and that's
why I include it.

Q.    Yeah.  And spontaneous
adverse event reports can't be used to
calculate risk ratios that you would
calculate in clinical research, right?

A.    I think I understand what
you're saying, and I would agree with
that.  Again, that's not the purpose
here.

The purpose here is, is
there an association for 6, and is there
a reasonable possibility of a causal
association for 6.  So, again, you look
for a number of different factors and

you --

Q.    But when you're referring to a signal, you're referring to disproportionate reporting on the drug in question compared to reporting on other drugs.

A.    Exactly.  You -- so you don't -- it's sort of a forced control, in essence.  I mean, based on, you can't -- you're not just looking at, there were 50 cases.

If I looked at how many cases had intestinal obstructions you're getting versus -- meaning from the GLP-1s versus the SGLT-2s, there's somewhat of a control, there's a similar population, similar population intended treatment.

Q.    Yeah.  I mean, what I'm trying to understand is that you're not comparing the numerator of events in the exposed population to the numerator of those events in a comparator population?

A.    Well, you often -- if the numerator is the number of adverse

events, you don't have the benefit of the denominator.

Q.    Yeah.  Yeah.  I think we're saying the same thing.  What --

A.    I mean, you -- again, to me, just so -- so it's clear, I think I've said this many times, you know, mechanism and the quality of what you're seeing, I mean, clinically, I think it gets you there.

All these other things, I

# Redacted - Confidential

Q.    Okay.  All right.  Just going back to your report.

On Footnote 521 on Page 183, you also note that "All [drug-event combinations] with EBGM

greater or equal to 2 are considered hits."

     Do you see that?

A.    Right.



**Redacted – Confidential**

20260513_123-000000018

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

# **Redacted – Confidential**

# Redacted – Confidential

20260513_123-000000018

# Redacted – Confidential

20260513_123-000000018

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 279 of 326

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

# **Redacted – Confidential**

Q.    There's a portion of your report where you compare the Novo's GLP-1 RA labels to the labels for other medications; is that right?

A.    No, not exactly.  If I can state it in my words.

Q.    Of course.

A.    I believe this notion of severe gastrointestinal hypomotility, right.  And to your point earlier, what is that category?  I think that certainly with regard to the anticholinergics, there is a specific warning.  We'd have -- we'd have to pull it up, that -- it is in the anticholinergics.  It may be in certain of the opioid drugs too.

Q.    Yeah.

A.    But this is not a new concept.  The anticholinergic receptors are different than the GLP-1 receptors. But this constellation of being a

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

spectrum, where you are focused on --
your questions are what about ileus and
what about intestinal obstruction and
those.

And if you look at the
anticholinergics you can see FDA dealt
with these motility conditions as a
class, as a grouping, and warned about
severe -- let's see what it says.  Let
me pull the paragraph.

I didn't want -- please, I
did not mean to say the mechanism is the
same or the receptor is the same, right.
Just whether other warned about serious
gastrointestinal motility adverse
events.

So if you go -- this is not
something that's novel.  I'm talking
about motility disturbances.

Q.    If you go to Paragraph 222
of your expert report, please.

A.    I'm there.

Q.    Okay.  I believe in that
portion of your expert report, you --
you reviewed the Trulicity label as of

2024, and as you just mentioned, other drug classes and medication that affected gastrointestinal motility.

A.    Correct.

Q.    Okay.  How much did other labels factor into your analysis as to whether Novo should have included a Section 5 warning?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Is this the question you ask, how high a fence is, it should be six feet, which is what percentage would be my factor.  Right.

So I think where it becomes important is if you look -- let's go through the FDA factors.  Okay.

And if you go through the FDA factors, one of those factors, to my memory is whether other drugs in the class show similar pharmacological effects, right.

And you certainly see -- so to the extent to which other labels -- you know, you have severe gastrointestinal adverse events being put on other labels, because we have that pharmacological effect -- those pharmacological effects on motility are recognized as a class effect, I think.

We all do -- and the second point is, just to go to your point, this is not some novel compilation that I'm putting together.  I mean, motility disturbances are being warned about as it was done with the anticholinergics.

