# EXHIBIT 27D



David Kessler, MD Volume II

4/22/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: GLUCAGON-LIKE                )
PEPTIDE-1 RECEPTOR AGONISTS         ) CIVIL ACTION
(GLP-1 RAS) PRODUCTS                )
LIABILITY LITIGATION                ) MDL No. 3094
_____        ) 24-md-3094
THIS DOCUMENT RELATES TO:           )
ALL ACTIONS/ALL CASES               ) HON. KAREN
                                    ) SPENCER MARSTON


WEDNESDAY, APRIL 22, 2026

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of David A.

Kessler, MD, Volume II, held at the offices

of Morgan & Morgan, 1901 Pennsylvania Avenue

NW, Washington, DC, commencing at 10:04 a.m.

Eastern Time, on the above date, before

Carrie A. Campbell, Registered Diplomate

Reporter, Certified Realtime Reporter,

Illinois, California & Texas Certified

Shorthand Reporter, Missouri, Kansas,

Louisiana & New Jersey Certified Court

Reporter.

- - -


HARTFORD REPORTING & TECHNOLOGY
855.443.3767
www.hartfordreporting.com

A P P E A R A N C E S :


SEEGER WEISS LLP
BY:   PARVIN AMINOLROAYA
         paminolroaya@seegerweiss.com
55 Challenger Road, Sixth Floor
Ridgefield Park, New Jersey  07660
(973) 639-9100


and


WAGSTAFF & CARTMELL LLP
BY:   SARAH RUANE
         sruane@wcllp.com
         HANNAH PFEIFLER
         hpfeifler@wcllp.com
         ERIC D. BARTON        (VIA ZOOM)
         ebarton@wcllp.com
4740 Grand Avenue, Suite 300
Kansas City, Missouri  64112
(816) 701-1100


and


MORGAN & MORGAN
BY:   BETHEL KASSA           (VIA ZOOM)
         bkassa@forthepeople.com
20 M Street SE, Suite 600
Washington, DC 20003
(202) 772-0560


and


MORGAN & MORGAN
BY:   KIMBERLY HORSLEY       (VIA ZOOM)
         khorsley@forthepeople.com
633 West 5th Street, Suite 2200
Los Angeles, California  90071
(323) 825-3424

and


LEVIN, SEDRAN & BERMAN LLP
BY:   FREDERICK S. LONGER    (VIA ZOOM)
      flonger@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106-3697
(215) 592-1500


and


LIEFF CABRASER HEIMANN & BERNSTEIN
BY:   DANIEL E. SELTZ        (VIA ZOOM)
      dseltz@lchb.com
50 Hudson Street, 8th Floor
New York, New York  10013
(212) 355-9500
Counsel for Plaintiffs


DLA PIPER LLP (US)
BY:   BRENNA D. KELLY
      brenna.kelly@us.dlapiper.com
33 Arch Street, 26th Floor
Boston, Massachusetts  02110-1447
(617) 406-6000


and


DLA PIPER LLP (US)
BY:   LAUREN GRINDER        (VIA ZOOM)
      lauren.grinder@us.dlapiper.com
1900 North Pearl Street, Suite 2200
Dallas, Texas  75201-2482
(214) 743-4500


and

DLA PIPER LLP (US)
BY:   BRADLEY JENNINGS      (VIA ZOOM)
          bradley.jennings@us.dlapiper.com
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
(212) 335-4846
Counsel for Novo Nordisk A/S and
Novo Nordisk Inc.


KIRKLAND & ELLIS LLP
BY:   DIANA M. WATRAL, P.C.
          diana.watral@kirkland.com
          RENEE D. SMITH
          renee.smith@kirkland.com
          MARIE NOTTER
          marie.notter@kirkland.com
          MARK PREMO-HOPKINS     (VIA ZOOM)
          mark.premohopkins@kirkland.com
          ELISABETH FRIEDMAYER  (VIA ZOOM)
          elisabeth.friedmayer@kirkland.com
          ANDREW HARTFORD        (VIA ZOOM)
          andrew.hartford@kirkland.com
333 West Wolf Point Plaza
Chicago, Illinois  60654
(312) 862-2000

and

GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
BY:   ELIZABETH C. CURTIN    (VIA ZOOM)
          ecurtin@goldmanismail.com
          BRIDGET WHOLEY        (VIA ZOOM)
          bwholey@goldmanismail.com
191 North Wacker Drive, Suite 3000
Chicago, Illinois  60606
(312) 681-6000
Counsel for Eli Lilly & Company


  ALSO PRESENT:

        SCOTT TWOMEY, paralegal, Seeger Weiss

        MICHAEL BACHMANN, paralegal, Seeger
  Weiss

V I D E O G R A P H E R :
     DAVID CAMPBELL,
     Hartford Reporting & Technology

                         –  –  –

INDEX

                                                    PAGE

APPEARANCES.................................... 326

EXAMINATIONS

   BY MS. WATRAL............................... 333


                    EXHIBITS

 No.    Description                                Page

 12     David A. Kessler notes                      336

 13     Expert Report David A. Kessler, MD          338

 14     NOT MARKED

 15     Expert Report, David A. Kessler,            340
        MD, unredacted

 16     February 2026 Saxenda label                 368

 17     March 2026 Trulicity label                  376


     (Exhibits attached to the deposition.)


CERTIFICATE.................................404

ACKNOWLEDGMENT OF DEPONENT....................406

ERRATA......................................407

LAWYER'S NOTES..............................408

VIDEOGRAPHER:  We are now on the record.  Today's date is April 22, 2026, and the time on the video monitor is 10:04 a.m.

My name is David Campbell.  I'm the legal videographer with Hartford Reporting.

This is in the matter of Glucagon-Like Peptide-1 Receptor Agonist, GLP-1 RAs, Products Liability Litigation, Civil Action Number MDL Number 3094.  This is in the United States District Court for the Eastern District of Pennsylvania.

The deponent today is Dr. David Kessler.

The court reporter is Carrie Campbell, also with Hartford.

All counsels' appearances will be noted on the stenographic record.

If the reporter will please swear in the witness, we may proceed.

THE WITNESS:  I'm asking for clarification of whether this is a separate deposition or is it a

Case 2:24-cv-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

continuation.

MS. WATRAL:  It's a -- I think it's as part of the same deposition.

THE WITNESS:  It is part of the same --

MS. WATRAL:  It is part of the same deposition, yes.

THE WITNESS:  It's part of the same deposition.  Okay.

I'm happy to be sworn again.  I don't have any problem with being sworn.  But it's the same deposition.  We have one deposition here.  This is a continuation of that deposition.

MS. WATRAL:  That's right.  And just for completeness, we'll just re -- we'll do a reswearing.

THE WITNESS:  I'm happy to be sworn again.

DAVID A. KESSLER, MD, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendants, as follows:

DIRECT EXAMINATION

QUESTIONS BY MS. WATRAL:

Q.    Hi, Dr. Kessler.  My name is Diana Watral.  We met last time, said hello again earlier today.  It's nice to see you again today.

A.    It's a pleasure.

Q.    Before I get started with questioning, I'm going to read on the record some agreements that we have with plaintiffs' counsel related to your opinions.

MS. WATRAL:  The first agreement is that for purposes of Issues 2 and 3 in the MDL, plaintiffs are not relying on Dr. Kessler or proffering an opinion from Dr. Kessler that tirzepatide warnings or labeling were inadequate.

And the second agreement is that Dr. Kessler's notes, which we are marking as Exhibit 12, are not a supplemental or amended disclosure.  The notes will not be used in argument or briefing about disclosure of Dr. Kessler's opinions that were

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 12 of 86    CONFIDENTIAL - PERSONS - PROTECTIVE ORDER

disclosed on January 2nd.

