# EXHIBIT 28D



David Kessler, MD-Volume III

4/27/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability
Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAs) PRODUCTS LIABILITY LITIGATION | : CIVIL ACTION |
| | : |
| | : MDL NO. 3094 |
| | : |
| | : 2:24-md-03094 |
| _____ | : -KSM |
| This Document Relates to: | : |
| | : |
| | : |
| All Actions/All Cases | : |

VOLUME III

HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

- - -

April 27, 2026

- - -

Videotaped deposition of DAVID A. KESSLER, M.D., taken pursuant to notice, was held at the law offices of Kirkland & Ellis, 1301 Pennsylvania Avenue NW, Washington, D.C., beginning at 7:34 a.m., on the above date, before Michelle L. Ridgway, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public.

- - -

APPEARANCES:


     SEEGER WEISS LLP
     BY:  PARVIN K. AMINOLROAYA, ESQ.
     (In person)
     55 Challenger Road
     6th Floor
     Ridgefield Park, New Jersey 07660
     973.639.9100
     Paminolroaya@seegerweiss.com

          - and -

     WAGSTAFF & CARTMELL
     BY:  SARAH RUANE, ESQ.
     (Zoom)
     BY:  HANNAH R. PFEIFLER, ESQ.
     (In person)
     4740 Grand Avenue
     Suite 300
     Kansas City, Missouri 64112
     816.701.1100
     sruane@wcllp.com
     hpfeifler@wcllp.com
     Representing the Plaintiffs


     LIEFF CABRASER HEIMANN
     & BERNSTEIN, LLP
     BY:  DANIEL E. SELTZ, ESQ.
     (Zoom)
     250 Hudson Street
     8th Floor
     New York, New York 10013
     212.355.9500
     dseltz@lchb.com
     Representing the Plaintiffs

APPEARANCES:   (Cont'd.)


LEVIN, SEDRAN & BERMAN LLP
BY:   FREDERICK S. LONGER, ESQ.
(Zoom)
510 Walnut Street
Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500
Flonger@lfsblaw.com
Representing the Plaintiffs


KIRKLAND & ELLIS LLP
BY:   DIANA M. WATRAL, ESQ.
BY:   MARIE NOTTER, ESQ.
(In person)
BY:   ANDREW HARTFORD, ESQ.
BY:   MARK PREMO-HOPKINS, ESQ.
(Zoom)
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.2000
diana.watral@kirkland.com
marie.notter@kirkland.com
andrew.hartford@kirkland.com
mark.premohopkins@kirkland.com

      - and -

KIRKLAND & ELLIS LLP
BY:   RENEE D. SMITH, ESQ.
(In person)
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.2000
Rdsmith@kirkland.com
Representing the Defendant, Eli
Lilly

APPEARANCES:


GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM, LLP
BY:  OREN KRIEGEL, ESQ.
(Zoom)
191 North Wacker Drive
Suite 3000
Chicago, Illinois  60606
312.681.6000
okriegel@goldmanismail.com
Representing the Defendants, Eli Lilly


DLA PIPER (US)
BY:  BRENNA D. KELLY, ESQ.
(In person)
One Liberty Place
1650 Market Street
Suite 5000
Philadelphia, Pennsylvania 19103
215.656.3300
brenna.kelly@us.dlapiper.com
Representing the Defendant, Novo Nordisk

APPEARANCES:



VIDEOTAPE TECHNICIAN:

     Matt Szychowski
     (Hartford Reporting) - in person



ALSO PRESENT:


Adam Tolin - inhouse counsel
(Novo Nordisk) - Zoom


Scott Twomey - in person
Legal Analyst
(Seeger Weiss)

Michael Bachmann - in person
Legal Analyst
(Seeger Weiss)

                    -   -   -

- - -

I N D E X

- - -

Testimony of:


                    DAVID A KESSLER, M.D.

                       (Volume III)


     By Ms. Watral                    418

     By Ms. Aminolroaya               606

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION              PAGE

Kessler
Exhibit 18    Guidance for             513
              Industry
              Adverse Reactions
              Section of Labeling
              For Human Prescription
              Drug and Biological
              Products


Kessler
Exhibit 19    Highlights of            513
              Prescribing Information
              Trulicity
              11/2022


Kessler
Exhibit 20    MedDRA Terms             536
              (Exhibit of Dr.
              Kessler)


                  - - -

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

P R E V I O U S L Y

E X H I B I T S

- - -

NO.                    DESCRIPTION

Kessler
Exhibit 13        Expert Report
                  1/2/26
                  (Kessler)

Kessler
Exhibit 15        FAERS Cases

Kessler
Exhibit 17        Highlights of
                  Prescribing
                  Information
                  Trulicity
                  3/2026

- - -

                            -    -    -

              DEPOSITION SUPPORT INDEX

                            -    -    -


Direction to Witness Not to Answer

PAGE     LINE   PAGE LINE       PAGE LINE
None.

Request for Production of Documents

PAGE     LINE   PAGE LINE       PAGE LINE
None.

Stipulations

PAGE     LINE   PAGE LINE       PAGE LINE
None.

Questions Marked

PAGE     LINE   PAGE LINE       PAGE LINE
None.

- - -

THE VIDEOGRAPHER:  We are now on the record.  The time is now 7:34 a.m.

This is the continuing deposition of David Kessler, M.D.

The witness will now be sworn in.

- - -

... DAVID A. KESSLER M.D., having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MS. WATRAL:

Q.    Good morning, Dr. Kessler.

A.    Good morning.

Q.    You understand that today we're going to be covering the topics that were disclosed in your January 2nd expert report?

A.    Yes.

Q.   And I understand that when we met last week, you indicated that you did some work after you put together your January 2nd report, right?

A.   Correct.

Q.   So I'm asking you questions about the work that you did in connection with your January 2nd report, not work that you did thereafter.  Okay?

A.   Thank you, ma'am.

Q.   And if I ask you a question that is, you think, information that you reviewed after the report would be relevant to you, will you let me know that there's relevant information before disclosing what that relevant information is?

Does that make sense?

A.   Sure.  Can I just -- little footnote?

Q.   Sure.

A.   So the only thing is I'm not sure my brain works on a January 2nd -- you know, I'm not sure exactly what I knew in my head.  I'll

try -- I get what -- the written work.
But just, I can't put my -- just, you
understand, my brain, what's -- what I
know is sort -- I don't have an exact
date.  That's my only point.

I don't mean to be
difficult.  But you understand what I'm
trying to say.

Q.   Sure.  And we'll focus a
lot on what's in your report so that way
we're talking about things specific to
the four corners of what you put
together.  Okay?

A.   I got that exactly.
Thanks.  I appreciate that
clarification.

(Document previously
marked for identification as
Kessler Exhibit 15.)

BY MS. WATRAL:

Q.   Okay.  Dr. Kessler, I want
to go to Page 258 of your report, which
we've previously marked as Exhibit 15.

A.   I am there.

Q.   There's a heading, VIII.

Do you see that, at the bottom?

A.    Little 8.

Q.    Correct.

A.    Thank you.

Q.    And for Little Heading 8, you say, "When Lilly should have added a Section 6, adverse reactions warning for ileus and severe constipation, leading to fecal impaction and intestinal obstruction."

Do you see that?

A.    Correct.

Q.    And then what follows is six paragraphs that support your opinion about when Lilly should have added a Section 6 Warning for those adverse reactions, right?

A.    Yes.  Yes.

Q.    The last paragraph of that section, Paragraph 735, I want to ask you about that.  Okay?

A.    Sure.

Q.    Paragraph 735 indicates that "Lilly should have added a warning to Section 6 for the dulaglutide label

for ileus, severe constipation leading to fecal impaction, and intestinal obstruction by 2017."

Right?

A.   Correct.

Q.   I want to ask you about that date, 2017, okay, Dr. Kessler?

A.   Sure.

Q.   I notice that in your report for Novo, you identified a date of 2014 for liraglutide and 2018 for semaglutide, right?

A.   I'd have to review it.  I think you're -- you're exact.  I'll agree with anything you say today.  Yes.

Q.   Well, if you look at -- I don't want you to just --

A.   No, no, no, no, no.  I just don't have those dates.  I don't have those exact dates.  I take your stipulation.

Q.   Okay.  And I can -- it's on Page 82 of your report if you want to take a look.  Paragraph 208.  You indicate that the date for liraglutide

is 2014 --

A.    Right.

Q.    -- and the date for semaglutide is 2018.

A.    Right.  Yes, ma'am.

Q.    Okay.  Why did you have different dates for Novo medicines versus dulaglutide?

A.    I'd have to -- I don't know -- I'd have to go back and review the Novo information.  I don't have that exactly in my head.  I'm prepared to talk about Lilly.  So I -- I don't remember exactly the 2018.  I remember the 2017.  And...

Can I explain?

Q.    Sure.

A.    So, for example, I think, if I'm correct, the PRAC was, like, November 2017.  So I'm -- I think there was a PRAC determination, if my memory serves me right, November/December 2017. So that could -- it's toward that end of that year.

That's to the best of my

recollection.

Q.    Here is what I'm getting at, Dr. Kessler.  When you were looking at liraglutide versus semaglutide versus dulaglutide, you didn't reach a single date for all of the medicines that you thought the labeling needed to be updated.  Is that fair?

A.    I think -- I think that's what the report says.  I -- as I was writing the different sections, I looked at the evidence and reached the date based on the evidence in front of me.

But, again -- which we're probably talking about the end of 2017. You could -- I mean, I could go with 20 -- you know, January 2018, November and December 2017.

Q.    When you say that you looked at the evidence in front of you, what you're talking about is when you were looking at dulaglutide, you were looking at the evidence specific to dulaglutide.  When you were looking at liraglutide, you were looking at

liraglutide evidence.  And when you were looking at semaglutide, you were looking at semaglutide evidence.

Is that what you mean?

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  Yeah -- yes and no.  Yes, you're exactly right, as I was writing these different sections.  But you have the class issue also.

BY MS. WATRAL:

Q.    Okay.  But you did not select a class date by which all of these medicines needed to update their label; is that fair?

A.    I think -- I think that's fair.

Q.    Okay.  You understand that dulaglutide was approved in 2014, right?

A.    Correct.

Q.    And so you're not saying that dulaglutide needed additional warnings between 2014 and 2017, right?

A.    Correct.

Q.    You started getting at this, Dr. Kessler, but I want to know specifically when in 2017 you believe Lilly should have updated its label. But I want to ask you a particular question about that.  Okay?

A.    Sure.

Q.    So I want to focus, first, just on ileus.  Okay?  Just for ileus, when in 2017 do you believe that Lilly should have updated its label?

A.    Can I ask for a clarification?

Q.    Yes.

A.    You say just for ileus. Ileus versus intestinal obstruction?  Is that --

Q.    Yeah.  Let me clarify, Dr. Kessler.

A.    Thanks.

Q.    So in Paragraph 735, you list ileus, severe constipation leading to fecal impaction, and intestinal -- intestinal obstruction, right?

A.    Yes.

Q.    So I first want to ask you about ileus, and then I'm going to ask you about the other two.

For ileus in particular, when in 2017 do you believe Lilly should have updated the label for dulaglutide?

A.    So I did not give -- I did not give a month.  I was not that exact in there.

As I mentioned to you, I think PRAC was 12/2017.  I think there are -- I'd have to go back and look at the exact dates of those documents.  I did not give an exact date -- I did not give an exact month.

But I didn't mean to -- I don't mean to slice it by months.  I'm giving an approximate sense there.

Q.    So you don't identify in your report the particular month in 2017 when you believe that Lilly should have added the ileus warning to the dulaglutide label, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.  I'm giving -- correct.  It is more of an approximation.  It's a sense of in the overall timeline.

BY MS. WATRAL:

Q.    Is the same true if I asked you about intestinal obstruction?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I think that would be fair.

BY MS. WATRAL:

Q.    Is the same true if I ask you about severe constipation leading to fecal impaction?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Correct.

BY MS. WATRAL:

Q.    In 2017, when you think Lilly should have updated the label for ileus for dulaglutide, how many adverse event reports were there for dulaglutide?

A.    So I can -- give me a second.

Q.    And let me ask you a more precise question, Dr. Kessler, if you don't mind.

In 2017, at the time that you say the Lilly label should have been updated for ileus, how many ileus adverse event reports were there for dulaglutide?

A.    At one point I calculated that.  I believe there were -- and I don't have, exactly, in my -- I'd have to go back and count, but I can do that.

What I counted -- I'd have to go back and count exactly.

I remember, approximately, by -- again, I'm not sure of the month. I'm not that exact.  There were about 20 events when I had counted off of -- can I explain where I counted?  Is --

Q.    Yes.

A.    So there are spreadsheets that I have, and I have one in front of me and I have some in back of me.  I did

David Kessler, M.D. - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 430

some counting, and I think that there were 20.  I had spreadsheets -- what I remember is 2022 or 2020 -- but they listed the dates of all the events.

And I remember counting maybe about 20 -- I don't know if it was ileus or intestinal obstruction -- I think they were intestinal obstruction, but I'd have to check -- that were as determined causally related by the company.  About that magnitude.

Q.    Let me ask you a few follow-up questions about that.

You indicated that you have spreadsheets that looked at certain adverse event reports.  Were those spreadsheets included as part of your expert report?

A.    No.  They -- I don't believe they were.

Q.    Okay.  And do you, anywhere in your expert report, indicate the number of adverse event reports for ileus for dulaglutide by 2017?

A.    I don't -- I don't believe

I do --

Q.   Okay.

A.   -- specifically.  I don't believe I do.

Q.   And if I asked you those same questions for intestinal obstruction, would your answers be the same?

A.   I think so.

Q.   And if I asked you the same questions about severe constipation leading to fecal impaction, would your answers be the same?

A.   I think so.

Q.   I want to look at Paragraph 731 of your report, on Page 259.

A.   Sure.

Q.   You say, "By October 2017, Lilly had identified 17 positive dechallenge cases and 1 positive rechallenge case within the high-level group term 'gastrointestinal stenosis and obstruction.'"

Do you see that?

A.    I do.

Q.    And what you're referring to there is a safety topic report that Lilly conducted in 2017, right?

A.    I'd have to -- whatever the -- I'd have to pull the footnote, if that's the correct footnote.

Q.    Oh, I actually misspoke. I'm sorry, Dr. Kessler.

What you're referring, there, to is -- why don't we just look and see what you're referring to there. So you cross-reference here Footnote 764.

Do you see that?

A.    I do.

Q.    Okay.  If you go back to Footnote 764, that's on Page 242. You'll see that refers to a dulaglutide label.  I think what you're actually referring to is Page 252.

A.    Thanks.

Q.    And there's a Footnote 796 at the Little Heading 6.

Do you see that?

A.    Yes.

Q.    And that Footnote 796 refers to 17 positive dechallenge cases.

Do you see that?

A.    I see -- I see that.

Q.    And so what you're referring to in -- or strike that.

The 17 positive dechallenge cases identified in Footnote 796 are what you're referring to in Paragraph 731, right?

A.    I have to double -- I have to pull those exact documents.  I've got to understand.  I'd have to pull PRAC, too.

Q.    Yeah.  Let's -- we're going to go item by item, Dr. Kessler.

A.    If you can go through --

Q.    Yeah.

A.    Yeah.

Q.    But let -- let me see if I can help you here.

If you look at Footnote 805, you'll see that there's a Bates number for that document?

A.    Yep.  Yep.

Q.    That ends in 10313454.

Do you see that?

A.    I'm sorry.  This is Footnote 805?

Q.    Correct.

A.    Yeah, I see a footnote ending in 8957.  Is that what you're --

Q.    No.  So Footnote 805 ends in --

A.    805.

Q.    Ends in -- ends in 10313454.

A.    Footnote 805.

MS. AMINOLROAYA:  I think we're off by a footnote in the different versions.

THE WITNESS:  Oh.

MS. WATRAL:  How?

MS. AMINOLROAYA:  Yeah. This is -- he has a copy of his Novo and Lilly report in one. Not separate.

MS. WATRAL:  How -- I don't know how I have a

different version of the report than you guys have.  I have the version that was produced to me.

BY MS. WATRAL:

Q.   Are you looking at a -- is your -- can I -- can I see what you're looking at, Dr. Kessler?

A.   You can absolutely see this is Exhibit 15.  May I get up?

Q.   Yeah.  Thank you.

So, Dr. Kessler, the version that you're looking at, Paragraph 731 is attached to Footnote 804; is that right?  I'll hand it back to you so you can see.

A.   I apologize.  I have no idea how -- that's the report I have.

Q.   Is that right, Dr. Kessler?

A.   I'm sorry.  It's attached to Footnote?

Q.   804, in your version.

A.   Correct.

Q.   And that's the version that you brought to the deposition, right?

A.   Yes, ma'am.

Q.     And the version --

A.     The one -- the version that I have is marked Exhibit 15.  Yeah.  Thanks.

Q.     And then if you have Exhibit 13 that we gave you last time.

A.     I do not.  I apologize. I'm happy to work off --

MS. WATRAL:  Do we have a copy of the old exhibits?  I'll just re-mark as Exhibit 13 what was previously marked as Exhibit 13.

