# EXHIBIT 30D



Jeffry Lansman, Ph.D.

4/2/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE: GLUCAGON-LIKE            )
PEPTIDE-1 RECEPTOR AGONISTS     )    CIVIL ACTION
(GLP-1 RAS) PRODUCTS            )
LIABILITY LITIGATION,           )    MDL NO. 3094
                                )
_____)
                                )
THIS DOCUMENT RELATES TO:       )    2:24-md-03094-KSM
                                )
ALL ACTIONS/ ALL CASES.         )    HON. KAREN
                                )    SPENCER MARSTON
_____ )

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

JEFFRY LANSMAN, PH.D.

(Taken by Defendant)

Charlotte, North Carolina

Thursday, April 2, 2026

Reported in Stenotype by
Kristy L. Clark, RPR, NV CCR #708,
CA CSR #13529, NC Notary #201807900150

Hartford Reporting & Technology Job No. 3173

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

                PAUL PENNOCK, ESQUIRE
                MORGAN & MORGAN
                350 Fifth Avenue
                Suite 6705
                New York, New York 10118
                (212) 738-6299
                nlovett@forthepeople.com


ON BEHALF OF THE DEFENDANT ELI LILLY:

                MARK PREMO-HOPKINS, ESQUIRE
                KIRKLAND & ELLIS
                555 California Street
                27th Floor
                San Francisco, California 94104
                (415) 439-1400
                mark.premohopkins@kirkland.com

                - AND -

                MICHAEL SMITH, ESQUIRE
                KIRKLAND & ELLIS
                333 West Wolf Point Plaza
                Chicago, Illinois 60654
                (312) 862-2000


ON BEHALF OF THE DEFENDANT NOVO NORDISK:

                KATIE INSOGNA, ESQUIRE
                DLA PIPER LLP (US)
                33 Arch Street
                26th Floor
                Boston, Massachusetts 02110-1447
                (617) 406-6000
                katie.insogna@us.dlapiper.com

                - AND -

                BRADLEY JENNINGS, ESQUIRE
                DLA PIPER LLP (US)
                1251 Avenue of the Americas
                New York, New York 10020-1104
                (212) 335-4500
                bradley.jennings@us.dlapiper.com

APPEARANCES (Continued)

THE VIDEOGRAPHER:  JON LANDAU

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 6 of 156    CONFIDENTIAL - PERSONAL - PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF JEFFRY LANSMAN, PH.D., a witness called on behalf of Defendant, before Kristy L. Clark, Registered Professional Reporter and Notary Public, in and for the State of North Carolina, appearing from 525 North Tryon Street, Suite 1600, Charlotte, North Carolina, on Thursday, April 2, 2026, commencing at 9:13 a.m.

INDEX OF EXAMINATIONS

| EXAMINATION | PAGE |
|---|---|
| By Mr. Premo-Hopkins | 7 |
| By Ms. Insogna | 88 |
| By Mr. Pennock | 148 |

INDEX TO EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Expert report of J. Lansman, Ph.D. | 9 |
| 2 | Report of J. Lansman, Ph.D. | 10 |
| 3 | Rebuttal report of J. Lansman, Ph.D. | 11 |
| 4 | Materials Considered List | 11 |
| 5 | Meta-Analysis from Taylor & Francis | 71 |
| 6 | Statement of Compensation for Jeffry B. Lansman, Ph.D. | 79 |
| 7 | Publication of J. Lansman | 91 |

CHARLOTTE, NORTH CAROLINA; THURSDAY, APRIL 2, 2026;

9:13 A.M.

-oOo-

THE VIDEOGRAPHER:  The following will be the videotaped deposition of Jeffrey Lansman, Ph.D., in the matter of In Re: Glucagon-like Peptide-1 Receptor Agonist Products Liability Litigation, File No. MDL3094.

Today's date is April 2nd, 2026, and the time is 9:13 a.m.

The court reporter is Kristy Clark, and the videographer is John Landau.  We are here today at 525 North Tryon Street, Suite 1600, Charlotte, North Carolina.

At this time, I; will ask all attorneys present to state their name and who they represent for the record.

MR. PREMO-HOPKINS:  Mark Premo-Hopkins, and with me from Kirkland & Ellis Michael Smith on behalf of Eli Lilly.

MS. INSOGNA:  Katie Insogna from DLA Piper and Bradley Jennings also from DLA Piper on behalf of Novo Nordisk.

MR. PENNOCK:  Paul Pennock for the

plaintiffs.

THE VIDEOGRAPHER:  Okay.  You may swear the witness, please.

Thereupon--

JEFF LANSMAN, PH.D.

was called as a witness, and having been first duly sworn, was examined and testified as follows:


EXAMINATION

BY MR. PREMO-HOPKINS:

Q.  Good morning, Dr. Lansman.

A.  Good morning.

Q.  I'll let you get your watch wound.

A.  I'm going to try to sync up with everybody else.

Q.  Sounds good.  Sounds good.  We can do a few preliminaries --

A.  Okay.

Q.  -- that I think you can probably handle while you're winding.

But have you -- have you been deposed before, sir?

A.  Yes.

Q.  How many times?

A.  Seven or eight.

Q. And have those all been as an expert witness in a litigation?

A. As an expert.

Q. And have those been as an expert in some form of chemistry or molecular issues like you're addressing today?

A. Pharmacology.

Q. Pharmacology. Thank you.

We're going to be -- I say this to every expert. We're going to be in your area of expertise, not mine, so if I have any foibles or I mess up a question that's unclear, will you let me know?

A. I will definitely let you know.

Q. It's important to me that you understand my questions. If you answer a question that I ask without clarifying it, I'm going to assume that you understood it.

Is that fair?

A. Uh-huh.

Q. And here's another sort of rule of the road, which is we've got a court reporter taking down what we are saying, so we have to have verbal responses, so a nod of the head or an "uh-huh" doesn't translate as well. I may follow up and say, "Does that mean yes?" I don't mean any disrespect --

A.    No.  I do that.

Q.    And the last piece that I wanted to do -- to share with you is I'm going to do my very best to let you finish speaking before I start.  I tend to be a slow talker in the world of attorneys.  So she can only take down one person at a time.  So can you commit to do your best to let us finish speaking so there's only one person on the transcript at a time?

A.    Absolutely.

Q.    And you understand that I represent Eli Lilly here today; there's lawyers from Novo Nordisk, and we're going to be asking you some questions about your expert opinions.  Yes?

A.    Yes.

Q.    Can you agree to give complete, honest answers to the questions you get today?

A.    Yes.

Q.    In terms of sort of moving us along and getting some administrative stuff out of the way, I'm going to mark the expert reports in this case as exhibits.

A.    Okay.

(Defendant's Exhibit 1 was marked.)

BY MR. PREMO-HOPKINS:

Q.    So we'll hand those to you and have you

identify those.

So I've handed you what we've marked as Exhibit 1.

A.   Uh-huh.

Q.   And you issued, I think, three separate reports in this case, is that right, two primary reports and then a rebuttal report?

MR. PENNOCK:  There was one for each -- each defendant.

MR. PREMO-HOPKINS:  One for each defendant, but the same -- same content, I think.

THE WITNESS:  Yeah, I don't know about that.

(Clarification by the reporter.)

THE WITNESS:  Yeah, I only remember, you know, writing this and the rebuttal.

BY MR. PREMO-HOPKINS:

Q.   Got it.  Okay.

So there's two defendants.  So it looks like there was a report served on both defendants.  We checked, and the content is exactly the same, so -- but we'll mark both just for the record.  I have handed you Exhibit 2, which is the same -- same report.  But this was the report that was directed to Novo Nordisk.

(Defendant's Exhibit 2 was marked.)

/////

BY MR. PREMO-HOPKINS:

Q.   Dr. Lansman, you did issue a shorter rebuttal report?

A.   I did.

Q.   Let me hand you as Exhibit 3 the rebuttal report.

(Defendant's Exhibit 3 was marked.)

BY MR. PREMO-HOPKINS:

Q.   And then as Exhibit 4, we got -- we received with your report, a materials considered list.

A.   Uh-huh.

Q.   And --

A.   Papers.

Q.   -- papers, yes.  So I will hand you as Exhibit 4, a materials considered list.

(Defendant's Exhibit 4 was marked.)

MR. PREMO-HOPKINS:  And that way we have all got those, if we need to refer to them.

BY MR. PREMO-HOPKINS:

Q.   And just for the record, if we start with Exhibit 1, I'll ask you a few administrative questions.

A.   Sure.

Q.   If you take a look at Exhibit 1, you can take a second to familiarize yourself with it.

Does this appear to be a complete copy of

your --

A.   Yep.

Q.   -- expert report?

A.   Yes.

Q.   And have you been asked to -- setting aside the rebuttal report, have you been asked to issue any additional opinions, other than those that are included in your report here?

A.   No.

Q.   And so the expert report that is Exhibit 1, with a copy that's also Exhibit 2, and then the rebuttal report that's Exhibit 3, those would contain all of your opinions?

A.   Yes.

Q.   And the bases for those opinions?

A.   Yes.

Q.   Have you been asked since you issued your rebuttal report to form any additional opinions?

A.   No.

Q.   Do you have today any changes or corrections that you need to make?

A.   No.

Q.   So just so I understand, if we take Exhibit 1, it has a series of end notes?

A.   That's right.

Q.    And it looks like there's 77, I think?

A.    That's right.

Q.    And the materials considered list has substantially more documents referenced on it.  Can you -- we'll start with this question:  How did -- if you look at Exhibit 4, how did it come to be that materials wound up on the materials considered list?

A.    You mean in the report?

Q.    We'll start with that.  It looks to me -- you tell me if I'm wrong -- it looks to me like there was a broad set of information to which you had access that's listed on the materials considered list.

A.    Right.

Q.    And then there's a narrower set of information that you included in the report that you felt was relevant to the opinions you were offering; is that right?

A.    That's right.

Q.    And so the -- if you take a look at Exhibit 4 for just a brief minute.  There's -- you can see that there's different categories of information?

A.    Right.

Q.    And the -- did you -- do you know, did you personally compile Exhibit 4?

A.    I believe that I did -- I did.  I mean, I

got -- I think I got some indication of -- of other references.

Q.   Got it.

And then -- and then this would have been -- whether through some Share Drive or Dropbox or something, this would have been information you had access to consider?

A.   That's right.

Q.   And then from these sources, you would have narrowed that down to what you thought was relevant and included in your report?

A.   Yeah, unless I needed something else.

Q.   And if you needed something else, you would have gone to find that and then cited it in your report?

A.   That's right.

Q.   Did you review any -- I know -- I know you reviewed some reports by Lilly and Novo experts in order to issue your rebuttal report.  I want to focus your attention on Exhibit 1, your -- your initial report.

Did you review any other expert reports before issuing this report?  So either --

A.   No.  No.

Q.   Did you have any discussions with any other

plaintiff experts before issuing Exhibit 1?

A.   No.

Q.   And just again, for the record, on page 18 of Exhibit 1, that's your signature, dated January 1st of 2026?

A.   Yep.

Q.   Okay.  Dr. Lansman, I want to make sure I -- we have a shared understanding of some of the technical matters in your report before we get into the questioning, because I think it will help us move things along.

In -- in reviewing your report, I wanted to make sure I had an understanding of the overview that you provide of how GLP-1 RAs -- and when I say that, what do you understand to fit into that category of GLP-1 RA, the receptor agonists?

A.   Yeah.  The receptor agonist, the simplest definition is it binds specifically to the GLP-1 receptor.

Q.   Got it.

And as I understood your helpful description, there was, as I saw it -- and you can let me know if I'm wrong -- but there was sort of three steps to how a GLP-1 receptor agonist binds to the cell and then causes events to occur after.  And we can -- you can --

you're free to disagree with me, but we can talk about them.

A.    In terms of binding, there's two steps.

Q.    So tell me --

A.    And I'm not sure what you mean by the third step would be engagement of G proteins and signaling molecules.

Q.    Okay.  So what I -- what I had -- the way I had understood it, based on reviewing your report, is there was a first step, which -- which I consider binding.  So there would be a -- the receptor agonist would bind to the receptor, sort of I had as step one. Step two would be some sort of cellular signaling that occurs as a result inside the cell.  And then step three would be some sort of physiological effect in the body as triggered.

A.    Yep.  That's one way of looking at it.  What I'm talking about now is --

(Clarification by the reporter.)

THE WITNESS:  I would make it as the first step would be binding, and that's a two-step process. We call it, like, dock and lock.

BY MR. PREMO-HOPKINS:

Q.    Okay.  So tell me how the binding is a two-step process.

A.    We first get for all the GLP-1 receptor agonists the C terminal end of it, docks in -- in the extracellular domain.  There's like an opening called a clam shell, and it's composed of two beta sheets, which are just the way proteins are organized, and an alpha helix.  And it fits in there and forms contacts, hydrophobic contacts, and that's like oil likes oil, and there are some salt bridges with -- with residues inside that binding.

Once it's docked in the binding domain, then the end terminus comes around and inserts into the transmembrane domain.  So that's the idea of load and lock.  And that locks it in place basically, and depending -- well, I don't know how much detail you want, but ...

Q.    We'll --

A.    We'll leave it there.

Q.    Yeah, I think we'll get into that.

So as part of the GLP-1 receptor agonist, in this case a medication, binding to a GLP-1 receptor, that you mentioned that there's a extracellular domain, sometimes called a pocket?

A.    You can call it a pocket.  There's a pocket within the domain.

Q.    Got it.

A.    Let's put it that way.

Q.    And the binding occurs because the -- by the C terminal docking, and then -- was it the end terminus?

A.    The other side.

Q.    The end terminus coming around and locking in.  And is it into that same pocket?

A.    No, not into the same pocket.  Into the transmembrane domains.  There's seven transmembrane domains that span from the outside to the inside.

Q.    Now, once that binding has occurred -- maybe I should back -- back up, back up and say, when a person takes a medicine that has a GLP-1 receptor agonist mechanism, the medicine eventually makes its way into the person's blood and circulates around their body.  Yes?

A.    That's right.

Q.    And the medicine circulating through their blood will come into contact with individual cells at various parts of their body, various systems in their body.  Yes?

A.    Yes.  It exposed pretty much everything.

Q.    And there are many places or systems in the body that have GLP-1 receptors that these medicines can interact with.  Yes?

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 21 of 156

A.    Right.    They would be specific for the GLP-1 receptor and different tissues.

Q.    And what are -- what are -- what are some of those tissues?

A.    We have -- well, primarily pancreatic cells. We have them in the brain.  We have them in the vagus nerve.  We have them in -- there's -- there's a small amount in smooth muscle.  There's some cardiac tissue which can account for some of the other effects of the drugs.  There's some in the endothelial layers, which is the layer of cells that are in the inside blood vessels.

Q.    So let me make sure I got those nice and loud.

A.    And the brain regions, of course, receptors on the NTS, the nucleus tractus solitarius, and in the hypothalamus.

Q.    So I think, Dr. Lansman, it might be helpful if you scoot forward a little bit.

A.    I'm sliding back.

Q.    And then.

MR. PENNOCK:  The court reporter is having a tough time hearing you.

MR. PREMO-HOPKINS:  So let's try to keep our voices up.

BY MR. PREMO-HOPKINS:

Q.   So did I hear you correctly -- and I'm just going to go through them one by one -- that there are GLP-1 receptors present in pancreatic tissue?

A.   That's right.

Q.   And there are GLP-1 receptors present in different areas of the brain?

A.   That's right.

Q.   And there are, Dr. Lansman, receptors present in the vagus nerve?

A.   That's right.

Q.   And GLP-1 receptors present on smooth muscle?

A.   There's some on smooth muscle.

Q.   And is the -- is your understanding that there are less GLP-1 receptors on smooth muscle?

A.   The density tends to be lower; the pancreas tends to be higher.

Q.   And when you say "smooth muscle," what is that?

MR. PENNOCK:  You got to keep your hands from your mouth -- I'm so sorry -- because otherwise, the court reporter can't hear you, and I sympathize because I have hearing problems as well.

BY MR. PREMO-HOPKINS:

Q.   When you talk about smooth muscle, where is

smooth muscle and what part of the body?

A.   Smooth muscle is in the GI tract, it's in the blood vessels.

Q.   And you said the density of the GLP-1 receptor in smooth muscle is lower than you might see in other locations?

A.   It's not considered a high-density tissue.

Q.   You mentioned that there are GLP-1 receptors on cells in the cardiac, in the heart?

A.   In the heart.

Q.   How about the lungs?

A.   I don't know about the lungs.

Q.   You said that there are GLP-1 receptors on cells on the interior lining of blood vessels?

A.   Yeah, the endothelial layer.

Q.   Endothel [sic]?

A.   Endothelial.  E-n-d-o-t-h-e-l-i-a-l.

Q.   Any other systems or regions of the body where you feel comfortable saying GLP-1 receptors are present on cells?

A.   There are low density found in gallbladder.

And that covers the major sites.  I'm sure there are other sites that just haven't occurred to me yet.

