# EXHIBIT 31D



Nilesh Lodhia

4/7/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| IN RE: GLUCAGON-LIKE | ) | |
| PEPTIDE-1 RECEPTOR AGONISTS | ) | CIVIL ACTION |
| (GLP-1 RAS) PRODUCTS | ) | |
| LIABILITY LITIGATION, | ) | MDL NO. 3094 |

_____ )
                                   )
THIS DOCUMENT RELATES TO:      )   2:24-md-03094-KSM
                                   )
ALL ACTIONS/ ALL CASES.        )   HON. KAREN
                                   )   SPENCER MARSTON
_____ )

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

NILESH LODHIA, M.D.

(Taken by Defendants)

Charlotte, North Carolina

Tuesday, April 7, 2026

Reported in Stenotype by
Kristy L. Clark, RPR, NV CCR #708,
CA CSR #13529, NC Notary #201807900150

Hartford Court Reporting Job No. 3187

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

PAUL PENNOCK, ESQUIRE
MORGAN & MORGAN
350 Fifth Avenue
Suite 6705
New York, New York 10118
(212) 738-6299
nlovett@forthepeople.com


ON BEHALF OF THE DEFENDANT ELI LILLY:

DIANA WATRAL, ESQUIRE
SARAH, DONNELL, ESQUIRE
LEXI WUNG, ESQUIRE
KIRKLAND & ELLIS
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862-2000
diana.watral@kirkland.com


ON BEHALF OF THE DEFENDANT NOVO NORDISK:

LUCAS PRZYMUSINKSI, ESQUIRE
ANTONIOUS SADEK, ESQUIRE
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500
lucas.przymusinksi@us.dlapiper.com


THE VIDEOGRAPHER:  RACHAEL CORCIONE

VIDEOTAPED DEPOSITION OF NILESH LODHIA, M.D., a witness called on behalf of Defendants, before Kristy L. Clark, Registered Professional Reporter and Notary Public, in and for the State of North Carolina, appearing from 525 North Tryon Street, Suite 1600, Charlotte, North Carolina, on Tuesday, April 7, 2026, commencing at 9:06 a.m.

INDEX OF EXAMINATIONS

EXAMINATION                                        PAGE

  By Ms. Watral                                      6

  By Mr. Przymusinski                              156


INDEX TO EXHIBITS

NUMBER            DESCRIPTION              MARKED

  1          Rule 26 Expert                  7
             Disclosure

  2          Rule 26 Expert                  7
             Disclosure

  3          Rebuttal Expert                 7
             Report of Nilesh
             Lodhia, M.D.

  4          Statement of                  156
             Compensation for
             Nilesh Lodhia,
             M.D.

  5          Gastroenterology             240
             Journal Article
             dated 2025

  6          Clinical                     279
             Pharmacology &
             Therapeutics
             Article dated
             January 2022

  7          NeuroGastroenterol           324
             Motil Journal
             Article dated 2008

CHARLOTTE, NORTH CAROLINA; TUESDAY, APRIL 7, 2026;

9:06 A.M.

-oOo-

THE VIDEOGRAPHER:  On record.  Today is April 7th, 2026, and the time is 9:06 a.m.  I'm the videographer Rachael Corcione, and the court reporter is Kristy Clark.

This is the videotaped deposition of Nilesh Lodhia, M.D., in regards to the glucagon-like peptide one receptor agonist products liability litigation.

Will counsel now introduce themselves for the video record, after which the court reporter will swear in the witness.

MR. PENNOCK:  Paul Pennock for the plaintiffs.

MS. WATRAL:  Diana Watral for Eli Lilly.

MS. DONELLE:  Sarah Donelle for Lilly.

MS. WUNG:  Lexi Wung for Lilly.

MR. PRZYMUSINSKI:  Lucas Przymusinski for Novo Nordisk.

MR. SADEK:  Antonious Sadek for Novo Nordisk.

/////

/////

/////

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Thereupon--

NILESH LODHIA, M.D.,

was called as a witness, and having been first duly

sworn, was examined and testified as follows:


EXAMINATION

BY MS. WATRAL:

Q.   Good morning, Dr. Lodhia.  We met off the

record.  My name is Diana Watral.  I represent

Eli Lilly.

A.   Hi.  How are you?

Q.   I'm doing well.  How about you?

A.   Doing well.

Q.   Have you had your deposition taken before?

A.   Yes.  For other issues, yes.

Q.   I'm going to ask you a series of questions

today.  If I ask you something that you don't

understand, will you let me know?

A.   I will.

Q.   And if you answer a question, is it fair for

me to assume that you understood the question that I

asked?

A.   Yes.

Q.   And I'll just ask today that you give me a

verbal answer, like you have been doing so far, rather

than a head shake or a nod, if that works?

A.  Definitely.

Q.  Great.

I'm handing you what I have marked as Exhibits 1 through 3 for your depositions for the record:  Exhibit 1 is the expert report specific to Eli Lilly; Exhibit 2 is the expert report specific to Novo; and Exhibit 3 is the rebuttal report that you issued in this case.

Does that sound right to you based on what you have in front of you?

A.  It does.

(Defendant's Exhibit 1 was marked.)

(Defendant's Exhibit 2 was marked.)

(Defendant's Exhibit 3 was marked.)

BY MS. WATRAL:

Q.  So fair to say you submitted two main expert reports in this case, one for Lilly, one for Novo, and then you also submitted a rebuttal report as well; is that right?

A.  That is correct.

Q.  And that's the totality of the reports that you submitted in this case, those three?

A.  Correct.

Q.  Each report, Exhibits 1 through 3, do you

agree is a complete and accurate recitation of your opinions in this case?

A.    Well, assuming this is what I submitted, then yes.

Q.    Fair enough.

And is it also the case that you have no changes that you're planning to make to the reports you submitted in the case?

A.    No significant changes, no.

Q.    And your reports, Exhibits 1 through 3, include all of the opinions that you're offering in the case; right?

A.    I don't know if I can say all of the opinions.  I mean, they summarize many of my opinions, but I think I'm -- I have opinions beyond those.

Q.    Are there opinions that relate to this litigation that are not included in your report?

A.    No significant opinions.  I mean, I just -- I can probably expand on some of these opinions, but this summarizes my opinions I can say.

Q.    Part of the deposition is for me to understand if there's anything that is -- or for what the scope of your opinions is in this case.  So I'm trying to understand, is there anything beyond what you included in your report you're planning to talk about

in court?  That's what I'm trying to understand.

A.   I guess the question's a little bit difficult for me because this is a summary of my opinions.  I can discuss something that's not listed in these documents in court, but nothing will stray from these basic concepts, if I'm explaining that correctly.

Q.   Is there anything you can identify today, as you sit here, that you plan to discuss in court that's not disclosed?

A.   Nothing that I plan to discuss, no.

Q.   Your expert reports include a materials considered list; correct?

A.   Correct.

Q.   And the materials considered list includes a complete and accurate list of the materials you considered in forming your opinions in this case; is that fair?

A.   That is fair.

Q.   And is it fair also that you have no changes, as you sit here today, to your materials considered list?

A.   That is fair.

Q.   You've been disclosed as an expert by the plaintiffs in this case; right?

A.   Correct.

Q.   When were you retained by the plaintiffs?

A.   Probably say -- probably October of 2025.
Approximately.

Q.   And when you were retained, what was the
scope of the issues that plaintiffs asked you to look
into?

A.   So I was asked to answer a question about
potential risks of GLP-1 agonists in relation to
causing small bowel obstruction and small bowel ileus.

Q.   Who wrote the first draft of your Lilly
expert report, Exhibit 1?

MR. PENNOCK:  Objection.

Don't answer the question.

MS. WATRAL:  What's the basis for that?

MR. PENNOCK:  Federal Rules of Civil
Procedure.  He's not going to get into the drafting of
reports or draft processes, or anything along those
lines.

BY MS. WATRAL:

Q.   Did you draft your expert report?

MR. PENNOCK:  Objection.  Are you asking him
if this is his expert report?

MS. WATRAL:  No.  I'm asking if he drafted
his expert report.

MR. PENNOCK:  Objection.

Don't answer the question.

BY MS. WATRAL:

Q. Same questions for Novo.

Did you draft the report of your Novo expert report, which is Exhibit 2?

MR. PENNOCK: Objection.

Don't answer the question.

BY MS. WATRAL:

Q. Same question for your rebuttal report.

Did you draft the rebuttal report?

MR. PENNOCK: Objection.

Don't answer the question.

BY MS. WATRAL:

Q. Are you going to follow counsel's instruction to not answer that series of questions about drafting.

MR. PENNOCK: He's following my instructions.

BY MS. WATRAL:

Q. Did you use AI to prepare any portions of your report?

A. I did not.

Q. Did you use AI to review any studies in your report?

A. I did not.

Q. Do you agree that there's a hierarchy of evidence in medicine in epidemiology?

A.    I agree that when reviewing evidence in any topic in medicine, in epidemiology, in science in general, there's some studies that are of higher quality than other studies.

Q.    When you say there are some studies that are of higher quality than other studies, what do you mean by that?

A.    Some studies have better methodology, some studies are better able to answer particular type of questions than other studies.  There's definitely difference in quality of some studies compared to others.

Q.    Is there, or do you agree with me, that randomized controlled trials are the gold standard experimental evidence for evaluating causation?

A.    Not necessarily, no.  Randomized control studies are good studies to evaluate efficacy of a particular agent or a particular medication or a particular intervention.  But history has shown us that to look for rare side effects, they are not the gold standard.

We look at drugs in the past, and a lot of times randomized studies have not borne out these rare side effects because they are not designed to do so. They are designed to study efficacy and common side

effects.

But, for example, there are numerous drugs such as Vioxx, which was taken off the market in 2004, which randomized control studies didn't show the increased cardiovascular risk, nor did meta analyses of randomized controlled studies, but the risks were found in large-scale observational studies.

So I don't want to make a blanket statement that randomized control studies are the gold standard because it depends on what you're looking for.

Q. Would you agree that a randomized control trial is considered a high level of evidence?

A. It is considered high-level evidence for evaluating efficacy and common side effects, correct. It is not considered a high-level evidence for evaluating much less common side effects.

Q. You mentioned that some studies are higher quality than other studies.

What type of study design would be a higher quality study?

A. It's -- it's hard to make a blanket statement on that, to be honest, because it depends what we're looking for. I just kind of differentiated for you the difference between looking at efficacy or evaluating efficacy versus the evaluation of rare side effects.

Vioxx is one example.  Propulsid is another example of drugs that get -- have gotten pulled off the market because of the data borne out in observational studies.

So I can't make a blanket statement.  It all depends on what we are trying to evaluate for.  For some situations, case -- case reports are very valuable; for many they are not.  So it really depends on what we are trying to evaluate.  We have to cater the type of question we're trying to answer to the type of study that we are -- that we put the most weight on.

Q.   Is it appropriate to determine causation from case reports?

A.   I -- I don't want to make a blanket statement on that.  I mean, case reports can shed some light, but I think we have to look at the particular situation, particular case report.  Sometimes they -- they can just be more hypothesis generating.  But I'm just giving an example of the fact that we don't always know -- we can't make a blanket statement on what type of study is best.  We have to look at the particular question, the particular type of study, and that particular study and make a statement.

So I'm kind of looking at all these studies individually, and looking at the methodology.  I mean, you can have really good studies with poor methodology,

Nilesh Lodha

and they have less weight, so we really have to look at all the evidence in their totality.

Q.    Do you agree that an association is not the same as causation?

A.    I do agree that a causation goes stronger than association.

Q.    What's the difference between association and causation?

A.    Well, association just means two things are associated.  It means they're correlated.  It doesn't necessarily mean causation.  So in order for causation to occur, you do need association.  We need something deeper than that.

You know, for example, we can -- we can come up with a association saying that people who carry lighters in their pockets have a higher risk of lung cancer.  That doesn't prove causation.  But a causation would be more people who smoke have a higher risk of lung cancer.

So I think that association does require causation -- I'm sorry.  That causation does require association, but causation -- but association doesn't necessarily mean causation, if I explained that correctly.

Q.    So association is necessary for causation,

but not sufficient for causation.  Is that fair?

A.    That's very fair, yes.

Q.    Are you familiar with the concept of a valid association?

A.    I am.

Q.    What does that mean?

A.    A valid association is basically association that does truly exist.  It -- it doesn't imply causation, but it does say that association does exist.  The example I gave you was, you know, lighters in pockets causing -- you know, associated with lung cancer.  So that probably is a valid association, but it's certainly not causative.

Q.    Do you agree that a valid association is necessary for, but not sufficient for, a causation?

A.    I would agree with that also.

Q.    Do you agree that multiple statistically significant results are necessary to find causation?

MR. PENNOCK:  Objection.

THE WITNESS:  I would -- I would say that we need to look at the totality of the data to find causation.  It's -- it's dependent upon the totality of the data, and we have to evaluate that data individually.

/////

BY MS. WATRAL:

Q.   Do you agree that multiple statistically significant results are necessary to find causation?

MR. PENNOCK:  Objection.

THE WITNESS:  I would agree.  As I have said before, we need to look at the data in its totality and evaluate that, and I hope we can evaluate the data we are discussing today in its totality.

BY MS. WATRAL:

Q.   When looking at data in the totality, multiple statistically significant results are necessary to find causation; right?

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  Should I answer the same thing again?

MR. PENNOCK:  You can -- you can answer.

MS. WATRAL:  Well, I don't know what your answer is.  You haven't answered my question.

MR. PENNOCK:  Wait a second.  He has answered it.

But go ahead.

THE WITNESS:  So I would say that we have to look at the data in its totality.  We have to look at the different studies.  And look at the statistical significance of the different studies, and use the

overall totality of the data and the evidence to arrive at a conclusion.

BY MS. WATRAL:

Q.   Outside of litigation, have you ever found causation in the absence of multiple statistically significant results?

A.   So I'm trying to understand your question. So were we looking at just in general in medicine or in what -- what are you asking exactly?

Q.   You published a number of articles.  Isn't that right?

A.   Correct.

Q.   And in the articles that you published, have you ever found that there was causation in the absence of multiple statistically significant results?

A.   Yeah, I mean, things -- one variable can cause another variable, and it doesn't -- just because each study does -- doesn't have -- doesn't show statistically significant results doesn't mean that it's not there.  So, you know, I mean, we don't -- lots of things can be causative for another variable without every study supporting that.

Q.   And which one of the studies that you have authored have you found causation in the absence of multiple statistically significant results?

A.    We can go into my -- do you have my CV?

Q.    It's attached to your expert report, so we can look at Exhibit 1.  It's Exhibit A to Exhibit 1.

A.    Okay.  So a lot of them may not be necessarily relevant to the question you're asking, but I can do my best.  All right.  So we are -- we currently have a lot of active grants which are intended to --

Q.    Let me ask my question again because my question was a little more focused.  Okay?

A.    Okay.

Q.    You indicated that you have authored a number of publications; correct?

A.    Correct.

Q.    And if I look at your CV, pages 8 through 9, I see a bibliography with your peer-reviewed publications.

Do you see that?

A.    Okay.  I see that.

Q.    In your CV, does that cover the publications that you have authored?

A.    Yes, it does.

Q.    In the -- in the publications that you have authored, in which one have you found causation in the absence of multiple statistically significant results?

A.    So I guess I'm trying to understand what you mean by "multiple statistically significant results."

So in my paper on the risk contrast --

(Clarification by the reporter.)

THE WITNESS:  On my paper No. 3, on the risk of contrast-induced nephropathy in hospitalized patients with cirrhosis that was published in 2009, that study did show an increased risk of contrast-induced nephropathy in patients with cirrhosis particularly in -- with the presence of ascites, which is basically fluid in their abdomen.

Now, that study relied upon one statistically significant result in that study; it didn't rely upon any other studies or multiple statistically significant results.  It relied upon that study.  So that is one example that did show causation without multiple statistically significant results.

BY MS. WATRAL:

Q.    Can you identify any of your publications that have concluded there's causation based on results that are not statistically significant?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  Case reports?  So case reports aren't allowed to bring about statistical significance

nor a case series.  But I do -- I do conclude that this case did happen, and the most likely cause -- for example, in my case published in British Medical Journal in 2018, I concluded that in this case, histoplasmosis did cause perito- -- well, I concluded that histoplasmosis in the peritoneal cavity was caused in the setting of Crohn's disease and the treatment of a particular drug.

Now, I don't have statistically significance there, but I did conclude that based on the evidence we had and the exclusion of other factors.

BY MS. WATRAL:

Q.   In any of your publications, did you conclude that there was causation based on results that were not statistically significant?

A.   So as I said before, in that case report, I did, and there's no statistical significance on that.

Q.   Other than case reports, in any of your publications, did you conclude causation based on results that were not statistically significant?

A.   Not based upon -- not based upon multiple results.  I can base it upon that one result because I know your previous question was multiple results.  But yeah, results do need to be statistically significant outside of case reports in the setting of many studies

for that conclusion.

Q. And you said results need to be statistically significant.

Why is that?

A. Well, because we use statistics to evaluate for causation. I'm not saying that we need multiple statistically significant reports, but typically outside of case reports, that's how we conduct studies. But I do want to clarify, that just because we don't find causation doesn't mean there's not causation. That's a major distinction.

If a study fails to find causation, it doesn't mean that there's not causation. It just means that that study did not show it.

Q. What is a high-impact journal?

A. High-impact journal, there is a factor called an impact factor, which basically engages how that paper's recited in the scientific view of that journal.

So a high-impact journal, if we were to talk about it subjectively, is a journal that people place a lot of high emphasis upon, such as JAMA, for example, or BMJ or New England Journal of Medicine. Those journals tend to have more rigorous peer review, are viewed higher by the scientific community or cited more, and tend to have more rigorous study methodology.

Q.   Do you consider the American Journal of Gastroenterology to be a high-impact journal?

A.   I do.

Q.   Do you consider --

A.   I've published in there.

Q.   Do you consider the Clinical Gastroenterology and Hepatology Journal to be high impact?

A.   I do.

Q.   Do you consider the Journal of Diabetes Obesity and Metabolism to be high impact?

A.   Honestly, I'm not an endocrinologist, so I can't comment on the impact of that journal.

Q.   Do you consider the --

(Clarification by the reporter.)

BY MS. WATRAL:

Q.   Do you consider the International Journal of Molecular Sciences to be a high-impact journal?

A.   I don't know enough about that journal for impact factor.

Q.   Do you -- do you agree with me that when reviewing literature, it's important to consider both strengths and weaknesses of each particular article?

A.   I agree that we need to view an article in its totality, and we also have to view it in light of its ability to answer a particular question that we're

asking.  So sometimes journal articles can be really well done.  Randomized control studies can be really well done, but it doesn't mean that it always answers the question we're looking for.

Q.  If you are interested in understanding the relationship between a particular medicine and a particular outcome, if you have both medication-specific data and class-wide data, do you agree with me that you need to consider both the class data and the medication-specific data?

A.  It kind of depends.  Sometimes medication-specific data may be limited and may not generate the power necessary to arrive at a -- at a conclusion because of that -- because of the limitations and the numbers of patients on that medication in that study.

So then we have to look at how do we consider a particular side effect or particular efficacy parameters as a class effect?  So if we're looking at, for example, in the setting of GLP-1s, if we're looking at a direct effect of stimulation -- stimulation to the GLP-1 receptor, that can be considered a class effect. The pleiotropic effects or the other effects of the medication not directly related to stimulation of that receptor can be something that we need to look at the

individual drugs more so.

For example, we talk about statins; right? Statins are widely used throughout the country, and they inhibit an enzyme called HMG-CoA reductase. Now, their ability to lower cholesterol by inhibiting that enzyme is a class effect, but there are other pleiotropic effects beyond that. There are cardio protective effects, anti-inflammatory effects that are not directly ascertained by looking at that particular enzyme inhibition need to be viewed separately. So there's a distinction there.

So in looking at a rare side effect, we basically need enough data to generate the numbers and the duration of therapy long enough to see the potential for that rare side effect. Whereas, you know, in other -- in other parameters we're looking at either safety or evaluating efficacy parameters, we may not be able to view it as a class effect, so it kind of depends on what parameter we're looking for.

Q. And I want to ask you something very specific about your response. One of the things you said is you have to look at the medication-specific data to see what the numbers were.

Did I understand you saying that correctly?

A. So we need to look at the -- the -- the

number of patients and the duration that those patients were on a particular medication. And, unfortunately, when we are looking at less common aspects of a drug, we may not always generate that if we look at each study and each drug within that study. We may not generate the number of patients necessary nor the duration of use necessary.

And in the setting of GLP-1s and its -- and the risk of ileus or small bowel obstruction, we need higher numbers and we need appropriate duration of therapy. So in that setting, we need to make sure that we -- that we get the -- we get numbers necessary to generate that data. And that's why it's important to view them as a class effect.

Q. I see. So are you saying that if there is medication-specific data, it's important to consider that data and assess the strengths or limitations of that data. Is that fair?

A. Be more specific -- can you be more specific, please?

Q. Absolutely. So I'm thinking of a scenario where there is class data and there is medication-specific data. Okay?

A. Okay.

Q. And so in that scenario, when there is

medication-specific data, do you agree it wouldn't be appropriate to ignore the medication-specific data; you would have to look at it and assess its strengths and limitations.  Is that fair?

MR. PENNOCK:  Objection.  Form.  Objection. Incomplete hypothetical.

Go ahead.

THE WITNESS:  Okay.  So I -- I think it would be important to look at the particular example you're talking about in order to fully answer the question.

However, I can say that, you know, a differentiated side effects related to the specific stimulation at the -- of that receptor and the direct effect of that versus other idiosyncratic effects or pleiotropic effects of a drug.  And when we're looking at the potential effects of just direct stimulation to the receptor, I think it's very appropriate to look at it as a class effect.

BY MS. WATRAL:

Q.   Let me ask you a more specific question, then, about our scenario.  So let's -- we'll go to the scenario of GLP-1 medicines and ileus obstruction. Okay?

A.    Mmm-hmm.

Q.   I'm asking you about a scenario where a study

has both class data and GLP-1 medication-specific data. Okay?

A.   Okay.

Q.   In that scenario, where you have both medication-specific data and class data, do you agree with me that it would not be appropriate to ignore the medication-specific data, you would have to look at the strengths and weaknesses of that particular data?

MR. PENNOCK:  Objection.  Just objection.

Go ahead.

THE WITNESS:  I would love to look at the particular study you're talking about.  I think it's a hypothetical question.  And I would love to look at the specific data you're talking about and then we can discuss that data in detail.  I will say, though, that, in general, I understand your point, that we want to look at the totality of the data.  But what my point is is that I want to evaluate when we are evaluating the direct effect of stimulation of the GLP-1 receptor, it is appropriate to look at them as a class.

So we are not evaluating other side effects, we are evaluating a direct effect of stimulation of the GLP-1 receptor.  And all these drugs, by definition, are GLP-1 receptor agonists.  So I think that we need to keep that in mind when evaluating for the potential

for small bowel ileus or small bowel obstruction.  But I think it's -- your point is that we need to look at the totality of the data, and I think we need to look at the study and we can -- we can sort out what the most appropriate way of evaluating that data would be.

BY MS. WATRAL:

Q.   And that was helpful.  I think you're getting at what I was getting at in a more artful way.  So let me see if we have some agreement here.  Okay?

A.   Okay.

Q.   If a study has data that's medication specific and class specific, when looking at an injury like ileus or obstruction, you would want to consider the totality of that data.  Is that fair?

MR. PENNOCK:  Objection.  Form.

Go ahead.

THE WITNESS:  I would want to consider that particular study and look at all of the evidence and determine what the best way of evaluating the study would be based upon the details of that study.  I'm afraid I can't make a blanket statement on any -- on, you know, every study and how we evaluate every study. I think the methodology is key, and I'm sure you appreciate the subtleties that go into evaluation of each study.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MS. WATRAL:

Q.   As part of your expert reports, Exhibits 1 and 2, you did a literature review to evaluate whether GLP-1 medicines cause ileus and obstruction; right?

A.   That is correct.  I reviewed the literature.

Q.   I want to look at Exhibit 1, page 7 of your expert report.  Let me know when you're there.

A.   Okay.  I am there.

Q.   I want to ask you about the paragraph that starts with "Once the literature was narrowed."

Do you see that?

A.   I do see that.

Q.   Your report lists several criteria that you used to evaluate each of the studies that you found using your literature review.  Is that fair?

A.   That is fair.

Q.   Okay.  And if I look at this using the semicolons and commas, it looks there were four factors, but I want to see if you agree with that.  Okay?

A.   You know, as I -- as I stated, this is not an exhaustive list --

Q.   That's what I want to get at.

A.   -- of the criteria.

Q.   Let's walk through this.

A.    Okay.

Q.    So I want to first start with the criteria that you list here, and then I want to ask you about your comment about not having an exhaustive list. Okay?

A.    Okay.

Q.    So let's start with the criteria that you identified here.  The first criteria that you identified when evaluating literature is the methodology employed, whether retrospective or prospective, cohort versus disproportionality analysis for what confounders the authors accounted, study population, and comparator drugs, if applicable; right?

MR. PENNOCK:  Just note my objection.

You said it's the first one.  I mean, there are, like, seven of them.

MS. WATRAL:  Sure.  I'm going to go through each of them.

THE WITNESS:  Okay.  Yes, that is what I wrote.

BY MS. WATRAL:

Q.    Is that an accurate description of one of the factors that you considered when evaluating studies?

A.    So I'm looking -- yeah, I'm looking at all of these studies in totality, confounders that we're

looking at.  I mean, we have to look at the retrospective versus prospective nature of a study.  We have to look at the study population, what other drugs were used to compare it to.  Yes.

Q.   The second consideration you considered is sample size; is that right?

A.   Yeah.  I look at the sample size, yes, in each study.

Q.   The third consideration is the data range of the study period; is that right?

A.   Correct.  And especially as it relates to approval of GLP-1 drugs.

Q.   The fourth factor you considered is the journal in which the study was published; right?

A.   Correct.

Q.   So I said I would start with the items listed in your report as considerations.

In your methodology section, the particular criteria that you identify are the four that we just walked through; right?

MR. PENNOCK:  Note my objection.

There are numerous -- there are far more than four listed here.  You just covered them.

BY MS. WATRAL:

Q.   You can answer my question.

A.    I'm looking at multiple factors.  And this is not an exhaustive list, but I'm looking at multiple factors.  And there are also subjective criteria that I look at when -- when evaluating any study.

Q.    What are the subjective criteria you look at when evaluating studies?

A.    You know, I feel like every study has to be viewed as an individual study, and there are a lot of criteria that I -- that I may use to strengthen or weaken my opinion of the study.  That may not be listed explicitly.  And I don't know if we're going to get to different, individual studies, but if we do, we can kind of discuss what I felt were strengths and weaknesses of individual studies.

Q.    Yes.  And I -- we will get to individual studies.

A.    Okay.  All right.

Q.    So you indicated that there are additional -- let me restart my question, if you don't mind.

A.    Yes.

Q.    You indicated that there are additional subjective criteria that you consider that can strengthen or weaken your opinion; right?

A.    Correct.

Q.    And you applied those additional subjective

criteria that can strengthen or weaken your opinion to the studies that you reviewed here; right?

MR. PENNOCK:  Note my objection. Mischaracterizes.

He was speaking to the -- his opinion of the study, not his opinions.

THE WITNESS:  So the studies, for example, in this particular question may not always just be -- just be able to be broken down by these factors, the strength of these studies.  So I can give one example for many of the studies would be the -- the presence of diabetic neuropathy or the presence of diabetes in these patients.

So diabetes itself can bring about confounding factors.  And particularly, the presence of diabetic neuropathy, which is fairly common and underdiagnosed in the setting of diabetes, can actually bias results towards a null hypothesis in this question.

Because as we -- as I've shown, particularly in a mechanistic study by Nakatani, that diabetic neuropathy can basically lessen or attenuate a patient's response to a GLP-1 in the setting of slowing gut motility.

So we have to take factors like that into

account.  That's not necessarily listed in this paragraph because this is just more of a general concept.  And I have to look at multiple factors when evaluating a study, not the -- it's not limited to these factors.  So I would consider --

BY MS. WATRAL:

Q.  Can I -- I'm going to get into --

MR. PENNOCK:  No.  Please don't interrupt him.

Please finish your answer.

THE WITNESS:  When I mentioned subjective criteria, I was referring to the presence or absence of diabetic neuropathy, for example, and how closely the authors tried to arrive at that diagnosis.  For example, there's one study in which they looked at a diagnosis of diabetic neuropathy, but they didn't -- they didn't test for it.  And that is a criteria that I'm looking at when I'm trying to assess the validity of a study.

BY MS. WATRAL:

Q.  I want to ask you about some -- your statement in here that you list on page 7 is not an exhaustive list.  But before I do that, I don't want to argue with you about the number of factors you have listed in this paragraph, so can you just tell me, in

your own words, how many factors do you have listed on page 7 of your report, just so we're speaking the same language?

A.    Okay.  So we --

MR. PENNOCK:  You want him to count?

MS. WATRAL:  Sure.

BY MS. WATRAL:

Q.    I just don't -- I don't want to call them four and you call them eight, and then we're disagreeing about the number.  So you can just tell me.

A.    Right.  This is basically examples of criteria that I look at.  Most important is my ability or our ability to critically evaluate each study as an individual study.  And these are -- these are factors that are -- that are kept in mind as we're evaluating, critically evaluating each study.  So I mean, we can -- do you want me to count?

Q.    Sure.  I just don't want to speak a different language, so that would be helpful.

A.    So study design is No. 1.  I mean, a lot of these are kind of -- can be meshed together.  So study design is No. 1; methodology is No. 2.  And methodology is a very broadly encompassing term.  Whether it's retrospective or prospective is No. 3.  The design of a cohort study versus disproportionate analysis would be

No. 4; confounders, looking at confounders is very important, No. 5.  The study population is No. 6.  And if they are comparator drugs, that would be No. 7; the sample size would be No. 8.  The date range is No. 9.  The journal is No. 10.

Again, we talked about other factors, factors such as the presence or absence of diabetes, whether that's excluded, diabetic neuropathy, whether that's strictly assessed for.  I mean, there are infinite number of factors we look for.  But when I'm writing this paragraph, I'm just trying to give some examples.

Q.   Understood.  So your paragraph identifies the ten factors that you just walked through, and you also articulated the issue about diabetic neuropathy as another factor that you considered.  Is that fair?

A.   That was an example.  That was an example.

But, again, that doesn't mean that's an exhaustive list, and we can get through each study and talk about -- talk about the factors I looked at in each of these studies.

Q.   Other than the ten factors listed on page 7 and the issue about diabetic neuropathy that you mentioned, are there other factors that you considered when evaluating the body of literature that you reviewed?

A.    As I said, there are a multitude of factors. Infinite number of factors.

I mean, I can't give every factor that I employed with every study that we -- that we evaluated. That's impossible.

Q.    Why is it impossible to list all of the factors that you considered when evaluating studies?

A.    Because I have had, you know, four years of medical school, three years of residency, three years of fellowship, and many years of medical experience after that.  I mean, we have to evaluate a study in the background of our knowledge, in the background of everything we've learned, in the background of our experience, in the background of every potential factor that they're looking at.

There are an infinite number of factors.  I mean, the very notion that we can limit the number of factors when we -- when -- when evaluating a study that we are looking at is absurd, to be honest.  I mean, we look at, all of us in our everyday lives when we read a New York Times article, we look at our background, we look at our experience, we look at our education, and we come up with what we think is a conclusion based upon that New York Times article.

And for me to ask you how many factors are

you looking at to evaluate the validity of a New York Times article would be absurd.

Would you agree?

Q.   Do you think --

MR. PENNOCK:  Don't debate her.

BY MS. WATRAL:

Q.   Do you think it would be absurd to identify all of the factors that you considered when reviewing the literature in this case?

MR. PENNOCK:  Note my objection.

He's -- he's answered the question.

THE WITNESS:  I'm not going to limit the number of factors that I looked at in each study at this time to what we're discussing at this moment.  I think we can look at an individual study and arrive at assessment of that study, but I just think it's very difficult to pigeonhole ourselves into a set number of criteria that limits us from interpreting a study that takes in -- that doesn't take into account our education and clinical experience.

BY MR. PREMO-HOPKINS:

Q.   You gave the example of me reviewing a New York Times article and asked whether I agreed it would be absurd for me to come forward with all the factors I considered.

Do you think it would be absurd for you to list out all of the factors that you considered when reviewing the literature here?

MR. PENNOCK:  Just objection.  Asked and answered.

He's explained that to you.

BY MS. WATRAL:

Q.   Please go ahead and answer.

A.   So I would say that it is absurd for me to go through a general list of factors that I applied to every study on this subject, yes.

If we talk about a particular study, I can discuss which factors swayed me one way or the other. But I do think it's absurd to come up with a list that applies to every study in any particular subject, yes.

Q.   I want to talk to you about how you used the factors and criteria that you applied to the studies across your literature review.  Okay?

A.   Okay.

Q.   We talked through the ten criteria listed on page 7.  You mentioned diabetic neuropathy.  There's an infinite number of criteria you considered.  How did you go about quantitatively assessing the studies you reviewed based on those factors?

MR. PENNOCK:  Objection.  Form.

Go ahead.

THE WITNESS:  So that's a good question. Each study needs to be looked at in terms of the validity of the data.  I think that, you know, factors that I'm looking at include factors that we discussed, as well as what factors could be confounding.

So confounding variables are very important in this analysis and the extent to which the authors go through confounding variables is important in evaluation of each study.

So my point when -- when we were discussing this previously was that it's very hard for me to have a set number of criteria when looking at a study. Rather, I kind of look at each study, evaluate the pros and cons because there are no perfect studies.

And each study has limitations.  We have to recognize the limitations in a particular study and not only look at that when evaluating that study, but make -- make us understand how we evaluate the evidence as a whole.

So the only reason I gave that New York Times example is just so we can kind of illustrate in real terms that we use multiple factors in our mind to critically evaluate a study or an article, and it's all in the setting of the evidence that we have.  So I can

look at a particular study and tell you what factors swayed me.  But I'm sorry, I can't do better than that at this time.

BY MS. WATRAL:

Q.   Did you -- so for the criteria that you applied, did you have a particular scoring system that matched them that a particular factor would get particular weight when doing your analysis?

A.   I --

MR. PENNOCK:  Objection.  No foundation.

Go ahead.

THE WITNESS:  No, I didn't have a scoring system.  And the reason is is that if there's a very important limitation, then that needs to be noted when evaluating that study as a whole.  But I don't think a scoring system will do it justice.  I think that oversimplifies the process of evaluation of literature.

BY MS. WATRAL:

Q.   Is it the case that you reviewed the literature and applied your various factors and for each study made an assessment based on your view of which factors were more or less important for that particular study?

A.   So yeah, I reviewed each study individually and I looked at potential strengths and weaknesses of

each study.  And based upon the strengths of that study and the weaknesses of that study, and how those strengths and weaknesses play into the overall body of literature, I made a conclusion based on those studies based on that.

Q.   I see.  And so you knew what your conclusion based on how you saw the literature that you were reviewing for each particular -- let me ask a better question -- I don't think that was very clear -- if that's all right.

A.   Okay.

Q.   You indicated you reached a conclusion at the end of your review of each article.

Did I understand that correctly?

A.   I reached a conclusion as to the validity of that article in what question, if any, that particular study answers.  So the conclusion that I reached was based upon reading all of the studies and examining all the evidence that we had available to us.  I didn't reach a conclusion to -- to the question based on any one individual study but rather on the totality of the evidence.

Does that explain it better?

Q.   It does.

How many of your criteria need to be vet for

something or for a study to have a rigorous methodology?

MR. PENNOCK:  Objection.

THE WITNESS:  I don't have a set number of criteria because, again, we have to evaluate the particular study.  For example, we're evaluating in this -- in this -- well, in this report, we're evaluating multiple different types of studies.  We're evaluating animal mechanistic studies which serve a purpose.  We're evaluating human mechanistic studies which serve an important purpose, as well as the epidemiological studies.

So we can't apply those same criteria to different studies.  Obviously, the animal studies and the human mechanistic studies aren't going to have the numbers, but they also generate other key insights into answering this question that the epidemiological data may not be able to, and also allows us to interpret that epidemiological data better and allows us to understand concepts of biological plausibility and coherence in the setting of the entire body of literature.

