# EXHIBIT 32D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
------------------------------)
                              )
IN RE:  GLUCAGON-LIKE         ) CIVIL ACTION
PEPTIDE-1 RECEPTOR AGONISTS   )
(GLP-1 RAs) PRODUCTS          )
LIABILITY LITIGATION          ) MDL No. 3094
                              ) 24-md-03094-KSM
------------------------------)
                              )
THIS DOCUMENT RELATES TO:     )
ALL ACTIONS/ALL CASES         )
                              )
------------------------------)
```

WEDNESDAY, APRIL 8, 2026

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of DAVID MADIGAN, PH.D., held at the offices of Morgan & Morgan, 155 Federal Street, Suite 1502, Boston, Massachusetts, commencing at 9:09 a.m., on the above date, before JULIANA F. ZAJICEK, a Registered Professional Reporter, Certified Shorthand Reporter and Certified Realtime Reporter.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

      SEEGER WEISS
      55 Challenger Road
      Ridgefield Park, New Jersey 07660
      973-639-9100
      BY:  MAX KELLY, ESQ.
           mkelly@seegerweiss.com

ON BEHALF OF ELI LILLY AND COMPANY:

      KIRKLAND & ELLIS LLP
      555 California Street, 27th Floor
      San Francisco, California 94104
      415-439-1910
      BY:  MARK PREMO-HOPKINS, ESQ.
           mark.premohopkins@kirkland.com;
           MYRA FAROOQI, ESQ. (Via Zoom)
           myra.farooqi@kirkland.com

      KIRKLAND & ELLIS LLP
      333 West Wolf Point Plaza
      Chicago, Illinois 60654
      312-862-2000
      BY:  DAISY ALMONTE, ESQ. (Via Zoom)
           daisy.almonte@kirkland.com

ON BEHALF OF NOVO NORDISK:

      DLA PIPER LLP (US)
      1650 Market Street, Suite 5000
      Philadelphia, Pennsylvania 19103
      215-656-3300
      BY:  BRENNA KELLY, ESQ.
           brenna.kelly@us.dlapiper.com

      DLA PIPER LLP (US)
      33 Arch Street, 26th Floor
      Boston, Massachusetts 02110-1447
      617-406-6000
      BY:  KATIE INSOGNA, ESQ. (Via Zoom)
           katie.insogna@us.dlapiper.com

ALSO PRESENT:

      ROBERT MARTIGNETTI, Videographer
      Hartford Reporting & Technology.

                        I N D E X

WITNESS:                                    PAGE:

 DAVID MADIGAN, PH.D.

     EXAM BY MR. PREMO-HOPKINS............    4


                        * * * * *

                    E X H I B I T S

DAVID MADIGAN, PH.D. EXHIBIT          MARKED FOR ID

  No. 1     Document titled "GLP-1 Drugs and      6
            GI Adverse Events," by David
            Madigan Ph.D.

  No. 2     Statement of compensation for        15
            David Madigan, PhD

  No. 3     Curriculum Vitae - David Madigan     78

  No. 4     Article published January 26th of    88
            2024 by Cutroneo and colleagues
            called "Conducting and
            interpreting disproportionality
            analyses derived from spontaneous
            reporting systems"

  No. 5     Document titled "FAERS               104
            Disproportionality Analysis
            Script"

  No. 6     Medical Dictionary for Regulatory    109
            Activities Terminology (MedDRA),
            Gastroparesis

  No. 7     Medical Dictionary for Regulatory    109
            Activities terminology (MedDRA),
            Gastroptosis

  No. 8     Document titled "Analysis of GI      123
            Adverse Events in the Pooled GLP-1
            Clinical Trials," by David
            Madigan, Ph.D.

THE VIDEOGRAPHER:  We are now on the record.  My name is Robert Martignetti.  I'm a legal videographer for Hartford Reporting & Technology.  Today's date is April 8th, 2026, and the time is 9:09 a.m.

This deposition is being taken In Re Glucagon-Like Peptide-1 Receptor Agonists Products Liability Litigation.

The deponent is David Madigan, Ph.D.

All counsel will be noted on the stenographic record.  The court reporter is Juliana Zajicek and will now swear in the witness.

(WHEREUPON, the witness was duly
                  sworn.)
                  DAVID MADIGAN, PH.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PREMO-HOPKINS:

Q.    Good morning, Dr. Madigan.

A.    Good morning.

Q.    We met briefly off the record, but I'm Mark Premo-Hopkins, and I'm going to ask you some questions today.  I represent Eli Lilly in this litigation.

Do you understand that?

A.    Yes.

Q.    And you've issued multiple reports in this case, is that right?

A.    Two reports.

Q.    Reports for Lilly and a report for Novo Nordisk?

A.    No.

Q.    Okay.

A.    No.  There's a -- there's a report pertaining to Novo clinical trials and there's a report --

Q.    Thank you.

A.    -- pertaining to affairs that re- -- that -- that covers both.

Q.    Understood.  So the two reports that you've issued in this case, one relates to what -- postmarketing adverse events in the FAERS database, and another relates to clinical trial, is that right?

A.    Novo clinical trials, that's correct.

Q.    Okay.  And the clinical trial report doesn't include any information related to Lilly clinical trials?

A.    Correct.

Q.    Let me mark as Exhibit 1 --

MR. PREMO-HOPKINS:  Do you mind if I...

THE COURT REPORTER:  Go ahead.

(WHEREUPON, a certain document was marked David Madigan, Ph.D. Deposition Exhibit No. 1, for identification, as of 04/08/2026.)

BY THE WITNESS:

A.     Thank you.

BY MR. PREMO-HOPKINS:

Q.     I'll hand to you -- they gave me lots of copies today -- what's identified as "GLP-1 Drugs and GI Adverse Events, David Madigan Ph.D.," and has page numbers, at least in the copy that I have, from 1 to 18?

A.     Yes.

Q.     And I see your signature on Page 14, I believe, dated January 2nd of 2026?

A.     Yes.

Q.     And does this appear to be a full and complete copy of your expert report that relates to the postmarketing adverse events?

A.     It does.  Can I -- can I make a correction, or do you want to do that later?

Q.     Yeah, go for it.

A.     I'm trying to find it now.  Oh, there it is.  So on Page 5, Paragraph 14 --

Q.    Yes.

A.    -- there's a, if you will, a stray reference to medroxyprogesterone and meningioma.

Q.    Okay.  And what is medroxyprogesterone?

A.    Depo-Provera.  It is a contraceptive.

So -- so that should be "namely GLP-1 drugs and gastric adverse events."

Q.    Do you know how the report came to list medroxy- -- list medroxyprogesterone and meningioma in Paragraph 14?

A.    Sure.  So that -- that portion of the report, you know, I -- is -- versions of that have appeared in other analyses that I've done.

Q.    Okay.

A.    So that's just a carryover from a different report.

Q.    So in Para- -- Paragraph 14, the change that you want to make reflects a change from "medroxyprogesterone" to "GLP-1 drugs" and a change of "meningioma" to "gastric adverse events"?

A.    Sure.

Q.    And the reason that this report includes the medroxyprogesterone and meningioma is because you've -- you're doing work on a different expert report that includes a similar paragraph?

A.    Yeah.

Q.    Are you doing that work with the same lawyers that you're working with here?

MR. KELLY:  I'm going to object on the basis of work product.

MR. PREMO-HOPKINS:  Okay.  Are you going to instruct him not to answer?

MR. KELLY:  Where -- where is the line of questioning going, Mark?

MR. PREMO-HOPKINS:  Well, in -- in part it has to do with how -- I'm trying to understand how he wound up with the wrong medicine and the wrong injury in Paragraph 14 of his report.

MR. KELLY:  I think you got that answer with a similar paragraph in a different expert report, right?

MR. PREMO-HOPKINS:  Well, I understand I got one answer, yeah.

BY MR. PREMO-HOPKINS:

Q.    Did you put medroxyprogesterone and meningioma into Paragraph 14, Dr. Madigan?

A.    Yes, but it's -- you know, it was a -- I wrote that paragraph in a different context at an earlier time.

Q.    Okay.

A.    And then copied it over into this -- into

this report and missed -- you know, missed the -- the incorrect reference.

Q.    Understood.  But you are -- you are doing work in the -- in the Depo-Provera litigation?

A.    No, not -- you used the present tense. No.

Q.    Previously you were doing work in the Depo-Provera litigation?

A.    Yes.

Q.    And -- and which side were you hired by in the Depo-Provera litigation?

A.    Plaintiffs.

Q.    And in the Depo-Provera litigation, do you work with the same lawyers that hired you here?

A.    Yes.

Q.    Any other corrections that you want to make to Exhibit 1?

A.    So there's one other thing.  It's not really a correction so much as a clarification, but I'm on Page 11.  So at the very top, it's to do with the -- the choice of MedDRA terms for my -- MedDRA is M-e-d-D-R-A -- the choice of MedDRA terms for my analysis.

Q.    And this is Paragraph 32?

A.    Yes, correct.  So it says there, "I am

advised that Dr. Metz approved these choices."

Q.    Yes.

A.    And then if you go to the next paragraph, there's a footnote, and it's to do with the -- the choice of drugs.  And the footnote says, "Dr. Metz confirmed the appropriateness of these search terms." So the -- the "I am advised" is -- really should -- should say "Dr. Metz confirmed."

So the, you know -- what actually happened here is -- is -- this was relayed to me -- the choice of better terms was relayed to me from Dr. Metz through an attorney, and then -- but before I finalized the report, I spoke with Dr. Metz and confirmed both the MedDRA terms and the drugs.

So that's -- that's just left a little ambiguous, the way it's written here.

Q.    So let me make sure I understand the sequence of events.  With regard to the MedDRA terms that are listed in Paragraph 32, you initially were informed by a lawyer that Dr. Metz had approved of the MedDRA terms?

A.    That he -- that, Here are the MedDRA terms that Dr. Metz would like you to -- to run, if you will.

Q.    Okay.

A.    And then later -- and I won't be able to recall the date off the top of my head, but later, you know, I actually -- I spoke with Dr. Metz.

Q.    And when you spoke with Dr. Metz, did -- did you rely on anything in that conversation in issuing your opinions here?

A.    Yeah.  I mean, he confirmed that these were the MedDRA terms that I should use in my analysis.  I had known that already, but I got it, you know, not directly.

Q.    You got it straight from the horse's mouth, so be it --

A.    That's exactly right.

Q.    -- so to say?

A.    That's exactly right.

Q.    Okay.  And when you say he confirmed, what -- how did -- what did he say to you and what did you say to him?

A.    We're talking about a conversation two months ago or four months ago, whatever it was, so I don't -- I couldn't tell you exactly verbatim, but the gist of it was, Dr. Metz, I'm told these are the MedDRA terms that -- that I should use, and I told him what they were, and he said, Yes, that's exactly right, that's what I want.

Q.    And when you say "that's what I want," you were talking in Dr. Metz' voice?

A.    Yes.  So it's not so much a correction as a -- but, you know, when I read -- reread it with fresh eyes, I thought, that's kind of ambiguous, so I just thought I'd bring it to your attention.

Q.    Why -- why did you feel the need to talk to Dr. Metz about the choice of MedDRA terms?

A.    Just to be sure.

Q.    To be sure of what?

A.    That they're the correct terms.

Q.    Correct terms for what?

A.    For my analysis.

Q.    Your analysis of what?

A.    FAERS.  F-A-E-R-S.

Q.    She's -- she has got a good dictionary, it looks like.

Why -- why did you need to talk to Dr. Metz to understand whether these were the correct terms or not?

A.    So I'm a statistician, epidemiologist, so I -- I'm not a clinician, so, you know, I need to collaborate and -- and generally in the work I do, either in litigation or in -- in my academic world, you know, I collaborate with typically clinicians,

depending on the context, but typically clinicians. That's what I'm doing in this case.

Q. And why do you as a statistician need to collaborate with a clinician to understand the correct MedDRA terms to use in your analysis of the FAERS database?

A. Because I'm not an expert in pharmacology or I'm not an M.D., so in general -- in general, I'm not the one to say, Okay, it's these specific terms are what we should be looking at.

Q. Other than the conversation you had with Dr. Metz around confirmation of the MedDRA search terms, did you have any other conversations with Dr. Metz?

A. No.

Q. Did you talk with Dr. Metz about anything else that relates to your expert report?

A. No.

Q. When you had the conversation with Dr. Metz, did -- did you discuss any other potential MedDRA terms other than the three Med- -- MedDRA terms that you include in your report?

A. No.

THE COURT REPORTER: Can you hold on one second.

Thank you, go ahead.

BY MR. PREMO-HOPKINS:

Q.   Other than Dr. Metz, did you talk to any other of plaintiffs' expert in -- prior to issuing your report that we have as Exhibit 1?

A.   Not -- no, not pertaining to this report, no.

Q.   Did you review any expert reports of other plaintiff experts prior to issuing your report that we have as Exhibit 1?

A.   No.

Q.   Exhibit 1, does it contain -- with regard to postmarketing FAERS adverse events, does Exhibit 1 contain all of the opinions that you -- you have been asked to issue in this case?

A.   Yep, plus the appendices, yes.

Q.   Thank you.  Plus the appendices.  Yeah, there are reference to a number of appendices that we haven't attached.  But the report that is Exhibit 1 and the referenced appendices, those would include all of your opinions as well as the materials considered for those opinions?

MR. KELLY:  Objection to the form.  There was a discussion about another report in the same case.

MR. PREMO-HOPKINS:  Thank you.

BY MR. PREMO-HOPKINS:

Q.   Exhibit 1 contains -- and the referenced appendices contains all of the opinions as well as the materials you've considered for issuing the report that is Exhibit 1, yes?

A.   That's correct, yes.

Q.   And you haven't been asked to issue any additional opinions at this point in time, is that right?

A.   I --

Q.   With regard to postmarketing adverse events.

A.   Correct, I have not.

Q.   So in your -- let me -- let me mark as Exhibit 2, we'll just get the administrative stuff out of the way.

(WHEREUPON, a certain document was marked David Madigan, Ph.D. Deposition Exhibit No. 2, for identification, as of 04/08/2026.)

BY THE WITNESS:

A.   Thank you.

BY MR. PREMO-HOPKINS:

Q.   We've marked as Exhibit 2, Statement of Compensation for David Madigan, Ph.D.  And, Dr. Madigan --

MR. KELLY:  Can I have one, Mark?

