# EXHIBIT 33D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE:  GLUCAGON-LIKE          ) CIVIL ACTION
PEPTIDE-1 RECEPTOR AGONISTS    )
(GLP-1 RAs) PRODUCTS           )
LIABILITY LITIGATION           ) MDL No. 3094
                               ) 24-md-3094
THIS DOCUMENT RELATES TO:      )
ALL ACTIONS/ALL CASES          ) Hon. Karen Spencer Marston
                               )
_____)


VIDEOTAPED DEPOSITION OF

DAVID METZ, M.D.

TUESDAY, MARCH 24, 2026, 8:15 A.M.

LAGUNA BEACH, CALIFORNIA


STENOGRAPHICALLY REPORTED BY:
CHERYL HAAB SCOTT, RDR, CRR, CCRR
CA CSR No. 13600
WA CCR No. 3499
NV CCR No. 1003

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  GLUCAGON-LIKE            ) CIVIL ACTION
PEPTIDE-1 RECEPTOR AGONISTS      )
(GLP-1 RAs) PRODUCTS             )
LIABILITY LITIGATION             ) MDL No. 3094
                                 ) 24-md-3094
THIS DOCUMENT RELATES TO:        )
ALL ACTIONS/ALL CASES            ) Hon. Karen Spencer Marston
                                 )
_____)

VIDEOTAPED DEPOSITION OF DAVID METZ, M.D.,

taken at 211 North Coast Highway, LAGUNA BEACH,

California, on Tuesday, March 24, 2026, at 8:15 a.m.,

before Cheryl Haab Scott, RDR, CRR, CCRR, Certified

Shorthand Reporter No. 13600 in and for the State of

California, Certified Court Reporter No. 3499 in and for

the State of Washington, and Certified Court Reporter

No. 1003 in and for the State of Nevada.

A P P E A R A N C E S
--oOo--


For Plaintiffs:

        MORGAN & MORGAN, P.A.
        BY:  PAUL PENNOCK, ESQ.
             SHANNON PENNOCK, ESQ. (VIA ZOOM)
             NICOLE LOVETT, ESQ. (VIA ZOOM)
        199 Water Street, Suite 1500
        New York, New York 10038
        917.566.4755
        ppennock@forthepeople.com
        spennock@forthepeople.com
        nlovett@forthepeople.com


        GOZA & HONNOLD, LLC
        BY:  BRADLEY D.  HONNOLD, ESQ. (VIA ZOOM)
        9500 Nall Avenue, Suite 400
        Overland Park, Kansas 66207
        913.451.3433
        bhonnold@gohonlaw.com


For Eli Lilly:

        KIRKLAND & ELLIS LLP
        BY:  MARK PREMO-HOPKINS, ESQ.
             MYRA FAROOQI, ESQ.
             MICHAEL SMITH, ESQ. (VIA REALTIME TEXT STREAM)
             DAISY ALMONTE, ESQ. (VIA REALTIME TEXT STREAM)
        555 California Street, 27th Floor
        San Francisco, California 94104
        415.439.1910
        mark.premohopkins@kirkland.com
        myra.farooqi@kirkland.com


        GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
        BY:  OREN KRIEGEL, ESQ. (VIA ZOOM)
             KIMBERLY L. ROCKWELL, M.D., ESQ. (VIA ZOOM)
        191 North Wacker Drive, Suite 3000
        Chicago, California 60606
        312.881.5974
        okriegel@goldmanismail.com
        krockwell@goldmanismail.com

A P P E A R A N C E S
(CONTINUED)
--oOo--


For Novo Nordisk:

      DLA PIPER US
      BY:  LUCAS P. PRZYMUSINSKI, M.D., ESQ.
           CHRISTOPHER GISMONDI, ESQ.
      1251 Avenue of the Americas
      New York, New York 10020
      917.776.9602
      lucas.przymusinski@us.dlapiper.com
      christopher.gismondi@us.dlapiper.com


Also Present:

      DAVID KIM, VIDEOGRAPHER

I N D E X
--oOo--


WITNESS: David Metz, M.D.

                                                      PAGE

Examination By Mr. Premo-Hopkins                          8

Examination By Dr. Przymusinski                        132

Examination By Mr. Pennock                             281

Further Examination By Dr. Przymusinski                291

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

INDEX TO EXHIBITS
--oOo--

EXHIBIT NO.                                                    PAGE

Exhibit 1        "Expert Report of David C. Metz,          9
                 M.D."

Exhibit 2        "Acute Functional Gastric Outlet          87
                 Obstruction Associated With
                 Low-Dose tirzepatide"

Exhibit 3        "Statement of Compensation for            133
                 David Metz, M.D."

Exhibit 4        Documents produced by witness             133

Exhibit 5        "Expert Report of David C. Metz,          135
                 M.D."

Exhibit 6        "Materials Considered (All                136
                 materials referenced and/or
                 discussed within my opinion report
                 are incorporated herein by
                 reference)."

Exhibit 7        "AGA Abstracts"                           214

                    TUESDAY, MARCH 24, 2026, 8:15 A.M.

                      LAGUNA BEACH, CALIFORNIA

                              --oOo--

           THE VIDEOGRAPHER:  We are now on the record.

Today is March 24, 2026, and the time is 8:15 a.m.

My name is David Kim.  I'm a legal videographer for

Hartford Reporting & Technology.  This deposition is

being taken In Re: Glucagon-Like Peptide-1 Receptor

Agonists Product Liability Litigation, MDL Number

309424-md-3094, for the U.S. District Court for the

Eastern District of Pennsylvania.

           The deponent today is David Metz, M.D.

           The court reporter today is Cheryl Scott.

Appearances will be noted on the written record.

And Cheryl will now swear in the witness.

           THE COURT REPORTER:  Good morning.  My name

is Cheryl Scott.  I am a California Certified

Shorthand Reporter and the deposition officer for

today's proceeding.  My CSR license number is 13600.

                              --oOo--

                            Whereupon,

                        DAVID METZ, M.D.,

                  having been called as a witness,

                was duly sworn by the court reporter

                    and testified as follows:

--oOo--

EXAMINATION

BY MR. PREMO-HOPKINS:

Q    Good morning, Dr. Metz.

A    Hi.

Q    My name is Mark Premo-Hopkins, and I represent Eli Lilly in the GLP-1 RA litigation.  I'm going to ask you some questions about some expert reports that you issued in the matter.

Do you understand that?

A    I do.

Q    And you've done this before, but -- yes?

A    Yes.

Q    I'll go over a few ground rules that will be helpful.  I'm going to do my very best to let you finish your answer before I start my question.

I sometimes talk a little slow and so I'd ask you to give me the same courtesy.  If you let me finish my question before you start your answer, it'll be a lot easier for our court reporter.

Is that okay?

A    I'll do my best.

Q    The -- it's important that you understand my questions today.  We're going to be talking in your area of expertise more than mine.  So if you don't

understand my question today, would you let me know?

A    Sure.

Q    And if you answer a question without asking me to clarify it, I'm going to assume that you understood it.  Is that fair?

A    Sure.

Q    Is there any reason you can't give complete, honest answers to my questions today?

A    No.

Q    Dr. Metz, you issued two reports in this case; is that right?

A    Yes.

Q    One related to Eli Lilly and one related to Novo Nordisk?

A    Yes.

MR. PREMO-HOPKINS:  We're going to mark as Exhibit 1 your report that relates to Eli Lilly's medications.

(Defendants' Exhibit 1 was marked.)

BY MR. PREMO-HOPKINS:

Q    And can you just take a moment to look at Exhibit 1 and confirm for me that it looks to be a complete and accurate copy of your expert report related to Lilly?

A    Without reading the whole thing, I'd say

yes.

Q    So just for the record, it's 180 -- the paginated pages run to 185 and it's got your signature on the back there, dated January 2nd of 2026; is that right?

A    Electronic, yes.

Q    And as of today, all of the opinions you intend to offer in this case, are they included in this report?

A    Yes.  But not all, I mean, there might be something you're going to ask me that I have another opinion about.

Q    As of right now, at 8:20 in the morning, today, this report that we're looking at, Exhibit 1, contains all the opinions you intend to offer at this time, yes?

A    No.

Q    You -- there's other opinions that you intend to offer right now that are not in this report?

A    Depends on what you ask me.  If you ask me something that I haven't necessarily put into my report, I've only provided examples so there may be something you ask me that I haven't actually put in.

MR. PENNOCK:  I think he -- just so you

know, he's talking about opinions regarding materials, not materials -- so I think we're -- we're good on the opinions.

BY MR. PREMO-HOPKINS:

Q    Let me make sure -- let me just make sure we're clear.

I understand that you may provide additional information or elaborate on something in response to a question that I ask today or my colleague from Novo Nordisk asks today.

That's what you're trying to convey?

A    Correct.  Yes.

Q    I'm asking you right now.  Before you've gotten any of those questions.

A    Correct.

Q    Before you've gotten any of those questions, all of the opinions and the bases, therefore, that you've offered in this case are in this report; yes?

A    That is correct.

Q    And the report itself, at least with regard to Lilly, is 185 pages with footnotes.  Where you've intended to rely on a particular source or citation, did you endeavor to include that in your report?

A    Yes.

Q    Is there anything you're aware of right now,

before -- at 8:20 a.m., before we get into substantive questions about your report that you would like to correct or amend or fix that's in your report, Exhibit 1, with regard to Lilly?

A    There are a bunch of typos that I've noticed subsequently that, you know, I don't mind if they stay.  There might be a few small little areas here and there, but generally speaking, no.

Q    Nothing substantive with regard to your opinions or the bases therefore that you feel needs to change at this time?

A    Correct.  Yeah.

MR. PENNOCK:  Can I interrupt one second?

MR. PREMO-HOPKINS:  Yes.

MR. PENNOCK:  I think you have the wrong counsel examining.  It's Mark Premo-Hopkins.

(Discussion off the record.)

BY MR. PREMO-HOPKINS:

Q    So Dr. Metz, with regard to Lilly, if I turn to page 17 of Exhibit 1 on your report, you lay out the inquiries that you were asked to evaluate?

A    Correct.

Q    And I want to make sure I understand the inquiries here.  All three inquiries refer to -- let me back up and say -- am I correct in understanding

that Question 1 and Question 2, they talk about cause, and then Question 3 talks about reasonable evidence of a causal association.

Those are different standards, yes?

A    Correct.

Q    And the standard for Question 3, which asks:

"At what, if any time, did the available evidence on adverse events establish reasonable evidence of a causal association between the use of GLP-1 inhibitors and drug-induced gastroparesis?"

The standard for reasonable evidence of a causal association is a lower, less stringent standard than there would be for causation?

A    I believe so.

Q    If we just use the -- the three questions to orient us, the -- the first question is:

"Do GLP-1 inhibitors cause drug-induced gastroparesis in some patients?"

And the second question is:

"Do GLP-1 inhibitors caused prolonged symptoms of gastroparesis in some patients after the drug has been withdrawn and if so, what is the mechanism for that effect?"

Did I correctly read those first two questions?

A    You did.

Q    And am I understanding the two questions to be talking about a drug-induced gastroparesis in Question 1 and then something other than a drug-induced gastroparesis in Question 2?  Let me ask you a better question.

Is that okay, Dr. Metz?

A    Yeah, I didn't quite understand that.

Q    Understood.  Neither did I.  So Question 1 asks:

"Do GLP-1 inhibitors cause drug-induced gastroparesis?"

Maybe we can do it this way.  That term, "drug-induced gastroparesis," if we turn to page 136, I think it's -- there's some language in there that will help us understand that.  So, where -- we moved into the body of your report and specifically, we're in the specificity criteria for the Bradford Hill.

I'm not trying to get into the substance of that, but there is some language in here that I think might help -- help us.

In the middle of the specificity paragraph, the report says:

"Gastroparesis defined as severe impairment

of gastric emptying with clinical consequences occurring in some patients that resolves upon removal of the causative agent, GLP-1, is nearly unique, from my review and in experience."

Do you see that language?

A    I do.

Q    And does that accurately what you mean by drug-induced gastroparesis, in this context?

A    Well, it's with caveats.  I mean, it doesn't always have to be terribly severe.  You can have mild gastroparesis, but essentially, drug-induced gastroparesis is taking a medication that causes the stomach muscles to weaken and to delay its emptying. That is, then, related to the drug.  The drug caused it.

Q    So a drug-induced gastroparesis, you understand to be a weakening of the stomach muscles that results in delayed emptying where there's a conclusion reached that the drug caused that?

A    Correct.

Q    What about -- in here you talk about clinical consequences in thinking of drug-induced gastroparesis.

Do there need to be clinical consequences or symptoms?

A    Yes.

Q    And you said for a drug-induced gastroparesis, sometimes those symptoms can be mild, sometimes they may be severe, yes?

A    Yeah.  And in some patients, they may even be absent.

Q    So is it your opinion, sir, that you can have a drug-induced gastroparesis with an -- with an absence of symptoms?

A    At that particular moment in time, yes.

Q    So if we just, again, focus on the language here in 136, when you say, "clinical consequences," is that synonymous with symptoms?

A    Yeah, of varying -- of varying degree, from nothing to a little bit of bloating to vomiting and aspiration and pneumonia and death.

Q    So when you -- when you talk about clinical consequences in the context of drug-induced gastroparesis, they could be of varying degree from mild to moderate to severe, all the way up to aspiration, pneumonia, and death?

A    Yeah.  And of varying different kinds, yes.

Q    And are those clinical consequences or symptoms, are those -- in a drug-induced gastroparesis, are they secondary to the impaired

gastric emptying?

A    Well, they can be and they don't have to be. The -- if we're talking purely about gastroparesis, then gastroparesis is the primary cause of the symptoms, but these drugs do other things, as well.

Q    As I understand it, based on the inquiries you were asked to look at, you were looking at a drug-induced gastroparesis, yes?

A    Correct.

Q    So that's what I want to be focused on today. In the context of a drug-induced gastroparesis, the -- when we talk about clinical consequences or symptoms, you understand those to be symptoms that would be secondary to an impairment of gastric emptying, yes?

A    Yes, with qualification. If you look at my report, somewhere along the way in there, what I'm describing is that binding to GLP-1 receptors has effects. There are GLP-1 receptors all over the show. You will get all of the effects conspiring together to cause the symptoms. This is part of how the drugs work. It's a mechanism of their action.

In other words, you're not going to have a GLP-1 drug that's going to bind to some GLP-1s in certain parts of the body, but not to others.

Q    Recognizing that GLP-1 receptor agonists can bind to GLP-1 receptors in different parts of the body, when we talk about a gastroparesis, a drug-induced gastroparesis and clinical consequences of that, those would be secondary to an impaired or delayed gastric emptying; yes?

A    Correct.

Q    And you use the phrase "impaired gastric emptying" at various points in your -- in your report.

Do you distinguish between an impaired gastric emptying with symptoms and what you call "drug-induced gastroparesis," or are those synonymous?

MR. PENNOCK:  Objection.

THE WITNESS:  The manifestations are the same, the mechanisms may be very different.

BY MR. PREMO-HOPKINS:

Q    When you say "the manifestations are the same," what do you mean?

A    Well, gastroparesis, per se, means gastro stomach paresis weakness.  It's a syndrome rather than a disease.  Syndrome being a collection of signs and symptoms.  So a sign could be a delayed gastric emptying on a gastric emptying scale.  It

would be other abnormalities, retained food, CT scans, a big bloated stomach that the doctor can see.

The symptoms could be anything from bloating, nausea, vomiting, reflux, regurgitation, aspiration, abdomen pain.  Primarily, I think the most important symptoms that I looked for in all of the data I looked at was really nausea and vomiting and abdominal pain, dyspepsia suggested, regurgitation suggested, et cetera.  Bloating.

I did look at those 14 symptoms that the company looked at when they responded to the FDA, and I actually thought of a few extra that I wanted to look for.  But there are lots of possible symptoms of gastroparesis or weakness of the stomach that would be part of the -- the -- the -- you know, the syndrome.

Q    I'm just trying to make sure I understand the -- the terms that you've used in your report. So maybe we can turn to 134, page 134.

A    Excuse my coughing.

Q    So again, we're -- we're in the Bradford Hill criteria, but I'm not -- I'm not asking you substantive questions about that.  I'm just trying to make sure I understand the terms.

So towards the top of the page, about --

about four lines down, you say, it is not a -- or

starting at the second line, right-hand side:

"It is not a supposition as to whether GLP-1

drugs can cause delay in gastric emptying.  It is,

in fact, a mechanism of the drug's action.  The

precise mechanism underlying impairment of gastric

emptying, in other words, gastroparesis, with native

GLP-1 or pharmacologic GLP-1 agonist, is due to the

binding of the drugs to GLP-1 receptors."

A    Correct, or native GLP.

Q    Or native GLP.  So in your report, when you

talk about an impairment of gastric emptying in the

context of the queries you were asked, is impairment

of gastric emptying with some combination of signs

and symptoms the same thing as drug-induced

gastroparesis, or are we talking about something

different?

A    Can you repeat that again?  I'm sorry.  I

don't quite follow it.

Q    So -- so at various places in the report,

there's a discussion of something, like,

drug-induced gastroparesis.  And then I see a term,

like, here, impairment of gastric emptying with a

parenthetical that says, in other words,

gastroparesis.

In the context of the queries you were asked to answer, is impairment of gastric emptying -- can I treat that the same as gastroparesis, for purposes of our questions today?

A   Oh, yeah.  I see what you're getting at.

Yes, to a degree.  I mean, you can have an impairment that comes and goes and you're not stuck with any delay and then you don't have paralysis at that moment in time.  But if there's a delay in emptying at that moment in time, you have gastroparesis.  Yes.

Q   So in terms of the -- the language and the words that are used in your report, when I see discussion of impaired gastric emptying or delayed gastric emptying with signs and symptoms associated with gastroparesis, I should treat that as you talking about gastroparesis?

A   Yeah.  I think so.

Q   We can turn back to page 17 of your report now, back to the queries, Dr. Metz.  Inquiries, excuse me.

In Question 2, the question you were asked is:  Do -- excuse me.

"Do GLP-1 inhibitors caused prolonged

symptoms of gastroparesis in some patients after the drug has been withdrawn and if so, what is the mechanism for that effect?"

I'm trying to understand why Question 1 talks about drug-induced gastroparesis and Question 2 does -- does not use that term?

A    Well, Question 2 says, "Do GLP-1 inhibitors cause."  GLP-1 is our drugs, and do they cause prolonged symptoms of gastroparesis?  I think the two tie together.  It's drug induced, and GLP-1 caused.

Q    I see.  So in Question 2 -- I understand. Question 2 would also be talking about a drug-induced gastroparesis?

A    Yes.

Q    Okay.  And then Question 3 discuss -- states, at what time -- excuse me.  I'm going to start over.

At what, if any time, did the available evidence on adverse events establish reasonable evidence of a causal association between the use of GLP-1 inhibitors and drug-induced gastroparesis; right?

A    Uh-huh.

Q    Now, that's a yes?

A    Yes.

Q    And in the context of your report, what is the significance of reasonable evidence of a causal association?

A    Well, it's the less stringent definition you alluded to earlier regarding causation based on how the FDA would assess a significant risk that there would be a necessity to warn physicians about a potential problem.

Q    So when we see reasonable evidence of a causal association, you understand that to mean a standard when, if met, would identify a significant risk that there would be a necessity to warn physicians about a potential problem?

A    Yup.

Q    And based on your experience at the FDA, where -- where would that warning need to go in a -- in a medication's label?

A    Well, there's a warning section.

Q    And -- let me ask you a little bit, Dr. Metz -- I'm going to shift gears and ask you about your experience at the FDA.

A    Okay.

Q    You've served on the FDA Gastrointestinal Drug Advisory Committee for a period of years; is

that right?

A     Correct.

Q     And that was from 2001 to 2005?

A     And correct.  And after that, I became an SGA, a special government -- I don't know what the A stood for.  So that they -- I was available, potentially, for additional things afterwards if they needed me for ad hoc meetings.

Q     After 2005, in your role as an SGA, have you been called on by the FDA to help with any ad hoc meetings or assignments?

A     Well, you know, I believe I was called.  I have no recollection of exactly where and when.  I know I never went back down to D.C. for any specific meetings.

Q     The advisory committee that you were on, that was a committee that provided advice to the FDA regarding safety and effectiveness of drugs used in the treatment of gastrointestinal diseases?

A     Yeah, it was for GI diseases.

Q     And does GI diseases cover a broad array of conditions?

A     Everything from lips to anus and whatever's in between.

Q     And did you have any confusion about what

your charge was on the advisory committee with regard to what gastrointestinal diseases you might be asked to opine on?

A    I mean, I understand what gastroenterology entails.

Q    And you understand what "gastrointestinal diseases" means, yes?

A    Yes.  As a gastroenterologist.

Q    Do you -- if you look back in time, why did you ultimately agree to accept the position on the FDA's Advisory Committee?

A    Well, it was part of my academic career. When you get a request to do that, it's an honor, and it was a pleasure for me to do it.

Q    And why is it an honor?

A    It's serving the people.

Q    And when you were serving the people, you mean the -- the public?

A    Correct.

Q    And did you carry out that service to the best of your ability?

A    Of course.

Q    And did you believe that the FDA did important work in evaluating the safety and efficacy of medications?

A    Very much so.

Q    In your report, you describe -- I believe it's on, roughly, pages 20 to 22, you describe the process that that advisory committee would undertake?

A    Yeah.

Q    In the work that you did at the FDA, did you observe that the FDA had a rigorous process in place to review and evaluate medications?

A    Yes.

Q    And on page 121 of your report, you note that from time to time, you were asked to weigh in on and vote on specific issues related to a drug or a class of drugs that treat gastrointestinal diseases; is that right?

A    That is correct.

Q    In terms of treating gastrointestinal diseases, I want to make sure I'm clear:  Did your advisory committee deal with drugs that treat diabetes?

A    You know, that's an interesting question because I worked at the NIDDK in my earlier years, so that's diabetes, digestive diseases, and kidneys, which is combined.  The FDA was separate.  I think The Endocrine Group looked after diabetes.

There were times where you would have an expert from one area weigh in on another because of the potential -- let's say, potential adverse event on a GI drug that was neurological.  You might get somebody from the neurological side.

I was not personally ever asked to sit on an endocrine committee, if that's your question.

Q    So you don't recall having any personal experience addressing -- while you were at the FDA, addressing any safety request related to a diabetes drug?

A    No.

Q    I put a negative in there and then you said "no."  So I'm going to ask my question again, but I think we're on the same page.

It's correct, isn't it, that you don't have any personal experience while you were at the FDA addressing any safety request related to a diabetes drug?

A    I did not.

Q    And what types of data and materials would you receive in your role on this advisory committee with the FDA to help you advise them?

A    Well, it was quite a prolonged and rigorous process, as you suggested, you know.  So first they

would say there's a potential meeting going to happen on a certain date, are you available.  Yes.  Or potentially available.

Do you have any potential conflicts of interest with such and such a company.  Do you know any of the following people.  Yes or no.  Then they would sort of work out -- and I actually, personally, got recused from quite a lot of the meetings, given my clinical associations.

If I was felt to not be in any way potentially tainted, I then would have received up front, usually, a prepared presentation from both the company and the FDA to review and then those would -- then we'd go down to the meeting and we'd actually go through those presentations.

And we would be asked specific questions and we would potentially vote on specific questions and then the FDA, itself, could actually decide whether or not they wanted to follow the advisory board's recommendations.  And usually they do and sometimes they don't.

And then, you know, things continued.  Those meetings could have either been for approval of a drug, for discussion of a warning for a drug, whether to expand an indication for a drug,

et cetera.

Q    And so one of the purposes of the meetings that you would have attended with regard to the advisory committee was to decide whether or not there should be a new warning potentially added to a medication's label?

A    Or even withdrawal of warnings, yes.

Q    And so part of that work you were doing to advise the FDA was to make sure that label language was accurate; is that right?

A    Up and to that point in time, yes.

Q    And that -- did you feel like part of the responsibility of the FDA and the work you were doing was to make sure that labeling language was -- was clear and easily understood?

A    That's part of the mandate.  You know, of course the ultimate responsibility, I believe, lies with the company.

Q    You mentioned that the recommendations that your advisory committee provided were nonbinding on the FDA; right?

A    Correct.

Q    And so the FDA could choose to reject or override those recommendations?

A    That is correct.

Q   And do you recall there ever being an instance where the FDA -- excuse me -- ultimately decided to reject the advisory committee's recommendations for the committee you sat on?

A   You know, I can't really recollect at this stage.  You know, I remember there was some very contentious meetings that I got involved with.  I mean, one of the meetings I remember well, if you want me to tell you about it.

Q   What I'd like to know now is if you have any recollection of the FDA ultimately deciding to reject any recommendation that the advisory committee provided, that you served on?

A   Offhand right now, I can't say one way or another.

Q   Did you feel like there was always a fair and robust discussion in those advisory committee meetings?

A   Yes.

Q   And were -- were there folks like you who -- who were on the advisory committee who came in from outside the FDA, as well as the FDA professionals involved in those meetings?

A   Correct.

Q   And on occasion, there might be

representatives from a particular manufacturer or industry in the advisory committee meetings giving -- giving presentations to you?

A    Oh, yeah.  Yeah.  Yeah.  Not on occasion. That's what -- usually they're there.

Q    And you mentioned earlier that -- that there was a pretty -- you mentioned a conflicts of interest process.

A    Uh-huh.  Yes.

Q    And did you -- what did you understand was the purpose of that conflicts of interest process with regard to your work on the advisory committee?

A    Well, they wanted to try and make sure that they were not going to be getting any biased advice.

(Reporter clarification.)

BY MR. PREMO-HOPKINS:

Q    Did you understand that to help the FDA ensure that the review that was happening was independent?

A    Correct.

Q    Dr. Metz, on page 22 of your report, you explain that while you were on this committee, you were explicitly instructed to take the pertinent regulations for labeling and the definition for reasonable evidence of an association into account;

right?

A     Yup.

Q     And when you say you were explicitly instructed, by whom?  Was that by people at the FDA?

A     Yeah, I'm trying to remember whom, but somebody -- we had a -- there was a long educational process with slides and before you got onto this committee, they made sure you understood what it is they wanted you to do.  And they had an educational process on how the FDA works, et cetera.

Q     And did you feel that the FDA was careful and thorough in educating you about how the process worked?

A     Yeah.

Q     On the top of page 23 in your report, Dr. Metz, you also say that you used the, quote, "Codified regulatory standard for reasonable evidence of a causal association."

       There, you're referring to the code of federal regulations used by the FDA; is that right?

A     I believe so.

Q     You note in a couple of footnotes that some of the language around that regulation has changed, but that you understand the substance of the regulation or the application of the regulation to

be the same today as when you served?

A     Correct.

Q     Dr. Metz, as part of your work in this case with regard to Lilly, did you review correspondence and documents exchanged between Lilly and the FDA?

A     Yes.  I was -- I had to sign a waiver for two documents, if I recall, that came from the Court, about -- about confidentiality.  I saw the -- the actual reports that the company sent to the FDA in response to the FDA's inquiries about gastroparesis and aspiration, and I think subsequent updates that were later.

I think that's the only direct communication between the company and the FDA that I saw, unless you consider the actual pivotal trial data, which was mountains and mountains.

Q     So let me -- let me make sure I break that down.

You signed the -- the confidentiality order as part of this case to allow you to review documents that were produced as confidential, yes?

A     Correct.

Q     And with regard to exchanges between Lilly and the FDA, the documents that you recall reviewing included some of the clinical trial data that would

have been submitted to the FDA?

A    Well, I'm not sure if there's others I haven't seen, but I've seen an enormous amount of -- of literature.  And specifically, in addition to that, were responses to queries from the FDA as issues developed with people out in the community.

Q    Thank you.  I want to take them piece by piece to make sure I -- I understand.

One of the sets or types of documents, correspondence, that you saw that had been exchanged between Lilly and the FDA as part of your work in this case was clinical trial data?

A    Yeah.

Q    And then you noted a regulatory request inquiry about gastroparesis and then the -- Lilly's response to that?

A    Correct.  And -- and I think there was also a question about aspiration and there was a question about endoscopic -- I mean, it was on a separate one or not, but, you know, retained gastric products and other ways of assessing for delayed gastric emptying over and above a gastric emptying scan.

Q    Other than the clinical trial data and the specific FDA inquiries that you mentioned and the corresponding responses by Lilly, do you recall

seeing any other documents exchanged between Lilly and the FDA as part of your work in this case?

A    Absolutely.  All the post-marketing events that -- that were evaluated, and there may well have been additional stuff that I can't recall offhand right now.  But yeah, no, I think -- look, if there's anything out there that I should have seen that I haven't seen, bring it on, but it's going to take forever to go through it again.

Q    In your report, you identify a series of adverse event reports?

A    Yeah.

Q    Over time, yes?

A    Yeah.

Q    And those were certain adverse event reports that you felt were meaningful enough to include in the body of the report, yes?

A    Yeah, well, in order to answer the question as to when it became clearly evident to everybody and their mother that this was a potential concern, you have to go beyond the actual approval and, you know, experience out in the community.  So yeah, those are pivotal to deciding when this was clearly an issue.

Also, you know, in addition to the adverse

events, it necessitated doing a fair amount of literature searching and looking for what's out there in the public domain since a lot of these events were, you know, private between the FDA and the company and not necessarily generally known.

Q When you say that certain events were private between the FDA and the company and not necessarily generally known, what do you mean?

A Well, I believe that the adverse events are reported to the company and the company's obligated to report them within a certain period of time to the FDA; the FDA doesn't release that to every Tom, Dick, and Harry to act on. So a doctor working out in Podunk doesn't know that that's happened.

