# EXHIBIT 34D

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: GLUCAGON-LIKE          )
PEPTIDE-1 RECEPTOR AGONISTS   ) CIVIL ACTION
(GLP-1 RAS) PRODUCTS          )
LIABILITY LITIGATION          ) MDL No. 3094
_____ ) 24-md-3094
THIS DOCUMENT RELATES TO:     )
ALL ACTIONS/ALL CASES         ) HON. KAREN
                              ) SPENCER MARSTON


TUESDAY, MARCH 31, 2026

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -


Videotaped deposition of Kevin O'Brien, VMD, MVetMed, DACVP, MRCVS, held at the offices of Morgan & Morgan,2005 Market Street, Suite 350, Philadelphia, Pennsylvania, commencing at 8:59 a.m. Eastern, on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri, Kansas, Louisiana & New Jersey Certified Court Reporter.

- - -


HARTFORD REPORTING & TECHNOLOGY
855.443.3767
www.hartfordreporting.com

A P P E A R A N C E S :


MORGAN & MORGAN
BY:   PAUL J. PENNOCK
        ppennock@forthepeople.com
        JONATHAN M. SEGDH      (VIA ZOOM)
        jsedgh@forthepeople.com
199 Water Street, Suite 1500
New York, New York  10038
(201) 209-3425


and


MORGAN & MORGAN
BY:   BESS DEVAUGHN
        bdevaughn@forthepeople.com
        STEPHEN B. EDWARDS     (VIA ZOOM)
        stephen.edwards@forthepeople.com
2005 Market Street, Suite 350
Philadelphia, Pennsylvania  19103
(215) 446-0003


and


LEVIN, SEDRAN & BERMAN LLP
BY:   FREDERICK S. LONGER   (VIA ZOOM)
        flonger@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106-3697
(215) 592-1500
Counsel for Plaintiffs


DLA PIPER LLP (US)
BY:   KATHERINE W. INSOGNA
        katie.insogna@us.dlapiper.com
        TAYLOR DODSON          (VIA ZOOM)
        taylor.dodson@us.dlapiper.com
33 Arch Street, 26th Floor
Boston, Massachusetts  02110-1447
(617) 406-6000

and


DLA PIPER LLP (US)
BY:  BRADLEY JENNINGS
        bradley.jennings@us.dlapiper.com
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
(212) 335-4846
Counsel for Novo Nordisk A/S and
Novo Nordisk Inc.



KIRKLAND & ELLIS LLP
BY:  RENEE D. SMITH
        renee.smith@kirkland.com
        MARIE NOTTER
        marie.notter@kirkland.com
        ELISABETH FRIEDMAYER  (VIA ZOOM)
        elisabeth.friedmayer@kirkland.com
333 West Wolf Point Plaza
Chicago, Illinois  60654
(312) 862-2000


and


GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
BY:  CAROLINE CORDELL BRIGGS    (VIA ZOOM)
        cbriggs@goldmanismail.com
191 North Wacker Drive, Suite 3000
Chicago, Illinois  60606
(312) 681-6000
Counsel for Eli Lilly & Company


V I D E O G R A P H E R :
    DAVID LANE,
    Hartford Reporting & Technology

                    - - -

Page 4

INDEX

                                                        PAGE

APPEARANCES....................................   2

EXAMINATIONS

  BY MS. INSOGNA...............................   9

  BY MS. SMITH................................ 231

  BY MR. PENNOCK.............................. 332

  BY MS. INSOGNA............................. 350


                    EXHIBITS

  No.   Description                          Page

  1     Expert Report of Kevin O'Brien,         9
        VMD, MVetMed, DACVP, MRCVS

  2     Dr. O'Brien invoices to Morgan &       16
        Morgan

  3     Curriculum vitae of Kevin O'Brien,     19
        VMD, MVetMed, DACVP, MRCVS

  4     Materials Considered - Novo Nordisk    55

  5     Trial ID: EX9536-4388 Clinical         93
        Trial Report,
        Novo_GLP-1_MDL_000008762

  6     "GLP-1R Agonists Promote Normal       115
        and Neoplastic Intestinal Growth
        through Mechanisms Requiring
        Fgf7," Koehler, et al.

  7     Center for Drug Evaluation and        124
        Research nonclinical review of
        Ozempic

  8     Center for Drug Evaluation and        126
        Research nonclinical review of
        Rybelsus

Page 5

| | | | |
|---|---|---|---|
| 9 | NNC 0113-0217 2 Week Subcutaneous Toxicity Study in Cynomolgus Monkeys, Report Amendment 1, Novo_GLP_MDL_OZM_NDA_000065950 - Novo_GLP_MDL_OZM_NDA_000066183 | 130 |
| 10 | NNC 0113-0217 13 Week Subcutaneous Toxicity Study in Cynomolgus Monkeys with a 4 Week Recovery Period, Novo_GLP_MDL_OZM_NDA_000066373 - Novo_GLP_MDL_OZM_NDA_000066850 | 150 |
| 11 | NNC 0113-0217 Toxicity Study by Subcutaneous Administration to Cynomolgus Monkeys for 52 Weeks Followed by a 4 Week Recovery Period, Novo_GLP_MDL_OZM_NDA_000067961 - Novo_GLP_MDL_OZM_NDA_000069191 | 160 |
| 12 | NNC 0113-0217 Carcinogenicity Study by Subcutaneous Administration to CD-1 Mice for 104 Weeks, Novo_GLP_MDL_OZM_NDA_000022547 - Novo_GLP_MDL_OZM_NDA_000022904 | 169 |
| 13 | NNC 0113-0217 Carcinogenicity Study by Subcutaneous Administration to CD Rats for 104 Weeks, Novo_GLP_MDL_OZM_NDA_000025556 - Novo_GLP_MDL_OZM_NDA_000025617 | 184 |
| 14 | "Brunner's Gland Hyperplasia in the Sand Rat (Psammomys obseus)," Steinbach, et al. | 195 |
| 15 | NNC 0113-0217 Toxicity Study by Subcutaneous Administration to CD Rats for at least 26 Weeks Followed by a 4-Week Recovery Period, Novo_GLP_MDL_OZM_NDA_000069493 - Novo_GLP_MDL_OZM_NDA_000069697 | 201 |

Page 6

16    Expert Report of Kevin O'Brien,     231
      VMD, MVetMed, DACVP, MRCVS - Eli
      Lilly

17    Materials Considered - Eli Lilly    231

18    "Association between different       245
      GLP-1 receptor agonists and
      gastrointestinal adverse
      reactions: A real-world
      disproportionality study based on
      FDA adverse event reporting system
      database," Liu, et al.

19    General Considerations for the Use   257
      of New Approach Methodologies in
      Drug Development, Guidance for
      Industry, Draft Guidance

20    "Effects of GLP-1 Receptor Agonist   259
      Dulaglutide on the Structure of
      the Exocrine Pancreas of
      Cynomolgus Monkeys," Vahle, et al.

21    Center for Drug Evaluation and       265
      Research nonclinical review of
      dulaglutide

22    "Physiological and pharmacological   271
      actions of glucagon like peptide-1
      (GLP-1) in domestic animals,"
      Model, et al.

23    Final Report Amendment 02, A         281
      Repeat-Dose Toxicology Study in
      Cynomolgus Monkeys Given LY2189265
      Twice Weekly by Subcutaneous
      Injection for a Total of 27 Doses

24    Final Report Amendment 02, A         295
      Repeat-Dose Toxicity and
      Toxicokinetic Study in Rats Given
      LY2189265 Twice Weekly by
      Subcutaneous Injection for 6
      Months with a 1 Month Recovery

Page 7

25    A Repeat-Dose Toxicology Study in        298
      Cynomolgus Monkeys Given LY2189265
      Twice Weekly by Subcutaneous
      Injection for a Total of 9 Doses

26    Repeat-Dose Toxicology and              302
      Toxicokinetic Studies in Fischer
      344 Fats Given LY21899265 Twice
      Weekly by Subcutaneous Injection
      for a total of 10 Doses

27    A Repeat-Dose Toxicity                   309
      Toxicokinetic and Immunotoxic
      Study in Cynomolgus Monkeys Given
      LY2189265 Twice Weekly by
      Subcutaneous Injection for 9
      Months with a 2 Month Recovery

28    104-Week Subcutaneous Injection          312
      Carcinogenicity and Toxicokinetic
      Study with LY2189265 (Compound
      2189265) in Rats

29    A Repeat-Dose Toxicity and               318
      Toxicokinetic Study in Rats Given
      LY3298176 by Subcutaneous
      Injection Twice Weekly for 6
      Months with a 4-Month Recovery
      Phase

30    An Embryo-Fetal Development and          324
      Toxicokinetic Study of LY3298176
      Administered by Subcutaneous
      Injection on Gestation Days 7 and
      14 in New Zealand White Rabbits

31    NNC 0113-0217 Embryo-Fetal               337
      Toxicity Study in the Rabbit by
      Subcutaneous Administration,
      Novo_GLP_MDL_OZM_IND_000008762

(Exhibits attached to the deposition.)

CERTIFICATE..................................357
ACKNOWLEDGMENT OF DEPONENT....................359
ERRATA.......................................360
LAWYER'S NOTES...............................361

Page 8

VIDEOGRAPHER:  We are now on the record.  Today's date is March 31, 2026.  Our time on the record is 8:59 a.m.

My name is David Lane, legal videographer for Hartford Reporting & Technology.

This deposition is being held in the matter of GLP-1 Receptor Products Liability Litigation.

Our deponent today is Dr. Kevin O'Brien.

All parties -- all counsel will be noted on the stenographic record.

The court reporter today is Carrie Campbell, who will now swear in our witness.

KEVIN O'BRIEN, VMD, MVetMed, DACVP, MRCVS, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendants, as follows:

VIDEOGRAPHER:  Please begin.

DIRECT EXAMINATION

QUESTIONS BY MS. INSOGNA:

Q.   Good morning.

A.   Good morning.

Q.   My name is Katie Insogna.  I'm an attorney for Novo Nordisk in this litigation.  It's nice to meet you.

A.   Thank you.  You, too.

Q.   Okay.  Is this your first deposition?

A.   Yes.

Q.   Okay.  Great.

Is there any reason you can't testify truthfully today?

A.   No.

(O'Brien Exhibit 1 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.   Okay.  Great.  I'll hand you what we'll hand you as Exhibit 1, which is your Novo Nordisk exhibit.

Here you go.

A.   Thank you.

Q.   Great.

Are you aware of any errors in

your report?

A.      For Novo Nordisk, no.

Q.      Okay.  Great.  Is there anything you need to change or correct about your report?

A.      No.

Q.      Okay.  And does this report set forth all the opinions you intend to offer as to Novo Nordisk in this litigation?

A.      Yes.  I would say there -- there might be some other opinions as we go through our discussion, but the large majority of them are in this report.

Q.      Okay.  Is there something you have in mind?

A.      No.  I'm just trying to say, like, potentially if you ask something, I'm not -- I can't speak to all the possibilities, but I want to say 99.9 percent of it is in here.

Q.      Okay.  That's fair.

And just to confirm, there are no materials you're relying on for your opinion in this litigation as to Novo that are not reflected in your report or your

materials considered list.

Right?

A.    No.

Q.    What did you do to prepare for this deposition?

A.    So to start, I looked at basic -- I was given a task of -- you know, I got a brief rundown of what the case was for Novo, and from there I went through -- basically I found all of the pivotal studies that Novo Nordisk had submitted for their FDA approval, which were publicly accessible.  I gathered those.

From there, I made my opinions on, you know, a little bit more information on what was going on with the case.

And then at that point, once I had those pivotal studies read and more or less understood, I looked at these tabulated summary documents that were internal for Novo Nordisk, and that sort of allowed me to see which further internal studies I might want -- or actually, sorry, backing up. Excuse me.

From the pivotal studies, I

asked the attorneys, Mr. Pennock, Ms. DeVaughn, to then provide me with all of the internal documents, or really anything they can bring to my attention to read.

And then from there, I kind of sifted through -- I only really wanted to focus on those studies that were multiple-dose studies. I largely ignored the single-dose studies just to better recapitulate what people take in the real world from their doctors.

And then I ignored -- there were some duplicate studies, so I ignored those as well, and then I largely focused on those that describe the GI system at all, whether it was for lesions or no lesions at all.

And then from that point, one of the first documents I looked at, once I received everything -- and I was -- sorry that I'm jumbling a bit.

I also asked for paraffin-embedded blocks that have the tissues from when the study pathologists performed their postmortem exams, and then I

Page 13

asked for the glass slides.

But when we send -- or when I -- sorry.  Speaking in "we" because I'm a doctor.

When I said that those would be important for me, that we'll probably cover later on, that request was denied, so I'm limited to just the reports that I was given.

So then from there, looked at the internal summary documents from Novo, found which summaries -- or, sorry, which studies might be more relevant to the case at hand.  And then from there I went through all of the studies that I was given that fit the criteria for peak dose studies and everything and wrote the report from that.

Q.    Okay.  Great.

And so thank you for that summary.  That's a summary of how you put together your report in this --

A.    Oh, yeah.  Yeah.

Q.    Okay.  Great.

And so then from the report, what did you do to prepare for this deposition?

Page 14

A.    Okay.  So then from this, reading through the reports, figuring out if there was a potential signal in the gastrointestinal tract from treatment with --

MR. PENNOCK:  Just hold on one second.  You're going to have to clarify what you mean by "this deposition."

MS. INSOGNA:  That's fair. Thank you.

MR. PENNOCK:  Yeah.

QUESTIONS BY MS. INSOGNA:

Q.    So once you put in -- once you finalized this report --

A.    Uh-huh.

Q.    -- it came to the defendants.

A.    Okay.

Q.    You understand that?

A.    Yeah.

Q.    Okay.  Great.

And so then from that point, that was in January, right?  You signed it --

A.    Oh, yes, yes, yes.  It should be the 2nd, I believe.

Q.    -- in -- January 2, 2026.

Right?

A.      Yes.

Q.      Okay.  And so then what did you do from that point to today to prepare for what we're doing today?

A.      Oh, okay.  Yes.

So I didn't look at any new material because obviously you're not going to be presented with any of that.  So I continued to just better familiarize myself with the document that I had prepared because there was going to be some lag time between finalizing the report and then obviously today.

And then yesterday met with Mr. Pennock and kind of went through briefly what a deposition was going to entail and briefly went through --

MR. PENNOCK:  You don't have to disclose the nature of our conversations.

THE WITNESS:  Okay.  Yeah.  Yeah.

QUESTIONS BY MS. INSOGNA:

Q.      Just simply that you had a

meeting --

A.    Yes.

Q.    -- is sufficient.

Okay.  Great.

Did you look at any other expert reports in this litigation?

A.    No.  I was not aware of any other expert.

Q.    Okay.  And so you haven't looked at any other depositions, transcripts, in this case.

Right?

A.    No.

Q.    Okay.  Great.

And when were you first retained?

A.    My retention was probably July 2025.

(O'Brien Exhibit 2 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Let me show you what we'll mark as Exhibit 2.  We were handed this right before the deposition.

Do you recognize this document?

Page 17

A.    Yes.  These are invoices that I had sent to Morgan & Morgan.

Q.    Okay.  Great.

And so this document captures the time you spent putting together your expert reports in this litigation?

A.    Correct.

Q.    Okay.  Great.

Because it goes up through December 31, 2025.

Is that right?

A.    Correct.

Q.    Okay.

A.    So, yes, for compiling my reports.  Yes.

There's another invoice that I have not sent yet that will be finalizing from the January 2nd date of this Exhibit 1 that I have not sent yet.

Q.    Okay.  Can you estimate how much time you've spent from -- since January 1, 2026, to yesterday that you've spent on this litigation?

MR. PENNOCK:  Can you break that down?  Because you've got the --

Page 18

January 1st and 2nd was completion of the report. Right?

MS. INSOGNA: Sure.

QUESTIONS BY MS. INSOGNA:

Q. Can you estimate the time you spent January 1st and 2nd completing your report?

A. It was likely between 10 to 12 hours.

Q. Okay. And then since then, can you estimate the time you've spent re-reviewing and doing all the activities you described preparing for the deposition today?

A. That? 45 to 50 hours. I have to still calculate how long we go today.

Q. Totally fair.

And just to confirm, this compilation of your invoices in 2025 captures all the time you spent preparing both the Novo and the Lilly expert reports in this litigation.

Is that right?

A. Yes, everything that I've put on this invoice are the hours I've spent preparing for both cases.

Q.    Okay.  Great.

And I see that you've got an initial entry in July of 2025.

Does that capture your time putting together your additional preliminary expert report from the summer?

A.    This was the initial retainer which covered a subset of what I had started to do when I was approached for the case -- or when I was retained, I mean.

(O'Brien Exhibit 3 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  That's great.

Let me mark your CV as Exhibit 3, and I'll hand you a copy.

Can you take a look, confirm that's your most up-to-date CV?

A.    So I can -- this is the most up-to-date CV that I sent Mr. Pennock.

Q.    Okay.

A.    As an academician, we update it every month, so it has since been updated.

Q.    Okay.

A.    But this is, you know, the most

recent one I sent.

Q.    That's fair.  We'll go through that.

So just to confirm, you graduated from undergrad in 2013?

A.    Correct.

Q.    Okay.  And you completed your fellowship in December of 2024.

Correct?

A.    Which fellowship?  Yes, my comparative and laboratory animal fellowship, yes, finished in 2024.

Q.    Okay.  And you're currently a staff pathologist at University of Pennsylvania?

A.    So I have two positions currently.  So -- because I'm in two different schools.

So in the veterinary school, I am an assistant professor of comparative pathology.  And then I'm in -- it's not necessarily a school, but it's called the Office for the Provost.  We deal with all the research that goes on on campus.  Any funding that goes to a laboratory, any

Page 21

grants, goes through the provost office.  And for whatever reason, they have the lab animal program there.  So there I'm considered a staff pathologist because it's not part of the school.

Q.    Okay.  On the first page of your CV, it says, "university laboratory animal resources" --

A.    Correct.

Q.    -- under staff pathology.  Is that --

A.    Yes.

Q.    Pathologist, is that the same --

A.    Yeah, that's -- so that's within the Office for the Provost.  It's essentially where we conduct -- we have all of our lab animal veterinarians, and they maintain the welfare of all of the research animals on Penn's campus.

Q.    Okay.  Great.  Thank you.

And then if we turn to page 2, you've got a summary of your research and/or clinical interests.

Do you see that?

A.     Yes.

Q.     Okay.  You write, "Research interests focus on viral-induced neoplasia, particularly papilloma viruses and squamous cell carcinoma.  Pathology and clinical interests focus on digital pathology, ocular pathology and clinical diseases of research animals, particularly piscine infectious and oncologic diseases."

Did I read that correctly?

A.     Correct.

Q.     Okay.  Great.

And these research interests in particular appear primarily related to cancer.

Is that fair?

A.     Correct.

Q.     Okay.  And piscine infectious and oncologic diseases relates to fish.

Right?

A.     Correct.

Q.     Great.

In looking at the rest of your CV, is it correct that you've never published anything related to GLP-1 RAs?

Page 23

A.      That is correct.

Q.      Okay.  And have you published anything related to human medicines more generally?

A.      So currently what's not on this trans -- I just got a publication, it was published last week, that was on the research that I did during my residency.  So currently I should qualify that as my faculty track is considered academic clinician, research is not required; it's encouraged.

So for research and clinical interests for this Penn-style CV, I wrote what I put in my -- what I did in my residency and what I just published, that particular paper, which looks at a virus, particularly in horses.

We have extensive comparisons to what see in men and women, or humans, and so that looked -- we collaborated with human physicians, and so that has comparisons to humans.

Q.      Okay.

A.      Yeah.  So more translational research.

Q.    Got it.

What's the virus?

A.    Equus papillomavirus type 2.

Q.    Okay.  And that's a -- okay.
Great.

You've never published about
obesity.

Correct?

A.    Sorry, no, I was just making
sure.  No, I did not.

Q.    Okay.  And I saw one article
related to tree shrew type 2 diabetes.

A.    Yeah, that one -- that one --
so I have -- I just -- so I have four papers
I just got published within the last month,
two that are in the review stage.  This one
in particular is in the review stage right
now.

Q.    Okay.  That's the only article
you've published related to type 2 diabetes.

Correct?

A.    Published, yes.

Q.    Okay.  And have you done any
professional pathology work involving
assessing cellular changes related to

Page 25

gastroparesis?

A.    Not particularly for gastroparesis.

Q.    Okay.  Same question for ileus?

A.    An actual study?

Q.    Have you done any professional pathology work --

A.    Oh, yes, for ileus, yes.  Oh, we see it all the time, yes.

Q.    Okay.  Get back to that.

And have -- has any of your professional pathology work involved looking at the effects of GLP-1s on animal cells?

A.    Yes.

Q.    Okay.  Besides this litigation?

A.    Yes.

Q.    Okay.

A.    One case.

Q.    Is that reflected in your CV?

A.    No.  It was not published.  It was one case.

Do you want to hear about it?

Q.    Please.

A.    Okay.  So I -- as a faculty member in the vet school, I collaborate a lot

Page 26

with the zoo now.  And so one of my patients in -- this was probably a year before I even heard about this deposition, so I want to say it was around January of 2024.  I had what's known as a red-capped mangabey.  It's a type of primate.  They have a red tuft of hair.  And it was being treated by the zoo veterinarians with Ozempic.  It had DKA, or diabetic ketoacidosis.  It's the end form of diabetes mellitus.

And I thought it was really interesting because I thought, are we Kim Kardashian?  What's happening?  How does this animal have, you know, a GLP-1?

So that was, like, my first interest.  But we didn't publish that or anything.  It was just knowing -- that was my first inkling that we can treat an -- like, I'm allowed to prescribe it to animals, which I didn't know before.

I'm a pathologist now.  I don't really generally -- I have my license.  I don't generally prescribe.  I like dealing with the -- the dead.

But --

Page 27

Q.   That's fair.  All right. Let's -- let me break that down real quick.

Can you prescribe medicines to humans?

A.   No.

Q.   Okay.  You can prescribe medicines to animals?

A.   Yes.  Correct.

Q.   Have you ever prescribed a GLP-1 to an animal?

A.   Nope.

Q.   Okay.  And in the case of the red-capped mangabey that you were describing who was taking Ozempic --

A.   Uh-huh.

Q.   -- what was the nature of your work on that?

A.   Yes.  So sometimes the zoo contacts me before an animal is going to be euthanized to let me know to expect something.  Or if they want to take a biopsy, a surgical biopsy, depending on what they find, if the animal's unwell, they just let me know to know if I'm free to help out with the case.

Page 28

So I was able to come in when the animal was still alive just to see, you know, what was going on before they euthanize.  Because sometimes as -- even as a pathologist, it's important to know kind of what was going on antemortem, so before death, so I can get a better picture of what's going on.  We had a good enough relationship where I'm able to do that.

But then the majority of my role in this was figuring out cause of death.  Even though we knew it was likely related to maybe no -- not an ideal response to the medication, anything that is euthanized or is found dead on zoo property anywhere in the world, we -- they have to get a postmortem exam.

So I was basically confirming for them, you know, the cause of death.

