# EXHIBIT 35D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------)

IN RE:  GLUCAGON-LIKE            ) CIVIL ACTION

PEPTIDE-1 RECEPTOR AGONISTS     )

(GLP-1 RAS) PRODUCTS             )

LIABILITY LITIGATION             ) MDL No. 3094

                                 ) 24-md-3094

------------------------------)

THIS DOCUMENT RELATES TO:       ) HON. KAREN

ALL ACTIONS/ALL CASES            ) SPENCER MARSTON

------------------------------ )

VIDEOTAPED DEPOSITION OF JOSEPH R. PISEGNA, M.D.

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 31, 2026

8:58 A.M.

Job No.: 3135

Pages: 1 - 200

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Deposition of JOSEPH R. PISEGNA, M.D., held at the offices of:

MORGAN & MORGAN, P.A.

12300 Wilshire Boulevard

Suite 200

Los Angeles, California

Pursuant to notice, before Leslie Anne Todd, California Certified Shorthand Reporter in and for the State of California, who officiated in administering the oath to the witness.

A P P E A R A N C E S


ON BEHALF OF PLAINTIFFS:

      STACY HAUER, ESQUIRE
      shauer@johnsonbecker.com
      JOHNSON BECKER
      444 Cedar Street
      Suite 1800
      St. Paul, Minnesota 55101
      (800) 279-6386

      BETHEL KASSA, ESQUIRE (via Zoom)
      KIMBERLY HORSLEY, ESQUIRE (via Zoom)
      bkassa@forthepeople.com
      khorsley@forthepeople.com
      MORGAN & MORGAN, P.A.
      20 M Street S.E.
      Suite 600
      Washington, DC 20003
      (202) 772-0560

      BRIDGET WHOLEY, ESQUIRE (via Zoom)
      bwholey@goldmanismail.com
      GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM
      191 North Wacker Drive
      Suite 3000
      Chicago, Illinois  60606
      (312) 681-6000


ON BEHALF OF ELI LILLY AND COMPANY:

      MARK PREMO-HOPKINS, ESQUIRE
      DAISY ALMONTE, ESQUIRE
      MYRA FAROOQI, ESQUIRE (via Zoom)
      mark.premohopkins@kirkland.com
      daisy.almonte@kirkland.com
      myra.farooqi@kirkland.com
      KIRKLAND & ELLIS LLP
      555 California Street
      San Francisco, California 94104
      (415) 439-1400

APPEARANCES (Continued):


ON BEHALF OF NOVO NORDISK:

        ANTONIOUS E. SADEK, PHARMD., ESQUIRE
           (via Zoom)
        antonious.sadek@dlapiper.com
        DLA PIPER
        One Liberty Place
        1650 Market Street, Suite 5000
        Philadelphia, Pennsylvania 19103-7300
        (215) 656-3300


ALSO PRESENT:

        NOA RAITER (via Zoom)
        DAVID KIM, Videographer

                    C O N T E N T S

EXAMINATION OF JOSEPH R. PISEGNA, M.D.          PAGE

     By Mr. Premo-Hopkins                          8




                    E X H I B I T S

               (Attached to transcript)

PISEGNA DEPOSITION EXHIBITS                      PAGE

No. 1      Expert Opinion Report by Joseph R.

           Pisegna, M.D.                           11

No. 2      Appendix C - Materials Considered       11

No. 3      Article entitled "Clinical

           Consequences of Delayed Gastric

           Emptying with GLP-1 Receptor

           Agonists and Tirzepatide"               61

No. 4      AGA Abstract: "Tirzepatide shows

           lower risk of gastrointestinal

           side effects compared to other

           glucagon-like peptide GLP-1

           receptor agonists:  A real world

           analysis of over one million

           patients" by Jabber                    152

E X H I B I T S

(Attached to transcript)

PISEGNA DEPOSITION EXHIBITS                                    PAGE

No. 5        Manuscript entitled "Comparative

             Gastrointestinal safety of

             Dulaglutide, semaglutide and

             tirzepatide in adults with

             Type 2 diabetes"                                  156

No. 6        Diabetes article entitled "GIP

             Receptor Agonism Attenuates

             GLP-1 Receptor Agonist-Induced

             Nausea and Emesis in Preclinical

             Models"                                           162

No. 7        Research letter entitled "A long-

             acting glucose-dependent

             insulinotropic polypeptide

             receptor agonist improves the

             gastrointestinal tolerability of

             glucagon-like peptide-1 receptor

             agonist therapy"                                  169

No. 8        Invoice of Joseph R. Pisegna, M.D.

             January 29, 2026                                  186

P R O C E E D I N G S

------------------

THE VIDEOGRAPHER:  We are now on the record.  Today is March 31st, 2026, and the time is 8:58 a.m.

My name is David Kim.  I'm a videographer for Hartford Reporting & Technology.

This deposition is being taken in In Re Glucagon-Like Peptide 1 Receptor Agonists Products Liability Litigation, Case Number MDL Number 309424-MD-3094, for the U.S. District Court, the Eastern District of Pennsylvania.

The deponent is Joseph Pisegna.

All counsel will be noted on the stenographic record.

The court reporter today is Leslie Todd, CSR Number 5129, and she will now swear in the witness.

JOSEPH R. PISEGNA, M.D. having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PREMO-HOPKINS:

Q.     Good morning, Dr. Pisegna.

A.     Good morning.

Q.     My name is Mark Premo-Hopkins.  I introduced myself off the record, but I'll do it again on the record.

I represent Eli Lilly in a series of cases that allege injury from GLP-1 medications.  I'm going to be asking you some questions today.

Do you understand that?

A.     Yes.

Q.     Have you given a deposition before?

A.     Yes.

Q.     Have you given a deposition as an expert before?

A.     Yes.

Q.     How many times?

A.     Once.

Q.     So just a few sort of ground rules for today.  I'm going to do my very best to let you finish answering your question before I speak.  And for our court reporter,

can you do the same for me? We shouldn't be talking over each other. She can only take down one person at a time.

Do you understand that?

A. Yes.

Q. It's important that you understand my questions today. So if you don't, we're going to be -- we're going to be talking in your area of expertise more than mine, so if you don't understand a question I ask, would you let me know?

A. Yes.

Q. And if you answer a question without asking me to clarify it, I'm going to assume that you understood it; is that fair?

A. Yes, that's fair.

Q. Is there any reason that you can't give complete, honest answers to my questions today?

A. No.

Q. Dr. Pisegna, you've issued an expert report in this matter; is that right?

A. Yes.

Q. And it -- you may recall it was issued in early January of this year. Does

that sound right?

A.    That sounds about right. January 2nd or so.

Q.    When do you recall first getting retained or being asked to work on this matter?

A.    In -- over the summer.  I think I was first contacted in June 2025.  And then I had a meeting, I think it was, at the end of June 2025.  And then, officially, I think I was notified -- I think it was in August.  I don't really -- I don't remember the dates exactly, but I think it was about August 2025.

Q.    August of 2025 is when you would have considered yourself to have really started in earnest on your work in this case?

A.    It was towards the -- probably I started working in probably September, because I was on vacation at the end of August 2025. And I think we had a Zoom call.  I know I was overseas, and I probably really started working on it in September 2025, just because I was on a family trip, and, you know, I wasn't going to spend my family trip reviewing articles.

Q.    Understood.  Understood.

Let's mark your report.  You don't have anything with you today, like --

A.    No.  Just --

Q.    Okay, great.  So we're going to mark as Exhibit 1 and Exhibit 2.

(Exhibit Nos. 1 and 2 were marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    So, Dr. Pisegna, the way it will work today is, when there is sort of an official copy of a document I want to talk to you about, the court reporter will put a sticker on it, that will go in front of you, and then we'll ask you some questions about it, okay?

A.    Got it.

Q.    So what I put in front of you as Exhibit 1 is something titled "Expert Opinion Report, In Re Glucagon-Like Peptide 1 Receptor Agonists," and it's got your name on there, yes?

A.    Yes.

Q.    And can you take a look and just confirm for me that what we've marked as

Exhibit 1 looks to be a complete copy of your expert report that was e-signed on January 2nd of 2026.

A.    Yes, I'm looking -- I don't see my signature.  I know that it should be on the last -- I've never seen it in sort of print form.  I've only seen it on a computer.

Q.    If you turn to page 48 on the bottom.

A.    Yes.  Yes, that's correct.

Q.    Okay.  And then following page 48, there's a series of endnotes that correlate with the endnotes cited in your report.

A.    Yes.

Q.    And then it looks like a -- what appears to be sort of an Adobe Acrobat DocuSign page on the very back.

A.    Yes, that's correct.

Q.    Okay.  And then Exhibit 2 is what's called a materials considered list.  And this is an appendix to your report.

    Do you recall putting this together?

A.    Yes.

Q.    And so this contains a list of, it looks like, 336 documents, if I go to the very last page.

A.    Yes, that's correct.

Q.    And you don't cite all of these in your expert report.

A.    Correct.

Q.    What was the significance of a study that's cited in the materials considered, but didn't make it into the body of the report?

A.    Well, there are several articles that I saw that weren't so relevant to the case at hand, or to the question that the plaintiffs' counsel had raised, so -- but I did review them.

As an example, for instance, the Graham Dockray paper referenced under 65, it's sort of a review paper related to gastrointestinal hormones that was very well done.  And I know Dr. Dockray, I've worked with him -- or, you know, we've had discussions at meetings.

So that was a paper that I used more as a general reference, just to kind of

review the field of gastrointestinal hormones, but there wasn't anything specific about GLP-1 that I thought was going to be relevant to the case. So that's just an example.

But, you know, I think that there were a lot of references that I used, things that I would typically use as an academician. So when I sort of approach a research question, I do sort of a pretty exhaustive review of the literature, and kind of review papers that I think are going to be relevant to the research question at hand.

So that's, you know, an example of why there are some papers that are in the references considered, but didn't actually get into the report.

Q.    Understood.

So in approaching a question, I think you said, as you do in the academic setting, you would start with sort of a general literature review?

A.    Yes.

Q.    And then from there, you would narrow things down. And the things that are specifically relevant to the questions that

you're asking, that -- that would be what you've eventually cited in the expert report?

A.    Correct.

Q.    If we can turn back to Exhibit 1, the expert report.

The expert report here contains all of the opinions and the bases for those opinions that you're offering in this case; is that right?

A.    Yes, that's correct.

Q.    And I want to ask in the paper -- excuse me, in your report, Exhibit 1, it talks about a number of different conditions or adverse events that you call gastrointestinal -- severe gastrointestinal injuries; is that right?  And I can direct you, sir, if we can start, like, at page 30 of the expert report.

A.    Okay, let me just review that. I don't know if I used the term gastrointestinal injuries, but I probably would have probably called it gastrointestinal adverse events.

Q.    So the section that I'm thinking starts on Roman VII, and it starts on page 28. And then it continues for a few pages.

A.      Yes, I recall this.

Q.      And so, for example, on page 30, there's a -- let me start by this.  You -- are the different subsections in this Section VII, are these injuries that you considered, I guess, what you call severe gastrointestinal injuries?

A.      I'm not sure that I use that exact word, gastrointestinal injury, but gastrointestinal adverse events would, I think, be more accurate.

Q.      Got it.  Okay.

So in terms of the subsections that run -- for example, if we look on page 30, there's a little (b) that's "GERD, nausea, and dyspepsia."

A.      Yes.

Q.      And so that would be one section or one subset of severe gastrointestinal adverse events, yes?

A.      Yes.

Q.      Okay.  And then there is a section -- subsection (c) on page 32 that talks about gastroparesis.

A.      Yes.

Q.    Subsection (d) on page 34 talks about gastric bezoars.

A.    Yes, there are some pictures associated with that.

Q.    Yes.

A.    Yeah, I included the photographs just to -- because I wasn't sure that the word bezoar was something commonly -- you know, parlance, and just language that people would understand, so I showed photographs.

Q.    Understood.

And then there's a subsection (e) on page 36 that says, "Paralytic ileus/intestinal blockage."

A.    Yes.

Q.    Just for clarity here, did you issue any opinion on a non-functional blockage, like a mechanical blockage?  Did you intend to issue any opinion on that injury here?

A.    No.  I primarily stuck with the word paralytic ileus, which could be considered a functional blockage.  I mean, it's just a matter of what the mechanism of the blockage is.

Ileus is a term that's more typically used in sort of medical language, if you will, just because it -- it's a relatively severe intestinal dysfunction. And that's why I included the photograph of -- just the figure, to show what it looks like.

But if you tell a doctor, this patient has an ileus, it's pretty clear that that patient has something pretty severe that would result in the potential for a perforation.

Q.    So a couple of follow-up questions there.

When you talk in your report about paralytic ileus/intestinal blockage, you're talking about ileus and a functional blockage, but not a mechanical blockage?

A.    Well, more likely than not, it will be functional. Because a mechanical blockage is usually caused by usually a stricture, a tumor, or a mass that obstructs the outflow of the intestine.

And so a mechanical blockage would confer that the patient has either a mass, a stricture -- we typically see those

post-operatively, where a patient will have a mechanical blockage.

A functional blockage would be more typically due to a condition where the intestine is just not moving very well.  And that could usually be drug-related, typically, like, opiates could cause it.

And then the -- but there is no mechanical blockage.  There is not a stricture or a narrowing of the intestine that is restricting the movement of the intestinal contents.

So hopefully, I differentiated those two.

Q.    I see.  No, I understand.

So just for clarity, when you talk about -- in section (e) on page 36, when you talk about paralytic ileus/intestinal blockage, you're talking about either ileus or a functional blockage based on a lack of motility in the intestine?

A.    Yes, that would be a great way to differentiate it.

Q.    As opposed to differentiating from a mechanical blockage, where there's a

physical blockage inside the intestine.

A.    Exactly.  A mechanical would be like if you had a cork, you know, kind of like blocking the flow of intestinal contents from moving; whereas a functional blockage would be the smooth muscles just not contracting, so everything just sort of staying in stasis.

And the other way to differentiate it, radiographically, is if you have a mechanical blockage, you'll usually see what's called a -- you'll see an area of bowel that's going to be distended and dilated.  And then after the blockage, you won't see any bowel gas.

So we can usually differentiate, radiographically, if it's a mechanical or a functional blockage, based on the radiographic picture.  So in the case of -- that I'm showing here in the figure, that would be more typical to be a functional blockage or ileus.

Q.    The figure that is on page 37?

A.    Correct.

Q.    Got it.

And the etiology or the causes of a functional blockage, those are different

than a mechanical blockage, yes?

A.    Yes.

Q.    The -- so you go on to describe some additional subcategories of gastrointestinal adverse events, including on page 38, "Perioperative procedures and anesthesia risk."  Do you see that?

A.    Yes.

Q.    So with regard to these specific severe gastrointestinal adverse events, and when you were evaluating the reports of those, did you use the same methods as -- for example, for GERD, nausea, dyspepsia, were you using the same methodology to evaluate those that you did for gastroparesis and ileus?

A.    Yes.  Which was, you know, typically doing a sort of search through PubMed, and I would typically use search terms that would -- you know, for instance, the question with GERD, you know, I would look at the association between GERD and GLP-1, for instance.  So I would do that search, and try to examine any literature where those two were associated.  So I typically used either Google searches or PubMed searches.

Q.    Have you seen any other expert reports in this case?

A.    No.

Q.    Whether from the plaintiff side or the defense side.

A.    No, I haven't.  They were never provided to me, so --

Q.    The materials -- I'm going to direct you back to the materials considered list for a moment, so you can set the report aside for a second.

The materials that are listed in the materials considered list, how -- I assume these weren't all found by you, independently. Was this sort of a joint effort in putting this together?

A.    That's correct.

Q.    Between you and then counsel for the plaintiffs?

A.    Yes.  What I -- because I was limited to be able to actually download a lot of the manuscripts, because I didn't want to use government-related, whether state or federal, servers to do those searches.  Only because, you know, I didn't want there to be

any potential conflict.

So as a UCLA professor, I have full access to the UCLA computer system, which is pretty extensive, but I didn't use that. I would typically e-mail and ask for the counsel to provide a copy to me.

Q.    I see.

So the process that you went through was, you conducted searches, and then once you identified a potentially relevant manuscript, you would ask counsel to download that and provide it to you?

A.    In some cases, yes. In some cases, it was a free download. So I used those. But I didn't really -- I don't subscribe to any of the other search categories for being able to download manuscripts, so --

Q.    So you have a pretty robust set of materials considered here. Did you feel like there were -- that you missed out on any studies?

A.    I think I did a very extensive search. You know, it's possible there could be a paper that I may have missed. But I

think I typically would identify a paper, some of those were review papers, and they would reference a paper.

Some of the older papers, for instance, I wasn't able to easily download those, but it was kind of like basically one paper led to another paper and another paper. So that's how I sort of approached it. I think it was pretty -- pretty extensive.

Q. Yeah. You didn't feel like you were missing any paper or manuscript or scientific evidence that you needed to reach your opinions in this case?

A. No, I didn't. I felt like I did a pretty -- pretty extensive review.

Q. So your -- if I can direct you back to your report now, sir, Exhibit 1, your report focuses on -- it has a scope section on page 7; is that right?

A. Yes.

Q. And that identifies the questions you were asked to opine on by plaintiffs' counsel?

A. These were the specific questions that I was asked to opine on.

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 26 of 202

Q.    And your opinions here focus on the tirzepatide molecule, yes?

A.    Yes.

Q.    And of the studies that you looked at as part of your work, did you identify any that included a -- I'm going to start my question over.

Is that all right with you, Dr. Pisegna?

A.    Sure.  Sure.

Q.    So in the studies that you looked at, a lot of them were reporting on the level of correlation or association between a medication, on the one hand, and an adverse outcome, on the other, yes?

A.    Yes.

Q.    In your review of the literature, did you identify any paper or study that had a statistically significant positive association between tirzepatide, as a medication, on the one hand, and any adverse GI outcome, on the other?

MS. HAUER:  Object to the form.

THE WITNESS:  When you say statistically significant, so there

were studies that have shown that tirzepatide was associated with gastrointestinal adverse events.  And whether -- because of the way some of the studies were powered, you can't really determine statistical significance.

So my approach wasn't really to try to look at this as an epidemiologist, but more in terms of the associations that tirzepatide and other peptides of the incretin family, have on gastrointestinal adverse events.

BY MR. PREMO-HOPKINS:

Q.    I appreciate that, Dr. Pisegna. I want to make sure I understand what you found in your review.

Did you identify any study that reported a statistically significant positive association between tirzepatide, on the one hand, and any of the severe GI adverse events that you've opined on?

A.    The Urva study would suggest that there was a significant association

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

between tirzepatide and gastrointestinal adverse events, would be an example.

Q.    You said the Urva study?

A.    Urva, yes.

Q.    U-R-V-A, yes?

A.    Yeah.  And I think I have a figure in my report that I excerpted from the study.

Q.    Do you know -- you can take a second.

Do you know what of the severe GI adverse events Urva reported on as having a statistically significant association with tirzepatide?

