# EXHIBIT 36D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  GLUCAGON-LIKE PEPTIDE-1          )

RECEPTOR AGONISTS (GLP-1 RAs)            )   CIVIL ACTION

PRODUCTS LIABILITY LITIGATION            )

_____          )

                                         )

THIS DOCUMENT RELATES TO:                )   MDL No. 3094

                                         )   2:24-md-03094-KSM

ALL ACTIONS/ALL CASES                    )

_____          )

CONFIDENTIAL

WEDNESDAY, JANUARY 29, 2025

—  —  —

Videotaped Deposition of DANIEL RAINES, M.D., taken pursuant to notice and conducted at The Ritz-Carlton, 901 Canal Street, New Orleans, Louisiana, at 8:56 a.m. CST, on the above date, before Jennifer A. Dunn, Registered Merit Reporter; Certified Realtime Reporter; California, Illinois & Texas Certified Shorthand Reporter; and Missouri Certified Court Reporter.

Job No.  7130405

GOLKOW, a Veritext Division

Page 2

                    A P P E A R A N C E S

SEEGER WEISS LLP
    BY:  PARVIN K. AMINOLROAYA, ESQ.
    paminolroaya@seegerweiss.com
    BY:  CHARLES BACHMANN, ESQ.
    cbachmann@seegerweiss.com.
    55 Challenger Road
    Ridgefield Park, New Jersey  07660
    Tel:  (973) 639-9100
and
BUXNER LAW FIRM
    BY:  EVAN BUXNER, ESQ.
    230 South Bemiston Avenue
    Suite 1400
    St. Louis, Missouri  63105
    Tel:  (314) 863-6000

and

LEVIN PAPANTONIO
    BY:  CAMERON STEPHENSON, ESQ.  (via Zoom)
    cstephenson@levinlaw.com
    316 South Baylen Street
    Pensacola, Florida  32502
    (850) 435-7176
and
MORGAN & MORGAN, P.A.
    BY:  JONATHAN M. SEDGH, ESQ.  (via Zoom)
    jsedgh@forthepeople.com
    199 Water Street, Suite 1500
    New York, New York  10038
    Tel:  (212) 845-2800
        Counsel for Plaintiffs

Page 3

A P P E A R A N C E S (Cont.)

KIRKLAND & ELLIS LLP
    BY:  MARK PREMO-HOPKINS, ESQ.
    mark.premohopkins@kirkland.com
    BY:  MICHAEL S. SMITH, ESQ.
    michael.smith@kirkland.com
    333 West Wolf Point Plaza
    Chicago, Illinois  60654-2000
    Tel:  (312) 862-2000
and
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
    BY:  KENNETH F. BAUM, M.D.  (via Zoom)
    kbaum@goldmanismail.com
    100 Wilshire Boulevard
    Suite 1760
    Santa Monica, California  90401
    Tel:  (310) 576-6900
        Counsel for Defendant Eli Lilly & Company

DLA PIPER LLP
    BY:  LUCAS P. PRZYMUSINSKI, ESQ.
    lucas.przymusinski@us.dlapiper.com
    BY:  MELISSA JEAN WHITNEY, ESQ.
    melissa.whitney@us.dlapiper.com
    1251 Avenue of the America, 27th Floor
    New York, New York  10020-1104
    Tel:  (312) 324-1000

and

DLA PIPER LLP
    BY:  KATIE INSOGNA, ESQ.  (via Zoom)
    katie.insogna@us.dlapiper.com
    33 Arch Street, 26th Floor
    Boston, Massachusetts  02110-1447
    Tel:  (617) 406-6000
and

Page 4

A P P E A R A N C E S (Cont.)


DLA PIPER LLP

BY:  STEPHANIE PEATMAN, ESQ.  (via Zoom)

stephanie.peatman@dlapiper.com

2000 Avenue of the Stars

Suite 400 North Tower

Los Angeles, California  90067-4735

Tel:  (310) 595-3000

Counsel for Novo Nordisk A/S and Novo Nordisk Inc.


ALSO PRESENT:

DARREN GUASTELLA - Videographer

Page 5

I N D E X

PAGE

DANIEL RAINES, M.D.

Examination by Mr. Premo-Hopkins                8

Examination by Mr. Przymusinski               198

Examination by Ms. Aminolroaya               294

Certificate of Reporter                        302

Letter for Signature                           303

Witness Signature Page                         304

Errata Sheet                                   305

Page 6

E X H I B I T S

NUMBER          DESCRIPTION                                    PAGE

Exhibit 1       Expert Report of Dr. Raines                    10

Exhibit 1A      Rule 26 Expert Witness Disclosure              12

Exhibit 1B      Supplemental Materials Considered              12

Exhibit 2       Slide Presentation:  "Esophageal Motility      12
                Disorders Achalasia"

Exhibit 3       Slide Presentation:  "Gastroparesis An         12
                Update on Management"

Exhibit 4       Slide Presentation:  "Billing & Coding:        12
                Goodbye to the Long History & Physical"

Exhibit 5       List of Hours Billed Summary                   12

Exhibit 6       Slide Presentation:  Wireless Motility         12
                Capsule Technology (Smartpill)

Exhibit 7       Black Binder Documents                         59

Exhibit 8       ACG Clinical Guideline Gastroparesis           129

Exhibit 9       ACG Clinical Guidelines:  Gastroparesis        134
                (Camilleri 2022) - Figure 1

Exhibit 10      Research Letters - "Misdiagnosis of            153
                Gastroparesis is Common:  A Retrospective
                Review of Patients Referred to a Tertiary
                Gastroenterology Practice"

Exhibit 11      Original Article - "Food Residue               226
                During Esophagogastroduodenoscopy Is
                Commonly Encountered and Is Not
                Pathognomonic of Delayed Gastric
                Emptying" by Danse Bi, et al.

Page 7

                    E X H I B I T S (Cont.)

  NUMBER          DESCRIPTION                           PAGE

Exhibit 12    Real-World Effects of GLP-1 Receptor      248
              or Dual GLP-1/GIP Receptor Agonists on
              Gastrointestinal Symptoms and Gastric
              Emptying:  Results from a Large Clinical
              Practice Database by Camille Lupianez-
              Merly, M.D., et al.

Exhibit 13    ASFE Guideline - "The role of            286
              endoscopy in gastroduodenal
              obstruction and gastroparesis

Page 8

P R O C E E D I N G S

(Wednesday, January 29, 2025 at 8:56 a.m. CST)

THE VIDEOGRAPHER:  We are now on the record.
My name's Darren Guastella.  I am a videographer for
Golkow.

Today's date is January 29th, 2025.  The time
is approximately 8:56 a.m.

This video deposition is being held at the
Ritz-Carlton in New Orleans, Louisiana, in the matter
of In Re:  Glucagon-Like Peptide-1 Receptor Agonists,
GLP-1 RAs Products Liability Litigation, for the United
District Court for the Eastern District of
Pennsylvania.

The deponent is Daniel Raines, M.D.

Counsel will be noted on the stenographic
record, after which the court reporter, Jennifer Dunn,
will swear in the witness.

DANIEL RAINES, M.D.,
of lawful age, having been first duly sworn to tell the
truth, the whole truth and nothing but the truth, deposes
and says on behalf of the Defendants, as follows:

EXAMINATION

BY MR. PREMO-HOPKINS:

Q    Good morning, Dr. Raines.

A    Good morning.

Page 9

Q   I introduced myself off the record, but let me do it again.

I'm Mark Premo-Hopkins.  I represent Eli Lilly in this legal proceeding.  I'm going to ask you some questions today.

Do you understand that?

A   Yes.

Q   And have you given a deposition before?

A   Yes.

Q   How many?

A   Probably five.

Q   So you're pretty familiar with the process.  I'll give you a couple quick reminders for my sake and for Jennifer's sake, which is, I need you to do your best -- I talk kind of slow.  I need you to do your best to wait for me to finish talking before you talk so that she can get us both down.

Do you understand that?

A   Yes.

Q   And if you don't understand a question I ask today, we're going to be in your area of expertise and not mine, so if you don't understand a question I ask today, would you please ask me to clarify it or rephrase it?

A   Of course.

Q   Can you agree to give complete, honest answers to

Page 10

my questions today?

A    Yes.

Q    Dr. Raines, you issued an expert report in this matter?

A    Yes.

Q    And I noticed that you've got some documents in front of you.  Is one of those a copy of your expert report?

A    It is.

MR. PREMO-HOPKINS:  All right.  I'm going to hand to you what we're going to mark for the record as Exhibit 1 to your deposition.

(Raines Exhibit 1 marked.)

MR. PREMO-HOPKINS:  If it's easier for you to refer to the one that's bound, that's fine, but we need to have one for the record.

BY MR. PREMO-HOPKINS:

Q    Can you just confirm for me, Dr. Raines, that Exhibit 1 is a complete and accurate copy of your expert report in this matter?

A    It is.

Q    Great.  And Exhibit 1, your expert report, that contains all of the opinions that you've been asked to render at this point in time in this case; is that right?

A    Yes.

Q    And it includes all the materials you considered

Page 11

that are referenced in there?

A    It does.

Q    And you haven't issued any updates or supplements to that report thus far, correct?

A    No.  There's one typo I noticed last night on page 12.

Q    All right.

A    In the middle of the page.

Q    So we're going to go to page 12 on Exhibit 1 with you.

All right.  And can you direct me to where you found the typo?

A    Yeah.  There's four paragraphs.  The second paragraph, last sentence.

There's a "See Appendix A."

Q    Yes.

A    But that's a typo.  The Appendix A is the materials considered.

So there's not -- so that's just a typo that needs to be removed.

Q    I see.  So just on page 12 of Exhibit 1, the "See Appendix A" referenced in the second full paragraph there, you would omit that?

A    Correct.

Q    Okay.  Any other changes?

Page 12

A     No.

Q     Did you write this report yourself, Dr. Raines?

A     I did.

Q     And all of the opinions in the report are yours?

A     Yes.

Q     And you hold them to a reasonable degree of medical and scientific certainty?

A     Yes.

MR. PREMO-HOPKINS:  I'm going to hand you what we've premarked as Exhibits 2 through 6, which are documents that we received last night, and I think from your materials it looks like you may have in the -- with you, but I'm not sure.

So we'll start with Exhibit 2.

THE WITNESS:  Okay.

(Raines Exhibits 2 through 6 marked.)

BY MR. PREMO-HOPKINS:

Q     Do you recognize Exhibit 2 as a presentation entitled:  "Esophageal Motility Disorders Achalasia," and it has your name on the front?

A     Yes.

Q     And did you -- is this your presentation?

A     Yes.

Q     And do you know how it came to be produced to me last night?

Page 13

A   I submitted it to Parvin for submission and printing out for this meeting.

Q   And is there anything in -- tell me what is Exhibit 2, what's the purpose of this presentation?

A   This is a presentation for our fellowship lecture series.

Q   And what is the fellowship lecture series?

A   So, I'm a gastroenterology fellow program director.  I spent 20 years training gastroenterology fellows, and so we cover different topics.

Each year, typically nine years of topics in the field of gastroenterology.  A gastroenterology fellowship is three years long, and so we cover 270 topics over the course of three years in the different areas of gastroenterology, for, you know, part of our didactic series, as a supplement to procedural training.

Q   So the audience for the presentation that's Exhibit 2 would be gastroenterology fellows at LSU?

A   Yes.

Q   And when is the last time you gave this presentation?

A   I think it was two years ago.

Q   So sometime in the first -- the spring of 2023, you think?

A   Yeah.

Page 14

Q    Is it still accurate, as far as you know?

A    Yes.

Q    Let me ask you about one of the slides in here.

If you turn to page 9 of Exhibit 2, and then just for the record, I read the title of a medical condition when I was reading the title of this "achalasia."

A    Yes.

Q    Is that a motility disorder with which you're familiar?

A    Yes.

Q    And do you see that on page 9 there of Exhibit 2, there are three slides?

A    Yes.

Q    And would these slides be handed out to the GI fellows at LSU so they can take notes on them; is that why they print out this way?

A    No.

Q    Would you present them live on a screen --

A    Yes.

Q    -- typically?

And if we look at page 9 of Exhibit 2, can you tell me what is in the third slide down, the slide on the bottom of page 9?

A    There's these injection therapy, one is botulism toxin injection.

Page 15

Q    Oh, I'm sorry.  I'm on -- what I'm looking at, sir, it looks almost like a flowchart on the bottom slide.

A    Yeah.

Q    Here?

A    Yeah.

Q    Do you know what the source of that flowchart is?

A    I don't recall.

Q    Do you know whether it -- do you think it could be from the American College of Gastroenterology guidelines for achalasia?

A    Achalasia.

Q    Achalasia.  Excuse me.

A    Probably.

Q    And is that a source that you would use as a reliable source to educate your GI fellows at LSU?

A    Could you just make that statement a little more clear?

Q    The American College of Gastroenterology guidelines on achalasia, is that a source in which you would rely to reliably education your GI fellows at LSU?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  It's a reference that I would use.

BY MR. PREMO-HOPKINS:

Q    What does that mean?

Page 16

A    Meaning like the way you look at different sources of data, publications, lectures, opinions, clinical experience, to make presentations and give recommendations or assessments to our fellows.

Q    Do you remember how -- when you give this presentation, how you use the flowchart that's on the bottom of page 9?

A    Could you clarify what you're asking; how do I use it?

Q    Do you remember what -- what typically would you say when you stand up and give this presentation to your GI fellows when you've got this flowchart on the screen?

A    So I would say, you know, this is an example of one algorithm to evaluate patients with dysphasia symptoms, and so it kind of goes through different diagnostic testing and suspicion for different disorders.

And then in this case, it's type 1 -- or type 2 versus -- achalasia versus type 3, and then it talks about treatment for those types of achalasia.

Q    And do you think that the algorithm that's identified here on the bottom of page 9 is accurate in terms of how your GI fellows should diagnose achalasia?

A    I think it's a useful reference.  Like any guideline, it doesn't contain, you know, every bit of information for every patient, and that's how we use

Page 17

guidelines and flowcharts like this.

Q    So you agree with me that the guidelines listed here in your presentation would be a useful reference for a GI fellow in diagnosing achalasia, yes?

A    Yes.  Achalasia.

Q    Achalasia.  Thank you.

A    That's okay.

Q    When you give your presentation about -- to the GI fellows at LSU -- let me back up and say, did the GI fellows -- at what point in their education is that?

A    So fellowship is three years after internal medicine training.  So GI fellows -- physicians go to four years of medical school, three years of internal medicine training, and then three years of gastroenterology fellowship, and then take a board certification exam after their fellowship to be board certified in gastroenterology.

Q    So these people would be -- for lay people, they would be doctors who are taking a specialized training in gastroenterology?

A    Correct.  And really internists, so not just out of med school, but board certified internists.

Q    And when you give this presentation to those folks, do you recall -- to that audience, do you recall that you make any changes or suggest any changes to the algorithm that's listed here on the bottom of page 9?

Page 18

A    Can you repeat your question?

Q    Yeah.  When you present this algorithm --

A    Yes.

Q    -- to the GI fellows at LSU, do you suggest any modifications or changes that they might want to consider to this algorithm with regard to achalasia?

A    I typically present it as a piece of information, just like the other pieces of information in the lecture.

Q    Is it just like the other pieces of information?

A    I don't know what just like means.

Q    You said it, not me.

A    It's a piece of information.  So this presentation has information about typical symptoms, risk factors, evaluation, variations, and this is one slide that is just kind of an additional piece of information in the discussion.

Q    And when you present this piece of information to the GI fellows at LSU, do you recall ever telling those fellows that this particular set of guidelines or algorithm that we see is unreliable?

A    I've never recalled saying it's unreliable.

Q    And you would tell those students that they should use something like the ACG guidelines when they were evaluating a diagnosis of achalasia?

A    I would tell them it's a useful reference when

Page 19

they're evaluating patients with potential achalasia.

Q    I'm just trying -- there's no sort of -- you don't like mark this up or make changes to it during the presentation?  That's what I'm trying to get at.

A    I don't mark it up or make changes or create boxes or change the algorithm.  It's just kind of it is what it is.

Q    Got it.  You can take a look at the -- you can set that one aside for now, Dr. Raines.

A    Okay.

Q    I'm just going to do some housekeeping here.

You have in front of you what's been marked as Exhibit 3.  It's another presentation that has a similar format with the title:  "Gastroparesis.  An Update on Management"?

A    Yes.

Q    And is this a similar type of presentation to the one you described with regard to achalasia in terms of its role?

A    Yes.

Q    And is this one that you would present to the same types of audiences that you described with regard to the achalasia presentation?

A    Yes.

Q    And do you remember the last time you gave this

Page 20

presentation?

A    Probably last year.  It's like probably every other year.

Q    And is this -- as far as you know, is this presentation still accurate today?

A    Yes.

Q    Exhibit 4.  Let's move -- you can set that one aside for now.

Exhibit 4 is a presentation called:  "Billing & Coding:  Goodbye to Long History & Physical"?

A    Yeah.

Q    Is this the same -- sort of a similar role in terms of it's a presentation you would give to the GI fellows at LSU?

A    Similar role, but I also give this presentation to other specialties at the school of medicine and the department of medicine as a whole, because the topic is pertinent to other areas of medicine.

Q    So this is -- you would say a more generally applicable presentation that would apply to more subspecialties than just gastroenterology?

A    Yes.

Q    And so you give this presentation to fellows and med school students at LSU?

A    Correct.  PA students, medicine grand rounds, or

Page 21

sometimes individual departments ask me to give a presentation like this.

Q    And when's the last time you gave this presentation?

A    To which audience?

Q    Any audience.

A    Probably like a few months ago, or I'll give it to different audiences and different sizes, probably three or four times a year.

Sometimes I'll do an individual presentation to an individual, like a new faculty member.

Q    And as far as you know, is Exhibit 4 still complete and accurate today?

A    Yes.

Q    Exhibit 6, so -- is a presentation that has a similar format in the way it was printed out to the prior 2, 3, and 4, which says:  "Wireless Motility Capsule Technology (Smartpill)," and it's got your name and -- at the bottom of the first slide.

Do you see that?

A    Yes.

Q    Is this -- what's the purpose of this presentation?

A    It's the same for the fellowship program.

Q    And the fellowship program in gastroenterology?

Page 22

A    Yes.

Q    And so this would be one of the presentations that you, as a faculty member, would present to GI fellows at LSU once every couple of years?

A    Yes.

Q    And when's the last time you recall giving this presentation?

A    I think it was 2022 maybe.

Q    And as far as you know, is it still accurate today?

A    Yes.

Q    Now, I should have also handed you a single page that's marked as Exhibit 5, that has some summary billing information, it might have stuck to the back of your Exhibit 4, but I want to make sure you've got it.

A    Okay.  Yes.

Q    Dr. Raines, do you have Exhibit 5 in front of you?

A    I do.

Q    What's Exhibit 5?

A    It's a list of hours billed.

Q    By you?

A    Yes.

Q    In your work on this matter?

A    Yes.

Q    And it goes through November 2024; is that right?

Page 23

A    It does.

Q    And if I divide the amounts by the hours billed, I would get your hourly rate; is that right?

A    Yes.

Q    And what is that?

A    $750 an hour.

Q    And is that the same for your prep work and the deposition and trial?

A    Yes.

Q    And since November of 2024, how many hours have you spent working on the case?

A    Estimated like 30 more hours.

Q    Up to today?

A    Yeah.

Q    And have you billed for your time after November 2024?

A    No.  I still need to prepare and send my invoice for December.

Q    And in January -- so December you had an additional 30 hours?

A    No.  I think probably -- I have to count them up, but December and January, I'm guessing 30 hours.

Q    That would be roughly another $20,000 in terms of the total amount?

A    Yeah.  I guess 30 times $750.

Page 24

Q    What's the -- if you go to Exhibit 1, what's the date of your report?

You can look at your copy or the exhibit copy.

A    It doesn't have a date.

Q    Do you remember what month?

A    It's around December 1st.  Or the end of November.  But I don't see a date on this.  On the beginning or the end.

Q    So you recall completing your report around the end of November or beginning of December?

A    Yes.

Q    And that's when you would have signed off on it?

A    Yes.

Q    And since you signed off on your report that we've got as Exhibit 1, what have you done in the hours that you've worked on the matter since then?

A    Primarily preparing for this deposition.

Q    Did you have meetings to prepare for the deposition?

A    Yes.

Q    How many?

A    Probably three.

Q    When were the meetings?

A    One was yesterday afternoon.  The other was a Zoom call probably a week or two ago, and then maybe a Zoom call

Page 25

in December.

Q    The meeting yesterday, how long did that last?

A    Like two hours.

Q    Was there anyone present -- or who was present?

A    The three attorneys in this room.

Q    Okay.  So the three attorneys who are sitting by you?

A    Yes.

Q    So Ms. Aminolroaya, Mr. Buxner, and Mr. -- the gentleman whose name I couldn't hear.

A    Charles.

Q    Charles.  Thank you.

Those are the three folks who were present yesterday?

A    Yeah.

THE WITNESS:  What's your name?  I call her Parvin.

MR. PREMO-HOPKINS:  Aminolroaya.

THE WITNESS:  I gave you a different first name.  Never mind.

BY MR. PREMO-HOPKINS:

Q    Was anyone else present for the meeting yesterday?

A    No.

Q    The Zoom two week -- a week or two ago, how long was that?

Page 26

A    Like also two hours.

Q    And who was present?

A    The same three attorneys.

Q    Anybody else?

A    No.

Q    And the meeting in December, how long was that meeting?

A    Probably the same.

Q    About two hours?

A    Yes.

Q    And who was present?

A    The same three attorneys.

Q    Anybody else?

A    No.

Q    I'm going to turn your attention to Exhibit 1, Dr. Raines.

Let me ask you a quick question, Dr. Raines.

A    Sure.

Q    It looks like to this point from August through the end of January, you have roughly 115 hours billed on this matter; is that right?

A    117, yeah.

Q    117.

A    Yeah.

Q    And if I multiply that times $750 an hour, I'd get

Page 27

the total amount that you're going to bill to this point?

A    Correct.

Q    And do you agree with me it's between 85 and 90 million -- $90,000?  I wish it was a million for you.

It was between 85 and $90,000?

A    At 750 times 117.

Q    And how does that amount compare to what you would take home in terms of your day-to-day salary at LSU?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Are you asking what my salary is?

BY MR. PREMO-HOPKINS:

Q    What is your salary at LSU?

MS. AMINOLROAYA:  Objection to form.  That's not relevant.

We're going to instruct the witness not to answer that question.

MR. PREMO-HOPKINS:  You're instructing the witness not to answer the question what his salary is at LSU?

MS. AMINOLROAYA:  I don't know what you mean by "salary," or what exactly you're referring to by that.

MR. PREMO-HOPKINS:  I'll as it again.

BY MR. PREMO-HOPKINS:

Page 28

Q   Dr. Raines, what is the salary that you make working at LSU?

MS. AMINOLROAYA:  Objection to form.  That's not relevant.

MR. PREMO-HOPKINS:  Well, we can have an argument about why it's relevant, but are you going to instruct the witness not to answer?

MS. AMINOLROAYA:  Why do you need that information?

MR. PREMO-HOPKINS:  It's relevant to his opinions in this case, potential bias, given how much money he's made.

MS. AMINOLROAYA:  He's testified as to the amount of money that he's billed in this litigation. You have that information.

MR. PREMO-HOPKINS:  I understand that.

BY MR. PREMO-HOPKINS:

Q   Dr. Raines, what's your annual salary at LSU?

MS. AMINOLROAYA:  Objection to form.

MR. PREMO-HOPKINS:  You can answer.

THE WITNESS:  Can I answer?

MS. AMINOLROAYA:  If you understand the question.

THE WITNESS:  My annual salary at LSU is $510,000 per year.

Page 29

BY MR. PREMO-HOPKINS:

Q    And do you have any other sources of income besides your annual salary at LSU in expert witness work?

MS. AMINOLROAYA:  Objection to form.  And, you know, this may be a confidential area.

MR. PREMO-HOPKINS:  We can certainly mark the deposition as confidential for now and sort it out if we need to once the transcript gets produced.

THE WITNESS:  The only other source of income I have are some legal consulting, or I've done some consulting for Medtronic.  Typically maybe --

MS. AMINOLROAYA:  Hold on a second, Doctor.

To the extent that any of that work is confidential or governed by a confidentiality agreement, I'm going to instruct you not to disclose any of that information.

THE WITNESS:  Okay.  I mean, the disclosure from my consulting work with Medtronic is something I present as like normally when I give a lecture or presentation when it's pertinent, so.

BY MR. PREMO-HOPKINS:

Q    So the fact of your consulting role with Medtronic you've disclosed before to other folks?

A    Sure.  Yes.

Q    And is there a typical amount that you -- do you

Page 30

get paid an annual salary for that consulting job?

A    No.

Q    Is it an hourly pay?

A    Yes.

Q    And do you know, for example, last year, do you know how much you made from your Medtronic consulting job?

A    Maybe like $2,000.

Q    Is the Medtronic consulting, would you consider it a significant portion of your income?

A    No.

Q    Are there any other medicine or pharmaceutical companies that you do consulting for besides Medtronic?

A    I've done some with Fujinon.

Q    Can you spell that for me?

A    F-u-j-i-n-o-n.

Q    And what type of company is Fujinon?  What type of consulting do you do for them, in what area?

A    It's usually product development.

Q    What type of products?

A    Balloon endoscopy or small bowel enteroscopy equipment solely through the small bowel.

Q    And when you -- when did you last do work for Fujinon?

A    Last time I was paid for work was maybe two years ago.  They paid me to train somebody, or teach somebody how

Page 31

to do endoscopy.

Q    In the last five years, did you consider any money you received from Fujinon a significant source of income for you?

A    No.  And a lot of the work I do with Fujinon and Medtronic is kind of -- it's interesting, like, you know, kind of -- I have relationships with these organizations so that I can, you know, work to develop these technologies related to endoscopy equipment, and it's not -- it's not really that I'm making a significant income from that.  It's kind of related to my job.

Q    So you see your role of consulting with these companies like Medtronic and Fujinon as part of your job?

A    No, I wouldn't say that.  I'd just say like it's not something that's necessarily important like as a source of income or something that I would do as like an extra job.

Q    Got it.

A    That's got nothing to do with what I, you know, what I'm normally interested in or where I normally practice.

Q    Understood.  So the work that you do for the companies, Medtronic and Fujinon, you're not doing that for the money?

A    Correct.

Q    When -- you said in addition to your salary at

Page 32

LSU, and the consulting, the other sources of income that you identify was litigation consulting work; is that right?

A   So every year or two, I encounter a case that's pertinent to my specialty.

Q   And how do you encounter those cases?

A   Usually it's word of mouth or an e-mail or a call.

Q   Word of mouth or an e-mail from whom?

A   It depends on the case.

Q   Can you generally describe a type of person from whom you receive an e-mail or a call to engage you for potential litigation consulting?

A   When you say "type of person," what does that mean?

Q   Are you having trouble understanding my question, Dr. Raines?

A   Yes.

Q   Do attorneys call you?

A   Do attorneys call me?

Q   To ask you to consult on litigation?

A   No.

Q   Okay.  How do you find out about the litigation matters?

A   Attorneys usually e-mail me.

Q   Okay.  There we go.  Glad we got that one straight.

Page 33

So when an attorney e-mails you to engage on a litigation matter, how do you decide whether you want to take it or not?

A    It depends on if it's my field of specialty is like a big part of that.

Q    How many litigation matters have you consulted on in the last four years, four or five years?

A    I think it was three.  Three or four, I want to say.

Q    And if you want to look at your list, I believe it is in your report.

MS. AMINOLROAYA:  You're welcome to reference your report on that.

MR. PREMO-HOPKINS:  It's not a memory test.

Excuse me, it's in the disclosure.

Why don't we do this.  For clarity, can we mark this as Exhibit 1A?

(Raines Exhibit 1A marked.)

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, we've handed you what's been marked as Exhibit 1A to your deposition.

And do you recognize this as a disclosure that identifies you as someone providing expert witness testimony in this matter?

A    So this is a copy of my CV.

Page 34

Q    If you look at the very first page.  Sorry, sir.

A    Sorry.

Q    Do you see where it says:  "Rule 26 Expert Witness Disclosure"?

A    Yes.  I've never seen this document.

Q    But it's got your name on it, yes?

A    It does.

Q    And then it identifies your hourly rate.

Do you see that?

A    Yes, I see that.

Q    And when it says $5,000 per day for trial testimony, is that your rate for a day at trial whether you spend one hour or 10 hours?

A    That kind of varies.  There are cases where there's a trial that's cancelled or a case in which I might charge an hourly rate if it's going to trial for an hour, but I'll have take off a whole day of work.

It's generally $5,000 per day if I have to take off a day of work basically.

Q    And how did you calculate that rate?

A    I just kind of made a guess.

Q    And then there's a copy of your CV attached to that.  Do you see that?

A    Yes.

Q    And this was submitted on November 18th of 2024.

Page 35

Are there any updates to your CV since then?

A     No.

Q     Okay.  And if we go to the very back, there's an Exhibit B, and it's on the very back page of Exhibit 1A.

A     Yes.

Q     Does this identify the litigation matters on which you've consulted that you were discussing earlier?

A     Yes.

Q     And the Fonda Stephens Gonzales action that's listed first, is that a medical malpractice case?

A     Yes.

Q     And on behalf of -- who retained your services, the plaintiff or the defendant?

A     It was actually both.  I served as a member of the medical review panel for this case, and so the -- both attorneys met with me, and then I gave testimony, a deposition, and then testified in court regarding my perspective or my opinions as kind of an independent member of the medical review panel.

So in Louisiana we have review panels where physicians review cases and give their opinion.

Q     And was that actually in court or was that in front of like sort of an administrative body, do you know?

A     No, it was actually in court.

Q     And what was the -- generally, what were the

Page 36

allegations in that case with regard to what happened to
Fonda Stephens Gonzales?

A    She had an issue of colonic hypomotility.

Q    When you say "hypomotility," that means slowed
down?

A    Yeah.  Or colon stopping.

Q    And with regard to that matter, what was your
opinion with regard -- were you asked about the cause of the
colonic hypomotility?

A    No.  I was asked about whether the
gastroenterologist involved in the case deviated from the
standard of care in management of her case.

Q    And with regard to the management of Fonda
Stephens Gonzales' case, was your opinion that the doctor
had deviated from the standard of care?

A    No, it was my opinion that the doctor's care was
within the standard of care.

Q    If we look at the next item, it says:
"AstraZeneca action, 2023."

Do you see that?

A    Yes.

Q    What does that refer to?

A    That was referred to an opinion where -- I was
asked to give an opinion regarding the relationship between
proton pump inhibitors and an adverse reaction of kidney

Page 37

disease -- or the development of chronic kidney disease, and actually the opinion was not really pertaining to that relationship as much it was the indications of proton pump inhibitor therapy or acid suppressive therapy, and how proton pump inhibitors work. Kind of indications for therapy, for that therapy, that's kind of background information.

Q    Do you know on behalf of whom you were retained in the AstraZeneca action?

A    I was retained by an attorney, but the attorneys were representing AstraZeneca.

Q    Do you know any of those attorneys, could you name any of them?

A    I'd have to look it up.

Q    But that work was in the last two years?

A    Last four years, yeah. Well --

Q    I just ask because you put 2023 next to it.

A    Yeah. I guess it kind of ended up -- it was like intermittent for a couple of years, but the last interaction I had with them like was probably the beginning of 2023.

Q    Do you know if you actually had an expert report that was issued or submitted in that case?

A    We developed a report. And then it was never -- I don't think it was ever submitted, and I was never deposed because maybe they settled the case or changed some

Page 38

direction.

I'm not aware because it was such a large litigation, set of litigation, and I don't really know what happened to it, but they basically told me that they didn't need me to work on it anymore.

Q   Charlotte Wilcoxon, the next entry.

What -- is that one of the medical review boards that you had talked about, is that similar?

A   No.  This was -- this is a case in which a gastroenterologist was a defendant for a patient that experienced like a small bowel tumor cyst or like a benign small bowel fibrotic disorder.

And so that was brought to my attention, and I was retained by the defense to discuss whether the gastroenterologist adhered to the standard of care for the management of that case.

Q   And the specific question that you were looking at with regard to the standard of care was whether the doctor met the standard of care with regard to the diagnosis and treatment of a small bowel tumor versus something that could have been a fibrotic disorder?

A   Correct.

Q   And did you issue an expert report in that case?

A   No.

Q   Were you ever deposed or give any testimony?

Page 39

A    No.

Q    And you said you were retained on behalf of the gastroenterologist?

A    Yes.

Q    And I see somebody there named Raj Bhandari.  Is that the gastroenterologist?

A    Yes.

Q    Do you know Raj Bhandari separate and apart from the work you did on this case?

A    Yes.

Q    Where does Raj Bhandari work?

A    He works in Monroe, Louisiana, and -- so he was in Monroe, Louisiana when my father -- I grew up in Monroe, Louisiana, so I know who he is.

Q    And in that case was it your opinion that the physician met the standard of care?

A    It was.

Q    If we go to the last entry here on your testimony, Marguerita Gallegos vs. Ricardo McCall.

What was that matter about?

A    That was a case of -- I think it was a small bowel bleeding case, and I was retained to assess whether, on behalf of the physician, to assess whether they provided the standard of care.

Q    And was the physician Ricardo McCall?

Page 40

A    No.   That was maybe one of the internal medicine doctors.

Q    So you offered an opinion on behalf of the gastroenterologist in that case?

A    Yes.

Q    In terms of whether the gastroenterologist met the standard of care in the diagnosis or treatment of a small bowel bleeding disorder?

A    Yes.

Q    And what was your opinion with regard to whether the physician met the standard of care?

