# EXHIBIT 37D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

IN RE:  GLUCAGON-LIKE      :
PEPTIDE-1 RECEPTOR         :
AGONISTS (GLP             :
-1-RAS) PRODUCTS          :
LIABILITY LITIGATION      :     CIVIL ACTION
                          :     NO. 3094-
                          :     24-md-3094
                          :
THIS DOCUMENT RELATES     :
TO:  ALL ACTIONS/ALL      :
CASES                     :

- CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER

- - -

March 9 2026

- - -

Videotaped deposition of DAVID B. ROSS, M.D., taken pursuant to notice, was held at Motley Rice, 1717 Arch Street, Philadelphia, Pennsylvania, beginning at 9:12 a.m., on the above date, before Michelle L. Ridgway, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public.

- - -

APPEARANCES:


WAGSTAFF & CARTMELL, LLP
BY:  THOMAS ROTTINGHAUS, ESQ.
(In person)
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
816.701.1100
Trottinghaus@wcllp.com
Representing the Plaintiffs


MOTLEY RICE, LLC
BY:  JOSHUA M. NEUMAN, ESQ.
(In person)
1717 Arch Street, Suite 2610
Philadelphia, Pennsylvania 19103
267.267.4735
Jneuman@motleyrice.com
Representing the Plaintiffs


LEVIN, SEDRAN & BERMAN LLP
BY:  FREDERICK S. LONGER, ESQ.
(In person)
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500
Flonger@lfsblaw.com
Representing the Plaintiffs


HAMMERS LAW FIRM
BY:  SARA SCHRAMM, ESQ.
(Zoom)
5555 Glenridge Connector
Suite 975
Atlanta, Georgia 30342
Sara@hammerslawfirm.com
Representing the Plaintiffs

APPEARANCES:   (Cont'd.)


DLA LLP (US)
BY:  KATHERINE W. INSOGNA, ESQ.
(In person)
33 Arch Street
26th Floor
Boston, Massachusetts 02110
617.406.6000
katie.insogna@us.dlapiper.com

        - and -

DLA LLP (US
BY:  TAYLOR DODSON, ESQ.
(In person)
33 Arch Street
Boston, Massachusetts 02110
617.406.6093
Taylor.dodson@us.dlapiper.com

        - and -

DLA LLP (US)
BY:  BRADLEY JENNINGS, ESQ.
(Zoom)
1251 Avenue of the Americas
New York, New York 10020
212.335.4944
bradley.jennings@us.dlapiper.com
Representing the Defendant, Novo
Nordisk

APPEARANCES:  (Cont'd.)


KIRKLAND & ELLIS LLP
BY:  RENEE D. SMITH, ESQ.
(In person)
BY:  MARIE NOTTER, ESQ.
BY:  ELISABETH FRIEDMAYER, ESQ.
(Zoom)
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.2000
Rdsmith@kirkland.com
marie.notter@kirkland.com
Elisabeth.friedmayer@kirkland.com

        - and -

KIRKLAND & ELLIS, LLP
BY:  TIA T. TROUT-PEREZ, ESQ.
(In person)
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.389.5000
ttrout-perez@kirkland.com
Representing the Defendant, Eli
Lilly



ALSO PRESENT:


VIDEOTAPE/LITIGATION TECHNICIAN:

    David Lane in person
     (Hartford Reporting)




                - - -

- - -

I N D E X

- - -

Testimony of:

DAVID B. ROSS, M.D.

By Ms. Smith                13, 328

By Ms. Insogna                 202

By Mr. Rottinghaus             296

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Ross Exhibit 1 | Rule 26 Expert Witness Disclosure 1/9/26 (Eli Lilly) | 14 |
| Ross Exhibit 2 | Supplemental Application Proposing Labeling Changes 1/16/08 | 33 |
| Ross Exhibit 3 | CFR 314.70 Supplements And Other Changes | 34 |
| Ross Exhibit 4 | CFR 314.3 Definitions | 34 |
| Ross Exhibit 5 | 2.7.4 Summary of Clinical Safety Dulaglutide LLY-GLPMDL-00344791-24 | 59 |
| Ross Exhibit 6 | E-mail Thread 2/11/13 Subject, dulaglutide CSS LLY-GLPMDL-10683857-59 | 75 |

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Ross<br>Exhibit 7 | Medical Reviews<br>CDER<br>Application 125469Orig1s000 | 104 |
| Ross<br>Exhibit 8 | Regulatory Response<br>Request for Additional<br>Clinical Analysis<br>LLY-GLPMDL-00396575-87 | 105 |
| Ross<br>Exhibit 9 | Guidance for<br>Industry<br>October 2011<br>Labeling | 125 |
| Ross<br>Exhibit 10 | Policy and<br>Procedures<br>Office of New Drugs | 139 |
| Ross<br>Exhibit 11 | Supplement<br>Approval Fulfillment of<br>Postmarketing Requirement | 155 |
| Ross<br>Exhibit 12 | 2.7.4 Summary of<br>Clinical Safety<br>LLY-GLPMDL-01004357-29 | 156 |

                    - - -

          E X H I B I T S

                    - - -


NO.                DESCRIPTION                PAGE

Ross
Exhibit 13      E-mail Thread              159
                1/22/20
                Subject, Priority
                Confirmed
                LLY-GLPMDL-17085300-27

Ross
Exhibit 14      Highlights of             165
                Prescribing Information
                Trulicity

Ross
Exhibit 15      Pharmacovigilance         171
                Review
                2/25/22
                Novo-GLP-MDL-004636775-93

Ross
Exhibit 16      E-mail Thread             174
                8/27/21
                Subject, Notification
                Of Newly Identified
                LLY-GLPMDL-10152033-37

Ross
Exhibit 17      Safety Labeling           182
                Change Notification
                LLY-GLPMDL-17085976-10

- - -

E X H I B I T S

- - -

NO.                DESCRIPTION                    PAGE

Ross
Exhibit 18      Association of              185
                Glucagon-Like Peptide-1
                Receptor Agonist Use
                (He)

Ross
Exhibit 19      Rule 26                    202
                Expert Disclosure
                1/9/26 (Novo)

Ross
Exhibit 20      Supplement Approval        214
                Novo_GLP_MDL_004077206-37

Ross
Exhibit 21      Association of             224
                Bile Duct and
                Gallbladder
                (Faillie)

Ross
Exhibit 22      Safety Issues with         225
                Glucagon-Like
                (Monami)

Ross
Exhibit 23      CDER                       261
                Medical Reviews
                206321Orig1s000
                Novo_GLP_MDL_000041566-21

Ross
Exhibit 24      Serious Adverse            273
                Events
                Novo_GLP_MDL_08802972

- - -

E X H I B I T S

- - -


NO.                DESCRIPTION                PAGE

Ross
Exhibit 25    E-mail Thread          275
5/28/10
Subject, Pancreatitis
Event
Novo_GLP_MDL_007941508-09


Ross
Exhibit 26    Meta-Analysis          303
Of the Association
(Wang)


Ross
Exhibit 27    Comprehensive          303
Analysis of the
Safety
(Yin)


- - -

- - -

DEPOSITION SUPPORT INDEX

- - -


Direction to Witness Not to Answer

PAGE     LINE   PAGE LINE      PAGE LINE
None.


Request for Production of Documents

PAGE     LINE   PAGE LINE      PAGE LINE
None.


Stipulations

PAGE     LINE   PAGE LINE      PAGE LINE
None.


Questions Marked

PAGE     LINE   PAGE LINE      PAGE LINE
None.

- - -

THE VIDEOGRAPHER:  We are now on the record.  Today's date is March 9, 2026.  Our time on the record is 9:12 a.m.

My name is David Lane, legal videographer for Hartford Reporting & Technology.

This deposition is being held in the matter of GLP-1 receptor products liability litigation.

Our deponent today is Dr. David B. Ross, M.D.

Our counsel will be noted on the stenographic record.

The court reporter today is Michelle Ridgway and will now swear in our witness.

- - -

... DAVID B. ROSS, M.D., having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MS. SMITH:

Q.    Good morning, Dr. Ross.

A.    Good morning.

Q.    We met briefly before, but my name is Renee Smith and I represent Eli Lilly.  You've been retained by experts representing plaintiffs in certain lawsuits against Lilly in this case, correct?

A.    Yes.

Q.    And you've been disclosed as an expert to testify on plaintiffs' behalf; is that correct?

A.    Yes.

Q.    You submitted two expert reports in this case?

A.    Yes.

Q.    One for Lilly and one for Novo?

A.    Yes.

Q.    And we've handed you what's been marked as Exhibit 1, which is the Lilly report.  Do you have that in front

of you?

A.    I do.

Q.    Okay.  And you have a binder in front of you as well.  I think we discussed this before we started, but the binder is -- you have a copy of -- of your expert report in that binder, it's the same report; is that correct?

A.    Only -- just for the sake of making sure that I'm speaking truthfully, I'm just going to very -- not compare them, take a long time to compare them, but I'll -- as best as I can tell from this very brief comparison, they are the same.  If it said different --

Q.    Appreciate that.  If something comes up and you need to let us know, please do.

A.    Yes.

Q.    Okay.  And does the expert report, Exhibit 1 --

(Document marked for identification as Ross Exhibit 1.)

BY MS. SMITH:

Q.    -- that report is complete and accurate; is that correct?

A.    Yes.

Ms. Smith, I apologize. You've certainly done many more of these than I have.  Can -- just, for the sake of my failing memory, if you could -- no, my memory is not failing, just to be clear.

Can you just go over the ground rules in terms of not speaking over -- the sort of usual introduction you give for people who are being deposed for the first time?

MR. NEUMAN:  She -- just answer it, it's okay, just answer the question and she'll get to it.

THE WITNESS:  Oh, I'm sorry, I apologize, I thought that's how -- I'm sorry.

BY MS. SMITH:

Q.    That's all right.  That's okay.

A.    Clearly I do not do enough of these.

Q.    That's all right.  Do you not remember the rules?

A.    I would just like to hear them stated again, so I am very clear at the beginning.

Q.    Okay.  You know you're testifying under oath?

A.    I do.

Q.    Okay.  And you know we have a court reporter here?

A.    I do.

Q.    Who will be taking down everything we say, right?

A.    Yes.

Q.    Okay.  And so if I ask you a question, if you can answer with an audible answer, a yes or a no, as opposed to a nod or a shake of the head?

A.    Yes.

Q.    Okay.  And -- and is there any reason you can't testify truthfully today?

A.    No.

Q.    And if I'm asking a question, I would appreciate it if you would answer my question before asking for any kind of break; is that okay?

A.    Yes.

Q.    Okay.

All right.  Is Exhibit 1 a complete and accurate copy -- excuse me.

Is Exhibit 1, which is your expert report, complete and accurate?

A.    Yes.

Q.    And is -- does Exhibit 1 include the opinions you intend to offer in this case?

A.    Yes.

Q.    Okay.  And does Exhibit 1, and by Exhibit 1, I mean your expert report for Lilly, does Exhibit 1 include the bases for those opinions?

A.    Yes.

Q.    And does your expert report also include a list of the materials that you considered in reaching your opinions and conclusions in this case?

A.    Yes.

Q.    And that's Appendix A; is that right?

A.    Yes.

Q.    And is Appendix A a complete and accurate list of materials you considered in forming your opinions?

A.    Yes.

Q.    You understand that Lilly and Novo make different medicines, right?

A.    Yes.

Q.    And Lilly makes a medicine called Trulicity, you understand that, right?

A.    Yes.

Q.    And sometimes it will be referred to by its active pharmaceutical ingredient, which is dulaglutide; is that correct?

A.    Yes.

Q.    Okay.  And you understand that Lilly also makes two other medicines, Mounjaro and Zepbound?

A.    Yes.

Q.    Okay.  And those have a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

different pharmaceutical ingredient, and that is tirzepatide; is that correct?

A.    Yes.

Q.    And some conditions we're going to be talking about today are gallbladder conditions; is that correct?

A.    That's my understanding.

Q.    Okay.  And one -- one condition is cholelithiasis, am I pronouncing that right?

A.    Yes, you are.

Q.    Okay.  And that's -- is that a kind of fancy word for gallstones?

A.    It -- yes.

Q.    Okay.  And -- and cholecystitis, what does cholecystitis mean?

A.    Cholecystitis is the term -- is a term that refers to inflammation of the gallbladder.

Q.    Is it correct you were retained as an expert on the regulation of prescription drugs?

A.    Yes.

Q.    And that you've been asked to evaluate regulatory questions concerning GLP-1 RA medicines?

A.    Yes.

Q.    And throughout your expert report, which is Exhibit 1, you sometimes use words referring to causation or causal associations; is that correct?

A.    Yes.

Q.    Is it correct that you, when you use those terms in your report, are looking at those from a regulatory perspective?

A.    Yes.

Q.    And is it correct that even from a regulatory perspective, evidence required to conclude that a causal association exists depends on the relevant standards?

A.    I'm sorry, could you just repeat that again.

Q.    Of course.

Is it correct that even from a regulatory perspective, evidence

required to conclude that a causal association exists depends on the relevant standards?

MR. NEUMAN:  Objection. Form.  Foundation.  Vague.

Go ahead.

THE WITNESS:  When you -- I'd ask you to clarify what you mean by the word "standard."

BY MS. SMITH:

Q.    Could you please turn to Exhibit 1, Page 74?

A.    Of course.

Q.    And do you see there's a section, bolded section, Roman Numeral VI, FDA Guidance on Assessing Evidence of Causal Association?

A.    Yes.

Q.    And do you see the first sentence says, "From a regulatory perspective, the evidence required to conclude that a causal association exists depends on the relevant standard"?

A.    Yes.

Q.    Is that a correct statement?

A.    Yes.

Q.    Is it correct that the regulatory standard to include -- the regulatory causation standard for the warnings and precautions section of the label is "reasonable evidence of a causal association"?

A.    Yes.

Q.    And would you agree that if there's information added to a prescription drug label because of reasonable evidence of an association under the FDA regulations, that does not mean the medication caused the adverse event or outcome?

MR. NEUMAN:  Objection to form.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  Say -- to use the language in the regulation, it does not mean necessarily that there's a causal relationship.

BY MS. SMITH:

Q.    Okay.  And would you agree that the standard for adding warnings to a drug label is lower than the level of proof required for robust epidemiological conclusions?

A.    I believe so.

Q.    Is it correct for the purposes of your opinions in this case, you're not offering a causation opinion in terms of a Bradford Hill analysis?

A.    So I'm going to understand Bradford Hill to mean something that's following the principles in Hill's paper that he outlines there.

Not -- some -- the factors that I used to follow the FDA's guidance are obviously related to Bradford Hill, but not in terms of the kind of epidemiologic analysis you would see in a published paper.

Q.    In your report, Exhibit 1, you offer some opinions about the adequacy of the Trulicity label; is that correct?

A.    Yes.

Q.    Is it correct that your report does not disclose opinions regarding the labeling of Mounjaro?

A.    That is correct.

Q.    And is it correct you will not be offering opinions on the adequacy of the labeling of Mounjaro?

A.    Unless I'm asked to, no.

Q.    Okay.  As of today, is it correct you're not planning to offer opinions on the labeling adequacy of Mounjaro?

A.    That is correct.

Q.    And is it also correct you're not going to be offering opinions on the labeling adequacy of Zepbound?

A.    That is correct.

Q.    And you won't be offering opinions that Lilly failed to meet its regulatory obligations with respect to Mounjaro or Zepbound; is that correct?

A.    That is correct.

Q.    Is it correct that your opinion in this case is that the

Trulicity labels should have included warnings regarding acute cholelithiasis, or gallstones, by December 2017?

A. Let me make sure that I'm answering you accurately to what's in my report.

That is correct.

Q. And is it also correct that one of your opinions that there is, that the Trulicity label should have also included a warning regarding acute cholecystitis by December 2017?

A. Yes.

Q. And is it correct that your report is not offering warning adequacy opinions as to any other conditions as opposed to acute cholelithiasis or cholecystitis?

A. That is correct.

Q. Is it correct that your report does not disclose an opinion about the adequacy of Trulicity labels with respect to gallbladder disease after June 2022?

A. That is correct.

Q.    Is it correct that you are not offering an opinion that the Trulicity labels were inadequately warned about gallbladder conditions after June 2022?

A.    That is correct.

Q.    And is it also correct that you're not offering opinions that the Trulicity label was inadequate before December 2017?

A.    I'm sorry, can you repeat the question?

Q.    Of course.

Is it correct you have not disclosed in your report opinions that the Trulicity label should have included different warnings before December of 2017?

A.    So what I said in my report is that it should have been no later than December 2017, which is different from before.

Q.    Is -- is it correct that -- are you offering opinion that there is a date before 2017 when the label should

have been changed?

A.    No.

Q.    Okay.  Is it fair to say that the date you believe -- or you will be opining to a reasonable degree of regulatory certainty the labels should have been changed is December 2017?

A.    I'm sorry, Ms. Smith.  If I -- I just want to make sure I'm answering -- if I ask you to repeat it, I just want to make sure I'm getting the right --

Q.    No, it was not a good question.  It was not a good question.

Is it -- is it correct that you will not be offering an opinion that the Trulicity warning as to gallbladder conditions was inadequate before December of 2017?

MR. NEUMAN:  Objection to form.

Go ahead.

THE WITNESS:  So while I have not expressed that opinion, I haven't opined on that one way

or another.  As I said at the beginning of my report on Page 7, that I reserve the right to amend my opinions and bases as further information and evidence become available.

But to answer your question, at this time, no.

BY MS. SMITH:

Q.    Okay.  You have not amended your opinion, correct?

A.    Correct.

Q.    You have not filed an amendment to this report, correct?

A.    Correct.

Q.    Is it correct that as of today, you will not be offering an opinion that the Trulicity warnings were inadequate before December 2017?

A.    With the caveats that we just discussed, in terms of amending it, that's correct.

Q.    Okay.  You're not -- you haven't amended the report, correct?

A.    Correct.

Q.    I'm asking you, as of today --

A.    Correct.

Q.    -- is it correct you're not offering an opinion that the Trulicity warnings were inadequate before December 2017?

A.    Correct.

Q.    Is it correct that your opinion is that Lilly should have submitted a CBE, or changes being effected, to add warnings about the risk of acute gallbladder disease to the warnings and precaution section?

A.    Yes.

Q.    And is it correct that your opinion is Lilly should have submitted that CBE by December of 2017?

A.    Yes.

Q.    Let's talk a little bit about your work before litigation.  You used to work at the FDA; is that correct?

A.    Yes.

Q.    And is it fair to say that

much of your training and working at the FDA was on-the-job training?

A.     Yes.

Q.     And is it correct that the FDA, in your experience, there could be differences of opinion -- opinions regarding regulatory and scientific issues?

A.     That was the reason I loved working there was -- truly, that is correct.

Q.     And is it correct while you were at the FDA, you did not work at what was the division at the time that was responsible for diabetes or obesity medicines; is that correct?

A.     That is correct.

Q.     And at the time, it would have been called the Division of Metabolic and Endocrine Drug Products; is that correct?

A.     Yes.

Q.     And I think now it's called the Division of Diabetes, Lipid Disorders, and Obesity; is that correct?

A.    That's my understanding.

Q.    While you were at FDA, did you ever serve as a medical reviewer for any diabetes or obesity medicine?

A.    I don't believe so.

Q.    Did any of your work at FDA involve GLP-1 RA medicines at all?

A.    No.

Q.    Were they -- were they even around then?

A.    Well, they were under investigation, but no, not in terms of, as far as I know, any applications.

Q.    And you did not participate in any FDA advisory committees regarding any GLP-1 RA medicines, correct?

A.    That is correct.

Q.    Did you participate in any FDA advisory committees involving diabetes or obesity medicines?

A.    As best I can remember, no.

Q.    Is it correct you left the FDA in 2006?

A.    Yes.

Q.    Is it correct you have not

worked at the FDA for about 20 years?

A.    That's about right.

Q.    And when you left the FDA, that was about seven years before the Trulicity BLA was submitted, correct?

A.    Correct.

Q.    Is it fair to say that things may have changed at the FDA over the past 20 years?

A.    I'd say they've changed just over the last year.  Certainly, that is correct.

Q.    Okay.  And it's correct they've changed -- in addition to the last year, things have changed over the last 20 years, correct?

A.    Yes.

Q.    Is it correct while you were at the FDA, one of your duties and responsibilities as a medical reviewer included review of changes being effected, or a CBE, supplemental new drug applications?

A.    Yes.

Q.    And is it correct that the

CBE regulation was amended in 2008?

A.    It may be.  Off the top of my head, I'm not sure.

Q.    Let's pull Tab 8, please.

(Document marked for identification as Ross Exhibit 2.)

THE WITNESS:  Thank you.

BY MS. SMITH:

Q.    And, Dr. Ross, I've just handed you what's been marked as Exhibit 8, which is a printout of a proposed rule from 2008.  Do you have that?

THE REPORTER:  Is this Exhibit 8 or Exhibit 2?

BY MS. SMITH:

Q.    I'm sorry, I apologize.

Exhibit 2, which is a printout of the proposed rule from 2008; is that correct?

A.    That's what it says on the first page, yes.

Q.    Okay.  Does this refresh your recollection that there was an

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

amendment to the changes being effected rule in 2008?

A.     So this is a proposed rule, not a final rule.  So it's -- I don't know, you know, if this -- again, off the top of my head, there's hundreds of pages, as you well know, and every day in the federal register.

So just looking at this to say, I can't say again, off the top of my head, one way or the other, whether this became a final rule or not.

Q.     Okay.  Let's...

(Document marked for identification as Ross Exhibit 3.)

BY MS. SMITH:

Q.     I've handed you what, for the record, is going to be -- what is marked Exhibit 3, which is a printout of 21 CFR 314.7.  And the other, for the record, is Exhibit 4, which is a printout of 314.3.

(Document marked for identification as Ross

Exhibit 4.)

BY MS. SMITH:

Q.    Do you have those exhibits?

A.    So these are Exhibits 3 and 4.  Yes.

Q.    Okay.  And is it correct that, if we look at Exhibit 3, that in 20 -- 2008, the CBE rule was amended to include this language:  Changes in labeling to reflect newly acquired information, except for changes to the information required in Section 205.7 of this chapter, which must be made under Paragraph B.2.V.C of the section to accomplish any of the following.

And then it has some additional language about what could be used to strengthen a contradiction or a precaution.

Does this refresh your recollection that there was an amendment to the CBE regulations in 2008?

Let me withdraw the question.  Let me short-circuit this.

A.    Okay.

Q.    Do you have -- do you recall whether, when you were at the FDA, was there, in the regulation, a requirement that there be sufficient evidence of a causal association or reasonable evidence of a causal association in the -- in the changes being effected rule?

A.    I don't know.

Q.    Okay.  Do you recall if whether, when you were at the FDA, there was a formal definition for newly acquired information under the changes being effected rule?

A.    I don't know.

Q.    Is it correct that in forming the opinions in your report, though, you are using the current version of the changes being effected rule; is that correct?

A.    I'm using the version of the changes being effected regulations under 314.70, and 201.57, that existed at the time that these labeling changes were under, that are discussed

in my report.

