# EXHIBIT 38D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

IN RE: GLUCAGON-LIKE PEPTIDE-1
RECEPTOR AGONISTS (GLP-1 RAs)
PRODUCTS LIABILITY LITIGATION                CIVIL ACTION

MDL 3094

2:24-md-03094-KSM

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS/ALL CASES:

_____/

CONFIDENTIAL

VIDEO DEPOSITION OF:      ELIOT SIEGEL, M.D.

DATE:                    JANUARY 31, 2025

TIME:                    9:06 A.M. - 5:30 P.M.

PLACE:                   20 N. ORANGE AVENUE
                         SUITE 1600
                         ORLANDO, FLORIDA

REPORTED BY:             TAMARA MASCI TANNEN, RPR, FPR-C
                         STENOGRAPHIC COURT REPORTER
                         NOTARY PUBLIC, STATE OF FLORIDA

APPEARANCES:

CHARLES BACHMANN, ESQ.
SEEGER WEISS LLP
55 CHALLENGER ROAD
RIDGEFIELD PARK, NEW JERSEY   07660
(973)639-9100
CBACHMANN@SEEGERWEISS.COM

AND

EVAN BUXNER, ESQ.
BUXNER LAW FIRM
230 SOUTH BEMISTON AVENUE
SUITE 1400
ST. LOUIS, MISSOURI   63105
(314) 863-6000
EVAN@GORILAW.COM

AND

CAMERON STEPHENSON, ESQ.   (VIA ZOOM)
LEVIN PAPANTONIO
316 SOUTH BAYLEN STREET
PENSACOLA, FLORIDA   32502
(850) 435-7176
CSTEPHENSON@LEVINLAW.COM

AND

JONATHAN M. SEDGH, ESQ.   (VIA ZOOM)
MORGAN & MORGAN, P.A.
199 WATER STREET, SUITE 1500
NEW YORK, NEW YORK   10038
(212) 845-2800
JSEDGH@FORTHEPEOPLE.COM

COUNSEL FOR PLAINTIFFS

Page 3

APPEARANCES (CONTINUED)

REBECCA FITZPATRICK, ESQ.

ANDREW HARTFORD, ESQ.

KIRKLAND & ELLIS LLP

333 WEST WOLF POINT PLAZA

CHICAGO, ILLINOIS  60654

(312) 862-4164

REBECCA.FITZPATRICK@KIRKLAND.COM

ANDREW.HARTFORD@KIRKLAND.COM


MARK PREMO-HOPKINS, ESQ. (VIA ZOOM)

MICHAEL. S. SMITH, ESQ.

KIRKLAND & ELLIS LLP

333 WEST WOLF POINT PLAZA

CHICAGO, ILLINOIS  60654-2000

(312) 862-2000

MARK.PREMOHOPKINS@KIRKLAND.COM

MICHAEL.SMITH@KIRKLAND.COM


AND

KENNETH F. BAUM, M.D. (VIA ZOOM)

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP

KBAUM@GOLDMANISMAIL.COM

100 WILSHIRE BOULEVARD

SUITE 1760

SANTA MONICA, CALIFORNIA  90401

(310) 576-6900

KBAUM@GOLDMANISMAIL.COM


        COUNSEL FOR DEFENDANT ELI LILLY & COMPANY

Page 4

APPEARANCES (CONTINUED)

LUCAS PRZYMUSINSKI, ESQ.

MELISSA JEAN WHITNEY, ESQ. (VIA ZOOM)

DLA PIPER LLP

1251 AVENUE OF THE AMERICAS

27TH FLOOR

NEW YORK, NEW YORK  10020-1104

(312) 324-1000

LUCAS.PRZYMUSINSKI@US.DLAPIPER.COM

MELISSA.WHITNEY@US.DLAPIPER.COM


AND

KATIE INSOGNA, ESQ. (VIA ZOOM)

DLA PIPER LLP

33 ARCH STREET

26TH FLOOR

BOSTON, MASSACHUSETTS 02110-1447

KATIE.INSOGNA@US.DLAPIPER.COM

(617) 406-6000

AND

STEPHANIE PEATMAN, ESQ.              3

DLA PIPER LLP

2000 AVENUE OF THE STARS

SUITE 400 NORTH TOWER

LOS ANGELES, CALIFORNIA  90067-4735

(310) 595-3000

STEPHANIE.PEATMAN@DLAPIPER.COM

               COUNSEL FOR NOVO NORDISK A/S AND NOVO NORDISK INC.

ALSO PRESENT:

JEFF FLEMING, VIDEOGRAPHER

                    * * * * * * * * *

                  S T I P U L A T I O N S

          It is hereby stipulated and agreed by and between counsel for the respective parties, and the deponent, that the reading and signing of the deposition are hereby was reserved.

Page 5

I N D E X

WITNESS                                                    PAGE

ELIOT SIEGEL, M.D.

Direct Examination by Ms. Fitzpatrick                        9

Cross Examination by Mr. Przymusinski                      185

Cross Examination by Mr. Buxner                            326

Certificate of Oath                                        328

Reporter's Deposition Certificate                          329

Errata Sheet                                               330

E X H I B I T S

DEPOSITION              DESCRIPTION                       PAGE

Exhibit Number 1   Eliot Siegel, M.D.'s Expert            11
                   Report

Exhibit Number 2   "Rome Foundaton and international       99
                   neurogastroenterology and
                   motility societies' consensus on
                   idiopathic gastroparesis"

Exhibit Number 3   ACG Guidelines                         103

Exhibit Number 4   ACR-ACNM-SNMMI-SPR Practice            115
                   Parameter for the Performance of
                   Gastrointestinal Tract, Hepatic,
                   and Splenic Scintigraphy

Exhibit Number 5   Consensus Recommendations for          122
                   Gastric Emptying Scintigraphy: A
                   Joint Report of the American
                   Neurogastroenterology and
                   Motility Society and the Society
                   of Nuclear Medicine

E X H I B I T S

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Number 6 | Supplemental Materials Considered | 143 |
| Exhibit Number 7 | Expert Report of Ronnie Fass, M.D. | 145 |
| Exhibit Number 8 | Effects of GLP-1 Receptor or a Dual GLP-1/GLP Receptor Agonists on Gastrointestinal Symptoms and Gastric Emptying: Results from a large Clinical Practice Database" by Lupianez-Merly, et al. | 146 |
| Exhibit Number 9 | "Misdiagnosis of Gastroparesis is Common" | 164 |
| Exhibit Number 10 | DiBaise Article entitled: "The relationship among gastroparetic symptoms, quality of life, and gastric emptying in patients referred for gastric emptying testing" | 303 |



Page 7

Page 8

P R O C E E D I N G S

\* \* \* \*

THE VIDEOGRAPHER:  We are now on the record.  My name is Jeff Fleming.  I'm a videographer for Golkow, a Veritext Division.

Today's date is January 31st, 2025.  Time is 9:06 A.M.  This video deposition is being held in Orlando, Florida, in the matter of Glucagon-like Peptide-1 Receptor Agonists, (GLP-1 RAs) product liability litigation.

The deponent is Eliot Siegel, M.D.

Counsel, please state your appearances after which our court reporter, Tamara Masci Tannen, will swear in the witness.

MR. BUXNER:  Evan Buxner for Plaintiffs.

MS. FITZPATRICK:  Rebecca Fitzpatrick for Eli Lilly.

MR. PRZYMUSINSKI:  Lucas Przymusinski for Novo Nordisk.

MR. HARTFORD:  Andrew Hartford for Eli Lilly.

THE REPORTER:  Raise your right hand, Doctor.  Do you swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

Page 9

ELIOT SIEGEL, M.D.,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. FITZPATRICK:

Q.   Good morning, Doctor.

A.   Good morning.

Q.   We met before we started, but just for the record, my name is Rebecca Fitzpatrick.  I represent Eli Lilly.  Good morning.

A.   Good morning.

Q.   Have you ever given a deposition before?  I know you haven't in the last four years.

A.   Yes.

Q.   How many times?

A.   I think about four times.  It's been many, many years.  It's been longer than four years since I did one before.

Q.   Okay.  So just as a refresher, if you ever don't understand my question, please just let me know.

A.   Okay.

Q.   If you do answer, I'll assume you understood it.  Okay?

A.   Okay.

Q.   We have a court reporter taking everything down, so for her sake, please wait till I finish the question to

Page 10

answer; fair?

A.   Yes.

Q.   And if you can answer in full words out loud instead of mm-hmm or head shakes; fair?

A.   That is fair.

Q.   Okay.  And I'll remind you.  And I will not remind you to be rude.  I'm just reminding you for the sake of the record.

A.   Yes.  I appreciate the reminders.  Thanks.

Q.   Okay.  We will take a break when you need one. Just answer the question I've asked and then we can take a break.  Okay?

A.   Okay.

Q.   So it's as opposed to taking a break with a question pending.

A.   Okay.

Q.   That's the distinction I'm drawing.

A.   Okay.  Sure.

Q.   You're testifying under oath today.  Is there any reason that you can't give truthful testimony?

A.   There is no reason.

Q.   Okay.

MS. FITZPATRICK:  If I could have Dr. Siegel's report.

BY MS. FITZPATRICK:

Page 11

Q.    I'm handing you what I'll mark as Deposition Exhibit 1.

(Deposition Exhibit Number 1 marked for identification.)

BY MS. FITZPATRICK:

Q.    It will come to you through the court reporter.

A.    Okay.  Thanks.  Thanks for walking me through some of the logistics.  I appreciate it.

Q.    No, you're welcome.  It's an odd --

A.    Thank you.

Q.    I can't talk and have her stickering at the same time.

A.    Sure.

Q.    This is the Expert Report that you submitted in this matter.  True?  Is that true?

A.    Let me just page through it just so I can answer that question completely.

Yes, it's true.  It contains my CV which was not part of what I submitted as my report.  So it contains a superset of my report.

Q.    So it's your report plus your CV contained in the same document?

A.    Contained in the pages that I was just handed, right.

Q.    Yes.  Contained in Exhibit 1?

Page 12

A.    Correct.

Q.    Okay.  Are you aware of any errors in your report?

A.    I'm not aware of any errors.

Q.    Okay.  Anything you need to correct or change?

A.    No.

Q.    Does your report set forth all of the opinions that you intend to offer in this case?

A.    I think it depends on what questions that you ask; and so, there may be questions that you ask that are not in the report, so I think I should answer that it really depends on how the discussion goes.

Q.    There may be questions I ask over the course of today that you then want to offer in this case; is that right?  You want to offer answers in this case?

A.    There -- I would like to address the report specifically.  And my understanding is that we are here to go over the report and what's in the report.  I just don't know what you're going to ask, so I can't tell you whether or not there may be something that you ask me that's not in the report.

Q.    That's fair.

As you sit here right now with only having heard the questions I've asked so far, is there anything that you know that you are going to give as an opinion in this case that's not in the report?

Page 13

A.    Not that I can think of.

Q.    Are all the materials on which you're relying to support your opinions cited in your report and its appendices?

MR. BUXNER:  Object to form.

THE REPORTER:  Who objected?

MR. BUXNER:  I did.  Sorry.  I should be the only one objecting live.

THE WITNESS:  So I think if you object to form --

MR. BUXNER:  Oh, actually --

BY MS. FITZPATRICK:

Q.    Oh you can answer, yes.

MR. BUXNER:  If you understand you can answer, Doctor.

THE WITNESS:  Yeah.  I'm sorry, please repeat that.

BY MS. FITZPATRICK:

Q.    Yes.  Are all the materials on which you intend to rely to support your opinion cited in either the report itself or your appendices to the report?

MR. BUXNER:  Object to form.

THE WITNESS:  All the information that I've used to create the report is cited.  But there may be -- I've read a wide variety of different things and have a lot of clinical experience.  And so, there will be

Page 14

things that informed answers that I may give you depending on what you ask that are not cited in this particular report or bibliography.

BY MS. FITZPATRICK:

Q.   As you sit here right now, is there any document, article, reference other than what's already cited in your report and the appendices that you know you want to support your opinions in this case?

A.   None that I can think of.

MR. BUXNER:  Rebecca, just for clarification, did you get the Amended Materials Considered List?

MS. FITZPATRICK:  Yes.

MR. BUXNER:  Okay.

MS. FITZPATRICK:  That's a good point.

BY MS. FITZPATRICK:

Q.   You gave us a Supplemental Reliance List yesterday; is that your understanding?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.

BY MS. FITZPATRICK:

Q.   Do you understand that we received a Supplemental Reliance List from you yesterday?

MR. BUXNER:  Same objection.

THE WITNESS:  I understand that that's what was sent to you, but I didn't send it myself and didn't

Page 15

really supervise that process, so I can't tell you for sure.

BY MS. FITZPATRICK:

Q. Okay. So now reframing my question: Is there anything outside of what's cited in the report, the report's appendices and your Supplemental Reliance List that you know you want to use to support your opinions in this case that's not in there already?

A. There's nothing I can think of.

Q. Okay. If you turn to Page 25 of your report.

A. Mm-hmm.

Q. Do you see the heading Summary of Opinions?

A. I do, yes.

Q. Does your Summary of Opinions on Page 25 of your report summarize your opinions in this matter?

A. It summarizes my opinions that I created in the report, yes. When you say this matter, I'm not sure exactly what you mean by this matter.

Q. That's fair. I understand your answer.

If you turn now to Page 6.

A. Mm-hmm.

Q. Do you see under the heading, Glucagon-Like Peptide 1 Receptor Agonists?

A. Oh, I'm sorry, I'm on -- Page 6 of my CV.

Q. Yes. Page 6 of your report, please.

Page 16

A.    Sure.  Okay, thanks.

Q.    Do you see the paragraph under that heading 4?

A.    I do.

Q.    And if you look into that paragraph, do you see the sentence that starts "although" towards the bottom?

A.    Yes.

Q.    It says:  "I am not offering a general causation opinion in this report."  True?

A.    It's true that that's in my report and it's true that I do not offer a general causation opinion.

Q.    And that means that you're not offering any opinion about whether any GLP-1 receptor agonist is capable of causing gastroparesis, correct?

A.    That's not correct.

Q.    You're offering an opinion about whether a GLP-1 receptor agonist is capable of causing gastroparesis --

        MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.    -- in this report?

A.    I am essentially offering that there is an association of those two and that I do believe that GLP-1 agonists do indeed cause symptoms.

Q.    What do the words, I am not offering a general causation opinion, in this report mean to you, Doctor?

A.    It means that I'm not really going into the

Page 17

mechanism, the physiology of why GLP-1 agonists impact patients' symptomatology or gastric emptying.  I don't believe that I have -- I'm not offering that particular analysis.  And so, that's what I'm thinking about with regard to causation.  But there may be other things that would be on the list of what I am not offering with regard to causation.

Q.   You have no basis to offer an opinion about how GLP-1 agonists could cause gastroparesis; is that right?  That's what you just told me?

MR. BUXNER:  Object to form.

THE WITNESS:  Yeah, I'm not sure exactly what you mean by --

BY MS. FITZPATRICK:

Q.   You referred to mechanism.

A.   Right.

Q.   So what that means to me -- and I'm asking you if it's right --

A.   Mm-hmm.

Q.   -- is that you have no basis because you haven't done the work and you're not expressing the opinion to say how GLP-1 agonists -- Receptor Agonists could cause gastroparesis, right?

MR. BUXNER:  Object to form.

THE WITNESS:  Yeah, I'm still -- when you say how,

Page 18

in other words, when I -- you asked me what I thought of when I'm thinking of causation. With regard to causation, I'm thinking of pathophysiology. And so, exactly how it is that GLP-1 agonists work from a physiologic perspective and a pharmacologic perspective, those are things that I really am not offering opinions on.

BY MS. FITZPATRICK:

Q. So you are not offering opinions on how GLP-1 agonists work, true?

MR. BUXNER: Object to form.

THE WITNESS: Yeah, I mean, work is kind of a general term. And so, I just don't want to mislead you by suggesting to you that, you know, a more general definition of work. In other words, I believe there's a strong association of GLP-1 agonists and delayed gastric emptying and patient symptomatology. And so, when you're asking about how they work, I'm not sure exactly what you're referring to.

BY MS. FITZPATRICK:

Q. You used the word "work." Do you recall that, Dr. Siegel?

A. Yes, I did.

Q. Okay.

A. But I was using --

Page 19

Q.    You told me --

A.    -- it in a more generic sense.  And so when you're asking me that question specifically, I just want to make sure that the way I'm using it and the way that you're using it are the same.

Q.    Okay.  I'll adopt your definition.

A.    Okay.

Q.    You told me that you're not offering an opinion of how GLP-1 Receptor Agonists work, correct?

A.    In -- and I meant specifically the pathophysiology and the pharmacology associated with GLP agonists.

Q.    And what that means then is that you're not offering an opinion as to what exactly GLP-1 agonists do in the body, right, the effects they have within the body?

MR. BUXNER:  Object to form.

THE WITNESS:  Yeah.  Overall I'm not going to be offering specific information about the pathophysiology within the body.

BY MS. FITZPATRICK:

Q.    What does pathophysiology mean to you?

A.    It means how the drug specifically impacts various organs within the body, various hormonal systems, how it interacts with the brain, any of the specifics that might answer the question from a pharmacologic perspective of the mechanism of action of the GLP-1 agonists on the body.

Page 20

Q.   If you turn -- in your report, Exhibit 1, you noted that it has your CV attached to it, right?

A.   Correct.

Q.   Can you turn to that Appendix C?

A.   Is that my CV?

Q.   It should be.  But if you get to it, you'll see that it's labeled Appendix C.

A.   Oh, okay.  Thanks.

Yes, it is labeled Appendix C.

Q.   Okay.  This is your CV?

A.   Yes.

Q.   Is your CV current and accurate?

A.   Yes, recently as of November 2024, but not as of today.

Q.   What has changed in it as of today?

A.   I have some additional articles that I've published since then.  And so there may be a couple of additional things since November, but it's probably 99 percent accurate.

Q.   What are the additional articles you've published?

A.   They're related to Theranostics, related to nuclear medicine and related to Informatics.  I don't recall which ones specifically.

Q.   Is there one that's related to nuclear medicine or multiple?

Page 21

A.   Probably one related to nuclear medicine that would be related to a PET CT or -- actually, it's related to ultra low dose PET CT scanning.

Q.   Do any of the additional articles you're referring to relate to gastric emptying studies?

A.   No.

Q.   Do any of them relate to gastroparesis?

A.   No.

Q.   Do any of them relate to GLP-1 Receptor Agonists?

A.   No.

Q.   Now, if you look in your report at Page 3.

A.   In Appendix C; or are we back to the report?

Q.   Back to the report itself.

A.   Okay.  Page 3.

Q.   Do you see the heading, Credentials, Expertise and Experience?

A.   I do, yes.

Q.   It says you're a physician who is Board Certified with the American Board of Radiology with an additional certification of "special competence" in nuclear medicine. Do you see that?

A.   I do, yes.

Q.   You're a Medical Doctor, true?

A.   True.

Q.   You're a Medical Doctor who specializes in

Page 22

radiology.  And that's both radiology generally and then nuclear medicine within radiology, right?

A.    Correct.

Q.    Okay.

A.    And also interventional radiology.

Q.    And you're Board Certified in radiology?

A.    Correct.

Q.    You have certification of "special competence" in nuclear medicine?

A.    Correct.

Q.    What did you do to get the certification of "special competence"?

A.    So I think you're asking what test did I take? Because the answer what did I do was a fellowship, plus also a huge amount of reading and studying specifically within the domain of nuclear medicine.

And so, in radiology, we typically have a certain number of months of nuclear medicine training.  And so every radiologist has exposure to nuclear medicine.  No pun intended.  And then, if one wants to have "special competence" in nuclear medicine, then one needs those additional months of training and one also needs to be able to pass an oral examination by multiple examiners specifically in nuclear medicine that goes into a much greater depth in the field of nuclear medicine than the

Page 23

radiology board exam that I had taken the year previously does.

Q.   You have held positions as a radiologist and nuclear medicine specialist for Johns Hopkins University, right?

A.   No.

Q.   What was your role at Johns Hopkins?

A.   Just to give lectures at Johns Hopkins and give presentations, but I didn't have any paid role at Johns Hopkins.

Q.   Did you treat any patients at Johns Hopkins or through Johns Hopkins?

A.   No.

Q.   Were you a radiologist in nuclear medicine specialist at University of Maryland?

A.   Yes.

Q.   Okay.  VA Maryland?

A.   Department of Veterans Affairs in Baltimore.

Q.   Okay.

A.   The VA Maryland healthcare system.

Q.   And then also the Department of Veterans Affairs for Network 5, right?

A.   Correct.  I was responsible -- I was in charge of radiology in nuclear medicine for the Department of Veterans Affairs hospitals in West Virginia, Washington, DC and

Page 24

Maryland.

Q.   And those three locations are Network 5?

A.   Those three regions are Network 5, right.

Q.   So over your career you've provided radiology and nuclear medicine care to patients in Maryland, West Virginia and Washington, DC; is that right?

A.   Yeah, predominantly Maryland.  And so, even though I had administrative responsibility and I would have interpreted some studies from Washington and West Virginia, the vast majority of them would have been on patients who were located in Maryland.

Q.   If there was a patient who needed your expertise in the VA system in West Virginia or Washington DC, their records made their way to you, right?

A.   Yes, through the electronic medical record system that the Department of Veterans Affairs has.

Q.   You didn't put your hands on patients in West Virginia, Washington, DC; is that the distinction you're drawing?

A.   No, that's not the distinction.  I'm not sure what you mean by putting your hands on exactly.

Q.   You don't understand what put your hands on a person means?

A.   Well, I'm a radiologist and a nuclear medicine physician.  And so, in general, the majority of my job is to

Page 25

do image interpretation.

However, as an interventional radiologist, then I perform procedures on patients, or have in the past when I was doing procedures, I've performed a very, a large number, probably thousands of gastrointestinal studies, such as upper GI series, barium enemas, esophagrams, et cetera.

Q.    Did you --

A.    And so that involved touching the patients.  But in general, I just want to make sure that we draw the distinction between doing an image interpretation on patients, which is what I do more of, and actually performing procedures on patients which requires physically touching patients.

Q.    Did you perform procedures on patients in West Virginia and Washington, DC?

A.    There were occasional patients who would have been sent to Baltimore to have procedures performed that I did perform.

Q.    Okay.  You also have licenses for Florida and New Jersey, true?

A.    True.

Q.    Do you treat patients or have you ever treated patients in Florida and New Jersey?

A.    No.

Q.    Why do you have those licenses?

Page 26

A. Well, that's a long story. So let's talk about that a little bit.

Q. I -- I'm on a clock, so I'm going to avoid a long story.

A. Okay. I just want to try and answer --

Q. I know.

A. -- as completely --

Q. I very -- I very much you appreciate you telling me it was a long story.

A. Right.

Q. I'll take the question back.

I take it you have not treated patients in Florida or New Jersey?

A. I have treated patients in Florida because I live in Florida. At least one of the places that I live is Florida. And so, in order to be able to bill, I need to have a Florida license. And so, as I do image interpretation for patients in Maryland or West Virginia or Washington, DC, then it requires me to have a license in Florida, which is where I am.

In addition to that, I also have a new career as a medical oncologist who specializes in radiopharmaceutical therapy. And so, I plan sometime later this year to open up a oncology center for treating patients with radiopharmaceuticals and performing nuclear medicine

Page 27

diagnostic studies here in Orlando and perhaps other places in Florida as well.

And the same is true for Princeton, New Jersey, where we have a center currently where I need to be able to work at that clinic, which is predominantly an oncology clinic but also a nuclear medicine diagnostic clinic.

And so that's the reason that I have those licenses. I'm in the process of establishing a national practice with hopefully dozens of oncology treatment patients -- treatment centers for patients throughout the country in a pioneering new area of oncology, which is radiopharmaceuticals.

Q. So as of today, you haven't treated New Jersey or Florida residents; do I understand that correctly?

A. That's probably not correct. We have a lot of patients who get referred from a variety of places across the country to Baltimore. And so we see patients in Baltimore who come up from Florida or down from New Jersey.

Q. Okay. So you provided radiology and nuclear medicine care to patients who reside all across the country, right?

A. Yes, with a preponderance of patients in Baltimore, but with patients occasionally who travel in from many areas of the country.

Q. If you go to Page 12 to 14 of your report.

Page 28

A.    Mm-hmm.

Q.    On Pages 12 to 14, you discuss nine different forms of imaging studies that can be obtained depending on clinical presentation, true?

A.    I'd have to count them up, but that sounds accurate.

Q.    All are imaging studies that can be done on the GI tract, right?

A.    Correct.

Q.    If we look at the top of Page 12, you say:  "These tests may provide useful data to reach a diagnosis."  Do you see that?

A.    Yes.

Q.    Okay.  And the sentence before that reads: "These -- "

And that refers to these imaging studies, right?

A.    Mm-hmm.

Q.    These --

Is that a "yes"?

A.    I'm sorry.  Yes, that is correct.

Q.    "These imaging studies can enable a physician to rule out alternative causes within the differential diagnosis."

True?

A.    It's true that the sentence says that.

Page 29

Q. Okay. And so, this is a list of imaging studies that can -- a physician can use to rule out alternative causes of gastroparesis, right?

MR. BUXNER: Object to form.

THE WITNESS: Yeah, I think that what's important to point out is that rule out in this particular case, the way I intended it in the report is to be able to sort through or determine a probability, but not to be able to completely exclude any particular diagnosis with these studies.

And so, really by rule out, what I meant in the report -- and maybe I could have added additional verbiage -- was to evaluate and utilize any of these tests in the workup of patients as part of the differential diagnosis.

BY MS. FITZPATRICK:

Q. And so what that means is that these are all imaging studies that physicians can use to evaluate whether their patient has gastroparesis as opposed to something else?

A. They're all studies that provide additional anatomic and functional information that could be used in the overall large picture determination in any one particular patient.

So these are all essentially data points that

Page 30

allow one to be able to make better informed decisions in a differential diagnosis.

Q. And their data points that allow doctors to make better informed decisions as to whether their patient has gastroparesis specifically, right?

MR. BUXNER: Object to form.

THE WITNESS: Right. I did not -- I mean, in this particular paragraph, we are talking about a variety of different types of tests that are used for different things.

And so, I mentioned that specifically if we are looking at the subset of tests that may be considered in a patient that is suspected of having gastroparesis, then there are quite a variety of imaging studies that are done in radiology, nuclear medicine and other specialties. And this -- as I mentioned, they include these. This is not meant to be exhaustive list of all of those. But these are all helpful studies that could be considered in a patient in the context of a diagnosis of gastroparesis.

BY MS. FITZPATRICK:

Q. And that's all my question is. This is a non-exclusive list of imaging studies that can be used to evaluate whether a patient has gastroparesis?

A. I wouldn't say evaluate whether they have it. It

Page 31

would be useful information in the greater context of trying to help make a diagnosis.

Q.   Of gastroparesis as opposed to something else, right?

A.   Of -- in this particular case, these are diagnostic imaging studies that come to mind specifically when considering a diagnosis of gastroparesis.

Q.   And these diagnostic imaging studies generate objective evidence of what's going on in a patient's gastrointestinal tract, true?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.  I think it's subjective and objective evidence.  So there's quantitative evidence where we make measurements.

For example, in a gastric emptying study, we might make a quantitative assessment of the amount of retained material in the stomach at a particular time point.  That would be a quantitative analysis.

But there's also the subjective analysis where I as a radiologist evaluate images and subjectively come to conclusions and essentially share the findings in a report that could be subjective or objective and then have an impression in the report that will in some ways add additional value to the findings that I've observed.

Page 32

BY MS. FITZPATRICK:

Q.    The quantitative data that you get in a gastro empty --

A.    Gastric emptying study.

Q.    -- gastric emptying study is objective evidence; is that right?

A.    I get both --

Q.    I'm just summarizing what you just gave me.

A.    -- subjective and objective data --

Q.    Yes.

A.    -- both.

Q.    And I want to -- I want to take them one by one.

A.    Sure.

Q.    So the quantitative data --

A.    Yes.

Q.    -- that you get from a gastric emptying study is objective evidence, true?

A.    I believe that the quantitative data is objective evidence which has to be taken in context of all of the things related to the validity of a gastric emptying study in any particular patient.

And so, we have to make a broad variety of different assumptions about whether or not a patient consumed an entire meal and many, many other assumptions associated with it.

Page 33

But it does provide numerical objective data given all of the assumptions.  Given the way the study was done, it gives us numbers essentially.  And so usually, I think we refer to quantitative numbers in a more objective sense than subjective.

Q.    The imaging studies listed here on pages 12 to 14, have you personally performed each one of these?

A.    Let's go through each one and I can --

Q.    Could you just answer my question?  Can you scan pages 12 to 14 of your own report and tell me whether you have personally performed each one of these?

A.    Right.  I'm just trying to understand the question.

Q.    Yes.

A.    So when you say each one of these, are you asking all of these or for each one of them true or false have I performed the study?  I just want to try and be as accurate and complete in my answer.

Q.    So my question was:  Have you personally performed each one of the nine that are listed here?  And if you said no, then I would identify which ones you have not performed personally.  Does that make sense?

A.    So -- not exactly.

But let me answer the question a different way.  I have not performed all of these studies.

Page 34

Q.   You have not personally performed all of these studies?

A.   Correct.

Q.   Okay.  Which ones have you not personally performed?

A.   I think that's what you were --

Q.   Yes, it was.

A.   Okay.

Q.   Which ones have you not personally performed?

A.   So I have not performed the Smart Pill Wireless Motility Capsule.  I have not performed the Gastric Emptying Breath Test.  I have not performed the Esophagogastroduodenoscopy.  I have not performed electrogastrography.  I have performed conventional radiograph X-ray.  I have performed upper GI series.  I have performed computed tomography.  I have performed Magnetic Resonance Imaging.  I have performed ultrasound.

Q.   For the ones that you have performed, did you perform them specifically on the gastrointestinal tract? Have you done that?

A.   So let's understand.  When you say specifically on the gastrointestinal tract, there are multiple types of studies.  A subset of studies are performed specifically to evaluate the gastrointestinal tract, but there's a really large superset of studies that include the gastric -- the

Page 35

gastrointestinal tract incidentally in those studies.

Q. Okay.

A. Most nuclear medicine studies evaluate the entire body, for example, or a large portion of the body. And so the gastrointestinal tract is included in a really surprisingly broad variety of different studies that we do, even cardiac studies where we get some information about the GI tract.

So are you asking specifically about whether these studies were performed specifically with the indication of trying to evaluate the gastrointestinal system?

Q. Yes.

A. Then the answer is yes.

Q. For each of X-ray, upper GI series, CT, MRI and ultrasound?

A. Correct.

Q. Okay. For the ones that you haven't personally performed --

A. Mm-hmm.

Q. -- have you directed that those four be done?

A. I have not directed that those four be done in -- I'm not sure what you mean exactly by direct. So I think the answer is actually yes, I have.

So I have recommended EGD in studies that I've done and suggested that an EGD would provide additional

Page 36

important or valuable information in addition to the other studies that I've done.

I can't recall suggesting a Smart Pill Wireless Motility Capsule in any of my studies or a Gastric Emptying Breath Test or electrogastrography.

Q. Okay. Have you ever interpreted the results of a Smart Pill Wireless Motility Capsule?

A. Yes, I have helped in the interpretation in those by reviewing the results of those on paper and then trying to correlate that with other findings when I've been asked to do that by a clinician and patient in the past.

Q. Have you ever interpreted the results of a Gastric Emptying Breath Test?

A. No.

Q. Have you ever interpreted the results of an EGD?

A. I have never interpreted the results. I've seen a number of images from EGD, but I've never actually been the interpreting physician. I have discussed results of those when I've seen the images, but I've never been the one actually doing the primary interpretation.

Q. Have you ever interpreted the results of an EGG?

A. I have not, no.

Q. Have you taught anyone about a Smart Pill Wireless Motility Capsule?

A. Did you say taught?

Page 37

Q.    Taught.

A.    I have not.

Q.    Have you taught anyone about a Gastric Emptying Breath Test?

A.    I have not.

Q.    What about an EGD?

A.    I've mentioned it in talks or lectures that I've given, in all likelihood.  But I have not taught anybody how to do that or to interpret that study.

Q.    And what about an EGG; have you taught anybody how to do that?

A.    I have not.

Q.    Have you taught how to do or -- and/or how to interpret X-ray, GI series CT, MRI, ultrasound?

A.    Yes, to all of those.

Q.    Okay.  For the ones -- for the subset of the tests listed on Pages 12 to 14 that you have either personally done or that you have directed to be done or that you have interpreted, have you been involved with those tests in the context of patients suspected of gastroparesis?

A.    Let's look at those and try and answer that.  So for conventional X-ray, yes.  For upper GI series, yes.  For computed tomography, yes.  For Magnetic Resonance Imaging, no.  And for ultrasound, yes.

Q.    Now, turning to a gastric emptying study.

Page 38

A. Okay.

Q. Have you personally performed --

A. Are we turning to a particular page or did you just mean turning to the subject of gastric emptying study?

Q. You discussed -- you do discuss gastric emptying studies at Page 4 of your report --

A. Mm-hmm.

Q. -- among other places, obviously. But I was turning to the subject.

A. Okay.

Q. Have you personally performed a gastric emptying study?

A. So I have supervised technologists who perform those studies, but the nuclear medicine physician or radiologist does not actually perform them, depending on how you define perform.

Q. You're not the one actually pressing the buttons?

A. I'm the consult. I'm not the one that's injecting the radiopharmaceutical, I'm not the one that's preparing the meal, I'm not the one that is doing the quality checking on the instrumentation, et cetera. But I am the one that is directing all of those and responsible for the quality associated with all of those.

Q. Have you recommended to patients or referred patients to get a gastric emptying study as well?

Page 39

A.    Yes.

Q.    Where you didn't supervise it directly?

A.    Where I didn't supervise it directly, yeah, both, when I supervised it and when I didn't supervise it.

Q.    Okay.  And then if you look -- if you do look at Page 4 of your report --

A.    Mm-hmm.  Or yes.

Q.    The top paragraph.

A.    Okay.

Q.    You note that you have interpreted tens of thousands of nuclear medicine examinations?

A.    Correct.

Q.    And that's correct?

A.    It is.

Q.    That's a true statement?

A.    It is a true statement.

Q.    And then you note that you have interpreted over 1,000 gastric emptying studies.  Do you see that?

A.    I do, yes.

Q.    Gastric emptying studies is and have been over the course of your career available to patients, obviously?

A.    Yes.

Q.    If we take not just interpret gastric emptying studies, but either interpret them or supervise them or recommend them, how many gastric emptying studies have you

Page 40

been involved with over the course of your career?

A.    As I said in the report, it's over 1,000.  I don't have a way to remember exactly how many it was.  And so, that's an estimate.  I would -- if I erred on one side or the other, it would be underestimating the number of gastric emptying studies that I've done.

And the reason for that is that in general, my observation anecdotally, although I don't have statistics related to this, is that fewer gastric emptying studies are being done in recent years than there were years ago.  More patients are getting EGD than they did back in the 1980s, for example.  And so --

Q.    Was EGD available in the 1980s?

A.    I think it was available in the late 1980s, as I recall.

Q.    That's when it first became available?

A.    Yeah, I think in the 1980s, it became available and much more widely used.  But we used to do more -- a higher percentage of the studies that we did in a greater number of gastric emptying studies were done in the past than are done currently.

And so, that estimate of a thousand was really sort of related to how many have been done within the last several years, but I bet that the rate of gastric emptying studies being done per day or per period of time was

Page 41

significantly greater in years past.  So I would bet that it's well over a thousand gastric emptying studies.

Q.    Okay.  You've been involved in potentially many thousands of gastric emptying studies?

A.    I would say maybe somewhere between 1,000 and 3,000.

Q.    Okay.  Gastric emptying studies have been around for decades?

A.    Yes.

Q.    It's a well-established medical procedure?

A.    It is, yes.

Q.    Now, if you go to Page 10.  Do you see the heading 7, Gastroparesis?

A.    I do, yes.

Q.    You give a definition of gastroparesis in here, right?

A.    I give a definition of gastroparesis and then a reference to that definition.

Q.    Okay.

A.    Two references, actually.

Q.    And you say gastroparesis has three elements, right, numbered?

A.    Correct.

Q.    Okay.  And that's consistent across the medical literature, those three elements, right?

Page 42

A.    Yes.

Q.    The first element of gastroparesis is gastrointestinal symptoms, true?

A.    True.

Q.    The second is the absence of mechanical obstruction of the pylorus?

A.    True.

Q.    And the third is the presence delayed gastric emptying?

A.    True.

Q.    All three elements are required for the definition of gastroparesis to be met?

A.    I think that is the most common definition of all of the things that I've read, correct.

Q.    And specifically, gastroparesis requires the presence of delayed gastric emptying, true?

A.    Correct.

Q.    If you only have GI symptoms, so element one, and absence of mechanical obstruction, element two, do you agree that the definition of gastroparesis is not met?

A.    If you have element one symptoms and then two, a lack of mechanical obstruction, then I do agree with that. I believe that one needs to have -- in order to diagnose gastroparesis, I think one needs to have evidence suggesting that it is likely that there's delayed gastric emptying.

Page 43

Q.   The symptoms for the first element, gastrointestinal symptoms, you say those include most commonly --

A.   Mm-hmm.

Q.   -- nausea --

A.   Yes.

Q.   -- vomiting, postprandial fullness and abdominal pain, right?

A.   Right.

Q.   Those are all gastrointestinal symptoms?

A.   They are a subset of gastrointestinal symptoms.

Q.   What is postprandial fullness?

A.   It means the sensation of fullness after a patient or subject ingests a meal.

Q.   And this is not the exclusive list of gastrointestinal symptoms of gastroparesis, right?

A.   Correct.

Q.   There could be others?

A.   There can be others.

Q.   Okay.  Other symptoms could be diarrhea, right?

A.   Other symptoms can be fairly broad.  I don't think diarrhea would be near the top of my list as most common symptoms associated with gastroparesis.

