# EXHIBIT 39D



Ma Somsouk, MD

3/12/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE:  GLUCAGON-LIKE PEPTIDE-1     CIVIL ACTION
RECEPTOR AGONISTS (GLP-1 RAs)
PRODUCTS LIABILITY LITIGATION       MDL No. 3094
---------------------------------/
THIS DOCUMENT RELATES TO:           2:24-md-03094-KSM

ALL ACTIONS/ALL CASES
---------------------------------/


 ** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER **

VIDEO-RECORDED DEPOSITION OF MA SOMSOUK

Thursday, March 12, 2026

Stenographically reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523
Washington CSR No. 3318
Oregon CSR No. 19-0458
Texas CSR No. 11318

Job No.:  3130

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE:  GLUCAGON-LIKE PEPTIDE-1    CIVIL ACTION
RECEPTOR AGONISTS (GLP-1 RAs)
PRODUCTS LIABILITY LITIGATION       MDL No. 3094
-------------------------------/
THIS DOCUMENT RELATES TO:          2:24-md-03094-KSM

ALL ACTIONS/ALL CASES
-------------------------------/


BE IT REMEMBERED that on Thursday, March  12, 2026, commencing at the hour of 8:57 a.m. PDT, thereof, at the offices of Lieff, Cabraser, Heimann & Bernstein, 275 Battery Street, Suite 2900, San Francisco, California, before me, LORRIE L. MARCHANT, CSR, RMR, CRR, CCRR, CRC, a Certified Stenographic Shorthand Reporter for the State of California, personally appeared

MA SAMSOUK, MD,

Called as a witness by the Defendants herein, who, being by me first duly sworn/affirmed, was thereupon examined and testified as hereinafter set forth.

---oOo---

A P P E A R A N C E S


Appearing as counsel on behalf of the Plaintiffs:

          MORGAN & MORGAN
          BY:  PAUL PENNOCK, ESQ.
               JONATHAN M. SEDGH, ESQ. (via Zoom)
          199 Water Street, Suite 1500
          New York, New York 10038
          (212) 845-2800
          ppennock@forthepeople.com
          jsedgh@forthepeople.com
          BY:  NICOLE LOVETT, ESQ. (via Zoom)
          201 North Franklin Street, 7th Floor
          Tampa, FL 33602
          (813) 223-5505
          nlovett@forthepeople.com


Appearing as counsel on behalf of the Defendants,
Novo Nordisk A/S and Novo Nordisk, Inc.:

          DLA PIPER LLP (US)
          BY:  CHRISTOPHER GISMONDI, ESQ.
          1251 Avenue of the Americas
          New York, New York 10020
          (212) 335-4876
          christopher.gismondi@us.dlapiper.com
          BY: STEPHANIE PEATMAN, ESQ.
          2000 Avenue of the Stars, Suite 400
          Los Angeles, California 90067
          (310) 595-3000
          stephanie.peatman@us.dlapiper.com


(Continued)

A P P E A R A N C E S


Appearing as counsel on behalf of the Defendant, Eli
Lilly & Company and Lilly USA, LLC:

          KIRKLAND & ELLIS, LLP
          BY:  MARK PREMO-HOPKINS, ESQ.
               MYRA FAROOQI, ESQ.
          555 California Street, 27th Floor
          San Francisco, CA 94104
          (415) 439-1400
          mark.premohopkins@kirkland.com
          myra.farooqi@kirkland.com
          BY:  DAISY ALMONTE, ESQ. (via Zoom)
          333 West Wolf Point Plaza
          Chicago, IL 60654
          (312) 862-2000
          daisy.almonte@kirkland.com


Also present:

          Bridge Wholey (via Zoom)
          Douglas Stock, Videographer

                         I N D E X

                    INDEX OF EXAMINATION

EXAMINATION BY                                          PAGE

  MR. GISMONDI                                            12

  MR. PREMO-HOPKINS                                      183

                        ---oOo---

I N D E X

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

EXHIBIT         DESCRIPTION                                    PAGE

Exhibit 1    Expert Report of Ma Somsouk, MD,      21
             MAS, AGAF

Exhibit 2    Curriculum Vitae of Ma Somsouk,       21
             MD, MAS, AGAF

Exhibit 3    Materials Considered list             21

Exhibit 4    Defendants' Notice to Take the        67
             Videotaped Deposition of Ma
             Somsouk, MD, and Requests for
             Production of Documents

Exhibit 5    Responses to Defendants' Notice       68
             to Take the Videotaped
             Deposition of Ma Somsouk, MD,
             and Requests for Production of
             Documents

Exhibit 6    Statement of Compensation for Ma      68
             Somsouk, MD

I N D E X

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

EXHIBIT        DESCRIPTION                              PAGE

Exhibit 7    International Journal of Surgery    99
             article entitled "Strengthening
             the Reporting of Observational
             Studies in Epidemiology
             (STROBE): Explanation and
             elaboration"

Exhibit 8    Article entitled "Risk of          155
             Gastrointestinal Adverse Events
             Associated with Glucagon-Like
             Peptide-1 Receptor Agonists for
             Weight Loss

Exhibit 9    Mesgun report                      161

Exhibit 10   Article entitled "Comparing the    166
             risk of gastroparesis following
             different modalities for
             treating obesity: semaglutide
             versus bupropion-naltrexone
             versus sleeve gastrectomy - a
             retrospective cohort study"

I N D E X

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

EXHIBIT         DESCRIPTION                                PAGE

  Exhibit 11   Article entitled "Frequency      166

               of GLP-1 Receptor Agonists Use

               in Diabetic Patients Diagnosed

               with Delayed Gastric Emptying

               and Their Demographic Profile"

  Exhibit 12   Article entitled "Glucagon-Like   171

               Peptide-1 Receptor Agonists and

               Gastrointestinal Adverse Events:

               A Systematic Review and

               Meta-Analysis"

  Exhibit 13   Article entitled "Meta-analysis   175

               of the association between new

               hypoglycemic agents and

               digestive diseases"

  Exhibit 14   Marked up version of Expert       179

               Report of Ma Somsouk, MD, MAS,

               AGAF

                         I N D E X

       INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

     EXHIBIT       DESCRIPTION                         PAGE

      Exhibit 15   Marked up version of article        180

                   entitled "Comparing the Risk of

                   Gastroparesis Following

                   Different Modalities for

                   Treating Obesity: Semaglutide

                   Versus Bupropion-Naltrexone

                   Versus Sleeve Gastrectomy - A

                   Retrospective Cohort Study"

      Exhibit 16   Marked up version of article        180

                   entitled "Glucagon-Like

                   Peptide-1 Receptor Agonists and

                   Gastrointestinal Adverse Events:

                   A Systematic Review and

                   Meta-Analysis"

      Exhibit 17   Marked up article entitled          181

                   "Quantified Metrics of Gastric

                   Emptying Delay by by GLP-1

                   Agonists:  A Systematic Review

                   and Meta-Analysis with Insights

                   for Periprocedural Management"

I N D E X

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

EXHIBIT        DESCRIPTION                      PAGE

Exhibit 18   Marked up article entitled       181
             "Effects of Liraglutide on
             Gastrointestinal Functions and
             Weight in Obesity:  A
             Randomized Clinical and
             Pharmacogenomic Trial"

Exhibit 19   Article entitled "768-P:         193
             Glucagon-Like Peptide 1 Receptor
             Agonists and the Risk of
             Motility-Related
             Gastrointestinal Adverse Events
             - A Cohort Study"

Exhibit 20   Article entitled                 227
             "Gastrointestinal and
             Hepatobiliary Safety of
             Glucagon-like Peptide-1 Receptor
             Agonists in Patients with Type 2
             Diabetes"

---oOo---

THURSDAY, MARCH 12, 2026

SAN FRANCISCO , CALIFORNIA

8:57 a.m. PDT

THE VIDEOGRAPHER:  Good morning.  We are on the record.  Today's date is March 12th, 2026, and the time is 8:57 a.m. Pacific time.

My name is Douglas Stock acting as the legal videographer representing Hartford Reporting & Technology.

This deposition is being taken in the matter of In Re: Glucagon Peptide Receptor Agonists (GLP-1 RAs) Products Liability Litigation.  The case number is 2:24-md-03094-KSM.

This case is venued in the United States District Court, for the Eastern District of Pennsylvania.  The deponent today is Ma Somsouk, MD.

All counsel will be noted on the stenographic record.

The court reporter today is Lorrie Marchant.

And, Madam Court Reporter, if you would please swear in the witness.

And then, Counsel, you may proceed.

THE STENOGRAPHER:  My name is Lorrie Marchant.  I am a California Certified

Shorthand Reporter, CSR License No. 10523. I will be producing a transcript of this proceeding that is automatically admissible in court.

And I will go ahead and swear in the witness.

MA SOMSOUK, MD,

FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

EXAMINATION BY MR. GISMONDI

BY MR. GISMONDI:

Q. Good morning, Dr. Somsouk. My name is Chris Gismondi. I represent Novo Nordisk, and today I'll be asking you a couple of questions.

I saw that you've been deposed before so I'll be pretty quick with the ground rules.

If I ask a question, if you could just respond to that question, that would be great.

If I ask you a question, I'm going to try very hard not to talk over your answer. And if you could try hard to not talk over my question, that would be fantastic.

If at any point in time you need a break, just let me know. But if there's a question that is pending, if you could please respond to that question.

And if you could give me a verbal answer.

Even if your natural response would be a head shake, that would also be great.

A.    I will.

Q.    Thank you.

So I want to start by just going through some definitions.

Do you agree that gastroparesis is a condition characterized by upper GI symptoms such as nausea, vomiting, early satiety, abdominal pain, and delayed gastric emptying in the absence of a mechanical obstruction?

A.    Yes, I do.

Q.    Now, you agree that just because you have symptoms like nausea, vomiting, early satiety, and abdominal pain, that does not mean that you have gastroparesis?

A.    It does not necessarily mean it, just because nausea, vomiting, and some of those constellation of systems may be associated with many other conditions.

Q.    Okay.

A.    But it could imply that someone has gastroparesis.

Q.    And what are some of those other conditions that it could -- that they could be related to?

A.    Some -- you could get a viral illness, and then you don't feel well.  You get nausea, vomiting.

You could have a -- a brain tumor.  You could get nausea, vomiting.

You could undergo chemotherapy.  You get nausea, vomiting.

So there's a variety of conditions that would manifest itself as nausea/vomiting.  So it has to be contextual as well.

Q.    And by "contextual," what do you mean?

A.    Contextual as in what type -- of the constellation of symptoms.  So the nausea/vomiting, and whether it's related to food intake, for example; the duration of symptoms; the persistence.  And -- and then the underlying illnesses and whether or not there's other co-incidental issues that are going on.

Q.    And you also agree that delayed gastric emptying in and of itself is not gastroparesis; correct?

A.    That is correct.

Q.    How does delayed gastric emptying differ from gastroparesis?

A.    Yeah.  So delayed gastric emptying can be a measure or a numerical assessment, for example.  A

delay in gastric emptying may be similar to nausea/vomiting as in, like, you may have some quantifiable delay.

But you may not have symptoms of gastroparesis or even of nausea or vomiting, so someone who has a little bit of a delay may not necessarily have gastroparesis. But let's say it is still -- again, it's a measure. It's a marker. And it can then be linked and lead to gastroparesis.

Q. Is impaired gastric emptying the same thing as gastroparesis?

A. There again, I -- I would say it's similar in that it's under this constellation of symptoms where delayed gastric emptying -- impaired gastric emptying when it is symptomatic and presumably no mechanical obstruction, then -- and the individual has symptoms that are persisting, then one would call that gastroparesis.

Q. Is impaired gastric emptying the same thing as delayed gastric emptying?

A. They are -- I -- I would consider them broadly as the same or very similar.

Q. How would they differ, if at all?

A. Delayed gastric emptying, it sounds to me a bit more quantitative, like there's a delay that

they're quantifying.

But in an impaired, it's just functionally -- it doesn't work as well.  It's a bit more qualitative, the term.

Q.   So what do you mean by "It's more qualitative"?

A.   The -- the term, the -- in terms of just the word "impairment," sounds more as a qualitative term, like something is not working as well.

A delay sounds like it's measured as there's a time and now there's another time, and then there's a difference.  And that difference in time is a delay.

And so it perhaps is more commonly used in a measurement or a calculation.  And then they say delayed in gastric emptying versus impaired where it gives you that connotation that functionally it's not working as well as it should.

Q.   And you would still have to measure, though, to determine if it was not working functionally as well as it could; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  You do not -- you do not have to measure because many times measuring may not be available.  And so we have a sense from the -- from

the clinical and the qualitative side something is not working right. We would infer that there's a delay in the gastric emptying and that delay is causing an impairment in its function.

BY MR. GISMONDI:

Q. So you would infer without any quantitative measurement?

MR. PENNOCK: Objection.

THE WITNESS: You -- you may infer without a quantitative measurement.

People use quantitative measures to try to diagnose and say, "Oh, this is gastroparesis." But many times the measurement is not available, and we make a clinical diagnosis of gastroparesis.

BY MR. GISMONDI:

Q. So -- and that's with respect to gastroparesis?

A. It could be gastroparesis. It could be a delayed gastric emptying. It could be impaired gastric motility. This is all in that basket of abnormal gastric motility and delayed gastric emptying.

Q. You talked about persistent symptoms.

Can you explain persistent when you compare delayed gastric emptying versus gastroparesis?

Ma Sonsouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    So when I mentioned persistent before -- I can GI you an example:  Let's say someone who has a viral gastroenteritis or food poisoning.  They have nausea/vomiting.  They have symptoms of -- like, it feels like they can't eat anything.  It doesn't stay down.  Everything is coming right back up.

Effectively they have some sign of gastroparesis because the stomach isn't functioning normally, and everything that goes down comes back up.  That episode typically lasts several days and then it goes away, and then the individual gets better.

So the persistence here that I'm referring to is typically it takes weeks at least.  It persists to the point where someone feels like, "Oh, something is not going away, so I'm seeking attention for it."

And so that's the type of persistence.

And so in the context of delayed gastrian [sic] -- gastroparesis, generally a provider, a clinician, would not want to give a diagnosis that someone has delayed gastric emptying and gastroparesis when the situation is a transient episode in the context of, for example, an illness.

On the other hand, if they perceive it to

be -- this is a durable -- you know, it's just not getting better, then they give that diagnosis of impaired gastric emptying and gastroparesis.

Q. Have you heard of the term "drug-induced gastroparesis"?

A. I've heard of it.

Q. And you agree that drug-induced gastroparesis is a temporary condition that ceases when the person stops taking the drug and it washes out of the system?

MR. PENNOCK: Objection.

THE WITNESS: I -- I don't know if I can generalize that to, let's say, all drugs or every situation, but I can imagine that it could be temporary. But in some cases, if it causes long-lasting damage, then it may not go away.

BY MR. GISMONDI:

Q. What medication are you aware of that can cause long-lasting damage?

A. I am not familiar with drugs that cause long-lasting damage. I can imagine that perhaps some drugs can do it, but I am not familiar -- for example, like, certain chemotherapies; certain things that cause some damage to the gastrointestinal tract in the context of treatment,

and then that might cause a durable damage.  But I'm not familiar with any specific one.

Q.   And chemotherapies are a treatment that does damage to the cells?

A.   That's right.

Q.   But outside of chemotherapy, there is not -- no other drug that you could imagine that could cause long-lasting damage to the gastrointestinal system; correct?

A.   I'm not familiar.

Q.   Now, you agree that there are forms other than drug-induced gastroparesis that are chronic conditions; correct?

A.   That is correct.

Q.   And those are caused by damage to the nerves, muscles, cells, and/or connective tissue involved in gastro motility; correct?

A.   Typically.

Q.   You are not aware of any evidence that a GLP-1 RA medication can cause permanent damage to the nerves, muscles, cells, and/or connective tissue involved in gastric motility; correct?

A.   I am not aware.

Q.   So I want to take a look at your expert report.  And I'll also mark your expert report, your

CV, and your MCL.  So we can just get this out of the way.

(Discussion off the stenographic record.)

MR. GISMONDI:  That's 1.

(Comments off the stenographic record.)

(Marked for identification purposes, Exhibit 1.)

MR. GISMONDI:  Here is 2.

(Marked for identification purposes, Exhibit 2.)

MR. GISMONDI:  This is -- your CV will be 2.

I'm guessing you guys have one.

(Comments off the stenographic record.)

MR. GISMONDI:  And then your materials considered list will be 3.

(Marked for identification purposes, Exhibit 3.)

MR. GISMONDI:  Here you go, Paul.

BY MR. GISMONDI:

Q.   So if we could take a look at Exhibit 1.

Can you tell me what this document is?

A.   This is a expert report from Ma Somsouk.

Q.   And that is yourself?

A.   That is me.

Q.   Thank you.

Does this report contain all the opinions you plan on offering in this case?

A.   It does.

Q.   Are there any changes or corrections you need to make to this report?

A.   No, I do not.

Q.   Are there any changes you want to make to this report?

A.   No.

Q.   Now, if we could look briefly at Exhibit 3, your materials considered list.

A.   Yep.

Q.   Are all the materials you reviewed in connection with drafting Exhibit 1, your expert report, listed in this materials considered list?

A.   It is.

Q.   Is there any additional literature that you have come across since January 3rd, 2026, that you should -- you believe should now be included in the materials considered list?

A.   I did come across a paper.  And I did not see it in the materials considered list.

Q.   And what is the name of that paper?

A.   "Effects of liraglutide on gastrointestinal

functions and weight in obesity."  And it's a randomized clinical and pharmacogenomic trial.

Q.    And who is --

A.    First -- first author is Maselli, M-A-S-S -- or M-A, one S, E-L-L-I.  It's published in Obesity.  This is 2022.

Q.    And when did you first come across this report?

A.    I cannot recall.  It may have been in between the time period because I did not see it. I -- I did not see it in the materials or in my report and in the materials considered list.  But it is supportive of the report, and it does not really change the statements in the report.

Q.    And how did you come about locating this study?

A.    Honestly, I don't recall.  I remember just looking back over the evidence with respect to delayed gastric emptying and just seeing whether or not there were studies and -- related to quantifying delay in gastric emptying.  And that's what this paper is about.

Q.    And did you bring a copy of that paper with you to this deposition?

A.    I -- I did, although I marked it.

Q.    Okay.

A.    But you feel free to make a copy of it.

Q.    Okay.  Thank you.

MR. GISMONDI:  If we could get a copy of that, that would be great.

MR. PENNOCK:  Yeah.  Let me get somebody in here.

BY MR. GISMONDI:

Q.    And did you bring anything else with you to the deposition today?

A.    I brought my report --

Q.    Okay.

A.    -- and several other papers that were already in the materials considered list and in the report that were cited.

Q.    And what papers did you bring?

A.    There's one by Chiang, which is a meta-analysis from Gastroenterology in 2025.

There's a paper by Hiramoto.

There's another paper by Aneke-Nash.

Q.    And did you --

A.    That's it.

Q.    And did you similarly mark up those documents?

A.    I did.

MR. GISMONDI:  Okay.  If we could get a copy of those documents --

MR. PENNOCK:  Yeah.

THE WITNESS:  -- as well, that would be great.

MR. PENNOCK:  I just texted somebody to get someone in here and copy them.

MR. GISMONDI:  We can take them up during the break.  There's no rush.

MR. PENNOCK:  Okay.

BY MR. GISMONDI:

Q.   Now, certain studies on your materials considered list I noticed were specifically referenced in your expert report.

How did you come to determine which studies from the materials that you considered should be reflected in the report that you issued?

A.   Yeah.  There -- overall, I wanted to see studies that one had a level of rigor with respect to comparisons of the GLP-1 and whether or not there was an association with gastroparesis.

That was the request of me and so that was my objective, to try to look for studies that could demonstrate whether or not there was or was not an association.

With that in mind, I have experience in epidemiology and stats and study design, so I tried to apply some of these principles to identifying the studies that were more meritorious with respect to these qualities and factors: whether or not they had relevant control groups, whether or not they adjusted for factors that could have contributed to bias.

And so overall that also limited the analysis to -- for example, a case series became much less relevant; right?  The absence of a control group is less relevant.  Sometimes, like, certain selected groups of patients who were referred for something, I can anticipate that there's going to be some selective bias involved.  And so I did not place as much attention to those.

So it's a process of just trying to identify the studies that hopefully were high with respect to rigor, statistical approach, design approaches, and analytic methods in such a way that we could get towards, quote-unquote, like, more truth with respect to the association.

Q.  And we're going to get into your methodology a little bit later, but --

A.  Yeah.

Q.    -- when you -- you used the word "rigor" twice.

What do you mean by "rigor"?

A.    So rigor is -- when I say "rigor," the opposite of rigor is this being prone to bias.  So being -- so essentially it's an approach in which you have considered the factors that can lead to bias, trying to minimize bias, and then in so doing provide a measure of association that's more likely to be true.

Q.    Now, in your materials considered list, there is a list of documents that were produced by my client, Novo Nordisk.

What documents produced by Novo Nordisk in this litigation did you consider in issuing your opinion?

A.    So I am not aware of which ones were from Novo Nordisk.  I just looked through the documents.

And so I -- I can't say that I know which one exactly is from Novo Nordisk.  I just read -- I just went through them and searched for -- yeah, I just went through the documents.

So I -- I don't know exactly which one is which by Eli or Novo Nordisk.

Q.    What do you mean you just went through the

documents?

A.   Like, I read through the document.  I -- I guess I -- I don't -- so at this time, I'm much more familiar about which drug is made by Novo Nordisk.

Q.   M-hm.

A.   But when I was going through it, I just read through, "Okay.  This is a trial of this drug."  And I looked at the drug.

So I'm not familiar with which one is Novo Nordisk material.

Q.   Okay.  So at the time you reviewed those documents, you weren't sure if it was a Novo Nordisk drug or an Eli Lilly drug?

A.   Exactly.

Q.   And once you determined which drugs were created by Novo Nordisk or Eli Lilly, did you go back and review those materials?

A.   I did not do it in the -- in that way.

Q.   Can you give me an approximate amount of time you spent reviewing the documents that were produced by Novo Nordisk and Eli Lilly?

A.   So -- so these were -- so -- and I'm not sure exactly which ones were the ones that were produced.  I assumed these were the study-related documents that are more likely to be confidential

Ma Sansouk, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

and not the ones that are in the public domain.

And so of those, I probably spent eight hours or so.

Q.   On the entire universe?

A.   No.  This is the -- the documents related to the trial data.

Q.   Okay.  So -- but eight hours on the entire universe of the trial data?

A.   That's correct.

Q.   And the trial data is what you were referring to when you said "study-related documents"?

A.   Yes.

Q.   Do you know how many pages, approximately, were in that -- in those trial-related data?

A.   There were a lot.  I -- I don't know. There were, like, hundreds in some of the files. Maybe even a thousand.

Q.   And did you rely on any of those trial-related documents in issuing your opinion in this case?

A.   I remember I went through searching for keywords and I recall -- and I include in my report one of the studies that had treatment-emergent adverse events that I did not see in one of the

other papers or reported in the clinical trials that were -- which I included in the report.

Q. And that was a public study, though, that you included in your report?

A. That's correct.

Q. And the keywords that you used to search the clinical trial data, do you recall those words?

A. I looked for gastroparesis, delayed gastric emptying, impaired gastric emptying. Those were probably the standard terms that I had used.

And then if I found something related to that, I might have used another term. But my recollection that it was those terms.

Q. And you did not include any of these clinical trial studies in -- within the confines of your expert report; correct?

A. I did not individually describe those individual trials. There's, like, another term "hypomotility," outlet obstruction.

Q. And those are other terms you used to search the clinical trial data?

A. Yes.

Q. And after searching for these terms, there were -- there were no clinical trial studies that you decided to include within your expert report?

A.   I mentioned one of them in the context of the Chiang meta-analysis.  And that was the REWIND trial where there was additional treatment-emergent adverse events.

Q.   And that's the only trial that you mentioned in your report?

A.   That was the only one I mentioned.  I recall seeing, my recollection was, another one where there was several other cases of delayed gastric emptying that was a little higher, but it wasn't as high as that one.  That one was -- my recollection was, like, 17 and 6.  That was in the intervention versus control arm.

Q.   And the other one that you're referencing that's not the REWIND trial, do you recall what trial that was?

A.   I don't remember which one, but it was on the order of probably under -- it was, like, five cases.

Q.   And do you remember how many participants were in that trial?

A.   I do not.

Q.   So if we could turn back to Exhibit 1.  And if you could put your copies of the report to the side and use the exhibit that I gave you, that would

be great.

