# EXHIBIT 40D



Jonathan Campbell, Ph. D.

4/8/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE: GLUCAGON-LIKE            )
PEPTIDE-1 RECEPTOR AGONISTS     )    CIVIL ACTION
(GLP-1 RAS) PRODUCTS            )
LIABILITY LITIGATION,           )    MDL NO. 3094
                                )
_____)
                                )
THIS DOCUMENT RELATES TO:       )    2:24-md-03094-KSM
                                )
ALL ACTIONS/ ALL CASES.         )    HON. KAREN
                                )    SPENCER MARSTON
_____)


CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

JONATHAN CAMPBELL, PH.D.

(Taken by Defendant)

Charlotte, North Carolina

Wednesday, April 8, 2026


Reported in Stenotype by
Kristy L. Clark, RPR, NV CCR #708,
CA CSR #13529, NC Notary #201807900150


Hartford Reporting Job No. 3190

                         APPEARANCES

  ON BEHALF OF THE PLAINTIFF:

                STACY HAUER, ESQUIRE
                RACHEL ARCHAMBEAU, ESQUIRE
                JOHNSON BECKER, PLLC
                444 Cedar Street
                Suite 1800
                St. Paul, Minnesota 55101
                (612) 436-1800


  ON BEHALF OF THE DEFENDANT ELI LILLY:

                ELIZABETH CURTIN, ESQUIRE
                CAROLINE CORDELL BRIGGS, ESQUIRE
                GOLDMAN, ISMAIL, TOMASELLI, BRENNAN &
                BAUM, LLP
                191 North Wacker Drive
                Suite 3000
                Chicago, Illinois 60606
                (312) 681-600
                cbriggs@goldmanismail.com

                - AND -

                MICHAEL SMITH, ESQUIRE
                KIRKLAND & ELLIS
                333 West Wolf Point Plaza
                Chicago, Illinois 60654
                (312) 862-2000

APPEARANCES (Continued)

ON BEHALF OF THE DEFENDANT NOVO NORDISK:

KATIE INSOGNA, ESQUIRE
DLA PIPER LLP (US)
33 Arch Street
26th Floor
Boston, Massachusetts 02110-1447
(617) 406-6000
katie.insogna@us.dlapiper.com
(VIA ZOOM)

- AND -

BRADLEY JENNINGS, ESQUIRE
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500
bradley.jennings@us.dlapiper.com
(VIA ZOOM)


THE VIDEOGRAPHER:  KYLE ROEDER

VIDEOTAPED DEPOSITION OF JONATHAN CAMPBELL, PH.D., a witness called on behalf of Defendants, before Kristy L. Clark, Registered Professional Reporter and Notary Public, in and for the State of North Carolina, appearing from 1450 Raleigh Road, Suite 100, Chapel Hill, North Carolina, on Wednesday, April 8, 2026, commencing at 9:08 a.m.

INDEX OF EXAMINATIONS

EXAMINATION                                          PAGE

  By Ms. Hauer                                    7, 129

  By Ms. Curtin                                   119


                    INDEX TO EXHIBITS

 NUMBER              DESCRIPTION              MARKED

   1           Notice of                        11
               Videotaped
               Deposition of
               Jonathan Campbell

   2           Expert Report of                 43
               Jonathan Campbell,
               Ph.D.

   3           Materials                        44
               Considered List
               Jon Campbell,
               Ph.D.

   4           Supplemental                     44
               Materials
               Considered List
               Jon Campbell

   5           NIH Public Access                87
               Author Manuscript
               dated April 2012

   6           Gastrointestinal                 90
               Motility Effects
               of GLP-1 Receptor
               Agonists article
               dated 6/13/25

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**

Case 2:24-mh-03094-KSM    CONFIDENTIAL - PERSONAL PROTECTIVE CROSS    Filed 05/19/26    Page 8 of 140

INDEX TO EXHIBITS (continued)

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 7 | Mechanisms of action and therapeutic applications of GLP-1 and dual GIP/GLP-1 receptor agonists article dated 7/24/24 | 92 |
| 8 | New England Journal of Medicine article by C. Rosen and J. Ingelfinger | 94 |
| 9 | Statement of Compensation for Jonathan Campbell, Ph.D. | 105 |
| 10 | Duke article by J. Campbell dated 10/16/20 | 105 |
| 11 | Duke article by Jonathan Campbell, Ph.D. dated 11/1/22 | 105 |
| 12 | Diabetes Volume 74, August 2025 | 108 |
| 13 | JCI Insight article | 110 |

CHAPEL HILL, NORTH CAROLINA; WEDNESDAY, APRIL 8, 2026;

9:08 A.M.

-oOo-

THE VIDEOGRAPHER:  On record at 9:08 a.m. today's date is April 8th, 2026.  My name is Kyle Roeder, and I am a legal videographer for the Hartford Reporting and Technology.  This deposition is being taken in the glucagon-like peptide one receptor agonist products liability litigation, MDL No. 3094 before the United States District Court for the Eastern District of Pennsylvania.

The deponent today is Dr. Jonathan Campbell.

All counsel will be noted on the stenographic record.  The court reporter today is Kristy Clark, and she will now swear in the witness.

Thereupon--

JONATHAN CAMPBELL, PH. D., was called as a witness, and having been first duly sworn, was examined and testified as follows:


EXAMINATION

BY MS. HAUER:

Q.   Hi, Dr. Campbell.  My name is Stacy Hauer. We met briefly this morning.  I represent the

plaintiffs in the GLP-1 litigation, and I'm joined by my colleague Rachel Archambeau today.

Can you quickly just state your name for the record?

A.    Jonathan Campbell.

Q.    And you understand you're here today and have been designated as an expert to give testimony on behalf of Eli Lilly with respect to their products dulaglutide and tirzepatide?

A.    I do.

Q.    Okay.  Are you providing any testimony that would relate to any of the Novo Nordisk products semaglutide or liraglutide?

A.    I am not.

Q.    Have you ever had your deposition taken before?

A.    I have not.

Q.    Okay.  Your counsel may have gone over this with you, but I'll just give you a couple of ground rules.  Hopefully, it will make our day a little bit smoother today and make the court reporter's life easier.

If you could wait until I finish asking a question, that will give your counsel time to lodge any objections she has and before you start to answer.  It

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

will also make the court reporter's job a little easier for the transcript today.

          Can you do that for me?

    A.   I can do that.

    Q.   Also, in conversation, it's really easy to go with "uh-huh" and "huh-uh."  Also makes it difficult for the court reporter.  So if you could do your best to answer with "yes" or "no," that would be appreciated.

          Can you do that for me?

    A.   I will do my best.

    Q.   I know in conversation it's very difficult and very easy to forget, so I will remind you if something seems to be a problem.

          Today is not a marathon session, and every so often we'll take breaks to give everybody time to just kind of reset their brain, get a drink of water.  If at any time during the day you need a break, feel free, just let me know, and we'll take a break.  My only request would be if I have a question pending, I would like to finish that question before we go ahead and take a break.

          Does that sound fair?

    A.   That sounds fair.

    Q.   Okay.  If there is any time today where I ask

a question that you don't understand, please feel free to let me know that you don't understand my question or you would like me to rephrase it because I want to make sure I get an answer to my questions.  Okay?

A.    That sounds fair.

Q.    Okay.  And if you do answer my questions, I will assume you understand them.

Does that sound fair?

A.    Yes.

Q.    Okay.  Any reason you wouldn't be able to answer honestly and truthfully today?

A.    No.

Q.    Did you bring anything with you to the deposition today?

A.    I did not.

Q.    Okay.  I see you have some papers in front of you.

What do you have in front of you?

A.    This?

Q.    Yep.

A.    This is my expert report and my materials considered list.

Q.    Okay.  Throughout the deposition today, as I am asking questions, I will hand you exhibits that the court reporter will mark, and they will be the official

paper copies that stay with the transcript and the official record of your deposition today. And so you can expect if I am asking you questions about a certain document, I will just hand you a copy. Okay?

A. Okay.

Q. And I am going to start by marking your deposition notice as Exhibit No. 1.

(Defendant's Exhibit 1 was marked.)

BY MS. HAUER:

Q. Dr. Campbell, have you seen this document before today?

A. I have.

Q. Okay. I understand you're -- you may have only gotten it as recently as yesterday, so I apologize for that short notice. I just wanted to ask if you had an opportunity to look for the documents that were requested in that notice, starting on the documents requested on the bottom of page 1.

A. I don't see the document on the bottom of page 1. Maybe you can clarify it for me.

Q. Yeah, sure. I apologize. On the bottom, about two-thirds of the way down the -- of page 1, there's a section header called "Documents Requested."

A. I see that.

Q. Okay. And I just meant generally speaking.

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 14 of 140

A.   Oh, I see.  I see.

Q.   The documents -- there's about seven -- or there's nine requests in there.

Did you have an opportunity to look for any documents that may be responsive to those requests?

A.   We looked for some of the -- I looked for some of the documents, yes.

Q.   Okay.  I did get this morning a couple of presentations that I -- I assume you found when you went looking for documents?

A.   Those were the ones that I could find.

Q.   Okay.  Did you happen to have -- I'm going to draw your attention to request No. 6.

A.   I see it.

Q.   We had requested some of your research; funding agreements that you had with Eli Lilly and Novo Nordisk.

Do you see those?

A.   I do.

Q.   I did not get a production of any of those.

Did you look for those funding agreements?

A.   I did.

Q.   Okay.  And you were not able to locate them?

A.   We have them.  I -- I'll leave that between you and the lawyers, because I think there's some --

probably some confidentiality issues that are in there. I don't know whether I'm allowed to share those.

MS. HAUER: Okay. And so, just so the record is clear, I am going to request production of those documents.

MS. CURTIN: We have objected to the written request.

BY MS. HAUER:

Q. Dr. Campbell, have you had any communications with any of the other experts designated by either Novo Nordisk or Eli Lilly in this litigation, to your knowledge?

A. I have not.

Q. You can put that aside.

I just want to spend a few minutes on your background before we go too far down the road.

Dr. Campbell, you are employed here at Duke?

A. I am.

Q. And what is your current position?

A. I am an associate professor of medicine in the division of endocrinology.

Q. You are not an M.D.; is that correct?

A. That is correct.

Q. You hold a Ph.D.?

A. That is correct.

Q.   And in your role at Duke, do you perform research?

A.   I do.

Q.   Okay.  Can you just generally give me an overview of what type of research your lab performs?

A.   Sure.  Mostly we are doing basic or translation research.  Basic research would be understanding mechanism of action around incretin-related peptides and related biologies, including glucagon.  We also perform translational research, which could be translating the basic findings towards human implications.  Sometimes that is using human tissues.  And in collaboration with my lab partner, we do human studies.

Q.   First of all, who is the lab partner?

A.   Dave D'Alessio.  He is the chief of endocrinology.

Q.   And what type of human studies do you perform with Dr. D'Alessio?

A.   These would be studies that would ensure the -- the findings that we get from our -- our preclinical models translate to the best of the ability that we can in human models.

Q.   And so are those clinical trials using human participants?

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 17 of 140

A.   Technically, you would call them a human trial, but we call them human studies because they better resemble an experiment that we would run in the lab as opposed to a trial for a particular drug.

Q.   And what would your role be in conducting those human studies?

A.   My role is more of a collaborator to help with study design, analyze the data.  I don't actually run the studies myself.

Q.   And so can I assume that you don't treat patients as part of your day-to-day responsibilities at Duke?

A.   That is correct.

Q.   You're not -- and because you're not a doctor, would you agree with me you're not a gastroenterologist?

A.   I am not a gastroenterologist.

Q.   And you're not board certified in any of the area of medicine?

A.   That is correct.

Q.   So some of my questions today are just so that I can make sure I understand the boundaries of your testimony.  And so I appreciate sometimes they may seem simple, but -- and obvious, but I have to ask them.

Dr. Campbell, are you a statistician?

A.    I am not a statistician.

Q.    And do you have any particular expertise in epidemiology?

A.    I'm not an epidemiologist.

Q.    Do you teach at Duke?

A.    Very infrequently.

Q.    If you were to teach, what -- or on what occasions when you have taught, what type of classes, course lectures have you provided?

A.    In the past, it has been to graduate students mostly around how to write a successful grant.  They are currently trying to twist my arm into teaching medical students fundamentals of biology.

Q.    But as of now, you haven't capitulated?

A.    Not as now.

Q.    Okay.  Dr. Campbell, have you been asked to provide any testimony in this case that relates to diabetes?

MS. CURTIN:  Object to form.

MS. HAUER:  It was a bad question.  Let me reask it.

BY MS. HAUER:

Q.    Actually, let's just skip it, and I will come back to that later.

Case 2:24-mc-03094-KSM    Document 691-40    Filed 05/19/26    Page 19 of 140

I saw on your CV that you have some funding from Eli Lilly and Novo Nordisk; is that correct?

A. Currently or -- or in the history?

Q. Great clarification. So I will break it down into a couple of different pieces. And I understand you had some concerns about providing the funding agreements with those. But I want to kind of flush out that history a little bit more, so let's start with Novo Nordisk.

Historically, have you had any past funding agreements with Novo Nordisk to fund your lab?

A. I have.

Q. And do you have any current funding in place with regards to your lab?

A. I do not.

Q. Can you tell me, to the best of your recollection, what years the funding from Novo Nordisk was covered?

A. If I recall correctly, we've had two sponsored research agreements with Novo Nordisk. Approximately, the first one would have been around 2018 to 2019. I think it was about a year long. The second one was more recent, and I believe it was one to two years. And it recently ended, so '23 to '25 is my best guess.

Case 2:24-md-03094-KSM     Document 691-40     Filed 05/19/26     Page 20 of 140

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



        Q.   Any other funding from Novo Nordisk that you
can recall as you sit here today?
        A.   I don't think so.

Q.   All right.  Switching to Eli Lilly, have you ever had any research funding agreements with Eli Lilly?

A.   Yes.

Q.   Okay.  And have you -- let's kind of break it down in the same past and present situation.  So, historically, in the past, did you have any funding agreements with Eli Lilly that are completed?

