# EXHIBIT 41D



Suneil Koliwad, M.D., Ph.D.

4/24/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE MATTER OF:                    )
                                    )
GLUCAGON-LIKE PETPTIDE-1            )
RECEPTOR AGONISTS (GLP-1 RAs) )  MDL No. 3094
PRODUCTS LIABILITY LITIGATION )  24-md-3049
_____)
                                    )
THIS DOCUMENT RELATES TO:      )
                                    )
ALL ACTIONS/ALL CASES          )
_____)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF SUNEIL KOLIWAD, M.D., Ph.D.

SAN FRANCISCO, CALIFORNIA

FRIDAY, APRIL 24, 2026

Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
Realtime Systems Administrator
California CSR License #11600
Oregon CSR License #21-0005
Washington License #21009491
Texas CSR License #10725

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE MATTER OF:                    )
                                    )
GLUCAGON-LIKE PETPTIDE-1            )
RECEPTOR AGONISTS (GLP-1 RAs) )    MDL No. 3094
PRODUCTS LIABILITY LITIGATION )     24-md-3049
_____)
                                    )
THIS DOCUMENT RELATES TO:           )
                                    )
ALL ACTIONS/ALL CASES               )
_____)

VIDEOTAPED DEPOSITION of SUNEIL KOLIWAD, M.D., Ph.D., taken before Heather J. Bautista, CSR No. 11600, a Certified Shorthand Reporter for the state of California, with principal office in the county of Santa Clara, commencing on Friday, April 24, 2026, 9:05 a.m., at 555 Mission Street, Suite 2400, San Francisco, California 94105.

APPEARANCES OF COUNSEL:

For Plaintiffs:
Morgan & Morgan
BY: NICOLE M. LOVETT, ESQ.
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Phone: (813) 223-5505
nlovett@forthepeople.com

Wagstaff & Cartmell LLP
BY: THOMAS A. ROTTINGHAUS, ESQ.
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Phone: (816) 701-1193
trottinghaus@wcllp.com

For NOVO NORDISK:
DLA Piper LLP (US)
BY: CHRISTOPHER GISMONDI, ESQ.
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Phone: (212) 335-4500 / Fax: (212) 335-4501
christopher.gismondi@us.dlapiper.com

DLA Piper LLP (US)
BY: ALEXANDRA N. ORIGINES, ESQ.
555 Mission Street, Suite 2400
San Francisco, California 94105
Phone: (415) 836-2511
alexandra.origenes@us.dlapiper.com

For ELI LILLY:
Kirkland & Ellis LLP
BY: MARK PREMO-HOPKINS, ESQ. (Remote)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Phone: (312) 862-2000
mark.premohopkins@kirkland.com

Goldman Ismail Tomaselli Brennan & Baum LLP
BY: CAROLINE CORDELL BRIGGS, ESQ. (Remote)
191 North Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: (312) 681-6000 / Fax: (312) 881-5191
cbriggs@goldmanismail.com

ALSO PRESENT: Alejandro Zamora Ruiz, Videographer

INDEX OF EXAMINATION

                                                          PAGE

SUNEIL KOLIWAD, M.D., Ph.D.

    EXAMINATION BY MS. LOVETT                             8

    EXAMINATION BY MR. ROTTINGHAUS                        112

    EXAMINATION BY MR. PREMO-HOPKINS                      131

    EXAMINATION BY MR. GISMONDI                           137

    EXAMINATION BY MR. ROTTINGHAUS                        139

Case 2:24-md-03094-KSM   Document 691-41   Filed 05/19/26   Page 7 of 144

INDEX OF EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 1 | Dr. Koliwad report | 9 |
| Exhibit 2 | Original materials considered list | 10 |
| Exhibit 3 | Corrected materials considered list | 10 |
| Exhibit 4 | UCSF magazine article - "Are the New Weight Loss Drugs Too Good to be True" dated June 13th, 2024 | 29 |
| Exhibit 5 | Suneil Koliwad CV | 36 |
| Exhibit 6 | medRxiv article titled "Phenom-wide Risk Evaluation of GLP-1 Receptor Agonist Use in Type 2 Diabetes With Real-World Data Across Multiple Health Care Systems" | 40 |
| Exhibit 7 | Research Letter:  Risk of Gastrointestinal Adverse Events AssociatedWith Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss | 53 |
| Exhibit 8 | December 2017 Ozempic prescription drug label | 86 |
| Exhibit 9 | Prescription information for Wegovy | 89 |
| Exhibit 10 | Coutinho study | 101 |
| Exhibit 11 | Invoice summary table | 107 |

                    Friday, April 24, 2026

                         9:05 a.m.

                         --oOo--

          THE VIDEOGRAPHER:  We are now on the record.
Today's date is April 24, 2026, and the time is
9:05 a.m. Pacific Time.

          My name is Alejandro Zamora Ruiz.  I'm the
legal videographer for Hartford Reporting and
Technology.

          This deposition is being taken in the In Re:
Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs)
Products Liability Litigation, Cause No. MDL 90 -- 3094,
before the United States District Court for the Eastern
District of Pennsylvania.

          The deponent today is Dr. Suneil Koliwad, M.D.,
Ph.D.

          Counsel, please state your appearances and whom
you represent for the record.

          MS. LOVETT:  Nicole Lovett, Plaintiffs.

          MR. ROTTINGHAUS:  Tom Rottinghaus on behalf of
Plaintiffs.

          MR. GISMONDI:  Chris Gismondi on behalf of
Novo Nordisk and the witness.

          (Stenographer clarification.)

          MS. ORIGENES:  Alexandra Origenes on behalf of

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 9 of 144

Novo Nordisk.

THE VIDEOGRAPHER:  The court reporter will now introduce herself and swear in the witness.

THE STENOGRAPHER:  Good morning.

My name is Heather Bautista, and I am a Certified Shorthand Reporter licensed by the State of California.  My license number is 11600.

This deposition, and any transcript produced therefrom, will be handled pursuant to Federal Rule of Civil Procedure Section 30.

As the deposition officer, I will be retaining my duties and responsibilities under the Code.

Please raise your right hand so I can swear you in.

SUNEIL KOLIWAD, M.D., Ph.D., having been first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE STENOGRAPHER:  Thank you.

Please state your full name for the record.

THE WITNESS:  Suneil Koliwad.

THE STENOGRAPHER:  Thank you.

Counsel, you can begin.

///

///

EXAMINATION

BY MS. LOVETT:

    Q.    Good morning, Doctor.

    A.    Good morning.

    Q.    My name -- my name is Nicole Lovett.  We met briefly off the record, and I'm going to be asking you some questions first today.  Okay?

    A.    Okay.

    Q.    You understand you're testifying under oath, just as you would be in court; correct?

    A.    I do.

    Q.    If you do not hear or understand a question, will you please let me know?  And if you answer a question, I will assume you understood it; is that fair?

    A.    That's fair.

    Q.    I'm going to mark -- well, first, did you bring anything with you today to your deposition?

    A.    I did not.

    Q.    Okay.

    Is that a copy of your report that you have?

    A.    This is a copy of my report, looks like, here, sitting in front of me.

    Q.    Okay.

    I'm going to mark as Exhibit 1 a copy of your report.

(Exhibit 1 was marked for identification.)

Q.   (By Ms. Lovett)  Doctor, before we get into the substance of your report and opinions, I wanted to direct you to the Overview section of your report at Page 1, wherein you state, "The purpose of this report is to explain the key biological and drug-related principles that make a glucagon-like peptide-1 (GLP-1), receptor agonists (GLP-1 RAs), including semaglutide and liragutide, so effective for treating diabetes, obesity, and other approved conditions."

Did I read that correctly?

A.   You did.

Q.   Okay.

And this statement indicates that some portions of your report and opinions are directed at efficacy of these medications in treating disease; correct?

A.   There is a portion of the report that's directed at that, yes.

Q.   And you know that this deposition will be about the risks and warning issues only, so I'm not going to be necessarily asking you questions on the substance of your efficacy opinions.

Do you understand that?

A.   Understood.

Q.   Okay.

I'm going to mark next a copy of your materials considered list.  This is both the original materials considered list and also the corrected materials considered list that we received yesterday evening.

(Stenographer clarification.)

MS. LOVETT:  Exhibit 2 and Exhibit 3.

(Exhibits 2 and 3 marked for identification.)

MR. GISMONDI:  Do you have copies for us, Counsel?

MS. LOVETT:  I do not have copies of the corrected materials considered.

MR. GISMONDI:  Okay.

MS. LOVETT:  I do have it for the one that was originally produced.

MR. GISMONDI:  Thank you.

MS. LOVETT:  Um-hum.

Q.    (By Ms. Lovett)  Doctor, the metadata for your materials considered list, both the original and the corrected materials considered list, shows that a lawyer, Gumabon-Greaver, prepared your MCL; is that your understanding?

MR. GISMONDI:  Objection.

MS. LOVETT:  On what basis?

MR. GISMONDI:  We're getting into the preparation of his materials considered list.  First of

all, it's a PDF, and we're talking about -- we had an

agreement that we're not getting into drafts of

different things.  And that's part of the Federal Rules

of Evidence.  We're not getting into the preparation of

his materials considered list.

        MS. LOVETT:  Okay.

    Q.   (By Ms. Lovett)  And you had an opportunity to

look at all of the documents that are listed on your

materials considered list, did you?

    A.   I have seen the document.  I haven't seen the

one that you just gave me that's revised, because I

haven't had a chance to look at it.  But other than

that, I've looked at the document.

    Q.   And you looked at all of the documents that are

listed within the materials considered list.

    A.   Yes.

    Q.   Okay.

        You did not discuss in your report each and

every document that is listed on your materials

considered list; correct?

    A.   That's correct.

    Q.   Okay.

        Why not?

    A.   When preparing my document, I think two points

are important to emphasize.  Number one, the document

largely reflects my own expertise; expertise derived as somebody who prescribes these medicines and has done so for nearly 20 years as a class, if not a little bit longer than that; my scientific expertise in having, you know, a lot of scholarship about the mechanisms by which the medicines work; and the work that I've done to prepare teaching and other educational efforts to -- you know, to educate learners about these medicines clinically, as well as, you know, pharmacologically.

So I didn't really need much in the way of literature review in order to write the report.

The -- the articles that I include in the report are done because they help me corroborate the points that I make, which I, you know, am confident and based on what I just told you with elements in the literature.

The ones that I didn't include largely reflect either irrelevant in terms of making any specific points; useful to me to know that they're there, but not useful in writing the report; or a part of datasets that were largely conflictual and, therefore, confusing and, therefore, not worthy of -- of including in a report for that reason.

And so I really focused on articles that would be helping me make points that -- that I thought were

worth making.

Q.   Thank you.

Outside of the documents, there's a line in your report referencing some regulatory communications you asked counsel to provide to you; correct?

A.   Sorry.  Can you repeat that.

Q.   In your report, there is a statement reflecting your request to counsel for certain regulatory communications related to Novo's GLP-1 RAs; is that your understanding?

A.   That is my understanding.

Q.   Okay.

Outside of those documents, there is no description within the confines of your report of how you obtained the items on your materials considered list, is there?

A.   I don't think so.

Q.   Okay.

Did you have a particular search methodology that you employed to identify the relevant scientific literature?

A.   Yes.

Q.   What was that search methodology?

A.   So I employed -- well, let me just couch what I'm saying with the fact that I approached this report

the same way I approach all of my academic research; all the papers that I've written, all the research studies that I've done, all the scholarships that I've done for teaching modules and other things.

And so I did this report using a very similar, if not identical, approach; and that involved literature searches using standard clinical and scientifically-oriented search engines.  And so the ones that I relied on, for the most part, in this were Google Scholar, as well as PubMed.  I find them to be pretty comprehensive and useful, especially when you cross-reference the two against each other.

That, then, coupled with my own understanding and knowledge of the literature, directly, was very useful in helping me formulate this report and find articles, and I did that on a periodic basis and had a standard approach to assessing the literature using those tools.

Q.  Okay.

You said earlier "similar, if not identical" to how you perform various portions of academic research. How would it have been different?

A.  In academic research, oftentimes, we have projects that are funded through grants that are multi-investigator grants, papers that are collaborative

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 17 of 144

in nature; and in those instances, I might also get information about papers that we want to look at from other investigators.

In this instance, I did all of that work on my own and didn't share any information with other investigators or clinicians or anybody else working in the field, and so I didn't have the benefit of a team-based approach to looking at the literature; I did it all on my own, which I oftentimes do, but not always.

Q.   You did not provide the search terms in your report that you used; correct?

A.   That's correct.

Q.   Nor the date ranges of when searched -- when the databases were searched.

A.   That's correct.

Q.   Did you provide, in your report, the search strings that you used in your literature searches?

A.   No.

Q.   You did not identify the inclusion criteria for selecting literature; correct?

A.   No.

Q.   You did not identify the exclusion criteria for the literature you chose not to rely on; correct?

A.   No.  I mean that's correct.

Q.   What search terms did you use?

A.    I used a variety of search terms.  I didn't use one single set of search terms to look at the literature, and that's consistent with what I always do in academic research.

The idea is that every time you have an idea to try to find more papers, you add search terms and see if those additions will pull up additional papers; the goal being to try to be inclusive and find papers that could be interesting, informative, pique curiosity or otherwise lend value to the work I was doing.

I feel, and always am -- feel in my own literature reviews that having one single set of search terms for work like this is not very useful, because you will -- you will, by definition, not be comprehensive; and with the goal of being comprehensive, I tried to add terms to find more papers and change terms to find different papers and so on.  So the fluidity was useful to me.

Q.    Did you record those search terms?

A.    No.

Q.    So if you were to go and do all of your searching within Google Scholar and PubMed again with nothing recorded, how would you be able to do the exact same searches a second time?

A.    I -- I would answer your question in the

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 19 of 144

following way:  that even if I didn't do the search exactly the same way, because of my understanding of the field and my understanding of what the literature means and my direct understanding of the -- the timeline of research in this field, I would be able to find the same papers again, even if I used slightly different search terms, more search terms, you know, or search terms that I didn't apply the previous time.  So you don't have to use identical search terms to end up finding the same pool of papers.

So I'm quite confident that if I did it again, I could find all the same papers again, but I could do that using a number of different search-term combinations in order to accomplish that goal.

Q.    Did you search for only published literature?

A.    I searched for -- my search brought up literature that Google Scholar and PubMed are able to bring up.  That includes published literature. Although, Google Scholar may have access to aspects of publication that PubMed won't show because they don't have an identification number that brings them into the NCBI that PubMed uses to identify papers.

So you will get a slightly different subset of papers for access through those engines.  That's why I use two.

Q.   If we can look at your report for a moment.  On Page 43, you signed your expert report dated February 13th, 2026; correct?

A.   Yes.

Q.   And this report contains the opinions you disclosed in this matter; correct?  As you sit here today?

A.   Yes.  Yes.

Q.   You included sections with your qualifications, summary of opinions, background discussion, discussions on GLP-1 RAs and responses to some of Plaintiff's experts; correct?

A.   Yes.

Q.   Your report does not state what questions you were specifically asked to evaluate and answer; correct?

A.   I don't believe there's a section where I list off a listing of questions I was, quote/unquote, supposed to answer.  I -- I tried to direct the report towards what I felt was the gist of, you know, the area that I was asked to comment on.

Q.   Okay.

If we look at Page 3 of your report, and if you look at the full paragraph that begins "Pertinent to this expert report."  Do you see that?

A.   Yes.

Q.    That's the methodology you used for your review of the issues that you opined on in your report; correct?

A.    Sorry.  I'm just reading for a moment to make myself familiar with the paragraph.  Yes.  Although I will say that -- today is -- this being 2026, I think I've actually been prescribing relevant medications for even more than -- well, I say over 15 years; it's actually closer to 20; maybe even 21.