So I don't think -- I think this is just additive, if that's fair.  It's one point in a thousand.  You can strike all this and it doesn't change my opinion.

BY MR. BROWN:

Q.    How did you select the labels that you included as examples in your report?

A.    So, two things.  There's one other -- there's one other as you said.  There's two manufacturers, right now with approval, so that's -- that gives me a universe.

I mean, also, I knew pharmacologically what were the motility disorders or not.  I mean, I recognize GI set of symptoms and what are the -- I mean, it's known in the anticholinergics as well as the opioids, I mean, have receptors that modify and result in a spectrum of conditions.  And they recognize this as severe.

Q.    The FDA would have been aware of the Trulicity label when it approved the Ozempic label; isn't that right?

A.    Only you can testify on what awareness is.  I can't testify to what someone's subjective state of mind is.

They would have had -- they would have had -- they would have had that information. It would have been available to the division of course. We would have had -- we don't know what the individual medical reviewer would have done.

BY MR. BROWN:

Q. Well, FDA was aware that severe GI adverse events occurred in GLP-1 RA users in 2017 when Ozempic was approved; isn't that true?

A. I'm not going to testify --

MS. AMINOLROAYA: Object to form.

THE WITNESS: -- what FDA was aware of.

BY MR. BROWN:

Q. Well, based on your review of the record, can you tell me what FDA had available to it when Ozempic was approved in 2017?

A. FDA had available to it what the companies provided to it.

Q. And that would include

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

evidence of severe GI adverse events that occurred in Novo's clinical trial database; isn't that true?

A.    If you had those, you would have labeled severe GI adverse events. I'm not sure I understand what --

Q.    Well, I'm asking --

A.    FDA responds -- is only as good as what you give it, right.  And FDA is not doing this independent. You're proposing a label.  You didn't propose this as the label.

Q.    Yeah.  My question is, in 2017 when Ozempic was approved, FDA had available to it evidence of severe GI outcomes that had occurred in both the Ozempic clinical trial program and the clinical trial program of predecessor GLP-1 RAs; isn't that true?

A.    There are certainly people in the division who were probably working on that.  You know, I mean, we can go back and compare -- I didn't compare exactly who the reviewer was and who signed off on those same labels.

20260513_123-000000018

But, again, FDA, when it's dealing with your company, is looking at your company, what your company has submitted.  It's not responsible to, you know, carry over what other companies are doing.

Q.    I think the other medication class that you were referring to were atypical antipsychotic medications used for treatment-resistant schizophrenia; is that right?

A.    Show me the paragraph.

Q.    Well, the references that you made earlier to Clozaril and Lotronex --

A.    Show me the -- show me where in the paragraph.

Q.    Yeah.

A.    I mean, I have in my -- I thought, just show me --

Q.    The Clozaril paragraph --

A.    Let me pull the paragraph.

Q.    I think Tab 31 you've got the --

A.    Tab 31.

20260513_123-000000018

Case 2:24-md-03094-KSM    Document 691-26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 288 of 326

Q.    -- the Clozaril label.

A.    Do me a favor.  What paragraph --

MR. GISMONDI:  479 on Page 188.

THE WITNESS:  188. Thanks.  That's what I've been looking for.  Let me just pull -- Page 189?

BY MR. BROWN:

Q.    Yeah, if you look at Page 188, Paragraph 479, Dr. Kessler, I think you make reference to the Clozaril label.

A.    478.

Q.    188, Paragraph 479.

A.    Okay.  So it's -- but it's an anticholinergic.

Q.    Yes.

A.    Correct.

Q.    Okay.  And that medication was initially approved in 1989; is that right?

A.    I -- I believe -- I mean, I don't know, have it in my head.  19,

540.  I don't have that -- I don't have the approval date there.

This is -- the Clozaril is an example of an anticholinergics is what I refer to.

Q.    And -- well, Clozaril only added a warning regarding severe gastrointestinal adverse reactions in April of 2020, approximately 31 years after it was first approved; is that right?

A.    I think that is exactly correct.  It was -- it was many years afterwards.

Again, the point is there's this constellation of hypomotility with severe complications.

You were raising my -- my composite of hypomotility, and the only point that this responds to is don't be surprised when there are symptoms that are associated with hypomotility because you see this with other drug categories.