MS. AMINOLROAYA:  Diana, we had agreement on the second agreement.  I didn't -- I did not understand --

MS. WATRAL:  I apologize, Parvin.

MS. AMINOLROAYA:  -- last conclusion on the first agreement.

MS. WATRAL:  My apologies.  I had a different understanding.  So let me just read you this so that we're on the same page about this.  And my apologies for that, Parvin.

So let me restart, and I apologize there.

So here's what our agreement is, and I will strike what I had previously said.

Our agreement is one agreement, which is, Dr. Kessler's notes, which are Exhibit 12, are not a supplemental or amended disclosure.  His notes will not be used in argument or briefing about disclosure of Dr. Kessler's opinions that were disclosed on

January 2nd.

Do you agree with my recitation of our agreement there?

MS. AMINOLROAYA:  Yes, with the -- just a clarification that they're not a supplemental or amended disclosure of his opinions.  They may contain facts that he's disclosed in his -- from documents that he's disclosed in his supplemental materials considered list.  We would consider that a supplement, those facts.

So -- and just -- I'm not trying to -- the only thing, if he has -- any of those documents are on his supplemental materials considered list, we would still consider those to be, you know, a fair supplementation of the materials he relied on and facts that he considered as further supporting his opinions.

MS. WATRAL:  Understood.  But I believe we're in agreement that the notes are not a supplemental or

amended disclosure and that plaintiffs won't point to the notes in any argument or briefing about disclosures.

Is that what we're agreed on?

MS. AMINOLROAYA:  Yes, as to opinions.

I just want to make sure that we're clear that, you know, they may discuss facts that he's supplementally identified, and we agree that -- you know, we don't agree that those are not fairly disclosed.

MS. WATRAL:  We will...

(Kessler Exhibit 12 marked for identification.)

QUESTIONS BY MS. WATRAL:

Q.    Dr. Kessler, I'm going to mark as Exhibit 12 the notes that counsel provided to us last night.

Does Exhibit 12 look to you like the notes that you prepared in this litigation with respect to Lilly?

A.    It -- I prepared notes.  This looks like -- and I might not turn every

page.  I made every page available to counsel.  They took pictures.  I'm sure this is accurate.  Right?

With respect to Lilly, these are notes.  I think they're with respect to to Lilly, but I haven't looked at every note, whether they respect for Lilly.

MS. WATRAL:  And, Parvin, would you -- are you -- will you represent that this is the scope of his notes?  I assume you took pictures of everything that Dr. Kessler has with him today.

MS. AMINOLROAYA:  As far as the sheets over here, yes, that is my understanding, that Exhibit 12 represents the sheets.

There are other materials in the room.  Those are related to the paragraphs in the report.

So what was the question?  Sorry.

MS. WATRAL:  I can reask my question.

MS. AMINOLROAYA:  Yeah.  I

mean, we didn't take pictures of the binders, for example.

MS. WATRAL:  Understood.

In terms of Dr. Kessler's notes, Exhibit 12 includes the notes that you-all sent to us last night, and you're not aware of any other notes that he has with him today that you didn't send to us last night.

MS. AMINOLROAYA:  Notes that he has with him today.  We can confirm that.

You know, I just -- I have not asked him that question specifically, if there is, you know, something that was created between the time we produced this to you and now, so I'm happy to inquire about that on a break.

MS. WATRAL:  That's great. Thank you.

(Kessler Exhibit 13 marked for identification.)

QUESTIONS BY MS. WATRAL:

Q.    Dr. Kessler, I'm going to hand

you what I'm marking as Exhibit 13, which is your expert report in the case.

A.    Thank you.

Q.    You might have one of your own in front of you.

A.    I do.

Q.    You can use whichever one you prefer.

A.    Can I just -- you didn't ask me a question.  The appendices are not attached to that.

Q.    This is just the report, so that's why -- so I'm going to get to that in a second.

A.    Fine.  I don't know the definition of what a report is.  That's fine.

Q.    So, Dr. Kessler, Exhibit 13 is the report of your -- let me strike that.

Exhibit 13 is your expert report relating to Lilly, excluding the appendices?

A.    There's appendices -- is this just appendices or the appendices and schedules -- I think every -- whatever -- there was -- supplementary materials was also

attached.

Q.    Sure.

A.    That's fine.

Q.    Yes.

Other than the appendices and the supplementary materials, Exhibit 13 represents your expert report regarding Lilly?

A.    So, and again, I apologize. You handed me a document. My document is obviously thicker. My document, you're correct, also includes, quote, a report with regard to Novo, but there's -- I haven't looked at every single paragraph. There's stuff that was -- I mean, my sense is that there should be a report that has 262 -- again, I don't know exactly how it was served, ma'am. I apologize. But there should be a lot that's redacted. And there were blank pages that were taken out of this, so this is smaller, but my report is actually larger with blank pages.

I mean, I'm not sure how it was served, so I --

(Kessler Exhibit 15 marked for

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

identification.)

QUESTIONS BY MS. WATRAL:

Q.    Let's see if there's an easier way.  I'm going to give you a sticker.  Let's mark yours as Exhibit 15 --

A.    Sure.  I'm --

Q.    -- so that we're talking about the same report.

A.    Same report.  Thanks so much.  This is unredacted.

Q.    Understood.

A.    So I don't know what the -- I leave it to counsel, who rules on what's redacted.

Q.    Thank you.

A.    You understand.  Thank you.

Q.    And so that I understand, if I am asking you questions about sections of your report that were in your Novo section, that's now going to be in Exhibit 15 also.  Is that right?

A.    This is -- this is -- this is without the schedules.  There are schedules here behind me.  This is the body of the report.  I consider the schedules as also

Case 2:24-cv-03094-KSM    Document 691-27   CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER   Filed 05/19/26

part of my report, and those are behind me.

Q.    Great.  Thank you.

Let's turn to page 230 of your expert report, Exhibit 15.

A.    Sure.

Q.    Let me know when you're there.

A.    I'm there.

Q.    You start with a section called Overview and Background.

Do you see that?

A.    I see that on the section, yes, ma'am.

Q.    And in paragraph 645, you say, "I have been asked to address the following questions, colon," with three sub-Roman numerals under that.

Do you see that?

A.    I see that.

Q.    And what you are listing here are the questions that plaintiffs' counsel asked to you.

Right?

A.    Yeah.  I have to go -- well, this is part 3 here, introductory parts of this report.  I certainly -- you're correct

as far as this paragraph.  I'd have to put it into context with the earlier paragraphs and the earlier pages.  That's my only point.

Q.    Okay.  With respect to Lilly, the first question that you were asked is, "What is a pharmaceutical manufacturer's responsibility as it relates to a duty to warn?"

Right?

A.    Correct.

Q.    And with respect to Lilly, the second question was, "Should Eli Lilly have included warnings of gastrointestinal hypomotility that include ileus, severe constipation, including fecal impaction and intestinal obstruction, in the adverse reaction sections" -- "section, Section 6, of the label for dulaglutide?"

A.    Correct.  You're reading that correctly.

Q.    Correct.

And the third opinion -- or the third question that you were asked with respect to Lilly is, "Could Lilly have included warnings of gastrointestinal

hypomotility that include ileus, severe constipation, including fecal impaction and intestinal obstruction, in the adverse reaction section, Section 6, of the label for dulaglutide?"

Right?

A.    Correct.

Q.    With respect to Lilly, the medicine that you were asked these three questions about -- or, actually, let me just focus on the second and third question.