(Document previously marked for identification as Kessler Exhibit 13.)

BY MS. WATRAL:

Q.     If you go to Page 259, Dr. Kessler, in Exhibit 13.

A.     259?

Q.     Yes.

A.     Thanks.

Q.     For Paragraph 731.

A.     Yeah.

Q.     You'll see that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Paragraph 731 in what was provided to Lilly has Footnote 805.

Do you see that?

A.    Yes.

Q.    So it looks like what you were looking at, versus what I was looking at, has an extra footnote in one of the versions.

A.    Some -- yeah.  I have no idea.

Q.    Do you know what is the basis for that discrepancy?

A.    Not at all, no.  I have no idea.

MS. WATRAL:  I'm going to -- I'm going to put in an objection that there's some version that Dr. Kessler is looking at that's different than what we are looking at.

MS. AMINOLROAYA:  Yeah.  I know that the versions that we served were redacted per the parties' agreement.  That's the only reason I can think of that

would have caused, maybe, a footnote glitch.

But other than that, I'm not aware of any basis for a version change.

MS. WATRAL:  Okay.

BY MS. WATRAL:

Q.    So, Dr. Kessler, I'm just going to refer to this as the footnote that's -- that's tagged to Paragraph 731, if that works.

A.    Correct.

Q.    So we are talking about the same thing.

A.    And, in fact, if I may, can I pull my -- can I -- maybe this will be helpful, if I pull Paragraph 731 --

Q.    Why don't we do this, Dr. Kessler.  Why don't we use, right now, while we are talking about this, Exhibit 13 so that you and I are talking about the same thing.  Okay?

A.    Okay.

Q.    So in Exhibit 13, Paragraph 731 --

A.    Right.

Q.    -- Footnote 805, the Bates number at the end is 10313454.

Do you see that?

A.    Correct.  May I ask my -- can I just pull my notebook --

Q.    Sure.

A.    -- in front of me, for Paragraph 731 and 732.

Q.    Sure.

A.    Maybe that will be helpful.

Q.    While we do that, I'm just confirming the Bates number here, Dr. Kessler.

If you look at Footnote 796, you'll see that the same Bates number ending in 10313454.

A.    Paragraph 796?

Q.    Footnote 796 --

A.    Footnote 796.

Q.    -- which is on Page 252.

A.    Could you just put that over there.

Footnote 792?

Q.    Six.  Footnote 796.

A.    Footnote 796.  I have that now.

Q.    And that also refers to Bates number that ends in 10313454, right?

A.    Yes, ma'am.

Q.    Okay.  And so the 17 cases that are referred to in Paragraph 731, those are the same cases that are identified in the Footnote 796, right?

A.    It should be.

Q.    I didn't hear what you said.

A.    It should be, yes.

Q.    Looking at Footnote 796, Dr. Kessler -- and I want to focus on what's in your report right now.

Do you identify in your report which of these 17 cases involved ileus?

A.    I don't -- I'd have to go check.  Well, I don't believe I distinguish there.

Q.    And same for intestinal obstruction and constipation leading to

fecal impaction?

A.    Correct.

Can I explain?  I'm happy to add.

Q.    Let -- let me ask you a few more questions about this, Dr. Kessler.

Do you know which of these 17 cases identified in Footnote 796 identified ileus, in particular?

A.    I don't think -- I don't think a distinction -- I do not.  I don't think the distinction was made, exactly, versus -- ileus versus intestinal obstruction?  Was that the question?

Q.    I'm just wondering, looking at -- you identified 17 adverse events in Footnote 796.  I'm wondering if you know which of those is ileus, in particular.

A.    I don't believe I made that distinction, no, in my head.

Q.    Same answer for how many of these 17 cases involve intestinal obstruction?

A.   Correct.  Again, happy to put a footnote there, if you'd like me to explain.

Q.   And then same for fecal impaction as a result of constipation, right?

A.   Correct.  I didn't make that distinction, nor do I think the MedDRA sort of classification does.

Q.   When you were assessing the addition of ileus, intestinal obstruction, and constipation leading to fecal impaction and adding those to the dulaglutide label, did you consider all of those injuries together or did you separately analyze whether each needed to be included?

A.   That was exactly my footnote, the prior questions.  So the answer is I took them deliberately as a whole.

Q.   And so you did not separately assess whether an ileus warning needed to be added to the dulaglutide label separate from whether

an intestinal obstruction warning or a constipation leading to fecal impaction warning needed to be added.  Fair?

A.    Exactly.  Because of the pathophysiology, I approached those as a piece.

Q.    And would the same be true if I switched the order in my questions to say you didn't consider -- or that you considered intestinal obstruction together with ileus and fecal impaction and you considered fecal impaction together with ileus and obstruction when you were assessing the need for a labeling for each, right?

A.    I think that -- if I understand your question, I think that's -- I think that's exactly right.

Again, just a footnote there, if you want.

Q.    Well, let me ask you this, Dr. Kessler.

Your opinion is that Lilly should have added three warnings in Section 6: one for ileus, one for fecal

impaction caused by constipation, and one for intestinal obstruction, right?

MS. AMINOLROAYA: Objection to form.

THE WITNESS: Yes. Under the rubric of hypomotility, yes.

BY MS. WATRAL:

Q. What do you mean when you say "under the rubric of hypomotility"?

A. I -- well, I believe these drugs, through the GLP, work on hypomotility.

And what my overall sort of opinion is, there is a spectrum of hypomotility disorders, of which these are on.

Q. When -- going back to Paragraph 735. When you say --

A. Let me get -- let me get there --

Q. Sure.

A. -- please.

Q. Are you there?

A. I'm there.

Q. When you say that Lilly

should have added warnings to the dulaglutide label, you identify ileus, severe constipation leading to fecal impaction, and -- and intestinal obstruction, right?

A.    Correct.

Q.    Are you saying that each of those three terms needed to be added to Section 6?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  It should -- my opinion is that it should have included those three terms or something similar to those three terms.

BY MS. WATRAL:

Q.    And when you were giving the opinion that Lilly should have included ileus in Section 6, you were considering adverse event reports about ileus, severe constipation leading to fecal impaction, and intestinal obstruction together.  Is that fair?

MS. AMINOLROAYA:  Object

to form.

THE WITNESS:  So yes and no.

BY MS. WATRAL:

Q.    Tell me why yes, first.

A.    Because those are -- those are all on the spectrum of hypomotility disorders.

Q.    And why no?

A.    Because I don't -- again, my goal in the opinion was to reflect the mechanism in the pathophysiology, which reflects hypomotility disorders, of which these all can be on the spectrum.

And when one looks at, for example, nonmechanical intestinal obstruction in that term, there's not a fine line between ileus and nonmechanical intestinal obstruction in my -- I mean, medically.

Q.    When you're talking about intestinal obstruction here, are you talking about mechanical or nonmechanical obstruction?

A.    That's an excellent question, and I'm happy -- I'm happy to elaborate.

Q.    Well, why don't you answer my question first.

When you referred to intestinal obstruction in Paragraph 735, are you referring to mechanical obstruction or nonmechanical obstruction?  Which one?

A.    Probably more so nonmechanical but can also be mechanical, recognizing there's not a fine -- recognizing that, you know, stool can be mechanical; fecaloma could be mechanical.  It depends on the definition.

Q.    You say it depends on the definition.  I want to use the definition that you're using for intestinal obstruction.  Okay?

How are you defining intestinal obstruction in Paragraph 735?

A.    Great.  Thank you.  That's helpful.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I try not to make it my definition rather than internal medical definition.  But it could be nonmechanical intestinal obstruction or mechanical obstruction.  Again, happy to elaborate.

Q.    And so when you're saying that Lilly should have included a warning in Section 6 by 2017 for intestinal obstruction, you're referring to both mechanical and nonmechanical obstruction.

Is that what you're saying?

A.    I think that's -- I think that's fair, although there's some nuances to that.

Q.    Are there particular mechanical obstructions that you think Lilly did not need to warn of in its dulaglutide label?

A.    Yes.

Q.    Which ones?

A.    I think -- I mean, I think there are causes of mechanical obstruction that I didn't mean -- that I

don't think are relevant: volvulus tumor, other causes of mechanical obstruction.

Q.    Do you think the dulaglutide label needed to include a warning for adhesions?

A.    Probably -- probably not.

Q.    Do you think the dulaglutide label needed to include warnings for hernias?

A.    No.  No.

Q.    Do you think the dulaglutide label needed to include a warning for neoplasms that lead to a mechanical obstruction?

A.    I think I said tumor, yes. It did -- it did not need to do that. Anything that's an extrinsic cause, imposing on the bowel from external forces, I don't think, because I don't think that matches the pathophysiology.

Q.    Do you believe that Lilly needed to include a warning in dulaglutide's label for strictures or inflammatory conditions leading to

mechanical obstruction?

A.    Certainly not strictures. I don't -- I don't think -- inflammatory is more nuanced, I think.

Q.    What about something like inflammatory bowel disease leading to obstruction?

A.    No.  No, ma'am.  I think that's a -- that's not in the pathophysiology of how these drugs would work, that I'm aware of.

Q.    When you're referring to mechanical obstruction that you believe Lilly -- let me strike that.

When you're referring to the need for a mechanical obstruction warning for dulaglutide, you're referring to the situation where severe constipation leads to fecal impaction or fecal wellness.  Is that fair?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Yes.  Plus.

BY MS. WATRAL:

Q.    What is the plus?

A.    The plus is I think there are certain case reports of phytobezoars -- it depends on how you define constipation in your question.

I think there are phytobezoars.  There's -- some call them food bezoars.  Some call them constipation.  It's the accumulation of material in the intestine -- its contents of the -- in the intestine.

Q.    So when you're referring to the need for a mechanical bowel obstruction warning for dulaglutide, you're referring to the situation where there is an accumulation of stool in the intestine that leads to a mechanical bowel obstruction?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Stool -- stool.  Other bezoar material.

The point that -- I'm referring to intestinal obstruction.  Your questions are about mechanical, and I'm trying

to answer that.  But I think we're on the same wavelength.

BY MS. WATRAL:

Q.    Looking at your three adverse events, ileus, severe constipation leading to fecal impaction, and intestinal obstruction, here is what I'm trying to understand.

Does intestinal obstruction capture anything that's not captured by ileus and severe constipation leading to fecal impaction?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Perhaps the bezoar in the food contents would be -- could be viewed as something in addition.

BY MS. WATRAL:

Q.    Other than bezoar and food contents, does intestinal obstruction refer to anything else that is not captured by ileus and severe constipation leading to fecal impaction?

A.    Sorry.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  I just didn't follow that version.

BY MS. WATRAL:

Q.    Sure.  Yeah.

Other than bezoars and the materials related to bezoars, does intestinal obstruction capture or include anything that is not otherwise captured by ileus or severe constipation leading to fecal impaction?

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  It's all -- I mean, it's all of a piece.

You know, it's possible, depending on how different people would interpret those terms, what overlaps, exactly.

BY MS. WATRAL:

Q.    I want to know what your understanding is.

Based on your understanding of these terms, other than bezoars and

materials related to bezoars, can you identify anything that would fall within the category of intestinal obstruction that is not otherwise covered by ileus or severe constipation leading to fecal impaction?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  Generally, I think that's the -- that's the -- that would be what's in my head.

BY MS. WATRAL:

Q.    And so you can't identify anything else; is that right?

A.    No.  It's all -- anything that -- well, anything that would result from hypomotility that would lead a doctor to write down intestinal obstruction, that is what is in my head.

Q.    Like what?  What specifically, do you have in mind?

A.    So any -- what I'm specifically thinking about is decreased motility and the effects of that on the

patient in the intestine, that could lead a doctor to -- you know, to call that intestinal obstruction.

Q.   Right.  What I'm trying to understand is what's -- in what situation would that intestinal obstruction be something different from ileus or severe constipation leading to fecal impaction and be something that you think needs to be warned of?

A.   I'd have to think about the radiological findings that a doctor would see in each one that would trigger one versus the other.  Happy to explain.

Q.   That's -- and that's not something that you've done, to date?

A.   I see --

Q.   Well, let me ask a different question.

That's not something that you discussed in your report.  Is that fair?

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  That's fair.

That's exactly correct.

BY MS. WATRAL:

Q.    Can you tell me what was the -- let me ask a different question.

Do you identify in your report what was the specific injury or adverse reaction in each of the 17 cases in Footnote 796?

A.    No.  Deliberate -- and that's no.  I do not.

Q.    When you were considering whether there was a need to add a warning for a severe constipation leading to fecal impaction, did you consider adverse event reports about ileus?

A.    I considered these, again, in the totality, as part of a spectrum.

Q.    Let me ask my question differently.

When you were opining that Lilly needed to add a warning for severe constipation leading to fecal impaction, was your opinion informed by cases of ileus?

A.    I think so.

Q.    And when you were -- would the same be true if I asked you about the different combinations for ileus and intestinal obstruction?

A.    They were all informed -- they were all -- they were informed by -- by the pathophysiology, the factors that I enumerated.  And the fact that, in the end, that -- this is what was decided on in 2025 in the label.

I'm happy to explain.

Q.    Each of these cases identified in Footnote 796 is a spontaneous case report, right?

A.    I don't believe any of this -- I believe -- I have to double-check.  I don't believe there are any solicited.  I'd have to go back and double-check.

Q.    So you don't know, one way or the other, whether these are spontaneous reports or not?

A.    They are so -- you can go find them in the materials.  I just

don't have them all in my head.

Q.   In Paragraph 732 you refer to a November 3, 2017, safety topic report from Lilly related to gastrointestinal stenosis and obstruction.

Do you see that?

A.   I do.

Q.   And what you cite in your report is that Lilly found a disproportionality in the reporting of GI obstruction and stenosis with dulaglutide versus placebo; is that right?

A.   That's what I said, yes. That's -- there was that statement.

Q.   What you were specifically calling out from the safety topic report was this disproportionality.  It was not any particular adverse event report within that safety topic report, in your report, right?

A.   Those numbers that went into that sort of imbalance were adverse event reports that went into a total.

Q.   Right.  But what I'm getting at is in Paragraph 731, you identified 17 cases.

In Paragraph 732, when you're talking about the safety topic report, you were talking about the aggregated cases.  You weren't talking about any particular cases in that discussion of the STR?

Do you want me to ask my question again?

A.   No.  I think I understand your question.

I think I agree with that, recognizing that the numbers in the table are an aggregate of individual cases.

Again, I can explain if you'd like.

Q.   Sure.

Dr. Kessler, do you know, in Lilly's safety topic report, were there any cases of ileus that were discussed?

A.   I'd have to go look.  I'd

have to go -- I mean, I have charts of all those.

Q.    I want to focus on what's in your report.

Did you identify in your report whether the safety topic report disclosed or discussed ileus cases?

A.    I'd have to go back and search all the footnotes.  I don't have a recollection specifically.  I'd have to go just check that.

Q.    As you sit here today, do you know whether Lilly's November 2017 safety topic report included any cases of ileus?

A.    I'd have to go look -- I'd have to go -- I mean, I have -- I have that.  I don't have it at the top of my head, sitting here, from memory.  I'd need to pull that report and look at it.

Q.    Is the same true for obstruction and severe constipation leading to fecal impaction?

A.    Yes.  And, again, I approached these as a whole.

Q.   Do you know whether FDA ever indicated what it thought the injury was for a particular patient in the cases identified in Lilly's safety topic report from 2017?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I'd have to go back and look at the '22 report and see how they -- that cross-references to the 2017 cases, in order to answer that question.

BY MS. WATRAL:

Q.   Okay.  Fair enough.

I want to ask you about Paragraph 733.  You refer to PRAC's December 2017 signal assessment report.

Do you see that?

A.   Yes.

Q.   And Paragraph 734 also refers to the PRAC 2017 signal assessment report, correct?

A.   Correct.

Q.   And in Paragraph 734, you

indicate that PRAC identified three cases of positive rechallenge, right?

A.   That's what I do say, yes.

Q.   Do you know if any of those cases were for ileus?

A.   I'd have to go back and look at those, specifically.  I have those numbers.  I don't have that in my head.

Q.   Same for intestinal obstruction and fecal impaction?

A.   Again, I don't have those in my head.  I just -- I'd have to look -- I have those case numbers, and I would have to look at that to refresh.

Q.   When you were doing your assessment of when Lilly should have added warnings for ileus, severe constipation leading to fecal impaction, and intestinal obstruction, am I understanding correctly that you didn't analyze whether Lilly, FDA, or PRAC, in particular, had adverse event reports for each one of those injuries, separately, in front of them?