Q.   And with regard to the binding that you

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

described with the dock and lock steps, does that binding happen with GLP-1 receptors in all of these different locations and systems of the body?

A.   It would have to to create -- have an effect. So, you know, I haven't seen papers where it analyzed dock and lock in the brain, just because it's difficult to do those experiments.

Q.   You make a good point, which is, in order for the medication to have an effect through GLP-1 receptor binding, there would need to be binding in a particular tissue?

A.   That's right.  Exactly.

Q.   Now, in terms of what you've described in your expert report, I thought you did a nice job -- at least for a nonscientist like me -- of describing what happens after that binding occurs, so I want to make sure I understand that.

A.   Sure.

Q.   So after the binding occurs -- I understood that the binding occurs on the outside of the cell. Yes?

A.   That's right.

Q.   But the -- the receptor itself is almost like a doorway or a pathway where activity can occur; it touches the inside of the cell also.  Is that right?

A.    That's right.  There's seven transmembrane domains that go through the membrane binding sites.  On the extracellular surface and on the intracellular surface is where it couples to all the other pathways it activates, turns on.

Q.    And -- and so the -- what I thought of as sort of step two, and maybe that are sub-steps, but at a high level, step two after the binding was you described some intercellular signaling that occurs; is that right?

A.    Correct.

Q.    And we'll talk about this more later.  But this inside the cell signaling pathways, those could be complicated.  Yes?

A.    They can be complicated.  But I would say there are canonical pathways that are very common.

Q.    When you say "canonical pathways," what does that mean?

A.    Canonical would simply mean that this is the pathway that's usually associated with the binding of the drug.  And in that case, it would be the --

(Clarification by the reporter.)

THE WITNESS:  It would be the cyclic AMP G protein pathway.

/////

BY MR. PREMO-HOPKINS:

Q. So the canonical pathway, cell -- cellular signaling pathway you described was cyclic AMP G protein?

A. Well, it would be G protein and then cyclic AMP. It would be G protein, the enzyme adenylyl cyclase, a-d-e-n-y-l-y-l, cyclase, and then -- it activates adenylyl cyclase, which is the enzyme which makes cyclic AMP.

Q. So the canonical cell signaling pathway is the pathway that results in cycling AMP; right?

A. Right.

Q. And in your report, you also identify a cell signaling pathway that relates to B arrestin; is that right?

A. Beta arrestin. Yes. That's also in the membrane.

Q. And are those separate cell signaling pathways that can be triggered by the binding?

A. They are activated simultaneously, more or less.

Q. So does the -- does GLP-1 receptor binding necessarily cause cAMP activation as well as beta arrestin activation?

A. Yes, it will cause both, depending on the

Case 2:24md-03094-KSM    Document 691-30    Filed 05/19/26    Page 27 of 156

drug.

Q.    Okay.

A.    The extent of which depends on the drug.

Q.    Got it.  Got it.  So depending on the GLP-1 receptor agonist, you may have more signaling in one or the other?

A.    Exactly.

Q.    And then, I understood that the process you have described with regard to how a GLP-1 RA has a -- could have an impact on a person is -- doesn't just stop with the cell signaling; right?  There's then some what I would describe as kind of a physiologic response that the body has to that signaling?

A.    Yeah.  The signaling pathway sets into motion various processes.

Q.    In your report, you discussed, for example, the release of insulin from pancreatic beta cells.

A.    Right.

Q.    And that would be -- the release of insulin from pancreatic beta cells would be more of the body's responses to activation of these cell signaling paths?

A.    That's right.

Q.    And so just to sort of sum up, I think we are on the same page, but we've got a first step with the way these GLP-1 RAs interacted with the cell, which is

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 28 of 156

to bind through dock and lock.  Yes?

A.    Yes.

Q.    And then, after that, the second step would be activating the cell signaling pathways?

A.    Yes.  That would simplify it.

Q.    And then a third step would be as a result of the cell signaling pathways, those signals would cause cells in the body to take some action?

A.    Exactly.

Q.    Dr. Lansman, your report I understood to be focused on the structural -- basically on the mechanism of action of these drugs.  Is that fair?

A.    Yeah.  The pharmacology, which includes mechanism of action, pharmacokinetics, how long it lasts in the bloodstream.  That would be the main focus.

Q.    And there are some references to things like cohort studies in your paper -- in your report, excuse me.  But I didn't understand you to be offering specific epidemiological --

A.    I'm not offering any epidemiological evidence.

Q.    Okay.  Dr. Lansman, I want to ask you a couple of questions about your background that weren't entirely clear from your CV, but just to be sure I

understand them.

A. Sure.

Q. In addition to not offering opinions on epidemiology, you don't consider yourself an expert in that area; right?

A. I'm not an expert.

Q. And you're not a healthcare provider?

A. I'm not a healthcare provider.

Q. Do you consider yourself an expert in endocrinology?

A. No.

Q. You don't have any formal medical training?

A. No formal medical training.

Q. Have you ever worked with a company or on your own to interact with the Food and Drug Administration, the FDA?

A. No.

Q. I looked through some of the publications that you listed in your CV.

Have you ever personally published an article looking at incretins, incretin medications?

A. No.

Q. And do you have any publi- -- so we received your CV in January of this year.

Do you have any publications since then that

would be need to be added to update?

A.   No.

Q.   Are you -- do I understand you're an emeritus professor at --

A.   UCSF.

Q.   Do you live in the Charlotte area now?

A.   I live in Asheville now.

Q.   In Asheville.  Asheville, North Carolina.

And one of my good partners just moved to Asheville from Chicago.  So I think it's also similar -- similar timeline in her life, so ...

The -- so you're not currently active at UCSF?

A.   Well, sometimes I take a part in, like, seminars and stuff.  I'm still emeritus, so ...  And I have collaborators there for other projects.

Q.   You haven't previously authored any articles about GLP-1 receptors specifically?

A.   No.

Q.   Or GIP receptors?

A.   No.

Q.   You understand this litigation relates to adverse events in the GI tract primarily?

A.   Yes.

Q.   You haven't personally authored any articles

about gastroparesis; is that right?

A.   No.

Q.   No articles about ileus?

A.   No.  I don't offer opinions on medical topics.

Q.   Has any of your research or work previously been funded by a pharmaceutical company?

A.   No.

Q.   Any of your colleagues work with pharmaceutical companies at UCSF?

A.   I'm sure some do.  Dr. Koliwad was my next-door neighbor.

(Clarification by the reporter.)

THE WITNESS:  Koliwad.

BY MR. PREMO-HOPKINS:

Q.   Dr. Koliwad?

A.   Yeah.

Q.   Your next-door neighbor at UCSF?

A.   He was next door, but I never saw him in there.

Q.   I didn't know if you meant your next-door neighbor.

A.   No, at UCSF.

Q.   And, again, just to sort of close out this administrative line of questioning here, Dr. Lansman,

you didn't conduct any review of preclinical animal studies that the company's performed, did you?

A.    That ...

Q.    So --

A.    I've looked at basic science studies that have come out.

Q.    You looked at basic science studies in the published literature.  Yes?

A.    In the published literature.

Q.    With regard to the -- the pharmaceutical companies' performance of preclinical studies as part of a drug approval process?

A.    No, not part of the drug approval.  These are papers that have come out recently.

Q.    Dr. Lansman, I also want to make sure, before we get into some questioning, that I understand you mentioned before that your report was focused on the pharmacology and pharmacokinetics of these medicines and their mechanism of action.  Yes?

A.    Mechanism of action would be probably the best.

Q.    Great.  And you -- but you said you're not offering any medical opinions here?

A.    No medical opinions.

Q.    So you don't -- you don't intend to offer any

opinions that a medicine -- a particular medicine can cause a particular medical outcome in a patient?

A.    No.

Q.    Okay.

A.    I'm not giving a medical causation.

Q.    Streamlining a lot of stuff, Dr. Lansman, I got to make sure I mark something if I want to come back to it.

Dr. Lansman, I want to now ask you some questions about -- excuse me -- some of the differences that exist with regard to GLP-1 receptor agonists. That's a subject we are going to go to now.

Is that all right?

A.    That's fine.

Q.    You understand that different GLP-1 agonists aren't identical; right?

A.    They're not.  They're not identical chemically.

Q.    That they have different molecular sizes. Yes?

A.    Yes.

Q.    And they have different molecular structures. Yes?

A.    Yes.  I would have to say yes.

Q.    And they differ in their amino acid

sequences; right?

A.    They have different amino acid sequences.

Q.    And they have different pharmacokinetics; right?

A.    They have different pharmacokinetics.

Q.    And those differences, I think you said, account for differences in affinity or potency between the drugs.  Yes?

A.    Yes.  The groups that are added can affect the potency.

Q.    And different GLP-1 RAs have different efficacy and signaling bias as well; right?

A.    That's right.

Q.    And you also recognize that the different GLP-1 RAs have different side effect rates.  Yes?

A.    I don't have information on the actual rates.

Q.    So you -- you didn't look into the extent to which any specific GLP-1 RA may have a different rate of side effects than another?

A.    No, I didn't look at the rates.  I looked at whether they occurred or not, and that was mostly for context for understanding --

Q.    Okay.  So --

A.    -- mechanism of action.

Q.    So you -- you looked -- when you say you

looked at whether different side effects occurred or not for context, what -- what do you mean by "side effects"?

A.    By side effects, what -- what are common adverse -- in pharmacology, we classify drugs in terms of their mechanism of action, the site in where they act, and adverse effects that are related to the mechanism of action and adverse effects that are unrelated to the mechanism of action.

Q.    And so you -- you looked at some literature about adverse effects to help you understand the context around whether or not those adverse effects would be reported consistent with what you understand the mechanism of action to be?

A.    Can you rephrase that?

Q.    Yeah, sure.  You mentioned that in the pharmacology field, when you're classifying drugs in terms of mechanism of action, you would look at side effects for context to understand are they consistent with the -- what you understand the mechanism of action to be or are they inconsistent in some way?

A.    I think that would be fair to say.

Q.    Yeah.  Did you do any investigation into individual -- any of the individual GLP-1 RAs and potential differences in the occurrence of side effects

between them?

A.   No.

Q.   Based on your review and your understanding, Dr. Lansman, the physiological reactions or the responses that the body has to these medications, those occur only when the GLP-1 receptor is activated or bound; is that right?

MR. PENNOCK:  Note my objection.

THE WITNESS:  That's right.

BY MR. PREMO-HOPKINS:

Q.   Dr. Lansman, if just for ease of reference today, in the deposition, I may refer you back to those three steps that we talked about, the binding, the cellular signaling, and then the physiological response; will you understand?

A.   Yes, I will.

Q.   And if you don't understand or if I'm somehow fumbling, you should let me know.  Okay?

A.   I will help you out.

Q.   With regard to the binding step, are there differences that you identified in your review in how the GLP-1 RA medications bind to the receptor?

A.   So it's going to be a complex question which I will give you an answer as simplified as I can.

Again, it's a multistep binding process.  The

first load stage, where it enters the extracellular domain and binds this clamshell structure that's composed of alpha helixes and beta sheets, that is conserved among all the GLP-1 receptors.  And, in fact, you know, they have to have certain residues, certain amino acids for that binding to be specific.  Okay?

So if someone were designing a new one and they left out one of the important amino acids, you wouldn't get the same binding.  Likewise, for that step, it has to be an alpha helix.  All of the GLP-1 drugs have some alpha helical component that fits in that binding pocket.  And so it's very specific. There's sites on the pocket and sites on the drug that are absolutely required and, you know, I think that's probably sufficient.

Q.   That's helpful.  Let me -- let's take an example.  So dulaglutide, that's one of the GLP-1 RA medications that you consider in that basket; is that right?

A.   Right.

Q.   And dulaglutide is, in particular, larger than other GLP-1 agonists; is that right?

A.   That's right.

Q.   And that's because it contains two peptide sequences fused to some human immunoglobulin?

A.    That's right.

Q.    And does -- does dulaglutide bind in that pocket in any different way so there's any difference in the binding as to dulaglutide compared to other GLP-1?

A.    I would say they're the same because the GLP-1 part binds into the docking site identically. Now there's going to be differences a little later on.

Q.    When you say "differences a little later on," what do you mean?

A.    When --

(Clarification by the reporter.)

THE WITNESS:    When the end terminus has to lock in, that's the end of the -- the beginning of the amino acid sequence.

BY MR. PREMO-HOPKINS:

Q.    That's helpful.  So how does the locking port, with the end terminus of dulaglutide, differ from other GLP-1 RA medications?

A.    Well, the locking is similar because they both -- they -- the end terminus inserts into the transmembrane domains and -- but, you know, the extent to which it will insert within those transmembrane depends -- domains also depends somewhat on groups that are attached.  Like in the case of dulaglutide, there's

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 39 of 156

the FC, which is a human antibody.

Q.   So the -- the -- the different GLP-1 RA medications, if they have different groups attached, there can be a difference in how they lock into the transmembranes?

A.   That's right.  Okay?  But the fundamental mechanism remains the same.

Q.   And the fundamental mechanism, as you describe it, is?

A.   Well, what happens is once the end terminal region is inserted into the transmembrane domains, there's a shift.  There's seven different transmembrane domains.  There's a shift, I think, in either five or six.

It moves outward a bit, and that allows the G protein to insert.  That's common to all of them, except, you know, the extent of the rotation of the helix 5 or helix 6, you know, could depend on the agonist type.  Certainly you see that with tirzepatide.

Q.   I will ask you some specific questions about tirzepatide because it has some more fundamental differences than the other medications --

MR. PENNOCK:  Objection.

Go ahead.  You need the question read back?

THE WITNESS:  Did you ask a question?

BY MR. PREMO-HOPKINS:

Q.   Yeah, I can ask a question again.

As compared to -- tirzepatide has activity on the GIP receptor as well.  Yes?

A.   That's right.

Q.   And tirzepatide, given its structure and its contents, is more different than the other GLP-1 RA medications are to each other.  Yes?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  More different, that's kind of imprecise.

BY MR. PREMO-HOPKINS:

Q.   Okay.  We can -- we can get more precise as we go.  If that -- if you can't answer that one, that's fine.

A.   I just don't want to answer --

MR. PENNOCK:  There's no question pending.

THE WITNESS:  Okay.

BY MR. PREMO-HOPKINS:

Q.   So let's talk for a minute about tirzepatide. Tirzepatide isn't identical to GLP-1 receptor monoagonist medications; right?

A.   Right.  It's unique.  It then binds GIP receptor.

Q.   And -- and with regard to its binding of GLP-1, tirzepatide only partially activates GLP-1 receptor-initiated pathways; right?

A.   That would be a simplification; I think it would be an acceptable one.

Q.   Acceptable simplification is my middle name.

The -- so tirzepatide is a -- what you would call a full agonist of the GIP receptor, but only a partial agonist of the GLP receptor?

A.   It is a partial agonist of the GLP-1 receptor.  I can't conclude that it's a full agonist at the GIP receptor.

And there's a lot of detail on that, if you want to go into it.

Q.   We may get there.

Tirzepatide has -- one of the signaling pathways we described was the beta arrestin pathways; right?

A.   It's what's called a bias agonist.

Q.   Thank you.

A bias agonist meaning what?

A.   In the case of tirzepatide, it recruits beta arrestin.

Q.   It's biased towards that recruitment?

A.   It's biased towards that recruitment.

Q.   As opposed to the other cell signaling pathways that might be triggered by other GLP-1 RA medications?

A.   Most of them are what we call balanced; they do both.

Q.   So most of the GLP-1 RA agonists -- and just for the record, now we're talking, at least in my acceptable, simplified method, about step two, right, the cell signaling portion.

In the cell signaling portion, the tirzepatide has some difference as compared to the other GLP-1 RAs.  Yes?

A.   Yes.  So the cell signaling side and the recruitment of G proteins.

Q.   And -- and that difference is that tirzepatide is biased towards the recruitment of B arrestin, where the other GLP-1 agonists show a more balanced recruitment?

A.   That's correct.

Q.   Are there -- if we move from step two to step three --

A.   Uh-huh.

Q.   -- sort of physiologic response of cells in the body, does the difference in cell signaling pathway, whether it's B arrestin or cAMP, does that

create the potential for different physiologic effects?