So I think it would be oversimplified to say that I had a numerical scoring system or any kind of particular numbers that I used to apply to each study

because we have to evaluate different studies differently based upon what they show us.

BY MS. WATRAL:

Q. I want to ask my question specifically about the 23 epidemiological studies you discuss in your report. Okay?

A. Okay.

Q. So for the 23 epidemiological studies that you discussed, how many criteria must be met for one of those studies to be -- to have a rigorous methodology?

MR. PENNOCK: Objection.

THE WITNESS: I'm not looking at a specific number of criteria. I'm looking at how these criteria taken together allow for a valid study that I feel like -- again, a valid study needs to apply to our question. There are lots of great studies -- there are lots of great randomized studies that may not apply to our question, so I'm looking at valid studies that would apply to answering our question.

BY MS. WATRAL:

Q. So it sounds like there's not a set number of criteria that must be met for one of those 23 studies to have a rigorous methodology.

Am I understanding that correctly?

MR. PENNOCK: Objection. Form. Asked -- and

objection.  Asked and answered.

THE WITNESS:  So I would say that I'm looking at different studies and seeing what they provide for us based upon the methodology that's employed in each study.  I evaluate each study individually, and I come up with -- I come up with the pros and cons of each study based upon that particular study, not based upon a numerical scoring system.

BY MS. WATRAL:

Q.   Are there a particular number of criteria that must be met for one of those 23 studies to be a high-quality study?

A.   There's no particular number, no.  It's based upon the particular study.  Again, we were evaluating -- you know, we talked about mechanistic studies and epidemiological studies separately.  But we are also evaluating meta analyses separately, we're evaluating observational studies separately, we're evaluating a lot of different types of studies and a lot of different methodological details separately.

So I don't have one set number of criteria that I can apply uniformly like a blanket, no.

Q.   Is it the case that you're the one who knows how you applied the criteria to each of these studies?

MR. PENNOCK:  Hold on one second, please.

Could you read that question back.

(Record read by the reporter.)

MR. PENNOCK:  I would object to form.

Go ahead.

THE WITNESS:  I applied the criteria to these studies, and I did my best to convey my thoughts.  And my understanding is one of the purposes of this deposition is to better understand my thoughts as to how I interpreted these studies.

BY MS. WATRAL:

Q.   One of the criteria that you listed on page 7 of your report was sample size; right?

A.   Correct.

Q.   What was the sample size cutoff that you applied to whether something was a high-quality study or not?

A.   I didn't have a cutoff.  And, again, we have to look at sample size in the setting of duration of therapy.  So we could have a very high sample size.

But if the patients are on this medication for a very short period of time, that sample size is fairly meaningless because we know that patients don't develop these particular side effects from GLP-1 receptor agonists the second they start to take it.

If you look at our study by Faillie, for

example, it usually peaks at about 1.6 years.  So, sample size, again, is noted in the setting of how long patients have been on a particular drug.  So, again, we can have a million patients who have been on it for two weeks, and I would not attribute any stock to that because they haven't been on it for long enough.

So it's not only the number of patient years. We can't come up with just patient years on a particular drug.  We have to -- we have to look at how long the different patients have been on that drug in order for us to interpret it meaningfully.  Because my goal is to answer the question that was set forth by -- to me.  And in order to do so, I need to evaluate all of the data.

Q.   When you considered sample size, did you consider that together with duration?  Is that what you're saying?

A.   I considered sample size with duration when that data were available, yes.  Now, I will -- I will say that none of these studies were perfect.  If we had perfect studies all of our lives, it would much easier, including mine, treating patients clinically.  So we had to go to the data that we had available and make a determination based on what was available.

So in every -- in every study, a lot of these

factors weren't available, but we went with the totality of the -- what was available.

Q.    What was the threshold of sample size and duration combination that would make something a high-quality study?

A.    So I think we need to look at the particular study.  I -- I don't have any particular threshold. Again, science and medicine would be much easier if we could stick to these rigid cutoffs, but the fact of the matter is that it doesn't work like that.  We need to look at all the data, especially because in some of the studies we don't have all of that data, and we have to -- we have to utilize a scientific process based upon the data we do have available.

I mean, a lot of times when we're treating patients clinically as well as reading studies, we have to go with the information that we have available and make a determination based on the totality of the data.

Q.    Are you saying your evaluation of sample size and duration was specific for each particular study that you reviewed?

MR. PENNOCK:  Objection.

THE WITNESS:  I am saying that we need to take into account the fact that duration is important in -- was very well illustrated in the Faillie study,

whereas these side effects, SBO and small bowel ileus, did peak around that 1.6 year range. And I think that we need to look at that in the setting of the overall methodology and sample size and confounders utilize -- assessed for in each study.

MS. WATRAL: We are just about at the hour, and I was going to jump in to a -- maybe a ten-minute line, so I would rather either break or go through it, your choice.

MR. PENNOCK: Whatever you prefer.

MS. WATRAL: I'd be happy to keep going. I want to get to my next spot.

Does that work for you, Doctor?

THE WITNESS: That works for me.

BY MS. WATRAL:

Q. Great.

So section -- the report, starting on Section 24 of your report, has your discussion of 23 epidemiological studies; right?

A. That is correct. Yes.

Q. Of the 23 studies, the epidemiological studies that you reviewed, did any of them employ a rigorous methodology?

A. That's a very subjective term, "a rigorous methodology." I would say that every study had faults.

No, no study was perfect.  Again, if the studies were perfect, we wouldn't be here; we'd have an answer right now without any contention theoretically; right?  So I think to say that any study employs a rigorous methodology is a very difficult question to answer.

I think that there's some studies I liked better than others in terms of their methodology, in terms of their follow-up, in terms of their -- their exclusion criteria, and inclusion criteria.  But I think it's very difficult to say, to answer your question whether any studies employed a rigorous methodology.

Q.   Okay.  As you sit here today, can you identify any of the 23 studies that in your view employed a rigorous methodology?

A.   Well, I can say that there's some studies that I felt were more valid in terms of answering the question than others.  I think a rigorous methodology is a very subjective term, to be honest.  It's hard for me to use that term because many of the -- of these methodology could be rigorous but may not be applicable to the answer we are trying to ascertain.

Q.   Okay.  I want to focus in particular on whether any of them applied a rigorous methodology.

As you sit here today, are there any that you

would describe in that way, that they -- that they used a rigorous methodology?

A.   I think it's very hard for me to answer that question, to be honest.  I think we can go through individual studies, but it's very difficult to make these blanket statements on rigorous methodology, because, again, you know, there are -- there are aspects that are rigorous in many of the studies, and many of the studies have elements to be desired.

So I think -- so we have to weigh the pros and cons of each study, so it's very difficult for me to say any particular study employed a "rigorous methodology."

Q.   Okay.  In your view, did any the 23 epidemiological studies -- or strike that.

Let me reask my question.  In your view, were any of the 23 epidemiological studies what you would consider to be high-quality studies?

A.   I think that some were higher quality than others in terms of answering the question.  None of them were perfect quality.  And I do acknowledge that. I wish it were different, but I have also never published a perfect quality paper, either, so I can't say too much.

Q.   You indicated that some of the 23 studies

were higher quality studies.

Which of the 23 studies would you consider higher quality studies?

A. Well, I would say that I like the paper by Sodhi in that it excluded patients with diabetes. I thought that was very helpful in terms of eliminating confounders. And also we discussed the fact that diabetic neuropathy can bias the results towards the null because of the fact that it does increase the risk of small bowel ileus in patients not on GLP-1 receptor agonists, but it also attenuates that response in patients on GLP-1 receptor agonists. So I did appreciate that aspect of the Sodhi study.

And there also appears to be some other studies also that I liked. But, again, each study has pros and cons. For example, the Faillie study, although, unfortunately, it did include -- well, it had to include patients with diabetes because that was part of what they were looking at, but I like the fact that they went through a lot of confounders and accounted for that, as well as the fact that they looked at patients at new starts.

So they looked at patients who started these diabetic drugs at the -- at that time as opposed to just people who had been on it for an unspecified

period of time.

So, again, we are looking at different aspects of both studies. For example, one of them had some positives, and others had other positives.

Q. You just mentioned Sodhi and Faillie, do you consider both of those to be higher quality studies?

A. I do.

Q. Other than Sodhi and Faillie, are there any other studies that you considered to be higher quality studies?

A. Well, I would like to get into each study individually. I think some were higher than others, but I do like those two studies. And I do put stock into those two studies. But to be honest, you know, all the studies that I included I did find were of some benefit in certain patient populations. I just felt like those were probably the two studies taken together in the setting of the mechanistic studies that we do have, that did expand upon our knowledge.

Not saying that other studies weren't powerful, I'm just saying that those are two studies. And I'm sure we'll get into all the details of the studies, as you mentioned, that I did -- that I did consider significantly when making these evaluations. And, again, I'm not saying that these studies were

Nilesh Lodha   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

perfect. They have limitations, and we need to take those limitations into account.

Q. You indicated that some studies you reviewed were higher quality. You mentioned Sodhi and Faillie. I just want to understand if there were any other studies that you would consider to be in that bucket of higher quality studies.

A. I would like to go -- those are the two that come out at me right now. But I wouldn't say those are the only two high-quality studies. I mean, you know, we also talked about some randomized studies that I considered can be high quality in assessing other questions, but I'm talking about specifically in assessing our question.

I would say that those are two studies that -- that were higher quality. And then the rest, we can -- we can rank or we can -- we can assess in terms of how impactful they were and what they helped us answer. But, you know, those were -- those were two studies that I did consider to be of higher quality.

Q. You said that the rest of the studies you could rank.

How would you rank the remainder of the 21 studies?

A. I said rank, and then I took that back,

actually, because I think that a straight ranking wouldn't do this justice.  I can't rank any of these studies.

I think that we have to evaluate all of these studies together as well as individually and see how they add to our body of knowledge.

Q.   Is there anywhere in your report where you say here are the studies I considered to be the higher quality studies?

A.   No.  I discuss each study individually, and I discuss conclusions based upon the totality of the evidence.

Q.   Do you consider the Sarwal study to be a higher quality study?

A.   Why don't we go through that study?  Do you have the study for me?

Q.   Let's start with the report.

MR. PENNOCK:  They'll mark the study for you, Doctor.  They're just pulling it out of the box right now.

MS. WATRAL:  Hang on a second, Lexi.

BY MS. WATRAL:

Q.   I want to start with your report.  Okay, Doctor?

MR. PENNOCK:  Well, he asked to see the

study.

THE WITNESS:  Do you have the study?

MS. WATRAL:  I'm going to start with his report, and then we'll go through there.

MR. PENNOCK:  So you -- just so I'm clear, he asked to see the study.  You want to ask him questions about the study, but you're not going to mark the study?

MS. WATRAL:  No.  I want to ask him a question about his report.

MR. PENNOCK:  Okay.

BY MS. WATRAL:

Q.   I want to ask you about page 36 of your report.

A.   Okay.  So am I not able to see the study as we are discussing it?

Q.   I first want to ask you about your report, let's start there, sir.  Okay?  You discuss the start -- if you need to see the study -- just go question by question with me.  I think you will not need to see the study, but if you disagree with me based on the particular questions I'm asking, please let me know.

MR. PENNOCK:  I just object.  He asked for the study to be put in front of him.

BY MS. WATRAL:

Q.    You discuss the Sarwal study on page 36 of your report.

A.    I do, yes.

Q.    Do you say on page 36 of your report whether you considered the study to be a higher quality study?

A.    I do not say whether I considered this to be a higher quality study, no.

Q.    Without looking at the Sarwal study right now, can you tell me whether the Sarwal study is a higher quality study?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  I think the fact that diabetic neuropathy may be epidemiologically in -- and its very common in vets with Type 2 diabetes, limits the study. Although they attempt to account for diabetic neuropathy with inverse probability weighing, I do not think that they do that justice because of the fact that we're -- that it's differentially affecting patients with GLP-1s versus other patients.

So we're also assessing patients on -- on insulin versus SGLT2s and GLP-1 agonists, insulin -- patients on insulin have different risks of diabetic neuropathy and more confounders than others.  So I do

not consider this one of the highest quality studies that we are looking at, no.

Q.   On page 33 of your report, you discuss the Hurwitz study.

Do you see that?

A.   I do.

Q.   Do you say in your discussion of the Hurwitz study whether you considered it to be a higher quality study?

A.   I do not say that in -- in my discussion of the Hurwitz study.

Q.   Without looking at the Hurwitz study today, can you tell me whether you have a view on whether it's one of the higher quality studies?

A.   Well, I can say based on the short duration of follow-up six months in the setting of data that illustrate that it takes far longer than that to develop the symptoms that we are questioning in the setting of GLP-1s, as well as the wide range of confidence intervals, that it's probably not the highest quality study that we have.

I think the main issue I have with this is the fact that it's only assessing six months.  So a lot of times patients are on a very low dose of GLP-1s and that dose is slowly titrated upward.  And it takes time

to develop these side effects.

So, again, I think that the low duration of follow-up does bias the results towards the null hypothesis because it can take longer for many patients to develop ileus and from the use of GLP-1 receptor agonists.

Q.   In your discussion of the Hurwitz study in your expert report, Exhibit 1, did you discuss any of the strengths of the study?

A.   It does not look like -- I described the study.  It does not look like I described the strengths of the study.

Q.   Okay.  Do you agree that several of the studies that you reviewed did not find a statistically significant association?

A.   I think that many of the studies, because of the methodology that were employed, were unable to find an association due to methodological issues.

Q.   Which were the studies that you reviewed that did not find a statistically significant association?

A.   I mean, do you want me to just go through all 32 studies?

Q.   Here's what I am wondering.  Is there anywhere in the report where you put all the information together and say here are the ones that

show a statistically significant association and here are the ones that do not show a statistically significant association?

A.   No, I listed each study individually.

Q.   Okay.  You identified a number of limitations of studies, for instance where a study included patients with diabetes who may have diabetic neuropathy.

Do you remember talking about that earlier?

A.   I do.  I do.  And I mean, just to clarify, diabetes can have multiple confounding factors. Diabetic neuropathy can sway the results because of its differential effects on patients without GLP-1s and -- and on GLP-1s.

Q.   Okay.  And let's use this example of diabetic neuropathy, but I will agree with you that you have other factors that you considered, too.  I just want to use one factor to make sure I understand.  Okay?

A.   Okay.

Q.   So for the factor that we are discussing here about diabetic neuropathy, if you came across a study that involved patients that may have diabetic neuropathy, how did that impact your assessment?  Did you discount that study?  Did you give it greater or lesser weight?

Do you understand what I'm asking?

MR. PENNOCK: Objection. Form. Objection. Incomplete hypothetical.

Go ahead.

THE WITNESS: So we have some studies -- we have many studies -- obviously, when we're looking at GLP-1s, we have many studies that include patients with diabetes. And we do know that many patients with diabetes have diagnosed or undiagnosed diabetic neuropathy. I think that the presence of diabetic neuropathy needs to be taken into -- into account when interpreting these studies because of the fact that it affects different groups of patients differently. And I think that that needs to be taken into account.

BY MS. WATRAL:

Q. That's what I'm wondering. So you said that fact needs to be taken -- taken into account. What do you mean "taken into account"? How are you taking it into account?

A. I think we need to recognize that as a potential limitation. I don't think that every study with diabetes need to be completely discounted, but I think it needs to be taken into account, and also the way in which it's taken into account is that it can affect the results, as I said many times before,

differentially between GLP users and GLP nonusers.

Q.   And so it's not appropriate to entirely discount a study that involves diabetic patients. Fair?

A.   I would not entirely discount any study because of one factor.  I look at everything in its -- in the broader context.

Q.   And at what point does something become methodologically flawed such that you would discount the study?

MR. PENNOCK:  Can you read that question back, please.

(Record read by the reporter.)

MR. PENNOCK:  I feel -- just note my objection.  It's an incomplete hypothetical.

Go ahead.

THE WITNESS:  When I'm treating patients all the time, I'm relying upon medical data.  We have multiple issues here because the medical studies are always -- always have some flaws.  And also, a lot of times our patients don't fit neatly within our inclusion/exclusion criteria.  So it's not a binary system in which I say something is good or something is flawed.  It's a -- it's an assessment of the risks of the pros and the cons, I should say, of each study and

how it applies to a patient or how it applies to a particular question.

BY MS. WATRAL:

Q.   You started your answer there talking about treating patients.  I want to ask you about in the context of your expert report.  Okay?  In the context of your expert report, at what point does -- does a study become methodologically flawed such that you would discount that study?

MR. PENNOCK:  Objection to form.  Objection. Incomplete hypothetical.

THE WITNESS:  I would have to discuss any individual study and discuss the pros and the cons of that study.  I feel like you're asking me for some kind of numerical scoring system or some kind of cutoff, but the fact of the matter is we don't have that cutoff.  I wish we had better data in all of the medical literature to answer our questions.  But, unfortunately, the data is what we have available.

And there are always inherent limitations to all of our data, and we have to use all of it to arrive at a conclusion, despite the fact that it does have methodological limitations.

Q.   You talked about certain studies having a short follow-up period; correct?

A.    Correct.

Q.    What do you consider to be a short follow-up period?

A.    Well, that's a great question.  We know that the -- based on the data we have available, we know that the incidence of small bowel obstruction and ileus tend to peak a little bit beyond one and a half years, at 1.6 years.  So I would say that the follow-up for most -- the majority -- the majority of the patients should be -- should be well longer than it is in the Hurwitz study, for example, that only looks at a six-month follow-up because I feel like if we are trying to answer a question, we need to answer it appropriately and not just come to rapid conclusions based upon incomplete data with patients who haven't been on a particular medication for long enough.

Q.    Okay.  So a six-month follow-up period is too short.

Is that what you're saying?

A.    I would say a six-month follow-up period does shift the hypothesis.  So, basically, it shifts everything toward the null because of the fact that patients can get it early.  I'm not saying they can never get small bowel obstruction or ileus early, but we're getting many -- we're getting -- we need more

time to evaluate the -- the full effect of the medication.

So if we see a signal earlier, than that needs to be noted. If we see some patients get the side effects in question earlier, we need to take that into account. We also need to take into account the fact that it takes more time for most of these patients to develop these complications.

Q. Okay. Is a one-year follow-up period short, in your view?

A. I mean, again, a one-year follow-up is lower than the -- than the peak time based upon the data that we have. I think a one-year follow-up is better than six months, but I don't think that a one year is ideal. I think that, you know, longer follow-up is better because, you know, with it -- if it peaks at 1.6 years, I do -- that does mean that many patient also get these complications even later than that.

So I think that, you know, one year is better than six months, but the longer duration we have, the more valid our data will be.

Q. Okay. Look at page 37 of your report.

A. Okay.

Q. You say "Studies that did not find a statistically significant" -- I'm sorry. I'm at the

first full paragraph.

Do you see that?

A.    I see that paragraph.

Q.    And you say "Studies that did not find a statistically significant association are largely explained by methodological limitations."

Do you see that?

A.    I see that.

Q.    I noticed your use of the word "largely." You say, "Studies that did not find a statistically significant association are largely explained by methodological limitations."

What did you mean by that word "largely"?

A.    I don't want to make a specific statement on every study.  I wanted to state that there are methodological limitations in -- in these studies.  But I -- I feel like it's more worthwhile to look at studies individually than to make general statements, so that was more of a general statement that I made.

Q.    Are there any other studies that did not find a statistically significant association that are not explained by "methodological limitations"?

A.    Well, I mean, every study that do find -- that find associations and that doesn't find associations do have methodological -- do have

methodological limitations.  And I think we have to interpret those methodological limitations in the setting of how they impacted the results.

For example, we talk about diabetic neuropathy, and we keep going back to this, but you brought it up.  And the limitation there is a limitation.  It's not just a general limitation; it's a limitation in finding these results because of the fact that it differentially affects GLP-1 users and nonusers.  So I think that we can look at potential methodological limitations in every study, and every study has them.  It is just a matter of how those methodological limitations affect the results.

Q.   All right.  Are there any studies that did not find a statistically significant association where you look at it and you say -- strike that question.

Okay.  You talked earlier about a 1.6 year peak from the Faillie study.

Do you remember that?

A.   I do remember that.

Q.   Are there any -- any studies, other than Faillie, that support that 1.6 year peak that you described?

A.   I think that number is well derived at in the Faillie study because of the fact that that study looks

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

at patients from initiation of GLP-1s and SGLT2 inhibitors, whereas other studies are randomized control studies, which we talked about the inherent limitations in the question we're trying to answer and other large-scale observational studies don't have that aspect.

So I think for -- I think in that study there are limitations, but we have to look at the positive aspect, and that gives us a better timeline of how long it takes these events to occur from drug initiation.

Q.   Other than Faillie, can you identify any other study that supports the 1.6 year peak that you described?

A.   I would -- we would have to go through each study.  But I -- other studies aren't as well designed to answer that question as Faillie.  So I would say that that study is -- is best designed to answer that question with the evidence, with the data that we do have.

Q.   As you sit here today, can you identify any study that supports the 1.6 year peak period beyond Faillie?

MR. PENNOCK:  Objection to form.

Just some ambiguity in there.  Just go ahead and you're entitled to look at --

THE WITNESS:  So other studies aren't set up to assess that time period as well as Faillie is.  So if other studies don't have that same design, it's more difficult to come up with that timeline as it would be in Faillie.  So, again, Faillie has limitations, but there are also very positive aspects to it also, and that's why I want to look at each study and -- and see what they potentially can bring to the table, and I feel like the Faillie study is really good at bringing that timeline to the table because it looked at initiators of GLP-1 agonists, DPP-4 inhibitors, as well as SGLT2 inhibitors.

Q.  I want to know what you're relying on for your statement with the 1.6 year peak.

Is there anything, other than Faillie, that you're relying on for that view?

A.  So that number of 1.6 years does come from Faillie because of the way that study is set up.

Q.  And you indicated earlier that it was about a year and a half, so let's go a little bit broader. We've extended to a year and a half peak for the duration of a study to be well designed.

Are you relying on anything, other than Faillie, for that point?

A.  Well, so I also want to say that, you know,

if the peak is at one and a half years and if a study has a median follow-up of one and a half years, half of the patients in that study didn't meet that 1.5 years. So I do want to make that distinction that just because a study has a median follow-up of a period of time, doesn't mean it's assessing the number of patients necessary to reach those potential complications in time.

Q.   Understood.

But are you relying on any studies, other; than Faillie, to support your view about the one-and-a-half-year follow-up period understanding the -- the explanation you just gave?

A.   Right.  Again, we're looking at that study because that study does look at initiators of this drug.  And we're also looking at biologic plausibility, we're looking at the way things work clinically.

In my clinical experience, people don't get ileus or small bowel obstruction the second they take the drug.  These -- these complications are rare, but they do take time to occur typically from the initiation.

And part of that reason is because the dose titration, part of that reason is because it -- it -- of the way it works is through slowing small intestinal

motility as well as small intestinal flow.  So I -- I am using that study because that study is best equipped to do that in the setting of what makes sense clinically and biologically.

MS. WATRAL:  Let's go ahead and take a break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Off record at 10:33.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 10:47.

BY MS. WATRAL:

Q.   Dr. Lodhia, in doing your assessment in your Lilly report, you considered all GLP-1 medicines together as a class when determining whether there's a causal relationship to ileus and bowel obstruction; right?

A.   I felt like that was the most appropriate way to consider them based on the fact that, you know, the risk of SBO and small bowel ileus were directly related to receptor simulation.  And that way, we would have the most amount of power in terms of number of patients and duration therapy.

So I felt like, in this situation, particularly, it would be appropriate to consider them as a class.  If we're looking at other pleiotropic effects of GLP-1s or other idiosyncratic side effects,

I think that would be the -- that could be considered differently. But with this particular question, I think that it's most appropriate to consider it as a class -- consider them as a class.

Q. Is the same true for Exhibit 2, your expert report for Novo?

A. It is.

Q. Do you know how many different GLP-1 medicines are currently approved for use in the United States?

A. I do not have that number. No, I do not. I know it's constantly changing. I do not know how many are currently approved for use in the United States.

Q. Do you agree that each GLP-1 medicine has a different sequence of amino acids?

A. I don't know the molecular aspect of these GLP-1s, but I do know that they're all designed and they have all been gone through rigorous testing in terms of their ability to -- to agonize or stimulate the GLP-1 receptor.

Q. I'm going to ask you some questions now. I don't know what's in the scope or out of the scope of your opinions. It might just help us get through things a little faster today. Okay?

A. Perfect.

Q.   Is it in the scope of your report or out of the scope of your report about whether there are differences in amino acid sequences of -- among the various GLP-1 medicines, and how those affect pharmacokinetics of each GLP-1 receptor medicine?

A.   That would be out of my scope.

Q.   Is it in the scope of your report or out of the scope of your report whether differences in amino acid sequences among the various GLP-1 medicines affect the pharmacodynamics of each GLP-1 receptor medicine?

A.   That would be out of my scope, also.

Q.   Is it in scope or out of scope about whether differences in amino acid sequences among the various GLP-1 medicines affects the half lives of each individual medicine?

A.   Pharmacokinetics basically, that would be out of my scope.  I'm looking at predominantly their ability to stimulate the GLP-1 receptor.  And I'm not looking at the pharmacokinetics of the different drugs because my -- the -- the way I see it is this is all done through stimulating the GLP-1 receptors in the gut.

Q.   Is it in scope or out of scope whether each individual GLP-1 medicine has a different or the same shape at the molecular level?

A.    It's out of my scope.

Q.    So is it also out of scope whether there are differences about how tightly or loosely each different medicine binds to the GLP-1 receptor?

A.    It's within my scope to know they do bind and stimulate the GLP-1 receptor, but the way in which they bind is not within my scope, no.

Q.    So how tightly or loosely they bind is out of scope; is that right?

A.    That is right.

Q.    And is it also out of the scope reviewing molecular and atomic level studies about how the different GLP-1 medicines fit inside the GLP-1 receptor at binding?

A.    That is also out of my scope.

Q.    Is it also out of your scope whether the GLP-1 receptor changes shape when different GLP-1 agonists are bound to it?

A.    That is also out of my scope.

Q.    Is it also out of your scope whether intracellular signaling pathways can be activated by a GLP-1 receptor at a cell?

A.    So can you expand upon that?

Q.    Yeah.  Did you -- do you -- are you familiar with the phrase "biased agonists"?

A.    Yes.

Q.    Okay.  Did you offer any opinions about whether different GLP-1 agonists are biased agonists of the GLP-1 receptor?

A.    I did not know.

Q.    Did you offer any opinions about the physiological differences, if there are any, that occur when a cell -- sorry, that occur in a cell when its GLP-1 receptors are activated by a biased agonist?

A.    No, I did not.

Q.    Are you offering any opinions about how activation of a GLP-1 receptor and an intracellular signaling from that receptor ultimately lead to a physiological outcome in a gastrointestinal cell?

A.    So expand upon that.  I do talk a little bit about the physiology of GLP-1s, so expand upon your question.  I want to make sure we are thinking about the same thing.

Q.    Yeah.  I'm wondering if you're offering an opinion about how the activation of a GLP-1 receptor and the intracellular signaling from that particular receptor ultimately can lead to a physiological outcome in a gastrointestinal cell?

A.    So I'm talking about how in my report I offer an opinion on how GLP-1s when -- when GLP-1 is secreted

by the distal small intestine or it's given exogenously, how they bind to GLP-1 receptors in the gut and cause their effect. But I'm not offering any molecular opinions beyond that.

Q. You're not opining about intracellular signaling from receptors?

A. I'm not, no.

Q. In your report, did you compare the chemical structures of GLP-1 medicines to opioids?

A. No, I did not.

Q. Did you compare the chemical structures of GLP-1 medicines to antipsychotics?

A. So I didn't compare the chemical structures, no.

Q. Did you analyze whether GLP-1 medicines and opioids delay motility to the same extent?

MR. PENNOCK: Objection.

Go ahead.

THE WITNESS: I didn't compare extents of motility delaying in GLP-1 -- with GLP-1s and opiates.

BY MS. WATRAL:

Q. Did you analyze whether GLP-1 medicines and antipsychotics delay motility to the same extent?

A. I did not compare the extent to which antipsychotics and GLP-1 agonists delay motility.

Q.   Did you compare the mechanism of action of GLP-1 medicines to the mechanism of action for --

(Clarification by the reporter.)

BY MS. WATRAL:

Q.   Opioids.

A.   So I acknowledged that they both can slow the gut.  I didn't compare the way in which they slowed the gut, if that's what you're asking.

Q.   It is.

A.   The intercellular mechanism through that.

Q.   Would the answer be the same for antipsychotics?

A.   It would be.

Q.   Do you agree that GLP-1 medicines do not have anticholinergic effects?

A.   I'm not opining on that.

Q.   Do you agree that given the wide number of GLP-1 medicines out on the market, that differences in pharmacokinetics, efficacy, adverse reaction rates, and dosing requirements for each of the medicines needs to be evaluated independently?

MR. PENNOCK:  Objection.

THE WITNESS:  So it depends for what question you're trying to answer.  GLP-1s do have different pharmacokinetics, they have different half lives.  I

fully acknowledge that all GLP-1s are not the same in every way.  There's some combined mechanisms.  There's a triple mechanism that's being studied.

What I'm talking about is the effect of stimulation of the GLP-1 receptor, the direct effect of stimulation to the GLP-1 receptors in the gut and how that direct effect of stimulation of GLP-1 receptors in the gut can lead to the -- the questions we are trying to answer about small bowel ileus and small bowel obstruction.

BY MS. WATRAL:

Q.    Do all GLP-1 medicines have the same magnitude of effect on gastric emptying?

A.    So a lot of that is dose dependent.  So it's hard to compare different doses of different agents.  But all GLP-1 agents, through stimulation to the GLP-1 receptor, do impact gastric and small bowel motility.

But I'm here opining on small bowel motility, and I have not done an extensive literature review on their effect on gastric motility, so I prefer not to answer questions on gastric motility directly.

Q.    So you're not offering an opinion that all GLP-1 medicines have the same magnitude of effect on gastric emptying; is that right?

A.    I'm not commenting on gastric motility

because I don't like answering questions on which I have not an extensive literature review.

Q.   And you have not done an extensive literature review on whether all GLP-1 medicines have the same magnitude of effect on gastric emptying; right?

A.   I have not, no.

Q.   Is it also the case that you haven't done an extensive literature review on whether all GLP-1 medicines have the same magnitude of effect on testing motility?

A.   So I have done a literature review based on the data we have available, and we're -- I'm using the mechanistic studies as well as the epidemiologic studies.  And based on the science that we know, it's effect on the small bowel is dependent upon its stimulation of the GLP-1 receptor.

Q.   Let me try to understand that.

Have you done any extensive literature review on whether all GLP-1 medicines have the same magnitude of effect on intestinal motility?

A.   So there is no comparative data on different GLP-1s and its effect on intestinal motility.  I researched the information that we do have available. And, again, as I stated many times before, the effect of small intestine motility is directly related to the

GLP-1 stimulation.  So insofar as they stimulate the GLP-1 receptors, they -- they should have or they do have a similar effect on its ability to produce -- or its ability to cause ileus or small bowel obstruction because it's a direct effect of stimulation of the GLP-1 receptors.

Q.   Are you offering an opinion on that all GLP-1 medicines have the same magnitude of effect on intestinal motility?

MR. PENNOCK:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  So as I have said before, the effect on intestinal motility is directly related to the -- to the stimulation of the receptor.

BY MS. WATRAL:

Q.   Are you aware of any high-tech studies that compare the effect on intestinal motilities between various GLP-1 medicines?

A.   So typically studies are done when they're answering a question.  I don't think it would be worthwhile use of resources to compare that because of the fact that the effect on small intestine motility is related to its stimulation of GLP-1 receptor and not some other idiosyncratic or pleiotropic effect of these agents.

Q.   Understood.

But are you aware of any study that does do a head-to-head comparison of the effect on intestinal motility between various GLP-1 medicines?

A.   No, I am not.

Q.   Is it possible that some of the GLP-1 medicines have a larger effect on intestinal motility than others?

A.   I think a lot of it is dose dependent, so then we get into comparing equivalent dosages.  So, basically, we are looking at these different GLP-1 agents and all of them are dosed a little bit differently.  But we have to look at equipotent doses among different medications.  And if we're looking at that, then, you know, we should -- if we're looking at its direct stimulation to GLP-1 and its strength of that stimulation, then the direct effect of that is its effect on gut motility.  That is how GLP-1 works.

We have mechanistic data on that, so I think it's -- it gets circular to think about that when we are talking about different dosages that vary between different medications, but the effect of GLP-1 agonists as they say are to agonize GLP-1 receptors.

Q.   So can you give me an example of this just so I can -- I can understand using dulaglutide and

tirzepatide, what would be doses that would be on par doses to consider in an assessment of whether these two medicines have the same effect on intestinal motility.

A.   So, unfortunately, I don't prescribe GLP-1s. I am a gastroenterologist who manages patients who develop side effects from GLP-1s.  But I can't give you dose equivalents, but I can say that the ability to slow intestinal motility is a direct effect of GLP-1 agonism.

Q.   I asked you in my example about dulaglutide and tirzepatide.  If I subbed in liraglutide and semaglutide, would your answer be the same?

A.   It would be the same, yes.

Q.   Is it possible that some of the GLP-1 medicines improve intestinal motility in patients?

A.   A direct effect of GLP-1 agonism outside the setting of diabetic neuropathy would be to decrease intestinal motility.  That is what GLP-1 does physiologically.  And we have a good amount of mechanistic data, basic science data as well as some data in human subjects that illustrate that.

So, you know, there -- there are different combinations of drugs.  But agonism of the GLP-1 receptor does slow gut motility.  And the caveat to that is patients with diabetic neuropathy as we

mentioned before.

Q. Can you help me understand when you're considering something like the effect on intestinal -- intestinal motility, why can't you just pick one dose of one medicine and just pick another dose of another medicine? Why are you thinking about the -- this as dose dependent?

MR. PENNOCK: Objection.

THE WITNESS: So why can't we just pick one dose of one medicine and one dose of another medicine? I don't really -- I'm sorry, can you clarify the question?

BY MS. WATRAL:

Q. Sure. And thank you for asking for me to clarify.

You understand that each of these GLP-1 medicines have various doses that are available in the market; right?

A. Correct.

Q. And let's say one of the medicines has four doses that are available. Okay?

A. Okay.

Q. And another medicine has four doses that are available, but they're not the same doses. Okay?

A. Right.

Q.   Can I just pick one of the doses of one of the medicines and just randomly pick a different dose of the other medicine when I'm comparing the effect on intestinal motility?

MR. PENNOCK:  Objection.

THE WITNESS:  So we do know that increased doses, we have a dose-dependent relationship that higher doses of each medicine will stimulate the GLP-1 receptor to a greater degree than a lower dose of that medicine.  And I am not intimately familiar with the prescribing patterns of GLP-1s, but we have to examine that dose within each particular medicine.

Doesn't mean there's not equipotent dose in another medicine of another GLP-1 agonist.  I just don't know that dose because I'm not an obesity medicine specialist; I'm a gastroenterologist.  And they're having me answer a question about the gastrointestinal side effects of GLP-1 agents, not dose equivalencies.

But I will say that we do know that based on the physiology, GLP-1 receptors do slow gut motility in response to GLP-1 stimulation.

Q.   Did you consider dose when you were evaluating the various studies that you considered?

A.   So a lot of these studies don't mention dose.

A lot of epidemiological studies don't mention dose. We do have some mechanistic studies that do show a dose-dependent relationship. Couple of studies by Tolessa and another study actually in humans with IBS and healthy controls, we do see that dose-dependent relationship in those studies in both animal models as well as human models.

Q.    You definitely answered my question, but I had a different one in mind, if you don't mind.

A.    Okay.  All right.

Q.    Not your fault at all, so let me try again, if you don't mind.

When assessing the studies that you evaluated, did you consider the dose of a particular GLP-1 medicine that was studied to compare it to other medicines that were studied or weren't studied?  That's what I was wondering.

MR. PENNOCK:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  In the epidemiologic data I looked at, whatever we had available, a lot of times we would -- we would know what medication a patient was on, we didn't always have the complete data in terms of their dose and dosing history because that dose changes over time.  So what we did was we looked at patients on

a particular class of medicines and looked at, in a real world setting, how that -- how taking that GLP-1 medications would impact their risk of small bowel ileus or small bowel obstruction.