MR. PREMO-HOPKINS:  Oh, yeah.  Sorry.

BY MR. PREMO-HOPKINS:

Q.    Can you describe for me what -- what we have as Exhibit 2?  And it's a two-sided -- for the record, it is a two-sided page.

A.    So this is a record of all of the time that I spent working on this matter, and actually I see the conversation with Dr. Metz was on December 19th.  It's itemized.

It's -- it's a list of all of the hours I spent preparing this and one other report.

Q.    And the one other report is the clinical trial report?

A.    Pertaining to Novo trials, yes.

Q.    As part of your work for the postmarketing adverse event report that's Exhibit 1, did you review any Eli Lilly clinical trials or anything?

MR. KELLY:  Objection to the form.  Can you rephrase that?

BY MR. PREMO-HOPKINS:

Q.    As part of your work for the most -- postmarketing report that's Exhibit 1, did you review any Eli Lilly clinical trials for purposes -- purposes of issuing your report?

A.    Not as part of my postmarketing analysis.

Q.    Okay.  Did you review Eli Lilly clinical trials as part of the clinical trial report, clinical trial expert report?

MR. KELLY:  Objection to the form.  Are you asking for work product here, Mark?

MR. PREMO-HOPKINS:  He has a 966-page materials considered list.  I can mark it, and we can --

BY MR. PREMO-HOPKINS:

Q.    Do you -- do you know that there are Lilly -- Eli Lilly clinical trials listed on your materials considered list?

A.    Yes.

Q.    Okay.  Why?

MR. KELLY:  I'm going to object based on work product and instruct the witness not to answer.

BY MR. PREMO-HOPKINS:

Q.    He considered them for purposes of this case.  I don't understand how you can instruct the witness not to answer that question.

MR. KELLY:  You are asking him --

BY MR. PREMO-HOPKINS:

Q.    How did you -- why do you have Eli Lilly materials considered -- on your materials considered list for clinical trials?

MR. KELLY: I'm going to object on the basis of work product, Mark. I can go off the record and -- and we can talk about it.

MR. PREMO-HOPKINS: I'll -- I'll ask a different question if you're going to instruct the witness not to answer.

MR. KELLY: I'm going to instruct the witness not to answer. But if you're asking about the basis of his opinions in Exhibit 1?

MR. PREMO-HOPKINS: I'm asking about the work that he did in this case.

BY MR. PREMO-HOPKINS:

Q. Dr. Madigan, there's a number of clinical trials that were conducted by Eli Lilly and Company that are listed on your materials considered list.

You're aware of that, yes?

A. Yes.

Q. Did you review those materials at all?

MR. KELLY: I'm going to instruct the witness not to answer on the basis of work product.

MR. PREMO-HOPKINS: Do you -- are you going to submit a revised materials considered list?

MR. KELLY: I'm happy to -- to talk to co-counsel about that off the record and get back to you. I can get back to you today about that, Mark.

MR. PREMO-HOPKINS:  Okay.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, do you have any opinions in this case, whether in Exhibit 1 or in any oth- -- your other expert report related to Eli Lilly's clinical trials?

MR. KELLY:  You can answer.

BY THE WITNESS:

A.    No, not sitting here this minute.

BY MR. PREMO-HOPKINS:

Q.    The -- your statement of compensation, if we go back to Exhibit 2, does this reflect the total hours spent on this matter for -- that resulted in both reports you've issued?

A.    Yes.

Q.    If we look at the statement of compensation, is there a way for you to identify which entries -- entries relate to the work for Exhibit 1, the expert report on FAERS data?

A.    Partly.  Probably not completely, but I can -- I can -- some items here are -- are explicitly the FAERS report, some are explicitly the work I did on Novo clinical trials.

Q.    Okay.  For the ones that you -- you can identify as relating to Exhibit 1, which line items

would you call out?

A.    Sure.  So how will I do this, by day?

Q.    Sure.

A.    So the December 9th pertains to the FAERS analysis, and December 13th, December 17th, December 19th.

Q.    I'm sorry, just for the record, Dr. Madigan, there's two entries for December 13th.  There's a --

A.    Oh, Lordy, sorry.  Yeah, it's the -- it's the one that's one and a half hours.

Q.    Got it.

So I apologize, I cut you off.  You had said the -- go --

A.    The next one is December 17th.  And then it's the first one, I see now there are two on December 19th, so the -- the entry on December 19th that's two hours pertains to Exhibit 1.

And then -- then January 1, March 25th, and March 30th, and there's a -- there's a couple in there that are -- that are ambiguous.  Like the one on -- on January the 2nd, finalized reports, given that this report was January 2nd, some of that is probably pertaining to the -- to Exhibit 1.  There's one or two like that.  Like, there's a call on

December 11th.

Q.    Yes.

A.    I have no memory of what -- which -- which matter that pertained to.

Q.    So the -- the entries that -- that reflect work on SAS files or SAS report, that relates to the clinical trial report?

A.    It pertains to the clinical trials in general, yes.

Q.    So in -- in terms of the work, as I understand it, recognizing that some of the entries are ambiguous, but the entries that you can specifically identify as relating to the work for Exhibit 1 would be one hour on December 9th, one and a half hours on December 13th, four and a half hours on December 17th, two hours on December 19th, one and a half hours on the 1st of January, some portion of two and a half hours on the 2nd of January, one hour on the 25th of March, and two and a half hours on the 30th of March, yes?

A.    That's right.  So I -- I total around 14, I think.

Q.    If we take a look at Exhibit 1, we can go back to Exhibit 1 now, and do I understand correctly that the -- the results of your report in Exhibit 1

reflect work that you did on a disproportionality analysis?

A.    Sure.

Q.    And the disproportionality analysis in general, not just in your report, but in the literature and -- and in your area of expertise is typically comp- -- computed as a numerator and a denominator, right?

A.    That's not too crazy, yeah, more or less.

Q.    Acceptable simplification?

A.    It is a simplification for sure.  There's a lot of details, but, yeah, sure, it's a -- it compares -- generally speaking, it compares an observed number of reports to an expected number of reports.

Q.    And the numerator would be the observed number of reports in a select -- reported with a select group of medications, yes, usually?

A.    Sure.

Q.    And -- and the denominator would be those same types of reports observed in some other population, and in the case of your report, it would be all of the drugs in the FAERS database, right?

A.    Sure.  Yeah, that's basically -- it depends on the particular metric, you know, exactly

how it's computed, but in -- but in broad brush strokes, that's -- that's about right.

Q.    And just so I understand, is the -- your report ref- -- uses the term "signal," and this report, Exhibit 1, did it involve any -- any signal refinement or validation?

A.    So they're pretty vague terms.  So, you know, what I'm doing is -- you know, I'm doing a statistical analysis of the FAERS database.  I'm using certain metrics that are -- that are used in these disproportionality analysis.  I am noting where and when there was a signal of disproportion reporting.

You know, these analysis -- you know, I wouldn't -- I would not characterize my work as going as signal refinement.  What was the other term you used?

Q.    Oh, signal validation, have you seen that language in the FDA guidance?

A.    Yeah.  So generally speaking, that's -- you know, that's not what I'm doing here.  I'm doing a statistical analysis using certain metrics that are used in -- in these disproportionality analyses.

Q.    And you -- you've seen in the FDA guidance documents where it talks about signal identification, and -- and then after that you might engage in

refinement or validation, yes?

A.    I'm aware that people use these terms. They are very ill-defined.

Q.    And we'll get into more detailed specific questions on that to make sure there's no -- no confusion about the definition later.

As I understand the -- the research question, if we look at that part -- portion of your report, it's on Page 2.

A.    Yep.

Q.    It says, "I was asked to conduct a statistical analysis of FAERS data, the FDA's spontaneous adverse event reporting system database regarding GLP-1 drugs and certain gastrointestinal outcomes, and to determine whether any safety signal for these outcomes existed and, if so, the timing of such signal."

Do you see that?

A.    Yes.

Q.    The -- what is a -- in that -- in that research question that you've identified in Paragraph 6, what does safety signal mean?

A.    So that part of the work is to do with basically does the -- the metrics that I'm using to measure the association between these drugs and those

outcomes, whether or not those metrics exceed certain thresholds.

Q.    When you talk about the association, you're talking about the association between reports and the FAERS data that are -- that are reported with particular drugs as compared to the -- all other drugs, right?  You mentioned the association between drugs and outcomes?

A.    That's the -- yes, so the -- I'm -- I'm analyzing a potential association between two things, you know, a set of drugs and -- and an outcome. That's what I'm analyzing.

Q.    You know you can't use a disproportionality analysis to reach a conclusion about the association between a drug and an outcome, can you?

A.    Of course you can.  It's a measure of assoc- -- you know, these -- these metrics are measures of association.

Q.    All right.  And you -- you believe you can reach a definitive conclusion about the association between a drug and an outcome based on disproportionality analysis?

A.    Let's get on the same page here.  What do you mean by "association"?

Q.    I don't know, why did you evilly touch your fingers today when we're talking about --

MR. KELLY:  Objection to the characterization --

MR. PREMO-HOPKINS:  You're the one -- you're the --

MR. KELLY:  -- of the witness as evil.

MR. PREMO-HOPKINS:  You're the -- you're the one -- I didn't say he was, I said he did something that looked evil.

BY MR. PREMO-HOPKINS:

Q.    What do you mean by an association?

A.    I mean a statistical association.  So as measured by -- in some context you use a correlation coefficient, in other context you use a regression coefficient, in other context you use an odds ratio. In this context I'm using disproportionality metrics to measure an association.

Q.    And your -- the association that you're measuring is not -- is -- are reports, yes?

A.    Weird way to put it.  I'm analyzing data, I'm measuring an association in a database.

Q.    And the database is data of reports?

MR. KELLY:  Can you let the witness finish his answer?

BY MR. PREMO-HOPKINS:

Q.    Go ahead.

A.    You finished my sentence.

Q.    I've read a lot of your depositions, Dr. Madigan, and we're going to get out of here a lot sooner if -- if the answer to the question is yes -- if the honest answer to a question is yes, can you agree to answer yes today?

A.    I can, but I am annoyed that you're characterizing my answer this minute -- a minute ago as dishonest in some sense.  I'm trying to be very accurate and precise.  That's what I'm trying to do. And your question wasn't.  That's why I had to clarify it.

Q.    In that FAERS database, there -- there's no confirmation of whether the reports are actual outcomes, true?

A.    The reports are outcomes, I don't know what you mean by that.

Q.    Okay.  In -- in your work that you did for this case, did you do any investigation as to whether the reporting numbers that you've pulled back reflected outcomes that occurred after a drug was administered?

A.    I don't know quite what you have in mind. I mean, I analyzed the FAERS database.  It

comprised -- the -- the entries in the FAERS database are reports of individuals who consumed certain drugs and experienced certain outcomes.

Q.    Did you do any work to understand whether any of the reports that fed into the data that you reviewed reflected adverse events that were onset before the drug was administered or after the drug was administered?

A.    I have no basis on which to do that in the FAERS database.  I am just analyzing FAERS data.

Q.    All right.  That -- that's -- that's what -- one of the things I'm trying to understand.

What you looked at were reports that were made into the FAERS database, yes?

A.    That's correct.

Q.    Did you do any work to de-duplicate those?

A.    Since 2004 the FDA, with the open FDA access to the database, they removed duplicates.

Q.    Did you do any work to remove duplicates from the FAERS data that you reviewed?

A.    I didn't.  I told you the FDA does it.

Q.    Do you know -- you didn't include in your report any discussion of how accurate this work that you rely on by the FDA is in removing duplicates, right?

A.    Did -- in my report did I discuss the accuracy of their de-duplication?  No, I did not.

Q.    Okay.  And -- and recognizing that -- that there is open FDA access to the database, you yourself didn't do any work to confirm whether or not or to what extent duplicates had been removed from the data you reviewed, correct?

MR. KELLY:  Objection; asked and answered.

BY THE WITNESS:

A.    Not in this context.  In other contexts, I'm aware of, you know, of what they do.  One thing, by the way, just to be clear, is we're talking about duplicates here.  I am -- there can be multiple versions of the same report, you know, updated over time.  I'm using the last one, right.

So in that sense, I do de-duplicate.  I'm interpreting your questions in the sense of, you know, different reporters sending in reports about the same event.

BY MR. PREMO-HOPKINS:

Q.    So you recognize that because adverse events are reported for multiple sources, there is the risk or the potential in the FAERS data that you would have multiple reports for a single event, yes?

A.    It's con- --

MR. KELLY:  Objection; asked and answered.

BY THE WITNESS:

A.    It's conceivable from different reporters, but -- but -- and the FDA has efforts to de- -- to -- to resolve that, but -- but there are also -- you know, reports get updated or can get updated over time, so in that case my -- you know, my approach just uses the last, the most -- the final version of any one report.

BY MR. PREMO-HOPKINS:

Q.    You recognize that because adverse events are reported from multiple sources, there is risk or the potential in the FAERS data that you would have multiple reports from different reporters for a single event, yes?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    It could happen, yeah.

BY MR. PREMO-HOPKINS:

Q.    And you didn't do any work in your expert analysis in this case to understand whether and to what extent there were duplicate reports in your FAERS analysis, true?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    True.    I'm relying on the FDA's approach.

BY MR. PREMO-HOPKINS:

Q.    And you did not do any work in analyzing -- let me ask you this.  Did you look at any underlying reports, like the -- the narrative or the content of any underlying reports?

A.    No.

Q.    So for the reports in -- that went into the statistical analysis you did in Exhibit 1, you would not be able to identify what, if any, reports reported adverse events before the administration of the drug in question or after, true?

A.    It's just not something I've looked at.

Q.    The -- did you do any sensitivity analyses or any other sort of analysis to address stimulated reporting bias to the extent that may be present here?

A.    I have some discussion about that in my report, but, no, I didn't do any particular analysis. If such a thing is real, I did not do any analysis pertaining to that.

Q.    Is it your opinion, sir, that in this case with these drugs that stimulated reporting bias is not real?

A.    It's just not something I've looked at -- I've looked at it in general, and, you know, in

general, there isn't much evidence of stimulated reporting in general.  I have not looked at it in this specific context.

Q.    And when you say "this specific context," you mean with regard to GLP-1 medications?

A.    Yes.

Q.    In conducting your review in -- for Exhibit 1, you used particular MedDRA terms, three particular MedDRA terms, yes?