Q In your report, you don't identify any adverse event or case report or literature study that Lilly had that the FDA wasn't aware of; right?

A I am unable to answer that question, I don't know. I have no idea what -- whether Lilly withheld any information or not.

Q You weren't asked to look into or opine on whether or not Lilly withheld any information to the FDA?

A I answered the three questions.

Q And as part of your review of this vast

volume of material you described, you were looking at information that was actually primarily exchanged between Lilly and the FDA, yes?

A    No, not only that.  I mean, all the published literature never went from Lilly to the FDA.  It went from the authors to the journal.

Q    Did you do any inquiry as to whether the literature that you reviewed was adequately reported per FDA regulations as "adverse events" by the company?

A    Well, I have a disagreement with how the company decided something was clinically important enough to report.  And that's the whole crux of, you know, this discussion; but I don't think the FDA was -- I don't think the company purposefully withheld information.  The interpretation thereof is what I have a problem with.

Q    You have a disagreement with Lilly's position on whether and to what extent there was reasonable evidence of a causal association between its medications and drug-induced gastroparesis?

A    Yes.

Q    But otherwise -- you're not aware of, based on your review, anybody at Lilly purposefully withholding anything from the FDA as part of

consideration of that?

A   I am unaware of anybody from Lilly withholding substantive information that the FDA had asked for.

Q   Was it relevant to your inquiries that you looked into how many different times the FDA approved the Trulicity or Mounjaro or Zepbound label language?

A   Can you ask that again, please?

Q   You understand that when medication is originally approved, there's a process where the labeling is reviewed by folks at the FDA?

A   Right.

Q   And do you understand that after a medication is on the market, there can be reasons why particular labeling language may come up and be reviewed again?

A   Yes, and I reviewed those labels.

Q   Do you know of -- Trulicity came on the market in 2024. Is that your understanding?

A   That's correct. And that's the label I primarily deal with in my report.

Q   I didn't see it, but you don't have any discussion of the Mounjaro or Zepbound language in your report; is that right?

A    I reference in footnotes all of the labels because I have looked at all of the labels, but you know, I could have put everything in and then you would have had a 500-page report, so I had to sort of, you know, have provided examples that related to all the other agents. And throughout my report, if I have an example of a Lilly issue that generally would relate to a Novo issue and vice versa because GLP-1s are GLP-1s.

Q    Do you know how many different times between 2014 and today that the FDA reviewed Section 5 of the Trulicity labeling and approved the language in the Trulicity label that you reviewed?

A    You know, I believe 2014 or 2017, I think there's a 2020, and there might be a '23 and a '24 or a '24 and a '25 that I did review. I've seen those labels. I would have to have them put in front of me to compare one to the other to see how and where they changed, at which moment in time. And also, as I point out in my report, you know, most doctors -- I don't even know how many doctors really read labels, but those that read labels tend to probably read the top half of the label which is the summary and not the bottom half which is the more substantive details; and there were issues

where the two didn't match in terms of gastrointestinal effects, especially in the 2014 label, which is why I chose that one to put into the report.

But the top half is different from the bottom half in relation to Section 5 and Section 6, possibly, as well, I believe.

Q    And when you say "the top half," are you talking about the highlights section?

A    Yeah, the highlights.  Docs tend to look at the highlight because they're always cutting corners.

Q    And is it your opinion, sir, that Lilly's should have updated the highlight section of the label prior to the end of 2018, which I think is when you claim that a reasonable evidence of causal association --

(Simultaneous colloquy.)

THE WITNESS:  Yup.

BY MR. PREMO-HOPKINS:

Q    Let me finish my question.

A    I'm sorry.

Q    So let's set the table a little bit.

With regard to Trulicity, you opined that you believe there was reasonable evidence of a

causal association between Trulicity and drug-induced gastroparesis by the end of 2018; is that right?

A   I believe that's what my report states.  We can check that if you'd like.  I believe so.

Q   And you mentioned in your earlier answer that -- that there was issues with the highlight section of the label at some point in time; is that right?

A   Yeah, well the 2014 label didn't even mention GI in the highlight section at all.  It wasn't there.  I think it was moved up in '17.  I'm not sure.  I'd like to look at the label again with you to be sure of that before I commit.

Q   And does your assessment of reasonable evidence of a causal association have any impact on whether or to what extent Lilly could include information in the highlight section of the label?

A   Anything that's important for a physician to know should be provided in the highlight section, knowing that many docs don't bother to read below the line.  So if there's a potential concern and risk, I think you need to have it put up there.  I also think that the potential concerns for GLP-1 associated gastrointestinal delay and its effects

should have been aware and should have been areas of concern for the company to look at from dot, from the very, very beginning, because it's a mechanism of action of the drug so I think it should have been a potential adverse event of special interest and it never was made to be as one.

So internally, if you take native GLP-1 and you inject it into a human being, you will get effects; and amongst those effects, you will see that there's a concern. And if you look at the Phase 1 and Phase 2 data, you saw that there was a concern because there were those symptoms.

And when you get to the comparative data in Phase 3, where there's a comparison to placebo or comparison to another active control that doesn't inhibit gastric emptying, you would have seen a two- to threefold increase. And that, to me, would have been enough of a warning for the company to have said jeez, this is potentially a worry.

But I don't think that that was done.

Q    Do you understand that your assessment of the regulations for reasonable evidence of a causal association, is that connected all through the -- what's known as the changes being effected -- mechanism for changing a medication label?

A     You're going to have to educate me on that. I don't understand it.

Q     So maybe I can ask you:  Do you know one way or another about whether a -- whether a manufacturer like Lilly or Novo can unilaterally change the highlights section of the label based on what they perceive to be reasonable evidence of a causal association?

MR. PENNOCK:  Objection.

THE WITNESS:  My understanding -- and I'm not a regulatory expert, although I have sat on some data monitoring safety boards, so I know what happens, what they say is.  But my understanding is that the original label is a negotiation between the company and the FDA, and they agree on wording and everybody puts in their two pieces and they come up with a label.

As time goes on, more information becomes available either to the FDA or to the company, and the company are obliged to report on certain events as they occur, and when and if those do occur, they obliged to let the FDA know within a certain period of time and if that is felt to be significant, on consultation they would change the label.

That's my understanding, but I may not be a

hundred percent accurate.

BY MR. PREMO-HOPKINS:

Q    I mean, I want to make sure I'm very specific.

One of the -- one of the issues that you've described is a concern that with regard to the Trulicity labeling, that the highlights section didn't include information about GI adverse events; is that right?

A    Correct.

Q    And are you familiar at all with the regulatory framework as to whether or not the highlight section of the label can be changed unilaterally by a manufacturer?

A    I am not aware of the manufacturer being able to change the label without talking to the FDA or the FDA necessarily change the label without talking to the company, necessarily.

Q    So whether it's the highlight section or Section 5 or Section 6, your understanding is that you're not aware of the manufacturer being able to change the label without talking to the FDA or the FDA being able to change the label without talking to the company?

MR. PENNOCK:  Objection.

BY MR. PREMO-HOPKINS:

Q    Is that right?

A    I'm not an expert in that area.

Q    In your experience working at the FDA --

MR. PENNOCK:  Excuse me.  I objected to that last question.

THE COURT REPORTER:  I have an objection to.

MR. PREMO-HOPKINS:  I see the objection.

THE COURT REPORTER:  You don't see your objection?  There's an objection.

MR. PENNOCK:  Oh, it's down below.  Sorry.

BY MR. PREMO-HOPKINS:

Q    So in your report, in your expert report -- I'm going to start my question over.  Is that all right, Dr. Metz?

A    Sure.

Q    In the work that you did in reviewing -- in preparing for the expert report that you've issued that's Exhibit 1, did you review at all the Zepbound approval package that the FDA produced in late 2023?

A    The actual package that was sent to the FDA, I don't believe I saw it as a single package.  I'm not sure how it was presented to me.  I know that I've seen the trials and the pivotal trials under their names.  The words "SUSTAIN," et cetera,

"LEAD," "LEADER," but I don't think I actually saw letters, Dear Mr. FDA, here is our package asking for approval.  I did not see that.

Q    Did you see any back and forth -- setting aside the clinical trial data for the Zepbound, did you see any back and forth with the FDA around the Zepbound approval, whether that's FDA consideration of labeling or anything like that?

A    No.

Q    Dr. Metz, you said earlier something to the effect of a GLP-1 is a GLP-1.

Do you recall making that statement?

A    Yeah.

Q    Did -- do you agree with me that GLP-1 RA medications have differing molecule structures?

A    Yes.

Q    Do you agree that they have differing molecule sizes across agents?

A    Yes.

Q    Do you agree that GLP-1 RAs have differing effects on glycemic control?

A    You can certainly change the structure of the drug to affect the pharmacokinetics and pharmacodynamics of the drug, yes.

Q    Did you do any review or analysis of any

structural changes in any of the GLP-1 RAs to understand whether they impacted the pharmacokinetics or pharmacodynamics of the medications?

MR. PENNOCK:  Objection.

THE WITNESS:  I'm not a pharmacologist.

BY MR. PREMO-HOPKINS:

Q    So the answer to that is "No"?

A    Correct.

Q    Do you know, one way or the other, whether the differing GLP-1 RAs have differing cardiovascular effects?

A    I'm not commenting on cardiovascular effects.

Q    Do you know, one way or the other, whether the GLP-1 RAs have differing effects on weight loss?

A    Well, I know that there's a certain difference in the efficacy of these drugs in terms of how much weight loss they produce.

Q    Do you agree that GLP-1 RAs have differing side effects?

A    That's a tricky question.  Binding to a GLP-1 receptor will cause effects whether it's drug A or drug B or drug C, but there may be differences in the molecular structures of these drugs that they

could have other adverse events.

Q    And you didn't do any sort of analysis to understand the extent to which drug A or drug B or drug C may present a different side effect profile; is that right?

A    Well, I did look into whether GIP has any effects on the stomach.

Q    Other than looking into whether GIP has any effects on the stomach, did you do any other sort of analysis to understand the extent to which, as you described it, drug A or drug B or drug C may present a different side effect profile?

A    Not that I recall.

Q    You mentioned that all GLP-1 RAs bind to the GLP-1 receptor; is that right?

A    Uh-huh.

Q    That's a "Yes"?

A    Yes.

Q    And that's what you understand to be the known mechanism of action of these medications?

A    The mechanism of action of these drugs is that they are, as the name suggests, the GLP-1 receptor agonist.

Q    And are you aware of any literature based on your work in preparing your report that identifies

an effect on the body that GLP-1 RAs have when they're not bound to the GLP receptor -- let me ask you a question a little different way.

Is that all right?

A    Yeah.  Please.

Q    Furrowing your brow a little bit.

A    Yeah.

Q    In your review of the literature, did you see any evidence to support a conclusion to a reasonable degree of medical or scientific certainty that GLP-1 RAs have an effect on the body after they're no longer bound to the receptor?

A    No.

Q    Dr. Metz, I want to switch topics.  It should be a pretty quick line of questioning.  We can do that and then take a break or we can take a break now, whatever is better for you.

A    Keep on trucking.  I'm great.

Q    Great.  So if we turn to page 137 of your report.  And this is going to relate to your second inquiry.

Do you see on page 137, you've got a header there that lays out Question 2 and then methodology, along with some of the categories you examined follow.

Case 2:24-md-03094-KSM    Document 691-33    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

A    Correct.

Q    And you used the Bradford Hill criteria to assess the evidence and answer Question 2?

A    Correct.

Q    And at the bottom of 137 onto page 138, you have a section called "Definition of prolonged."

A    Yeah.

Q    And you write that you identify the term "prolonged" as being:

"Continued gastroparesis diagnosis or report of symptoms listed in the gastroparesis cardinal symptoms index for more than six months following cessation of GLP-1 treatment where an episode of acute and medically treated gastroparesis (index event) occurred post commencement of GLP use."

Right?

A    Uh-huh.  I do.

Q    And I'm going to ask you about this six-month period.

It says that you chose six months on the basis that if the acute onset of gastroparesis is severe and some continuing symptoms might be sensed or perceived by patients for some time after cessation but complete resolution of even perceived continued symptoms should, in my opinion, occur

within six months at the outside.

Right?

A    Correct.  That's what I wrote.

Q    You don't cite anything here.  What do you rely on to -- for your six-month outside limit?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, you know, if a drug is going to have an effect, usually after five half-lives, it will have left the body and those effects may have abated unless there was a change induced during those five half-lives and the multitude period of time beforehand.

So let's say somebody was on a drug for two years and then they developed an issue.  If you stop the drug five half-lives beyond that time, you would expect that it would necessarily go away unless the cumulative effect of being exposed over that time changed something in the body that it would persist.

I would give them up to six months before I said, you know, let's just hold tight and see how you go.  This may get better.  You're feeling bad. You might not feel bad forever.  The drug's gone away.  Let's just give it enough time.  And I'm -- arbitrarily came up with six months.

You know, if you're still having symptoms

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

four months later, I would say, let's see how you go; and you're still having symptoms five months later, let's see.  And by the time six months is up, you're going to have to say, okay, could this truly be drug related or is this thing totally unrelated that just happened to have been true, true, and unrelated and then I would have to look into it and try to work out all the potential ways that I think prolonged exposure to a GLP-1 might lead you with a permanent effect.

I give you one example in my report, but there are others.

BY MR. PREMO-HOPKINS:

Q    Understood.  So let me make sure I understand that various things you said in that answer.

Usually, as you understand it, after five half-lives, it's accepted that a medication will have left the body and typically effects of that medication will have abated?

A    Correct.

Q    And then you said, well, in order to understand whether there may be prolonged symptoms, I, Dr. Metz, would want to continue to monitor a patient for six months?

A    Yup.

Q    And that line is one that you arbitrarily came up with?

MR. PENNOCK:  Objection.

BY MR. PREMO-HOPKINS:

Q    You can answer.

A    I can answer?

Q    Yes.

A    Well, "arbitrarily" -- I wouldn't say I sucked it out of thin air, but I'm saying that if people get effects related to any kind of illness, it might take you really a long time to truly feel back to your normal self; and I would say six months is a reasonable period of time to have come up with.

Q    You don't cite in your report any sort of study that would test whether that six-month cutoff is more likely than not to be correct?

A    I don't cite anything.  I'm sort of going by 30 years of exposure to patients and their symptoms.

MR. PREMO-HOPKINS:  All right.  Why don't we take a five-minute break.  We can go off the record.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 9:26 a.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going back on

the record, and the time is 9:39 a.m.

BY MR. PREMO-HOPKINS:

Q    Dr. Metz, we took a break.  Are you ready to begin again?

A    Yes.

Q    So Dr. Metz, I'm going to focus your attention now on the third inquiry that you were asked.

And do you recall that inquiry related to at what point in time there was reasonable evidence of a causal association between GLP-1 medications on the one hand and drug-induced gastroparesis on the other, yes?

A    Correct.

Q    And if we turn to page 169 of your report, actually, the section begins on the bottom of 168, there's an opinion header and the actual opinion follows onto 169.

Do you see that, sir?

A    Got it.

Q    And --

A    Sorry, I lost my mic.  I think I've lost a piece.  Sorry about that.

Q    Dr. Metz, you've identified on page 169 the -- that by the end of 2018, the clinical trial

evidence coupled with post-marketing evidence led you to your opinion that there was reasonable evidence of a causal association with Trulicity by that point in time; is that right?

A    Correct.  Especially also because of the published article in the public domain that I referred to as well by RAI.

Q    Okay.  And the published article in December of 2018 by RAI, do you know what medication that involved?

A    It involved liraglutide.

Q    And without the case report of RAI that was published or reported in late December of 2018 -- I'm going to start my question over again.

Is that all right?

A    Please do.

Q    I'm trying to understand the role that that case report played in your ability to reach the conclusion that there was reasonable evidence of a causal association.  And so the -- you note that the R-A-I, RAI, report was important.  Without that RAI report, would you have been able to reach the same conclusion?

MR. PENNOCK:  Hold on a second.  Let me just read that.

Objection.  Go ahead.  Want it read back?

THE WITNESS:  Sure.  Yeah.  Tell me what --
what the issue is.

BY MR. PREMO-HOPKINS:

Q    On page 169, you note that based on the
clinical trial evidence, real world post-marketing
evidence, and then you said also in your response to
my last question that the RAI publication was an
important consideration for you, even though it
related to liraglutide, yes?

A    It was a consideration.  I mean, as I'm
saying, and I've said all along, native GLP-1 should
have been an issue to be concerned about because
it's what it does to the stomach.  If you make a
GLP-1 agonist and you add that, you should be aware
that that's a potential concern.

When you do your Phase 1 and Phase 2 trials
with the drug and you start seeing symptoms that are
compatible with gastric emptying issues, you should
be aware of it.  In fact, the company did do one
gastric emptying scan with scintigraphy that shows
clearly that there was a delay in gastric emptying
caused.

So they knew that and they, in fact,
accepted that fact.  And they also knew that it was

not statistically significantly worse after five weeks of exposure.  They then get on to doing Phase 3 trials and you see a two-to-threefold-increase in the symptoms associated with the drug versus placebo.

And so by now you're starting to think there's a real issue here with gastroparesis.  You go to the FDA, you show them the data.  They get you approved.  You get on the market and then post marketing.  Doctors start using it in the real world situation and they see more and more and more mounting evidence.

Somewhere along the way you have to turn around and say well, this is no doubt in my mind.  This is a real association and it's a real potential concern.

And I think then when you finally start seeing publications in the general domain of events with case reports that don't have anything to do with private communication between the FDA and the drug company, that you say hell, this is an association.  So I come up with 18.

As I say in my report, when considering the steps to establish reasonable evidence, the whole paragraph to follow that, I think I'm being generous

Case 2:24-md-03094-KSM    Document 691-33    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 59 of 302

about that suggestion.  I think you could clearly say based on how this all works, that you could have known all this much sooner.

Q   Could have known what much sooner?

A   Could have known that the drug was going to be causing problems with gastric emptying effects.

Q   And when you talk about problems with gastric emptying effects, is that -- are you using that synonymously with your --

A   Yes.

Q   With your term "drug-induced gastroparesis" or impaired gastric emptying or gastric dysmotility, things like that?

A   Correct.

Q   Dr. Metz, I -- I want to go back for one moment to the conversation we were having about half-lives.

A   Yeah.

Q   And prolonged effect?

A   Yeah.

Q   And you mentioned that if you had a patient who had been on a GLP-1 and then was off the GLP-1, you would want to monitor that patient for six months to see if there was any sort of permanent effect or prolonged effect, excuse me.

A    Okay.

Q    Is that -- am I -- am I accurately --

A    Well, let me -- let me state it, then.

Q    Yeah.

A    If I have a patient who's been on a drug and has side effects related to that drug that we believe on the basis of gastric emptying delay and we stop the drug, you would expect hopefully that it will all go away.  And it probably does, in most patients.

However, I think it -- and there are, I understand, patients who have persistent complaints. Until I want to blame the drug and think it's something that I need to work on as an alternative possibility, I think you would need to want to go for six months.

And I'm saying that because everybody is different.  Some people have it worse.  Some people have it more severe.  Some people have life-threatening events that landing up in hospital, it gives them PTSD that might take them time to get over.

And then I have to think about how could it be that a drug that isn't in the body anymore could still be causing effects that lasted, prolonged.

And there are possibilities.  I give an example in my report of the effects on microbiome and, in fact, it's quite interesting.  I know that GLP-1s affect the microbiome.  It doesn't happen early.  It happens later on in the course, but once it's happened, it might not change and go back again.  The microbiome can cause certain effects.

I know that GLP-1s could potentially impact on triggering functional gastric symptoms.  You know, the Rome IV criteria is functional dyspepsia.  So you could have somebody that has a traumatic event.  They land up with aspiration.  They land up in a pneumonia situation.  They're on a ventilator in a hospital.  They nearly die.

They stop the drug.  Everybody says you're going to be fine, but now they've had influence of all that -- the triggering event that might precipitate a functional dyspepsia that could persist.  And if it doesn't go away by six months, I'm going to say, well, we better start looking into the potential cause of it.

I know that the drugs affect the motility as a result of its effect on its vagus nerve, afferent on afferent.

And they interact with the interstitial

cells of Cajal, which is the pacemaker cells in the stomach.  And for all I know, there might be some kind of impact in some patients on the interstitial cells of Cajal that could present for long term and affect the motility the whole way down the GI tract, not just only in the stomach.

So what I'm getting at is, I would give a patient time to get better.  If they don't necessarily get better, I would say, well, this is a real problem.  How can I symptomatically treat you with whatever drugs I want to try.  Prokinetics, antikinetics.

(Reporter clarification.)

THE WITNESS:  Proton pump inhibitors and other medications, and if they're still not better in six months, now I have to decide how much of an evaluation am I going to need to do to try and determine whether those could be related to the previous exposure or not.

And there are no firm data on this, as I point out in my report.  But it is certainly not beyond the realm of possibility.

BY MR. PREMO-HOPKINS:

Q    You're not aware of any firm data that would support the conclusion that a patient who has been

off of a GLP-1 RAs medication for six months would still be suffering from delayed gastric emptying or related symptoms as a result of that medication; true?

A    So what I'm getting at is, it's not necessarily the drug caused the effect.  The effect persisted for whatever reason.  It's not directly, but A can cause B and B can lead to C.

Q    Are you aware of any evidence, any study, that supports the claim that a drug effect for GLP-1 RAs can persist for up to six months after the medication has been stopped?

MR. PENNOCK:  Objection.  Asked and answered.  Go ahead.

THE WITNESS:  Yeah.  I'm saying I don't believe that there are any known data at this point, but it is certainly not beyond the realm of possibility.  And we do know that traumatic events related to a drug could induce an effect that would persist.

BY MR. PREMO-HOPKINS:

Q    So there's no known data at this point that a drug effect for GLP-1 RAs can persist for up to six months after the medication has left the system; true?

MR. PENNOCK: You're now switching back to up to six months, or are you saying beyond six months? Because...

BY MR. PREMO-HOPKINS:

Q Let me ask my question again. There's no known data that you're aware of that a drug effect for GLP-1 RAs could persist after washout of the medication up to a period of six months; right?

MR. PENNOCK: Objection.

THE WITNESS: I know of no published data.

BY MR. PREMO-HOPKINS:

Q Thank you. Are you aware of any unpublished data on that topic?

A I gather there are patients that are out there who are complaining. Otherwise, we wouldn't be sitting here.

Q Outside of what you assume based on the fact that people filed a lawsuit, are you aware of any actual, unpublished study, something that's in the works, that would support the position that a drug effect for a GLP-1 RAs could persist after washout of the medication up to a period of six months?

MR. PENNOCK: Objection.

Go ahead.

THE WITNESS: I'm not aware of anything

that's in the works.

BY MR. PREMO-HOPKINS:

Q    Dr. Metz, I want to look at your report on page 70 -- 170, excuse me.  I think it's the next page where you began to address some of the language from the Trulicity label.

A    Right.

Q    And am I correct that this is the Trulicity labeling language from the original approval in 2014?

A    Correct.

Q    Have you -- you're a gastroenterologist; is that right?

A    Correct.

Q    And when -- when did you stop -- I'll ask you a better question.

At one point you were board certified as a gastroenterologist; is that right?

A    Correct.

Q    And you no longer are?

A    Well, that's -- I recertified three times. I came around to recertifying for, I think, the fourth time, if I'm correct.  '90, '00, '10, '20. And I elected at that stage not to recertify.  But I consider myself a fully qualified

gastroenterologist.

Q    Do you maintain a medical practice, currently?

A    I don't actually see patients at this stage.

Q    Have you seen patients since 2021?

A    No.

Q    Have you ever prescribed Trulicity?

A    No.

Q    Have you ever prescribed Mounjaro or Zepbound?

A    No.

Q    On page 170 and 171, you identify some opinions that you have about the language in section 5.6 of the approval version of the Trulicity label; is that right?

A    Correct.

Q    And the -- on 170, you lay out language from section 5.6 of the Trulicity label and then you have some notes underneath, the first of which is that you do not -- as a gastroenterologist, you do not interpret the language to convey a warning that there is any risk of -- sorry about that -- of drug-induced gastrointestinal disease, severe or not, including, but not limited to, impaired gastric emptying or drug-induced gastroparesis; right?

A    Uh-huh, that's what's written.

Q    And that's your opinion?

A    That's my opinion.  The first of my opinions.

Q    Sure.  That's one -- that's one of your opinions.

A    Yes.

Q    Yes?  And your view is that it's not reasonable for a practicing physician, including a gastroenterologist, to be expected to interpret the language in this manner, you say; right?

A    Uh-huh.  I do.

Q    And when you say "this manner," do you mean as a warning that there is any risk -- I'm trying to understand what you mean?

A    Okay, let me explain what I'm trying to get at here.  The label under Section 5.6 says:

"Use of Trulicity may be associated with gastrointestinal adverse reactions, sometimes severe.  Trulicity has not been studied in patients for severe gastrointestinal disease, including severe gastroparesis and is therefore not recommended in this patient."

I interpret that to say that if you use Trulicity, some patients can get side effects.  It

doesn't say be wary of using these drugs in patients because sometimes they can get such severe side effects that they're going to land up in hospital or on ventilators with aspiration or they're going to get extremely ill and malnutrition from this thing.

I also say Trulicity has not been studied in patients with severe gastrointestinal disease, including severe gastroparesis.  So saying we haven't studied it in that drug.  But it doesn't say don't use it in those patients.

All it says, it's not recommended for use in patients with severe gastrointestinal disease, which is no -- in no way defined.  I don't know what severe is or mild or moderate gastrointestinal disease.  And certainly, what severe gastroparesis is.

And I don't believe the study tested anybody, but they tried to exclude patients with severe gastroparesis.  How did they define a patient as having severe gastroparesis and not being allowed into the trials in the first place, because that was an exclusion criteria, but they never measured emptying in any of the patients to do that.

They never actually said, do you have bloating.  How bad does the boating have to be to

quantify.  We know there's no association with severity of symptoms and severity of emptying.  So they want it -- do you want it both ways here?

If you're not going to put those patients into your trials?  How are you defining what doesn't get into the trial and therefore shouldn't get the drug if there's no definition even in the first place when you started your clinical trials?

So I have a real problem with how the wording is worded.  And I don't think that the doctors that were interpreting that wording could actually understand until there were lots and lots of cases that developed in post marketing trials that people realized, yeah, this is a potential real, serious problem and patients are going to get sick.

So I have a problem with the way the label is worded.  Not being a labeling expert, just being a gastroenterologist who's going to come in 2014, probably just look at the highlight section and not see that even listed in the highlight section.

But even if you go far enough away to look at the whole label, it still doesn't make any clinical sense to me, that says to me, this is a drug that you've got to be really worrying about

because it can hurt people and even potentially maybe kill them.  That's my whole concern.

Q    And so you don't think that the risk of gastrointestinal adverse events is -- is mitigated by the labeling here?

A    Absolutely.  I think the labeling is far -- sort of vague.

Q    And did you talk to any other doctors who were practicing in September of 2014 to understand their perspective on this Trulicity labeling language?

A    No.

Q    Did you conduct any sort of study or survey, anything like that?

A    No, I based my decision on 30 years of experience, 30 years of treating patients with all sorts of drugs that potentially may have issues related beyond their release.

Q    With regard to -- that would reflect your personal understanding, yes?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, I was asked to give my opinions based on all the stuff that I reviewed related to the three questions that I was asked. That's what I did.

BY MR. PREMO-HOPKINS:

Q    And you're offering an opinion that it would not be reasonable for a practicing physician to be expected to interpret the language in the manner that you described; yes?

A    I am stating in my report, on page 170 to 172, as to why I think there were issues with the label in 2014.

Q    And you go on to say that in your opinion, it is not reasonable for a practicing physician -- are you referring to people other than yourself there?

A    Yeah.

Q    Okay.  And you'd be referring to folks like primary care doctors, internal medicine doctors, things like that?

A    I would say that anybody who's able to prescribe this drug should have been made aware of its potential concerns by 2014.  That is not clearly conveyed in the way, first of all, the highlight section is written, with its gaping hole.  And second of all, if people were to look at the whole complete label below, as I outlined on this report.

Q    And what you would expect or want to see is more information about the fact that there had been

reports about severe gastric emptying events; is that right?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  I would like to see a lot more.  I would have liked to have seen, as I say in my section that we've already gone through before, that I think as far as the very start of this program, that there should have been awareness that these drugs bind to GLP-1 receptors, they have effects on GLP-1 receptors throughout the body, including all the enteric nerves, and it results in issues with gastric emptying.

It's how they work.  It's what the drug does.  And therefore, a drug-induced effect from an on-target result should make the manufacturers and people studying these drugs aware that they potentially could lead to effects that may hurt patients while at the same time achieving other objectives, such as glycemic control, and then later in patients who don't even have diabetes looking at weight loss control.

And that when you get to your Phase 3 trials, long before you even got into the public domain, and you see a two-to-threefold increase in

side effects that might be labeled as mild,
moderate, or severe according to the, you know, the
standards, but could have significant clinical
consequences that were a lot more severe than just a
little bit of nausea and vomiting -- oh, everybody
gets it.

We can look after it.  Don't worry.  That's
how the drug works.  You can modify it.  You can
sort of give them antinauseants.  You can tell them
to change their diets.  You can go with a lower
dose.  All of those issues were ways to mitigate it.

But not recognizing the fact that yeah,
despite all of those things, there is a risk to the
patient that you haven't told them in this label.
You haven't told the doctor in this label.  That's
my concern.  That's my concern about the entire
program.

BY MR. PREMO-HOPKINS:

Q    When you say "the program," what do you
mean?

A    The entire GLP-1 efforts with all of these
drugs.