Q.   And do you recall what the cause of death was?

A.   It was diabetic ketoacidosis.

Q.   Okay.  And did that work inform any of your opinions in this litigation?

A.   Inform, I don't know.  But it

did already give me sort of a background on GLP-1s because I -- as you've pointed out, I'm not prescribing to people.  So for me, I just thought, oh -- and I'm not diabetic or obese, so I'm not really looking at it for myself.  I just thought it was -- it just opened my eyes to that we can -- there's a bunch of companies right now that are, you know, giving these drugs to animals of varying species.

So it was just interesting to figure out more about that and see when they come my way, if something goes wrong from medication, which oftentimes, especially with my job right now, I see things that go wrong with either a medication or a surgery or just, you know, something that comes up without any of those issues.  So, yeah.

Q.    Sure.  Okay.  That's helpful.

So we already covered that you have not published anything with respect to GLP-1s.

Have you made any presentations related to GLP-1s?

A.    No.

Page 30

Q.    Okay.  And have you made any presentations related to gastroparesis?

A.    Oh, sorry.  When you say "presentation," do you mean like a conference?

Q.    Yes.

A.    Oh, no.

Q.    Okay.  Publicly?

A.    I mean, publicly every Friday morning we present internally to my entire department.  It averages between 15 to 20 people who are either in the room us or on Zoom for a meeting.  And we go through -- one of the -- the last 30 minutes of this hour-and-a-half meeting is going through what pathology we've had that week.

So I do share all the cases that I examine, and so I did share about the red-capped mangabey.

Q.    Okay.  Besides that presentation internally, have you made any other presentation with respect to GLP-1s?

A.    No.

Q.    Okay.  Great.

And just to go back to my

earlier question.

Have you made any presentations related to gastroparesis?

A.    No.

Q.    Okay.  Have you made any presentations related to intestinal obstruction?

A.    Correct.  Yes, several.

Q.    Okay.  And have you made any presentations related to ileus?

A.    Yes, several.

Q.    Okay.  In animals?

A.    Yes.

Q.    And same for intestinal obstruction?

A.    Yes.

Q.    Okay.  Have you ever written any book chapters related to any of those injuries we just talked about?

A.    No.

Q.    Okay.

A.    Or not yet.

Q.    And have you authored any guidelines that are published to the medical or scientific community?

A.    No.

Q.    Let me just switch gears briefly and talk about FDA.

You know what FDA is?

A.    Yes.

Q.    Okay.  You aren't offering any opinions on behalf of FDA here.

Correct?

A.    No.

Q.    Okay.  And you aren't authorized to offer an opinion on behalf of FDA.

Correct?

A.    Not that I know of.

Q.    Have you spoken to anyone at FDA regarding this litigation?

A.    No.

Q.    Okay.  Have you ever worked for FDA?

A.    No.

Q.    Okay.  Have you ever communicated with FDA?

A.    No, not personally.

Q.    Okay.  Has FDA ever solicited your opinion on a pathology submission?

A.     No.

Q.     And have you ever conducted professional pathology work that was part of a submission to FDA?

A.     Yes.

Q.     Okay.  And what was that?

A.     This was a study I worked with a biotechnology startup group called Six Therapeutics.  They work on developing a product that accelerates wound healing.

Q.     In humans or --

A.     Pigs.

Q.     Pigs?

A.     Pigs.  But, I mean -- sorry.  Pigs -- sorry.  Pigs is the model animal, but it's for people.

Q.     Okay.  So you worked on one study in pigs to support a submission for a wound-healing medicine in humans?

A.     Correct.

Q.     Okay.  And was that medicine approved by FDA?

A.     We are still awaiting that.  So it's a long time to get this approval, so our last submission was -- it might have been the

first week of January or one of the last
weeks of December.  So we're expecting a few
months before we hear anything.

Q.    So you're using the "we" again
here.

A.    I'm sorry.  I, yeah.

Q.    No, that's okay.  I just -- I'm
curious.

Do you have some connection to
this company?

A.    To Six Therapeutics?

Q.    Yes.

A.    I am a consultant for them.

Q.    Okay.

A.    They just needed a pathologist.
So when I said "we" before, "we" as in the
Six Therapeutics group.  I apologize.

Q.    Totally fair.  I just wanted to
confirm you weren't -- it wasn't your
company.

A.    No.  No.

Q.    Okay.  All right.  And do you
know what an NDA is?

A.    Yes.  Nondisclosure agreement.

Q.    Okay.  Let me ask it

differently.

Do you know what a new drug application is?

A.    Oh.  Briefly.

Q.    Okay.  What's your understanding of a new drug application?

A.    Do you know what, I -- you know what, let me just rephrase to say no.  Why don't you tell me what it is.

Q.    Okay.  Do you know what an IND is?

A.    Can you say the acronym?

Q.    Sure.  An IND stands for an investigational new drug.

A.    Oh, I -- like, I believe I -- I can't give you, like, a full coherent definition of them, but I believe I've worked with INDs and, like, new drug -- like, if any of the studies that I've read for, you know, the approval, the pivotal studies for FDA approval, like, if those would be considered NDAs or if they would be considered INDs, then I will say that I have read them if they're applications to get a drug approved by the FDA.  But otherwise...

Q.    Okay.  So do you know what's submitted to FDA as part of an IND?

MR. PENNOCK:  Objection.

MS. INSOGNA:  What's the objection?

MR. PENNOCK:  It's overly broad.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  You can answer.

A.    I can answer?

MR. PENNOCK:  You can if you -- I mean, it's -- go ahead.

THE WITNESS:  Can you repeat the question?

QUESTIONS BY MS. INSOGNA:

Q.    Sure.

Do you know what is submitted to FDA as part of an IND?

MR. PENNOCK:  Objection.  It's also ambiguous.

You can answer.

THE WITNESS:  So what's submitted to FDA as part of an IND?

I think part of that package would be submitting the pilot studies

that would be able to get further funding or approval -- or and/or approval from the FDA in order to be able to bring this product to the market, or to continue through from nonclinical trials to clinical trials that will then enter the market.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  And so are you familiar with the different modules or sections of an IND?

A.    I am not.

MR. PENNOCK:  Objection.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  But it sounds like you're aware that a manufacturer can't start clinical trials until an IND is approved.

Correct?

A.    Correct.

Q.    Okay.  What's your understanding of the relationship between an IND and an NDA?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  Relationship

between a new drug authorization --

QUESTIONS BY MS. INSOGNA:

Q.    Application.

A.    -- application and an IND?

I believe that the NDA should come before the IND, and then probably both would be necessary to get approval from FDA for moving on from -- or I guess entering nonclinical trials, moving on to clinical trials and then to the market.

Q.    Okay.  Before this litigation, have you reviewed any parts of a new drug application?

A.    I don't believe so.

Q.    Okay.  And before this litigation, have you reviewed any parts of an IND, or an investigational new drug, application?

A.    And that's what I'm unsure of, because with Six Therapeutics I'm involved in a letter that we sent to the FDA that shows that as a pathologist I'm involved with the case, and I understand -- you know, I saw the pilot study and that I -- like, I don't know if that was actually part of an IND.  I was

not provided with that information, so I don't know for sure.

Q.    That's fair.

Besides your work on the Six Therapeutics wound-healing medicine, have you reviewed, to your knowledge, an IND before this litigation?

A.    Not to my knowledge.

Q.    Okay.  And did you review the semaglutide INDs in this case; do you know?

A.    I reviewed everything that was in the materials -- oh, sorry, we don't have that, the materials considered list.

Q.    Okay.  You agree that FDA would not approve a developmental medicine to proceed to human clinical trials if it was not satisfied with the preclinical studies performed with the IND.

Correct?

A.    Correct.  I think the FDA would need to be certain that the product was safe enough for human consumption before they agreed to do it.

Q.    Okay.  Great.

All right.  Let's turn to

page 5 of your report.

Do you have that?

Okay.  And so on page 5, you were -- it's at the bottom of page 5, Purpose of Studies Reviewed.

Do you see that section?

A.    Yes.

Q.    And you're basically discussing the role that animal testing plays in preclinical studies before humans are exposed to the medicine.

Correct?

A.    Correct.

Q.    Okay.  Great.

And you agree that preclinical studies are an initial step in the developmental process?

A.    Correct.  Actually, the FDA -- one of the issues we're dealing with at Penn right now with our many thousands of researchers is that the FDA actually seems to require, or at least highly encourage, you to do animal trials.  Some -- before you get to human trials.

So sometimes we have

researchers who use organs on a chip.
They're called organoids.  It doesn't involve
any animal use.  So from a veterinary
standpoint, from a lab animal medicine
standpoint, it's better not to, you know,
waste animals when you can just use tissues.

But the FDA comes back on those
applications and says, you have to show
animal trials before you can continue.

Q.    Okay.  Thank you.

A.    Yeah.

Q.    And so just so we can have the
order of operations clear --

A.    Yeah.

Q.    -- we start with preclinical
studies, and then you've got phase 1 clinical
studies, which are in healthy humans.

Correct?

A.    Uh-huh.

Q.    And then phase 2 clinical
trials are the dose-ranging trials.

Correct?

A.    Uh-huh, yes.

Q.    Okay.  And then phase 3 are the
pivotal clinical trials in humans.

Correct?

A.   Correct.

Q.   Okay.  Great.

And you understand that all clinical trials capture safety information?

A.   Correct.

Q.   Okay.  And in the middle of the paragraph on page 6, you describe the -- one of the roles of nonclinical or preclinical studies is to detect and interpret signals for predicting human safety risks and guiding dose selection for clinical development.

Do you see that?

A.   Can you just tell me where -- which paragraph you're reading?

Q.   Yeah.  Sure.  It's the -- that main paragraph --

A.   Yeah.

Q.   -- right here.

A.   Okay.

Q.   If you see the last sentence of that paragraph.

A.   Oh, yes.  Yeah.

Q.   All right.  You're with me?

A.   Yes.

Q.    And so one of the roles of preclinical studies is to help guide dose selection --

A.    Correct.

Q.    -- in humans?

A.    Correct.

Q.    Okay.  Good.

And so you agree that animals may be helpful surrogates to first ensure a product is not inherently unsafe in humans.

Correct?

A.    Correct.

Q.    Okay.  And it cuts both ways. Sometimes what's safe in animals may not ultimately be safe in humans and vice versa.

Correct?

A.    Correct.  But on the whole, usually when the researchers are developing a drug or a test article, they particularly choose a model animal or model organism that will best capitulate the findings we would see or the effects we would see in people, which is why all of these studies in Novo Nordisk's study in this case, you know, has so many different species.  It's not -- you

Page 44

know, one species can't really recapitulate everything that would affect a person.

And even with people, there's a lot of, you know, idiosyncrasies between each person. So not every person is even going to have the same effects.

But, yes, we do like to see multiple different animals, you know, each sex, you know, young, old, in between, just to see if there's anything that comes up with -- that could be a safety signal.

Q.    Okay. Great.

And sometimes what seems to be an issue in animals doesn't ultimately manifest in humans.

Correct?

A.    There -- yeah, potentially.

Q.    Okay. And so if you saw a potential signal in a preclinical or nonclinical study and you wanted to confirm whether that signal is validated in humans, would you look at human clinical trials?

MR. PENNOCK: Objection.

It's just a form objection. Go ahead.

Page 45

THE WITNESS:  I'm sorry, can you repeat?

QUESTIONS BY MS. INSOGNA:

Q.    Yeah.  No problem.

So if you saw a potential signal in a preclinical or nonclinical study and you wanted to confirm whether that signal was validated in humans, would you look at human clinical trials?

A.    Well, I'm not -- I haven't seen any human clinical trials for this.  I would just say that from my standpoint in a nonclinical trial case, you want to take these findings in animals seriously if you see changes -- in this case we're looking at the GI tract.

If you see changes that are really just focused on the high-dose group or the low-dose group of these drugs and they're not present in a control or the low-dose, or maybe they're present in a significantly higher proportion in the -- in the high-dose groups compared to the control or low-dose groups, that, to me, says that there's something that's treatment-related.  And

Page 46

then, you know, I'll look at the data further to see if it's also dose-related.

So I think regardless of whether, you know, we validate it in the human trials, that, to me, still should send a signal to the study pathologist, to the FDA, to the peer reviewers for these studies, that something has to be further looked into in order to figure out, you know, what's going on, is this treatment-related; if so, why; what is the -- you know, the severity of this.

So for me, if I saw this -- and what I did for this report is when I see cases where it seems like it's dose-related or treatment-related, I then look in the literature to see if there's anything currently published in humans or animals of this lesion to figure out what -- or figure out more about the severity of it or just more background on it to know for myself how important of a signal is this. Was this missed. Was this masked. Was this treated fairly.

So I can't really speak to the

human clinical trial part because I haven't seen any.

Q.    Got it.

That's what I just want to confirm.  So you haven't looked at any clinical trials related to GLP-1s.

Is that right?

A.    I've only reviewed what was in the materials considered case.

I have reviewed several metagenomic, like, meta-analysis papers from human doctors that looked at their own patients, tens of thousands of their own patients, and what they found in terms of percentages of vomiting, diarrhea, constipation, any sort of GI-related things, ileus.

But, no, the actual data from Novo Nordisk I have not been privy to in terms of the human clinical trial.

Q.    So can I go back?

At the beginning you talked about -- you started by reviewing the pivotal trials that were published.

A.    Oh, yes.

Page 48

Q.      What do you mean by that?

A.      So the papers that basically Novo Nordisk had selected and submitted to the FDA that are in the materials considered online, I reviewed those to see if there was any sort of issue with gastrointestinal signals --

MR. PENNOCK:  I can help you here.  He -- he's speaking in terms of animals.  He calls them clinical trials.  You can ask him that.  Because I had to figure that out myself.

THE WITNESS:  Oh, sorry.

QUESTIONS BY MS. INSOGNA:

Q.      That's okay.  I just want to -- I just want to be crystal clear that you haven't looked at, in reaching your opinions here, human clinical trials related to GLP-1s?

A.      I've only seen the nonclinical, sorry, the animal ones.

Q.      Okay.  Thank you.  Thank you.

A.      Sorry.

Q.      Do you know -- do you know how

many phase 3 clinical trials have been conducted with semaglutide?

A.     Not offhand, no.

Q.     Do you know how many phase 3 clinical trials have been conducted with liraglutide?

A.     Not offhand.

Q.     Okay.

A.     I do know in general that in order to make it to phase 3, you have a significantly lower number than what you started with in the -- you know, initially making your studies or, you know, going through the phases.  As you get from phase 1 to 2 to 3, you get a significantly lower number.  But I don't know offhand what the number would be.

Q.     What do you mean by "significantly lower number"?

A.     Just that -- so in --

MR. PENNOCK:  Just note my objection.  It's beyond the scope.  He said he didn't review --

THE WITNESS:  Yeah.

MR. PENNOCK:  -- human clinical

Page 50

trials, so --

THE WITNESS:  Yeah.

QUESTIONS BY MS. INSOGNA:

Q.     No, you could -- you could still answer.  I'm just -- you said --

A.     Oh, so just -- I was making a generalization, where usually for drugs on the market, those that enter phase 3, there are fewer studies that are in the phase 3 category than in phase 2 or 1, in general.

Q.     Do you know how many more -- strike that.

On the last paragraph of page 6 of your report, you -- it starts with the words "in order to support."

Do you see that?

A.     Yes.

Q.     And the sentence continues on to page 7 and ends with, "And if there are macroscopic findings is responsible for finding their corresponding histological findings."

Do you see that?

A.     I do, yes.

Q.     Okay.  I don't see a citation

for this.

Is that right?

A.     Yeah.  Actually, I can show you on page 11, I have a diagram that is from -- the citation is 27 for Kumar, et al., from 2021.

So this was from a textbook that's a widely referenced and authoritative anatomic pathology reference book.  It's actually published for human pathologists.

But as veterinary pathologists, we are also told to read it, know it.  It's our phase 1 exam for boards, so it's a very important text for us, too.

So in this case, the textbook that we all go for, it states this -- well, basically this diagram will state that in order to have a macroscopic finding or a gross change, first you have a functional change.  You don't see any changes under the microscope or ultrastructurally to the naked eye.

And then you go through ultrastructural changes.  Then once those become big enough, you start to get

Page 52

microscopic changes or histological changes.

And once those, you know, proliferate enough or become severe enough, you get a macroscopic change.

So that would be the reference I would use for my previous statement where in order to see a macroscopic change, there has to be a histological change. And I know we'll get to it, but there are several studies included in -- yeah.

MR. PENNOCK:  It's all right.

THE WITNESS:  Oh, yeah.  So there are several studies included that we'll get to that don't have a corresponding histological change when there's a macroscopic change.  So this is just a point I wanted to make, that there should be.

QUESTIONS BY MS. INSOGNA:

Q.    Thank you very much.

I just want to confirm.  So you intended to but did not include the reference to Kumar on -- for that sentence?

A.    Correct.

Q.    Is that what you're saying?

A.    Correct.

Q.    Okay.  Are you aware of any FDA regulation that supports that sentence as well?

A.    Not offhand.  Just because I would think that -- or my impression is that being in a widely referenced and important textbook would be sufficient.  So I can't speak to whether the FDA has that same -- they might even have the same reference. It's that well-known of a textbook.  I think they're in their 11th edition -- or 10th edition now.

But, no, I don't know offhand if the FDA has something like that.

Q.    You didn't look to find out whether FDA has a regulation on that point.

Correct?

A.    Correct.

Q.    Okay.  And are you -- well, okay.  Let's keep moving.

Are you familiar with the hierarchy of evidence?

A.    I am not.

Q.    Okay.  Do you know what the

Bradford Hill criteria are?

A.      Not offhand.

Q.      Okay.  Are you familiar with the term "weight of the evidence review"?

A.      Not in an official definition, but I can make a guess.

Q.      I don't want a guess.  I only want to know if you know.

A.      No.

MR. PENNOCK:  These questions are all beyond the scope of anything you've been offered for in this case.

QUESTIONS BY MS. INSOGNA:

Q.      So I just want to confirm.

You have not conducted a weight of the evidence analysis in reaching your opinions here?

A.      No, I have not.

Q.      Okay.  You agree that cherry-picking data would not be appropriate --

A.      Oh, yeah.

Q.      -- correct?

A.      Not appropriate.  Yeah.

Q.      And I just want to confirm.

Page 55

You reviewed certain preclinical studies here and are offering your opinion based on those.

Correct?

A.      Yes.

MR. PENNOCK:  Objection.

THE WITNESS:  So --

MR. PENNOCK:  Go ahead.

THE WITNESS:  -- this certain clinical studies -- I just want to reword.  Like, anything that's in the materials considered is what I read.

The ones that I speak about in the report are only a subset of the ones that I have read, but the materials considered has all of the studies that I've actually read.

(O'Brien Exhibit 4 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.      Okay.  Let me -- let me hand you the materials considered list, just so we've got that as an exhibit.

There you go.

Can you take a look at that?

Just confirm that's...

Page 56

Is that a correct copy of your materials considered list as it relates to your Novo Nordisk report and opinions?

A.    It is.

Q.    Okay.  Great.

And so you, at the top of page 2, you've got 2/26/2025 semaglutide nonclinical studies list, and 2/26/2025 liraglutide nonclinical studies list.

Do you see that?

A.    Yes.

Q.    And those -- that is just the list of the studies that were provided to you.

Is that right?

MR. PENNOCK:  Objection.

THE WITNESS:  This was the list that I had asked to be provided with after reading the pivotal studies.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  And then the actual studies that you reviewed here are either listed on pages 4 and 5 of your materials considered list or are cited in your report.

Correct?

Page 57

A.     Correct.

So they should all actually be in the materials considered.  It's just a subset I have additionally spoken about in my report in Exhibit 1.

Q.     Okay.  So all -- strike that.

Okay.  All right.  I just want to confirm -- hopefully get some boundaries here, and it will make the rest of the day go much faster.

I just want to confirm.  You're not offering any general causation opinions here.

Correct?

MR. PENNOCK:  That's correct.

THE WITNESS:  Correct.

QUESTIONS BY MS. INSOGNA:

Q.     Okay.  That's your answer, too?

A.     Yes.

Q.     Okay.  Thank you.

MR. PENNOCK:  Did you see any in the reports?

MS. INSOGNA:  I was just confirming.  Just confirming.

THE WITNESS:  Just

Page 58

associations.

QUESTIONS BY MS. INSOGNA:

Q.    Sorry.  What did you just say?

A.    Strike that?

MR. PENNOCK:  What did you say?

THE WITNESS:  I said, just associations.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  So --

MR. PENNOCK:  The problem is, you're using terminology that you didn't define.  General causation.

Anyway, you can continue, and I'll object.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  So are you saying that you are offering an opinion of an association between GLP-1 RA medicines and certain outcomes in animals?

A.    I'm offering an opinion on semaglutide and liraglutide and association between the animals and adverse GI effects, those safety signals.

Q.    Okay.  And what's your understanding of an association in this

Page 59

context?

A.   In this context?  So as you'll point out or as you already know, not every study that I've read can show GI changes at all.  Those that do show GI changes that support a potential, like, GI adverse signal, or just a signal, are those that I described before where I'm looking at these studies.  And in the high-dose groups, these animals tend to have lesions that are absent in the control group or are present in significantly higher proportions in those high-dose groups or low and high-dose group compared to the control group.  But there are other studies that don't have those same findings.

However, I can't -- you know, I don't want to ignore the studies that do have those findings because they are real.  If there's a change that's present in a high-dose group for an animal, especially animals of different sexes, different species, I can't ignore that.  And that has to be an adverse effect or a GI signal that would require further follow-up.

Q.   Okay.  Are you familiar with

the term "valid association"?

A.    No.

Q.    Okay.  Are you familiar with the term "confounding" in the context of association?

A.    In general, confounding opinion, yes.

Q.    What's your understanding of confounding in the context of an association?

A.    So, for example, one of the common examples that we would hear is you have, let's just say, men, and they develop lung cancer as they get older.  You can make an association that as the age they just naturally get lung cancer, and the confounding factor is they're all smokers.

Q.    Okay.  Do you know what bias is in the context of an association?

A.    Correct.

Q.    And what are some examples of bias that could affect an association?

A.    So there's selection bias. There -- I mean, there are different several types of bias.  I think the one you're probably alluding to is if there's been any

Page 61

selection bias, if I've cherry-picked some of these or if I have a bias toward only finding those studies that have or support our case or our report.  That's the big one.

And so I made sure before really starting to read through the studies to ask my counsel for all of the studies that were used that were repeat-dose studies, rather than single-dose studies, and get rid of the duplicates so I can read everything so that there wouldn't be that selection bias, and I would be able to read everything to know full hand the full scope of these studies.

So when I offer an opinion, it's not just because I've only looked at the ones that best make our case, but that I see the bigger picture and I know that there are other cases that don't support our case as much as the ones I've included in Exhibit 1.

Q.    Got it.

Your report only summarizes those studies for which you found something of note.

Correct?

Page 62

A.    Correct.

Q.    Okay.  So your report doesn't summarize the totality of the preclinical data for semaglutide.

MR. PENNOCK:  Objection.

QUESTIONS BY MS. INSOGNA:

Q.    Correct?

A.    This -- sorry, can you --

Q.    Yeah, no problem.  I just want to confirm.

Your report doesn't summarize the totality of the preclinical data for semaglutide.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I can answer?