And if it's helpful, I think Urva begins being discussed on page 21 of your report.

A.    Perfect, yes.

So if you look at the figure on page 21, in the mouse studies that Urva reported on, there was a statistically significant difference with semaglutide and placebo.  So they compared it against placebo.

And then if you look at the figure B, that's with tirzepatide, that

there's a significant difference between the vehicle, or placebo, and the tirzepatide doses.

Q.    And just so it's very clear, what's being measured in those figures is a percentage of gastric emptying, yes?

A.    Yes.

Q.    And did you treat delayed gastric emptying as an adverse outcome?

A.    Yes, because there's an association with delayed gastric emptying and symptoms that's been shown in other studies looking at primarily GLP-1s, where they've correlated delays in gastric emptying with adverse upper GI side effects, such as nausea, vomiting, dyspepsia, which -- so for the -- for both GLP-1 agonists, as well for tirzepatide, the GLP-1 component primarily results in the delayed gastric emptying.

In a way, you almost want that to happen, because if you want the drug to work for, let's say, reducing obesity, if you delay gastric emptying, the patients feel fuller, so they eat less.  And so that results in lower gastrointestinal emptying.  So in a

way, the delay is sort of beneficial if you want to lose weight.

Q.   And you understand from your review in this case that the medication labels for tirzepatide, for example, identify that the medication can delay gastric emptying?

A.   Yes.  And I included, I think, as -- I included the labels as revised, I think it was, in January of 2025.  So the revised tirzepatide label includes that information.  I actually went through and did a pretty extensive review of the FDA labels for the whole family of peptides, and wanted to see if that was reported.

Q.   Did you consider the delay in gastric emptying to be an on-target effect or off-target effect of the medications?

MS. HAUER:  Objection to form.

THE WITNESS:  The -- it would be an off-target effect if the expected -- the expectation was that it wouldn't cause that.  And, in fact, the majority of patients, it doesn't cause a delay that results in symptoms.

So what we see from the Urva study and others is that a subset of patients, somewhere around 10 to 15 percent, will experience symptoms related to probably the off-target effects of the medication.

It's interesting because GIP peptide itself probably doesn't have an effect on gastric emptying, but GLP-1 has been shown in a lot of studies that -- I think I referenced them all -- that GLP-1 does cause that effect. It's -- I think it's an expected outcome.

BY MR. PREMO-HOPKINS:

Q.    So if you're taking tirzepatide, a delay in gastric emptying, that would be an expected outcome?

A.    Yes.  In a subset of patients. I'm sorry to stop you.  Just I wouldn't say that every patient will have that issue, but a subset -- from my review, a subset will have a delay in gastric emptying.

Q.    And I want to set aside the delay in gastric emptying, because I understood you

Case 2:24-md-03094-KSM        Document 691-35        Filed 05/19/26        Page 32 of 202

-- for example, if we go back to the gastrointestinal adverse events sections of your report -- maybe we can do it this way.

So I'll look at page -- initially, at page 30 of your report. At page 30 of your report, you have a heading that identifies GERD -- that's gastroesophageal reflux disease --

A.    Yes.

Q.    -- nausea and dyspepsia as a subset of the severe gastrointestinal adverse events you looked at, yes?

A.    I would say adverse events. I don't know -- you've added severe into your comment. But it could, in a subset, be severe. But I think I looked at it more as -- you know, the incidence of gastrointestinal adverse events.

Q.    Got it. They could be severe?

A.    They could, potentially. But I looked at it more in terms of adverse events, rather than severity of adverse events.

Q.    So --

A.    And that's sort of what I see in clinical practice. So as a

Joseph Tiseghia, M.D.    Case 2:24-md-03094-KSM    Document 691-35    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

gastroenterologist, I see patients that are referred to my clinic usually from primary care providers that present with GERD, nausea, and dyspepsia.

And so oftentimes in clinic, I'm working with my trainees, which are residents and medical students, and they'll present the case of a patient with dyspepsia.

And one of the first things I do now is I look at the medication list to see if the patient is taking a -- a GLP-1 agonist. And if so, I usually will discontinue it or reduce the dose.

But I would say, four years ago or so, when we first started seeing patients come in with dyspepsia, we didn't really quite understand the association with GLP-1s. That's more recent. I think that, oftentimes, we would see these patients, and we would order a series of radiographic and endoscopic procedures, to try to identify the cause of dyspepsia.

But I think in the last two years, we're a little more aware of the -- of the association between GLP-1 agonists and

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 34 of 202

these adverse events like nausea and
dyspepsia.

Q.    So let me make sure -- I want to
go back to the question I was asking before,
and focus your attention on page 30 and 31 of
your report.

In your report, you don't
identify any study or paper or abstract that
reports a statistically significant increased
correlation or association between
tirzepatide, on the one hand, and GERD,
nausea, or dyspepsia, on the other hand, true?

A.    That's true.  But I did refer to
GLP-1.  And so if you were to ask me whether
or not tirzepatide could cause these things,
because it's a fairly new drug, so there is
less studies available, I would probably say
that the experience that we've had with GLP-1
would carry forward with tirzepatide.  It's
just that it -- there's -- I didn't come
across literature that specifically discussed
that.

And I put that as a sentence in
my report on page 31.  At this point in time,
Mounjaro was only recently approved, and

Zepbound was not on the market at the time that papers came out related to the association between GLP-1 agonists and these adverse events.

Q.    So with regard to GERD, nausea, and dyspepsia, based on your review of the literature that exists today, you're not aware of any study or report or abstract that would report a positive association between tirzepatide, on the one hand, and GERD, nausea, or dyspepsia, on the other, true?

A.    That's true.  I have not seen any reports that -- where they specifically talk about tirzepatide causing these upper GI symptoms of GERD, nausea, or dyspepsia.

Q.    So let me turn your attention now to page 32 of your report, which is -- talks about gastroparesis.  And you write at the top of page 32 that "Gastroparesis is a chronic gastrointestinal motility disorder characterized by delayed gastric emptying of solid food in the absence of a mechanical obstruction of the stomach, resulting in the cardinal symptoms of early satiety, postprandial fullness, nausea, vomiting,

belching, and bloating," right?

A.     Yes.

Q.     When you say that gastroparesis is a chronic disorder, what do you mean by chronic?

A.     By chronicity, it means that it would last several months at least.

Q.     And with regard to gastroparesis, as you've defined it here, did you identify any study, or report, or abstract that reported on a statistically significant increased risk or correlation between tirzepatide, on the one hand, and gastroparesis, on the other?

A.     Well, if we go back to the Urva study, it actually goes back to your previous question, too, there is an association between tirzepatide and symptoms of, like, nausea, vomiting, diarrhea.  So there is data out there to suggest that tirzepatide could cause those symptoms.

Now, whether or not this is due to a delayed gastric emptying is not clear, because the studies with tirzepatide at least -- well, it's clear with GLP-1.  I mean, I

think there is a lot of data suggesting that GLP-1 slows emptying and causes symptoms.

With tirzepatide, we don't have the data -- or at least I didn't find any data, where they actually specifically looked at tirzepatide and gastric emptying rates, but what we see with tirzepatide is symptoms of nausea, vomiting.

And so I would infer, based on the data that we have for GLP-1, where there's plenty of data, that delayed gastric emptying results in those symptoms, I would -- I made the connection that tirzepatide probably would cause those symptoms, that it would be more likely than not that tirzepatide would cause symptoms that we've seen typically with other incretins, such as semaglutide.

So in terms of gastroparesis, it's more of an issue of chronicity.  So if a patient were, let's say, taking a drug that would delay gastric emptying and causing gastroparesis, and they continued to take the drug, they would be labeled as gastroparesis.

But -- so I think gastroparesis is sort of a word that encompasses a lot of

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 38 of 202

different causes.  And so gastroparesis would be associated with, let's say, chronic use of a drug that would slow emptying.

Q.     So let me make sure I -- there's a lot in there.  I want to make sure I understood it.

So with regard to an outcome, gastroparesis as an outcome, did you observe any study, or paper, or report, or abstract in your review that reported a positive association between tirzepatide, on the one hand, and the outcome of gastroparesis, on the other?

A.     No, only the symptoms related to delayed gastric emptying, which is the symptoms of nausea and vomiting.

Q.     And the inference that you're drawing is that because there are reports of symptoms associated with gastroparesis, and the use of a GLP-1 medication known to delay gastric emptying, that you can make the connection to gastroparesis?

A.     Yes.

Q.     Okay.

A.     Yeah, I think that was a very

succinct way of saying that.  But I would also add that gastroparesis could be caused by a number of other medications, not just GLP-1 agonists.  But more typically, what we would see is opiates associated with gastroparesis.

And in one of the review papers, it shows a -- it's a case report of tirzepatide causing gastric outlet obstruction.

There is actually a very nice photograph of that particular patient.  I think he was a 57-year-old man, who presented with these symptoms of nausea, vomiting, and bloating.

And they did an x-ray, and you could see the stomach is quite enlarged and full of gas.  And so that would be gastroparesis.  And in that particular patient, once the tirzepatide was discontinued, he was discharged home and was feeling okay.

So that would be a case report.  It doesn't have the weight of a large study, but that would be a case report of tirzepatide causing gastroparesis.

Q.    You know, so is that -- if you look at page 33, there is a reference to the 2025 case report by Iskander et al.  Is that --

A.    Yes, that's the paper.  Sorry, I should have mentioned that.

Q.    That's all right.  And do you know whether the word gastroparesis is ever used by the clinicians who were treating that patient in the paper?

A.    I would have to go back to the paper.  As I recall, it talked about gastric outlet obstruction.  I don't recall if they specifically used the word -- we could probably Google the paper to see if it was used, but I don't recall if it was used or not.

Q.    Okay.  We're going to get into some more detail as we go and specific papers. I just want to make sure I follow up on some of the things that you said before.

You mentioned that there's an element of chronicity that's involved in gastroparesis; is that right?

A.    Yes.

Q.    And by chronicity, you mean several months at least?

A.    I would estimate several months. Usually it's a diagnosis. A patient usually has gastroparesis, and it's usually -- they have had it for quite a while. We oftentimes do see it with diabetes, for instance, where a diabetic patient, unrelated to using a GLP-1 agonist, will present with probably vaguely mediated gastroparesis.

And so they will have a diagnosis of gastroparesis. And gastroparesis is a -- I view it as a really important issue, because if those patients are taking any medications that require intestinal absorption, and those medications are sitting, sloshing around in the stomach, then the patient is being deprived of the medication, whether it be for their heart, or kidneys, or lungs.

And so I think gastroparesis is a major issue. It's such a major issue that the NIH/NIDDK put together sort of a -- sort of a consortium of investigators around the country that study gastroparesis. And I

think, you know, Camilleri is part of it.  I

know Richard McCallum was part of it.  And

several -- so there's probably, like, ten

centers around the country that just focus on

gastroparesis.

Q.    And this NIH/NIDDK group, were

you ever part of that?

A.    Well, I was, yes.  I trained

there, so I did my post-fellowship training at

NIH/NIDDK.

Q.    Did you happen to work with

Linden Wynn while you were there at all?

A.    No.

Q.    Do you know who that is?

A.    No.

Q.    So with regard to GLP-1

medications and a potential drug mediated

gastroparesis, you mentioned that the patient

-- I thought you mentioned the patient would

stay on the drug.

MS. HAUER:  Object to the --

BY MR. PREMO-HOPKINS:

Q.    Let me ask you a different

question, because that was a poorly worded

one.

Are you aware of any evidence that suggests -- I'm sorry, are you aware of any evidence that would support the conclusion that GLP-1 medications can have an effect on gastric emptying, after they have washed out of the body?

A.    I'm not aware of any study that has shown that.  So that's why, originally, when you talked about gastrointestinal injury versus adverse events, I tried to make the distinction, because injury would be something that would result in a permanent sort of issue.

But an adverse event is something that you may see an association with -- with some sort of external event, such as a medication.  It could be exposure to sun -- like a sunburn would be an exposure to sun.  It's sort of an adverse event.  Like most people don't want to get a sunburn, but, you know, people know that if you are exposed to the sun, you're going to get a sunburn.

So sorry about using that example --

Q.    No.  If we continue with your

analogy, melanoma or skin cancer might be an injury in that context.

A.    Exactly, yes.

So with gastroparesis, if you have a drug that causes delayed gastric emptying and the patient is taking a drug chronically, they could be labeled as having gastroparesis just because the clinician didn't recognize the fact that that drug, whether it be an opiate or other medication, it could be GLP-1, it could be tirzepatide, caused that dysfunction.

And if -- hopefully, the physicians will be more aware of this issue, so that they would stop the medication.  So if a patient was on an opiate, they would go into some sort of program to get off the opiate to resolve the gastroparesis.

But in some conditions, like diabetes, the injury could be more permanent, because in diabetes, there is a pathophysiologic effect on the vagal efferents, so that those pathways could be forever changed.

We used to, for instance, do

vagotomies to treat gastric acidity.  So if you have a patient who has undergone a vagotomy, they could develop gastroparesis as a consequence to the surgical removal of the vagus nerve.  And that's why we typically will do a gastric emptying procedure, usually a Roux-en-Y or gastrojejunostomy, so that the stomach empties.

Otherwise, if you just did a vagotomy, but didn't allow for the gastric contents to empty, patients would typically have gastroparesis.  So gastroparesis can be a permanent effect, like surgical.  It could be a temporary, related to medications.

But I'm not aware of any medication that caused gastroparesis that once stopped, the gastroparesis should improve, unless there's some other underlying reason for the patient to have it.

So for instance, if a patient had diabetes, and had gastroparesis before starting GLP-1, and then GLP-1 just exacerbated it, and the patient became symptomatic, if you stop the GLP-1, you're not really doing away with the diabetes, so the

patient may still have issues with gastric emptying, once you stop it.

Hopefully, I clarified it a little bit for you.

Q.    Yeah, you did.

So I understood you to identify as one example of a permanent injury to sort of nerve or muscle that could lead to delayed gastric emptying as diabetes?

A.    Yes.

Q.    And in looking at, for example, GLP-1 medications or tirzepatide, you don't see that same sort of permanent effect; is that right?

A.    That I saw any literature to support that, no.

Q.    Okay.  And in your review of the literature, what you saw supported was that when you took the medication away, typically, the symptoms would resolve?

MS. HAUER:  Object to the form.

THE WITNESS:  Well, so the literature that we just talked about, the paper by Iskander -- so in that paper, once the medication was

discontinued, the patient -- the condition resolved.

There is another paper with GLP-1 that looked at small intestinal motility, in that case, of the ileus. The patient, once the medication was stopped, the ileus resolved. So that would be an example of where the -- you know, once you stop the medication, it resolved.

The other studies that show associations between, whether it be GLP-1 agonists or tirzepatide, a delayed emptying or symptoms of nausea and vomiting, they didn't specifically look at what happened when you stopped the medication. Those were studies that, actually, I think were funded by Lilly, at least for tirzepatide, and then I think for Novo Nordisk for the semaglutide studies, they didn't really look at the offset effect. They sort of looked more at the onset of symptoms.

BY MR. PREMO-HOPKINS:

Q.    And based on your review of the literature, you didn't see anything that suggested that tirzepatide could cause a permanent effect to delayed gastric emptying?

A.    That's correct.  I didn't see any.  But it would -- I think it would be helpful, now that tirzepatide is approved for the past two years, to actually do studies looking at the effects of tirzepatide on gastric emptying, using a reliable emptying procedure, like a nuclear medicine gastric emptying test, which is lacking.

It's present for GLP-1s, but not for tirzepatide.  And I think it would be helpful.  I could give you a better informed answer if they had a paper that looked at that, specifically.

Q.    So if we just -- let me focus your attention back on the outcome of gastroparesis.  And you understand that that is an outcome that was measured either for GLP-1s and/or tirzepatide in some of the studies that you reviewed, yes?

A.    Yes, that's correct.

Q.    And in review of that data, did

you see any outcome that reported a positive

association between tirzepatide, on the one

hand, and the outcome of gastroparesis, on the

other?

A.    Not specifically gastroparesis.

Only symptoms.

Q.    Okay.  If we turn to page 34,

there's a -- your section on gastric bezoars

with the photos.

A.    Yes.

Q.    And the same question for gastric

bezoars.  In your review of the literature,

did you identify any outcome that was reported

to be a positive association between

tirzepatide, on the one hand, and gastric

bezoars, on the other?

A.    Not for tirzepatide, but there

is literature for the GLP-1.

Q.    Do you know whether -- when it

talks about -- when you talk about GLP-1 RA

medications, do you know whether that even

included tirzepatide?

MS. HAUER:  Object to the form.

THE WITNESS:  The papers -- so

the GLP-1 agonists, going back to

liraglutide, have -- were done at a time when tirzepatide wasn't yet developed and approved.

So the answer to your question would be, no, those studies primarily looked at GLP-1 agonists.

BY MR. PREMO-HOPKINS:

Q.    And then the last -- or not the last, but the next injury -- or adverse event, excuse me, that you include a section on in your report is the paralytic ileus and functional intestinal blockage; is that right?

A.    Yes.

Q.    And in your review of the literature, did you identify any study or report that reported on the outcome of ileus or functional intestinal blockage, and showed a positive association between tirzepatide, on the one hand, and ileus or functional blockage, on the other?

A.    No, the studies that I included were primarily the GLP-1 agonists.  But as I -- I think I made a statement here that it's plausible -- it's my opinion that because tirzepatide acting like GLP-1 agonists would

impair intestinal motility, and could result in ileus in a subset of patients.  There is, of course, the case that we talked about with the gastric outlet obstruction.  So in that case, that would be, in a sense, a case report with tirzepatide.

Q.     And that was a case report of one patient, yes?

A.     That's correct.

Q.     Let me ask you about that sentence that you refer to on page -- I think it's on 38 of your report.  You note, "It is my understanding there are other expert opinions on these issues with a more detailed epidemiological analysis, and I am not providing an opinion on epidemiological issues.  Nevertheless, it remains my opinion that there is a biologically plausible mechanism that tirzepatide impairs intestinal motility, which can result in ileus and nonmechanical small bowel obstructions," right?

A.     Yes, I read that.  And the reason for that is, I was told that there was an epidemiologist that was actually going to

specifically look at larger epidemiologic studies, so I didn't specifically look at that.

When I talk about biological plausibility, it's because there's receptors in the small intestine for GLP-1. So GLP-1 is known to activate cyclic AMP, which, in turn, causes relaxation of the smooth muscle in the small intestine.

So tirzepatide has both a GIP agonist and a GLP-1 agonist. So it really has a dual effect. It was created for that purpose. It was developed as a dual agonist, so the -- it still has a very high affinity for the GLP-1 receptor. The half maximal stimulation is about four nanomolar for the GLP-1 receptor.