A    That he did.

Q    Did any of the expert testimony that you have listed on the back page of Exhibit 1A involve assessment of the diagnosis of gastroparesis?

A    No.

Q    Before the -- before 2021, so before the time period listed on this chart, have you been engaged in any litigation consulting related to the diagnosis of gastroparesis?

A    No.

Q    You can set that aside for now, Dr. Raines, and I want to turn your attention to your report, which is Exhibit 1.

And I want to draw your attention to page 3 of

Page 41

your report.  And in particular, the section with the heading Roman II:  "Question Presented"?

A    Yes.

Q    Does that accurately represent the question that was presented to you and that you attempted to answer in offering your opinions?

A    Yes.  I was asked to provide an opinion regarding the diagnosis of gastroparesis and how that's done in clinical practice.

Q    I'm going to ask you some questions about that.

Specifically, you were asked to describe the accepted/standard of care methods used to diagnose gastroparesis in clinical practice in the United States?

A    Yes.

Q    And that's the opinion you've offered here?

A    Yes.

Q    What does accepted/standard of care mean?

A    I think for the layman, it would be accepted and then for physicians we would use standard of care.

Q    And so you don't see a difference in those two terms?

A    I think they're slightly different.

Q    Okay.  How are they different?

A    As a physician, I would use standard of care, and other physicians would be, you know, kind of understand what

Page 42

that means.

Q    How is standard of care different from -- standard of care methods different from accepted methods?

A    Accepted is a little bit more ambiguous.

Q    Okay.  Are there any methods that you described for the diagnosis of gastroparesis in this case that you believe are standard of care but not accepted?

Or, excuse me, I asked that question backwards, too, Dr. Raines.

So you identify -- I'm going to start my question over.  Is that all right, Dr. Raines?

A    Of course.

Q    Are there any methods that you describe in your report used to diagnose gastroparesis that you would say are accepted but not standard of care?

A    You would have to ask me about a specific item for me to be clear on that.

Q    Are you able to tell me anything that you know of that you described with regard to the diagnosis of gastroparesis in your report that you would consider accepted by the medical community but not standard of care?

A    And generally, we use standard of care, so accepted is more like a layman's term.

Q    So with regard to your opinions in this case, is there any significance to the term "accepted" and the term

Page 43

"standard of care," are you drawing a distinction there for your opinions in this case?

A    I'm not really drawing a distinction.  I think it would be simpler to just use standard of care.

Q    When you -- the second half of that sentence you talk about methods used to diagnose gastroparesis in clinical practice.

Do you see that?

A    Yes.

Q    What is clinical practice?

A    Clinical practice can vary somewhat between clinical practice and like a research setting.

Q    So you're using the term "clinical practice" to distinguish between doctors taking care of patients and doctors doing research?

A    Correct.

Q    And clinical practice would be the doctors who are actually treating patients, yes?

A    Yes.

Q    And then you say that you're offering the -- you're describing -- excuse me, the methods used to diagnose gastroparesis in clinical practice in the United States, yes?

A    Yes.

Q    And you're a doctor in clinical practice in the

Page 44

United States, right?

        A    Yes.

        Q    And the methods that you describe in this report, they would be applicable to doctors in clinical practice anywhere in the U.S.?

        A    Yes.

        Q    Do you agree with me that you have more experience and training in diagnosing gastroparesis than the average clinical practitioner in the United States?

        A    Do you mean gastroenterologist or do you mean internist?

        Q    Why don't we start with any medical doctor.

             Would you agree with me that you have more experience and training in diagnosing gastroparesis than the average clinical practitioner in the United States?

        A    I have more experience than, obviously, a primary care doctor, more than an internist.

             And as a gastroenterologist, many gastroenterologists have experience and training in motility disorders, and so it kind of depends on, you know, which gastroenterologist you're talking about.

        Q    Do you think you have more expertise and expertise in diagnosing gastroparesis than most gastroenterologists in the United States?

        A    Yes.

Page 45

Q    And you consider yourself an expert in the diagnosis of gastroparesis?

A    Yes.

Q    When you talk about the methods used to diagnose gastroparesis, I want to focus you on that phrase.  Okay?

A    Okay.

Q    When you talk about diagnosing gastroparesis, does that mean to you that you conclude a patient more likely than not has gastroparesis?

A    I think the threshold that we use generally is more likely than not, but unless some medical diagnoses vary depending on, you know, the scenario or type of diagnosis.

Q    In this report, when you're talking about the methods used to diagnose gastroparesis, you're talking about diagnosing gastroparesis as more likely than not in a patient, yes?

A    Yes.

Q    When you talk about the methods used in clinical practice to diagnose gastroparesis in the United States, are there different methods used by different subspecialties of clinical practice?

     Let me reframe my question.  Is that all right with you?  That was a poor question.

A    Of course.

Q    Do you identify any different methods or any

Page 46

distinction methods to be used by particular subspecialties to diagnose gastroparesis in your report?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  What subspecialties -- because gastroenterology is a subspecialty.

BY MR. PREMO-HOPKINS:

Q    I don't see any reference to any subspecialty in the sentence that I read.  I have been asked to describe the accepted/standard of care methods used to diagnose gastroparesis in clinical practice in the United States.

That's the sentence that I'm reading.

A    Yes.

Q    Okay.  What -- the methods that you described as standard of care would be applicable to any subspecialty; is that right?

A    That kind of infers that a subspecialty like an orthopedic surgeon is a subspecialist that's going to diagnose gastroparesis, but they don't do that.

Q    Okay.  So this would apply to any doctor in clinical practice that would diagnose gastroparesis; is that fair?

A    I think the inference is generally how gastroenterologists diagnose gastroparesis.

Q    How gastroenterologists diagnose gastroparesis; is that right?

Page 47

A    Yeah.

Q    And would you apply your description of the standard of care methods used to diagnose gastroparesis to any other type of physician other than a gastroenterologist?

A    There are internists that basically practice gastroenterology and it depends on their individual experience and comfort level and how they practice.

So, maybe that other group or some other physicians that would generally be internists, that have that kind of experience or that -- the evaluation and management of gastrointestinal disorders is kind of in their purview.

We don't usually -- hmm -- we don't usually alter people's -- like physicians' diagnostic recommendations based on like if they're a primary care doctor or a gastroenterologist, we just generally make recommendations for how patients are generally evaluated.

I wouldn't say like this doctor should do this or this doctor should do this for the same patient.

Q    So you would apply your definition or your descriptions of the standard of care methods used to diagnose gastroparesis to doctors in clinical practice whether they're a gastroenterologist or an internist or whether they're in rural Nebraska or Los Angeles; is that right?

Page 48

A    If they're in the United States and they manage patients with common gastrointestinal disorders and that's comfortable for them.

Generally, it would be an internal medicine doctor and generally somebody that specializes in gastrointestinal disease.

Q    So the descriptions that you apply, or that you describe with regard to the diagnosis of gastroparesis in clinical practice in the United States, would be applicable to a doctor who has to diagnose gastroparesis, true?

A    Yeah.  Well, doctors that see patients with gastrointestinal disorders.  So it wouldn't be applicable to an orthopedic surgeon that doesn't see those type of patients.

Q    Got it.  So you're not going to hold the orthopedic surgeon to this standard of care with regard to gastroparesis, but for doctors who see patients with gastroparesis?

A    Yes.

Q    You would apply your standard of care here?

A    If that's what they like consider within the purview of their practice.

Q    And what if they don't consider it in the purview of their practice?

A    Then I would expect them to not necessarily make

Page 49

that diagnosis if they don't feel comfortable in that area, like the orthopedic surgeon.

Q    In the background section of your report, just above the Question Presented, you mention some societies that you're a part of?

A    Yes.

Q    It says you're an active member of all three major U.S. gastroenterology societies.  Is that still true?

A    Yes.

Q    And one of those is the American Society for Gastrointestinal Endoscopy?

A    It is.

Q    Can we call that the ASGE today?

A    We do.

Q    And if I say that today, you'll not what I'm talking about?

A    Yes.

Q    Another gastroenterology society of which you're a member is the American College of Gastroenterology, or the ACG?

A    Yes.

Q    And then the third is the American Gastroenterological Association, or the AGA, right?

A    Yes.

Q    And if we talk about the ACG and the AGA, you'll

Page 50

know what we're talking about today?

A    I will.

Q    Are there any of those three societies that you think is, you know, presents more compelling or more reliable material than the other?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I wouldn't make such a generalization.

BY MR. PREMO-HOPKINS:

Q    Is there any society that you go to more often with regard to gastric motility issues if you're looking for a reference?

A    Not really some preferential society.

Q    It says that you were selected as a fellow of the ACG in 2012.  What is a fellow of the ACG?

A    That is someone that's -- has specific or a certain amount of time allocated to meetings with the ACG, at least three annual meetings, and has recommendations from other fellows, the ACG, that kind of documents more involvement or particular involvement with that society to a certain degree and has been assessed by the society as somebody that's particularly engaged.

Q    And are you still a fellow of the ACG?

A    Yes.

Q    Do you still engage with the ACG in the way you

Page 51

just described today?  In other words, did it start in 2012 and continue to today?

A    Boy, it started in like maybe 2000.  And then -- and then I'm currently writing a book, a second edition, of my capsule endoscopy book with the ACG, and so that's really a big portion of my relationship with them, with the staff.

Q    You say the majority of your relationship with the ACG staff relates to your work on capsule endoscopy?

A    Mm-hmm.

Q    Is that yes?

A    Yes.

Q    As a doctor in clinical practice in the United States, what materials would be significant to consider when evaluating what constitutes a standard of care for a diagnosis of gastroparesis?

A    It would be clinical training.  So we train in certain areas, and as a doctor I would consider myself a gastroenterologist who trained in digestive disorders, so the standard of care is what most physicians do and, you know, in our field or specialty and situation.

And so I reference publications.  I reference lecture materials, opinions, my own clinical experience, the mentorship of the physicians that train me.

Q    In considering and evaluating what constitutes of standard of care in your report, one of the things you would

Page 52

consider would be your clinical training?

A    Yes.

Q    Another thing that you would consider would be, you said reference or lecture materials, yes?

A    Yes.

Q    And publications?

A    Yes.

Q    And the mentorship of physicians that trained you?

A    Yes.

Q    And I think you said the standard of care is what most physicians do; is that right?

A    Yes.

Q    What is the significance, if any, of consensus guidelines published by groups like the medical societies you referenced in understanding the standard of care?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  We use guidelines as -- as also another data point or a reference point.

BY MR. PREMO-HOPKINS:

Q    Does the fact that they are consensus guidelines make them any more or less important in your evaluation of the standard of care?

A    It depends on the topic.

Q    Why?

A    Because sometimes there's lack of consensus

Page 53

between individuals, groups. Like sometimes different societies and different specialties, so if there's no consensus or there's a lot of conflict between different societies or different experts, then if you can get them all to agree on something, then it's more significant than, you know, a case in which there is no disagreement or there's not much debate about something.

Q If physicians in these societies are coming to agreement on certain points, with regard to reaching a consensus on certain points, that would be something that you would -- I think you said that would be more significant to you; is that right?

A It's a factor.

MS. AMINOLROAYA: Object to form.

THE WITNESS: Yeah.

BY MR. PREMO-HOPKINS:

Q And the more consensus there is, the more significance it would be to you, right, with regard to the standard of care?

A I would say it's significant as far as a reference point and still I'm making my standard of care determination based on all those other data points.

Q Have you ever previously departed from a consensus guideline in reaching an opinion with regard to the standard of care in any of your litigation consulting?

Page 54

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.

MR. PREMO-HOPKINS:  We've been going for about an hour, Dr. Raines, do you want to take a quick break?

THE WITNESS:  I'm good.

BY MR. PREMO-HOPKINS:

Q    Okay.  So you also mention in your report an organization called The Rome Foundation?

A    Yes.

Q    What's The Rome Foundation?

A    It's a collaboration of physicians that talk about the disorders of brain-gut axis, and I think probably for -- in your reading and everybody in this room, it's a bit confusing because it started many years ago and you originally think of it as like irritable bowel syndrome and then over time the terminology we use has changed significantly from irritable bowel syndrome to functional disorders to disorders of the brain-gut axis.

So when they changed the terminology or name of the conditions that they address, it makes it hard for people to follow.

Q    So you understand The Rome Foundation to be an organization focused on disorders of brain gut function?

A    Brain gut interaction, really.

Page 55

Q    Interaction, thank you.

A    Yeah.

Q    And are you -- are you -- I'm not exactly sure how people get selected to be part of The Rome Foundation's -- are you a member of The Rome Foundation?

A    No.

Q    Have you ever been asked to participate in any proceedings of The Rome Foundation?

A    No.

Q    Is gastroparesis a disorder of brain gut interaction?

A    No.

Q    Why do you say that?

A    It's a motility disorder and The Rome Foundation disorders are disorders defined and addressed by The Rome Foundation don't have a clear or definable path of physiology, and that's one of the ways that we differentiate those orders from other disorders.

Q    Would you look to The Rome Foundation ever for guidance on the standard of care with regard to diagnosing gastroparesis?

A    I think there's some useful data points in The Rome Foundation publications.  So I think it's a useful reference.

         There's a lot of information published by them,

Page 56

you know, books, lectures, so I think useful data points, but The Rome Foundation doesn't -- doesn't define or set us -- like set diagnosis for gastroparesis because it considers it a motility disorder, or it's outside of a -- it's not a brain gut disorder.

Q    So you would agree with me that The Rome Foundation publications could be useful inferences or data points with regard to the diagnosis of gastroparesis?

A    It can be, yes.

Q    Do you agree with me that publications by the American College of Gastroenterology can be reliable sources for the diagnosis of gastroparesis?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I feel like publications by the ACG can be useful.

BY MR. PREMO-HOPKINS:

Q    And they can be useful for diagnosing gastroparesis, yes?

A    As a reference, yes.

Q    And how about publications by the American Gastroenterological Association, are those publications that can be a useful reference for diagnosing gastroparesis?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  They can be a reference, yes.

Page 57

BY MR. PREMO-HOPKINS:

Q    And they can be a useful reference, yes?

A    Some can.

Q    With regard to the references that you thought might be useful that have been endorsed by these various organizations, did you cite them in your report?

A    I cited specific information to support my specific conclusions.

Q    And did you give any consideration when you were citing your sources in your report as to whether or not they had been endorsed by one of the medical societies of which you're a member?

A    You'd have to give me a specific data point to discuss.

Q    In your -- do you recall in your analysis whether you gave any more or less weight to sources based on the fact that they were published by one of these medical societies of which you're a member?

A    Again, I'd have to have like a specific reference on like what statement, because there's a lot of different statements.

Q    Do you think that where the -- for example, the ACG has published guidelines on the diagnosis of gastroparesis, yes?

A    Yes.

Page 58

Q   And they have an updated version as of 2022?

A   They do.

Q   And you have a copy of that there with you?

A   I do.

Q   Just for the record, you have a black binder in front of you with some documents.

Can you tell me what documents you have in that binder?

A   Yeah.  One is a copy of my CV.  That's also Exhibit 1A.

And then there's probably five articles that talked about guidelines.  One of those is the ACG guideline.

There's five or six kind of different articles on different topics that pertain to things in my report or are cited in my report.

And then there's five or so articles that pertain to gastroparesis and GLP-1 receptor agonist studies.

Q   And what -- did you collect the articles that are in the black binder?

A   I did.

Q   And you put the binder together?

A   I did.

Q   And do you know if all the articles in the binder are cited in your report?

A   They're either cited or they're included in the

Page 59

materials considered.

Q    And you have some markings on some of those, it looks like, from here?

A    Just like dates and there's a couple highlights in a couple of them.

MR. PREMO-HOPKINS:  For the record, why don't we mark the black binder as Exhibit 7.

(Raines Exhibit 7 marked.)

THE WITNESS:  Sure.

MR. PREMO-HOPKINS:  And we'll take a look at that on a break.  I don't want to spend your time having to read the titles of articles.

THE WITNESS:  Okay.

BY MR. PREMO-HOPKINS:

Q    How would you use -- excuse me.  Strike that.

How should a clinical practitioner in the United States who's going to diagnose gastroparesis use consensus guidelines about gastroparesis?

A    As a reference point.

Q    And would you tell a clinical practitioner in the United States that they should give any additional weight to consensus guidelines versus other publications?

A    Not necessarily.

Q    Why not?

A    It just kind of depends on the guideline.

Page 60

Q    If the guideline reveals a high level of consensus, would that be more significant to you than a guideline that reveals a low level of consensus?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I don't think they typically grade guidelines by like degree of evidence, rather than like we have high consensus.

And so usually we do like level of evidence to support a different conclusion and then make a recommendation.

BY MR. PREMO-HOPKINS:

Q    And how does the level of evidence, in a particular consensus guideline, influence how you would consider it in setting the standard of care?

A    So, as a factor, I'm using the guideline as one factor in my opinion when I render an opinion regarding standard of care, and when a guideline has a statement that has a recommendation, whether it's strong or weak, then that influences how I would weight that in my opinion.

Q    And if a -- if a guideline, a consensus guideline has a statement that has a strong recommendation, you would weight that heavier in your opinion; is that right?

A    That would influence my opinion.

Q    You would weight it heavier, wouldn't you, than one that had lower ranked evidence?

Page 61

A    Yes.  They have strength of recommendation and then they have quality of evidence typically.

Q    And how does the quality of evidence affect your reliance on consensus guideline statements in understanding the standard of care for diagnosis of gastroparesis?

A    It also influences it just like the strength of the recommendation.

Q    So the stronger the evidence, the more likely you would be to rely on that statement in understanding the standard of care?

A    It would be more likely that I would rely on it as a factor that influences my opinion on the standard of care.

Q    And the stronger the evidence, the stronger the influence on your opinion, yes?

A    Yes.

            MR. PREMO-HOPKINS:  I've had too much coffee this morning, so I'm going to now ask that we take five.

            THE WITNESS:  Okay.

            MR. PREMO-HOPKINS:  And -- but we can be very quick.

            MS. AMINOLROAYA:  Mark, if we can take just a slightly longer break, that will get us back at 10:15, and I think that will set us up for the 11:30 lunch break.

Page 62

MR. PREMO-HOPKINS:  Perfect.  Yeah, then we can run it from 10:15 to 11:30.

THE VIDEOGRAPHER:  Now off the record.  The time is 10:05 a.m.

(Recess taken at 10:05 a.m.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 10:24 a.m.

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, we just took a break.

Are you ready to begin again?

A    I am.

Q    If we turn to page 13 of your report, which is Exhibit 1.

You see you have a bullet there that says:  "Other forms of gastroparesis (non-drug induced.)"

Do you see that?

A    I do.

Q    What are -- what do you consider the subtypes of gastroparesis?

A    Idiopathic, diabetic, drug induced, hypothyroid, connective tissue disorder related, parkinsonian.  And then we have to look at kind of obscure or rare causes.

Q    So let me make sure I got all of them here.

Idiopathic gastroparesis would be one subtype of gastroparesis?

Page 63

A    Yes.

Q    Gastroparesis associated with hypothyroid, that would be one subtype?

A    Yes.

Q    Diabetic gastroparesis is one subtype?

A    Yes.

Q    Parkinsonian gastroparesis, I think you said?

A    Yeah.

Q    And is that related to Parkinson's disease?

A    It is.

Q    You had gastroparesis -- connective tissue gastroparesis?

A    Gastroparesis related to connective tissue disease.

Q    Okay.  Great.

And what's a connective tissue disease?

A    Like scleroderma.  You skipped over drug-induced gastroparesis.

Q    I'm going to get there, don't worry, sir.

And another subtype of gastroparesis you identified is drug-induced gastroparesis?

A    Yes.

Q    Are there any other subtypes of gastroparesis that you would identify?

A    I think the other -- the iatrogenic one, other

Page 64

than drug induced is post-surgical or vagal injury.  So nerve injury.

It really is vagal nerve injury, but we classify it as often like post-surgical.

Q    And you mentioned a term "iatrogenic."  What does that mean?

A    That means caused by a medical intervention like a surgery or a medicine.

Q    And are there any other subtypes of gastroparesis that you can think of sitting here today that you would identify as --

A    No, that's mostly it.

Q    You mentioned that if you sort of worked through all these you may have to consider some more rare causes; is that right?

A    Yes.

Q    What are some of those?

A    There's a case report of checkpoint inhibitor-induced gastroparesis, causing kind of nerve injury with a chronic nerve injury with prolonged or like an indefinite course as kind of one pathophysiology.

Q    What is a checkpoint inhibitor?

A    It's a chemotherapy drug.

Q    Is drug-induced gastroparesis an iatrogenic form of gastroparesis?

Page 65

A    It is.

Q    How does hypothyroidism lead to gastroparesis?

A    It's not clear as far as a pathophysiology, but it's probably inhibition of muscular function rather than nerve function.

Some people develop gastroparesis from nerve injury or dysfunction or muscle injury or dysfunction, or both.

And in the case of hypothyroidism, it affects muscular function because the lack of thyroid hormone influences muscular function or contraction, and so the smooth muscle of the stomach is not able to contract.

Q    You mentioned one thing I had a question about. You said "nerve function."

You see that as different than muscular function?

A    I do.  So there's, as far as pathophysiology, we think about nerve injury or dysfunction or muscle injury or dysfunction, or both of those.

Q    And you mentioned that in the case of a gastroparesis related to hypothyroidism, you'd be looking at injury or dysfunction to the muscle?

A    Correct.

Q    And how about diabetic gastroparesis, how is diabetes related to gastroparesis?

A    It's felt more of a nerve injury.  So if we're

Page 66

dividing it into muscle or nerve or both, it tends to be more of a nerve injury.

Q   You said people develop gastroparesis from nerve injury or dysfunction or muscle injury or dysfunction or both?

A   Correct.

Q   Parkinsonian, what you call parkinsonian gastroparesis, how is that related, how is the Parkinson's related to gastroparesis?

A   It's probably related to signaling, so it's like a nerve dysfunction class, if we're going to divide them into muscular or nerve classes.

Q   Are there any other classes you would use to diagnose gastroparesis in terms of dysfunction other than muscle and nerve or both?

A   No.

Q   You mentioned connective tissue disease as being potentially related to gastroparesis.

How is it related to gastroparesis?

A   The most common example would be scleroderma, which I would think is -- considered as a combined muscular and nerve injury, so fibrosis develops in the upper GI tract in the wall of the esophagus, stomach, and small bowel, and that fibrosis interferes with nerve function, causes nerve injury and muscular function, causes muscular injury.

Page 67

Q    Are there any other connective tissue diseases that you would associate with gastroparesis?

A    There are some rare presentations of like a vasculitic disorder where like a systemic lupus erythematosus or other vasculitis that damages the blood vessels that feed the GI tract.

I would imagine, but can't confirm that there are case reports or descriptions of kind of rare manifestations of those disorders.

These are groups of systemic disorders, and when I say "systemic," it affects the whole body, so if you have a disorder that affects blood vessels, then you can imagine how that disorder can kind of affect any organ and so that group of disorders could theoretically injure the stomach.

Q    Is diabetes a systemic disorder?

A    Not in the same way, no.

And when I say "system disorder," it's like a systemic inflammatory disorder, so a disorder that affects all blood vessels.  All your organs have blood vessels, so you can imagine how it affects all your organs.

Q    You mentioned a post-surgical gastroparesis, but you also called it vagal nerve injury gastroparesis.

A    Yes.  And that's the most common presentation.

So a patient had, say, the common surgery would be a fundoplication, where we wrap the stomach around the

Page 68

esophagus.  It's a treatment of heartburn.

And sometimes inadvertently the vagal nerve is either severed or injured during the surgery and then it's nonfunctional or its function is altered after the surgery.

That's the common scenario, but there are cases of trauma.  So like a gunshot wound that injured the vagal nerve would be another example of vagal nerve injury.

Q    Oh, I see.  So the most common presentation of vagal nerve injury gastroparesis would be post-surgical?

A    Correct.

Q    And does diabetic gastroparesis relate at all to damage to the vagus nerve?

A    It primarily relates to damage to the smaller nerves that are -- that are derived from the vagus, and then they affect the enteric system and also the autonomic nervous system.

So like hyperglycemia is related to nerve injury and that nerve injury can be in branches of the vagus nerve, the enteric system or small nerves within the stomach, the interstitial cells of Cajal, which are like the pacemaker nerves of the stomach, and then also the autonomic nervous system, which are nerves that extend from the spinal column to the stomach.  The sympathetic and parasympathetic systems.

So dysfunction of those nerves related to injury

Page 69

from chronic hyperglycemia results in nerve dysfunction, nerve damage, and gastroparesis.

Q    There's a number of types of nerves that can experience dysfunction related to chronic hyperglycemia, yes?

A    Yes.

Q    And you mentioned a series of them in your prior answer, I want to make sure I understand.

Sympathetic and parasympathetic nervous system?

A    So there's the autonomic nervous system.

Q    Okay.

A    And that is the sympathetic and parasympathetic nervous system.

Q    Mm-hmm.  And so that can be affected by diabetes and lead to gastroparesis?

A    Correct.

Q    What else, what other type of nerves?

A    And then there's the vagus nerve, and then the gastrointestinal tract has its own nervous system called the enteric nervous system.

Q    Can you spell that for the court reporter, enteric?

A    E-n-t-e-r-i-c.

Q    And can the vagus nerve be damaged by chronic hyperglycemia associated with diabetes?

Page 70

A    Yes.

Q    Can the enteric nervous system be damaged by hyperglycemia?

A    Yes.

Q    Is -- there's a number of drugs that are -- you would associate with gastroparesis; is that right?

A    Yes.

Q    And what are those?  And we can -- I think it's page 7 of your report probably.

A    Yeah.

Q    Excuse me.  I think it's on page 6.

A    So the second paragraph.

Q    So the start of the second paragraph says: "Certain mediations may interfere with the gastric motility resulting in drug-induced gastroparesis."

Do you see that?

A    Yes.

Q    And you identify GLP-1 ARs as drugs that may delay gastric emptying?

A    Yes.

Q    If -- if you look at the next paragraph, sort of the short paragraph before Roman V.

A    Yes.  Other medications.

Q    Are all -- all the medications there are medications which you have the opinion have been associated

Page 71

with drug-induced gastroparesis?

A    Yes.

Q    Do you make a distinction between drug-induced, delayed gastric emptying and drug-induced gastroparesis?

A    No.

Q    If you turn to page 14 of your report, Dr. Raines, I'll direct you there.

We have some bullets there that summarize your opinions; is that correct?

A    Yes.

Q    One of them is:  "Drug-induced gastroparesis is a subtype of gastroparesis which accounts for an estimated 11.8 percent to 22 percent of all cases of gastroparesis in the United States."

Yes?

A    Yes.

Q    So what are you relying on to reach those figures?

A    There's two large epidemiological studies which are quoted in my report.  Jung, 2009 and Ye, 2022.

Q    You said Ye, Y-i.  Yes?

A    Y-e, 2022.

Q    And what was the other name?

A    J-u-n-g, 2009.

Q    So in your opinion, non-drug-induced gastroparesis would represent 78 to 88 percent of the cases, yes?

Page 72

A    If you exclude drug-induced gastroparesis, then the remaining would be 82 to 78 percent.  Or 88 to 78 percent.

Q    And for that 78 to 88 percent cases of gastroparesis.  Is it your opinion that an objective evidence of delayed gastric emptying is required to diagnose gastroparesis?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  It depends on the cause.

And when you say "objective," like I need a description of.

BY MR. PREMO-HOPKINS:

Q    Why don't we do this.  Why don't we go back to when you described sources for the standard of care that you used.

A    Sure.

Q    You can set the report aside for a second.

One of the sources that you identified for what you would use to establish the standard of care is your clinical experience; is that right?

A    Yes.

Q    Other than asking you about your clinical experience, is there any source I can go to to understand how that would influence how you set the standard of care?

A    My CV would be an example of my training.

Page 73

Q    Any other source?

A    When you say "my clinical experience," does that include my training or just how I practice?

Q    Is there any objective source I can go to to -- based on your clinical experience, that I could test whether or not that would support the standard of care or not?

                MS. AMINOLROAYA:  Object to form.

                THE WITNESS:  It's still not clear to me what you're asking.

BY MR. PREMO-HOPKINS:

Q    So let's -- your clinical experience.  How would you define your clinical experience?

A    So 20 years of practicing internal medicine gastroenterology, plus another 20 years training with my father in the hospital as a gastroenterologist since I was probably 12.

        I worked with really one of the leaders in esophageal and upper GI motility, Worth Boyce, for a summer, probably 1997.

        And then spent a summer with a radiologist reading imaging studies, including gastric emptying scintigraphy, around that time, with Dr. Warren Green.

        And kind of over time, when you develop an interest in a certain specialty then, you know, you attend lectures, see patients, work with referrals, manage those

Page 74

patients.  So kind of a lifetime of interests and experience in gastroenterology, learning from people that have an interest and experience in gastroenterology, including motility disorders as a specialty.

Q    So when you talk about relying on your clinical experience to set the standard of care, you're talking about your lifetime of interest and your experience in gastroenterology?

A    My experience, the mentorship of the people that taught me, collaboration with other physicians, seeing patients with gastroparesis and other gastrointestinal disorders.

So it's kind of a combination of all those data points as far as like my personal experience.

Q    Well, when you talk about your clinical experience, it's just that, your personal clinical experience, right?

A    Yes.

Q    And have you written down anywhere, other than me asking you these questions in your deposition, what your clinical experience is?

A    I don't know how physicians normally type out their clinical experience on their CV.  I think it's pretty well described in my CV, kind of my role, responsibilities, where I work, different positions I've taken, things like

Page 75

that.

Q    Another source that you mentioned that you would evaluate in figuring out the standard of care is references and publications?

A    Yes.

Q    With regard to the standard of care you used in this case, are you relying on any references or publications that aren't cited in your Materials Considered List?

A    No.  When you say "references," I assume that you mean publications.

So the publications and other references are included in this bibliography and updated in the Materials Considered List.

Q    Do you -- and are you making a distinction between references and publications?  I'm confused.

A    Well, you could say any reference.  Like I talk to my cousin about something is a reference.

So when you say "references," I assume that you mean publications, or if you want to say reference and we're assuming like a drug label or something that's published that's not a peer-reviewed article.

So the materials I use to support the opinion are my clinical experience, my training, and then the information included in this -- in this opinion as referenced, like the publications that are referenced.

Page 76

Q    So with regard to your opinion as to the standard of care in this case, you're relying on your personal clinical experience.  That's one thing?

A    Yes.

Q    Your training.  That's the second thing?

A    Yes.

Q    And then the references or publications that are referenced in your report?

A    Yeah.  And the fourth would be kind of a lifetime of attending lectures, talking with colleagues, like those kind of smaller interactions.

Q    Is there anything I can go look at to understand which conversation with a colleague you had that is influencing your opinions here?

In other words, if I wanted to make sure that you're saying what your mentors say, that you're accurately delivering to me the conversations that you're relying on, how would I know that?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  You wouldn't know.  It's just -- medical training is kind of an accumulation of data points through those experiences and you select information that -- from individual case presentations or mentors teach, you know, teach different data points and then you pick up things that fit with what makes

Page 77

sense for your practice, and then you put it altogether as an individual physician.

BY MR. PREMO-HOPKINS:

Q    Outside of the publications and references that you've cited in your report, is there any objective evidence that I could go look at that would support your opinion as to the standard of care?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Still -- that's still not a -- that's not familiar to me as a physician.  Usually physicians are asked to provide their opinion regarding standard of care and it's an opinion, so.

BY MR. PREMO-HOPKINS:

Q    Do you understand that -- you don't make your opinion based on anything, do you, willy-nilly or just --

A    Sure.

Q    -- you're just issuing opinions, you don't do that?

A    Based on the four things that we just discussed.

Q    Okay.  And of those four things, the -- your mentorship, your clinical training, your lifetime of experience, and the publications referenced --

A    Yeah.

Q    -- which of those can I go look at as objective evidence to understand whether I agree with your standard of

Page 78

care?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I can guide you as far as which of those four things have objective data.

So obviously the references is easy.  And then you can easily see kind of a majority of like the places I've trained or confirmed that I've trained at different places, that I'm board certified in gastroenterology, that I'm involved in the gastroenterology community, that I've attended lectures or I have continuing medical education.

I think it's fairly easy to see that I'm objectively clinically productive and I see a lot of different patients, that I teach students.  And so a lot of those things are, you know, easy to define.

But it's kind of impossible to find -- define like every patient I've seen or every conversation I've had in my lifetime, so some of those data points are objectively definable and easy to define, and -- but as a whole, not every single conversation or every single mention from a mentor is going to be documented for review.

BY MR. PREMO-HOPKINS:

Q    To the extent it was important enough for you to rely on it to issue your opinions as to standard of care in

Page 79

this case, you would have referenced it or included it in your report, yes?

A    I reference the publication data because some of those things are not referencable.

So, for example, having discussion with Dr. Boyce about motility studies, like I didn't write that down, it's not published for other people to read.

So it's, you know, it's hard to reference in the report.  So we write reports with those four components in mind, and that's how I made my opinion based on the standard of care from those four data points.

Q    You mentioned Dr. Boyce.  Am I saying that right?

A    Worth Boyce.

Q    What's the first name?

A    Worth.

Q    Worth.  W-o-r-t-h?

A    Yeah.

Q    Good southern name.

A    Yeah.

Q    Do -- is there anything in your conversations with Dr. Boyce that you can tell me now that's not included in your report that influenced your opinion as to standard of care?

A    Yeah.  I remember Dr. Boyce was one of the pioneers in motility, and I remember he was telling me about

Page 80

how they originally did gastric emptying studies and how they were looking for like a quality way to have it so the tracer was really retained in the food.