Q.    Is it fair to say that since you've left the FDA, there have also been a change in the FDA Amendments Act of 2007 that allowed the FDA to order a change in a label without going through the misbranding process?

A.    Can you -- I'm sorry, Ms. Smith, can you repeat the question again?

Q.    Yes.

Is it correct that in the FDA Amendments Act of 2007, there was a change that allowed the FDA to change a label without going through the misbranding process?

A.    I'd phrase it a little differently.  That it gave the FDA the authority to order a change.  The manufacturer would actually be the one to change -- the entity that would change the label.

Q.    Okay.  And -- and that's something that sometimes referred to, is it a safety label change notification?

A.    There's two different processes, is the right word; SLC notification and an SLC order.

Q.    And -- and neither of those processes were available to the FDA while you were there; is that correct?

A.    That is correct.

Q.    Have you ever prescribed Trulicity to any patient?

A.    I don't believe so.

Q.    Have you ever prescribed any GLP-1 RA medicine to any patient?

A.    With the understanding that in the system in which I practice, I would not be -- its use in the Veterans Health Administration is restricted to particular providers and particular service lines, so...

But having said that, no.

Q.    Okay.  And have you ever published or presented on GLP-1 RA issues?

A.    No.

Q.    Have you ever published or presented on acute gallbladder disease?

A.    Best of my recollection, no.

Q.    Okay.  Have you ever published or presented on cholelithiasis or cholecystitis?

A.    To the best of my recollection, no.

Q.    Have you communicated, to the best of your recollection, with anyone who worked at the FDA on the Trulicity approvals?

A.    No.

Q.    Are you aware of whether -- of anyone at the FDA who worked on a Trulicity safety information, who you believe didn't have the necessary expertise to evaluate the safety and efficacy of those medications?

MR. NEUMAN:  Objection to form.  Foundation.

Go ahead.

BY MS. SMITH:

Q.    Okay.  Let me -- let me fix the question.

You don't know who at FDA

worked on the Trulicity safety analysis, do you?

A. Not off the top of my head, no.

Q. And is it fair to say you haven't formed an opinion that anyone who worked on the safety analysis lacked the sufficient qualifications to do such analyses?

MR. NEUMAN: Objection to form. Foundation. Calls for speculation.

Go ahead.

THE WITNESS: So, and I'm sorry, I'm not trying to be funny here. There's a double negative --

BY MS. SMITH:

Q. I hear you.

A. -- but if I understand what you're saying is, do I have an opinion that someone who worked on this didn't have -- wasn't qualified. No, I have not formed such an opinion.

Q. It's correct you're not a

gastroenterologist?

A.    That is correct.

Q.    Okay.  You're not an endocrinologist, correct?

A.    That is correct.

Q.    Not an epidemiologist?

A.    My public health practice involves areas of epidemiology related to -- well, involves areas of epidemiology, I'll say.  But I don't hold myself out as an epidemiologist.

Q.    Okay.  And would the same be true for toxicology.  Do you hold yourself out as a toxicologist?

A.    As an expert in toxicology, I'm going to assume when you say that -- no.

Q.    And you do not hold yourself out as an expert on gallbladder disease; is that correct?

A.    That is correct.

Q.    You're not a pharmacologist; is that correct?

A.    That is correct.

Q.    Is it correct you have not

published on a pharmacology of any medicine?

A.    Just one question.  I'm going to refer to my CV, to make sure I'm answering accurately.

Q.    Of course.

A.    But by pharmacologist, do -- I want to make sure -- I assume you mean a clinical, as opposed to an animal pharmacologist?

Q.    Well, have you -- have you published on the pharmacology of any medicine in any -- for anything, animal or human?

MR. NEUMAN:  Hang on one second.  Just so you're not mixing exhibits.

THE WITNESS:  Thank you. Thank you.

The only publication listed on my CV that might have something regarding pharmacology, or gallbladder disease, is that, under Book and Book Chapters, Primary Care of

Veterans with HIV.

But I'm not saying there is. I just -- without looking at that, I honestly couldn't say.

BY MS. SMITH:

Q. Okay. Thank you. I appreciate -- I appreciate you looking. Thank you.

Is it fair to say that any -- any work you may have published on pharmacology wouldn't have involved GLP-1 RA medicines?

A. Yes, that is.

Q. Is it correct, before your expert work in this case, you had not reviewed the literature on the mechanism of action of GLP-1 RA medicines?

A. I may have in the context of continuing medical educations of physician. But in terms of sort of review of literature described here, that is correct.

Q. And is it correct, as of today, you have still not conducted a

comprehensive literature search about the mechanism of action of GLP-1 RA medicines?

MR. NEUMAN:  Objection to form.

Go ahead.

MS. SMITH:  What's the form objection?

MR. NEUMAN:  Well, you said, "Is it correct as of today you still have not conducted a comprehensive literature search about the mechanism of action of GLP-1 RA?"

He did conduct a literature search when drafting his report.  So he was provided literature, so if you can just clarify --

MS. SMITH:  Okay. Okay. That's a totally improper objection.  Let me -- I asked him if he's done it.  He can answer whether he's done it or not.

BY MS. SMITH:

Q.    Is it correct that you have not conducted a comprehensive literature search about the mechanism of action of GLP-1 RAs?

A.    So I'm going to understand your question, the word "comprehensive" to mean a literature search that's focused on mechanism of action for GLP-1.

So, as I describe it, did a broader literature search, but not one focused specifically on mechanism of action.  It's a superset, if you will.

Q.    Okay.  But you -- but is it correct to say you did not do a literature search focused on the mechanism of action of GLP-1 RA medicines?

A.    That's -- I think that's fair.

Q.    Let's talk a little bit about the methodology from your report if we could.

A.    Okay.

Q.    Is it correct that in forming your opinions in this case, you took the same approach as you took while you worked at the FDA?

A.    So, I'm just -- I think I framed -- phrased it slightly differently.  If I can go to my methodology.

Actually, I think that's actually -- what you -- the way you stated -- let me just read this, to make sure we're on the same -- literally on the same page.

Q.    Let me withdraw, because I didn't do the whole sentence.

A.    Okay.

Q.    So let me ask you -- let me ask this since you're on the page.

A.    Okay.

Q.    Is it correct, in forming your opinions in this case, you took the same approach as you took when you were employed as an FDA reviewer charged with making recommendations regarding regulatory decisions and your review of

NDAs and sNDAs?

A. That's correct.

Q. And that approach, some of the things that you looked at in that approach included good review practices; is that correct?

A. Yes.

Q. And also, you looked at something called CDER's Manual of Policy and Procedures, or MAPPs?

A. Yes.

Q. And is it correct that one part of good review practices at the FDA is to conduct accurate review of materials?

A. I believe so.

Q. And is it correct that at the FDA, one of the requirements is to make decisions based on reliable evidence?

A. I don't have the MAPP in front of me, but that sounds correct.

Q. While you were at the FDA, in your practice, would you want to -- did you make decisions based on reliable

evidence?

A.    So, no evidence is 100 percent reliable.  There are different degrees of strength of evidence, I will say.  Reliability is one aspect of that.  Completeness, relevance.

So I think it's fair to say that you may consider -- and I'm speaking about current reviewers as well.  You can consider evidence of different degrees of reliability, different strengths of rigor, if you will.

But you take that into account in forming your conclusions.

Q.    And is it correct, while you were at the FDA, you would want to make sure your decisions were based on as complete information as was available; is that correct?

A.    Yes.

Q.    Is it correct that your opinions in this case, as expressed in Exhibit 1, that all of them are to a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

reasonable degree of medical, scientific, and regulatory certainty?

A.    Yes.

Q.    And is that correct for all of the opinions in your report on Exhibit 1?

A.    Yes.

Q.    Is one of the sources of materials you looked at in forming the opinions, internal company documents and communications?

A.    Yes.

Q.    And in your reliance list, I'll represent to you, I think you cite about 200 internal company documents from Lilly.  Does that sound about right?

A.    Subject to my actually looking at the list, I'll accept it for purposes of your question, yes.

Q.    You realize that Lilly has produced hundreds of thousands of documents in this case?

A.    I have no doubt.

Q.    And in your report, you

don't describe what methodology you used to select which documents to review in forming your opinions; is that correct?

A.    Not explicitly, correct.

Q.    What methodology did you use to select which internal company documents to review to form your opinions?

A.    So let me go back to the first sentence where I describe it.  And I'm happy to describe this in more detail.

So, as an FDA reviewer tasked with answering a question, let's say it's an NDA, do the data show that this product is safe and effective.

And there's actually some disciplines where it's explicitly a question-based review.  Clinical pharmacology is an example.

So, in terms of addressing the questions that I describe at the beginning of my -- or the questions of what data, specific data do I need to answer a particular question.  And that

is the overall framework for what I said I want to look at.

And, for example, I spent some time in my report describing a draft version of the clinical safety summary from Module 2, I believe.

And so, that's an example of something that would address a question of, okay, what data was there and what data did the company have in its possession at a particular point in time, specifically regarding gallbladder disease.

So the focus is, what data on that specific -- from clinical trials, for example, or toxicology, would be germane.  So I'm not going to look at documents that, for example, describe cardiac issues.  That's the first thing.

The second thing, as the FDA reviews which -- I have to say in terms of your earlier question, my qualifications, I was leaving aside anything else I might say about the

adequacy of the label.  I thought this review is done by a competent reviewer and supervised by a competent team leader.

So, if those reviews, to the extent that they could answer a question I have that was -- if it couldn't, then I would seek information that would.  And this is, by analogy to an NDA review, if a reviewer says the data I have in front of me doesn't answer all the questions I have, or there's new questions, they'll go to the company and submit, or they'll ask for the company to respond to an information request.

So the focus was, broadly, what is the universe, or the sub-universe, if you will, of information that will allow me to answer this question, whatever it shows.

Q.    And did -- you didn't have, in your possession, before this litigation, a set of the hundreds of thousands of documents that Lilly

produced, correct?

A.    No.    Actually I believe that I did have access to that.

Q.    Okay.  Did you conduct searches to find documents?  How did -- how did you -- say you had a question on what -- what did Lilly know about gallbladder disease in 2014, for example, okay.  Are you with me?

A.    Yes.

Q.    Okay.  Did you -- to look at internal documents on that issue, how did you find those documents?

A.    So retaining counsel provided access to, I think it was like 3 million documents, over 3 million, through an electronic database.  And I would use that as the basis, as a data source for my searches.

I know one of the things, going back to good review practices, is to say, what your data sources are, as well -- which is the materials considered list, but that's -- that was the mechanism by which I had access.

Q.    And is it correct, did you perform your own searches, or did you have counsel perform searches for you?

A.    Both.

Q.    And do you have -- have you retained the search queries that were used?

A.    Not on my computer.  I don't know if the database, offhand, if they are retained or for what period of time they might be retained.

Q.    And if you had -- suppose you looked at a document and you had a question for follow-up, would you have the ability to do queries and search, search of the database to see -- see if there was something that could help -- help you answer the question?

A.    I did have that ability. Or -- both by doing the search, but also asking retained counsel.

Q.    Did -- is it correct you did not review any depositions for any of the Lilly employees?

A.    That is correct.

Q.    You would expect there would have been depositions of Lilly employees in this case?

A.    I actually did not ask about that, because I did not think that was going to help me answer the questions.

Q.    Is it correct that the FDA has been actively involved in looking at the issue of GLP-1 RAs and acute gallbladder disease since before 2014?

MR. NEUMAN:  Just objection to vague and the word "actively," but go ahead.

BY MS. SMITH:

Q.    I'm sorry.

A.    So --

MR. NEUMAN:  Hang on.

THE WITNESS:  Sorry.

BY MS. SMITH:

Q.    You know what the word "actively" means, don't you?

A.    Actually, in this context, one person's active is another person's passive.  And I'm not trying to be

clever, because I'm not clever.

Q.    Okay.  All right.  Let me -- okay.  I think you are clever.

A.    Thank you.

Q.    Is it correct that the FDA has been involved in the issue of looking at GLP-1 RAs and gallbladder disease since before -- excuse me -- since before Trulicity was improved in 2014?

A.    I'm really -- I am not able to really answer that question, because of the way -- it's this -- the question -- the subquestions that come into my mind, just so you know, are, what does involved mean because it --

Q.    I'll withdraw the question.

A.    Okay.

Q.    Is it correct that prior to the Trulicity approval in 2014, the FDA was aware of potential risk of acute gallbladder disease associated with some GLP-1 RA medicines?

Can you not answer that question?

A.    So --

MR. NEUMAN:    Do you understand the question?

THE WITNESS:    Not -- not completely.

I'm sorry, Ms. Smith, go ahead, you were going to say something.

BY MS. SMITH:

Q.    Okay.  In forming your opinions in this case, one of the things you looked at was materials available to the FDA, correct?

A.    Correct.

Q.    And you cite lots and lots of FDA materials, right?

A.    Yes.

Q.    Are you unable to tell me that as of 2014, that -- whether the FDA was or was not aware of potential risks of gallbladder disease in patients taking GLP-1 RAs?

A.    Well, I think that -- two things.  One is, FDA really means FDA reviewers.  There may have been, I just

don't have the reviews in front of me, so I'm reluctant to say yes or no.

But I do believe there were statements and reviews.

I think the focus of my analysis was, was the sponsor aware.

Q.    Dr. Ross, I'm asking you whether the FDA was aware of 20 -- of potential risk of gallbladder disease before it approved Trulicity in 2014?

A.    So, in terms of the FDA being aware, it would be individual reviewers and the review team.  Not something -- when you say the FDA, that implies the entire organization is aware.  That's what it implies to me.

Q.    Okay.  Would you agree that reviewer -- that people at the FDA who were working on the Trulicity BLA were aware of potential risks of gallbladder disease in patients taking GLP-1 RA medicines?

A.    It's not clear to me what -- to what extent they were aware.

Q.    Were they aware?

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

A.    I can't say yes or no.

MS. SMITH:  Could you --

let's do Tab 14.





Q.    Okay.    And is it correct that on September 11, 2014, there was a meeting of the FDA Endocrinologic and Metabolic Drugs Advisory Committee regarding Saxenda?

A.    Okay.

Q.    Are you aware of that?

A.    I believe -- yes, I believe that's -- I believe I reference that in my report.    But please go ahead.

Q.    Okay.    And is it correct that at that meeting, members of the FDA

specifically looked at the question of the safety profile of liraglutide, a chemical name for Saxenda, including concern for gallbladder-related events?

A.    That's correct.

Q.    And members of the FDA were certainly aware of that meeting before they approved Trulicity's label September 18, 2014?

A.    I'm sorry, can you repeat the date again of the advisory committee?  I know I have it in my report.  Save us some time.

Q.    That's okay.  All right. Okay.  There was an advisory committee meeting September 11, 2014; is that correct?

A.    Yes.

Q.    Okay.  And Trulicity was approved September 18, 2014, correct?

A.    Correct.

Q.    And you would agree that members of the FDA were certainly aware of the gallbladder issues raised at the Saxenda 2014 meeting before they

approved the Trulicity BLA?

A.    Both Lilly and the FDA were aware of them.

Q.    Would you agree the FDA was aware of the gallbladder issues raised at the September 11th advisory committee meeting before the FDA approved Trulicity's BLA on September 18, 2014?

MR. NEUMAN:  Objection. Asked and answered.

Go ahead.

THE WITNESS:  So, with the understanding that the sponsor, not the FDA, has the responsibility of ensuring that the label is accurate and not false or misleading, yes.

BY MS. SMITH:

Q.    Okay.  My question to you is simply, simply this, not what the sponsor knew or didn't know.

I just want to know, is it correct that members -- based on your experience of the FDA, okay, is it correct that the members of the FDA who

approved the Trulicity BLA September 18, 2014, would have been aware of gallbladder issues being discussed at an advisory committee meeting one week before?

MR. NEUMAN:  Objection. Asked and answered.

Go ahead.

THE WITNESS:  So I may very well have been aware, but it was not my responsibility.

I'm just trying to put this in context.

Didn't have the responsibility for ensuring that the label was, as I said, accurate and not false or misleading.

The FDA also didn't have that.  So was it aware of it? Yes.  But just -- the sponsor was the one with the responsibility for doing that. So I would say yes and the sponsor knew as well.

BY MS. SMITH:

Q.    Okay.  I would just -- we can move this along.  You can talk about other things at other times.  We have a limited time.

A.    Okay.

Q.    I just want you to answer: Was the FDA aware, was the FDA aware, when they approved the Trulicity label in September 18, 2014, of the advisory committee meeting that had happened just the week before?

MR. NEUMAN:  Objection. Asked and answered.  Badgering.

Go ahead.

THE WITNESS:  So, let me answer it this way.

Anybody who watched that advisory committee or the proceedings was aware.  Anybody in the -- watched the FDA was part of that.  So to answer your question, given that, was yes.

BY MS. SMITH:

Q.    And the FDA would have had

access to additional materials regarding the Saxenda submission that Lilly wouldn't have had, correct?

A.   Yes.

Q.   Are you aware that some of the same personnel at the FDA reviewed both the Saxenda and Trulicity submissions?

A.   I haven't compared the office/employee list that they have for those, but I wouldn't be surprised.

Q.   Is it fair to say that the FDA would have been aware of data submitted regarding gallbladder disease by the time it approved the Trulicity label in September 2014?

A.   I'm sorry, can you repeat the question?

Q.   You know what, I'll withdraw the question.

A.   Okay.

Q.   Is it correct that when the FDA approved Trulicity in 2014, it knew it was in the same established pharmacologic class as Saxenda?

A.    So, again, both the FDA and the sponsors for that GLP-1 RA and any other GLP-1 RA being developed knew it.

Q.    Okay.  Can you answer my question of, is it correct the FDA was aware in -- before September 2014 that Trulicity and Saxenda were in the same established pharmaceutical class?

A.    The FDA was one of the entities that knew that, was aware of that, yes.

MS. SMITH:  Okay.  We've been going for about an hour, can we take a break?  Is that okay with you?

THE WITNESS:  Oh.  Sure.

THE VIDEOGRAPHER:  All right.  We're going to go off the record.  The time is 10:12 a.m.

(Short break.)

THE VIDEOGRAPHER:  Back on the record.  The time is 10:28 a.m.

BY MS. SMITH:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Would you agree that for Lilly to use the CBE process, it would have had to have newly acquired information?

A.    So understanding newly acquired information to have the broad definition in 314.3, yes.

Q.    Okay.  And -- and I should have clarified that.  Newly -- Lilly would have needed to have newly acquired information as defined in the regulations; is that correct?

A.    Yes.

Q.    And is it correct that newly acquired information must be something that had not previously been submitted to the FDA?

A.    With the understanding that that definition includes new analyses or -- of existing -- of information that's already been submitted.  Again, that's what I meant when I said broad definition.

Q.    Okay.  And is it correct that in your report, you don't disclose

which information was submitted to the FDA -- I'm sorry.

Is it correct that in your report, you don't identify information that was not previously available to the FDA?

MR. NEUMAN: Objection to form. Mischaracterizes the testimony.

Go ahead.

THE WITNESS: I'm sorry, I'm not trying to be snarky.

When you -- a double negative --

BY MS. SMITH:

Q. Okay. Let me -- let me do this.

Do you -- in your report, you list a bunch of information, correct? You list -- you list information that you describe as newly acquired information; is that correct?

A. I don't think -- well, I catalogue the various items that would constitute newly acquired evidence.

Q. And is it correct in that

catalogue, you don't catalogue which information was or was not available to the FDA before it approved Trulicity?

A.    Again, as if going back to -- sorry.  Hang on a second.  Before I answer your question, let me make sure I'm actually answering it.

MS. SMITH:  Can we go off the record for one moment.

THE WITNESS:  Yes.

THE VIDEOGRAPHER:  Going off the record.  The time is 10:31 a.m.

(Short break.)

THE VIDEOGRAPHER:  Back on the record.  10:34 a.m.

BY MS. SMITH:

Q.    Dr. Ross, I apologize for that technological break.

A.    No apologies --

Q.    I think before we went off the record, I asked:  Is it correct that when you were cataloguing the various items, you didn't catalogue which information was or was not available to

the FDA before it approved Trulicity?

A.    Respectfully, I disagree.

Q.    Okay.  You think you -- you identified which information was or was not available to the FDA?

A.    That is correct.

Q.    Where do you think you did that?

A.    So can I turn to Page 35 of my report.

And the information that is in -- started in the section discussion going up to the -- through the end of the first paragraph on Page 40, summarizes one, not the only one, but one of the pieces of newly acquired information, or what would have been newly acquired information, had Lilly submitted it and made the FDA fully informed about the information in those pages.

Q.    Okay.  You believe that the information you're talking about starting on Page 35, through about Page 40, is an example of newly acquired

information that's identified in your report?

A. Yes.

I'm sorry, I'm sorry, before you ask another question, that was not submitted to the FDA.

Q. All right. Well, let's -- let's take a look at that.

At Page 35 of your report, you are discussing some material regarding Dr. David Hyslop, H-Y-S-L-O-P; is that correct?

A. Yes.

Q. Do you know Dr. David Hyslop?

A. I do not.

Q. Do you know anything about him?

A. No.

Q. Would you agree that if you're accusing an individual of making false and misleading conclusions, that that's -- that's a pretty serious accusation?

MR. NEUMAN: Objection.

Argumentive.

Go ahead.

THE WITNESS:  I don't see -- I said the conclusions are false and misleading.  I'm not accusing him of -- I don't see the word accuse or saying this is a crime or anything like that here.

BY MS. SMITH:

Q.    Would you agree calling somebody's conclusions false and misleading is a serious accusation?

MR. NEUMAN:  Same objection.

Go ahead.

▮                ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮                ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮                ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮                     ▬▬▬▬▬▬▬▬▬▬▬▬

▮                ▬▬▬▬▬▬▬▬▬▬▬▬▬

▮                ▬▬▬▬▬

BY MS. SMITH:

Q.    Okay.  And you understand that was an internal document, right?

A.    This was a draft of the Module 2.7.4, intended for submission of the FDA.

Q.    Okay.  But the document you're referring to, beginning at Page 35 of your report, you understand that was an internal document that did not go to the FDA, correct?

A.    Not in that form.

Q.    And is it correct on your report, that in your report you say that these false and misleading conclusions rely primarily on ignoring what is in plain sight?

And that's on -- that's on Page 37, the first full paragraph.

A.      Yes.

Q.      Okay.  And you see, you say, "Dr. Hyslop's report is like comparing a grenade to a pineapple and concluding that the former is harmless because on the surface it looks like the latter."

Did I read that correctly?

A.      You did.

Q.      Okay.  Did you ever make conclusions like that while you were at the FDA?

A.      Did I ever make conclusions like that while I was at the FDA.  Which specifically -- are you talking about the analogy or --

Q.      Yeah, did you ever as a reviewer say that somebody's data is like comparing a grenade to a pineapple?

A.      I don't believe I used that analogy.

Q.      Okay.  And is it correct that in your report, you do not quote from the cover e-mail that goes with this draft?



A.    That is correct.

Q.    Okay.  Did you disclose that in your report?

A.    No.

Q.    And in your report, on Page 37, and this is your actual report.

A.    Yes.

Q.    37?

A.    Yes.

Q.    You note, the second to the last paragraph, "Of greater concern is the strong possibility that this egregiously false and misleading conclusion was incorporated into the final clinical safety summary (CSS), sometimes referred to as a summary of clinical safety and/or integrated summary of safety (ISS) in Trulicity's BLA."