Q.   Okay.  But it does appear with gastroparesis sometimes?

Page 44

A.   Sometimes.

Q.   Okay.  What about constipation?

A.   Sometimes.  Although I think constipation from a mechanistic perspective would be -- or constipation would be less likely.  But yes, constipation has been associated in patients who have gastroparesis.

Q.   What about decreased appetite?

A.   Decreased appetite has been associated with gastroparesis as well.

Q.   For the second element, a mechanical obstruction, you're referring to a physical blockage of the pylorus; is that right?

A.   A physical blockage or a functional blockage as well potentially.

Q.   What's --

A.   Pyloric spasm, for example, might essentially result in what looks like blockage and is blockage from an anatomic perspective, but is a functional issue.  But usually it's an anatomic blockage where there is a physical barrier.

Q.   And it's a physical barrier that prevents food from leaving the stomach?

A.   Correct.  Or at least it can be partial or it could be complete.

Q.   On Page 10, you talk about gastroparesis has an

Page 45

estimated prevalence per 100,000 persons of 37.8 for women and 9.6 for men.  Do you see that?

A.  Yes, I was quoting the article from Lacy in 2022.

Q.  Okay.  Then you talk about approximately 5 million U.S. adults suffering from gastroparesis-like symptoms.  Do you see that?

A.  Yes.

Q.  You're referring to the prevalence of the symptoms you named:  Nausea, vomiting, postprandial fullness and abdominal pain, right?

A.  No.  Actually, I'm referring to the article Lacy in 2022 who quotes an estimated prevalence.  And that's really all I'm referring to.

Q.  But it's the prevalence of gastrointestinal symptoms, not of gastroparesis, right?

MR. BUXNER:  Object to form.

THE WITNESS:  No.  I mean, we'd have to look at that.  But I think that it's gastroparesis-like symptoms --

BY MS. FITZPATRICK:

Q.  The prevalence --

A.  -- specifically.

Q.  The prevalence of gastroparesis-like symptoms is --

A.  Right.

Page 46

Q.    -- much, much greater than the prevalence of gastroparesis itself, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know how much greater it is. But I would imagine that it is a -- one is a subset of the other.

BY MS. FITZPATRICK:

Q.    Do you know how many -- there's about 350,000,000 people in the U.S., right?

A.    About.

Q.    Okay.  And 5 million U.S. adults, that's a prevalence number, right?  That's at any given time?

A.    Correct.

Q.    Okay.  So 5 million adults?

A.    Yeah.

Q.    Over 350 million adults?

A.    Yeah.

Q.    I'll withdraw that because I actually don't have an adult number.

But you agree with me that the prevalence of gastrointestinal symptoms like nausea, vomiting, postprandial fullness and abdominal pain is much, much higher than the prevalence of gastroparesis, right?

A.    I agree that fewer people have gastroparesis than the number that have -- well, I actually don't know the

Page 47

number of patients who have -- who have one or the other.

But I believe that the number of patients who have symptoms of -- like gastroparesis is greater than the number of patients who have gastroparesis. I think that's what's you asked.

Q. The symptoms associated with gastroparesis are common, right?

MR. BUXNER: Object to form.

THE WITNESS: I think that symptoms that we listed as being characteristic of gastroparesis are common. I think it really depends on the severity of those symptoms. And the etiology of those symptoms is really important also.

And so, you know, one can have nausea associated with so many different types of things. And so, each one of these symptoms, you know, may have a very different pattern of presentation than the pattern for gastroparesis.

And so, I think it's really important not to generalize and to look specifically at any particular patient and the constellation of findings that they have.

BY MS. FITZPATRICK:

Q. My question is: You agree with me that nausea, vomiting, postprandial fullness and abdominal pain are

Page 48

common?

A.    I think each one of them are relatively common --

Q.    Okay.

A.    -- in that millions of people likely suffer from those during the course of a year.

Q.    And the symptoms of -- these symptoms:  Nausea, vomiting, postprandial fullness and abdominal pain, they are not specific to gastroparesis, true?

A.    Correct.  One cannot diagnose gastroparesis from any one of those symptoms.  And it really -- again, the diagnosis of gastroparesis really depends on a constellation of findings from a temporal perspective and constellation of findings as far as multiple different things that a patient has over time, including severity of those findings, et cetera.

Q.    If you go to Page 15.

A.    Uh-huh.  Yes.

Q.    The top paragraph.

A.    Okay.

Q.    You note -- doctor, you note that the symptoms of gastroparesis are non-specific, right?

A.    Correct.  The report says that because the symptoms of gastroparesis are non-specific.

Q.    Yes.  That was my question.

A.    Yes.

Page 49

Q.   What does that mean to you, non-specific?

A.   It means that the symptoms of -- that any one symptom of gastroparesis essentially -- or associated with gastroparesis is not sufficient to make the diagnosis of gastroparesis in and of itself by knowing that a patient does have that symptom.

Q.   Because the symptoms of gastroparesis also appear in a lot of other conditions, right?

A.   Correct.  There's overlap with a lot of conditions, yes.

Q.   You go on to discuss -- you say -- you briefly list some of the more common potential alternative diagnoses to gastroparesis; do you see that?

A.   I do.

Q.   And the conditions you list share symptoms with gastroparesis, right?

A.   There's some overlap of the symptoms in each of these, but that doesn't mean that one can't make a diagnosis of gastroparesis.  It just means that there's overlap of some of the symptoms.

Q.   My question is just the narrow one.

A.   Sure.

Q.   The conditions you list here have symptoms that overlap with the symptoms of gastroparesis, true?

A.   Yes.

Page 50

Q.    But the conditions you list here are all distinct or different from gastroparesis, right?

A.    That's correct, but it -- also, it does not mean that one cannot have more than one of these happening at the same time.  So one could have gastroparesis and others of these as well.

Q.    So let's go through the list.

A.    Sure.

Q.    The first one on your list is functional dyspepsia, right?

A.    Correct.

Q.    Functional dyspepsia is not itself gastroparesis, right?

A.    Functional dyspepsia is a different diagnosis than gastroparesis, correct.  A patient with functional dyspepsia could also have gastroparesis.

Q.    Patients with functional dyspepsia can present with postprandial fullness?

A.    Yes.

Q.    And early satiation?

A.    Yes.

Q.    And epigastric pain?

A.    Yes.

Q.    What is epigastric pain?

A.    It means pain and discomfort in the region of the

Page 51

stomach, which is in the left upper quadrant.

Q.    And they can present with epigastric burning?

A.    Right.  So burning can be a separate sensation than pain.  There are many different complex ways to be able to describe pain.  One type of pain is a burning type of pain.

Q.    All those symptoms can appear with gastroparesis as well?

A.    Any symptoms can appear with gastroparesis.  But these are not classic symptoms of gastroparesis.  In fact, they're symptoms that would lead me away from a diagnosis of gastroparesis.

Q.    Postprandial fullness?

A.    Epigastric burning.

Q.    I understand.  But you listed postprandial fullness in particular as a classic common symptom of gastroparesis, true?

A.    It's one of the symptoms of gastroparesis, yes.

Q.    And it's also a classic common symptom of functional dyspepsia?

A.    Correct.

Q.    And the other symptoms of functional dyspepsia can appear with gastroparesis, true?

A.    Any symptoms can appear with gastroparesis.

Q.    You're telling me that gastroparesis can have --

Page 52

A.   I'm saying that --

Q.   -- any symptom at all in the whole world?

MR. BUXNER:  Will you please just let him finish your question.

And don't talk over her.  Okay?  You guys are kind of talking over each other.

THE WITNESS:  Oh okay.  Sorry.

MR. BUXNER:  But finish your answer.

THE WITNESS:  Yeah.  So a diagnosis of gastroparesis does not in any way preclude any other diseases or any other symptoms that a patient may have. And so gastroparesis may occur along with other disease entities.

BY MS. FITZPATRICK:

Q.   I'm asking, though, you agree that early satiation epigastric pain and epigastric burning can be associated with gastroparesis, true?

A.   They are not --

MR. BUXNER:  Object to form.

THE WITNESS:  -- classically associated.  In other words, that constellation would not lead me toward a diagnosis of gastroparesis.

MR. BUXNER:  Doctor, just give me a second to object --

THE WITNESS:  Sure.  Yes.

Page 53

MR. BUXNER:  -- after the question in case I need to.  Thanks.

THE WITNESS:  Yes, sorry.

MR. BUXNER:  You're fine.

BY MS. FITZPATRICK:

Q.  I'm not asking about classic symptoms.  I'm just asking:  Early satiation, epigastric pain, and epigastric burning can be associated with gastroparesis, true?

A.  They would be -- that would be an unusual combination.  Is it possible?  Pretty much anything in medicine is possible.  But that constellation of symptoms would not lead me to a diagnosis of gastroparesis.

Q.  I'm not asking about the constellation.  I'm asking about each individually.

A.  Right.  Each individually would have to be taken in the context in order to make a diagnosis of gastroparesis of many other factors, such as intensity, what it is combined with the temporal aspect of it, all of those.

And so, can a patient with gastroparesis also have epigastric pain?  The answer is yes, but it is not characteristic of gastroparesis.

Q.  But you agree with me that epigastric pain can be associated with gastroparesis?

A.  When you say associated with, can a patient who has gastroparesis -- if you're asking the question of do

Page 54

patients with gastroparesis never have epigastric pain, I would disagree with that.

Q.   What's the difference between epigastric pain and abdominal pain?

A.   Abdominal pain can occur anywhere throughout the abdomen, whereas epigastric pain is more specific to the location of the stomach.

Q.   So abdominal pain is broader?

A.   Abdominal pain is broader than epigastric pain, yes.

Q.   And so, you have told me that abdominal pain is a classic pain of gastroparesis, true?

A.   It is one of the classic symptoms of gastroparesis.

Q.   Okay.  And now, epigastric pain, which is a type of abdominal pain, can obviously be seen with gastroparesis, true?

A.   I wouldn't say obviously.  I would say that abdominal pain in general can be seen with gastroparesis. And epigastric pain is more characteristic of functional dyspepsia than it is of gastroparesis.

Q.   But it can be seen with gastroparesis?

A.   Yes.  If you're asking the question, would it never be associated with gastroparesis, the answer is that's incorrect.  It could be associated with it.  But it would

Page 55

not lead me to the diagnosis of gastroparesis.

Q.   All I'm asking is, it can be associated with gastroparesis, true?

A.   It can be associated with gastroparesis, but I think it's important to just underscore what we mean by associated.

In other words, can the same patient have both of those symptoms?  Yes, if that's what you mean.  If you mean is there an association that would lead one towards that diagnosis, the answer is no.

Q.   Okay.  I appreciate that context.  My question is the narrow one.

Epigastric pain can be associated with gastroparesis, true --

A.   Patients --

Q.   -- or not true?

A.   I still don't understand exactly how I can answer the question when you say can be associated with because that has many different interpretations.  One is in the literature, do they -- do the two tend to occur together?  The other is, could a patient have both of those?  And the answer is a patient could have that symptom and have gastroparesis.

Q.   Okay.

A.   But that doesn't mean --

Page 56

Q.   Gastro --

A.   -- that one would lead me to a diagnosis of gastroparesis within a patient who has epigastric pain.

Q.   But you agree with that gastroparesis can cause epigastric pain?

MR. BUXNER:  Object to form.

THE WITNESS:  So I don't know whether or not -- I'm not talking about causation, per se.  And so I don't know whether one causes the other or not.

BY MS. FITZPATRICK:

Q.   You're not able to say what symptoms gastroparesis causes?

MR. BUXNER:  Object to form.

THE WITNESS:  I'm able to say what it is associated with.  I don't know specifically what it causes.  But the two are associated together.  I'm not really able to talk, as we talked earlier, about causal relationships and exactly how one causes the other.  So I don't know whether it causes it.

I do know that there are a number of studies that have demonstrated the association, that one is associated with the other, whether or not one causes the other.

BY MS. FITZPATRICK:

Q.   As a general matter, association is not causation,

Page 57

right?

A.    Right.

Q.    Not necessarily?

A.    Yes.

Q.    Correlation is not causation?

A.    Correct.

Q.    And you're not an expert in determining causation, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I'm not -- I'm not in a -- I am not offering an opinion on causation associated with this report.

BY MS. FITZPATRICK:

Q.    If you go on in your report, mechanical gastric outlet obstruction is another condition similar to gastroparesis, true?

A.    There is overlap, but in general, patients with mechanical gastric outlet obstruction can be distinguished from those with gastroparesis.

Q.    My question is just, do you agree with me that the symptoms of mechanical gastric obstruction can overlap with gastroparesis?

A.    Some of the systems can over -- symptoms can overlap, yes.  But --

Q.    That's all I've asked.  Doctor --

Page 58

A.    I know.

Q.    -- that's all I've asked.

MR. BUXNER:  Please let him answer.  He's an expert.  He's entitled to explain his answer.

Do you have anything you want to add to that?

THE WITNESS:  Yeah.  I just wanted to also say that in general, patients have a very different history and presentation when they have a gastric outlet obstruction than when they have gastroparesis.  And so in general, I think those two are relatively easy to distinguish.

BY MS. FITZPATRICK:

Q.    I appreciate that context.  I do.

Now, though, I have it, can you answer me yes or no, mechanical gastric outlet obstruction has symptoms that overlap with the symptoms of gastroparesis?  Yes or no?

A.    There are some symptoms that overlap that would not in general make it difficult for me to make that diagnosis.

Q.    That would?

A.    In other words, there are symptoms that overlap, but I would feel confident in general making the diagnosis of a gastric outlet obstruction in -- I'm distinguishing it from gastroparesis.

Q.    But you agree there are symptoms that overlap?

Page 59

A.   Yes.

Q.   Symptoms of mechanical gastric outlet obstruction, for example, include nausea?

A.   Yes.

Q.   Same as gastroparesis?

A.   When you're asking same as gastroparesis, I would think that the intensity of the nausea in general would be different, the intensity.  I think that the way it would present from a temporal perspective would be different.  The history would be different for a gastric outlet obstruction in comparison to gastroparesis.

So I think -- I don't want to generalize that nausea is always exactly the same, that you either have it or don't.  There are different degrees of nausea.  There's different ways that nausea essentially comes on.  And I think it's really important the make that distinction.

Q.   But you agree with me that nausea is on the list of common symptoms of both gastroparesis and mechanical gastric outlet obstruction?

A.   Yes, I think the word "nausea," but I think different types of nausea.

Q.   And you agree with me that vomiting is on the list of both common symptoms of gastroparesis and mechanical gastric outlet obstruction?

A.   Yes.  I think vomiting in general.  But again, the

Page 60

character of the vomiting, the time of the vomiting, type of vomiting, what the patient vomits may be different from one to the other, but the term "vomiting" is common to the description of both.

Q.   Where would I find a description of how the character of vomiting differs between gastroparesis and mechanical outlet obstruction?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   If I was a doctor trying to make that distinction, where would I look?

A.   I think --

MR. BUXNER:  Object to form.

THE WITNESS:  Yeah.  I mean, so I think that one would do research in the literature and differential diagnosis in general.  There are descriptions in the literature, particularly in the surgical literature about patients who present with acute gastric obstruction and the signs and symptoms.  So I think I would probably turn to one of the surgical textbooks and make that distinction.

BY MS. FITZPATRICK:

Q.   You agree with me that abdominal pain is a common symptom of both gastroparesis and mechanical gastric outlet obstruction?

Page 61

A.    I agree that both of them can present with abdominal pain, but that the abdominal pain is very different in one in comparison to the other.

Q.    How so?

A.    I think the abdominal pain tends to be much more acute in a patient who has a complete obstruction.  I think that the abdominal pain tends to be increasing over time over a longer period of time than in a patient with gastroparesis.

I think patients present very acutely with very, very severe pain in a way that is different than in gastroparesis where the pain is less and the onset is more gradual than in a patient that presents with gastric obstruction.

Q.    You agree with me that early --

A.    Satiety.

Q.    Satiety?  You agree with me that early satiety is a common symptom of both gastroparesis and mechanical gastric outlet obstruction?

A.    No.

Q.    Because it's not common enough for gastroparesis?

A.    I think early satiety would not be a symptom that I would expect in somebody whose stomach was completely obstructed or had an outlet obstruction.

So early satiety is a more chronic issue that one

Page 62

would have over a longer period of time, whereas an obstruction is something that presents very acutely.  And patients usually don't give me the history of having early satiety.

Q.    Cyclical vomiting syndrome is another condition with symptoms that overlap with gastroparesis, true?

A.    Yes, but the nausea and vomiting essentially have a very different pattern with cyclical vomiting syndrome than they do with gastroparesis.  It has more of an undulating or kind of remitting comes and goes essentially.

Q.    You're not opining that cyclical vomiting syndrome always begins in childhood, true?

A.    True.

Q.    And you're not opining that cyclical vomiting syndrome always is associated with headaches, vertigo and photophobia?

A.    Not always.  But there is a strong association in the literature.

Q.    Certain psychiatric disorders share symptoms with gastroparesis, true?  You make that point in your report on Page 16?

A.    Let me see where you're referring to.

Q.    Number 4.

A.    They can cause persistent upper GI symptoms, as I said.  But the symptoms would be different.  And one would

Page 63

know, for example, if a patient had other signs or symptoms of anxiety, anorexia nervosa would be something that would be relatively evident based on patient history, patient physical examination.  Same is true for bulimia.

Q.   The neurological -- sorry, scratch that.

The psychiatric disorders that have symptoms that overlap with gastroparesis include anxiety, anorexia and bulimia, true?

A.   All I said in the report was that they can cause persistent upper GI symptoms, but not that those symptoms are specific -- you know, have a strong overlap with gastroparesis.

Q.   This list is common potential alternative diagnoses to gastroparesis, true?

A.   It is true, but some of these are relatively easy to distinguish even though they're in the differential diagnosis.  Just because an entity is easy to distinguish doesn't necessarily mean that it wouldn't be in a complete differential diagnosis.

Q.   But you agree with me that psychiatric -- certain psychiatric disorders can have symptoms that overlap with gastroparesis, true?

A.   I think that there are some, but in general, I would not have a difficult time making the diagnosis in most patients.

Page 64

Q.   What are the other psychiatric disorders that have persistent upper GI symptoms?

A.   You mean in addition to what I listed?

Q.   Yes.

A.   I really am not an expert in that area, so I really can't give you a comprehensive list.  I would imagine that there are other psychiatric disorders that are associated with upper GI symptoms, but I don't have the expertise to be able to give you a really comprehensive list.

Q.   You're not an expert in psychiatric disorders and their upper GI symptoms, true?

MR. BUXNER:  Object to form.

THE WITNESS:  As a radiologist, I have to be an expert in all of the different areas of subspecialty, but I am not a subspecialty expert in psychiatric disorders, particularly GI-related psychiatric disorders.

MR. BUXNER:  Whenever you have a good time to break, we've been just over an hour.  No hurry.

MS. FITZPATRICK:  This is fine.

THE VIDEOGRAPHER:  Off record, 10:12 A.M.

(Recess was taken.)

THE VIDEOGRAPHER:  On record, 10:22 A.M.

BY MS. FITZPATRICK:

Page 65

Q.   Doctor, before we broke you told me that as a radiologist, you have to be an expert in all of the different areas of medical subspecialty?

A.   I did, yes.

Q.   And you are representing yourself as an expert in all of the different areas of medical subspecialty?

A.   I'm representing myself as an expert in what I need to know for imaging of all those different subspecialty areas --

Q.   You've never --

A.   -- and diagnosis.

Q.   You've never diagnosed anxiety, anorexia, bulimia, for example, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I -- I don't think I've been the primary person that's made the diagnosis, but I've written notes that would have included information about patient anxiety and frequently do treat patients with anxiety who present for MRI scans, for example, by prescribing medications to decrease their anxiety.  So in that sense, since I've prescribed medications about anxiety, I've also diagnosed anxiety as well.

BY MS. FITZPATRICK:

Q.   You're not telling me that you can distinguish gastroparesis from anorexia or bulimia based on imaging,

right?

MR. BUXNER: Object to form.

THE WITNESS: I actually can distinguish anorexia based on imaging in comparison with other body habitus. And so, I can relatively confidently distinguish a patient who has anorexia, per se, but I can't diagnose bulimia just from imaging.

BY MS. FITZPATRICK:

Q. You told me that the character of the vomiting distinguishes gastroparesis from mechanical gastric outlet obstruction; do you remember that?

A. I do remember that.

Q. That's not anything you can see in the imaging, true?

MR. BUXNER: Object to form.

THE WITNESS: I can see a tremendous amount in the imaging as far as gastric outlet obstruction. In other words, I can actually identify the gastric outlet obstruction and the lack of a gastric outlet obstruction in a patient with gastroparesis without a mechanical or -- or a partial mechanical obstruction.

BY MS. FITZPATRICK:

Q. You as a radiologist use imaging to differentiate between mechanical outlet obstruction and gastroparesis, true?

Page 67

A.    No.    I use imaging to make the distinction between mechanical outlet obstruction in patients who don't have mechanical outlet obstruction.

Q.    You don't use the character of their vomiting to make the distinction between mechanical outlet obstruction and patients who don't have mechanical outlet obstruction?

A.    That's incorrect.  So I actually do.  In other words, so I get history.  One thing that's really important to underscore is that as a radiologist, part of what I do is to take in information about the patients prior to making a diagnosis.  And so, that might be talking with a referring physician.  It might be chart review.  And so all of those things are factors in my making a diagnosis.

I never would just look at an image in and of itself without having all of that context in the patient. That's really critical and what I teach our residents and fellows also.

Q.    You are not a gastroenterologist, correct?

A.    I am not.  My specialty is radiology and nuclear medicine.

Q.    And you are not an endocrinologist, correct?

A.    My specialty is only diagnostic radiology and nuclear medicine, but those overlap from a diagnostic perspective with those other specialties.  And I'm actually the consultant to those specialists in a variety of

Page 68

different disease entities.

Q. My question is very specific. You are not an endocrinologist, correct?

A. Correct.

Q. When's the last time you performed a physical examination of a patient?

A. Probably about -- maybe three or four weeks ago.

Q. In what context do you personally do physical examinations of patients?

A. So I've retired from the practice of radiology and nuclear medicine with regard to my roles at University of Maryland and the Department of Veterans Affairs. But now I'm actually working as an oncologist at an oncology center that specializes in radiopharmaceuticals.

In that sense, then I see patients on a regular basis and also do histories and physicals. At this point, I'm just starting to do those, so it's been a relatively small number, but that will increase as time goes on.

Q. You're not currently working as a radiologist, true?

A. False. So in addition to working at --

Q. You answered my question. There is no question pending. Thank you.

A. Okay. I'm just trying to be complete.

Q. I understand that. And I'm keeping an eye on my

Page 69

time.

MS. FITZPATRICK:  There is no question pending, Counsel.

MR. BUXNER:  I appreciate that, but please don't interrupt him.

Go ahead.

BY MS. FITZPATRICK:

Q.  There is no question pending.

Before you retired from the University of Maryland and the VA system, how often did you do physical examinations of patients?

A.  So right before I retired I did not do physical examinations on patients.  But when I was doing interventional radiology for many years, I did do physical examinations and histories on patients that I was performing procedures on.

And just to be complete, I also --

Q.  There is no question pending.

A.  Okay.

Q.  There is no question pending.  Thank you, though.

A.  Sure.

Q.  If you look at Page 15 to 16 of your report --

A.  Okay.

Q.  -- the list of conditions that we've been working our way through; do you see those?

Page 70

A.    I do.

Q.    All of these conditions have GI symptoms, true?

A.    All of these symptoms can be associated with GI symptoms.  For example, endocrine disorders.  There's a wide variety of endocrine disorders, such as thyroid disorders, for example, and most of those do not have GI symptoms associated with them in most cases.

And so, these would all be things in the differential because of the fact that there are subsets of these conditions, such as endocrine disorders, for example, that can have GI manifestations, but they certainly don't all have GI manifestations.

Q.    So all of the conditions listed on 15 to 16 of your report, if I understand you correctly, can have GI manifestations.  That's what you just told me, true?

MR. BUXNER:  Object to form.

THE WITNESS:  All of these entities can have GI symptoms associated with a subset of those disorders. So neurologic conditions tend not to have GI symptoms, but a small subset do.

BY MS. FITZPATRICK:

Q.    But some of them can; is that fair?

A.    Correct.  It is fair.

Q.    Okay.  And the endocrine disorders you called out, those can have GI symptoms, right?

Page 71

A.    Correct.

Q.    The neurological conditions you called out, those can have GI symptoms, right?

A.    Correct.

Q.    Rumination syndrome, that can have GI symptoms, true?

A.    It can have GI symptoms, although that also has fairly characteristic GI symptoms that would allow me to distinguish that from gastroparesis.

Q.    Chronic pancreatitis can have GI symptoms, true?

A.    Yes, frequently has GI symptoms.

Q.    And the GI disorders you called out can have GI symptoms, obviously?

A.    Yes.

Q.    All of these conditions can occur in people taking GLP-1 Receptor Agonists, true?

A.    GLP-1 Receptor Agonists do not prevent one from having this set of symptoms or diseases, that is correct.

Q.    It's fair to say that not everyone with chronic nausea or vomiting has gastroparesis, true?

MR. BUXNER:   Object to form.

THE WITNESS:   It is fair to say that.

BY MS. FITZPATRICK:

Q.    And it's fair to say that --

A.    Yes.

Page 72

Q.    And it's fair to say that not everyone taking a GLP-1 receptor agonist with chronic nausea or vomiting has gastroparesis, true?

A.    I think that it is fair to say not everyone does, but I believe the majority -- vast majority of patients who are taking GLP-1 agonists do in fact have delayed gastric emptying and the subset that have symptoms do indeed have drug-induced gastroparesis.

Q.    You're telling me that everyone taking a GLP-1 agonist that has GI symptoms has drug-induced gastroparesis?

MR. BUXNER:    Object to form.

THE WITNESS:    I'm telling you that patients who are taking GLP-1 agonists are likely to have delayed gastric emptying.    And that's from the information in the labels and from a preponderance of the literature.    And so they meet the criteria for probable delayed gastric emptying.

And so since the majority of them don't have a gastric outlet obstruction, the subset of those that have symptoms I would diagnose drug-induced gastroparesis.

BY MS. FITZPATRICK:

Q.    And so, for the subset of people taking GLP-1 Receptor Agonists that have GI symptoms, you would diagnose drug-induced gastroparesis, right?

Page 73

A.    It would depend on --

MR. BUXNER:  Object to form.

THE WITNESS:  Sorry.

MR. BUXNER:  Go ahead.

THE WITNESS:  It would depend on the presentation because it may be a presentation that would be much more suggestive of one of the other things in the differential diagnosis, which is why it's important.

So I think each patient I would diagnose and look at their information separately.  And so, it would depend on how the differential diagnosis went and whether or not there are any things that would lead me to one of the entities in the differential diagnosis.

But if there were not any things that would lead me to these other things, which is really kind of the point of the differential diagnosis, as you know, then in that case, then I would diagnose drug-induced gastroparesis.

BY MS. FITZPATRICK:

Q.    And so, you would agree with me that not everyone taking a GLP-1 receptor agonist who has chronic nausea or vomiting has gastroparesis, right?

A.    I would agree that not everyone does, but I believe that it would be a logical diagnosis in the preponderance of patients.

Page 74

Q.   What's preponderance?

A.   In the majority -- in the strong majority of patients.  I believe that the definition, as we talked about earlier, of gastroparesis requires knowledge of delayed gastric emptying symptoms and a lack of outlet obstruction.

And since the labels suggest that the mechanism of action essentially is to cause or result in delayed gastric emptying or that these drugs do cause delayed gastric emptying, then they would meet my criteria unless in my differential diagnosis, I had a more likely entity that I thought was a greater likelihood.  But that would really depend on the temporal association, for example, when the patient was put on the GLP-1 Receptor Agonists.

Q.   But you just told me that your default assumption if someone comes to you on a GLP-1 receptor agonist and they have GI symptoms, your default assumption is going to be that that is -- that that is gastroparesis, true?

A.   I don't really have a --

MR. BUXNER:  Object.

Hold on, Doctor.

THE WITNESS:  I'm sorry.

MR. BUXNER:  Object to form.  Misstates.

Go ahead, Doctor.

THE WITNESS:  I really don't have a default.  Each patient is separate.  One of things that I've done a

Page 75

lot of work under in my career has been personalized medicine or precision medicine so that we essentially tailor the diagnosis to each patient without really having a default.  So I'd be characterizing it incorrectly if I called it a default.

BY MS. FITZPATRICK:

Q.   You told me that if someone came to you on a GLP-1 receptor agonist with GI symptoms, then they would meet your criteria for gastroparesis unless there was a more likely entity that you thought was a greater likelihood, true?

A.   True.

Q.   If you go to Page 25 of your report.

A.   Okay.

Q.   And look at number 3 in the Summary of Opinions.

A.   Yes.

Q.   Your opinion is that a gastric emptying study is not required to diagnosis GLP-1 receptor agonist-induced gastroparesis, true?

A.   True.

Q.   And if we go to now Page 16/17 of your report, bottom of 16 --

A.   Okay.

Q.   -- onto 17, you make the point that first line treatment for drug-induced gastroparesis is simply to withdraw the drug suspected to be delaying gastric emptying;

Page 76

do you see that?

A.   I do.  And I agree with that.

Q.   Fair to say that if GLP-1 Receptor Agonist-induced gastroparesis is suspected, the first thing to do is simply withdraw the drug, true?

MR. BUXNER:  Object to form.  Misstates.

THE WITNESS:  I think it depends on the context of the patient and history.  If you give me more information or if I can ask more information, then I can answer that question.

But I don't believe that it's always true that a patient on GLP-1 agonists with any symptom whatsoever should be withdrawn.  I think that needs to be tailored to and specific to the individual patient.

BY MS. FITZPATRICK:

Q.   But you agree with me that the first line treatment for drug-induced gastroparesis, so including --

A.   Assuming that a treatment actually is indicated, which it may not be.  So a patient may come to me with symptoms that are relatively minor or symptoms that sound as though they would not result in my wanting to withdraw the GLP-1 agonist.  It would really depend on the patient and the symptoms as far as I would withdraw them.  So I wouldn't withdraw them for any symptoms however minor or however short-lived they were.

Page 77

Q.    What you wrote in your report is that the first line treatment for drug-induced gastroparesis, including suspected GLP-1-induced gastroparesis, is simply to withdraw the drug, true?  That's what you wrote in your report.

A.    True.  Right.  But I just want to clarify.

Q.    That's what you wrote in your report.  That's what you wrote in your report is my actual question.  Do you understand that, Doctor?

MR. BUXNER:  Object to form.  You're badgering the witness.

Go ahead, Doctor.

BY MS. FITZPATRICK:

Q.    Is that what you wrote in your report, Doctor?

A.    What's in the report here is what I put in the report.

Q.    Okay.

A.    If you want me to clarify --

Q.    I don't.

A.    -- what's in the report --

Q.    I don't.

A.    Okay.

Q.    If you move on to 17, the next sentence:  "If the gastric emptying effect of the drug is responsible for the patient's symptoms, they should begin to resolve as the drug clears his or her system."  Do you see that?

Page 78

A.   I do.

Q.   Okay.  If you see the symptoms start to resolve with withdrawal or reduction of the drug, you believe that's evidence that the gastroparesis is drug-induced, right?

MR. BUXNER:  Object to form.

THE WITNESS:  No.  I don't say that in the report.

BY MS. FITZPATRICK:

Q.   So if you have somebody that you suspect has GLP-1-induced -- GLP-1-induced gastroparesis; do you understand that?

A.   Right.

Q.   Okay.

A.   If it's somebody who I --

Q.   Suspect.

A.   Yes.

Q.   Yes.  And then you withdraw the drug?

A.   Yes.

Q.   And the symptoms start to recede, right?

A.   Yes.

Q.   That is evidence to you that they had GLP-1-induced gastroparesis, right?

A.   That is one piece of evidence to me.  But it's not all the evidence that I would have.  I would still have lots of questions specific to the patient.  So that in and of itself wouldn't be the only thing I would use to determine

Page 79

whether or not the patient had gastroparesis.

Q. But you agree that -- as you wrote in your report, that if the gastric emptying effect of the GLP-1 receptor agonist is responsible for the patient's symptoms, they should begin to resolve as the drug starts to clear his or her system, right?

A. That's correct. I'm not sure I would have stated it that way, but yes.

Q. In your report, you note that GLP-1 receptor agonist medications can have half-life of a few hours up to as many as seven days, right?

A. Correct.

Q. That's the time for fully half of the drug to be cleared from the body, right? That's what a half-life means?

A. It -- it may be a more technical definition from that, but I think that's one definition. It's really how much activity is there. Some of that activity gets cleared from the body in different ways. And so that t 1/2 may have a more precise pharmacologic definition than that.

But I think in general, the idea is that t 1/2 is the time when half of the drug is still within the patient's body.

Q. The time to clear less than half of the drug from the body is even less than that range, right?

Page 80

A.   Correct.

Q.   So you expect to see symptoms resolve within a day or two of drug withdrawal, right, for GLP-1 Receptor Agonists?

MR. BUXNER:  Object to form.

THE WITNESS:  It would depend on whether it was long-acting or short-acting in the half life.  And so I think the patients are variable as far as how they end up responding to withdrawal.  And so, some may respond, you know, more quickly than others.  Some may never respond, or some may not, you know, respond indefinitely.

And so, I don't believe that there's any hard and fast rules about determining whether or not it was due to gastric emptying based on how a patient responds after the medication is withdrawn.

BY MS. FITZPATRICK:

Q.   Your -- you -- are you aware that anesthesiologists recommend to stop GLP-1 Receptor Agonists five days before surgery?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   Are you aware of that?

A.   So -- no.  What I am aware of is the fact that anesthesiologists are concerned about GLP-1s.  And because

Page 81

anesthesiologists in their literature do believe that it -- GLP-1 Receptor Agonists cause delayed gastric emptying, there's a concern about aspiration in a patient essentially vomiting associated with it.

But it really would depend for an anesthesiologist on which specific GLP-1 agonist. And there are different recommendations and different ideas within the anesthesiology literature about how long one should wait or whether one should wait prior to procedures.

Q. You're not aware of surgical consensus guidelines that say stop five days before surgery?

MR. BUXNER: Object to form.

THE WITNESS: I am not aware of one. And I would feel uncomfortable with a guideline that generalized GLP-1 Receptor Agonists to any one particular recommendation for how long without considering which GLP-1 agonist it was and other specific information about the patient.

BY MS. FITZPATRICK:

Q. If you go -- still on Page 17 --

A. Okay.

Q. -- further down. Hold on. Let me find it. At the -- all the way at the bottom, last couple sentences, there's one that starts "if symptoms persisted."

A. Okay.

Page 82

Q.   Do you see that it says:   "If symptoms persisted after the patient was off his/her medication for an appropriate period of time to allow clearance of the medication, I would consider a nuclear medicine gastric emptying study."

Do you see that?

A.   I do, yes.

Q.   And then if you go down 17 to 18, it says: "If there is no obvious cause, or if symptoms fail to resolve after the suspect drugs is withdrawn, a broader more comprehensive analysis may be required."

Do you see that?

A.   I do.

Q.   That's because if the symptoms fail to resolve after the suspect drug is withdrawn, it doesn't appear to be drug-induced gastroparesis, true?

MR. BUXNER:  Object to form.

THE WITNESS:  It's not true.  It just changes the probability.

BY MS. FITZPATRICK:

Q.   Makes the probability less, true?

A.   I believe it's true that if one withdraws a GLP-1 agonist and the patient continues to have the same symptoms, then it raises larger questions about what is the probability that it was caused by gastric emptying.  So I

Page 83

think that's what you were asking.  And the answer to that is yes.

Q.   And the probability is less.  If the symptoms persist after the drug is out of their system, the probability that the symptoms are caused by the drug is less, right?  We can agree on that?

A.   We can agree on that.  It may still be the most likely cause, but it would trigger me to look into other causes more deeply than I had previously.

Q.   And at that point, if the symptoms persist after withdrawal of the drug, you would consider a gastric emptying study, true?

A.   I would consider a gastric emptying study once I was able to perform it within the guidelines suggested by the Society of Nuclear Medicine, which are to wait until the patient has had the drug cleared from their system.

Q.   That's the premise of my question.  If symptoms persist after they're off them in enough time for the drug to clear and they still have symptoms, you would do a gastric emptying study, true?

MR. BUXNER:  Object to form.  Asked and answered.

THE WITNESS:  That's not true.  In other words, I would consider a gastric emptying study, but we just talked about a large number of different studies that could be done, including an EGD, including taking

Page 84

additional patient history.  And so I'd really want to know the context of the patient.

So if you're asking would I do a gastric emptying study in every patient that still has symptoms after the medications are withdrawn, which I think you're asking, the answer is, no, I would not do it in every patient.  I would probably do it in only a small minority of those patients.

BY MS. FITZPATRICK:

Q.  If you look at Page 16 of your report?

A.  Sure.

Q.  Under C.  You wrote in your report that:  "When gastroparesis is based on a permanent or unknown underlying condition, it should be confirmed by gastric emptying study and upper endoscopy."

Do you see that?

A.  I do.  I was quoting --

Q.  And you have --

Do you see it?

A.  I do see it, yes.

Q.  And you have two citations, correct?

A.  Correct.  And I was really quoting both of those citations.

Q.  And you agree with those citations; that's why you put them in your report, true?

Page 85

MR. BUXNER:  Object to form.