A.    Okay.

Q.    Sorry.  If you could just put those documents to the side.

I want to turn to page 3 of your expert report under the section titled "Request and Analysis."

A.    I see it.

Q.    Perfect.

The first sentence states (as read):

"I was asked to conduct a search for and review the published medical literature in order to evaluate whether there is an association between the use of glucag- -- I'm going to mispronounce that word -- GLP-1 receptor agonist medications and development of gastroparesis.  And, if so, to provide my opinion as to the strength of the association."

Do you see that?

A.    I do see it.

Q.    Is this an issue you considered prior to being retained in this case?

A.    I considered it.

Q.   When did you consider this issue?

A.   Just when I saw patients.

Q.   And we'll get into that a little bit later.

Have you ever published any papers or research articles on this topic?

A.   Not on gastroparesis or GLP-1.

Q.   Have you ever written anywhere outside of this litigation on this topic?

A.   I have not.

Q.   Have you ever presented on this topic?

A.   I have not.

Q.   Now, if you stay on page 3 and going on to page 4, it states (as read):

          "I was not asked to evaluate
          causation through a review of all
          available, relevant evidence but only
          where -- whether there is an
          association."

Do you see that?

A.   I do see it.

Q.   You are not offering an opinion on whether GLP-1 RA medications can cause the development of gastroparesis in this litigation; correct?

A.   That is correct.

Q.   And if you're called on to testify in front

of the Court at the hearing in September, you are not going to offer an opinion on whether GLP-1 RA medications can cause the development of gastroparesis; correct?

A.    That is correct.

Q.    You are only going to offer an opinion on whether there is an association?

A.    That is correct.

Q.    Why are you only opining on association?

A.    That's what I was asked to do, and I was requested of that from the legal team.  And I also understand there's quite a lot of work even with the assessment of association.

Q.    What do you mean you understand there's quite a lot of work even with the assessment of association?

A.    Just -- just with the search of the literature, just going through this whole process.  There was a good amount of work to do to go through all the studies.

Q.    Can you explain to me the distinction between association and causation?

A.    A -- well, an association is typically correlative.  It may more likely not be in the context of a randomized controlled trial.  So you're

Ma Sonsouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

using observational data, and you're trying to infer based off of that observational data whether or not there's a linkage between the exposure or the predictor and the outcome.

A causation study is typically in the context of a randomized controlled trial where you have balanced groups from the outset. And then the only factor that's different is the exposure or the intervention, you know, and you're assessing the differences and the outcomes in that setting.

Q. And in the context of the review you conducted here, you did not review any randomized control study balance groups that you just described that would support causation?

A. I evaluated the meta-analyses that were provided through the -- the search. And then based off of that, I went into individual studies.

Q. You mentioned other work that would need to be done for causation.

What other work would need to be done for an -- for a determination that there's causation?

A. For causation analysis, you would be looking at the clinical trial data. You would look at the -- I would say probably weigh heavily on the clinical trial data in terms of the outcomes, and

then -- yeah.

Q. And you reviewed the clinical trial data in connection with issuing your opinion in this case; correct?

A. I reviewed some of them, yes.

Q. Now, in that sentence, you state that you did not conduct a review of all available, relevant evidence to issue a causation opinion.

What other evidence would you need to review to issue an opinion on causation?

MR. PENNOCK: I'm just going to object. I mean, this is beyond the scope. He's not offering an opinion on causation. He told you that, and he said it in his report. I don't know why we're going down this -- this track.

BY MR. GISMONDI:

Q. It's in your report that there's other available relevant evidence.

What other available relevant evidence would you have to consider?

A. I would assume that there may be more evidence from the clinical trial data that I am -- yeah.

I have the published literature that I looked at. There was the meta-analysis that I

looked at.  That's what I have in terms of the -- you know, the available clinical trial data and then whatever that was provided to me from the legal team.

Q.   And when you say you assumed there may be more evidence from the clinical trial data, you don't know one way or the other?

A.   I don't know.

Q.   Are you capable, based on your background particularly in epidemiology, to offer an opinion on causation?

A.   I would be capable of doing so.

Q.   Now, I want to jump ahead to page 20 of your report under the section entitled "Conclusion."

And underneath that you restate the requested analysis from what we just looked at; right?

A.   Yes.

Q.   And then you state (as read):

"I conducted a review of the studies
consistent with the method I set forth
above."

Do you see that?

A.   Yes.

Q.   And we're going to get into your

methodology in more detail a little bit later, but if you briefly take a look at page 4 to 5 of your report, and the section's "Method for Review of Studies and Search Methodology."

A.   Yes.

Q.   This is the method you are describing on page 20; correct?

A.   That is correct.

Q.   Now, the review of the studies you're describing, does that include both the studies listed on your materials considered list as well as the studies referenced in your report?

A.   Yes, it does.

Q.   And turning back to page 20, you state (as read):

> "Based upon this review, the
> following is my opinion:  There is real
> association between GLP-1 RA use and
> increased risk of drug-related
> gastroparesis supported by mechanism and
> convergent observational evidence, but
> the exact magnitude of that risk is
> uncertain due to residual confounding,
> detection bias, and outcome
> misclassification that cannot be fully

addressed."

Do you see that?

A.    Yes, I do.

Q.    Now, your opinion is that GLP-1 RA is associated with drug-related gastroparesis; correct?

A.    That's correct.

Q.    Is drug-related gastroparesis the same as drug-induced gastroparesis?

A.    I use the term "drug-related" because it's association.  But drug-induced is more in the context of causation.

Based off the evidence, I do think that it is quite similar in this context when I use that, drug-related gastroparesis versus drug-induced gastroparesis.

Q.    Now, when you say "drug-related because it's association," what do you mean?

A.    Because the studies that I used were observational.  They were studies with measures of association, but not in the context of a clinical trial and an interventional trial.

But even with that, you know, there are design strategies in which you try to mimic, you know, a clinical trial even in observational studies.

And so the more that you are grounded by that, you -- it lends itself more towards that causation piece.  But we tend to rely on clinical trials for -- for causation, you know, assertions.

Q.  And you can't rely on simply observational literature for a causation opinion; correct?

A.  You could in some instances if it's -- you're looking for the totality of evidence and the strength of evidence to say whether or not this has clearly enough considered all the other confounders and other, you know, coincidental factors that could have explained the association.  And once you've adjusted for all those things or accounted for all those things, then it becomes -- you feel very confident that it's causation.

Q.  But you can't do that here; correct?

A.  I was asked to do association.

Q.  And you cannot use the observational literature that you reviewed here to determine causation; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I -- I would say that the totality of the document here lends itself strongly to that assertion that there is a causation.

But, again, you know, this is observational

studies.  The -- the focus is to identify whether or not there's a consistency in the association and whether or not there were any other issues that could have explained away the association.  And based off of many of these studies, the association persists.

BY MR. GISMONDI:

Q.   But it's still an association; right?

A.   That's correct.

Q.   Now, the requested analysis that we've discussed, i.e., whether there was an association between the use of GLP-1 medications and development of gastroparesis, that was not limited to the question of drug-related gastroparesis; correct?

A.   Can you ask that question again?

Q.   Sure.

If you look at the requested analysis, it says you were asked to evaluate whether there was an association between the use of GLP-1 medications and development of gastroparesis; right?

A.   That's correct.

Q.   And so you're not qualifying that by drug-related gastroparesis; correct?

A.   No, I'm not.

Q.   But in your conclusion, you are qualifying

the association by "drug-related"; correct?

A.    I'm not sure I understand the difference or the -- the nuance.

Can you ask it another way?

Q.    Sure.

We talked earlier about how there --

A.    Sorry about that.

Q.    No, no.

A.    Yeah.

Q.    No worries.  If there's ever --

A.    Yeah.

Q.    Going back to the ground rules, if there's ever any time you need clarification, please just let me know.  I'm happy to -- there's no trick questions here.

So we talked earlier about how there's drug-related gastroparesis and then there's other forms of chronic gastroparesis; correct?

A.    That's correct.

Q.    And my question is simply, when you were asked to evaluate the association, you were reviewing gastroparesis more broadly than drug-related; correct?

A.    That's correct.

Q.    And your conclusion is that there's an

association with drug-related gastroparesis?

A.    Exactly.

Q.    There was not an association between other forms of gastroparesis and GLP-1 use in the literature that you reviewed?

A.    I am not able to tease that apart.

Q.    Okay.  Now, looking at page 20 again --

A.    Yeah.

Q.    -- you state that the association between GLP-1 RA use and increased risk of drug-related gastroparesis are supported by mechanistic evidence; correct?

A.    That is correct.

Q.    What mechanistic evidence are you referring to?

A.    The mechanistic evidence is that performed by gastric emptying studies largely.

Q.    And in your opinion, the mechanism of action by which GLP-1 RA medications would result in drug-related gastroparesis in a user is by causing delayed gastric -- the emptying by binding to GLP-1 receptors; correct?

A.    That is correct.

Q.    And if you actually turn quickly to page 6 of your report, under "Mechanistic Studies," you say

(as read):

"Mechanistic studies have demonstrated that GLP-1 RA delays gastric emptying, which have been acknowledged in product labels."

Do you see that?

A.    Yes.

Q.    And then you say (as read):

"As a class, GLP-1 RA binds to the GLP-1 receptor, which are expressed on pancreatic beta cells, central nervous system, cardiac mycocytes [sic] of the" --

A.    "Myocytes."

Q.    (As read):

-- "myocytes of the" --

A.    "Sinoatrial node."

Q.    Thank you.

(As read):

-- "smooth muscle of the stomach and" --

A.    "Arterioles."

Q.    (As read):

-- "gastrointestinal and enteroendocrine cells and enteric nervous

                    system as well as vagal and dorsal root

                    ganglia."

          Do you see that?

     A.   I do.

     Q.   And now, before we break that down a little

bit, does drug-related gastroparesis differ from

drug-induced delayed gastric emptying?

          MR. PENNOCK:  Objection.

          THE WITNESS:  Drug-related gastroparesis

and drug-induced delayed gastric emptying, the

distinction between those two?

          BY MR. GISMONDI:

     Q.   M-hm.

     A.   So drug-induced delayed gastric emptying

does not necessarily lead to drug-related

gastroparesis, like a delay doesn't necessarily

result in gastroparesis.

          So they aren't the same.  Gastroparesis is

like a clinical syndrome in symptoms, whereas the

other one, delayed gastric emptying, is a

measurement or potentially, depending on the context

of its use, can be implied to be gastroparesis, but

it can also be a quantitative measure.

     Q.   Prior to preparing your report, did you do

a comprehensive review of the literature addressing

the mechanism of action of GLP-1 RA medicines in the body?

A.   I did not.

Q.   Did you do a comprehensive review of the literature regarding the location of GLP-1 receptors in the body?

A.   I searched the literature.  I looked at summaries.  But I did not look at the basic studies that tried to describe all the different locations. I did not go to the individual studies in terms of the source data, but I looked at more of review of what's been described about the location and the receptors on different cells.

Q.   Why is the location of the receptors important?

A.   The receptors are important because they may have different effects in different places.

Q.   And what kind of different effects could they have in different places?

A.   That is something that I don't believe I have enough expertise to be able to describe that, you know, in its totality.  In different organs, it may have different effects.

Q.   Did you do a comprehensive review of the literature regarding the manner in which GLP-1 RA

medications can contribute to GI symptoms, such as nausea and vomiting?

A.    I did not do a comprehensive measure of health or assessment of exactly how that occurs.

Q.    Do you have an understanding as to the degree to which GI symptoms, such as nausea and vomiting, result from the central effects of GLP-1 RA medications on the brain?

A.    I have read that that has been implicated. I cannot tell you what -- what's the contribution of the central effects versus the gastrointestinal effects.

Q.    Meaning you don't know the degree to which GI symptoms are caused by the effects on the brain versus delayed gastric emptying effects?

A.    Yes.

Q.    And you agree that the effects of GLP-1 RA medications on gastro motility are dependent on the interaction between the medication's molecule and the GLP-1 receptor; correct?

A.    That is correct.

Q.    Are you aware of any reliable evidence of nonreceptor-mediated effects of GLP-1 RAs on gastric motility?

A.    I am not aware.

Q.   You're not aware of any other mechanism by which GLP-1 RA medications can delay gastric emptying?

A.   That is correct.

Q.   And if the medication is no longer in the system, it is no longer able to bind to GLP-1 receptors; correct?

A.   That is correct.

Q.   And any impact caused by GLP-1 RA medications on gastric emptying should resolve once the medication is discontinued and washed out of the user's system; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  I don't know if I can say that.

BY MR. GISMONDI:

Q.   Why don't you know if you can say that?

A.   A drug may have durable effects on a receptor or the receptor may change or the cellular response to a drug may change over time.  These are things that you -- would be speculative on my part.

Q.   It would be speculative on your part to determine that there was a durable effect on the receptor; correct?

A.   Right.  That is correct.

So it would be speculative either way.  I don't have the evidence or the data to say that one way is true or the other.

Q.   It would be fair to say that there is no evidence that GLP-1 RA medications have durable effects on the GLP-1 receptor; correct?

A.   I am not aware of that evidence.

Q.   And you'd agree there is no evidence to support a claim that gastroparesis was caused by a GLP-1 RA medication if it develops or continues six months after the discontinuation of the medication; correct?

A.   I am not aware of that evidence.

Q.   You also reference "convergent" -- turning back to page 20 --

A.   Yep.

Q.   -- of your expert report.

You also reference "convergent observational evidence."

What is convergent observational evidence?

A.   So convergent, what I mean by that is I looked at the association and the description of GLP-1 and gastroparesis through different lens.  One is, for example, the delay in gastric emptying.  Does that occur?

I look at when gastroparesis is not reported, what is the likelihood or the proportion of the individuals who are having symptoms that might be similar to that?  It could be nausea, vomiting, reflux disease, abnormality in constipation or diarrhea.  These are all related to motility issues.

And I looked at the -- these observational studies in which there are comparison groups of people who are exposed and not exposed to GLP-1s.  I looked at the clinical guidelines in terms of this perception of whether or not there's delayed gastric emptying and does that manifest itself as gastroparesis.

There's also -- as a gastroenterologist, we consider issues related to retained gastric or food content, you know, at the time of endoscopy.

So these are the studies that are out there that pertain to this topic.  And that's what I meant by "convergent information."

Q.   And you referenced the symptoms like nausea vomiting, reflux disease, diarrhea.

As we discussed earlier, you don't know the degree to which those symptoms are caused by impact on gastric motility as compared to the medication's

impact on the brain; correct?

A.    That -- that is correct.

Q.    And you were unable to, as a result, account for how that difference should be reflected in your conclusions; correct?

A.    As in I am not able to say the contribution from the brain was larger or smaller than the contribution from the gastrointestinal tract with respect to the effect of the drug on the GLP-1 receptor, yes, I cannot say that.

Q.    And on the contribution to causing those symptoms, correct, or being associated with those symptoms?

A.    Right.  As in I am not aware of the pathway by which the drug is mediating the effects on the clinical outcomes of nausea/vomiting, whether it's through the CNS or through the gastrointestinal tract.

Q.    And in this paragraph you talked about the convergent observational evidence and mechanistic evidence, but I don't see any reference to clinical trials or meta-analysis; is that right?

A.    The convergent -- oh, when I responded to you?

Q.    Yes.

A.    No.  I -- I meant to include that as well.

Q.    Okay.

A.    I -- yeah.  Essentially, that convergent -- that term, "convergent," was a reflection of the content of the report, which it also included the meta-analysis of the clinical trials.

Q.    Okay.  And we'll get into those in a little bit.

But sticking with page 20, you note that (as read):

"The exact magnitude of the risk is uncertain due to residual confounding detection bias and outcome misclassification that cannot be fully addressed."

Correct?

A.    That is correct.

Q.    What are you referring to by the "exact magnitude of the risk"?

A.    Yeah.  So -- so when we look at measures of association, there is -- one component is this confidence that there is an association.  That may be a statistical confidence, like what they call a "p-value" or "95 percent confidence interval" that supports the measure of association.

The measure of association can be a risk ratio, a odds ratio, a hazards ratio that links the exposure, GLP-1, to gastroparesis.

The magnitude, then, is what is that value, that -- that centered value?  Like, is this risk ratio 2, 1.5, 3-fold, 4, 5, 6, 10?  That is difficult to ascertain based off of the available evidence.

And in part what I meant by this is that, depending on your control group, let's say you're doing this study in patients who have diabetes, the risk between the association of GLP-1 and gastroparesis may look different from when it's applied in people who have obesity or if in some studies they looked and compared GLP-1 versus another antidiabetic drug in people who have diabetes.  And now when you look at that measure of association, it's not between the -- the drug and usual care, it's against another agent.

So then it becomes even more difficult to tease apart.  But yet the association, whether or not it exists, is one thing and then the strength of the -- or the magnitude is a different factor.

Q.    M-hm.

So I guess to summarize, what you're saying

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

here is that you can't say whether or not there is a relative risk ratio of 1.5, for instance, in a GLP-1 user compared to a non-GLP-1 user of developing gastroparesis?

A.    I cannot say if the exact value is 1.5, 2, 2.5.  And, yeah, I cannot say exactly where that number is.

Q.    When you're referring to "residual confounding that cannot be fully addressed," what are -- what do you mean?

A.    Yeah.  I -- I mean, this is a difficult issue that we deal with in the context of, you know, observational studies.  We know that there are factors that are not adequately captured in clinical data or in clinical records.

And so some of these things, for example, structured data, things that are inputted by clicks and things like that, are easily captured.  And things that are for billing purposes tend to be captured well in our clinical data systems.

But, for example, if a patient has had many years of diabetes, the number of years doesn't really get coded in the system.  And so we only know "Oh, this patient has diabetes."  And we may not -- so someone who has diabetes, who's had it for

ten years, may look exactly the same as someone who has diabetes for one year when we are extracting data from the clinical records.

But clinically, they may be different.  And how do we account for that?

It's not so straightforward to be able to account for that.  People try to do it, perhaps looking at other factors.  For example, hemoglobin A1C, number of drugs, how long they've been in the system, prior diagnoses.

So there are ways to try to account for it, but there's often times -- if it's not a randomized controlled study, these are some of the limitations that we end up dealing with.

THE VIDEOGRAPHER:  Sorry to interrupt.

Your mic is rubbing just a little bit.  If you could move it to your lapel on the outside, that will avoid that.

THE WITNESS:  Yeah.  Sorry about that.

BY MR. GISMONDI:

Q.    And as a result of those limitations, you're unable to ascertain the magnitude of the risk?

A.    That is correct.

Q.    And when you talk about -- and so you

cannot tell us to a reasonable degree of medical and epidemiological certainty the magnitude by which residual confounding is affecting the association; correct?

A.    What we can typically say is that the major factors that we believe are really important in studies that can contaminate or bias the result were largely accounted for, but then what you are left with are these probably less meaningful factors that you cannot fully account for.

And so what you are left with is still some confidence in the measure of association, but that the magnitude may not be right.

Q.    Is the duration of diabetes a less meaningful factor when it comes to the development of gastroparesis?

A.    It's a valuable factor.

Q.    When you're referring -- what are you referring to when you say, "There is detection bias that cannot be fully addressed"?

A.    Yeah.  So detection bias.

So when we care for patients, sometimes -- I'll just GI you a couple of different examples of what might happen.

A patient may, for example, start on the

GLP-1, and they might have some symptoms of nausea, vomiting, and they don't tolerate it so well.  If they kept on the medication, they might have then a diagnosis of gastroparesis.  But the provider might say, "You know, you're not feeling well with this drug.  Let's just stop it."  And then the symptoms may go away, and then it never manifests itself as a signal, right, as a gastroparesis event.

They were exposed.  They had some symptoms.  And then the event never occurs.

And so there's a bit of a detection bias because now you're underestimating the -- the exposure and the association.

But that would be one.

In other cases, for example, someone might have symptoms.  They come to your attention.  And you may end up saying, "Well, you know, I -- we don't have a gastric emptying study."  Some hospitals don't have it.  "And so we're just going to automatically treat you as if you have gastroparesis, but we're not going to do the test.  But we think you have possibly gastroparesis.  And so we'll just take care of you as such."

But that might not get coded in the system as gastroparesis.  And so that could be an

underestimation in terms of what we call -- did I say misclassification or outcome?

Q.    You --

A.    Detection bias.  Yeah.

Q.    And so let's break that down a little.

They also could code it as gastroparesis without that?

A.    That's correct.

Q.    So it could also overestimate the diagnosis of gastroparesis?

A.    It could.

Q.    And with GLP-1 RA medications, it's described on the label and it's well-known that it causes delayed gastric emptying; correct?

A.    I am actually not fully aware of the details of what's -- I -- I know that they -- they have some comment about delayed gastric emptying. And I mention that in my -- the beginning of my report, but I don't know -- I don't recall exactly what -- what's the term on the label.

Q.    It's well-known in the medical community that a potential effect of a GLP-1 RA medication is delayed gastric emptying?

A.    I -- I don't know if everyone is aware of -- of that.  I do think that many people have

become aware that patients need a ramp-up phase because some of them don't tolerate it initially with some symptoms of nausea or vomiting.

I am not so certain that they would say, "Oh, yeah, it's because of a delayed gastric emptying."

Q.   I think we're getting confused here.

A.   Yeah.

Q.   I just mean that one of the known, intended effects of the medication is to delay gastric emptying, correct, putting aside the symptoms?

A.   Yes.

Q.   Okay.  And the symptoms are also something that's well-known; right?

A.   The nausea and the vomiting.

Q.   And someone who's taking a GLP-1 RA medication and is experiencing nausea may be more likely to seek medical treatment than someone who is not taking a GLP-1 medication for nausea; correct?

A.   I am -- I am not sure if they would seek treatment, and that maybe if they expect it, they might just say, "Okay, I have to get through it."

So I'm not sure if they would go seek treatment for it versus just saying, "This is one of the side effects of it."

Q.   Is it possible that they could seek treatment?

A.   It is possible.

Q.   And is that a form of potential detection bias?

A.   So it -- I -- I'm not sure if it would be a detection bias.  But if someone has, let's say -- and what I'm specifying here is with respect to the term "gastroparesis."

Q.   M-hm.

A.   Right?  A detection bias for gastroparesis.

If they -- and what I'll say is that on the clinical side, a provider does not want to use the term "gastroparesis" unless they perceive that the patient's symptoms are durable and persistent.

So if someone has nausea and vomiting, they may just call it "nausea/vomiting."  And they may not give you -- or give the patient a diagnosis of gastroparesis, which as a problem is -- would be perceived of as, like, this is a durable diagnosis.

Q.   In the observational literature that you reviewed, did they discuss the persistence of symptoms prior to the diagnosis of gastroparesis?

A.   They do not.  They -- so in many of the studies, they look at coding.

Q.   M-hm.

A.   So diagnosis codes.  And those diagnosis codes, they do not have any linkage in terms of what was happening prior to that diagnosis code, for example.

Q.   M-hm.

And you would have no way of knowing in reviewing that literature what was happening prior to that diagnosis code?

A.   That's correct.

MR. GISMONDI:  Now might be a good time for a quick break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record at 10:10 a.m.

(Recess taken from 10:10 to 10:28.)

THE VIDEOGRAPHER:  We are back on the record at 10:28 a.m.

BY MR. GISMONDI:

Q.   Now, Dr. Somsouk, did you review any other expert reports in this case?

A.   I did not.

Q.   So you did not review the expert report of Dr. Linda Nguyen?

A.   I did not.

Q.    Are you familiar with Dr. Linda Nguyen?

A.    Yeah, I know Dr. Linda Nguyen.

Q.    And you have a high opinion of Dr. Linda Nguyen?

A.    Yes.

Q.    She's one of the leading experts in the gastroparesis field?

A.    I am not aware if she's, like, a lead.  But I know she is certainly -- I would say she is.  She recently moved from Stanford down to Hoag.

Q.    M-hm.

A.    Yeah.

Q.    And are you familiar with Dr. David Metz?

A.    I am familiar.

Q.    And is he considered a leader in the field of gastroparesis?

A.    I am not -- I am not familiar with that.

Q.    Now, we were talking before about some of the different detection bias and confounders.

What are some of the confounders or bias that you noticed in the observational literature that you reviewed that might tend towards a finding of an -- a positive association?

A.    That might tend towards a finding of positive association.

So I would imagine that if -- let's say someone was more likely to be ill; okay?  Meaning, let's say, they need their diabetes to be better controlled.  Maybe they are more likely to be out of options of various meds.

So if those are selectively given a GLP-1, then they may be more likely to have gastroparesis.

Q.   How about gender?

A.   Gender?

So women tend to have a higher event risk profile associated with GLP-1, adverse event.  Yeah.