MS. CURTIN:  I'm going to object to form.

THE WITNESS:  Yes.

BY MS. HAUER:

Q.   All right.  Approximately, how many of those do you recall?

A.   If I recall this correctly, we have had three independent sponsored research agreements that have since been completed.

Q.   All right.  All right.  Let's start with the first one.  Approximately, what years was the first agreement that you recall?

A.   Around 2018.



Q.    All right.  And then moving to the second funding agreement that you mentioned.

Do you recall what year that would have been approximately?

A.    I think it was a year after, so 2019.

Q.    And approximately how long was that funding agreement in place?

A.    How long?

Q.    Yes.

A.    I think it was either one or two years.



Q.   All right.  And the third agreement that you recall, what year would that have been?

A.   I believe it was around 2022.

Q.   And how long was that research agreement in place?

A.   It was either two or three years.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER



Case 2:24-mc-03094-KSM    Document 691-40    Filed 05/19/26    Page 26 of 140

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



[REDACTED]

[REDACTED]

[REDACTED]

Q.   And what types of experiments, as you're sitting here today, do you recall that would have involved an evaluation of tirzepatide?

A.   Centered around the -- the functional implications of its bias profile.  So basically asking does tirzepatide look like other GLP-1 receptor agonists because it has a different receptor pharmacology?  Trying to understand whether that translates into functional differences in cells that are as close to humans as we can get.

Q.   And when you -- I think you said --

MS. HAUER:  Actually, can I have you read back his answer for me?

(Record read by the reporter.)

BY MS. HAUER:

Q.   And when you said tirzepatide has a different receptor pharmacology, what did you mean by that?

A.   At the GLP-1 receptor, tirzepatide has a bias profile.  It doesn't recruit beta arrestins like other GLP-1 receptors.

MS. CURTIN:  You're going to have to talk slowly.  Sorry to interrupt.

THE WITNESS:  Do you want me to start again?  Okay.

So previous work by Lilly, us, others in the field have shown that they have a different receptor pharmacology.  But understanding what that actually means, in terms of functional consequences, hasn't been shown.

BY MS. HAUER:

Q.    And as you sit here today, has that been shown?

A.    We're the ones that showed that.

Q.    And what -- what were the results of your research?  What did that show?

A.    So it's ongoing.  The one publication that we have put out now says that tirzepatide does not require the beta arrestin molecule in order to signal for insulin secretion in beta cells.

Q.    So to break that down for the judge who's probably not going to understand a lot of the deep science here, can you put that into some laymen terms for me?

A.    There are several functional implications of recruiting beta arrestins.  One could be internalization of the receptor.  We showed in collaboration with Lilly that because tirzepatide does

Case 2:24-cm-03094-KSM    Document 691-40    Filed 05/19/26    Page 30 of 140

not recruit beta arrestins, it doesn't cause internalization of the receptor.

Another aspect that we showed, which is outside of the beta arrestins, is its preference for the human GIP receptor over the GLP-1 receptor in human cells versus mouse cells.

So if I step back and talk about that a little bit, a lot of the work up until this -- until what the studies I'm about to describe were done in either cell lines or in mouse cells. One major issue is the GIP receptor is very different in mice versus humans.

So when tirzepatide came out, and it was described as having dual activity, activity at both the GIP receptor and the GLP-1 receptor. Because of the historical view of GIP, its activity at the GIP receptor was largely dismissed by the field. And you could pull data to support that out of the mouse studies.

The issue is tirzepatide doesn't work very well at the mouse GIP receptor, and it has a right shifted dose response curve. So you have to use it at very high concentrations, which is a confounding variable in my mind.

So we did a lot of work in human islets,

something that our group does a lot, and it gives us access to a more translatable model.  And in that situation, we were able to show that a lot of the biological activity, at least in a beta cell for tirzepatide, is mediated at the GIP receptor.

So we've done a few things talking about its bias profile, its unique receptor pharmacology, looking at its relative contribution at the two receptors that it targets, and then we have some ongoing unpublished work that I can share the high levels with, if you would like.

Q.   I think -- I think that covers it for -- for the time being.  I wanted to follow-up on one thing.

With respect to your testimony that you had found tirzepatide doesn't -- does not recruit the beta arrestins, what is the functional implication in the human of that result?

A.   Yeah, that's a good question, and that's the unpublished stuff.  We actually have it under review right now.  So some of the most exciting stuff I think my lab has done.

What we can show is that for agonist like semaglutide -- that way I can contrast it with tirzepatide we call a full agonist at the GLP-1 -- it recruits beta arrestins in beta cells, and that's all I

can speak to is in beta cells.

And I will tell you why at the end.  That is an absolutely essential feature for semaglutide.  So up until our findings, the field would view beta arrestins as something that desensitizes, puts the brakes on GLP-1 receptor signaling.

It's how the name beta arrestin came in, the arresting part of it, because it arrests the signal.

What we found is that the beta arrestin recruitment also provides a signaling pathway.  So different path, a different set of signaling signals within the cell that the GLP-1 receptor can recruit. And semaglutide absolutely needs those.

So if we delete that in a preclinical model, we can make a knock out.  And if we delete beta arrestin, semaglutide stops working.

Tirzepatide doesn't have that same liability. We translated that to humans and we found that the expression of beta arrestin varies across individual human islets that we get across donors.  And donors with low amounts of beta arrestin, semaglutide doesn't work so well.  In people with high amounts of beta arrestin, it works pretty good.

Tirzepatide, again, doesn't have that liability because it doesn't recruit arrestins.  So the

take-home message from that is these two agonists -- and, again, it's important for me to point out we are doing this all in the context where we can experimentally remove tirzepatide's activity at the GIP receptor.  So we are essentially rendering down tirzepatide to a mono agonist, a simplistic way of looking at it.  But just comparing tirzepatide and semaglutide just at the GLP-1 receptor.

When we do that, we find very different effects, which highlights the point that we are trying to get the field to understand right now is that every GLP-1 receptor agonist is unique because it carries a unique pharmacological profile, not just as PK differences, not just how you deliver it, but how it actually interacts with the receptor is very different.

And the biological outcomes, again, we are only able to speak right now to the beta cell.  We are now building models to translate this to other portions of the body that are relevant, particularly in the brain.  But it tells you that at least at the beta cell, you need to treat each GLP-1 receptor ligand as a unique entity.

Q.   Thank you for being so detailed in your description.

You mentioned a couple of times that these

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 34 of 140    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

results you have right now are limited to beta cells; correct?

A.    That's where we are at, yes.

Q.    Just so our transcript is clear for people who are coming at this and aren't sitting here today. What's a beta cell?

A.    A beta cell is a endocrine cell within the pancreatic islet that makes insulin.

Q.    So the results you're looking at right now relate to pancreatic cells?

A.    Yeah, that's correct.  And we are also excited to move this into the brain because if you look at the heterogenous response across the clinical trials for an outcome like weight loss, it would argue that a lot of the -- a lot of the biology that we're describing in beta cells, we're pretty excited it will translate to the neurons, but we haven't tested.

Q.    So you haven't done any experiments in the brain or CNS at this point?

A.    No.  The models are currently being built right now.

Q.    You've mentioned a couple of times biased agonism today.

Do you remember that?

A.    I do.

Q.   Okay.  Can you explain for the purposes of our transcript today exactly what you mean by "bias agonism"?

A.   So in the context of a GPCR, like the GLP-1 receptor or the GIP receptor, when an agonist binds to that receptor, it has several different signaling nodes that it can engage.  If it engages all of those, usually relative to baseline, because you need a framework in order to compare a unique agonist to.  So in this case, we use the native ligand, so GLP-1 for the GLP-1 receptor.

We call that a full agonist because it recruits all of the available signaling nodes downstream of the receptor.  A biased agonist would show a different receptor pharmacology where it recruits one of those signaling nodes more preferentially, so it's biased towards one way or the other.

Q.   And so is that a comparison to the native peptide -- strike that.  Let me ask it a better way.

Would you ever consider a native peptide to be a biased agonist or is that a term you use when looking at some kind of a synthetic peptide or molecule?

A.   Good question.  You have to start with a

Case 2:24-mb-03094-KSM    Document 691-40    Filed 05/19/26    Page 36 of 140

framework of how an agonist activates a receptor, and so using the native ligand to set the foundation for this is how the endogenous peptide or endogenous hormone signals is generally the baseline that we use.

Q.   Okay.  So the term "biased agonist" would refer to a synthetic peptide or molecule?

A.   Only in the context where there's one ligand for that receptor.  So, for instance, the GLP-1 receptor actually has two endogenous ligands.  One is the GLP-1 receptor made by gut cells or pancreatic alpha cells, but also the glucagon, which is made by alpha cells is another ligand for the GLP-1 receptor.

A weaker ligand for the GLP-1 receptor could be oxyntomodulin, another product of the --

(Clarification by the reporter.)

THE WITNESS:  -- proglucagon peptide that's made in the L cells.

So in this case, you have three unique endogenous ligands, and they could have different biases.  So because we have to set a framework and a baseline to compare it to, generally the GLP-1 native hormone is the framework or the baseline that we use to describe other agonists.  They don't have to be synthetic, just other agonists despite the GLP-1, and what is their bias profile or their receptor

pharmacology relative to the GLP-1.

BY MS. HAUER:

Q.   I want to make sure I'm understanding what you're saying because it's a little complicated.  And so essentially the endogenous native ligand is going to set the standard of a baseline, and so any determination of bias is going to refer to something other than the endogenous ligand.  Is that fair?

A.   I think that's a fair way of putting it, yeah.

Q.   Okay.  Have you ever done any research involving dulaglutide?

A.   We have one paper using dulaglutide.

Q.   And what do you recall in terms of your experimental research using dulaglutide?

A.   We -- this is a paper from, I believe it was, 2018.  And we were using receptor antagonists for both the GLP-1 receptor and the GIP receptor to look at the effects on weight loss alone or in combination.  We were using dulaglutide as a positive control for weight loss.

Q.   When you say you were using it as a "positive control for weight loss," does that mean the experimental design was looking at a different molecule or compound and that was -- strike that.

Let me ask it a different way.

When you described dulaglutide as a positive control, what do you mean by that?

A.    Well, in mice, dulaglutide can cause weight loss that's appropriate for at least our purposes at the time.

Q.    So when you were using it as a control in your experiment, were you evaluating some other compound or chemical or peptide to see how it compared to dulaglutide?

A.    Only in the sense we were using dulaglutide as a reference.  You want to know that the mice are losing weight.  And the other -- to answer your question more specifically, the compounds of interest were agonists for the GIP receptor and GLP-1 receptor.

Q.    What was the reason you were doing experiments using -- did you say GLP-1 or GIP --

A.    Both.

Q.    -- antagonists?

A.    We did both.

Q.    Okay.  And what was the reason you were doing experiments with GLP-1 and GIP antagonists?

A.    So around this time, Amgen, another pharmaceutical company, had reported on the initial findings of their -- what is now MariTide, which is a

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

GIP receptor antagonist in combination with the GLP-1 receptor agonist.

So from an academic standpoint, this is a bit of a paradox. How you can agonize the GIP receptor in combination with a GLP-1 agonism to cause weight loss, or you can antagonize the GIP receptor with the combination with the GLP-1 receptor agonism for weight loss. So it doesn't take a scientist to say those sound like very opposite approaches and you get the same output.

A lot of Amgen's rationale for their approach is based on mouse genetics data, so that's been known since the early 2000s that if you generate a mouse that has a knockout for the GIP receptor, they're protected against diet-induced obesity. And that has led the field to believe that GIP is pro-obesogenic, again, contrasting with the results of GIP agonism causing weight loss.

So there's a paradox. It's a puzzle in the field. That's what we do, we like to solve puzzles. So we set out to ask the question: How does an antagonizing receptor contribute to weight loss? And based on, you know, some of our ideas, some of the way we view the field, we thought that antagonizing either receptor would produce the same effect. And so that

was the impetus for running that study.

Q.    So your hypothesis was if you antagonized either GIP or GLP, you would have -- I think the word you used was a pro-obesogenetic effect.  Did I get that right?

A.    Not entirely.  I will try and correct it.  But -- and I will frame it this way.  Our hypothesis was antagonizing either incretin system would cause the mice to lose weight.

Q.    And what did you find?

A.    That antagonizing either incretin receptor system caused the mice to lose weight.

Q.    As you sit here today, is it still kind of a puzzle within the field whether or not GIP agonism or antagonism is the more -- strike that.  Let me ask it a different way.

Has the -- has the puzzle of whether or not a GIP antagonist or agonist being the better molecule for losing weight been solved?

MS. CURTIN:  Object to form.

THE WITNESS:  No, the puzzle has not been solved.  Amgen has moved into Phase 3.  They are getting weight loss that is proportional or on par with what tirzepatide is getting.

/////

BY MS. HAUER:

Q.    Okay.

A.    So the field is still confused looking at it going, how can you take two different approaches to get the same effects?  I think it's more nuanced than that.

But to answer your question directly, the puzzle has not been solved.

Q.    So there's still kind of an unknown in the field with respect to how GIP impacts weight loss?

MS. CURTIN:  Object to form.

THE WITNESS:  I wouldn't put it that way.  I think -- I think the field is starting to come around to how agonism can contribute to weight loss.  I think antagonism of the GIP receptor from a mechanistic standpoint is behind.

BY MS. HAUER:

Q.    Have you done any experiments with MariTide, the Amgen product?

A.    Not specifically with MariTide.

Q.    Have you had any research funding agreements with Amgen for any other compounds or molecules?

A.    I have not.

Q.    I didn't ask this earlier.  But other than Novo and Eli Lilly, have you had funding agreements with any other pharmaceutical company that would relate

to a GIP or GLP-1 agonist?