Q.    Thank you for that clarification.

But otherwise, that's the methodology that you used for your review of the issues that you opined on in this report.

A.    Correct.

Q.    Thank you.

You can set your report aside for a moment.

Have you ever called anyone, ever, to say that they misquoted you in any kind of published article?

A.    Personally called -- called anybody?  I don't believe so.

Q.    Okay.

Have you ever written anyone to say that they misquoted you in any kind of published article?

A.    I just want to make sure I'm clear on what you're -- what you're asking.  When you say "misquoted,"

are you talking about the press?

Q.   I'm talking about any article or -- we'll start with article; an article where you had a discussion, and there was a document that was published and quotes you within the article based on statements that you said.

And I'm asking:  Have you ever written anyone to say, following publication, that you have been misquoted?

A.   I have never written a news organization or periodical or other press to tell them that they're misquoting me in a -- in something that -- that they've quoted me on.

Informally, have I ever mentioned to someone, "I don't think that they quoted me correctly," probably, because it happens that sometimes you don't get quoted accurately, but I've never -- I've never officially, you know -- or even intended to officially let anybody know about that or worry about that in any way.

Q.   Do you recall the times where you informally have mentioned something that you don't think you've been quoted correctly?

A.   No, because they're not -- none of those instances were important to me.  They were -- if done at all, done in the context of casual conversations, just talking about, you know, things that happen; not because

it mattered very much to me one way or the other.

Q.   When you speak to journalists, you intend to tell the truth; correct?

A.   Correct.

Q.   We can go back to your report on Page 29.  In the second full paragraph, you state that when you prescribe a GLP-1 RA, you discuss warning signs of --

(Stenographer clarification.)

Q.   (By Ms. Lovett)  -- delayed gastric emptying, nausea, vomiting, abdominal pain, pancreatitis, and gallstones; correct?

A.   Yeah.  Sorry.  I want to make sure I'm looking at the same paragraph.  "Potential signs of pancreatitis and gallstones"?

Q.   I'm looking at the paragraph that starts with "In my clinical practice."

A.   Correct.  So I'm reading the same thing that I think you're saying, except to say that the sentence says "potential signs of pancreatitis."  It doesn't just say pancreatitis.  Is that the right -- okay.  Got it.

Q.   Understood.  Thank you for that clarification.

What did you mean by "warning signs" in that sentence?

A.   There are symptoms that patients feel, because at these -- these -- this list includes symptoms and

conditions.

And symptoms and conditions are two different things.  Symptoms are what patients feel, and conditions are diagnoses.  So a gallstone and pancreatitis are diagnoses.

But the potential signs of pancreatitis might include things that a patient would feel and be able to express, as is diarrhea potentially indicative of multiple conditions, but the patient simply knows that they're having diarrhea.

And so I view those as, quote/unquote, "warning signs," because they reflect symptoms that might make me want to talk to them about whether any of those symptoms have happened after they started taking the medicine that I'm about to prescribe or have already prescribed, so that I can get context around what those symptoms are and what they might represent.

And I -- I use the word "warning" because the symptoms might be indicative of something else, and I would like to know what that something else might be.  And in order to do that, I've got to talk to them about these symptoms.

Q.    Thank you.

A.    And the other reason I use the word "warning" is because it's meant to convey the fact that I like to,

quote/unquote, "warn" or "inform" my patients about the likelihood that they might actually develop these symptoms so they are not surprised or worried when they do.

Q.    What are the warning signs, in your opinion, on delayed gastric emptying?

A.    Well, really, three or four; and everybody's different.  So, you know, the combination of these things could be different from patient to patient.  And some patients may have minimal of these features, and some may have more.

But nausea can be one, and that could be coupled with vomiting, as another.  Bloating could be one, feelings of fullness.  Abdominal discomfort, which can sometimes be very nebulous and difficult for patients to articulate because everyone feels, quote/unquote, "discomfort" differently and expresses it differently verbally.  Heartburn, or what we call water brash, which can be the acid reflux that goes on in the context of heartburn.

All of those could be symptoms of delayed gastric emptying or indicative of potential delayed gastric emptying.

Q.    Sticking with that same paragraph, the last sentence, "These points of discussion are routine among

providers."

Is that what you say in your report, right, after the last sentence after listing the various points of discussion?

A.    Yes, it is.

Q.    I'm going to refer back to either Exhibit 2 or Exhibit 3, your materials considered list.

A.    Okay.

Q.    Can you show me -- do you have it?

A.    Um-hum.

Q.    Can you show me every document that you relied on to conclude, in your opinion, that all points of discussion that you have listed in this paragraph are routine.

MR. GISMONDI:  Objection.

THE WITNESS:  I can't provide you a list of those documents.  I haven't memorized the documents by title and by author name.  I would have to look at all of them again and read them all again to see if -- if and which of these documents informed that thinking.

I will, though, say that I don't need any of these documents to inform that paragraph and the statement that I make.  These documents weren't reviewed as a means to specifically allow me to make that statement.  I can make that statement because I've

prescribed these drugs for as long as I have. I can make the statements because I'm aware, very keenly, of what a large number of colleagues in the field routinely say to their patients in prescribing these drugs through direct communication.

I can say it because of my attendance at a large number of conferences, including those that I've given presentations at, where I've heard uniform, consistent agreement about the discussion that should precede prescribing these medications. And all of that has been pretty consistent, and that's one reason why I know that it's a routine discussion that we have.

Q.   (By Ms. Lovett) Okay.

Well, you say, "These points of discussions are routine among providers." You just referenced that there are a undisclosed large number of colleagues. Have you ever done a poll to ask them what is routine in terms of their prescribing practices?

A.   I don't think I need to do a -- have done a poll; it's that commonly talked about. I mean, you hear about the way you unveil the -- the way to talk to patients about these potential side effects at every turn. It's not difficult to find.

And if there was a lot of variability, I would have expressed that variability in this report. I have

not run across much variability in any of the ways that I've been exposed to how we discuss this with patients, and that is why I say routine.

Q.   Okay.

Would it be fair, then, to say that your statement of what is routine among providers, it's your opinion as to what is routine among providers?

MR. GISMONDI:  Objection.

THE WITNESS:  My opinion reflects the fact that I'm a leader in this field and have connection to academic division chiefs and training programs where we're educating the next generation of diabetologists and endocrinologists at at least 50 or 60 large medical centers around the country.  And I've had conversations with all of those people around this.

So I do think that although it is my opinion, it is really reflective of a large swath, not only of providers, but also of the way we teach the next generation of providers the exact same information.

Q.   (By Ms. Lovett)  Can you name each and every person that you believe this is routine practice for?

A.   It's far too many for me to name them all.

Q.   So you don't have the names?

A.   I can't possibly have enough names in my memory of all the times I've had conversations that reflect how

common and routine this practice is.  It's too many people.

Q.    This entire paragraph of what you've listed here?

A.    Essentially, this entire paragraph, because the entire paragraph covers the routine elements of what we talk about.

Q.    Nowhere in this section of your report describing the counseling session that you have with your patients when you initiate or titrate a GLP-1 RA do you list discussing with your patients the potential adverse effects of stomach paralysis; right?

A.    When I talk to patients about what they might experience while starting or increasing the dose of a GLP-1 receptor agonist, I don't routinely talk about named diagnoses.  And the reason I don't talk about named diagnoses, nor do colleagues that I'm aware of talk about named diagnoses, is because patients don't understand them.  They don't know what that means, and -- and, therefore it can create confusion.

And so it's better and more effective and, therefore, more useful in engaging communication with my patients to talk about symptoms.  And then we use our medical knowledge to infer whether the symptoms that the patient is expressing is reflective of a named diagnoses

like the one you just mentioned or another named diagnosis and then, you know, take action accordingly or refer them to care from either a gastroenterologist or, you know, urgent care, et cetera, depending on what we think needs to happen.

Q.    Okay.

And just for completeness, the -- the answer that you just gave would also be applicable to bowel obstructions; correct?

A.    Any named diagnosis.  It's not -- it's not an effective way to talk about medicine with patients from a learning and teaching standpoint, which is what we're trying to do when we initiate a medicine like this.

Q.    You gave an interview to UCSF, University of California San Francisco, magazine for an article about GLP-1 weight loss drugs sometime in 2024.  Do you recall that?

A.    I think I've been interviewed.  That's my home institution, so it's -- it's one in which, you know, I'm easily reached out to by -- by folks doing these kinds of pieces.  I think I've given a couple of interviews to UCSF magazine, and I think you're right, that there was one in 2024.

MS. LOVETT:  Okay.

I am going to mark as our next exhibit that

article.

(Exhibit 4 was marked for identification.)

Q.   (By Ms. Lovett)  Okay.

I'm showing you Exhibit 4.  This is the UCSF magazine article titled "Are the New Weight Loss Drugs Too Good to be True," dated June 13th, 2024; correct?

A.   Correct.

Q.   And this appears on the UCSF magazine website; correct?

A.   Correct.

Q.   And in Section 1 on the second page, it identifies you as Suneil Koliwad, M.D., Ph.D.; correct?

A.   Correct.

Q.   And this article contains direct quotations attributed to you; correct?

A.   Correct.

Q.   If you look at Page 3, there's a section titled "They Come With Risks That We're Still Learning About."

Do you see that?

A.   Trying to find the paragraph.

Q.   On the third page under the Number 2, there's a bold header.

A.   Sorry.  Bold header.  And I'm looking right underneath that?

Q.   No.  I was just referring to the header of

underneath --

A.    Oh, that itself says that.  Okay.

Got it.

Q.    Okay.

And then if you can go to the next page --

A.    Um-hum.

Q.    -- within that section.  And the second paragraph from the top, it reads, "For others, GLP-1 agonists can slow digestion to a problematic degree. Patients have sued the drug makers after developing dangerous conditions such as stomach paralysis and bowel obstructions.  Koliwad says these complications are incredibly rare, but it's important for patients to know they're a possibility."

Did I read that correctly?

A.    You read it correctly.

Q.    If a patient experienced this, as you put it, incredibly rare complication of stomach paralysis, can that complication require a hospitalization to treat it?

MR. GISMONDI:  Objection.  Mischaracterizes the document.

Q.    (By Ms. Lovett)  I'll rephrase.

If a patient experiences an incredibly rare complication of stomach paralysis, can that complication require a hospitalization to treat it?

A.   Well, let me first say that when I was asked this question, I was asked the question about dangerous conditions, meaning GI adverse effects that might ultimately lead to severe symptoms requiring emergency room visit or even hospitalization.

But the "such as stomach paralysis and bowel obstructions" were included as an informative part for readers, and when I was answering the question, I wasn't specifically only talking about those two; I was just talking about adverse events in general.

And so that's not how the question was asked to me, but it's fine.

And so, in general, all of these -- this constellation of -- of GI-related adverse events that sometimes can be severe, are incredibly rare, but I do educate my patients to look out for the symptoms so that they know that these things are a possibility right up front and so that they tell me about the symptoms early so that we might be able to avert any severe outcome before it manifests.

So with that background, can you make sure that I didn't -- did I answer the question?  I don't know if you had another part to it, because I kind of maybe forgot.

Q.   No, that was helpful clarification.  Thank you.

And you had mentioned -- I think just now you had said it's fine the way that this is written.

A.    Yeah.  I think it's fine, because, you know, delayed gastric emptying, which, you know, from a lay press perspective can be called, quote/unquote, stomach paralysis, is known about the medicine as a potential, you know, effect -- unwanted effect that can happen; and so this is another way of saying slowed gastric emptying or delayed gastric emptying; something else like that.

Q.    You can put that aside.

Doctor, you've been a co-corresponding author on a paper before; correct?

A.    Correct.

Q.    And when you have been designated as a co-corresponding author on a paper, that indicates a special role in relation to the manuscript; correct?

A.    It usually indicates that the -- the author that -- who's listed last in the series of authors and I both had critical input into the study and the manuscript that was written.  So that if anybody had questions about it, they could go to either that other author or me.

Q.    Got it.  So you review the manuscript before it is submitted; correct?

A.    Yes.

Q.    Okay.

Do you approve the manuscript for submission?

A.    I will usually do three things with manuscripts that I'm a co-corresponding author on or even just an author on.

Q.    Um-hum.

A.    One is read it, one is give edits -- and oftentimes, those are very deep edits, and I take a lot of pride in making sure that I give a good effort in trying to improve the clarity and informative communication in the papers that we write.  It's also very useful training for the first author, who's usually the one writing the paper, to learn how to write scientific papers, and so I take that role seriously as well.

And -- and then I let the other senior author, co-corresponding author and the first author, decide which of those comments they would like to insert, include, edit, and ultimately have present in the final version.

I don't usually require, unless I'm the senior author, a, quote/unquote, approval of the paper before it's actually submitted.  When I am the senior author, I usually do; meaning, that I'm, oftentimes, the one who submits it in the end myself.  So, by definition, I must

have approved it because I submitted it.

Q.    Um-hum.

Have you ever, at any time, asked your name be removed as a co-corresponding author?

A.    I can't think of an instance where I've ever asked for my authorship to be removed from a paper, period.  And I certainly cannot remember any instance where I did so as a co-corresponding author.

Q.    Have you published in medRxiv before?

A.    medRxiv.

Q.    I think I read somewhere --

A.    Sorry.

Q.    Yeah.

A.    It's a -- that's a preprint --

Q.    Yes.

A.    -- server called "med archive."  Yes.  And we have a paper -- I think I have one paper in medRxiv that is present there now as we speak.  Just to make sure that we're talking about the same thing.  These are not peer-reviewed places, and so if a paper, quote/unquote, gets published there, it's usually a way to -- to share the work with the scientific community while it's being considered for peer-reviewed publication in a journal that is a -- an actual journal in a classical sense.

And so the paper that I think you're referring

to is nearly done going through the review and peer-review process at another journal and will appear in press soon, we hope.  But in the meantime, it's present on medRxiv so that people can see it.

Q.    Which journal?

A.    That we hope the paper will get published in?

Q.    Yes.

A.    I just don't know if I'm allowed to say.  I think I am.  So it would be a journal called JCI Insight, Journal of Clinical Investigation Insight, but it's not -- it's not published yet, and we haven't gotten the e-mail saying that indeed they accepted it, so I can't tell you that I know it's going to be --

Q.    Understood.

A.    -- until I get that.

MR. GISMONDI:  And if it makes you more comfortable, we can designate that as confidential so if you think that --

THE WITNESS:  Please do, because usually -- I mean, I'm not an expert on this, but usually journals embargo public knowledge about papers that are not yet in press until they actually appear in press, and so I didn't want to overspeak on that.

Q.    (By Ms. Lovett)  Understood.

And I'm going to introduce as our next exhibit,

a copy of your CV.

(Exhibit 5 marked for identification.)

Q.   (By Ms. Lovett)  Is this a copy of your CV that you prepared?

A.   Yes.

Q.   Go to Page 47 of 56.

A.   Okay.

Q.   Item 72, is that the medRxiv preprint that you were discussing just a moment ago that is still available on medRxiv?

A.   Sorry.  There's two, then.  There's Number 70 and Number 72.

Q.   I think I actually counted three.

A.   Oh, really?

Q.   Yes.

A.   Okay.  Yeah.

Q.   Yeah.  70, 71, and 72.

A.   There you go.  Correct.

Q.   So all three of these are on medRxiv right now?

A.   Yes.

Q.   Okay.

The one that --

A.   To my knowledge, they are.

Q.   Which of the three -- 70, 71, or 72 -- is the one that is almost through the peer-review process?

A.    70.

Q.    Number 72 is an article.  The first author listed, Vashisht -- I apologize if I mispronounce that.

A.    Yes.  Vashisht.

Q.    Okay.

"Phenom-Wide Risk Evaluation of GLP-1 Receptor Agonist Used in Type 2 Diabetes with Real-World Data Across Multiple Health Care Systems."