This is not -- yours is not the first -- yours is not the only

20260513_123-000000018

drugs. The opioids, the anticholinergics, I mean, are -- can affect a range of hypomotility which affects a range of symptoms. That's the only point.

Q. And did -- do you know why it took 31 years to update the Clozaril label to include a warning for severe gastrointestinal adverse reactions?

A. At one point I looked. I don't think -- I mean, it's the -- I'd have to go back and study the history of this.

I don't think we -- FDA took severe constipation -- realized people can die from severe -- I mean, the realization that people die from severe constipation is sometimes underestimated.

Q. I am almost finished today actually. I just want to ask a few more questions.

So you mentioned ileus and intestinal obstruction as severe adverse GI events that should have been warned

20260513_123-000000018

about earlier in Novo's GLP-1 RA labels;
is that correct?

A.    I would phrase it a little different, sir.

I mean, so, to be clear.  I mean I think that these drugs affect -- very simply put, they reduce and impair, you know, GI motility.  They can give a range of symptoms and conditions.  Those can be very severe.  They range the spectrum.  They can include the conditions you mentioned.

But it's that -- just as you just talked about, severe hypomotility with severe complications, I think you can have gastrointestinal hypomotility with severe complications with GLP-1s.  I think that was what was underestimated.

Q.    Yeah.  Yeah.

A.    I mean, to me the issue isn't just one -- this severe, related to hypomotility that can result -- you can say it in a number of different ways.

20260513_123-000000018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Yeah.  Yeah.  I'm just trying to determine the clinical outcomes that you believe should have been warned about sooner than when they were.

A.    Yeah.  So they are the -- what I care about is the patient who has been on this drug, who's dose escalating, who comes in in severe abdominal pain, right, who says, you know -- may or may not say I've been severely constipated, right.

I think we have to -- you know, doctors and patients need to be warned of that condition, which can be an emergency, right, or can look like an emergency, I mean, and what do we know about that condition.  What do we know about the effect of slowing down GI motility causing severe constipation, and what's the constipation or -- altering the myenteric plexus activity, what does that look like clinically, so doctors can take care of their patients and that risk/benefit can be warned

20260513_123-000000018

about in taking into the individual risk/benefit equation.

That's what I think should be on the label.  It's not just one word, ileus.  It's taking into account the serious complications that occur from that spectrum of conditions.

Q.    Wasn't the risk of constipation well characterized in every single label that Novo marketed in relation to their GLP-1 RAs?

A.    So let me just pull -- the answer to that question is no.

I don't think, when I tell you -- when I tell the average person, or even the average doc that this drug can cause constipation -- let's get the exact wording, right.  20 -- let me see if I can pull.

So -- so, so you list, for example, let me just get it, adverse reactions to placebo control.  No doubt you talk about nausea, vomiting, diarrhea, abdominal pain and constipation, right.  That's listed in

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 294 of 326

with the placebo and in your control trial data.

I think that nowhere does that say, right, that you can end up in the hospital.  You can end up in surgery.  You can obstruct.  You can perforate.  You can have sepsis, right.  This could be a life-threatening condition.

When you just say constipation, that doesn't take care of it in my view.  Constipation is not the same thing as the severe complications.

You did, for example, you said, well, the stroke can cause dehydration, right, and then you warned about acute kidney injury.

So this drug did cause constipation, can cause severe constipation, and you should have just simply said, "And it can cause serious GI effects, including, you know, leading to intestinal obstruction."  It's as simple as that.

Q.    In your opinion, the

average doctor wouldn't understand the potential consequences of constipation in some cases?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Play the -- play the videotape of all the presenters, right, the lines are mild to moderate.  Most are mild to moderate.  You underestimated the extent.

I mean, had you -- had you told everyone that, you would have known.  You didn't tell everyone.  You kept on the lines were mild to moderate.  The tachyphylaxis.  That's what I heard repeatedly, and that's still what's in the record.

BY MR. BROWN:

Q.    To the best of your knowledge, Dr. Kessler, what specific GI outcomes has FDA identified through adverse event reporting as opposed to clinical trials or other studies of

GLP-1s?