Okay, Dr. Kessler?

A.    I'm there.

Q.    With respect to the second and third question, the medicine that you were asked about was Lilly's medicine dulaglutide.

Right?

A.    The word "dulaglutide" is in little 2 and little 3.

Q.    Right.  And I can read that to you.

But my question is, with respect to the second and third questions, the medicine that you were asked about in your section about Eli Lilly, part 3, relates

to dulaglutide.

Right?

A.    Yeah.  My only -- well, those were questions -- as an overview, I tried to give you a sense of what I was asked and trying to do in this section.  That's all that was meant to be by these questions, to give you a sense of, you know, what -- what I was trying to work through.

As I just stated earlier, there's earlier sections of the report that this has -- again, there's some complexity because there were two defendants, and there was obviously an overlapping -- you know the GLP-1s are a class, and this class effect, and they should be treated -- I think the FDA treats them in very significant ways as a class, certainly on safety.

So there's earlier parts of the report that, for example, talk about other Lilly drugs that are not that as it relates to mechanism.  So -- and I was certainly -- to clarify, I think that in studying mechanism, I was looking at the class that included tirzepatide.  So -- and that's in

this report also.

Q.    Okay.  You do not say here that you were asked whether Lilly should or could have included particular warnings about tirzepatide.

Right?

A.    That's -- that is -- I don't say that here, but, again, when one's talking about the class and when one's talking about GLP-1 drugs and one's looking at safety and one's looking at adverse reactions as the report does, it goes into mechanism of a wide range of GLP-1s.  And they're -- you know, I try to be comprehensive in that regard.

Q.    Dr. Kessler, when you are discussing the questions that you were asked, you refer to whether a warning should have been and could have been included in Section 6 of the label.

Right?

A.    The questions are -- say exactly what the questions say.

Q.    No, but I'm wondering the question that was asked to you.

You were asked specifically

about Section 6.

Right?

A.      Yeah.  So let me clarify.

I do say I've been asked to address.  Okay?  I'm not saying that is exclusive.  I am not saying -- this is sort of a -- this is meant -- you're -- you're trying to make these questions into something that this was not meant -- this was meant to be sort of -- you know, in general when a witness comes, I give you a sense of what I've been focused on, but it's not -- this is not exclusive.  That's my -- that's my only point.

And there is not a moment -- again, I try to summarize my understanding of scope here, but it -- I don't want to be taken so literally that that's -- that's the only scope this report addresses.

Q.      Let me ask it this way.

Do you disclose an opinion in your report that Lilly should have included warnings in the label for tirzepatide?

A.      So the answer is -- let me make sure I understand the wording -- the words of

your question.

No, I do not disclose at this time, at the time of this -- this report that was signed, I did not disclose -- I did not discuss that question of whether they should have included warnings of tirzepatide.

I will say that -- I mean -- I mean, I have worked on that question subsequently.

You're shaking your head.  If you want to, I mean, let me finish and --

Q.    No, please, go ahead.  Finish.

A.    All right.  But I have worked on that question subsequently and may, at a future time, offer such opinion.

Q.    Are you offering an opinion now that Lilly should have included a warning in the label for tirzepatide?

A.    Again, I'm going to -- well, my goal here is not to offer any new opinions. I mean -- and I don't want to do that.  Okay? I mean -- but my goal is not to offer any new opinions.

And your question is -- my goal is not to offer any new opinions on

Case 2:24-md-03094-KSM    Document 691-27    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    Filed 05/19/26

tirzepatide.

I certainly have, I mean, subsequently to this report, you know, and may have to do that.  I leave it to the lawyers in a subsequent report at some time if there's an opportunity to do that.

I don't want to lawyer that question.  I just want to -- I'm telling you, in my head, I mean, I have opinion -- well, let me just stop there.

I don't want -- I don't want to put -- I don't want to play lawyer and what's a new opinion and what's not a new opinion and what counts.  You spent an hour, I think, discussing and reading some agreement that I'm happy to have the lawyers do that agreement, but I have to be able to -- I just want to answer your questions fully.

Q.    Do you agree that today, as you sit here, you are not offering an opinion that Lilly should have included warnings in the label for tirzepatide?

A.    I think this would answer that, at least -- again, I don't want to -- I did not do that in my report.

Q.    But I want to understand if you're showing up today, Dr. Kessler, and planning to offer an opinion that the labeling for tirzepatide was inadequate.

A.    Again, I don't recognize I -- you know, that I'm the witness here, and I'm going to answer your questions, and I want to answer your questions fully.

I think -- again, I don't want to play lawyer here.  I understand the sort of lawyerly state of play.  Again, I leave it to counsel to do this.  And I'm a little uncomfortable doing this because you read an agreement that I -- I will abide by any agreement, obviously, that you've done.

I have certain views in my head.  I have certain -- I have done certain -- I did certain work up through the report.  I've done certain work subsequently to that report.

I think it would probably be fair -- again, I'm out of my lane here, and I'm probably talking more lawyerly --

MS. AMINOLROAYA:  And --

THE WITNESS:  -- and I should

not do that.

MS. AMINOLROAYA:  -- I'll just interrupt, Dr. Kessler.  No need to offer any opinions as to legal issues.

Answer -- you can answer Ms. Watral's question without doing that.

THE WITNESS:  Well, I think it would be reasonable, again, if I were going to do something on tirzepatide, that I probably would need to do -- I mean, is that a legal opinion?  Am I getting into legal grounds here?  I'm looking to --

QUESTIONS BY MS. WATRAL:

Q.    I didn't catch the end of your answer.  Can you say -- it would be reasonable -- I didn't catch what you said.

A.    I think it would be reasonable if I did a -- and I'm just looking for counsel whether I'm going into the -- to the lane of lawyerly opinions.

MS. AMINOLROAYA:  Yes. Dr. Kessler, you should not offer opinions about when it might be

appropriate to do so --

THE WITNESS:  Fine.  Then I --

MS. AMINOLROAYA:  -- or anything like that.

THE WITNESS:  Fine.  Thank you, Parvin.  Thank you.

Then let me leave it to -- I will answer your questions fully and -- but I -- you know, I did not -- I did not offer an opinion as of the date this report was signed on tirzepatide.

QUESTIONS BY MS. WATRAL:

Q.    And as of the date today, are you offering an opinion about the adequacy of the warnings in the tirzepatide label?

A.    If you -- if this deposition goes on and you ask me a question, I will answer it fully.  So ask your questions, and I will be happy to answer it.

Q.    Dr. Kessler, I'm entitled to know, though, what opinions you're offering in the case.

Will you agree with me that you are not offering an opinion about the

adequacy of the warnings in the tirzepatide label?

A.    I -- ever?

Q.    Do you understand that you are being disclosed for what we are all referring to as Issues 2 and 3 in the MDL litigation?

A.    I apologize.  I do not know Issue 2 and Issue 3.

Q.    That is fair.

A.    But I will -- I mean, I'm sorry, I don't know what those numbers attach to.

Q.    And there was a schedule set by the Court in which you disclosed an expert opinion on January 2nd.

And what I'm trying to understand is in connection with your opinions that were disclosed there, I want to know:  Do you have an opinion about whether the tirzepatide labeling was adequate that you are planning to offer at this time?

MS. AMINOLROAYA:  This could go back and forth for a long time.

MS. WATRAL:  I know.  This is why I was trying to get an agreement

before the deposition.

MS. AMINOLROAYA:  Yes.  Can we go off the record for a minute now?

MS. WATRAL:  Sure.

VIDEOGRAPHER:  Off the record at 10:28.

(Off the record at 10:28 a.m.)