David Kessler, M.D. Volume II    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 463

A.    At that moment in time?
What moment in time --

Q.    Yeah.  Let me ask -- let me
ask you --

A.    At what moment in time are
you asking that question?

Q.    Sure.  So why don't I just
break each injury apart so I'm able to
ask you a question about that.

So when you were saying
that Lilly should have added a warning
for ileus in 2017 to the dulaglutide
label, did you consider whether Lilly,
PRAC, or FDA had in front of it cases
that specifically were ileus as compared
to the other injuries?

A.    Or the overlap, or the fine
line between nonmechanical intestinal
obstruction and ileus?

Q.    Yes.

A.    I -- I considered -- I
considered them as a whole because of
this complexity or the nonmechanical
intestinal obstruction, by some, can
consider that ileus.  I considered that

David Kessler, M.D. Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 464

all similar pathophysiology of all three.

Q.    And the same is true for severe constipation leading to fecal impaction and intestinal obstruction, if I repeated my question for those?

A.    Correct.  Because of mechanism and pathophysiology, I saw those as a whole, recognizing that you and I could, you know, maybe come up with somewhat slightly different words, it would mean the same thing.  What I meant was that spectrum of -- that more severe part of the spectrum of hypomotility.

Q.    And that's because something like ileus could capture nonmechanical obstruction and fecal impaction leading -- or constipation leading to fecal impaction or mechanical obstruction; is that right?

MS. AMINOLROAYA:
Objection to form.

THE WITNESS:  Bingo.  Yes.
I mean, I think we're saying

exactly the same things.  As well as the fact, I think those things can be hard to diagnose without radiology or doing surgery.  There may be overlaps in what that diagnosis -- I think they all result from hypomotility.

BY MS. WATRAL:

Q.   Dr. Kessler, what is Section 6 of an FDA label?

A.   Postmarketing events.  The idea -- it's -- sorry.

Q.   No.  You're actually getting where I'm going.

So when you're referring to Section 6, adverse reactions, in your report, including in Paragraph 735, you're referring to the postmarketing section of Section 6, right?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  I'm sorry. There is -- let me back up.

What I should do is,

there's a clinical trial and a -- what I'm referring to as Section 6 of the label is referred to in 201.57.  I think.  It's that -- it's that adverse event section is referenced in that CFO.

BY MS. WATRAL:

Q.     This is what I'm getting at.  So let's break that down a little bit.

Section 6 includes two sections: Section 6.1, which refers to clinical trials, and Section 6.2, which refers to postmarketing data, right?

A.     Correct.  At various points in time, there was some change, depending on what date you put 6.1 and 6.2 at, I believe.  There was some change in the label.

Q.     About what time was that?

A.     2'07, 2'08.

Q.     Okay.  So --

A.     2007, if my memory serves me right, but I have to go back.

Q.   Yeah.  So dulaglutide was approved in 2014.

A.   Correct.

Q.   Okay.  So since dulaglutide was approved, there are two sections in Section 6: 6.1 for clinical trial and 6.2 for postmarketing, right?

A.   Correct.

Q.   And when you're referring to the need for a Section 6 warning, you're referring specifically to the need for a warning in postmarketing, in 6.2, right?

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  I'd have to go back and refresh every reference I make here to -- to remember exactly.  And there were different comments -- let me stop there.

BY MS. WATRAL:

Q.   Dr. Kessler, as you sit here today, do you know whether, when you say there needed to be a Section 6

Warning, it's your opinion that there needed to be a Section 6.1 Warning?

A.   There was a -- I'd have to go back and refresh and look at the negotiation comments, because at certain points, the Section 5 Warning, Section 6, sometimes it said 6.1, sometimes it said 6.2.  So I'd have to refresh my memory on that.

Q.   As you sit here today, can you identify any Section 6.1 Warning that you believe was required for dulaglutide related to ileus, severe constipation leading to fecal impaction, or intestinal obstruction?

A.   I'd have to go back and refresh my memory.  I was not making a -- in my opinion, I wasn't -- I was using the standard in 201.57 for 6.  I was not breaking it down to 6.1 and 6.2.

Q.   You understand that Lilly ultimately added ileus, severe constipation leading to fecal impaction, and intestinal obstruction to the dulaglutide labels, right?

A.    At FDA's request, yes.

Q.    And when Lilly added those adverse reactions to the label, it added them to Section 6.2, right?

A.    Correct.

Q.    And so what I'm wondering is are you saying that Lilly needed to add any warning related to ileus, severe constipation leading to fecal impaction, or intestinal obstruction to Section 6.1?

A.    Not specifically, no.

Q.    If I talk about postmarketing and spontaneous reports as the same thing, do you understand those to be the same?

A.    Spontaneous and --

Q.    Postmarketing.

A.    Sure.

Q.    Dr. Kessler, if you go to Page 244 of your report, Paragraph 6 --

A.    Page 244.

Q.    Yes.  Let me know when you're there.

A.    Okay.

Q.    You -- in Paragraph 692, you refer to FDA's guidance for industry, adverse reactions section of labeling for human prescription drug and biological products, content and format, which you call "FDA adverse reactions guidance."

Do you see that?

A.    Correct.  About 2006, if I remember.  That's the guidance of 2006.

(Document marked for identification as Kessler Exhibit 18.)

BY MS. WATRAL:

Q.    I'm going to hand you what I'm marking as Exhibit 18, I believe.

A.    Yes, ma'am.

Q.    Exhibit 18 is the FDA adverse reactions guidance that you cite in Paragraph 692 of your report, right?

A.    Correct.

Q.    If you go to Page 2 of Exhibit 18, under the heading "Adverse Reactions Section, Content and Format."

Do you see that?

A.    I do.

Q.    Do you see that?

A.    Yeah, I do.

Q.    You'll see that in the second sentence it says, "Separate lists are required for adverse reactions identified from clinical trials and those identified from spontaneous reports after a drug has been marketed."

Right?

A.    Correct.

Q.    And those spontaneous reports after a drug has been marketed, those are post -- postmarketing reports, right?

A.    Fair.

Q.    And then it goes on to say that -- it talks about which sections of the guidance will refer to various issues.

Do you see that, that last sentence?

A.    Mm-hmm.

Q.    And it indicates that Section 3.B refers to information for

adverse reactions from clinical trials, right?

A.    Correct.

Q.    And that's the equivalent of Section 6.1, right?

A.    At that point -- again, I believe that's correct, depending on what your timing is.  But I think that's correct.

Q.    At least post-2014, that refers to --

A.    Yeah.  This is 2000 -- this is 2006.  It just gets complicated in how this was formatted.

Q.    Sure.

But for the information on adverse reactions from clinical trials post-2014, that refers to Section 6.1, correct?

A.    Correct.

Q.    And the guidance indicates that Section 3.B refers to that Section 6.1, Clinical Trials, right?

A.    Correct.

Q.    And then it indicates that

postmarketing safety reports refer to Section 3.C.

Do you see that?

A.    Correct.

Q.    And postmarketing safety reports, that is Section 6.2, right?

A.    Correct.

Q.    And so if we wanted to look at the FDA's guidance for Section 6.2, we would look to Section 3.C, right?

A.    I'm not sure it's all in 3.C, but I see that reference, yes.

Q.    You certainly would want to consider information, though, that's in Section 3.C for 6.2?

A.    You'd want to consider all the information.  Right.

Q.    Including what's in Section 3.C, right?

A.    Sure.

Q.    I want to look at -- go back to your report, Paragraph 699, on Page 245.

A.    Right.

Q.    You indicate that you

David Kessler, M.D. - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 474

applied FDA guidance factors, including four factors that you identify at the end of that paragraph.

Do you see that?

A.    Included.  Yes.

Q.    And those factors include, "1, timing of onset or termination with respect to drug use; 2, plausibility in light of the drug's known pharmacology; 3, occurrence at a frequency above that expected in the treated population; and 4, occurrence of an event typical of drug-induced adverse reaction."

Do you see that?

A.    Yes.  And -- I list that there, and I think I go on to do a few other factors.

Q.    Sure.  I want to focus on this first.  Okay?

A.    Correct.  Yeah.

Q.    And you apply these four factors in assessing whether there's a need for a Section 6.2 Warning, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.  I think I apply this with regard to whether there's a Section 6 warning.

BY MS. WATRAL:

Q.    Right.  But we just talked about how you don't have an opinion that there needed to be a Section 6.1 Warning.  So it must be Section 6.2, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.  No.

BY MS. WATRAL:

Q.    Why not?

A.    Because when I went to -- when I was thinking about this, I was using the standard in 201.57 in the reg, which I think is the standard for when an adverse event has to be listed.

And that was -- I mean, that takes -- that was in my head, as well as I was not distinguishing -- I was using that CFR standard.

Q.    Right.  But when you

cite -- at the end of Paragraph 699, you have Footnote 783.

Do you see that?

A.    Footnote 780 -- hold on a second.  I'm looking at my report --

Q.    Yeah.  Please look at Exhibit 13.

A.    699.

I'm sorry.  Ask your question again.

Q.    Sure.

In Paragraph 699 --

A.    Right.

Q.    -- when you talk about the four factors, you have a footnote at the end, Footnote 783, right?

A.    I do.

Q.    Footnote 783 refers to the 2006 FDA adverse reactions guidance at Page 5, right?

A.    Those are factors that are listed there, yes.

Q.    Right.  And you are applying those factors, the four factors in section -- or in Paragraph 699, in

assessing whether a label warning needs to be included in Section 6 of the label, right?

A.    I certainly used those factors and others, yes.

Q.    And you applied those factors to section -- to whether there was a need for a Section 6.2 Warning, right?

A.    No.  That's not what my intent was.

Q.    Okay.  So you did not apply the factors in Section 6 -- in Paragraph 699 to assess whether there was a need for a Section 6.2 Warning?

A.    I applied -- I used them for overall Section 6 under 201.57.

Q.    All right.  So let me make sure -- let me see if I understand this.

You're saying that the factors in section -- in Paragraph 699 were factors that you applied to whether there was a need for a Section 6 Warning, which would include, potentially, either a Section 6.1 and/or

a Section 6.2 Warning?

A.    Anywhere in Section 6, yes.

Q.    Okay.  Let's take a look at what you cite in Exhibit 18.  Let's go to Page 5.

A.    Sorry.  In Exhibit?

Q.    18.

A.    Yes.  Thank you.

What page?

Q.    Page 5.

A.    Page 5.

Q.    Let me know when you're there.

A.    I'm there.

Q.    Section Heading 4, "Presentation" --

A.    I'm sorry.  Show me exactly where on the page.

Q.    Sure.  There's a Section Heading 4 called "Presentation of Less Common Adverse Reactions."  It's about halfway down the page, on Page 5.

A.    Correct.  Correct.

Q.    And if you look at the bottom of the page, that's where there's

the four factors that you identify in Paragraph 699 of your report, right?

A.    Generally, yes.

Q.    And there's also a statement after that, that, "For serious events that are typical of drug-induced adverse reactions, the occurrence of a single event could be a basis for inclusion in the list."

Right?

A.    I understand that.

Q.    Okay.  If you go to Page 3 of Exhibit 18.

A.    Thank you.

Q.    You'll see that the discussion of the four factors that you identify in Paragraph 699 is in Section 3.B.

Do you see that?

A.    I do.

Q.    And so, as we talked about earlier, Section 3.B refers to clinical trials, Section 6.1, right?

A.    I see those factors listed there, yeah.

Q.    Okay.  And, again, as we talked about earlier, Section 3.B refers to clinical trials, Section 6.1, right?

A.    I see that listed there, yes.

Q.    Okay.  And the statement about a single event being a basis for inclusion in the list, that is also in Section 3.B, relating to Section 6.1 of the label, right?

A.    As -- as that's written.  But it would be applicable to both sections.

Q.    Just stick with me here.

The statement about "even a single event being the basis for inclusion," that's listed in Section 3.B, which relates to the clinical trial, or Section 6.1, right?

A.    But be well -- but would be well accepted for both sections.

Q.    Okay.  Well, let's get back to that in a moment.

Did you look to see whether Section 3.C, which refers to section --

hold on.  Before you go there.  I'm just wondering about the work you did.

A.    Sure.

Q.    Did you assess whether Section 3.C has factors that should be considered when looking into whether a 6.2 Warning is needed?

A.    Sure.  I -- I considered all -- I considered all the factors that one would use in pharmacovigilance.  All these relate to sort of the Bradford Hill factors that I considered.

Q.    And if you look at Page 7, you'll see that that's where Section 3.C starts.

A.    Right.

Q.    And if you look at Page 8, there's a list of three factors that apply to Section 6.2, correct?

A.    Correct.

Q.    The factors in Section 3.C are not the same.  They don't overlap entirely with the factors in Section 3.B; is that right?

A.    Yeah.  I've had

conversations with colleagues on this.

Q.   And so the factors for Section 3.C are different than the factors for Section 3.B, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  The factors in how many -- for example, how many you would need.  It says "one or more of the following."

These are general -- these all go sort of to Bradford Hill factors, as well as the factors in Section 5.

I've considered all the factors, I think.

BY MS. WATRAL:

Q.   Okay.  Section 3.C does not indicate that one adverse event report can be sufficient for a Section 6.2 Warning, right?

A.   It may not say that here, but that's well accepted.

Q.   Can you point me to any FDA guidance that says, for Section 6.2,

that one adverse reaction is sufficient?

A.    You'd have to go back, again, depending on how you think what the word "guidance" means.  Dal Pan has done some writings.  We'd have to pull some of his writings.

But, certainly, one case can be used for -- FDA never -- never was that precise.  These factors are all Bradford Hill factors.  There's obviously less rigor in Section 6 than Section 5.

Q.    As you sit here today, can you identify any FDA guidance that says, for Section 6.2, one adverse reaction is sufficient?

A.    I think Dal Pan's writings generally talk about maybe one or two. There are some examples that I know we've discussed in the past, and I can't recall which section.  I don't think that's material.

Q.    Do you identify anything in your report that indicates, for Section 6.2, FDA guidance that

David Kessler, M.D. Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 484

indicates, for Section 6.2, that one adverse reaction is sufficient?

A.    I may not in my report, but, again, it's generally accepted.

Q.    Do you agree with me not all cases of hypomotility are cases of ileus?

A.    Can I just think through that question?  There's how many negatives?  I just want to make sure how many negatives there --

Q.    Yeah.  I'm trying to understand.  So hypo -- let me ask it this way.

Hypomotility is a broader category than ileus, right?

A.    Hypomotility can be anywhere in the GI tract.

Q.    Okay.  And so just because a patient has hypomotility does not mean the patient has ileus, right?

A.    I think that would be fair. You can have hypo -- well, it's a complicated answer to that question.

Q.    Are hypomotility and ileus

synonymous?

A.    No, but they overlap, obviously.

Q.    Do you agree that hypomotility is not the same as intestinal obstruction?  That patients can have hypomotility but, ultimately, not have intestinal obstruction?

A.    Yes, I would agree with that.

Q.    Do you agree that patients can have hypomotility but not ultimately have constipation that leads to fecal impaction?

A.    People can have hypomotility and not have fecal impaction.  I would agree with that.

Q.    Do you agree that not all cases of nausea lead to either ileus, obstruction, or constipation leading to fecal impaction?

A.    It's on -- there are different points on the continuum.

Q.    So you agree?

A.    I'm not sure I understand

the question, exactly.

Q.    Yeah.  Let me ask that -- there -- just because a patient has nausea does not mean that that patient is going to go on and develop ileus, obstruction, or constipation leading to fecal impaction, right?

A.    I would agree with that.

Q.    Same for vomiting?

A.    I would agree with that.

Q.    Same for abdominal pain?

A.    I would agree with that.

Q.    Same for impaired gastric emptying?

A.    If you have delayed gastric emptying, you would not go on to develop intestinal obstruction.  Is that the question?

Q.    I'm saying just because a patient has impaired gastric emptying does not mean that the patient necessarily will develop ileus, right?

A.    I think that would be a fair statement.

Q.    Same for obstruction and

constipation leading to fecal impaction?

A.    They are -- they can, but they don't, necessarily.

Q.    So the answer is yes?

A.    They can, but -- well, ask your question again.

Q.    Sure.  Just -- I'll just ask for each one, Dr. Kessler.

Just because a patient has impaired gastric emptying does not mean that the patient will necessarily develop obstruction, right?

A.    Sure.

Q.    And just because a patient has impaired gastric emptying doesn't mean that the patient necessarily will develop constipation leading to fecal impaction, right?

A.    I think -- I think they relate, but not necessarily.  So I think that's correct.

Q.    Do you know what the background rate is of ileus in the diabetic population?

A.    I'd have to -- at some

point, I've seen.  I'm not sure.  There are a number of different estimates.  I don't have them in my head.

Q.    Do you know the background rate of ileus in obese patients?

A.    I'm not sure -- background from -- I'm not sure that's generally referred to.  But I don't know.

Q.    Okay.  Do you know the background rate of either -- strike that.

Do you know the background rate of intestinal obstruction in either the diabetes or obesity populations?