A.    The physiological effects would be broadly similar.  And, for example, we know that tirzepatide is a partial agonist and doesn't make as much cyclic AMP as other drugs and compensates for that by either you can use a higher dose.  That's one of the things that we have to consider when we talk about, you know, cyclic gain production.  If you want to get a therapeutic response, you might have to increase the dose.

Q.    When the beta arrestin pathway is preferentially activated, that would cause the cell to react differently than if the two signaling pathways were activated in a balanced manner?

A.    Well, the beta -- should I answer -- I'll answer it fully because I think it's important.  The beta arrestin pathways are a recycling pathway in desensitization, so for all -- pretty much all receptors in the body, you know, in the constant presence of a drug or an agonist, they will down regulate.  Okay?

Some will desensitize, which means they just don't respond.  Others get incorporated into vessels, they get pulled inside the membrane.  So in this case, beta arrestin signaling would tend to terminate --

terminate receptor activation, and that's what --
that's what that pathway does.

Q.   I see.  So --

A.   So it would bring the --

(Clarification by the reporter.)

THE WITNESS:  It would -- the beta arrestin
pathway would cause internalization of the receptor
within a vesicle, which is a membrane-bound structure,
and it sits there inside for a while and then it gets
translocated back to the membrane, so you get a
regeneration of that receptor to the surface.

BY MR. PREMO-HOPKINS:

Q.   So you mentioned that the B arrestin
signaling pathway is associated with I think what you
described as a desensitization?

A.   It could be desensitization.  There's a lot
of terms for it.

Q.   And so --

A.   Can I clarify the terms?  Something like
desensitization is -- and another one is tachyphylaxis,
you may say.  Those are mostly -- they are just saying
that the response goes away with time.  It doesn't
really address the mechanism.

Q.   Understood.  I see.

So with regard to the cellular signaling

pathway that you focused on, the B arrestin pathway, the bias towards that pathway is the idea that you would see less physiological effect from engaging the GLP receptor?

A.    Again, I don't think I can make that statement just because it's a little simplified.  A lot goes on once these things are internalized.

Q.    So you're not able to say whether tirzepatide's bias towards the B arrestin signaling pathway would have an effect on -- a differential effect on what we see physiologically?

A.    What I can say is the Beta arrestin pathway would limit the amount of cyclic AMP that's produced. And -- that would be the main -- it would limit -- it would tend to limit the amount of cyclic AMP produced, but it depends on the context.  Okay?  So context is really important.  And I will let you ask me the questions before I give you a lecture.  I'm used to lecturing.  I'm used to lecturing.

Q.    So the -- so what you can say is that a medication bias towards the B arrestin signaling pathway would necessarily limit the amount of cyclic AMP that is activated or produced?

A.    Well, I can't say that because the one thing that's -- that -- that's very clear is beta arrestin is

a one-to-one binding to the receptor to cause desensitization and internalization.  When the receptor activates adenylyl cyclase, it makes cyclic AMP, that's a multiplicative event.  So, you know, one G protein can activate lots of cyclic AMP producing -- make a lot of cyclic AMP from adenylyl cyclase.

Q.  Maybe I am going down a path that doesn't make sense to you.  But are you able to answer what, if any, difference in physiologic effect is there from having a biased agonist that's biased towards the B arrestin pathway as opposed to the cyclic AMP pathway?

A.  It's not something that can be predicted exactly because it's still making cyclic AMP.

Q.  Tirzepatide, for example --

A.  Tirzepatide makes cyclic AMP.  And I think the point I wanted to make is that, you know, the desensitization just requires one beta arrestin molecule.  But once you activate G proteins, you activate lots of cyclic AMP producing enzymes.

Q.  Do you know --

A.  So --

Q.  I'm sorry.  Go ahead.

A.  I was just going to say it's multiplicative.

Q.  So recognizing that it's multi-activation of the cyclic AMP signaling pathway is multiplicative, is

it multiplicative for all the GLP-1 RAs?

A.    Yes, it is.

Q.    Are you able to say whether or not there is a difference in physiologic effect given tirzepatide's bias towards the B arrestin signaling pathway?

A.    I mean, I think the output would be the same, the physiological output.  It would just -- I'm speculating here, so I'm not going to speculate.

Q.    Okay.  So in order to understand whether the -- the differential cell signaling pathways had a different physiologic effect, you would have to speculate?

A.    I would have to --

MR. PENNOCK:  Objection.

BY MR. PREMO-HOPKINS:

Q.    You can answer.

A.    I can answer?

What I'm saying is that the signaling pathways, beta arrestin versus cyclic AMP, they're both operating as long as the agonist is binding to the cell receptor and you are producing cyclic AMP.

Probably in the case of tirzepatide, you're going -- you may see transient changes because, in other words, it's going to down regulate and that receptor is no longer active.

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 48 of 156

Now, the complexity comes is when you talk about what tissue are you looking at. Because the biased agonism is important for low density receptors. Okay? This is -- this is a complex --

Q. No, no. I'm -- you explain it.

A. I'm -- yeah, that's why I'm -- so there's something called spare receptors. Okay? Spare receptors are something that was observed a long time ago. It's when the half effect of concentration for producing a physiological effect is less -- is at a lower concentration than the half effect of concentration for binding to the receptor itself.

Does that make sense?

Q. I think I understand.

A. Normally -- well, let's start with the low density system. The low density system, you know, there's going to be an equilibrium between the drug and the receptor; right?

Q. Okay. So --

A. So say it's 50 percent down to the receptor low density, you'll get a certain amount of cyclic AMP and you will see some desensitization. So in the low density case, you will see more desensitization. When you have spare receptors and there's a high density, you only have to occupy a small fraction of the

receptors to get a response.

Again, cyclic AMP production is multiplicative. So, you know, if half binding is like 100 nanomolars, you may see full effect at 50 nanomolar.

And that tends to -- I won't say remove, but tends to abrogate the effects of beta arrestin because you don't care if that receptor has been internalized. It's now -- you now have, you know, say, 80 percent of the receptors, of the spare receptors, the excess receptors that can still be activated. The drug's in the bloodstream, it got its maximum response. Some receptors have been internalized, but we still have lots left.

Q. I understand, I think. So let's kind of start from the beginning and walk through some of those things you described.

We've been talking about the tirzepatide molecule in particular. Yes?

A. Yeah. I'm talking about tirzepatide.

Q. And the -- and the tirzepatide is biased towards the B agonist signaling pathways, where other GLP-1 RAs are not biased in that way. Yes?

A. They're not highly biased. I mean, they're, I would call, you know, neutral biased.

Q.    They're more balanced?

A.    They're balanced.  "Balanced" is the word.

Q.    And -- and because of the bias towards the B arrestin signaling pathway, there will be lower proliferation of cyclic AMP with tirzepatide as compared to other GLP-1 RAs.  Yes?

A.    Yes.  There's a first approximation, unless there's a high receptor density.

Q.    I'm going to get there.

And then depending on the tissue and the density of the receptors in that tissue, you may or may not have a differential physiologic effect as a result of that reduced cyclic AMP?

A.    Yeah, it would be a quantitative difference in the amount of cyclic AMP produced if it's -- if it's at a low-density receptor.

Q.    In terms of whether the bias between those signaling pathways has a different physiologic effect, is that something that you -- let me start my question over; is that all right?

A.    Yeah, go ahead.

Q.    The extent to which bias in the signaling pathway might affect the physiologic outcomes of tirzepatide versus other GLP-1 receptor agonists, that would depend on the tissue that the drug is binding in.

Yes?

A.   The density of the receptors in the tissue.

Q.   Yes?

A.   Uh-huh, yes.

Q.   And the -- whether and to what extent the bias in the signaling pathways for tirzepatide would alter the physiologic effect is not something you are able to opine on right now?

MR. PENNOCK:  Objection.

THE WITNESS:  I'll answer -- the question is confusing to me because when you say "physiologic effect," physiologic effect is always going to be the same.  It's going to be cyclic AMP production downstream.  So the question would be more precisely put, you know, is it going to change cyclic AMP signaling in magnitude?  Are you going to get -- and the answer in pharmacology is always it depends.  And if you want to go into why it depends, we can do that.

BY MR. PREMO-HOPKINS:

Q.   Let me ask you a more precise and specific question.

In treating -- in looking at tirzepatide, because of its -- the bias in its agonism, you understand that there will be less cyclic AMP produced, all things being equal, as compared to other GLP-1 RAs?

MR. PENNOCK: Objection.

THE WITNESS: Everything is not equal. It would depend on the receptor density in the tissue.

BY MR. PREMO-HOPKINS:

Q. So let's take the same tissue; right? If we are talking about the same tissue with the same receptor density and we are comparing tirzepatide to other GLP-1 RA medications, you would expect to see less cyclic AMP produced. Yes?

A. I really can't answer if it's less. I mean, in experiments I have seen that, you know, it looks like the cyclic AMP, you know, drops off a little bit. But, you know, the time course of cyclic AMP hasn't been studied in detail in experimental animals; so you can't really see what it looks like over a long period of time.

So, you know, it could be a lower level initially, but it could stay at a lower level for a long time. I don't know about that. I have seen nothing, and I've looked for that.

Q. So that is helpful. So in terms of the literature that's available and out there, it wouldn't allow you to reach an opinion as to whether or not the differences in the cell signaling pathway might have a different physiological effect in specific tissues; is

that right?

A.   Again, I can't say different physiologic effect.  It would be the magnitude of the physiologic effect.  So, you know, maybe it'd be either just talking about the pancreas and talking about mouse pancreas because it's fairly homogenous; it has a high density of receptors.  And so you would expect in a mouse pancreas, you know, to desensitize it because it has a high density of receptors; those internalized receptors wouldn't count very much, and, you know, because of the spare receptors, you would have more receptors for the drug to bind to.

MR. PREMO-HOPKINS:  Should we take a break?  Why don't we take a break.

THE VIDEOGRAPHER:  Going off record.  The time is 10:18 a.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  Okay.  We are going back on the record.  The time is 10:34 a.m.

BY MR. PREMO-HOPKINS:

Q.   Dr. Lansman, we just took a break.  Are you ready to begin again?

A.   I am.

Q.   For the court reporter's benefit, let's both try to keep our voice up.

A.    Yeah.

Q.    So before we broke, we were talking about cell signaling pathways that are initiated by the GLP-1 receptor.

A.    Correct.

Q.    The two that we are talking about were the beta arrestin signaling pathway and the cAMP signaling pathway.  Yes?

A.    Correct.

Q.    And we were discussing specifically tirzepatide as an example of a medication that you looked at that is biased, more biased than the others with regard to its activation of one of the particular cell signaling pathways?

A.    That's correct.

Q.    And that is a bias towards the B arrestin pathway.  Yes?

A.    That's correct.

Q.    And as a result of that bias, you understand that there could be a difference in the magnitude of a effect that you see in tissues in the body depending on the density of their receptors.  Yes?

A.    I would have to rephrase that, and you could -- there could -- let me see how I would explain it.  There's a little bit more complexity to the beta

arrestin story that once -- once -- you know, taking the case of tirzepatide, once the receptor is biased towards, you know, beta arrestin binds to the receptor and is internalized.  It's in a vesicle, and it can still produce cyclic AMP internally inside the cell.  Okay?

Q.    You're going to have to help me with why that matters.

A.    Well, because what we are talking about is the main signaling pathway is formation of cyclic AMP, and we are talking about biased agonism is removing the receptor and removing cyclic AMP production.

But, in fact, the internalized receptor can produce a separate pool of cyclic AMP inside the cell which engages other pathways.  It can produce cyclic AMP.  There are five or six different forms of adenylyl cyclase, which make cyclic AMP, or adenylyl cyclase, a-d-e-n-y-l-y-l.  So it's still producing cyclic AMP inside the cell.

That cyclic AMP can be used for the traditional and the standard pathway.  And we haven't talked about what happened -- what cyclic AMP does.  But it also activates a different factor that's called an exchange protein factor, which is involved in the release of insulin secreting granules.

So, you know, I would say about these internal pools of cyclic AMP, we know from experimental work that they exist, they've just never been -- they can't be explored in humans. It would be too difficult to explore in human cells, but -- so that's why it's very difficult to address the question whether, you know, because it's biased, it should be making less cyclic AMP. But, in fact, internalized receptors can make cyclic AMP from their -- their vesicular site.

Q. Okay. So let me -- we know that tirzepatide as an example is a biased agonist as compared to the other GLP-1 RAs. Yes?

A. Yes.

Q. What we don't know is the effect that that may have on the results of the cell signaling pathway and how that translates into physiologic effect, is that right, or the magnitude of effect?

A. I think that that's fair to say, but doesn't capture the complexity.

Q. Okay. So let me -- I want to ask you a question that you're comfortable with.

A. Again, I would start with the idea that, I mean, it's an effective anti-diabetic and an effective antiobesity, so the signaling pathways are engaged in a way that, you know, produces a desired response, weight

loss and insulin release.  I'll stick to those two.

Q.   So we understand that tirzepatide and its bias agonisms still allow it to activate cell signaling pathways in a way that leads to efficacious medication. Yeah?

A.   Yeah.  The bias agonism doesn't take away from it.  Again, I have to, you know, emphasize that it depends on receptor density in a high-density tissue. The beta arrestin pathway is not going to do much because you have so many other receptors.

Q.   So let me focus you, then, on a low-density tissue, like smooth muscle.

A.   Right.

Q.   In a low-density tissue like smooth muscle, are you able to say whether the bias agonism toward the beta arrestin pathway would have an -- would alter the magnitude of effect you'd expect to see?

A.   The only thing I can say, I haven't seen any research articles that address that.  That's a -- kind of the answer you need, to see a study where they actually looked at the magnitude of cyclic AMP.  And, you know, there are problems with actually measuring cyclic AMP.  You don't want to break up the cell and do chemical analysis; then you ruin, you know, the whole time course because you have to keep killing cells.

You know, what people use now are -- are probes that glow, like fluorescent probes that will glow with cyclic AMP.  But you can see -- you can see in some cases, there was one paper where cyclic AMP goes up, you can see it drop down from the internalization.  But whether that affects a physiologic response, we don't know, because even if it's going up and down over a time course of, I don't know, internalization could be over an hour, you know, the cell signaling pathways are not going to care about the peaks; they're going to integrate the whole signal.  Does that make sense?  The calculus.  It's -- it's summing the whole signal.

Q.  I -- I think I understand that.  I'm going to pretend like I do.

A.  Well, an integral is just the area under the --

Q.  Under the curve?

A.  So that tells you how many cyclic AMP molecules there are.  So even though it comes down to a lower level that doesn't tell you whether, you know, the cell is not actually recording, you know, the total level over a period of time, and that's pretty much how cells often work, because is that it will integrate something like a cyclic AMP or a calcium signal.

Q.    So, again, if we focus on a low-density tissue, like smooth muscle, in your work and your review of the literature, you didn't see anything that would allow you to reach a conclusion about whether the differences in cyclic AMP activation changed the physiologic outcome?

A.    That's correct.  The only place I could find papers that actually measured cyclic AMP quantitatively were in the pancreas.

Q.    And when you looked at those in the pancreas, you were looking at production of insulin as a result of the --

A.    No.  I was looking at actual cyclic AMP levels.  And it's also been done -- a lot of the experimental work is done in just, you know, cell lines.  So they'll transfect -- they'll transfect the cell with the receptor, and then study that.

Q.    Got it.

A.    And in that way, one of the things I found is everybody uses low density transfection because they get the result they want.

Q.    What does that mean?

A.    That means if you want to see the beta arrestin pathway, you have to use low-density receptors.  So you would transfect at a level where you

don't have spare receptors.

Q. So in low-density tissues that have less receptors, those would be areas where you would -- at least hypothesize that you would expect to see a lower magnitude of effect from a bias agonist?

A. Well, again, I can't say whether it's lower magnitude. If it's integrating the cyclic AMP signal, the magnitude of the response could be, you know, more or less. And, you know, in some cases, you know, I think we have to go back to pharmacology principles. I mean, if you're not getting enough to get the physiological response you want, which is insulin release and weight loss, then you up the dose and you try to find a dosage range which gives you the beneficial effects without going into the adverse effects.

Q. With regard to -- I'm focused on the mechanism piece and sort of the three steps we talked about --

A. Okay.

Q. -- and make sure I understand as well as I can the potential effects of a biased agonist in the cell signaling pathways. So that's what I'm going to focus your attention on.

Outside of the pancreas, the pancreas is a

high-density receptor tissue.  Yes?

A.    In humans, it can vary from individual to individual and actually from cell to cell in the pancreas.

Q.    While in humans, the pancreatic cells differ in their receptor density.  In mice, it's pretty homogenous?

A.    It just makes sense because they have the same genes, they eat the same food, same daylight cycle, same cage.  Humans aren't like that.