But, again, we didn't have the dosing history of all these patients in the -- in the epidemiological data, and that's why it's important that we have different types of studies when -- when arriving at a conclusion. When we are answering a question about a potential risk related to a drug class, we need to have epidemiologic data, obviously, to see how that potential risk appears to work in the real world.

We also need mechanistic data, and I feel like our mechanistic data is very important in our global understanding of how this -- how GLP-1s can impact the risk for small bowel ileus and small bowel obstruction.

Q. I'm going to ask you a few more questions about the 23 studies that you discussed in your report. Okay?

A. Okay.

Q. So I'm focused on the epidemiological study.

You understand the question I'm going to be asking about?

A. I understand.

Q.   Okay.  Great.  Do you know whether all 23 of those studies involved patients taking one of Lilly's GLP-1 medicines?

A.   So each study has -- each study lists what medication -- what medications they were taking.  But I can't tell you off the top of my head all 23 studies which medications they were on and whether they were Lilly's medications or not.

Q.   Do you know if all 23 included Lilly's medicines?

A.   I would have to look at that.  It wasn't an important question for me to answer, to be honest, and the reason is because I view them as a class effect and the FDA views them as such also.

Q.   Okay.  When you discussed each of the 23 studies in your report, did you mention whether any of those studies involved a Lilly medicine?

A.   I didn't -- I don't feel like the company that produces the medicine has an impact on the science, so I didn't get into that.  It wasn't a worthwhile question for me to answer.  I -- I am -- I'm not -- honestly, I'm not dealing with the legal aspect with different companies.  I'm more dealing with the scientific and medical aspect with the drug class.  So that wasn't even a consideration for me as I was going

through the -- the study which ones were Lilly and which ones were Novo Nordisk or which one was some potential other company.  I didn't think about that.

Q.   And to take the company out of it for a moment, do you know which GLP-1 medicines are the Lilly medicines?

A.   Not important to me; I don't know.

Q.   You don't know.  Okay.

Do you know whether any of the studies that you reviewed, those 23 studies, involved dulaglutide?

A.   Yes.  Some of them did.  I can't give you the -- I can't tell you every study right now without reviewing it.  But I can say that dulaglutide was on many of the studies.

Q.   Is there anywhere in your report where you identify the studies that involved dulaglutide?

A.   Where I separated that out?  Where I separated out dulaglutide from other studies?  Is that what you're asking?

Q.   No, I'm asking something a little different. Is there anywhere in your report which you indicate which of the studies involved dulaglutide?

A.   I just want to make sure I understand your question.  I would mention the medication particularly in the context of a study.  But I didn't do a separate

analysis of dulaglutide, and I didn't -- is that what you're asking?

Q.    Sort of.  Let me ask another question.

Is there any -- if I wanted to know your understanding of which studies involved dulaglutide, is there anywhere in your report I can look to see which ones involved dulaglutide?

A.    I would have to look -- you would have to look through the different studies.

Q.    I looked through your Lilly report, and I saw a few instances where you mentioned Novo medicines, but I didn't see any instance where you mentioned whether a study involved dulaglutide.  Are you aware of any instance where you did?

A.    So are we going through each study?  So, again, I -- I viewed these primarily as a class in -- I did not break it down in -- in each study between the Novo and the Lilly drugs.  I'm trying to make sure I understand your question.  I'm not trying to be evasive.  I'm just trying to understand your question.

Q.    No, that's helpful.  I think you said earlier you didn't do a separate analysis of whether there was an association or causation for dulaglutide; is that right?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  I -- I examined this as a class effect, and I think that's the most accurate way of stating what I did.  I examined this as a class effect.

BY MS. WATRAL:

Q.  Did you do a separate analysis of whether there's an association for dulaglutide in particular?

A.  So I did an analysis as a class effect and I applied it to the different GLP-1 receptor agonists.

Q.  Did you assess whether there is an association for dulaglutide based on studies that involved dulaglutide?

A.  Many of the studies involved dulaglutide, but, again, as we stated many times before, I considered this as a class effect and given the reasons why I considered this as a class effect.

Q.  Did you mention in your report -- or let me take a step back.

You understand that in some studies, there were specific findings for dulaglutide together with other GLP-1 medicines, and in other studies, there were end points that were just for dulaglutide in particular.  Do you understand that?

A.  I do understand that.  And I also understand that, you know, many of the studies included different

drugs.  And dulaglutide was on -- was a drug in many of these studies.  So I -- again, I consider them as a class effect.  So that's how I viewed it.  I feel like especially in these types of relatively uncommon side effects, we need to view them as a class effect if they are, in fact, related to the receptor stimulation of GLP-1.  And that's because we need to generate the power and the numbers in order to do an appropriate statistical analysis.

Q.    Do you know how many of the 23 studies involved tirzepatide?

A.    I do not know.

Q.    And did you do a separate assessment of whether tirzepatide in particular is associated with ileus obstruction?

A.    So I viewed them as a class effect and -- much like the FDA did -- and I made assessments on the different drugs as a class affects because this effect is directly related to receptor stimulation.

Q.    And you understand that in some studies there were results that were specific to tirzepatide?

A.    I understand that the different studies had results for the drugs that they studied.  I don't think any study stated that these results are limited to one particular drug or another.  Again, we are not looking

at -- we are not looking at other side effects.  We are looking at side effects directly related to agonism of the GLP-1 receptor.

Q.    Yeah.  Here's what I'm getting at.  There are some studies that look at GLP-1 medicines together, and when they're reporting their odds ratio or hazards ratio, they are doing it together for the medicine studied.

Do you understand that?

A.    Right.

Q.    There are other studies that will include data that are specific for a particular molecule.  So, for instance, they'll report an odds ratio or a hazard ratio for dulaglutide in particular not combined with other medicines.

Do you understand that?

A.    I understand that.

Q.    And --

A.    But what I -- I fully acknowledge that.  But I also want to let you know that when I am evaluating these studies critically, I'm evaluating it for the class of medications, because biologically, they should cause those same side effects through receptor stimulation.  So I don't think that any study said that the results were limited to one particular drug.

I would say that the conclusion that this study -- that a particular study made might be from the data we have on a particular drug, but in no way did -- were any of those studies limiting the results to that particular drug.  And that's why we also have similar class warning than the FDA or class for these particular side effects because they're viewed as a class by myself as well as by -- by myself as well as the FDA.

Q.   You understand that in some of the studies you reviewed they reported an odds ratio or hazard ratio for tirzepatide separate from other GLP-1s?

A.   Right.  They're -- they're reporting the results of the study.  When we read studies, we are evaluating the results and also seeing how they fit into our broader framework, and that's why we are looking at mechanistic studies as well as epidemiologic studies, and we're looking at different types of mechanistic studies, and we're -- we're overall coming to a conclusion in no study did they say that these results are limited to one particular drug.

Q.   I want to make sure we are speaking the same language when I ask the next few questions.  So if I refer to "class data," will you understand that I'm referring to a study that combines data for various of

the GLP-1 medicines?

A.    Yes.  I will understand that class data that you're referring to is for the class.

Q.    And if I refer to "molecule-specific data," what I'm referring to is where a study has data specific to dulaglutide or specific to tirzepatide or specific to semaglutide that's not grouped together with other molecules?

A.    So I do want to just clarify that I want to make sure we are on the same page.  So just because a study has more patients on a particular drug or did study a particular drug, in no way, shape, or form are any of these studies implying that it's only -- the results are only applicable to that particular drug and that might be the reason for a little bit of confusion.

Q.    Yeah.  And I want to focus on the -- the data so that I can be asking you precise questions about the data.  If I refer to data that is -- as molecule-specific data, will you understand that what I'm referring to there is a particular odds ratio or hazard ratio that was for one molecule rather than grouping together?

A.    I understand that.  But I also just don't want to -- don't want there to be an implication that it only applies to that particular drug when

Nilesh Lodhia    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

interpreting the results.

Q.    I understand.

A.    Are we on the same page there?

Q.    I understand what you're saying there.

A.    Perfect.

Q.    In your report, do you mention the molecule-specific data for tirzepatide or dulaglutide anyplace in your report?

A.    Can we go through studies?  Again, when I think about this in my mind, as a scientist, I think we think about this in terms of the class.  So I know there were studies that did just look at one medication.  I think a lot of these were -- hold on. There were some of the randomized studies -- where are they?  For example, the Gudbergsen study.

Q.    Where are you?

A.    Page 26.  So the Gudbergsen study looked specifically at liraglutide, but it was looking at the use in patients with symptomatic knee osteoarthritis. There were 156 patients; they were followed for one year, and they were not designed to evaluate bowel obstruction or ileus.

So yes, this study only looked at liraglutide, but there were clear, inherent limitations of this study when used to answer the question that we

are trying to answer in this report and in this deposition.

Lundgren study on the same page, page 26.

Q.   I'm just going to interject just to make sure my question is clear.

So my question is focused on dulaglutide and tirzepatide, so I just want to make sure you have that in mind.

A.   Okay.

Q.   In your report, when you're discussing studies, when you're doing your assessment of association, when you're doing your assessment of causation, is there anywhere where you discuss dulaglutide-specific data or tirzepatide-specific data?

MR. PENNOCK:  Take time to look at your report, if you need to.

THE WITNESS:  Okay.  I'm looking at my reports.  I -- again, I apologize.  I didn't think of it in those terms as a scientist, so I have to say I need to review my report to answer that question.

(Witness reviewing document.)  Almost done.

So based on my review of this report, I can't find any particular study that limits its -- its results to dulaglutide or tirzepatide.

/////

BY MS. WATRAL:

Q. Did you discuss in your report any data that is specific to dulaglutide or tirzepatide?

A. No. Again, we are dealing with side effects that are directly related to the GLP-1 receptor stimulation.

Q. Did you say anywhere in your report how you weighed molecule-specific data for dulaglutide versus class data?

A. I did not because of the reasons we discussed.

Q. Is the same true for tirzepatide?

A. It is.

Q. I want to ask you again about the 23 studies that you reviewed as the scope of my questions. Okay?

A. Okay.

Q. Of the 23 epidemiological studies that you reviewed, can you identify any that found a statistically significant increase in risk of ileus with dulaglutide use in particular?

A. Again, none of the studies specifically looked at dulaglutide that I'm aware of. We are looking at a class effect, but I couldn't find a significant study that looked at dulaglutide in particular.

Q.    Is the answer the same for obstruction?

A.    Yes.

Q.    Is the answer the same for tirzepatide and ileus?

A.    Based on the fact that none of these studies specifically looked at dulaglutide or tirzepatide, I would say that there's not a specific study that evaluated that.  It doesn't mean that there's not a study that would show an increased risk of obstruction or ileus in patients on those medications, it just means that none of the studies that we have were limited to those two drugs.

Q.    Can you identify any study that found a statistically significant increased risk of obstruction with tirzepatide use?

A.    I would say that we found an increased risk of obstruction, but not -- but no study specifically only evaluated tirzepatide.

Q.    Do you know whether Sodhi involved dulaglutide?

A.    So Sodhi involved liraglutide and semaglutide compared to buproprion and naltrexone.

Q.    Sodhi did not involve dulaglutide or tirzepatide; right?

A.    No, it did not.

Q.    What you talked about earlier was a dose comparison between various medicines, did you do an assessment of the doses of the medicines studied in Sodhi to see how they compared to the doses of the --

(Clarification by the reporter.)

MS. WATRAL:  Lilly medicines.

MR. PENNOCK:  Objection.  Objection.

THE WITNESS:  So, again, we have -- we have to go with the data we have available.  So we don't have all that data with all the liraglutide and semaglutide patients, so therefore we're unable to do that type of dose comparison.

BY MS. WATRAL:

Q.    Do you agree that gastrointestinal dysmotility is not the same as ileus?

A.    I would say that ileus is a severe form of gastrointestinal dysmotility, but -- but I do believe that as gastro- -- as small bowel motility continues to decrease, it can lead to an ileus.  But gastrointestinal dysmotility is a more generalized term.  And there -- it's a different term than ileus. But the mechanism through which GLP-1s can cause ileus is through increasing gastrointestinal dysmotility. We're talking about the small intestine in this situation.

Q.   So gastrointestinal dysmotility is a more general term that can include conditions other than ileus and intestinal obstruction.

Is that a fair way to understand what you're saying?

A.   I would say that gastrointestinal motility, yeah, just applies to -- or dysmotility applies to altered motility of the gastrointestinal tract and can lead to these conditions, but it doesn't necessarily lead to these conditions.

Q.   So a patient can have gastrointestinal dysmotility that does not lead to ileus; right?

A.   A patient can have GI dysmotility without ileus, yes.

Q.   And a patient can have GI dysmotility that does not lead to obstruction; right?

A.   Yes.   And I also do want to use your point, if we can, to further elucidate some of the issues we are dealing with in these studies.   So a lot of times when patients are placed on GLP-1 receptor agonists, they do have signs and symptoms of gastrointestinal dysmotility.   And when they do have those signs and symptoms, the doctor may either stop the medication entirely or decrease the dose to try to prevent one of these events from occurring.   So that also does shed

some light on how these conditions can -- can be impacted by clinical practice.

Q.   Can you give me an example of a patient that would have gastrointestinal dysmotility but wouldn't have ileus?  What would it look like in that patient?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  I mean, there's a lot of patients -- I mean, gastrointestinal dysmotility is a -- is a generalized term.  It can relate to the esophagus, it can relate to the stomach, it can relate to the small bowel or the colon.  And people can have increased motility or decreased motility.  So I think that that's a very -- that's a very difficult hypothetical to answer.

Also, if we consider the fact that many people with dysmotility can have varying symptoms and some may not be symptomatic, people have different thresholds for developing symptoms.

So I think it's very difficult to say what a patient with gastrointestinal dysmotility would look like.  I can't answer that question because it's too broad and too generalized and too hypothetical.

Q.   You're also getting at what I was wondering,

so this is helpful.

So gastrointestinal dysmotility includes dysmotility in the esophagus, the small bowel, the colon.  It's not specific to ileus or small bowel obstruction.  Is that fair?

A.   I would say that gastrointestinal dysmotility is a general term.  In this deposition or this report, we're talking about the effects on the small intestine. But yeah, gastrointestinal dysmotility with or without GLP-1s can be of any patient part of the gastrointestinal tract, as the name implies, and can have a variety of symptoms and manifestations, yes.

Q.   Thank you.  That was helpful.

Is gastrointestinal dysmotility the same as delayed gastric emptying?

A.   Delayed gastric emptying is a type of gastrointestinal dysmotility.  So, again, as we talked about, there are numerous parts of the GI tract and motility can be decreased or -- or increased.  And gastrointestinal dysmotility is a very broad category within which we have esophageal dysmotility, we can have delayed gastric emptying, for example, we can have decreased small bowel motility, we can have altered colonic motility.

So gastrointestinal dysmotility is a more

generalized term within which gastric -- delayed gastric emptying is a part of that.

Q. Functional bowel obstruction is another name; for ileus; right?

A. Yes.

Q. Functional bowel obstruction is different from mechanical bowel obstruction; right?

A. That is correct.

Q. Ileus occurs in the absence of mechanical obstruction; right?

A. Ileus occurs in the absence of a clear mechanical obstruction. A lot of times it's considered a functional obstruction -- obstruction as you mentioned. But in the setting of GLP-1s, they can be closely related.

Q. When diagnosing ileus, one of the things that you look for is the absence of evidence of a mechanical bowel obstruction?

A. That is correct. A lot of times they'll need a CT to evaluate for mechanical obstruction so we can differentiate whether there's a mechanical obstruction or whether it's just purely functional because of dysmotility of the small intestine.

Q. I see. So to differentiate between mechanical obstruction and ileus, something like a CT

scan is required.

Is that what you're saying?

A.   Depends on the situation.  A lot of times the x-ray is appropriate.  It depends on the pretest probability of findings mechanical obstruction and what the overall clinical situation is.  I acknowledge that sometimes the diagnosis may be blurred because sometimes they can have very similar symptoms.  And ileus is basically very similar symptomatically in the setting or outside the setting of a mechanical cause of that obstruction.

I will also say that a small bowel obstruction can be much more severe and is more likely to result in bowel ischemia, severe consequences of lactic acidosis, sepsis, and potentially death and may also require surgery.  Whereas, typically an ileus doesn't get to that point because there's no mechanical obstruction.

But yeah, sometimes that is a diagnostic question that we have to ask ourselves when people present with similar symptoms.  Similar signs and symptoms, whether they have a functional obstruction, known as an ileus, or a mechanical obstruction, known as a small bowel obstruction.

Q.   Do you agree that imaging is essential to

diagnose mechanical obstruction?

A.    I never like saying things are essential. But almost always it is -- it is necessary.

Q.    Let's take a look at page 19 of your report, Exhibit 1.  You actually start on page 18.

A.    Okay.

Q.    I'm asking you about the section of your report E that talks about small bowel mechanical obstruction.

Do you see that?

A.    I see that.

Q.    At the top of page 19, you say, "Similar to an ileus, patients typically present with abdominal pain, distension, nausea, vomiting, and constipation."

So you're talking about mechanical obstruction; right?

A.    Yes.

Q.    Then you say, "Imaging is essential for diagnosis."

Do you see that?

A.    That is correct.  So I guess the caveat that -- the distinction I'm trying to make is, yes, an imaging test is necessary, but, for example, if we know that a patient has a small bowel mass, if we know that they have a small bowel mass, we may not need an

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

imaging in that particular setting, but they have a known mass.

You see my point?

Q. I don't.

A. Okay. If someone had imaging previously and they have a known 5-centimeter jejunal mass, and they come in to the hospital with these signs, we can say that it's likely an obstruction. So, I guess, when speaking -- I hate using terms like "essential," because they leave the door open. But, in general, yes, we do need -- we need -- we do need some form of imaging.

When -- when I was clarifying my statement, I said it's -- what words did I say exactly? I said it's almost always necessary or something like that.

Q. Why don't I ask this: Do you stand by the statement in your report that imaging is essential for diagnosis in this context talking about mechanical bowel obstruction?

A. I would say that imaging is typically necessary for a diagnosis.

Can we keep it at that?

Q. Is it essential?

A. Imaging at some point, yes.

Q. So --

A.   How about --

Q.   -- whether imaging at the point in time of diagnosis or shortly before.  Is that fair?

A.   Yeah.  That would be a more fair way of stating that, yes.

Q.   Go to page 6 of your report.

A.   Okay.

Q.   I was looking at page 7, which is why I couldn't find what I was going to ask you.

A.   Are we going to page 6 or 7?

Q.   No.  Supposed to be page 7.  Give me a moment, please.  At the very bottom paragraph, it starts with "Many published reports."

Do you see that?

A.   Yes.

Q.   And in the second-to-last line -- that might be the easiest way to find it -- you say that, "Because of this and because ileus and obstruction can be viewed as points along a continuum of drug-induced gastrointestinal dysmotility injury with GLP-1 receptor agonists."  It's a fragment of your sentence.

Do you see that?

A.   I see that.

Q.   Do you agree that ileus is a gastrointestinal adverse reaction?

A.   So adverse reaction.  So, I mean, adverse reaction to what?  I just want to make sure.  In the setting of GLP-1 agonist use, ileus is an adverse reaction -- is a gastrointestinal adverse reaction, yes.  It's one of many adverse reactions that we have in the GI tract for -- from GLP-1 agonists.

Is that what you're asking?

Q.   It is.

And intestinal obstruction is a gastrointestinal adverse reaction in the context of GLP-1 medicines; right?

A.   I would say that, yes, I would consider that as an adverse reaction to GLP-1 agonists.

Q.   You note in this paragraph that, "Many published articles group together ileus and mechanical obstruction."

Do you remember discussing that in your report?

A.   I do remember discussing that, yes.

Q.   And you say that, "Some articles use ICD codes or outcome definitions that encompass both ileus and mechanical obstruction."

Do you see that?

A.   I see that.

Q.   Okay.  In your view, is it appropriate for

articles -- or let me ask you a different question.

When assessing the risk of ileus, is it appropriate to combine together ileus and mechanical bowel obstruction?

A.   So in the setting of GLP-1 receptor agonist use, they are thought to be related.  Outside that setting, they may not be as closely related.  But when -- when looking at causal effect from GLP-1 receptor agonists, the theory is that the slowing of gut motility as well as the slowing of intestinal flow can lead to these enteroliths or fecaliths, these -- these concretions of gastrointestinal contents that then can lead to a small bowel obstruction.

So it depends on what question we're trying to answer.  If we're talking about -- specifically about the risk of GLP-1 receptor agonist and the risk of ileus and small bowel obstruction, then, yes, they are viewed along the continuum.  In many other situations, they may not be.

Q.   That's helpful.  Let me ask a specific question.

In the context of GLP-1 medicines and ileus, is it appropriate to consider together data about ileus and mechanical obstruction when assessing causation?

MR. PENNOCK:   Objection to form.

Go ahead.

THE WITNESS:  So we are asking the same question.  In one question we're discussing the risk of ileus and obstruction.  And in a perfect world, I wish -- which -- sorry.  I can't say that.  I wish that each study would separate the two out and we can look at differential risk for both.  Unfortunately, we don't have all of these data; so we have to use the data we have available to arrive at the -- at the most scientifically accurate conclusion that we can.

BY MS. WATRAL:

Q.   If you were sitting down today and working through the method of a study that looked at whether there was a relationship between GLP-1 medicines and ileus, would you group together data about ileus and mechanical obstruction or would you consider them separately?

A.   In an ideal study, I would consider them separately.  However, I think there is some validity to -- I wouldn't -- to -- to studies that do group them together.  I wouldn't completely discount a study because they group them together.

Again, earlier you were asking me about assigning different points for different criteria, and I said I can't do that because there's so many

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

different criteria we have to consider.  And, yes, in a perfect study, I would love to separate the two out, but I don't have every study that's exactly the way I want it.  So we have to use the totality of the evidence.

Q.    Which ICD codes do you think are most likely related to decreased intestinal motility?

A.    So I personally do not know all the different ICD codes in my computer.  When I -- when I'm seeing a patient, I type in the diagnosis, and it gives me different ICD codes.  I don't know them.

Q.    Do you consider yourself an expert in ICD codes?

A.    I do not.  No.  Nor do I want to be.

Q.    Do you know whether literature that looks for motilities should examine ICD Code K59.2, for example?

A.    Can you tell me what ICD Code 59.2 is?

Q.    Do you know that?

A.    I do not know that.

Q.    Okay.  Have you ever published anything about what ICD codes are proper to use when evaluating whether a GLP-1 medicine causes ileus or obstruction?

A.    I have not published anything like that.

Q.    Have you seen anyone else publish anything about which ICD codes are appropriate to use when

evaluating whether a GLP-1 medicine causes ileus?

A.    No, I have not.

Q.    Would your answers be the same for obstruction?

A.    I have not seen any publication on the appropriateness of different ICD-10 codes for ileus or obstruction, particularly in the setting of GLP-1 receptor agonist use.

Q.    Have you ever advised someone who was doing an assessment of GLP-1 medicines and ileus or obstruction about what ICD codes they should use?

A.    I have not, no.

Q.    Is there anywhere in your report that you list out and compare the ICD codes that were used across various studies -- the 23 studies that you reviewed?

A.    Can you ask me that question again?

Q.    Yeah.  Absolutely.

Is there anywhere in your report where you discuss particular ICD codes that the various 23 studies use and compare the particular codes with one another across studies?

A.    No.  The studies provide variable information on what ICD codes are used.  And this is not only limited to this search, but in general when reading

studies, we are looking at the diagnoses, but I don't know, and a lot of times it's not provided, which ICD codes are used in the study's methodology.

Q.   When you were doing your analysis here, did; you separate out studies that were looking at ileus from studies that were looking at obstruction?

A.   I did not.  One is because they represent a point along a continuum in the setting of GLP-1 receptor agonist use.  And two is because all the studies weren't that explicit.  So I wasn't able to ascertain all that data as I would have liked.  And; again, all these studies have pros and cons.  None of these studies are perfect.  So I have to use the evidence that we have available to us.

Q.   Do you know whether any of the studies listed the ICD-10 or the ICD codes that were evaluated in the study?

A.   Off the top of my head, I can't remember which studies list ICD-10 codes that they used.  I can't remember.

Q.   Do you know if any did?

A.   I know that they listed the diagnosis -- diagnoses they used, but I can't -- I can't remember the ICD-10 codes that were -- that were listed or used.

Q.   And if they were ICD-9 codes, would that

change your answer in any way?

A.    Not at all.  Again, I'm the furthest thing from an expert for ICD-10 codes --

MS. WATRAL:  Paul, we're at --

THE WITNESS:   -- or 9.

MS. WATRAL:   -- we're at the hour point again.  I have what I think is really ten minutes now.  Do you want me to keep going?  Do you want to take the lunch break now?  Just want to be mindful of timing on this.

MR. PENNOCK:  I think we should keep going.

Is that okay?  You good with that?

THE WITNESS:  I'm fine with that.

BY MS. WATRAL:

Q.    Let's look at page 3 of your report, Exhibit 1.  And let me know when you're there.

A.    Okay.  I'm there.

Q.    I want to look at the third paragraph in your Summary of Opinions section.  Your last sentence says, "It is well accepted in the medical communities and it is my opinion, held to a reasonable degree of medical and scientific certainty, that GLP-1 receptor agonists cause ileus and bowel obstruction."

Do you see that?

A.    I see that.

Q.    We talked earlier about functional obstruction, mechanical obstruction.  Which one are you referring to here when you say it is your opinion that GLP-1 receptor agonists cause bowel obstruction?

A.    So when I separate ileus from bowel obstruction, I'm separating out functional obstruction from mechanical obstruction.

Q.    So you're offering an opinion in this case that GLP-1 receptor agonists cause mechanical bowel obstruction?

A.    I am.

Q.    Are you offering an opinion that GLP-1 receptors -- let me take a step back.

When I asked you earlier about the question you were asked when the plaintiffs reached out to you, you said that you were asked to evaluate ileus and small bowel obstruction.

Do you remember that?

A.    That is correct.

Q.    Are you performing an evaluation about whether there's an association or causation with large bowel obstruction?

A.    I'm not commenting on large bowel obstruction.  I'm commenting on small bowel obstruction.  That's the question that I was asked to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

answer.

Q.   Are you offering an opinion about whether GLP-1 medicines cause severe constipation?

A.   So severe constipation is not the question that I was asked to answer.  So that's not what my literature review was -- was based upon.  Now, I mean we talked about the dysmotility associated that can cause constipation.  But my -- my literature review was focused on ileus and small bowel obstruction.  So I prefer to just focus on what we've done in the literature review on, what I've done the literature review on and not other similar potentially related symptoms.

Q.   When I was asking earlier about what's in your scope and out of your scope, this was all out of your scope, whether these medicines cause severe constipation.  Is that fair?

A.   So, clinically, I have seen patients with severe constipation on GLP-1 receptor agonists.  But in terms of the scope of this research that I currently did, I would -- it would be out of my scope.

Q.   And you -- as you said, you didn't do a literature review assessment about whether these medicines cause severe constipation; right?

A.   That is correct.

Q.   Here's another exercise of is this in scope or out of scope.  Okay?

A.   All right.

Q.   I think this will cut through things to let us prioritize what we need to.

Are you offering an opinion that GLP-1 medicines cause intussusception?

A.   I'm not offering an opinion on that.

Q.   Are you offering an opinion that GLP-1 medicines cause intussusception that ultimately leads to mechanical obstruction?

A.   I'm not offering an opinion on intussusception at all.

Q.   And so you're also not offering an opinion that there's some basis to believe that there's a causal relationship between GLP-1 medicines and intussusception; is that right?

A.   Unfortunately, I didn't do a review on that, so it's difficult for me to comment on that.

Q.   Fair.

Are you offering an opinion that there's basis to believe there's a causal relationship between GLP-1 medicines and --

(Clarification by the reporter.)

MS. WATRAL:  Volvulus.

THE WITNESS:  I'm not.  I did not do a literature review on volvulus, so I'm not offering an opinion on that.

BY MS. WATRAL:

Q.   How about gallstone ileus?

A.   I'm not offering on opinion on that, either.

Q.   Intestinal adhesion?

A.   So I'm not offering an opinion on that.

Q.   Obstruction of the duodenum?

A.   The duodenum is part of the small intestine, but I didn't isolate any data particular to the duodenum.  So I can -- I can discuss it in terms of the general context of the small intestine, but I can't offer a specific data for the duodenum.

Q.   So you won't be offering an opinion that there's a basis to believe that there's a causal relationship between the GLP-1 medicines and the occurrence of obstruction of the duodenum?

A.   So I can't -- I can say that mechanically GLP-1 agents can slow down the entire small intestine which does slow the duodenum, but I'm not going to specifically comment on its individual risk in the duodenum.  It doesn't -- I'm not saying that it doesn't -- it doesn't decrease the motility of the duodenum and can't lead to obstruction, but in the

context of my literature review, I didn't isolate the duodenum from other parts of the small intestine.

Q.   That's what I'm trying to understand.  Given you didn't do that literature review for obstruction of the duodenum, you're not going to offer an opinion that there's a basis to believe there's a causal relationship between GLP-1 medicines and obstruction of the duodenum in particular?

A.   Well, I just can't comment on a differential impact on the duodenum.  I can comment on the small intestine and the duodenum being part of the small intestine, but I can't comment on the differential effect of the duodenum.

Is that what you're asking?

Q.   Yeah.  Here's what I'm getting at.  I just want to understand, are you going to stand up in court and say, Judge, I have done an assessment of ileus, I have looked at obstruction, and one of the things I'm here to tell you is there's a basis to believe that there's causation between GLP-1 medicines and obstruction of the duodenum.  That's what I'm trying to understand.

MR. PENNOCK:  Objection.  Form.

THE WITNESS:  I guess, it's a little bit of a difficult question for me.  And the reason I say that

is because the duodenum is part of the small intestine. And we do have data that it does slow down the entire small intestine. I don't have differential data for the duodenum, but it doesn't mean that it -- it doesn't mean -- it doesn't mean that it's not associated with duodenal obstruction. I'm just saying I don't have differential data for the duodenum.

You know, we talked about all these studies and the pros and cons and a lot of them didn't break it down as to the particular site of the small intestine. So, I mean, I can say that GLP-1s do slow down the -- the small intestine, and the duodenum is part of the small intestine. I just can't -- can't comment at this moment on a differential effect of the duodenum compared to other parts of the small intestine.

Q. Are you offering an opinion that there's a basis to believe there's a causal relationship between GLP-1 medicines and occurrence of the obstruction of the duodenum that leads to a mechanical obstruction?

A. I think the same -- same answer applies. I mean, the duodenum is part of the small intestine. I just can't comment on the differential effect of the duodenum as compared to the rest of the small intestine. I hope I'm able to answer your question the way you're -- what you're trying to get at, but the

duodenum is part of the small intestine.  I just don't have any differential data for the duodenum.

Q.  And I think I'm understanding this, but you haven't identified data that is specific to the obstruction of the duodenum that you're considering in reaching your -- reaching your conclusions in this report in those 23 studies.  Is that fair?

A.  Exactly.  I don't have specific data for the duodenum, but the duodenum is part of the small intestine.

Q.  Are you offering an opinion that there's some basis to believe that there's a causal relationship between strictures and GLP-1 medicines?

A.  So I don't believe that GLP-1 medications cause strictures.  I do believe that strictures in a setting of GLP-1 medications can work synergistically to potentially cause obstruction.  And, you know, we can talk about that when we talk about some of our IBD cases.  But I don't -- I don't believe that GLP-1 medications cause an intrinsic stricture to the small intestine.

Is that what you're asking?

Q.  It is.  Are you offering an opinion that there is a basis to believe there's a causal relationship between GLP-1 medicines and

diverticulitis?

A.    I'm not going to comment on colonic diverticulitis because that wasn't part of my report. Nor am I going to even comment on small bowel diverticulitis because I did not -- that -- that -- I did not do the research on that.

Q.    And that's what I'm trying to understand, just what's in and what's out.

A.    Right, right, right.  The duodenum is still part of the small intestine; that's part of my review, although it's not specific to the duodenum, whereas diverticulitis is not part of my review.

Q.    How about bowel ischemia?

A.    That, again, gets a little bit open to interpretation because small bowel obstruction can lead to bowel ischemia.  But I wouldn't say an -- I wouldn't say that I'm going to comment on an independent association between GLP-1s and bowel ischemia outside the setting of obstruction or ileus.

Q.    What about bowel ischemia that precedes a bowel obstruction?  Are you saying -- are you going to be offering an opinion that GLP-1 medicines can cause bowel ischemia in that instance?

A.    I would only offer an opinion on bowel ischemia that is relate- -- that is temporarily related

to a cause of ileus or small bowel obstruction.  So if -- if it precedes an ileus or small bowel obstruction, I would not be offering an opinion on that.

Q.   Are you offering an opinion that there is a basis to believe that there's a causal relationship between bowel perforation and GLP-1 medicines?

A.   That's also a little bit of a difficult question because ileus or small bowel obstruction can lead to a bowel perforation, but I will not offer an opinion on independent association of GLP-1s and bowel perforation outside the setting of ileus and small bowel obstruction.

Q.   And is the same true as for bowel ischemia that if the bowel perforation precedes the ileus or obstruction, you're not offering an opinion there's a basis for a causal connection there?

A.   Not based upon my literature review, no.

Q.   So you agree with me?  I just want to make sure our no's are in line?

A.   Yes, yes, yes.  So let me just state it again so we -- we both agree.  So I'm not going to offer an opinion on the -- on GLP-1s causing bowel perforation if it's not through obstruction or ileus.

Are we good?

Nilesh Sodhia    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   Yes.   You're not offering an opinion that there's a basis to believe that there's a causal relationship between GLP-1 medicines and inflammatory bowel disease?

A.   No.   I will not -- I will not offer any basis for GLP-1s leading to inflammatory bowel disease.

Q.   How about hernias?

A.   No.

Q.   Same answer?

A.   Same answer.   I am not going to offer any opinions on GLP-1s leading to hernias.

Q.   Same answer for tumors or cancer?

A.   The same answer.

Q.   How about Ogilvie syndrome?

A.   So Ogilvie syndrome is basically related to the colon, and I did not -- I did not review the data on GLP-1s and the risk of Ogilvie syndrome; so I will not offer an opinion on that.

MS. WATRAL:   Let's go ahead and take our lunch break.

THE WITNESS:   All right.

THE VIDEOGRAPHER:   Off record at 12:04.

(Whereupon a lunch recess was taken.)

THE VIDEOGRAPHER:   On record at 12:40.

/////

BY MS. WATRAL:

Q.    Doctor, do you agree that fecal impaction occurs in the colon?

A.    I agree that it can occur in the colon, yes.

Q.    Does fecal impaction occur outside of the colon?

A.    Well, we can get fecaliths, enteroliths, which is basically the same concept.  In the small intestine, we can get a fecalith in the -- in the distal small intestine.

Q.    How about fecal impaction, can that occur outside of the colon?

A.    Well, we're talking about stool, yes, it can occur in the -- the -- the -- in the small intestine, in the distal small intestine.

Q.    I want to understand your opinion about the instance when GLP-1s can cause mechanical bowel obstruction.

A.    Okay.

Q.    What is the situation you say when a GLP-1 medicine causes a mechanical bowel obstruction?  How does that proceed?

A.    So can we go to one of the mechanistic studies?  Would that be okay just for explanation?  We can discuss on page 22 and 23.  So there is a

mechanistic study by Thazhath, and there's also another mechanistic study by Nakatani.

So the mechanism I provide as far as how this occurs is basically through a decreased small intestinal motility, as well as the decreased small intestine flow of intestinal contents.  Now, the study Thazhath very well describes how this can happen in that it uses both manometry to detect small intestine motility as well as it uses impedance to detect flow.

And what it shows is that it not only decreases small bowel motility, but it also decreases small bowel flow.  So what happens when it decreases both intestinal motility and flow is these intestinal contents can form through the decreased motility and decreased flow and develop an enterolith, and that enterolith that develops can lead to a mechanical obstruction.

Q.   Thazhath and Nakatani, the two studies you just referenced, those are mechanistic studies; correct?

A.   Those are mechanistic studies, yes.  And, again, we are using mechanistic studies to provide biological plausibility and to shed some light on the epidemiological studies.