A.    That's correct.

Q.    And those we were discussing previously, but those are listed on -- in Paragraph 32, yes?

A.    Yes.

Q.    And the MedDRA terms you used were, one, gastroparesis; two, impaired gastric emptying; and, three, vomiting projectile, right?

A.    Yes.

Q.    No other terms, correct?

A.    Correct.

Q.    Did you consider or evaluate using potential other terms for this report, Exhibit 1?

A.    No.

Q.    And the first time that you heard about using these three terms in the analysis was when you were asked to conduct the analysis by plaintiffs'

counsel, yes?

A.    Yeah, I was told, Dr. Metz, you know, would like you to do an analysis that he would presumably rely on, and here are the terms.

Q.    Did you -- when you spoke with Dr. Metz, did you ask Dr. Metz, Are there other terms that -- that you think are relevant that I should include?

A.    I don't recall.  My -- my memory of that conversation is -- is, Dr. Metz, I understand these are the terms you want me to look at, can you confirm that.  And he said yes.

Q.    As part of your work with regard to the FAERS data, did you do any review or analysis of Eli Lilly or Novo Nordisk's assessment of the signals or similar signals?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    In FAERS, for example?

BY MR. PREMO-HOPKINS:

Q.    Yeah -- let me ask you a better question.

Your -- your report identifies safety signal for what you call gastric adverse events, yes?

A.    Sure.

Q.    Do you know one -- one way or the other whether there are additional MedDRA terms that would

Case 2:24-md-03094-KSM  Document 691-32  CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER  Filed 05/19/26  Page 35 of 135

be reflective of gastric adverse events that either Eli Lilly or Novo Nordisk used to analyze a similar question that you were asked in this case?

A. I don't know.

Q. And did you conduct any sort of analysis to understand whether or to what extent using a broader set of preferred MedDRA terms would impact the analysis you were asked to do?

A. No.  The only analysis I did are the ones in your hand in Exhibit 1.

Q. One of the pieces of your analysis included running those same preferred terms against a drug called -- not a GLP-1 drug but a drug called metformin?

A. Yes.

Q. How did you identify metformin as the drug for purposes of this analysis?

A. So I identified that.  I've written a paper about this some years ago.  I did confirm it with Dr. Metz.

Q. And how -- why did you identify metformin as a medication that you wanted to use in this analysis?

A. So it's not a GLP-1 and it is widely used for the same indication.

Q.    And what is the indication?

A.    In that context it's diabetes.

Q.    Did you look at any other drugs in the -- in the therapeutic class, in other words, used to treat diabetes other than the GLP-1 drugs you list and metformin?

A.    No.

Q.    Did you ask Dr. Metz whether or not there are other drugs you should look at?

A.    I don't remember if -- if I asked him that explicitly, but we -- I confirmed that metformin was a reasonable comparator.  He wanted to see metformin.  I don't -- I just don't remember, did I ask him, should I include others.  I have no memory of whether I asked him that or not.  I don't think I did.

Q.    Do you yourself know, either based on your work or the -- or discussions with Dr. Metz, whether metformin is used as a first-line, second-line, or third-line treatment for diabetes?

A.    I do know.

Q.    What do you know?

A.    So in 75 percent of newly diagnosed Type 2 diabetes in this country, metformin is the first drug that's prescribed.

Q.    And do you know how that compares to

tirzepatide?  For example, in how many cases of newly diagnosed Type 2 diabetes is tirzepatide the first line therapy?

A.    I don't have that in my head.  I have a paper about this, a published paper.

Q.    You have a published paper about GLP-1 receptor agonists and how often they're prescribed for -- as first line therapies for diabetes?

A.    No.  I have a paper about first-line -- actually, not just first-line -- I have a paper that quantifies how different medications are used in the treatment of Type 2 diabetes.

Q.    And when was that paper published?

A.    It's referenced in here.  It's -- let's see.  It's Footnote 34 on Page 11.

Q.    When was that paper published?

A.    2016.

Q.    Which are the medications that you analyzed here in the GLP-1 RA group were on the market in 2016?

A.    I don't know.

Q.    I mean, we can look at your report on Paragraph 37, right, and see?

A.    Oh, yeah, you're right, you can.  You're right.  So two -- two of them were approved before

2016, and two of them were approved after 2016.

Q.    Did you do anything to assess the extent to which met- -- metformin would be a better or worse comparator for any of the GLP-1 drugs that you analyzed?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Not specifically.  So, I mean, I -- I chose metformin, confirmed by Dr. Metz because it is -- at least in 2016 was by far and away the most widely used first line of therapy for diabetes, for Type 2 diabetes.

BY MR. PREMO-HOPKINS:

Q.    Do you know if post 2016 metformin continued to be the far and away most widely used first-line therapy for diabetes?

A.    I don't know.

Q.    Do -- do you know whether and to what extent dulaglutide or tirzepatide were used for -- as first-line therapies for diabetes?

A.    So dulaglutide, we'd have to look at my paper.  I -- I don't have that in my head, what the percentage was in 2016 at the time of my paper, but for tirzepatide it wouldn't be included in my paper, so I don't know.

Q. Do you know one way or the other based on your work or your conversations with Dr. Metz whether or to what extent dulaglutide is used for more severe cases of diabetes than metformin?

A. I don't know.

Q. Do you know for any of the drugs, the GLP-1 drugs that you listed on -- in Paragraph 37 whether or to what extent they are used for more severe cases of diabetes than met- -- metformin?

A. I don't know.

Q. The FAERS data that you analyzed includes some fields that are excerpted or pulled out from the actual reports that come into the FDA, right?

A. I don't know what you mean. Try again.

Q. Let me ask a better question.

The -- the FAERS data that you reviewed, it didn't include the full adverse event report that would have gone into the FDA, is that correct?

A. It doesn't include the narrative.

Q. Okay. Do you know what -- what -- what fields it does include versus doesn't include as compared to an actual report that goes into the FDA?

A. Oh, Lordy, I mean, I don't -- I don't have that in my memory. It is like 20 fields or 22 fields, something like that. It's -- it's pretty much

everything except the narrative.  There's no free-text in what the FDA makes available.

Q.    Does the FAERS data allow you to assess the -- whether the reports you're reviewing were coded as serious adverse events?

A.    It does.

Q.    And your analysis with regard to the postmarketing didn't do any sort of stratification based on seriousness, true?

A.    True.  Dr. Metz didn't ask me to do that.

Q.    Does the FAERS data that you looked at, do you know if that includes whether -- identifies whether or not there would have been a dechallenge or rechallenge for a particular event?

A.    No.

Q.    It does not?

A.    It does not.  In what's released publicly, it does not.

Q.    In the work that -- that you did for your report that's Exhibit 1, did you do any work to scale the results based on the utilization of the drugs?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Scale the results?  I mean, I'm -- I'm -- utilization of the drugs.  I don't have sales data.

So I don't -- so, therefore, I presume the answer to your question is no.

BY MR. PREMO-HOPKINS:

Q.    So in terms of scaling results based on utilization of a drug, that would involve incorporation of sales data?

A.    I don't know what you mean by the word "scale."

Q.    Well, what did you mean when you said, "I don't have sales data, so I presume the answer to your question is no"?  How would you use sales data in an analysis like the one that you see in -- that we see in Exhibit 1?

A.    So it's conceiv- -- we talked earlier about a numerator and a denominator.  It's conceivable you could use sales data as a -- as the denominator.  I don't have it.  I didn't do that.  I'm not advocating for it.  But I've seen that in other contexts.  It can -- you know, one can do that, and I didn't do that.  So that's kind of how I interpreted your question about scale.

Q.    Do you under- -- do you -- how would that impact the denominator that you used?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    It would be different.  It would just simply be different.

BY MR. PREMO-HOPKINS:

Q.    But you didn't look at -- whether or not you had access to it, you didn't look at sales data for purposes of issuing your report that's Exhibit 1?

A.    No.  I analyzed FAERS.

Q.    And you -- you don't know one way or the other whether or not or how using sales data would alter the analysis that you did in Exhibit 1?

A.    I have no idea.  It's pure speculation.

Q.    Did you ask anyone for any sales data that might allow you to assess the impact on the denominator for your calculation?

A.    No, I did not, nor would I.  I was asked to do a FAERS analysis.  That's what I did.

Q.    Did the data that you looked at for Exhibit 1 and the opinions there, did it allow you to assess -- let me start my question over.  Is that all right, Dr. Madigan?

A.    Of course.

Q.    The -- the FAERS data that you got on the GLP-1 medications, did that allow you to assess which reports included preexisting risk factors for the adverse events you were analyzing?

A.    No, as a general matter, it doesn't. Well, actually, hang on a sec.  Age is in there.  Age and sex are in there, so insofar as age and sex are -- are risk factors, then the answer would be yes. But -- but in -- that -- that's about it.

Q.    With regard to age and sex, did your analysis evaluate or attempt to calculate the impact of those as potential risk factors?

A.    No, but -- but all of the analyses are stratified by age, sex, and year of report.  So it accounts for age and sex and year of report.

Q.    Let me just make sure I understand. The -- the graphs that you have in -- on Pages 12 and 13, those don't reflect different results based on age or sex, true?

A.    Correct, they adjust for age and sex. They're adjusted metrics, in -- in the case of two of them.  So in the case of the -- the so-called the IC and the IC05, they're both adjusted for age, sex, and year of report; and the PRR is not because conventionally it's not.

Q.    Maybe I can -- can ask a better question.

Do you know one way or the other whether age or sex are potential risk factors for the adverse events that you examined?

Case 2:24-md-03094-KSM   Document 691-32   Filed 05/19/26   Page 44 of 135

A.     I don't know.

Q.     And other than age and sex, the FAERS data that you reviewed would not allow you to assess any other potential preexisting risk factors that might be associated with the adverse event outcomes that you analyzed, true?

A.     I think that's true.  Yeah, nothing else comes to mind.

Q.     Does the FAERS data that you analyzed allow you to examine why a medication was prescribed, the indication for which it was prescribed?

A.     So there -- there is a field in there called indication, but it's -- it's fairly sparsely populated.  It's kind of unusable.

Q.     And is it -- is the indication field in the FAERS data unusable as a general matter, or is it more with regard to these drugs it is less usable?

A.     As a general matter.  I didn't even look at it in this context.

Q.     So in this context, you -- you didn't do any examination of the FAERS data to understand which reports were reports for people getting the drug for diabetes versus some other indication?

A.     I didn't look at that, but like I said, the -- I've worked with FAERS for more than 20 years.

That -- that field is rarely -- it's empty mostly.

Q. It's empty mostly in other cases that you've looked at, but you didn't look at it here, correct?

A. No, that's not quite right. So I've -- actually, it's 27 years ago I did my first FAERS analysis. I've worked with FAERS in litigation, I've worked with FAERS in the context of my academic work, I've worked with FAERS in my consulting activity with pharma companies, and in many of those contexts over the years, I've taken a look at the indication field and it's not usable.

Q. In this case for your work that results in Exhibit 1, did you look at the indication field?

A. No.

Q. So the numerator -- can we go back to the numerator and the denominator for a moment?

A. Sure.

Q. What are the factors that influence the numerator in a disproportionality analysis like the one you conducted?

A. The factors that influence it? It's just a number. It is the number of reports that contained one of those drugs and the particular outcome.

Q. There were choices that you made to

identify -- that resulted in the output of that number, yes?

MR. KELLY:  Objection.

BY THE WITNESS:

A.   Sure, that we've discussed, the particular drugs and the particular MedDRA terms.

BY MR. PREMO-HOPKINS:

Q.   Okay.  That's -- that's what I -- I want to make sure I understand.  The -- the numerator isn't some a priori existing number out in the world that you can go grab, right?  I mean, you have to make choices about what data you want out of the FAERS database to generate the numerator, yes?

MR. KELLY:  Objection.

BY THE WITNESS:

A.   Sure.

BY MR. PREMO-HOPKINS:

Q.   Okay.  So what choices have to be made to select the numerator for a disproportionality analysis like the one that you did in Exhibit 1?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.   Asked and answered.  It's -- it's the particular drugs and the particular MedDRA terms.

BY MR. PREMO-HOPKINS:

Q.    So for the numerator, the factors that go into what that numerator will be are the drugs you want to look at and the particular MedDRA terms for the reports, yes?

A.    Sure.

Q.    Are there any factors that are different than that that affect the denominator in your disproportionality analysis?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    I guess you should also put time period in there.  So I did -- I did this analysis cumulatively, you know, over time cumulatively, so what goes into the numerator as of Q4, 2010 is the number of reports with that particular drug and that particular MedDRA term or terms.

BY MR. PREMO-HOPKINS:

Q.    So in -- in terms of the computation of the numerator, that's a -- that reflects the particular set of drugs, the particular set of MedDRA terms as of a particular time period?

A.    Sure.

Q.    Okay.  And the denominator for your analysis also would be as of that same particular time period, yes?

A.    Is that a different question, or is that the --

Q.    The denominator.  I'm -- I'm switching to the denominator now.

A.    I beg your pardon.  I beg your pardon.  I beg your pardon.  I missed it.

Yeah, the denom- -- similarly the denominator depends on obviously the cut -- you know, where your -- your cutoff is for the analysis.

Q.    And the denominator in a disproportionality analysis would use the same MedDRA terms, yes?

A.    Sorry, just a second.  I hope I answered your earlier questions correctly, I didn't get confused about numerator and denominator.

Q.    No, the -- the only confusion arose when -- once I flipped.  So I understand your --

A.    Okay.

Q.    Let me make sure the record is very clear for you.

With regard to the numerator, the top of the fraction, in your disproportionality analysis, the -- that -- that number would be a reflection of the particular drugs being analyzed, one; the MedDRA search terms that were selected, two; and the time

period at which the analysis is done, three.  Yes?

A.    Yes.

Q.    Okay.  And the bottom -- now I'm going to move to the bottom of the fraction, the denominator.

A.    Okay.

Q.    The denominator for your disproportionality analysis would similarly include -- it would be a reflection of the same time period as the numerator, yes?

A.    Yes.

Q.    And you -- you used the same MedDRA search terms in -- in the denominator, yes?

A.    Yes.

Q.    The drugs or medications for which the MedDRA terms are pulling back reports, that's different than the denominator, yes?