Q    And so if these labels would have said
something like, these drugs -- we've seen reports of
these drugs with impaired gastric emptying,

including severe gastroparesis, you should be aware of that, monitor your patients; is that the type of thing you'd like to see?

MR. PENNOCK: Objection.

BY MR. PREMO-HOPKINS:

Q Go ahead.

A I would have liked to have seen warnings to physicians that if a patient taking one of your drugs starts getting nausea vomiting, they're at risk of getting very sick and you should probably withhold the drug, as was done in a lot of the trials, in fact.

Many of these patients withdrew. Why did they withdraw? They withdrew because they had vomiting. And they didn't like the drug and it didn't make them feel good and they were at risk for getting really sick. That's not warned here.

So if you have a drug and you say, oh, you know, the effect goes away with time, yeah, the effect may go away with time. It doesn't dissipate. We know there's only one gastric emptying study that was done that showed it was not a statistically significant -- the significance for tachyphylaxis.

(Reporter clarification.)

THE WITNESS: But there's no significance --

no significant difference, so they -- they claim that, but patients are still potentially at risk of getting these issues happening to them. And when they happen, they can be significant in terms of the long-term effect.

I don't see anybody being warned about that. Now, if you have enough people withdraw from your trials early on, you're going to be selecting out the patients that are at risk. You're not leaving the patients behind that are potentially at risk and then you're coming to the real world where people aren't being removed because they're getting these symptoms.

The doctor is going to say, oh, well, don't worry. The drug causes this effect. It's fine. You'll get used to it. It goes away with time. Everything is going to be okay. Just hold tight, Ms. Jones. And then Ms. Jones aspirates.

So I have a problem with the way the labeling described the effects. And I think it was a concern. That's why I got involved in answering those three questions.

BY MR. PREMO-HOPKINS:

Q   And you said one of the things you would like to have seen in the labeling is warnings to

physicians that if a patient is taking one of these GLP-1 RAs and they start experiencing nausea or vomiting, then you should monitor the patient and potentially hold the drug?

A    There are ways to address it, yeah.  You reduce the dose, hold the drug, change the diet. There's all sorts of things that can be done, but there was no warning to the physician that getting effects of gastroparesis at the time of taking this drug is something for you to really see as something serious.

Not just, you know, yeah, it's very recognized.  This is what the drug does, so we're not going to worry about it because it goes away. Everything will be fine.  Mrs. Jones will handle it.

And actually, I've had personal experience with friends who have noticed this with, on a couple of occasions.

Q    I'm sorry.  I want to make sure I understand because you have in your report -- you have an opinion with regard to -- a lack of clarity, I'll say, of the language?

A    An absence, yeah.  An absence of the significance of how bad this potentially could be.

Q    And when you say "how bad," you mean the

incidence of drug-induced gastroparesis or -- or impaired emptying and the side effects associated with that?

A    Correct.

Q    And the -- the information that led you to believe that there was a reasonable evidence of a causal association, that eventually came through where the adverse event reports that were in the real world, yes?

A    No, as I say again in my report, I would have felt it probably would have been appropriate for the company studying these drugs, especially subsequent drugs after previous ones had already been approved and there was information out there, that when you started this program and you got to your Phase 3 data and you see a threefold increase in these potentially life-threatening risks, which instead of downplaying them and saying it's part of the mechanism of the drug, is I think you should start -- have looked at those as potential side effects of special interest related to off-target effects.

Sorry, on target -- you know, GLP-1 effects that weren't necessarily going to be only giving you what your desired outcome was, which was weight loss

and/or diabetes control.

Q    So you would have expected to see some more specific language around the severity, the potential for severe reactions?

MR. PENNOCK:  Note my objection.  He's given you some very detailed answers here.

THE WITNESS:  Yeah.  I mean, I think I pointed out the fact that to just say you get more -- you get nausea, vomiting, bloating, dyspepsia, abdominal pain, and that by CDCR criteria, these are called mild, that -- oh, don't worry about it, that's what the drug does.

But you can have mild vomiting and aspirate.

So what I'm getting at is the consequences of what was labeled as being mild and therefore not worth worrying, so let's have a look at all the meta-analyses, for example, that I cite in my report.  Sure, if you've got a million patients treated and you only have three what you call severe vomiting, you know, that's not important; but what about all the hundreds and hundreds of people that had mild enough vomiting that they could get sick. So yeah, it's the outcome that's important.  Not the labeling according to some criteria.

BY MR. PREMO-HOPKINS:

Q    What do you mean it's not important, "the labeling according to some criteria is not important"?

██    ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████    ██

████████████████████████████

████████████████████████████

████████████████

I'm saying that those were also important. So if you take -- in fact, I remember offhand, let's take the Award trial where the meta-analysis only had one or two adverse events.  Wasn't statistically significant because it was so few numbers; but if you looked at the actual events, there were 17 in the drug side and I think 6 on the other side and there was a statistical significance, but they didn't see that as important, and I actually allude to that in my report, in the Award trial specifically.

Now, that's a particular trial, but it's not

the only trial.  It was repetitive.  You know, every single program or trial, you name it.  SUSTAIN, PIONEER, LEAD, any of them.  If you look at what happened to those patients, you'll see that always -- in fact, almost always, if not always, at the top of the list, the adverse events, which were two or three times higher, were nausea; vomiting; gastroenteritis; which might be an infectious gastroenteritis, or it might just be nausea and vomiting related to late emptying of what is mislabeled as gastroenteritis, et cetera, et cetera. So I think the signal was definitively there long before it got to post-marketing reports.

Q    The inquiry you were asked was at what point in time were manufacturer- -- does the evidence support a conclusion that there was reasonable evidence of a causal association between GLP-1 agonists and drug-induced gastroparesis; right?

A    Correct.

Q    And with regard to your criticism of the label, you, as a gastroenterologist but not an FDA expert, have said -- you should have had more information in there; right?

MR. PENNOCK:  Objection.

THE WITNESS:  As a gastroenterologist who

would be totally unaware of all this information that you or I are privy to now because it was between the companies and the FDA and it wasn't public knowledge, if I was a gastroenterologist and I read the label in 2014, I would not have necessarily realized -- in fact, I would not have realized and that's what the whole argument is that I state about their label that these drugs could potentially really hurt people.

BY MR. PREMO-HOPKINS:

Q    And, you, as a practicing gastroenterologist in 2014, you would have wanted to see some additional language in the label about the fact that there are events related to impaired gastric emptying that are severe here?

MR. PENNOCK:  Hold on a second, please.

THE WITNESS:  Can I just get a little bit of water if you don't mind.

MR. PREMO-HOPKINS:  Yeah, sure.

THE WITNESS:  Thank you.

MR. PENNOCK:  I mean, I'll object because you -- his opinion relates to 2018, and you're asking him about 2014.

MR. PREMO-HOPKINS:  Sure.

///

BY MR. PREMO-HOPKINS:

Q    At any point from 2014 -- you lost your microphone again, sir.

A    Whoops.

MR. PENNOCK:  We're going to have to invest in a new microphone for you.

BY MR. PREMO-HOPKINS:

Q    Dr. Metz, I'm going to focus your attention on the time period when you say, with regard to Trulicity, reasonable evidence of a causal association exists which is no later than the end of 2018; is that right?

A    That is correct.

Q    All right.  So at that point in time, based on your review of the labeling, you think that the label should have been -- should have included additional language to explain to physicians that there were events related to impaired gastric emptying that were being seen, that they could be severe, including gastroparesis; right?

MR. PENNOCK:  Objection.

THE WITNESS:  That there were events relating to delayed gastric emptying that could have been severe, yes.

///

BY MR. PREMO-HOPKINS:

Q   And that physicians who were prescribing these medications, if they see symptoms that could be associated with an impaired gastric emptying or gastroparesis, that they should consider dose modification or discontinuation?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  I'm not -- sorry can I go?

MR. PENNOCK:  Yes.

THE WITNESS:  Yeah, I'm not commenting on how the label should have necessarily been labeled. I'm not writing the label.  But what I'm saying is that the doctors who read what was there weren't aware of the potential risk and that the label should have been written in some way to warn people that these bad things could happen.

BY MR. PREMO-HOPKINS:

Q   And "these bad things," you mean, impaired gastric emptying, including severe gastroparesis?

(Reporter clarification.)

MR. PENNOCK:  Just note my objection.  I mean, he states his opinion in writing in his report.

But you're -- you're not referencing to a

Case 2:24-md-03094-KSM    Document 691-33    Filed 05/19/26    Page 84 of 302

report.  You keep recasting things.

BY MR. PREMO-HOPKINS:

Q    So Dr. Metz, you said, "the doctors who read what was there."  And by "there," you're referring to the language that's on page 170 of your report, yes?

A    Correct.

Q    The doctors who read that weren't aware of the potential risk and that the label should have been written in some way to warn people that these bad things could happen.  That was what you just said?

A    That is what I've just said.  I stand by what I wrote in my report.  I mean, I think the report speaks for itself.

Q    And I just want to make sure I understand.  When you say, it should have been written in a way such that physicians were more aware of these bad things happening, what you mean is impaired gastric emptying including the potential for severe gastroparesis, yes?

A    That is correct.

Q    Okay.  Dr. Metz, on page 55 of your report, I'll direct you there.  Let me ask you.  This is a long report.

A     Yeah.

Q     How much time did you spend putting it together?

MR. PENNOCK:  Objection.

THE WITNESS:  I can't give you precise numbers offhand, but I think they did pass on how I was paid and what was done and so I think that should hopefully give you the number of hours.

I spent a lot of time.  Let me put it that way.  Lots and lots of time looking at the data that was sent to me, doing literature searches myself, sending manuscripts up and down.  Reviewing them, discussing how to present the data, and it took ages.  Ages and ages.  It's a good thing I've been semi-retired.  I don't see how anybody in practice would have had the time to have reviewed all this information and come up with such a long report, of which I'm very proud.

BY MR. PREMO-HOPKINS:

Q     So you -- again, if I direct you back to page 56 of your report.  On 55, you've begun the introduction to the experiment factor in the Hill criteria; is that right?

A     Correct.

Q     And one of the pieces of evidence that you

look at for the experiment criteria is a series of case reports that are included on pages 56 to roughly 63; is that right?

A    Correct.  And the first one, RAI, is the one we've already discussed.

Q    Correct.

A    Yes, it ends at 63.

Q    And you call these "challenge events"; is that right?

A    Correct.

Q    And why do you call these "challenge events"?

A    Well, you can get a challenge and a dechallenge and a rechallenge.  So obviously, and one of -- the only absolute requirement for Bradford Hill is that the exposure has to happen before the event.

So a challenge event is if you take the drug and you get an effect.  A dechallenge event is if you stop the drug and it goes away.  A rechallenge event is if you restart the drug and you get it again.  If you have all three of those, you've got sort of cast iron evidence.  If you've got two of them, you've got less than cast iron evidence.  If you're got one of them, you're getting suggestion of

an evidence; and when you see more and more and more and more of those, you start reaching a point when you say look, this is real.

Q   And so when you talk about challenge events, you're generally referring to the concept of challenge, dechallenge, or rechallenge?

A   Yes.

Q   Did any of the challenge events that you identified in your report in pages 56 to 63 indicate that any of the patients had persistent effects after the patient went off the medication?

A   I would have to look through every one of them, one by one, to be sure of that.  My suspicion is no -- it's not what I was getting at in this section of the report.  And a doc who made the report that the challenge event resulted in an evidence that there was gastroparesis-associated effects doesn't necessarily mean that the paper wasn't written to say, and it persisted for six more than months or a year or five years.

Q   Do you recall any evidence in the case reports that you identified here that indicated that any of these physicians who were publishing these case reports reached a conclusion that after the patient came off the medication, there were still

persistent effects for up to six months?

MR. PENNOCK:  Up to six months?

THE WITNESS:  Oh, up to six months, yeah, they all had events.

BY MR. PREMO-HOPKINS:

Q    For how long?  After the medicine washed out, for how long?

A    We'd have to look at them, one by one.

Q    Why don't we take a look at one.

A    Pick one.

Q    Why don't we take a look at the Iskander case on page 61.

A    That's quite a long case.  Okay.  Would you like me to read it and get familiarized?

Q    That's fine with me.  I also have a copy of it if they would like that.

A    The actual manuscript?  That would be great.

Q    Yes.

A    Let's rather look at the actual manuscript.

MR. PREMO-HOPKINS:  Why don't we mark this as Exhibit 2.

(Defendants' Exhibit 2 was marked.)

BY MR. PREMO-HOPKINS:

Q    And feel free to consult the -- Exhibit 2, which is the Iskander manuscript or your summary

that is on pages 61 and 62.

A     Sure.

(Reporter clarification.)

THE WITNESS:  I said isn't that an impressive X-ray.

BY MR. PREMO-HOPKINS:

Q     First, if you look at the case report, they describe the event as an "acute functional gastric outlet obstruction"; right?

A     Correct.

Q     And they don't describe this case as a case of gastroparesis; right?

A     Well, they're a functional gastric outlet obstruction implies that the stomach doesn't empty. It's dilated and there's no mechanical obstruction. So you can get into semantics, you know, gastric atony is another way of describing this.  So I don't mind how you want to define it.  And I think we can get into definitions between what is gastroparesis, what's drug-induced gastroparesis, what is gastric atony, what's meteorism, what's a functional outlet. It's all the same problem.  This guy has a stomach the size of Texas and is at risk for getting aspiration, regurgitation, and significant effects.

In fact, looking at the X-ray, I would say

there's evidence of a lot of air in the large bowel. I'm not sure the large bowel was working as well here either, so we got to talk about the enteric effects all the way down the GI tract from neurogenic involvement from these drugs. And there's a lot of gas in the small bowel as well.

So I would say, you know, this is probably, essentially, an atony or enteric dysmotility all the way down from the stomach all the way down to the rectum. But the size of the stomach is extra super impressive in both the X-ray and in the -- this is a CT as well, which is, you know, filled with debris blocking the spleen. The spleen is being crushed.

Q   There's no objective evidence of the patient's rate of gastric emptying reported; right?

A   If you want to measure gastric emptying, you have to do a gastric emptying scan.

Q   And was there -- in the Iskander case report, was there any evidence provided that you could rely on that reported the patient's rate of gastric emptying?

A   The absence of a -- the rate of emptying? There's very little emptying if any at all here based on what we see, but we do know that the

gastric -- we know that this is a nonmechanical obstruction.  Okay?  There's nothing blocking the stomach from emptying so it's a functional obstruction; and therefore, it's a paralysis of the stomach that didn't empty.

So do you need to get a gastric emptying scan?  You can't give this guy a gastric emptying scan, I mean, I think there's absolute clear evidence in the literature that in the presence of an acute event, getting a gastric emptying scan is going to be of no use.  All it's going to do is make your patient vomit radioactive material because this ain't going to go anywhere.  This patient needs to be decompressed.  Shouldn't have anything put into the stomach.  They should have a nasogastric tube down and they should have everything sucked out.

So there's no way you would be able -- you should get a gastric emptying scan in this situation.  It would be dangerous.

Q    I appreciate that helpful information, Doctor.

A    Sure.

Q    In the report, whether or not you would recommend it or not, there is no evidence of -- an objective evidence of the patient's gastric emptying

or whether it was delayed.  True?

A    I believe so.  And amongst many -- all of these case reports, there's always some comment as we never got a gastric emptying scan because.  And they may have actually put that in.  We can read it and see.

No, the gastric emptying study was not done.

Q    And the report indicates that the symptoms that were observed went away after the tirzepatide was discontinued?

A    That is correct.  Essentially a dechallenge.

Q    And the symptoms that were disappearing after the dechallenge were vomiting and other gastrointestinal symptoms that were described in the report, yes?

A    That is correct.

Q    That's no indication of whether or not that dechallenge -- that dechallenge could not apply to a measure of the rate of gastric emptying; right?  Because we don't know what it was?

A    The only thing we know from what I've just read is that three days later, there was nothing in the stomach when they did an endoscopy.  So the gastric emptying was something less than three days.

Q    Let me direct you to page 50 of your report.

And do you see that on page 50 of your report it's sort of the end of the experiment section and you have a summary table of various published literature, yes?

A    Correct.  Yeah.

Q    And how did you identify the studies that are included in the table here?

A    These are the studies I believe that I referred to above.  They are many, many, many, many other manuscripts that I've reviewed.  As I said, I did lots of literature searches; and the ones that I felt were the most germane to the questions being asked, I summarized in my report; and in order to make it easy for you and I to go through them, I've listed them in a table.

Q    And with regard to the -- I appreciate the summary table.  That makes things easier.

With regard to the studies you've included in your report here, it's correct, isn't it, that there is no study that you've included that reports on exposure to a Lilly medication and finds a statistically significant increase point estimate for gastroparesis; right?

A    The only study that I know of that was done that showed a statistically significant increase in

gastric emptying after exposure to the drug was the study that was done by the company, one study, and it is clearly positive and it shows a delay in gastric emptying.

There's one study that was done with scintigraphy, and the patients got placebo on the first week and then every week there afterwards for four weeks, they got a rather low-ish dose of drug; and clearly, that shows a 90 percent emptying time over four hours in every case that got drug and not in one single case that didn't; but that is in the clinical trial data.  It's not in these studies.

These studies, I believe, were showing acute events in patients when I don't believe it is appropriate to submit them to a gastric emptying scan and that your diagnosis of gastric emptying delay is based on the fact that they have nonobstructive emptying and a potential exposure to a drug that causes it.

Q    Let me make sure I'm clear:  You were talking about one study.  That was a study that was done as part of the clinical trial program for Trulicity; is that right?

A    You know, I don't want to commit to which drug it was because I really had -- you know, as I

Case 2:24-md-03094-KSM     Document 691-33     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER     Filed 05/19/26     Page 95 of 302

said, a GLP-1 is a GLP-1, and I don't remember which particular study that was.

MR. PENNOCK:  You're allowed to look at your report if you discussed it.  If he wants you to.

BY MR. PREMO-HOPKINS:

Q    I want to make sure because I was asking you about the studies that were in your summary table. I understand those to be the observational literature that you reviewed -- or that you included in your report?

A    That is correct.

Q    This is a different set of studies, then, would have been included in your review of the clinical trial data?

A    Well, I mean, you've got to look at the totality of the data.  You know, you get your signal.  You decide that this might be something worth learning about.  You look at your Phase 1 data.  You look at the Phase 2 data.  You look at the Phase 3 data.  You look at any other post-marketing data.  You look at post-marketing studies.  You look at case reports.  You look at issues that are mentioned to the FDA or published in the literature.  And you come up with a decision. So, you know, I -- this is -- I've looked at

everything before I came to a decision.

Q    I appreciate that.  One of the things you looked at was clinical trial information.  Yes?

A    Yes.

Q    Another thing you've looked at and included in your report were these 15 observational studies that have been done between 2023 and 2025.  Yes?

A    Correct.

Q    With regard to these 15 observational studies that were done between 2023 and 2025, reflected in your table, none of them identify a statistically significant increase point estimate or association between a Lilly medication on one hand and gastroparesis on the other hand.  True?

A    Gastroparesis is a weakness of stomach emptying.  One of the ways of showing it is to do a gastric emptying scan and the specific diagnosis of more than 10 percent retention at four hours after an eight-hour fast in the appropriate setting is relevant.

These patients were acutely ill.  This was not the time to do any gastric emptying studies.  So you don't expect that there would be any point estimates of any kind of emptying, but you have indirect evidence in all of these cases of

nonobstructive functional delay; and therefore, that is by definition in my opinion, compatible with drug-induced gastroparesis.

Q    Dr. Metz, I want to look at your table.  In your table, you have a column called "relevant outcome"; right?

A    Yeah.

Q    Under the "relevant outcome" column for each of these studies, you identified whether there's an outcome for gastroparesis, sometimes it uses gastric emptying study results, sometimes it doesn't. Sometimes there's a different outcome.  Yes?

A    Yeah, I mean, look, Kalas, for example, says using gastric emptying scan results.  So you can go back to Kalas.  We can look at Kalas.  There were gastric emptying scans done in that particular study.  Okay.  So the diagnosis of gastroparesis can relate to a CPT code.  It can relate to other ways people determine gastroparesis.  This is not necessarily the most accurate way of doing things, but you work with what you've got.

And the bottom line is gastroparesis is defined in the paper.  You can go to each manuscript and say how do they define the outcome.  And is it a relevant outcome.  Is it a real outcome.  Is it the

best outcome that they have.  How limited is their outcome.  Does it require a gastric emptying scan showing more than 10 percent retention at four hours or not.  And we can work from there.

Q    With regard to your table and your summary of the summary table of these articles to make it easier for us, as you said --

A    Yeah.

Q    -- none of the outcomes listed in your table, that runs from page 50 to 52 identified a statistically significant increase point estimate or association between a Lilly medication on the one hand and gastroparesis as an outcome on the other. True?

A    As defined by?

Q    The study authors.

A    Well, no, that's not true.  Sodhi shows you an observation of 3.67 with a positive confidence interval.

Q    For a Lilly medication?

A    All right.  So let's remind me now which --

MR. PENNOCK:  He's referring to this column.

THE WITNESS:  So remind me, please, of which drugs are which.

///

BY MR. PREMO-HOPKINS:

Q    So let me ask you a question without getting into the summary table.

Do you know one way or the other, whether any of the studies -- the observational studies that you included identify a statistically significant association between a Lilly medication on the one hand and the outcome of gastroparesis on the other?

A    And I'm asking you to please list for me the Lilly medications.  I can look for them.

MR. PENNOCK:  You can reference your report.

BY MR. PREMO-HOPKINS:

Q    Dulaglutide and tirzepatide are the generic names of the Lilly --

A    The --

(Reporter clarification.)

THE WITNESS:  The fourth study down on the summary table, Lupianez-Merly has dulaglutide listed.

BY MR. PREMO-HOPKINS:

Q    I can read your table as well as you can.

A    Yeah.  So then you don't have to ask me, but yeah.

Q    But I want to make sure --

A    The Crisafulli manuscript has dulaglutide

and tirzepatide.  The Sarwal study has dulaglutide.

And those are the ones that are listed and named as such.

We could go back to Nathani and see because that was just listed as GLP-1 RAs, and I have to look at the trial.  As with C, as with Alkabbani.  So we can go ahead and look at all of those trials and see which ones specifically they reference.

But, you know, I get back to my original comment that if a drug inhibits GLP-1 or a receptor, it's an agonist of the GLP-1 receptor.  It's an agonist of the GLP-1 receptor whether it's by one company or another company.  The drugs have a class effect.

Q    Are you relying on any other expert to reach the conclusion that the drugs have a class effect?  Any other expert disclosed in this litigation on the plaintiff side?

A    I haven't actually seen other people's reports, but I mean, it's -- it's what the drugs do.  It's how they work.

Q    If I can draw your attention to page 52, the conclusion under the table of studies.

A    Yeah.

Q    What you identify here is, you write in your

first sentence:

"This is a considerable set of studies from different authors and centers that set out to assess the association between GLP-1 medications and gastroparesis, the majority of which found statistically significant associations and none of which showed an inverse association."

Do you see that?

A    I do.

Q    What's the relevance of an inverse association?

A    Well, if you have a study showing that the drug protected against gastroparesis or caused an accelerated emptying, then you would say, well, this one is very different from all the others.

Let me make sure that this is an outlier or is it the real one and is there something going on with how these studies are designed?  But all of these studies were in that direction.  So cumulatively, I don't find anything that was against the hypothesis.

Q    So a -- a study which showed an inverse association would be one that you needed to consider and evaluate whether or not it -- how it affects the hypothesis?

A    Yeah, absolutely.  I mean, you've got to look at all the literature that you can find.  And, you know, so I basically -- my -- I looked at all the literature that the company felt was important when they were responding to the FDA.  That was my first cut.

Because if they feel it's important, then I feel it's important.  I then decided I wanted to look at all the Phase 3 data because you've got in Phase 3 data comparisons against an active control or an inactive control.  Et cetera, et cetera.  We can go down the line.  I can repeat it again and again.

But yes, so you've got to look at all the literature.  And when something says this doesn't happen, then you've got to think, well, maybe I've got to be sure that I'm actually explaining this as a reality and maybe -- so what I'm getting at is, I know of no literature showing an opposite effect.

Q    One of the things that you mentioned is some of -- some of the written material that you looked at were abstracts or posters.  Not peer-reviewed literature?

A    Correct.

Q    What's the significance of that?

A    Well, when you -- the -- publish -- well, abstracts are peer-reviewed, but not as rigorously peer-reviewed.  So what happens when you go to a scientific meeting, as I'm sure as you know, people present their data in early initial form prior to writing up a manuscript that's going to be submitted for, you know, rigorous peer review and publication.

And you put that -- that information out and people come and talk to you about it and they help you with the design and potentially making changes and looking at things a little bit differently.  But you still have got a -- you know, to be selected for presentation that requires a peer review.

And then the whole aim of the abstract presentation is to discuss the -- the events and say wow, that's interesting.  Let's write that up as a paper.  Or, I have a similar event and let's combine our data or whatever else you want to do in terms of the academic pursuits.

But abstracts are not as definitive, in my mind, as a manuscript that has been put into a -- into a peer review process and published in a journal.

Q    So if you had on the one hand an abstract and on the other hand a manuscript that's been put

into the peer review process and published in a journal, you would weigh the manuscript more heavily?

A    No.  No, not at all.  Not at all.

Q    All other things being equal, you wouldn't? You would treat them the same?

A    Well, all things being equal, what do you mean by "all things being equal"?  I mean, if I've got an abstract that looks exactly the same as a published manuscript, same design, same power, same everything, yeah, I would believe the journal.  If they disagreed.  If they agreed, then it doesn't really matter.

Q    It doesn't matter why?

A    Because they're both saying the same thing, so I'd be happy to accept both as being evidence of the same direction.

Q    Would you treat one with more caution than the other?

A    I look at the totality of the evidence.  I would look at all the things that I have evaluated. All the studies, all the manuscripts, all the data that I've gotten, and I come up with an opinion.  I may weight an abstract particularly heavily if it's a giant study, for example.

Q    I asked you earlier if you had ever prescribed dulaglutide or tirzepatide.  Have you ever treated a patient taking dulaglutide or Trulicity?

A    I'm certain I must have, but I don't recall definitively.  I practiced until 2021.  I had a lot of patients who had obesity and diabetes.  Many, many, many, many, many.  And so I'm certain I saw many patients on these agents.  But I can't recall a specific case.

Q    The adverse events that are outlined in your report, there's a lengthy recitation in the Lilly report first with dulaglutide or Trulicity and then with tirzepatide; yes?

A    I believe so.

Q    And how did you identify those adverse events as the ones that you wanted to highlight in your report?

A    I first looked at what the companies came up with when they responded to the FDA's queries.  I think there were 14.  And then I looked at what I thought were other relative terms.  And one that springs to mind, I think, was bloating wasn't -- wasn't there.

I think regurgitation wasn't

necessarily there.  You know, I was thinking of delayed gastric emptying causing distension on the fundus of the stomach, leading to transient lower esophageal sphincter relaxations and reflux disease. So I think you'll find that at times I was looking at reflux as well as potentially being associated.

So I looked at all of those terms and added a few, I think.  And I think we listed or I listed, the royal we, a few of the extra terms that I looked at.  I think bloat was one -- I think bloat was the first one in the report.  We can go to that page, if you can find it.

Q   We can do that, but I want to make sure I understand.  So the process you used to identify adverse events of interest to you was first to start with the adverse events that were highlighted in the -- Lilly's regulatory responses that you reviewed?

A   Plus anything else that I believe is a significant symptom associated with gastric emptying.

Q   I'm going to get to that, sir.  The first step you described to me was that you started with a set of adverse events that had been -- where there had been vignettes or descriptions of those events

in the regulatory responses; is that right?

A    As soon as I realized that there was an issue raised with the FDA and that the FDA had asked the companies to go back and look at certain effects -- outcomes, adverse events, and then listed them, I thought, well, if the company feels they're important, then I think they're important.

But I don't limit myself to that because I, you know, there may be others that I feel are important that the company may not have considered.

Q    So if you turn to page 64, there's a description of your selection methodology.

A    Okay.

Q    Right at the end of the paragraph that ends in the middle of the page.

Do you see that?

A    "I did not limit myself to the search strategy this is listed in either document which focused on" --

(Reporter clarification.)

THE WITNESS:  "I did not limit myself to the search strategy that is listed in either document, which focused only on 14 preferred terms."  And that's footnoted.

"I additionally reviewed issues that I

thought might relate:  Vomit, gastrointestinal because of being admitted to hospital, bloat, abdominal, gastro, dyspepsia, satiety."

BY MR. PREMO-HOPKINS:

Q    And -- and when you say you additionally reviewed for those terms, what do you mean, how did you do that?

A    Well, when I -- you know, if you look at all of these study reports, which are done in a very rigorous repetitive manner, there is a section in which they first listed all the adverse events:  The mild, the moderate, the severe.

And then I go on to the actual terms we used.  Nausea, vomiting, gastroenteritis, infectious processes, nasopharyngitis, et cetera, et cetera. And there's a nice figure each time in every single presentation that showed the discrepancies, if any, between drug, placebo, drug, dose responses, drug, active comparator.

And I could run through all of these and say, well, what about vomiting, what about gastroenteritis, what about satiety, et cetera.

Q    So the -- the reports that you are describing are clinical trial study reports?

A    Correct.

Q    And they would have -- in what was sent to the FDA, they would have identified these differences, as you describe them, with regard to the appearance of symptoms in the exposed group versus the control group?

A    And in terms of the various doses, which for me, dose response is a very, very important predictor here of how bad things could potentially get.  So if you get a little bit of response at a lower dose and more of a response at a higher dose and a real big response at a bigger dose, that says this is a drug-induced effect.

Q    You used the tables that Lilly sent to the FDA to identify the additional symptoms you wanted to focus on for your case reports; yes?