So for --

MR. PENNOCK:  It's ambiguous.

I mean, because --

MS. INSOGNA:  It's fine.

MR. PENNOCK:  -- summarized.

THE WITNESS:  From my understanding of your question, I read all of the studies that were included, but I highlighted those that more

Page 63

supported -- at least in this report that more supported that there was a noticeable gastrointestinal signal, or there are actually some -- sorry. There are some in this Novo report that do not support a gastrointestinal signal but do highlight what I would consider poor laboratory practices.

So there are some studies that I've included in here that have that situation instead of showing a GI signal.

QUESTIONS BY MS. INSOGNA:

Q.    Totally fine.

I just want to confirm that you haven't, as part of this report, put together a summary of all the data from all those preclinical studies, some of which showed something, some of which did not.

Correct?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  Correct.  Because as I said before, once I saw that there were several studies that had

Page 64

shown evidence of a GI signal and that -- from my understanding, that is because there are several studies that show, for instance, Brunner's gland hypertrophy in the high-dose groups of various mice and rats or Brunner's gland dilation in cynomolgus macaques.

When I see those changes present in those high-dose groups, even if it's only 10 or 20 of the entire group, I can't ignore that.

It's -- even though the majority maybe might not have had that lesion or that association, it's the reason we sort of -- it's the reason pharmaceutical companies do this plethora of studies to figure out, you know, with every scenario considered, is there a safety signal that's present, did we miss it, are we checking every box before, you know, we send them this drug out to the market.

And from my -- in my opinion, the fact -- sorry. The fact that I

Page 65

was able to identify in multiple cases that there was something related to -- either a treatment-related and/or dose-related effect, I can't ignore the -- I can't ignore that.

QUESTIONS BY MS. INSOGNA:

Q. Okay. On page 3 of your report you say, "All the opinions that are stated by me in this report are made with a reasonable degree of veterinary and scientific certainty."

Did I read that correctly?

A. Yes.

Q. Okay. And I just want to be clear. You chose those words carefully. You did not say medical certainty?

A. Yes. I'm a veterinarian.

Q. Okay. What does that sentence mean to you?

A. That as a veterinarian and as a scientist, because I'm also researching, that I have experience dealing with research animals. It's what I do every day for work. I work with thousands of labs that are researching in, you know, animals for

Page 66

translational studies, some of them making vaccines, some making drugs going to the market. So I have experience working with research animals.

And also as a veterinarian, I have experience that allows me to understand and read these reports, these studies, to -- as a pathologist, essentially, to make a reasonable opinion.

Q. Okay. Back to the scope. We've already got general causation handled.

I just want to confirm. You aren't offering any opinions as to gallbladder disease in humans or animals.

Correct?

A. No. I focused on stomach and all parts of the small intestine and colon.

Q. Okay.

A. I have research in gallbladders in animals, but, yeah.

Q. But no opinions here.

Correct?

A. No opinions here.

Q. Okay. And I see reference on page 3 of your report to ileus in the search

Page 67

terminology.

A.      Yes.

Q.      That's the only mention of ileus in your entire report.

I just want to confirm.  You aren't offering any opinions as to ileus in this case.

Correct?

A.      I believe I have a paper, Behera, et al., 2025, that describes a human case that we'll get to later on, and I believe we might have used a term similar to ileus.  So I might have used the term "dysmotility," which can also include ileus.

So I do -- I do speak about that.  I actually speak about it a lot at the end of my report when I talk about interstitial cells of Cajal.

Q.      Okay.  Are you offering an opinion as to the risk of ileus with GLP-1s in humans or just as to animals?

A.      Well, I mean --

MR. PENNOCK:  Note my objection.  There's no opinions offered regarding risks in humans in

this report.

MS. INSOGNA:  He just described -- he just said he cited a human case.  That's why I asked.

That's all.  That's all.

QUESTIONS BY MS. INSOGNA:

Q.    So let me ask it this way.

All the opinions you're offering today are only as to animals.

Correct?

A.    Yes.  Yeah.  Based on the animals and the nonclinical studies, yeah.

Q.    And by clinical studies, you mean --

A.    No, I said nonclinical studies.

Q.    And nonclinical studies.  Got it.  Thank you.

I just want to just confirm, hopefully we can short-circuit some of this.

None of the studies involving GLP-1s that you reviewed diagnosed any animal with gastroparesis.

Correct?

A.    No.  However, what I want to add for that is that we never looked for it.

Page 69

When I say "we," I meant the study pathologists and the people involved with these studies had not accurately looked for it. So if I can ask you to flip in --

Q.    It's okay. I just --

MR. PENNOCK: Don't interrupt him, please.

THE WITNESS: So at the -- at the end of my report, on page 37 on to 39, I describe the importance of interstitial cells of Cajal. Essentially what those are, there are these mesenchymal cells that live in your GI tract. They're especially prevalent in your stomach. They are widely cited in both animal papers and in human papers as one of the most defining features of gastroparesis. You cannot see those cells with the typical hematoxylin and eosin stain that every pathologist uses. You need to do something called immunohistochemistry, which is special antibiotic marker -- sorry, an antibody marker for that particular

cell.

So there are multiple studies that show that when you do this immunohistochemistry, the most common marker is called c-Kit.  You will be able to identify a significant reduction, absence or change in the shape, which usually identifies that it's not functioning normally, if there's a shape change, in those studies.

This was something that was not identified in nonclinical trials by Novo that should be performed in order to identify with certainty that there's gastroparesis.  It's one of the reasons I asked for the paraffin blocks because the slides wouldn't help me.  I need the block to cut a new piece of tissue that I can then give to my lab at Penn to go through immunohistochemistry for the c-Kit marker and then identify from control group animals and these treated animals if there's a difference in

Page 71

number of interstitial cells of Cajal to better support that.

So when you say "gastroparesis," that's one of the reasons why I don't -- I can't say for certain because those studies were not performed, and I feel like they should have.

The other thing is that with gastroparesis, in order to tell that an animal has evidence of that, they need to be fasted first.  And none of these studies, to my knowledge, show that the animals had been fasted.

So in order for us to figure out if there's still a bolus of food in the stomach -- you know, a lot of time they're being euthanized at the end of the study.  They're feeling okay for the most part, let's just pretend.  They should be appetent, so I should expect food in the stomach.

So if you fast them beforehand and then you see on the necropsy that they have food in the stomach, I can

Page 72

make a case that says that's maybe

more suspicious for gastroparesis.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Thank you for all of that.

I just want to just confirm. I'm just going to ask just very specific questions that I think typically should be a yes or no.  I'm happy -- we're going to get into all of this additional detail.

A.    Okay.

Q.    It's just to make sure I understand what you looked at in reaching your opinions here.

A.    Okay.

Q.    Does that help?

A.    Yes.

Q.    Okay.  Thank you very much.

Okay.  So we've already talked about none of the studies involving GLP-1s that you reviewed diagnose any animal with gastroparesis, but now I want to turn to some other injuries.

None of the studies involving GLP-1s that you reviewed diagnosed any animal

with ileus.

Correct?

A.    I did not see that word in particular in the studies, no.

Q.    Thank you.

And none of the studies involving GLP-1s that you reviewed diagnosed any animal with intestinal obstruction.

Correct?

A.    Not -- no, not that I've read from those words.  No.

Q.    Great.

And you're aware that the doses of GLP-1 medicines approved by FDA for use in humans vary depending on the medicine and the indication.

Correct?

A.    Correct.

Do you mean in terms of whether it's, like, an injectable versus an oral tablet?  Like the formation of it?  Formulation?

Q.    That's one way in which they may be different.

A.    Or just in terms of ramping up.

Page 74

You know, when you start a drug, you start at the lowest dose, and then if you still have issues, they increase the dose up to a maximum recommended dosage.

Q.    That's another way.

A.    Okay.  Yeah.

Q.    And also, for example, Ozempic and Wegovy have different --

A.    Oh, yes.

Q.    -- indications --

A.    Yes.  One --

Q.    -- different patient populations --

A.    -- for diabetes, one for obesity, yeah.

Q.    Great.  Thank you.

And I just want to confirm. None of the animal studies on which you're basing your opinion reflect the comparable doses in humans that are approved right now.

Correct?

A.    Actually, I -- it's not in the report, but just looking at the values of what's in -- what are the -- you know, the publicly available max doses for each of

Page 75

these drugs, so the liraglutide, semaglutide, they actually match pretty well with what was given to the animals in this study.  It varies between the exact dose that, you know, you would expect to see in people to about two times, or 1.9 times.

So -- and that's another reason why, like, when you're performing these studies you want to make sure that you have, like, an equivalence, basically.  Or you want to make sure that the doses you're using in animals are going to represent, you know, the doses you see in people.  Unless it's a carcinogenicity study and you're purposely giving, you know, 20 times the normal dose to see exactly what would happen if you had 20 times the normal amount, which anything 20 times the amount could be toxic.

Q.    Did you conduct a conversion for each of the studies that you reviewed here?

A.    Not in the report, but just for myself, I had conducted just to figure out what -- because I'm expecting a question like that.  So for myself, it was after the

report's written.  I just wanted to see if these are comparable from the studies to what's recommended in people as the max dose.

Q.     Do you have that written down somewhere?

A.     I do not.

Q.     How did you do that then?

A.     Ah.  Math, mental -- like, going through the study and being, like, okay, type into a calculator.  I'm like, okay, fine, calculator.  So it's not written down.  It was, like, a phone app.

Q.     Okay.  And you did that conversion for every study, for every medicine, for every indication?

A.     Ah.  I did that for just the one -- I mean, I -- I didn't want to spend too much time on it.  I just wanted to see a subset of them.  So I used the ones from my -- each study in Exhibit 1 I did that calculation for.

Q.     Okay.  We'll go through those.

MS. INSOGNA:  I think we're over an hour, so why don't we go ahead and take our first break.

VIDEOGRAPHER:  All right.
We're going to go off record at
10:06 a.m.

(Off the record at 10:06 a.m.)

VIDEOGRAPHER:  We're back on
the record at 10:20 a.m.

QUESTIONS BY MS. INSOGNA:

Q.    Great.  We're back from our break.

Can we turn to page 3 of your report, please?

And at the top of page 3 of your report, this is the summary of your opinions in this litigation as to Novo.

Correct?

A.    Correct.

Q.    Okay.  And this is an accurate summary of the opinions you're offering in this litigation.

Correct?

A.    A summary, yes.  It's not exhaustive, but, yes.

Q.    Okay.  And opinion 1 is the semaglutide nonclinical studies indicate a potential risk for gastrointestinal injuries,

Page 78

and then you've got A and B as to semaglutide.

Is that correct?

A.    That is correct.

Q.    Okay.  And so I just want to confirm.  You're not offering these opinions as to liraglutide.

Correct?

A.    Correct.

Q.    Okay.  And likewise, your summary of opinion number 2 also is as to semaglutide only.

Correct?

A.    Let me just double-check if I had...

Q.    You only cite to two liraglutide studies.

A.    Yes.  Yes.  Yes.  Yes.  Give me one moment.

Yes, they -- so I have opinions on them.  They're just not in my summary of opinions.  So the summary, yes, you're correct, I don't mention liraglutide.

Q.    But are you offering -- because the opinion number 1 is only as to

semaglutide.

Correct?

A.   Correct.

Q.   Okay.  And number 2 is also only as to semaglutide?

A.   Well, I didn't specify semaglutide in that one, which is why I wanted to include the two liraglutide studies for Victoza.

Q.   Let me -- sorry to interrupt. Let me just point you to the text of the sentence of number 2.

A.   Oh, yeah.

Q.   It says --

A.   Oh, for --

Q.   -- "Novo downplayed the significance of these findings" --

A.   Yes, yes, yes, yes.

Q.   -- correct?

A.   Yes.  Semaglutide, yes.

Q.   I just want to confirm.  You were intentional about your language here.

Right?

A.   Yes.

Q.   So your opinion as to number 2

is as to semaglutide only.

Correct?

A.   Yeah.

Q.   Okay.  And are you saying that your opinion as to number 3 is as to liraglutide and semaglutide?

A.   Let me just double-check.

Yes.  So these -- this number 3 is for both liraglutide and semaglutide.

Q.   Okay.  And for liraglutide, you reviewed and summarized two Victoza studies.

Is that correct?

A.   I only included two studies in this report, but I reviewed several others.

Q.   Several others?

A.   I can't -- I would have to look at the materials considered to see how many actual liraglutide.

Q.   Which are the liraglutide studies that you reviewed?

A.   I cannot point them out from -- I can't remember which ones are semaglutide versus liraglutide, but of the ones included -- sorry.  Of the ones included on page 4 and 5 by Novo, they should have a

combination of semaglutide and liraglutide.

And those are what I reviewed.

A.   Okay.

Q.   And would it surprise you if there are only four entries on your materials considered list that are liraglutide studies?

A.   No.

Q.   Okay.  And so those are the studies you reviewed in reaching your opinions as to liraglutide here.

Correct?

A.   Yes.

Q.   Okay.

A.   Yeah, I reviewed everything provided.

Q.   And if additional semaglutide preclinical studies are not listed between materials considered entries 78 and 133, you would not have reviewed those.

Case 2:24-md-03094-KSM   Document 691-34   Filed 05/19/26   Page 83 of 362

Page 82

Correctly -- correct?

A.     If they're not in this materials considered, I would not have reviewed them.

Q.     Perfect.  Okay.

Okay.  Let's turn to page 38 of your report.  We'll talk about those ICCs.

Is that how you typically refer to them in your practice?  ICCs?

A.     Yeah, either/or, just because it's a mouthful to say the full name.  So ICCs is perfect.

Q.     Okay.  Thank you.

And this is -- pages 38 and 39 of your report are the only places you discuss ICCs.

Correct?

A.     Correct.

Q.     Okay.  And with the context of your earlier answer in mind that I have, I just want to confirm that you're not offering the opinion that there is evidence that GLP-1s damage or impact ICCs.

Correct?

A.     No, because we don't know.  We

don't have enough data to support that.

Q.    I'm just going to ask that again because I think I framed it as a negative, and you said no.

A.    Oh.

Q.    And so I just want to make sure -- I think I know the answer is that you -- let me just ask it this way.

A.    We just can't know for sure.

Q.    Okay.  And so you're not -- you're not offering the opinion that there is evidence.

Correct?

A.    I'm not offering evidence that there is, just that we can't form an educated opinion because we lack the data to do that.

Q.    Okay.  So in other words, you aren't pointing to any affirmative evidence that GLP-1s negatively affect ICCs.

Correct?

A.    No.  I'm not -- sorry --

Q.    No, or -- that's okay.

A.    The negatives.

No, I'm not affirming that they damage ICCs because we don't have the IHC

Page 84

results to confirm or deny that.

Q.      Okay.  So no preclinical studies show ICC damages after GLP-1 use.

Correct?

A.      It would be impossible.

Q.      Okay.  And no independent study that you've reviewed in reaching your opinion here shows that either.

Correct?

A.      Independent study as in outside of Novo Nordisk that GLP-1s cause this?

Q.      (Nods head.)

A.      Not that I recall.

Q.      Your point is simply there's an absence of evidence on this point.

Correct?

A.      Correct.

Q.      Okay.  So let's go back to the summary of your opinions on page 3.  And we'll set aside number 3 as to liraglutide.

And so -- but just focusing on semaglutide, these are your opinions as to semaglutide and nonclinical studies.

Correct?

A.      Correct.

Page 85

Q.    Okay.  And let's look at 1A.

You write, "Semaglutide is associated with causing Brunner's gland hypertrophy in various animal species in both sexes at various exposure levels."

Did I read that correctly?

A.    You did.

Q.    What do you mean by -- strike that.

What do you mean when you say "semaglutide is associated with causing Brunner's gland hypertrophy"?

A.    Yeah, sure.  I just wanted to use that word instead of saying it's causal because it's not -- this lesion is not present in every study provided that I read.

Q.    Okay.

A.    So there is a subset of studies where this change does exist, and so that's why I used the word "associated."

Q.    Okay.  So you're making a distinction in your mind between association and causation.

Correct?

A.    Yes.  Yeah.

Q.     Okay.  And your opinions are simply of an association?

A.     Correct.

Q.     And did you calculate the magnitude of that association?

A.     I did not.

Q.     Okay.  Let's move on to B.

You say, "Semaglutide is associated with the formation of erosions and/or ulcerations in the stomach of various animal species in both sexes at various exposure levels."

Is that right?

A.     That is correct.

Q.     Okay.  And again, for that did you calculate the magnitude of association?

MR. PENNOCK:  Just note my objection.

THE WITNESS:  I did not.

QUESTIONS BY MS. INSOGNA:

Q.     And just to confirm, I think I already know the answer, but you're not offering an opinion one way or the other as to these outcomes in humans.

Correct?

A.     Correct.

Q.     Okay.  And moving on to 2, you write, "Novo downplayed the significance of these findings in their reports, citing to conclusory alternative explanations such as spontaneous lesions and lack of human relevance, without providing sufficient justification to discard these findings."

Did I read that correctly?

A.     Yes.

Q.     Okay.  And when you say "downplayed," downplayed to whom?

A.     By whoever reads the report. So I guess for FDA, to get approval.

Q.     Okay.  And so this is based on Novo's nonclinical studies that you reference in your report.

Correct?

A.     Correct.

Q.     Okay.  Do you know if FDA has ever expressed concerns to Novo that Novo may have downplayed the significance of these findings?

A.     No.  It's in the market, so I would think that FDA approved them because

they thought it was safe.

Q.    And are you aware that Novo produced in this litigation the summary of its correspondence with FDA on these medicines?

A.    Not that I recall.

Q.    Okay.  So you didn't search Novo's documents for any such communications.

Correct?

A.    Not that I recall.

Q.    Okay.  If you could just help me understand.

You are reviewing the same documents and conclusions and looking at the same universe of documents, or a subset of the universe of documents, that FDA did.  You came to a different conclusion than FDA.

Is that what you're saying?

MR. PENNOCK:  Objection. Objection.  No foundation.

He's not said anything of the kind.  I don't know what you're talking about.

THE WITNESS:  I respond?

MR. PENNOCK:  Do you know what

Page 89

the question was?

THE WITNESS:  Can you repeat?

QUESTIONS BY MS. INSOGNA:

Q.    That's fine.  That's fine.

I'm just trying to understand the disconnect here between your findings and what -- strike that.

Are you saying that FDA missed this?

MR. PENNOCK:  Objection.

Objection to the preamble.

There's no disconnect.  He's not offered any opinions regarding FDA.  He's not offering any opinions regarding.  He's not testified regarding.

So you want him to offer a new opinion on whether the FDA missed it?

MS. INSOGNA:  I'm certainly not.  I'm just confirming --

MR. PENNOCK:  Well, he's about to.

MS. INSOGNA:  -- what his opinion is.

QUESTIONS BY MS. INSOGNA:

Q.    Your point is simply -- your opinions are only as to Novo's conduct up to the point that it is submitted to FDA.

Correct?

A.    Correct.

Q.    You're not offering any opinion about FDA's review or conclusions.

Correct?

A.    No.  Just what was presented to the FDA from Novo from their nonclinical studies.

Q.    Okay.  And the third summary of opinion here, you write, "Novo utilized poor laboratory diagnostic practice that resulted in ignoring the gastrointestinal signal rather than fully assessing abnormal lesions such as Brunner's gland hypertrophy and stomach erosions, ulcerations."

Is that right?

A.    That is correct.

Q.    And this is based on your review of the study reports themselves.

Correct?

A.    Yes.  Because I wasn't provided

Page 91

with the slides, so I only have the reports to make these decisions.

Q.    Okay.  And you didn't review any other underlying documents that went into the -- strike that.

You didn't review any other documents in reaching that opinion besides the study reports.

Correct?

A.    Correct.

Q.    Okay.  So let's turn back to your materials considered list.

And mine is just a summary because you just have the Bates numbers.

A.    When you were naming numbers, I was like, I don't know which number.

Q.    That's fine.  I have a cross-reference, so that's what I'm looking at.

A.    Okay.

Q.    It's different than what you've got.

A.    Okay.

Q.    Okay.  And so for entries 78 to 98 on your materials considered list, where

those are individual pages within a much larger document, is -- you're simply relying on that page.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I'm using that page as the best example, but I've read the entire -- or I say in my report, like, each of the sections that I have read because some of them are like 3,500 pages.  So let me -- let me find where it says what I've focused on.  Hold on one second.

Okay.  So on page 7 of my report, the second paragraph, it shows what exactly I've read from each individual study and in the order of which I did it.  So if I am only referencing one page, it's probably just to support the point I wanted to make.

But I've read, you know, all of these subject headings, essentially, for each of the studies.

QUESTIONS BY MS. INSOGNA:

Q.    And that is as to the preclinical studies that are cited in your materials considered list.

Correct?

A.    That is correct.

(O'Brien Exhibit 5 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  I'm going to show you what we will mark as Exhibit 5.  This is -- okay.  Let me show you what we will mark as Exhibit 5, although I realize we printed a copy without the Bates number.

So it is Bates Novo_GLP-1_MDL_ 000008762, which is entry 83 on your materials considered list.  We will substitute that out on a break.

Do you have a copy?  There you go.

So this is entry 83 on your materials considered list.  Does that look right?

MR. PENNOCK:  He doesn't have his list numbered, as he pointed out.

Page 94

You have it numbered, right?

MS. INSOGNA:  I -- yes, we have the Bates number that we will --

MR. PENNOCK:  I mean, his list, I don't think, has numbers on it, does it?

THE WITNESS:  Yeah, no, it's just --

MS. INSOGNA:  Oh, sorry.  It is the sixth entry down under the Novo.

THE WITNESS:  Okay.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  And so this is that page, that Bates number.  It's one page of 29,600 pages of that document.

I just want to confirm.  When you said you reviewed the whole documents, that was as to the preclinical studies.

Right?

A.    Correct.

Q.    Okay.  And for all the other entries on here where you have just cited a single page, you're just relying on this discrete page?

A.    Correct.

Q.    Okay.

A.    From my -- yes, from what I recall.  Yes.

Q.    Okay.  How did you go about selecting a document like this to be on your materials considered list?

A.    Give me one second.

I -- for something like this, I was trying to focus apart from the -- you know, the nonclinical trials, anything that referenced diabetes.  So in this case the patient historical condition toward the bottom, prediabetic state, were things that I just wanted to be -- have some consideration for.

But otherwise, most of what I found would hopefully support this preclinical trials and nonclinical trials that I included in the report.

Q.    Did you have access to Novo Nordisk's whole production in this litigation?

A.    From what I recall, I just requested all of the studies within a particular framework.  And so I may have had

access, but I did not ask for -- it might have been in the category that I did not specify before.

But if it's in my materials considered, I've at least looked at it.

Q.   Okay.  Let me ask it this way.

Did you run your own searches on the database of the full production?

A.   For Novo's database?  No.  I requested from counsel what I wanted, and then I was provided with hundreds of studies that fit my criteria.

Q.   Okay.  And then within that universe of documents, you were -- that counsel selected and provided to you --

MR. PENNOCK:  Objection.

MS. INSOGNA:  Okay.  Let me finish the question first, and then you can object.

QUESTIONS BY MS. INSOGNA:

Q.   You requested from counsel what you wanted --

A.   Correct.

Q.   -- and then within the universe of what was provided to you by counsel, you

ran additional searches.