So tirzepatide would have an effect on the smooth muscle. I think the reason why we don't see a lot of literature out there is because tirzepatide has only been recently approved, and, you know, I don't think it's the market leader, although I didn't specifically look at the market size for it.

But I see all the commercials on TV, talking about semaglutide.  So I don't really know what market share tirzepatide has in the overall market.  But having worked with other pharmaceutical agents, there is usually a typical market size.  And so I just don't know if tirzepatide is that widely used.  So that could be why we're not seeing that literature.

Q.     Let me make sure I understand the significance of this last paragraph in your ileus section.

Do I understand it correctly that you are saying, you didn't evaluate the epidemiological literature, but you principally are relying on the biologically plausible mechanism that you describe to conclude that tirzepatide can cause ileus?

A.     Yes.  That would be a succinct way of stating that.  If I'm going too long on my responses, let me know.

Q.     If I need to, I'll follow up. It's all helpful information.  This is the only chance I get to ask you questions before we wind up in court, so it's helpful.

Joseph Eisenga, M.D.    Case 2:24-md-03094-KSM    Document 691-35    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

A.    I see.  Well, you know, it's an interesting field of peptide receptors and peptides.  I've been in this field for pretty much all of my adult career, and so -- so I specifically study receptor peptide interactions, so -- so this is sort of what I've been doing for most of my adult career.

So when I talk about biologic plausibility, you know, if you were to take, let's say, smooth muscle isolated from the small intestine of a mouse, and you were to add GLP-1 versus tirzepatide, you probably would see a very similar effect on smooth muscle contractility.

Those studies may have been done, but I didn't really see those studies.  That would have helped, you know, in terms of better understanding the mechanisms.  But the fact that you have a GLP-1 receptor on smooth muscle, they've actually done those studies, both in mice, also in pigs.

So they actually took GLP-1, administered it to isolated smooth muscle for pigs.  And I've actually done those studies, too.  Not for pigs, but from mice.  So I've

actually seen it in the laboratory, where I added a peptide, and you could look at the effects on smooth muscle.

So, you know, I believe the results that were reported previously. Jens Holst has been studying this for his whole career, and I think the data would lead me to believe that tirzepatide would have a similar effect on the smooth muscle of the small intestine.

Q. Do you know, one way or the other, whether there are other expert opinions addressing epidemiological analyses as it relates to gastroparesis or GERD or the other adverse events you identify?

A. I don't know of anybody specifically looking at that. I was told that the epi studies would be handled by somebody else. I don't know if that's one other person or several. I never inquired to find out who is going to be that expert, or, you know, what's their experience. So I don't really know the answer.

Q. So with regard -- let me make sure, then, I understand something clearly.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

And then maybe we can take a quick break.

For the adverse events that you spell out in your report, you didn't consider, as part of your scope, a complete evaluation of the epidemiologic literature, right?

A.    That's correct.  That's what I was told by the plaintiffs' counsel.  I offered, but they informed me that somebody else was going to be doing that.

Q.    And so in terms of the conclusions you reached in your report, those were focused on relying on the biological plausibility of the mechanism; is that right?

A.    That's correct.

MR. PREMO-HOPKINS:  All right. Why don't we take a quick break.

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are now going off the record, and the time is 9:58 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 10:14 a.m.

BY MR. PREMO-HOPKINS:

Joseph Pisegna, M.D.

Case 2:24-md-03094-KSM   Document 691-35   Filed 05/19/26   Page 57 of 202   Page 56

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.     Dr. Pisegna, I want to -- we just took a break.  Are you ready to begin again?

A.     Yes.

Q.     I wanted to direct your attention to page 24 of your report.  And on page 24, you -- there's a term called -- I'll spell it for the court reporter, tachyphylaxis, T-A-C-H-Y-P-H-Y-L-A-X-I-S.

That's one of the concepts that you discuss in this section, yes?

A.     Yes.

Q.     And what is tachyphylaxis?

A.     So tachyphylaxis could also be viewed as desensitization.  So when you have G protein coupled receptors, there is a peptide that -- or it could be, actually, even a non-peptide agonist, but you have a ligand that binds to a receptor.

And that ligand receptors signal an intercellular signaling phenomena, usually it's either going to be activation of cyclic AMP, or intercellular calcium, depending on the receptor, but with repeated dosing of a ligand to a receptor, what is observed is that there's a reduction in the efficacy of the

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

ligand for stimulating the effects.

So for instance, if you were looking at the beta adrenergic receptor, if you have the ligand which would be epinephrine, acting at the beta receptor, that after repeated dosing, there would be a reduction in the efficacy which would be cyclic AMP.  So in general terms, it's a desensitization whenever you have a ligand at a receptor.

The things that mediate that are a group of kinases called BARKs, or the beta arrested receptor kinase.  It's called BARK. That's what it stands for.  And so these kinases are involved in degrading this ligand from the receptor.  And then the receptor recycles back up to the surface of the cell to be ready for the next ligand to bind to it.

So generally, what happens with -- in some cases, though, is that as you stimulate or maybe overstimulate a receptor, the cell produces a lot more of that receptor. So now you have a lot more receptors on the surface of the cell, and so that phenomena is, like, tachyphylaxis.

Q.    And I thought you described it well here as "A pharmacological concept, where a person's response to a drug lessens over time or after repeated doses of a drug, causing the effect of the drug to decrease."

A.    Yes, I wrote that because I wanted to put it in sort of simplistic terms.

Q.    That's helpful.

And you would agree that the evidence that you reviewed supports that with GLP-1 medications, including tirzepatide, over time, there is a reduction in the delay in gastric emptying, yes?

A.    Yes, that's what the literature suggests, that if you look at the studies, including the Urva paper, there's a reduction, but not a complete abolition, but there's a reduction in the efficacy of the peptide.

So the study where they increased the dose of tirzepatide, a dose-ranging study, it took higher doses of the drug in order to have the same effect.  So I think they used 5, 10 -- or 5, 7 and a half, 10, and 15 milligrams of the drug.

But -- so even though there is

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 60 of 202

tachyphylaxis, it doesn't mean that you don't have an effect over time.  Otherwise, let's say take, as an example, unrelated to your case, but let's say beta receptor blockers, like propranolol, atenolol, labetalol, all of these beta blockers are used commonly in practice to treat conditions such as hypertension.

And they've been shown to be quite effective to improve outcomes following heart attacks.  So if you had a tachyphylaxis which does occur with those drugs, but there's still going to be an overall effect.  Otherwise, people wouldn't use them for longer than a month.

So -- so the -- there is tachyphylaxis, but the net effect, even over repeated doses over a long period of time, is that they're still effective.  Otherwise, people wouldn't be using these medications.

Q.    And do you recall, from the studies you reviewed, how long those studies looked at the relative effect of the medication, and whether there was evidence of tachyphylaxis?

A.       I think in the Urva paper -- I'd have to go back to the actual paper, but I believe that they looked at one week, two weeks, three weeks, four weeks, but I would want to refresh my memory, looking at the paper.  But it was within about a month, typically.

Q.       Are you aware of any literature that is available that would allow you to measure the remaining effect on gastric emptying after the desensitization occurred?

MS. HAUER:  Object to the form.

THE WITNESS:  The studies where they looked at gastric emptying in response to, let's say GLP-1 agonists were typically done short term.  So they -- I don't believe any of them went beyond two months to see if there was still an effect on gastric emptying.

BY MR. PREMO-HOPKINS:

Q.       Do you recall reviewing, as part of your work in this case, Dr. Pisegna, some -- I think a couple of different studies where the lead author's name is Jalleh, J-A-L-L-E-H?

A.    Yes.

(Exhibit No. 3 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    We're going to mark as Exhibit 3, a paper published in the 2025 edition of the Journal of Clinical Endocrinology and Metabolism called "Clinical Consequences of Delayed Gastric Emptying With GLP-1 Receptor Agonists and Tirzepatide."

Is Exhibit 3 one of the papers you reviewed in putting together your report?

A.    Yes.

Q.    And it looks like just on the first page, I'm going to make sure I understand the -- on the first page, in the beginning -- at sort of the introduction, this is -- first of all, this is a review article, right?

A.    Yes, it's using PubMed database searches.

Q.    And a review article is, at least in this case, what they say they're doing, if you look in the bottom left-hand corner is that Jalleh and colleagues are summarizing the

state of the art knowledge regarding the beneficial and detrimental consequences of the effects of GLP-1 RAs on gastrointestinal motility with the intent of formulating sound clinical recommendations, right?

A.    Yes.  And also, they looked at tirzepatide.

Q.    And that's -- we know that -- it's in the title, right?

A.    Right.

Q.    Do you -- do you agree, based on your review of the literature that you looked at, that Jalleh's paper reflects state of the art knowledge regarding the beneficial and detrimental consequences of the effects of GLP-1 RAs on gastrointestinal motility?

MS. HAUER:  Object to the form.

THE WITNESS:  Well, I would characterize it more as a recent paper that looked at the PubMed literature on the search terms that they used, the GLP-1, exenatide, lixisenatide, liraglutide, dulaglutide, albiglutide, semaglutide, efpeglenatide, and tirzepatide.

So they looked at those peptide molecules. And they also did a search on gastric emptying, gastroparesis, chylomicron motility, retained gastric contents, pulmonary aspiration, and small bowel obstruction.

So they essentially used a combination of search terms, kind of like what I did when I was first asked by plaintiffs' counsel to opine on the potential that tirzepatide could delay gastric emptying.

So this paper seemed like a logical one to use. And I referenced it in the report as a pretty up to date -- I think you called it a sort of state of the art. But I would characterize it more as a up-to-date review.

BY MR. PREMO-HOPKINS:

Q.    So as of the date of its publication, and when you looked at it, you treated it as an up-to-date review?

A.    Yes.

Q.    Okay.

A.    State of the art would be a paper that would have, like, investigated all of these search terms, but looked at it prospectively, randomized in a sort of randomization and enrolled 10,000 patients, I would call that state of the art.  But I would call this more of a review paper that's up to date.

Q.    And when you took a look at this as part of your work in this case, did you understand this review paper to be up to date with regard to the state of the evidence that you understood?

A.    Yes, although I didn't have full knowledge of the results of their search.  I could only opine on what they concluded from the study, but I wasn't actually doing the search that they were doing, but -- so, yeah, I would say that's generally true.  But I don't have firsthand knowledge of how they did the search.

Q.    Do you know any of the authors that are listed here on the Jalleh study?  It looks like most of them --

A.    No, I think they are in

Australia.  But Michael Nauck, I don't know him personally, but he is very involved with a lot of studies related to GLP-1.  I think he is in Germany.

Q.    You mentioned before that you had done some other -- some work with other pharmaceutical agents.  I'll take your attention away from the article for now.  But have you done work before with pharmaceutical companies?

A.    Yes, lots of studies.

Q.    What types of studies?

A.    I've even developed my own peptide that could be used to treat obesity. So, yeah, I've worked with Johnson & Johnson, Pfizer, Merck, Salix -- in fact, Salix acquired the license to my peptide that I patented.

So if you do a patent search, my name pops up with a particular patent application.  The university actually owns the patent.  I'm just listed as the inventor.  But I've worked with Merck, I was -- Wyeth.  So Wyeth-Ayerst used to exist.  They no longer exist, but I did a lot of work with Wyeth.

Phathom Pharmaceuticals is a more recent company that I worked with. Abbvie which is another pharmaceutical company that I've worked with. But -- I've never worked with Eli Lilly or with Novo Nordisk, but I've consulted for companies usually when a drug gets approved, or even preapproval, we'll have advisory board meetings to look at preclinical data, make recommendations on study design.

I've helped with phase 1, phase 2, phase 3 clinical trials, designs. I've conducted phase 1, 2, or 3 clinical trials. More recently, with companies that have been looking at the fatty liver space. Gilead and with -- so Abbvie and Gilead.

But, you know, as an advisor/ consultant, I help with study design. I've worked with medical affairs teams looking at adverse events. So a lot of those are sometimes post-approval reviews that companies do.

I've done a clinical trial now with Takeda Pharmaceuticals. So I think I -- it should be on my CV, the list of the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

companies.  I may be forgetting one or two, but --

Q.    All right.

A.    -- suffice it to say, I've worked with a lot of companies.

Q.    And you've worked with a lot of pharmaceutical companies on various phase 1, phase 2, or phase 3 clinical studies, both pre- and post-approval?

A.    That's correct.  But post-approval, they would be typically called a phase 4.

Q.    Right.

A.    But preapproval, that would be phase 3.

But, yeah, so since -- so I worked with TAP Pharmaceuticals, with Takeda for the clinical development of dexlansoprazole.  Yeah, so quite a number of companies.

Q.    And what is your understanding of why those pharmaceutical companies reach out to you to get your help with these studies?

A.    Let's see.  Probably because of my experience, both as a basic and also

clinical researcher. So it depends on which phase of the study. So for instance, we did some work with a company called Kairos Pharmaceuticals. They got acquired by a Danish company.

But with Kairos, the idea was to develop a blocker of serotonin to treat conditions such as irritable bowel syndrome. And so that work was preclinical, so it was all animal models. They would send me their peptide, and we would study it in the laboratory looking at cell models.

But I think, you know, so those companies were interested in my preclinical basic science knowledge. But more recently, you know, with clinical trials, you know, I think it's -- you know, the experience factor factors in. And, you know -- so, yeah --

Q.    And let me ask you this. Does any of the work that you've done previously for pharmaceutical companies influence your conclusions here, in terms of, you know, does it bias you, one way or the other?

A.    Not really. Because the -- so I

try to be very objective.  I try to look at the data at hand, and make an opinion.  So you know, so for instance, if I'm working with a pharmaceutical company, the question is, does this drug work, you know?  I look at it very objectively.

We test it.  And you know, I think the data speaks for itself.  You know, we have sometimes made -- had discussions about trying to modify the peptide or to make a peptide modification to try to improve its efficacy.

So for instance, with -- I don't know if I should really discuss which company, because there's some secrecy agreements, but with some companies, there's some proprietary formulation issues that the company will make modifications to the structure, to try to either improve its half-life in the serum or improve its efficacy.  So those are back and forth discussions that are, you know, quite fruitful.

Q.    In this particular matter, you understand that you're testifying on behalf of a group of plaintiffs, and there are

pharmaceutical companies on the other side of the case, yes?

A.    Yes, of course.

Q.    And --

A.    And I've also done work for the other side.  So we've -- I've done patent litigation work with companies that were -- there was patent infringement issues.  I've looked at GLP-1 and risks for pancreatic cancer, which was a big issue back in 2010.  And in those cases, I was working for one of the pharmaceutical companies, so with their defense team, so --

Q.    And let me just make sure that you don't feel like your connection to any pharmaceutical company would lead you to have any sort of bias today.

A.    No.

Q.    Okay.

A.    I don't -- I don't believe so.  Because I basically just stuck with the data, and made a sort of an opinion.  I mean, before I agreed to do this case, I did do a search.

Also, I was influenced a lot by my clinical practice, where I was seeing a lot

of patients that were coming in with adverse events associated with GLP-1s.  And you know, I don't think it would be fair to characterize my expert testimony as just always trying to help pharmaceutical companies, just because I work with them.  I hope that -- you know, that there's no bad feelings or any --

Q.    Sure.

A.    You know, I like working with pharmaceutical companies.  I hope to continue to work with them.  I view this matter as just staying specific to this particular case.

Q.    Yeah, I think that's what I was trying to get at.  We're on the same page.

It wouldn't be fair to characterize your expert testimony as biased in some way, just because you've worked with pharmaceutical companies before, right?

A.    No, it wouldn't be.  If -- you know, I don't know if you're trying to say that I'm too easy on the review or not.  But I think I've tried to be very objective.  You know, I haven't really been biased in favor of helping out Novo Nordisk or any of the other companies involved.

But you know, I think I've tried to stay on point to answer the questions that they asked. If they were to ask me, well, do GLP-1 agonists -- do they help patients with diabetes, I think, you know, the evidence would suggest, although I didn't specifically look at that, but the evidence would suggest that these peptides do work very well to treat diabetes. They work well to -- for weight loss.

So -- so if that's the question, I would have had to do another analysis, but this really is focused on adverse events in the GI tract.

Q. Understood. Understood.

So I understand you do some patient treatment at UCLA; is that right?

A. That's correct.

Q. And some patient treatment at the VA?

A. At the VA.

Q. What percentage of patients that you treat are at the VA versus UCLA?

A. The majority are going to be at the VA. So I would say that about 90 percent

are at the VA.  I have a clinic one-half day a week at UCLA, so that's about 10 percent.

Q.    Okay.

A.    So the UCLA clinic, I see primarily patients with rare neuroendocrine tumors, also with pancreatic disease, reflux, and dyspepsia.  At the VA, I see patients with a wide variety of GI problems.  Essentially, anywhere from irritable bowel syndrome to inflammatory bowel disease, so --

Q.    And in terms of your -- you mentioned that you've treated patients who are taking GLP-1 medications; is that right?

A.    That's correct.

Q.    And is that -- are those patients primarily seen at the VA?

A.    At both.  But primarily, at the VA, just because I'm there more often.

Q.    And are most of those patients taking the GLP-1 to treat diabetes?

A.    That's correct.  Although more recently, we're starting to use it to treat obesity.  So we have a clinic called MOVE, and so we're also using it to treat fatty liver disease.  So I think that's the -- but

historically, it's the Bedford Type 2 diabetes.

And usually the folks that were prescribing the GLP-1 agonists were the endocrinologists in the diabetes clinic. And then the patients were coming back with symptoms attributable to the upper GI tract, dyspepsia, nausea, abdominal pain, bloating. So the endocrinologists were referring it to us to evaluate those patients, because they thought they could have a peptic ulcer or reflux.

They kind of left it up to us to analyze it. But I think, additionally, we were treating those patients, not knowing that GLP-1 agonists caused these symptoms. That really didn't come out until later.

So we were treating those patients by doing endoscopic procedures, radiologic procedures. But as we became more aware of the literature, because a lot of the studies that I've referenced here, we became more aware of the GI side of things that these peptides could cause problems. We recognized that, and then we would stop the medications,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

and then assess.

Another area was endoscopy.  As we became aware of a lot of these studies, that GLP-1 agonists delay gastric emptying, that influences how we prepare patients prior to endoscopic procedures, because when we put people to sleep, we have to insert an endoscope through the mouth into the stomach.

And if the stomach is full of gastric juice and food and other things, there is a risk that some of that food could reflux up causing aspiration pneumonia.  So the anesthesiologists primarily are very concerned about GLP-1s.

And we now have algorithms where patients are typically off for at least a week, maybe two weeks prior to procedures.  So all of that is kind of evolved by these studies, by a lot of these authors that have like, for instance, that have actually brought this to our attention.  Sorry for a long answer.

Q.    No, that's all right.  It's helpful.  There are things in there I want to follow up on.

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 77 of 202

Did -- have you ever prescribed a GLP-1 RA medication?