So originally he worked at Walter Reed and where I was born in 1975 in D.C., and when my father was training with him, they had a chicken coop behind the hospital and you would inject radiotracer into the chicken. Like you'd have to like find a vein and inject them with a tracer, and then wait until the tracer was taken up by the liver.

And then you had kill -- you killed the chicken and then took the liver out and cut it up into pieces and then cooked it in Dinty Moore Beef Stew, and you wanted to use the same amount.

And then you made the patient eat the thing of stew and then you did the gastric emptying study. And when they started using the egg label studies, he was like: It's not the same because of the fat content is really, you know, not what you would normally eat in a meal, like the fat content's pretty low in an Egg Beaters meal with the bread.

And -- and just remarkable to me like, you know, he's an old school doctor and he's like, you know: You young kids, you don't have a chicken coop in the back of your hospital, you're not doing gastric emptying studies correctly.

And it's like: Dr. Boyce, like it's hard enough

Page 81

to get the techs to cook, you know, scrambled eggs in the -- in the nuclear medicine department, like I don't really want to have a chicken coop in the back killing chickens to get the liver out.

So the summary being like the Egg Beaters meal that we use, it feels like it's not perfect because it doesn't have a high fat content. So he was always critical of that compared to chicken liver, but obviously it's a lot more difficult to obtain tracer label chicken liver.

Q    Is -- so you're relying on some information you received with -- from Dr. Boyce?

A    Yeah.

Q    Some historical information --

A    Yeah.

Q    -- that -- to say that the Egg Beaters meal that's sometimes used in a gastric emptying scintigraphy study now has insufficient fat content?

A    Yeah. There's some skepticism whether it might be more optimal to have a -- have the standard meal modified so it has more fat in it.

Q    Is it your opinion that the standard of care for provision of gastric emptying scintigraphy should involve chicken livers?

A    I think it would be a better study.

Q    If we did it the Dr. Boyce's way?

Page 82

A    Yeah.  And that's the way it was originally developed, or one of the ways.

Q    Have you -- are you aware of any source, other than Dr. Boyce, that would say we should have a chicken coop out behind the hospital and kill chickens and put radio-labeled chicken liver into a meal?

A    I think there's other sources that say they should have more fat in the meal, but it's hard to get the tracer to stick to certain things.  You can't just mix the tracer in a meal.  Like it's got to be a way that the tracer is adherent to specific molecules in the meal.

Q    Anything else from Dr. Boyce that you would tell a jury supports your opinions with regard to standard of care?

A    I think one of the things that's not -- like a data point that's not -- that's in my report that's not kind of widely published is the history point about vomiting solid food.

And Dr. Boyce, I collaborated with Dr. McCallum, Richard McCallum, who is also a motility specialist, and my father also, you know, they remarked on how when people vomit undigested food four hours later, how that's really, you know, a key piece of history and it's kind of hard to dispute that somebody vomiting, you know, somebody eats a hamburger at 9 p.m. and throws it up at 8 a.m., you know, and it's undigested, like I would say that that's a useful

Page 83

piece of information and evidence that they're not emptying normally.

Q    So when you said history point, you weren't talking about like history in the past. You're talking about patients --

A    No. Just like seeing patients and doing their evaluation and what's useful as far as eliciting history or key components of their description of their symptoms.

Q    With regard to the method that you used, you said the first thing you do is to take a comprehensive history and physical, right?

A    Yes.

Q    For the diagnosis of gastroparesis?

A    Just kind of any patient that I see, yeah.

Q    And what are the types of questions that would be important for you to ask in conducting that history and physical?

A    There are many.

Q    If one of the things you're considering is potential motility disorder in the gut, what are the questions you would ask?

A    So, first, you know, asking the patient why they're here, or why they came to the ER, you know, often leading with that chief complaint.

So if they're here with a complaint. Say, I'm

Page 84

here with vomiting or nausea or pain, then we further describe that symptom. How long has it been, how often, in what setting, you know, what are the associated signs and symptoms, what's their pertinent medical history, surgical history.

And then you have to -- it's kind an art form, you kind of tease out specific histories from patients with specific presentations, but it's -- it kind of deviates or varies based on their presentation.

Q    You mentioned some symptoms that you would -- generally would be reported in the context of an investigation into whether a person is diagnosed with gastroparesis; nausea and vomiting. Those are two of them?

A    Nausea, vomiting, abdominal pain, and early satiety.

Q    What does satiety mean?

A    Meaning feeling full. So early satiety would be a meal, say, if a made a sandwich and you ate half of it and you can't finish the other half, whereas that would be normal for you to finish like the whole sandwich.

So early satiety is kind of an inability to finish a standard meal.

Q    And chronic nausea and vomiting are predominant in the majority of gastroparesis cases, yes?

MS. AMINOLROAYA:  Object to form.

Page 85

THE WITNESS:  I would say chronic nausea and vomiting, that would be present, present in the majority of cases of gastroparesis.  Like that's commonly the primary symptom.

BY MR. PREMO-HOPKINS:

Q    Let's just take a look at page 7 of your report.

A    Sure.

Q    You have a section in here entitled: "Differential Diagnosis for Gastroparesis."  Yes?

A    Yes.

Q    And the second sentence that you wrote under there is:  "Chronic nausea and vomiting are predominant in the majority of cases."

Do you see that sentence?

A    Yes.

Q    That's an accurate sentence that you wrote with regard to gastroparesis cases, yes?

A    Yes.

Q    And are there any other symptoms that you -- other than stomach pain and early satiety that you think are informative as to a diagnosis of gastroparesis?

A    You have to clarify what you mean as informative.

Do you mean patients with gastroparesis have other symptoms or --

Q    Are there any other signs or symptoms that you

Page 86

would obtain from a history and physical that would help you diagnose whether a patient has or doesn't have gastroparesis outside of nausea, vomiting, abdominal pain, and early satiety?

A     Oh, yes.

Q     What other signs or symptoms would you be looking for that would help you diagnosis whether a patient has or doesn't have gastroparesis?

A     I think it's helpful if we reference the differential diagnosis because there are so many that it would kind of take a long time.

So if we look at the differential diagnosis on page 9, it provides kind of an overview of guidance of what other factors would be examples.

So other symptoms for, say, gastric cancer, would be weight loss.  So patients with gastric cancer have nausea, vomiting, and abdominal pain, but they also have weight loss.

And then patients with dyspepsia tend to have more of like a burning sensation rather than like a pain.  People that have, obviously, a fever would be another example.

Somebody that has a history of like major depression or obsessive compulsive disorder, or symptoms of those would be an indicator of potentially a dysfunctional disorder or a eating disorder, so there's a variety of

Page 87

things that would influence my evaluation of a patient with chronic nausea and vomiting.

Q    Let's take a look at that chart -- at that chart that you've listed.

A    Yeah.

Q    Is this a list of conditions that you would consider in addition to gastroparesis if a patient presented with nausea, vomiting, abdominal pain, and early satiety?

A    Yes.

Q    And gastric ulcer, how would you -- can you distinguish a gastric ulcer from gastroparesis simply based on a history and physical?

A    Usually, we use upper endoscopy to confirm a gastric ulcer, and so I would describe their symptoms, and I could probably reliably tell whether their presentation is consistent with gastroparesis versus gastric ulcer, and then we usually use upper endoscopy to confirm a gastric ulcer.

Q    You wouldn't diagnose somebody with a gastric ulcer without doing upper endoscopy, would you?

A    No.  Well, I guess if they had a CAT scan that showed an ulcer or something like that.

Q    You wouldn't diagnose a patient with a gastric ulcer as opposed to gastroparesis without having some imaging; is that right?

A    I wouldn't necessarily diagnose gastric ulcer

Page 88

without an upper endoscopy or some unusual test that shows a gastric ulcer.

There are cases where people have like a perforated gastric ulcer that is a contraindication to endoscopy, so we can't look in their stomach to confirm the ulcer, so we have to make a diagnosis based on like an imaging study.

Q   With regard to a gastric ulcer, diagnosing a gastric ulcer, you're not simply relying on the patient's report, true?

A   Correct.

Q   Gastric cancer.  That's a condition that can present with similar symptoms to gastroparesis, yes?

A   Yes.  But usually more of like a progressive, like they used to have mild symptoms three months ago and then over the last few months they're more and more as far as progressive pain, progressive nausea and vomiting, that's more and more severe every week or every month, and then they have progressive weight loss is really a significant feature of that presentation.

Q   And would you feel comfortable distinguishing a diagnosis of gastroparesis from gastric cancer based solely on a history and physical?

A   No.  I would want to confirm a diagnosis of gastric cancer by upper endoscopy.

Page 89

Q    Gallstones.  Gallstones is a -- another condition that you have on here that can present similarly to gastroparesis, yes?

A    It's a disorder of nausea and vomiting, so that it's included in the differential diagnosis.

Q    And could you distinguish between a diagnosis of gastroparesis and gallstones based on a history and physical alone?

A    Yes.  Like I think that they would be differentiated if, you know, if you had to pick kind of the patient has one of these two disorders, then the description of gallstone pain is fairly typical.

A pain after eating, often without vomiting in a particular patient presentation, like if it's a young female that was obese, taking oral contraceptives and has risk factors for gallstones, has a two-month history of episodes of postprandial pain after eating with some nausea but no vomiting, no weight loss, that would be typical for gallstones.

And often we use tests like ultrasound to confirm gallstones.  Sometimes the ultrasound's imperfect, so it will miss little stones, and so some people will have their gallbladder removed in the absence of a confirmatory test because they have such typical symptoms.

Q    I'm going to move down to pancreatitis.

Page 90

A    Yeah.

Q    Pancreatitis is another condition that can present with similar symptoms to gastroparesis, yes?

A    Yes.

Q    And would you feel comfortable distinguishing a diagnosis between gastroparesis and pancreatitis based solely on a patient's history and physical?

A    No.  I'd want either a CAT scan or an elevated lipase level or both.

Q    I'm going to move down to epigastric pain syndrome, EPS.  That's the next row in your chart?

A    Yes.

Q    And that's -- epigastric pain syndrome is a condition that can present with similar symptoms to gastroparesis, yes?

A    Yes.

Q    Are you able to distinguish a diagnosis of gastroparesis from epigastric pain syndrome based on a history and physical alone?

A    Sometimes.

Q    What, how?

A    For like a classic presentation.  And you'll find that in the literature, including guideline articles of classic presentations of different disorders are fairly easy to diagnose, and like a classic presentation of a young

Page 91

female with anxiety that has epigastric burning and abdominal bloating that's intermittent with no vomiting, no weight loss, no fever, no other signs or symptoms, her symptoms have been present for 10 years since the age of 16, so, you know, kind of a classic description of that presentation you can diagnose based on history alone.

Q    So if there's a classic presentation of epigastric pain syndrome, you'd be comfortable diagnosing that as opposed to gastroparesis based on history and physical alone?

A    Yes.

Q    If it's something other than the classical presentation, if it's a muddy presentation of potentially epigastric pain syndrome or gastroparesis, would you be able to diagnose that based on history and physical alone?

A    Yeah, it depends on the case.  So classic's easy.

Q    Postprandial distress syndrome is the next row in your table.

Do you see that?

A    Yes.

Q    What does postprandial mean?

A    After eating.  So prandial is eating.  So after eating distress syndrome.

So after people eat, they have early satiety, they can't finish their meal, or they feel very full after their

Page 92

meal.  Sometimes they have nausea.  Sometimes they have vomiting.

But the predominant symptom is typically like a fullness after eating.

Q    Sorry.  I wanted to -- one question I forgot to ask you about, if we can focus your attention back on the pancreatitis row.

A    Yes.

Q    You mentioned that one of the risk factors you would look for to distinguish pancreatitis from gastroparesis would be heavy alcohol use by the patient?

A    Yes.

Q    What does that mean, what is heavy alcohol use?

A    You mean how much alcohol?

Q    Yes.

A    Typically, we define heavy alcohol use as more than three drinks a day.

Q    If somebody has two drinks a day, are you thinking more about pancreatitis or more about gastroparesis?

A    I think with alcohol use, it depends on the nuances of their description.  Some people say they have two drinks a day, but it kind of sounds like they have more, or their wife or spouse, or husband says:  Like, no, they drink more than that.

Or like episodes of -- people get pancreatitis

Page 93

when they drink really heavily in different episodes rather than like they have three drinks one day and got pancreatitis. It's usually like a lot heavier alcohol use, either over time or in spells.

Q   So let me go back to the postprandial distress syndrome now, the bottom row of your table on page 9.

Would you be able to reach a diagnosis as between gastroparesis and postprandial distress syndrome based on a history and physical alone?

A   In a classic case, yes.

Q   In a non-classic case?

A   It depends on the case.

Q   So only in the classic presentation of postprandial distress syndrome would you be comfortable distinguishing it from gastroparesis based on history and physical alone, true?

A   I would say a portion of patients that have postprandial distress syndrome I can diagnose by history and physical alone, and whether that portion is patients -- not patient population in a certain setting might be all classic or it might be all kind of muddy. It depends.

Q   So I was looking at the table that you have here, and I noticed that you don't have functional dyspepsia on the table.

A   Yes.

Page 94

Q    Is functional dyspepsia, it's a separate disease from gastroparesis, right?

A    It is.

Q    Are you able to distinguish between functional dyspepsia and gastroparesis as a diagnosis based on history and physical alone?

A    Well, functional dyspepsia is really two disorders.  So it's been divided into epigastric pain syndrome and postprandial distress syndrome.

So functional dyspepsia is on this table, but it's just kind of divided into the two subtypes that exist now and that's kind of evolved over time.

Q    So with regard to the two types of functional dyspepsia that you've identified, EPS and PDS on your table?

A    Yes.

Q    You would feel comfortable diagnosing EPS or PDS in a classical presentation as distinct from gastroparesis, yes?

A    Yes.

Q    I'm going to -- the rest of the table here, can you -- that you have, it rolls onto page 10.

Which of these -- from chronic nausea and vomiting, all the way down through bulimia, which of these would you feel comfortable identifying as a diagnosis in contrast to gastroparesis based on history and physical

Page 95

alone?

A     Again, the classic presentations, cyclical vomiting syndrome, cannabinoid hyperemesis, rumination syndrome, anorexia, and bulimia.

So some of those cases, if they have like a very typical description, then that diagnosis can be made by history alone.

Q     Chronic nausea and vomiting syndrome, is that a diagnosis that you could distinguish from gastroparesis based on history alone?

A     No.  That's really a -- often chronic nausea and vomiting syndrome is -- we can't explain why they have chronic nausea and vomiting, and so often these patients, they have, you know, an extensive evaluation and we still don't know what's wrong with them.

And so it's kind of a catchall for what patients don't fit into any of these other criteria.

Q     Is that sometimes called a diagnosis of exclusion?

A     It is.

Q     And cannabinoid hyperemesis syndrome, CHS, on your chart.  Can you distinguish between CHS and gastroparesis based on history and physical alone?

A     Yes.

Q     How?

A     It's a really classic description and it's

Page 96

striking.  So for cyclical vomiting syndrome and cannabinoid hyperemesis, it's a description of attacks of vomiting usually one -- 24 to 48 hours in length that recur in discrete episodes, you know, maybe every few weeks or a few months for a long period.

And I think the distinguishing feature is that in between the attacks, they have no symptoms, they feel great.

Q    Do you need to know whether they've used cannabis?

A    Yes.  You would need to know.

And so usually cyclical vomiting occurs in the setting of frequent cannabis use or it occurs in the setting of kind of migraine headaches, as kind of a -- potentially a manifestation of migraine headaches.

And cannabinoid hyperemesis has all these -- like these interesting history and features where patients will report that their nausea gets better if they take a hot shower or sit in a hot bath, and when you ask that specific question, they'll often say:  "Yeah, I feel so much better."

And so there were some key data points that you can obtain from the history that helped make that diagnosis, and when they have such a classic description, then you can make the diagnosis by history alone, and physical.

Q    If we -- I want to direct you back to page 7 in your heading that says:  "Differential Diagnosis for Gastroparesis."

Page 97

You write in the middle of page 7 there:  "The differential diagnosis for patients with chronic nausea and vomiting (greater than seven days), includes" -- and then you list a number of conditions, yes?

A    Yes.

Q    What are you relying on to conclude that chronic nausea and vomiting means nausea and vomiting greater than seven days?

A    That's the textbook definition that we get from the Yamada Textbook of Gastroenterology.

Q    Is the Yamada textbook a reliable source for information about gastroparesis and gastroenterology?

A    It's a useful data point.

MS. AMINOLROAYA:  Object to form.

BY MR. PREMO-HOPKINS:

Q    And when you talk about the Yamada textbook, are you talking more specifically about the chapter written by Dr. Cangemi, and -- oh, gosh, the two doctors at the Mayo Clinic?

A    I'd have to look.  Because the textbook's obviously a whole textbook.

Q    Yeah.  We have -- I have a chapter, we can look at it later.  You don't have to -- it's not a memory test.

A    Yeah, it's, you know, regarding the differential diagnosis portion of the book, and if that's the portion

Page 98

that they're authoring then, yes, but I don't recall -- this is a reference to that kind of specific portion of the book.

Q    Got it.  And so when you say -- you would consider a differential diagnosis for gastroparesis if a patient presented with nausea and vomiting for more than seven days?

A    Yes.

Q    Not everyone who has chronic nausea and vomiting for greater than seven days has gastroparesis, right?

A    Correct.

Q    The symptoms of recurrent nausea and vomiting can be caused by many different conditions other than gastroparesis, right?

A    Correct.

Q    Put another way, would you agree that the symptoms of gastroparesis are nonspecific?

            MS. AMINOLROAYA:  Object to form.

            THE WITNESS:  I would say that the symptoms of gastroparesis -- I wouldn't say they're overall nonspecific.  They certainly correlate with the disease.

BY MR. PREMO-HOPKINS:

Q    Would you agree with me that the symptoms of gastroparesis overlap with many other conditions?

            MS. AMINOLROAYA:  Object to form.

            THE WITNESS:  The symptoms of chronic nausea

Page 99

and vomiting overlap with all the other differential diagnosis on this table.

BY MR. PREMO-HOPKINS:

Q    So one of the things that you list in the paragraph we were just looking at for the differential diagnosis, actually the very first thing you list is medication-related nausea.

Do you see that?

A    Yes.

Q    What is medication-related nausea?

A    That's a side effect from a medication where a patient has nausea after ingesting medication.  We think it's -- it's often like a centrally mediated nausea, meaning like they have nausea from something in the CNS, or a receptor in the CNS potentially, the nausea center, causing nausea.

Q    What does centrally mediated in the CNS mean?

A    In the brain.

Q    How would you distinguish or differentiate between medication-related nausea or drug-induced gastroparesis?

A    I'd probably review the symptom of vomiting, especially vomiting undigested food, would be a good example.

Q    When you talk about medication-related nausea, are you referring to nausea that's not caused by delayed gastric

Page 100

emptying?

A    I think there certainly is a centrally mediated or brain related -- brain receptor mediated nausea that's seen with multiple medications.

Q    Are you aware, one way or the other, about whether or not there's a centrally mediated or brain-related nausea and vomiting seen with GLP-1 RA medications?

A    I haven't seen any literature to support that theory.

Q    If we turn to page 11 of your report.

One of the necessary conditions for diagnosing gastroparesis is delayed gastric emptying, yes?

A    Yes.

Q    And delayed gastric emptying alone, though, isn't sufficient to diagnose gastroparesis, would you agree with that?

A    I would.

Q    So of the conditions that you mention on page 9 and 10 of your report in the table?

A    Yes.

Q    Are patients who take GLP-1 RA medications, are they how immunized or protected from any of those conditions?

In other words, would they suffer them at a lower prevalence than the general population?

Page 101

A    Are GLP-1s decreasing the risk of any of these disorders?  I guess if you extrapolate, if you -- if somebody took GLP-1 and lost weight, then their risk of gallstones may decrease.

And then GLP-1s are associated with pancreatitis, so their risk would increase, but a decrease.

Q    Patients on GLP-1 RA medications can suffer from all of the conditions you list in the table on pages 9 and 10, irrespective of whether they're taking a GLP-1 RA, true?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I can't imagine a scenario where somebody with anorexia would be given a GLP-1, or certainly shouldn't be.

So if you're asking that any patient -- any human can have any of these disorders then, yes, including patients that are given GLP-1, or really any other medication.

BY MR. PREMO-HOPKINS:

Q    You talked about that history point with regard to vomiting of undigested food, and I can direct you to page 7, that's where that's referred to in your report.

A    Yeah.

Q    You say:  "Vomiting of undigested food is a cardinal symptom which may be considered pathognomonic" --

A    Yeah.

Page 102

Q    -- "for delay in gastric emptying if the food was ingested greater than four hours prior."

A    Yes.

Q    What does pathognomonic mean?

A    Pathognomonic means like it's like a clear indicator.  It's kind of difficult to dispute.

I don't think anybody would -- any physician would make a statement that somebody ingested food or ate a meal more than four hours prior and then vomited the same meal that their stomach is emptying normally.

Q    I think you said more than four hours.

A    Yeah.  More than four hours.

Q    Okay.  So if -- is it your opinion that if someone vomits undigested food that was ingested more than four hours earlier that you can diagnose gastroparesis?

A    The statement is that their stomach's not emptying normally if they're vomiting food that was ingested more than four hours prior.

Q    Is that sufficient for you to diagnose gastroparesis?

A    Not just that one data point.  I would need the rest of the patient's history and physical.

Q    I'm going to ask you about some conditions that aren't listed in your table.

Is median arcuate ligament syndrome, MALS, are you

Page 103

familiar with that?

A     Yes.

Q     Is that something that can present with symptoms similar to gastroparesis?

A     Median arcuate ligament syndrome, it typically presents with primarily pain, and since some patients with gastroparesis, you know, present with pain as like one of their major complaints, then I think that's certainly in the differential diagnosis.

Q     All right.

A     But it's really a pain syndrome.

Q     Symptoms of stomach pain, nausea and vomiting, present commonly with MALS, right, M-A-L-S?

A     Yeah.  I mean, it's -- it's not usually vomiting, nausea predominant.  It's usually pain predominant.

        Like it's in the differential diagnosis and we can include that, as well as other disorders, which I'm sure that you can -- you're going to list for me.

Q     Superior mesenteric artery syndrome?

A     Yes.

Q     Would you consider that as part of the differential of a patient that presented with nausea, vomiting, and epigastric pain, and early satiety?

A     Yes.

Q     Gastritis.  Is that something you would consider

Page 104

in the differential?

A    Gastritis is kind of vague.

Q    How about narcotic bowel syndrome, is that something you would consider in the differential of a patient that presented with abdominal pain, nausea, and vomiting?

A    When you say "narcotic bowel syndrome," there's different ways to describe that.

There can be opioid-induced gastroparesis or opioid-induced constipation.

Q    When you say "opioid-induced gastroparesis," do you mean opioid-induced delay in gastric emptying?

A    Yes, with symptoms.  So if they have delay and symptoms.

Q    How about pelvic floor dysfunction, is that something you would consider as part of the differential if a patient presented with pain, nausea, vomiting?

A    No.

Q    How about constipation, is that something you would consider?

A    That would be unusual, except in like very unusual cases of constipation with basically bowel obstruction.

Q    How about thyroid disease, is that something you would consider that could potentially mimic the symptoms of gastroparesis?

Page 105

A     We talked about hypothyroid gastroparesis, so.

Q     So that's a yes, you would consider thyroid disease?

A     Hypothyroid gastroparesis.

Q     How about kidney failure?

A     People with urinemia, with kidney failure, they experience nausea and vomiting.

Q     So would you consider potentially urinemia in the context of kidney failure in your differential of a patient that presented with nausea and vomiting?

A     Yes.

Q     What about electrolyte abnormalities?

A     As a cause of nausea and vomiting?

Q     Yes.

A     We call that metabolic derangement.  So, you know, so, say, like a toxic ingestion or something unusual.

Q     You said -- metabolic derangement is the term you used?

A     Yeah.

Q     And would you consider metabolic derangement in the differential of a patient who presented with severe nausea and vomiting?

A     Yes.  And metabolic derangement would be something that would present kind of acutely and not over a long period.  It would be like a 24 hours, 48 hours, like often

Page 106

like very sick, rather than somebody with kind of chronic symptoms for weeks or months.

Q   Is abdominal distension, is that one of the symptoms you would look for in a patient if you were learning the differential that you describe in your report?

A   I think abdominal distension is like one symptom that we use to differentiate between these disorders.  It's like a symptom like you would see a little bit more with a functional dyspepsia.

Q   Is abdominal distension sufficient to diagnose drug-induced gastroparesis or gastroparesis?

A   Not by itself.

Q   Can centrally mediated drug-related nausea ever result in vomiting?

A   Yes.

Q   Is that common?

A   What I typically see in my experience is nausea without vomiting, but it can result in vomiting.

Q   Do you -- you describe in your report a process by which you did a literature search in PubMed?

A   Yes.

Q   As part of your review of the published literature, did you look to see if there was any literature on centrally mediated mechanisms by which GLP-1s RAs can cause nausea and vomiting?

Page 107

A     That was not the purpose of my research.

Q     So you didn't find any of those?

A     I didn't find any, and I didn't look for any either.  So my search was for gastroparesis, and then, you know, sorting out things for diagnosis, evaluation, of gastroparesis, etiology, pathophysiology gastroparesis, and not for -- I didn't search specific:  "Do GLP-1s cause nausea"?

Q     Your opinion is that you can diagnose the subtype of gastroparesis that you call drug-induced gastroparesis without -- based on history and physical alone, yes?

A     Yes.

Q     What is it in the history and physical that allows you to reach the conclusion that a patient with drug-induced gastroparesis has delayed gastric emptying?

A     An example would be the vomiting of undigested food.

Q     Anything else?

A     It's the context.  And a lot of this is patient context.

So a patient that has a classic presentation of a patient that's got no prior history of GI symptoms, no risk factors, of any of the other diagnoses that we discussed, nothing to suggest an alternative diagnosis.

Begins a GLP-1, experiences nausea, vomiting,

Page 108

that's repeated and recurrent that begins with the use of the drug, and then that, you know, that's really consistent with that as the diagnosis, if there's no other factors that suggest any other cause of their presentation.

Q   In order to reach a diagnosis understand the standard of care, as you described it as drug-induced gastroparesis, do you require observing the patient on withdraw medication?

A   I think that's supportive, but in my own experience, I've seen some people that had kind of a residual of nausea, vomiting symptom and so their symptoms didn't completely resolve.

Q   And how would you determine that that's a drug-induced symptomatology?

A   So in that case I would have to evaluate the patient further, and I would question whether it was just the drug or if there was something else.

Q   So if symptoms persist after withdrawal of the drug, you would consider alternative diagnoses, other than drug-induced gastroparesis?

A   Yes.

Q   And you would conduct additional tests?

A   I would.

Q   And you wouldn't rely simply on the history and physical to make a diagnosis of drug-induced gastroparesis

if symptoms persist after withdrawal, true?

MS. AMINOLROAYA: Object to form.

THE WITNESS: I would still have it in the differential diagnosis, but I would investigate for other causes, other symptoms.

BY MR. PREMO-HOPKINS:

Q You wouldn't be able to say that a patient more likely than not suffers from drug-induced gastroparesis if symptoms persist after withdraw of the drug, true?

MS. AMINOLROAYA: Object to the form.

THE WITNESS: I think it depends on the context. If a patient had no other reason to have these symptoms and they began with the drug, and then we withdrew the drug and their symptoms got better but they didn't completely go away, then, you know, I wouldn't be sure why they have these symptoms now.

BY MR. PREMO-HOPKINS:

Q Okay. So if a patient had no other reason to have the GI symptoms, they began taking a drug, that correlates with the onset of those symptoms?

A Yes.

Q Then you take the drug away and the symptoms got better but didn't completely go away, you wouldn't be sure what the cause of those symptoms were, true?

MS. AMINOLROAYA: Object to form.

Page 110

THE WITNESS:  I think when you say "sure," that sounds like 100 percent.  I think -- I would do further tests and do their evaluation, and sometimes as part of their testing I would do more evaluation, their symptoms may go away completely, and then I would be more confident that that's really just what it was -- it was just a residual effect.

Or if I follow them along and they didn't get any better or they got worse, then obviously we would do more evaluation.

So our further testing kind of depends on how patients do.  If they get better, then we do less.  And if they are still sick or get worse, then we do more.

BY MR. PREMO-HOPKINS:

Q    So with what you called a drug-induced gastroparesis, is that a temporary entity, a medical condition?

A    In my experience, when you withdraw the drug, most patients get better or their symptoms completely resolve.

Q    In your experience, if you're diagnosing based on your standard of care, you see drug-induced gastroparesis involving most patients getting better or their symptoms completely resolve upon withdraw of the drug, true?

A    Yes.

Q    How soon after the withdraw of the drug do you see

Page 111

the symptoms get better in what you call drug-induced gastroparesis?

A    It depends on the half-life of the drug and like how long you've been taking it.

Q    Explain that to me.

A    The half-life is how long the drug's in your bloodstream.

Q    Okay.  Is it your opinion that you need the drug to completely wash out before you would feel like the evidence confirmed your diagnosis of drug-induced gastroparesis?

A    I think it's going to -- the time that I would expect is going to be influenced by how long the drug's in the blood.

So if it's a drug that comes and goes within a few hours, then I would expect, you know, maybe a few days, whereas if it's a drug that lasts, you know, it's in the bloodstream for a week, then it might be more like a few weeks.

MS. AMINOLROAYA:  Object to form.  Misstates the testimony.

BY MR. PREMO-HOPKINS:

Q    Are you familiar with the fact that the ACG recommends that you take patients off of a potential -- drugs that could potentially delay gastric emptying 48 hours

Page 112

before conducting a gastric emptying study?

A     The recommendation is generally to take people off of drugs that either accelerate or interfere, or just kind of alter the motility of the gastric function, and they use like a 48 hours as kind of all drugs, because most drugs have a short half-life, but how I would generally use, if it's a drug that's going to be in the bloodstream for a people or, say, it's a depo shot, we use shots that stay in the bloodstream for a month, then you'd have to factor that in when timing a gastric emptying study.

MS. AMINOLROAYA:  Mark, it's 11:30.

MR. PREMO-HOPKINS:  Why don't we break for lunch.  Thank you for keeping an eye on that.

All right.  We'll go off the record.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:32 a.m.

(Recess taken at 11:32 a.m.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 12:10 p.m.

BY MR. PREMO-HOPKINS:

Q     Dr. Raines, we broke for lunch.  Are you ready to begin again?

A     I am.

Q     During the break at lunch, we marked as Exhibit 1B, a document, it's a single page document entitled:

Page 113

"Dr. Daniel Raines Supplemental Materials Considered."

Did you see that?

A    I do.

Q    Did you put this together?

A    I did.

Q    When did you put it together?

A    Over the last few weeks.

Q    Just for the record, again, we marked this as Exhibit 1B.  We'll come back to this.

A    Okay.

Q    Dr. Raines, but you can set that in your pile of exhibits for now.

I want to go back to your differential diagnosis process in your report.

A    Yes.

Q    On -- you talk about step one that you would do is history and physical, right?

A    Yes.

Q    And as part of that, hopefully you would learn whether or not a patient is taking a drug that might affect gastric motility?

A    Yes.

Q    When you talk about drug-induced gastroparesis --

A    Yes.

Q    -- you say that could be -- that type of

Page 114

gastroparesis can be diagnosed based on history and physical alone, yes?

A    It depends on the presentation, but in a classic presentation, then yes.

Q    What's a classic presentation?

A    So a patient that we described previously with no other health symptoms, no risk factors for gastric cancer, gastric ulcer, gallstones, pancreatitis, no history of anything to suggest any other diagnosis, other than drug-induced gastroparesis, starts taking a drug, has severe symptoms of nausea, vomiting, abdominal pain, vomits food eaten four hours prior, has no fever, has no abdominal tenderness, and so that correlation of starting a drug and being severely sick with those kind of typical symptoms, that would be consistent with a diagnosis of drug-induced gastroparesis, and really no features of anything else or no suggestion of any other diagnosis, that's alternative.

Q    So in order to diagnose a patient with drug-induced gastroparesis in the absence of -- or based on history and physical alone, you would want to make sure that that history and physical was negative for alternative diagnoses?

A    It would be more compelling if it didn't have any other diagnosis and so, as we described previously's, it's like in a classic case, it makes it easy, and the answer is:

Page 115

Yes, I can.  In those classic cases.

And then cases that are more complicated and patients have previous diagnosis of pancreatitis or other, you know, other history, it makes it difficult and that's when you have to kind of drill into the individual case as far as how you would evaluate that specific patient.

Q    Can you describe for me what you would call a classic case that can be diagnosed as drug-induced gastroparesis based on history and physical alone?

A    Yes.  So a patient with no history of any other illness, especially like no other like pre-existing symptoms, completely asystematic, no medical problems, not on any other medicines, that suddenly started a drug, like a GLP-1, and then developed severe nausea and vomiting, with vomiting food within four hours after ingestion, that was kind of persistent for more than seven days or recurrent over the course of seven days.

No fever.  No weight loss.  Other than like acute weight loss with dehydration, no abdominal tenderness necessarily, so that kind of classic story.

Q    If you see a patient that presents with symptoms consistent with gastroparesis, they're on a GLP-1 RA medication, those symptoms, the onset of those symptoms correlates with the initiation of the GLP-1 RA?

A    Yeah.

Page 116

Q    And the history is negative for alternative diagnoses, you're diagnosing drug-induced gastroparesis?

A    It depends on the case, but if we have a hypothetical scenario of a classic case that I've just described, then, yes, I can diagnose drug-induced gastroparesis.

Q    What would complicate a case such that you can't diagnose drug-induced gastroparesis based on history and physical alone?