Is that correct, did you state that?

A.    Yes.

Q.    And couldn't you have actually found out whether this statement was actually incorporated into the final CSS?

A.    Couldn't I have found out.

Q.    Let me -- let me -- let me withdraw that.

A.    Okay.

Q.    Did you look at the final

submitted CSS to see if the statement was included?

A.    I'd need to -- if it's not on the materials considered list, then I didn't.

If it is, I did.

I can't tell you off the top of my head.  One thing I will say --

Q.    There's no question, thank you.

A.    Okay.  Sorry.

MS. SMITH:  Could you -- let's do Tab 14.  Exhibit 5.

BY MS. SMITH:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





[REDACTED]

MR. NEUMAN:  Objection to form.  Argumentative.  Calls for speculation.

Go ahead.

THE WITNESS:  My opinion is based on what the sponsor -- by the way, just to be clear, I'm using the word "sponsor" and "applicant" as being synonymous. It's an old habit.

In terms of forming my opinions, whether or not the FDA could add them, I'm sure they could, but that was not germane to my opinion.

The question was, how was this data presented.  And was it presented so that the FDA would be fully informed.

BY MS. SMITH:

Q.    Could there be a value in

separating out different rates for different doses?

A.    Absolutely.

Q.    Okay.  And you're not opining that Lilly was trying to mislead the FDA by putting together that chart, are you?

A.    You mean the question of mens rea, if I am pronouncing that right?  No, I've not expressed an opinion on that.

Q.    And you don't know, FDA may have requested the information to be divided up by doses, correct?

MR. NEUMAN:  Objection to form.  Foundation.  Calls for speculation.

Go ahead.

THE WITNESS:  I -- in terms of reviewing minutes from pre-BLA meetings between the sponsor and FDA, I did not see any indication of that.

If that is the case, I'd certainly be willing to review

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

such a document.

        I certainly did not see
something where they said only
presented as split up and not
pooled.

BY MS. SMITH:







Q.    Before we -- before we went to this other document, we were talking about whether there was a catalogue of what newly acquired information was available -- available to Lilly but not to the FDA.

Do you recall that?

A.    Yes.

MR. NEUMAN:  Are we done with this document?

MS. SMITH:  Yes.

MR. NEUMAN:  Okay.

MS. SMITH:  Thank you.

BY MS. SMITH:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Aside from the document we just discussed regarding Dr. Hyslop, if we go to Page 42, for example.

A.    Yes.

Q.    For the examples of information you cite on that page, is it correct you have not catalogued what was available to Lilly, but not to the FDA?

MR. NEUMAN:  Objection to the form.

I'm confused by the question.  If you understand it, go ahead.

BY MS. SMITH:

Q.    Let me just withdraw it.

Did you -- you list numerous examples, correct, of information in support of your opinions, right?

A.    Yes.

Q.    Is it correct you did not systematically disclose which of these examples were information that was actually even available to Lilly?

A.    It's implicit in what I've

listed, that if you have a -- for example, when Ozempic -- let me -- let me back up.

There are any number of things that are publicly available.  For example, I mention scale trial results being published.  The Saxenda, not only the label, but also the review documents were available, publicly -- under the FDA Amendments Act of 2007, the FDA is required to post a summary basis of approval, sorry, medical team leader memo within 48 hours.

And the full action package, it's been redacted within 30 days, and FDA generally has been very good about that.  So those documents are available.  And --

Q.    So those documents were available to the FDA, correct?

MR. NEUMAN:  Doctor, were you finished with your response?

THE WITNESS:  Yes.

MS. SMITH:  Okay.  Sorry. I didn't mean to interrupt.

BY MS. SMITH:

Q.    Those documents also were available to the FDA, correct?

A.    The FDA, with the understanding FDA is not charged with developing itself newly acquired information, that's correct.

Q.    Okay.  I just -- all I'm asking is, those documents were also available to the FDA; is that correct?

MR. NEUMAN:  Objection to form.  Asked and answered.

Go ahead.

THE WITNESS:  So, again, as I said earlier, the FDA is not responsible for ensuring the accuracy of the label and the sponsor is, nor is the FDA responsible for putting together the kind of information that I've catalogued here --

BY MS. SMITH:

Q.    Doctor, did you understand my question?

A.    I did.

Q.    Okay.  Do you understand I'm only asking you whether those materials also available to the FDA?

A.    With the caveat that that's not relevant to answering my questions, yes.

Q.    Were those materials also available to the FDA?

MR. NEUMAN:  Objection to form.  Asked and answered.

He answered it.  Just because you didn't like the way he answered it doesn't mean it's not an answer.

Go ahead, give it again.

THE WITNESS:  The FDA's awareness of this would not change my conclusions regarding the sponsor's obligation.  But, yes.

BY MS. SMITH:

Q.    You understand that for newly acquired evidence -- excuse me, newly acquired information under the regulation, the issue isn't just what

Lilly knew, right, you understand that?

MR. NEUMAN:  Objection to form.  Argumentative.

Go ahead.

THE WITNESS:  Please go --
I'm sorry, please go ahead.

BY MS. SMITH:

Q.    Is that correct?

A.    I'm not sure I -- first off, can you repeat the question?

Q.    Newly acquired information under the regulations is not just a question of what Lilly knew, correct?

A.    Correct.

Q.    It's also a question of what the FDA had available to it at the time of approval; is that correct?

A.    Yes.

Q.    Are materials -- what's a PSUR?

A.    Periodic -- sorry, periodic safety update report.

Q.    And are one -- one sponsor's, or one applicant's PSURs generally publicly available?

A.    No.

Q.    Do you expect that Lilly would have had available to it, for example, the March 2015 -- I'm sorry, the Novo's July 2013 through June 2014 PSUR?

A.    I'm going to answer that in two parts.  So, first and foremost, I'm aware that I made a mistake on the materials considered list and listed PSURs and others as being publicly available.  That was incorrect, and that was a mistake on -- that was a typo, if you will.

But, anyway, no, I would not have expected that.

Q.    Is it correct that for information before December 2017 -- are you with me on the time?  Before --

A.    Yes.  Yes, I'm listening, honest.

Q.    No, no.  No.

That you do not disclose what information disclosed gallbladder conditions that were a different type of

the kinds of conditions the FDA knew about it before?

MR. NEUMAN:  Objection to form.  Foundation.

If you understand the question, go ahead.

THE WITNESS:  I confess, I am confused.

First, if you could repeat the question, I am listening.

BY MS. SMITH:

Q.    Did you do an analysis in your -- in forming your opinions in this case, of whether any of the information you cite in there showed that any of the gallbladder conditions were of a different type than the FDA was already aware of in 2014?

A.    Other than cholelithiasis and cholecystectomy?  No.

Q.    Okay.  Did you do an analysis of whether any of the information, from before 2017, showed that there was a greater frequency in reporting cholelithiasis that had been

available to the FDA in 2014?

A.    If you could clarify, which drug or drugs that we are talking about --

Q.    For Trulicity.

A.    Okay.

Q.    For Trulicity, you cite materials from before December 2017 in your report; is that correct?

A.    Yes.

Q.    And did you do an analysis, in forming your opinion in this case, of whether any of those materials showed an increase or greater frequency in reporting of acute gallbladder disease?

MR. NEUMAN:  Objection to form.  Foundation.

Go ahead.

THE WITNESS:  You're talking about the periodic safety update report -- then, I'm sorry, what are you --

BY MS. SMITH:

Q.    No, I'm sorry.

For any of the information

that you can -- the information, 2017, before December 2017, did you do an analysis to determine what, if any, of that information showed acute gallbladder disease occurring at a greater frequency than was reported to the FDA when it approved Trulicity?

A.    I'm sorry, Ms. Smith.  I'm trying to parse your question.  I'm not -- please repeat it again.

Q.    Okay.  You understand that in submitting the NDA -- excuse me, the BLA for Trulicity, there was data provided about the incidences of acute gallbladder disease, correct?

A.    Yes.

Q.    We just -- we just looked at some of that; right?

A.    Yes.

Q.    Right.  In forming your opinions in this case, did you do an analysis to see whether any additional information showed a greater frequency of acute gallbladder disease than the FDA considered when it was approving

Trulicity?

MR. NEUMAN:  Objection to form.

Still confused about the question, but go ahead.

THE WITNESS:  So I'm going to apologize.

Was I aware of other information, other than what was presented to the FDA, or did I look at anything that showed a greater incidence?

Yes, it's on Page 35 of my report.

BY MS. SMITH:

Q.    Are you talking about the February '13?

A.    I am.

Q.    Okay.  And what -- in February 2013 -- first of all, that was before the FDA approved Trulicity, correct?

A.    Yes.

Q.    And you think that this is something that shows a greater frequency

than what was reported to the FDA in 2014 -- 2013?

A.    You mean in the NDA submission?

Q.    Correct.

A.    Well, what was actually presented to the FDA, seeing the -- going back to Exhibit 5, this is on Bates number page ending 4922.

So -- I'm sorry.  I'm sorry.  My mistake.

Q.    That's okay.

Q. Hold --

A. I'm sorry --

MR. NEUMAN: Were you -- do you want to -- hold on --

THE WITNESS: I want to --

BY MS. SMITH:

Q. If you're breaking it up in two, I want to --

A. Okay. Go ahead. Sorry.

Q. If you're breaking it up in two, I --

A. You're entitled to do the same. I'm sorry, Ms. Smith. Please go ahead.

Q. You know what, I withdraw the question.

Aside from this February 2013 materials you've discussed here, is there anything else that you've pointed to in your report that you believe shows a greater frequency of acute gallbladder disease than what the

FDA had available when it approved Trulicity in September 2014?

A.    I know you said other than this.  I think we've only been discussing cholelithiasis.  I do want to clarify one thing before I go on to answer your question.

So, in terms of other differences or other data, so if you look on Page 39.

Q.    Yes.

A.    So the table at the top is what was reproduced, I believe, in the medical officer's review, because that's where I got it from.

And I discuss information that was included that was not just

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 102 of 342

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

irrelevant, but misleading, such as P-values.

The appropriate way to look at this, if you wanted to, would be confidence intervals. But let's leave that aside.

But, again, by splitting all this up across the different doses, you -- and not presenting the table that I constructed from these same data at the bottom of the table, that information was also not presented.

Q. And in your report, on that page -- is it Page 30? I think 38. You say that, under that table, Page 38.

A. I'm sorry, am I on 38 or 30 -- I'm sorry, which?

Q. I'm sorry, Page 39.

A. Okay.

Q. Sorry. Page 39. Under the table, you say, "Of note, the table provided by Lilly included calculations of P-values and odds ratios presumably meant to demonstrate that there were no statistically significant differences,

i.e., P-values less than 0.05, between treatment groups with regard to the incidence of adverse events."

Did I read that correctly?

A.    You did.

Q.    And then you say, "Such calculations are extremely misleading, given the absence of any pre-specified testable hypothesis and the relatively small sample size and correspondingly low power to detect uncommon events."

Did I read that correctly?

A.    You did.

Q.    And there you say, you've presumably -- that these materials were included presumably to demonstrate no statistical significance; is that right?

A.    Yes.

Q.    Okay.  And when you say meant to demonstrate, are you saying that Lilly included them presumably to demonstrate there was no statistically significant differences?

A.    If somebody can -- there's a presumption, I didn't say -- well,

it's certain.  But if somebody can show me another plausible explanation, I would be interested in hearing it.

Q.    Okay.  And -- well, did you look to see why they were included?

MR. NEUMAN:  Objection to form.  Vague.

Go ahead.

BY MS. SMITH:

Q.    Did you not understand my question?

Let me repeat.  Let me -- let me rephrase it.

A.    Okay.

Q.    Okay.  All right.  You said you presumed the reason they were included in there, correct?

A.    Yes.

Q.    And did you do any follow-up to find out why those values were actually included in there?

A.    I don't remember seeing an explanation anywhere in the materials from Lilly, such as the -- what we discussed already or the medical

officer's review.

I should say, if my own experience at FDA is relevant here my beginning reviewers would make this mistake all the time. I would say these are meaningless, take them out.

Q. I'm going to hand you Exhibit 7, which is the medical review that I believe you quote from.

(Document marked for identification as Ross Exhibit 7.)

THE WITNESS: Okay.

BY MS. SMITH:

Q. It's probably just an excerpt from it?

A. Okay.

Q. But if you look at what are Page Numbers 200 to 201.

A. Two -- okay.

Q. You know, maybe it's the -- sorry.

A. Go ahead. Go ahead.

Q. Oh, are you there? Okay.

And do you see, is that the

chart that you excerpted in your report?

          A.    I believe so.

          Q.    And you see below the chart, it says, "Source:  Table APP 5.3, Applicant's response to IR dated April 24, 2014."

          A.    Okay.

          Q.    And that -- that was in the document you reviewed, but you didn't -- that wasn't included in your snapshot in the report; is that right?

          A.    Correct.

          Q.    And you see it's referring to IR.  Do you think, based on your FDA experience, that is an information request?

          A.    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





BY MS. SMITH:

Q.    Okay.  And by the way, who was -- who was the medical reviewer at FDA?

A.    According to the page here, it was Dr. Suchitra Balakrishnan.

Q.    Do you know Dr. Suchitra Balakrishnan?

A.    I do not.

Q.    Okay.  Do you have any reason to believe that she is not an experienced reviewer?

A.    I don't know anything about her.

Q.    Any reason to believe that she wouldn't understand what P-values would or would not show?

A.    I don't know anything about her.

Q.    Aside from the February 2013 Hyslop document and this, the document we were just talking about with the chart with the P-values, did you identify any other materials before December 2017 that you believe showed a greater frequency of acute gallbladder events than what the FDA already knew about when it approved Trulicity?

A.    So are we talking about, when we talk about knew about, are we talking about newly acquired information or generically?

Q.    Whatever you call it.  Do you identify in your report any information from before 2017 that you believe showed a greater frequency of acute gallbladder events than what the FDA already knew about when it approved Trulicity in 2014?

A.      Give me a minute just to take a look at my report.

You're asking before 2017; is that correct?

Q.      Before December 2017, yes.

A.      Yes.

Q.      Yes?

A.      Yes.

Q.      Okay.  What?

A.      So as I've said previously, the Saxenda label was publicly available to Lilly.  In terms of newly acquired information, FDA did not receive a submission from Lilly, as far as I can tell, saying Saxenda, GLP-1 RA, same established pharmacologic class as Trulicity, has a documented or demonstrated increased risk that applies -- presumptively applies to all members of that established pharmacologic class.  So they did not have that newly acquired information in the form of a package that -- an analyses, showing that the label should be changed.

Q.    The FDA knew about the Saxenda data when it approved Trulicity's label in September 2014, correct?

A.    Knew about Saxenda.  So, again, going back to -- I don't even want to say newly acquired information. What they were not told by Lilly is we think there should be a warning in the label.  That's the information they didn't have.

Q.    My question to you is, the FDA knew of the Saxenda data and label before it ever approved Trulicity, correct?

A.    Wait a minute.  I'm confused.  We're talking about 2017 or earlier?

Q.    I'm talking about, Trulicity was approved in 2014, correct?

A.    Yeah.

Q.    I was asking you whether there's anything before December 2017 that showed a different -- or, excuse me, a greater frequency in acute

gallblader disease that the FDA didn't already know about when it approved Trulicity in 2014?

A.    Yes.

Q.    What?

A.    It did not have a CBE submitted by Lilly tying all this together.  That would be newly acquired information.  That would meet the definition.

It's -- and, again, I have to emphasize, it's a misconception that newly acquired information is -- excludes anything that has been previously submitted that forms part of a new analysis.  That's just not correct.  And the definition makes that very clear.

Q.    Okay.  Aside from the CBE, the February 2013 document, and the document we looked at regarding P-values, anything else that you are pointing to that you believe shows that before 20 -- before December 2017 Lilly had information that showed a greater

frequency of acute gallbladder disease than what the FDA already knew about when it approved Trulicity in 2014?

A.    Well, apologies, but I believe I've answered that.  I will just say, and that is, if you're talking about a discrete piece of data, that would not be consistent.  That's not the universe of newly acquired information.

So for example, I'm looking at Page 76 of my report, the paper by Monami, which was published in September of 2017, did the FDA know about that? Yes.  But not in the context of a new analyses -- analysis, sorry -- incorporating that.

So, a combination of all of these things that are part of what would form newly acquired information wasn't submitted.

Bottom line is, if Lilly says, we're not going to -- we're not going to pull all these dots together and connect them, because the FDA already has the dots, F -- newly

acquired information is meant to include connecting the dots.

Q.    Is there some analysis connecting the dots that you saw that Lilly did that it did not provide to the FDA before December 2017?

MR. NEUMAN:  Objection to form.  Foundation.

Go ahead.

THE WITNESS:  Do you mean did they actually do an analysis?  They chose not to.

BY MS. SMITH:

Q.    Okay.  Did you do an analysis in forming your opinions in this case regarding whether there was information Lilly had showing a greater severity in gallbladder -- acute gallbladder disease than what the FDA already knew about when it approved the Trulicity label in 2014?

A.    Yes.

Q.    And what is that?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



Q.    And did you look to see what cholecystectomy information the FDA had available to it, when it approved -- excuse me, before it approved the Trulicity label in 2014?

A.    Yeah.

Q.    You looked, and you don't

think they had any cholecystectomy data?

A.    It's not mentioned in the review.

Q.    Have you done a comprehensive -- understanding that I am the one who sent you excerpts.  I'm just saying, aside from the excerpts, have you looked to see whether the FDA had information regarding cholecystectomy before it approved the Trulicity label in 2014?

MR. NEUMAN:  I'll just object to the foundation, because of the excerpts.

But go ahead.

THE WITNESS:  So, from what I looked at, what I saw, I did not see any evidence that they did.  If some -- if that's a statement, I'm happy to look at a document that says yes, they did.

BY MS. SMITH:

Q.    While informing your opinions in this case, didn't you want

to be accurate and careful before you formed them?

A.    Of course.

Q.    Let's talk about reasonable evidence of a causal association.

Is it correct that under the changes being effected rule, to use it, the newly acquired information has to provide a reasonable evidence of a causal association?

A.    Yes.

Q.    Your report discusses something called -- we talked about it a little bit -- EPC, correct?

A.    Yes.

Q.    And that stands for established pharmacological class, correct?

A.    Yes.

Q.    And in your report, at Page 28, the second paragraph under Heading A.  Do you have that?

A.    Yes.

Q.    And do you see, you have a sentence that says, "Data showing" --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

sorry.

Sorry.  Give me one second.

MS. SMITH:  You know what, we've been going about an hour.  Would you guys mind if we took a break?

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:34 a.m.

(Short break.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 11:50 a.m.

BY MS. SMITH:

Q.    Dr. Ross, if you could please turn to your report, Exhibit 1, at Page 28.

A.    Okay.

Q.    And at the very bottom of the page, do you see the paragraph that begins, "However"?

A.    Yes.

Q.    Okay.  And you say, "However, the same pharmacologic similarities mean that drugs in the same

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

EPC frequently have very similar profiles as well."

Did I read that correctly?

A.    Very similar toxicity profiles.

Q.    Oh, I apologize.  Thank you.

And then the next sentence says, "From a regulatory perspective, if the labeling for a particular number of an EPC carries a warning in the W&P section about a particular SAE, because it is a clinically significant hazard for which there is a reasonable evidence of causal association, prudence would dictate assuming that reasonable evidence of a causal association should be inferred for other members of the same EPC class."

Did I read that correctly?

A.    You did.

Q.    And you don't cite any FDA regulation or guidance in support of that statement, do you?

A.    Actually, I do.

David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    What do you say?

A.    So in the paragraph immediately below, which I refer to the guidance for industry on warnings and precautions, et cetera, I quote verbatim from there to say, it appears likely that the adverse reaction -- that a warning on a clinically significant adverse reaction should be -- that it -- placed in the section for a drug if it appears likely that the adverse reaction will occur with the drug based on what is known about the pharmacology, chemistry, or class of the drug, e.g., a drug with a QT prolongation effect would be likely to cause Torsade de Pointes -- sorry, I'm sorry.  I have trouble with that one.  I've taken care of patients with that one.  Torsade de Pointes arrhythmia, even if no cases have yet been seen.

Q.    And do you believe that that guidance means that every time something is in a warning and precautions section of one drug in an

EPC class, that there is necessarily reasonable evidence of a causal association between another drug in the same class?

MR. NEUMAN:  Objection to form.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  So, let me answer that by going -- if I can find it quickly.

The section from 201.57.C.6, and I'm sorry if I -- I may not be able to find it immediately.

But essentially it says, along with, "If a clinically significant hazard has been reasonably associated" -- there's reasonable evidence of causal association, the second thing that it says is, in essence, if it's been seen with the drug in another class.  And that's extremely common.

For example, and I'll give

two examples.  One is antimicrobials.  And that's not an established pharmacologic class issue, but they -- even if you've never seen with a particular antimicrobial case of Clostridium difficile.  Colitis, we know that that can occur with an antimicrobial.

To give you another more specific example, the label for Rybelsus that was approved in June of 2022, the -- there are no new cases reported, there is no change in the incidence that was reported in the label, simply pointed out in the revised labeling that it had been seen with other GLP-1 RAs.

BY MS. SMITH:

Q.    Is it your testimony that in your time at the FDA, that any time there was a condition in warnings and precautions in one drug in a class, that that same condition would be included in

warnings and precautions section of every other drug in that class?

MR. NEUMAN:  Objection to form.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  No, that's not my testimony.

BY MS. SMITH:

Q.  Okay.  Is it your testimony that there is guidance that says that it is -- well, let's look -- let's look at tab -- let's look at the guidance that you're citing.

A.  Okay.

(Document marked for identification as Ross Exhibit 9.)

BY MS. SMITH:

Q.  And I've handed you Exhibit 9 which is the 2011 Guidance For Industry.  Is that what you were citing here?

A.  Yes.

Q.  Okay.  And if you go to Page 5 of that document.

A.    Yes.

Q.    Okay.  And do you see at the top of that document, it says, "There are circumstances in which an adverse reaction that has not been observed with the drug can nonetheless be anticipated to occur"; is that correct?

A.    Yes.

Q.    And then the example you gave is the next example where, if it appears likely the adverse reaction will occur with the drug based on what it has known.

This guidance isn't saying that every time there is a warning in one drug in an EPC, that that constitutes reasonable evidence of a causal association in another drug in the same EPC, right?

MR. NEUMAN:  Objection to form.  Argumentative.

THE WITNESS:  I'm not saying that either.

BY MS. SMITH:

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 128 of 342

Q.    What is the methodology by which you are determining whether a -- whether the inclusion of an event in the warnings and precautions section of one EPC constitutes reasonable evidence of a causal association in another drug in the same EPC?

A.    Okay.  So I just want to clarify something, read from, in terms of what I actually said.

So, Page 29, in the first paragraph, what I say is, "Prudence would dictate" -- I'll explain why -- "assuming the reasonable evidence of a causal association should be inferred for other members of the same EPC."