THE WITNESS:  I wanted to detail what was in the literature.  And so both of those authors believe that it should be confirmed by -- by another study.  I don't agree that one needs to do upper endoscopy and a GES study in those patients.  And I think it really depends on the specific patient.

And so they mention that.  I would not have made that particular statement because I think it's too much of a blanket statement.

So even though I wanted to quote those two authors in what they had said, I don't believe that the majority of patients need to have a gastric emptying study if there are other studies that have provided that information, such as an EGD or history or other things.  So again, I'd want to go back to the individual patient.

BY MS. FITZPATRICK:

Q.  Did you write your report?

A.  Yes.

Q.  And you said you quoted those two authors, but there's no quote marks, right?  It's just a sentence.

A.  Right.  The reason I didn't put quote marks is --

Q.  I'm not asking.  There's no quote marks, correct?

A.  True.

Page 86

Q.   It's not a quote, true?

A.   I -- I don't know that I would have put a quotation mark if it were a quote.  In other words, this is not a scientific paper.  So I don't recall.  I'd have to look back to see whether or not that specific sentence was in there.

But I wanted to do was make sure that that sentence was attributed to those two authors so I could reflect what their opinion was in those articles.

Q.   If you go to Page 19 --

A.   Okay.

Q.   -- the paragraph right above heading B.

A.   Nineteen, paragraph above heading B.  Okay.

Q.   Here you're also referring to Camilleri's 2022 paper?

A.   Okay.

Q.   Same as what we were just looking at on Page 16, right?

A.   I don't know if --

Q.   Page 19 immediately above heading B.

A.   Camilleri wrote multiple articles.  And so I don't know if this is the same one or not because there's so many Camilleri articles that I refer to.  So I don't know whether this is the same one.

I think this one, the Camilleri one, is the ACG

Page 87

clinical guideline that was gastroparesis in '22.  I don't know if the other one is that same article or not.

Q.    Your bibliography contains a single publication by first author Camilleri, true?

A.    Right.  But that --

Q.    True?

A.    It's -- to my knowledge, that is correct.

Q.    Okay.

A.    I'd have to look and verify that.

Q.    And on Page 19 when you quote Camilleri 2022, you use quotation marks, true?

A.    I'd have to look back.

MR. BUXNER:  Hold on for one second.  Hold on one second, Doctor, before you answer.

I just want to make sure I'm where you are because I've lost you.

MS. FITZPATRICK:  We're on Page 19.

MR. BUXNER:  19.

MS. FITZPATRICK:  We're on the sentence above heading B.

MR. BUXNER:  Okay.  Gotcha.

BY MS. FITZPATRICK:

Q.    You see there's a quote from Camilleri 2022?

A.    Right.  Now -- now I'm lost too.  In other words, I quoted it saying further studies are required to appraise.

Page 88

That's in quotes.

Q. Yes.

A. And so, I know that that is a quote. I don't know whether the other one is a quote or not. I may have not put the quotation marks in it but still used it as a quote. I probably would have been more careful if it had been a scientific paper.

But I'd have to go back and see whether or not I'm summarizing or extrapolating or I'm quoting him directly. I just don't know the answer to that.

Q. If you look back at Page 16 --

A. Okay.

Q. -- there are not -- we've established no quotation marks, right, for the statement --

A. We've established in the report that there are no quotation marks.

Q. Yes. And also, no disagreement with that statement is in the report, true? You don't follow up that statement by pointing out any disagreement with it, right?

MR. BUXNER: Object to form.

THE WITNESS: I don't disagree with that -- with my own statement. But as the author -- I mean, you asked me who wrote the report. I wrote the report, so I'm telling you that when I wrote the report, I was trying to refer to those two authors and what their

Page 89

opinion was, not to express my own opinion.

BY MS. FITZPATRICK:

Q.    But the statement:  "When gastroparesis is based on a permanent or unknown underlying condition, it should be confirmed by GES and under endoscopy" is your own statement, true?

A.    It is.  But I wish that I had essentially had the opportunity to -- I mean, I want to clarify that by saying that I was quoting these two authors and that I believe it should be confirmed based on a patient-by-patient basis. That's really the theme of what I'm trying to convey.

And so, I hope that the report as a whole conveyed that information.  When I said one size does not fit all, I was really referring to why it's so important to individualize it to the patient.

And so, this particular statement was not in any way meant to essentially deny the theme of establishing this in each and every patient.  I always teach my residents and fellows essentially that there should not be overarching rules, but that one needs to determine that on a patient-by-patient basis.

So I personally don't agree with that particular statement myself based on my reading.  But that's what was contained in Camilleri and Lacy's 2022 papers.

Q.    If you look at the last sentence in that

Page 90

paragraph, it says: "Because it can be difficult to distinguish from other conditions."

And you're referring to gastroparesis, true?

A. Correct.

Q. So "because it can be difficult to distinguish gastroparesis from other conditions -- "

A. Yeah.

Q. " -- especially functional dyspepsia --"

A. Yes.

Q. You say: "It is important to use confirmatory diagnostic testing." True?

A. True. But that doesn't refer to a gastric emptying study necessarily.

Q. There's other imaging studies we talked about besides gastric emptying studies, right?

A. Yeah, CT, ultrasound. Quite a variety.

Q. And it's important to use some form of imaging study because it can be difficult to distinguish gastroparesis from other conditions, true?

A. No, I didn't say imaging.

MR. BUXNER: Object to form.

THE WITNESS: I said confirmatory diagnostic testing. So that would mean lab values. It would mean a variety of different diagnostic tests. I'm not implying --

Page 91

BY MS. FITZPATRICK:

Q.   What lab values distinguish gastroparesis from functional dyspepsia?

A.   It may be -- I can't tell you what the specific ones are that would make that distinction.  It may be -- I don't know.  In other words, I can't tell you a specific lab value off the top of my head that would do that.

But I specifically mentioned other diagnostic testing that could be confirmatory of one or the other.

The challenge is, is that functional dyspepsia is a diagnosis of exclusion.  You see that in the literature over and over again.

And so, it's really important essentially to be able to, you know, understand that's a diagnosis of exclusion.  There's the Rome criteria specifically for it. And so, the idea would be to do other testing, but not necessarily a gastric emptying study.

Q.   Because it can be difficult to distinguish gastroparesis from other conditions, as you write --

A.   Yeah.

Q.   -- especially functional dyspepsia --

A.   Yeah.

Q.   -- it's important to use some kind of objective evidence.  True?  Whatever that form is?

A.   Objective or subjective --

Page 92

THE REPORTER:  Wait, wait, wait.

THE WITNESS:  Sure.

MR. BUXNER:  Doctor, let her finish the question.

THE WITNESS:  Oh okay.

MR. BUXNER:  You're in the middle of her and then I can't get the objection.

THE WITNESS:  Sorry.

BY MS. FITZPATRICK:

Q.   I'll restate.  Because it can be difficult to distinguish gastroparesis from other conditions, especially functional dyspepsia, it's important to use confirmatory objective evidence, whatever the form, whether that's diagnostic testing or imaging testing, it's important to have objective evidence, true?

MR. BUXNER:  Object to form.

THE WITNESS:  Either objective or subjective confirmatory diagnostic testing.  It doesn't have to be objective.

BY MS. FITZPATRICK:

Q.   What is a subjective diagnostic test?

A.   Subjective diagnostic test might be palpation of a patient to determine whether or not there's bloating.  It might be essentially listening for gastric sounds.  It might be any number of different things that might not provide a specific number that's associated with it.

Page 93

Q.    It's fair to say, though, that when gastroparesis is based on a permanent or unknown condition, it can be difficult to distinguish from other conditions?

A.    Yes.

Q.    If symptoms persist after drug withdrawal objective proof of delayed gastric emptying is required, right?

MR. BUXNER:  Object to form.

THE WITNESS:  Subjective or objective.  In other words, additional information is required.  I don't want to get caught up on the word "objective" because so much of what we do in medicine is subjective, including radiology and nuclear medicine.

BY MS. FITZPATRICK:

Q.    You agree that consensus statements from the Rome 4 Foundation, from the American College of Gastroenterology, from the American College of Radiology, they refer to having objective evidence of delayed gastric emptying to diagnose gastroparesis, true?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.    They use the word "objective," true?

MR. BUXNER:  Same objection.

THE WITNESS:  I don't recall whether they use objective, but I don't think if they do use the word

Page 94

"objective," that it would preclude also wanting subjective evidence.

And I think -- I mean, we could get into the semantics of what they mean by objective and what is meant by subjective. We talked about that earlier.

And so, when I think of objective, I think of quantitative. I don't know whether or not they're actually looking for quantitative data or not. The majority of what I do is not quantitative.

BY MS. FITZPATRICK:

Q.   When you think of the word "objective," you think of quantitative data, true? You just told me that?

A.   I do.

Q.   And the only one of -- well, that's probably not true.

Which of the imaging studies that you discuss at Pages 12 to 14 of your report generates quantitative data on delayed gastric emptying?

A.   The Smart Pill Wireless Motility Capsule does. The Gastric Emptying Breath Test does. The EGD is more subjective, I would suggest. Rather than quantitative data, there's more descriptive data, but certainly one can quantify or measure certain things, but for the most part, I believe that's subjective. The EGG is more objective. The x-ray is subjective. Upper GI series is subjective.

Page 95

Computed tomography is mostly subjective, but there are measurements that we can make with computed tomography. MRI is mostly subjective, but there are objective measurements that one could make, for example, measuring gastric thickening. I'm trying to assess the amount of volume that's in the stomach any particular time. Those could all be translated into quantitative objective data.

Q.    But not of gastric emptying?

A.    One can determine gastric emptying using MR or CT or ultrasound.

Q.    You can use the gastric thickness measurements from an MRI to determine gastric emptying?

A.    No.  So let me refer to my report.

Q.    Is that -- that's a "no"?  You said no?

MR. BUXNER:  I don't -- I'm confused if there's a question pending, so object to form.

BY MS. FITZPATRICK:

Q.    I can repeat my question.  Do you agree with me that you can't use the gastric thickness measurements from an MRI to determine delayed gastric emptying, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I would use other data from an MRI other than the thickening of the stomach wall --

BY MS. FITZPATRICK:

Q.    The subjective --

Page 96

A.    -- that would allow me to objectively determine the gastric emptying.

Q.    If you look at Page 15 back in the discussion of functional dyspepsia?

A.    Yes.

Q.    You make the point that functional dyspepsia can have slowed gastric emptying, true?

A.    Functional dyspepsia can be associated with delayed gastric emptying, yes.

Q.    And so, you agree that conditions other than gastroparesis can be associated with delayed gastric emptying, right?

A.    Correct.  In my report, I mention Kim, et al., and others, so yes.

Q.    If you look at Page 10 under the heading Gastroparesis, the paragraph at the bottom, you write that the etiology of gastroparesis is diverse with more than 50 recognized causes, right?

A.    Right.  I'm quoting Jung and Ye and Ye.

Q.    Another quote without quotation marks?

A.    A reference without quotation marks.  I don't want to get too hung up on the distinction that I made in creating the report myself as to whether or not I always put quotation marks around it.  I'd be more careful about the quotation marks if I were publishing this.

Page 97

Q.   But you agree -- you agree that the etiology of gastroparesis is diverse?

A.   Yes.

Q.   You wrote your report differently than you write scientific papers for publication?

MR. BUXNER:  Object to form.

THE WITNESS:  It's a completely different use case, so absolutely, yes.

BY MS. FITZPATRICK:

Q.   And you wrote it less carefully than you write a publication for publication?

A.   No.

MR. BUXNER:  Object to form.

THE WITNESS:  No, not less carefully.  Just differently.

BY MS. FITZPATRICK:

Q.   Gastroparesis has more than 50 recognized causes, true?

A.   True, according to what I read by Jung and Ye and Ye.

Q.   Which you have no reason to doubt?

A.   Which I do not have a reason to doubt.

Q.   Causes of gastroparesis include diabetes, drugs other than GLP-1 Receptor Agonists, connective tissue disease and complications of surgery?

Page 98

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.

BY MS. FITZPATRICK:

Q.   And dozens more, right?

A.   And dozens more, right.

Q.   And there could also be gastroparesis that has no clear cause, right?

A.   Idiopathic gastroparesis, yes.

Q.   Is that a "yes?

Your report cites the Rome 4 criteria when discussing functional dyspepsia, true?

A.   True.

Q.   And that reference refers to the Rome Foundation?

A.   It does.

Q.   The Rome Foundation collaborates with international neurogastroenterology and motility societies to reach consensus criteria?

A.   I believe that is the case.

Q.   And you agree that the Rome Foundation guidelines are an authoritative source?

MR. BUXNER:  Object to form.

THE WITNESS:  I think that they are perceived as a authoritative source.  And I believe that they are one authoritative sources.  I think there are multiple authoritative sources.

Page 99

BY MS. FITZPATRICK:

Q. And they reflect international consensus, right?

A. And there's international input into the Rome criteria, yes.

Q. They're authored by experts in the field of gastroenterology, right?

A. I believe so, yes.

Q. Are you aware that after you submitted your report, the Rome Foundation issued consensus criteria on idiopathic gastroparesis?

A. I am.

Q. Did you review the guidelines?

A. Yes, but briefly superficially. I didn't review them obviously for the report, but I'm -- I am familiar with the fact that those were issued.

MS. FITZPATRICK: If we could have those, Andrew.

BY MS. FITZPATRICK:

Q. Handing you what we will mark as Exhibit 2.

(Deposition Exhibit Number 2 marked for identification.)

THE WITNESS: I haven't really read these as carefully as the other things that were put into my report.

MR. BUXNER: Wait for a question, Doctor.

THE WITNESS: Sure.

Page 100

BY MS. FITZPATRICK:

Q.   Do you see that these are the Rome Foundation consensus on idiopathic gastroparesis?

A.   Yes.

Q.   Dated 2025?

A.   January 2025, yes.

Q.   Published in The Lancet?

A.   Yes.

Q.   If you look at the abstract -- scratch that.

If you look at Page 3, so PDF Page 3 --

A.   I'm not sure what you mean by PDF Page 3.

MR. BUXNER:  Page 70?

BY MS. FITZPATRICK:

Q.   Yes.  So it's marked Page 70, but it is just Page 3 of your document, if that makes sense.

A.   It's the third page.

Q.   Yes.

A.   Okay, sure.

Q.   That's what I meant by Page 3.

A.   Yes, thanks.

Q.   Do you see on the right towards the bottom there's a paragraph that starts "To date"?

A.   I do.

Q.   It says that:  To date, gastric emptying scintiography [sic.] of a solid-phase meal is considered the

Page 101

gold standard for gastroparesis diagnosis.

Do you see that?

A.    Scintigraphy, yes.

Q.    Sorry.

A.    That's okay.

Q.    You see the statement, though?

A.    Yes.

Q.    And you agree with that statement?

A.    Yes.  I think that -- I agree that it is the gold standard for determining gastric emptying, but I don't agree that it is the gold standard for gastroparesis diagnosis.

In other words, I think it is the best -- it is the gold standard for determining gastric emptying.  As far as gastroparesis diagnosis, I think the gold standard is really the differ -- the patient history and physical and presentation, and I would not ever diagnose a gastroparesis solely on the basis of a positive gastric emptying study.

Q.    You agree, though, that a gastric emptying study is the gold standard for determining delayed gastric emptying, right?

A.    For determining the rate of gastric emptying.

Q.    And whether it's delayed, right?

A.    And determining whether it's delayed beyond a particular set value.

Q.    But you agree with the Rome Foundation Consensus

Page 102

Guidelines when they say that the gastric emptying study is the gold standard for gastroparesis diagnosis?

A.   I strongly disagree with --

MR. BUXNER:  Object to form.

THE WITNESS:  Oh sorry.

MR. BUXNER:  Asked and answered.

Go ahead.

THE WITNESS:  I disagree with that.

BY MS. FITZPATRICK:

Q.   You said you strongly disagree with that, right?

A.   Yeah, I strongly disagree with that as an expert in gastric emptying studies.

Q.   If you look on the right column up at the top, there's a sentence that starts:  "By definition."  Do you see that?

A.   Yes.

Q.   "By definition, gastroparesis implies an objective delay in gastric emptying in the absence of mechanical obstruction, and requires both an assessment of gastric emptying and confirmation of the absence of gastric outlet obstruction or other mechanical factors."

Do you see that?

A.   I do.

Q.   You agree with that statement?

A.   No.

Page 103

Q.   You strongly disagree with it?

MR. BUXNER:  Object to form.

THE WITNESS:  I disagree with it.  I think --
let's read it again.  By definition gastroparesis
implies --

BY MS. FITZPATRICK:

Q.   There is no question pending.

A.   Okay.

Q.   My question was:  Do you agree with that
statement?  And you answered me.

A.   Okay.

Q.   I appreciate that.

A.   Sure.  Just to be clear, I want to make sure I --

Q.   There's no question pending.

A.   Okay.

MS. FITZPATRICK:  Can I have the ACG guidelines
now?

BY MS. FITZPATRICK:

Q.   I'm handing you what I'll mark as Deposition
Exhibit 3.

(Deposition Exhibit Number 3  marked for
identification.)

BY MS. FITZPATRICK:

Q.   Doctor, you know that other groups like the
American College of Gastroenterology and the American

Page 104

Gastroenterological Association also provide guidelines for diagnosing gastroparesis, right?

A.    I am, yes.

Q.    You would agree with that the American College of Gastroenterology guidelines are reliable, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't understand what you mean by reliable, so I would not characterize any particular consensus as reliable or not reliable.

BY MS. FITZPATRICK:

Q.    You would agree that the AC -- can I call it ACG?

A.    Yes, please.

Q.    You agree that the ACG guidelines on diagnosing gastroparesis are an authoritative source, right?

A.    Yes.

Q.    And the American Gastroenterological Association guidelines for diagnosing gastroparesis are also authoritative, right?

A.    Right, authoritative in the sense that they are an authority.  But authorities disagree with each other frequently.  And so, just I want to make sure that the way you're using authoritative and the way I'm using it are the same.

Q.    If you look at what I've handed you as Exhibit 3, do you see that it's the ACG Clinical Guidelines on

Page 105

Gastroparesis?

A.    I do.

Q.    And if you look at the first sentence of abstract, do you see that it says:  "Gastroparesis is characterized by symptoms suggesting retention of food in the stomach with objective evidence of delayed gastric emptying in the absence of mechanical obstruction."

Do you see that?

A.    Yes.

Q.    I understand that it is your opinion that you can diagnose gastroparesis even without objective evidence of delayed gastric emptying, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I wouldn't say even without.  But I believe you can diagnose gastroparesis without having a gastric emptying study or quantitative data that determines rate of gastric emptying.

BY MS. FITZPATRICK:

Q.    Well, not just without a gastric emptying study or quantitative data, you think it can be diagnosed without objective evidence of delayed gastric emptying, true?

A.    I think that objective evidence includes patient history and physical and I think objective evidence includes the differential that we've been talking about, so I would include that in objective evidence.

Page 106

Q.   To you, a patient history and physical constitutes objective evidence?

A.   To me, it depends on how one interprets what they are saying.  To me, I like quantitative data, but history and physical can essentially collect quantitative data.  For example, what was the duration of the time that you had vomiting?  When was the onset?  To me, that's all objective data.

Q.   If you go into those guidelines --

A.   The ACG Clinical Guidelines?

Q.   Yes.

A.   Yes.

Q.   To -- it says Page 5 on the top right.

A.   Okay.

Q.   At the bottom Diagnostic Testing?

A.   Okay.

Q.   Do you see that it says that:  "After exclusion of mechanical obstruction, diverse tests are available to objectively document the presence of delayed gastric emptying."

Do you see that?

A.   I do.

Q.   And it goes on to say that:  "The gold standard is scintigraphic gastric emptying."

Do you see that?

Page 107

A.    I do.

Q.    In that gastric -- in that Diagnostic Testing section, it nowhere mentions history or physical, true?

MR. BUXNER:    Object to form.

THE WITNESS:    I haven't read the whole -- I mean, is that the whole paragraph?  Are you saying in these three sentence, does it --

BY MS. FITZPATRICK:

Q.    No, the heading -- that section goes onto the next page, right?

A.    Until we get potential confounding between gastroparesis and functional dyspepsia; is that right?

Q.    That's how I interpret it.  You cited this paper in your report, true, Doctor?

A.    I did.  So Diagnostic Testing, for me that only goes until it says optimal duration of gastric emptying test.

Q.    Okay.

A.    In other words, it only goes down one subheading, essentially.  So to me, when you asked the question about Diagnostic Testing, you're talking about those three sentences.

Q.    Optimal duration of gastric emptying tests falls under the heading of Diagnostic Testing, true?  Do you see how it's indented?

Page 108

A.    Yes.

Q.    Okay.  This is a paper you cited in your report, true?

A.    True.

Q.    You read it carefully, right?

A.    I did.

Q.    You're familiar with it from even before this litigation, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I'm familiar with the fact that there was a guideline, but I'm more familiar with it given my involvement in this litigation.

BY MS. FITZPATRICK:

Q.    Okay.  And so, you know that the American College of Gastroenterology, when they talk about diagnostic testing to confirm gastroparesis does not mention history or physical, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I do not believe that that is correct.  I believe that history -- I mean, my understanding -- and I'd have to read this again -- is that they do mention information related to gathering history and information about the patient and that it's not essentially just based on quantitative data such as gastric emptying study.

Page 109

BY MS. FITZPATRICK:

Q.   Okay.  In this Diagnostic Testing section --

A.   Yes.

Q.   -- do you see references to a gastric emptying study?

MR. BUXNER:  Object to form.

Doctor, take your time.  If you want to read it, you can read it.  It's not a memory test.

BY MS. FITZPATRICK:

Q.   It's a page.  Do you see references to gastric emptying study?

A.   In the section Optimal duration of gastric emptying tests?

Q.   Yes, under Diagnostic Tests.

A.   I see Gastric Emptying Test, but I don't see scintigraphic.  I see GE test methodology.  And they also refer to a solid meal and at least three hours of data collection.  And then it says it's worth noting that scintigraphic assessment should be ideally performed.  And so -- but they also mention the '92 studies, the breath test as well.  And so it's not just referring to a -- a scintigraphic gastric emptying study.

Q.   Absolutely.  They refer to scintigraphic testing?

A.   Right.

Q.   And --

Page 110

A.    Ultrasound, Wireless Motility Capsule.

Q.    Yep.  Right?  They refer to several different kinds of imaging tests for delayed gastric emptying, true?

A.    That's not true.  Because for example, the capsule is not an imaging study.

Q.    Didn't you put it under the heading Imaging Studies in your own report?

A.    I may have.  But essentially, what that section meant was different studies that had been done to collect objective and subjective information about gastric emptying.

So maybe I should have created another section that put it outside of imaging.  But it really is not an imaging study technically.  I just want to make that distinction.

Q.    So when the American College of Gastroenterology guidelines talk about diagnostic tests for delayed gastric emptying, they refer specifically to scintigraphic testing, true?

A.    They include scintigraphic testing in the list of possible tests.

Q.    And they include breath tests?

A.    Correct.

Q.    They include ultrasound?

A.    In their discussion --

Q.    Yes.

Page 111

A.   -- correct.

Q.   And they include Wireless Motility Capsule?

A.   Correct.

Q.   Correct?

And nowhere in this section on Diagnostic Tests for delayed gastric emptying do they put anything about history and physical?

MR. BUXNER:  Object to form.

THE WITNESS:  They don't put information about history and physical because it's titled:  Optimal duration of gastric emptying tests."  So --

BY MS. FITZPATRICK:

Q.   Under the heading Diagnostic Tests, right?

A.   Correct.

Q.   The whole Diagnostic Test section, I'm asking you.

A.   Right.  I guess we're talking about the fact that they decided not to put it in this particular section.  If that's your question, then I guess they didn't decide to put it in this section on Diagnostic Testing.  I really wouldn't infer anything from where they -- which section they put that information in.

Q.   If you look back at your report at Page 18 --

A.   Okay.

Q.   -- do you see there's a paragraph where you refer to the ACG, right?

Page 112

A.    Correct.

Q.    And the AGG -- AGA, right?

A.    AGA, correct.

Q.    And you make the point that not just the ACG, but the AGA also recognized the gastric emptying study as the most reliable method for objectively assessing gastric emptying, true?

A.    I believe that's true.

Q.    And the most reliable method for confirming the diagnosis of gastroparesis, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't believe that it goes beyond assessment of gastric emptying.  And so I don't believe that one can extrapolate that because it's the gold standard, which I believe it is for determining gastric emptying, that it is essentially the gold standard for making the diagnosis of gastroparesis.  I think it's an important distinction.

BY MS. FITZPATRICK:

Q.    Do you see where you wrote in your report just two months ago that both the ACG and the AGA recognize the gastric emptying study as the most reliable method for objectively assessing gastric emptying and confirming the diagnosis of gastroparesis; do you see that?

A.    Assuming that one wants to have an objective

Page 113

measurement to confirm gastroparesis, I believe gastric emptying is the best study.  But that doesn't imply that I believe that gastric emptying is required to make the diagnosis of -- or a gastric emptying study is required to make the diagnosis of gastroparesis.

Q.    But you recognize that the ACG and AGA do require objective evidence of gastric emptying for a diagnosis of gastroparesis, true?  They use the word "objective."

MR. BUXNER:  Object to form.

Go ahead, Doctor.

THE WITNESS:  Right.  I believe that when they're using the term "objective," that they are not restricting that to a gastric emptying study or a study that essentially gives you quantitative data, that I believe when they are using objective, that objective would also relate to information in the history and physical, patient presentation, temporal aspects as well.

BY MS. FITZPATRICK:

Q.    Are you aware that the American College of Radiology published practice parameters for the performance of gastrointestinal scintigraphy?

A.    Yes.

Q.    You're a member of the American College of Radiology?

Page 114

A.    Yes.  I'm a fellow of the American College of Radiology.

Q.    The American College of Radiology is a credible, reputable organization, right?

A.    I believe so.

Q.    And the practice parameters from them are authoritative, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't --

BY MS. FITZPATRICK:

Q.    In the sense you gave before?

A.    In the sense that I gave before that there can be multiple authoritative sources, but they are one authority that people look to essentially for guidelines.

Q.    I'm handing you now what I've marked as Exhibit 4.

A.    Do I have that?

THE WITNESS:  I think I want to take a stretch break.

MR. BUXNER:  Have we been going for an hour; do you know?

MS. FITZPATRICK:  We could take a break.

MR. BUXNER:  If it's good for you.

MS. FITZPATRICK:  Yeah, that's fine.

MR. BUXNER:  Great.

THE WITNESS:  I'm not in the middle -- you're not

Page 115

in the middle of a question, are you?

MS. FITZPATRICK:  No.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Off record, 11:22 A.M.

(Deposition Exhibit Number 4 marked for identification.)

THE VIDEOGRAPHER:  On record, 11:35 A.M.

BY MS. FITZPATRICK:

Q.    Doctor, do you see Exhibit 4?  I've handed you Guidelines from the American College of Radiology on the performance of scintigraphy.

A.    I do, yes.

Q.    Okay.  These are not guidelines on how to diagnose gastroparesis, true?

A.    True.

Q.    I've shown you guidelines from the Rome Foundation, from the American College of Gastroenterologists and from the AGA on gastroparesis, true?

A.    You have.

Q.    Those are all organizations of -- or that include gastroenterologists?

A.    Yes.

Q.    Can you point me to any guidelines from a radiology organization on how to diagnose gastroparesis?

A.    No, there are no guidelines that I'm aware of that

Page 116

specifically talk about diagnosing gastroparesis.

Q.   From radiologists, right?

A.   From radiologists.  That would not be the type of guideline that radiology would typically issue.

Q.   That's not the expertise of radiologists, true?

MR. BUXNER:  Object to form.

THE WITNESS:  The expertise of radiologists is very much in the area of diagnosis.  But in general, the ACR guidelines are more specific to how to perform studies rather than comprehensively going into detail. The guidelines would be so incredibly expansive because there are so many different specialties that we cover.

So in general, they tend to limit themselves to guidelines on how to perform the study rather than how to make specific diagnoses with the study.

BY MS. FITZPATRICK:

Q.   Radiologists can be experts in how to use imaging studies to diagnose diseases, right?

A.   Right.

Q.   Radiologists are not experts in diagnosing diseases without imaging studies, right?

A.   I disagree with that.

MR. BUXNER:  Object to form.

THE WITNESS:  Oh sorry.  I'll try to wait.

BY MS. FITZPATRICK:

Page 117

Q. If you look at the guidelines that you have in front of you, these are done in conjunction -- not just the American College of Radiology, but also with the American College of Nuclear Medicine?

A. Correct.

Q. That's a credible, reputable organization?

A. I believe so.

Q. Are you a member of that one too?

A. I'm in the process of joining. There's another society called the Society of Nuclear Medicine and Molecular Imaging that I'm a member of. And I'd like to become a member of that society as well. ACNM.

Q. If you go to Page 7 --

A. In Exhibit 4, you mean?

Q. Yes. Under the heading Gastric Emptying, do you see that?

A. I do.

Q. Do you see that it says: "Evaluation of gastric motility utilizing a radiolabeled meal provides functional information that is indispensable in the management of patients presenting with various upper gastrointestinal signs and symptoms."

Do you see that?

A. I do.

Q. And the radiolabeled meal, they're describing a

Page 118

gastric emptying study, true?

A. They are.

Q. And so what the American College of Radiology guidelines state is that gastric emptying studies provide information that is indispensable in the management of patients presenting with upper GI symptoms, true?

A. It is true that this -- that sentence that you just read is in the guideline.

Q. And you disagree because you think the gastric emptying study is not necessary, not indispensable, true?

MR. BUXNER: Object to form.

THE WITNESS: I believe that -- that a) they're not talking -- when they talk about indispensable in the management of patients presenting with various upper GI signs and symptoms, number one, they're not talking specifically about gastroparesis.

But number two, I would interpret this as a member of the American College of Radiology, as meaning that in managing patients who present with those, that a gastric emptying study is the study that would be best to determine gastric motility if that is thought to be required in the workup.

And so, I think this is really a statement that it's an indispensable study once the decision is made that a study is actually needed. That's how I would

Page 119

and do interpret that.

BY MS. FITZPATRICK:

Q.    You understand that indispensable means absolutely necessary, right?

MR. BUXNER:    Object to form.

THE WITNESS:    I don't understand that it means absolutely necessary.  I think what they're saying is that other studies, such as a Capsule Study or a breath test study, et cetera, are not what they believe is the preferred study.  And those other studies are dispensable, but that they believe and they agree with the other standards that you mentioned, in my own opinion, that it is the best and arguably indispensable gold standard for determining rate of gastric emptying.

BY MS. FITZPATRICK:

Q.    So patients presenting with various upper GI signs and symptoms.  That would include people with gastroparesis, true?

A.    It would.

Q.    Okay.  And when they say that a gastric emptying study is indispensable to the management of those patients, you think they mean indispensable only if you've already decided to do some kind of study?

A.    I know they mean that because otherwise, they would be suggesting that every one of those millions of

Page 120

patients that we talked about previously should have a gastric emptying study. And they clearly in my mind are not suggesting anything close to that.

Q. You were not part of the authorship of those guidelines, true?

A. No, I've been on part of authorship of other guidelines, but not this one.

Q. Okay. You've never asked the authors of these guidelines what they meant by any of the words in the guidelines, true?

A. True. I haven't talked to them about what they meant in this guideline.

Q. And that's true for the American College of Gastroenterology and AGA and Rome guidelines as well. You've never asked any of those authors what they meant by the words in their guidelines, true?

A. True. But I would think that they're --

Q. There's no question pending, Counsel.

MR. BUXNER: There is a question pending. You asked him a question. He said true and he's giving his answer. And he's explaining it as an expert.

Go ahead, Doctor.

THE WITNESS: So these guidelines are written in such a way that they would be interpretable by the typical member of that particular society. And so,

Page 121

when they say indispensable, me and any of my colleagues would understand, without having to specifically talk to one of the people that wrote it, that what they meant was indispensable when one needs to do quantitative analysis of gastric emptying, not that they need to be done in every patient with symptoms.

I don't think any of my colleagues or would have interpreted it that way, nor felt the need to talk with the authors.

BY MS. FITZPATRICK:

Q.   Did you intend to mislead or trick anyone in your report about your words and what statements are from you and what statements are from others?

MR. BUXNER:  Object to form.

THE WITNESS:  No, I certainly didn't mean to trick anybody.  I was just trying to be as helpful as possible in the report to try to clarify the issues that I was asked to clarify, which I describe in the beginning of the report.

BY MS. FITZPATRICK:

Q.   I'm handing you what I'll mark as Deposition Exhibit 5.

(Deposition Exhibit Number 5 marked for identification.)

Page 122

THE WITNESS:  Thanks.

BY MS. FITZPATRICK:

Q.    Do you see that these are Consensus Recommendations for Gastric Emptying Scintigraphy:  A Joint Report of the American Neurogastroenterology and Motility Society and the Society of Nuclear Medicine?

A.    Yes.

Q.    And you cited these guidelines in your report, true?

A.    Yes.

Q.    If you go to page 1 on the left --

A.    By Page 1, you mean the first page, the one with the title?

Q.    Yes.

A.    Okay.

Q.    Do you see the third sentence talking about gastric emptying studies says that that study has become the standard for the measurement of gastric motility in clinical practice?

A.    Yes.

Q.    Because it provides a physiologic non-invasive and quantitative measurement of gastric emptying?

A.    Yes.

Q.    You agree with that statement?

A.    I do.

Page 123

Q.   If you go to Page 2 on the right, do you see that it says that -- at the top under Delayed Gastric Emptying, do you see that heading?

A.   Yes.

Q.   It says:  "Gastroparesis is diagnosed when symptoms such as nausea, vomiting, early satiety, postprandial fullness, abdominal discomfort and pain are associated with objective evidence of delayed gastric emptying in the absence of an obstruction."

Do you see that?

A.   I do.

I just want to point out that --

Q.   There's no question pending, Counsel.

A.   Okay.

Q.   I mean --

A.   I got it.

MR. BUXNER:   I wasn't answering.

BY MS. FITZPATRICK:

Q.   And same question I asked earlier:  You haven't asked any of the authors of these recommendations either what they mean by the word "objective," true?

A.   True.

Q.   You understand that when you do take a -- when you sit down with a patient and ask them about their symptoms --

A.   Mm-hmm.

Page 124

Q.    -- what they're feeling --

A.    Mm-hmm.

Q.    -- you understand that in the medical record, that goes under the heading Subjective, right?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.    You've seen that in medical records?

MR. BUXNER:  Same objection.

THE WITNESS:  When --

BY MS. FITZPATRICK:

Q.    That's all my question.  You know that the -- what you get from the patient goes under the heading Subjective, true?

MR. BUXNER:  Object to form.

THE WITNESS:  Not in all medical records.  It varies from medical record to medical record.

BY MS. FITZPATRICK:

Q.    Very commonly it's under the heading Subjective, true?

MR. BUXNER:  Object to form.

THE WITNESS:  It is commonly under that heading, although I don't -- I wouldn't impute any meaning to that given the fact that the Electronic Medical Record has essentially had to arbitrarily put things under certain columns and that the fact that it's under

Page 125

Subjective doesn't -- would in no way imply to me that it is only subjective.

BY MS. FITZPATRICK:

Q.   It's your opinion that drug-induced gastroparesis can be diagnosed in the absence of a gastric emptying study or other -- any other -- or one of the other tests that you discuss in your report under the heading Imaging Studies, right?

A.   Right.

Q.   Okay.  You haven't done a study to test how often your method of diagnosing drug-induced gastroparesis would or would not be confirmed by a gastric emptying study, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I have not done that study, no.  Nor would I as a radiologist typically be the one that would conduct that type of study.

BY MS. FITZPATRICK:

Q.   And you can't identify a study by anyone else that tests anything that resembles your method of diagnosing drug-induced gastroparesis and how often it would or would not be confirmed by a gastric emptying study, true?

MR. BUXNER:  Object to form.

THE WITNESS:  There are multiple reports in the literature that essentially speak about drug-induced gastroparesis without mentioning anything about any

Page 126

specific objective study, such as a gastric emptying study and specific recommendations in the guidelines that we've talked about specifically to take patients off of their medications without suggesting that those patients have a gastric emptying study.

So to me, I don't understand why one would do that particular study. In other words, I can't imagine a need for that particular study.

BY MS. FITZPATRICK:

Q. But you agree with me that you can't identify a study that tests anything resembling your method of diagnosing drug-induced gastroparesis, right, and how often it gets confirmed by gastric emptying study or doesn't get confirmed, right?

A. There are multiple studies --

MR. BUXNER: Doctor, hold on.

THE WITNESS: Sure.

MR. BUXNER: Object to form.

Go ahead.

THE WITNESS: There are multiple studies that establish the relationship between GLP-1 agonists and delayed gastric emptying.

And so, to me, I think that those studies essentially in the aggregate end up supporting the idea that one does not have to do that -- a gastric emptying

Page 127

quantitative study in order to make that diagnosis.

BY MS. FITZPATRICK:

Q. My question is more specific. My question is: You can't identify a study that does test diagnosis without any of the imaging studies against the use of the imaging studies, right?

A. I can --

Q. I can take that back. That made no sense.

My question is very specific. You can't identify anything in the literature -- in the medical and scientific literature that looks at how often a diagnosis of drug-induced gastroparesis that's not done on the basis of any imaging studies would or would not be confirmed by an imaging study like a gastric emptying study?

MR. BUXNER: Object to form.

Go ahead, Doctor.