Q.   And is that something that should be controlled for?

A.   Yes.

Q.   And what about COVID-19?

A.   COVID-19 is a factor that could -- just like any sort of viral illness or any sort of illness, can lead someone to have symptoms of nausea, vomiting, and discomfort.  But I don't anticipate that being a cause of -- let's say a diagnosis of gastroparesis.

You may get more nausea/vomiting, but the question is, do you then have ongoing symptoms to the degree that you would get a diagnosis of gastroparesis?

But to the extent that could be accounted for, that would be reasonable to ensure that it was balanced between groups.

Q.   Are you aware of the literature that has associated COVID-19 with the development of gastroparesis?

A.   I have been involved with some long COVID work, and there has been some association.  But I am not familiar with the strength of the association and whether or not it is, like, a true association.

Q.   Do you know if any of the observational studies that you reviewed accounted for COVID-19 in the subjects?

A.   I am not aware.

Q.   So those were the confounding.

Do you have any examples of bias that might tend towards the positive association?

A.   I put that in a similar category, like, the confounding and the bias.

Q.   M-hm.

A.   The confounders, if left unchecked, would result in bias.

Q.   And how about outcome misclassification? How could that tends -- tend towards the bias?

A.   So how would it more likely increase the

association between the two; right?

Q.    Yes.

A.    Is that what you're --

So if -- so, for example, if, let's say, someone who starts on a GLP-1 were more likely to have recurring visits.  Like, they have access to care.  They have -- they're more likely to seek care.  And then by just the factor of seeking care more frequently, perhaps they get more diagnoses, including gastroparesis.

Q.    And would another example be if they were diagnosed without a gastric emptying study that confirms the gastroparesis?

A.    But that would be more of what we call, like, a nondifferential misclassification.  Like, where in the GLP-1 versus the non-GLP-1, like, that might happen either way --

Q.    M-hm.

A.    -- equally between groups.  Whereas, like, when you were asking me about -- I was giving a potential scenario where --

Q.    M-hm.

A.    -- someone is going to their doctor. They're saying, "I'd like to start on GLP-1" or that "You need to be on a GLP-1," but it's in a group of

patients where they're more likely to seek care. And then they're more likely to say, "Oh, and I have this other problem and this other problem." And then they get the diagnosis of gastroparesis.

So we see this as a -- those who use medical care more are more likely to get more diagnoses. And sometimes that gets accounted for, like, by number of encounters per year --

Q. M-hm.

A. -- lab draws or, you know, being up to date with health maintenance and other measures of -- surrogate measures of engagement with care. So -- and -- and it's one of those things that, yeah, there can be some contamination and bias.

Q. Do you know if any of the observational literature that you reviewed accounted for the number of encounters between the -- the control group and the case group?

A. I -- I don't recall exactly. Some of these propensity matched the propensity scores models and matching. They -- they often consider that, like, number of encounters as a measure of they're involved in the health care system so that you don't get this differential ascertainment of the outcome just because, like, someone goes, like, once every

two years.  You might not likely see some outcome.

So usually they do do that in these.  And in these propensity score match, they usually include a bunch of factors which may have included that, but I can't be sure.

Q.    And when you propensity match by these different factors, it's best practices to report on the different factors that you're matching by?

A.    That -- that is correct.

MR. GISMONDI:  So we'll do this very quickly, but I'm going to mark as Exhibit 4, 5, and 6 a deposition notice that was sent to you, responses and objections, and a invoice statement that we received today.

MR. PENNOCK:  Note my objection.  You characterized the deposition notice as being sent to him.

MR. GISMONDI:  Oh, my apologies.  Sent to counsel.

So this will be 4.  That's the deposition notice.

(Marked for identification purposes, Exhibit 4.)

MR. GISMONDI:  And that will be Exhibit 4.

Then here are the responses.  This will be

Exhibit 5.

(Marked for identification purposes,

Exhibit 5.)

MR. GISMONDI:  And Exhibit 6 will be the statement of compensation that we were provided today.

(Marked for identification purposes,

Exhibit 6.)

BY MR. GISMONDI:

Q.    If you take a quick look at Exhibit 4, have you ever seen this document before?

A.    I have not.

Q.    And did you review documents in advance of this deposition that you provided to counsel to produce to us?

A.    I provided four documents.

Q.    M-hm.

A.    And I was requested five documents, and I found four of them.  And I just passed it along.

Q.    Okay. And you can put that to the side for now.

A.    Okay.

Q.    And have you ever seen Exhibit 5 before, the responses and objections?

A.    I have not.

Q.   You can put that to the side as well.

And the statement of compensation,
Exhibit 6, have you ever seen this before?

A.   Yes, I have.

Q.   And did you prepare this document?

A.   I did not.

Q.   And is this -- does this accurately reflect
the work that you prepared and provided in
connection with this litigation?

A.   Yes, it is.

Q.   And if I understand this correctly, the
February 10th, 2026 date, is that the date that you
issued an invoice?

A.   It's not.

Q.   Okay.  It says (as read):

"Discussions with attorneys and
analysis and report preparation as of
January 1st, 2026."

Do you see that?

A.   Yes, I do.

Q.   So is that amount in connection with the
issuance of your report?

A.   I believe so, but I don't recall exactly
how it was itemized.

Q.   And when it says "Review and analysis of

literature and continued searches," does this include both public data and data that was produced in this litigation that is nonpublic?

A.   Yes, it is.

Q.   And has there been any subsequent amounts that are not accounted for in this document?

A.   Perhaps just the work over the course of this past week in preparation for this.

Q.   Okay.  And do you know about how much the approximate amount would be for that work?

MR. PENNOCK:  You can do it in hour -- in hours is okay.

MR. GISMONDI:  Yeah, that's fine.

THE WITNESS:  Yeah.  At least 12 hours this past week.

BY MR. GISMONDI:

Q.   Okay.  You can put that to the side.

Now, you have a background in epidemiology; correct?

A.   Yes, I have a degree in epidemiology.

Q.   And you also teach courses on epidemiology?

A.   I am involved in the teaching of trainees, and I do not run a course on epidemiology.

Q.   M-hm.

But you do -- in the courses that you do

run, you do teach epidemiology principles?

A.   Yes.

Q.   And what exact training do you have in epidemiology?

A.   So in 2- -- between 2006 and 2008 --

Q.   M-hm.

A.   -- I obtained a degree in epidemiology and statistics.  This was during the time when I was receiving training as a clinical gastroenterology fellow.

Q.   M-hm.

A.   And during that time period while I was at the University of California, San Francisco, I was co-enrolled in a master's training program.

And so I spent those two years doing that during fellowship.

Q.   It's very impressive.

Do you consider yourself an expert in epidemiology and statistics?

A.   I consider myself -- it's maybe -- it's hard to -- I'm not the type to say, like, I'm an expert in something.  But, you know, I think I have sufficient training --

Q.   Yeah.

A.   -- to be able to be critical of the studies

and analytic methods.

Q.   Yeah.   And I got the sense from your report that you are --

A.   Yeah.

Q.   -- you try not -- you try to approach things with humility.

I think that's fair to say; right?

A.   Yes.

Q.   So what -- can you tell us what statistical significance is?

A.   So statistical significance is -- is a quantitative measure of certainty.

And so when you look at this concept of certainty, you're -- you -- it could be as confident as the -- you know, what proportion of people who will vote for Gavin Newsom.  You know, and if you have enough sample, you can say, "I have some confidence of what that's going to look like."

And then there's a different type of certainty, which is now comparisons between groups.

Q.   M-hm.

A.   So besides having one sample of certainty, now you have two samples in which you have some certainty between those two.  And then there's a difference between those two groups, and there's a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

certainty around that as well.

And so statistical significance is essentially like mathematical calculations --

Q.   M-hm.

A.   -- based off of whatever the estimate is, off of the power, our sample size, and then the difference between groups as you have certainty between the two groups.

Q.   You mentioned "power."  What do you mean by "power"?

A.   So power is a -- a reflection of, let's say, analytic approaches that account for size of the population and the difference that is anticipated.

So power includes those two factors:  One is the difference and then the ability to detect that difference.  And the ability to detect that difference is based off of the sample size.

Q.   And a smaller sample size would mean that the study has less power?

A.   It has less power to detect a small difference.

Q.   Or to detect any difference?

A.   To detect a big difference, it might be sufficient, right, because then the worlds are

apart.  You only need a little to say, "Oh, they're clearly different."

Q.    M-hm.

But if it's a small sample size and the difference is small, then it would not have a lot of power?

A.    That is correct.

Q.    And if a study reports a risk ratio of 1.0 but has limited power, what conclusions can you draw based on that study?

A.    So a risk ratio of 1.0 is basically saying that the numerator and the denominator is the -- the same, that there is no increased risk of one way or the other.

And then -- so then there is essentially no significant difference between the groups.

Q.    And if a study reports a nonsignificant risk ratio above 1.0 with limited power, what conclusions can you draw based on that study?

A.    Yeah.  So if it's greater than 1.0 or less than 1.0, then the question is -- there's two things that you consider.

One is the magnitude.  We talked a bit about the magnitude earlier.  So what is that risk ratio?  Is it near 1, or is -- is it significantly

higher than 1?  The higher it is, then that magnitude of association is larger.  And then you would need a smaller sample size to detect that magnitude.

On the other hand, if it's, of course, a lot closer to 1, then you need a larger sample size to detect that difference.

Q.   Because it could be chance that was causing it?

A.   Exactly.

Q.   How is statistical significance assessed?

A.   Statistical significance is assessed -- so I described it earlier as typically used as a p-value --

Q.   M-hm.

A.   -- and a confidence interval.  Those are the standard ways in which people describe statistical significance.  And these are to give you some sense of whether or not the groups are different based off of the study design, the power, whether or not the measure of association demonstrates that the two groups are significantly apart statistically.

Q.   In a published peer-review article, would it ever be appropriate to conclude that an

association is present based on a nonsignificant finding?

A.     The -- so if there is -- there's an association, but it's nonsignificant.  And so how do you interpret the nonsignificant finding?

That's -- my understanding is that that's the question.

Q.     Yes.

A.     Okay.

So if the measure of association is not 1, so it's in one direction, and you see that it's not significant, then the next questions are how -- what is the magnitude of that?

Q.     M-hm.

A.     And what is the confidence?  Even though it's not significant.  Because it's not a binary.

Q.     M-hm.

A.     Like yes/no is significant or not.  But it's also a gradation.

So sometimes, like, we will see -- we say this measure of association, a p-value of, let's say, less than .05, we would say that if you ran this type of study or analysis 20 times, 1 out of 20 times with a p-value of .05, you might accidentally just see this.

If it's .01, then it's like 1 in 100 that this may be a fluke.

Q.   M-hm.

A.   Right?

And so the smaller is less likely to be a fluke.  But if it's .08, which we deem that as not significant, it's still close to only 1 out of 10 times it's a fluke, meaning, like, 90 -- 9 out of 10 times is actually a real finding.

That said, the question is, how do you approach that result?

You could say something along the lines of we see a nominal or we -- you -- we see a tendency towards that, but it's not significant.  And so you just need to interpret it with humility.

Q.   And when you say "interpret it with humility," what do you mean?

A.   It's not to say, "Oh, this is a real association and that we can be confident about it," but that we would say something along the lines of, you know, "We see this trend.  It might need to be looked at again in another study."

Q.   And would -- how would sample size factor into this kind of analysis?

A.   So sample size will give you more certainty

around every estimate.

Q.   M-hm.

A.   So, you know, the confidence will narrow. And so -- and so you're more likely to see statistical differences.

Q.   What is a narrow confidence interval?

A.   What is a narrow -- from the standpoint of a publication, it's like narrow then becomes more likely to find statistical significance.

Q.   M-hm.

Numerically, what would be a narrow confidence interval?

A.   It depends.  In general, I would say that usually people look at p-values.

Q.   M-hm.

A.   And they would say it's, like, less than .05.

Q.   Okay.  And when you have that wide confidence interval, what would you -- what kind of numbers would you see there?

A.   Greater than .05.

Q.   Now, a risk ratio below 1 suggests that an exposure is protective; correct?

A.   It depends on how the relationship is defined, but it's demonstrating that the

relationship is reduced or less likely to happen.

But protective meaning, like, if the -- if, let's say -- is -- it depends on, like, what the outcome is, you know.  And so less than 1 might be bad.

Q.   How could less than 1 might be bad?

A.   Like, if, let's say, for example, we're looking at, let's say, survival, you know, over time.

Q.   M-hm.

A.   And so less than 1 is, like, less likely to survive.

Q.   Okay.  But when you're talking about the development of a medical condition, less than 1 would be a protective effect?

MR. PENNOCK:  Objection.

THE WITNESS:  It -- it's -- it's always about, like, the -- the outcome being measured. Like, for example, pneumonia.

BY MR. GISMONDI:

Q.   M-hm.

A.   If it's less than 1, then you're more likely, potentially, to get pneumonia.

Q.   Can you explain that a little bit?

A.   Like, if the drug has a -- let me make sure

I -- I have it correctly.

So ...

Yeah.  So it depends on, essentially, like, if you're defining it as a good outcome, as the outcome of interest, then, you know, like, for example, the people who aren't going to the hospital or ED visits --

Q.   Okay.

A.   -- like, if you're looking at that as the outcome, then a low value meaning, like, you're actually going to the ED more.

Q.   Okay.  So --

A.   It just depends.

Q.   So basically, if you're looking for a positive outcome, you'd want a risk ratio above 1; and if you're looking at a negative outcome, you'd want a risk ratio below 1?

A.   That's right.

Q.   Okay.  Do you agree that generally researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn?

MR. PENNOCK:  Objection.

THE WITNESS:  That was a lot of things

and -- can you repeat that?

BY MR. GISMONDI:

Q.   Sure.

Do you agree that generally researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn?

MR. PENNOCK:   Objection.

THE WITNESS:   In -- in general, I would say that investigators -- I -- of course, it depends on the measure of association and the finding and the -- you know, how confident they are.   But oftentimes researchers would like replication of their findings somewhere to ensure that this is not just a one-time, you know, observation.

So I would support that statement.

BY MR. GISMONDI:

Q.   Do you agree that rarely, if ever, does a single study persuasively demonstrate a cause-effect relationship?

A.   Rarely.

It depends on the type of study and the type of intervention and the degree and the benefit that you see.   But if you are able to have that type

of study, then you could be confident.

Q.   What is the value of replication?

A.   Replication is to show that it's -- that -- so it's to lend more confidence in whatever the conclusion is.

Q.   And is that something that's important in assessing an association?

A.   Yes.

Q.   And is it also important in -- in assessing causation?

A.   Yes.

Q.   Do you agree that it is important that a study be repeated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists?

A.   Generally it is.

Q.   Do you agree that consistency of the findings of multiple investigations is an important factor in making a judgment about causation?

A.   Yes.

Q.   Do you agree that different studies that examine the same exposure-disease relationship generally should yield qualitatively similar but likely not quantitatively identical results?

MR. PENNOCK:  Objection.

THE WITNESS:  Generally, you would expect it to -- the totality of the evidence to trend in the same way to be more confident with the -- with the finding, yes.

BY MR. GISMONDI:

Q.    Are you familiar with the concept of a hierarchy of scientific evidence?

A.    I have heard of that, yes.

Q.    Is that a concept you apply in your own clinical and research practice?

A.    Yes.

Q.    What is the hierarchy of scientific evidence?

A.    So there are -- there are studies that can be nonclinical trials that are very mechanistic with clear -- clearly defined intervention pathways and then measurable outcomes in which you can prove that something has an effect that's desirable.

We sometimes see this in, for example, the New England Journal of Medicine where people are targeting a specific immune cell against a -- or they are modifying a gene, and then they put it back.  And then you clearly see an -- an effect on that individual.

It's not a clinical trial in -- in the

randomized controlled trial sense of it.  But it is a trial and an intervention in which you demonstrate causality.

And then there are clinical trials in which there is rigor in the balance between the placebo or the comparator group against the intervention group. And then you have -- you follow with high fidelity in -- with respect to the design of measuring the outcome and ascertaining the outcome.

Those are the hierarchy of -- like, that's the studies for causality.

And then beneath that would be observational studies which use much more of these design strategies, epidemiologic design, and analytic tools to try to measure the association.

And then below that -- and even within that, there are cohort studies, case control studies, different types of sampling strategies.

And then you go down towards cross-sectional studies and case series.

Q.    So do you agree with the statement that when ordered from strongest to weakest, a systematic review of randomized trials is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies,

physiological studies, and unsystematic clinical observations?

A.    I think it can be arguable whether or not, I mean -- so meta-analysis, sometimes people say a meta-analysis gets done because the clinical trial did not show enough on its own.

Q.    M-hm.

A.    That's why you need something else to -- to prove it.

So the meta -- meta-analysis lends strength in that way.  But the way it's done sometimes can be flawed depending on the way it's conducted, and there -- are they identifying studies in a way -- or they might be putting together studies that are not at the same level of rigor.

Q.    M-hm.

A.    Then it can pose a problem in that way.

But generally, I would say if you are doing a meta-analysis and you adhere to -- you know, to techniques to reduce bias, then, yes, that could be better than a single clinical trial.

And then, similarly, with the observational study.

Q.    What are the main limitations of observational studies?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    The main limitations are that, from the outset, there are potential issues with assignment of the people that you're studying into the different groups.

So there's potential for selection bias.

Q.    M-hm.

A.    People who are falling into different groups may be in those groups in such a way that it's not random; right?

And so that process is one of the concerns for any observational study.

And then in terms of the sequence of events, like, are -- can the study measure an exposure and an outcome that occurs over time versus it just -- are -- it ends up being coincidental? And so it gets contaminated in that way.

So usually people like to do it in the context of a longitudinal study.  Even though it's looking back in time, you're looking for exposures that occur before the outcome of interest.

And then the other aspect is that the outcome may be biased in whatever way because you are not -- whether it might be missed or maybe people are lost to follow-up.  And so you don't end up seeing the -- either the individual over time or

the outcome over time.

And so those are the main issues:  The selection, the design strategy of capturing things over time, and then the outcome being that the -- whether or not it's collected in -- in a -- with high fidelity.

Q.    What are the studies that you place the most weight on in concluding that there was an association between GLP-1 RA use and drug-related gastroparesis?

MR. PENNOCK:  Objection to form.

THE WITNESS:  I -- I outlined them in the report.  And so we can go over the report, but the first couple that were described in the report describe an association between GLP-1s and gastroparesis with respect to odds ratios and hazards ratios.

And then over the course of the report, also looked at whether or not the drug had a higher risk relative to other co-interventions with respect to events like gastro- -- with respect to gastroparesis as the outcome event.

And then towards the latter part of the report, looked at comparisons between different GLP-1s.

BY MR. GISMONDI:

Q.   And sitting here today, can you -- without looking at your report, can you tell me any of the studies that you place the most weight on in finding that there was an association?

MR. PENNOCK:   I'll object.

Go ahead.

THE WITNESS:   Yeah.   So -- so there is the So- -- Sodhi study.   I forget, like, the authors' names, but they use, like, the TriNetX dataset.

There's another study that used the Merative dataset.

Another one that used the Optum database.

And one that use FarMetrics database.

And so across different datasets, these studies found associations between the exposure and gastroparesis.

BY MR. GISMONDI:

Q.   Do you have any specific criteria that you consider in evaluating the strength of a study?

A.   The -- in my report, I outlined a -- an approach called STROBE.

Q.   M-hm.

A.   And that's just a guidance as to how to approach observational studies.

But in general, you are looking at the exposure. You're looking at the comparator group. You're looking at whether or not there might be bias in the ways that they're compared. You try to look at similarities between those two groups that are being used for comparison, whether or not, you know, it's a study of diabetes patients or obesity, whether or not they excluded diagnoses prior to being included in the study. For example, like, they should exclude, like, GLP -- or a gastroparesis diagnosis, you know, in advance.

And then what you also would like to see are people who are starting on new agents and then the occurrence of events over time.

Q. Do you agree one study quality criteria that should be considered is outcome specificity?

A. Outcome specificity.

You certainly want that outcome to be defined. Is that what is meant, "outcome specificity"?

Q. Yes.

A. Yeah, you want to define the outcome.

Q. And do you also agree that one study quality criteria would be adjustment for confounders?

A.   Yes.

Q.   And would another study criteria be the selection of the comparators?

A.   Yes.

Q.   And would another one be confirming that there was actual exposure to the medication?

A.   Yes.

Q.   And would the study design be another quality criteria you would consider?

A.   Yes.

Q.   And how about generalization to the population?

A.   Yes.

Q.   And then statistical power; is that another quality criteria you would consider?

A.   Yes.

Q.   And did you apply these criteria to your review of the epidemiological literature cited in your report?

A.   Yeah, I attempted to do so.

Q.   And how did you attempt to do so?

A.   Just as I read through the papers, these things are inherently things that I think about as I go through a study.

Q.   And thinking about these criteria, can you

let me know which studies discussed in your report
you would consider it to be of high quality?

A. Yeah. I can -- do you want me to go over
the studies?

Q. We're going to do that in -- in a bit. But
just sitting here today, can you let me know which
ones that you can think of as being high quality?

MR. PENNOCK: So are you directing him not
to look at his report to answer that question?

MR. GISMONDI: Right now. I mean, if he
can't answer it, it's not a memory test, but ...

MR. PENNOCK: I agree.

I'll object to that.

THE WITNESS: Yeah, I -- I remember the
datasets of what they were using and the strategies
in which they were looking at the studies. The
specific authors I don't remember in detail.

BY MR. GISMONDI:

Q. Would you consider the Sodhi study to be
high quality?

A. My recollection was that it was a smaller
study in terms of the semaglutide group. And so
from that standpoint, it was a smaller study. But
it was done with also a -- with -- with rigor.

So I thought that it was a reasonably good

study.

Q.   Would you consider it a high-quality study?

A.   I think that my recollection was that there are -- you know, the -- the groups were different in that study.  So this is looking at, my recollection, obese patients who were receiving different types of therapies.  And there could be some bias involved in the different groups, like, as to how they were assigned.

They didn't have all of the -- it's -- so they were less likely to be able to adjust for the different factors like some of the other studies that use a propensity score matching strategy.  But yet, they were able to find a difference.  And I still thought that it was a solid quality study.

Is it high quality?

I think there were certain limitations of it.

Q.   And one of those limitations being the small sample size?

A.   Smaller sample size.

Q.   And another one being the failure to use propensity matching?

A.   That's my recollection.

Q.   So let's look at page 4 of your expert

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

report.

MR. PREMO-HOPKINS:  He's got -- he's got his marked-up copy in that pile there (indicating), I think, if he wants that copy.

MR. PENNOCK:  Okay.  Yeah.

BY MR. GISMONDI:

Q.  So the -- in the first sentence on page 4, you say -- and this is the methodology you implemented on page 4?

A.  Right.

Q.  And you say that (as read):

"In reviewing the studies, I applied the epidemiological considerations as outlined in the STROBE statement."

Do you see that?

A.  Yes.

Q.  So would it be fair to say that your methodology in this case was to review the studies and apply epidemiological considerations as outlined in the STROBE statement to those studies?

A.  Yes, that's correct.

Q.  Is there anything else that your methodology consisted of?

A.  The STROBE statement is a fairly skeletal approach.

Q.    M-hm.

A.    Like, two observational studies.  And I think it -- it provides more of a guidance as to these are the considerations that you should make when you review an observational study.

I think that some of the other, you know, aspects in terms of weighing, like, the quality of the study is that you look for even additional, like, analytical and -- and design strategies --

Q.    M-hm.

A.    -- that elevates the quality of the observational data.

Q.    And what additional analytical and design strategies elevate the quality of the observational data?

A.    Yeah.  So -- so oftentimes, like, these are propensity matching or -- and -- and, like, I would say -- yeah, you know, exclusion of certain factors that might contaminate, like, the selection process.

And in STROBE, it's more about here are the big principles that should be applied.  But some of these studies use more granular detail in terms of the way they approach their study and analysis.

Q.    And what are the epidemiological considerations outlined in the STROBE statement?

Ma Soulsouk, MD    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

A.    So the STROBE statement, they kind of provide you with, let's say, a checklist of 22 items.  And they say, "You should go about the study and, you know, in your title you should state this.  In the abstract, it should have that."

        And then the things that I would say that as -- in the -- in thinking about the epidemiologic -- epidemiologic considerations of a study, we focus on the -- the design.  And the STROBE does talk about, how are the cohorts designed?  Is it a case cohort study?  Is it a case control study?

        And so it -- it gives a guidance to the authors to specify what those things are.

        And then beyond that, then there are, you know -- were groups considered?  Were subgroups considered?  Were -- was confounding considered?  What were the outcomes?  How was it measured?  Are there losses to follow up?  These are the other concerns.