A.    I have.



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



Q.    What's the budget for your lab per year?

A.    That's a good question.  Just so I can guess with -- with the best accuracy, total, which includes -- so the reason I'm guessing is because we have directs, which is the -- the budget that I control, that I get to spend, but then on top of it, there are indirects which go to the university to pay for overhead.

Would you like the total or the budget of just the directs that I have access to?

■ ■

■ ■ ■ ■

■ ■

■ ■

Q.   What's the Helmsley Charitable Trust Foundation?

A.   It's a foundation that supports -- one of their missions is Type 1 diabetes.  So we are doing work to understand how to restore alpha cell function and glucagon activity to prevent hyperglycemia in Type 1 diabetes.

Q.   And the 60 percent from the NIH, those are NIH funded grants?

A.   Correct.

Q.   Does your lab have any research projects outside of the incretin world?  Do you have any other research interests?

A.   I think I'm going to need you to define what's outside the incretin world.

Q.   We've been talking a lot today about GIP and GLP.  Do you have ongoing research projects, including grants or funding, that would relate to something other than GIP or GLP?

A.   We do.

Q.   Okay.  And can you tell me what those would

involve?

A.   Broadly, they're probably going to fall under the umbrella of glucagon biology.

Q.   Can you be more specific?

A.   Well, for instance, the Helmsley agreement that we have has nothing to do with incretins.  It's all about glucagon to correct hyperglycemia.

MS. HAUER:  I think -- why don't we take a little break.  I'm kind of at a natural stopping point rather than start something new and then take a break in ten minutes.

THE VIDEOGRAPHER:  Off record at 10:01 a.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 10:16 a.m.

MS. HAUER:  Dr. Campbell, I'm going to mark as Exhibit 2 to the deposition your report, the reason we all came here today.

(Defendant's Exhibit 2 was marked.)

BY MS. HAUER:

Q.   You have one in front of you.  This one's the exact same, but that's going to be the official exhibit that goes with the transcript.

Do you recognize that report?

A.   I do.

Q.   Do you recall when you were first asked to

provide expert testimony in this case for Eli Lilly?

A.    Yes.  It was late 2024.

Q.    You also had in front of you your materials considered list, so I am also going to mark that as Exhibit 3 to your deposition.

(Defendant's Exhibit 3 was marked.)

MS. HAUER:  For the sake of the transcript so everything's clear, we got the updated materials considered list yesterday.  There was a full materials considered list and, like, a one-page supplement.  I'm going to mark the original materials considered list because I already had a copy of it, and then also as Exhibit 4 will be, like, the supplemental stuff.

(Defendant's Exhibit 4 was marked.)

MS. CURTIN:  Got it.

MS. HAUER:  Does that make sense?

MS. CURTIN:  I think so.  Just -- just so we are clear, the -- the -- the amended that was produced yesterday reflects the entirety of the --

MS. HAUER:  It should be these two things put together.

MS. CURTIN:  Yes, yes.

MS. HAUER:  Exactly.

MS. CURTIN:  But we consider the new one the operative one, for what it's worth, just we were doing

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

this for ease.

MS. HAUER:  Yes, and I appreciated that since I was on the road, so.  To whoever did that, thank you.

BY MS. HAUER:

Q.  Okay.  Dr. Campbell, so I want to primarily focus on your report, but the materials considered list, while you have it in front of you, has a list of something like 950 articles on it.

Does that sound about right?

A.  Yeah.

Q.  And did you put together that list of materials?

A.  I did.

Q.  And did they come from literature searching or how did you generate that list?

A.  It was a combination of literature searching, papers, and reports provided to me by the lawyers.

Q.  Okay.  Your expert report itself has, like, 50 references.  Does that sound -- 57 references.

What -- what distinction -- strike that.

What -- why are some of the articles referenced in your expert report, but not all of the information on your materials considered list is referenced in your report?  Does that make sense?

A.  I believe it does.  It would be a very long

report if I included all the materials considered list. The references that made it into the report were the most relevant ones for drawing the opinions that are in the report.

Q. Did anyone else in your lab help you in the creation of the expert report, like a graduate student or any other professors?

A. No.

Q. All right. Turning to your report, I had a question on page 4, under the subsection B, Editorial Grants Panel and Committee Service.

Do you see where I'm at?

A. I do.

Q. The second paragraph down talks about reviewing grants for agencies such as the American Diabetes Association, the Helmsley Charitable Trust, Diabetes Canada, the Novo Nordisk Foundation, and the European Research Counsel.

Do you see where I'm at?

A. I do.

Q. What's the Novo Nordisk Foundation?

A. This is a foundation -- to the best of my knowledge, I am only loosely familiar with this. But this is a foundation that was set up by mandates with the Danish law, where some of the proceeds from Novo

Nordisk need to go to a separate foundation, and then they administer research grants and such.

Q.   Okay.  And do you receive compensation for that work with the Novo Nordisk Foundation?

A.   I don't think so.  Not to my knowledge.

Q.   Okay.  All right.  And then if you could turn to the next page, page 5.  At the top, there is subsection C Consulting and Advisory Roles.

Do you see where I'm at?

A.   I do.

Q.   We talked a little bit today about some of those companies and the work in research funding you've gotten from Lilly and Structure.

My first question is: the very last sentence of that paragraph, it says, "My first consulting or advisory role with Eli Lilly is as an expert in this case."

Do you see that?

A.   I do.

Q.   And what does that sentence mean?

A.   The first time I have consulted or advised for Lilly is this case.

Q.   And do you mean -- let me ask it in a different way.  Prior to this case, you had research agreements with Eli Lilly for research in your lab;

correct?

A.   That is correct.

Q.   And so what distinction are you making when you're saying "my first consulting with Lilly is as an expert in this case"?

A.   So consulting or advisory role would be different than a sponsored research agreement.  A sponsored research agreement is -- which is what you're referring to as previous relationships I've had with Lilly, was to conduct research in my group, not necessarily advise or give consultation to Lilly or for whatever reason.

Q.   Okay.  And when you are talking about consulting, is that limited to expert testimony or is that any type of consulting advice that you would provide?

A.   For Lilly?

Q.   Okay.

A.   I'm asking you.

Q.   Oh, let's be specific.  To Eli Lilly.  When you -- when you say my first consulting or advisor role with Eli Lilly as an expert in this case, do you mean in the capacity where you're providing expert testimony in the GLP-1 lawsuits, or have you provided any other consulting or advisory -- have you served as a

consultant or advisor to Eli Lilly in the past in any other way?

MS. CURTIN:  Object to form.

THE WITNESS:  This is the only situation where I would consider a consulting or advisory role for Eli Lilly.

BY MS. HAUER:

Q.   Okay.  Let me ask a foundational question.

Before today -- before this case, have you ever been an expert in a lawsuit for any company ever before?

A.   No.

Q.   Okay.  When you have served as a consultant or an advisor to the other companies that you have included in this paragraph, what services have you provided to those companies?

A.   That would be more of a consulting role for a variety of things, but generally using my expertise to give them advice.

Q.   And are you currently consulting for any of those companies you identified in your expert report?

A.   Yes.





Q.    Approximately, how much per year do you make in your consulting work?

A.    In total?

Q.    Yes.

A.    For the companies that we just listed, maybe 20,000.

Q.    All right.  Moving on to the middle of page 5, there's a section called "Assignment and Summary of Opinions."

Do you see where I'm at?

A.    I do.

Q.   And underneath that section, there is a series of one, two, three, four, five, six -- seven bullet points that go on to page 7.  Or go on to page 6, I apologize.  Are those opinions that you intend to offer in this case?

A.   They are.

Q.   As you sit here today, have you been asked to offer any opinions different or in addition to what's already been provided in this report?

A.   Not that I can think of.

Q.   Okay.  So no intention to add to what you have already put down on paper?

A.   No intention right now.  I guess I will reserve the right to give you an opinion depending on how we do.

Q.   Okay. Fair enough.  All right.  And then, following that section, your report goes on for about eight pages.  And it looks to me like you have kind of delved into further detail from each of those bullet points as we move through the report.

Does that sound fair?

A.   That sounds fair.

Q.   Okay.  So I think we might as well just go more to the meat of your report, and I can always come back if something seems inconsistent.

Case 2:24-mc-03094-KSM    Document 691-40    Filed 05/19/26    Page 55 of 140

First of all, the methodology on Section 6.

Do you see where I'm at?

A.    One moment.  I do.

Q.    Okay.  You noted you routinely monitor and review new --

(Clarification by the reporter.)

BY MS. HAUER:  "As part of my professional practice, I routinely monitor and review new literature -- literature in this field and have continued to do so while serving as an expert in this litigation."

Did I read that correctly?

A.    Yes.

Q.    And so earlier I marked the materials considered list, which was a long list of literature that you had reviewed or considered in preparing your report.  Is that fair?

A.    That is fair.

Q.    And there was a supplement that we marked as 4 that had a couple of additional articles that was added in since the report was provided to us.  Is that accurate?

A.    That is accurate.

Q.    And -- and so were -- I can't talk today.

Did you come across any other new articles as part of your routine review between when the report was

submitted and today that aren't on that list?

A.    Not that I can think of off the top of my head.

Q.    Okay.  Let's turn to page 7.  You have a title -- a section titled "Differentiating features of GLP-1 RA agonists and dual agonists."

Do you see where I'm at?

A.    I do.

Q.    Okay.  "Plaintiffs' experts argue that biological effects of GLP-1 RA agonists can be assessed on a class wide level; I disagree."

Did I read that correctly?

A.    You did.

Q.    I want to, I think, start out with some kind of foundational questions to figure out where we agree, where we disagree, and make sure we are kind of working from the same framework.

So in this litigation, there's a number of drugs that are involved and people have alleged to have caused injury.  A number of them are GLP-1 R agonists, mono agonists.

Do you understand that?

A.    I do.

Q.    And it also includes tirzepatide, which is a dual agonist of GIP and GLP; correct?

A.   Correct.

Q.   And tirzepatide is the only dual agonist within the class of drugs that are -- are on the market today; correct?

A.   That is correct.

Q.   Okay.  Do -- in these cases, the injuries that the plaintiffs have alleged include a variety of gastrointestinal adverse events.

Do you understand that?

A.   I do.

Q.   Would you agree with me that the GIP adverse effects are stemming from the GLP agonism of the drugs and the GLP-1 agonism of tirzepatide?

MS. CURTIN:  Object to form.  Vague.

THE WITNESS:  I would agree that the GLP-1 -- that activation of the GLP-1 receptor can induce the gastrointestinal effects.

BY MS. HAUER:

Q.   Okay.  And so just -- I want to make sure that I am understanding where we are coming from.  So with respect to tirzepatide that's also a GIP agonist, do you have any opinion about -- strike that.

Is it your opinion that the GIP agonism of tirzepatide can lead to GI adverse events?

A.   No, I would say the opposite.

Q. Okay. I expected that to be your answer. I just wanted to make sure it was clear. So with respect to the drugs at issue in this litigation, we are talking about the GLP-1 R agonism in relation to their GI adverse events. Is that fair?

MS. CURTIN: Object to form.

THE WITNESS: We'll take it as we go, yeah.

BY MS. HAUER:

Q. What about that is giving you hesitation?

A. I'm not sure. Maybe if you can rephrase the question, I can answer more succinctly.

Q. Sure. Is there any reason why -- let me phrase it a different way.

Do you have any opinions that any GI adverse events would be coming from anything other than the GLP-1 agonism of the drugs?

MS. CURTIN: Object to form.

THE WITNESS: No.

BY MS. HAUER:

Q. Okay. Earlier today, we were talking about biased agonism of tirzepatide and the recruitment of beta arrestin.

Do you remember that?

A. I do.

Q. Okay. Are any of the GLP-1 mono agonist

drugs, are any of those biased agonists at the GLP-1 receptor, to your knowledge?

A.    It would be helpful if -- I mean, I don't know what you mean any of them, so maybe if we take them case by case.

Q.    Sure.  Are you aware of whether or not, for example, semaglutide is a biased agonist at the GLP-1 receptor?

A.    I would frame semaglutide as a full agonist.

Q.    Okay.  Are you -- and when you say "full agonist," you mean it acts similar to the endogenous peptide?

A.    It recruits the pathways downstream of the receptor similar to the endogenous peptide, yes.

Q.    Is tirzepatide a biased agonist with respect to the GLP-1 receptor?

A.    That's correct.

Q.    Okay.  And how is -- and explain how tirzepatide is a biased agonist with respect to the GLP-1 receptor.

A.    Tirzepatide's activity at the GLP-1 -- GLP-1 receptor?

Q.    Yes.

A.    It recruits G proteins, the G protein pathway, about the same as an endogenous ligand GLP-1

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the referenced peptide.  It does not recruit arrestins similar to a GLP-1.

Q.   Okay.  And that's the GLP-1 receptor, not the GIP receptor?

A.   It is a full agonist at the GIP receptor.

Q.   Okay.  Understood.

Is liraglutide a biased agonist at the GLP receptor?

A.   Not to my knowledge.  There's less -- less data on liraglutide.

Q.   Okay.  Your expert report has starting at the bottom of page 7 a section on the method of half life extension.

Do you see where I'm at?

A.   I do.

Q.   And if you could just kind of tell me in laymen's terms, how does the method of half life extension have any impact on the drugs within the class activation of the GLP-1 receptor?

MS. CURTIN:  Object to form.

THE WITNESS:  That's a broad question.  Maybe you can be more specific.

BY MS. HAUER:

Q.   You have got quite a few, about a page and a half talking about the method of half life extension,

for the different drugs.

Does that sound like a fair characterization of your report?

A.    It does.

Q.    Okay.  And so you start talking about, for example, the half lives of the drugs.

A.    Okay.

Q.    Okay.  And so do the pharmacokinetics of the drugs, including things like their half life, impact their ability to activate a GLP-1 receptor?