Did I read that correctly?

A.    Yes, you did.

Q.    Is this preprint in peer-review?

A.    This preprint, to my understanding, is potentially, tomorrow, being resubmitted back for consideration at a journal and will then be under peer-review.

It had been under peer-review.  Comments were made about how to improve it.  It was not accepted for publication.  Those comments have been addressed, and I believe that the first author is resubmitting it now for consideration at another journal.

And the reason why I say believe and, you know, am not 100 percent sure, is that 71 and 72 are very similar.  The group of investigators and authors is overlapping, and the work was done as part of a larger project split into two individual papers.  And I think

it is 72 that's being resubmitted as we speak now.

Q.    Okay.

Have you republished 72 to medRxiv after receiving the comments, or it's in the same format when it was initially provided to medRxiv or published on medRxiv?

A.    That's a really good question.  It's in -- to my knowledge, it's in the original earlier format without the revisions that have since been made.

Once the paper is submitted to the -- to the new journal or the journal again for reconsideration, you know, the suggestion to the first author should be to go back and amend the version that's on the preprint server to update it to reflect what's now being considered for publication.

Q.    Do you recall, as you sit here today, what edits have been made to the version of this article that was preprinted on medRxiv?

A.    I haven't read yet the -- the final version that's being planned to be submitted, because I'm here today.  I would have been doing that today otherwise. You happened to ask the question literally on the day that the person is asking, "If anybody has any more input to give on this paper, can you please give it."  I have that e-mail, and I've not responded to it.  He's

probably kind of like wondering when I'm going to or if I'm going to.

And so that's where that sits.  That said, I did give a lot of deep editorial feedback earlier, like maybe a couple months ago.  So I assume that they've incorporated those edits now.  And those edits had a lot to do with incompletely expressed understanding and expertise about diabetes itself.

The other authors on this paper are all Ph.D. scientists and don't actually treat patients like I do. And so it helps them to be able to express ideas in ways that reflect a clinical understanding, because pat- -- Ph.D. scientists, while good in many other things, sometimes lack in that -- in that ability, to explain things in a way that is clinically relevant.

Q.    And so the edits that you made a number of months ago related to this preprint, those deep edits that you just described were focused on diabetes.

A.    Focused on diabetes pathogenesis and understanding data with respect to how diabetes actually manifests and the natural progression of diabetes and diabetes-related complications.

Q.    Why don't we mark the preprint that is published on medRxiv of this article.  Okay?

A.    Okay.

MS. LOVETT:  So mark this as our next exhibit.

(Exhibit 6 was marked for identification.)

THE WITNESS:  Should I close the CV for now?

MS. LOVETT:  Yes.

Q.   (By Ms. Lovett)  And this is the paper titled "Phenom-wide Risk Evaluation of GLP-1 Receptor Agonist Use in Type 2 Diabetes With Real-World Data Across Multiple Health Care Systems"; correct?

A.   Correct.

Q.   And this paper doesn't differentiate the type of author that you were, co-corresponding author versus a regular author, but I understand from your prior testimony that by virtue of your name appearing second-to-last, that designation means that you are a co-corresponding author.

A.   Yeah.  I can give you detail on that.  When you submit to medRxiv or bioRxiv, these preprint servers, they don't have the mechanism to allow you to indicate that stuff.  They're not sophisticated on that point.  I don't think it really matters, because it's not really a publication in the same way as a journal publication anyways.

So as I said, we had already submitted this paper to a journal.  And in that journal submission, we had indicated co-corresponding authorship for the final

two authors officially.  And in the one that we're about to resubmit, the same thing is true.  But in the preprint server version, we're not able to do that. But, indeed, it is reflective, as you say, of the fact that myself and the final author are -- let me add one other detail here, and, you know, this is unique to this paper, perhaps, and other ones with this group, is that one other reason why I'm co-corresponding author in this instance is because the final author passed away.  And that was really unfortunate, untimely recent passing away of an individual relatively young in life.  And so all the other authors and the head of the center that funded this research asked if I would take over the senior authorship since I had a huge role to play in the paper, and I, you know, was obviously happy to do that.

Q.   Of course.  And I did see that online.  I'm sorry for your loss.

A.   Yep.  Thank you.

Q.   If we could go about halfway through, but at the end of the paper, I'd like to direct you to a section towards the end.  I recognize that the preprint does not have page numbers, but it's a section entitled "Declaration of Interests."

A.   Let's see.

Yes.

Q.   And there are a number of initials for authors on this paper, but I could not locate your initials. Could you direct me to the Declaration of Interest statement that is applicable to you?

A.   No.  There's nothing.

Q.   And at the end of the paragraph on the next page, it states, "No other disclosures were reported."

Did you not report your conflict of interest for this?

MR. GISMONDI:  Objection.

MS. LOVETT:  I'll rephrase.

Q.   (By Ms. Lovett)  Did you report your conflict of interest prior to the publication of this preprint?

MR. GISMONDI:  Objection.

Q.   (By Ms. Lovett)  You can answer.

A.   The -- the conflicts that were being reported for this paper were one -- ones in which the -- the individual reporting it had either a grant-related advisory or financial interest in the companies that they're talking about here, or had received research funding from them in some other way and wanted to disclose it so that, you know, you don't -- you don't interpret the paper's findings without understanding those -- those relationships and the possibility that they could have influenced the way people analyzed or

expressed the data in the paper.

I -- and I think maybe some other authors also fell into this category -- didn't have the kind of relationships or topical connection with any entities that really met the bar for the kinds of -- of the worthy inclusions like these other ones did.  These are really deep, deep financial, grant-related or advisory roles in companies.  Most of them were by the final author on the paper at the time.

Q.    You don't think that a -- being a paid expert for a company that manufactures GLP-1s, such as Novo Nordisk, is a financial interest that would meet the bar to disclose your relationship with the company in this paper?

A.    Well, two things.  Number one, at the time this section was written, which -- which wasn't one of the areas that we edited and worked on, you know, and -- and will revisit for the published version, which is going to have a whole new section on disclosures, at that time, the nature of this ongoing litigation was evolving.

And I really didn't know where it was going to go or what it was all going to be about in the end and whether -- what the level of my involvement with this case would end up being.  And so it didn't strike me as

anything, you know, influential on any level compared to these other kinds of relationships that people had.

I think, furthermore, my involvement in this case, even to this point, really, is just relevant to the expert report that I've generated and the opinions that I state. The -- the financial element that you -- that you bring up has just to do with paying me for the time that it took me to do this.

At the end of the day, I don't have an interest in how the litigation turns out. I mean, it's not part of what I'm -- what I'm focused on. I'm trying to be truthful and express my knowledge on this matter. And that's different, fundamentally, than all of these other relationships, because people's research is being funded by the companies sometimes that are connected to areas that are relevant to the science that they're talking about. That type of reporting, I think, is much, much -- much different and in a category separate from what we're talking about here.

Q. You have received grant funding from Eli Lilly; correct?

A. Yeah. And that's another good point. I received one grant from Eli Lilly, but that grant had nothing to do with GLP-1s or anything related to GLP-1-related biology.

Q.   Well, you, nonetheless, declare, in the new Declaration of Interest, in the version of this paper that presumably will be published following peer-review, the fact that you have had relationships with both Novo Nordisk and Eli Lilly that do manufacture GLP-1 RAs.

MR. GISMONDI:  Objection.

THE WITNESS:  The journals ask the questions using a different web portal to answer them.  And so because they ask the questions in a different way, we're able to answer in a different way.  And their methodology for asking us to submit this kind of information lends itself to being more inclusive.  So the likelihood is, yes, I will be including those relationships in the final published version.

Q.   (By Ms. Lovett)  You said, "The likelihood is yes."  You can't say definitively, "Yes, I will disclose"?

MR. GISMONDI:  Objection.

THE WITNESS:  I can, but I only said "likelihood is" because I haven't seen the portal yet.  And how the questions are being asked, that's what determines what you're required to submit information about in terms of disclosures.

But I expect to include that information.

Q.    (By Ms. Lovett)  Okay.

If given the opportunity in the portal, you will include that information.

A.    Correct.

Q.    Okay.

Can you go to the abstract section of this paper that you are an author of.

A.    Um-hum.

Q.    One of the reported results, about three-quarters of the way down, five lines from the bottom, "GLP-1 RA was associated with elevated risks of nausea/vomiting:  SHR 1.37 versus SGLT 2 I, 95 percent CI" --

(Stenographer clarification.)

Q.    (By Ms. Lovett)  -- "CI 1.15-1.62:  SHR 1.46 versus sulfonylureas, 95 percent CI 1.24-1.71."

Did I read that correctly?

A.    Yes.

Q.    What does SHR mean?

A.    It's -- SHR is a -- a methodology of expressing something called a hazard ratio, which is an assessment of relative increased likelihood that the -- the hazard or harm associated with an unwanted outcome might occur.

Q.    What does CI mean?

A.    CI stands for confidence interval.  It's a

statistical methodology to assess whether that hazard ratio that is reported could have occurred by chance.

Q. And there's a sentence in particular related to this result that I wanted to discuss with you; and again, I understand that this doesn't have page numbers, but I'm going to direct you to the "Discussion" section.

A. Okay.

Q. See the "Discussion"?

A. Yes.

Q. Okay.

And if you go to the next page within the "Discussion" section --

A. Um-hum.

Q. -- the last paragraph starting with "our study." Do you see that?

A. I do. Actually, there are marks on this version that -- it's in the last question and this question reflect exactly where you want me to look.

Q. Oh. "Our study was able to capture the well-established gastrointestinal adverse events."

Do you see that?

A. Yes.

Q. And there are two footnotes for that sentence, 3 and 44, that are listed to support that statement; correct?

A.   I'm looking -- 3 and 44, yes.

Q.   If we go to the last page, Number 44, the reference for the statement "Our study was able to capture the well-established gastrointestinal adverse events is a paper by Sodhi, Risk of Gastrointestinal Adverse Events Associated with Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss, published in JAMA in 2023"; correct?

A.   Correct.

Q.   You know this Sodhi article?

A.   I have seen it, yes.

Q.   And it's listed in your materials considered list under "scientific and medical literature"; correct?

A.   Correct.

Q.   You cited Sodhi in this paper because it was a reliable reference for the well-established gastrointestinal events in your study; correct?

MR. GISMONDI:   Objection.

THE WITNESS:   Two things.

Number one, this paper was cited because it was recent versus other ones that are older.  You'd like to use a more recent paper to select.  They usually limit the number of references that they allow you to include for papers, not so much for medRxiv, but because we want to submit the paper for publication anyways, we don't

want to make too many edits to the references.  So there's limitations in the numbers, so you don't want to, like, list off 20 references for one point that you're making.  So this was a recent one, and, therefore, it was selected.

The -- the word "well-established" has to do with the totality of experience with these drugs and the commonality of knowledge that gastrointestinal adverse events have been associated with them, and this paper documents that as well as others do, but it's recent, so it was used, as far as I understand.

Q.    (By Ms. Lovett)  Okay.

A.    Meaning, that it's not well-established because that paper showed it or talked about it, but it's well-established in general, and this paper is a recent one that's an example that looks at that.

Q.    So the Sodhi paper is an example of the well-established gastrointestinal adverse events that are seen with GLP-1s; is that your testimony?

MR. GISMONDI:  Objection.  Mischaracterizes.

THE WITNESS:  No, that's not what I said.  What I said is the idea that GLP-1 receptor agonists can have adverse GI-related effects on individuals, including potential events related to those GI effects, is well established.  And the Sodhi article talks about that.

Q.    (By Ms. Lovett)  The Sodhi paper does not appear anywhere in your expert report; correct?

A.    Correct.

Q.    You did not cite it as support for any opinion in your expert report.

A.    I did not, nor -- I mean, I will say, similarly, I didn't cite the paper that we've just been speaking about that I'm an author on on this report for kind of similar reasons, actually.

Q.    Okay.

What are those reasons?

A.    Well, one of the reasons that this paper is on medRxiv right now and not already published is because the reviewers have consistently taken exception with the statistical approach that we use to make the comparisons that we present, and chief among those is a lot of -- a lot of concern about comparing GLP-1 receptor agonist related effects to a specific drug, as opposed to listing off all the comparisons against all the other diabetes-related drugs that a person might have taken.

And that, I will agree, is a relatively weak way to make comparisons, because one might then ask: Why did you pick SGLT 2?  Why did you pick sulfonylurea? You make other comparisons against --

(Stenographer clarification.)

THE WITNESS: You make other comparisons against DPP-4 inhibitors. Why didn't you make the nausea and vomiting comparison against DPP-4s? Maybe it's because you wouldn't have seen a difference, and it would have been really inconsistent.

So that criticism of our paper is one that we're trying now to address methodologically. The Sodhi paper has that fundamental flaw that never was addressed, and it was published with that flaw in place, in my estimation, because the -- the -- the data that are shown are comparisons between one drug and another drug, not one drug and all the other drugs that you could compare it against, and that is a strong weakness about a paper that uses retrospective data. It might have been the two datasets that they had access to, but that doesn't mean that it's a good comparison to make, and so I think while it is a paper that talks about the phenomenon, it has these critical weaknesses to it. That's why I didn't include it.

Q. But it's still cited in this paper that we've been talking about.

A. It is, although as I -- as I, you know, might mention, I wasn't chiefly responsible for creating the reference list for this paper and selecting the papers that the first author chose as examples of points that

Sundeep Kishwar, M.D., Ph.D.    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

the person wanted to make.

Q.   But you are the co-corresponding author of the paper.

A.   That's correct, and that reflects the writing of the paper itself, not necessarily, you know, approving of the entire reference list.  That's a level of detail that we, oftentimes, leave to the first author.

We look at the references, and I did that as well, and I do agree with the author that this paper is a recent one and is an example that talks about a principle that's well established, which is the way the sentence is written, and I agree with that sentence.

Q.   Well, the sentence does not say that it's an example; right?

A.   It doesn't say that, but it is common understanding in scientific literature like this that references cited are cited because they're examples of a point that you're making in the sentence that you write.

Q.   But to be clear, this sentence simply states, "Our study was able to capture the well-established gastrointestinal adverse events," period; right?

A.   Yes.

Q.   Okay.

We can take a look at the Sodhi paper and

introduce this as our next exhibit.

(Exhibit 7 marked for identification.)

Q.   (By Ms. Lovett)  The Sodhi paper.

MR. GISMONDI:  Can he take a second to look at the document.

MS. LOVETT:  Of course.

MR. GISMONDI:  Thank you.

THE WITNESS:  Sorry.  I just want to make sure I see one thing, to familiarize myself.

Okay.  Perfect.  Thank you.

Q.   (By Ms. Lovett)  The Sodhi research letter that we are looking at was published in JAMA; correct?

A.   Correct.

Q.   Do you consider JAMA a high-impact journal?

A.   JAMA has a wide readership, and so I think that, in general, it would be considered a high-impact journal.

Q.   And the gastrointestinal adverse events that this paper sought to investigate were biliary disease, pancreatitis, bowel obstruction, and gastroparesis; correct?

A.   Yes, it is.

Q.   You can put this aside.

Go back to the paper that you're an author on, the Phenom paper, to the Conclusion section.

A. Sorry. Is that at the very end?

Q. No. It is --

A. Conclusion?

Q. Yes, Conclusion.

A. Yes. Yes, I see it.

Q. And you state, "With the rapid rise in GLP-1 RA utilization across a range of indications, it is imperative to rigorously assess their long-term risk/benefit profile.