A.    I'd have to --

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I'd have to go back and -- I mean, you're narrowing it to GI.  You know, I'd be happy to go back.

I mean, in general, Japan has written articles on how single adverse events -- we can go back and see what he cites. I have not done a search of that.

BY MR. BROWN:

Q.    Okay.  But nothing comes to mind in terms of GI outcomes that have been discovered through adverse event reporting which were not observed in clinical trials or observational studies?

A.    So -- well, now you added from clinical trials to observational studies.  And you have observational studies.  Some here are positive, and

20260513_123-000000018

some -- some are negative.

We have -- for example, let's go back and look at the anticholinergics.  We can look and see what the anticholinergics and others in the clinical trials.  I don't know.  I don't know the answer to that question.

Q.    Yeah, and you might have misunderstood my question.  I was trying to limit it to Novo's GLP-1 medications.

A.    I missed the answer.  Yeah, I mean, I missed the question.

Q.    Yeah.  I'm trying to understand whether, to the best of your knowledge, there are specific GI outcomes that FDA identified through adverse event reporting which were not identified in clinical trials or other studies of GLP-1s.

**Redacted – Confidential**

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 298 of 326

# Redacted – Confidential

20260513_123-000000018

Redacted – Confidential

Redacted - Confidential

# Redacted - Confidential

# Redacted - Confidential

# Redacted - Confidential

# Redacted – Confidential

# Redacted - Confidential

# Redacted - Confidential

# Redacted - Confidential

# Redacted – Confidential

# Redacted – Confidential

# Redacted - Confidential

# Redacted – Confidential

20260513_123-000000018



# Redacted – Confidential

# Redacted - Confidential

20260513_123-000000018

# Redacted - Confidential

A.   **Redacted – Confidential**

# Redacted – Confidential

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

# Redacted – Confidential

20260513_123-000000018

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

# **Redacted – Confidential**

BY MR. BROWN:

Q.    I don't think you answered my question, Dr. Kessler.

I had asked that, based on your review of the FDA record in this case, has FDA specifically concluded that the labels for any of Novo's GLP-1 medications are or were inadequate due to deficiencies in Novo's pharmacovigilance process?

MS. AMINOLROAYA:

Objection.  Asked and answered.

20260513_123-000000018

THE WITNESS:  We don't have access to FDA's complete record.

**Redacted - Confidential**

BY MR. BROWN:

Q.    Sitting here today, can you tell me whether FDA has specifically linked deficiencies in Novo's pharmacovigilance practices to inadequacies in Novo's GLP-1 drug labeling and warnings?

A.    I don't -- I can ask FDA.

**Redacted - Confidential**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Redacted - Confidential

20260513_123-000000018

# Redacted - Confidential

# Redacted - Confidential

Again, you're asking me my opinion.  It sure looks like it.  But, you know, I don't -- I'm limited to exactly what the record shows and others can draw their conclusion.

BY MR. BROWN:

Q.    Thank you, Dr. Kessler.  Give me just a couple more minutes to confirm with my colleagues.  I think we're done.

THE VIDEOGRAPHER:  Off the record.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Off the record at 4:43.

(Short break.)

THE VIDEOGRAPHER:  Back on the record at 4:55.

MR. BROWN:  Dr. Kessler, thanks for your time today.  I have no further questions.

Just, once again, I'm just going to reserve the right to review the materials that you brought, the additional notes that you brought, some of the blown-up exhibits that you brought, and then, again, reserve the right to ask additional questions based on new information, if -- if we see the need to do that.

I'll end there.

MS. AMINOLROAYA:  And we would -- these exhibits have been available to counsel today. These are Dr. Kessler's notes. He brought them with him to the deposition this morning.

20260513_123-000000018

Counsel has taken pictures of them in the morning, had them available during the lunch break, and throughout the breaks today.  So we would ask that if you have any questions about them, you ask them today.

MR. BROWN:  Given the total magnitude of materials, it's just impossible for me to evaluate them and formulate questions and conduct an examination based on them.  I just need to see what's there, and we'll leave it there.

MS. WATRAL:  For Lilly, I want to put one thing on the record.  We would ask that to the extent Dr. Kessler is planning to have similar summary note materials for the Lilly portion of the deposition, that we get a copy of those in advance.  We'd ask for them the day before.