VIDEOGRAPHER:  Back on the record at 10:45.

QUESTIONS BY MS. WATRAL:

Q.    Dr. Kessler, before the break, I asked you whether you're planning to offer an opinion that the labeling for tirzepatide was inadequate.

And in your answer, you said: "I have certain views in my head."

Do you recall that?

A.    Yes.

Q.    Okay.  What I'm wondering is, are you planning at this time to offer an opinion that the labeling for tirzepatide was inadequate?

A.    So I will answer questions that I am asked by you or at trial by counsel.  I will -- I do note -- and I would have to

review what I said at my prior deposition -- I'm sorry, at the first part of this deposition.  I don't have it -- that transcript in my head, but I think I was talking about the class of GLP-1 drugs, of which tirzepatide is one.  So I stand by anything I said previously.

I have also said that I did not offer an opinion on the adequacy of the warning of tirzepatide, the label of tirzepatide, when I signed my report.  And I've also stated that I have, as you said, thoughts in my head.

I -- that's -- you know, what's an opinion, what's -- what I'm allowed to -- I leave that to counsel and the Court to determine.  That's as fully as I think I can answer without going into the question of, you know, out of --

MS. WATRAL:  Okay.  Then let me ask counsel.  For purposes of Issues 2 and 3 in the MDL, will you agree that you're not relying on Dr. Kessler for an opinion that the tirzepatide warnings or labeling were inadequate?

Case 2:24-cv-03084-KSM    Document 091-27    Filed 05/19/26

MS. AMINOLROAYA: I'm not being deposed here, so I'm not going to testify.

And we'll -- as you said, we can have -- if there is an argument to be had, we can have the regular argument about this in papers down the line.

I don't know what we're going to exactly put in papers, and so I can't talk -- I can't testify -- give you an answer as to that today.

And he's answered your questions so far, and any of that may be information we reference.

MS. WATRAL: Let's take a break.

VIDEOGRAPHER: Off the record at 10:48.

(Off the record at 10:48 a.m.)

VIDEOGRAPHER: Back on the record at 11:14.

QUESTIONS BY MS. WATRAL:

Q. Dr. Kessler, I want to turn to page 261 of your report.

A.    Thank you, ma'am.

Q.    This has the summary of your opinions in paragraph 744.

Do you see that?

A.    Correct.

Q.    Look at number -- Roman numeral number 1 under 744.

Okay?

A.    Yes.

Q.    Do you agree with me that you are --

A.    If you could talk a little louder.

Q.    Oh, sure.

A.    I apologize.

Q.    There's a fan behind us.

A.    There's a fan there, so I just want to make sure I can hear you.

Q.    Thank you for asking that.

A.    Thank you.

Q.    You are offering an opinion about the injuries of ileus, severe constipation leading to fecal impaction -- actually, let me restart my question, Dr. Kessler.

Do you agree with me that in your report you are offering an opinion that Lilly should have added a warning to the dulaglutide label for ileus, severe constipation leading to fecal impaction and intestinal obstruction to Section 6?

A.    Among others.

Q.    What does the "among others" refer to?

A.    There are other paragraphs on what I'm offering opinions on with regard to Lilly, and they're in this report.  I'm happy to go through those if you would like.

As you see in that summary, there's a footnote that's not meant to be an all-exclusive.  Please look at the report, and there are other paragraphs where I issue an opinion.

Q.    Sure.

One of the opinions that you're offering is that Lilly should have added warnings to Section 6 for ileus, severe constipation leading to fecal impaction and intestinal obstruction.

Right?

Case 2:24-cv-02094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Correct.

Q.    In terms of the injuries or the adverse events that you are saying should have been added to Lilly's labels, you identify ileus, severe constipation leading to fecal impaction and intestinal obstruction.

Right?

A.    That's not correct.

Q.    Okay.  In your report, did you disclose an opinion that Lilly should have added a Section 6 warning for injuries other than ileus, severe constipation leading to fecal impaction and intestinal obstruction?

A.    There are -- again, there are other paragraphs about other injuries that Lilly should have warned about in my report, I believe.

Q.    Okay.  Which other injuries do you say Lilly should have included in its label?

A.    So if you turn to paragraph 692, for example.

Q.    Give me a moment to get there, please.

Go ahead.

A.      I believe that says, "Lilly should have included warnings of gastrointestinal hypomotility," all right, "that include ileus, severe constipation." And there's a footnote there, and there's several other paragraphs.

So, I mean, there's the general warning of gastrointestinal hypomotility that includes those three, but it also includes others.

Q.      You pointed to paragraph 692.

In paragraph 692, you're talking about the question of whether Lilly should have included for -- included warnings of gastrointestinal hypomotility, including a list.

Right?

A.      Yeah.  I put -- I put those -- I mean, my intent in that paragraph was -- as throughout the report, the whole report, is about gastrointestinal hypomotility.  I mean, and those -- all the -- the injuries.  That's what the, you know, 260 pages are about.  And that's what, you know, my focus, I mean, is

on those.

Certainly ileus, intestinal obstruction are hypomotility, but there's certainly delayed gastric emptying that is very much, you know, a symptom of gastrointestinal hypomotility.

Q.    Dr. Kessler, other than ileus, severe constipation leading to fecal impaction and intestinal obstruction, can you give me the list of adverse reactions that you are opining should have been included in Lilly's labels?

A.    The -- they are -- they would be all the -- they should refer -- I mean, the answer is, yes, I can do that, and I think I've indicated that they fall under the rubric of gastrointestinal hypomotility.

And there is a spectrum of disease.  If you look at, you know, paragraph 700, I think -- let me just go back -- footnote 700 -- let me just see if my memory is right.  Sorry.  Paragraph 700.

Yeah.  I mean, I think generally the symptoms of hypomotility are well laid out in paragraph 700.

Q.    Are you saying that Lilly should have included in its label all of the adverse events that are identified in paragraph 700?

A.    Oh, sure.  I mean, you would -- I mean, Lilly should -- certainly should have its drug effects of hypomotility, and you should -- you know, there is a -- there is a -- there is a spectrum of severity.  And I don't think there's any dis -- there shouldn't be any disagreement that these things all can occur with your drug.

Q.    How many adverse events do you list in paragraph 700?

A.    I'd have to count them.

Q.    Go ahead, please.

A.    Nausea, vomiting, abdominal pain, constipation, paralytic ileus, ileus, functional obstruction, intestinal obstruction, small intestinal obstruction, intestinal pseudoobstruction, intestinal perforation, bezoar, impaired gastric emptying.  I'm sorry, I didn't count them. I'm listing them.  Somebody else -- gastrointestinal hypomotility,

gastrointestinal obstruction, fecaloma, fecalith.

Q.    And do you believe each of those terms needed to be included in Lilly's labels?

A.    I think -- I think the -- do they all have to be exactly like that?  No, I think they -- but certainly the spectrum of conditions from delayed gastric emptying to impaired gastric emptying to -- you know, the ones that are currently on the label of severe constipation.

Again, we can spend -- I'm sure we will -- what's impaired gastric emptying versus a gastroparesis.  I'm happy to discuss that.

I think that spectrum is absolutely critical because it has very significant implications for patient care. And I think that's what's been sort of minimized in this label.

Q.    So you indicated that each of the terms you listed in paragraph 700 -- not each of them needs to be included in Lilly's labels.

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Right?

A.        You're putting words in my mouth.  I don't think that's exactly what my answer was.

I think that all the conditions that would likely flow from the mechanism of this drug, you have a drug whose effectiveness and adverse event -- I mean, mechanism of action works through its adverse events.