A.    I don't know if that's known.

Q.    Do you agree that diabetes is a known cause of ileus?

A.    I think they can -- diabetes can result in neurological changes to the gut, yes.

Q.    Okay.  Do you agree that ileus is a severe gastrointestinal adverse reaction?

MS. AMINOLROAYA:  Object

to form.

THE WITNESS:  Can be.

BY MS. WATRAL:

Q.    Do you agree that obstruction is a severe gastrointestinal adverse reaction?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  Can, yes.

BY MS. WATRAL:

Q.    Do you agree that fecal impaction is a severe gastrointestinal adverse reaction?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I think that's correct.  Can be, yes.

BY MS. WATRAL:

Q.    When you were asked questions by Novo's counsel, one of the things that you were asked about is whether you were offering a general causation opinion.

Do you remember being asked those questions?

A.    Yes.

Q.    You are familiar with what general causation is, in litigation, right?

A.    I am.

MS. AMINOLROAYA:

Objection.

BY MS. WATRAL:

Q.    You're not offering a general causation opinion with respect to Lilly's medicines, right?

A.    I think that's -- I think that's fair.  I think I -- my report would just be more on the liability side.

Is that a way to say that?

Q.    So, for instance, you're not offering an opinion about whether there's a statistically significant association between Lilly's medicines and a particular injury, right?

MS. AMINOLROAYA:

Objection.

THE WITNESS:  There are references to statistically

significant associations.

BY MS. WATRAL:

Q.    Let me ask you this, Dr. Kessler.

A.    There are references in my report to statistically significant associations with Lilly's medicine.  For example, atonic hypomotility is statistically significant with a Lilly medicine.

Is that an opinion?

Q.    Let me ask it this way.

You didn't do an analysis of the entire body of literature to sit down and assess, from an epidemiology perspective, is there a statistically significant association between Lilly's medicines and ileus in particular, for instance?

A.    I sort of did.  But my conclusion went to -- to that liability question, not a general causation.

Is that your question?

Q.    Yeah.  And I'm getting at the general causation piece.

A.    Yeah.  So I'm just -- so I looked at epidemiology.  Right.  I understand that there are other epidemiologists who will come in.

But I think it's fair to say I am on the liability side of that question.

Q.    When you say you're on the liability side --

A.    Right.  I'm sorry.  I apologize.

I -- there are certain experts that will come in that will talk about general causation.

Q.    Yeah.

A.    And there are certain experts that will talk about failure to warn.

Again, I just -- I just meant I think I'm generally on the discussion of what would -- I'm generally referred to as a regulatory expert.  You would be talking more on failure to warn than I would be talking on causation.

Q.   One of the experts for Plaintiffs who you spoke with was Dr. John.

Do you recall that?

A.   Yes.

Q.   Okay.  You understand that Dr. John is giving a general causation opinion about ileus, obstruction, that sort of thing?

A.   Yes.

Q.   And Dr. John did an assessment of Bradford Hill criteria, consistency of a causal association.  You didn't do that sort of assessment.  That's what I'm getting at.

A.   I sort of did, to get -- well, I sort of did, in order to get to 201.57 in the analysis of what's a 5, what's a 6.

They are not exactly the same as Bradford Hill.  I mean, they do overlap.  FDA factors aren't exactly the same.

So I sort of did, but I'm not offering that opinion.  Is that

helpful?

Q.   It is.

And so, for instance, you are not offering an opinion about the consistency of a causal association, one of the Bradford Hill criterias?

A.   One of the -- yes.  Yes. You are correct.  I'm not -- I'm using -- my standard is 201.57, right, rather than Bradford Hill.

Q.   I see.

And the same is true for the strength of a causal association, right?

A.   It factors into 201.57.  We talked a little about statistical significance, but I didn't do the Bradford Hill.

Q.   Let me ask you this.  Is there anywhere in your report where you discussed the strength of any causal association?

A.   I think I talk about statistical significance that goes to that, but I -- I'd have to go back and

look at the word "cause" and -- I don't believe so, but I'd have to go back.

Q.    I want you to flip through your Lilly opinion.  Can you identify for me anywhere where you opine on the strength of a causal association?

A.    Thanks.  Just give me a second.

Q.    Sure.

A.    I'm just searching for the word "cause."

Q.    You're searching?

A.    I'm searching my report. I'm searching my report, if that's okay. I just want to see what I say, cause or causal.

The adverse guidance talks about -- again, for example, when they may --

Q.    Where are you, Dr. Kessler?

A.    Example, on Page 30, which is where I'm just setting out the guidance, not setting out the standards in general.

Q.    Right.  And what I'm

wondering is, specifically for dulaglutide, can you identify anywhere in your report where you opine on the strength of a causal association?

A.   Let me just continue to look for a second example.

I think I use the standard, generally, reason to believe, whether it may have been associated -- may have caused the event.  But that's not the exact same thing as...

Again, I'm not sure.  You are talking about strength, using is it Bradford Hill specifically, or as it relates to 201.57?

Q.   I want to know --

A.   There's a possibility of a causal association.  I'm just trying to understand how you're using the term.

Q.   In the context of your labeling opinion, do you, anywhere in your report, opine on the strength of a causal association for dulaglutide?

A.   I use the reason -- the "reason to suspect" or "reason to

believe" standard, which were generally for 6, which is not -- the only place possible that I use this -- again, I think we talked about -- is it 590 -- let me make sure my paragraphs are right.  Give me a second to get there.  It's not that.

It's got to be 690.  Hold on a second.

656, I talk about the Novo label.

Q.    Give me -- give me one second.

A.    I'm sorry.

Q.    Which page are you on?

A.    So I'm on 232, paragraph 656.

Q.    Okay.

A.    So, again, this is sort of, I mean, connecting the pieces.  I just want to answer your question exactly.

So -- and, again, I'm not sure, when you say "strength of a causal association."

I use Section 5 Standard,

as well as Section 6 Standard, in my opinions, which is reasonable evidence of a causal association, a reason to believe there is an association.

If you think -- I mean, I don't know whether that gets to your question of strength of an association. It sort of does.

Q.   Can you --

A.   But it's not.

Q.   You say, "But it's not"?

A.   It's not the Bradford Hill specific strength.  I think this -- I would distinguish it.  But, obviously, there's a level of association that goes to 201.57.

Q.   Yeah.  And what I'm wondering is on the labeling side of things.  So not on the Bradford Hill side.

On the labeling side of things, can you identify for me anywhere in your report where you discuss the strength of association for dulaglutide?

A.   As -- well, I apply this --

I apply the 201.57 sort of as the reason to believe there's different standard.

Q.    That's not my question, though.

A.    Then I don't understand -- I'm sorry.  I don't understand the question.  I'm sorry.

Q.    Can you identify for me anywhere in your report where you discuss the strength of association for dulaglutide?

MS. AMINOLROAYA:
Objection to form.

BY MS. WATRAL:

Q.    And let me rephrase my question.

Can you identify for me anywhere in your report where you discuss the strength of any causal association for dulaglutide?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I'm having -- I'm struggling -- I'm struggling, because 201.57 is

reason to believe there's an association, approximately.  A reasonable basis.  Something like that.

If you think that's strength of association, then maybe, but I'm just trying to...

But I'm not sure I talk about the -- I talk about statistical significance here or there.

I may not use -- I don't have a section that says strength of association.

Is that helpful?

BY MS. WATRAL:

Q.    It is.

And so you just -- you have your report up on one of your screens, and you just control-F'd to do some searches, right?

A.    I didn't actually get to anywhere.  I was typing -- trying to type in "strength."

So I'm -- I was trying to

think through, because I use a standard,
and that standard has a level of
association.  So there is, somewhere in
there, a strength of association.

          Q.    Right.  And what I'm
wondering is, is there a place in your
report where you discuss the strength of
a causal association.  And I think you
said that you don't have a section that
discusses that particular topic, right?

          A.    I'd have to go back and --
I'd have to go back.  I certainly go to
discussing whether reason to believe
is -- it meets that standard.

          Q.    Right.  But that's not what
I'm asking.

          I'm asking you, is there
anywhere in your report where you
discuss the strength of any causal
association for dulaglutide?

          A.    Well, I talk about
statistical significance.  That would go
to strength.

          Q.    Right.  But is there
anywhere where you say, I'm considering

strength, and the things that I consider for strength are this, and here is what I conclude about strength?

A.    I don't use -- that would be in the Bradford Hill context of looking at strength, as opposed to looking at -- one wouldn't do that for the 201.57.  In that context, I don't do that.

Q.    Okay.  But even in the labeling context, you don't say, here is how I would consider strength, and this is my conclusion for dulaglutide. Right?

A.    Correct.

Q.    Do you know how long ileus takes to develop?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  I'm not sure.  I do not -- I'm not sure anybody does.  And I would certainly -- I defer to the gastro -- gastroenterologist.

I'm obesity medicine

board-certified, but I'm not aware of any specific scientific knowledge on that question.

BY MS. WATRAL:

Q.    Same for intestinal obstruction?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  How long?

BY MS. WATRAL:

Q.    Yeah.  Let me ask my question.

Do you know how long it takes for intestinal obstruction to develop in a patient?

A.    I have not -- I have not seen anything in the medical literature that scientifically determines that question.

MS. AMINOLROAYA: Objection to the form of the question.

BY MS. WATRAL:

Q.    Do you know how long it takes for severe constipation to

develop?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I'm not sure there's anything in the scientific -- I mean, I've studied constipation in the obesity context and in this context.  I'm not sure I've seen anything that goes to that question.

BY MS. WATRAL:

Q.    Do you know how long --

A.    I mean, people can give you their clinical judgment of those questions.  If you can be more specific, I can maybe help with it.

Q.    Sure.

Do you know how long it takes for severe constipation to progress to fecal impaction?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  I've seen nothing in the medical

literature that would help me --
the answer is I don't know.  I'm
not sure it's known.  I assume
there's great variability.

BY MS. WATRAL:

Q.    Do you consider yourself to
be an expert in ICD codes for reactions
like ileus or obstruction?

A.    I'm a regulatory expert.
I'm not a coder.  I'm not a coder.

Q.    Do you know the names of
Lilly's adverse event database?

A.    I'd have to go back.  It
was Argus at one point.  I mean, I'd
have -- there was LSS that was referred
to as being searched.  I think it was
Argus at some point.  I'd have to go
back and specifically understand at
different points in time.

Q.    I want to go back to that
little Section 8 we started with on
Page 258 to 259.

A.    Yep.

Q.    When you were doing an
assessment of when Lilly should have

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 506

added a Section 6 Warning, you did not do your own independent assessment of Lilly's adverse event data by querying Lilly's databases, right?

A.   Lilly's LSS safety databases, for example.  I only can query the databases -- I think.  I think that's correct.

I did look at control trial study reports.  Is that considered part of your database, as opposed to your LSS databases.  So I looked at the discovery database, but I didn't have access to Lilly's specific databases, beyond what's in Lilly's reports, medical narratives, and clinical study reports.

Q.   I see.  You're getting at what I was going after next.

So in that little Section 8, from Pages 258 to 259, you were relying on the analysis and culling and pulling of adverse event reports that Lilly did.  You didn't do your own pulling of adverse event reports to do that assessment; is that right?

David Kessler, MD - Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 507

A.    Correct.  I mean, Lilly and/or PRAC or other third parties. There's -- I mean, I am -- I didn't -- I didn't pull -- what was your --

Q.    Adverse event reports.

A.    I pulled adverse event reports from -- let me just understand where the medical narratives came from.

The medical narratives may have come from S -- I may have had -- I do have piles of medical narratives for STR reports, or STR reports to be used in PRAC reports.  So I have medical narratives that would also be in the Lilly database, but I didn't query the Lilly database.

Q.    The starting point for your assessment in Section 8 was the adverse event reports that either Lilly or regulators pulled together.  You didn't do your own assessment where you pulled together the adverse event reports that you considered, right?

A.    Let me just -- let me just think that for a second.

David Kessler, MD - Volume III     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER     Page 508

I think that's correct.  I do have medical narratives.  I think they -- but they -- but they were on some spreadsheet or some clinical study report or in some way -- I think if Lilly said -- if I can explain.

If Lilly said there was 106 adverse events, I may -- I went back and looked at those 106, pulled those 106 medical narratives.

Q.    Right.  So when you say you pulled medical narratives, that was from a universe of adverse events that either Lilly or a regulator identified, right?

A.    I think that's generally correct.

Q.    And you didn't go out and do an evaluation of what search terms should you apply, apply those search terms to adverse events, and then look at your own set of adverse events to assess whether a warning was needed.  Is that fair?

A.    I didn't have access to the LSS database.  Correct.

Q.    And you didn't do it in the FAERS database either, right?

A.    I didn't do a separate analysis.  I mean, I did -- I think I used those that were identified.

Q.    You do not say, in your report, the search terms, for instance, that you would use to evaluate adverse event reports or identify adverse event reports for ileus, obstruction, or fecal impaction, right?

A.    No.  I used the terms as they were identified by -- by that cohort that we just described.

Q.    I want to go to Page 239.

And let's use the version that we've marked so we're using the same footnotes, Dr. Kessler.

A.    Sure.

Q.    Let's use Exhibit 13.

A.    Sure.

Q.    Page 239, exhibit -- sorry. Footnote 751.

Let me know when you're there.

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 510

A.    Can I just trouble you for my notebook on -- for that footnote, please?  Thank you.

I'm there.

Q.    And you discuss an August 2022 dulaglutide safety topic report, right?

A.    Correct.

Q.    That's a Lilly safety topic report?

A.    That's correct.

Q.    You talk about the search terms used in a 2017 safety topic report versus the search terms used in the 2022 safety topic report, right?

A.    At some point in my report -- I think in Footnote 750.  Is that --

Q.    751.

A.    Yeah.  Again, yes, I think we're off one footnote.

Q.    Let's take a look at Exhibit --

A.    751 is the footnote I'm -- yes, that -- my report, 750.  Yes.

Q.    Well, they are both your reports.  So I want you to look at --

A.    I understand -- I understand there is --

Q.    Yeah.

A.    But we're talking about the same footnote.

Q.    Okay.

A.    I know the differences in those search terms.

Q.    You didn't, though, run a separate set of search terms based on data that was available in August of 2022 to determine the number of adverse events that would be found if a different set of search terms was used, right?

A.    I think that's fair.

Q.    And you don't know, if a different set of search terms was used, whether there would be a different set of adverse events for ileus, obstruction, or fecal impaction, right?

A.    I can tell you what I know.

Q.    Let me ask --

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 512

A.     I can -- I can tell you what I know.

Q.     Yeah.  Let me ask a more precise question.

You don't say in your report that if a different set of search terms was used, that there would be a different set of adverse event reports identified in 2022 related to ileus, obstruction, or fecal impaction, right?

A.     I don't think I conclude -- I don't think I conclude it that way. Correct.

Q.     I want to go to Page 240 of your report.  And let's stick with the Exhibit 13.

A.     Sure.

Q.     Subparagraph K on Page 240.

Do you see that?

A.     Yes.

Q.     It indicates that in November of 2022, Lilly updated the Trulicity label with the addition of gastrointestinal ileus in Section 6.2, "Postmarketing Experience."

David Kessler, MD - Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 513

Do you see that?

A.      Correct.

(Document marked for identification as Kessler Exhibit 19.)

BY MS. WATRAL:

Q.      I'm going to hand you what I'm marking as Exhibit 19.

Exhibit 19 is the November 2022 label for Trulicity, or dulaglutide, right?

A.      Yes.

Q.      And you understand that in November of 2022, ileus --

A.      I'm sorry.  You said this is the label?

Q.      For Trulicity or dulaglutide, right?

A.      As of what date?

Q.      November 2022.

A.      And just --

Q.      It's on the first page.

A.      Thank you.  Thank you.  I was just looking for the -- I was checking the back date -- the back date,

David Kessler, MD Volume III CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER Page 514

and you're correct, it's on the front.

Q.    And this is the Trulicity label for November 2022, right?

A.    Correct.

Q.    In November of 2022, Lilly added to Section 6.2 a warning for ileus, correct?

A.    Correct.  At the request of FDA.

Q.    Mm-hmm.  With respect to ileus in particular, are you saying that Lilly's warnings for ileus were inadequate after this 2022 change?

A.    No, because it says ileus. But then I have a footnote.

Q.    What's your footnote?

A.    This continuum of ileus nonmechanical obstruction.  They are all of a piece.  That would be my footnote.

Q.    Okay.  And so for patients who have ileus that does not go on to lead to mechanical obstruction, do you agree with me that you are not saying that the label was inadequate after the 2022 change?

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 515

A.    For ileus?

Q.    For ileus, yes.

A.    No.  I -- once you say ileus, you can't -- you're not -- I don't think there's a problem with regard to ileus.  Just recognizing, again, that same footnote.

Q.    Yeah.  So your footnote is focused on the mechanical obstruction or fecal impaction that could develop down the line.

Is that what you're saying?