Q.    And because of the ability to control the mice's genetics and environment, you're able to have a pancreatic cell that is easier to use as a control, for lack of a better term?

A.    Yeah.  It's what you can study.  I mean, it makes it simpler, but doesn't make it completely transferable to humans.

Q.    And the -- the mice studies that you're describing, they focused on the pancreatic cells?

A.    Yeah, mostly pancreas.  These are cyclic AMP measurement studies.

Q.    And the -- and the reason we, you and I, wind up talking about these studies is because of a difference in activation of the two cell signaling pathways that happen after the receptor activation.

Yes?  With tirzepatide.

A.    What's the question?

Q.    That was a really bad one.  Really bad one.

Can you tell me in a low -- do you have data or a study that would allow you or someone to understand how bias towards the beta arrestin pathway affects the magnitude of effecting low-density tissues?

A.    Yes.  There's one study I'm thinking of.  It wasn't in the pancreas, though; it was in a cell lining.

Q.    Cell lining of what type of cell?

A.    Oh, you know, the standard outline is like --

(Clarification by the reporter.)

THE WITNESS:  A standard cell line that people do experiments in that I don't -- I don't remember which kind of cell.  Could be Chinese hamster ovary cells or --

BY MR. PREMO-HOPKINS:

Q.    Chinese hamster ovary cells?

A.    There are various cells that are sort of generic.

Q.    That would have been an in vitro study?

A.    In vitro in a cell in a dish.

Q.    And are you aware of a study or a paper that you reviewed that you can rely on to tell me that the

difference -- how the differences in bias agonism affect the magnitude of cyclic AMP in low -- in -- in low-density tissues?

A.    Yeah.  There is one paper, and I don't remember the author.

Q.    Okay.

A.    Might be Wood.  It came out of Lilly lab.  So they were associated with -- it was actually a very well-done paper.  They transfected cells with GLP-1, and they looked at these -- they measured cyclic AMP optically, you know, with -- so you can see these things in real time.  You know, you don't want to do biochemical studies because you're basically breaking apart everything.

So you -- you stimulate the receptors.  As cyclic AMP goes up, you get a light signal, fluorescent signal, and you can see it come down in the low-density tissue.  So on that time course, you could see the effect of beta arrestin.

Now, the problem was, and this is why I think it was a good paper is they did low density, but they also did intermediate density, slightly high density, and very high density that was buried way back in the appendix, and it did show the spare receptor effect, so they are aware of the spare effect.

Q.    So in the paper that you described by Wood --

A.    I think it's Wood.  You know, I --

Q.    We'll --

A.    2020.

Q.    The Lilly lab.

A.    It was from Lilly.  I saw the Lilly name on it.

Q.    And the paper that you're describing from the Lilly lab that did the measurements of cyclic AMP, it was observed that the biased agonism towards the beta arrestin pathway resulted in a reduction in cyclic AMP?

A.    Well, that was the hypothesis.  So they're hypothesizing that the down regulation of the GLP-1 receptor should lead to a decrease in cyclic AMP.

Q.    And they measured it?

A.    And they measured that.

Q.    And they saw that there was in the low-density tissues a reduction?

A.    Right.  What I can't conclude is how that would affect the physiology.

Q.    And you can't make that connection because there's just not studies that allow you to?

A.    There's not studies, and it's not clear, you know, how cyclic AMP -- like I said, it could be integrated, you know, it could be summed.  Each

transient could be summed.  There are factors that would influence what I would call the output of the cell.  In this case, it's a cell line that has no output.

Q.    I wanted to come back to one question I asked you earlier.  You mentioned -- you're not a doctor, you're not trying to offer medical expertise here?

A.    No, I don't offer medical opinion.

Q.    And you're not here to offer an opinion on whether a particular medication can cause a particular adverse outcome in a human; right?

A.    No.  I'm not prepared to do that.

Q.    Based on the review that you did, Dr. Lansman, do you know one way or the other whether the different GLP-1 receptor agonist medications have different cardiovascular effects?

A.    I don't know offhand.  I think the one epidemiology paper I looked at, just for context, the Z paper from 2022, it was an unbiased cohort study, like 2 million Veterans Administration patients, where they compared all the GLP drugs as a group, and they produced the -- what we consider class-related adverse effects.

Q.    The Z paper that you described --

A.    And so they showed a beneficial effect of all

the GLP agonists on cardiac function.

Q.    The Z paper that you described didn't look into or examine whether there were differential effects on a medication-by-medication basis?

A.    No.  No.

Q.    Dr. Lansman, if I can direct you to page 4 of your report, which is Exhibit 1.

A.    Uh-huh.

Q.    And I'm focused on paragraph No. 4.

A.    Uh-huh.

Q.    It looks like you described that chemical differences between GLP-1 receptor agonists affect how tightly each medicine binds into that receptor pocket; is that right?

A.    No.  It's -- what -- what the atomic resolution study shows is that they all bind to that receptor pocket, but it's the end terminal region of the drugs that reaches around and goes into the transmembrane domains, that can be slightly different, depending on the structure of the drug.

Q.    So just for my organization in my head, we're talking about step 1A and 1B --

A.    Yeah.

Q.    -- in the binding?

A.    Dock and lock, so the lock stage.

Q. So in the lock stage, the -- the chemical structure of the different medicines can affect how it locks into the cell?

A. That's right. And -- yes. That's -- that's correct.

Q. And that can influence, as you said, drug potency and the concentration of the drug that produces a half maximal physiologic response?

A. Yeah, it affects coupling to everything. So if you have a very tight binding, then you get tight coupling is one way to think about it. If there's loose binding to that transmembrane domain, then, you know, GTP binding proteins would be less engaged.

Q. When you -- when you say that the changes in how the medicine locks into the cell affects the coupling, the tightness of the coupling?

A. Yeah, yeah. The locking stage, where it interacts with the -- I think I mentioned this before. You can take, like, the transmembrane domains being six matchsticks going through the membrane and the bottom are kind of splayed out. And when the end terminal locks them, one of those moves out. I think it's five. And that allows the GTP binding protein, GS, to associate with the receptor, and then it can get activated at adenylyl cyclase.

Case 2:24-md-03094-KSM   Document 691-30   Filed 05/19/26   Page 68 of 156

Q.   I see.  So the -- the tightness of the

binding, you said it may affect I think you said

everything after that.  The tightness of the coupling

can affect what?

A.   The tightness can definitely affect -- the

primary effect is on the coupling to the GTP binding

proteins.

Q.   Okay.  And --

A.   Okay.  And, you know, once you engage a GTP

binding protein, then you're going to make cyclic AMP,

because adenylyl cyclase, the enzyme that makes cyclic

AMP is a soluble enzyme.

(Clarification by the reporter.)

THE WITNESS:  Yeah.  The GTP protein will

bind to the inside of the transmembrane domain when one

of the helicis tilts outward, and then it can interact

with adenylyl cyclase, which makes cyclic AMP.

BY MR. PREMO-HOPKINS:

Q.   Got it.

A.   And slight differences in how it interacts

with those five transmembrane domains will effect

coupling to G proteins.

Q.   So the -- the method or tightness with which

the medicine locks into those transmembranes affects

how the -- how the cell will behave and the cell

signaling pathway, step two of our discussion?

A.   Yes.

Q.   Got it.  I understand.

A.   I would add, you know, just one thing, you know, the binding is very specific, you know, for the docking and locking.  But there is flexibility in those transmembrane domains, depending on the structure of the agonist.  Okay?  Because I think I have a drawing, a cartoon that, you know, I think human GLP-1 fits kind of almost perpendicular to the membrane.  It sits straight up.  Others will have a slight tilt.  If they're a little bit longer or a little bit shorter, they'll, you know, basically have a different effect on the movement on those domains.

Q.   So in your report, you describe one of the effects of the signaling cascades on the pancreas cells.  Yes?

A.   Uh-huh.

Q.   Yes?  Sorry.

A.   Yes, I'm sorry.

Q.   That's all right.

And did you look for any studies or literature that would allow you to describe the effect of the signaling cascades on other tissues?

A.   I've looked at some of them.

Q.   Yes.

A.   In neurons, it could be slightly different because there could be a different class of G proteins, they're called GQ, which has a different signaling mechanism.  Hasn't been studied very long in neurons.

Q.   So to make sure I understand the -- with regard to the effect of the signaling cascades that you identified on neurons, you said it hasn't been studied particularly well and could be different; is that right?

A.   Well, there are other pathways that a GLP-1 receptor can engage.  And one of them is a G protein pathway called GQ, which activates phospholipase C which leads to inositol triphosphate production and calcium, so that could be happening in neurons.  I'm not sure about the detailed physiology neurons.

Q.   Okay.  That's all I'm trying to make sure. You've got a description in the -- in the report of the particulars of how it works with regard to pancreatic cells.  Yes?

A.   Pancreatic cells, probably in muscle.

Q.   And for the release of insulin in particular?

A.   Definitely for the release of insulin. Because we know -- I mean, it's clear that when cyclic AMP's activated, it turns on an enzyme called cyclic

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 71 of 156

AMP dependent protein kinase --

(Clarification by the reporter.)

THE WITNESS:  Protein kinase.  And it phosphorylates --

MR. PREMO-HOPKINS:  Phosphorylates.

THE WITNESS:  Phosphorylates.  It puts a high-energy phosphate onto a calcium channel.  So when a calcium channel opens, more calcium comes in.  And calcium is a trigger for exocytotic release of insulin.

BY MR. PREMO-HOPKINS:

Q.    Then we get insulin outside of the cells into the bloodstream?

A.    Right.  So it helps -- it's necessary for getting a big bolus of insulin outside because the amount of release depends on the amount of calcium coming in.  That's the trigger.  It's like that in every secretory cell.

Q.    So the description that you just gave with regard to how binding of the receptor agonist and the cell signaling pathway can affect the release of insulin --

A.    Right.

Q.    -- do you have -- can you reach a conclusion, to a reliable degree of scientific certainty, as to how the binding of a GLP-1 receptor in a neuron might lead

to a particular physiologic effect?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  Again, it's speculation because I haven't come across any papers and looked at that in the depth and level that I would like.  But it could use the same pathway going through calcium channels because calcium channels are important in neurons for -- for neurotransmitter to release.  It could also engage a different pathway, the GQ pathway.  I have seen that.  I don't know if it's been studied in detail in neurons, but it's another calcium releasing pathway.

BY MR. PREMO-HOPKINS:

Q.   And with regard to -- with regard to what's in your report, right, the --

A.   I focus mainly on cyclic AMP.

Q.   You focused on cyclic AMP pathway and the impact that that pathway has on the release of insulin by pancreatic cells?

A.   That's correct.

Q.   And beyond that, in your report, you don't describe how activation of any particular cell signaling pathway would lead a cell to take any further action, right, in a different tissue?

A.   No.

Q.   Okay.

A.   I have to depend on, you know, careful scientific studies.

Q.   And those you're not aware of that level of a scientific study being done at this time?

A.   No.

Q.   Dr. Lansman, we are going to hand you what we've marked as Exhibit 5 to your deposition.

(Defendant's Exhibit 5 was marked.)

BY MR. PREMO-HOPKINS:

Q.   And Exhibit 5 is a paper entitled Evaluating Bowel Obstruction and Ileus Events in Patients on GLP-1 Receptor Agonist, A Systematic Review and Analysis. And the lead author is Alfehaid, A-l-f-e-h-a-i-d.

Do you see that?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Is this a paper that you recall reviewing?

A.   I don't recall seeing this.

Q.   Okay.  I just had a real quick question.

A.   I should say I stayed away --

Q.   Go ahead.

MR. PENNOCK:   There's no question pending.

THE WITNESS:   Okay.

BY MR. PREMO-HOPKINS:

Q.   So I now want to ask you -- I'm not going to ask you epidemiological questions.

A.   Okay.

Q.   So I will say that from the start.

If we take a look at page 5, there's a Section 3.4.  And this -- this particular Section 3.4 on page 5 of Exhibit 5, talks about liraglutide versus semaglutide.

Do you see that?

A.   The risk of GLP-1 RA associated bowel obstruction?

Q.   That's right, that section.  And it specifically mentions liraglutide versus semaglutide in the heading.  Those are both medicines that you considered as part of the GLP-1 RA class that you looked at.  Yes?

A.   Yes.

MR. PENNOCK:  I just have to object that he's not been given time to read this and review this very long study that he already said he has never seen before.  So I have -- I have to object to this line of questioning.

MR. PREMO-HOPKINS:  I will allow a standing objection to the question.

MR. PENNOCK:  I don't do standing objections. I'm just saying he needs to be given some time to look at this if you're going to be asking questions about it.

BY MR. PREMO-HOPKINS:

Q.  Well, you can tell me if you need to look at anything else.  I'm going to -- I'm going to focus you on two numbers, and then I'm going to ask you about your mechanism opinions.  That's -- and if you need to look at anything else in the paper to understand that, let me know.

A.  You can ask the question.

Q.  So in --

A.  I will see if I can answer it.

Q.  So in this Section 3.4 of the -- of the paper, it identifies an odds ratio for bowel obstruction or ileus for liraglutide of 3.0.

Do you see that?

A.  Uh-huh.

Q.  And then it shows an odds ratio for semaglutide of 0.50.  Less than 1.  Yes?

A.  (Witness nods head.)

Q.  Do you --

A.  Yes.

Q.  Do you -- is there anything that you looked

at based on your work in the mechanism of action that would help me understand why a meta analysis looking at lira and sema would show a six times difference in the outcome of bowel obstruction or ileus?

MR. PENNOCK:  Objection.  Again, same objections regarding he's not reviewed this paper in detail.  Objection to form.

Go ahead.

BY MR. PREMO-HOPKINS:

Q.   Why don't you just put the paper away.  Put the paper away.

A.   Yeah, I couldn't explain.  It's a meta analysis; it's not scientific study.

Q.   So that's helpful.  I can ask you a more general question.

With regard to specific outcomes in humans that are seen in observational studies as between one medication or another, you weren't asked to look at and you didn't look at whether or not any of those had an impact on your mechanism opinion; is that right?

A.    I didn't look at the clinical studies, the RCTs, or the meta analysis.  I was not asked to do that.

Q.   And you weren't asked to look at the -- at least in any systematic way the human observational or

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 77 of 156

epidemiologic studies that there were?

A.   No.

Q.   Can I draw your attention to Exhibit 3, which is your rebuttal report?  And in your rebuttal report, that is Exhibit 3, you have two sections.  One that addresses some criticism raised by Dr. Koliwad and another section that addresses some criticisms raised by Dr. Campbell.  Yes?

A.   Yes.

Q.   And does this -- if you just take a look at Exhibit 3, does this appear to be a complete copy of your rebuttal report?

A.   Yes.

Q.   So one of the things that you say in your rebuttal report, if you look at the section just above the Dr. Campbell heading, you say, "I believe my report clearly sets forth that on-target GLP-1 receptor activation reduces GI and hepatobiliary motility, and thereby precipitates gastroparesis or bowel obstruction and biliary obstruction"; right?

A.   That's right.

Q.   What did you mean by "on-target GLP-1 receptor activation"?

A.   Oh, "on-target" simply means it's specific for GLP-1 receptor activation.  They're not off-target

effects.

Q.   Okay.  That's what I was trying to understand.  So when you say "on-target effects," you mean the drug is intended to have that effect or expected to have that effect?

A.   I don't know if it's expected.  I mean, in pharmacology, the general idea is that there are adverse effects that are directly related to the mechanism of action.  And then there are adverse effects that, you know, are completely unpredictable.  You don't see that with a peptide agonist simply because the peptide binding is highly specific.  Nothing's going to get into that GLP-1 receptor binding domain and stay there very long if it isn't, you know, structured properly.

Q.   So when you say "on target," you're talking about effects that are related to the activation of the GLP receptor?

A.   That's right.

Q.   And you note that activation of the GLP receptor reduces GI and hepatobiliary motility; right?

A.   Right.

Q.   And then you say, "Thereby, precipitates gastroparesis or bowel obstruction"; right?

A.   That's correct.

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 79 of 156

Q.   Do you know -- or have you looked into at all the correlation between GI motility and the -- the medical outcome of gastroparesis?

A.   No.

Q.   Have you looked at all at the correlation between measurements of hepatobiliary motility and any sort of bowel obstruction?

A.   No.  I haven't made links between the actual medical pathology.

MR. PREMO-HOPKINS:  Okay.  Why don't we go off the record for one second, Paul.  So I think if I have like a --

THE VIDEOGRAPHER:  Going off record.  The time is 11:15 a.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  Okay.  We are going back on the record.  The time is 11:36 a.m.