Now, Nakatani is looking at patients in the

hospital who swallow what's called a capsule endoscopy, and what they found is that the small bowel residue rate was increased in patients who are on GLP-1 agonists.  So the same kind of concept where decreasing small intestinal flow, which would be evidenced as an increased residue rate in the capsule endoscopy, and by that increased residue, we are basically allowing these GI contents to form into an enterolith and cause a mechanical disruption.

Q.   I want to look at page 6 of your report.

A.   Okay.  I'm there.

Q.   Give me one moment, please.  Give me one second.  I think my page is wrong.

A.   Sure.

MS. DONELLE:  It is page 8.  We're two off.

BY MS. WATRAL:

Q.   Let's go to page 8 at the top.  You -- you start at the top there saying, "This drug-induced slowing of motility can cause ileus, a functional bowel obstruction."

Do you see that?

A.   I see that.

Q.   You then say, "In some cases, it can progress to mechanical bowel obstruction where hardened stool or fecal impaction actually blocks the intestines."

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

See that?

A.    I see that.

Q.    And then you say, "In other words, these drugs slow the intestinal tract.  In some individuals, that effect can become so pronounced it results in severe constipation and/or ileus."

Do you see that?

A.    I see that.

Q.    You -- in the second sentence that I read through there, you're talking about a scenario where there is a bowel obstruction; correct?

A.    So in some cases, sentence -- that sentence, yes.

Q.    Yes.  And specifically mechanical bowel obstruction; right?

A.    Yes.  Correct.  We are differentiating ileus, a functional bowel obstruction, from mechanical bowel obstruction.

Q.    And when you say "in some cases it can progress," you're describing ileus from the previous sentence; correct?

A.    Right.  This drug-induced slowing of motility that can then lead to an ileus which can ultimately lead to a mechanical small bowel obstruction through --

(Clarification by the reporter.)

THE WITNESS:  The formation of a fecalith or an enterolith.

BY MS. WATRAL:

Q.  So the steps you're describing here are there is slowing of intestinal motility that leads to ileus, ileus then leads to a mechanical obstruction where hardened stool or fecal impaction blocks the intestines; right?

A.  Right.  And I think the other point that I'm making is we also -- we not only have decreased motility, but we have decreased small intestine flow. So together those combine to allow for the formation of contents such as a fecalith or enterolith, which can subsequently block the intestine, yes.

Q.  The scenario you're describing in your report on page 8 contemplates that a patient first has ileus, then has mechanical obstruction; right?

A.  I would -- I would not necessarily say that. And I can say that the slowing of motility can progress to an ileus, but it can be extremely slow motility which might be not the definition of a ileus, but that slow motility can lead to a formation of a fecalith or enterolith if I'm just going to be more specific.

So it starts out with slowing of motility. That slowing of motility can go down one path and lead

to an ileus, whereas that slowing of motility can also predispose to the formation of a hardened concretion such as a fecalith or enterolith which may never have seen the discrete ileus, but may have just led to a small bowel obstruction.

Q.    And you just pointed me to two mechanistic studies, Thazhath and Nakatani.

Are you aware of any of the 23 epidemiological studies that you cite that finds there is an increased risk of mechanical obstruction through this pathway that you described?

A.    That's not what the epidemiological studies are designed to do.  The epidemiological studies are designed to look at the incidence of these conditions and the mechanistic studies have to try to explain why.  So the epidemiologic studies are not designed to be mechanistic by definition.

Q.    And so do you agree that you do not identify an epidemiological study that identifies an increased risk in patients taking GLP-1 medicines of mechanistic bowel obstruction through the pathway that you described?

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  I believe that the epidemiologic studies are not designed to do that.  I

Nilesh Sojitra    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

believe the epidemiologic studies are designed to look at the incidence of small bowel obstruction or small bowel ileus, but they're not designed in any way, shape, or form to describe mechanisms.

BY MS. WATRAL:

Q.    You just told me how they're designed.  I wanted to understand what the data shows.

So is there any study of your 23 that shows that there is an increased risk of mechanical bowel obstruction in patients taking GLP-1 medicines?

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  So in order to discuss what the data show, we have to design what the studies are there to evaluate.  And as I stated, the studies are not designed to evaluate mechanistic data like that.

BY MS. WATRAL:

Q.    My last question was a little bit different, though.

Can you identify any of the 23 studies that you cite, the epidemiological studies, that find a statistically significant increased risk of mechanical bowel obstruction in patients taking GLP-1 medicines?

A.    So we're talking about any study that shows an increased risk of GLP-1 medications causing a small bowel obstruction?

Q.   Causing mechanical bowel obstruction.

A.   So we look at Sodhi, for example, on page 27, No. 6.  And that looks at bowel obstruction in the setting of GLP-1 agents.  They don't specifically state whether it's mechanical or functional and they tend to lump them together in this analysis.  And this study does show a statistically significant increased risk. We can look at Faillie and also see that's significantly increased risk.

So is that what you're asking?

Q.   No.  So looking at mechanical obstruction in particular, not grouped together with ileus, but mechanical obstruction separate, is there any study that finds a statistically significant increased risk of mechanical obstruction in patients taking GLP-1 medicines?

A.   So these studies do show an increased risk. And, unfortunately, they don't help differentiate very well between mechanical or functional obstruction.

Q.   Can you identify a study that looks at Lilly-specific data, so data for dulaglutide or tirzepatide, that find a statistically significant increased risk of mechanical obstruction?

A.   So as I stated, as we have discussed before, we don't have any studies that limit it to the Lilly

drugs dulaglutide and tirzepatide.

Q.   Are -- does Nakatani show whether there is development of fecaliths in patients taking GLP-1s?

A.   Although Nakatani does show an increase in small bowel residue rate, it doesn't specifically show the development of fecaliths.  So this is how we interpret the data together, and that's why we're looking at both the mechanistic data as well as the epidemiologic data.

So you asked me earlier if the epidemiologic data provides a mechanism, and it's -- it's -- I understand it wasn't designed to do so.  Similarly, the mechanistic data has its limitations.  It can provide a mechanism but it doesn't provide the incidence rates or what the actual clinical outcomes could be.  This was a study looking at patients in whom they underwent the capsule endoscopies and they found, among other things, increased residue rates in their patients.

Q.   Nakatani did not show enterolith development, either; right?

A.   It showed increased residue rate that could lead to enterolith development.

Q.   But it did not actually show enterolith development?

A.   Not in -- in the confines of that study.

Nakatani did not show enterolith, but it did provide a mechanism for the formation of enteroliths.

Q. Thazhath did not show fecalith or enterolith development; right?

A. Again, it provided a mechanism through the use of impedance in the formation of gastrointestinal contents that can form a fecalith or enterolith, but within the confines of that study, it did not directly show the enterolith formation. It did set the understanding of how that would occur.

Q. Do you know what led to the mechanical obstruction in the patients in the Sodhi study?

A. We do not know what led to the mechanical obstruction in those patients, no.

Q. Do you know whether it was intussusception versus volvulus versus something else?

A. We don't have that level of detail. We do know there was a differential effect on patients on GLP-1s compared to buproprion and naltrexone, but we don't have data on all the individual patients and how they developed the small bowel obstruction.

Q. Are you -- of your 23 studies, are you aware of any that shows a statistically significant increased risk of mechanical obstruction in patients who have hernias?

A.    So can you repeat your question?

Q.    Yeah.  In your 23 epidemiological studies, are you aware of any that shows a statistically significant increased risk of mechanical obstruction in patients taking GLP-1 medicines who have hernias?

A.    So we do have separate data showing that a hernia is a major risk factor for the development of small bowel obstruction.  These studies weren't there to evaluate that.

Q.    Which studies are you referring to that --

A.    The 23 epidemiologic studies are -- they're designed to look at GLP-1 agonists and they're not designed to assess the risk of small bowel obstruction from a hernia.

Q.    You indicated that they are -- there is separate data showing that a hernia is a major risk factor for the development of small obstruction.

Do you discuss that data in your report?

A.    It's not in these 23 epidemiological studies. It's basically in the foundation in the small bowel in my discussion of small bowel obstruction.  We can get to that in my report.

Let's see.  It looks like it's page 18.  I talk about interperitoneal adhesions as the most common cause of mechanical obstruction in industrialized

countries.  And I also say that hernias are the next

most common cause responsible for about 10 to

30 percent of SBO cases.

But I did not -- other than my discussion on

this paragraph, I don't have separate epidemiological

reports in detail that discuss hernias.  I didn't think

that was important for this discussion.

Q.    Understood.

And I just want to make sure I understand.

I'm focused on patients taking GLP-1 medicines.  So I

want to just make you sure you haven't identified a

study that shows an increased risk in that patient

population of mechanical obstruction in patients who

have hernias.

A.    So there are studies that look at the

presence of hernias when evaluating risk.

Is that what you're asking?

Q.    No.  So of your 23 studies, do any of them

identify a statistically significant increased risk of

mechanical obstruction in a patient who has a hernia?

A.    So they're not designed to make those

statistical analysis.  They're designed to try to;

assess the risk of GLP-1s causing small bowel

obstruction.  And they try to account for hernias.  But

these studies do not take into account the statistical

analysis to make that determination because it's not the question we're trying to answer.

Q. So the literature you're reviewing -- you reviewed is not assessing whether there's an increased risk of mechanical obstruction in patients who have hernias. Is that fair?

A. No.

Q. No?

A. I'm sorry. It is not. Right. So it is fair. Yes.

Q. Okay. And is the same true for strictures, that the studies you reviewed did not assess whether there's an increased risk of mechanical obstruction in patients who have strictures?

A. So, again, stricture is another factor that -- that can predispose to small bowel obstructions. And we have some studies with Crohn's disease. And in those studies of Crohn's disease, my critiques of those studies, actually, of all those studies, one of the critiques I have of all those studies, they never sorted out patients with stricturing Crohn's disease and separated that risk out.

So, yes, stricture is a risk factor for small bowel obstruction. But none of these studies assess

the particular increased risk of strictures in -- in the setting of Crohn's disease in the setting of GLP-1 use.

Q.   And outside the setting of Crohn's disease, the same is true; right?

A.   That none of these studies independently associated the contribution of strictures to SBOs?

Q.   Correct.

A.   That is true, yes.

Q.   Is it also true that none of the 23 studies shows an increased -- a statistically significant increased risk of mechanical obstruction in patients taking GLP-1s who have bowel ischemia or bowel perforation?

A.   So can you repeat that?  I'm sorry.

Q.   Sure.  Is it also true that of your 23 epidemiological studies, none shows an increased risk of mechanical obstruction in patients taking GLP-1s who have bowel ischemia or bowel perforation?

A.   So none of these 23 studies show an increased risk of GLP-1s in leading to bowel ischemia or bowel perforation.

Q.   Which then leads to a mechanical obstruction?

A.   I'm sorry.

Q.   Let me rephrase.  Let me just make sure.  So

I'm talking about a scenario where you have patients who have bowel ischemia or bowel perforation.

A.    All right.  Prior to -- independent of small bowel obstruction or ileus.

Q.    So prior to having ileus or small bowel obstruction.

A.    Okay.

Q.    None of your studies-- none of your 23 studies shows an increased risk of patients developing mechanical obstructions when taking GLP-1s in that scenario?

A.    So what you're asking is:  Do any of the studies show an increased risk of bowel perforation?

Q.    My question is a little different.  So why don't I ask it again just to make sure we're on the same page.

A.    Okay.

Q.    So I'm thinking of a scenario where a patient has bowel ischemia or bowel perforation.

Did any of the 23 studies assess whether in those patients they take a GLP-1 medicine, whether they have an increased risk of developing mechanical obstruction?

A.    So they have baseline bowel perforation or bowel ischemia?  They're not going to be put on a

GLP-1, if that's what the case is.  Bowel perforation is a surgical emergency.  That's why I'm a little bit confused with your question.

So bowel perforation is a surgical emergency. The patient would be potentially hypotensive, septic, going to surgery emergently, so I don't really understand how we can assess that risk in the setting of GLP-1 use.

Q.   See if I can just cut through it.  Is it the case that -- let me ask it this way.  Do the 23 studies you cite show a statistically significant increased risk of bowel perforation in GLP-1 patients?

A.   So they -- bowel perforation can be a consequence or ileus or small bowel obstruction, and they didn't specifically assess for those end points. But I guess just to clarify your previous question, I'm still having difficulty understanding it.  So if someone has bowel ischemia, small bowel ischemia or -- or bowel perforation, no one's going to be starting a GLP-1 in that setting.  They're not.

Q.   Understood.  Understood.

So I'm thinking of the scenario or of the following:  I want to just know, do any of the 23 studies show that there's an increased risk of bowel perforation in GLP-1 patients?

A.    So bowel perforation is a potential consequence of the two issues we're discussing of -- of small bowel obstruction and small bowel ileus.  They're not -- these studies are not assessing the long-term outcomes when patients on GLP-1s do develop a small bowel obstruction.  They're not assessing whether they ultimately will develop a perforation or not, if that's --

Q.    That's what I'm getting at.

So I'm wondering do any of the 23 studies show there's a statistically significant increased risk of a patient ultimately developing bowel perforation after taking a GLP-1 medicine?

A.    They're not designed to evaluate that.  The only -- the only outcome they're looking for is small bowel obstruction and ileus.  But they're not -- these studies are not describing the -- the long-term or short-term consequences of what happens in these patients after they develop an obstruction.

Q.    I see.  So would the answer be the same for bowel ischemia?

A.    So we've gone through the question in many forms.

Q.    Yeah, why don't I ask it again.  Thank you for asking me to clarify.  I appreciate that.

A.    Okay.

Q.    Is it the case or do you agree that none of the 23 studies show a statistically significant increased risk of bowel ischemia in patients taking GLP-1 medicines looking at that end point?

A.    They're not looking at that end point.  I would say that none of these studies looked at that end point.

Q.    Is the same true for stricture development?

A.    Yes.  These studies did not evaluate the stricture development end point.

Q.    Okay.  One of the things you talked about in your report is the study population in each of the studies you reviewed, those 23 studies, whether the patients had diabetes or whether the patients had obesity.

Do you recall discussing that in your report?

A.    Yes.  Many times.  The two primary indications for GLP-1 use.

Q.    Why is the patients' underlying disease in those studies relevant to you?

A.    Well, because we talked about the fact that diabetes can be associated with diabetic neuropathy. And diabetes itself can also add a lot of confounding factors to the mix.  So any time you're trying to

critically evaluate a study, you want fewer confounding variables.

And although the studies do try to account for many of these variables, we all know these studies aren't perfect, and the diabetes does bring -- bring about multiple confounding variables, most notably of which is diabetic neuropathy. And we've been talking about the implications of diabetic neuropathy multiple times.

Q. What is the impact on intestinal -- intestinal motility on a patient who has diabetic neuropathy?

A. So, typically, diabetic neuropathy would decrease intestinal motility. The relevance in this analysis is that the motility in diabetic neuropathy is decreased. However, it also may attenuate the decreased motility related to GLP-1 agonists. So when we are evaluating two groups of patients, they can affect those two groups differentially.

Q. You said that diabetic neuropathy may attenuate the decreased motility related to GLP-1 agonists.

What do you mean by that?

A. Meaning GLP-1 agonists do decrease gut motility, and I don't believe that that's in question

at all.  I mean, that's one of the direct effects of GLP-1 agonism.  And if you go back to the study by Nakatani, it shows that that decreased motility is attenuated by the presence of diabetic neuropathy.  So let's go back to that study, if we can.

Are we able to do that?

Q.   Can I just ask what you mean by "attenuated"? You say "decreased motility is attenuated."

What does that mean?

A.   Right.  So meaning it may not have the same impact on motility.  So if you look at the study by Nakatani, they -- they have seven patients with diabetic neuropathy and seven patients without diabetic neuropathy.  And they actually did a good job testing for diabetic neuropathy in that study.

And they found that with liraglutide, gastric transit time decreased in patients with diabetic neuropathy, although this difference was insignificant, statistically insignificant.  But in patients without diabetic neuropathy, gastric transit time increased in -- in a statistically significant manner.

Now, in patients in the small bowel, they found that patients without diabetic neuropathy had a significant increase in small intestinal transit time, but patients with diabetic neuropathy did not have that

significant increase.  So the total transit time was not significantly increased in diabetic neuropathy, but it was significantly increased without diabetic neuropathy.

So the effect of GLP-1 on its receptors wasn't significantly pronounced in patients with diabetic neuropathy.

Q.   So is it the case that if a patient has diabetic neuropathy and they take a GLP-1 medicine, the patient does not experience additional decreased motility?

Is that what you're saying?

A.   I don't want to say that because we have -- we, you know, I mean, this study had its limitations. I would say that it definitely is attenuated.  That's why I was saying attenuated because it probably is not -- the decreased motility is probably not as significant.  But I don't want to say it has no impact. And, obviously, it depends on the degree of neuropathy.

We also have to remember, we can't think of diabetic neuropathy as a binary outcome.  You know, there are different degrees of diabetic neuropathy. And diabetic neuropathy can decrease the response, the decreased motility from GLP-1s.

But I don't think we can make any binary

Nilesh Sodhi    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

statement saying that it has no impact or it has an impact.  I would say that it's -- the impact is attenuated.

Q.   Are you saying that the impact of GLP-1s in terms of intestinal motility is different between patients who have diabetic neuropathy versus patients who don't?

A.   I would say based on the results of this study, yes.

Q.   And if you were designing a study today to look at the impact of GLP-1 medicines on ileus and obstruction, would you separately consider obesity patients from diabetes patients?

A.   I would -- I would ideally do a study in which we are not looking at diabetic patients because of the confounders, including diabetic neuropathy that diabetes brings about.  Again, I'm not going to completely discount a study because it does include diabetic patients, but I think if I were designing a perfect study, part of it would be to take out the confounding variables of diabetes from the equation.

Q.   And it would be more -- it would be a more rigorous methodology to look at obesity separately rather than combining obesity and diabetes together.

Is that what you're saying?

A.    I would say that an ideal study would look at them separately.

Q.    Okay.  And are you aware of any studies that you consider to be high-quality studies that have found a statistically significant increased risk of ileus or obstruction in diabetes patients?

A.    Yes.  So the -- the Faillie study looks at diabetes patients, they look at patients with GLP-1, DPP-4 inhibitors, as well as SGLT2 inhibitors, and they do find a statistically significant increased risk.  In addition, the Gudin study looks at the risk with the use of GLP-1 and DPP-4 inhibitors compared to other diabetes drugs, and they find a statistically significant increased risk.

So I am aware of those studies.  But I do think that diabetic neuropathy can bias the results actually to the null hypothesis, what I said earlier, which means it could -- it could increase the risk for patients not on GLP-1s of obstruction and it can decrease the risk for people on GLP-1s.

Q.    You indicated earlier that all of the studies you reviewed had limitations.  There was no perfect study, I think is what you said; right?

A.    I did say that, yes.

Q.    The fact that Faillie and Gudin considered

both diabetes and obesity patients together, was that a strength of those studies or a limitation of those studies?

A.    It's a limitation.  Again, I do want to keep -- I do want to emphasize the point that the presence of diabetic neuropathy does skew the results in one way, and that's to the null hypothesis.  So it's not just a random skewing.  It's skewed towards a null hypothesis.

But, yeah, I mean, there -- there are other factors in play with diabetes that introduce more confounding variables than just diabetic neuropathy.  But, yes, I would say that a stronger study would not have included patients with diabetes.  I'm not saying every study that didn't include patients with diabetes is ideal, but -- but the exclusion of diabetic patients does lead to fewer confounding variables.

Q.    You referred to a concept of bias to the null in your answer; yes?

A.    Yes.

Q.    Do you agree that there are mathematical calculations that can be performed to assess whether a bias to the null is present in a particular study?

A.    Assuming that the data that we have is able to undergo those mathematical calculations.  So if we

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

have every patient with diabetes, we don't know which ones have diabetic neuropathy or not.  I mean, an extensive evaluation has not been undertaken in any of these studies to evaluate for the presence or absence of diabetic neuropathy.  So the fact of the matter is with incomplete data, we can't really perform these mathematical calculations and with any degree of certainty.

Q.   Fair to say you didn't perform that mathematical calculation about bias to the null as part of your opinions?

A.   I don't think I'm able to without -- with the information that I have, no.  I don't think anyone is.  And, you know, keep in mind there's also different grades of diabetic neuropathy.  It's not an easy calculation that can be performed, or it's not a calculation that can be performed because of all the different variabilities and the unknown factors.

Q.   Do you agree with me that the effects that GLP-1 medicines have on a patient's A1C result from activation of the GLP-1 receptor?

A.   I would not -- I think it's multifactorial.  It's not only GLP-1 receptor that affects their A1C.  And I'm not an endocrinologist also, so I don't want to comment on that, either.  And I also know that diabetic

neuropathy is not only a function of the A1C.  The A1C is a basic marker for a patient's blood glucose over the previous three months.  It doesn't take into account yearly or decades prior to that.  And diabetic neuropathy typically is correlated with long-term diabetic control.  So I think that there are a lot of questions in play there.

Q.    You don't have the benefit of seeing that I have moved to the next page of my outline, and I'm not asking about diabetic neuropathy.  So let me just ask you a more general question, just so we're on the same page.

A.    Okay.  Okay.

Q.    Not focused on patients with diabetic neuropathy.  Focused on patients at large.  Okay?

A.    Okay.

Q.    Do you agree that the effects of GLP-1 medicines on A1C result from activation of either the GLP-1 or GIP receptors?

A.    So I would say that in GLP-1 medications, they -- the effect on their -- they do impact the A1C in multiple ways, and they also decrease appetite.  And that in and of itself can affect A1C.  So, I agree that there is a component that can be directly related to the GLP-1 receptor, but I feel like there's more to it

than that because of the multiple downstream effects of this whole incretin pathway.

Q.    What are the other ways that the GLP-1 medicines have effects on A1C, other than activation of the GLP-1 or GIP receptors, if you know?

A.    Well, I would like to preface this.  I'm not an endocrinologist; I'm here specifically to look at the effect on the small bowel motility and small bowel obstruction.  But a very simple way would be through differential effects on appetite.

So if you're eating better or, I guess I should say, from a diabetes standpoint, if you're eating a lower glycemic index meal, that in and of itself would -- would decrease the A1C, and that wouldn't be a direct effect of the GLP-1, it would be considered an indirect effect.

And I also -- again, I'm not an endocrinologist, but I know enough endocrinologists. There's so many different pathways with the incretin pathway that I don't think that's a direct cause and effect relationship.  We kind of discuss class effects and how directly we can measure them.  And it's effect on the A1C is multifactorial, unlike it's effect on gut motility.

Q.    I don't want to take you outside your area,

so why don't I ask this:  Are you offering opinions in the case about how the GLP-1 medicines have effects on A1C?

A.   I'm not offering those opinions, no.

Q.   Do you agree with me that you don't analyze each of the Bradford Hill factors specifically for dulaglutide?

A.   I -- I agree that I'm looking at Bradford Hill in the setting of a class effect, not specifically for dulaglutide.

Q.   Same for tirzepatide?

A.   I'm looking at it at the class effect.

Q.   So same answer?

A.   Yes.

Q.   For your Bradford Hill analysis, you don't analyze whether the Bradford Hill factors are met for ileus alone, separate from bowel obstruction.  Is that fair?

A.   I'm considering these in -- as a continuum from the effects from GLP-1 agents.  So I am considering both of those factors together.

Q.   All right.  So you're not separately analyzing Bradford Hill factors for ileus and then separately analyzing Bradford Hill factors for obstruction; is that right?

A.    That is correct.  I'm looking at them both together.

Q.    Do you agree with me that you don't analyze whether the Bradford Hill factors are met for diabetes patients separate from whether the factors are met for obesity patients?

A.    So I'm looking at Bradford Hill for GLP-1 agonists on our patient population.  Now, we have talked about the fact that diabetic neuropathy can impact those results, but I have to use the data that we have available to us, which includes both diabetic as well as obesity patients and people taking it for either one mechanism or both mechanisms together.  And I'm trying to find a direct effect of the drug on the -- on the -- on those two variables that we've talked about, small bowel obstruction and small bowel ileus.

Q.    Your Bradford Hill analysis considers the diabetes patient population and the obesity patient population together; right?

A.    I would say that it considers them both.  But with the caveat that diabetic neuropathy is in a different category.

Q.    Are you offering an opinion that GLP-1 medicines cause ileus or obstruction in patients who

have diabetic neuropathy?

A.    I'm not offering an opinion on that, no.  I think that there's different shades of gray when we talk about diabetic neuropathy.  And I think it's beyond my scope to offer an opinion on patients with diabetic neuropathy.

Q.    Are you offering an opinion whether GLP-1 medicines cause obstruction or ileus in diabetes patients?

A.    I would say that they -- that it does cause ileus and obstruction in diabetic patients, with the caveat that diabetic neuropathy patients should be viewed separately.

Q.    So you're carving out the neuropathy patients.  Is that fair?

A.    I'm just saying that the effects on diabetic neuropathy are variable, so I don't want to comment on every patient with diabetic neuropathy.  Someone with mild diabetic neuropathy may be very different than someone with severe diabetic neuropathy.

MS. WATRAL:  So I think I may be done.  I'd like to take a break just to confirm.  But if I'm done, we'll then switch over to Lucas doing some questioning.  I just want to look through quickly, make sure that's the case, and we'll take a little break.

THE VIDEOGRAPHER:  Off record at 1:26.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 1:39.


EXAMINATION

BY MR. PRZYMUSINSKI:

Q.   Okay.  Hey, Dr. Lodhia, how are you?

A.   Good.  How are you?

Q.   I have been obviously listening, but thanks for giving some time to me, too.

Before we get started, I want to just mark what was provided to us earlier today by the plaintiffs' counsel.  It's a document that's being marked Exhibit 4.  It's titled "Statement of Compensation for Nilesh Lodhia, M.D."  I'm not going to ask you any questions on it.  I just want it for the record, Doctor.

Can you just confirm that's what the document says?

A.   Sure.  This looks accurate to me.

(Defendant's Exhibit 4 was marked.)

MR. PRZYMUSINSKI:  Okay.  All right.

THE WITNESS:  Where should I put it?

MR. PRZYMUSINSKI:  Just somewhere on the table.  You are not going to need it.

BY MR. PRZYMUSINSKI:

Q.   One quick call it cleanup question, and I don't mean it in any way other than that.

So you were talking for a while or you were talking for a while about sort of what's in and out of your opinions, and you made a distinction between your offering opinions on the small bowel, but you said you weren't offering opinions about obstruction of the colon.

Do you recall that?

A.   I do recall that.

Q.   Does that also apply to -- let me ask that a different way.

Am I also correct in assuming you're not offering opinions with respect to colonic ileus?

A.   That is correct.  I'm not offering any opinions with respect to colonic ileus, anything related to the colon in this.

Q.   Okay.  Now, second cleanup question, for efficiency, but we should not prioritize efficiency over accuracy, so let me make sure this is correct.  I know you were asked a lot of questions over the last three, three and a half hours over your reports, and those questions came from counsel by Lilly.

Do you understand that?

A.    I understand that.

Q.    And to some extent, those questions were specific to their medications, like dulaglutide and tirzepatide.

Do you understand that as well?

A.    I understand that.

Q.    I'm not asking specifically right now about dulaglutide or tirzepatide, but in terms of the general questions and answers you're giving with respect to the opinions you're offering.

Can I assume those also apply with respect to the report related to Novo Nordisk?

A.    Yes, you can because I discuss that I would like to discuss this as a class effect, as it relates to small bowel ileus or small bowel obstruction.

Q.    Okay.  So I don't need to retread ground on things that are class-related opinions in terms of the Novo report, which I think was marked as Exhibit 2, as opposed to the Lilly report, which was marked as Exhibit --

A.    Yes.

Q.    And the rebuttal report, I know you didn't really talk much about it, but that's in response to both Novo and Lilly experts, not specific to one report or the other?

A.    Correct.  Correct.  It's in response to both.

Q.    Okay.  Doctor, if you could look at what is Exhibit 2, which is the Novo expert report --

A.    Yes.

Q.    -- that we provided the original.  And at the back part of that report, there's something called Exhibit C, which is the materials considered list.

A.    Yes.

Q.    Would you just find that for me?

A.    Let's see.  Here it is.

Q.    And I don't want to retread ground because I know you were asked questions on that.  I just want to focus on the last page of that materials considered list, which has a heading titled "Produced Documents."

Do you see that?

A.    Yes.

Q.    Okay.  And there's three columns on that page of documents, some of which starts with the letters LLY, and some that start with the letters NNI, and some that start with letters NOVO.

Do you see that?

A.    I see that.

Q.    Now, given that these are on your reliance list or materials considered list, I'm assuming you reviewed these documents?

A.    I mean, these are basically product labels. Yeah, I've reviewed them with varying degrees of detail.

Q.    So if you look at the two pages before that, Doctor, maybe it's even longer than that, maybe four pages, there's a whole list of labels on those pages.

A.    Yes.

Q.    Is it your understanding these previous documents are also product labels or something else?

A.    These are product labels.

Q.    Outside of product labels, do you recall looking at any documents that were nonpublic and produced either by Novo Nordisk or by Eli Lilly?

A.    So when I was first contacted about this, probably September or so of '25, I was just kind of getting a primer on -- on the question we're trying to answer and why we're trying to answer it.

And at that point, I was just learning about everything.  I know I was provided some documents on a potential risk of small bowel ileus and small bowel obstruction internal to these two companies.

To be perfectly honest, I can't remember the details of those communications.  At that time, it was just supposed to be a primer and it wasn't anything I went over in detail.  It was just parts of a long

discussion on the ultimate goal here, which was to answer my question, but I don't remember the details of those documents.

Q. With respect to those documents, whatever you're describing in terms of assessment of ileus or small bowel obstruction that may have been internal documents, from what you said, it sounds like to me you're not relying on those documents for the opinions you're offering in this report?

A. That is correct.

Q. Is that accurate?

A. I'm not relying on those documents.

Q. Let's just make sure that you let me finish my question and I let you finish yours just for the court reporter.

A. Okay.

Q. Beyond those documents that you may have seen relatively early on that you described as documents maybe internal talking about ileus and small bowel obstruction, internal to the companies, do you recall any other documents, nonpublic documents that you may have reviewed that you actually relied on for the opinions in your report that you've produced in this litigation?

A. No, I do not recall any.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   All right.  All right.  Doctor, if you turn to the very first page of your report.  And if yours is like mine, it comes with this Rule 26 expert witness disclosure first on top.

A.   Yes.

Q.   Ignore that.  I really mean the first page of your report after that.  That's got the heading "Rule 26 Expert Report of Nilesh Lodhia."

Do you see that?

A.   I see that.

Q.   And I want to start in the qualifications section there at the bottom.

A.   Okay.

Q.   You with me?

A.   I'm with you.

Q.   Okay.  If you look at the bottom of the first paragraph under "Qualifications," you wrote "I also participated in numerous Phase 2 and Phase 3 international clinical trials through the gastroenterology" --

A.   Wait, wait.  I'm sorry.

Q.   Are you on the first page of your report?

A.   Okay.  Okay.  Okay.  Sorry.  Yes.  I see that.  Yes.

Q.   You with me?

A.   Yes.

Q.   Let me read that again, then.  Last sentence of the first paragraph, "I also participated in numerous Phase 2 and Phase 3 international clinical trials through the gastroenterology department at Wake Forest."

Do you see that?

A.   I see that.

Q.   Now, first question:  Any of the trials that you're working or have worked on, either at Wake Forest or elsewhere, have those trials involved a GLP-1 or RA medicines?

A.   No, they have not.

Q.   And so I assume you've never been involved in a clinical trial or other study assessing either the safety or efficacy of a GLP-1 medication?

A.   So the trials I'm taking part in are for inflammatory bowel disease for Crohn's and ulcerative colitis.  I know there is currently a Lilly trial assessing a GLP-1 agonist in the setting of Crohn's disease, but we are not a part of that trial.

Q.   So with respect to your own activity, am I correct that you have not been involved in a clinical trial or other study in which the safety or efficacy of a GLP-1 medication was being studied; is that correct?

A.   That is correct.

Q.   Now, you talked about clinical trials here.

Have you ever personally conducted an observational study?

A.   Yes.

Q.   Okay.  And is that on your CV?

A.   It's on my publications.

Q.   Okay.  Which -- can you tell me which one that is?

A.   So let's -- let's go through the studies.

Do you know what page this is on?

Q.   I mean, at the end of your report, which ends on page 43, there's an Exhibit A, and then you have your CV.

A.   Okay.  So let's just go through publications.

So you're saying an observational study?

Q.   I just wanted to know if you'd ever done one.

A.   Yeah, yeah.  So No. 3 --

Q.   No. 3.

A.   -- was a retrospective observational study.

Q.   Do you remember for No. 3, what database you used as a basis for that study?

A.   I used an internal database with that hospital.

Q.   Which hospital was that?

Nilesh Souchia     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.     That was in 2009, so I was at the University of Rochester.

Q.     Okay.  Got it.

A.     So that was an internal database with patients at that university.

As far as other -- No. 10 --

Q.     Uh-huh.

A.     -- was an observational retrospective study, looking at predisposing factors for -- for a positive breath test for small intestinal bacterial overgrowth. I don't want to get into too many details, but that was using a database from the University of Florida.  So I wasn't at the University of Florida, but I did work with people there; they asked to me to help out with that.

Q.     Just to back out, on the study that you used the internal database from the University of Rochester, was that a patient-level database where you had access to their medical records or prescriptions or was it a database that you get the identified data and then have ICD-9 or -10 codes you use to measure or do you not remember at this stage?

A.     I'm trying to remember.  It was actually a patient-level database.

Q.     So in that case, you would be able to look

for outcomes based on actual medical record information?

A.    Yes.

Q.    And the --

A.    And the same with --

Q.    -- same in Florida?

A.    The same with the one in the University of Florida.  We had patient-level data, so we did not rely on ICD-9 or -10 codes.

Q.    What else on this list would fall under the category of "observation"?

A.    No. 14.

Q.    What was the database used there?

A.    That was the database at the Medical University of South Carolina.

Q.    MUSC?

A.    Yeah.

Q.    And was that a patient-level database or was that a ICD-9 administrative-type database?

A.    It was a patient-level database.

Q.    Anything else?

A.    No.

Q.    All right.  Is it fair for me to say that of the observational studies that you have done, none of them have relied on administrative data sets where the

outcomes were identified based on the use of ICD-9 or ICD-10 codes?

A.   That would be accurate.

Q.   Okay.  All right.  And with respect to those observational studies, the three we talked about, would you have been the person involved in those studies responsible for the statistical analysis?

A.   I was -- I was one of the people involved in statistical analysis.  We had statisticians for all of these studies.  But I was in -- I can say with all these three studies, I was involved with some degree of statistical understanding, not necessarily the in-depth analysis, and also I had extensive roles in all these three of writing the actual manuscript.

Q.   Great.  All right.

Now, if you turn to the second page of your report, Doctor.

A.   Okay.

Q.   If you look at what is the second full paragraph, that's the one that starts with, "I am also."

Do you see that paragraph?

A.   Yes.

Q.   Okay.  In that paragraph, broadly speaking, you were discussing your role as a principal

investigator or PI on certain clinical trials; correct?

A. Correct.

Q. All right. And just based on what you said earlier and my looking through your CV, it looks like most of the trials that you've been involved with are either involving ulcerative colitis or Crohn's disease. Is that fair?

A. That is fair.

Q. Now, you list a number of manufacturers whose clinical trials you have been involved with in that paragraph. Have you ever been a PI or otherwise an investigator on a Novo Nordisk trial?

A. Not that I know of.

Q. How about a Eli Lilly clinical trial?

A. No, not that I'm aware of. Sometimes a lot of these drugs have multiple pharmaceutical companies involved. But from my recollection, I can't think of any clear association with either Eli Lilly or Novo Nordisk. There's one inflammatory bowel disease drug with Eli Lilly called mirikizumab, and I haven't been involved in those clinical trials. So I think the likelihood is pretty low.

Q. All right. Now, if you look still at that same paragraph, you write, "In my role as a principal investigator, I must decide whether to enroll a patient

in a clinical trial, which requires considerations of the likelihood of the patient getting placebo as well as the potential efficacy of the drug based upon its mechanism (with incomplete clinical information)."

Do you see that?