A.    Sure, yes.

Q.    And in -- in your analysis for the disproportionality that you did in Exhibit 1, the denominator was a reflection of -- of all drugs other than semaglutide, liraglutide, dulaglutide, and tirzepatide?

A.    That's right.

Q.    Are there any other factors or inputs that -- that we haven't identified that would affect

the numerator or the denominator in your disproportionality analysis?

A.    So age, sex, and year of report influence the denominator.

Q.    And how do age, sex, and year of report influence the denom- -- denominator?

A.    So it's a stratified analysis.  So you -- you -- you match -- you compute the ex- -- the so-called expected value, the denominator, within each stratum defined by those three factors.

Q.    Does -- do age, sex, and year of report affect the numerator?

A.    No.

Q.    Are there any other factors that would influence the numerator or denominator that we haven't talked about?

A.    No.  Well, so yes, for the PRR -- no for the PRR.  For the IC analysis, that's a Bayesian metric, so there's a -- in essence there's a prior -- there's -- there's an adjustment that goes into that one that is -- yeah, it's a Bayesian analysis.  So it's -- it's not just a simple ratio of a -- of a -- the count over the expected value.  There's an adjustment because it's a Bayesian approach.

Q.    Can you explain that adjustment to me in

as simple terms as you can?

A.    It -- it amounts to just adding .5 to the counts, and it is -- it has the effect of kind of -- of shrinking the estimator -- the estimator towards 1. So the -- the IC, in general, will be smaller than the PRR.  It's more conservative than the PRR.  The IC05 is more conservative still.  So it's the fifth percentile of the posterior distribution.

Q.    So the -- the strat- -- the strat- -- in your report, you list a stratified IC and stratified IC05 outcome?

A.    Right.

Q.    And those are -- given the -- the Bayesian components of that analysis, those are more conservative or driven closer to 1?

A.    By design, yes.  One more than the other, right, so IC05 is -- generally speaking, you'll find it as -- as you go out from 1, you'll first hit the IC05, then you'll hit the IC, and then you'll hit the PRR if that -- that makes sense.

Q.    Understood.  And the IC05 reflects the -- on the distribution curve, the right-hand 5 percent?

A.    Left-hand.

Q.    I'm sorry, thank you.  Left-hand 5 percent?

Case 2:24-md-03094-KSM   Document 691-32   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26   Page 52 of 135

A.     Yeah.  You've got my picture --

Q.     I do.

A.     -- just to make sure it's the right person.

Q.     You look great.  I assume this one may not be that long ago or, otherwise, you still look great.

Dr. Madigan, the -- so other than the -- does the Bayesian -- does the Bayesian calculation influence both the numerator and the denominator for -- for both the drugs of interest and the comparator?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.     I'd actually have to check my -- I don't have the formulas in my head.  I think it might be the numerator only, but the IC05 concerns both numerator and denominator.

BY MR. PREMO-HOPKINS:

Q.     Can I direct you to Paragraph 9 of your report.

A.     Okay.

Q.     In Paragraph 9, you note that reports in the FAERS database are "classified according to standardized AE" -- that's adverse event?

A.     Yes.

Q.    -- "coding dictionaries such as MedDRA," right?

A.    Yes.

Q.    And then if you glance at Paragraph 15, you note that there are over 26,000 distinct preferred terms in the MedDRA adverse event coding system, right?

A.    Yeah.  I think it's even bigger now actually.  It is more like 28,000, but, yes, they're of that order.

Q.    And in -- this -- this may seem overly simple, but the -- the graphs that you identified, when you talk about them being influenced by the MedDRA terms, that means they're impacted by the selection of the three MedDRA terms that you used and they could be different if you were to put different MedDRA terms into those calculations, yes?

A.    Sure.

Q.    And with regard to the -- what -- what you've identified as the MedDRA terms of interest, is it important to you in your opinions that the MedDRA terms accurately reflect the -- an outcome that is relevant to the litigation?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    I assume that's the case, but I'm -- I'm doing the analysis that Dr. Metz asked for.

BY MR. PREMO-HOPKINS:

Q.    I see.

A.    So it's his -- yeah, ask him that question.

Q.    So you didn't have any -- you didn't have any role or expertise in selecting the MedDRA terms that went into the analysis, true?

A.    I did not.

Q.    What is the concept of stimulated or publicity-triggered bias in FAERS data?

A.    So I have a paragraph about it in my report.

Q.    It's 29.

A.    Yeah.  So it's -- it's this theory, if you will, or I don't know what you want to call it, notion, that something in the world, like a news story, for example, might stimulate people to go out and start submitting reports to FAERS.

Q.    Have you yourself done any study of the -- a published study, that examines the stimulated or publicity-triggered bias in FAERS?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    I have not.  But, you know, I'm -- as you can see, I'm referencing two peer-reviewed papers in -- in Paragraph 29.

BY MR. PREMO-HOPKINS:

Q.    Did you give any consideration to the type or volume of marketing that was done around these drugs and whether that may or may not influence the reporting patterns in FAERS?

A.    I think you asked did I do anything.  No, I did not.

Q.    If we go back to your -- your report, just to orient us, I'm on Page 12.

A.    Okay.

Q.    And while you -- you looked at three different MedDRA terms, you didn't report and you didn't include in your report the outcomes for those -- all of those terms individually, right?

A.    I just did what Dr. Metz asked.  So one of them, the vomiting projectile is individual, and then the others are in combos, so to speak, combinations.

Q.    So you -- you didn't do any analysis for the preferred term "gastroparesis" on its own, right?

A.    I did not.

Q.    And you didn't do an analysis for the term "impaired gastric emptying" on its own, right?

A.    Correct, I did not.

Q.    Do you know one way or the other whether gastroparesis or impaired gastric emptying are referenced in the -- the labels or product monographs for these drugs?

A.    I don't know.

Q.    You used a different set of preferred terms for your clinical trial report, yes?

A.    For the Novo trials, yes, I was working with a different clinician.

Q.    And the different clinician was Doctor, who?

A.    Kessler.

Q.    And Dr. Kessler told you to look at a broader set of preferred terms?

A.    You know, I don't have it in my head. It's different, I know that, but I don't remember if it's broader.

Q.    Well, when -- when a different doctor in the same case asked you to look at a different set of preferred terms for an analysis of adverse events, did you think, Hey, maybe I should -- maybe I should be consistent in that regard?

MR. KELLY:  Objection to the form.

You can answer if you understood.

Case 2:24-md-03094-KSM    Document 691-32    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 57 of 135

BY THE WITNESS:

A.    Different, no, different contexts.  You know, I'm -- I'm not the -- the expert on choosing these terms.  I assume they have their reasons, clinical reasons.  I -- I didn't ask.

BY MR. PREMO-HOPKINS:

Q.    You didn't ask about the clinical reasons for why one doctor told you to conduct an analysis using three preferred terms and another doctor asked you to conduct an analysis using a different set of preferred terms?

A.    Correct, I did not.

Q.    Can I direct your attention, Dr. Metz, to --

A.    Dr. Madigan.

Q.    Thank you.  Thank you, Dr. Madigan.  I apologize.

-- to Paragraph 10 of your report.  It runs from Page 3 to Page 4.

A.    Okay.  I'm there.

Q.    And in this paragraph you are describing something called the drug -- a reported Drug Event Combination that you abbreviate DEC.

Do you see that?

A.    Give -- give me a second.

Q.    Yeah, take -- take your time.

A.    Okay.  Sorry, was there a -- I believe was there a question?

Q.    Yeah, I'll ask the question again.

You identify something called a Drug Event Combination, capital D, capital E, capital C, and then you abbreviate that DEC, yes?

A.    Yes.

Q.    And is a Drug Event Combination the relationship between the -- what you've described as the drug of interest that's chosen and then the MedDRA terms or events that you're looking at?

A.    I wouldn't say about the relationship.  I mean, it is -- a drug event combination is a drug and an event.

Q.    Understood.

And you write at the end of Paragraph 10, "In the appropriate clinical context, drug event combinations that stand out statistically against the background reporting experience represent a signal and warrant additional investigation," yes?

A.    Yes.

Q.    And when you say that DECs that stand out statistically against the background reporting experience represent a signal and warrant additional

investigation, does that describe the -- what -- the conclusions that you reached here, that you -- you've identified a signal?

MR. KELLY: Objection to the form.

BY THE WITNESS:

A. Well, I've done more than that. I mean, I -- I've done a statistical analysis using three different metrics over time, and I report that. And then as a separate matter, there's a generally agreed quantitative threshold for signaling in these analyses, and I comment on when and if, you know, any of these drug event combinations signaled.

BY MR. PREMO-HOPKINS:

Q. Okay. Great. I just want to make sure I understand.

The results of your analysis -- of your statistical analysis was to identify a drug event combinations that met certain thresholds against the background reporting experience and, therefore, represent a signal at certain times, yes?

A. In part. So I also --

Q. For -- for Exhibit 1 report?

A. No. No, no, no. I -- two -- two separate things.

Q. Okay.

A.    So one is a statistical analysis, so looking at these measures of association over time and what do they look like, what are they, quantitatively. That's one part.

And then in my mind as a distinct part is having done that, do any of these rise to the level of a signal, and the answer, you know, is yes, at various times.

Q.    And so in your -- in the language we're looking at in your report here, the threshold that you've described is what you used to identify whether or not a drug event combination stood out statistically against the background sufficiently to call out a signal, yes?

A.    Sure.

Q.    And you indicate in here that when drug event combinations stand out statistically against the background and, therefore, represent a signal, that -- that they warrant additional investigation, yes?

A.    Sure.  You know, as a general matter in the practice of pharmacovigilance, when you've identified -- when you identify a signal, you know, you should do something about it.

Q.    Whether and to what extent there was any additional investigation or whether the investigation

was appropriate for the signals you identify in Exhibit 1, you don't address that?

A.   I do not.

Q.   If -- if we turn to Paragraph 13 of your expert report on Page 5 of Exhibit 1, you can take a second and read -- why don't you read Paragraph 13 to yourself.

A.   Okay.

Q.   You agree with me, don't you, that safety signals represent concerns that require further investigation?

A.   Sure.

Q.   And the -- at the bottom of Paragraph 13, you note that, "drug manufacturers who find safety signals suggesting potential safety risks of their products are encouraged to investigate the signals, perform risk/benefit analyses of the product, and communicate the potential concern through a labeling change."

Do you see that?

A.   I do.

Q.   And in that sentence you're describing what you understand the FDA to recommend, yes?

A.   It's basically -- it's not a direct quote, but it's the gist of what's in the guidance, FDA

guidances, actually, plural.

Q.    And -- and you haven't done any analyses or reached any opinions with regard to whether either Lilly or Novo did or didn't do anything you describe here in Paragraph 13, correct?

A.    Correct, just not something I've looked at.

Q.    The -- in terms of the preferred terms that -- that were provided to you for this analysis, do you know whether or to what extent the outcomes included there are heterogeneous at all?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Sorry, I'm not following the question.

BY MR. PREMO-HOPKINS:

Q.    Is -- is heterogeneity, is that a topic that you're familiar with at all in statistical analyses?

A.    Sure, but it depends -- it depends on the context what it means.  It means different things in different contexts.

Q.    With regard to an analysis, a statistical analysis of potential adverse event outcomes, does the potential heterogeneity of the outcomes being examined, is that important or relevant at all?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    The heterogeneity of the outcomes.  Sorry, I'm struggling.  I just don't understand.  I'm -- I'm examining three different outcomes.  They are what they are.

BY MR. PREMO-HOPKINS:

Q.    If you -- if you were examining brain cancer and toe fungus and belly button lint, right, those are three things that may or may not be clinically related to each other at all, right?

A.    Okay.

Q.    Does the -- does the magnitude or type of difference between the outcomes you're looking at matter to your analysis?

MR. KELLY:  Object to the form.

BY THE WITNESS:

A.    I'm sure it matters more to Dr. Metz than to me.  I mean, he -- I'm -- I'm -- he gave me three things that captured presumably the clinical concepts that he's interested in, and, you know, whether it's the same or different is -- is really a Dr. Metz question.

BY MR. PREMO-HOPKINS:

Q.    Understood.

A.    They are different, we know they're different, but you know what I mean.  The meaning of those -- those choices, that really is a Dr. Metz question.

Q.    The -- maybe I can ask you a better question.

If you turn back to page -- Paragraph 10 of your report.

A.    Okay.

Q.    You say, "In the appropriate clinical context," the last sentence of Paragraph 10, "drug event combinations that stand out..."

I want to focus you on the "appropriate clinical context" language.  What does that mean?  What does the -- why does the appropriate clinical context or how -- what does that mean?

A.    To take your example, what I assume that belly button lint, you know, would not warrant additional investigation.  I don't know, maybe it would.  What do I know.  But the clinical context, you know, the interpretation of the results will depend on the clinical context.  That's for Dr. Metz.

Q.    So maybe I can ask -- I'm asking a more simple question.  What is clinical context?

A.    It's the -- the reason for doing the

analysis, the context in which the analysis is done, you know, what -- what exactly is the clinical outcome that is of interest here that you're -- you're analyzing in these data.  And that's, you know, that comes from Dr. Metz.

Q.    "Clinical" means, what, medical -- of medical expertise or medical derivation?

A.    Sure -- sure, that's reasonable.

Q.    And you took your conversation with Dr. Metz to mean that you were looking at a drug event combination that was being looked at in the appropriate clinical context?

A.    Sure.  I mean, I'm just doing the analysis, but that's -- ask him about that.  But, I -- yeah, I assume, you know, there's a reason why he asked me to look at those particular outcomes, those particular drug event combinations.

Q.    So you assumed that the analysis you were doing of the drug event combinations was in the appropriate clinical context, to use your words?

A.    Sure, yeah.  But if you ask me any questions about it, I'll refer you to Dr. Metz.

Q.    You would agree with me that the -- that the output of any disproportionality analysis is -- if you -- if you use the wrong MedDRA terms, you're

going to get an inaccurate or unreliable result, right?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Wrong MedDRA terms, I don't know.  Again, that's really a Dr. Metz issue.  You know, if you use -- I'll -- I'll give you, if you use different MedDRA terms, you will get different outputs, that's -- that's for sure.  But right and wrong, I -- I don't know how you would -- that -- I'm not the one to opine about that.