A    As well as all the other tables that they -- yeah.  I mean, these -- these reports and the study reports are very voluminous, as you know.  And so I paged through -- I mean, I don't look at efficacy. I looked at study design to get an idea about what is being looked at in this particular study.

What are the inclusion criteria; what are the exclusion criteria.  Were the patients allowed mitigation, for example.  If you're designing a study and you're mitigating against nausea and

Case 2:24-md-03094-KSM    Document 691-33    Filed 05/19/26    Page 110 of 302

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

vomiting, then you know it's a real problem.

So if you're going to go so far as to allow patients to take antinausea therapy, well, that means nausea's an issue you should be thinking about, right?  So if you design some of your studies to protect against the side effects, that, in itself, is another signal that this is the real deal.

Then I wouldn't worry about any of the efficacy stuff.  I looked at some of the -- the sort of, you know, the -- the structures of how the studies were done.

And then what I really focused on was side effects and I also specifically looked at the gastrointestinal side effects, which are listed, you know, in -- in section 5.3.1, if I recall, I can't remember, but it's repetitive in every single exam, in every single report.

And then to be complete, I did look at the individuals, which in many of the reports had individual lines of each patient and at which doses. And some of those, now that's included in all the paperwork that -- that was handed to you.

I've did a lot of this stuff online in the beginning with links to a Dropbox.  And then that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

didn't work any longer and so I then started getting hard copies. And so I have got some hard copy notes that I've given you, but I looked at this in many different formats.

Q   Let me see if I can ask my question again.

A   Okay. Sorry. I'm getting carried away. Apologies.

Q   I'm focused on the search strategy that you used, that you described on page 64 of your report. All right?

A   Right. It says what I did.

Q   Yeah. And I want to make sure it's very clear. Your identification of those additional terms that you included, you pulled those out of tables that were in the clinical trial reports that Lilly had sent to the FDA; yes?

A   No. I decided in my own mind, I think these are potential symptoms that -- issues that could have related. Are they reported on in the trials. I didn't pull it out. For example, hospital is not necessarily going to be listed there.

But if it had been there, I would have said, ah, this guy got hospitalized. They're now in the hospital. So serious adverse events that led to hospitalization would have been important for me and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

wouldn't necessarily been on those figures you're describing, but would have been in the reports.

And so some were severe. Some were mild. Some were moderate. All over the show. I looked at the entire adverse events section.

Q Okay. Maybe I can cut to the -- cut to the quick here.

In terms of identifying the adverse events that you included in your report, whether they'd be clinical trial adverse events or post marketing adverse events, you looked to the regulatory responses in the clinical trial reports that went to the FDA from Lilly as the source; yes?

MR. PENNOCK: Objection. Objection. There's been a lot of discussion on this and I'll just say asked and answered.

Go ahead.

THE WITNESS: I don't know. Am I supposed to say asked and answered? I think I've answered it, actually. So I've looked at these events --

BY MR. PREMO-HOPKINS:

Q I can exhaust it a different way, if you like, Dr. Metz.

Did you go to the FAERS database yourself and search in the FAERS database?

A    Did I go to the FAERS database and search?
No.

Q    Okay.  When you were identifying, like, the adverse events with number that you report in here, I notice that many of them, if not all of them, have a Lilly Bates number associated with them; yes?

A    Yes.

Q    And that's because the adverse events that you are reporting in your -- or that you are including to identify in your report came from documents that you reviewed that were provided by Lilly to the FDA; yes?  I'm talking about the source of the adverse events, where you got them from.

A    I got them from going to the Dropbox and looking at the various hard copy trials that were sent to me.  So then I had all those evidence available to me.  I am not sure what -- you know, I mean, what else do you want me to have looked at?

Q    Okay.  I'm not asking you to have looked at anything.  I'm trying to ask a pretty simple question that I don't think you're answering.  Let's take a look at -- at Footnote 40 on page 63.

A    Yeah.  That's an LLY, so that's a Lilly document.

Q    I'm not ask -- there's no question pending.

Do you see Footnote 40?

A    I see 40.

Q    All right.  Are there any adverse event reports that you include in here that you say help accumulate towards a reasonable evidence of causal association that you got from somewhere else, other than the documents that Lilly provided to the FDA?

A    All of the case reports, they weren't necessarily -- I searched those, myself.  The meta-analyses that I identified, I searched myself.  So it's not only what Lilly provided, it was also what was out in the public domain when I went and did literature searches.

Q    Let me make sure I'm clear here:  You identify in your report a series of adverse event reports; right?  You say --

A    The clinical trials were based on the clinical trials.  Yeah.

Q    And then you have a series of post-market adverse events --

A    Correct.

Q    So as between the clinical trial adverse event reports and the post-market adverse event reports --

A    Right.

Q    -- that you identify as information relevant to your query?

A    Correct.

Q    Were any of those adverse events sourced from any location other than documents that Lilly sent to the FDA?

A    Yes.  The post marketing public domain -- we mentioned RAI, for example.  That was not something that was only with Lilly and the FDA.  That was -- that became an important point, as I mentioned earlier, because now it's clearly that this isn't private information just between Lilly and the FDA, it's public information.

In fact, the manuscripts that were published, the New England Journal of medication -- New England Journal manuscripts that -- the pivotal trials that have been published by that time, I looked those, as well.  And then you see adverse events, drug versus placebo and dose responses.

So, I'm not quite sure.  You know, it's an accumulation of looking at all of it.  It wasn't all only private between Lilly and the FDA.

Q    I'm not asking you a question about all of everything.  I'm trying to ask you a pretty specific question about your report.  So I'm going to pause

for a second and make sure I ask a very clear question that I think a smart guy like you can answer.

A    I'm going to do my best.

Q    I'm sure you will.  I want to take a look at pages 145 to 167.  Do you see that there's 22 pages of your report that describe a series of post-marketing spontaneous adverse events reports that you thought important enough to fill 22 pages of your report?

A    Yeah.

Q    Where did those come from?

A    Those came from the company sending them to the study.  To the -- to the -- to the FDA.

Q    Okay.

A    It's their -- their obligation.

Q    And the clinical trial adverse events that you identify that occurred during clinical trials, those also are based on what you reviewed would have been supplied to the FDA; yes?

A    Okay, now I understand.  Are you asking me, was the FDA aware of all of these reports?  And I'm going to say, yes, they were.

Q    Thank you.

A    Okay.  Phew.

Q    You said you hadn't reviewed any other reports by any other experts in this case?

A    Correct.

Q    Is that true on the plaintiff's side and the defense side?

A    Yes.

Q    Did you ask to see any other expert reports?

A    Yes.

Q    But you weren't provided with them?

A    Correct.

Q    Do you know the identity of any of the other experts on the plaintiff's side?

A    Plaintiff, meaning --

Q    Your -- the same side as you?

A    Okay.  I always get that mixed up.

Dr. -- the statistician.

Q    Madigan?

A    Madigan.  I actually -- I know of him.  I think Dr. Kessler's involved.

Q    Have you had any interaction in forming your opinions with Dr. Madigan or Dr. Kessler?

A    I spoke to Dr. Madigan.

Q    And did you rely on that conversation with Dr. Madigan at all in forming your opinions that are in your report?

A    No, not at all.  It was, if anything, the reverse.

Q    What do you mean by "the reverse"?

A    He and I were discussing potential terms that may relate to gastroparesis being a side effect of GLP-1 drugs and he felt he wanted, I believe, a clinician's input.

Q    Did you have any conversations with Dr. Kessler?

A    No.

Q    Do you know who Dr. Kessler is?

A    Yes.

Q    Former FDA commissioner?

A    Correct.

Q    With regard to regulatory standards and labelling, would you defer to Dr. Kessler?

A    As long as he and I had the same opinion, I would certainly agree.

Q    And if your opinion is different than Dr. Kessler on issues with regard to regulatory and labeling?

A    You'd have to tell me exactly what the issue is before I could say I'd agree he's right or I'm right.

Q    Okay.  As part of your work in forming your

opinions, Dr. Metz, did you -- with regard to Lilly, did you review any of the back and forth between Lilly and the FDA around specific label language or contents?

A    No.

MR. PREMO-HOPKINS:  Why don't we take a break.  I think I'm relatively close with being done with questions for Lilly.

We can go off the record.

THE VIDEOGRAPHER:  We're now going off the record, and the time is 11:08 a.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going back on the record, and the time is 11:24 a.m.

BY MR. PREMO-HOPKINS:

Q    Dr. Metz, we just took a break.  I think I'm going to switch topics and ask you some questions to make sure I understand about some of your background information that you provided in your CV and things like that, and then I should be wrapping up with my questions on behalf of Eli Lilly.

A    Okay.

Q    So your CV identifies that you are at Penn School of Medicine for a number of years; is that right?

A    That's correct.

Q    Do you still teach there, at all?

A    No, no direct teaching responsibility right now.  I do maintain contact.  I'm actually giving a lecture, funnily enough in the next week to -- at the university.  So I suppose you could say, yeah, but it's really a no.

Q    Did you consult with any -- anyone at Penn with regard to the issues in your report?

A    Not at all.

Q    Okay.  And the presentation that you're going to give, does it have any relation to gastroparesis or GLP-1 medications?  Let me ask you a better question.

A    Yeah.

Q    Does the presentation you're going to give, is it relevant to the issues in your report at all?

A    No.

Q    You mentioned that you conducted a literature search.  How did you go about doing that?

A    Well, I have -- I have access to PubMed through the university, and whenever I came up with a potential association of looking to research X or Y, I would just plug it into PubMed.  And still having access to the university library, I'm able to

still download all the articles.

So I have -- it's been one of the perks you get as being a -- sort of retiree, is you still -- I'm still on e-mail through the university, for example, and I get all the GI related e-mails.  I still have contact with colleagues and I have access to the school of medicine and the library whenever I want or need it.

Q    Dr. Metz, I think I asked you this.  But I want to make sure:  Were you asked to do a rebuttal report in this case?

A    No.  I haven't seen any of the reports to rebut.  I'm happy to.

Q    Dr. Metz, your hourly rate, at least as was reported a few months ago, as $700 an hour?

A    Correct.

Q    Is that still the case?

A    Yes.

Q    And is that the same hourly rate for reviewing materials and testifying, et cetera?

A    Yeah.  I have always felt that it's the knowledge that you're testing, whether it's writing or talking or being pretty on a video.

Q    And I will tell you, I don't know that I got your bills; but do you have an estimate as to how

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

many hours you've spent thus far?

(Simultaneous colloquy.)

MR. PENNOCK:  No, I was thinking out loud.

THE WITNESS:  I've submitted both.  I've -- we've discussed -- it started off, they asked me how much I charge.  I told them.  They sent me a retainer, I thought, hmm, that's a lot of money. And I was planning to getting around to asking for more money when I'd used up that amount.  And basically what it resulted in was I would speak to somebody and they'd say, I want you to review this. It's going to take you about so much time.  We were assuming that's what it is.  Here's some money.  And so right now, I feel I'm whole on what I've received.

MR. PENNOCK:  Can I interject for one second?

MR. PREMO-HOPKINS:  Yeah.

MR. PENNOCK:  I thought I sent you the thing this morning.

MR. PREMO-HOPKINS:  That's all right.

MR. PENNOCK:  I could give it to you right now and you can pull it up.

MR. PREMO-HOPKINS:  Perfect.  Why don't we do that.

MR. PENNOCK:  Okay.

Myra, what's your e-mail?

MS. FAROOQI:  It's M-y-r-a dot F-a-r-o-o-q-i @Kirkland.com.

MR. PENNOCK:  F-a-r what?

MS. FAROOQI:  O-o-q-i.  Farooqi.

MR. PENNOCK:  Kirkland.com?

MS. FAROOQI:  Yes.

MR. PENNOCK:  Okay.  Go ahead.

BY MR. PREMO-HOPKINS:

    Q    So Dr. Metz, you mentioned that you received a retainer initially?

    A    Yeah.

    Q    How much was that?

    A    I think it was 25K.  I've received checks for 25s, 21s.

MR. PENNOCK:  I'm going to give them the --

BY MR. PREMO-HOPKINS:

    Q    You can -- I'll get it from your account from --

    A    My account.

    Q    -- Mr. Pennock -- from Mr. Pennock and I can ask you some specific questions once we get that.

    A    Okay.

    Q    Do you receive any employment -- any income

from being a -- still having an e-mail address at Penn?

A    I get no compensation from Penn at all.  I do do other work.

Q    What other work do you do?

A    I'm on a couple of data monitoring safety boards for various drugs as a sort of independent evaluator, you know, of Phase 3 trials.  I chair two of those.  I am working with a -- consulting with some early biotech companies in the development of various drugs, none of which are antidiabetic drugs. But one company is an endocrine company.

I have done recently as last year, a litigation, a med-mal case.  Once or twice been interviewed by hedge funds for, you know, opinions about drugs.  But that's -- I'm turning all of that down.  I'm trying to be less active but anything that has a physiologic interest to me, I pursue so I -- and this particular assignment has been something that I've gone at with gusto.

Q    And when you say "this particular assignment," you mean the drafting of these expert reports?

A    Correct.

Q    And I received -- I received from

Mr. Pennock, it looks like through March 10th of 2026, you had received payments totaling $161,200.

Does that sound consistent with your --

A    Sounds correct.

Q    And do you know -- have you received any payments since the 10th of March, which was about two weeks ago?

A    No.  But obviously I've spent time subsequent to that for meeting with them yesterday, the day before, ongoing review of my reports, looking at everything in preparation for today, today, and whatever else comes forth next.

Q    So by my math, at $700 an hour, you've spent about somewhere between 200, 250 hours on this matter so far?

A    That makes sense.  Yeah.  I've -- you've seen what this data looks like.  I'm directed as to where I've -- as I told you, I'm not going to look at the efficacy data, for example; but there's a lot of stuff to go through and there's a lot of stuff to think about and there's a lot of literature searching to be done.

So yeah, I spent easily -- as I said, if I was still in practice, I don't know if I could have been able to really digest all of this stuff.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q    I don't have any specific questions about the statement of compensation that Mr. Pennock sent. We'll figure out how to get it printed before the deposition is over and mark it as an exhibit.

Dr. Metz, how does the $161,000 that you've been paid, you know, between October of 2025 and March of 2026, how much of your income does that make up?

A    Well, close to half, I would say.

Q    Aside from the folks who work at the law firms that you were working with, did anybody else -- like, did you have an associate or anybody else assisting you in preparation of the report or review of data?

A    Well, I jokingly last night had my wife help with pulling the papers that we gave you this morning.  But other than that, no.

Q    Have you ever done any work for Eli Lilly before?

A    I don't believe so.

Q    Have you ever done any work for Novo Nordisk before?

A    I don't believe so.

Q    And you mentioned that you currently do some work on data safety boards advising on clinical

trials?

A    Correct.

Q    How much work is that?

A    Well, it depends.  I mean, I'm on -- right now, as we are, I'm on two data safety monitoring studies.  So every time there's an SAE that gets submitted, they send it out to us.  And then every three months, we would have a meeting.  I chair that meeting.  So at times, I'm contacted by e-mail by the medical monitor.  Do you think we need to do something about this.  Do you not think I'm obliged to tell you that we've had a death?  You know.  And so it varies.  And they pay me by my time for these events and then we have those meetings every three months.  And sometimes they'll have an internal safety meeting, and then they'll have to report it back to me, so it varies.

The other one is still in the process of really getting going.  And right now, I have some concerns about the way the protocol is written and the way my charter is being written and my role as chair is.  So I'm back and forth about that.  Fair amount of time involved, and I just keep track of all the time, and I only bill after meetings.

Those are the safety monitoring events,

yeah.

Q    And --

A    I also do consulting for the biotech companies, which is a different thing.

Q    Right.  Let me -- I'm going to stay focused on consulting for clinical trials.

Did you do any consulting for the clinical trials before the ones that you described to me now, so historically in your time as a gastroenterologist?

A    Oh, absolutely.  I've done -- I think my CV lists a whole lot of clinical trials that I was PI on and involved in.  And many of those, I, at times consulted with and went to meetings.  I've been in -- listed on manuscripts as involved but not an author in cases where I've had conflicts so that I haven't been the author so I've been involved in those.

I've helped design trials.  In fact, one of the biotech companies that I'm working with, I've actually started with before Phase 1, even with some animal trials and helping to design Phase 1 trials, setting up IBs, setting up the -- you know, the actual NDA submissions.  The same company has some Phase 3 studies going that I'm involved in,

recommending study design with. And, you know, I've been involved in helping them with that with regard.

There's another company that has had an unexpected adverse event that's developed in their clinical trial, and I happen to be an expert in that. So they consulted me on looking at all the data of all their patients that have had this unexpected event, to sort of, you know, help them as to how to navigate and handle their Phase 3 trials.

So yeah, I'm doing -- I'm actually -- I don't -- I say I've retired from seeing patients, but I'm actually still employed and enjoying it a lot.

Q    And when you talked about receiving payment for your time doing that work, that's payment either from a manufacturer seeking approval for a drug or somebody who owns the right to do that; is that right?

A    Sometimes it's from the CRO, the clinical research organization that -- so the data monitoring safety board, so you would separate it from the company. And I'm not allowed to really know anything or have any stock or deal with them in any way. So those, the CROs are paying me.

And the others where I'm directly consulting

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

with the companies, I've gotten paid by the company directly. And I bill as necessary on occasion. And some of the interview stuff that, you know, they're really looking to find a gastroenterologist with knowledge of such and such and your name came up, will you contact us -- you know, then you get it from the hedge fund I think directly almost. So in all varying sort of ways.

Q    And when you're doing that work, you're getting paid for your time, yes?

A    Yeah.

Q    And the fact that you're getting paid by either someone interested in a pharmaceutical drug or someone who's running a clinical trial, it doesn't affect your independence at all, does it?

A    Not at all. I mean, I like to believe that I'm telling what I really think, that's what they're asking me. I'm not supposed to be -- I'm not there to tell them what they want to hear because then they don't need me.

Q    And you mentioned that the reason that you understand that these folks are reaching out to you is because of your experience and expertise in certain medical areas; is that right?

A    Correct.

Q    Dr. Metz, one of the inquiries you looked at related to -- or excuse me, one of the opinions you offered related to labeling language and you had laid out language from the Trulicity label.

Do you recall that generally?

A    Yes.

Q    In terms of reaching your opinions with regard to what was communicated there, whether it was clear or not, did you talk to any other doctors other than yourself?

A    No.

Q    When you worked -- I'm going to ask you some questions and it may sound a little silly.  I don't mean them to be offensive at all, but I need to sort of close out your areas of expertise.  All right?

A    Sure.

Q    You don't claim to be an expert in linguistics?

A    No.

Q    And you don't claim to be an expert in cognitive decision-making or psychology?

A    No.

Q    You're not an expert at running surveys?

A    I have run a couple of surveys.  I've been involved in survey design on some of the manuscripts

I've published, but I'm not an expert.

Q    And you don't have any training or expertise related to -- I'm going to start my question over.

Is that all right, Dr. Metz?

A    Please do.

Q    The opinions that you've offered in your expert report with regard to Lilly relate to gastroparesis, yes -- and I say that to mean you're not offering any opinions about ileus or intestinal obstruction, for example?

A    I'm happy to but I'm not.

Q    They're not included in your report?

A    Correct.

Q    And you haven't offered any opinions in your report with regard to gallbladder or kidney issues; right?

A    That is correct.  I noticed that there have been gallbladder and kidney issues in the report that I've looked at, but no, I'm not offering that.

Q    Do you recall this morning when I told you it was important for you to understand my questions and I asked you to clarify those when you get a chance.

And did you do that today when you needed to?

A    I think we did it a couple of times, yes.

Q    And were you able to give, complete, honest answers to the questions I asked you thus far?

A    I believe so.

MR. PENNOCK:  Objection.

MR. PREMO-HOPKINS:  I think I do not have any further questions for you at this time, Dr. Metz.  The lawyers from Novo Nordisk will have some questions in the additional time we have remaining.

And so we can go off the record, and we'll figure out how to handle that.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is now 11:45 a.m.

--oOo--

(LUNCHEON RECESS.)

--oOo--

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 12:21 p.m.

--oOo--

EXAMINATION

BY DR. PRZYMUSINSKI:

Q    All right, Dr. Metz.  Welcome back.  My name is Lucas Pryzmusinski.  I am an attorney for Novo. I'll do my best to be efficient because I know we

all want to get out of here.

A couple of quick cleanups.  The first thing I want to do is -- Mr. Pennock was nice enough to give us a document that's titled "Statement of Compensation for David Metz, M.D." that reflects the payments you received to date, and I know you talked about that document with Mr. Premo-Hopkins.

But let's mark that for the record as Exhibit 3, please.

(Defendants' Exhibit 3 was marked.)

BY DR. PRZYMUSINSKI:

Q    And can you just confirm for me that that's a document that reflects the compensation you've received to date, as far as you know?

A    As far as I know.  I mean, I haven't gone through it step by step, but I'm happy to say yes.

DR. PRZYMUSINSKI:  You can put that aside.

The other thing I want to mark, Doctor, is a manila folder with a collection of documents, some of which appear to have your handwriting on them or somebody's handwriting on them that were produced to us by your counsel.  And we will mark that as Exhibit 4 whenever Cheryl is ready.

(Defendants' Exhibit 4 was marked.)

///

BY DR. PRZYMUSINSKI:

Q    And Doctor, I don't plan to have any substantive questions on those.  But can you just confirm for me two things.  One is that that manila folder includes documents you brought with you to this deposition and that the writing on those documents is yours?

A    Correct.

Q    Very good.  Put that aside.

All right.  Can you give me the Novo report, please.

MR. PENNOCK:  Are we going to give that one to the court reporter.  And can I get the original back as opposed to you getting the original?

MR. PREMO-HOPKINS:  That's fine with me.

MR. PENNOCK:  Okay, thank you.

MR. PREMO-HOPKINS:  No problem at all.

BY DR. PRZYMUSINSKI:

Q    All right.  So earlier this morning when you were talking to Mr. Premo-Hopkins, who's here on behalf of Lilly, we talked about the fact that you submitted two reports in this case; correct?

A    Correct.

Q    And the report that we spent the morning talking about was the report specifically directed

at Eli Lilly; correct?

A    Correct.

Q    Okay.  And that is the report that was marked as Exhibit 1 for your deposition.  Correct, Doctor?

A    I believe so.

Q    Okay.  What I have in front of me now and I'm going to mark as Exhibit 5 is the report that I believe you submitted with respect to Novo, and it's 137 pages long and appears to be electronically signed by you on January 2, 2006 [sic].

Once Cheryl marks it, I want you to confirm that for me, please.

(Defendants' Exhibit 5 was marked.)

THE WITNESS:  Sure.  Thank you.  Excuse me.

BY DR. PRZYMUSINSKI:

Q    I'm sorry, Doctor.  Could you just confirm for me that that is your report for Novo Nordisk that you produced and signed on January 2nd, 2026?

A    Correct.

Q    Now, some of these questions Mr. Premo-Hopkins asked earlier, but I wanted to make sure that they're also correct and accurate with respect to your report with regards to Novo.  Okay?

A    Okay.

Q    First of all, other than the typographical-type things you referred to earlier this morning, are there any substantive changes or corrections you would like to make to the Novo report?

A    No.

Q    Okay.  And subject to the discussion you had earlier in terms of answers to my questions, can I assume that the Novo report contains all the opinions you intend to offer with respect to Novo Nordisk in this case?

A    Yes.

Q    Okay.  Now, can you give me the materials considered list.

What I'm going to mark next for you, Doctor, it's going to become Exhibit 6 once I get it, is what I believe is a materials considered list that was provided to us along with your report.

(Defendants' Exhibit 6 was marked.)

BY DR. PRZYMUSINSKI:

Q    Can you just take a look at that, Doctor, and see if that looks accurate to you?

A    Yeah, it sort of looks -- looks like what I've seen.

Q   Okay.  In terms of this materials considered list, a simple question, first of all.  Can I assume that if I look at your expert report with respect to Novo and I look at your materials considered list, the universe of data, documents, studies, information that you looked at and considered in preparing your opinions, I would either find it in these materials considered list which we've marked as Exhibit 6 or is referenced in your report.

Is that a fair assumption?

A   That is correct, although there are many, many more ongoing documents that I have continued to find in literature searches and ongoing discussions as I've continued to ponder those, but that's subsequent to the report.

Q   In terms of things you considered prior to completing your report, putting your signature on it, that would be reflected in the references in your report itself plus potentially, plus whatever's listed in the materials considered list?

A   I believe that.

Q   But since that time, you may have looked at some additional studies, documents, or information; is that right?

A   That is correct.

Q    Is there anything among the initial studies, documents, or information you considered since you completed your report that particularly stands out to you as changing, adding to, or modifying your opinions on?

A    Well, I gave examples of specific possibilities in my initial report that I have subsequently continued to look into and have come up with additionals.  As an example, I provided an example for how I believe symptoms could have persisted beyond the five half-lives after the drugs disappeared, up to and including six months and beyond; and the example in my report pertains to microbiome alterations.  I've subsequently been reading more and more around that topic.

I haven't provided information regarding interstitial cells of Cajal potential abnormalities that might have persisted.  I haven't provided examples regarding functional bowel disease and triggers for dyspepsia that may have been caused by traumatic events.  Those are, for example, three that come to mind.  They will potentially be more to explain how you can have a drug that's now gone away but the effect of the drug could have potentially persisted.

MR. PENNOCK: Beyond the six months?

THE WITNESS: Correct.

BY DR. PRZYMUSINSKI:

Q All right. So we'll talk about that in a minute. Those examples that you just gave, those were the same hypothetical mechanisms you discussed with Mr. Premo-Hopkins earlier; correct?

A Correct. They've not been defined as being fact. They should be considered.

Q They're not things that are established scientifically; correct?

A I would agree. Well, I suppose -- I think it's fair to say that it has been established scientifically that the microbiome effects of GLP-1 drugs can develop well into a course of therapy and persist. That, I think I do have information about that's not in this report. Somewhere along the way, I have a manuscript along those lines.

I do have -- I think it's also a fact that functional dyspepsia, not ulcer dyspepsia, can be triggered based on the Rome IV criteria, for example, after an event has gone away. So there are potentially references that I could come up with that I haven't included specifically in this report that I can go and dig up for you if you would like;

but what I'm saying is that there are -- there are suggestions in the literature that would have potential mechanisms to explain persistence beyond the drug no longer being in the bloodstream.

MR. PENNOCK:  And beyond the six months post?

THE WITNESS:  Beyond the six months. Correct.

What I'm getting at with the six months is I'm suggesting that not everybody is going to say, oh, yeah, I had the drug, I had a terrible event. I'm over it, life's great.  It's more than, you know, six weeks.

I'm saying around about six months or so, within, you know, a fairly long period of time; but I'm not suggesting it should be 15 years, but I'm suggesting that there will be a time at which you can still have symptoms despite the drug being gone and you can't be sure that it's not drug related.

BY DR. PRZYMUSINSKI:

Q    Let's unpackage that a little bit because what I want to make sure is I understand what opinions you're actually offering here today.

A    I'm sorry, I didn't get that.

Q    I want to make sure I understand the

opinions you're offering here today --

A    Sure.

Q    -- to a reasonable degree of medical certainty.  And as you plan to offer in front of the Court.

The discussion you had with Mr. Premo-Hopkins before he turned the microphone over to me --

A    Yeah.

Q    -- are you saying that somehow your opinions on that have changed?

A    No, no, not at all.

Q    Okay.  All right.  All right.  Now, let's go to this materials considered list which we just marked as Exhibit 6.  Exhibit No. 6.  If you look, Doctor, at pages 24 through -- it's called page 30. There's a list of what you described as "Designated confidential documents produced by Novo."

Do you see that?

A    I do.

Q    Okay.  And those are identified by Bates numbers that begin with "Novo"?

A    Uh-huh.

Q    Now, I assume you reviewed all those documents prior to finalizing your report; is that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

correct?

A    Well, they're on my list of having reviewed them, so I looked through them.  I don't say I looked at every single word and read every single, you know, paragraph and made a specific decision but I -- as you can see from the example of this Exhibit 4, I did that with the trials; I did that with these things as well.

Q    Okay.  And I know it's a lot of documents that are listed.

A    It's a lot of documents.

Q    But here is my question:  I know that within the body of your Novo report, if you'll allow me to call it that way, there's a discussion of Novo clinical trial data.

Do you recall that?

A    Yes.



Q    And it's specifically referenced in your report, or more broadly; okay?

A    Correct.

Q    Is there anything, outside of those two buckets, that sitting here right now you remember from the documents you described as confidential documents produced by Novo that you can recall, sitting here right now, was of significant importance to your opinions?

A    Well, anything that was out in the public domain.  So any -- any literature that was published on any GLP-1, whether it was Novo or not, that was available in, you know, New England Journal or case reports or any of those things, I would have considered, as well, as we discussed it, yeah.

Q    And that's fair.  And I'm sorry, just to get a clean record.  I was just asking amongst the documents listed in your materials considered list --

(Simultaneous colloquy.)

BY DR. PRZYMUSINSKI:

Q    Let me -- let me do it again.  Among the

documents listed in your materials considered list that you described as confidential documents produced by Novo, outside of that bucket of clinical trials and the response to the FDA, were there any other documents in that set that sitting here right now you can say you considered important or significant to the things you're offering in your report?

A     No, I think they're all trended in this same direction.

Q     Okay.  All right.  Very good?

We can put the materials considered aside, Doctor.  And let's go to your Novo report.  If you look with me on page 17, Doctor, of that report. Let me know when you're there.

A     Got it.

Q     Much like in the Lilly report, there is a section entitled "Inquiries."