Correct?

A.    Searches on what?

Q.    On those documents.

A.    Ah, yeah.  I mean, I went through, you know -- I read through the -- usually it becomes, like, a table of contents or sort of thing to see where I can hone in on what might be more useful for my case.

And then if they mentioned diabetes or they mentioned anything related to these various, you know, drugs or any sort of effect, then that caught my eye.  So, yes.

Q.    And so how many documents were you provided from counsel in the first instance?  What was the starting universe that you had?

A.    From my memory, 153 studies on page 7, first paragraph.

Q.    And then you narrowed down that universe to what is in the materials considered list?

A.    That is correct.

Q.    Okay.  Let's go to Section 4 now of your report where you talk about the

Page 98

methodology and review of nonclinical studies.

A.    Roman numeral 4 or you said page 4?

Q.    Section 4, page 7.  Thank you.

A.    Page 7.  Okay.

Q.    Sorry about that.

A.    I guess mine seems diff -- so my page 7 is roman numeral 7.

Q.    You're right.  That's on me.

Page 3, section 4, Literature Review Search Terminology.

A.    Yes, yes.  Okay.  Very good.

Q.    I'm sorry.

A.    You're fine.

Q.    Okay.  And this is where you summarize additional literature review you conducted to identify documents you wanted to review and rely on in reaching your opinions.

Correct?

A.    Correct.

Q.    Okay.  And you describe it as a broad search.

Correct?  Broad exploratory search?

Page 99

A.      Correct.

Q.      Okay.  And you then -- this is the search string at the bottom of page 3 that you used.

Correct?

A.      Yeah.  Exactly.

Q.      Okay.  And this search -- do you recall how many results it generated?

A.      Around 1,533, 1,570-something, over 1,500, I think.

Q.      Okay.  I did and got 1,600, so we're in the ballpark.

A.      Okay.  Okay.

Q.      Okay.  Great.

And this captured all different types of studies.

Correct?

A.      Correct.

Q.      Epidemiologic studies, randomized controlled studies.

Correct?

A.      Correct.

Q.      Okay.  And so when you say you evaluated the evidence, what do you mean by "evaluate" with respect to that body of data?

A.      So as I was going through the various types of published, peer-reviewed papers from that search, I was just more curious for myself in terms of learning more about -- both learning more about the drugs and its effects on people and also in animals for whatever had come up, just to better acquaint myself with what could happen, the method of action, why people are using it, the side effects.

And so there were several papers, for instance, like these meta-analysis papers that looked at -- they were essentially reviews that looked at several individual peer-reviewed papers and combined their findings and did a huge analysis on what would be -- or what's associated with some of these drugs.

So looking at liraglutide, semaglutide, looking at, you know, other GLP-1s on the market, seeing which ones have more adverse GI effects than others.  I think if you're looking -- it might be like X-i-e, et al.

Q.      That's the meta-analysis that

you reviewed?

A.      Yeah.  Yeah.  That was a great -- well, yeah, for me it was an informative paper that included a lot, the most recent.

So, yes, looking for evidence like that, just to better support if there is something that doctors are seeing in their patients, obviously outside of these clinical trials and preclinical trials.  Or I didn't see the clinical trials.  So outside of these nonclinical trials, if there's anything that they're seeing in their patients.

Because obviously even if you do -- whatever trial you do, there's only a subset of animals in these nonclinical trials you can use.  So obviously when you're giving this drug to however many, I don't know, millions of people, you're going to see some effects that you might not have seen in your trials before.

So I was just curious what people found in the real world.

Q.      Great.

And so ultimately your

materials considered list has just fewer than 50 studies, published studies, listed on there.

Does that sound about right?

A.    Yeah, I can't remember the exact breakdown.  I think I have over a hundred references.  I just can't remember how many of them were studies.

Q.    Okay.  And so now my question is, how did you get from the 1,500 or 1,600 that your search generated down to the, what I think is going to be, 47 to 50 references in your materials considered list?

A.    So for those, I mainly was focusing on those that supported our -- my, sorry, summary of opinions for do they show changes in the GI tract.  Are they -- I was actually really curious if any of them showed -- I was really honing in on if any of them showed microscopic findings or even macroscopic findings.  But I was more curious about the microscopic findings in the GI tract, because oftentimes the papers that I've referenced here, I could not really find many papers that even described things other

than a functional disturbance.

And what I mean by that is like if it was, you know, nausea, vomiting, constipation, diarrhea, that kind of thing, abdominal bloating.  I was hoping to see anything that could support, like, Brunner's gland hypertrophy or ileus or an obstruction or intussusception, like, any of these pathological lesions that could take place in the GI tract.

And the papers didn't describe really any histo findings.  They really made it less pathology and more clinical.

So I -- yeah, I was just hoping a pathologist or like a gastroenterology-specific pathologist would be able to write a paper on that, and I guess maybe it's so new, there hasn't been time for that.

Q.    Okay.  So you didn't find that type of study that you were looking for?

A.    No.

Q.    Okay.  And looking at the search specifically, how did you -- how did you come up with the words that you chose in here?

A.    Yeah.  So for this one, what I wanted to focus on was any type of iteration of GLP-1, just so I'm covering -- I know that, you know, we're only talking about two drugs in this case, liraglutide, semaglutide, but I just wanted to see in general what the GLP-1s on the market are doing for their patients.

And --

Q.    Sorry, can I stop you there because I want to drill down on that point?

A.    Yeah.

Q.    You mention a number of other GLP-1s in your search --

A.    Correct.

Q.    -- including taspoglutide.

Do you see that?

A.    Yes.

Q.    Okay.  How did you -- that medicine never made it to market.

Correct?

A.    (Witness nods head.)

Q.    Do you know?

A.    I don't know.

Q.    Okay.

A.    Yeah.

Q.    How did you find that term?

A.    I don't recall, but it could have been -- so I did this search partially -- like, I've been editing this search as I have been going along, more refining it.  So either I started with a broad scope of these GLP-1s -- and maybe from reading like the FDA approval documents, if they mentioned something like that, added it back in just to, again, get a full scope of what GLP-1s can do or what, you know, evidence is out there, even if it's a pre-publish, prepublication document, just to see if PubMed had anything related to those topics.

Q.    Okay.  And in the summary paragraph above, you say you refined the search to focus on literature discussing a variety of things, one of which is ileus.

Do you see that?

A.    Yes.

Q.    Okay.  So you looked for studies on ileus?

A.    Yeah, I basically included that

with the very last search term, the mesh term, for, like, safety/adverse effects, and then I looked at anything that came up from that search.

Q.    Okay.

A.    Because, again, ileus sometimes is named as, like, a dysmotility, so the safety adverse effects would just help me cover all the bases.

Q.    What is ileus?

A.    So if you think about the GI tract or just your -- you know, from stomach basically to colon, you have something called peristalsis.  And that helps you get a bolus of food from -- well, we'll just focus on from stomach out through the rectum.

And so for ileus, it's when you have sort of a stop in your peristalsis, and your GI system is not as motile as it would be in a normal person or a normal animal.

And so that just means that for whatever reason, your GI tract is not functioning normally with it's autonomic nervous system.  So they have little nerves in the GI tract that help propel the food and

have your contractions or the peristalsis to move through.  So that's -- ileus is basically the lack of peristaltic movement.

Q.    Okay.  Let me just take a moment to substitute out -- actually, we'll do it on a break.  There's the correct copy with the Bates number.  We'll reprint the exhibit tag.

You also looked for studies on gastroparesis.

Is that correct?

A.    Yes.

Q.    And what is the -- what do you understand gastroparesis to be?

A.    So in this case, it's a very common condition to see with your diabetic patient -- or you tend to see it just with your type 2 diabetic patients.  And so that entails similar to what I described before for ileus but more limited to the stomach.

So you have a bolus of food in the stomach, and instead of moving on through your first part of the small intestine, your duodenum, it stays in the stomach.  And that has one effect of making you feel more

Page 108

satiated, so you're not wanting to eat anymore, but it also has a negative effect, where, if you ever needed surgery or endoscopy, colonoscopy, wherever you're under anesthesia, that bolus of food should not be there if you're undergoing those surgeries. That's why they want you to fast before you're undergoing anesthesia, because you're at risk of aspirating.

So with this bolus of food, you're at risk of, under anesthesia, vomiting and inhaling that vomitus, which would then cause something called aspiration pneumonia, which you have to treat quickly in order for you not to die from that.

And so in this case, there's a lot of anesthesiologists -- I can't remember the name of their organization, but the college for anesth -- human anesthesiologists will say the recommended protocol for a person on a GLP-1 to undergo anesthesia.  And they might say, stop for a week your taking of the drug.  Fast for, you know, 24 hours or 12 hours just to prevent this from happening, because it is a serious condition that could

happen based on gastroparesis.

Q.    And do you differentiate between chronic gastroparesis and transient gastroparesis?

A.    In this report?  No.

Q.    Okay.  Let's turn now to page 4 to 5 of your report.

Here we're at the Review of Manufacturer-Affiliated Discovery and Development Papers on GLP-1 Receptor Agonists in Animals.

Do you see that?

A.    Yes.

Q.    Okay.  And you, in this section, cite several development papers in support of your opinions.

Correct?

A.    Yes.

Q.    Okay.  And I count nine papers here between pages 4 and 5.

Does that sound right?

A.    Yes.

Q.    Okay.  And do you know -- you mention in the first sentence, "Many affiliated with pharmaceutical companies."

Do you know which ones were affiliated with pharmaceutical companies?

A.    Ooh, off the top of my head, no.  I'd have to look at the actual paper because in the paper they'll say, you know, they're -- or usually when you author a paper, the author affiliations come up, and then I can see, oh, it's from Novo Nordisk.

Q.    Okay.  Great.

And are you familiar with the first author on your footnotes 1 and 2 here, Lotte Bjerre Knudsen?

A.    Yes.

Q.    You are familiar with her?

A.    Oh, I don't know her.  I'm familiar with the paper that I've referenced.

Q.    Okay.  And you didn't review her transcript in reaching -- her deposition transcript in reaching your opinions here.

Correct?

A.    I did not.

Q.    Okay.  You didn't review any -- I apologize if we already covered this.

You didn't review any deposition transcripts from this litigation

in reaching your opinions.

Correct?

A.     No.

Q.     Did you reach out to any of the authors of these studies to discuss your opinions?

A.     No.

Q.     Okay.  And then the bottom of page 4, you set up the dichotomy, so to speak, between the development papers and the nonclinical studies.

Is that correct?

A.     Oh, yes.

Q.     Okay.  And so in this sentence when you're setting that up, when you say "internal, nonclinical studies," those are the studies that you've reviewed in this report?

A.     Yes.

Q.     Okay.  Great.  And those were what were provided to FDA.

Correct?

A.     Yes.

Q.     Okay.  And then you talk about two independent mechanistic studies, right,

on -- really on page 5?

A.      Oh, yes.

Q.      Koehler and Vahle?

A.      Yes.

Q.      Okay.  So let's look at the first one.

Footnote 14, which is, "GLP-1 R agonist promote normal and neoplastic intestinal growth through mechanisms requiring Fgf7."

Do you see that?

A.      Yes.

Q.      And this study involves liraglutide and exenatide.

Correct?

A.      Correct.

Q.      Okay.  So it does not involve the study of semaglutide?

A.      Correct.

Q.      Okay.  And then you go on to say, "Although these findings are routinely cited in scientific review articles to illustrate the broader biologic actions of GLP-1 signaling, they do not appear to be referenced in the pharmaceutical

Page 113

company-conducted, nonclinical studies that supported regulatory approval of GLP-1 receptor agonists."

Is that right?

A.    Correct.

Q.    How did you reach that conclusion?

A.    In that, for instance -- well, in one case, this study came out after some of the Novo studies even were produced.

Q.    Did you review the regulatory files for the Novo medicines to see if this study was submitted to FDA?

A.    So what I mean is this study is from 2015, and a lot of the Novo studies were pre-2015, so they wouldn't have known this paper.

Q.    Nobody could have known this paper?

A.    Right.  Yeah.  For a lot of the Novo studies, they couldn't have known.  This is new -- this is new info.

Q.    Help me understand that sentence, then, because you say, "Although these findings are routinely cited in

scientific review articles to illustrate the broader biological actions of GLP-1 signaling, they do not appear to be referenced in the pharmaceutical company-conducted, nonclinical studies that supported regulatory approval of GLP-1 receptor agonists."

A.    Ah, yes.  So in some of the studies I can't remember off the top of my head, they'll have addenda to them.  And so in my opinion, I thought this would be -- you know, they find out something new, they want to cover their bases, they do an additional study, they add it as an addendum.

So that was my reasoning.  I thought from seeing this thing that, you know, they might want to go back and do another study to figure this out.

Q.    Did you review -- what did you review in reaching your conclusion here?

A.    Oh, my conclusion on the same page?

So in the studies that are in the materials considered, there are several instances where the either study pathologist

Page 115

or the peer-reviewed pathologist will include references, select references, to explain a certain finding or explain something.  Rather than a signal, they'll explain it as, you know, within background findings, or this is expected for whatever species of this age.

So they do include certain references.  I just could not find, really, any of these referenced texts in their documents.

(O'Brien Exhibit 6 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.   Okay.  Let me show you what we'll mark as Exhibit 6.

A.   Okay.

Q.   Okay.  This is your footnote 14.

Correct?

A.   Uh-huh.

Q.   Yeah?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Great.

Page 116

And you'll see the Bates number at the bottom of the document.

Do you see that?

A.    Yes.

Q.    So I just want to confirm.  You didn't review module 4, nonclinical study reports, literature references, from the Victoza regulatory file in reaching that opinion.

Correct?

A.    No.  I did not see that file.

Q.    Okay.  It's not a -- I'm not trying to be tricky.  This was submitted to FDA --

A.    Ah.

Q.    -- with that.

A.    Ah.

Q.    And so I just want to confirm that you didn't -- you didn't look in that section in reaching your opinion here.

A.    No.  I basically looked at the full study reports and then saw that they had made references throughout the report, and didn't see this one referenced in that report.

Page 117

Q.    Okay.  Got it.

So there were -- you didn't look at any other of the nonclinical submission documents that went to FDA besides the clinical study reports.

Correct?

A.    Correct.  I just reviewed what was in the materials considered list.

Q.    Okay.  And then you go on to discuss Vahle 2015 in your footnote 15.

Correct?

A.    Correct.

Q.    And this study involves dulaglutide.

Correct?

A.    Correct.

Q.    So it does not involve the study of either liraglutide or semaglutide.

Correct?

A.    Correct.  I mostly used it as just a reference that some of these GLP-1s could have this sort of effect.

Q.    Okay.  And you didn't do any class-wide analysis to confirm that what is relevant to one is necessarily relevant to

others in the class.

Correct?

A.     No.

Q.     Okay.  And then on page 5 you say, "Overall, the pharmaceutical company-affiliated scientific literature supporting GLP-1 RA development presents a weak gastrointestinal signal" -- "safety signal in the nonclinical data."

Is that right?

A.     Correct.

Q.     What do you mean by "weak"?

A.     I mean that the -- compared to what I'm seeing in the studies, the nonclinical studies, that these additional papers don't recapitulate all of the histological findings that we're seeing in the nonclinical trials.

So in my mind, if I see evidence in these studies of ulcer -- like gastric ulcers, erosions or Brunner's gland hypertrophy or any of these histological lesions, as I mentioned before, a lot of the papers that were read don't -- haven't mentioned really histological findings

associated with these GLP-1s.

So in my mind, my reasoning for saying a weak safety signal was that it wasn't really showing evidence of, you know, the microscopic picture of these, and I felt that that would be necessary for me to be certain if it was a strong or a weak signal at all.

Q. Okay. And did you -- that's helpful. Thank you.

Did you compare these nine studies and the nonclinical studies that they are reporting on with the nonclinical studies in your report?

A. I -- I'm not sure if I knew which studies that they were from. So I just compared basically what I'm finding in these to in general what I found with the Novo Nordisk paper of the drug they were describing.

Q. Okay. And so the summary that you are offering on page 5, the last paragraph of Section 5, is as to those footnotes 1 through 15, the development papers?

A.    Correct.

Q.    Okay.  And the second sentence you say, of that last paragraph, "Gastrointestinal effects are portrayed almost exclusively as functional and reversible consequences of GLP-1 physiology, rather than evidence of underlying tissue injury or pathology."

Is that right?

A.    Correct.

Q.    Okay.  Are you offering the opinion that GLP-1 effect is not reversible?

A.    Oh, it depends.  It depends on -- well, for instance, so there are several studies that go through the treatment period, let's say for 26 or 28 weeks.  Some of those studies also have, like, a four-week or two-week recovery period where they, you know, have cessation of treatment.  In some studies, there's either partial recovery or maybe no recovery or full recovery.

But my point is that you'll never -- there will never be a diabet -- in my mind, I don't think there will be a diabetic that has this wonder drug and wants

Page 121

to stop taking it in favor of doing, you know, daily, you know, blood sticks or some other type of drug.

Same thing with an obese person. If they're suddenly, like, you know, fit, and they love looking slimmer, I can't imagine that they'll also want to give up a drug in, like, risk of or the fear of going back to what they were.

So I just don't think it's relevant when you have a lifelong condition like diabetes unless there's a full cure. You're never going to stop taking the drug.

So in my mind, whether they recovered or not, it's not really recapitulating what's happening in the world.

Q.    That's helpful.

So you're not offering an opinion one way or the other as to reversibility --

A.    Yeah.

Q.    -- in this report?

A.    Yeah.  Yeah.

Q.    Okay.

A.    You're correct.

Page 122

Q.    In the interest of time, I just want to confirm that you're not offering an opinion one way or the other as to any GLP-1 on the question of reversibility.

Correct?

A.    On reversibility, no.

Q.    Correct?

A.    Oh, correct.

Q.    Okay.  Okay.  Great.

That'll speed things along later.  The more questions I can ask for them, it'll get us out of here faster.

You also mention at the top of page 5 that most laboratory animal species lack the ability to vomit?

A.    Correct.

Q.    So this adverse event cannot be accurately evaluated in most nonclinical studies.

Is that right?

A.    That is correct.  Only the ones that have nonhuman primates in the Novo studies could we really assess that because the mice, the rats, rabbits, they just don't have the neurological framework or the

function to vomit.

Q.   Okay.

A.   So...

Q.   Given that, I just want to confirm you're not offering any opinions as to GLP-1s and nausea or vomiting.

Correct?

A.   Only pertaining to the nonhuman primate studies would I even consider that as a possibility.

Q.   Okay.  I didn't see that in here, so I just want to confirm that given that, you're not offering any opinions as to GLP-1s and nausea or vomiting.

Correct?

A.   Correct.

Q.   Okay.  So let's move on and talk about the Ozempic preclinical studies --

A.   Okay.

Q.   -- you cited and discussed in your report.

A.   Okay.

Q.   Starting on page 8.

A.   Okay.

Q.   Got it?

Page 124

Okay.  And so between pages 8 and 29, you discuss ten animal studies for Ozempic.

Is that right?

A.    That is correct.

Q.    Okay.  And all of these studies were provided to FDA before FDA approved Ozempic in 2017.

Correct?

A.    Correct.

Q.    And you know that because you looked at FDA's preclinical review?

A.    Correct.

(O'Brien Exhibit 7 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  I'll hand you what we've marked as Exhibit 7.  I just want to confirm. This is that document that you just mentioned, FDA's nonclinical review of Ozempic.  This is on page 1 of your materials considered list.

Correct?

A.    Correct.

Q.    Okay.  Great.

And I will advise that as you can see from the table of contents, it's a very large document, so I excerpted the pages that are relevant to what you have referenced in your opinion with respect to the nonclinical findings.

A.    Okay.

Q.    Okay.  I think we can set that aside and hopefully move on then.

And then in footnote 25 on page 8 you say, "Wegovy relied on these same studies."

Do you see that?

A.    Yes.

Q.    Did you review the additional studies that were performed for Wegovy?

A.    Yes.  Everything that's in the materials considered I reviewed.

I can't recall the individual studies that were specific for Wegovy, but I do know that there was a document that said that they were using a lot of the studies from Ozempic for Wegovy.

Q.    Right.

FDA's nonclinical review for

Page 126

Wegovy is also something you've reviewed?

A.    Correct.

Q.    All right.  And that's where it says two -- only two additional pharmacology studies were conducted?

A.    Correct.

Q.    Okay.  And so if you reviewed those two additional studies, they would be in your materials considered list?

A.    Correct.

Q.    Okay.  And then moving on to Rybelsus, between pages 29 and 32 you discussed three animal studies for Rybelsus.

Is that right?

A.    That is correct.

(O'Brien Exhibit 8 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  And all three studies you cite here are -- were reviewed by FDA.  And I'm handing you what we'll mark as Exhibit 8.  That's the nonclinical review by FDA.

That was kind of a run-on question, so let me -- now that I've handed

Page 127

it to you, let me ask it this way.

All three studies you cite here were reviewed by FDA in advance of their approval of Rybelsus.

Correct?

A.      To my knowledge, yes.

Q.      Okay.  We can look at -- we can set that aside.

I just want to confirm.  None of the studies on which your opinion relies were not provided to FDA.

Correct?

A.      Correct.

MS. INSOGNA:  Okay.  In the interest of time, can we take a break so I can get organized?  We're going to switch gears.  Thank you.

MR. PENNOCK:  Only because it's you.

VIDEOGRAPHER:  All right. We're going to go off the record, 11:17 a.m.

(Off the record at 11:17 a.m.)

VIDEOGRAPHER:  Back on the record at 11:30 a.m.

QUESTIONS BY MS. INSOGNA:

Q.   All right.  We're back.  Thank you again.

[redacted]

A.   Okay.  Okay.  Good.

Q.   We're on the same page.

A.   Yeah.

Q.   Start on page 8 and then page 12.

You got that?

A.   Yes.

Q.   Okay.  Great.

A.   Yeah.

Q.   And so I just want to confirm kind of your summary -- the summary of your observations about these two studies are captured on -- at the top of page 12.

Page 129

Right?  This is your primary

concern?

A.   At the top of page 12.



Page 130



(O'Brien Exhibit 9 marked for identification.)

QUESTIONS BY MS. INSOGNA:













Q.     Okay.  Do you agree that gross lesions can be observed visually but histological assessments reveal no cellular pathology?

A.     In my understanding, no, I don't think it's possible.

Q.     Okay.

A.     Whether or not it's normal or not is one thing.  But I -- you have to have something histologic in order to see something grossly.

Q.     Okay.  And so I just want to go through a couple of potential reasons for discrepancies or discordant findings.

A.    Sure.

Q.    Okay.  Are you aware that functional or metabolic changes could lead to a discrepancy between macroscopic and microscopic findings?

MR. PENNOCK:  Objection.

THE WITNESS:  It depends. Usually a functional disturbance, we might not even see any microscopic or macroscopic findings.

So, for example, you might have a dysrhythmia, so a type of irregular heartbeat in the heart.  We might not even see anything histologically or grossly, but you can still have a heart attack if it affects your conduction area.

So that's an example of the functional thing that has no changes.

Usually if we see a functional change it's because it might either be acting on its own or it's so acute that, you know, we don't have time to develop these microscopic or macroscopic lesions, or it's because

you also have concurrent macroscopic and microscopic lesions that fit with the irregular function.