A.    Yes, I have.  Mainly to try to reduce the dose.  So the patient had been on it.  And I've, you know, prescribed it at a lower dose to try to see if we could improve symptoms, so -- but not as usually primary treatment, so -- just because I don't have a clinic, where patients are coming in with diabetes.

But in the future, as we're going to get approvals to use a lot of these agents, like tirzepatide, for fatty liver disease, we will probably be primarily prescribing it.

Q.    Do you know approximately how many times you think you've prescribed a GLP-1 RA medication in the concept of adjusting dosage?

A.    Probably less than five times.

Q.    And you mentioned that over time, evidence has developed to support the idea that GLP-1 medications can cause these upper GI symptoms?

A.    That's correct.

Q.    And when did you become aware that GLP-1 medications and/or tirzepatide could cause upper GI symptoms?

A.    I would say probably about four or five years ago.  So that was sort of right around the time of COVID.  So there were a lot of things going on during that time.

And actually, I was -- because you asked if I worked with pharmaceutical companies.  I was working with Moderna.  We were one of the sites for their phase 3 Moderna vaccine trial.  We were the only federal site actually to do that study.  So that was about 2020, 2021.  I was, like, so immersed in Operation Warp Speed with weekly meetings with Tony Fauci, the folks at Moderna, Pfizer, that it was kind of a blur.

But about that time, I would say that I was first aware, because I would see patients come in with this nausea and vomiting.  But at the time, we didn't really know that it was related to the GLP-1 that they were talking.

In that era, I think we were using subQ semaglutide, primarily, Ozempic.

And so, you know, everything was kind of a blur with COVID, and we didn't know -- there was papers that COVID could cause a lot of these symptoms.

And so there was a concern that could the patient have COVID. Should they be on an H2 blocker, because there was some data to suggest that H2 blockers would help reduce the symptoms of COVID. But it was about that time, but it was all kind of mixed in with COVID.

But it was probably in about 2022, where we really started to develop an appreciation that GLP-1 caused these symptoms. And then we would stop the drug or reduce the dose.

So in most instances, the recommendation was back to the endocrinologist to either stop it or reduce it. It sort of depended on which endocrinologist. Some don't like you to sort of make changes to the drug. In other cases, it was a primary care doctor. So that's more or less the time period, 2021.

Q.    So based on your experience in your field, it was around 2021 when you came

to know that GLP-1 can cause these upper GI symptoms?

A.    That's correct.  About -- roughly that time.

Q.    If we take a look back at Exhibit 3, which is the Jalleh paper from the Journal of Clinical Endocrinology and Metabolism, the -- do you agree that if we -- part of this paper was looking at the data or the studies that existed at this time regarding the relationship between gastrointestinal symptoms and gastric emptying.  And I'll direct you to page 4 of the study.

A.    Well, I think it looked at a PubMed search of papers that used search terms that looked at GLP-1 agonists, tirzepatide, and symptoms of --

Q.    And then you -- well, I understand this isn't a study itself.

A.    Yes.

Q.    Where they are actually studying patients, right?

A.    That's correct.  It's really a review paper.

Q.    But the review paper, as part of reporting on the state of the literature, identifies it in this one section, GLP-1 RAs, relationship between gastrointestinal symptoms and gastric emptying, right?

A.    Yes, they did look at that.

Q.    And they noted that the quality of data relating to the effect of GLP-1 RA on gastric emptying is highly variable, largely due to the continued use of imprecise measurement techniques, right?

A.    Yes, that's an issue in terms of how those studies were conducted.  Some used acetaminophen for absorption to estimate gastric emptying.  Some used scintigraphy.  If you look at the Camilleri paper, they kind of really emphasized the fact that the scintigraphy, where you're using an isotope to look at emptying, is really the more accurate way to really assess it.

There were some studies that looked at the smart pill, which is a little pill that you swallow that measures pH.  And so you wear a little monitoring device.  And so based on the pH, you know if it's in the

stomach or the intestine, and some people have used smart pill.

And that's probably pretty close to being accurate.  It's a solid.  So there's differences between liquid emptying and solid emptying.  So, yeah, I think the nuclear medicine test sort of looks at a scrambled meal -- scrambled eggs that they use as a meal that's labeled with a isotope.

So that's really more of a -- I guess you could call it semisolid or sort of soft material.  The smart pill actually looks at an actual device looking at its emptying.

So I guess it depends on which study you look at, and how they measure the emptying.

Q.    And it looks like another way that you can measure the pace of gastric emptying is something called a stable isotope breath test?

A.    Yes, that's another way to do it as well.

Q.    And was that done in some of these studies?

A.    I think they did use that in at

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

least one study.  But not in all the studies, but in -- I think there was one study cited.

Q.    In the left-hand column of page 5 of the Jalleh review article, towards the bottom of this section, it says, "It was traditionally believed that gastrointestinal symptoms were a direct outcome of a delay in gastric emptying.  The majority of studies that have evaluated the relationship between the effects of GLP-1 RAs on gastric emptying and gastrointestinal symptoms in health, obesity, or Type 2 diabetes have found no or a weak correlation."

Do you see that language?

A.    Yes.

Q.    Do you agree with that?

A.    Well, I think this is an opinion, so I would say that there's -- I think he's summarizing several of the papers, yes.  But I -- it's there, so I'm not going to dispute it, but that's sort of an opinion.

Q.    Do you -- these authors wrote in this publication that was published in 2025 that, at that time, the state of the literature was such that the majority of

studies that have evaluated the relationship between the effects of GLP-1 RAs on gastric emptying and gastrointestinal symptoms have found no or weak correlations, they wrote that, yes?

A.      Yes.

Q.      And do you agree that as of early 2025, the majority of studies that evaluated the relationship between the effects of GLP-1 RAs on gastric emptying and gastrointestinal symptoms have found no or a weak correlation?

A.      I think that's -- that's been suggested, yes.

Q.      Okay.  If you look in the upper right-hand corner of this page 5, right at the end of this section on the relationship between symptoms and emptying, the authors write, "In summary, the presence or absence of gastrointestinal symptoms cannot be used to diagnose or exclude the presence of delayed gastric emptying.  Instead, this condition must be specifically measured using suitable techniques, such as scintigraphy or the stable isotope breath test."

Do you see that language?

A.    Yes.

Q.    And do you agree with that statement?

A.    That -- yeah, I would agree with that statement that those scintigraphic methods are better than just looking at the, for instance -- acetaminophen absorption, for instance, would be something that would come to mind.

Q.    Let me ask you about the first -- the first sentence, where it says, "The presence or absence of gastrointestinal symptoms cannot be used to diagnose or exclude the presence of delayed gastric emptying."  Do you agree with that?

A.    Well, that's what they wrote. That's their opinion.  I don't know that I would agree with their opinion, but -- because there are other papers that have suggested that symptoms are correlated with gastric emptying.  But they wrote that.  I agree that they wrote that.  But I don't know that I would necessarily agree with what they wrote.

Q.    That's what I was asking you, yeah.

Do you agree -- do you agree that, as a matter of what your opinion is as a medical doctor, that the presence or absence of gastrointestinal symptoms cannot be used to diagnose or exclude the presence of delayed gastric emptying?

A.    I would probably disagree with that, only because if you have delayed gastric emptying, you typically will have symptoms. But if you don't have symptoms, it doesn't necessarily exclude that you could have delayed gastric emptying.

I mean, there are some people that have delayed gastric emptying, but are asymptomatic.  And I would probably pose it that the majority of the patients on GLP-1 agonists, or even tirzepatide, probably have delayed gastric emptying, but they're asymptomatic.  So we never captured it in the data that people have used in the, for instance, the SURPASS trials.

Those phase 3 trials are done in such a way that patients are asked to report if they have symptoms.  And so what the study sites do is they accumulate all of those

reports, it goes to a central agency, where they tabulate it all, and then they report it to the FDA as, okay, well, for drug X, there's 10 percent of people have this symptom, 5 percent have that symptom.

But just because you don't have symptoms doesn't imply that your emptying rate is normal.  So I guess the way I would analyze that sentence is that it may or may not be associated with delays in gastric emptying.

Q.    So based on your experience and your work for this case, you understand that the presence of gastrointestinal symptoms may be secondary to delayed gastric emptying, but it doesn't necessarily mean that the patient is suffering from delayed gastric emptying?

MS. HAUER:  Object to the form.

THE WITNESS:  Or vice versa.

BY MR. PREMO-HOPKINS:

Q.    Or vice versa?

A.    Or vice versa.  So that if you have a patient who takes drug X, and they have a symptom, it's really hard to infer whether the symptom is related to delays in gastric emptying or not.

So what it does for me is it forces me to go back to look at some of the earlier data with GLP-1, looking at specific data on motility, where they show that there is a delay.

And so if you try to overlay the delay with the symptoms, it's reasonable, in my mind, that the symptoms are related to a delay. So it would be hard to prove unless you actually did a scintigraphic or a smart pill study to -- it would have been nice in the SURPASS studies if they took the patients that reported nausea and vomiting, and actually had them do a gastric emptying test, just to see, are these symptoms related.

But that's typically not how clinical trials are designed. But that would -- you would have to do a phase 4 study that the company would have to pay for to take patients that develop those symptoms and actually do those studies. But without that, it's hard to interpret.

Q.    So without having a randomized control trial with actual scintigraphic results, the existing data is hard to

interpret with regard to how well gastrointestinal symptoms correlate with delayed gastric emptying?

A.      I think that's --

MS. HAUER:  Object to form.

BY MR. PREMO-HOPKINS:

Q.      Go ahead.  You can answer.

A.      Yeah, I think that's a fair way to -- to look at this.

Q.      Okay.  If we take a look at one of -- page 6 of the Jalleh article.

And there's a -- excuse me, there's a section that is providing a summary of the current state of the literature on GLP-1 receptor agonists, and the risk of small bowel obstruction or ileus.  It's on the right-hand column.  Do you see that?

A.     Yes.

Q.      And that's one of the adverse events -- those are some of the adverse events that you looked at, small bowel obstruction or ileus, yes?

A.     Yes.

Q.      And as a result of their search process for the Jalleh article, the literature

Joseph Biseghia, M.D.    Page 89
Case 2:24-md-03094-KSM    Document 691-35    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 90 of 202

that they reviewed says that "While the mechanisms by which GLP-1 and GLP-1 RAs affect intestine motility remain to be defined, they appear to inhibit gastrointestinal motor function through both parasympathetic, vagal efferents, and direct central nervous stimulation."  Do you see that?

A.    Yes.

Q.    And do you agree that as of early 2025, when this Jalleh article was published, that the existing literature had not yet defined the mechanisms by which GLP-1 or GLP-1 RAs affect intestine motility?

MS. HAUER:  Object to the form.

THE WITNESS:  In general, I think that's a true statement, that we don't really know the full mechanism. It's inferred from studies, where if you administer GLP-1 agonists, it slows smooth muscle contractility. That's been pretty well-established. So there is a direct effect.

There's a paper where they did a vagotomy in a pig model, and they showed that it's not mediated through

Hartford Reporting & Technology, LLC
www.hartfordreporting.com

the vagus nerve.  So that was a study that was actually -- I think Jens Holst was one of the authors.

BY MR. PREMO-HOPKINS:

Q.    Can I pause for a second, because we've used a word a couple of times.  A vagotomy, is that a surgical procedure to remove the vagal nerve?

A.    Or to cut the vagus nerve.

Q.    To cut it, so it no longer communicates?

A.    That's correct, yes.  Sorry about using all these terms.

Q.    No, that's all right.

A.    So the vagus nerve is a very important nerve.  It basically innervates the entire GI tract.  It probably accounts for acid secretion, hepatic metabolism, because there's hepatic branches.  And it also innervates richly the small intestine.

So the problem with vagotomies is that patients have slowed emptying, and so -- typically.  So that's why we do the emptying procedure for the stomach.  But it's a good model to do a vagotomy, and look at the

Case 2:24-md-03094-KSM    Document 691-35    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 92 of 202

effects of these drugs.

And I think that's what they did in the pig model to show that GLP-1 actually has a direct effect on the smooth muscle. So it's probably more of a direct effect of the smooth muscle, based on what I've read, than it is through the vagus nerve or through the central nervous system.

Q. So the studies that you're describing are studies that were -- that you've looked at that were done in animal models?

A. In animal models, yes.

Q. And the studies in the animal models that you looked at hadn't defined yet the mechanism by which GLP-1 and GLP-1 RAs affect intestine motility, right? There was still uncertainty there?

MS. HAUER: Object to the form.

THE WITNESS: There was uncertainty, although if you go back to the very early studies, where Jens Holst, who was credited with sort of the discovery of the GLP-1, those studies actually did show that there

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 93 of 202

was a delayed emptying.

But the more recent studies, I think have tried to better define what is the mechanism.  I think it's reasonable to know what the mechanism is, because, perhaps, you could approve the drug target or the drug molecule to sort of reduce that risk.

So I think these studies are important to do.

BY MR. PREMO-HOPKINS:

Q.    And the follow-on studies that you're describing have indicated that the mechanism by which GLP-1 or GLP-1 RAs might affect intestine motility could be this direct effect on the smooth muscle that you described, that's one?

A.    Yes.

Q.    Another one may be the parasympathetic vagal effect?

A.    They're separate. Parasympathetic would be separate from vagal. So the vagus is a -- would be sort of different -- I think they talked about a sympathetic effect and a parasympathetic

effect, which would be vagus.

Q.    Got it.

A.    Sorry to correct you.

Q.    That's all right.  And then another potential mechanism that's been identified and researched is direct central nervous system effects?

A.    That's correct.  That's been postulated, although not really proven.  It's very hard to prove those studies.  But I think Ruby did the studies where they used a radioisotope GLP-1, and he showed that it does cross the blood-brain barrier with -- so the blood-brain barrier sort of protects the brain from a lot of things circulating in your blood.

So these could be drugs.  They could be hormones, could be viruses, bacteria. So the blood-brain barrier is sort of this imaginary complex, sort of a cover, if you'll, of the brain.

So these larger molecules, like tirzepatide is 39 amino acids, they may or may not cross into the brain.  And so the peptide that I developed is actually 56 amino acids.

So this always comes up. Does it cross the blood-brain barrier.

And unless you do the studies like Dr. Ruby, who is somebody who I know pretty well in Switzerland, he's really an expert at being able to isotope -- radiolabel isotope a peptide. And then study to see where it goes.

He suggests that it doesn't cross the blood-brain barrier, so that's -- so we don't really know about the brain effect.

Q. And when you say the brain effect, is that synonymous with the central nervous effect?

A. Yes. Whereas the native peptides, like GIP and GLP-1 probably cross. And in fact, GIP and GLP-1 have effects to reduce appetite in the brain. So that may be one of the mechanisms by which they work. That's the native peptide.

But when you start adding, like, in the case of tirzepatide, additional amino acids, and an acyl group at C20, it's unclear to me whether it does cross the blood-brain barrier.

Q.    So at this point in time, and based on the literature you reviewed, the mechanism by which a GLP-1 RA might affect intestine motility, you agree, it remains to be defined at this point?

MS. HAUER:  Object to the form.

THE WITNESS:  Yes, I would agree with that, generally.  I probably should say that the precise mechanism is yet to be defined, but the data suggests that it probably works peripherally.

BY MR. PREMO-HOPKINS:

Q.    And when you say peripherally, what do you mean?

A.    Through the smooth muscle that expresses receptors for GLP-1.  But in terms of knowing precisely, you'd have to block each pathway.  Very hard studies to do in humans. You may not be able to get a precise mechanism ever established.  We can just go with what we have currently.

Q.    Do you see that there are -- in that same section of the Jalleh paper, there's a discussion on observational studies that

look at the potential association between bowel obstruction or ileus, and the use of GLP-1 RAs.  Back on page 6 -- 6 and 7.

A.     Yes, I see that.

Q.     And at the end of that section that we were just looking at, I'm on the left-hand column of page 7, the authors of the Jalleh paper write, "In summary, available data on the association of bowel obstruction or ileus with the use of GLP-1 RAs are inconsistent, and no definitive conclusions can be made."  Do you see that?

A.     I see that.

Q.     And with regard -- sorry.

A.     Yeah, I see that statement.

Q.     And with regard to your work here, you mentioned you didn't conduct a comprehensive review of the epidemiological literature related to ileus or bowel obstruction, right?

A.     Yeah, that's correct, because I was instructed that that would be done by somebody else.  But they do point out here in this paper, it says, "While some studies suggest up to a threefold increase in risk,

others report no association."

So I think that was pretty fair and balanced on the part of the Jalleh authors, to be able to say that some studies show that there is an association, and others don't.

Q.   And just so we're clear here with regard to -- you didn't do any work to understand the extent to which you could agree or disagree with the specifics of what the Jalleh authors say there, right?

A.   I didn't.

Q.   Okay.

A.   I didn't do that sort of review. Yeah, and I would say that to -- you don't really -- I can't really fault the authors, because this type of data is really important for us clinicians that are practicing in the field, to really bring this to our attention, because, you know, we're on the front lines of actually seeing patients that actually come in with these symptoms.

And if authors like Jalleh and others didn't bring this to our attention, there would be no way for us front line

doctors that are not doing the clinical trials with GLP-1 receptor agonists to be aware that there is an association.

Like, until I read the papers about the risk of patients with -- on GLP-1s that are going into endoscopy with aspiration risk, which actually was only brought to my attention about a year ago, because we run -- I run an endoscopy unit. And we had to create an algorithm for how to deal with patients coming in for preendoscopic procedures.

And I remember when I first read that, I said, Geez, this is really significant. Like, we need to really be on the lookout for people on GLP-1s to make sure that we stop them, you know, early enough to -- so I had to, like, give instructions to the nurse that helps with the preendoscopic scheduling, to advise patients to not only stop their warfarin drugs or blood thinners, but that they need to stop their GLP-1s.

So that was only brought to my attention from a paper I read. And so these papers are really important. So I think what Jalleh is doing is he's sort of covering his

bases. He's saying that some papers suggest that there is an increased risk, and some papers don't show that.

But the way I interpret it, as a clinician, is I'm worried about the threefold increased risk, because if I miss that, and a patient develops a complication, that's sort of on me.

So in a way, I think it's useful for papers to overcall things, and bring it to our attention, so that we don't make a mistake in clinical practice.

Q. You used the term overcall things, what does that mean?

A. Well, to be able to say that a particular drug or treatment plan has an association with a particular disease. It's not a hundred percent certainty that if you use it, you're going to get that disease, but that you're aware of.

A lot of this stuff is not covered in medical school, you know, so I think it's our ability, after we graduate from school, and after we finish all of our training, to go back and read these papers, to

really, you know, just make sure we don't miss this in clinical practice.

Q.    With regard to your -- just going back to sort of the cover of the Jalleh article, and just to orient us in time, you mention this is a relatively recent publication.  It looks like it was accepted and then available online in October of 2024?

A.    Yes, that's correct.

Q.    And do -- and you would have read it in the second half of 2025, at some point, when you were putting your report together?

MS. HAUER:  Object to the form.