A    Too many things to talk about.

Q    Can you name some of them for me?

A    So like a pre-existing history of gastroparesis. A pre-existing history of pancreatitis. A pre-existing history of abdominal surgery with like a gastrectomy or some change in anatomy would be kind of examples.

Q    Diabetes?

A    That would be a factor. It depends on like the severity of the diabetes and how longstanding, if they have other features or features of end organ damage from their diabetes.

Q    And in order to make a diagnosis under your standard of care with regard to drug-induced gastroparesis, you don't require the cessation of symptoms after withdraw of the medication?

MS. AMINOLROAYA:  Objection to form.

Page 117

THE WITNESS:  I would -- there's a threshold where I would assign a diagnosis, and so I want to assign a diagnosis at that time before I withdrew the drug, and then I would withdraw the drug.

BY MR. PREMO-HOPKINS:

Q    And if you withdraw the drug and the symptoms persist, you would consider alternative diagnoses?

A    I would.

Q    If you have a patient that presents with what you called the cardinal symptoms of gastroparesis and they're taking a GLP-1 RA in correlation with those symptoms, you reach the conclusion they have drug-induced gastroparesis?

A    It depends the presentation, but in the classic presentation I described, I would.

Q    And you understand that gastroparesis requires a delayed gastric emptying, yes?

A    Correct.  Gastroparesis has two requirements.

One is symptoms related to delay in emptying from the motility disorder.

Q    How do you know that patient that we just described that presents with symptoms and tells you that they're taking a GLP-1 RA has delayed gastric emptying?

A    Like vomiting food more than four hours after ingestion is certainly an indicator.

Q    What if there's no food vomited more than four

Page 118

hours before?

A    It depends on the case.  So if they don't have a classic presentation or if you want to pick out variations from the classic, then I'd really have to see the patient and kind of tease out their story.

Q    I guess I'm trying to understand.  In your diagnosis, is it sufficient that the patient is taking a GLP-1 RA in correlation with symptoms to reach the conclusion that they're suffering from delayed gastric emptying?

A    All I can say is it depends on the case, except for if we describe a classic case, then, yes, I can make that diagnosis, and then if we generalize that to every patient, then that's a different story.

Q    So only in some cases is it sufficient for you to reach a diagnosis of drug-induced gastroparesis if a patient is taking a GLP-1 RA in correlation with symptoms consistent with gastroparesis, true?

            MS. AMINOLROAYA:  Object to form.

            THE WITNESS:  Yes.  I would say it's not all
        cases that I would assign a diagnosis of drug-induced
        gastroparesis with somebody that's taking a GLP-1 RA
        and has symptoms of nausea and vomiting.

BY MR. PREMO-HOPKINS:

Q    You need something else?

Page 119

A    It depends -- it really depends on the details of their case.  It's like a --

Q    What --

A    I need -- like I described, you know, a classic case is easy, and then a really complicated case with a bunch of other reasons for these symptoms or a previous history of gastroparesis or a previous history of pancreatitis, then, you know, probably not, and then there's a lot of wide range in between because, you know, different patients have different presentations.

Q    So what you've described as classic case --

A    Yes.

Q    -- walks in, tells you:  "I have these classic case symptoms of gastroparesis and I'm taking a GLP-1 RA," and they explain to you that they don't have other alternative potential causes of gastroparesis.

A    Yes.

Q    In that -- in that case, you can -- you can diagnose more likely than not drug-induced gastroparesis?

A    Yes.

Q    Is there any other case you can describe to me where you'd be able to do that?

A    They would only like be variations of that same case with somebody that's like a little bit older or younger or, but there is -- I mean, obviously we're seeing a debate

Page 120

over, can you diagnose that at all.

So in some patients you can, and then in some patients that it's not really classic or they have a lot of modifying factors then you can't.  So it's really some you can and some you can't.

And that goes for probably a lot of these diagnoses, especially things like cyclical vomiting syndrome, where if they have a classic description, then it's just by history, but if they have symptoms in between episodes and it's not -- doesn't quite fit the history or description very clearly, then you can't, and you would still, you know, you might do further testing in that patient.

So it depends on if their presentation fits typically with the diagnosis as far as what we do.

Q    In the classic case that you described --

A    Yeah.

Q    -- with GLP-1 RA usage --

A    Yeah.

Q    -- how do you conclude that the person is suffering from delayed gastric emptying?

A    That symptom, that story of vomiting, especially vomiting undigested feed.

Q    Anything else?

A    You know, other things that would be supportive

Page 121

would be early satiety, you know, abdominal bloating, but I think the vomiting symptom is -- is, you know, really important.

So I wouldn't diagnose drug-induced gastroparesis in patients that had like potentially bloating as their only symptom or if they're in clinic with bloating as kind of a mild symptom.

Q   So you've describe symptoms to me, I'm trying to -- does the use of the GLP-1 RA at all factor into your equation about whether or not there's delayed gastric emptying or not?

A   Well, I think independently there's evidence that GLP-1s cause delay in gastric emptying, and I think that's pretty well-established, at least in the literature that we -- like we review in gastroenterology, and so when patients start a GLP-1 on a drug that's known to cause delay in gastric emptying, they come to the ER vomiting undigested food just after starting the drug and there's no other explanation, then this would be the conclusion or the assumption, and I think with a fairly reasonable likelihood that that's the cause or that's the diagnosis.

Q   So you state in your report that delay in gastric emptying is included in the labeling for the drugs that you address in your report, right?

A   It does.

Page 122

Q    And what is the significance of that statement to your opinions?  And it's on page 6, if you want to look at it.

A    Sure.  The significance, as it describes, an effect of these drugs.  And it doesn't -- like I think the label is kind of incomplete where it fails to kind of correlate delay in emptying with symptoms.

And I've seen patients that have onset of symptoms with the drug and evidence of delay in emptying by vomiting solid food, and so I would call that drug-induced gastroparesis, but the label doesn't really say drug-induced gastroparesis, it just says a delay.

Q    I'm asking you, sir, how did the label inform your opinion as to the standard of care as to how the diagnose gastroparesis?

A    I think it's just a data point like all the other data points.

Q    And you know from your experience as a gastroenterologist that GLP-1 RA medications can delay gastric emptying?

A    Yes.

Q    How long have you known that?

A    Probably since we started using them, like '20, '21, '22, in the obesity medicine clinic.  So we're affiliated with -- our department has an irritable bowel

Page 123

syndrome specialist, an inflammatory bowel disease specialist, it's got an obesity medicine specialist, Dr. Hudson.

And so we started an obesity medicine program at LSU where we manage patients with medical therapy, procedures, surgeries, and kind of through exposure to use of those drugs in that setting, through that clinic, we've seen more and more patients with drug-induced gastroparesis from GLP-1 therapy, or in the setting of GLP-1 therapy.

Q    The -- I want to ask you about the obesity medicine clinic.  You -- what's your interaction with the clinic?

A    I helped create the clinic, so I hired Dr. Hudson to be the gastroenterology provider.  So she's a gastroenterologist and she works with bariatric surgeons, so treatment of obesity is surgical, procedural, and medical. And so she helps kind of fill out that medical part and endoscopy part.

And then gastroenterology fellowship is, including procedural training, hepatology, but also includes nutrition, and so the management of obesity kind of crosses over into gastroenterology for gastroenterologists that are interested in that field or wish to specialize in that field.

Q    When you say "that field," do you mean in obesity

Page 124

medicine?

A    Yes.

Q    And that's a legitimate field of medicine?

A    Yes.

Q    And you agree that obesity can be treated medically without surgery, right?

A    Yeah.

MS. AMINOLROAYA:  Object to form.

BY MR. PREMO-HOPKINS:

Q    Based on your experience with your -- with these societies and your long clinical experience, is it well-known by those in clinical practice in the United States that GLP-1 RA medications can delay gastric emptying?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  That would be speculative for me to say it's well-known that nobody knows that.

I can say in our GI, like our department, where we interact every day, that we're well aware, we see those patients in the ER, or in the hospital, and because we have an obesity medicine program at our institution, then, you know, it's kind of prevalent in our minds as far as patients that are using these drugs and the potential side effects.

So we see them in the hospital with pancreatitis and other, you know, complications, too,

Page 125

just because of the volume of patients that are
treated.

BY MR. PREMO-HOPKINS:

Q    So with regard to your department, you recognize
that it's well-known that GLP-1 RA medications can delay
gastric emptying?

A    In our department, or our community, it's
well-known.

Q    When you say "our community," what do you mean?

A    Like in our department, we have GFLO's resident
students, so we have six faculty, seven fellows, two PAs.

And then I think for that interaction, like just
day-to-day interaction, but especially conference activities
during the week.  You know, we all get together and talk
about new drugs or previous diseases or existing diseases
that there's updates or like there's kind of a continuing
education thing.

And through that we talk about GLP-1 drug-induced
gastroparesis, or really kind of gastroparesis in general,
just like we do pancreatitis, and then we talk about obesity
medicine as well.

Q    I think we marked as Exhibit 3, your presentation
on gastroparesis.

A    Yeah.

Q    Do you have that in front of you?

Page 126

A    I do.

Q    And this is a presentation that I believe you said you would have given to fellows?

A    Yeah.  Yes.

Q    And in the last two years?

A    Yes.

Q    And is there anything in this presentation that indicates that -- how to diagnose gastroparesis?

A    If you look into the second page.  We use these slides as kind of like a platform for discussion, so the slide number four talks about using scintigraphy and the thresholds for an abnormal scintigraphy study.

Q    Okay.  So in the presentations that you give to the fellows, one of the elements that you would discuss with regard to diagnosis of gastroparesis is a scintigraphy study?

A    It is.

Q    Is there anything in this presentation that indicates that drug-induced gastroparesis can be diagnosed without a scintigraphy study?

A    That's not written down in this lecture series, but certainly discussed in the lecture.

Q    And have you ever written it down anywhere in any peer-reviewed publication?

A    Have I written it down in a peer-reviewed

Page 127

publication, no.

Q    Is the term "drug-induced gastroparesis" referenced anywhere in your presentation?

A    It is.

Q    Where is it?

A    It's on the slide number three.

Q    Okay.  And what -- in what context is drug-induced gastroparesis referenced in your presentation?

A    That's in one of the epidemiological studies, it talks about different etiologies or subtypes of gastroparesis.

Q    And one of those is identified as drug-induced gastroparesis?

A    It is.

Q    And in the presentation that you give to the fellows, there's no slide or any information that indicates they can diagnose drug-induced gastroparesis without a scintigraphy study, correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  The slides uses a platform and so in the discussion we talk about presentation and kind of variation of presentation and diagnosis of gastroparesis amongst these subtypes.

So in medicine, we really try to specialize our evaluations of particular -- as much as possible to

Page 128

a particular patient group.

So patients with idiopathic gastroparesis might have a little bit different symptoms or disease cores compared to say diabetic diagnosis, or hypothyroidism gastroparesis, or particularly post-viral gastroparesis is an example where patients sustain like an injury from an infection, and then it's fairly severe and then they may slowly improve or recover over time.

So when we use the term "gastroparesis," it's really helpful to kind of subclassify which type or subtype of gastroparesis we're talking about.

BY MR. PREMO-HOPKINS:

Q    So when you're talking about gastroparesis, it's important to understand which subtype you're talking about?

A    Yeah.  Off and on with context, yeah.

Q    And in the presentation that you put together for the fellows in your program about gastroparesis, there's no slide or information that would tell anyone reading the presentation that they can diagnose drug-induced gastroparesis without a scintigraphy study; isn't that right?

A    Yeah.  Is doesn't that we diagnose it, it requires a scintigraphy study either.

Q    Did you write in your presentation in the slides

Page 129

that you were going to show to the medical fellows that they can diagnose drug-induced gastroparesis without a scintigraphy study?

A    I didn't write that in the presentation, no.

(Raines Exhibit 8 marked.)

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, do you recognize Exhibit 8 as the ACG Clinical Guidelines for gastroparesis?

A    I do.

Q    And is this something you familiarized yourself with in your practice?

A    Yes.

Q    Do you know the folks who are the authors listed here?

A    I know Tom Abell.  It's been a while.  Tom Abell was in Jackson, Mississippi, for many, many years, not too far from Monroe.

And Tom is -- I think he's in Louisville now. He's kind of getting older.

Q    Are the folks who are listed here, would they be members of the ACG?

A    Typically, the ACG likes for authors to be members.  I don't know about the criteria for like a co-author, but in general, yes, I would say probably everybody on this list is a member of ACG.

Page 130

Q    Would following ACG guidelines allow a clinical practitioner in the United States to reliably diagnose gastroparesis?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Following ACG guidelines would allow someone to evaluate and diagnose, say, diabetic gastroparesis.

BY MR. PREMO-HOPKINS:

Q    Would following the ACG guidelines allow someone to diagnose hypothyroid-related gastroparesis?

A    No.

Q    Why not?

A    Because the way we diagnose hypothyroid gastroparesis is to check a thyroid study, and that's not included here.

Q    How would you know the patient's suffering from delayed gastric emptying?

A    Because of the symptoms, yeah.  So vomiting undigested food would be a good example.

So nausea, vomiting, vomiting undigested food, and then -- that's a good example of patients with hypothyroidism might have a lot of other symptoms of hypothyroidism like hair loss, fatigue, and when people have those hypothyroidism or severe hypothyroidism symptoms and they have symptoms of gastroparesis, the test that we might

order is like a thyroid level, and then if it demonstrated they had severe hypothyroidism, we would just treat their hypothyroidism. Like we wouldn't wait to do a scintigraphy study on that patient.

Q   Are you familiar with Figure 1 in Exhibit 8?

A   I am.

Q   And Figure 1 is on the bottom of page 2; isn't that right?

A   It is.

Q   And is -- is this a guideline that you would follow to diagnose gastroparesis?

A   I would --

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I would follow this guideline to diagnose diabetic gastroparesis, idiopathic gastroparesis, which are two of the major groups.

BY MR. PREMO-HOPKINS:

Q   Any other subtypes of gastroparesis?

A   I don't think it's useful to diagnose kind of the not applicable to every case of gastroparesis, and that's the concern is that it's not that the guideline is wrong, it's just guidelines, it's hard for them to cover every possible scenario.

And, you know, that's why when -- I think you can see above the table in Figure 1, there's a paragraph that

Page 132

says:  "ACG guidelines are established to support clinical practice and suggest" -- suggest, not kind of require -- "preferable approaches to a typical patient with a typical medical problem based on currently available published literature.  When exercising clinical judgment, particularly when treatments pose significant risk, healthcare providers should incorporate this guideline in addition to patient-specific medical comorbidities, health status and preferences to arrive at a patient-centered approach."

And so that's how guidelines work, you know, it's a suggestion for like a typical presentation.  It's not a requirement, and it's -- and it's not -- not a recommendation that physicians just kind of follow a certain algorithm and not think about the particulars of that particular patient, like it should be adapted to the particular patient.

The thing is, the guidelines can't cover every presentation or every case.

Q    Do you agree, sir, that to -- in diagnosing diabetic or idiopathic gastroparesis, you would have to exclude iatrogenic disease?

A    That's a little bit odd in the table how that's worded because, you know, I've seen some descriptions of evaluation of -- evaluate for drug-induced gastroparesis, as far as like an iatrogenic drug-induced -- like an iatrogenic

Page 133

gastroparesis.

And I think that that's what the table is saying is like it could be drug-induced gastroparesis, and if it is, then we wouldn't necessarily do a scintigraphy study, we might just remove the drug.

Q    It says:  "Exclude iatrogenic disease."

Do you see that?

A    I do.

Q    And diagnosing diabetic or idiopathic gastroparesis, how would you exclude iatrogenic disease?

A    So if somebody had diabetic gastroparesis and they were taking a GLP-1, then I don't know.  I may have to stop the drug and see if their symptoms are better.

Q    So in order to exclude iatrogenic disease in a diabetic patient on a GLP-1, you would stop the drug to see if their GI symptoms improved?

A    Yeah.  That would be an example, yeah.

Q    And you would have to do that exclude iatrogenic disease, wouldn't you?

A    I wouldn't say have to, but it depends on the case.

Q    Tell me a situation in which you could exclude iatrogenic disease in a patient taking a GLP-1, who also has diabetes and presents with symptoms of gastroparesis?

A    I'd have to be like really detailed as far as the

Page 134

presentation, like have an example.

Q    Well, you told me that it's -- you told me that it's not always true, so I'm just asking you, when is it not true?

A    That word "exclude," it's more like the next step in an evaluation.  So this algorithm is like what's recommended to do next.

So if I saw somebody with -- a diabetic, for example, with symptoms of gastroparesis that correlated with onset of a drug, then like a GLP-1, then I think the next step in the algorithm might be to withdraw the drug and that would -- that would be the same for opiates or anti-cholinergics, especially if they correlate with the symptom onset.

And then if they had no change in their symptoms or they got sicker, then I might go back to the algorithm and do a scintigraphy study for example.

(Raines Exhibit 9 marked.)

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, the court reporter's going to hand you what we've marked as Exhibit 9 to your deposition.

Do you recognize this as a blown-up version of the algorithm that's on -- from the ACG?

A    I do.

Q    So I want to make sure, it sounds like you were

Page 135

describing some things you would do differently than what's described here?

A    It's more of a supplement.  So this is a general guideline for general gastroparesis without subclassifying subtypes of gastroparesis, and it covers the majority of cases of gastroparesis if we consider that the majority of the cases are idiopathic or diabetic.

So when you take those two groups of cases, then it covers the majority of the cases.  So it applies to the majority of the patients.

Q    And you can't diagnose diabetic or idiopathic gastroparesis without excluding iatrogenic disease, true?

A    You'd have to be a little more particular about like iatrogenic disease because some things wouldn't be easy to exclude.

So if the patient had a, say, a gunshot to the chest that may have injured the vagus nerve, how do I exclude -- or say they have a surgery that's in the proximity of their vagus nerve and they could have injured their vagus nerve, and I'm not sure, how do I exclude the vagal injury?  So -- and it's a little bit odd the way that works.

I think the inference is that if somebody's taking a drug that's the cause of their gastroparesis, then that would be where it kind of splits off.

Page 136

Q    How would you exclude iatrogenic disease caused by GLP-1 RA medications such that you could continue down this flowchart?

A    So the next step would be to stop the GLP-1, and if their symptoms completely went away, then I wouldn't go to a gastric emptying study next, for example.

Q    They'd be cured of their gastroparesis, right?

A    Yeah.  I think if you say drug-induced gastroparesis is induced by a drug and then when the drug's removed their gastroparesis resolves, then I would say they're cured.

Just like if they have a viral gastroparesis or post-viral gastroparesis that improves with time and so they're cured with time.

Q    So if you identify a drug-induced gastroparesis and the symptoms abate when you remove the drug, that person's gastroparesis will have resolved, true?

A    Yes.  Because their symptoms went away and you have to have symptoms to have gastroparesis.

Q    How would you know if they had delayed gastric emptying in the meantime?

A    You'd have to go by their history.  If they haven't had a scintigraphy study yet.

Q    And what if they haven't vomited any food older than four hours, could you reach a conclusion that they

Page 137

suffered delayed gastric emptying?

A    Still again, depends on the case, and if they have a typical case.

Q    Tell me the case of a patient who's taking a GLP-1 RA who hasn't vomited any food older than four hours where you can reach a conclusion they suffered from delayed gastric emptying, based on history and physical?

A    I think anybody that has onset of symptoms, so I would use onset of symptoms correlating with the drugs.  So if they didn't have nausea and vomiting before they started the drug, I would say, like no other reason to have that, that new symptom, and usually I use like a severity.

So, you know, I wouldn't say like a little bit of nausea.  And things that would make it easy for a classic case would be patients that like become dehydrated or come to the ER or present to the hospital or urgent care with nausea and vomiting, so that would kind of be an indicator of severity.

Q    I keep asking you about delayed gastric emptying and you keep telling me about symptoms.

A    Yeah.

Q    So I want to make sure I understand your answer.

A    Yeah.

Q    Describe to me a patient who's taking a GLP-1 RA medication who hasn't vomited any food that's older than

Page 138

four hours where you can reach the conclusion that they suffer from delayed gastric emptying?

MS. AMINOLROAYA:  Object to form.  Asked and answered.

THE WITNESS:  I think it's recurrent vomiting.

BY MR. PREMO-HOPKINS:

Q    How many times?

A    It would have to really depend on the case.  It really would.

Q    You don't have a standard?

A    I don't say like they vomited, you know, three times instead of seven times.  You know, there's a -- it's kind of nuanced patient to patient.  So it's hard to describe criteria for, you know, kind of beyond that to kind of tease it out beyond that.

Q    So in terms of determining whether or not a patient taking a GLP-1 RA medication who hasn't vomited any food that's older than four hours, that's something that's hard to describe criteria for in determining whether they're suffering delayed gastric emptying?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think it's hard to describe like criteria that applies to all patients, and I don't think it would be hard to describe for an actual

Page 139

patient that I examined, how likely it would be or not and my reasoning for that patient or not.

BY MR. PREMO-HOPKINS:

Q    Okay.  So then tell me the patient who's taking a GLP-1 RA medication who hasn't vomited any food that's older than four hours where you reached the conclusion that they are more likely than not suffering from symptoms due to delayed gastric emptying?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  I think they would need to have symptoms for more than seven days.  That they would have really more than just a little nausea.

I would say a patient that came to the ER vomiting, that's dehydrated, but didn't vomit solid food, and was sent home with nausea medicine, came back the next day dehydrated, or two days later, didn't vomit solid food, and that they're not really able to eat, but they're not vomiting solid food.

Like that would be like another example.

BY MR. PREMO-HOPKINS:

Q    But determining whether or not a patient taking a GLP-1 medication is actually suffering symptoms secondary to delayed gastric emptying, that's a patient-by-patient inquiry, yes?

A    Me arriving at that diagnosis is going to be

patient by patient. But, in general, there are some patients that I can diagnose with drug-induced gastroparesis based on history alone.

Q   And those patients need to have symptoms of gastroparesis for more than seven days?

A   I would say more than seven days, just because the late of like acute infection gastritis is -- when we talk about symptoms less than seven days or nausea and vomiting that's less than seven days, the differential diagnosis that I describe in my report is a lot different.

So there's different pathologies, and included in the differential diagnosis is acute infectious gastritis or a stomach virus or a stomach bug, and that's pretty common.

So if I see a patient in the ER that has nausea and vomiting just for one day, then, you know, I would not diagnose that person with gastroparesis or drug-induced gastroparesis, or any form of gastroparesis, just with like a short duration of symptoms, just because of the prevalence of like other diseases and, namely, like a stomach virus.

Q   Given the potential for alternative causes, you would not diagnose a patient who's been suffering from GI symptoms for less than seven days with gastroparesis, true?

A   True.

Q   And to diagnose a patient with nausea and vomiting secondary to delay in gastric emptying, you would expect, I

Page 141

think you said, more than just a little nausea, right?

A    Yes.

Q    You would expect a patient that has to present to the emergency room unable to eat, those types of things?

A    Those would be examples, yeah.

Q    That's the level of severity you're talking about, though?

A    Those are examples of severity.

Q    Are they on the high end?

A    I don't know, I never graded them, but I can give you examples.

Q    So you don't have a grading of the severity of symptoms that would be required to diagnose drug-induced gastroparesis in the absence of scintigraphy, true?

A    I never created a grading system for diagnosis of drug-induced gastroparesis based on the symptoms.

Q    You just know it when you see it?

A    Yeah.

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  It's more like it depends on the individual case.

BY MR. PREMO-HOPKINS:

Q    And it depends on how severe their symptoms are, yes?

A    It does.  And in general, it depends like how much

Page 142

we do for a patient.  It depends on how severe their symptoms are.

Q    The more severe the GI-related symptoms, the more likely you are to conclude that they're suffering from drug-induced gastroparesis?

A    The more classic their presentation is for drug-induced gastroparesis, the more likely.

Q    It seems circular to me, sir.

A    I know, me, too.  So it's like -- there's a certain threshold, like, yes.  They have to have symptom onset with the drug.

Q    Okay.  So the first step, they would need symptom onset with the drug, yes?

A    Yes.  It's got to correlate with the drug.

Q    Okay.  Which symptoms should correlate with the drug?

A    So typically it would be nausea and vomiting is the symptoms that I would want to see to make the diagnosis of drug-induced gastroparesis, so.

Q    So you want -- in order to make a clinical diagnosis without a gastric emptying study, you would want to see onset of nausea and vomiting that correlates with use of GLP-1 RA?

A    Yeah.  Or, you know, maybe if they change their dose or increase their dose.

Page 143

I understand it's like there's got to be some kind of criteria, so the criteria would be correlation with the drug and then symptoms of gastroparesis, namely, nausea and vomiting, more than seven days.

And then when we talk about severity, there's a lot of ways to grade severity.  So it's hard to like create a threshold for severity.

Examples of severity would be dehydration, coming to the ER, hospitalization, you know, if they're not able to get out of bed, you know, it's kind of those -- those components, and those are kind of nuanced for the patient as far as severity.

So it's hard to set like a number as far as severity.  I can give kind of examples of severity.

Q    Are you done with that answer?

A    Yes.

Q    You didn't say anything about gastric emptying, which I thought was a necessary criteria for diagnosing gastroparesis.

A    I said nausea and vomiting, yeah.

Q    Is it your opinion that nausea and vomiting in the context of onset of GLP-1 RA medication can only be caused by delayed gastric emptying?

A    I think it would be wrong to say only like 100 percent.

Page 144

Q    You think you can reach a conclusion more likely than not that nausea and vomiting onset in temporal correlation with the use of a GLP-1 RA medication is sufficient to reach a diagnosis of drug-induced gastroparesis?

A    Yes.  In the criteria that I described.

So chronic nausea and vomiting, onset of the drug. Really no other reason to have this presentation.  And particularly vomiting solid food.

So those are all things that would be compelling for that diagnosis as more likely than not, because, you know, in practice we have to act.  So what do I do if I'm not sure what's wrong with them?  And if I'm like:  "Oh, well, let's do a gastric emptying study," then I can't and shouldn't do that test on a GLP-1 because it's going to interfere with the test.

And then if I think the drug's making them really sick, then I think it would be kind of unethical for me to just to continue it thinking that's what's wrong with them.

So every test has a risk and a benefit as well. So what's the risk of holding the medicine for a few weeks? You know, really nothing.

So if a test is to withdraw medicine and there's no negative effect from that withdrawal, then that sounds like a reasonable test.

Page 145

Q    You can reach a conclusion more likely than not that nausea and vomiting onset in temporal correlation with the use of GLP-1 RA medication is sufficient to reach a diagnosis of drug-induced gastroparesis, yes or no?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  In seven days, so we fill the criteria thing.

So nausea and vomiting.  Severe symptoms, which are -- can be kind of difficult to delineate.  More than seven days.  And then like no other reason to have this presentation.

BY MR. PREMO-HOPKINS:

Q    And then you would expect the drug-induced gastroparesis, you said, to go away if you did the test of withholding the medication?

A    So if I withdrew the drug, I've personally observe people's symptoms resolve in a few weeks, probably like 90 percent.

Q    When you say "a few weeks," are you talking two weeks, three weeks?

A    Some people get better in like a week and some people it's three weeks, but usually within a few weeks, the vast majority of patients, you know, are either -- their symptoms resolved or they're improving.

Page 146

Often, we don't have to wait until their symptoms are completely resolved to kind of, you know, get an estimate or kind of an impression of how their course is. So if their symptoms are 80 percent improved at three weeks but they still have some symptoms, then usually they'll like go -- like go away, and that's what we've seen in our practice at LSU.

Q    So in your practice at LSU, you see that when you withdraw a drug that could be inducing gastroparesis, their symptoms resolve in a few weeks up to 90 percent of the patients?

A    Yeah.  So with GLP-1 drugs.

Q    All right.  Would you -- in order to make this diagram that we've marked as Exhibit 9, I think it's Exhibit 9, isn't it, clearer --

A    Yeah.

Q    -- would you -- would you make it clearer to indicate a -- how to diagnose drug-induced gastroparesis in your -- in your practice?

A    I think it would be helpful to, you know, when they put this little box that says:  "Exclude at iatrogenic disease, for example, opiate use," you know, I think it would be helpful to put some more detail in there because iatrogenic could mean like surgical nerve injury, traumatic nerve injury, drug-induced gastroparesis, you know, what are

Page 147

they talking about?

So, you know, they have limited space to put things on this diagram, but I think to make it clear, you put more information about what exactly do they mean.  And then, you know, what do they recommend.

So the inference is that in somebody taking a drug that might be the cause of their gastroparesis to withdraw the drug.  And so that's what I see from this table.

Q    Are you aware of any peer-reviewed published literature that supports your conclusion that you can diagnose delay in gastric emptying based on symptoms alone?

A    It's mostly discussion of withdraw of the drug. So people don't say -- I'd have to see if there's comments. I'd have to read the -- like in all this literature talking about like the recommendations to withdraw the drug, and that's probably the cause of their drug-induced gastroparesis.  Like I think it comes across in that, you know, in that phrasing.

Q    You've told me that withdrawal of the drug is not necessarily for you to make a diagnosis, though?

A    Not always.

Q    Okay.  Are you aware of any peer-reviewed published literature that supports your conclusion that you can diagnose delay in gastric emptying based on symptoms alone without withdraw of the medication?

Page 148

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  I think we'd have to go through this discussion of papers that talk about GLP-1-induced gastroparesis, and we could look for phrases that talk about, it seems like this might be the cause of their gastroparesis, and the next step would be -- or the intervention would be to withdraw the drug and, you know, we'd have to look for a phrase or a comment like that.

BY MR. PREMO-HOPKINS:

Q    So you're looking for a phrase that says: "Withdraw of the drug."

A    Would be the next step in management, yeah.

Q    Management of what?

A    Somebody that's presenting -- like that typical case of somebody in the ER with no other reason to have gastroparesis that's vomiting that just started the drug.

Q    As you sit here today, can you -- you can look at your report, look at your Materials Considered List, can you name for me any peer-reviewed or published literature that says you can diagnose delay in gastric emptying based on symptoms alone?

MS. AMINOLROAYA:  Objection.  Asked and answered.  He's asked the question for the third time.

THE WITNESS: Okay. I can't quote a peer-reviewed article that contains that specific phrase that says you can diagnose drug-induced gastroparesis by symptoms alone.

BY MR. PREMO-HOPKINS:

Q    Can you identify for me, whether you're quoting or not, peer-reviewed published literature that says you can diagnose delay in gastric emptying based on symptoms alone?

MS. AMINOLROAYA: Objection. Asked and answered for a fourth time.

THE WITNESS: I think we can look through and find things that say examples of GLP-1s are associated with gastroparesis, and when you suspect that's the reason of their symptoms, then the next step is to withdraw the drug.

And so that phrasing of they drug-induced gastroparesis, it's from a GLP-1, and the management is to withdraw the drug. Like I think that's pretty straightforward, but I don't think --

BY MR. PREMO-HOPKINS:

Q    You just said -- you just said that you've looked at papers that say patients suffer from drug-induced gastroparesis caused bay GLP-1?

A    Yeah. Let's look at some of those. So I'm sure you're very familiar with this.

Page 150

Q    You're looking in your black binder, yes?

A    I am.

Q    What's the paper that you're looking at?

A    So probably start with the Maselli article that's in my reference list from 2022.

Q    And what would you rely on there to reach the conclusion that the standard of care in the United States is that one can diagnose delay in gastric emptying based on symptoms alone?

A    It's a study that demonstrates that GLP-1s are associated with significant delay in gastric emptying, that's symptomatic, and that the follow-up study by Dr. Camilleri from Obesity Medicine in 2023, talks about how that delay varies between individuals, with about 50 percent experience symptomatic delay and then 50 percent of those patients have improvement or resolution and some have kind of persistent symptoms.  So it's more of a documentation of GLP-1s.

There's evidence that they induce delay that's symptomatic and that sometimes it resolves and sometimes it doesn't.  Some people have significant delay and some don't, but I think that -- you're searching for me to say somebody made a statement somewhere that kind of fits your specific statement that you once stated somewhere, but I don't know a specific article that makes the exact statement that you're

Page 151

asking for.

Q    Is drug-induced gastroparesis refractory gastroparesis?

A    Refractory gastroparesis is kind of like a generalized term, that it doesn't get better with standard medical treatment.

Q    Would you consider drug-induced gastroparesis to be refractory gastroparesis?

A    They're kind of two different qualifiers.

So drug-induced gastroparesis is a subtype of gastroparesis and refractory gastroparesis is gastroparesis of any subtype that doesn't improve, or it's not really manageable with standard therapy for that specific type of gastroparesis.

Q    Do the ACG guidelines say anywhere that you can diagnose delayed gastric emptying, the 2022 ACG Guidelines, do they say anywhere that you can diagnose delayed gastric emptying based on symptoms alone?

A    They do not make that statement.

Q    In fact, don't they say the opposite?

MS. AMINOLROAYA:  Object to form.

BY MR. PREMO-HOPKINS:

Q    That you can't diagnose gastroparesis based on symptoms alone?

MS. AMINOLROAYA:  Object to form.

Page 152

THE WITNESS:  They say that the period of testing is to do a scintigraphy, and I would agree with that in the context of diabetic and idiopathic gastroparesis.

And, again, the guidelines are not meant to cover every scenario.  They don't talk about hypothyroid or drug-induced gastroparesis as far as subtypes that require scintigraphy.

And, you know, when I talked about that classic presentation, they also use a similar word, which is a typical patient.  So this guideline is really for a typical patient.

And if they have a typical patient with diabetic gastroparesis or idiopathic gastroparesis, then I think that this guideline fits and that's the majority of cases.

So it's not that the guideline's wrong.  It just -- it doesn't cover every presentation of gastroparesis.