I do not say, prudence would dictate labeling other members of the same EPC.

Q.    Okay.  That's very helpful.

A.    It's -- it's -- I guess I would say a rebuttable presumption.

So in terms of --

Q.    Where -- where is that rebuttable presumption?

I mean, I'm sorry, what is the basis for you saying that there is a rebuttable presumption?

A.   Oh.   I'm going to -- I'm going to get to that.

So, the definition of an established pharmacologic -- well, start with pharmacologic class, just to break it up a little bit.  So these are drugs, a class of drugs, that share similarities in chemical structure and/or mechanism of action and/or physiologic effect.

And, as I point out on Page 28, and that's maybe actually a little bit above that -- that is the whole reason for develop -- you know, one company such as Novo successfully demonstrates effectiveness for GLP-1 RA. It's certainly reasonable to assume that others may have that.  You don't know for sure, but it's, you know, worth investing a lot of money.

But by the same token, those same similarities mean that these

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 130 of 342
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

products are going to -- products in the same established pharmacologic class -- and by that I mean, pharmacologic class that has a name that is scientifically valid and clinically meaningful -- that they are going to have -- targets for potential toxicity are also going to be similar.

And in this case, you'll have -- it only takes one of those three criteria, chemical structure, mechanism of action, and physiologic effect, to have -- define a pharmacologic class. In this case, we have all three.

So it's a bit -- I won't use an analogy. But if you have those kind of similarities, it's a -- it's a rebuttable presumption. In other words, you might have a member of an EPC that doesn't have those toxicities. But proving that, assuming that it's safe and doesn't have those, flips the requirements of the FDCA on their head. You can't assume safety in a particular domain. You have to demonstrate it.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

And starting -- it's very reasonable, I think prudent I would say -- to say, until we know otherwise, it's safest to assume that it's going to have the same clinically significant hazards.

Q.    Okay.  Is there any regulation or guidance that you can cite that says there is a rebuttable presumption that one member -- if one member of an EPC has an adverse event, that that same adverse event -- excuse me.

Is there any regulation or guidance you can cite that says there is a rebuttable presumption that if one member of a class includes a warning about a particular event, that that same member of the class should have the same warning?

A.    So, again, to clarify, I'm applying the term "rebuttable presumption" to the existence of reasonable evidence, not with regard to labeling.  That's Number 1.

Number 2, again, the guidance says -- well, I don't see the words rebuttable presumption there.  It says the same thing in different language.

Q.    Doesn't it say it's if it appears likely?

A.    Well --

Q.    Does it say it?  Because I just want to know.  Does the guidance say if it appears likely?

A.    Of course.  Of course it does.

Q.    Okay.

MR. NEUMAN:  Just hang on and let her get out the question.

THE WITNESS:  Oh, I'm sorry.  So sorry, sorry, sorry.

BY MS. SMITH:

Q.    No, you're fine.

By the way, that's a -- you know, we'll talk about class labeling a little bit later.

A.    Okay.

Q.     But that's not how FDA approaches class labeling, is it, do they start with a presumption that every -- every event in the warnings and precaution section should be labeled for the whole class?

A.     Again, to repeat what I said earlier, I did not say it's a rebuttable presumption that one member of a class being labeled for a particular clinically significant hazard dictates that all members of the class should be.

It's -- I'm -- you know, it's subject to the principles that are outlined in the warnings and precautions.  So I want to be very, very clear on that.

Q.     Okay.  Is there any guidance or regulation that says that there's a rebuttable presumption that if one member of the class includes a warning for a particular safety issue, that that constitutes reasonable evidence of a causal association for a

David Ross, MD

drug in the other -- another drug in the same class?

A.    Say the question one more time.

Q.    Is there any guidance or regulation that says there's a rebuttable presumption that if one member of a class includes a warning for a particular safety issue, that that constitutes reasonable evidence of a causal association for that same safety issue in another drug in the same class?

A.    So if you -- let me answer that by going to Page 75 of my report.

After the second paragraph, I cite seven factors to be considered. And adding a warning -- or assessing reasonable evidence of causal association -- I'm sorry.  Reasonable evidence of a causal relationship -- it should actually be causal association. Another typo on my part.

Then I list seven factors. And the last one is whether the adverse event is known to be caused by related

David Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

drugs.

So that's in the guidance, and, you know, if you have a warning, and they don't talk about a warning, a drug being labeled with a warning, but if a drug is -- have a warning, by definition, it has to be a clinically significant hazard for which there is a reasonable evidence of causal association or the other criteria for adding something.

So the FDA having a warning is evidence for that drug -- evidence -- reflection of the fact that there is reasonable evidence of causal association.

And then for the related drug that we're talking about, that is decidedly, I think, one element.

But, again, going back to Page 28, I don't say well, it's automatic, it has to be concluded that that's the same -- it's prudent, would dictate --

Q.    I just want to know, based

on your experience at the FDA, were -- well, actually, I withdraw that question.

Q.    By the way, could you go to your report at Page 42, please?

A.    Of course.

Q.    Do you see at the very top?

A.    Yes.

Q.    And you say, "In addition, despite the presence of this Saxenda warning and the data that was available, Eli Lilly should have added a similar warning to the Trulicity label, since its API was in the same established pharmacological class as Saxenda."

Did I read that correctly?

A.    You did.

Q.    Okay.  And, in fact, are you now saying that is not your opinion, that -- that Eli Lilly, even though there's a Saxenda warning, that didn't necessarily mean that Eli Lilly should have added a warning?

A.    No.  That's not a change in my opinion at all.  That was a different

question, respectfully.  I apologize.

Q.    Okay.  So is it your opinion that because there is a Saxenda warning, and available data, Eli Lilly should have added a similar warning to the Trulicity label since its API was in the same established pharmacological class as Saxenda?

A.    So, if I can --

Q.    Is that your -- I just want to know, is that your opinion?

A.    Yes.  If --

Q.    Okay.  Thank you.

Is it correct that you're not offering an opinion on the mechanisms of action of GLP-1 RA drugs based on any specialized training in pharmacology?

A.    Excuse me.

(Brief conversation about Internet connectivity issues.)

THE WITNESS:  So let me answer that question by directing you to Page 4 of my report.  I'm sort of in the

middle of the paragraph there. It reads, and this was my role as a team leader, medical team leader, "I was also responsible for synthesizing findings from the primary" -- excuse me -- "multi-disciplinary review team into an integrative written summary of the basis for the regulatory action taken."

Going on, clause, "I was responsible for understanding and incorporating nonclinical review findings and recommendations into my reviews, including reviews in the disciplines of chemistry, manufacturing, and controls; microbiology; toxicology" -- which includes animal pharmacology -- "biopharmaceutics and clinical pharmacology."

So the answer to your question is, I don't know if

that -- my experience there constitutes specialized training.  I do not claim to be a clinical pharmacologist, I'm not holding myself as an expert.

But my regulatory role, I had to understand the concepts enough to write, review, and sometimes to say, what about the clinical implications of this or this.

BY MS. SMITH:

Q.    And there are people who, for different drugs, specifically will study the mechanism of action, right?

A.    That is correct.

Q.    And you're not one of those people for GLP-1 RA drugs, correct?

A.    Again, I think it -- that's not something that I've published research on, if that's what you're -- or study -- I don't have a Ph.D. or a PharmD.

Q.    And you would agree that not all drugs in the same EPC have the

same risk profiles, correct?

A.    I would agree with that.

Q.    In fact, there are multiple examples with drugs, even with class labeling, where the individual drugs are differentiated from each other, correct?

A.    With regard to the subject of the class labeling, that's correct.

Q.    And if the FDA does class labeling -- let me put it this way.

Does the FDA have certain policies and procedures regarding safety labeling changes?

A.    What -- it has many, but it -- I'm not sure specifically.

Q.    Let's --

MS. SMITH:  Tab 28, please.

(Document marked for identification as Ross Exhibit 10.)

THE WITNESS:  Thank you.

BY MS. SMITH:

Q.    Exhibit 10 is a July 2019 FDA CDER Manual of Policies and

Procedures For Safety Labeling Changes.

A.    Yes.

Q.    Under Section 5.04; is that correct?

A.    Yes.

Q.    And -- and that is the safety labeling change provision?

A.    Okay, and this clarifies it.  Because I was not -- did not understand if you were talking about generically --

Q.    I'm sorry.

A.    You are talking about Section 5.05.04, changes.

Q.    Yes.

A.    Okay.  Thanks.

Q.    And the FDA can use that section to invoke class labeling, right?

A.    Yes.

Q.    And if you go to Page 4 of the guidance, do you see it's got FDAA SLCs for drug classes?

A.    Yes.

Q.    Okay.  And you see that it says, "SCER staff will require FDAAA

SLCs for each drug in a class where an NSI exists that affects the entire class.  The FDAA SLC notification letters will explicitly state which class of the drugs" -- "of drugs the NSI applies to and why the information can be generalized to the entire class."

Did I read that correctly?

A.     You did.

Q.     Is that consistent with your understanding of the FDA's approach to class labeling?

A.     Well, this specifically --

Q.     Yes.

A.     -- under the 5.05.04.

Q.     Yes.

A.     So the scope of this is broader than just class labeling.

Q.     Yeah.  So let me -- let me rephrase the question.

Is it consistent with your understanding of the FDA's practices under 5.05.04, is that consistent with your understanding of how the FDA approaches class labeling?

A.     Respectfully, I can't say yes or no to that, because I think we're conflating two medically overlapping concepts here.  One is SLCs under 5.05.04, and the second is class labeling.

With regard to the former, the guidance on implementing Section 5.05.04 -- by the way, the usual pronunciation, I'm not -- what I use is FDAAA if that helps.

Q.     I like that.

A.     But that guidance for industry, I'm implementing it, I mentioned this in my report, explicitly the FDA anticipates that most labeling changes will be -- not require them, they will be handled by the sponsor through, you know, CBE supplement.

So the FDA -- even if everyone is appropriately labeled in terms of the class, the FDA may choose to do this for -- to issue a safety label change for harmonization.

But there's -- certainly it

doesn't say, if you're a member of a class, you have to wait until FDA does that.

So there's nothing about class labeling that -- labeling the sponsor's actions to label it appropriately that says, no, we can't do it because the FDA has -- there's a statute or regulation saying you can't do it.

Q.    Would you agree that from before the time that the FDA approved Trulicity's BLA, that the FDA did treat certain conditions as a class for labeling purposes?

MR. NEUMAN:  Objection to form.  Vague as to conditions.

THE WITNESS:  So by conditions, do you mean adverse events?

BY MS. SMITH:

Q.    Yeah.  Well, let me rephrase that.  Thank you for the clarification.

Is it correct that before

the FDA ever approved Trulicity's BLA, the FDA didn't treat certain adverse events on a class-wide basis for labeling purposes?

A.    I'm -- it's not as -- I'm just trying to answer you accurately.

It's certainly linked together.  For example, the -- I believe it was the Saxenda review, the reviewer mentioned, I think it -- was that -- it might have been Victoza.  I apologize. I don't have them in front of me, the same API.

But referred to the decision on exenatide about how they are going to label it.

I -- but -- I'm not sure that there was a unified class approach to GLP-1 RAs.

And, again, I am just saying, as I said before, the sponsor has the responsibility regardless -- you know, if the FDA says no, don't do that, we don't want anyone to make any changes, that's obviously different.

But that's not what happened here.

Q.    But is it correct -- I apologize, my question wasn't clear.

Is it correct that at the time of the BLA review for Trulicity, in 2014, the FDA did, in fact, treat certain adverse events across GLP-1 RAs on a class basis?

A.    I don't know the answer to that.

Q.    Is it correct that at the time the FDA approved Trulicity's BLA in 2014, the FDA did not treat gallbladder disease on a class basis?

A.    With the understanding that it had only the information that had been provided to it by the two manufacturers of the GLP-1 RAs that we discussed, sorry, discussed -- discussion -- that are under discussion today, that's correct.

Q.    And by the way, the FDA didn't have only the information from the manufacturers, right; the FDA does its own analysis too, right?

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 147 of 342
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Of the data supplied by the manufacturers, yes.

Q.    Are adverse events in products within the same EPC, can they be signals for another product within the same EPC?

A.    Yes.

Q.    And is -- a signal is not equal to reasonable evidence of a causal association, correct?

A.    It -- it really -- it may be.  I mean, if you're talking about -- think of examples.  If you have a single extraordinarily unusual event, it certainly can be.

Q.    Generally, is it correct under FDA guidance though, after a signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other actions should be taken?

A.    That's correct.

Q.    Has the FDA opened NISS, newly identified safety signal, for -- for GLP-1s that are not necessarily

related to gallbladder disease?

A.    I don't know.

Q.    Do you know if the FDA did open a newly identified safety signal for GLP-1s, did it -- you know, I'm going to withdraw this.  This is going to take too long.  I might go back to it.

Sorry.

By December 2017, had the FDA determined that acute gallbladder adverse events should be treated on a class basis across GLP-1s?

A.    To the best of my knowledge, no.

Q.    Setting aside information from other GLP-1 RAs, is it your opinion there is robust evidence of a causal association between dulaglutide and acute gallbladder disease?

A.    Yes.

Q.    And is there dula-specific data that you're relying on for that opinion?

A.    Yes.

Q.    Is it correct that in your report, you do not identify any study that shows a statistically significant association between dulaglutide and cholelithiasis?

A.    Say that -- I'm sorry, one more time.

Q.    Okay.  Is it correct that -- is it correct that in your report, you do not identify any study that shows a statistically significant association between dulaglutide and cholelithiasis?

David Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



Q.    You're not offering an opinion -- your opinions are that there should have been warnings on cholelithiasis and cholecystectomy, correct, in the Trulicity labels, right?

A.    I did not say specifically what the labeling should be.  I just said acute gallbladder disease.

And I'm sorry, let me go to my actual opinion on this, so I'm citing it accurately, I apologize.

I'm sorry, Ms. Smith.  I will get there, I promise.

The entity I specifically referred to as acute gallbladder disease. So that is on Page 8 of my report, in the one, two, three, four -- fifth bullet.

Q. Aside from that February 2013 document that we've discussed, it is on Page 35, is there any other material in your report that you believe shows a statistically significant association between Trulicity and cholelithiasis?

MR. NEUMAN: At any point?

THE WITNESS: I'm sorry, say -- can you repeat the question again?

BY MS. SMITH:

Q. Aside from the February 2013 document that we discussed, that's on page -- you start on 35. Aside from that document, okay, do you identify in your report any published -- I'm sorry -- any study that shows a statistically significant association between Trulicity and

cholelithiasis at any point?

A.    With the understanding that, A, that is not a requirement to add a warning to a label.  And, B, none of these studies were powered or prospectively designed to study that, no.

Q.    And would the answer be the same for cholecystitis?

A.    Cholecystitis --

Q.    Here, let me just ask it for cholecystitis.

Aside -- do you identify in your report any study that shows a statistically significant association between Trulicity and cholecystitis at any point?

A.    Again, with the understanding that, A, studies were not powered or designed to look at differences between groups on that particular endpoint, and that statistical significance is absolutely not listed or required in the regs, no.

Q.    Let's look at Page 32 of

your report, please.

A.    Okay.

Q.    Are you there?

A.    Yes.

Q.    And it is correct Page 32 is a chart --

A.    I'm sorry.

MR. NEUMAN:  Do you want some water?

THE WITNESS:  No, I'm okay.  Thank you.

I'm sorry.  Please go ahead.

BY MS. SMITH:

Q.    No, no, I'm sorry.  No problem.

Page 32 is a chart that summarizes information about the warnings and precautions and highlights of prescribing information in approved GLP-1 RA labels, correct?

A.    Yes.

Q.    And that chart doesn't include information about what is in or is not in labels in the adverse event

section of the label, right?

A.    The adverse reaction section of the label.

Q.    Sorry.  And that's a different -- warnings and precautions Section 5, right?

A.    Yes.

Q.    And adverse reaction section -- I'm sorry.  Adverse reaction section is Section 6, correct?

A.    Yes.

Q.    And you do look at that in the next chart, next page, please.

A.    Yes.

Q.    And this is Page 33 of your report, Figure 1, "Timeline of GLP-1 RA labeling revisions related to biliary adverse events"; is that correct?

A.    Yes.

Q.    And this chart is not accurate for Trulicity, is it?

A.    I'm sorry, I didn't hear your question.

Q.    This chart is not accurate for Trulicity, is it?

A.    I believe it is.  But I'm certainly willing to see if there's a different timeline that should be used. I certainly would.

Q.    Well, when forming your opinions in this case, did you carefully review what had actually been in the labels for Trulicity with regard to gallbladder disease?

A.    Yes.

Q.    Were you aware that in 2019, Lilly submitted an efficacy supplement for a new indication for Trulicity for cardiovascular disease?

A.    Okay.

Q.    Were you aware of that?

A.    I now am, let me just say that.

Q.    Okay.  Is it fair to say you weren't aware of that when you issued your opinions in this case?

MR. NEUMAN:  Objection. Form.

Go ahead.

THE WITNESS:  So I looked

David Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

at all the supplements, or identified all the supplements focusing on those that were labeling changes related to safety.

(Document marked for identification as Ross Exhibit 11.)

BY MS. SMITH:

Q.    Do you have Exhibit 11 in front of you?

A.    Yes, I do.

Q.    Is Exhibit 11 a February 21, 2020, letter from the FDA regard to a supplemental biologic -- biologics license application dated April 19, 2019?

A.    Yes.

Q.    And the next paragraph says, "The prior approval supplement biologics application provides for the addition of efficacy and safety information to the prescribing information, including a new indication for reduction of major adverse

cardiovascular events in adults with Type 2 diabetes mellitis, based on the clinical data from Study GBDJ, or REWIND, a Phase III cardiovascular outcomes trial."

A.    Yes.

Q.    Did I read that correctly?

A.    Yes.

Q.    And you're familiar with REWIND, right?

A.    I certainly have -- I am aware of it.  But it's a CV outcome study that was the basis for this efficacy supplement.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





                    MS. SMITH:  Tab 45.

                    (Document marked for

        identification as Ross

        Exhibit 13.)

BY MS. SMITH:

        Q.    And you -- oh, sorry, I

didn't hand it to you.  Sorry.

        A.    Thank you.

        Q.    I handed you Exhibit 45,

which is an e-mail from Jennie Walgren

at Lilly --

                    THE REPORTER:  This is not

        Exhibit 45 --

David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. SMITH:  I'm so sorry,

I keep looking at --

BY MS. SMITH:







Case 2:24-md-03094-KSM     Document 691-37     Filed 05/19/26     Page 164 of 342





CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



(Document marked for identification as Ross

Exhibit 14.)

BY MS. SMITH:

Q.    And I'm going to hand you what's Exhibit 14.

A.    Okay.

Q.    Okay.  And this is the February 2020 updated label.  Do you have that in front of you?

A.    Yes.

Q.    And do you see that, in fact, in February 2020, information about cholelithiasis and cholecystitis was added to the adverse reaction section?

A.    I just want to make sure, because I did not see anything at all mentioning the approval letter from FDA about cholelithiasis or cholecystitis.

And I don't see it here under recent major changes.  So I'm just trying to -- so it's certainly not in the highlights of prescribing information.

Q.    Yes, all I want to know is, just to be clear, is it, in fact, in the

approved label in 2020, is there now, for the Trulicity label, a section -- or an entry under Section 6 for cholelithiasis and cholecystitis?

A.    Excuse me.  Yes. There's -- on page -- well, under the second paragraph under Table 2.

MS. SMITH:  I think we are at about another hour if you guys want to --

MR. NEUMAN:  Maybe lunch?

MS. SMITH:  Is that okay?

THE VIDEOGRAPHER:  We're going to go off the record. 12:46 p.m.

-  -  -

(Whereupon, a luncheon recess was taken.)

-  -  -

A F T E R N O O N   P R O C E E D I N G S

-  -  -

THE VIDEOGRAPHER:  Back on the record at 1:30 p.m.

-  -  -

CONTINUED EXAMINATION

- - -

BY MS. SMITH:

Q.    Dr. Ross, if we could go back to your expert report, which is Exhibit 1, please.

A.    Yes.

Q.    And on Page 33.

MR. NEUMAN:    You know, I forgot my binder.    Just one second.

(Brief pause.)

BY MS. SMITH:

Q.    Okay.    Dr. Ross, are you there?

A.    Yes.

Q.    Oh.    Based on our discussion before the break, is it fair to say that the chart on Page 33 is inaccurate with respect to Trulicity?

A.    Only with respect to -- for Trulicity alone, the period from roughly April 2020 and June 2022 should have been -- I know this isn't in color, but it should have been pink, rather than the red.

Q.    In your expert report at Page 11 -- sorry.  Bottom of page 11. You see there's a paragraph that begins, "my methodology"?  Oh, a lot of them start there.  Something about FAERS data, F-A-E-R-S.

A.    Second paragraph from the bottom.

Q.    Yes.  Yes.

A.    Yes.

Q.    Okay.  And is it correct in forming your expert opinions in this case, one of the things you looked at were queries from FAERS database?

A.    Yes.

Q.    And were these queries that you did, they were queries that you did for the purposes of your expert opinion in this case, right?

A.    Yes.

Q.    And they wouldn't have been queries that Lilly had done, say, prior to 2017?

A.    I don't know.

Q.    Okay.  And you would agree

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

that FAERS data has several limitations, right?

A.    As I discussed in the paragraph immediately below, the bulleted list on Page 12, yes.

Q.    And on Page 12, you also discuss a search of the published medical literature.  Do you see that?

A.    Yes.

Q.    And that search, again, is something that you did for the purposes of your expert opinion in this case; is that true?

A.    Yes.

Q.    It's a new analysis that you did for this litigation, correct?

A.    Well, I've never done it before, let's just say that.

Q.    Okay.  And on that same page, you also, in that same paragraph, you refer to adapting the inclusion, exclusion, and causality criteria used in the CDER's Office of Surveillance and Epidemiology, February 25, 2022, Pharmacological Review; is that correct?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Pharmacovigilance.

Q.    Oh, sorry, pharmacovigilance review.

A.    Yes.

Q.    And that -- and that review was -- it's part of an evaluation of a NISS; is that correct?

A.    Yes.

Q.    Let's --

MS. SMITH:  Tab 22.

(Document marked for identification as Ross Exhibit 15.)

BY MS. SMITH:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





MS. SMITH: Let's go -- can we do Tab 48.

BY MS. SMITH:

Q. And vice versa, is it correct some of that information, Novo wouldn't have had access to because it would have been Lilly's confidential information?

A. So, two things. First, I certainly considered in reaching my opinions what the availability of various datasets were to the Novo and Lilly.

Secondly, the commercial confidential information that Lilly and Novo had was -- while it was not available -- was not available to the

other, the majority of information that was -- of data reflected in this report was available to both of them.

Q.    But there's information -- there is just information that the FDA has that individual sponsors or applicants may not have?

A.    I'd agree with that.

Q.    Okay.



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER









David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



Case 2:24md-03094-KSM    Document 691-37    Filed 05/19/26    Page 184 of 342

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

(Document marked for identification as Ross Exhibit 18.)