THE WITNESS: I'm not aware that -- of a -- I can't name -- I don't know that there isn't one. But I can't name a study that took patients who were taken off of their GLP-1 agonists and then had a gastric emptying study that was done. I would have difficulty performing that in real practice because of the fact that there's a contraindication to performing gastric emptying studies until the patient is -- has had the drug cleared from them.

Page 128

So I think that's probably why nobody's done -- to my knowledge, I haven't seen publication of that particular study.

BY MS. FITZPATRICK:

Q. But you agree with me that you haven't seen publication or any other writeup of such a study?

MR. BUXNER: Objection. Asked and answered.

Go ahead, Doctor.

THE WITNESS: I have not.

BY MS. FITZPATRICK:

Q. A gastric emptying study is a type of nuclear medicine test, right?

A. No. One way to determine gastric emptying is to utilize nuclear medicine. But there are a number of gastric emptying studies that don't use nuclear medicine.

Q. Gastric emptying scintigraphy is a nuclear medicine test?

A. Yes, pretty much by definition, scintigraphy really implies nuclear medicine.

Q. The acronym for gastric emptying scintigraphy is GES?

A. I think -- I've seen GES used to refer to gastric emptying study and also to refer to gastric emptying scintigraphy.

Q. Nuclear medicine uses radioactive tracers to

Page 129

diagnose and treat disease, true?

A.    Correct.  True.

Q.    How do you explain nuclear medicine to patients who are going to receive a test?  Do you give a spiel?

MR. BUXNER:  Object to form.  A spiel?

THE WITNESS:  Yeah, I wouldn't call it a spiel exactly.  And we have, you know, questions that patients ask all the time about radiation doses and about nuclear medicine and what it is.

I think the best way or one way that I would explain that to patients is that there are certain -- unlike X-rays or unlike CT studies, there are substances that essentially give off the equivalent of X-rays and that we can inject them into the body, and then we can detect those -- let's call them X-rays as they are emitted from the body.  And that when we use this technique, we are able to study function in a way that we can't do with a regular CT scan or X-ray study.

BY MS. FITZPATRICK:

Q.    Do patients ask you if a gastric emptying scintigraphy is safe in terms of the radiation dose?

A.    They would more often ask their referring clinician that question than asking me.  The patients see the technologist.  They see my resident and fellow.  But they wouldn't typically see me in the course, so they

Page 130

typically wouldn't ask me.  But patients do ask our residents and fellows, they do ask the technologists, and they do ask their referring physicians.

Q.   Do you help your residents, your fellows, your technologists and the referring physicians understand how to explain the risks and/or benefits of gastric emptying scintigraphy?

A.   Yes.

Q.   Okay.  So how would you explain whether the radiation in a gastric emptying scintigraphy, is that safe or not?

MR. BUXNER:  Object to form.

THE WITNESS:  Yeah.  So I would say that the benefit when a gastric emptying study is required or needed outweighs the very small risk associated with the radiation associated with a gastric emptying study.

I might go on to say that the relative dose associated with a gastric emptying study is probably more comparable to a -- maybe a CT -- a low dose screening CT scan of the lungs and that the dose is less than a CT scan, but probably a little bit greater than a typical chest X-ray, and that it's probably a small fraction of the dose, perhaps a third of the dose or so that those patients might get associated with just the cosmic rays and the radon that we are all

Page 131

exposed to during the course of a year.

BY MS. FITZPATRICK:

Q.    In your report, you wrote that a gastric emptying scintigraphy would be 80 percent of a low dose CT screening for lung cancer, right?

A.    It varies tremendously even by a factor of two or more.  Because the dose that we administer might be a half a millicurie, it might be a millicurie.  It really varies according to how quickly the dose is cleared.

So in a patient with delayed gastric emptying, they would have the radiopharmaceutical essentially around for a longer period of time than somebody not.

So the dose that's really -- there's a whole science of estimating doses to patients.  And it really varies from patient to patient.

So that was just one particular estimate of a characteristic dose.  But it really, just as we've been talking about, varies from patient to patient personally.

Q.    So the radiation dose in a gastric emptying scintigraphy could be 80 percent of a low dose CT scan or it could be even lower, true?

A.    True.

Q.    If you look at your report on Page 18 --

A.    Okay.

Q.    -- at the top, do you see that you use -- you

Page 132

write:  "Gastric emptying study is a nuclear medicine test."

Do you see that?

A.    I do.

Q.    Okay.  And you write in the heading above, you have gastric emptying study, and then you have the acronym GES?

A.    Right.

Q.    And so, it's true that in your report, you used gastric emptying study and gastric emptying scintigraphy --

A.    Interchangeably?

Q.    Yes.

A.    Yes.

Q.    Okay.  Thank you for the word.

A.    Sure.

Q.    We looked at various guidelines from both radiology societies and gastroenterology societies, right, already today?

A.    When you say we --

Q.    I have shown you, right?

A.    Yes, during the course of our discussion.

Q.    Yes.  And some of those, you had -- you cite in your report as well?

A.    Correct.

Q.    The gastroenterology and radiology guidelines that we've looked at today do not raise concerns about the level

Page 133

of radiation in gastric emptying scintigraphy, true?

MR. BUXNER:  Object to form.

THE WITNESS:  There's a theory in radiology that's debated about whether or not any amount of radiation puts patients at increased risk of cancer.  And it's essentially the linear no-threshold theory.

And so, some people would suggest that even a relatively small dose still increases the risk of cancer to patients.

And so, I think that the risk is small, but nobody has a mechanism at this point to definitively determine for any given dose what the risk is.  But there is a real risk every time patients have any study that involves radiation is the consensus of radiology.

BY MS. FITZPATRICK:

Q.   The Consensus Statements that we've looked at today from the American College of Gastroenterology, from the AGA, from the American College of Radiology, from other groups, from the Rome Foundation have not raised any concerns about the level of radiation in gastric emptying scintigraphy, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't -- I'd have to look through those again.  I wouldn't be surprised if the American College of Radiology does mention radiation dose.  But

Page 134

I'd have to look at that.

There's a huge emphasis in recent years that wasn't true for many years for gastric emptying study on looking at radiation doses. And we talk about keeping doses as low as reasonably achievable. And there are a number of efforts now to try minimize dose. And there's -- this strong effort to decrease dose has been only in relatively recent years after some of those guidelines that we talked about.

BY MS. FITZPATRICK:

Q. My question was not whether the guidelines mention radiation dose.

A. Okay.

Q. My question is: None of those guidelines that we've looked at today say in any way, shape or form that the level of radiation in a gastric emptying scintigraphy is unsafe, true?

MR. BUXNER: Objection. Asked and answered.

THE WITNESS: To my knowledge, that is true.

BY MS. FITZPATRICK:

Q. You've administered gastric emptying scintigraphy to patients of the Veterans Administration?

A. Yes.

Q. And to patients of University of Maryland?

A. Correct. When you say you've administered,

Page 135

meaning that I've had responsibility?

Q.   Or directed.

A.   Yes.

Q.   Right.

Gastric emptying scintigraphy is not an emergency procedure, true?

A.   I believe that in general, that it's not an emergency procedure.  I know that it is performed as a non-emergency procedure in the vast, vast majority of cases.

There are other studies that do a much better job in an emergent situation of evaluating for contents of the stomach than a gastric emptying study.

MS. FITZPATRICK:  It's 12:00.  Do you want to break for lunch?

MR. BUXNER:  Whatever you guys want to do.

MS. FITZPATRICK:  Okay. Now's good.

MR. BUXNER:  Okay.

THE VIDEOGRAPHER:  Off record, 12 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  On record, 12:38 P.M.

BY MS. FITZPATRICK:

Q.   Doctor, if you can look at Exhibit 1, your report, and go back to Page 16.

A.   Yes, I can do that.

Q.   Under heading C., there's that first sentence that

Page 136

we talked about a fair amount earlier today.  "When gastroparesis is based on a permanent or unknown underlying condition, it should be confirmed by GES and upper endoscopy."

Do you see that?

A.   I do.

Q.   To more accurately reflect your testimony today, do I understand it correctly that somewhere in this paragraph should be inserted that you disagree with that statement?

MR. BUXNER:  Object to form.

THE WITNESS:  I would elaborate on that statement and provide additional information to that statement. But I don't disagree with that statement in the sense that I think it would be the first part of a thought that I would elaborate on.

In other words, I would just clarify it by saying that it doesn't always need to be confirmed by GES or upper endoscopy when it's based on a permanent or unknown underlying condition, but that GES and upper endoscopy are both helpful.

BY MS. FITZPATRICK:

Q.   So to more accurately reflect your testimony today, we should insert the word "sometimes" into that sentence, true?

Page 137

A.   True.

Q.   And then if you go to 16 to 17, another sentence we talked about earlier today, says:  "First-line treatment for drug-induced gastroparesis is simply to withdraw the drug suspected to be delaying gastric emptying."

Do you see that?

A.   I do.

Q.   And to more accurately reflect your testimony today, we should also insert the word "sometimes" into that sentence, right?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   Sometimes to simply withdraw the drug?

MR. BUXNER:  Same objection.

THE WITNESS:  I would say in the majority of times, rather than sometimes.

BY MS. FITZPATRICK:

Q.   Okay.  But -- so you agree the first-line treatment for drug-induced gastroparesis in the majority of patients is simply to withdraw the drug suspected to be delaying gastric emptying?

A.   Yes.

Q.   And then the next sentence:  "If the gastric emptying effect of the drug is responsible for the patient's symptoms, they should begin to resolve as the drug clears

Page 138

his or her system."

We need to insert the word "sometimes" into that sentence as well to reflect your testimony today?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.

BY MS. FITZPATRICK:

Q.    Do you agree it's important for an expert witness to testify accurately and carefully?

A.    Absolutely.

Q.    As accurately and carefully as you are in your clinical practice and your research?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know that I really want to quantify different levels of accuracy.  I try be as accurate as possible all the time.  With regard to clinical care and patients, I think -- I think of accuracy in a somewhat different way.  So I don't want to really equate the two.  But I think both -- you know, in all of those circumstances, it's really important to be accurate.

BY MS. FITZPATRICK:

Q.    You testified earlier that there's a contraindication to performing gastric emptying studies until the patient has had the drug cleared from them.  Do you remember that?

Page 139

A.    I do.

Q.    Okay.  You understand that there is no risk to a patient from a gastric emptying study while on a GLP-1 receptor agonist?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.    True or false?

A.    I don't believe that being on a GLP-1 agonist in and of itself increases the risk associated with doing a gastric emptying study other than that it ends up causing symptoms, such as nausea and vomiting, and the vomiting associated with it with giving a patient a meal when one wouldn't otherwise could cause risk or harm to the patient.

Q.    Patient's on GLP-1 receptor --

(Witness' phone rang.)

THE WITNESS:  Sorry, I'm going to just turn off my -- I thought it had it on Do Not Disturb.  I apologize.  It is on Do Not Disturb.  I think I'll just turn it off.  Sorry about that.

BY MS. FITZPATRICK:

Q.    You know that patients on GLP-1 Receptor Agonists are eating meals, whether they're doing gastric emptying studies or not, true?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know that all of them are.

I would imagine most of them are. I think ones that present with acute signs and symptoms of gastroparesis for evaluation may not be eating meals.

BY MS. FITZPATRICK:

Q. And you think that eating a meal poses a risk to them; that's your testimony?

A. My testimony is overall I think gastric emptying studies are safe in most patients on GLP-1 agonists but not all the time.

Q. And not all the time refers to the fact that they might vomit up the meal?

A. Correct.

Q. If you go back to your report at Page 6, if you look at footnote 2, it notes that you reviewed the labels for Saxenda.

MS. FITZPATRICK: I'll get you all the records.

THE WITNESS: You're doing great.

BY MS. FITZPATRICK:

Q. I'll start over. If you look at footnote 2, it notes that you reviewed the labels for Saxenda, Victoza Wegovy, Ozempic, Dulaglutide, also known as Trulicity, Mounjaro and Zepbound, true?

A. True.

Q. And you note that the labels for GLP-1 Receptor Agonists all disclose that they can delay gastric emptying,

Page 141

true?

A.    True.  To my knowledge.

Q.    And indeed, the labels say that they do delay gastric emptying, true?

A.    I believe that's true.

Q.    If you go now to Page 9 in the first full paragraph, you see it starts with the word "normal"?

A.    Yes.

Q.    You write that:  "It is well established that -- " at the end of that paragraph:  "It is well established and documented in the medical literature that GLP-1 Receptor Agonists cause delayed gastric emptying."

Do you see that?

A.    I do.

Q.    And you agree with that statement, true?

A.    I do, true.

Q.    And you knew it before this litigation, right?

A.    Yes, I -- I knew it, although I learned a lot more about it once I became involved with the litigation given the fairly deep reading that I had the opportunity to do.

Q.    But you've known for a long time that GLP-1 Receptor Agonists cause delayed gastric emptying, true?

MR. BUXNER:  Object to form.

THE WITNESS:  It depends on what you define as a long time.  But for more -- for years.

Page 142

BY MS. FITZPATRICK:

Q.    In that paragraph, you cite papers for that statement from 2021, 2011 and 2019, true?

A.    It -- essentially, are we talking about:  "GLP-1 agonists have shown to have significant inhibitory effects on gastric motility, including trituration and jet-like propulsion."  Based on prior studies, we know these following things.  Is that what you're referring to or are you referring to something else?

Q.    That's a good point.

No.  It's the -- yes, it's the statement that GLP-1 agonists have been shown to have significant inhibitory affects on gastric motility, including trituration and jet-like propulsion, yes.  Do you see that statement?

A.    I do.

Q.    Okay.  And then after that you cite three papers, right?

A.    I have three bullet points.

Q.    And before the bullet point you have three papers, right?

A.    I have -- yeah, I have three -- three references.  I don't -- let's call them papers, yes.

Q.    Okay.  Fair to say it's been known since at least, you know, 2011, 2019, 2021 that GLP agonists slow gastric

Page 143

emptying, true?

MR. BUXNER:  Object to form.

THE WITNESS:  It's been progressively -- there's been more and more data that have been collected since then.  So I think the case for that has become increasingly strong as additional studies are performed.

BY MS. FITZPATRICK:

Q.   I'm handing you what we will mark as Deposition Exhibit 6.

(Deposition Exhibit Number 6 marked for identification.)

THE WITNESS:  Thank you.

BY MS. FITZPATRICK:

Q.   Do you recognize this as your supplemental reliance list?

A.   Yes.  My name's spelled wrong here, but yes.

Q.   Yeah.

A.   But that's me.

Q.   Okay.  You added -- you added five papers -- five papers -- five peer-reviewed literature to your reliance list, true?

A.   True.

Q.   When did you -- have you read these papers?

A.   I have.

Page 144

Q.    When did you read them?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't recall when I first read each one of the three of these.

BY MS. FITZPATRICK:

Q.    Five.

A.    I'm sorry, the five.  You're right.

Q.    What about -- you have three Expert Reports; do you see that?

A.    You mean of the -- oh, yes.

Q.    Under the peer-reviewed.

A.    Yes, Raines, Fass and also, Nguyen.

Q.    When did you read --

A.    When actually is I guess is how it's pronounced.

Q.    When did you read those Expert Reports?

A.    I think they -- I got a copy of those in December after I completed my report.

Q.    And so, Dr. Fass' report in particular you read that after you had already formed your opinions as expressed in your report, right?

A.    Right.

MS. FITZPATRICK:  And now could I have Dr. Fass' report?

BY MS. FITZPATRICK:

Q.    I'm handing you what we will mark as Deposition

Page 145

Exhibit 7.

(Deposition Exhibit Number 7 marked for identification.)

THE WITNESS:  Thank you.

BY MS. FITZPATRICK:

Q.   Is this the report from Dr. Fass that you read in December?

A.   I believe so.  I haven't looked at every page yet.

Q.   Does it appear to be?

A.   It does appear to be, yes.

MS. FITZPATRICK:  At this point, I'll just put on the record that we understand -- we understand from plaintiffs they've indicated they're withdrawing Dr. Fass.  We learned from counsel for Novo who received a call from plaintiff's counsel.  Apparently, Dr. Fass was sick with two different flus back to back and so, withdrew from the litigation.

As plaintiff's counsel described it, he has anxiety over his medical calendar and won't agree to continue if they got an extension on his deposition.

We reserve all rights with respect to Dr. Fass. And plaintiff's position is that he is withdrawn.

THE WITNESS:  That's not a question, right?

MR. BUXNER:  It's not a question for you.

BY MS. FITZPATRICK:

Q. If you turn back to your report, Exhibit 1, Page 17 --

A. Yes.

Q. -- in the first full paragraph a sentence in, do you see the sentence that starts -- two sentences in -- I apologize, one sentence in -- do you see the sentence that reads: "There is evidence that suggests that not all patients who experience symptoms associated with abnormal gastric emptying in fact have delayed gastric emptying as measured by gastric emptying study."

Do you see that?

A. I do.

Q. And you agree there is a evidence that not all patients treated with GLP-1 Receptor Agonists who experience GI symptoms in fact have delayed gastric emptying as measured by a gastric emptying study?

A. I believe that --

MR. BUXNER: Object to form.

THE WITNESS: Oh sorry. I believe that's the case.

BY MS. FITZPATRICK:

Q. I'm handing you now what I'll mark as Exhibit 8.

(Deposition Exhibit Number 8 marked for identification.)

BY MS. FITZPATRICK:

Page 147

Q.   Do you recognize this as a publication by a Dr. Lupianez-Merly among others that you cite in your report?

A.   Yes.

Q.   This publication by Dr. Lupianez-Merly is a piece of evidence that not all patients treated with GLP-1 Receptor Agonists who experience GI symptoms in fact have delayed gastric emptying as measured by a gastric emptying study?

MR. BUXNER:   Object to form.

THE WITNESS:   I'm not sure I understood the question.   Sorry.

BY MS. FITZPATRICK:

Q.   We looked at your report --

A.   Right.

Q.   -- where you made the statement that there's evidence that suggests that not all patients on GLP-1 RAs who experience GI symptoms actually in fact have delayed gastric emptying once they go get a gastric emptying study. We saw that in your report, right?

A.   Right.

Q.   You cite this publication by Dr. Lupianez-Merly, right?

A.   I do.

MR. BUXNER:   Object to form.

BY MS. FITZPATRICK:

Page 148

Q.   And so, I'm just confirming that this publication by Dr. Lupianez-Merly is the evidence you're pointing to or some of the evidence you're pointing to that not all patients on GLP-1 RAs who experience GI symptoms in fact have delayed gastric emptying?

MR. BUXNER:  Object to form.

THE WITNESS:  I think you're asking the question about whether or not this was the study that I was -- and paper, even though it's not peer-reviewed that I was referring to in my report.  The answer is yes.

BY MS. FITZPATRICK:

Q.   And so, this paper is evidence that not all people taking GLP-1 Receptor Agonists who have GI symptoms actually have delayed gastric emptying, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I think it really depends.  I think there are a lot of limitations of this particular paper.  But I was citing this as one of the articles in the literature that support that suggestion, yes.

BY MS. FITZPATRICK:

Q.   And you understand that this paper looked at 696 patients on GLP-1 Receptor Agonists who had GI symptoms and a standard gastric emptying study, right?

A.   Right.

Q.   And only -- scratch that.

Page 149

455 out of those 696 turned out to have normal gastric emptying studies, true?

A.   I -- I'd have to make sure that that's -- those figures are right, but -- so maybe we could do that again because I'd have to look at the numbers.  I didn't memorize the numbers.

Q.   So if you look in the results -- do you see the Results section?

A.   Uh-huh.  80,000 patients --

Q.   Yeah.

A.   -- were prescribed.

Q.   So they start with a bigger population and then whittle it down, right?

A.   Yeah.

Q.   That's common, right?

A.   Uh-huh.

Q.   Is that a "yes"?

A.   Yes, I'm sorry.

Q.   And then, they write:  Among these -- "Among those 696 underwent validated gastric emptying study."

Do you see that?

A.   I do.

Q.   So they're talking about 696 patients who had been prescribed a GLP-1 RA and developed at least one GI symptom suggestive of gastroparesis.  Do you see that?

A.   I do.

Q.   Okay.  And then, of those 696 only 35 -- I'm sorry.  Only 35 percent of them had a delayed gastric emptying at four hours by study, right?

A.   Right.  In other words, the numbers that you're quoting from the paper are what is indeed in the paper.  I don't believe the paper is valid or changes my mind significantly.  But it is evidence that is supportive of that idea, which is why I cited it in my report.

Q.   Okay.

A.   I think there are multiple major limitations to the study.

Q.   This is the only study that you cite of patients on GLP-1 Receptor Agonists with symptoms getting tested for delayed gastric emptying, true?

MR. BUXNER:  Object to form.

THE WITNESS:  To my knowledge, that's the only one that I included.

BY MS. FITZPATRICK:

Q.   And it's the only --

A.   I'm not sure if I included any other.  I'd have to look.  But this is a paper that I really think is fundamentally flawed.

Q.   So my question is:  You cite one paper and one paper only of people on GLP-1 Receptor Agonists with GI

Page 151

symptoms --

A.    Mm-hmm.  Yes.

Q.    -- and how often they turn out to have delayed gastric emptying by study, true?

A.    It's one case report.

Q.    Okay.  But it's the only paper you have for that question, right?

A.    I don't know that that's true.  I'd have to look through and be careful to validate that.

Q.    Certainly none are coming to mind, right?

A.    Correct.

Q.    Okay.  So just this one paper?

A.    Is coming to mind.

Q.    Okay.  And its results are that only 35 percent of those people on GLP-1 Receptor Agonists with GI symptoms turn out to have delayed gastric emptying by study, true?

A.    I don't think that can be generalized.

Q.    Okay.

A.    But that is what the paper states.

Q.    Okay.

A.    In other words, if you're asking me what is on the page in the paper, then yes.

Q.    Why do you discount this paper?

A.    So I think there are a number of reasons.  One is the fact that it included patients that had any number of

Page 152

the subset of symptoms.  So as I recall -- and I'd have to look at the table -- but as I recall -- yeah, here we go.

So constipation.  To me, I don't believe that the fact that patients on GLP-1 agonists with -- Receptor Agonists with constipation would necessarily be patients that I would consider making a diagnosis of gastroparesis and just based on the fact that they have constipation, for example.

So some of these symptoms that they included, like diarrhea and constipation, are not symptoms that I believe actually are associated with things that would cause me to make the diagnosis of gastroparesis in and of themselves.

So you know, if a patient had all of these different symptoms, then I would -- and depending on the onset and the temporal relationship and how long and how severe, then I might diagnose gastroparesis.

But if you tell me that a patient only has constipation or only has diarrhea, then those would not -- that symptom -- one or two symptoms, for example, would not really put me in the direction of diagnosing gastroparesis.

So I think if I told you that based on this paper that I believed just because a population of these patients that had these one or more symptoms, that would not be a constellation that I would use clinically to diagnose gastroparesis.

Page 153

Based on that, I do not believe that their conclusion about 35 percent only having delayed gastric emptying is valid.

Also, because I believe that the literature suggests that of all patients with GLP-1 agonists, whether they have symptoms or not, a higher percentage than 35 percent have delayed gastric emptying.

So I believe most patients, whether they have symptoms or not, have delayed gastric emptying based on the literature.

So I think there are major flaws in this. I think this is only a case report, essentially. I don't know that it was peer-reviewed. I don't see information saying it was peer-reviewed and it only represents the patients in this one population. I think it was Mayo Jacksonville, if I'm not mistaken. I'd have to -- or Mayo Rochester. At Mayo, anyway.

So this really would not -- this paper doesn't really add anything from my own perspective as far as how I would -- I wouldn't learn anything that I would apply. Or if my residents or fellows gave me this paper, I would acknowledge it's in the literature. I would acknowledge that it makes that point. But I don't believe the methodology is valid to be able to make any conclusions.

Q.    You have no contrary studies, true?

Page 154

A.   I don't have any contrary studies that I can cite.

Q.   And if you look at the list of symptoms that they included --

A.   Mm-hmm.

Q.   -- that qualified a patient for this study --

A.   Right.

Q.   There are seven, true?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   There are six.

A.   I see six.

Q.   Sorry.

A.   That's okay.

Q.   Three of them are the symptoms you identified as classic for gastroparesis:  Nausea, vomiting, abdominal pain?

MR. BUXNER:  Objection to form.

THE WITNESS:  In combination.

MR. BUXNER:  Let me get the objection in.

THE WITNESS:  Oh sure.  I'm sorry.

MR. BUXNER:  Go ahead.

THE WITNESS:  In combination.  So I don't believe that any one of these by itself would be enough to make me diagnose gastroparesis depending on the severity or the onset.

Page 155

It may be that a patient who is vomiting, you know, within a short number of days after they were first put on it and it was really severe vomiting, then I think I would consider or conclude that it's likely that it's due to delayed gastric emptying. But it would have to be, as we've talked about during the day, you know, specific to the temporal relationship and the combination of symptoms that they were having.

And so, I really just don't want to put any blanket idea that any one or two of these symptoms in and of themselves would have made me diagnose gastroparesis.

So I'm not surprised at the results that they had because isolated constipation, isolated diarrhea, isolated bloating, for example, would not be things that would lead me to a diagnosis of gastroparesis.

BY MS. FITZPATRICK:

Q.   So if I understand you correctly, you're saying that you believe that you can diagnose gastroparesis in patients on GLP-1 Receptor Agonists who have a certain constellation of classic gastroparesis symptoms and a certain temporal relationship; is that true?

A.   Those would be real --

MR. BUXNER:  Object to form.

THE WITNESS:  Oh sorry.

Page 156

MR. BUXNER: Go ahead.

THE WITNESS: Those would be really important components in making a diagnosis. So yes, I think those would be the most important things in my diagnosis. We've talked about my differential diagnosis. So I'd want to know many other things about the patients. I'd want to know what other medications they were on, et cetera.

I just don't want to try and oversimplify the diagnosis of a really important disease process by narrowing it down to just taking any one formulaic combination of symptoms or time sequence.

BY MS. FITZPATRICK:

Q. So you would look at more information than just this. But what you -- the minimum that you require in order to diagnose gastroparesis without any kind of gastric emptying study in GLP-1 receptor agonist patients is a certain constellation of classic gastroparesis symptoms and a certain temporal relationship, true?

MR. BUXNER: Object to form. Misstates. Asked and answered.

Go ahead, Doctor.

THE WITNESS: So those would be really important components.

BY MS. FITZPATRICK:

Page 157

Q.   Those -- you need those, right?

MR. BUXNER:  Objection.

BY MS. FITZPATRICK:

Q.   You can look -- there might be other things that exclude somebody, but you need those, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't believe that's the case.  I think one could have a temporal relationship or one could -- in other words, I don't think you need all of that.  I think in each individual patient -- and we could -- you know, we'd have to discuss the specific case study.  Then I could tell you whether or not I would diagnose gastroparesis in that patient without a gastric emptying study in a patient where I thought that I should withdraw the medications and there not be a need for gastric emptying studies.

BY MS. FITZPATRICK:

Q.   You're not able to in advance tell the judge in this litigation what is the set of circumstances that you would say somebody should proceed in this litigation because they may have drug-induced gastroparesis; you're not able to specify that, right?

MR. BUXNER:  Object to form.

THE WITNESS:  I am not able to, nor do I wish to create a formula that essentially would obviate my

Page 158

clinical responsibility in each patient to be able to take each patient as an individual. And so I wouldn't want to come up with a formula where I said everybody who met that formula.

Guidelines sometimes, you know, try to -- and they're just called guidelines for exactly that reason, is that they essentially guide one with the realization that it's really up to the clinician to make that determination knowing the guidelines in that particular patient.

So if you're asking can I give you a formula that the judge could follow to know that if a patient meets that simple formula, that the diagnosis would always be made, the answer is I can't.

BY MS. FITZPATRICK:

Q. What we would need instead is for you, Dr. Siegel, to do a patient-by-patient evaluation, true?

A. If you're asking me my own opinion about how I would do it, I would want to do that evaluation. But I believe that the majority of physicians who work with patients with gastrointestinal symptoms would also be qualified to make that by virtue of their medical school training and their internship and their residency training.

Q. How often does a doctor record the subtype of gastroparesis in a medical record?

Page 159

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   How often do they specify drug-induced gastroparesis as opposed to any other gastroparesis?

A.   I have not done a study of medical records to be able to answer that question.

Q.   We talked about -- so I understand it's not a formula.  But the certain constellation of classic symptoms that you're looking for to make this diagnosis in the absence of a gastric emptying study, what is that?

A.   Well, so, I would want to go through the same differential diagnosis that we covered earlier.  I'd want to know what medications the patient was on.  I would want to --

Q.   I'm asking specifically about the constellation of symptoms.

MR. BUXNER:  Please don't interrupt him.

Go ahead, Doctor.

BY MS. FITZPATRICK:

Q.   You are not answering my question.

MR. BUXNER:  He was answering your question.

MS. FITZPATRICK:  My question was about the symptoms.  And I was getting the differential diagnosis excluding medication.

MR. BUXNER:  He's answering how he would get them.

Page 160

Let's start -- maybe let's start over and ask the question.

BY MS. FITZPATRICK:

Q.   Here's my question:  We just talked about the fact that there's no formula for this.  But you agreed with me that it would be very important in order to diagnose somebody with gastroparesis -- in the absence of a gastric emptying study, it would be very important for them to have a certain constellation of classic symptoms of gastroparesis, right?

A.   I believe that it would be important for them to have symptoms that a clinician would need to make that diagnosis, yes.  I don't know if it has to be classic.  I wouldn't have used the term "classic" myself.

I think there's so many factors.  When you talk about symptoms, symptoms are only one of a broader set of data that I would use in order to make that diagnosis.

Q.   I understand that.

But are you able to tell me what symptoms -- what constellation of symptoms you would want to see it would important to see in a patient who you were going to diagnose with gastroparesis in the absence of a gastric emptying study?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.  So essentially, if we are only

Page 161

looking at symptoms, which I think is a small part of the whole picture, then I think the symptoms would include the nausea, would include vomiting, would include abdominal pain, postprandial fullness. Those would be ones that I think would be important. But I don't think that all of them or any specific combination of them would be -- would make the diagnosis, nor do I think the symptoms should be evaluated in isolation, but should be evaluated with all the other things.

BY MS. FITZPATRICK:

Q. You told me --

A. I just don't want to trivialize --

MR. BUXNER: Wait.

THE WITNESS: -- the diagnostic process. You know, I think there's a lot of discussion about AI and a lot of discussion about non-physicians being put into a role by being told that there are formulaic ways to be able to essentially make diagnoses. And I really am a strong believer, despite being a data scientist, essentially, in the idea of a physician's judgment looking at the entire picture of a patient.

And so, I wouldn't want to mislead the judge by essentially suggesting that there is a way the judge himself or herself would be able to make the diagnosis

Page 162

just purely following any specific things that I wrote down.

BY MS. FITZPATRICK:

Q.   Would it important to see all four of those symptoms you just identified --

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   -- in this patient?

A.   I think it would be important to know the answer to all four of those questions.

Q.   If they only had two of them, would that suffice?

A.   So now you're --

MR. BUXNER:  Object to form.

Go ahead, Doctor.

THE WITNESS:  So now you're begging the question that I've been saying is that I don't believe that there are any combination of two or three or four or any other ones that would allow me to make the diagnosis in the absence of all the other things that we've been talking about.

BY MS. FITZPATRICK:

Q.   If somebody asked you to write guidelines like the ones we looked at today for how to diagnose drug-induced gastroparesis according to Dr. Siegel in the absence of a gastric emptying study, you wouldn't be able to come up with

Page 163

a set of rules, correct?

MR. BUXNER:  Object to form.

So you're switching from guidelines to rules.  And so, I want to be really careful because I don't believe that guidelines are rules; and in fact, I think they're named guidelines because of it.

If somebody had asked me for our residents or fellows or for the nuclear medicine literature to write a paper, then I would include many of the things that I have in the report, but would certainly conclude that one needs to look at all of the information about patients.

So do I believe that I could create guidelines as well as most nuclear medicine or radiologists, I believe that I could, but they would just be guidelines.

BY MS. FITZPATRICK:

Q.   Well, to be clear, you think you could create guidelines for the diagnosis of gastroparesis just as well as any gastroenterologist, true?

A.   So when you talk about guidelines, I mean, I think that each one of us has our own perspective.  I have a perspective as a radiologist.  A gastroenterologist would have a perspective because they would be writing about treatment.  I don't do treatment.  I just do diagnosis.

Page 164

But I believe that I would be able to write guidelines about the diagnosis just looking at the diagnostic part, not the therapeutic part, as well as gastroenterologists.

Q.    You reviewed Dr. Cangemi's 2023 study --

A.    Yes.

Q.    -- titled:  "Misdiagnosis of Gastroparesis is Common."  Do you remember that?

A.    I do.  That was Mayo Jacksonville.  Was it?  It was Mayo.

Q.    It was Mayo, correct.

A.    Yes.

Q.    I'm handing you what I'll mark as Deposition Exhibit 7 or 8.

(Deposition Exhibit Number 9 marked for identification.)

THE WITNESS:  Thank you.

BY MS. FITZPATRICK:

Q.    This is the paper we just referred to, correct?

A.    Right.  They refer to it as a research letter, but yes.

Q.    Mayo Clinic is a prestigious medical institution, true?

MR. BUXNER:  Object to form.

THE WITNESS:  Very true.

Page 165

BY MS. FITZPATRICK:

Q.   Do you know Dr. Cangemi personally?

A.   No.

Q.   Do you know him by reputation?

A.   Yes.

Q.   You agree he's a well-respected gastroenterologist?

A.   I do agree with that.

Q.   And you agree there's been reports that gastroparesis is misdiagnosed, true?

A.   True.

Q.   And that misdiagnosis of gastroparesis is common; you've seen that literature?

A.   I have seen that literature.  I don't know how common it is because one really needs to have a consensus of what gastroparesis actually is.  But I would not be surprised if gastroparesis is misdiagnosed in some cases.

Q.   You wouldn't be surprised if misdiagnosis was common of gastroparesis?

MR. BUXNER:  Object to form.  Misstates.

THE WITNESS:  I think it depends on based on my own definition or somebody else's definition or -- I do believe that gastroparesis is often misdiagnosed based on what I've read.

BY MS. FITZPATRICK:

Page 166

Q.   If you look at the first page on the left, do you see that it says:  "We assembled a retrospective cohort population -- "

A.   Yes.

Q.   " -- consisting of adult patients referred to Mayo Clinic Jacksonville -- "

A.   Yeah, it was Jacksonville, okay.

Q.   " -- specifically for the evaluation of gastroparesis."  And then it gives the dates.

A.   Yes.

Q.   Okay.  You understand that Dr. Cangemi and his co-authors looked at the files of 339 patients referred to the Mayo Clinic in Jacksonville who all had gastroparesis diagnoses before their referral, right?

A.   Actually, on a careful reading of the paper, it's not clear that they all did have that.  In other words, it actually specifically says 339 patients were referred for tertiary evaluation of gastroparesis.

That doesn't necessarily mean to me -- it just stuck out in my mind when I read it that it really doesn't mean that they were already carrying a diagnosis, but they were referred for evaluation.  And so, it's not clear to me in the paper that they actually had a diagnosis of gastroparesis when they came.

Q.   If you look at the supplementary table -- if you

Page 167

turn further back into the study, do you see Supplemental Table 1?

A.    I do.

Q.    Do you see the title of this is:  "Demographic and historical data for patients diagnosed with gastroparesis and those with alternative diagnoses."  Do you see that?

A.    I do.

Q.    And then it talks about the 339 total?

A.    I do.  But I'm not sure the table would really clarify this for me.  I mean, it is -- I guess it's a research letter and maybe it was not as complete.

But I'd really want to know what the -- when they say tertiary evaluation of gastroparesis, I want to know if that was to confirm or deny the diagnosis or whether they were suspected of having gastroparesis and they were referred -- my reading of this is that they didn't know for sure if they had gastroparesis, which is why they were referred.

If they had the diagnosis and they knew it, I don't know why they would have referred it to Mayo.  To me, all of these patients were patients where they had a suspicion that the patients may or may not have gastroparesis.

Q.    Do you think that it would be a paper called "Misdiagnosis of Gastroparesis is Common" if it was only

about people who were suspected to have gastroparesis as opposed to who had been diagnosed with gastroparesis?

MR. BUXNER: Object to form.

THE WITNESS: Yeah, I mean --

BY MS. FITZPATRICK:

Q. Does that seem plausible?

MR. BUXNER: Same objection.

THE WITNESS: It does actually seem plausible. I mean, it said they were referred for tertiary evaluation.

BY MS. FITZPATRICK:

Q. If you look at Page 2 of the paper on right?

MR. BUXNER: Please don't interrupt him. He's answering the question.

BY MS. FITZPATRICK:

Q. Do you see the paragraph that starts "In summary"?

A. I do.

Q. It says: "In summary, more than 80 percent of patients referred for further evaluation of gastroparesis." Do you see that?

A. Correct. It just -- that still doesn't tell me that they actually were diagnosed with gastroparesis. I think one could infer that, but I don't think that's necessarily the case.

I wish they would have provided us with a little

Page 169

bit more information because it's a retrospective study of patients that were sent to them.  And whether or not they carried an internal diagnosis, whether they were coded, for example, as gastroparesis or whether they had symptoms, and there's a lot of lack of rigor in whether or not these patients had symptoms and they wanted Mayo to tell them whether it was gastroparesis or they said these are patients that we know have gastroparesis and we're referring for treatment.

The only reason to refer to Mayo if they knew that they had gastroparesis would be for treatment, not for additional workup.  But Mayo did additional workup on those patients, which implies to me that it may be that they were referred for suspected gastroparesis and that the paper really essentially is about patients who have suspected gastroparesis that turn out on more detail deeper evaluation not to have gastroparesis.