        And so those things are certainly, like, considered here as I review the studies.

        And then, as I said, in addition, you know, we're also looking at -- we're also anticipating that the cohorts may be different at baseline.  So

how do we try to account for those differences at baseline and adjust for them?

Q.   So what are the epidemiological considerations that were outlined in the STROBE statement that you applied in reviewing the studies in this case?

A.   So the way the studies are designed, the control comparator groups, active control, control for confounding, and then measurement including bias, loss to follow-up, and ascertainment of the outcomes, those were -- yeah.

Q.   And you said that there might be some granular details that you would consider.

What are the more granular details that you considered in evaluating the studies that you reviewed?

A.   So the granular details include the matching of the cohorts; controlling for confounders; exclusion of certain -- in, you know, individuals who have, like, a risk factor; adjustment for things like BMI, hemoglobin A1C. Like, these things that could be linked to the outcome of gastroparesis propensity matching.  Those are a bit more of the granular details here.

Q.   And did you place less weight on studies

that did not include propensity matching?

A.    I -- for -- yeah.  So for the observational studies, I would say that the ones without propensity match, I think may be less -- potentially less rigorous.

Q.    And how did you account for baseline differences in the populations of the observational literature that you reviewed?

A.    So the baseline differences are largely accounted for by these propensity matching.

Q.    Okay.  In the absence of the propensity matching, did you do anything to --

A.    Yeah.

Q.    -- account for the baseline?

A.    So when -- when you do not have propensity matching, then what you are left with is control for -- adjustment for confounding.  So even though the groups are different at baseline, the statistical techniques analyze the groups, you know, accordingly, even though there are differences between groups.  And they can adjust for it in the -- in the models.

And then you -- the other things that people do is subgroup analyses, looking at different groups and see if the -- if there's consistency

across groups.

Q.   Now, if you don't have propensity matching, and let's, for example, say you have four events in one group and three events in the other group, how do you adjust for that confounding through a statistical technique with only one event difference?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  So when the outcome events are small, in the, let's say, observational studies --

BY MR. GISMONDI:

Q.   M-hm.

A.   -- it is -- it is -- I mean, if you're giving me an example, whereas like 3 and 4, it is not possible to statistically adjust for -- for these things.  You look at them in the groups that they are, and you just report it as such.

Q.   I'm going to hand you what I'll mark as Exhibit 7.  And this is what is cited in your report as Footnote 1.  It's the STROBE guideline.

MR. PENNOCK:  Thank you.

MR. GISMONDI:  No problem.

(Marked for identification purposes,

Exhibit 7.)

MR. PENNOCK:  I'm sorry.  Did you say that was Exhibit 6?

MR. GISMONDI:  Exhibit 7.

Exhibit 6 is the invoices.

MR. PENNOCK:  Got it.

THE VIDEOGRAPHER:  And, Counsel, if you don't mind to -- put your mic on.

Thank you.  Thank you.

BY MR. GISMONDI:

Q.    And so what is this document?

A.    So this is a publication of the STROBE document.

So the STROBE stands for Strengthening the Reporting of Observational Studies in Epidemiology. And it is a guidance on how observational data should be conducted -- or how studies should be conducted of observational studies.  And it includes some guidance around items that would be important in this approach.

Q.    Now, is this about reporting of the studies or about guidance in conducting the studies themselves?

A.    It's -- I think as people do observational

studies, it also kind of makes the investigator bear these issues in mind.

Q.    M-hm.

A.    And as they write the paper, they would consider these factors as they write it.

Then for a peer reviewer, when they review a paper that comes their way, these are natural considerations that they would take.

Q.    And do you teach your students about the epidemiological considerations provided for in the STROBE statement?

A.    Yeah.  Yes, I do.

Q.    Have the epidemiological -- you know what, scratch that.

And does STROBE only apply to observational literature?

A.    My understanding is that STROBE is being applied in other settings as well, but this one document is primarily on observational studies.

Q.    Okay.  And if we look at the abstracts, in the second sentence, it says -- on the first page.

A.    Yeah.

Q.    It says (as read):

        "The reporting of observational
        studies is often of insufficient

quality."

What does it mean that observational studies are often of insufficient quality?

A.   When they say "insufficient quality," my interpretation -- so -- so there's one.  Either the way it's disseminated is of low quality.

The other is the way the studies are conducted could be of low quality.

And here, the following sentence, it says "poor reporting."  So there -- it sounds like it's alluding to the way it's being described or disseminated.

Q.   M-hm.

And what do you mean when you distinguish between how it's disseminated versus how it's conducted?

A.   How it's conducted is, you know, basically when a study is conducted and it is predisposed to bias.

Q.   Okay.  And when it's disseminated, that's how it's reported?

A.   Yes.

Q.   And if it's disseminated poorly, then you're unable to understand what actually happened in that study?

Marsonouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    That's correct.

Q.    And so that second -- that next sentence that you just referred to "Poor reporting hampers the assessment of the strengths and weaknesses of a study and the generalizability of its results," what does that mean?

A.    That -- my interpretation is that the study is not reporting clearly on the methods, the analytical techniques, and the issues that would allow it to be replicated.

And so that's one aspect.

And then it also may not lend itself as much confidence in terms of how it's generalized. Yeah.

Q.    And what is the problem with the inability to allow replication?

A.    If -- so a -- sometimes a study may end up having a different combination of, let's say, confounders that were adjusted for or the way the outcome is measured.  And so even though you are stating the same term, "gastroparesis," you may not be measuring it the exact same way or adjusting for the issues in the same way.

Q.    And when you say that it may not lend itself as much confidence in terms of how it's

generalized, you're referring to -- generalized to a larger population outside of the study?

A.    That's correct.

Q.    Is there any other way that poor reporting hampers the strengths and weaknesses of a study?

A.    I -- I'm sure I did not describe the universe of how poor studies can be conducted.

Q.    M-hm.

A.    So there's probably other ways.

Q.    In your mind, sitting here today, how --

A.    Yeah.

Q.    -- does poor reporting hamper the strengths and weaknesses of a study?

A.    Yeah.  I -- I think we'll probably just have to go on a case-by-case basis, but these are the major issues.

Q.    What are the major issues?

A.    Selecting -- selection of individuals; the way it's described; the assessment of confounders, how it's applied; propensity score matching; ascertainment of the outcomes.  These things will need to be evaluated, you know, within each study.

Q.    And how does poor reporting hamper the generalizability of a study's results?

A.    And the poor reporting would be that they

did not describe things in sufficient detail or provide enough methodologic detail for it to be critically evaluated or -- or replicated.

Q.   So let's take a look at Section 1.1 on page 2 -- or on 1501, I guess, at the top right-hand corner.

A.   Okay.

Q.   If you look at that first sentence underneath the STROBE Statement, it says (as read):

"Reporting of observational research is often not detailed and clear enough to assess the strengths and weaknesses of an investigation."

Do you see that?

A.   You said on the top right?

Q.   The -- that's 1501.  And then it's the first sentence on the --

A.   Oh, the first --

Q.   Yes.

A.   Oh, the first sentence.  Okay.

Yes, I see it.

Q.   And how are observational studies not detailed and clear enough to assess the strengths and weaknesses of an investigation?

A.   So it's not clear enough when they don't

Ma Semouk, MD  Case 2:24md-03094-KSM   Document 691-39 PROTECTED ORDER  Filed 05/19/26  CONFIDENTIAL PURSUANT TO

present the items that are provided in this checklist.

Q.    That is the checklist that's located in --

A.    In Table 1, yes.

Q.    What needs to be done to ensure that studies are detailed and clear enough to assess their strengths and weaknesses?

A.    So studies should report on these domains, "Title and Abstract," "Introduction," explain, you know, the methods and all the subcomponents of those methods, the results, the components of those results and then how it's interpreted.

Q.    And if you turn to page 1503, there's Box 2.  It states at the top --

A.    Yeah.

Q.    -- (as read):

          "In any case-control study, sensible choices need to be made on whether to use matching of controls to cases and, if so, what variables to match on, the precise method of matching to use, and the appropriate method of statistical analysis."

          Do you see that?

A.    Yes, I do.

Q.   And then in the next sentence, it says (as read):

"Not to match at all may mean that the distribution of some key potential confounders is radically different between cases and controls."

Do you see that?

A.   Yes.

Q.   Should case controls assessing an association between GLP-1 RA medications and gastroparesis match the cohorts?

A.   Matching, again, would lend more strength to the study.  The alternative that you're left with is adjustment and control for confounding.

Q.   And you can't use statistical methods to adjust if the event rate is not significant between the two groups?

A.   Can you repeat that?

Q.   And you can't use statistical methods to adjust if the event rate is -- is -- is de minimus between the two groups?

A.   You -- even if it's very low, you would not even be able to ascertain a difference in the observational study if the event rate is low.

And, you know, just to -- some people,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

like, even in this box --

Q.   M-hm.

A.   -- if you look at the last paragraph -- or in the middle of it, they talk about some of the concerns related to matching.  Like, they talk about overmatching and -- which is potentially a problem.

And so, you know, I think in many of these things, you do just need to review, what's the approach?  How are they matching?  Is it sensible? What are you losing out on when you match or not?

But the alternative when you aren't able to match is that you have differences at baselines, and you adjust for it on the back end -- on the analytic end.

Q.   And not to use foul language, but matching can be a "darned if you do, darned if you don't" situation?

A.   Yeah.  I mean, I think -- I think you -- you -- from an epidemiologic standpoint, there are other ways to adjust when matching doesn't occur. And in some ways, people at times like to see the unmatched data because then they can see how groups are different, who are in different buckets; right?

Once you match it, now you've altered the normal distribution of the individuals.

And so are they supposed to be the same, or are they inherently maybe different?

So these are considerations that people take when they look at the paper and they want to see what are the groups like at baseline.

But the matching is a way in which one would want to control for the exposure to, like, a GLP-1 or to another agent. And you want to try to control for that.

So I -- I understand the benefit of doing it as well.

Q.   M-hm.

And a confounder, like diabetes, for instance, where there's --

A.   Yeah.

Q.   -- a significant risk associated with that and the development of a condition like gastroparesis?

A.   Yeah. And so typically in these studies, you -- for the ones that you really don't want to care about, you match for because you know it's going to contaminate it like diabetes. That you want in both groups. You only want to compare people who have diabetes against each other. People who don't, you don't want to compare it against

those that have diabetes.

So that would be a good reason to match in that setting, or at least to even just exclude the analysis if they do not have diabetes; right?

So everyone has diabetes. So that those are ways in which you, yeah, try to isolate the problem.

Q. And gender would be another good match, given the differences --

A. Yes.

Q. -- in ...

MR. PENNOCK: Hold on. I didn't hear that.

THE WITNESS: Yeah, I -- I -- it would be a good match or, like, adjustment to consider gender. And we had discussed it, that women do have -- they're more likely to have side effects or adverse events related to GLP-1s.

BY MR. GISMONDI:

Q. They're also more likely to develop gastroparesis; correct?

A. That's correct.

Q. And so that would be a reason to match gender?

A. Right. So it's either you match or you adjust for it in such a way that you consider gender

in the analysis.

Q.    And how would you adjust for gender in the analysis without matching?

A.    So in the -- the mathematical models, the way they do it is the gender would be -- like, let's say you have a disproportionate representation of women in one group, and that representation is associated with gastroparesis.

In the model, it would account for that.

And so it would account for that contribution of women in the mathematical model linkage to gastroparesis.  And that would effect, then, your measurement of the GLP-1 with the outcome.

Q.    Why is it difficult to match if there are several risk factors that need to be adjusted for?

A.    Some -- some people do not -- they argue that by not matching, you see more of the natural distribution of the population.  When you match, you are basically controlling what the numbers look like.  That would be the downside of matching.

But in an analysis, you could -- again, you could either match, you could do a control for the confounding and adjustment, or you could do a subgroup analysis in which you're analyzing that

group of -- of patients.

Q.    And at the bottom of the box here, it says (as read):

    "Matching remains most desirable or even necessary when the distributions of the confounder might differ radically between the unmatched comparison groups."

Do you see that?

A.    Yes.

Q.    And diabetes would be an example of a confounder where the matching -- or the unmatched groups might differ radically?

A.    Yes.

Q.    And gender is another example where there might be a radical difference between the unmatched groups?

A.    Yeah.  I would think that people, I think, in almost all the studies that I looked at, they controlled for gender in some way.

Q.    How about length of diabetes?

A.    Yeah, we talked -- I mentioned that earlier on.  The length of diabetes can play a factor.

    People who have longer-duration diabetes may have more disease, but it also depends on how well they controlled it, that is, if someone is --

maintains their hemoglobin A1C constantly, you know, under 7 throughout their lifetime, even though they have diabetes, it may be that they're just living with diabetes rather than experiencing the harm from diabetes.

Q.   And one of the diseases that people who have longer duration of diabetes might have is gastroparesis?

A.   Typically it's longer duration, uncontrolled, high blood sugars, and often then also associated with sometimes other diabetic complications.

Q.   What other diabetic complications?

A.   Some people have, like, retinal disease, retinopathy, kidney disease, cardiovascular disease, neuropathy.  Those are some of the more common ones.

Q.   Now, if you look towards page 1504, there's a box called "Bias."

A.   I see it.

Q.   What is bias?

A.   So systematic deviation of the studies result from the true value.

Q.   And you agree -- so you agree with the statement in this report and -- about what bias is?

A.   Yes.

Q.   And if you look at the second paragraph in the "Bias" box, it says (as read):

"Information bias occurs when systematic differences in the completeness or the accuracy of data lead to differential misclassification of individuals regarding exposures or outcomes."

Do you see that?

A.   Yes.

Q.   In assessing whether there's an association between GLP-1 RA medications and gastroparesis, the outcome would be gastroparesis; correct?

A.   That's correct.

Q.   And studies assessing an association between these medications and gastroparesis would be subject to information bias because gastroparesis might not be appropriately diagnosed; correct?

A.   It could be predisposed bias.  And the -- the type of bias that is concerning is -- you know, and they describe it here -- is differential misclassification.

Q.   M-hm.

A.   Right?

So meaning that one group is being

classified differently from the other group.

How it's -- so, you know -- and -- and so, for example, is the diagnosis of gastroparesis occurring differently in one group versus another group?  Which is different from nondifferential bias -- or nondifferential misclassification where they're being reported in both groups.  They just aren't doing it quite well.

Q.    M-hm.

A.    Like, they're inaccurate in the way they're diagnosing gastroparesis.  But it's occurring equally between groups.  That's a nondifferential misclassification.

And then a differential misclassification is one group is predisposed to diagnosing gastroparesis differently from the other group.

Q.    Is it fair to say that in the vast majority of the literature that you reviewed, there is no description of the basis for the diagnosis of gastroparesis?

MR. PENNOCK:  Objection.

THE WITNESS:  The description for the -- the way gastroparesis is -- is captured is many of these things are based off of ICD-10 codes, so claims codes, diagnosis codes, that exist in the

medical record.  And that is derived from an encounter with a patient who's -- who a clinician attributes the diagnosis.

BY MR. GISMONDI:

Q.  And those studies do not explain how that physician came about with providing that diagnosis; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  They do not.  I mean, the studies are not -- the ones I came across, their goal was not to describe how the provider came to that conclusion or the way the diagnosis is made. They are only capturing when it occurs, when the diagnosis occurs.

BY MR. GISMONDI:

Q.  And the exposure -- looking at this bias sentence that we were looking at before, the exposure that we would be discussing in the context of this case would be whether or not the individual took the GLP-1 RA medication; correct?

A.  That is correct.

Q.  And in the observational literature you relied on, in many of those studies, there's no indication as to whether the subjects actually took the medication; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  That is -- that is correct. The -- the literature -- or in the studies what we see -- and this is what happens in clinical care, is that we prescribe a medicine.  And so the medicine may be picked up, may not be picked up.  If it gets picked up, they might be used, they might not be used.

So whether or not it gets used, you know, is steps away from the order.  But, you know, we use the order as typically the exposure of -- because we can't capture the other factors.

BY MR. GISMONDI:

Q.   And would such a study look at repeated prescription fills or should it look at repeated prescription fills or just the initial order?

MR. PENNOCK:  Objection to form.

THE WITNESS:  I -- you know, I think that if you have a repeated exposure, right -- so repeated prescriptions -- and in some of -- I think there's one that took from a pharmacy database.  So they were able to capture the -- and it might still be exposure to an order versus prescriptions.  But you have different data when you look at filled prescriptions.

CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

So one is the richness of that data is then you would know more about how many individuals or what proportion who started were able to maintain on it and then ascertain the outcome versus someone who has started on it and may have not continued on it.

And so if there was a real association between the two, right, between GLP-1 and gastroparesis, if they stopped and did not keep refilling it, then you wouldn't -- you would be less likely to see the outcome because they stopped the medication. And so they never got the diagnosis if they were truly associated.

And so it is helpful to see it and to see, like, "Well, are people stopping? Did they need to stop? Or did they continue on it?"

Some studies, if they look -- yeah. I'll stop at that.

BY MR. GISMONDI:

Q. If they had an order for the medication --

A. Yeah.

Q. -- and never continued to fill the prescription and then developed the condition later on, that would still be recorded, though; right?

A. Yes, it --

MR. PENNOCK: Objection.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

THE WITNESS:  It could be recorded.

BY MR. GISMONDI:

Q.    If you look two sentences down, there is a -- right after No. 65 on the STROBE statement, Footnote 65, it says (as read):

"Patients receiving a drug that causes nonspecific stomach discomfort" --

A.    Chris, can you -- which?

Q.    1504, Box 3.

A.    Okay.

Q.    And then there's a little No. 65.

A.    Oh, I see it.

Q.    Yeah.

A.    Okay.

Q.    Sorry.

(As read):

"Patients receiving a drug that causes nonspecific stomach discomfort may undergo gastroscopy more often and have more ulcers detected than patients not receiving the drug, even if the drug does not cause more ulcers."

Do you see that?

A.    Yes.

Q.    And you agree that GLP-1 RA medications

cause nonspecific stomach discomfort?

A.   GLP-1s do -- can cause more nonspecific discomfort, yes.

Q.   And is that a way that GLP-1 RA medication or use of it could be subject to detection bias?

A.   I guess the question is, like, would you consider it a bias if, let's say, the discomfort is directly linked to the outcome?

If -- for whatever reason, if it's like an ulcer and you end up getting an ulcer -- more likely to get an ulcer or you're more likely to detect the ulcer because you're getting endoscopy, then, yes. But in this case, is the fact that GLP-1s causes more discomfort, does that automatically lead one to say, "Oh, now you have gastroparesis"?

We don't know that.

Q.   It states below (as read):

"One way to assess detection bias is to measure the intensity of medical surveillance in the different study groups and to adjust for it in the statistical analysis."

A.   Yes.

Q.   And that's one way you could address detection bias?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Yes.

Q.    And then in the paragraph where they discuss selection bias towards the bottom --

A.    Yes, I see it.

Q.    -- if you go about middle of that paragraph after the No. 71, you'll see "Similarly."

A.    Yes.

Q.    It says (as read):

"The use of disease registers may introduce selection bias.  If a possible relationship between an exposure and a disease is known, cases may be more likely to be submitted to a registrar if they have been exposed to the suspected causative agent."

A.    Yes, I see it.

Q.    Can you explain what that means?

A.    So if -- if there's an impression or if there's even an understanding that there is a -- let's say, a general knowledge out there that there is a link between, let's say, G -- you know, GLP-1s and gastro -- or gastroparesis, then when someone sees someone on a GLP-1, they might say, "Oh, we're going to just report this event."

Or let's say it this way:  Like, let's say

if there's more of an understanding that there's nausea/vomiting with GLP-1s and someone were to come get hospitalized, it may be that that provider might say, "Oh, there's -- this might be an adverse drug event reporting, you know, because I've heard of GLP-1s and nausea/vomiting."

So they might report it somewhere, like to the FDA, for example.

Q.   Now, if we go to page 1505, there's a Box 5 called "Confounding."

What is confounding?

A.   So confounding is a -- factors that may be in this -- the way it's described here, confusing the effects of the relationship between the exposure and the outcome.

Q.   Because some other factor is the actual catalyst for that event?

A.   We don't know if it's the actual catalyst, but it may be also a cofactor that is linked to something that is a true factor.

Q.   Now, if you look towards the bottom, it's the last paragraph in this box, it says (as read):

"Taking confounders into account is -- is crucial in observational studies."

Why is that?

A.    Why it's crucial is because in observational studies, you aren't randomly assigning people into their groups.  And so there are inherent differences between groups.  And so those differences may be linked to -- or confusing the relationship between the exposure and the outcome.

Q.    And then it says (as read):

"But reader should not assume that analysises [sic] adjusted for confounders establish the causal part of an association."

Do you see that?

A.    Yes.

Q.    What does that mean?

A.    It's saying that an association -- just because you see a linkage between a -- an exposure and an outcome, it doesn't mean that that exposure, even though it still exists after adjustment, causes the outcome.

It could be something like, let's say, matches and lung cancer.  Just because you have matches, it doesn't mean that the matches cause lung cancer.  But, you know, the people who have cigarettes and smoke is the real factor.  But the

association may still be there, between the matches and the lung cancer, even after adjustment.

Q.   And then it -- it goes on to say (as read):

"Results may still be distorted by residual confounding" --

A.   Right.

Q.   (As read):

-- "the confounding that remains after unsuccessful attempts to control for it, random sampling error, selection bias, and information bias."

What does that mean?

A.   It basically says there's always -- it's always hard to get to the truth of something, and that there's some factors that might be unaccounted for that might actually be the factor that associates or nullifies the relationship between the exposure and the outcome.

Q.   Is that one of the reasons replication is so important?

MR. PENNOCK:  Objection.

THE WITNESS:  Replication, doing studies in different datasets, looking at the problem in different ways, even -- yeah.

So, yes, you want to look at different --

the -- the totality of what's out there.

BY MR. GISMONDI:

Q.    What is "random sampling error" referring to?

A.    Random sampling error.

So sometimes even though you try to, like, keep things random, it's imperfect.  Even in clinical trials, you know, you do a random -- even like coin tosses; right?  Like, you think, oh, it should be 50/50, heads and tails.  You do 10 and it's, you know, 6 and 4.  You do 100, it's like 52 and 48, but it's not perfect.  And sometimes it remains slightly imperfect.

Q.    Now, if we go to page 1510, there's a section "Data Source Measurement for Each Variable of Interest."

A.    1510, at the very top; correct?

Q.    Yes.

A.    Okay.

Q.    And then there's a little explanation.

Do you see that?

It's the -- after Example 2.

A.    I see it.

Q.    And under "Explanation," it says (as read):

"The way in which exposures,

          confounders, and outcomes were measured
          affects the reliability and validity of a
          study."

          Do you see that?

     A.   Yes.

     Q.   And it says (as read):

          "Measurement error and
          misclassification of exposures or
          outcomes can make it more difficult to
          detect cause-effect relationships or may
          produce spurious relationships."

          Do you see that?

     A.   Yes.

     Q.   (As read):

          "An error in measurement of potential
          confounders can increase the risk of
          residual confounding."

     A.   Yes.

     Q.   How does misclassification of outcomes make
it more difficult to detect cause-effect
relationships?

     A.   So it -- it goes back to that -- so
misclassification of the outcome.

          It goes back to the issue of, one, is it
differential versus nondifferential

Massouh, MD   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

misclassification?

Okay. Assuming we're talking about nondifferential misclassification, meaning that whether or not you're on a GLP-1 or you are on a SGLT-2i or another diabetic agent, when, let's say, a provider sees a patient, they will -- through their interaction, they will diagnose gastroparesis in the same way.

It may be inaccurate. That provider might be talking to the patient and the patient says, you know, "Oh, I vomited up undigested food today."

And whether they're on -- you know, is that gastroparesis?

If that happens in a nondifferential way, like, the provider just, like, says, "Oh, okay. That sounds like -- I'm going to code it a gastroparesis," it can happen between both groups. It may be inaccurate. It might be right; it might not be right.

If that happens in such a way where it's not accurate, but it's happening inaccurately in both ways, then you end up not really seeing as much of a difference between the groups because there's noise in both groups.

And so the confidence or the measurement of

that problem becomes more of a wider spectrum of it occurring. And it happens inaccurately in both groups. And then you can't see it.

And so when they say -- this error in measurement can basically reduce -- make it more difficult to detect the relationship.

Q. Staying on page 10 and going to "Study Size," under that "Explanation" section, if you look at the third sentence, it states (as read):

"Small studies" --

And do you see where I am?

I don't want to jump ahead on you.