A.    Depends on whether you mean acutely or over a course of time.  Because I could make the argument both ways.

Q.    Okay.  So explain what -- explain how that would impact acutely.  We'll start there.

A.    So -- well, the reason I'm dancing around, not to be difficult, is depends on how you mean activation at the receptor.  Generally, the way the field would conduct that kind of study is with a cell-based assay.  And so doing modifications to the peptide that influences their pharmacology, adding acylation, DPP-4 protection --

(Clarification by the reporter.)

THE WITNESS:  -- acylation or DPP-4 protection, as examples, can influence the way that it

Case 2:24-mc-03094-KSM    Document 691-40    Filed 05/19/26    Page 62 of 140

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

would interact the receptor even in a cell-based model. There are different rules when you go into an in vivo situation, because now you have the combination of altering the receptor pharmacology along with the PK which ultimately turns into a PD. issue.

So the answer is yes to both.

BY MS. HAUER:

Q.    Did you say PK which turns into a PD issue?

A.    Right.  So PK or pharmacokinetics is just measuring the time that a peptide spends in circulation.  Pharmacodynamics translates into what it's actually doing.  Generally, they can be aligned but not always.

Q.    And can you give me examples of when they are not aligned?

A.    Sure.  One of the ones that we are working on right now is Exendin-4, one of the original GLP-1 receptor agonists, and it has a PK of -- I'm going to speak to a mouse because that's where I'm most comfortable -- of about 20 minutes in a mouse.  It has a PD of about four hours.  So there you're divorcing a PK from a PD.

The mechanism is really interesting.  It actually binds to the receptor and internalizes and continues to signal.  Doesn't last forever, but it does

**www.hartfordreporting.com**

extend the PD a little bit beyond the PK because of its unique pharmacology with the receptor.  We don't see that with, say, GLP-1 which has a half life of minutes in a mouse and a PD of minutes in a mouse.

Q.   Are you aware of any examples -- let me ask it in a different way.

Have you observed in your work any differences between the pharmacokinetics and the pharmacodynamics in any of the GLP drugs at issue in this litigation, so semaglutide, liraglutide, tirzepatide, dulaglutide?

A.   Yes.  We can see a difference in the PKs between tirzepatide -- no, the PKs of tirzepatide and semaglutide are similar in a mouse where their PKs-- or their PDs, excuse me -- will differ slightly.  We attribute that again, to differences in receptor pharmacology.

Q.   Okay.  And can you give me more specific information on that difference?

A.   Some of it I can, some of it I cannot because it's confidential.  This is unpublished stuff.  So let me -- let me go to a safe place that I think we can talk about and then translate into an in vivo situation.  I can't take you to the in vivo, but in islets.  Okay?  And we're using a primary cell, and the

function is insulin secretion. We like to do that because we're tying receptor pharmacology to a biological outcome as opposed to stopping at just looking at differences in signaling. Because sometimes it's hard to interpret what those signals mean.

If we can take it one step further and look at insulin secretion, then you can tie it to a biological outcome that's meaningful. That's why we use islets often. In that situation, we can show that the effects of semaglutide will persist for a period -- it's not indefinite, but for a period that is longer after we wash it out compared to tirzepatide. So when we remove tirzepatide from the islets, it's effects diminish almost immediately, where semaglutide continues on for an extended period, you know, maybe 20 minutes.

But, again, that is an example where we're separating PK from PD. It's not exactly that, because this is not an in vivo situation. But it's a tangible example. If you want to extrapolate it to the stuff that I can talk about, but in vivo you would start to see a similar kind of relationship.

Q. Are you aware of any differences -- strike that.

The example you just gave me related to

comparing tirzepatide and semaglutide in islet cells as it related to insulin secretion; correct?

A.    Correct.

Q.    Are you aware of any or could you give me any examples of a situation where that same difference may exist as it relates to GI adverse event?

A.    No.  No.  We are building our models now to go towards satiety and weight loss.  I assume a natural progression that will come from that will be looking at aspects such as nausea and gastric emptying.  Those are things that are in the works, but we have not made it there yet.

Q.    Okay.  I want to go to page 9 of your report. At the top, you have a paragraph that starts with "Dr. Lansman."

Do you see where I'm at?

A.    I do.

Q.    And you reviewed Dr. Lansman's report and deposition?

A.    I did.

Q.    Okay.  And you have an opinion.  You've noted that, "The modifications enabling GLP-1 RA agonists and dual agonists to have a longer half life mostly just affect the dosing interval of the medication.  This is not true."

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 66 of 140

Did I read that correctly?

A.    Can you rephrase that?  It almost made it sound like that was my opinion.  I actually think I have the opposite opinion.  Maybe we just get that correct.

Q.    Yeah.  No.  So you've noted Dr. Lansman states that, "The modifications enabling GLP-1 RA agonist and dual agonists to have a longer half life, mostly just affect the dosing interval of the medication.  This is not true."

Did I read that correctly?

A.    Correct.

Q.    And so it's your opinion that the modifications -- strike that.

And what -- what about that opinion do you disagree with?

A.    Good question.  The -- the modifications that allow an extension of the half life improve the PK also reset -- alter the way an agonist will bind with the receptor or interact with the receptor.  So a very tangible example for the -- the drugs relevant to this case are adding an acylation moiety to a peptide.  It makes it a different peptide than an unacylated peptide.

We ran into this issue years ago when we

first started working with acylated peptides going back to how we measure insulin secretion in primary islets, our method requires a buffer that has a lot of BSA in it. That's what acylation binds to is the BSA. That's how it gets its extended half life.

Q. I don't mean to interrupt. But just so the transcript is clear. Do you mean bovine serum albumin?

A. Correct. And so the issue is when we started to do these experiments, the BSA in that buffer would bind up all of the peptide because it's acylated, and that's just not how it would work in our acute situation, so we needed to figure out a way to get around that to solve that problem.

So we thought, well, we'll just remove the acyl component of these peptides, then it won't bind. That's not going to work because now you're studying a completely different entity. The way that acyl component allows a peptide to bind to the receptor, interact, turn the receptor and initiate a signaling pattern is a key component of its pharmacology.

So to simply state that acylation or other modifications that extend half life just allow for dosing intervals, is an oversimplification.

Q. I didn't notice any citations in this paragraph.

Is there literature that you're relying on for your opinions that that would support, for example, the acylation that you were just discussing?

A.   That's a good question.  So in the -- in the following paragraph, you'll notice 18, that's the one I went to, which is the Sun paper and PNAS where for specifically for tirzepatide, they show that the acyl version of tirzepatide versus the unacylated version of tirzepatide have different pharmacology, different signaling patterns at the GLP-1 receptor.

And then part of the supplementary materials considered list that we -- that I provided here, you can actually -- there's a good title of it here where it says, "Acylation of the incretin peptide Exendin-4 directly impacts glucagon-like peptide 1 receptor signaling and trafficking."  Again, making the point that adding that acyl component to a ligand changes the way it interacts with the receptor.

Q.   Okay.  And so your reference 18 is specific to some functional changes to tirzepatide itself; correct?

A.   Let me just double-check that to make sure we are on the same page, but it should be the Sun paper from maybe a few years in PNAS.

(Clarification by the reporter.)

THE WITNESS:  I'm sorry.  Yes.  The answer to your question is yes.

BY MS. HAUER:

Q.   And so --

MS. HAUER:  Did you get what you need?

BY MS. HAUER:

Q.   So that particular paper isn't comparing the different GLP-1 drugs within the class.  Those are just different -- it's more of a structure activity paper for different tirzepatide variations.  Is that fair?

A.   The -- the key data results of that paper that I wanted to use and I reference here is that if you remove the acylation component of tirzepatide, you turn it into a different type of agonist.

Q.   Yes.  Okay.  And so whether or not you are modifying the peptide to acylate it or change the way the DPP can improve the molecule is ultimately turning it into a different peptide; right?

A.   The DPP-4 is a different issue.  Just want to make sure we stay on point here.  The acylation certainly does.  DPP-4 would as well -- or modify position to give it protection against DPP-4 is likely to have the same effect.

Q.   So -- and I just want to make sure I'm understanding your testimony.  So, for example, the

acylation of the tirzepatide molecule may give it some kind of a stair constraint that changes the way it interacts with the receptors.  Is that an example?

A.  Broadly speaking, the way I like to think about it is -- I mean, it's not going to change the way the end terminus of the peptide sits in the binding pocket of the receptor.  But the confirmational change in the receptor on whether or not the acyl component is on there or not will be different.  And in my mind, that is what generates the different signaling pattern that will be initiated by an acylated versus an unacylated peptide.

Q.  And do you have -- I want to make sure I'm understanding what you're saying.  So when you're talking about an acylated peptide versus an nonacylated peptide, are you referring to the data from the Sun paper that all relates to tirzepatide?

A.  Yeah, as well as the -- the literature that I pointed to in the supplementary materials considered list that looks at it for Exendin-4, which says this is not just specific for tirzepatide.  This is a feature for ligands, for GPCR ligands that if you add something that extends their half life, you have to consider them to have different pharmacology at the receptor.

Q.  Okay.  And are you aware of any literature

that looks at the receptor pharmacology among the drugs in the class that would compare tirzepatide to semaglutide to liraglutide to dulaglutide with respect to the receptor pharmacology?

A.    Can you just ask that in a different way?  I don't think I follow that completely.

Q.    Sure.  Are you -- if I'm understanding your testimony correctly, your testimony is you can't compare the drugs among the class because they may have different receptor pharmacology with respect to how they're binding the receptor if there's acylation or something like that.

Do I have -- do I have that right?

A.    I think if I were to summarize it, I would say that each ligand needs to be considered a unique entity.

Q.    Are you aware of any literature that has done an experiment to compare the pharmacodynamic effects among and between dulaglutide, tirzepatide, liraglutide, semaglutide to look at their downstream pharmacology?

A.    So directly comparing, say, tirzepatide and semaglutide?

Q.    Yes.

A.    Their downstream -- there's -- yeah.  I mean,

there are a handful of papers out of the group from Monash that look at tirzepatide versus semaglutide using the spiderweb plots that say their receptor pharmacology is very different.  Our work with Lilly that we published that really illustrated that tirzepatide is a biased agonist at the GLP-1 receptor, directly compared that to, say, semaglutide or GLP-1 or Exendin-4 to say, look, the pharmacology of these are very different.

In that paper, we took it one step further to put this at function by looking at this in knock out animals of beta arrestin 1, using islets and insulin secretion so that we could tie it to a biological activity.  Our unpublished work that I have been touching on has extended that a little bit further to really compare and contrast different drug classes or different GLP-1 receptor agonists with respect to how they interact with the receptor and what does that mean for biological outcomes.

Q.    Does any of the literature you just referenced evaluate the biological outcomes by way of gastrointestinal adverse events?

MS. CURTIN:  Object to form.

THE WITNESS:  Just trying to think.  Most of the work has been done for beta cell function, glucose

tolerance, probably --

(Clarification by the reporter.)

THE WITNESS:  -- satiety and weight loss.  I can't think of anything off the top of my head for nausea or gastric emptying.

BY MS. HAUER:

Q.    You mentioned -- in addition to some of your work, you mentioned a group.  I think you said Monash.

A.    Monash.  It's a University in Australia. Patrick Sexton and Denise Wooten are the investigators.

Q.    And are those articles in your materials considered list?

A.    There will be, yeah.  They will be in there.

Q.    We talked a little bit earlier about tirzepatide being a biased agonist at the GLP-1 receptor.

Do you remember that?

A.    I do.

Q.    Is there -- and it doesn't recruit beta arrestins; correct?

A.    Correct.

Q.    Okay.  Is there any literature that suggests that the beta arrestin or the lack of the beta arrestin would have any impact on gastrointestinal adverse events?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I don't think that there's any literature to suggest an impact on gastrointestinal events.  I just don't think people have actually made it that far.  There's a reason for that.  I mean, well, I could speculate on someone who studies GLP-1, you can fall into one of two bins.  As an academic right now, you're either studying insulin secretion or food intake because these are the two most well-described actions for GLP-1.

The field is starting to catch up and study the adverse events that regulate release of gastrointestinal and adverse events, so it just becomes we haven't gotten there yet.

Q.    Have you -- has any of your research or work in your lab evaluated gastric emptying associated with the GLP-1 receptor agonist?

A.    It has been some time since I have looked at gastric emptying.  I -- not -- not recently.  Let's just say it's not an ongoing thing.

Q.    Okay.  Have you ever done any research looking at -- for the -- the gastrointestinal motility associated with GLP-1 receptor agonist?

A.    I have not.

Q.    Have you done any research in your lab looking at the gastrointestinal adverse event

associated with GLP-1 receptor agonist?

A.    We have not.

Q.    Does -- are you aware of any research or literature that would show an impact of beta arrestin on gastrointestinal motility?

A.    Not yet.

Q.    Okay.  All right.  I want to talk a little bit about tachyphylaxis.

A.    Okay.

Q.    You, in looking at page 12 of your report, have a section on tachyphylaxis of gastric emptying effects.

Do you see where I'm at?

A.    I do.

Q.    Okay.  And it starts with a sentence, "Even with continued use, some effects of GLP-1 are agonist decline over time, including effects on gastric emptying."

Did I read that correctly?

A.    You did.

Q.    Okay.  And so -- so the transcript is clear, can you describe for me what tachyphylaxis is?

A.    Tachyphylaxis is a diminished response often occurring with repeated agonism of a receptor.

Q.    And -- and with the continued use of GLP-1

receptor agonists, is it your opinion that the effect on gastric emptying stops entirely?

A.    That depends.  I think there's a lot of heterogeneity in that -- to answer that question, mostly because the baseline effect of GLP-1 receptor agonist is -- on gastric emptying is heterogenous across people.  Some people have lower -- lower effects on gastric emptying, others have more.  And then that complicates the interpretation of trying to quantify the rate of tachyphylaxis for GLP-1 receptor agonist over time.  So it's a hard question to answer.

Q.    Would it -- would it be fair to say that the effect of the tachyphylaxis you see with GLP-1 receptor agonist would be a diminishing effect, but not a complete abolishment of the effect?