"Our findings both align with existing evidence from RCTs while also contributing new knowledge to the growing body of real-world data that underscores the importance of continued safety monitoring."

Did I read that correctly?

A. Yes.

Q. And that's what you declared publicly about seven and a half months ago, meaning that seven and a half months ago, this was the conclusion that was published in this article?

A. Yes.

MR. GISMONDI: Give me a second.

Objection.

Q. (By Ms. Lovett) You can set that aside.

A. I -- if I could, though, I think it's really important to make a point about this paper. The purpose

Sundeep Khosla, M.D., Ph.D.    CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

of this paper is to -- to show the emerging benefit of a new methodology of using real-world data in the context of computer science and AI increasingly, to potentially, ultimately, supplant and/or augment randomized control trials.

So -- so as -- as we go on, I think that -- that we can use computer science to assess the medical record in ways that will give us insights that randomized control trials can't give, because they have significant limitations.  And these have limitations too but, together, they can be much more informative.  So the paper is really -- that sentence that you mentioned is trying to make that point.

MS. LOVETT:  Thank you for that.

We have been going a little over an hour.  Do you need to take a break, or are you good to continue?

THE WITNESS:  I'm okay to continue right now.

MS. LOVETT:  Let's take a break.

THE WITNESS:  Okay.  Sure.

THE VIDEOGRAPHER:  Going off the record at 10:15 a.m. Pacific Time.

(Recess taken from 10:15 a.m. to 10:32 a.m.)

THE VIDEOGRAPHER:  We're back on the record at 10:32 a.m.

Q.   (By Ms. Lovett)  Hi, Doctor.  Just had a brief

break.

I'm going to ask, you understand you're sitting here as a disclosed expert for Novo Nordisk; correct?

A. Yes.

Q. You have not been retained by Eli Lilly as an expert to provide testimony in this matter; correct?

A. I have not.

Q. Okay.

If we could bring your report back, Exhibit 1.

A. There it is.

Q. And I'm going to go back to the Overview section of your report where it states, "The purpose of this report is to explain the key biological and drug-related principles that make glucagon-like peptide-1, GLP-1, receptor agonists, GLP-1 RAs, including semaglutide and liraglutide, so effective for treating diabetes, obesity, and other approved conditions."

Do you see that?

A. Yes, I do.

Q. When you said "including," did you mean only semaglutide and liraglutide?

A. That's a good question. No. I did not mean only including.

The reason I mentioned those two is because

currently, among GLP-1 receptor agonists, those are the most commonly prescribed drugs.  And I mentioned them by name also because they are simply GLP-1 receptor agonists, which distinguishes them from a different drug like Tirzepatide, which is not just a GLP-1 receptor agonist but is a biospecific, quote/unquote, "dual agonist."

Q.    Understood.

A.    I could have added exenatide or dulaglutide or others to that list as well.

Q.    Um-hum.

A.    But I chose to choose -- to select those two out of just commonality, and they're emblematic of the class.

Q.    So the Overview section relating to the purpose of your report refers to GLP-1 RAs as a group, as you mentioned, then?

A.    In that part of explaining the key biological -- quote/unquote, "key biological and drug-related principles" that make them effective medications, yes.

Q.    Well, the next sentence says, "This report also addresses well-known side effects associated with GLP-1 RAs and how those side effects are considered by prescribing physicians in the medical community";

correct?

A.    Correct.

Q.    And that would also be GLP-1 RAs as a group; correct?

A.    As a group, yes, correct.

Q.    Okay.

And similarly, if we go to Page 3 of your report under Section 3 with the Summary of Opinions.

Are you there?

A.    I am there, yes.  I see it.

Q.    Your first summary opinion refers to GLP-1 RAs; correct?

A.    Yes.

Q.    So your opinion -- your summary opinion listed in Number 1 of Section 3, Summary of Opinions, is an opinion about GLP-1 RAs generally together as a group; correct?

A.    Correct.

Q.    Your summary opinion in Number 2 of the Summary of Opinions section in your expert report is also an opinion about GLP-1 RAs generally, not only Novo's manufactured drugs, semaglutide or liraglutide; correct?

A.    That's correct.

Q.    Your summary of Opinion 3, the first line states, "The mechanism of action of GLP-1 RA medicines

has been extensively studied, including both the basic

biology on which these medications are based, as well as

how they achieve a wide range of clinically beneficial

effects."

        Did I read that right?

    A.    Yes.

    Q.    What did you mean when you refer to the "basic

biology on which these medicines are based"?

    A.    So the 20-years-plus of availability of

medications in this class is preceded by another

20 years of fundamental basic biology.  And that basic

biology has established a number of key principles.

        Number one, something called the incretin

effect.  I view the incretin effect as the --

foundational to where we are now.  And it is a basic

fundamental biological principle.  And that principle is

that if you give a person a shot of glucose into their

bloodstream as an IV injection, glucose will go up in

the blood and come back down.  And insulin levels will

go up in the blood and come back down in order to bring

that glucose down.

        But if you give a person the exact same amount

of glucose as a drink instead of as a shot, so they're

getting the same amount of glucose into their body both

ways, the rise in glucose is much less pronounced if

they give that glucose orally.  And the rise in insulin is much more pronounced than if you give it by IV.

And what boosts that insulin response when you take the glucose orally versus by IV is referred to as the incretin effect.  And from the moment it was described in the 1960s, actually, the hunt was on to try to identify factors that would underlie and explain that incretin effect.

The idea being that potentially, it would completely, you know, inform our understanding of how glucose is regulated in the body when we eat food and maybe could result in a therapeutic strategy to control something like diabetes.

(Stenographer clarification.)

THE WITNESS:  That is the basic knowledge that led to the identification of a series of gut-derived peptides, among which are GLP-1 oxyntomodulin, GLP-2, PYY, CCK, and others.  And they all do a variety of different things relevant to regulating metabolism.

GLP-1s, then, another aspect of the foundational biology, were able to be turned into a shortened peptide that could control blood glucose and lower hemoglobin A1c.  And that knowledge, coupled with the identification of a very similar peptide, if not exactly identical, produced in the saliva of the Gila

monster, led a company to turn that into exenatide, ultimately, the first FDA approved GLP-1 receptor agonist.

So all of that history I think of as the -- the basic biology on which these medications are based. And I -- I teach about it. I think it's fascinating science and amazing confluence of different investigators working in different fields connecting around this peptide, ultimately coming to the conclusion that it could be used as a drug.

Q. (By Ms. Lovett) Thank you.

What did you mean by the mechanism of action of GLP-1 RA medicines, and you structure that as a group?

A. Yes. So there are multiple aspects to that point as well, and I think I captured it in mechanism of action, but one aspect of the mechanism of action is understanding what cells in the body express the receptor for GLP-1, because the drugs -- therapeutic and even our own indigenous GLP-1, the GLP-1 that we make, works through its binding to its so-called cognate receptor, and understanding how that affects the responding cells and which cells those are in the body is also really important information that took a while to figure out and is still ongoing research actually.

So the receptor biology is part of the

mechanism of action, what cells express it and how does that receptor then do things once it's activated by the drug.

The second part of the mechanism of action is what part of the effects of GLP-1 receptor agonists work in the brain and what part of the effects of GLP-1 receptor agonists are mediated through other parts of the body where they also might bind to their receptor.

The third part of the mechanism of action has to do with bifurcating the effects in lowering blood sugar from the effects in lowering weight. Are they -- are they one dependent on the other, or are they independent effects? That's also very critical for understanding the mechanism of action.

And, finally, another key piece of the mechanism of action that's really the forefront right now is given that these drugs are increasingly being approved for a variety of different uses, which of those are weight-dependent, and which of those are weight-independent? And that has led investigators to look at so-called anti-inflammatory mechanisms of action of these drugs and its early days in trying to understand the basis of that mechanism of action.

Q. Thank you.

And so -- and I appreciate what you just said,

but looking at the mechanism of action, you're looking at that as a group of GLP-1 RAs together; correct?

A.    Yes, with one caveat, and that is that the key factor or factors that has influenced the evolution of these drugs in that class, as you state, are changes to the drugs that have increased their duration of action after the given dose, and also limited the ability of the drugs to be -- to be degraded by enzymes in the body, notably an enzyme called DPP-4, so each of the newer drugs from exenatide to now has optimized those two things so that the drug can be given less frequently and, therefore, be more potent for a longer period of time.

Q.    Your fourth summary of opinion says "There is," quote, "no reliable evidence," end quote, "that GLP-1 RAs cause toxic GI injury causing persistent impairment after the medication is no longer active"; correct?

A.    Correct.

Q.    That's a class-wide causation opinion, isn't it?

MR. GISMONDI:    Objection.

THE WITNESS:    Can you explain how you mean it's that so I understand.

Q.    (By Ms. Lovett)    Sure.

You're saying "There's no reliable evidence to

suggest that GLP-1 RAs caused any toxic injury or damage to the GI tract resulting in persistent impairments in GI motility after the medication is no longer active in the patient's system."

That's what your report says in the Summary Opinion No. 4.

A.    That's what the report says, yes.

Q.    Okay.

And you say GLP-1 RAs as a group; correct?

A.    Yes.

Q.    And you are making a opinion relating to GLP-1 RAs as a group causing a toxic injury; correct?

MR. GISMONDI:  Objection.

THE WITNESS:  I'm not making a statement in this report one way or the other about causation; rather, I'm highlighting evidence to date and what those -- that -- those data and that evidence suggests, and that's the statement that's reflected here is what the state of the evidence right now suggests, especially when coupled with Point No. 3, and that is:  what we know about the mechanism of action of how these medications work, which is substantial.

Q.    (By Ms. Lovett)  Okay.

How many of your summary opinions are explicitly limited to Novo's GLP-1 RAs?

A.    None of the points that I make are made in this report with the intention of specifically limiting them to GLP-1 RAs made by any particular manufacturer. However, I will add one detail, and that is that some of what you're asking is actually logically impossible to separate from the manufacturers, because, for example, exenatide, which was FDA-approved, and this was in the class, doesn't have an indication for obesity, specifically, and as such, can't be talked about with respect to its immense weight-loss benefit, and so then you limit the discussion towards the ones that do have the ability to lose significant weight, and so in some ways the comments are, by default, limited to specific manufacturers but not purposefully.

Q.    Understood.

Look at your report, in Section 4, Scientific Literature Points to Future Benefits.

A.    Sorry.  We're still talking about my report.

Q.    Correct.

A.    Okay.  Good.

Sorry.  I'm looking at another section.  What page?

Q.    That is on Page 27.

A.    Yes.

MR. GISMONDI:  Do you mean "Section"?

MS. LOVETT:  Number 4 within the section of --

MR. GISMONDI:  Eight, I think.

MS. LOVETT:  Yes.  It is discussion on Novo Nordisk GLP-1 RA medicines.

Q.   (By Ms. Lovett)  And Section 4 is titled Scientific Literature Points to Future Benefits; correct?

A.   That is correct.

Q.   Section 4 does not analyze whether any FDA-approved label adequately warned about impaired gastric emptying, does it?

MR. GISMONDI:  Objection.

MS. LOVETT:  I can rephrase.

Q.   (By Ms. Lovett)  Does this Subsection 4 on Scientific Literature Pointing to Future Benefits analyze whether any FDA-approved label adequately warned of impaired gastric emptying?

A.   Sorry.

My pause is because the section in question is talking about the literature pointing to future benefits.  So it's unclear to me why a section pointing towards future benefits would talk about side effects and unwanted outcomes.

Q.   Fair.

And so the answer -- well, I won't testify for

you, but it does not analyze whether any FDA-approved label adequately warned about impaired gastric emptying.

A.    Yeah.  This section was not meant to talk about that topic.

Q.    Okay.

And Section 4 was not also meant to analyze whether any label adequately warned about ileus or intestinal obstruction; correct?

A.    Correct.

Q.    And the same would be true that Section 4 does not analyze whether any label adequately warned about severe nausea and vomiting; correct?

A.    Correct.  Section 4 is meant to talk about evolving new applications for these drugs based on data that suggests that maybe because of some of what I just outlined earlier in terms of the basic biology might benefit or improve a wider variety of conditions than we originally anticipated.

MS. LOVETT:  Okay.

You can put that down, please.  Thank you.

Q.    (By Ms. Lovett)  Doctor, you state in your report that the scientific and medical community has known about the risk of severe GI adverse reactions with GLP-1 RAs since the very inception of the class; correct?

A.   Can you show me where you're reading from so I can just be where you are.

Q.   Sure.

There are a few different parts, but we can go back to the Summary of Opinions on Page 4, Summary Opinion 5, "The scientific and medical community has known about the risks of severe GI adverse reactions with GLP-1 RAs since the very inception of the class." Do you see that?

A.   I do.

Q.   Okay.

A.   Correct.

Q.   Did you conduct a survey of the medical community before making these statements in your report as to the scientific and medical community?

A.   I think that my answer goes back to the prior answer I gave to a question that was pretty similar to this one, which is:  one thing I do, among other things, I guess, but certainly one thing I do feel pretty confident about is my sense of the field.  And my sense of the field is -- is not just because of one vantage point.  It's because of three or four different vantage points that connect me to large swaths of the prescribing population.

One is as an educator; one is as a researcher;

one is as a sought-after clinical -- you know, clinical care expert in the field academically; and one is as a provider, myself, who prescribes these medications extremely frequently.

And so the -- the cohesive sense from all of those vantage points about the common knowledge of what I expressed in Point No. 5 that you referred to is why I say that it is well-known. It's well-known because I know it's well-known. I -- everything that I've learned, taught, been involved in, and contributed to shows that it is uniformly well-known across the field. There is not a lot of diversity of thought about whether these drugs can cause GI adverse effects.

Q. In your -- so you're saying with your expert -- expertise, it is well-known to you that the scientific and medical community views these --

A. My expertise has afforded me the opportunity to directly appreciate first-hand that these phenomenon are well-known to providers in general. Because I've interacted with enough that I know that my understanding of what people know is not chance alone; it's reflective of an actual thematic general consensus.

Q. And I think you mentioned -- you testified, in a prior answer, "large swaths of the prescribing population." But that does not mean all prescribers in

the country.

A.   Correct.

Q.   Okay.

And with the understanding of your prior testimony, you did not poll the entire medical community before making these statements in your report; correct?

A.   Correct.  I'm unaware of anybody who's polled providers on their knowledge of whether this is something that they're aware of.

Q.   Understood.  I'm just talking about --

A.   But I did not either.

Q.   Okay.

And you did not conduct a survey of every endocrinologist across the country; correct?

A.   That is correct.

Q.   Nor did you conduct a survey of every family doctor in the country.

A.   That's correct.

Q.   Or every internist in the country.

A.   That's correct.  I have not conducted a formal poll on this topic.

Q.   Of any provider --

A.   Correct.

Q.   -- that would be prescribing these GLP-1 RAs.

A.   That's correct.

Q.   Okay.

On Page 30 of your report, there's a statement that, "It has been known that the GI-related side effects of GLP-1 RAs can be severe enough to induce vomiting and prompt discontinuation of treatment"; right?

A.   Can you -- I mean, I want to say yes, but can you please point me to the paragraph.  I'm just scanning the whole page right now.

Q.   It's in the first full paragraph starting with, "From the earliest clinical trials."

A.   Correct.  I see it.

Q.   Okay.

A.   Okay.  Yes.

Q.   What about hospitalization?

A.   Well, vomiting -- this gets back to a point I made earlier.  I don't know about -- about whether, you know, you need to think about any of this with respect to what ends up happening to the person.  Do they go to the emergency room and get observed?  Do they go to the emergency room and get admitted to the hospital?  Are they able to go to an urgent care and then go home?  Or can they just communicate with me, and I can help them manage what's going on without them having to go seek acute care in any capacity?