I understand from our discussion on the break just now that those don't exist today, but to the extent that Dr. Kessler is planning to create or have those documents available to him on the day of the second part of the deposition, that's what we're asking for, is to have copies of those in advance.

And then the other thing I want to say on the record is, today, until the point of the break, I think we were on the record for just a little over five and a half hours.  I just don't want there to be any confusion.  We're going to use the remainder of the 11 hours.  I know there was some discussion of allocation between us and Novo, I just don't want there to be any confusion about that.

MS. AMINOLROAYA:  And when

you say you're going to use it, that's Lilly going to use the six and a half hours?

MS. WATRAL:  The remainder of the time, yes.

THE WITNESS:  So --

MS. AMINOLROAYA: That's -- that's it.  We'll leave it.

THE WITNESS:  Okay.  I'm not available beyond 12:30 on the date.

MS. AMINOLROAYA:  I think we have realized there is some logistical complexities on the 14th.  So we will work together to see if we can find another date.

THE WITNESS:  Also, I'm happy to stay here for eight hours today.  That was my understanding initially.  I'm happy to stay here for eight hours today.  I don't have -- on the 14th, I'm flying out.  I'm

available till 12:30.

Just let that be on the record.  And I'm happy to stay here.  If you want to go, let's go, if you want to use seven hours today.  But I'm here for seven hours today.

MS. WATRAL:  I appreciate that.

THE WITNESS:  Let counsel deal with that.  I'm not -- this is --

MS. AMINOLROAYA:  We'll --

THE WITNESS:  I'm happy to stay.  I'm happy to let you read all these sheets and answer your questions tonight as late as you want, but we're not doing this again.

MS. WATRAL:  And I appreciate that.

Just for the record, the deposition was previously scheduled for the 13th and 14th.  We agreed to move this

date to today contingent on it only being Novo doing the questioning because of a scheduling issue on our end for questioning today.

And so I just want that to be clear on the record for the reason that we're --

THE WITNESS:  And the record should be clear that I was told -- I made it very clear that I have eight hours available today, and three hours available on the subsequent day. That's what I got.  Nothing else.

So if you want more time, talk to counsel, but I don't have more than three hours available on the 14th.

MS. AMINOLROAYA:  I think this is just an error, Diana, but the deposition was not scheduled for the 13th.

MS. WATRAL:  Was it the

14th and 15th?  It was two back-to-back days with the 14th.

MS. AMINOLROAYA:  We originally offered -- I mean, we can go over the entire scheduling history.  I don't think that the record needs that.

But it's -- we've offered two dates that Dr. Kessler was originally available, the 8th and the 9th.  Those were not accepted.  We worked to find alternative dates.  It's a full schedule.  Everyone has a full schedule.

And so there have been changes, I think, on both sides at this point in time.  And we will work with you to find a date that works for Lilly.

MS. WATRAL:  Sounds great.  Thank you.

THE VIDEOGRAPHER: Anything else from anybody?

CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

                    MS. WATRAL:  No.

                    THE VIDEOGRAPHER:  All
right.  That is everything.  Off
the record on March 31, 2026, at
5:00 p.m.

                    * * * * * * * * * *

                    (Excused.)

                    (Deposition concluded at
approximately 5 o'clock p.m.)

20260513_123-000000018

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, DAVID A. KESSLER, M.D., have the opportunity to read and sign the deposition transcript.

MICHELLE L. RIDGWAY,
A Registered Professional
Reporter, Certified Shorthand
Reporter, Certified Realtime
Reporter, Certified Court
Reporter, and Notary Public
Dated:  April 1, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

20260513_123-000000018

Case 2:24-md-03094-KSM    Document 691-26    Filed 05/19/26    Page 323 of 326

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

```
      _   _   _   _   _   _
      E   R   R   A   T   A
      _   _   _   _   _   _
```

PAGE   LINE   CHANGE

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

_____  _____   _____

   REASON:      _____

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 324, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

DAVID A KESSLER, M.D.                    DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____


Notary Public_____

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

20260513_123-000000018

## LAWYER'S NOTES

PAGE    LINE

20260513_123-000000018