I mean, and I think that that spectrum -- so the doctors -- anything that -- what's important is with doc -- to doctors and patients should know those -- that spectrum of hypomotility, that severe hypomotility adverse reaction spectrum that can occur.

Because, you know, I mean, Trulicity didn't have a warning until overdose, I mean, or how to take care of patients with that -- who get it, who can get into trouble because of impaired gastric emptying or on the road to severe constipation, on the road to intestinal impaction and nonmechanical/mechanical

intestinal obstruction.

Q.     The injury --

A.     It's that spectrum, what doctors need to know.  This isn't just nausea and vomiting and constipation.  This is a -- this drug causes impaired gastric emptying that results in -- that can result in certain patients and them being in the hospital, and then even maybe even taken into surgery.

And that was -- I mean, that has to be in the label.  That's the sum and substance, I think, of the report.

Q.     Where in your report do you disclose the specific language that you believe needed to be included in Lilly's label?

A.     So I think you -- if you go to 656, I think, basically gives you a sense of what I think -- is what I would point you to is my opinion.  The dulaglutide label, because there are similarities in the mechanism of action and for reasons set forth below, should have had the same labeling as Novo Nordisk should have had on their GLP-1 RA drugs and has as of October 2025.

Q.    And the Novo label as of October 2025 includes a warning for ileus in the postmarketing section.

Right?

A.    If you want to give me the --

MS. KELLY:  Objection to form.

THE WITNESS:  Yeah, if you want to give me the actual label --

MS. WATRAL:  Yeah.

THE WITNESS:  -- we can talk about everything -- everything that it --

QUESTIONS BY MS. WATRAL:

Q.    Yeah, let me -- I'll get there. But before I get there --

A.    Thank you.

Q.    -- can you tell me, what are the particular warnings that you are saying should have been included in the Lilly labels, the specific language that you say was missing that should have been included?

A.    So let's pull up the October 2025.  I can give you the opinion.  And I can do it from my head, but I don't want to be held to, like, leave something out.  Right?

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 45 of 86
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I mean, but let me -- let me try to do it just -- you know, but I appreciate the label.

But I'm saying it's basically -- again, it's not a perfect label. It's a better label as of October '25. And I may have my month wrong exactly when it was printed in that label, but I think we're all aware.

Q.    Do you say in your report, Dr. Kessler, the specific language that you believe needed to be included in Lilly's label?

A.    I say 656. That's a specific -- I mean, you have the label. If you want me to read the entire label, I'm happy to read the entire label as of October 2025.

But it clearly has a Section 5 warning that includes severe gastrointestinal adverse reactions. It certainly has a Section 5 warning for impaired gastric emptying. It certainly has a Section 5 warning for gas -- I mean, pulmonary aspiration, if my memory serves me right.

And there is -- importantly, all Section 5, it says cross-referenced per the August 2011 adverse reaction -- the August 2011, if I'm correct, FDA guidance.

So you got Section 5 is cross-referenced to Section 6. And in Section 6 you have, I believe, nausea, vomiting, constipation. It should be obviously severe, I mean, as part of that. Ileus, then fecal impaction leading to -- I don't know the exact words, but fecal impaction leading obviously to intestinal obstruction, and intestinal obstruction. I think that's the -- an ileus there.

(Kessler Exhibit 16 marked for identification.)

QUESTIONS BY MS. WATRAL:

Q. I'm going to hand you what I'm marking as Exhibit 16.

A. This is the October -- thank you. Thank you very much.

Q. I'm giving you the February 2026 Saxenda label.

A. For liraglutide?

Q. Yes.

You have that in front of you?

A.        Yeah.  So thanks for that one.

Can I also trouble you for the semaglutide one?

Q.        Do you have a copy in your materials, Dr. Kessler?

A.        I'm sure -- I mean, I'm sure we can get the semaglutide -- the latest semaglutide label I would appreciate. Because they may be slightly different.

Q.        Sure.

A.        You can pull -- do you mind pulling it out?  I'm sorry, just give it to me.  Thank you.

Q.        So, Dr. Kessler, to go back to my question.

A.        Sure.

Q.        But let me just -- which label are you looking at right now for the record?

A.        Right now I have right in front of me, ma'am, I have Ozempic, semaglutide, and this is a revised date of October 2025.

Q.        And my question for you is, what are the particular warnings or labelings that you are saying Lilly should have

Case 2:24-md-03094-KSM   Document 691-27   Filed 05/19/26   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

included in its label?

A.    Yeah, let me just -- I'm going to need to take a minute to look at this.

So there's obviously a 5 -- I mean, theirs starts with a 5.7, and they have a 5.10.

Q.    Tell me, what is the -- so you're saying Lilly's label should have included the language from the Ozempic Sections 5.7 and 5.10?

A.    I mean, not necessarily.  I mean, I'm talking about the, again, the spectrum of conditions that relate to these -- this -- all the hypomotility, which is -- you have the 5.10 warning on Ozempic, delays gastric emptying, and there's a cross-reference.  And then it goes to aspiration.

And then you have 5.7, which is tied to a gastrointestinal -- I'll leave aside the nausea -- well, you have the nausea, vomiting.  I believe there's constipation in here.  And then you have ileus, intestinal obstruction.  You have severe constipation, including fecal

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 49 of 86

impaction.

So it's that -- that -- that -- that spectrum of -- now, there may be other aspects in this label, and I would need a couple minutes to search about those suggestment, et cetera.  But I would -- I would need to -- those are the conditions. That's the spectrum I'm talking about.

Q.    Okay.  I want to know in the entirety, what are -- what's the exhaustive list of language that you believe was not in the Lilly labels that needed to be included in the Lilly labels.

A.    You needed to give the physician and the patient information about this drug can cause severe hypomotility disorders that is due to delay -- impaired gastric emptying.  And again, you can define that multiple different ways.  Severe constipation, including fecal impaction, ileus, intestinal obstruction.

And I -- and certainly what to do about that if patients get into trouble.

Q.    Do the Novo labels use the phrase "hypomotility"?

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL-PERSONAL-PROTECTIVE ORDER

MS. KELLY:  Objection.

QUESTIONS BY MS. WATRAL:

Q.    You can answer.

A.    Thank you.

The -- they use the word in Section 5 "delayed gastric emptying."

I mean, is it delayed or impaired?  I apologize.  I think it's delayed gastric emptying, if my memory is right.

Q.    So they do not use the word "hypomotility"?

A.    Let me just -- let me just -- let's just see.

5.10.  I'm sorry, it's delays.  It's delayed gastric emptying.

Q.    And so what I'm trying to understand, Dr. Kessler, is what is the specific phrasing?

I'm not asking for the general concepts of what you think should be included in the Lilly label.  I want to know, what are the particular phrases in the particular sections of the label that you think needed to be included?

A.    So you -- again -- well, with

regard to particular sections, we're dealing with -- you know, this all falls under, you know, serious -- I would say the 2011 FDA guidance. So you have a Section 5/Section 6 cross-reference.

And you have to warn that there can be serious hypomotility disorders due -- and impaired gastric emptying that it can lead to severe nausea, vomiting, diarrhea, severe constipation, that you can be impacted, that leads to -- result in ileus and intestinal obstruction. I mean, I've said it four or five times now.

Q. Yeah, let me see if I can ask this differently.

Do you agree that the particular phrasings used in Sections 5 and 6 in the Ozempic label, that particular labeling language, is the language that you think should have been used in the Lilly label?

MS. KELLY: Objection.

MS. AMINOLROAYA: Object to form.