A.    More than nonmechanical obstruction than mechanical obstruction.

Are we saying the same thing?

Q.    I'm not sure if we're saying the same thing.  So let me ask you a different question.

A.    Sure.

Q.    As to ileus, as of 2022, when the label is changed, you are not saying that ileus is not adequately warned of, right?

A.    I think that once you warn

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 516

of ileus, you've warned of ileus. Correct.

Q.   Do you know whether FDA assessed whether ileus was the right term to include in Section 6.2 as compared to some other term?

A.   I think in 2022, as I read FDA's pharmacovigilance review, they were struggling to find which cases were related to surgery or not, and they were -- they were trying to identify what the pathophysiology -- what the injury was.

Am I -- does that answer?

Q.   Not really.

A.   Ask again.  I'm sorry.

Q.   Let me ask it again.  Sure.

Do you know whether FDA, when evaluating what language to include in Section 6.2 assessed whether ileus was the right term or whether a different term should be included?

A.   They were struggling with intestinal obstruction and ileus in trying to figure out what was going on.

Q.    And so in November of 2022, or leading up to the November 2022 label change, FDA was considering whether obstruction needed to be included in the dulaglutide label, right?

A.    Certainly some, some -- yes, I think that's -- I think that's correct.

Q.    And FDA did not require that obstruction be included in Section 6.2 in November of 2022, right?

A.    You are correct.  They selected -- they selected the term "ileus."  They did require it in 2025.

Q.    Right.  But do you agree with me that in 2022, FDA considered obstruction but did not require obstruction to be included in the dulaglutide label?

A.    Correct.  Based on the information they had.

Q.    In 2022, FDA issued a class-wide newly identified safety signal for GLP-1 medicines, right?

A.    I'd have to -- do you want

to just -- let me just pull up my timeline, if I may.

Q.    If you go to Page 239.

A.    There were a number of NISS's and I just want to make sure.

Q.    Sure.

A.    So you're referring to?

Q.    I'm referring to Paragraph E on Page 239.

A.    For intestinal obstruction?

Q.    Yes.  So let me ask my question.

A.    Let me just pull up my other timeline, if I can.

Q.    What are you pulling up?

A.    I'm just pulling -- I just want to pull up my timeline from the FDA actions.

Q.    And that's from your notes?

A.    Yes.  May I do that?

Q.    Yes, but I just want to see what you're looking at.

A.    Sure.  You -- whatever --

MS. AMINOLROAYA:  Diana, if there's a good time for a

short break between now and 9:30.

MS. WATRAL:  I'm nearing the end.  Or nearing a stopping point, I should say.

THE WITNESS:  So I have a sheet that's called -- it's Set 6.  It's called "Timelines."

So I have one for intestinal obstruction, specifically one for gastric emptying, and one that's foreign.

(Document previously marked for identification as Kessler Exhibit 12.)

BY MS. WATRAL:

Q.    Dr. Kessler, I'm going to give you what we've previously marked as Exhibit 12, which is a copy of your notes.

Can you tell me just what page you are looking at so we're all looking at the same thing?

A.    Yeah.  If somebody -- yeah.

I don't want to take time.

Can I -- I think it begins on Page 14, is the set that I have.  And then I'm just looking at a different timeline here on intestinal obstruction.

And then I have...

So I'm looking at these general sheets.  Exhibit 14.

Q.    Okay.  And if you flip to a particular note page in answering these questions, just let me know which one it is so I can follow along with you.  Okay, Dr. Kessler?

A.    Sure.  Right.

Q.    Okay.  In June of 2022, FDA issued a newly identified safety signal for intestinal obstruction, right?

A.    Correct.

Q.    The -- this topic was not ileus.  It was intestinal obstruction, right?

A.    Correct.

Q.    And so in 2022, FDA was assessing whether GLP-1 medicines could be causally associated with intestinal

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 521

obstruction, right?

A.    Certainly.

Q.    And FDA was evaluating whether there was reasonable evidence of a causal association between GLP-1 medicines and intestinal obstruction, right?

A.    Let me see your question. You used a specific regulatory standard there.

Reasonable evidence.  Do I see that exactly in those words?  I'm not sure.

Q.    As part of a NISS, does FDA assess whether there is reasonable evidence of a causal association between a medicine it's evaluating and the outcome it's evaluating?

A.    I'd have to -- I'd have to look at the standard specifically for a NISS.  I don't have that -- you're citing 201.57, and I'd have to double-check whether that's the standard for a NISS.

I just -- I don't have it

in my head.

Q.   Okay.  If -- but you indicated FDA would be evaluating whether the products could be causally associated.  That's what you indicated a few questions ago, right?

A.   I'm sorry.  A few questions ago?

Q.   When I asked you -- so I asked you a few questions ago --

A.   Sure.

Q.   I said, if in 2022 FDA was assessing whether GLP-1 medicines could be causally associated with intestinal obstruction, right?  And you said, "Certainly."  Okay?

A.   Sure.

Q.   I'll follow up on that.

If FDA had a basis to believe that GLP-1 medicines could be causally associated with intestinal obstruction, they would have asked Lilly and other companies to add intestinal obstruction to the product labels, right?

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 523

A.     I don't know that.

Q.     Why not?

A.     I don't know what they would have done.  You are speculating on their -- if they knew something, they would have done something.  I can't get into their -- whose mind it is.  We don't have a record of knowledge and what people would do.  I can't say that they would have done something.  I think that would be speculation.

They had -- you know, they were trying to figure this out, I think.  I'll stop there.

Q.     Can you think of a scenario where, in 2022, FDA would have been evaluating intestinal obstruction, thought that there was some basis for a causal association but decided not to include a warning for intestinal obstruction?

A.     I think so.

Q.     What is that?

A.     Well, I think FDA -- well, I mean, they could have been thinking --

David Kessler, MD, Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 524

and they could have had a definition of intestinal obstruction that was mechanical, right.

And -- but they -- but, you know, at a certain point they could have realized, well, mechanical could be nonmechanical.  And once you think about the pathophysiology, you connect the dots, and you go, oh, this all makes sense.  This is part of a hypomotility spectrum.

So they could have been thinking along those lines.  I don't know -- I don't know when the light bulb went off in FDA's head.

Q.    Do you know what FDA is referring to as "intestinal obstruction" when that language was added to the labels later in time, in 2025 and 2026?

A.    I don't -- I have not talked to -- I have not talked to FDA, so I'm not sure who made -- so the answer is I don't know what was in their head.

Q.    And you don't know whether

FDA's definition of intestinal obstruction in 2025 and 2026 is the same as your definition, as you sit here today?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I have not talked to FDA, so I -- there's a lot of questions that I -- that I would ask like that.

But without talking to FDA -- based on the biology, I would have -- I think -- again, I have to speculate, and I don't know if you want me to speculate.

BY MS. WATRAL:

Q.    No, I don't, but I want you to answer the specific question.

You don't know whether FDA's definition of intestinal obstruction in 2025 and 2026 is the same as your definition of intestinal obstruction, as you sit here today, right?

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 526

A.    I don't -- I don't -- I have no reason to believe it's different, that it could include mechanical and nonmechanical.  I think that's generally accepted.

But I have not talked to FDA.  So I have to -- I'm assuming the words "intestinal obstruction," as medically understood and as the records show, could be mechanical or nonmechanical.

And I have to believe -- I mean, Lilly certainly understood that. I'm trying to think whether FDA, from the record -- I'd have to go back and see, exactly.

Lilly -- Lilly recognized it could be nonmechanically that was causally related.  But I don't know whether FDA, how -- what's in FDA's head.  And I'm not sure the record shows how they -- how their subsets offer intestinal obstruction.

MS. WATRAL:  Perfect.  I'm almost done here, and we'll take

a break.

BY MS. WATRAL:

Q.     You don't know whether FDA's definition of intestinal obstruction included mechanical obstruction, nonmechanical obstruction, or both in 2025 and 2026.  Is that fair?

A.     I don't know how they -- I'm not sure we see how they split it. I'd want to go back and review, to be specific, all the terms in the 2022 pharmacovigilance review, to see if -- how they were referring to those terms.

Q.     And you don't have -- or you don't know whether FDA's definition of intestinal obstruction in 2022 is different from its definition in 2025 and 2026.  Is that fair?

A.     So it's fair -- it's fair that in 2022 we have a numbered page report that goes into intestinal obstruction.  I don't believe the record in 2025 -- we have a record -- I have not seen anything that describes FDA's decisionmaking process in 2025.

David Kessler, M.D. Volume III          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER          Page 528

Q.    Right.  And so you don't know if FDA was using a different definition of intestinal obstruction in 2022 versus in 2025 and 2026, right? You just don't know one way or the other?

A.    They use the same word -- they were using the same words.  So I'm getting a little lost in your question.

Q.    Yeah.  I'm wondering if you know they had a different understanding of what intestinal obstruction meant in 2022 versus 2025 and 2026?

A.    I -- that would call for speculation.  I don't think the record shows what their understanding was.

We do see -- Lilly has -- I can see it in the record for Lilly's understanding.

Q.    Right.  But I'm asking you about FDA.

A.    For FDA, I don't see it.

MS. WATRAL:  Okay.  Let's go ahead and take a break.

THE VIDEOGRAPHER:  Going

David Kessler, MD - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 529

off the record.  The time is now 9:27 a.m.

(Short break.)

THE VIDEOGRAPHER:  Going back on the record.  The time is now 9:48 a.m.

BY MS. WATRAL:

Q.    Dr. Kessler, I want to go back to Page 258 of your report.

A.    Yes, ma'am.

Q.    And we talked through Paragraph 731 through 735, but we didn't yet talk about Paragraph 730.  So I want to ask you a few questions about that.  Okay?

A.    Sure.

Q.    You -- in Paragraph 730, you say that there was statistically significant evidence of gastrointestinal hypomotility by 2012, and you point to Lilly's test data from September of 2012.

Do you see that?

A.    Correct.

And there's an error in

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 530

there.  I don't know -- and I apologize. The Level 1 is a mistake.  I mean, there's different levels, and it shouldn't be there.

Q.    That was one of my questions.  So --

A.    Sorry.  I apologize.

Q.    -- what's the mistake there?

A.    It's a little -- Level 1 should just -- strike Level 1.

Q.    I see.  And so it should say, Lilly's test data from September 24, 2012, indicates statistically significant rates for gastrointestinal atonic and hypomotility constipation?

A.    And constipation.

Q.    And constipation.

A.    There are two numbers, if my memory serves me right, from that table.

Q.    If you look at footnote -- Paragraph 730 is linked to Footnote 804, right?

A.   Yes.

Q.   And let's use my version again.  So my version is Exhibit 13.

A.   Yeah.  And, Counsel, I think there's a difference in just -- in serving.  But they can explain that.

Let me get it now.

Q.   Sure.

A.   If I can find it.

Okay.  So you're at 730.  Thanks.

Q.   So Footnote 804 refers to Paragraph 692, with a document that ends in 542.

Do you see that?

A.   Correct.

Can I trouble you for my binder on that?  I don't know which binder it is.  Thank you.

Q.   And if you go to Paragraph 692, that's on Page 244.

A.   Wait a second.

Q.   You'll see that -- this is one where the paragraphs are, right?

A.   Yeah.

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 532

Q.   But I think what you're referring to is Paragraph 714 on Page 247.

A.   What's the paragraph number again?

Q.   714.

A.   Yeah.  I'm getting there.

Yes, I remember it.  Yeah, that makes sense.

Q.   And so what you're referring to in Paragraph 730 is the data that you discuss in Paragraphs 714 and 715, right?

A.   Correct.

Q.   On Page 248 of your report, you paste a table from that 2012 data, right?

A.   Correct.

Q.   And it shows certain Level 1, Level 2, Level 3, and Preferred Term results for dulaglutide from clinical trials, right?

A.   Correct.

Q.   What's the source of this table from Page 248 of your report?

A.    Well, the source is -- it's from the discovery database.  I don't have the Bates number.

Q.    I guess I'm asking a different question.

A.    I'm sorry.

Q.    What kind of document is it?  Is it, like, an internal document, an FDA submission?  Do you know?

A.    No.  I think it was a Lilly document.

Q.    Okay.  You -- so you told me that the table -- let me ask you this.

Is this another error where it should say, in Paragraph 715, "Lilly's table above shows statistically significant rates for gastrointestinal atonic hypomotility and constipation"?  Is that what that should be?

A.    That's exactly -- thank you, ma'am.

Q.    So let's start with gastrointestinal atonic and hypomotility in the chart on -- in the table on

Page 248.  Okay?

A.    Right.

Q.    If you look at gastrointestinal atopic -- atonic and hypomotility, what level term is that?

A.    I'd have to look at my MedDRA -- my MedDRA sheets to tell you that.

Q.    Are you looking at one of your notes?

A.    Yes.  I have it on my MedDRA sheets.  And I can tell you exactly.  I think -- -- it's not a high-level group term.  It's the one below.  I believe it's a high-level term, but I'd have to check that.

Q.    You're looking through your notes now?

A.    Yeah.  I'm looking for the -- there's a sheet on MedDRA.  I think it's not a high-level group term. It's a high-level term, if my memory serves me correct.  Let me stop there.

Give me one second.  I'm just trying to --

Q.     Sure.

A.     Thank you.  Thank you for the kindness.  Give me a second.

Q.     Okay.  So Dr. Kessler --

A.     Just --

Q.     Just hold on one second.

You have one of your notes in front of you.  Can you tell me, from Exhibit 12, which note you have in front of you?

A.     Sure.  It's labeled on the bottom, "MedDRA," and -- let me go to your sheets.  May I do that?

Q.     Please.  Exhibit 12.

A.     Okay.  So I just -- oh, I don't think this is -- this was previously brought to Novo, this sheet. So this was not made a copy -- this was brought to the prior deposition, this sheet.  This was not new for last time.

Q.     Okay.  Can I see what you're looking at there?

A.     I'm happy -- may I pass?

Q.     Sure.  Please.

A.     Thank you.

Q. I see. Let's just mark this as Exhibit 19, just so we have in the record what you're looking at here.

A. Great.

THE REPORTER: And it would be Exhibit 20.

(Document marked for identification as Kessler Exhibit 20.)

BY MS. WATRAL:

Q. Okay. So, Dr. Kessler, going back to my question.

For gastrointestinal atonic and hypomotility, what level term is that?

A. So within the high-level group term, GI motility and defecation condition is the high-level term.

Gastrointestinal atonic and hypomotility disorders. Not elsewhere considered.

Q. Okay. And what follows under gastrointestinal atonic and hypomotility are four terms: constipation, gastroesophageal reflux

disease, infrequent bowel movements, and impaired gastric emptying.

Do you see that?

A.    On the table?

Q.    Yes.

A.    Yes.

But under -- there are other terms under that MedDRA term.

Q.    That's what I wanted to get at.

A.    Thank you.

Q.    So let's start with the table, first.

A.    Thanks so much.

Q.    So under the table in your report on Page 248, under the high-level term of gastrointestinal atonic and hypomotility, there are four terms included within that: constipation, gastroesophageal reflux disease, infrequent bowel movements, and impaired gastric emptying, right?

A.    That's what's on the table, yes.

Q.    And are there other adverse

reactions or terms that fall within the high-level term of gastrointestinal atonic and hypomotility that are not included in the table?

A.    Yes.

Q.    Which ones?

A.    So I think that if you -- I don't have a full list -- I think there's a broader -- I think if you look at the MedDRA terms, there is terms such as gastric hypomotility, gastrointestinal hypomotility, intestinal pseudoobstruction, obstructive defecation.

There are a whole range of possible MedDRA terms.

Q.    Okay.  Does ileus fall within the high-level term of gastrointestinal atonic and hypomotility?

A.    It falls -- it falls -- if I'm correct -- under -- well, no, not under that term.

It falls under the high level -- well, ileus, paralytic, and

postoperative ileus, it's not exactly ileus, fall -- is under the high-level group term gastrointestinal motility and defecation condition.  And ileus is also under high-level group term gastrointestinal stenosis and obstruction.

Q.    So ileus does not fall under the high-level term gastrointestinal atonic and hypomotility, right?

A.    Correct.  I don't believe so.

Q.    Does obstruction fall within the high-level term gastrointestinal atonic and hypomotility?

A.    Only intestinal pseudoobstruction and obstructive defecation does.  Not intestinal obstruction, I believe.  I'd have to check that.  I don't have the -- I don't have the full list, but my memory serves me, it does not.

Q.    And how about constipation

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

leading to fecal impaction, does that fall under gastrointestinal atonic hypomotility?

A.    Only constipation.

Q.    And so the gastrointestinal atonic and hypomotility data in the table on Page 248 do not involve any cases of ileus obstruction, other than pseudo -- strike that.

The term "gastrointestinal atopic hypomotility" does not include ileus obstruction, other than pseudoobstruction or obstruction defecation, I think you said.

A.    Obstructive.

Q.    Obstructive defecation.  Is that right?

A.    That's my understanding. I'd have to pull the full list.  I don't have the full MedDRA list.  I just have notes on those.