BY MR. PREMO-HOPKINS:

Q.   Dr. Lansman, before we took the break, I was asking you some questions about correlations and specific medical outcomes.

Do you recall that --

A.   Yes.

Q.   -- those questions?

Just to close out -- close the loop there,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

wherever in your report that you discuss adverse events or specific medical outcomes, I want to confirm you weren't intending to make the link between the mechanism and those specific outcomes; is that right?

A.    No, I didn't go into that detail.

Q.    Dr. Lansman, I noticed in your report that you had an interesting section about a Gila monster venom.

A.    Yes.

Q.    What's the significance of the Gila monster venom to your opinions?

A.    Well, first, a GLP-1 agonist was isolated from the venom of the Gila monster, and it evolved independently from the human, but it has -- it's -- I think it's slightly shorter, but it has all the residues needed to lock in -- to dock and lock.

Q.    I see.

A.    So exenatide was one of the first.  And also had a substitution, I believe, in one of the earlier residues that prevent cleavage, breakdown in the bloodstream through DPP, which is dipeptidyl peptidase.

Q.    And is it your -- your understanding that the exenatide is derived from Gila monster venom?

A.    Yes.

Q.    Okay.

A.   Those are first-generation drugs.

Q.   Would that be one of the short-acting GLP-1 RAs?

A.   It was a little bit longer acting simply because it wasn't broken down by the enzyme that breaks those things down.  For the development of the other drugs, they put an amino acid into place that prevents degradation into the bloodstream.

Q.   So for -- for what are generally referred to as the longer-acting, weekly dose GLP-1 RAs, those have an amino acid in place that prevents degradation?

A.   That's one of the medicinal chemistry tricks.

Q.   Understood.

Dr. Lansman, we are going to mark as Exhibit 6 -- sorry.  We are going to mark as Exhibit 6 the Statement of Compensation for Jeffrey B. Lansman, Ph.D.

(Defendant's Exhibit 6 was marked.)

BY MR. PREMO-HOPKINS:

Q.   And, Dr. Lansman, it indicates here that total payments to date are -- as of -- at least as of February 10th, were $50,000; is that right?

A.   That's correct.

Q.   And was the -- there's -- there's a date of August 27th of 2025 on here.  It looks like the

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 82 of 156

earliest date I see on Exhibit 6.

A.    Yes.

Q.    And is that approximately when you started your work on this matter?

A.    Yes.

Q.    And the report that is Exhibit 1, the full report, primary report, when approximately did you start drafting that?

A.    I don't know if this is dated, but shortly after that I started doing the research.

Q.    Okay.  So the initial report was dated January 2nd of 2026.

A.    Right.  So there's some time between that work.  I gathered papers, reviewed what I thought I needed to review.

Q.    Understood.

Did you talk with anybody -- other than the attorneys, did you talk with any colleagues --

A.    No.

Q.    -- about your opinions?

A.    No.

Q.    Do you work with anybody else, like an associate or research assistant or anything like that?

A.    No.

Q.    So in terms of the time and the compensation

that we see on Exhibit 6, that's your hourly rate times the number of hours you worked?

A.    Exactly.

Q.    And the latest date on here is February 10th of 2026.  And I assume that that work relates to preparation of the rebuttal report; is that right?

MR. PENNOCK:  Note my objection.  Hold on a second.  I think that's a payment going back.

Did you see December 9th?

MR. PREMO-HOPKINS:  I see.

MR. PENNOCK:  I think we are talking about a -- because we didn't even have the -- your reports yet, I don't think.

MR. PREMO-HOPKINS:  Understood.

BY MR. PREMO-HOPKINS:

Q.    So for the record, then, let's make sure, Dr. Lansman, this is clear.  The $50,000 in payments, what we see on the -- the dates on there, you think those are the dates of invoices that you submitted?

A.    They must be.  I mean ...

Q.    And so this would have been the work that you had done up to the point of issuing the primary report?

A.    This primary report -- the final primary, yeah.

Q.    Yes.  Got it.  Yes.  The Exhibit 1?

A.   Right.

Q.   Okay.

MR. PENNOCK:   Just so you know, it's the date of payments.

MR. PREMO-HOPKINS:   Thank you.   Thank you.

BY MR. PREMO-HOPKINS:

Q.   And then after your Exhibit 1 report was issued, you did some additional work.   Yes?

A.   Yeah.

Q.   You reviewed the reports of Dr. Koliwad and Dr. Campbell?

A.   That's right.

Q.   And you prepared the rebuttal report that is Exhibit 3?

A.   Correct.

Q.   And were you -- in Exhibit 3, were you able to lay out your responses to the criticisms of Dr. Koliwad and Dr. Campbell in a fulsome manner?

A.   Yes.

Q.   Since -- after this $50,000 that we see in Exhibit 6, have you billed for any additional time since then?

A.   Yes, I have.

Q.   Do you know how much you billed up through today?

A.    I don't remember.  I think it was 40,000.

Q.    So an additional 40,000 since the information on Exhibit 6?

A.    Yeah.

Q.    And that would reflect work for the rebuttal report as well as preparation for the deposition today, things like that?

A.    Yeah.

Q.    So in total from the time when you were retained until today, you billed for -- billed and/or been paid for approximately $90,000 worth of work?

A.    Roughly, yeah.

Q.    And that's at an hourly rate of $750 an hour?

A.    Exactly.

Q.    In preparing your opinions -- no, I'm going to ask you a different question.

Is that all right, Dr. Lansman?

A.    Yes.

Q.    Do you -- are you currently paid by UCSF still at all?

A.    Pension.

Q.    Oh, outside of your pension, do you receive any salary or anything like that?

A.    No.

Q.    You mentioned that you have done expert work

before.  Yes?

A.    That's correct.

Q.    And can you estimate for me at this point in time, given that you're an emeritus professor, what percentage of your income currently comes from doing litigation consulting?

A.    Total income, maybe a quarter.  I don't have a large caseload.

Q.    Do you do other forms of consulting that's outside of litigation?

A.    Just pharmacology.  So it would be litigation, civil litigation.

Q.    I see.  I see.

But you don't have sort of a separate consulting job, where you're consulting with pharmaceutical companies?

A.    Oh, no, no, nothing like that.

Q.    Have you worked with the Morgan & Morgan firm before?

A.    No, I don't think so.

Q.    Have you previously provided expert -- litigation expert work in the context of a personal injury or product liability case like this one?

A.    You know, personal injury.  But usually medical injury or --

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 87 of 156

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    I see.

Have you ever --

A.    -- doctor giving the wrong drug.

Q.    And have you ever provided an expert opinion before in a case where the injury's like a product defect case, like this case?

A.    No.  No, no.

Q.    So your prior expert work has primarily been in the context of, like, medical malpractice claims?

A.    Personal injury.  Though, I have one case that's pending that's a new drug case.

Q.    And what -- what medicine does that relate to?

A.    It's a cardiac medication for cardiomyopathy. It's a new experimental treatment.

Q.    And do you know on which side of the case you're retained, on the plaintiffs' side or the defense side for that one?

A.    Plaintiff.

Q.    And what's the name of the medication?

A.    JK-07.

Q.    So early stage?  Or has a code name?

A.    Yeah, it's an experimental stage.

Q.    And do you know if any of the lawyers or law firms you have worked with in this case about GLP-1s,

are they working on the JK-07 matter?

A.    No, not that I know of.

Q.    Have you ever done any work for Eli Lilly before?

A.    No.

Q.    Any work for Novo Nordisk?

A.    No.

Q.    You ever received any payments from either of them before?

A.    No.

Q.    In your CV, one of the things that I -- that we saw was that you're a founder and chief scientific officer for Turex Marine Biopharma --

(Clarification by the reporter.)

MR. PREMO-HOPKINS:  T-u-r-e-x Marine Biopharma.

THE WITNESS:  Yes.

BY MR. PREMO-HOPKINS:

Q.    And that's a company in -- drug discovery company?

A.    It was a drug discovery company.

Q.    Is it still active?

A.    It's not active anymore, no.

Q.    And what type of work was -- did you do at Turex?

A.    Turex was -- it was a drug discovery from marine invertebrates on coral reefs.  A place I'd like to be.

Q.    Sounds like a nice place to do research.

Did you wind up developing or commercializing any --

A.    No, nothing was realized.

Q.    You mentioned your lab was next door to Dr. Koliwad's for a period of time.

Do you know Dr. Joseph Campbell who issued the -- Joseph Campbell is actually a philosopher.

A.    A novelist.

Q.    A what?

A.    A novelist, yes.

Q.    Are you -- were you familiar with Dr. Campbell whose opinions you rebutted?  Do you know him at all?

A.    I don't know him.  And I also don't really know Dr. Koliwad.  His name is on the outside of the lab, but I have never seen him.

Q.    Got it.

So in terms of -- you don't have any knowledge that would allow you to develop an opinion outside of the -- about those gentlemen outside of looking at their reports in this case?

A.    That's right.

MR. PREMO-HOPKINS:  And, for the record, Dr. Campbell's first name is Jonathan.

I think that is all of the questions that I have for you.  At this time, Dr. Lansman, I think what I would suggest is we break for a quick lunch and then Novo's counsel will have some follow-up questions.

THE VIDEOGRAPHER:  Okay.  We are going off record.  The time is 11:52 a.m.

(Whereupon a lunch recess was taken.)

THE VIDEOGRAPHER:  Okay.  We are going back on the record.  The time is 12:33 p.m.


EXAMINATION

BY MS. INSOGNA:

Q.    Thank you.  Dr. Lansman, we are back from lunch.  Are you ready to proceed?

A.    I am.

Q.    Okay.  Thank you.

We met earlier today.  My name is Katie Insogna.  I'm an attorney for Novo Nordisk in this litigation.  I am going to ask some questions at this point.  I'm going to go and apologize in advance that it's going to seem erratic because we've covered so much ground this morning that I'm going to be bouncing

around just to close out some things that maybe didn't get touched.

A.    Okay.  That's fine.

Q.    Okay.  Great.

Can I turn your attention to Exhibit 4 for a moment.  That's your materials considered list.

A.    Uh-huh.

Q.    Do you have that in front of you?

A.    Yes.

Q.    Just a couple of questions.  On the first page, underneath certain of the labels for which you've noted label change, you also have a section called "Product Monographs."

Do you see that?

A.    Yes.

Q.    What -- what is a monograph?

A.    Product monograph?  That's like a large document which outlines the uses and adverse effects.

Q.    Okay.  So in this case, is it -- where did you locate the product monographs?

A.    These were, I believe, sent to me.

Q.    Okay.  Is another word for the product monograph the U.S. prescribing information like the label for the medicine?

A.    I don't think it's the label.  It's the

detailed description of the medication.

Q. Okay. Is it publicly available?

A. I would think so. I don't know.

Q. Okay. Okay. I'll come back to that.

You also have down here just a couple of entries under "Designated Confidential Documents Produced by Eli Lilly" and "Designated Confidential Documents Produced by Novo."

Do you see that?

A. Yes.

Q. And these are the only documents from -- produced by the defendants in this litigation that you reviewed in reaching your opinions; correct?

A. Yes.

Q. Okay. And so you didn't -- just to confirm, you didn't review any depositions of any witnesses in reaching your opinions; correct?

A. No. I never got the depositions until after I wrote my report.

Q. What depositions did you receive after you wrote your report?

A. Koliwad and the other one.

Q. You received their reports?

A. Yeah, their reports.

Q. Correct? Okay.

A.   Not their deposition.

Q.   Okay.

A.   The reports.

Q.   Let me ask that again.

Have you reviewed any deposition transcripts in reaching your opinions here today?

A.   No, I haven't seen any deposition transcripts.

Q.   Okay.  Thank you.

You talked -- we can set that aside.

You talked briefly about your prior expert work, including medical malpractice work; is that right?

A.   Yeah, mostly medical malpractice.

Q.   Have you also done patent work?

A.   No.

Q.   No patent work?

A.   No patent work.

Q.   Okay.  Let me show you what we will mark as Exhibit 7 to your exhibit -- your deposition.

(Defendant's Exhibit 7 was marked.)

BY MS. INSOGNA:

Q.   This is going to be a blast from the past, perhaps.

Do you recognize this document?

A.    Of course.

Q.    Okay.  What is this document?

A.    This is a paper I published a while back.

Q.    And it's reflected on your CV; correct?

A.    Correct.

Q.    Okay.  Good.  And you're coauthor on this paper?

A.    Yeah, I was the primary author.  I just put my post doc source; it's the polite thing to do.

Q.    What does it mean to be a primary author?

A.    I concede the experiments; I wrote the paper; I helped with the analysis.  They mostly carried out some of the experiments under my direction.

Q.    Okay.  Great.  Do you recall this paper --

A.    Oh, yes.

Q.    -- as you sit here today?

A.    Oh, yeah.

Q.    Okay.  Okay.  Great.  So I'm going to jump around.  On the first page, which is page 421 of the publication, on the setting, the second sentence under the introduction, you write, "A body of evidence shows that the aminoglycosides inhibit neuromuscular transmission."

A.    Yes.

Q.    And then you've got a parentheses with seven

citations; is that right?

A.    That's correct.

Q.    Why did you cite several papers for this point?

A.    I like to cite -- you know, when writing original research papers, I like to cite the original observations that I did with this study.  So this is kind of a historical context in there.  So they didn't do what I did, but they're the first ones to look at the neuromuscular transmission.  And I think it was like a frog or something.

Q.    Would you agree that more weight is given to a scientific subject when there's a body of evidence supporting that subject?

A.    In general, yes.  I mean, unless, you know, there are -- some of the evidence is fragmentary and, you know, needed further study before you can draw a further conclusion.  That's why I usually go with the history and then, you know, this is my contribution.

Q.    Okay.  Great.  And when you write scientific papers, how do you approach the search and review of literature on the subject?

A.    In this case, it was retroactive.  I get the idea for the experiment and we try it out to see if we can measure what we said we are going to measure,

which, you know, is not always obvious.  I can just take a look at page -- I looked at different antibiotics.  If you look at page --

(Clarification by the reporter.)

THE WITNESS:  Page 424.  Figure 2 at the top, it shows you what a control -- that's a single molecule opening, it's a single calcium channel opening.  When you put the drugs in, it causes a flicker.  It's a single drug molecule going in and coming out.  So we're looking at molecular events.  So you can see they have different patterns, and that was a primary observation for continuing the study that you can actually resolve this at the level of a single molecule.

So that was -- you know, that extends the initial observations for some --

(Clarification by the reporter.)

THE WITNESS:  It extends the observations of, you know, if you stimulate a nerve on a frog nerve going to a muscle, and you put these drugs there, it blocks the muscle contraction.  Okay.  That's nice, but how does it do it?  And so, those references led up to this idea that we could resolve the effects on calcium channels.

BY MR. PREMO-HOPKINS:

Q.  And what's the value of having a control here

like you included on Figure 2?

A.   The control would be just what we see with our new drug.  Obviously, we have -- take as many on the oscilloscope and get as many sweeps.  And you see it stays open for a long time, the channel goes into its open state, and then closes, but you have a lot of time in the open state.  So we put these drugs in, you could see the flickering, which tells you how fast it goes in and out.  So that, you know, showed the feasibility of actually analyzing this in detail.

Q.   I see.  Okay.  Thank you.

So if you turn to 430, the second-to-last page, the paragraph on the right.

A.   I have to say, it's beautiful data.

Q.   Wonderful.  The paragraph that begins, "The pore blocking."

A.   Let's see.

Q.   On 430.

A.   Where is ...

Q.   So you start the paragraph that begins --

A.   The mechanism block?

Q.   In that section on the right side of the page.

A.   Oh, the pore blocking.

Q.   Do you see that paragraph?  And then if you

go down ten lines, go to the sentence that begins "To account for."

Do you see that?

A.   That's right.

Q.   Okay.  You can just read that sentence and then you've got, it looks like, two citations and then you have also a but see, and then you have one other citation.

Do you see that?

A.   Yes.

Q.   Why is it important to include a but see?

MR. PENNOCK:  Objection.

THE WITNESS:  I have to look at what -- what the but see was.  It was a long time ago.

MR. PENNOCK:  She means --

BY MS. INSOGNA:

Q.   In general.

A.   In general?

Q.   In general.

MR. PENNOCK:  That's my objection.

BY MS. INSOGNA:

Q.   Let me ask it this way --

A.   In case there was conflicting evidence.

Q.   Okay.  So it's important to account for the entire universe of evidence on a subject?

MR. PENNOCK: Objection.

THE WITNESS: I wouldn't use the word "entire universe," but if there's one outstanding paper that shows something that may influence the interpretation, then, you know, you would put that in. But no, not the whole universe of ...