A.   Yes.

Q.   Then you go on to say, "Once a patient is enrolled in the study, I evaluate the potential efficacy of the drug as well as assess the potential causal relationship between the various adverse events, et cetera."

Do you see that?

A.   I see that.

Q.   So within the scope -- this is a general understanding for us, so within the scope of the clinical trials where you have been involved in as a PI or as an investigator, would you -- oh, strike that. Let me try again.

Within the scope of the clinical trials you have been involved with, as a general matter, how are adverse events identified?

A.   So one is through patient diaries, and we have clinical trial coordinators that go through patient diaries.  And the other is through conversation with either the clinical trial coordinator or with me.

We can discuss their symptom, and based on that, we can assess the likelihood of it being involved -- of the study drug being involved with that -- with that potential symptom or not involved. And we can say reasonable possibility, unlikely.

Every -- every study is a little bit different in the way they want us to phrase it, but we have to assess the likelihood of a particular symptom being involved with the drug.

Q.   All right.  So if I understand correctly, as an investigator, you're working on a particular clinical trial, and in that trial there are patients who are enrolled who may be getting a study medication or a placebo.  Is that fair?

A.   That's fair.

Q.   And those patients in some trials will be keeping diaries where they record their experience; right?

A.   Yes.

Q.   Presumably, those patients will also be coming in for regular scheduled visits --

A.   Yes.

Q.   -- at some cadence, whatever it is, within the trial?

A.   Correct.  Correct.

Q.   And either you or the PI or another investigator or someone working on the trial will see them on those visits, and do whatever testing or evaluation is required; correct?

A.   Correct.

Q.   And it would also ask the patients during those visits about how things are going, including are they having any adverse experience.  Is that fair?

A.   Right.  We are trying to assess both positive changes from the drug or placebo, as well as potential side effects.

Q.   Okay.  And so if a patient comes in either based on their diary, right, or on their report and they tell you they're having some potential side effect related to their therapy, they don't know if they are on the placebo or not, but their therapy, that's something you would then evaluate as your role of investigator; correct?

A.   Yeah.  And sometimes you're limited on how closely we can evaluate that within the confines of the study.  You know, they might have some nonspecific side effect, and we can't -- through the study, we can't always go through great detail in terms of evaluation. Especially some of the people on studies are doing that because they may not have insurance or they may have

Nilesh Sodhia    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

limited means, and if a study doesn't cover all of the costs associated with investigation of that particular side effect, we may not be able to do it through the same level of detail we would normally.

Q.   And that makes sense.  There's some limitations on what you can do.  But the goal is to -- if a patient reports some sort of side effect, to do your best to evaluate that, provide some causality assessment with it and then report that back to the --

A.   Correct, correct.  And if, for example, they have a side effect that warrants drug discontinuation, then we would do so without -- sometimes we may not be able to fully evaluate the potential side effect or potential causes of the side effect.

Q.   Makes sense.  And so, for example, just to -- I know your trials were not necessarily by ileus or structure, right.  But if a patient came in with symptoms that might be suggestive of ileus or intestinal obstruction while they were in your clinical trial, right, that's something as an investigator, to the extent you're able to, you would evaluate and then report; correct?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  So, again, our trials are not associated with that.  But I can give an example of a patient.  And, again, I'm not -- I don't have GLP-1 receptor drugs in my studies.  But trying to extrapolate what I do to a potential study with those drugs, if -- if a patient came into me with significant nausea, that's limiting their oral intake, they're having bowel movements maybe less frequent, but they're having bowel movements, we may need to stop the drug without fully evaluating the degree of dysmotility they have or without -- or without doing a full investigation because we want to stop the progression of that potential side effect.

So yeah, we are able to closely monitor side effects that we may discontinue a drug or decrease a dose based on those side effects, but unfortunately, within the confines of a study, we are not always able to fully -- fully evaluate the side effect the way we would like to.

BY MR. PRZYMUSINSKI:

Q.   But you obviously report -- whatever your conclusion is, you report back to make sure you maintain integrity of the trial; correct?

A.   Correct.  I would say that the patient had nausea or abdominal pain or constipation, assuming that

these are related to GLP-1 drugs.

Q.   It doesn't matter what; right?  Any adverse event would get reported?

A.   Exactly.

Q.   Your studies don't have GLP-1 drugs so we are just talking generic?

A.   We are talking hypothetically to some degree, yes.

Q.   If a patient in one of your clinical trials went to the hospital, right, to the emergency room, and they got diagnosed with ileus, okay, they got treated, they came back to see you at your trial visit and called you and said, hey, Doc, I'm in your trial; I went to the ER; I got diagnosed with ileus.  That information is something you would collect and report; correct?

MR. PENNOCK:  Just hold on.  Just objecting.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  That is a hypothetical situation.  I would say that it's also likely in this -- in the clinical trial setting we're following so closely that we would see symptoms of nausea and constipation, abdominal pain, and stop the drug to prevent them from getting ileus if we could.

So, yes, if they were to develop full-blown ileus, that would be reported.  However, it's also less likely for them to develop full-blown ileus if they're being monitored so closely and drugs are being stopped as a result of their symptoms.

BY MR. PRZYMUSINSKI:

Q.   How long, Dr. Lodhia -- let me strike that.

I know we've talked about that 1.6 year peak from the study; right?

A.   Right.

Q.   I'm not talking about how long from drug initiation until you get high -- higher rates.  My question is a little bit different.

How long does it take from the onset of a patient experiencing nausea and vomiting until they develop ileus, on average?

A.   That -- that is impossible for anyone to answer.  I mean, patients can have nausea for months if the drug is continued.  And it may ultimately develop into ileus, and they may continue to have nausea and no ileus.  We don't have an answer for that.  And I think that it's impossible to even speculate on that and generalize that to a particular group of patients.

Q.   Well, I don't want to generalize.  I just want to -- I want to sort of understand.  You say

patients are being monitored so closely.

A.    Right.

Q.    So how long is the minimum amount of time it would take a patient to experience nausea and vomiting until they developed ileus, clinically speaking?

A.    There is no minimal amount of time.  Some patients may not feel nausea and vomiting until they get an ileus.  Some patients may have a very low threshold to feel nausea.  And despite the fact they're continued on the drug, they may -- they may never develop an ileus.  I think that that's an impossible question to answer.

Q.    Okay.  And how often are you seeing patients typically in a clinical trial?  How often do they come in for visits?

A.    It totally depends on the drug.  Sometimes I have seen patients as frequently as two to four weeks and I've seen patients three to six months.  It also depends as the trial persists a lot of times.  The visits may be less frequent.  And I would also say that a lot of times with the trial, it may involve colonoscopies in addition to the visits.  So it totally depends on the trial, where they are in the trial, and then what symptoms they're experiencing.

Q.    Okay.

A.    I will say that most of my trial patients are very good at keeping in touch with my trial coordinators, and my coordinators do keep in close contact with them.

Q.    Now, we talked about ICD codes; right?

A.    Correct.

Q.    And fair to say that of the observational studies that you reviewed among the 23, because I know that includes some clinical trials and some pharmacovigilance studies, but of the observational studies --

A.    Okay.  So let's get to the observational studies.  Okay.

Q.    How many of those observational studies identified clinical outcomes, meaning ileus or intestinal obstruction or whatever you were looking at, based on something other than ICD-9 or ICD-10 codes?

        (Clarification by the reporter.)

        THE WITNESS:  So I would have to review the different studies.  Do I have a minute to ...

BY MR. PRZYMUSINSKI:

Q.    Well, so let me ask you this:  I want to save us time.  And it's not that big of a deal, but did you -- did you -- in looking at that body of observational studies, I'm including the RCTs, I'm

Nilesh Mehta · CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

excluding the pharmacovigilance studies, in terms of evaluating their design, whether the studies identified the outcomes based on ICD-9, ICD-10 codes, or on something else, is that something you considered?

A.   Yes.   I would say that predominantly the studies, these observational studies did look at ICD codes.  In order for me to answer that question completely accurately, I probably have to go through all the studies, but my recollection is that there was a lot of use of ICD-9 and ICD-10 codes.

Q.   We'll get to the studies in a little bit, I promise.  I'll actually show you some studies, so we'll get to talk about studies.  But let me ask you something a bit higher up.

Do you have an opinion as to what -- whether the use of ICD-9 or -10 codes for identifying clinical outcomes in this study is more or less reliable than clinical investigator assessments within the context of a randomized clinical trial?

MR. PENNOCK:  Objection.

THE WITNESS:  So we're talking about different studies.  We're talking about randomized control studies versus ICD-9 and -10 codes.  And there are pros and cons to randomized control studies versus observational studies.

Nilesh Sodha    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I gave an example of a few drugs in the past that have had -- that have made it through randomized control studies without seeing a signal for a particular adverse event, have made it through meta analysis or randomized control studies, and have ultimately through observational studies have been found to have an increased risk for a particular side effect, whether it be heart disease or QT prolongation or something else.  So I think we have to look at the pros and cons of randomized control studies versus observational studies.

I think it's fairly well established that randomized control studies are better at evaluating for efficacy end points with a particular drug, and I also think it's fairly well established that large-scale observational studies are better at assessing for rare side effects of a particular drug based upon, you know, examples I have given both to -- to both of you about drugs that have been pulled off the market and just based upon the size of the database and the duration of follow-up, as well as the fact that it more accurately resembles real-world follow-up as opposed to an idealized situation and randomized control studies.

So I think that we're looking at two different types of studies that have pros and cons.

Q.    Okay.  So I appreciate that.  Remember what my question was.  I wasn't asking about are RCTs or observational studies better at evaluating safety?

A.    Okay.

Q.    I wasn't even asking the question of are they better for evaluating safety for rare versus common.  My question was a little bit different.  What I was asking was whether the error rate, right, you get when using ICD-9 and -10 codes and observational trial study, meaning how often do the ICD-9, -10 codes result in a outcome being identified as not real; right?

Do you understand that?

A.    I understand that.

Q.    So how accurate ICD-9 and -10 codes are for identifying clinical outcomes as compared to how accurate the adverse event identified in the clinical trials are for identifying the actual event that's occurring based on clinical trial reporting and assessment?

Do you have an opinion as to which one of those is better, excluding other factors about strengths and limitations of these studies?

A.    Right.  As we mentioned before, there's strengths and limitations in these studies.  Investigator-initiated assessment tends to be more

accurate in the setting of observing a particular side effect.  But, again, we have the limitations that are inherent in randomized control studies for assessing rare side effects.

Q.   So the limitations we're talking about, right, are size of the study?  That's one?

A.    Size of the study, yes.

Q.    Duration of follow-up would be another?

A.    Yes.

Q.    Okay.  The -- let's call it non-fully real-world experience of a clinical trial; right?

A.    Yes.

Q.    Any others?

A.    The fact that a lot these studies aren't powered or designed to measure these rare side effects. I gave you the example of a patient coming in with nausea.  And rather than the full investigation of the source of the nausea, the drug is stopped.  The patient never develops ileus, which is a great thing; that's what we want.  But it also doesn't give us an accurate assessment on -- on whether or not that patient would have developed the ileus in the real world.

Q.    I appreciate all that.  We'll talk about all of that more.  But in terms of the accuracy of the actual diagnosis that's made for that adverse event,

right, whether you're comparing in one case a study that's predicated its outcome identification based on ICD-9 and -10 codes, whereas, the other one is looking at investigator-assessed events, adverse events, whatever they are -- I know they're not powered for it -- the accuracy you would agree in terms of the correctness of the diagnosis is higher in the RCT; correct?

MR. PENNOCK:  Hold on a second.  Form.  And the objection asked and answered to some degree.

Go ahead.

THE WITNESS:  So the accuracy, we can look at the accuracy both ways.  One way is to say that in a randomized control study, they're not always able to fully assess the source of an outcome, as we would like to, for the reasons we discussed before.  So in that way, it could be less accurate because we only know the symptom and we have to act upon the symptom without the ability to fully do the diagnostic evaluation.

But in terms of directly talking to the patients, that is a positive aspect of a randomized control study.  You can directly talk to the patient and assess a particular side effect.  But you may not be able to fully diagnose it.  So, again, it's -- it's -- there -- it's a pro and a con.

BY MR. PRZYMUSINSKI:

Q.   You wouldn't put ICD-9-based outcome identification above clinical trial identification as more reliable?

MR. PENNOCK:  Objection.  Form.  Ambiguous.  Go ahead.

THE WITNESS:  I mentioned the reliability in both those aspects, in both the ability to accurately diagnose it as well as the ability to directly talk to the patient.  So I think that the ability to directly talk to the patient is better, but the ability to directly -- to diagnostically assess it may not be as good.

Q.   So strengths and limitations to each; right?

A.   Correct.

Q.   My question is:  Are you putting one above the other in terms of -- not in terms of assessing the risk, but identifying correctly the clinical outcome? Do you put one above the other or in your view are they -- both have strengths and limitations, they're more or less equivalent?

A.   The clinical outcome, again, I would put it differently in terms of clinical symptom versus clinical outcome.  You know, as I said before, we may not be able to figure out the clinical outcome based on

limitations in a randomized control studies.  So it's hard to say.

Q.   Let me ask it in a different way.  If you review a clinical trial, okay, and in that clinical trial, there's a patient identified with diagnosis of ileus.  Okay?

With me so far?

A.   Yes, I'm with you.

Q.   On the other hand, I have an observational study, and there's a patient with --

(Clarification by the reporter.)

BY MR. PRZYMUSINSKI:

Q.   On the other hand, I have an observational study in which there's a patient identified as having ileus based on ICD-9 and -10 codes.

You with me?

A.   I'm with you.

Q.   Which one of those is more reliable?

MR. PENNOCK:  Which diagnosis?

MR. PRZYMUSINSKI:  Yes.

MR. PENNOCK:  Okay.  I mean, you got -- a doctor is diagnosing and putting an ICD-9 code and a doctor is diagnosing --

MR. PRZYMUSINSKI:  Are you testifying, Paul?

MR. PENNOCK:  No, I just don't understand the

question.

MR. PRZYMUSINSKI:  You don't have to.  That's the beauty of this.  As long as Dr. Lodhia understands, we are good.

THE WITNESS:  So if they both come up with a diagnosis of ileus, I think that they both were inputted by a physician.  It's hard to say.  I mean, we have to look at the details.  I'm trying to -- I'm trying to answer you as accurately as possible.  And I think there are factors in play that can make it difficult to answer.

BY MR. PRZYMUSINSKI:

Q.  Let me ask you a different question.

A.  Okay.

Q.  I know the thing you want to look at in a study, right, is whether the patient is actually taking the medication when they experience the adverse effect; right?  Would you at least agree with me that in a clinical trial, you have a more complete understanding of the specific product the patient is taking, the doses they are taking, and the temporal relationship between that use and the adverse effect than you do in an observational study that depends not on direct patient records, but on an administrative prescription database?

A.    I think that in a clinical trial, you're more closely able to assess a patient's pattern in terms of what drug they're taking.  A lot of times it's administered within the confines of a trial.  As opposed to an observational study, I think that there are some limitations there.

I mean, again, we have to weigh the pros and cons of observational versus randomized studies.  But I think that in a clinical trial, I would acknowledge that we can more accurately assess a patient's compliance to the particular drug than in an observational study.

Q.    One thing that you see sometimes with observational studies, right, is they rely on a prescription; correct?

A.    Correct.

Q.    But the fact that a patient gets a prescription doesn't necessarily mean they filled it; correct?

A.    Correct.

Q.    And so while they may have that prescription, you don't know whether that patient ever took it, let alone how long they took the medication?

A.    And I do mention this limitation in observational studies, and I also say that actually

this -- this limitation would bias towards the null hypothesis because we're trying to assess a risk from a GLP-1 receptor antagonist.  And if a patient -- we're assuming they're taking it because they're prescribed the medication or they were prescribed the medication.  So if they weren't taking it, it actually does decrease the risk of them getting the variable in question.

So, yes, I mean, I would acknowledge that we're more able to accurately assess whether a medication is given in a clinical trial and that actually can bias our observational studies to the null.

Q.   In clinical trial, you generally will know whether the patient actually took the medication or not; correct?

A.    Correct.  Depending on the trial design, we would typically know that.

Q.    All right.  Now, finally switching topics. Page 37 of your report discusses Bradford Hill.

See that?

A.    I see that.

Q.    I think based on the conversation this morning, I know that you apply the Bradford Hill methodology in forming your -- your causation opinions; is that correct?

A.    That is correct.

Q.    Okay.  And I believe you told my cocounsel for Lilly that you had not done specific Bradford Hill analysis for either dulaglutide or tirzepatide, instead you treated it as a class; is that accurate?

A.    That is accurate.  I treated them all as a class, so I didn't do it for the Novo Nordisk drugs, either.

Q.    That's what I was going to ask.  So you didn't do it for liraglutide or for semaglutide?

A.    Correct.

Q.    All right.  Now, Bradford Hill, is that a methodology you use outside of your -- in this litigation?

A.    I use it implicitly.  I wouldn't say I explicitly use the Bradford Hill criteria.  But looking at temporality and biologic plausibility and coherence, and dose response are all factors that we do look at.  But when I'm deciding what to do for a patient, I don't explicitly go through those nine criteria, and try to apply them.

Q.    Okay.  If you look at the seventh line down in that paragraph, under Bradford Hill analysis, do you see the "For the reasons discussed below"?

A.    I see that.

Nilesh Sodhia    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   You state there, "I assigned the greatest weight to the biological plausibility, coherence, and analogy factors.  I also assigned greater weight to" --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:  -- "dose response, temporality, and experiment."

BY MR. PRZYMUSINSKI:

Q.   Do you see that?

A.   Yes, I see that.

Q.   Yes.  Now, outside of litigation, Doctor, have you ever concluded that cause and effect relationship exists based solely on biological plausibility?

A.   I have prescribed a medication based on biological plausibility in the setting of rare conditions.  I can give you an example, if you would like.

Q.   That's okay.

A.   A medical example.  I don't know if you'd be interested or not.  You know, if there's a rare condition that I'm treating, and there's no indicated treatment for it, and there's a biologically plausible reason why one medication would work and I feel like the potential benefits outweigh the potential risks, I have used it before.

Nilesh Sodhia CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    It's a little bit different from what I'm asking.

MR. PENNOCK:  Just note my objection to that statement.

MR. PRZYMUSINSKI:  Not sure.

MR. PENNOCK:  Well, I'm saying is you just told him that you just kind of criticized him, and I just think that was gratuitous.

MR. PRZYMUSINSKI:  What I said is I'm not sure I understand that.

MR. PENNOCK:  You said it's a little bit different than what I'm asking.  I don't think it was at all.

MR. PRZYMUSINSKI:  Okay.  Let's try again.

BY MR. PRZYMUSINSKI:

Q.    I don't mean to criticize you.  What I was asking is whether in your clinical practice, outside of the litigation, you ever decided that cause and effect exists in a manner and to a level of certainty that you're applying in this report, I didn't have that before, to a reasonable degree of medical and scientific certainty?

MR. PENNOCK:  Asked and answered.

BY MR. PRZYMUSINSKI:

Q.    Solely on biological plausibility.

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  So I have used a medication based on biologic plausibility with the reasons I gave before.

Based on my use of a medication, I believe that a medication would work in that setting.  But, again, to answer your question, the more data we have, the better.

BY MR. PRZYMUSINSKI:

Q.    Okay.  And when you were using that medication in the example you're thinking of, had you reached a conclusion at that point in time that there must be a cause and effect relationship between the use of that medication and the outcome you were seeking?

A.    No.  I reached a conclusion that the benefits outweighed the risks, and there is biological reasons why it should work.  So I guess the distinction is is whether a medication is worthwhile to use or whether I have reached a conclusion in terms of causative benefits.  I think they are slightly different.  I have reached a -- I have thought a medication would be okay to use in a particular setting.

But no, biological plausibility in and of itself would not be enough to -- to determine a cause and effect relationship to a reasonable degree of

medical certainty.

Q.   Okay.  Perfect.

Now, another thing you talk about in this paragraph is dose response; right?

A.   Yes.

Q.   And I know that in your report, you point to some studies in the mechanism section.  I think there's two studies by Tolessa, T-o-l-e-s-s-a, I think, 1998 and a 2001 study?

A.   Yes.

Q.   And there's another study by maybe Hellstrom. I don't remember, maybe H-e-l-l-s-t-r-o-m.

Outside of those three studies, have you seen any other studies, whether it's an epidemiological section or elsewhere, that have evaluated whether a dose response relationship exists between use of a GLP-1 medicine, any, and the outcome of ileus, bowel obstruction, whatever you were considering relevant in this case?

A.   So I have seen a dose response relationship in patients as they increased their dose.  They're decreased motility symptoms, they're decreased motility increase, and as they decrease their dose, their symptoms of decreased motility decrease.

Did I say that correctly?

Q.    Yeah, I think so.

A.    Okay.

Q.    Yeah, I mean, I'm guessing.

A.    So I have seen that dose response relationship in my patients.  And these basic science studies do illustrate that.  The epidemiologic literature that we have doesn't assess for that.

Q.    So your testimony is that none of the epidemiological studies you reviewed assess whether a dose response relationship exists between GLP-1 exposure and the outcomes of ileus, intestinal obstruction, or otherwise?

A.    I'm relying upon the mechanistic studies for that.  Again, we use the mechanistic studies differently than we use the -- the epidemiologic studies, and I think they're both complimentary in our assessment and understanding of the disease activity in the setting.

Q.    Yeah.  And I -- look, I -- I -- setting mechanistic study aside, we'll talk about those with the epidemiological studies.

Is your testimony that none of those studies evaluate whether a dose response relationship existed between GLP-1, RAs, and the outcome of ileus, bowel obstruction, whatever you consider relevant to your

analysis?

A.    None of them were designed to assess that.

Q.    That's a different answer.  Did any of them assess it?

A.    I mean, they weren't designed to nor did they assess it, no.

Q.    Okay.  All right.  We'll see later.  Okay.

All right.  Now, I'm going to try to make this a topic change, and then try to make this efficient because I know we have went through this before, the dulaglutide and tirzepatide.  But I also need to make sure I get it correctly for the Novo medication, which are liraglutide and semaglutide, so if you need to take your time on any of these, please do.

A.    Okay.

Q.    I'll just ask my questions, and we'll go from there.

Sound good?

A.    That sounds good.

Q.    Okay.  If you look at the last page of your report, the very end, which is page 43, and that's got your signature on it.

Tell me when you're there.

A.    Okay.

Q.   All right.  You have a statement there saying that, "GLP-1 receptor agonist use, including Ozempic (semaglutide), Rybelsus (semaglutide), Wegovy (semaglutide), Victoza (liraglutide), and Saxenda (liraglutide), causes both ileus and any resulting bowel obstruction."

Do you see that?

A.   Yes.

Q.   Now, first question:  Is that an opinion you held prior to being retained as an expert in this litigation?

A.   I did not have an opinion on that.  I think I was -- I felt confident about a decrease in motility prior to being retained on this litigation.  But I hadn't done the in-depth research at that point to -- to arrive at a conclusion on that.

Q.   And if my question included the Lilly medication dulaglutide and tirzepatide, with respect to your prior consideration, would the answer be the same?

A.   It would be the same.

Q.   Okay.  All right.  And so I'm assuming -- but correct me if I'm wrong -- that you have never published any papers or research articles addressing the relationship between GLP-1 RA use and ileus or intestinal obstruction?

A.    That's correct.  I have reviewed the published literature, but I have not published any myself.

Q.    And outside of litigation, outside of these reports, have you ever written anywhere that GLP-1 RA medications cause ileus or intestinal obstruction?

A.    Have I written that anywhere?

Q.    Yeah.

A.    No.

Q.    Have you ever --

A.    Actually -- actually, I have not written that formally anywhere in terms of -- in terms of a paper like a manuscript, but I have seen patients in the hospital with those conditions and I have written that as a factor.

Q.    When you say "a factor," you listed that as a potential --

A.    I listed that as an implicating factor.  So if a patient comes in with a GLP-1 -- on a GLP-1 receptor agonist and an ileus, I would say that the GLP-1 receptor agonist I have said is a major contributing factor.

Q.    All right.

A.    And it needs to be held during this period of time, and we can reassess what we do in the future in

terms of dosing. But I had implicated that as a cause in patients in the hospital. So I haven't written that in the setting of a published manuscript, but I have written that in my clinical notes.

Q. So those individual cases we're talking about, have you ever submitted a case report or a case series reflecting your findings in those cases?

A. I have not. I have not, no.

Q. Have you ever -- sorry -- strike that.

I think I understood you correctly that in terms of a written opinion on this topic that you submitted for peer review and publication in a journal or somewhere else, you hadn't done anything?

A. Correct. That was just -- I was just clarifying my position that I have seen patients clinically in which I attribute the cause to a GLP-1, but I have not formally written that in a published manuscript or peer review.

Q. And do you teach, Doctor?

A. Yes.

Q. Have you ever prepared a presentation that you gave to other attendings, fellows, or residents in which you stated specifically that GLP-1 RAs cause ileus or bowel obstruction?

A. That has not been a topic that I presented

Nilesh Sodhi    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

upon.

Q.   Now, one more question.  You're a member of various medical societies; correct?

A.   Correct.

Q.   And I think if I pull up your CV, this will be easier than relying on my memory.  But I think you list yourself as a member of the American Society of Gastrointestinal Endoscopy; is that correct?

A.   Yes, yes.

Q.   Also the American Gastroenterological Association?

A.   Correct.

Q.   AGA is an acronym for that?

A.   It is.

Q.   The American College of Gastroenterology?

A.   Yes.

Q.   ACG?

A.   (Witness nods head.)

Q.   The Crohn's and Colitis Foundation of America?

A.   Correct.

Q.   And the Crohn's and Colitis Foundation of America Clinical Research Alliance?

A.   Correct.

Q.   Any other GI associations you are a member

of?

A.    Not that I can think of.

Q.    I guess the Crohn's and Colitis Foundations don't talk about GLP-1 RAs; is that correct?

A.    It's now being postulated as something that can potentially reduce inflammation in Crohn's disease.

(Clarification by the reporter.)

THE WITNESS:  So it is discussed.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Discussed in the context of potentially having a beneficial effect in your patients with Crohn's disease?

A.    In the inflammatory nature of Crohn's disease, yes.

Q.    Okay.  So across the five organizations or societies we discussed, are you aware of any one of the societies that has published anywhere that GLP-1 RAs cause -- cause specifically ileus or intestinal disruption?

A.    They have not addressed that issue in terms of ileus and intestinal obstruction.

Q.    How about if I go broader?  Any other medical scientific organization that you may be aware of that has concluded and published an opinion that GLP-1 RAs cause -- cause -- specifically cause ileus or

intestinal obstruction?

A. So -- I mean, there is a discussion especially looking at the anesthesia literature on an increased risk of perioperative aspiration due to decreased gut motility. But as it currently stands, none of these organizations have specifically stated that -- that it causes ileus or small bowel obstruction, nor have they specifically said it does not cause it.

Q. Okay. Getting back to the conversation of the different GLP-1 medications. Okay? I'm assuming from the conversation earlier that you do not go through the exercise of asking the following question: Let me compare the magnitude of risk conferred by use of liraglutide to the magnitude risk compared by semaglutide for ileus or intestinal obstruction?

A. As I discussed before, I viewed these as a -- as a class effect.

Q. So is the answer you have not done that?

A. Yeah, that is the answer.

Q. And would the answer be the same regardless of what combination of GLP-1s I put into that question?

A. Yes. That answer would be the same, that I viewed them as a class effect, and I didn't have differential analysis on the different GLP-1 agonists

in terms of their risk for ileus or small bowel obstruction.

Q.   Okay.  All right.  Now, open your report to page 24, which is where your epidemiological study starts.

A.   Okay.

Q.   And looking at your report, can you tell me of any study that reported a statistically significant increased risk of ileus or bowel obstruction specifically attributed to semaglutide use?

A.   A lot of them lump together the different GLP-1 agonists, so I am not -- I can go through this quickly.  But a lot of these have lumped these together.

And as I discussed numerous times before, I'm evaluating this as a class effect.  So it looks like they were all considering it as a class effect and nothing is specifically stated an increased risk specifically to semaglutide.  However, an increased risk with GLP-1 receptors can be a -- should extrapolated to semaglutide.

Q.   That's your opinion; that's not what they said.

MR. PENNOCK:  Objection.

THE WITNESS:  Well, it's my opinion based on

the review of the data and the review of the mechanisms and review of the mechanistic literature.  I mean, nobody has stated one way or the other the very fact that there -- that they are discussing this as a class effect, implies that they are viewing it as a class effect and not specific to any one drug; otherwise, they would separate out the different drugs.

BY MR. PRZYMUSINSKI:

Q.   Right.  And I wasn't -- look.  Strike that.

I was simply wanting to make sure the statement you had made wasn't you saying that the author specifically wrote that sentence.  That was your interpretation of the -- of their data of the semaglutide.

A.   Based upon the way they conducted their studies, yes.

Q.   Okay.  Now, do you know how many of those 23 studies actually had a specific risk estimate reported for semaglutide alone?

A.   Again, the answer would be that they did not separate out semaglutide from the other GLP-1s.

Q.   How certain are you of that?

A.   So I would say that the Sodhi study did have patients on semaglutide.  They had many more patients -- if we can go -- can I go to the Sodhi

study?

Q.    Sure.

A.    So the Sodhi study had 613 patients on semaglutide and 4,144 patients on liraglutide.  The interesting thing about this study is that the study enrolled patients from 2006 to 2020.  Semaglutide was not approved for obesity until 2021, and it was not approved for use in diabetes until, I believe, December of 2017.  So it was lacking numbers in duration during the -- during the time points in this study.

Q.    So in Sodhi, there was no events in the semaglutide group; correct?

A.    With limited data, yes, there were no events with the limited data that they -- that they had to deal with in terms of both numbers and duration --

Q.    Right.

A.    -- which we need for a rare event that takes time to occur.

Q.    And the authors in Sodhi did not do a semaglutide analysis; correct?

A.    They evaluated semaglutide with liraglutide together.  But there weren't any events in the semaglutide arm with the caveats that there was a shorter duration and a much lower number of patients.

Q.    And the only reason I ask that is because my

question was a little bit different.

How certain are you that none of the other 23 studies, other than Sodhi that you relied on in your report, in discussing your report, actually had specific individual analysis reporting a risk ratio for semaglutide?

MR. PENNOCK: Objection. Form.

THE WITNESS: I would have to go through all the studies again. When I -- when I viewed these studies, I viewed them as a class effect, and I did not -- I do not remember at this time what they -- what analysis any of them may have done with semaglutide, in particular.

BY MR. PRZYMUSINSKI:

Q. That was not something you focused on in your analysis?

MR. PENNOCK: Objection.

THE WITNESS: I focused on evaluating them as a class effect.

BY MR. PRZYMUSINSKI:

Q. Okay. Now, for liraglutide, how many of the studies that you reviewed had a specific risk estimate for liraglutide alone, not in combination with other medication?

A. So the liraglutide, that -- that was a

preponderance of patients in the -- in the Sodhi study. Most of the studies lumped together the GLP-1s.  There was a -- there were two randomized studies that did look at liraglutide, but those had inherent limitations in terms of number of patients that were enrolled.

Are you asking about randomized studies? You're asking about --

Q.   Anything in your 23.

A.   So I do not believe that any of them specifically had -- so in the Alfehaid study, studies that evaluated liraglutide did show an increased risk of bowel obstruction compared to controls with a odds ratio of 3.0, and 95 percent confidence interval between 2.03 and 4.05.

They did not see that same risk with semaglutide, but they also acknowledged that it was a small number of patients on that drug.

Q.   Is Alfehaid one of the studies you consider higher quality?

A.   So I think that one of the -- can I -- can I go through my review again?  So I am not terribly impressed with meta analyses, and I also don't like the heterogeneity involved, particularly with this meta analysis, and that included two randomized studies including two that we discussed that I don't find of

any value in this question, Gudbergsen and Lundgren.

It also had eight observational studies and four were case reports.  They had meta analyses of RCT, so I personally don't consider this a very high quality study.  I think there's a lot of heterogeneity, a lot of methodological limitations, and I am not putting that much weight into the Alfehaid study.

Q.   Other than Alfehaid and the two clinical trials you mentioned that had liraglutide specifically assessed that you said had limitations --

A.   Right.

Q.   -- how many total studies do you have -- do you know out of the 23 assessed specifically the risk of ileus or bowel obstruction for liraglutide alone as opposed to any combination with other GLP-1 medications?

A.   Based on my report, I do not see that any of them specifically assess -- any other specifically assessed, liraglutide.  I don't have all the papers in front of me, so I have to give you that caveat, though.

Q.   So Alfehaid plus the two RCTs is what you can recall right now?

A.   For liraglutide, yes.  So he had a preponderance of patients, but assessed it with semaglutide.

Q.    Okay.  Now, do you know if any of the 23 studies that you reviewed reported a statistically significant decreased risk for liraglutide and the outcomes of ileus or intestinal obstruction?

A.    I would say that some of these studies did show a decreased risk, did show -- but they were methodological limitations of these studies.

Q.    Well, you just told me that there were four studies you're aware that reported only -- let me strike that.  Let me try again.

You told me there was the Alfehaid study.  There were the two clinical trials, which we'll talk about, I think listed as No. 1 or 2 in this list.  And then maybe I'm wrong, but the two clinical trials.  And then Sodhi, which didn't really break it out, but the preponderance was people taking liraglutide; is that correct?

A.    That's correct.

Q.    What I'm asking of the trials or studies, the 23 that you reviewed, how many of those studies specifically for semaglutide alone, without anything else, reported a statistically significant decreased risk of ileus or intestinal obstruction?

A.    You're asking for decreased risk with semaglutide?

Q.    Let me do it again because I think I may have misspoke because I'm getting a little circled.

A.    Okay.

Q.    Let's try again.  Of the 23 studies listed in your epidemiological section, how many reported a statistically significant decreased risk of either ileus or intestinal obstruction specifically for an analysis limited to liraglutide as opposed to a combination of GLP-1 drugs?

A.    So based on my memory and my quick review of my reports, I do not see any.  But if you bring anything you would like me to review further to your attention, I'll be happy to review it in more detail.

Q.    We will do that.  No promises.

Now, let's talk about clinical trials.

A.    Okay.

Q.    If you look at your report, I think you mentioned two relatively smaller liraglutide trials that you discussed; correct?

A.    The randomized control studies?

Q.    Yes.

A.    Yes, the Gudbergsen and Lundgren, yes.

Q.    I was wrong.  It's No. 3 and 4 on page 26; right?

A.    Right.

Q.   Now, let's focus on semaglutide first.

A.   Okay.

Q.   Did you look at the results of any individual RCTs of semaglutide as part of your analysis?

A.   I did not, no.

Q.   Do you know how many total clinical trials have been conducted with semaglutide to date?

A.   I do not know the answer to that.

Q.   Do you know how many patients were treated in those clinical trials receiving semaglutide as opposed to a placebo or control?

A.   I do not know how many clinical trials or how many patients have been with -- you're talking about any -- any type of study with semaglutide?

Q.   Correct.

A.   I do not know the answer to that.

Q.   Do you know of any RCT of semaglutide has reported increased risk of either ileus or intestinal obstruction?

A.   So I reviewed the literature in terms of GLP-1 receptor agonists in relation to intestinal obstruction, small bowel obstruction, and ileus.  I did not review every clinical trial on semaglutide.

Q.   Okay.  But do you know of any clinical trial of semaglutide that has reported an increased risk of

statistically significant for either ileus or intestinal obstruction?

A.    So typically a lot of these trials have a lot of limitations.  As we discussed, randomized control studies in terms of assessing it's -- it's potential side effect, such as ileus and small bowel obstruction, as well as other less common side effects.  So I did not have the desire or the time to review every clinical trial involved in semaglutide.  I tried to focus my efforts to answer the question that was being asked.

Q.    You didn't actually review any semaglutide trials; correct?

A.    Not specific to semaglutide, no.

Q.    And so can I assume that limitations notwithstanding, you're not aware of any semaglutide clinical trials that reported a significant increased risk of ileus or intestinal obstruction?

A.    I'm not because of the fact that that wasn't in my search criteria.  And, typically, yeah, as we've talked about numerous times, talked about with both of you, randomized controlled trials are not the gold standard in evaluating for conditions such as small bowel ileus or small bowel obstruction.