BY MR. PREMO-HOPKINS:

Q.    Let me make sure I'm very clear.  There was a set of intended MedDRA terms that you received from Dr. Metz that were included in your analysis, yes?

A.    Sure.

Q.    And you would agree with me the use of different MedDRA terms than you intended would lead to a different result?

A.    Than I intended or that he intended?

Q.    Or that Dr. Metz intended and gave to you?

A.    True.  It's kind of tautological.  I mean, if you did a different analysis, you would get different outputs, you would get different results, of

course.

Q.    I want to make sure this is -- is clear. Based on the conversation you had with Dr. Metz, did he identify any other MedDRA terms of interest that he wanted to be included in your analysis?

A.    You asked me that before.  No.

THE WITNESS:  Can we take a break sometime?

MR. PREMO-HOPKINS:  If you're ready to take a break, we can take a break.  Why don't we take five.

THE VIDEOGRAPHER:  The time is 10:34 a.m. and we are off the record.

(WHEREUPON, a recess was had from 10:34 to 10:43 a.m.)

THE VIDEOGRAPHER:  The time is 10:43 a.m. and we are on the record.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, we just took a break.  Are you ready to begin again?

A.    Yes.

Q.    Dr. Madigan, in the -- the FAERS -- I'm going to turn your attention to the FAERS data again.

The FAERS data that you pulled down to do your analysis, did that include information about concomitant medications or medications that were being reported as taken at the same time as the medications

of interest?

A.    Yes.

Q.    And did you -- how did you account for concomitant medications in your analysis?

A.    I didn't.  I just looked to see was -- was the drug that I'm analyzing present or not.

Q.    Okay.  And so I understand, is that -- if we go back to the numerator and the denominator, there was no attempt to account for concomitant medications in the numerator or the denominator?

A.    That's right.  It's just is -- is the drug of interest on the report, yes or no.

Q.    Outside of your separate pull for metformin, did you do -- I'm going to start my question over.  Is that all right?

A.    Yep.

Q.    Your -- the group of reports that's included in the denominator for your disproportionality analysis, we mentioned this before, but that -- that's all other drugs, all non-semaglutide, liraglutide, dulaglutide, and tirzepatide drugs, yes?

A.    Sure.  It's every -- it's every other drug other than the drug that you're -- that I'm doing the analysis for.

Q.   And do you know how many or what percentage of the reports in the denominator were reported by patients who have diabetes?

A.   Your reference to the denominator is confusing me there.  In general, there's a field called "Indication" in FAERS.  It's not well populated, so there's kind of no way of knowing, generally speaking, what the drug was indicated for; numerator or denominator.

Q.   So you understand, though, that -- in terms of FDA approval, do you know what the four medications you examined are approved for in terms of indication?

A.   Not off the top of my head.  I have looked at the label, but I -- labels, but I -- I can't -- not off the top of my head.

Q.   Did the diseases for which the medications are indicated have any influence at all in the disproportionality analysis that you did?

A.   No.

Q.   Outside of age and sex, was there any sort of matching or modeling adjustment that was done to account for simulators or differences between the patients in the numerator and the denominator?

A.   Simulators and differences?  Sorry.

Q.   Let me ask you a different.  Do you understand what propensity score matching is?

A.   Yes.

Q.   What is propensity score matching?

A.   So it's a -- it's a type of causal analysis where you -- you can do matching or stratification, but you try and -- you -- you find -- this isn't quite 100 percent correct, but let me-- let me explain it this way.

You find a patient who was treated and you find a patient who is not treated, and you're going to compare the treated and the not treated.  You try and match together patients who have the same probability of being treated.

Q.   Was there any -- treated for what?

A.   Treated, you know, the -- the healthcare intervention of interest that you're analyze -- that you're -- you're analyzing.

Q.   Was there any healthcare intervention of interest other than the prescription of semaglutide, liraglutide, tirzepatide, or dulaglutide that you were examining?

A.   No.  I guess you should put metformin on that list, but, yep, no, that's -- that's -- that is the intervention.

Q. Did you do any sort of calculation that would identify how much of what you describe as the signal is explained by the disparity and rate of underlying disease, like diabetes or obesity?

MR. KELLY: Objection to the form.

BY THE WITNESS:

A. Sorry, that was a complicated question. Can you repeat it or just --

BY MR. PREMO-HOPKINS:

Q. That's fine.

The -- the -- maybe I can ask a simpler question. The disproportion- -- disproportionality analyses that you did that resulted in this -- the signal results and graphs in your report --

A. Right.

Q. -- was there any part of that calculation that attempted to quantify how much of the signal is a result of underlying disease state?

A. How much of the signal. I mean, the signal doesn't have a how much of. It's binary. Either there is a signal or there isn't a signal. But the answer -- I'm sure the answer -- the basic answer is no, but I -- I don't know that it's a well-posed question.

Q. Well, you understand that, for exam- -- do

you know one way or the other whether or not gastroparesis, impaired gastric emptying or projectile vomiting are associated with the underlying disease states that GLP-1 medications are used to treat?

A.    I do not.

Q.    And so because you don't know that, there was no attempt to correct for or take into account the extent to which the observed difference in reporting that you identified would have been caused by an underlying disease state as opposed to a drug, correct?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    I guess -- I -- I do know that -- that, like, these -- these drugs are not indicated for any one of those three items.  I know that.  I think that's the question.  Is that the way you phrased it a minute ago?

BY MR. PREMO-HOPKINS:

Q.    No, no, no.  You understand that -- do you know what confounding by indication is?

A.    Sure.

Q.    What is confounding by indication?

A.    So there's a common cause for both taking the drug and experiencing the outcome.

Q.    Was there any adjustment or assessment as to how much confounding by indication may have influenced the signal that you identified?

A.    Not in these analyses.  I -- I only adjusted for age, sex, and year of report.

Q.    Okay.  Do you agree that disproportionality analyses are generally hypothesis generating?

A.    No.

Q.    Do you agree that there are limits on the conclusions that can be drawn from disproportionality analyses as it relates to causation?

A.    Sure.

Q.    What are those limits?

A.    You can't -- just -- just from an analysis like the one I have in Exhibit 1, you cannot draw any causal conclusions.

Q.    Do you agree that a safety signal alone doesn't equate to a safety risk?

A.    It's indicative of a risk.  And there --

Q.    It's indicative of a potential risk, yes?

A.    No, it's indicative of a risk.

Q.    Okay.

A.    You know, that's why you do these analyses.

Q.    Did you do any analysis after identifying the signal to understand whether or to what extent there was an actual safety risk?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    The analysis I did are what's in Exhibit 1.  So that's it.  That's what I did.

BY MR. PREMO-HOPKINS:

Q.    Okay.  All right.  You cite a couple of different FDA guidances for industry in your report, yes?

A.    Yes.

Q.    And one is dated March 2005, I believe?

A.    That sounds right.

Q.    And then another one that you cite is -- I think it's a pharmacovigilance planning guidance from around the same time?

A.    Yep.

Q.    Do you agree that those are reliable sources in terms of evaluating the type of disproportionality analysis that you did?

A.    I mean, I'm not going to give them a blanket approval.  There's -- there's a lot of good stuff in there.  There's -- there are also contradict -- self-contradictory in places, so.  But

in general, they're solid.

Q.    They're solid enough for you to rely on them for the propositions you relied on them for in your report, yes?

A.    Sure.  They're -- they're important documents.  I mean, they are the Agency's guidance, you know, official guidance for industry.

Q.    You mention specifically in your report that you weren't engaged in data mining in this -- in the project that you undertook, is that right?

A.    That's right.

MR. PREMO-HOPKINS:  And for the record, I'm handing the court reporter a copy of Exhibit 1 that I dropped on the floor.

BY MR. PREMO-HOPKINS:

Q.    So how does data mining differ from what you did here?

A.    So it's a bit of an anachronism, like as in, you know, ten years ago people used to characterize -- people used to characterize the kind of analysis I'm doing here as -- as data mining.  I haven't heard that comment in a long time.

But back in the day, people referred to data mining as kind of -- essentially a fishing expedition.  You know, you go looking, let's take a

look in the database and see what we can find, you know, no -- no particular drug in mind or outcome in mind.  That is absolutely not what I'm doing here.  So -- so just -- just to be clear, I put that comment in my report, which is, you know, this is a data analysis.  This is a statistical analysis.

Q.    Understood.

Can I direct your attention to Paragraph 5 --

A.    Okay.

Q.    -- of your report.  In Paragraph 5 you note that, "The approach I have taken to this work would have been the same had a defendant hired me to carry out these analyses."

Do you see that?

A.    Um-hum, yes.

Q.    And you would agree with me that in order for your -- your method to be reliable, it would need to be the same, whether you were asked by a plaintiff to do it or a defendant to do it, yes?

A.    Yeah, that seems reasonable, I agree.

Q.    And do you -- double-sided always get me.

In the litigation context, have you ever testified on behalf of a defendant in a pharmaceutical case?

A.    Once in an -- in an IP case, but generally speaking, no, I have never been asked.

Q.    How many times have you testified on behalf of plaintiffs in pharmaceutical product liability cases?

A.    I -- I don't know.  You have -- I mean, I presume you have the list.

Q.    I have the list for the last four years that we can -- we can go through, but in -- in your career, would you agree it's more than 50 times?

A.    Are you talking about 50, like, different depositions and trial -- and trial testimony -- testimonies, or are you talking about 50 different litigations, where, like, you know, GLP-1 drugs and gastric adverse events, that's a litigation?

Q.    We can -- we can start that way.  I understand you testified a lot in talc cases, yes?

A.    Yes.

Q.    Do you have an estimate of how many different pharmaceutical product liability litigations you have been retained in by plaintiffs over the course of your career?

A.    I don't.  I can -- I can take a wild guess if you want, but I don't know.

Q.    Do you think it's more than 50?

A.    Oh, God, no.

Q.    Do you think it's more than ten?

A.    Probably.

Q.    Do you think it's more than 20?

A.    I doubt it.

Q.    So somewhere between 10 and 20 different litigations?

A.    Just so the record is clear, I don't know -- we -- this is kind of looney.  Like, I -- I should get the facts here, right.  I -- I think that's the range.  I guess you don't have it, right.  You only have the last four years.

Q.    I have the last four years, yeah.  You've been doing this a while, yes?

A.    Yes.

Q.    I can show you the last four years, and we can talk about that.

A.    And I can get the answer for you on a break, if you want.

Q.    If that's available to you, that would be helpful.  But let's start with --

A.    Okay.

Q.    -- what I'm marking as Exhibit 3.

            (WHEREUPON, a certain document was

             marked David Madigan, Ph.D.

Deposition Exhibit No. 3, for

identification, as of 04/08/2026.)

BY THE WITNESS:

    A.    Yeah.  So it's nine in the last four years.

BY MR. PREMO-HOPKINS:

    Q.    Okay.  Nine litigations in the last four years?

    A.    Yes.

    Q.    And the -- in all of those litigations, you were retained by the plaintiffs?

    A.    Correct.

    Q.    And has the amount of time that you've spent on litigation as a percentage of your work increased in the last four years?

    A.    No.

    Q.    So do you have any reason to believe that the rate of litigations that you were involved in changed in the last four years?

    A.    Changed in the last four years, no.

    Q.    This particular -- Exhibit 3 for the record is a list of Deposition and Trial Testimony - Last Four Years of Dr. Madigan dated December 29th, 2025; is that right, Dr. Madigan?

    A.    Yes.

Q.    And does this accurately reflect, as far as you know, that information as of that date?

A.    As of that date, yes.

Q.    Since December 29th of 2025, have you been retained in any other pharmaceutical product liability litigations?

A.    No.

Q.    Since December 29th of 2025, have you testified at deposition or trial in any additional cases?

A.    Talc.  I've done some talc.  I did a talc trial last week and I've had, I don't know, two or three depositions, talc depositions.

Q.    Other than the two or three talc depositions and the talc trial, any other deposition or trial testimony since December 29th of 2025?

A.    I don't think so.

Q.    How long have you been providing consulting services for -- statistical consulting services for litigation?

A.    Since 2006, I think.

Q.    From 2006 to 2020 -- I'm sorry.

The information I have on Exhibit 3 dates back to 2021.  Prior to 2021 for the 15 years between 2006 and 2021, do you have an estimate of how many

litigations you have been involved in for plaintiffs in the pharmaceutical product space?

A.    Isn't that the same question you asked me a few minutes ago and we agreed it's less than 100 --

Q.    Oh --

A.    -- more than ten --

Q.    -- okay.

A.    -- right?

Q.    No, no, I don't --

A.    Or no?  Not quite.  So you asked over all time.  Now you're asking prior to this four-year period?

Q.    So this four-year period includes nine different litigations and a number of different instances of testimony, yes?

A.    Sure.

Q.    And you've told me that your -- your rate of being involved in pharmaceutical product litigation on behalf of plaintiffs hasn't changed in the last four years.

Did -- between 2006 and 2021, were you doing work on behalf of plaintiffs in these types of cases at the same rate you are now?

A.    Again, it's kind of -- it's speculation about something that is just a matter of fact.  We

Case 2:24-md-03094-KSM   Document 691-32   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26   Page 82 of 135

can -- we can get the facts.  The talc litigation is very unusual for me.  There has never before been something where I've been deposed so many times.

But in terms of -- of different matters prior to 2021, I would be really surprised if it's more than ten more in that period.  Like I say, you know, I can -- I can -- this is -- we're arguing about something that is a simple matter of fact that we can ascertain.

Q.    Okay.  So on a break you'd be able to ascertain the number of litigations prior to 2021 in which you've been retained by the plaintiffs' --

A.    Yes.

Q.    -- counsel?

A.    Yes.

Q.    Okay.  The FAERS data -- let me ask you, Dr. Madigan, do you do work on your own, or do you have any associates or colleagues do work with you?

A.    In the work I did preparing for the report in Exhibit 1, it's purely myself.

Q.    Okay.  Dr. Metz, can I draw your attention to the --

A.    Madigan.

Q.    Dr. Madigan, thank you again.  Sorry, I've been at a lot of depositions in the last week.

Dr. Madigan, the -- if I can draw your attention to your report, it's Exhibit 1, and particularly the images or the -- the pictures of the graphical representation that you have.

A.    Yes.

Q.    So if we take a look at the -- the images, and I'm going to focus on the PRR image initially.

A.    Okay.

Q.    The -- did you do any investigation as -- as to why the PRR calculation for dulaglutide -- just for the record, that's the green line, is that right?