Do you see that?

A     Yes.

Q     In that section you state that you've been asked to:

"Evaluate two questions concerning GLP-1 inhibitors and offer my opinions to a reasonable degree of medical certainty."

And you list questions one and questions two.

Do you see that?

A    I do.

Q    Fair to say that those are the two questions that you addressed in the Novo report?

A    Correct.

Q    Okay.  Unlike Lilly, you don't have a third question; is that correct?

A    That is a fact.

Q    Okay.

Now, I don't want this to feel in any way like a trap, so feel free to respond in any way you want.  But I'm trying to short circuit things a little bit.

So to the extent that you were asked questions by Mr. Premo-Hopkins about issues related to Question 1, meaning causation for drug-induced gastroparesis, related to gastric emptying, or Issue 2, which is the prolonged symptoms, can I assume that the answers to those questions are equally applicable whether we're talking about Novo's drugs or Lilly's drugs, or do I need to go back and ask them again?

A    No, you can consider them all applicable.

Q   Very good.

A   I think we just saved an hour and a half.

Q   I think we did.

All right.  Now, a couple of other housekeeping things before we move on.

On page 20, Doctor -- let me know when you're there.

A   I'm there.

Q   That bottom paragraph that starts "In the stomach."

Do you see that paragraph?

A   Yes.

Q   There's a sentence that starts with "Excessive TLESR."

Do you see that?

A   Yes.  Yes.

Q   And that sentence ends with a list of different conditions.  So predisposes to dyspepsia, bloating, nausea, and vomiting, heartburn, regurgitation, gas, esophageal reflux disease, excessive weight loss, and potential pulmonary aspiration.

Do you see that?

A   I do.

Q   Two questions.  In terms of the scope of the

opinions you're offering here today, are you offering an opinion to a reasonable degree of medical certainty that GLP-1 RAs cause excessive weight loss?

A    No.

Q    Same question.  Are you offering an opinion to a reasonable degree of medical certainty that GLP-1 RAs cause pulmonary aspiration?

A    Pulmonary aspiration is an endpoint that can potentially result from gastroparesis, so it is an example of what would happen after severe gastroparesis, delayed emptying, nausea, vomiting, regurgitation, and potentially aspiration.

So yes, that is part of the whole sphere of gastroparesis and its side effects.

Q    Okay.  Doctor, you're aware, I assume, that there are studies out there both observational and clinical trial based meta-analyses, potentially, that look specifically at the relationship between GLP-1 RA medicines and pulmonary aspiration as an endpoint?

A    Correct.

Q    Did you review that body of studies?

A    I have looked, for example, at the -- the AGA's position statement about scoping patients and

the anesthesiologist's response.  Yes, I have.

Q    Those are position --

MR. PENNOCK:  I'll just note that he didn't offer opinions regarding pulmonary aspiration in his report.

DR. PRZYMUSINSKI:  Well, that's what I'm trying to confirm, because he just said he did.

MR. PENNOCK:  Well, -- okay.  I'm just pointing out that I am -- you know, confined by the opinions that I asked him to -- I mean, the questions I asked him to evaluate.

BY DR. PRZYMUSINSKI:

Q    So if we can get on the record that you're not offering a causation opinion on pulmonary aspiration, I can move on.

A    I believe you can.

Q    Okay.  Very good.

Okay.  Now, I'm going to try to not cover the same ground as Mr. Premo-Hopkins, but I do want to ask a few questions just on your background.  Okay?

A    Sure.

Q    On page 1 is where you have qualifications in your report.

Do you see that?

A    I do.

Q    Now, as I understand it, you retired from clinical practice in March of 2021?

A    That is correct.

Q    Have you treated any patients since March 2021?

A    No.

Q    Okay.  When is the last time you prescribed a GLP-1 RA medicine?

A    I've never prescribed a GLP-1 medicine.

Q    When is the last time you treated a patient you suspected of having drug-induced gastroparesis as a result of taking a GLP-1 RA medication?

A    I can't -- I haven't.

Q    Okay.  When is the last time you treated a patient you suspected of having any GI event as a result of taking a GLP-1 RA medication?

A    I haven't.

Q    Okay.  Prior to being involved in this litigation, Doctor, in other words, before Mr. Pennock or whoever did reach out to you and said hey, we'd like you to work with us, okay.  Prior to that, when is the last time you reviewed the product labeling for any GLP-1 RA medicine?

A    I hadn't.

Q    So when you first became involved in this litigation, you received a product labeling from plaintiff's counsel, maybe did your own research. That was the first time you've seen the labels for any GLP-1 medication?

A    Yes.

Q    Okay.  Now, page 3 of your report talks about in that second paragraph, your experience on the FDA advisory board for gastrointestinal that you had a pretty extensive conversation with Mr. Premo-Hopkins about.

Do you remember that?

A    Yes.

Q    One quick question on that.  And I assume I know the answer, but I want to confirm.

Is it fair to say that none of the advisory boards that you sat on for FDA involved any GLP-1 RA medication?

A    That is correct.

Q    Okay.  And that would extend to the time period when you were working as an SGA for FDA?

A    Correct.  I -- I reviewed drugs related to gastroparesis and its therapy thereof, but not GLP-1s directly.

Q    Understood.  Okay.

Now, Mr. Premo-Hopkins also asked you a number of questions about GLP-1 medications particularly on the context of I think -- tell me if I'm misquoting you, that a GLP-1 is a GLP-1.

Do you remember that?

A    Yes.

Q    Now, just a few quick follow-ups on that.

Will you agree with me, Doctor, that each individual GLP-1 RA medicine has a unique safety and efficacy profile?

A    Well, that's -- the drugs are structurally different, and so they may potentially have different effects, but the effects on the GLP-1 receptor would be the same for all.

Q    And so I understand that.  And I think you explained that really well, which is that GLP-1 RAs act through interaction through the GLP-1 receptor in the body; correct?

A    Correct.

Q    And I think the point you're making -- please tell me if I'm wrong -- is that every GLP-1 at some level causes its effects through the interaction with that GLP-1 receptor; correct?

A    That is correct.

Q    And those receptors, those are G coupled

receptors; correct?

A    Correct.

Q    And so what ends up happening is, you have activation of the receptor, cycle of GMP gets activated, and then you have downstream effects; correct?

A    Correct.  Yup.

Q    And those downstream effects are -- can vary from cell to cell; right?  They're not the same in every single cell; correct?

A    Oh, absolutely.  Different cells will have different effects.

I'm sorry to do this to you, may I just hit the bathroom?

DR. PRZYMUSINSKI:  Absolutely.

THE WITNESS:  I do apologize.

THE VIDEOGRAPHER:  And we are now going off the record, and the time is 12:45 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going back on the record and the time is 12:47 p.m.

BY DR. PRZYMUSINSKI:

Q    All right, Doctor.  Back to -- I think we were talking about the GLP-1 receptors?

A    G protein receptor and its downstream

effects.

Q    The downstream effects that occur as a result of the interaction between either this native GLP-1 or a GLP-1 receptor agonists, those are dependent on the activation of the GLP-1 receptor; correct?

A    Correct.  That's why they're GLP-1 receptor agonists, because they activate.

Q    And to simplify for those of us who are not scientists or physicians and so for the Court and the jury, when that GLP-1 molecule, whether it's a native or the receptor agonist connects to the receptor, it turns it on; right?

A    Correct.

Q    And when they disconnect, it turns it off; right?

A    The effect is turned off.  Correct.

Q    Excellent.

Now, before we got to that discussion of GLP-1 receptors, what I was asking is whether the safety and efficacy profiles of the different GLP-1 molecules medications differ.

Do you recall that?

A    Yes.

Q    And so, I understand that the ultimate

effect mechanism is by interaction with the GLP-1 receptor; okay?

A    Right.

Q    What I'm asking is a little bit different question.  Is it fair to say that despite the mechanism of action being the same, different GLP-1s will have, nonetheless, unique safety and efficacy profiles dependent on that specific molecule and its properties?

A    It is a theoretical possibility.  I mean, I don't know and I'm not a pharmacologist and I think you'd need to ask them that question.  But there are biased agonists and there are antagonists and there are different degrees of binding and disconnection from -- from the receptors.

However, once the receptor is occupied, its downstream effect on whatever that particular cell is will be persistent and when the agent is disconnected, the effect should go away.

Q    Understood.  Okay.  Now, maybe let me ask it a little bit differently.  So is it your opinion, to a reasonable degree of medical certainty, that GLP-1 RA medicines, all of them, cause GI side effects at the same rate?

A    Well, it depends on pharmacokinetic and

David Metz, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

pharmacodynamic effects.  I mean, how long is the drug there.  How long does it stay in the bloodstream.  How tightly does it bind.  So the effect when it's happening is the same.  The potency of your doses and how often they bind and how they switch on and off may vary.

Q   So, I understand that it depends on things, but what I'm asking is a much simpler question.

Are you offering an opinion, to a reasonable degree of medical certainty, based on what you know, you reviewed, and obviously, your own expertise, that all GLP-1 RA medicines have the same rate of GI side effects?

MR. PENNOCK:  Objection.  Asked and answered.  Go ahead.

THE WITNESS:  Yeah, I -- I mean, I believe that there are differences in the pharmacokinetics and pharmacodynamics of those drugs, so their effects may differ.

BY DR. PRZYMUSINSKI:

Q   So the effects of individual GLP-1 RA medicines because of the difference in their pharmacokinetics and pharmacodynamics may differ; correct?

A   The side effect of gastric emptying delay is

a class effect, is what I'm saying.

Q    I understand that, but I'm asking a different question.  I'm asking whether the frequency of the GI side effects differs between the different molecules, the different drugs we're talking about in this litigation.

A    I don't know the answer to that question.  I think probably a good way to look at it would be to take all your trials and see the frequency of the potential side effects of one drug versus the other drug.

And I can say that generally speaking, I see a two-to-threefold increase over and above placebo, regardless of which GLP-1 agent I've looked at.  So the frequency, how often, how many times out of a hundred, there may well be differences, but there could also be trial design.

Q    It's not an issue you've looked at as part of your report; is that fair?

A    As part of my report I would say that all of the drugs that I looked at had similar effects and a similar frequency of imbalance between gastroparesis related drug effects in drug exposed patients versus drug unexposed patients, usually with a dose response curve.

So obviously, the dose is going to have an impact on that, too, but generally, two to three times.

Q   Let's turn to page 19, Doctor, of your report.

A   Page?

Q   Page 19.

A   Page 19.  Okay.

Q   Let me know when you're there.

A   I'm on 19.

Q   If you look at the 7th line down, there's a sentence that starts with "Indeed, one of the."

Do you see that?

A   Indeed, yeah.  One of the key mechanisms of action.

Q   So in that sentence you wrote:

"Indeed, one of the key mechanisms of action of the drugs is the delayed gastric emptying."

Do you see that?

A   I do.

Q   When you say "the drug," you're talking about GLP-1 RAs; correct?

A   Correct.

Q   Okay.  Now, I think you said this earlier, but I want to make sure I get this right.  That

delay of gastric emptying is an intended mechanism of the medications; correct?

A    Well, I don't know if that was the intended mechanism up front.  I mean, I think the initial designs were to look at diabetes control and I think more of an insulin related effect.

But they noticed that gastric emptying related to improved insulin control and so that when it came to the weight loss studies, then that was an intended event.  Yes.

Q    And --

A    Excuse me, one second.  I'm just going to put this on a message.

Okay.

Q    To make sure I understand that:  The effect on gastric emptying that GLP-1 medicines have has actual salutary or positive effects with respect to both control of glycemia and weight loss; correct?

A    The drugs were studied for those effects, yes.

Q    And the impact on gastric emptying is actually contributing to both control of glycemia postprandially and to weight loss; correct?

A    That's how the drugs work.

Q    Okay.  Now, that mechanism or at least that

aspect of the mechanism by which these medications work, the delay in gastric emptying, is that a well known mechanism of these medications?

A    It is now.

Q    When did you, personally, first find out that GLP-1 RA medicines are capable of delaying or actually do delay gastric emptying in some cases as part of their mechanisms of action?

A    As soon as I started looking into how GLP-1 drugs work.

Q    So when you started being involved in this litigation; is that correct?

A    Well, I -- I like to think of myself as a sort of frustrated endocrinologist, so I do look at it a lot and G protein coupled receptors happens to be in an area that I am particularly interested in and work with other companies on.

So, you know, I would look at how GIP works, how GLP works, how Bombesin works, how SL coding works.  You know, I like to think of myself as a frustrated endocrinologist.  And today I actually looked at GLP-1 and gastric emptying.

I don't know when it would have happened, but it certainly happened, you know, close to or during the start of this employment, should we say.

Q    Do you know when the first GLP-1 RA medicine was approved for clinical use in the United States?

A    Yeah, in the early 2000s.

Q    Exenatide, isn't that --

A    Correct.  And an interesting thing about that drug is a shortened version of that drug that was an antagonist had the reverse effect.  And so that's part of the reason why I firmly believe that GLP-1s retard gastric emptying.

(Reporter clarification.)

THE WITNESS:  And the abbreviated version of that particular drug was known to accelerate gastric emptying.  So if you antagonize GLP-1, you get the reverse effect.  So that, to me, is the class effect that I first focused so much of this discussion upon.

BY DR. PRZYMUSINSKI:

Q    And I appreciate that.  Thank you.

The first drug in the GLP-1 class to be approved in the United States, early 2000s?

A    Okay.

Q    So more than 20 years ago?

A    Right.

Q    Okay.  Do you know whether the labeling for that drug, at the time of the initial approval,

noted that the drug delays gastric emptying?

A    I don't believe I looked at that particular label.  Is it in my materials considered list?

Q    Honestly, I'm not sure.  I was just asking if you remembered?

A    I don't remember if I -- but I know about those drugs, specifically, because that was one of the -- one of the bits of information that may not have actually made it into my report, per se, that I found firmly to believe that these drugs retard gastric emptying and I think that was a very salient example.

Similarly, as I mentioned to the previous questioner, I looked at GIP as another G protein coupled receptor and its effects.  And I note that GIP has no effect whatsoever on promoting or retarding gastric emptying.

Q    Understood.  All right.

If you look a little bit further down that same page, actually, the very next line.  Page 19 of your report.  You write:

"This does not mean that all of the drugs will slow stomach emptying and reduce spikes in glucose after meals to the same degree, but they will all correspondingly cause the stomach to retain

contents to some degree."

Do you see that?

A   Correct.

Q   So do I understand correctly what you're saying is that although you believe that all the GLP-1s will slow gastric emptying, the magnitude of the impact on gastric emptying can vary from drug to drug?

A   The magnitude as well as the duration based on each drug's dosage, administration, form, and the other pharmacokinetics and dynamic effects.

Q   In preparing your report, did you do an analysis and ask the following question, which of the GLP-1 RA drugs at issue in this litigation or in the class has the greatest effects on gastric emptying and which one has the least?

A   Well, the problem with that is there's very, very few, if any -- I don't think I looked at any head-to-head trials comparing gastric emptying.  In fact, as I mentioned earlier, there's only one study that anybody ever did looking at gastric emptying with an acceptable format, and that would be a scintigraphy study, not a paracetamol based study or liquid emptying trial.  So there really is only one study that was ever done and so I can't say any were

ever compared so I can't say which is good and which is bad. I also can't say whether symptoms correlated with emptying in any degree because we know from all the literature related to gastroparesis that symptoms and severity of emptying are not correlated.

Q    Yeah, that's a good point.

So given that, fair to say that you couldn't come right now and tell me, based on my review of the data, this is the GLP-1 that has the greatest effect on gastric emptying and this is the one that has the least?

MR. PENNOCK:  Asked and answered.

THE WITNESS:  I can't say this drug is worse than that drug; but I can say all of the drugs, they all cause gastric emptying delay, every which one of them.

BY DR. PRZYMUSINSKI:

Q    Understood.

Now, let me ask you a follow-up.

On the one study you mentioned that used scintigraphy to measure --

A    Yeah.

Q    Do you recall that?

A    Yeah, I can't remember the name but it's in

my report.  We should put it up.  It's a very informative study.

Q    We may do that later, but my question is actually more generic.  You said it's the only acceptable -- I think that's the term you used, test for measuring gastric emptying.

Do you recall that?

A    Yeah, it's not the only acceptable.  It's the gold standard.  There are other methods that have been subsequently shown to be also very good such as octanoic breath testing is an example; but by me, gastroparesis, if you want to define it on the basis of a test, you need to have a four-hour study in an appropriately fasted individual with an appropriate meal labeled and done with an appropriate lag time and follow-up and all the other sort of limitations that are required to do a proper gastric emptying study.

Q    Okay.  Totally makes sense.

All right.  Let's drop down on the same page of your report.

A    Uh-huh.

Q    If you look at seven lines from the bottom, do you see a sentence that starts "finally, the Chiang"?

A    The Chiang meta-analysis, yeah.

Q    So in that sentence, you were talking about the meta-analysis of clinical trials.  It looks like the first author's last name was Chiang, C-h-i-a-n-g --

A    Yes.

Q    -- and that was published in the "Journal of Gastroenterology."

Do you see that?

A    I do.

Q    Now, feel free to refer to your materials considered list, but I think that the publication you're referring to there is called "Glucagon-Like Peptide-1 Receptor Agonist and Gastrointestinal Adverse Events:  A Systematic Review and Meta-Analysis."

Do you recall that?

A    Yup.

Q    Okay.  My question here is kind of to try to understand the flow of information you're sharing in this section of your report.

Why did you include discussion of that Chiang meta-analysis in this paragraph?

A    Well, it's not the only Chiang meta-analysis.  It's not the only meta-analysis I

looked at.  There were a few reported.  And why did I pull up this particular Chiang here.  Well, I'd have to look back to what I was thinking about the time.  But I think when I was using the Chiang meta-analysis in this particular event to describe is that this study included various GLP-1 medications and lumped them altogether in terms of being in the same class.  So I think that was -- if it was acceptable peer review for people to look at the Chiang meta-analysis and say a GLP-1 is a GLP-1 is a GLP-1, I would agree with them that that was what it is.

It's a GLP-1 and all of these agents bind to GLP receptors, activate them, cause downstream effects, different effects on different cells.  Some cells might secrete more or secrete less.  Some cells might switch on more nerves and switch off other nerves, et cetera, et cetera, whatever the differences are; but they all do the same thing, and they all have an affinity for binding to that receptor and it can be measured pharmacologically.

Q    Did you do anything to look at the relative affinities of the different GLP-1s' photoreceptor?

A    I have not looked at the relative affinities, and I think that's a pharmacological

question.

Q   Now, in that sentence about the Chiang meta-analysis, you wrote that it was peer-reviewed and published in one of the prominent medical journals, Gastroenterology.

Do you see that?

A   Yes.

Q   Why is it important to note that the meta-analysis was peer reviewed and published in a prominent journal such as Gastroenterology?

A   Well, as a gastroenterologist, I like Gastroenterology, I think it is the highest-rated journal in my field.  And I think any literature that is published should be appropriately peer reviewed because if it's not peer reviewed, you're not going to trust it.

It doesn't mean that the reviewers are the world's best and can't make mistakes and so there are papers that have been published that have been retracted.  There are papers that have errata.  But I think Gastroenterology, as an ex-editor thereof, is a very good journal.  And I think that if they accepted the combination as a class, it should be accepted as a class.

Q   Understand.  And is it fair for me to take

away from that, that the fact that this meta-analysis was not only peer reviewed but peer reviewed by peer reviewers that are part of this Gastroenterology journal that you respect, does that give you some indicia that or confidence that the analysis itself was done with high quality?

A    I believe that it would have been a reasonable analysis that was acceptable to be published in a good journal and that it should be relied upon.  It doesn't mean that as one particular paper it is the one paper that I'm going to hang my hat on in terms of it having good effects or bad effects.  Its efficacy compared to other meta-analyses or even big single-cite trials would just, you know, go together with the others; so if this one showed a little effect and that one showed a big effect, the fact that they both showed an effect, for me, is evidence in the right direction suggesting that it's real.

Q    And I'm not suggesting that -- I'm sorry.  Did I cut you off?

A    No, not at all.

Q    I'm not suggesting a comparative valuation of this versus other studies.  I'm trying to understand whether the process of peer review,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

particularly by what you consider a prominent journal such as "Gastroenterology," that you yourself have been affiliated with, does that give you a certain degree of assurance that the study itself, its design, its analysis, its results are reliable in terms of what is being produced?

A    To a degree, I would say yes.  I'm going to value it more, but it doesn't mean that it is -- I've certainly read articles in the New England Journal of Medicine and said this is a lot of nonsense, but they accepted it.  So I'm not suggesting that that's sine qua non.

Q    So let's talk about this.

Did you review this meta-analysis prior to completing your expert --

A    Yes, yes.

Q    Did you make a determination yourself of whether you considered it a high-quality paper that you could rely on?

A    It was one of the papers that had enough quality in it for me to comment on it, and I think it was even one of those that was listed in my discussion when I spoke about all three of the meta-analyses having similar effects in a two- to threefold increase in the development of

gastroparesis.  If I recall, this one had the widest confidence intervals but it also had a point estimate that was about three, if I recall.

Q    I think that's right.

A    In your opinion based on your review of this meta-analysis, do you believe that the Chiang meta-analysis provides reliable evidence regarding the GI effects of GLP-1 medications?

MR. PENNOCK:  Note my objection.

One second.

Okay.  You're not limiting to gastroparesis.  Okay.

DR. PRZYMUSINSKI:  You can answer.

MR. PENNOCK:  You can answer.

THE WITNESS:  Tell me that again.

BY DR. PRZYMUSINSKI:

Q    Based on your review of this meta-analysis which whatever you did, right, the peer review process, the publication of the journal.  In your opinion, is this a meta-analysis that provides reliable evidence regarding the GI effects of GLP-1 RA medicines?

A    Taken together with all the other evidence that I looked at, yes.

Q    Okay, very good.

Okay.  Let's flip forward to page 21,
Doctor.

Do you see the heading there that says
"Method for evaluating published observational
studies"?

A     Yeah.  Yeah.  Yeah.

Q     And is that the method -- that section --
strike that.

Let me do a clean question.

Does that section outline the high level or
whatever level, the approach you applied in
evaluating the observational studies that you relied
on in this education?

A     Yeah, I mean, I think what happens is you --
when you look at it, you get in any medical journal
club, you'll look at the journal, you'll look to see
that the methods make sense, you look to see that
they chose their appropriate populations and they
weren't biased and they didn't put an issue in there
that could be -- lead to a poor result, ultimately.

In fact, it's interesting that you bring
that up because I saw an article two days ago, I
think, on the Chiang meta-analysis in
gastroenterology with a letter to the editor,
talking about how the Chiang manuscript was actually

limited and had additional statistical considerations that weren't valid.

Now I'm not a statistician, so I can't comment on it, but that was a letter to the editor literally in the last week or so.

Q    Does that letter to the editor somehow change your opinions with respect to your reliance on the Chiang meta-analysis?

A    Not combined with all the other stuff that I've looked at.  There's not one smoking gun here. This is a collection of many, many, many trials. Lots and lots of post-marketing results.  Analyses that looked well or badly at all the data that's out there.  And you know, we can -- a lot of it can be criticized -- but putting all of that together, the totality of the evidence to me suggests that both Question 1 and Question 2 are real and that I think they are true.

Q    Okay.  Let's stop there for a second.

A    Okay.

Q    Because your response to Question 2 was that there was no evidence to support a persistent effect past six months?

MR. PENNOCK:  After six months.

///

BY DR. PRZYMUSINSKI:

Q    After six months?

A    After six months.  And I'm saying there are theoretical explanations that there could be.

Q    But you just said my -- putting together the totality of the evidence together suggests that both Questions 1 and Questions 2 are real and I think they are true.

A    As I -- my report speaks for itself.  What I said in my report is what I believe.

Q    Very good.

Now, back to this methodology.

A    Okay.

Q    Can I assume that you applied these principles in evaluating the observational studies you reviewed for purposes of your report?

A    Yeah, at least those principles and possibly others that I haven't mentioned.

Q    Did you do anything in terms of ranking the studies in terms of their overall quality based on applications of these principles?

A    Yeah, I mean, I think I spent a lot of time in a lot of places on all the studies that I've reported on saying that these are potential limitations that the author stated.  These are

David Metz, MD     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

potential limitations that I've seen as well.  So there are -- you know, when you look at the epidemiology studies, there are certainly -- you know, unidentified confounders.  Then there's, you know, you're limited by the population that you've got.  It's not a real world, the whole world, everybody; but I think, you know, as good as you can get is as good as you can get and you look at whatever evidence is out there and you look at it altogether.

Q    My question was a little bit different.

So first of all, I understand that all observational studies have strengths and weaknesses; right?

That's a fair point?

A    That's a fair point.

Q    Okay.  But I also understand that when you look at a body of observational data -- I'm not necessarily talking about this, but any body of observational data, there are going to be studies that have higher quality, studies that have lower quality; correct?

A    Well, yeah, each study has its own inclusion, exclusion criteria in the database and population is defined and so, yeah, there are ways

of analyzing it and absolutely true.  The data,
integrity may differ from study to study.  So yeah,
they're good studies, they're bad studies.  Yeah.
No -- you know, nothing is perfect in this world.

Q    And I'm not asking for perfection by any
means, but my question is this:  So in looking at
this body of literature that I know you said you as
a totality supports your opinion, are you able to
tell me which of the studies that you reviewed on
this topic, issue 1, Question 1, are of the highest
quality in terms of providing the most reliable
methods based on the criteria you set out here?

A    No, I can't do that for you right now, but I
can certainly go through each one by one; and I
mean, we can go through every study and I can say,
yeah, I think this one's better than that one and
that one's better than this one.  But they're all --
anything that's published in the peer-reviewed
literature, I'd say, is acceptable to start with and
then there may, as I said, be some good ones and
some bad ones.

Sometimes an abstract is a ginormous study
might be something that I'm really going to accept
even though it hasn't necessarily been appropriately
peer reviewed.  If something is in the NEJM is

better than something that's in Gastro.  Well, many people would like to think so, but I think sometimes in Gastro it's not the best articles and in NEJM it's not the best articles in the world.  So I don't think I need to or should be able to tell you that this is the study that's the best.  And this is the study that's the worst, but I put the good and the bad together.

I think what's more important for me was to actually look at all the data and see that it all look in the same direction or they -- are there any studies out there that said hey, this is not on, and no, GLP-1s accelerate gastric emptying.  I never found one study that did that, for example.

So I think that to have to be on the best or the worst, the literature is the literature.  And, you know, the label is the label.  It's not the best, but it's as good as it can be and at the time; and you need to change it when it's appropriate to change it, and that's what we were talking about earlier.

Q    Okay.  One last question on this topic and then I'll move on.

So I understand that -- well, strike that.

As I understand it, you can't tell me the

best versus the worst; and I'm not saying you need to by any means.

Are you able to tell me which of the studies that you relied on for issue -- or Question 1, you put the most weight on and not even one study but which set of studies; or is that something you'd have to look through the report --

A   We're going to have to -- I mean, there are many, many, many, many studies that I looked at. There are studies that aren't even in my report and aren't even in my materials considered list that I might have said, oh, here's another one showing this, so I'm not going to modify it again.  So I think this is a representative document.  And had I found anything that I thought was better than what was in here or showed the opposite effect and limited the comfort with which I could state what I was stating, I believe I would have put it in here; and I actually also think had the companies found anything that was in any way more defensive of the one or other positions, they would have put them in here too.

Q   Okay.  The criteria that you outlined here are for observational studies; correct?

A   Yeah, yeah.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q    In terms of looking at either data from clinical trials or from meta-analysis of clinical trials, did you apply the same criteria or some different version?

A    Well, I think clinical trials have different issues.  I mean, you know, they have inclusion criteria so it's not the whole world.  It's potential inclusion.  Did they have any transgressions of the inclusion criteria.  Did they have -- how many patients didn't come for follow-up.  How many patients were kicked out of the trial with side effects and therefore didn't show an ongoing effect down the pike.

So there are lots of reasons for how a double-blind randomized control study is done.  I would say in terms of levels of evidence, I think back to the typical pyramid where you started with an observation and then a case report and then a series and then a comparative trial and then a blinded comparative trial with appropriate selection and -- you know, you can go up, up, up, up, up; and in theory, the meta-analysis is better, but I don't know so much about that because there's heterogeneity you have to take into account.  So, I mean, all studies give you a certain amount of

information and once again putting it altogether is the overall picture.

You know, we like to -- I've always said, you know, when somebody comes to me and says, oh, this is good for that. I always say, well, show me the double-blind randomized control study with appropriate allocation because otherwise it isn't -- I'm not going to accept it.

But, you know, I mean, I think that there are many times that you learn things in medicine and there ain't evidence for.

Q    So fair to say, right, whether you're talking about observational studies, clinical trials, and meta-analysis, everything has got limitations; right?

A    Correct.

Q    Am I correct to say you would never dismiss clinical trial data as not relevant when you're looking at the question of safety of the medication?

A    If I see clinical trial data that shows me a safety signal, I would say that needs looking into.

Q    That's a little bit of a different answer.

So when you're thinking about -- you say you have to look at the totality of the evidence; right?

A    Right.

Q   And part of that totality is data from clinical trials; correct?

A   Right.

Q   And it could be individual trials or it could be meta-analyses or it could be both; right?

A   Okay.

Q   And all I'm asking is:  As a principle when you're looking at a safety issue, whatever that safety issue is for a medication, the clinical trials, whatever the limitations may be, provide some piece of relevant evidence to consider in evaluating that question.

Is that fair?

A   Yeah.  Yeah.  So, I mean, you're getting at an absence of evidence isn't an evidence of absence.