QUESTIONS BY MS. INSOGNA:

Q.    And so are you -- what about metabolic changes?  Could that be a reason for discrepancies or discordant findings like these?

A.    Not -- I would think of usually similar bode to function.  Sometimes with metabolic changes we use that as a -- oh, I can't think of the term -- like a scapegoat, almost, sometimes, where if you don't find any findings grossly or histologically, you say it could be one of these things.  It could be fatal seizure activity that just happened.  It's too acute for us to see any sort of changes under the scope or to the naked eye.  It could be a metabolic dysfunction.  It could be like a fatal arrhythmia.

So we usually use that, in residency at least, on reports if we didn't find anything and we can't -- we can't rule out a metabolic condition.  But I don't think

Page 140

a metabolic condition, in my mind, would lead to only gross findings and not histo findings.

Q.   Okay.  That's helpful.  Thank you.

So let me read some statements, and you tell me just if you agree or disagree or can't answer.

Do you agree that changes to tissue's metabolic state might change the color or texture without having produced observable or irreversible cellular damage?

MR. PENNOCK:  Objection.

THE WITNESS:  So asking if the metabolic state of a tissue can change its appearance?

MR. PENNOCK:  Objection.  Hold on a second.  I have an objection to the question.  That was not the question.

Do you want the question read back?

THE WITNESS:  Sure, yes, please.

Page 141

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Do you agree that changes to tissue's metabolic state might change the color or texture without having produced observable or irreversible cellular damage?

MR. PENNOCK:  Objection.

THE WITNESS:  No, not that I can think of.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Do you agree that fluid or hemodynamic changes could be a reason for discrepancies between gross and microscopic findings?

MR. PENNOCK:  Objection.

THE WITNESS:  No, not that I can think of.

QUESTIONS BY MS. INSOGNA:

Q.    Do you agree that age-related changes could be reasons for discrepancies or discordant findings between gross and microscopic findings?

A.    No.  I do agree that there are age-related lesions, but I would still expect to see a coherence between a histo lesion and

Page 142

a macroscopic lesion.

Q.    So I'm only asking about discordance, so --

A.    Yeah.  So, no, I don't think there should be a discordance for an age-related lesion.

Q.    Okay.  Great.

So let's turn to page 193 of that study where we start Appendix FF.

Do you see that?

A.    Yes.

Q.    Okay.  And so this is part of what you reviewed?

A.    Correct.

Q.    Right.  Are these standard acronyms?

A.    Yes.

Page 143



Page 144



Q.    Okay.  You, on page 11, also in the middle of the second paragraph, say, "A

Page 145

study pathologist must be able to rationalize each individual gross macroscopic finding during the nonclinical trials, and if there are macroscopic findings, is responsible for finding the corresponding histological findings."

Is that based on an FDA regulation?

A.    No.

Q.    Okay.  There's no citation, so what is the basis for that requirement?

A.    Ah, sure.  Well, that statement is really just from working with, you know, colleagues who read studies.  And it's very important if you want a drug or a vaccine to reach the market, you don't want these loopholes or these, like, open ends when you're submitting your application.

You want to have an answer for everything so you can support, yes, we saw these findings grossly, but histologically, it was just normal tissue, either hypertrophied or hyperplastic, so we can ignore it.

The fact that they're saying,

Page 146

we don't know, like, there's no histological lesion, makes me think that something was missed because you found it grossly.

So from that standpoint it's just -- you should have -- you should be able to explain away any of your findings, because otherwise a study sponsor could easily come and say, hey, I'm taking a big risk funding this, like, I want to know that this is going to be safe when we introduce it to people.

Q.    Thank you.

And I just -- the beginning of that began with, the statement is from working with colleagues who read studies.

Right?

A.    Oh, in addition --

MR. PENNOCK:  Objection.

THE WITNESS:  Yeah, in addition to me.  But, yeah, my colleague -- the other pathologists who I work with in my department.

QUESTIONS BY MS. INSOGNA:

Q.    So it's based on your clinical practice or your understanding of how these studies fit into the larger picture for

approval?

A.    From my understanding, both.

Q.    Okay.  And this is one of the studies that was provided to FDA.

Correct?

A.    Correct.

Q.    Okay.  And so FDA presumably had all the same information that you had with respect to this document?

A.    Correct.

Q.    Okay.  Let me just clarify something.

A.    Okay.

Q.    Okay.  Just looking at your last answer, so I just want to say.  If they find just normal tissue in that histological slicing, would the correct answer be no histological correlation?

A.    No.

So when I say "normal," I just mean that it's, like, nonneoplastic, let's say, or they see these raised lesions in the stomach grossly.  Histologically, they still see that there's -- there are raised foci in whatever part of the stomach there are, but

it just looks like, you know, extra tissue that's otherwise normal. But it shouldn't be there because it's producing these sort of grossly identified -- identifiable nodules.

Yeah, just to say that it's not cancerous, but they would still say histo-wise that there are, whatever, polyps, or there are, you know, multi-focal, you know, growths of otherwise unremarkable gastric mucosa or whatever part of the wall it was.

I still wouldn't write it off as nothing if I saw even just normal tissue in a higher quantity than I would expect in that area or forming sort of a mass effect.

Q.    Okay. Did you, in the course of your review, evaluate the rate of these injuries that occur spontaneously? Background rate, for example?

MR. PENNOCK: Objection. No foundation.

THE WITNESS: No. What I focused on was particularly if the lesions were present in, you know, the high-dose groups, for example, and

Page 149

absent in the controls, so I know that it's a treatment -- or I am more confident that it's probably a treatment-related issue or potentially a dose-related issue and a treatment-related issue.

So, no, I just went off of what the controls were showing and what the treated groups were showing.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Let's turn to page 14. This is the second of the two studies we --

A.    Yes.







Page 153











Page 158





Q.    And I just want to confirm. You didn't see anything in the materials you reviewed where FDA raised a concern about this premature euthanasia.

Correct?

A.    Not that I recall.













Page 166



Q.    Okay.  Okay.  Let's move on to the Brunner's gland issue.  That's the second topic -- I believe the second opinion you have as to semaglutide.

Correct?

A.    Correct.

Q.    Okay.  Because the -- we talked about the first opinion, which is the

Page 167



discordant findings between the macroscopic
and microscopic?

A.    Correct.

A.    Let's find out.  One second.

Yes.

Q.    Okay.  Great.

And then --

A.    Then you said 214479?

Q.    Yes.

A.    Yeah.

Q.   Okay.  Great.  I just want to make sure we've got the universe --

A.   Okay.

Q.   -- agreed before we get going.

A.   Yes.

Q.   And so just -- we'll go through this, but is it fair to say that your concern regarding the Brunner's gland findings is that it's consistent across these studies that you have identified?

Correct?

A.   Correct.

MR. PENNOCK:  Objection.

QUESTIONS BY MS. INSOGNA:

Q.   Okay.  There may not have been similar Brunner's glands findings in other studies that you have not cited in here.

Correct?

MR. PENNOCK:  Objection.

QUESTIONS BY MS. INSOGNA:

Q.   Let me ask it this way.

You've only included the studies where you have found Brunner's gland hypertrophy findings that were --

A.   No, I've included others, but

Page 169

of the ones that had Brunner's gland lesions, I've included them in this report.

Q.   Okay.  Lesions.  Okay.  I think I've got it.

Okay.  So let's turn to the first study.  Let's go to the top of page 16.

This is a carcinogenicity study by subcutaneous administration to mice for 104 weeks.

Is that right?

A.   Yes.

(O'Brien Exhibit 12 marked for identification.)

QUESTIONS BY MS. INSOGNA:





Page 172

Q.    And then is dilatation of glandular lumens in the Brunner's glands the same thing as Brunner's gland hyperplasia?

A.    It is not.

Q.    Okay.  What's the difference?

A.    So here -- well, yeah, I need to give some background because a lot of the studies will say Brunner's gland hypertrophy. Technically it's hyperplasia.

So in some of the referenced text you'll see from, like, medical doctors, a gland can only perform hyperplasia, which is the dividing of cells or multiplying of cells to form more.

Hypertrophy is only for a terminally differentiated cell, like muscle tissue, where the cell gets bigger.

So I know that these say

hypertrophy, and I'll use hypertrophy for the -- for this deposition, but technically the term is hyperplasia.

But essentially the difference between a dilation and hyperplasia is a dilation just means because you have a gland, you have -- essentially if you think of a tube, the surrounding of the tube is full of cells. Those are your epithelial cells that produce whatever product the gland is supposed to produce. Inside is a lumen where the secretions will go into, and they can be excreted wherever they need to be excreted.

In this case, the dilation means that that lumen is expanding in size, but it's not technically hyperplasia because the cells surrounding it, making up the outside of the gland, are still in their normal numbers. Maybe they're flattening to make more room for a dilated lumen.

Does that make sense?

Q.    I think so. So let me -- let me see I can summarize it in lay terms, and you tell me if this is right or not.

A.    Yeah.

Page 174

Q.    Hyperplasia refers to a proliferation of cells?

A.    Correct.

Q.    Okay.  And dilation means that some of the cells are swollen but not proliferating?

A.    Oh, so the cells might not even be swollen.  It's just relating to the lumen --

Q.    Okay.

A.    -- which is usually just like an empty space.

Q.    I omitted that part in my question because I thought I was trying to be -- I see that I was incorrect.  Let me ask that again.

So dilation of the lumens means that some of the cells are swollen, not proliferating?

A.    No.

Q.    Okay.

A.    The cells usually don't change at all.  It's just -- so you have cells around the outside.  The lumen is completely separate.  It's just the accumulation of --

Page 175

it's maybe like the cells are producing more fluid and it's making the lumen bigger, but the cell should still look normal histologically.

Q.    Okay.  And you're saying here that wherever is written "hypertrophy" is intended to mean hyperplasia?

A.    In my understanding, yes.

I know that pharmaceutical companies and CROs, they have their own specific language, terms.  And my thought was just that maybe the term "Brunner's gland hyperplasia" is not in their system and they use "hypertrophy" for that.

But technically a gland can't really hypertrophy.  It was just something we learned when we were first starting at pathology residency, or even in med school with our pathology classes, that only terminally differentiated cells could hypertrophy and get bigger because they don't have the ability to divide and produce new cells like a stem cell would, for example.

So I was just saying that if you see me say "hyperplasia" instead of

Page 176

"hypertrophy," it's because generally that was confusing in my head.

Q.    Okay.  We'll go through that --

A.    Yes.

Q.    -- because I want to make sure we're on the same page here.

A.    Yeah.







Page 180



Q.    And when you say "hyperplasia,"
do you mean cancer?

A.    Not necessarily.

Q.    Okay.

A.    Sometimes hyperplasia could be
called a preneoplastic finding, which means
that, you know, it's something that
veterinarians or doctors want to keep an eye
on, and then you get rechecked to make sure
it's not proliferating more.

Page 181

Hyperplasia, as we said before, it's a proliferation of cells.  Generally, it doesn't mean that it's cancer, but it is something that you really want to watch for because it could very easily become cancer the more it proliferates.

And even if it's not becoming cancer, the more it proliferates, it creates a large mass effect that we call it, and if it's in, like, your GI tract, it can cause an obstruction, it can cause any number of issues, even though it's not technically a neoplasm or cancer.

Q.    Got it.



Page 182

MS. INSOGNA: Okay. We are over an hour, so why don't we -- do we want to -- I know there's lunch out there. What do you want to do? Do you want to -- I can keep going or --

MR. PENNOCK: How much longer do you have?

MS. INSOGNA: I've got at least another -- like another hour to get through.

MR. PENNOCK: Well, I guess we

can break for lunch, but, I mean, how much -- how much -- so let's go off the record.

VIDEOGRAPHER:  We're going to go off the record, 12:35 p.m.

(Off the record at 12:35 p.m.)

VIDEOGRAPHER:  We're back on the record at 1:23 p.m.

QUESTIONS BY MS. INSOGNA:

Q.    Great.

You had lunch?

A.    Yes.

Q.    Okay.  Good.

You're ready to keep going?

A.    Ready.

Q.    Awesome.

(O'Brien Exhibit 13 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Page 185





Page 187



Q.    Okay.  Right.

Because you say this glandular hypertrophy may represent a preneoplastic change?

A.    Correct.

Q.    And then you note, "There have been several reports of adenomas" --

Which are benign tumors?

A.    Correct.

Q.    -- "and carcinomas, malignant tumors, of the Brunner's glands in humans and various animal species," and then you cite six studies right there.

Is that right?

A.    That is correct.

Q.    Okay.  Do any of these studies identify Brunner's gland hypertrophy as a preneoplastic change?

A.    They do -- well, let me just see if it's in this one.

Hines with the Brunner's gland adenoma in two cats, let me just double-check where I wrote that in one of my reports.

On page 37, I'm just flipping to on my report for Exhibit 1 they do publish -- this study was in cats.  So it says, in 2024, Hines published a study where Brunner's gland hypertrophy led to -- oh, excuse me.

Sorry.  One second.  Oh, sorry, sorry.  You can -- you can strike that.

No, that was not related to neoplasia.  That was related to other downstream effects in the GI tract from

Brunner's gland hypertrophy.

No.  The only reference that I'll mention is in the paragraph below what I just mentioned by Behera, et al., 2025, is that this Brunner's gland hypertrophy created a mass effect, but it was not listed as a neoplasm.  Simply they called it hyperplasia of the Brunner's gland.

Q.    Okay.  So in that study, you're saying they used both words to describe it?

A.    Do you know what, I don't think they did.  I think it was mainly I was getting confused with myself as to what to write to be consistent with the studies.

But that report in particular -- hold on one second.  They call it -- the title of the paper is "Brunner's gland hyperplasia causing gastric outlet obstruction in a child: a case report."

Q.    Okay.  So -- and that's the study that you would point to that identifies Brunner's gland hypertrophy as a preneoplastic change --

A.    Hyper -- hyperplasia.

Q.    Okay.  So just so I'm clear, do

Page 190

you have any studies that identify Brunner's gland hypertrophy as a preneoplastic change?

A.    Not that I recall, but it would -- like, you would need -- some of the studies will say that there's some atypia with the hypertrophy, cellular atypia or, you know, other cellular changes that would be considered a preneoplastic finding in the papers on page -- highlighted on page 20.

In some of their cases they'll say that, you know, from causing a Brunneroma or, you know, more carcinoma, that they mention, from my memory, that it was, you know, hyperplasia with cellular atypia.

Q.    Okay.  Where the FDA nonclinical reviews reference hypertrophy, what's your understanding of what they mean there, if you have any understanding?

MR. PENNOCK:  Do you have a document you're referring to?

QUESTIONS BY MS. INSOGNA:

Q.    We've looked at them, and it's cited in his report.  So I'm just -- I'm just trying to figure out this discrepancy that you flagged between hypertrophy and

Page 191

hyperplasia in the language of the studies.

A.    Okay.

MR. PENNOCK:  I'm objecting on the basis that you're not showing him specifically what FDA nonclinical reviews that you want him to reference.

So you've asked him a question about it, but you didn't tell him what one -- or where in the document.

QUESTIONS BY MS. INSOGNA:

Q.    So I'm talking about the FDA nonclinical reviews --

A.    Oh.

Q.    -- that you cited in your materials considered list --

A.    Right.

Q.    -- that FDA summarizes and posts online.

A.    Right.

Q.    In those summaries where FDA refers to hypertrophy of Brunner's gland, do

you have any opinion as to what they mean there?



Q.    And just to be clear, you didn't identify that technically incorrect finding that you've made in your report --

MR. PENNOCK:  Objection.

Page 193

QUESTIONS BY MS. INSOGNA:

Q.    -- previously.

Right?

A.    Not that I recall.

Q.    Okay.

A.    No.



Page 194

[text redacted]

[text redacted]

[text redacted]

[text redacted]

[text redacted]

[text redacted]

[text redacted]

Q.   Okay.  And in the last sentence of the paragraph you reference Steinbeck -- Steinbach, et al., 2013 --

A.   Yes.

Q.   -- where you note they found an association with evidence of gastric ulceration and hypertrophy of the Brunner's gland in sand rats.

Is that right?

A.   Yes.  So I changed the wording from hyperplasia to hypertrophy to mirror -- the report's confusing enough, I feel, and I didn't want to add to that by constantly going back and forth or, like, put parentheses next to every time it said it.

But technically, for reference 39, the title of the article is "Brunner's Gland Hyperplasia."  Yeah.

(O'Brien Exhibit 14 marked for identification.)

QUESTIONS BY MS. INSOGNA:

Q.    Understood.  Thank you.

Let me hand you a copy of that study, which we'll mark as Exhibit 14.

A.    Thank you.

Q.    Is this a -- you can take a look at it.  This is the study that you cited there on page 21, it's footnote 39 of your report.

A.    Yes.

Q.    Okay.  So just to confirm so the record's clear, you mean -- when you write this, you mean that there's an association with evidence of gastric ulceration and hyperplasia of the Brunner's glands in sand rats.

Correct?

A.    Correct.  From this paper, that is correct.

Q.    Okay.  And if you go to the conclusion of this study, page 713, the last two sentences.

A.    Uh-huh.

Q.    Okay.  It says, "From our data, it appears in the sand rat that age and gastric ulceration are associated with Brunner's gland hyperplasia."

Did I read that correctly?

A.    Yes.  From our data, it appears that the sand rat -- in the sand rat, that age and gastric ulceration are associated with Brunner's gland hyperplasia.  Correct.

Q.    All right.  This is -- this is from which you get your summary of the findings in Steinbach.

Correct?

A.    Correct.

Q.    Okay.  You omit one of the associations, though.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Ah.  Because in this case, it's not saying that age and -- or hold on one second.

Yeah.  Because in this case it's not saying that you need both in order to -- you don't need both age and gastric ulceration to have this

association with Brunner's gland hyperplasia.

From reading the paper, I understood it that it could be either age or -- and/or gastric ulceration, which is why I felt it wasn't relevant to comment on age if all of these in this study are considered the same age.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  But that is an independent risk factor that's reflected in here?

A.    Correct.

Q.    Okay.  And this was a study from 2012.

Correct?

A.    Correct.

Q.    And it was the first to report on this potential association between gastric ulceration and Brunner's gland hyperplasia.

Right?

A.    At least the first report of an incidence of Brunner's gland hyperplasia in any species, it says.

Page 198

Q.    Okay.  And are you aware of whether the study has been repeated and...

A.    I am not.  Yeah.

Q.    Okay.  Are you aware of any studies done that the authors suggested to try and establish a more reliable extrapolation from sand rat to humans on this issue?

A.    Well, in their last line of the conclusion on 713, they say, "Further study in the sand rat to establish a link between gastric ulceration, levels of gastric acid and Helicobacter status could help establish sand rat as a model for this condition in humans."

So for future directions they want look at three different things, and if that has any sort of correlation to what we're seeing in people.

Q.    Okay.  And are you aware of whether such studies have been done?

A.    Not that I recall, but I thought this was sufficient for what I needed.

Q.    All right.  So back to the

Page 199

report.

So you've got Steinbach -- at the bottom of page 21 I just read -- you write, "Steinbach, et al., 2013," but I just want to confirm that it's the same study that we just looked at, which is actually 2012.

A.    Yes.  Thank you for that. Yeah.  Yes.  Yeah.  Correct.

Q.    Okay.  So -- all right.  On page 20 of your report where you're talking about the findings that are potentially preneoplastic, I just want to confirm.

Are you saying that this is potentially a cancer signal?

A.    Yes.

Q.    Okay.  And where you are otherwise talking about nonneoplastic or preneoplastic findings, that is in the context of a potential cancer signal.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Can you repeat that?

QUESTIONS BY MS. INSOGNA:

Q.    Yeah.

Page 200

So where you're elsewhere in your report talking about nonneoplastic or these preneoplastic findings, that's in the context of this potential cancer signal.

Correct?

MR. PENNOCK:  Objection.  Form. Objection.  Overly broad and ambiguous.

THE WITNESS:  From what I understand of your question, the preneoplastic comments of mine are related to the findings of Brunner's gland hypertrophy, and I don't think they were fully evaluated to know if they could become cancerous or not.

QUESTIONS BY MS. INSOGNA:

Q.    Got it.

So I just -- that's what I'm trying to make sure.

It's a -- it's a precursor. These findings could potentially be a precursor to a cancer signal.

Is that right?

A.    Correct.

Q.    Okay.  Thank you.

A.     Yeah.

Q.     All right.  So let's go back to your report.  On page 23, we'll move on to study 207377.

And this is just on 23 and 24.

Right?

A.     Uh-huh.  Correct.  Yeah.

(O'Brien Exhibit 15 marked for identification.)

QUESTIONS BY MS. INSOGNA:





Page 203



Page 204







Page 208

















Page 216





Page 218



Q.    Okay.  Let's turn to page 35 of

your report.

Okay.  And this is the section of your -- the analysis on Brunner's gland histopathology.

Right?

A.    Yes.

Q.    Okay.  And in the first sentence of your second paragraph you say, "Brunner's glands contain high levels of GLP-1 receptors, so I expected to see a minor effect on these glands."

Is that right?

A.    That is correct.

Q.    And when you say "minor," you mean you were expecting to see an effect on --

A.    Correct.

Q.    -- these glands?

A.    Yes.  I wasn't sure how big the effect would be, but I thought that there would be an effect.

Q.    Okay.  Great.

And then you say, "After reviewing the cumulative data, I was surprised when I saw the magnitude and extent

Page 220

of Brunner's gland hypertrophy and related findings in various animal species, study design, sex and ages."

Is that right?

A.    That is correct.

Q.    Okay.  And that's, again, based on what you have cited in your report and in your materials considered list?

A.    Yes.

Q.    Okay.  And you say, "In my opinion, the repeated Brunner's gland findings in treated animals provides a gastrointestinal signal that is relevant for humans."

A.    Yes.

Q.    Is the pattern of Brunner's gland hypertrophy on imaging typically a cobblestone visual?

A.    So it depends on what species you're looking at.  And if you're talking about in humans, some of the papers can describe a multitude of shapes or formations that it could form.  Cobblestone's one that's described, but it really depends on the nature of the outgrowth of these Brunner's

Page 221

glands.  They can -- it can do a number of shapes.

Q.     Is there -- what would you expect to see in a human?

A.     With Brunner's gland hyperplasia?

Any number of things.  I mean, from these reports, it depends on what imaging you're doing.  If you're doing endoscopy, potentially you would find, if you think of the intestine as a tubular structure, I would expect something from the mucosa or the innermost lining of the GI tract to have an asymmetric proliferation of cells, soft tissue, into the lumen.  We call that a mass effect, so it's not technically like -- it doesn't mean that it's neoplasia. It could be.  They'd need to do a biopsy.

But it's basically narrowing the lumina of your GI tract, and potentially it could be obstructing the flow of food from one part of the GI tract to the other, which then could lead to other issues as we can see in some of the reports that I've mentioned.

The big one that I would

Page 222

mention would be the Behera, et al., 2024 paper, which is on the -- it's on page 37, the last paragraph.