BY MR. PREMO-HOPKINS:

Q.    I'm not trying to trick you.  I'm just trying to understand, if you do recall when you first looked at this one.

A.    I probably looked at it probably in November, early December.  Because it came out as a -- as an electronic -- I think it was available before it came out.  Advance access, yeah, so it was available probably to me -- I don't know, late November, early December.

Q.    And I want to make sure we're on the same page with regard to the year.  So

this paper would have been available November, December?

A.    2024.

Q.    2024, yes.  And I'm asking you when you became aware of the paper.

A.    Yeah, I think it was, like, the end of November, early December.  Because that's really when I did the bulk of my research for this -- for this particular case, was in December.  Because I had -- I had vacation time.  So I had time off from work.

So the end of November was around Thanksgiving time, so I think I took some days off.  So I typically only do this work when I'm not being paid by the federal government.

Q.    I got it.

A.    Yeah, so I typically would be away or on some sort of leave before doing the work.  So probably the bulk of the work was done in the last two weeks of December.

Q.    Of 2025?

A.    Of 2025.

Q.    Okay.  And that's your best assessment of when you likely reviewed this

Jalleh paper?

A.    I think I probably reviewed the Jalleh paper in November, because I may have pulled a lot of papers in my searches, but actually didn't really incorporate it into the report until December, so --

Q.    And since you -- are you aware of any studies that have come out after this Jalleh review paper that played a role in your opinions about intestine motility, or ileus, or functional blockage of the intestine?

A.    Since the time of my report, I haven't gone back and done a search, so -- yeah, so the report is sort of everything -- the clock -- sort of, like, time stopped at the beginning of January 2026.  So, you know, I haven't actually done a comprehensive search since then.

Q.    Well, let me ask a more specific question.  The Jalleh article -- between the publication of the Jalleh article in early 2025 and when you issued your expert report in early 2026, were there any studies with regard to intestine motility, ileus, or obstruction that influenced your opinion that came out

sort of after the Jalleh article?

A.    No, I would say that -- the only thing would be the case report, but that was actually published before Jalleh.  So since the Jalleh paper came out, I haven't seen any papers -- I haven't come across any papers that have looked at this.

Q.    Okay.  I'm going to change topics.  Are you doing okay or do you want to take a five-minute break?

A.    I'm okay.  Maybe we could take a break in about 15 minutes, so I could use the restroom.

Q.    Sure thing.  That's one of the things I should have said at the beginning. Whenever you need a break, just feel free to let me know.

A.    Okay.

Q.    The only thing I would ask is, if there's a question pending, if you could answer the question first?

A.    Sure, I'd be happy to.

Q.    Okay.  You've mentioned a couple of times, Dr. Pisegna, that given the timing of the approval of Mounjaro, that there is

less -- there are less studies out there looking at the tirzepatide molecule as compared to other GLP-1 molecules; is that right?

     A.     That's right.  It sort of makes sense, because the GLP-1 drugs have been out a lot longer, but so we have more data on GLP-1.

     Q.     And did you do -- I understand that you have -- you mentioned you have both experience in what you call basic science as well as clinical science?

     A.     Yes.

     Q.     What's the difference there? What is basic science?

     A.     Well, basic science would be science that doesn't involve humans. Typically, it involves cells or animal models, whereas clinical would be studies involving humans.

          Translational would be where you involve humans, and you do -- like, you obtain tissue or cells from a human.  And then you go back to the lab, and try to understand what those are.  So there's basic, translational, and then there's clinical.

Joseph Segura, M.D. CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

And then there's also outcomes research and epidemiology.  Those are sort of different.  So, yeah, so my expertise would be in the basic, translational, and clinical research, but I don't really have expertise in outcomes research or epidemiology, because those are folks that have really done rigorous studies looking at large datasets.  They're very good at statistical studies.

It doesn't mean that I'm not an author.  If you look at my CV, you'll see that I've been an author on epidemiology studies.  But in those studies, I'm actually working with an epidemiologist that's got a -- usually has a Ph.D. in epidemiology to look at associations.

So we've done studies looking at pancreatic cancer associations with, let's say, smoking or weight loss.  So those I'm working with epidemiologists.  I'm there just to provide sort of clinical context, but they're actually going in, crunching numbers.

I don't know how they do it, but they do it.  And they are great people to work with, but I'm unfortunately not one to do

those.

Q.   The tirzepatide molecule, one of the ways it works is by binding to a GLP-1 receptor, yes?

A.   Yes.

Q.   And then it has another component that is referred to as GIP?

A.   Yes.

Q.   And the -- are you aware of data that suggests that the GIP-1 component of the tirzepatide molecule ameliorates or mitigates GI symptoms?

A.   Yes, I'm aware of those studies. Originally, it was thought that GIP would ameliorate the issues related to emptying.  So if you go back to the very early stage of GIP, so Mike Wolfe, who was at Boston University, a close friend of mine, had actually started working with GIP.

And it was thought that GIP would inhibit acid secretion.  In fact, that's why it's called the gastric inhibitory peptide, but it was thought to have really minimal effects on gastric emptying.

So later on, it sort of

really -- GIP itself probably doesn't have a major effect on motility. It does increase glucagon secretion from the liver. And it does act at the beta islet cells to help create insulin.

So I think the thought is, although I don't know this firsthand, and I was not consulting for any of these companies, so there is no conflict of interest, but they probably thought that -- so they knew that GLP-1 has a lot of the gastric adverse events.

And so probably the folks at Eli Lilly thought, Well, here's this other peptide, GIP, that really has a minimal effect. So if we could structure a dual agonist that had the GIP backbone, but we'll add some amino acids from GLP-1, so that it binds to the GLP-1 receptor, and maybe we could see an amelioration of gastric emptying issues that was present for all the other peptides of the GLP-1 family.

That's my thought -- and it was, I think, a good strategy. They added the acyl group in C20 to increase its stability, which I think was really great. It had some

Joseph St. Geme, M.D.    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

components of exendin.

So exendin was the helodermin peptide -- the helodermin-based peptide that is similar to the Gila monster peptide. We were originally working on cloning these peptides when I was at the NIH, in sort of the mid to late '90s.

We hypothesized that the helodermin peptide -- so there's a peptide called helodermin, which is in the same family, and it was a peptide found in the Gila Monster's salivary glands.

So when I was at the NIH, what we did is we went to the Gila Valley in Arizona, and were able to get the salivary glands from the Gila monster to be able to do a CDA library to look for a similar peptide, because we hypothesized that there would be an mammalian homologue to the helodermin peptide.

And so we never found it. We found exendin-4 -- I think we referenced that paper for you. But it was just an interesting historical piece. But, you know, these peptides in that family of exendins are very effective at lowering blood glucose levels.

So if you look at the tirzepatide sequence, there is probably a stretch of, I think, five or six amino acids. I'd have to pull up the actual structure, that were similar to exendin-4.

So I think the thought at Eli Lilly is, Well, let's put a little bit of GIP, a little bit of exendin-4, and a little bit of GLP-1, and we will isolate the C20, we'll develop a drug that has a longer half-life because these peptides in normal people like you and I, that -- when we release from the K cells, GIP, or from the L cells, GLP-1, these peptides only last in our serum for, like, a few minutes, because they are all inhibited by the DPP4 that sort of cleaves and breaks them up.

But it was a good strategy, but I would say that Eli Lilly, by keeping the end terminus of the tirzepatide peptide very similar to GLP-1, that gave it its specificity for GLP-1, which is a little less specific than for GIP.

If you look at the pharmacokinetics, tirzepatide works better at

GIP receptors than it does at GLP-1 receptors. But it still has agonist activity at GLP-1 which, I think, causes a lot of the adverse events that they're seeing.

So the thought was to try to improve the structure, but it didn't completely fix it, so -- yeah, so at least for the motility-related issues.

Q.    Are there differences that you're aware of between how the different GLP-1 RA molecules attach to the receptor?

A.    So are there differences -- just so that I understand your question correctly. So the different GLP-1 agonists, like liraglutide, semaglutide, they have the same typical binding probably to the receptor, although I didn't really specifically look at the structure and function studies.

I think there was one paper that had a very good summary of the structure and function studies, but I don't think I'm prepared to really go through each of the GLP-1 molecules and where they bind.

But in general, the thought is that there's a region of the peptide that will

form a loop structure and allow it to bind into a binding pocket of the receptor. So these -- so the structure and function studies were done years ago for GLP-1, where they did alanine substitutions to the GLP-1 peptide.

And they concluded that the end terminal region of the GLP-1 peptide is critical for binding to the receptor. So if you -- so there's a critical component -- I think it's amino acid 5 or 6, where there is an amino acid that's really critical for binding.

So if you truncate it or you alanine substitute the amino terminus of the peptide, it results in a lack of binding to the receptor. Similarly, for the receptor, because the GLP-1 receptor is very similar to the receptor that I cloned called the PACAP receptor.

So these receptors all have a large end terminus region with a signal peptide region which is usually the first 20 amino acids that help it to insert into the cell membrane.

And then the receptors get

expressed on the cell membrane.  And the end terminus of the receptor interacts with the end terminus of the amino acid -- or of the peptide to allow it to bind.  They all should bind more or less the same.  There may be some subtle differences.  The signaling pathways are the same, though.

So whether it be liraglutide, semaglutide, tirzepatide.  When tirzepatide binds to the GLP-1 receptor, it stimulates cyclic AMP.  So that's why I've sort of concluded that -- with tirzepatide, it will have a lot of the same effects as GLP-1, because it depends on where the receptors are expressed.

So if you express GLP-1 receptors on the smooth muscle of the colon, and you give a drug like tirzepatide, it should bind to those smooth muscle receptors, so --

Q.    That was a lot of --

A.    Sorry.

Q.    -- detail.  Let me see if I can follow up.  So your understanding is that the various GLP-1 RA agonists and dual agonists

like tirzepatide engage the GLP-1 receptor in the same way?

A.    Yes.

Q.    And do you know, one way or the other, whether there are differences in efficacy or biological outcome as a result of how these agonists engage the receptor?

MS. HAUER:  Object to the form.

THE WITNESS:  Well, if I understood your question correctly, there's an understanding of the second messenger signaling pathways.  And there is an understanding of the physiologic pathways.

So once you give the receptor -- the ligand to the receptor, we know how it's going to behave within the cell and we know how it's going to behave on certain cells, like whether it be the beta islet cells.  We know from studies where the GLP-1 peptides will stimulate the release of insulin from beta islet cells.  Those pathways are pretty well worked out.

So there are probably some

subtle differences between each peptide, and the overall response is about the same.

BY MR. PREMO-HOPKINS:

Q.    When you say the overall response, what response do you mean?

A.    The response to be the physiologic response would be the beta cells releasing insulin, the smooth muscles relaxing, so those would be the physiologic responses.  Sorry, I should have been more specific.

Q.    That's all right.

A.    Yeah, I wasn't asked to really look at each individual GLP-1 agonist going back over time, although it would have been -- I would have been happy to do it, because it's an interesting history.

And I've known Jens Holst since the time that he first -- and I knew Dan Drucker, who also worked on it.  We used to go to the same meetings, and I would listen to Dan Drucker talking about GLP-2, which, you know, is another peptide in the sort overall same family.  It's an interesting history, but

I wasn't asked to put that in my report.

Q.    So with regard to the details around any differences between the GLP-1 RA agonists historically and tirzepatide, you weren't asked to address those details?

A.    I was not.

MR. PREMO-HOPKINS:  Okay.  All right.  Why don't we take a break. We're at 11:30, and then -- we can go off the record.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 11:29 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 11:48 a.m.

BY MR. PREMO-HOPKINS:

Q.    Dr. Pisegna, we just took a break.  Are you ready to begin again?

A.    Yes.

Q.    We're going to move on from Exhibit 3, and I want to direct you back to Exhibit 1, which is your expert report.

And in your expert report, you

cite various sources, including preclinical animal data, as well as observational studies and clinical trial data, yes?

A.    Yes.

Q.    Are you familiar with the concept of the hierarchy of medical evidence?

A.    Well, yes.

Q.    And what is your --

A.    Well, in terms of the -- how much to weigh different types of studies, I'm aware of those studies.

Q.    And what is your understanding of that concept with regard to the hierarchy of evidence?

A.    Well, the best evidence would be randomized prospective studies that are placebo controlled, where you compare X and Y to see which is better.  They could also be what are called noninferiority studies, where you're --

THE REPORTER:  I'm sorry?

THE WITNESS:  Noninferiority, so N-O-N, inferiority.

BY MR. PREMO-HOPKINS:

Q.    Dotted?

A.    N-O-N, inferiority.

Q.    Okay.  Noninferiority.

A.    Yes, noninferiority.  Yeah, so those are studies where drug X is being compared to drug Y that has an FDA approval for a particular indication.

And the FDA does not require the drug X to be better than drug Y, just equivalent.  So those are called noninferiority studies.

So those are also very valid.  And then it goes down to meta-analyses studies, where they're retrospective in nature, where they try to look at different studies and identify parameters within those studies that show one thing or another.

And then so the lower ones are going to be, you know, case reports and review papers.  And I would summarize it that way.  So a case report is very useful, but it doesn't have the same weight as a prospective randomized control study.

Similarly, a meta-analysis has validity, because it allows you to sort of look at trends within various studies.  But it

doesn't have the same weight as a prospective clinical trial.

You have, then, retrospective studies that could be part of a meta-analyses. Not necessarily, but I've never done a meta-analysis. It requires a particular skill set, where, let's say, you do a meta-analysis to look at a particular symptom, let's say nausea and GLP-1 agonists.

And so you'll look back at 20 different studies just to see what the -- that association is. And they try to weigh it based on the number of subjects enrolled. It probably depends on if it was a prospective randomized control study or not, that's given more weight.

How those folks do it, I honestly don't know. I've never done one, but I do read them. I think they're helpful, but they're not the same as doing a phase 3 clinical trial.

Q. So in terms of studies that look at outcomes in people, if we think about your -- how you understand the hierarchy, the prospective randomized clinical trial would be

sort of the gold standard at the top.

A.    Yes.

Q.    And then you might also have a noninferiority study that is similar to a randomized control trial?

A.    Yeah, well, a noninferiority study is usually a randomized control trial. It's just that the endpoints of the study, the primary efficacy endpoint doesn't have to show superiority.

In some cases, they do.  So for instance, if you have a drug like semaglutide that is approved by the FDA for, let's say, obesity, if I have a drug, let's say, my drug that I've patented, if I want to show that my drug works equivalently and should get FDA approval after it goes through all of its safety studies, et cetera, preclinical, safety, phase 1 trials, phase 2 trials.

And then I go to the FDA and say, Look, I want to compare my drug which is called MaxCap, but -- so I want to take MaxCap, and show that it's effective, it's safe to treat obesity.

So the FDA will say, well,

you'll need to show that you're as good as semaglutide. You don't have to show that you're better. Now, if I do my trial, and my adverse events are worse -- significantly worse than semaglutide, the FDA may say, Well, there is a safety signal here that we are concerned about, because, you know, half the people in your study died of a heart attack, that would be a safety trigger that I might not get approved, even though I might be as effective as semaglutide.

But -- so if it's safe -- so the FDA really looks at adverse events, safety issues, or probably more important than efficacy. But to get approval, you have to show that you're as effective.

And I've appeared before the FDA to -- you know, with companies to try to get a drug through the sort of the pipeline of approval. And you know, they're looking at safety, they're looking at efficacy. And so that noninferiority trial would be as valid as a superiority trial, just the primary endpoints are different.

Q. Understood. And based on your

experience, you understand that the FDA is paying particular attention to safety issues with medications as part of the approval process and post-approval?

MS. HAUER: Object to the form.

THE WITNESS: Yes, absolutely.

Sorry.

BY MR. PREMO-HOPKINS:

Q. And beneath the prospective randomized control trial in this hierarchy, you identified meta-analyses.

A. Yes.

Q. And that would be a combination of studies. It could be a combination of retrospective studies, prospective studies, but it's a combination of studies; is that right?

A. I would say a combination of retrospective studies. So usually a meta-analysis doesn't look at prospective data, because that would sort of stand on its own.

Q. Understood. And then in terms of the hierarchy of evidence, where would you put individualized retrospective studies?

A.      I would put those right under the meta-analysis.

Q.      Okay.  And then below the retrospective studies, you would have things like case reports or review papers?

A.      Yes.

Q.      Okay.  And --

A.      Although a good review paper could also be a meta-analysis.  So a lot of times, the people that do the reviews, they do sort of a -- an evaluation of all the studies on a particular topic.

And like the Jalleh paper is essentially a review paper.  And it looked at other studies.  If you look at the studies that looked at all the SURPASS studies, for instance, the -- for instance, the Crisafulli paper, those bring in all the SURPASS 1 through 4 studies, and look at particular adverse events.

Now, that would be a review paper, but I would probably give it about the same weight as a meta-analysis, although it wasn't officially a meta-analysis, but it was probably equivalent to a meta-analysis.

Joseph Bosegna, M.D. Case 2:24-md-03094-KSM  Document 691-35  CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER  Filed 05/19/26

Q.   Because it was looking at trends across a combined set of studies?

A.   Yes.

Q.   And what about animal -- non-clinical studies?

A.   So the animal studies are, I think, in my mind, as somebody who does them, very important.  They give important signals that we could look at in humans, but unfortunately, some animals are not the best model for looking at a specific thing.

For instance, rats are not a great model to look at nausea and vomiting, because rats are not capable of vomiting.  So if you look at the studies where they've used rats, they've had to use other surrogates like pica, for instance, as a way to look at nausea and vomiting.

A lot of those symptom-based studies in animals are really difficult to interpret.  So I think you have to kind of look at them, and weigh the -- how applicable it will be to a human.  So I would definitely weigh human studies as more important than animal studies.

The animal studies do shed light on mechanisms of particular actions of a drug. So for instance, if you're looking at motility studies, as we do in our laboratory, we've looked at our peptide against placebo or vehicle for motility.

So we will take a group of mice, we will feed them a particular meal. And then we'll administer our drug subcutaneously in the mice. And then we will sacrifice the mice at various time points to see where the meal is, in respect to the GI tract.

We know, for instance, if we develop a transgenic mouse model, where we, let's say, knock out a particular receptor -- this has been done for GLP-1 receptors, and also for GIP receptors -- we know how those receptors function, because if you knock out the receptor, you get a particular physiologic effect.

So for instance, that's how we discovered that our peptide, we developed a mouse model where we essentially blocked the receptor. It was a PACAP receptor, knock-out mouse model. All of those mice developed

obesity.  So we had a post doc in the laboratory that said, Wow, they also get fatty liver.

And so we hypothesized, Well, if we administer that peptide to a normal mouse, could we try to improve obesity?  So that kind of led to that discovery.  So I think animal models are useful for discovery, but I wouldn't say that they are a hundred percent applicable to the human state.

Q.    So you see animal models more as discovery and hypothesis generating?

A.    Yes.

MS. HAUER:  Object to the form.