BY MR. PREMO-HOPKINS:

Q    Does the -- you reviewed the 2023 Cangemi article that came out of the Mayo Clinic as part of the work that you did in this case?

A    I did.

Q    And -- why don't we -- do you have it in your

Page 153

binder?

A    No.

Q    That one wasn't important enough to put in there?

A    It was.  It was just -- it was a short like letter.  Are you talking about the one that was like a letter, not really the publication?

Q    I'm talking about a 2023 publication by Cangemi, et al., in the -- called:  "Misdiagnosis of Gastroparesis is Common."

Are you familiar with that one?

A    Yeah.  Do you think that -- we can look at it together.

MR. PREMO-HOPKINS:  Yeah, we can mark that one.

(Raines Exhibit 10 marked.)

BY MR. PREMO-HOPKINS:

Q    If you look in here, do you see the authors listed on this publication are David Cangemi, Lilly Stephens, and Brian Lacy?

A    I do.

Q    Do you know who they are?

A    I don't know who Lilly Stephens is, she's probably GI.

Q    Do you know Cangemi and Lacy, they're respected experts in the field of gastroenterology, aren't they?

Page 154

A    They are.

Q    And is Clinical Gastroenterology and Hepatology, is that a peer-reviewed journal?

A    It is.

Q    Is it considered a reliable authority to you?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  You can call it a high-powered journal, which means like mostly differentiating journals that are not very -- like the quality's low because they kind of accept everything, so I wouldn't consider it one of those journals where the quality's very poor and you can't trust anything in the journal.

BY MR. PREMO-HOPKINS:

Q    Do you see that it's published, it looks like, by the ACG Institute, if you look on the first page in the bottom right-hand corner?

A    Yes.

Q    That's one of the societies you're a member of, right?

A    Yes.

Q    Have you ever published in Clinical Gastroenterology and Hepatology?

A    Maybe the -- my ACGE study.

You may be referring to the article I published in 2016 on enteroscopy in the setting of thiopurine therapy?

Page 155

Q    I'm not referring to anything, I'm just asking if --

A    Oh.

Q    -- if you know.

Do you know whether or not you've published in this high-powered journal before?

A    It's probably not the most high-powered journal but it's -- yeah, it's a respected journal.  And I think that my 2016 publication on enteroscopy was published in this journal.

Q    You're proud of that publication, aren't you?

A    Yeah.

Q    And in this -- you reviewed this when you were originally putting your report together, yes?

A    Yes.

Q    And it came up in your PubMed search?

A    It did.

Q    And this study talks about 339 patients who have been referred to the Mayo Clinic in Jacksonville, Florida, right?

A    It does.

Q    And they've been referred because doctors in clinical practice in the United States had thought they had supposed gastroparesis, right?

A    This was a tertiary care referral's retrospective

Page 156

review, not really fully published, it's a letter.  So all the information's not available, but, yeah, it's a letter describing their review of 339 patients referred to their center for tertiary evaluation of gastroparesis.

Q    And that evaluation, the only way you can get referred to the Mayo Clinic for a tertiary evaluation of gastroparesis is if a clinical practitioner in the United States, or some other place, thinks you have gastroparesis, right?

A    It requires a referral from another physician, and I don't think it requires that they have gastroparesis, but it requires a referral from another physician.

Q    It requires a referral from a clinical practitioner who would fit under your standard of care, right?

A    I think the requirement is just a physician.  Like it could be an orthopedic surgeon, if they want.

Q    Do you think it's likely that in these 339 patients in the Mayo Clinic article were being referred to a tertiary center for gastroparesis care by an orthopedic surgeon?

A    No.

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  There were probably people in that class that they're either gastroenterologists or

Page 157

they are physicians that see patients with digestive illnesses, like an internist that sees, you know, a significant number of patients with digestive disorders.

BY MR. PREMO-HOPKINS:

Q    The patients who are getting referred for this type of tertiary evaluation were initially seen by the types of doctors that you are describing as falling under your standard of care, true?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I don't know how I apply my standard of care to everybody.  Like I apply my standard of care primarily to gastroenterologists in my field, in my specialty, but yeah, I mean, in general, yes.

BY MR. PREMO-HOPKINS:

Q    Okay.  And the -- the clinical practitioners, before the Mayo Clinic in the Cangemi study, had diagnosed suspected gastroparesis in these 339 patients, right?

A    Yes.

Q    And the original clinical practitioners got the diagnosis of gastroparesis wrong 80 percent of the time, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I wouldn't say that.

Page 158

BY MR. PREMO-HOPKINS:

Q   More than 80 percent of the 339 patients that were referred to the Mayo Clinic were given a final diagnosis that was not gastroparesis, true?

A   No.  That's not really what they say, you know, when you get into the detail on the second page --

Q   I can read a sentence to you if you'd like.

A   Sure.

Q   At the top left column:  "In this retrospective study of 339 patients referred for evaluation of gastroparesis at our tertiary gastroenterology practice, we determined that most, 80 percent patients did not have gastroparesis but, rather, an alternative diagnosis."

That's what they determined, right?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  They received a alternative diagnoses, and in the paper it kind of describes that they would not assign a diagnosis of gastroparesis unless the patient had a documented scintigraphy study that was done with a standard meal and standard protocol.

And so they're setting a bar where the patient has to have had a study that's documented.  If they don't have the study, they're not going to assign the study.

Page 159

And if they have the study but they don't have the details of how it was done, they're not going to assign the diagnosis.

And so when you set this bar of they have to have the study.  I have to have the record of it.  I have to have documentation that it was done, per the standard protocol, it kind of sets the bar kind of high.

Like what if they had the study for standard protocol but they don't have the record?  So that's kind of one factor.

I think it is true that this study or -- and again, it's a letter, so it's hard to analyze the data when it's a letter and not a research study that's published with the details.

It describes kind of this tertiary care bias, which I also see in my practice.  So I see people with, say, for example, part of my practice is small bowel bleeding, and maybe a third of the patients that are referred to me for small bowel bleeding don't really have small bowel bleeding, they just have anemia.

So when you're accepting referrals from other providers, you get that referral bias where people are referred for one diagnosis but they're referred because their presentation, or their clinical course, doesn't

Page 160

really fit very well with the diagnosis or they're not responding to the standard treatment for that diagnosis. You know, their case isn't proceeding as you would expect, or they're not getting better.

And so that's what we see in referral centers is, we see preferentially people that aren't getting better. They have an unusual case. They have a complicated case. They're not improving. They're not responding to the standard therapy.

So when you look at that population of patients that's different than a population of patients that we would see, you know, say, in a general practice diagnosed with gastroparesis.

So we call that tertiary referral bias, and that's what you see -- they kind of quote that in the limitations of the study.

MS. AMINOLROAYA: Mark, we've been going a little over an hour.

Can we go off the record and take a short break?

MR. PREMO-HOPKINS: Yeah. It was going to go quicker if he stops giving speeches. Yes, we can go off the record and take a break.

THE VIDEOGRAPHER: We are going off the record at 1:16 p.m.

Page 161

(Recess taken at 1:16 p.m.)

THE VIDEOGRAPHER:  We're now back on the record.  The time is 1:26 p.m.

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, we just took a break.

Are you ready to begin again?

A    I am.

Q    So before the break, we were looking at the -- what I'm calling the Cangemi study, but the 2023 study in Clinical Gastroenterology and Hepatology that's titled: "Misdiagnosis of Gastroparesis is Common."

Do you have that in front of you?

A    I do.

Q    And your opinion in this case is that -- in this litigation, is that in a classic presentation of gastroparesis symptoms, that correlates with the initiation or increase of GLP-1 RA medication, you can diagnose delayed gastric emptying in gastroparesis based on those facts alone, right?

A    The description that I gave for a classic presentation, I can diagnose drug-induced gastroparesis based on all those factors combined alone.

Q    And that is the classic symptoms and the use of the GLP-1 RA medication and what I think you said was exclusion of alternative diagnoses, right?

Page 162

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No evidence of.

BY MR. PREMO-HOPKINS:

Q    No evidence of.  Thank you.

A    Yeah.  And then seven days.

Q    Right.

A    And then, you know, more severe symptoms, and I can't define like every severe symptom criteria, but I could give examples, as we discussed.

Q    You don't require there to be vomiting of undigested food more than four hours after a meal in order to diagnose?

A    No.

Q    If we -- have you ever presented that -- this theory about the diagnosis of drug-induced gastroparesis for publication?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  A theory of diagnosing gastroparesis?

BY MR. PREMO-HOPKINS:

Q    Have you ever presented this idea that you can diagnose drug-induced gastroparesis based on symptoms, a history and physical alone, for publication?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  No.

Page 163

BY MR. PREMO-HOPKINS:

Q    And you're not -- you haven't published it anywhere, not only have you not presented it for publication, it hasn't been published anywhere, right?

A    It's not really like a theory.  It's kind of a generally-accepted practice, and so that's why it's referenced in my standard of care.

Q    It's a generally-accepted practice that clinical practitioners in the United States can diagnose drug-induced gastroparesis based on history and physical alone?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  It's a generally-accepted practice that patients fitting that classic presentation of onset of symptoms with the onset of a drug that's known to cause gastroparesis, with no other evidence of any other pathology that's chronic over seven days and severe, that most physicians would make the diagnosis of the drug is the cause of their symptoms, and so their next step would be to withdraw the drug.

And I would call that drug-induced gastroparesis, and so where withdrawing the drug is like the next step rather than ordering a scintigraphy.

BY MR. PREMO-HOPKINS:

Q    I'm sorry.  Are you here offering opinions today

Page 164

about the causation of gastroparesis?

A    I'm saying the GLP-1 RAs are associated with drug-induced gastroparesis, and there's evidence that they delay gastric emptying.

Q    Do you have an opinion, to a reasonable degree of medical or scientific certainty, that any particular GLP-1 RA causes gastroparesis?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I referenced articles in my report and have some today that we can discuss that talk about the association between GLP-1 RAs and delay in gastric emptying.

BY MR. PREMO-HOPKINS:

Q    Do you have an opinion to a reasonable degree of medical or scientific certainty that any particular GLP-1 RA causes gastroparesis, yes or no?

MS. AMINOLROAYA:  Same objection.  Asked and answered.

THE WITNESS:  Yeah.  I think as I describe in my report, I'm not here to provide -- I haven't been asked to provide an opinion an all of the literature related to causation.

So I'm here to talk about diagnosis of gastroparesis and different subtypes and presentations in different subtypes.

Page 165

BY MR. PREMO-HOPKINS:

Q    So let's go back to this Cangemi article.

A    Yeah.

Q    Is it your -- do you surmise, sir, that the authors at the Mayo Clinic were looking at records of patients who hadn't had gastric emptying studies done?

A    They're -- yes.  So they're looking at patients that were referred for gastroparesis, a diagnosis of gastroparesis.

Q    And is it -- can you divine from this article whether or not the Mayo Clinic, when they got to the Mayo Clinic, actually did a gastric emptying study or not, on these 339 patients?

                MS. AMINOLROAYA:  Objection to form.

                THE WITNESS:  So from the description, it's only 58 percent had had a gastric emptying study, and of those, only 23 percent ingested radiolabel eggs as the test meal, and so obviously there was not 100 percent of these patients were referred with the gastric emptying test and -- that they could document.

                So they may have had it, but they don't have the document, and then they could only confirm that it was done correctly in a portion of those patients.

BY MR. PREMO-HOPKINS:

Q    Do you see on the first page in the left-hand

Page 166

second -- middle of the second paragraph?

A    Yeah.

Q    "A final diagnosis was determined by review of clinical notes, communications, and tests by experts in the field."

Do you see that?

A    I do.

Q    Do you have any reason to believe that the Mayo Clinic, the tertiary care facility, didn't perform gastric emptying studies on these individuals before diagnosing them with gastroparesis?

A    This is a chart review and it's not a research study that's published in detail, and it's a letter.  So I don't have the information to say that.

I can only have the information that they described, which is that the patients were referred.  This is the information that we collected on them.

And what the article really describes is that they, in this retrospective review, they can't talk to these patients or do any additional tests.  They don't want to assign a diagnosis of gastroparesis without a confirmed positive gastric emptying study that they can document, and it's documented it's done per the standard way.

And so they're withholding that diagnosis until -- like if they don't have that documentation in their chart.

Page 167

Q    But you understand that these 339 patients were treated at the Mayo Clinic for tertiary evaluation of gastroparesis, right?

A    They were referred, yeah, and treated, yeah.

Q    And then Dr. Cangemi and Dr. Stephens and Dr. Lacy went back and looked at the records, not just of the referring doctor, but the ones at the Mayo Clinic, right?

A    Sure.

Q    And it's your supposition that maybe these Mayo Clinic doctors, who believe a gastric emptying study is required, didn't do a gastric emptying study when determining whether to diagnose these patients with gastroparesis?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I don't see documentation that they all repeated the gastric emptying study or that every patient had a gastric emptying study.

BY MR. PREMO-HOPKINS:

Q    You just don't know?

A    I think the inference is that doctors in the community -- so if we go to the first paragraph, it says: "The assumption is that doctors in the community."

Q    I'm sorry.  Where are you looking, sir?

A    So the last sentence in the first paragraph of the study.

Page 168

Q    Yes.

A    Or the letter.  "We hypothesize that gastroparesis is frequently incorrectly overdiagnosed."

So it's not that the patient didn't have gastroparesis.  They felt like people in the community aren't ordering gastric emptying studies in every patient and not ordering them in the correct way in the community.

And so that is the concern that patients are referred to them that either didn't have a gastric emptying study or they don't have a copy of it, or they were referred for a gastric emptying study that they can't document it was done in a standard protocol way.

BY MR. PREMO-HOPKINS:

Q    Do you agree that the findings of the Cangemi letter that we're looking at support the notion that gastroparesis cannot be diagnosed based on symptoms alone?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think it's not specific because it doesn't break out type of gastroparesis, and I think that's obviously something that's missing from -- the detail that's missing from this letter, as well as, you know, some of the other guideline articles is subtype in gastroparesis.

BY MR. PREMO-HOPKINS:

Q    Okay.  Let's look at the final diagnoses --

Page 169

A    Yeah.

Q    -- that we have here.  The final diagnoses are listed on a -- on a pie chart on page 2671.

Do you see that?

A    Yes.

Q    And do you see that, I think roughly, if I have my colors correct, I think 5 percent are finally diagnosed with a medication-induced condition?

A    Yes.

Q    And is it your opinion that that is not medication-induced gastroparesis?

A    I'm assuming that.  They don't really say, but I would assume it could mean medication-induced gastroparesis.

Q    They don't call it gastroparesis though?

A    Yeah.  And you say that, but then Dr. Cangemi and Dr. Lacy also make comments in other articles where they're co-authors in articles that use the term "drug-induced gastroparesis."

Q    In September of 2023, Dr. Cangemi and Dr. Lacy write, in the bottom right-hand corner, just before they put their names on this:  "Our findings reaffirm guidelines noting that gastroparesis cannot be diagnosed based on symptoms alone," period.

Do you see that?

A    I do.

Page 170

Q    Do you agree with that statement that gastroparesis cannot be diagnosed based on symptoms alone?

A    I disagree, because it's a generalization. It's -- it doesn't apply to all subtypes of gastroparesis.

So drug-induced gastroparesis can be diagnosed based on symptoms alone and physical in a classic presentation, or hypothyroidism-induced gastroparesis.

And there's -- the guidelines and this letter, they just don't include information about all the different subtypes, including those subtypes.  And I don't think that these doctors would recommend doing a -- like a scintigraphy study in somebody with hypothyroid gastroparesis, rather than just kind of treating their hypothyroidism, for example.

Q    You disagree with the statement that the Cangemi article reaffirms guidelines noting that gastroparesis cannot be diagnosed based on symptoms alone?

MS. AMINOLROAYA:  Objection.

BY MR. PREMO-HOPKINS:

Q    You disagree with that?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  This is a statement that they reaffirm the guidelines.  And the guidelines are based on a typical patient.

Page 171

BY MR. PREMO-HOPKINS:

Q   Do you know what guidelines they're referring to that note that gastroparesis cannot be diagnosed based on symptoms alone?

A   There are several.

Q   Okay.  What are the several guidelines that note that gastroparesis cannot be diagnosed based on symptoms alone?

A   So, there's the ACG 2022 that recommended scintigraphy in a typical patient, and I would consider that a diabetic or idiopathic would be common examples.

So in those common groups, then we do scintigraphy commonly to diagnose gastroparesis.

And then the AGA clinical practice update in 2022.

Let's see.  I don't know if that article specifically makes that statement, but it's kind of inferred.

And then the other one was the Rome publication in The Lancet 2025.

Q   Okay.  So the ACG 2022, the AGA 2022, and the Rome Lancet 2025, all support the proposition that gastroparesis cannot be diagnosed based on symptoms alone, true?

A   These guidelines state that in these typical presentations, in a typical patient presentation then -- which I infer is diabetic and idiopathic gastroparesis, that

Page 172

they should get a scintigraphy study, which I would agree with.

Q    And so you're inferring a lot from these articles in terms of what the authors of the articles meant about what type of gastroparesis they were talking about, yes?

MS. AMINOLROAYA:  Objection to form.

BY MR. PREMO-HOPKINS:

Q    Wouldn't you agree with me?

A    I think they don't mention the subtypes.  So they don't mention how to manage somebody with hypothyroid gastroparesis.

And so like, you know, they're missing out on parkinsonian gastroparesis, or they're missing out on drug-induced gastroparesis.  And sometimes -- and rather than just not mentioning it, they mention it, but they're not really clear about, you know, the term that they use.

Sometimes they use drug-induced gastroparesis and sometimes they say -- like this ACG article in 2022, like exclude iatrogenic disease, which is -- seems like a vague statement about stopping the drug that's the cause of their gastroparesis or the cause of their symptoms.

Q    Have you ever published in any peer-reviewed literature the view that the ACG guidelines are vague or unclear?

A    I think they make that statement in the guideline

Page 173

that it's a typical patient and that you should evaluate the patient based on their individual presentation.

Q   Have you ever published any criticisms of the ACG guidelines?

A   No.  And again, I don't think that they're necessarily incorrect, it's just they don't -- they don't describe every case, and they're describing a typical case of a common presentation of idiopathic and diabetic.

Q   If I wanted to know whether you're right --

A   Yes.

Q   -- about the ACG guidelines, I could go talk to some of these authors on the ACG guidelines probably, right?

A   Absolutely.

MS. AMINOLROAYA:  Objection.

THE WITNESS:  So it's like if you ask the author:  "How do you manage a patient that has drug-induced gastroparesis?"

BY MR. PREMO-HOPKINS:

Q   Well, you've just diagnosed them already.

How do you diagnose a patient with drug-induced gastroparesis is the question you're here to answer; right, sir?

A   Sure.

Q   Okay.  And you diagnose a patient with drug-induced gastroparesis in a way that's inconsistent with

Page 174

the ACG clinical guidelines, right?

A    No.

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  No.  It's on the guideline.

BY MR. PREMO-HOPKINS:

Q    Where is it on the guidelines?

A    So it says, like when they say:  "Exclude iatrogenic disease," that -- to me, that means stop the drug.

Q    When they write:  "Exclude iatrogenic disease," they mean stop opioids or GLP-1 RAs?

A    Yeah.

Q    And that is what you infer to mean that you can diagnose gastroparesis based on history and physical alone?

A    I think it's supportive of that conclusion.

Q    If I wanted to know whether it was actually supportive of that conclusion, I could ask the authors of the ACG guidelines, right?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think you can definitely ask them:  "Is drug-induced gastroparesis an entity?"  And they would say yes, many of them.

And then:  "How do you manage drug-induced gastroparesis?"  And I would be surprised if they would say:  "You should get a scintigraphy study on the

Page 175

drug."

So if we can't do a scintigraphy study on the drug, or if it causes the patient harm to continue the drug, then how can we do a gastric emptying study based on this algorithm if we go straight to diagnosis by scintigraphy study.

So, it's -- you know, there's an obstacle to doing this study on a GLP-1, or it's kind of a contraindication. And then it's kind of harmful to continue a drug that's causing the patient harm.

BY MR. PREMO-HOPKINS:

Q    You read Dr. Linda Nguyen's report in this case, yes?

A    Yes.

Q    When did you read that?

A    Like a month ago, or something like three or four weeks ago.

Q    And did any of the lawyers on the other side ask you to submit a rebuttal report in response to Linda Nguyen's report?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  No.

BY MR. PREMO-HOPKINS:

Q    Did you ever consider offering a rebuttal report in response to Linda Nguyen's report?

Page 176

MS. AMINOLROAYA:  And I'm just going to instruct you not to reveal any discussions with counsel.

THE WITNESS:  It just never really came up. It was just kind of another data point, just like reviewing the publications.

BY MR. PREMO-HOPKINS:

Q   So your opinion, sir, is that this ACG guideline doesn't apply to drug-induced gastroparesis?

A   It actually does with the table where the recommendation is to stop the drug before, or without doing a gastric emptying study.

Q   Is there anything in the ACG guideline that says you can actually affirmatively diagnose what you call a drug-induced gastroparesis based on history and physical alone?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I don't know that it makes that statement, no.

BY MR. PREMO-HOPKINS:

Q   Okay.  Is there anything in the AGA guidelines that you talked about from 2022 --

A   Sure.

Q   -- that says you can affirmatively diagnose, what you call a drug-induced gastroparesis, based on a history

Page 177

and physical alone?

A    I don't recall that statement in there either.

Q    Is there anything in the 2025 Rome guidelines that says you can affirmatively diagnose what you call a drug-induced gastroparesis based on history and physical alone?

A    Just like hypothyroidism-induced gastroparesis, it doesn't make that statement.

BY MR. PREMO-HOPKINS:

Q    Part of what you're relying on here for your opinions is your experience as a treater; is that right?

A    Yes.

Q    And do you prescribe GLP-1 RA agonists, or GLP-1 RA medications?

MS. AMINOLROAYA:  Objection.  Beyond the scope.

He's not here to offer opinions about the prescription of GLP-1 drugs.

Where are you going with this?

MR. PREMO-HOPKINS:  Let's go to page 2 of your report, Dr. Raines.

BY MR. PREMO-HOPKINS:

Q    Page 2 of your report, the paragraph in the middle of the page there that begins:  "As chief of gastroenterology."

Page 178

Do you see that paragraph?

A    I do.

Q    If you can focus your attention on the last sentence of that paragraph, it says:  "Glucagon-like peptide-1 receptor agonists (GLP-1RA) agents are commonly utilized in our patient population in the treatment of obesity as well as diabetes."

Do you see that language?

A    Yeah.

Q    Okay.  And when you say "our patient population," what do you mean?

A    The weight loss and bariatric surgery department.

Q    And you're in that department?

A    No.

Q    Have you ever prescribed -- when you say "our patient population," are you -- are you making any statement about whether you have prescribed GLP-1 RAs?

A    It's more of a statement of our health center, so health science center, University Medical Center, where I primarily work, has an obesity medicine program that has surgeons and bariatric gastroenterologists, which I am not.

And that program treats patients with GLP-1 RAs, so because of that program's presence in our hospital, then I encounter a lot of patients that are on GLP-1 RAs, and that's the kind of setting that we're talking about.

Page 179

Q    And have you, as the chief of gastroenterology in May of 2018, you collaborated with members of the LSU department of surgery to establish this center you're talking about?

A    Yes.

Q    And have you gone to the doctors at that center since then and said:  "Hey, you got to stop prescribing these medications, these GLP-1 RA medications"?

A    No.  Every medicine has a risk and a benefit.

Q    Do you prescribe medication?

A    Do I prescribe medication?

Q    Yes.

A    Of course.

Q    And have you prescribed GLP-1 RA medications?

         MS. AMINOLROAYA:  Objection.  Beyond the scope.

         Dr. Raines is not here to testify about the prescription of GLP-1 drugs.

         MR. PREMO-HOPKINS:  He testified earlier that you shouldn't give a GLP-1 RA medication to certain people in certain conditions, and I'm trying to figure out how much he's going to stand behind that.  Like he's got to be able to tell me whether or not he prescribes the medications that are the subject of this litigation.

Page 180

MS. AMINOLROAYA: Okay. I will allow that single question, but he's not here to testify if that came up incidental to a question you asked about the diagnosis of gastroparesis.

THE WITNESS: Where did I say that?

BY MR. PREMO-HOPKINS:

Q You mentioned that certain patients, like a patient I believe with anorexia or bulimia, shouldn't be given a GLP-1 RA.

Do you recall giving that testimony?

A I said that they wouldn't be on a GLP-1 RA.

Q Have you ever prescribed a GLP-1 RA medication?

MS. AMINOLROAYA: Mark, same objection as before. Beyond the scope.

MR. PREMO-HOPKINS: You said I could ask that one question.

MS. AMINOLROAYA: Yeah, you can ask that one question.

MR. PREMO-HOPKINS: I asked it.

MS. AMINOLROAYA: I just want to be clear that I'll object again to further questions, and I don't think it's appropriate.

BY MR. PREMO-HOPKINS:

Q Have you ever prescribed GLP-1 RA medications?

A Yes.

Page 181

Q    For how long?

MS. AMINOLROAYA:  Objection.  Don't answer that question.

Dr. Raines is not here to answers about the prescription of GLP-1 drugs.  If you have questions about how to diagnose gastroparesis, ask those questions.

BY MR. PREMO-HOPKINS:

Q    Are any of the patients that you observed that you say suffer from drug-induced gastroparesis, were they prescribed GLP-1 RAs by you?

A    No.

MS. AMINOLROAYA:  Objection to form, and I'm going to instruct the witness not to answer further questions about that.

BY MR. PREMO-HOPKINS:

Q    When you see a patient on a GLP-1 RA that you say -- you believe is suffering from drug-induced gastroparesis, do you stop the GLP-1 RA?

A    Yes.

Q    And that's the -- and then you -- 90 percent of the time you see the symptoms resolve within weeks, right?

A    Yes.

Q    And that -- when you describe drug-induced gastroparesis, that's the entity, as you said, that you're

Page 182

describing?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  The entity.  I don't know what -- how that's different than the previous question you just asked.

BY MR. PREMO-HOPKINS:

Q    Well, you told me that you -- you told me I should go ask people whether drug-induced gastroparesis is an entity.

Do you remember when you said that?

A    I said it's a thing, yeah.

Q    Yeah.  Okay.

Well, when you talk about drug-induced gastroparesis, you're talking about what you see, which is symptoms suffered in correlation with a GLP-1 RA?

A    Yes.

Q    That then abate 90 percent of the time within weeks after you remove the GLP-1 RA, true?

A    The classic case we described was somebody with onset of symptoms with the drug and no other reason to have those symptoms or evidence of any other contributing factors for more than seven days with nausea and vomiting, that's more than mild or severe or indicators of severe.

And so that's how I would define a presentation as an example of drug-induced gastroparesis.

Page 183

Q    And that example that you've given me, you would take the patient off the GLP-1 RA?

A    I would.

Q    And based on what you observe in your experience, 90 percent of the time within weeks after you remove the GLP-1 RA, those symptoms abate, true?

MS. AMINOLROAYA:  Objection.  Asked and answered many times.

THE WITNESS:  Yeah.  That's typically the course.

BY MR. PREMO-HOPKINS:

Q    Do you agree that gastric emptying scintigraphy is the most accurate test of gastric emptying currently available?

A    Yes.

Q    And it's considered the gold standard, right?

A    Yeah.  In the sense that it's the test that we compare other tests.  So if you develop a new test, then we compare it to the best available test.

Q    And the best available test is sort of the standard, if you will, that you would compare all others to is the gastric emptying scintigraphy?

A    Yes.  So the standard -- gastric scintigraphy is the most accurate test that we have available.  It's not perfect, but -- and then because it's the most accurate, if

Page 184

you develop a new test, then we're using it as the standard, and that's what we use kind of gold standard.

Q    The -- do your opinions differentiate at all between medicines that are GLP-1 RA, GLP-1 receptor agonists, and GIP receptor agonists?

A    If you're referring to tirzepatide, it's a GLP-1 RA drug, but it also has a secondary effect as a GIP agonist.

Q    Is it relevant to your opinions that it has a GIP activity?

A    I didn't really look into the effect of that GIP component in my study because, in my opinion, because my opinion focuses primarily on religious gastroparesis diagnosis and evaluation.

Q    Well, it focuses on diagnosis of drug-induced gastroparesis in the context of symptom onset with GLP-1 RA medications, right?

A    My opinions talks about evaluation of gastroparesis prevalence, diagnosis, and diagnosis in different subtypes or different presentations.

Q    Does your -- does the standard of care in diagnosing what you call drug-induced gastroparesis change if the drug is, for example, Ozempic, which is a GLP-1 RA, versus tirzepatide?

A    I would consider GL -- tirzepatide also a GLP-1

Page 185

RA.

Q    I asked you if your standard of care changed, sir.

Does the standard of care in diagnosing what you called a drug-induced gastroparesis change at all if the drug is Ozempic on the one hand, or tirzepatide on the other?

A    No.

Q    Is -- you talk about retained food on endoscopy as being a helpful tool in diagnosing gastroparesis?

A    Yeah.  It's a -- it's a data point that's -- I think it's useful in some particular cases.

Q    In what cases is it useful?

A    I think primarily in -- you know, if you talk about the Bi study, I don't know if you have it available, that talks about retaining gastric contents on endoscopy, the larger one.

You know, they talk about correlation between retained gastric contents on endoscopy.  And in one study, I think that's the single one, compares that finding compared with gastric emptying studies in those individual patients, and that kind of correlation between a delay in gastric emptying by scintigraphy compared to a finding of retained food in the stomach on upper endoscopy, and so the different patient populations had different correlation and some of those correlations were pretty high.

Page 186

Q    Do you believe that retained food on endoscopy should be deemed diagnostic of gastroparesis?

A    In certain situations I think that -- the authors of that study, Bi 2021, also had the same conclusion about if the correlation is very high in, say, type 1 diabetics, that if they fit a particular presentation, then it can be, but I don't usually take just that one data point to make a diagnosis.

I really have to take all the other data points together.

Q    So you wouldn't rely on retained gastric food on an endoscopy as diagnostic on its own of gastroparesis?

A    No.  In gastroparesis, the description of symptoms and delay in gastric emptying.  So if you only know one thing, that there's food in their stomach, I don't know if they have symptoms or anything else about the patient.

So I think it's a useful data point, or it's really useful to demonstrate evidence of delay in gastric emptying, and the reliability kind of depends on the particular case or a patient population.

Q    Did you -- I'm sorry.  Did I hear you correctly that retained gastric food on endoscopy is useful to demonstrate evidence of delay in gastric emptying?

A    It's a factor.

Q    Is it reliable?

Page 187

A    It's more reliable in type 1 diabetics.  I think the correlation was like 70 or 80 percent.

And if you read that study, there's a conclusion that I think in the algorithm for the study, if you want to pull it up, I don't know if you have it with you.

Q    I'm asking you, sir, what your opinion is.

I mean, if you're going to quote the Bi article to me, I can go look at it, but --

A    Sure.

Q    Is it reliable -- would you rely on retained food on endoscopy as diagnostic of gastroparesis in the context of GI symptoms?

MS. AMINOLROAYA:  Objection to form.  Asked and answered.

THE WITNESS:  I would -- I would say that, particularly in patients with type 1 diabetics, the correlation is sufficiently high to use -- retain gastric food as an indicator of delayed gastric emptying, and, you know, in some cases may obviate the need for a gastric emptying study.

BY MR. PREMO-HOPKINS:

Q    Outside of the context of type 1 diabetics, would you rely on the retained food on endoscopy as diagnostic of gastroparesis in the context of GI symptoms?

A    No.  Again, it depends on the case.

Page 188

Q    You would just follow the -- what they wrote in the Bi study?

A    I think we use things as like different evidence for different weights, and so it's -- it's a data point, and I think it's a reliable data point in type 1 diabetics, and then in other patients that may be more or less -- more or less reliable.

So it's a data point that I would use.

Q    Is there a group of patients, other than type 1 diabetics, that come to mind to you right now where it would be reliable to use?

A    I think it's useful in anybody with nausea and vomiting and a differential diagnosis of gastroparesis as a data point.

And I don't usually use the word "reliable."  It's kind of like supportive or not supportive.  Relying makes it sounds like I'm just using that one data point to make a diagnosis.

Q    You wouldn't rely solely on retained food on endoscopy as diagnostic of gastroparesis outside the context of a type 1 diabetic, true?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  I wouldn't rely solely on retained gastric food to make a diagnosis of gastroparesis in any patient.

Page 189

It's more of something that would be supportive and kind of highly supportive in type 1 diabetics in particular.

BY MR. PREMO-HOPKINS:

Q    Let me ask you about Exhibit 1B.

If you can go back to that, that's your supplemental materials list.

A    Yeah.  Which document is it?

Q    It's the single page.  Supplemental materials list.

MS. AMINOLROAYA:  There we go.

MR. PREMO-HOPKINS:  Exhibit 1B.

THE WITNESS:  Yeah.

BY MR. PREMO-HOPKINS:

Q    So you mention that -- you added some peer-reviewed literature and medical text to -- in your supplemental materials, yes?

A    Yes.

Q    And I noticed that it looks like two of the four mention the word "gastroparesis" in the title.

A    Yes.

Q    I mean, and they predate your original report, right?

A    Yes.

Q    How did it come to be that you only added them to

Page 190

your Materials Considered List in January of 2025?

A    Yeah.  So it's a sorting of 2000 articles.

So, you know, my initial search, you know, captures 2,000 articles, and then I have to sort those based on their relevance to the question asked, and many of them are kind of commentaries on other research, rather than like an original research study, and there's quite a lot of commentary.  And so not all of these were -- especially these two articles from 2012 and 2018, they're not research studies, they're kind of commentary on other studies.