BY MS. SMITH:

Q.    I've handed you Exhibit 18, which is a copy of the He 2022 article; is that correct?

A.    Yes.

Q.    And this is an article you reviewed and cited in your report; is that correct?

A.    Yes, yes.

Q.    -and if you look at page -- Page 514 of the article, it's the second page when you flip it.

A.    Yes.

Q.    And do you see the second full paragraph where Dr. He says, "Whether increased risk of gallbladder-related diseases, a class effect of GLP-1 RAs has not been established."

Is that what Dr. He says in March of 2022, as well?

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 187 of 342

A.    I'm going to make sure.  So this is the sentence that begins with that clause and then says "and prescribing information for all GLP-1 RA medications does not provide a warning regarding increased risk of gallbladder disorders."

Am I -- that's the --

Q.    Yes.

A.    Okay.

Q.    Yes.  I appreciate.  You're right.  I stopped at the end.

But is it correct that in May 2022, Dr. He stated that whether increased risk of gallbladder-related events is a class effect of GLP-1s has not been established and prescribing information for all GLP-1 RA medications does not provide a warning regarding increased risk of gallbladder disorders.

Is that what Dr. He says?

A.    Yes.

Q.    Before the break we had discussed some questions on severity of gallbladder events.  Do you recall that?

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 188 of 342
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I do.

Q.    And I believe you pointed to the February 2013 document where it referred to certain incidences of cholecystectomies?

A.    Yes.

Q.    And that's gallbladder removal.

Aside from that material, is there anything in your report that provides information regarding the severity of gallbladder events that the FDA did not previously have?

A.    Say the question -- besides which?

Q.    I'm sorry, besides the -- I think you pointed to a February 13th chart that had some information on cholecystectomy.

Do you recall that?

A.    Yes.

Q.    Aside -- aside from that information, is there any other information in your report regarding -- that you rely on to say that there's a

showing of greater severity in reporting gallbladder disease that had not previously been available to the FDA?

A.    Yes.

Q.    Okay.  And what is that?

A.    So at the bottom of Page 76, I describe the findings by He et al.  The -- for context, it's important to mention that the data sources that He et al. used were all publicly available, and available to Lilly, and the methodology was certainly, for a very long time, well within Lilly's resources and capabilities.

Having said that, this finding was GLP-1 RA use was also associated with a higher risk of cholecystectomy compared with control trials.

Q.    And understanding that the caveat of when the source information was available, it's correct that the He article itself was not published until spring of 2022; is that correct?

A.    That is correct.

Q.    In your expert report at Page 8, you have, the third bullet down, "Defendant Eli Lilly's failure to provide adequate warning about the risk of acute gallbladder disease in the GLP-1 RA drug misled prescribers and patients taking Trulicity."

A.    I'm sorry, which page are you on?

Q.    I'm so sorry.  No problem. It's Page 8.

A.    Ah, okay.

Q.    And then it's the third bullet down.

A.    I knew it was one of the earlier pages.

Yes, that is what I -- my opinion.

Q.    And you don't identify any methodology in your report for reaching the conclusion that any inadequate warning actually misled prescribers or patients, do you?

MR. NEUMAN:  Objection to

form.  Mischaracterizes the evidence and testimony.

Go ahead.

THE WITNESS:  So I think the -- what I would say is, on its face, the fact that there was no warning in the Trulicity label until it was compelled by FDA's safety label change notification, until June 10, 2022, meant that prescribers and patients did not see that warning listed either in Section 5 or, even more importantly, in the highlights of prescribing information.

And if you -- if I'm advising a patient on the benefits and the risks of a drug, and I don't know about a clinically significant hazard, that is, by definition, incomplete and it means that it's not true informed consent, the treatment, if I don't know

Case 2:24-md-03094-KSM    Document 691-37    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 192 of 342

about it, I can't tell the patient about it.

So, yes, I would say that's, by definition, misleading.

BY MS. SMITH:

Q.    Is it correct to say that in forming your opinions in this case, you did not conduct a survey of any GLP-1 RA prescribers regarding what they understood about the Trulicity labels?

A.    That was not part of my methodology.

Q.    And is it also correct that in forming the opinions in this case, you did not conduct a survey of any patients regarding what they understood about potential risks of Trulicity?

A.    That is also -- you are correct, that was not part of my methodology.

Q.    And it is also correct that in your report, you cite no data regarding how prescribers may have understood potential risk of gallbladder

disease?

A.    There is no indication that the principles of risk communication for these products differ from -- significantly from the general principles of risk communication, that somehow people could magically infer that this was a clinically significant hazard if it wasn't in there.

So it's not a question of needing data to show that.  By definition, if you haven't disclosed something, that patient or prescriber, the reasonably prudent physician or patient would want to know, you're not providing the information required for informed consent.

Q.    Is it correct that in your report you cite no data regarding how prescribers may have understood potential risk of gallbladder disease?

MR. NEUMAN:  Objection to form.  Asked and answered.

Go ahead again.

THE WITNESS:  I would say

that data are not necessary to
reach that conclusion.
BY MS. SMITH:
     Q.    Regardless of whether you
think it's necessary, relevant or not,
all I'm asking you is, in your report,
is it correct that in your report, you
cite no data regarding how prescribers
may have understood potential risks of
gallbladder disease?
               MR. NEUMAN:  Objection to
     form.  Asked and answered.
               Go ahead.
               THE WITNESS:  I would say
     the same thing, and, no, there
     are not data, because there --
     if you get a negative finding,
     it's not going to tell you
     anything.
BY MS. SMITH:
     Q.    I think on that same page,
Page 8 of your report, at the bottom,
you have a bullet that says, "Defendant
Eli Lilly failed to meet its regulatory
obligation to ensure the labeling for

David B. Ross, MD    Case 2:24-md-03094-KSM    Document 691-37    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26    Page 195 of 342    Page 194

Trulicity was not false or misleading in any particular, because it did not timely submit a CVA, sNDA, or a CBE SBLA to add a statement to the warnings and precautions section of the labeling, warning prescribers and patients about the risk of acute gallbladder disease, with Trulicity after there was reasonable evidence of a causal association with the drug."

Did I read that correctly?

A.    You did.

Q.    Is it your opinion that Lilly's labeling for Trulicity was false and misleading from December 17th to 2022 [sic]?

A.    Well, I don't state that it was false -- excuse me, I want to go back to what I actually said in my opinion.

"Defendant Eli Lilly failed to meet its regulatory obligation to ensure that the labeling for its products was not false or misleading."

That's in the last bullet.

Hartford Reporting & Technology, LLC
www.hartfordreporting.com

I'm just incorporating text from the previous bullet for this regulatory obligation.

Q.    Okay.  So is it fair to say, setting aside whatever is in your report, you do not hold the opinion that Lilly's labeling was false and misleading?

MR. NEUMAN:  Objection. The instruction says as reported.  Go ahead and clarify your understanding.

THE WITNESS:  I'm sorry, I didn't hear the objection.

MR. NEUMAN:  Just to the statement about setting aside your report.

BY MS. SMITH:

Q.    All right.  Let me -- let me -- let me break it up for you.

A.    Please.

Q.    Okay.  I understand what you have in your report.  Okay?

A.    Okay.

Q.    I want to know, sitting

here today, Dr. Ross, speaking --
speaking to everyone here, do you have
an opinion that Lilly's labeling for
Trulicity was false and misleading?

          A.    Yes.

          Q.    Okay.  And when, from what
period of time to what period of time
was it false and misleading?

          A.    From no later than December
of 2017 until June 10, 2022.

          Q.    Okay.  And you recognize
that the FDA has authority to address
false and misleading labeling, right?

          A.    Yes.

          Q.    Okay.  And you agree that
the FDA may not knowingly approve any
labeling it knows to be false and
misleading, right?

          A.    I'm sorry, you said may not
knowingly?

          Q.    Yes.  The FDA would not
knowingly approve labeling that it knows
to be false and misleading, right?

          A.    I believe that's correct.

          Q.    And the Food Drug and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Cosmetic Act prohibits the misbranding of drugs, correct?

A.    It does.

Q.    And violators can be subject to regulatory and enforcement actions, correct?

A.    And criminal enforcement.

Q.    And the medication could be removed from the marketplace, correct?

A.    Yes.

Q.    And based on your review of the record in this case, has the FDA determined that Trulicity's labeling regarding gallbladder conditions was false or misleading?

A.    I don't know of any evidence that it has considered that question.  But, no.

Q.    Aside from your opinion in this litigation, do you know if anyone has determined that Trulicity's labeling with respect to gallbladder conditions was false and misleading?

A.    No.

Q.    On Page 81 of your expert

report, right before the summary section, you have a section that says, "In addition, as discussed above, Eli Lilly's haphazard postmarketing pharmacovigilance and risk management was completely ineffective"; is that correct?

A.    Yes.

Q.    Okay.  And is that an opinion you hold?

A.    It's a basis for my opinion.

Q.    And your -- today, as a -- to a reasonable degree of medical, scientific, and regulatory certainty, you are testifying that you believe Eli Lilly had haphazard pharmacovigilance and risk management?

A.    With regard to acute gallbladder disease, yes.

Q.    Okay.  And is it correct that your report does not cite any standard operating procedures regarding pharmacovigilance at Lilly?

A.    Thank you for being

patient.

Q.    No.  A lot of material.

A.    So based on -- to answer your question, this was implicit in my description of Lilly's postmarketing pharmacovigilance and risk management because of, I'll give you two, I guess I would say data points.

First off, bottom of Page 66, in terms of postmarketing pharmacovigilance, DPV found that Lilly, when they were trying to rebut the safety label change notification, Lilly had not included any of the seven cases that DPV-1 had identified, or published case report by Butler et al.

Secondly, going to the section in which I discuss the various PSURs and PBRERs for dulaglutide, there was no cogent analysis that I could find.  I quote some of the experts here, in pages -- let's see, starting on Page 60 through I think 64 about Lilly, kind of just quoting, but not doing anything, about the evidence that had

been accumulating.

And it's just one example, which I've already said this, they quote the study by He et al.  That was well within Lilly's capabilities, and yet they chose not to do it.  So when I say ineffective risk management, that's what I'm referring to.

Q.    Is it fair to say that for preparing your opinions in this case, you didn't do an analysis of Lilly's pharmacovigilance practices and policies?

A.    Meaning, in the abstract the written -- I'm sure if I had done so, they would have looked fine.  But the proof is actually in the results.

Q.    Okay.  And those results are -- you're referring to a 2022 response --

Okay.  You are aware that there were depositions taken of Lilly witnesses, correct?  You wouldn't have reviewed them, but you -- it wouldn't surprise you that there were Lilly

witnesses deposed?

A.    No.  No.

Q.    And some of those witnesses who were Lilly employees worked on pharmacovigilance issues, that wouldn't surprise you?

A.    Not at all.

Q.    Okay.  But you didn't review those in forming your opinions in this case, correct?

A.    That is correct.

MS. SMITH:  Okay.  I have good news for you.  I think I'm done.

I have bad news for you. Kate has to go.

MR. NEUMAN:  Do you want to go off?

THE VIDEOGRAPHER:  We're going to go off the record at 2:15 p.m.

(Short break.)

THE VIDEOGRAPHER:  And we're back on the record at 2:30 p.m.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

                      -   -   -

                   EXAMINATION

                      -   -   -

BY MS. INSOGNA:

        Q.    Good afternoon, Dr. Ross.
My name is --

        A.    Good morning -- good
afternoon, I'm sorry.

        Q.    It's been a long day.

        A.    Yes.

        Q.    My name is Katie Insogna,
I'm an attorney for Novo Nordisk.  So
I'm going to be asking questions for the
remainder of the deposition.

              I may bounce around because
I think a lot of what you covered with
Ms. Smith earlier is generally
applicable.  But to the extent the
record wasn't totally clear, I might
re-ask a question specific to Novo.

        A.    Understood.

        Q.    Okay.  Thank you.

              So, I'll start and I'll
introduce -- give you what we'll mark as
Exhibit 19.

(Document marked for identification as Ross Exhibit 19.)

BY MS. INSOGNA:

Q.    And this is your expert report in this case as to Novo Nordisk, correct?

A.    Yes.

Q.    Okay, great.  And it includes Appendix A, which is your materials considered list, your CV, Appendix B, and past expert work, Appendix C.

A.    Yes.

Q.    Okay.  Great.  And that report is dated January 9, 2026, correct, that's when you signed it?

A.    Yes.

Q.    And you don't have any changes or corrections to make to this report, correct?

A.    No.

Q.    And does this report contain all the opinions you're planning to offer as to Novo in this case?

A.    Yes.

Q.    And the references in your report and the materials considered list comprise the bases for all of your opinions in this report, correct?

A.    Yes.

Q.    And the materials considered list is a complete and accurate list of materials you considered in reaching your opinions here as to Novo, correct?

A.    With one, well, correction I would say, which Ms. Smith asked about, discussed earlier, which is that I put down publicly available PSURs and that was a mistake.  That was an unintended error.

Q.    Separate and apart from that categorization error, the list of information is a complete and accurate list?

A.    Yes.

Q.    Thank you.

Have you taken any steps to subject the opinions in your report to

peer review?

A.    No.

Q.    We didn't really cover much of your background before.  You're a medical doctor, yes?

A.    Yes.

Q.    Did you learn about cholelithiasis in medical school?

A.    Yes.

Q.    And if cholelithiasis is suspected, what did you learn to do next in medical school if you recall?

A.    In medical school -- we're going back to the 19th century now, I don't -- that was, in all seriousness, that was in the '80s, so I honestly don't remember what, you know, the management -- or the diagnosis or management was exactly what I would have learned then.

It's not too different now. But, first and foremost, it depends on is the patient symptomatic at all.

The first thing you do is take a history and then do physical

examination. And, again, this is where it's going to be different.

Back in the '80s, you would have gotten an ultrasound. Now you'd get a CT scan, get blood work -- some of these things have changed, some haven't.

Q. Okay. This is helpful. Just to summarize then. So when you learned about cholelithiasis previously, you learned that if it was suspected, you would run tests, whether it be blood work or some imaging?

A. That would be some of the things you would do.

Q. Okay. And did you learn about cholecystitis in medical school as well?

A. Yes.

Q. And if cholecystitis was suspected, what were you taught to do?

A. Call a surgeon. No, I'm being -- that is what you would do.

But most cases of cholecystitis are due to gallstones. There are some that are not. But it

would be similar.  You don't know necessarily offhand when you have someone coming in with right quadrant pain, what's causing it.  It could be a number of things.  So you -- the imaging, blood work, a surgeon to say, you know, management.  They would be much more experienced at examining patients with acute abdomens than a general internist.

You know, the imaging studies, even now, back in medical school, it would have been what's called a HIDA scan, they still use those.  So similar in some respects.

One thing that would be different now, which was not available as widely back then, was a procedure called ERCP.  Please don't make me try and pronounce that.  And that can be used to -- use fiberoptic scope to explore the bile ducts and so on.

Q.    Okay.  Thank you very much.

All right.  Now switching gears further.  I think you already

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 209 of 342

answered this as to Lilly, but just so it's clear for the record.  The opinions you're offering in this case are offered from a regulatory perspective, correct?

A.    Yes.

Q.    Okay.  And so your opinions are limited to regulatory matters, specifically whether labels should have been updated sooner pursuant to FDA standards, correct?

A.    That is correct.

Q.    Okay.  And you're not offering opinions on medical or scientific causation, in other words, whether GLP-1s, individually or as a class, actually cause gallbladder disease in a scientific sense?

A.    I would say it overlaps a bit with that.  Go ahead.

Q.    You answered this earlier as to Lilly, so I just want to make clear --

A.    Okay.  Go ahead.

Q.    -- that it's your opinion as to the scope of your opinions on

medical or scientific topics, is the same with respect to Lilly as it is to Novo?

A.    Yes.  Thank you for clarifying that.

Q.    Okay.  Thank you.

You're not offering these opinions in this litigation on behalf of the FDA, correct?

A.    That is correct.

Q.    Okay.  And you are not authorized by the FDA to do such a thing, correct?

A.    Correct.

Q.    And nobody from FDA consulted with you or was involved at all in preparing your expert report, right?

A.    That is correct.

Q.    And you didn't discuss your opinions with anyone from FDA during the process of either preparing your report or since then, correct?

A.    That is correct.

Q.    Okay.  Thank you.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Okay. You are aware that Novo manufactures five different GLP-1 medicines, correct?

A. Yes. Yes.

Q. Okay. And so we're primarily going to be talking about three of them, Ozempic, Rybelsus, and Victoza, but I just want to make clear, I understand the situation with respect to Wegovy and Saxenda first.

A. Okay.

Q. So just to short-circuit this, in your report, on Page 27, you say, "I highlight two GLP-1 RA drugs that adequately warned of the risk of acute gallbladder disease at the time of NDA approval" --

A. I'm sorry, I'm sorry. I'm sorry, what -- okay. First paragraph. Got it. I apologize for interrupting you.

Q. That's okay.

A. I'm just -- I was just trying to find --

Q. That's okay. I can -- I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

can say it again.

A.    Okay.

Q.    "I highlight two GLP-1 RA drugs that adequately warned of the risk of acute gallbladder disease at the time of NDA approval:  Saxenda (liraglutide) and Wegovy (semaglutide)."

Did I read that correctly?

A.    Yes.

Q.    And so to be clear, you're not offering the opinion that either of these labels were ever inadequate from a regulatory perspective?

A.    You mean for Saxenda and Wegovy, that is correct.

Q.    Thank you.  Okay.  So then let's move on to Ozempic.

In December of 2017, Ozempic was approved by FDA as an adjunct to diet and exercise to improve glycemic control in adults with Type 2 diabetes mellitis.  You are aware of that, correct?

A.    Yes.

Q.    Okay.  And it was later

approved for additional indications?

A.    Yes.

Q.    And Ozempic's original FDA approved label describes cholelithiasis in the adverse reaction section, correct?

A.    Correct.

Q.    Specifically it says, "In placebo-controlled trials, cholelithiasis was reported in 1.5 percent and 0.4 percent of patients treated with Ozempic, 0.5 milligrams and 1 milligram respectively. Cholelithiasis was not reported in placebo treated patients," correct?

A.    I don't have the label in front of me, but I'm willing to accept that that's what it, in fact, said.

Q.    Okay.  Thank you.

And FDA reviewed this and other gallbladder data in connection with its approval of Ozempic in December of 2017, correct?

A.    Yes.

Q.    And did you review FDA's

own review of the NDA in reaching your opinions here?

A.     Yes.

Q.     Okay.  It was not on the materials considered list.  So, does that help?

A.     Let me -- I'm --

Q.     It's what you described earlier as the full action package that's available publicly.

A.     Yes.

Q.     Okay.  I'm not sure it would have been necessary, but it was just a question.

A.     No, I understand.

Q.     Okay.

A.     When you said it's not on my materials considered list...

So, if you -- on page -- on the materials considered list, on Page 22 of 25 and this would be in row -- well, really, Rows 599 through 606.

Q.     And so these entries on your materials considered list say, "New

Drug App" --

A.    Right.  And -- I'm sorry.

Q.    Are you intending to communicate that is also the -- what's publicly available on FDA's website simultaneous, or near simultaneous with the approval?

A.    Let me make sure I'm answering you correct.  Again...

Q.    Because elsewhere you cite those reviews specifically.

A.    As -- right.  You know, if I -- so, bottom line, if it's not in the materials considered list -- and I thought I had looked at it.  But if it's not on here, I didn't consider it.

Q.    That's fine.

A.    It's that simple.

Q.    Thank you.

I'm going to hand you what we'll mark as Exhibit 20.

(Document marked for identification as Ross Exhibit 20.)

BY MS. INSOGNA:



Q.    Now, when you're talking about the CBE process, changes being effected process, that's -- it's not -- this is going to be a strange question.

A.    Okay.

Q.    So let me -- let me put it this way.  CBE is not available preapproval, correct?

A.    You mean before the original NDA?

Q.    Yes.

A.    You are correct.

Q.    Okay.  And so at the initial approval, FDA is the final arbiter of the label, correct?

A.    Well, they are always the

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    Page 218 of 342

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

final arbiter.  But I know -- I'm sorry. I understand what you're getting at, yes.

Q.    So FDA is always the final arbiter of the label, but in particular, on the -- at approval, correct?

A.    Correct.

Q.    Okay.  And so on the day of approval, the CBE process was not available to Novo to have changed that label, correct?

A.    Well, there was no label to change.  The only possibility would have been to propose it in the NDA itself.

Q.    Okay.  And so in this case, FDA approved the Ozempic label with the data regarding cholelithiasis in Section 6, in the clinical trials section of the adverse reaction section, correct?

A.    That is correct.

Q.    Without requiring cholelithiasis or cholecystitis in the warnings and precautions section at approval, correct?

A.    You are correct.

Q.    Let's turn to Page 28 of your report.

And in the middle of the page, followed by six bullets, you summarize the support for your opinion that the acute gallbladder disease warning should have been on the Ozempic and Rybelsus labels at the time they entered the market; is that correct?

A.    That is correct.

Q.    And just so we've got the time period right.  Ozempic was approved in December of 2017 and the label was updated in March of 2022, correct?

A.    Yes.

Q.    Okay.  And so, you're not offering the opinion that the label was inadequate as to gallbladder injuries after March of 2022, correct?

A.    That is correct.

Q.    So your opinion is only as to the time period between at approval to March of 2022 as to Ozempic?

A.    Correct.

Q.    Okay.  Thank you.

Okay.  So let's -- let's run through these reasons listed in your opinion for why acute gallbladder disease should have appeared in the warnings and precaution section at the time they entered the market.

Number 1, you say, "Novo Nordisk had incontrovertible evidence of a causal association between Saxenda and acute gallbladder disease from its LEADER randomized controlled trial, which was so robust that when first approved, the labeling for Saxenda carried a warning about gallbladder disease in the warnings and precaution section."

Do you mean the SCALE trial instead of LEADER?

A.    I -- that was -- I don't want to call it a typo, but it was -- what I had meant to say was randomized control trials in the Saxenda NDA.  So that's an error, because LEADER was published in July of 2016, so after

Saxenda's approval.

Q.    Okay.  We'll get to LEADER.

A.    Okay.

Q.    Thank you for that clarification.

And so Saxenda is approved as a medicine for a different indication than Ozempic, correct?

A.    I believe that's correct.

Q.    Okay.  And so, therefore, a different patient population, correct?

A.    Yes.  You're correct.

Q.    Thank you.  And no patients taking semaglutide participated in SCALE, correct?

A.    I believe that's correct.

One thing I want to clarify, and it's just -- consistent with what you had asked about different -- different patient samples, I should say, drawn from similar underlying population, and that -- the answer though is maybe semantics -- your second question is more -- is directly related to that, it's -- you are

correct.  These are different patients from then that -- so I hope that addresses the question.

Q.    Patients in SCALE did not have diabetes, correct?

A.    I believe that's correct.

Q.    The second bullet says, "Novo Nordisk knew that Ozempic and Rybelsus were in the same EPC as Saxenda."

Did I read that first sentence correctly?

A.    You did.

Q.    Okay.  "This was an essential basis for the hypothesis justifying their clinical development, i.e., that they might be effective for the same indication as Saxenda.  However, this also meant they were likely to be associated with the same drug toxicities as Saxenda."