Q.   Do you think the title would say, you know, faulty suspicion of gastroparesis is common if that was the case?

A.   So for many years I --

MR. BUXNER:  Let me object to form.

Go ahead.

THE WITNESS:  For many years I ran journal club at the University of Maryland.  And we would have all sorts of articles where the title did not really come

Page 170

to bear out on what was in the article.

BY MS. FITZPATRICK:

Q.   So your argument that I'm hearing is that --

A.   If I had to bet, I would bet --

Q.   You think that -- sorry.

MR. BUXNER:  You guys are talking over each other.

BY MS. FITZPATRICK:

Q.   You think the title of this research letter does not correspond to the actual content of the study that was done?

A.   I think --

MR. BUXNER:  Object to form.

THE WITNESS:  I think, as is true of so many articles that I've read, casual reading of the title does not really necessarily hold up into a deeper understanding of the methodology.  And I would really be surprised if all of these patients essentially had been diagnosed as having gastroparesis and they were just sent to Mayo Clinic to reevaluate them to see whether they had gastroparesis or not.

I believe that they were referred for -- I believe they were referred to Mayo Clinic with the question still about their final diagnosis, knowing how things work.

BY MS. FITZPATRICK:

Page 171

Q.   You agree, though, that a reasonable inference of reading this paper is that 339 people received diagnosis of gastroparesis before they ever got to Mayo?

A.   Unfortunately --

Q.   You --

MR. BUXNER:  Hold on for one second, Doctor.

Are you done with your question?

MS. FITZPATRICK:  Yes.

MR. BUXNER:  Object to form.

Go ahead.

THE WITNESS:  Unfortunately, I believe that -- that people may infer that.  But on carefully reading the article, I'm not convinced that that's the case.

BY MS. FITZPATRICK:

Q.   You see that Dr. Cangemi found that only 19.5 percent, he writes, if you look at that section where we were --

MR. BUXNER:  Where were we?  Can you orient?  Do you mind?

MS. FITZPATRICK:  Yeah.

BY MS. FITZPATRICK:

Q.   If you go back to Page 2 on the right, the paragraph starting "In summary."  Do you see that, Doctor?

A.   Two on the right starting "In summary," yeah.

Q.   It says:  "In summary, more than 80 percent of

Page 172

patients referred for further evaluation of gastroparesis ultimately received alternative diagnoses."

Do you see that?

A.   I do.  And it's interesting.  When it says further evaluation, that suggests to me that a diagnosis was not made actually because it wasn't for treatment of gastroparesis.  It was for further evaluation.

So that would support my suspicion that the title actually is -- that inference that you would have made from the title is actually not accurate.

Q.   You agree that the Mayo Clinic people refer them to try to figure out a treatment for gastroparesis?

A.   And to diagnosis, both.

Q.   Okay.  So these could be people who were referred to them to evaluate them for treatment, and in the course for evaluation, they did a more careful gastric emptying study, true?

MR. BUXNER:  Object to form.

BY MS. FITZPATRICK:

Q.   That's entirely possible?

A.   I think it's possible, but not likely.

Q.   Do you see that Dr. Cangemi writes:  "Our findings reaffirm guidelines noting -- "  down further in that paragraph.

A.   I do.

Page 173

Q.   "Our findings reaffirm guidelines noting that gastroparesis cannot be diagnosed based on symptoms alone."

Do you see that?

A.   I see that sentence, yes.

Q.   You agree that gastroparesis cannot be diagnosed based on symptoms alone?

MR. BUXNER:  Object to form.

THE WITNESS:  That's what I've been pretty much saying all day, yes, absolutely.  I don't believe that symptoms alone without any other information would allow one to make that the diagnosis.

The other thing that I think is really important to point out is that this is --

BY MS. FITZPATRICK:

Q.   There's no question pending.

MR. BUXNER:  No, no, he's -- there is a question. He's explaining his answer.  He has a right to explain it as an expert.

Go ahead, Doctor.

MS. FITZPATRICK:  You will have your own opportunity.

MR. BUXNER:  No, he's in the middle of a sentence and you cut him off in response to your question.

MS. FITZPATRICK:  Because it was a non-responsive sentence.  The other thing I think is important to note

Page 174

is literally what he was saying.

MR. BUXNER:  Right.  He's explaining it.

You can finish your answer, Doctor.

BY MS. FITZPATRICK:

Q.   Let's hear it.  Let's hear how responsive it is.

A.   Right.  So what I was going to say is that it's important to point out that my understanding of this study was that it was not conducted on a patient population with GLP-1 Receptor Agonists, but it was conducted on a patient population that had general symptomatology associated with it without mention in here of this being a GLP-1 receptor agonist study.

Q.   What was my question, Doctor?

A.   It's been awhile since we talked, so I'd be happy to have that played back.

Q.   If you turn back to the supplementary material in the Supplementary Methods; do you see that section?

A.   Supplementary Methods.  The several sentences on -- I guess what's that, Page 2672.e1?

Q.   Yes.

A.   Yes.

Q.   First, you understand these are patients referred to Mayo and Mayo's been asked to consult.  Whatever they've been asked to do, it definitely falls under the word "consult," right?

A.    Correct.

Q.    Okay.  So the Mayo doctor's the consulting provider, right?

A.    Correct.

Q.    Okay.  And do you see that it says:  "If a gastric emptying scintigraphy Study was recommended by the consulting provider."  Do you see that?

A.    I do.

Q.    Okay.  And so you understand that Mayo did their own scintigraphy of the patients who had been referred to them, true?

A.    True.  I would infer that from the paper or the, I guess, letter.

Q.    Doctor, you're not aware in your experience of any patient with gastroparesis diagnosed without some kind of study that you categorized in your report as an imaging study, right?  In your personal experience, that hasn't happened?

MR. BUXNER:  Objection to form.

THE WITNESS:  I'm sorry, I don't understand that question.

BY MS. FITZPATRICK:

Q.    Sure.  You have no personal experience of a patient being diagnosed with gastroparesis without one of the studies that you categorized as imaging studies in your

Page 176

report?

MR. BUXNER:  Object to form.

THE WITNESS:  That's not correct.  I believe patients are diagnosed with drug-induced gastroparesis all the time and --

BY MS. FITZPATRICK:

Q.   You've seen that in your personal experience?

A.   Yes.

Q.   How often?

A.   Often.  In other words, we have patients who are referred to us for evaluation of gastroparesis and those patients are sometimes on medications that impact the -- the perceived gastric emptying.

Q.   And so, you do not do the gastric emptying scintigraphy or other imaging study even though they've been referred to you?

A.   Correct.

Q.   You reject them and turn them away?

A.   Yeah.  That sounds like a dire way of saying it. We don't really reject or turn away patients, per se.  But that I frequently will have my resident or fellow, or in fewer cases, I will talk with the referring physician letting them know pretty much the same thing we've been talking about today, that I don't believe a gastric emptying study is indicated.

Page 177

We radiologists and nuclear medicine physicians are physicians. And so, it's not that somebody tells us what to do and we do it. We are essentially their consultants. And so, when they give us a consultation, then we determine whether that's in the patient's best interest or not. That's part of our responsibility.

Q. So you sometimes do the study and sometimes don't?

MR. BUXNER: Object to form.

THE WITNESS: So -- so we would not do the study in a patient who was on a medication that delayed gastric emptying because our guidelines suggest that we not do the studies until the patient is off their medications that impact their gastric emptying.

BY MS. FITZPATRICK:

Q. So in order for them to have a study, you would always tell them get off the medication, true?

A. We tell the patients that they should not schedule -- I'm sorry. We tell the technologists they should not schedule patients who are on these medications until they're off the medications for the appropriate period of time.

Q. And you tell the clinicians -- the referring clinicians to discontinue the medications prior to study?

MR. BUXNER: Object to form.

BY MS. FITZPATRICK:

Page 178

Q.    Is that your testimony?

A.    We tell the technologists to tell the physicians that and to tell the physicians that we are happy to talk with the physicians if they have additional questions and to do a physician-to-physician consult or resident- or fellow-to-physician consult.

Q.    But you're telling me today that you always say to get the study, you need to come off the medication?

A.    We have a policy in the department to follow the Society of Nuclear Medicine guidelines.  And so, our technologists are told essentially not to schedule patients who are on medications that delay gastric emptying when they're doing a gastric emptying study.

Q.    If you go to Page 24 of your report, the last sentence.

A.    Let me find that.  Page 24.

Q.    Do you see that the last sentence reads:  "In my practice -- "

A.    Uh-huh.

Q.    " -- we occasionally contact referring clinicians about patients who are on medications that can reduce gastric emptying to discuss discontinuation of the medications prior to performing the study."

Do you see that sentence?

A.    Yes, I do.

Page 179

Q.   And in order to more accurately reflect your testimony that you've given here today, we need to change "occasionally" to "always" in that sentence, true?

MR. BUXNER:  Object to form.

THE WITNESS:  No.  When I'm talking about we, I was actually referring to the physicians who in our practice are fellows or residents or me.  The technologists are typically involved when a study's done and they may contact the person that actually requested the study, which is not always the referring clinician.  Sorry if that sounds confusing, but it's a --

BY MS. FITZPATRICK:

Q.   So you're telling me today technologists always contact referring clinicians to discuss discontinuation --

A.   Technologists are --

Q.   -- but you and your residents -- occasionally, you do it?

A.   Right.  The reason for that is that the technologists are told that if there are any objections or further discussion, then that they should contact us or we are happy to contact them and discuss any individual patients.

So the technologists would really tell them about the policy.  Hey, our policy is not to do this because of

Page 180

A,B,C. The clinician then might say, well, hey, I think it needs to be done anyway, you know, despite the guideline or policy. And then the technologist says, oh, okay. That's fine. Why don't you talk to Dr. Siegel or one of his residents or fellows.

Q. But in this report, you told me only the practice of you and your residents and you didn't tell me anything about what the technologists are doing at your direction, right? That's how I'm supposed to read this sentence?

MR. BUXNER: Object to form.

THE WITNESS: Yeah, I mean, I'm trying to remember exactly. But in my practice, we occasionally contact referring clinicians about the patients. That's -- that's correct.

But at the time -- it's often that the clinicians themselves are not the ones that actually interact with the technologists. So Dr. Wellby, the clinician, tells Ms. Smith, who may be the scheduling person, to please schedule the study. And so, then our technologist tells Ms. Smith that the guidelines and our policy is not to do patients until they're off their medications. And so, that would be a case where I did not contact the referring physician.

BY MS. FITZPATRICK:

Q. If the -- if there's a clinical reason that the

Page 181

patient needs to stay on their medications, you do the study while they're on their medications, true?

MR. BUXNER:  Object to form.

THE WITNESS:  No.  What I was saying is that in every case, if there were an exception to the Society of Nuclear Medicine guidelines and I guess other people's guidelines also, then in that particular case, we would discuss the individual patient with the clinician.

BY MS. FITZPATRICK:

Q.   And you would do the scintigraphy study while the person was still on the medications if it was clinically necessary, true?

A.   If it was -- if there was a compelling reason to do that while the patient were on the medications.  But I can't recall a single case where that happened in all the 37 years.

Q.   If you go to your report at Page 16 --

A.   Sixteen.

Q.   -- under heading C., you're talking about gastroparesis that's based on a permanent or unknown underlying condition.  Do you see that?

A.   Correct.

Q.   Okay.  And you note that in many contexts, particularly diabetes, you would expect the symptoms of

Page 182

gastroparesis to develop gradually over time in these patients, right?

A.   Correct.

Q.   With patients only seeking care once they become intolerable?

A.   Right.  Once the symptoms rise to a certain level of severity, then the patients would come to us.  Otherwise, they would not.  And that probably varies from patient to patient.

Q.   If you go back to the American College of Radiology guidelines I gave you.

A.   Do you remember which -- sorry, I should keep the numbers better organized.

MR. BACHMANN:  It's 5.

BY MS. FITZPATRICK:

Q.   Exhibit 5.

A.   That's 4.  That's 6, 8, 7, 2.  Of course it's going to be the last one.  Eight.  I'm going to put them in order as I -- 3, 9, 5.  Sorry.

Q.   Do you see this is the American College of Radiology Guidelines for Scintigraphy that we talked about earlier?

A.   No, this is a Joint Report of the American Neuro --

Q.   Sorry.  Exhibit 4.  I'm sorry, that was my fault.

Page 183

A.   Okay, good.  I've got that one handy, thanks.

Q.   And you agree that's the American College of Radiology Guidelines --

A.   I do, yes.

Q.   Okay.  Now --

A.   Revised 2020.

Q.   If you go to Page 7.

A.   Yes.

Q.   If you look under the -- in the Gastric Emptying paragraph --

A.   Okay.

Q.   -- there's a sentence that starts:  "Prokinetics."

A.   Okay.

Q.   "Prokinetics and medications that delay gastric emptying must be discontinued two days prior to examination."

Do you see that?

A.   I do.

Q.   That's the standard among radiologists?

A.   No.

Q.   That's not what you do?

A.   No.  I mean, clearly, the common sense thing to do is to tailor it to a particular medication.  We've been talking about tailoring care to patients.  It would be silly in my opinion to have a one size fits all for all

Page 184

medications.  So I'm not sure about this reference 26, but I would disagree.  They're probably thinking about -- they may be thinking about opioids in that one.  We'd have to read the article in 26.

But for any medications that were longer acting, such as some of the GLP-1 Receptor Agonists, then two days wouldn't make sense because it really wouldn't be cleared which is what all the guidelines actually recommend.

Q.   So you agree that the guideline as stated by the American College of Radiologists is to discontinue medications that delay gastric emptying two days before that?

A.   I agree that it says that in the guideline.  But I strongly disagree with it.  I think it's highly likely that they would revise that with further discussion.

Q.   But they haven't revised it, right?

A.   Not to my knowledge.

MS. FITZPATRICK:  I'm going to pass the witness.

MR. BUXNER:  We are at an -- I think we're -- are we at an hour on the record?  Yeah.  Can we take a break?

MS. FITZPATRICK:  Yeah, yeah.

THE WITNESS:  I'm not sure what pass the witness means.

MR. PRZYMUSINSKI:  That means that I get to ask

Page 185

the questions next, Doctor.

MR. BUXNER: Oh okay. Who is that?

MR. PRZYMUSINSKI: We will take a break, Doctor, before we start.

MR. BUXNER: Do you want to go off record?

THE VIDEOGRAPHER: Off record, 1:38 P.M.

(Recess was taken)

THE VIDEOGRAPHER: On record, 1:57 P.M.

CROSS EXAMINATION

BY MR. PRZYMUSINSKI:

Q. Is it Dr. Siegel; is that correct?

A. Are you asking?

Q. The pronunciation.

A. Oh yeah, that's how you pronounce it, yes.

Q. Okay.

A. Thanks for asking.

Q. I'm just -- yeah. My last name is really long and I get it messed up a lot, so I pay some more attention to maybe --

A. People tend to pronounce it right but just not spell it right.

Q. It makes sense. Dr. Siegel --

THE WITNESS: You're shaking your head.

MR. BUXNER: What's happening, guys?

MS. FITZPATRICK: Hold on, Lucas. Our court

Page 186

reporter is having an issue.

THE VIDEOGRAPHER:  Off record, 1:58 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  On record, 2 P.M.

BY MR. PRZYMUSINSKI:

Q.  Dr. Siegel, let's try again.  My name is Lucas Przymusinski.  I'm an internal medicine physician and a lawyer with DLA Piper, and I'm here on behalf of Novo Nordisk.  Nice to meet you, Doctor.

A.  Good to meet you too.

Q.  You and I have never met before, correct?

MR. BUXNER:  It's really bad.

THE WITNESS:  I didn't hear that last --

MR. BUXNER:  The court reporter is having trouble, Lucas.

MR. PRZYMUSINSKI:  Do you have any other suggestions, you guys?  Can you go off the record for a moment?

MR. BUXNER:  Sure.

THE VIDEOGRAPHER:  Off record, 2 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  On record, 2:17 P.M.

BY MR. PRZYMUSINSKI:

Q.  Okay.  So after some technical difficulties, I think we are back.

Page 187

Dr. Siegel, what I was saying is that my name is Lucas Przymusinski. I'm an internal medicine physician and an attorney with DLA Piper. And I'm here on behalf of Novo Nordisk. Pleasure to meet you this afternoon and thank you for being here.

A. Good to meet you too, thanks.

Q. And Doctor, we haven't met before, correct?

A. Not to my knowledge.

Q. Okay. I've had a chance to review your report, which I think we've marked as Exhibit 1. Do you have that in front of you, Doctor?

A. In a pile, yes.

Q. Okay. And I'm going to do my best. Ms. Fernandez [sic.] did a very nice job this morning. I'm going to do my best not to go over the same things, but I do have some questions. Okay?

A. Okay.

Q. Maybe, Doctor, we could start on Page 5 of your report. And specifically if you could go with me to the second paragraph that starts "I have diagnosed." And let me know when you're there.

A. I'm here -- there.

Q. Okay. And I want to focus on that first sentence where you say: "I have diagnosed gastroparesis, particularly in patients with diabetes on at least a hundred

Page 188

occasions."

Do you see that sentence, Doctor?

A.    I do.

Q.    Okay.  My first question, Doctor:  Generally speaking, what was your role in diagnosing those 100-plus patients that you discuss in that paragraph?

MR. BUXNER:  Object to form.

Go ahead.

THE WITNESS:  My role is as a nuclear medicine physician and radiologist.

BY MR. PRZYMUSINSKI:

Q.    Well, okay.  I understand that's your specialty and your training, but specifically in the context of these patients, what was -- what aspect of diagnosis were you engaged in when you said you have diagnosed gastroparesis in these 100-plus occasions?

MR. BUXNER:  Object to form.

THE WITNESS:  I think what you're asking is -- and tell me if I'm wrong -- what information did I use in order to diagnose gastroparesis?  The answer really is information that's provided in the clinical indication for the study, plus information that's in the patient's chart, plus information that we have in discussion with patients when we have additional questions, plus the results of the gastric emptying study that I

Page 189

interpreted.

BY MR. PRZYMUSINSKI:

Q. Okay. So in all 100 -- or 100-plus of these occasions, you would have been relying on information that was provided to you by the treating physician and other information that you had and then interpreting the results of the gastric emptying study; is that correct?

MR. BUXNER: Object to form.

THE WITNESS: I would have been relying on information from the chart, the patient, the referring physician and any information that I would get from my technologist, my radiology resident or radiology fellow, plus the study that I'm interpreting, plus all the studies that the patient had in the department, plus any previous gastric emptying studies that the patient may have had.

BY MR. PRZYMUSINSKI:

Q. Okay. But in all of the at least 100 occasions we are talking about, there would have been a gastric emptying study conducted that you in your role as a radiologist and nuclear medicine specialist would have been interpreting; is that correct?

A. Correct. That's how I would have had those patients referred to me by their providers.

Q. Okay. So none of the 100 cases or at least 100

Page 190

cases we are talking about here involve a diagnosis of a patient with gastroparesis without conducting a gastric emptying study, correct?

A. That's correct. Pretty much, by definition, since they find their way to me because I perform that interpretation and that diagnostic study and service, then yes. I don't see patients outside of that context. Or at least I haven't.

I changed my career, as you may have heard early -- earlier in the day, but up until when I quote/unquote retired from University of Maryland and the VA, even though I still work for of them to some extent, in general the patients referred to me came by way of diagnostic studies that were interventional studies that I performed on patients.

Q. So Doctor, is it also fair for me to conclude from that that you have never personally diagnosed a patient with drug-induced gastroparesis; is that correct?

MR. BUXNER: Object to form.

THE WITNESS: I'm not sure what you mean by personally. So let's talk a little bit about personally. So I mean, anytime I make a diagnosis, it's personally.

I think what you may be saying is have I diagnosed patients outside of my role interpreting gastric

Page 191

emptying studies?  Because when you say personally, please help me understand what you mean by that.

BY MR. PRZYMUSINSKI:

Q.    Well, let's back up then.  In your report, you describe that you've diagnosed gastroparesis on at least a hundred occasions, correct?

A.    Correct.

Q.    And I thought what you told me that is in every one of those cases, you diagnosed gastroparesis in the context of conducting a gastric emptying study or Scintigraphy.  Am I wrong?

A.    You are correct.

Q.    Okay.  Are you saying there's some other subset of gastroparesis diagnosis beyond these you discuss here that you have made as well?

A.    Yes.  So -- so I have.  But I just want to say that I consider that I diagnosed all of those patients personally when I do of gastric emptying studies.  But I've also diagnosed gastroparesis on CT scans, I've diagnosed gastroparesis on X-ray studies, on ultrasound studies, and on MR studies as well.

Q.    Are those in addition to the 100 occasions you describe here or is that part of the at least hundred occasions you discuss here?

A.    In addition to.

Page 192

Q.   Okay.  Have you ever diagnosed a patient, diagnosed, given a formal diagnosis to a patient of drug-induced gastroparesis?

A.   Of drug-induced gastroparesis.  I have not because patients who are essentially on drugs would not be referred to me for nuclear medicine studies.

Q.   Okay.  So you have never diagnosed a patient as having GLP-1 Receptor Agonists or GLP-1 RA-induced gastroparesis; is that correct?

A.   I have.  But it's been in the context of imaging studies and in the context of my practice as an interventional radiologist and in the context of gastrointestinal studies and other studies that I've done.

Q.   Just a second ago you told me you have never diagnosed a patient with drug-induced gastroparesis because that's not how patients come to you.

A.   For -- for a Gastric Scintigraphy.

Q.   How then are you --

THE REPORTER:  Um-umm.

THE WITNESS:  Oh I'm sorry.

THE REPORTER:  Wait, wait.  Stop.

BY MR. PRZYMUSINSKI:

Q.   How then did you diagnose a patient with GLP-1 RA-induced gastroparesis?

MR. BUXNER:  Lucas, it's Evan.  Can you restate

Page 193

that because there was talking here right while you were talking.

MR. PRZYMUSINSKI:  I sure will, Evan.  Let me strike that question and start again.

BY MR. PRZYMUSINSKI:

Q.   You told me, Doctor, that you have never formally diagnosed a patient with drug-induced gastroparesis in your practice.  How is that statement consistent with you now telling me that you have diagnosed patients with GLP-1 RA-induced gastroparesis?

A.   The way it's consistent is that I don't always know when I'm doing a X-ray study or a CT scan or an MR what the patient's medications are.  I just know that in the context of doing gastric emptying studies where the purpose of the study is specifically to come up with an objective number to be able to quantify gastric emptying.

In those other studies, we don't have the same requirement that patients be off their medications.

And so, I believe that there are patients who have been referred to me where I've read their CT scans or other studies where they've been on a GLP-1 agonist.  But there are no cases that I can recall of where the indication for a study was a patient with GLP-1 -- on a GLP-1 agonist to find out whether or not they had delayed gastric emptying for those other types of studies.  Does that make sense?

Page 194

Q.    Not really.  But let me ask some questions to follow up.

A.    Sure.

Q.    So in the context of conducting some other types of radiographic studies --

A.    Yes.

Q.    -- you had patients who also happen to be on GLP-1s where you observed what?

A.    Where I observed a large amount of retained material in the patient's stomach in a patient where that patient indicated that they had not eaten recently.

Q.    So Doctor, are you -- I know you haven't done EGDs, so I'm assuming it's not an EGD.

Are you talking about retaining gastric contents in the context of a GI series, a CT scan?  What are you talking about specifically here?

A.    All those.  So for example, I read a PET CT scan this morning where there was a large amount of retained material in a patient's stomach.  And I see studies frequently in all of those different modalities where we see retained fluid or where we see retained solid material in the stomach.

Q.    Okay.  And are PET CT scans a methodology that's approved by any clinical organization, either in the gastroenterology or the radiology communities, for the

Page 195

diagnosis of gastroparesis?

A.   So as you know, PET CT scans and all the other studies are done -- may come up with incidental findings. So we may do a PET scan to evaluate a patient with lymphoma and then see that that patient has a hugely distended stomach on the PET CT scan, and so note that as an incidental finding.

And so, these are not studies in general where patients have been referred for quantitative gastric emptying data, but where the gastric distension is one of many incidental findings.

So for a PET CT, I may make 50 or more incidental findings.  The study wasn't designed to make that finding specifically and there's not a guideline that suggests it, but I see incidental findings that are important to report all the time.

Q.   Right.  And when you find an incidental finding, you share that information with the physician who is treating a patient and it's their responsibility there to decide how to follow up on that finding, correct?

A.   It's a co-responsibility.  So it's the responsibility I believe of both the referring physician and the radiologist.

There have been a number of court cases and a number of opinions by the radiology societies that the

Page 196

radiologists share a responsibility for communication of important findings.

Q.   Okay.  Fair enough.

In the case of the patient that you had a PET scan -- PET CT scan done where you found some gastric food contents, did you report that to the physician?

A.   So this was this morning before the deposition at about 5:30 or 6.  So I shared it with the resident to follow up with the referring physician that it was an incidental finding.  It was really severely distended.

Q.   Did you tell the resident that you diagnosed that patient with GLP-1-related gastroparesis?

A.   No.

Q.   Okay.  Did you tell that patient that you diagnosed the patient with gastroparesis?

A.   Yes.  I mentioned gastroparesis in the -- in the report.  I didn't have information as to whether the patient was on a GLP-1 agonist or not.

Q.   Did you tell the resident that you diagnosed the patient with gastroparesis or did you say gastroparesis is a potential cause of the finding?

MR. BUXNER:  Objection.  Asked and answered.

THE WITNESS:  I told the resident that gastroparesis was a possibility in addition to a gastric outlet obstruction and that both of those

Page 197

possibilities needed to be followed up on expeditiously.

BY MR. PRZYMUSINSKI:

Q.   And when you say those possibilities needed to be followed up on expeditiously, presumably that would involve an EGD to rule out obstruction and a gastric emptying study to rule out gastroparesis, correct?

A.   No, not necessarily.  I think it would -- the first study that I would do would be to try to ascertain whether the patient had gastric outlet obstruction.

So this is a patient who was referred who did not have any gastric symptomatology that we were made aware of.  This patient may have had severe gastric symptoms, but the patient was essentially referred for evaluation of multiple myeloma, I believe it was.  And so, I don't really know anything about the patient's history or symptoms from the study that I interpreted this morning because the process of questions that are asked for a PET CT scan are different than the questions that we would ask in the nuclear medicine department for a patient that's referred for a gastric emptying study.

Q.   That makes sense, Doctor.

But regardless of what study you would recommend as the next study, based on that incidental finding, you would have told the resident that gastroparesis is on the

Page 198

differential?

A.    Yes.

Q.    You need to do some additional testing to evaluate the cause of what you saw on the scan, correct?

A.    Correct.  But I would not have suggested a gastric emptying study because the CT has established that there is a huge amount of food and fluid within the stomach.  I think a gastric emptying study would be contraindicated in that particular patient.

Q.    All right.  Outside of that one example, Doctor, can you recall any other example where you diagnosed -- formally diagnosed, i.e. called the patient or called the treating physician or their resident and said I diagnosed your patient with GLP-1 RA-induced gastroparesis?

A.    You mean with a gastric emptying scintigraphy Study or a non-gastric emptying scintigraphy Study?

BY MR. PRZYMUSINSKI:

Q.    In any way, Doctor.

A.    Yeah.  So I can recall times when we've called and mentioned that we thought the diagnosis or our diagnosis was gastroparesis.  But I don't recall patients who are on GLP-1 Receptor Agonists being referred to us.

The clinicians who refer patients to us do not refer patients for evaluation of GLP-1 Receptor Agonists for all the reasons we've been talking about today, I believe.

Page 199

Q. So the answer to my question is "no," correct?

MR. BUXNER: Object to form.

THE WITNESS: If you could restate your question.

BY MR. PRZYMUSINSKI:

Q. Sure. What I --

A. I'm just trying to --

THE REPORTER: Wait, wait, wait.

THE WITNESS: I'm sorry. Go ahead, please.

THE REPORTER: One at a time.

BY MR. PRZYMUSINSKI:

Q. I was going to restate the question, if that's okay. The question I had was: Have you ever formally diagnosed a patient with GLP-1 RA-induced gastroparesis? And you gave me an answer. And I thought that answer was "no." Is that correct?

A. That's correct.

Q. Okay. Now, Doctor, in your report and this morning with -- over the course of, I don't know, three, three and a half hours of this deposition, you talked about the fact, in part at least, that it's your opinion that drug-induced gastroparesis can be diagnosed without the use of objective diagnostic testing, including specifically without the use of scintigraphy; is that correct?

MR. BUXNER: Hold on for a second. Can you repeat it, Lucas? I apologize. I just had trouble hearing

Page 200

you.  It got muddled in the middle.

MR. PRZYMUSINSKI:  Okay.  Let's try again.

BY MR. PRZYMUSINSKI:

Q.  Doctor, in the morning section of your deposition and certainly in your report, we talked about the fact that part of the opinion you're offering, perhaps the main part, is that the diagnosis of gastroparesis can be made without the need for specific diagnostic testing, including specifically without the need for performing gastric emptying study, correct?

A.  Correct.

Q.  And I assume part of that opinion is that you believe that a diagnosis of drug-induced gastroparesis can be made in a similar manner, correct?

A.  I believe that a diagnosis of drug-induced gastroparesis can be made looking at the temporal proximity of a drug and all of the other signs, symptoms and studies that are available to us in the patient's history, yes.

Q.  Yes.  So it can be made without the need for diagnostic testing, including specifically without the need of scintigraphy, correct?

A.  Specifically, scintigraphy.  As far as diagnostic testing, that really would vary from patient to patient.  I don't want to make a blanket statement that I want to diagnose gastroparesis without any diagnostic studies of any

Page 201

type imaging or otherwise.  I think that would be too sweeping.

Q.   Fair enough.

At least within the context of drug-induced gastroparesis, it's your opinion that you can reliably make that diagnosis without some form of gastric emptying study, correct?

A.   Correct.

Q.   Okay.  And presumably, that opinion also applies specifically to GLP-1 RA-induced gastroparesis, correct?

A.   It would apply to others, but it would also apply to GLP-1 Receptor Agonists.

Q.   It's part of the subset, right?  Part of the subset of what you view as gastroparesis, correct?

A.   Correct.

Q.   Okay.  But you also agree with me, Doctor, that at least in your own practice, you've never actually diagnosed drug-induced gastroparesis in this manner, correct?

A.   I'm constantly diagnosing drug -- I'm constantly diagnosing gastroparesis.  I don't always -- I don't have the history of whether or not a patient is on a GLP agonist, but I still diagnose gastroparesis.

And so, in the case where I'm doing a gastric emptying study, those questions are explicitly asked.  And so for those studies, I don't have studies that I diagnose

Page 202

because those patients do not get gastric emptying studies.

Q. Ultimately, Doctor, the methodology that you describe for diagnosing drug-induced gastroparesis, whatever your opinion is about the reliability of it, it's not a methodology you've ever actually done to formally diagnose a patient, correct?

MR. BUXNER: Object to form.

THE WITNESS: Yeah. I guess -- I think what you're saying is similar to the questions you've been asking; and that is, I work in the context of my role as a radiologist and nuclear medicine physician. And so, the patients that I see in that particular role until now that I've changed to become an oncologist, in that particular role are exclusively patients who have been referred for either one type of imaging study or the other or a consultation related to those imaging studies.

BY MR. PRZYMUSINSKI:

Q. Doctor, I think you talked a little bit about the fact that it's important to understand the history and physical for patients and sort of their global medical history when making a diagnosis, correct?

A. Correct.

Q. Okay. Now, I think from the discussion we just had, you also would acknowledge that when a radiologist

Page 203

receives information on the history and physical findings of a patient, it's often incomplete.  For example, as you said, you may not know specifically what medications they're on, correct?

A.   It is often incomplete, which is why I ask my residents and fellows to look through the chart and to talk with the referring physicians to make that as complete as possible.

Q.   But you yourself acknowledge a lot of the time you don't even know whether a patient was on a GLP-1 medication when you were doing the study, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  So I think we are -- I'm trying to find out whether we are focusing on gastric emptying scintigraphy or all imaging studies that one may perform.

BY MR. PRZYMUSINSKI:

Q.   I'm just asking about your job as a radiologist and what information you're provided when you're making your own assessment of the radiographic study, regardless of if it's a GES, an X-ray, a CT scan, MRI, a PET scan.  In any of the situations, you don't have the full physical history information that the treating physician has, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  So the type of information I have

Page 204

depends on the type of study that I'm doing.  And so, we actually have a much more structured mechanism for being able to obtain that type of information on patients where there's a referral for quantitative gastric emptying studies that goes above and beyond the type of history that I might take if I'm doing abdominal radiographic, for example.

And so, it really varies depending on the type of study.

So if you're asking the question do I have as much information available to me as my colleagues, the answer is yes from the Electronic Medical Record.  If you ask me, have I talked with the patient before the patient came to the imaging department, as much as the gastroenterologist, the answer in most cases is probably no.

But I think the histories that we are able to get nowadays, given that we have access to the Electronic Medical Record is probably comparable to what the referring physicians have access to.

BY MR. PRZYMUSINSKI:

Q.   That actually brings up a point that I wanted to ask about.

So let's talk about these patients that came to your radiology department for a gastric emptying

Page 205

scintigraphy study.  Okay?

A.    Yes, okay.

Q.    And I think you mentioned that for most of the actual procedure is being done by technicians, correct?

A.    So the procedure itself as far as injecting the radiopharmaceutical, as far as putting the patient under the imaging system, as far as scanning and obtaining the image and sending the images, that's all done by the -- they prefer to be referred to as technologists.

Q.    Okay.  So for the 100 patients or so you describe as having diagnosed with gastroparesis in your report, for any of those patients, did you yourself put your hands on the patient and actually do a physical examination?

A.    So in a subset of those patients, I've talked with the patient.  But it's a relatively small subset.  In a larger subset of the patients, my resident or fellow has talked with the patients.  And in a hundred percent of the cases, our technologist has talked with the patients in detail.  And so, any --

Q.    Well, I asked about performing a physical exam, Doctor, not talking to them.

So the question on the table was:  How many of those 100-plus cases did you actually perform a physical examination of the patient?

MR. BUXNER:  Object to form.

Page 206

THE WITNESS:  It would be a tiny number of those when I was doing interventional radiology as an interventional radiologist.  Then I did do a physical examination prior to performing procedures on the patient.

BY MR. PRZYMUSINSKI:

Q.  Well, but I wasn't asking about procedures.  I was asking about the patient you said you diagnosed with gastroparesis.

Of those patients, how many did you perform a physical examination on, put your hands physically on the patient and examine the patients?

MR. BUXNER:  Object to form.  Asked and answered.

Go ahead, Doctor.

THE WITNESS:  I did not perform a physical examination on any of those patients.

BY MR. PRZYMUSINSKI:

Q.  Okay.  What percentage or those 100-plus patients do you think you personally took a medical history from?

A.  I would say probably closer to 5 percent.  But I had access to the medical history and the physical results on all the patients.  I just didn't do the exam myself.

But I don't believe that my physical exam and history would necessarily be better than the one that's documented in the chart by my fellow clinician colleagues.

Page 207

Q.    Doctor, for those 100-plus patients that you describe as having diagnosed with gastroparesis, after you reviewed their results of the scintigraphy study, did you then go talk to the patients and inform them of your diagnosis?

MR. BUXNER:  Object to form.

THE WITNESS:  The answer is in the majority of cases, those patients had already left the imaging department by the time that I reviewed the study.  So I would have talked to them before my resident would have talked with them before, the technologist would have talked with them until they -- until they left the department.

BY MR. PRZYMUSINSKI:

Q.    What I'm asking, Doctor, would you have after you did the study called the patients, reached out to the patient, say, hey, I reviewed your history, your physical examination, findings and your study results and I diagnosed you as your doctor with gastroparesis?  How often did you do that?

A.    I'm not sure what you mean by as your doctor.

But the answer is, if we have findings that are significant or important to the patient, then we have the fellow or resident call the referring physician.  When we are not able to contact the referring physician, then we

call the patient.  I've called the patient myself with findings on many occasions.

Q.   Okay.  And Doctor, would you agree with me, because you and I both are physicians and I -- my grandfather was a radiologist.  My uncle was a radiologist. We all kind of know how this works.

MR. BUXNER:  Object to form.

BY MR. PRZYMUSINSKI:

Q.   Would you agree with me that --

MR. BUXNER:  Was that a question?  Lucas -- Lucas.

MR. PRZYMUSINSKI:  Yeah.

MR. BUXNER:  Object to that because that's not a question.  That's -- you're giving background.  And we could all give our qualifications.  I appreciate that. Just ask questions.

MR. PRZYMUSINSKI:  And I can give background if I want as long as it's followed by a question.

BY MR. PRZYMUSINSKI:

Q.   But the question is here.  The question, Doctor, is:  Would you agree with me that in the context of medical care, you evaluate the radiological study, the radiographic study, you provide an interpretation of that study, for example.  On a gastric emptying study, you may say we find evidence of food in the stomach at four hours at percentages whatever.  This is consistent with severe delayed gastric

Page 209

emptying, or moderate gastric emptying, or mild gastric emptying. You report that to the treating physician, who then will take that information, combine with whatever other information they have, their own analysis of the history of the patient, their relationship with the patient, their prior history, and then they will deliver the diagnosis to the patient, which is dependent on information you provide them, which is critical, but also on their own opinion and their own work with the patient and their own knowledge about the clinical history. Is that fair?

MR. BUXNER: Object to form.

THE WITNESS: So that occurs in the majority of cases.

But one thing that's really important to emphasize is the fact that nuclear medicine is different from radiology fundamentally. A large percentage of the people who do nuclear medicine actually have an extensive internal medicine background.