A. I see No. 10.

Q. Yeah.

A. And then this -- is it in the explanation?

Q. Yes.

A. Okay. Yep. I see it.

Q. And -- okay. And then it says (as read):

"Small studies often provide valuable information, but wide confidence intervals may indicate that they contribute less to current knowledge in comparison with studies providing estimates with narrower confidence intervals."

Do you see that?

A.    Yes, I do.

Q.    How many subjects constitute a small study size?

A.    A small study size is -- it depends on what you're trying to prove, essentially.  But if, let's say, you're trying to prove something that is small, the difference between groups is small, and it's infrequent in terms of the event occurring, then a small study is one that doesn't have enough power to detect those differences.

Q.    And what is a wide confidence interval?

A.    A wide confidence interval can occur kind of -- in kind of two ways.

One is when the outcome is infrequent, then just because the outcome is infrequent, you don't have a great capture of the certainty of that outcome.

And then the other is when the sample size is small, then you're less likely to get that.

So they are linked in some ways.

Q.    And you can have a wide confidence interval even if you don't cross that 1.0 risk ratio; right?

A.    Yes.

Q.    And if you go down a little bit, it says

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

(as read):

> "Small studies that show interesting
> or statistically significant associations
> are published more frequently than small
> studies that do not have significant
> findings.  While these studies may
> provide an early signal in the context of
> discovery, readers should be informed of
> their potential weaknesses."

Do you see that?

A.   Yes.

Q.   And that second sentence, the "While the studies may provide" --

A.   Yeah.

Q.   -- "an early signal," that is referring to small studies that show interesting or statistically significant associations; correct?

A.   That is correct.

Q.   What are the potential weaknesses of small studies showing statistically significant associations?

A.   So the weakness is, one, if you say it's a small study, it means -- the implication is that the power was not very good to be confident in the findings; right?

So that would be the small study.

So it's difficult to be conclusive or have confidence in whatever you're trying to disseminate.

The wide confidence interval, if it's wide but yet the magnitude is large, then you kind of counter the -- the wide confidence interval because of that magnitude.

Does that make sense?

Q.    In a small study, if there's only a small number of events, is that more subject to chance?

A.    If it's small numbers, then, yes.  You have less confidence in the difference between groups.

Q.    If we turn to page 1518, it states under "Discussion" -- it's "2.5, Discussion."

A.    Yep.

Q.    Do you agree that "Discussion" sections are often dominated by incomplete or biased assessments of the studies' results and their implications?

MR. PENNOCK:  Objection.  Form.

THE WITNESS:  That sounds like a loaded statement, "dominated by incomplete and biased -- or biased assessment."

I think that when one writes a discussion, it has to be placing the results in the context of the literature and then describing the limitations

of those observations or results.

BY MR. GISMONDI:

Q.   And if you go to the next page, 1519, and if you look over under Section 20 on the right-hand side -- and it's in the "Explanation" section in that second paragraph, right in the middle.  It says (as read):

"For example, some have argued that relative risks below 2 or 3 should be ignored."

Why do some argue that relative risks below 2 or 3 should be ignored?

MR. PENNOCK:  Objection.  No foundation.  Calls for speculation.

THE WITNESS:  So with a relative risk below 2 and -- 2 or 3, people start to wonder how -- what's the magnitude of the relationship and whether or not that difference between groups is clinically significant.  That's what some may be concerned about.

It doesn't always, you know, mean that -- I mean, I think, again, you have to put everything in context with respect to the totality of the evidence and what other -- how the study is designed.

Part of this statement also has a healthy

respect for the potential for bias; right?

And so if you have a modest relative risk, it may be that you -- you may not be the truth.

BY MR. GISMONDI:

Q.   And a modest relative risk would be below 2?

A.   Yeah, that would be a modest relative risk.

Q.   And when you say "The difference between the groups may not be clinically significant," what do you mean?

A.   Meaning, like, the proportion between groups might be small, like, of the event happening between groups.

Q.   And once we get into that below 2 range but above 1 range, is a 1.1 versus a 1.9 -- would that also have similar problems?

MR. PENNOCK:   Objection.

THE WITNESS:   You know, these things are -- again, they aren't binary.  It's not like, "Now, this is the threshold for sure, and you have not met the threshold, so discard it."

I think with these numerical estimates, you need to put it in context of the -- all the -- all the different studies.  But, you know, a 1.9 is more significant, certainly, in magnitude than a 1.1.

BY MR. GISMONDI:

Q.   And a 1.1 may be more likely due to chance?

A.   1.1 would be more likely due to chance, yes.

Q.   You can put that to the side for now.

Going back to your report, after discussing the STROBE statement, you say (as read):

"I considered several types of confounding and sources of bias."

A.   I see it.

Q.   What sources of confounding did you consider?

A.   So confounded by indication.  There's confounding from selection of patients.  There's confounding that can happen because of gender, age, type of illness.  Yeah.  A wide multitude of both demographic as well as underlying illness.

Q.   And those are things you considered in assessing the literature?

A.   Yes.

Q.   And in assessing the sources of bias, what did you consider?

A.   So the sources of bias include, similarly, biases -- anything that can alter the interpretation of the results.

So they would include the underlying illness, the indication for treatment, for intervention, the various demographic factors, and then whether or not there's prior GI symptoms that were included in the study design strategies.

Q.   In the next sentence you state (as read):

"Confounding by indication and disease severity describes the fact that individuals prescribed GLP-1 RAs are different from those individuals not offered the prescription."

Do you see that?

A.   Yes.

Q.   How are individuals prescribed GLP-1 RAs different from individuals not offered the prescription?

A.   So the people who are offered the prescription, they may need tighter glycemic control, for example.  They may be wanting to lose weight.

So those are inherently different from the people who are in the other group who have the same illness but may not need those -- for those indications.

Q.   And how would that -- those differences

impact your analysis?

A.   The way it would impact it is you would consider whether or not they -- how things are controlled or adjusted for it in the studies in the way they were designed.

Q.   Continuing down, you say (as read):

"In patients with Type 2 diabetes, some patients may have longer disease duration, worse glycemic control, more complications, higher BMI, and more comorbidities, all of which can increase the risk of gastroparesis.  And this should be considered in evaluating those studies."

You flag "Type 2 diabetes, worse glycemic control, higher BMI, and more comorbidities."

What are the "more comorbidities" that you're referring to?

A.   So more comorbidities could be heart disease, kidney disease, nerve-related disease.

Q.   How about --

A.   Those are -- yeah.  Go ahead.

Q.   Oh.  How about different rates of gastric emptying at baseline?

A.   That's typically not captured in the

records.  It doesn't -- it's rarely performed, so it's not like a structured field that can be abstracted from the medical records.

Q.  So that's not something that was accounted for in the literature that you reviewed?

A.  Baseline gastric emptying?

Q.  M-hm.

A.  Yeah, it was not.

Q.  How about predisposition to nausea or vomiting?

A.  The baseline predisposition, the studies tried to exclude people who had a prior diagnosis of the condition, for example, like, gastroparesis.  If you had that, they typically would capture patients who were -- have records in the system for some time before they were prescribed the medication.  And during that window of time, there was no diagnosis of gastroparesis.  So they tried to exclude those factors in the analysis.

Q.  What about opioids?

A.  Opioids, some studies may have considered that.

Q.  What about studies that compared BPN to GLP-1 RAs?

A.  B --BPN, do you mean buprenorphine?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   Yes.

A.   Whether or not they considered it?

Q.   M-hm.

A.   I do not recall.  I think Sodhi -- I remember reading it somewhere, but I do not recall the specifics.

Q.   Isn't it correct that BPN is a contraindication for opioids?

A.   Yes.

Q.   And so if you were match -- or if you were comparing individuals who were taking GLP-1s to individuals who were taking BPN, you should try to control for opioid use; correct?

A.   Yes.  You would certainly be considering -- you could consider that and adjust for it.

Q.   And a failure to consider that would weaken the quality of the study; correct?

A.   It could weaken the quality of the study.

Q.   How about tri-cyclical antidepressants?

A.   Yes, that can alter the motility.

Q.   And that should be something else that's accounted for?

A.   It certainly could be accounted for.  And the medication is one where you also have to question whether or not it's differentially versus

non-differentially given between groups.

Q.   Now, if you go down a little bit further, it says (as read):

"On the other hand, there could be confounding by prior GI symptoms and motility such that patients with preexisting GI symptoms, nausea, dyspepsia, reflux, might be less likely to initiate treatment, clinicians avoiding GLP-1s in symptomatic patients, and this must be considered."

Do you see that?

A.   Yes.

Q.   Why would people with preexisting GI symptoms be less likely to initiate GLP-1 RA medications?

A.   In the event that providers are aware or have identified that their patient might be more sensitive to the medication, then they may be less likely to prescribe it.

Q.   And providers are aware of a potential sensitivity to GLP-1 medications and GI symptoms?

MR. PENNOCK:   Objection.

THE WITNESS:   I -- I am not aware with regard -- with regard to the general practitioner

whether or not they're aware.  But if they come across the clinical trials and see its linkage with nausea/vomiting as a side effect, then they would be aware, and they might be wary of prescribing it.

BY MR. GISMONDI:

Q.    And a clinician would be familiar with the labeling for the medication prior to prescribing it; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  They are typically aware of the indication for it.  But they may be less aware about all the side effects.

BY MR. GISMONDI:

Q.    In your experience, do clinicians often prescribe medication without reviewing the labels for side effects?

A.    They do not -- they do not -- they do not review -- they may not be reviewing the -- all the side effects when they start a medication.  They may not be aware.

They are more likely to be aware if there is, like, a black -- black box warning or if there's, like, a high-risk label, whereas if it's, let's say, nausea/vomiting, they -- they might not alter their prescribing patterns.

Q.   But it's not my question about whether or not it might alter their --

A.   Yeah.

Q.   -- prescription patterns.  But it would be something they would be aware about prior to offering that medication; correct?

MR. PENNOCK:  Note my objection.

Your question is asking about the mindset of unstated physicians apparently across the United States, so I object to the question and the argumentative nature of that last question.

THE WITNESS:  I -- I don't want to speak with respect of what I think they know or what they don't know.  I -- certainly, like, when they are starting the patient on a medication, they are understanding the indication for why they would like to start it.  And I -- and I would anticipate that also people may be aware that nausea is common.

They understand that there's, like, a ramp-up phase and that that ramp-up phase is linked to these symptoms and that they -- that some of the patients may not be able to tolerate it.

BY MR. GISMONDI:

Q.   Do you prescribe medications to your patients without being aware of the potential side

effects that are described on the label of a medication?

A.   There are often -- like, the side effects, that -- that list and profile is often very large. And they include many things that as a provider we are not clear how significant it is.

Of course, if it's a serious side -- a serious adverse event, serious side effects, maybe with organ damage, then we're aware of those things that lead to hospitalizations, that lead to ER visits.  Then we are more likely -- much more likely to be aware of those things.

But if it's a side effect, as in, like, someone has certain symptoms that may be linked to that drug, it may not always alter what we do.

Q.   How about yourself?  Does it alter what you do?

A.   If I am aware, I would counsel the patient.

Q.   And when it's listed as a potential side effect, are you aware of that before you prescribe a medication to a patient?

MR. PENNOCK:  Just note my objection.

Listed where?

MR. GISMONDI:  On a label.

MR. PENNOCK:  Where on the label?

MR. GISMONDI:  Anywhere on the label.

THE WITNESS:  I don't tend to see what's put on a label.

BY MR. GISMONDI:

Q.  So before you prescribe a medication, you tend to not see what's on the label for that medication?

A.  I see the drug and then the indication and what it's going to be used for.  I would have to look to a site to look for the adverse events and the things to be cautious about.

Q.  And before you prescribe medications to your patients, do you look to a site to look for the adverse events and things to be cautious about?

A.  Not always.

MR. PENNOCK:  We've been going about -- over two hours.  Would you like to take a break, Doctor?

MR. PREMO-HOPKINS:  There's also food.

THE WITNESS:  Already?

Yeah.  We can take a break.

MR. PENNOCK:  Let's take a quick break.

THE WITNESS:  Okay.

MR. PENNOCK:  Do you want to come back and then have lunch or --

THE STENOGRAPHER:  Do you want to go off the record first?

MR. PENNOCK:  Huh?

THE STENOGRAPHER:  Do you want to go off the record first?

MR. PENNOCK:  Oh, yeah, we can go off the record.

MR. GISMONDI:  Yeah.

THE VIDEOGRAPHER:  Going off the record at 12:32 p.m.

(Recess taken from 12:32 to 1:18.)

THE VIDEOGRAPHER:  We are back on the record at 1:18 p.m.

BY MR. GISMONDI:

Q.   Dr. Somsouk, before we broke for lunch, we were just looking at your method for review of studies.  And I want to go to the -- back to page 4. And it's about halfway down, there's a sentence towards the end of the page that says "Regarding outcome misclassification."

A.   Yes.

Q.   It says (as read):

"Regarding outcome misclassification, gastroparesis codes may represent transient GLP-1-induced delayed emptying

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

rather than chronic diseases.  The GLP agent is discontinued due to symptoms of gastroparesis, but the intolerance is not reported or the diagnosis of gastroparesis is not pursued because treatment options are limited."

Do you see that?

A.    Yes.

Q.    What do you mean by "transient, delayed emptying rather than chronic disease"?

A.    Transient as in if -- if -- let's say the symptoms go away and if it gets misclassified as still present, as in the symptoms of gastroparesis, that it is present, but yet it goes away.  But the code is in the system.

Q.    Meaning the symptoms -- sorry.  Strike that.

Meaning that transient in that you stay on the medication and you no longer experience the symptoms?

A.    That's correct.

Q.    Is that consistent with -- and I'm going to mispronounce the word, and I think you probably know what word I'm going to mispronounce -- but tachiaphylaxis [sic]?

Ma Sonsouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   Oh, tachyphylaxis.  Yes, which it could be.

So tachyphylaxis is typically on effect --
the effectiveness of it, that someone doesn't have
the same effect of the drug.

So in this case we're talking about it from
a -- from the vantage point of the side effect, that
the side effect doesn't have the same effect.  So it
gets blunted over time.

Q.   M-hm.

And transient in that the body may build up
a tolerance to the effect of the medication?

A.   That is -- that is correct.

Q.   Now, if you go to the next sentence, it
says (as read):

> "There are follow-up time-related
> biases to consider, such as losses to
> follow-up, as described earlier, immortal
> time bias example requiring duration of
> exposure to be classified as exposed, and
> time-varying confounders; example,
> beneficial effect of weight loss changes
> and practice trends."

What do you mean by "immortal time bias"?

A.   So immortal time bias is something along
the lines of -- let's take an example of a clinical

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

trial.

The -- the people who stay in the study may be different from the people who have experienced, like, treatment dis- -- discontinuation.

And so the ones that you see in the study seem like they do well with the drug. They tolerate the drug. And so it seems like it's okay. And they never get coded with, let's say, gastroparesis.

The people who leave the study, they may have side effects and symptoms. They may also not get coded with gastroparesis. But then they stop the drug.

And so you don't -- so the immortal time is essentially the people -- we don't see the people who don't last. And so you see the people who last, and they look better.

Q. How is beneficial effect of weight loss a time variant and confounding?

A. With weight loss, if, let's say, weight loss is linked independently to gastroparesis, as someone loses weight, it may be that their symptoms of gastroparesis gets modified.

You can imagine that, for example, someone who is obese, they are more insulin resistant. So they may have borderline diabetes but doesn't meet

Massaouk, MD Case 2:24-md-03094-KSM Document 691-39 CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER Filed 05/19/26

the threshold or so.  As they lose weight, those factors kind of go away.

Q.   Lower caloric intake is associated with the development of gastroparesis; correct?

A.   Lower caloric intake.  I am not aware of that.

Q.   Or it can cause slowing of the intestinal motility if you're taking less calories?

A.   They're linked, for sure.  But it's usually the other way around, like, where someone has either nausea, vomiting, and intolerance to food or getting full quickly, which is early satiety linked to gastroparesis.  Then they are unable to take as much calories.

Q.   Then you say (as read):

"Some residual confounding and bias is, however, inevitable, and these must be considered."

What residual confounding is inevitable?

A.   Yeah.  So I -- I do mention some of these things that I believe are one of the limitations of observational studies.  And they fall into the domain of either things that you don't think about or things you can't really capture from the records.

So, for example, the duration of diabetes,

we may not -- it's not well coded in the electronic health records.  So how do -- how long is that?  Is it differentially represented in one group or another, like, the duration?  And how does that affect the outcome?

Glycemic variability, so people who have really high blood sugars, may be prone to gastroparesis.  And we typically aren't capturing that over time in people.

We do it, as a surrogate measure, as a hemoglobin A1C.  And a study can adjust or -- or -- or match, you know, for that.

Neuropathy is nerve, you know, pins, needles, tingling, numbness.  That isn't always as well captured in the medical records.

Exercise, substance use, those things are not well captured in -- in the records as well.

Q.   And neuropathy is the mechanism by which diabetes can cause gastroparesis?

A.   It's along the same lines in that there is potentially damage to the nerve, the small blood vessels that feeds the nerves.  And so the nerves die out.

And so that can happen in, you know, your limbs, fingers and toes.  And then it can happen in

Marsausouk, MD    CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

the gut as well.

Q.   We talked about opioids earlier, but alcohol is another substance that can slow gastric intestinal motility?

A.   Not -- I -- I don't know if it's associated with a -- like, a delayed gastric motility.  But it does cause irritation to the gastrointestinal tract.

Q.   Cannabis is another substance that can cause swelling of the gastric intestinal motility?

A.   I don't know the literature on that, but I know people do sometimes have hyperemesis, like, they vomit a lot with cannabis.

Q.   How did you consider this residual confounding?

A.   It's -- you know you don't have all the information, and you do the best with what you have.  And -- and then you're essentially looking for the patterns across the studies and whether or not there's consistency.

Acknowledging that, one report on its own wouldn't be conclusive.  And so it would be in the totality and looking at observational studies, looking at other studies, do they lend themselves support?  Do I -- because of all of these ways to triangulate the information, do I feel more

Massouh, MD    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

confident that this is true versus superfluous?

Q.   What do you mean by "triangulate the information"?

A.   Yeah.  So I mentioned early on about the convergent data.

Q.   M-hm.

A.   So looking at, well, is there biological plausibility?  Is there evidence of delayed gastric emptying?  Are there signs of nausea -- like, correlative symptoms to gastroparesis that exist?

And then what does the data show in terms of these associations, measures of association in the observational studies?

And then looking at the available evidence from meta-analysis as well.

Q.   What bias is inevitable?

A.   What bias is inevitable?

The residual confounding would be considered a bias that is inevitable because the residual is something that you can't adjust or control for.

The other ones are certainly, like, related to, along those lines, things you can't control for, sometimes you aren't aware.  And so you did not include it in your model.

Q.   And can you give me some examples of those?

A.   Some of the things that we --

Q.   That would be separate, sorry, than the confounders.  I don't want to make you repeat yourself.

A.   Yeah, yeah.  I -- there -- these are these factors.  Yeah, illness duration.  Illnesses, different types of illnesses.

I think one study looked at the Charlson score.  But we think about, like, the illness as -- sometimes a cofactor as more susceptible to having bad disease.

Q.   You say underneath that (as read):

"Some clinical information is not well captured, such as diabetes duration and glycemic variability, neuropathy severity, central idiopathy, weight trajectory, diet, exercise, substance use, and GI symptom history that does not lead to coding or medication."

And those are some of the examples you just gave me; right?

A.   That's correct.

Q.   Would this also be true for COVID-19?

A.   COVID-19 can be captured, but the type of

COVID-19 that you're probably more concerned about is, like, the long COVID, the people who have persistent symptoms.  And that is probably not well coded.

Q.   And then you say (as read):

"Therefore, it is important to approach the balance of the data and conclusions with humility."

What do you mean that you have to approach conclusions with humility?

A.   It's similar to what I was describing earlier around understanding that sometimes a finding may not be true.  A measure of association in and of itself can be just reported because someone thinks they found something and they wanted to share it.

And then it's more likely to be true when more and more people are trying to report on it and they find similar findings.  Then it lends itself to more evidence.

So the humility is not jumping to conclusions until you see more and more data and evidence and seeing consistency and a pattern that you believe.

Q.   And underneath it, you say (as read):

"My approach is to give greater focus and consideration to the studies that employ strategies such as active comparator new user designs, propensity score models, follow-up considerations and sensitivity analysises."

Did you give greater focus and consideration on studies with propensity matching scores?

A.   Yes, I did.  I felt like those generally allowed the control -- the -- the exposure groups to be more matched across groups.

Q.   Then if you turn to the next page, in the first full sentence you say (as read):

"The goal is to understand the estimate of the association in the context of other signals."

Do you see that?

A.   Yes.

Q.   Are you referring here to the magnitude of the association?

A.   I -- so there is two estimates of the association.  One is the -- the magnitude, and the other is the confidence of that.

Q.   And so you are considering the magnitude in

that sentence?

A.    Yes.

Q.    And what other signals are you referring to?

A.    So the other signals is, like, the biological studies on gastric emptying; looking at meta-analyses, which are inherently different from the observational study designs; looking at the other case series, the ones that get reported to registries.  Those are different as well.

And then there are also studies where -- along the lines of the delayed gastric emptying studies, are the ones that go into the guidelines, like, into the anesthesia societies or the gastroenterology societies around concern.  And they -- some of them have done studies on whether or not there is residual food on the day of the procedure.  But those are -- they took less weight from my standpoint in terms of the quality of the evidence.

Q.    And you are a member of the American gastroenterology association?

A.    Yeah, the American Gastroenterological Association, that is correct.

Q.    The AGA recommends use of semaglutide for

obesity?

A.    I don't know the details of what it recommends, but I understand that people -- that that is commonly used.

Q.    Do you know that it does recommend the use of semaglutide --

A.    I -- I'm fairly confident that it does.  I don't know if the society exactly makes that recommendation.

Q.    And do you know that it also recommends the use of liraglutide for obesity?

A.    It probably does.

Q.    I'm going to show -- well, before we do this, if you could turn to page 9.

A.    Yeah.

Q.    And one of the studies you cite on page 9 is Sodhi 2023?

A.    Yeah.

MR. GISMONDI:  I'm going to mark as Exhibit 8 the Sodhi study.

(Marked for identification purposes, Exhibit 8.)

BY MR. GISMONDI:

Q.    Does the fact that this is published as a research letter affect your opinion in any way?

A.    With -- as -- as a research letter, it typically is a shorter paper.  So they do not typically present as much information with respect to the -- the methods and the analytic analyses as well.

Q.    And how does that affect the quality of the study?

A.    I think, just, you would have a little bit more caution around interpreting the results.

Q.    And if you look at page 9 of your report, in the third sentence you state (as read):

          "GP" --

     Which is gastroparesis?

A.    Yes.

Q.    (As read):

          -- "was defined as having an ICD code
          for filling a prescription for a
          promotility agent."

     Do you see that?

A.    Yes.

Q.    Promotility agents can be prescribed for conditions other than gastroparesis; correct?

A.    It could, or it could be that someone suspects that they have gastroparesis or perhaps has symptoms that suggest of it and they just prescribe

it.

Q.    It can also be prescribed for a condition that's other than gastroparesis as well; right?

A.    It depends on the medication and the agent. But, yes, it could.

Q.    And Sodhi does not specify which promotility agent is being prescribed?

A.    No, they do not.

Q.    And if we look at Table 1 --

A.    Yep.

Q.    -- underneath "semaglutide," there's a number, and it says 613?

A.    Yes.

Q.    That's the number of subjects?

A.    Yes.

Q.    If you go to the bottom, it says "Gastroparesis" --

A.    Right.

Q.    -- "9.1" with a "4" in parentheses?

A.    Yes.

Q.    9.1 is the calculated events per -- per 1,000 persons per year?

A.    Yes.

Q.    And then 4 is the actual number of events?

A.    Yes.

Q.    And so 4 here is either an ICD code or the prescription of a promotility agent?

A.    Yes.

Q.    Now, if you look over to the BPN, the number is 654 subjects?

A.    Yes.

Q.    If you go down to "gastroparesis," there's a "3.1" and then a "3" --

A.    Yes.

Q.    -- in parentheses.

A.    Yep.

Q.    And that's three events that happened in the BPN group?

A.    That is correct.

Q.    And so even though there were three events in the BPN group and 4 events in the semaglutide group, the author calculated a 9.1 -- a three times higher rate of developing gastroparesis from semaglutide based on that one event?

A.    That's correct.

Q.    And that event could have just been an additional prescription for a promotility agent?

A.    It was -- that is correct, that it could -- it could be related to that.

And it's also -- you know, this study also

considered duration of time, right, in their analysis. And so it occurred in a more -- in a shorter period of time.