MS. CURTIN:  Object to form.

THE WITNESS:  To answer that, we can do this on -- on an average.  So if you look at an average population, the effects of GLP-1 receptor agonists on gastric emptying diminish with chronic use.

BY MS. HAUER:

Q.    And when you say "diminish," are you saying are abolished?

MS. CURTIN:  Object to form.

THE WITNESS:  I don't think I would go as far

as to say abolish.  I just don't know that there is good data to support "abolished" versus "diminished."

BY MS. HAUER:

Q.   Okay.  And so I just want to make sure I'm understanding your testimony, because the sentence says, "decline over time, including effects on gastric emptying."

Is there -- is it your intention to say that the effect on gastric emptying stops?

A.   No, I don't think that's what I'm saying there.  I think I'm trying to indicate that there is a level of desensitization or tachyphylaxis on GLP-1 on how GLP-1 agonists impact a lot of biological functions, including gastric emptying.

Q.   Okay.  All right.  Moving to the next paragraph.  "Endogenous GLP-1 is released after consuming a meal which slows gastric emptying and thereby moderates the" --

(Clarification by the reporter.)

MS. HAUER:  -- "the rate of glucose entry into the circulation."

BY MS. HAUER:

Q.   The next sentence notes, "Pharmacological GLP-1 R agonist further enhancing this effect producing dose-dependent delays in gastric emptying."

Did I read that correctly?

A.    You did.

Q.    Okay.  And so you would agree with me that GLP-1 R agonists cause a delay in gastric emptying?

A.    Yes.  I would agree with that.

Q.    And then your next sentence is, "GLP-1 R agonism but not GIP agonism influences gastric motility"; is that right?

A.    That's correct.

Q.    And so it's your -- is it your opinion that GIP agonism does not impact gastric motility?

A.    That is correct.

Q.    Okay.  And so with the GLP-1 R drugs like dulaglutide, you would agree that impacts gastric motility and causes a delay in gastric emptying?

MS. CURTIN:  Object to form.

THE WITNESS:  I would say that dulaglutide reduces gastric emptying.

BY MS. HAUER:

Q.    Okay.  And would you agree that tirzepatide reduces gastric emptying?

A.    I would.

Q.    And that is a result of its GLP-1 agonism, not its GIP agonism?

A.    That is what the data would say, yes.

Q.    The next paragraph that starts with "Tachyphylaxis."

Do you see where I'm at?

A.    I do.

Q.    "Also described as desensitization, is the development of tolerance after repeated dosing of a medication."  And the next sentence is the one I wanted to ask about.  "With respect to gastric emptying in response to a GLP-1 R agonist, this can occur due to neuromal and/or receptor level adaptation in the brain circuits that regulate gastric motility."

Do you see where I'm at?

A.    I do.

Q.    Can you describe to me what you mean by that sentence?

A.    Sure.  In my opinion, I think the way GLP-1 agonists reduce gastric emptying mediated through CNS brain pathways, they start in the brain.  And then they're on neural afferents that will arrive along the intestinal tract or the stomach to reduce gastric emptying.

So when you look at tachyphylaxis as a product of repeated dosing in response to a GLP-1 receptor agonist, there can be two points where the system can slow down.  One is the brain sensing the

GLP-1 receptor.  So desensitization at the neural networks where GLP-1 receptors act, as well as the neural pathways and the endings there where they communicate with the stomach to reduce gastric emptying.

Teasing those two out, I wouldn't be able to do that.

Q.   Okay.  Is there literature out there that would tease out the differences among those two hypotheses?

A.   The literature out there would support that there's CNS --

(Clarification by the reporter.)

THE WITNESS:  Yes.  The literature out there would support that brain activation of GLP-1 receptor is responsible for the gastric emptying, but nothing to tease out the desensitization occurring at the CNS versus the level of the intestine.

BY MS. HAUER:

Q.   Okay.  Further on in that paragraph, it looks like you have cited a meta analysis that's Footnote 31 involving semaglutide; is that correct?

A.   I was waiting for the question.

Q.   Sorry.

A.   That's correct.

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 81 of 140

Q.    Okay.  The last sentence of that paragraph says, "Gastrointestinal symptoms secondary to delayed gastric emptying effects of these medications would also be expected to diminish over time with use of a stable dose."

Did I read that correctly?

A.    You did.

Q.    And so, is it your opinion that gastrointestinal symptoms are the result of a delay in gastric emptying?

A.    It is.

Q.    Okay.

MS. CURTIN:  Been going about an hour, if you're at a breaking point.

MS. HAUER:  Oh, sure.

THE VIDEOGRAPHER:  Off record at 11:15 a.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 11:24 a.m.

BY MS. HAUER:

Q.    All right, Dr. Campbell.  All right.  Going back to your report, I want to look at page 13. Starting at the top of the page, you have got a section titled "Central Versus Peripheral Mediation of Gastric Emptying in Gastrointestinal Adversive Effects."

Do you see where I'm at?

A.    I do.

Q.    Okay.  All right.  And you start with a section on gastric emptying we'll call Section 1.

Do you see where I'm at?

A.    I do.

Q.    Okay.  The first sentence notes, "Mechanistically, GLP-1 R agonism --

(Clarification by the reporter.)

MS. HAUER:  -- "delays gastric emptying through both brain and peripheral non-brain pathways."

BY MS. HAUER:

Q.    Right before the break, we were talking about whether or not GLP-1 agonism causes gastric emptying delay; correct?

A.    Correct.

Q.    Okay.  And what is your understanding or the basis of your opinion that mechanistically, the agonism delays gastric emptying through both brain and peripheral pathways?

A.    I'm sorry.  Can you rephrase that?  Just to make sure I answer correctly.

Q.    Sure.  So you wrote, "Mechanistically, GLP-1 R agonism delays gastric emptying through both brain and peripheral pathways" --

A.    Correct.

Case 2:24-md-03094-KSM   Document 691-40   Filed 05/19/26   Page 83 of 140

Q.   -- correct?  So can you tell me where that opinion comes from?

A.   So my opinion is that most of this is going to occur through the brain pathways.  It's not exclusive, and you can see that from preclinical models where you dissect out those pathways by selectively deleting or knocking out the GLP-1 receptor in different areas and then measuring the outcomes on gastric emptying.

There's work where people have knocked out the GLP-1 receptor from the brain in brain regions and much, maybe not all, but much of the gastric emptying effects and response to a GLP-1 receptor agonist disappear.  So collectively you would say I can't ascribe all of the actions to happen from activation in the brain, but much of the actions happen from activity in the brain.

Q.   Okay.  But the end result is still a delay in the gastric emptying in terms of the physiology?

MS. CURTIN:  Object to form.

THE WITNESS:  I don't think we were talking about physiology there; we were talking about pharmacology.

BY MS. HAUER:

Q.   Yeah.  So the end biological effect is the

patients are experiencing delay regardless of whether it's peripheral or CNS.  Is that fair?

A.    I think I understand what you're saying, but I will ask you to rephrase it, so I answer it correctly.

Q.    So we are talking about delaying gastric emptying in patients; right?

A.    Correct.

Q.    And I think what I just heard you say is that can be through CNS and peripheral mechanisms.

A.    Again, the preclinical studies would suggest that both mechanisms are in play even if not equal.  But yes.

Q.    Okay.  And -- and so there are two potential biological mechanisms that lead to the biological effect of a delay in emptying.

A.    Okay.  Yes.

Q.    Okay.  That's -- I am just making sure we are talking in the same language.

A.    Yes.

Q.    Okay.  Now, the next section of your report talks about aversion and nausea in Section 2.

Do you see where I'm at?

A.    I do.

Q.    Okay.  "GLP-1 R agonism, but not GIP R

agonism can cause adversive effects like nausea and vomiting, which are largely calmed by brain affects rather than from delayed emptying."

Did I read that correctly?

A.   Delayed gastric emptying, but yes.

Q.   Okay.  And so -- and that is your opinion in this case?

A.   It is.

Q.   Now, can adversive effects, like nausea and vomiting, be a result of a delay in gastric emptying?

A.   Depending on the degree of delayed gastric emptying, it can result in nausea and potentially vomiting.

Q.   Okay.  And nausea and vomiting are adverse effects associated with the GLP-1 drugs at issue in this litigation?

A.   That is correct.

Q.   I wanted to -- I wanted to ask about the sentence that kind of runs between the end of 13 and beginning of 14.  It says, "The most up-to-date consensus within the incretin field is that the majority of the gastrointestinal adverse events in response to a GLP-1 R agonist are mediated by GLP-1 R activity in the brain."

Do you see that sentence?

A.    I do.

Q.    Okay.  And so it's -- I just want to confirm. So your opinion is the consensus within the medical community is that the adverse event -- the majority of the gastrointestinal adverse events caused by the drugs are due to brain activity?

MS. CURTIN:  Object to form.

THE WITNESS:  I would rephrase that as the research community, the neuroscientists actually doing this work.

BY MS. HAUER:

Q.    Okay.  And so I just want to make sure I'm understanding what you're saying.  So the neuroscientist research community, of which you are a part?

A.    I would say adjacent, but yes.

Q.    Okay.  Let me -- let me start at the beginning.

So your opinion is that the neuroscience research community has a consensus that the GIP adverse events in response to the drug are mediated?

A.    I think that sounds right.

Q.    What about the physician community?

A.    I can't speak for the physicians.  In my experience, the physicians don't have the same level of

mechanistic understanding as the scientists, so I'm not sure that physicians would hold to this opinion.

Q.   And so if physicians are attributing symptoms, like aversion and nausea, to gastro -- or a delay in gastric emptying, does that impact your opinion in any way in this litigation?

MS. CURTIN:  Object to form.

THE WITNESS:  No.

BY MS. HAUER:

Q.   Okay.  Are you aware that there are physicians in the community who attribute the symptoms to delay rather than solely the brain?

MS. CURTIN:  Object to form.  Foundation.

THE WITNESS:  No.

BY MS. HAUER:

Q.   Okay.  Would -- do you disagree with the notion that the symptoms of aversion and nausea could be caused through some kind of multifactorial pathway where it's a combination of delay and some kind of action in the brain?

A.   I -- I would agree with that.  I think that's what was stated in the sentence we were talking about on page 13 is there is some combination of activity that originates in the brain and some that originates outside the brain.

It's my opinion that most of it is occurring in the brain, but it can't be all.

Q.   And so I'm glad you brought that up, because I want to -- so in your report, you kind of have a section on gastric emptying and a section on aversion and nausea.

A.   (Witness nods head.)

Q.   And I was viewing those differently, but I think I just heard you, you were viewing those similarly in -- in that whether we were talking about gastric emptying or aversion and nausea, it may be some combination of both pathways to get to the biological effect.

Is that a fair characterization of what you just said?

MS. CURTIN:   Object to form.

THE WITNESS:   There's a lot to unpack there.

BY MS. HAUER:

Q.   Okay.   I will back up.

Okay.   Do you agree with me that the biological effect of the delay in gastric emptying is likely through both brain and peripheral pathways?

A.   To varying degrees, but yes.

Q.   And would you say the same thing for aversion and nausea?

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

A.    Even more in balance, but yes.  I don't like to work in binaries where it's one or the other.

MS. HAUER:  Okay.  Doctor, I handed you what I have marked as Exhibit 5.

(Defendant's Exhibit 5 was marked.)

BY MS. HAUER:

Q.    Which is a paper by Scott Kanoski titled "The role of nausea in food intake and body weight suppression by peripheral GLP-1 receptor agonists Exendin-4 and liraglutide."

Have you seen that document before?

A.    I have.

Q.    Okay.  And is this the article that's referenced in Footnote 35 on the bottom of page 13?

A.    Let me just double-check that for you.  This appears to be.

Q.    Okay.  I have a couple of questions about the article.  And some of it I just kind of want to start with in terms of this is a paper that involves some rodent models.  Is that fair?

A.    That is fair.

Q.    And they -- in the abstract on the very first page, it talks about using two established rodent models of nausea, conditioned taste avoidance, and pica, ingestion of non-nutritive substances.

Case 2:24-mc-03094-KSM    Document 691-40    Filed 05/19/26    Page 90 of 140

Do you see where I'm at?

A.    I do.

Q.    And just, again, for the judge and the court, why are these authors using rodent models of nausea using CTA and pica, if you know?

A.    Why are they using rodent models or why are they using those outputs?

Q.    I think you know where I'm going, but let me start over and ask a different question.

A.    Sure.

Q.    Doctor, are they using rodents in this particular experiment?

A.    Yes, they are.

Q.    And do rodents vomit?

A.    Rodents do not vomit.

Q.    So do these researchers use some substitute end point to measure nausea and vomiting in animals?

A.    I would call them surrogates, but yes.

Q.    What is conditioned taste avoidance?

A.    It's an assay where you can get a rodent to get used to drinking a -- usually, it's drinking or consuming a particular substance.

And if you co-administer a drug like Exendin-4, the thought is they will learn to avoid that substance, and then you can measure after how much they

will continue to avoid that substance.  You're learning to associate the feeling of nausea with consuming that substance.

Q.   And similarly, what is the pica end point that they use?

A.   Pica is something that rats will eat when they're feeling nauseated.

Q.   Okay.  And what do they eat?

A.   I don't know exactly what pica is.  I know it's a nonnutritive substance they'll eat, similar to how when dogs don't feel well, they'll go eat grass.

Q.   Have -- in your lab, do you use rodent models using these surrogate end points?

A.   We have not done that historically, no.

Q.   So in these particular experiments, I think you called them surrogate end points, they are using the animals' feeding behavior to essentially kind of extrapolate what they think would be nausea and vomiting; is that fair?

A.   I can't speak to vomiting.  These are established assays in rodents that will help you approximate in gauging the adverse events or the aversion pathways in the brain that typically would in humans result in something like nausea.

Q.   I mean, the animals can't tell you they don't

feel good?