But the point is that -- the key part of that sentence is "severe enough to induce vomiting." Vomiting, to me, is a very important symptom. Because if somebody is vomiting, then either it's going to go away quickly, or it's -- or someone's going to need to do something about it. So the patient needs to be aware, when they're vomiting, that I've told them that they might end up having nausea severe enough to cause vomiting and that they should let me know if that's the case or, if they can't let me know because the vomiting is intense enough, they need to seek care.

Whether that seeking of care ends up resulting in them being hospitalized is really a function of whether the vomiting has anything to do with the medicine or not. It could be that the reason that they're vomiting is because of something else going on.

And so I want my patients to understand that symptom really well, because it affords me the chance to discontinue the medicine or reduce the dose and, therefore, quell the symptom, or get care acutely so that myself or the treating provider in an emergency room, for example, can determine what actually is going on.

Q.    Okay.

You had mentioned whether or not their being

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 75 of 144

hospitalized is really a function of vomiting from the medicine, but the inverse is true as well; right?  That someone could be on a GLP-1 RA vomiting to a severe degree that does require hospitalization; right?

MR. GISMONDI:  Objection.  Incomplete hypothetical.

THE WITNESS:  I think if anybody is vomiting severely or uncontrollably or in a protracted manner, that whatever is producing that vomiting, including, potentially, the vomiting associated with the GLP-1, could be severe enough that the person needs to be hospitalized in order to give them fluids and quell the nausea using medicines that can be better given IV than orally and, therefore, stop the vomiting.

Q.   (By Ms. Lovett)  Why is it, then, that you think that there are still so many case reports that are getting published throughout the country relating to individuals on GLP-1s who, for example, are developing gastroparesis or impaired gastric emptying if it had been so well-known?

MR. GISMONDI:  Objection.

MS. LOVETT:  I'll rephrase.

Q.   (By Ms. Lovett)  If these GI side effects were well-known, as you say, why is it that there are still case reports that are being published all the time

relating to -- or case reports that are being published relating to individuals who have had impaired gastric emptying as a result of GLP-1 RAs?

MR. GISMONDI:  Objection.

THE WITNESS:  I don't know what motivates folks to try to publish or report individual case reports for things that are established and really well-known already.  It is a -- a phenomenon that is confusing to me as to why anyone would do that.

Q.  (By Ms. Lovett)  Could it be that it's because you, with your expertise, have known about these risks; that a lot of doctors aren't up to your knowledge?

MR. GISMONDI:  Objection.

THE WITNESS:  No.  As I said already, I'm very confident with the fact that it's widespread understanding that GLP-1 receptor agonists can lead to nausea, vomiting, and that that can be severe enough that it might need management acutely.

Q.  (By Ms. Lovett)  In terms of hospitalization?

A.  Emergency room, discontinuation; if those two things aren't sufficient to -- to quell the problem at hand, then potentially so, yes.  And I think that that's really well understood.

And so why anyone would publish a case report of someone having that problem is beyond me, honestly.

It is unlikely, in my opinion, to be related to anything informative to the field.

Q.   Okay.

There were a few portions of your report where you refer to "our."  What does "our" mean in the context of your report, like "our" understanding?

A.   The -- the community of metabolic biologists and -- and clinical/academic researchers who are interested in this field.

Q.   I think you testified earlier, though, that you didn't consult with anyone outside of yourself, at least in doing the research for this expert report; right?

Did you work with anyone on your expert report?

A.   No.

I just want to reiterate, I think now, you know, perhaps for the third time, that I used the word "our" because I have not a unique -- meaning it's not singular to me, but I do have an especially well-developed sense of the field widely across a lot of clinicians, providers, researchers, and basic scientists.  And it is true that not a lot of people have that vantage point, who have a lab, teach, see patients, and also run a division of endocrinology in a large academic medical center.

But I happen to be someone who does all of

those things, and there are a number of individuals nationwide who fit the same mold that I have.  And I think all of us can say what I said.  And so I do feel that it's easy for me to use the word "our," because I am deeply connected to all of those populations of individuals who are involved in this field.

Q.    Okay.

By training, you're an endocrinologist; correct?

A.    Correct.

Q.    And a professor, as you just mentioned, at the University of California San Francisco; correct?

A.    Correct.

Q.    You're not an FDA employee; correct?

A.    That is correct.

Q.    You've never worked for the FDA; correct?

A.    Correct.

Q.    Your CV does not list any position with the FDA, does it?

A.    Correct.

Q.    You've never served on an FDA advisory committee; right?

A.    Correct.

Q.    Your CV does not list any service on any FDA advisory committee, does it?

A.   It doesn't.

Q.   The committee service you highlight is with the American Diabetes Association; correct?

A.   Correct.

Q.   And American Diabetes committee writes diabetes standards of care, not FDA-approved drug labeling; right?

A.   Correct.

Q.   Your report says that your GLP-1 understanding comes from medical training, clinical practice, research, papers, discussions, and meetings; correct?

A.   That's correct.

Q.   Your report does not say you gained that understanding from working at the FDA; right?

A.   That's right.

Q.   You state on Page 31 of your report, "Novo's GLP-1 RA product labels have always informed prescribers of the risk of GI-related adverse reactions, including GI adverse reactions that can be severe"; correct?

A.   Correct.

Q.   And you state on Page 32 that in multiple sections the labeling of Novo's GLP-1 RAs have always -- or "always have conveyed that GI adverse reactions can be severe"; correct?

A.   Correct.

Q.    The support that you cite by way of example for the statement, there's a paragraph relating to discontinuation of treatment where you state, "As a prescriber, my understanding of patients needing to discontinue treatment because of GI-related adverse reactions is that those adverse reactions were severe enough that the patient could no longer tolerate the treatment"; correct?

A.    Correct.

Q.    And then you go on to say, "From the outset, the Ozempic label has consistently cited the possibility of vomiting or treatment discontinuation because of GI adverse reactions as a potential risk of medications; thus, in my opinion, the labeling clearly informs prescribers and patients that potential GI adverse reactions could be severe."

Did I read that correctly?

A.    I just want to train my eyes to the space -- place where you're looking so I can read it with you.

Q.    Um-hum.  He has it on the screen in front of you as well in the paragraph that starts with "As a prescriber."

A.    There it is.  I see.  "From the outset" -- okay.

Hold on.  Let me just read this so I can see

Case 2:24-md-03094-KSM     Document 691-41     Filed 05/19/26     Page 81 of 144

what you said.

Q.   Okay.

A.   Yes.

Q.   The word "severe" does not appear in any of what is in your report that we just read; correct?

MR. GISMONDI:  Objection.

THE WITNESS:  I'm not understanding what you're getting at, which is to say that I'm seeing the word "severe" in my report here, and you're telling me that you want me to say that my report doesn't use that word?

Q.   (By Ms. Lovett)  I'm not saying that, no.

I'm saying that you are referring to individuals who discontinue treatment to gastrointestinal adverse reactions and that that imparts a degree of severity because they had to discontinue the drug; right?

A.   That is correct.

Q.   And the question I'm asking is that the section in your report talking about discontinuation of treatment does not use the word "severe."

It does not say "due to severe gastrointestinal adverse reactions," does it?

A.   Where it says from -- the sentence starting "From the outset" -- that sentence?

Q.   No.  The section that you quoted from the

Ozempic prescribing label from December 5th, 2017.

A.    Sorry.

I just want to make sure I'm looking at the right place.  Is it a page or a paragraph?

Q.    It's on Page 32, right before the paragraph that says "As a prescriber," there is an indented paragraph.

A.    Okay.

Let me read that.  Thank you.

That's useful.  Okay.

Yes.  And your -- I'll repeat your question.  I think what you said is nowhere in that paragraph is the word "severe" used.

Q.    Correct.

A.    That's correct.  It's not used in that paragraph.

Q.    Okay.

If you go to Page 31 in the first paragraph, where -- second sentence, "Two indicators of GI side-effect severity include vomiting or the need to discontinue a medication."

Do you see that in the paragraph?

A.    Yes.  "Two indicators of GI side" -- yes.

Q.    You offer no citation to support that statement; correct?

MR. GISMONDI:  Objection.

Q.  (By Ms. Lovett)  Is there a citation referenced supporting the statement that "Two indicators of GI side-effect severity include vomiting or the need to discontinue a medication"?

A.  So there is not, because that is medical-school-level understanding of cause and effect between vomiting and the severity of GI symptomatology, as is discontinuation of a medicine that -- that a patient feels that they cannot tolerate.

And so no, I don't have a citation to underscore that point; it's one I can make without one.

Q.  Okay.

A.  And it -- it dovetails with the prior point, which is that, yes, it is the case that the prior paragraph you had me look at didn't use the word "severe," but discontinuation of a medicine due to intolerance is an indicator of severity.  That's pretty -- pretty obvious, in my opinion.

Q.  So when the label reports "discontinuations," do you treat that equivalent as the label warning about severe gastrointestinal injury?

A.  In my opinion, vomiting -- so let me back up and say that what patients express is nausea, GI upset, dyspepsia, upset stomach, some -- some level of unwell

with respect to their -- to their gastrointestinal function.

And sometimes abdominal pain.  Those symptoms, if they're -- if they're also coupled with vomiting, are reflective of a more severe response than when those symptoms are present and not coupled with vomiting. Similarly, if those symptoms are present and sufficient for the patient to want, or for me to want them, to stop the medicine, it's an indicator that those symptoms are reflective of more severe response than if the patient feels like they can perfectly easily persist with the medicine and doesn't need to stop it.

Q.    Okay.

My question was a little different, though. When the label reports discontinuations, you treat that as equivalent to the label having warned about severe GI injury; correct?

MR. GISMONDI:  Objection.

THE WITNESS:  I treat it -- sorry.

I treat it as an indication that the label acknowledges that the symptoms that it's talking about can be severe.

Q.    (By Ms. Lovett)  Is "indication" different than a "warning" in a prescription drug label?

A.    I don't know.

Q.    You also rely, in certain -- in certain portions of your report, on "renal monitoring" language and "acute kidney injury" that does show in the warnings and precautions section; right?

A.    Correct.

Q.    And that instruction is tied to monitoring renal function in patients with severe GI reactions; right?

A.    Correct.

Q.    Is it your testimony that the only way someone could experience drug-induced impaired gastric emptying on these GLP-1 medications, that is in the context of an acute kidney injury?

MR. GISMONDI:  Objection.

THE WITNESS:  No, it's not.  Rather, in my opinion, the point of the label on this matter is whether it provides clinicians and patients the information they need to know with respect to gastrointestinal adverse symptoms that they might have, and that those symptoms could get worse, and they should be on the lookout for that.

From the presriber's standpoint, acute kidney injury or renal monitoring is an indication that vomiting, in particular, is leading to -- and/or potentially diarrhea, but vomiting in particular -- is

Case 2:24-md-03094-KSM   Document 691-41   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER   Filed 05/19/26

leading to enough water loss to produce dehydration and enough volume loss to produce a volume contraction, and both of those things can lead to acute kidney injury, and so if -- if an individual develops acute kidney injury, it's an indication that the volume loss or water loss is severe; and, therefore, that the vomiting is likely severe.

And we've known from the beginning of this class that -- that these drugs can cause vomiting, and it's well-known in terms of just basic medical education and medical-school-level learning that if someone vomits enough to lose water and lose volume, that they can have acute kidney injury.

And so my understanding of the label has always been that the mentioning of acute kidney injury is a way to provide clinicians with a way to track the severity of vomiting.

Even if an individual doesn't feel bad enough that they want care to quell the nausea right now from a symptomatic standpoint, if their renal function is deteriorating, it gives the provider an indication that whatever the patient says, they must be vomiting enough that we probably need to think about whether we should change the dose of the medicine, stop the medicine, or do something else about the vomiting, because they're

showing manifestations of renal injury from that water/fluid loss.

Q. (By Ms. Lovett) Acute kidney injury is different than a diagnosis of impaired gastric emptying; correct?

A. They are not the same, but the reason for including the acute injury information in the label is because one can beget the other.

Q. The one being vomiting?

A. The one being vomiting; meaning that these drugs are not nephrotoxins, to our knowledge. They don't directly affect the kidney and cause injury to it. The injury to the kidney that might result in an alteration in blood laboratory levels through monitoring is a function of what the drugs do in the GI system.

Q. Right. And patients can have severe impairment of gastric emptying with severe vomiting and dehydration but do not end up with an acute kidney injury; right?

A. If you catch it through monitoring and -- and respond to the vomiting, which is what we are really, really focusing on here and what the label has always focused on is the vomiting, then yes; but if we're complacent and let a patient vomit and vomit and vomit and don't do anything about that, despite seeing it and knowing about it, then that -- that dehydration could,

indeed, result in an acute kidney injury.

Q. Understood. But your answer -- you just answered yes, a patient can have severe impairment of gastric emptying with severe vomiting and dehydration that does not end up with acute kidney injury; right?

A. Only if intervention occurs and someone pays attention to the vomiting. If you don't, then yes, it will.

Q. Right. Understood.

We can mark as our next exhibit the December 2017 Ozempic prescription drug label.

(Exhibit 8 marked for identification.)

Q. (By Ms. Lovett) And I'm going to direct you to Section 5, Warnings and Precautions, and the acute kidney injury that is in Subsection 5.6 in the prescription label.

MR. GISMONDI: Can you just give him a second to take a look at it.

And if you need to review any of the rest of the document, Doctor, feel free.

THE WITNESS: Thank you.

I just want to take one second to make sure I see it properly. Okay. Yes.

Q. (By Ms. Lovett) And are you at Section 5.6?

A. I am. I am on that section now.

Q.   And it states, "There have been postmarketing reports of acute kidney injury and worsening of chronic renal failure, which may sometimes require hemodialysis in patients treated with GLP-1 receptor agonists."

Did I read that; right?

A.   Yes.

And then a couple sentences down, "A majority of the reported events occurred in patients who had experienced nausea, vomiting, diarrhea, or dehydration."

Did I read that correctly?

A.   That is correct.

Q.   Does "majority" mean all?

A.   Majority, in general, does not mean all.

Q.   Okay.

So some patients that took this drug, according to postmarketing reports, were without any of these problems, according to this; right?

MR. GISMONDI:   Objection.

THE WITNESS:   So that's a complicated question. I wish it wasn't.  But the answer has to be couched in the fact that at this time -- this is 2017; correct?

Q.   (By Ms. Lovett)   This is the approval label.

A.   Right.

This drug was being marketed for individuals with diabetes.  And so, therefore, the postmarketing

surveillance would have, by definition, been occurring in individuals with diabetes, and -- Type 2 diabetes in particular. And Type 2 diabetes, notably, has, as one of its classical complications over time, so-called microvascular complications, chronic kidney disease.

And so it is not surprising to me that it would have been difficult, if not impossible, for any postmarketing surveillance to say "all," because people are going to get chronic kidney disease while taking this medicine, as they would while taking any antidiabetic medicine, simply because they have diabetes. And so that -- that's not surprising.

What is interesting is that despite that fact, despite the fact that the patient population in question has diabetes, and we know that patients with diabetes go on to get worsening of chronic renal failure at rates much higher than the general population, that even still then, a majority of the --

(Stenographer clarification.)

THE WITNESS: -- of events occurred in patients who had experienced nausea, vomiting, diarrhea, or dehydration. That's the interesting part of this; not that it wasn't everybody. I wouldn't expect that it would be everybody, because you're talking about patients with diabetes.

Q.   (By Ms. Lovett)  Okay.

Why don't we introduce as the next exhibit the prescription information for Wegovy.

A.   Okay.

(Exhibit 9 was marked for identification.)

Q.   (By Ms. Lovett)  And the indicated use of Wegovy is for individuals not with Type 2 diabetes but that are obesity or -- have obesity or are overweight; correct?