THE WITNESS: Yeah. So I think

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I testified earlier in this deposition, the prior day, that I thought that there were improvements in that final labeling.  I -- but I'm not sure that it -- I mean, I think there were improvements in that.

I think Lilly -- I think Lilly needed to warn about the severe hypomotility that, you know, that result from -- in significant part from the mechanism, and what doctors were supposed to do about it and what patients were supposed to do about it, and to monitor it and to prevent those from happening.

I think that's -- I mean, you -- what occurred here -- what is important to stress is the mechanism of action of this class and Lilly's drugs on impaired gas -- that result in impaired gastric emptying cause a state that's different than -- that can't just be summarized by nausea, vomiting and constipation.

It is a -- it's a set of --

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

because of the mechanism of living while you're on this drug for what -- you know, that your -- many doctors think you're supposed to be on for life, with a state of ill-being that is -- that needs to be warned about, and especially if we're going to push -- if the drug pushes people in, as it does, some -- there's great variability among patients -- into severe gastro -- push them into a severe gastroparesis or severe impaired gastric emptying, you push people into that state, you got to -- you got to keep people out of that state, especially if you're going to want this drug to be a lifetime drug or for extended periods of time.

So you have to monitor that, and you can't just simply say, hey, nausea and vomiting.

That's the -- what I think Lilly needs to do -- needed to do on this labeling and didn't do.

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 54 of 86    CONFIDENTIAL - PERSONS - PROTECTIVE ORDER

QUESTIONS BY MS. WATRAL:

Q.    For paragraph 656, you say it's your opinion that the dulaglutide label should have had the same labeling as Novo did in October of 2025.

Right?

A.    Yeah, I mean, I think that -- I mean, I was trying to use that as having a number -- there are a number of other paragraphs I have, but I think of the things that I mentioned, everything that I mentioned should be on that label.

This is from -- in Section 5, there needs to be a discussion of delayed gastric emptying.  It can cause pulmonary aspiration, it can cause severe gastrointestinal adverse reactions, and it's tied -- and if you cross-reference with 6, and 6 should be the full spectrum, and also what you do about it.

(Kessler Exhibit 17 marked for identification.)

QUESTIONS BY MS. WATRAL:

Q.    I'm going to mark as Exhibit 17 the March 2026 label for Trulicity.

Case 2:24-md-03094-KSM    Document 691-27    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    Filed 05/19/26

A.    Thank you, ma'am.

This is 2017?

Q.    No, it's March 2026.

A.    2026.  I'm sorry.  Thank you.
I didn't hear you.

Q.    And I want you to look at
Section 6.2.

MS. AMINOLROAYA:  Do you have
an extra copy of that?

MS. WATRAL:  Oh, I'm so sorry,
Parvin.  I do.

THE WITNESS:  Tell me what
page, please.

QUESTIONS BY MS. WATRAL:

Q.    This isn't paginated,
unfortunately.

A.    Oh, sure.

Q.    If it helps any, it's towards
the bottom of the page.

A.    No.  Thank you.  Section 6.2.

Is this postmarketing?

Q.    Yes.

A.    Thanks.

Q.    Trulicity's label in March
of 2026 includes in the postmarketing section

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 56 of 86

a warning for ileus.

Right?

A.    Yes.  FDA required that in 2023.

Q.    And --

A.    Yeah, go ahead.

Q.    Since 2023, the Trulicity label has included a warning in the postmarketing section for ileus.

Right?

A.    Because FDA required it.  Lilly objected to it.

Q.    In the 2026 Trulicity label in the postmarketing section --

A.    Let me just get to the postmarketing -- I'm just trying to -- yes, I'm there.  Thank you very much.

Q.    Sure.

In the postmarketing section in the 2026 Trulicity label, intestinal obstruction is a postmarketing event that is warned of.

Right?

A.    Correct.

Q.    And in the Trulicity 2026

label, severe constipation, including fecal impaction, is also a warning that is included.

Right?

A.    Correct.

Q.    And so do you agree with me that the -- well, before I get there.

Those are the same terms that are included in the Novo label for Ozempic from 2025.

Right?

A.    In the -- in the comparable section, FDA harm -- FDA -- yes, I mean, for that section -- if you're matching section to section.  It's not the entire label.

Q.    Sure.

But the Section 6.2 warning about ileus, intestinal obstruction and severe constipation, including fecal impaction, is the same in the Lilly Trulicity 2026 label as the Ozempic 2025 label.

Right?

A.    Yeah, I just --

MS. KELLY:  Objection to form.

THE WITNESS:  So I just -- the

6.2 -- well, when you say it's the same, that those things are included in both Section 6.2s, let's be a little careful.

You used the term "warning." I mean, Section 6 -- let's just see, see the correct -- it's different -- yeah. So Section 6 is referenced in 5.6. So you just put it -- want to make sure you're in the context of that, too.

But I see those terms -- those terms in both 6.2 and in 6.2 of the Ozempic label that I was looking at.

QUESTIONS BY MS. WATRAL:

Q. You indicated at your last deposition that you were not offering an opinion about the adequacy of the current Novo labels.

Can I assume that you're also not suggesting that the inclusion of intestinal obstruction, ileus, severe constipation leading to -- or including fecal impaction, is also inadequate for Lilly, not -- let me restart my question.

So you indicated at the first

part of your deposition that you were not offering an opinion about the adequacy of the current warnings in the Novo labels.

And so I'm asking you, is the same true for Lilly, that the warnings about ileus, fecal impaction and intestinal obstruction, you likewise are not offering an opinion about the adequacy of those warnings?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  About the current label?

QUESTIONS BY MS. WATRAL:

Q.    Yes.

A.    Yes, I'm not offering any opinion on the current -- on the current label.

Q.    Dr. Kessler, you've looked at all of the labels along the way.

Did plaintiffs ask you to opine on whether the phrases "ileus," "intestinal obstruction," "severe constipation, including fecal impaction," whether those are adequate warnings for the issues you discussed in your report?

MS. AMINOLROAYA:  And

objection.  We're not going to get into the discussions with counsel.

THE WITNESS:  And I'm not sure I understand the question.

QUESTIONS BY MS. WATRAL:

Q.    Yeah, let me ask it -- let me ask it differently.

A.    Thanks.

Q.    Dr. Kessler, you put together a several-hundred-page report.

Right?

A.    Yes.

Q.    Okay.  And the issues that you're including in your report relate, among other things, to labeling adequacy.

Right?

A.    Sure.  I mean, yes, absolutely.

Q.    Okay.

A.    What you should disclose so doctors can make --

Q.    And I'm wondering why, then, you are not offering an opinion about the adequacy of the current labels.

Is it because you think they're adequate?

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PERSONS PROTECTIVE ORDER

A.      Is that the issue for the
Court?

Q.      No.  I'm wondering why you're
not offering an opinion about whether you
think, from your perspective, the current
labels do or don't sufficiently warn about
intestinal obstruction, severe constipation
and ileus?

A.      So look, for example -- well,
why am I not doing it?

Q.      That's my question, yes.

A.      I'm not sure that's the issue
in this matter.

Q.      Well, I might have a different
view, so I'm wondering why you're not doing
it.

A.      Are you asking me whether this
is an adequate label?

Q.      No.  I'm asking you why you
didn't do that assessment in your report.

A.      I didn't -- you know, I --
there's only so much time when you do a
report, as you can tell, and I was focused on
what I was focused on when I was focused on
it.