Q.    And the clinical trial data that you point to on Page 248 does not include any cases of ileus, right?

A.    Not there.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Okay.  And the data that you refer to on Page 248 does not include any cases of constipation, right?

Or -- I'm sorry.  I misspoke there.

The data that you point to on Page 248 does not involve any cases of obstruction, right?

A.    Other than the obstruction that we just talked about, right.

Q.    Right.  But if you --

A.    On the -- I'm sorry.

Q.    If you look at the --

A.    On the table, per se, as opposed to the MedDRA term?

Q.    Yes.  Yes.

A.    Yes.  And I think it's just -- it's statistically significant for atonic and hypomotility, and it's statistically significant for contraception, and that goes to the overall opinion.

Q.    And you said contraception, but I think you mean constipation.

A.    I just did it -- I did it again.  I meant constipation.

Q.    And just so that I'm clear, though, I'm talking now about the data on Page 248 of your report.  Okay?

A.    All right.

Q.    The data on Page 248 of your report does not include any cases of ileus, obstruction, or fecal impaction, right?

A.    It goes to that -- correct.  It goes to atonic hypomotility.

Q.    There are -- I want to look at the constipation information here.

A.    Sure.

Q.    You don't know -- or do you know whether any of the patients who had constipation went on to develop obstruction or fecal impaction?

A.    I don't think -- you can't tell that from this table.

Q.    Okay.  And do you know whether those constipation cases cited in the data on Page 248 were serious or severe?

A.   I can't tell that just from this data.

Q.   Paragraph 700 of your report lists a number of adverse reactions under the term "severe gastrointestinal motility-related adverse events," right?

A.   Correct.

Q.   Are you aware of any source that supports including all of the -- or let me take a step back.

After you say the word "severe gastrointestinal motility-related adverse events," you list a number of adverse events that you're including within that definition, right?

A.   I did.

Q.   All right.  And are you aware of any source that has linked together all of those reactions that you've identified in Paragraph 700 as severe gastrointestinal motility-related adverse events?

A.   Yes, I believe so.

Q.    What is that?

A.    So several.  I have to go back and check cross-references for the earlier paragraphs in the report to make sure 700 relates -- I think the definition is the same as used earlier in the report.

I have -- one, I spoke -- well, in reading the GI literature on hypomotility disorders, I think these are all generally listed there under different discussions of disorders that are -- can be associated with hypomotility.

And I believe I testified in my first deposition that I spoke to Dr. John to speak -- again, being board-certified in obesity medicine, I can tell you these are all linked to hypomotility, but I think I wanted a perspective of a gastroenterologist.

And I believe this is the paragraph, but I'd have to confirm this with my -- looking earlier at the report.

But I believe I asked Dr. John whether this -- all these can be -- it was the terms that I used for earlier on, in the Novo for Madigan.

Q.    Okay.  You indicated that the events in Paragraph 700 have been included together in a definition of severe gastrointestinal motility-related adverse events in hypomotility literature.

Where in your report do you identify the literature that collapses together these adverse reactions into severe gastrointestinal motility-related adverse events?

A.    I'm not sure this -- they all can be included as motility disorders.  I don't think -- I'd have to go back and look at the entire MCL to be able to see where the -- what's listed for the gastroenterology.

But my recollection isn't, looking at general reviews of motility disorders, that these are the type -- these are the kind of conditions, plus

or minus certain terms.  You know, similar wording that is generally accepted as hypomotility.

Q.    Can you -- as you sit here today, can you point me to a source that links together all of the adverse reactions you have listed in Paragraph 700 as severe gastrointestinal motility-related adverse events?

A.    They -- well, let me clarify.

I think I'd have to go refresh exactly what searches I did in PubMed and what those were under motility disorders.  And I'm not sure they all -- that definition -- these all can be severe, right.  I don't think there's any disagreement they can be severe.  And I assume they can also not be severe.

Q.    Right.  But what I'm wondering is, other than Dr. John, can you identify any source that has said severe gastrointestinal motility-related adverse events include the list that

you've identified in Paragraph 700?

I just want to know, as you sit here today --

A.    Is it --

Q.    Just let me finish.

As you sit here today, can you point out a source for me?

A.    Not without checking my MCL list and referring to -- going back and looking at the PubMed search.

Q.    I want to go back to what we marked last time as Exhibit 17.  And we're just going to re-mark it for you, Dr. Kessler, but I don't think you have a copy of the old exhibits.  This is what was previously marked as 17.

(Document previously marked for identification as Kessler Exhibit 17.)

BY MS. WATRAL:

Q.    Do you have that in front of you, Dr. Kessler?

A.    I do now.

Q.    Exhibit 17 is the March 2026 dulaglutide Trulicity label,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

right?

A.    Correct.

Q.    And if you go to the Section 6.2, "Postmarketing."  Let me know when you're there.

A.    I'm there, ma'am.

Q.    The March 2026 postmarketing section for dulaglutide lists intestinal obstruction and severe constipation including fecal impaction.

Do you see that?

A.    I do, ma'am.

Q.    Do you agree with me that as of March 2026, you're not saying that dulaglutide's label was inadequate for intestinal obstruction or severe constipation, including fecal impaction?

A.    Sorry.  I don't understand the question.

Q.    Sure.  So --

A.    I'm looking at -- I'm looking at a Novo label.

Q.    Oh, no.  You should have the dulaglutide label, Exhibit 17, in front of you.

David Kessler, MD - Volume III CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER Page 549

MS. AMINOLROAYA:  Oh.  Actually, it does have a 17 sticker, but --

MS. WATRAL:  Is it the wrong --

BY MS. WATRAL:

Q.    Let's give you the right one, then.  This would have been a confusing line of questions if you had the wrong thing in front of you.

A.    Thank you.  I'm sorry.

Q.    No, no, no.  I want to get the right thing in front of you.

Okay.  Dr. Kessler, you now have the right Exhibit 17?

A.    Thank you very much.

Q.    And I just want to make sure we're looking at the same thing.  You're looking at --

A.    Let me get there.

Q.    But I -- I'm at the cover page.  I just want to make sure we're on the same thing.

A.    Thank you, sir.  Thank you, ma'am.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    The Trulicity label for March of 2026, right?

A.    I am.

Q.    Okay.  Great.

So now let's go to "Postmarketing," 6.2.  Let me know when you're there.

A.    Okay.  I'm looking at 6.2, the first bullet.

Q.    In March of 2026, the Trulicity label includes "intestinal obstruction and severe constipation including fecal impaction" in the postmarketing section, right?

A.    I see that, yes.

Q.    And as of the March 2026 label update for Trulicity, you're not saying that the Trulicity label was inadequate with respect to intestinal obstruction or severe constipation including fecal impaction, right?

MS. AMINOLROAYA: Objection to form.

THE WITNESS:  Let me just think about the way you phrased

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

that.

I think I testified last time that I wasn't giving an opinion on this label.

BY MS. WATRAL:

Q.   That's what I wanted to confirm.  So I just --

A.   So I was not giving an opinion on this label.

Could you ask your question again, recognizing that I'm not -- I want to be --

Q.   That's what I want to confirm.  So you're not -- once the postmarketing section includes intestinal obstruction and severe constipation including fecal impaction, you're not offering an opinion at that time about whether the label is adequate or inadequate.  Is that fair?

A.   At that time -- I'm sorry -- for -- in 2026?

Q.   Yeah.  Let me just -- let me just make my question.

A.   Sorry.

Q.    No, no, no.  Let me make my question clear.

So once the intestinal obstruction and severe constipation including fecal impaction are included in Section 6.2, at the time of that inclusion, you're no longer offering an opinion about whether the -- the label is adequate or not with respect to intestinal obstruction and severe constipation including fecal impaction, right?

MS. AMINOLROAYA:
Objection to form.

THE WITNESS:  I'm not offering any opinion.

BY MS. WATRAL:

Q.    Including that the label is inadequate with respect to intestinal obstruction and severe constipation including fecal impaction?

A.    I'm not offering any opinion on whether it's adequate or inadequate as of 2026.  I think that's right.

David Kessler, MD - Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 553

Q.   Right.  And so -- but just taking a step back, even broader.

Once the language is included in Section 6 about intestinal obstruction and severe constipation including fecal impaction, you're not saying actually it also needed to be included in another section, right?  That's what I want to confirm.

A.   Again, we had a discussion last time about cross-reference of 6 with 5.  So I have nothing -- I have nothing -- I'm not sure I -- I'm not understanding -- 6 is tied to 5, I think I testified when we stopped.

Q.   I guess what I'm getting at is you're not saying that in addition to having a 6.2 Warning for severe constipation including fecal impaction and intestinal obstruction, there also needed to be something in Section 5 that said that there have been reports or other language specific to intestinal obstruction and severe constipation including fecal impaction.  That's what

I'm getting at.

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  I'm not issuing any opinion on the adequacy of this label, I believe.  So I'm not sure -- I may be missing your question.

BY MS. WATRAL:

Q.    I think you are.

A.    Okay.  Thanks.

Q.    Once -- let's take them each one at a time.

Once intestinal obstruction is included in Section 6.2, you are not offering an opinion about whether it needed to be included in any other sections of the label as well, like Section 5.  You're just not giving an opinion on that?

MS. AMINOLROAYA:

Objection to form.

THE WITNESS:  Correct.

BY MS. WATRAL:

Q.    And the same is true --

David Kessler, MD, Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 555

A.    I was giving no -- no opinion with regard to a 2026 label.

Q.    And the same is true for severe constipation including fecal impaction, right?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I'm giving no opinion on the adequacy of the '26 label.

BY MS. WATRAL:

Q.    Okay.  Do you agree with me that the opinions you're giving in this case about labeling are not about what doctors understand the label language to mean?

A.    Correct.  What doctors understand is not the regulatory standard.

Q.    That's what I wanted to confirm.

So you're not giving an opinion, for instance, about whether doctors understood, either from the label or otherwise, about risk of ileus,

for instance?

A. Let me just -- I have a few notes. Just give me a second, and I'll show you if I find what I'm looking for.

Can you ask your question again so I can --

Q. Yes.

A. Thank you, ma'am.

Q. You're not giving an opinion, for instance, about whether doctors understood, either from the label or otherwise, about the risk of ileus?

A. From the label, is your question?

Q. Yeah. So let me just rephrase my question.

A. Okay.

Q. So I just want to confirm that you're not going to be giving an opinion in this case about whether doctors read certain label language and understand that it does or it doesn't cover ileus, for instance?

MS. AMINOLROAYA:

Objection.

BY MS. WATRAL:

Q.     Is that fair?

MS. AMINOLROAYA:

Objection.

THE WITNESS:  From the label, the way you precisely asked the question, I would agree with it.

BY MS. WATRAL:

Q.     And how about do you agree that you're not going to be giving an opinion about what doctors understand about the risk of ileus, whether from the label or from anything else, at the time -- at any particular point in time?

A.     I do believe I testified at my first deposition -- there was a discussion of what was being said at meetings, et cetera.  I believe there's testimony in that -- I believe there's a back-and-forth on what was taken away at meetings.  Yes.

Q.     Okay.  And I want to focus on Lilly, in particular.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

You don't have any discussion in your report about what was discussed at meetings related to Lilly and what doctors understood about what was said at those meetings, correct?

A.    In my report, I don't believe so.  In my report, I don't believe so.

Q.    All right.  And with respect to Lilly in particular -- I know last time your deposition was about Novo.  But with respect to Lilly in particular --

A.    Two.

Q.    Two ago, yes.

With respect to Lilly in particular, are you planning to offer an opinion about what was said at meetings about Lilly data or Lilly information and/or what doctors understood about that information?

MS. AMINOLROAYA: Objection.

Just clarifying that it applies to this, with respect to

this expert report and Issue 2.

MS. WATRAL:  Correct.

That's right.

BY MS. WATRAL:

Q.    Why don't I rephrase my -- let me rephrase my question, Dr. Kessler.

With respect to Lilly in particular, in connection with your expert report that you disclosed on January 2nd, are you offering an opinion about what was said at meetings about Lilly data or Lilly information and/or what doctors understood about that information?

MS. WATRAL:  And, Parvin, I'm only referring to testimony that is going to be used for the upcoming motions.  That's what I'm referring to here.

Parvin, can we just stipulate that he's not, and then we can -- it's not in his report.  So can we just stipulate that he's not doing

that for purposes of the upcoming motions?

MS. AMINOLROAYA:  I still have an objection as -- I think it gets confusing when it becomes compound.

BY MS. WATRAL:

Q.   Okay.  So let me go -- let me ask you thing by thing, Dr. Kessler.

In connection with your report disclosed on January 2nd, are you offering an opinion about what was said at meetings about Lilly data or information?

A.   I don't believe there's anything in my report to that point.

Q.   Okay.  And how about what doctors understood about information from Lilly, is that something that you disclosed in your report?

A.   I don't believe so.

Q.   And you mentioned that you talked about something at your last deposition, so I'm just trying to understand if that's within something

that you believe is in the scope of your opinions for Lilly or not.  And that's what I'm trying to understand.

MS. WATRAL:  And so, Parvin, will you agree that the questions I just asked him, where he said it's not in his report, he's not planning -- you're not planning to use that in connection with the upcoming briefing?

It's not a question about down the line.  It's just the upcoming briefing.

MS. AMINOLROAYA:  If you want me to provide a scope disclosure or discuss the scope, if it's in his report, it's something that we plan to rely on.  If it's not in his report, then I don't expect that we'd rely on it.

MS. WATRAL:  Okay.  That's helpful.  Thank you.

BY MS. WATRAL:

Q.   And just so that I make sure I understood.  I think I did, but I want to make sure I understand, Dr. Kessler.

You don't have an opinion one way or the other about the adequacy of dulaglutide after ileus, intestinal obstruction, and severe constipation were added to Section 6.2 of the label, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I don't comment on the label as of 2025, the adequacy, one way or the other.

BY MS. WATRAL:

Q.   Okay.  Thank you.

We've talked some about your notes that you prepare in advance of a deposition.

When did you start preparing your Lilly-specific notes?

A.   I don't remember exactly.

Q.   Was it before or after the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Novo deposition?

A.    Some were done before. Some -- well, my -- what did you refer to them as?

Q.    So we've marked as Exhibit 12 your notes that are specific to Lilly.

Did you begin preparing any of the notes in Exhibit 12 before your Novo deposition?

A.    No.  But there were notes that were marked Lilly that I brought to the Novo deposition.

Q.    Right.  But for the notes in Exhibit 12, when did you start preparing those notes?

A.    I believe -- those notes, I believe -- I believe afterwards, but I don't have a firm recollection.

Q.    Okay.  How much time did you spend preparing your notes in Exhibit 12?

A.    I have no idea.

Q.    Give me a ballpark, please.

A.    I do not know.

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 564

Q.     Is it more than five hours?

A.     When you say "preparing your notes," certainly, the thought process was probably more than five hours.

Q.     Okay.  Was the thought process more than ten hours?

A.     I'd have -- I'd have to think about it.

Q.     Yeah.  Give it -- give it a minute to think about it.

A.     Considerable thought went into those concepts over time.  I can't tell -- I can't tell you how many hours, but considerable time went into those -- that thought process.

Q.     Do you think it was more than ten hours?

A.     I don't recall specifically.  It's very possible.

Q.     Okay.  Do you think it was more than 15 hours?

A.     It's -- I don't know.  I'm speculating.  I'm speculating.
              I mean, I can't tell you

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 565

when, you know, a thought that starts, that then goes into another thought, goes into looking into documents and then goes to putting it on paper.  So when does that process start.  That's why I'm a little confused.

Q.     Yeah.  How much time have you spent in this case, between your Novo deposition and today, either considering opinions or preparing for today?

A.     For both our depositions after Novo?

Q.     Yes.

A.     I've spent considerable time.  I don't have -- I don't have a specific number in my head.

Q.     What's your best estimate?

A.     I don't know.  I have not added up my hours.

Q.     Okay.  Do you think it's more than ten hours?

A.     So since my Novo deposition, yes.

Q.     Do you think it's more than

20 hours?

A.   I've spent considerable time.  I don't know how many.  But, yes, it would be more than that.

Q.   Do you think it's more than 30 hours?

A.   Yes, I think it's probably more than that.  But I -- I don't -- I don't know.  I'd have to add up my hours.  I'm almost sure it was more than 30 hours.

Spent look -- spent between the Novo deposition and today, I think it's a considerable number of hours, yes.

Q.   More than 40 hours?

A.   Perhaps.

Q.   More than 50 hours?

A.   Perhaps.

Q.   More than 60 hours?

A.   Perhaps.

Q.   More than 70 hours?

A.   Perhaps.

Q.   More than 100 hours?

A.   It's possible.  I'd have to

go back and look.  Certainly perhaps.