BY MS. INSOGNA:

Q. Let me go back because I think I was -- I think we are talking over each other, so let me make sure my question -- let me get my question clear.

Would you agree that it's important to account for conflicting evidence on a subject in a research paper? Yes?

A. I would say it depends. In a paper like this, this is biophysical. I mean, this is a physical measurement. You know, I'm not, like, injecting a drug into a mouse and, you know, seeing if it falls over or swims fast or something like that where there's a million things. This is like physical chemistry. We're measuring the absolute rates of a drug that have an open channel.

So if I think it's an interesting paper, and I have to look what the paper -- what paper I was referring to, the but see paper, I know it has -- what was the name of the person? Just give me a second.

Let's see. Armstrong. Okay. Yeah. That was -- that but see paper is -- is -- is a classic paper in the field which shows a slightly different mechanism. So it's not like trying to show everything that's been done on this, but it is showing a paper that used a different drug from the inside of a cell to look at blocking.

So this was extra -- outside the cell blocking. So I put that in there just 'cause I thought it was a good paper that someone should look at because it basically -- it's not really a but see. It's you should look at this because it is relevant to this kind of phenomenon.

Q. Okay. So, but you agree that in this -- in a -- in general, in your scientific work, you include the relevant information on a subject that may not comport with your findings --

MR. PENNOCK: Objection.

BY MS. INSOGNA:

Q. -- to be scientifically rigorous and honest --

A. No.

Q. -- correct?

A. No. No. The point is for me to -- is to point out a paper where blocking of ion channels --

blocking of ion channels was studied earlier with a different technique, and I wanted to point that paper out just because I like that paper.  So it wasn't like I was trying to be complete or anything.  I could have left that out.  I didn't feel a need to put that in.

Q.    Okay.

A.    And in fact, you know, it supports our model.

Q.    How, if at all, did you write your report in this litigation differently than you would write scientific papers?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, scientific papers start with the data.  You know, you first make sure your data is good.  You get the data that's out.  You put -- you make figures and you write the results.  So you are not looking at the literature right then.  You're writing the results.

Then you go back and, you know, you write an introduction and putting in references that you think, you know, would be interesting to the reader to provide context.

BY MS. INSOGNA:

Q.    And that's not what you did here because you didn't perform any new, for example, laboratory tests in reaching your opinions here?

A.    No.    This was not a -- I wasn't experimental -- I wasn't doing experimental work and, you know, I didn't have to create a narrative for, like, why do it and how does it fit in, you know, because when it goes to a journal, they want to know how it fits into the journal's, you know, standards or what they want to publish.

Q.    Okay.    In what other ways did you write this report similarly or differently than how you would write scientific papers for publication?

MR. PENNOCK:    Objection.

THE WITNESS:    Well, I think I just said that, you know, I would start with the results.    I don't have any results when I'm writing a review article, basically, which was my report.    So I would go in and, you know, read the papers I thought were interesting and try to decide what the important concepts were.    So really, you know, my report is a conceptual, you know, of a conceptual -- not conceptual.    It's a scientific report of, you know, what we know about the pharmacology of these drugs.    And some of it is kind of basic pharmacology.    It's been around for a long time, the cyclic --

(Clarification by the reporter.)

THE WITNESS:    The cyclic AMP pathway is not

unique to GLP-1 receptors.  It's activated by beta receptors, beta adrenergic receptors, so ...

BY MS. INSOGNA:

Q.   Have you ever written a review article outside of this litigation?

A.   Yeah.  Usually on my own work.

Q.   So you are, in those cases, summarizing your own data and research?

A.   Mostly, yeah.  Most of the research -- I've had a couple, which it usually -- yeah, I have stayed away from writing general reviews just because they don't count in an academic environment.  They want original research.

Q.   I see.

So what you've done here in this in preparing your expert report is different than what you typically did in your scientific practice --

MR. PENNOCK:  Objection.

BY MS. INSOGNA:

Q.   -- right?

MR. PENNOCK:  Go ahead.

THE WITNESS:  Yeah.  It has to be different because I don't have any -- I don't have any original data I have to explain.

/////

BY MS. INSOGNA:

Q.   Okay.  I think I know these answers, so -- but I'm going to -- I will ask them anyway just for completeness.

You didn't perform any new clinical tests to verify your litigation opinions; correct?

A.   No.

Q.   Okay.  And you didn't perform any laboratory tests to verify your litigation opinions; correct?

A.   No.

Q.   And you did not perform any computational tests to verify your litigation opinions; correct?

A.   Was there any computational -- no, there was none.

Q.   And have you published any papers that have reached the same conclusion as your opinion in this litigation?

A.   No.

Q.   And have you taken any steps to submit your opinions in this litigation to peer review?

A.   No.

Q.   Okay.

A.   Heavens, no.

Q.   Why do you say that?

A.   Heavens, no.  There's enough reviews out

there.

Q.   Okay.  Fair.  I would like to turn briefly to your rebuttal opinion, if you wouldn't mind, Exhibit 3.

A.   Uh-huh.

Q.   I just want to make sure I understand what you mean on page 1.  In response to Dr. Koliwad's opinion, you say, "I did not offer an opinion that injuries are permanent or irreversible.  That characterization by Dr. Koliwad is simply without basis."

Did I read that correctly?

A.   Yes, you did.

Q.   So I just want to confirm, consistent with what I think your opinion was earlier, that there's only an effect of the medicine when the GLP-1 receptor is activated; correct?

A.   Yes, exactly.

Q.   So you're not aware of any evidence that the effect persists after medication cessation; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I can still answer?  I didn't form an opinion on whether there were long-lasting effects after medication that is out of the body.  I start from the premise -- basic premise of pharmacology is that it's, you know, the drug works when it's bound

to its receptor cell.  It goes back to A.V. Hill in 1898 in Trinity Hall in Cambridge.  You have to have --

(Clarification by the reporter.)

THE WITNESS:  The receptor has to be occupied for a physiological effect.

BY MS. INSOGNA:

Q.  So you don't have any effect -- you -- let me just make sure I understand this.  You don't have an opinion on whether the effect persists after cessation; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I couldn't make that based on the receptor pharmacology that I was basically focused on.

BY MS. INSOGNA:

Q.  That's outside the scope of what you were asked to look at?

A.  Well, it's outside the scope of the receptor pharmacology that mediates the effects of the drugs.

Q.  So your opinions are limited to the time when the receptor is activated; correct?

A.  The time that the drug is in the body.

Q.  And you're aware that different of the medicines in the GLP-1 class have different half lives?

A.  Oh, absolutely.

Case 2:24-nd-03094-KSM    Document 691-30    Filed 05/19/26    Page 107 of 156

Q.    And is that the relevant time period for you with respect to in the body?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, you would take the half life and you say five half lives is out of the body; right?  That's the working idea.  Maybe still a little bit left, but it's an exponential from the line. Exponential.

BY MS. INSOGNA:

Q.    So you're not opining that GLP-1 can cause permanent damage to any cells in the body; correct?

A.    No, I never had that opinion.  Never had held that opinion.  Never even considered that opinion.

Q.    Okay.  Okay.  Let's turn to your -- back to your report, Exhibit 1 or Exhibit 2.

Okay.  And on page 3, you discuss your methodology; right?

A.    Uh-huh.

Q.    Okay.  And you first conducted a literature review; right?  You say, "I approached the review of the literature in the same manner as I would writing a scientific article; correct?

A.    Yeah.  That's mostly correct.  It's a good approximation.

Q.    Okay.  How would you clarify it to make it

more correct?

A.   Well, I think, you know, I can come up with an idea for an experiment just based on what I know without consulting the literature.  I don't consult the literature often.  You know, if I think I can do something technically that's difficult that would show something, then I'll do it.  I consult -- so it would be a little different here.  I have to, you know, go through the literature.

And, you know, PubMed -- PubMed mostly, since the only benefit of being emeritus is I can still access the PubMed through UCSF.  I put in the key words for things I want to look for, and, you know, I start -- I start my reading.

Q.   That was going to be one of my questions was whether you still had access through UCSF, so thank you for covering that.

Does that mean that if a paper you find on PubMed has a -- requires a subscription or there's a pay wall?

A.   I get past the pay wall.

Q.   You get past the pay wall?

A.   90 percent of the time.

Q.   Did you have to pay for any of the articles you reviewed here?

A.    No.    I think I was able to get most of them.

Q.    Okay.    And then you've got a list of the search terms at the -- on page 3; is that -- is that correct?    Those are the terms you used for your PubMed and Medline searches?

A.    Yeah, I probably used all of those and probably others at different times.

Q.    Okay.    And so this was a search that you used to find the literature that wrote -- that are reflected in your report?

A.    Yeah.    Yes.    PubMed is slow because you have to go through thousands -- my tolerance is hundreds -- before, you know, and get, you know, really not waste time on the bad papers.

Q.    What would be considered a bad paper?

A.    In a journal I never heard about.    That's if I look at the paper and I see the data looks poor. Poor quality data, things, like, that you have done research for a long time, you pick up on very quickly.

Q.    You mentioned later in this section that you selected "articles in tightly peer-reviewed journals with a high impact factor."

A.    That's right.

Q.    Is that right?    That's what you did?

A.    Yeah.    I -- I aim for the journals that are

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

hard to get into because they're reviewed so carefully,

so tightly reviewed means -- and then you know that,

you know, these are people in the field who wrote the

paper, they criticize it with inside knowledge not to

the extent of someone who doesn't know anything about

what they're commenting on.

Q.   And what are some high impact factor

journals?

A.   Nature journals, science journals.  And

they've expanded.  Nature reviews, science report

reviews, and then there are the specialty journals like

my field, the Journal of General Physiology, the

Journal of Physiology, and then you go down the ladder,

you know, to the journals that publish pretty much

everything.

Q.   When you say "high impact factor," that's --

that's a numerical rating; right?

A.   Right.

Q.   And how do you locate that?  Is there a

database where you can identify the impact factor?

A.   Yeah, there are.  There are impact factor

ratings for journals.

Q.   Okay.  In your mind, what's the threshold for

high impact?

A.   Well, it's a loose criteria.  I don't set

strict criteria. You know, I know the journals where the best people publish, you know, the really knowledgeable scientists who do really good science with Nature and Science, other journals. What was -- what was the rest of your question? How do I determine whether it's high impact?

Q. What's the threshold? What's a numerical --

A. I don't have a threshold.

Q. Double digits?

A. You know, impact means how many -- how many references it gets from other people, and so high impact would be the ones who get, you know, if you're publishing in that journal -- but it doesn't guarantee you're going to get a lot of references. Sometimes it's a really good scientific article but nobody cares about it, but you know it's very well peer-reviewed and any problems have been addressed and the data is reliable.

Q. So I just want to make sure if I were to try to recreate your work here, could I apply a criteria to identify what a high impact factor journal is?

A. You could. You could. The papers that I used I considered the data credible. Not everything is going to be in Nature or Science.

Q. Okay. But if I were to try to do it

independently, what are the criteria that you used? I'm -- you told me it's a quantitative factor, the high impact -- the impact factor. I'm just trying to figure out what you mean by that if I were to try to recreate it.

A. It's a number given for the relative -- for the number of the references each paper gets, and it can vary between journal articles in the same journal. So it's just a rough indication of the impact that journal has in terms of other people referencing that paper. And so, you know, in this case, for example, when it came to like atomic resolution studies for --

(Clarification by the reporter.)

THE WITNESS: The -- the structural -- the molecular resolution studies that included cryoEM, c-r-y-o, cryo, electron microscopy, and x-ray, crystallography, where they're looking at the atomic properties of the atoms in the receptor, and how the agonists line up in the receptor. And, you know, this is atomic dimension, so it's not -- it's not really -- it's -- it's a physical measurement in a sense, you know. It's not like our, you know, hypothesis this would cause this kind of effect.

It's like what does it look like in its binding site to the best of our resolution? And the

criticisms that come to that are what temperature did you freeze, you know, the receptor at?  So they become very technical.

BY MS. INSOGNA:

Q.   Do you remember my question?

A.   You can repeat it again.

Q.   Okay.  I think we got afield there, so let me ask it again.  I'm just trying to understand why you chose to describe your literature review and selection of articles as those limited to tightly peer-reviewed journals with a high impact factor.  Okay?

A.   Okay.  That's just a way of saying a good journal that's reliable, where you can -- you know, for the most part, you can believe that they've been reviewed carefully, and people, you know, spend a lot of time reviewing it because good journals people will spend a lot of time reviewing an article, and you know that any obvious mistakes are not going to be there.

Q.   Okay.  And is this something that is kind of an objective criteria or you know it when you see it --

MR. PENNOCK:  Objection.

BY MS. INSOGNA:

Q.   -- in reviewing the articles?

A.   Well, it's a little bit of both.  You know, good journals tend to have good papers if they have

Jeffrey Aunsman, Ph.D.                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

good reviewers or are very critical.  Bad journals tend to have a lot of bad papers.  So the impact factor isn't a deciding thing.  I might come across a paper where the results are quite good and they may not be in, like, a fancy journal.

In that case, I will look at the results and see how they were done.  Like the one report from Lilly showing changes in cyclic AMP using fluorescent probes was actually a very well-done paper.  So, you know, I don't remember the journal.  It wasn't what you called high impact.

Q.   So -- so you weren't limited in your selection to tightly peer-reviewed journals with a high impact factor?

MR. PENNOCK:  Objection.

THE WITNESS:  I would say that I start from that, you know, certainly for reviews and, you know, oversight, you know, the overview.

BY MS. INSOGNA:

Q.   And focusing in on your adverb "tightly" in the phrase "tightly peer-reviewed journals," what does that mean?

A.   Tightly?  Carefully.

Q.   Okay.  Is --

A.   Carefully and with great, you know, effort --

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 115 of 156
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Okay.

A.    -- to find flaws.

Q.    And how do you know when an article is tightly, peer reviewed?

A.    Well, I don't get to see the reviews, and I don't know what corrections were made.  But if I read the article, and I can see the data is reliable, which is a big problem with all scientific studies, the data is just not reliable.  You know, it's full of artifacts and all kinds of things.  You know, I know that's not -- in a tightly, peer-reviewed journal, you're not going to find papers where the data is questionable.

Q.    Okay.  Is there -- is the antonym to this a loosely, peer-reviewed journal or not peer reviewed at all?

A.    I mean, there are journals like that.  Now there's a big explosion in these open-access journals where you pay a lot of money to publish.  So yeah, the scientific literature is full of junk now.  It's gotten worse in the last ten years.

Q.    So do you have an example of a loosely, peer-reviewed journal?

A.    Yeah.  Things like there's an open-access journal called NDPI.  Sometimes you get some good papers in it because it's fast.  The faster it is, you

know, the more superficial the review; right?  That's my, you know, gut feeling, you know, but sometimes there are good papers in there.

Q.   Okay.

A.   It's an open-access journal.  You have to pay a certain amount of money.  And then I always get papers from them to review because they don't have experts in every area, you know, where something like the Journal of General Physiology, I know exactly who to go to, and I respect their work and they're really good scientists.

Q.   Why is peer review important in the scientific field?

A.   Peer review?  It's important to make sure you're not making any either conceptual or experimental mistakes.  I would think the most important thing is experimental mistakes, that you think you're doing something -- for example, this paper, why we're here is a very -- is a very good one, because one of the things that came up was towards the end after I did everything, I looked at this, and I said, what happens if our water is contaminated?  What if that's not aminoglycoside?

It's not the amino -- the antibiotic that I was studying.  Family of antibiotics.  So maybe it was

something like zinc in an anabolic concentration or iron or something, because, you know, when you triple distilled water, you can still have contamination.  So we did an experiment where we put a chemical in, which was a chelator, it binds to metals.  So we knew there was no metals.  We got the same result.

So that's the kind of thing that this could have been completely false had it been a contaminant.

Q.   Was that flagged for you through the peer review process.

A.   No, that was my own.

Q.   You peer-reviewed yourself?

A.   Well, yeah, you know, I was thinking about it, and I -- by God, this could be contamination that happens all the time.

Q.   I want to focus on peer review in the -- in the way you've described it in your report on page 3, which I think is a little bit different than what you just described.  So how, as a scientist -- strike that.

Would you rely on non-peer-reviewed literature in your professional work?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

THE WITNESS:  I don't know of any non-peer-reviewed -- I would -- I would not use -- I

Jeffrey Aaronson, Ph.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

would not reference a non-peer-reviewed article.  And there are journals I would avoid.  I mean, I get these requests to be an editor of some obscure journal that never existed, like International Journal of Molecular Cellular Pharmacologic Neurobiology and Endocrinology, and, you know, they just make up these journals, so you never know what you're going to get.