Q.    Now, are you familiar with the select

clinical trial of semaglutide?

A.   That is the largest clinical trial with semaglutide?  Yes, I am familiar with that.

Q.   Do you know how many patients were enrolled in that?

A.   I don't know how many patients were enrolled.

Q.   Over 17,000 sounds familiar?

A.   That sounds about right.  Yes.  I am aware of the trial.  I haven't gone into the trial in detail.

Q.   Do you know what the indication was for the population included in that trial?

MR. PENNOCK:  Are you going to show him the paper?

MR. PRZYMUSINSKI:  I'm asking if he knows.

THE WITNESS:  I do not.  I knew that I was aware of the study, but I don't know the details in that it didn't come across my search to answer the question that I was asked to answer.

BY MR. PRZYMUSINSKI:

Q.   Are you aware at least that Select was a clinical trial of semaglutide for the treatment of overweight or obesity?

A.   I do know that, but I can't give you details on the study.

Q.   Nondiabetic population; correct?

Nilesh Sodhi    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   I believe so.  Yes.

Again, I haven't read the study.  I'm just going by my general medical knowledge.

Q.   Do you know how long the follow-up was in that study?

A.   I do not know that.

Q.   If I told you it was more than three years, would that surprise you?

A.   I would -- I think I would like to see the study.

Q.   Okay.  And --

A.   And what they assessed for in particular.

Q.   But you personally did not review that trial prior to finalizing your report; correct?

A.   I did not, no.

Q.   Now, with respect to Select, I know it's a semaglutide; so set that aside for the moment.

With respect to your review of clinical trials, individual trials, we've talked about two small liraglutide trials that you discuss as No. 3 and 4 on page 26; correct?

A.   Okay.  Yes.

Q.   Outside of those two, have you reviewed any other liraglutide clinical trials?

A.   No, I have not.

Nilesh Sodha CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   In terms of my questions that I asked about semaglutide and trials, meaning do you know how many patients were enrolled, those kinds of things, was that same answer you gave me on semaglutide applied to liraglutide clinical trials data set?

A.   Well, I was aware of the select trial, but I don't know the trial details.  I do not know about many other clinical trials of liraglutide, other than what I have come across in my review of the literature.

Q.   So if I asked you how many clinical trials have been conducted with liraglutide, your answer would be?

A.   I do not know the answer to that.

Q.   If I asked you how many total patients were treated with liraglutide in those clinical trials, you would say?

A.   I do not know the answer to that.

Q.   If I asked the same question about dulaglutide, your answer would be?

A.   I do not know the answer to that.

Q.   If I asked you the same question about tirzepatide, your answer would be?

A.   I don't know the answer to that.

Q.   Do you know if there were any tirzepatide clinical trials that studied a nondiabetic population?

A.    I don't know.

Q.    Do you know if any liraglutide clinical trial that has reported a statistically significant increased risk of either ileus or intestinal obstruction?

A.    Again, my in-depth -- my knowledge of these GLP-1 clinical trials are listed in these papers -- in these summaries.  I can't comment on every study.

Q.    So would the answer be you don't know?

A.    I don't know.

Q.    Okay.  Same answer for tirzepatide?

MR. PENNOCK:  Objection.  Same answers to what?

THE WITNESS:  You just asked me about tirzepatide.

MR. PENNOCK:  What's the question at this point?

BY MR. PRZYMUSINSKI:

Q.    I thought I had it clearly, but maybe I misspoke.

Do you know of any clinical trial of liraglutide that has reported a statistically significant increased risk of ileus or bowel obstruction?

A.    No, I do not.

Q.    Same answer for tirzepatide?

A.   Can you ask me the full question?

Q.   Sure.  Do you know of any clinical trial of tirzepatide that has reported a statistically significant increased risk of ileus or intestinal obstruction?

A.   No, I do not.  And, again, a lot of these clinical trials we have to look at the methodology of the trials and what they were designed to assess.

Q.   Would it be the same answer for dulaglutide?

A.   Same answer that, no, I'm not aware of other clinical trials that are not in my -- in my summary or materials to be considered.

Q.   All right.  Now, I want to still continue talking about clinical trial data.  Okay?

A.   Okay.

Q.   Now, I want to make sure I'm fair to what's in your report.  Okay?

A.   Okay.

Q.   So when I went through those 23 epidemiologic studies, okay, and I'm focused on mechanistic studies right now, but we'll go to this, in addition to the two liraglutide studies, which are three and four on page 26, the other clinical trial data that I found includes the Chiang meta analysis C-h-i-a-n-g, which is located on page 31.

Do you see that?

A.    Yes.

Q.    And that's No. 13 on the list; is that correct?

A.    That's No. 13.

Q.    Okay.  The other clinical trial data that I found was actually in your rebuttal report, where -- do you have Exhibit No. 3 in front of you?

A.    I don't have that, no.

Q.    I thought it was marked as Exhibit No. 3.  Is that not correct?

A.    This is 1, this is 2.  Oh, this is 3.  I'm sorry, here it is.  Okay.  So looking at -- are we discussing Chiang right now or ...

Q.    I just want to get the universe of the studies, then we can talk about them.

A.    Okay.

Q.    So Chiang we talked about as No. 13 in your main report?

A.    Yes.

Q.    Okay.  The other clinical trial data that I have seen in your reports is discussed in your rebuttal report in the section that is titled "Meta Analysis of Randomized Controlled Trials" that includes a study by Yin, Y-i-n, published in 2021.  A study by Wang,

W-a-n-g, published in 2022.  Another study by Wang,
W-a-n-g, published in 2024, and another study by Chen,
published in 2026.

Do you see those?

A.    Yes.

Q.    Did I miss any clinical trial you missed in
your reports?

MR. PENNOCK:  Objection.  Give him time to
look at it.

MR. PRZYMUSINSKI:  Sure.

THE WITNESS:  So any clinical trial data
meaning ...

BY MR. PRZYMUSINSKI:

Q.    Individual clinical trials or meta analysis
of clinical trials in the epidemiological section, not
the mechanistic section.

A.    And we haven't discussed all the
observational studies.

Q.    So clinical trials, not observational
studies.

A.    I believe you've gotten them all.

Q.    Okay.  All right.  Now, take a look -- you
have Chiang here on page 31 of your report -- of your
rebuttal report.  All I'm asking is in these meta
analysis, understanding that they all have limitations,

Nilesh Sodhi          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

right, limitations related to the underlying clinical trials, limitations to the meta analysis, whatever it may be, did any of the meta analysis that you discuss either in your report, meaning the Chiang meta or the meta analysis you addressed in your rebuttal report, find a statistically significant increased risk of ileus or intestinal obstruction with any GLP-1 RA medication?

A.    So if you look at Yin, they report a risk ratio of 4.23, the 95 percent confidence interval does include one.  So in this case, it's not statistically significant, but there is a trend towards statistical significance in that study.

Q.    My question was different.

MR. PENNOCK:  Objection.

MR. PRZYMUSINSKI:  Appreciate that.

BY MR. PRZYMUSINSKI:

Q.    My question was:  Did any of these studies Chiang and the meta analysis you discuss in your rebuttal report, report a statistically significant increased risk of ileus or bowel obstruction with any GLP-1 RA?

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  So they do not.  But they also -- these are meta analyses of randomized

controlled studies, and they have significant limitations and significant heterogeneity in the studies they're combining. And I think even Yin, the authors, note a limitation and note the increased trend in the risk of intestinal obstruction, but there -- none of these studies are methodologically sound enough that I would put enough weight on them to form a conclusion.

I think that they add to the overall body of evidence, but I don't think that they -- that they're methodologically appropriate enough to arrive at a conclusion based on these results.

BY MR. PRZYMUSINSKI:

Q. Okay. I appreciate that. Among the clinical trial data that you discussed, either in your report or in your rebuttal reports, acknowledging limitations in the way you put on those, none of those found a statistically significant risk for either ileus or intestinal obstruction with any GLP-1; is that correct?

A. That is correct.

Q. And in terms of other clinical trial data that may be out there, individual trials for any of these individual medications, that's not something you've reviewed in the context of preparing this report correct?

MR. PENNOCK: Objection. Asked and answered.

Go ahead.

THE WITNESS: As I have discussed before, I have listed the ones that I have reviewed. We've also discussed studies that I have not reviewed.

BY MR. PRZYMUSINSKI:

Q. Okay. But beyond these -- the individual clinical trials, outside of the two that you discussed as No. 3 and 4, for purposes of this report, you did not review those; correct?

A. Correct.

Q. Okay. So you have no idea whether any of those studies -- I don't know how many there are -- reported on ileus and intestinal obstruction end points and what they found; correct?

MR. PENNOCK: Objection.

THE WITNESS: Well, I mean, based on my search terms, it didn't come up in my search terms, but I do not know the contents of each of those randomized control studies.

BY MR. PRZYMUSINSKI:

Q. Did you ask counsel for plaintiffs whether you could obtain the clinical trial data that was produced to plaintiffs' counsel by either Eli Lilly or Novo Nordisk?

A.    Sorry.  Can you repeat the question?

Q.    Sure.  Did you ask plaintiffs' counsel whether you could obtain access to the clinical trial data, the underlying study results for the clinical trials provided -- conducted by Eli Lilly and Novo Nordisk and provided to plaintiffs?

A.    I was going through the published data available; so I did not -- I didn't -- I did not ask for additional information.  I tried to get the published data that's available and peer reviewed.

Q.    Okay.  How long have we been going?

THE VIDEOGRAPHER:  An hour, 19.

MR. PRZYMUSINSKI:  Want to take a break?

THE VIDEOGRAPHER:  Off record at 2:58.

(Whereupon a short recess was taken.).

THE VIDEOGRAPHER:  On record at 3:23.

BY MR. PRZYMUSINSKI:

Q.    Welcome back from a break, Doctor.

A.    Thank you.  Welcome.

Q.    Earlier on, we were talking about the Hurwitz study.  Well, not "we," but you and the other counsel.

A.    Yes.  Can we go back to that?

Q.    Well, let me ask my question.  You can absolutely flip back it.

A.    All right.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   You mentioned something called the "wide confidence interval."

Do you recall that?

A.   I do recall that.

Q.   What is a wide confidence interval?

A.   A wide confidence interval is basically a result of inadequate power in the study.  Basically saying that in order to rule in or out a particular association, to a reasonable degree of medical certainty or statistical significance, it is difficult to do so because that confidence interval is very wide. It's a -- it's related to a lack of statistical significance, and generally it requires more number of -- a higher number of patients and can be a longer duration of therapy.

Q.   How -- do you have a definition in your own mind of what's a wide confidence interval?

A.   I don't have a specific definition.  But when the number is .2 to 10, then that's a wide confidence interval.  I'm just giving an example.

Q.   Yeah, yeah, no.  Definitely.

A.   No.  I mean, typically, if that confidence interval includes 1, that illustrates a lack of statistically significance; although, if it's -- if it's very close to that number, it can -- it can mean

something more meaningful like a trend towards statistical significance.

Q. So the width of a confidence level, right, meaning the number or numbers or the difference, the low end of the confidence interval, 95 percent confidence interval to the high end is large; right? Whatever that large is defined as?

A. Right.

Q. It has nothing to do with whether the confidence interval crosses 1; correct?

A. Correct.

Q. You can have a wide confidence interval that crosses 1 and a wide confidence interval that does not; right?

A. That's correct. Right. I'm talking about the interpretation in terms of statistical significance.

But yes, that wide confidence interval just purely means the width of the confidence interval.

Q. Right. And that reflects some extent the power of the study; right?

A. Correct.

Q. And it's generally something you have to think about and interpret cautiously; right? Because when you see a wide confidence interval, whether it

crosses 1 or not, it tells you that because the sample size, there's a great deal of variability and potentially the result can be less reliable than it would be if you had a tighter confidence interval; is that correct?

A.   We can say that there's a higher likelihood that the results can be obtained by chance rather than from a particular variable.

Q.   Even -- sorry.  Go ahead.

A.   Now, if we go to the study at Yin, you talked about the Yin study and the rebuttal, that has a relative risk ratio of 4.23 and a confidence interval of .85 to 20.94.  So that is a wide confidence interval, but it is also worth noting that the majority of that confidence interval is well above 1, and that's why we call it a trend towards statistical significance.

Q.   I understand that.  I just want to go back to the Hurwitz.

Do you have that in front of you?

A.   I have that.

Q.   There's a number of odds -- or I guess in this case, I don't know if these are odds ratio.  It looks like relative risks.  There's a variety of confidence intervals there; right?  The GLP-1 RA versus

SGL-2 [sic] inhibitors.  You report a risk ratio of 1.09 with a --

MR. PRZYMUSINSKI:  Let me do it.

BY MR. PRZYMUSINSKI:

Q.  A risk ratio -- or I guess relative risk of 1.09 with a 95 percent confidence interval from 0.98 to 1.21.

In your view, is that a wide confidence interval?

A.  That's a narrow confidence interval.

Q.  Then there's one for comparing GLP-1 RAs to Nalproxone, buproprion --

A.  Naltrexone.

Q.  Sorry.  It's getting later in the day for me.

And that one is from .63 to 5.60 for the confidence interval; right?

A.  Right.

Q.  Do you consider that a wide confidence interval?

A.  Relatively wide.  It's much wider than between GLP-1s and SGLT2s.  I mean, wide is all relative, risk relative.  It's wider than the other one we are looking at.

Q.  Right.  So then the GLP-1 RA versus topiramate is 0.45 to 6.99; right?

A.   Correct.  That's even a wider confidence interval.

Q.   Okay.

A.   And I discuss the wide range of confidence intervals because of the low power of the study.

Q.   I get it.  I -- I was trying to get a sense of what in your view is a wide versus narrow confidence interval.

THE VIDEOGRAPHER:  Sorry, real quick.

Doctor, could you move over back to your left a little bit?  Just like move -- thank you.  We got a little off center, so I was getting to the end of my --

THE WITNESS:  Trying to get my better side; right?

BY MR. PRZYMUSINSKI:

Q.   All right.  Let's talk a little bit more about power.

So power from a statistical perspective is the ability of a study to detect an effect when one is actually present; correct?

A.   Correct.

Q.   And power typically is evaluated as a -- prior to conducting the study; correct?  As an A priority determination?

A.   Correct.  Correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    You can look at a study after it's been conducted and assess whether you believe that study was underpowered; correct?

A.    Correct.

Q.    And how do you do that?  How do you scientifically assess after a study has been completed whether it was underpowered?

A.    Well, sometimes there's a wide confidence interval or a trend towards statistical significance. But it didn't meet statistical significance, so we try to -- we're talking about randomized studies at this point; right?

Q.    Well, I don't know.  I would assume it's applicable to all.  But is there a difference?

A.    I'm just giving an example.  So we try to conduct study protocols so that it would have the power to detect the variable in question.  Now, the issue is is if we are doing a randomized control study, and we are evaluating multiple factors, it may not have the power to detect some of the rare side effects that are in question, which is one of the issues with the randomized control studies that we have on this subject.

Q.    Okay.  But let's be practical about this.  So we'll look at some studies here in just a second, but I

want to initiate how this is done.

So I hand you a study, right, that's been completed, that has results.  You get a manuscript and read it.  That study has a certain patient population, has a certain number of events, has a certain odds ratio, has a certain confidence interval.

If you conclude that study was underpowered, are you performing some sort of statistical calculation or are you doing something different when you get to that result?

MR. PENNOCK:  Just note my objection.  Are you going to show him a particular study you want to ask him about?

MR. PRZYMUSINSKI:  Later, but right now that's just the question.

THE WITNESS:  Yeah, I mean, I think we have to look at the particular study.  I would say that sometimes the -- because we are not -- we are not always looking at it at the primary -- at SBO or ileus as the primarily primary outcome, a study can be underpowered to detect those adverse events.

BY MR. PRZYMUSINSKI:

Q.   But how do you know this?

A.   If it didn't -- if it didn't reach statistical significance and there's a trend towards

statistical significance, that could be a function of being underpowered.

Q. Or it could be a function of that; right?

A. Could be a function of that, too.

Q. You wouldn't be scientifically correct to say, hey, this study didn't reach statistical significance, ergo, the only conclusion, underpower; right?

A. I wouldn't say that's the only conclusion. I think we have to look at the study in particular. For example, the Yin study, the authors -- which has a very wide confidence interval, but a relative risk ratio of 4.23 with a confidence interval between 8.5 and 20.94, the authors even concluded that the increased trend -- that -- that semaglutide showed an increased trend towards intestinal obstruction.

Q. I understand that. But I'm not talking about Yin specifically, although you did identify one factor, which is the width of the confidence interval.

A. Right.

Q. What I'm trying to understand is -- well, let me ask it to you differently. Forget ileus and intestinal obstruction, forget GLP-1 RA. Let's talk about statistics, right, let's talk about epidemiology statistics, interpretation of studies. Okay?

A.    Okay.

MR. PENNOCK:  Objection.

BY MR. PRZYMUSINSKI:

Q.    You review a study, okay.  It's called an observational study that reports a risk ratio that is 1.0.

A.    Okay.

Q.    1.0 exactly on the dot.

A.    Okay.

Q.    Obviously, not statistically significant; right?

A.    Correct.

Q.    Are you able to -- let's -- strike that.

Let's assume you believe that that study is underpowered maybe because the confidence interval is wide, maybe because there's a very small number of subjects or events.

Are you able to within that study scientifically ever in any situation say, well, it's underpowered.  The odds ratio was 1.0, but I know for a fact, to a reasonable degree of medical certainty, if I increase the power, the study would find a statistically significant effect?

MR. PENNOCK:  Objection.  It's a patently incomplete hypothetical.

THE WITNESS:  I mean, this is a hypothetical situation.  And I don't know.  We're not talking about one particular event, so it's hard to discuss how this goes at for or against the totality of the medical literature.  And we also don't know the method -- potential methodological limitations in this study.

But -- but to your point, if the -- if the risk ratio is 1.0, we can't say with any definitive nature that the only reason it's 1.0 is because it's underpowered.

BY MR. PRZYMUSINSKI:

Q.   Right.  No matter how widely confident the interval; correct?

A.   I mean, I think that this is a purely hypothetical situation.  And in your hypothetical situation, the way you're framing it would be very hard to make an assessment based on what -- the information you're giving me.

Q.   Imagine you have the same scenario, you can pick any sort of census you want, but the risk ratio is 1.2, still not significant.  Okay?

You with me.

A.   I'm with you.

Q.   And you believe the study is underpowered.

Would it ever be, to a reasonable degree of

scientific certainty, appropriate for the scientist to say I know for a fact if I increased the power in this study, the effect would have been found in this study to be statistically significant and increased?

MR. PENNOCK:  Objection to form.  Objection. Incomplete hypothetical.

THE WITNESS:  I mean, this is getting more and more hypothetical as we -- as we progress.  It's -- but I don't think that a scientist can say with absolute certainty the reason why an association didn't occur is because it has inadequate power in that setting.  I think it might be more worthwhile to discuss individual studies so we can come up -- we're not dealing with hypotheticals.

BY MR. PRZYMUSINSKI:

Q.   You determine absolute certainty.

Do you recall that?  And I frame -- so hold on.

A.   By definition --

Q.   Let me finish my question.

MR. PENNOCK:  You did.  You said, "Do you recall that?"  And then he was answering.

Finish your answer.

MR. PRZYMUSINSKI:  Fine.

THE WITNESS:  So by definition, we are

talking about a 95 percent confidence interval.  We're talking about P values of less than .05, which means that with 95 percent certainty, the results did not occur by chance.  So absolute certainty is absolute -- absolute would imply 100 percent.  So I don't think I said "absolute certainty" anywhere.

BY MR. PRZYMUSINSKI:

Q.    You can just read your answer.

MR. PENNOCK:  He was dealing with your nonsensical hypotheticals.

THE WITNESS:  Right, right.  So we cannot say that with absolute certainty.  I didn't say --

BY MR. PRZYMUSINSKI:

Q.    He didn't let me finish my question, so that's why we got off.

MR. PENNOCK:  That's not true.  That's not what happened.  He was responding to your question, as to whether you could say with absolute certainty that the result was due to the study being underpowered. And he said, no, you couldn't say that.

THE WITNESS:  I could not say that with absolutely certainty.  I didn't say I could say something with absolute certainty.

BY MR. PRZYMUSINSKI:

Q.    You used the term "absolute certainty" in

that response; right?

A.   But I was saying it in the negative.

Q.   I know.  I wasn't implying that.  I was just going to use that term.  The way I had asked the question was:  With a reasonable degree of scientific and medical certainty, which is the same level of rigor you're applying to your report.  And so what I wanted to understand is when you used the term "absolute certainty," are you saying that, yes, you could offer that opinion that the lack of the effect was simply due to the lack of power, to a reasonable degree of medical scientific certainty, but not to absolute certainty, or do you understand my question?

MR. PENNOCK:  Objection to form.

THE WITNESS:  I do not.

MR. PENNOCK:  Objection to form.

THE WITNESS:  I do not understand.  We are dealing with multiple hypotheticals and different statements.

BY MR. PRZYMUSINSKI:

Q.   It's one hypothetical.  Let me reset it.  Let me reset it.  Okay?

I asked you a question about a risk ratio that was 1.2 that was nonsignificant, and you believed came from a study that was underpowered.

Do you recall that?

MR. PENNOCK:  Objection.

THE WITNESS:  Which study are we talking about?

BY MR. PRZYMUSINSKI:

Q.   It's the hypothetical study I was talking about.

MR. PENNOCK:  Objection.

THE WITNESS:  And I believed that it came from a study that was underpowered?  I said --

BY MR. PRZYMUSINSKI:

Q.   That was part of the hypothetical.

A.   Right.  I said we cannot say with absolute certainty it did come from a study that was underpowered.

Q.   And now my question was:  When you used the term "absolute certainty," right, that's a different term from the term I was asking about, which was, to a reasonable degree of medical and scientific certainty. So I want to know the answer to this question.

Are you able to say that the reason this statistical significance was not present, to a reasonable degree of scientific certainty, was as a result of the lack of power in the study, or is that different from what you said?

MR. PENNOCK:  Objection.

THE WITNESS:  Are we --

MR. PENNOCK:  I don't know what we are talking about.

THE WITNESS:  Are we still speaking in the hypothetical?

BY MR. PRZYMUSINSKI:

Q.  Yes.

A.  So can you clarify your question again?

Q.  Let's go to a study because you want to see a study.  Let's go look at the Chiang meta analysis, which is on page 31 of your report, Doctor.

Now, we talked, albeit very briefly, earlier about some of the clinical trial data in your report, and one of the things we had mentioned was the Chiang 2025 meta analysis, which is No. 13 on page 31; correct?

A.  Correct.

Q.  All right.  And you do have a brief discussion of that on page 31; right?

A.  Correct.

Q.  Okay.  Now, well, you state in your report is, "This was a meta analysis, a systematic review that included 55 randomized controlled trials evaluating GLP-1 agonists in diabetic patients, overweight obese

patients, and patients with" --

(Clarification by the reporter.)

MR. PRZYMUSINSKI: -- "fatty liver disease."

BY MR. PRZYMUSINSKI:

Q. Do you see that?

A. Yes.

Q. And if you look a little bit further down, you state that, "This meta analysis of 55 RCTs did not show an increased risk of intestinal obstruction or ileus."

Do you see that?

A. Yes.

Q. Now, the same time, if you look at the last couple sentences here, you raised some concerns regarding the design of this meta analysis; correct?

A. The heterogeneity was significant. Gastrointestinal adverse events weren't fully elucidated, like they're not in most of our randomized control studies. And -- and they were -- there were a lot of diabetic patients, again, with the possibility of diabetic neuropathy as well as other confounding factors.

Q. So the three things you specifically call out in your report in terms of limitations are heterogeneity; right? Correct?

A.   Correct.

Q.   The way that gastrointestinal adverse events were collected and evaluated; correct?

A.   Correct.

Q.   And the fact that many of the trials included patients that were diabetic; correct?

A.   Correct.

Q.   Okay.  Now, tell me what "heterogeneity" is, Doctor?

A.   Heterogeneity is, in the setting of meta analysis for randomized control studies, they're combining different studies with different end points, different inclusion/exclusion criteria, and analyzing them together.  The definition of heterogeneity could be further exemplified with the Alfehaid study in which they are combining randomized studies, observational studies, case reports, meta analyses, all those.  So a lot of times the heterogeneity within meta analysis limits meaningful interpretation.

Q.   Okay.  That's helpful.  Now, have you, yourself, ever done a meta analysis?

A.   I have not.

Q.   Are you familiar with I-squared statistics for evaluating heterogeneity?

A.   I am not familiar in how to use it.  I'm

familiar of that as well as the grade scoring system in -- in meta analyses, but I'm not familiar how to use it, no.

Q.   So -- but you do know that I-squared statistic, I to the 2 power, is a measure of heterogeneity that's used in meta analysis; correct?

A.   Correct.

Q.   Do you know what percentage I-2 statistic -- it gives you a percentage.  You're aware of that?

A.   (Witness nods head.)

Q.   Do you know what percentage of the I2 comports with high heterogeneity?

        MR. PENNOCK:  Objection.  No foundation.

        Go ahead.

        THE WITNESS:  I do not know.  And I think we also need to discuss the heterogeneity involved with the outcomes in question.

BY MR. PRZYMUSINSKI:

Q.   Well, you're aware that a meta analysis when you conduct it, you actually do testing to assess heterogeneity?

A.   Yes.

Q.   And one way you do that is by performing an I-squared test; correct?

A.   Correct.

Q.   And that tells you, based on the results of that test, what percentage of heterogeneity is present in the study population; correct?

A.   Correct.

Are you able to give me that study?

Q.   Let's finish this thought.  That's going to be next, I promise.

You're at least familiar with that concept?

A.   I'm familiar with the concept, yes.

Q.   But in terms of the specific I-squared levels that are attributed to the low versus medium versus high heterogeneity, that's not something you know, sitting here right now?

A.   That is correct.

Q.   Okay.  Let's do this, so no one feels like they are not getting what they need.  We are going to mark as Exhibit No. 5, this is a paper titled "Glucagon-like peptide 1 receptor agonists and gastrointestinal adverse events, a systematic review and meta analysis."  That first author is Chiang, C-h-i-a-n-g, and was published in the Journal of Gastroenterology in 2025.

(Defendant's Exhibit 5 was marked.)

MR. PRZYMUSINSKI:  Doctor, this is a copy for you.  Paul, this is a copy for you.  I don't know if

anyone else wants one, but if they do, there's one there.

BY MR. PRZYMUSINSKI:

Q.   Feel free to look at it.

I was going to ask you about your second criticism in your report, but let me know when you're ready to talk about that.

A.   (Witness reviewing document.)

So we can go ahead and ask questions, and I can read it further if there are any --

Q.   I appreciate that.

A.   -- other issues if that works just in the interest of time.

Q.   Yeah.  So the second limitation that you noted in your report, just to quote, "Gastrointestinal adverse events were not prespecified as primary outcomes in the RCTs."

Do you see that?

A.   I see that.

Q.   I'm assuming that quotation marks in your report reflects that comes from the article?

A.   Yes.

Q.   All right.  Great.

Now, I assume I know the answer to this, but I want to make sure.  In terms of the RCTs that were

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

included in this meta analysis, the 55, did you individually pull up the publications from those articles or get a look at the protocols from those articles --

A.    So --

Q.    Let me finish my question.  Let me finish my question.

And look at -- well, I have to finish my question.  To determine how adverse events were collected in those studies, in evaluating those studies?

A.    So typically what I do when I'm reading these meta analysis of RCTs is I go through some of these studies depending on if anything comes up that may want me to -- that may prompt me to refer to one of these studies.  But I did not personally review each of these 55 randomized control studies.

Q.    And that makes sense.

But sort of the corollary of that, right, is you don't know for any of the individual studies included how adverse events were collected, in what manner they were reported and analyzed, or really, frankly, anything about that collection process beyond what you know generally about how RCTs are collected; correct?

A.   Yeah.  I didn't go through each of these studies individually, if that's what you're asking.

Q.   So without doing that, can you opine, to a reasonable degree of scientific or medical certainty, that the methods used to identify adverse events in the clinical trials included in this meta analysis by Chiang, was less reliable than the methods used in the observational studies you rely on for your causation opinion, such as Sodhi or Faillie?

MR. PENNOCK:  Can you read that question back?

(Record read by the reporter.)

THE WITNESS:  So, you know, I have done randomized control studies, and I -- I also understood that the fact that a lot of times these are not prespecified end points --

(Clarification by the reporter.)

THE WITNESS:  And I have also discussed the fact that a lot of times randomized studies with close follow-up when patients develop symptoms that might be precursors to the diagnosis in question, the drug may be stopped or decreased.  So we've talked about that.

But I can't comment on the methodology on every randomized control study listed in this -- in this analysis.  I can also say that when the authors

acknowledge that they were not prespecified as primary outcomes in the included RCTs, I would say that they acknowledge that for a reason.

BY MR. PRZYMUSINSKI:

Q.  Well, that's good.  But now let's answer my question and make sure I get the answer.

MR. PENNOCK:  Objection.

MR. PRZYMUSINSKI:  It's not what I want.  I just want an answer to my question.

MR. PENNOCK:  Your commentary was objectionable.

MR. PRZYMUSINSKI:  Okay.  That's fine.

BY MR. PRZYMUSINSKI:

Q.  Having not reviewed the underlying clinical trials, can you opine, to a reasonable degree of scientific or medical certainty, that the methods used to identify adverse events in the clinical trials included in the Chiang and meta analysis was less reliable or were less reliable than the methods used in the observational studies you relied on in your causation opinion such as Sodhi and Faillie?

MR. PENNOCK:  Objection to form.  Objection. Asked and answered.

Go ahead.

THE WITNESS:  So if we want to go back to the

second-to-last paragraph in the -- in the discussion.

BY MR. PRZYMUSINSKI:

Q. Sorry, which page are you on?

A. I'm on page 1277.

Q. Okay I'm with you.

A. There are multiple comments the authors make about -- about not having baseline gastrointestinal or biliary comorbidities in the --

(Clarification by the reporter.)

THE WITNESS: -- in the GLP-1 receptor agonist and placebo groups. And they talk about participant dropout rate, which is an issue we've discussed, particularly due to adverse events were inconsistently reported. It is -- it was unclear whether individuals who discontinued treatment were fully accounted for in the adverse outcomes. And the lack of standardized reporting across trials may introduce bias or underestimation of gastrointestinal or biliary events.

So they even discuss that these limitations limit our ability to determine whether the observed risk are unique to GLP-1 receptor agonists. And basically, the authors state the limitations -- many of the limitations of this study. So it's -- it's -- it's consistent with what we see from meta analysis of

randomized control studies that are looking at rare adverse events.

BY MR. PRZYMUSINSKI:

Q.   Okay.  I appreciate that.  But what I asked you was different.  I asked you whether you could opine, based on your review of -- of this meta analysis without looking at the individual trials, that the methods that were used to identify AEs in the clinical trials included in this meta analysis were less reliable than those using the observational studies you relied on for your opinions, including the Sodhi or Faillie study?

If the answer is yes, you believe that to be the case, that's fine.  If it's no, if you don't know, but I need an answer to that question.

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  So I have not reviewed in detail all of the studies.  I typically -- when I'm reading meta analyses, I do glance at some of the more relevant studies, so I can't comment on the methods for each of these studies.

BY MR. PRZYMUSINSKI:

Q.   Okay.  That's helpful.  But that's only part of it.  I asked overall the methods used by the studies included in this meta analysis, do you have an opinion,

to a reasonable degree of medical certainty, whether the methods used in these studies as a whole resulting with whatever outputs came in the study are more or less reliable than those methods used in the observational studies you rely on like Sodhi and Faillie?

MR. PENNOCK:  Hold on a second.  Objection.

I had asked you to stop with the preambles to your question.

Please read the entire question back to the doctor.

(Record read by the reporter.)

MR. PENNOCK:  Object to form.

Go ahead.

THE WITNESS:  So I can't comment on every individual study.  I can comment on the lack of reliability of randomized control studies in the setting of rare side effects, particularly in the setting of a meta analysis and the added layer of heterogeneity that's involved.  But I can't comment on each of these different randomized control studies.

BY MR. PRZYMUSINSKI:

Q.  Okay.  Going to try again because I really need an answer to my question.  I'm not asking you to go through every single one of these 55 individual

Nilesh Sodhia                    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

studies and compare that one individual study against every other study in your 23 study list.

What I'm asking is whether today you're willing to testify, as you sit here today based on whatever review you did prior to coming here, prior to finalizing your report, that the way the adverse events were collected in the 55 studies that contributed to this report as a whole was less reliable than the methods used to collect adverse events in the other studies you relied on, such as Sodhi and Faillie.

MR. PENNOCK:  Objection to the preamble. Objection whatever that meant about telling him what your question means.  Just ask an intelligible question.  Then he won't have to define it.  Okay?

I'm also objecting to the form, and I'm objecting to the overly broad nature of the question.

Go ahead.

THE WITNESS:  So we talked earlier, if you remember, talking about pros and cons of using ICD codes to extract diagnoses versus clinical trials.  And the fact that clinical trials, sometimes we might have difficulty obtaining a ultimate diagnosis based on symptoms because of the inherent limitations with patients in clinical trials.

So all of those limitations, all those -- all

those limitations, all those pros and cons still continue to apply.  So I think that there are pros and cons there.  And we need to view them as such.

BY MR. PRZYMUSINSKI:

Q.   Are you offering an opinion, to a reasonable degree of medical scientific certainty, that the methods used to detect AEs for the trials in this study is better or worse or equivalent to that used by the authors of the Sodhi study or Faillie study or the other observational studies you rely on?

MR. PENNOCK:  Objection to form.  Objection.  Overly broad.

Go ahead.

THE WITNESS:  I would say they are different limitations to different pros and cons.

BY MR. PRZYMUSINSKI:

Q.   So one is not better than the other; they each have pros and cons?

A.   I think we need to view them all in a totality.

Q.   Let's move on to your next list.  You say that a large proportion of the patients -- you say these patients were diabetic.  Many of the patients in the clinical trials in this meta analysis; correct?

A.   Correct.

Q.   Did you look at the individual trials included in the meta analysis to see which ones evaluated nondiabetic patients?

A.   There are 55 clinical trials.  I can't tell you which ones had diabetic and which ones have nondiabetic patients.  So if we look at Table I on page 1271 --

Q.   Mmm-hmm.

A.   -- 1272, and 1273, we can see which ones have diabetes.  We can also see which ones have diabetes with recent acute coronary syndrome as well as with chronic kidney disease.  And those patients with other complications of diabetes are more likely to have diabetic neuropathy also.

And then we can also see which ones are dealing -- we're dealing with that have -- that have diagnoses of being overweight or obesity as well as a combination of overweight and obesity.

So I did look at this table.  I didn't -- again, I mean, I did not look at all of these studies individually, but I did look at this table and get a sense for how many of these studies have -- how many of these studies include diabetic patients, diabetic patients with complications as well as overweight patients, as well as overweight patients with Type 2

diabetes.

Q.   Based on -- sorry.

A.   A significant number of them were diabetic and significant number of them were diabetic with complications which leads to a high incidence of diabetic neuropathy.

Q.   Table I, which you just talked about. There's a group of studies where the indication was Type 2 diabetes; correct?

A.   Correct.

Q.   There's also a group of studies where the indication is overweight or obesity?

A.   Correct.

Q.   There were some studies at the very end where the indication was Mash, M-a-s-h, or Nash, N-a-s-h; correct?

A.   Which is associated with both diabetes and being overweight.

Q.   Now, did you look to see which of those 55 trials that are listed on that table actually contributed to the risk estimates provided for ileus or intestinal obstruction in this study?

A.   No.  All these populations were included in this meta analysis.

Q.   That's assuming that all of them had data on

ileus and intestinal obstruction; correct?

A.   Or even when they don't have data of ileus or intestinal obstruction, it still goes into the pool of data.

Q.   We'll look at that in a second.  I promise.

A.   And additionally -- I'm sorry.  Go ahead.

Q.   I thought I cut you off.

MR. PENNOCK:  Go ahead.

THE WITNESS:  Okay.  Okay.  So, yeah, I mean, additionally, a lot of these, the authors acknowledge that they weren't prespecified end points in many of the studies, but yeah, and that there's a -- they discuss a duration of the studies, also, which I did evaluate.