A.    Yes.

Q.    Did you do any investigation as to why that result spiked so high in the 2014, 2015 time period and then came back down?

A.    Not really.  I mean, it's a -- it is -- it was just a large bolus of reports in a particular quarter.  You have the numbers.  We can look at it.

Q.    Do you know -- do you know why that was the case based on your analysis?

A.    No, I don't know why.  I mean, it just is what it is.

Q.    You know that dulaglutide based on -- in terms of what you've provided, dulaglutide was approved in the Quarter 3 of 2014, yes?

A.    If you say so.  Yes.

Q.    Does the approval of dulaglutide in Quarter 3 of 2014 have anything to do with the spike that we see in the 2014, 2015 timeframe in the dulaglutide results?

A.    I don't know.

Q.    Of the three different outcomes that you've produced in Exhibit 1 for the different groupings of preferred terms, is there any one that you think is more or less accurate than the other?

A.    No.

MR. KELLY:  Objection to the form.

THE WITNESS:  Sorry.

MR. KELLY:  Sorry.

BY THE WITNESS:

A.    No.

BY MR. PREMO-HOPKINS:

Q.    Do you know the extent to which -- if we look at Figure 1 and that's the results from -- for gastroparesis and impaired gastric emptying, do you know whether or to what extent there is any overlap in the lower level terms that are included under the preferred terms for gastroparesis or impaired gastric emptying?

A.    I don't know.  I don't know, but actually,

just as a point of clarification, if that's the case, you know, if a report were to hit on, say, both gastroparesis and impaired gastric emptying, it counts -- it gets counted once in that analysis.

Q.   Understood.  Do you know how -- what the logic would be for if something were reported as an event of gastroparesis and impaired gastric emptying, which would be chosen, do you know?

A.   Neither.  It's counted as -- for this it's combined, so it just counts as one in the numerator.

Q.   Do you --

A.   Am I -- am I being clear?  So let's imagine there's a report that has both gastroparesis and impaired gastric emptying as MedDRA terms listed and potentially others --

Q.   Sure.

A.   -- that adds one to the numerator in the analysis in Figure 1.

Q.   Understood.  What if there are two reports, one that has gastroparesis and related lower level terms and then one that has impaired gastric emptying and -- and related lower level terms, would that count as two?

A.   Two different reports?

Q.   Yes.

A.    One with gastroparesis, one with impaired gastric emptying, sure, it counts as two.

Q.    Okay.  Are -- are there any reporting biases that you would agree can influence the number of reports seen in the FAERS database -- I'll start there.

Are you aware of any reporting biases that -- that might influence the number of reports seen for a drug and an outcome in the FAERS database?

A.    I discuss this at length in my report.  So that primary concern is underreporting.  So as a general matter, underreporting -- not all adverse events that happen in the world get reported to the FDA.  So that's -- that's an issue.

Q.    Other than underreporting, are you aware of any other reporting biases that might influence the number of reports seen for a drug and an outcome in the FAERS database?

A.    Sure.  I mean, so I discuss them -- I discuss this at length in my report, so there are, say, the primary one is underreporting, another concern we already talked about is, you know, the potential for stimulated reporting, although the evidence suggests that is perhaps less common than -- than some people have suggested.

What else would I highlight.  And it's a re- -- you know, it's a report, so you -- you -- you know, you can't be certain that what is in the report is actually what happened.

Q.    Well, what is -- the fact that you can't be certain that what is in the report is what actually happened, what's the significance of that?

A.    So this is not the same as, you know, say, the context of a randomized clinical trial where, you know, if an adverse event is reported, you know, by a patient during the context of a -- of a trial.  You know, there -- there's extensive follow-up and documentation and -- and cleaning of the data.

In the context of FAERS, that does happen, particularly if the report goes -- if the report goes to a pharmaceutical company, which most of them do, you know, the pharmaceutical company in general, you know, they employ hundreds of people to check these reports, they will attempt to document it, and they will reach out to the physician and so on and so forth.  But it's not the same level of scrutiny that -- you know, that you have in the context of a -- of a clinical trial.

Q.    The relative lack of follow-up and documentation in -- in the FAERS data, how, if at all,

does that impact what conclusions you can draw from the FAERS data?

A.    So it's one of the reasons why, you know, as a general matter you wouldn't draw causal conclusions from an analysis like mine in Exhibit -- in Exhibit 1, whereas in a randomized trial all things being equal, you might draw a causal conclusion. Here -- here you wouldn't.  But, you know, it's not -- it's not the same -- it's not the same.

Q.    Understood.  Are you familiar at all with the concept of a safety signal being confirmed or refuted based on the -- the types of analysis that are done in the FDA guidance documents that you've described?

A.    Sure.  I mean, it's common enough for a signal to rise and then -- and then there follows further studies and investigation, and sometimes it is confirmed and sometimes it's not.

Q.    And the work that you did that led to Exhibit 1, that didn't include any assessment of the extent to which the signals you identified were confirmed or refuted, true?

A.    That is true.  Didn't I answer that already?  I mean, so there's, you know -- I'm just doing an analysis of FAERS here, full stop.

Case 2:24-md-03094-KSM    Document 691-32    Filed 05/19/26    Page 89 of 135

Q.    Understood.

Have you heard of something called the Weber effect?

A.    I discuss it in my report on Paragraph 28.

Q.    What is the Weber effect?

A.    So it's this notion that when a drug is first on the market that there might be an in- -- you know, a higher rate of re- -- of adverse event reporting.  It -- it -- all intents and purposes it has been debunked.  It doesn't -- it doesn't -- it's not a real thing.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, I'm going to hand you what I'm marking as Exhibit 4.  For the record, Exhibit 4 is an article published January 26th of 2024 by Cutroneo and colleagues called "Conducting and interpreting disproportionality analyses derived from spontaneous reporting systems."

(WHEREUPON, a certain document was marked David Madigan, Ph.D. Deposition Exhibit No. 4, for identification, as of 04/08/2026.)

BY THE WITNESS:

A.    Okay.

BY MR. PREMO-HOPKINS:

Q. Dr. Madigan, are you familiar at all with this publication by Cutroneo and colleagues?

A. No.

Q. Okay. If you take a look at -- there's a lot of content in the article. If you need to review any of it to answer any of my questions, let me know.

A. Okay.

Q. There is -- in this article, there is a table, Table 1 on Page 7, that is entitled "Major biases and disproportionality analyses and strategies for their minimization."

Do you -- do you see that table?

A. Yep.

Q. So I want to make sure we -- to the extent we can, that we've addressed or talked about these. We've talked about data quality bias in the FAERS data, yes?

A. We did.

Q. And the notoriety bias appears to be similar to what you describe as stimulation reporting or stimulated biases?

A. Well, they say that. They say it's a form of stimulated reporting.

Q. Do you -- there's a definition on here that talks about "A dilution effect for older drugs

(when a drug class is influenced by media attention) is possible."

Do you see that?

A.    I see that.

Q.    Do you know one way or the other whether or not there is a dilution effect for older drugs in the reporting of adverse events?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    I have looked at this in the past and didn't see anything, so I -- I don't know.

BY MR. PREMO-HOPKINS:

Q.    There is a bias that the authors identify as competition bias -- competition -- competition bias, sorry.  My brain is scrambled.  Competition bias.

Do you see that one?

A.    I do.

Q.    Are you familiar with what they've described as competition bias?

A.    I -- I've seen people talk about this, yep.  I'm not sure if it's real.

Q.    What do you understand competition bias to mean?

A.    So if a -- if an adverse event is known,

that somehow it is more -- known sort of out there in the public that it is somehow more likely to be reported.  I -- I have no idea if that's true or not.

Q.    And when you say an adverse event being known, do you mean being known in some way by physicians or the public to be associated with a particular drug or type of drugs?

A.    Sure.

Q.    Okay.  And -- and you don't know one way or the other whether or not this competition bias is something that would influence a disproportionality analysis?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    It's not something I've looked at.  I -- I just don't know.

BY MR. PREMO-HOPKINS:

Q.    Okay.  And there's something called "Co-Prescription Bias."

Do you see that?

A.    Yep.

Q.    And is that something you're familiar with?

A.    Yep.

Q.    And what is co-prescription bias?

A.    So this is the notion that -- I've written papers about this.  This is the notion that, you know, on a report, on a FAERS report, let's say there are two drugs listed, A and B, and let's say you're doing an analysis of drug A, but it really could be caused -- the problem could be drug B, is the short version of the story.

Q.    Co-prescription bias relates to the -- the risk that a concomitant medication could be causing the effect that's observed?

A.    That's right.

Q.    And do you think that co-prescription bias is something that is real and can influence a disproportionality analysis?

A.    Yeah, it could be, if a -- if a drug -- if a drug is very commonly co-prescribed with another drug, then it's a concern.  I'm -- it can be a concern.  I -- it's not something I've looked at in this context.

Q.    There is -- the -- the next type of bias listed in the table here is confounding by indication.

We talked about that, yes?

A.    Yes, we did.

Q.    And then there's -- the last entry or row in the table is Channeling Bias.  Is that something

you've heard of?

A.    Yep.

Q.    And what is channeling bias?

A.    It is just a -- it's a general concern in observational studies that you worry that -- that people with certain predispositions or -- or medical complications are being channeled towards the drug, thereby kind of driving up the -- the adverse event rate.  That is a general concern in observational studies, which is -- you know, that's what I'm doing here, is an observational study.

Q.    It -- one of the things that it notes here -- and channeling bias may be more -- more general than this, but one of the things identified in the definition in the -- in this paper is, differential prescription of drugs in relation to disease severity with newer drugs usually prescribed to patients with more severe disease.

Do you see that?  That's --

A.    I do see that, yeah.

Q.    Is that one form of channeling bias that you're aware of?

A.    It -- it's --

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Well, aware of, I mean, sure.  Could that potentially happen, could it, I suppose it could, yeah.  I don't know.

BY MR. PREMO-HOPKINS:

Q.    In your disproportionality analysis, was there anything done to assess or account for the potential for differential prescription of the drugs you looked at in relation to disease severity?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    There's no way of doing that in FAERS.  It can't be done.  The only -- the only kind of surrogate is age.  You know, as a general matter age, is a risk factor for just about everything, and I do adjust for age.  But other than that, there's -- there's -- you can't -- you can't address this concern in FAERS -- in a FAERS analysis.  Yeah, don't get old.  Getting old is bad.

BY MR. PREMO-HOPKINS:

Q.    If only I could avoid it.

Do you see that in the -- on Page 6 of Exhibit 4, there's a Section 6 of the paper called "Possible interpretation of a disproportionality signal"?

A.    I see that.

Q.    The first two sentences say, "A number of common pitfalls can be identified in presenting study results from disproportionality analyses.  Due to inherent limitations, causality, risk ranking, incidence, prevalence, and reporting rate cannot be calculated or claimed (with the exception of vaccines if the background rates are known or in case of sufficient drug utilization data)."

Do you see that?

A.    I see that.

Q.    And do you agree that due to inherent limitations and disproportionality analyses, causality, risk ranking, incidence, prevalence, and reporting rate cannot be calculated or claimed as a result of a disproportionality analysis?

A.    So let's take them one by one.  So I agree --

Q.    Let's -- let's start.  You agree that causality cannot be claimed as a result of a disproportionality analysis?

A.    Generally speaking, yes.

Q.    And you agree that risk ranking cannot be claimed as a result of disproportionality analysis?

A.    No.  It's a -- you know, it has its limitations, but it's a type of risk ranking --

Q.    Okay.

A.    -- that you get by looking at these metrics.

Q.    Incidence of a particular adverse event, can that be claimed based on a disproportionality analysis?

A.    Generally speaking, no, because you need to know how many people are consuming the drug, and you need to -- to know how many people experience the adverse event in the world.

Q.    Prevalence, is that something that can be -- can be claimed based on a disproportionality analysis?

A.    No, same thing.  The -- incidence and prevalence go hand in hand there.

Q.    Reporting rate, can that be calculated or claimed based on a disproportionality analysis?

A.    Sure, I mean, that's what it is.  It's the -- the numerator is a report -- you know, divided by the denominator is a reporting rate of a kind.  But if you want to know what the reporting rate is per hundred-thousand uses of the drug, you can't do that from FAERS.

Q.    You can do that with -- if you incorporated sales data into your analysis, yes?  And

not you specifically, but one, one could?

MR. KELLY: Objection to the form.

BY THE WITNESS:

A. That's the denominator. You also need a numerator. So, like, you know, if you use FAERS numbers as your numerator and sales data as your denominator, it's a bit of apples and oranges. You can do it. I've seen that people do do it, but -- but really, you know, in the, you know, general sense of the word, when people talk about an incidence rate, it really should be like the number of adverse events that occurred in the world on the drug, divided by the number of people taking the drug. And you can't do that with FAERS.

BY MR. PREMO-HOPKINS:

Q. So if you are going to do a real disproportionality analysis you would want to understand the -- to understand the incidence rate, you would want to know the number of adverse events that occurred in the world compared to the number of people taking the drug in the world?

A. No --

MR. KELLY: Objection to the form.

THE WITNESS: Sorry.

BY THE WITNESS:

A.    No.   If you wanted to do a real disproportionality analysis, you do what I did.  It is a very real, very, very real disproportionality analysis.  If you want to know what the incidence rate is of a particular -- you know, of gastroparesis with, you know, liraglutide, you know, you -- you need to know how many people are taking liraglutide and of those people how many of them experienced gastroparesis, and that -- that is not my analysis.

BY MR. PREMO-HOPKINS:

Q.    The -- in the right-hand side of -- of the right column of Page 6, there's a discussion of in- -- information bias as one of the reporting biases?

A.    Sorry, sorry, direct me here.

Q.    Sorry.  I'm in the second new paragraph --

A.    Yep.

Q.    -- it says, "Several reporting biases have been described" --

A.    Yep.

Q.    -- "including temporal, information, selection and competition biases."  And then it goes on to -- to describe those in more detail.

Do you see that language?

A.    I do.

Q.    The -- one of the unique features of the

FAERS database that should be carefully considered is that there's unrestricted access to the FAERS database through different public dashboards, right?