Q   And I'm -- so let me back you out because that's a little step further, and I understand that absence of evidence doesn't mean that you can rule something out.  But I'm asking a different question, which is:  In evaluating the totality of the evidence, that data from clinical trials, meta-analyses, that's stuff that's at the top of the evidence hierarchy, it's still relevant that you completely look at; correct?

A   Correct.

Q    And it's not something you would dismiss and say, oh, that comes from clinical trials, that can't be informative; correct?

A    Oh, no, no.  In fact, in this particular situation here, I think the clinical trials were very informative.  There's -- you know, I mean, if you're going to design a trial and say I'm going to give somebody an antiemetic because I know they're going to vomit, that says to me, I know they're going to vomit.  That means while they're vomiting, there's the symptoms and signs of gastric emptying delay.

And so, yeah, the way the studies are designed and all the effects, in this case, were very limited.  If I'm doing it -- designing a trial that -- and I've got six or seven trials with the same agent beforehand that showed a two- to threefold change in the likelihood of symptoms of gastroparesis, I would say yeah, those are real. I'd better make sure that next time I'm -- you know, look into it and maybe I should have done more gastric emptying trials.

Q    So from a perspective of data from randomized trials, limitations notwithstanding and acknowledging and considering them, fair to say that

on understanding the GI effects of these medications, including nausea, including vomiting, including all that range, gastroparesis, for you, they're very relevant; correct?

A    I think that the gastric -- I think that the clinical trials are robust and are very important in terms of analyzing over and above sort of, you know, case reports and adverse events because they are so rigidly designed.  The big limitation there, of course, is that you're looking at a limited population and you're looking at a specific population and so you've only got, you know, in this case 5,000, 6,000, 10,000 patients that have been exposed and so you don't know what's going to happen out in the big real world.

And the other limitation is, for example, anybody who had evidence of severe gastroparesis, don't ask me how it was defined -- but if you had it, you wouldn't have been included, whereas in the real world out there, you may have well had those people exposed.  So clinical trials are very, very, very important.  And I would go back to the Phase 1 trials even where they aren't comparators to say, you look for signals on the very beginning because Phase 1 trials are only there for safety.  They're

not there for efficacy at all.

Q    Okay.  Let's flip forward, Doctor, to page 23 of your report.  Okay?

A    Okay.

Q    And there is a section on "Strength of association."

A    Yeah.

Q    And under that section, the first study you talk about is study by Sodhi, S-o-d-h-i?

A    Yeah, yeah.

Q    Can I assume that you reviewed that study before?

A    Yeah, I've looked at Sodhi; I've looked at the response to Sodhi, the letter that I've -- and I've also looked at Sodhi's response to the letter.

Q    Okay.  In terms of the overall quality of the Sodhi study, meaning its relevance, strengths, and limitations, do you have an opinion as to the overall quality of the study, based on your review?

A    Well, as I say, it is what it is.  This is what the literature showed and that's what you're going to get.  So was this a hundred percent terrific study?  No.  Was it a terrible study?  No. Are the limitations there?  Yes.

In fact, I think of all the studies that I

Case 2:24-md-03094-KSM   Document 691-33   Filed 05/19/26   Page 186 of 302

put into my report, this study has been hammered by the response from the literature and that -- from the letter that was written, and that's what peer review is all about, that doesn't end after the study is published.

And then Sodhi has an opportunity to come back and say, yeah, I accept what you're saying is reasonable, but.  And so I think of all the manuscripts that I've got here, this is one that's got a publication that has its limitations, somebody said, oh, and then on top of it, these are even more limitations.

And then the author can come back and say, well, I accept these, I don't accept those; but the bottom line is the general message coupled with all the other papers says to me, yeah, there's a tremendous strength of association.

And I don't believe for a minute that there isn't evidence that GLP-1s cause gastric emptying delay and side effects and that it is a strong association and it is supported with dose response outcomes, with an -- all other Bradford Hill criteria in terms of having an explanation of how it might have worked.  That they all move in the same direction.  That there aren't any studies that show

the reverse.

So put this all together.  This is incontrovertible.  I just don't see how you or anyone else can say that these drugs don't do what they do.

Q    The beauty of it is, I don't need to say anything because I'm just asking the questions.

A    You're asking me.

Q    No one cares about my opinion, so we'll put it that way.

But -- but I want to separate things out.  All right.  I understand your overall opinion; right.  The overall opinion is totality.

I want to understand some of the pieces of that opinion; right?

A    Right.

Q    And generally speaking, when I do things, right, I look at a bunch of stuff and this piece maybe contributes a little bit, this piece may contribute a lot, and this piece may not contribute anything.

I look at different pieces and I have a totality, but I can look at each individual piece and tell you, this is strong evidence, this is weak evidence, this I didn't really consider because it

may not be that helpful.

With respect to Sodhi, can you give me a sense of where that study, given the limitations you, your yourself, acknowledge, given some of the criticism received from others and the response that the authors gave, where does it rank in terms of your -- just the powerful or the contribution it gives to your overall opinion?

A    Well, it was certainly important enough for me to consider it in the list.  These are, I believe -- I can't remember exactly, but I think they are all arranged in chronological order, yes. They are.  I think.

So that was an earlier-on publication.  They were potentially raised for doing it differently. But actually, that's not a hundred percent because Kalas was 23.  But generally speaking, where I had tried to sort of say, well, how did this evidence come about over time?

And this was one of the earlier publications, it was, in my opinion, sufficient to include.  I'm not going to give a mark of four out of ten or nine of ten, but it's good enough for me to say, okay, I'm going to consider this one.

Now, let me look at the next one.  Oh, it's

in the same direction, right.  That's interesting.

Does it add that much more to what I've already

said?  Well, I can drive for the next three weeks

here, but then I'm going to, you know, add in a

bunch of papers, which I think he said was 15 when

he counted them earlier today.

Q    I didn't count.

A    Yeah.  I think the other gentleman counted

them.  I think it was 15.  I think, okay, now, I've

got enough info to say I can stop searching for --

for these kind of manuscripts.

Q    I promise last question on this line.

A    Okay.

Q    Sodhi.  Out of those 15?

A    Yeah.

Q    Top half, bottom half in terms of quality?

(Reporter clarification.)

MR. PENNOCK:  Sodhi?

DR. PRZYMUSINSKI:  That's right.

MR. PENNOCK:  Note my objection.  Asked and

answered.

Go ahead.

THE WITNESS:  Yeah, I mean, I -- let's -- we

have to look at -- let's look at all 15 and we can

sit here and say this one is -- this one is better

than that one.  I'm going to make that a two.  I'm going to make that a -- they're all -- it's all connecting it all together that I think is important.

BY DR. PRZYMUSINSKI:

Q    Okay.  Fair enough.  I got it.

Let's go back to page 24.  We're still talking about the Sodhi study, but I'm not going to be asking you about --

A    How good or bad it is.  Okay.

Q    Well, I'm going to ask you about design, but not comparing it.

Fair enough?

A    Okay.  Yeah.

Q    On page 24, the third paragraph, you write:

"In addition, two sensitivity analyses were conducted, one excluding hyperlipidemia."

(Reporter clarification.)

BY DR. PRZYMUSINSKI:

Q    "Because more semaglutide users had hyperlipidemia and the second to definitively exclude patients with diabetes by using a one-year lookback to exclude exposure to anti-hyperglycemic agents in addition to the absence of an ICD code for diabetes."

Do you see that?

A    Yeah.  So that was a type of a sensitivity analysis.

Q    Now, I want to focus on that first part, right, the sensitivity analysis that excluded hyperlipidemia, because more semaglutide users had hyperlipidemia.

A    Yeah.

Q    Why would you exclude hyperlipidemia in the context of a situation like this where more semaglutide users had hyperlipidemia?

A    Because it could be a potential confounder. It didn't mean that the two populations were identical.  So if you -- if you have a study and you're looking at shoe sizes and everybody's shoe size is between eight and 10 and the average on the one group is 9 and the other group is 9.9, you're going to say well, these two populations might be a little bit different.

So let's try to do an analysis where we take that, as a confounder, out of the study.  So I think that was the reason they tried to do that.

Q    Understood.  So you're -- you're basically identifying a characteristic that's not balanced between the two groups; right?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    Yes.

Q    And you're saying, well, that could be confounding or confusing the results; right?

A    Correct.

Q    And then you say, I'm going to control for that characteristic, adjust for it?

A    You've got to do your best to do that.

Q    As much as you can?

A    As much as you can.

Q    And then I'm going to see what I can see after that?

A    Correct.  And does it change the outcome.

Q    And if it doesn't change the outcome, then that's reassuring?

A    Correct.

Q    And if it changes the outcome, that raises questions about the overall analysis?

A    Potentially.

Q    Okay.  Got it.

A    Because there may have been other confounders and there may be other untested issues.

Q    So there could be other issues that you still don't even know about?

A    That is correct.

Q    All right.  Understood.  Okay.  Now, page

David Metz, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

27, Doctor, there's a study by Liu.

Do you see that?  L-i-u.

A    I see it, yeah.

Q    Okay.  And that study is titled, "Some Risks of Gastrointestinal Adverse Events Associated With Glucagon-Like Peptide-1 Receptor Agonists Are Likely Explained By BMI."

Do you see that?

A    Correct.

Q    And that's another study that you reviewed and considered for your report; correct?

A    Correct.

Q    Okay.  Now, if you look right underneath the heading, you wrote:

"Liu (2025) is a respective cohort study with propensities for matching similar to Sodhi et al. (2023) but now designed specifically with initial BMI matching (a major stated limitation of Sodhi)."

Do you see that?

A    Right, I do.

Q    Okay.  So sounds like what Liu was trying to do is say, let's look at what Sodhi did in their analysis and make some adjustments, in particular for BMI, to see if we can have a more robust, more

accurate analysis.

Is that fair?

A    I think that's fair.

Q    Okay.  Do you know, by the way, if Sodhi used propensity score matching?

A    Not right now offhand.  We should have a look at the manuscript.  I'm happy to have a look at it.

Q    We can --

A    I can't --

(Reporter clarification.)

THE WITNESS:  I can't remember specifically how they were matched at the time.  But -- you know, as a -- there are so many variables that you have to do if you're trying to do a decent study, that I can't think of all of those right now.

And as we've discussed, you know, observational studies are not as robust as double blind randomized controlled studies with appropriate dedication.

BY DR. PRZYMUSINSKI:

Q    Totally okay.  We'll come back to that later.

You go on to say two lines or, like, two sentences, down you wrote:

"The exclusion criteria for diabetics was also more stringent than Sodhi, excluding patients that had ever been diagnosed with Type 2 diabetes or had hemoglobin A1C greater than or equal to 6.5 percent."

Do you see that?

A    I do.

Q    And you go further down saying:

"Liu, utilized the TriNetX US network health database, which at the time of the study had data from 58 participating health care organizations and 112,810,999 patients from 2011 to 2023."

Do you see that?

A    I do.

Q    Okay.  Now, are you familiar with the TriNetX database?

A    I know of the database.  I know, you know, just like there's the CA [phonetic] database, there's the TriNetX database.  There are multiple databases that are felt to be relatively representative of the population.  But nothing really is.  It's as good as you can get.

Q    Within the limitations of as good as you can get --

A    Correct.

Q    -- do you consider the TriNetX, to be a reliable --

(Simultaneous colloquy.)

BY DR. PRZYMUSINSKI:

Q    Okay.  So within the limitations that nothing is perfect; right?  Is it fair -- do you believe that the TriNetX database provides a reliable dataset for assessing the GI effects of GLP-1 RA medications?

A    Yes.

Q    Okay.  What would your reaction be if a clinician or a researcher told you that she did not give any weight to studies using the TriNetX database due to concerns about the quality of the dataset?

A    What would I say if somebody said they don't use that database because?

Q    What if somebody said to you, I would give zero weight to studies using that database because I don't believe that database is reliable?  What would your reaction be?

MR. PENNOCK:  Hold on one second.  This is not coming out right on the transcript.

BY DR. PRZYMUSINSKI:

Q    Well, let me do the sentence again.  Or the

question.

A    Sure.

BY DR. PRZYMUSINSKI:

Q    What would be your reaction if another clinician or researcher, whoever that might be, came up to you and said, Dr. Metz, in my opinion, you can't put any weight on any studies with the TriNetX database because it's completely unreliable?

MR. PENNOCK:    Because what?

BY DR. PRZYMUSINSKI:

Q    Because it's completely unreliable.

What would your reaction be?

A    My reaction would be, I'd like you to tell me why and on what basis you feel this particular database isn't worth analyzing.  And if you can convince me thereof, then I will agree with you and will say, oh, my, I can't accept it.

And no database is a hundred percent perfect.  And as I said earlier, you get what you can get.  And database in, data out, garbage in, garbage out.  So if anybody said something is good, bad, or indifferent, I would say show me why you think that.  And if you can convince me, then I'm going to agree with you.

Q    Okay.  Certainly within your review, this is

one of the studies you cited; right?

A    Yeah, there have been a lot of studies looking at this particular database.

Q    I think I found six in your report.

A    Yeah.  Yeah.

Q    So at least from your perspective, you did not dismiss studies using this database; is that fair?

A    Well, nobody has come to me to tell me that it's an unreliable database, as you proposed.

Q    Okay.  Fair enough.

Now, if you look at a couple lines down, there's a quote, which I think you're quoting from the actual publication where it says:

"After propensity score matching 8,792 patients in each cohort."

Do you see that?

A    Yes.

Q    Okay.  And in terms of size, I don't know if you recall.  Do you know if this was bigger or smaller than Sodhi?

A    I beg your pardon?

Q    Terrible question.

In terms of the number of participants, do you know if the Liu study had more or less subjects

included than the Sodhi study?

A     Well, after your propensity score match, you're always going to get -- end up with less.  I mean, that's what propensity score matching does.

You're going to start with the whole database, you're going to find people that match it, and then you're going to match people to the cases and you're going to try and make them look as similar to each other as you possibly can.

And therefore, you're certain you're going to last.  So the database will have millions of people, 112 million plus, and they found 8,792 that they could match to they could match 8,792 --

(Reporter clarification.)

THE WITNESS:  -- in the exposed cohort to a similar number of patients in the unexposed cohort.

BY DR. PRZYMUSINSKI:

Q     So I probably asked the question poorly.  I wasn't asking about comparing that number to the total number of patients in the database.  I was asking whether you knew, sitting here, whether the number of match participants in Liu, L-I-U, was greater or smaller than the number of subjects evaluated in the Sodhi study.  S-O-D-H-I?

A     We can just page back and see.  8792 in the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

one and Sodhi may or may not have -- I might not have put it in my --

Q    Page 23 for you, if that helps?

A    So -- I mean, there we had 613 versus 4,144 versus 654.  So the numbers, as you can see, compared to -- it was another 8,700, so it's ballparky.

Q    There's a total of 16, maybe 17,000 patients in Liu, right, because you have two arms and about 6,000 patients in Sodhi?

A    Yeah.  Okay.

Q    So it's about three times larger?

A    Yeah.  Okay.  Okay.  Go with those numbers.

Q    Is it fair to say that the authors of the Liu study used a more robust methodology than authors of the Sodhi study by adjusting for BMI, excluding patients with diabetes, and by having a larger sample size to conduct an analysis of the effect of the GLP-1 RA medications in the study on GI side effects?

        MR. PENNOCK:  Objection.  Form.

        THE WITNESS:  Well, I can say that those are factors that seemed better in one than in the other.  There may be other factors that aren't mentioned that weren't evaluated.  So I think the only way to

do that is -- and then a publication, actually, isn't even good enough.

You'd have to go back to the study protocol and actually look and see how the protocol was written, which I haven't done and I will do with pleasure if you'd like me to, to actually say I think this is a better design than that design.

So I can't answer that question and I don't think it's a fair question.

BY DR. PRZYMUSINSKI:

Q    Okay.  Let me ask you if this is a fair question.  Do you believe the Liu study provides reliable evidence regarding the GI side effects of GLP-1 RA medications?

A    Taken together with all the other stuff and all the other literature and all the other events that I've looked at beginning with the Phase 1 trials, going all the way through to everything, as I've said multiple times, I think this is one article that was good enough for me to put in to tell you for what you questioned me on today that I think this gives us important, valid information.

Q    Can you do me one favor because I understand you always go back to totality and I appreciate that.  But my question was really, specifically,

this one study.  I'm not saying it answers the question fully.  That's not what I'm suggesting. I'm asking, do you believe it provides reliable evidence about the GI side effects of the GLP-1 medications?

A    I'm saying this study is as good as any of the others that I've felt was good enough for me to consider showing the trend that the others all supported.

Q    Okay.  That's totally fair.  Go with me to page 34, Doctor.

Do you see the Garg, G-A-R-G, study being discussed there?

A    I do.  I do, yeah.

Q    And that looks like another TriNetX study?

A    Yes.

Q    Can I assume -- understand there's limitations and strength of the study and understand that you consider the totality, that this is also another study that provided reliable evidence with regard to the GI side effects of GLP-1 medicines within the context of the totality of the data you reviewed?

A    This is another article that I am considering valid to show the trend.  And it is also

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

TriNetX.  And if, you know, the TriNetX is terrible or not terrible, I don't know, but from what I've seen with the peer-reviewed literature, plus everything else, this does -- I accept it as another example of the trend.

Q    Totally fine.  One more study, page 35, just flipping over.

A    I bet you it's a TriNetX study.

Q    It's not.  You lost your bet.

A    45?

Q    35.  35.

A    35.  Okay.

Q    This is Sarwal, S-A-R-W-A-L.

Do you see that study?

A    Yes.  Yeah.

Q    Now, at the top of page 36 where you have some of your discussion of the Sarwal study, the last sentence in your discussion says:

"Despite the large size and robust design, this study was limited by potential residual confounding limited generalized ability due to the predominantly male population, reliance on provider generated ICD-10 codes without laboratory confirmation and lack of analysis by specific drugs, doses, or duration of therapy."

Do you see that?

A    I do.

Q    Okay.  I just have a limited question.  Why is reliance on providing generated -- why is reliance on provider-generated ICD-10 codes without laboratory confirmation a limitation of the study?

A    Well, an ICD-10 code is a -- is a diagnosis that the treating doctor chooses when treating a patient in terms of a billing requirement.  It isn't necessarily confirmation that the patient has proven to have that exact disease.

And in fact, some of the ICD-10 codes aren't diseases and make absolutely no sense.  You know, I can't think of some of them.  But when The ICD-10 came out and it was so much bigger than ICD-9, I mean, there were diagnoses that, you know, exposure to a bomb blast or, you know, some ridiculous topic that now became an ICD-10 code.

So, you know, again, it's as good as you can get, but nothing is a hundred percent positive.  And, you know, again, like the VA studies, they're going to have predominantly men and that's another example of how there's a potential confounder.

But if you've got 30 trials or 15 trials or 130 trials all showing similar outcomes with all of

the inherent lack of ability to be 100 percent best and they aren't double blind randomized control trials, which even if they were would have limitations, the general trend of all of this overwhelming evidence for me is that "yes," these drugs cause these effects.

DR. PRZYMUSINSKI:  How long have we been going?

THE VIDEOGRAPHER:  Just under an hour.

DR. PRZYMUSINSKI:  Why don't we take a break.  Sound good?

THE WITNESS:  Up to you.

DR. PRZYMUSINSKI:  Two minutes.

THE VIDEOGRAPHER:  We're now going off the record, and the time is 1:44 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going back on the record, and the time is 1:51 p.m.

BY DR. PRZYMUSINSKI:

Q    Okay.  Ready, Doctor?

A    I'm ready.

Q    Page 49, 4-9.

A    Got it.

Q    There's a sentence about seven lines down that begins with "Three studies."

A    Yes.

Q    In which you wrote:

"Three studies examine the association between GLP-1 use and scintigraphically confirmed gastroparesis using an appropriate four-hour endpoint, Kalas, K-a-l-a-s, Mesgun, M-e-s-g-u-n, and Lupianez-Merly L-u-p-i-n-e-z dash M-e-r-l-y.

Do you see that?

A    I do.

Q    Okay.  Why did you call out these three studies specifically in your report?  What's the importance of that sentence?

A    Well, if I'm being asked to evaluate whether these drugs cause gastroparesis, scintigraphy with an appropriate endpoint done properly, is the gold standard test to prove that it exists, and there were three studies that I could find.

Q    So you looked for the studies, whatever was available within the limitations that actually used the gold standard test to evaluate for gastroparesis, and you found these three?

A    Correct.

Q    All right.  Now --

A    And there's a fourth one within the clinical trial data.

Q    Let's focus on -- okay, what's the fourth one?  What's the name of it?

A    I can't remember.

Q    Okay.

A    But it is there.

Q    Okay.  That clinical trial that you're referring to, the fourth one.

A    Yeah.

Q    Sitting here, can you tell me whether the endpoint of that trial was delayed gastric emptying as measured by GES or was it gastroparesis as a clinical condition?

A    It is gastric emptying.  And basically they gave 10 percent, 50 percent, 90 percent.  90 percent emptying means 10 percent left.  10 percent left by me, therefore, was the time to output that if it was below four hours was normal, and if it was above four hours was abnormal.  And all the normal -- all of the patients who were diabetic, every one of them, all of them were less than 10 percent at the 90 percent emptying period was less than four hours in every single case.

Everybody that got placebo remained less than 10 percent throughout the period and they measured it at four weekly -- at weekly intervals

for four weeks. All of the patients, every single one that received drug started with a baseline emptying that the T -- T90 emptying time was less than 10 percent, and every single one of them at most of the subsequent four measurements were 90 percent emptying times of more than four hours and beyond a shadow of a doubt, to me, that proves these drugs cause gastric emptying delay.

Q How many of those patients had symptoms?

A That was irrelevant. The question I looked at was the gastric emptying output. Could they have had symptoms. Could they have not had symptoms. We know lots and lots of these patients do get symptoms whether they're measured or not measured; but in that particular trial, and I think there were patients that had symptoms. I can't remember how many of them, but the particular question you asked me was, are these the three studies that I found that showed that measured gastric emptying and I said yes; but there also is a trial in the clinical database, the trial database, that shows to me beyond a shadow of a doubt that these drugs caused delay in gastric emptying with an appropriate four-hour endpoint.

Q Okay. Now -- that's a good explanation, but

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

it wasn't the question that I asked; and it's going to draw out the deposition a little bit more, which is fine. But --

A    Okay. Sorry about that.

Q    No, I'm not blaming you because it's a long day and I get it. What you said in the sentence that we're talking about is there's three studies that examine the association between GLP-1 use and scintigraphically confirmed gastroparesis.

Do you see that?

A    Yes.

Q    Okay. Now, the study, the clinical trial you're referring to, even if it identified delayed gastric emptying in some subset of patients or all patients taking a GLP-1, that is not the same thing as confirming scintigraphically confirmed gastroparesis; correct?

A    No, it is. Scintigraphy study that looked at 90 percent emptying time. So the time to emptying -- if you have all 10 percent left at 4 percent, it's all normal; right? At four hours. If you look at four hours and there's more than 10 percent there, which is 90 percent emptying and that time is more than four hours, it's -- it's extrapolatable. It's the same result.

Q    Confirm -- tell me if I'm wrong.  I thought the definition of gastroparesis is rule out obstruction.  Show evidence -- objective evidence of delayed gastric emptying and have symptoms.

A    Well, as we discussed, the showing delayed emptying is variable depending on the presentation.  The symptoms also could be variable depending on presentation.  So you could have a delay in gastric emptying and you could have weakness of the stomach, gastroparesis.  And you don't necessarily, at that moment in time, feel the need to vomit.  That doesn't mean you don't have gastroparesis.

So correlation of symptoms on emptying are very poor.  We've discussed that previously and so I'm not suggesting that those three factors aren't all paramount, but they don't all happen at the same time and they don't have to all happen at the same time; and, in fact, the patients that presented with gastric emptying delay side effects in all of these clinical trials and in all the post-marketing stuff didn't have emptying studies done because you can't do emptying studies.

Q    We have to take this a little bit apart, Doctor, so let's focus on one piece at the time because --

A    Okay.

Q    -- there's so many concepts coming together.

A    Yeah.  All right.

Q    You're a member of the American College of Gastroenterology; correct?

A    No longer.

Q    You were in the past?

A    I was, correct.

Q    Are you aware that the ACG criteria for diagnoses of gastroparesis requires the presence of symptoms, evidence of delayed gastric emptying, and ruling out mechanical obstruction?

A    I agree.

Q    Okay.

A    They don't have to happen at the same time, but you have to have all three.

Q    And within the context of that particular clinical trial you were talking about, do you know how many of the patients on GLP-1s had symptoms at any time?

A    I know for a fact that it's in the trial.  I don't remember how many.  We can certainly go back and have a look at the study, but I do know for a fact that that was a study that was specifically designed to look at gastric emptying, I guess

because the company felt maybe this is something that could be an issue we need to look at.

And they measured it and they did it with a meal and they did it scintigraphically; and rather than presenting a residual at four hours, they looked at a 90 percent emptying which was convenient for me because 90 percent emptying means 10 percent left; and if 10 percent left was more than four hours, there's a delay; and if 10 percent left is less than four hours, there isn't a diagnostic delay; and so therefore, I'm saying that was a very important trial that I did look at.

I know there were some symptoms. I can't tell you exactly how many without pulling the trial, which we can do. And I think somewhere in my report here we can do a search if somebody has got it electronically, they will be the only trial that was done because there was only one trial done. It was surprising to me that the actually only with its known effect and went all this way and they only did one study to effectively measure real gastric emptying of solid meals.

Q    Maybe Mr. Pennock wants to do that later.

Let's talk about these three studies.

A    Okay.

Q    With respect to Kalas, K-a-l-a-s.

A    Right.

Q    The next sentence says:

"Whereas a single center Kalas study failed to find the association between GLP-1 exposure and gastroparesis."

Do you see that?

A    Yeah.

Q    Okay.  So at least the Kalas study, for whatever reason based on its limitations, did not find an significant association; correct?

A    Right.

Q    Okay.  Great.  The Lupianez-Merly study.

Do you remember that study?

A    Yeah, we can see what I wrote about it.

Q    You discuss it in a couple places in your report.  You have some discussion on page 50 of your report?

A    Yup.

Q    And we also have -- find out where it is in here.  It's got to be in the abstract section of your report.  Page 43.  You have another section.  And one question about Lupianez-Merly, is there a comparator group?  In other words, did the Lupianez-Merly authors compare the rate of

gastroparesis in patients taking a GLP-1 to those not taking a GLP-1, allowing for a determination of whether an association exists?

A    So -- okay, keep talking?

So of these three studies, you're correct, the first study was done at a time there wasn't a way to really work out when the drug was taken, when the patient had the gastric emptying scan; so you can't really utilize that, although it didn't measure gastric emptying.

This particular study that you're talking about was retrospective going to the Mayo database saying, who had gastroparesis studies done.  Of those that had gastroparesis studies done, how many of them were taking GLP-1?  So it was a retrospective look without a comparative trial and therefore didn't have as much validity to it which is why I raise that point in my actual report.

Q    But as a study without a comparator group, it cannot tell you whether there's an association, meaning whether there's an increased risk of gastroparesis in patients taking GLP-1s as compared to others because there is no comparator; correct?

A    Correct.

Q    So that's two of the studies.  Let's now

talk about the last one as you mentioned, Mesgun;

right?

A     That's the abstract.

Q     That's the abstract.  Now, you can look at

it in the abstract section or you can look at it on

page 49 where you have a discussion on it as well.

And I have only one question for you.

A     Yeah.

Q     Did the Mesgun study, in fact, as you say,

use scintigraphy to confirm diagnosis or was it, in

fact, based on ICD codes?

A     Can I please have the abstract?

Q     You can absolutely have the abstract.

We're going to mark that as Exhibit 7 for

the record.

(Defendants' Exhibit 7 was marked.)

BY DR. PRZYMUSINSKI:

Q     The good news is it's short.  The bad news

is the print is small.  So I hope you're able to

read it.

A     Back to TriNetX.

So that is an obvious error because they did

not measure gastric emptying based on what is said

in the report.

Q     Okay.  So at least within the context of the

three studies you discuss on page 49 of your report,
Kalas, Mesgun, and Lupianez-Merly, that you say
examine the association between GLP-1 use and
scintigraphically confirmed gastroparesis, not a
single one of those studies actually reported
association between GLP-1 use and scintigraphically
confirmed gastroparesis; correct?

A    Correct.

Q    All right.  Let's talk about clinical trial
data.  We all like that.  And that, Doctor, is on
page 51 on your report.  There's a section called
"Experiment."

Do you see that?

A    Yeah.

Q    And right under that heading, you write:

"The Hill criteria explicitly recognized
that experimental evidence may be the strongest
support for a causation analysis."

Do you see that?

A    I do.

Q    Do you agree with that?

A    Yeah, for sure.  May be.  It may be the
strongest support.

Q    Right.  So may be the strongest support for
positive causation.  It's present.  It could be the

strongest support?

    A    Yeah.

    Q    And that's because of what we discussed about the -- either within clinical trial context; the strength of the clinical trial design; or, in the case report context, the challenge, dechallenge, or rechallenge concept we talked about; is that right?

    A    Correct.

    Q    Okay, very good.

         Now, in terms of Novo, because we already talked about Lilly, page 98 of your report is where you have the section entitled "Novo clinical trial evidence."

         Tell me when you're there.

    A    90?

    Q    9-8.  98.

    A    Yeah.

    Q    That section right there at the top, says "Trial selection methodology."

         Do you see that?

    A    Uh-huh.

    Q    Very similar to what you have in the Lilly report; correct?

    A    Yeah.

(Telephonic interruption.)

BY DR. PRZYMUSINSKI:

   Q   Do you need to get that?





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



(Simultaneous colloquy.)