So in that case, in a 12-year-old boy, they found this, you know, Brunner's gland hypertrophy, and they -- this boy, from this hypertrophy, it led to intestinal obstruction.  Histopath from surgical biopsies of the duodenum, the first part of your small intestine, confirmed Brunner's gland hyperplasia -- sorry, I'm going back and forth between the terms -- with no evidence of atypia or malignancy, which struck me as interesting because a lot of the Brunner's gland hypertrophy we saw here didn't mention cellular atypia or malignancy.

And they said just hyperplasia of the Brunner's gland alone was sufficient to cause several weeks of intermittent abdominal pain after meals, bilious vomiting, marked abdominal bloating, and eventual surgery due to intestinal obstruction.

The surgery was pursued due to risk of perforation of the intestine.

Page 223

MR. PENNOCK:  Slow down a little bit.

THE WITNESS:  Okay.  Sorry.

And when they performed imaging, two types of imaging, they identified a large mass, obstructing more than half of the lumen of the duodenum.

And so the authors conclude that even just this Brunner's gland hypertrophy, with no cellular atypia, no malignancy, has the potential to cause upper GI bleeding, duodenal obstruction or intussusception, which is the telescoping of the intestine.

QUESTIONS BY MS. INSOGNA:

Q.    Thank you.

And so looking at the citations you've got here on page 36, in the second sentence you say, "Brunner's gland hypertrophy can lead to significant symptoms, including gastrointestinal bleeding, abdominal pain and intestinal obstruction." And then you've got 71 through 78 as your citations.

Page 224

Is that right?

A.    Correct.

Q.    Okay.  And all of these relate to nodes, tumors or polyps.

Correct?

A.    Correct.

Q.    Okay.

And so I just want to make sure I understand how your opinion fits in here.

A.    So, for example --

MR. PENNOCK:  Hold on.

MS. INSOGNA:  Sorry.

THE WITNESS:  Sorry.

QUESTIONS BY MS. INSOGNA:

Q.    In the larger scheme of this litigation.

So you're saying that the Brunner's gland hypertrophy can cause a mass of cells which can lead to intestinal obstruction.

Is that right?

A.    Yes.

Q.    Okay.  Do you have an opinion on whether that is the mechanism by which the plaintiffs in this litigation who are

Page 225

alleging intestinal obstruction after GLP-1 use -- I can -- I can repeat that because I think my -- I think my inflection was off, and so that's what was confusing.

So let me try that again.  I got the whole question out, but I'll reread it.  I'm sorry.

Okay.  Do you have an opinion on whether that is the mechanism by which the plaintiffs in this litigation who are alleging intestinal obstruction after GLP-1 use were injured?

A.    I think it's a possibility.

Q.    Okay.

A.    But I don't know those cases firsthand to know exactly what was going on.

Q.    Okay.  And so I just want to be clear.

You haven't done any analysis to compare your opinion here as to Brunner's gland hypertrophy in animals and the potential outcome of intestinal obstruction in humans.

Right?

A.    Well, as I've showed, there are

Page 226

papers that have this, you know, Brunner's gland hypertrophy that then led to obstruction.  So that was the most -- comparing -- like finding papers in animals or in people that led to this.

Q.    So the people study was 80 -- is your citation 85.

Correct?

A.    Yes.  I would say that's one of them.

But, I mean, even 71 on page 36, the title of the paper is "Brunner's Gland Hyperplasia" and how, you know, the downstream effects of just hyperplasia, what that can do.

Nodular -- then 72, "Nodular Hyperplasia Brunner's Glands.  So I would say those in addition.

Q.    Okay.  And so that is -- those studies form the basis of your opinion that the Brunner's gland hypertrophy findings that you've highlighted in your report here may be relevant to humans taking GLP-1s?

A.    Correct.

Q.    Okay.  Do you have an opinion,

to a reasonable degree of scientific certainty, that this is the mechanism?

A.    I think this is a potential mechanism.

Q.    So --

A.    So, yes, if there was a degree of veterinary scientific certainty, it's entirely possible to get an intestinal obstruction from Brunner's gland hyperplasia when it forms a mass effect.

Q.    Okay.  And so I just want to be clear that your opinion is to a reasonable degree of veterinary and scientific certainty, that Brunner's gland hyperplasia following GLP-1 use can cause an intestinal obstruction in humans.

That's your opinion in this litigation?

MR. PENNOCK:  It's -- I'll just object.

Do you see it anywhere?  Huh?

MS. INSOGNA:  I just --

MR. PENNOCK:  You asked him, and he said, I think it's a possibility.

Page 228

MS. INSOGNA:  Okay.

QUESTIONS BY MS. INSOGNA:

Q.    I just want to confirm -- it's okay if it's not your opinion.  It's okay if it's not your opinion.  So I just -- I just need to make sure that I know the boundaries of what your opinion is in this litigation.

A.    Okay.

Q.    That's why I'm asking.

A.    Yes.

Q.    So let me ask it again, and you can just answer.

A.    Okay.

MR. PENNOCK:  I'm going to object as asked and answered before you even start.  He's answered it twice.  He said it was a possibility.  He said twice that he thought it was a possibility.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  So your opinion is, is to a reasonable degree of veterinary and scientific certainty that it is a possibility that Brunner's gland hyperplasia following GLP-1 use can cause intestinal obstruction in

Page 229

humans?

A.    Yes.

Q.    Okay.  And that is reflected in the citations in your report here?

A.    Yes.

Q.    Okay.  Did you find any studies reporting an association between GLP-1 use and the mass effect that you described with respect to Brunner's gland hyperplasia?

MR. PENNOCK:  In humans?

MS. INSOGNA:  Yes.

THE WITNESS:  Give me one second.

No, sorry, I thought I had -- I thought I had two case reports, but maybe it was for a different topic.

So, no, not -- not to my knowledge.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Thank you.

Last -- what I think will be the last question.

Your sentence here where it says, "Brunner's gland hypertrophy can lead to significant symptoms, including

Page 230

gastrointestinal bleeding, abdominal bleeding and intestinal obstruction," you agree that it doesn't have an impact on ileus.

Correct?

A.      Technically, I don't see why it couldn't.  If it causes an obstruction, it's preventing the flow of food from one part of your GI to the other, so it could.

Q.      Well, to go back to your definition of ileus, which is the peristalsis.

A.      Yeah.

Q.      So your opinion that it could have an impact on ileus would simply be as a function of causing an intestinal obstruction and not independently causing ileus.

Correct?

A.      For Brunner's gland hypertrophy, yes.  Yeah.

MS. INSOGNA:  Okay.  Okay.  I think I'm done, and we can -- I'll let Renee ask questions.

Do you want to go off the record?

VIDEOGRAPHER:  We're going to

go off the record at 2:19.

(Off the record at 2:19 p.m.)

VIDEOGRAPHER:  Back on the
record.  The time is 2:28 p.m.

(O'Brien Exhibits 16 and 17
marked for identification.)

DIRECT EXAMINATION

QUESTIONS BY MS. SMITH:

Q.    Good afternoon, Dr. O'Brien.
How are you doing?

A.    I'm okay.

Q.    Good.  We're in the homestretch
now.  I met you a little bit earlier, but my
name is Renee Smith, and I represent Eli
Lilly in this case.

A.    Okay.

Q.    And you've been retained by
plaintiff's lawyers in this case.

Correct?

A.    Yes.

Q.    And you've been retained to
offer expert opinions.

Correct?

A.    Yes.

Q.    And we've handed you what has

Page 232

been marked as Exhibit 16.

Do you have that in front of you?

A.    Yes.

Q.    And is that a copy of the report you did for -- as to Eli Lilly in this case?

A.    Yes.

Q.    Is that report in Exhibit 16 a complete and accurate statement of the opinions and the bases of your opinions in this case?

A.    Yes.

I do have minor edits to bring up.

Q.    Okay.

A.    I can do that?

Q.    Yes.

A.    Okay.  So just for one thing, on the last page it's meant to say 2026 instead of 2025 for January 2nd.  So, yeah, that was from this year.

Q.    Happens to the best of us. Okay.

A.    And then in addition, on --

hold on. Let me just find it.

Okay. On page 4, the Review of the Manufacturer-Affiliated Discovery, so this is a typo. I meant to the say in the second sentence, "Nonclinical testing programs," instead of semaglutide and liraglutide, it's dulaglutide and tirzepatide.

And therefore -- let me just get it on mine. The references -- you can just strike reference 1, 4 through 7. And that should be everything.

Q.    Okay. Any other corrections to Exhibit 16?

A.    Not that I know of.

Q.    Okay. And then you should also have in front of you Exhibit 17.

Do you have that in front of you?

A.    Yes.

Q.    And is that a list of the materials you considered in forming your opinions as to Lilly in this case?

A.    Yes.

Q.    And is that list complete and

Page 234

accurate as of today?

A.    Yes.

Q.    And you discussed with Ms. Insogna some of the methods you used to develop your opinions in this case.

You recall some of those questions?

A.    Yes.

Q.    Is it fair to say that you used the same methodology for both your opinions as to Lilly and your opinions as to Novo in this case?

A.    Correct.  My methodology hadn't changed.

Q.    Okay.  And is it correct your preparation for the deposition and things like that that Ms. Insogna asked you about, that was the same for Lilly and for Novo.

Is that correct?

A.    Correct.

Q.    Okay.  And was the methodology you used to select documents and things like that, was that the same whether it was Lilly or Novo?

A.    Correct.

Page 235

Q.   See, look at all this time we saved.  Excellent.

All right.  If you could look at your expert report, Exhibit 16, and page 2 of that report.

Do you have that in front of you?

A.   Yes.

Q.   And in Section 2 at the bottom of page 2, you have a list of your Assignments and Materials Considered.

Is that correct?

A.   Yes.

Q.   And is that an accurate list of the assignments and what you were asked to consider in this case?

A.   Yes.

Q.   And I think when Ms. Insogna was asking you some questions, either you stated or Mr. Pennock clarified that you were not offering opinions regarding risks to humans in your report.

Is that correct?

A.   That is correct.

Q.   And is that correct as to

Lilly, meaning is it correct you are not offering opinions as regards to the risks of Lilly medicines in humans?

A.    Correct.

Q.    And in point 5 of the Assignment and Materials Considered, you have the statement, "Whether there was a signal for gastrointestinal injury" based on some of the studies you referred to above.

Is that correct?

A.    Yes.

Q.    And when you say "signal," do you mean a signal for gastrointestinal injury in animals or humans or --

A.    In animals.

Q.    And on page 3 of your report, you have a Summary of Opinions.

Are you there?

A.    Yes.

Q.    And you note that in your -- the dulaglutide and tirzepatide nonclinical studies indicated a potential risk for gastrointestinal injuries.

Is that correct?

A.    Yes.

Q.      And when you say "potential risks," is that a potential risk for gastrointestinal injuries in animals?

A.      In animals.

Q.      Is it a potential risk for gastro -- excuse me, gastrointestinal injuries in humans?

A.      A possibility, but this -- my study is based on the nonclinical trials.

Q.      Okay.  And is it fair to say that as you're forming your opinions, your opinions may raise possibilities for humans, but you're not offering opinions as to whether, in fact, there is a risk in humans for these issues.

Is that correct?

A.      Correct.

Q.      And you note there's a potential risk for gastrointestinal injuries, and you list certain things for dulaglutide.

Do you see that?

A.      Yes.

Q.      And you say, "Dulaglutide is associated with vomiting, diarrhea, gastric inflammation, gastric infiltrates and gastric

Page 238

epithelial hyperplasia in nonhuman primates of both sexes at various hormone" -- excuse me, "various exposure levels."

Is that correct?

A.    Yes.

Q.    And is that what you found?  Is that your opinion?

A.    Yes.

Q.    And you also note that dulaglutide is associated with the formation of hemorrhage, erosions and/or ulcerations and inflammation in the stomach of rats of both sexes at various exposure levels.

And is that your opinion as well?

A.    Yes.

Q.    You then separately note some gastrointestinal injuries that you opine tirzepatide is associated with.

Is that correct?

A.    Yes.

Q.    And that includes formation of erosions and/or ulcerations and neutrophilic inflammation in the stomach of rats in both sexes at high exposure levels and with the

Page 239

formation of gastric erosions, ulcerations,

inflammation, degeneration and necrosis of

duodenal ulcerations/perforation and necrosis

in rabbits of both sexes at various exposure

levels.

          Is that correct?

     A.     Yes.

     Q.     And is it correct that the

potential risk for gastrointestinal injuries

you found was not exactly the same between

dulaglutide and tirzepatide?

     A.     Correct.  There were some --

there were some overlap, but there were also

some things specific to each of the drugs.

     Q.     And is that surprising to you?

     A.     Not necessarily.

     Q.     Why not?

     A.     I mean, if you're going to get

the same side effects or -- you know, the

drugs are different for a reason, so they're

all going to come with their different

adverse effects.  So I'm not surprised that

some, you know, maybe cause ulcerations and

the others might not.  Just the nature of the

molecule.

Page 240

Q.      And is it correct that for your summary of opinions for the Novo expert report, which I believe is Exhibit 1 -- and page 3 of Exhibit 1, you have a summary of opinions.

Is that correct?

A.      That is correct.

Q.      And you have some opinions about what semaglutide indicates a potential risk for.

Is that correct?

A.      That is correct.

Q.      And you note that semaglutide is associated with causing Brunner's gland hypertrophy in various animal species in both sexes at various exposure levels.

Is that correct?

A.      That is correct.

Q.      And is it correct that you did not find in a report an association between dulaglutide and Brunner's gland hypertrophy in the materials you reviewed for Lilly medicines?

A.      Correct.

Q.      In your expert report, page --

Page 241

Exhibit 16, on page 3 -- this is for Lilly's report.

Are you there?

A.    Yes.

Q.    You have in Section 4 that you conducted a literature search.

Is that correct?

A.    Yes.

Q.    And you list that you searched literature discussing, for example, gastrointestinal complications, gastroparesis and ileus.

Is that correct?

A.    Yes.

Q.    And is it correct that you did not diagnose any animal -- or did not find a diagnosis in any animal with gastroparesis or ileus?

A.    No.  But as I said for Ms. Insogna, the -- there were no experiments performed to really clarify if there was gastroparesis, and I don't believe they also looked for ileus.  So I didn't find them, but I don't think they were tested for.

Q.    And for you, as a veterinarian,

Page 242

to diagnose an animal with, say, ileus, would you need to look at something beyond tissue slides?

A.    Oh, I mean, it would be helpful to see the macroscopic changes as well.

Q.    Okay.

A.    Sometimes, also, you know, whenever we get a case submission for a postmortem exam, we have a completed history or, you know, what their referring vet had found.

So sometimes it's helpful to get the history from the owner, from the vet, to say, oh, they haven't passed a bowel movement in a while, or they're eating but no bowel movement.

So, yeah, all of that together.

Q.    And so would part of the diagnosis include, for example, a clinical -- and I use the term "clinical" to include animal here -- a clinical exam of the animal, either by you or by someone you're relying on?

A.    Yes, that would help.

Q.    Do you agree -- I think you

Page 243

noted that each of -- or at least the medicines we're discussing here may have some differences.

Is that correct?

A.    That is correct.

Q.    And do you agree because each of these medicines is unique, the best evidence of specific effects of a medicine would be derived from a study of that specific medicine?

A.    Correct.

Q.    Okay.  Do you know if the GLP-1 medicines at issue here have different half-lives?

A.    I do not know offhand, no.

Q.    Would it surprise you if they did?

A.    Not necessarily.

Q.    Okay.  And do you know whether the GLP-1s at issue here -- and by GLP-1s, I'm going to use it just broadly meaning both Lilly and Novo medicines, if that's okay?

A.    Yeah.

Q.    Do you know if they target all the same receptors in the body?

Page 244

A.    It's my understanding that a GLP-1 receptor -- or a GLP-1 receptor agonist would still affect the same receptors.  So -- or there's still a possibility to affect the same receptors.

Q.    Okay.  Is it fair to say in forming your opinion in this case you didn't specifically analyze the mechanism of action of each of the Lilly and Novo medicines you opined on?

A.    No.

Q.    And one of the studies you rely on is a study by Liu, L-i-u.

Is that correct?

A.    Do you know what reference that would be?  Let me just see.  One second.

Oh, I see.  The 2022 paper, "Association between different GLP-1 receptor agonists and gastrointestinal adverse reactions: a real-world disproportionality study based on FDA adverse event reporting system database."

Q.    Yes.  Yes.  Sorry, I should have had it at the ready.  But, yes, that's the study I was talking about.  I'm happy to

show it to you.  But I'll ask you a question, and if you want to see it, that's obviously fine.

But is it correct that is one of the studies that I think you may have been discussing some meta-analyses with Ms. Insogna, and was that an example of one of the human -- studies looking at humans that you had looked at in forming your opinions in this case?

A.    Yes.

Q.    And do you recall if, in fact, Dr. Liu found that different adverse events happened at different rates depending on the medicine at issue?

A.    Yes.  Yeah, they even state that between January 2018 and 2022, a total of 231,730 GLP-1-associated adverse effects were recorded.  21,000 of those were gastrointestinal-related.  And of these, 50 -- over 50 percent of them were for dulaglutide.

(O'Brien Exhibit 18 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.    And among those -- actually, why don't we just pull it out so we can look at it.

Could you pull Tab 38, which I think will be Exhibit 18?

And do you have Exhibit 18 in front of you, Dr. O'Brien?

A.    I do.

Q.    And is this the Dr. Liu article that you reference in your report?

A.    Correct.

Q.    And this is an article that you reviewed in forming your opinions in this case.

Is that correct?

A.    That is correct.

Q.    And if you look at page 6 of Exhibit 18?

A.    Yes.

Q.    Do you see at the left column, the first full paragraph that begins "simultaneously"?

A.    Yes.

Q.    And do you see there's a

discussion of the different risks that Dr. Liu found for different kinds of gastrointestinal events?

Correct?

A.    Correct.

Q.    So, for example, Dr. Liu found that semaglutide had the highest risk of nausea, diarrhea, vomiting and constipation.

Correct?

A.    Correct.

Q.    Whereas liraglutide had the greatest risk of abdominal pain.

Correct?

A.    Correct.

Q.    And those are just some examples.  The numbers were different depending on the medicine.

Right?

A.    Correct.

Q.    And did you also review, in forming your opinions in this case, an article by Dr. Xie, X-i-e?

A.    Yes.

Q.    And was that another -- I think that may have been a meta-analysis you

Page 248

referred to with Ms. Insogna.

Is that correct?

A.   That is correct.

Q.   And do you recall if that study also found different incidence rates in gastrointestinal events depending on the medicine at issue?

A.   They did.

Q.   One of the things you discuss in your report are safety signals.

Is that right?

A.   Yes.

Q.   And is it correct a safety signal refers to a concern about excess adverse events compared to what would be expected with an associated product?

A.   Correct.

Q.   And do you know if the events or gastrointestinal injuries you discuss in your report, do you know if by the time those studies were completed, were those already expected events associated with the products at issue?

MR. PENNOCK:  Objection.

Page 249

QUESTIONS BY MS. SMITH:

Q.    Let me try to fix the question.

So I think you opined that there's a signal of gastrointestinal injury for GLP-1s.

Correct?

A.    Yes.

Q.    Do you know if what -- if certain gastrointestinal events were already expected to be associated with GLP-1 medicines before these -- before these nonclinical trials ever happened?

A.    I don't recall.

Q.    And you would do --

MR. PENNOCK:  Can we go off the record a second?

MS. SMITH:  Yes, of course.

MR. PENNOCK:  Just pause.

MS. SMITH:  No problem.

VIDEOGRAPHER:  Going off the record at 2:46 p.m.

(Off the record at 2:46 p.m.)

VIDEOGRAPHER:  We're back on the record at 2:48 p.m.

Page 250

QUESTIONS BY MS. SMITH:

Q.    And you agree, Dr. O'Brien, that signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event.

Is that correct?

A.    That's correct.

Q.    And is it correct that after a signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be taken?

A.    That is correct.

Q.    And I think in the Liu report, which you discuss at page 9 of your report, Dr. Liu reports the most frequently reported adverse events were gastrointestinal adverse drug reactions including nausea, diarrhea, vomiting and upper abdominal pain.

Is that right?

A.    That is correct.

Q.    And do you know, are you aware that from day one, the label for dulaglutide, which is Trulicity, from the first day it was

on the market, that it specifically noted that the most common adverse reactions were nausea, diarrhea, vomiting, abdominal pain and decreased appetite?

A.   I didn't know it was from day one.

Q.   Okay.  Do you know if Mounjaro, which is tirzepatide, do you know if from day one when Mounjaro was approved that it included a list of the most common adverse reactions, and they included nausea, diarrhea, decreased appetite, vomiting, constipation, dyspepsia and abdominal pain?

A.   I did not know it was from day one.

Q.   Okay.  Do you -- let me put it this way.

Do you know that now the label --

A.   Yes.

Q.   And do you understand the label for Zepbound, which is the -- another name for tirzepatide, has a similar, like --

A.   Yes.  And I know that the labels will say that those effects are more

Page 252

likely as you're titrating a dose.

Q.    Okay.  And do you have any reason to -- or do you -- you don't offer an opinion in this case that that's -- if there is that statement, that that's inaccurate.

Correct?

A.    If what statement is inaccurate?

MR. PENNOCK:  And not --

QUESTIONS BY MS. SMITH:

Q.    So let me -- I'll try to ask it better.

So you noted that there was also a statement, you believe, in the labels about the effects are more likely as you're titrating a dose?

A.    Oh, right.  Yes.

Q.    Okay.  And is it correct you are not offering an opinion in this case as to whether or not that statement is accurate?

A.    Oh, no.

Q.    Okay.  It's not something you've studied for this case?

A.    Yeah.  Yeah.

Q.    I believe already discussed,

Page 253

you have not worked for the FDA.

Correct?

A.    No.

Q.    And I think you noted you were working on a submission, or had worked on a submission, to the FDA for a human drug product.

Correct?

A.    Correct.

Q.    And is it correct that the FDA, in addition to regulating human drugs, also regulates animal drugs?

A.    Yes.

Q.    And have you submitted, or worked on anything submitted, to the FDA for an animal drug going through the approval process?

A.    Not that I recall.  I'll say no.

Q.    And is it correct that for the development of human drugs, the FDA generally requires human studies in addition to animal studies?

A.    Correct.

Q.    And there's a rare exception to

Page 254

that for, like, bioterrorism or something like that, but generally humans are required.

Is that right?

A.   Correct.

Q.   You mentioned, and quite frankly, my favorite part of your testimony so far, about the primate on Ozempic.

A.   Yes.

Q.   I love the Kim Kardashian reference.

Do you know if the Ozempic that that primate was being administered, do you know if Ozempic is approved for use in animals?

A.   Ooh, offhand, I'd have to check on that.

I know that in some cases zoos tend -- or they can use things off-label just to try to save the animal.  So I don't know for certain because I'm not prescribing it myself.

Q.   And so is it correct, you don't know if that primate received it as part of a study or --

A.   Oh, it's not part of a study.

Yeah.

Q.    Not part -- okay.

Would you agree that animal studies can raise hypotheses or possibilities about risks in humans?

A.    Yes.

Q.    But is it correct they cannot necessarily definitively establish quantitative or qualitative effects of medicines in humans?

A.    Yes.  I would say they just raise the possibilities of signals that you would then further look into.

Q.    And is it correct that even among animals who are studied, there may be inconsistencies across animal test species?