BY MR. PREMO-HOPKINS:

Q.    And you would -- before you -- you wouldn't want to reach a conclusion about an effect in humans based solely on an animal model.  Is that fair?

MS. HAUER:  Object to the form.

THE WITNESS:  I think that it would inform me to look at that particular signal in humans, but it wouldn't convince me that all humans will have that problem.

BY MR. PREMO-HOPKINS:

Q.    Got it.  And you would want to know -- if you saw an effect in the animal model, you would want to know, is there human data I can look at to see if it's consistent or inconsistent?

A.    Yes, I would say that as an investigator, if I saw papers related to a particular issue with animal models, I would definitely bring it up.  In our discussions with a pharmaceutical company, certainly with the FDA, we would, I'm sure, bring it up about looking at that particular signal in humans.

Q.    You mentioned that in studying nausea and vomiting, that there are certain animal models that aren't as good, and one you called was the rat?

A.    Yes.

Q.    And that's because the rat actually doesn't vomit and can't tell us it feels nauseous?

A.    Precisely.  But we could say that with mice, for instance, we would potentially look at surrogate markers of nausea.  So for instance, we have -- in our

laboratory, we have 16 cages that have --
they're made by a company called Promethean.

And so these Promethean metabolic cages, we put a mouse into an individual cage. And we can monitor their body weight, food consumption, oxygen consumption. So we can actually tell you in a lot of detail whether your drug of interest has a particular effect in the mouse.

So we would look at things like weight loss, appetite. So if we saw that a particular drug reduced food consumption, that, of course, led to body weight that would sort of suggest to me that there's some issue with that drug causing the mouse to be averse to consuming food.

So not only could we look at bouts of food consumption, but we could look at amount of food consumption. So those would be very instrumental studies.

So for instance, in our animal model, our drug MaxCap doesn't have that effect. The animals actually eat the same amount as a vehicle or placebo, and lose weight, because they have higher energy

expenditure.

So I think that that would suggest to me that the drug doesn't cause those symptoms in a mouse model. But of course, if we go to human studies, we would have to look at those signals.

But it's not a perfect world. So, you know, mice inform us, but it's not a hundred percent. Now the FDA is primarily looking at sort of in vitro models. They have kind of moved more away from animal model testing, because of concerns about animal health and safety.

Q. You mentioned one of the categories of information that you mentioned is the individual or retrospective analyses.

A. Yes.

Q. And you understand that there can be differences in methodology in retrospective studies that affect the reliability of those studies?

A. Yes, absolutely. It depends on how well they're conducted.

Q. You talk about some of those in your report at page 8, and if I could ask you

to turn there.

A.    Yes.

Q.    And you identify some what you describe as strengths and weaknesses of articles and studies that you reviewed.  And then you list some of those there, sort of in kind of the middle paragraph.  Do you see that?

A.    Yes.

Q.    One of the items that you identify as a potential strength or a weakness of an article or study is the method by which delayed gastric emptying was measured.  Do you see that language?

A.    We're on page 8?

Q.    On page 8, at the top of the -- the paragraph begins, "In reviewing this material, I gave attention to" --

A.    Yes, okay, I see that.

Q.    And you say, "For example, I reviewed and considered the method by which delayed gastric emptying was measured."

A.    Yes.

Q.    How would the method by which delayed gastric emptying is measured be either

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

a strength or a weakness of an observational study?

A.    That's a great way -- I have to credit Dr. Camilleri for really bringing that -- he had a very nice paper, looking at gastric emptying.

But there is different methodologies that have been used.  So for instance, the scintigraphic method is probably the best way to look for emptying, compared to acetaminophen absorption, where acetaminophen is only absorbed through the small intestine. So anything that delays the acetaminophen or Tylenol from getting absorbed through the small intestine would have an inverse relationship with the rate of gastric emptying.

So it's a good sort of -- I hate to use the word "poor man's," but it's a suggestive way of looking at that data.  But it's not as accurate as either smart pill or scintigraphic.

Q.    So the more accurate that the gastric emptying can be measured, the stronger that particular study would be?

Case 2:24-ml-03094-KSM     Document 691-35     Filed 05/19/26     CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

A.     Yes.

Q.     Then you say, "The extent to which adverse events were endpoints or otherwise reported," is that just talking about what the specific goals of the study were?

A.     Well, generally, that statement refers to the -- those are usually secondary endpoints.  So these studies were conducted to really look at effects on insulin release or improvement in blood glucose levels.  Those are usually the primary endpoints, or it could be weight loss could be an endpoint.

The second endpoints are usually tolerability studies that are analyzed and collected.  So none of these studies are really powered to look at differences in rates of nausea, vomiting, constipation, or diarrhea.  Those are just listed as adverse events.

Q.     When you say none of these studies, you're talking about the randomized control trials?

A.     That's correct.  I'm sorry, I should have clarified that.  I'm talking about

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the phase 3 drug trials that were conducted by whatever company it is of interest.

They would usually list, as their primary endpoint, because the FDA mandates that, but the adverse events are usually monitored.  So if you notice, in those phase 3 trials, the adverse events are usually discussed last.  So the primary endpoints are what's shown upfront.

Q.    And the -- with regard to -- if we set aside randomized control trials, and focus on, like, a retrospective observational study, does the choice of which adverse events or endpoints in those types of studies affect their reliability or applicability?

A.    They wouldn't, typically.  So most of those retrospective studies were focused on GI adverse events.  There are some that have looked at other events like pancreatitis or gallbladder disease, but they sort of get lumped under a general category of GI adverse events.

Pancreatitis always shows up because, like I said, you know, early on, there had been concerns that GLP-1 agonists

induce pancreatitis.  So, you know, those are listed.  I treat patients with neuroendocrine tumors.  A lot of these tumors express GLP-1 receptors, so there's a lot of concern if you were to use GLP-1 in a patient with a neuroendocrine tumor, you know, it could stimulate the growth of the tumor.

And I think that's actually a wording on these drugs, that if you have a neuroendocrine tumor to not use it.  In fact, I have a patient with a neuroendocrine tumor. I saw him last week.  And he's a little bit heavy.  And he asked me -- he said, you know, I'd like to go on GLP-1.

And I said, No, you're not going to want to do that, because they could potentially increase the growth of the tumor. Is it a hundred percent certain?  I would say, no, we don't know for sure.  But I don't want to really test the -- I don't want to really test the hypothesis on a patient that --

Q.    Yeah.  So let me -- maybe I can ask you a different question.  In a retrospective study, I understand that you looked through some retrospective studies that

identified different endpoints, different
adverse events endpoints?

A.    Yes.

Q.    Some are bezoars, some had
gastroparesis, some had ileus, things like
that, yes?

A.    Yes.

Q.    You want to make sure that the
adverse event that you're looking for or
looking at is actually measured in the study,
though, right, yes?

A.    Correct.  They usually are,
though, because the phase 3 randomized trial
would typically list -- there's usually
several tables that list adverse events.

So I can tell you, when we wrote
our New England Journal paper with the COVID
vaccine, yeah, there was a, you know, whole
table about adverse events associated with the
Moderna COVID vaccine, so those are listed.

It would be very disingenuous to
not include that.  It would be probably a huge
issue.  My experience working with companies,
they have all been very aboveboard about
listing any adverse event.  I will say,

Case 2:24-ml-03094-KSM     Document 691-35     Filed 05/19/26     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

sometimes the adverse events -- so these are reported by patients and captured by a clinical coordinator usually on a case report form.

So sometimes a patient might come in and say, Well, I've got this symptom, you know, we don't really know if it's associated with the drug or not. So as a principle investigator, I have to go back and look at that symptom, and identify whether, in my opinion, my medical opinion, whether I think that it's associated with that particular drug.

And so it's captured on these CRFs or case report forms. And all that data goes to the FDA. It's tabulated. And usually when we do these really large studies, the pharmaceutical company has a good group of data people that will data crunch the numbers and put together these tables, because if you're one investigator out of, let's say, a hundred around the world, you know, I really don't know the adverse events at another drug trial site.

So the drug companies are the

ones that really put these tables together, but for the most part, these are reported data.  It's hard to verify the validity of it, but we just have to accept it, I think.

Q.     So one of the other potential strengths and weaknesses of a study that you identify, if you look down a couple of lines is whether material had been subject to peer-review.  Do you see that?

A.     Right.  Yes.

Q.     What is the significance of peer-review, in terms of whether a particular study is stronger or weaker?

A.     Well, that's a great question. So I'm an associate editor for a journal, and I have to make these decisions every -- several times a week.

Basically, you'll have to look through the paper.  You'll typically, as an editor, review it.  And then you'll typically send it out to experts in the field, what are called reviewers.  Usually it's two or three reviewers.

And those reviewers scrutinize the data.  And so if there's something that

Case 2:24-md-03094-KSM     Document 691-35     Filed 05/19/26     Page 138 of 202

doesn't look correct, it will be sent back with a lot of comments. The authors will have to address those comments. So that's the peer-review process. It's meant to, I think, enhance the quality of the publication, and to approve it.

Now, abstracts, for instance, are not typically peer-reviewed. So when I submit an abstract to a meeting, those typically are not peer-reviewed. So the information in it is not subject to scrutiny.

And so that -- so abstracts, I typically don't really consider very high -- in fact, I think I referenced an abstract by Chiang, C-H-I-A-N-G. I may be mispronouncing the name, but -- so that's an abstract that focuses on tirzepatide adverse events.

And so that paper, it's sort of at odds with other papers, but I considered it. But because it's an abstract, I kind of give it a lower weight than I would for a paper that's a retrospective study that looked at a particular issue.

So let's say if you look at -- I think it's Crisafulli and Chiang, the weights

are somewhat different between both groups of data.

Q.     So abstracts, generally not subjected to peer-review, those would be lower in the hierarchy of evidence as compared to a study subject peer-review?

A.     Yes, that's the way I would view it.  And you know, as an editor, as the reviewer of many papers, if -- let's say somebody were reporting on a particular dataset, and it wasn't supported by the actual data, we would -- I would probably decline the paper.

Would it ever get published in a peer-reviewed paper?  It's possible, because the authors might send it to another journal. But I think, especially for journals like the New England Journal, I think that they're pretty stringent in terms of their review process.

And then there's lesser journals based on who is on the editorial board, who are the group of reviewers.  So there's still some subjectiveness to getting a paper published.  So even though you have a

peer-reviewed paper, I kind of look at the journal that it's published in.

So if it were published in New England Journal, I'd probably give it more weight.  If it's published in JAMA, I'd give it more weight.  If it were published in sort of an obscure journal that is not heavily read, I'd probably give it less weight, even though they're both peer-reviewed papers. That's how I tend to look at things.

Q.    That's helpful.  And I've seen that sometimes, there's a concept referred to as a high impact journal.

A.    Yes.

Q.    And so things like the New England Journal of Medicine and JAMA, you would consider those high impact?

A.    Yes.

Q.    And so you might give a paper that was published in a high impact journal more weight than you would something published in a lower impact journal?

A.    Yes, I would.  And I probably can speak for most people in academics, you typically look at the quality of the paper the

journal that it's published in.

Q. And is a poster, is that like an abstract. I've seen sometimes, where there are sort of posters that go along with conferences. Is that similar to an abstract?

A. Well, a poster is sort of an end result. So typically, the abstract gets published, depending on the meeting. And then if it gets accepted for poster presentation, there's a group of reviewers that work at the journal that will accept or decline a paper for presentation.

So you could present as a poster, you could present as an oral. So you know, they do -- it does go through some review process to be selected for presentation, but what actually gets presented isn't reviewed.

Q. I see. So the contents of the poster or the underlying data wouldn't be subject to peer-review?

A. It would not.

Q. Okay. And then a letter to the editor, is that something that you would put a lot of weight on in reviewing the literature

about a particular topic?

A.     Well, to be published as a letter to the editor, the -- the editorial board reviews those.  What I can tell you what I do with my journal, American Journal of Gastroenterology, as an editor, is if somebody writes a letter to the editor, oftentimes those should be related to an article that actually came out, but not always.

And some authors will try to publish original data as a letter to the editor.  What I typically do is send those out for review to people that are experts in the field, because you don't want to give somebody a free hand to just put whatever they want to put.

But you said -- depending on the journal, the letters to the editors are probably reviewed, but I can't really say for sure, just reading it, once it's published.

Q.     Understood.  You mentioned the American Journal of Gastroenterology.

A.     Yes.

Q.     And is that a journal that you're currently an editor on?

A.      Currently, yes.

Q.      And which organization -- is that the flagship journal of one of the organizations -- the gastroenterological organizations in the United States?

A.      Yes, it's the journal for the American College of Gastroenterology.

Q.      And so with regard to your experience in the American Journal of Gastroenterology, if there were a letter to the editor that contained original data, that would be something that would be subject to some form of peer-review?

A.      If I were the editor reviewing it, I would send it for peer-review, typically.

Q.      Do you know if that's the practice in any other journals?

A.      I can't really tell you that firsthand without knowing the journal.  But I personally would say that it should be, but -- the practice, but I can't really say.  I haven't really looked at other journals.

Q.      Along these same lines, I want to direct your attention to page 40 of your

report, Dr. Pisegna.

And at page -- if you need to orient yourself, you can sort of look back to page 38, 39.  It will give you an idea of the top that's being discussed.

But do you see that this is a portion of your report where you talk about the existing data around mechanisms for gastrointestinal symptoms that are reported with GLP-1 RA drugs?

A.    Yes, I see that.

Q.    And one of the mechanisms that you talk about is the centrally mediated CNS, and that I see discussion of that on page 40, in particular?

A.    Yes.  So essentially, I've sort of regurgitated what the authors of those papers talked about.  I'm not suggesting that GLP-1 acts centrally or not.  Just the authors brought that issue up.

In fact, I think I put it in quotes for that reason, because I don't know if that's true or not.  So the -- on page 39, it says, "GLP-1 significantly inhibited centrally induced antro-motility and the

inhibitory effects of GLP-1 on gastric motility persisted after vagal deafferentation, supporting the hypothesis that the inhibitory effects result from direct interaction of GLP with receptors of the CNS, which, in turn, reduces vagal effort output."

I just took that directly from the paper, so I put it in quotes. I'm not making that statement.

Q. I see. I see. And if I turn your attention to the bottom of page 40, the last full paragraph that you had there, it looks like you have some commentary about the state of the literature with regard to a CNS effect.

A. Well, yes, I was trying to just look at all the data objectively, and so I wrote that "There is not sufficient data to conclude that GLP-1 receptor agonists are modulating biologic effects through the CNS system. And if so, any effects is greater or surpassed by that caused by the symptoms associated with the delay in gastric emptying."

I wrote that to be very

objective about what I read about the data. So that's why I wrote that.

Q.    Understood.  And so you wrote in the -- in that paragraph, sort of right in the center, you said, "The vast majority of references to a centrally mediated mechanism in relevant medical literature frame the interaction between GLP-1 RAs, gastrointestinal adverse events, and central nervous system function as speculative, or as an area in which more study is needed."

Do you see that?

A.    Yes.

Q.    What is the significance of the fact that the authors of those studies identify that connection as speculative or an area where more study is needed?

A.    So if we could look at reference 162, I think that's where -- so that's the Bellavance paper that was published in Current Gastroenterology Reports, which, by the way, I'm also an editor with that journal as well. And that was published in 2025.

Basically, its summary says, studies are needed to further ascertain the

mechanisms -- the mechanistic differences between GLP-1 and GLP-1 receptor agonists.

So that's why I wrote that, because the Bellavance paper brought it up that we don't really know a lot about the mechanisms for how these incretins like Ozempic or tirzepatide, how these actually work.  And it's an area that needs further evaluation.  So I wrote that just to be very objective.

Q.    I see.  So if there are -- if the authors of a particular study are saying, this data is still speculative, this is one area where more study is needed, you would tend to defer to the authors on whether or not that is true or not?

A.    Yes, I --

MS. HAUER:  Object to the form.

BY MR. PREMO-HOPKINS:

Q.    Go ahead.

A.    Yeah, I would, because the -- I'm just reporting what the authors reported in my report.

Q.    Got it.

A.    So I try to be very fair and

balanced to address the original questions that were posed to me, to provide guidance to the court about, you know, the potential for these agents to cause this problem or that problem.  So I try to be very fair and balanced when I could.

Q.    And in being fair and balanced, you felt that it was important to note that when authors had identified whether or not the connection they were evaluating was speculative or where more study was needed?

A.    I think it would be helpful to all those concerned to know that it's not a cut and dry answer, that there's still areas for further research and exploration.  And so --

Q.    Understood.

A.    So I think -- you know, I think it's important for my report to provide really a very balanced view of these questions.

Q.    Understood.

All right.  Well, I'm at a natural stopping point.  Why don't we take a break for lunch, and then I think -- I hope -- we can go off the record.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 12:26 p.m.

(Lunch recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 1:24 p.m.

BY MR. PREMO-HOPKINS:

Q.    Dr. Pisegna, I wanted to ask you, if we take a look at page 20 of your report, which is Exhibit 1.

A.    Okay.

Q.    And the -- on page 20, you describe some particular abstract that you identified by author, I'm going to pronounce it Jaber.

A.    Yes, Jaber.

Q.    Do you know of Jaber?  Do you know that person?

A.    No, I don't.

Q.    And the -- you identified in particular here that "Jaber's abstract carries less weight in forming my opinion, because the Jaber abstract reports wide confidence intervals, and it is not accompanied by full

underlying data."  Do you see that?  It's the last sentence of the first large paragraph on page 20.

A.    Yes, that's the abstract that I was referring to earlier today.  I apologize.  Yes, so that's the abstract that -- that doesn't typically doesn't get peer-reviewed.

I think when you were asking me about the peer-review process, that abstract probably didn't get peer-reviewed.  That's why I wrote it carries less weight in forming my opinion.

Q.    And when you say less weight, less weight than what?

A.    Less weight than the earlier studies that I was referring to earlier in this paragraph.  So the Crisafulli study, for instance, because that used a large database, so I would view an abstract as sort of lower priority or lower confidence compared to a larger study, even using retrospective data from a large database.

The Jaber abstract also used another database, I think they used the Tridex database, so -- for their analysis.  So I

think that because it's an abstract, it wasn't really peer-reviewed. So I was actually kind of curious when I came across that abstract, because I had assumed that they would have written a full paper.

See, usually, when you put an abstract, it's sort of like preliminary because to a meeting, you present a poster. And then usually afterwards, you write a larger study that gets published in a peer-reviewed journal, so -- but I didn't find it. I looked. I tried to see if that data had been published in a peer-reviewed journal, but I couldn't find it.

So, you know, it could be, when those kind of things happen, that maybe there were some issues with it -- usually whenever you write an abstract for a meeting, usually the credit you get in academics is to come out with a published paper in a peer-reviewed journal. At least at UCLA, all the promotions which I have had to go through for 30 years to be a full professor, so usually what the promotions committee looks at is, did they write papers.