Q    Were they -- they weren't necessary for you to reach your opinions in the first place, were they?

A    They weren't required for me to reach my opinion, no.

Q    How did you select which articles to add in your supplemental materials list?

A    In this short list?

Q    Yes.

A    Just kind of reviewing the information, reviewing Dr. Nguyen's report.  Sometimes I'll see references in articles that I read.

I don't remember -- I think at least one or two of these was in Dr. Nguyen's report, as far as a reference.

And then one was more recent, so -- or two were more recent.  So this is 2025, is one of them, out of four.

Page 191

And the other one was, I guess, late 2024.

Q    You mentioned that one of the important elements of your diagnostic process is to -- in that classic case, you want to understand that there aren't other potential alternative causes, other than the medication; is that right?

A    I'm searching for evidence of other pathologies.

Q    And a fever would be evidence of an alternative pathology, right?

A    It would.

Q    Blood in the stool.  That would be evidence of an alternative pathology?

A    Sure.

Q    Diarrhea.  That would be evidence of an alternative pathology, wouldn't it?

A    It can be.  Depends on how -- like how severe it is.

Q    History of NSAID use.  That would be evidence of an alternative pathology?

A    Again, depends on the case and depends on the significance.

So if somebody took an Advil once last month versus I take a whole bottle of Advil every day.  So kind of matters of degree.

Q    I would hope nobody's taking a whole bottle of

Page 192

Advil every day.

A    I see it every day.

Q    You have patients -- you treat patients that take a whole bottle of Advil every day?

A    Not that much, but, I mean, I see people that take like probably a thousand milligrams three times a day or something like that.  A lot of Advil

Q    And a history of heavy NSAID use would be evidence of an alternative pathology for GI symptoms, yes?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think it's going to influence, you know, my opinion and my assessment, yes.

BY MR. PREMO-HOPKINS:

Q    History of alcohol abuse.  That's something that would influence your diagnosis?

A    Yeah, it would be a factor.

Q    Use of cannabis.  That would be something that would influence your diagnosis?

A    That would be a factor.

Q    Findings such as elevated temperature, jaundice, or severe abdominal tenderness, would also be suggestive of an alternative diagnosis from drug-induced gastroparesis, right?

A    Yes.  Those would also be factors in my assessment.

Page 193

MR. PREMO-HOPKINS:  Why don't we take a quick break.  I think we're very close to switching questioners, and I just want to go through my notes and make sure.

THE WITNESS:  Okay.

MS. AMINOLROAYA:  Sure.

THE VIDEOGRAPHER:  We're going off the record.  The time is 2:07.

(Recess taken at 2:07 p.m.)

THE VIDEOGRAPHER:  We're now back on the record.  The time is 2:20 p.m.

BY MR. PREMO-HOPKINS:

Q    Dr. Raines, if I can direct your attention back to page 2 of your report.

A    Yeah.

Q    It's Exhibit 1.  And draw your attention, again, to the sentence where you say:  "Glucagon-like peptide-1 receptor agonist agents are commonly utilized in our patient population in the treatment of obesity as well as diabetes."

Do you see that?

A    I do.

Q    How commonly utilized are they in the patient population that you treat for obesity and diabetes?

A    When I say "our patient population," I'm referring to the patient population of the University Medical Center

Page 194

in New Orleans Louisiana, and our medical center includes this obesity medical program, and so I would say the program treats probably 4,000 unique patients a year, and of those, I would say at least, you know, 20 percent have been treated with a GLP-1 RA, and that's, you know, that's an estimate, because I'm not the one actually prescribing the drug, I'm just collaborating with that program.

Q    And -- but you have prescribed GLP-1 RAs before, yes?

MS. AMINOLROAYA:  Wait.  I didn't hear that last word in the question.

BY MR. PREMO-HOPKINS:

Q    You have prescribed GLP-1 RA medications before; isn't that right?

MS. AMINOLROAYA:  Objection.  Asked and answered.

BY MR. PREMO-HOPKINS:

Q    You can answer.

A    Yes.

Q    How often did you prescribe GLP-1 RAs in the last five years?

MS. AMINOLROAYA:  Objection.  I will instruct the witness not to answer as beyond the scope.

BY MR. PREMO-HOPKINS:

Q    Are you going to follow your -- the lawyer's

Page 195

instruction, Dr. Raines?

A    That's what my lawyer would tell me to do.

Q    Okay.  And so the only reason you can't tell me how often you've prescribed GLP-1 RAs in the last five years, I mean, you know that fact, right, that's a fact that you know in your head, a rough estimate at least?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  I'm not an attorney, so I'm not sure.

BY MR. PREMO-HOPKINS:

Q    No, look.  I'm not asking you to tell me what -- whether you have.  I'm just asking you whether you know, whether you could tell me, if your lawyer didn't instruct you not to answer, could you tell me how often you roughly have prescribed GLP-1 RAs in the last five years?

MS. AMINOLROAYA:  Are you -- will you -- are you going to -- if he gives you the number, are you going to have more questions or will you drop it?

MR. PREMO-HOPKINS:  I don't know.  I don't know what his answer is.

He's been instructed not to answer, and apparently the only reason he's not going to answer is because you're telling him not to.

MS. AMINOLROAYA:  Well, yeah.  That's how it goes.

Page 196

MR. PREMO-HOPKINS:  No, I don't think that's how it goes.  I think he answers the question or you move for protective order, that's how it works.

So I'll ask you the question, Dr. Raines.

BY MR. PREMO-HOPKINS:

Q    In the last five years, how often have you prescribed GLP-1 RA medications?

A    Probably like five prescriptions over the last few years, and generally people that are entering --

MS. AMINOLROAYA:  That's all.  Just answer the question, Dr. Raines.

THE WITNESS:  Five times.  I would guess.

BY MR. PREMO-HOPKINS:

Q    Have you made a decision to stop prescribing them?

MS. AMINOLROAYA:  Objection.  And beyond the scope.

Mark, this is well beyond the scope of his report.  There's no reason you need this testimony, and I'm instructing Dr. Raines not to answer any more questions.

BY MR. PREMO-HOPKINS:

Q    So, Dr. Raines, I had asked you whether you had made a decision to stop prescribing GLP-1 medications. Maybe I can ask you a different question.

Is there any sort of policy or bulletin, or

Page 197

anything else that's gone out at your LSU Health Services Center, that says doctors shouldn't prescribe GLP-1 RAs anymore?

A    No.

Q    And as far as you know, the other doctors that work with you at the LSU Health Services Center are prescribing GLP-1 RAs today, yes?

MS. AMINOLROAYA:  Objection to form.  Beyond the scope.

BY MR. PREMO-HOPKINS:

Q    Is that right?

MS. AMINOLROAYA:  And --

THE WITNESS:  I think it's -- the statement in my report is true.  These drugs are commonly utilized in our patient population in the treatment of obesity, as well as diabetes.

And, you know, as previously -- I previously stated, you know, every medicine has a risk and a benefit.

So, you know, we see people with drug-induced pancreatitis from GLP-1s.  We see people with drug-induced gastroparesis.  That doesn't mean that these drugs should never be used.

It's more like -- it's that risk-benefit evaluation when we prescribe drugs.

Page 198

BY MR. PREMO-HOPKINS:

Q    And as of today, the doctors that you work with at LSU Health Services Center prescribe GLP-1 RAs, or they think that the benefits outweigh the risks, right?

MS. AMINOLROAYA:  Objection.

I'm instructing the witness not to answer any more questions, Mark.  You've asked a lot of questions about a topic that has nothing to do with the scope of Dr. Raines' report, or why we're here for this deposition on issue one, which has been described as a narrow issue.

MR. PREMO-HOPKINS:  I don't have any further questions at this time.

We're going to switch to a lawyer for Novo, and we can go off the record.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is 2:26 p.m.

(Off the record at 2:26 p.m.)

THE VIDEOGRAPHER:  We're now back on the record.  The time is 2:29 p.m.

EXAMINATION

BY MR. PRZYMUSINSKI:

Q    Good afternoon, Doctor.  How are you?

A    Good.

Q    I know it's been a long day, so I want to, first

of all, maybe follow-up on some of the things that you talked about for the first four hours, and then go through your report a little bit, but let me start with a couple of general things.

So --

MS. AMINOLROAYA: And I'm just going to object to the extent that you expect to have duplicative questions. We think that's inappropriate.

MR. PRZYMUSINSKI: Okay.

BY MR. PRZYMUSINSKI:

Q If you look at page 3 of your report, Doctor, in that very first paragraph.

Will you let me know when you're there?

A Yes. So page 3?

Q Yeah. First paragraph, it's carrying over from page 2, but there's a sentence right in the middle of the paragraph says: "The LSUHSC Gastric and Esophageal Motility Curriculum is a recent example of my enduring teaching materials. This curriculum was developed to ensure competency in the evaluation of gastric and esophageal motility disorders. It includes reading materials, virtual lectures, and patient case studies."

Do you see that?

A I do.

Q So here's my question, Doctor.

Page 200

Is that curriculum, the LSUHSC curriculum, does that also include information for fellows and others providing them guidance on how to evaluate and diagnose gastroparesis?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  It's a curriculum that demonstrates how to read, primarily how to interpret manometry studies of the esophagus with hands-on case studies and examples.

And then the other platform is Smartpill, or a motility capsule.  So teaching fellows how to interpret the studies and also as they learn about the normal motility of the GI tract.

BY MR. PRZYMUSINSKI:

Q    Okay.  Does it -- as part of that curriculum, does it discuss gastroparesis?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  It does.  There's a gastroparesis case in the curriculum.

BY MR. PRZYMUSINSKI:

Q    Okay.  And as part of the curriculum, is there a discussion of the appropriate process for evaluating and diagnosing gastroparesis?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  The curriculum emphasizes kind

Page 201

of interpretation of the studies, because that's a skill that they would need for their board exam, as well as for clinical practice.

Now, the motility capsule, they stopped making them like a year and a half ago, so there's only a few left. If they don't make them anymore, then it's still useful to demonstrate kind of the motor function the GI tract, but not as useful to read those studies in clinical practice.

BY MR. PRZYMUSINSKI:

Q   Okay. Doctor, do you still have the materials from this curriculum available to you?

MS. AMINOLROAYA:  Object to form.

MR. PRZYMUSINSKI:  What is the objection to form?

MS. AMINOLROAYA:  Well, you haven't defined what you mean by "available."

THE WITNESS:  We're trying to figure out how to do that because you have to log into the platform.

MR. PRZYMUSINSKI:  Okay.

THE WITNESS:  And read the studies.

So I don't know how we translate that into something principal, because really the purpose of the curriculum is reading the studies on esophageal manometry and Smartpill.

Page 202

So I don't know -- I'd be certainly open to a suggestion on like how to -- how to demonstrate that. I guess that we could get the software installed, I think the manometry system software is proprietary to get a license, but I'm not sure about the Smartpill software.

BY MR. PRZYMUSINSKI:

Q    Okay.  Doctor, one of the things that I think you spent a fair amount of time talking to Mr. Premo-Hawkins about was, and I think is the focus of your report, ultimately is your opinion, and correct me if I'm wrong, that at least for some subset of patients, you are able to reliably diagnose them with drug-induced gastroparesis based on performing a history and physical; is that correct?

A    It's correct to say that for a specific presentation or individual presentations of classic drug-induced gastroparesis, as we described previously, that I would arrive at the diagnosis and assign the diagnosis of gastroparesis based on a history and physical exam and in lieu of a gastric emptying study.

Q    So for some subset of patients, and I understand the caveats you're providing around, Doctor.

A    Yeah.

Q    There's a population of patients for whom you believe you can reliably diagnose drug-induced

Page 203

gastroparesis, as you describe it, without the need for a

gastric emptying study, based on your history and physical

examination; is that fair?

A    Yes.

Q    Okay.  Now, I think I understood from the

questions earlier that that methodology, that approach, that

diagnostic approach that you describe --

A    Yeah.

Q    -- is not a diagnostic approach that you can point

to as being spelled out specifically in any of the

guidelines we reviewed; is that correct?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  I would disagree.

BY MR. PRZYMUSINSKI:

Q    Okay.  Why do you disagree?

A    Because the inference, especially the example the

ACG guideline describes in the table, like exclude

iatrogenic disease, and so if that means, stop the drug,

that's the cause of the drug-induced gastroparesis, then it

is in the guideline and that's actually demonstrated in the

algorithm.

Q    So you're making an inference, right, you're

saying --

A    Yeah.

Q    -- I'm seeing.  Let me finish my question.

Page 204

A    Sure.

Q    I'm seeing them discuss exclude iatrogenic causes, and you're then drawing the inference that that implies that they are then adopting an assumption that those cases are drug-induced gastroparesis, correct?

A    It's hard to say because it's not spelled out.

Q    Well, and I think that's my point.

A    Sure.

Q    So in none of the guidelines -- and I think we already talked about this, but I want to go back to it for a different reason.

My understanding was, at least within the guidelines we talked about, the AGA 2022, the ACG 2022, and the Rome 2025, there was no specific discussion of the methodology you are proposing today; is that correct?

A    I think the guidelines talk about discontinuing the drug as drugs that are potential causes of the patient's presentation, so.

Q    Again, that's different from diagnosing them with gastroparesis, correct?

MS. AMINOLROAYA:  Let Dr. Raines finish his answer, please.

MR. PRZYMUSINSKI:  Fair enough.

THE WITNESS:  Yeah.  Yeah.

You know what I don't see is if a patient is

Page 205

on a drug like a GLP-1 that's suspected to be the cause of their symptoms is to recommend doing a scintigraphy study on their drug, and then diagnosing them with drug-induced gastroparesis. I don't see that.

MR. PRZYMUSINSKI: Okay.

THE WITNESS: And so -- and it doesn't really talk about like how to manage those patients as a specific subtype. It doesn't talk about subtypes of hypothyroidism-induced gastroparesis either.

So again, it's not that the guidelines are wrong. It's just they don't cover every particular scenario.

BY MR. PRZYMUSINSKI:

Q    And, Doctor, I'm not asking whether you think the guidelines are right or wrong.

A    Okay.

Q    The simple point is that the methodology you are describing today for diagnosing some subset of patients with drug-induced gastroparesis is not specifically described or adopted in any of these guidelines; that's fair, correct?

MS. AMINOLROAYA: Objection. This is duplicative of questioning that was covered earlier today.

THE WITNESS: I think it's depends on how we interpret things like the figures in tables, like you

Page 206

might have a different interpretation than -- or different assumptions or interpretation than I do.

Because it doesn't really describe what they mean exactly.  It describes what they want you to do, which is to stop the drug.

BY MR. PRZYMUSINSKI:

Q    But it does not tell you that in those cases you can conclude that they have a diagnosis of drug-induced gastroparesis, correct?

MS. AMINOLROAYA:  Same objection.  Asked and answered many times earlier today.

THE WITNESS:  Just, you know, you're asking me if there's a specific statement that says this specific phrase, and I don't know of it spelled out in a specific phrase exactly the way you're saying.

MR. PRZYMUSINSKI:  Okay.  Let's move on from that, Doctor.

THE WITNESS:  Sure.

BY MR. PRZYMUSINSKI:

Q    Let's talk about this.  So one of the things you told Mr. Premo-Hopkins was that in order for you to be able to make a diagnosis of drug-induced gastroparesis in a patient who's on a GLP-1 medication is, one, correlation of the drug initiation with dose or dose change with symptoms, correct?

Page 207

A    Yes.

Q    The presence of symptoms of nausea and vomiting for at least seven days, correct?

A    Yes.  Or at least like recurrent over seven days, so it doesn't have to be all day for seven days, but like symptoms can't resolve within a couple days.

Q    So some temporal component beyond seven days?

A    Yes.

Q    And then some degree of severity, that although it's hard to grade without, in your view, reach a certain level of threshold of severity that was sufficient; is that correct?

A    Yes.

Q    Now, the first question, Doctor:  In terms of the correlation between initiation of the GLP-1 medication or increase in dose, whichever one it may be, how long from the time of initiation of the drug or change of dose before you need to see symptoms for you to consider the correlation to be present?

A    In a typical patient, I would see potentially the first week or the first week in the change in dose or starting the medication and kind of a classic case.

Q    So if the symptom onset was two weeks after initiation, would that decrease your confidence in your diagnosis?

Page 208

A    It would certainly be a factor, and so I'm using all these different factors to decide.

Q    Three weeks would be even less; is that fair?

MS. AMINOLROAYA:  Objection.  Incomplete hypothetical.

THE WITNESS:  Yeah.  I think the -- when you loosen the correlation or there's less temporal correlation, then that's a factor in my, you know, in my assumption, or my decision-making.

BY MR. PRZYMUSINSKI:

Q    Doctor, are you familiar with the concept that temporality alone is not sufficient to establish causation?

A    I'm familiar with the Bradford Hill criteria and different ways that we establish causation, and I'm not here to talk about causation.

Q    Well, the causation you're establishing is saying that the presence of symptoms of nausea and vomiting in correlation with onset of treatment or change of dose of a GLP-1 allows you to conclude that in that patient the medication caused them to develop drug-induced gastroparesis, that is literally causation.  That's what you're saying.

MS. AMINOLROAYA:  Objection to form. Misstates the witness' testimony.

He's not here to offer opinions about

Page 209

causation.

THE WITNESS:  I'm saying what the standard of care is.  What would most gastroenterologists do?

So when gastroenterologists see people in the ER that were asymptomatic, started a drug that's known to delay gastric emptying and they come to the ER vomiting, vomiting residual food, most gastroenterologists would say:  "I think that your symptoms are related to the drug," and they would stop this drug.

BY MR. PRZYMUSINSKI:

Q    So there's a difference, Doctor, between saying symptoms are related to the drug and saying the symptoms are related to the drug and your diagnosis is drug-induced gastroparesis.

You see the difference, right?

MS. AMINOLROAYA:  Objection.

THE WITNESS:  I see the difference, and I would use the term "drug-induced gastroparesis," and it's obviously that you have a different opinion that you wouldn't use that term.

BY MR. PRZYMUSINSKI:

Q    Well, it's not about my opinion.  My opinion doesn't matter.  No one cares what my opinion is.  We care to hear about what your been is.

Page 210

A    Sure.

Q    So here's the question.  So the methodology that you have, right, the methodology that encompasses, in some substantive patients, taking a temporal correlation between initiation of therapy or a change in dose with a GLP-1 --

A    Yeah.

Q    -- in combination with the presence of nausea and vomiting for some version of over seven days --

A    Yes.

Q    -- in combination of whatever level of severity that you assign to it.

A    Yeah.

Q    Have you tested that methodology in any scientific way?

A    I haven't done like a research study or something like that to evaluate that practice pattern.  That's kind of a standard of practice that people do.

Q    Well, I know you keep saying it's the standard of practice, but --

A    Sure.

Q    -- I'm trying to understand how reliable it is.

So have you done any study to test -- "when I have these symptoms and I make a diagnosis of drug-induced gastroparesis, how often am I right and how often am I wrong?"

Page 211

Have you done a study to evaluate that?

A    I haven't done a formal research study.  I just have my personal experience of, say, maybe 100 cases like that and about 90 percent improve with time.

And of the people that don't have resolution of their symptoms, then I may be skeptical of their individual diagnosis, kind of depending on their course, and if they're slowly getting better or not, or if they have -- like other reasons to have those symptoms or not.

Q    And I appreciate that, Doctor, but it's a little bit different from what I'm asking.

A    Sure.

Q    The question -- what you're telling me, as I understand, correct me if I'm wrong, is that, in your experience of about 100 patients who have been on a GLP-1 that had nausea and vomiting, after stopping the medication, 90 percent had resolution in a few weeks, correct?

A    Yes.

Q    Okay.  My question is not about resolution of nausea and vomiting.  My question is about the presence of gastroparesis.

A    Okay.

Q    Which is a different concept, right?

A    It's a -- one cause of nausea and vomiting, so sure.

Page 212

Q    One of many causes of nausea and vomiting, correct?

A    Correct.

Q    All right.  So my question is this:  Have you done any study to assess whether your methodology, history, physical, symptoms, correlation, all the stuff you talked about throughout the day, how often that methodology actually results in the right answer, meaning the patient actually has real gastroparesis, meaning there is evidence of delayed gastric emptying sufficient to meet criteria to make a diagnosis of delayed gastric emptying and gastroparesis?

            MS. AMINOLROAYA:  Objection.  Asked and answered.

            MR. PRZYMUSINSKI:  I don't think so.

            THE WITNESS:  I think if somebody's vomiting solid food, like that they ate 10 hours ago in the ER, I would call that objective evidence that they're not emptying their stomach.

            And so if you're asking if I did a research study with an IRB protocol to publish, I haven't done a research study like that.

BY MR. PRZYMUSINSKI:

Q    Do you know of any data that's been published in the peer-reviewed literature that reports on the positive

Page 213

predictive value, meaning the likelihood that the result is accurate for the methodology you propose, versus gastroparesis as a diagnosis?

A    I'm not aware of any particular study like with that specific design.

Q    So if I wanted to know how reliable your methodology is for predicting gastroparesis based on symptoms and presentation, I can't go find any literature anywhere that would tell me how accurate it is and how often it's wrong, can I?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  I think for a lot of questions there's not a specific research study to answer that specific question, and there may never be.

BY MR. PRZYMUSINSKI:

Q    I'm not asking about lot of other issues, I'm asking about this one --

A    In this particular --

Q    Let me finish my question.

A    Sure.

Q    In the context of this methodology, which you're putting forward as a standard of care in your report, I want to know, is there any peer-reviewed literature, published literature, that I can go to to determine whether the method

Page 214

is accurate, and if so, how often it's right and how often it's wrong?

MS. AMINOLROAYA:  Objection.  Asked and answered several times now.

THE WITNESS:  No.

BY MR. PRZYMUSINSKI:

Q    Okay.  Doctor, a related question.

One of the things you've been talking about a lot today is the relationship between different types of symptoms.  Certainly, we talked a lot about nausea and vomiting, but other symptoms --

A    Yeah.

Q    And gastroparesis, correct?

A    Yes.

Q    Okay.  Are you aware of any data or any publications or any peer-reviewed articles of any kind that provide evidence or an assessment of the rate of correlation between symptoms and the diagnosis of gastroparesis?

Meaning, can I take certain symptom, like nausea, and use that symptom to predict whether the patient has gastroparesis or some other GI disorder?

A    Are you asking if there's data describing the correlation between symptoms and delayed gastric emptying on a gastric emptying study?

Q    Let me rephrase the question.

Page 215

A    Yeah.

Q    I think you're right, but I want to make sure you understand what I'm saying.

A    Sure.

Q    Are you aware of studies that have looked at the following question:  Patient presents, let's say, with nausea.

A    Mm-hmm.

Q    Okay.  How likely is the presence of that symptom to predict accurately that they have delayed gastric emptying.

Same question for vomiting.  Same question for abdominal fullness.

As opposed to them predicting some other GI condition?

A    I'm not sure about the "opposed to."  I just know of a lot of publications discussing correlation between symptoms and abnormal gastric emptying study, and that's been kind of researched in a bunch of different ways and kind of with, you know, a variety of different results.

Q    Okay.  Are you aware of any published study -- let me strike that question.

A    Yeah.

Q    Strike that question.  Let me ask it a different way.

Page 216

If your report, Doctor, on page 7, you have a section titled -- it's Section B:  "Differential Diagnosis for Gastroparesis."

Do you see that?

A    Yes.

Q    Okay.  And if you go in that section and then there's some bullets underneath that, and the first one is on gastroparesis.

Do you see that --

A    Yes.

Q    -- bullet?  Okay.

The second sentence in that -- whatever, subsection of gastroparesis:  "Vomiting of undigested food is a cardinal symptom which may be considered pathognomonic for delay in gastric emptying if the food was ingested more than four hours prior."

Do you see that?

A    Yes.

Q    Now, can you cite to me any article, peer-reviewed publication, or study, that has concluded that the presence of vomiting of undigested food is sufficient, on its own, to make a diagnosis of delayed gastric emptying?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I don't know of an article or a publication that talks about just that one data point

Page 217

as the only thing to consider and that we can use that.

I think it's, as described in my report, it's a factor, and if we're describing gastric emptying should be more than 90 percent in four hours, then it would make sense for somebody vomiting food that they ate four hours ago or 10 hours ago to not be an indicator of delay in gastric emptying.

BY MR. PRZYMUSINSKI:

Q    Well, Doctor, I understand that you believe it's a factor, and I understand what you're saying here.

What I'm asking is:  Can you point to any data, any publications, any article, any peer-reviewed materials, that say that vomiting of undigested food four hours after a meal is pathognomonic for delay in gastric emptying?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  I don't see that statement. Like I can't quote a statement from like -- exactly like that from a particular article.

BY MR. PRZYMUSINSKI:

Q    Okay.  Can you point me to any article that has a statement that, maybe not exactly like that, but makes the same point?

A    I would correlate it with the Bi article that talks about retaining gastric food on upper endoscopy.

Page 218

So if we know, or its well-understood that food is supposed to be digested within four hours, evidence that the food is not digested is an indicator that the emptying is delayed.

And so I think the upper endoscopy one is a more -- it's an easier way to do a study like that because it would be more challenging to, I guess, do a survey of patients on like when they vomit and take pictures of it to kind of document it in a scientific way.

So some things are easier to study because they're more objective, so the upper endoscopy would be a better example.

Q    And objective is better than not objective, Doctor?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think objective of watching somebody vomit food like on the ground is pretty objective.

BY MR. PRZYMUSINSKI:

Q    But you do agree with me, Doctor, that when you're trying to answer scientific questions --

A    Sure.

Q    -- and medicine is a science, right?

A    Yes.

Q    Okay.  So when you're trying to answer a

Page 219

scientific question --

A    Sure.

Q    -- the best place to go to answer the question is to objective scientific data, correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think it's helpful to have objective scientific data on everything that we do, but it's just not feasible -- or some questions that we ask are -- it's not really feasible to get that answer.

Kind of like we study colon polyps, and I'd like to know how long it takes colon polyps to grow, but I'm never going to know because like I can't go and let polyps grow in somebody's colon, like they're going to grow into cancer.

So, you know, some things are hard to study and they're not defined.

BY MR. PRZYMUSINSKI:

Q    Doctor, I fully accept that there's lot of things in medicine we still don't know and things we'd like to know, but you're familiar with a concept of evidence-based medicine, right, that's pretty familiar to you, right?

A    Sure.

Q    Right.  And the whole idea of evidence-based medicine is we practice medicine based on scientific evidence, correct?

Page 220

A    As much as we can.

Q    As much as we can.  Which is why I ask you the question, if you're going to propose a concept suggesting that undigested food being vomited after four hours is pathognomonic, which essentially means is diagnostic for delayed gastric emptying, I ask, what is the evidence to support that, the scientific evidence, meaning what studies, what data, what evidence do we have, that actually checks and asks the question:  "Hey, let's look at these patients that have vomited after four hours after they had a meal, then do a gastric emptying study and see if they actually correlate or not."

Is there such a study and can you identify it for me?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  I think the evidence would be documentation of emptying of the stomach.

So we know scientifically, on scientific data, that the stomach is supposed to empty in four hours.

BY MR. PRZYMUSINSKI:

Q    On average?

A    Sure.

Q    Sure.  But you still haven't answered my question.

Page 221

Are you aware of a study that's actually tested how reliable a predictor this symptom is of the presence of delayed gastric emptying?

A    I'm not aware of a study that shows that.  So many people vomited undigested food four hours after eating and then they have gastric emptying studies to kind of correlate the two findings.

Q    So the answer's no?

A    Correct.

MS. AMINOLROAYA:  Objection to form.  Asked and answered.

BY MR. PRZYMUSINSKI:

Q    Doctor, I'm going to switch gears a little bit.

A    Sure.

Q    You talked a little bit about retained gastric good on endoscopy.  Do you recall that conversation?

A    I do.

Q    And, in fact, you talked about -- is it Bi or Bi? I don't know how to pronounce that.

A    I think it's B-i.

Q    It is spelled B-i, but I just don't know what the pronunciation of that is.  Do you know?

A    I'm not sure, because I think it's a -- I guess a Chinese publication or a Chinese author.

Q    I'm going to say Bi, and if I get it wrong, I

Page 222

apologize.  The Bi article --

A    Sure.

Q    -- do you recall that conversation?

A    I do.

Q    Okay.  And one of the things you said is in that study, when they looked at the relationship between a retained gastric food on endoscopy and then delay in gastric emptying, they found different levels of correlation measured as positive predictive value, correct?

A    Yes.

Q    And you said that for patients who had type 1 diabetes, I can't remember the exact number, in the 70 percent; is that correct?

A    It was like between 70 and 80 percent.  I don't remember the exact number.

Q    Somewhere in that range?

A    Yeah.

Q    Okay.  So what it's saying is at least in that study, in the population of patients with type 1 diabetes, the presence of retained gastric food on endoscopy, 80 percent of the time would be correlated with delayed gastric emptying, 20 percent of the time, even though you have retained gastric food, you wouldn't actually find evidence of delayed gastric emptying, correct?

A    The authors correlated the abnormal scintigraphy

Page 223

study with the finding of gastric food and found the correlation to be 70, 80 percent in type 1 diabetics.

And so in their opinion and in their algorithm, a gastric emptying study was not necessary for patients with that presentation who had retained gastric food.

Q    I appreciate that, but that wasn't my question.

A    Okay.

Q    The question that I asked you is in that study -- and I get it, we're not looking at it together right now, but it's 70 to 80 percent range, whatever that range was.

A    Yes.

Q    Let's call it 80 percent for type 1 diabetics. That means that when you look at that study in that population, in their experiment what they found is if I had retained gastric food on endoscopy and I happen to also be a type 1 diabetic --

A    Yeah.

Q    -- then there was a 80 percent chance that if I did a gastric emptying study, I would find delayed gastric emptying.  And, of course, as a corollary, that meant 20 percent of the time I did not, correct?

A    Yes.  That's what the authors are saying.

Q    Okay.  Now, doctor, do you know what the indications of GLP-1 RA medicines?

A    I know they're indicated for diabetics and they're

Page 224

indicated for weight loss.

Q   Do you know if GLP-1 RAs are indicated for people with type 1 diabetes?

I'll help you out.  They're not.

MS. AMINOLROAYA:  Is there a question?

MR. PRZYMUSINSKI:  I'm trying to help the doctor.

MS. AMINOLROAYA:  Let's move on if there's no question.

THE WITNESS:

BY MR. PRZYMUSINSKI:

Q   Doctor, do you know whether GLP-1 RAs are indicated for the treatment of type 1 diabetes?

MS. AMINOLROAYA:  It sounds like you've answered the question, Lucas.

MR. PRZYMUSINSKI:  I've answered.  He hasn't.

THE WITNESS:  I'm aware they're treated --
they're typically used for obesity and type 2 diabetes.

BY MR. PRZYMUSINSKI:

Q   Okay.  So you probably would agree with me you wouldn't expect a lot of patients with type 1 diabetes to be on GLP-1 RAs, correct?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I wouldn't really know because that's not really what I do.

Page 225

BY MR. PRZYMUSINSKI:

Q    That's fair.  Now, doctor, in that same Bi study --

A    Yeah.

Q    -- do you know what positive predictive value they found for retaining gastric food on endoscopy for patients who had, quote-unquote, no risk factors for gastroparesis?

A    I don't remember.

Q    If I told you it was 32 percent, would that refresh your recollection?

A    I'll have to look at the paper.  Do you have it there?

Q    Yeah, I do.  But that does not refresh your recollection, correct?

MS. AMINOLROAYA:  Objection to form.  He asked for the paper.

THE WITNESS:  Yeah.  I think like if you want to talk about the elements, then let's look at it together.

BY MR. PRZYMUSINSKI:

Q    Let's get back to that, that's totally fine.  I promise you I will show you the paper before we're done, so I promise you that, we can take a look at it together.

Do you remember the title of the paper at all, Doctor?

A    I don't know the specific wording of the title.

Q    Why don't we get that out.

A    Residue -- "Food Residue During Esophagogastroduodenoscopy Is Commonly Encountered and Is Not Pathognomonic of Delayed Gastric Emptying."

MR. PRZYMUSINSKI:  That's very good.  That's exactly the question.

Doctor, I'm going to mark this as 11, because I don't -- I do not not keep my promises, so here you go.

THE WITNESS:  Okay.

MR. PRZYMUSINSKI:  Sorry for the reach.

(Raines Exhibit 11 marked.)

BY MR. PRZYMUSINSKI:

Q    So let's start with the title, Doctor.  We talked about pathognomonic as a term, correct?

A    Yeah.

Q    And what the author's title is, that the presence of "Food Residue During esopha -- geez, that's even hard for me -- "During EGD Is Commonly Encountered and Is Not Pathognomonic of Delayed Gastric Emptying."

Do you see that?

A    Yes.

Q    Okay.  What that's saying is as an overall proposition, the presence of food residue on an EGD cannot

Page 227

be used to predict the presence of delayed gastric emptying, correct?

MS. AMINOLROAYA:  Objection.  Is that a question?

MR. PRZYMUSINSKI:  Yes, that is a question.

MS. AMINOLROAYA:  It's a long paragraph.

THE WITNESS:  The conclusions were that in allcomers that they don't recommend using that as the indicator of delayed gastric emptying.

But then in certain populations, it could be more predictive, and then their conclusion was in type 1 diabetics, that it can be used as a surrogate for a gastric emptying study.

BY MR. PRZYMUSINSKI:

Q    Let's look at the conclusions, Doctor, it's in the abstract.

A    Okay.

Q    "Retained gastric food, or RGF, is common during EGD."

Do you see that?

A    I do.

Q    "The positive predictive value, or PPV, of RGF for delayed gastric emptying varies depending on underlying risk factors (type 1 diabetes, type 2 diabetes, gastroparesis and amyloidosis)."