Did I read the rest of that correctly?

A.    You did.

Q.    Okay.  Ozempic and Rybelsus

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

do not have the same indication as Saxenda, correct?

A.    That's what they -- yes, that's correct.

Q.    Okay.  And, again, I think you already covered this, but just to be specific to Novo, you agree that FDA would have been equally aware that Ozempic and Rybelsus were part of the same EPC as liraglutide, correct?

A.    I'm sorry, can you just repeat the question?

Q.    Yeah.

You agree that FDA would have been equally aware that Ozempic and Rybelsus were part of the same EPC as liraglutide?

A.    Ah.  So, you mean -- well, when you say equally, both Novo and FDA, just want to -- yes, that is correct.

Q.    Okay.  Great.

The third bullet says, "Novo Nordisk" -- I'm sorry.

"When two drugs are in the same EPC, there are similarities between

them in at least one of three domains: mechanism of action, physiologic effect, or chemical structure.  Novo Nordisk knew that Ozempic and Rybelsus are similar to Saxenda for all three of these domains, increasing the likelihood of similarity in toxicities."

Did I read that correctly?

A.    You did.

Q.    Okay.  And you agree this holds true for FDA as well, correct?

A.    Yes.

Q.    The fourth bullet says, "Novo Nordisk had NAI establishing that acute gallbladder disease risks associated with Saxenda were associated with its other GLP-1 RAs as well, given these drugs are in the same EPC as Saxenda."

Did I read that correctly?

A.    Yes.

Q.    And then you go on to cite a 2016 study by Faillie in support of that; is that right?

A.    Yes.

Q.    Okay.  And I think we've already talked about NAI at length today.  Just to be clear, NAI is data, analyses, or other information not previously submitted to FDA, correct?

A.    Correct.

Q.    And that's relevant to the CBE standard, right?

A.    Yes.

MS. INSOGNA:  Can I have Tab 11.

(Document marked for identification as Ross Exhibit 21.)

BY MS. INSOGNA:

Q.    I'm going to hand you what we'll mark as Exhibit 21.  This is the Faillie study.

A.    Thank you.

Q.    It was published in the summer of 2016.

A.    Yes.

Q.    So before FDA approved Ozempic or Rybelsus, correct?

A.    Yes.

Q.    And Faillie doesn't include any patients taking Ozempic or Rybelsus, correct?

A.    That is correct.

Q.    Your fifth bullet, back to your report, "In 2017, Monami et al. published the results of a meta-analysis assessing the effect of GLP-1 RAs on pancreatitis, pancreatic cancer, and cholelithiasis.  This meta-analysis analyzed published randomized control trials comparing a GLP-1 RA with placebo or other non-GLP-1 RAs with a duration of treatment of at least 12 weeks in patients with Type 2 diabetes."

Did I read the first half of that correctly?

A.    Yes.

Q.    Okay.

(Document marked for identification as Ross Exhibit 22.)

BY MS. INSOGNA:

Q.    All right.  I'm going to hand you the study just to speed this

along.

          A.    Sure.

          Q.    We'll mark this as Exhibit 22.  Thank you.

          So Monami was a meta-analysis that included data from over 100 RCTs, I think 90 of which reported information on gallbladder, specifically cholelithiasis, correct?

          A.    Yes.

          Q.    Okay.  And there's no data on cholecystitis in this study, correct?

          A.    I believe that's correct.

          Q.    And looking at Table 1, lists the RCTs that were included in this meta-analysis, correct?

          A.    Yes.

          Q.    And only one involved the use of semaglutide, correct?

          A.    Okay.  Well --

          MR. NEUMAN:  It starts on the prior page.

          THE WITNESS:  Yeah, no, no, no, I know.  I was quickly looking through it.  But

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

there's --

BY MS. INSOGNA:

Q.    Take a moment to look at it.

A.    Okay.

Q.    I'm not tricking -- trying to trick you --

A.    Oh, no.  I'm sorry, I hope I didn't --

Q.    No, no, no.  It's totally fine.  I want to make sure you're with me, as we move forward.

A.    That's correct.

Q.    Okay.  And Marso 2016 is the only semaglutide study included as part of this meta-analysis, correct?

A.    Correct.

Q.    And Marso is SUSTAIN 6 --

A.    Yes.

Q.    -- correct?

A.    Yes.

Q.    And that's the preapproval Phase III study as to Ozempic?

A.    Yes.

Q.    And SUSTAIN 6 was reviewed

by FDA in advance of the initial approval of Ozempic, correct?

A.    That is correct.

Q.    And the finding from that trial, so the only trial involving semaglutide in this meta-analysis, was not statistically significant, correct, and that's on Figure 2?

A.    Yes.  That's -- well, there is SUSTAIN 6 and then there's LEADER right below it.

Q.    LEADER did not include patients taking semaglutide --

A.    No, I'm just making sure I'm looking at the right one.

Q.    Yes, you are.  Marso 2016, SUSTAIN 6, is the Figure 3 results for cholelithiasis in this meta-analysis, and the results for this, from this study were not statistically significant because the confidence interval crosses one, correct?

A.    So there's a -- odds ratio is 1.23, but you're correct, it's -- the confidence interval, which is broad, is

the number of patients, crosses one.

Q.    Okay.  Thank you.

And no studies involved oral semaglutide were included in Monami, correct?

A.    It would not have been commercially available at that point.

Q.    So no findings to Rybelsus specifically are in this study, correct?

A.    Correct.

Q.    Nor any findings as to any GLP-1 and cholecystitis, correct?  I think you already said that.

A.    That is correct.

Q.    Okay.  Let's jump back to your report, the sixth bullet, on Page 28.

Okay.  And so the sixth and final bullet here under your reasons for why acute gallbladder should have appeared in the warnings and precautions for Ozempic is, "Data available to Novo Nordisk from the Wegovy trials (another semaglutide developed for weight management) and the decision to place

gallbladder in the warnings and precautions section for that drug on its approval in the 2021 further support my opinion that Novo had ample evidence well before 2022 to add a warning to the labeling about acute gallbladder disease for Ozempic and Rybelsus."

Did I read that correctly?

A.    You did.

Q.    Okay.  And so Wegovy is semaglutide, correct?

A.    Yes.

Q.    But you agree that Wegovy evaluated a different patient population than Ozempic is indicated for, correct?

A.    With the understanding that that does not mean that those toxicities are going to go away, that is correct -- or potential toxicities, I'm sorry.

Q.    Well, the STEP trials were the pivotal trials for Wegovy, correct?

A.    I believe that's correct.

Q.    And the STEP trials were in obese or overweight patients without diabetes, whereas Ozempic is only

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

indicated for patients with diabetes, correct?

A.    Correct.

Q.    Okay.  And you are aware that the dosing regimen for Wegovy and Ozempic is different, correct?

A.    I am aware of that.

Q.    And the dosing regimen for Wegovy and Rybelsus is likewise different, correct?

A.    Yes.

Q.    All right.  In addition, is there any other information, data -- strike that.

What other data, if any, are you relying on to reach your opinion that Ozempic labels should have been approved based on newly acquired evidence, earlier than it was?

A.    So, let me -- if I am going to be succinct, so I state in my opinion -- let me get to my opinion.

So on Page 8, I state, Ozempic and Rybelsus should have appeared in the warnings and precautions

David B. Ross, MD   Case 2:24-md-03094-KSM   Document 691-37   Filed 05/19/26   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

section at the time of approval.  And as you correctly point out, it's meaningless to talk about CBE supplements before you have an approved drug.  But what I said was, it should have been in from the beginning.

And so I've outlined the data here.  The considerations in terms of there being established pharmacologic class are the starting place for that.

The points, very well taken points that you raised about, well, these are different indications, and different patient populations, are correct, but that -- they do not automatically make these potential toxicities go away, if I could use a very related example.

Insulin can cause hypoglycemia if, you know, given to diabetics with excessive sugar.  But if you take -- give it to people who don't have diabetes and give an excessive dose, it will also cause hypoglycemia.  So the population matters, but first and

foremost, it's the established pharmacologic class.

So I outline in my report what the considerations are with regard to Saxenda being the same EPC.

With regard to Ozempic, Wegovy, and Rybelsus, Wegovy had the warning from the beginning. It's the same API in Ozempic and Rybelsus. So, let me stop there.

Q. Okay. And Wegovy was approved in 2021, correct?

A. Yes.

Q. Okay. So -- so the time period during which Ozempic did not have the same warning that you say it should have, as Wegovy, is 2021 to 2022, correct?

A. Well, again, I think it should have been done earlier than that, but certainly with Wegovy, same ingredient. Say, well, for whatever reason it didn't go at the time of approval, and I opine that it should, certainly it goes along with that, and

Wegovy's approval that Novo could have submitted a CBE supplement for both Ozempic and Rybelsus when it had -- was applying for approval for Wegovy.

Because, again, same API warning for Wegovy, it would be logical to submit a CBE for that, for those drugs, based on the data and the warning from Rybelsus, Saxenda, and other data which is already available, for example, the 2016 Faillie analysis.

Q.    I think you said Rybelsus at the end there, and I think you meant Wegovy.

Based on the date and the warning from, you said Rybelsus, Saxenda, and the other data from Faillie.

A.    Yes.  I'm sorry.  I'm -- the other thing, and I apologize for not mentioning this.

The number of patients or the sample size in these applications, if somebody said, well, we didn't see -- and this was, I think, the case for

Rybelsus.

Well, there were no events, and you wouldn't expect to see any events, or certainly wouldn't expect to see any differences between Rybelsus and comparators, given the small size, sample size.

Q.   And you reviewed all of the clinical trial data from Rybelsus RCTs and Ozempic RCTs in reaching your opinions here?

A.   Yes.

Q.   Okay.  You don't cite them in the report, but you do rely on them, is that what you're telling us?

A.   Well, I -- I would say I considered them.

Q.   You considered them.

And did you find them to be not relevant to your opinions, or why are they not cited then, in your report?

A.   By the way, I want to be very clear.  When I use this term, it is not meant to be critical.  It's simply a technical statement.

They are noninformative with regard to this issue, because of the sample size. Sample size is -- and I'm sorry, I don't mean to sound like I'm lecturing -- are generally driven by considerations regarding showing effectiveness.

So when I say they are noninformative, they don't prove or disprove anything about a particular safety adverse event. That's all I'm trying to say.

So it's not that they are not relevant. But negative -- the saying goes, absence of evidence is not evidence of absence. It doesn't mean that they don't -- shouldn't consider them. It just means it doesn't tell me anything one way or the other.

Q. Okay. When data are potentially underpowered, is a way to address that to pull them into a meta-analysis?

A. That's one approach that is widely used.

Q.    Okay.  Did you review any meta-analyses of Ozempic and Rybelsus RCTs in reaching your opinion here?

A.    So as we've discussed, Faillie did not include those.  And, I'm sorry, I'm looking for the citation for Monami.

I think the first paper I can think of, the first published paper, would be the study that was published by -- is it He or He.  I'm not -- you know who I'm talking about.  That might include those, those drugs.

Q.    Okay.  You didn't look for, or find -- strike that.

Did you search for, in the course of your work in putting together your opinions here, for any meta-analyses specific to the RCTs of the semaglutide diabetes medicines?

A.    Excuse me.

Before I answer that, I just want to clarify -- correct something I just said.  So Faillie was actually an observational study.  I was

sticking with Monami in terms of meta-analysis.

No, I didn't.  Again, the studies that I found referencing Monami and He generally consider these as a class.

Q.    And you didn't do any medicine-specific analyses as part of this report?

A.    That's correct.

Q.    So are you aware of the Yin 2021 study that's a meta-analyses -- meta-analysis of the SUSTAIN and PIONEER trials?

A.    If it's on my materials considered list, I --

Q.    It's not.

A.    If it's not, then -- then I'm not aware of it.

Q.    Okay.  That's fine.

And so you didn't review that study in reaching your opinion in this case, correct?

A.    Correct.

Q.    I will tell you in that

study, it included 21 of the randomized trials, 10 PIONEER trials, and 11 SUSTAIN trials for Ozempic and Rybelsus.

You're not aware -- your -- that doesn't ring any bells, you didn't review it, correct?

A.    It --

MR. NEUMAN:  Objection to form and foundation.

Go ahead.

THE WITNESS:  It does not.

BY MS. INSOGNA:



Q. Okay. That's totally fine. That's --

A. Okay. But I'm not trying to -- if I didn't review it, I didn't, but it's --

Q. That's totally fine. Absolutely --

MR. NEUMAN: If at any point you want to look at something to clarify one of your answers, just let me --

THE WITNESS: I mean, I just want to make sure, because I don't want to come back and say oh, yeah, I did look at it.

BY MS. INSOGNA:

Q. I don't think --

A. I don't think so either.

Q. Yeah.

A. Actually you could probably recite it from memory, and I mean that.

At least it was published in 2021, and then both the FDA and I

missed it.

Q.    Fair.  Just to finish out these couple of questions and we'll take a break.

Yin 2021 is not the only meta-analysis you didn't consider. There is another study by Wang titled "Meta-analysis of the association between new hypoglycemic agents and digestive diseases," and it analyzed RCTs from SUSTAIN and PIONEER, and the other semaglutide medicines.

Did you review that in the course of preparing your report opinion here?

A.    Wang doesn't ring a bell. However, just give me one second to look.

So I'll -- I don't recall reviewing that.  I will say that the search strategy, and this is the same as the FDA used, which I've outlined in the bottom of Page 12 of my report, if that -- if when it is indexed on PubMed, if it does not have -- if it doesn't

meet the search criteria under the search string, it wouldn't have come up. But it doesn't ring a bell, to be honest with you.

Q.    Okay.  And just setting that aside, are you aware of any epidemiologic data that reports an increased risk of gallbladder disease and Ozempic specifically?

A.    We're talking about outside the data submitted by Novo to the FDA and the published literature.  I just want to -- in terms of the universe -- well...

Q.    I mean, if any of those also show an increased risk of gallbladder disease in Ozempic, I'd like to know it.

So I'm saying, all the data out there, are you aware of any epidemiologic data that reports an increased risk of gallbladder disease and Ozempic use?

A.    I can't think of any.

Q.    Okay.  And are you aware of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

any epidemiologic data that reports an increased risk of gallbladder disease and Rybelsus?

A.    Actually, not only would I say no, I think one thing I noted was in the label change in Rybelsus in June of 2022, as you pointed out.  The epidemiology -- or the adverse event data in the -- revised in the updated label was the same as it had been in the adverse reaction section.  So it's not like there was new information in the sense of specific to Rybelsus.

It was, however, recognition that it certainly is possible, based on what we discussed earlier with Ms. Smith that -- about -- if it's anticipated -- likely -- likely to be anticipated -- I'm sure I'm not quoting it correctly.

Oh, okay.  So including those that is clinically significant hazards that are expected for the pharmacologic class.

So it wasn't that, oh,

David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

there's some new paper out here.  It was the reasonable evidence of a causal association was the recognition that as a member of the same EPC.

Even if you haven't seen any evidence or any increase in events, that represents reasonable evidence of a causal association.  Ultimately that's why FDA issued the notification.

Q.   So, really, the 2022 updates for Ozempic and Rybelsus were based on that class harmonization effort by FDA on this warning precaution?

MR. NEUMAN:  Objection to form.  Just the use of harmonization is vague.

Go ahead.

THE WITNESS:  Respectfully I would disagree, because I think as I talked about earlier, the DPV-1 analysis, specific -- or the regulatory research, if you will, focused on GLP-1 RAs that did not have a warning.

So it's less class -- I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

mean, it's not like they issued Novo a notification for Wegovy or Saxenda.

BY MS. INSOGNA:

Q. That's fair.

For the GLP-1s for which there was not already a warning or precaution as to gallbladder disease, the -- would you agree that the change in 2022 was for class harmonization, to be harmonized with those that already had the label?

MR. NEUMAN: Same objection.

Go ahead.

THE WITNESS: So, and this -- this is a question of connotation, but harmonization certainly comprises -- I'm sorry -- includes whether there's a warning there or not.

I think harmonization, to my ear at least, suggests well, we want to get the exact phrasing correct, and that's

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

certainly a consideration.

            But, first and foremost, is there a warning there at all. So if you call that harmonization, I understand what you're saying, but I would say it's -- it's -- harmonization, I think, is too broad a term. That's all I would say.

BY MS. INSOGNA:

        Q.    Okay.  That's fair.

            MR. NEUMAN:  Do a break whenever you're ready?

            MS. INSOGNA:  Yeah, that's fine.

            THE VIDEOGRAPHER:  All right.  We're going to go off the record.  The time is 3:20 p.m.

            (Short break.)

            THE VIDEOGRAPHER:  Back on the record.  The time is 3:37.

BY MS. INSOGNA:

        Q.    All right.  We're back on the record.  Thank you again for your

David B. Ross, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

time today.  It's a long day today.

A.   No, thank you for keeping me -- I'm sorry for keeping you late.  Sorry.  Go ahead, please.

Q.   So I think we covered the conversation as to Ozempic and the -- your opinion as to the data supporting the label change for Ozempic.  So I just want to clean up a few items on Rybelsus.

A.   Okay.

Q.   Where we didn't otherwise cover it.

A.   Okay.

Q.   So Rybelsus, otherwise known as oral semaglutide, was approved by FDA in September of 2019, correct?

A.   Yes.

Q.   Okay.  And in the Rybelsus original label, it included cholelithiasis as an adverse reaction, correct?

A.   Excuse me.  Yes.

Q.   Okay.  And specifically in the original label it said, "In placebo

controlled trials, cholelithiasis was reported in 1 percent of patients treated with Rybelsus, 7-milligram. Cholelithiasis was not reported in Rybelsus, 14-milligram or placebo treated patients"; is that correct?

A.     Yes.

Q.     And then as you note in your report, in June of 2022, the Rybelsus label was updated to further include acute gallbladder disease in the warnings and precautions section, correct?

A.     Yes.

THE VIDEOGRAPHER: Dr. Ross, can you put your mic up?

THE WITNESS:  I'm sorry.

THE VIDEOGRAPHER:  That's okay.  Just a little higher.

THE WITNESS:  Is that better?

THE VIDEOGRAPHER:  Yes.

THE WITNESS: Okay.  Thank you.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MS. INSOGNA:

Q.    I know we already covered this as to Ozempic, but at the time of the initial approval in September of 2019, FDA was the final arbiter of the contents of the Rybelsus label, correct?

A.    What was the time frame that you said -- said again?  I'm sorry.

Q.    At the time of approval, in September of 2019, FDA was the final arbiter of the contents of the Rybelsus label, correct?

A.    Correct.

Q.    And FDA approved the Rybelsus label with data on cholelithiasis in the adverse reaction section, correct?

A.    As proposed by the applicant.

Q.    Okay.  FDA did not require cholelithiasis or cholecystitis in the warnings and precautions section of the initial approved label for Rybelsus, correct?

A.    To the best of my

knowledge, FDA neither required nor objected to its inclusion.

Q.    And each time an sNDA is submitted, FDA reviews and presumably then approves a new label, correct?

MR. NEUMAN:  Objection to form.

Go ahead.

THE WITNESS:  It approves -- if we're talking about -- are we talking about a labeling supplement, in general, or just any sNDA requesting a label change?  Just to make sure the scope of...

BY MS. INSOGNA:

Q.    Any sNDA -- when any sNDA requesting a label change is submitted, FDA then reviews and approves that new label, correct?

MR. NEUMAN:  Objection to form.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  With the understanding that its review

and approval takes place before the label could be distributed with the drug, if it's a prior approval supplement that takes place after CBE labeling change is submitted, yes.

BY MS. INSOGNA:

Q.    Thank you.

Just to be clear of the scope of your opinions here, it's your opinion that as of June of 2022, the Rybelsus label adequately warned of the risk of gallbladder disease, correct?

A.    Again, just making sure, from June 10, 2022, onwards, yes.

Q.    Thank you.

Turning back to your report, on page 12 of your Novo report, I just want to be clear, the -- in the bottom paragraph here, you say you adopted FDA's criteria for inclusion, exclusion, causality criteria in reaching your opinion here; is that right?

A.    Yes.

Q.    Okay.  And so you didn't develop your own independent methodology for how you reached your conclusions here?

A.    That is correct.

Q.    And you, also on Page 12, you mention the FAERS data, and that you performed a FAERS -- FAERS queries; is that correct?

A.    Yes.

Q.    Okay.  You didn't summarize the results of those queries in your report, correct?

A.    Correct.

Q.    Okay.  Are you familiar with the concept of a hierarchy of scientific evidence?

A.    Yes.

Q.    Okay.  And is that a concept you apply in your clinical or research practice?

A.    I'm sorry, did you say clinical research practice?

Q.    Clinical, or research practice.

A.    Well, clinical -- both, I would say.

Q.    And you agree, as you stated, on Page 72 of your report, "Randomized controlled trials (RCTs), referred to as Level 1 evidence, provide the highest quality clinical evidence by comparing two or more groups of patients with the same medical condition who are randomly assigned to different treatments"; is that right?

A.    Yes.

Q.    And, again, I think you already covered this earlier, but just to be clear, you didn't perform a Bradford Hill analysis specifically in reaching your opinions here, correct?

A.    So, as I described in, I'm sorry, well, the section that we were in, in terms of the factors which is on Page 71, these are factors that are taken from the FDA's guidance, and so, they are related to Bradford Hill, but it's not -- as I discussed earlier with Ms. Smith, a Bradford Hill analysis in

the sense of the nine factors that Hill -- Bradford Hill described in his paper on this.

Q.    And what page are you looking at, just on --

A.    I'm sorry.  Page 71.

Q.    No, that's okay.  Okay. Great.  Got it.

And this is part of the section titled FDA Guidance on Assessing Evidence of a Causal Association, correct, starting on Page 70?

A.    Yes.

Q.    And so this is, from the beginning A through H, is your summary of how FDA reached its conclusion?

A.    Yes.

Q.    Do you --

A.    I'm sorry, I apologize.  I want to just be clear.

It's -- I'm using that as a framework for both generally and then in the specific case, and that may be essentially the same question, but I just wanted to mention that it's

starting with that general framework and applied.

I'm sorry, please go ahead.

Q. That's helpful. Thank you.

You agree that it's methodologically inappropriate to cherry-pick results that support one hypothesis while rejecting those that are inconsistent with the hypothesis, as a general rule?

MR. NEUMAN: Objection to form. Argumentative. Incomplete hypothetical.

Go ahead.

THE WITNESS: Could you repeat the question? Sorry.

BY MS. INSOGNA:

Q. Sure. Sure.

As a general rule, you agree that it's not appropriate to cherry-pick results supporting a hypothesis while rejecting those that are inconsistent with the hypothesis?

A. I see what you're saying. In other words, starting with the

conclusion and then you're -- I completely agree with that.

Q. Okay. Great.

Again, we already covered this with Lilly, but just to be clear for the record. You didn't review any Novo Nordisk depositions in reaching your opinions in this case, correct?

A. That is correct.

Q. Was your process for reviewing and selecting internal documents the same for Novo, as you described for Lilly previously?