And so, the bias that I teach my residents and fellows and emphasize, and also our radiology residents, is the importance of being that patient's physician, of communicating with the patient, of seeing the patient, of putting hands on the patient as much as possible.

So I think what you're saying is probably more

Page 210

characteristic in the radiology department than it would be in most nuclear medicine departments where most of we nuclear medicine physicians pride ourselves on really being the patient's physician to a greater extent than I think is perceived generally.

BY MR. PRZYMUSINSKI:

Q. And I appreciate that. I think that's great. But I think we looked at your -- talked about education, right? As I understand it, you went to medical school, correct?

A. Correct, at the University of Maryland.

Q. Then you had a transition year, the first year internship year, whatever you want to call it, a transitional year of residency training, correct?

A. No. Actually, back then I was able to go directly from being a fourth year medical student into radiology. That was permitted back in 1982 when I graduated. So I did a number of clerkship years during my fourth year of medical school, but actually bypassed the intern year.

Q. Okay. So after medical school, you went straight to residency in radiology?

A. Correct. I was a PG-1 radiology resident right out of medical school. And so, I had the option --

THE REPORTER: Wait, wait, wait. Wait.

MR. BUXNER: Lucas. Lucas, you interrupted him. And he wasn't finished answering the question.

Page 211

Go ahead, Doctor.

THE WITNESS:  I was just trying to answer the question just to say that I finished four years of medical school, and then there is -- was the option back then of the program to ask one to do a year of clinical additional training if the program didn't think that the person was ready by virtue of training from medical school.  But I was able to go directly -- I guess by virtue of doing those clerkships and other things during my fourth year to be able to go directly into the radiology residency.

BY MR. PRZYMUSINSKI:

Q.   Okay.  And how long was the radiology residency?

A.   Four years.

Q.   And then you had a fellowship in nuclear medicine after that; is that correct?

A.   That is correct, yes.

Q.   And then you went into what's called clinical practice.  We know you practiced during residency.  But you were done with your training; is that correct?

A.   Right.  When I was done with my training, then I immediately became the chairman of the department at the VA.

Q.   Okay.  So you yourself outside of medical school did not have any internal medicine training; is that correct?

Page 212

A.   I did not have -- I mean, during medical school and during clerkships, et cetera, then we did many rotations in internal medicine and we had, you know, internal medicine exposure.  But I didn't do a formal internship in internal medicine.  I think that's what you're asking.

Q.   Well, what I guess you said to me a few minutes ago was that people in nuclear medicine tend to have a strong background in internal medicine.

And I'm asking whether after medical school you actually had any training in internal medicine.  And I think the answer to that is "no."  Correct?

A.   Right.

MR. BUXNER:  Object to form.

THE WITNESS:  I'm sorry.

MR. BUXNER:  Go ahead.

THE WITNESS:  That's correct.  In other words, there are really two types of nuclear medicine physicians in general.  One are the ones that have done training in diagnostic imaging and then they specialize in nuclear medicine.  The other pathway is to go to -- through internal medicine and do years of training in internal medicine and then go from there to nuclear medicine.

And so, that's why there's such a strong emphasis on this.  And so, even those of us who have not had

Page 213

training in internal medicine really by virtue of the culture essentially have a very hands-on, very, you know, patient communicative attitude more so than would typically be the case in radiology.

BY MR. PRZYMUSINSKI:

Q. And I think that's great.

But, Doctor, let me ask you this: Do you have a clinic or a office where you routinely see patients coming in to see you where you do examinations, history and physical? And let me caveat that because I know you changed positions. Let me say -- let me strike that.

Prior to retiring from your role at the VA, did you have a clinical office where it was your responsibility on a routine basis to see patients, to do histories, to do physicals and to make diagnoses based on your hands-on examination of the patient?

A. No, I relied on my clinical colleagues to do that and then to communicate that information to me and in the chart.

Q. And Doctor, I know in talking this morning, we went through this list of I think what you described as not a complete list, but a list of potential disorders that might be confounded with or confused with gastroparesis based on the premise of GI symptoms. And those are on pages 15 to 16.

Page 214

A.    Yeah, you mentioned confounded or confused.  I really wouldn't necessarily use that terminology.  I think what I would say would be are in the differential diagnosis and should be considered in a patient where gastroparesis is also being considered.

Q.    And that's perfect.  It's a much better way of saying it, Doctor.  Thank you.

A.    Thank you.

Q.    So I'd like to ask you a few questions.

A.    Sure.

Q.    One of the categories you have on this list under Endocrine Disorders is diabetic ketoacidosis.  Do you see that?  It's on Page 16.

A.    Yeah, thanks for the page reference.  It makes it easier.  I do.

Q.    Can you tell me when the last time you diagnosed a patient with diabetic ketoacidosis?

A.    I can't recall the last time I diagnosed a patient with diabetic ketoacidosis.  I refer -- I rely on my colleagues to make that diagnosis and to put that into the chart or to communicate that to me.

Q.    Okay.  And next to that is the term "Thyroid Disorders," which could be hypothyroidism, hyperthyroidism or other things.  When's the last time you diagnosed a patient with hypothyroidism?

Page 215

A.    Sometime in the last two days, probably.  So I do extensive work in diagnosis of thyroid conditions.

Q.    Okay.

A.    Thyroid biopsies, treat patients with thyroid cancer, have patients who are referred for hyper- or hypothyroidism where we get all the information associated with that and we are asked to make a diagnosis, we are asked to be able to make recommendations for Grave's disease or autoimmune thyroiditis or a wide variety.

I actually lecture the residents in the diagnosis of conditions related to the thyroid, including fairly extensive discussion about palpating the thyroid, taking a history and the things pretty much that one would do as potentially as any physician that was doing complete care on those thyroid patients.

Plus I -- in my lectures, I ask the residents to actually meet the patient, palpate the thyroid, estimate the size of the thyroid, palpate nodules, et cetera.  So that's an area where we really do pretty complete diagnosis.

Q.    Okay.  Perfect.  Tell me about anorexia nervosa. When's the last time you diagnosed a patient with anorexia nervosa?

A.    It's not a common diagnosis at the VA.  I would think that it would be very rare or relatively rare in that population.  So I would rely on referring physicians to make

Page 216

that diagnosis from the history and their examination and to share that with me.

Q.   Is that the same for bulimia?

A.   It is.

Q.   Okay.  When's the last time you diagnosed rumination syndrome, doctor?

A.   That's -- I have not diagnosed the rumination syndrome.  I would rely on the information in the Electronic Medical Record and from my referring clinician colleagues.

Q.   What about cyclic vomiting syndrome; when's the last time you made that diagnosis?

A.   Same.

Q.   Doctor, on Page 5 again, Doctor, where we were a second ago in your report -- and we were still talking about that one sentence about your diagnostic experience with gastroparesis, you have this phrase that by commas that says, "particularly in patients with diabetes."  Do you see that?

A.   Yes.

Q.   Okay.  And am I correctly understanding that that suggests that the majority of the hundred patients that you diagnosed with gastroparesis in the way that we discussed were diabetics?

A.   You are correct.

Q.   And would you then have diagnosed those patients

Page 217

with diabetic gastroparesis?

A.    I would have diagnosed those diabetic patients with gastroparesis.  I would have essentially suggested that the most likely etiology was their diabetes, per se.

But those diabetic patients have many other risk factors, including medications that they're on, including many other etiologies that we've talked about.

So I would have suggested the diagnosis of diabetic gastroparesis is the most likely diagnosis, but the results of the gastric emptying study would allow one to be able to make a variety of diagnoses.  And I wouldn't exclude that -- just because a patient's diabetic, I would not conclude that all diabetic patients with delayed gastric emptying have diabetic gastroparesis.  But the patients are referred.

Q.    You would -- (cross-talk)

A.    -- that question.  I'm sorry.

MR. BUXNER:  Keep going, Doctor.

THE WITNESS:  I was just saying a lot of the indications for these studies that I get or common most common indication is diabetic patient with the following symptoms.  And then we would talk with the patient about what medications they're on.  We would look at the patient's chart.  And in my diagnosis, I would say that this would be consistent with the

Page 218

diagnosis, but not specific for the diagnosis of diabetic gastroparesis.

And really, the emphasis for me is more in this being a data point with quantitative information rather than the gastric emptying study itself making the diagnosis in the absence of other information just only knowing that they're diabetic.

BY MR. PRZYMUSINSKI:

Q. And so, what happened is you provide that data point and you would expect their gastroenterologist or the primary care physician who ordered the study to then follow up and make a determination specifically of their diagnosis and use it as a treatment line, correct?

A. In most cases, that's correct.

Q. All right. Doctor, diabetes is the most common known cause of gastroparesis, correct?

A. To my knowledge, that's correct. And in my clinical experience, that's correct also.

Q. And Doctor, you're aware that GLP-1 RA medicines are indicated for the treatment of diabetes?

A. I am aware that they're used in the treatment of diabetic patients, but not that they're necessarily indicated in every patient with diabetes.

Q. I didn't mean to imply in every single patient. But they are indicated, meaning that if you look at their

Page 219

labeling, the indications line which is approved by FDA states that they are indicated for treatment of Type 2 diabetes at least for some portion of the GLP-1 medicines?

A. Correct.

Q. Correct?

A. In other words, my impression is that one of the reasons to prescribe them is a patient who has diabetes, but I think it would vary depending on the particular patient as to whether a diabetic patient was indeed put on GLP-1 agonist.

But if you're looking at the indications for the study, diabetes would be one of a number of indications.

Q. Okay. That's a fair answer, Doctor.

And I guess sticking briefly on diabetes -- and I think you mentioned this to some extent on Page 9 of your report -- and feel free to flip there from if it's helpful --

A. Thanks.

Q. -- that in fact the slowing of gastric emptying that's associated with GLP-1 medicine is actually part of the mechanism of action of these medicines and they'd actually be helpful in preventing what's called postprandial hyperglycemia or spike in sugar after a meal, correct?

A. I have read that in the articles that I read as part of this -- this report, yes.

Page 220

Q.   It's not a side effect of the medicine, it's actually the intended effect meant to help with controlling some of the blood sugar spikes people can experience after they've had a meal, correct?

A.   Yes, I believe that the labels all indicate that all of those GLP-1 agonists are associated with decreased gastric emptying rates, and also, that my understanding is that that gastric emptying delay is part of the positive effects or associated with the positive effects of the GLP-1 agonists.

Q.   Okay.  And Doctor, I'm totally fine if you don't know.  Do you know how long GLP-1 RA medicines have been available in the United States for the treatment of Type-2 diabetes?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know for sure how long they've been available.  I -- and when you say available, I think you mean FDA cleared and CMS also approved, or do you mean FDA cleared?  Or have they been available for research?  Because research studies on those go back fairly far.  And so, I think those would be different times.

But if you're asking me what is the date that it was FDA -- each one of those medications was FDA cleared, I'd have to look that up.

Page 221

BY MR. PRZYMUSINSKI:

Q.    Well -- and your clarification is great.  Because you're absolutely right.  There was a lot of different questions.  And it wasn't a good one.  So let me ask it differently.

Do you know how long any -- the first GLP-1 RA -- how long ago the GLP-1 medicine was FDA approved for clinical use in the United States?  Do you have a sense of how long that's been?

A.    No.  I know it's been many years, but I can't tell you the date.

Q.    Do you know if it's been more than a decade?

A.    I would -- I would expect that it's been more than a decade.

Q.    And do you think that the fact that that medication, the GLP-1 RA's part of their effect included the slowing of gastric emptying would have been known from the time they were approved by FDA back more than a decade ago?

MR. BUXNER:  Object to form.

THE WITNESS:  I think that whatever one was approved.  In other words, there were a number of GLP-1 agonists that weren't known at that time.  And so, I think the particular GLP-1 agonist that was approved, it was known at the time that it was approved that it caused delay in gastric emptying.

Page 222

BY MR. PRZYMUSINSKI:

Q.   Doctor, that's a good transition.  Because I know we talked earlier this morning about your opinions with respect to causation versus association.  And I think I heard you say, but I want to make sure I'm correct, that there is a strong association between GLP-1 RA medication use and gastroparesis; is that correct?

A.   No.  There's a strong association between GLP-1 use and delayed gastric emptying.  But I didn't say that there was a strong association with gastroparesis.

Q.   Okay.  And when you say there's a strong association with delayed gastric emptying, what data are you relying on for that conclusion, Doctor?

A.   Yes.  So there are a couple of Mayo studies that were done.  There was a two studies that were done.  I think the first one was done in 2017, if I'm correct.  And that was done with 40 patients, I believe.  And then there was a second study done.  I believe it was done in 2022 also at Mayo.  And that that was done with I believe 136 patients.

And they looked at the impact of liraglutide at five weeks and at 16 weeks on a number of different parameters.

The second study actually looked at some genomic information and looked at snip data to try and see if there was an association.  They also looked at other factors in

Page 223

addition to just gastric emptying. But gastric emptying was included in the information that they looked at.

And so, you know, as we -- as I've already said, I think Mayo is a prestigious university and I think that, you know, that is a study that I would rely on among other information to convince me that the GLP-1 agonists indeed do -- or at least liraglutide does cause delayed gastric emptying.

Q. Okay. So a couple quick questions: First of all, would the studies that you're relying on for the strong association between GLP-1 medicines and delayed gastric emptying be identified in your Expert Report?

A. I believe so.

Q. Okay. The next question I have for you: You said something about Mayo being highly respected institution; is that correct?

A. I did. I think -- I was asked that earlier. I'd have to look at the transcript, but I believe that we -- we discussed that.

Q. Okay. And are you familiar with Dr. Michael Camilleri?

A. I don't know him personally, but I am familiar with articles that he has written or been a co-author on.

Q. Are you aware that he is a professor at Mayo Clinic?

Page 224

A.    I am.

Q.    Are you also aware that he's a gastroenterologist?

A.    Yes.

Q.    Would you agree that he is a highly-respected expert in the area of gastroparesis and gastric motility from a GI side?

MR. BUXNER:  Object to form.

THE WITNESS:  I believe that there's a general perception that that is correct.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Remember that you were shown -- and it's Exhibit 8 which you can have in front of you.

A.    Exhibit --

Q.    -- an abstract titled or by the first author, Lupianez-Merly; do you remember that one?

A.    I do.

Q.    Okay.  I just want to make one thing just to confirm with you.  I know you have your conservative limitations about the abstract.  And certainly, this is an abstract.

But can we agree to the fact that this was an abstract that was produced by the Mayo Clinic?

A.    Yes.  But I'm sure we would also agree that Mayo Clinic doesn't exclusively publish data that cannot be contested.  In other words, I think the fact that

Page 225

something's published by Mayo -- I mean, me in my role as editor or co-editor of journals or peer review, I would not rely just on the institution, but really want to rely on the contents of the paper.

So I think it would be a mistake in generalization to assume that anything that any prestigious university, including University of Maryland --

Q.   I didn't ask that question, Doctor.  I just asked you is it was true that it was put out by the Mayo Clinic? That's what I asked.

MR. BUXNER:  Let him finish his answer, Lucas.

MR. PRZYMUSINSKI:  But seriously, like, he's talking a lot and I'm being very respectful.  The question is, was it put out by the Mayo Clinic?  That's all I asked.

I appreciate your concern, Lucas.  But he's in the middle of a sentence and you interrupted him.

Finish your thought, Doctor.

THE WITNESS:  Yes.  So essentially, yes, it was put out by Mayo Clinic.  I just don't want to imply by that answer that the fact that it was put out by Mayo Clinic would preclude me from questioning the methodology.

BY MR. PRZYMUSINSKI:

Q.   I didn't suggest that, although a second ago you

mentioned another study we were talking about and mentioned the fact that it came from the Mayo Clinic as an impetus or imprint -- sorry -- of reliability in your discussion of it. So I just wanted --

A.    You mean --

THE REPORTER:  Wait, wait, wait.

THE WITNESS:  I'm sorry.  Go ahead, please.  I apologize, I talked on top of you.

MR. BUXNER:  Lucas, he talked on top of you.  The court reporter --

MR. PRZYMUSINSKI:  It's okay.  Let me try the question again.  Strike the question and let me do it again.

BY MR. PRZYMUSINSKI:

Q.    I appreciate what you're saying that the Mayo Clinic name alone is not an end-all, be-all.  I do recall, however, that you were talking about some of these studies that you said supported the strong association between GLP-1s and delayed gastric emptying and you did mention a lot of them came from the Mayo Clinic.  And I think you identified that as an imprint of reliability for that study. And so, that's why I asked whether this abstract also came from the Mayo Clinic.  That's my only question, Doctor. Does that make sense?

So is it correct that this abstract is from the

Page 227

Mayo Clinic?

MR. BUXNER:  Object to -- object to form.  Asked and answered.

Go ahead, Doctor.

THE WITNESS:  So it is from the Mayo Clinic.  And the point that I was trying to make -- and I appreciate you giving me the opportunity to clarify it -- is that articles that come out from the Mayo Clinic would get a greater level of scrutiny from me with regard to -- I would pay a lot more attention to articles from the Mayo Clinic, but I would not necessarily agree with them if I thought the methodology was flawed, but I would really pay attention to an article coming from the Mayo and essentially reread it where I might not from another institution.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Fair enough.

Doctor, the only other thing I want to ask you about this -- and I understand the limitation, so please don't tell me another long narrative about limitations.

Can we also agree that Michael Camilleri is one of the authors of this document, this presentation that we have in front of you as Exhibit 8?

A.    As Exhibit 8?

Q.    I think it's Exhibit 8.

Page 228

A.    Yeah.

Q.    Dr. Camilleri is listed as one of the co-authors of this presentation, correct?

A.    Correct.

Q.    Okay.  That's what I wanted to know, Doctor. Thank you.

A.    Sure.

Q.    Now, let's get back to -- let's get back to where we were.  So in your report on Page 9 the -- I know we read the sentence -- or you read the sentence a little bit earlier, but I want to ask a different question about it.

The sentence at the end of the first full paragraph says:  "As discussed above, it is well established and documented -- "

A.    I'm sorry, I don't see --

Q.    -- in the literature -- (inaudible due to cross-talk)

THE REPORTER:  Wait, wait, wait.

BY MR. PRZYMUSINSKI:

Q.    Do you see that?

MR. BUXNER:  We are not caught up to you, Lucas. We apologize.  What page are you on?

THE WITNESS:  I'm on Page 9.

BY MR. PRZYMUSINSKI:

Q.    I'm on Page 9.

Page 229

A.    And can you -- I'm not finding that quote yet, so --

Q.    If you look at the first full paragraph, not the one that runs over from the prior page.

A.    It says hold transit, right?

Q.    The last sentence:  "As discussed above, it is well established and documented in the medical literature --

A.    I don't --

Q.    " -- that GLP-1 RAs cause at delayed gastric emptying."

Do you see it now?

A.    No, I'm on the wrong --

Q.    It's your report, Doctor.  It's in your report.

A.    Right, I'm on the wrong document.  I'm sorry.

Q.    That's my fault.  I probably wasn't clear.

A.    I was just on another document.  So let's do this again.  Now I'm on Page 9 of my report.

Q.    Your Expert Report, last sentence of the first full paragraph.

A.    Yes, I'm with you.  Thanks.

Q.    We were talking about a second ago about a strong association between GLP-1 RAs and delayed gastric emptying. And in the report, you used the word "cause."  And I'm trying to understand whether the word "cause" in your report is wrong, whether the term "strong association" is wrong, or

Page 230

whether somehow I'm confusing two different concepts that are not connected to each other?

MR. BUXNER:  Object to form.

If you understand, go ahead, Doctor.

THE WITNESS:  I do understand.  So I believe I understand.

So I think you're asking the question in addition to an association, do I believe that the use of a GLP-1 receptor agonist results in delayed gastric emptying. And I believe the answer to that is yes.

So I would use the word "cause" in this case. Even though we talked about my not talking about causation, that discussion was in a different way that causation is used, if that makes sense.

BY MR. PRZYMUSINSKI:

Q.   Well, whatever data you reviewed and of course your own experience, Doctor, together, based on that, it's your opinion that not only is there an association between GLP-1 medicines, but there's also a causal relationship between use of those medicines and delayed gastric emptying, correct?

A.   Correct.

MR. BUXNER:  Object to form.

THE WITNESS:  Oh sorry.

BY MR. PRZYMUSINSKI:

Page 231

Q. Okay. Was that a "yes," Doctor? I'm sorry, I didn't hear you.

A. It was.

Q. Okay. And Doctor, do you have the -- any methodology in mind by which you would move scientifically from an association to causation? Meaning are you of a proponent of something like the Bradford Hill methodology? Or is there some other process by which you take data and say there's an association and now I'm convinced it's more than that, I'm convinced it's causal?

A. Yes.

Q. And what is that, Doctor?

A. So for example, in a study where a patient was given the GLP-1 agonist and multiple time points were collected, then I think it's easier to be able to tease out a causal relationship than an association relationship.

And so, you can do a, you know, a retrospective study, as was done as Mayo.

But to me, I think when you do a trial and you have the ability to be able to control which patients get it, when they get it, have a placebo, then that allows you to go beyond just the association question, but actually to be able to infer a cause.

Q. So in your --

MR. BUXNER: Lucas, I don't want to -- it's Evan.

Page 232

Just one second.  I just want to note, I'm giving you some leeway here because it's in the report and he's saying it.  But I just want to make sure it's clear, on Page 6 of his report, he's saying he's not offering an opinion on causation.  It's not what he was asked to do.

MR. PRZYMUSINSKI:  Well --

MR. BUXNER:  And he's not offering one.  So at some point, it's beyond the scope.

MR. PRZYMUSINSKI:  I know it is.  But he actually has that opinion in his report.  And that means that either that opinion has to come out of his report or I have to be entitled to ask about it.

MR. BUXNER:  I think what he says on his report is that it's well established in the literature.  I don't think he's offering --

MR. PRZYMUSINSKI:  GLP-1 RAs cause delayed gastric emptying.  That's what he's saying.

MR. BUXNER:  Right.

MR. PRZYMUSINSKI:  I mean --

MR. BUXNER:  He's saying --

MR. PRZYMUSINSKI:  -- if you want to go back and say, no, what I actually meant to say was association, I haven't considered causation, I'm happy to amend the report.  But it says causation.

Page 233

MR. BUXNER:  No.  I think what it says is it is well established documented in the literature that it causes it.

So if you want to ask him what literature, which I think you've already asked him, he's just commenting on the literature, but he's not here as an expert on causation.

MR. PRZYMUSINSKI:  Okay.

BY MR. PRZYMUSINSKI:

Q.   So Doctor, are you not offering an opinion that GLP-1s cause delayed gastric emptying?

A.   I'm offering an opinion that based on the literature, there's -- a preponderance of the literature that I've read, I believe that literature implies that there is a causal relationship.

Q.   And based on your analysis of the literature, you're offering the opinion --

THE REPORTER:  Wait, wait, wait.  Wait, Lucas.

BY MR. PRZYMUSINSKI:

Q.   -- by which there's causation?

THE REPORTER:  Lucas, can you say that again?  You were muffled.

MR. PRZYMUSINSKI:  Sure.  I'm sorry.  I'll try again.

BY MR. PRZYMUSINSKI:

Page 234

Q.    So based on your review of the literature and your analysis of available data, you're offering the opinion that you think the totality of that evidence is sufficient to reach a conclusion there's a causal relationship; is that correct?

MR. BUXNER:  Object to form.  Outside the scope.

THE WITNESS:  So essentially, what I'm saying is that the literature suggests there is a causal relationship in my analysis.

BY MR. PRZYMUSINSKI:

Q.    Okay.  So your analysis reaches the conclusion that there's a causal relationship with delaying gastric emptying, correct?

MR. BUXNER:  Object to form.  That's beyond the scope.  I don't want to get in an argument that I'm coaching because I'm really not trying to, Lucas.  I'm just saying --

MR. PRZYMUSINSKI:  I know you're not.

MR. BUXNER:  -- he's not offering an opinion on causation.

MR. PRZYMUSINSKI:  I get that, Evan.  But you see where there's a tension between saying you're not offering an opinion on causation and then using the word "cause" with respect to the underlying physiological issue that he says is the sine qua non of

Page 235

the disease, right?  You see the tension there?

MR. BUXNER:  I see what you're saying.  But I think what he's saying -- and it's in the report -- that he's relying on the literature that suggests there's a causal link.  He's not coming to a conclusion.  He's not claiming that he's read all the clinical studies and he has an opinion of causation, which is not part of cross-cutting motion number one or issue one.

BY THE REPORTER:

Q.   All right.  Doctor, maybe you'll help me.  Is it your testimony that you have not done a comprehensive review of the literature such that you're not in a position today to offer an opinion one way or the other that there's a causal relationship or not between GLP-1s and delayed gastric emptying?

A.   I believe that I have done as comprehensive a review of the literature as is called for in the report.

MR. PRZYMUSINSKI:  Well, then, Evan, I'm sorry.  I don't know how to help you on this.

MR. BUXNER:  Well --

MR. PRZYMUSINSKI:  I need to ask some more questions here.

MR. BUXNER:  He said it's called for in the report.  He's saying in the report, I'm not offering an

Page 236

opinion on causation.

MR. PRZYMUSINSKI:  Evan, come on.  I literally tried to give you the language that you would need to say to me if he was not offering a clinician opinion. He literally told me the opposite, that he reviewed the literature sufficient to reach the opinion in his report that says causation.

MR. BUXNER:  He's not.  He's --

MR. PRZYMUSINSKI:  I don't know any other way to deal with that, Evan.

MR. BUXNER:  Well, Page 9 says it's well established in the literature.  He's not trying to say he's digested all the literature and come to a conclusion.  Did you not --

MR. PRZYMUSINSKI:  Did you hear what he just said? I mean, listen, if we went to call the judge, Judge Martston on this, there's no question that she would allow me to ask questions about this.

And frankly, all I would require for you is to say he's not offering a causation opinion.  And frankly, I'd be fine.  But I keep hearing he's analyzed the data and reached a conclusion.  So I need one or the other.

MR. BUXNER:  Look, we are at an hour.  Why don't we take a break and come back in five?

MR. PRZYMUSINSKI:  Fair enough.  Let's come back

Page 237

in five.

THE VIDEOGRAPHER: Off record, 3:17 P.M.

(Recess was taken.)

THE VIDEOGRAPHER: On record, 3:26 P.M.

BY MR. PRZYMUSINSKI:

Q. Okay. Doctor, so I know we just took a break and we were talking about Page 9 of your report and the sentence at the bottom of the first full paragraph. And I'll ask it again.

Are you intending to offer the opinion that based on your review and analysis of the literature, that there's sufficient evidence to conclude that GLP-1 RA medicines cause delayed gastric emptying?

A. Yes, based on my review of the literature and the labels.

Q. And that opinion is based upon the studies and information that's referenced in your report and reliance list; is that correct?

A. Correct. And the labels that indicate that there is a causal relationship and that that's really part of the intent of the medications.

Q. Okay. Doctor, let me ask you a few clarifying questions.

A. Sure.

Q. When reaching the conclusion based on your review

Page 238

of the literature that GLP-1 medicines cause delayed gastric emptying, did you consider whether this association was present for all GLP-1 medicines across the board or whether it was unique or limited to one or more medication?

A.   My understanding is that it is true across the board.  It may be different for different medications.  And the onset and effects and duration of effects may vary from one to the other.

But it's my understanding that there's a causal relationship and that the labels also indicate a causal relationship across the board with the GLP-1 agonists that I'm aware of.

Q.   Okay.  And Doctor, did you -- in the studies that you reviewed, did any of those studies evaluate the effect of semiglutide on gastric emptying?

A.   So I believe that there are studies that were done earlier to evaluate the impact of semiglutide, in addition to the ones we've been talking about which use liraglutide.

Q.   Okay.  Do you know whether those studies are referenced in your report?

A.   I believe so.

Q.   Did you look at any studies that evaluate the effect of trizepatide on gastric emptying?

A.   I don't recall a specific study other than that the label associated with trizepatide mentions that it

Page 239

decreases gastric emptying.  But I don't recall a separate study or seeing a separate study specifically with a randomized placebo-controlled parallel trial associated with a trizepatide.

Q.   Okay.

A.   I don't believe there's a reference to that in my report.

Q.   Okay.  Doctor, and am I correct in just trying to in layman's terms kind of think about delayed gastric emptying as a concept, right, is simply a slowing down or a break on how fast the stomach moves food through it, correct?

A.   I'm sorry, I lost you on those last couple words.

Q.   Yeah.  Let me try again.  Let's strike that and let me try it again.

A.   Sure.

Q.   In layman terms, the slowing of gastric emptying or delaying gastric emptying simply means slowing down of the rate at which food moves through the stomach, correct?

A.   You said moves through the stomach, I think.

Q.   Yes, I did.

A.   And the answer is, one can look at a solid phase, which would be food; one can look at a liquid phase, which I wouldn't necessarily -- I don't think most lay people would consider that food also.  And so, we can do gastric

Page 240

emptyings in either the solid phase or in the -- in the liquid phase.  Some people have advocated doing both.  But in general, people are suggesting that the solid phase is more important than the liquid phase.

Q.   And at a high level of people who are not --

THE REPORTER:  Wait.  Wait, wait.

BY MR. PRZYMUSINSKI:

Q.   (inaudible)  -- talking about gastric emptying being a --

MR. BUXNER:  Lucas, the court reporter lost you at the very beginning.  It got a little muffled there.  I don't know why.

THE REPORTER:  I have something high level of people who are not, so I need the question.

MR. PRZYMUSINSKI:  Let me try it again.  It's okay.  I know it's tough.

BY MR. PRZYMUSINSKI:

Q.   So at a high level, the question I'm asking you, Doctor, for people who are not radiologists, nuclear medicine expert, motility GIs, when you talk about delaying gastric emptying, that means a slowdown in how food or liquid moves through the stomach, correct?

MR. BUXNER:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  Correct.

Page 241

BY MR. PRZYMUSINSKI:

Q.   Okay.  And presumably, if I'm not wrong, delayed in gastric emptying is a concept that has a magnitude associated with it, meaning you could have a small delay in gastric emptying, a medium, a large, a very large, right?  It's something that can be on a scale from very little effect or zero effect to very significant.  Is that fair?

A.   It is fair, but only a part of it.  Because actually, there are multiple time points.  And so, that gastric emptying may occur in a non-linear rate.  And so, we are actually looking at a temporal component where one would assess gastric emptying at multiple different time points.

And so, I think a quality gastric emptying study actually assesses gastric emptying at multiple time points.  And there's diagnostic information to be discerned by looking at gastric emptying, which may happen differently in different patients.  Even though those patients have the same level of gastric emptying at four hours, for example, there may be different patterns of emptying.

Q.   Yeah.  And so -- that makes sense.  It's complicated, right?

A.   Yes.

Q.   And one of the advantages of scintigraphy is it allows you to look at data over different time points, right, a baseline, at two hours, at four hours, and provide

Page 242

a full picture on what's really happening, correct?

A.   Correct.

Q.   Okay.  But as a general principal, Doctor, would you agree with me that -- let's say we all agree that a certain medication -- we don't have to talk about GLP-1s for now -- has an effect that slows down gastric emptying.  Are you with me so far?

A.   I am.  I believe so.

Q.   That's some information, right?  But what you'd really want to know is how much of an effect and what kind of effect it has on gastric emptying to be able to really know whether that effect is clinically meaningful, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  So I think that information is helpful, but doesn't in and of itself make a diagnosis.

But I believe -- I think what you're saying is that the complex information that's contained in the analysis of gastric emptying has significant value in addition to just a single number or single assessment of severity of delaying gastric emptying at any one particular time point.

BY MR. PRZYMUSINSKI:

Q.   That's part of what I'm saying.  But I'm also trying to ask the question, right, which is:  Just the fact that you decide that a medication based on your review and

Page 243

analysis has an effect on gastric emptying and the effect being slowing doesn't tell you how much of an effect it has, correct?

MR. BUXNER:  Object to form.

BY MR. PRZYMUSINSKI:

Q.   That's not a yes/no answer.  It's a magnitude question.

MR. BUXNER:  Same objection.

THE WITNESS:  You're correct in saying it's not a yes/no question from my perspective.

BY MR. PRZYMUSINSKI:

Q.   Right.  So the question that I have is:  Did you look in terms of your review to assess what the magnitude of impact on gastric emptying is of any individual GLP-1 medication at issue in this litigation?

A.   So --

MR. BUXNER:  Object to form.

MR. PRZYMUSINSKI:  So for example, with liraglutide, we have objective information, although it's in a somewhat different format than other people might report it.  For example, in the Mayo studies, the two studies that were done with liraglutide, they ended up looking at the t 1/2 rather than the amount that was retained at four hours, which is actually the requirement or the recommendation for the study by the

Page 244

Society of Nuclear Medicine and other societies that suggest a four-hour study.  And so, in that case, they ended up using the t 1/2.  And so yes, I am aware.

BY MR. PRZYMUSINSKI:

Q.   Well, that's liraglutide.  But the primary medications involved in this litigation are semiglutide, trizepatide and dulaglutide.  Did you look at those medications to see what the magnitude of gastric emptying effect there is in those cases and assess whether that was clinically meaningful?

MR. BUXNER:  Object to form.

THE WITNESS:  So the answer is:  I have not seen data on each one of those medications.  But I assume that because of the mechanism, because of the label, because they're all GLP-1 Receptor Agonists and because the metanalysis that has been done in the past on multiple different GLP-1 agonists have consistently demonstrated when you use gastric emptying as the criteria, that multiple different GLP-1 agonists are associated with that delay rather than just liraglutide.

BY MR. PRZYMUSINSKI:

Q.   Doctor, when you conducted your analysis on the relationship between GLP-1 medications and gastric emptying, did you consider whether there was a difference between

Page 245

agents that were short-acting and agents that were long-acting?

A.   I believe that there is a temporal difference in those that are short-acting and those that are long-acting in their effect.  And I think if we did a randomized study on each one of those, there would probably be differences from one to -- when comparing the short-acting with the long-acting ones.  But I don't know what the profile would be for each one of those medications because I haven't seen specific data other than just to conclude by all the literature that I've read that there is significant delay of gastric emptying associated with all the GLP-1 agonists, including trizepatide.

Q.   You've heard of the concept of tachyphylaxis, Doctor?

A.   Yes.

Q.   Have you heard of the concept of tachyphylaxis in the context of long acting GLP-1 medications?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes.

BY MR. PRZYMUSINSKI:

Q.   Does that concept in any way affect your opinions in this case about the relationship between long-acting GLP-1s and delayed gastric emptying?

MR. BUXNER:  Object to form.

Page 246

THE WITNESS:  It doesn't change my opinion that long-acting GLP-1 Receptor Agonists also cause delayed gastric emptying.

BY MR. PRZYMUSINSKI:

Q.   Okay.  Doctor, slight shift, but still in the same area.  So we've been talking about delayed gastric emptying, right, and we've been talking about your opinions with respect to the effect of GLP-1 medicines on gastric emptying.

I want to go a little bit broader than that and ask you the following question:  Is it your opinion that any medication that prolongs gastric emptying or slows gastric emptying is capable of causing gastroparesis?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know exactly what you mean by any medication.  But I would say in general that medications that slow down gastric emptying would fall into the criteria that I would have for a drug-induced gastroparesis without it necessarily being limited to GLP-1 Receptor Agonists.

For example, opioid medications, one could have -- and the literature has consistently essentially mentioned opioids as one of the causes of drug-induced gastroparesis.

BY MR. PRZYMUSINSKI:

Page 247

Q.    Is there any distinction in your mind then, Doctor, between a medication causing a delay in gastric emptying and a medication causing gastroparesis?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes, I think they're two different things because you can -- a medication can delay gastric emptying without being associated with significant GI symptoms.  And so, I don't -- I would not equate gastroparesis with a delay in gastric emptying.

BY MR. PRZYMUSINSKI:

Q.    How would a medication delay gastric emptying but not cause gastric symptoms?

A.    I believe that the delay in gastric emptying is a huge spectrum from one medication to the other.  That -- that spectrum changes over time.  You mentioned the idea of being on the medication, reducing the amount of delay in gastric emptying.  And so, I believe that it really depends and that there's a significant spectrum.

Q.    Okay.  So the -- I'll use a loose term and you can make it more precise.  The magnitude of the -- (inaudible)

THE REPORTER:  Wait, wait, wait.  We've got to start that over.

MR. PRZYMUSINSKI:  Do you want me to start over?

THE REPORTER:  Yeah.

Page 248

MR. PRZYMUSINSKI:  Okay.  That's not a problem.

BY MR. PRZYMUSINSKI:

Q.   So I used the looser term -- and you can make it more precise -- use better language than I can because you're the expert.  But is it fair to say that the magnitude or the nature of the impact on gastric emptying that an individual medication has may make it more or less likely to result in GI symptoms related to that effect?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes, I think that's fair.

BY MR. PRZYMUSINSKI:

Q.   Okay.  And so, just the fact that a medication delays gastric emptying alone is not sufficient to conclude that it causes gastroparesis; is that correct?

MR. BUXNER:  Object to form.

THE WITNESS:  Not in isolation, but in each individual patient, when considering the patient's symptoms, history, other medications that they're on, co-morbidities, et cetera.

BY MR. PRZYMUSINSKI:

Q.   Doctor, please tell me if this is not something you're familiar with.  But with respect to symptoms like nausea and vomiting, are you familiar with the fact that medications can have impacts that are essentially mediated, meaning at the brain level, that can cause nausea and

Page 249

vomiting in patients without actually having direct effects or the stomach or musculature or nerves?

A.   I'm not aware of specific medications.  For example, I'm aware that there are medications that have an impact on CNS in addition to actually delaying gastric emptying, such as the GLP-1 agonists.  If there are medications that only operate at a CNS level, then I'm not clear on specifically what those are.