And so they -- the number, even though it's 4, translates to a 9 because it was adjusted for person years of time.

Q. Symptoms of delayed gastric emptying, nausea, those have been described as more pronounced in GLP-1 RA users at initiation and dose escalation; correct?

MR. PENNOCK: Objection.

THE WITNESS: It is -- has -- the clinical trials do show that people have more nausea and vomiting who have been on GLP-1s.

BY MR. GISMONDI:

Q. At initiation and dose escalation; correct?

A. That is my understanding.

Q. If you look up to the "Sex Percentage," you look to female --

A. Yes.

Q. -- under "semaglutide," it says "44.2 percent."

A. Yes.

Q. If you look over at "BPN," it says "17.6 percent."

A.    Yes.

Q.    That means that there's a larger group of females in the semaglutide cohort than in the BPN cohort?

A.    Yes.

Q.    And there's no matching in this study?

A.    That is correct.

Q.    And as we discussed earlier, if there's a different event count, like 3 and 4, like here, it is not possible to statistically adjust with that small number of events; correct?

A.    You know, in this case, you would want to be wary of the count of 3 and 4.  And this type of study design does include a time component, like, a follow-up time.  And so that's where, you know, the density of the events per time is higher.

But that said, with a count of 3 or 4, it's still very small.

Q.    To confirm, with that very small count, it's not possibly -- possible to statistically adjust the female versus male disparity; correct?

A.    That is correct.

MR. GISMONDI:  Now, I'm going to show you another study that you cite in your report.  This is Mesgun.  I'll mark it as Exhibit 9.

(Marked for identification purposes,

Exhibit 9.)

BY MR. GISMONDI:

Q.    So if you turn to page 11 of your report, about midway through your description of Mesgun, you state that (as read):

"GLP-1 RA use was associated with an increased risk of gastroparesis with an odds ratio of 1.52."

Do you see that?

A.    I do.

Q.    Mesgun actually reports a protective effect with respect to GLP-1 RA use; isn't that right?

A.    Did I incorrectly -- so let's see, Mesgun says (as read):

"A new diagnosis of gastroparesis was found in 81, 0.1 percent, in the GLP-1 group; and 1,696 patients, 0.04 percent in the non-GLP-1 group with an odds ratio of 1.52."

And then it gives a statistical confidence and p-value after that.

So the -- the odds or risk of gastroparesis was elevated in the GLP-1 group.

Q.    How much weight did you give to the Mesgun

Mandanici, MD    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

study?

A.   I -- I considered the study like the other studies.  You know, I think it had some strengths.  Use a large network of data as large sample size.  The study population was obese.  The comparator group was a usual care group.

So considered all those things.

Q.   And they used propensity score matching; correct?

A.   Yes, that is correct.

Q.   Now, if we look at the "Results" section of this study, it says (as read):

"After propensity score" -- or

"PSM" --

That's propensity score matching?

A.   Yes.

Q.   It says (as read):

"After propensity score matching, the cohorts were balanced with 143,213 patients in both case and control groups."

Do you see that?

A.   Yes.

Q.   And then it says (as read):

"A new diagnosis of gastroparesis was

found in 81 patients in the GLP-1 group and 1696 patients in the non-GLP-1 group."

Correct?

A.   That's correct.

Q.   How can there be an increased risk of developing gastroparesis compared to the control group if only 81 patients developed it in the GLP-1 group and 1600 developed it in the -- in the control group?

A.   They must have not -- they must have reported it in perhaps the total population.  Let me see.

MR. PENNOCK:  Does that say .04 percent?

THE WITNESS:  Yeah.  But the denominator is probably different.

BY MR. GISMONDI:

Q.   And that's your speculation?

A.   That's my --

MR. PENNOCK:  Objection.

THE WITNESS:  That's -- I -- I would think it's either an error of the number of patients or the denominator.

BY MR. GISMONDI:

Q.   You don't know one way or the other?

A.    I do not.

Q.    This study doesn't tell us what the denominator would have to be for this to -- to actually bear out?

A.    I would -- you may need to multiply that out to try to figure out what their denominator is.

Q.    Well --

A.    But we don't know for certain.

Q.    Is a limitation of a study if it contains typographical errors?

A.    Yes.

Q.    Given the typographical error in this study, do you have a change in opinion on the quality of this?

MR. PENNOCK:    Objection.    There's no foundation there's a typographical error.

THE WITNESS:    I would say that, yeah, it -- it would need to be clarified as to what -- where their source and what their estimate is -- truly is. Like, is that number a representation of the association before propensity score matching or not? We do not know that.

BY MR. GISMONDI:

Q.    And to the best of your knowledge, Mesgun has never issued an update to this piece?

A.    Yes, I have not seen it.

Q.    You can put that one to the side.

Another study that you considered was Aneke-Nash.

Dr. Somsouk, in the Aneke-Nash study, there are two comparator groups used for semaglutide; correct?

A.    That's correct.

Q.    One of the comparator groups is individuals that had a sleeve gastrectomy performed?

A.    Yes.

Q.    Sleeve gastrectomy is known to accelerate gastric emptying; correct?

A.    It -- I do not know the details of what happens with a sleeve gastrectomy in terms of the emptying, but it does shrink the size of the stomach.

Q.    You have not reviewed the literature on the impact of sleeve gastrectomy on gastrointestinal motility?

A.    I have not.

Q.    Assuming that sleeve gastrectomy can accelerate gastrointestinal motility, is that a fair comparator to a compound like semaglutide that is known to delay gastric emptying?

A.   I think it -- you would make that comparison, and you would acknowledge that they are -- they have -- they're inherent biases.

Q.   The other comparator in Aneke-Nash is BPN?

A.   Yes.

Q.   We discussed this earlier, but BPN is contra -- contraindicated for opioid use?

A.   Yes.

Q.   I'm going to provide you a copy of Aneke-Nash, which we can mark as Exhibit 10.

(Marked for identification purposes, Exhibit 10.)

BY MR. GISMONDI:

Q.   Did the Aneke-Nash study match for opioid use when comparing the semaglutide to BPN groups?

A.   I do not see it.

Q.   If we look at Table 1 real quickly, on page 3 --

A.   Yes.

Q.   -- there is a higher percentage of prediabetic patients in the semaglutide group; correct?

A.   That is correct.

Q.   And there's also a higher percentage of BMI in the semaglutide group than the BPN group;

correct?

A.    Higher --

Q.    Higher percentage of BMI.

A.    Yeah.  The BMI is slightly higher than the BPN group, that's correct.

Q.    And those are both confounders for gastroparesis?

A.    Yes.

Q.    You can put that to the side.

Another study that you considered was Kalas 2023.

And I'll mark as Exhibit 10 --

THE STENOGRAPHER:  Eleven, I think.

MR. GISMONDI:  Eleven.  Oh, yes.  Eleven.

(Marked identification purposes,

Exhibit 11.)

BY MR. GISMONDI:

Q.    And Kalas, this is the only study that attempted to measure gastroparesis while also using gastric-emptying studies; correct?

A.    That I included in my report?

Q.    Yes.

A.    I believe so.

Q.    And if you turn to page 13.

A.    Thirteen?

Q.   Yes.

A.   Oh.   Oh.

Q.   On the Kalas.

If you look at the second column, third full paragraph, it says (as read):

"In addition, we did not find any association between GLP-1R agonist use and GPU, which is consistent with the literature."

Do you see that?

A.   Yes, I do.

Q.   And so Kalas did not find an association between the medication and gastroparesis?

A.   I think that what they said was that it was just not statistically significant.

Q.   And the lack of statistical significance leads the authors to report that they did not find an association?

A.   Yeah.  So they -- they describe that the relative risk was 1.3 between GLP-1 and the gastroparesis, but that it was not statistically significant.

And then they ended up doing another subgroup analysis.

And then they said that if patients had

Mansour, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

shorter disease duration of less than ten years of disease, then there is an association between -- between GLP-1 and gastroparesis.  That is in Table 3, second-to-last row.

Q.  And the bottom part of the confidence interval for that is 1.01?

A.  That's correct.  It's 1.01 to 3.84, and the risk ratio is approximately 2.

Q.  Is that an example of a wide confidence interval?

A.  It is a wide confidence interval, you know. And -- and the p-value is just right at that cusp of .048, so .05.

The -- sometimes, again, with a wide confidence interval, you also want to look at the relative risk.  And the relative risk here in, you know, individuals who have shorter duration of diabetes is a twofold increased risk of gastroparesis.

Q.  This is a study of only 51 patients with gastric emptying studies?

A.  They had a lot of people with gastric emptying study, but they only focused on 51 who had a GLP-1 RA.  And about half of that population had gastroparesis.

Q.   And these were people who were referred to for gastric emptying studies because of preexisting symptoms?

A.   That's correct.

Q.   And they were already suspected of having delayed gastric emptying at the time of referral?

A.   Most -- most likely that they had it.  And they wanted to compare those with and without GLP-1 agents.

Q.   And that group that's under ten years, that's 18 people?

A.   The group that is under ten years -- so then with the GLP-1 agents, is 18.  That's correct.

And the -- right.  And then 13 of 18 had the delay.

Q.   Based on a sample size such as this and a confidence interval such as this, can this data be generalized to the population?

A.   It's a small -- it's a small sample size. This study is also a subset of individuals who end up getting referred.  So the referral base ends up not being a great generalization for the public.

Q.   Now, there are no meta-analysises that show a statistically significant increased risk of developing gastroparesis from GLP-1 RAs; correct?

A.    There are no meta-analyses that show increased risk for gastroparesis.  Yeah, I -- I do not recall seeing one.

Q.    We can look at two of these briefly.

So the first one we can take a look at is Chiang.

(Marked for identification purposes, Exhibit 12.)

BY MR. GISMONDI:

Q.    Turning to your -- to your expert report on page 18 --

A.    Okay.

Q.    -- you discuss Chiang there.

You report that it (as read):

"Employed a systematic review and meta-analysis of 55 placebo-controlled, randomized controlled trials compromising 106,395 participants with Type 2 diabetes, overweight/obesity, or NASH/MASLD, to evaluate the safety of GLP-1 RAs"?

A.    That is correct.

Q.    Then you say (as read):

"Regarding gastroparesis, the meta-analysis found 10 trials that

reported the risk of gastroparesis with a total of 12 events in the treatment group and 5 events in the control group."

Do you see that?

A.   Yes, I do.

Q.   And 12 events is a small number of events; correct?

A.   It's generally considered as a small number.

Q.   Then you report (as read):

"The risk of GP with GLP-1 RAs was nominally increased but did not reach statistical significance."

Do you see that?

A.   Yes.

Q.   If you turn to the Chiang paper, under the "Conclusions" on the first page, it states (as read):

"GLP-1 RAs are associated with an increased risk of choli-" --

A.   Cholelithiasis.

Q.   Thank you very much, Doctor.

A.   No problem.

Q.   (As read):

-- "and GERD, but do not appear to

increase the risk of other

gastrointestinal or biliary adverse

events."

Do you see that?

A.   Yes, I do.

Q.   One of the other adverse -- adverse gastrointestinal events that would be included here that they did not appear to increase the risk of would be gastroparesis; correct?

A.   Yes, they do not mention that.

Q.   If you turn to the third page, which is 1270, it states that (as read):

"Eligible studies were required to

report at least one of the following

gastrointestinal or biliary conditions."

And then it lists a series of them, including intestinal obstruction, paralytical ileus, and gastroparesis.

Do you see that?

A.   This is in the first paragraph on the left?

Q.   Yes.

A.   And then "Eligible studies were required ..."

Yes, I see it.

Q.   And so these were the conditions -- these

conditions that are listed here that were found to not have an association with increased risk with GLP-1 use?

A.  That is correct, they did not observe that.

Q.  If you go to page 1274 under "Outcomes," in the last paragraph on the page, in that second sentence, it says (as read):

"Similarly, GLP-1 RAs probably have little or no effect on gastrointestinal outcomes, such as gastritis, esophagitis, intestinal obstruction, paralytical ileus, gastrointestinal ischemia, gastrointestinal ulceration, gastrointestinal perforation, and gastroparesis and may have little to no effect on gastrointestinal hemorrhage."

Do you see that?

A.  Yes.

Q.  And that's consistent with what we've been talking about, that the authors of Chiang found little to no effect on these gastrointestinal outcomes?

A.  They -- yes, they report nonstatistical significant difference between the groups.

Q.  And then say that there's little to no

effect as a result of that nonstatistical significance; right?

A. They say that there's little to no effect on GI outcomes --

Q. Including?

A. -- such as gastroparesis.

Q. And now if we turn to page 1277 -- actually, you know what, strike that.

If we look to the next document I'm going to hand you, which is Wang, this is another -- you're familiar this is another meta-analysis that looked at gastroparesis?

A. They included three studies. That's my recollection; right? That had gastroparesis in it.

Q. And that's on page 19 of your report?

A. Yeah.

Q. It says they -- yes, they identified 3 studies out of 21 randomized controls; right?

A. That's right.

MR. GISMONDI: I'm going to hand you Wang, which we'll mark as Exhibit 13.

(Marked for identification purposes, Exhibit 13.)

BY MR. GISMONDI:

Q. If you turn to Table 1 on page 5 --

A.    Page 5.  I see.

Q.    Yes.  Yeah.

It lists a variety of conditions.  One of them is impaired gastric emptying.  And there's three comparators here:  SGL2, GLP-1 RA, and DPP4.

A.    Yes.

Q.    The highest risk ratio with respect to these -- to impaired gastric emptying is for DPP4 here?

A.    Yes.

Q.    Now, if we go back to Table 1 -- and there's not -- actually, before we do that, there's not a statistically significant finding of GLP-1 RAs with impaired gastric emptying; correct?

A.    That's correct.

Q.    And if we turn back to page 3, there is diabetes gastroparesis?

A.    Yes.

Q.    And in this classification, GLP-1 RAs has a higher relative risk ratio than the SGL2 and the DPP4; right?

A.    That's correct.

Q.    But if you look over to the events, an Events 1 in this table is the events in the case group?

A.    Yes.

Q.    And that means the people who are taking GLP-1 medications?

A.    That is correct.

Q.    And if you look over at Event 0, that's the control group?

A.    Yep.

Q.    And here for GLP-1 RAs, there were three events total out of 12,691 patients for diabetic gastroparesis versus zero events in the control group?

A.    That is correct.

Q.    So the relative risk ratio is being driven by the lack of events in the control group; correct?

MR. PENNOCK:   Objection.

THE WITNESS:   It's -- it's the relative difference between the two groups.  So it's -- I guess they estimate it at about 3, but it's 3 versus 0.

BY MR. GISMONDI:

Q.    If you look, for instance, at the DPP4, which has a relative risk of 0.67, you'll see that there were three events in that group as well, right, in the -- in the -- or in the case group?

A.    Yes.

Q.    Meaning the people who took DPP4?

A.    Yes.

Q.    And if you look over at the control group, there were five individuals --

A.    That's correct.

Q.    -- in that control group that had diabetic gastroparesis?

A.    That is correct.

Q.    And as a result, it appears that DPP4 has a protective effect because there were five events in the control group?

A.    That is correct.

Q.    But with these low numbers, those numbers could be the result of random chance; correct?

MR. PENNOCK:  Objection.

THE WITNESS:  There -- it is possible that the groups are -- right, that low event rate that you have to bear in mind, that it -- chance will play a role.

BY MR. GISMONDI:

Q.    Again, as well, diabetic gastroparesis, the relative risk ratio for GLP-1s is not statistically significant; correct?

A.    That is correct.

Q.    And the low end of the confidence interval

is 0.47 and the high end is 19.04?

    A.   Yep.

    Q.   That's a very wide confidence interval;
correct?

    A.   That is a wide confidence interval.

         MR. GISMONDI:  Let's take a two-minute
break, and then I think I'll be wrapped up.

         MR. PENNOCK:  Okay.

         THE VIDEOGRAPHER:  Going off the record at
2:19 p.m.

         (Recess taken from 2:19 to 2:34.)

         THE VIDEOGRAPHER:  We are back on the
record at 2:34 p.m.

         BY MR. GISMONDI:

    Q.   Dr. Somsouk, I want to thank you very much
for your time today.  I'm just going to spend
one minute marking the documents that you brought
today, and then I will pass the baton.

    A.   Okay.

    Q.   So the first document which I'll mark as
Exhibit 14 is a copy of your report that you brought
with you today that contains several notations.

         MR. GISMONDI:  Can we mark ...

         (Marked for identification purposes,
            Exhibit 14.)

BY MR. GISMONDI:

Q.    And, Dr. Somsouk, this is a copy of the report that you brought with your notations today?

A.    That's correct.

Q.    You can put that to the side.

I'm going to hand you what I will have marked as Exhibit 15.  This is a copy of a medical study by Aneke-Nash from 2025 that contains notations that I believe you made.

(Marked for identification purposes, Exhibit 15.)

BY MR. GISMONDI:

Q.    Dr. Somsouk, is this a copy of the Aneke-Nash study that you brought with you today with your notations?

A.    Yes, it is.

Q.    Thank you.  You can put that to the side.

The next document I'm going to hand you I'll mark as Exhibit 16.  This is a copy of a study by Chiang from 2025.

(Marked for identification purposes, Exhibit 16.)

BY MR. GISMONDI:

Q.    This is a correct copy of the document that you brought with your notations by Chiang from 2025?

A.    That is correct.

MR. GISMONDI:  I'm going to hand you as Exhibit 17 a study by Hiramoto from 2024 that contains your markup.

(Marked for identification purposes,
Exhibit 17.)

BY MR. GISMONDI:

Q.    This is a copy of your markup of the Hiramoto study from 2024?

A.    That's correct.

Q.    And I'm going to hand you what I will mark as Exhibit 18.  It's a copy of a report -- or a study done by Maselli from 2022 that contains your markup.

(Marked for identification purposes,
Exhibit 18.)

BY MR. GISMONDI:

Q.    This is a copy of the report that you -- or a copy of the Maselli study that you had marked up?

A.    Yes, that's correct.

Q.    Why did you circle Michael Camilleri's name in that?

A.    Oh, I know he does a -- a lot of work on gastric emptying studies.  So ...

Q.    Is he one of the leading experts in that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

area?

A.   I think he does good work in this area.

Q.   Okay.  Thank you.

A.   And -- and, Linda, I -- I know her.
Actually, we work together.  I just am un- -- less
aware about her publication.

Q.   M-hm.

A.   But I know she does a lot of -- she sees a
lot of patients with gastroparesis.  So she --

Q.   Linda is great; right?

A.   Yeah, she's great.  We work together quite
a bit on -- oh, sorry.

Q.   No, no, no.  Keep going.

MR. PENNOCK:  There's no question on the
record.

THE WITNESS:  Yeah.

We worked together on a research awards
panel, so we've worked together in the past.

BY MR. GISMONDI:

Q.   And do you have a high opinion of
Dr. Linda Nguyen?

A.   Yeah, I do.

THE VIDEOGRAPHER:  And are we closing for
the day?

MR. GISMONDI:  No.

Massouk, MD   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

(Simultaneous speakers - unclear.)

THE VIDEOGRAPHER:  No worries.

THE WITNESS:  That was Round 1.

MR. PREMO-HOPKINS:  We can go off the record.

THE VIDEOGRAPHER:  Okay.  Going off the record at 2:39 p.m.

(Recess taken from 2:39 to 2:42.)

THE VIDEOGRAPHER:  We are back on the record at 2:42 p.m.

EXAMINATION BY MR. PREMO-HOPKINS

BY MR. PREMO-HOPKINS:

Q.   Good afternoon, Dr. Somsouk.  We met off the record, but I'll introduce myself again on the record.

My name is Mark Premo-Hopkins, and I represent Eli Lilly in these cases in which you've offered some opinions.

So I'm going to ask you some follow-up questions that will focus more specifically on the Lilly medications.

Do you understand that?

A.   Yes, I do.

Q.   And it's important that you understand my questions today.  We're in your area of expertise,

not mine.

So if -- if I ask you a question that you don't understand, would you -- would you let me know?

A.    Yes.

Q.    And if you answer a question without asking me to clarify it, I'm going to assume you understood it; is that fair?

A.    That's fair.

Q.    And is there any reason you can't give complete, truthful testimony today?

A.    No, there's not.

Q.    Dr. Somsouk, have you ever prescribed a GLP-1 receptor agonist?

A.    I have not.

Q.    Have you ever treated patients that you knew were on GLP-1 receptor agonists?

A.    Yes, I have.

Q.    Can you quantify that?

A.    I have done many procedures in patients who are on GLP-1.  I have been consulted on a handful of patients, meaning on the order of ten individuals who were on a GLP-1 who had a GI issue.

Q.    And based on your work in this case, you're familiar to some degree with the information that's

in the labeling for various GLP-1 medicines; yes?

A.    I am familiar with some of it, yeah.

Q.    And you're --

A.    That's correct.

Q.    And you're familiar with -- that the -- some of the labeling, based on your familiarity, mentions certain GI symptoms; yes?

A.    Yes.

Q.    Like nausea and vomiting and things like that; yes?

A.    Yes.

Q.    And you're familiar based on your work in the case that labeling for these GLP-1 RA medications mentions the fact that they can act by -- to delay gastric emptying; yes?

A.    That is my understanding.

Q.    Dr. Somsouk, just so I -- I can understand, I'm going to look at Exhibit 1.  It's your report. If you've got a copy of it where -- that you've marked up --

A.    Yes, I do.

Q.    -- that's easier for you to reference.

Can you just remind, for the record, what is the number -- the exhibit number on the marked-up report?

Is there a sticker on the front of it?

A.   It is No. 1.

Q.   Oh, no.  I'm sorry.  The -- you're currently looking at a version that has your markings on it; yes?

A.   That's correct.

Q.   And -- and is there a exhibit number on that?

A.   Fourteen.

Q.   Okay.  Great.

And is there -- just for the record, what types of stuff did you write on your version of the report?

A.   The name of the journal.  Some of the issues related to the study design.  The measure of association.  The comparator group.

Q.   Is there anything in terms of the notes that -- were those just for your reference or the ease of reference in the deposition?

A.   Yes.

Q.   So nothing in the notes that you wrote that impacts the opinions, the overall opinions, in the report?

A.   They should not.

Q.   Okay.  So, Dr. Somsouk, I just want to make

Ma Sobkouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

sure -- I'm going to use some -- try to cut to the chase and not have us walk through a whole bunch of studies, but I noticed in your report that you have sort of two sections of studies.  You have individualized observational studies and then you have meta-analyses; is that right?

A.    That's correct.

Q.    And when you described the literature search that you did in your report, I assume more than these 23 studies initially came back; is that right?

A.    That is correct.

Q.    And you did work to narrow down the studies that you thought would be important to include in the report?

A.    That's correct.

Q.    And I -- I counted 19 individual observational studies that you include in your report.

Does that sound right to you?

A.    That sounds about right.

Q.    And then four meta-analyses; is that right?

A.    That sounds about right.

Q.    And in terms of the studies, how they're laid out here, the individual studies each have sort

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

of their own vignette that you've included; yes?

A.   That is correct.

Q.   And the same is true for the meta-analyses that -- that you identified; yes?

A.   That's correct.

Q.   So most of these studies that are included in your report looked at a comparison of outcomes in patients who are on GLP-1 medications on the one hand and those who are not on the other; yes?

A.   That's correct.

Q.   And based on what you understand is known in the medical community about GLP-1 medications, don't you think it's more likely that a patient who's known to be taking a GLP-1 is going to be -- receive a -- a diagnosis of a gastric motility-related condition?

A.   I do not think that people -- or let's say a provider will intentionally think that they will have more likely a diagnosis of that.  I think that, you know, as time has gone by, people have become more aware of the nausea/vomiting, the ramp-up phase, the symptoms.

I don't think that a provider would -- because of that knowledge -- would want to give them a diagnosis of gastroparesis, especially if they

believe that that is inherent to the medication to have those symptoms at the out- -- at the onset.

On the other hand, as time goes by, if a patient continues to have the symptoms, then a provider may link that diagnosis to that patient.

Q.   Why do you not think a provider would use the knowledge of a patient's taking a GLP-1 medication to diagnose them with gastroparesis?

A.   I -- well, a diagnosis of gastroparesis is one that -- my -- my take on it is that it's like a durable problem, like a persistent problem.

And so if one believes that someone has nausea/vomiting and it's transient and maybe it's part of the escalation phase of the medication, I would be less likely to give them a -- a diagnosis that goes onto their problem list and says, "You have gastroparesis, and so we should manage gastroparesis as that persistent problem."

And I think if a provider is aware of that, they would be reluctant unless they believe that that's the case.