A.   They can't tell them they don't feel and they do not vomit, or at least rats don't vomit.

Q.   Okay.

(Defendant's Exhibit 6 was marked.)

BY MS. HAUER:

Q.   Dr. Campbell, I have handed you what's been marked as Exhibit 6.  And while you're taking a look at that, I'll describe it for the court reporter.  It's a paper by Danielle Bellavance titled Gastrointestinal Motility Effects of GLP-1 Receptor Agonist."  And I see you're looking at your materials considered list.  It's on there.

A.   Just wanted to double-check.

Q.   Feel free to confirm.

Dr. Campbell, have you seen that paper before?

A.   I have.

Q.   Okay.  If you would quick just take a look at the abstract on the first page.

A.   Sure.

Q.   About halfway through the Recent Findings sections, there's a sentence that starts, "While GLP-1 RAs target."

Do you see where I'm at?

A.    A wider range?

Q.    I'm sorry?

A.    Yes, I do.  I do see where you're at.

Q.    "While GLP-1 RAs target a wide range of organ systems, their impacts on gastrointestinal motility are widely regarded as a major mechanism by which they exert their metabolic effects.  However, the drug's alterations in gut motility may account for many of their commonly reported adverse effects, including nausea, vomiting, early satiety, dyspepsia, and bowel habit changes."

Did I read that correctly?

A.    You did.

Q.    So do you agree with that statement?

MS. CURTIN:  Object to form.

THE WITNESS:  I would have worded it differently.

BY MS. HAUER:

Q.    Okay.  How would you have worded it?

A.    The second half is -- is pretty vague on "may account."  Again, as we discussed earlier, I don't want to rule out multiple mechanisms because I think biology is complex.  So "may" could be 1 percent.  It could be -- I don't know what their intention is, so ...

MS. HAUER:  So, okay.  You can put that to

the side.  Okay.

(Defendant's Exhibit 7 was marked.)

BY MS. HAUER:

Q.   Dr. Campbell, I am handing you what I have marked as Exhibit 7.  While you're taking a quick look, that is an article titled "Mechanisms of Action and Therapeutic Applications of GLP-1 and Dual GIP/GLP-1 Receptor Agonists" by Quiyuan Keith Lou.

A.   You did well.

Q.   I see you were looking at your materials considered list.  I will represent to you this is included in your list of materials.

A.   Sure.

Q.   If you could take a look for me on page 12.

A.   Twelve.

Q.   About halfway down the first column, there's a paragraph that starts with, "The most common side effects."

Do you see that?

A.   I do.

Q.   Okay.  If you want to take a minute to read it, go ahead.

A.   Okay.

(Witness reviewing document.)  Okay.

Q.   All right.  So I don't know if it's

Dr. Lou -- we'll assume it's Dr. Lou -- noted on page 12, "The most common side effect of GLP-1 RAs is nausea and vomiting, which are hypothesized to result from inhibition of gastric emptying.  Long-acting agents seem to have a lower incidence of gastrointestinal adverse effects likely due to tachyphylaxis in gastric emptying with sustained GLP-1 RA stimulation.  Nonetheless, residual effects on gastric emptying could still produce significant gastrointestinal adverse effects in patients treated with long-acting GLP-1 RAs."

           Did I read that correctly?

     A.    You did.

     Q.    And so, this author is suggesting the common gastrointestinal side effects are associated with a delay in gastric emptying; correct?

           MS. CURTIN:  Object to form.

           THE WITNESS:  They are suggesting that they are associated -- delays in gastric emptying are associated with adverse events.  It seems like that is what they are implicating, yes.

BY MS. HAUER:

     Q.    And do you disagree with that?

     A.    Again, I don't disagree with the broad strokes.  I think that what is lacking here is a

language to attribute whether or not this is a major contributor or not.

Q.   Okay.  Understood.

(Defendant's Exhibit 8 was marked.)

BY MS. HAUER:

Q.   While you're taking a look at that one, I have just handed you Exhibit, 8 which I have marked, which is an article titled, "GLP-1 Receptor Agonist" by Clifford Rosen and Julie Ingelfinger.  This one is not on your list.

A.   Save me time.

Q.   But if you note on the bottom, it was published April 2nd, 2026, so it just came out last week.  So I didn't know as part of your routine review of literature in your day-to-day life if this is an article you had come across?

A.   I have not seen this, no.

Q.   Okay.  This was published in the New England Journal of Medicine last week.  Are you familiar with the New England Journal of Medicine?

A.   I am.

Q.   Is it fair to say that's a fairly well-respected publication in the medical community?

A.   It is.

Q.   Okay.  If you would look at 13 -- 1319.

A.    Okay.

Q.    There's a section on the bottom of the first column titled "Adverse Events."

Do you see where I'm at?

A.    I do.

Q.    These authors have noted, "Adverse events are well described and not uncommon with incretin analogs. Gastrointestinal side effects are the most common and have been reported in virtually every trial of GLP-1 receptor agonists, and GLP-1/GIP dual agonists during dose escalation.  These side effects include nausea and diarrhea, constipation and vomiting, which occur most often during the first eight weeks of treatment because the mechanism of action of GLP-1 receptor agonists is to slow gastric and intestinal motility to reduce glucose absorption.  It is not surprising these agents cause nausea and constipation."

Did I read that correctly?

A.    You did.

Q.    So is this another publication where the authors are attributing the effects to a reduction in the gastrointestinal motility?

MS. CURTIN:  Object to form.

THE WITNESS:  That seems to be their opinion.

/////

Jonathan Campbell, Ph.D.

BY MS. HAUER:

Q. Okay. And so I think I just showed you three papers from the literature that are attributing effects to gastric delay. Is that fair?

A. Attributing what effect?

Q. The gastrointestinal.

A. The gastrointestinal effects. So a delay in gastric emptying. All right. Yes, that is fair what you just said.

Q. Okay. And so going back to your opinion on the bottom of 13, you noted, "The most up-to-date consensus within the incretin field is the majority of these effects are due to activity in the brain."

And so I just wanted to talk about that "consensus" word that you used. Okay? Does it appear there's consensus in the medical communities based on the articles I just showed you that the GI effects are due to central nervous activation?

MS. CURTIN: Object to form. Foundation.

THE WITNESS: So looking at Exhibit 6, 7, and 8 -- I'm sorry. Can you repeat the question now that we're oriented?

BY MS. HAUER:

Q. Yes. So I'm -- your opinion is, "The most up-to-date consensus within the incretin field is that

Case 2:24-md-03094-KSM   Document 691-40   Filed 05/19/26   Page 99 of 140   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the majority of the gastrointestinal adverse events in response to GLP-1 agonists are mediated by GLP-1 R activity in the brain."

Does -- do the three articles we just looked at, do they impact this opinion about the consensus in the field being mediated by the CNS in any way?

A.   Not at all.

Q.   Why is that?

A.   Well, let me go back, just make sure I read what I wrote correctly.  So give me a moment.  It's on page 13; right?

Q.   It's the last sentence on 13.

A.   The last sentence on 13.  Okay.  So the most up-to-date consensus within the incretin field.  I would argue that none of these authors are in the incretin field.  The only author I know on here is Cliff Rosen.  I have a lot of respect for Cliff Rosen, but he is a clinician who treats patients and probably doesn't think to the level of detail of mechanism.

The emerging evidence that much of the gastrointestinal effects originate from GLP-1 receptor activity in the brain has come out in the last two to three years with some really high-impact journals.  You pointed to the New England Journal of Medicine.  I would point you to the Nature paper that came out about

a year ago that starts to pinpoint the exact neurons on where GLP-1 receptors' activation is driving satiety versus nausea.

It's actually quite an exciting time to be in that space. I doubt that these authors -- I won't speculate. I don't know that they are aware of that data or not.

The point I'm trying to make is in order for the up-to-date field and the scientific community to trickle down to clinicians that will speculate on mechanism takes time. And I would guess, to the best of my ability, that these particular authors are probably just not aware of the most up-to-date mechanistic aspects in the incretin field.

Q. You also had -- I can find it. Hold on. Okay. On the top of page 14, that first full paragraph starts with "Unlike GLP-1."

A. I see it.

Q. Okay. And what is your understanding of the association between GIP and the adversive effects like nausea and vomiting?

A. So first GIP has not been shown to induce nausea. Preclinical studies would argue that GIP activation in specific areas of the brain actually reduce the incidence of nausea that are brought about

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 101 of 140

by GLP-1 receptor agonists as well as other drugs that induce nausea.  And there are now starting to emerge some clinical studies that say that GIP is also antiemetic and antinausea.

Q.  Do you have the opinion that tirzepatide is not associated with adverse symptoms like nausea and vomiting and other GI adversive effects?

A.  The clinical trials with tirzepatide would suggest they have a level of adverse events like you describe.

Q.  Okay.  Are you intending to offer any opinions in this case that relate to ileus or intestinal motility?

A.  Only from a mechanistic standpoint.

Q.  Okay.  And what opinions do you have with respect to ileus or intestinal motility from a mechanistic standpoint?

A.  That any -- any delay or any -- I'm sorry. Ileus -- and then what was the second one?  I got thinking about the answer.

Q.  Ileus --

A.  And intestinal motility?

Q.  Yeah, intestinal motility.

A.  Intestinal motility and ileus, that they would be a consequence of -- of GLP-1 receptor

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 102 of 140
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

activity, that largely stems from the neuro side -- the CNS activation of GLP-1.

Q. Okay. And so your opinion with respect to the brain activity relates to not only the delay in gastric emptying, but also intestinal motility in, like, the small bowel obstruction?

MS. CURTIN: Object to form.

THE WITNESS: I would say it's complicated, yeah.

BY MS. HAUER:

Q. Okay. I didn't see that in your report, so maybe I missed it.

A. Okay. Well, if it's not in my report, then maybe we won't give an opinion on it.

Q. Okay. Let me double-check. Make sure I don't want to say something that's not true. So on page 6, I noted on the bullet -- the last bullet. It says, "The mechanism study cited by Dr. Lodhia and Dr. Pisegna that dulaglutide and tirzepatide cause ileus or bowel obstruction."

Are you offering any opinion about mechanism that relates to ileus or bowel obstruction?

A. Not specifically. More on what I wrote right here, that I think that the mechanistic studies that were cited failed to show a cause on ileus or bowel

obstruction.

Q.   Okay.  And what is the basis for that opinion?

A.   That they didn't measure bowel or bowel obstruction or ileus in the studies that were cited, they were loose associations and extrapolations.

Q.   Okay.  And just to confirm, you've never done any research measuring intestinal motility in animals?

A.   That is correct.

Q.   Okay.  You raised an interesting point and I just wanted to ask:  You do basic science in your lab; right?

A.   Yes, that is correct.

Q.   Lots of animal experiments?

A.   I don't want to say "lots," but we do animal experiments.

Q.   Your career involves animal experiments in addition to self-culture and other basic science research?

A.   That is correct.

Q.   Do you believe that the animal models that you use in your research lab provide evidence of the way incretins exert their biological activity in animals and humans?

A.   Provide evidence?  I would -- I would agree

Case 2:24-md-03094-KSM    Document 691-40    Filed 05/19/26    Page 104 of 140

that there is -- that we can gain insights that would provide evidence that need to be tested.  So almost -- well, let me put it this way.  I think all animal experiments ultimately need to be translated to humans. At least that's the model we follow in our lab.

Q.   Do you agree with me that a lot of mechanism-type research is done in animals?

A.   I would agree with that.

Q.   Okay.  You've -- one of your criticisms of Dr. Pisegna and Dr. Lodhia's papers is that they are animal studies and at most raise hypotheses.

Do you see where -- do you see where you make that statement on page 6?

A.   Could you help orient me?

Q.   Sure.  It's the last sentence of the last bullet point.

A.   Okay.

Q.   Right in the middle.

A.   I see it.  I see it.

Q.   Okay.  And so you seem critical of their reliance on animal studies?

A.   That is not the intent of this sentence.

Q.   Okay.

A.   Raising hypotheses means if I -- if I see a delay in gastric emptying, and then attribute that to

ileus, that's not a link.  That is -- that could be a hypothesis, but that is a loose association.  And -- and my review of their reports, that was the kind of jumps that they were making.

Q.  Okay.  Did you evaluate any of the epidemiological literature looking at ileus or bowel obstruction?

A.  No, that's outside the scope of what I was asked to do.

Q.  So you're not offering an opinion as to that?

A.  I'm not offering an opinion on that.

Q.  So your opinion is simply that you felt like the mechanism studies that those experts relied on didn't reach a conclusion on ileus or bowel obstruction?

A.  That sounds fairly accurate, yes.

Q.  Okay.  I don't want to put words in your mouth, so ...

A.  Understood.

Q.  All right.  At the -- I also had a question about on page 15 of your report, you have a paragraph on gallbladder injuries, the first full paragraph on page 15.

Do you see where I'm at?

A.  I do.

Q.   Are you providing any opinions that relate to gallbladder injuries in this litigation?

A.   I am not.

Q.   Okay.  And that includes mechanisms?

A.   The intent of this paragraph was to highlight that the statement of GLP-1 receptor being expressed in gallbladder is not as concrete as proposed.

Q.   Okay.

A.   That's -- that's the intent of the paragraph.

Q.   So the only testimony -- have you looked at any literature that suggests a difference in the expression of GLP-1 receptor expression on gallbladders?

A.   I think it is cited there.  Fifty-one -- let me just double-check, make sure I'm not speaking out of turn.  Yeah.  Fifty-one is the paper I had in mind.

Q.   So the limit of your testimony as it relates to gallbladder would be limited to the --

A.   An open question as to whether there are direct or indirect effects as alluded to by Dr. Lansman.

Q.   Okay.  And do you have an opinion one way or the other if there are any effects on the gallbladder?

A.   The available data would suggest there's not a direct effect of GLP-1 on gallbladder.

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. HAUER:  Okay.  Why don't we go off the record.

THE VIDEOGRAPHER:  Off record at 12:06 p.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 12:38 p.m.