A.   The FDA indication for Wegovy includes individuals who have obesity without diabetes; but also, notably, is used by patients who have both diabetes and obesity.

Q.   Okay.

If we look at the first page of the highlights in prescribing information on the left-hand column, under Indications and Usage --

A.   Yes.

Q.   -- it states that, "Wegovy is indicated as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with an initial BMI of 30 kilograms or greater for obesity or 27 kg/m, subscript 2, or greater overweight in the presence of at least one weight-related co-morbid condition," and there are three different examples

listed there; correct?

A. Correct.

Q. Okay.

If we can go to Section 5.5 of the warning label. We're at the Warning section.

MR. GISMONDI: Take a second if you need to review the document.

THE WITNESS: Yeah, let me make sure the same -- the numbers mean the same things as the previous one.

So in the previous one, 5.6 -- and so 5.5 here equals 5.6 in the earlier one. Okay.

Q. (By Ms. Lovett) And 5. -- the Section 5.5, in the Warnings and Precautions of the Wegovy label that we are looking at, has a similar statement that states, "There have been postmarketing reports of acute kidney injury and worsening of chronic renal failure which have, in some cases, required hemodialysis in patients treated with semaglutide"; correct?

A. Correct.

Q. And if we look at the last sentence of that paragraph, it also states, "A majority of the reported events occurred in patients who had experienced nausea, vomiting, or diarrhea, leading to vomiting depletion"; correct?

A.   Correct.

Q.   Are you saying that this section still refers to individuals that are Type 2 diabetic?

A.   Yes.

THE WITNESS:  Sorry.

MR. GISMONDI:  No problem.

THE WITNESS:  In all likelihood it does, because they're there.  The -- the postmarketing surveillance includes all people who take Wegovy.  And I think it's really important to -- for us all to understand what Wegovy is.

Wegovy is not a different medicine.  It's the same medicine.  It's just a higher dose of Ozempic.  And in giving it at a higher dose, it achieves weight loss. And so that allowed the company to, you know, get approval for that drug to be given to people without diabetes.  But it is still very commonly given to the patient population, perhaps even most notably given to the patient population that has both Type 2 diabetes and obesity.  It's really been a game-changer for that patient population.

So I am pretty confident and not at all surprised that there would have been substantial number of patients with diabetes, albeit with also obesity, in this dataset.  And all of the patient events that drove

the inability to say "all" and, you know -- you know, in the end, allowed them to just continue the same wording of, quote/unquote, "majority," was a function of the people with diabetes.  At least that would be my takeaway.

Q.  (By Ms. Lovett)  You can die with acute kidney injury; right?

A.  Acute kidney injury is not a common cause of death, but I think it is -- it is possible to say that a person can die from acute kidney injury if left untreated.

Q.  You can put the label aside, please.  Thank you.

I want to go back to your report, Doctor, and refer you to Pages 41 and 42 of your expert report relating to the topic header "Response to Opinions on Labeling of GLP-1 RAs."

Do you see that?

A.  Yes.

Q.  The substance of the bullet points in this section specify your responses are relating to Novo's GLP-1 RAs; correct?

A.  Yes.  My -- the commentary here is with respect to other expert opinions which were -- were focused on Novo's GLP-1 receptor agonists.  And so this -- these

bulleted points are similarly confined to that.

Q.    And in your report, you refer generally to Dr. David Metz's opinion; correct?

A.    Sorry.  In the section in Page 41 and 42?

Q.    Which continues on to Page 43, last bullet point, relating to Dr. David Metz's opinion.

A.    Oh.  Okay.

Sorry.  Yes, I see it now.

Q.    And your materials considered list -- well, one, let me ask -- your report, as written, does not specify whether you reviewed one expert report from Dr. Metz or more than one; correct?

A.    Correct.

Q.    And in your materials considered list, you consider -- you list that you considered expert report of David C. Metz and accompanying materials; correct?

A.    Correct.

Q.    Were you aware that Dr. Metz may have issued more than one report in this litigation?

MR. GISMONDI:  Objection.

THE WITNESS:  Well --

Q.    (By Ms. Lovett)  Did you know that he --

A.    -- I reviewed what I was able to review, and I don't know if what I reviewed reflects the totality of -- of -- of opinions or documents he produced.  But

I'm happy to look at any additional ones if they are ones that you think I may not have been able to review.

Q.    That's not necessarily what I'm trying to ask or elicit, but I'm just wondering if before coming to your response to opinions on Novo's GLP-1 RA labeling, if you confirmed whether there were separate reports prepared by Dr. Metz for different defendants in this litigation.

A.    Well, I would only be able to ask for confirmation for things that I had a suspicion needed confirmation.  So it's hard for me to answer that question with respect to not being prompted to wonder whether there were additional documents I was unaware of or more than one document being prepared for a different, you know, expert witness.

Q.    Did you only review one report that was issued by Dr. Metz in this litigation?

A.    I don't remember that, actually.

MR. GISMONDI:  Objection.

Maybe it would just be easier to ask if he reviewed a report directed at Lilly by Dr. Metz.

Q.    (By Ms. Lovett)  Did you review a report directed to Lilly by Dr. Metz?

A.    I did not.

Q.    Okay.

THE WITNESS:  That was useful.

Q.   (By Ms. Lovett)  I'm going to go back to your report to Page 23, on the section related to liraglutide relating to Victoza and Saxenda.

Let me know when you're there.

A.   I'm on Page 23.

Q.   Okay.

In your report, you organized the liraglutide and semaglutide as evidence around the major trial programs; correct?

A.   Correct.

Q.   For liraglutide, you highlighted the LEAD program and the SCALE program; correct?

A.   Correct.

Q.   And for semaglutide, you highlighted the SUSTAIN, PIONEER, and STEP programs; correct?

A.   And also, I believe, for semaglutide, SELECT as well, and SOUL.

Q.   Okay.

And those were larger cardiovascular outcome trials?

A.   Correct, and ESSENCE was another one relevant to metabolic associated liver disease.

Q.   Right.

And you wrote that semaglutide has been studied

in more than 55 clinical trials.  So your report was not attempting to discuss every single semaglutide study one-by-one, was it?

A.   No, it was not.

Q.   The same would be true for liraglutide.

A.   That's correct.

Q.   You selected trial programs that you considered most significant to clinical understanding; would that be fair?

A.   What we might call pivotal clinical trials that underscore the common uses that these drugs have now approval for.

Q.   Right.  And in the third paragraph on Page 23, you state the "LEAD program (Liraglutide Effect and Action in Diabetes) was a series of six pivotal Phase 3 trials, (LEAD-1 through LEAD-6) that shaped the clinical understanding of liraglutide in Type 2 diabetes."

Did I read that correctly?

A.   Yes.

Q.   And you included LEAD-6 among the trials that you called pivotal; correct? -- by virtue of this sentence?

A.   Yes.

Q.   If it turns out that LEAD-6 should not have been labeled a pivotal clinical trial, that would not

change your overall opinions about the GLP-1 class; would it?

A.    Well, because I haven't put all the LEAD trials into my working memory, I probably need to look at LEAD-6 before I answer that question if it's an important one, because I just don't remember what all differentiates LEAD-1 through LEAD-6, by memory.

Q.    Understood.  And we can take a look at some documents, but my question is more so that if LEAD-6 was not deemed a pivotal clinical trial, that would not change your opinions that you've issued in your report?

A.    My general opinions?

Q.    Correct.

A.    Correct.  It would not.

Q.    Why would that not undermine your overall opinion if a trial you listed as a pivotal Phase 3 trial was not, in fact, a pivotal trial for liraglutide?

A.    Well, as I said at the outset -- and we've revisited this a few different ways now -- my opinion about the main points that I'm making is based on the class as a whole, the history of the class as a whole, and all of the other understandings that I have in all of the ways that we've been talking about thus far, and so I don't think that there is a specific trial -- any individual specific trial, inclusion or exclusion, that

would be sufficient to completely change that opinion.

Q.   Right.  Okay.  Thank you.

You would disagree with any suggestion that your report is based on cherrypicking a handful of isolated studies; correct?

A.   Yeah, I would disagree with that.

Q.   And your report expressly says that GLP-1 RAs have been extensively studied in hundreds of clinical trials and epidemiological studies; correct?

A.   Correct.

Q.   So your position is that your methodology was to synthesize large bodies of literature, not to select only data favorable to one side; fair?

A.   And another thing, too.  What you say is -- is -- is fair, but in addition, some of the reasoning behind showing various trials is for educational purposes and just to provide the background with respect to where we are today and how we got there, and not necessarily to take a side one way or the other through the use of that literature.

Q.   Right.  And you did not gather every document in this case yourself reflected on your materials considered list; correct?

MR. GISMONDI:  Objection.

THE WITNESS:  So the methodology involved

working with -- with the counsel as well.

MR. GISMONDI:  Well, I'm going to just object and ask you not to get into any kind of communication you may have had with counsel.

THE WITNESS:  Okay.

Q.   (By Ms. Lovett)  Your report -- we talked about this earlier.  Your report says you asked counsel to provide you certain documents; right?

A.   I did ask to be provided certain documents.

Q.   Okay.

So at least some of the materials you reviewed were provided to you by defense counsel; correct?

A.   With the caveat that I also independently assessed documents through my own literature search and would see the overlap between being able to find similar papers or documents through that methodology as well.

Q.   And there's nothing improper in your view about counsel providing materials for an expert to review; correct?

A.   From the standpoint of convenience, no.

Q.   Okay.

What AI tools, if any, did you use in connection with your expert report?

A.   I did not use any AI tools with respect to this expert report at all.

Q.    Did you use AI to search for literature?

A.    I did not use AI to search for literature, unless there's AI embedded in either Google Scholar or PubMed that I'm unaware of.

Q.    Did you use AI to generate any of the appendices in your report?

A.    I did not.

Q.    Did anyone assisting you use AI in connection with generating the appendices in your report, even if you personally did not?

MR. GISMONDI:  Objection.

You can answer.

THE WITNESS:  I'm unaware of any use of AI in producing this expert report at all.

Q.    (By Ms. Lovett)  Okay.

I'm going to go to Page 20 of your report.

And the first full paragraph, starting with "To this end"; do you see that paragraph?

A.    I do.

Q.    And that paragraph is in relation to the Coutinho study that --

(Stenographer clarification.)

Q.    (By Ms. Lovett)  -- Coutinho study referenced by Footnote 10, Glucagon-like Peptide-1 Agonist Liraglutide Induces Temporary Impairment to Gastric

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Electrical Activity in Healthy Volunteers.

Do you see that paragraph?

A.    Yes, I do.

Q.    Okay.

There were only 20 people in that study that completed the study; right?

A.    There were 20 individuals who completed the study.

Q.    And the individuals that completed the study were mostly overweight; right?

A.    I would have to look at the study again to confirm that.

Q.    Sure.

A.    But I can see that the BMI range was 22 to 35, and so I'm sure that it included people who were overweight in that 18- to 65-year-old patient, you know, cohort.

MS. LOVETT:   We can mark the Coutinho study as our next exhibit.

(Exhibit 10 was marked for identification.)

THE WITNESS:   So would you like me now to answer the question you previously asked after having seen the actual study?

Q.    (By Ms. Lovett)   Sure.   My question was just that the patients in the study were mostly overweight;

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

right?

A.   Yeah.  The mean BMI was 30.9, which is, itself, right at the diagnostic borderline of obesity.  So for that to be the case, and the data show that, indeed, most of the people were at least overweight.

Q.   Okay.

And they were treated with Saxenda; right?

A.   They were treated with liraglutide; correct.

Q.   But specifically, the paper states that they were given Saxenda as the liraglutide.

A.   Yes.  The -- the study gave a dose in -- that would be in the range of the Saxenda dosing range, so yes.

Q.   Well, they only gave up to 1.8 milligrams for two days; right?

A.   They did.  That was the purpose of the study.  But I'm just saying 1.8 milligrams places it in the Saxenda dosing range.

Q.   But the -- in -- the optimal dosing of Saxenda would be 3 milligrams.

A.   Correct.

Q.   Okay.

And I wanted to direct you to a sentence in -- on the second page, left-hand column, first full sentence, "However, this may not apply in people without

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 105 of 144

symptoms, highlighted by the fact that 75 percent of the healthy volunteers in this study had abnormally slow gastric emptying induced by liraglutide, yet had minimal symptoms."

Did I read that correctly?

A.   Yes.

Q.   So that statement states that 75 percent of the volunteers in that study did not have -- they had minimal symptoms associated with their delayed gastric emptying; correct?

A.   So, notably, this study did not look at people with diabetes.  And they're using the term "healthy" volunteers.  And even though by BMI, you're stating that the -- many of these individuals were overweight, the majority of the individuals were not obese.  And overweight is, you know, indicated at a much lower BMI than obesity is.  And so in general, these are people who were healthy other than that weight.

And the point is that, indeed, using this metric to measure, actually try to quantify gastric emptying and gastric motility, that there was a commonality of effect that the drug would induce that, but that that was not necessarily coupled with everybody saying that they had a lot of symptoms that -- that, you know, might trigger concern.

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26

Q.   Right.

So of this study that had 20 people that completed it, there were not a lot of symptoms that these individuals had from the two weeks that they took liraglutide; correct?

A.   Correct.

Q.   And they were only on the 1.8 milligram dosing, which was the highest dosing, correct, in the study?

A.   In this study; correct.

Q.   And they were only on the 1.8 milligram highest dosing of this study for two days; right?

A.   For this study, yes, um-hum.

Q.   And it was only 14 days' worth of use of liraglutide, whether at .6, 1.2 milligrams, or 1.8; correct?

A.   Right.  So it was a ramp-up.  And, indeed, it was a two-week process of ramping up.

Q.   Okay.

Gastric emptying breath test was one of the modalities used in this study to test gastric emptying; correct?

A.   Correct.

Q.   They did not measure emptying at wash-out, correct, through gastric emptying breath test?

A.   Yeah, I don't believe so.

Q.    You can set that aside.

How did you come to meet the attorneys for Novo Nordisk in this case?

A.    Sorry.  That was an abrupt change of what the question was about before.

I don't remember.  I think maybe it was by e-mail.

Q.    Okay.

Do you remember when?

A.    I think it was sometime around April -- yeah, April, like, 2024.

Q.    Okay.

Who was the first lawyer who you spoke with?

A.    That, I don't remember.

Q.    Was it -- was this the first you had met attorneys for Novo Nordisk?

A.    Yes.  And I can't say "met," because it was an e-mail.

Q.    When did you meet them in person?

A.    That's a good question.  In person?  I don't know that I've met any lawyers from Novo Nordisk in person until, like, now.

Q.    For preparation for this deposition?

A.    Correct.

Q.    How much time did you spend preparing for your

deposition?

A.   A few sessions over the course of this week.

Q.   For approximately how long each session?

A.   It was -- it's hard for me to say, because each session was very, very choppy, because I had a lot of clinical responsibilities this week.  It was a -- bad timing, you might say.

Q.   Um-hum.

A.   And so it was a couple of hours.  And then I had to flee back to UCSF to do clinic or give a lecture or go to my lab meeting or some other thing I couldn't miss, and then I would come back for another couple of hours.  And so maybe we're talking about, depending on the day, like three to four hours, you know, in pieces.

Q.   Okay.

Have you ever done any consultant work for pharmaceutical companies?

A.   I've been an advisor on specific projects for a few pharmaceutical companies over the last 20 years, but not a lot.

Q.   Which companies?

A.   I gave advice to Merck.  This is all preclinical kind of stuff.  Gave advice once to Merck.  Gave advice once to Corcept.  I've given advice to Abbott Diabetes for device-related stuff in the past.