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

I am happy to sit here and tell you you should -- you know, you have --

Q.    I'm asking about what you've disclosed, though.

A.    What?

Q.    I'm not asking you to offer any opinions right now.

A.    Can I finish my answer?

Q.    Yeah, but I'm not asking you to offer any opinions, so I just want that to be clear.

A.    You were asking about the adequacy of the label --

Q.    No.  I asked why you didn't include an opinion.  I didn't ask what your opinion is.

A.    I'm sorry, I don't understand. I don't understand what -- why my answer to date so far is not adequate.

I'm not sure why I didn't answer your question.  I told you I focused on what I focused on when I focused on it.

Q.    Okay.

A.    Right.  And there's only so much time, and I didn't focus on that

question.

If you want to know the answer to that question, I'm happy to tell you the answer to that question.

Q.    Have -- are you offering an opinion about the adequacy of Lilly's warnings about gastroparesis?

MS. AMINOLROAYA:  Object to form.

QUESTIONS BY MS. WATRAL:

Q.    And, Dr. Kessler, let me rephrase my question for you.

In your report, do you disclose an opinion about the adequacy of Lilly's labels with respect to gastroparesis?

A.    I certainly talk about hypomotility, right?  And there is consideration -- I mean, I think that everything is -- relates to hypomo -- disorders of hypomotility.

And I think I -- as I've just testified here so far, I certainly think that impaired gastric emptying should have been in -- as it is -- I think they use the word "delayed gastric emptying" -- is in

Case 2:24-md-03094-KSM    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER    Document 691-27    Filed 05/19/26

Section 5.  And I think delayed gastric emptying or impaired gastric emptying should be in 5 and should have been in the label in 5.

It could have been cross -- it could be cross-referenced, again, taking -- there are cross-references you should just make note of.  So I think I already testified about delayed or gastric emptying should be in 5 as it -- as we see it, as we discussed.

We can -- you know, impaired gastric emptying -- you know, I mean, I -- as a Lilly official said, to answer your question on gastroparesis, I think there's a -- there's a telling statement by a Lilly official, by Dr. Beardsworth, if I'm correct, where he says we need a better term.  And Lilly was search -- he was searching for that better term because he was certainly seeing cases of gastroparesis.  And we can't name it gastroparesis.

I think you should have came up with a name for it and had it in Section 5, and it's really -- I mean, because it should have been in Section 5.

Q.    Dr. Kessler, do you disclose in your report an opinion that Lilly should have warned of gastroparesis?

MS. AMINOLROAYA:  Objection. Asked and answered.

THE WITNESS:  I certainly talk about hypomotility, and that should -- it would include those conditions and whether hypomotility disorders and delayed -- impaired gastric emptying is the mechanism of this drug.

It also is known with -- and it's also known as -- in many terminologies as gastroparesis.  I'm happy to spend the next -- talk extensively about that.

Impaired gastric emptying and intestinal -- decreases in intestinal ability, that's -- that collection of conditions has to be disclosed.  It can be severe.  It can lead people into the hospital.

QUESTIONS BY MS. WATRAL:

Q.    Where in your report do you disclose that Lilly should have warned of

gastroparesis?

A.    I talk about -- I talk about in -- that Lilly's labels should have had what -- what was in the Novo labels. Section 5.11 certainly talks about impaired gastric emptying. We can call it impaired gastric emptying. You want to call it gastroparesis. You want to call it drug-induced gastroparesis that resolved -- that likely resolved after the drug, I'm okay with that.

You know, in most cases it is -- the impaired gastric emptying in Section 5.10 of the Ozempic label, I think, makes it very clear that, you know, that it certainly -- it talks about that -- that mechanism and those set of symptoms.

Q.    Other than paragraph 656, can you identify anything in your report that you believe disclose -- discloses that Lilly should have warned of gastroparesis?

A.    So I think when -- I think you have to look at 692 we talked about. I think we talked about 656. And I think you have to look at 700, too.

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26    Page 67 of 86

And again, I'm only too happy to call it impaired gastric emptying or drug-induced gastroparesis. I think there are -- I mean, I think that's what Beardsworth was searching for, and I think that's what should have been on the label.

Q. If you look at your summary of opinions, do you mention gastroparesis as a needed warning anywhere in there?

A. I -- that was not meant to be an exclusive. Those words are exactly what those words are.

Q. Do you mention gastroparesis as a needed warning in your summary of opinions; yes or no?

A. Again, recognizing that list was not meant to be exclusive or exhaustive for the opinions set out for -- in the report, that word does not appear -- gastroparesis does not appear, but the whole report is based on hypomotility.

Q. Dr. Kessler, going back to paragraph -- or page 230, paragraph -- or page 231, sorry, paragraph 641.

A. Can I trouble you to just take

Case 2:24-cv-03094-KSM    Document 691-27    Filed 05/19/26

back the label?  And can we just put this --
230?

Q.    231.

A.    Page 231 or paragraph 231?

Q.    Page 231.

A.    Thanks.

Q.    Paragraph 647, the section of the label that you say in your opinion needed to be updated is Section 6.

Correct?

A.    6.  But the -- I certainly say that in -- in 6, recognizing that 6 is tied to 5.

Q.    Where in your report do you say that -- or let me ask you this.

Are you offering an opinion that Lilly needed to revise, amend, change, add language in Section 5?

Are you offering that opinion?

MS. AMINOLROAYA:  Object to form.

QUESTIONS BY MS. WATRAL:

Q.    Let me ask you a different question.

Are you offering an opinion

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

that Lilly should have or could have added a Section 5 warning?

MS. AMINOLROAYA: Object to form.

THE WITNESS: Surely could have added a Section 5 warning -- I'm sorry --

QUESTIONS BY MS. WATRAL:

Q. Let me ask you --

A. You certainly could have added a Section 5 warning --

Q. Let me ask this.

A. You can add any warning you want to according to the '79 regs --

Q. Let me ask you a different question.

A. -- I mean, if it goes to safety. So you can add any warning you want.

Q. In your report, do you disclose an opinion that Lilly could have or should have added an adverse reaction or warning to Section 5 of the label?

MS. AMINOLROAYA: Object to form.

THE WITNESS: Again, by adding

it to 6, you're adding it to 5, that cross-reference.

I do believe that Section 5, that change that you made from severe gastrointestinal disease to severe gastrointestinal adverse events, was significant, right?  Because the first was a -- whatever -- I mean, we can read it -- I mean, it was -- if you look at the documents primarily in exclusion, that that changed in, what, 2024.  So I recognize that change.

And these all are cross-referenced to -- I mean, it's part of the 2011 -- I mean, it's standard -- it's in the label.  If you look at the Section 6, it's in -- there are different points.  There's 6.1, 6.2, at different points in time. It was 6.  It got changed slightly, but it was always that cross-reference.

Recognizing that cross-reference, you're correct that I think these should have been

cross-referenced in 6.

QUESTIONS BY MS. WATRAL:

Q.    You reference a change in 2024 in language to Section 5.

You do not disclose an opinion about the adequacy of the labeling respect -- with respect to that change.

Is that fair?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I mean, I think I -- I think it's noted that -- I mean, it's a factual statement that you made that -- that change.  Right?

I mean, I think that severe gastrointestinal disease in itself was not -- was not adequate.

We can go back and look and see exactly what -- what I said.

But sitting here today, if you're asking me about that change, that change -- the prior label was -- it was recognized as -- as non-adequate, and that's, I assume, why it was changed.

QUESTIONS BY MS. WATRAL:

Q.    Where in your report do you disclose that the label before 2024 was not adequate in Section 5?

A.    Well, my only point -- I'm talking about the heading now, right?

You asked me about this Section 6, and I'm just making it clear that that is cross-referenced to 5.  And it's in the label.

I mean, you know, I don't think I have to read the entire label and say, this needed to be in 6 but 6 had to be -- was cross-referenced in 5.  That's factual.