Q.   Is it possible that it's more than 150 hours?

A.   I don't know.  I'd have to go back and look.  I just don't know.

Q.   Is it possible that it's more than 200 hours?

A.   You're asking me.  I just have no idea, ma'am.  You know, I don't know.

Q.   I don't want to discuss any content that you talked about with lawyers.  But in the time period between your Novo deposition and your Lilly depositions, did you meet with counsel about your opinions or about your testimony or your deposition?

A.   To prepare for -- to prepare for my deposition, between -- I'm sorry.  Between?

Q.   The Novo deposition and both Lilly depositions.

A.   Certainly, probably by phone, I presume.  And I'd have to recall whether it was in person.

There's -- but, I mean, assume there was a Zoom or a phone call.

Q.   Here is what I'm trying to understand.

Of the work that you did between your Novo deposition and your Lilly depositions, what's the general breakdown between how much of it was independent work by yourself versus with counsel?

A.   Oh, most of my work was by myself.

Q.   That's what I was trying to understand.  Thank you.

Were the lawyers involved in preparing your notes in any way, your notes in Exhibit 12?

A.   If they were, it was only forms of dictation, et cetera.

Q.   What do you mean by that?

A.   I mean it was -- there was a process by which I got things down on paper.

Q.   And so you would share information with counsel, and counsel

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 569

would put that on paper?  Is that what you're saying?

A.     Well, I would -- I would -- I don't know how much -- there's no objection.  So I mean I would dictate stuff.

Q.     You -- but who would you dictate to?  To counsel?

A.     I would dictate to counsel or to staff, yes.

Q.     Okay.  And then staff would then send you a draft -- or counsel would send you a draft of the notes?

A.     Usually, my pattern is just, if I'm on Zoom, I'm actually dictating.  I'm doing stuff.

Q.     Were the lawyers or their staff at all involved in editing or revising your notes with you?

A.     No.  Typographical.  I mean, they are typing, but I'm dictating.  I am -- this is my work, if that's what...

Q.     When were you retained by Plaintiff's counsel in this case?

A.   I knew that, probably before my -- prior -- before my first deposition.  I'm not sure I remember.

Let me go back.  In this matter, probably October of 2025.  But I'd have to double-check that.

Well, you used the word "retained."  I wouldn't use the word "retained," because I'm not sure -- that's the date when I was first contacted.

Q.   So you were first contacted around October 2025 by Plaintiff's counsel.  When were you retained?

A.   Depends on what that term means.

Q.   Do you have a retention letter with counsel?

A.   No, I don't believe I do.

Q.   Okay.  Did you reach agreement about how much Plaintiff's counsel -- or how or how much Plaintiff's counsel would compensate you?

A.   I'd have to go back.  There

is an understanding.  Very simply --

it's very simple -- my hourly rate,

et cetera.

          I'm not -- I mean, I think

there was an understanding, but I'm not

sure the -- I mean, I'm not sure there

was an agreement, per se.

     Q.    Who from Plaintiffs reached

out to you in October of 2025?

     A.    Counsel.

     Q.    Ms. Aminolroaya?

     A.    Yes.

     Q.    You've worked with

Ms. Aminolroaya in the past, right?

     A.    I have.

     Q.    How many times?

          MS. AMINOLROAYA:

     Objection to form, the form of

     the question.

          THE WITNESS:  I'd have to

     count.  There's a prior

     testimony list.  There are a

     number of matters.  I don't --

     I'd have to review to be exact.

BY MS. WATRAL:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    How many do you think?
What's your best estimate?  Is it more
than five?

A.    That's -- that seems to
be -- let me just try to think.

I can't say.  I'd have to
go count.

Q.    Okay.

A.    I've never counted that
number, but it could be determined from
that prior testimony.

Q.    Okay.  Have you been
retained or worked with lawyers from
Morgan & Morgan in the past?

A.    Yes, I did -- well, yes,
perhaps when they were in different
firms.

Q.    What do you mean?

A.    Well, there are lawyers now
at Morgan & Morgan, and I believe Paul
Pennock was involved in Actos.  I don't
think he was at Morgan & Morgan at that
time.  That's what I think.  That's what
I know.

Q.    Okay.  How about lawyers at

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 573

Seeger Weiss other than Ms. Aminolroaya?

A.   If my memory serves me right, she's been involved in each matter that I've been involved, but I could be wrong.  But that's my memory.

Q.   Okay.  How about lawyers at Motley Rice?

A.   I'd have to go back.  There were a few matters.  Opioids, I believe, Motley Rice was involved in.  And two contraceptives, I believe, if my memory serves me.

Q.   Anything else?

A.   That's what -- that's what's coming to my head.  Again, all this -- don't take -- we'd have to go through a specific list.  And even -- and, Counsel, when you say "lawyers involved," sometimes I don't even -- sometimes lawyers are involved in multidistrict litigation.  They are on certain committees and I don't even know they are involved.

Q.   Sure.

A.   So I couldn't get it right.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Sure.  And I'm focused on who you're working with, so -- not folks who were involved and you just didn't know were involved.

A.    So -- sure.

Q.    Yep.  And what about Wagstaff & Cartmell?

A.    Maybe a long time -- a number of years ago, I think, there was a matter I think that I was involved in previously.

Q.    When you were contacted in October of 2025, were you contacted about both Lilly and Novo, or was there any point in time where you were contacted about only one defendant?

A.    I think I was -- my recollection, I was contacted with regard to GLP-1.

Q.    Okay.  And was there any point in time where you were retained with respect to opinions about Novo or Lilly but not the other one?

A.    Not to my understanding, no.

David Kessler, M.D. - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 575

Q.    Do you agree you've never published a peer-reviewed article about GLP-1 medicines?

A.    I think my publication's only in book form.  So that would probably be correct.  I'm just trying to think.

It's only in book form.

Q.    Okay.  I believe you mentioned that you're board-certified in gastroenterology.

Did I hear that correctly?

A.    No.

Q.    Oh, you're not.  Okay.

A.    I'm board-certified in obesity medicine.

Q.    When were you board-certified in obesity medicine?

A.    I took my boards last -- last year.  Last year.

Q.    When last year?

A.    I think the boards are given once in October.

Q.    Before October --

A.    Don't hold -- I could be

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 576

off on dates.  It's a blur.

Q.    Can I call it late 2025?
Would that be okay?

A.    Yeah.  I think -- I think
the board is given once -- you know,
it's a relatively new board.

Q.    Before you were certified
in obesity last year, in 2025, had you
ever been board-certified in obesity
before?

A.    That was -- no.  By
definition, that was -- I took my exam.
I mean, I wrote -- I'm the only one who
writes the book and then takes the exam,
right.  So I wrote the book on obesity,
and then -- but then I took the exam.

Q.    But just so that I'm clear.
Before 2025, you had not been
board-certified in obesity, right?

A.    Correct.  My board
certification was in 2025.

Q.    And you've never been
board-certified in gastroenterology,
right?

A.    No.  Correct.  I'm

board-certified in pediatrics, which has a -- obviously includes -- includes subareas, you know.  That's correct.

Q.    When were you asked to testify in this matter?  So apart from having a consulting role, when were you asked to testify?

A.    I'm not sure that question was ever phrased like that.

Q.    So you were always in a testifying capacity.  Is that fair?

A.    I'm not sure --

MS. AMINOLROAYA:

Objection to form.

BY MS. WATRAL:

Q.    There was never a distinction drawn?

A.    The last, I think, is my understanding.

Q.    So you always understood that you would be in a testifying role?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.  I understood I would be in an

expert role.  I never -- well, let me clarify that.

Until I sign my report, I am in sort of -- I'm in whatever role there is before you sign a report.

BY MS. WATRAL:

Q.    You were never, in your mind, drawing a distinction between consulting or testifying.  You were just thinking of it as expert.  Is that what I'm hearing?

MS. AMINOLROAYA:
Objection.  Asked and answered.

THE WITNESS:  I didn't draw -- I'm not sure I had the word "testifying" in my head or "consulting" in my head.

BY MS. WATRAL:

Q.    Okay.

A.    I mean, I was -- let me just see if this is helpful.  I was reviewing materials that, at a certain point, I -- if I put it in a report, and if I signed it, then I would be an

expert.

Q.    You talked at your Novo deposition about prescriptions of GLP-1 medicines.

I want to ask you specifically about Lilly's GLP-1 medicines.  Okay.

How many times have you prescribed Trulicity?

A.    I don't believe I've prescribed Trulicity.

Q.    Okay.

A.    I'm happy to answer your questions, but I'm not here as a prescribing doc.  Right.  So I just want to make that clear for the record.

Q.    No.  That's helpful, and that might make these questions go faster.  So --

A.    I'm not here as -- I'm here -- please understand.  My medical understanding is important as a -- in that regulatory interface between medicine and the label, and so that's where my -- but I'm not here -- others

David Kessler, MD Volume III  CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER  Page 580

will come in as practicing docs.

Q. How many times have you prescribed Mounjaro?

A. Again, very -- just a handful of times, is my sense. But I don't -- again, I prefer not to get into my own prescribing.

Q. Well, let me ask you this. Have you -- you said you've prescribed Mounjaro a handful of times --

A. I prescribed -- well, again, I mean I think I have. I have to go back and do that. But I believe I have.

Q. Can you say for sure, under oath today, that you've prescribed Mounjaro before?

A. I believe I have.

Q. How many times do you believe you've prescribed Mounjaro?

A. Very few.

Q. One or two?

A. Maybe -- maybe of that kind of magnitude.

Q. Okay.

David Kessler, MD - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 581

A.    I tend -- I tend not to prescribe -- to find myself in that situation.

Q.    Okay.  What are the situations in which you prescribed Mounjaro one or two times?

MS. AMINOLROAYA:  An objection to the extent it calls for --

THE WITNESS:  I'm not sure --

MS. AMINOLROAYA:  Let me just get the objection on the record.

Any confidential medical care that Dr. Kessler has given.

THE WITNESS:  Yeah.  I mean, I -- so I get involved in a few clinical cases.  I mean, well, even prescribing, whether I prescribed or whether I advised someone to be on the drug and actually had someone else write the script, I'd have to go back and review.

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 582

BY MS. WATRAL:

Q.   Right.  I'm just trying to understand how you know that you've prescribed Mounjaro a small number of times.  How do you know that it was Mounjaro that you prescribed those handful of times?

A.   I have -- I have a recollection.  I think I have a recollection in my head.

Q.   Okay.  And what are the other details you have around that recollection?  I don't want personal health information about anybody.  But do you remember it was an older gentleman who I saw in connection with obesity issues?  Do you remember any details around those?

A.   I may have some.  But I'd be crossing the line into that personal -- that kind of personal stuff.

I am not here as a prescribing doc.

Q.   Okay.  Do you recall, for any Mounjaro you've prescribed, whether

it was for a male or for a female?

A.    I think I was involved in cases of both.  But I don't think I prescribed -- I'd have to go back and see where I prescribed.

Q.    So as you sit here today, you can't tell me that you've prescribed Mounjaro, whether it was for a male or for a female patient?

A.    I think I've been involved in cases, both male and female.  I don't recall whether I actually wrote the new script.  I certainly advise people to -- I mean, I think it's fair -- let's strike the word -- strike the word "prescribe" and use the word "advised" patients to go on the drug.

Q.    Okay.  So I want to -- I want to focus on prescribe first, though.

You've drawn a distinction between advising a patient to go on a drug and prescribing.

A.    Correct.

Q.    Have you ever prescribed

Mounjaro?

A.    I believe I have, when --

Q.    Where you've written the script?

A.    Well -- or I've called in a script.  I think is --

Q.    Fair enough.

A.    -- probably more accurate.

Q.    Okay.

A.    I believe I've called in a script.

Q.    How about for Zepbound. Have you ever prescribed Zepbound?

A.    I believe I have.

Q.    How many times?

A.    Just a very few.

Q.    So in the magnitude of under five for both Mounjaro and Zepbound?  Does that sound right?

A.    Yeah.  It's about -- and, again, prescribed, called in, advised, I think is the -- I've been involved in a few patients in a direct.

Q.    You just mentioned a few questions ago that you wrote a book

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 585

about GLP-1 medicines, right?

A.    I did.

Q.    One of the things that you discuss in your book is your own personal use of GLP-1 medicines, right?

A.    Yes.

Q.    Which GLP-1 medicines did you use?

A.    I didn't describe -- I deliberately did not name that because, in the book, I didn't disclose that in the book for reasons -- I mean, for very special reasons.

I'm happy to -- and I'm not sure I'm willing to -- well, I'm going to do whatever the court wants me to do. Whether that falls in the line of personal medical information or not, I'd be happy to work out whatever you and the court want.

I'm not -- but I specifically didn't for competitive reasons.  I was silent, and I made a conscious decision not to put that information out publicly, because I was

David Kessler, M.D. Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 586

using it more in the generic sense.

Q.    And we have protective orders in the case, Dr. Kessler, so your personal health information would not be shared.

Which GLP medicine did you take?

A.    Yeah.  I would need to ask counsel to advise me what my personal -- whether I have to answer that question. If you can work with me on -- again, I have nothing to hide here, but I just -- once I put it out, I have certain concerns.

I have never put in a deposition where I'm an expert my own medical history.  I have nothing to hide.  So I mean, I need -- I would want to talk to counsel for a second, you know, how best to answer that and be responsive to you.

Q.    Yeah.  And I'll stipulate that we will treat your personal health information as highly confidential.  We would never publicly disclose that

information.  Any discussion would be in sealed.  To the extent there even is any discussion would be all treated under the protective order, where it is not public information.  That's how personal health information is treated.

A.    Sure.  And, again, I'll let you and counsel -- that is -- this is relevant to this case, I mean, and all the legal standards.

Again, I'm just a little uncomfortable disclosing personal medical information beyond in the general sense.

MS. AMINOLROAYA:  And I'll object to further questions about which specific medications Dr. Kessler has taken.

THE WITNESS:  But I'm happy to -- I'm happy to cooperate in getting to you what you need here.

BY MS. WATRAL:

Q.    Will you provide through counsel to me an indication of which

David Kessler, M.D. Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 588

GLP-1 medicine used, something in writing, that we will treat as confidential, but it won't be part of your deposition transcript?

THE WITNESS:  Sure.  I mean, I'm well --

MS. AMINOLROAYA:  No.

Dr. Kessler, I'll instruct you not to answer further questions about this.  It goes to your personal use of medications, which is not the subject of the expert report.

THE WITNESS:  I'm happy to cooperate in any way I can.

BY MS. WATRAL:

Q.    Okay.

A.    I mean, I -- there's nothing to hide.  I'm just a little cautious here.  You understand?

Q.    Have you ever prescribed a GLP-1 medicine to yourself?

A.    I'd have to check.

Q.    Do you believe you've prescribed a GLP-1 medicine to yourself?

A.    I may have refilled a GLP-1 medicine to myself.  I've always been -- I was under the care of an endocrinologist who prescribed my medicine.

The endocrinologist, you know, would have made the decision -- made the decision, but I may have refilled, in essence.

Q.    Sure.

When you took the GLP-1 medicine that you took, you decided that the medicine was safe enough for you to take it, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Again, you're -- I'm happy to answer your question.  You're asking about personal.

The risks were acceptable in light of the benefits, right. Did I know everything about the drug, blah, blah, blah.  I've been studying this, one could

David Kessler, MD, Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 590

argue.

But I made a decision -- well, my endocrinologist made the decision to -- in shared decisionmaking.

Does that -- does that answer your question?

BY MS. WATRAL:

Q.   It does.

Have you ever prescribed Victoza, Saxenda, Ozempic, Rybelsus, or Wegovy?

A.   Not to my recollection.

Q.   And have you ever -- actually, strike that.

You talked at your last deposition, the Novo deposition, about conversations that you had with Dr. Camilleri.

Do you remember that?

A.   I do.

Q.   Do you have notes about your conversations with Dr. Camilleri?

A.   I may have had -- in preparing the report, I may have taken

notes.  I may have taken notes when I did the book.  I think there's references to Camilleri in my book.

Q.    Will you go and look at your files to see if you have any notes about your conversations with Dr. Camilleri, and if you do have those notes, provide them to counsel so counsel can provide them to me?

A.    I'll do whatever counsel instructs me to do.

Q.    Okay.  Thank you.

MS. AMINOLROAYA:  And we would object to that request.  I mean, if you have a request, you can send it over in writing and we're happy to take a look at it.

MS. WATRAL:  Sounds great. Let's go ahead and take a break.

THE VIDEOGRAPHER:  Going off the record.  The time is now 10:46 a.m.

(Short break.)

THE VIDEOGRAPHER:  Going back on the record.  The time is now 11:06 a.m.

BY MS. WATRAL:

Q.    Dr. Kessler, I want to ask you about, if you go to Page 189 of your report.

A.    Yes, ma'am.

Q.    You have -- I want to ask you about Paragraph 481.

A.    Yes, ma'am.

Q.    And I just, here, want to know -- I'm going to just ask you a question to then ask you a Lilly question.  Okay?

A.    Sure.

Q.    Even though this is in the Novo section of the report.

A.    Can I just read 481?

Q.    Yes.  Please go ahead.

A.    Thank you.  Thank you.

Let me just cross-reference.  Okay.