Q.   What about abstracts?  Would you rely on an abstract in your professional work?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

THE WITNESS:  I don't search for abstracts in my work.  If I happen to go to a meeting and someone is doing something really exciting and I know the person and I know the work, I might cite their abstract.  I don't think I have ever cited an abstract, except my own.

BY MS. INSOGNA:

Q.   Okay.  Can I go back to the monographs for a minute?  I'm still just trying -- I'm puzzled what this document is.

A.   Yeah.

Q.   And how it's -- is there anything else about the document that you remember -- any of the documents that -- that can help me --

MR. PENNOCK:  I can provide copies.

BY MS. INSOGNA:

Q.    -- figure out what it is.  What is it?

A.    I'm sure I looked at them, but I don't remember, because it's such a dense piece of text that has everything under the sun that, you know, doesn't follow any, you know, logic other than probably legal disclosure.

Q.    Do you know who prepared the document?  Who would have prepared the document?

A.    If it was a product monograph, it would have to come from the company that developed the drug.

Q.    Is it a U.S. document or an international document?  Do you know?

A.    I don't know.  I'm not involved in, like, you know, the pharmaceutical industry.

Q.    Okay.  These were -- let me just back up, maybe.  These were documents that were provided to you?

A.    Right.

Q.    You didn't go out and look for these?

A.    No, I didn't look for them.

Q.    Okay.  I'll ask later.

Now, back to your methodology in your report. You've got a list of the search terms.

When you say GLP-1 receptor agonists in your

report generally, which ones are you talking about? Which ones do you mean?

A. When I use that as a search term, I'm looking for whatever comes back under GLP-1 receptor agonists. So it may include, you know, two or it may include all. Usually doesn't include all.

Q. I see that you include four by name. Semaglutide, liraglutide, dulaglutide, and tirzepatide; is that right?

A. Yeah, those are the ones I initially focused on.

Q. Did you expand your search to others you located?

A. I have to see. I first looked at the most -- the common ones. There was --

(Clarification by the reporter.)

THE WITNESS: I'm just talking to myself. Those were the ones I mostly focused on because that covered most of the territory.

BY MS. INSOGNA:

Q. You didn't search for lixisenatide, for example?

A. That came up in one -- in one probably GLP RA and it had some interesting properties, but I didn't include a full discussion on that.

Jeffrey Lansman, Ph.D.  CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   And what about -- you didn't include albiglutide in your search, either?

A.   No, I didn't do that one.

Q.   Was that part of your analysis here, that one in the class?

A.   I don't think I mentioned that in this report.

Q.   What about others that were researched, but never marketed?

A.   No.  I don't think I looked at those.  I was looking for the ones in clinical use.

Q.   And so -- and your -- the focus of your report when you talk about GLP-1 RAs is the four that are listed here in your search terms; correct?

A.   Yeah.

Q.   Okay.  And you're aware that each of these medicines has different indications; correct?

A.   Yeah, slightly.

Q.   And different dosing regimens; correct?

A.   Definitely.

Q.   Definitely.

And different half lives?

A.   Definitely.

Q.   The -- the different dosing regimen didn't play a role in your opinions in -- in this report;

correct?

A.    No.  Because -- simply because dosing regimens are related to, like, receptor binding and receptor occupancy in effect, and they have to be set by the onset -- the concentration which you get beneficial therapeutic effects and the concentration which you start getting more adverse effects, because they're both based on binding to GLP-1 receptors.  It's standard that you are -- are going to see more adverse effects at higher concentrations.

Q.    That's a general statement, not specific here.  That's a general scientific statement?

A.    That's a general pharmacology statement.

Q.    You didn't do that research specifically here with respect to GLP-1 RAs and adverse events?

A.    I didn't look at the dosage ranges except in terms of -- no, I actually didn't look at the dosage ranges.  I was more concerned about the binding concepts, what's the binding to the receptor?  What's the path maximal efficacy?

Q.    Okay.

A.    And that pretty much describes behavior of the drug.  And dosing is -- is decided during clinical trials from trial and error.

Q.    Back to your evaluation of the literature and

the journals from which you decided, I think you -- you said that Nature reviews is a high impact factor journal?

A.   That's right.

Q.   And what about -- strike that.  We'll keep moving.

Let's go back to your report on page 25.  Do you have that in front of you?

A.   Uh-huh.

Q.   No.  Sorry.  On page 8 -- we'll start on page 8.  Do you see those?

A.   Yes.

Q.   So you have got, first, a figure at the top with GLP-1, 7-36, and then --

(Clarification by the reporter.)

BY MS. INSOGNA:

Q.   GLP-1, (7-36,) and then you've got exenatide, liraglutide, semaglutide, dulaglutide, and albiglutide.

Do you see that?

A.   Yes.

Q.   Did you create this graphic?

A.   I believe I did, but it was based on a published amino acid sequence.

Q.   Okay.  I don't see a citation, so I'm trying to find from where you got it.  You're saying you

created that?

A.    I didn't make it up.  I mean, I looked at the amino acids.  A lot of times, they give it to you in, like, a linear fashion.  Like the drawing on another page, where it shows the full length with the positions.  This just lists the amino acids for comparison.

Q.    Okay.  And then the figure below, likewise, is the attached groups; right?

A.    Yeah, that was generated -- it's not meant to be down to the last angstrom, but this is my summary of, you know, how these things become oriented and where particular groups are located.

Q.    And where did this -- this graphic come from?

A.    This came from a constellation of -- of the atomic resolution studies cryoEM, and electron microscopy. cryoEM and actual crystallography.

Q.    I don't see any citations in this section, so is it the studies you have cited at the beginning on page 7, the bottom paragraph on page 7?

A.    Now, what was the question there?

Q.    Let me ask it this way:  Did you create the graphic at the bottom of page 8?

A.    Yeah, I created the graphic.

Q.    Is there like a computer program that creates

this imagery?

A.    There are lots -- yeah, there are programs that, you know, you give it the parameters, and it will generate a rough diagram.

Q.    What's the -- what's the name of the computer program that you used to generate the diagram on page 8?

A.    I don't exactly remember.

Q.    Is it something that you have access to through UCSF?

A.    No.  It's not that high level.  UCSF would be like a high level.

Q.    Is it something like ChatGPT?

A.    Yeah, it wasn't Chat, but it was something like that where I could put in the papers and ask it to draw it and then compare it to the papers.

Q.    Not ChatGPT.  Was it Claude?

A.    Could have been Claude.

Q.    Claude.  Okay.

A.    Perplexity.

Q.    Okay.  And do you recall what studies you submitted -- you input into Claude or Perplexity to have the AI program generate these six graphics?

A.    I think I remember putting in a couple papers and just, you know, telling it to, you know, show the

general orientation of the alpha helicis with these compounds and receptor.

Q. Did you use the same program to create the table at the top of page 8?

A. Probably -- I probably asked it to just list the amino acids using the amino acid abbreviations rather than a lot of times they just use a single letter for amino acid, which is hard to -- for people to understand it.

Q. Okay. And then on page 9, I see another graphic here, again without a citation. So is this another graphic that was generated by Claude or Perplexity?

A. Actually, I think this came from the paper, but it wasn't cited, just by mistake.

Q. So you think this is actually from a paper and you omitted a citation?

A. Yeah. I think that's possible. I don't remember.

Q. What paper do you think this came from?

A. I can't recall. I would have to go through all the references to see where it came from.

Q. Okay. Is this the only image in here for which you're missing a citation? Because there are others without citations. I'm just curious, is this

the only one that came from an original reference?

A.    Yeah.  On 14, the signaling pathway, that's -- that I just drew using -- because that's -- that's kind of in every textbook in the world.  And the plots, I just took the ECGs and told it to plot out, you know, a binding curve using the half -- you know, the half -- using the KD which is the half -- the concentration which half the receptors are occupied.

Q.    Okay.  Let's go through -- that's -- that's so helpful.  Thank you.

So let's just go back to page 14 and start here.  You said the graphic on the bottom you created?

A.    Well, the form of this is probably virtually in every paper that talks about cyclic AMP.  This is, you know, kind of college textbook kind of cartoon.

Q.    Understood.

How did the graphic here with the colors and the shapes come to be?  Did you create that?

A.    No, I didn't do it.  I think it was either -- I think it was Perplexity that I told it to draw the cyclic AMP cascade and show receptor internalization and beta arrestin.

Q.    Okay.  And then, the table above that, you've got three columns and four rows.

Do you see that?

A.   Yes.

Q.   Okay.  And this was also created by Perplexity?

A.   It might have been, yeah.  I think so.

Q.   Why do you think that?

A.   Because I wouldn't have embedded -- embedded the references like that.

Q.   That was going to be my next question because those references don't line up to the -- to the reference numbers you have got here.  So were those the documents that you gave to Perplexity and Perplexity created this table?

A.   I don't -- I think Perplexity gave the references, and I asked it to put in the signaling pathways and clinical uses.

Q.   So you asked Perplexity a question, and it generated these references.  And then you asked Perplexity to take those references and create this table; is that right?

A.   No.  I asked it to create a table, and it gave those references.  I believe that's how it worked.

Q.   When you asked it to create a table, what information did you give to Perplexity?  Did you just ask them to -- did you ask for the things that are on the X and Y axis here?

A.    Yeah.  In other words, native GLP-1 signaling, what's the primary coupling?  What are the cyclic AMP factors?  Things that cyclic AMP activates.  What type of trafficking do you see?  And what's the functioning bias?  It's really a summary of lots of papers.

Q.    I see.

So you asked Perplexity this question, and it generated the table with the references?

A.    It put references in.

Q.    Okay.  And then you didn't go through and double-check each of those?

MR. PENNOCK:  Objection.

THE WITNESS:  I checked the answers.  These are the answers you would expect.

BY MS. INSOGNA:

Q.    Okay.  You just didn't delete the references?

A.    Yeah.  I forgot to delete the references.

Q.    And do you still have the searches, the search history that you -- that you conducted --

A.    I'd have to --

Q.    -- with Perplexity in creating your report here?

A.    I would have to look.  I don't know.

Q.    And then on page 15, you said you also

created this graphic; right?

A.    Yeah.  This was easier because you just take the KD values and you ask it to draw --

(Clarification by the reporter.)

THE WITNESS:  You -- you -- you enter the KD, which defines the half activation point.  And then you ask it to fill in the one-to-one binding curve.

BY MS. INSOGNA:

Q.    Was this also Perplexity or was this Excel?

A.    This wasn't Excel.

Q.    I'm sorry, it was not Excel?

A.    Yeah.

Q.    Okay.

A.    And the point was really just to show that these things do act in different concentration ranges. This is not kind of a big quantitative argument on the mechanism or anything.

Q.    And what -- where's the data that went into creating these different curves?

A.    Again, the curves are general.  They're a general form that are used for fitting dose response data for one-to-one binding.  But the critical variable you have to put in is the KD, the half activation level.

Q.    Okay.

A.   So what you're looking at is the shift curves along the concentration axis.  And this just shows the main point is that they vary in the agonist concentration which is effective.

Q.   Can you show me in your report where the KD is, where the KD figures are?

A.   I don't have a KD figure.  I mean KD is simply too close to this, is -- between .4 and .6 is .5.  You just draw a horizontal line, and that gives you the KD.

Q.   Okay.

A.   That's the half activation level.

Q.   All right.  I'm going to apologize in advance because I'm not understanding this.  And I -- I am virtually certain this is on me.  So can you walk me through again what data you input or what your request was of the program to generate this graphic on page 15 of your report?

A.   Yeah, for example you would say GLP-1 has half activation level of 5 to minus 11.  Tirzepatide has a different one, a value for half activation.  You enter those values, you just ask it to draw the curve, the response curve to that one point.  So you're not fitting any points; you're just drawing an expected dose response curve given the position on the X axis.

Q.   Okay.  Thank you.

So where is the half activation level that you input?  Where can I find that in your report?

A.   I don't have -- I didn't put that in there. I just put that in there to show -- I mean, to me -- maybe I'm too close to this.  But to me, you derive the half activation simply by drawing a line from .5 through here, to this, this, this, this, this, and this.  And then the curve just gets generated using the standard binding curve.

Q.   Don't steal his pen.

So I think I'm still not understanding what the original data input was to create this.  I appreciate you saying you create a line at .5.

A.   Oh.  The data would be the value at .5.  So for -- let's say for, like, semaglutide, we know in the literature it's very reproducible that, you know, the half maximal concentration would be somewhere between tenth of minus 12, tenth of minus 13.  So you have that value.  And that's from the literature.  It's repeated many times in many experiments, you know, there may be slight variations, but not very big.

Q.   That's information that's not in your report; right?

A.   No, I didn't put the numerical values in.

Q.   That helps to answer that.

A.   The point was not to make it quantitative, but to show the qualitative.  There are differences in potency and binding.

Q.   And that's what you have done because each of the -- at least five GLP-1 RA medicines that you have included here are different at .5?

A.   That's right.

Q.   You didn't include all of the GLP-1 RAs in a class, though, correct?

A.   Not every one, no.

Q.   On page 17 of your report, there's another graphic.

A.   Yeah.

Q.   How did you create this graphic?

A.   It was the same thing.  I mean, I asked to be given -- I had a group of atomic structure papers because I had a lot of good ones, and I said just orient -- provide, you know, the receptor structure and basically, you know, orient the drug molecule within -- within the transmembrane domains.

And, again, this is not meant to be quantitative.  The atomic resolution studies are extraordinarily complex.  You are looking at x-ray diffraction patterns and, you know, bind angles and,

you know, to put that out there would -- I was going to do that, but no one would understand it.  And so I really -- you know, these are cartoons to show that what the variation is to be up front and say they are not all alike.  They do bind slightly differently depending on their structure.

And, you know, these are the kinds of probable orientations.  GLP-1 should be the closest to perpendicular.  The rest will bend out or bend a little, and you can see the transmembrane domains will accommodate those bends, and that determines the efficiency coupling to beta arrestin or cyclic AMP to the G protein.

So, again, you know, cartoon illustration to illustrate a very complex point.

Q.   Just so I'm understanding, the shape of the colored lines on page 17 is meaningful to your point; correct?

A.   The shape of the colored lines?

Q.   Yes.

A.   Mostly the orientation of the colored lines. The shapes are supposed to indicate Alpha helices.

Q.   So the gray behind or the squiggle pattern is supposed to?

A.   Well, I mean, the drugs have an alpha helical

section, too, and that's what aligns in the binding pocket.

Q.    And the length, is that meaningful in any way?

A.    The length would be meaningful if they were longer drugs.

Q.    And --

A.    They'd have bigger groups.

Q.    So when you asked Perplexity to create this cartoon, did you give it --

MR. PENNOCK:  Objection.

BY MS. INSOGNA:

Q.    -- data to generate this or was it a qualitative request?

MR. PENNOCK:  Hold on a second.

Note my objection.  Did you call it a cartoon?

MS. INSOGNA:  His words.

MR. PENNOCK:  Is it a cartoon or a figure?

MS. INSOGNA:  His words, cartoon.

MR. PENNOCK:  You called that a cartoon?

THE WITNESS:  Well, I mean, that's what we call it in textbooks.

MR. PENNOCK:  That's what you call them in textbooks?

THE WITNESS:  Yeah.

MR. PENNOCK:  Okay.

THE WITNESS:  If it's illustrative for teaching, and not -- you know, I mean, something like this if you were to show it in the original form would be indecipherable to everybody.

MS. INSOGNA:  Let me ask my question again. We got sidetracked on the cartoon.

BY MS. INSOGNA:

Q.   When you asked Perplexity to create this cartoon, I just want to confirm, you gave it a qualitative request, not a quantitative request; correct?

A.   Well, I don't think it is a dichotomy.  I asked it to do it as accurately as possible given the atomic structures.

Q.   You gave it the atomic structure?

A.   Yeah.

Q.   Or did you tell it to go find the atomic structure?

A.   No, no.  I gave it the -- the references that I thought showed.

Q.   Okay.  What references were those?

A.   I didn't -- again, I didn't note -- these here.

Case 2:24-cv-03094-KSM    Document 691-30    Filed 05/19/26    Page 137 of 156

Q.   Okay.  Can you talk me through your process to confirm that the output of the graphics from Perplexity were accurate?

A.   Again, depends what you mean by "accurate." But in terms of what we know about the groups that are added to these molecules, and, you know, how they would fit into -- into the extracellular domain, then these would be accurate.  We would know that, you know, some of them are slightly tilted which tilt -- which tilt the transmembrane domains, which allow the G proteins to bind.

Q.   Did you go back for each of these graphics and compare the original data in the study with the output?

A.   I did.  I did look at the original.

Q.   For each of these graphics or just certain of them?

A.   This one, it doesn't matter.  This comes from a single data point.  Let's see what else.

MR. PENNOCK:  Sorry.