BY MR. PRZYMUSINSKI:

Q.   Okay.  Now, did you look to see whether the authors conducted any analysis to look at whether there was a difference in risk of ileus or intestinal obstruction in patients who were studied in diabetic trials versus patients studied in trials for obesity?

A.   I looked at that, and that was -- I did not see any analysis on that.

Q.   Okay.  Now, let's talk about some of the other things you just mentioned.  I'm sorry.

A.   I'm sorry.  I just want to mention the other

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

issue is there were patients with a longer duration of follow-up, there were trials with a longer duration of follow-up, and those were not examined separately, either.

Q.   Okay.

A.   They were all lumped in together.

Q.   In terms of -- well, let's -- you know what? Let's just go to this document.  So, Doctor, if you turn me to the supplemental materials.

A.   Okay.

Q.   You'll see at the end, when you get there, it's a long ways back, it's a figure called supplemental Figure 11.

MR. PENNOCK:  What page is this on?

MR. PRZYMUSINSKI:  They're not numbered in the supplement.

MR. PENNOCK:  How many pages is the document?

MR. PRZYMUSINSKI:  Pretty long, but it looks like this.  Supplemental Figure 11.

THE WITNESS:  I see it.

BY MR. PRZYMUSINSKI:

Q.   Okay.  If you look at supplemental Figure 11, Doctor, the title is "Forest Block Summarizing Association Between GLP-1 Receptor Agonist and Intestinal Obstruction."

Do you see that?

A.   Yes.  I see that.

Q.   Now, you can probably tell pretty quickly that that risk estimate is not based on 55 clinical trials; right?

A.   Correct.

Q.   In fact, if you count them, which I did, I promise there's 19 trials listed under the left-hand column.

Do you see that?

A.   Sounds about right, yeah.

Q.   And just ballparking.  You don't have to believe me.  If you want to count it, go ahead, but I did some quick math.  There's about 70,000 patients across those 19 trials between the treatment and control group.

Does that look reasonable based on the numbers listed there?

A.   Sure.  That sounds --

MR. PENNOCK:  Hold on a second.  Does that look reasonable?  Are you talking both treatment and control?

MR. PRZYMUSINSKI:  Yeah.  That's what I said.

MR. PENNOCK:  You did say that.  I'm sorry.

THE WITNESS:  Oh, wait.  Treatment and

control?

BY MR. PRZYMUSINSKI:

Q.    Together.

A.    So there's the Select -- this includes the Select study that is 8,779 in the treatment and 8,783 in the control.

Q.    That's why I said total of about 70,000.

A.    70,000.  Okay.  Okay.

Q.    I'm sorry if I --

A.    Okay.  I thought I heard 17, and that's why I was confused.  But --

Q.    Bless you.

A.    Bless you.

Q.    So about 70,000 seem right.  I'm not going to lock you into that.

A.    Yeah, I think that sounds about right.

Q.    Now, if you look at this table, you see at the bottom right-hand corner is where the risk ratio is calculated, 0.82 confidence interval of --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:  0.82, with a confidence interval of 0.33 to 1.33.

BY MR. PRZYMUSINSKI:

Q.    Do you see that?

A.    Yes.

Q.   So based on the total of these 19 studies in this meta analysis -- I understand there's limitations. We will talk about the --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:  -- the authors found a risk ratio that was below 1; correct?

MR. PENNOCK:  Note my objection.  No foundation.

THE WITNESS:  So this is a forest plot summarizing GLP-1 receptor agonist and the intestinal obstruction.

Again, we have heterogenous data being lumped together with varying follow-up, varying diagnoses, et cetera.  But, yes, on this analysis, I will acknowledge that is what is written here is a risk ratio of .82 with a 95 percent confidence interval between .51 and 1.33.

BY MR. PRZYMUSINSKI:

Q.   You wouldn't call that a wide confidence interval, would you?

A.   No.

Q.   Okay.  Now, if you look at the heterogeneity, which you mentioned, the I-squared value is 35.27 percent.

Do you see that number?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   I do see that.

Q.   Do you know what level of heterogeneity that implies for this analysis?

A.   I do not.

Q.   If I told you it was medium, would that make sense for you?

A.   Why don't you tell me what it is?

Q.   Okay.  Typically, 0 to 25 is low, 25 to 50 is medium, and 50 and above is considered high.

Does that sound familiar?

A.   That sounds familiar.

Q.   This will be medium level heterogeneity?

A.   (Witness nods head.) I would say that.  When you are dealing with overall issues of heterogeneity, in meta analyses, yes.

Q.   In this meta analysis, there are, by my count, eight trials of semaglutide.

Do you see that?  The first eight that are listed there?

A.   Yes.

Q.   None of those individually found the significant association; correct?

A.   Correct.

Q.   And there are also four trials of tirzepatide; correct?

A.   Correct.  And within the limitations of randomized control studies that we discussed ad nauseam today, they did not find -- they did not find an association in these studies.

We've talked about all the issues with Vioxx and Propulsid and sibutramine and other drugs in the past that have had rare side effects that have not been found in randomized control studies, and I don't see this as an exception here.  We have randomized control studies, including a meta analysis of randomized control studies, that are not finding a causative association, which doesn't mean there is not one.  It just means it's not found within the limitations of these studies.

Q.   Not just finding causative association; they're not finding any association; correct?

A.   Which studies are we talking about, though? We're talking about these studies.

Q.   Right.

A.   Right.  And we've discussed the limitations of randomized control studies in finding associations or causative associations.  We've discussed those limitations.

Q.   From liraglutide, none found association; correct?

A.    Within the limitations of randomized control studies, they did not.  And I think you also remember that there is -- there were concerns regarding we don't know why people dropped out of the studies.  People had GI symptoms, but they may not have been fully elucidated, so all of those should be considered when interpreting these data.

Q.    For dulaglutide in the study, they did not find association; correct?

A.    Again, I will restate my understanding of the ability of randomized control studies to evaluate for rare side effects, including the -- the statements that the author, themselves -- the authors, themselves, made about not being designed to evaluate for ileus or SBO and the inherent limitations of randomized control studies.

Q.    The authors said they were not able to evaluate for ileus or SBO.

Where does it say that?

A.    The authors -- let's -- I may have misspoke.  Let's go back to that discussion that we talked about.  So the authors -- the authors -- I was -- I was paraphrasing, I'm sorry.  The authors did discuss the -- their difficulty with isolating gastrointestinal and biliary adverse event profiles.

Q.   That's a different statement; right?

A.   Well, ileus and SBO are gastrointestinal adverse events.

Q.   Let's go to Figure 12, which is on the next page.  That will be easy to find.

Do you see that, Doctor?

A.   I see that.

Q.   This one is a forest plot again.  Again, GLP-1s, but looking at paralytic ileus at the end point; correct?

A.   I see that.

Q.   The risk ratio calculated based on what looks like eight studies included in here was 0.89 with a confidence interval between 0.39 and 2.01.

Do you see that?

A.   Yes.  And, again, I think we have to interpret this in light of limitations of these types of studies in assessing adverse -- rare adverse events related to a drug.

Q.   Do you consider that a wide confidence interval?

A.   It's wider than the confidence interval from the page before, but I wouldn't consider it inherently wide.

Q.   You see the I-squared value, Doctor?

A.    I see the I-square value.

Q.    25.90?

A.    25.90.  It's a medium I-squared value.  And, again, I think we have to interpret this in light of the limitations that we have of randomized control studies in assessing these side effects.

Q.    Go to Table 42, supplemental Figure 42.  Let me know when you're there.

A.    I'm there.

Q.    Okay.  So this is another forest plot, GLP-1 RAs looking at the end point of paralytic ileus now in subgroup analysis.

Do you see that?

A.    Yes, I see that.  I'm just reading it.

Q.    The first section looks at different populations, one with diabetes, one with overweight and obesity, and one with Mash and Nash LD.

Do you see that?

A.    I see that.

Q.    If you look at P value in the right-hand side, it's 0.83, meaning they found no difference in the risk across these populations; correct?

A.    Yes.  Again, we have to understand these studies found no difference based upon the inherent limitations we have with these studies.

Q.    But nonetheless, across this body of RCTs, when they looked at studies looking at diabetic patients as compared to studies with overweight or obese patients, they found both had a reduc- -- a risk ratio below 1, and in fact, the risk ratio was higher in the diabetes population than the overweight/obesity population.  But there was no statistical difference between those indicating that there was no difference in effect between the two populations; correct?

A.    This doesn't take into account diabetic neuropathy patients.  I mean, some of them may have been, clearly some of them were, but it doesn't subcategorize them.  So I don't want to say that all patients are going to respond in a similar fashion to GLP-1 receptor agonist.  All I'm saying is that when these studies are limited in their ability to detect certain associations, we have to view it with those limitations in mind.

Q.    But is that correct, my statement, subject to the diabetic neuropathy caveat?

A.    Based on the limitations of this study, there did not seem to be a statistically significant difference between these two populations within this study -- within these studies.

Q.    And the risk ratio for each was below 1;

correct?

A.    That is correct.

Q.    And, in fact, there was ratio for the diabetic population rather than the overweight obesity population?

A.    Again, we are dealing with multiple limitations of these statistics.

Q.    All right.  Now, look at the dose section of this same page.  There's a section that looks at dose, comparing low dose and high dose.

Do you see that?

A.    I see that.

Q.    Again, P value is 0.42; right?

A.    Correct.

Q.    So among these studies, they found no evidence of a dose effect between a low and high dose; correct?

A.    And do you know in each of these studies --

MR. PENNOCK:  Note my objection to the question.

No effect as to what?

BY MR. PRZYMUSINSKI:

Q.    It's a better question for you since you're the one that's offering opinion.

Do you know how they define "low dose" and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

"high dose"?

MR. PENNOCK:  Hold on a second.  Hold on.

You had a question on the record regarding was there any difference in effect between low dose and high dose?

MR. PRZYMUSINSKI:  Right.  To which he responded --

MR. PENNOCK:  Any difference of effect on what?

MR. PRZYMUSINSKI:  He responded saying what do I mean by low dose and high dose or how was it defined in the -- in this study?  So he didn't answer my question, so I'm going to try to redo it.

MR. PENNOCK:  Please do.

MR. PRZYMUSINSKI:  So let me start with your question.

BY MR. PRZYMUSINSKI:

Q.   Do you know how "low dose" and "high dose" were defined in this study of this meta analysis?

MR. PENNOCK:  You're free to look at the study that you previously looked at.

THE WITNESS:  So --

MR. PENNOCK:  It's not a memory test.

THE WITNESS:  Right.

MR. PRZYMUSINSKI:  I'm not.

THE WITNESS:  Right.

MR. PENNOCK:  Take your time.

THE WITNESS:  Let me take a look and see how they define "high dose" and "low dose" in this study. So let's look at supplementary Table II.

BY MR. PRZYMUSINSKI:

Q.  You're almost there.  Keep going.  It looks like this.  You are going back -- yeah, towards -- yeah.  Got to get through all the study summaries.  Now you are too far.  If you look at the page that is --

A.  Table I?

Q.  Right there.

A.  Supplementary Table II.  So it does kind of give a classification.  It doesn't tell us how it arrived at this classification.  You know, looking at exenatide, for example, or looking at a lot of the other drugs, it doesn't quite tell us how it arrived at a classification system here.  It does tell us what they classify it as, but it doesn't give us the medical reasons behind that.

But what is your question?

Q.  So within the construct of how they define low and high dose, if you look at supplemental Figure 42, right, which is looking at paralytic ileus as an end point, they found that there was no

Nilesh Sodhia                    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

difference in the risk statistically between low dose and high dose, and, in fact, the risk was higher in the low dose than high dose; correct?

A.   Well, they didn't find a statistical significant difference in this study where they're grouping together heterogenous studies, in one analysis.

Q.   Right.  But as you told me earlier, the only data you have on dose response comes from two rat studies and one small clinical trial that doesn't address ileus or intestinal obstruction at all; correct?

A.   Well, I mean, I think there's a lot to be said for doing EMGs in small bowel muscle when we're evaluating dose response.  I think there's a lot to be said for that as opposed to heterogenous studies with varied follow-up, varying exclusion/inclusion criteria. So, although the -- the numbers may not be quite as high as the study, there is validity to actually directly measuring EMG studies and assessing a dose response relationship.

Q.   You don't discuss either of these two end points in supplemental figure 42 anywhere in your report; correct?

A.   Correct.  I didn't -- I didn't find it

clinically meaningful.

Q.   Did you see it before?

A.   I've looked through this study.

MR. PENNOCK:  Objection.

BY MR. PRZYMUSINSKI:

Q.   Well, you told me this study didn't assess the risk for diabetes versus obesity patients in the meta analysis.

So did you actually see this figure before today?

MR. PENNOCK:  Objection.  And I think you misstated the testimony.

THE WITNESS:  Can we go back to what was -- what that conversation -- the context of that conversation?

BY MR. PRZYMUSINSKI:

Q.   Well, let's leave it.  It's fine.  Doesn't matter.

Can we go to Figure 41 real quickly, and I want to move on from this.

A.   Okay.

Q.   The record will speak for itself.

Figure 41 is the same kind of analysis except it's for intestinal obstruction instead of paralytic ileus.

Do you see that?

A.    I see that.

Q.    And, again, in this case, no difference in terms of P value, .93 between diabetes, overweight/obesity, or MASH/MASLD population; is that correct?

A.    No statistical significant difference based on the confines of this study.

Q.    And the risk ratio as a point estimate for the diabetes population as a point estimate was higher than for the overweight/obesity population; correct?

A.    There was no significant difference statistically.  The lines intersect.  There's no statistically significant difference.

Q.    And for the dose -- again, the low dose versus the high dose, no significant difference; correct?

A.    Correct.

Q.    And in fact, the number for the low dose is higher than for the high dose; correct?

A.    Correct.  I mean, I think we're talking about heterogenous studies, which you've acknowledged that as a limitation in these meta analysis.  We're talking about different analyses.  I don't -- I don't put much stock into meta analysis that is randomized control

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

studies for the -- for this type of evaluation.

Q. Doctor, let's go to page 25 of your report.

A. Are we going to refer back to the study or should I just put it over here?

Q. You can any time you want, but I don't plan to.

Am I on the right page? Sorry. I meant page 7, Doctor. I apologize. Let me ask you a different question, Doctor. Actually, I will get there.

So remember this second paragraph here, second full paragraph here, counsel for Lilly asked you some questions about these criteria that you used in evaluating the studies.

Do you recall that?

A. Yes.

Q. Okay. And I don't want to rehash that, so please, I promise, but I do have a couple of specific questions.

One of the things you said in terms of study design considerations was cohort versus disproportionality analysis.

Do you see that?

A. Yes.

Q. What, in your view, is the difference between the cohort study and disproportionality study analysis?

Nilesh Sodhia            CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   A cohort study is more detailed.  So a cohort study is looking at two particular cohorts where a disproportionality analysis, it's kind of a more crude evaluation.

Q.   Would you put more weight on a cohort study than a disproportionality analysis, generally speaking?

A.   Depending on the situation, I believe that there -- that there's -- that there's more weight that typically is placed on a cohort study.

Q.   A disproportionality analysis, right, typically is looking at reporting rates of two different populations; right?

A.   Right.

Q.   So it may ask how many reports of certain outcome have been reported for one medication and compare that to the number they're reporting for another population; correct?

A.   Right.

Q.   That disproportionality analysis can tell you whether more reports have come in for one versus the other, but doesn't really estimate risk; correct?

A.   Sorry.  Can you repeat that?

Q.   Sure.  This disproportionality analysis, sometimes called a pharmacovigilance analysis, can tell you if reports of one event have come in more

frequently for one medication than for another.  But it actually doesn't allow you to estimate risk between those two different populations; correct?

A.   That would be correct.

Q.   And those kind of disproportionality analyses are often used for signal detection; right?

A.   Correct.  And I do want to qualify that these are all factors I looked at.  I didn't have -- I don't have one factor that I feel like is the end all be all to evaluate all studies.  But I do feel that these are some of the factors that I did evaluate in my review of the literature.

Q.   I'm not suggesting otherwise.

But I'm talking about pharmacovigilance studies.  And so those are studies that are generally used to identify signals, right, within a surveillance database, an adverse events database, or something otherwise; correct?

A.   Correct.

Q.   And then those signals can potentially generate hypotheses that eventually later would be tested with cohort studies or clinical trials or some other evaluation; correct?

A.   Correct.

Q.   All right.  Disproportionality analyses do

not individually by themselves provide reliable evidence of association; correct?

A. I think they add to a body of literature. I don't want to discount all disproportionality analyses. I think that, as I mentioned before, all of our studies have limitations. None of these studies are perfect. Certainly not meta analyses when we're evaluating random- -- when we're evaluating rare side effects.

And, again, I don't want to put too much emphasis on any one of these factors when evaluating methodology. But, yes, in general, a cohort study is -- does provide more refined data than a disproportionality analysis.

Q. And thank you. But I -- what I wanted to just clarify is the last question I asked, which is pharmacovigilant studies conducted by performing a disproportionality analysis cannot be used to identify evidence of a -- of an association. They're simply limited to signal generation; correct? On their own. On their own, not saying in context.

A. In the context -- yeah, they can -- they can add to a body of literature. But in and of themselves, they can't in and of themselves -- there are limitations there.

Q. They cannot in and of themselves establish a

presence of an association; correct?

A.    Correct.

Q.    All right.  The other question I had for you on this paragraph is you mentioned right after the word "disproportionality analysis," for what confounders the authors accounted.

Do you see that?

A.    I see that.

Q.    Okay.  And what I'd like to know is, in your view, what confounders authors should control for in an ideal study?

A.    Okay.

Q.    And I'm going to guess diabetes and diabetic nephropathy -- diabetic neuropathy, sorry, is on that list.  So we'll tick that box.  Tell me what else.

A.    I will say that the confounder of diabetic neuropathy is -- is difficult to account for because of the differential effects that it has on both the GLP-1 users and the GLP-1 nonusers.  So I feel like studies that include diabetic neuropathy are inherently limited, and it's virtually impossible to completely control for that confounder.

Q.    So I got that one.  That's one.  What other confounders in your view are important to control for in studies in evaluating the relationship between GLP-1

exposure and the end points of ileus and/or small bowel obstruction, as you discussed them in your report?

A. So other risk factors for ileus and small bowel obstruction, we can talk about adhesion; right? Previous surgeries, we can talk about Crohn's disease, we can go through the list of risk factors for ileus as well as small bowel obstruction.

So we talk about risk factor for small bowel obstruction, we talk about hernias, Crohn's disease, previous radiation, the use of nonsteroidal anti-inflammatory drugs. We have congenital causes of fibrosis ideally. And, again, we don't have any of these perfect studies, and some of them can be very difficult to control for.

Now, risk factors for ileus, we can -- we can talk about, obviously, significant systemic illnesses can contribute, especially cardiac and respiratory illnesses, metabolic disturbances, electrolyte disturbances. We've talked a lot about diabetes. And then, medications are an important factor to control for, also.

Q. What medications?

A. Opioid medications, anticholinergic medications.

Q. Anything else?

A.   We can -- we can talk about certain antipsychotic medications that can slow the gut down.

Q.   How about calcium channel blockers?

A.   Yeah, calcium channel blockers can have an impact.

Q.   How about gender?  Is that an important factor?

A.   You know, we'd like them to match gender approximately, but -- so I don't -- typically, in most of these studies, gender are fairly well matched.

Q.   Okay.  How about BMI?

A.   BMI, it's not a known risk factor for ileus outside the setting of acute pancreatitis.

Q.   What about intestinal obstruction?

A.   I don't think it's been found to be an independent risk factor.  It's associated with issues that are an independent risk factor.

Q.   So diabetes, diabetic neuropathy, adhesions, previous surgery, Crohn's disease, hernias, radiation, NSAIDS, congenital defects, systemic illness, metabolic conditions, electrolyte disturbances, medications including opioids, anticholinergics, antipsychotics, calcium channel blockers, gender to some extent, and plus or minus BMI.

A.   I guess tricyclic antidepressants would also

be on it -- on that list.

Q.   What else?

A.   So if you have -- we talked about -- I think we talked about neoplasms.  Did we mention neoplasms?  Well, neoplasms should definitely be on that list.

Q.   What else?

A.   Any kind of known motility disturbance, any kind of previous surgery or congenital abnormality or a blind loop in the setting of a previous surgery, all can -- all can have an impact on the risk for ileus or small bowel obstruction.

Q.   What else?  Anything else?  I mean, I know we can't cover everything.

A.   I can't give you an all-inclusive list.

MR. PENNOCK:  That was pretty good.  Best I ever heard.

BY MR. PRZYMUSINSKI:

Q.   That was pretty good.

Anything else jumps out at you major we haven't talked about?

A.   I don't want to commit myself to no other potential confounding variables.

Q.   But sitting here, nothing else major comes out right now?

MR. PENNOCK:  Well, just note my objection.

Did he say that those were all major?

BY MR. PRZYMUSINSKI:

Q.    Okay.  I'll scratch that question.

Anything else you want to -- I know that it's hard to get everything, but right now anything else you want to add?

A.    Right.  And part of the purpose of coming out with all these factors is that, you know, as we discussed before, it's impossible to develop a perfect study.  I mean, we can't develop these studies in a bubble, nor do we want to.  They have to represent the real world, and yet we want them as clean as possible so we are kind of at a balancing act.

Q.    But anything else you want to add to this list; right?

A.    No.  But I don't want to commit myself to not adding anything to the list.

Q.    Fair enough. Okay.  Now, one quick question.

MR. PRZYMUSINSKI:  I will take a break, because I think we all probably need it.

BY MR. PRZYMUSINSKI:

Q.    Confounder adjustment alone as a category of study quality, how good did Sodhi do on this category? S-o-d-h-i, Sodhi.

A.    So we can consider the Sodhi study.

Can we do that?

Q.   We'll look at the whole study, I promise, after a break if you want to wait till then.  I don't know if you want to do that.  I don't know if you have enough in your report to do.

A.   Yeah.  I think that Sodhi did a really good job of excluding diabetic patients.

Was the study perfect?  Not at all.

Q.   In terms of confounder adjustment beyond diabetic -- in diabetic patients?

A.   He didn't adjust for that.  He just didn't include diabetic patients, which I think is far better than confounder adjustments.

Q.   I thought I said apart from excluding diabetic patients, in terms of confounder adjustments for these other factors, how did it do?

A.   I would like to get to the study in detail.

Q.   Let's do it.

A.   Okay.

THE VIDEOGRAPHER:  Off record at 4:34.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 5:01.

BY MR. PRZYMUSINSKI:

Q.   Okay.  Done with this.  All right.  I know we are all getting tired, so trying to be efficient, I

hope.

Let's talk about Faillie study, F-a-i-l-l-i-e.  I think page 27 of your report has that.

A.  Okay.  Do you have the study that I can reference --

Q.  I do.

A.  -- while we discuss it?

Q.  I do.

MR. PRZYMUSINSKI:  Can you get us a copy of that?  So this is going to be Exhibit 6.

(Clarification by the reporter.)

(Defendant's Exhibit 6 was marked.)

MR. PRZYMUSINSKI:  The title is "Incretin-based drugs and a risk of intestinal obstruction among patients with Type 2 diabetes."  The first author is Faillie, F-a-i-l-l-i-e, and the journal here is Clinical Pharmacology and Therapeutics from 2022.

MR. PENNOCK:  Thank you.

THE WITNESS:  Okay.

BY MR. PRZYMUSINSKI:

Q.  So I'm going to start with your report, but if you need to look at that journal itself, that's fine, too.  So I'm on page 27.

A.    Okay.  Yeah, I'm looking at both.

Q.    Yeah, that's fine.  So you write on the top of page 27, "This population-based active comparator cohort study of patients from the UK looked at initiators of GLP-1 agonists and DVP-4 inhibitors compared to initiator SGLT2 inhibitors between 2013 and 2019."

Do you see that?

A.    I see that.

Q.    So this is, again, a retrospective cohort study; is that right?

A.    Yes.

Q.    And one of the criteria you talk about in your report was prospective versus retrospective studies.

Do you recall that?

A.    I do recall that.

Q.    Are there advantages of prospective design over retrospective design?

A.    I think in evaluating efficacy there are. And I think in evaluating rare safety concerns, as we've discussed with -- as I've discussed with both counsels, I think that these type of large observational retrospective studies do have an edge there, a significant advantage, I should say.

Q.    Doctor, in terms of the electronic database portion of this, this is one of those studies that use ICD codes; is that correct?

A.    I believe so.  This is similar to ICD codes.  This is from Great Britain, from the UK, so ...

Q.    Go to the bottom of page 274 onto 275, might make it easier.

A.    Right.  So they're looking at the ICD codes that I have discussed that I am not familiar with as far as the particular codes, K56.0, K56.7 and K59.2.  So it's always helpful for me to see what those -- what those codes refer to.

Q.    But in terms of the outcome definition, I think probably should have been more appropriate and pointed you towards the --

A.    Yeah.  Because that's just looking at the -- restricting the outcome to those diagnoses, so --

Q.    If you look at the follow-up period on page 273, the authors state, "We use an on treatment" --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:    -- "exposure definition where patients were followed from cohort entry while continuously exposed to the drug class of interest until the occurrence of intestinal obstruction defined

as hospitalization or the primary or secondary diagnosis of intestinal obstruction ICD classification of disease ICD-10 codes."

BY MR. PRZYMUSINSKI:

Q.   Do you see that?

A.   Yes.

Q.   Okay.  So outcomes in this case are based on ICD codes; correct?

A.   Correct.

Q.   All right.  And that would be -- never mind.

Now, if you look at the strengths of the study, which you discuss in the next paragraph.

Do you see that?

A.   Yes.

Q.   You give credit to the study for the study for the size, which included over 25,000 new GLP-1 agonists users.

Do you see that?

A.   I see that.

Q.   And the use of an SGLT2 inhibitor as an active comparator.

Do you see that?

A.   I see that.

Q.   So in terms of comparator, do you believe SGLT2 is an appropriate comparator to use in these

studies?

A.    Well, again, I would prefer studies without the inclusion of diabetic patients.  But I think in general, GLP-1 as well as SGLT2s are used in similar stages and in diabetes -- in the treatment of diabetes.  A lot of times, they might use metformin first line, so not -- may not be the most ideal comparison to use, metformin as a comparison.  I feel like that is one aspect that I do like about this study.

Q.    Outside of SGLT --

A.    They're also looking at -- I'm sorry, go ahead.

Q.    Outside of SGLT2 inhibitors, are there any other active comparators you would consider to be appropriate or preferable for you in designing a study to address the issues we are discussing today?

A.    Well, this is actually looking, you know, at DPP-4 inhibitors in addition to GLP-1 agonists.

Q.    Well, I'm just asking for both GLP-1s and DPP-4s in this study, there were two separate cohorts; right?

A.    Right.

Q.    I'm talking about the comparison group, the SGLT2.  You said that was a reasonable choice, I'm paraphrasing, for a comparator to use?

A.    I would say SGLT2s are a reasonable choice, correct.

Q.    In terms of selection of comparators in studies, overall epidemiological studies, are there any other comparators, besides SGLT2s, that you would say would be an appropriate choice as a comparison in a study of evaluating the relationship between GLP-1 RA use and ileus and/or intestinal obstruction?

A.    You know, when we are looking at obese patients, I think that the buproprion/naltrexone is a good comparator.  What we want to do is we want to look at an agent ideally, an ideal agent would be used at a similar stage of disease that does not have a risk of ileus or small bowel obstruction, and I think that SGLT2s are a very reasonable choice to use here.  I don't want to say other choices are not reasonable.  I think that this is a very reasonable choice, and I like that choice.

Q.    Are there any others?  You mentioned buproprion and naltrexone.  You mentioned SGLT2s as an appropriate choice.

Are there any others that would be reasonable choices in your view?

A.    Reasonable choices, I mean, I don't want to say that something is unreasonable.  I would prefer to

look at the individual study and then discuss how reasonable it is and weigh it in the context of the other aspects of the study.

Q. But sitting here trying to get some parameters around what you consider to be an appropriate control, you've given me two examples.

Are there any others that come to mind right now?

A. No. I mean, I have to look at the individual studies. I don't want to say that other choices are unreasonable. I just want to say that I like SGLT2 inhibitors in this setting.

Q. And when you call out in your report -- if you look at the second line, "The use of GLP-1 agonists showed an increased risk of intestinal obstruction."

Do you see that? Second line of your report --

A. Yes.

Q. -- under Faillie. Under Faillie.

And then you mention that number we discussed, which is the highest hazard ratios observed around 1.6 years of use.

A. Correct.

Q. Now, as far as you know -- feel free to look at this document -- did the authors -- well, first of

all, do you know what medications were included in this study?

A.   What GLP-1 receptor agonists were included in this study?  I would have to review this.  So why don't --

Q.   Look at page 273 on the right.

A.   So dulaglutide, exenatide, liraglutide, lixisenatide, and semaglutide.

Q.   No tirzepatide in this study?

A.   It does not appear that way, no.

Q.   All right.  Now, the risk ratio that you report or the hazard ratio you report, that's for the whole group of GLP-1s included in this study; correct?

A.   Correct?

Q.   Did you look to see whether this study evaluated the risk for the individual molecules separately, meaning the risk for semaglutide individually, liraglutide individually, whatever that may be?

A.   I would have to review it.  The way I -- as I said before, the way I consider these risks, I consider them as a class effect.  So I would have to review whether they did a separate statistical analysis on each of these drugs individually.

Q.   You don't recall whether that was done or

not?

A. I don't. But I can review it if you give me a couple of minutes.

Q. That's fine. And did you -- certainly in your report you don't discuss that; is that correct?

A. That is correct. Because for the reasons I have discussed numerous times, I do not -- I do not find it clinically relevant. I consider them a class effect as they're a direct manifestation of stimulating the GLP-1 receptor.

Q. On page 274, Doctor, there's a section on the methods discussing secondary analysis.

Do you see that?

A. I see that.

Q. And then it lists -- well, basically, the authors say, "We conducted four sets of secondary analysis."

Do you see that?

A. I see that.

Q. Okay. Did you review those results of those secondary analyses prior to completing your report?

A. I did review it prior to completing the report, but I'd love to review it again.

Q. Okay.

A. So we --

Q.    Let me ask you one more question about what's in your report.  In your report, do you discuss the --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:  Do you discuss the results of any of those secondary analyses in your report?

THE WITNESS:  So we discussed the duration of use.  Second, they said they determined the association with individual GLP-1 receptor agonists in DPP-4 inhibitors.  Third is they -- they repeated the analysis by restricting the outcome to diagnoses more closely related to decreased motility.  And they also assessed whether there's an effect measure modification by age.

The use of drugs associated with decreased intestinal motility, history of abdominal surgery, and the use of incretin-based drugs before cohort entry.

So I would like to get more into the secondary analysis on table S2 through 10.

Q.    Let's do that.  But before you do that, can you just tell me if those analyses are reflected in your report, the results of those analyses are reflected in your report?

A.    I did discuss the -- the timing, the increased risk of intestinal obstruction at 1.6 years and at 1.8 years with DPP-4 inhibitors.

Q.   Is that that first secondary analysis?

A.   That's the first secondary analysis.

Q.   What about the other three?

A.   I did not get into the individual GLP-1s merely because of the reason that I think that the relevant characteristics are noted as a class effect.

Q.   What about the analysis of what the authors described, Doctor, as restricting the outcomes to diagnoses more closely related to decreased motility?

Did you look at that?

A.   I looked at that.  So that would be on Figure -- where is Figure 3?

Q.   If it will help you, it's table S4?

A.   Table S4.  Okay.

So these are the hazard ratios for intestinal obstruction comparing GLP-1 receptor agonists and DPP-4 inhibitors with SGLT2 inhibitors restricted the outcome to the ones that are more related to decrease in intestinal motility.

Q.   What did the doctors find with respect to GLP-1 receptor agonists?

A.   So basically what they found was the weighted hazard ratio was 1.0 with the SGLT2 inhibitors and .9.

Q.   I think you're misreading.  Let me help you just so we get it correct.  The hazard ratio for SGLT2

inhibitors?

A.    Yeah.

Q.    Well, that's just the rough ones; right?
That's not hazard ratio.

A.    Right, right.  So the -- the crude hazard
ratio was 1.0 versus 1.90.  Is that ...

Q.    Right.  I'm talking about the weighted.
Sorry.  This is my fault.  I interrupted you.  Just go
ahead.

And my question was:  What did they find with
respect to GLP-1 receptor agonists?

It's on me.  Go ahead and answer.

A.    Right.  So the reference, which was the
SGLT2s, which was trying to illustrate was 1.0 as a
reference.  And the weighted hazard ratio with GLP-1
receptor agonist was 0.96 with a confidence interval of
.39 to 2.38.

Q.    So when the authors limited their outcomes
assessment using ICD codes to those they believe were
most related to the increased intestinal motility, they
found absolutely no effect of GLP-1 on risks; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  So basically, what we can get
into is the overall totality of the data that they
found.  They found that there was an increased risk of

intestinal obstruction at 1.6 years, and I don't believe in this -- in this analysis that they took into account the difference in duration of therapy.

BY MR. PRZYMUSINSKI:

Q.    You sure about that?

A.    I am -- I'm taking a look at it right now, and seeing how they were able to come up with this. They looked at person years.  So looking at person years is different than looking at each individual patient and assessing how long they were on the drugs for.  Person years is a crude assessment.  You can have many people on a drug for a short period of time compared to fewer people on a drug for a longer period of time, and those results would be dramatically different.  And it would be interesting if we can see in detail how they came up with that.

Q.    Just while you're doing that, Table 3 is where the overall results are.  And why don't you compare what they did for the overall results with what they did for the supplemental table and tell me what the difference is.

A.    So Table 3 is the overall results which they did -- they did find a weighted hazard ratio of 1.69.

Q.    Using person years; right?

A.    But -- yeah.  Person years is different than

how long each patient was on there, as I just -- I just described that to you.  So using person years is a crude assessment looking at the total number of years patients were on it.  But as the example I just gave, you can have many people on it for a short period of time, which is very different than fewer people on it for a longer period of time.

So person years in the setting of -- of a moving variable, depending upon the use of GLP-1s is not the most accurate way of assessing.

Q.   Okay.  I'm asking to confirm, right, the person years, which you say is crude, is the same exact way of evaluating it that the authors used for their primary analysis, which you report in your report, as they use in the analysis for what they describe as the outcomes that are more related to intestinal motility, which you don't discuss in your report; correct?

A.   But I am putting my emphasis on not the total number of years.  I'm putting my emphasis on what happens around 1.6 years of use.  So, again, when patients are on a drug for a variable period of time, we have to assess not the risk when they just initiate the drug, but we have to assess the risk after that period of time when we believe the incidence peaks.

Q.   So you're not relying on the primary estimate

from this study, you're relying just on that 1.6 year number?

A.    I'm relying on the totality of the data, and I feel there's a very different risk ratio when you're relying upon patients who have been on it for a sufficient period of time for a particular event to occur as opposed to just all of the patients.

Q.    Well, does the totality -- so let me back out of that and just be very clear about this.

When the authors' Table S4 provide their estimates for the risk of intestinal obstruction, based on the outcomes being defined by the -- those that are more related to increased intestinal motility, they did not find evidence of increased risk, in fact, the risk estimate ratio went below .10; correct?  That is a correct statement; right?

MR. PENNOCK:  Objection.

THE WITNESS:  I'll read -- are we discussing their conclusions based upon the study?  Are we discussing what this one table states or are we discussing the overall conclusions based upon the study?

BY MR. PRZYMUSINSKI:

Q.    I was asking about the study.

A.    Well, I think that we need to interpret the

table in light of the overall data and in terms of the conclusions based upon the study.

Q.    The data in that table does not appear anywhere in your report; correct?

MR. PENNOCK:  Just note my objection.

THE WITNESS:  So if you look at the pathophysiology of the development of small bowel obstruction and ileus in the setting of GLP-1 receptor agonist use, it takes time to develop.  It doesn't happen right away.  And the authors acknowledge that. And the authors also recognize the fact that we can't -- although this is a table that's looking at the hazard ratios restricted to the outcome of increased -- of decreased intestinal motility, it doesn't assess that at a particular time.  It lumps every -- all these patients in the same category.