A.    Yeah, they're -- they're saying that it's one of the unique features of FAERS.

Q.    And the public access dashboards creates a -- a need to at least consider the potential for duplicate reports, right?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    That's a non sequitur.  What's that got to do with the dashboard?  So duplicates are a concern in FAERS.  What's that got to do with dashboards?

BY MR. PREMO-HOPKINS:

Q.    Are they -- are they more of a concern where anyone in the public can access and report as opposed to a more limited form of reporting?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    I cannot understand -- I don't understand the question.  So FAERS -- there's a concern about duplicates in FAERS.  The FDA makes efforts to de-duplicate.  They make that data available.  That's what I analyze.  I download the data in its entirety. They also make it available via an interface, if you

will. You know, the -- the concern has nothing to do with how you view the data or use the data. The concern is the concern.

BY MR. PREMO-HOPKINS:

Q. Maybe I'm -- we're hung up on the word "dashboard."

The fact that anyone at any time can make a report into FAERS leads to some concern over the potential duplicate -- duplication of reports, yes?

MR. KELLY: Objection to the form.

BY THE WITNESS:

A. Okay. That's a completely different question, right. So, yeah, sure, to, you know -- you know, you -- you could experience an adverse event and report it to the FDA, and your physician -- you go to your physician and maybe your physician reports the same thing. That's a concern.

BY MR. PREMO-HOPKINS:

Q. What methods does the FDA use to -- what did you say?

A. De-duplicate.

Q. -- to de-duplicate?

A. I don't actually know. I've seen it, but it's been some years since I've -- I've looked at that. They make some efforts.

Q.    Do you know -- do you know what methods they use?

A.    I just answered that question.  It has been some years since I've looked at it.  I need to refresh my memory.

Q.    Do you know how accurate their methods are at elimination duplication?

A.    Not sitting here this minute.  I don't -- I can't give you numbers, like in terms of the accuracy.

Q.    Dr. Madigan, can I -- I'm going to focus your attention away from the paper for a moment and go back to the concept of incidence rate.

With regard to incidence rate, based on the analysis that you did in Exhibit 1, you can't know if gastroparesis, for example, or any other preferred term you analyzed was occurring at a higher rate than would be present in folks with diabetes, right?

A.    Is occurring at a higher rate than folks who have diabetes who are not taking that drug?

Q.    Correct.

A.    Yes and no.  So the analysis in FAERS provides some window into that question, that exact question, but you don't know the number of people taking the drug, so most people would not call that an

incident rate, which is I think the term you used.  So it's not irrelevant to the question, but it isn't an incidence, you know -- it's not an incident rate or -- or an incident rate ratio.

Q.    You can't reach a conclusion based on the disproportionality analysis that you did that the rates of the specific preferred terms are occurring more often in patients prescribed the drug as compared to patients who have diabetes that aren't taking the drug, true?

A.    Yeah, that's true.  It's -- it's a surrogate for that, what you're getting at.  It's what's happening in the FAERS database, is what you're getting at.

Q.    You can set aside the exhibit.

A.    Okay.  Can I keep it?

Q.    I may have an extra copy for you, but she needs to keep the exhibit.

A.    Okay.

Q.    Dr. Madigan, I need to ask you a few questions about what you did and didn't do, in part because there's still some uncertainty on my end around the materials considered list.

A.    Okay.

Q.    So I just want to make sure we're -- we're

clear.

You -- you aren't presenting yourself here in this case as an expert in the observational literature, epidemiological literature, is that right?

A.    No, I am.

Q.    Did you review any of the observational epidemiological studies in healthcare databases, set aside the FAERS data, but that are out there in the world that exist to support your opinions?

A.    No, I did not.

Q.    Okay.  With regard to Lilly, are you relying on any clinical trial data to support your opinions in this case?

A.    No.

Q.    Did you review any -- I think this is answered by the clinical trial data, but let me make sure.

As part of your work in this case, you didn't review any gastric emptying studies that had been done by Lilly, any examination in patients?

A.    I did not.

Q.    Okay.  In your analysis, you didn't make any attempt to -- to stratify the results by indication, true?

MR. KELLY:  Objection to the form.

BY THE WITNESS:

A.    Asked and answered.  I -- I don't have indication, reliable indication available to me in FAERS, so no, the answer is no.

Sorry, you said you were going to repeat some questions.  I get it.  I get it.

BY MR. PREMO-HOPKINS:

Q.    So as part of your analysis, I understand, Dr. Madigan, you had to use a computer code to conduct -- to evaluate the data that you got from FAERS, is that right?

A.    Sure.

Q.    And you -- I think you said you -- you wrote some Perl code for this analysis, is that right?

A.    Perl code and R code, and -- and you have it.  You have it all.

Q.    If we -- you're much more familiar with computer code than I am, so I want to make sure I ask some questions and -- and understand how the code worked for some of the analysis we see the result of in Exhibit 1.  Give me one moment.

(WHEREUPON, a certain document was marked David Madigan, Ph.D. Deposition Exhibit No. 5, for identification, as of 04/08/2026.)

BY MR. PREMO-HOPKINS:

Q.    So, Dr. Madigan, I -- I'm going to hand you as Exhibit 5 an excerpt of the -- of -- you can see the page numbers on the bottom, but it's the first 11 pages and then a couple of other pages from the computer code that I understand was used to perform the analysis.  I'll hand that to you now.

A.    Thank you.

MR. KELLY:  Counsel, this is a compilation exhibit, like you said, pages from different parts of the range?

MR. PREMO-HOPKINS:  The pages in Exhibit 5 are the first 11 of 159 pages from the script that was provided and then Pages 121, 122, and 123 out of 159.

BY MR. PREMO-HOPKINS:

Q.    So, Dr. Madigan, just for the record, does this look to be a -- at least some of the pages that were used to conduct the analysis that resulted in Exhibit 1?

A.    Yes.

Q.    And on Page 10 -- we're going to -- we'll start on Page 9, actually, because I think the -- the code carries over.  Do you see at -- at the bottom of Page 9, there's a section that begins, "Define target adverse events outcome definitions"?

A.    Yes.

Q.    And in the lines of code that follow, does that identify the target adverse events that were used as provided by Dr. Metz?

A.    Yes.

Q.    And if we take a look on Page 10, I just want to make sure we see.  We can see the three different outcomes that you analyze sort of in the top third of the page, is that right?

A.    Yes.

Q.    And --

A.    Can -- I know I'm not supposed to interject like this, but it might be helpful if I just make a little statement here.  This is not a program I wrote specifically for -- you know, I have a program that I've used for years and years and years to do these kind of analyses.  You're looking at it.

Q.    Okay.

A.    So I, you know -- if I want to do a new FAERS analysis, I take my program, I plug in the drugs and the adverse events and so on.  So there's a lot of stuff in here -- maybe you're going to go there or not, but there's a lot of stuff in here that has nothing whatsoever to do with my analysis in this case.

Q.    Understood.  The --

A.    I just -- rather than kind of slice and dice it, I just turned over the whole thing.

Q.    So we've got the code that reflects a program that -- that you have -- you typically would use to conduct a FAERS analysis?

A.    Exactly.

Q.    And in this case, you selected three target preferred terms to be the subject of that analysis based on the information provided to you by Dr. Metz?

A.    Sure.

Q.    And that includes target PT for gastroparesis, impaired gastric emptying, and vomiting projectile, yes?

A.    Yes.

Q.    And then the -- so -- so those preferred terms that are input into the program, that would be different or new for this particular analysis as compared to another?

A.    There you go, exactly.

Q.    And --

A.    And ditto the drugs.

Q.    Thank you.

The -- if we just focus on outcome 2, do I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

understand -- what's the number -- it says "target PT," and then inside of a brackets, there's a number and then it -- and then it has the -- you know, the English language word that I understand as the outcome.

So, for example, there's one line that says, "Target PT 10018045," and then it lists gastroparesis.

What does that signify?

A.    So MedDRA -- the MedDRA dictionary, for every preferred term in the dictionary, there's an English version and there's a numeric code, an eight-digit number, so the eight-digit number for gastroparesis is 10018045.  In the -- the med -- I beg your pardon -- the FAERS data that the FDA provides, it's the number that they use.

Q.    Okay.  So in terms of -- of pulling from the FAERS data the outcome of interest for this particular line, gastroparesis, you have to use the -- the number associated with the preferred term?

A.    That's right.

Q.    And the number you used for gastroparesis in the code is 10018045?

A.    Yes.

Q.    And then for impaired gastric emptying,

Case 2:24-ml-03094-KSM    Document 691-32    Filed 05/19/26    Page 110 of 135

10021518 and so forth, yes?

A.    Correct.

Q.    And then just to close out the record, for vomiting projectile, that was a preferred term with the MedDRA code 10047708?

A.    Correct.

(WHEREUPON, certain documents were marked David Madigan, Ph.D. Deposition Exhibit Nos. 6 and 7, for identification, as of 04/08/2026.)

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, I'm going to hand you what I'm marking as Exhibits 6 and 7, two entries from the MedDRA dictionary for two different codes.

Exhibit 6 is -- it was downloaded by my team on April 3rd of 2026, the version of the dictionary, it looks like it was last uploaded March 22nd of 2026.  Exhibit 6 is the entry for gastroparesis.

A.    Okay.

Q.    Exhibit 7 which I'm going to hand you is from the same date and the same dictionary, and it is the entry for the preferred name gastroptosis.

Dr. Madigan, can you just --

MR. KELLY:  Can I get a copy, Mark?

Case 2:24-md-03094-KSM     Document 691-32     Filed 05/19/26     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PREMO-HOPKINS:  Exhibit 6, Exhibit 6. Exhibit 7, Exhibit 7.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, can you just confirm for me that based on your code that you ran, what you actually investigated were the events coded as gastroptosis and not gastroparesis?

A.    No, I cannot confirm that.  This is -- this is -- I have no idea what I'm looking at.  So this is -- this is not MedDRA.  This is -- this is the National Center for Biomedical Ontology, so it's not -- it's not the mother source, the source.  That's one thing.

The second thing is I don't know if these are PTs or LOTs or what they are, so I have -- I cannot confirm.  I don't know what I'm holding in my hand.

Q.    All right. Let's take a look at what the words say.  On Exhibit 6 is the entry that was pulled from the medical dictionary for regulatory activities terminology.  That's MedDRA, right?

A.    That's what they're saying, yep.

Q.    And the number that's associated with gastroparesis is 10018043.

Do you see that?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    They say, but I don't know if this is a preferred term.  I have no idea what I'm looking at.

BY MR. PREMO-HOPKINS:

Q.    Okay.  If you take a look at the Exhibit 7, that -- that has a preferred name of -- of gastroptosis, yes?

A.    Whatever it is, yeah.

Q.    You don't know what gastroptosis is?

A.    No, no, whatever this piece of paper is. I have no idea what we're looking at here.

Q.    How would you today confirm whether or not what you put into your code was pulling events for gastroparesis or gastroptosis?

A.    I'd look at the MedDRA dictionary just to double-check.

Q.    And do you have access to that?

A.    I do.

Q.    The -- with regard to what's in Exhibit 7, it indicates, whatever it is, indicates that the number that you included in your code is associated with a label of gastroptosis, correct?

MR. KELLY:  Objection.

BY THE WITNESS:

Case 2:24-md-03094-KSM    Document 691-32    Filed 05/19/26   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I have no idea what I'm looking at.  So some -- on some piece of paper, it says gastroptosis has the number 10018045.  I -- I don't know.  I don't know what I'm looking at.

BY MR. PREMO-HOPKINS:

Q.    All right.  So how today would you know what you're looking at and be able to understand whether the adverse events that you pulled in your analysis were for gastroparesis or gastroptosis based on the number that you used?

MR. KELLY:  Objection; asked and answered, and form.

BY THE WITNESS:

A.    I'd look at the MedDRA dictionary.

BY MR. PREMO-HOPKINS:

Q.    How would you access the MedDRA dictionary?

A.    I have it on my computer.

Q.    Do you have your computer with you today?

A.    I do not.

Q.    Okay.  Is that something that's publicly available on the internet?

A.    No.

Q.    Is there a way for you to tell me today whether or not your analysis reflects adverse events

with the label preferred name "gastroparesis," or whether it reflects the preferred -- the terms -- excuse me, events associated with the term "gastroptosis"?

MR. KELLY:  Objection; form.

BY THE WITNESS:

A.    What was the preamble there?  Is there any way I can tell you sitting here this minute?

BY MR. PREMO-HOPKINS:

Q.    Can you tell me today?

A.    Sure, I can tell you when I get home.

Q.    Could you tell me, if I gave you a computer right now?

A.    No, no.

Q.    Why not?

A.    Because you can't download the MedDRA dictionary.  It's proprietary.

Q.    Did -- you used a particular MedDRA dictionary for purposes of your analysis, yes?

A.    Their MedDRA dictionary from MedDRA.

Q.    Okay.

A.    From NSSO.

Q.    And can you look at it on a screen without downloading it?  Are you able to access it real-time --

A.    No.

Q.    -- online?

A.    No.

Q.    Okay.  So what you did then was you looked at a hard copy or a PDF copy and then trans- -- translated the numbers into your code?

A.    No, no, I have --

MR. KELLY:  Objection.

THE WITNESS:  Sorry.

BY THE WITNESS:

A.    I have a copy of it on my -- on my computer.

BY MR. PREMO-HOPKINS:

Q.    Okay.

A.    But I can't access it from here.

Q.    Do you have any reason to believe that the national center for biomedical oncology is going to be inaccurately reporting the MedDRA terms?

MR. KELLY:  Objection.

BY THE WITNESS:

A.    I have no idea what we're looking at, if it's a preferred term or a lower level term, it could be.  But I -- I would be happy to double-check.

BY MR. PREMO-HOPKINS:

Q.    Is there any way without your personal

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

computer that you can double-check today?

A.    No.

Q.    Does looking at Exhibit 6 and 7 give you any concern that there might be a typo in your code?

A.    Sure, yeah, I'll check.  I'll be happy to check.

Q.    Gastroptosis, do you know what that is?

A.    I do not.

Q.    And that would -- that's not an outcome of interest that Dr. Metz told you to look at, right?

A.    It's not.

Q.    Is there any reason why you didn't report specific outcomes for the preferred terms "gastroparesis" individually or "impaired gastric emptying" individually?

MR. KELLY:  Objection; asked and answered.