DR. PRZYMUSINSKI:  Sorry.  That's on me. How about we look at page 104.

THE WITNESS:  Okay.  Victoza.

BY DR. PRZYMUSINSKI:



Now -- let's go to page 6.

Now, one of the things that appears in various parts of your report is the discussion of the mechanism of action of GLP-1 RAs; correct?

A     Uh-huh.

Q     And in fact, both with Mr. Premo-Hopkins earlier -- need some water?

A     Some water, please.  Yeah.

Q    Both Mr. Premo-Hopkins earlier and with me, we've had already some conversations about that; correct?

A    Correct.

Q    I want to look at some of the things you say in your report on that and make sure that I understand and we have it in the record for the Court.

Is that fair?

A    Sure.

Q    Okay.  On page 6, if you look at that large paragraph before the section on functions of the stomach.

Do you see that paragraph?

A    Yeah.

Q    And about six sentences down, you write:

"GLP-1 receptors" --

Do you see that?

A    Yes.

Q    -- "are also located on vagal, afferent, and efferent nerves."

Do you see that?

A    Yes.

Q    "GLP-1 receptor stimulation of parasympathetic vagal nerves inhibits gastric

contractility leading to satiety."

Do you see that?

A   Yes.

Q   And if you jump another sentence down, you say:

"GLP-1 receptor stimulation on a myenteric nerves directly inhibits gastrointestinal motility."

Do you see that?

A   Yes.

Q   So here, we're discussing the matter in which, based on your review, you believe GLP-1 may affect gastric emptying, in particular focusing on effects on both the vagal nerve and what are called myenteric nerve; correct?

A   Correct, the intrinsic enteric system and the autonomic system.

Q   Right.  Now, on page 20, if we flip forward, right in the first sentence of the first full paragraph --

A   Yup.

Q   -- you write:

"Activation of GLP-1 receptors mediates dyspepsia and gastroparesis-like symptoms through various specific central and peripheral neural pathways particularly involving afferent and

efferent vagal nerve fibers."

Do you see that?

A    I do.

Q    So again, now you're talking about GLP-1s effects through the GLP-1 receptor; right.  Acting both in central, meaning central nervous system; correct?

A    Yeah.

Q    And peripheral, meaning peripheral nerves, and having those effects together have impact on both which what you call dyspepsia and gastroparesis-like symptoms; correct?

A    Correct.

Q    Okay, very good.  Now, if you go to page 130.  1-3-0.

Are you there?

A    Yeah.

Q    Okay.  In that big paragraph the fourth line, you write:

"The precise mechanism underlying impairment of gastric emptying, i.e., gastroparesis with native GLP-1 or pharmacologic GLP-1 agonists is due to the binding of the drugs or native GLP-1 to GLP-1 receptors."

Do you see that?

(Reporter clarification.)

THE WITNESS:  I do.

BY DR. PRZYMUSINSKI:

Q    And again, you talked about that with Mr. Premo-Hopkins earlier; right?

A    Yeah.

Q    And so again, what you're saying here is that with respect to how these drugs, in your opinion, affect gastric emptying or gastroparesis is through the interaction of those drugs, the GLP-1 receptors located in various parts of the body, including on the vagus nerve; correct?

A    Correct.

Q    Including on myenteric nerves in the stomach; correct?

A    Correct.

Q    As well as certain nerve centers located in the brain, both in the brain stem and the broader CNS; correct?

A    Correct.

Q    Now, you made, I think the point to me earlier, that this binding to the GLP-1 receptors is really important; right?

A    Uh-huh.

Q    It's what activates the G protein-coupled

receptor, causing the downstream effects, lock and key -- when the lock's turned on, the effect occurs when the lock is not connected, it stops; correct?

A    Correct.

Q    Now, we also talked about the concept that -- well, maybe we didn't.

So would you agree with me that the condition of chronic gastroparesis, for example, as a result of having longstanding uncontrolled diabetes, one of the characteristics is you end up having damage to either muscles, nerves, or connective tissues involved in gastric emptying.

Is that a fair statement?

A    Yeah.

Q    Okay.  Now, here is my question:

Are you aware of any evidence to a reasonable degree of medical certainty that GLP-1 medication causes damage or permanent injury to myenteric nerves?

A    I am not aware of any studies that have shown that.

Q    The muscles of the stomach, same question.

A    The muscles, same question.  I'm not aware of any studies.

Q    Connective tissues in the stomach.  Same

question.

A    I agree, I'm not aware of any studies.

Q    Interstitial cells of Cajal, same question.

A    Well, no, I'm not aware specifically of any injury to interstitial cells of Cajal induced by these drugs.

Q    Brain stem, same question.

A    No.

Q    And lastly, the CNS more broadly, same question.

A    Correct.  No.

Q    Let's go to page 20.

I'm going to go back to that first full paragraph --

A    Yeah.

Q    -- on page 20.  A second ago, we read the first sentence about activation.

Do you recall that?

A    Yeah.

Q    I'm going to go to the next sentence:

"While GLP-1 receptors are found directly on gastric cells, as mentioned above, the effect of GLP-1 inhibition on gastric motility is predominantly neurally mediated."

Do you see that?

A    Yes.

Q    Okay:

"A major stimulus for GLP-1-induced GI (side) effects in the GI tract is relayed to the brain through vagal afferents in the stomach and intestine."

Do you see that?

A    Yes.

Q    I'm there.  Now, what I want to focus on is the next section:

"These stimuli are augmented by stimulation of brain stem nerves involved in the 'vomiting center,' efferent vagal nerve centers that directly inhibit gastric motility" --

(Reporter clarification.)

BY DR. PRZYMUSINSKI:

Q    -- "myenteric plexus nerves that reduce smooth muscle contractility and other areas higher in the central nervous system that mediates satiety, reduce appetite, and alter feeding behavior."

Do you see that?

A    Correct, it's a two-way street.

Q    Now, tell me what the vomiting center is, Doctor.

A    I beg your pardon?

Q    Tell me what the "vomiting center" is.

A    It's a location in the brain that induces nausea and vomiting.  They're a couple.  There's the area postrema and a few other areas that I'm no world authority on.

Q    Fair to say, Doctor, that patients taking GLP-1 RA medications, for example, by GLP-1 medications acting on receptors in what's called the "vomiting center," or more broadly in the CNS, can experience nausea or vomiting without having any delay in gastric emptying?

A    I don't know that for a fact and I'm not willing to accept that as fact because my point is if you've taken a GLP-1 receptor and it is in your bloodstream and it's binding to GLP-1 receptors in one place, it is also binding to GLP-1 receptors in other places.  And I don't know if their affinity differs in any way between the neurons in the vomiting center, the neurons in the myenteric plexus, the neurons in the pancreas, or the neurons in the colon for that matter.

So the point I'm getting at is it's a two-way street.  The ileal brake, which I'm sure you know of, is driven by contents in the small bowel that tell the body to switch on peptide YY,

et cetera, et cetera, including the L cells that release GLP-1.  And then GLP-1 goes and tells the body, hey, there's a lot of stuff coming down in here.  Let's just slow the process down, and whether it's slowed down through the brain and the stomach and which the stomach talks to the brain or the brain talks to the stomach, the point I'm trying to get at is it's a two-way street and it's an effect of GLP-1 drugs.

That's what they do.  They cause nausea. They cause dyspepsia.  They cause vomiting.  They delay gastric emptying.  They improve gastric accommodation.  They increase the tone in the pylorus.  So if you want to separate out nausea from the brain or nausea from the stomach, you can't do it.  It's all the effect of the drug.  It's what the drug does.  It's part of the mechanism of action.

Q    You have not done that.  You have not asked the question.  Let me finish my question.

You have not asked the question or asked -- and answered the question in your report whether patients who experience nausea and vomiting while taking a GLP-1 can experience that symptom or those symptoms purely as a result of effects on the central nervous system, the vomiting centers and

other areas in the brain, without having evidence of delayed gastric emptying?

MR. PENNOCK:  Objection.

Go ahead.  You can answer.

THE WITNESS:  I beg your pardon?

MR. PENNOCK:  Objection.

Go ahead.  You can answer.

THE WITNESS:  I was asked to talk about the stomach, and I spoke about the stomach.  What I'm saying is, if there's GLP agonists in your bloodstream, when it gets to the brain, gets to the pancreas, it gets all over the body, it's going to affect all GLP receptors, and I don't know that the difference in affinities, that's something that I don't even know is known, maybe it may not be known; but the effects of the drug are to cause nausea.  Is the primary cause of nausea, stimulation of the brain center?  Is it distension of the stomach?  Is it delayed emptying?  I don't know the answer to that.  I don't think anybody does.

BY DR. PRZYMUSINSKI:

Q    Not something you've personally answered for this report?

MR. PENNOCK:  Objection.

THE WITNESS:  I was not asked to talk about

central nervous effects.

BY DR. PRZYMUSINSKI:

Q    So the answer's "No"?

MR. PENNOCK:  Objection.

THE WITNESS:  No, the answer is not no.  The answer is I don't know.

BY DR. PRZYMUSINSKI:

Q    You don't know the answer to that question?

A    Correct.

Q    Okay.  Now, do you remember the Lupianez-Merly study we looked at?

A    That was one of those, yeah.

Q    That's a study in which you had a large group of patients taking GLP-1 RAs; correct?

A    I believe so.

Q    And subset of that group had GI symptoms -- nausea, vomiting, and others; correct?

A    Correct.

Q    And then a smaller subset of that group, about 690, had scintigraphy; correct?

A    Correct.

Q    So you have symptomatic patients, some of whom get scintigraphy; and after they did the scintigraphy of those symptomatic patients, only 35 percent had actual evidence of gastric emptying.

Do you recall that?

A    Yes, I do recall that, and I recall the 35 percent number.  Yeah.

Q    So the other 65 percent had symptoms of nausea and vomiting and other GI symptoms, but no evidence of delayed gastric emptying?

A    No, I disagree with that.  I'm saying the other 65 had symptoms at one time and had no evidence of gastroparesis on scintigraphy at another time.  And the two don't necessarily relate to each other.  And when you have your symptoms and when you have your delay may or may not be related.

Now, the fact that 35 percent, that's one out of over three people had evidence of a gastric delay says to me yeah, that's a significant number.

Q    Let's make sure we get that right.

A    Pardon?

Q    Let's make sure we get that right.

A    Okay.

Q    That's not 35 percent of all the subjects in the study.

A    No.

Q    It's only 35 percent of the select group of patients whose physicians decided to do the gastric emptying study?

A    Of course.  Of course.

Q    Which is a self-selected group; correct?

A    Look.  The fact is that there are a lot of patients who had low gastric -- evidence of delayed gastric emptying.  You want me to give a number? I'm saying 35 percent of those that were tested, for me, was a relevant number.  And so I think it's something worth considering.

Q    I want to make sure we're accurate.  That's all I'm saying.  Your opinion, right, is your opinion.  Can't change that.

A    I'm happy to hear that.

Q    Okay.

A    No, if you show me information that changes my opinion, I'd be happy to change my opinion.

Q    Okay.

A    But I can't say that you have told me that --

Q    That's fair.

A    -- that the drug doesn't cause gastric emptying because 65 percent of the people tested at one moment in time don't have it.

Q    I'm not.  I'm not.  I can't tell you anything.  I'm certainly not trying to tell you anything.  I'm just asking you questions.

A    Okay.

Q    Now, do you agree with the following statement?

"Interestingly, symptoms do not universally correlate to objective finding of gastroparesis."

A    I think that that's a true statement.

Q    Do you agree with the following statement?

"Some asymptomatic diabetics demonstrate abnormal emptying by scintigraphy, while others who have severe nausea and vomiting may have normal gastric emptying studies."

A    Where is that in my report?

Q    It's not in your report.

A    Oh.

Q    I'm asking if you agree with that statement.

A    You're asking me if I think there's a correlation between measurements of gastric emptying and symptoms?  I'm saying that the correlation is poor.

Q    But for the moment.  Just focus on my question.  All right?

"Some asymptomatic diabetics demonstrate abnormal emptying by scintigraphy while others with severe nausea and vomiting may have normal gastric emptying studies."

True or false?

A    Well, wherever that came from, it makes sense to me.  I'm not -- you know, some diabetics -- depends on the diabetics.  I mean, I don't understand what the relevance that has to where the GLP-1s cause delay in gastric emptying.

But I'm telling you that I know that gastroparesis is poorly correlated on scintigraphy with symptoms.

Q    Okay.  Would you also agree with the following statement?

"Symptoms of gastroparesis include chronic or intermittent nausea, vomiting, early satiety, bloating, belching, postprandial abdomen pain, weight loss, and gastroesophageal reflux symptoms. All are symptoms that may be present with a variety of gastrointestinal disorders and none as specific to gastric motor dysfunction."

Do you agree with that statement?

MR. PENNOCK:  Objection.

THE WITNESS:  I believe that dyspepsia, which basically means just indigestion, and you can put any of those symptoms in and say are those dyspepsia, I'd say, yes, they may occur in people who don't have objective evidence of gastric

Case 2:24-md-03094-KSM    Document 691-33    Filed 05/19/26    Page 245 of 302

emptying delayed when tested.  So yeah, it's a non-specific symptom.  The complex of which have been labeled as gastroparesis, but the drugs delay gastric emptying and so I think the association is there.

BY DR. PRZYMUSINSKI:

    Q    Okay.  But that wasn't my question.  I just asked if you agree with that statement?

    A    Yeah, I agree entirely.  People that have headaches may or may not have auras.

    Q    Last statement for agree or disagree:  No physical examination findings are specific for diagnosis of gastroparesis.

        MR. PENNOCK:  Objection.

        THE WITNESS:  Physical examination, I agree.

BY DR. PRZYMUSINSKI:

    Q    Excellent.  All right.

    A    I mean.  Gastroparesis, as I say, is a syndrome.  So it's not a disease as such.

    Q    Okay.  Let's go to page 18 of your report, Doctor.  We're getting close to done.

    A    Good.

    Q    I am sure you're happy about that.  Top of the page, you write:

        In approaching questions one and two, I

utilize the widely known and highly regarded Bradford Hill methodology.

Do you see that?

A    Yes.

Q    You go on to say, the methodology requires the application of nine considerations for determining a causal relationship between exposure and of certain effect.

Do you see that?

A    Uh-huh.

Q    In your opinion, what is the difference between causation or a causal relationship and association?

A    Well, things can be true, true, and unrelated or true, true, and related.  I sound like Donald Rumsfeld.  True, true, and related, true, true, and unrelated; and if A causes B and you think there's enough evidence that that's the case, then you have causal association, you just don't have the existence of two things happening at the same time.

Q    So an association is what?

A    An association is if there's -- if one thing is found more commonly with something else, then the two are associated.  It doesn't mean that this causes that.

Q    Have you heard the term valid association, Doctor?

A    What is -- valid, it's real or it's not real.  It's confounded or it's true.  The associations themselves don't causation make.

Q    That's helpful.  So would you agree that a valid association epidemiology is a statistical relationship between an exposure and an outcome that is not due to random error, bias, or confounding?

A    Yes.

Q    And what that means is an individual-observed association could be explained by chance, could be explained by bias, could be explained by confounding; correct?

A    I agree.

Q    And an association that is actually due to chance or due to bias or due to confounding would not be a valid association for purposes of establishing causality; correct?

A    Yes.

Q    Now.  Another way of saying that is a valid statistical association is a necessary predicate for establishing causation but itself is not sufficient; correct?

A    I agree.

Q    Now, Doctor, are you familiar with the concept of power in epidemiology?

A    Yes.

Q    And power is a way for, probably statisticians, typically, right, to estimate the ability of an individual study to detect an effect if that effect is indeed present; correct?

A    Correct, and not by chance.

Q    And things that you attribute to power in a study could be sample size, having enough patients; correct?

A    Correct.

Q    Although it would be posthoc because of the results, the number of events in the study could influence how powerful it is to detect a difference; correct?

A    Correct.

Q    Now, a few questions about that.  You're familiar, obviously, with risk ratios because you discuss them in your report; right?

A    Uh-huh.

Q    A risk ratio 1.0 means no effect; correct?

A    I agree.

Q    All right.  Now, if you have a study that is underpowered, meaning it doesn't have a sufficient

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

sample size or a sufficient number of events but it reports an odd ratio of 1.0, right, that's the result.

A    Okay.

Q    As a scientist, as a physician, what conclusions can you draw based on that study?

A    You can't.

Q    What if I give you a different example. What if I have a study that reports a risk ratio that's above 1?

A    Okay.

Q    But the study is underpower --

A    Okay.

Q    -- and it's not significant.

A    Yup.

Q    What conclusion do you draw from that?

A    Well, it depends on the confidence intervals; and if it crosses 1, it's not statistically significant.  It's a trend.

Q    So if it crosses 1, the confidence interval, it's a nonsignificant relationship?

A    Correct.

Q    Okay.  If you have that situation, right, I have an odds ratio or risk ratio above 1, confidence interval crosses 1, you look at the study and you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

say it's probably unpowered.  Okay?

A    Correct.

Q    Assuming that.

Can you reliably, as a scientist, as a physician, say, okay.  I can look at that, I can tell you that if I increase the power of the study, if I had more patients, more samples, more events, then I can reliably conclude it would have shown an increased risk that was significant?

A    I can't be sure of that.

Q    Okay.  How about the opposite example. Let's say I have a study where the risk ratio is below 1; right?  But it's not significant.  Whether the P value is over .05 or the confidence interval crosses 1.

Are you with me?

A    Yeah.

Q    But again, small sample size, small number of events.  Are you able to, as a scientist, look at that study and say I know for a fact if I increase the power, had more patients, more events, that event, that outcome of that study would have been statistically significant reduction of risk?

A    No.

Q    Okay.  Very close.  I've got like four pages

left.

You discussed the Bradford Hill criteria in terms of the nine specific criteria in your report; right?

A    Right.  Yep.

Q    And one thing you said, which I think is indisputable, right, is the temporality is the only one that's fully required; correct?

A    Correct.

Q    Okay.  Now, so first of all, tell me if you agree with this statement:

"Generally researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn."

Do you agree with that?

A    Yeah.

Q    Okay.  And from your perspective and the way you approach whether it's in the context of this litigation or in the context of the work that you do outside of that litigation, is that how you would approach causation?

A    Yeah.  I think you would have a preponderance of the evidence before you claim.

Q    A conservative approach?

A    Correct.

Q    Okay.  Now, on page 22 of your report, and I know you talked about this with Mr. Premo-Hopkins a little bit earlier -- you talk about the dechallenge and rechallenge events.

Do you recall that?

A    Yeah.

Q    And I think you mentioned that dechallenge provides some evidence of causation; right?

A    Right.

Q    And that's because a patient was exposed to medication.  They experience a side effect.  You take the medication away.  It resolves, right, that's the challenge.  That suggests to you that potentially it could be related to the medication, because at least temporality is met; correct?

(Reporter clarification.)

THE WITNESS:  I agree.

BY DR. PRZYMUSINSKI:

Q    We have a rechallenge, right, which is the next step.

A    Yeah.

Q    You go a step further.  You say, you have the medication.  You stop the medication -- you had a side effect or potential side effect.  You stopped

the medication and it went away.

A    Right.

Q    You restart it again and it came back;
right?

A    Right.

Q    Do we have any of those kind of reports in
this case?

A    I actually saw a couple of rechallenge
events where the patient had restarted and we don't
know what happened to them afterwards, so I don't
know the answer to that.  I can't think specifically
of any absolute challenge, dechallenge, rechallenge
with a persistent recurrence of the event, so I
can't offhand say I can't see any of those
definitively.

Q    Okay.  If you look at page 23, Doctor.  And
again, this is something that Mr. Premo-Hopkins
asked you about.  I just want to get a little bit of
additional clarification.  Make sure I find where I
am.  I'll come back to that.

Let's instead go to page 116, Doctor.

A    1-1-6?

Q    1-1-6.  Where you talk about the biological
grading.

A    Yeah.

Q    Biological grading and dose response, basically synonyms?

A    Yeah.

Q    And the idea there is that generally speaking, as a dose increases, you are more likely to see -- strike that.

If the cause-and-effect relationship exists, as the dose of the exposure increases, be that the medication or toxin or whatever it is, you generally would expect with higher doses to have either more events or higher likelihood of those events; is that correct?

A    Yeah, I'm not sure it's only those two; but yes, as the dose goes up, the effect gets more pronounced.

Q    You said it better than I did.  Thank you.

And I think in your report, you say right here, just under "biological gradient" under these, like, ten I through X items, you say:

"Biological gradient or dose response is also very important criteria under Bradford Hill."

Right?

A    Yeah.  Yeah.

Q    And I think earlier you said, in fact, dose response is a really important indicator supporting

drug-related effects?

A    Okay.

Q    Is that fair?

A    Yeah.

Q    Okay.  Now, why is it that dose response or biological gradient, whether it's here, very important, or here really important; you know, why is it that dose response is such an important indicator of causality?

A    Well, if a little bit of a stuff causes an event and a lot of the stuff causes more, you can say the stuff is related.

Q    Okay.  What if you don't see that response effect?  What happens then?

A    I don't think it's an absolute, because you can reach your maximum effect at a lower dose and so you may not necessarily see your dose response.  I mean, you'd have to see and go back in reverse and get even lower; but if you do see a dose response, that, to me, is very supportive of the relationship.

Q    Does absence of a dose response at least raise some questions in your mind about whether the relationship exists?

A    Well, if you've only got one dose and you're looking at one other, then you ain't going to get a

dose response.  So it really depends on having enough doses and looking at enough responses to be sure.  So yeah, I mean, a dose response is very helpful.  It's one of the criteria for that reason.  It's not the only criteria and it's not paramount.

Q   In your report, when you discuss, at least with respect to Novo, dose response, you talked about the fact that at higher doses, you see more events of nausea and vomiting of the GI side effects.

Do you recall that?

A   Correct.

Q   I didn't see anywhere in your discussion of any studies that reported a dose response effect with respect to the actual outcome of gastroparesis, impaired gastric emptying, or anything like that.

Do you have such studies?

A   I didn't -- that wasn't asked or looked for as far as I know.  And so if it wasn't asked for, then you wouldn't be looking for it.  But for example, if 10 people had nausea and vomiting on the lower dose and 20 people with the same denominator had nausea and vomiting on the middle dose and 40 people on the highest dose, that, to me, suggest nausea and vomiting is dose-response related.

And could it be from gastroparesis, yes.  Is it only from gastroparesis?  The point you brought up time and time again.  It could be from pancreatitis.  But if it isn't pancreatitis and it is typically dose related and it's gastroparesis-related side effects, then I would say it's from gastroparesis.

Q   Or it could be from central effects that are independent from --

A   They're not independent.

Q   How do you know that?

A   Well, you've asked me.  I'm telling you that the drug binds to the receptors, and it's binding to the receptors in all the places; and you can't say this one works and that one doesn't and this particular drug only works on the brain, it doesn't work on the stomach.

Even if it only worked on the brain, it would secondarily cause gastroparesis because it's going to activate those vagus nerves that are going to go down.  It's a two-way street between what happens in the GI tract and in the central nervous system.  You know, they talk about the little brain and the big brain.  So the enteric nervous system and the vagus nerve and the parasympathetic and

sympathetic nervous system, they supply everything from there to there.  That's a lot of neurons.

Q    Are you aware --

(Reporter clarification.)

BY DR. PRZYMUSINSKI:

Q    Are you aware of the fact that multiple studies have reported the majority of nausea and vomiting effects of GLP receptor agonists are dependent on central effects and have nothing to do with the GI effects of medication directly?

MR. PENNOCK:  Objection.  Show him the papers.

THE WITNESS:  Yeah, I'm unaware.  You show me what it is.  But my feeling is if there's GLP in the bloodstream, it's binding to the receptors in all of these locations.

BY DR. PRZYMUSINSKI:

Q    So you have not seen such studies?

A    I have not seen those studies.

Q    Fair enough.  Last page.

A    Yay.

Q    Let's go to page 137.

A    37?

Q    137.  The very last page of your report. You can't go any further back.

And just so I orient you so there's no sort of confusion. This is in the section of your report where you respond to Question 2; right?

A    Right.

Q    Okay. Now, you state here:

"An application of the Bradford Hill methodology to this question compels the conclusion with this time causality of prolonged symptoms of gastroparesis after cessation of a GLP-1 drug cannot be supported."

Do you see that?

A    I do see that.

Q    Okay. And that related to a six-month period you were talking about, just so Mr. Pennock doesn't think I'm pulling one over on you; is that right?

A    Yes.

Q    Okay. Now, you go on to say:

"In my opinion, however, a careful and detailed evaluation of individual patients might lead to a conclusion of causality and the prolonged symptoms based upon general medical and gastroenterological evaluation and a careful development of a differential diagnosis."

Do you see that?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    I do.

Q    I want to talk about that a little bit.

So tell me in your own words what a differential diagnosis is.

A    Differential diagnosis is looking at various possible diagnoses that may explain a presentation.

Q    So you're a physician; right?  A patient comes to you with particular symptoms; correct?  And then based on your expertise, your knowledge, you say, okay, there are X amount of different conditions that might explain that; right?

A    Right.

Q    Then you do some testing.  Some examination. Whatever it may be.  You rule things out until you get to one; correct?

A    Yeah.  In an ideal world, yes.

Q    All right.  And that really has nothing to do with the cause of the symptoms.  That has to do with what the condition is; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  No.  That can -- the differential diagnosis as to the cause really exists as well.  You can't have a differential diagnosis of what could cause this guy's symptoms, this or this or this or this.  So the differential could be a

differential as to cause as opposed to a differential of different diseases that could cause the cause.

BY DR. PRZYMUSINSKI:

Q   Understood.  And sometimes it's called "differential etiology"; right?

A   Okay.

Q   So here's parts to this process; right?  The first part of that differential etiology or differential diagnosis is saying, okay, here is the presentation of the patient.  Let me make a list. It may not be a real list, it may be in your head -- of the potential causes or explanations for that condition; correct?

A   Yes.

Q   Okay.  And the way you put things on that list is as a physician or a scientist, you say, okay, what possible exposures or conditions or factors have been established to the potential causes of this condition; right?

A   Yeah.

Q   Okay.  You make a list of all those things that have been established to be potential causes first; right?

A   Okay.

Q    And then you say, okay, now I'm going to do whatever testing or examination or processes I can do and I'm going to ask the question, can I rule -- which ones of those can I rule out; right?

A    Right.

Q    And what you want to get to, right, is I start with ten potential explanations based on things that are known possible causes and I really want to get to one so I can identify the actual cause if possible; correct?

A    Yeah.  With the caveat and the caveat is that they are diseases that have diagnosis of exclusion.  So you can't actually have -- all the functional bowel diseases, as an example, don't have a specific testing, you do this test, you get the answer.  That's what it is.

So you rule out gastrointestinal obstruction by showing no obstruction, which means there's a functional obstruction.  It doesn't mean that you had the definitive diagnosis but yeah, you rule things out and you get the best you can to try and work in association.

Q    And that's kind of the point, right, which is that if you had a direct test, I could -- you come to me with a symptom, I can run a specific test

David Metz, MD          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

and it tells me the cause of your symptom.  I wouldn't need a differential diagnosis; right?

A    Well, but you can have --

Q    I wouldn't need it.

A    -- more than one thing at a time.  You can have -- you know -- Occam's Razor and multiple different causes.  There's all sorts of ways that we can talk about the edges of it.  But yeah, if I've got a diagnosis and there's a definitive test that's a hundred percent sensitive and a hundred percent specific, then you can just do the test and if the test is positive, it's there and if the test is negative, it's not.

Q    There's no need for a differential in that context; right?

A    Yeah.  Although, there may, as I say, be more than one thing going on at the same time so you need to look at the whole picture and the whole patient.

Q    Now, in the absence of a test, right, we're not doing -- as a doctor, as a physician, as a scientist, I'm saying, okay, I don't have a specific way to say I can just take blood from Lucas's arm and it will tell me what's happening.

So what I have to do is say, what is my list

of possible options based on what I know scientifically has been shown to cause those symptoms and do my very best to eliminate the ones that are not the explanation in whatever method you can to get down to the one that you believe is the most likely cause; correct?

A    I think that's reasonable.

Q    Okay.  So what that means is that -- and, for example, so -- and it gets even more complicated, right, in cases with, like gastroparesis, where we know that there are a substantial number of cases of gastroparesis that are actually described scientifically as idiopathic; right?

A    Correct.

Q    Which means we have a gastroparesis but we really have no idea what the cause is?

A    And the reverse as well.  The reverse means we have the emptying and we don't have the symptoms. We don't know what that means.  We have the symptoms and we don't have the emptying.  We don't know what that means.  There's a poor correlation, I agree, between symptoms and emptying, even if it's done in the best situation at the best time.

And there's an intra-observability as well.

David Metz, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

So you can measure somebody on one day and they're delayed and on another day and they're not delayed and the other way around.

Q   And that's perfect conflict; right?  It's a complicated issue; right?

A   It's complicated, I agree.

Q   And so when you try and do a differential diagnosis for gastroparesis, right, you're going to start putting on your list the things that you believe may cause that; could be diabetes on that list, right, if the patient is diabetic.  You could have viral or post-viral syndrome.  You could have autoimmune situations.  You could have, you know, a vagus nerve being cut as a result of surgery.  You can create a whole different diagnosis with gastric medications on there.

And then if you're trying to figure out for this specific patient what caused that injury, you can say, okay, well, they don't actually have diabetes so I can scratch that one out.  They haven't had surgery.  The vagal nerve is intact.  You know, I can't currently rule out viral.  And you keep going through them and you try to get down to one that is your most likely explanation; correct?

MR. PENNOCK:  Objection.  Form.  And

incomplete hypothetical.

Go ahead.