A.    Yes, I agree there's, like, inter-animal variability.

Q.    For example, a chemical may be carcinogenic in mice but not in rats?

A.    Correct.

Q.    And is it correct that a chemical may be carcinogenic in rodents but not in humans?

A.    Correct.

Page 256

Q.    And is it also correct that in many cases animal studies use -- the medicines used in animal studies are at higher doses than would be used in human studies?

A.    Not always.

Q.    Okay.  Would you agree that the animal studies often include doses substantially higher than concentrations to which humans would be exposed?

A.    I don't know about the frequency, but typically you'll have, you know, a control group, maybe a vehicle group, a low-dose, maybe a mid-dose, a high-dose. So the high-dose could be well above the recommended maximum dosage for a person, but it would vary on the -- on the study.

Q.    Do you agree that human studies cannot be completely substituted by animal studies for human medicines?

A.    I agree in that I think the most accurate results would come from studying the species to which you're going to prescribe medicine.

Q.    I believe when you testified

Page 257

with Ms. Insogna you discussed how sometimes you may have been involved in something where nonanimal studies or substitutes for animal studies were going to be submitted to the FDA, but the FDA actually required animal studies.

Is that right?

A.      Yeah.  Yes.

Q.      And are you aware of whether the FDA is taking steps to move toward using less animal studies?

A.      I don't know about the FDA, but I do know that at least at the University of Pennsylvania where I currently work, that it is our goal.

(O'Brien Exhibit 19 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.      And do you have Exhibit 19 in front of you?

A.      I do.  Yes.

Q.      So this is fresh out --

A.      Yeah.

Q.      -- from the FDA.

A.      Yeah.

Page 258

Q.    And I understand that you probably haven't seen it before, but it's the FDA draft guidance on considerations for the use of new approach methodologies in drug development from March 2026.

Do you have that?

A.    I do.

Q.    And if you go to page -- feel free to look as much as you want, but I just -- I'm going to ask you one question, which is, in the background section on page 2.

Are you there?

A.    I am.

Q.    Okay.  And you see in this guidance, which is a draft, the draft guidance at the very end of that paragraph says, "Although animal toxicity studies have previously been relied upon to assess the potential risks to human health from drug products, the development and use of reliable NAMs," which stands for new approach methodologies, "furthers an important FDA priority to reduce and replace animal testing while advancing predictive toxicology using

human-centric methods."

Did I read that correctly?

A.   You did.  Yeah.

This is a big topic in the lab animal medicine field.

Q.   Okay.  And is this consistent with what you were discussing about UPenn is --

A.   Exactly.  So what you just mentioned before with the reducing and replacing, that's two Rs.  We call it the three Rs.  But, yeah, it's what we're discussing.

(O'Brien Exhibit 20 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.   I'm handing you as Exhibit 20 an article that you cite in your report by Vahle, V-a-h-l-e, called the "Effects of GLP-1 Receptor Agonist Dulaglutide on the Structure of the Exocrine Pancreas of Cynomolgus Monkeys."

Got that article?

A.   Yes.

Q.   And is that an article that you

Page 260

reviewed in forming your opinion in this case?

A.    I'm just trying to find the -- oh, yes, I see.  Yep.

Q.    Okay.  And this article addresses at least one, I think, of the five or six studies -- dulaglutide studies that you specifically discuss in your report.

Is that correct?

A.    Yes.

Q.    And if you could go to page 2 of the study, the left-hand column, you see the first full paragraph is discussing what I believe is the very first study you discuss.

A.    Uh-huh.

Q.    And that study discusses that -- the doses for the injection, and it says, "This dose represents approximately 500 times the maximum recommended" --

A.    Wait.  Sorry.  Which paragraph are you on now?

Q.    Oh, I'm so sorry.  It's -- I'm sorry.  It's the left page -- it's --

A.    Not the "in routine chronic" --

Q.    It is that one, but it's

Page 261

further down.

A.     Oh, okay.

Q.     So take your time looking at the thing.

But what I'm going to ask you about, just so you know, is what it says about the dose compared to humans.

A.     Oh, I see.  Right.  Yeah.

Q.     Are you there?

A.     Yes.

Q.     Okay.  And does this study say that the dose represents approximately 500 times the maximum recommended human dose based on plasma exposure?

A.     Yes.

Q.     And do you have any reason to disagree with that analysis?

A.     I do not.  No.

The only thing that I remember from, you know, choosing this paper is that, again, it didn't really highlight anything apart from functional terms of GI findings. I was hoping it would have something more pathologic-forward in terms of necroscopy, but, yeah.

Page 262

Q.    Are you aware that in developing nonclinical studies for submission for human trials that there are certain guidelines, international guidelines?

A.    Yes.

Q.    Okay.  And one of those guidelines is the ICH Harmonised Guideline M3(R2) for Nonclinical Safety Studies for the Conduct of Human Trials and Marketing Authorization for Pharmaceuticals?

A.    Yes.

Q.    Did you review that guideline in forming your opinions in this case?

A.    Not that I recall.

Q.    Did you form any opinions in this case that any of the Lilly studies you reviewed violated those guidelines?

A.    Not that I recall.

Q.    I know you discussed with Ms. Insogna a little bit about the phases of drug development, that the nonclinical studies, for example, come generally before at least the first human exposure.

Correct?

A.    Correct.

Page 263

Q.    And I won't go over all of that again, I promise.  But I think Ms. Insogna discussed with you something called an IND, or an investigational new drug, application.

Is that correct?

A.    Correct.

Q.    Did you review any of the investigational new drug applications for any of the Lilly medicines discussed in your report?

A.    Not that I recall.

Q.    Do you know when Trulicity was first approved to be on the market by the FDA?

A.    I do not.

Q.    If I said it was September of 2014, any reason to disagree with that?

A.    No.

Q.    Okay.  Did you know that the IND, meaning the investigational new drug, application was submitted to the FDA in 2005?

A.    That doesn't surprise me.

Q.    And why doesn't that surprise you?

A.    Because I know that it takes

Page 264

several years to even get a drug to the market or even to a stage that could go to market.  So it doesn't surprise me that it took, you know, roughly nine, ten years.

Q.    And is it correct that you did not review any communications with the FDA and Lilly regarding their investigational new drug submission?

A.    Correct.

Q.    And is it correct you did not, aside from the specific -- the reports that you provided in your report, that you didn't review specific back-and-forth between the FDA and Lilly as they were discussing things like the preclinical testing program?

A.    Correct.

Q.    Are you aware that if the FDA had required additional information, or wanted additional information on, say, the nonclinical studies, that it could ask for them?

A.    Yes.

Q.    Do you know if the FDA asked for -- so, for example, you had mentioned some tissue slides, if they asked for tissue

Page 265

slides from Lilly?

A.    I do not recall if they did.

Q.    Do you have any reason to doubt that if they asked for such slides, Lilly would have given them to them if they --

A.    I think they would have given them to them.

Q.    One of the materials you reviewed in forming your opinions in this case was the portion of the new drug application, the NDA, for Trulicity, and that was the nonclinical portion.

Correct?

A.    Correct.

Q.    And that was the FDA's review.

Correct?

A.    Correct.

(O'Brien Exhibit 21 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.    Dr. O'Brien, I'm handing you what is marked as Exhibit 21, which is the -- that is the FDA's -- the pharmacology, toxicology BLA review and evaluation for dulaglutide.

Page 266

Is that correct?

A.    Yes.

Q.    And what is -- do you know what a BLA is?

A.    I do not recall.

Q.    And I'll just represent to you that my understanding is it's -- instead of a new drug application, it's a biological license application, but it's the same process.  So if I use "BLA," you know what I'm referring to?

A.    Sure.

Q.    Okay.  And if you go to the first -- what I'll say is kind of the first real page of Exhibit 21, it's kind of at the title page.  There you go.

And do you see it's got a list of -- sorry.  Actually, go to the -- if you don't mind, go to the very, very first page, like right when you flip on the cover.

And do you see there is -- it says, "Tertiary Pharmacology/Toxicology Review."

A.    Yes.

Q.    And you see the introductory

Page 267

comments say, "The pharmacology/toxicology reviewer and supervisor concluded that the nonclinical data support approval of dulaglutide for the indication listed above."

Is that correct?

A.      Yes.

Q.      And do you see --

MR. PENNOCK:  Just note my objection to the last question.  Only because --

MS. SMITH:  No, you're fine.

QUESTIONS BY MS. SMITH:

Q.      Okay.  And you see it's from Timothy J. McGovern, Ph.D.?

A.      Yes.

Q.      Do you know who Dr. McGovern is?

A.      I do not.

Q.      Do you know that he was the former president of the Society of Toxicology?

A.      I did not.

Q.      Do you have any reason to believe that Dr. McGovern was not qualified to review and assess the preclinical

Page 268

materials submitted by Lilly?

MR. PENNOCK:  Objection.

THE WITNESS:  I do not at this time just from his background.

QUESTIONS BY MS. SMITH:

Q.    And then if you go to the -- what I'll call the first kind of real cover page that I directed you to before.

And do you see that has some additional names of people who participated in the pharmacology, toxicology review?

A.    Correct.

Q.    And one of those persons is the Timothy Hummer.

Correct?

A.    Yes.

Q.    Do you know anything about Dr. Hummer?

A.    Just that the -- his denotation of the Diplomate at the American Boards for Toxicology.

Q.    And what does that mean?

A.    It means that while there's no official residency program for it, by experience route, if you have enough, you

know, experience and cases and knowledge of studying for toxicology, you can sit the boards exam.  And then that denotation means he's passed his boards exam for toxicology.

Q.    Okay.  And you have that same denotation, too.

Is that correct?

A.    I do not have that.  Mine is for veterinary pathology, but it's something that I can attain if I wanted.  If I worked in a pharmaceutical company where I would have the caseload for that.

Q.    And is it -- do you know any of the reviewers or people listed, for example, on this page, page 1, in front of you?

A.    I do not.

Q.    And is it fair to say that you are not offering an opinion that any of these reviewers were not qualified to conduct the pharmacology, toxicology review of Trulicity?

A.    I am not, just from looking at their names.

Q.    In your report, which is Exhibit 16 for Lilly, at page 4 --

A.    Sorry, my report?

Q.    I'm sorry.  I'm so sorry.
Yeah.  So we can sit exhibit whatever that
was aside.

A.    Yeah.

Q.    I apologize.

We'll go back to Dr. O'Brien's
Lilly report, Exhibit 16.

And at page 4, there's a
Section 5, Review of Manufacturer-Affiliated
Discovery and Development Papers on GLP-1
Receptor Agonists in Animals.

Correct?

A.    Correct.

Q.    And you've already -- and I
appreciate this -- given the correction that
in the first sentence, instead of saying
semaglutide and liraglutide, it should be
dulaglutide and tirzepatide.

Is that correct?

A.    Correct.

Q.    Okay.  And then I think you
also noted that that would make some of the
footnotes not --

A.    Relevant.

Q.    -- relevant.

Page 271

Okay.  And I think if I -- if I wrote it down correctly, did you say that footnote 3 was still relevant or not?  That's the Park study.

A.    Oh, yes, that would be irrelevant, too, because we're not talking about exenatide.

Q.    So is it fair to say for this section in these footnotes, the only study that's specific to a Lilly medicine is footnote 2, the Vahle study that we discussed already?

A.    Yes.

And then in general, GLPs for footnote 8.

Q.    Okay.  And do you know if footnote 8 refers to a study by Model, M-o-d-e-l?

A.    Correct.  Yeah.

Q.    And does that study review or reference any Lilly medicine?

A.    That, I cannot remember.  I chose it particularly because it mentioned in general GLP-1s in animals.

(O'Brien Exhibit 22 marked for

Page 272

identification.)

QUESTIONS BY MS. SMITH:

Q.    Okay.  I'm handing you Exhibit 22, which is the Model study.  And as everyone will tell you, this is not a memory test, so --

A.    I don't think --

Q.    Oh, is that not the same one?

A.    No, this is the exenatide. This is number 3, I think.

Q.    Let's see.  We're confusing you by giving you the wrong study.  I'm sorry.

Is what we've now handed you as Exhibit 22 the article cited in footnote 8 at page 4 of your Lilly report?

A.    Correct.

Q.    And take your time looking at it, but I do just want to confirm.  I don't believe the study actually examines either dulaglutide or tirzepatide, but if you could please confirm that.

A.    They don't -- actually, hold on.  They do talk about Eli Lilly, actually, but they're -- sorry.  I guess the reason I was including exenatide was because it was an

Page 273

Eli Lilly product at first, but I know we're not talking about that.

But, yes, this one, in the context of Eli Lilly, it was about the exenatide product, because they do mention of the however many drugs they were studying, a few of them were from Eli Lilly on page 5 of this document.

Q.   Fair point.  And thank you for that.  That's a very good clarification.  So let me try to make my question better.  I think my question was not precise either.

But let me ask it this way. Aside from Vahle --

A.   Right.

Q.   -- at footnote 2, are there any other studies that you discuss in this section that included analysis and review of either dulaglutide or tirzepatide?

A.   No, not from the studies.

Q.   Is it correct that all of the nonclinical studies you discuss in your report were provided to the FDA?

A.   Sorry, one more time?

Q.   No, no problem.

In your report, you discuss a number of nonclinical Eli -- studies on either tirzepatide or dulaglutide.

Correct?

A.    Yes.

Q.    And is it correct the reports you were looking at are actually the reports that were submitted to the FDA as well?

A.    I believe so.

Q.    Would you -- would you agree that as a researcher, when different research studies reach different conclusions about toxicity, it's helpful to explain how those differing results are taken into account in forming an opinion?

MR. PENNOCK:  Objection.

THE WITNESS:  I think, yes, but also it probably warrants another study to see, you know, what results the third study got.

QUESTIONS BY MS. SMITH:

Q.    And if we go to your Lilly report at page 7 -- and you discuss a methodology, and I promise I will not review the methodology with you.

Page 275

But it does say you determined that hundreds of nonclinical studies were performed to support the approval of Trulicity, Mounjaro and Zepbound.

Correct?

A.   Where -- yes.  Yes.  I see that now.

Q.   Okay.  And is that an accurate statement, that there were hundreds of nonclinical studies performed to support the approval of Trulicity, Mounjaro and Zepbound?

A.   Yeah, I can't remember the exact number, but from my reviews, at least the ones I've included in the materials considered, were, again, like, repeat-dose studies.  So of those, I can't remember how many there were.

Q.   Right.

But -- and to be fair, you're very candid in saying you selected certain studies based on certain criteria.

Correct?

A.   Yes.

Q.   And you also note in that same paragraph that "while there were not

Page 276

concerning gastrointestinal findings in every study I received, I found sufficient evidence of severe gastrointestinal injury in animals of various species, sex and ages to support my opinion that a gastrointestinal signal did exist."

Is that right?

A.     Yes.

Q.     And then you note you provide summaries of some of those most relevant studies.

Correct?

A.     Correct.

Q.     Is it correct that you, in your report, do not provide summaries of the studies that did not have concerning gastrointestinal findings?

A.     Not that I -- there might have been.  Again, similar to what I discussed with Ms. Insogna, there might have been ones that I included that just highlight in my mind poor laboratory practice but maybe not a particular gastrointestinal signal.

Q.     Okay.  Did you include in your report a discussion of any study that didn't

Page 277

support your opinion of a gastrointestinal signal or poor laboratory practices?

MR. PENNOCK:  Objection.

THE WITNESS:  One second.

Yes, there was one study that I've included that is a carcinogenicity study on page 15 of my report.  It's 8203405.

So on page 16 of my report, I write down that -- my last paragraph I'll just read aloud.

"So of note, regarding the incidences of inflammation within the stomach, while there seems to be a treatment-related difference in the nonglandular stomach, this is not the case for the glandular stomach. Although there is no evidence of inflammation within the nonglandular stomachs of control animals, there is inflammation within the glandular stomach in 3 out of 80 control animals.  Therefore, for this particular study, gastric inflammation may not represent a gastrointestinal

Page 278

signal."

QUESTIONS BY MS. SMITH:

Q.     Is it correct in the paragraph above, however, you note that -- you discuss studies and you say, "Considering both male and female rats from the treated group showed evidence of these gastric and duo" -- "duodenal macroscopic and microscopic lesions, which were absent in control group rats, this suggests treatment-related and potentially dose-related pathology"?

A.     So in that case, regarding the small intestine or the duodenum, yes.  But regarding the gastric inflammation, no.

Q.     Okay.  So at least some of the findings in the study you believe support your opinion.

Correct?

A.     Oh, yes.  Yes.

Q.     Of the nonclinical studies you reviewed, it is correct there are studies from which you didn't find any concerning gastrointestinal findings.

Right?

A.     Correct.  However, not to

Page 279

discount those studies at all, the reason I'm -- and the same thing I said for Ms. Insogna, is the reason that I'm saying in my summary of opinions that there's an association between these drugs and some of the, you know, GI lesions or GI signal is because I can't ignore what I already see in some of our treated groups that may not be present in the control groups.

So because of that, I can't discount them, even though in other papers there might not be any GI lesion at all.

Q.    In your report, is it correct you don't quantify the number of studies in which you didn't find concerning findings versus those in which you did?

A.    No, I also don't think I quantified the ones that did have signals, so I don't think I quantified it at all.

Q.    Is it correct that in your report you don't address the data from those studies where there were no findings of any gastrointestinal injury?

MR. PENNOCK:  Objection.

THE WITNESS:  Can you read that

Page 280

back to me, please?

QUESTIONS BY MS. SMITH:

Q.    Yeah.  Yes, of course.  I'm sorry.  Yes.

Is it correct that in your report you don't discuss or provide charts of studies where you didn't find any concerning findings?

A.    Not that I recall.

Q.    Okay.  Let's talk about some of the dulaglutide studies, if we could.

A.    Uh-huh.

Q.    At page 8 of your report, you note that -- oh, sorry.  You asked to review nonclinical study reports and summaries for the repeat-dose toxicity and carcinogenicity studies included in Eli Lilly's Trulicity BLA 125469 to assess the above-mentioned observational gastrointestinal effects.

Correct?

A.    Correct.

Q.    And then you provide below study findings most relevant to the issue at hand.

Is that correct?

A.    That is correct.

Q.    Okay.  And again, all of the studies we're about to discuss are studies that were provided to the FDA.

Is that correct?

A.    That is my understanding, yes.

Q.    Okay.  And you looked at the Trulicity --

A.    I did.

Q.    -- nonclinical review.

Correct?

A.    Yes.

Q.    And that's -- and it included those studies.

Correct?

A.    To my knowledge, yes.

Page 282



Page 283







Page 286



Page 287











Page 292



Page 293



Page 294

Q.    And in fact, that is what --
actually, I'll leave that question.

So I'm happy to keep going,
we've been going about an hour, but I'm happy
to take a break.  Whatever y'all want.

Should we go a little longer?

We'll get through the studies.
Not that they're not fun.  That was the
longest one.  I promise.

Let's move to the next study on
your report, if we could, which is discussed
beginning at page 11, study 7608-236.

A.    Yes.

Page 295

Q.    And that is A Repeat-Dose Toxicity and Toxicokinetic Study in Rats Given LY2189265 Twice Weekly by Subcutaneous Injection for 6 Months with 1 Month Recovery.

Correct?

A.    Yes.

(O'Brien Exhibit 24 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.    Okay.  And this study was -- and we're happy to give it to you, but -- and maybe we'll mark it.

And I'm going to hand you Exhibit 24, which again is only an excerpt of the 2,018 pages of the study.

And is it correct, this study is dated January 19, 2010?

A.    Yes.

Q.    And when you discuss this study in your report at page 11, for example, you are citing information that was presented in FDA's nonclinical review.

Is that right?

A.    Yes.

Q.    And therefore the information

Page 296

you're presenting in your report, the FDA obviously had that information.

Correct?

A.    Yes.  So for pages 64 and 69, those were of the FDA nonclinical review.

And then for page 262, that should be in this study, Exhibit 24.

Q.    I apologize if we already asked this.

But is it correct you don't know what the half-life is of dulaglutide?

A.    That is correct.

Q.    And in your report, your expert report, at page 12 you note in the very top,

Q.    And is it correct in forming your opinions in this case, as I think you told Ms. Insogna, you're not offering an opinion whether, in fact, any potential gastrointestinal effects are reversible or not reversible in humans?

A.    That is correct.

Q.    And in your report at page 8, at the top where -- the very first sen -- excuse me, para -- excuse me, paragraph under Trulicity.

Do you have that?

A.    Yes.

Q.    And that is citing the FDA's nonclinical review for Trulicity.

Correct?

A.    Yes.

Q.    And you state, and you're quoting the FDA, saying, "Observed gastrointestinal effects were transient."

Is that correct?

A.    That is correct.

Q.    And that is a quote from the

Page 298

FDA.

Correct?

A.    Correct.

Q.    And are you offering an opinion that that FDA finding was wrong?

MR. PENNOCK:  Objection.

THE WITNESS:  I'm offering an opinion that these gastrointestinal effects were still present in the recovered animals.  I don't know how long to wait for it to be considered transient versus not.

QUESTIONS BY MS. SMITH:

Q.    So is it correct for your opinions in this case you are not offering an opinion to a reasonable degree of scientific certainty that the FDA's conclusion that the observed gastrointestinal effects were transient was incorrect?

MR. PENNOCK:  Objection.

THE WITNESS:  To the best of my ability, that is correct.







Q.      And is it correct the people who were working on this report were doing it in connection with a -- with submission to the FDA?

Right?

A.      That's my understanding.

Q.      It was a preclinical study for submission to the FDA.

Correct?

A.      Yes.

Q.      And you personally, aside from the one recent event you have, have not worked on reports that would be submitted to the FDA.

Correct?

A.      That is correct.

(O'Brien Exhibit 26 marked for identification.)

QUESTIONS BY MS. SMITH:





████      ████      ██████████████      ██████████

Q.    No, I'm sorry to interrupt you.

And in fact, the FDA took that into account in their pharmacology review.

Is that correct?

A.    I can't remember offhand.

Q.    So if we could go back to -- and I -- forgive me, I don't know -- Exhibit 21, which is the FDA pharmacology review.

And if you could turn to page 4 -- 47?

A.    Okay.

Q.    Okay.  And is it correct that the FDA report notes that the sponsor, meaning Lilly --

Do you understand the sponsor would be Eli Lilly?

A.    Yes.

Q.    Okay.

-- concluded that the no -- NOAEL, N-O-A-E-L, which that stands for no-observed-adverse-effect level --

Is that correct?

A.    Yes.

Page 306

Q.   -- was 20 milligrams per kilogram.

Correct?

A.   Yes.

Q.   And in fact, the FDA reviewers felt that the treatment-related effects on body weight and reproductive organs at 20 milligrams per kilogram were adverse, and therefore the NOAEL, N-O-A-E-L, was considered to be 6 milligrams per kilograms.

Correct?

A.   Yes.

Q.   Is it correct that the FDA determined the NOAEL should be lower than what Lilly suggested it be?

A.   Correct.

Q.   What does that mean?  What does a NOAEL mean?

A.   It means that they're trying to form a basis -- or the study or the FDA is trying to form a basis for what would be a maximum threshold of a drug before you start to see side effects or adverse effects.  So they're trying to work out maybe a max therapeutic dose before you get into a toxic

Page 307

level of a drug.