And so the -- on the promotion committee, we actually ding people that just write a lot of abstracts, but never go on to full papers, so -- so to have an abstract without a full paper is a little bit concerning.

I kind of looked at it -- so I guess, I think that's why I wrote in forming my opinion, it had less weight, because had it been an abstract that led to a full paper, I would have, obviously, given it equal weight to the Crisafulli paper.

But because it was an abstract only, then, you know, I don't want to read into too much about it.  But it's -- I was curious why it wasn't published.

Q.    Do you have any thoughts, one way or the other, about the Tridex database, whether it's reliable or not?

A.    Well, I think as I said earlier, I'm not an epidemiologist.  So usually it's my epi colleagues that actually work with these large datasets.  And although I've published epi papers, where we've looked at databases like the Medicare databases or the insurance

Case 2:24-ml-03094-KSM     Document 691-35     Filed 05/19/26     Page 153 of 202

databases, it's usually my epi colleagues that actually know how to go in to pull data out of those large datasets.

I don't really know how to do that.  But, yeah, I guess it's really more of a question for epi to sort of figure out whether Tridex is better than Optum.  The reason -- it's just that -- because one is an abstract and one's a paper, I kind of gave more weight to the paper that was peer-reviewed than an abstract.

Q.    Understood.  And just for the record, let's do this.  Let's mark this Exhibit 4.

(Exhibit No. 4 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    Short, but small font.

A.    Yes.

Q.    Just for the record, on Exhibit 4 includes a -- on page S945, includes an abstract entry entitled, "Tirzepatide shows lower risk of gastrointestinal side effects compared to other glucagon-like peptide GLP-1 receptor agonists:  A real world analysis of

over one million patients."

And then it lists Jaber as the lead author, yes?

A.    Yes.

Q.    Is this the abstract that you're discussing on page 20 of your report?

A.    Yes.

Q.    And other than the fact that this is an abstract, and you don't know -- you're comparing it to a paper, do you have any other criticisms of the study design or process that was used here?

A.    Well, I think I concluded that the other issue with it is that the primary endpoints -- so this is a retrospective cohort study.  So it looks at 69 healthcare institutions.  They looked at adults that were prescribed tirzepatide as a single agent for Type 2 diabetes.

They used ICD-10 and CPT codes to identify those subjects that were using tirzepatide.  I'll just kind of pause for a second there, just to tell you, from my limited discussions with my epidemiologists, and I'm in no way an expert, but, like,

sometimes the way you pull the data out of ICD-10 and CPT coding, it's not as accurate as if you pull actual pharmacy database.

So, for instance, if you're pulling data directly from the pharmacy databases, it tends to be a little more accurate.  So because ICD-10 and CPT coding can be incorrect at times, because it relies on the physician's coding of the drug.

So for instance, when I prescribe a drug at UCLA, I have to link an ICD-10 code to that particular drug.  And sometimes, I have to say it's a bit onerous, and sometimes I may miscode.  And so I apologize if I do that.

But oftentimes, you're a very busy clinic and sometimes you can make a mistake.  So they excluded people that were pregnant or had cancers.  And that's all fine.

But the primary endpoints were gastroparesis, reflux -- sorry, I'll say it slower.  I apologize.

Primary endpoints were gastroparesis, reflux, presumably they're talking about reflux esophagitis, Barretts

esophagus, and GERD, or gastroesophageal reflux disease.  And they looked at time periods of six months, one year, and two years.

So when I first read this abstract, I thought to myself, Well, they're coding gastroparesis, but oftentimes, that's not coded, because as we talked about earlier, it's sometimes hard to make that diagnosis of gastroparesis without doing motility studies or, like, scintigraphy.

So some people may not list gastroparesis, even though the patient may have nausea, vomiting, diarrhea.  I think if I were doing this abstract, and I was on this team with Jaber, I would have suggested pulling data such as nausea and vomiting, diarrhea, constipation, instead of looking for specific diagnoses like gastroparesis, which may or may not be used commonly.  So I think that was my big issue with this.

So I think that explains why they saw a low risk of gastroparesis, because the patients weren't coded with that particular code.  So that it wouldn't have

popped up. That's how I would explain this abstract. If I were reviewing it, I would probably have asked them to look at those codes.

Q. Do you know whether the Crisafulli study relied on ICD codes? I can show you a copy.

A. Yeah, if we could, because they used the Optum database. But I think that's a fair question. I believe they did use codes. But the codes they used were for nausea, vomiting, diarrhea, not gastroparesis.

Q. We're going to mark as Exhibit 5, the Crisafulli study.

(Exhibit No. 5 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q. So I've handed you Exhibit 5, which is the Crisafulli study, which is the one that you compared to the Jaber abstract on page 20 of your report.

And if you look at the study outcomes section on page 4, you see that it indicates that study outcomes were identified using the 10th revision of International

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 158 of 202    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Classification of Diseases, or ICD-10 codes.

A.    Yes.

Q.    And that includes ICD-10 codes, for example, for gastroparesis, yes?

A.    Correct.

Q.    And so the same concern, if I may call it that, that you identify with regard to ICD-10 codes, and identification of gastroparesis would be equally applicable to Crisafulli, yes?

A.    I wouldn't say the same concerns because they looked at other parameters that weren't part of the Jaber paper.  So they also looked at acute pancreatitis.  They looked at biliary disease, bowel obstruction.  They did look at gastroparesis and severe constipation, so -- but the -- the two studies both looked at gastroparesis.

Q.    I guess what I'm trying to understand is, other than the peer-reviewed piece, do you have any reason to trust the data in the Crisafulli study more than the data in the Jaber abstract?

A.    Well, with regards to gastroparesis, I guess that I would probably

go back, based on that discussion about gastroparesis and the issues related to coding, and say that maybe they underreported gastroparesis, because that would be the issue for both studies.

If you looked at gastroparesis, that diagnosis doesn't always pop up on ICD-9 or 10 coding. So if they probably had looked at nausea and vomiting, they probably would have seen a bigger -- sort of a larger number of patients that had those symptoms. But they didn't. But they looked at gastroparesis. But they did show a difference, but I guess the issue is, did they underreport it? And that would be my only concern.

Q. The -- do you have a reason to believe that there would be differential underreporting in the groups analyzing Crisafulli? I mean, one group was tirzepatide patients, and the other groups were also receiving GLP-1 RA medication, yes?

A. Well, I think with regards to gastroparesis, if that was the ICD-10 code that you used, you potentially could underreport other upper GI symptoms, because

you can have symptoms of -- you could go in to be seen with nausea and vomiting, but the doctors seeing you in clinic may not actually put a diagnosis of gastroparesis without having some other imaging finding, because gastroparesis is a pretty specific diagnosis, but it's not really an adverse event, so much as it is an actual diagnosis.

Q.    If we take a look -- well, I guess one of the concerns that you noted about Jaber was that they reported on the gastroparesis diagnosis, but that they should have looked at more specific -- excuse me, more -- something more like adverse events, like nausea and vomiting, dyspepsia, and things like that?

A.    Correct.  Yeah, I would say that would be my criticism of probably both papers, would be looking at other symptoms, in addition to just the ICD coding for gastroparesis.

Q.    Okay.

A.    That's a good point.  Could I also just point out, if you go to the supplemental table 4 on the Crisafulli

paper -- so one advantage of the Crisafulli paper that wasn't really apparent in the Jaber paper is that they have a list of all the adverse events that they evaluated as part of their analysis.

So it included a large number of diagnoses, and whereas the Jaber paper doesn't really show exactly what specific ICD-10 codes that they used for their analysis.

Q.    Let me ask you in Crisafulli, if you look at the ICD-10 codes in supplementary table 4, supplemental table 4 is identifying the codes that the Crisafulli authors used to identify what they called gastrointestinal adverse events?

A.    Yes.

Q.    Do you see any reference to nausea, vomiting, or dyspepsia?

A.    No, with the exception of, they do include irritable bowel syndrome with constipation.

Q.    And in -- you would think that this would be a better analysis if, instead of looking at things like the final diagnosis of gastroparesis, it instead included more a

symptom-based approach, looking at nausea, vomiting, dyspepsia, and things like that?

MS. HAUER:  Object to the form.

THE WITNESS:  I think that would be easier to extrapolate this information to the data from the phase 3 studies.

BY MR. PREMO-HOPKINS:

Q.    Okay.

A.    If they were to use similar terms.  We're kind of looking at apples and oranges, but I think that's, you know, a definite weakness.  If I were reviewing the Crisafulli paper, I would have probably asked for those other adverse events that are -- that were seen very historically with GLP-1 agonists.

And that there have been a number of papers showing that GLP-1 agonists caused those symptoms.  And since they were including GLP-1 agonists in their report, along with tirzepatide, but they also included a large number of patients that were on GLP-1 agonists, it would have seemed reasonable to have included those diagnostic codes.

Q.    Why don't we take a look at another document.  Thank you for helping me understand that.  So the -- you looked at a couple of studies, I think, that they were preclinical studies by an author named Borner.

A.    Yes.

Q.    The -- why don't we mark tab 40.

(Exhibit No. 6 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    And Exhibit 6 is a 2021 article by Borner and colleagues published in Diabetes.  Is this one of the articles you reviewed in forming your opinions?

A.    Yes.

Q.    And the title of this article is "GIP receptor agonism attenuates GLP-1 receptor agonist-induced nausea and emesis in preclinical models," right?

A.    Yes.

Q.    And do you agree that the work by Borner and colleagues here provides some support for the idea that GIP-1 receptor agonism, which is a differentiating factor for tirzepatide, would lead to less GI adverse

events?

A.    That's what this paper suggests.

Q.    And do you think -- and if we take a look at page 2552, in the upper right-hand corner, the work by -- you know, from reviewing this study, as well as at least one other, that the work by Borner and colleagues identified in multiple species that GIP activation reduced the incidence of gastrointestinal adverse events, right?

A.    Yes.

MS. HAUER:  Object to the form.

BY MR. PREMO-HOPKINS:

Q.    And the -- in terms of understanding, how did you reach a different conclusion than Borner -- let me back up and ask you a different question.  Is that all right, Dr. Pisegna?

A.    Sure.

Q.    My understanding is that you don't necessarily hold the same conclusion that tirzepatide or GIP -- GLP-1, GIP result in fewer GI adverse events; is that correct?

A.    Yes.

MS. HAUER:  Object to the form.

THE WITNESS:  Yeah, I would say that the tirzepatide, which is the dual agonist, has similar effects on adverse events, as does GLP-1.

BY MR. PREMO-HOPKINS:

Q.    And when you say adverse events, are you referring specifically to upper GI adverse events?

A.    Thank you for the correction. Yes, it would be upper.  Nausea, vomiting, diarrhea, constipation.  So it would be both upper as well as some colonic-related issues.

Q.    Did you say colonic?

A.    Colonic, yes.

Q.    Okay.  And do you recall seeing human data that identified whether or not the -- those specific adverse events, nausea, vomiting, upper GI-related adverse events were reduced with tirzepatide as compared to other GLP-1?

A.    The studies suggest that they're similar, maybe slightly lower than GLP-1, but sort of within sort of the error range of GLP-1 effects.  So there was a trend towards slightly -- a reduced effect, but still was

present.

The difference with this study is, this is an animal model study, so they were using GIP administration.  And the thought was that GIP would be able to attenuate or reduce the effects of the GLP-1 agonists.

And I think it was -- you know, it was a reasonable approach.  And perhaps if you were to give GIP and GLP-1 as two separate injections, it's possible that you would be able to attenuate the GLP-1 effects.

But tirzepatide is a sort of a unique compound that's not really two separate peptides.  It's essentially -- it's a molecule.  I mean, it's conceivable that if you were to give GIP separately to GLP-1, it's possible that it may attenuate the results.

But based on this paper, that's what this paper would suggest, that if you were going to use this data to go to a human study, it would suggest that you should administer them separately as two separate drugs.

So perhaps GIP plus semaglutide

might have a lower side effect profile for adverse events related to the GI tract. That's possible.  But that was outside of the scope of what I reviewed.

Q.    So in terms of the translational work, or translating this particular paper that's Exhibit 6 into a human clinical context, the one way to do that would be to look at people who took GLP-1 and give them separately GIP?

A.    Yes.

Q.    Okay.

A.    Right.  And actually, this study -- so it was done at the University of Pennsylvania.  And I'm sorry to interject this, but it was an Eli Lilly study, at least it was -- you know, there were -- some of the authors were actually Eli Lilly.

And it's possible that Eli Lilly was actually looking into trying to do that. I don't know, because I wasn't part of that discussion, but it's possible that back in 2018, '19, '20, probably when these studies were done, they probably were thinking about trying to do that.

Case 2:24-ml-03094-KSM    Document 691-35    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Because it was evident that GLP-1s had all these adverse events. And the great folks at Eli Lilly probably said -- they were probably sitting in a room much like this, and they were trying to say, Well, is there anything we can do to create a novel product that we can patent, take to the market to be better than a GLP-1 agonist.

And that's probably what led to the genesis of this study, because they probably figured, Well, if we administered GIP separately -- and it could probably be in the same vial. Like, so the same injection can have both GIP and GLP-1, as long as the two didn't cross-react. But most peptides usually are pretty stable. It could be what they were thinking of doing as a research project.

Q.   The 2021 Borner paper from Diabetes, do you take this as any evidence that tirzepatide has a reduced side effect profile when it comes to upper GI adverse events as compared to other GLP-1 agonists?

A.   I think that would be a stretch of extrapolation. I don't think it would be -- I don't think you could equate this

study to tirzepatide directly, because one is using a GIP agonist separate, and a GLP-1 receptor agonist separate.

Tirzepatide is its own unique peptide. And as I mentioned, it also has exendin -- so exendin has typically a lot of adverse events. In fact, that's why exenatide is not used as commonly as opposed to semaglutide.

So it could be that the amino acids that are exendin-related might contribute to some of the nausea and vomiting, I don't know that, because I didn't look at it that way. I'm just thinking about it here today, that the -- I think you should look at tirzepatide as its own unique peptide that was developed, patented, tested.

And this -- the GIP itself, I don't think could inform you about tirzepatide, would be my recommendation.

Q. So with regard to looking at the scientific evidence related to tirzepatide, you would want to look at it as its own unique peptide?

A. Yes. If I were -- I don't know,

if I was like the project leader for tirzepatide, I would -- that's what I would recommend.

Q.    Got it.  Okay.

A.    I should add, GIP is a very important peptide.  So in our studies that we published on bariatric surgery patients, we actually measured GIP levels in patients who have had bariatric surgery.  And so those levels do go up.

So we kind of like administering GIP.  But what we've done is we've surgically rerouted the GI tract.  We also know that the microbiome plays a big role in releasing some of these peptides.  So there's a whole microbiome component to this as well.

MR. PREMO-HOPKINS:  I'm going to hand the court reporter what I'm going to mark as Exhibit 7 to your deposition.

(Exhibit No. 7 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    Is this paper by Knop and colleagues, is this one that you reviewed as

part of your work in this case?

A.    Yes.

Q.    And this is a -- an actual study in real people, right?

A.    Yes.

Q.    And the -- just to be clear, if we take a look on what I think is the first page, we can see in this study design that this is a randomized placebo controlled study, right?

A.    Yes.

Q.    And if we turn into the paper to the conclusions -- oh, and this is -- sorry, this is dated 2024, right?

A.    Yes.

Q.    So a few years after the animal model studies that we were looking at, right?

A.    Yes.

Q.    If we take a look at the conclusions, and the very first sentence of the conclusion says, "Here we show that coexposure to a GIP RA," that's a GIP receptor agonist; is that right?

A.    Yes.

Q.    "Can reduce the incidence of

GIAEs," that means gastrointestinal adverse events, correct?

A. Correct.

Q. "That are commonly seen with GLP-1 RA treatment," right?

A. Yes.

Q. And this evidence that's reported by Knop and colleagues is consistent or concordant with the animal evidence that we saw in the Borner article, right?

A. I wouldn't say it was identical, because this paper by Knop, they actually looked at some of the symptoms, such as gastroesophageal reflux, nausea, abdominal distention, early satiety, vomiting, diarrhea, dyspepsia, constipation; whereas, in the other paper, that wasn't actually specifically looked at in the paper by Borner.

So there's obviously differences. One is a human study, one's an animal study. They are using in the Borner paper, which, again, is also funded by Eli Lilly, they are using a compound called LY3537021 that they've abbreviated LY for this paper.

So their thought was -- consistent with the Borner paper, the folks at Eli Lilly probably figured, Well, let's study this in humans.  And if we give a GIP receptor agonist, can we ameliorate the GI symptoms with a GLP-1 receptor agonist.  So I think that was the whole point.

And I think the study did show that there was a reduction in some of the GI adverse events.  So if you look at the table -- or the figure called figure 2, so I think figure 2 sort of summarizes everything.

So the placebo is in gray, and the LY compound is in orange or red.  So you can see that if you give the LY compound to these subjects, you do reduce the appetite, you reduce the gastroesophageal reflux rate, you reduce the nausea, the abdominal distention, and early satiety.

But the only one that was significant was the gastroesophageal reflux.  And that was -- the P-value suggested significance.  For those other symptoms, there was really a -- they listed as nonsignificant.  So there was a trend to a reduction, but what

Case 2:24-ml-03094-KSM    Document 691-35    Filed 05/19/26    Page 174 of 202

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

was not statistically significant, probably because they didn't enroll enough subjects.

Q.    So what I'm trying to understand is, you've got the Borner -- you've got Borner.  We looked at one Borner study. There's another Borner study as well, right, that you looked at, about chemotherapy-induced nausea and induced vomiting?

A.    Yes, that's correct.

Q.    And those Borner studies were done in animals, yes?

A.    Yes.

Q.    And then in the Knop study, we have a similar, but not identical investigation in humans, yes?

A.    Humans, yes.

Q.    And then knowing that all three of those papers showed a reduction in GI adverse events in the population that was exposed to GIP, yes?

A.    It was not statistically significant, but there was a trend that it was less.

Q.    And then how did the work done by Borner and Knop help you, if at all, in

deciding whether you thought Crisafulli was more right or Jaber was more right?

A.      You know, I don't think that it really had a lot of influence.  You know, this was a separate study.  It was using a GIP peptide, whereas the Jaber study, you know, they were looking at tirzepatide, which is, as I mentioned earlier, is its own unique peptide structure.

So, you know, I don't fault the folks from Eli Lilly for doing this study.  It kind of makes complete sense.  You give GIP, see what the effects are.  The only thing is how that influenced their decision to make tirzepatide, which also has an extended component to it.

I'm not sure that these results would support the development of tirzepatide as a unique entity, that's, you know, its own proprietary entity.  But I think these studies would help point me in the direction of trying to utilize GIP to help improve the side effect profile for the GI tract for a GLP-1 receptor agonist.  I think that makes a lot of sense.