Page 228

Do you see that?

A    I do.

Q    So now if we look at some of the data in this study, Doctor, let's look at the Table 4 on page 3955.

Do you see that table, Doctor?

A    I do.

Q    Do you see a column that says:  "No RGF," and a percentage next to it?

A    Yes.

Q    No retained gastric food.  Do you see that?

A    Yeah.

Q    Okay.  Next to that is a column:  "RGF Percentage."

Do you see that?

A    I do.

Q    And that's for patients who had retained gastric food on endoscopy, correct?

A    Yeah.

Q    Okay.  Now look at the percent, delayed gastric emptying overall.

For those who had no retained gastric food on endoscopy, 20 percent of those patients had delayed gastric emptying, correct?

A    Yes.

Q    Okay.  Which means that even though you have no

Page 229

retained food in your stomach, you still had a 20 percent of having delayed gastric emptying, correct?

A    Yes.

Q    Okay.  Now let's look at the patients who had retained gastric food.

As a percentage, 32 percent of those patients had delayed gastric emptying, correct?

A    Yes.

Q    Okay.  Which means that as an overall proposition across patients who had retained gastric food in their stomach, 68 percent of those patients did not have gastric emptying, correct?

A    So 68 percent had a gastric emptying study that was within normal limits.  Is that what it says because I'd have to look at the table.

Q    I mean, they say percent delayed gastric emptying is the line.  Correct, Doctor?

A    Yeah, I just want to confirm --

Q    Yeah, go ahead.

A    -- that's exactly what they're saying.

So I think it's best described on page 3954, the page before that.

Q    Okay.

A    So bottom of page, left side.

Q    Mm-hmm.

Page 230

A    So retained gastric food was present in 87 or 4 percent and delayed gastric emptying was documented in 20 percent.  We'll go next.

"Gastric emptying was slower in patients with retained gastric food at two hours and four hours and retained gastric food was associated with a greater likelihood of delayed gastric emptying as defined by gastric emptying study, 32 versus 20 percent.  In this cohort, patients without -- in patients without diabetes, gastroparesis or amyloidosis, the positive predictive value for delayed gastric emptying was 32 percent.  Negative predictive value is 80 percent.  Sensitivity was 6 percent, and specificity was 97 percent."

So it sounds like the specificity was really high.

Q    Right.  But the positive predictive value was 32 percent, right?

A    Yeah.

Q    That means if you have a positive result, meaning you have retained gastric food, the likelihood that that will also mean that you have delayed gastric emptying is only one out of three roughly, correct?

A    It is.  And, you know, I think with the results of this study I'm taking all of those data points, including the specificity.

Q    You would certainly agree that outside of the

Page 231

population of patients with type 1 diabetes, the presence of retained gastric food on endoscopy is not diagnostic of delayed gastric emptying; correct, Doctor?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I would say that retained gastric food is a factor that influences my opinion, and we keep going back to -- like one thing is how I would diagnose gastroparesis but, you know, I'm using the different elements of their presentation, not just one piece of evidence.

BY MR. PRZYMUSINSKI:

Q   And I'm not suggesting, Doctor, that you're using one piece of evidence.  I think you told us what you needed to see, right, you needed the correlation, you needed the nausea and vomiting for over seven days, and a certain severity.

But I'm simply asking, because you guys talked about this, on this Bi 2000 article.  Outside of the type 1 diabetes population, the predictive value of the retained gastric food on endoscopy was 32 percent, correct?

MS. AMINOLROAYA:  Objection.  Asked and answered.

THE WITNESS:  I think it's more like the, you know, the overall, when they take allcomers in all -- and all patients in the whole study with different --

Page 232

different risk factors, when you lump them all together, that was the comparison that they made in this population.

So it's -- we want to generalize something to a particular population. So it's not that this population is our population. It's more like this study of this population found this.

So it seems that retained gastric food correlates with an abnormal scintigraphy study, and in different populations it correlates more -- more closely.

BY MR. PRZYMUSINSKI:

Q   And that different population in which it correlates more closely is type 1 diabetics, correct?

A   In this study, yes.

Q   Do you know of any other studies that suggests that correlation between retained gastric food and DGE is stronger than that reported in this study?

A   No.

Q   Okay. Great.

Doctor, is obesity a risk factor for gastroparesis?

A   Yes.

Q   Okay. How strong of a risk factor is it?

A   I can't give an odds ratio or a percent.

Page 233

Q    Would you agree or disagree with this statement:
That patients who are obese are at increased risk for
developing gastroparesis"?

                MS. AMINOLROAYA:  Object to form.

                THE WITNESS:  I would agree that obesity is a
     risk factor for gastroparesis, development of
     gastroparesis.

BY MR. PRZYMUSINSKI:

     Q    Is that different from what I said?

     A    I don't think so.

     Q    Okay.  So you agree with what I said?

                MS. AMINOLROAYA:  Objection.  Asked and
     answered.

                THE WITNESS:  Well, you tell me.  Is it
     different?

BY MR. PRZYMUSINSKI:

     Q    You're answering the questions, Doctor.

     A    Well --

     Q    Is it fair -- let me ask it again so we can talk
clearly.

          Do you agree with the proposition that patients
who are obese are at increased risk of developing
gastroparesis, yes or no?

                MS. AMINOLROAYA:  Same objection.

                THE WITNESS:  You know, in medicine, we don't

Page 234

use proposition, but obesity is a risk factor for gastroparesis, yes.

BY MR. PRZYMUSINSKI:

Q    Okay.  What I'm trying to understand is a risk factor -- and I'm thinking about the jury, who's going to be listening to your testimony, Doctor, right --

MS. AMINOLROAYA:  The jury is not -- there's no jury who's going to be listening.

MR. PRZYMUSINSKI:  There's no talking objections.  You know this, Parvin, right?

You have to object to form.

MS. AMINOLROAYA:  You're providing him incorrect information to the witness.

MR. PRZYMUSINSKI:  That's not really the point.

BY MR. PRZYMUSINSKI:

Q    Doctor, what I'm trying to make sure for the lay person, who's not a physician, or not a scientist, or not an epidemiologist, the concept of a risk factor is something that increases your likelihood of developing whatever it is it's associated with, correct?  That's what a risk factor is?

A    Sure.

Q    Okay.  So if obesity's a risk factor for developing gastroparesis, that means that people who are

Page 235

obese are at increased risk for getting gastroparesis,
correct?

A    Yes.

Q    Okay.  Great.

Now, Doctor, when you see a patient -- and you
talked about this classic presentation, right, of patients
that could come in for your drug-induced gastroparesis
diagnosis, correct?

A    Yeah.

Q    And I think one of the things you said about the
classic patient is your ability to eliminate other risk
factors or other potential causes of gastroparesis, correct?

A    I think more of a classic presentation is somebody
that has like a history or a presentation and a physical
exam findings that are all consistent with what we would
commonly see with a disease, yeah.

Q    But I thought you talked about, Doctor, you have
findings that are consistent, but then you also talked about
the fact that you have to exclude -- they don't have any
signs or symptoms suggestive of other etiologies or other
risk factors that might confound the presentation; am I
wrong?

A    I think the presence or absence of those other
signs or symptoms or risk factors is going to influence my
opinion.

Page 236

Q    Does it influence the fact that you would categorize that patient as a classic presentation?

A    Yes.

Q    Okay.  Does the presence of obesity, what you said is a known risk factor for gastroparesis, affect your categorization of a patient as a classic presentation versus non-classic?

A    I don't think the presence or absence of obesity would dramatically influence my impression of a patient as just an individual factor --

Q    And why is that?

A    -- in a patient.

Obesity is correlated with an increased risk of gastroparesis in population studies, potentially driven by incidence of type 1 diabetes, which is a reason that people develop gastroparesis.

And so, okay, like if they're a type -- type 2 diabetic and obese, then that would influence my conclusions.

Q    How -- how would it influence your conclusions if they were a type 2 diabetic and obese?

A    So just like any other risk factor, if like the more classic they are, the more -- the more apt I would be to assign the diagnosis of drug-induced gastroparesis and the less classic.

Page 237

So it's like taking this other information that makes it not so clear is going to influence my opinion and that would depend, again, on the individual case.

Q   So if I have a patient who presents -- you have a patient who presents to you --

A   Yeah.

Q   -- who's a type 2 diabetic and is obese, does that -- that fact, on top of whatever the rest of the presentation is of their symptoms and their use of a GLP-1 --

A   Yeah.

Q   -- make it more or less difficult for you to make a diagnosis of drug-induced gastroparesis using your methodology?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  It would influence my reasoning.  It's a factor of one of many factors.

BY MR. PRZYMUSINSKI:

Q   But you're telling me it influences, it's a factor.

A   Sure.

Q   It's a factor that makes you more certain or less certain of the diagnosis of gastroparesis?  Drug-induced gastroparesis, excuse me.

A   Sure.  I mean, I think it's fair to say, like I'm

Page 238

assessing all these factors and those would be factors, and the absence of any factor associated with gastroparesis, other than the drug, would be supportive, and then you add factors in, like type 2 diabetes or a history of, you know, of gastroparesis in the past or, you know, these other factors would influence me to be less prone to assign that diagnosis, but it kind of depends -- the strength of that factor is going to depend on the particular patient.

Q    So for a patient who, in addition to presenting with the symptoms we discussed, also happens to be a type 2 diabetic and also happens to be obese, that would lower your degree of confidence in making a diagnosis of drug-induced gastroparesis without further testing; is that fair?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think it's going to influence my decision-making.  I think I answered that a bunch of different ways.

So it's like --

BY MR. PRZYMUSINSKI:

Q    You said it would influence.  You're not telling me whether it would lower your decision, your confidence of in the decision of making that diagnosis?

MS. AMINOLROAYA:  Objection.  Asked and answered by Dr. Raines several times.

THE WITNESS:  Yeah.  I think the absence of

any other comorbidities, you know, risk factors or any other findings or -- that would suggest any other pathologies is a positive. And then when you add things in like diabetic, history of gastroparesis in the past, history of -- of like hypothyroidism or like all these things lead me in the other direction.

So it's like the easiest case would be no other risk factors.

BY MR. PRZYMUSINSKI:

Q So I get there's an easiest case, and I get that as you add additional factors, it gets harder, right, that's what you suggested, correct?

MS. AMINOLROAYA: Object to form.

THE WITNESS: I think I answered the question. It's like there's these positive and negative factors, so.

BY MR. PRZYMUSINSKI:

Q How do you weigh those factors, Doctor?

A That's a great question.

Q Can you explain it to me?

A Yeah. So I would have to be an individual patient. So this is a complete assessment of the patient and like how they look and their whole story, and really their description of their nausea and vomiting and how well it correlates with the drug and any previous history of GI

Page 240

symptoms.

And you have to qualify the symptoms as they come out of the patient. And it's hard to set, you know, individual criteria. Like we already set criteria for correlation with the drug use, and we already set criteria for they should really have nausea and vomiting, and it should really be more than seven days, and it really should be, you know, kind of severe and not a little nausea.

And then like it's not going to be feasible to like set criteria for, in these patients, if they have this other history, then that one piece of evidence is going to push them one way or the other, you know, is going to exclude or include them in the diagnosis.

So I think having those baseline criteria and then you'd have to make a clinical judgment.

Q    And I appreciate that.

A    Yeah.

Q    But I guess what I'm asking is: You have additional positive or negative criteria, right?

A    Sure.

Q    Which we talked about, and I want to understand how you weigh those, and I think what you're saying to me, correct me if I'm wrong, is that it's a patient-specific subjective process based on your view as a clinician; is that fair?

MS. AMINOLROAYA: Objection to form.

THE WITNESS: Yeah. I think it's a -- it's a clinical decision-making process based on the individual physician.

BY MR. PRZYMUSINSKI:

Q And it's subjective based upon your view and your interpretation, correct?

A That's just how medicine is practiced, yeah.

MS. AMINOLROAYA: Objection to form.

BY MR. PRZYMUSINSKI:

Q And is it also fair to say that for the same individual patient who presents with these core symptoms and presentation that has these different positive and negative factors, you're wearing of those factors to determine whether they have a diagnosis of drug-induced gastroparesis could be different from another gastroenterologist; is that fair?

A I think there's certainly nuances to how people weigh certain things. I can only speak to the standard by which most gastroenterologists would practice.

Q Well, but I'm asking you a different question.

I'm saying -- you're telling me, I think, Doctor, that you get a presentation of a patient coming to you with this constellation of symptoms and then you look at other factors; diabetes, history of gastroparesis, all that, and

Page 242

you weigh that, you consider that with your own clinical judgment, and then you, based on that, using the method you're proposing here, determine, yes, drug-induced gastroparesis, or, no, or I need more testing, or something else, correct?

A    Can you tell me what you're trying to get at again?

Q    Well, I'll do it again.

A    Yeah.

Q    Let me ask you the question again.

A    Sure.

Q    What we've been talking about for a while, right, is that you have a presentation of a patient coming to your office with the symptoms we've talked about; the nausea, the vomiting, the correlation with GLP-1 and all that, correct?

We talked about that?

A    Yeah.

Q    And then you also said that then you have to consider sort of the rest of the history of the patient, right, and the physical examination, you're considering things like:  Do they have diabetes, are they obese, do they have a history of gastroparesis, all these other factors, correct?

A    Yeah.

Q    And you take all of that information together and

Page 243

kind of underneath this method you described in your report, you then make a determination whether the totality of that information, in your view, correlates to a diagnosis of gastroparesis, something else, or whether you just need more testing; is that fair?

A    Yeah, that's fair.

Q    Okay.  Now, what I'm asking is:  Is it also fair for me to assume that presenting the exact same patient to you versus to another gastroenterologist over here, they may look at the exact same case and reach a different conclusion based on the methodology you are putting forward?

A    It's possible that somebody would make a different conclusion, yes, but I think the majority of gastroenterologists would reach the same conclusion and have the same action, which is how we use the standard of care for like a classic case of drug-induced gastroparesis.

Q    How do you know the majority of other gastroenterologists would reach the same conclusions, what's the basis for that opinion?

A    Sure.  That's an understanding of what other gastroenterologists do in our community, and also -- and understanding of gastroenterology based on my training, and experience.

Q    But you can't point me to any individual peer-reviewed article or other source that actually confirms

Page 244

that, can you?

A    I think the standard of care, how that's dictated and how it's been described to me is how other gastroenterologists behave, and that's an opinion based on my clinical experience, my understanding of the medical literature, my training.

And it's not strange for physicians.  Actually, it's very common for us to render an opinion regarding standard of care based on that -- based on that information.

Q    I understand that, but the question, although you refer to it as standard of care, the real question is:  Can you reliably diagnose a patient with drug-induced gastroparesis without performing a gastric emptying study, that's the actual question before us.

A    Sure.

Q    It's not a question of the standard of care is --

A    Yeah.

Q    -- it's the question of what is required to make a reliable diagnosis.

Do you understand that?

MS. AMINOLROAYA:  Objection to form.  You can answer if you understand the question.

THE WITNESS:  I believe that I can make a diagnosis of drug-induced gastroparesis in a classic presentation, and that my actions of withdrawing the

Page 245

drug as the next step and not doing a gastric emptying study are consistent with what most of the gastroenterologists do, which is consistent with the standard of care, and it's more likely than not that the patient has drug-induced gastroparesis.

BY MR. PRZYMUSINSKI:

Q   So I understand that's your opinion and that's your belief.

What I'm asking for is actually data, evidence, scientific data, to support that conclusion that it's more likely than not that you are right.  Point me to something.

What study shows that your method is more likely than not to result in a correct diagnosis of drug-induced gastroparesis, anything?

MS. AMINOLROAYA:  Objection.  Asked and answered many times during the day.

MR. PRZYMUSINSKI:  I think the answer was no, so if it's no, it's no, I'll move on.

THE WITNESS:  I think it's more about like, you know, there's recommendations in the guidelines on like how to manage patients, and you're looking for me to say like -- if you're looking for me to say there's a research study that says:  Patients that have a presentation typical for drug-induced gastroparesis and then you stop the drug and then they get better, and

Page 246

then you -- like I'm not sure what study design you're looking for.

BY MR. PRZYMUSINSKI:

Q    I'm not asking you for a study design, Doctor.

What I'm asking you is for a simple -- well, let me back up.

A    Yeah.

Q    Let me ask you a different way.

A    Yeah.

Q    Is it your opinion that in every single patient who experiences nausea and vomiting while on a GLP-1, the cause of that nausea and vomiting is delayed gastric emptying?

A    Of course not.

Q    Okay.  Do you know what percentage of patients who experience nausea or vomiting while on a GLP-1, experience it as a result of delayed gastric emptying?

A    I don't know the percent.  There is small amounts of data in that regard.

Q    Okay.  What's your best estimate and where does it come from?

A    So like an example is this analysis, the Maselli data, this letter.  Have you seen this?

Q    What's the title, Doctor?  I can't see it from that far away.

Page 247

A    Yeah.  So it's a description of a recent trial, it's called:  "The prevalence and variations on the gastric emptying delay in response to GLP-1 receptor agonist liraglutide."

Q    Okay.  What --

A    It kind of has a table that describes this analysis of patients that most had a delay in gastric emptying on therapy and some of them had a persistent delay and some did not.

So that was -- 57 percent developed a very significant delay, and those patients who developed delay, 51 percent had persistent delay, and the remaining had normalization in 16 weeks.

So --

Q    Does it correlate that delay with symptoms?

A    There was an actually interesting analysis that we looked at.  There's not a lot of great data that describes the delay and symptoms and how they correlate.

There was a study that we discussed in my opinion that was -- just published in abstract form on the bottom of page 12.

So I'm sure you're familiar with the Lupianez-Merly 2024 data.

Q    Mm-hmm.

A    So this is some data -- it's not really

Page 248

high-quality data, and it's still in abstract form, it's a retrospective review.

And Dr. Nguyen, I recall, kind of also discusses this study or abstract that was published, and so it infers that gastric emptying studies were done on patients that had symptoms on GLP-1 RA in kind of a deliberate manner. But it was a chart review of patients that had symptoms, and those symptoms included nausea, constipation, bloating, not necessarily the symptoms that we normally see and -- or normally consider to be typical for gastroparesis.

And in this analysis -- and they just did a retrospective chart review. They found that 34 percent of patients were found to have delayed emptying.

Q    Doctor, are you talking about the poster presentation by Camille Lupianez-Merly, spelled L-u-p-i-a-n-e-z?

A    Yeah.

Q    Dash M-e-r-l-y; is that correct?

A    Yeah.

MR. PRZYMUSINSKI:  Well, let's mark that as Exhibit 12, just so we have it in the record.

(Raines Exhibit 12 marked.)

BY MR. PRZYMUSINSKI:

Q    This is the document, Doctor, that we're talking about; is that right?

Page 249

A    Yeah.

Q    Okay.  Now, as I understand, you said poster presentation.  I understand you said limited data, but if you -- and I think this is what you just said.

If you look at the second bullet underneath the little flowchart, it says:  "One-third of patients who underwent gastric emptying study were found to have delayed gastric emptying."  Correct?

A    Yeah.

Q    All right.  So what it's telling you in this study is that of the patients who had GI symptoms while on a GLP-1 drug, only a third of them actually had delayed gastric emptying, correct?

A    Yeah.  And it's kind of misleading, though.  It kind of gives you the impression that they didn't have the symptoms before, but this includes patients that had GI symptoms before.

So like half of them had GI symptoms before they started the drug, and then half didn't.  And they didn't separate out which patients were which, so they just kind of blended them together, and so it's kind of hard to interpret.  And when they say they average everything together, there's not much difference.

But I think the issue is that they took patients that had GI symptoms before they started the drug, and then

Page 250

they lumped them in with the patients that had symptoms that began after they started with the drug.

Q    And that's fair.  I understand there's limitations, Doctor, and we can talk about that another time, but the question that I had asked that prompted you to pull this out was -- it started with a question of whether every patient who has nausea and vomiting on a GLP-1 develops that as a result of delayed gastric emptying and you said:  "No."

And then I asked whether you had data to -- to predict reliable data to tell us what percentage of patients who have GI symptoms while on a GLP-1 actually also had delayed gastric emptying.

A    Sure.

Q    And you pointed me to this as the best data you could identify.

If this data were correct, Doctor, that would mean that 67 percent, or two-thirds of patients have GI symptoms on a GLP-1, do not have delayed gastric emptying, correct?

A    I didn't say this was the best data I could identify.  It was a data point that I could recall, that's when I review all the medical literature, like that was an example of a piece of medical literature.

Q    Okay.  What is the best piece of medical literature you can identify for me --

Page 251

A    Sure.

Q    -- sitting here today, that provides us with an estimate of the rate of delayed gastric emptying in patients who have nausea and vomiting while taking a GLP-1?

A    The incidence of nausea and vomiting on a GLP-1 overall?

Q    No, let me do it again.

A    Okay.

Q    So what is the best piece of evidence of data, of scientific data, that you believe is available, sitting here today, that you know of, that reports on the percentage of patients who have delayed gastric emptying among the full body of patients on GLP-1s, who experience symptoms such as nausea and vomiting?

A    I don't know if there's a lot of literature pertaining to that specific data point.

Q    Well, if there's not a lot of literature --

A    Sure.

Q    -- how do you know that the majority of patients have nausea and vomiting while on a GLP-1 have delayed gastric emptying as the cause of that nausea and vomiting?

A    I think pathophysiologically that's a mechanism. So first that there's an explanation for biopathophysiology that's -- it seems fairly well-established these drugs cause delay in gastric emptying, and so if that's a known

Page 252

mechanism, then I think it makes sense that that's -- the symptoms are related to that mechanism.

Q   So if I understand that correctly, Dr. Raines, because you're aware that GLP-1 medication is delayed gastric emptying, you then conclude that a patient who experiences nausea and vomiting at or around the time when they start the medication or increase their dose, their symptoms must be a result of delayed gastric emptying; is that correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think using "must" makes it sounds like it's so absolute.  So it's like it makes sense or that -- it's more likely than not that that's why they have those symptoms.

BY MR. PRZYMUSINSKI:

Q   So the more likely than not part comes from your belief that the effect of gastric emptying of these medications is more likely than not the reason why patients develop nausea and vomiting when they're on these medicines; is that correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  When I see a patient -- well, it's when patients that started a medication like this, or a GLP-1, present with nausea and vomiting, I feel like the most likely explanation, it's related to the

Page 253

drug, and the most likely mechanism is that they have delay in gastric emptying.

BY MR. PRZYMUSINSKI:

Q    Okay.  So I think that's good, Doctor.  We can -- let's leave that.

Actually that's a goods point.  Let's look at this, Doctor, this same exhibit we just marked as Exhibit 12.

A    Yeah.

Q    Do you see where under "Characteristics," in the table in the middle, there are incident symptoms listed at the bottom?

A    Yes.

Q    Okay.  Do you see that actually the percentage of nausea was higher in patients who had normal gastric emptying than those who had delayed gastric emptying?

A    I do.  And half of those patients had symptoms before they started the drug.

Q    Do you also see that the percentage of vomiting was virtually identical between patients with normal gastric emptying and those of delayed gastric emptying?

A    Yeah.  Same problem.  Like they mixed in patients that had these symptoms before they started the drug.

Q    Well, at least within this analysis here, you could not use nausea or vomiting to predict whether a

Page 254

patient had delayed gastric emptying or normal gastric emptying while on a GLP-1 medication, correct?

A   I think because of the analysis in mixes in patients that had the same symptoms before they start the drug, it doesn't really specify.

Q   I understand what you're saying, but I'm asking within this analysis here.

The presence or absence of nausea and vomiting was not correlated at all with the presence or absence of gastric emptying delays, correct?

A   I see that the authors have a particular conclusion, and when they describe how they did this evaluation and you look it in further detail, it's not convincing because it's a mixture of patients that had symptoms before they started the drug.

So I understand that they are making their own conclusion, but the concern is like how these conclusions were made based on the information that they use.  Like the data points that they included.

Q   You would disagree with their conclusion?

A   I disagree that this study is compelling as a study which demonstrates lack of correlation between delay in gastric emptying or really symptoms of nausea and vomiting in patients who began a GLP-1 and developed nausea and vomiting that's new.

Page 255

Q    Okay.  Doctor, I want to turn to your report.

Actually, how long have we been going?

MS. AMINOLROAYA:  Lucas, we've been going for about an hour.

MR. PRZYMUSINSKI:  Yeah.  That's what I was thinking, too.  Let's take a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:30.

(Recess taken at 3:30 p.m.)

THE VIDEOGRAPHER:  Back on the record.  The time is 3:36 p.m.

BY MR. PRZYMUSINSKI:

Q    All right, Dr. Raines.

One of the things you talked about earlier this morning was about different subtypes of gastroparesis.

Do you recall that?

A    Yes.

Q    I think we talked about idiopathic, diabetic, hypothyroid, connective issue, parkinsonian, post-surgical, and drug abuse.

Do you remember that?

A    Yes, I do.

Q    Okay.  One of the things you mentioned as kind of an odd -- I don't know if you called it an additional one or just a rare one, was a checkpoint inhibitor related

Page 256

gastroparesis?

A    Yes.

Q    Okay.  And I think you mentioned, and that's a situation of a medication that's used for cancer treatment, correct?

A    It is.

Q    And that in some patients that it is thought to potentially cause a vagal nerve injury; is that right?

A    It -- from the case report, it sounds like it caused nerve injury.

Q    Okay.

A    And it's an example of a drug that causes nerve injury and in that case, the patient might have prolonged or, you know, residual symptoms for after the drug's removed from the nerve injury.

Q    Is that also, in your view, a drug-induced gastroparesis, or is that different?

A    I would still classify it as drug-induced gastroparesis.

Q    Okay.

A    I mean, it's -- like the etiology is drug.

Q    Etiology is drug in the sense that you believe the drug is responsible for the symptoms; is that correct?

A    The drug is responsible for like that subtype, yeah.

Page 257

Q    Okay.  All right.

Let me go back to your report, Doctor, and I want to look at pages -- it's really pages 12 and 13, but your section starts on 11, on diagnoses associated with delayed gastric emptying.

A    Yeah.

Q    Let me know when you're there.

A    Bottom of page 11?

Q    Yeah.  I mean, I want to talk about 12 and 13, but I just wanted to orient you to the bottom of 11 is really where the section starts; is that --

A    Yeah.

Q    -- fair?  Okay.

And I guess on page -- just go ahead and start on page 11.

You start off by saying, under Section D: "Delayed gastric emptying is a defining feature of all subtypes of gastroparesis, but it's also driven 25 to 40 percent of patients with functional dyspepsia."

Do you see that?

A    Yes.

Q    And then you say:  "Evaluation of these diagnoses may be specific for drug-induced gastroparesis, other gastroparesis not drug-induced, and functional dyspepsia."

Do you see that?

Page 258

A    I do.

Q    Okay.  Can you tell me why in your description you separate drug-induced gastroparesis from all other forms of gastroparesis in the way you present it and in the way you discuss the diagnostic approach?

A    I separate it because I feel like the guidelines, they don't include this discussion of evaluation by subtype, because it's a general guideline for the typical patient with gastroparesis.

And I feel like as a supplement to the guideline, I'm not disagreeing with the guideline.  It's just that I feel like it needs, in practice, to apply to every patient, then I have to kind of subclassify like which patient we're talking about.

And that would be for, say, hypothyroid-induced gastroparesis as an example, or drug-induced gastroparesis, as an example.

Q    Okay.  And I understand we talked about the guidelines.  I don't want to retread that old ground because we'll be here forever, but --

A    Yeah.

Q    -- what I want to understand is:  Is there anything specifically unique about drug-induced gastroparesis, beyond its -- your perception of how it's treated in the guidelines that would cause you to separate

Page 259

it and treat it differently in term of your approach and analysis?

A    I feel like it would be ideal to evaluate each subtype of gastroparesis kind of independently.  And we do that generally in medicine.

Once you specialize in a specific subpopulation, then I think health care is probably more -- more precise.

So it's like I'm separating that type because I feel like it would be more appropriate for our detailed discussion to talk about individual presentations or subtypes of gastroparesis than sometimes gastroparesis as a whole and not subtyping kind of makes it kind of cloudy.

Q    I guess I'm asking in -- from a clinical perspective.

A    Yeah.

Q    Is there, in your view, clinical differences between drug-induced gastroparesis and other types of gastroparesis that are relevant in terms of your approach, whether it's a diagnosis or a management of those conditions?

A    Drug-induced gastroparesis has a different presentation.  Different management.  Different course.

And I think post-viral gastroparesis is a different presentation, course.  Diabetic as well.

So I think these different subtypes have different

Page 260

presentations, symptoms, courses, clinical courses, and diagnostic algorithms.

Q   Just out of curiosity, Doctor, the ACG guidelines, the '22 that you reviewed earlier, I know you testified that you don't think -- you think those are focused on diagnosis and evaluation of patients with diabetic and idiopathic gastroparesis, correct?

A   Correct.

Q   Is there anywhere in that guideline that it says that the gastroparesis that they're talking about is only diabetic or idiopathic, or is that your inference from your review of it?

MS. AMINOLROAYA:  You asked this exact question about an hour ago.

MR. PRZYMUSINSKI:  I did not actually.

THE WITNESS:  I don't remember the guidelines saying something like this is a guideline for idiopathic and diabetic.

I recall the guideline states that this is a typical patient, which means the authors probably considers like a common presentation with a common subtype, which would be idiopathic and diabetic.

BY MR. PRZYMUSINSKI:

Q   That's your inference, right, that's what your that's your conclusion from reading --

Page 261

A    Sure.

Q    -- that.  That's not -- what I'm asking, is there anything in that guideline that says:  This guideline for diagnosis and management of gastroparesis is limited to diabetic and idiopathic gastroparesis only?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  Yeah.  I think the word "typical presentation" is kind of inferring like a -- a common, you know, the common type and the common type would be diabetic and idiopathic.

BY MR. PRZYMUSINSKI:

Q    But that's your inference, correct?

MS. AMINOLROAYA:  Same objection.

THE WITNESS:  Yeah.

BY MR. PRZYMUSINSKI:

Q    All right.  So, Doctor, let's go to -- let's go to page 6 on your report, and there's a Section B on "Etiologies of Gastroparesis."

Do you see that?

A    I do.

Q    Okay.  The first sentence you have there, it says: "The term 'gastroparesis' literally translates to paralysis of the stomach."

Do you see that?

A    I do.

Page 262

Q    Okay.  In clinical practice, do you ever use the term "paralysis of the stomach"?

A    I do, because my clinical practice is integrated with a teaching service, so as I see patients, including patients with gastroparesis, I'll talk about the case with the students and residents and patient about a diagnosis.

And in this case it would be gastroparesis, and what that means and the kind of pathophysiology, so, yeah, I use it in practice because my practice is kind of part of a teaching service, and then sometimes I use it to talk -- to use that terminology with the actual patient.

BY MR. PRZYMUSINSKI:

Q    So you'll tell patients that they have paralysis of the stomach?

A    Yeah.

Q    Okay.  All right.

You go to say that "this condition may develop as a result of any pathology which interferes with any normal motor function."

Do you see that?

A    I do.

Q    What does the term "pathology" mean"?

A    It's more like an abnormality.  So there's normal physiology, and then if it's abnormal then it's pathology rather than physiology.

Page 263

Q    Okay.  So pathology is abnormal physiology?

A    No.  Normal physiology is physiology, and then pathology is abnormal.

Q    I think that's what I said, but let me make sure.

So in your view, the term "pathology" refers to an abnormality in the physiology?

A    It's an abnormality.  Sometimes it's a physiologic abnormality and sometimes it's a structural abnormality.

Q    And is that the same -- the term "pathology," is it the similar or the same concept as you have in the next sentence saying:  "Specific pathologies may contribute to injury or dysfunction of gastric smooth muscle nerves, which serve the stomach or both"?

A    Yep.

Q    Okay.  So the -- the pathologies we're talking about involve either injury or dysfunction of muscle, nerve or both, correct?

A    Correct.

Q    Okay.  And so I guess in diabetes -- and I think you talked about this a little bit, you may have hyperglycemic-related injury to various nerves, correct?

A    Correct.

Q    And that results in dysfunction of those nerves, correct?

A    So that would be primarily an injury.

Page 264

Q   An injury, okay.

A   Yeah.

Q   And I think you talked about scleroderma, correct?

A   I did.

Q   Okay.  Is that an injury or a dysfunction in the context of scleroderma?

A   I would think of it more of like an injury.

Q   What about GLP-1 medicines, do they cause an injury or a dysfunction or something else?

A   I don't know.

Q   Do you know whether they cause any injury?

A   The pathophysiology that's in my report, it is my understanding is that they interfere with acetylcholine transmission to the intestine that results in kind of disruption of normal gastric propulsion.

So it's -- it seems more of a -- like a dysfunction.

Q   It's a slowing, right, of gastric motility?

A   Yeah.  And rather from the literature I reviewed, and it's not really something that I'm an expert in, but from what I can tell, it looks like a -- like a slowing related to a dysfunction, and that's kind of a neurally mediated, like a nerve dysfunction.

So it's interfering with the receptors on the nerves.

Page 265

Q    And once the GLP-1 medication is removed, that effect on the nerves goes away, correct?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think that's an assumption, but that's what I've observed in my practice is in 90 percent of patients that when we remove the drug they get better.

BY MR. PRZYMUSINSKI:

Q    Okay.  So you're not talking about a permanent injury or dysfunction in the context of GLP-1s, correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think the vast majority I've seen improve, and then in the remaining patients, I don't know if they have a residual effect from stimulation of the nerve over time or -- or a loss of function as a result, I'd have to speculate on that.

BY MR. PRZYMUSINSKI:

Q    Okay.  Well, we don't want you to speculate.