A. Yes.

Q. Did you take notes while you were reviewing those documents?

A. While I was reviewing?

Q. The documents that you had access to on the electronic database.

A. Not in a -- incorporated my thoughts into the drafts as I went along, but not -- not separate notes, no.

Q. Great.

Okay. Let's move on to

Victoza then.  We talked about Ozempic, we talked about Saxenda.  Let's talk about Victoza for this next section here then.

A.    Okay.

Q.    And so in 2010, Victoza was approved as an adjunct diet and exercise to improve glycemic control in adults with Type 2 diabetes; is that right?

A.    Yes.

Q.    Okay.  And I think it's clear from your report, but I just want to make sure, it's not your opinion that the data at the time of FDA's 2010 approval of Victoza demonstrated reasonable evidence of an association with gallbladder disease warranting labeling at that time, correct?

A.    That's not one of the opinions expressed.

Q.    Okay.  Just so that we are guard railing our conversation for Victoza.

A.    Okay.  I understand.

Q.    On the back end, you agree

Case 2:24-md-03094-KSM    Document 691-37    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

that as of August 2017, the Victoza label adequately warned of gallbladder risks, correct?

A.    I'm sorry.

Q.    Nope.  That's okay.

Page 38 of your report.

A.    Thank you.

No, I just did not mean to seem discourteous when I'm going like this.

Q.    No.

A.    Page 30 -- ah.

That is correct.

Q.    And on Page 8 under summary of your opinions, you say for Victoza in the middle, the sub-bullet, "a CBE sNDA should have been submitted no later than December of 2014.  Defendant Novo Nordisk possessed sufficient evidence as to the risk of acute gallbladder disease from its clinical trials with Saxenda, and should have sought to add acute gallbladder disease to its warnings and precautions section for Victoza at the same time that it did so for Saxenda."

Did I read that correctly?

A.    You did.

Q.    Okay.  So the period of time that we are talking about for the Victoza label that you're saying the warnings and precautions should have included gallbladder disease is 20 -- December 2014 to August of 2017; is that right?

A.    In terms of the -- no later than, as I said.  It's -- in other words, the evidence that I examined showed that by that point, it should have been done.  If somebody said, well, let's do it before that, I'm not saying that would have been wrong, but clearly by December of 2014 to August of 2017, that's the period that I'm talking about.

Q.    Got it.  So for purposes of your opinion here, you're saying that as of December 2014, through August of 2017, the Victoza label was inadequate as to gallbladder disease warnings, correct?

A.    Yes.

Q.    Okay.  You're not expressly putting forth the opinion in this report that before December 2014, it was inadequate as to gallbladder disease?

A.    I'm silent on that issue.

Q.    Fair.  Totally fair.

Okay.  So then let's jump to 2014 then.  And look at FDA's medical review of Saxenda at the time of its approval and talk about the reason behind that warning.

In 2014, FDA did a clinical review of liraglutide data, correct?

A.    Yes.

Q.    And did you -- did you review FDA's summary of its review in reaching your opinions here?

A.    Well, I certainly reviewed the medical officer's review.

Q.    Okay.  And do you believe that's in your materials considered list?

A.    I -- if it's not, it should be.  And I'm really -- I'd have to -- I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

believe that it is.  Let me -- and if it's not, you know, rather than go through this, I believe that it is. It's certainly something that I considered.  And I believe that I cite it -- if it's not in the materials considered list, it's cited as a footnote in the document.

Go ahead.  I'm not -- I'm sorry, I'm not trying to give you a hard time.

Q.    I'm trying to decide whether it's worth it to have you look at the list.  I don't think it's in there, but I'm not sure if it matters.

A.    Yeah.

David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER







CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER





[REDACTED]

Q.   Okay.  So to kind of pick up our earlier questions.  Now, again, focused on Victoza, are you aware of any epidemiologic data as of 2015 specific to Victoza -- I'm sorry, I said Victoza twice.  Strike that.  But now I think you've got a preview of where I'm going.

Are you a -- are you aware of any epidemiologic data as of 2015, specific to Victoza that demonstrated an increased risk of gallbladder disease?

A.   No.

Q.   So then let's jump ahead in time to 2016.

A.   Okay.

Q.   Are you aware of any epidemiologic data from -- as of 2016, specific to Victoza, that demonstrated an increased risk of gallbladder disease with Victoza?

A.    With the caveat that there's -- I'm taking up epidemiologic data as we discussed before.  I mean, for example, a published paper using a full Bradford Hill analysis, and try and analyze the relationship.

A absence of evidence in one category does not -- it's not determinant of any one thing Professor Bradford Hill emphasized in this paper, which I'm sure everyone in this room has read and knows better than me.  It's not -- and I know you know this, not a checklist kind of thing.  But having said that, no.

Q.    Okay.  And then in August of 2017, FDA approved a label update for Victoza that included gallbladder warnings, correct?

A.    Yes.

Q.    And you point to, in your report, some company documents that you believe support your conclusion that Novo Nordisk had sufficient data to support a reasonable causal association

between GLP-1 RA in cholelithiasis as early as December of 2014; is that right?  Page 64.

A.    Okay.  Thank you.

MR. NEUMAN:  Are you done with 23?

MS. INSOGNA:  Yeah.  Thank you.

THE WITNESS:  So you're referring -- you know what, I am looking -- oh, my God, at the wrong -- I'm so sorry.  I'm looking at the --

MR. NEUMAN:  Just so the record is clear, he was looking at the report.  He's looking at the Lilly report --

THE WITNESS:  Yes, I really apologize.

BY MS. INSOGNA:

Q.    Just right then?

A.    Yes.  I really apologize.

Q.    We have to do this all over again.  I'm just kidding.

A.    Okay.  No.

Q.    63, actually --

A.    Yes.

Q.    -- is where you start the discussion.  What I read to you was your summary conclusion on Page 64.

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    Okay.

A.    Thank you.  Yes.  I'm on the same page, finally, as you are.

Q.    Okay.  Just give me one moment and I'll get organized.

All right.  So, let's see, you've got one, two, three, four -- five documents you cite in this section, correct?

A.    Yes.

Q.    And October 2008, November 2008, April 2009, are the first three dates of those documents, correct?

A.    Correct.

Q.    And those three predate the initial approval of Victoza, correct?

A.    The April 2009 -- the

answer is yes, but the third one may have document -- that date is going to be, I believe, during the -- or after the submission of the Victoza NDA.

But, yes, you are correct that is before approval.

██ ██ ████████████████

██ ████████████████████

██ ████████████████████

██ █████████████████████

██ █████████████

██ ██ █████████████████

██ ████

██ ██ ████ ███████████

██ ██ ██████████████

██ ████████████████████

██ ███████

Q.    Okay.  And what's the purpose of an advisory committee meeting, in the context of a preapproval submission?

A.    So it's an opportunity. You mean back in the days when the FDA was still having advisory committee meetings.

It's an opportunity for FDA to get guidance from an advisory committee, sometimes there's joint meetings, on specific questions that are raised.

It's actually, under the FDA Amendments Act of 2007, Congress instructed FDA to have advisory committee meetings for new molecular entities unless FDA provided a reason why it shouldn't.

But the substantive reasons are to get their opinion on outstanding regulatory questions.  It does not necessarily mean there's a controversy, but the -- there can be.  And the members of the panel are giving an independent opinion to FDA, and obviously to the applicant as well.

Q.    That's helpful.  Thank you.



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



A.    So this exhibit, 24, is that -- or am I --

Q.    Well, I'm going to hand you the next document.

A.    I'm sorry.  Sorry.

Q.    Nope, you're fine.  This

was my screw-up.

(Document marked for identification as Ross Exhibit 25.)

BY MS. INSOGNA:

Q.    I'll hand you what we've marked as Exhibit 25.

And this is the document that is reflected in Footnote 82 of your report; is that right?

A.    Yes.



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



MS. INSOGNA:  Why don't we go ahead and take another break if that's okay.  I don't know where we are on time.

THE VIDEOGRAPHER:  Off the record.  4:14 p.m.

(Short break.)

THE VIDEOGRAPHER:  Back on the record.  The time is 4:51 p.m.

BY MS. INSOGNA:

Q.    Thank you for your time. We are near the end of the day.

A.    Okay, thank you.  I appreciate it.

Q.    Okay, good.

We're going to turn to -- the last little section I just want to cover is starting on Page 70 of your report.

A.    Okay.

Q.    This is the -- we already talked about most of this, I think Monami I see, we talked about the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Saxenda data.  But I want to talk about the evidence of dose-response relationship section, starting on Page 72.

Do you see that?

A.    Yes.

Q.    Okay, great.  And so in this section you cite the He study --

A.    Yes.

Q.    -- in support of your evidence of a dose-response relationship; is that right?

A.    Yes.

Q.    Okay.  Great.  And you write on Page 73, "Randomization to subcutaneous semaglutide was also associated with increased risk, although the investigators found the increase was not statistically significant"; is that right?

A.    Yes.

Q.    Okay.  Great.  Can you -- can we turn to the He study for just a moment.  It's Exhibit 18 in your stack.

A.    Sure.  Oh, okay.

Q.    If you don't mind.

He's got them organized so nicely, I don't want to mess them up.

Okay.  Did you review the supplemental data when you looked at this study?

A.    I did.  I mean, I -- well, I read it.  It was part of the -- the problem, as you know, is sometimes it's all hard to get an active link, but yes, I did.

Q.    Great.  Okay.  Wonderful.

And so then Figure 3, on Page 516 of the study, has the summary that you -- I think the data that you were just referencing in your report for SC semaglutide.  The relative risk is 1.28, but the confidence interval crosses one; is that right?

A.    Yes.

Q.    Okay.  And that's what you mean by not statistically significant, correct?

A.    Correct.

Q.    Okay.  And then there's

also a line for oral semaglutide, which refers to eight studies.  That would be Rybelsus, correct?

A.    Yes.

Q.    Okay.  And that was, the relative risk ratio is below 1.77, correct?

A.    Yes.

Q.    But also not statistically significant, because it crosses one?

A.    Correct.

Q.    Okay.  And so would you agree that the data here don't demonstrate a statistically significant dose-response relationship for gallbladder diseases with Ozempic or Rybelsus?

A.    So, again, with the caveat that -- I'm sorry, statistical significance is not required to find that there's reasonable evidence of a causal association, yes.

Q.    Okay.  Okay.  Back to your report.  That is all I wanted to do on that one.

Moving on to the strength of association section.

A.   Yes.

Q.   I just want to just be clear because you included on Page 74 as a section, but I don't see it in your list of seven on Page 71.  If you don't mind comparing those two.

A.   I'm sorry, can you say the question one more time.

Q.   Sure.

If you compare your list of seven criteria, maybe criteria is the wrong word, but seven considerations --

A.   You are correct.  You are correct.  That was an oversight on my part.

Q.   Got it.  So this list should have eight?

A.   Correct.

Q.   Okay.  That's helpful.

And so then, in the strength of association section, you say:  This factor encompasses the magnitude of an association and the

probability that chance alone could account for the association; is that right?

A.    Yes.

Q.    And chance is a consideration with respect to statistical significance, correct?

A.    Yes.

Q.    Okay.  And I don't see in here where you state the magnitude of the association for any GLP-1 RA and any gallbladder injury.  I just want to confirm that --

A.    No.  You are correct.

MR. NEUMAN:  Just let her finish getting the question out.

THE WITNESS:  I'm sorry, I'm sorry.

BY MS. INSOGNA:

Q.    No.  You're good, go ahead.

A.    No, I interrupted you.  I apologize.

Q.    Let me try this again. We'll get it clear.

I don't see in your report

where you state the magnitude of any association for any GLP-1 RA and gallbladder injury.  I just want to confirm that that's correct.

A.    You are correct.  I, you know, reference He, for example, but I don't indicate what the actual relative risk that they calculated or the confidence intervals, which correspond to the -- kind of the -- well, the -- not just the strength of the association, but the probability that it's a chance event versus a real association.

Q.    Okay.  And you don't provide relative risk or odds ratios figures that you've calculated for any of the GLP-1 RAs and the medicines at issue?

A.    No.  I've relied on the published literature that I've cited here.

Q.    And I said medicines at issue and GLP-1s, but I meant the adverse events at issue --

A.    I'm sorry.

Q.    -- and the GLP-1s --

A.    Yes.

Q.    -- but you understood my question?

A.    Yes.

Q.    Okay.  Great.  Thank you.

And then the last section is Dechallenge/Rechallenge -- the second to last section here is dechallenge and rechallenge.

A.    Yes.

Q.    And you state:  There's evidence in the literature that higher frequency of GLP-1 RA treatments led to higher incidence of acute gallbladder disease as compared to lower frequency use.

Did I read that correctly?

A.    You did.

Q.    So what do you mean by high frequency?

A.    Back to --

Q.    Actually, let me strike that and back up.

David B. Ross, MD    Case 2:24-md-03094-KSM    Document 691-37    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

What do you mean by dechallenge?

A.    Dechallenge is when -- a positive dechallenge response is a effect, whether positive or negative, going away basically, when you take the drug away.

Rechallenge is when the effect, again, positive or negative, reoccurs when you reinstitute the drug. Allergic reactions are a classic example.

Q.    Okay.  Great.  And so you've cited He --

A.    Yes.

Q.    -- for that; is that right?

A.    That is correct.

Q.    Okay.  And so, can you show me where in He it cites rechallenge or dechallenge data?

A.    I don't think it cites it using that.  And I'm -- you know, I don't see it here.  Either I'm mistaken about the citation, or I'm mistaken itself of something that shouldn't be in

there.



Q.    Okay.  Do you have -- or based on the information in your report, and what you've cited, do you have specific dechallenge/rechallenge evidence that you're relying on for your

conclusion as to Ozempic specifically?

A.    No.

I -- one other comment -- and the reason it does not play a huge role in this is, once one's gallbladder is removed -- it sounds like I'm being facetious, but certainly symptomatic cholelithiasis can ebb and flow if you don't take the gallbladder out.

But, again, that does not -- your point that the statement -- this citation does not support that statement.  I agree, you are correct on that.

Q.    Okay.  Great.  And let me just do the same for Rybelsus so we're clear.

A.    Okay.

Q.    Do -- or I'll do it for all of them.

Do you have dechallenge or rechallenge evidence that you're relying on for your conclusion as to Rybelsus?

A.    No.

Q.    Okay.  Last section, and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

it's going to be a hodge-podge.  So I apologize in advance.

A.   No, please.

Q.   Let's turn to Page 25 of your report, please.

A.   Okay.

Q.   Thank you.  The second -- the first full paragraph, the second paragraph on that page begins, "In theory."

Do you see that?

A.   Yes.

Q.   Okay.  I'll give you a moment to look at it, and then I'm going to read the last sentence for the record.

A.   Okay.

Q.   The last sentence of that paragraph says, "I'm unaware of a single instance in which such a rejection led to FDA deeming a drug to be misbranded and subjected to recall because of a retroactive rejection of a CBE-0 supplement."

Did I read that correctly?

A.    You did.

Q.    Okay.  I just want to know what this statement is based on.

So my first question is, what research did you do to support this statement?

A.    Oh, it's based on, first off, my personal experience, and as well as part of what I do, since, as Ms. -- sorry.

MS. SMITH:  Smith.

THE WITNESS:  Brought up has been 20 years, not quite 20 years since I was at the FDA.

So, you know, I do read about things that are of interest to me, and I just -- I just have never seen it.

Does that mean it hasn't happened?  Of course not.  But, you know, if somebody said, well, here is an example, I certainly would consider that.

BY MS. INSOGNA:

Q.    Okay.  I just want to know

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

if you did a systematic review --

A.    No, no.

Q.    Okay.

A.    I will say -- I'm sorry, I did not mean to interrupt you.

Q.    No, it's okay.  You're good.

A.    It's possible I wouldn't know about it, because if you have an NDA or an SDA -- sNDA that is -- gets a complete response letter, until it gets an approval letter, it remains -- it's not available for public consumption, so to speak.

But I -- what I'm trying to say is, I think, the fact that I haven't heard of something, I have never seen aliens land in Manhattan, it could happen.  But in all seriousness, it's -- that's why I said in theory, in theory.

Q.    That's helpful.  That's helpful.  Thank you.

And, again, I think we covered this in some form earlier, but FDA has the authority to issue some sort

of letter or discipline a manufacturer for failing to submit a required CBE supplement, correct?

A.    A required CBE supplement. I'm not sure I know what you mean by that.

Q.    Okay.  Let me ask it this way.

The FDA has authority under Section 505 to issue a safety label change notification at any time, correct?

A.    Yes.

Q.    Okay.  And before 2022, FDA did not issue any such safety label change notification to Novo as to gallbladder disease, correct?

A.    Correct.

Q.    Okay.  And in any of the materials you reviewed, did you see FDA conclude that the Ozempic label should have been updated sooner with the gallbladder warning?

A.    With the understanding that I don't -- come to think of it, if FDA

would have actually have said that, the answer to your question is no.

The other thing that I would say, going back to this. If FDA issues a safety label change notification or order, that generally is going to be -- the company will be instructed to do that as a prior approval supplement, rather than a CBE.

The other thing is, going back, and I'm sorry for tracing back here, but in terms of FDA rejection of a CBE supplement, the usual course of action, I believe, would be for FDA to request the company convert it to a prior approval supplement. So...

Q. I think I saw that in your report. That's helpful.

Just to make sure I've got a clear answer here for the record.

In any of the materials that you reviewed, did you see FDA conclude that the Ozempic label should have been updated sooner with the gallbladder warning?

MR. NEUMAN: Objection to form. Asked and answered.

Go ahead.

THE WITNESS: Again, with the understanding that I just -- at least in a letter to the sponsor, I don't know, it would be based on kind of the present and the current analysis, but no, I have never seen -- seen anything like that.

BY MS. INSOGNA:

Q. Okay. And is the same answer -- strike that.

Is the same true as to Rybelsus and Victoza?

A. Yes.

Q. On Page 77 of your report --

A. I'm sorry, please go ahead.

Q. The first paragraph, you discuss Novo Nordisk's postmarketing pharmacovigilance and risk management; is that right?

A. Yes.

Q. Okay. And I just want to confirm that the bases for this opinion are reflected in the report and the materials considered, correct?

A. Yes.

Q. Okay. Do you consider yourself to be an expert in European prescription drug regulation requirements?

A. Well, I feel knowledgeable about it. I don't believe that I would -- no, I don't.

Q. Okay. And you're not offering any opinion in this litigation with respect to labeling requirements of any country besides the U.S., correct?

A. Correct.

MS. INSOGNA: I think I'm done.

THE VIDEOGRAPHER: We're going to go off the record, 5:12.

(Short break.)

THE VIDEOGRAPHER: We're back on the record. The time is

5:14 p.m.

- - -

EXAMINATION

- - -

BY MR. ROTTINGHAUS:

Q.    Doctor, I'm going to jump around as well with just a few questions in follow-up to the questions that you've been asked today.

I've put a couple of exhibits in front of you that I'll refer to in a minute.

A.    Okay.

Q.    First of all, just to make sure, from an overview of what I've heard you say today -- well, first of all, let me ask you this:  Is the methodology that you describe in your two reports, which I think are Exhibits 1 and 19, starting on around Page 10, and feel free to look at it if you want to, but is the methodology that you describe in those reports, does it accurately reflect what you attempted to do as you went about your review of this

Case 2:24md-03094-KSM    Document 691-37    Filed 05/19/26    Page 298 of 342

case?

A.    Yes.

Q.    Okay.  I think you said that, among other things, you did FAERS, F-A-E-R-S, queries?

MS. SMITH:  Objection. Leading.

BY MR. ROTTINGHAUS:

Q.    Is that correct?

A.    That is correct.

Q.    Okay.  When you went about the FAERS queries, did you have the entire database available to you?

A.    When you say the entire database, can you be -- tell me what you mean by that.

Q.    Well, you know this database better than I do when you do your FAERS queries.  What is it you go about doing and what are you looking at?

A.    So, maybe this is the simplest way to answer your question, I'll get to what I did.

But there are going to be data elements that are not publicly

David B. Ross, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

available that the FDA has access to, but general members of the public will not.  So that's the first thing.

The second thing is the specific procedure that I followed was that FAERS public dashboard is available.  There's a -- I think I may have given the URL for it.  And you can do a search on a limited number of trade names, or I mentioned USA, and names. You know, essentially the generic names, and then select particular -- that will narrow it down to just those products. You can only do five at a time.

And then you can select adverse events, specific adverse events, using metro vocabulary.  And then you can download the specific ISRs, the specific reports, and you can do raw frequency counts, you can look at trends by year.

As the agency says on that website, however, you really can't use it -- there's a bit of a caveat to this, but it's not -- it's problematic to try

Case 2:24-md-03094-KSM     Document 691-37     Filed 05/19/26     Page 300 of 342

and determine rates from it.

The other thing is, in terms of causality assessment, I do not have access, as a member of the public, to the same level of detail that FDA will.

So when they do -- when I refer to OSE's causality criteria that they used, those involve data, looking at data that are not necessarily available to me.

So, that was prospectively what I did, when I looked -- started looking at it I realized I would not be able to go beyond reading as far as OSE did.

Q. I'm not going to review with you everything that your report discusses and the methodology that you went about. But I want to make sure I understand, with regard to the new drug applications that were filed for each of the subject drugs in this case, did you review all of those new drug applications?

David C. Ross, M.D.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Okay.

A.    I mean, not a -- just to be -- I'm sorry, go ahead.

Q.    You've got to give a verbal answer.

A.    No, I know, I want to be clear.  It was a very focused review.  It's not like I -- I mean, it would be impossible to look, and unproductive to look at everything.

So I'm focused -- earlier some of these exhibits were from Module 2.7, which includes the clinical safety summary.  It's because that was the relevant section for me.

As I said earlier, you know, I'm not going to be looking at Module 1, administrative data, and that sort of thing.  So it's very focused.  I just want to be clear that I'm not -- it's not like I've reproduced the FDA review.  That would simply -- it would not be possible.

Q.    Understand.  Understood.

But you did look at

information for the new drug applications for each of these drugs --

A.    Yes.

Q.    -- is that correct?

A.    Yes.

MS. SMITH:  Objection. Leading.

BY MR. ROTTINGHAUS:

Q.    There's a -- there's a database that all the attorneys and some of the witnesses, I think, have access to in this case.  I think it's called Everlaw.  You were given access to Everlaw as well?

MS. SMITH:  Objection. Leading.

THE WITNESS:  Yes.

BY MR. ROTTINGHAUS:

Q.    Okay.  Tell us what Everlaw is and whether you were given access to it.

A.    So, as I understand it, Everlaw is a database that contains -- I don't know if this is -- contains, among other things that it might contain,

David B. Ross, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

production from defendants.  I don't know, because this wasn't a focus of it, contains production going the other way.

But it's -- the one thing I remember it's 3 million documents.

Q.    Were there times that you contacted the attorneys that retained you in this case to ask with assistance in locating certain documents on Everlaw?

A.    Yes.

Q.    Okay.  And then you also -- I think as your report mentions that you did some literature searches.  Here is my question for you.

Did you make an attempt to review all of the relevant published literature as you went about your review?

A.    Yes.  Yeah.

Q.    You were asked about your materials considered list, which is the list of documents you put at the end of your report.  Here is my question for you:

Is it possible you missed memorializing some of the material you reviewed at some point in this case on your materials considered list?