For example, opioids operate at multiple different levels.  So you'd have to have something that would be specific to CNS.  But yet, there are neural cells throughout the body.  And so, I think it would be very difficult to find an isolated medication that would only impact the central nervous system without having an impact on the peripheral nervous system now that we know even with a gut biome, essentially that there's so many quote/unquote aspects of the peripheral nervous system that are mediated.

Q.   Well, this is why I go to the expert who said it a lot better than I did.  So let's take the example of GLP-1s which you just brought up that can have affects on gastric emptying, but they can also have affects essentially within the brain, correct?

A.   I wouldn't make that necessary distinction.  In other words, I think that what you're saying is correct, but in addition to that, they can have an impact on the brain

Page 250

that secondarily has an impact on gastric emptying mediated, say, by the say vagus nerve, for example.

Q.   So there's a number of options.  You can have a direct effect on gastric emptying.  You could have the stomach and muscular nerve level.  You could have an effect that's central that's independent of gastric emptying.  You have an effect on the central level that could then have a downstream effect on the stomach itself on gastric motility or some combination of all of those, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  One thing I want to be really careful about is that I don't get into causation.  And the questions that you're asking are sounding increasingly like causation.  You may disagree with that, but to me -- and maybe I just don't understand causation.

BY MR. PRZYMUSINSKI:

Q.   No, no, no.  I'm not asking causation at all, Doctor.  So sorry.  It's really about the question really boils down to, we are talking about how medications can have -- and I said it could be anything.  I don't care about GLP-1s.

THE REPORTER:  Wait, wait, wait, Lucas.

MR. BUXNER:  Court reporter lost you.

MS. FITZPATRICK:  Start over.

Page 251

MR. BUXNER: We all did.

BY MR. PRZYMUSINSKI:

Q. Okay. So I don't want to adopt the causation. I think we've done that already. That's why I said I don't need to pick GLP-1s. You mentioned GLP-1. That's the only reason I came to it. I was just talking about medication is generally.

And the concept I'm trying to make sure I understand is, is it fair to say that certain medications can have an impact on gastric emptying directly, can have an impact potentially at the CNS at the brain level, and potentially then, as you said, as the third option, the effect at the CNS level could then feed back to the stomach directly through the vagus nerve or otherwise. Is that fair?

MR. BUXNER: Object to form.

THE WITNESS: You're asking about drugs or medications in general. And I believe the answer to that --

BY MR. PRZYMUSINSKI:

Q. In general.

A. -- is yes.

Q. Okay. And so, if there are multiple ways which a medication can contribute to GI symptoms, such as nausea and vomiting, and if you said just the fact that a medication

Page 252

delays gastric emptying is not enough to conclude that it's causing gastroparesis, how can you conclude just based on the fact that you have a medication that doesn't delay gastric emptying and you have symptoms, that those symptoms relate to gastric emptying and not have some other effect of the medication that's contributing to nausea and vomiting?

MR. BUXNER:  Object to form and scope.

THE WITNESS:  You're asking about all drugs; is that correct?

BY MR. PRZYMUSINSKI:

Q.   Any drugs.

A.   Or are you asking about --

Q.   Any drugs that's got multiple effects at different levels related to nausea and vomiting.

MR. BUXNER:  Object to the form of the question. And I think it's outside the scope of his report.  It seems like you're asking pharmacology.

If you understand it, go ahead, Doctor.  But --

MR. PRZYMUSINSKI:  Well, not really, Evan. Because what I'm asking about is a methodology that purports to be able to diagnose gastroparesis based solely on symptoms without direct evidence of delayed gastric emptying.  And so, I'm trying to understand how he diagnosed gastroparesis based purely on a general understanding that these medicines may delay gastric

Page 253

emptying in some patients to some extent.  So my question simply is -- let me stop there.  That was not a question.  It was a response to Evan.

BY MR. PRZYMUSINSKI:

Q.   So let me provide you a question.  I'll do it one more time.

If we discussed earlier that it's not about GLP-1s, it's simply about medications effects, that medications can have effects on symptoms, such as nausea and vomiting, by acting in different levels, including through gastric motility, including through central effects, including through combinations of those effects, my question is:  How do you know in an individual case that the effect you are seeing is related to the gastric emptying effect of the medication as opposed to something else if you're not actually measuring the gastric emptying with some sort of test?

MR. BUXNER:  Object to form and scope.

If you understand it, Doctor.  It seems to me to be outside the scope of your report, but if you understand, you can answer.

THE WITNESS:  I think it's outside the scope of the report.

BY MR. PRZYMUSINSKI:

Q.   You think it's outside the scope of your report.

Page 254

Okay.

All right. Doctor --

A. If you're simply asking the question, are there some medications that only act on the CNS that impact nausea, then I believe the answer is yes. But I think you're asking for something more than that.

Q. I'm asking for something different, but it's okay, Doctor. We only have so much time.

Doctor, when you do a scintigraphy -- gastric emptying scintigraphy Study, and I think you mentioned you have multiple time points, but typically, you're looking at zero, two hours and four hours; is that correct?

A. So I like to actually look at images obtained over the first hour every three minutes or every five minutes. And so, it actually allows me to create a dynamic phase for the first hour to actually see, for example, whether or not there's gastroesophageal reflux, for example. There are patients who have very rapid gastric emptying who may have symptoms also. And it allows me to be able to assess that.

So actually, the study that I would do would have more time points that what -- than what you had suggested. But I would include the time points that you suggested.

Q. Okay. And Doctor, in sort of the classic interpretation of a gastric emptying study, what is the four-hour threshold over which you need to be to make a

Page 255

diagnosis of gastroparesis?

A.   The threshold that is mentioned most often by the various societies is 10 percent retention at four hours. Ten percent.

Q.   Can you say that again because I didn't hear the last part?

A.   I'm sorry.

Q.   Ten percent at four hours?

A.   Ten percent retention at four hours.  In other words, there should be -- if there's more than 10 percent retention at four hours, then that is one threshold that is mentioned in the literature frequently.

Q.   And is there then a subdivision of that threshold based on whether you characterize it as mild, moderate or severe?

A.   I -- I believe that some have advocated that.  I personally don't believe in doing that.  I think it creates arbitrary distinctions.  I would rather just report the number.

So rather than my saying it's 19 percent and not 21 percent, I think those numbers both fall within statistical significance.  So I always report out the number.

I would really resist the temptation to actually put a label associated with it.  And if I did put a label

Page 256

associated with it, I'd always have the number because I think the number is more important.

Q. All right. So without performing a gastric emptying scintigraphy Study or potentially a Breath Test or Wireless Motility Capsule, is there any way to know how much retained food is present in a patient taking a GLP-1 medication that's experiencing symptoms suggestive of gastroparesis --

A. If you're asking --

Q. -- to tell whether it's over that 10 percent threshold that you identified?

A. So there is not a mechanism without performing one of those studies to be able to determine how much is within the stomach at four hours, other than if it happened that a patient had eaten just four hours prior to a CT scan or MR study, or ultrasound examination, then one would be able to actually make that determination.

At EGD, for example, one of the comments that have been made in the literature is that endoscopists are able to see retained food within the stomach. And it's been suggested that that is one of many different metrics that they can use to try and make the diagnosis of delayed gastric emptying.

But if you're asking for the gold standard for quantification, if you're looking for a number at four hours

Page 257

and trying to quantify how much is in the stomach, I do not know of a better study than a gastric emptying scintigraphy Study.

Q.   If I -- if I came to you, Doctor, and I said, hey, I have a patient, right, that has been having chronic nausea and vomiting.  They started GLP-1.  Can you tell me what their gastric retained content is at four hours by looking at them more, by listening to the symptoms they present or their history, could you do it?

MR. BUXNER:  Object to form.

THE WITNESS:  So the answer to that is no.  But I'd also want to ask the question -- when you say chronic, do you mean chronic after the patient was on GLP-1s?  Was that prior to the patient being on GLP-1s? I think it probably doesn't matter because really I can't tell you without doing a study that is quantitative to be able to give you quantitative data at four hours.

BY MR. PRZYMUSINSKI:

Q.   Doctor, is it possible that a medication can slow gastric emptying and that a patient can take that medication and then you could do a gastric emptying study while they're on the medication and they still have less than 10 percent retained gastric contents in their stomach at four hours?

MR. BUXNER:  Object to form.

Page 258

THE WITNESS:  So the answer to that question is we would not do a gastric emptying study on one of those patients.  If you're saying if we essentially didn't follow the guidelines, if our technologists didn't screen the patient, which the patient is supposed to, and the patient actually had one, then the answer is yes.

BY MR. PRZYMUSINSKI:

Q.   To be fair, Doctor, I understand you're talking about doing gastric emptying studies in a clinical setting. But as we know from looking at the Mayo Clinic poster, right, and a lot of the other studies you've discussed which are the basis of your opinion that these medications slow gastric emptying, there's lots of studies that have measured gastric emptying in patients who are on GLP-1 medications and have done it concurrently, so it's doable.  It's just a research study, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  Right.  One can essentially deviate from recommended clinical practice in doing a research study, if that's the question that you're asking, sure.

BY MR. PRZYMUSINSKI:

Q.   I mean, that's the point of research, right, is to learn.  Research is not always conducted consistent with clinical practice because you do it to learn things and then

Page 259

potentially amend or change or improve clinical practice, correct?

A.   I'm a big fan of research, and so I would give you a whole-hearted correct on that.

Q.   And so, there's nothing that would prevent somebody, ethically or otherwise, from doing a study that said, hey, I'm going to take a hundred patients, I'm going to get a ethics committee approval, I'm going to get them to do it an informed consent, I'm going to take a hundred patients, which according to my symptom analysis, I think they have gastroparesis based on their presentation, their history, all those things, and then I'm going to measure their gastric emptying using a scintigraphy test to find out if my symptom-based methodology is actually reliable and how reliable it is.  You can do that, correct, in a research study?

A.   So I can tell you at the University of Maryland, with our IRB process, I doubt that that would essentially be approved because there would be multiple reasons not to do that study in that particular population.  And so, I think you'd have to find someplace that would do -- give IRB approval in 2025.

Based on my experience at the VA and University of Maryland and with a IRB approval process, it can be difficult to get something that would deviate from practice

Page 260

in that particular way and get the gastric emptying studies. And one would also have to have a nuclear medicine department. I mean, it's one thing to get the IRB approval, but then you'd have to have a nuclear medicine department that would be willing for quote/unquote research purposes to essentially violate what the guidelines suggest and all the reasons that one would not do that in that department.

So theoretically, if one could find the right IRB to approve it, theoretically if one could find a department that would actually do the study, then the answer is one could do that research project. But I know I would not have an easy time.

Q. Didn't the Mayo Clinic do exactly that study, Doctor?

A. So Mayo Clinic did that with liraglutide, but Mayo Clinic is a much more captive, essentially -- in other words, it's an internal system. At the VA, for example, we have University of Maryland that makes decisions about IRB.

So I just think logistically it would be difficult. I don't know how hard it was and how many years it took them to their IRA to actually approve to that -- of that. I don't know -- if the researchers were part of the nuclear medicine department, then that may have made it easier to get that done.

So I think hypothetically, what you're saying is a

Page 261

study that could be done.  I just know that if I wanted to do that study, I would have a very difficult time in 2025 in doing that and finding the department.

Q.    And that's fair, Doctor.

But we also I think agreed that you're not aware of any study that has taken your diagnostic methodology predicated on symptoms and history and tested how reliable it is in predicting the extent of delay in gastric emptying, correct?

A.    Correct.  I mean, I would, through inference of other data that I've seen and what I've read, you know, believe that that study would be of limited value.  But I have not seen that particular study done, nor would I feel as though I would want to conduct it.

Q.    So because the study hasn't been done, we actually cannot predict what the error rate is of your methodology, meaning how many times out of a hundred -- if the physician says I think this patient has drug-induced gastroparesis based on their presentation, how many times of out of a hundred they're actually right and how many times out of a hundred they're wrong, correct?

A.    So without doing the study, would one would not be able to come up with that quantitative data.  I can tell you our gastroenterologists at the University of Maryland and Department of Veterans Affairs are not asking us for gastric

Page 262

emptying studies clinically. They're making the decision themselves -- not me, they're making the decision that they can take the patients off the medications without doing a gastric emptying study.

And so, you know, to answer your question, if you wanted that -- the quantitative data, you'd need to do the study, you're right.

Q. Also, Doctor, tell me if I'm wrong, right? So clinical medicine, right? Let's say you are -- let's say I'll see a patient, right? And I put that patient on some medication. Let's not talk about GLP-1 so we don't get into causation. All right? And I give the patient a medication. And a week later they come back and they have a side effect. Right? Or they report a side effect. They have some experience, whatever it is, right? Then as a physician, what I would do, right, is I would say, okay, is this a side effect that potentially could be related to this medication? If the answer to that is no, in my experience and everything I read, no, that's one thing. But if I think it could potentially be related, then I say, okay, maybe we will stop the medication, I'll reduce the dose and see what happens, right? That's a pretty common thing physicians do?

A. Agree.

Q. Okay. And if the symptom resolves, right, goes away, either with dose reduction or cessation, you say,

Page 263

well, probably whatever your side effect you acknowledge was related to the medication. If it doesn't, you say maybe it wasn't the medication, maybe it's something else, correct?

MR. BUXNER: Object to form.

THE WITNESS: And you would write a note in the chart based on your best diagnostic acumen as far as what you believed was the reason that the patient's symptoms improved when you withdrew the drug.

In most cases, I would assume you would document in the chart that you believe that it was drug-induced for whatever -- if we are looking at gastric emptying or whatever. And so --

BY MR. PRZYMUSINSKI:

Q. Yeah. Here's the thing, Doctor, patients don't come in to you complaining of delayed gastric emptying. They come in to you saying I'm nauseous and I'm vomiting. Right? And so, as a physician, you stop the medication and say if they have nausea and vomiting, if it goes away, I could care less what the cause of the nausea and vomiting was, they're better and they're happier. I'm not diagnosing them with drug-induced gastroparesis. I'm just saying the cause of their symptom is better. I don't need to do a test because it doesn't matter what the cause of it was. They're not saying I concluded that they had drug-induced gastroparesis, and therefore, that's the cause of their

Page 264

nausea and vomiting, are they?

MR. BUXNER:  Object to form.

THE WITNESS:  So I wouldn't say I could care less. I would never really characterize it that way.  I think what I would want to do as the clinician would be to feel comfortable that indeed I was aware of what the most likely diagnosis was.  And so, it really wouldn't be, for most physicians that I know, that they would not really care as long as once they stopped it. Because I think all we physicians are really scientists and researchers as you've sort of talked about.  And I think all of us like to think that we can come up with a most likely reason.

And so, it's not just serendipity that, hey, we stopped the medication.  The patient ended up not having the symptoms.  It's actually I come to the conscious conclusion and would chart it that I stopped it.  I believe it's most likely related to the medication even though I have not done pharmacologic or kinetic or other studies to be able to prove it in a research manner.

BY MR. PRZYMUSINSKI:

Q.   You also can't -- you can -- you can say all that, but without actually doing a gastric emptying study or a (inaudible), you actually can't tell if that guess is right

or wrong, right? All you're doing is guessing. You're guessing the nausea and vomiting could have been from delayed gastric emptying. It also could have been from a central effect. It also could have been because they happened to have --

THE REPORTER: Wait, wait. Wait, wait.

BY MR. PRZYMUSINSKI:

Q. (inaudible) -- that resolved at the same time, right?

THE REPORTER: No, no, no. You've got to start that over. You've got to start that over. Try to slow down a little bit. That might help.

MR. PRZYMUSINSKI: Sorry. That's okay.

BY MR. PRZYMUSINSKI:

Q. In that situation, you're not actually concluding that that's because. You're saying if I wanted to conclude, I would do a gastric emptying study and then I would know. What you're doing is you're saying, okay, well, the nausea and vomiting could have been caused by any number of different things. What's important is that my patient's feeling better. I'm not going to test them for any of those things. I'm not going to test them and see if they had a gastric outlet obstruction. I'm not going to test them to see a gastric cancer. Their symptoms resolved. So I'm not ruling out the other things. I'm simply saying symptoms are

Page 266

gone, that's fine.

That's not the same thing as ruling any conclusion that they actually had a particular medical condition; is that fair?

MR. BUXNER: Object to form. And it's an improper hypothetical.

THE WITNESS: So I think the answer to your question is that it's important to be able to know that part of the practice of medicine -- or the whole practice of medicine really is a matter -- and I wouldn't use the term guessing, but it's essentially looking at apriori probabilities and coming up with what is the most likely possibility. And so, we guess in medicine all the time.

For example, if I put a patient on a medication and that patient develops myocardial pain and possible ischemia associated with an erectile dysfunction medication, just to give you an example, and I stop that and the patient doesn't have the pain, I do not necessarily need to do a cardiac cat study while the patient is on that medication. I don't need to do a cardiac workup. I'm going to take my best common sense impression and actually follow up on that without feeling as though I need to do additional objective study. And that happens all the time in medicine, not

Page 267

just with these GLP-1 agonists.

And so, I think the common sense approach of saying the labels say that these medications are associated with delayed gastric emptying, the patient's temporal relationship with the medications, taking the patient off of it, I don't believe that that patient needs additional objective proof, as is true in so many things in medicine where we really just don't have the resources, time. And it's not arguably always safe to be able to do that objective workup to confirm our tentative diagnosis, even though we realize we might not be right in a hundred percent of cases.

BY MR. PRZYMUSINSKI:

Q. Okay. Doctor, let me ask you this then: So in a situation that you just gave with the erectile dysfunction drug and the chest pain, you stop the drug, the chest pain goes away, you're somewhat reassured, and you may still do some workup because you might be concerned that they have underlying gastro sporadic disease, but let's set that aside for the moment.

A. Okay.

Q. What if you stopped the medication and the pain doesn't go away? Do you then say, eh, probably just related to the drug anyway and move on?

MR. BUXNER: Object to form.

Page 268

THE WITNESS: Are we talking about the erectile dysfunction or GLP-1s?

BY MR. PRZYMUSINSKI:

Q. That's what I'm talking about. That was your example. I'm just using that one as a way to talk.

A. Right. So in my example then, I would want to know the duration. In other words, if there's a temporal duration, if I just put the patient on the medication, their Viagra, for example, or Sildenafil, and then they ended up having symptoms of cardiac pain that sounded like ischemia, and then I took the patient off the medication, I would have to know how long after the patient was off the medication that they had the symptoms, whether the symptoms were worsening, whether the patient had a history of previous cardiac disease, whether the patient had risk factors for cardiac disease. I mean, there's so many -- there's so much complexity in medicine. I don't need to tell you that, I know.

Q. I know there's a lot of complexity. And that's kind of why we are having this deposition, because --

A. Yes, agree.

Q. The beauty of gastric emptying scintigraphy is it allows you to actually have data and help sort through some of that complexity.

But on that question, Doctor, so let's assume,

Page 269

right, that you withdraw the medication for a period long enough for it to out of the system. As you said, it depends on the half-life.

A. Are we back to GLP-1? Hold on just a sec. Sorry.

THE REPORTER: You've got to --

THE WITNESS: Court reporter.

THE REPORTER: You're talking over each other.

MR. BUXNER: You need to start over, Lucas.

THE REPORTER: You're talking over each other.

BY MR. PRZYMUSINSKI:

Q. Okay. Let's assume that -- let's assume that you stopped the medication, the Viagra in this case we were talking about --

A. Yeah.

Q. -- for a sufficient amount of period of time for it to be out of the system based on the half-life of the medication --

A. Yes.

Q. -- but that the clinical symptom that you described, the chest pain, whatever they were having, persist. Right? In that situation, as the clinician, what you would say is most likely whatever's going on is unrelated to the medication, correct?

MR. BUXNER: Object to form.

THE WITNESS: I would say that the likelihood that

Page 270

it's related to medication is much lower than I thought it was when the patient first presented with those symptoms associated with the medication, yes.

BY MR. PRZYMUSINSKI:

Q.   Would you think that the likelihood that it was the medication was more or less than 50 percent in that hypothetical?

MR. BUXNER:  Object to form.  Improper hypothetical.

THE WITNESS:  I don't know enough about Sildenafil and myocardial infarction to give you an exact percentage, so I don't know if it's 50 percent.  I think if you're trying to illustrate that my level of certainty would be lower than it was initially, the answer is yes.  Whether it would be lower than 50 percent, I just don't have enough data, nor do I have the background literature to be able to answer that question.

BY MR. PRZYMUSINSKI:

Q.   I get it.

Doctor, one other question kind of on this topic. In your view, with respect to gastroparesis, from a clinical perspective -- and I'm talking in terms of presentation, impact on the patient, whatever it may be -- is there a clinical difference in the presentation of drug-induced

Page 271

gastroparesis from other types of gastroparesis?

A.   I think it depends on the type of gastroparesis that we are talking about.  So for example, diabetic gastroparesis I would expect to have occurred over time to be correlated with a severity of diabetes.  I would expect it to be a longer-term condition, whereas the nature of the nausea or vomiting associated with drug-induced would have a relatively shorter onset associated with the drug.  So it would really be the temporal history.  Whether or not the nausea and vomiting was similar to what the patient experienced before the meds, I would ask the patient.  Because patients are pretty good at telling you, no, this is kind of a different type of nausea or I'm vomiting in a different way.  And so, those would be the sorts of things that I'd want to look into.

Q.   You're relying in large part on the temporal relationship between exposure to medication and dose change and the onset of symptoms; is that correct?

A.   And the --

MR. BUXNER:  Object to form.

And the character of the symptoms also.  Is the nausea different?  You know, grandpa -- grandpa, is the vomiting different?  Are you experiencing this?

What I found is that often patients will tell you that it's fundamentally different, even though we call

Page 272

it nausea or we call it vomiting.

BY MR. PRZYMUSINSKI:

Q.    How much time after initiation of a GLP-1 medication or a change in dose would you expect symptoms to begin for you to consider that to be supportive of a diagnosis of drug-induced gastroparesis?

MR. BUXNER:  Object to form.

THE WITNESS:  So I believe that the symptoms can start very early within a short number of hours after the administration of a GLP-1 receptor agonist.  And they can go out potentially to quite a few days or weeks that they're on it.  So I think there's a broad spread.

But if you asked me if a patient had those symptoms two hours after first administration, then I believe that -- then I would still believe that it is drug-induced, if I'm understanding your question correctly.

BY MR. PRZYMUSINSKI:

Q.    Yeah, you are.

What about four weeks after initiation or dose change, would that still be drug-induced?

MR. BUXNER:  Object to form.

THE WITNESS:  Yes, I believe that at four weeks, that would not change my mind about the duration in a

Page 273

patient that had not had those symptoms previously, whether they were diabetic. If these were new symptoms, then near the top of my list of possibilities would be the GLP-1 agonist, but, again, it depends on --

BY MR. PRZYMUSINSKI:

Q. (Inaudible due to cross-talk)

A. -- the specific patient and their history. Sorry, I didn't mean to talk on top of you.

Q. I'm sorry. I thought you were done.

What about eight weeks after initiation?

MR. BUXNER: Same objection.

THE WITNESS: So I don't really want to give you a specific tried and true -- a specific number because that kind of goes against the theme of what I've really been trying to talk about; and that is, you need to look at the overall patient, the specifics of the presentation, and the onset, whether or not it's associated with a change in dose. I think you need to look at all of those different factors.

So I really would resist giving you a specific number 4 or 8 or 16. I think the farther out that it is, then I might have a slightly lower level of expectation it's related to the medication. If it is sooner, I would have a higher level. But I really

Page 274

would resist giving you a cutoff because it's really against the idea of getting a complete history on every patient and treating each patient individually.

BY MR. PRZYMUSINSKI:

Q. Doctor, would it have to be from initiation or dose change for you to say it's unlikely that this is a drug-induced?

MR. BUXNER: Object to form. Asked and answered.

THE WITNESS: I'd want to know if this was the only time that the patient had had those symptoms and I'd want to know other risk factors and specifics about the patient. So I'd rather answer that question about a specific patient.

BY MR. PRZYMUSINSKI:

Q. Okay.

A. And even with a specific patient, I don't really know how to give you an answer because there isn't a study that I'm aware of that specifically gives you those numbers.

But I can tell you, you know, it would depend on experience and overall information with that patient and other patients that were being -- that were treated with GLP-1 receptor --

Q. Okay.

A. And it would probably depend on the specific GLP-1 receptor agonist whether it was short-term or long-term

Page 275

also.

Q.   Listen, I get it that you prefer to talk about a single patient (inaudible) --

THE REPORTER:   I didn't hear that.  I didn't hear that.

THE WITNESS:   You've got to just repeat that same comment.

BY MR. PRZYMUSINSKI:

Q.   Sorry, let me try again.

What I said, Doctor, is I know you want to talk about a single patient, but that's not what we are talking about here.  I need to understand your opinion.

And what I'm trying to understand is, is am I correct to assume that this temporal relationship that you describe as being a part of the evidence you're relying on for the diagnostic methodology can range anywhere from two hours from initiation of the medicine or change of dose to months or even years later?

MR. BUXNER:   Object to form.

THE WITNESS:   I think you're trying to pin down a specific time limit and I really don't have one.  I think we could talk about a hypothetical patient in great detail and then discuss, you know, some of those numbers.

But even if we did discuss that patient, I really

Page 276

don't believe that there is enough data that's out there to be able to draw a distinction of at which time.

I can just say that from a clinical perspective, the longer out a patient is -- for example, if a patient were years out, then I would be more likely to more vigorously pursue other possibilities rather than taking the patient off the medication. If the patient had been on the same medication and it had been stable and on the same dose, then the longer out it is, the more I'd consider other possibilities.

BY MR. PRZYMUSINSKI:

Q. Okay. Doctor, something you said earlier before we switched was that you could write guidelines on diagnosis of gastroparesis. Is that correct? That's within your experience and your qualifications?

MR. BUXNER: Object to form.

THE WITNESS: I believe that I would be qualified to make recommendations for guidelines either in my department at University of Maryland or the VA or to the -- essentially to present a paper to the Society of Nuclear Medicine with rational recommendations or recommendations about GLP-1s and gastroparesis. It would be very much along the lines of what we've been talking about all day today.

Page 277

BY MR. PRZYMUSINSKI:

Q. So let's be more general and talk about diagnostic guidelines -- guidelines for diagnosis of gastroparesis.

Have you authored any guidelines for the diagnosis of gastroparesis from any organization?

A. No.

Q. Have you been invited to participate in the drafting of diagnostic guidelines for gastroparesis by any organization?

A. No.

Q. Okay. Has anyone ever approached you and say, Dr. Siegel, we would love you to come participate in the publication of a guideline on how to diagnose patients with gastroparesis?

A. No.

Q. Okay. And Doctor, I'm guessing that you've also never published anywhere a methodology that you describe in your report whereby you can diagnose drug-induced gastric emptying without conducting a gastric emptying study, correct?

MR. BUXNER: Object to form.

THE WITNESS: I have not published anything related to diagnosis of gastroparesis.

BY MR. PRZYMUSINSKI:

Q. So in fact, this is the first time you've really

Page 278

put together or written an opinion on the topic in this litigation, correct?

A. Correct. This litigation gave me the opportunity to do a fairly deep literature search that I had not done before in order to create this report which has information in it that I think would be valuable to nuclear medicine physicians and radiologists in general. But I don't think that I -- my name has been associated with expertise in that particular area.

Q. Okay. Doctor, on Page -- on Page 5 of your report --

A. Page 5.

Q. -- there's a section on Methodology; do you see that?

A. Yes, I do.

Q. Okay. In the second paragraph in that section, you describe what you did at the onset of generating this report, you created a list of search terms and then you started doing searches on Google Scholar, PubMed, backward and forward searches. And is that the process you undertook to do the literature search you've been referring to today?

A. Yes.

Q. Doctor, how many studies did you identify or articles or publications did you identify through this search?

Page 279

A.   So I list a large number in my Materials Considered.  In those materials that I read, there were a number of citations.  I did a number of searches for articles that -- where I read an abstract but didn't believe that I needed to include that.  I just tried to do ones that were as responsive as possible to the reason for the report, the ones that I thought, you know, were the -- some of the reviews that best summarized what was in the literature.

But in my Materials Considered List, it does not have an exhaustive list of all of the websites, all of the articles.  These were ones that I focused on in order to create the report.  That's what I mean by Materials Considered.

Q.   That makes sense.

Ballpark, can you estimate for me how many articles you actually -- not scanned, but actually read that came out from this -- this search that you conducted as part of your report preparation process?

A.   You mean materials considered plus ones that I didn't list as materials considered?

Q.   No, no.  Here's my question:  So you established you did a pretty comprehensive search.  And presumably, that search identified a lot of different things that you probably then filtered to things that you thought were relevant to your opinion.  I assume some of those you

Page 280

scanned, some of those you list the abstract, others you read in detail.

My question is:  Do you have an estimate out of that whole search how many articles you actually took that last level where you read in detail and evaluated?

MR. BUXNER:  Object to form.

THE WITNESS:  So in the Materials Considered, I looked at all of the materials -- all of the articles that I included in Materials Considered in detail.  But I -- a subset of those articles I may not have read every single section, but I tried to find all the sections in those articles that I thought were relevant to my report, plus ones that I was curious about that weren't necessarily in the report.

BY MR. PRZYMUSINSKI:

Q.  Okay.  I'm not sure if I've seen your -- your itemized bills for this litigation.  How much time have you spent working on this case?

A.  Right.  So up until the end of the report, the number of hours was 81, and then subsequent to that the number of hours is 49.

Q.  So 130 total, 81 before, 49 since?

A.  Correct, up until now, although I haven't generated an invoice or a bill.  The only thing that I've received is a retainer at the beginning of the case.  And

Page 281

so, that is -- I went through hours on my calendar and hours and email and came up with that estimate, but I have not translated that into any invoices.

MR. BUXNER:  Lucas, when you hit a spot to stop, I think we've been going for about an hour.

MR. PRZYMUSINSKI:  Yeah, let me just finish on this one quick point --

THE WITNESS:  Sure.

MR. PRZYMUSINSKI:  -- and then we'll take a break.

THE WITNESS:  Sure.

BY MR. PRZYMUSINSKI:

Q.    What was your hourly rate, Doctor, with those hours?

A.    Five hundred dollars per hour for the report and review.

Q.    Okay.  And last question, I promise, before we take a break:  Can you tell me how many of those 81 hours that you invested prior to finishing your report you spent reviewing literature?

A.    I --

Q.    Ballpark?

A.    I didn't break it down into that.  I would say that it's probably comparable to probably maybe a little more than actual writing the report were done in the literature.  But I don't really have -- I can't give you a

Page 282

breakdown of those, but maybe 60, 40, something like that.

Q.    Okay.

MR. PRZYMUSINSKI:  I know you want to take a break.  Let's take a break.  Let's go off the record.

THE VIDEOGRAPHER:  Off record, 4:22 P.M.

(Recess was taken.)

THE VIDEOGRAPHER:  On record, 4:32 P.M.

BY MR. PRZYMUSINSKI:

Q.    So I want to circle back, Dr. Siegel, on the hours we talked about.  And you said it was 81 prior to completion of the report, and then 49 since that; is that correct?

A.    That is correct, although that doesn't count today.

Q.    Okay.  All right.  So let's -- let me understand that.  So let's leave the 81 hours before completion of the report and talk about the other 49.

How many of those 49 hours did you spend preparing for this deposition?

A.    So I continued to read my report and continued to read the things in the report and continued to read on GLP-1 Receptor Agonists.  And so, I'm trying to understand, are you asking the question how many have I technically pre- -- you know, prepared to understand what a deposition is and how a deposition works, or are you asking what's the total number of hours that I've actually spent on the subject

Page 283

matter, which is helpful for this -- for this deposition?

Q. You're right. That's a much better question. Let me break it up.

In terms of actual session, all right, where you met with anyone to prepare for the deposition here virtually or in person, how many of those were there?

A. I don't -- I -- I don't know the answer to that. I'd have to look. In other words, I think once I do invoices, I'll be able to have an answer to that question. It was the minority of the time, that remaining 49 hours, but I can't tell you whether it was 5 hours or 9 hours or 12 hours, 15 hours. I just don't know. But I will know once I do the -- the invoices.

Q. Okay. Let me ask maybe a different way. We are sitting here on Friday, correct? So this week did you meet with anyone to prepare for this deposition?

A. Yes.

Q. How many times?

A. So I met once yesterday. I'm here partly to essentially get an idea of where the place is and -- and the layout.

MR. BUXNER: Doctor, don't disclose -- Lucas isn't asking for anything we talked about.

THE WITNESS: Yeah, no, I wasn't going to discuss -- I was going to say we did meet here

Page 284

yesterday.  And it's okay to say the number of hours.
Is that okay?

MR. BUXNER:  For sure.

THE WITNESS:  For two hours.  And then, we met earlier in the week on I think it was Monday and maybe Tuesday again probably for somewhere between a half an hour and two hours on a couple of occasions.

BY MR. PRZYMUSINSKI:

Q.   So Monday and Tuesday for a half hour to two hours total or each time?

A.   But not --

THE WITNESS:  You want him to repeat?

THE REPORTER:  No.

THE WITNESS:  You want me to not talk on top of him.

I'm just being admonished about talking on top of you.  I'm sorry, I'm just trying to understand the question, so please repeat.

BY MR. PRZYMUSINSKI:

Q.   Yeah.  What I wanted to understand is, on that Monday and Tuesday, you said for a half hour to two hours, was that half hour to two hours each time or half hour to two hours total?

A.   It was two hours one of the times and another time it was shorter than that, significantly shorter, but I don't

Page 285

remember exactly how long.  It could have been one hour and then two hours or maybe a little over an hour and then two hours.  One of the sessions was two hours.

Q.    And were those meetings on Monday and Tuesday in person or were they over video or telephone?

A.    Over video.

Q.    Okay.  And last week did you have any meetings with anyone to prepare for this deposition?

A.    Yes.

Q.    And when was that?

A.    I don't -- I'd have to look at my calendar to tell you exactly which days.

Q.    Just how many times?  The date doesn't matter.  Like, once, twice, and for how long?

A.    I would say three times for somewhere between a half an hour and two hours.  I think we had a meeting over the weekend that was a relatively short meeting.  Maybe another one that was short.  And then, at least one that was two hours, but I don't recall.  It's been an incredibly busy week for me with this deposition only being one of many, many different things that I've been working on, including working clinically, so --

Q.    Well, you have a real job too, right, besides this, so I --

A.    It sounds like we all do.

Page 286

Q.    -- get it.

Doctor, and again, as Evan I think instructed you, I'm not asking you about any conversations you had or what you guys discussed.

A.    Right.

Q.    But my question is simply:  In any of these meetings this week and last week, was there anyone else present either in person or virtually who was not one of your lawyers in this case?

A.    Not to my knowledge.

Q.    Okay.  Have you discussed this case with anyone other than your lawyers?

A.    My wife.

Q.    Okay.  And what did you tell your wife about the case?

A.    I told my wife that I'm doing a -- a deposition. I told my wife that it's about GLP-1 Receptor Agonists and that I've been asked to testify about imaging aspects related to GLP-1 agonists, and that the deposition that -- I anticipate is going to be a marathon as far as the number of hours and where I would be.  But we haven't really -- she's never read my report, never provided any input.  We haven't discussed the -- the GLP-1, you know, agonists' content. She knows I'm doing a GLP-1 agonist report, but that's pretty much it.  But no one -- no one else.

Page 287

Q.    Is your wife a physician too?

A.    She is.

Q.    What kind of medicine?

A.    She started out -- she did a residency in anesthesiology and then decided that she wanted, as you might put it, hands-on with the patients; and so, switched over to psychiatry, actually.  Child psychiatry.  So that's what she really did during her career before she retired.

Q.    Okay.  And outside of your wife anybody else you've discussed the case with?

A.    No.

Q.    What about anyone at work, either your former position at the VA or your current engagement that you're working on?

A.    No.

Q.    The hours, Doctor, you mentioned where you were doing additional reading, review materials, as you've said, on GLP-1s and others, was there anything that you read since you completed your report that in any way impacted your opinions or affected the testimony you've given today?

A.    That's a pretty broad question.  And so, I mean, have I learned additional things since I issued my report?  Absolutely.  I've learned a lot of additional things that probably are not relevant to the report.  In other words, I would stand by the report.  I wouldn't modify or append the

Page 288

report, but there's been new information. I think you guys showed me an article from January of '25, for example. And there's other information that has come out.

I've learned more and have been reading more broadly about the GLP-1 Receptor Agonists so that I can learn more. It's really fascinating that the science behind them that goes beyond my report. And so, it's really piqued my curiosity, which is, you know, part of the reason that I accepted the invitation to serve as expert witness.

Q. Okay. But nothing that you've read that alters any of the opinions in substance that you write in your report; is that fair?

A. That is fair.

Q. And they are pretty amazing medications, so I get the interest.

MR. BUXNER: Objection.

BY MR. PRZYMUSINSKI:

Q. I want to go to Page 17 of your report, Doctor.

MR. BUXNER: What page is that, Lucas?

MS. FITZPATRICK: Seventeen.

MR. PRZYMUSINSKI: Page 17, 1-7.

THE WITNESS: Yes.

BY MR. PRZYMUSINSKI:

Q. Okay. Now, I know we talked a little bit about this paragraph, but here's the good news: The last

Page 289

questions I have are all going to be about this one paragraph. When we are done with it, I'm going to be done and I will turn it over to Lilly counsel or anyone else who may have followup questions.

But the first full paragraph on this page, the one that says, "It has been suggested." Okay? Are you there with me, Doctor?