Q.   Many of the studies that you looked at used ICD-9 or ICD-10 codes to identify patients who were suffering from outcome of interest; yes?

A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Q.    And in -- and in the case of your investigation, you were looking at an association between GLP-1 RA medication as a group; yes?

A.    Yes.  That's correct.

Q.    On the one hand.

And then that was the exposure; yes?

A.    That's the exposure.

Q.    And the outcome you were looking at was what various studies had identified as gastroparesis; yes?

A.    That's correct.

Q.    And are you familiar at all with the literature around the accuracy of gastroparesis diagnoses when there's no gastric emptying study involved?

A.    I am not aware of the literature.

Q.    One of the databases that you mentioned that some of the studies pulled from was something called the "TriNetX database"?

A.    Yes.

Q.    And have you ever personally worked with that database before?

A.    I have not.

Q.    Do you -- did you do any investigation into the accuracy or reliability of the data in the

TriNetX database?

A.   I did not.

Q.   As between TriNetX and Merative, Optum, and FarMetrics, do you have any opinion one way or the other about whether any of those sources is more or less accurate or reliable than the other?

A.   I am not familiar with the accuracy of them.

My understanding of them is that they are large datasets that include patients with structured codes and elements.  And oftentimes they are related to billing and utilization.

Q.   Did you feel like the TriNetX database was a source that was reliable enough for you to -- let me ask you a different question.

The studies that used the TriNetX database, did you discount them in any way in your analysis?

A.   I did not.

Q.   And when you talk about -- in your report and today, when you talked about considering bias and confounders, is that something that you did while you read the studies?

A.   Yes.

Q.   And asking it a different way, there's no sort of scoring system or chart that you kept to

rank the studies; is that right?

A.   I did not proceed in that way.

Q.   And were the different confounders or biases -- were any of those disqualifying when you were reviewing the -- the studies?

A.   More the disqualifying factors were related to the overall large study design, like, whether or not it was a case series versus, like, was there a comparator group?  Was it just a report on -- like, single-center experience.  These sort of things. I -- I was more reluctant to put weight on those.

Q.   And so in terms of the studies that made it into your report that are listed there, those are ones that you wanted to ensure had a comparator group?

A.   Yes.

Q.   And you wanted to be sure that they were accurate in terms of the defined exposure and the defined outcome?

A.   That's correct.

Q.   Once they passed the threshold to get into your report for consideration, do you have any finer gradation of -- of ranking or consideration of the studies?

A.   I did not specifically have that.

Q.   One of the studies that you mention in your report, it is on page 14 of your report.  It's in the center of the page.  It's on page 14 of Exhibit 1 and Exhibit 14.  And it's called the Alkabbani, at least that's how I pronounce it, from 2025.

A.   Yeah.

Q.   Is that a study that you have some familiarity with?

A.   Yes.

Q.   And why don't we mark that as the next exhibit number.

(Marked for identification purposes, Exhibit 19.)

MR. PENNOCK:  What number is that?

MR. PREMO-HOPKINS:  Exhibit 19.

BY MR. PREMO-HOPKINS:

Q.   And, Dr. Somsouk, let me ask you, is the -- is Exhibit 19 that you've got in front of you there, is that the Alkabbani abstract that you reference on page 14 of your report?

A.   Yes.

Q.   And -- and what's the significance of the fact that this is an abstract as opposed to a full report?

Massouk, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   An abstract has not gone through the full peer-review process.  Abstracts are managed -- it may be managed differently, you know, depending on the society or the conference or a -- yeah, a meeting, but typically it gets reviewed by several people.  And it often does not have a back-and-forth component where there's a criticism that goes back to the author and the author responds to it.

Q.   You would agree, though, that -- that typically in your experience the publication of an abstract wouldn't undergo the same level of peer review as a full published paper; correct?

A.   That is correct.

Q.   And do you agree with me that the more rigorous a peer-review process is, the more credible and reliable the study is?

A.   Yes.

Q.   Did you discount in any way the impact of the Alkabbani abstract in your analysis, given that it's only an abstract and not a full published study?

A.   With abstracts, in general, I think I tend to be a bit more cautious about them.  The Alkabbani left out some details with respect to the databases that were used.

Q.   So why -- let me break that down.

Why would you generally tend to be more cautious with abstracts?

A.   Because it just hasn't gone through that vetting process of that back and forth.

Q.   And when you say "that vetting process," you mean typical peer review?

A.   That's correct.

Q.   And when you say that Alkabbani left out some details with respect to the databases, what -- what do you mean?

A.   It describes using several healthcare databases, but it does not specify exactly which one that was used.

Q.   And what's the significance of that?

A.   It's -- you -- you like to know and -- what they used in the ideal world.  You would like to be able to review the dataset if you wanted to pursue the same replication or analysis.

Q.   And so given the limitations of what's included in Alkabbani, you wouldn't be able to replicate this study; is that right?

A.   That's correct.

Q.   And do you see that the Alkabbani study -- we talked about defining exposure and defining

outcome.  And the Alkabbani study has an outcome definition that's different than gastroparesis; right?

A.   They do describe gastroparesis, but it is in the composite.

Q.   And it's in the composite of what?

A.   Constipation, gastroparesis, and bowel obstruction.

Q.   And does the Alkabbani study have an umbrella term that they use that they report on for that -- that outcome?

A.   Yes.  They call it a primary composite outcome.

Q.   And that's a -- that outcome is motility-related gastrointestinal adverse events; right?

A.   That is correct.

Q.   And that includes not just gastroparesis but also bowel obstruction and constipation?

A.   Yes.

Q.   Severe constipation.  Excuse me.

Is that right?

A.   Yes.

Q.   And so looking at the Alkabbani abstract, you couldn't identify a point estimate or an odds

ratio that would be applicable to the defined outcome of gastroparesis; correct?

A.    That is correct.  You would assume that -- you would have to assume that gastroparesis was a component of that composite measure.

Q.    Whether it was driving the composite measure up or down, you can't tell?

A.    You can't tell.

Q.    Are there any other limitations in the Alkabbani Cabani abstract that we haven't talked about?

A.    Nope.

Q.    Do you agree that one -- one limitation -- so this -- this abstract relied on electronic health record data; yes?

A.    Yes.

Q.    And one of the limitations to electronic health record data is that there could be coding errors that lead to misclassification of outcomes; right?

A.    Yes.

Q.    And also -- oh, sorry.  I was getting my big head in the way.

Also, the one limitation to using administrative claims or electronic health record

data is that once a -- once a finding or a diagnosis is in the record, it's going to get picked up whether that gets changed later or not; right?

That was probably a poorly worded question.

Did you understand it?

A.   Saying that if there is something that shows up, it's like an enduring association with that patient -- linkage to that patient?

Q.   Correct.   Correct.

If -- in the way the -- this type of study is done --

A.   Yeah.

Q.   -- if, for example, a patient has a diagnostic code for gastroparesis in their record and later the physician decides, "Oh, actually, I don't think you have gastroparesis," that wouldn't be picked in the -- in the record usually?

A.   Yeah.   My -- my understanding of the way it's being captured is that they're looking for incident diagnosis.   And once it occurs, it is assumed that it is present and linked to that individual.

The -- the natural question, you know, is whether or not that linkage to that individual and the occurrence happens randomly throughout and is

that a permissible -- does that bias the data?

Q.   Right.

What about the follow-up period in -- in the Alkabbani abstract?  Was that any -- did that give you any concern?

And I can direct you, if you want, your -- to your summary on page 14 of your report.

A.   So their duration of follow-up is generally a little bit more brief; right?  Is that --

Q.   I think it's at six-and-a-half months.

A.   Yeah, six-and-a-half months.

Yeah.  And I don't have a, like, strong opinion one way or the other with the duration of follow-up.  The way the study is analyzed is what's called, like -- they -- they account for person time of follow-up.  And -- and so they use what's called, like, a hazards ratio and the incidence rate over time.

Q.   So you -- you don't have an opinion one way or the other about whether that six-and-a-half-month follow-up period is a -- a limitation that might affect the outcome?

A.   Yeah.  The -- the limitation that would be concerning is if, let's say, diagnoses are more likely to occur over time.

And so if you have short follow-up time, you are naturally reducing your likelihood of capturing it.

So maybe too short of a time might be less likely to capture a diagnosis.

Q.   And let me ask you a question just because you talked about follow-up time.

The association that you were looking into as part of your assignment was an association between GLP-1 RA medications as a group on the one hand and the outcome of gastroparesis on the other; yes?

A.   That's correct.

Q.   And did you observe any of the studies where they excluded patients who had been taking other GLP-1 medications before enrolling?

A.   I don't recall that.

Q.   Do you -- for your opinion that you issued, do you rely on any one particular study in your report or are you relying on all of the studies?

A.   All of the studies.

Q.   And were there any studies that you recall that were identified -- that you can recall specifically that you identified as a result of your search process but did not include in your report?

A.   I do not recall.  I mean, there were a handful of studies that seemed like they were -- they weren't well designed or poorly done.  So they weren't included.

Q.   Dr. Somsouk, I'm going to -- I'm going to ask you a couple other questions while we pull some documents together.

You mentioned that -- that there's a difference based on gender with regard to side effects or adverse events, GI adverse events with these medications as well as instance of gastroparesis; is that right?

A.   That is correct.

Q.   And is -- what -- what is the difference?

A.   The observed data describes women having more symptoms of nausea/vomiting when exposed to GLP-1.  Yeah.

Q.   Is there any reason why -- I'm going to start my question over.

Is that all right, Dr. Somsouk?

A.   That's fine.

Q.   Is there -- if you were looking at gender-based groups, would you -- would you expect -- do you have any reason to expect to see higher numbers in females as compared to males in

terms of the association you were investigating?

A.   If individuals are more sensitive or -- to side effects, then you would expect it to be higher.

Q.   So all other things being equal, you would -- based on the association you were looking at, you would expect to see higher numbers in -- in females as compared to males?

A.   That's correct.

Q.   Do you recall looking at any studies that broke out the outcomes based on gender and where there were meaningful differences?

A.   I don't recall specifically.  It might have been in the clinical trials.

Q.   Do you recall whether there were any studies that used datasets that were heavily male or heavily female?

A.   I remember -- I mean, the veterans population tend to be heavily male.

Q.   And did the studies with the veterans population, did they have any role in your assessment of how gender might affect the outcomes here?

MR. PENNOCK:  Objection.  Form.

Go ahead.

THE WITNESS:  Yeah.  My recollection is

that there was a study by Xie, H -- X-I-E, Xie, that had a modest association between GLP-1s and gastroparesis.  And that cohort has also a lot of -- you know, the vast majority are men.

BY MR. PREMO-HOPKINS:

Q.   Did you look into any of the -- I'm sorry.

Was your -- were your findings influenced at all by differences between male populations, female populations?

A.   I don't recall.

Q.   You don't recall that being a part of your analysis?

A.   I -- I did not, yeah.  And -- and my recollection is when I read through the papers, many of them had some accounting for gender.

Q.   Do you recall looking at any that -- where there was a difference, a meaningful difference, between the genders?

A.   I did not look closely at the clinical trial data with respect to the side effects and who dropped out, and my recollection was that there were more women that dropped out.

Q.   So setting aside the clinical trial data and focusing on you observational studies that you --

A.   Yeah.

Q.   -- identify in your report, in those studies do you recall seeing any relevant differences between male and female populations that -- that you wanted to investigate --

MR. PENNOCK:  Objection.

BY MR. PREMO-HOPKINS:

Q.   -- think more about?

A.   I did not look at them separately, like, between male versus female.  In the observational studies, my recollection is that many of them attempted to account for gender.

Q.   And how would you account for gender?

A.   Either by propensity matching or by adjustment in the analytic phase.  The -- most of -- yeah, it -- it appeared to me in terms of the study that they were focused primarily on the association between the GLP-1 and gastroparesis, and they did not look into detail with respect to different subgroups.

(Stenographer interrupted for clarification of the record.)

BY MR. PREMO-HOPKINS:

Q.   Did I understand you correctly, when you were asked to define statistical significance, did

you identify that as a -- a mathematical calculation that's a reflection of how much chance has been eliminated as a potential cause of the association?

A.    That is -- that is correct.

Q.    And is there an accepted standard in your field for what's sufficiently eliminated chance as a variable?

A.    They would use a p-value and say that it's less than .05, and that is sometimes arbitrary.  And it depends also on how many things you are testing.

Q.    Is a -- is a p-value of -- of less than .05 what you most commonly see in your field as the standard for sufficiently eliminating chance as a variable?

MR. PENNOCK:  Did you say "less than .05"?

MR. PREMO-HOPKINS:  Yes.

I can start -- I can ask my question again.

THE WITNESS:  Sure.

BY MR. PREMO-HOPKINS:

Q.    Is the p-value of less than .05 what you typically see in your field as the standard for sufficiently eliminating chance as a variable analysis?

A.    I think, yeah.  So less than .05 is when we consider something to be significant statistically.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

And then the questions then come into how truthful it is. The other analytic and adjustment factors were that -- was there likelihood of bias and residual confounding? And all of those other issues.

Q. I understand.

So as a first step to understanding whether or not an association is, as you described it, truthful, would be to see whether you sufficiently eliminated chance such that the association is statistically significant; is that right?

MR. PENNOCK: Objection.

THE WITNESS: We would want to see that the value -- the p-value is less than .05. That would give some confidence.

And then we would look at the -- the measure of association and so forth.

BY MR. PREMO-HOPKINS:

Q. So I want to make sure. You had -- you said you -- first you would want to see if there's a p-value less than .05, and then you would look to the other measures of association like bias and confounding that you described?

A. That is correct.

Q. Okay. And then do you recall getting some

questions earlier from my cocounsel about magnitude of association?

A.   Yes.

Q.   And that's -- that's just how high -- how large or small is the point estimate, for example?

A.   That is correct.

Q.   And all other things being equal, do you agree that the higher the magnitude of a point estimate, the more likely the association is true?

A.   There's -- there's both aspects; right?

So it's the magnitude, but it's also the power and the confidence based off of the type of study.

Q.   So in order to understand whether an association is a true association, you want to see sufficient magnitude as well as sufficient confidence?

A.   Right.  I would like to see both the -- the estimate of the measure of association and the statistical significance.

Q.   Did I hear you correctly that one of the elements that you were thinking about in evaluating this association in this case was consistency of the association?

A.   Yes.

Q.    And what does that mean?

A.    The consistency is whether or not the pattern of the association is in the same direction and, if you're able to, the size of that -- you know, the magnitude of that association, but whether or not the patterns are consistent versus having measures of association that goes on opposite sides.

Q.    And so when you have measures of association that go on -- when you say "opposite sides," you mean opposite sides of the -- of 1.0?

A.    That's correct.

Q.    And if you have measures of association that go on opposite sides of 1.0, would that -- would those be inconsistent?

A.    That's correct.

Q.    And I wrote this down from earlier, but I want to make sure I got it right.  In your experience, a modest relative risk would lead people in your field to question the clinical significance of a particular study's findings; is that right?

A.    If it's -- depending on how modest it is, then one would question it.

Q.    And less than 2.0 was a number you were asked about before.

Is that -- is that one that you would tend

to question, less than 2.0?

A.   I -- I think it -- it depends; right?  I mean, a 2.0 can still be quite significant in that it's a doubling of the risk.

So it's like 100 percent increase between two -- two groups, a twofold.

Q.   And at 2.0 -- what you're describing to me, though, would be a statistically significant 2.0; yes?

A.   That's correct.

Q.   Is magnitude of the -- of the association, is that -- should I think about that as strength of the association?

A.   I think the strength of the association -- these are qualitative terms; right?

The strength can be the size of the confidence interval, like, if it's a tiny confidence interval, meaning, oh, that you are confident, and so there is some strength there.  But I think it encompasses both the magnitude and the confidence.

Q.   And so, Dr. Somsouk, is it generally accepted in the epidemiological community that you work in to conclude that there's a consistent association when -- when you don't have multiple studies finding a relative risk -- a significant

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

relative risk of 2 or more?

MR. PENNOCK:  Objection.

THE WITNESS:  No, I wouldn't -- I wouldn't say that.

BY MR. PREMO-HOPKINS:

Q.  That is, you wouldn't say that it's generally accepted?

I -- I had -- I had a couple of negatives in that question, so let me see if I can ask you again.

Is that all right?

A.  Sure.

Q.  Did you consider the strength and consistency of the association at all as -- as part of your analysis?

A.  Yes, I considered them.

Q.  And we're talking about the strength and consistency of -- of the association between GLP-1 medications as a group and the outcomes that generally were -- you've identified as gastroparesis; yes?

A.  That's correct.

Q.  And for that particular association, did you see relative risks greater than 2?

A.  There were several studies that had

relative risk or hazards ratios greater than 2.

Q.    And did you -- for -- for that association between GLP-1 RAs and gastroparesis, did you see more than one study with a relative risk greater than 2 that had a statistically significant confidence interval?

A.    You mean the -- the confidence -- the bottom end of the confidence interval was greater than 2?

Q.    No.  I'm sorry.  Let me -- let me ask that again.

Do you recall whether there was more than one study included in your report that identified a relative risk -- a point estimate --

A.    M-hm.

Q.    -- greater than 2 that was also statistically significant based on its power and confidence interval?

A.    My recollection was there was more than one study.

Q.    And in order to find that there's a true consistent association, it's generally accepted in your community, isn't it, that you need replicated statistically significant results?

MR. PENNOCK:  Objection.

THE WITNESS:  We would like to see the -- the trend or the pattern and the measure of association consistently in the same direction and -- and across multiple studies.

BY MR. PREMO-HOPKINS:

Q.   But -- I understand that.  I understand that, Dr. Somsouk.  And it's a little different than the question I asked.

You would agree with me, wouldn't you, that it's generally accepted in your epidemiological community that you need replicated statistically significant results to conclude that there's a -- a true or a real association; yes?

A.   I -- when you say "replicated," do you mean that another group is doing the exact same thing or they are doing a similar study with similar findings?

Q.   Does that make a difference to how you would answer?

A.   It is more likely that another study group will look at maybe a different dataset to try to reproduce the findings in a different cohort.

Q.   And so you would agree with me, wouldn't you, that it's generally accepted in your epidemiological community that you need replicated,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

and by "replicated" I mean the same result in a different dataset, that's statistically significant to conclude there's a true or real association?

A.   That -- that would be stronger.  Exactly.

Q.   Yeah.

And if all you had here in this case was one statistically significant result from one population, would you be able to reach the opinion that there was a true association?

MR. PENNOCK:  Objection.  Incomplete hypothetical.

Go ahead.

THE WITNESS:  I would be -- I would be very cautious of that to come to a conclusion with one study.

BY MR. PREMO-HOPKINS:

Q.   Dr. Somsouk, you brought a few studies with you that you had marked up that we -- we attached to your deposition as Exhibits, I believe, 11, 12, 13, something like that.

A.   Okay.

Q.   The ones with your handwritten notes.

I just wanted to ask you, what's the significance of you having brought those studies and not any of the others that are in your report?

A.    I thought that some you may be bringing up for discussion, so I wanted to be ready.

There was one that I did not include in my report that I thought was valuable to bring to your attention.

Q.    And that was the Machelli [sic] study?

A.    Yeah, the Maselli study.

Q.    Otherwise, was there any significance to your selection of these four studies that you brought with you?

A.    No.

MR. PREMO-HOPKINS:  Why don't we take a five-minute break?

I'm going to be able to streamline, and I think we should be able to wrap up pretty quickly.

THE WITNESS:  Okay.

MR. PREMO-HOPKINS:  Okay?

THE VIDEOGRAPHER:  Going off the record at 3:30 p.m.

(Recess taken from 3:30 to 3:48.)

THE VIDEOGRAPHER:  We are back on the record at 3:48 p.m.

BY MR. PREMO-HOPKINS:

Q.    Dr. Somsouk, we just took a break.  Are you ready to hopefully wrap up here pretty quick?

A.   Yes, I am.

Q.   All right.  The -- some of the studies that you looked at, in fact, some of the meta-analyses, were meta-analyses of randomized controlled trials; is that right?

A.   That is correct.

Q.   And that's a different type of study than the observational studies that you include in the individual studies; right?

A.   That is correct.

Q.   How is that different?

A.   The --

Q.   Let me ask you the better question.

How is a randomized controlled trial different than a observational study?

A.   How is a randomized controlled trial different from an observational study?

So a randomized controlled trial inherently has a balance between the groups from the outset, meaning that there are -- there is balance, as in they get close to 50/50 percent across all different types of demographic factors, et cetera.

So that is inherently different from a observational study in which there is a selection. Patients and the care that they received are

Matsoukis, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

naturally being selected and routed to different forms of treatment.

Q.   Given the differences in methodology, the -- you've referred to randomized controlled trials as -- as the gold standard for evaluating safety issues in medicines; right?

A.   I -- I would be cautious about saying that in terms of safety, because clinical trials are not powered or designed to look at safety.  They are powered and designed to look for efficacy.

Safety is, like, a secondary thing that they have to do, but they don't really -- they -- they aren't geared towards powering a study to say, "Oh, do we see an outcome like gastroparesis," for example?

They're more geared towards, like, diabetes control, for weight loss.

And so the observational studies are typically in a place where you are looking for the safety signals.

Q.   Would you agree with me that even if they're not designed with safety as a primary end point that randomized controlled trials are an important part of the safety evaluation of a medicine?

A.   It is certainly important.  And our regulatory bodies will ask for reporting and want to collect that type of data.  And there are things that are typical -- typically assessed.  When a patient comes in, they see the clinical research coordinator.  The clinical research coordinator assesses them for whatever symptom or whatever they -- that patient is experiencing.  These are typical -- typically symptoms rather than diagnoses.

And so one of the limitations of clinical trials is that it's actually much more difficult to get new diagnoses in the context of safety.

Q.   So you agree with me, Dr. Somsouk, that in terms of evaluating safety, there are limitations that you've described in your report around observational studies; yes?

A.   With -- with safe- -- so there are just general limitations with observational studies.

Q.   Whether they're looking at safety or anything else?

A.   Exactly.

Q.   And you've described to me that -- that there are also some limitations with randomized controlled trials as it relates to, for example, rare safety events?

A.    There are limitations in the clinical trials, yes.

Q.    And even though the randomized controlled trials have limitations, you would still agree with me that they're important part of evaluating the safety profile of a medicine; yes?

A.    It is.

Q.    The -- if I can direct you to your report, page 18, I believe, and I'm directing you to Exhibit 1 and particularly the entry that runs from page 17 on to 18 about the Sarwal study.

A.    Yes.

Q.    And then in terms of the organization of the studies, are they in chronological order?

A.    I don't recall specifically.

Q.    Okay.  All right.  But no particular significance to the order of -- that you've listed the studies in here, in your report?

A.    I don't -- I don't recall.  I think some of them I might have found later, and so as I'm creating the report, I'm adding it in.

Q.    Yeah.

So in the -- in the Sarwal study, in particular, you identify some limitations at the -- at the end of the entry.

Do you see that?

A.    Yes, I do.

Q.    And one of the limitations that you identify is (as read):

"Pooled analysis masking differences among individual agents."

Do you see that language?

A.    Let me take a look.  Is this now on page 18 at the last sentence?  Yes, I see it.

Q.    Right.

So in page 18 of your report with regard to the Sarwal study, one of the limitations you identify is that they conducted pooled analysis, masking differences among individual agents?

A.    Yes.

Q.    And what -- what does that mean?  What is a pooled analysis, and -- and how would that mask differences among individual agents?

A.    Oh.  I don't recall exactly why I included it.  But when I see it, I am thinking that I may have wanted to see whether or not there were differences across GLP-1 agents.

Q.    And how would looking at GLP-1 agents as a group mask differences among the individual agents?

A.    And this is just to see whether or not the

association is consistent across agents versus
different -- difference across agents.

Q.    And why is a pooled analysis a limitation?

A.    It's -- a pooled analysis is a limitation
if the intent is to look at individual agents and
their effect.  If the intent is just to look at
their overall effect, then it wouldn't be considered
a limitation.

Q.    So if you wanted to look at the effects of
individual agents in the class of GLP-1 RAs, one
limitation of a study would be if it looked at a --
a pooled group as opposed to individual medications;
yes?

A.    It would be a limitation if one wants to
infer that there are differences in the effect and
that -- you know, versus that all GLP-1s have some
similar either effect including adverse events.

Q.    Did you conduct any statistical or other
analysis to evaluate any differences among the
results for individual agents within the GLP-1
class?

MR. PENNOCK:  Objection to form.

THE WITNESS:  I did not do any specific
analysis, although I looked at papers that did
describe different types of agents.  And in those

studies, I examined them to see if there were any described differences.