MS. HAUER:  All right.  Dr. Campbell, welcome back from lunch.  I'm going to start super quick with a couple of housekeeping things.  So I am going to mark as 9.

(Defendant's Exhibit 9 was marked.)

MS. HAUER:  10 and 11.

(Defendant's Exhibit 10 was marked.)

(Defendant's Exhibit 11 was marked.)

BY MS. HAUER:

Q.   These are the documents that I received from your counsel that you produced this morning.  I am going to start with Exhibit 9, which is a statement of compensation.  It looks like you have been paid $29,400 so far in your capacity as an expert.  Is that fair?

A.   That's fair.

Q.   Okay.  And it looks like your -- was your most recent invoice April 1st, 2026?

A.   That is correct.

Q.   And so is -- is there a little bit of time since then preparing for today or ...

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 108 of 140

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.   There will be some additional time, yeah.

Q.   But that's -- this is generally up to date? It's not like there's $100,000 coming down the road?

A.   No, not at all.

Q.   All right.  And this looked to me at $400 an hour, like you put in, like, 75 hours over the last year, year and a half?

A.   If that's what the math adds up to.  I can't do that in my head.

Q.   Okay.  And so the only question I had related to the materials considered list had, like, 950 articles.  Because I thought to myself, wow, he really reads fast if he got through 950 articles in 75 hours. And so, did you read all of the articles on your materials considered list?

MS. CURTIN:  Object to form and the narrative.

Go ahead.

THE WITNESS:  Two different degrees.  So some were given more attention to others -- than others, yeah.

BY MS. HAUER:

Q.   Okay.  Exhibit 10 is a slide presentation you gave on October 16th, 2021.

A.   Sorry, did you ask a question?

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 109 of 140

Q.    Is that a slide presentation you provided to your counsel?

A.    That's correct, yes.

Q.    Is it a fair and accurate representation of what you found?

A.    I believe so.  I'm going through it, but yes, I would ...

Q.    And where and when did you give this presentation?

A.    I don't know.  Simply because I didn't write it on here.  Since then, I've been in the habit of writing on there where I actually am.  So I can't recall.  I could probably cross-reference it with this. Actually, no, I don't know.

Q.    That's fine.  So -- okay.  And then Exhibit 11 is a second slide presentation you found?

A.    That is correct.

Q.    And do you recall where and when that presentation was given?

A.    This one I do because the title is on there, so this was in Copenhagen.

Q.    Where are you seeing Copenhagen?

A.    I recognize the title, "100 years of glucagon and more."  So I know the person who put this conference on, and I remember it being in Copenhagen.

Q.   Okay.  And what type of conference was it?

A.   This was an academic conference to celebrate 100 years of glucagon.

Q.   Was it like a endocrinology conference?  What kind of an academic conference?

A.   No.  It was put on by a professor over in Copenhagen named Nicoli Wewer Alberstchen.  If I can spell it, that would be great.  I'll do my best for you.  Wewer, W-e-w-e-r.  And then Albestchen, A-l-b-e-s-t-c-h-e-n.  It's my best guess.  He's an academic who does glucagon research and wanted to put on a conference to celebrate the 100th year since the discovery of glucagon.

Q.   Okay.  Those are the only questions I have on this.

A.   Okay.

Q.   Okay.  And then I just wanted to follow up on a couple of the things we talked about today.

I'm handing you what has been marked Exhibit 12.  While you're taking a look at that, for the court reporter, it is an article called --

(Clarification by the reporter.)

MS. HAUER:  -- "Therapeutic Targeting of the GIP Receptor:  Revisiting the Controversies."

/////

(Defendant's Exhibit 12 was marked.)

BY MS. HAUER:

Q.　All right.　Dr. Campbell, do you recognize that article?

A.　I do.

Q.　And is that an article that you wrote with Daniel Drucker?

A.　It is.

Q.　Okay.　And that was published in Diabetes in 2025?

A.　That's correct.

Q.　Okay.　Earlier today, we were talking about kind of the puzzle of GIP agonism versus antagonism.

Do you remember that?

A.　I do.

Q.　And is this article reflecting the subject of what we were talking about during your deposition today?

MS. CURTIN:　Object to form.

THE WITNESS:　In essence, what I can tell you about is this was a series of articles to get to the point of GIP agonism versus antagonism, and there were authors who wrote the -- the agonism side and there were authors who wrote to explain the antagonism side.

And this particular piece was meant to try

and reconcile that and/or point out the limitations of what we don't know highlighting that this is still an ongoing conversation.

BY MS. HAUER:

Q.   Okay.  And so as I was looking through it, it looked like you kind of were putting forth various hypotheses of trying to reconcile all the data.

Is that a fair characterization?

A.   I think it's fair to call them hypotheses at this point.

Q.   Is that the state of the world as it is today, too?

A.   I don't think any of these have been fully resolved, too.

MS. HAUER:  Okay.  That's all I had on that. All right.  And then -- all right.

Dr. Campbell, I am handing you what's been marked as Exhibit 13 to your deposition.

(Defendant's Exhibit 13 was marked.)

BY MS. HAUER:

Q.   An article titled "Tirzepatide is an Imbalanced and Biased Dual GIP and GLP-1 Receptor Agonist."

Dr. Campbell, do you recognize that article?

A.   I do.

Q.    And you were one of the authors?

A.    I was.

Q.    And it's from 2020 and was published in JCI Insight --

A.    That's correct.

Q.    -- correct?

Now, is this article talking about the biased agonism of tirzepatide that we discussed during your deposition earlier today?

A.    In part, as well as the imbalance aspect of it.

Q.    Okay.  And is this research that you performed in your lab?

A.    We performed a portion of the research. Specifically, if you would like to know, we contributed the data in Figure 3, which is the functional data looking at insulin secretion.

Q.    Okay.  So the -- the results reflected in some of the other tables would have come from other labs or figures?

A.    Yes.  That is correct.  The -- the data came from other labs outside of Figure 3.  And I don't have the supplementary data, so I don't want to speak to that here.

Q.    That's fine.  So you recall Figure 3?

A.   Well, I recall all of this.  I was -- I was involved with the entire production of this.  But yes, Figure 3 is the data that came from my lab.

Q.   Okay.  I noticed this article also has a bunch of, I guess I'll call them, pharmacokinetic calculations looking at receptor occupancy.

Do you recall that article?

A.   I see that it's here.  Yes.  And I -- I don't know if you have a specific question about it, but ...

Q.   My -- my question was:  Did your -- did you or your lab do any of those calculations?

A.   No.  I recall going through it with the authors that did do this, and they confused me as we did it.

Q.   Okay.  What is the importance of receptor occupancy?

A.   This is actually fascinating.  I was being a little bit tongue and cheek when I said I was confused.  It took me a while because this is outside of my normal way of thinking, but it was trying to predict the amount of free peptide, free agonists that would actually be available to interact with the receptor.

So why is that important?  Because if you measure -- let's say this is tirzepatide, but the same application would happen for something like semaglutide

or anything that is acylated that is bound in majority to albumin.  When it's bound to albumin and now called --

(Clarification by the reporter.)

THE WITNESS:  I don't know.  Let me rephrase that.

MS. CURTIN:  Free peptide.

THE WITNESS:  Free peptide. Right.  So bound peptide, free peptide, only the free peptide is able to interact with receptor.  This was an attempt to try and predict what concentration of the total peptide is free and able to bind to the receptor through a series of testing activity with and without albumin in the system.

It's an imperfect measurement because it's still an in vitro system, but I thought it was a pretty ambitious way to address a very complicated question.

BY MS. HAUER:

Q.    And there was a lot packed into what you just said, so I want to make sure I'm understanding.

A.    Sure.

Q.    So you were doing in vitro experiments?

A.    I was not doing the in vitro experiments. The collective we were doing in vitro experiments.

Q.    Okay.  And so there was an effort to kind of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

mimic the physiological free drug, is that what I'm understanding?

A.    I think that's a fair way of stating it, yes.

Q.    Okay.  And so I think earlier today we were talking about acylation.  If there was bovine serum albumin bound, it would interfere with your experiments; right?

A.    Correct.

Q.    Are you describing a similar concern here?

A.    Not so much in terms of interference.  That's the biology, this is how it works.  That's how you get the extended half life.  If it's bound to the albumin in the circulation, it can't be filtered by the kidneys, so it stays around.  A certain percentage of that that will fall off albumin, which means it can be filtered by the kidney and/or interact with the receptor.

Trying to predict the total concentration, how much of that is actually free and able to activate the receptor would be part of the goals of the task here.

Q.    Okay.  And I suppose conversely, the number of receptors available for binding also kind of impacts the activity in any situation?

A.    So that was --

MS. CURTIN:  Object to form.

THE WITNESS:  That was a component of this. Again, it's hard to fully capture an in vivo situation by replicating in a dish.  One of the mistakes that I think a lot of people make is they used overexpressed cells where the number of receptors is not limiting. So part of this aspect was to use cells with the best estimation that recapitulate what happens in vivo.

In this paper, we call them low density, medium density, high density to try and capture that. It's an imperfect system, but relative to what came before it, I think it was a big jump forward.

BY MS. HAUER:

Q.    Okay.  And so in -- in -- in a human person, there's different receptor density in different tissues; right?

A.    That is a hard question to answer because it's complex.

Q.    Okay.

A.    So would you like me to extrapolate on that?

Q.    Yes, please.

A.    So the way most people would quantify receptor density, I think, is actually a misnomer. They will use it by looking at the level of RNA expression.  And why would you do RNA expression for

CONFIDENTIAL - PURSUANT TO PROTECTED ORDER

something like the GLP-1 receptor?  Because it's really hard to develop antibodies that are specific for the GLP-1 receptor.

So if you were to go and do a PubMed search, I'm sure you'll find lots of papers where people use antibodies.  It doesn't mean those antibodies have been validated and they're correct and it means they're giving the right answer.

That has been an issue that has plagued this field since -- and it's not just GLP-1s. It's the GPCRs.  They are notoriously hard to generate an antibody that is both specific and gives an adequate signal.

So as a surrogate for receptor density, people have relied on the expression of RNA.  But, again, for a low-expressing gene like -- like a GPCR, like GLP-1 receptor, RNA doesn't necessarily reflect receptor density.  So it's -- it's a common misnomer to say the amount of RNA in tissue A is higher than the amount of RNA in tissue B; therefore, the density of receptors in A is higher than the density receptors in B.  That may be true; that may not be true, but people often make that mistake.

Q.    Are there different areas of the human body where there's higher level of GLP-1 receptors, like,

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 119 of 140

for example, like in the gut versus the brain versus the pancreas?

MS. CURTIN: Object to form.

THE WITNESS: Again, that becomes very difficult. So are you talking about density on a per cell basis on a per tissue basis?

BY MS. HAUER:

Q. Per cell.

A. Okay. So per cell, that becomes a little bit easier to answer just simply because now you can compare apples and apples. Based on that, I would say the answer is probably yes.

Q. Okay. And does receptor density in the tissue affect the pharmacological activity of the GLP-1 agonist?

A. I mean, in theory, it should -- the answer is correct, but it depends on -- on -- I mean, if we're talking about GLP-1 receptors, I think you can marshal data together that if you tighter in the receptor density in a cell line, you can get a dose response in response to the same concentration of agonists. So that would answer your question. More receptors means more activity.

A similar type of experiment hasn't been done in primary cells. Most people in this field don't work

Hartford Reporting & Technology, LLC
www.hartfordreporting.com

in primary cells, so it's difficult for me to say with certainty that that is true in a biologically relevant system.

Q.    Okay.    Is there any scenario where you have got a tissue with high receptor density where you've got just spare receptors around that might allow you to have additional activity from any given agonist or ligand?

MS. CURTIN:    Object to form.

THE WITNESS:    I mean, you're asking a broad question on GPCRs in general.

BY MS. HAUER:

Q.    So I am -- I guess I'm just thinking theoretically.    And maybe the answer to your question was -- maybe the answer to the last question answers my question, I'm not sure, but I want to just clarify.

If you have a tissue where there's a high level of GLP receptor expression, they are not all going to be bound to ligand, unless they're saturated, I guess; right?

MS. CURTIN:    Object to form.

THE WITNESS:    I'm not sure if you're asking me or asking yourself.

MS. HAUER:    I think that is all I've got for you today.    I'm going to pass the witness.

Case 2:24-cr-03094-KSM     Document 691-40     Filed 05/19/26     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

THE WITNESS:  Okay.

MS. CURTIN:  Okay.  Can we go off the record for a minute?

THE VIDEOGRAPHER:  Off record at 12:56 p.m.

(Whereupon a short recess was taken.)

THE VIDEOGRAPHER:  On record at 12:58 p.m.

EXAMINATION

BY MS. CURTIN:



Q.    Is your funding, your research funding from Lilly contingent on the outcome of the research for them?

A.    Absolutely not.  In fact, Lilly had very little to do -- after we agreed on the scope of the research, had almost nothing to do with the day-to-day interactions nor the results.

Q.    How is the research funding you receive from a company like Eli Lilly used?

A.    Some of it goes -- well, all of it is given to the university, of which they keep a portion for overhead to support the -- the cost of running things. Some of it is used to pay people in my lab, and the bulk of the remaining or the remaining of it is used to actually conduct the experiments.

Q.    Are you compensated personally from any of that research funding?

A.    Part of the budget for that will be towards my effort.

Q.    Can you explain that?

A.    Effort is a way that we at the university make sure that we don't extend beyond 100 percent.  So,

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 123 of 140
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

as we have multiple projects going on, they can add up to over 100 percent of the efforts.  So our salary is divided up by a 100 percent in that sense.  So when we write a budget line, we mark the salary portion for myself as percent effort.



Q.   Okay.  How does the amount of time that you spend on projects supported by Lilly research funding compare to the amount of time you spend on projects from other sources?

A.   Well, you can quantify that two different ways.  As a percent effort right now, 2 percent of my effort from a salary perspective is given to projects supported by Lilly.  That meaning 98 percent is other stuff.