I have recently given -- been on an advisory panel for AbbVie. And once I was asked to give advice to Pfizer with respect to drugs related to triglycerides and liver physiology.

Q. And so you had never worked for Novo Nordisk before your retention as an expert in this litigation?

A. That's correct.

And all of the other advisory work that I mentioned, all of that is largely focused in the preclinical sphere in terms of where my expertise is, not with respect to trials or postmarketing or any aspect of the clinical availability of any drugs.

Q. We received -- and I'll just mark it so it's a part of the record. I only have one copy, but this is an invoice summary table that we received reflecting the amount -- the approximate time that you have billed or been paid in this matter.

(Exhibit 11 was marked for identification.)

Q. (By Ms. Lovett) Have you seen this document before?

A. I have not seen the document prepared this way before. You're showing it to me for the first time, but it -- I'm aware of -- of these invoices.

Q. Is the information reflected in this invoice summary table accurate as it's listed?

A.    I believe so.

Q.    Do you have any reason to believe that the information is inaccurate?

A.    No, I don't.

Q.    Okay.

And so you have spent a total of 52 hours since you began working on this case on August 2nd, 2024, to February -- or I'm sorry -- to April 12th, 2026, for a total amount of $44,200; correct?

Does that sound right?

A.    That is right.

Q.    Okay.

You can set that aside.

You talked a few different times about your materials considered list, and that list is supposed to identify the materials you reviewed in forming your opinions; correct?

A.    That -- that materials considered list really more accurately reflects materials that helped couch my opinions in light of corroboration with the literature, to make sure that I -- you know, that I did work to -- to show myself that my opinions didn't differ from what the literature says.

Q.    Okay.

But there are items on your materials

considered list that aren't only medical and scientific literature; correct?

A.    Yes, that's correct.

Q.    Okay.

Your materials considered list does not identify any FDA regulation governing prescription drug labeling, does it?

A.    I believe not.  And my report was not meant to opine on expertise in FDA drug labeling or FDA regulatory affairs specifically.

Q.    But you do make opinions as to the labeling for Novo's GLP-1 RA medications.

A.    I make opinions on that with respect to their adequacy for providing patients and providers with what they need to know to advise patients when starting the drugs or dose-escalating the drugs so as to prevent severe unwanted effects from occurring.

Q.    Okay.

So in your opinions that you've made with respect to the adequacy of the GLP-1 RA labels, you do not list any guidance on the content and format of prescription drug labeling, correct, from the FDA?

A.    Correct.

Q.    You do not list any FDA guidance addressing warnings and precaution sections of prescription labels;

correct?

A.    FDA guidance on that topic?

Q.    Correct.

A.    That's correct.  I didn't -- I don't think that that's relevant to my opinion.

Q.    Okay.

And as a part of your work in this case, you did not conduct a review of FDA labeling regulations; correct?

A.    No.  Again, I don't think that such a review would have been relevant to the purpose of my report, nor to anything I need to know to evaluate the adequacy of the label as a provider and as somebody who gives these medicines to people.

Q.    Okay.

And as a provider, evaluating the adequacy of a label and someone who gives these medicines to people, your opinions in that regard were not based on review of any FDA regulations or guidance documents governing drug warnings of a prescription drug label.

A.    That's correct.

Q.    How many patients do you see a year?

A.    It's fluctuated over the years, but in general, I probably see somewhere around 150 to 200 patients a year; maybe 250 to 300, depending on the year.

Q.   How much time would you estimate that you spend with each patient?

A.   We at UCSF are, I think unfortunately for us financially, old-fashioned, but from a clinical care standpoint, I'm glad that we are.  I spend an hour with my new patients, and I spend a half an hour with my return patients, whether by video or in person, depending on the nature of the visit.

Q.   How many hours per week would you say that you spend on direct patient care?

A.   I do, depending on the week, usually at least two sessions per week, so that's two half-days, so like a full day, so I probably spend somewhere between eight to 12 hours per week.

Q.   Okay.

A.   And then beyond that, though, I also attend in our fellows clinic; and in that instance, the fellows see the patients, and I have the patients presented to me, and then I go see the patient with the fellow, and we go over the plan, and we do some education, and we explain things together so that I can teach the fellows and residents how we do that.

Q.   Um-hum.

A.   As well as make sure that the care plan for the patient is adequate and appropriate, and effective, and

that the patient understands it.

Q.   Okay.  Okay.

Want to take a break?

A.   Sure.

THE VIDEOGRAPHER:  Going off the record at 11:56 a.m.

(Lunch recess taken 11:56 a.m. to 12:44 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 12:44 p.m.

MS. LOVETT:  Doctor, we're back on the record after having a lunch break.  I don't have any further questions for you at this time, but I am going to turn questioning over to my co-counsel, Mr. Rottinghaus. Okay?

THE WITNESS:  Thank you very much.

EXAMINATION

BY MR. ROTTINGHAUS:

Q.   Okay.

Doctor, I'm going to try to just keep us moving with a few follow-up questions and maybe a topic or two that we haven't talked about too much, but as we discussed in our break, I think we'll -- we'll get you out of here a little earlier than we anticipated.

A.   Okay.  Thank you.

Q.   To kind of back up, when you first were asked

to evaluate this case or evaluate some of the issues in this case, and as you started looking at materials and offering some preliminary thoughts, was there anything you asked, whether it be the attorneys or anyone else, to allow you to review when undertaking your review of this case specifically?

A.    Not specifically.

Q.    I mean, you had access to the literature.  I know you told us how you did the searching to refamiliarize yourself or take a look at all the literature you thought you should look at; correct?

A.    Correct.

Q.    And in other words, I guess what I'm wondering is were there any -- either studies that you thought might be internal studies that only the company Novo Nordisk might have -- that had -- might have data that would be of some value to you?  Did you ask for anything like that?

A.    I did not ask for any internal company-specific data that I didn't know whether it would be in the public sphere or not.

Q.    Okay.

We -- we know from your -- what we call your materials considered list, and you're probably familiar with this, but under the -- the rules of civil procedure

that we, as lawyers, and in cases like this we all have to follow, you know experts are required to list the materials they've considered as part of their opinions. You basically understand that; right?

A.   Yes.

Q.   Okay.

A.   Correct.

Q.   I don't have it right in front of me, and we can pull it up if we need to, but in looking at your materials considered list, it looked like there were a limited number of documents you may have looked at that had what we called Bates numbers, but internal numbers, on them, but what I really want to ask you is -- and you're probably generally familiar with this -- there are a lot of documents that have circulated in this case, and it appears that you have -- have not looked at the lion's share of those documents; is that -- is that correct?

A.   That's correct.

Q.   Okay.

And, again, I'm not critical of you for that; I'm just wondering was there anything internally you did ask to look at that you just didn't get a chance to look at for one reason or another?

A.   No, not that I didn't get a chance to look at.

Q.   Okay.

And looking back at that materials considered list, which I think we've marked as Exhibits 2 and 3 --

A.   Um-hum.

Q.   -- sitting here today, are you confident that it lists all of the materials and literature that you considered as part of your opinions in this case?

A.   Yes, that's correct.

Q.   You told us about, kind of, how you split up your time in the various positions you hold at UCSF and elsewhere.

Do you have -- are your privileges to see patients at the UCSF hospital system?

A.   So during the course of the time of my clinical practice, as reflected in the report, I've had privileges at three hospitals:  the UCSF-affiliated VA hospital; the so-called San Francisco General Hospital which is our flagship county hospital, public health system hospital; and the UCSF Health system.

So some of the patients that I've treated with GLP-1 receptor agonists over that period of time were, in fact, also treated in the Department of Public Health, San Francisco General Hospital system; but since 2020, I've been chief of the division of endocrinology for UCSF Health, and from that point forward, all of my

clinical care has been specifically and solely in the UCSF Health system:  Mission Bay campus, Parnassus campus, and other campuses, but all UCSF Health.

Q.    Do you do rounds at the hospital on a regular basis at this point in your career?

A.    I do do rounds in the hospital on a regular basis.  I will not be doing rounds in the hospital on in-patients next year, because we've hired enough faculty that I'm going to be rotating off this time, but it will be the first time that I have not done rounds in the hospital.

Q.    Okay.

And then I saw reference to -- I think it was referred to as the Koliwad lab.

A.    Yes.

Q.    Can you make sure I understand what that is, exactly.  Is that your clinic, your own clinic, or what is that?

A.    That is my own basic science lab.  So I'm --

(Stenographer clarification.)

THE WITNESS:  -- an NIH-grant-funded investigator, and I have been a member of our co-called Diabetes Center, which is a research institution at UCSF since 2011, and I've run that lab -- my lab continuously since then; you know, bringing in post-docs and graduate

students, clinical fellows, and other people who want to do diabetes, obesity, and metabolism-related research, and so that's what my lab is focused on, and we have had projects that deeply focus on the basic biology of obesity, as well as diabetes, and that includes GLP-1 related pathways.

Q.    Are you currently, or in the past have you been, involved in working on the development of any specific medications or drugs in collaboration with any other entities or individuals?

A.    I have not.

Q.    Okay.

I think I heard you say, and I totally respect what you meant, was you sometimes are sought after for your knowledge base that you have in the field of endocrinology; correct?

A.    Correct.

Q.    Okay.

And I can tell from just looking at your background and listening to you today that you have a lot of expertise and knowledge base about GLP-1 RAs, and I say that as a compliment to you.

Here's my question:  In the realm of doctors that prescribe GLP-1 RAs, would you consider yourself to be kind of at the highest level of knowledge base of

those doctors?

A.    With respect to precisely how the medicines work, scientifically, et cetera, yes, I would consider myself to be among the top maybe 5 percent if you want to say, roughly guessing, that I would be in that group.

Q.    In other words, there are internal medicine doctors and family medicine doctors who are great doctors but do a lot of other different things, and they're probably not going to have that same knowledge base that you have with respect to GLP-1 RAs as a whole when they're prescribing those medications; correct?

MR. GISMONDI:  Objection.

THE WITNESS:  I will -- I will add one -- one caveat to that point that you -- that you make, which is that increasingly, patients get these medicines in primary care, and the rate at which they get them in primary care, family practice, from nurse practitioners, has gone up and up and up over the last decade, and so what those providers have that exceeds what I have is volume.

And from the volume, they have acquired a lot of experiential knowledge about these medications which is also really valuable, so I will say that those individuals now participate as part of our community of providers, and I do learn from them as well.

Case 3:24-md-03094-KSM     Document 691-41     Filed 05/19/26     Page 121 of 144

Even though I provide knowledge about exactly how the medicines work to explain what they're seeing, but they see it, and that's what they bring to the table now increasingly.

Q.   (By Mr. Rottinghaus)  And, for instance, I think you -- you said in your report that you personally have not seen a patient who has developed gallbladder disease, from what you could tell, as a result of the prescription you had for GLP-1 RAs; correct?

A.   Yeah.  In all of the patients I've treated to date, there's been one patient who had gallbladder inflammation and had their gallbladder removed.  And it was unclear whether that all preceded ever having taken one of these medicines.  So that's the only instance, and even in that instance, I can't be sure.

Q.   Okay.

And correct me if I'm wrong, but what I'm hearing you say is among that group of larger family physicians and other doctors who prescribe who might have an even larger knowledge base, you're not saying they don't see patients who develop, for instance, gallbladder disease as a result of the use of GLP-1 RAs; correct?

A.   Yeah.  The --

MR. GISMONDI:  Objection.

THE WITNESS:  The -- you are correct in saying that that community sees a huge number of patients in conjunction with, A, academic physicians; and, B, academic specialists.

On the other hand, in all of the ways that I interact with -- with general providers, including internists, for example, I don't hear them mentioning that they see it any more frequently than I anecdotally have just mentioned to you.  So, like, if it's there, it's strikingly rare.

Q.    (By Mr. Rottinghaus)  Okay.

What -- and maybe I'm mistaken from reading your report.  You correct me if I'm wrong.  Am I correct that you are not saying that there's no causal association between the use of GLP-1s and an increased incidence in gallbladder disease?

A.    I'm not making a statement about causal effect on that matter at all.

Q.    Okay.

But what I did see is you make the point that there are -- you see -- what you see as warnings already in the labels talk about some of those things.

A.    That's correct.

Q.    Okay.

But, again, just to make sure I'm not mistaken,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

you're not sitting here today saying there's no causal association between the use of GLP-1s and either cholelithiasis or cholecystitis.

A.   I'm not saying that.

Q.   Do you plan to even offer an opinion on that one way or the other?

A.   I do not plan to offer an opinion on that topic one way or the other.

Q.   Okay.

I think I saw either in your report or you said today that you will educate patients about various symptoms when taking GLP-1s.  You said that this morning, I think.

A.   Correct.

Q.   And I think what you said is I don't use -- sometimes use the specific diagnostic terms; I'll just explain to them the type of symptoms they need to be on the lookout for; is that right?

A.   That's correct.

Q.   Nausea and vomiting being among those -- two of those symptoms.

A.   Absolutely.  Correct.

Q.   Okay.

Understanding you have a pretty good knowledge base about GLP-1s, would you agree that for a lot of

doctors, looking at the actual prescribing information is where they're going to get information about the various symptoms to educate their patients about when they start them on a medication like a GLP-1?

MR. GISMONDI: Objection.

THE WITNESS: I actually will state, and I think it's -- I feel like I'm very much in the norm in this statement, that hardly any, if not -- essentially none of the providers I'm aware of actually look at the prescribing information or label as a means to understand what the drugs can do from an adverse perspective in order to inform their patients.

We don't learn about that from that source. We learn about it from the reading that we do about the medicines as they're being developed even before the FDA approval, including at meetings, talks, seminars that are given at our institution and, therefore, learning it from experts who are -- who are working on the drugs at the time, such that by the time they're FDA approved, there's a lot of word-of-mouth understanding about what to be thinking about with these medications and what, really, to be discussing with patients.

And perhaps some physicians will look to the label to corroborate what they think about the medicines against what the label says to make sure there's no

disparities there, but I'm unaware of providers, physicians and otherwise, who use the label to educate themselves.

Q.   (By Mr. Rottinghaus)  Let me ask you this: Has -- I'll call it informed consent, but has that discussion you have had with patients about the benefits and risks of GLP-1 RAs changed at various points in time based upon different information or warnings that get added to the prescribing information on the labels?

A.   My -- my discussion with patients has not changed at all since the beginning.  And that even includes exenatide.

And the reason for that is that I was really influenced by the original randomized clinical trial that led to exenatide approval from DeFronzo and colleagues, which had a table.  Even though the medicine was not even a weight-loss indication at that -- at that time at all, I'm clearly showing nausea, vomiting, and these other side effects.

And the reason why I think I can say that confidently now, looking back, is that we thought that the way these drugs worked was because they produced nausea.  We thought that they -- that people lost weight because they were nauseated at a minimal level, and they didn't want to eat; and because they didn't want to eat,

they would lose weight.

Now, of course, we know that it's much more complicated than that.  And the brain effects of the drugs play a role in inducing the nausea, just as the GI effects of the drugs do, but that led me to counsel patients about nausea, vomiting --

(Stenographer clarification.)

THE WITNESS:  -- diarrhea, abdominal pain, et cetera, from the very beginning.  And that means I haven't really had to change that.

The only other caveat I'll throw in is that if a patient may be or is considering or is about to undergo a procedure, I do talk to them about the fact that, you know, they should talk to whoever's doing that procedure about whether they should or shouldn't stay on the medicine at the time the procedure is being done.

Q.   (By Mr. Rottinghaus)  Let me jump to Exhibits 2 and 3, and I think probably it makes sense to refer to Exhibit 3, since that's your corrected materials considered list.

Let me know if you have that in front of you.

A.   I do have it in front of me.

Q.   Okay.

Keep that in front of you, because you might want to refer to it.