Q.    Dr. Kessler, where in your report do you disclose your opinion that the label before 2024 was not adequate?

A.    This label wasn't adequate in 2024.  It wasn't adequate in -- I mean, in 2017.  This -- and I say it's not adequate in 2017.  I'm telling you why it's not adequate.

Here, you didn't talk about these hypomotility set of serious adverse reactions that could end someone in the hospital.

Case 2:24-md-03094-KSM    Document 691-27    Filed 05/19/26

Q.    And but where in your report do you disclose that you believe Section 5 was inadequate for the --

A.    I --

Q.    Hold on.  Let me finish, please.

Where in your report do you disclose that the Section 5 of the label was inadequate before the 2024 change?

A.    Well, I mean, obviously I just did it in 650 -- I mean, if you go turn to 692 -- I'm sorry.  I apologize.  I'm getting my paragraphs...

656, you didn't have delayed gastric emptying in Section 5 in that -- and my opinion says that it should have -- we just went through this, that the Novo label had that in October of 2025.  You didn't have that in Section 5 previously.

So you should have had delayed gastric emptying because it's delays in gastric emptying in Section 5.  I say that in section -- in paragraph 656.

Q.    Okay.  Let's go to paragraph 230, and I want to ask you about

the last two --

A.    Paragraph 230?

Q.    I'm sorry, page 230.

A.    Thanks.

Q.    I want to ask you about the last two bullets in your summary of opinion for your Novo opinions.

Okay?

A.    (Witness nods head.)

Q.    You offer --

A.    I'm sorry, the last two bullets?

Q.    The last two Roman numerals.

A.    Roman numerals.  Thanks. Sorry.

Q.    You offer an opinion about -- that "Novo's failure to maintain pharmacovigilance standards deprive the FDA" --

A.    I'm sorry, you're on page 230?

Q.    I am.

A.    And then you're on what number?

Q.    VII.

A.    VII.

Q.    Okay.  So one of the things you

do is evaluate Novo's failure or non-failure of maintaining pharmacovigilance standards. That's one thing you do with respect to Novo.

Right?

MS. KELLY:  Objection.

THE WITNESS:  Yes.

QUESTIONS BY MS. WATRAL:

Q.    Okay.  And you do not do an assessment in your report about whether Lilly maintained pharmacovigilance standards.

Right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I'm just trying to think.

I want to -- I don't agree that what -- with the way you phrased that. I understand that you -- how you maybe -- well, I don't know exactly how you're using "pharmacovigilance."

If you look at footnote 750, for example, if you look at the --

QUESTIONS BY MS. WATRAL:

Q.    Give me a moment, please.

Which page are you on?

A.      Thank you, ma'am.

Q.      I see.

A.      If you look at 750, I talk about the safety topic report that has all the pharmacovigilance in there.  And I say that that is flawed.

And, you know, I mean, the fact is, that report, as well as other documents that went to the FDA, you know, concluded that there was not a clear association or an association, depending on the exact document, between liraglutide and intestinal obstruction and ileus.

And in fact Lilly had -- I mean, according to its own analysis and spreadsheets, had 70 -- had determined -- I mean, as determined -- as I understand it, as determined by the company, had a total of 70 cases of intestinal obstruction where it was determined that causality was -- you know, if you look at the Lilly SOP, but causality was likely or possible.  And that was not -- you know, or probable.

And, you know, for liraglutide, similarly, you have STRs on tirzepatide.

Case 2:24-md-03094-KSM    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER    Document 691-27    Filed 05/19/26

There was no disclosure.  There was 121 cases where the company determined there was causality determined on intestinal obstruction for tirzepatide.

Similarly, in your STRs for delayed gastric emptying, pulmonary aspiration, that the company had determined that there were 237 cases, 224 of which were in pharmaco -- postmarketing pharmacovigilance.

So the -- to tell FDA there's no -- there's no clear association, or there's no association, and yet have hundreds of cases where the company has determined, you know, a possible association, that, to me -- there's a problem in pharmacovigilance review.

Q.    Dr. Kessler, where in your report do you identify and say that there is a problem in pharmacovigilance review for Lilly?

A.    I -- what I say is you -- a safety topic report you see reached a flawed conclusion and that pharmaco -- STR is based on pharmacovigilance.

And if you reach a flawed conclusion, right, the reason you reach -- you know, I told you what I -- I mean, among the reasons why I thought that was flawed, that goes to pharmacovigilance.

Whether that was -- you know, here -- I mean, here you're -- the spreadsheets that have those cases where you've determined causality, you didn't share -- your client didn't share that with the company in an STR saying there is no -- there is no causal link, and yet those -- you have hundreds of cases where they have -- where they've determined there's a possible causal link, that is a -- Lilly is better than that.

Q.    Are you saying Lilly -- are you offering -- or let me strike that.

Did you disclose an opinion in this case that Lilly failed to share information with the FDA that needed to be shared?

A.    What I disclosed was that your STRs were flawed.  The STRs were flawed.  The facts show that there were -- there were

cases that the company had internally on its spreadsheets determined -- either company determined or as reported causal, but where the company determined and didn't share that on the specific questions whether the causal -- whether there was a causal link.

So I said it was flawed, and that flawed has to do with pharmacovigilance. So, I mean, I said it was flawed, and I just gave you the reason why it was flawed.

Q.     Please answer me with a yes or no.

Yes or no, did you disclose an opinion in this case that Lilly failed to share information with the FDA that needed to be shared?

MS. AMINOLROAYA:  Objection. Counsel will not testify for the witness.

Dr. Kessler, you can answer the question.

THE WITNESS:  Is everything okay?

No, I'm sorry.  I don't want to -- do you want to take a break?

MS. SMITH:  Nothing's bad.

THE WITNESS:  Congratulations.

MS. SMITH:  Continue on.

THE WITNESS:  I'm sorry.  Can we -- I apologize, because -- I'm sorry, I just -- I was concerned --

MS. SMITH:  That was nice of you.

THE WITNESS:  I apologize.  I just -- I'm sorry.  I apologize.

QUESTIONS BY MS. WATRAL:

Q.    No, don't apologize.

Yes or no, did you disclose an opinion in this case that Lilly failed to share information with FDA that needed to be shared?

MS. AMINOLROAYA:  All right.  Same objection.  Counsel will not testify for the witness.

Dr. Kessler, you can answer the question.

THE WITNESS:  What I disclosed -- what I disclosed was that an STR was flawed.  And one of the reasons why it was flawed was you

didn't disclose certain information.

          MS. WATRAL:  Let's go ahead and
take a break.

          VIDEOGRAPHER:  Off the record
at 12:09.

   (Off the record at 12:09 p.m.)

               - - - - - - -

CONFIDENTIAL - PER PROTECTIVE ORDER

                    CERTIFICATE

        I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
of the examination, David A. Kessler, MD, was
duly sworn by me to testify to the truth, the
whole truth and nothing but the truth.

        I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

        I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.


_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  April 23, 2026

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Case 2:24-cv-03094-KSM    Document 691-27    Filed 05/19/26

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
David A. Kessler, MD                  DATE

Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____

Notary Public

Case 2:24-cv-03094-KSM    Document 691-27    Filed 05/19/26

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - - - - -
ERRATA
- - - - - -

PAGE    LINE    CHANGE

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

Case 2:24-cv-03094-KSM    Document 691-27    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    Filed 05/19/26

```
        _ _ _ _ _ _ _
          LAWYER'S NOTES
        _ _ _ _ _ _ _


   PAGE      LINE


   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____

   _____     _____      _____
```