Q.    Paragraph 481 has a number of sub-bullets, (i) through (v),

David Kessler, MD, Volume III   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   Page 593

underneath it about Victoza, Saxenda, Ozempic, Rybelsus, and Wegovy.

Do you see that?

A.   I do.

Q.   I want to understand what's the source for that information.  Is that from the analysis that you asked Dr. Madigan to do?

MS. AMINOLROAYA:  And we would object to that question, because the Novo deposition has concluded, as out of time and beyond the scope of his Lilly deposition today.

MS. WATRAL:  Okay.

MS. AMINOLROAYA:  Are you asking a question about Novo?

MS. WATRAL:  No.  I'm going to -- you're going to see how I'm going to bring it back to Lilly.  I have a Lily question, but I'm just trying to understand, is this -- is this based on an analysis that Dr. Madigan did.

David Kessler, MD — Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 594

THE WITNESS:  I'd have to study -- I'd want to study this a little more, because this is Novo, and my head has been focused on Lilly since the -- I think that -- I think that's generally correct, but I would need to go back and study this a little more.

BY MS. WATRAL:

Q.    So what I -- here is what I'm wondering about for Lilly.

For Lilly, you didn't ask Dr. Madigan to do an assessment for you like you did for Novo?

A.    That's correct.

Q.    Okay.  And so for the items that you've identified in (i) through (iv), I'm just trying to understand if those were things that --

A.    (i) through (iv)?

Q.    I'm sorry.  (i) through (v) --

A.    Thanks.

Q.    -- in Paragraph 481, if

those were things that Dr. Madigan did or were things that you did.

That's what I was trying to understand.

A.   I'd have to go back and refresh my memory, I think.

Q.   Okay.

A.   Because -- I can't quite track the footnote, sitting here this moment.  I'd want to go back and review. That's my general sense, yes.

Q.   Okay.  But for purposes of Lilly, you didn't ask Dr. Madigan to assess whether there was statistically significant evidence of severe gastrointestinal adverse reactions in clinical trials for the Lilly medicines, right?

A.   I didn't ask Dr. -- the only thing I think I asked Dr. Madigan for that involved Lilly was, I think, Schedule 4.

Q.   What is that?

A.   A Schedule 4?  I could have my -- could someone hand me my

Schedule 4 notes.

There was one analysis that I -- that I asked Dr. Madigan to do that involved Lilly, that's Schedule 4.  I believe it was Lilly data.

Yes.  It was only one thing that I asked Dr. Madigan to do.

Q.   Okay.  And what did you ask Dr. Madigan to do with respect to Lilly?

A.    There was one set of data, and I believe -- I'd have to -- I'd want to review Schedule 4.

Q.   Yeah.  Can you let me know? I'd like to know what you asked Dr. Madigan to do for you.

A.    So if you look in Schedule 4, there is an association between weight loss and gastrointestinal adverse events.

I'd have to check my report.  I believe I asked him whether certain numbers were statistically significant or not.  I asked him to do that calculation.  And I asked him -- specifically, you can see Schedule 4,

David Kessler, MD - Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 597

and you can see the tables that I asked him to review.

Q.    Are you relying on Dr. Madigan's analysis in your Schedule 4 in reaching your opinions in the case?

A.    Schedule 4 is referred to in my report.  There's a statement about Schedule 4 and that it does go to underlying mechanism.  I don't want to get into what's an opinion, what's not an opinion.

So there is -- can someone help me where -- tell me what footnote? I can look it up on my computer.  But if someone just -- can just look what the footnote Schedule 4 is referenced.  I apologize.  If I can just get that assistance.  Or I can do it.

Just give me one second.  I can do it.  Just give me a second.  I just have to search the footnotes.

Did I call it Appendix 4 or did I call it Schedule 4?

Just give me one more

second, please.

There should be a reference to this, in some footnote, if my -- my memory serves me right.  I'm just having trouble finding it right now.

It relates to -- there's a footnote, I think, that relates to whether weight loss is -- whether they develop nausea in weight loss and whether there is a mechanism, whether the greater the nausea, the greater the weight loss.  It was to that point.  So it goes to mechanism.

Q.    Do you rely on Dr. Madigan in reaching the opinions or conclusions that you reach in this case about Lilly?

A.    I'd have to -- I have to find that footnote.  If you give me a second.

Q.    Sure.

A.    I don't want to define opinion in this case inappropriately, as opposed to...

So there's an error in my report.  That maybe is part of the

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 599

problem.

Q.   What is the error in your report that you're referring to?

A.   So if I'm correct, if you go to footnote -- let me see if I can find -- if you go to Footnote 456.

I'd want to check this. I'd have to check the actual footnote.

Q.   Dr. Kessler, Footnote 456 is in your Novo report.  It is not in your Lilly report.

A.   No.  I understand. And that's where may be the error.

If you look at Schedule 4 -- we have to -- should to look at Dr. Madigan's report too.

The Schedule 4 says the association between weight loss and gastrointestinal adverse effects, and that is from a dulaglutide table.  So I'd have to double-check.

And I say semaglutide here. And I'd have to check.

It's the -- this is -- so the question is off whose data did I ask

Madigan to run it.  And I may have confused several -- by error.  I just have to check what Madigan actually ran, if he ran it off Lilly data or semaglutide data.

I have in my Schedule 4 dulaglutide.

Q.   Can you tell me again, just one more time, which footnote that you were looking at?

A.   I was looking at 7 -- 456, please.  But it's a Novo document that I cite there.  But I include in Schedule 4 a Lilly document, so I'd have -- an ISS, it looks like, from Lilly.

So I would have to double-check that.

Q.   If you look at Footnote 456, you refer to Schedule 3 there.

Do you see that?  Not Schedule 4.

A.   Yeah.  And that should be Schedule 4.  That's -- I mean, that -- I think that error should be on my -- original error --

Q.    What is Schedule 3 to your report?

A.    Sorry?

Q.    What is Schedule 3?

A.    I think that's labeling. It's one of the labeling.

If you can hand me my notebook on Schedule 3. I think there is a labeling history, right.

There is -- should be a Schedule 4 that is attached. Again, I can't tell you, maybe there was an error on redacting, who got Schedule 4. I don't know that.

Q.    Do you know if Dr. Madigan's analysis in Schedule 4 was for a Lilly medicine or a Novo medicine?

A.    So I know that my Schedule 4 -- actually, hold on a second. No. I'm not reading this correctly. Hold on a second.

Nope. I am -- I am -- this is right. I apologize. Excuse my impression.

So Schedule 4 is off of --

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 602

is both a Lilly medicine and a semaglutide -- includes data for both.

So could someone -- if I can reach for my Madigan report.

Q.   Sure.

A.   I can tell you whether he ran this off Table 1 or Table 2.

Q.   Go ahead.

A.   Because that will be the answer.

If you have Madigan's report?

So he may have run this off Table 2, but I have to check with his report.  It says, "See Dr. Madigan's report for statistical significance."

I'm not sure they can find it.  It's whatever Madigan's report says.

Q.   We can print a copy to the extent that Dr. Madigan is relying on Lilly data.  Let's just assume that for the moment.  Are you then relying on Dr. Madigan in reaching your conclusions?

A.    What I say in this footnote that I think is applicable to the class is, "This pattern provides insight into the drug's mechanism of action, suggesting the gastrointestinal adverse effects, particularly nausea, closely associated with greater therapeutic effect of this."

That -- so it provides insight.

Q.    Yeah.  I guess I'm wondering, are you --

A.    Is that an opinion?

Q.    Yeah.  I'm wondering in the testimony that you're reaching in this case, are you relying on Dr. Madigan's analysis or opinions?

A.    For Lilly?

Q.    For Lilly, yes.

A.    I'm sorry.  Because I do rely on it for Novo.

Only -- only to the extent that that provides insight into mechanism.

Q.    Okay.  And so for your --

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 604

for the mechanism aspects of your opinion, you were relying, at least in part, on Dr. Madigan's assessment.  Is that fair?

A.   Generally, for the class -- well, I mean, it reinforced -- it's further data that these drugs work in part -- not very controversial -- through the gut-brain access, as I've testified, in GI adverse events.

Q.   I have a specific question, which is, in the mechanism part of your opinions in the Lilly report, are you relying on Dr. Madigan in reaching your opinions related to mechanism?

A.   Well, most of my mechanism doesn't have anything to do with Dr. Madigan.

This is one small point where I asked him to run a statistical -- a statistical with certain numbers, or a statistical -- those who had greater nausea had greater weight loss.

And my recollection is

Madigan concluded, yes, that was statistically significant.  I'd have to go back and check which table he ran it off of.

Q.    I see.

And if I went back and looked, which table would tell me that it was related to Lilly, if I look back?

A.    So Table 1 is Lilly data. Table 2 is semaglutide data.

And he -- I apologize.  I just have to pull Dr. Madigan's report.

Q.    No.  That's fine.

In the interest of time, if Dr. Madigan did not run the data from Table 1, then he wouldn't be giving information related to Lilly.  Is that fair?

A.    Fair point.

MS. WATRAL:  Okay.  I don't have anything further, Dr. Kessler.

Thank you very much.

THE WITNESS:  Thank you, ma'am.

MS. AMINOLROAYA:  I just need a short break.  I may have some redirect.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:23 a.m.

(Short break.)

THE VIDEOGRAPHER:  Going back on the record.  The time is now 11:29 a.m.

- - -

EXAMINATION

- - -

BY MS. AMINOLROAYA:

Q.    Good morning, Dr. Kessler.

A.    Good morning.

Q.    I just have a few questions.

Do you recall earlier today you were asked about what the term "intestinal obstruction" in the dulaglutide label captured?

A.    There was a series of questions.

Q.    Yeah.  Yeah.  This was over

a number of questions.  And I wanted to follow up on that and see what you discussed, about what you discussed in your report.

In your report, did you discuss what was conveyed by the term -- or what was captured by the term "constipation" versus "obstruction"?

And I'll direct you to Paragraph 666, on Page 235.

A.    What paragraph, ma'am?

Q.    Paragraph 666 on Page 235.

A.    Thanks, ma'am.  Just give me a second.

Q.    Sure.

I'll also direct you to Paragraph 669.

A.    Great.  Thanks.

Just give me one second, if you don't mind.

Q.    Sure.

A.    Can you ask your question again.

Q.    Sure.

In your report, what did

David Kessler, MD Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 608

you say about the risk of constipation and whether that was sufficient to disclose the risks of obstruction and ileus?

A.    So I say, "Disclosing" -- the actual quote in 666, about two-thirds of the way down.  What I say is, "Disclosing the risk of constipation is not sufficient to disclose the risk of functional obstruction ileus, nonmechanical obstruction or mechanical, risk of hospitalization, surgery, ischemic, septic, or perforation complications," and it go on.

Q.    Okay.  And as far as the risk of ileus is, based on what you have here in your report, what did you say about whether the risk of ileus is sufficiently disclosed as the risk of intestinal obstruction?

MS. WATRAL:  Objection. Form.  Leading.

This is also outside the scope of his report, so I'll object to that.

THE WITNESS:  I think what I've testified to is the -- there is a continuum, right. There's a spectrum going from nausea, vomiting, ileus.  These are all hypomotility, to the more severe.

Certainly, when the ileus does not imply, it would not be sufficient to -- that there's an obstruction.

Whether that's a phytobezoar or food bezoar or constipation, there's not an obstruction to the lumen.  So ileus does not convey that.

And the most important thing is when you get into the area of intestinal obstruction from any of those causes that I just -- you run the risk of surgery, whether you have to operate, because you have the risk of possible perforation and sepsis.

So it's not -- those are -- while those are a continuum, they are separate, and one does not negate warning about the other.

MS. WATRAL:  And I'll move to strike as not disclosed in his expert report.

BY MS. AMINOLROAYA:

Q.   Dr. Kessler, in your expert report, you discussed what the risk of constipation disclosed, correct?

MS. WATRAL:  Objection. Same objection.

THE WITNESS:  I discussed -- I discussed -- I discussed disclosing constipation, yes.

BY MS. AMINOLROAYA:

Q.   Okay.  And what did you say in your expert report about the adequacy of disclosing a risk of constipation compared to the risks of functional obstruction and ileus?

A.   I say it's not sufficient

to disclose.

Q.   And why isn't it sufficient?

MS. WATRAL:  Objection. Outside the scope of his report.

BY MS. AMINOLROAYA:

Q.   Well, let's stick with your report to deal with counsel's objection.

Based on what you have here in Paragraph 666 and 669, why is it important -- or why isn't it sufficient to use the word "constipation" in order to disclose the risks of obstruction and ileus?

A.   Because constipation is something that can occur.  I mean, we've all experienced it in day-to-day act -- life.  There's gradations.

And when you get on to impaction and obstruction, it takes on a much more serious aspect.

Because I think in 669, I talk about the risk of hospitalization and potential surgery.

David Kessler, MD, Volume III   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Page 612

MS. WATRAL:  I'll move to strike there as well as outside the scope of his report.

BY MS. AMINOLROAYA:

Q.   And based on your expert report, and including Paragraph 666 and 669, is use of the term "ileus" sufficient to disclose the risks of intestinal obstruction?

MS. WATRAL:  Objection. Leading.

Objection.  Outside the scope of his expert report.

THE WITNESS:  No.  That's why I list them separately.

BY MS. AMINOLROAYA:

Q.   And what additional --

MS. WATRAL:  And just for the record, I move to strike that.

BY MS. AMINOLROAYA:

Q.   And what additional risks did you describe in your expert report that are attendant to obstruction?

A.   The risk of --

MS. WATRAL:  Objection.
Outside the scope of the report.
Objection.  Leading.

THE WITNESS:  The risk of
hospitalization and surgery.

MS. WATRAL:  Move to
strike that as well.

BY MS. AMINOLROAYA:

Q.    And you're reading from
your report right now, or referencing
your report right now, Dr. Kessler,
correct?

A.    Yes.

Q.    And so, for example, would
ileus describe ischemic bowel
obstruction?

MS. WATRAL:  Objection.
Outside the scope.

THE WITNESS:  Medically,
no.  Those are different --
those are different terms.

MS. WATRAL:  Move to
strike.

BY MS. AMINOLROAYA:

Q.    And could ileus describe

David Kessler, MD Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 614

the risk of perforation during a bowel obstruction?

MS. WATRAL:  Objection. Outside the scope.

THE WITNESS:  Obviously not.

MS. WATRAL:  Move to strike.

BY MS. AMINOLROAYA:

Q.    And could ileus describe the risk of a septic bowel obstruction?

MS. WATRAL:  Objection. Outside the scope.

THE WITNESS:  Obviously they are different.

MS. WATRAL:  Move to strike.

BY MS. AMINOLROAYA:

Q.    If you look at Paragraph 669, you talk about a few risks that may exist with the intestinal obstruction that you did not expect with constipation.

Can you tell us what those two risks are?

A.     I think I referred to them as hospitalization, potentially surgery.

Q.     And why may surgery be needed to treat an obstruction?

A.     Because you can perforate. You can get ischemia.  You can get sepsis.

Q.     And is surgery always something that is expected with the case of ileus?

A.     No.

Q.     So --

A.     Not at all.  Ileus doesn't imply obstruction.

MS. AMINOLROAYA:  Okay. That's all -- that's all I have.

MS. WATRAL:  Nothing further from me.

Thank you, Dr. Kessler.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Going off the record.  The time is now 11:38 a.m.

David Kessler, MD - Volume III          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER                    Page 616

```
          **********

          (Excused.)

          (Deposition concluded at

approximately 11:38 a.m.)
```

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, DAVID A. KESSLER, M.D., have the opportunity to read and sign the deposition transcript.

*Michelle L. Ridgway*

_____
MICHELLE L. RIDGWAY,
A Registered Professional
Reporter, Certified Shorthand
Reporter, Certified Realtime
Reporter, Certified Court
Reporter, and Notary Public
Dated: April 28, 2026

(The foregoing certification

of this transcript does not apply to any

reproduction of the same by any means,

unless under the direct control and/or

supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

David Kessler, M.D. Volume III    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Page 619

```
             _   _   _   _   _   _
              E   R   R   A   T   A
             _   _   _   _   _   _


PAGE   LINE   CHANGE

_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
_____  _____   _____

     REASON:   _____
```

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

ACKNOWLEDGMENT OF DEPONENT


        I,_____, do

hereby certify that I have read the

foregoing pages, 409 - 621, and that the

same is a correct transcription of the

answers given by me to the questions

therein propounded, except for the

corrections or changes in form or

substance, if any, noted in the attached

Errata Sheet.




_____

 DAVID A. KESSLER                    DATE



Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____


_____
Notary Public

David Kessler, MD Volume III CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER Page 521

LAWYER'S NOTES

PAGE     LINE

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____