THE WITNESS:  And this lined up with pictures that -- you know, other pictures from other papers about how they -- how they -- how the drug lines up with the alpha helicis.  But more important, I wanted to show where the groups were.  It was more -- again,

it was illustrative to show where, for example, for native GLP-1, you know, shows you where C16 is. Semaglutide, you see where the C18 acid is, the diacid, which keeps it in the bloodstream longer. You see the AIB6, which is amino isobutyric. It's not a naturally-occurring amino acid, but it prevents breakdown by dipeptidyl peptidase, which is the main enzyme which breaks down these drugs.

And so it was really to illustrate where these things lie in relationship to the receptor helicis, because that's important. I mean, you know, trying to give people an understanding of how these things look in three dimensions. If you include all the data, again, it's going to be imperceptible.

BY MS. INSOGNA:

Q.    Understood.

So you had reviewed the studies before you gave them to Perplexity to generate these graphics, and then when you received the output graphics, it looked consistent with what you expected?

A.    Yeah.  In fact, I used -- I used the original articles first.  And I put them in there, and I said no one's going to understand this.  And I am not going to be able to explain it.  So, you know, put it in a form where it's user friendly and can illustrate the points

and, you know, that are made in the text.  Because I wanted -- I wanted, you know, one of the things I was concerned about is, you know, there -- that there are slight variations in how they bind and activate, and you can trace those variations back to structural details.

And I don't think anyone wants to hear, you know, a two-hour lecture on cryoEM studies and, you know, all the bond angles you have to measure and all the things that can go wrong, so this just gives a rough idea.

Q.   Absolutely understood.

In any of the graphics that were output from Perplexity, did you make any changes?

A.   They probably went through iterations until I was happy with -- you know, with what came out and it was accurate.

Q.   Iterations with Perplexity itself?

A.   Yeah.  Iterations -- I would do it over and over again because nothing ever comes out right the first time.  And when something came out in a -- you know, represented, you know, the hard data, then -- then I used it.

Q.   Okay.  Great.  In what other ways did you use Perplexity in writing your report here?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Actually, I didn't use Perplexity.  I didn't use anything very much back when I wrote this report because I didn't trust them with the models.  I think they have gotten better since then.  I did use it to gather research on the atomic resolution.  I gathered papers from PubMed, but then I wanted to see if there's a consensus.  So I researched other research papers for atomic resolution.

Q.    And did it generate any additional papers?

A.    Yeah.  It gave me a couple other papers.  And not so tightly peer-reviewed, but good, decent journals because, you know, they came along second or third in the structure bin.

Q.    And when you -- when was it that you were doing your paper writing?

A.    I think this is dated -- what's the date of this?  This is a while ago.

MR. PENNOCK:  What's your question?

MS. INSOGNA:  Approximately when was he writing this paper?

MR. PENNOCK:  The report?

MS. INSOGNA:  Yeah.

BY MS. INSOGNA:

Q.    It's dated January 1st, 2026.

A.    Yeah, that's right.  We had a deadline of

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 141 of 156

January 1st.  I was given a deadline.

Q.    You said that you -- the reason I ask is you said you didn't use Perplexity much beyond what we have already described because you didn't trust it back then.  You think it's gotten better since then.  So I'm just trying to place in time when you were working on this report.

A.    Yeah.  I don't know when the shift was.  I think it was the most recent release of ChatGPT and Claude and the new ProMax Perplexity where it became a little more reliable and controllable.  Actually, more than reliable; it's controllable.

Q.    What do you mean by "controllable"?

A.    The people that put in -- a lot of times put things in and ask a lot of questions.  A lot of times you have to set up the parameters like you're writing computer code.  And, you know, you can have -- you can have -- tell it to, like, go back and check against the atomic structures and tell me what differences you see.  And then if you see any differences, you correct it.  So it's an iterative process.

Q.    Okay.  I don't see --

MR. PENNOCK:  Can we take a break?

MS. INSOGNA:  Sure.

THE VIDEOGRAPHER:  Going off record.  The

time is 1:42 p.m.  We are off record.

(Whereupon a short recess was taken.).

THE VIDEOGRAPHER:  Okay.  We are going back on the record.  The time is 1:52 p.m.

BY MS. INSOGNA:

Q.   Dr. Lansman, welcome back.

A.   Thank you.

Q.   Are you good to proceed?

A.   I am.

Q.   Okay.  Any reason you can't give your full and truthful testimony here today?

A.   No.

Q.   Okay.  Good.  Just checking.

I'm just about done.  I just want to wrap up a few more questions just about the drafting of your report.

A.   Okay.

Q.   Okay?  And so I understand you used Perplexity to generate some of the graphics that are in your report; correct?

A.   Correct.

Q.   Okay.  Did you use Perplexity in any other way in --

A.   Not --

Q.   -- in putting together your expert report

here?

A.    I did use it to, like, track down some -- for the atomic resolution study.  I think I said that.

Q.    Okay.  Thank you.  Thank you for reminding me.

So you also used Perplexity to search for additional scientific literature; correct?

A.    Right.

Q.    Okay.  And is the literature that it generated listed among your 77 references?

A.    I'd have to go through that.  I'm sure most of them are in there.

Q.    Okay.

A.    I'd have to go through it.

Q.    Totally fine.

Did you use Perplexity in any way to generate summaries of the studies that you located through your searches?

A.    Not initially.  Usually, I -- well, back when it was a little clunkier, I would use it to, like, go through PubMed to have it identify papers.  Now, if there's an area that I think I need to think about more, I will have it generate a little summary that I can use personally to read, and then go back and do whatever I have to do to make something clearer.

Q.   Given that you had not researched GLP-1s before, did you do that in this case?

A.   It was after I wrote this, when I was actually trying to think about, you know, the different ramifications, so ...

Q.   So you've done --

A.   So something that's -- that's not in here was like receptor density.  When I start thinking about receptor densities being an important aspect of drug action, then I asked it to, you know, generate papers on where they looked at receptor densities using gold standard labels, not --

(Clarification by the reporter.)

THE WITNESS:  Not messenger RNA but immunohistochemistry, which is an antibody that directly binds to a -- the receptor and you can count how many receptors.

BY MS. INSOGNA:

Q.   Did Perplexity or Claude help draft any of the report into lay terms?

A.   No.  That's my -- that's my work.  You know, I write it and rewrite it.  That's how I write papers.

Q.   Okay.  Did you submit your report to Perplexity or Claude and ask any questions of it?

A.   No.

(Clarification by the reporter.)

THE WITNESS:  I didn't think of that at the time.

BY MS. INSOGNA:

Q.  Did you submit the reports of defense experts that you reviewed, Dr. Koliwad and Dr. Campbell, to Perplexity or Claude?

A.  No.  No.

Q.  So besides generating the graphics and doing the additional research on the subject you described earlier --

A.  The atomic resolution studies.

Q.  Thank you.  The atomic resolution studies, how else did you use Perplexity or Claude in reaching your final expert report here?

MR. PENNOCK:  Objection.

THE WITNESS:  The expert report was based on my understanding of the field, which is basically that receptor binding pharmacology, signaling mechanisms in cells, which are, you know, fairly general --

(Clarification by the reporter.)

THE WITNESS:  Which are receptor binding mechanisms and intracellular signaling pathways, which are also fairly -- are common throughout lots of different tissues, not just GLP-1 tissues.

Jeffrey Guilmann, PhD.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MS. INSOGNA:

Q.   So let me just make sure I'm clear.  You did not use Perplexity or Claude for any other -- in any other way in preparing your report here?

A.   No.

MR. PENNOCK:  Objection.

BY MS. INSOGNA:

Q.   Just to make sure I understand, you came up with the -- strike that.

You researched receptor density after drafting your report in this case; correct?

A.   Right.  Because that became where the importance of spare receptors in pharmacological response -- I mean, I knew about spare receptors, but I hadn't applied it because I hadn't heard anybody in the literature talking about it as something that has to be considered.  And when I started thinking about it, you asked to view the literature and see what was -- and people had looked at receptor density, but they haven't -- the experimental studies looking at mechanism, you know, they always do it low density.  So I was trying to sort that -- those problems out in the literature.

Q.   Was that triggered by your review of Dr. Campbell's report?

A.    No.

Q.    What triggered that?

A.    Well, the department that I was professor at of cellular molecular pharmacology UCSF, the chairman that hired me was the world's expert on GTP binding proteins, he discovered them.  And so, you know, I was immersed in G protein and receptor pharmacology.  And he used to teach spare receptors.  Nobody could figure out what spare receptors -- why they were important.

But I got that in my head, you know, that there's a spare receptor effect, and it was just one of those things.  Oh, yes, spare receptors; I wonder if it makes a difference?  And I decided to look more into it.  It makes a huge difference.

Q.    Okay.  And is that -- that's reflective of the conversation earlier today about high density and low density?

MR. PENNOCK:  Objection.  Overbroad.

THE WITNESS:  Can you rephrase that?

BY MS. INSOGNA:

Q.    Sure.  I just want to make sure I understand, if this is a new opinion or if it's what we -- what you previously discussed this morning with Mr. Premo-Hopkins about high-density tissue and low-density tissue.

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26    Page 148 of 156

A.    It was when I read the one paper from Lilly that I referred to earlier on the cyclic AMP response, and I saw that they did it in low density, but in the appendix they had medium, medium high, and high density.  And you can see there were spare receptors in the high density.  I said, look, this must be really important, I have to look at the density of receptors. And, you know, so I start thinking, you know, it's not always the binding to the receptor of pharmacology. There are other things which, you know, were not obvious like polymorphisms in the GLP-1 receptor.  It varies between their genetic variations between people.

And, you know, type 2 diabetes will effect, you know, the kind of responses you get.  So, you know, any kind of pathophysiology that's existing will.  So those are kind of the things I started thinking about in terms of mechanisms.

Q.    Understood.

That was triggered by an article you read before finalizing your report; correct?  Because that was a study that was in your materials considered list.

A.    Okay.  Then -- yeah, then that was in there. If it's --

Q.    That was a question.

A.    Oh, so what was the question again?

Q.   This was triggered by your review of an article before you finished your expert report; correct?

A.   I think my deep dive into, like, spare receptors and genetic polymorphisms came afterwards trying -- you know, when I saw that people were using low-density receptor expression systems.

Q.   And that deep dive research doesn't change the opinions that you offered in this report; correct?

A.   No.  This sticks with basic pharmacology, receptor pharmacology --

Q.   Okay.

A.   -- and would be more relevant to, like, predicting outcomes in patients.

Q.   Which is something you did not do in this case; correct?

A.   Well, I know there are side effects that are general.  But why would some drugs produce these effects more or less, you know, I had no way of evaluating that.

Q.   And that's not something that you evaluated in this case; correct?

A.   Right.

MS. INSOGNA:  I think I'm done.  We're done.

Do you have questions or are we done?

MR. PENNOCK:  I think I have a couple of questions.

MS. INSOGNA:  Okay.  Do you want to just go ahead?

MR. PENNOCK:  No, I'm good.  It's very short.

MS. INSOGNA:  Yeah.

EXAMINATION

BY MR. PENNOCK:

Q.  Doctor, earlier today, you were asked a question about your rebuttal report and whether it was a fulsome rebuttal to the defense experts.

Do you remember that discussion?

A.  I remember fulsome.

Q.  Okay.  So could you please tell us what your -- what your intent was with regard to the rebuttal report?

A.  Please rephrase that.

Q.  What was your purpose in issuing the rebuttal report?

A.  Oh, the rebuttal report, they just misquoted -- not even misquoted -- they said things that were not in the report.  There was -- I think it was Koliwad who thought that, like, I thought you know, just having -- even if the drug is there, it caused

damage, it's causing long-lasting damage.  I don't know that.  I do know in medical cases and you give a drug and the drug could be out of your body and you set off a pathological process, that can carry on, but I just didn't get into that.

Q.   Did you have any intention in preparing that rebuttal report to counter or set forth all of your disagreements with regard -- with the defense experts' reports?

A.   Not at all.  I had many disagreements --

(Clarification by the reporter.)

THE WITNESS:  I had many disagreements with at least one of them.  And, no, I didn't go into a rebuttal.

MR. PENNOCK:  Okay.  That's all.  Thank you.

THE VIDEOGRAPHER:  Okay.  All right.  Then we are going off record.  The time is 2:04 p.m.  This concludes today's deposition.

(Thereupon, the deposition
concluded at 2:04 p.m.)

CERTIFICATE OF DEPONENT

PAGE       LINE       CHANGE                          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*    *    *    *    *

        I, Jeffry Lansman, Ph.D., deponent herein, do hereby certify and declare the within and foregoing transcription to be my deposition in said action under penalty of perjury; that I have read, corrected and do hereby affix my signature to said deposition.

_____ May 13, 2026
Jeffry Lansman, Ph.D., Deponent Date

# Corrections

Deposition of Jeffry B. Lansman, Ph.D.
In RE: Glucagon-Like Peptide Receptor Agonists (GLP1 RAS)
PRODUCTS LIABILITY LITIGATION

<u>Page</u> <u>Line</u>

17    11    Correction: "end terminus" should be "N-terminus"

18    22    Correction: "It exposed pretty much everything" should read "It (the drug) *is* exposed *to* pretty much everything"

36    13    Correction: "end terminus" should read "N-terminus"

36    21    Correction: "end terminus" should read "N-terminus"

37    10    Correction: "end terminal" should read "N terminal"

39    19    Correction: "…bias agonist." Should read "biased agonist"

39    22-23 Correction: "it recruits beta arrestin." Should read "it *doesn't* recruit beta arrestin"

41    8    Correction: "…cyclic gain production…" Should read "…cyclic *AMP* production"

41    23    Correction: "…get incorporated into vessels,…" Should read "…get incorporated into *vesicles* …"

46    9    Correction: "…the half effect of concentration…" Should read "…*the half-effective concentration*…"

46    11    Correction: "…than the half effect of concentration…' Should read "…*than the half-effective concentration*…"

46    20    Correction: "… 50 percent down to the receptor…" Should read "50 percent *bound* to the receptor*…*"

53.    2-3    Correction: "… biased towards…" Should read "biased *against*…"

60    10    Correction: "…cell lining…" Should read "…cell *line*…"

63    18    Correction: "…the Z…"   Should read "the *Xie..*"

64    17    Correction: "…the end terminal…"  Should read "*the N-terminal*…"

65    21    Correction: "… the end terminal…"  Should read "…the N-terminal…"

66    16    Spelling error: "helicis" should be "*helices*"

92    11    Correction "I concede." should be "I *conceived*…"

95    2    Correction "…. we see with…" Should read "…we see *without*…"

97    20    Correction: "… rates of a drug that have…"  Should read "…rates of a drug that *blocks*…"

105    7    Correction: "…it's an exponential from the line."  Should read "…it's an exponential *decline*…"

108    3    Correction: "…people in the field who wrote…"  Should read "…people in the field who *reviewed*…"

113    24    Correction: *MDPI* not NDPI

115    1    Correction: "…like zinc in an anabolic concentration…"  Should read: "…like zinc in a *contaminating* concentration…"

120    20    Correction: "…the path maximal efficacy…"   Should read "…the maximal efficacy…"

125    5    Correction:  "…took the ECGS…"  Should read "…took the *EC50s* (half- effective concentrations)…"

129    20    Correction:  "…half activation level five to minus eleven…"  (transcript makes no sense).  Should read  "…has a specific half-activation level…"

130    19    Correction: delete "tenth of minus 12, tenth of minus 13…"   This makes no logical or scientific sense.

131   25   Correction: "… you know, bind angles…"   Should read "…bond angles…"

132   3    Correction: "… these are cartoons…"   Should read "these are illustrative diagrams…"

136   5    Correction  "…which is amino isobutyric…"   Should read "…which is an unnatural amino acid, aminoisobutyric acid…"

136   11   "helices" not "helicis"

May 13, 2026

Jeffry B Lansman, PhD
Professor Emeritus of Cellular &
Molecular Pharmacology
School of Medicine
University of California, San Francisco

Case 2:24-md-03094-KSM    Document 691-30    Filed 05/19/26

CERTIFICATE OF REPORTER

STATE OF NEVADA    )
                   )     ss:
COUNTY OF CLARK    )

I, Kristy L. Clark, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:  That I reported the deposition of Jeffry Lansman, Ph.D., commencing on Thursday, April 2, 2026, at 9:13 o'clock a.m.

That prior to being deposed, the witness was duly sworn by me to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript is a complete, true and accurate transcription of my said shorthand notes, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 3rd day of April, 2026.

_____
KRISTY L. CLARK, CCR #708

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**