BY MR. PRZYMUSINSKI:

Q.    So you were relying on an outcome by definition based on what the authors said was based on ICD-9 codes or -10 codes that were less specific for intestinal motility disorders and in favor of -- as opposed to the outcome that they specified was actually based on the ICD-9, -10 codes that they thought were the most closely related to decreased motility.  Is that what I'm getting --

MR. PENNOCK:  Objection to form.

THE WITNESS:  I'm sorry.  Can you repeat that long question?

BY MR. PRZYMUSINSKI:

Q.  Never mind.

The secondary analysis dealing with the hazard ratio as measured in this study on Table S4 related to the risk when limiting the outcomes to those that they believe are closest related to delays in intestinal motilities does not appear in your report; correct?

A.  Correct.  I think the relevant aspect of the findings are what happens after they are on it for a sufficient period of time, not when they are on it for a random period of time, and I think that's a very important distinction we need to make and emphasize.

Q.  The authors also looked, Doctor, at whether the -- give me a moment.  The authors also looked, Doctor, at whether the effect in terms of the interaction or the -- between GLP-1 use and intestinal obstruction as an outcome was affected based on the presence or absence of diabetic complications such as nephropathy, retinopathy, or neuropathy.

A.  I'm sorry.  I was looking at this other excerpt from the discussion when they're -- when

they're saying that, "Some secondary analyses generated estimates with wide confidence intervals, and thus should be interpreted with caution.  This includes a duration analysis that were based on relatively short meeting durations of follow-up, which likely" --

(Clarification by the reporter.)

THE WITNESS:  -- "which likely reflect duration patterns observed in the setting of real-world practice."  So the authors --

BY MR. PRZYMUSINSKI:

Q.   Where are you reading this?

A.   This is the second-to-last paragraph in the discussion.  So, I mean, I think the authors acknowledge and we should acknowledge the fact that these outcomes of interest, small bowel obstruction, decreased intestinal motility, small bowel ileus do take time to develop.  They don't happen as soon as it is started, as soon as the drug is started, and that needs to be analyzed in the setting of the appropriate time course.

Q.   Let's stop there because you brought up a good point.  So what they wrote is, "Finally, whereas the primary analysis were well powered to" --

MR. PRZYMUSINSKI:  -- "powered to assess the association, some secondary analyses generate point

estimates with wide CIs, and thus should be interpreted with caution."

BY MR. PRZYMUSINSKI:

Q.    Correct?

A.    Correct.

Q.    All right.  This includes the duration analysis.  It goes on; correct?

A.    Correct.

Q.    So what they are saying is that the secondary analysis, specifically the one related to duration, which you rely, should be interpreted with caution because it has a wide confidence intervals; correct?

A.    Well, what they are also saying is many of these secondary analyses that we -- that you wanted to discussion in, what is it, Table S4, are limited by the -- by the duration, and I think that the duration needs to be taken into account.

Q.    That's actually not what they are saying. They're saying they have limited by power, and they may have wide confidence intervals; right?

MR. PENNOCK:  Objection.

THE WITNESS:  When they're saying that, they are based upon relatively short meeting durations of follow-up, that is recognizing limitations of these analyses when the patients have not been on it for that

long of a period of time.

BY MR. PRZYMUSINSKI:

Q.   It's recognizing the limitations of the entire study?

A.   There are limitations of the study, but there's also positives in terms of its ability to look at patients recently initiated.  And in their summary, they do summarize this article by stating that GLP-1 receptor agonists and DPP-4 inhibitors may be associated with an increased risk of intestinal obstruction.

Q.   Okay.  Doctor, the Table S4, can we go back there?

A.   Yes.

Q.   Tell me when you're there, when you're ready.

A.   I am back there.  Wait.  I am back there.

Q.   The confidence interval for the GLP-1 RA analysis was 0.39 to 2.3; correct?

A.   Correct.

Q.   You don't consider that a wide confidence interval, do you?

A.   I consider this analysis flawed, and that's why it's in the back of the table on a separate analysis because of the fact that they're not taking into account the duration of use.

Q. Is that a wide confidence interval?

MR. PENNOCK: Objection. Asked and answered.

THE WITNESS: I told you why I considered this -- this --

MR. PENNOCK: He answered.

THE WITNESS: -- data flawed.

MR. PRZYMUSINSKI: No, he didn't. The question is: Does he consider that a wide confidence interval? That's a yes, no, or I don't know.

MR. PENNOCK: Objection.

THE WITNESS: I told you I considered why -- I -- why I considered this data flawed.

BY MR. PRZYMUSINSKI:

Q. So can I assume you don't see that as a wide confidence interval?

A. I told you why I think this data is flawed.

Q. And just to be clear, the data -- the primary data you assigned to this study is the -- on your report, the hazard ratio of 1.69 with a confidence interval of 1.04 to 2.74 also does not take into account the duration analysis in the way that you explain it to be; correct?

A. Right. And I am looking at the highest hazard ratio after 1.6 years of use, and that shows a high hazard ratio with a confidence interval between

1.79 to 6.79 suggesting with a high degree of confidence that there is a significant increased risk in obstruction in the setting of GLP-1 use.

Q. And you consider that a wide confidence interval --

(Clarification by the reporter.)

MR. PRZYMUSINSKI: Do you consider that a wide confidence interval, the 1.79 to 6.79?

THE WITNESS: I consider -- I mean, it's -- it's wide only in the -- in the fact that it's well above 1.

BY MR. PRZYMUSINSKI:

Q. So the --

A. So meaning it does illustrate the -- the outcome in question.

Q. You don't believe -- sorry, go ahead.

A. So what I'm talking about is the fact that forget the confidence interval. Okay? I'm talking about the fact that that secondary analysis you're referencing takes into account, or I'm sorry, does not take into account the fact that patients are on these drugs for a differential period of time, and that differential period of time is everything when we are talking about these -- these side effects that occur after a long period of time on GLP-1 receptor agonists.

Q.    Okay.  But I'm asking about the confidence interval and the criticism the authors had, at least the caution they raised about wide confidence intervals in secondary analysis, and I'm asking if the confidence interval in your report for that 1.6 hazard ratio is wide or not in your opinion?

A.    I can't comment on that, but I do agree with their assessment that we do need to look at the duration of time that patients are on a GLP-1 receptor agonists.

Q.    Last question on this study.  Did you look at the analysis the authors did with respect to the impact of diabetes complications on the risk ratios and the relationship between the GLP-1 RAs and intestinal obstruction?

A.    So all of these patients were diabetic in this study?

Q.    Well, I'm not asking whether they were diabetic.  I'm asking about the severity of their diabetes or the kind of things you say might impact the effect on intestinal motility.  Did they look at that?

MR. PENNOCK:  Okay.  Hold on a second. What's your question, then, because I heard two questions?

MR. PRZYMUSINSKI:  Let me do it again.

BY MR. PRZYMUSINSKI:

Q.    In reviewing this article and discussing it in your report, do you -- did you find any information about the impact of diabetes severity as measured by complications of diabetes on the risk estimates identified by the study authors?

THE WITNESS:  So I'm sorry.  Can you repeat your question?

MR. PRZYMUSINSKI:  Read it.  Do you want me to do it again?

MR. PENNOCK:  Read it back.

THE WITNESS:  You can read it back?  It's okay.

(Record read by the reporter.)

THE WITNESS:  So I think we have to understand that all these patients are diabetic and they purely looked at a diagnosis of neuropathy based on -- based on a known diagnosis.  They didn't do any testing to evaluate that.

BY MR. PRZYMUSINSKI:

Q.    Did they do an analysis assessing whether diabetes severity impacted the risk ratios reported in their study?  I don't see it in your report.  I wonder if you looked at it and if you know if it's there.

A.    So we looked at the baseline characteristics

of the DDP-4 inhibitors, the SGLT2 inhibitors, and I am having a little bit of difficulty finding it right now.

If you know where it is, I would be happy to --

Q.   Do you recall?

MR. PENNOCK:  Take your time.

BY MR. PRZYMUSINSKI:

Q.   Take your time.

MR. PENNOCK:  It's not a memory test.

BY MR. PRZYMUSINSKI:

Q.   Take your time.  Do you recall looking at it, though?

A.   I do recall looking at this.  But I have to review my -- I have to review the study for -- for my recollection.

Q.   And looking at your report, you don't have any discussion of that in your section on --

(Clarification by the reporter.)

MR. PRZYMUSINSKI:  -- on the Faillie study. Is that fair?

THE WITNESS:  That is fair.

BY MR. PRZYMUSINSKI:

Q.   Okay.  All right, Doctor.  You can put that away, unless you want to keep looking through it.

All right.  Let's look -- I just have one

quick question on Sodhi, I promise.  If you look on page 27 of your report -- do you have Sodhi?

A.   Okay.

Q.   You discuss it, and you say in the fourth -- sorry, fifth line, "The study found a statistically significant increased risk of bowel obstruction, the hazard ratio of 4.22 and a confidence interval of 1.02 to 17.4."

Do you see that?

(Clarification by the reporter.)

THE WITNESS:  I see that.

MR. PRZYMUSINSKI:  1.02 to 17.4.

BY MR. PRZYMUSINSKI:

Q.   Now, would you agree with me that's a wide confidence interval?

A.   It's a wide confidence interval.  But a wide confidence interval that intersects 1 is very different than a wide confidence interval that does not intersect 1.  And, I mean, with this hazard ratio is 4.22 with a confidence interval greater than 1 and going up to 17.4.

Q.   So in the Hurwitz study, in the confidence interval that you described as wide, was it narrower or wider than the confidence interval?

A.   So we can look at the Hurwitz study and --

Q.   Go ahead.

A.   And what page is that on?

Q.   Page 33 of your report.

A.   Right.  Page 33.  And the difference between these confidence intervals is that these intersect 1. So that's a major -- we're not just looking at how wide a confidence interval is, we are looking at what the statistical significance is.  Based on all the accepted medical literature with a confidence interval that does not -- does not intersect 1.  It is statistically significant.  We have here a 95 percent confidence interval between 1.02 and 17.4, whereas all of these confidence intervals in the Hurwitz study intersect 1. I can read it to you, .98 to 1.21, .63 to 5.60, and .45 to 6.99.

So it's -- we have to not only look at how wide a confidence interval is, we have to look at the statistical significance based upon accepted medical and scientific paradigms.

Q.   So your testimony today that when it comes to statistical evaluation of immunological studies, that the width of the confidence interval is only relevant where the confidence interval does not cross 1; is that correct?

MR. PENNOCK:   Objection.

THE WITNESS:  I didn't say it's only relevant then.  I'm saying that we have accepted scientific standards, and when we have a 95 percent confidence interval that doesn't include 1, we can make -- it's we can make a conclusion that that is statistically significant within the confines of that study.  Whereas it's different, there's a difference between a confidence interval that intersects 1.  That's what I'm saying.  I didn't say anything about only relevant.

BY MR. PRZYMUSINSKI:

Q.   A narrow confidence interval that crosses 1, right, is not statistically significant; correct?

A.   A narrow confidence interval that crosses 1, yes.  Correct.

Q.   A wide confidence interval that crosses 1 is not statistically significant; correct?

A.   Correct.

Q.   Thus, the only question was whether the confidence interval crosses 1 as an indicator of statistical significance, the width of the confidence interval would have no meaning; right?

MR. PENNOCK:  Objection.  Just hold on a second.  I don't want know what you mean by "the only question was."

THE WITNESS:  So --

MR. PENNOCK: Go ahead.

THE WITNESS: So we look at all of the statistics in their totality. Now, when there's a confidence interval that's exceeding 1, that is a statistical significance by scientific standards. You agree with that?

MR. PENNOCK: You're --

BY MR. PRZYMUSINSKI:

Q. You shouldn't be asking me questions. How about you tell me what you think?

A. Okay. So by scientific standards, if the confidence interval does not intersect 1, it is statistically significant. Now, we have narrow and wide confidence intervals just like we've been talking about how, you know, we have to interpret studies with a lot of factors in mind, that's how we interpret the statistics also. But by scientific standards, if a confidence interval is greater than one, it is considered statistically significant. As Sodhi also defined that they found a statistically significant increased risk of bowel obstruction because their confidence interval did not intersect 1.

Q. Would you at least agree with the following: That regardless of whether the confidence interval crosses 1 or not, results that have a wide confidence

interval should be interpreted with caution?

A.   I wouldn't say necessarily that.  No.  I would not.  I could say that if we are speaking hypothetically, we can say that something can have a confidence interval between 3 and 100, and that's still statistically significant.

Q.   Okay.  Doctor, let's look at something different.

On page 28 of your report, you have a section with a number 7 next to it titled "Ding 2024." D-i-n-g, like the doorbell.

A.   Yes.

Q.   And this is something you describe as a Mendelian randomization study?  Do you see that?

A.   Yes, I do see that.

Q.   Have you ever performed a Mendelian randomization study before?

A.   I have not.

Q.   Do you know what it is as a methodology?

A.   My understanding is they're looking at genetic variants for a particular gene and assessing whether those variants have an impact on the outcome in question.

Q.   Okay.  Okay.  Let's try it -- okay.  I think that makes sense.  Let me try to make sure I restate

it, make sure I understood it.

So in Mendelian randomization studies, what they are doing is using genetic variants, right, as an instrumental variable to determine if a specific modifiable exposure, right, is causally related to an outcome.  Is that fair?

A.   Yes.

Q.   Okay.  And for this particular study, the Ding study, you say in your report, "The study showed GLP-1 agonists were associated with decreased risk of paralytic illness."

Do you see that?

A.   Yes.

Q.   And so this particular study using the Mendelian -- it's a hard word to pronounce -- the Mendelian randomization methodology actually found patients treated with GLP-1 RAs have a reduced risk of paralytic ileus; correct?

A.   I would have to qualify the study by stating that the genetic variants were only determined based upon their impact on the A1C.  So I don't think that's an appropriate way of assessing different genetic components of the GLP-1 receptor gene.

Q.   Okay.

A.   If it's only based upon the effect on the

A1C.

Q.   What should it be based on?

A.   Well, I mean, we have effects based upon, you know, the effect on the small intestine.  And this is only looking at genes, genetic variants of the GLP-1 receptor gene based on its effect on A1C.  So basically what this study would tell us is that if we look at the appropriate genetic variants, that those that are more likely to -- to decrease the risk of diabetes are associated with a decreased risk of paralytic ileus.

Q.   Okay.  What if the variants didn't just get selected based on A1C or diabetes status, but also on BMI or weight?  Would that make it better or worse?

A.   I think that the outcome in question is related to a decreased motility.  So I think that we need to have a study that's assessing the decreased motility associated with the GLP-1 receptor gene.  So this study did not come close to that.

Q.   How much weight did you give this study in your analysis?

A.   Minimal.

Q.   Do you know if any other Mendelian analyses have been done of a similar type?

A.   I'm not aware of any.  I didn't come across it in my -- in my review.  I -- last I -- when I did

this analysis, this study was not accepted and has now gone through peer review.  I found the study on PubMed, so I included it.  But I think it was -- did not really add significantly to my body of knowledge because of the fact that it didn't take into account the question we were looking for, which is the decreased motility associated with the GLP-1 receptor.

Q.   Okay.  I'm going to ask you on page 29, the No. 9 article, you referenced by Nanah, N-a-n-a-h, 2024.

Do you see that?

A.   I see that.

Q.   You say there in the next-to-last line, "Additionally, this study was only evaluated in the abstract form, and I am unable to completely review the data and methodology."

Do you see that?

A.   I see that.

Q.   So why do you call out this was only evaluated abstractly?

A.   Well, I don't think that abstracts go through the same degree of peer review as papers.  And I also don't think we were provided as much detail in abstracts.  I'm not completely discounting abstracts, but I think that the main issue I had with this paper

was that it was looking at obese patients with inflammatory bowel disease who were either given GLP-1 agonist or bariatric surgery.  I think that it's designed to assess the risks of GLP-1 agonists versus bariatric surgery in IBD patients, and it's not designed to assess the question that we are asking.

And yeah, I will mention the fact that it is an abstract.  I don't think that an abstract in and of itself completely discounts the study.  I mean, I published multiple abstracts and some of them get published in papers, some of them don't.

But more importantly for this study, I think that it's not answering the question that we are trying to ask -- or that we are trying to answer because it's looking at it at obese inflammatory bowel disease patients and comparing two interventions for weight loss, and that's not what we're doing at all.

Q.   Okay.  I appreciate the information.  I just really wanted to hear about why it was important for you to discuss -- make the point it was an abstract.

So is it -- can I understand from what you said, at least that within the context of your review of the relevant studies, studies that were presented only in abstract form would get lower weight because you would have limited information about the design of

the study and statistical adjustment and all of that sort of stuff.

Is that a fair statement?

A.   I think -- so this study, in particular, has limitations beyond just the abstract form.  But, in general, I put more weight in manuscripts where I'm provided more detail than abstracts.

Q.   And would it be fair to say that when it comes to abstracts, the statement you have at the end of the sentence, which is, "I am unable to completely review the data and methodology," would be generally applicable to all abstracts?  Is that fair to say?

A.   That's fair to say.

Q.   And one of the problems with not being able to completely review the data in the methodology is you may not know such things as which drugs were included in the analysis; correct?

A.   I mean, there are multiple factors that I may not know in the abstract form.  And, again, I don't want to discount every abstract, because abstracts do get published.  But we do get more data when we do publish them.  I just think that, as we talked about before, none of these studies are perfect.  And that is one of the factors that I do evaluate when I'm -- my ability to evaluate the methodology and the -- the --

the stringent of the peer review these studies go through does have an impact.

MR. PRZYMUSINSKI:  Okay.  All right.  How much time have we been going this last session?

MR. PENNOCK:  Let's just keep going.

MR. PRZYMUSINSKI:  Well, some of us need a bathroom break.  So how much time do we have left?

THE WITNESS:  Fifty minutes.

MR. PRZYMUSINSKI:  All right.  Let's go a few more minutes, and then we will take a little break.

MR. PENNOCK:  How long have we been going?

MR. PRZYMUSINSKI:  Fifty.

MR. PENNOCK:  5-0.  And you're going to take a break?

MR. PRZYMUSINSKI:  Some of us are older than they look.

MR. PENNOCK:  You're assuming somebody's going to let you back in.

BY MR. PRZYMUSINSKI:

Q.  I may have to use the girl's rooms.  We'll figure that out in a second.  Let's go for a little bit longer, and then we'll take a break.

Is that okay?

A.  That's okay.

Q.  Now, I want to go to page 39 of your report.

A.    39?

Q.    3-9.

A.    Okay.

Q.    You talk about dose response in Section E.

A.    Yes.

Q.    You see that?

A.    Yes.

Q.    Now, you do not discuss in this section data on dose response from any of the epidemiological studies that you have listed between pages 24 and 33 or so in your report; correct?

A.    Correct.  I -- I feel like the meta analyses of randomized studies obviously have inherent limitations, and I'm discussing the dose response in these mechanistic studies.

Q.    Okay.  Well, that's fine.  You don't discuss any dose response information there from either metanalyses of RCTs or from any other study, correct, in the epidemiological set of data you reviewed?

A.    Well, the -- most of the dose response data we have is from the meta analysis data.

Q.    Okay.  Well, I appreciate that.  What I'm asking for clarification on in this section, you do not talk about dose response data from any epidemiological studies that you reviewed of the 23, whether those be

meta analyses, observational studies, or anything else; correct?

A.   I didn't feel it was warranted, no.

Q.   Okay.  Did you find such data?

A.   We discussed the meta analysis data.

Q.   Any others?

A.   I'm trying to remember.  There was nothing that I found clinically significant in terms of dose response.  But if you're aware of something, I would be happy to revisit it.

Q.   Sitting here today, you don't recall -- other than the one study we reviewed -- the meta analysis, the Chiang, C-h-i-a-n-g, of any dose response analyses conducted in any of the other epidemiological studies in the 23 you reviewed?

A.   At this point, no.  I'm not going to say that there wasn't any, but I cannot recall any at this time.

Q.   And certainly we don't see them discussed in your report; correct?

A.   Correct.

Q.   All right.  We do discuss?

A.   I discussed -- I discussed whatever I thought was clinically relevant.

Q.   All right.  So you discussed as clinically relevant was data from the Tolessa 1998 study, the

Tolessa 2021 study, and the Hellstrom 2008 study, at least with respect to the dose response; correct?

A. Correct.

Q. Now, can we agree that both the Tolessa. That's T-o-l-e-s-s-a studies, 1998 and 2001 rat studies?

A. We can agree on that.

Q. Do you know whether in either of those Tolessa studies the rats were treated with any of the GLP-1 RA medications at issue in this litigation?

A. They were -- their GLP-1 receptors were stimulated. But, from my knowledge, they were not treated with these particular drugs. And as I have discussed and as we all discussed with -- you know, on multiple occasions, we are considering this a class effect.

Q. You're considering it a class effect?

MR. PENNOCK: Objection.

BY MR. PRZYMUSINSKI:

Q. Right?

A. I am considering this a class effect. And I have given my reasons behind it.

Q. All right. And that's fine. But for the record, these are rats that were treated with GLP-1, but none of them received any of the medications that

they should in this litigation; correct?

A.   As far as what we can tell from -- what I can tell from the methodology of these studies, they did not receive these particular drugs.  They did receive drugs considered appropriate to stimulate the GLP-1 receptors.

Q.   Do you know whether the doses of the GLP-1 that they received were equivalent to higher, or lower to the doses that you would use in clinical practice that were relevant in clinical human use?

A.   So we can say that there were doses that didn't stimulate the GLP-1 receptors adequately.  And then there were doses that did ultimately stimulate those GLP-1 receptors.  So I can't comment on dose equivalence, but I can comment on exogenous GLP-1 going through different grades of dosing that did ultimately stimulate the GLP-1 receptors.

Q.   That's a different question.  So my question is:  The GLP-1 molecule that was used in these two studies by Tolessa, T-o-l-e-s-s-a, do you know whether the doses that were used of that GLP-1, how they translate to doses of the GLP-1 RA medications at issue, meaning are they equivalent, lower, higher, or neither?

A.   We can't get a dose equivalence, but we can

say that we have seen different dosage that do stimulate, that -- that have minimal stimulation and then do -- ultimately do stimulate the GLP-1 receptors.

Q.   So the doses used in this study of the GLP-1 molecule could have been potentially far higher than any of the doses used in clinical practice with the GLP-1s; is that correct?

A.   That is speculation.  And the reason I say that is because if you look at the Tolessa in the 1998 study, they're looking at a dose required to inhibit gastric emptying.  And lower doses did not have that effect.  So they -- they had graded dose increases that ultimately did have that impact, which tells me that these doses were clinically relevant to what we are studying now.

If every dose that they used was far higher than -- sorry.  Let me take that back.  If every dose that they used produced significant stimulation, then we would not have that data.  But they did use graded dose adjustment.  And they found increasing stimulation with those higher doses, which -- which basically leads to the conclusion that these doses were -- were appropriately stimulating the GLP-1 receptors compared to lower dosages that were used.

Q.   Let me ask you a question.  What is the

treatment -- maximum treatment dose of semaglutide for Type II diabetes?

A.    I don't know the answer to that.

Q.    How about liraglutide?

A.    I would have to defer my -- my answer on that.  I don't treat Type II diabetes.

Q.    Okay.  What's the maximum dose of semaglutide used for the treatment of weight loss?

A.    So I do not -- I do not personally prescribe these medications.  I deal with complications from gastrointestinal standpoint from these drugs, but I do not personally prescribe these medications.

Q.    So let's assume we have a dose of semaglutide, injectable, 2.4 milligrams.  Okay?

A.    Okay.

Q.    Do you know whether the impact on a GLP-1 receptor in terms of the strength of the interaction and the degree of activation of those receptors of the GLP-1 molecules used in the Tolessa study is greater, less, or equivalent to that semaglutide 2.4?

A.    So I don't think we can compare to one particular dose, but what we can say is that an IV infusion in -- in this initial '98 Tolessa study of less than 20 picomoles per KG per minute did not inhibit gastric emptying.  And higher doses did.  So we

Nilesh Sodhia

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

are finding that threshold in which they do inhibit gastric emptying compared to doses where they do not inhibit gastric emptying.

Q.   In rats?

A.   Yes.

Q.   And you don't --

A.   As I -- as I have stated.  I'm sorry.  I didn't want to interrupt.

Q.   But you don't know how those doses actually compare -- are used in the study to the doses of the medications at issue in this litigation; correct?

A.   So I cannot give a one-to-one comparison, no. But as I said before, we do see that graded-dose response as well as doses -- lower doses that do not have an impact.  Therefore, we can make a conclusion that these are doses that are -- are considered -- are -- let me -- let me scratch that.  Let me phrase this better.

Based on the fact that we see doses that don't have an impact on a gastric emptying, and then we see slightly higher doses that do, in a dose-dependent manner, we can -- we can state that these doses are what we would consider to be treatment doses.

Q.   For a rat?

A.   Yeah.  And as I said before, none of these

studies are perfect.  I mean, we have rat data because we can do experimental work in rats that we cannot do in humans.  We have human mechanistic data that we cannot do in large-scale epidemiologic studies.  And we have large-scale epidemiologic studies.  So that's why we combine all of these -- all of these types of studies when arriving at a conclusion.

Q.  Do any of the rats in the Tolessa study or of 1998 or 2001 develop ileus?

A.  I don't believe they were assessed for ileus.

Q.  And how about intestinal obstruction?

A.  They were not assessed for intestinal obstruction.

Q.  So any dose response in those studies is for effect on motility in rats, not on actual clinical outcomes like ileus or intestinal obstruction?

A.  Yes.  These studies are there to assess motility, not -- not the clinical outcomes of ileus and intestinal obstructions.  And that's how we establish mechanistic data as well as clinical epidemiologic data.

Q.  Once you have mechanistic data within human studies, do you see that that translates to human use; correct?

A.  That is a common way of assessing data in

terms of medication use.

Q.   So if you wanted to know whether these studies that you say support evidence of a dose response actually translate to clinical effects on humans and that those clinical effects are dose dependent, you would do a study in humans, then look for the outcomes of ileus, intestinal obstruction, and then ask the question whether there's a dose-response relationship; correct?

A.   So we don't always find all the Bradford Hill criteria in all of our human studies.  We are -- we still use animal data for much of our mechanistic hypotheses in many drugs.  And as we talked about before, we can start with rat studies, progress to human studies, progress to randomized control studies.  And then we -- after that, once drugs are approved, post-marketing data is very helpful, also.  And that's where these large observational studies come into play.

Q.   But as you sit here today, you can't identify for me any epidemiologic studies in humans that --

          (Clarification by the reporter.)

BY MR. PRZYMUSINSKI:

Q.   -- found a dose-response relationship between a GLP-1 RA of any kind and ileus and intestinal obstruction as a clinical outcome?

A.    I don't believe it was assessed sufficiently in any of our epidemiologic data, no.  And that's why we -- we have to rely upon different forms of data for our scientific and medical conclusions.

Q.    Well, let's look at the one piece of human data you cite in this section.  That's the Hellstrom study, H-e-l-l-s-t-r-o-m, from 2008.  Now, this is a study that we are going to mark as Exhibit 7.

(Defendant's Exhibit 7 was marked.)

BY MR. PRZYMUSINSKI:

Q.    It's got the title GLP-1 Suppresses Gastrointestinal Motility and Inhibits the Migrating Motor Complex in Healthy Subjects in Patients with Irritable Bowel Syndrome.  And it was published in the journal called NeuroGastroenterology Motility.

There you go, Doctor.

A.    Okay.

THE VIDEOGRAPHER:  If there's a moment, can we take a quick break?

MR. PRZYMUSINSKI:  Well, how about we take one right now?

THE VIDEOGRAPHER:  I have to check something.

MR. PENNOCK:  Change the tape.

THE VIDEOGRAPHER:  Off record at 6:04.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 6:12.

BY MR. PRZYMUSINSKI:

Q.  All right.  Doctor, home stretch, I hope.

A.  Okay.

Q.  We were talking about what I think we marked as Exhibit 7, which is the Hellstrom study; is that correct?

A.  Correct.

Q.  Okay.  Now, this is the right study in terms of what you were referring to in your report, with what I provided you?

A.  Yes, yes.

Q.  All right.  So what I want to do is just -- let me literally ask five or six questions.  Okay?

A.  Okay.

Q.  So, first of all, just based on the title, we know that this was a study that was conducted in both healthy subjects and in patients with irritable bowel syndrome; correct?

A.  Correct.

Q.  And if you look at the abstract -- I don't know -- maybe one, two, three, four, five -- ten lines down, they give you the number of subjects that were included in this study.  And it lists for GLP-1 healthy subjects equals 16.  And then IBS subjects equals 14.

Do you see that in the abstract?

A.   Yes, so 16 healthy.  IBS, 14.  Yes.

Q.   So relatively small study; is that fair to say?

A.   Relatively small study, yeah.

Q.   Now, if you look at page 651, Doctor, under Compounds --

A.   Okay.

Q.   -- you see that they say that, "Glucagon-like peptide one was purchased from Polypeptide Laboratories somewhere in Germany."

Do you see that?

A.   I see that.

Q.   Okay.  So this, again, is not in this study. They are not using any of the medications at issue here, but rather some form of native GLP-1?

A.   Right.  They're stimulating the GLP-1 receptor, not the same compounds that we are discussing, but they are stimulating the GLP-1 receptors just as the medications that are commercially available currently attempt to do.

Q.   Okay.  And can we save some time by agreeing that our discussion of the comparisons of the dose, meaning the amount of the GLP-1 that was used in this study versus the medications that are at issue in this

case and the clinical doses that are used, if I asked you those same questions, you would give me the same ones you gave me on the Tolessa studies?

A.   Yes.   That we do not -- we are not using the same compounds.   We are using varying doses of this compounds of GLP-1, but they are not the same compounds as the ones that are commercially available.   But, again, we view all this as a class effect.

Are you getting glare?

Q.   That's fine.

But in terms of a one-to-one comparison as to how this dose compares to a specific dose of other GLP-1s, we can't do that; correct?

A.   Correct.

Q.   Okay.   Now, if you look at page 657, Doctor, this is in the Discussion section.

Do you see that?

Discussion starts on 656, and we are at page 657.

A.   I do see that.

Q.   Okay.   If you look at the last full paragraph in the left-hand column, starting Using Motility Index. Do you see that?   On 657, last full paragraph.

A.   Yes.

Q.   You go eight lines down, there's a sentence,

starts with "We were."

Do you see that sentence?

A. Yes.

Q. The authors write, "We were not able to obtain any dose response relationships with GLP-1, which might be used at --

(Clarification by the reporter.)

BY MR. PRZYMUSINSKI:

Q. "As we were not able to obtain any dose response relationship for GLP-1, which might be due to the small group study."

Do you see that?

A. I see that.

Q. So at least in the discussion with the authors, what they are saying is that in their study, whether that's because of the small numbers or otherwise, they did not -- were not able to find evidence of those responses.

Am I correct?

A. So they looked at different aspects of the dose response. If we can go back to the motility index.

Q. Okay. We are going back to where?

A. Let me -- if you can give me a couple of minutes --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   Yeah.

A.   -- I would love to find that.  So there was a specific place where they calculate the motility.  So if you look at the first paragraph of the discussion, "With reference to the motility index as a general measure of gastrointestinal motility, we found a dose-related inhibitory motility response in both normal subjects as well as IBS patients with GLP-1," discussing that dose-related inhibitory motility response.  So that's what I was referencing.  And I want to get into greater context with the paragraph that you were referencing.

MR. PENNOCK:  Killed by friendly fire.

THE WITNESS:  Pardon?

MR. PENNOCK:  Nothing.  Take your time.

MR. PRZYMUSINSKI:  I tried.

THE WITNESS:  So I'm looking at the reason why they made that statement compared to the statement that they made in the discussion with finding a dose-related inhibitory --

(Clarification by the reporter.)

THE WITNESS:  Motility response in both normal subjects and IBS patients with GLP-1.  So I understand where they came up with the discussion on finding a dose-related inhibitory motility response in

both normal subjects and IBS patients.  And I'm trying to read through this, understanding limitations of time, and understand why they made that statement later on.

So to be honest, I'm looking at the discussion -- the first paragraph of the discussion. And that is more congruent with the results of the study.  And I would probably have to analyze this in more detail to figure out why they made that other comment you were referencing later on in the discussion.

BY MR. PRZYMUSINSKI:

Q.  So right now, can we agree that comment is present in their discussion?

A.  If we can also agree that the comment about a dose-related inhibitory motility response is also present in their discussion.

Q.  So both of those statements are in the discussion; correct?

A.  Right.  And the results of the motility index and the results of the study correlate with a dose-related inhibitory response.

Can we agree on that?

Q.  I don't know if we can.  That's -- that's your opinion, but that's okay.

A.   Okay.  Well, I mean, there are certain factual opinions, but go ahead.

Q.   Right.  But I've got to get this guy out of here.  With respect to --

MR. PENNOCK:  I'm gone.

BY MR. PRZYMUSINSKI:

Q.   With respect --

MR. PENNOCK:  Oh, excuse me.

MR. PRZYMUSINSKI:  You missed it.

MR. PENNOCK:  Yeah.  I don't think I can make it, so ...

BY MR. PRZYMUSINSKI:

Q.   With respect to the -- those two statements, they appear to state different things; correct?

A.   Yes.  That is -- that is correct.

Q.   And so sitting here today having looked at this for time and obviously presumably reviewed this study before you had submitted your report, you can't figure out for me right now why those two statements are in there; is that correct?

A.   Well, I can tell you that in the body of the study, they do find that dose-related inhibitory motility response, looking at the motility index --

Q.   Where are you reading?

A.   Do we want to go through the entire study?

Q.   I mean, look, I don't -- look, here's what I need to know.  Okay?  I understand that you believe the study found dose response.  I also see the statement referencing the discussion.  And I also note that the authors in the discussion also state they were not able to obtain dose-response relationship.  So all those things I understood.

A.   Yeah.  And they also -- yeah, they state they were able to obtain that dose-related inhibitory motility response also.

Q.   Those are -- those may be slightly different things, but regardless, if you -- if you believe that you can explain to me right now what the distinctions of those are, or if you think the authors made a mistake there, or whatever it is, I'm more than happy to hear that.  Otherwise, I'm not sure there's a point in us sitting here and spending 20 minutes reviewing that, but if you feel that's important to do, then I'm happy to do with it you.

A.   Yeah.  I would be okay with tabling this discussion for the time being, understanding that we have two seemingly conflicting statements, one of which is more consistent with the study, the one that I have discussed.  And we can discuss the study in detail if it ever comes about again.

Q.   Well, I am not sure that's how it works because --

A.   Then --

Q.   -- this is your deposition, and this is your time; right?

A.   Okay.

Q.   So if you believe that there's something here that would allow you to reconcile those statements or explain to me why the authors ultimately state that were not able to obtain any dose-response relationship, I'm ready to listen.  Leave it at that.

MR. PENNOCK:  As I said, it's not a memory test, Doctor; so take your time.

THE WITNESS:  All right.  Well, we can go through the motility index in the -- all right.  Well, I'm not able too reconcile both of those statements at this time.

MR. PRZYMUSINSKI:  All right, Doctor.  I don't have any further questions for you.  I guess I will turn it over to Mr. Pennock in case he does.

MR. PENNOCK:  No.  I don't have any questions.

MR. PRZYMUSINSKI:  All right.  Then we are done, Dr. Lodhia.  Appreciate your time.

THE VIDEOGRAPHER:  This concludes the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

deposition.  The time is 6:29.

(Thereupon, the deposition

concluded at 6:29 p.m.)

CERTIFICATE OF DEPONENT

PAGE        LINE      CHANGE                              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* * * * *

I, Nilesh Lodhia, M.D., deponent herein, do hereby certify and declare the within and foregoing transcription to be my deposition in said action under penalty of perjury; that I have read, corrected and do hereby affix my signature to said deposition.

_____
NILESH LODHIA, M.D., Deponent Date

CERTIFICATE OF REPORTER

STATE OF NEVADA    )
                   )      ss:
COUNTY OF CLARK    )

I, Kristy L. Clark, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:  That I reported the deposition of Nilesh Lodhia, M.D., commencing on Tuesday, April 7, 2026, at 9:06 o'clock a.m.

That prior to being deposed, the witness was duly sworn by me to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript is a complete, true and accurate transcription of my said shorthand notes, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 8th day of April, 2026.

_____
KRISTY L. CLARK, CCR #708