BY THE WITNESS:

A.    Yeah, I told you, this is what Dr. Metz asked me to do.

MR. PREMO-HOPKINS:  So why don't we take a break.  We can go off the record.

THE VIDEOGRAPHER:  The time is 11:49 a.m. and we are off the record.

(WHEREUPON, a recess was had from 11:49 a.m. to 12:45 p.m.)

Case 3:24-md-03094-KSM    Document 691-32    Filed 05/19/26    Page 117 of 135
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

THE VIDEOGRAPHER:  The time is 12:45 p.m. and we're on the record.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, we just broke for lunch. We're ready -- are you ready to begin again?

A.    Yes, I am.

Q.    Before we took the break for lunch, Dr. Madigan, I -- we were asking some questions about your code and use of the MedDRA numerical identifier for purposes of gastroparesis.

Do you recall those questions?

A.    Yes, I do.

Q.    And on the break, were you able to determine whether or not there was an error in the code that you used?

A.    Yes.  So there was an error.

Q.    Okay.  And -- and that error was that in the calculations that you did, there was -- that led to the analysis in Exhibit 1, you included the outcomes for gastroptosis but not gastroparesis, true?

A.    Yes.  So it affects Figure 1 and Figure 3.

Q.    Okay.  And let me get -- get your report in front of me.  In Exhibit 1, if we take a look at Figure 1 and Figure 3, Figure 1 and Figure 3 would -- are the outcomes that you reported for -- Figure 1 is

gastroparesis and impaired gastric emptying combined, yes?

A.    Yes.

Q.    And Figure 3 is gastroparesis, impaired gastric emptying, and vomiting projectile combined, yes?

A.    Yes.

Q.    And that -- the -- do you know or have you done any analysis -- I know you just -- did you just discover this on the lunch break?

A.    Yes.

Q.    Have you done any analysis to understand how it might impact the outcomes of those graphs?

A.    No.

Q.    And just to be clear, it also would impact or affect the -- potentially the -- the stuff that's in the -- the items that are in the table on Page 13 for the outcome as it relates to gastroparesis and IGE and then the all three outcome, yes?

A.    Potentially, yes.

I just realized I didn't do the other thing that you asked me to over lunch.

Q.    Do you know -- what we had -- what we had discussed was the -- the -- the volume of work done in -- in product cases for plaintiffs prior to 2021.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

That's something that's knowable, yes?

A.     Yes, and if you want -- if we want to take a two-minute break, I can go do it.

Q.     Well, why don't we do that -- I'm going to get through a couple of things --

A.     Sure.

Q.     -- and then we can take -- take a break.

In the FAERS data, you mentioned before that you had -- you didn't use the -- the Indication field for purposes of your analysis, right?

A.     Correct.

Q.     Do you know, is there a certain number of events, like an N or -- that would be necessary for you to be able to reach a result in the FAERS analysis that you stand behind?

MR. KELLY:  Objection; form.

BY THE WITNESS:

A.     So that's -- is there a minimum number for some hypothetical analysis?  Like, I don't even know what such an analysis would be.  So it would depend on what that analysis would be.  I did not do an analysis involving indication.

BY MR. PREMO-HOPKINS:

Q.     And -- okay.  Got it.  So in terms of whether or not you could reach a re- -- a reliable

result, if you limited just to outcomes that identify an indication, you don't know that one way or the other?

A.    I --

MR. KELLY:  Objection; form.

THE WITNESS:  Sorry.

BY THE WITNESS:

A.    Yeah, I have no idea.

BY MR. PREMO-HOPKINS:

Q.    Okay.  And, again, just so the record is clear, the -- the code that was used that you've described, that was used for the analysis in Exhibit 1, and that would apply to Lilly and Novo, yes?

A.    Sure, yes.

Q.    And do you recall you were telling me about an article that you coauthored that's -- I think it's Footnote 34 in your report?

A.    Okay.  Yes.

Q.    That -- and that relates to first-line, second-line, third-line treatment for diabetes, yes?

A.    Right.

Q.    And in terms of -- of what was common or used back in 2016 when this was published, would you defer to the actual findings in that -- in that

Case 2:24-md-03094-KSM    Document 691-32    Filed 05/19/26    Page 121 of 135

article?

A. Sure, I would.

Q. And you don't -- sitting here today without looking at it, you don't -- you don't have any specific recollection of -- of what it says with regard to, for example, liraglutide or semaglutide or...

A. I do not. I remember what it says about metformin, which was the striking -- the finding, but I don't remember any other drugs.

Q. Dr. Madigan, I know -- I just want to make sure we're clear. With regard to -- I -- in your report, you've -- you identify that there's a manifestation of a safety signal according to the metrics that you used at various points in time, yes?

A. Sure.

Q. You aren't offering any opinions with regard to whether that should or could lead to any particular regulatory action or anything like that?

A. I am not.

Q. Okay. You said, Dr. Madigan, if we -- if I go back to Exhibit 2, that's your statement of compensation.

A. Sure.

Q. There's a reference to your Dr. Metz

conversation on -- on the 19th of December?

A.    Right.

Q.    And you -- you mentioned that other than confirming the preferred terms that he wanted you to use, you didn't recall anything specific from that conversation?

A.    And the drugs.

Q.    And the drugs.  Thank you.

The terms for adverse events and the terms to use for the drugs, that -- that's what you recall from that conversation, but you don't have a specific recollection of anything else?

A.    Whatever I said -- you know, I said earlier --

Q.    Yeah.

A.    -- like I -- you know, I think I -- I -- I do know I put it to him, you know, is -- you know, can you confirm --

Q.    Okay.

A.    -- that these are -- these are -- are what you're after.

Q.    Okay.  And is part of that conversation -- so you're relying on Dr. Metz for that, for that -- that the terms are correct?

A.    Sure, yes.

Q.    Did -- and Dr. Metz didn't tell you about that whether or not Lilly or Novo had examined the -- the same signals you looked at in the past?

MR. KELLY:  Objection; form.

BY THE WITNESS:

A.    He did not.

BY MR. PREMO-HOPKINS:

Q.    Okay.

A.    One way or another.

Q.    If that exists, if there are analyses that -- that Lilly or Novo did on these specific signals, is that something that you would want to look at in ensuring that what you've done here is accurate and reliable?

A.    No.  I've done -- you know, I -- this is my -- this is my analysis of the FAERS data.  I don't need to refer or compare it to anyone else's analysis.

Q.    Did Dr. Metz -- did you ask Dr. Metz, Hey, are there -- is there anybody else that thinks you should use different preferred terms, whether that's a plaintiffs' expert or Lilly or anything like that?

A.    No.

MR. KELLY:  Objection; asked and answered.

BY MR. PREMO-HOPKINS:

Q.    Dr. Metz didn't tell you that -- that he

himself looked at many more adverse events types than you did for this analysis?

A.    He certainly did not, no.  That did not come up in the conversation.

Q.    Okay.  As part of your experience in this field, are you aware of -- of any other publication or peer reviewed that combines the adverse event outcomes in the way you've done here?

A.    You mean like putting together gastroparesis and impaired gastric emptying, for example?

Q.    Correct.

A.    I don't know.  I have not -- I have no idea.  It's not something I've looked for.

(WHEREUPON, a certain document was marked David Madigan, Ph.D. Deposition Exhibit No. 8, for identification, as of 04/08/2026.)

BY MR. PREMO-HOPKINS:

Q.    We'll mark -- mark as Exhibit 8, and again, I think this is -- just for clarity of the record, this is Dr. Madigan's analysis of GI adverse events in the pooled GLP-1 clinical trials.

A.    Okay.

Q.    I'm --

MR. KELLY: I'm just --

BY MR. PREMO-HOPKINS:

Q. I am just going to close out --

MR. KELLY: For the record, I am going to lay down, this is the other Novo clinical trial report, correct?

MR. PREMO-HOPKINS: I understand Exhibit 2 to relate only to Novo. I'm just going to make sure with this document that I've -- I've got the record clear.

MR. KELLY: And I'm not going to stop you, but I'm just going to put down for the record that defense counsel insisted on separate reports and insisted on a specific allocation of separate depo time and separate depo days. So examination of Novo topics is out of scope for today.

MR. PREMO-HOPKINS: All right. If I get anywhere near my five hours, we can talk about it.

BY MR. PREMO-HOPKINS:

Q. Dr. Metz, the -- the -- what we've --

Dr. Madigan -- Dr. Madigan, Exhibit 8, just to make sure the record is clear, is Exhibit 8 what we have been discussing in the abstract as your other expert report related to Novo's clinical trials?

A. Yes.

Q. And, again, for the record, Exhibit 8 at

this point in time, does it contain all of the opinions that you've been asked to provide with regard to adverse events in -- in clinical trials in this -- in this matter?

MR. KELLY:  I'm just going to -- same objection continuing after all of your questions on this.

BY THE WITNESS:

A.    Yes.

BY MR. PREMO-HOPKINS:

Q.    Okay.  And the -- as part of your work -- in the clinical trial opinions with regard to adverse events, those relate only to Novo, right?

A.    That's correct.

Q.    Was there -- did you use Lilly's clinical trials at all to inform your opinions either in Exhibit 1 or Exhibit 8?

A.    No.

Q.    Okay.

MR. PREMO-HOPKINS:  All right.  Why don't we take that two-minute break, let Dr. Madigan get the information we asked, and then I think we'll be able to wrap up pretty quickly.

THE VIDEOGRAPHER:  The time is 12:57 p.m. and we are off the record.

(WHEREUPON, a recess was had

from 12:57 to 1:01 p.m.)

THE VIDEOGRAPHER:  The time is 1:01 p.m. and we are on the record.

BY MR. PREMO-HOPKINS:

Q.    Dr. Madigan, we just took a quick break for you to gather some information.  Are you ready to begin again?

A.    Yes.

Q.    And to orient us, previously in the deposition I had asked you about Exhibit 3, which includes your deposition and trial testimony for the last four years, which would effectively go back to 2021, and it identifies nine different litigations and a number of different instances in which you've provided deposition and trial testimony, isn't that right?

A.    Yes.

Q.    And prior to 2021, can you tell me, in how many different litigations you were retained on behalf of the plaintiff in a pharmaceutical products case?

A.    So I just checked, and my estimate is it's 12 between 2006 and 2021 -- 2021 that are not on the list of Exhibit 3.

Q.    Got it.  So in total, we're looking at approximately 21 different litigations, yes?

A.    Yes.

Q.    And you -- what percentage of your income today would you -- is attributable to work done for litigation consulting?

A.    It's a -- it's around 20 percent.  It has been at that level for many years.

Q.    And are you able to estimate from 2006 to today roughly, based on that factor, 20 percent, roughly how much you've been paid for work on -- on the plaintiffs' side of pharmaceutical product litigations in those 21 matters?

A.    Oh, I -- I couldn't do that.  I mean, I -- I have no memory of what my income was exactly or what -- even what my rate was at the time.  I -- I can't do that.

Q.    Understood.  Well, over the last roughly 20 years, is that right?

A.    Yeah.

Q.    You -- you have received approximately 20 percent of your income from litigation consulting?

A.    Yeah, approximately.

Q.    And that has been -- with regard to pharmaceutical products cases, that has been exclusively for plaintiffs, yes?

A.    Yes.  I've -- I've never been asked by --

by a defense firm.

Q. And in your report where you say, "I would have done the same analysis if asked for the defendant," you mean the -- the specific analysis that you were requested to do, yes?

A. If -- yeah, if I was asked by Lilly to address the questions that are specified in my report, I would have done exactly the same analysis.

Q. How do you know that if you didn't look at what Lilly did to address the same thing?

MR. KELLY: Objection; form.

BY THE WITNESS:

A. It has nothing to do with what Lilly did. So what I'm saying is, if I were asked to address the questions that are specified in Page 2 of my report, it doesn't matter who asks me, I'm going to go about it exactly the same way and I would have produced exactly the same report.

BY MR. PREMO-HOPKINS:

Q. And, Dr. Madigan, we were -- today I -- we were in your area of expertise, not mine, and so I -- I asked some questions that were inartful from time to time.

Did -- when you answered a question today without asking me to clarify, did you understand the

question?

A.     Yes.

Q.     And were you able to ask me to clarify a question when you needed to?

A.     Yes.

Q.     And -- and did you give complete, honest answers to my questions today?

A.     Yes, I did.

Q.     Is -- at the beginning of the deposition, you told me, no -- no intent to issue any opinion -- any new opinions.

Do you right now at 1:06 p.m. on Wednesday, April 8th, do you have any intent to issue any additional opinions?

A.     Not -- if -- if I'm asked, I will.

Q.     But otherwise, no?

A.     I -- I -- it depends on what counsel wants.

Q.     But you haven't been asked?

A.     No, I have not been asked --

Q.     Okay.

A.     -- at this point.

Q.     And I think that's all of the questions that I have for you at this time, Dr. Madigan.  I don't know if there's going to be any other

questioning, but I'll pass the witness at this -- at this time.

A.    Thank you very much.

MR. KELLY:  There's not.

MS. KELLY:  Okay.  I'll see you on the 23rd, Dr. Madigan.

THE WITNESS:  Okay.  Very good.

THE VIDEOGRAPHER:  The time is 1:06 p.m.  This deposition has concluded and we are off the record.

---

Thereupon, at 1:06 p.m., on Wednesday, April 8, 2026, the deposition was concluded.

---

REPORTER'S CERTIFICATE

I, JULIANA F. ZAJICEK, a Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination of the witness herein, the witness was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my availability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand on this 9th day of April, 2026.

JULIANA F. ZAJICEK, Certified Reporter

DEPOSITION ERRATA SHEET


Assignment No.  3314

Case Caption:  In Re Glucagon-Like Peptide-1 Receptor

Agonists, Products Liability Litigation


DECLARATION UNDER PENALTY OF PERJURY


I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


DAVID MADIGAN, PH.D.


SUBSCRIBED AND SWORN TO

before me this        day

of                 , A.D. 20__.


Notary Public

Case 2:24-md-03094-KSM    Document 691-32    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                    DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____

SIGNATURE:_____DATE:_____

                    DAVID MADIGAN, PH.D.
```

Case 2:24-ml-03094-KSM    Document 691-32    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                    DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____DATE:_____

                    DAVID MADIGAN, PH.D.
```