THE WITNESS:  Yeah, well, I try and work out how to explain Mrs. Jones's presentation as best as I can, yes.

BY DR. PRZYMUSINSKI:

Q    By ruling things off your differential to try and get to something that is your most likely result; correct?

A    Well, let me say that if you don't have diabetes and you have gastroparesis, it can't be from diabetes.  So you do exclude that.  But, you know, there are other possibilities, so you can only exclude what you can exclude.

Q    And it'd be pretty hard to exclude idiopathic; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, as I said, idiopathic is a diagnosis of exclusion.  If you can't find any other possibilities, then you call it "idiopathic" if you believe that it's real.

BY DR. PRZYMUSINSKI:

Q    And I guess -- even outside the context of gastroparesis, it goes to one of the complexities of differential diagnosis, which is that differential

diagnosis assumes that the list of potential causes that you actually have identified is exhaustive; right?

MR. PENNOCK:  Objection.

THE WITNESS:  It's not exhaustive.  So what we're talking about here are not taking a list of all the possibilities in patients who didn't see GLP-1s.  So there still is that fact that they saw the GLP-1s.  So it remains a potential possibility regardless of if you end up coming to well, is it idiopathic or GLP-1?

Let's say you get all the way down to it's either idiopathic or it's GLP-1, and this patient had a GLP-1.  You can't exclude the GLP-1 by saying it's idiopathic until you make sure that you know in your heart of hearts that it's not a GLP-1.

BY DR. PRZYMUSINSKI:

Q    And you can't exclude idiopathic by assuming it's the GLP-1; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Well, you don't make the decision of idiopathic until you've ruled out everything else, so that's the last step.

BY DR. PRZYMUSINSKI:

Q    And I guess what I'm saying, and I'm really

close to done.  But I guess what I'm saying on this, what I want to understand is one of the things that happens in medicine, right, there are -- there's a certain amount of knowledge we have, right, and it continues to grow over time but there's finite knowledge we have about conditions; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  We, us, all of us, yeah, we all collectively know what we know.

BY DR. PRZYMUSINSKI:

Q    The medical community, right, individual doctors, but really medical community and the scientist community, there's a finite amount of information we have about any disease state; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Yeah, okay.

BY DR. PRZYMUSINSKI:

Q    That's fair?

And for pretty much any disease state you can come up with, there are unknowns; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I would accept that there are things you don't know about every single thing.  Yeah.

BY DR. PRZYMUSINSKI:

Q    And in fact --

A    Nobody knows everything.

Q    -- you could probably say pretty reasonably that for whatever medical condition your patient has, there are probably some explanations for that condition that medicine currently doesn't know?

MR. PENNOCK:  Objection.  And objection. Incomplete hypothetical.  Form.  Hypothetical.

THE WITNESS:  Well, you know -- as a physiologist and a gastroenterologist, if there's an explanation of biological plausible explanation, one of the Bradford Hill's criteria, I think you need to examine it before you can say it doesn't count.

So there may be things we don't know, but I'm looking at -- it's not what I don't know; I'm looking at could this be related.  Is it worthwhile not looking into the fact that this drug may have caused Mrs. Jones's problems, and I can't say it didn't until I have had the opportunity to check it. That's, I think, what I'm saying.

BY DR. PRZYMUSINSKI:

Q    That's not --

A    Can I come up with any potential possibilities?  I've given you one in my report and

I've given you a couple more possibilities today.

Q    But that wasn't my question.  My question wasn't about gastroparesis.  It wasn't about GLP-1s. My question was a very different question.  It's within the context of medicine as a whole.

What I asked was -- and you can limit to gastroenterology if you feel more comfortable in the field of gastroenterology.  You can pretty much pick any disease state.  Pick whatever you want that a patient can have; and as a medicine and science as advanced as we are today in 2026, there's still likely to be unknown causes or unknown contributors to those conditions that we as yet don't understand.

Is that fair?

MR. PENNOCK:  Objection to form.  Objection. Incomplete hypothetical.  Objection.  Beyond the scope of appropriate examination of an opinion regarding -- or based upon reasonable degree of medical certainty.

Go ahead.

THE WITNESS:  I object too.

BY DR. PRZYMUSINSKI:

Q    I'm not sure you can object.

A    What I'm getting at is we don't know everything about everything.  We just don't.  I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

mean, medicine is medicine and you do the best you can with what you know; and I think that if you know that there's something that's a potential concern, you should tell the people who are going to prescribe the drug that look guys, this is something that can happen and can hurt people.

You know, gastroparesis aside, any drug that could potentially hurt people and has been hurting people, I think it's incumbent on the people who may know that to tell the people who may prescribe it, you have a potential concern here, don't mess it up because your patients could get sick.

Q    Okay.

A    And I think that's really the mechanism that I've been trying to --

(Simultaneous colloquy.)

BY DR. PRZYMUSINSKI:

Q    That's fine.

But Dr. Metz, to be fair, literally nothing to do with my question.

MR. PENNOCK:  Objection.  Objection.

DR. PRZYMUSINSKI:  No, there's no question.

MR. PENNOCK:  Well, I know.  But I'm objecting to you harassing my witness with that statement.

DR. PRZYMUSINSKI:  By saying his response is not related to my question.  That's harassing?

MR. PENNOCK:  You said, Dr. Metz, to be fair, that has nothing to do with my question.

DR. PRZYMUSINSKI:  And you consider that to be harassing?

MR. PENNOCK:  Yeah, I do.

BY DR. PRZYMUSINSKI:

Q    Okay.  Let's try again.

My question was simply about the concept of what is known and unknown in medicine or gastroenterology; is it better for you.  It had nothing to do with gastroparesis.  It had nothing to do with GLP-1s and causation opinions in this case.

So let me try it again.

Do you agree with me, Doctor, that -- I'm a physician too.  Pick your disease in gastroenterology, while we, in 2026, know a tremendous amount, there's still lots of unknowns with respect to the causes of virtually any disease you can think of.

Is that fair?

MR. PENNOCK:  Hold on a second.  Okay. Objection to form.  Objection to the preamble. Objection to the testimony regarding facts not in

evidence regarding yourself or whether or not he bonded in any question.

You can answer.

THE WITNESS: Do I have to answer questions that don't pertain to my report?

BY DR. PRZYMUSINSKI:

Q You talk about differential diagnosis in your report and so I want to understand differential diagnosis and this, in my view, is very closely related to differential diagnosis.

But if you don't want to answer the question, you can say you can't answer it.

That's your choice.

MR. PENNOCK: No, no, no. He didn't say that. Okay?

Can you read the question back to him, please.

(The record was read as follows:

"Question: Do you agree with me, Doctor, that -- I'm a physician too. Pick your disease in gastroenterology, while we in 2026, know a tremendous amount, there's still lots of unknowns with respect to the causes of virtually any disease you can think of.

Is that fair?")

MR. PENNOCK:  Also.  Note my objection.
Beyond the scope of examining regarding opinions
offered to a reasonable degree of medical certainty.

Go ahead.

THE WITNESS:  So I'm saying do I need to ask
a question that doesn't relate.  Sure.

BY DR. PRZYMUSINSKI:

Q    I think the answer's "yes."

A    I mean, the answer is -- I mean, sure, I'm
happy to say there's a lot of things we don't know
about medicine.

BY DR. PRZYMUSINSKI:

Q    Okay.  And one of the limitations or
challenges for any physician when they're doing a
differential diagnosis is they have to understand
that when you have unknown causes, things you don't
know about a disease, when you're trying to get to
an answer by eliminating things off a list, it's
possible that what the actual explanation is
something as yet unknown because we haven't gotten
there as the medicine of science; correct?

MR. PENNOCK:  Objection.  Form.  Objection.
Incomplete hypothetical.

Go ahead.

THE WITNESS:  My answer is that is the final

step and before that, you need to look at all the possible potentials and examine them before you come to the decision that is something that is unknown and before you can say it's unknown, you've got to test to see if is a possibility.

BY DR. PRZYMUSINSKI:

Q    How do you rule out an unknown?

MR. PENNOCK:  Objection.  Outside the scope.

THE WITNESS:  As I said, that's the last step.  Once you reach no ability to answer the question at all, then you're stuck with idiopathic. Idiopathic is a diagnosis of exclusion.  So you can't be sure that there isn't a cause.  And in fact, there must be a cause but it's unknown.

BY DR. PRZYMUSINSKI:

Q    Okay.  Doctor, you personally -- Dr. David Metz -- you have never used the differential diagnosis methodology to conclude that a patient's drug-induced gastroparesis is caused by a GLP-1 RA medicine?

(Reporter clarification.)

THE WITNESS:  I have never treated a patient who comes to me with that diagnosis, so I've never had to do it, but it doesn't mean it's not real and it's not possible.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY DR. PRZYMUSINSKI:

Q    You also have never, for those same reasons or others, never concluded that a patient's gastroparesis symptoms that persist after a medication is stopped and the washout period is done, that those symptoms were caused by the GLP-1 RA medication; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  No.

BY DR. PRZYMUSINSKI:

Q    And you also, Doctor, never have, using a differential methodology, concluded that a patient who exhibits symptoms of gastroparesis more than six months after stopping their GLP-1 RA medication concluded that a GLP-1 RA was the cause of that gastroparesis; correct?

A    It is biologically possible but I have not personally diagnosed it.

Q    And when you say it's biologically possible, all right, are you referring to the studies you say have shown can have effects on the microbiome or the initial cells of Cajal.  Is that what you're referring to?

A    Yes, I'm saying there are theoretical possibilities that would explain the insult leading

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

to an event that persists and results in these symptoms, complexes.

Q    Can you identify for me, Doctor, right now, a study that proves that GLP-1 RA effects on the microbiome can cause gastroparesis that persists after the medication is out of the system, meaning it meets whatever timelines for washout?

MR. PENNOCK:  Hold on a second.

Hold on.  You just switched gears here.

First of all, he's not offered an opinion that there is any evidence at this time that can cause continuing gastroparesis symptoms beyond six months.  He signed a report.

DR. PRZYMUSINSKI:  I'm not asking.

MR. PENNOCK:  Saying it's theoretical.

DR. PRZYMUSINSKI:  I didn't ask about six months.  I asked about a washout.

MR. PENNOCK:  He's also not offered any opinion that there's an effect on microbiome that will continue to cause symptoms from a gastroparesis event up to six months.  He's not offered that opinion.

BY DR. PRZYMUSINSKI:

Q    Is that correct?

A    I'm saying it's a theoretical possibility.

Q    And that's all you need to say to me.
Because you told me it's biologically possible?

MR. PENNOCK:  Post six months.  He's talking
post six months.  His report is clear.

DR. PRZYMUSINSKI:  Paul, now you're
testifying.

MR. PENNOCK:  Because you're kind of
creating a little mess here.

BY DR. PRZYMUSINSKI:

Q    I'm actually not creating a mess.  The mess
is that the testimony is inconsistent so I need to
make sure it is consistent.  And I don't think it's
your fault, Doctor, I think it's just the way the
report is structured is a little bit confusing.

So if I ask you this question, right, you
told me that it's biologically plausible; right,
that a patient can experience gastroparesis symptoms
somehow related to a GLP-1 RA, at some point after
the medication has been washed out.  I don't know if
you were talking about after six months or in the
window between the washout and six months.

Is that not correct?

A    I'm saying that the drug can be washed out.
The effect that the drug caused could cause a

persistence of symptoms.

Q   We already talked about the fact that you couldn't point to any evidence of that; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I'm saying that I can think of biologically plausible causes, but I haven't seen any data that would show that it could truly happen.

BY DR. PRZYMUSINSKI:

Q   And that is true whether we talk about the period between a washout and six months or the period after six months; correct?

A   I'm saying that by the time the drug has washed out, there will still be some patients who may potentially have symptoms.  That's why I came up with six months.  I had to say that every patient is different.  There are so many patients that could have had PTSD and traumatic effects that are then going to say, I'm still not a hundred percent right. I end up in hospital, and I was very, very sick and I felt terrible, and I'm scared to go out of the house or whatever it is that those patients could still potentially have lingering symptoms that could persist beyond five half-lives.  That's what, I think, you're getting at.

Q   And I want to know what evidence do you

have, in that window -- because I thought you said you didn't have any. What evidence do you have within that window at five half-lives to the what you called your six month cutoff that these medications can cause patients to continue to experience symptoms related to gastroparesis?

A   Well, I can lean back on any of the functional diseases: The functional dyspepsias, their own four criteria of functional bowel disease. There is a triggering event that might precipitate these patients feeling very sick, right? So it's possible you have a patient that had gastroparesis induced by the drug or nausea and vomiting induced by the drug who landed up dehydrated in the hospital with or without aspiration, very, very sick. Okay, had a traumatic experience as a result of that, and lands up persistently feeling crappy for longer than five half-lives.

MR. PENNOCK: Keep going -- don't stop your answer just because he's making a face at you.

BY DR. PRZYMUSINSKI:

Q   Did I cut you off?

A   I'm -- I've said what I wanted to say.

Q   So I know that you're saying that it's hypothetically possible. What I'm asking for is any

study, any data, any actual scientific evidence that patients can experience symptoms of gastroparesis related to their GLP-1 RA use after the period of washout.

MR. PENNOCK:  Objection.  Form.

BY DR. PRZYMUSINSKI:

Q    Can you identify any of that?

THE WITNESS:  I'm saying that I -- unless you look at the possibility, you can't exclude that it precipitated an event.

BY DR. PRZYMUSINSKI:

Q    I'm not asking about excluding it?

A    I don't know of any specific studies.

Q    Okay.  Let's take a break and see.  We might be done.

THE VIDEOGRAPHER:  We're now going off the record.  And the time is 3:15 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're now going on the record and the time is 3:23 p.m..

DR. PRZYMUSINSKI:  Dr. Metz, I want to thank you for your time.  I have no more questions.

MR. PENNOCK:  Thank you.

THE WITNESS:  Okay.  Great.

MR. PENNOCK:  I just have questions on one

area that I'm concerned.

DR. PRZYMUSINSKI:  You want to flip, or are you happy sitting there?

MR. PENNOCK:  No, I'm happy sitting here.  I shouldn't be very long at all.

--oOo--

EXAMINATION

BY MR. PENNOCK:

Q    Can you turn to page 134 of your report.

MR. PREMO-HOPKINS:  This is the Novo report.

MR. PENNOCK:  I happen to have the Novo report.

THE WITNESS:  Yeah.

BY MR. PENNOCK:

Q    Okay.  I want you to look at this sentence. It says:

I chose six months on the basis that if the acute onset of gastroparesis is severe, then some continuing symptoms might be sensed or perceived by patients for some time after cessation but complete resolution of even perceived continued symptoms should in my opinion occur within six months at the outside, period end quote.

Do you see that statement?

A    I do.

Q    All right.  So I have a few questions about it.  First, what do you mean when you say some continuing symptoms that might be sensed or perceived by patients?

A    Well, when a patient has an event that makes them feel ill, they may take time, and everybody is different, until they can truly say I feel I've gotten back to myself again and it's completely gone away.

Q    When you said above the acute onset of gastroparesis is severe, what do you mean by "acute onset"?

A    Acute is a measure of it happened suddenly, out of the blue.

Q    And what do you mean by severe in that sentence?

A    You can have an episode that is bad enough to really make you feel absolutely terrible and sick.  It might be coded as moderate because it doesn't land you necessarily in hospital, but it still is a severe event in your mind because it caused significant side effects.

Q    So you mentioned, in answer to one of the prior questions, I heard you make mention of patients can have essentially PTSD from an event

that occurs.

A    Right.

Q    Can you expand on that a little bit, please?

MR. PREMO-HOPKINS:  Object to form and foundation.

BY MR. PENNOCK:

Q    Let me rephrase.

Doctor, what, if anything, have you considered in forming your opinions as to whether some form of a post-traumatic stress disorder could occur with respect to a sudden acute onset of gastroparesis, requiring hospitalization?

MR. PREMO-HOPKINS:  Same objection.

BY MR. PENNOCK:

Q    Go ahead.

A    Well, what I think I'm trying to get at is I'm trying to find an explanation that may potentially exist for patients that have an extremely unsettling experience after having a side effect related to a drug like these, that then it's gone out of your system but it hit them in a way that it's now triggered ongoing dysfunction.  And I think there's a tremendous amount of evidence in the GI medical literature for what is considered functional bowel disease, in which includes

functional gastric emptying issues that may be triggered by an episode such as this. And there's all the functional diseases that you, as a physician, would know so cyclic vomiting syndrome, et cetera, as an example. People getting labeled as having functional dyspepsia. They get sick. You can't find a definitive cause. You call it a functional disease. Whether you call it idiopathic or not, I don't know the answer to that but I can say potentially these events that land people in hospital that make people very sick, could potentially be the triggering event that leads to some kind of ongoing functional problem. It's a hypothetical or it's a potential explanation that I'm trying to come up with.

Q    Well, you indicate here that in the instance of GLP-1 gastroparesis, that you say, in my opinion, you say even perceived continued symptoms should, in my opinion, occur -- let me withdraw that and rephrase.

You say, but complete resolution of perceived symptoms -- I apologize, folks, let me start over. I skipped a word.

At page 134 of your report, Doctor, you say, but complete resolution of even perceived symptoms

should, in my opinion, occur within six months at the outside. What do you mean by that with respect to your opinions in this case?

A    What I'm saying is that, if after five half-lives have gone by and the symptoms are persisting, I'm thinking, well, there might be some other triggering event. If they've all gone away by six months, I would say to the patient, okay, everything has gone away and you're doing fine. If they even persist beyond that, you always have two possibilities, before or after six months, that it could be the drug or something else. And if it's persistent, I think it's required for you to look into the possibility thereof.

Q    Beyond the six months?

A    Correct.

Q    I'm talking about within the six months. Is it your opinion that patients that have had a gastroparesis event requiring hospitalization could sense or perceive symptoms within six months that would be due to the event that occurred?

DR. PRZYMUSINSKI:  Objection to form.

THE WITNESS:  Absolutely. It could be due to the event that occurred even though the drug's no longer in the body.

BY MR. PENNOCK:

Q    And what -- withdrawn.

Tell me why it is your opinion that it could be due to the event that occurred even though the drug is no longer in the body?

DR. PRZYMUSINSKI:  Objection to form again.

MR. PREMO-HOPKINS:  Same objection.

THE WITNESS:  So I've come up today, I think, with three possibilities, and I mentioned one in my report.  The one possibility that I mentioned in my report is that prolonged exposure to GLP-1s has been associated with a disruption of the microbiome.  It tends to take a long time to occur, as far as I know from the studies I've looked at. But once it occurs, it doesn't necessarily return and it can persist and change and give you GI upset and GI manifestations.

The second possibility that I came up with that I've been focusing on today a fair amount is the possibility of it being a trigger to produce functional symptoms.  And the third possibility is that is there anything that could potentially have happened that is an irreversible or damaging event. You mentioned damage to the interstitial cells of Cajal, for example, you asked me about.  Is it

possible there is an injury to the interstitial cells of Cajal that's going to take a long time to get better, despite the fact that the drug has gone away because that would affect GI motility everywhere, from the stomach all the way down to the anus.

BY MR. PENNOCK:

Q    Are you positing the theory that beyond six months those things might continue to affect someone theoretically?

DR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  Theoretically, I think, yeah, it could persist too.

BY MR. PENNOCK:

Q    But within the six months, is it your opinion that -- having nothing to do with the three things you just mentioned -- that people could continue to, as you say in your report, sense or perceive symptoms even after the drug has washed out?

DR. PRZYMUSINSKI:  Objection to form again.

THE WITNESS:  Yes, I think that that -- I think that that could happen, that somebody could get symptoms, have a bad time out of it, take a long time to get better because of the severity of the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

impact on them.

BY MR. PENNOCK:

Q    And --

A    Somebody who got dehydrated and needed to be rehydrated and have intravenous and have electrolytes fixed up and that sort of thing, as an example.

Q    You would expect that patient, regardless, to have -- no longer experience or perceive symptoms within the six months?

DR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  Yes, I think potentially those -- yeah.  If, eventually, everything will settle down and you'll start feeling better again and it will all go away.  Yes.

BY MR. PENNOCK:

Q    Okay.  You say here, there is of course great patient variability.  In your report, the same page.

What do you mean by that?

A    Well, no two patients are the same.  Some people are going to get a symptom that's going to not bother them in the least and some people are stoic and some people aren't.  Some people can get a symptom, could make them feel terrible and keep

focusing on it and feel it for a much longer period of time. So there is tremendous variability in how people would respond to an effect.

Q So is it correct that your opinion is that the drug itself is not continuing to cause those symptoms beyond washout but what happens to them during the event from the drug that is continuing to --

A Correct, that's exactly what I'm saying.

DR. PRZYMUSINSKI: Objection to form. Leading.

(Reporter clarification.)

BY MR. PENNOCK:

Q I think I heard you say this earlier in the day. It is your opinion that the event can cause some patients to continue to perceive symptoms for some limited number of months after drug washout?

DR. PRZYMUSINSKI: Objection.

BY MR. PENNOCK:

Q Is that right?

A That's exactly what I'm saying.

Q Have you seen that type of thing in any other instances during your practice of medicine?

A Absolutely. I mean, gastroenterology is kind of unique in that regard in that we do see a

tremendous amount of functional disease, and many patients that present with GI complaints have functional disease, so there's tremendous variabilities.  Think of irritable bowel syndrome as being functional disease of the lower tract and dyspepsia and nausea and vomiting and all of these symptoms like gastroparesis symptoms as being irritable bowel syndrome of the upper GI tract.  So your stomach wasn't happy and still isn't happy.

Q    And functional disease, can you please define that for the Court.

A    Well, functional is that there's an abnormality with function as opposed to an actual structural or organic abnormality.  So the first thing you would do in excluding obstruction is to look for an actual structural cause for obstruction. And so you do your upper endoscopy and you go all the way into the small bowel, but the stomach doesn't -- looks full and doesn't want to empty, probably, then it has to be an abnormality of function.  And you can get uninvestigated and investigated dysfunction, as I mention in my report, I speak about nonulcer dyspepsia and dyspepsia.

So dyspepsia being a sort of lay term for functional bowel symptoms, it can either be ulcer

cause or cancer cause or a structural cause or it can be a functional cause in which you don't find any abnormality but the patient still has the symptoms.

MR. PENNOCK:  Okay.

Thank you, Doctor, for your time.

THE WITNESS:  Okay.

DR. PRZYMUSINSKI:  I'm going to have some follow-ups for that.

--oOo--

FURTHER EXAMINATION

BY DR. PRZYMUSINSKI:

Q    Doctor, you talked about quite a few things in that segment with Mr. Pennock.  So I'm going to hit on these.

So first question for you:  Are you aware of any reliable evidence that GLP-1 RA medicines can cause delayed gastric emptying or delay gastric emptying after they're washed out?

A    No.

Q    No. 2:  You talked about -- I don't know if it was PTSD or some sort of traumatic effect of a medical event, be that severe gastroparesis or anything else that causes lasting symptoms.  Do you recall that?

A     Mm-hmm.

Q     Are you aware of any studies that actually report or show that patients taking GLP-1 RA medicines and then experiencing some sort of GI effect later on develop PTSD, resulting in continuing symptoms?

A     No, and I mention that in my report.

Q     Now, you also said that patients who experience a severe gastroparesis event that you attribute to the medication, be that GLP-1 in this case, may continue to perceive those symptoms after the medication is stopped for some period of time.

Do you recall that?

A     Yeah.

Q     Are you aware of any actual studies, clinical trials, observational studies, case reports, which report that the symptoms persist past washout?

A     I have not seen any studies that have actually looked at that.

Q     Doctor, you mentioned the concept of functional gastrointestinal diseases, correct? Whether that be of the upper GI tract, lower GI tract?

A     Yeah.

Q    Are you aware of any studies, of any kind, that have reported that patients taking GLP-1 RAs are at any increased risk of developing functional disease of the bowel after the GLP-1 medication has washed out from the system?

A    I am not aware of any specific studies.  I am aware of the fact that there are a lot of functional disorders in patients, specifically those who have obesity, so that I imagine that patients taking GLP-1s may well have a higher prevalence of dyspepsia related to functional disease.

Q    Those are baseline things that occur with obesity; correct?

A    Correct.

Q    Great.  Last question from me, and maybe Mr. Premo-Hopkins has some so I'll certainly defer to him, we went back again to these three theories or hypotheses, you said -- came up to explain potentially prolonged symptoms.  Do you recall that?

A    Yes.

Q    You mentioned microbiome effects --

A    Yes.

Q    -- triggering of -- functional symptoms?

A    Yeah.

Q    And irreversible damage or injury.

Do you recall that?

A    Yeah, and I never said necessarily irreversible.  It may be reversible but there may be an injury that we don't know of.  Example, inflamed interstitial cells.

Q    Damage or injury.

Fair enough?

A    Yeah.

Q    Pretty sure I asked you about damage or injury across the entire panoply of physiological aspects involved in gastric motility, and you said you did not know of any evidence that GLP-1s cause that kind of damage; is that correct?

A    That's correct.

Q    All right.  With respect to triggering for functional symptoms, I think what I just asked you if you knew of any studies that suggested these medications had caused functional disorders of the gut after they were withdrawn, and you said you don't know of those studies either?

A    I know of no direct studies.

Q    Okay.  So that leaves microbiome.

Do you know of any studies, Doctor -- any kind -- showing that GLP-1 RAs can have an effect on the microbiome such that they cause persistent

gastroparesis or symptoms of gastroparesis after washout?

A    I am aware of a particular study that I can think of in which the microbiome was affected and remained affected and was felt to be a consequence of the effect of the drug rather than directly from the drug itself because it took a long time for it to develop.

So people have a microbiome; they are exposed to the drug, they start losing weight or getting differences in their sugar metabolism, and then there's a consequence:  Their microbiome gets altered and stays altered.

That is what I know of.  Could that potentially cause symptoms in itself to persist that were present before, I don't know.  As I say in my report, I'm unaware of these things.  These are just potential explanations I'm trying to identify. However, question whatever it was, was it question or 2 or 3, I'm now getting confused.

Q    Two.

A    Ultimately, Question 2, said these are theoretical possibilities that I think should be examined in patients who potentially have ongoing symptoms.

DR. PRZYMUSINSKI:  Mark?

I'm done.

MR. PREMO-HOPKINS:  No further questions from Lilly.

MR. PENNOCK:  Okay.  Thanks.

THE VIDEOGRAPHER:  Okay.  This concludes the video deposition of David Metz.  We're now going off the record.  The time is 3:42 p.m..

(Time noted:  3:42 p.m.)

DECLARATION UNDER PENALTY OF PERJURY

I, David Metz, M.D., do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on Tuesday, March 24, 2026; that I have made such corrections as appear noted herein; that my testimony as contained herein, as corrected, is true and correct.

DATED this ___9TH___ day of ___April___, 2026, at ___LAGUNA BEACH___, ___CA___.
                    City                      State

_____
David Metz, M.D.

David Metz, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER                Page 298

## ERRATA SHEET

Printed Name  DAVID METZ                Date  4.9.2025

Signature  _____

| Page/Line | Correction | Reason |
|---|---|---|
| 18/25 | 'scede' should be 'scan' | typo |
| 22/8 | 'GLP-1 is our' should be 'GLP-1s are' | typo |
| 24/5 | 'SGA' should be 'SGE' throughout | I misspoke |
| 37/15 | to clarify, I don't know one way or another | clarification |
| 38/20 | I heard 2014 not 2024 | typo |
| 47/6 | As a gastroenterologist I have general understanding | clarification |
| 57/24 | please see additional page (298 b) | |
| 53/2 | | |
| 62/20 | add 'beyond 5 half lives' to clarify drug can cause effect leading to persistent symptoms | |
| 77/10 | ███████████████████ | typo |
| 78/10 | | |
| 81/24 | This is an incomplete response. Please refer to my full report regarding comments on the label | clarification |
| 83/22 | as for 81/24 | |
| 92/24 and on | this is study GBDM | clarification |
| 115/23 | as for 37/15 (see pg 219) | |
| 160/19 | 'sl coding' should be 'Somatostatin' | typo |
| 194/18 | 'CA' should be 'SEER' | typo |
| 208/20 | 'all' should be deleted | typo |
| 208/21 | 'percent' should be 'hours' | typo |
| 213/9 | 'didn't' should be 'did' | typo |

ERRATA SHEE (cont)

Name David Metz                    Date 4.9.2025

Signature

| Page/Line | Correction | Reason |
|-----------|-----------|--------|
| 213/24 | Please add "35% positive studies in symptomatic patients is significant | clarification |
| 279/9 | 'their own' should be 'Rome 4' | typo |
| 293/11 | Add 'exposure to GLP-1 side effects can trigger symptoms beyond 5 half lives that can persist in predisposed patients' | clarification |

Regarding pg 52 line 24 and pg 53 line 2:
To clarify 'arbitrarily' I mean that after 30 years of practice I believe there is much variability in how patients respond to illness. Once the insulting agent has gone away (5 half lives after GLP-1 removal in this case), some patients may take longer than others to recover completely. The insulting agent may cause an effect that precipitates ongoing symptoms for up to 6 months or longer. I would give patients up to 6 months to recover but if symptoms persist for that long it would be necessary to investigate further. Could there be another cause completely or could the effect of the insult be persisting because of an intermediate injury.
Please see pages 137-8 of my report.

ERRATA SHEET

Printed Name _____ Date _____

Signature _____

Page/Line        Correction                    Reason

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter and Deposition Notary Public of the States of California, Washington and Nevada does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript was not requested/offered on the record.

In witness whereof, I have subscribed my name, this date:  March 25, 2026

_____
Cheryl Haab Scott, RDR, CRR, CCRR
CSR No. 13600/WA CSR No. 3499/NV CCR No. 1003