Q.      And does a lower NOAEL -- is a lower NOAEL a more conservative approach, meaning you assume an even lower dose could have an adverse effect?

A.      Do I assume a lower dose --

Q.      So if -- is it correct that the lower the NOAEL, kind of the more conservative the approach is, meaning you're assuming even at a lower dose you might have an adverse effect?

A.      Typically.

Q.      And at page 13 of your expert report, Exhibit 16, you note that in your opin -- this is the very last sentence.  "In my opinion, this was a compound-related finding that warranted additional follow-up before placing the product on the marketplace for human use."

        Is that correct?

A.      That is correct.

Q.      And again, this study was dated 2005.  So this study was nine years before the FDA approved Trulicity.

        Correct?

Page 308

A.      That is correct.

Q.      And in fact, wasn't there lots and lots and lots of follow-up after that?

MR. PENNOCK:  Objection.

THE WITNESS:  There was follow-up after that.

QUESTIONS BY MS. SMITH:

Q.      And that follow-up would have included clinical studies in humans.

Correct?

A.      Hopefully, yes.

Q.    And this is an example of where the FDA looked at something and made a different decision than what the sponsor suggested.

Correct?

A.    Correct.

Q.    And there's nothing wrong with the FDA doing that.

Right?

A.    Oh, no.  No.  I would prefer if they do that.

Page 310



Q.    And the FDA also reviewed the study and -- in their review and noted that one monkey was sacrificed on day 17. Is that correct?

A.    That is correct.

Q.    And is it correct that the FDA set the NOAEL, N-O-A-E-L, based on this finding?

And if you want to look at the FDA review, I think it's on page 72.

A.    Of 21?  The --

Q.    Yes.

A.    Okay.

Q.    And I can ask the question again once you have it.

A.    Page 72.  Correct.

Q.    One more study and then we'll take a break, if that's okay.

MR. PENNOCK:  Sure.

MS. SMITH:  Are you okay to go one more?

THE WITNESS:  Yeah, certain -- was there a point to the -- sorry.

QUESTIONS BY MS. SMITH:

Q.    People often ask that in response to my question.  But, no, that's good.  You answered the question.



Page 312

Q.    And in your review of the materials, did you see any concern from the FDA about this not adequately having been reviewed?

A.    I did not.



Q. Is it correct you are not offering an opinion in this case that any of the GLP-1 medicines here are carcinogenic?

A. No.





Page 316

Q.    Okay.  Do you have any basis for -- to believe that there are different gastrointestinal effects in animals depending on the sex of the animal?

A.    I do.

Q.    Okay.

A.    And just to use pigs as an example, I was part of a research study that was published in Microbiome a few years ago that looked at pigs.  But we looked at the parity number, which just means how often they've given birth.  And so if they have only given birth once, it's a parity of one.  If they've never given birth, a parity score of zero.  We went up to nine.

So in that case, depending on if these animals were bred or not, their microbiomes are different, and they had different organisms making up their GI tract.  And that had effects on, you know, how their immune system tolerated different diets or, you know, anything that a microbiome should do.  They had different bacterial makeups that made some more resistant to certain

Page 317

things than others.

So I do think that there are sex-specific differences, regardless of whether an animal has been impregnated before.

Q.    And is it correct, have you done any specific research on whether that is the case with rats?

A.    Not with rats.

Q.    Is it correct that the FDA reviewed this carcinogenicity study?

A.    That's my --

MR. PENNOCK:  Objection.

QUESTIONS BY MS. SMITH:

Q.    Okay.  And is it correct you know that because you saw it referred to in the FDA review?

Correct?

A.    Correct.

Q.    Okay.  And is it correct the FDA, in the review, actually noted the finding of lesions?

A.    To my understanding, either the study authors or FDA, they referred to the lesions as incidental background lesions, not

compound-related.

MS. SMITH:  Okay.  If it's okay with you, we could take a break.

MR. PENNOCK:  Okay.

VIDEOGRAPHER:  We're going off the record, 4:05 p.m.

(Off the record at 4:05 p.m.)

VIDEOGRAPHER:  Back on the record at 4:19 p.m.

(O'Brien Exhibit 29 marked for identification.)

QUESTIONS BY MS. SMITH:

Q.    Okay.  Dr. O'Brien, we're now going to talk about the two tirzepatide studies that you specifically discussed in your report.

Okay?

A.    Okay.

Q.    And in front of you, you should have Exhibit 29?

A.    Yes.

Page 319



Q.    Is it correct you do not do an analysis of whether these events were statistically significant?

A.    That is correct, because I don't think getting statistical significance

as far as finding a signal is always performed or expected.

Q.    And is that because a signal is an indication to do further investigation?

A.    Exactly.

Page 321







Page 324



Page 325



Q.   And is it correct, again, just to be clear, you're not offering any opinion on reproductive effects of GLP-1s?

A.   I am not.

Q.   In animals or humans?

A.   I am not.









Page 330



MS. SMITH:  If you give me one moment, I might be done.

VIDEOGRAPHER:  You want to go off the record?

MS. SMITH:  We can stay on.

Could we go off, I promise you, one millisecond?

VIDEOGRAPHER:  We're going off the record at 4:33 p.m.

(Off the record at 4:33 p.m.)

VIDEOGRAPHER:  We're back on the record at 4:34 p.m.

QUESTIONS BY MS. SMITH:

Q.    Dr. O'Brien, could we go back to your expert report, please?  And page 3 under Summary of Findings.

A.    Yes.

Q.    In summary -- excuse me, Summary of Opinions.

Do you see that?

A.    Yes.

Q.    In opinion number 2 you state, "Eli Lilly either failed to acknowledge or downplayed the significance of these findings in their reports, citing to conclusory alternate explanations such as spontaneous lesions and lack of human relevance, without providing sufficient justification to discard these findings."

Did I read that correctly?

A.    Yes.

Q.    And I just want to clarify one

Page 332

thing on that.

Your use of the word "discard," you're not saying the findings were discarded, thrown away.

Right?

A.    Oh, no, no, no.  Not thrown away.  Just as in they maybe weren't taken seriously.

Q.    Okay.  And they were in the study reports, correct --

A.    Correct.

Q.    -- the findings?

And they were provided to the FDA.

Correct?

A.    Correct.

MS. SMITH:  Okay.  Thank you.  That's all I have at this time.

THE WITNESS:  Okay.

CROSS-EXAMINATION

QUESTIONS BY MR. PENNOCK:

Q.    Okay.  I have a few questions, Doctor, sort of several different areas, but it shouldn't take too long.

Okay.  First question.  Do you

Page 333

remember questions earlier today as to whether or not there were findings of ileus in any of the laboratory animals looked at in the Novo studies?

A.    I remember the question.

Q.    What, if anything, did you see in the Novo study reports that you looked at regarding the Novo scientists looking for ileus in those studies?

A.    I did not find the study pathologists to be looking for ileus at all, which was my understanding why I did not find evidence of that in the studies.

Q.    Next question.  There was a discussion regarding your post-report conversion of the doses used in the animal studies in the Novo studies to see how they corresponded to human therapeutic doses.

Do you recall that discussion?

A.    I do.

Q.    Okay.  What, if any, necessity was there for you, when you were evaluating the studies prior to finalizing your report, to calculate the corresponding human dose for the doses utilized in the Novo animal

studies?

A.   Oh, I mean, as I mentioned previously, I -- that knowledge wasn't necessary for me to make my opinions and write my report.  Simply that I -- it was a curiosity of mine after finalizing the report, you know, if there was any similarity between the maximum tolerated doses in people.

But, no, this was not necessary for me to figure out if there were potential gastrointestinal signals in the reports.  I trust that the doses that were chosen for these studies were chosen by a team of people that were evaluating what would be, you know, a therapeutic dose range, a toxic dose range and then, you know, lower than a therapeutic range.

So I didn't question the doses at that point.  It was merely just for my curiosity after the fact.

Q.   So when you were evaluating the question you were asked to evaluate, what, if any, necessity was there for you to look at the human therapeutic dose in comparison to

Page 335

the doses used in the studies?

A.     What necessity was there?

Q.     Yeah.  Was there any necessity to do that to evaluate and conduct a signal analysis on these animal studies?

A.     No, not that I think.  I mean, I was just seeing this collection of studies in general.  You know, I'm just really focusing on are there lesions that are particularly present in the high-dose group or the low and high-dose group that are absent in the control groups.

But I don't need to know that it's, you know, the same dose that we give to people to figure that out.  So that wasn't really necessary for me in making my report.

Q.     And when you say "I don't need to know," are you -- is that a standard that is applicable across the board with veterinary histopathologists looking at animal evidence?

A.     Yes.  I would say that across the board with veterinary pathologists reading these studies, that that's not a piece of information that's needed to figure

out if there was a potential signal in a study.

Q. Okay. Let's see. You were asked some questions about the magnitude of the association that you found with regard to the evidence in the Novo studies.

Do you remember that?

A. Yes.

Q. Okay. Now, I think you -- withdrawn.

You testified in response to Ms. Insogna's question that you did not calculate a magnitude of the association that you have opined existed in the animal evidence that you were talking about earlier today.

Do you remember that?

A. I do remember that.

Q. Okay. Why is it that you did not calculate a magnitude of the association when looking at this animal evidence for signal evaluation?

A. Well, for just evaluating a signal, it doesn't -- I don't think it's necessary for me or for veterinary

Page 337

pathologists in general reading just a single study, for example, to calculate something like that.  So in order to figure out if there was a signal or an association, I don't think it's necessary to calculate that.

If we were looking for actual, I don't know, statistical significance or like a causal relationship rather than an association, then maybe it would be more necessary.  But just for figuring out a signal, I don't think it's necessary to calculate that.

Q.   Okay.  I have just -- I want to show you what was marked as Exhibit 5 to your deposition.

Do you have an exhibit tab, next exhibit?

A.   Yes.

Q.   Do you remember looking at that document?

A.   Yes.

(O'Brien Exhibit 31 marked for identification.)

QUESTIONS BY MR. PENNOCK:

Q.   I'm going to mark as Exhibit 31

Page 338

to your deposition -- do you have another copy of this?

MS. INSOGNA:  What is it?

Are you trying to say this is related to this document?

MR. PENNOCK:  We'll see.

MS. INSOGNA:  I would like a copy.

QUESTIONS BY MR. PENNOCK:

Q.    Do you remember -- okay.  Let me show you what's been marked as Exhibit 31.  And I have -- also putting in front of you Exhibit 5.  I've marked 31.

And do you have Exhibit 4?

A.    I -- yes.  Hold -- yes.

Q.    Okay.  Number 4, Exhibit 4, is what?

A.    This is my materials considered list.

Q.    Okay.  And you remember looking at Exhibit 5 that Novo's counsel showed you earlier.

Correct?

A.    Correct.

Q.    Okay.  Now, when you were shown

Exhibit 5 and you first looked at it, what,
if anything, did you evaluate as to your
prior review of that document?

A.    It didn't -- it didn't seem as
familiar to me, but then again, I reviewed
tens of thousands of pages.  So I was trying
to figure out why I would have referenced
this, but it didn't ring a strong bell for
me.

Q.    So do you remember, when you
were first shown Exhibit 5, the Bates number?

Do you remember the
discussion -- maybe it was going over your
head --

A.    Yes.

Q.    -- but that it wasn't marked
with a Bates number?

A.    Yes.  Yeah.  It was 6 down from
my Novo, I think.

Q.    Okay.  Do you remember a
discussion about there not being a Bates
number?

A.    Oh, yes.  Yes.  Yes.

Q.    And then at some point, at a
break later, it was substituted with this one

Page 340

with the Bates number?

A.      Yes.  Yes.

Q.      Do you remember that?

A.      Yes.  I remember that.

Q.      So when you were looking at it and testifying about Exhibit 5 -- if you go to page 4 of your materials considered list --

A.      Yes.

Q.      -- do you see that?

A.      Yeah.

Q.      Okay.  So also, there was some reference to your -- the exhibits that you -- I'm sorry, the materials considered list numbering them out.

Do you remember that --

A.      Yes.

Q.      -- during that questioning?

A.      Yeah.

Q.      Now, what's marked as Exhibit 4, your materials considered list, does that have any numbers on it where you numbered out the different --

A.      I did not.

Q.      Okay.  It just listed what the

order of -- well, there's no numbers corresponding to each column.

Right?

A.   Yeah.  Correct.





Page 342

Q.    Okay.  So when you were shown
Exhibit 5, this single-page whatever it is,

Page 343

adverse event report -- is that what that is?

Do you know what Exhibit 5 is?

A.    So this is -- this is what I was trying to place, because I also don't remember reading something that was almost 30,000 pages.  But again, I reviewed a lot of things.  But, no, it didn't really ring a strong bell for me.

Q.    Okay.  Well, let me -- when you were shown this document at first, before the Bates number one was substituted, defense counsel, Novo's counsel, read you a Bates number off.

Do you remember that?

A.    Yes.

Q.    Okay.  So I want you to take a look at the Bates number on Exhibit 5 and compare it, if you would, to the Bates number on Exhibit 31.

A.    That -- the actual number portion is identical.

Q.    The numbered portion on both is --

A.    Is, you know, five zeros and then 8762.

Page 344

Q.    Okay.

A.    And then there's an additional two acronyms in the paper that I'm more familiar with that are absent from Exhibit 5. So Exhibit 31 has two additional sets of letters.

Q.    What about the first three acronyms?

A.    Completely the same.

Q.    So the first three acronyms on Exhibit 31 are identical to the letter acronyms on Exhibit 5.

Correct?

A.    Correct.

Q.    But there are two additional acronyms on Exhibit 31?

A.    Correct.

Q.    And then the same set of numbers?

A.    Correct.

Q.    Okay.  And if you look at your materials exhibit list, the sixth reference down under Novo?

A.    Yeah.

Q.    Okay.  And the number that's

Page 345

listed there with the acronyms, which document does that correspond to?

A.      This corresponds to exhibit --

MS. INSOGNA:  Object to form.

QUESTIONS BY MR. PENNOCK:

Q.      Huh?

A.      Exhibit 5.

Q.      Exhibit 5.

Okay.  In looking at these two documents and comparing the Bates numbers, what, if anything, do you conclude regarding the document that was supposed to be listed on your materials considered list?

A.      That there was a typo in generating the list.

Q.      How so?

A.      In that instead of -- it should have been Novo_GLP_MDL_OZM_IND_ that same exact number sequence.  So because the OZM and IND acronyms were omitted, it's showing Exhibit 5 as a reference rather than Exhibit 31.

Q.      Okay.  Thanks for helping me hopefully clear that up.

Okay.  One last -- few

Page 346

questions.

Okay.  Sir, earlier today, Novo's counsel asked you some questions about the interstitial cells of Cajal findings.

Do you recall that?

A.    Yes.

MS. INSOGNA:  Object to form.

QUESTIONS BY MR. PENNOCK:

Q.    Do you have any recollection of that discussion?

A.    I do.

Q.    All right.  Let's see.

And at one point do you recall being asked the following question and giving the following answer?

This is at page 77, line 2, of the deposition that's reflected on the realtime.

"Question:  Okay.  So no preclinical studies show ICC damages after GLP-1 use.  Correct?

"Answer:  It would be impossible."

A.    Oh.

Q.    Okay.  Could you please explain

what your view is as to why there was no ICC, interstitial cells of Cajal, damage findings in the Novo trials that you reviewed?

A.    Yes.  So when I say "impossible," I don't mean impossible in general to figure that out.

I mean from the data that was collected for those sets of studies, there was not enough data in those studies to support that there were reduction or some sort of damage to the interstitial cells of Cajal because additional studies involving the immunohistochemistry for c-Kit weren't performed.  So you can still do if you had the paraffin blocks and do those IHC tests.

So, impossible, I just meant from what I was given, there's no way the study pathologists in that particular study or studies could have figured that out.  They would need to do an additional series of tests.

Q.    And could you describe what those additional series of tests would be if you had the paraffin blocks?

A.    Oh, yeah.  So you would

basically ask the histology lab to cut using an instrument known as a microtome blade. It takes the wax block, it cuts, you know, 5-micron sections of tissue, so, you know, less than a millimeter. Make it into a slide.

And then before you stain it with our typical hemotoxin eosin stain, you put it through a machine that will have an antibody that you choose in advance, in this case c-Kit, that's specific for interstitial cells of Cajal.

It takes a few hours to run, and then I get the slides back. And if it's -- any interstitial cell of Cajal that's present will be highlighted in a brown color. Anything that's not ICC would be a light blue, which denotes a negative or that it's not ICC.

I would compare -- I would do that also for the control animals and basically compare the quantity. You can even use a -- like an image analysis software, something if you want to count by hand, to figure out the numbers between ICCs and the

control to that of the treatment groups and see if there's any consistency with what their reports are showing -- or the peer-reviewed papers are showing for animals and in people.

Q.     So what, if anything, would you conclude if you found, after doing these studies on the tissue block, that there was damage to interstitial cells of Cajal?

MS. INSOGNA:  Object to form.

THE WITNESS:  Sorry, what --

QUESTIONS BY MR. PENNOCK:

Q.     What, if anything, would you conclude if you conducted these studies and found that there was damage in the treated group in their interstitial cells of Cajal?

A.     Yeah.

MS. INSOGNA:  Object to form.

THE WITNESS:  So I would say based on the research studies, mostly included in my report for Novo, Exhibit 1, that it would be consistent with -- or highly suggestive, consistent with gastroparesis because this is one of the most pathonomic

Page 350

findings for gastroparesis or most consistent finding.

So if I saw damage or a reduction in numbers of the ICCs in the treated animals compared to control, then I would feel fairly confident that that's an example of gastroparesis.

MR. PENNOCK:  Okay.  Thank you. I have no further questions.  I'll pass the witness.

REDIRECT EXAMINATION

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  I'm going to ask a few more questions just based on what you went through.

First off, based on the conversation with Exhibit 4, 5 and 31, I just want to confirm.  You've identified a typo in your materials considered list.

Is that right?

A.    Correct.

Q.    Okay.  That's the only error that you've identified.

Correct?

Page 351

A.      Correct.

Q.      Okay.

A.      And only during the process of this.

Q.      Okay.  Everything else is accurate?

A.      To my knowledge, yeah.  Yeah.

Q.      Okay.  So none of the others are missing?

A.      No.

Q.      Okay.

A.      Not to my knowledge.

Q.      Missing additional information in the Bates numbers?

A.      No, not to my knowledge.  No.

Q.      Okay.  Thank you.

        And so just to confirm, based -- the Bates numbers of the documents listed in there, with the exception of that one correction, are the universe of information you reviewed in reaching your opinions here today?

A.      Correct.

Q.      Thank you.

        Okay.  As to the ICC cells, are

Page 352

you aware of whether ICC damage is permanent?

A.    I cannot recall, to be honest. However, similarly, I -- if it was -- if it was reversible, you would have to stop taking the drug to see if, you know, they -- those cells were able to proliferate again or, you know, come back.

But I cannot recall.

Q.    Okay.  So based on any of the other data that you reviewed and cited in your report, do you have an opinion about whether ICC cellular damage is permanent or reversible?

MR. PENNOCK:  In these animals?

MS. INSOGNA:  (Nods head.)

THE WITNESS:  In these animals, I'm not -- I'm not certain.

It depends -- so the reason I say that, it depends on the organ you're looking at.  If you have, let's say, a heart attack, those cardiac cells can't regenerate, so you're replacing it with scar tissue.

I don't know for certain if that's the same thing with the ICCs,

Page 353

if they're replaced with scar tissue

or not.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  Sorry, let me just grab

my report.

Okay.  So -- okay.  So the

material that you cited in section -- titled

Importance of Interstitial Cells of Cajal in

your report on pages 37, 38 and 39 of the

Novo report, I just want to confirm.  You

don't know whether reflected in those studies

there's information about whether any damage

to ICC is permanent or reversible.

Correct?

A.    I cannot recall.

Q.    Okay.  And so if you had the

blocks that you posit, you could get -- that

would only show a potential signal.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I mean, it would

show whether or not there was a change

to the quantity and the quality, I

guess, of the ICCs.

QUESTIONS BY MS. INSOGNA:

Q.    And that may or may not be a signal?

MR. PENNOCK:  Objection.

THE WITNESS:  Based on the reports referenced, that appears to be a signal only because it seems consistent -- or the most consistent finding with gastroparesis.

QUESTIONS BY MS. INSOGNA:

Q.    In animals?

A.    Oh, sorry.  Well, actually, in both, but we're just talking about animals.

So some of the papers I reference talk about this finding in people with gastroparesis due to diabetes.

Q.    Okay.  And so I just want to make sure I understand what you would be saying these hypothetical slides that you could have gotten would show.

A.    Ah.

Q.    If you got those slides --

A.    Yeah.

Q.    -- that you were talking about here on your direct exam, that would only

Page 355

show a signal, at most, in animals.

Correct?

MR. PENNOCK:  Objection.

THE WITNESS:  Yeah, I want to say more than a signal, but at least a signal.

QUESTIONS BY MS. INSOGNA:

Q.    Okay.  And a signal, as you've testified here, would simply warrant further investigation.

Correct?

A.    Yes.  Yes.

Q.    Okay.  And so if you had those slides and it showed some ICC cellular damage, you wouldn't confirm based on that that the animal had gastroparesis.

Correct?

A.    I would say that it's highly likely they did.  Just because of the association, I would say this warrants further evaluation or further studies or repeat studies to better evaluate this.  But I would say just based on the reports that I've cited that it seems like a consistent finding generally with people and with

Page 356

animals with gastroparesis.

Q.    Okay.  And so your opinion is based on the references you have cited here between footnotes 86 and 92 of your report.

Correct?

A.    Correct.

MR. PENNOCK:  Objection.

THE WITNESS:  Correct.

MS. INSOGNA:  Okay.  I think we're -- I think we're done.

You're done?

I think we're done.  Okay.

VIDEOGRAPHER:  Okay.  This ends today's deposition.  We're going to go off the record at 5:01 p.m.

(Deposition concluded at 5:01 p.m.)

- - - - - - -

                          CERTIFICATE

          I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Kevin O'Brien, VMD, MVetMed, DACVP, MRCVS, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

          I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

          I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.


          _____
          CARRIE A. CAMPBELL,
          NCRA Registered Diplomate Reporter
          Certified Realtime Reporter
          California Certified Shorthand
          Reporter #13921
          Missouri Certified Court Reporter #859
          Illinois Certified Shorthand Reporter
          #084-004229
          Texas Certified Shorthand Reporter #9328
          Kansas Certified Court Reporter #1715
          New Jersey Certified Court Reporter
          #30XI00242600
          Louisiana Certified Court Reporter
          #2021012
          Notary Public
          Dated:  April 1, 2026

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ACKNOWLEDGMENT OF DEPONENT

I, _____Kevin O'Brien_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_KOB_

_____
Kevin O'Brien, VMD, MVetMed, DACVP, MRCVS DATE

Subscribed and sworn to before me this

_____1st_____ day of _____May_____, 20 __26__.

My commission expires: _____

Notary Public

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

Page 360

- - - - - - -
                            ERRATA
- - - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

Page 361

- - - - - - -
LAWYER'S NOTES
- - - - - - -

PAGE    LINE