But I don't know that it really

Case 2:24-ml-03094-KSM     Document 691-35     Filed 05/19/26     Page 176 of 202
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

helps so much, because it's -- again, it's not tirzepatide.  I think if these studies were done with tirzepatide, and it showed this, I would say probably it would show a trend towards a reduction in upper GI adverse events, but it wasn't statistically significant.  So if we were to replace LY with tirzepatide or TDZ, and you showed me these results -- this is all hypothetical.

Q.     Yep.

A.     How would I interpret that.  I would probably say that it would suggest that there's a reduction in adverse events.  But it wasn't down to zero, or didn't completely ameliorate the effects, but there was a trend towards a reduction, but it wasn't statistically significant.  Hopefully, I didn't go too long on that answer.

Q.     No.  No, I -- so do you agree that the Borner studies and the Knop study are supportive of the conclusion that you can't simply take GLP-1 alone, and apply those results, full stop, to tirzepatide?

          MS. HAUER:  Object to the form.

          THE WITNESS:  I think that you

could look at the pharmacology of tirzepatide. It stimulates the GLP-1 receptor almost nearly as good as the native peptide. It's -- it's -- it's slightly less specific for the receptor for GLP-1. But it's close enough.

And then you have the body of data for GLP-1 receptor agonists that suggests that there is a delay. And then you get to tirzepatide, knowing that it has activity at the GLP-1 receptor would only allow me to believe that tirzepatide would have a similar adverse event profile to GLP-1 receptor agonists.

BY MR. PREMO-HOPKINS:

Q.    So because tirzepatide has activity at the GLP-1 receptor, you're reaching the conclusion that it's going to have a similar adverse event profile?

MS. HAUER:  Object to the form.

THE WITNESS:  Because of --

BY MR. PREMO-HOPKINS:

Q.    Go ahead.

A.    Yes, to -- I think you summarized the point that I was trying to make very well.  I apologize if I went a little -- too expansive in my answers, but it's a very interesting area of pharmacology, because I'm quite interested in this area.

So when you have a peptide that has very high activity against a receptor, that's very interesting.  And I would sort of look at that, and say that the results -- you know, there's an effect amongst drugs or the same sort of group that have a similar efficacy and adverse event profile.

Q.    I just want to make sure I'm very clear.  The -- your opinion is that, based on your review of the evidence, the existence of GIP activity in tirzepatide does not impact tirzepatide's incidence of upper GI adverse events?

A.    Yeah, I don't know that I would go as far as to say that, because it does act with the GIP receptor.  So you said tirzepatide has a very high affinity for a GIP receptor, but just activation of the GIP receptor alone, that tirzepatides contributed

to that component doesn't completely ameliorate the GI side effects.

Q.    I see.

A.    Which is somewhat consistent with these studies, where you give GIP by itself, you can see that the results -- it's not like the nausea completely goes away. It's still present.  And it's significant -- it's not significant in terms of the drop.

If -- I would be more convinced if you showed me this data with statistically significant differences between groups.  And I think this is a very good group that has published in a very good journal.  So I would give it a fair amount of weight, if it showed statistically significant differences.

Q.    And you're talking about -- when you say this, you're talking about the Knop study?

A.    The Knop study.

Q.    And why is statistical significance important to the weight that you give it?

A.    Well, statistical significance is important for any study, and how you

Joseph Biseusing, M.D.    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

analyze the results, because -- so -- and again, I'm not a statistician. I'm not a biostatistician. I work with them.

But what I know is that if you want to show significance between groups, you have to enroll enough people between groups to be able to see that difference.

What Eli Lilly powered this study -- I don't know how they powered it to see what -- there's usually a statistical section that usually describes how they powered the study. But I would probably say that if you wanted to show that event, you probably would need to include a larger number of subjects to really see.

If you went into the study thinking that GIP administered alone would significantly reduce the adverse events, you would, theoretically, include more subjects to be able to show that difference. But either they didn't show enough subjects or there wasn't really a difference between groups. So that's how I would interpret that as a non-epidemiologist, non-statistician.

Q.    As a non-epidemiologist,

non-statistician, a statistically significant result is more relevant to you than a non-statistically significant result?

A.    Absolutely.

Q.    And you would agree with me that the evidence supports -- the existing evidence that you reviewed supports the conclusion that the presence of GIP in tirzepatide likely at least reduces the incidence of GI adverse events, even if it doesn't totally eliminate them, yes?

MS. HAUER:  Object to the form.

THE WITNESS:  Well, so it's hard to know, because you're basically taking a compound called tirzepatide that has activity against both GIP and GLP-1.  So each one of them is going to bind to its own receptor.

So it's -- vectorally, if you were to look at it, which one is going up and which one is going down, what's the sum total of those two, I would say probably, based on the results that I've seen thus far, is that the GIP component activation doesn't

really contribute a lot, one way or the other.  It doesn't make it worse. I don't think it makes it a lot better.

BY MR. PREMO-HOPKINS:

Q.    In terms of the GI adverse events?

A.    In terms of GI adverse events, right.

Q.    Okay.  Do you agree with me that the Borner studies identify a plausible biological mechanism by which the GIP could reduce the incidents of GI adverse events?

MS. HAUER:  Object to the form.

THE WITNESS:  I would say, according to the Borner paper, there could be a -- the potential that the activity against the GIP receptor could improve or attenuate the issues with motility related to GLP-1.

But that's all just -- it's more or less theoretical, because that was the animal study, not necessarily applicable to humans.  So I think you'd have to look at the Borner

study, and also the human study to be able to come up with sort of a reasonable answer to that question.

I would say probably -- I would characterize it as not significantly different.  I think it was a good thought for them to try this approach, but I don't know that they were able to show that in the results that we've seen thus far.

BY MR. PREMO-HOPKINS:

Q.    So based on the Borner papers, the Knop paper, and the Jaber abstract, you're not willing to conclude that there's reasonable evidence that the GIP activity ameliorates GI adverse effects with tirzepatide, as compared to other GLP-1 RAs?

MS. HAUER:  Object to the form.

THE WITNESS:  I would probably put them all in relatively similar category of sort of a class effect between GLP-1s and GIP/GLP dual agonists.

Plus, there is even a third, the GLP/GIP glucagon agonist that's

under development.  So, you know, I would probably put them more or less in the same sort of class with GLP-1, having sort of the major effect on GI motility.

I honestly don't think GIP is going to do too much to GI motility, primarily because if you give GIP alone, it doesn't really have a pro or -- it doesn't really affect motility that much, GIP alone.

So if you administer GIP, we know a lot about what it does.  It improves -- it increases glucagon.  It affects the glucose -- increases blood glucose levels.  But in terms of motility, there is not a lot of receptors of GIP in the GI tract to account for sort of a pro-motility effect.

Now, if they were using, like, erythromycin, so erythromycin acts on the motilin receptor, which are present throughout the GI tract.  I use erythromycin regularly to treat my

patients with gastroparesis.

So these are patients that come to me that have delayed gastric emptying. And I have to do something to treat these people. So what do you do? Well, there is no FDA approved drug to treat gastroparesis.

So off label, I've used erythromycin at very low doses, because erythromycin works at the motilin receptor. So perhaps, had Eli Lilly considered maybe using erythromycin, along with the GLP-1 to try to have a pro-motility effect, they might have been able to really attenuate the issues of motility with GLP-1s.

BY MR. PREMO-HOPKINS:

Q. I don't mean to cut you off, but you used the word motility a lot. And I want to make sure my question is clear. We've looked at Jaber, Knop, and two Borner papers. Does -- and you reviewed those as part of your work in this case, yes?

A. Yes.

Q.    And it's your opinion that, setting aside GIP motility, that there is not a reasonable, plausible mechanism by which tirzepatide, based on its GIP agonism, could reduce the incidence of GI adverse events? I'm not asking about motility.  I'm asking about GI adverse events.

MS. HAUER:  Object to the form.

BY MR. PREMO-HOPKINS:

Q.    In Borner, the GI adverse events are down, both studies, in Knop, the GI adverse events are down, in the Jaber abstract, the GI adverse events are down.  And you're telling me that I shouldn't worry about that.

A.    Oh, well, I would actually weigh those.  But they did look specifically at tirzepatide in the -- in these last two papers.  They were looking at GIP.  So I think what you're trying to do is make the connection that -- the fact that it has agonist activity against GIP receptors, that it's going to be similar to the results from the Borner paper.

I would say the answer to that

would be no, because tirzepatide has other aspects to the peptide that are not -- it's not just GIP agonism.  As I mentioned, it has exendin, it has the GLP-1 included.

So I don't think you can jump and make the conclusion that these papers support that tirzepatide would have a lower effect on GI adverse events.

MR. PREMO-HOPKINS:  Dr. Pisegna, why don't we take a break, and sort out this e-mail thing.  For some reason, I don't know if I'm getting --

THE VIDEOGRAPHER:  We're now going off the record, and the time is 2:16 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 2:37.

BY MR. PREMO-HOPKINS:

Q.    Dr. Pisegna, we just took a break.  We're going to mark as the next exhibit, an invoice that you've submitted.

(Exhibit No. 8 was marked for identification.)

BY MR. PREMO-HOPKINS:

Q.    And, Dr. Pisegna, before we get into Exhibit 8, I just want to draw your attention back to Exhibit 1 briefly that's underneath that page.  So Exhibit 1 is your expert report, yes?

A.    Yes.

Q.    And just to make sure the record is crystal clear, you have not been asked to offer any additional opinions or reports in this case; is that right?

A.    That's correct.

Q.    There's one sentence in Exhibit 1 that I want to ask you about to make sure I understand it.

If you turn to page 26, on page 26, there's a sentence at the very end, right above the heading that begins (e).  And the sentence you write is, "It is furthermore my opinion that the delay in gastric emptying is persistent, and in some individuals may be long-lasting," right?

A.    Yes.

Q.    And I want to make sure we're very clear about what you mean there.  You're

referring to while a patient is on medication, yes?

A.    Yes.

Q.    Okay.  And so no attempt to suggest that somehow, there's going to be a delay in gastric emptying after the medication is washed out of the system?

A.    I'm not aware of any data to suggest sort of a long-lasting sort of effect of these peptides.

Q.    Got it.  Okay.

A.    But I would add that for patients on these agonists that are undergoing endoscopy, we usually ask them to stop taking the drug one or two weeks before the procedure to reduce the potential for aspiration or gastric emptying issues.  So I think beyond a week or two would be very unlikely to see a delayed effect.

Q.    So based on your experience, your clinical experience, you think it would be unusual to see any effect of delayed emptying from the medication more than a week or two after it's stopped?

A.    That would be my opinion, but I

think it would be very well-supported by the clinical data and the guidelines that various societies, including the anesthesiologists, the AGA position paper, and sort of patients that are undergoing endoscopic procedures, I think the -- I think it only talks about one or two weeks.

Q.    Okay.

A.    So if there was a delay beyond that, I think that would come out in those papers.

Q.    All right.  Now we can go to Exhibit 8, Dr. Pisegna.  Thank you.

So what I have here as Exhibit 8, and what we're looking at as Exhibit 8 is an invoice that you submitted, I assume January 29th of 2026; is that right?

A.    That's correct.

Q.    And this reflects the work that you had done since being retained by the Seeger Weiss firm up through the 28th of January; is that right?

A.    That's correct, but it includes a retainer that was actually given to me, I think it was sort of at the beginning of

Case 2:24-md-03094-KSM    Document 691-35    Filed 05/19/26    Page 191 of 202

August.

Q.    I see.

A.    So that was a retainer for $2,000.

Q.    So the -- up through January 29th of 2026, you had invoiced a total of $35,000, of which 2,000 had already been paid?

A.    Yes.  But I did receive the $33,000, so --

Q.    Before today?

A.    Yeah.

Q.    Okay.  Have you been -- have you submitted any other invoices in this matter?

A.    No, I have not.

Q.    Between the January 29th and today, can you estimate how much time you've spent working -- and I'm going to separate the time today for deposition -- so up until today?

A.    I have to -- I keep a record of that at home, but I don't actually -- I didn't actually look at that.  I didn't know I was supposed to provide that.  But it's probably going to be very similar, about -- to the time that I spent between August and January 29th.

Q.    Okay.  So over the last couple of months, you spent roughly somewhere between 100 and 200 hours?

A.    Yes, to prepare for the deposition.  So that included sort of reviewing all the papers, and rereviewing my expert evidence.

Q.    And so it's your best estimate that as of today, you have roughly another $35,000 that you'll bill?

A.    Roughly.  Yeah, I keep track of it very inaccurately.  I use sort of a timer at home, like sort of an old fashioned timer.

Q.    As a lawyer who bills by the hour, I understand.

A.    Okay.

Q.    Other than yourself, has there been anybody else, other than the lawyers, who support you, like an associate or a grad student, anything like that?

A.    No.  In fact, I have not talked to any of my colleagues or anybody at work, you know, with the exception of my wife, who, you know, had to know where I was at today, et cetera.

But outside of that, I didn't -- you know, I didn't feel it was necessary to tell anybody.  It's not something that I would -- you know, it's not something that I would really want to advertise, just because, you know, it's really nobody else's business.

Q.    Have you ever worked with the Seeger Weiss law firm before?

A.    No, I haven't.  I've worked with other law firms, but not with Seeger Weiss.

Q.    Have you ever worked with a plaintiff's lawyer in the context of another pharmaceutical litigation?

A.    No.

Q.    Have you ever worked with -- as an expert in another pharmaceutical litigation?

A.    Well, yes, several.

Q.    And --

A.    I think it's included in my CV.

Q.    And did any of those relate to personal injury type of claims?

A.    I have done personal injury, malpractice, product liability.  Yeah, I don't remember all the cases, but the Walmart case

was a product liability.

The -- you know, there were a couple of malpractice cases, where I've worked for both defense and plaintiff.  So, you know, I've done patent litigation work with a firm in New York.  I don't remember the name.  So, yeah, I apologize.  I think I have it written in my CV.

Q.    Yeah, I think you do, too.  Is there any other expert work that you're aware of that you've done recently that wouldn't be reflected on your CV?

A.    No.  Yeah, and I typically wouldn't do another case at the same time, just because I'm busy enough at work.  And I've got patients calling me left and right.  It would be too much to try to do more than one expert case at a time.

Plus, I also would want to give, you know, a fair effort on the one case.  It's not like I'm running around looking for cases.

Q.    You're not a one-man volume shop?

A.    Yes.  Yes, I'm not.

Q.    Have you ever -- do you know, one way or the other, whether you've done any

consulting work or any other work where you've been paid by Eli Lilly?

A.     No, that's the one company that -- and that was -- you know, so I brought that up when they first contacted me.  I think when I spoke to Parvin, who is the person this was addressed to, we went through all of the conflicts.  So she went through the -- so I haven't worked with Novo Nordisk, I have not worked with Eli Lilly, so --

Q.     Do you know whether any of your patients have filed a claim or a lawsuit in this matter?

A.     I'm not aware of any.  It's not something I would ask them.  I'm not sure they would even tell me.  But -- but, yeah, I'm not aware of any cases.

Q.     With regard to Lilly -- I'll start with Lilly.  Did you ever approach them or pursue work with Lilly that was turned down?

A.     To my knowledge, no, I mean, I've met folks from Eli Lilly, with -- you know, various, like, pharmaceutical reps, probably medical science folks for Eli Lilly.

But I've never really talked to them about any of my work.

And my peptide that I patented, I licensed it to Salix. So part of that, I wasn't allowed to really go to another company. But -- so, yeah, so I haven't talked to Novo Nordisk or Eli Lilly.

Q. Dr. Pisegna, do you recall, at the beginning of the deposition, when I asked you to clarify a question if you didn't understand it?

A. Yes.

Q. Did you do that today when you needed to?

A. I tried to clarify, as best as I could. I'm sorry if I went a little overboard, but I thought it would be helpful to just provide, you know, some information out there that might help you in your sort of pursuits in this case.

Q. That's helpful.

But just so the record is clear, if you needed a clarification on a question today that I asked you, you made sure to raise that?

A.    Yes.  And I think I did a few times, although I think your questions were very clear, and they were not confusing.

Q.    And were you able to give complete and honest answers to my questions today?

A.    Yes.

MR. PREMO-HOPKINS:  I don't have any further questions for you at this time, Dr. Pisegna.

MS. HAUER:  I don't have any questions either.

MR. PREMO-HOPKINS:  Okay.  So we can go off the record.

THE VIDEOGRAPHER:  Okay.  This concludes the video deposition of Joseph Pisegna.  We are now going off the record, and the time is 2:50 p.m.

(Whereupon, the deposition of JOSEPH R. PISEGNA, M.D. was concluded at 2:50 p.m.)

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date: April 1, 2026.

*Leslie A. Todd*

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You're signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.  It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

<u>ERRATA SHEET</u>

STATE OF CALIFORNIA         )

                                      ) ss.:

COUNTY OF LOS ANGELES     )


JOSEPH PISEGNA, being duly sworn, deposes and says:

I have reviewed the transcript of my deposition taken on March 31, 2026. The following changes are necessary to correct my testimony:

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| Page 92, line 7 | The word "approve" should be corrected to read "improve" | Typographical Error |
| Page 93, line 11 | The word "Ruby" should be changed to "Reubi" | Typographical Error |
| Page 94, line 4 | The word "Ruby" should be changed to "Reubi" | Typographical Error |
| Page 108, line 17 | The word "CDA" should be changed to "cDNA" | Typographical Error |
| Page 109, line 9 | The word "isolate" should be changed to "acetylate" | Typographical Error |
| Page 111, line 6 | The word "end" should be "amino" | Typographical Error |
| Page 111, line 21 | The word "end" should be "amino" | Typographical Error |
| Page 112, line 1 | The word "end" should be "amino" | Typographical Error |
| Page 112, line 3 | The word "end" should be "amino" | Typographical Error |
| Page 127, line 2 | The word "Promethean" should be changed to "Promethion" | Typographical Error |
| Page 127, line 3 | The word "Promethean" should be changed to "Promethion" | Typographical Error |
| Page 131, line 14 | The word "second" should be changed to "secondary" | Typographical Error |

1

Joseph Pisegna

Sworn to before me this 22nd of April,
2026

Notary Public

Please see attached certificate for notary

2

**CALIFORNIA JURAT**                                    GOVERNMENT CODE § 8202

┌─────────────────────────────────────────────────────────────────────────────┐
│ A notary public or other officer completing this certificate verifies only the identity of the individual who signed │
│ the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. │
└─────────────────────────────────────────────────────────────────────────────┘

State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on

this _22nd_ day of _April_, 20_26_, by
    Date       Month       Year

(1) _Joseph Pisegna_

(and (2) _____ ),
         Name(s) of Signer(s)

**ARASH REZAEE-TARI**
Notary Public - California
Los Angeles County
Commission # 2534939
My Comm. Expires Oct 10, 2029

proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

Signature

_Place Notary Seal and/or Stamp Above_        Signature of Notary Public

───────────────────────────── OPTIONAL ─────────────────────────────

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Errata Sheet_

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2018 National Notary Association