A    I don't want to speculate.

Q    Okay.  All right.

Let's go to the next paragraph.  And this is where you talk about the different medications -- in the next two paragraphs, I guess, that you believe may have an effect on gastric motility.

So there a sentence that starts with:  "Opiates

Page 266

are known to cause gastroparesis."

Do you see that?

A    Yes.

Q    All right.  So I assume it's your opinion that opioids actually cause gastroparesis in patients; is that correct?

A    I would consider it a form of drug-induced gastroparesis.

Q    Okay.  And does the effect of opioids on gastric motility, how does that compare to the effect of GLP-1s?

Do you have an opinion on that?

A    I think from the description in the physiologic studies, the mechanism was stimulation of the pelvic wall sphincter as one mechanism, and then a slowing of peristalsis.

And in the studies of GLP-1s, it sounded like a slowing of peristalsis and potential -- was it more like a lack of coordination between antrum motility and gastric peristalsis waves.

So a little bit different, but, you know, that's, again, not really something that's exhaustive in my analysis.

Q    I guess the question I had is a little bit different, which is -- I mean, you're talking about mechanism.

Page 267

What I wanted to know, do you know whether -- do you have an opinion as to whether opioids have a similar, greater, or lesser effect, on gastric motility than GLP-1 medications?

A    I don't have an opinion regarding like a comparison or whether they're -- and there's a variety of different opioids, and there's different GLP-1 RAs, so I can't make that comparison.

Q    That's not something you considered?

A    I didn't do a comparison of GLP-1 drug-induced gastroparesis compared to other drug-induced gastroparesis.

Q    Okay.  In the context of your diagnostic methodology, what would happen if you had a patient presenting with the classic symptoms who was both on an opioid medication and GLP-1, how would you handle evaluation of whether they have drug-induced gastroparesis, and, if so, which of the medications caused it?

MS. AMINOLROAYA:  Objection.  Incomplete hypothetical.

THE WITNESS:  I think I would have to factor in, you know, temporality.  So it's like when did they start the opioid versus when did they start the GLP-1.

BY MR. PRZYMUSINSKI:

Q    Do you know how accurately you would be able to make that determination in that context?

Page 268

MS. AMINOLROAYA:  Objection.  Incomplete hypothetical.

THE WITNESS:  I don't think there's any scientific data or research study that asks that specific question.

BY MR. PRZYMUSINSKI:

Q    And that's generally true for your methodology overall, right?  There's no scientific data that answers how accurate it is, correct?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  No.  No meaning like, yes, there's scientific data.  It's just like you're asking for a specific statement.

BY MR. PRZYMUSINSKI:

Q    I'm asking for scientific data --

A    Sure.

Q    -- that provides an estimate of the accuracy of your methodology?

A    My methodology is derived, like I have a standard of care derived from all the sources that we talked about, and that's how physicians describe the standard of care.

And that standard of care is based on experience and training and medical literature that concludes that GLP-1s slow gastric emptying, that GLP-1s are associated with symptoms of nausea and vomiting, that are more likely

Page 269

than not due to delayed gastric emptying, and that most physicians in practice would stop a drug that seems like it caused nausea and vomiting, and most physicians in practice would not continue the drug and then do a gastric emptying study on the drug.

And so it's -- that standard of care is kind of described in that way.

And when we talk about like scientific methodology, we don't have data points or kind of clinical trials done for every scenario, and this would be kind of one of those.

Q   Okay.  So the answer is:  "No," that there is no study that can provide us an estimate of how accurate your methodology is; is that correct?

MS. AMINOLROAYA:  Objection.  Asked and answered.  And that misstates the witness' testimony.

THE WITNESS:  Yeah.  When you say:  "My methodology," what are you saying?

BY MR. PRZYMUSINSKI:

Q   The ability to determine whether a patient has drug-induced gastroparesis based purely on history and physical without conducting a gastric emptying study?

MS. AMINOLROAYA:  Objection.  Form.

THE WITNESS:  I can only provide a standard of care, which is, physicians that see patients that

Page 270

have nausea and vomiting onset with starting a GLP-1 and a classic presentation would stop the drug and assume it's probably from the drug and then would not do a gastric emptying study because that's relatively contraindicated.

And then when somebody's sick from a drug, that you think it's from the drug, you wouldn't continue it.  You would typically stop it.

And I think that that's sound scientific methodology with the temporality of somebody starting a drug and then getting really sick immediately after, and so that sounds pretty scientific to me.

BY MR. PRZYMUSINSKI:

Q    It could be scientific with respect to whether the nausea and vomiting were caused by the drug, but the question here is different, whether the nausea and vomiting are actually caused by delayed gastric emptying and gastroparesis, and that's the distinction I'm trying to get at with you, Doctor.

A    Sure.

MS. AMINOLROAYA:  Objection to the commentary.  Is there a question pending?

MR. PRZYMUSINSKI:  There doesn't have to be.

Doctor, did you want to say something?

MS. AMINOLROAYA:  No.  There needs to be a.

Page 271

MR. PRZYMUSINSKI:  Well, there is.

Doctor, did you want to say something?

THE WITNESS:  No.

BY MR. PRZYMUSINSKI:

Q    Okay.  Let's go to the next paragraph.

You list a pretty long list of medications that you describe as being associated with drug-induced gastroparesis.

Do you see that?

A    I do.

Q    Okay.  Is it -- well, let me ask it this way.

Have you diagnosed patients with drug-induced gastroparesis with each of these medications on the list?

A    No.

Q    Okay.  Which ones have you diagnosed drug-induced gastroparesis with?

A    Definitely somatostatin.  So there's a lot of somatostatin use in our practice for treatment of patients with carcinoid tumor, as well as chronic GI blood loss.

And some of these patients, they just don't tolerate it, so they start the injections, they develop symptoms of gastroparesis, nausea, vomiting.  Vomiting, retaining food.

Often they don't get tolerant of it, and so we have to stop it and pick a different medication.

Page 272

Q    Okay.  So you have beta agonists.

So let's say -- have you ever seen -- let's say a person starts -- strike that question.

Let's say a patient is started on metoprolol and a week later starts having nausea and vomiting, would you then diagnose someone with drug-induced gastroparesis resulted from metoprolol therapy?

MS. AMINOLROAYA:  Objection.  Incomplete hypothetical.

THE WITNESS:  I think these all kind of depend on the case and then this is kind of an exhausted list of different medications that have been associated with and some are individual case reports, like the immune checkpoint inhibitor example, and then some have multiple case reports or more kind of robust data.

BY MR. PRZYMUSINSKI:

Q    But in terms of evaluating a patient, I guess in your practice, for the potential for drug-induced gastroparesis, you would identify any of these medications that they were taking and you would think about each of these as a potential cause; is that correct?

A    I will review their medication list, and then, you know, consider all of these medications and really consider which ones are -- have a stronger association or a more --

Page 273

or more commonly associated with gastroparesis and which ones are like one case report reported in the literature ever.

And also, frankly, my experience. So it's like I personally see a lot of people with somatostatin-induced gastroparesis.

Q    Okay.  Doctor, on page 14 of your report, right before you get to your "Summary and Conclusions."

A    Yeah.

Q    There's a last sentence which follows from a section on functional dyspepsia on the previous page.

Do you see that?

A    I do.

Q    The last sentence says:  "By definition, cases of functional dyspepsia cannot be attributed to a specific injury or medication."

Do you see that?

A    I do.

Q    What does that mean?

A    So The Rome Foundation clarifies or describes diseases that don't have a defined pathophysiology.

And so that is really one of the reasons, or I, you know, gastroparesis is not included as a Rome disorder because it has a pathophysiology, and so these Rome disorders don't have a clear pathophysiology and so

Page 274

functional dyspepsia is one of those disorders.

Q    So am I correctly understanding that if a patient is diagnosed with functional dyspepsia, you would not attribute that to a GLP-1 medication?

A    Correct.

Q    Doctor, one of the opinions I thought you gave earlier, and please tell me if I'm wrong, is that -- well, strike that question.

There was a discussion with Mr. Premo-Hopkins earlier about the mention of delayed gastric emptying and a labeling for some GLP-1 medications.

Do you recall that?

A    I do.

Q    Okay.  And I think you gave some opinions as to your view of the adequacy of the information in the labeling with regards to informing physicians about risks of drug-induced gastroparesis.

Do you recall that?

A    I don't remember making a specific recommendation or a statement.  If you want to clarify.

Q    Well, we can go back and read it.

A    Sure.

Q    But maybe a simpler way of saying it is:  Are you planning to offer any opinions as to the adequacy of the warnings in the product labeling for any of the GLP-1

Page 275

medications?

A    I don't think that's really part of my role here. You know, my role is to talk about evaluation of gastroparesis, not to talk about if I should or have plans to campaign to provide additional information to the GI community or other people that prescribe the drugs, particularly since like that's not my field.  Like I'm not in the field of physicians that we all prescribe these drugs all the time.

Q    Yeah.  Listen, I wasn't insisting you were in a campaign.  I'm just asking whether you plan to offer an opinion on that topic, because you did discuss that a little bit earlier during the deposition.  I just need to understand if that's part of your opinion or not.

A    You're asking if I am --

MS. AMINOLROAYA:  Asked and answered.

THE WITNESS:  -- going to offer an opinion about what?

MR. PRZYMUSINSKI:  Okay.  Let me re-ask it.

THE WITNESS:  Sure.

BY MR. PRZYMUSINSKI:

Q    Are you planning to offer, within the scope of your report, any opinions regarding whether the information in the product labeling for any of the drugs at issue is adequate or inadequate with respect to the information about

Page 276

the risks in gastroparesis?

MS. AMINOLROAYA:  He asked and answered that.

THE WITNESS:  Yeah.  That was not the question -- that was not the purpose of my report and that's not the question I was asked about.

BY MR. PRZYMUSINSKI:

Q    So no?

A    No.

Q    Okay.  Great.

Doctor, a lot of what we talked about today has to do with making determinations and decisions about the etiology or cause of GI symptoms based on the presence or absence of certain symptoms, their quality and the nature, that kind of stuff, right?

A    Yes.

Q    And, in fact, I think you went through with Mr. Premo-Hopkins this differential diagnosis list on pages 9 and 10, talking specifically about some symptoms or factors that might make it more or less likely that one of those conditions was the cause of the symptoms, right?

A    Kind of common cardinal symptoms, risk factors, and confirmatory testing as we discussed, yeah.

Q    So I'm going to assume, Doctor, that the accuracy of a history and physical examination and its ability to resolve between different types of GI conditions is highly

Page 277

dependent on the quality of the physician who's performing the history and physical; is that fair?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  That's not a question that I -- I don't have really have data to support that or any conclusions about certain presentations require a better physician and what a better physician is. That's kind of abstract.

BY MR. PRZYMUSINSKI:

Q    Okay.  Is it -- let me ask it this way.

Is a gastroenterologist, such as yourself, who's been practicing and studying medicine for many decades --

A    Yeah.

Q    -- going to perform a better history and physical than an internist, who just started practicing three years ago?

MS. AMINOLROAYA:  Object to form.

Speculative.  Calls for speculation.

THE WITNESS:  Yeah, that would be speculation.

BY MR. PRZYMUSINSKI:

Q    You don't have an opinion on that at all?

MS. AMINOLROAYA:  Same objections.

THE WITNESS:  I think I'd speculate whether that internist has a particular interest or training in

Page 278

gastroenterology, for example.

I think --

MS. AMINOLROAYA:  And you should not speculate, Doctor.

THE WITNESS:  Okay.

MR. PRZYMUSINSKI:  I agree with that.

THE WITNESS:  Yeah.

BY MR. PRZYMUSINSKI:

Q    Okay.  Well, do you -- with respect to the ability to make a diagnosis of gastroparesis, drug-induced gastroparesis --

A    Yes.

Q    -- based on the presence of certain symptoms and presentation without gastric emptying studies, does the accuracy of that method depend at all on the person doing the examination, history and physical, or is it the same for everybody?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  Yes.  I think, as a generalization, the orthopedic surgeon is not going to be as effective in evaluating a patient with GI symptoms.

BY MR. PRZYMUSINSKI:

Q    So in order --

A    Compared to like -- so it's like -- it's really

Page 279

presentations that are within somebody's, what we call purview, like what do you normally see, what do you feel comfortable seeing, what types of presences do you manage.

Q    So would it also be their to say that the reliability of an opinion as to a patient having drug-induced gastroparesis, without gastric emptying study, is highly dependent on the person who's making that determination, is that fair?

MS. AMINOLROAYA:  Object to form.  Misstates the testimony.

THE WITNESS:  That would be very speculative.

BY MR. PRZYMUSINSKI:

Q    You don't think it's dependent on the person making the diagnosis?

MS. AMINOLROAYA:  Objection.  Same objection.

THE WITNESS:  So it's like -- it's not something I would do to like quantify how accurate somebody's going to be in a different field, like that would be quite a stretch.

BY MR. PRZYMUSINSKI:

Q    I'm not asking you to quantify.  I'm asking you whether the accuracy of the method, which is dependent on a physician asking certain questions, doing an examination and drawing on conclusions based on that without an objective test, whether that's dependent on the skill, the training

Page 280

and experience of the physician or not?

MS. AMINOLROAYA:  Same objections.

THE WITNESS:  I think all I can say is, you know, obviously a gastroenterologist with experience in digestive disease is gonna be more likely to be accurate and provide the best care in a patient with a GI symptom and that other physicians, you know, may be able to provide care if it's within their experience and purview and training, and the standard of care that I refer to is generally the standard of care for people also in gastroenterology.

BY MR. PRZYMUSINSKI:

Q    Doctor, I think you said in your report that you work in a referral center; is that correct?

A    So a portion of my practice is tertiary care referrals.

Q    Okay.  And that means that there are patients that are referred to you for specialty evaluation because of your training and experience, correct?

A    Yes.

Q    Okay.  And presumably some of those patients are referred to you specifically for an evaluation of a potential diagnosis of gastroparesis; is that fair?

A    That's fair.

Q    Okay.  And presumably when those patients come to

Page 281

your office as referred by other physicians, you would review their medical history, correct?

A    Of course.

Q    Okay.  And you would review whatever records were provided by their outside referring physician?

A    Yes.

Q    You would do a history and physical?

A    Yes.

Q    You might order some lab tests?

A    It depends on the case, maybe.

Q    Okay.  And potentially you might do some gastric emptying studies, other evaluations, correct?

A    Nothing in -- you know.  Maybe.  It just kind of depends on the case.

Some people come with a ton of studies already done.  Some people come with nothing done.

So it's -- I'd like to have a specific example.

Q    I understand that.  Now here's my question, Doctor.

Have you ever had a situation where a patient came to your office with a diagnosis of gastroparesis from their outside physician that you, upon examination or evaluation, later found out, determined was not actually gastroparesis?

A    Yes.

Q    How often does that happen to you, Doctor?

Page 282

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I think from my experience with patients referred with gastroparesis, I see maybe 30 percent have an alternative diagnosis, and these are, again, kind of a referral bias where people are presenting with complicated cases or they're not improving.  Their story doesn't make sense to the referring doctor, or the tests are conflicting.

So, yeah, I also see that in my small bowel bleeding practice that patients referred for small bowel bleeding don't really have small bowel bleeding, they just have anemia or a low blood count.

BY MR. PRZYMUSINSKI:

Q    So at least within your own practice, understanding the referral bias points you're making, roughly a third of the patients that present with a presumptive diagnosis of gastroparesis turn out to have a different etiology, correct?

A    Yes.

Q    And what percentage of those patients that you, if you will, I'm going to use the term "undiagnosed gastroparesis," does that determination -- do you make that determination after performing some form of gastric emptying study or other test for gastric motility?

MS. AMINOLROAYA:  Objection to form.

Page 283

THE WITNESS:  It kind of all depends on the case.  I can't give a percentage as far as like it's kind of a mix of different diagnoses that they're -- that are made kind of later.

I think a portion of them are chronic nausea and vomiting disorder that's non-specified that's in the Rome criteria, where they have maybe like a borderline delay in gastric emptying that's outside the normal range but not compelling.  And then they have a lot of comorbidities that are consistent with like a functional disorder.

So, yeah.  I don't have percentages as far as like how many are reassigned a different diagnosis based on what tests, but I can say a number of them have like the Rome criteria disorder for chronic nausea and vomiting that's non-specified.

BY MR. PRZYMUSINSKI:

Q    But I'm assuming that in patients that have the chronic nausea and vomiting syndrome, in order for you to know that they have a mild delay in gastric emptying, you have to do a test to evaluate it, correct?

A    So, some people come with a test, some people we do a test.  Some people that they're intolerant of tests, like they've had three gastric emptying studies ordered and they vomit every time that they try to do it, so it's kind

Page 284

of impossible to get an objective test.

And that kind of speaks to their complications of, you know, how these people are really complicated.

Q    Okay.  Doctor, in terms of patients who come to you, right, and they have a presumptive diagnosis of gastroparesis, they refer to you for evaluation, whatever it is that you end up doing your end, you eventually presumably try to do your best to give them an accurate diagnosis, right?

A    That's kind of a general statement.  Like I generally try to assess patients, diagnose them, and treat them.

Like I've never heard anybody say like "I try to give them an accurate diagnosis."  Sure, like.

Q    But you want to do your best, right, to make sure you get the diagnosis correct?

A    I want to practice within my field of expertise and like provide the best care to the patient.

Q    Okay.  And, Doctor, why would it be important, for example, to be able to distinguish a patient who's got gastroparesis from a patient who's got a different etiology of the GI symptoms?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think what you're inferring is like there's discussion in the literature about

people being assigned a diagnosis of gastroparesis who may have a different disorder, like chronic nausea and vomiting disorder, and they may undergo treatment, like a surgical treatment, like a POEM surgery or a Botox injection, and how there's morbidity and mortality associated with those procedures, and that makes sense.

BY MR. PRZYMUSINSKI:

Q    In fact, in your own practice, right, you say there's 30 percent of patients who are misdiagnosed, correct?

A    Yeah.

Q    That's a substantial number of people who, based on external evaluation by physicians, who presumably are good clinicians, still get the wrong diagnosis before coming to see an expert like yourself, correct?

MS. AMINOLROAYA:  Object to form.

THE WITNESS:  I see that in my small bowel bleeding practice, too.

BY MR. PRZYMUSINSKI:

Q    You see that in what?  I'm sorry.

A    Like my small bowel bleeding practice.  So it's like -- that's what you get in a referral center, as a lot of patients that come, they don't have a straightforward case and they're not getting better with the standard treatment or they're not following the expected course.

Page 286

And so that referral bias, you know, really expresses itself at a tertiary care center.  So we see that in a lot of different conditions.

Q    No, I get that.

A    Yeah.

Q    But it is important to you, right, to get the right diagnosis, because you want to ensure that patients are not receiving unnecessary and inappropriate treatments, correct?

MS. AMINOLROAYA:  Object to form.  Asked and answered.

THE WITNESS:  Sure.  I understand the concern that patients that are labeled with a diagnosis of gastroparesis may get procedures and -- like a POEM surgery or medications that are not going to benefit them if they don't really have gastroparesis, and like I understand that concern.

MR. PRZYMUSINSKI:  Okay.  Doctor, a couple more things and then maybe we'll be close to done.

(Raines Exhibit 13 marked.)

BY MR. PRZYMUSINSKI:

Q    Here you go, Doc.

So what I've marked as 13 is the ASGE 2011 guideline that's titled:  "The role of endoscopy in gastroduodenal obstruction and gastroparesis."

Page 287

Do you see that, Doctor?

A    I do.

Q    I'm assuming this is a document you're familiar with?

A    Yes.

Q    I just want to ask you about a few statements in here and get your thoughts, but before I do that, if you look at the top left-hand column in the italics section, there is a statement, the second line, it says:  "The Standards of Practice Committee of the American Society for Gastrointestinal Endoscopy (ASGE) prepared this text."

Do you see that?

A    I do.

Q    Are you or have you ever been a member of the practice committee of the ASGE?

A    Yeah.

Q    Are you one now?

A    Yeah.  We're writing the guidelines for small bowel endoscopy and video capsule.

Q    Okay.  Fair to say that that practice committee gets recommendations and assessments or is considered reliable within the gastroenterology community?

A    We still don't use the word "reliable."  Basically we make recommendations within different levels of strengths and data.

Page 288

Q    Presumably, you make the best recommendations possible based on the data available, correct?

A    We say -- we just say like:  "This is our recommendation.  This is our strength and recommendation, and this is the data that supports it."

Q    Are you saying that the -- this committee doesn't make an effort to provide the best possible recommendations, they just provide random recommendations with various levels of evidence?

A    That's not what I said.

MS. AMINOLROAYA:  Object to form.

BY MR. PRZYMUSINSKI:

Q    Tell me what you're saying.  Explain that to me.

A    I'm saying that we don't use the words that you're using.

Q    What words do you use?

A    The words that we use are:  We make a recommendation, and then we have a level of strength, a recommendation of like strong or a low-level recommendation.

And then we qualify it with a level of evidence. Like small -- like low-level of evidence or high-quality evidence, and that's how we describe things.

Q    Okay.  Let's look at the right-hand column on this first page of 13 in this document, Doctor, and it's under the section "Etiology of Presentation."

Page 289

The guideline from ASGE states: "Gastric outlet obstruction, GOOO" -- sorry -- "GOO, is caused by mechanical gastroduodenal obstruction or motility disorders and can be divided into three major categories; benign mechanical, malignant mechanical, and motility disorders."

Do you see that?

A    I do.

Q    Do you agree with that statement, Doctor?

A    I think most people would, like since 2011 --

Q    Mm-hmm.

A    -- would use -- would consider gastric outlet obstruction to be like a mechanical obstruction.

Q    And motility disorder would be something different?

A    Yeah.  Because it's like you're really talking about two different things.

Q    Okay.  Let's go down to the third paragraph, where it says:  "Patients with gastric outlet obstruction may present with nausea and vomiting, weight loss, abdominal bloating, early satiety, and/or abnormal discomfort."

Do you see that?

A    I do.

Q    Okay.  "Because of the shared clinical features, it is often difficult to distinguish motility disorders from mechanical obstruction or functional dyspepsia based solely

Page 290

on symptoms."

Do you see that?

A    I do.

Q    Do you agree with that statement?

A    I think the key word is "often."  Like sometimes it is, and sometimes it's not.

Q    Well, often generally refers to frequently, right, not sometimes?

A    Sure.

Q    Do you agree that oftentimes it is difficult to distinguish motility disorders from mechanical and functional dyspepsia?

MS. AMINOLROAYA:  Objection to form.

THE WITNESS:  I think this is a general statement for all diseases that cause nausea and vomiting, from either mechanical obstruction or motility, which is like a large number of diseases.

And when you talk about them as a whole, then you get a lot of different symptoms that are generalizable, which is fine, and then a statement that often is difficult to distinguish between them means when you talk about them as a whole, it can be difficult to distinguish certain ones from the other based on symptoms.  And sometimes not.

Page 291

BY MR. PRZYMUSINSKI:

Q    Okay.  Doctor, one of the things -- if you turn to page 17, under "Motility disorders and Medical therapies," there's a discussion in the first paragraph about glycemic control.

Do you see that?

A    One more thing, it says that vomiting soon after a meal suggests an upper anatomic abnormality, whereas symptoms delayed for several hours after meals characterize gastroparesis.

Q    Where are you reading, Doctor?

A    Yeah.  It's the bottom paragraph, and it's -- it's two sentences up.

Q    "Characterize gastroparesis or a more distal obstruction;" is that what you're reading?

A    So "vomiting soon after a meal suggests upper anatomic abnormality, whereas symptoms delayed for several hours after meals."

Q    Mm-hmm.

A    "Characterized gastroparesis or a more distal obstruction."  So kind of one of those two pathologies.

Q    Okay.

A    So it's interesting that it says that.

Q    That is interesting.

Doctor, can you turn with me to page 17?  Do you

Page 292

see that?  Under the section for "Motility disorders."

There's a paragraph about "Medical therapies."

Do you see that?

A    I do.

Q    Okay.  The second sentence of that paragraph talks about glycemic control.

Do you see that?

A    Yes.

Q    "Glycemic control should be optimized in diabetic patients because hyperglycemia may delay gastric emptying and reduce antral contractility independent of the presence or absence of diabetic neuropathy."

Do you see that?

A    I do.

Q    Talk to me a little bit, because I've seen this a little bit in your presentation, too.

Talk to me about the relationship between hyperglycemia and gastric motility.

A    Gastric motility can vary by -- in the setting of hyperglycemia.  So often when people have like periodic symptoms where they have nausea or vomiting when their blood sugar's really high, like, say, greater than 275 in really one study, or in the setting of like a diabetic ketoacidosis, when it's really high, then we treat their hyperglycemia and then once we treat their hyperglycemia,

Page 293

then their symptoms resolve.

And we might see people that have like episodic nausea potentially related to episodes of hyperglycemia.

Q    So am I understanding correctly that for patients with diabetes, when their blood sugar levels arise to a certain point, they may actually have a slowing in gastric motility?

A    That's true.

Q    And so in those patients, they may then have symptoms like nausea and vomiting relating to that slowing, correct?

A    They may, yes.

Q    Okay.  Would you diagnose a patient with gastroparesis if they had slowing of gastric emptying related to a hyperglycemic episode?

A    No.  Because that episode would be like in a short limited time period.

Q    Okay.  So the distinction you're making is the duration of the symptoms; is that correct?

A    Yes.  So as we discussed before, how we think of chronic nausea vomiting is kind of like prolonged symptoms.

Q    And you wouldn't perform a gastric emptying study in a patient who had a blood sugar level over 200, right, because you may artificially see a delay in gastric emptying that's not actually there, correct?

Page 294

A    Yeah.  And some people use 275.

Q    Okay.

A    But, yeah.  If somebody's got severe hyperglycemia, it would be another example of, I would wait and do the test when their blood sugar's better controlled, just like if they were on the drug that might affect their GI motility.

Q    And that's because that hyperglycemia actually confounds the study, right, it may result in an abnormal finding when actually there's no pathology occurring within the stomach, correct?

A    Correct.  It's like it interferes with the motility of the stomach, so having a factor like that is going to interfere with accuracy of the test.

Q    And that's the same with medication that may delay gastric emptying, they confound the analysis, correct?

A    Yeah.  Similar concept, yeah.

MR. PRZYMUSINSKI:  Okay.  Let's take a break.

THE VIDEOGRAPHER:  We're now going off the record.  The time is 4:31.

(Recess taken at 4:31 p.m.)

THE VIDEOGRAPHER:  We're now back on the record.  The time is 4:37 p.m.

MR. PRZYMUSINSKI:  So I'm going to pass the witness to Plaintiff's counsel.

Page 295

EXAMINATION

BY MS. AMINOLROAYA:

Q    Good afternoon, Dr. Raines.

A    Hi.

Q    We've been going for a long time, but this should be really quick.

Before we broke, you were asked a question about running a gastric emptying study on a patient -- on a patient on a GLP-1 drug.

Do you have any clarification about that?

A    So when we perform gastric emptying studies, optimally we would not have a patient on any drug that affects their GI motility and not do studies on patients with hyperglycemia.  I think that's the optimal way we do these procedures, these tests.

I think doing a study like that on a drug that's known to delay gastric emptying, it's not that it's not useful data, it's that it's kind of not standard to do it that way.

I think patients that have delay on their gastric emptying study, it like further supports that concept that they have gastroparesis as the cause of their symptoms.

Q    Thank you.

Doctor, I want to turn back to your report.  You were asked some questions about page 9, and that's

Page 296

Exhibit 1.

A    Yeah.

Q    And you have a chart on page 9.  What does this chart represent?

A    So what I tried to describe for the Court is common causes of chronic nausea and vomiting on these two tables.  And these include organic pathologies and functional pathologies, in addition to gastroparesis, to kind of describe how patients with these different pathologies present.  Their kind of typical story or presentation, and what testing we might order in those different presentations.

So in some cases, like certain functional disorders, or drug-induced gastroparesis, we make a diagnosis based on history alone, and some disorders, like if I'm suspicious of gastric cancer as the most likely, then I would do an upper endoscopy with biopsy to confirm that suspicion.

Q    But this chart doesn't mean that you need a test to differentiate between gastric cancer and drug-induced gastroparesis in all cases?

A    No.  It's not -- that's not the purpose of the table.  The purpose of the table is to kind of describe different presentations, and often we'll arrive at a most likely diagnosis and then proceed with testing based on the

Page 297

most likely diagnosis.

And in the case of -- if gastric cancer was most likely, a patient that has progressive weight loss over six months with nausea and vomiting and family history of gastric cancer, then I would order an upper endoscopy to confirm that diagnosis.

And in somebody with like a classic presentation with cyclical vomiting syndrome, then I might not do any testing, just diagnose it based on history.

Q    And is that approach, is that similar for pancreatitis, gallstones, gastric ulcers?

A    The diagnostic approach is to kind of review the patient's history of nausea and vomiting and qualify it, and characterize it and really consider what's most likely.

And then testing, or lack thereof, is going to be dictated based on kind of their presentation on what seems likely.

Q    So you would only need to perform testing if you felt that the history or physical alone did not sufficiently suggest drug-induced gastroparesis?

MR. PRZYMUSINSKI:  Objection to form.

Leading.

THE WITNESS:  That's true.  Yeah.

So I would diagnose drug-induced gastroparesis based on history alone in a typical

Page 298

presentation, and the same goes for cannabinoid hyperemesis, cyclical vomiting syndrome, rumination syndrome.

BY MS. AMINOLROAYA:

Q    When would you perform -- when would you perform a test or order a test in a patient with symptoms of nausea and vomiting who were on a GLP-1 drug?

A    It depends on the presentation.  So the classic presentation we described where patients got no previous symptoms, no risk factors for any other pathology, their symptoms are typical or classic for gastroparesis, following set of symptoms correlates closely with like the initiation of the drug, then I would make that diagnosis and remove the drug.

In somebody with a very complicated history, and, say, a history of pre-existing diabetic gastroparesis or pre-existing pancreatitis, I may or may not make a conclusion that the patient's symptoms are related to the GLP-1, especially with lack of temporal correlation, where their symptoms were present before they started the drug.

Q    Thank you.  Turning to a different topic.

You were asked some questions about some rare or differential diagnoses for chronic nausea and vomiting, including median arcuate ligament syndrome, or MALS?

A    Yes.

Page 299

Q    Superior mesenteric artery syndrome.  Do you recall those questions?

A    I do.

Q    And you didn't include these in your chart.  Is that because they are very rare causes of nausea and vomiting?

MR. PRZYMUSINSKI:  Objection to form.

Leading.

THE WITNESS:  I didn't include every possible cause of chronic nausea and vomiting, just because they're too exhaustive, including those rare diseases.

So I included the most common disorders that we see, and kind of described the common disorders we consider and the kind of mechanism by which we evaluate patients by history and physical before we decide on doing tests, or sometimes not doing tests.

So basically including a list of kind of common or prevalent disorders and not -- this list is not meant to be exhaustive for every possible cause of chronic nausea and vomiting.

BY MS. AMINOLROAYA:

Q    And for MALS and superior mesenteric artery syndrome, can you distinguish them from drug-induced gastroparesis?

A    It's not so much that if they didn't have any risk

Page 300

factors for those disorders, or their presentation doesn't fit, I wouldn't consider them.

So it's more like the patient's history is classic for drug-induced gastroparesis and that I'm making that diagnosis and then withdrawing the drug.

You can imagine that it's possible that another diagnosis might be present, but, you know, we go with what's by far most likely and then manage them accordingly.

Q    And would you run tests for these conditions if you suspected them?

A    Of course.  So if there's a specific presentation, say, of SMA syndrome, would be a patient that's had dramatic weight loss, say of 100 pounds over the last couple months, and then has nausea and vomiting after eating, then that story is kind of consistent with or suspicious for SMA syndrome, and we would order a CAT scan as a specific test.

MS. AMINOLROAYA:  Okay.  Thank you, Doctor. No further questions.

MR. PRZYMUSINSKI:  Let's go off the record and give us one minute, please.

THE VIDEOGRAPHER:  We are off the record. The time is 4:46.

(Off the record at 4:46 p.m.)

THE VIDEOGRAPHER:  We're now back on the record.  The time is 4:46 p.m.

Page 301

MR. PRZYMUSINSKI:  We're done.  Thank you. We appreciate it, Doctor.

MR. PREMO-HOPKINS:  Just so the record's clear, no further questions on behalf of Lilly.

THE VIDEOGRAPHER:  This concludes the deposition.  We're now off the record.

The time is 4:47 p.m.

(Deposition concluded at 4:47 p.m.)

— — —

Page 302

CERTIFICATE

I, Jennifer A. Dunn, NCRA Certified Realtime Reporter, NCRA Registered Merit Reporter, Missouri Certified Court Reporter, Certified Shorthand Reporter in California, Illinois and Texas, do hereby certify that prior to the commencement of the examination, DANIEL RAINES, M.D., was  duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place, and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

"/s/JENNIFER A. DUNN"

Certified Realtime Reporter

Registered Merit Reporter

Dated:  January 29, 2025

Page 303

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.

If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 304

ACKNOWLEDGMENT OF DEPONENT

I, DANIEL RAINES, M.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

DANIEL RAINES, M.D.                    DATE

(Reported by:  Jennifer A. Dunn, CRR, RMR, CSR)

Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____

_____

Notary Public

Page 305

ERRATA SHEET

WITNESS:  DANIEL RAINES, M.D.

IN RE:     Glucagon-Like Peptide-1 RAs

           Products Liability Litigation

Upon reading the deposition and before subscribing thereto,

the deponent indicated the following changes should be made:

PAGE   LINE   CHANGE

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

REASON: _____

_____  _____  _____

_____

Witness signature