A.    Of course.  I mean, I hope I didn't, but if I did, it was not with any intended concealment.

Q.    Exhibit 26 and Exhibit 27 are in front of you.

(Document marked for identification as Ross Exhibit 26.)

(Document marked for identification as Ross Exhibit 27.)

BY MR. ROTTINGHAUS:

Q.    Let me focus on Exhibit 26 first.  This is a study I believe you were asked about earlier today, and whether you had this study and this article on your materials considered list.

You correct me if I'm wrong, but I believe your testimony was that you did not see it on your

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

materials considered list; is that right?

A.    That's correct.

Q.    Okay.  Same question with respect to Exhibit 27.  Is that also a study and publication that you were unable to locate on your materials considered list?

A.    It's -- I -- I'm sorry, can you repeat the question?

Q.    It's really the same question I have about Exhibit 27, this study by an author by the last name Yin, Y-I-N.  Is this a journal article that you did not see on your materials considered list when you were asked about it?

A.    That's correct.

Q.    Now, during a break a little earlier today, did you actually ask -- ask for and look at both of these articles?

A.    Yes.

Q.    Okay.  Let me focus on Exhibit 26.  The first author's last

David B. Ross, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

name is Wang.  And this article, the title is "Meta-analysis of the association between new hypoglycemic agents and digestive diseases," and I believe, if I'm correct when I look at the publication date, it appears to be June of 2022 on the first page in the bottom right-hand corner.

Do you see that?

A.     Yes.

Q.     Okay.  Now, when you -- and did you say that you did review this article during a break?

A.     Yes.

Q.     Okay.  Having reviewed this article, did you find it informative in any respect, and if so, why, and if not, why not?

A.     Okay.  So, first, no, I did not.

Q.     Just let me stop you.  You mean you didn't review it --

A.     No, no.  I'm sorry.  I did review it.

Q.     Okay.

A.    I did not believe it was informative, and --

Q.    Why not?

A.    Well, let me go to something that seems relevant, which is, the authors found that the relative risk for acute -- sorry.

Q.    Can you give us a page number, too?

A.    Yeah, I'm sorry.  This is on Page 2, under Meta-analyses 3.2.

I'm sorry, Section 3.2, Meta-analyses on Page 2.

And on the right-hand column in that very dense paragraph there, about one, two, three, four, five, six, seven, eight -- the eighth line that says that the relative risk for acute cholecystitis with GLP-1 RAs, 1.52, and then reports a confidence interval of -- it does not cross one.

So, nominally, that is statistically significant.  However, if somebody says, well, doesn't that support your opinion, and the answer is

no.

And the reason is, methodologically -- I'm sorry, I apologize to the authors for sounding harsh. There's some serious methodological flaws in this paper. And if you compare this to -- first and foremost, and this is a quality measure that the paper by Dr. Monami et al. followed, which is, there is an international consensus for reporting meta-analyses called the PRISMA statement.

And so if you look at the Monami paper, they give a flowchart of how many trials they started with when they did their search and how they got to the final number.

You don't see that here. Okay. They said, "We finally included 21 large randomized trials." Okay. There's a -- I actually didn't get to this supplemental digital content showing their flowchart.

But, you know, they include

Case 2:24-md-03094-KSM    Document 691-37    CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

many of the trials that I looked at. But there's no information in -- I did not have time to look at the supplement and say, well, how did they do it, but that should actually be upfront. You know, that's an extremely important issue.

The second thing, and they're statistical methods, they do not go into sufficient detail, I think, in terms of whether they did things like correct for multiple comparisons. Now, I believe that they did, but the real problem here is -- and just to be clear, Dr. Monami's study doesn't state that explicitly -- but the difference here is if you look at -- there's hundreds of results generated. If you look at Pages 3 through 6.

Q. What are -- let me stop you and just ask you.

A. Yeah, go ahead.

Q. What are these Pages 3 through 6 showing us?

A. So what they did was they

just -- or the computer said, okay, let's look for each of these three classes of hypoglycemic agents for 91 kinds of digestive system diseases.

And so when you're looking at that many comparisons, you are -- first off, if you don't correct for it in some way, you are extremely likely to get a, quote, significant difference by chance alone.

Now, you can correct for that. The most conservative correction is what's known as the Bonferroni correction, but I don't see that here.

And so, you know, it does mean that it's wrong, but -- and some of this is very alarming. Like for GLP-1 RAs, the relative risk for acute cholangitis, usually a death sentence for someone who gets it, it's a relative risk of six.

But -- and the question is, did they correct for all these comparisons, as opposed to the Monami paper where they are looking at a very

restricted universe.

So even though, you know, you'd say, well, Dr. Ross, it seems that number supports your opinion, methodologically I think this study is flawed.

The other thing is that when you look at the selection, how they selected the trials, they focused on -- I believe only on those trials were cardiac or renal endpoints -- efficacy endpoints, I'm sorry, so that leaves -- potentially leaves a number of trials out there.  Now, is that wrong to do? No.

But as -- I'm sorry, Katie, I can't remember your last name.

MS. INSOGNA:  Insogna.

THE WITNESS:  Insogna.

As Ms. Insogna was -- you know, her questions said, you know, thinking about the population is something, you know, if you look at the Monami paper -- or the He paper, I'm

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

sorry, that's what I was actually -- you know, they do a very careful job of saying, okay, here is how we're going to subset it.  And, you know, really they are lumping together all these studies.

So with this, you know, it would be convenient.  But I didn't see it.  But I can't look at it and say no, I believe this.  Or not that I don't -- I disbelieve it, but it was not informative.

That was way too long.  I'm sorry.

BY MR. ROTTINGHAUS:

Q.    You're referring to Exhibit 26?

A.    Yes.

Q.    Okay.  Let me ask you this.

And when you -- from the time you started looking at materials in this case, up until the time you finished your report, do you have any

idea how many articles you came across when you did search terms in the literature?

A. Hundreds.

Q. Okay. If you don't know, it's fine. I'm just going to ask you. Is it possible you had seen Exhibit 26 at some point in time in your review --

A. It's --

Q. Let me finish my question.

A. I'm sorry. Sorry, sorry, sorry.

Q. It's okay.

Is it possible you had seen Exhibit 26 at some point in your review of this case and just either did not register it or did not put it on your materials considered list or do you know?

A. I don't really know.

Q. Okay.

A. And these are both possible, but I can't -- I don't know.

Q. Okay. Let me focus you on Exhibit 27 for just a minute. I believe

Exhibit 27, as the title suggests, is a meta-analysis of the SUSTAIN and PIONEER trials that were performed in connection with evaluating the effectiveness and safety of semaglutide.

Now that's my -- as a lawyer, that's my description, not what this article actually says. But is that consistent with your understanding?

A.    Yes.

Q.    Okay.  Looking at Exhibit 27, I'm going to ask you a similar question.  Do you know whether you reviewed this article at some point in time from the time you started your review of this case until the time you authored your expert report?

A.    I don't know.

Q.    Okay.  Yeah, I believe it's not on your materials considered list.

A.    No, no.

Q.    Have you now -- have you either read it for the first time or refamiliarized yourself with it today, Exhibit 27?

A.    Yes.

Q.    Okay.  Did you find anything to be informative about Exhibit 27 that in any way whatsoever changes the opinions you have expressed in your reports of Exhibits 1 and Exhibit 19 in this case?

A.    No.

Q.    Was there anything in particular you found informative in Exhibit 27?

A.    So, you know, even though -- and I take them at their word. They actually specifically reference the PRISMA statement.

It's -- a lot of this, what their actual methods are buried on supplements.  Leaving those aside, I looked at those very quickly, I'm not sure if they actually are following it. That's Number 1.

Number 2, if you do look at those supplemental materials, they are, again, God, hundreds of adverse events, and that's just, methodologically,

that's problematic.

It's a little bit like -- well, a little bit like saying, we're going to do an efficacy study and we're going to have hundreds of primary endpoints. It's just bad design.

Lastly, and this is -- I don't have the data in front of me. If you look at the total patient population, and it is what it is, you have 12,000 semaglutide exposed patients, and 14,176 comparator exposed patients, and, you know, if you're -- the thing you have to -- you've got studies that were designed as efficacy studies, that were powered to look at primary endpoints -- which is -- that's what the FDA is looking for, so...

But they weren't powered or designed, more importantly, to look at safety endpoints in particular, or test a hypothesis. So there's a real statistical power problem here.

So -- and the same thing is true, actually, here for this. And it's

certainly frequently true.  People don't say, okay, here is the minimum difference we could conceivably detect. I mean, there's just no discussion in here or in here.  And that's -- that's frequently true, to be fair to these researchers.  But they are just not informative.

Q.    Let me shift -- you can put that aside.

Let me shift gears a little bit on you.  I'm now referring to Exhibit 19, your report.

A.    I'm just -- this is -- I'm sorry, this is the Novo report; is that correct?

Q.    Yes.

A.    Okay.  I'm sorry.  Sorry, sorry, sorry.  Okay.

Q.    It's okay.

Earlier you were referenced to Page 74 of your report, which discusses some of the factors one might look at in assessing reasonable evidence of a causal association, I believe.

                   Am I correct?

         A.    Yes.

         Q.    Okay.  I think you were asked about Paragraph G on Page 74 --

         A.    Yes.

         Q.    -- evidence of a dechallenge.  And then you referenced or were asked about the meta-analysis that was, I think, authored in 2025 by, or maybe it was 2024, by an author by the last name of He, H-E?

         A.    Right.  2022.

              MS. INSOGNA:  Object to form.

BY MR. ROTTINGHAUS:

         Q.    I apologize, my ears are getting mixed up.  I know I'm thinking of the right article, but I'm off by about four years, which I apologize for. Thanks for correcting me.  I think some of the attorneys were about to correct me if you didn't, so...

              As we look at Subsection G, and the question I have for you is, I've -- let me see if I have it.  I

meant to bring it over here.

This He article that you were asked about, I believe, was marked as Exhibit 18.  So if you have that and you want to pull it out, you can.

A.    I'm sorry, I'll get out of your way here.

Q.    Or I can give you my copy if you can't locate it.

A.    Okay.

Q.    You want it?  Well, mine is highlighted though, and I don't want you to think I'm trying to --

A.    Sure.  It's here somewhere.

Q.    Hang on to that, but let's go back to your report.  Exhibit 19, Paragraph G on Page 74.

So you were asked about this evidence of -- or the concept of an evidence of a dechallenge being a fundamental aspect of pharmacovigilance and a criteria used for causality reviews.

As I understand it, and I may be mistaken, as I look at Page 518

of this He meta-analysis, are you with me?

A.    Yeah, I'm sorry, I'm just trying to --

Q.    If you go to the left column of this article, of this page, there's a paragraph that starts with "Higher risk of gallbladder."

It's the first full paragraph, I think.

A.    Yes.

Q.    Do you see where I am?

A.    Yes.

Q.    And I may be misreading this, and may not completely understand this.  It says, "Higher risk of gallbladder or biliary diseases was associated with higher doses of GLP-1 RAs in weight loss trials compared with lower doses and diabetes controlled trials."

Is changing or adjusting the dose in a trial, is that -- is that consistent with the concept of dechallenge, or am I incorrect?

A.    That's an interesting question.

Actually just before I answer that, let me just go to -- just for a second.

Q.    I think I confused myself. All my colleagues around this table have convinced me that I don't know what I'm talking about.  So I'm going to withdraw my question.

A.    Okay.

Q.    I'm going to ask you a different one.

Refer to Page 72 of your report, please.

A.    Okay.

Q.    One of the other factors you discuss being utilized in assessing reasonable evidence of a causal association is Paragraph C, Evidence of Dose-Response Relationship?

A.    Yes.

Q.    Okay.  And then you discuss the He et al. article with respect to assessing evidence of a dose-response

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

relationship; is that correct?

A.    Yes.

Q.    To your knowledge, has there been any larger meta-analysis than the He article in any effort to evaluate the association of GLP-1 RA use with the risk for gallbladder or biliary disease, at least as of 2022?

A.    No.  I'm not aware of anything larger than this, in terms of that sample size.

Q.    Just in general terms, I know you were asked about several of the different clinical trials that were relied upon in support of the different GLP-1 RAs that went on the market between, I think, 2010 and 2017.

To your knowledge, did any of those clinical trials that were conducted -- was the purpose of any of those trials to evaluate the incidence of gallbladder disease in patients taking GLP-1 RAs?

A.    You say the purpose?  You mean was there -- like, was that an

endpoint.

Q.    Yes.  I'm sorry, that's a better way of describing it.

A.    No.  I mean, none of them were designed to test a hypothesis, and which would be quantitatively coming up with a sample size powered to test that hypothesis.

Q.    And as you went about your review of this case, reviewing medical literature, reviewing documents on Everlaw, reviewing other data, did you review data from all of the different clinical trials that were used to support the -- each of these drugs that were placed on the market?

MS. SMITH:  Objection. Form.

BY MR. ROTTINGHAUS:

Q.    That's a broad question.

A.    As best I could, yeah.

Q.    Let's go to Exhibit 13, please.  And I'm almost done.

A.    I'm sorry.

Q.    They might be in order over

there, reverse order.  They were in order.

A.    I'm sorry, you said --

Q.    13.

A.    13.  19.  Got it.  14.

Q.    13.

A.    13.  Okay.

Q.    Now, I don't have it in front of me.  May I see it very quickly? Thank you.

Q.    You may recall being asked about this earlier today.

A.    Yes.

Q.    I think you were asked earlier today, and I'm not trying to quote the specific question you were

you.

To the extent the FDA indicated that it was aware of this information being placed in Section 6, do you have an opinion as to whether Eli Lilly, as the sponsor, could have come back to the FDA and said that based upon all the data available to it, as of 2019, the company thought there should be a Section 5 warning for acute gallbladder disease?

MS. SMITH:  Objection. Form.  Objection to the prefatory reflection of the questions he was asked, and objection to --

I'll just do objection to form.

THE WITNESS:  Yes, I do.

BY MR. ROTTINGHAUS:

Q.    Why is that?

A.    Well, first of all, I'm sorry, to be clear, I do have an opinion.

Q.    Okay.  Okay.  Rather than ask why you have an opinion, let me ask, what is that opinion?

A.    See, I'm getting a little lost here.

So your question was, do I think they should have -- could have or should have?

Q.    Let me just ask it again, subject to the objections that were expressed --

A.    Okay.

Q.    -- and if there are any additional ones I create, that's fine.

Do you hold the opinion that Lilly, as the sponsor in this case, could have came back and told the FDA that Lilly, based upon the data it had available, felt that there should be a Section 5 warning for acute gallbladder disease?

MS. SMITH:  Objection. Leading and form.

THE WITNESS:  Yes.

BY MR. ROTTINGHAUS:

Q.    Why is that?

A.    Well, first and foremost, it is the manufacturer's responsibility to propose a label when they submit the NDA.

Secondly, if the FDA disagrees, they will do so.

Third, and this may -- it may seem like a shock, I'm certainly not being sarcastic here, but the -- I don't know what the action goal date was for this application.  The FDA is under pressure to meet that action goal date, and so if -- and I don't know.  I don't have any information on what discussions were within the FDA that led up to this.

But it may be somebody at the FDA said, well, Victoza has an, in the warning section, I know they said, pointed out, they said, but if they do that, they may balk and we may miss our -- or we're at risk for not meeting our action goal date, let's propose putting it in there.  So it's a negotiation, it's not an order.

And I don't -- that's fine. But, you know, that, you know, it's obvious from this, that it was not proposed at all, even by the sponsor. Could they have done that, certainly.

Q.    Okay.  So with respect to the opinions you have offered throughout the day today, have you tried to only offer those opinions to the extent you can express them to a reasonable degree of regulatory certainty?

A.    Yes.

Q.    And with respect to the opinions you set forth in your reports, Exhibits 1 and 19, I think, have you only expressed opinions to the extent you could express them to a reasonable degree of regulatory certainty?

A.    Yes.

MR. ROTTINGHAUS:  Those are all the questions I have.

MS. SMITH:  Let's go off the record.

THE VIDEOGRAPHER:  Off the record.  The time is 5:49 p.m.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

(Short break.)

THE VIDEOGRAPHER:   Back on the record at 5:57 p.m.

- - -

CONTINUED EXAMINATION

- - -

BY MS. SMITH:

Q.    Dr. Ross, good afternoon. I'm back, I'm sorry, it will be fast.

A.    No.  It is good to talk with you again, seriously.

Q.    It will be fast.



Q.      And you had mentioned, in your discussion with Mr. Rottinghaus, some question about whether FDA may have been under some kind of time pressure. Did -- did you raise that issue?

A.      I don't think I said may. I think I was quite -- both sides, to be fair, are under time pressure.  But, yes, I did say that.

Q.      Okay.  And is it fair to say that for this particular round of label negotiations, in forming your opinions in this case, you didn't do any analysis at all of what happened with regard to negotiations for this label?

MR. NEUMAN:  Objection to form.  Foundation, argumentative.

Go ahead.

THE WITNESS:  That's correct.

BY MS. SMITH:

Q.      Because you didn't know this even existed until this deposition,

correct?

A. Correct.

Q. Is it your testimony that Lilly could have used a CBE to put the same information that's in Section 6 in this label but to put it in Section 5?

A. Yes.

Q. It's not your testimony, is it, that Lilly could have used a CBE after the label was finalized in January -- February 2020, is it?

MR. NEUMAN: Objection to form. Argumentative.

Go ahead.

BY MS. SMITH:

Q. Let me -- let me -- let me rephrase it.

A. Okay.

Q. The label, this label, the 2020 label, with the gallbladder disease included in Section 6, that was finalized in February 2020; is that correct?

A. Yes.

Q. Okay. Is it your testimony

that after February 2020, that Lilly could have used the CBE to change the label to put gallbladder disease in Section 5?

A.    Yes.

Q.    Is it correct that you do not identify any newly acquired information after February 2020 that the FDA didn't already have when they approved this label?

MR. NEUMAN:  Objection to form.  Mischaracterizes the evidence and testimony.  Asked and answered.

Go ahead.

THE WITNESS:  So, I understand your question. Again, it's a question of submitting a new analysis, which certainly would include evidence that -- or information that already had been submitted.

But, again, as I said before, the definition of newly acquired information is quite

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

broad.

And FDA has said that can include previously submitted information.  It's not meant to bar a company from performing such new analyses.  Far from it.

BY MS. SMITH:

Q.    And is it correct that you are not aware of any new analyses Lilly did on this information after the label was approved February 20th -- February 2020?

A.    If they -- if they didn't do it -- I'm sorry, I did not mean to laugh.  I apologize.

Q.    No, you're -- don't worry.

A.    I felt like that might be taken as disrespectful.  I really apologize.

Q.    No worries.

A.    No, I -- it's that, as far as I know, they did not, they chose not to do that, even though they had, as I've mentioned before, they had their resources, and the data available.

So that would -- if it doesn't exist, they cannot be aware of it.  So I hope that's --

MS. SMITH:  I think that's all I have for you, Dr. Ross. Thank you, again, so much for your time.  It was a pleasure speaking with you.

THE WITNESS:  Thank you. Thank you.  Same here.  Thank you so much.

MR. NEUMAN:  We're done.

THE VIDEOGRAPHER:  This ends today's deposition.  We're going to go off the record.  The time is 6:02 p.m.

**********

(Excused.)

(Deposition concluded at approximately 6:02 p.m.)

CERTIFICATE


I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, DAVID B. ROSS, M.D., have the opportunity to read and sign the deposition transcript.


_____
MICHELLE L. RIDGWAY,
A Registered Professional
Reporter, Certified Shorthand
Reporter, Certified Realtime
Reporter, Certified Court
Reporter and Notary Public
Dated:  March 10, 2026


(The foregoing certification

of this transcript does not apply to any

reproduction of the same by any means,

unless under the direct control and/or

supervision of the certifying reporter.)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

```
                         - - - - - -

                       E R R A T A

                         - - - - - -


   PAGE LINE CHANGE

   25   15-6 Re-review and transcribe
     REASON: Text does not make sense as transcribed

   43   20   Change "educations" to "education"
     REASON: Use singular form of term

   43   21   Change "physician" to "physicians"
     REASON: Use plural form of term

   45   11   Insert "I" immediately before "did"
     REASON: Missing word

   52   2    Change "is" to "was"
     REASON: Wrong tense

   54   21   Change "retained" to "retaining"
     REASON: Should be present participle, not past participle

   76   21   End statement with question mark, not period
     REASON: Statement was an interrogative, not declarative

   82   23   ████████████ ████████████████████
     REASON: ██████████ ██████ ████████████████

   122  16   Change "torsades de pointes" to all lower case
     REASON: Only capitalized at start of sentence

   122  19   Change "pointes" to all lower case
     REASON: At start of sentence, only "Torsades" is capitalized
```

**Hartford Reporting & Technology, LLC**

**www.hartfordreporting.com**

David B. Ross, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER                Page 336a

```
                         - - - - - -

                         E R R A T A

                         - - - - - -


     PAGE LINE CHANGE

     123  12   Change "201.57.C.6" to "201.57(c)(6)
       REASON: Incorrect format

     140  3    Change "5.04" to "505(o)(4)
       REASON: Incorrect citation; incorrect format

     140  14   Change "5.05.04" to "505(o)(4)
       REASON: Incorrect format

     140  21   Change "FDAA" to "FDAAA"
       REASON: Incorrect acronym

     140  25   Change "SCER" to "CDER"
       REASON: Incorrect acronym

     141  3    Change "FDAA" to "FDAAA"
       REASON: Incorrect acronym

     141  15   Change "5.05.04" to "505(o)(4)
       REASON: Incorrect format

     141  23   Change "5.05.04" to "505(o)(4)
       REASON: Incorrect format

     142  5    Change "5.05.04" to "505(o)(4)
       REASON: Incorrect format

     142  9    Change "5.05.04" to "505(o)(4)
       REASON: Incorrect format
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                    - - - - -

                 E R R A T A

                    - - - - -


   PAGE LINE CHANGE

   183  6    ████████████ ████ ██ ██████████████

        REASON: █████████ █ ████████████████████

   269  7    Change "A" to "An"
        REASON: Incorrect form of indefinite article

   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
   ____ ____  _____
        REASON: _____
```

David B. Ross, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER                Page 336c

I, DAVID B. ROSS, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached        (**X**) Yes    ( ) No

_____
                    DAVID B. ROSS

STATE OF MARYLAND
COUNTY OF _Baltimore City_

I HEREBY CERTIFY, that on this _13th_ day of _April_, 20_26_, before me, the subscriber, a Notary Public of the State of Maryland, in and for _Baltimore City_, personally appeared _David B Ross_ (Name of Signer), known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

WITNESS my hand and Notarial Seal.

_____(Signature of Notary)

My Commission Expires: _10/16/2027_

> ANTIONETTE WILKINS
> Notary Public - State of Maryland
> Baltimore City
> My Commission Expires Oct 16, 2027

**Hartford Reporting & Technology, LLC**
www.hartfordreporting.com

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 338, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

DAVID B. ROSS, M.D.                    DATE

Subscribed and sworn
to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

LAWYER'S NOTES

PAGE    LINE

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____