A. I am, yes.

Q. Okay. So I want to go through this line by line, so I apologize. I promise you once I'm done with that, I will be done.

So the first sentence says: "It has been suggested that gastric emptying -- " when you say this here, are you saying studies or scintigraphy, the GES?

A. Scintigraphy.

Q. " -- is always required to confirm delayed gastric emptying because it cannot be conclusively determined whether delayed gastric emptying is responsible for gastrointestinal symptoms in a given patient."

Do you see that?

A. It has been suggested that it's always required to confirm it because it cannot be exclusively determined whether delayed gastric emptying is responsible for GI symptoms in a given patient, right.

And what I meant -- and I actually have --

Page 290

Q.   All I asked is, have you seen the sentence?  I'm asking you about it more broadly.  Do you see the sentence?

A.   I do see the sentence.

Q.   Okay.  And the citation you have there is from Jalleh 2024, right?

A.   Correct.

Q.   I don't know if I'm pronouncing that right, but we will have to go with that.

Now, here's the question, Doctor:  Do you agree with the statement that:  GES is always required to confirmed delayed gastric emptying because it cannot be conclusively determined whether delayed gastric emptying is responsible for gastrointestinal symptoms in a given patient?"  Here's your opportunity.

MR. BUXNER:  Object to -- object to form.

THE WITNESS:  I don't agree with that.

BY MR. PRZYMUSINSKI:

Q.   The next sentence you say:  "There is evidence that suggests that not all patients who experience symptoms associated with abnormal gastric emptying in fact have delayed gastric emptying as measured by gastric emptying scintigraphy."  Do you see that?

A.   Yes.

Q.   And this reference there you have is Balan 2011; do you see that?

Page 291

A.    I do, yes.

Q.    Now, is it -- will you agree with me at a minimum, that there is at least some evidence suggesting that not every patient who experiences symptoms associated with abnormal gastric emptying in fact has delayed gastric emptying as measured by GES?

MR. BUXNER:  Object to form.  Asked and answered.

THE WITNESS:  Yeah, I'm not sure I understand that question.

BY MR. PRZYMUSINSKI:

Q.    Well, I'm just asking:  Do you agree that there is at least some evidence, and then I read the sentence, that suggests that not all patients who experience symptoms associated with abnormal gastric emptying in fact have delayed gastric emptying as measured by GES?

MR. BUXNER:  Object.

BY MR. PRZYMUSINSKI:

Q.    Agree with that or not?

A.    Agree.

MR. BUXNER:  Sorry.  Let me just --

THE WITNESS:  Sorry.

MR. BUXNER:  I want to object as asked and answered.

But go ahead.

THE WITNESS:  Okay.

Page 292

BY MR. PRZYMUSINSKI:

Q. The next sentence talks about the Lupianez-Merly 2024 study, which we talked a little bit about. I know Ms. Fitzpatrick talked to you a little bit about it earlier today.

A. Yes.

Q. And that's the Mayo Clinic abstract, correct?

A. That is one of the abstracts that came out of Mayo Clinic, correct.

Q. It's the one we marked as Exhibit 8, correct?

A. Let me look at my list of exhibits. Yes.

Q. Okay. And with respect to that study, what you said there's also one study reported only in a non-peer-reviewed abstract that patients treated with GLP-1 RAs report similar results, right? That's what you said.

MR. BUXNER: Object. Asked and answered.

THE WITNESS: Correct.

BY MR. PRZYMUSINSKI:

Q. Is that correct?

A. Correct.

Q. Okay. So is it fair for me to say the following: at least with respect to the data that you summarized from Jalleh 2024, Balan 2011 and Lupianez-Merly 2024, which are the first three sentences of this paragraph, those studies call into question whether the presence of symptoms can be

Page 293

used to predict delayed gastric emptying clinically or through GES; is that a fair statement?

MR. BUXNER:  Object to form.  Asked and answered.

THE WITNESS:  Those studies do call that into question, yes.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Now, to be fair, because I want to be fair, you then have a sentence that talks about the limitations of those studies, right?  These studies have important limitations and you go on and read what those are, correct?

A.    Correct.  And the reason that I did that was because I had been asked originally or charged with the idea of trying as much as possible in my report to present both sides.  That as an expert witness, I really wanted to do as comprehensive a review as possible.  And I wanted to present information that I thought, you know, really did not necessarily fall into line with what my own thinking is, but to report what had been written in the literature.

Q.    And I get that.  I appreciate that.

I'm going to skip the next sentence for a minute, but not because I won't come back.  I promise I will.  That's one about the prospective observational study.  I want to skip that and do the other two sentences first, and then I promise I'll come back.

You then go on to say two sentences down:  "There

Page 294

are clinical studies of GLP-1 RA drugs that found patients who had delayed gastric emptying but did not report serious GI or gastrointestinal symptoms."

Do you see that?

A.    I do.

Q.    And there you reference a study by Jalleh from 2020, correct?

A.    Correct.

Q.    A study by Linnebjerg in 2008; do you see that?

A.    Yes.  Yes.

Q.    Terrible pronunciation.

A.    No, I would have had a tough time too.

Q.    2020?

A.    Yes.

Q.    Okay.  And is it fair to say that none of those studies support the idea that you can base -- sorry.  Strike that.

Those three studies, at least whatever limitations they may have, did not find a correlation between whatever effect GLP-1 RAs have on gastric emptying and serious GI symptoms, correct?

MR. BUXNER:  Object to form.

THE WITNESS:  The only thing that it says in the report is that they did essentially find patients who had delayed gastric emptying but did not report serious

Page 295

GI symptoms.  So I wouldn't broaden it to the statement that you just made.

BY MR. PRZYMUSINSKI:

Q.  Okay.  They did not find serious GI symptoms in patients who had delayed gastric emptying while taking the GLP-1 RAs, correct?

A.  They did not -- essentially, those patients did not report serious gastrointestinal symptoms.  I just want to make sure that the report's clear.

Q.  (Inaudible due to cross-talk)  I'm sorry, go ahead.

A.  I just want to make sure that we actually quoted the -- what's in the report.

Q.  In those three studies, patients who were treating with GLP-1 RAs who had delayed gastric emptying, in your words, did not report serious gastrointestinal symptoms, correct?

MR. BUXNER:  Object to form.  Asked and answered at least three times.

Go ahead, Doctor.

THE WITNESS:  Yeah.  So when it says they found patients, then that to me says that there was at least one patient in the study that they did that had documented gastric emptying but also did not report serious GI symptoms.

Page 296

BY MR. PRZYMUSINSKI:

Q.    Okay.  Fair enough.

So, so far I've covered the Jalleh 2024, Balan 2011, Lupianez-Merly 2024, Jalleh 2020, Linnebjerg 2008 and Quast studies in this paragraph.

None of those studies provide any information that supports your opinion that you can diagnose drug-induced gastroparesis in patients taking GLP-1s based on the presence of symptoms; is that correct?

MR. BUXNER:  Object to form.

THE WITNESS:  I don't know whether that's correct or not.  In other words, I'd have to read those papers and find out whether or not that is correct or not.

I just extracted from those that there were at least some small subset -- or a subset of patients who had delayed gastric emptying to some degree and did not report serious GI symptoms.

And so, that really does not mean that I know without rereading those papers whether or not there was additional information in those papers that would support what I'm saying, that one can diagnose gastroparesis based on the temporal relationship of a medication and also GI symptoms.

BY MR. PRZYMUSINSKI:

Q.    Well, Doctor, you cited these three studies in

Page 297

your report, correct?

A.    Correct.

Q.    Okay.  And you told me a few minutes ago that the studies that you reviewed and considered relevant, you read and reviewed completely, correct?

A.    No.  Actually, the ones that I considered I read the parts of those studies that I thought were most relevant to the assignment in the report in detail.  But there is no doubt in my mind that there are portions of what I read that I did not believe necessarily related to my report and that I didn't read.

Q.    Okay.  But certainly, these three studies, that information in them that was relevant to supporting your opinion that drug-induced gastroparesis in patients taking GLP-1 could be diagnosed by symptoms alone, you would have read that because that clearly would have been relevant to your opinion, correct?

A.    No.

MR. BUXNER:  Object to form.

THE WITNESS:  Oh sorry.

MR. BUXNER:  Go ahead.

THE WITNESS:  In other words, I don't know what I didn't read.  And so, I would have had to have read it in order to have confirmed what you just said.  There were sections that were labeled.  Sometimes I might

Page 298

have read an abstract.  In some cases, it's possible that there was an abstract that I didn't have the full text to and just relied on the abstract.  So I don't think that I would be accurate if I made that more broad statement.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Doctor, sitting here today without rereading the studies that you cite in your own report, we can't identify anything in this paragraph on those six studies which I just talked about:  Jalleh 2024, Balan 2011, Lupianez-Merly 2024, Jalleh 2020, Linnebjerg 2008 and Quast 2020, that supports your diagnostic approach at least within what you can recall with what's written here in the report; is that fair?

MR. BUXNER:  Object to form.

THE WITNESS:  It would be fair to say that I don't really recall most of those reports other than the summary that I have in this paragraph of what those -- of a subset of what those reports indicated that I thought would be useful information for the report.

BY MR. PRZYMUSINSKI:

Q.    Okay.  Doctor, let's mark as Exhibit 10.  And now, we are going to be a little more difficult because we are remote.  But I promise this is the only one we are going to do.  And Exhibit 10 is going to be what you cite in your

Page 299

last -- the middle sentence in paragraph that I skipped that I promised I would get back to.

So that's the sentence that says: "In a prospective observational study where the researchers were able to capture more detailed data for analysis, authors found an association between certain gastrointestinal symptoms and found that patients with more severe symptoms were more likely to have delayed gastric emptying."

And you cite a study -- I'm going to guess is DiBiase 2016, but I may (inaudible due to cross-talk)

A.    I think you need to stop, right?  I think our court reporter has not been able to follow that.

MR. PRZYMUSINSKI:  Okay.

THE REPORTER:  I can get it from the report.  I can get it from the report.

THE WITNESS:  Oh, because you put your hand up.

THE REPORTER:  I can get where he was reading.

THE WITNESS:  Okay.  So --

MR. BUXNER:  Do you need the question reasked?

THE WITNESS:  I do just because I thought --

THE REPORTER:  Okay. Go ahead.

THE WITNESS:  Was I mistaken when you --

THE REPORTER:  Lucas, go ahead and read it again.

MR. PRZYMUSINSKI:  Yeah, I'll redo it.

BY MR. PRZYMUSINSKI:

Page 300

Q.   So the -- I want to mark as Exhibit 10 the DiBaise study - D-I-B-A-I-S-E -- study from 2016 and that you reference in this paragraph in the sentence that reads:  "In a prospective observational study where the researchers were able to capture more detailed data for analysis, authors found an association between certain gastrointestinal symptoms and found that patients with more severe symptoms were more likely to have delayed gastric emptying."

Do you see that sentence?

MR. BUXNER:  No, he doesn't have a copy of the exhibit in front of him.

THE WITNESS:  Is there an Exhibit 10?

MR. PRZYMUSINSKI:  I'm just reading from his report right now, you guys.  That's all I'm doing.

MR. BUXNER:  Oh, okay.

THE WITNESS:  That wasn't clear.  I'm sorry, could you -- can you say the page and can we look at that again?  I thought you were reading from the exhibit.

BY MR. PRZYMUSINSKI:

Q.   It's Page 17 of the report.  It's the paragraph we have been talking about this whole time, which I promised was the last one.  And it's the one that sentence that I skipped over.

A.   Which page?

Q.   It's in the middle of the paragraph.  And there's

Page 301

a citation to a study by DiBaise -- D-I-B-A-I-S-E -- from 2016.  Do you see that, Doctor?

A.   Yes.  So essentially, we are back to, "In a prospective observational study"?

Q.   Yes.

A.   Yes, let me -- can I --

Q.   That sentence.  So what we are going to do is we are going to share that exhibit.

MR. PRZYMUSINSKI:  Is there a way to sharpen it up?  At least for me it's very -- yeah, there we go.

THE WITNESS:  I can't read that.

BY MR. PRZYMUSINSKI:

Q.   Because we are remote, I can't give you a hard copy exhibit, but you should be able to look at this.  This is a study, Doctor, titled:  "The relationship among gastroparetic symptoms, quality of life and gastric emptying in patients referred for gastric emptying testing.  The first author is J.K. DiBaise and was published in Neurogastroenterology and Motility in 2016."

Do you see that, Doctor?

MR. BUXNER:  Lucas, he is having trouble reading.

THE WITNESS:  I can't --

MR. BUXNER:  He doesn't have a paper copy and he can't make it out on the screen.

THE WITNESS:  Right.

Page 302

MR. PRZYMUSINSKI:  Well, can we do something to help him?

MS. FITZPATRICK:  Can you make it --

THE WITNESS:  Can we print it?  Can you send it or --

MS. FITZPATRICK:  Can you zoom, Lucas?

MR. PRZYMUSINSKI:  I mean, I'm not controlling it. Brenna is.  So whoever's projecting it -- Brenna, it's you.

MS. KELLY:  Yeah, I've shared it and it looks very small on my screen, so I don't know if --

THE WITNESS:  It's small on my screen too.  I just can't --

MR. PRZYMUSINSKI:  I thought we had it in the local box so that it could be shared with the Doctor so he can look at it.

MS. KELLY:  Sure.

MR. PRZYMUSINSKI:  Can you guys help with that so he can get access to it through your system?

MS. FITZPATRICK:  We are working on it.

MR. PRZYMUSINSKI:  Thank you, guys.  We can go off the record while you guys figure that out.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Off record, 4:56.

(Recess was taken.)

Page 303

THE VIDEOGRAPHER:  On record, 5:02 P.M.

(Deposition Exhibit Number 10 marked for identification.)

BY MR. PRZYMUSINSKI:

Q.   So Doctor, hopefully, now one way or another you have a copy of what's going to be marked as Exhibit 10 to your deposition.

A.   I do, yes.

Q.   You do?

A.   I do have a copy, yes.

Q.   Okay.  And that's the study by Dr. DiBaise:  The relationship among gastroparetic symptoms, quality of life and gastric emptying in patients referred for gastric emptying tests" that was published in Neurogastroenterology and Motility in 2016, correct?

A.   Let me just make sure of the date.  But other than the date, then correct.  Yeah, in February of 2016.

Q.   Okay.  Great.

And Doctor, this is the DiBaise 2016 study that you cite in your report in -- at the end of the sentence that says:  "In a prospective observational study where the researchers were able to capture more detailed data for analysis authors found an association in certain gastrointestinal symptoms and found that patients with more severe symptoms were more likely to have delayed gastric

Page 304

emptying."  Correct?

A.  Correct.

Q.  Okay.  Now, Doctor, if you'll start with me at the top, this is actually another study out Mayo Clinic, correct?

A.  Mayo Scottsdale, yes.

Q.  We seem to be hitting Mayo Clinic a lot today for some reason.

A.  Yeah, we are.

Q.  Let's look at the Key Messages.  The second bullet under the Key Messages states:  "Symptoms suggestive of gastroparesis are non-specific and conflicting reports exist regarding the ability of symptoms to predict the presence gastroparesis."

Do you see that?

A.  Yes.

Q.  Do you agree with that statement?

A.  I think in general, I agree.  I think that the GLP-1 question is not something that they address.  And so, this is gastroparesis in general, not drug-induced gastroparesis and not GLP-1-induced gastroparesis.

And so, I believe that in general, outside of that context -- and I didn't see anything to suggest that these patients had drug-induced gastroparesis.  And so, yes, in other words, for gastroparesis in general, that's what the

Page 305

paper is suggesting.

Q. Okay. To be fair, Doctor, I didn't ask about whether it was about GLP-1s or drug-induced gastroparesis.

A. Correct.

Q. But this is a paper that you rely on in your report, correct?

MR. BUXNER: Object to form.

THE WITNESS: Right. When you say rely on in my report, my report, you know, wanted to be as balanced as possible and to be able to present as many perspectives as possible.

But to say I rely on it would be a term that I would not use because I didn't rely on this in making my recommendations at the end of the report. So rely on just -- I relied on this to be able to present additional viewpoints where I tried to present things kind of pro and con what my opinions were.

BY MR. PRZYMUSINSKI:

Q. Doctor, you cited this in your report; is that fair?

A. Yeah, cited is a much better term than relied. I agree.

Q. And you cited in this paragraph that we've been talking about on Page 17 that's got a total of seven different studies, correct?

Page 306

A.   I'd have the look to make sure that --

Q.   You could trust me on this one.  I'm not going to lie to you.  But if you want to check, that's fine.

A.   I'm fine with trusting you.

Q.   Okay.  And we talked about the other six of these studies and we talked about the fact that none of those studies, at least within what you quoted from them, supported the concept that symptoms alone can be predictive of gastric emptying status as measured by GES, correct?

MR. BUXNER:  Objection.  Misstates his testimony.

THE WITNESS:  I don't recall saying that.

BY MR. PRZYMUSINSKI:

Q.   Okay.  Did any of the six studies we just talked about from what you remembered include any information that suggested that symptoms are predictive of gastric emptying status on GES?

A.   Those were -- I thought we just established that I had not read those last six papers necessarily in detail, that I'd need to read them to be able to answer the previous question you asked about them and this one as well.

Q.   And I'm being fair.  I'm saying to the extent that you're sitting here today and that you can recall the studies cited in your report, sitting here today you cannot recall any part of those studies that supports that opinion; isn't it fair?

Page 307

MR. BUXNER: Object to form.

In fairness, it's not a memory test. If you want him to sit and read it, he can. But he's asked -- he's been asked this question and answered it four or five times now, Lucas.

BY MR. PRZYMUSINSKI:

Q. Question is still pending, Doctor.

A. Right. So the answer is, I do not recall in those papers, but I really have not read those papers recently; and so, I would need to reread those papers in order to fairly answer those questions.

Q. Okay. In the context of the paragraph in your report on Page 17, the only sentence that I can find that talks about any study that you suggest correlates symptoms with gastric emptying status is the one reference to this article D-I-B-A-I-S-E 2016. Will you agree with me on that or am I wrong there too?

MR. BUXNER: Object to form.

THE WITNESS: Right. I haven't suggested that you were wrong on either one. I've just tried to clarify and make sure that I'm being careful and not making any misstatements. And so, this is the one study that I'm aware of in my report that I quoted that suggested that patients that in the literature it's been suggested based on this study -- and we could talk about

Page 308

limitations of the study -- that patients with more severe symptoms end up being more likely to be patients who have delayed gastric emptying.

BY MR. PRZYMUSINSKI:

Q.   Fair enough.

Doctor, let's look at Page 235, which is the -- I guess the second page of the study, under Materials and Methods, so in the lower left-hand column, under the section Study Subjects.  Do you see that part?

A.   Yeah, I'm having a hard time on this laptop scrolling, so --

Q.   Take your time.

A.   There's an --

Q.   Page 235, lower left-hand corner, section starts Study Subjects.

A.   Yes.  Yep.  Got it.  Thanks.

Q.   Yeah.  And it says:  "Consecutive patients referred for outpatient nuclear medicine gastric emptying testing, the GET, were approached to be enrolled in the study."

Do you see that?

A.   I do, yes.

Q.   "Study inclusion criteria included 18 years of age or greater."  Right?

A.   Correct.

Page 309

Q.   So they have to be adults, correct?

A.   Depending on how you define an adult.  But they had to be 18 years or older.

Q.   Okay.  Fair enough.  That's more precise.

Symptoms Suggestive of Gastroparesis.  Do you see that?

A.   Yeah, I do.

Q.   They had to have symptoms suggestive of gastroparesis, which are described as epigastric pain or discomfort.  Do you see that?

A.   I do.

Q.   Early satiety.  Do you see that?

A.   I do.

Q.   Persistent fullness.  Do you see that?

A.   Yeah.

Q.   Or abdominal distension?

A.   Yes.

Q.   Bloating?

A.   Yes.

Q.   Nausea?

A.   Yes.

Q.   And vomiting, right?

A.   Correct.

MR. BUXNER:  Object to form.  That's misstates the paper.

Page 310

BY MR. PRZYMUSINSKI:

Q. And then the next part says: "And willingness and ability to complete the questionnaire."

Do you see that?

A. Yes.

Q. Okay. So in this study, the investigator at Mayo presumably recruited people coming in age 18 or older who had some symptoms that were, as they describe it, suggestive of gastroparesis and provided those patients were willing to participate and fill out the questionnaires, they were enrolled in the study, correct?

A. Right. The list that we went over were examples. It was e.g. So I would assume because they put e.g. that there was a more exhaustive list of symptoms because otherwise, I think it would have been correct to have put i.e.

Q. If we go down to the next section, Doctor, on Gastric Emptying Test, the authors write: "A four-hour solid-phase nuclear medicine gastric emptying test was performed using the standard protocol of the Mayo Clinic Nuclear Medicine Department."

Do you see that?

A. I do.

Q. And can we assume from that we are talking about the scintigraphy test?

Page 311

A.    Scintigraphy, yes.

Q.    And then they go through the description of exactly how the test was done.  And they talk about the gastric emptying was analyzed by calculating the percentage retention at the end of the two- and four-hour images.  Do you see that?

A.    Yes.

Q.    "The radiologists were blinded to the results of the various questionnaires."

Do you see that?

A.    Yes.

Q.    Okay.  "The result was primarily stratified based upon the percentage gastric retention four hours as normal.  As normal, (gastric retention less than 16 percent) and abnormal (gastric retention greater than 16 percent)."

Do you see that?

A.    I do.

Q.    A little bit different from the numbers you gave, but kind of in the range, correct?

A.    In the ballpark.

Q.    Okay.  And then they said:  "The severity of the delay in gastric emptying was also determined using the a priori criteria as follows:  Mild delay (gastric retention 16-25 percent), moderate delay (gastric retention 26-35 percent), and severe delay (gastric retention greater

Page 312

than 35 percent)."

Do you see that?

A. I do.

Q. Okay. And they describe this modification as a modification of the cutoffs recommended by the American Neurogastroenterology and Motility Society, correct?

A. That's all correct as far as what's there. I would not have done it that way, but that's all correct as far as the study describes the gastric emptying test.

Q. Now, let's go to Results, which is on the next Page, Doctor, 236.

A. Okay.

Q. And there's a section called Patient Characteristics in the left lower-hand corner. Do you see that?

A. I'm trying to scroll, but --

Q. Take your time.

A. Yes, Patient Characteristics. It's being stubborn.

Q. So what the authors state there, 266 patients were enrolled, right?

A. Wait. I'm trying to get there.

Q. I'm sorry, let me know when you're ready.

THE VIDEOGRAPHER: I think it needs two. Try two fingers.

Page 313

THE WITNESS:  Yeah, I'm using two.  The scrolling is a challenge here.

THE VIDEOGRAPHER:  Where do you need to get to?

THE WITNESS:  The page that he wanted me to.  You said it was Page two hundred --

MR. PRZYMUSINSKI:  236. Thirty-six.

THE VIDEOGRAPHER:  Now it's scrolling.  Now it's not.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Okay.  Now it should be fine.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Which one?  236?

BY MR. PRZYMUSINSKI:

Q.   236 lower left-hand corner says:  Results. Patient characteristics."

A.   Got it.

THE WITNESS:  Thank you.

BY MR. PRZYMUSINSKI:

Q.   First sentence reads:  "266 patients were enrolled."

Do you see that?

A.   I do.

Q.   Okay.  Looks like 73 percent were female; is that right?

A.   73.3, right.

Page 314

Q.   And the median age was 49.1 years?

A.   Correct.

Q.   Okay.  So in this population of 266 patients, who had a baseline symptoms suggestive of gastroparesis after conducting gastric emptying study, they found delayed gastric emptying was observed in 75 or 28.2 percent of the patients.  Do you see that?

A.   I do.

Q.   Okay.  And the etiology for those 75 was divided into idiopathic, post-surgical and diabetic, correct?

A.   Correct.  And they listed figures for -- for those as well.

Q.   Okay.  Correct.

All right.  Just one simple question, Doctor:  In this study of patients evaluated at Mayo Clinic using the gastric emptying scintigraphy test that we've been talking about, out of 266 patients who have symptoms suggestive of gastroparesis upon conducting the gastric emptying study, they found that 71.8 percent of patients did not actually have delayed gastric emptying, correct?

A.   I'm trying to find where you're getting that 71-point --

Q.   Well, they say:  "Delayed gastric emptying was observed in study 5 or 28.2 percent, which leaves 71.8 percent which did not delayed gastric emptying."

Page 315

Correct?

A.   If it was in 28.2, that would leave 71.8, right?

Q.   I thought that's what I said.  I apologize if I was wrong.  71.8 percent did not have delayed gastric emptying, correct?

A.   I would assume that from the information in this Patient Characteristics.

Q.   So what we know from this study is that even at a place like Mayo Clinic, when you get referral of patients with symptoms that are suggestive of gastroparesis and then you perform a gastric emptying study, you find out that those symptoms only correlate with actual delay in gastric emptying in 28.2 percent or approximately -- well, a little bit more than that, correct?

A.   So I think -- and help me understand whether you're suggesting that we extrapolate any of this data.  In other words, this is a case report on a quaternary referral center or tertiary referral center that would have patients referred to them that would be very different than what I would expect in clinical practice and certainly not the subset of patients who would have drug-related gastroparesis.

So if you're asking me is this what they found in their special population utilizing questionnaires rather than an actual physical examination or review of symptoms by

Page 316

a physician or other healthcare provider, but just used questionnaires, if you're asking me did the questionnaires that they used at Mayo in their specific population find these numbers based on the article, absolutely, yes.

Do I believe that I would utilize this information and extrapolate it to other patient populations or actual clinical practice where patients don't get essentially diagnosed with a questionnaire that the patients fill out, or in patients that are -- that have suspected drug-induced gastroparesis, I don't want to give you the impression that I believe that.

But if you're asking in this particular case study at Mayo, were those the numbers in the article, the answer is yes.

Q.   That's a very long answer.  And I appreciate it.

A.   And I apologize if it's too long.

Q.   Those are (inaudible due to cross-talk)  That, we can agree on, correct?

A.   I just want to be accurate.

I'm sorry, say that again.  I was talking on top of you.  It's my fault.

Q.   I know that was a long answer and I appreciate it. But I need to kind of break it down.

You agree with me that those are the numbers in this study, correct?

Page 317

A.    Yes, correct.

Q.    Okay.  You also agree with me that this is a study that you referenced -- that's the word you wanted to use -- in your report, correct?

A.    We said cited, but I like referenced also.

Q.    Cited or referenced, whichever you prefer.

We will also agree that it's the only study cited or referenced in your report that provides any sentence or description next to it suggesting that symptoms can be predictive of gastric emptying status, correct?

A.    I don't believe that that's the case.  I believe that if we looked through the many articles that I referenced, we would find other articles that contained information that would state that there was that association.

Q.    Okay.  Well, my question was different.

My question was:  This is the only article in your report that it describes the sentence that links symptoms to being a predictor of gastric emptying status, correct?

A.    No, it's the only one that essentially asserts based on this particular study that the severity of gastric emptying has a correlation with a -- a positive correlation with the severity of patient symptoms.

Q.    So Doctor, without rereading every article that you have, can you identify for me any article that is in

Page 318

your report or anywhere else that reports that symptoms, symptoms can be used to predict gastric emptying status in patients with symptoms suggestive of gastroparesis?

MR. BUXNER:  Object to form.

THE WITNESS:  So the answer is there are multiple reviews that have been done that suggest diagnosis and mechanisms for diagnosis.  I'd have to read through those.  But the answer I believe is that peppered throughout multiple different references that they have there's a reference to the idea that patient's symptoms and the severity of the symptoms essentially has -- and gastric emptying delay has predictive value in being able to make the diagnosis of gastroparesis.

BY MR. PRZYMUSINSKI:

Q.   Doctor, I appreciate that.  But I'm going to ask you again.  Can you identify for me any study in your report or that you're aware of sitting here right now that actually reports an association suggesting that symptoms, those that are suggestive of gastroparesis, are capable of predicting gastric emptying status in patients?

MR. BUXNER:  Object to form.  Asked and answered multiple times throughout this entire, whatever we are at now, six hours and 15 minutes.

So you can answer it referring to your earlier testimony and your report.  Go ahead.

Page 319

But this has been asked by both of you today, Lucas. Go ahead.

MR. PRZYMUSINSKI: But it hasn't been answered.

MR. BUXNER: It has.

MR. PRZYMUSINSKI: Asked and answered is not an objection, but --

THE WITNESS: So --

MR. BUXNER: You just don't like the answer. It's been answered.

MR. PRZYMUSINSKI: If the answer is, no, I can't identify anyone specifically, but I'm sure there's a citation somewhere, then please say that and I'm fine with that.

MR. BUXNER: No, you don't get to tell him what the answer is. He's given you the answer six or seven times since about 10:00 this morning.

BY MR. PRZYMUSINSKI:

Q. Why don't you give me the answer one more time, Doctor. Tell what the answer is.

A. Sure. I think you're asking whether or not in the review articles and in the recommendations that do they refer to the fact that patient's symptoms and signs are part of what is required to make the diagnosis of gastroparesis and that are helpful in making the diagnosis of gastroparesis, or can make the diagnosis of gastroparesis

Page 320

yes, I believe multiple articles that I've cited contain information.

Q.   Doctor --

MR. BUXNER:  Let him answer, Lucas.  Lucas, you want to ask --

BY MR. PRZYMUSINSKI:

Q.   That's not what I asked.  I asked not whether signs and symptoms can be part of the process of diagnosing gastroparesis.

What I asked was whether signs and symptoms, and particularly symptoms, correlate with actual gastric emptying status when measured with a tool like a gastric emptying scintigraphy test.  That's a different question.  And I just need an answer.

And if the answer is I'm not sure, I'd have to read more, I'd have to go back and look at it, whatever it is, but can you name any for me sitting here today.  It's not a memory test.  I'm asking right now if you can do it.

MR. BUXNER:  Lucas, you interrupted the doctor on the seventh time he's answered this question throughout the course of the day.

MR. PRZYMUSINSKI:  But he wasn't answering my question.  He's answering a different question.

MR. BUXNER:  And now you're interrupting me.  If you behave like a gentleman, I will.  If don't want to

Page 321

act like a gentleman, then we can just be done for the day, Lucas. You've asked him seven times today. He's continued to answer it. He's said it throughout the day seven different times. And you just don't like the answer you're getting. And now you're interrupting him when you don't like the answer you're getting.

BY MR. PRZYMUSINSKI:

Q. Did you understand my question, Doctor?

A. I know you've asked multiple questions and I think I've answered the questions. But if you want to ask the question again, and if that's permissible, then I'm happy to listen to it again and try to answer it again. I'm really trying to provide as helpful information as possible from all the articles that I've read and all the information that I have.

And so, do you want to ask it again?

I think the answer was that I don't have all the articles memorized and that if you wanted me to look through articles to find evidence in the articles, I believe there are multiple articles in which I could find that information and would need to do that. I really haven't memorized them.

So if you're asking me can I quote a specific article or a specific passage, I can't.

But I just want to point out that I believe that it would not be difficult to find that within the literature

Page 322

that I've cited.  Is that helpful?

Q.    And that's a perfect answer.  That's all I was asking for.

A.    Okay, great.

Q.    One last question, Doctor:  When you talk about the DiBaise study or DiBaise study --

A.    Uh-huh.

Q.    -- you referred to it as a case report.  And my definition of a case report is a little bit different.  I want to make sure we are talking the same language.

To me, a case report is when a physician sees a case, writes it up, and says, hey, I had a patient who had this, we did this.  My understanding of this is this would be called a prospective observational study.

Are we talking the same definition or am I mistaken?

A.    No, I really appreciate you underscoring and highlighting that.

So as an editor of journals and as a reviewer, often one of the criticisms that comes back is that when there is information that's reported specific to an institution that may not be generalized beyond that information, that -- that often proof it is essentially dismissed as being similar to a case report where one is essentially reporting the case at an institution.

Page 323

So I think what you're pointing out, I think, you know, properly is that when we think about case reports as physicians, we think about a description of a particular patient.

But I've heard it used in many different contexts in reviewing articles when essentially the question becomes is any of that relevant to other facilities or is it just a questionnaire that's specific to the Mayo patients?

And so, when I say case report, I really mean this is the criticism as an editor that we have of articles that we don't publish where the information does not seem generalizable and seems idiosyncratic or specific to the institution.

So I appreciate your giving me the opportunity to highlight what I'm referring to or what I did refer to when I said case report.

Q.    Okay.  And that's helpful.

And I assume, Doctor -- just to follow up on that quickly -- that if you do studies at your own institution, I suspect there have been publications you have done with -- (inaudible)

THE REPORTER:  Wait, wait, wait.  Lucas.  Lucas, I lost your words.  You've got to say it again.

MR. PRZYMUSINSKI:  I'll try that again.

BY MR. PRZYMUSINSKI:

Page 324

Q.   I said I appreciate that, Doctor.  That's helpful. And I just wanted to make sure I understand, is it true or false that at your own institution, Doctor, you've conducted studies of one sort or another that have been conducted only at your institution and reported the results of those studies?

A.   I have.  And those have been dismissed as specific to the institution.  So we've submitted papers in the past where essentially the comment came back, could you please add additional institutions or could you please essentially try and generalize your methodology?

So at University at Maryland, if I did a questionnaire, I would expect that feedback to come back on my specific patients at University of Maryland asking how generalizable is this information to -- for publication so that one might be able to get useful information that would inform other practices.

Q.   Doctor, this particular publication or this particular study, right, was accepted for publication, peer-reviewed and appeared in Neurogastroenterology and Motility, correct?

A.   Correct.

Q.   So at least the peer reviewers and editors for that journal (inaudible) --

THE REPORTER:  Wait, wait, wait.  Wait.  Lucas.

Page 325

MR. PRZYMUSINSKI:  Yeah.

THE REPORTER:  I'm not hearing you.  I'm not understanding you.

MR. PRZYMUSINSKI:  Sorry.

BY MR. PRZYMUSINSKI:

Q.   So what I said was so this study was peer-reviewed and accepted for publication in Neurogastroenterology and Motility, so at least in this case, the peer reviewers and editors concluded that it was of sufficient quality to merit publication, correct?

A.   So the answer to that is correct.  I think it is an interesting, anecdotal report from their own experience at Mayo.

So I wouldn't have objected to it being published. I think it's okay to publish it.  But I would expect that those who were reading it would understand and come to a similar conclusion to me that it's specific to that institution and the questionnaires are not the way that people typically extract information about patient symptomatology.

MR. PRZYMUSINSKI:  Doctor, thank you.  I will first ask if lead counsel's got any questions and certainly an opportunity for your own counsel.  Thank you so much for your time.  I really appreciate it.

THE WITNESS:  Yeah, thank you.

Page 326

MS. FITZPATRICK:  No further questions from me.

MR. BUXNER:  I just have a few.

CROSS EXAMINATION

BY MR. BUXNER:

Q.   Do you still have Exhibit 10 up?  DiBaise, Exhibit 10?

A.   Are you asking me?  I still have it on the screen, yes.

Q.   I'm asking you, Doctor.

A.   Yes.

Q.   In fairness, you cited this in your report that you had been asked numerous times about?

A.   Yes.

Q.   The proposition that the more severe the symptoms, the more likely there would be delayed gastric emptying; is that right?

A.   Correct.

MS. FITZPATRICK:  Object to form.

BY MR. BUXNER:

Q.   Doctor, can I orient you to the Conclusion, please?

A.   The Conclusion at the end of the paper?

Q.   Please.

A.   Sure.  I'm scrolling really well now.

Q.   Page 240.

Page 327

A.    Yes.

Q.    I just want to read it just to orient you to where I am.  "In patients referred for testing of gastric emptying, those with delayed gastric emptying, generally had more severe gastroparetic symptoms during the two-week period prior to the GET and during the GET itself."

Did I read that reasonably correct?

A.    You did.

Q.    And that's what you cited it for, true?

MS. FITZPATRICK:  Object to the form.

THE WITNESS:  The Conclusion was what I cited it for.

MR. BUXNER:  I don't have anymore questions.

MS. FITZPATRICK:  No questions from me.

MR. PRZYMUSINSKI:  All right.  Thank you, guys. Really appreciate the time, Doctor.  Have a wonderful weekend.

THE WITNESS:  Hope you have a wonderful weekend too.  Thanks so much.

THE VIDEOGRAPHER:  This concludes today's testimony.  Time is 5:30 P.M.  We are off the record.

Page 328

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, TAMARA MASCI TANNEN, RPR, Notary Public, State of Florida, certify that ELIOT SIEGEL, M.D. personally appeared before me on the 31st day of January 2025 and was duly sworn.

Signed this 31st

_____

TAMARA MASCI TANNEN, RPR, FPR-C

Notary Public

State of Florida

My Commission #HH 621542

Expires March 7, 2029

Page 329

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA      )

COUNTY OF PALM BEACH)

I, TAMARA MASCI TANNEN, Registered Professional Reporter, certify that I was authorized to and did stenographically report the video deposition of ELIOT SIEGEL, M.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 1-325, is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 2nd day of February 2025.

_____

TAMARA MASCI TANNEN, RPR, FPR-C

Page 330

E R R A T A   S H E E T

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES

IN RE:          GLUCAGON-LIKE PEPTIDE-1

                RECEPTOR AGONISTS (GLP-1 RAs)

                PRODUCTS LIABILITY LITIGATION

CASE NO:        2:24-md-03094-KSM

DATE:           JANUARY 31, 2025

DEPONENT NAME:  ELIOT SIEGEL, M.D.


PAGE/LINE          CORRECTION                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

             (Use other side if necessary)

     Under penalties of perjury, I declare that I have read

the foregoing document and that the facts stated are true.


_____                _____

ELIOT SIEGEL, M.D.                             DATE

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.