BY MR. PREMO-HOPKINS:

Q.   And let me make sure I'm clear.  It was not part of your assignment and you did not evaluate whether or not there were different associations with individual medications within the GLP-1 RA class; correct?

MR. PENNOCK:  Objection.

MR. PREMO-HOPKINS:  Let me ask him a different -- let me ask -- ask you a different question.  Hopefully that's not objectionable.

BY MR. PREMO-HOPKINS:

Q.   In your report, you offer no opinions that an individual Lilly medication is associated with gastroparesis; true?

A.   I did not offer any individual, right, association.

Q.   And did I hear you correctly that if one wants to understand whether there's a difference in effect between the different GLP-1 RA medications, you would be limited if all you considered was pooled GLP-1 RA data; yes?

A.   That is correct.

Q.   If you wanted to understand whether there's

an association between an individual medication and gastroparesis, do you agree that the best data would be data about that medication?

A.   The -- if it were available, yes. Otherwise, it would be inferential based off of the other agents if the mechanism and the pathway is accepted.

Q.   Understood.

So if there were data available about individual medications and gastroparesis, that would be the best data to evaluate a potential association between that exposure and that specific outcome; yes?

A.   Yeah.  And -- well, I -- I would also say that I think if the understanding and the mechanism and the pathway is understood to be the similar or the same, then one would assume that the side -- side effects or adverse event profile would be similar, unless it proves that it is not.

Q.   Got it.

You wouldn't want to ignore the medication-specific data, though, if you -- if what you were looking for was an association between a particular medicine and a specific outcome; yes?

A.   Yes.

Q.   Dr. Somsouk, the -- I want to ask you about a couple of the studies that you looked at, and I believe one of them was already marked as the -- the Kalas study, K-A-L-A-S.  It's Exhibit 11.

A.   Okay.

Q.   And have you got the Kalas study, Exhibit 11, in front of you now?

A.   Yes, I do.

Q.   And do you see that -- if we look on the -- the left-hand side of the first page, there's a date when the publication was accepted.

Do you see that?

A.   2023.

Oh, up here (indicating).

Accepted August 24th, 2022.

Q.   And then it looks like it was published in 2023 at some point; yes?

A.   That's correct.

Q.   And are you familiar with the Journal of Investigative Medicine?

A.   I am not.

Q.   So if we -- do you have an opinion one way or the other about whether this is highly powered publication?

A.   I do not believe it's a highly powered

publication.

Q.   And by -- sorry.  We've used that word a lot.

One of the things that you describe is -- in your report -- is that publication in certain journals might confer a higher level of confidence in the -- in the work done; is that right?

A.   That is correct.

Q.   And that was the context of my question.  Is the Journal of Investigative Medicine, is that one that you would put in the category of conferring a higher level of confidence?

A.   I would not confer a high level of confidence.

MR. PENNOCK:  Did you say "high" or "higher"?

THE WITNESS:  I would not confer, like, a higher level of confidence in this journal.

BY MR. PREMO-HOPKINS:

Q.   Let me just make sure I use your words.

So in your report, you say (as read):

"The peer-review process lends a degree of confidence to the significance of the published studies, and acceptance and publication in high-impact journals

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

is a consideration."

Do you remember writing that?

A.    Yes.

Q.    And do you consider the Journal of Investigative Medicine a high-impact journal?

A.    In the scheme of impact -- high -- high impactiveness, I would consider it a lower impact journal.

Q.    When this is published in -- in 2023 -- so let me back up and say, this is one of the studies you summarized and included in your expert report; yes?

A.    That is correct.

Q.    And I believe -- can you confirm for me by looking through your report that this is what you believe to be the earliest-in-time study?

A.    What do you mean by "earliest in time"?

Q.    Earliest publication.

So if I look through your report, you summarize the individual studies that you reviewed, and there's a year next to each one.

Do you see that?

A.    Yes.

Q.    And this is the only -- the Kalas study is the only study I saw from 2023.

Is that consistent with what you see?

A.    The other one is the Sodhi study in 2023.

And then the meta-analysis in 2021.

Q.    Okay.  So with regard to the individual observational studies, at the time this was published -- let's turn to page -- what's page 15 in the bottom right-hand corner of the Kalas study.

And on page 15 in the -- in the left-hand column, about midway down of Exhibit 11, the Kalas study, it says (as read):

"Limited studies are available evaluating the use of GLP-1R agonists in patients with preexisting gastroparesis."

Do you see that?

A.    Yes.

Q.    Do you agree that as of August 2022 when this accepted -- was accepted, that there were limited studies available evaluating the use of GLP-1R agonists in patients with preexisting gastroparesis?

A.    I would agree that that is the case.

Q.    One of the studies that you cite is a study called Niu, N-I-U.

Do you remember looking at that study?

A.    Yes.

Q.   I'm going to grab a copy of it for you, Dr. Somsouk.

A.   Okay.

Q.   And I believe this may be one that's in your -- in the materials considered list, but it doesn't have a vignette --

A.   Okay.

Q.   -- in your report.

(Marked for identification purposes, Exhibit 20.)

BY MR. PREMO-HOPKINS:

Q.   Do you recall reviewing the -- this article as part of your work in this case?

A.   I remember going through it.  And, I mean, I might have lost track of it.

Q.   Do you have a specific recollection as to why this one wouldn't have gotten a vignette in your report?

A.   Yeah, I don't remember.  But I remember Niu.  When you told me Niu, I was like, "Oh, I remember reading it."

Q.   So if -- if we turn to -- just to orient -- orient us, the Niu study was published ahead of print with the date of September 3rd, 2025; yes?

A.   Yes.

Q.    And it's reported in the American Journal of Gastroenterology; yes?

A.    Yes.

Q.    And is that a journal you're familiar with?

A.    I am.

Q.    And is that sort of the flagship journal for the American gastroenterological society -- or association?  Excuse me.

A.    For the American College of Gastroenterology, which is another society.

The flagship Journal for the American Gastroenterological Association is Gastroenterology.

Q.    Okay.  So flagship journal for the American College of --

A.    -- Gastroenterology.

Q.    -- of Gastroenterology is the -- the journal that we're looking at here that N-I-U is published in?

A.    That is correct.

Q.    And the journal with the title "Gastroenterology," you understand that's the flagship journal of the AGA?

A.    That is correct.

Q.    Are you also a member of the American College of Gastroenterologists?

A.    Yes, I am.

Q.    The -- in the -- in the Niu article -- unfortunately, there are no printed page numbers. So I want to direct you to the fifth page of the document.

A.    Okay.

Q.    Towards the bottom.

A.    Fifth page as in, one, two, three, four, five.

It's printed on both sides.  So --

Q.    Correct.

A.    -- is it the results?

Q.    It's -- it's actually going to be the -- the page that has "Introduction" at the top of the page.

A.    Oh, I see.  I see.  So it's the fifth --

(Simultaneous speakers - unclear.)

THE WITNESS:  Back -- back to front page. Okay.

BY MR. PREMO-HOPKINS:

Q.    Correct.

A.    Back and front page.  Okay.

Q.    Correct.

And I want to draw your attention to the bottom -- the paragraph in the bottom half of the

page.

A.   Yes.

Q.   And there's a sentence toward the -- toward the bottom that says (as read):

"Meta-analyses have established a clear association between GLP-1 RA and gallbladder or biliary diseases; however, conflicting data exists regarding the association between GLP-1 RA use and risks of pancreatitis or GI malignancies with no clear consensus from current literature."

Do you see that?

A.   I do see it.

Q.   And do you agree that that accurately -- accurately reflects the state of the science as of the date of this publication, which is --

A.   September.

Q.   -- September 2025?  Yeah.

MR. PENNOCK:  Just note my objection.  I mean, he -- he wasn't asked to nor did he review those two particular injuries.  It's beyond the scope.

You can answer.

THE WITNESS:  Should I answer?

(Simultaneous speakers - unclear.)

BY MR. PREMO-HOPKINS:

Q.  Yeah.

Let me ask you this:  Do you consider -- do you consider gastroparesis a gastrointestinal malignancy?

A.  I do not.

Q.  Okay.  Do you think that's referring to, like, cancer or something like that?

A.  GI malignancy refers to a cancer.

Q.  Okay.  If we -- if we -- we stay here on page 3 -- so, again, the "Study" -- the "Study Highlights" section.

A.  Okay.

Q.  The "Study Highlights" section says "What is Known" and then "What is New Here."

Right?

A.  Yes.

Q.  And what's identified as known by the Niu study as of September 2025 is that (as read):

"The long-term GI and hepatobiliary safety profile of GLP-1 RAs remains uncertain."

Right?

A.  Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    And do you agree that as of September 2025, the long-term GI safety profile of GLP-1 RAs remained uncertain?

MR. PENNOCK:    Objection.

THE WITNESS:    I believe that they are -- the uncertainty is from the vantage point of the study authors and that there is probably some degree of controversy.  And so they wanted to add to that literature.

BY MR. PREMO-HOPKINS:

Q.    So as of September 2025, you agree that there was a controversy in the literature about the long-term safety profile of GLP-1 RAs as it relates to GI safety?

A.    And it's -- it's a very big, broad term, "GI safety."  But for whatever that they were studying, they felt that it remained uncertain and that this would add value to that literature.

Q.    Well, I mean, they identify what -- what they see as new in their publication right after that; yes?

A.    Right.

Q.    And one of the things that they identify as new as of September 2025 is that GLP-1 RAs increase risks of gastroparesis compared to oral antidiabetes

medications; yes?

A.   Yes.

Q.   And do you agree with the authors of the Niu study that that was a new finding as of September 2025?

MR. PENNOCK:  Objection.

Go ahead.

THE WITNESS:  I do not know exactly what they -- they list a handful of things that they consider as new here.

And so gastroparesis from their standpoint was new in that I believe they had more confidence to put it there, that it was something that they found, relative to the prior literature that may have had a signal but they felt that this perhaps was stronger evidence of it.

BY MR. PREMO-HOPKINS:

Q.   Do you agree with the authors of the -- of the Niu study that prior to September of 2025, the long-term gastrointestinal safety of -- profile of GLP-1 receptor agonists was uncertain?

MR. PENNOCK:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  I believe that they felt like

their -- what they found and what they -- what -- what they uncovered in their study would add to the existing knowledge and literature.  Perhaps from their vantage point, they didn't feel that the existing data was sufficient.

BY MR. PREMO-HOPKINS:

Q.    I understand what -- you're trying to tell me what you think they might have thought.  I'm just asking you whether you agree with what they wrote.

Do you agree that it was new in September of 2025 to reach a conclusion that GLP-1 RAs increased the risk of gastroparesis compared to oral antidiabetes medications?

MR. PENNOCK:  Objection.  Asked and answered.

THE WITNESS:  It looks to me like there was -- there have been studies that have described the association in the report.  And so it's not completely new.  But they may -- again, like, they may feel that their evidence was even stronger.

BY MR. PREMO-HOPKINS:

Q.    Did you feel like the N-I-U study was stronger than the preexisting record?

A.    They have -- I mean, to go through the peer-review process makes it stronger.

Q.   Stronger than what?

A.   Than an -- an abstract, using the same, for example, study dataset with a TriNetX.

(Stenographer interrupted for clarification of the record.)

BY MR. PREMO-HOPKINS:

Q.   Would you agree that the studies -- just on the same page.  Do you agree that the -- the studies before the Niu study often had limited sample sizes or follow-up duration?

A.   Some of the studies that were described before had large sample size.  The Niu study reports 230,000.  There were some other studies that were in excess of 100,000.

So some of the other studies do report on similar findings.

Q.   Given the journal it's published in, the timing of its publication and the folks involved with it, did you rate this journal or stack this -- excuse me, rate this article or stack this article in a particular spot in the articles that you analyzed?

A.   I remember seeing it.  And I may have lost track of it.  But I remember it being a -- one of the better studies that I came across.

Q.   And one of the better studies that you came across in your work identifies as a new finding that GLP-1 RAs increase risks of gastroparesis compared to oral antidiabetic medications; right?

A.   I think it reinforced some of the other studies' associations.

Q.   So I just want to make sure I'm clear.  You disagree with the authors of the Niu study that it was a new -- this is going to get real confusing.

What's the exhibit number on this one?

I don't have it.  I didn't --

A.   Twenty.

Q.   So Exhibit 20 is a study by lead author N-I-U, and its entitled "Gastrointestinal and Hepatobiliary Safety of Glucagon-like Peptide-1 Receptor Agonists in Patients with Type 2 Diabetes"; right?

A.   That is correct.

Q.   And Exhibit 20 -- and -- and published in September of 2025; yes?

A.   Yes.

Q.   And Exhibit 20 says, "What" -- on page 3 (as read):

"What is New Here, GLP-1 RAs increase risks of gastroparesis compared to oral

antidiabetic medications."

Right?

A.   That's correct.

Q.   Do you agree that as of September 2025, it was new that GLP-1 RAs increased the risk of gastroparesis compared to oral antidiabetic medications?

MR. PENNOCK:  Objection.  Form.  Objection. Asked and answered a few times.

Go ahead.

THE WITNESS:  I do not believe it was new.

BY MR. PREMO-HOPKINS:

Q.   N-E-W.

Okay.

A.   N-E-W.

Q.   Dr. Somsouk, I want to go back and ask you about your method for identifying the literature and just briefly follow up on it with a couple of questions, if that's all right.

A.   That's okay.

Q.   So you've got what I believe are 23 or 24 studies specifically described in your report; yes?

A.   Yes.

Q.   And -- but you -- initially your search that you described in the "Method" section of your

report identifies that that search pulled back more than those 23 or 24 studies; yes?

A.   That's correct.

Q.   And you narrowed them down to the ones that you felt were the most important?

A.   That's correct.

Q.   And after carrying out the work you were asked to do to produce your report, you reach no opinion that there is a real association between dulaglutide specifically and -- and any sort of gastroparesis; right?

MR. PENNOCK:  Objection.  Form.

Go ahead.

THE WITNESS:  I did not look specifically at dulaglutide.

BY MR. PREMO-HOPKINS:

Q.   And you didn't look specifically at tirzepatide; right?

A.   I did not.

Q.   And you -- you didn't offer any opinion that their exists even today a causal association between any Lilly drug and any adverse gastrointestinal outcome; right?

MR. PENNOCK:  Objection.  Foundation.

THE WITNESS:  I gave an opinion broadly

about the class of GLP-1 RA and gastroparesis.

BY MR. PREMO-HOPKINS:

Q. You did not give an opinion about any individual medication and gastroparesis in terms of the association; right?

A. That is correct.

Q. Now, in -- you mentioned that some of the studies you looked at included some outcomes for specific medications; yes?

A. Yes.

Q. And take your time and -- and look through your report, if you want. I've got the studies if we need them. But I'm going to ask you some questions about whether you recall seeing certain things about Lilly medicines in those studies; okay?

A. Okay.

Q. After carrying out the work to generate your report that's Exhibit 1, you identify in your report no study that reflects a statistically significant positive association between dulaglutide and gastroparesis; right?

A. That is correct.

Q. And after carrying out your work, you identified in your report no study that reflects a statistically significant positive association

between tirzepatide and gastroparesis; right?

A.   That is correct.

Q.   And -- give me just one second.

MR. PREMO-HOPKINS:  We can go off the record, but nobody needs to leave.

THE VIDEOGRAPHER:  Going off the record at 4:26 p.m.

(Recess taken from 4:26 to 4:27.)

THE VIDEOGRAPHER:  We are back on the record at 4:27 p.m.

MR. PREMO-HOPKINS:  Dr. Somsouk, thank you for your time today.  I don't have any other questions on behalf of Eli Lilly at this time.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  And anyone else?

MR. PENNOCK:  No.  We're good.

THE VIDEOGRAPHER:  We have reached the end of today's testimony, and we are going off the record on March 12th, 2026, and the time is 4:28 p.m.

Thank you.

///

///

///

///

Masloouk, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

THE STENOGRAPHER:  Mr. Pennock, do you need a rough of the transcript for today?

(Discussion off the stenographic record.)

MR. PENNOCK:  I'll take it, yes.

(Proceedings concluded at 4:28 p.m. PDT.)

---oOo---

**ERRATA**

Page 45 Line 24 – Page 46 Line 3:

I may have been thinking "Systematic Review", when the question was asked. I did not conduct a formal Systematic Review. However, I extensively reviewed mechanistic studies and studies addressing this issue as cited in my report and Materials Considered List. Below is a listing of relevant mechanistic articles.

1. Dahl K, Brooks A, Almazedi F, HoŬ ST, Boschini C, Baekdal TA. Oral semaglutide improves postprandial glucose and lipid metabolism, and delays gastric emptying, in subjects with type 2 diabetes. Diabetes Obes Metab. 2021;23(7):1594-1603.

2. Hjerpsted JB, Flint A, Brooks A, Axelsen MB, Kvist T, Blundell J. Semaglutide improves postprandial glucose and lipid metabolism, and delays first-hour gastric emptying in subjects with obesity. Diabetes Obes Metab. 2018;20(3):610-619.

3. Hiramoto B, McCarty TR, Lodhia NA, et al. Quantified Metrics of Gastric Emptying Delay by Glucagon-Like Peptide-1 Agonists: A Systematic Review and Meta-Analysis With Insights for Periprocedural Management. Am J Gastroenterol. 2024;119(6):1126-1140.

4. Jensterle M, Ferjan S, Lezaic L, et al. Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity. Diabetes Obes Metab. 2023;25(4):975-984.

5. Sherwin M, Hamburger J, Katz D, DeMaria S, Jr. Influence of semaglutide use on the presence of residual gastric solids on gastric ultrasound: a prospective observational study in volunteers without obesity recently started on semaglutide. Can J Anaesth. 2023;70(8):1300-1306.

6. Pyke C, Heller RS, Kirk RK, et al. GLP-1 receptor localization in monkey and human tissue: novel distribution revealed with extensively validated monoclonal antibody. Endocrinology. 2014;155(4):1280-1290.

7. Moiz A, Filion KB, Toutounchi H, et al. EUïcacy and Safety of Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss Among Adults Without Diabetes : A Systematic Review of Randomized Controlled Trials. Ann Intern Med. 2025;178(2):199-217.

8. Bellavance D, Chua S, et al. Gastrointestinal Motility Effects of GLP-1 RA. 2025. DOI: 10.1007/s11894-025-00995-3

9. Galindo R, Cheng A, et al. Insights into the Mechanism of Action of Tirzepatide: A Narrative Review. 2025. DOI: 10.1007/s13300-025-01804-w

10. Jalleh R, Marathe C, et al. Physiology and Pharmacology of Effects of GLP-1 based Therapies on Gastric, Biliary and Intestinal Motility. 2024/11/21. DOI: 10.1210/endocr/bqae155

11. Jalleh R, Plummer M, Marathe C, et al. Clinical Consequences of Delayed Gastric Emptying with GLP-1 RA and TZP. 2024/10/17. DOI: 10.1210/clinem/dgae719

12. Frazier R, Hasler W. Impact of GLP-1 Receptor Agonists on Gastrointestinal function and symptoms. 2025. DOI: 10.1080/17474124.2025.2579117

13. Abdulraheem A, Abujaber B, Ayers L, et al. Impact of GLP-1 RA on upper gastrointestinal endoscopy: an updated systematic review and meta-analysis. Surg Endosc. 2025;39(8):5135-5151

14. Bettge K, Kahle M, Abd El Aziz MS, Meier JJ, Nauck MA. Occurrence of nausea, vomiting and diarrhoea reported as adverse events in clinical trials studying glucagon-like peptide-1 receptor agonists: a systematic analysis of published clinical trials. Diabetes Obes Metab. 2017;19(3):336-347

15. Crespo J, Rodríguez-Duque JC, Iruzubieta P, et al. GLP-1 receptor agonists and gastrointestinal endoscopy: a narrative review of risks, management strategies, and the need for clinical consensus. J Clin Med. 2025;14(15):5597

16. Elmati P, Kogilathota S, et al. GLP-1 agonists and the risk of pulmonary aspiration during elective upper endoscopy: a systematic review and meta-analysis. Curr Mol Pharmacol. 2025. doi:10.2174/0118743064372550250603061720

17. Gao Z, Tabernaacki T, et al. Association of GLP-1 RA with risk of intestinal obstruction in patients with T2DM: a retrospective cohort study. Acta Diabetol. 2025. doi:10.1007/s00592-025-02525-z

18. Ghazanfar H, Javed N, Qasim A, et al. Is it necessary to stop glucagon-like peptide-1 receptor agonists prior to endoscopic procedure? A retrospective study. World J Gastroenterol. 2024;30(26):3221-3228

19. Grunvald E, Shah R, Hernaez R, et al. AGA clinical practice guideline on pharmacological interventions for adults with obesity. Gastroenterology. 2022;163(5):1198-1225

20. Huang X, Wu M, et al. Gastrointestinal safety evaluation of semaglutide for the treatment of type 2 diabetes mellitus. Medicine. 2024;103(21):e38236

21. Kalas MA, Dang TQ, Galura G, et al. Frequency of GLP-1 receptor agonist use in diabetic patients diagnosed with delayed gastric emptying and their demographic profile. J Investig Med. 2023;71(1):11-16

22. Kommu S, Sharma P, Gabor R. Efficacy and safety of tirzepatide on weight loss in patients without diabetes mellitus: a systematic review and meta-analysis. Obes Rev. 2025;26(4):e13961

23. Kushner RF, Almandoz JP, Rubino DM. Managing adverse effects of incretin-based medications for obesity. JAMA. 2025;334(9):822-823

24. Li XY, Jin Y, et al. Perioperative management of patients on GLP-1 receptor agonists: risks, recommendations, and future directions. J Clin Anesth. 2025;104:111871

25. Mozaffarian D, Agarwal M, et al. Nutritional priorities to support GLP-1 therapy for obesity: a joint advisory. Am J Clin Nutr. 2025. doi:10.1016/j.ajcnut.2025.04.023

26. Pomenti S, Gerber A, Katzka D, Camilleri M, Hur C. Review article: the evolving role of GLP-1 receptor agonists in gastroenterology practice. Aliment Pharmacol Ther. 2025. doi:10.1111/apt.70450

27. Rivera F, Arias-Aguirre E, Aguirre Z, et al. Evaluating the safety profile of semaglutide: an updated meta-analysis. Curr Med Res Opin. 2024;40(9):1495-1514

28. Safwan M, Bourgleh M, et al. Gastrointestinal safety of semaglutide and tirzepatide vs. placebo in obese individuals without diabetes: a systematic review and meta-analysis. Ann Saudi Med. 2025;45(2):129-141

29. Shah M, Kalra S, et al. Gastrointestinal tolerability of tirzepatide compared with GLP-1 RA, insulin and placebo in obesity: a meta-analysis of 11,000+ subjects. Gastroenterology. 2025;168(5):S736

30. Singh S, Rahman S, et al. Effects of GLP-1 RA on endoscopy outcomes: systematic review and meta-analysis. Gastrointest Endosc. 2025;101(2):343-349

31. Tan Y, Zhang X, Lv HE, et al. Glucagon-like peptide-1 receptor agonists increase the risk of residual gastric content and pulmonary aspiration on upper endoscopy: a meta-analysis. Dig Liver Dis. 2025. doi:10.1016/j.dld.2025.03.002

32. Tian Q, Song Y, et al. Efficacy and safety of tirzepatide for weight loss in patients with obesity or type 2 diabetes: a systematic review and meta-analysis. Front Endocrinol. 2025;16:1593134

33. Wharton S, Calanna S, Davies M, et al. Gastrointestinal tolerability of once-weekly semaglutide 2.4 mg in adults with overweight or obesity, and the relationship between gastrointestinal adverse events and weight loss. Diabetes Obes Metab. 2022;24(1):94-105

34. Wright S, Lindquist P, et al. Incretin signaling neighborhoods and adverse drug reactions. Annu Rev Pharmacol Toxicol. 2025. doi:10.1146/annurev-pharmtox-062124-015046

Dated: April 30, 2026

San Francisco, CA

_____

Ma Somsouk, M.D.

CONFIDENTIAL - PROTECTED UNDER PROTECTIVE ORDER

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at <u>San Francisco</u> on <u>April 30, 2026</u> .
              (Place)                (Date)

_____

MA SOMSOUK, MD

STENOGRAPHER'S CERTIFICATE

I, LORRIE L. MARCHANT, Certified Shorthand Reporter, Certificate No. 10523, for the State of California, hereby certify that MA SOMSOUK, MD  was by me duly sworn/affirmed to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported to the best of my ability by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting by computer; that request [  ] was [ X ] was not made to read and correct said deposition.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of March, 2026.

_____
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
Stenographic Certified Shorthand Reporter #10523

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**