The practical standpoint is it's probably more like 10 percent give or take only because I work more than a normal 40-hour work week.

Q.   Okay.  And, again, when you use the term

10 percent of your effort, can you explain that?

A.   Not of my effort.  Of the total hours I would put into a normal work week.

Q.   Okay.  Does your salary change depending on your research funding from companies?

A.   Not at all.

Q.   Okay.  Based on your knowledge, experience, and training, would you expect differences in the pharmacologic impact of gastrointestinal adverse events?

MS. HAUER:  Object to the form.

THE WITNESS:  Can you say that one more time? I want to make sure I capture it all.  You switched gears on me.

BY MS. CURTIN:

Q.   I did.  Without warning.

Based on your knowledge, experience, and training, would you expect differences in the pharmacologic impacts of -- well, strike that.

Based on your knowledge and experience of GLP-1 RAs and dual agonists, would you expect differences in the pharmacologic impact on gastrointestinal adverse events?

A.   I can answer that two ways.  The first way is just looking at the clinical trials, which would say

that most GLP-1 receptor agonists have similar rates, on average, of gastrointestinal events. Now, that's complicated because they all come with different doses and different ramping protocols, et cetera, et cetera, so it's not exactly an apple and apple comparison.

From a pharmacological standpoint and a biological standpoint, I would expect them to be very different, if you were looking on an individual basis.

Q. Are there pharmacologic differences within GLP-1 receptor agonists in terms of the impact on gastrointestinal adverse events?

MS. HAUER: Object to the form.

THE WITNESS: I think that's a complicated question to answer, especially when you're comparing semaglutide to tirzepatide. I think they just have different mechanisms of action, that it would be oversimplified for me to give you a simple answer.

BY MS. CURTIN:

Q. Understood.

And my first question referred to both a dual agonist and GLP-1 RAs. And this question -- and I can rephrase it -- I was intending to ask you about GLP-1 mono agonist specifically.

A. Okay. Can you rephrase it with that in mind or -- or restate it?

Q.    Let me do this a different way.  Is there differences in pharmacokinetics between mono agonists as opposed to just between tirzepatide and mono agonists?

A.    In pharmacokinetics, the answer is yes.

Q.    Can you explain that?

A.    Well, the -- the -- if we look across all the GLP-1 mono agonists that are approved, they each have different pharmacokinetics profiles and different half lives.  Some of them are drastically different like exenatide to liraglutide to dulaglutide and semaglutide, semaglutide and dulaglutide are probably more similar to each other.

Q.    Are there differences in pharmacodynamics between mono agonists as opposed to between tirzepatide and mono agonists?

A.    Sure.  And that's also true.  So I think the easiest way to compare that would be to look at the once weekly GLP-1 mono agonists like dulaglutide and semaglutide that have similar enough PK profiles to support once weekly dosing, yet their pharmacodynamics are pretty different.  Both of them will support A1C lowering to a comparable degree.  Yet semaglutide is not supporting meaningful weight loss that it can get an indication for obesity.

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 127 of 140
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    I'm going to shift gears slightly again here.

Did you review the rebuttal reports and deposition transcripts of some of plaintiffs' expert?

A.    I did review for three of them.

Q.    Do you have opinions in response to the deposition transcripts and rebuttal reports -- well, strike that.

Do you have opinions in response to the deposition transcripts of Drs. Lansman, O'Brien and Pisegna?

A.    I do.

Q.    And do you have opinions regarding the rebuttal reports of Dr. Lodhia and Lansman?

A.    I do.

Q.    Let's start with Dr. Lansman.  Do you have criticisms of or responses to any of Dr. Lansman's deposition testimony or anything in his rebuttal report?

A.    There were a few.  I guess, I would hone in on a couple that I can remember off the top of my head. First, and obvious to me that really stood out was he got the -- the pharmacology profile of tirzepatide backwards.  He said it was biased toward beta arrestin, and it's the opposite; it's biased away from beta arrestin.

The implications of being biased towards beta arrestins would be very different than being biased away from beta arrestins for several reasons.  The other -- the other thing that stood out in reading the transcripts was he -- was he was clearly an expert on ligand receptor interactions, but extending that to the physiology or the biological outcomes of the a GLP-1 receptor seemed not to be so obvious to him.

Q.   Let's start with the first part of your answer.

Are you aware of anyone in the incretin community that believes that tirzepatide is biased towards beta arrestins?

A.   I am not.

Q.   Are you aware of any literature supporting that tirzepatide is biased towards beta arrestins?

A.   I am not.

Q.   Okay.  Do you plan to review the transcript of -- the deposition of Dr. Lodhia when it becomes available?

A.   I do.

Q.   Do you have any criticisms based on your -- or responses to Dr. Pisegna based on your review of his deposition and rebuttal -- sorry, strike that.

Based on the review of his deposition?

A. Yeah. I think -- I think he weighted the effects of a GLP-1 receptor agonists on adverse events a lot differently than I would, and in my opinion, the way the literature would spell it out. There was almost a disregard for the central effects more heavily towards that gastric emptying, or delay in gastric emptying as the primary if not exclusive mediator of the adverse events largely by drawing associations.

It's true that GLP-1 receptor agonists reduce gastric emptying. It's true that adverse events, such as nausea, are present in people taking GLP-1 receptor agonists. I don't think it's fair to say that although they're both true, they are related.

Q. Okay. Do you have any comments today about on the report, the rebuttal report of Dr. Lodhia?

A. Not that I can think of right now.

Q. I have two housekeeping questions.

A. Sure.

Q. One, and I think this is just something that didn't come out right on the -- on the transcription.

Do you recall being asked whether you agree that the biological effects of the delay in gastric emptying is likely through both brain and peripheral pathways?

A. I do recall that.

Q. Do you recall answering to varying degrees, but yes?

A. That sounds like something I would say.

Q. Do you recall being asked then whether you would say the same thing for aversion and nausea?

A. I do.

Q. Do you recall answering even more imbalanced, but yes?

A. Yes, I do remember that.

Q. What did you mean "even more imbalanced"?

A. I think that the adverse events, such as nausea, let's be very specific here, are even more likely to be attributed by CNS mediated mechanisms relative to others.

Q. Okay. And to be clear, did you intend to say, even more imbalanced and even more in balance?

A. Imbalanced. So that is true. That is a poor choice of words. Balanced more towards the CNS.

Q. Like I said, just housekeeping. Okay. How did you understand -- or do you recall being asked a question about whether you had any opinions that gastrointestinal adverse events would be coming from anything other than the GLP-1 receptor agonism of these drugs?

A. I do.

Q.   And how did you understand that question?

A.   My understanding was whether or not the GLP-1 receptor agonists have a different mechanism of action other than binding to the GLP-1 receptor.

Q.   Are there other causes of gastrointestinal adverse events in the patient populations taking these medications?

MS. HAUER:  Object to the form.

THE WITNESS:  Yes, that is true.  And people with diabetes and/or other metabolic diseases that would be taking a GLP-1, they probably have gastrointestinal underlying events.

MS. CURTIN:  Okay.  I don't have anything else.


FURTHER EXAMINATION

BY MS. HAUER:

Q.   I just have a couple of cleanups.  I'm going to stay over here and not make everyone move again.

With respect to the questions you just answered with -- regarding Dr. Lansman.

A.   Uh-huh.

Q.   Your testimony was it was obvious he was an expert in ligand receptor interactions, but not so obvious as it related to GLP-1 or something like

Case 2:24-cv-03094-KSM    Document 691-40    Filed 05/19/26    Page 132 of 140

that's.

Do you recall that testimony?

A.    I do.

Q.    What did you mean by that?

A.    It seems like he was pulling his knowledge from other GPCRs ligands.  I think he was calling it the lock and dock on how a particular ligand can interact with a receptor and that may initiate signaling patterns.

What wasn't clear to me is that he had expertise on what those signaling patterns would do in terms of a biological outcome.

Q.    Specific to GLPs?

A.    For GLP-1 receptors.

Q.    And why was that not clear to you?

A.    It just wasn't well articulated.  He didn't answer the question specifically.  It seemed like that extended beyond the scope of the expertise.

Q.    And with respect to your testimony about Dr. Pisegna, do you recall being asked about his testimony?

A.    I do.

Q.    And you provided the opinion that it sounded like the two of you weighted criteria differently.

Does that ring a bell?

A.    That sounds like it is accurate, yes.

Q.    Okay.  And so if he testified at his deposition that he thought that symptoms of adversive effects, like nausea and vomiting, were multifactorial and included delay in the CNS, do you have a different opinion than that?

A.    On the whole, the way you just described it, I think that would be fine.

Q.    Okay.  Just to confirm, you were asked some questions about the biological effect of gastric emptying and nausea and vomiting just a minute ago.

Is it -- and your testimony was in both instances, there was some attribution to the CNS and some attribution to the peripheral.  Is that fair?

MS. CURTIN:  Object to form.

THE WITNESS:  Can you just state that?

BY MS. HAUER:

Q.    I'll ask it a different way.

With respect to the biological activity of the GLP compounds, I'm going to limit this to gastric emptying.  Your opinion is that there are two mechanisms involved, some through the brain and some through peripheral mechanisms; is that true?

A.    I think you're painting it with a broad brush.  I would rephrase it as there are more than one

mechanism, with most of it occurring in the CNS.

Q.   Okay.  Is that true for gastric emptying and adversive effects, like nausea and vomiting?

A.   That is true.

Q.   And is there a difference between gastric emptying and adversive effects, like nausea and vomiting?

MS. CURTIN:  Object to form.

THE WITNESS:  In terms of what?

BY MS. HAUER:

Q.   The multiple mechanisms.

A.   In terms of the relative contribution of each?  I mean, now we are getting into specifics that I don't think there is data to answer.  All I can say that both of those, in terms of gastric emptying as well as nausea, in my opinion, most of those actions originate from GLP-1 receptor activity in the CNS.

MS. HAUER:  And earlier today I asked the question, and you just raised a good point.  Is there data to show the contribution from the CNS -- CNS as it relates to adversive effects, like nausea and vomiting?

MS. CURTIN:  Object to form.

THE WITNESS:  Yes.

BY MS. HAUER:

Q.   And what data would that be?

A.   Oh, there's -- there's lots of different data from work coming out of Penn, both from Matt Hayes and Amber Alhadeff, Randy Seeley at Michigan, Timo Muller in Munich.  All of them are pointing to very specific neurons within the hindbrain that initiate nausea effects.

Q.   Okay.  And is there data to apportion whether adverse effects of nausea and vomiting and other gastrointestinal injuries are coming from the specific areas of the brain and/or gastric emptying delays?

MS. CURTIN:  Object to form.

THE WITNESS:  Yeah, I don't -- I don't like the term "injuries" in there.  But if you want to separate it into gastrointestinal events versus -- or that originate in the brain versus the periphery.  If we set the boundaries there, there's preclinical data that says if you remove the GLP-1 receptor from just the CNS, which means that it can act throughout the body, you remove most of the effects on gastric emptying and nausea.

MS. HAUER:  Okay.  All right.  That is all the questions I have.

MS. CURTIN:  Okay.  Thank you.

THE VIDEOGRAPHER:  This concludes today's deposition.  The time on the monitor is 1:16 p.m.  We

are now off record.

                    (Thereupon, the deposition

                 concluded at 1:16 p.m.)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE- 1 RECEPTOR AGONISTS (GLP-1-RAS) PRODUCTS LIABILITY LITIGATION | : : : : : | CIVIL ACTION |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS/ALL CASES* | : : : : : : | MDL No. 3094 24-md-3094 |

### ERRATA FORM
#### FOR THE APRIL 8, 2026 DEPOSITION OF JONATHAN CAMPBELL

Pursuant to Federal Rule of Civil Procedure 30, the deponent Jonathan Campbell has reviewed the transcript from the deposition taken on April 8, 2026, and submits the following corrections:

| Page | Line | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 16 | 16 | Not as now | Not as of now | Transcription error |
| 24 | 20 | ███████ | ███████ | ███████ |
| 26 | 21 | bias | biased | Transcription error |
| 29 | 22 | agonist | agonists | Transcription error |
| 34 | 24 | just other agonists despite the GLP-1, | just other agonists for the GLP-1 receptor, | Transcription error |
| 36 | 15 | agonists | antagonists | Transcription error |
| 37 | 5 | agonism | agonist | Transcription error |
| 37 | 7 | agonism | agonist | Transcription error |
| 50 | 4 | ███████ | ███████ | ███████ |
| 50 | 18 | ███████ | ███████ | ███████ |

| Page | Line | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 59 | 17 | is depends | is it depends | Transcription error |
| 60 | 5 | PD. | PD | Transcription error |
| 72 | 11 | regulate release of | regulate | Transcription error |
| 77 | 19 | they're on | they act on | Transcription error |
| 87 | 1 | in balance | imbalanced | Transcription error |
| 98 | 2 | receptors' | receptor | Transcription error |
| 100 | 2 | GLP-1 | GLP-1 receptors | Clarity; transcription error |
| 106 | 19 | Two | To | Transcription error |
| 117 | 19 | tighter | titer | Transcription error |

## **CERTIFICATION**

I, Jonathan Campbell, do hereby certify that I have read the transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections as indicated by me above.

Signed on the __5th__ day of __May_____, 2026.

*Jonathan Campbell*
_____
Jonathan Campbell

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

CERTIFICATE OF REPORTER

STATE OF NEVADA    )
                   )    ss:
COUNTY OF CLARK    )

I, Kristy L. Clark, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:  That I reported the deposition of Jonathan Campbell, Ph.D., commencing on Wednesday, April 8, 2026, at 9:08 o'clock a.m.

That prior to being deposed, the witness was duly sworn by me to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript is a complete, true and accurate transcription of my said shorthand notes, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 9th day of April, 2026.

_____
KRISTY L. CLARK, CCR #708

**Hartford Reporting & Technology, LLC**
**www.hartfordreporting.com**