Case 2:24-md-03094-KSM   Document 691-41   Filed 05/19/26

You comment in your report, I think on Page 43 of Exhibit 1, about some of the different expert reports that you have read in this case.  And I want to refer you to Dr. David Ross.  I think he's the first bullet point on Page 43 of Exhibit 1.

Do you see where I am?

A.   Yes, I do.

Q.   Take a minute to familiarize yourself with what you've got there.

A.   Okay.

Q.   Okay.

Beyond the label information that you refer to in this bullet, paragraph, is there any other information you rely upon in connection with your disagreement with Dr. David Ross on Novo Nordisk's warnings about the risk of gallbladder disease?

A.   No.  I think that, really, my -- my point stems from the adequacy of the label versus those comments.

Q.   Now, this is a label -- and correct me if I'm wrong.  This is a label that you said most doctors, in your experience, don't review.

A.   Not that they don't review.  They don't rely on to educate them on what they need to be looking out for.

Q.   Now, in conducting your literature review, did you do any focus on any of the medical literature

addressing potential mechanism of injury between the use of any GLP-1s and gallbladder disease?

A.   If you'll give me a moment, I think I do have one section on gallbladder disease.  I probably need to refer myself to it.  It's here.

So there's -- there's information -- I think it's on Page 37 of my report, Section 3 -- relevant to Saxenda, Wegovy, Victoza, Ozempic, and Rybelsus, with respect to gallbladder disease.  And so that's the extent to which the commentary is based, and that it is present as a data point in trials relevant to all of those drugs I just mentioned.

Q.   Okay.

In doing your literature review in this case, did you attempt to review any of the meta analysis addressing causal associations between use of GLP-1s and gallbladder disease?

A.   No, I did not.

Q.   In connection with your overall review of this case, I did not see any reference in your updated materials considered list, Exhibit 3, to any internal periodic adverse drug experience reports published by Novo Nordisk; is that correct?

A.   That's correct.

Q.   And you haven't reviewed any of those?

Case 3:24-md-03094-KSM    Document 691-41    Filed 05/19/26

A.    I have not reviewed those.

Q.    Okay.

Are you even familiar with periodic adverse drug experience reports?

A.    Not specifically.

Q.    Okay.

Similar question to a couple of other different types of internal reporting.  I just want to make sure I'm correct that you haven't looked at any of this.

In connection with your review in this case, did you review any of Novo Nordisk's development safety update reports?

A.    I did not review those reports.

Q.    Same question with respect to any of Novo Nordisk's periodic safety update reports.  Did you review any of those in connection with your review?

A.    I did not review those.

Q.    And one more, I think.  Did you review any of Novo Nordisk's periodic benefit/risk evaluation reports in connection with your review?

A.    I didn't specifically review those reports either.

Q.    Okay.

And I'm referring to from the time frame when each of these GLP-1 medications that Novo Nordisk has

created went onto the market until now, you just haven't looked at any of those reports.

A.   Yeah.   I mean, the only knowledge relevant, potentially, to those reports that you reference, in general, is through the reports of the other expert witnesses who may have looked at them, and then I compared what they said versus what I see and what the label shows, and I rendered my opinions based on that comparison.

Q.   To the extent there's data that was available to Novo Nordisk from any internal clinical trials that weren't published, that was referenced in any periodic benefit/risk evaluation reports, it sounds like you didn't look at it in connection with this case?

A.   I wouldn't know about unpublished internal clinical trial data.

Q.   Okay.

What about safety signals?  Did you review any internal data on safety signals that was within Novo Nordisk's file in this case?

A.   Yeah.  I -- I haven't reviewed unpublished internal-only data from Novo Nordisk on any of these topics.

Q.   Okay.

Do you know whether Novo Nordisk identified

cholelithiasis as an important risk factor for semaglutide as early as 2017?

A.    If it's unpublished and isn't part of the communications with the FDA that I do speak about here, I wouldn't have any knowledge about whether they did or didn't know anything like that.

Q.    Okay.

Do you know whether Novo Nordisk recognized an association between treatment with GLP-1 RAs and gallbladder-related adverse events by 2020?

MR. GISMONDI:  Objection.  You can answer.

THE WITNESS:  I -- I'm -- I'm aware of the interaction that Novo Nordisk had through the documents that I reference with FDA at the time of various reassessments of the label in conjunction with new drug applications and, therefore, new indications, and the extent to which FDA comments on the adequacy of that communication as being able to be reflected in the label, then I'm aware of that.

But beyond that, I'm not aware.

Q.    (By Mr. Rottinghaus)  Do you recall ever seeing any information regarding whether Novo Nordisk identified cholelithiasis as an important identified risk of semaglutides subcutaneously as of June 1st of 2017?

A.   Not specifically.  Only through the label.

Q.   Give me one minute.  Just give me one second.

A.   Sure.

Q.   I think you told counsel this -- or already confirmed this this morning, but just to make sure, Exhibit 1, your report, that's -- that's your updated list of everything you plan to talk about at the time of trial in this case.

A.   Yes.

Q.   And you signed that report; correct?

A.   I did; correct.

MR. ROTTINGHAUS:  I think those are all the questions I have, but give us just one minute, and we'll go off the record for a minute, make sure.  Okay?

THE WITNESS:  Absolutely.

THE VIDEOGRAPHER:  Going off the record at 1:08 p.m.

(Recess taken from 1:08 p.m. to 1:13 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 1:13 p.m.

Q.   (By Mr. Rottinghaus)  Doctor, did you feel like you understood the questions we asked of you today?

A.   I do.

Q.   And if you didn't understand a question, did you try to make sure you did and stop us to let us know

if you did not?

A.    Yes.   Thank you.

          MR. ROTTINGHAUS:   Okay.   All right.

          Thank you for your time.   I think these are all the questions we have for you today.

          THE WITNESS:   Great.

          MR. GISMONDI:   Is there any questions from Mr. Premo-Hopkins?

          MR. PREMO-HOPKINS:   I have a couple questions. Dr. Koliwad, can you hear me okay?

          THE WITNESS:   I can.   Thank you.

                    EXAMINATION

BY MR. PREMO-HOPKINS:

    Q.    And I don't know if I'm just a voice in the ether, but I'm Mark Premo-Hopkins, and I represent Eli Lilly in these cases.

          Do you understand that?

    A.    I do.   Thanks.

    Q.    I just had a couple of -- of follow-up questions I wanted to ask to make sure the record is clear.

          And, Dr. Koliwad, if I can direct you to Page 4 of your report, which I believe is Exhibit 1 to the deposition.

    A.    That is correct.   And I am looking at Page 4

Case 2:24-md-03094-KSM    Document 691-41    Filed 05/19/26    Page 134 of 144

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

now.

Q.    And on Page 4, that includes a -- thank you, whoever's driving the documents.

Page 4 includes enumerated Paragraph 5 and 6 at the top that I believe are from the summary of your opinions; is that right?

A.    Yes.  Correct.

Q.    And do you recall being asked about these paragraphs by Plaintiff's counsel?

A.    Yes, I do.

Q.    And I recall that -- or let me start that over. Is it all right if I start my question over, Dr. Koliwad?

A.    Sure.

Q.    Do you recall being asked about these paragraphs and particularly the use of the term GLP-1 RAs as a group?

A.    Yes, I do.

Q.    I want to make sure that the record is clear. You offered opinions here with regard to, for example, the knowledge of the medical community about potential GI adverse effects of all of the various GLP-1 RAs and GLP/GIP medications; is that right?

A.    That is right.

Q.    And just so we're very clear, you aren't

intending, with your opinions here, to suggest that it's appropriate to reach a reliable scientific conclusion about one GLP-1 RA by looking at outcomes solely for a different medication.  In other words, you looked at all of the outcomes; you didn't just sort of paint with a broad brush; is that right?

MR. ROTTINGHAUS:  Objection.  Vague and leading.

Go ahead, Doctor.  I'm sorry.

THE WITNESS:  Sure.  I looked at -- I looked at information from the literature; and, of course, as we've gone through, in some detail now, my own knowledge to consider risks with respect to what you're asking about for each of the named drugs; not only in the GLP-1 receptor agonist class but also in the dual agonist class.  I -- in other words, including the current slate of approved drugs that involve GLP-1 receptors.

Q.   (By Mr. Premo-Hopkins)  Just to be clear, by -- in issuing your opinions, you didn't intend to suggest that it was appropriate in some way to only look at class -- generic class level --

(Stenographer clarification.)

MR. PREMO-HOPKINS:  Thank you.

Q.   (By Mr. Premo-Hopkins)  Dr. Koliwad, I'm going to start my question over to make sure it's clear for

the court reporter.  Is that okay with you?

A.   Yes.

Q.   You didn't intend to suggest in your report or in your answers to questions today that it was appropriate to evaluate the outcomes for specific drugs by considering only GLP-1 class level information; is that right?

MR. ROTTINGHAUS:  Same objections as before.

Go ahead, Doctor.

THE WITNESS:  I -- I think that it is important to consider both class-wide common effects, as well as the effects of individual drugs within these classes, because the drugs are not exactly identical one to the next.

Q.   (By Mr. Premo-Hopkins)  And I believe you said this earlier, Dr. Koliwad, but you weren't asked to offer any opinions about causation; is that right?

A.   I wasn't asked to offer opinions about causation, and I'm not offering any opinions about causation.

Q.   And you mentioned it previously, but are you aware, one way or the other, even at a general level, that -- as to whether there are differences in outcomes in the literature for individual GI adverse reactions and individual medications that act on the GLP-1

receptor?

MR. ROTTINGHAUS:  Objection to the extent it exceeds the scope of his materials considered list.  And it's leading if it doesn't.

Go ahead, Doctor.  I'm sorry.

THE WITNESS:  That -- that, I think, is a complicated question.  I -- I do agree that it exceeds the scope of what I reviewed and what I talk about in the report, but your -- your question brings up some very --

Q.   (By Mr. Premo-Hopkins)  Dr. Koliwad, let me be clear.  I'm not asking you to offer any new opinions that aren't in your report.  So if that -- if that is your perspective that you just shared, that's fine with me.

A.   Okay.  Thank you.

MR. ROTTINGHAUS:  Anything else?

MR. PREMO-HOPKINS:  Yeah.  Sorry.  Yeah, I do have a couple of additional questions.

Q.   (By Mr. Premo-Hopkins)  Dr. Koliwad, did -- as part of your work in this case, did you examine -- and I want to make sure -- sorry.  Let me start my question over.  Is that all right, Dr. Koliwad?

A.   Yes.

Q.   There's nothing in your report that addresses

cellular molecular differences in the mechanism of action of the various GLP-1 RA medications; is that right?

A.   There is information in my report about the cellular and molecular mechanism of action of drugs that specifically target and solely target the GLP-1 receptor.  But there is not information about molecular specificity of action with respect to drugs that may target multiple receptors.

Q.   With regard to drugs that only target the GLP-1 receptor, were you asked to, or did you opine on, how differences in receptor binding might impact outcomes?

A.   I do not specifically go into differences in outcomes that might result from specific differences in -- in receptor-binding affinity or in the slate of receptors to which a given drug binds across the body as a basic biological point.  I don't mention that and talk about it in this report.

Q.   And would the same be true that you're not intending to offer any opinions about the different intracellular signaling pathways that can be activated by the GLP-1 receptors?  That wasn't part of your assignment here?

A.   I -- I, in general, mention the fact that there is intracellular signaling.  I alluded to that in

today's testimony.  But the report does not, as you --
as you correctly state, does not go into detail about
intracellular signaling pathways and the extent to which
different drugs stimulate specific intracellular
pathways when compared one against another.

Q.   And, again, just to make sure we're totally
clear, you didn't intend to examine or opine on how
differences in receptor binding or cell signaling might
affect the physiologic outcomes that are seen; is that
right?

A.   I did not opine on that.  I just indicated that
the general area that you just mentioned; i.e.,
differences in receptor binding and signaling, among
other things, may account for some differences in
effects that are seen.  But I don't go into detail on
that, and I don't intend to go into detail on that.

MR. PREMO-HOPKINS:  Thank you, Dr. Koliwad.

That's all of the follow-up questions that I
have.

MR. GISMONDI:  Just two brief questions from
me.

EXAMINATION
BY MR. GISMONDI:

Q.   Dr. Koliwad, you're not offering any opinions
on causation in this case.

A.    That's correct.

Q.    And with that caveat, we talked earlier about some well-established effects; right?

A.    Correct.

Q.    Is it -- do you have -- sorry.  Let me strike that.

Is it well understood as to whether or not GLP-1 RA medications can have a -- an established effect of bowel obstruction?

A.    It is not well-established.

MR. GISMONDI:  Okay.

No further questions.

THE VIDEOGRAPHER:  Before we go off the record -- oh, you done?

MS. LOVETT:  We're done.

THE VIDEOGRAPHER:  Before we go off the record, I'd like to confirm orders.  You have standing orders; is that correct?

MS. LOVETT:  Yes.

THE VIDEOGRAPHER:  All right.

This concludes today's testimony given by Dr. Suneil Koliwad.  Going off the record at 1:23 p.m.

THE WITNESS:  Thank you.

(Recess taken from 1:23 p.m. to 1:24 p.m.)

THE STENOGRAPHER:  We are back on the

stenographic record.  The time is 1:24 p.m.

EXAMINATION

BY MR. ROTTINGHAUS:

Q.   Doctor, thanks for sticking with us here.  I had intended just to confirm that you had produced, I think through counsel, multiple slide decks and some presentations you have done in the past; and I think, actually, a couple of them are even in this past week or month; is that correct?

A.   Yes.  That's correct.

Q.   I'm going to just going to give you the names of the files you produced to make sure you believe you have produced everything that was responsive to what we call a notice to take deposition.  You know what that is; right?

A.   Yes.  Correct.

Q.   Okay.

And we've got something called the "DAM LAM mini med."  Is that one file?

I'm going to refer to them by the file name because --

A.   Yes.

Q.   -- they're long, and I think the presentations are titled something else.

A.   That's correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.   Then we were provided one called "Hemholtz," H-e-m-h-o-l-t-z, "and Koliwad."

A.   Yes, that's correct.

Q.   Okay.

Then there's one file titled "Koliwad skinny on weight loss."

A.   Yes.

Q.   Then the next one is the "Koliwad cardiovascular outcomes trials."

A.   Yes.  Okay.

Q.   And then is that yours as well?

A.   That's correct.

Q.   Okay.

And then I think we were provided with a file called "Koliwad talk of April 10 of 2025."

A.   Correct.

Q.   And then we were provided one "April 1st of 2026."

A.   That is correct.

Q.   We have a file "April 22nd of 2026."

A.   That's correct.

Q.   Then we have one, going back in time, "November 18 of 2025."

A.   Correct.

Q.   Then one file titled "Merck National Med,

Koliwad," I think.

A.    That's correct.

Q.    And then, finally, a file titled "TMR & R Koliwad of 20-" -- I think -- "25."

A.    Yes, that's correct as well.

Q.    Okay.

And what you attempted to do is provide, with counsel, any files and slide decks and presentations that you felt were responsive to what we asked of you.

A.    Correct.  That's right.

MR. ROTTINGHAUS:  Thank you.

That's all I've got.

THE WITNESS:  Thank you.

THE STENOGRAPHER:  Thank you.

We're off the stenographic record.  The time is 1:27 p.m.

(Whereupon, the videotaped deposition of SUNEIL KOLIWAD, M.D., Ph.D. concluded at 1:27 p.m.)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I, HEATHER J. BAUTISTA, CSR No. 11600, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision;

That the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

( ) Reading and signing was requested/offered.

(XX) Reading and signing was not requested/offered.

( ) Reading and signing was waived.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated:    April 26, 2026

HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR