# EXHIBIT 42D



Linda Nguyen, MD

4/9/2026

In Re: Glucagon-Like-Peptide-1 Receptor Agonists Products Liability Litigation

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: GLUCAGON-LIKE )
PEPTIDE-1 RECEPTOR AGONISTS ) CIVIL ACTION
(GLP-1 RAS) PRODUCTS )
LIABILITY LITIGATION ) MDL No. 3094
_____ ) 24-md-3094
THIS DOCUMENT RELATES TO: )
ALL ACTIONS/ALL CASES ) HON. KAREN
) SPENCER MARSTON

THURSDAY, APRIL 9, 2026

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of Linda Nguyen, MD, held at Casa Loma, 211 North Coast Highway, Laguna Beach, California, commencing at 7:36 a.m. Pacific, on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri, Kansas, Louisiana & New Jersey Certified Court Reporter.

- - -

HARTFORD REPORTING & TECHNOLOGY
855.443.3767
www.hartfordreporting.com

                A P P E A R A N C E S :


     GOZA HONNOLD
     BY:   BRADLEY D. HONNOLD
           bhonnold@gohonlaw.com
     9500 Nall Avenue, Suite 400
     Overland Park, Kansas   66207
     (913) 675-5560


     and


     WAGSTAFF & CARTMELL LLP
     BY:   SARAH RUANE
           sruane@wcllp.com
           HANNAH PFEIFLER
           hpfeifler@wcllp.com
     4740 Grand Avenue, Suite 300
     Kansas City, Missouri   64112
     (816) 701-1100


     and


     LIEFF CABRASER HEIMANN & BERNSTEIN
     BY:   DANIEL E. SELTZ        (VIA ZOOM)
           dseltz@lchb.com
     50 Hudson Street, 8th Floor
     New York, New York   10013
     (212) 355-9500
     Counsel for Plaintiffs



     DLA PIPER LLP (US)
     BY:   LUCAS P. PRZYMUSINSKI
           lucas.przymusinski@us.dlapiper.com
           BRADLEY JENNINGS       (VIA ZOOM)
           bradley.jennings@us.dlapiper.com
     1251 Avenue of the Americas, 27th Floor
     New York, New York   10020-1104
     (212) 335-4846


     and

DLA PIPER LLP (US)
BY:  KATHERINE W. INSOGNA  (VIA ZOOM)
         katie.insogna@us.dlapiper.com
33 Arch Street, 26th Floor
Boston, Massachusetts  02110-1447
(617) 406-6000
Counsel for Novo Nordisk A/S and
Novo Nordisk Inc.


KIRKLAND & ELLIS LLP
BY:  RENEE D. SMITH        (VIA ZOOM)
         renee.smith@kirkland.com
333 West Wolf Point Plaza
Chicago, Illinois  60654
(312) 862-2000


and


GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
BY:  KIMBERLY L. ROCKWELL, MD   (VIA ZOOM)
         krockwell@goldmanismail.com
191 North Wacker Drive, Suite 3000
Chicago, Illinois  60606
(312) 681-6000


and


GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
BY:  KENNETH F. BAUM, MD   (VIA ZOOM)
         kbaum@goldmanismail.com
100 Wilshire Boulevard, Suite 1760
Santa Monica, California  90401
(310) 576-6900
Counsel for Eli Lilly & Company


ALSO PRESENT:

        JAMES VONWIEGEN, trial technician,
Nexus Trial Solutions, division of Hartford

V I D E O G R A P H E R :
     DAVID KIM,
     Hartford Reporting & Technology

                            - - -

INDEX

PAGE

APPEARANCES.................................    2

EXAMINATIONS

  BY MR. HONNOLD............................    9

  BY MS. PFEIFLER........................... 303

EXHIBITS

No.    Description                                    Page

1     Amended Notice of Videotaped              72
      Deposition of Linda Nguyen, M.D.

2     General Causation Expert Report           22
      of Linda Nguyen, MD

3     Honnold handwritten demonstrative         72
      "Drug-Induced Gastroparesis"

4     Expert Report of  David D. Dore,          84
      Pharm.D., Ph.D.

5     Dr. Linda Nguyen – Materials              97
      Considered List

6     Ileus - StatPearls - NCBI Bookshelf      107

7     Post-Operative Ileus, UpToDate           135

8     Invoice Summary Table                    148

9     Term Definition #4 Ileus,                156
      Clinical Definition

10    Term Definition #6 Surveillance          165
      Bias, Epidemiological Methods

11    Term Definition #1,                      172
      Non-Differential Misclassification
      of the Outcome, Epidemiological
      Methods

Linda Nguyen, M.D.   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

| 12 | Term Definition #7, Hazard Ratio, Statistical Terms | 187 |
| 13 | Term Definition #8, Confidence Interval, Statistical Terms | 199 |
| 14 | Honnold handwritten demonstrative CI (0.98 - 3.55) | 207 |
| 15 | Term Definition #2, Confounding by Indication, Epidemiological Methods | 207 |
| 16 | Term Definition #3, Biological Plausibility, Bradford Hill Causation Framework | 244 |
| 17 | Term Definition #5, Dechallenge/ Rechallenge, Clinical Evidence of Drug Causation | 248 |
| 18 | Honnold handwritten demonstrative "GLP-1 RA Drugs" | 256 |
| 19 | Honnold handwritten demonstrative "In small bowel," et cetera | 266 |
| 20 | Dr. Linda Nguyen - Materials Considered List | 267 |
| 21 | "Incretin-Based Drugs and Risk of Intestinal Obstruction Among Patients With Type 2 Diabetes," Faillie, et al. | 268 |
| 22 | "Association of GLP-1 receptor agonists with risk of intestinal obstruction in patients with type 2 diabetes mellitus: a retrospective cohort study," Gao, et al. | 280 |
| 23 | Alkabbani abstract | 283 |
| 24 | OZEMPIC (semaglutide) injection, for subcutaneous use, Initial U.S. Approval: 2017; Revised: 12/2017 | 319 |
| 25 | 21 CFR 201.57 (up to date as of 4/02/2026) | 323 |

26    OZEMPIC (semaglutide) injection,    337
      for subcutaneous use, Initial
      U.S. Approval: 2017; Revised: 10/2025

27    Pharmacovigilance Review,    351
      November 1, 2022, Food and Drug
      Administration Center for Drug
      Evaluation and Research, Office
      of Surveillance and Epidemiology,
      Office of Pharmacovigilance and
      Epidemiology

28    OZEMPIC (semaglutide) injection,    361
      for subcutaneous use, Initial
      U.S. Approval: 2017, Revised: 9/2023

29    "Association between delayed    371
      gastric emptying and upper
      gastrointestinal symptoms: a
      systematic review and meta-analysis,"
      Vijayvargiya, et al.

     (Exhibits attached to the deposition.)

CERTIFICATE...................................386

ACKNOWLEDGMENT OF DEPONENT....................388

ERRATA.......................................389

LAWYER'S NOTES...............................390

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOGRAPHER:  We are now on the record.  Today is April 9, 2026, and the time is 7:36 a.m.

My name is David Kim.  I'm a legal videographer for Hartford Reporting & Technology.

This deposition is being taken In Re: Glucagon-Like Peptide-1 Receptor Agonist Products Liability Litigation, Case Number MDL 3094, 24-md-3094, for the US District Court for the Eastern District of Pennsylvania.

The deponent is Linda Nguyen.

All counsel will be noted on the stenographic record.

The court reporter today is Carrie Campbell, CSR number 13921, and she will now swear in the witness.

LINDA NGUYEN, MD, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiffs, as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. HONNOLD:

Q.    Dr. Nguyen, good morning.

How are you today?

A.    I'm good.  Thank you.  Good morning.

Q.    I kind of rudely introduced -- introduced you for yourself.

Why don't you go ahead and tell me -- tell us your full name, please, for the record.

A.    It's Linda Anh Nguyen.

Q.    And you're a physician by profession and training?

A.    Yes.

Q.    And specifically by specialty and training, you're a gastroenterologist and maybe subspecialty interest in hepatology or liver disease?

A.    No.  My subspecialty interest -- so I am a gastroenterologist.  My subspecialty is neurogastroenterology and motility.

Q.    Okay.  And neurogastroenterology is maybe -- if I could

try to guess, would be the interaction of how the nervous system and gastrointestinal tract interacts, or at least the -- how the nervous system helps with the function of the GI tract?  Something like that?

A.    It's a specialty on the nerves of the GI tract itself, so the enteric nervous system and how the autonomic nervous system or the central nervous system interacts with that.

Q.    And then motility is just the process of food, liquids, other contents moving through the gastrointestinal tract in the human body?

A.    Yes.

Q.    Okay.  From stem to stern, as I've heard some say?

A.    Yes.

Q.    Okay.  I didn't introduce myself.  My name is Brad Honnold.  I'm an attorney from Kansas City.  I'm here today representing the plaintiffs in the cases that have filed lawsuits against both Novo Nordisk and Eli Lilly in the multidistrict litigation before Judge Marston.

Case 2:24-md-03094-KSM    Document 691-42    Filed 05/19/26    Page 13 of 392

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Are you aware of that?

A.    Yes.

Q.    You've had your deposition taken on at least one occasion before.

Is that true?

A.    That is correct.

Q.    Okay.  And is it just one occasion that you've been deposed?

A.    Yes.

Q.    That would have been related to the deposition that you gave in this case on a specific issue related to issues of gastroenter -- of gastroparesis and testing issues related to gastroparesis.

True?

A.    Correct.

Q.    Okay.  And that deposition, I think, was taken sometime back in early 2025, February or so, so a little over a year ago?

A.    I don't recall the exact date, but about a year.

Q.    And you know you were sworn to give truthful testimony at that time.

Right?

A.    Yes.

Q.    You did have the occasion to review that deposition, and I know you signed an errata sheet or a correction sheet where you made some minor changes related to kind of some transcription or grammatical issues in the transcript.

True?

A.    Correct.

Q.    But nothing in terms, really, of substantive changes in terms of medical or scientific issues that you testified to.

Correct?

A.    That's correct.

Q.    Before the deposition that you gave, you had also issued what's called an expert report, a written report, that you authored and signed.

True?

A.    That is correct.

Q.    As we go forward today, we'll call that your Issue 1 report.

If I say that, will that make sense to you?

A.    It does.

Q.    Okay.  And then as -- now, as

the cases move forward, you have also now filed an additional expert report related to what's been come to be called Issue 2 in this case.

Correct?

A.    That is correct.

Q.    Okay.  In terms of Issue 1, you still stand by everything that you said in that Issue 1 report.

Correct?

A.    Correct.

Q.    You still stand by the sworn testimony that you gave before Judge Marston back late last spring or early last summer in Philadelphia related to those question 1 issues.

True?

A.    True.

Q.    Okay.  You understand that you gave sworn testimony before the Court on issue -- on Issue 1 at that time.

Correct?

A.    Correct.

Q.    As of -- as of today, have you prepared any documents or writings that have

stated that you said something wrong or inaccurate either in your Issue 1 deposition that was taken in early 2025 or before the Court later in 2025?

MR. PRZYMUSINSKI:  Objection to the form.  Vague.

You can answer.

THE WITNESS:  I'm sorry, can you rephrase that question, please?

QUESTIONS BY MR. HONNOLD:

Q.    Sure.  You'll find as we go forward today, my worst habit is I can make a really simple question sound really difficult, so I didn't mean to.  And you did the right thing asking for clarification.

As you sit here today, have you -- have you made any formal writing, either to the Court or a court reporter or anyone else, that said the way you took my testimony down either in the deposition or in court was incorrect or inaccurate for any reason?

Have you made such a writing?

A.    No.

Q.    Thank you.  Let's go through a

few ground rules.

We're going to try to proceed today in what is hopefully a civil question and answer fashion.  So my job, first, is to ask you a question that, first, you can hear, and second, that you can understand.

If I fail to do that, will you let me know?

A.    I will.

Q.    Okay.  For example, if my voice drops off or there's an ambulance or something that goes by outside and you don't hear me, will you just let me know that?  And I'll either do my best to repeat the question or ask our court reporter to read it back to you.

Will you do that?

A.    Yes, I will.

Q.    Similarly, if I ask you a question that just seems awkward, nonsensical to you, which I can guarantee will happen several times, will you let me know that as well so I can either ask you a better question or perhaps even have the court reporter repeat it to you to see if that

helps?

Will you do that?

A.    Yes, I will.

Q.    If I ask you a question and you answer it, would it be fair for me to assume that you did, in fact, hear the question and understood it and gave your complete and truthful answer?

A.    Yes.

Q.    Thank you.

In terms of the Issue 2 report that brings us here today, is that something you prepared yourself?

A.    I prepared it.

Q.    You wrote that report?

A.    I wrote the report.

Q.    You had -- I will put it this way.  You had unfettered discretion to put into it whatever you felt was appropriate and necessary.

True?

A.    Can you define what you mean by "unfettered"?

Q.    Well, nobody was hovering over you telling, write this, don't write that,

make sure you write this, don't write that?

MR. PRZYMUSINSKI:  Okay.  So I'm going to insert an objection here.

Any communications and discussions with counsel specifically would be privileged, and I would instruct you not to answer.

If the question generically is asking whether the opinions you offer in your report are you own, you are free to do that, and you can answer that question.

MR. HONNOLD:  I'll speed this up.

QUESTIONS BY MR. HONNOLD:

Q.    Are the opinions that you've set forth in your report your opinions?

A.    Yes, they are.

Q.    Like I know you, as a physician, probably operate under certain kind of rules and parameters, in federal court we also operate under certain rules called the Federal Rules of Civil Procedure.

There is one rule, Rule 26(a), little A, 2, and then capital B, 26(a)2(B),

that sets forth in the rules what an expert such as yourself needs to do in preparing the report.

And it says that the report must contain, quote, "a complete statement of all opinions the witness will express and the basis and reasons for them," end quote.

Have you done that in your Issue 2 report?

MR. PRZYMUSINSKI:  So I'm going to object to that.  Dr. Nguyen is not an expert on the rules of civil procedure or what that means.

If you want to ask that question in the context of something that's not legally based, I would be more than happy to have her answer.

QUESTIONS BY MR. HONNOLD:

Q.    Does your Issue 2 report contain all of the opinions that you plan to express in this case and the basis and reasons for those opinions?

A.    Yes.

Q.    Okay.  And the opinions that you had or came to, you had the ability to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

express them in a straightforward manner using your own words and phrases.

True?

A.    True.

Q.    Okay.  If you felt that you needed to use extra or additional words to make a point or emphasize a point, you had the ability to do that.

Correct?

A.    Yes.

Q.    When you said something such as, quote, "It is my opinion that," and whatever it is that you might state, you also then did your best to state the basis and reasons for that opinion.

Is that true?

A.    That is true.

Q.    Okay.  You understand that today is my only opportunity and the plaintiffs' only opportunity to speak with you about the opinions that you plan to express and the reasons and basis for them.

You understand that?

A.    Yes.

Q.    And you also understand that

your Issue 2 report was the document that essentially put us on notice as to what your opinions, in fact, are and the reasons and basis for those opinions.

          True?

     A.    True.

     Q.    Okay.  And if I were to ask you if you had an opinion on a particular issue that's stated in your report, would you have the ability to go to your report and look at it to see if, in fact, you have an opinion on that issue?

     A.    Yes.

     Q.    Okay.  But as you sit here today, are you -- do you generally have some working knowledge in your mind's eye about your basic opinions related to Issue 2?

          MR. PRZYMUSINSKI:  Objection to form.  Vague.

          You can answer.

          THE WITNESS:  I'm sorry, can you rephrase that question?

QUESTIONS BY MR. HONNOLD:

     Q.    Sure.  Yeah.

          So as you sit here today,

before we get into the specifics, do you have some general working knowledge in your head about the various opinions that you've expressed in your report?

A.    Yes.

Q.    Okay.  Is it fair to say that if you felt there were reasons and bases for a certain opinion that you were going to give, that you also had the ability to fully state and explain those reasons and bases?

A.    Yes.

Q.    Is it fair to state also that in terms of what is in your Issue 2 report, it represents your true and best effort to provide the basis and reasons for your various opinions?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  Yes.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  You understood that that in fact was the task that you were being called upon to do, to state opinions and to give the reasons and basis for those

opinions.

Is that correct?

A.    That is correct.

Q.    Okay.  I'm going to go ahead and hand you what we have marked as -- a document that we've marked as Exhibit 2.  And it's called the General Causation Expert Report of Linda Nguyen, MD.

MR. PRZYMUSINSKI:  We skipped 1, Brad.

MR. HONNOLD:  We're going to go back to the notice.

MR. PRZYMUSINSKI:  Oh, we're going to go back.

MR. HONNOLD:  You know me, that I can't do anything in linear fashion, so...

(Nguyen Exhibit 2 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    And, Dr. Nguyen, as we go forward, just -- I didn't do a very good job of describing to you the layout that we're operating with today.

You see that we've got our

court reporter to your right, who's taking down everything that's going to be stated in the room.

You understand that, correct?

A.    Yes.

Q.    Okay.  I would ask you, and I will do my best as well, to make sure that we aren't speaking over each other so she can do the best job that she can to get a clear record.

Will you do that?

A.    Yes.

Q.    We also are assisted by a videographer today who is overseeing videotaping of your deposition.  And we also have a gentleman who is putting up various documents onto the screen.

So there may be times when I will direct you to a specific place in a document, and you may have a paper copy of it in front of you, but we'll also be going to the screen in front of you.  And I might ask certain areas to be highlighted, underlined, do some callouts, things of that nature.

So feel free, as you are

comfortable, going between either a paper document or looking at the screen.  So feel free to do that.

Will you do so?

A.    Yes.

Q.    Thank you.

Another ground rule, just so that you know just for planning purposes, we usually don't try to go any longer than an hour to an hour and ten minutes for -- you know, per segment, and then we'll take -- we'll take a break that we'd like to keep anywhere from, you know, six to eight minutes or so, so we keep moving today.

I know that you have a hard stop time today due to work or patient issues at 4:30 p.m. or 4:45?

A.    4:30.

Q.    4:30.  All right.

And we're -- I guarantee you, whatever happens, we will observe that and be respectful of your time requirements.

Okay.  If we go to the Exhibit 2 that's before you and also on the screen, is this, in fact, your expert report

related to the issue of general causation?

A.    Yes, this is my report.

Q.    Okay.

MR. HONNOLD:  And, James, if we could go to the front page of this.  I don't know if you have it.  Do you have the page with the caption?  Do you have a version with the caption?

TRIAL TECHNICIAN:  No.

MR. HONNOLD:  You don't?

TRIAL TECHNICIAN:  This is the front page for me.

QUESTIONS BY MR. HONNOLD:

Q.    Dr. Nguyen, you see -- we don't need to put it on the ELMO.  But the title page you see says, quote, "General Causation Expert Report of Linda Nguyen, MD."

Did I read that correctly?

A.    That's correct.

Q.    And at least looking at the cover of this then, it appears that your opinions in this expert report primarily relate to the issue of general causation related to various medical conditions that are laid out in the report.

True?

A.    True.

Q.    Okay.  And I'm going to ask you a very general question now, and that is, the term "general causation," to the extent because it appears on the front page of your report, what does that term mean to you?

What would be your best definition of general causation in a general sense?

A.    In a general sense, general causation means that something is causing another outcome.  So a disease, a disorder.

Q.    And to follow up, so when you say "something," that may mean a substance or a compound, a pharmaceutical drug, for example?

A.    Yeah.  "Something" could mean a drug, an infection, a surgery, anything that could potentially happen.

Q.    And then when you say that something is causing an outcome, and that outcome would be an end-state, a specific disease or a condition.

True?

A.    True.

Q.    Okay.  Also at various times, and we'll get into this in much more detail today, you use the term "association."  And again, just generally, so I have some understanding of what that term means to you, in this context of you as a physician, what does association mean to you?

A.    So in general, what association means is that this something that we've been talking about may be related to -- or it's hard to define it without using the word -- associated with that outcome.  So not necessarily a causation, but you're seeing a pattern where the two, the cause or the something, is related to that outcome.

MR. HONNOLD:  Okay.  And just so we know everyone in the room, I note that our air conditioner fan just kicked on.  It's noisy to me, but are we okay audio-wise.

VIDEOGRAPHER:  You're all mic'ed.

MR. HONNOLD:  Okay.  Thank you. I just wanted to make sure.

QUESTIONS BY MR. HONNOLD:

Q.    And so association means -- can you give me an example of -- as you -- as you use that term or definition, "association," can you give me an example perhaps from the medical or scientific field of association?

A.    Yeah.  So --

Q.    It may be true or made up to prove a point.

A.    Easier to talk about things that are true than to make things up.

So, for example, in the GI field, there is epidemiologic studies that show there's an association of taking proton pump inhibitors, which are medications for acid reflux, with dementia, meaning that there are people who are on this medication, you see higher rates of dementia.

It doesn't mean that it's a causation, but there's -- there's this pattern or this trend that you see.

Q.    And so you may look -- an association may be observed -- one way would be to look at a population of individuals with a certain condition and look at common

things that those individuals may have done or been exposed to, and you may see certain things.

That would be an example of an association without necessarily saying that it's causal?

MR. PRZYMUSINSKI:  Objection to form.

You can answer.

THE WITNESS:  Yeah.  So it's really looking at patterns, right?  So you're looking at exposures and then occurrences.  And again -- because associations don't necessarily mean causations.  Because when you're looking at a general population, you don't know what else is going on in those who are exposed.

So going back to my example of dementia, there's this association, but there's no biological plausibility as to why taking an acid suppressant medication would cause dementia.

However, individuals who have acid reflux who are likely to take

these medications have other comorbidities like obesity, heart disease, that increases the risk of dementia.

So you can see patterns, but they're not necessarily causation.

QUESTIONS BY MR. HONNOLD:

Q.    Thank you.

I take it you've not held back any specific opinions, kept them out of your report to spring them on me or tell me about them today.

Right?

MR. PRZYMUSINSKI:    Objection to form.    Vague.    Objection. Characterization.

You can answer.

THE WITNESS:    I have not held back.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.    If you have an opinion related to the issue to a general causation, it's in your report.

True?

A.    If it's -- yes, if it's an

issue that I was aware of, then it's in my report.

Q. Okay. So nothing held back in terms of your opinions on general causation. If you have an opinion on general causation related to drug-induced gastroparesis, ileus, bowel obstruction, it's in your report?

MR. PRZYMUSINSKI: Objection to form.

You can answer.

THE WITNESS: Yes. If it's an opinion that I have regarding those conditions, it is in my report.

QUESTIONS BY MR. HONNOLD:

Q. And if you were aware of a specific reason or basis for one or more of those opinions, to the best of your ability, you stated it in the report as well?

MR. PRZYMUSINSKI: Objection to form again.

THE WITNESS: I'm sorry.

QUESTIONS BY MR. HONNOLD:

Q. If you were aware of a specific reason or basis for an opinion, you put that in your report as well?

A.    Yes.

Q.    You understood that that was kind of a rule of the road, kind of an operating -- operating guidance for the report.

True?

A.    Yes.

Q.    Did anything prevent you from including any opinion, analysis or conclusion that you thought was relevant to the issue of general causation?

Anything prevent you from putting it in your report?

A.    No.

Q.    You had sufficient time to prepare the report?

A.    Yes.

Q.    Okay.  And the report that you submitted, I think, was served upon us February 12th or 13th, thereabouts.

You recall that?

A.    All the dates blend to me, but I think it's around that timeline.

Q.    To your knowledge, is there anything that you have said previously,

either in your Issue 1 report or your testimony before the Court related to Issue 1 that contradicts anything in your Issue 2 report?

A.    No.

Q.    Okay.  Fair to say then that your opinions on Issue 1 are in fact consistent with your opinions on issues of, for example, drug-induced gastroparesis in your Issue 2 report?

A.    Yes.

Q.    And you intentionally try to be consistent.

True?

A.    I'm always consistent.

Q.    Okay.  Well, you know on these matters of sworn testimony and scientific and medical principles, you know that you need to be consistent from talking about something on day 1 versus day 361.

True?

A.    True.  I've been doing that for the last 20 years.

Q.    Okay.  You testified in great detail on the issue of drug-induced

gastroparesis related to Issue 1 before the Court.

Correct?

MR. PRZYMUSINSKI:  Objection to the form.  Mischaracterizes the record.

You can answer.

THE WITNESS:  Issue 1 was about how to diagnose gastroparesis, independent of it was drug-induced or not.

QUESTIONS BY MR. HONNOLD:

Q.    You recognize the term "drug-induced gastroparesis"?

A.    I do.

Q.    What does it mean, that term, and I want to -- let me do something here.

Can we switch over to the ELMO?

Thank you.  I guess I could have done that.

I'm going to switch over, Doctor, to the image instead of something that's coming from our document assistant. Okay.  It's going to come up before you now.

All right.  I'm going to show

you what I'm writing on.  I just got some card stock here.  I've got a fairly recent picture of you there with your name, Linda Nguyen, MD, April 9, 2026, with today's date.

A.    I'll tell you that it's about 13 years old.

Q.    Oh, is it?

A.    It's not recent.

Q.    Time has not left a mark upon you, okay?  So you're --

A.    I do like it, but it is -- to -- if we're being consistent here, this is 13 years old.

Q.    I'll withdraw the fairly recent.  I'll say for a 13-year-old picture, it looks nearly identical to how you are today.  How is that?

Okay.  So I put quotation mark -- set of quotes there, and I'm going to write the term "drug-induced gastroparesis."

Check my spelling, because I can get a little out of hand at times.

Okay.  So drug-induced gastroparesis, that's the term that you use, correct?  Or you recognize that term,

correct?

A.    I do recognize that term.

Q.    What is drug-induced gastroparesis?

A.    Yeah, so I actually did put it in my report here in the footnote which I will read out for you.

It is, quote, "Drug-induced gastroparesis" -- "For the sake of consistency, the terms 'drug-induced gastroparesis' and 'drug-induced delayed gastric emptying' will be used interchangeably to mean temporary and confirmed delay in gastric emptying with concurrent, adverse GI symptoms and no mechanical obstruction, while the term 'chronic gastroparesis' indicates the disorder that currently is without a cure and has limited therapeutic options."

So...

Q.    And while your definition there that you just read -- and we're talking about footnote 2 -- this is just to make the record clear -- footnote 2 on the bottom of page 3 of your Issue 2 report.

Correct?

A.     That's correct.

Q.     Okay.  In that definition, you do not use the phrase or terms "gastric emptying study."

Correct?

Is that -- are those words or phrase, "gastric emptying study," in footnote 2?

A.     So the term "gastric emptying study" is not in there, but the term "gastric emptying" is.

Q.     Right.

And in that footnote where you say, "Confirmed delay in gastric emptying," would that be the process then -- or that would be the conclusion that would be drawn from some sort of testing on gastric emptying?

A.     So to confirm delay in gastric emptying, you would need an objective test. And in the US right now, there are three tests:  the gastric emptying scintigraphy, the gastric emptying breath test, and the wireless capsule motility study.

Q.    And so I've written three possible tests there, and I'm going to write one is GES.  True?

You've testified to that, and that's spoken to in your various reports.

Correct?

A.    That's correct.

Q.    GES stands for gastric emptying study.

Correct?

A.    Gastric emptying scintigraphy.

Q.    Scintigraphy.  Sorry.

Let's talk about first in your practice.  For you to conclude that a patient has drug-induced gastroparesis, what sort of outcome or result would they need on the gastric emptying scintigraphy?

I've read a lot of literature that talks about in the United States a common positive test result for gastroparesis would be at the four-hour mark, 10 percent or more remaining of a -- of a meal that was ingested at the beginning of the testing time.

Is that your definition?

A.    Yeah.  So in order to confirm the diagnosis of gastroparesis, irrespective of the cause, you need a confirmed delayed emptying.

For scintigraphy, if you're using the Tougas protocol, which is the most common protocol used, it's more than 10 percent at the four hours.

At May -- Mayo Clinic, so all three different Mayo centers, they use a different meal.  So their normal value is different, but they still use the four-hour.

Q.    But at least one common standard that's used is more than 10 percent of the ingested meal at four hours would still be remaining in the stomach.

Correct?

A.    That is correct.

Q.    Okay.  Now, can drug-induced gastroparesis occur acutely, meaning having a sudden onset?

A.    Can you clarify what you mean by "sudden," "sudden onset" and "acutely"?

Q.    Does acute have a meaning to you as a physician?  I just want to make sure

I'm using your terms.

A.    Yes.  So acute means you -- something happens and, like, for example, with a drug, and then immediately.

Q.    Okay.  So immediate onset would be kind of close to what I said about sudden onset?  Kind of close?

A.    Uh-huh.

Q.    Okay.  Put one on my chart.

A.    Okay.

Q.    All right.  And can a patient who develops this sudden or acute onset drug-induced gastroparesis be sick enough that they feel they need to go to the hospital, for example, the emergency room?

MR. PRZYMUSINSKI:  Objection to form.  Calls for speculation.  Lacks foundation.

You can answer.

THE WITNESS:  Yeah.  So, one, I would need to know the symptoms and what do you mean by drug-induced gastro -- acute drug-induced gastroparesis?

Because the symptoms and the

delay in emptying, they don't necessarily correlate with each other. So someone can have symptoms without delayed emptying, and there are people with delayed emptying without symptoms.

So I need to know more about the symptoms as opposed to the delay.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Here's what I'm trying to get to.

Can patients who take a GLP-1 drug get severe symptoms to where they feel sick enough they go to the hospital?  Can that happen?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.  Also, totally outside the scope of this report.

But you can answer.

THE WITNESS:  If someone's taking a GLP-1 and they have GI side effects like nausea, vomiting, it could be severe enough to go to the emergency room.

At that point we don't know that they have gastroparesis or not because they don't have a gastric emptying test.

QUESTIONS BY MR. HONNOLD:

Q.    Let's assume eventually, at some point during your treatment course the gastric emptying scintigraphy is done and in fact it's confirming for gastroparesis.  So let's assume that in these questions.

But can a patient that has those symptoms -- which could include what? If a patient does, in fact, have drug-induced gastroparesis, that range of symptoms may include what, in your view and experience?

MR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  So a patient -- so I'm going to follow your assumption that they have confirmed delay in gastric emptying, and they have symptoms.  So the cardinal symptoms of gastroparesis include nausea, vomiting, early satiety, bloating, abdominal pain.

QUESTIONS BY MR. HONNOLD:

Q.    And can those patients in that situation express those symptoms in a way that it seems like they're feeling pretty sick?

MR. PRZYMUSINSKI:  Objection to form.  Vague.  Lacks foundation.

You can answer.

THE WITNESS:  Yes.  If someone is having these symptoms, then they could express that they were severe.

QUESTIONS BY MR. HONNOLD:

Q.    Drug-induced gastroparesis can require the patient to be hospitalized.

True?

MR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  Again, assuming that they had a gastric emptying study, as you've mentioned earlier, then, yes, they can have severe symptoms.

We don't know if those symptoms are due to the gastroparesis or that they're due to the symptoms

themselves.

We know that, again, gastric emptying delay and symptoms do not match, and they're --

QUESTIONS BY MR. HONNOLD:

Q.    You said that twice now.  I get that.

Here's my question.  Can a patient who is later discovered to have gastroparesis from a gastric emptying scintigraphy be sick enough to be admitted to the hospital?

A.    I would have so many questions about this patient because it would be, why are they still on the GLP to get this gastric emptying test if they're that severe, because if they're having severe symptoms, the dose should be reduced or stopped.

Q.    Okay.  Can patients that have drug-induced gastroparesis be sick enough that they require hospitalization?  Yes or no?

A.    As I said, I would have to review the case and understand why, if they're having symptoms that severe, they

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

would still be on the medication, and on it long enough that you could do a gastric emptying scintigraphy test.

Q.    I guess we can go about it this way.

Is it your testimony in this case overall that patients with drug-induced gastroparesis don't ever go to the hospital?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.

You can answer.

THE WITNESS:  I'm not saying patients cannot have severe symptoms related to medications.

What I don't know with this scenario that you're asking me is, are these severe symptoms due to the delayed emptying or if they're due to something else.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Under either scenario, patients that are on a GLP-1 get severe symptoms.  Can they be -- can they require hospital admission?

A.    Yeah.  If someone's on a GLP-1

and they have severe symptoms, yes, it can require hospitalization or going to the emergency room, as I've mentioned before. But we don't know if those severe symptoms are due to delayed emptying or not.

Q.    Once they're in the hospital, can their treatment include further imaging studies, for example, CT scan, ultrasound, things of that nature, flat X-ray?

A.    Yes.

Q.    Can their treatment include the administration of intravenous fluids?

A.    Yes.

Q.    Can their treatment include needing to stick them multiple times to draw blood or other bodily fluids for laboratory analysis?

A.    Yes.

Q.    Okay.  Can patients vomiting be so severe as to cause injury or damage to their esophagus?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.  Outside the scope of her report again.

But you can answer.

THE WITNESS:  In theory, one can vomit enough -- or severe enough to cause a tear of the esophagus.

It's called Boerhaave's.

QUESTIONS BY MR. HONNOLD:

Q.    And what are the various sequelae and complications of a tear in the esophagus if the patient has vomiting severe enough to cause a tear and they have this syndrome that you talked about?

What are the downstream sequelae or possible sequela of that condition?

And you know sequelae means bad stuff that happens later.

True?

MR. PRZYMUSINSKI:  Objection to form.

You can answer.

THE WITNESS:  I do understand that question.  And the sequelae vary.  It may be acute bleeding and then it heals, nothing else occurs after that.

Or they can have a severe tear

and lead to peritonitis, so -- because there's a perforation that may or may not need surgery to operate on.

QUESTIONS BY MR. HONNOLD:

Q. Peritonitis, I know enough medicine as a lawyer that when a word ends in "itis," that means like an infection.

Right? Or inflammatory state?

A. "Itis" means inflammation.

Q. Okay. And it could be an infection?

A. It could be.

Q. Okay. And peri, peritonitis, can you explain -- you said that that may be a sequela of this bad vomiting from the gastroparesis that can tear a hole in the esophagus.

The peritonitis, what -- how does that happen?

A. Peritonitis is basically inflammation of sort of the tissue around your internal organs, so in your abdomen. And if there is a tear in the esophagus, fluids from the stomach and esophagus can go into the abdominal cavity and cause

inflammation.  That's peritonitis.

Q.    And the things that we're talking about right now, the tear to the esophagus, the severe vomiting and the peritonitis, how do you know this stuff?

A.    Do you mean how do I learn about it, or how do I diagnosis it?

Q.    Well, I guess how do you know this stuff?  Is this stuff that you learned about in school?

A.    It's stuff I learned in my school, my training.  I've taken care of patients with peritonitis.

Q.    Okay.  From -- esophageal perforation from bad vomiting?

A.    I've taken care of patients with peritonitis for various reasons.

Q.    Okay.  Including bad vomiting that tore a hole in their esophagus?

A.    Very rare, but, yes.

Q.    Okay.  What do you call -- I say tore a hole in their esophagus.

What's the more, I guess, delicate medical term?  What would that -- what would you call it?

A.    Perforation.

Q.    All right.  And you mentioned surgery for that.

Who -- what kind of doctor would do that surgery?  Is that something you do?

A.    I do not do surgery.  It would be a surgeon.

Q.    Okay.  So the patients that may have the drug-induced gastroparesis that we've been talking about with the severe vomiting and the perforation, they may need to have special doctors brought in to take care of them, for example, a surgeon.

Correct?

A.    If someone is vomiting and they have a perforation, then, yes, they may need a surgeon.

Q.    And where is the cut made?

Is that a surgery that's done by the -- by the microscopes that they stick in you, or is that like an open surgery where they would do an incision and open you up?

MR. PRZYMUSINSKI:  I'm going to object again.  This is so insanely

outside of scope of anything that's in her report, Brad. She's not a surgeon. She's not offering opinions on surgery. I don't know where you're going.

MR. HONNOLD: Okay.

MR. PRZYMUSINSKI: But if you want to answer that question, go right ahead.

THE WITNESS: I'm not a surgeon, so I can't offer an opinion on how the surgeons decide how they do the surgery.

QUESTIONS BY MR. HONNOLD:

Q. Those patients that may have peritonitis or concern about developing peritonitis for a perforation, might they need antibiotics?

A. If they have peritonitis, yes, they may --

Q. And oftentimes those antibiotics are issued into -- or given intravenously.

Correct?

A. That is correct.

Q.    And intravenous antibiotics carry their own set of potential further risks and complications.

True?

MR. PRZYMUSINSKI:  Same objection.  This is getting insane.

THE WITNESS:  All medications. But, yes, antibiotics can have potential risks with them.

QUESTIONS BY MR. HONNOLD:

Q.    Have you -- have you either seen or read about patients with drug-induced gastroparesis needing to be admitted into the intensive care unit?

MR. PRZYMUSINSKI:  Objection to the form.  Vague.

You can answer.

THE WITNESS:  I have not seen a patient with drug-induced gastroparesis.

QUESTIONS BY MR. HONNOLD:

Q.    Could a patient, at least in theory or hypothetically, with drug-induced gastroparesis be sick enough that they would require admission into the intensive care

Case 2:24-md-03094-KSM    Document 691-42    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER    Filed 05/19/26

unit?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.

You can answer.

THE WITNESS:  Again, I have not seen this.  This is all speculation at this point.

In terms of why someone would need to be in the ICU for vomiting, it really -- it really depends.  It's -- I would say -- I'm just thinking about my 20 years of doing this.

The only time I've seen a patient with nausea and vomiting requiring ICU is someone with diabetic ketoacidosis.

QUESTIONS BY MR. HONNOLD:

Q.    Can vomiting from drug-induced gastroparesis be severe enough to cause the patient to develop hiatal hernia?

MR. PRZYMUSINSKI:  Objection to form.  Same objection.

You can answer.

THE WITNESS:  I'd have to look

at the scenario.  Hiatal hernias are common in the general population.

Again, I've never seen someone vomiting from gastroparesis who developed a hiatal hernia.

QUESTIONS BY MR. HONNOLD:

Q.    What's the longest hospitalization that you have seen a patient have for the condition of drug-induced gastroparesis?  That you, in your own -- you talked a lot about your personal clinical experience in your report.

I want to ask you about your personal clinical experience in terms of the longest hospitalization you've seen for drug-induced gastroparesis.

A.    So as I mentioned earlier, I've never seen a patient hospitalized for drug-induced gastroparesis.

I've taken care of thousands of patients with gastroparesis.  The longest I've seen a patient hospitalized for gastroparesis is actually ten months for diabetic gastroparesis.

Q.    Did you learn about the concept

or phenomena of drug-induced gastroparesis generally when you were in medical school?

A.    Yes, in medical school.

Q.    Okay.  And then in your training as a -- as a medical student, before you got into residency or fellowship, then did you have occasion to see or perhaps take care of patients that were in the hospital for drug-induced gastroparesis?

A.    Honestly, during my medical school training, I never saw a patient with gastroparesis.  I didn't see my first patient with gastroparesis until I was a medical resident.

Q.    Okay.  And then when you were a resident, did you -- did you ever have an occasion to see a patient with drug-induced gastroparesis in the hospital?  Drug of any type that can cause it?

A.    Not drug-induced gastroparesis. A lot of diabetic and idiopathic gastroparesis.

Q.    Okay.  You yourself have never ordered gastric emptying scintigraphy on a patient with severe GI symptoms like nausea

and vomiting when they're on a GLP-1 drug, correct? Because you just either reduce the dose or stop the drug completely, correct?

A. Can you -- I didn't follow the question.

Q. Yeah. Sure. I'm trying to piece together things that I think I've either read from you or heard you say before.

But you yourself have never ordered a gastric emptying scintigraphy study on a patient on a GLP-1, because if you see such a patient with significant symptoms, nausea, vomiting, early satiety, abdominal pain, distinction, bloating, whatever would be the constellation of symptoms, you don't order the GES. You instead either reduce the dose of the medication or stop it entirely to see if the patient then improves.

Correct?

MR. PRZYMUSINSKI: Objection to form. Compound.

You can answer.

THE WITNESS: Yeah, whether it's GLP-1s or any drugs that's causing symptoms, before ordering the

gastric emptying test, in this case scintigraphy, you would stop the medication.  So if it's a long-acting GLP, I would stop it for five weeks. If it's an opiate, I would stop it for 48 hours.

QUESTIONS BY MR. HONNOLD:

Q.    Opiate, drugs like Percocet, OxyContin, fentanyl, things of that nature?

A.    Yes, those are opiates.

Q.    They can cause drug-induced gastroparesis.

Is that true?

A.    They can.

Q.    Okay.  And you said for stopping the GLP-1, you'd stop it for five weeks.  So if it was a weekly injectable, you would say, when was your last shot, and we aren't going to give you -- you aren't going to have any more shots for five weeks.

True?

A.    That is correct.

Q.    Could a patient who is hospitalized for drug-induced gastroparesis during the course of their hospitalization

miss work?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.  Outside the scope of her report.

You can answer.

THE WITNESS:  If the patient is being admitted to the hospital for any reason, if they're working, they could potentially miss work.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  And they may incur medical bills for their treatment.

True?

MR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  Yes.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Are you familiar with any literature that speaks to -- for patients who have an inpatient stay, and let's say for -- let's say for an acute gastrointestinal illness, whether it's gastroenteritis, gastroparesis, anything like that?

Have you yourself, in terms of work you've done on this case at any time, Issue 1, Issue 2, anything else, looked at whether there's any data for how those patients subjectively feel in the following weeks and months after their discharge?

MR. PRZYMUSINSKI:  Objection to form.  Outside the scope.

You can answer.

THE WITNESS:  Taking a moment to think through the literature out there.

There's no studies that I'm aware of that looks at how patients are feeling after discharge from a hospital.

QUESTIONS BY MR. HONNOLD:

Q.    Have you, in your medical career, ever said to a patient of yours that had a hospital stay for an acute gastrointestinal condition, have you ever said to them afterwards, it's going to take some time, and maybe a fair amount of time, until you feel better?

A.    It depends on what they're --

they were admitted for.  Yes, I -- depending on why they were hospitalized, the severity of the symptoms and their other comorbidities, then I give them a reasonable time frame as what their recovery will look like.

Q.    Okay.  The acuity of a patient -- of an inpatient stay may in fact have some effect and influence to how the patient then subjectively feels after discharge.

As a general matter, that's true, isn't it?

MR. PRZYMUSINSKI:  Objection to form.  Vague.  Lacks foundation.

You can answer.

THE WITNESS:  In general, yes.  If their -- if they have more severe symptoms, it could affect their recovery.

QUESTIONS BY MR. HONNOLD:

Q.    What I'd like to do is have you continue to look at Exhibit 2, which is your report that we've been talking about.  And specifically, if you were to look at -- well,

let me ask it this way.

You've written a lot of medical papers in your career, haven't you?

A.    I have.

Q.    Okay.  And that is because you have been a physician that has had a significant portion of your career in academic medicine, meaning you've been a doctor that's taught other doctors.

Right?

A.    That is correct.

Q.    Okay.  And you've worked at those hospitals where patients go, where there are senior doctors like yourself with other either doctors in training or doctors that have become doctors but are becoming super-specialized doctors, those are the sorts of doctors taking care of the patients.

Right?

Kind of doctors in training either to become an MD or to become a specialist MD.  True?

A.    True.

Q.    Part of your -- oftentimes for an academic-based physician like that, would

be that it is -- it is part of your calling
and mission to add to the realm of general
medical knowledge, particularly in areas
where you may have particular interest.

True?

A.    True.

Q.    So you may -- in addition to
taking care of patients, you may always kind
of have some focus or attention that you pay
to doing medical research.

True?

A.    True.

Q.    And the end -- and the end
result of that may be where you, in concert
with others, may write -- perform studies and
then write up the results and publish those
in the medical literature for others to read
and to hopefully learn from.

Right?

A.    Yes.

Q.    Okay.  That's one of the ways
that medical science kind of evolves and how
we get better in terms of taking care of
patients.

Right?

A.      Correct.

Q.      Okay.  Now, in the papers that you have written in that realm, what would be the types of papers or studies that you've done?  And here's some things that I'm thinking of.

One may be writing up the results of a randomized clinical trial where you're one of the investigators writing the paper.

Or another may be an observational study or an epidemiological study where you're looking at big bodies of data to try to identify certain things there.

Or you may do a systematic review as just kind of a teaching article that says, I, Dr. Nguyen, today, I'm going to write a paper and try to get it published generally on the issue of gastroparesis.

What are the different kind of categories of types of papers that you have written in your career under those general headings?

A.      So I've written RCTs, so randomized controlled trials.  Epidemiologic

studies using large databases.  I've done cohort studies, so pro -- you know, prospective data collection on cohorts.  I've done retrospective analyses on cohorts as well as case reports or case series.

Q.    Okay.  And those are all recognized kind of types of studies, different formats, different -- different types of work, different datasets, but those are all recognized types of studies that physicians and scientists produce and try to get published in the medical literature.

True?

A.    True.

Q.    Now, in any of those papers that you've ever written and gotten published, have any of those papers had a section that's titled "methodology" or "study methodology"?

A.    All the studies require a methodology section.

Q.    You said what?  All the --

A.    I said all studies require a methodology section.

Q.    Okay.  And all the studies

require a methodology section.

And from your perspective as a physician with your many years of education, training and experience, why is it your testimony that all of those studies require a methodology section?

A. In terms of being able to submit something for publication, you have to understand how -- so the methodology is how was the research conducted, so that as a reviewer you can understand how the results or how the data was obtained.

Q. Why is that important?

A. For --

Q. Scientifically, ethically, medically, all of those reasons. Why is that methodology and understanding how it was arrived at, how it was done, how the conclusions were done, why is it important to lay that out in a medical paper or study?

A. One is for reproducibility, so that if I do a study and someone else wants to replicate it, they're able to replicate it. To make sure that -- or not to make sure -- to understand how the data was

obtained so that you can interpret the data. Because we don't interpret results in a vacuum; we interpret them based on the methodology.

Q.    Is potentially another purpose of having a methodology section so that -- so that others can check your work?

For example, in the peer review process, they can look at your methodology section and say, ah, Dr. Nguyen and her team, they went to this database and they did this and they looked at -- looked at this and tried to identify how many of these there were versus how many of those, and run some statistical regression analysis on those to try to identify if there's an association and all of that?

Can it be important to state that clearly so those that come to check your work for scientific accuracy can follow what you did?

A.    Yes.  It's important for the -- as you say, to check your work.

Q.    Okay.  And why is it important to be able to check a scientist's work?

A.    I'm not quite sure what you mean.

Q.    Why is it important for somebody to be able to check your work for accuracy, for veracity and accuracy?

A.    So the check your work part is to make sure that the conclusions that you draw can -- from the results can be drawn based on the methodology.  How did -- how did you get there.

Q.    Okay.  In the clinical trials -- and you used the term "RCT."  When you used that, you meant randomized clinical trial.

True?

A.    Yes.

Q.    Okay.  And a randomized clinical trial is a special kind of study where -- at least one type of RCT is where there's a bunch of patients or volunteers who are brought in and, in a very crude explanation, may be broken up into groups.  And they may be exposed to different things to try to identify whether one of those things or more of those things actually

treats a certain condition effectively.

Correct?

Where the groups are compared in terms of the treatment group versus groups that didn't get the treatment.

MR. PRZYMUSINSKI: Objection to form. Vague.

QUESTIONS BY MR. HONNOLD:

Q. If I was trying to pass a test, an oral test, on randomized clinical trial, you'd fail me on that.

Wouldn't you?

A. Yes.

Q. You would?

A. So randomized controlled trials --

Q. Tell me. Why don't you give me your explanation.

A. -- are important.

So, A, they're all volunteers, so, you know, subjects -- we call them subjects because they are patients, but they do have to agree and volunteer to participate.

And they're randomized to

however many groups that you a priori decide that you're looking at.  And that's to look for -- in addition to your primary outcome.  So whatever outcome you decide.  So in this situation, if you're looking at response to therapies, to make sure that you can compare the response to therapy and also side effects.

So every RCT has a safety component.  So we do want to make sure that if we're looking at efficacy, we're also looking at safety.

And the reason that there is this randomization that can -- occurs is that there is a placebo response.  And then in terms of the safety, there are things that happen -- illnesses that happen to people kind of de novo out in the population.  So you want to know if this is kind of background symptoms, illnesses, or is it related to the therapy or the drug.

MR. PRZYMUSINSKI:  Brad, not to interrupt, but we've been an hour and ten.

MR. HONNOLD:  One more question

and then we'll be done.

MR. PRZYMUSINSKI:  Absolutely.

MR. HONNOLD:  Brilliant minds think alike.  I was going to say the same thing.

QUESTIONS BY MR. HONNOLD:

Q.    The adverse events that you were talking about, those are an attempt maybe to identify those things that may be related to the compound or agent that was given.

Correct?

A.    Yeah.  Adverse events are to really collect data on anything that is occurring that is either expected or unexpected during the trial period.

Q.    Okay.  I've seen adverse events oftentimes in randomized clinical trials broken down by mild, moderate and severe.

Are you familiar with that scale?

A.    Yes.

Q.    Okay.  In the context of a clinical trial, what is your working definition or working definitions, plural, of

a severe adverse event in the context of a clinical trial?

A.     So I don't remember the definition off the top of my head, but there -- for clinical trials, there is a definition for SAE, which is severe adverse events, AE, which is adverse events, and then among -- between those, there is, you know, expected and unexpected.

I don't remember the criteria for what defines an SAE, but it is clearly defined.

Q.     Okay.  You know, though, that among other things, those things that do fall under the heading of a severe adverse event would include patients that need to be hospitalized.

Correct?

A.     Hospitalization does fall under SAE.

Q.     It would include patients who unfortunately die.

Correct?

A.     That is correct.

Q.     It would include patients who

have significant impairment in their ability
to carry out activities of daily living.

True?

MR. PRZYMUSINSKI:  I'm going to
object.  Again, we're way outside the
scope.

But if you can answer, go
ahead.

THE WITNESS:  That one, I do
not recall.

MR. HONNOLD:  Okay.  Great.
Thank you for your time and courtesy.
We'll take a break.

VIDEOGRAPHER:  Okay.  We're now
going off the record, and the time is
8:38 a.m.

(Off the record at 8:38 a.m.)

VIDEOGRAPHER:  We are now going
back on the record, and the time is
8:53 a.m.

(Nguyen Exhibits 1 and 3 marked
for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Dr. Nguyen, we're back on the
record after our first morning break.

You ready to continue?

A.    Yes.

Q.    Just for housekeeping, so it's clear on the record, the card stock item that was shown on the camera earlier, we're going to mark that as Deposition Exhibit Number 3, just so that's clear for the record.

Before we go forward, I'm going to hand you what we've marked as Deposition Exhibit Number 1.

And, Dr. Nguyen, this is a document called Notice of Videotaped Deposition of Linda Nguyen, MD?

Do you see that?

A.    I do see that.

Q.    And this is nothing more than a legal paper that we file with the Court and serve to all interested parties just stating that your deposition is going to be taken today at a certain time and place.

And then as parties to a case often do, they will attach certain requests for materials for the witness to bring.

In Exhibit 1 you see, if you go to pages 4 and 5, there are two pages called

Exhibit A.

Do you see that?

A.    I do see that.

Q.    Any of those documents that are requested in Requests 1 through 8, do you have any -- or have you brought with you today to the deposition any documents responsive to that request?

MR. PRZYMUSINSKI:  I just want to make sure we're clear.

You guys did receive documents from us last night, correct?  So it's anything outside of that?  Is that what you're asking about?

QUESTIONS BY MR. HONNOLD:

Q.    Right.  Anything else that you've not given to your counsel or given to counsel to provide to us.

Anything else with you?

A.    No.

Q.    I don't know whether any of these teaching materials under Request Number 5 were provided, but, Doctor, if you look at Request Number 5, there's a particular item that says, "Presenter of,"

quote, "International Consensus on Idiopathic Gastroparesis on November 5, 2025."

Do you see that?

A.    I do see that.

Q.    Do you have those materials in your possession?

MR. PRZYMUSINSKI:  Brad, it was provided as part of --

MR. HONNOLD:  They were?  Okay. Thank you.  Thank you.  That answers that they were.

MR. PRZYMUSINSKI:  I believe each of the five presentations there --

MR. HONNOLD:  Thank you.

MR. PRZYMUSINSKI:  -- were included last night.

QUESTIONS BY MR. HONNOLD:

Q.    All right.  Other than materials you provided to counsel, you don't have anything else in your possession?

A.    I do not.

Q.    Okay.  Thank you.

The discussion we were having before the break, you recall we were talking

about methodology that you have used or employed in some of your formal medical literature that you've submitted for publication.

Do you recall that discussion that we had?

A.    Yes.

Q.    Okay.  If you look at your Deposition Exhibit Number 2, which is the general causation expert report, and I've got a very, very specific question for you, so I would in advance ask you to focus on that.

In terms of a section heading -- and if you look at the way you've done section headings throughout Exhibit 2 -- but you see on the screen there you've got a way that you've done headings.  You sometimes do headings in all capitals with underlining, and then you may then -- for subheadings you may then do them in all capitals without underlining next to a roman numeral.

Like, for example, if we go to page 4, the bottom of page 4, there's a section called "Background."  We're on page 4.

Well, in any event, if -- does the copy of the document that you have, Doctor, before you at page 4 have a heading that's called "Background"?

A.    Yes.

Q.    All right.  And then below that, there's roman numeral I, "GLP-1 hormone and its activity in the body"?

A.    Yes.

Q.    You see that?

A.    I see that.

Q.    And so that's the way that you do subheadings.  And it looks like that continues throughout.

Your main -- your main headings are in capitals with an underline, and then a roman numeral in all capitals without underlining.  That looks like kind of your formatting style.

Correct?

A.    Correct.

Q.    Now, is there -- in Exhibit 2 before you, your general causation report of Linda Nguyen, MD, is there a section heading, either in all capitals with underlining or

roman numeral with all capitals not underlined, is there a section or subsection that has in it the term or word "methodology" used?

A.    You were jumping around a little bit.

Q.    Sure.

A.    Can you summarize your question --

Q.    Yeah.

A.    -- just to make sure I heard it correctly?

Q.    Do you have a subject heading or a subheading, either one in all caps with the underlining, or roman numeral with all caps without underlining, do you have any heading or subheading that's called, quote, "methodology," end quote, or, quote, "methodology used," end quote?  Anything like that?

I'm really interested in whether there's a heading that has the word or term "methodology" in it.

A.    So there's not a section that specifically says "methodology."

I do put in the top -- sort of top paragraph in my summary of opinions there on page 3 that -- that generally talks about that based on my review of the literature and data, knowledge, training.

I also put in my report that I reviewed Dr. Dore's report and his analysis and his methodology there.

I'm happy to talk about my methodology and how I synthesized all the data and generated this report, but there's no -- there's no section there.

Q.    All right.  There's no section heading or subheading called methodology or methodology used.

Correct?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.

THE WITNESS:  As I said, I'm happy to talk about my methodology, but there is no section heading that says "methodology" here.

QUESTIONS BY MR. HONNOLD:

Q.    Any methodology that was used in your report hasn't been subjected to peer

review or published?

A.    I'm sorry, what?  What was the question again?

Q.    In terms of the methodology that you used in this report, has it been peer-reviewed or published?

A.    Yes.  So the methodology that I used, in part, utilizes the GRADE, or G-R-A-D-E, methodology, which is a framework that utilize -- that kind of shows us how to utilize research data, and it's used in the formation of guidelines.

So I implemented and I utilized the GRADE sort of framework to think about how the data fits into the -- my report.

Q.    Is the grade framework and that -- what you just told me, is that specifically written anywhere in your report, those words that you just gave in the answer?

A.    Those words were not written --

Q.    Okay.

A.    -- but that was my methodology.

Q.    And my question was, was the methodology that you used in this report, has it been peer-reviewed or published?

A.   So the GRADE methodology, yes, that has been peer-reviewed and published, and it's a well-accepted methodology.

Q.   What's the error rate of your methodology?

A.   I don't know that.

Q.   Okay.  Specifically, do you anywhere in this report state to what database you went to and what search terms that you used to identify pertinent materials or medical literature to review?

A.   So I utilized Dr. Dore's report and his search terms to help identify the research literature, and then I went into -- so I then went to those papers and reviewed them independently.

I also used PubMed, Google Scholar and then Perplexity and Claude to identify --

Q.   And my question was, are those things written anywhere in your report?

I'm not asking what you did.  I just said, is anything about what you did written there in terms of the specific databases you went to.

MR. PRZYMUSINSKI:  So objection to form.  Asked and answered.

You can go ahead and answer.

MR. HONNOLD:  Well, it was asked, not answered.

MR. PRZYMUSINSKI:  Okay.  Go ahead.

THE WITNESS:  As I answered, I utilized -- I did write here that I reviewed Dr. Dore's report, and I incorporated the -- his report, not his opinions but the studies that he identified in his report, in my analysis and my summary.

QUESTIONS BY MR. HONNOLD:

Q.    Do you specifically, anywhere in your report, specifically state what databases that you went to and what search terms you used specifically?  Is that stated anywhere in your report, Exhibit 2?

A.    It's not stated in my report.

Q.    In terms of materials that would have been yielded from any search that you did, is there anything stated in your report, specifically in writing in Exhibit 2,

that says what your inclusion and exclusion criteria were?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  I'm sorry, can you restate your question?

QUESTIONS BY MR. HONNOLD:

Q.    Yeah.

Is there anything specifically written in your Exhibit 2 about the inclusion and exclusion criteria that you used in terms of searches that you performed to find any medical literature?

A.    I did not include that in my report.

Q.    As you sit here right now, we'll pull it up and look at in a second, but I just want to see if you know.

Did Dr. Dore identify his search terms anywhere in his report?

A.    Let me look through Dr. Dore's report.

Q.    And what are you -- what are you looking at?

A.    I'm sorry.  If you give me a moment, I will -- I'm looking at Dr. Dore's expert report.

(Nguyen Exhibit 4 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    And while you're looking at that, just for the record, we will mark as Exhibit 4 Tab 4, which is the David Dore expert report.  It looks like you brought a copy, your own copy, of that report today.

A.    That is correct.

Q.    And let me do this just so that -- well, here, let me hand you one that we've marked.  You can verify that it's complete and accurate if you want to compare it to the one that you have.

And just so we're clear, the question is, did Dr. Dore identify anywhere specifically in his report, Exhibit 4, the search terms that he used?

A.    So I draw your attention to page 18.  And on top, he uses methodology and study identification.

And there in the second

paragraph it says, "To ensure inclusion of the scientific evidence relevant to the potential effect of GLP-1 RAs on the occurrence of ileus and intestinal obstruction, I performed a systematic literature review.  All relevant English-language, peer-reviewed articles published globally were identified.  The ProQuest DIALOG search service was used to identify relevant studies from four sources: PubMed, Cochrane Library, Embase and Medline. Articles were included if they mentioned at least one condition and at least one exposure.  No publication date restrictions were applied.  I searched all available fields for terms related to GLP-1 RAs, ileus and intestinal obstruction."

Q.    Okay.  Do you remember what my question was?

A.    Did Dr. Dore include in his methodology the database and the search terms he used.

Q.    My question was, were his search terms listed, and are his specific search terms listed?

A.    And it says ileus and intestinal obstruction.

Q.    Okay.  So your understanding as you read that, he just typed in ileus and intestinal obstruction?

A.    I can't tell you exactly what he typed in, but here he typed in ileus and intestinal obstruction and probably -- and GLP-1 RAs.

Q.    Does he say anywhere in that paragraph, does he say, the search terms I used were the following, where there's, in quotations, here's the search with these words, and then these connectors and these slashes and these ands or ors?

Does he -- does he specifically list or state those search terms?

MR. PRZYMUSINSKI:  Objection. Form.  The document speaks for itself.

You can answer.

THE WITNESS:  He did not put it in those -- in that format, but he does say he used the terms "ileus" and "intestinal obstruction."

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

QUESTIONS BY MR. HONNOLD:

Q.    Then in your report, do you specifically anywhere state the specific search terms that you used?  That's my question.

Do you include in writing, in your report, any listing or description of specific search terms where you say something like this:  In performing or creating this report, I performed search terms in the following databases, and the terms I used were as follows, quote, and then terms are listed, end quote, period?

Do you state that anywhere in your report?

A.    I do not state that in my report.  I'm happy to tell you how I did it.

Q.    In your reports -- or in your medical literature that you write, do you sometimes include search terms?

Have you ever included search terms in any paper that you've written?

A.    So search terms are typically for systematic reviews and meta-analyses. Those are not the types of research that I

perform, so I do not put those in my -- so I don't routinely do that because those are not the types of research that I do.

Q.    I thought you said you did some observational studies.

A.    But that's not -- that's different than systematic review and meta-analyses.

Q.    Okay.  So you've never done a systematic review or meta-analyses?

A.    It's not my area of expertise.

Q.    Okay.  Dr. Dore said in his deposition, he says, quote, "I do not have that list in my report," when he was asked whether he included his search terms.

Were you aware of that?

A.    I'm sorry, can you show me what you're -- where you're reading from?

Q.    Yeah.  It is his testimony at page -- give me the page number.

MS. RUANE:  Page number --

MR. HONNOLD:  This is from his deposition.  Have you read Dr. Dore's deposition?

THE WITNESS:  I have not read

Dr. Dore's.

MS. RUANE:  45.

QUESTIONS BY MR. HONNOLD:

Q.    I'll read you his testimony from page 45.

He was asked:  "Can you confirm that there is no documentation in your report of the specific search terms that were employed by you and your colleagues?"

This is at page 45, lines 13 through 22.

He says:  "So where I say terms related to GLP-1 RAs, ileus and intestinal obstruction, implying that there are potentially other terms, I do not have that list in my -- in my report."

Were you aware that Dr. Dore said that he did not fully list his search terms in his report?

MR. PRZYMUSINSKI:  So I'm going to object to the form.  If you're going to read from that, you need to show her what you're reading from,

Brad.  And separately, it's going to speak for itself.

But you can answer.

THE WITNESS:  This is the first I have any knowledge of Dr. Dore's deposition, so I can't speak to what's in his deposition and what he said.

QUESTIONS BY MR. HONNOLD:

Q.    In your materials considered list -- and we'll mark it in a bit.  But you know what your materials considered list is.

Correct?

A.    Yes.

Q.    Were those all things that were yielded or produced by your searches?

A.    Were -- I'm sorry.  The materials considered list?  Yes, those are things that came up during my searches that I reviewed in detail, and I included those.

Q.    Okay.  And so that process, is that everything that came up or yielded from your -- from your search?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

THE WITNESS:  If there -- there

were some abstracts that may have come up that were irrelevant, so I didn't include the thousands of things that come up with the search.

QUESTIONS BY MR. HONNOLD:

Q.    So what were your inclusion and exclusion criteria then to decide what was kept and what was discarded?

Let me ask it this way.  That process of inclusion and exclusion, is it specifically described and delineated in your report, Exhibit 2?

A.    It is not described in my report.

Q.    Okay.  Does your report specifically state -- specifically in your report, does it say the databases that you searched, for example, PubMed, Embase, Cochrane, for example?

Is that specifically stated anywhere in your report?

A.    No, that is not stated in my report.

Q.    Did you -- well, let me ask it this way.

In your view, are there -- do you view any general textbooks in gastroenterology as being authoritative or generally reliable?

A.     Do I -- do I view textbooks as generally reliable?

Q.     Are there any in the field of general gastroenterology, textbooks, that you view as being authoritative or generally reliable?

A.     Yeah, there are textbooks that are reliable.  And the way I think about textbooks is they're great for basic, fundamental knowledge, but they're behind in terms of being up to date on the science because books, or editions of books, can take years to update.

So I generally do not use books when I'm looking for up-to-date medical literature.

Q.     But textbooks have had basic definitions of gastro -- gastroenterology conditions in them for decades, haven't they, like a description or definition of ileus or gastroparesis or bowel obstruction?

A.    Textbooks do.  You can also find those on the internet.

Q.    Did you -- did you consult any textbooks, like, for example, Yamada's Textbook of Gastroenterology?

A.    I did --

Q.    Did you --

A.    I did not.

Q.    Okay.  Do you recognize Yamada as being either authoritative or generally reliable?

A.    Yes.

Q.    Okay.  And why do you view it as being authoritative and generally reliable?

A.    It was the textbook that I used way back when I was a GI fellow.

Q.    Okay.  And now it's, I don't -- I'm not sure what edition it is, but it's a big set.  It's a three-volume set.

Correct?

A.    That is correct.

Q.    What about the textbook Sleisenger & Fordtran, S-l-e-i-s-e-n-g-e-r, and Fordtran, F-o-r-d-t-r-a-n, apostrophe S,

Sleisenger & Fordtran's Gastrointestinal and Liver Disease?  Is that an authoritative and generally reliable text?

A.    Yes.  It was a textbook that I also read during my GI fellowship.

Q.    You would agree with me that it's a standard, comprehensive reference in your field.

Correct?

A.    It is.

Q.    Did you consult any medical textbook in preparing your report for any definitions, for example, definition of gastroparesis, drug-induced gastroparesis, drug-induced delayed gastric emptying, ileus or intestinal obstruction or bowel obstruction?

A.    I did not consult the textbooks for that.

Q.    Your report contains descriptions of GI anatomy, motility and the mechanism of ileus.

Did you specifically refer to any sources that you relied upon for those definitions or descriptions?

A.    Can you show me where you're reading --

Q.    Sure.

A.    -- from so I can tell you which source I may have?

Q.    Yeah, we can.

So if -- for example, if you go to page 4 of Exhibit 2, and the first bullet point at the top of page 4.

Is that page 4?

TRIAL TECHNICIAN:  I think our pages might be messed up, but, yes, on my end it's 4.

MR. HONNOLD:  Okay.  What I'm looking for is the page that actually has the number --

MR. PRZYMUSINSKI:  You're looking at Issue 1 report.  No, you're not.

What's on the screen is her Issue 1 report, which is why you're having problems.

MS. RUANE:  Let me -- I'll just pop --

MR. HONNOLD:  I thought that

was Exhibit 4.  I thought that was tab --

MR. PRZYMUSINSKI:  Well, what you've given her.  What we have is the actual report.  What's on the screen is not her report, is what I'm trying to say.

MR. HONNOLD:  And I want to correct that and make sure that I -- I apologize for being so confusing.

MS. RUANE:  Brad, look at the screen now.  I think --

MR. HONNOLD:  Okay.  There we go.  Great.  Thank you.

MR. PRZYMUSINSKI:  Do I get my one strike back?

MR. HONNOLD:  Hmm?

MR. PRZYMUSINSKI:  Do I get my one strike back?

MR. HONNOLD:  You bet.  Yes. Your good deed has been recognized.

QUESTIONS BY MR. HONNOLD:

Q.    If we look at that bullet point at the top of page 4, do you see where it starts with a sentence that says, "Ileus or

adynamic ileus"?

Do you see that?

A.    I do see that.

Q.    Okay.  First -- here's my first question, very specific.

Is there a citation for any aspect of that bullet-point paragraph?

A.    No.

Q.    In fact, did you go somewhere to retrieve that information, or did you just write it based upon your own knowledge?

A.    Can I have a copy of my --

Q.    Sure.  It should be over there. I handed you a copy of Exhibit 2.

A.    -- material?

No -- let me see --

MR. PRZYMUSINSKI:  I think she wants the materials considered list.

THE WITNESS:  The materials considered list.

(Nguyen Exhibit 5 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Oh.

A.    I don't --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Can we get that?  Let's see. What exhibit is that?

That is -- yes, we can.  I'm going to hand you Tab 3, which we will mark as Exhibit 5.

And just so the record is clear, you were looking for your materials considered list.

Is that correct?

A.    That's correct.

Q.    Okay.  And we're going to mark that as Exhibit 5.  I'm going to hand you a copy of that.  I'm going to hand a copy of it to counsel.

As you're looking, Doctor, can you tell me, or tell us, what exactly it is that you're looking for?

A.    I am looking for -- there we go.  It is -- it's on -- it doesn't have a page here, so this -- it's in alphabetical order.  It's Kalff, et al., Postoperative Ileus, UpToDate 2025.

Q.    So if we look at Exhibit 5, we're looking for -- what's the author's name?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.      Kalff, K-a-l-f-f.

Q.      So Postoperative Ileus, UpToDate.

So you -- so did some literature search yield an UpToDate reference?

A.      Yeah, so UpToDate is a widely used resource that's online, and it has reviews of various conditions in gastroenterology, you know, all the -- all the subspecialties there.  The reason it's called UpToDate is that it is updated more frequently than textbooks.

Most of us use UpToDate -- most of us who like using electronic versions instead of going to textbooks use UpToDate.  And this article -- or this review of postoperative ileus was updated in 2025.

Q.      What was my question that I asked you?

A.      Did a literature search result in going to UpToDate?  No.  That was part of my own search.

Q.      Okay.  So something that you didn't state anywhere in the -- anywhere in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

your report.  You didn't say, I also conducted a review of UpToDate on pertinent topics.

Do you see that anywhere in the body of your report?

A.     I did not say I specifically went to UpToDate.  I did say I did my own research, and I included UpToDate in my materials considered.

Q.     Okay.  And so when you go to UpToDate, you log in, little box comes up, you can type in whatever you want.

Correct?

A.     That is correct.

Q.     And it'll let you know whether there is a particular article or paper within UpToDate on that topic.

True?

A.     So UpToDate is not -- you're not searching for specific articles.  There are summaries of different disorders and conditions.

Q.     I got it.

You type in the medical condition in the box.  You type it in.  Did

you type in "ileus," or did you type in
"postoperative ileus"?

A.    I typed in "ileus."

Q.    Okay.  And so when you typed in
"ileus," what -- how many different things
about ileus came up on the UpToDate screen?

A.    It -- the postoperative ileus
was the one that came up.

Q.    Did anything come up -- so only
one?  Only one thing came up?

A.    There was postoperative ileus
definition, treatment, management.  So it
gives you all of those options.

Q.    Right.  Right.

I want to make sure you
understand what I'm saying.

When you typed in "ileus" --

A.    Uh-huh.

Q.    Well, strike that.  Let me tell
you -- let me go at it this way.  This is
what I'm trying to get at.

If somebody wanted to duplicate
exactly what you did to determine the
accuracy, veracity and to trace your
footsteps in looking at -- if they looked at

your Exhibit 2, how would they know what to type into UpToDate to get the benefit of all the stuff that would have come up when you typed in "ileus"?

A.    They could go to my materials considered or they can type in "ileus."

Q.    How would anybody know to do that?

How would anyone looking at your Exhibit 2 know that the world of information that you went to and looked at included the stuff that comes up on the UpToDate screen when you type in the word "ileus" on UpToDate?

MR. PRZYMUSINSKI:  Brad, this is borderline harassing.  She's got a materials considered list.  She reflects what she considered in that list.

I'm not sure what you're asking, but feel free to --

MR. HONNOLD:  I just want to know what else -- if there's any record anywhere of when she typed in "ileus" -- all the other stuff that

comes up on UpToDate when you type in "ileus" in the block.

MR. PRZYMUSINSKI:  I understand what your question is, and my objection is going to be still the same.

You can go ahead and answer.

THE WITNESS:  So UpToDate is a very limited source in terms of what comes up when you search it.  And it comes -- you get ileus.  In this case you get postoperative ileus, and it talks about diagnosis.

So you can get diagnosis, management, what to tell patients.

QUESTIONS BY MR. HONNOLD:

Q.    Well, at lunch, I'll call it up.  I've got it on my phone.  And so we'll look at it when you type in "ileus" and all the things that come up.

But how did you decide -- when you type in "ileus," how did you decide of the various things that come up, the things that you then carried forward to your materials considered list?

Are you saying that that postoperative ileus article is the only thing that comes up on the UpToDate screen when you type in the term "ileus"?

A.    I can't tell you exactly what comes up, but I can tell you that postoperative ileus comes up.  There's definition, diagnosis, management.

If there were any references in there that I looked at, they were included here in my materials considered.

I mostly went to UpToDate, as you asked, about the definition for ileus and bowel -- I wanted to make sure that the definition that I used for ileus was consistent with the definitions that are used in the literature.

Q.    Okay.  And so anybody reading your report, Exhibit 2, for that definition bullet-point paragraph there, how would we know that -- how would anybody know that it came from that postoperative ileus section?

A.    I can't speak for anybody, but if I was interested in ileus and I read this as an independent third party and I wanted to

know, I would go in and search "ileus."

But I can't speak for anybody because I'm not anybody.

Q.     I understand that, and I don't think we're communicating.

If you go to page 4 and that top bullet point, if somebody is reading that and wanted to know where that came from, we now know after discussing it for some period of time that it did come from somewhere.

True?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

But you can go ahead and answer.

THE WITNESS:  Again, this was the -- this is my working definition of ileus.

I wanted to make sure that my working definition of ileus was correct and that I was not mischaracterizing the definition.  So I went to UpToDate to see what does UpTo -- how does UpToDate describe ileus to me.

QUESTIONS BY MR. HONNOLD:

Q.    Anybody reading that bullet-point paragraph, though, would they know that it came from UpToDate?

MR. PRZYMUSINSKI:  Objection.

QUESTIONS BY MR. HONNOLD:

Q.    When they're just looking at that paragraph on the page?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.

THE WITNESS:  It's not -- this did not come from UpToDate.  This is my understanding and definition of ileus that I utilize.

I went to UpToDate to confirm, which is why I put it in the materials considered.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Is it your testimony and opinion in this case for somebody to have the condition of ileus, that there needs to be a complete, 100 percent paralysis shutdown, complete and total cessation of bowel activity?

A.    That is the definition of

ileus.

Q.    Okay.  So how many places did you go to to look for definitions of ileus, other than that UpToDate article we just looked at?

How many places did you go to look for definitions of ileus?

A.    I went to UpToDate to look.

Q.    Okay.  And so did you go anywhere else?

A.    I did not go to any other resource specifically to look for the definition of ileus.

(Nguyen Exhibit 6 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I want to show you a couple of things.  We're going to go to Tab 101 that we're going to mark as Exhibit 6.

And I'm going to hand you Exhibit 6.

And are you familiar with the StatPearls publication on the NCBI Bookshelf?

Have you ever accessed those before?

A.    I have seen it.  I don't routinely use StatPearls.

Q.    Okay.  If you look at the Continuing Education Activity section there, it says, quote, "Ileus refers to the intolerance of oral intake due to inhibition of the gastrointestinal propulsion without signs of mechanical obstruction," period, end quote.

Do you see that?

A.    I do see that.

Q.    Okay.  So would you agree with me that the inhibition of gastrointestinal propulsion is not necessarily the complete, total paralysis and cessation of peristalsis in the small bowel?

MR. PRZYMUSINSKI:  You should feel free to review the document, Doctor, if you need to.

THE WITNESS:  So if you go down to the introduction on that same page there --

QUESTIONS BY MR. HONNOLD:

Q.    Sure.

A.    -- the first -- the first

sentence -- and thank you for highlighting it for me -- says, "Ileus, also known as paralytic ileus or functional ileus, occurs when there is a nonmechanical decrease or stoppage of flow of intestinal contents."

Q.    Right.

So decreased does not mean a complete inhibition, cessation, total paralysis.

Correct?

A.    Decreased does not mean that, but paralytic, paralyzed, means just that, paralyzed.

Q.    Okay.  So let's look at this because it's at least important to me about whether your working definition of ileus when you use it, it means complete paralysis, complete cessation, a complete stoppage and inhibition of small bowel peristalsis.

You're telling me that that is your definition.

True?

A.    That is true --

Q.    Okay.

A.    -- which is why I defined -- if

you look in my report -- so if you look at my report on page 14, I define ileus.

I also define -- and if you go to page 15 in the middle there, the paragraph that says, "Ileus," it says, "Ileus must be distinguished from chronic intestinal pseudoobstruction, a rare syndrome characterized by recurrent episodes of obstruction-like symptoms without any mechanical cause."

Q.    Okay.  So the postoperative ileus -- well, let's do these things in order.

Let's go back to Exhibit 6 and go to that Introduction definition, which you can see it's highlighted.  It's also on the screen.

A.    Uh-huh.

Q.    It says, quote, "Ileus, also known as paralytic ileus or functional ileus, occurs when there is a nonmechanical decrease or stoppage of the flow of intestinal contents," period, end quote.

Did I read that correctly?

A.    Yes.

Q.     And you see that, don't you?

A.     I do see that.

Q.     Okay.  So that nonmechanical decrease, that does not mean complete cessation, complete paralysis or complete stoppage.

Correct?

A.     I'm sorry.  What was your question again?

Q.     Sure.

That definition for ileus does not require a complete stoppage, paralysis, complete cessation of the flow of intestinal contents, because it says "decrease."

Correct?

A.     It does say "decrease," but decrease in motility alone is not the definition of ileus.

Because if you also look at your Exhibit 6 and you look at the evaluation, it says, "Plain abdominal films are usually the first diagnostic imaging eliciting the difference between an ileus and a mechanical bowel obstruction.  Supine" -- and I'm going to skip forward a little bit.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

"Supine and upright films may reveal dilated loops of small bowel but should also show air in the colon and rectum without a transition point."

So in order to make a diagnosis of ileus, you have to have the symptoms, whether decrease or stoppage of motility, that leads to dilation of the small bowel.

Q.    Okay.  So as you just used the definition, you used the term "decreased"?

A.    I'm reading your definition here.

Q.    Yeah.

So you have -- you have embraced that definition to include the term "decrease"?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

You can answer the question.

THE WITNESS:  I'm not agreeing with the "decrease" here.  I'm reading what you read to me earlier.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So you disagree with that definition, then, because it doesn't say

complete, total stoppage and paralysis?

A.    I disagree that a decrease alone can lead to the manifestations of ileus.

Q.    So a significant decrease cannot result in symptoms of ileus in those flat X-rays?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  I don't know what you mean by how much of a decrease.

A decrease alone cannot lead to an ileus, but -- it cannot lead to dilation of small bowel.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So we've looked at postoperative ileus on UpToDate, and there's a definition in the very first part of it under Introduction.  I'm going to hand you the screen.  I want you to see -- oh, I lost it.  Let me see.

I'm going to hand you the computer screen and ask you to look at that top paragraph.

Do you see now that we're on UpToDate?  You see that, correct?

A.    I do see that.

Q.    Okay.  And then you see the search box?  Just up in the very top to the right of UpToDate, do you see where we've typed in the word "ileus"?

Correct?

A.    I do see that.

Q.    It has then yielded, among other things, the postoperative ileus article that you talked about.

True?

A.    True.

Q.    And if you go to the Introduction section, it says, quote, "Postoperative ileus, sometimes referred to adynamic or paralytic ileus, refers to obstipation" --

What does that mean?

A.    No bowel movements.

Q.    -- "and intol" --

So obstipation means not going number 2?

A.    Yes.

Q.    Okay.

-- "and intolerance of oral intake due to nonmechanical factors that disrupt the normal coordinated propulsive motor activity of the gastrointestinal tract following abdominal or non-abdominal surgery."

Did I read that correctly?

A.    You did read that correctly.

Q.    Okay.  Those sentences do not say complete cessation, complete and total stoppage or complete paralysis?

A.    So what I'm saying --

Q.    Are those words in there?

A.    What you have here is basically one paragraph plus a little bit of the second section.  It does not have the entire section of what comes up for ileus.

So if you look on the outline, it has introduction, normal gastrointestinal motility, etiology, definition of prolonged postoperative ileus.  So that's the whole -- that's the whole section.

Q.    Okay.

A.    This is really out of context.

Q.    Is it your testimony then that somewhere in that postoperative ileus section in UpToDate it says for there to be a diagnosis of ileus, there must be a complete and total cessation of motility?

MR. PRZYMUSINSKI:  Objection to form.

This is not a memory test.  If you want her to look at this article, you give her the full article and not a portion --

MR. HONNOLD:  Okay.  Let's get it.

MR. PRZYMUSINSKI:  -- and then she can talk about it and answer your questions.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Here you go.  Here's the whole thing.  I've got it on my phone.  Same thing.  It says "UpToDate."

Do you see that?

I typed in "postoperative ileus."  That article has come up.

Do you see it?

A.    I do see it.  It's small print

for my aging eyes.

Q.    You want me to put it on my iPad?

A.    That would be much easier.

Q.    Okay.  So looking there, do you see anything that you're seeing -- I'm trying to get it up on my iPad, and I'm having problems connecting.

Do you see anything that says complete and total cessation?

A.    I'm still scrolling through.

Q.    Okay.  I've got it on my iPad, if you want to look at it.

And just so I'm oriented, we -- I lost it.

So the path that we started going down was the issue of where did the definition come from ileus.

You told me that your definition does require, or you think that it requires, complete, total paralysis, shutdown and cessation of small bowel function.

You further told me that your definition came from -- or you verified your definition with what is in UpToDate

postoperative ileus section.

Correct?  Right?

A.    I'm sorry, I was reading.

Q.    Okay.

A.    I was trying to find your other question.

Can you please repeat --

Q.    Sure.

How we started down this path was you told me that your definition of ileus requires a complete and total cessation, stoppage or shutdown of all small bowel function, correct?

All peristalsis.  Complete cessation.  True?

A.    Correct.

Q.    Okay.  You said that to verify your definition, you went to the postoperative ileus section on UpToDate.

True?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

But you can answer.

QUESTIONS BY MR. HONNOLD:

Q.    Right?

A.    I used UpToDate to assist with confirming the diagnosis -- or not diagnosis -- definition.

Q.    And that's where we are right now.

True?

A.    That's where we are right now.

Q.    Okay.  And so my question is, where does that postoperative ileus section say that the definition of postoperative ileus says there must be a complete and total cessation, total shutdown, total paralysis of any and all small bowel peristalsis?  Where does it say that?

A.    I'm -- I'm --

Q.    Okay.  Go ahead.  That's where we are.

A.    I'm reading.

Q.    That just sets the stage.

A.    It was too hard to look for it on the phone, so thank you for having this on your --

Q.    Glad to do it.

A.    -- iPad.

Q.    I'm going to take back the

Linda Nguyen, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

laptop that we had.

How you doing?

A.    I'm trying to search for it, the word, going through the section on postoperative ileus.

Q.    Uh-huh.

To further set the stage of kind of bases we've covered, we walked through the introduction section that said -- used the term "disrupt" the normal coordinated propulsive motor activity.

Do you recall that that we looked at the very beginning in the introduction?

A.    I'm sorry, Counsel, I can't --

Q.    Okay.  I'll stop.

A.    -- at the same time.

Q.    I'll leave you alone.

A.    So in reviewing the UpToDate, I did not find the words -- what was the word that you were looking --

Q.    You've told me, I think now multiple times, that the definition of ileus --

A.    Yes.

Q.      -- to you means the complete, total -- complete and total paralysis and stoppage of any and all peristalsis in the bowel.  You said, yes, that's what my definition is.

I then asked you to find that in the UpToDate section, and you've now told me you don't find that stated specifically in that UpToDate section.

True?

A.      So I did not use the extreme of any and all, but I did say that there was cessation of motility that leads to --

Q.      Tell me where you're talking about now because I want to make sure that we get this exactly right.  Because I think you talk about cessation of normal motility.

Correct?

Temporary cessation of the normal muscle contractions.  Okay.

So when you say that, what you mean is it's just not normal?

MR. PRZYMUSINSKI:  Hold on.

You're on page 4?

MR. HONNOLD:  Yeah.

Linda Nguyen, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI: You know where you are?

THE WITNESS: I --

MR. PRZYMUSINSKI: Just so you're talking about the same thing.

QUESTIONS BY MR. HONNOLD:

Q. Can we call up -- can we call up Exhibit 2, please, and let's go to page 4, that top bullet point?

A. Yes. So I'm reading it here on page 4 as well as on page 14, is actually where I was reading earlier.

But it's cessation of normal muscle contractions. That's technically different than cessation of all contractile activity because you can have non-propulsive contractions that occur.

So I just -- I just wanted to be very precise on what I'm talking about in terms of normal motility.

Q. Okay. And so I think what you're saying now is, is that the definition of ileus does not require complete and total cessation of any peristalsis in the bowel.

Correct?

A.    So, I'm sorry.  What I said was that an ileus is cessation of normal muscle contractions.

So what is normal, meaning you can have contractions, but if there are abnormal contractions, then it -- you can have contractions, but if they're abnormal contractions or non-propulsive contractions, then you can see that in ileus, which is why I was careful to say normal muscle contractions or propulsive contractions.

Q.    Okay.  So if I interpreted that to mean that you were in fact saying complete and total cessation of all bowel -- small bowel activity or cessation of all contractions, that's not what you meant?

MR. PRZYMUSINSKI:  Objection to form.

QUESTIONS BY MR. HONNOLD:

Q.    True?

MR. PRZYMUSINSKI:  Sorry.

Objection to form.  Compound.

You can answer.

THE WITNESS:  Yes.  So not cessation of all contractions, because

you can have non-propulsive contractions that leads to ileus because the contractions are not moving the food or the material through the small bowel.

QUESTIONS BY MR. HONNOLD:

Q.    It means there can be a contraction that's just not strong enough to push the bowel contents through.

True?

A.    Typically what we see is uncoordinated contractions.

Q.    Okay.  All right.  And so now your definition of ileus is un -- includes uncoordinated contractions.

Correct?

MR. PRZYMUSINSKI:  Hold on.

So objection to form.

Mischaracterizes her testimony. Suggests that she changed her definition.

You can go ahead and answer.

THE WITNESS:  I'm not changing my definition of ileus.

What -- again, ileus is an

acute and temporary cessation of normal muscle contractions of the small intestine or colon that prevents food, fluid and gas from moving through.

So what I said earlier about the non-propulsive contractions, the discoordinated, that still stands here because it's not normal contractions.

QUESTIONS BY MR. HONNOLD:

Q.    All right.  So let's go to page 19 now of Exhibit 2 of your report because I just want to clear these things up.

MR. PRZYMUSINSKI:  Did you say 19?

MR. HONNOLD:  Page 19, right.  The first full paragraph that starts, "There is no evidence."

QUESTIONS BY MR. HONNOLD:

Q.    And if we could call out that first full paragraph there, you see, Doctor, it says, quote, "There is no evidence that GLP-1 RA use causes paralysis or complete cessation of small or large bowel contractility," period, end quote.

                    Do you see that?

          A.        I do see that.

          Q.        Okay.  So you would agree with me that a patient may in fact have ileus without a complete cessation of small or large bowel contractility.

                    Correct?

          A.        So I think what you're asking here are two separate statements here.

                    Indeed, there is no data that there are any GLP-1 RAs that causes paralysis or complete cessation of small or large bowel.  I don't see data, and I have not seen this in patients where they have -- where a patient is on a GLP and has developed an ileus.

          Q.        In terms of having complete cessation of small or large bowel contractility?

          A.        So I have not seen a patient on a GLP who has ileus, period.

          Q.        You're talking about your own experience now?

          A.        My own experience or what I've seen in the physiologic studies.

Q.    Okay.  Have you reviewed any of -- have you reviewed any internal Novo Nordisk documents that include specific reports from physicians in the field that talk about patients on GLP-1s who have ileus?

Have you reviewed -- my only question is, have you reviewed any of those?

MR. PRZYMUSINSKI:  Okay. Objection to form.  Lacks foundation.

But you can answer.

THE WITNESS:  I have not reviewed them.

MR. PRZYMUSINSKI:  We're over an hour, so whenever you're at a good stopping point.

MR. HONNOLD:  Sure.

QUESTIONS BY MR. HONNOLD:

Q.    This issue of complete cessation of small or large bowel contractility, why did you choose those words?

A.    One is, when you look -- I chose those words because they're -- with -- in patients with ileus, they're lacking the propulsive -- propulsive motility of the

small bowel in order for food or gastric contents to move through the small bowel and that results in dilation.  So the normal function has stopped.

Q.    Okay.  Just something real quick.  As part of your work on this case, have you reviewed the liraglutide studies that looked at gastric emptying times as measured by gastric emptying scintigraphy?

A.    I've looked at a number of studies.  If you show me which one you're specifically referring to, I'm happy to look at it.

Q.    I'm just asking if you remember.

Do you remember seeing liraglutide studies where there were patients on liraglutide who had gastric emptying scintigraphy who had significant delays of gastric emptying times to the tune of 400, 500, 600 minutes?

Have you seen that data?

A.    If you show me the study, I'm happy to look at it.  I can't remember all the studies that I've looked at.

Q.    Okay.  Based upon your understanding of the impact of GLP-1s on gastric emptying, in terms of the data that you've looked at, what is the range of extended times or delay that you've seen in the data that you've looked at?

What's the outer range of delay that you've seen that you can recall?

A.    Honestly, I can't recall.  If you -- if you show me the study, I'm happy to look at it and review it.  I just -- I've looked at a lot of studies.  I can't remember all the numbers.

Q.    Okay.  So for a patient on a GLP-1 to satisfy the commonly used definition of gastroparesis, they have a GES, you would conclude that a patient who has more than 10 percent of the food, meal, remaining after fours hours would, in fact, meet the definition for gastroparesis?

A.    I'm sorry, I was -- I'm thinking ileus, so I need to catch up with you again with the GES.

Can you ask that question again?

Q.    Sure.  Yeah.

So let's hypothetically imagine a patient who was on a GLP-1 and has significant symptoms that are commonly associated with gastroparesis.

Are you with me so far?

A.    I'm with you.

Q.    At least in terms of how symptoms of gastroparesis are described in medical textbooks or the literature, those symptoms would include nausea, vomiting, abdominal pain, early satiety, feelings of bloating and discomfort.

Correct?

A.    Correct.  I'm still following you.

Q.    Okay.  And so imagine hypothetically a patient like that.  And based upon your knowledge of them being on a GLP-1, you discontinue the medication pursuant to your prior testimony.

Correct?

A.    Correct.

Q.    And then imagine further in the hypothetical a patient who does have gastric

emptying scintigraphy done.

In that scenario, following one commonly used definition about outcome of GES, the patient that had greater than 10 percent of the test meal remaining after four hours would meet one commonly used definition of gastroparesis.

Correct?

A.    Yes.  So they would meet the criteria for gastroparesis.  I would have to go through this hypothetical case's history and chart to determine what is the cause of the gastroparesis.

Q.    Okay.  So let's imagine hypothetically that the patient is -- that the managing or treating physician rules out other explanations, meaning no history of diabetes, no prior -- no other concomitant medications that might also result in gastroparesis, and a rule-out through history and physical of other potential causes.

If a patient on a GLP-1 has that presenting scenario and has a GES outcome of greater than 10 percent of the test meal remaining after four hours, that

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

patient would meet your definition of a drug-induced gastroparesis.

MR. PRZYMUSINSKI:  Objection to form.

QUESTIONS BY MR. HONNOLD:

Q.    True?

MR. PRZYMUSINSKI:  Sorry. Objection to form.  Incomplete hypothetical.

You can answer.

THE WITNESS:  Again, I would need to know much more about this individual because diabetes and medications are not the only causes of gastroparesis.

There's a whole host of other things that you would have to evaluate, including their electrolytes, thyroid function, do they have Parkinson's, did they have a prior viral infection, are they taking cannabis.  So there's a lot of things that go into the evaluation of the individual.

And there's no data to suggest

that when you stop a GLP or any drug, and that drug is out of the system, that that's the cause of gastroparesis.

If your hypothetical individual, everything we looked at -- and I did the evaluation. In this hypothetical where they're no longer on drug, they're not -- it's out of their system, then the diagnosis is idiopathic gastroparesis, which is really the most common cause of gastroparesis out there.

QUESTIONS BY MR. HONNOLD:

Q. Okay. So when a patient does have GLP-1-induced gastroparesis, what are the presenting signs and symptoms, and what testing would need to be done to confirm that diagnosis?

A. So in terms -- your question is, how do I confirm if someone has a GLP-1-induced gastroparesis? Is that your question?

Q. Yes.

A. So --

Q. Exactly.

A. -- there's no -- there's no data out there that shows that GLP-1s can cause chronic, persistent gastroparesis.

Q. Okay. We're mixing apples and oranges now. You know that the way I prefaced my question was about drug-induced gastroparesis.

You stood in Judge Marston's courtroom, swore to tell the truth. You answered a question I think from Attorney Pennock and said, these GLP-1 agents can cause a drug-induced gastroparesis. You said yes.

Do you recall that testimony? The transcript will reflect it.

Do you recall it?

MR. PRZYMUSINSKI: Hold on. Object to form of that entire question and the entire prequel to that.

You can go ahead and answer.

Brad, just be respectful, please.

THE WITNESS: Okay. So you are mixing apples and oranges here.

The first -- the hypothetical was about an individual who was on a GLP-1, stopped the GLP-1 and now has delayed gastric emptying. So that was the first hypothetical.

QUESTIONS BY MR. HONNOLD:

Q.    It wasn't. It wasn't. I'll withdraw the question. The record will speak for itself.

MR. HONNOLD: Let's take a break.

VIDEOGRAPHER: We're now going off the record, and the time is 10:09 a.m.

(Off the record at 10:09 a.m.)

VIDEOGRAPHER: We are now going back on the record, and the time is 10:31 a.m.

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, we're back on the record now after our second morning break.

Are you ready to continue with your testimony?

A.    Yes.

(Nguyen Exhibit 7 marked for

identification.)

MR. HONNOLD:  Just so it's clear on the record, I'm going to mark as Exhibit 7 a plain sheet of legal pad paper with the note on it that says, quote, "Substitute UpToDate article on postoperative ileus per e-mail from me on April 9, 2026."

I e-mailed that UpToDate postoperative ileus article to our court reporter and to counsel, so there should be kind of timely, you know, documentation of the form of that.

I know UpToDate routinely can change things, it can happen overnight, but hopefully this was a timely capture of the one that's, at least as of today, the closest to when Dr. Nguyen would have looked at it.

MR. PRZYMUSINSKI:  So we are marking as Exhibit 7 the full UpToDate article that you e-mailed to Carrie, and she'll add --

MR. HONNOLD:  Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI: Okay.

MR. HONNOLD: Just as a placeholder, I'm just putting 7 on a piece of legal pad, and I'll just put that out there with the various marked exhibits.

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, in terms of your work on this case, how many different articles, studies or papers did any of your searches return?

A.    I don't recall how many.

Q.    And what specifically led to your choice of databases?

And I think you said you didn't remember whether it was PubMed, Embase, Cochrane, Google Scholar, which of those, how many you used.

MR. PRZYMUSINSKI: Objection to form. Compound. Mischaracterizes testimony.

But you can answer.

THE WITNESS: I did answer the question. I used PubMed. I used Perplexity, Claude, Google Scholar,

and the references in Dr. Dore's
report.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  But you agree -- we ultimately agreed that you see that Dr. Dore didn't include search terms in his report.

True?

A.    His report did not have search terms, but I did go through the references.

Q.    Okay.  So if you -- if the record would show that you said that you used Dr. Dore's search terms, you would have misspoke.

Correct?

A.    I did not say that I used Dr. Dore's search term.  I used Dr. Dore's report.

You asked if Dr. Dore's report had search terms he used.  I read from his report the term -- the terms that were in the report.

Q.    So did you rely upon Dr. Dore's report to some degree in the formulation of your opinions in this case?

A.    I relied on Dr. Dore's report

to help me identify the studies; that I then used those studies to formulate my opinion in this case.

Q.    Now, you are not an epidemiologist or a pharmacoepidemiologist.

True?

A.    I am not.

Q.    In any studies where you perform cohort studies, observational studies, epidemiological studies -- I can't remember if you said you did those, but -- do you do your own statistical analyses or biostatistical analyses on any studies or papers that you do?

A.    I do not.

Q.    Who do you use to do that?

A.    It depends on who my collaborators are at the time.  So depending on -- there's not one person that I use. Depending on the project, there is someone else who is doing the statistical analysis.

Q.    And I just want to follow up on something that you said because I just really want this to be explicitly clear on the record.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

In this record at 73:05, I asked you the following question specifically:  "Do you anywhere in this

report state to what database you went

to and what search terms that you used

to identify pertinent materials or

medical literature to review," question

mark?

That ends at 73:09.

Your answer beginning at 73:10

is, quote:  "So I utilized Dr. Dore's report

and his search terms to help identify

the research literature, and then I

went into -- so I then went to those

papers and reviewed them

independently."

So to the extent that says that

you used Dr. Dore's search terms, you would

have been mistaken or in error.

Correct?

A.    If you can show me what you're

reading from --

Q.    Sure.

A.    -- just so I can see the

context.

Q.    Uh-huh.  I sure will.

I'm going to hand you a --
whatever we call these screens that we use to
do realtime copy, but then I'm going to hand
you the realtime copy.

The question begins at 73:05,
and your answer continues through 73:14.

My question begins with
"specifically," and your answer begins with
"so I utilized Dr. Dore's report."

A.    Okay.  So the section that I'm
reading here, the -- so I'm going to start
with the question.  It says, "Specifically,
do you anywhere in this report state to what
database you went to and what search terms
that you used to identify pertinent materials
or medical literature to utilize?"

So I utilized Dr. Dore's report
and his search terms, so -- to help identify
the research literature I went into, so I
then went to those papers and reviewed them
independently.  I also used PubMed, Google
Scholar, then Perplexity and -- Perplexity
and Claude to identify.

So...

Q.     So what was my question?

A.     You --

Q.     Okay.

A.     Could you please repeat your question?

Q.     You say in that answer that you used Dr. Dore's search terms.  That's what you said.

Correct?

A.     I said that, yes.

Q.     And then about three minutes ago you said you didn't use Dr. Dore's search terms.

Do you recall that?

A.     Can you please read back to me what I said?  I don't -- I don't recall.

Q.     Okay.  Did you use Dr. Dore's search terms or not?  I'll ask you one more time.

A.     So I'm not sure what you're defining as Dr. Dore's search terms, but when I read his methods and study identification, he said here, fields, terms, related to GLP-1 RAs, ileus and intestinal obstruction.  So those were the terms I used.

Q.    And so you just typed in "GLP-1 RA," and then what next?

A.    "And ileus."

Q.    And?  Typed in "and" or "or"?

A.    "And."

Q.    So GLP-1 and ileus.  Then what?

A.    I start with just a broad search of GLP-1 --

Q.    And then what did you go to after you said you start with a broad search?  Then what did you do?

A.    I looked at what came up, and I reviewed the list of things that came up.

Q.    Okay.  And so everything that came up made its way onto your materials considered list?

A.    Not everything that came up.  I can't remember what all came up.

Q.    Okay.  And then specifically, what were your inclusion and exclusion criteria for what made it onto your MCL then?

A.    So I looked for human studies to start with, randomized controlled trials, meta-analyses, case reports, cohort studies, observational studies.  So any -- essentially

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I looked broadly for studies that would be relevant to the question at hand.

Q.    Okay.  That process that you just described, is that written down specifically anywhere in your report, Exhibit 2?

A.    It's not written in my report.

Q.    Thank you.  Okay.  I'll take this back.

I think I asked you this, but you did not review any internal Novo Nordisk documents.

Correct?

A.    I did not.

Q.    Okay.  You did not review any of Novo Nordisk's own internal safety assessments.

Correct?

A.    I did not.

Q.    Okay.  You did not review any foreign regulatory body assessments or evaluations on the issue of ileus and/or intestinal obstruction.

Correct?

A.    I did not.

Q.    You did not undertake any review of the FDA's adverse event reporting system commonly referred to as FAERS, F-A-E-R-S.  You did not look to that data for GLP-1 receptor agonists.

Correct?

A.    Correct.  I did not do that.

Q.    Did you review any individual adverse event reports, commonly referred to as MedWatch 3500A forms, where physicians reported ileus in patients taking GLP-1 receptor agonists?

A.    I did not.

MR. PRZYMUSINSKI:  Objection to the form.  Lacks foundation.

You can answer.

THE WITNESS:  I did not.

QUESTIONS BY MR. HONNOLD:

Q.    Did you review any internal pharmacovigilance reports or safety signal assessments prepared by Novo Nordisk?

A.    I did not.

Q.    Okay.  Doctor, in forming your opinions, did you review any internal Novo Nordisk documents regarding the safety of

GLP-1 receptor agonists?

A.      I did not.

Q.      Doctor, did you specifically go to any clinical trial reports or clinical trial protocols to identify specific adverse events from randomized clinical trials for any Novo Nordisk GLP-1 compound?

A.      I did not.

Q.      You are a gastroenterologist, we said, by specialty, education and training.

True?

A.      True.

Q.      With the subspecialties that you mentioned early at the beginning of the deposition.

Correct?

A.      That is correct.

Q.      So one of your subspecialties is gastrointestinal motility or some aspects of gastrointestinal motility.

Correct?

A.      That is my -- the specialty.

Q.      Okay.  And gastrointestinal motility or abnormalities, that would

basically be disorders of gut and GI tract movement.

True?

A.    I'm sorry, I wasn't following that.

Q.    Disorders of gut, g-u-t, and GI tract movement?

A.    That's correct.

Q.    You were retained by counsel for Novo Nordisk to provide expert opinions in this litigation.

True?

A.    That is correct.

Q.    Your compensation has been -- for your work on this case has been generally, I think, $650 per hour.

Is that right?

A.    For Issue 2, it's $750 per hour.

Q.    750.

In terms of -- for how many hours of work have you been compensated total between Issue 1 and Issue 2?

A.    I don't have all the invoices in front of me.  I would say Issue 2 was

probably about 80,000, give or -- give or take.

Q.    How much?

A.    80,000, give or take.

I don't recall on Issue 1.  If you have that, I would appreciate a jogging of my memory.

(Nguyen Exhibit 8 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I'm going to hand you what we've marked as Deposition Exhibit Number 8.

What is that document?

A.    This is an invoice summary table.

Q.    And what -- if you -- if we look -- if we look at this document, we see a total billed time.  It looks like it goes through March 31st of 2026.  Total hours of 114.5 and a total billed amount of 85,775.

Do you see that?

A.    I do see that.

Q.    And based upon the inclusive dates there of October 22, 2025, through March 31, 2026, does it appear that this

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

invoice summary table relates to your work on Issue 2?

A.    Yes, this is related to Issue 2.

Q.    Okay.  Doctor, do you know, is there a special term or label for the type of adverse reaction which is essentially an exaggerated mechanism of action response that can lead to an adverse effect within the body?

Does that have a special type of name or label in your experience or knowledge?

A.    I don't know if there's a special term.  I'm not familiar with --

Q.    Okay.  You know what I'm talking about, though.  There may be a medication that has a mechanism of action that provides a desired or therapeutic result.

True?

A.    Yes.

Q.    And that same mechanism of action then can also manifest in some patients at some times in an exaggerated way

that would result in a response that would be pathologic or undesirable.

True?

MR. PRZYMUSINSKI:  Objection. Form.  Lacks foundation.  Calls for speculation.

You can answer.

THE WITNESS:  Okay.  Yes, I don't know what that terminology is called specifically.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  You would agree with me then that in terms of the effects of pharmaceutical compounds that can be had in the human body, they can present on a spectrum.

True?

A.    That's correct.

Q.    Okay.  Examples would be for dia -- blood sugar or diabetic medications, in some patients a certain drug may provide absolutely spot-on glycemic control where the patient's blood sugar response, or HA1BC -- H1 -- what is it?  Tell me what I'm trying to say.

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    The hemoglobin A1C?

Q.    Hemoglobin A1C -- thank you -- may be spot-on and exactly what the prescribing physician wants.

True?

That's one potential.  Correct?

A.    That's correct.

Q.    There are sometimes, though, that those drugs may provide excess glycemic control, and the patient may develop what's known as low blood sugar or hypoglycemia.

True?

A.    That is true.

Q.    Okay.  So that would be an example where the intended mechanism of action moves out of a therapeutic response into something that would be undesirable, pathologic, even harmful.

True?

A.    That is true.  And in that scenario, you would discontinue or lower the dose of the medication.

Q.    Right.

Or potentially deal with any adverse medical effects that might occur as a

Linda Nguyen, MD                   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

result of the hypoglycemia.

Correct?

A.    You would treat the hypoglycemia and discontinue or lower the dose.

Q.    Sure.

Another example might be -- what would be the glycemic control compound equivalent to something that would affect heart rate?  Beta blocker?

A.    Sure.  A beta blocker does affect heart rate.

Q.    Sure.

So a beta blocker in some patients might have the desirable impact or reduction upon heart rate to reduce cardiac workload.

Correct?

A.    That is correct.

Q.    Okay.  But in other patients, that response may be exaggerated, excess or pathologic, and result in an undesirable effect that would be bradycardia, or low heart rate.

True?

A.    That is correct.

Q.    And significant bradycardia in some patients may be harmful.

True?

A.    I'm not a cardiologist, but recalling my training as an internist, it can -- some bradycardia is asymptomatic. Others are symptomatic and does require treatment and cessation of the beta blocker.

Q.    You would agree with me that in patients on GLP-1, the response reflected in gastric emptying time may also present on the spectrum.

Correct?

A.    I'm sorry --

MR. PRZYMUSINSKI:  Objection to form.  Vague.

Go ahead and answer.

THE WITNESS:  Can you clarify that question?  Because I'm having a hard time following it.

QUESTIONS BY MR. HONNOLD:

Q.    The impact on gastric emptying time in patients on GLP-1s, that may also present on the spectrum.

Correct?

MR. PRZYMUSINSKI:  Again, same objection.

THE WITNESS:  Yeah.  So in an individual taking a GLP-1, there can be differences in the rates of the delay in gastric emptying ranging from no delay to greater delay.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  And sometimes significantly greater delay.

Correct?

MR. PRZYMUSINSKI:  Objection to form.  Vague.  Lacks foundation.

THE WITNESS:  I think it depends on what you mean by significantly greater.

QUESTIONS BY MR. HONNOLD:

Q.    What do you mean by significantly greater delay?

A.    It depends on the context of the significant -- what you mean by significant.

Q.    What would be a significant delay in gastric emptying time from your

perspective for a patient on GLP-1?

A.    It depends on their symptoms and if that delay is associated with symptoms.

Q.    Okay.  And then what would you call them, based upon the impact on gastric emptying time, taking all those things into account?

What would be a gastric emptying time that you would say would be significantly delayed?

A.    So I use the definition of the four hour.  So if the retention time is greater than 10 percent at four hours, then that's a significant delay in gastric emptying.

Q.    Okay.  Have you ever testified as an expert witness on behalf of a plaintiff in a lawsuit related to a pharmaceutical product?

A.    No.

Q.    Have you ever testified at all, including your work on this case, that pharmaceutical products can in fact cause adverse events?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI:  Objection to the form.  Vague.

You can answer.

THE WITNESS:  The only testimony that I -- the only time I've testified, it was regarding Issue 1, and that was related to diagnosing gastroparesis.

I don't recall if I testified about a pharmaceutical causing gastroparesis.  I honestly just don't remember that.

(Nguyen Exhibit 9 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, I want to show you something that I created.

And, James, this is Tab 10 that I'm going to mark as Deposition Exhibit Number 9.  And we're going to switch over to the ELMO for this.

And, Doctor, I've got a series of these definitions, and I'm going to hand one to you that you can also look at on paper in addition to on the screen.

And so as you can see, I prepared on card stock, and I've given to you in paper form -- it says, "Term Definition Number 4." You can disregard that because we're putting this one up first.

The term definition is ileus. Then I say the clinical definition.

And we go on to say, "Ileus: A functional disturbance of intestinal motility in which the normal coordinated muscular contractions that propel contents through the intestines are impaired or absent, resulting in a failure of intestinal contents to pass. Ileus involves primarily the small intestine but can involve the stomach and colon. It is a functional obstruction, sometimes called an adynamic or paralytic obstruction, in contrast to mechanical obstruction caused by a physical blockage. Ileus is diagnosed clinically based on symptoms - abdominal distension, inability to pass flatus, nausea and vomiting - and imaging, abdominal X-ray or CT showing dilated bowel with air-fluid levels and absence of a transition point. A diagnosis of ileus does not require proof

that peristalsis has completely ceased."

Do you see that definition?

A.    I do -- I do see that.

Q.    Okay.

MR. PRZYMUSINSKI:  Can I just ask a question?

MR. HONNOLD:  Sure.

MR. PRZYMUSINSKI:  Because this is a demonstrative.

MR. HONNOLD:  Yes.

MR. PRZYMUSINSKI:  Is this definition a quote, or are these your words?

MR. HONNOLD:  These are my words, and I'm going to get to that.

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, I've paraphrased this and created this definition from the sources, the MSD Professional Edition - Ileus (decreased intestinal activity); Sleisenger & Fordtran's Gastrointestinal and Liver Disease, 11th Edition, 2021.

As you look at that definition, do you agree with it?

A.    So, one, I appreciate your

paraphrasing, but I do -- I would like to see the source material there.

As I read your paraphrasing, I agree with that.

The final sentence you have there where you highlight, "A diagnosis of ileus does not require proof that aperistalsis has completely ceased" -- so that's -- that's nuance, because required proof means that you need to do a test to show that there's complete aperistalsis.

If you have the symptoms that you outlined here and imaging of a dilated small bowel, that's enough information to then make the clinical diagnosis that there is aperistalsis there.

Q.    Great.

A.    Now, I would add one more thing.

MR. PRZYMUSINSKI:  Let her finish.

QUESTIONS BY MR. HONNOLD:

Q.    Sure.  I want to get it. Because I'm going to write it down.

A.    So in addition to the imaging

and the symptoms, the other part of the physical examination is absent or -- now I'm using my words wrong now.  Hypoactive.  There you go.  Absent or hypoactive bowel sounds.

So you use that together to make a clinical diagnosis of ileus.  You don't need to have proof of aperistalsis to have ileus.  That's different than the definition of ileus.

Q.    And --

A.    Would you like me to continue on?

Q.    No.  I just want to know if you're done.

Okay.  Because what I want to do is I want to get a form of this that you can agree to.

You'd at least give me a better grade than before, at least a C, in my terms of attempt to come up with a definition?

MR. PRZYMUSINSKI:  Objection to form.

If you need to redline it or --

MR. HONNOLD:  Yeah, we're going to do it -- we're going to do it on

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

my --

MR. PRZYMUSINSKI:  Make sure it's completely correct what you want to say.

MR. HONNOLD:  We're going to do it on my copy here.

QUESTIONS BY MR. HONNOLD:

Q.    And so the first thing, you took issue with the very last sentence, so I'm going to strike through it and just do away with it.

Would that be okay?

A.    The last sentence?

Q.    Yes.

A.    Yes.

Q.    Okay.  So we are going to strike through that.  And I'm going to put your initial there because you said that's okay.

All right.  Then you said something about physical exam.  So I'm going to put -- up at the top, I'm going to put -- let's see.  What should I write, physical examination requirement?

A.    Physical examination.  It's,

again, not a requirement.  There's not one thing that you -- you can say, this one thing leads to the diagnosis.  It's taking the totality of the history, the physical examination and imaging.

Q.    So I wrote physical exam, plus history, plus imaging, totality of circumstances?

A.    Yes.

Q.    Okay.  Okay.  So I'm going to put LN by that.

And then you said something about hypoactive bowel sounds.  Should I put including hypoactive bowel sounds?

A.    No.  It's including absent or hypoactive bowel sounds.

Q.    Okay.  And then I'm going to say, plus, including absent or hypoactive bowel sounds.

And then can I put LN there, too, because that's what you said?

A.    Sure.

Q.    Okay.

A.    And can I redline --

Q.    Yeah.

A.      -- and edit one more section?

Q.      I want you to.

A.      So the first sentence there where it says, "Intestines are impaired or absent" --

Q.      Uh-huh.

A.      -- I would cross out "impaired" there and --

Q.      So you want me to cross out "impaired"?

A.      Yes.  And I will -- I will show you why I want you to cross out "impaired."

So I typically do not read StatPearls, but during the break, I was able to look at the reference 1 and 2 there from the introduction where you highlight the -- the sentence about decreased or stoppage.

And those two references, which is the Venara and the Vilz study, actually uses the -- those words.

Can we get the --

MR. PRZYMUSINSKI:  It's Brad's deposition, but --

THE WITNESS:  Okay.  Yes.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So should I strike out the word "or" too?

A.    Yes.

Q.    Okay.  And then I'm going to do an LN there and get this skinny pen and attribute that to you.

Okay.  Now do we have a definition that you agree with?

A.    Okay.

Q.    Yes?

A.    Let me look at it one more time --

Q.    Okay.  Take your time.

A.    -- and make sure.  Okay.

Q.    So with these corrections as reflected on the current page then, is that a definition that you agree with?

A.    I agree with that.

Q.    Okay.  So I'm going to say down here in the annotation space, I'm going to say, witness agrees, witness modifies, and I'm going to put LN 4/9/26.

And so I want it to -- I'm trying to reflect here that you agree with

this definition per your modifications as directed, which I've tried to capture accurately pursuant to your instructions.

But with those modifications, then Exhibit 9 is an ileus definition that you agree with.

Correct?

A.    Correct.

(Nguyen Exhibit 10 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Thank you.

I'm going to go next to Tab 12, which we are going to mark as Exhibit 10.

I'm going to keep the stickered one here.  I'm going to hand you, Doctor, a copy of this.

MR. PRZYMUSINSKI:  Brad, can you do me a favor, just -- if it's okay with you?  On that document where you have the sources listed --

MR. HONNOLD:  Yes.

MR. PRZYMUSINSKI:  -- I'm not sure Linda agreed that the sources are supportive of that.  I just don't want

that implication to be there.

So would that be okay for a clarification?

MR. HONNOLD:  Yeah.  That's what I looked at to paraphrase, but --

MR. PRZYMUSINSKI:  Well, she hasn't looked at them.

MR. HONNOLD:  I'm going to say subject to verification by LN.  Also, subject to verification by LN.

MR. PRZYMUSINSKI:  As to the sources themselves?

MR. HONNOLD:  Yeah.

And I can -- I've pulled, just for the record, so it's clear, I've pulled Exhibit 9 back, and I'm going to say, "subject to LN verification."

QUESTIONS BY MR. HONNOLD:

Q.    And, Doctor, this raises a good point, and I'm glad counsel mentioned this.

But if you, today, wanted to kind of come up with a working definition of ileus but wanted to be cognizant of the definitions that might exist out there in various authoritative or reliable sources,

textbooks, online things, Mayo Clinic, Cleveland Clinic, different places, other dysmotility centers, things of that nature that may have websites with glossaries, how would you -- how would you construct a search to kind of corral as many of those reliable definitions that might be out there?

A.    Yeah.  So I don't use those resources -- so, for example, with my definition of ileus, it was -- it's really based on the definition that I used in my clinical practice.  And for the sake of this is where I went to and looked into the UpToDate to see.

And then as I'm reading other introductions and various papers, then, to see what definitions are used, just to make sure that the wording that I use is...

Q.    But different places that others might go to for similar guidance that would be possibly reliable would include Mayo Clinic, Cleveland Clinic.

What else?

A.    Websites I do not use because they're not written for physicians.  Websites

are written for the lay consumer.  And so I would -- I would look at published literature.

Q.    You wouldn't want to use a definition that a patient might be told?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes testimony.

THE WITNESS:  No.  Websites for different institutions are typically not written by physicians.  They're written by marketing folks who may or may not have the -- you know, the correct definition, or they may be trying to change the terminology to make it readable for patients.

So there's a difference between what I look at for medical literature versus what a patient looks at.  And websites like Cleveland Clinic, Mayo Clinic, even Stanford, those websites are meant for patients; they're not meant for physicians.

QUESTIONS BY MR. HONNOLD:

Q.    All right.  So next thing I want to do is look at what we've marked as

Exhibit 10.  And this is another definition, this time the definition of surveillance bias.  And I want to come up with a definition that you can agree to for surveillance bias.  And I will read it to you.

"Surveillance bias, also called detection bias or ascertainment bias, occurs when exposed patients are more likely to have an outcome detected and recorded in unexposed patients - not because the outcome is truly more common but because they are monitored more closely, receive more diagnostic testing.  For surveillance bias to explain an observed association, there must be differential ascertainment:  The exposed group must actually receive more diagnostic workup than the unexposed group in a way that would lead to more detected cases of the outcome."

Do you see that?

A.    I do see that.

Q.    And I will represent to you that I have taken this definition from what is found both in Lash, VanderWeele, Haneuse &

Rothman, that's Modern Epidemiology, Fourth, and then the Reference Manual on Scientific Evidence, Fourth Edition, 2025, the chapter that's on epidemiology.

This definition that I've stated here on Exhibit 10 for surveillance bias, do you agree with it?

MR. PRZYMUSINSKI:  And again, just for the record, this is your putting together of the definition for her review.

MR. HONNOLD:  This one -- this one may be verbatim out of the manual.

MR. PRZYMUSINSKI:  Okay.  Is it verbatim?

MR. HONNOLD:  Yeah, I think it is.

MR. PRZYMUSINSKI:  Okay.

QUESTIONS BY MR. HONNOLD:

Q.    Do you agree with that definition of surveillance bias?

A.    I think we've already established I'm not an epidemiologist, and so I would not be able to tell you -- agree or disagree with this definition.

Q.    Okay.  So in terms -- and I appreciate your candor on that.

So in terms of a note that would accurately -- so that we have some documentation on here of your view of this, would we say outside area of expertise? Cannot comment, outside area of expertise?

A.    I see.  Yes, cannot comment.

Q.    Okay.  So we'll do a new box down here that we'll X, and we'll say, c-a-n-n-o-t, cannot comment.  And I'll just put LN here, 4/9/26.

And would there be -- would there be a phrase that you would be comfortable with that would explain why you cannot comment?  Not an epidemiologist or outside practice area?  Something like that?

A.    Outside practice area.

Q.    Okay.  And then I'll do another square here that says "outside practice area."

All right.  So would that -- would that be a fair response to that, that LN, on today's date, cannot comment because it is outside practice area?  Would that be a

fair disposal of that term?

A.      Yes.

Q.      Thank you.

(Nguyen Exhibit 11 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.      Next I want to go to what is Tab 7, which we will mark as Deposition Exhibit Number 11.

And it may be, Doctor, that we can short-circuit some of this by you can say, same as before, if that is in fact the case.  But this is another epidemiologic term.

I'm going to hand you a card stock copy and for counsel.  This again is Exhibit 11.

MR. PRZYMUSINSKI:  Brad, for this one, are you representing this is a direct quote or a paraphrasing?

MR. HONNOLD:  Yes.  Or, no, this is -- this is right out of the manual.

MR. PRZYMUSINSKI:  Including -- the full text?

MR. HONNOLD:  Yes.

MR. PRZYMUSINSKI:  A direct quote from the manual?

MR. HONNOLD:  Well, I am going to say this is right out of the manual.  Okay?  I may stand corrected if we were going to put the manual language next to it.  And I can check it -- I'll verify it.  I should have put in quotes if it was exact, but I just want to go through the same exercise.

MR. GISMONDI:  And which manual are you referring to?  Because I'm not seeing this in the reference manual.

MR. HONNOLD:  Manual on scientific evidence.  There's a specific definition in there of nondefinition -- nondifferential misclassification of outcome.

It certainly is in there.  It's in the chapter on epidemiology.

MR. PRZYMUSINSKI:  Why don't you check.  So for right now --

MR. HONNOLD:  Okay.  And if

it's not, I'll take it out.  I want to
ask her if she knows what the -- what
the -- what it is.

MR. PRZYMUSINSKI:  Just for the
record, though, we're going to figure
out if this is a direct quote or not.
We're not sure right now.

Is that right?

MR. HONNOLD:  I'll agree with
that for now.

MR. PRZYMUSINSKI:  Okay.  All
right.

MR. HONNOLD:  And maybe I can
ask it this way.

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, do you know what
nondifferential misclassification of the
outcome is, that epidemiological term?

A.    I would have to read it.  I
don't know it off the top of my head.

Q.    Okay.  And so would the
response for this, if this is an accurate
paraphrase or right out of the manual or some
other source, would it be the same response
as before:  Cannot comment, outside area of

practice?

A.    I have yet to read.

Q.    Oh, go ahead.  Go ahead.  I'll read it through like we did before.

"Nondifferential misclassification of the outcome occurs when the outcome of interest is measured with the same degree of error in both the exposed group and the unexposed group.  Because the error is equal in both groups, it does not create a false positive - instead, it dilutes the true association, biasing the observed result towards the null, towards 1.0.  Key directional principle:  Nondifferential misclassification cannot produce a false positive.  It suppresses a true positive.  A significantly" -- "A statistically significant positive finding despite this bias is therefore more credible - not less."

A.    If it's okay, can I read it on my own?

Q.    Oh, absolutely.

A.    That's how I --

Q.    No, I want you to.

And my only question is, if we

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

can dispose of it in the same way as the prior, that would be fine, if that's the quickest way to address it.

MR. PRZYMUSINSKI:  So, Brad, I don't know how you want to do this.  We can't find it in there.

MR. HONNOLD:  Okay.  Here's what I'll do.

MR. PRZYMUSINSKI:  I just want to make sure that we're not creating a document that --

MR. HONNOLD:  So here's what I'll do.  I'll cross out the citation.

MR. PRZYMUSINSKI:  Okay.

MR. HONNOLD:  I want to ask her if she knows one way or the other if she can agree with that definition.

MR. PRZYMUSINSKI:  Okay.

THE WITNESS:  I would love to see the source of this definition.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Let me ask you this.

If you wanted to find out the definition of nondifferential misclassification of the outcome, where would

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

you go to find a reliable definition of that?

A.    I would start by looking at Google Scholar --

Q.    Okay.

A.    -- and then looking it up and seeing where the sources are.

Q.    So I'm going to say under witness notes, LN says search Google Scholar.

And the search language would be what?

A.    I would look for nondifferential misclassification.

Q.    Have you at least heard of this term before today?

A.    I have heard of this term.

Q.    In what context?

A.    In the context of epidemiological studies.

Q.    Okay.  Anywhere in your report, Exhibit 2, did you take up the issue and address whether or not there are potential issues of nondifferential misclassification of the outcome in any of the studies either in or materials considered list or studies specifically discussed in the text of your

report?

A.   So, no, I did not include that in my report.

My report really takes in the totality of the evidence in terms of looking at all of the studies that are out there.

Every study has a limitation, and I looked at the studies with their strengths and their limitations.

MR. HONNOLD:  Okay.  I'm going to move that be stricken after where you said, "No, I did not look at that."

QUESTIONS BY MR. HONNOLD:

Q.   Was there a specific reason why you did not address, in the text of your report, about whether or not any of the studies that were either listed in your materials considered list or discussed specifically in the text of your report, why you did not specifically take up and address the issue of nondifferential misclassification of the outcome?

A.   I did not specifically take up this one issue of nondifferential

misclassification because it was not relevant in the -- looking at the entire audience of literature.

Q.    Okay.

A.    And as we said earlier is that I'm not an epidemiologist.  I'm -- my role is to look at the evidence and put it in the context of my clinical and research experience in motility, not in epidemiology. So I'm not -- I was not trying to put holes in each individual epidemiologic study.

Q.    Okay.  So capturing that, if we wanted to kind of capture what it is that you just said, the one thing that caught my attention was "not relevant to the totality of the evidence approach"?  To your totality of the evidence approach?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

QUESTIONS BY MR. HONNOLD:

Q.    Is that what you just said?

A.    That was not what I just --

Q.    Okay.  So you did say not relevant.

So not relevant to what?

A.    Not relevant to the task that I was asked to do in terms of taking the data and applying it to the clinical experience.

And I also relied on Dr. Dore, who is an epidemiologist, to summarize the studies which then I used in my report.

Q.    Okay.  So what you said there, I tried to keep up with you.  "Not relevant to task that you were asked to do."

That's one thing that you said, correct?  It was not relevant to what you were asked to do?

MR. PRZYMUSINSKI:  Right, but she said a lot more, Brad.  So if you're going to take that --

QUESTIONS BY MR. HONNOLD:

Q.    And relied on Dore?

MR. PRZYMUSINSKI:  She said more than that, too.

THE WITNESS:  I said a lot more.

So you asked why I did not talk about nondifferential misclassification in my report.  And so the not relevant was not -- it's

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

not that nondifferential misclassification is not relevant, but it was not relevant to the task of my report.

QUESTIONS BY MR. HONNOLD:

Q.     Not relevant to task -- not relevant to task of my report.  So I'm going to take that out.  Not relevant to task of my report.  That's what you just said.

Right?

MR. PRZYMUSINSKI:  Again, Brad, I'm going to object to this exhibit because you're now taking a piece of what she said and representing it as if that's all she said about it.  And that's not going to reflect her testimony.

So if you want to put on there that she has testimony on that, which is recorded in the deposition transcript, that's fine.  But --

MR. HONNOLD:  Sure.

MR. PRZYMUSINSKI:  -- you can't just excerpt one piece without the context.

MR. HONNOLD: Sure.

QUESTIONS BY MR. HONNOLD:

Q.    Did you tell me, Doctor, that the issue of nondifferential misclassification of the outcome, the reason that you didn't take it up and discuss it specifically in the text of your report is because it was not relevant to the task of your report?

You said that, true?

A.    I said -- I said a lot of things there. And what I said was this specific addressing of nondifferential misclassification, this one epidemiologic concept, was not relevant to the report when I take all of the evidence in totality, plus the clinical experience as well as -- I mean, clinical experience of taking patients for 20 years.

That's what I was asked to do, was looking at the data, the evidence, and whether or not this occurs in clinical practice.

Q.    Is it your testimony then, when asked to look at epidemiological data, that

issues of nondifferential misclassification of the outcome is irrelevant to that task or exercise?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes testimony.

You can answer.

THE WITNESS:  It is -- it's something that I consider when I review the individual studies, but I did not include it in my report because my report was not going into detail of each individual study the way, say, Dr. Dore did where he looked at the study design, the results and the discussion.

I did not take that to put into my -- I did not do that type of analysis in my report.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So you yourself did not take up the issue of whether or not certain studies were impacted by nondifferential misclassification of the outcome; that is not something that you did?

A.    I did not -- I did not say

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTED ORDER

that.

I said I considered it when I reviewed the studies.  I just did not include that term in my report.

Q.    Okay.  Which studies were impacted then by nondifferential misclassification of the outcome?

A.    I would have to review the studies themselves.

Q.    Okay.  I don't want you to do that.  So you'd have to go review the studies.

Can you name one study as you sit here right now that you know was impacted?

A.    Counsel, I'd have to look at the studies.

Q.    Okay.  All right.

A.    I can't remember.

Q.    Would that same hold true for surveillance bias as to -- well, first, let me ask you.

Did you address specifically in the text of your report, Exhibit 2, as to whether any studies were impacted by

Linda Nguyen, MD

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

surveillance bias?

A.      Did I -- I'm sorry.  Did I address that in my report?

Q.      Yes.  Specifically.

A.      I did not address it in my report.

Q.      Okay.  So we can modify Exhibit 10 by saying, did not address in report.

MR. PRZYMUSINSKI:  And you mean by that not written in the report, Brad?

MR. HONNOLD:  In report text.

QUESTIONS BY MR. HONNOLD:

Q.      Had you heard of surveillance bias before today?

A.      I have, and I did consider it when I was reviewing the reports.

When I said that I do not have the expertise in terms of redlining the definition, as you -- as you were doing earlier, I know the concept, but I'm not an epidemiologist that I can go through and redline and disagree with a definition.

MR. PRZYMUSINSKI:  Before we

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

move on, what's the number of the last exhibit that we were talking about?

MR. HONNOLD:  I think it was 11.

MR. PRZYMUSINSKI:  That was the one with misclassification bias?

MR. HONNOLD:  Oh, wait.  Yes, nondifferential misclassification of the outcome is Exhibit 11.

MR. PRZYMUSINSKI:  I just want to make sure on the record, now that you have a final version of whatever you put together, that I'm going to object as exhibit -- as not reflecting accurately her testimony, the totality of the statements that she's made regarding that.  And I think we can leave it at that.

MR. HONNOLD:  Okay.  But the record will reflect the totality of her statements?

MR. PRZYMUSINSKI:  Of course.

MR. HONNOLD:  Of which Exhibit 11 would be at least a partial adjunct to that?

MR. PRZYMUSINSKI:  I'm not objecting to it existing.  I'm objecting that the exhibit itself does not reflect in totality what's written on it, which she actually said in the deposition.

MR. HONNOLD:  Okay.  And so if I made Exhibit 11 to say, needs to be supplemented by other testimony, would that make it accurate?

MR. PRZYMUSINSKI:  It will make it accurate if you said it does not reflect her testimony fully.

Other than that, I don't know what else to do with it.

(Nguyen Exhibit 12 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    All right.  Doctor, I want to go to Tab 13, which is going to be marked as exhibit -- I'm going to mark Tab 13 as Exhibit 12 and use that as we have before.

I've got a copy of -- for the witness and counsel.

And, Doctor, I'll present to

you this definition of hazard ratio.

"A hazard ratio is a measure of the relative rate at which an event occurs in one group compared to another group over the duration of a study.  It is the primary measure of association in time-to-event (survival) analyses.  A hazard ratio of 1, the event occurs at the same rate in both groups, meaning no difference.  A hazard ratio greater than 1, the event occurs more often in the exposed group; therefore, increased risk.  Hazard ratio less than 1, the event occurs less often in the exposed group, meaning a decreased risk and apparent protection.  A hazard ratio of 2 means the exposed group experiences the event at twice the rate of the comparison group at any given point in time.  A hazard ratio of 4.22 means the group experiences the event at more than four times the rate."

Okay.  To avoid --

MR. PRZYMUSINSKI:  Same question.  Is this a quote --

MR. HONNOLD:  To avoid any --

MR. PRZYMUSINSKI:  Okay.  And

is this addressing hazard ratio independent of significance or --

MR. HONNOLD:  Any issue.  It's hazard ratio generally.

MR. PRZYMUSINSKI:  Okay.

MR. HONNOLD:  Because you know hazard ratio exists as a concept independent of p-value and confidence interval.

MR. PRZYMUSINSKI:  That's all I'm asking.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Doctor, this definition of hazard ratio, do you agree with it?

A.    I just want to take a second to read it on my own.

Q.    Sure.

A.    So I agree with the definition. You do need the confidence intervals to be able to interpret the significance of the numbers.

Q.    Okay.  So this correction will be, agree with definition, need confidence intervals -- interval or vals -- to assess or ascertain significance.

What do you like better?  Assess?

A.    Ascertain.

Q.    Ascertain.  Okay.

And I'm going to put that in quotes and put LN there.

And then down below I'm going to say, witness agrees, witness modifies, and LN 4/9/26.

Okay.  So Exhibit 12 as stated, we have agreement there subject to the modifications?

A.    Yes.

Q.    In your Exhibit 2, your report, did you specifically, in the text of your report, identify any particular study or treatment arm of a study that said that there is a hazard ratio greater than 1 on the issue of ileus and/or bowel obstruction for patients exposed to GLP-1s?

Did you specifically discuss any study that found a statistically significant hazard ratio greater than 1 in the text -- in the text of your report?

MR. PRZYMUSINSKI:  You should

feel free to read it, Doctor.

THE WITNESS:  Yes, let me --

QUESTIONS BY MR. HONNOLD:

Q.    Please do, because here's what I'm -- here's what I'm trying to get at.

In terms of your totality of the evidence approach, did you specifically take on, address and evaluate the specific details of the hazard ratios from any of the observational or epidemiological studies where a hazard ratio greater than 1 was found with a confidence interval that did not transcend or cross 1?

A.    Is this question in relation to the gastro --

Q.    Ileus and bowel obstruction.

A.    Ileus.  Okay.

So I was double-checking because I did include some odds ratios, and I wanted to double-check to make sure that they were indeed odds ratios.

So I did not include hazards ratios in the report.  However, in my review of the literature, I do look at hazards -- hazard ratios, and looking at whether the

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

hazard ratios were significant or insignificant.

MR. HONNOLD:  Move to strike as nonresponsive.

QUESTIONS BY MR. HONNOLD:

Q.     Is the answer to my question, no, that in the text of your -- in the text of your report, you did not specifically address, evaluate or comment on any of the studies that identified a hazard ratio that was greater than 1 with a confidence interval that did not include 1?

MR. PRZYMUSINSKI:  All right. So objection to form.  Vague.

You can go ahead and answer.

THE WITNESS:  So I did include studies that had a hazard ratio greater than 1 that did not include 1. So that's the Faillie and Sodhi study that was included in the report.

I did not specifically write down the hazard ratio and the confidence intervals in my report, but I did review those studies.

QUESTIONS BY MR. HONNOLD:

Q.    But did you write down, this study identified in either the primary group, another comparator treatment arm, anything like that, where there was a hazard ratio greater than 1 that was identified with a confidence interval that did not cross 1?

Did you specifically write that in the text of your report?  That's my only question.

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.

You can go ahead and answer.

THE WITNESS:  I did not write those specific words that you asked about hazard ratio.

QUESTIONS BY MR. HONNOLD:

Q.    Thank you.

A.    I did review the studies with hazard ratios greater than 1.

MR. PRZYMUSINSKI:  Brad, do you think we're in a good spot for a break?

MR. HONNOLD:  Yeah, just a second.

MR. PRZYMUSINSKI:  Yeah.

QUESTIONS BY MR. HONNOLD:

Q.    But chose of your own volition, made your own decision of your own volition and choosing, not to specifically address or discuss in the text of your report any of those studies or treatment arms that included a hazard ratio greater than 1 with a confidence interval did not cross 1.

You were the one that decided not to specifically discuss such in the text of your report.

Is that true?

MR. PRZYMUSINSKI:  Objection to form.  Vague.  Mischaracterizes testimony.

QUESTIONS BY MR. HONNOLD:

Q.    It was you that made that decision?

MR. PRZYMUSINSKI:  Okay.  Try again.

Objection to form.  Compound. Mischaracterizes testimony.  As also -- stop there.

Go ahead.

THE WITNESS:  So I chose not to include hazard ratios on any of the observational studies, including the ones that were less than 1.

QUESTIONS BY MR. HONNOLD:

Q.    On the issue of addressing causal association, is there any single factor that's more important than assessing whether there are hazard ratios that are greater than 1?

MR. PRZYMUSINSKI:  Objection.

QUESTIONS BY MR. HONNOLD:

Q.    And if there is such a factor, tell me what it is.

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Vague.

You can go ahead and answer.

THE WITNESS:  There's not one factor, so you look at odds ratios which are in meta-analyses.  Odds ratios are similar to hazards ratios, but they're not -- when you're in a -- meta-analysis, you don't necessarily call them hazards ratios.

But -- so I looked at odds

ratios, hazards ratios, relative risk. So those are all things that go into consideration when you look at the data for making the -- kind of a determination or make -- giving my opinion about whether or not there's causation or an association there.

QUESTIONS BY MR. HONNOLD:

Q. What's the difference between a hazard ratio and odds ratio and a relative risk?

A. I would need to have those in order to have a very specific diag -- not diagnosis -- the very specific definition of those because they're very nuanced in statistics where they -- again, they have similar meanings, but depending on how the statis -- the statistical analysis, there are sometimes you use odds ratios, sometimes you do relative risk, other times you do hazard ratios.

I would have to read those for the full definition.

Q. Was there any study that had a relative risk greater than 1 that you

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

specifically wrote about and discussed in your text of your report?

A.    I would have to look at the studies.

Q.    While you're looking, look at odds ratio as well.

Are you looking at your Exhibit 2?

A.    So I'm looking at --

Q.    I was asking whether you discuss it in the text of your Exhibit 2.

MR. PRZYMUSINSKI:  All right. Make sure we have a clear question.

Are you asking her if she discussed any studies that had relative risk over a certain number or if the words "relative risk" appear in this -- the report?  Which one is it?

MR. HONNOLD:  Here's my question.  It's a fair objection.

QUESTIONS BY MR. HONNOLD:

Q.    In the text of your Exhibit 2, your Issue 2 report, in any of the text where you discuss any of the studies, did you specifically state for any of the studies,

this study had a relative risk or had an odds ratio of greater than 1 that was statistically significant?

Did you specifically point that out anywhere in the text of your report?

A.    So I do have a couple of areas where I put in an odds ratio.

The reason I was going back to Dr. Dore's report is that it's hard to put something in that doesn't exist.  So I'm looking to see if there are in his summary and systematic review that -- whether there are any studies that had hazard ratios or odds ratios greater than 1 that did not cross 1, because I did not want to rely completely on my memory alone.

So the two studies where the hazard ratios were above 1 and did not cross 1 were the Sodhi and Faillie studies, which I did review, do comment on that.  I took it in all of its totality with all the data and all the different studies here.

So I -- so I did not include the specific hazard ratio, odds ratio, relative risk in the text.  I do -- I did

consider it.  The two were the Faillie and Sodhi study that are in my report.

Q.    Is that it?

A.    Yes.

MR. HONNOLD:  Okay.  Do you want to go off the record real quick?

VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 11:46 a.m.

(Off the record at 11:46 a.m.)

VIDEOGRAPHER:  We are now going back on the record, and the time is 12:24 p.m.

(Nguyen Exhibit 13 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, we're back on the record now after a lunch break.  I'd like to continue.

Are you ready to continue with your testimony?

A.    I am.

Q.    Okay.  I want to continue with some of the definitional work that we were doing before.

I have marked as Exhibit 13 --
I have Tab 14, which I've marked as
Exhibit 13.  It's the definition of
confidence interval.

Again, to avoid any controversy
about it, I'm crossing out the sources there.
I just want to ask you whether or not you
agree with this definition of confidence
interval.

MR. PRZYMUSINSKI:  Can I get a
copy for each of us?

MR. HONNOLD:  Oh, gosh, I'm
sorry.

QUESTIONS BY MR. HONNOLD:

Q.    So, Doctor, confidence interval
definition.  "A confidence interval, CI, is a
range of values around a point estimate, such
as a hazard ratio, that reflects the
precision of the estimate given the study's
sample size and event count.  A 95 percent
confidence interval means that if the study
were repeated many times under the same
conditions, 95 percent of the calculated
values would contain the true population
value.  An example of a confidence interval

that excludes 1 would be, for example, confidence interval 1.04 through 2.74.  The result is statistically significant at a p-value less than .05.  The confidence interval that includes 1, for example, a confidence interval of .91 through 2.44, the result is not statistically significant.  A confidence interval crossing 1 does not mean that there is no association.  It means that the study lacked sufficient statistical power to exclude chance at the conventional threshold.  A nonsignificant result is not a null result."

Do you see that definition of confidence interval?

A.    I do see that.  I would like to read it.

Q.    Certainly.

A.    Okay.

Q.    As written, do you generally agree with that definition?

MR. PRZYMUSINSKI:  Objection to form.

THE WITNESS:  So I agree with the first part of the definition.

QUESTIONS BY MR. HONNOLD:

Q.    Which would be down through where?

A.    Down through the result "is not statistically significant" --

Q.    All right.

A.    -- there.

The second part of that I don't agree with entirely.  There is --

Q.    Okay.  Do I -- is the quickest way to get to something that you agree with just to strike out that last paragraph about a confidence interval crossing 1?  If I cross those three and a half lines out, then do we have something that you agree with?

A.    If you strike out that entire last...

Q.    So as I've corrected it here by striking that out, do we have a -- where I can check witness agrees, witness modifies, LN 4/9/26 as modified?

Does that get us to agreement?

A.    Yes.

Q.    Okay.  Now, having recognized that, I want to ask you about the part that

Linda Nguyen, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

we crossed out, though.

Have you specifically seen written anywhere, either in epidemiological materials or other places, that a confidence interval crossing 1 does not mean that there is no -- that there is no association?  Have you seen that written before?

A.     I don't recall.  I've seen it written somewhere.  If you have that source material, I'm happy to look at it.

Q.     Right.

Have you specifically, though, in terms of any of your work on this case, looked, for example, at a confidence interval, let's say, that did include 1 but just ever so slightly?  For example, a 0.98 through a 3.55, hypothetically.  Okay?

Is it your view of a confidence interval like that that it is proof of an absence of association or simply that an association cannot be proven?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.

You can answer.

THE WITNESS:  Can you rephrase

that?  The double negatives is kind of throwing me off a little bit.

QUESTIONS BY MR. HONNOLD:

Q.    Sure.

Okay.  I'm going to set 13 aside, just because we have agreement on that, and I'm going to do the next thing on kind of a sheet of paper.  And I think I gave you a situation where the confidence interval was 0.98 through 3.55.

And so my question is, is this proof of no association or that association is still possibly present?

MR. PRZYMUSINSKI:  Sorry.  Are you limiting her to those two choices?

MR. HONNOLD:  Yes.

MR. PRZYMUSINSKI:  Okay.

Well, if you can answer that, then go right ahead.  And feel free to say whatever you need to say to answer.

THE WITNESS:  So based on this confidence interval that you have here, based on the study done as-is, there's no proof of association.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

However, it doesn't mean that there is no association.  A study needs to be done.  You have to interpret the data as it is.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  What if I were to add to this a point value or a hazard ratio of 2.23, would that allow you to say any more about whether this is proof of no association or that association is still possibly present?

MR. PRZYMUSINSKI:  Objection to the form again in terms of the limitation on the answer.

You may go ahead and answer.

THE WITNESS:  It doesn't change the statement I made earlier.

QUESTIONS BY MR. HONNOLD:

Q.    But in a situation like this where there is a confidence interval that crosses 1, the fact that the confidence interval crosses -- or includes 1 is, in and of itself, not proof of an absence of association.

Correct?

MR. PRZYMUSINSKI:  Objection to

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the form.  Vague.

You can answer.

THE WITNESS:  So when the confidence interval crosses over 1, the interpretation is is that hazard ratio is not statistically significant, and so you cannot draw a conclusion that there's an association there.

It's not proof one way or another.  It's drawing the conclusion of that study as-is.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  And in fact, it's still possible that an association does, in fact, exist; it's just not provable?

MR. PRZYMUSINSKI:  Objection to form.  Calls for speculation.  Lacks foundation.

You can answer.

THE WITNESS:  Again, if there's a study that is conducted and done differently that shows the -- a positive -- a statistically significant, then you have to follow

the data.

But based on this hypothesis, I can't say one way or another.

(Nguyen Exhibits 14 and 15 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I'm going to mark as exhibit -- excuse me.  I have Tab Number 8 that I'm going to mark as Exhibit 15.  This definition is confounding by indication.

Doctor, before we get to the definition, I want to ask you about your report first, Exhibit 2.

Anywhere in your report where you discuss the issue of ileus and/or intestinal bowel obstruction, do you comment that any particular study may be influenced or affected by the limitation of confounding by indication?

And as before I'm saying, did you specifically say anywhere that a particular study is impacted or affected by confounding by indication, specifically using those words?

A.    So in my report, I did not use

those words specifically.  I did consider --

                    MR. PRZYMUSINSKI:  Let her

            answer.

                    THE WITNESS:  I did consider

            confounding when I reviewed each of

            the individual studies.  And as

            mentioned previously, I relied on

            Dr. Dore's report, and he does include

            the limitations of the studies and

            study designs.

                    I did not put those exact words

            in my report as I reference Dr. Dore's

            report.

QUESTIONS BY MR. HONNOLD:

            Q.    Did you say in your report that

any particular study was influenced by

confounding by indication?  Did you say it

anywhere?

                    MR. PRZYMUSINSKI:  Objection to

            form.  Asked and answered.

                    You can answer.

                    THE WITNESS:  As I said, I did

            not put those specific words in my

            report because I referenced them in

            Dr. Dore's report.

QUESTIONS BY MR. HONNOLD:

Q.    Did you use some other words where you meant confounding by indication but said something else?

MR. PRZYMUSINSKI:  Objection to form.  Again, asked and answered.

You can go ahead and answer.

THE WITNESS:  I did not include those terms in my report.  I referenced Dr. Dore's report.

QUESTIONS BY MR. HONNOLD:

Q.    Did you specifically say, Dr. Dore identified confounding by indication affecting the following studies?  Did you say that?

MR. PRZYMUSINSKI:  Same objection.

You can answer.

THE WITNESS:  I did not put those words in my report.  I referenced Dr. Dore's report.  I reviewed it.

I took into consideration all the studies, including those with confounders, but I did not put those

exact words in my report.

QUESTIONS BY MR. HONNOLD:

Q.    Which studies specifically are impacted by confounding by indication in your view or opinion?

A.    I don't have that memorized, but I'm happy to look at the studies.

Q.    And so let me ask it this way.

For you to answer that question, would you essentially say, I need to go to Dr. Dore's report and see which ones he said were affected by confounding by indication?

MR. PRZYMUSINSKI:  Objection to form.

QUESTIONS BY MR. HONNOLD:

Q.    Would that be the way for you to answer that question?

MR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  I would not go to Dr. Dore's report.

Dr. Dore's tables summarized the studies, so then I can go into the -- ask for the studies to look at

them.

I can't memorize all the methodologies used in every single study here, so I do need to go back and look at them.

QUESTIONS BY MR. HONNOLD:

Q.   Okay.  So to answer the question --

A.   Uh-huh.

Q.   -- as to whether any studies are influenced by confounding by indication and which studies those are, you would need to go to Dr. Dore's text of his report or his attached tables.

Is that true?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

You can answer.

THE WITNESS:  I would go to the tables, the text, and then I would need to look at the actual studies itself.

QUESTIONS BY MR. HONNOLD:

Q.   All right. Okay.  Let's go back now to Exhibit 15.

MR. PRZYMUSINSKI:  Brad, are we going to scratch out the sources, or are you keeping them?

MR. HONNOLD:  Yeah, let's just stay consistent.  Let's just scratch them out.

QUESTIONS BY MR. HONNOLD:

Q.    I'm going to turn Exhibit 15 over and ask you, do you know what confounding by indication is?

Turn Exhibit 15 over, if you could.

Okay.  Do you know what confounding by indication is?

A.    I know the concept of confounding by indication.

Q.    What is it?

A.    I won't be able to give you word for word.

Q.    Okay.  Give me your best effort as to what confounding by indication is or means.

A.    Confounding by indication -- so confounding is that a diagnosis or indication that may be affecting the results of the

study.

Q.    An example would be what?

A.    An example would be someone with obesity and looking at the rates of GERD or acid reflux because obesity will confound the findings of any -- anything that's related to acid reflux.

Q.    Which way will it push the hazard ratio?

MR. PRZYMUSINSKI:  Objection to form.  Calls for speculation.

You can answer.

THE WITNESS:  I can't speculate on that because it depends on what hazard or what outcome you're looking for.

QUESTIONS BY MR. HONNOLD:

Q.    But in the example that you gave me, what would be the example in terms of how the confounding by indication would affect one, either or both of the treatment arms in that scenario?

MR. PRZYMUSINSKI:  Same objection.

THE WITNESS:  Well, in this

example, I have not talked about what the outcome is.  It's just that GERD and obesity are related.  So any study that you do related to treatment of GERD, you have to take into account obesity as a confounder there.

QUESTIONS BY MR. HONNOLD:

Q.     All right.  So let's look at this definition then in Exhibit 15.

"Confounding by indication occurs when the clinical condition or disease severity that leads a physician to prescribe a particular drug is itself associated with the outcome being studied.  Patients who receive a drug are systematically different from patients who receive a different drug - not because of the drug but because of the underlying condition that prompted the prescription.  Result:  The observed association between drug and outcome is distorted by baseline differences between groups.  In studies comparing GLP-1 receptor agonists to insulin, insulin patients are typically sicker - longer diabetes duration, higher HbA1C, more corbid" -- "more

comorbidities" -- excuse me -- "more advanced end-organ disease - independently increasing their risk of bowel complications regardless of drug exposure."

Do you see that definition and then the example?

A.    I do see that.  If I could take a moment to read it.

Q.    Sure.  Please do.

A.    Okay.  I've read this.

And your question?

Q.    And do you agree with it?

A.    I do not agree with it.

Q.    Which part do you not agree with?

A.    So I disagree with the last sentence -- the example, basically, that says -- that starts with, "In studies."

Q.    Okay.  So if we cross that sentence out, then do you agree with the definition?

A.    Yes.

Q.    Okay.  So we'll cross this out.

And so then we have, witness agrees, witness modifies, LN 4/9/26 as

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

modified.

So we have agreement, based upon that form of Exhibit 15, with those modifications as directed by you?

A. Yes.

Q. Okay. Now, I want to look at what we crossed out.

The part that says, "In studies comparing GLP-1 receptor agonists to insulin, insulin patients are typically sicker" --

Do you see that?

A. I see that.

Q. Okay.

-- "as compared to patients on GLP-1s who are not on insulin."

In general, based upon the studies that you have looked at in this case, do you recall seeing in any of those studies, in fact, data that would show that the patients on insulin had had diabetes for a longer period of time, that they had higher HbA1Cs, that they had more related comorbidities and more advanced end-organ disease?

A. I would have to look at the

individual studies.

Q.    Which study would you look at?

A.    I would have to go back to the studies to look at the ones that compare insulin and H -- insulin and GLPs.

Like I said, I don't remember all the details of every specific study.  If I have the study in front of me, I'm happy to look at it and I can comment on it.

Q.    In terms of patients that have diabetes --

A.    Uh-huh.

Q.    -- and patients that need medical therapy or treatment for diabetes, as a general matter in that population, diabetic population, are the patients who are on insulin generally sicker, taking all things into account, specifically their longer diabetes duration?  And so patients that have longer diabetes duration may have longer diabetes-related conditions?

Correct?

A.    That's not -- that's a generalization, and that's not always true.  And so when you look at the patients who are

on insulin, there are many other factors that go into why someone's on insulin beyond the severity of their illness - cost of medications, availability, other comorbidities.

So just because someone's on insulin does not mean that their A1C is higher or they have a longer duration of diabetes.  So you'd have to actually -- I'd have to look at the table to look at the demographics to see for that specific study if the group on insulin was indeed sicker, higher A1C, longer diabetes, more comorbidities, more end-organ damage.

So the fact that they're on insulin alone does not impugn that this is -- this is an assumption.  It's not necessarily true.

Q.    Okay.  If you were going to fashion your own search and that you wanted to independently evaluate the available medical literature on that issue in terms of all diabetic patients who require some form of medical therapy, anywhere from oral agents to injectables such as GLP-1s to insulin, and

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

you wanted to evaluate those issues --

A.    Uh-huh.

Q.    -- particularly the population of patients on insulin, to determine whether they are typically overall sicker in terms of having a longer diabetes duration, higher HbA1Cs, more comorbidities or more advanced end-organ disease, how would you fashion a search to come up with the answer to that issue?

MR. PRZYMUSINSKI:  Objection to the form.  Compound.

Go ahead and answer.

THE WITNESS:  So it -- you cannot do a literature search specifically looking at that.  You would have to look at the demographics of the study when you're looking for whatever endpoints, in this case ileus or IO.

I would look for the -- search for that study, look at the demographics table and look at duration of diabetes, if it was known, their hemoglobin A1C, what their

comorbidities are, and if they captured any evidence -- any data on advanced end-organ damage.

So you have to -- in order to say that this population has more of this, you have to capture that data.

QUESTIONS BY MR. HONNOLD:

Q.    So if anybody in general wanted to address that question, they would say, the only way we can look at it is to go look at studies where those populations were compared based upon those attributes?

MR. PRZYMUSINSKI:    Objection to form and vague.  I'm not sure what the question is anymore.

You can go ahead and answer.

THE WITNESS:    So if you're trying to see if a study is making -- so if you're trying to see if this assumption that patients on insulin are sicker, you would have to compare the comorbidities.  You can't assume that insulin equals sicker, because there are so many other things that go into play as to whether or not someone

is on insulin or not.

And one of the major factors is cost.  Right?  So there are patients who cannot afford a GLP, and they're on insulin.  It doesn't mean that they've had diabetes longer or they have more comorbidities.  It just has to do with the cost.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Do you know if any study specifically looked at those factors, comparing the GLP-1 population versus an insulin-taking population, on those factors of length of diabetes, diagnosis, their HbA1c and degree of comorbidities and the advancement of end-organ disease?  Do you know if any of the studies that you looked at addressed that issue?

Because you looked at all the studies, right?

A.    I did look at the studies.  I can't remember the exact details of every study.  I don't remember the demographic tables of every study.

Q.    But was there a study, or were

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

there studies, that compared the GLP-1-taking population versus an insulin-taking population on those indices?

A.    I would have to go through the studies.

Q.    Okay.  All right.  Thank you.

Doctor, to your knowledge, do GLP-1 R -- do GLP-1 RA drugs cause intussusception?

A.    I am not aware of GLP-1s causing intussusception.

Q.    Do GLP-1 RA drugs cause volvulus?

A.    I have not seen a case of GLP-1s causing volvulus.

Q.    Do GLP-1 RA drugs cause adhesive obstruction?

A.    They do not.

Q.    Do GLP-1 RA drugs cause gallstone ileus?

A.    Not that I am aware of.

Q.    Okay.  Do you know why a study would then choose to combine all of those codes and treat drug cause and unrelated events identically?

A.    I can't speak for the authors of the studies that did that.

Q.    Would you ever design a study where you would take codes, specific ICD-9 or 10 codes, and if you were looking to answer the question of whether GLP-1s were associated with ileus, would you combine the code of paralytic ileus with the codes for intussusception, volvulus, adhesive obstruction or gallstone ileus?

Would you do that if you were designing the study?

MR. PRZYMUSINSKI:  Objection to form.  Compound.  Lacks foundation.  Calls for speculation.

You can answer.

THE WITNESS:  So if you're asking if I were to design the study, I would design multiple analyses.  So I would start with a broad diagnosis which would include those codes, mainly because oftentimes with ICD-9 or 10 codes, they're imprecise, so people may code incorrectly.  So casting a broad search does help you

increase your sensitivity in terms of detecting the number of cases or events.

Then I would do an analysis where then I would narrow down the codes to the nonmechanical obstruction codes, and then to see what the outcomes are there.

And this --

QUESTIONS BY MR. HONNOLD:

Q.    Why would you break it down by the nonmechanical codes?

A.    As I mentioned, they're two -- ileus and mechanical obstruction are two different things.  So if you're trying to see if ileus, you know, or mechanical obstruction occurs at a higher rate in GLPs, then you cast a broad net.

If you're looking at whether GLPs cause ileus, then you limit it to the ileus diagnoses.

Q.    In designing the study like you said in the first instance, that you would include all of those codes, what kind of bias is being injected into the study when it's

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

done like that where you would include the mechanical codes, the mechanical obstruction codes, in the study?  What kind of bias are you injecting into the study when it's done in that fashion?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.

You can answer.

THE WITNESS:  Okay.  I want to make sure I'm using your specific terminology here.

It would be considered nondifferential misclassification.

QUESTIONS BY MR. HONNOLD:

Q.    Of the outcome?

A.    Of the -- of the outcome.

Q.    Okay.  And do you agree with the general principle as to the directional -- directional basis of nondifferential misclassification of the outcome?

Do you agree that nondifferential misclassification of the outcome tends to push the hazard ratio for

the point value towards the null?

MR. PRZYMUSINSKI:  Objection to form.

You can answer.

QUESTIONS BY MR. HONNOLD:

Q.    As a general matter?

MR. PRZYMUSINSKI:  Same objection.

Sorry.

THE WITNESS:  So we're not speaking generals.  You have to do the analysis.  And actually if you look at the Faillie study, they did do that.

So -- where they started with a broad differential, and then when they go -- when they did a separate analysis looking at a more narrow definition, you actually lose significance.

So Faillie, when they looked broadly, there was a statistically significant increased risk.  And then when they looked less broadly, so more narrowly, you lose that significance.

And if you want to hand me the

Faillie study, I'm happy to point it out to you.

QUESTIONS BY MR. HONNOLD:

Q.    You know that Faillie identified a hazard ratio of 1.69.

MR. PRZYMUSINSKI:  Objection to form.

QUESTIONS BY MR HONNOLD:

Q.    Correct?

MR. PRZYMUSINSKI:  Lacks foundation.

If she needs the study, she can have the study.

Go ahead and answer.

THE WITNESS:  Well, that study shows you that you can't assume the directionality when it comes to the nondifferential misclassification of the outcome, that you actually have to do the analysis to see what direction it goes in.

QUESTIONS BY MR. HONNOLD:

Q.    So is it your testimony in this case that the nondifferential misclassification of the outcome bias that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

exists in parts of Faillie pushes the hazard ratio away from the null?

A.    I did not say that.

Q.    Okay.

A.    So if you show me the Faillie study, I'll show you exactly what -- where and what I was talking about.

Q.    Okay.  And so give me -- give me a hypothetical example of how nondifferential bias of the outcome can move the point value or hazard ratio actually away from the null.

A.    I can't give you a hypothetical example.  I have with the Faillie study a concrete example where this occurred.

I don't assume that when there's bias it's going to go in any direction.  That's why, when you do these studies, you have to account for confounders, biases, and include that in the analyses.

Q.    In your study, or in your report, Exhibit 2 -- and I guess I'm looking at that portion of your report, I guess, from pages 17 through 22.

Do you specifically include

anything in the text where you provide an explanation or specific evaluation as to how nondifferential misclassification of the outcome manifests or shows up in the Faillie study?

Because if you do, point it out to me.  I want to see where you say that in Faillie nondifferential misclassification of the outcome is specifically discussed in your report, as evidenced by certain parts of the data.

A.    Because in my report, I don't call out nondifferential misclassification of the outcome.

The discussion about Faillie and the directionality of the outcome, when you look at nondifferential misclassification of the outcome, was in response to their question.

Q.    Okay.  I get that.

But if you're saying that you think that it manifests in the Faillie study, or Faillie, however you -- oh, there's a -- there's a medicine -- I want to clear it up so I ask it right.

There's a -- are you familiar
with the medicine called Contrave?

MR. PRZYMUSINSKI:  Contrave?

THE WITNESS:  Contrave?

QUESTIONS BY MR. HONNOLD:

Q.    Oh, is that -- how is it
pronounced?

A.    Contrave?

Q.    Oh, I thought it had a fancy
kind of like -- it's pronounced Contrave.

What kind of medicine is that?

I must have heard -- I thought
I heard the commercial said Contrave, but
it's Contrave?

A.    I'm familiar with the name.
I'd have to look at the --

Q.    Okay.  All right.  We'll talk
about that in a bit.

But you -- I think you've told
me that Faillie was impacted by
nondifferential misclassification of the
outcome, and I want to know whether you
specifically analyzed that or said that in
the text in your report.

Did you specifically say the

findings of Faillie, the hazard ratio, odds ratio, relative risk, is inherently unreliable or different than stated due to nondifferential misclassification of the outcome?

Do you say that anywhere in your report?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered repeatedly now.  Also mischaracterizes the testimony.

You can go ahead and answer.

THE WITNESS:  I do not say that specifically in my report regarding Faillie.

The reason I talked about the effects of the nondifferential misclassification of the outcome on directionality was in response to the assumption here that when this misclassification bias occurs, that it only goes in one direction.  It's an example where you can't assume which direction hazard ratios go without doing the study.

QUESTIONS BY MR. HONNOLD:

Q.    Which way does it go in Faillie?

MR. PRZYMUSINSKI:  You can give her the study.  You can ask --

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Let me ask you this.

Does your report say which way it goes in Faillie?  Which way the nondifferential misclassification of the outcome bias in Faillie, which way it pushes the hazard ratio?

Do you say that in your report?

A.    I did not put it in my report. I used it as an example to address your question about the directionality of the hazards ratio.

Q.    So does the impact of nondifferential misclassification of the outcome bias in Faillie push the hazard ratio higher, meaning more than 1, or push it lower, more towards 1?

MR. PRZYMUSINSKI:  Objection to form.  She's asked repeatedly for the study.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. HONNOLD:  She's not --

MR. PRZYMUSINSKI:  She did, actually.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Do you say it in your report which way it pushes?

A.    I've already said I did not say in my report which direction.  I don't use the terms "nondifferential misclassification" of the outcome in my report.

If you give me the article or the paper, I'm happy to show you and review it.

Q.    Is it your opinion in this case that the hazard ratio in Faillie is unreliable because of nondifferential misclassification of the outcome?  Is that your opinion in this case?

And if so, is that stated anywhere in your report?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered repeatedly.

You can go ahead and answer.

THE WITNESS:  When I looked at the studies, I looked at the totality

of the evidence, the number of studies that showed positive or negative or null.

I took the study results as they were with their limitations, and I did not do a separate meta-analysis. I did not weigh them differently based on their limitations.

I looked at the studies using the GRADE methodology and taking the total sum of the evidence and incorporating them into my opinion.

So there was not one direction, one study, one bias that affected my opinion.

MR. HONNOLD:  Okay.  So that's all great and very interesting.  I move to strike it because it's nonresponsive.

QUESTIONS BY MR. HONNOLD:

Q.    Is it one of your opinions in this case that the hazard ratio in Faillie is unreliable due to nondifferential misclassification of the outcome?  Is that -- is that an opinion that you have in this

case?

A.    I did not make any conclusions about the reliability of the Faillie case in my -- in the Faillie study in my report based on the nondifferential misclassification of the outcome.

Q.    Okay.  Then is it your opinion in this case that the effects of nondifferential misclassification of the outcome in Faillie push the hazard ratio towards the null?  Is it -- is that your opinion in this case?

A.    If I could please see the study, I'm happy to look at it.

Q.    Have you written -- have you written it -- you told me at the beginning of this that your opinions are set forth in the report.

And so I just want to know is, is it an opinion that you have in this case that nondifferential misclassification of the outcome as it relates to the Faillie case pushes the hazard ratio towards the null?  Is that an opinion that you have expressed specifically in this case or not?

MR. PRZYMUSINSKI:  Okay.  I'm going to object again on multiple grounds.  It's been asked and answered repeatedly now.  It's getting harassing at this point.

MR. HONNOLD:  She's not answered the question.

MR. PRZYMUSINSKI:  You were asking two different questions.

MR. HONNOLD:  Lucas --

MR. PRZYMUSINSKI:  I'm sorry, Brad, give me a second.

You're asking her if it's written in her report.  She said it's not.  She also explained to you what her opinion was, and she's also asked you for the study.

If you refuse to give her the study and the opportunity to respond to it, she's going to keep repeating the same thing, which is what she's doing.  I don't know what else to do for you guys.

So give her the study or move on.  I don't know what else to do

here.

MR. HONNOLD:  I just want to ask her if that's an affirmative opinion that she has.

MR. PRZYMUSINSKI:  I think she's already expressed that.

But please go ahead and answer.

QUESTIONS BY MR. HONNOLD:

Q.    I'm not sure that you've answered it.

Do you have an affirmative opinion in this case, meaning one way or the other, that nondifferential misclassification of the outcome makes the hazard ratio in Faillie unreliable?

Is that your opinion or not?

A.    That is not my opinion --

Q.    Thank you.

A.    -- regarding the Faillie study specifically related to the -- your question about the nondifferential misclassification of the outcome.

Q.    And why is it not your opinion that nondifferential misclassification of the outcome renders the hazard ratio in Faillie

unreliable?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes testimony.

You can go ahead and respond.

THE WITNESS:  Honestly, I'm not sure what you're trying to ask me at this point.

In terms -- just -- I'm actually not sure what you're trying to ask me.

QUESTIONS BY MR. HONNOLD:

Q.    I'm just trying to understand whether -- one of your criticisms of Faillie that you are making as an affirmative opinion where you, Dr. Nguyen, are saying, I am going to testify in this case that Faillie is unreliable, the hazard ratios in Faillie are unreliable because of nondifferential misclassification of the outcome, I just want to know, is that testimony you're going to give in this case?  Based upon what you've written in your report.

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered repeatedly.

Go ahead and answer if you want

at this point.

THE WITNESS:  I have forgotten what the question was now.

In terms of the Faillie study specifically, I'm not saying it's reliable or unreliable.  I'm looking at the whole evidence of it.

The misclassification -- the nondifferential misclassification of the outcome is one bias among many other biases that can occur in observational studies.

So you have to look at all aspects of the study, the entirety of the -- of the scientific literature out there, because there's no one perfect study that you can say, this study gives you causality or association, or this study is so bad, you have to omit it.

I look at all the studies, whether they're positive, negative or null.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  I understand that.

You've said that many times.  And I'm just trying to understand what your opinion is, if any, on the specific impact of nondifferential misclassification of the outcome on Faillie.

And so here's my question one more time.  And if you say you don't have an opinion on that or you've not considered it, that's fine.

Do you have an opinion in this case, that you have written down anywhere in your report, Exhibit 2, where you say that the hazard ratio in Faillie is higher or lower than stated due to the impact or effects of nondifferential misclassification of the outcome?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.

I guess you can tell him if it was written down in your report.

Go ahead.

THE WITNESS:  It was not written down in my report.

QUESTIONS BY MR. HONNOLD:

Q.    Thank you.

Can you give me your best working definition of nondifferential misclassification by indication?

MR. PRZYMUSINSKI:  Objection to form.

THE WITNESS:  So you want my definition of --

QUESTIONS BY MR. HONNOLD:

Q.    We've talked about nondifferential misclassification of the outcome.  Now I want your best working definition of nondifferential misclassification of indication.

A.    I'm not an epidemiologist, and I can't -- I cannot pull that definition out of the air.

Q.    Okay.  I cannot tell from reading your report whether it is your opinion in this case that some GLP-1 medications, including liraglutide, are in fact protective of ileus.

Is that an opinion that you are stating affirmatively in your report, Exhibit 2?

A.    I'm not stating that GLP-1s are

protective of ileus.

If you look at the data in the hazards ratio, it would suggest that it is protective.  I look at that actually in the totality rather than adding up the hazards ratio of no effect.

Q.    Did you undertake a Bradford Hill analysis to determine whether or not liraglutide could be protective of ileus or intestinal obstruction?

A.    So in order to do a Bradford Hill is really to look at causation.  And you have to start by saying that there's an association.

I did not do a Bradford Hill to see if it was protective of because my interpretation, or the way I utilize the net -- the hazard ratios or odds ratios of less than 1, was that there was no effect.

So in total, when I take all of the data together, my conclusion is, is that GLP-1s do not have an effect on ileus or obstruction.

Q.    How do you specifically explain data that would show a hazard ratio

between -- with the use of liraglutide and ileus and bowel obstruction that is less than 1 with a confidence interval that does not cross 1?

A.    Can you clarify what you're trying to ask?  What --

Q.    How do you explain that data is not protective if, in fact, there's a hazard ratio that is less than 1 and a confidence interval that does not cross 1?  That its upper and lower ranges are both less than 1 at P, less than .05?

How do you explain that data then -- or put it into context that it is not protective?

A.    So if you look at the study in isolation, then the interpretation would be it is protective.

But when you think about mechanism of action, and just even clinically, it doesn't necessarily make sense or I'm not seeing it.  So the way I interpreted it was that a protective effect statistically is more of a null effect.

Q.    Why doesn't it make sense from

the mechanism of action perspective or the clinical perspective?  You used those words. I want to understand exactly what you meant.

A.    Yeah.  So in terms of the mechanism effect, we see inconsistent results on the effects on small bowel transit as well as colon transit.

In terms of clinically, I'm not -- I don't see this in terms of, you know, patients on it who have had bowel obstructions on a GLP, who now have fewer bowel obstructions.

(Nguyen Exhibit 16 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I now have Tab 9 that we're going to mark as Exhibit Number 16. Specifically now I want to talk about the definition of biological plausibility.

I'm going to use the one that I've marked.  I'm going to hand you one to look at and counsel.

Doctor, this definition of biological plausibility, this comes from the original Bradford Hill paper.  But just since

you -- I'm not going to make you take my word for it.  I'm going to cross that source out and then ask you if you agree with this definition of biological plausibility.

"Biological plausibility refers to the existence of a credible biological mechanism by which an exposure could produce the observed outcome.  It is one of Sir Austin Bradford Hill's nine criteria for evaluating whether an association between an exposure and a disease is causal.  Biological plausibility does not require proof of mechanism - it requires that a plausible mechanism exists consistent with established biological knowledge.  When a known pharmacological action of the drug directly predicts the observed adverse effect, plausibility is strong."

Do you agree with that definition?

A.    I agree that it is one of the nine criteria in evaluating --

Q.    As stated here?

A.    Without looking at the direct source from the paper, it looks correct to

me.

Q.    Okay.  So I'm going to say, witness agrees, LN for Linda Nguyen, MD, 4/9/26.

And just to take into account your explanation, could -- should I say, based on current understanding?  Would that be fair to say?

Or it is one of nine criteria?

A.    It is one of nine criteria.

Q.    Do you yourself, Dr. Nguyen, recognize a biological plausibility argument related to the use of GLP-1 RA medications and drug-induced gastroparesis?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  Can you restate the question?

QUESTIONS BY MR. HONNOLD:

Q.    Sure.

Dr. Nguyen, do you recognize a biological plausibility argument to support the finding of a causal -- of causality between GLP-1 RA medications and drug-induced

gastroparesis?

MR. PRZYMUSINSKI:  Same
objection.

THE WITNESS:  So in terms of
biological plausibility and the
diagnosis of drug-induced
gastroparesis, as I have defined in my
report, that -- yes, there is a
biological plausibility that GLP-1s
can cause drug-induced gastroparesis,
but there is no biological
plausibility for chronic
gastroparesis.

QUESTIONS BY MR. HONNOLD:

Q.    What's the biological
plausibility argument for drug-induced
gastroparesis?  How would you state it in as
much as detail as you can provide?

A.    I'm not sure how much -- what
detail you're looking for.

We know that GLP-1s can delay
gastric emptying.

Q.    And then what's the biological
plausibility argument that it -- that it's --
that it can cause drug-induced gastroparesis?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    I mean, by definition, if they have -- if they're on the drug and it is known -- the gastric emptying is delayed and they have symptoms, then it's drug-induced gastroparesis.

Q.    Thank you.

(Nguyen Exhibit 17 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I now have Tab 11 that I'm going to mark as Deposition Exhibit Number 17.

I want to ask you now about the concept of dechallenge/rechallenge.  And I'm going to hand you -- oh, wait, I'm going to switch you back.  I'm going to keep the one that's marked because we're putting those in a pile.  I'm going to give you one that's not marked and one to counsel.

We're going to put this, Exhibit 17, under the camera and to look at these definitions.

And in terms of its definition in terms of the dechallenge part. "Dechallenge.  Discontinuation" --

Dechallenge is "discontinuation of a suspect drug to observe whether the adverse effect resolves.  If symptoms improve or resolve after the drug is stopped, this constitutes evidence that the drug was causing or contributing to the condition."

Do you see that definition?

A.    I do see that.

Q.    Do you generally agree with that as a definition for dechallenge?

A.    I would need a little bit more specificity on what one means by condition as opposed to symptoms.

Q.    Okay.  So we would find agreement if we -- if I cross out the word "condition" and put "symptoms"?

A.    Yes.

Q.    All right.  And then if we look at rechallenge.  Rechallenge is the "reintroduction of the same drug after dechallenge to observe whether the adverse effect recurs.  Positive rechallenge - symptom recurrence upon reintroduction - is among the strongest available evidence of drug causation in clinical practice."

That definition for rechallenge, do you agree with that?

A.    I can't speak to the term "strongest."  I'm not sure about that one.

Q.    Would you agree with it if we said is strong evidence of drug causation in clinical practice?

MR. PRZYMUSINSKI:  Object to form.

THE WITNESS:  I -- I don't know in terms of -- yeah, in terms of the strength of this rechallenge.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Could we say is evidence of drug causation in clinical practice?

If we strike out this, "among the strongest available," and leave it, "is evidence of drug causation in clinical practice," then do you agree with that definition of rechallenge?

MR. PRZYMUSINSKI:  Objection to form.  Still vague.

THE WITNESS:  And what is the causation we're talking about here?

QUESTIONS BY MR. HONNOLD:

Q.    The causal association. Causation.  This is -- what -- do you know whether dechallenge/rechallenge is part of Bradford Hill?

A.    I believe it is part of Bradford Hill, but the causation needs more specificity.

Are we talking about a symptom? A disorder?  A condition?

Q.    How would you want it to -- how do you want it?  Evidence of drug causation of symptoms?  Because I'll gladly do that, because the upper part talks about symptom recurrence.

You see that, right?  "Symptom recurrence upon reintroduction is evidence of drug causation of symptoms in clinical practice."

If we put "symptoms" in there, would we then have agreement?

A.    I would be okay with that.

Q.    Yes?

A.    Yes.

MR. PRZYMUSINSKI:  Brad, are we

taking the sources off this one, too?

MR. HONNOLD:  Oh, sure.  Let's take all that out.

And so we have witness agrees, witness modifies, witness notes LN, for Dr. Nguyen, 4/9/26 as modified.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Thank you.

All right.  Doctor, as a general matter, do anticholinergic medications tend to slow intestinal motility?

A.    They do.

Q.    And why do they do that?

A.    They slow motility by working on the nerves and the smooth muscle.

Q.    Okay.  And do they act upon any receptor sites?

A.    Acetylcholine.

Q.    Okay.  And so anticholinergic drugs go and have affinity towards certain receptor sites.

Is that true?

A.    Correct.

Q.    And specifically they have affinity towards binding to or binding with

acetylcholine receptor sites.

Correct?

A.    That is correct.

Q.    Okay.  Now, as a general matter, can you explain to all of us this concept of this -- I think we call it a biological process of receptor agonist and receptor sites leading to a physiologic response.

Can you explain that generally as it relates to certain medications like we've talked about with anticholinergics?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  I'm sorry.  Is your question specifically about anticholinergic medications and how they bind to receptors?

QUESTIONS BY MR. HONNOLD:

Q.    Yes.  Explain that, I mean, to a lay audience who hears about a medication being a receptor agonist, then that medication going and binding, or having affinity to bind, with a receptor site that

then leads to a specific physiologic response.

Can you just, in the context of anticholinergic drugs, explain that?

A.    So just to take a step back, an agonist is actually activating a receptor. An antagonist blocks the -- either blocks the receptors itself or blocks the molecule that is supposed to activate the receptor.

So in the -- in the situation of the GLP receptor, this is the incretin that is activating the receptor with the acetylcholine -- with the anticholinergic. It's blocking the effects of acetylcholine on the receptors.

Q.    Okay.  And then how does that result in a physiologic response, meaning some observable result or reaction in the body?

A.    Yeah.  So acetylcholine, when you activate the acetylcholine receptor, it increases contractility.  So it induces contractions.  When you block that receptor, then it slows down.  It decreases the contractions.

Q.    And in anticholinergic drugs, is that decrease in contractions, is it significant or sufficient enough to result in ileus in some patients?

MR. PRZYMUSINSKI:  Objection to form.  Outside the scope of her report.

You can answer, if you're able to.

THE WITNESS:  Yeah.  So anticholinergics are risk factors for ileus.  There's actually no data, and I tried looking for this, that anticholinergics by itself can cause ileus without any other risk factors, so prior surgery, inflammation.

So now if you take high enough doses of anticholinergics at, you know, more -- like, overdose levels, then, yes, you can see ileus in that scenario.

QUESTIONS BY MR. HONNOLD:

Q.    Do anticholinergic drug labels, to your knowledge, warn of the effects of delayed bowel motility?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    You would have to show me the label.

Q.    All right.  Now, on GLP-1s, that has RA in the -- in the title of the drug.

Correct?

A.    Yes.

Q.    GLP -- let's do it -- let's do it this way.  Let's make a new picture.

(Nguyen Exhibit 18 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So on this new picture with Dr. Nguyen's stationery with today's date, we're going to put up here GLP -- then it's hyphen, right?

A.    Yes.

Q.    Hyphen 1, and then capital R, capital A.

Right?  Drugs?

A.    Okay.

Q.    So in talking about this class of drugs, what does that RA stand for?

A.    It stands for receptor agonist.

Q.    And so do GLP-1 RA drugs, do

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

they agonize some receptors in the body?

          A.     They activate the GLP-1 receptors.

          Q.     And so the GLP-1 receptors, what are they, and where do they exist in the body?

          A.     I'm not sure what you mean by what are they.

          Q.     Well, we've been talking about these receptors like they're, I don't know, like a -- like a lock on a door or something.

               I mean, what are they in the body?  Are they proteins?  Are they hormones?  Are they neurotransmitter chemicals?

               I'm just trying to -- trying to understand exactly what a receptor is, and the GLP-1 receptors, where are they?

          A.     So GL -- if you think about the GLP receptor, it's like a lock.  And the GLP peptide, or the hormone, is a key that activates that lock.

               And then when you activate that, then there is a cascade of activities that occur and results in a function.  And so it's sort of -- there is downstream

functioning here.

Depending on what area of the body you're looking at, the activity's different.  So there's GLP in the intestine.  GLP is made by the intestine, the pancreas and the brain.  So that's where they are made.

And they have activity in the brain, heart, GI tract, the pancreas, muscle and kidney.  It's here in Figure 1 of my report.

Q.    Okay.  So they're made in the intestine, the pancreas and the brain.

Right?

And then you said activity where?

A.    In the brain, the heart, the GI tract, the pancreas, muscle and kidneys.

Q.    Activity in brain, heart, GI tract, pancreas?

A.    Pancreas.

Q.    And what else after pancreas?

A.    Muscle.

Q.    Skeletal or smooth?

A.    Skeletal.

Q.      What about smooth muscle?

A.      Well, it's the smooth muscles of the GI tract.

Q.      Okay.  Okay.  And the physiologic response when there's activation of the GLP-1 receptor in the smooth muscle of the GI tract, what is that?  What's the physiologic response?

A.      I mean, it depends on which area of the body you're -- it's activating.

Which area would you like me to talk about?

Q.      Small bowel.

A.      So in the small bowel, we can see decrease in the migrating motor complex from the standpoint of that -- what that results in.  We're seeing in some individuals that accelerates gastric emptying -- or not gastric emptying -- accelerates small bowel transit.  In others it delays small bowel transit.

Q.      Decrease or increase in what transit?

A.      Small bowel.

Q.      And when there's a decrease in

Linda Nguyen, MD

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

small bowel transit, are there physiologic

responses or symptoms that can then result?

MR. PRZYMUSINSKI:  Objection to

form.  Just vague.

THE WITNESS:  So the --

MR. PRZYMUSINSKI:  So hold on.

I'll object to the form.

Vague.  Calls for speculation.

You can answer.

THE WITNESS:  Thank you.

So activation of the GLP

receptor and the effects on the

physiology does not necessarily result

in symptoms.

QUESTIONS BY MR. HONNOLD:

Q.    Can it?

A.    It can.

Q.    Okay.  And so when there's a

decrease, then what -- and there are

symptoms, what are those symptoms?

MR. PRZYMUSINSKI:  Objection to

form.  Vague.

You can answer.

THE WITNESS:  It typically --

the role of the GLP receptors in the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

small bowel natively is to induce satiety and slow small bowel transit so that you stop eating.  So induces satiety.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So the slow -- slower small bowel transit leads to increased satiety.

Is that true?  And we'll say fullness?

A.    It leads to satiety.  It's a satiation.

Q.    Leads to increased satiety, fullness feeling?

A.    Yeah.  Together that means satiation.

Q.    Satiation.  And I'm going to put "spelling" there.

Okay.  And so when small bowel transit time is increased, does that mean intraluminal bowel contents stay within the small bowel for a longer period of time?

A.    Not necessarily.

Q.    But can it?

A.    It depends on how much longer

you're talking about in terms of the increase.

Q.    Well, can, is it possible, that small -- that slower small bowel transit time results in intraluminal bowel contents remaining within the bowel for a longer period of time?

MR. PRZYMUSINSKI:  Objection to form.

QUESTIONS BY MR. HONNOLD:

Q.    Can it?

MR. PRZYMUSINSKI:  Vague.

Are we talking about GLP-1-related or generally?

MR. HONNOLD:  No, we're talking about GLP-1 right now.

MR. PRZYMUSINSKI:  Okay.

THE WITNESS:  Okay.  So I would need to know more information.

The question, are you talking about small bowel?  Large bowel?

QUESTIONS BY MR. HONNOLD:

Q.    Let's talk about small, because you said small bowel transit time.

A.    Okay.  The second question is,

how much delay or how much more increase in small bowel transit are we talking about?

Q.    You're the doctor.

Let's do it this way.  It is, like, all physiologic responses in response to a drug, it can vary from patient to patient.

True?

A.    True.

Q.    Okay.  So the range of the physiologic response may be not that much in some patients and could be a lot more in some patients.

True?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

THE WITNESS:  The reason I'm asking for specifics is when you look at small bowel transit and what's normal small bowel transit, it ranges from two hours to six hours.  So even if you increase the small bowel transit and it's within that two to six-hour range, the likelihood that you're going to have a problem is very

low.  I haven't seen it.

QUESTIONS BY MR. HONNOLD:

Q.      Yeah.  But you know that a patient's stasis point -- for example, if a patient's normal small bowel transit time is two and a half hours and you double it to five, that doesn't absolutely mean that that patient won't have any symptoms just because they're within the population range of normal, does it?

That's not what you're saying?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Calls for speculation.

You can answer.

THE WITNESS:  I can't speak on a specific patient without looking at the information.

What I'm telling you is that small bowel -- normal small bowel transit is between two and six hours.

So to answer your question about slowing of small bowel transit and leading to stasis, I would need to know how much more there was a delay,

what were they starting at and where do they end at.

I can't make a generalization that you're asking for.

QUESTIONS BY MR. HONNOLD:

Q. Doctor, is it true that constipation results from reduced GI motility generally?

A. It depends on which area of the GI tract is slow.

Q. Okay. In which area of the GI tract does slowing -- or can slowing result in constipation?

A. That would be the large bowel.

Q. Okay.

MR. PRZYMUSINSKI: Brad, we've been like an hour and 20, so when you have a good moment, please.

MR. HONNOLD: Okay. So let's just go where we left off.

QUESTIONS BY MR. HONNOLD:

Q. You were with me in terms of how we -- how we talked through these matters on Exhibit 18.

Correct?

A.    Yes.

Q.    Where we just talked about --
generally about receptor agonists and
receptor sites?

A.    That is correct.

(Nguyen Exhibit 19 marked for
identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  And then we went to the
next page, which is Exhibit 19, where we said
in the small bowel, there may be decrease or
increase in small bowel transit, and when
there's a decrease, symptoms -- there may be
symptoms from slower small bowel transit but
not always.

Correct?

A.    That is correct.

Q.    And the symptoms may result in
increased -- may result in satiety or a sense
of fullness.

Correct?  Or satiation?

A.    Correct.

MR. HONNOLD:  Okay.  Great.
Let's take a break.  Thank you.

VIDEOGRAPHER:  Okay.  We are now going off the record, and the time is 1:44 p.m.

(Off the record at 1:44 p.m.)

VIDEOGRAPHER:  We are now going back on the record, and the time is 2:05 p.m.

QUESTIONS BY MR. HONNOLD:

Q.    Doctor, we're back on the record now after an afternoon break.

Are you ready to continue?

A.    Yes.

(Nguyen Exhibit 20 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    I want to hand you now what's been marked as Exhibit 20.  And Exhibit 20 is your materials considered list.

And how did the --

MR. PRZYMUSINSKI:  Brad, I think you already marked it.

MR. HONNOLD:  Oh, did I already do it?

MR. GISMONDI:  Is that Exhibit 5?

MR. PRZYMUSINSKI:  I think we did.

MR. HONNOLD:  Oh, it's 5?

MR. PRZYMUSINSKI:  Yeah. Because I think we did --

MR. HONNOLD:  Well, since I marked it, say it's 5 or 20.  So you can either keep 20 in front of you or use 5.  I'm sorry about that.

QUESTIONS BY MR. HONNOLD:

Q.    And can you explain to me how Exhibit 5 or 20 came to be?  How you created it and why?

A.    Basically, this is a list of the things that I reviewed in drafting this report.  Not everything made it into my report, but I reviewed it, so it's here.

Q.    Okay.  I want to ask you specifically about some studies.

The Faillie report that we've talked about, is it something that is on your materials considered list?

A.    It is.

(Nguyen Exhibit 21 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.   Okay.  And I just want to confirm something just very -- a couple of things just very simply for cross-reference and accuracy.

I'm going to hand you Tab 27, which we are going to mark as Exhibit 21, which is a copy of the Faillie paper without supplemental materials.  But I don't -- for the purposes of these questions, we don't need supplemental materials.

Is that the Faillie paper that is listed in your materials considered list?

A.   Yes.  Yes, this is the article.

Q.   Okay.  So we have marked that as -- what exhibit number is that?  20?  21?

All right.  So with all the discussion that we've had on the record about Faillie, that paper is Exhibit 21.

Is that correct?

A.   That is correct.

Q.   It's on your materials considered list.

Correct?

A.   That is correct.

Q.    Doctor, in your role as an expert witness in this case, I can ask you to assume certain things and I can ask you hypothetical questions.

If you assume as true that the Faillie study found a hazard ratio of 1.69 for intestinal obstruction or ileus compared to SGLT-2 inhibitors that was statistically significant.  And when postsurgical patients were excluded in the sensitivity analysis, the hazard ratio rose to approximately 2.32, confirming the signal was not driven by surgical co-founders.

A.    Can you show me where you're reading that from?

Q.    Sure.

Do you not recall that from the study?

A.    It's a vague recollection, but I would like to see where you're reading that from.

Q.    Okay.  If you look at -- if you look at the abstract, you see where it says, "Glucagon-like peptide-1 receptor agonists and dipeptidyl peptidase-4 (DPP-IV)

Linda Nguyen, MD          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

inhibitors might increase the risk of intestinal obstruction, but real-world evidence for this severe adverse event is lacking.  Thus, the objective of this study was to determine whether GLP-1 RAs and DPP inhibitors are associated with an increased risk of intestinal obstruction compared with sodium-glucose cotransporter-2 (SGLT-2) inhibitors.  We used the United Kingdom Clinical Practice Research Datalink and linked databases to assemble two new-user, active comparator cohorts."

Do you see that?

A.     So I was following you until you got to the UK.  Did you jump?

Q.     No.  "We used the United Kingdom Clinical Practice Research Datalink and linked databases to assemble two new-user, active comparator cohorts."

Do you see that?

A.     I see that.

Q.     Okay.  "The first included 25,617 and 67,261 GLP-1 RA and SGLT-2 inhibitor users respectively."

Do you see that?

Linda Nguyen, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.      I see that.

Q.      Then "the second included 131,927 and 40,650 DPP-IV inhibitor and SGLT-2 inhibitor users respectively."

Do you see that?

A.      I see that.

Q.      "Propensity score fine stratification weighted Cox proportional hazards models were fit to estimate hazard ratios and 95 percent confidence intervals, CIs, of intestinal obstruction requiring hospitalization."

Do you see that?

A.      I do see that.

Q.      Then it says, "GLP-1 RAs were associated with an increased risk of intestinal obstruction compared with SGLT-2 inhibitors, 1.9 versus 1.1 per 1,000 person-years respectively; hazard ratio of 1.69."

Do you see that?

A.      I see that.

Q.      "95 percent confidence interval from 1.04 to 2.74.  The highest hazard ratio was observed after 1.6 years of use, where

their hazard ratio was 3.48 with a 95 percent
confidence interval of 1.79 to 6.79.  The
DPP-IV inhibitors were also associated with
an increased risk, 2.7 versus 1 per 1,000
patient-years, a hazard ratio of 2.59 with a
95 percent CI of 1.52 to 4.42, with a highest
hazard ratio observed after 1.8 years of use.
The number needed to harm after one year of
use was 1.223 and 603 for GLP-1 RAs and
DPP-IV inhibitors, respectively.  In this
large real-world study, GLP-1 RAs and DPP-IV
inhibitors were associated with an increased
risk of intestinal obstruction."

Do you see that?

A.    I do see that.

Q.    Did I read that correctly?

A.    You did read that correctly.

Q.    Anywhere in your report,
Exhibit 2, did you say the Faillie study
authors stated, quote, "In this large
real-world study, GLP-1 RAs and DPP-IV
inhibitors were associated with an increased
risk of intestinal obstruction"?

Did you state that
specifically?

A.    I do not see that I've stated that specifically.

Q.    Okay.  Anywhere in your report, Exhibit 2, do you specifically state or explain how it is that that statement of the authors in this large real-world study, GLP-1 RAs were associated with an increased risk of intestinal obstruction?

Did you state in your report anywhere your evaluation, analysis or estimation as to whether you were stating that the Faillie results were inaccurate, misleading, the result of chance, bias, confounding, random error, anything like that?

Do you say yourself in there, in your report, that Faillie was -- is unreliable for specific certain reasons?

MR. PRZYMUSINSKI:  Objection to form.  Asked and answered.  Also objection to form.  Compound.

You can answer.

THE WITNESS:  I'm sorry, you listed a number of things.

QUESTIONS BY MR. HONNOLD:

Q.    Uh-huh.

A.    Can you please restate the question?

Q.    Sure.

Do you say anywhere that -- for any reason, whether it's random error, some form of bias, some form of confounding, anything like that, do you say in your report, Faillie really should be discounted or not taken seriously because of one reason or another?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  So to be clear, I did not discount any studies in terms of not including them in the evidence, either for the risk of obstruction or against the risk of obstruction.

I looked at everything in total.  So I would not have written to discount Faillie because I did not discount it.  I took it into account.

QUESTIONS BY MR. HONNOLD:

Q.    Did you write anywhere in your report that Faillie should not be viewed as evidence of an association between GLP-1 RA use and increased risk of intestinal obstruction?  Did you write that in your report?

MR. PRZYMUSINSKI:  Objection to form.  Previously asked and answered.

You can go ahead and answer.

THE WITNESS:  Again, I'm not following the question.

What were the specific words?

QUESTIONS BY MR. HONNOLD:

Q.    Specifically, did you write in your report that Faillie should not be taken as evidence of an association between GLP-1 RA use and an increased risk of intestinal obstruction?

MR. PRZYMUSINSKI:  Same objection, please.

THE WITNESS:  Again, I did not dismiss Faillie as evidence.  I looked at all of the evidence together, including Faillie.

QUESTIONS BY MR. HONNOLD:

Q.   Okay.  I understand that.

But did you say that Faillie, in and of itself, should not be viewed as evidence of an association?

Did you say it or not?

MR. PRZYMUSINSKI:  Same objections, please.

THE WITNESS:  I did not say in my report that Faillie should be discounted.

What I talk about is taking all of the evidence, Faillie and others, into consideration when I made -- when I came up with my opinion.

QUESTIONS BY MR. HONNOLD:

Q.   Okay.  In your report, did you write anything about how the Faillie study at one point excluded postsurgical patients in the sensitivity analysis?

Did you mention that one way or the other?

MR. PRZYMUSINSKI:  Hold on.  Okay.

THE WITNESS:  Counselor, can

you show where you were reading that they excluded prior intestinal obstruction?

QUESTIONS BY MR. HONNOLD:

Q.    Let's do it this way.  In your report, is there any comment about excluding postsurgical patients in the sensitivity analysis?

Did you mention that in your report?

A.    I just want to make sure I'm looking at that section in the study itself before I comment on whether I included it or excluded it in my report.

Q.    Okay.  So as you sit here right now, you don't know whether or not Faillie excluded postsurgical patients in the sensitivity analysis.  As you sit here right now, you don't know that?

MR. PRZYMUSINSKI:  Objection to form.

I think she asked you to point her to where you're --

MR. HONNOLD:  I'm not going to point it out to her.  I'm just going

to ask her if she was aware of it.

MR. PRZYMUSINSKI: Okay.

THE WITNESS: I need to go back and review this in terms of the area for excluding -- I do not want to misspeak on what I've included or not included without knowing the exact details of what I am referring to.

So if I could -- if I could have a moment to review the methodology --

QUESTIONS BY MR. HONNOLD:

Q. I'll withdraw the question. I'll withdraw the question.

In designing a study like Faillie, do you have any understanding as to why postsurgical patients might be excluded in the sensitivity analysis? Why that would be a sensible thing to do?

MR. PRZYMUSINSKI: Objection to form. Same objection.

QUESTIONS BY MR. HONNOLD:

Q. From the study design perspective.

A. From a study design

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

perspective, the patients with intestinal obstruction are at higher risk of having recurrent obstruction.

Q.    But why would you want to include postsurgical patients?

A.    Because postsurgical -- because surgery is the greatest risk factor for bowel obstruction.

(Nguyen Exhibit 22 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.    Thank you.

If you go back to Exhibit 5 or Exhibit 20, your materials considered list, there is, I think, a paper called Gao, et al., G-a-o.  It's on the fourth or fifth page in the Gs.

I'm going to hand you from Tab 43, and that we've marked as Exhibit 42 {sic}, the Gao paper.

Can you just verify that that exhibit is, in fact, Exhibit 22?

MR. PRZYMUSINSKI:  Do I have a copy for me, Brad?

MR. HONNOLD:  I just put it

right there.  I put it right there.

I'm sorry.  I tossed it and your hand

wasn't there.

QUESTIONS BY MR. HONNOLD:

Q.    Is that the same paper that you

list --

A.    It is the same paper.

Q.    Okay.  In your report, do you

specifically discuss any aspect specifically

of the Gao paper, either the study design or

any of the hazard ratios that were identified

for any of the comparisons between GLP-1 and

other comparators?

Do you specifically discuss

that in your report?  The Gao paper?

A.    I did not specifically talk

about the Gao paper.

Q.    Okay.  Tell me why you didn't

discuss the Gao anywhere in your report.

Specifically why you chose not to write about

it at all.

A.    So I did not include it in my

report because it was included in Dr. Dore's

report and his analysis.

It wasn't a study that adds or

takes away from the discussion.  It was one piece of evidence among the various studies that were included in Dr. Dore's report.

Q.    You don't think Gao provided an important corollary or connection between the data in that paper and what's in the Ueda study?

MR. PRZYMUSINSKI:  Objection to form.  Vague.  Lacks foundation.

THE WITNESS:  I did not say that the Gao study was not important.

What I said was that it did not add any substance to what I was already writing here.

And as I referenced in my report, that I refer to Dr. Dore's report, and he does discuss Gao in detail.

QUESTIONS BY MR. HONNOLD:

Q.    And because Dore talked about it, you chose not to?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes testimony.

You can answer.

THE WITNESS:  I did not feel it

was necessary to discuss the details of Gao because it did not impact any specific details in my report.

(Nguyen Exhibit 23 marked for identification.)

QUESTIONS BY MR. HONNOLD:

Q.      If you go to your Exhibit 5, there's a paper called Alkabbani, A-l-k-a-b-b-a-n-i, et al.

I want to also cross-reference again.  So for Tab 30, we're going to mark as Exhibit 23, I'm going to hand you the Alkabbani abstract.

And you'll see that Alkabbani found a hazard ratio of 1.37 across 313,342 matched pairs.

Do you see how that's described?

A.      I do see that.

Q.      Okay.  Anywhere in your report, your Exhibit 2, did you specifically write about the Alkabbani paper?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the document.

Go ahead.

THE WITNESS:  So I did review this abstract.  I did not include it in my report.  It's hard to have a strong discussion about an abstract without details about the methodology of the abstract.

QUESTIONS BY MR. HONNOLD:

Q.    Sure.

Well, Faillie, there was pages and pages about methodology, study design and so on and so forth about Faillie, and you didn't write about that either.

Did you?

MR. PRZYMUSINSKI:  Objection to the form.  Mischaracterizes both her testimony and the report.

QUESTIONS BY MR. HONNOLD:

Q.    I'll withdraw the question.

Doctor, at any point in your report, Exhibit 2, did you provide any written analysis or discussion where you tried to explain why it is that the combination results of the Faillie study, the Gao study, the Alkabbani study, the Sodhi study, the FAERS information, published case

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

reports that document positive dechallenge, any of those things, did you try to explain how any of those things did not provide evidence of an association between GLP-1 RA use and ileus and bowel obstruction?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Assumes facts not in evidence.  Vague.

You can answer.

THE WITNESS:  So I heard the four studies.

QUESTIONS BY MR. HONNOLD:

Q.    Sure.

A.    What was the question regarding those four studies?

Q.    Sure.  And here's the real basis of my question.

Faillie finds positive hazard ratios.  Gao finds a positive hazard ratio. Alkabbani finds a positive hazard ratio. Sodhi finds positive hazard ratios.  The FAERS reporting odds ratio is 3.05.  There are published case reports that document positive dechallenge.

Anywhere in your report did you

say or try to explain why it is that those findings, those various findings, either individually or in combination, does not represent evidence of an association between GLP-1 RA use and ileus or bowel obstruction?

MR. PRZYMUSINSKI: Object to the form. Mischaracterizes the studies. Vague. Compound.

You can answer.

THE WITNESS: So those were not the only studies that were reviewed. So it was looking at the totality of all the studies taken together with the pos -- what I'll call positive studies, meaning those that showed an increase hazard ratio or odds ratio.

A negative study, I'm going to characterize those as studies that show no increased risk or decreased risk.

And when you take it all together -- and this is -- the approach I took was really taking this all together after review of each of these individual studies.

So my approach was not going into each study to say, this study has this limitation, that study has the other limitation, and because of this, I'm discarding it.

I'm taking all of the studies together, which is why my report does not read as a systematic review, because that was not the intention of what I'm doing.

QUESTIONS BY MR. HONNOLD:

Q.    Point me to the paragraph in your report, paragraph 2, where you go through your analysis at all about how you take on and address the positive studies?

MR. PRZYMUSINSKI:  Objection to the form.  Vague.  I'm not clear what the positive studies are.

MR. HONNOLD:  She used the term "positive studies."  She just said "positive studies."

MR. PRZYMUSINSKI:  Which ones are you talking about?

But go ahead.

QUESTIONS BY MR. HONNOLD:

Q.    I'll ask her.

When you said "positive studies," which ones were you talking about?

A.    So in order to help with the conversation, I defined positive studies as the studies by, collectively, Faillie, Sodhi -- my brain is just -- Alkabbani and Gao.  So collectively those studies, I -- lumping them together as positive studies so the -- for ease of conversation here.

The other studies that were reviewed were either null or showed a decreased risk.  So those studies, again, for ease of conversation, I'm calling those negative studies because they did not show a positive result.

Q.    Okay.

A.    Just so that we can have a conversation without listing all of the studies.

Okay.  So now let me just define positive and negative.  And I've just totally forgotten what your -- what the question was now.

Q.   Did you discuss your analysis about how you dealt with that?

For example, how is it that you came to the conclusion that the positive studies did not -- as a group did not represent evidence of an association between GLP-1 use and ileus or bowel obstruction?

A.   So if you take those together with the meta-analyses, so if you take the meta-analyses of the RCTs as evidence, as well as the other observational studies, then when you put everything together, then as a whole, there's no evidence that there is an increased risk of bowel obstruction or ileus.

Q.   Where do you say that in your report?

A.   Where do I say what?

Q.   That there's -- that there's -- because of all this, there's no evidence of an association.

Where do you lay that out specifically in your report?  Where do you explain it?

And also, where do you address and take on and speak to and analyze the

frailties in the null or negative studies in terms of their misclassification bias and confounding by indication that we've discussed?

MR. PRZYMUSINSKI:  Objection to form.  Compound.

You can answer.

THE WITNESS:  So in my report on page 20, I go through the various things that I -- "I was provided and reviewed the expert report of Dr. David Dore, a pharmacoepidemiologist who conducted an analysis of the scientific literature discussing GLP-1 RA use and ileus and intestinal bowel obstruction.

"I performed my own literature review and reviewed the literature he cited.

"I agree with his assessment that the scientific literature does not support an association between GLP-1 RAs and the risk of developing ileus or mechanical intestinal

obstruction, and, thus, there's no basis to consider a causal relationship.

"I am aware that FDA has updated the product labeling for GLP-1 RAs to include the terms 'ileus' and 'intestinal obstruction ' in postmarketing.  However, FDA has made in clear product labeling that such postmarketing experience does not establish a causal relationship," so that's related to the FAERS reports.

"I've also reviewed the reports issued by the plaintiffs' experts, Drs. Binu John and Dr. Nilesh Lodhia."

QUESTIONS BY MR. HONNOLD:

Q.    So page 20 is it?

A.    Yeah.  Basically page 20 tells you about all the things that I considered in totality to come with -- to develop my conclusions.

Q.    Okay.  So if we wanted to say, where does Linda Nguyen, MD, explain her conclusions about there not being evidence of an association, you would say Dr. Nguyen's

writing on page 20 answers that question?

A.    Page 20 talks about my methodology for going through and reviewing all of the evidence.  It also takes into account, in addition to the meta-analyses and observational studies, I've looked at the physiologic studies like Nakatani, Weber, Desai.

So I incorporated all of those along with the studies, which essentially Dr. Dore reviewed in detail, and I agreed with his assessment and --

Q.    So can we --

MR. PRZYMUSINSKI:  Wait.  Wait.  Wait.

MR. HONNOLD:  Sorry.  Sorry.  I thought she was done.

Go ahead.  I'm sorry.

THE WITNESS:  So I reviewed his report, and I agreed with it, and I wrote that in here, that I agreed with his report.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  So it's page 20?

MR. PRZYMUSINSKI:  Objection to

form.  Mischaracterizes the testimony.

You can answer.

THE WITNESS:  It's page 20. It's page 17.  It's page 18.  You can throw 19 in there.  These are all the things that I did to then develop my opinion and the conclusions that you see here on page 20, 21 and 22.

QUESTIONS BY MR. HONNOLD:

Q.    Okay.  Your clinical experience, you say you've never seen something.

Out of fairness, if you think that that's relevant, that you, one doctor, has never seen something, does that make the clinical experience of other doctors also relevant?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

THE WITNESS:  I can't speak to what experience we're talking about. I need to know the details.

QUESTIONS BY MR. HONNOLD:

Q.    Their experience like reporting cases, like turning ileus case reports in to

the FDA.

Dr. Smith sees this patient with ileus on GLP-1, takes the time to send in a form.  Is that doctor's experience in seeing that just as relevant as yours where you say, I've never seen it?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.  Assumes facts not in evidence.  Calls for speculation.

You can answer.

THE WITNESS:  I'm not calling into question the experience of a physician, but if you want me to tell you if a report that was submitted was due to an ileus or not, I would have to review all of the data there.

QUESTIONS BY MR. HONNOLD:

Q.    And you didn't ask for those, and nobody's given them to you?

A.    I did not ask for them.

Q.    Okay.  Generally, as it relates to bowel motility, if you hypothetically assume a patient who develops ileus, just generally, idiopathic or you can pick the

cause, at the time that that ileus develops, may that patient have some intraluminal bowel contents?

MR. PRZYMUSINSKI:  Objection to form.  Calls for speculation.

You can answer.

THE WITNESS:  So if someone has a confirmed ileus --

QUESTIONS BY MR. HONNOLD:

Q.    Yes.

A.    -- that they have bowel content?

Q.    Could they have bowel contents at that time?

A.    Are you talking about small bowel or large bowel?

Q.    Small bowel or large bowel, either one.

A.    It's actually very different.

Q.    Okay.  Let's talk small bowel.

A.    Okay.  So with small bowel, typically what you see is dilation of small -- the small bowel with air.  So if you classify air as contents of the small bowel, then, yes, it is air.

                    I don't know what else you
would --

          Q.    Can there be food content
somewhere in the small bowel at the -- at the
point in time when a patient develops an
ileus, can they have some food contents, or
remnants of food contents, in the small
bowel?

          A.    I don't know.  I would have to
look --

          Q.    Is it possible?

          A.     -- at the case.

                    It could be possible, depending
on when they've eaten and when the imaging
was taken.  But I would need a lot more
information to be able to say if there was
contents in the small bowel.

          Q.    When a patient has an ileus and
has food remnants or contents in the small
bowel, does the bowel -- does the body
continue to draw water out of the bowel
through osmosis?

          A.    So now you're talking about two
separate things.

                    So the small bowel and the

colon does absorb water, independent of whether there's food content in there or not. But that's the role of the small bowel and the colon.

Q.    Can the development of an ileus contribute to a patient also developing constipation?

A.    So constipation and ileus are two separate things --

Q.    I understand.

MR. PRZYMUSINSKI:  Wait.  Let her finish.

QUESTIONS BY MR. HONNOLD:

Q.    I understand.

MR. PRZYMUSINSKI:  Wait.  You didn't let her finish.

Were you done with your answer?

THE WITNESS:  No.

They are two separate things, which is why I was very specific in talking about them separately. Because constipation is talking about the large bowel.

If you're talking about ileus of the small bowel, they're two

separate things, and I can't talk about them together.

QUESTIONS BY MR. HONNOLD:

Q.    Can GLP-1 RAs cause or contribute to cause constipation?

A.    GLP-1 RAs can lead to constipation and diarrhea.

Q.    Okay.  And when GLP-1 RAs can cause or contribute to cause constipation, can the constipation become severe?

A.    I would need to know more data, but in theory, yes.

Q.    Okay.  Why do you say "in theory" that, yes, GLP-1 RA-induced constipation can in theory become severe?

A.    The reason I say "in theory" is because now we're talking about all hypothetical, and so there's no case in front of me.

The information I would need to know about the, you know, severity of -- whatever medications they're taking, did they try to take any medications to treat their constipation, are they on other medications that can cause constipation.

Linda Nguyen, MD                CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Generally when people experience constipation, unless they have some kind of cognitive problem like severe dementia or developmental delay, people are uncomfortable and treat the constipation before it becomes severe.

So I say "in theory" because if you add all of these caveats, then the theory is yes.  But you haven't given me these caveats, so I can only answer in theory.

Q.    You're an expert witness.  I can ask you to assume things.  So there's no specific one patient at issue here.

Here's my question for you. What is it about GLP-1 RAs that can cause or contribute to cause constipation in some patients?  What is the physiologic response that GLP-1 RAs can induce in some patients to cause constipation?

A.    I think the effects of GLP-1s on the colon is still really indeterminate and needs to be further evaluated.

We see studies where the GLPs accelerate colonic transit, which means they have more diarrhea.  And then we see that

there -- there are individuals with slower
transit.  We see constipation.

We have no idea if that slowing
of the -- even if you assume that this --
their slowing of colonic transit, we don't
know if that slowing of colonic transit leads
to constipation.

Q.    You told me that GLP-1 RAs can
cause or contribute to cause constipation.  I
want to know specifically what's the
physiology that could lead to it, even if
it's theoretical.

MR. PRZYMUSINSKI:  Objection to
form.  Asked and answered.

You can go ahead.

THE WITNESS:  This is why I
said it's still undetermined, because
we're seeing both acceleration and
deceleration of transit.  So I can't
tell you what the mechanism is because
you're seeing two ends of the
spectrum, and it's not known.

QUESTIONS BY MR. HONNOLD:

Q.    What are the sequela if someone
develops a severe constipation?  What are the

bad things that can happen when someone
develops severe constipation?

           MR. PRZYMUSINSKI:  Objection to
form.  Vague.  Calls for speculation.

           You can answer.

           THE WITNESS:  Assuming the
constipation is untreated, it depends
on, again, multiple factors:  How long
has it been going on for, over what
period of time, age, comorbidities.

           So there's a lot of factors
that go into -- to this.

QUESTIONS BY MR. HONNOLD:

    Q.    So what are the sequelae?

    A.    Without knowing the other
factors, sequelae are bloating, abdominal
pain, nausea, vomiting, and this is sort of
in progressive severity.

    Q.    So can severe constipation
evolve to fecal impaction?

    A.    The only time I've seen severe
constipation lead to fecal impaction -- and
again, we're talking about the colon now --
is in patients who have dementia and in
nursing home.

Q.    Can patients that get severe constipation and fecal impaction develop bowel ischemia?

A.    In theory, it's possible.  The only scenarios where I've seen severe constipation not treated is in that population that we talked about - the nursing home, severe developmental delay population.

Q.    Can they develop bowel ischemia?

MR. PRZYMUSINSKI:  Objection to the form.  Asked and answered.

You can go ahead and answer.

THE WITNESS:  It depends on where you're talking about.

Again, in theory, if they were to have a fecal ball in the rectum, you can get local ischemia causing an ulcer.

But if you're asking if they can develop ischemic colitis, I've never seen that.

MR. HONNOLD:  Okay.  Let's take a break.  We're going to change questioners.  My colleague is going to

have some questions for you.

VIDEOGRAPHER:  We're now going off the record, and the time is 2:48 p.m.

(Off the record at 2:48 p.m.)

VIDEOGRAPHER:  We are now going back on the record, and the time is 3:03 p.m.

DIRECT EXAMINATION

QUESTIONS BY MS. PFEIFLER:

Q.    Good afternoon --

A.    Before we get -- we jump in, can I just make a correction on -- to my prior --

Q.    Yes, of course.

A.    -- testimony?

I misspoke when I talked about the positive studies.

I said Gao, when really what I was -- I meant was the Sarwal study.

Q.    Sarwal.  Okay.

A.    Yes.  S-a-r-w-a-l.

Q.    Understood.

So is Gao not included in that kind of bucket of positive associations?

A.    Yes.  Yes.  So the four positive studies.

Q.    Okay.

A.    If you replace Gao with Sarwal, everything else, yes.

Q.    Understood.  Thank you for that clarification.

Well, Dr. Nguyen, my name is Hannah Pfeifler, and I know we met this morning.  I just wanted to introduce myself on the record.  And thank you again for your time all day today.  I know it's a tedious process.

I have very specific questions, so I might jump around a little bit.  But if I ask a question that was unrelated to the prior question, if there's any confusion, please just let me know.

Just in the realm -- the general realm of gastroenterology, if a -- if you were to see a patient in your clinical practice, and that patient came to you and you -- you know, or described symptoms consistent with what could possibly be a delay in gastrointestinal motility, excluding

any cause, right, just they're -- they came to you saying, you know, I'm feeling nauseous, I might be throwing up a little bit, you know, I have some pain in my abdomen which -- well, first question.

Would symptoms being relayed to you consistent with that, would you automatically assume, okay, maybe there's a -- something going on with that patient's intestinal motility?

MR. PRZYMUSINSKI:  Objection to the form.  Vague.

You can answer.

THE WITNESS:  Yeah, so those -- the symptoms you mentioned with the nausea, vomiting, abdominal pain, they're very nonspecific.

QUESTIONS BY MS. PFEIFLER:

Q.    Sure.

A.    So it is not necessarily related to a motility problem.  It can be a number of problems within the GI tract as well as outside the GI tract.

Q.    Okay.  So even considering all of the other potential causes, if a patient

comes to you and says, Dr. Nguyen, I'm having a lot of nausea, could a decrease in just gastrointestinal motility be one potential cause?

A. The cause of nausea is so broad. Delayed gastric emptying is one of a very broad range of possibilities, including vestibular dysfunction, centrally mediated nausea, so if someone has, like, migraines. It could be due to a tumor in the brain. It can be from medications causing toxicity.

So, yes, delayed emptying is one of the potential causes, but it's a very broad differential.

Q. Sure. Sure. No, I understand that.

And then similarly, if a patient comes to you and says, Dr. Nguyen, I've been vomiting a lot, could one potential cause -- understanding there could be multiple different causes, but could one potential cause be a decrease in gastrointestinal motility?

A. Similarly to my prior answer, with vomiting, it's one of many potential

diagnoses.

Q.    Okay.  Perfect.

And similarly, constipation could be -- or if a patient comes to you -- strike that.

If a patient comes to you and says, Dr. Nguyen, I've been experiencing constipation, could just a general decrease in gastrointestinal motility from the stomach all the way through to the colon be one cause of many potential causes of constipation?

A.    So constipation is very specific to a problem with the colon --

Q.    Uh-huh.

A.    -- so it could be due to -- in part to slow motility, but the most common cause is actually pelvic floor dysfunction or what we call normal transit constipation.  So the transit time is normal, but the patient still has symptoms of constipation.

Q.    Okay.  But, again, just decreased intestinal motility could be one cause of constipation, specifically in the colon?

MR. PRZYMUSINSKI:  Objection to

form.  Asked and answered.

THE WITNESS:  It has -- I want to clarify.  Stomach and small bowel motility problem does not lead to constipation.

QUESTIONS BY MS. PFEIFLER:

Q.    Look, and I said colon.  So, like --

A.    Colon, yes.

Q.    -- intestinal motility -- or motility, excuse me, specifically within the colon.

If there's a decrease in motility through the colon, that could be one potential cause of constipation?

A.    Yes, that could be one potential cause.

Q.    Understood.  And then -- thank you.

And then similarly, if a patient comes to you with symptoms consistent with an ileus and you conduct testings, objective imaging, and see on -- whether it's an X-ray or a CT scan that this patient does have ileus, regardless of the cause, could

one potential cause of that ileus be a decrease or disruption of gastrointestinal motility?

MR. PRZYMUSINSKI: Objection to form. Calls for speculation.

You can answer.

THE WITNESS: So again, with ileus it's such a specific diagnoses that the symptoms alone can't -- you can't say someone may or may not have ileus based on the symptoms alone because you need so many other factors like the timeline, the acuity of the symptoms, what else was going on, the imaging.

So unlike, you know, your other three scenarios, talking about nausea, vomiting, constipation, where those can be due to slow motility and can occur over time, with ileus, it's really an acute phenomena. So I would need a lot more information.

QUESTIONS BY MS. PFEIFLER:

Q. Sure. Sure. And I understand that.

Ileus is typically diagnosed with objective testing, correct, such as a CT scan or an X-ray?

A.    That's correct.

Q.    Okay.  So if you have a patient where they come to you, you know, complaining of symptoms of nausea, vomiting, abdominal pain -- I know you testified earlier, and I can find the specific testimony, if needed, where you said that some of the symptoms stemming from an ileus could be nausea, vomiting, abdominal pain, bloating -- and you under -- you do -- perform testing, whether it's a CT or an X-ray, and you confirm a diagnosis of an ileus, could one of the potential causes of that ileus be due to a slow -- slowing or decrease in the gastrointestinal motility of that patient?

A.    So decrease in motility alone cannot cause an ileus.  So, you know, so you -- things that decrease motility can be a risk factor for ileus, say, for example, following surgery, being in the ICU.  But slow motility alone doesn't cause an ileus.

Q.    But coupled with symptoms?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

A.    With or without the symptoms, there's no evidence out there that slow motility alone can cause the condition of ileus.

Q.    I'm going to go -- or ask you to pull out Exhibit 2, which is your Issue 2 report.  And I know that you had spoken with my colleague recently -- or earlier today about this.

On page -- where is it.  I will tell you.  Page 4, the first bullet point on page 4, this was the whole discussion about the UpToDate definition of ileus.

You have defined here, "Ileus or adynamic ileus is an acute and temporary cessation of the normal muscle contractions of the small intestine or colon that prevents food, fluid and gas from moving through."

Do you still stand by that definition?

A.    I do.

Q.    Okay.  So how is what I described or the hypothetical that I gave not an ileus?

A.    So slowing of motility is not

by definition an ileus.

Q.    Do you want it to be specifically related to the muscle contractions?

A.    I'm sorry, I'm not -- I'm not following the question.

Q.    Sorry.  Sorry.  I'll withdraw that question.

So in this definition of ileus, it states that -- which you just said that you would still agree with and use as your definition of ileus, it states, "Ileus is a temporary" -- "an acute and temporary cessation of the normal muscle contractions of the small intestines or colon."

Correct?

A.    Correct.

Q.    Okay.  So if you have a patient that comes to you saying, Dr. Nguyen, I have -- I'm experiencing nausea, vomiting, abdominal pain, bloating, and you run some testing, and that testing is objective scans, whether it's an X-ray or a CT, and you confirm a diagnosis of ileus, could one of those -- well, let me -- strike that.

That -- you just -- like, that would be a confirmed diagnosis -- or I guess would you agree with me that that's a confirmed diagnosis of ileus?

MR. PRZYMUSINSKI:  So you just struck the first part of that question?

MS. PFEIFLER:  I struck the second part.  Sorry.

MR. PRZYMUSINSKI:  I'm not sure I know what it is, but if you understand --

QUESTIONS BY MS. PFEIFLER:

Q.    I can reask it if you need me to reask it.

A.    Yes, if you could please reask the question.

Q.    Sure.  I will just read it back.

So if you have a patient that comes to you saying, Dr. Nguyen, I'm experiencing nausea, vomiting, abdominal pain, bloating, and you run some testing, and that testing is -- uses objective scans such as a CT or an X-ray, and that scan or that

test, coupled with the symptoms, leads you to the diagnosis of ileus, would you agree that that is a confirmed diagnosis of ileus?

A.    So that -- this hypothetical scenario of those symptoms you mentioned and dilated small bowel on imaging is actually not diagnostic of ileus.

It could be something called chronic intestinal pseudoobstruction, which is a chronic motility disorder of the small bowel that can have that exact same presentation on imaging as well as symptoms.

Q.    So, Dr. Nguyen, how do you -- as a practicing clinician, how do you diagnose ileus?

A.    So ileus is a clinical diagnosis --

Q.    Uh-huh.

A.    -- that then you use supporting evidence for.

So as I mentioned, ileus is an acute and temporary condition.  So generally, when someone has ileus -- and we're talking about in generalities now --

Q.    Right.

A.      -- and the most common one is surgery.  They come in, they have surgery, and then after surgery they develop an ileus.  So they're unable to eat.  They have nausea, vomiting, distension.  You do an X-ray, and you see that there's dilation of the small bowel.

So in that scenario, with the symptoms, the imaging, and coupled with the surgery, then you make the diagnosis of ileus.

If someone comes to me with similar symptoms, nausea, vomiting, abdominal distension, this has been going on for weeks, months, and I do imaging and find that there is dilation of the small bowel, then my concern in that situation, especially if it's been going on long term and they have other risk factors, is a different diagnosis of chronic intestinal pseudoobstruction.  I would not call it ileus.

Q.      Sure.  But let's take an example of an individual going to the emergency room --

A.      Uh-huh.

Q.       -- and they, instead of saying, Dr. Nguyen, I'm having these symptoms, say, emergency doctor, I'm having these symptoms. The emergency doctor runs these tests.  The tests show a -- confirm a diagnosis of ileus. The -- and gives the diagnosis of ileus, that would still be an ileus.

Correct?

A.       So it's the same scenario whether it's an emergency room physician, a gastroenterologist or, you know, some -- somebody else.  The presence of dilation and symptoms alone is not an ileus.

Now, just because someone receives a diagnosis of ileus, it doesn't necessarily mean it's the correct diagnosis. There's misdiagnoses that occur all the time, which is the challenge with using some of these epidemiologic studies, because you're not sure how the diagnosis was made.

So based on the definition, the clinical scenario needed to make a diagnosis of ileus versus pseudoobstruction, I wouldn't expect an ER doctor to be able to differentiate the two.

Q.    Uh-huh.

A.    But that's why the symptoms and imaging alone can't differentiate.  You have to bring in the whole history.

Q.    Understood.  Okay.

Okay.  I'm going to move -- switch topics just for a minute, so bear with me, please.

Okay.  And I just -- if you'll keep Exhibit 2 out in front of you, please, I just want to talk a bit about your methodology in forming one of your opinions on page 3 of your report.

And the first bullet point --

A.    Okay.  Give me one second to catch up with you.

Q.    Okay.  Take your time.

A.    Okay.

Q.    Okay.  So the first bullet point, you state, "GLP-1 RA medicines have a modest effect on gastric motility, which tends to decrease over time, parentheses, tachyphylaxis, end parentheses.  This is an intended mechanism of action in the medications for the management of both

Linda Nguyen, MD    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

diabetes and obesity, is well-known in the medical community, and is described in the product labeling."

Did I read that correctly?

A.    Correct.

Q.    Okay.  So I want to focus specifically on your statement that the delay -- or the effect, excuse me, on gastric motility is well-known in the medical community and is described in the product labeling.

Where -- and I'm happy to hand you a label.  But if you can tell me, where in the labels of GLP-1 RAs is the description of gastric motility?

A.    If you show me the -- hand me the label, I am happy to do point it out.

Q.    Absolutely.

And this is the December of 2017 Ozempic label.

MR. PRZYMUSINSKI:  Do you have a copy?

MS. PFEIFLER:  Yes.

MR. PRZYMUSINSKI:  Do you want to mark that as an exhibit before --

Linda Nguyen, MD

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. PFEIFLER:  Oh, yes, I'm so sorry.  This is going to be Exhibit 24.

MR. PRZYMUSINSKI:  Feel free to review whatever you need to review, Doctor.

THE WITNESS:  Yes.

(Nguyen Exhibit 24 marked for identification.)

QUESTIONS BY MS. PFEIFLER:

Q.    And while you're reviewing, I'll just say the main reason I ask is that it's not laid out in your report, so that's why I just want to make sure that you and I are discussing the same aspects of the labels.

A.    When you say it's not laid out in my report --

Q.    In terms of where -- because you state that the effect on gastric motility is described in the product labeling.  But the specific sections within the report.

A.    Okay.  Okay.  So I'm going to point you to two locations where it's in the label.

The first location is on the first page of Exhibit 24.

Q.    Uh-huh.

A.    And if you go to drug interactions where it says, "Oral Medications," it says, "Ozempic delays gastric emptying.  May impact absorption of concomitantly administered oral medications."

So that's the --

Q.    Drug interactions.

A.    The other location is where it says, "Clinical Pharmacology," so 12.1.  It says, "Mechanism of Action."

Q.    Uh-huh.

A.    And it says, "The mechanism of blood glucose-lowering is" -- "also involves a minor delaying in gastric emptying in the early postprandial phase."

Q.    Got it.

Okay.  Those two sections, Section 7 for drug-to-drug interactions and Section 12.1, Clinical Pharmacology?

A.    Yes.

Q.    Okay.  Okay.  Perfect.

So now you and I are in

agreement that those two sections, Section 7 and Section 12.1, are not listed anywhere in your report.

Correct?

A.    Those specific words were not listed in my report.

Q.    Okay.  Prior to being retained by defense counsel in this litigation, had you reviewed any of the labels for Novo Nordisk's GLP-1 RA drugs?

A.    I have not reviewed the label prior to this.

Q.    Okay.  And then prior to forming your opinions in this case, had you reviewed the labels for any of Novo Nordisk's GLP-1 RA drugs?

A.    I did not review the label.

MR. PRZYMUSINSKI:  Hold on a second.

Prior to submitting her expert report?  Is that what you're asking?

MS. PFEIFLER:  Prior to forming her opinions.

MR. PRZYMUSINSKI:  Okay.

MS. PFEIFLER:  I'm sorry.

MR. PRZYMUSINSKI:  I'm confused.  Could you ask your question again?  I'm sorry.

THE WITNESS:  I'm sorry.  Can you please ask that question again?

QUESTIONS BY MS. PFEIFLER:

Q.    For sure.  For sure.

So the first question was prior to being retained in this litigation, and you said, no, I had not reviewed the labels prior to being retained.

Prior to -- or as you were gathering all the data to review and evaluate in forming your opinions in this case, did you review the labels for Novo Nordisk GLP-1 RA drugs?

A.    Yes, I did.

Q.    Okay.  Have you ever been involved in a regulatory capacity in creating a label for a pharmaceutical drug?

A.    I have not.

Q.    Okay.  Are you familiar with the labeling requirements for pharmaceutical drugs?

A.    I am not.

Q.    Okay.  Have you ever read or seen 21 CFR 201.57?

A.    I -- you'd have to show me what you're looking at.  I don't know what those numbers are.

(Nguyen Exhibit 25 marked for identification.)

QUESTIONS BY MS. PFEIFLER:

Q.    Okay.  I'm going to mark as Exhibit 25 the -- a printout of 21 CFR 201.57.  And I have copies for you-all.

Okay.  Please take your time to review this document in as much depth as you would like to, but I only -- I just have a few specific questions on specific sections, if you want me to direct you to those specific sections.

MR. PRZYMUSINSKI:  So you're going to be asking questions about the federal regulations on this?

MS. PFEIFLER:  Correct.

QUESTIONS BY MS. PFEIFLER:

Q.    The first section I'm going to start with is Section 6 on page 6 of 20.

A.    Okay.

Q.    All right.  Do you see where it says, "5 Warnings and precautions"?

A.    I do see that.

Q.    Okay.  Before diving into any specific questions, you've seen, like, drug labels outside of the context of GLP-1s, right?

But, like, you've seen like a general format, obviously.  We just looked at the Ozempic label from December of 2017.

So you have an understanding of, like, the format and kind of the different sections within a label.

Correct?

A.    Yeah, I've read -- I've read labels.

Q.    Yes.  Okay.

So you understand that there is a section for indications and usage, dosage and administration, dosage forms and strengths, contraindications, warning and precautions, adverse reactions, drug interactions, et cetera, et cetera.

Correct?

A.    I'm familiar -- I'm familiar

with these sections.

Q.    Okay.

A.    I don't know how things are decided in terms of what goes in what section.

Q.    Okay.  Understood.

And so that's kind of what I'm getting at here in terms of your opinion that these effects, GLP-1 RA's effects, on gastric motility are described in the product labeling.

So with that context from your report, that's why I handed you this exhibit.

So if you look at page 6, Section 6, under Warnings and precautions, at the subsection little I, it starts, "This section must describe clinically significant adverse reactions, parentheses, including any that are potentially fatal or serious, even if infrequent," excuse me, "or can be prevented or mitigated through appropriate use of the drug, end parentheses.  Other potential safety hazards, parentheses, including those that are expected for the pharmacological class or those resulting from

drug-to-drug interactions, end parentheses. Limitations in use imposed by them and steps that should be taken if they occur, parentheses, e.g., dosage modification, end parentheses."

Did I read that correctly?

A.    Yes.

Q.    Okay.  So starting with "this section must describe clinically significant adverse reactions," do you understand that the FDA has specific definitions for what that means?

A.    I'm not an FDA expert, but I would suspect that the FDA has definitions for that.

Q.    Okay.  So when you -- or I guess in your clinical practice, if any of your patients are taking a medication and they come to you complaining of a -- they come to you complaining of some condition, medical condition, right, would you look to the medication that that patient is on, look to that medication's drug label for any information as to the side effects of that potential medication?

A.    Yes.  If I had a patient who recently started on a medication and comes in with whatever symptoms --

Q.    Uh-huh.

A.    -- then I would look to the drug label to see what symptoms may be there.

Q.    Okay.  And do you have an understanding of where those symptoms are typically located in labels?

A.    I generally read the whole -- not the whole.  I generally read the label. I can't tell you which section they're supposed to be in, but I read the label.

Q.    Okay.  Understood.

So if you go down just a little bit in that same warning -- excuse me, warnings and precautions section, in the middle of that paragraph in the -- sorry, the regulations.

In the middle of that paragraph, it starts with, "In accordance with," and there's two sections listed.  It goes -- it says, "The labeling must be revised to include a warning about a clinically significant hazard as soon as

there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

Do you see that?

A.    I do not follow along with you. Can you point it out again?

Q.    Yes, for sure.

In the middle of that first paragraph, the little subsection I --

A.    Okay.

Q.    -- where it starts with, "In accordance with sub" -- or "Sections 314.7 and 601.12" --

A.    Okay.

Q.    -- it states, "The labeling must be revised to include a warning about a clinically significant hazard as soon as there is a reason" -- excuse me -- "as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

Do you see that?

A.    I do see that.

Q.    Okay.  So that is FDA regulations specifically saying that a causal relationship does not have to be definitely established in order to be included in a product's labeling.

Do you see that?

A.    I do see that.

Q.    Okay.  So if we go to page -- let me see if I have this.

MR. PRZYMUSINSKI:  What exhibit are we on?

MS. PFEIFLER:  No, sorry, we're in --

MR. PRZYMUSINSKI:  This --

MS. PFEIFLER:  -- in the report.

MR. PRZYMUSINSKI:  The report.

MS. PFEIFLER:  Exhibit 2. Correct.

QUESTIONS BY MS. PFEIFLER:

Q.    If you go to page -- and I apologize.  I thought I had that written down.

Oh, okay.  Go to page 18 under Section 4.

All right.  You state, "It is my expert opinion to a reasonable degree of scientific and medical certainty, based on my clinical knowledge and experience, my review of the literature and the analysis performed by Dr. Dore, that no reliable basis exists to conclude that GLP-1 RA medications can cause ileus, mechanical small bowel or mechanical large bowel obstruction."

Do you see that?

A.    I do see that.

Q.    Okay.  And then on page -- all right.  Well, we'll just keep -- we'll just stick with page 18.  You state, "No reliable basis exists."

Where did that -- like, what -- where did you find that standard for no reliable basis, excuse me, in forming your opinions?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

THE WITNESS:  As discussed earlier, I looked at the meta-analyses of RCTs, the observational studies.  I looked at some of the mechanistic

studies.  And based on taking all of those studies together, there was no reliable evidence that GLP-1s can cause an ileus or bowel obstruction.

QUESTIONS BY MS. PFEIFLER:

Q.    Right.

But that use of the "any reliable evidence," that standard, where did -- like, did you find that standard anywhere?  Or, like, when you say "reliable," how do you define reliable?

A.    In terms -- I tend to use reliable and consistent interchangeably as a scientist, that, you know, reliable data has to be consistent.

Q.    Reliable -- I'm sorry, I didn't mean to interrupt you.  So reliable --

A.    I was not using legal term -- definition of reliable.  I have no idea what you guys use to define reliable.

Q.    No, that's okay.

I just want to make sure that whatever definition you ascribe to, like you wrote in your report, of course, that I'm using that same definition.

So reliable equals consistent. So there's no consistent evidence.

Could we, I guess, change out consistent for reliable -- or excuse me, strike that.

When you say, "I'm not aware of any reliable evidence that GLP-1 RAs can cause ileus" -- and I'm sorry, I'm on page 4 -- we could change out reliable for consistent and say, I'm not aware of any consistent evidence that GLP-1 RAs can cause ileus?

A.    Just so I make sure I'm --

Q.    Oh, sorry, the first -- the first -- page 4, the first bullet point in the middle of the paragraph.

A.    "Consistent" works there.

Q.    Okay.  Okay.  Consistent.

And would that be with respect to -- consistent be with respect to, like, epidemiological data, or are you also including other data as well?

A.    I'm including the physiologic studies --

Q.    Okay.

A.    -- the RCT studies, the meta-analyses of the RCTs, and the epidemiologic studies.

Q.    Okay.  And you didn't -- I recall Mr. Honnold asking if you had reviewed any, like, internal Novo Nordisk documents, including internal analyses, internal cumulative reviews, regulatory submissions based on requests for information.

You didn't review any of those in forming your opinions?

A.    I did not.

Q.    Did you ask counsel if any of those types of documents existed?

A.    I did not.

Q.    Okay.  Are you aware or do you have any knowledge that Novo Nordisk has internally determined that there is -- there is sufficient scientific evidence to support a causal association between intestinal obstruction, small intestinal obstruction, and ileus with its GLP-1 RA drugs?

MR. PRZYMUSINSKI:  Objection to the form.  Lacks foundation.  Assumes facts not in evidence.

You can answer.

THE WITNESS:  I have not seen any documents one way or another, so I can't answer that question.

QUESTIONS BY MS. PFEIFLER:

Q.    Sure.  Sure.

Had you known that prior to forming your opinions, would it have changed your opinion in this case?

MR. PRZYMUSINSKI:  Again, same objection.  There's no foundation for this.  There's absolutely -- well, assumes facts not in evidence.

You can go ahead and answer again.

THE WITNESS:  If you have those documents, I'm happy to review them.

QUESTIONS BY MS. PFEIFLER:

Q.    Sure.  Sure.

Quickly before we do that, are you aware that the FDA -- well, strike that.  We'll back up.

Do you consider the FDA to be a reliable source of data and information when it comes to the safety and efficacy of

pharmaceutical drugs?

A.    Oh, that's a loaded question these days.

In general, yes.

Q.    Okay.  Well, I mean, the FDA is the regulatory agency in the United States that pharmaceutical drugs, in order to be on market, they have to be approved through the FDA.

Correct?

A.    Yes, that is correct.

Q.    So are you aware that the FDA conducts their own quarterly kind of safety analyses on any pharmaceutical drug that is approved?  On the market?

A.    Yes.

Q.    Okay.  So are you aware of what's referred to as a newly identified safety signal?

A.    I'm aware of that.

Q.    Okay.  Have you ever personally, yourself, been on the FAERS database public dashboard?

A.    I have not.

Q.    Have you ever submitted a

report to FAERS -- or, excuse me, an adverse event report to the FAERS database?

A.    I have not.

Q.    Okay.  Have you reviewed any published studies or published articles about the FAERS database in terms of how FAERS is populated with adverse events?

A.    I vaguely remember reading one. I can't remember -- it's in my materials.  I don't remember all the details.

If you hand it to me, I'm happy to look at it in more detail.

Q.    And I'm not referring to, like, a specific document or anything.  I'm just trying to gauge your personal knowledge and kind of how much you know about the FAERS database.  So I'm not asking any, like, specific question about a document.

So with respect to newly identified safety signals, are you aware that in June of 2022 the FDA issued a newly identified safety signal for intestinal obstruction in GLP-1 RAs?

A.    Can I take a look at that?  The labeling?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    What would you like to see?

A.    You mentioned that the FDA issued a labeling change, I believe is what I heard.

Q.    A newly identified safety signal.  And I don't have it printed out, but I'm happy to pull it up on the internet if you would like me to, because they're published.

A.    Okay.  Yes, I am aware of it.

Q.    Okay.  And are you aware that from that review, or as a result of that review, rather, in 2022 the FDA required the manufacturers of GLP-1 RAs, including Novo Nordisk, to add ileus to Section 6 of their -- its GLP-1 RA labels?

MR. PRZYMUSINSKI:  I'm going to -- it says -- it lacks foundation, but you can go ahead and answer.

THE WITNESS:  Okay.  Again, I -- I'd appreciate seeing a label to look at it.  I do recall.

(Nguyen Exhibit 26 marked for identification.)

QUESTIONS BY MS. PFEIFLER:

Q.    That's okay.  Just for -- to get through quickly because I know we're on a time constraint, and I want to be respectful of your schedule.

I'm going to mark as exhibit -- that's okay, Brad.  I'm going to mark as Exhibit 26 the October 2025 label for Ozempic.

A.    Okay.

Q.    And I will represent that this is the October 2025 label, which has been updated since September of 2023 when the ileus adverse event went into effect in the Ozempic label.

But if you would like to see the September 2023 label, I'm happy to pull it up on the FDA website.

A.    Okay.  I can look at the 2025 label.

Can you point me to the section --

MR. PRZYMUSINSKI:  This is the 2023.

MS. PFEIFLER:  That's the 2025.

I have the 2023.

MR. PRZYMUSINSKI:  Yeah, this is the '25.  Now I'm confused.

MS. PFEIFLER:  Look at the first page.  With the date.

MR. PRZYMUSINSKI:  I know.  So the medication guide's different.

MS. PFEIFLER:  This is from the FDA website.

MR. PRZYMUSINSKI:  It's fine.  All right.  So --

MS. PFEIFLER:  So --

MR. PRZYMUSINSKI:  I'm sorry.

So to get the record straight, this is the October 2025 label.

Is that what you're saying?

MS. PFEIFLER:  That -- in your hand, yes, that's the October 2025 label.

MR. PRZYMUSINSKI:  That's been marked as Exhibit --

MS. PFEIFLER:  26.

MR. PRZYMUSINSKI:  26.  Got it.

QUESTIONS BY MS. PFEIFLER:

Q.    And I do have the

September 2023 label if you want to see it, but what you have in front of you now is just an updated version of the 2023 label.

A. And is there a section that you want me to --

Q. Oh, yes. If you go to Section 6, which is on page -- of course they don't have page numbers.

It's Section 6, Postmarketing Experience. And if you then flip the page, it's under Gastrointestinal.

A. Okay. I see it. I see that on the backside of 6.2.

Q. Uh-huh. Yes. So this October 2025 label under Section 6.2, Postmarketing Experience, Gastrointestinal, it shows -- or it lists, excuse me, ileus, intestinal obstruction, severe constipation including fecal impaction.

Do you see that?

A. I do see that.

Q. Okay.

A. I also see that in the paragraph below the Postmarketing Experience, the FDA also says, "Because these reactions

are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to the drug exposure."

Q.    Sure.

So if you want to go back to Exhibit 20 -- I think it's 24 or 25, which is the 21 CFR -- the regulation, 201.57, and if you go back to where we were under Warnings and Precautions --

A.    Okay.  So we're -- just to be clear, we're talking about Exhibit 25?

Q.    25, yes.

A.    Okay.

Q.    And so you see Section 6 says Warning and Precautions?

A.    I do see that.

Q.    And then Section 7, right below that, is Adverse Reactions?

A.    I do see that.

Q.    Okay.  And this section states, "This section must describe the overall adverse reaction profile of the drug based on the entire safety database.  For purposes of

prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence."

Did I read that correctly?

A.    You did.

Q.    And then if you -- the next sentence, halfway through it states, "Only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."

So this is the FDA -- the FDA's regulation, excuse me, saying that adverse events are included in Section 6 if there is some basis to believe there is a causal relationship.

Is that correct?

A.    I see that, and I can read that.

Q.    Okay.

A.    And again, to go on the record, I am not an FDA specialist, so I don't -- I

don't know why things are listed in certain areas.

Q.    Sure.  Sure.

And I'm -- the primary reason why I'm asking about regulations and where items are listed in labels is just due to one of your opinions in your report that the effect on gastric motility is well des -- excuse me, not well, but is described in the product labeling.

So I just want to -- wanted to make sure that we had context for what is supposed to go into labeling and where sections -- excuse me, where information in sections is supposed to be.

MR. PRZYMUSINSKI:  Yeah, so just -- I do want to clarify this. Dr. Nguyen is not a labeling expert. She doesn't have opinions on adequacy of the label.  She simply tells you what's described in the label.

But please feel free to proceed.

QUESTIONS BY MS. PFEIFLER:

Q.    Dr. Nguyen, are you -- do you

have any knowledge of a -- what is titled a Pharmacovigilance Review that the FDA conducted in November of 2022 related to the risk of intestinal obstruction with GLP-1 RA use?

A.    I don't know the details of it, but I'm familiar with the pharmacovigilance.

Q.    Okay.  That document, I do not see that document cited on your materials considered list.

Was that document something that you read and considered in forming your opinions?

MR. PRZYMUSINSKI:  I'm not sure you guys are answering the same question.  I think she said she understands pharmacovigilance.

Did you say you're familiar with that document, or did you say you understand pharmacovigilance?

THE WITNESS:  No.  I meant I'm familiar with pharmacovigilance and the FDA doing pharmacovigilance.

QUESTIONS BY MS. PFEIFLER:

Q.    Okay.  Yes.  And I was just

asking about a specific document.

So do you have any familiarity or knowledge of an FDA analysis, which is titled a Pharmacovigilance Review, that the FDA conducted in November of 2022 related to the risk of intestinal obstruction with GLP-1 RA use?

A.    I just wanted to double-check with my Exhibit B.

I am not familiar with the details, and I just recall the term "pharmacovigilance."  So I was just double-checking to see if I actually looked at it.

If I had, it would have been here, and it's not here.

Q.    Okay.  No, totally -- then thank you for checking just to be sure.

Would or do you consider it important to be informed about different analyses or evaluations that the FDA undertakes with respect to pharmaceutical drugs?

MR. PRZYMUSINSKI:  Objection to form.  Vague.

You can answer.

THE WITNESS:  When you say "importance," in what scenario?

Clinical care?  This opinion?

Research?

QUESTIONS BY MS. PFEIFLER:

Q.    Important in, yes, prescribing decisions, clinical care, how -- whether or not to, you know -- well, strike that last part.  And I'll strike that entire question.

Clinical care and prescribing decisions, yes.

A.    So as I mention in my report, I don't prescribe GLP-1s.

Q.    Uh-huh.

A.    So the pharmacovigilance data does not play a role in my prescribing because I don't, and I still -- still don't.

I -- when patients come to me specifically asking if they should take a -- or should start a GLP-1 medication, then what I do is I go through shared decision-making, tell them about the side effects that have been reported, the physiologic studies that have been conducted.  Some of those studies

are here in my report.

And then together the -- we come to a decision of whether or not the patient should work with their prescribing doctor to start the medication.

Q. Okay. So with respect to a patient of yours that comes and asks you a question about whether they should start a GLP-1, you just testified that you go through a shared decision-making and tell them about the side effects that have been reported.

What side effects do you tell them?

A. Nausea, vomiting, diarrhea, constipation, are the most common GI side effects, which is what the patients are most concerned about.

Q. Okay. Have you ever told one of your patients that there is a risk that they could develop gastroparesis?

A. I don't tell them that they're going to develop, you know, chronic gastroparesis.

I do tell them that the GLPs can delay gastric emptying, and that may or

may not be associated with their symptoms of nausea and vomiting.

Q.    Okay.  Do you tell your patients who ask you about taking a GLP-1 if there's a risk that they could develop an ileus?

A.    So there's no data that shows that a GLP-1 causes an ileus, whether it's in the RCT studies, the observational studies or the mechanistic studies.

I tell them that they may have symptoms, and if they have symptoms to let me know, and I would do an evaluation.  But there's no data that suggests that they would have an ileus, so I don't talk to them about that.

I talk to them about the symptoms.  Symptoms and ileus are not the same thing.

Q.    Sure.

So is it your testimony that you've never told one of your patients who have asked you about taking a GLP-1 RA that there is a potential that they could develop an ileus?

A.    I've never told a patient that they could develop an ileus.

Q.    Okay.  Do you have any estimate for when the last time one of your patients asked you about taking a GLP-1 RA?

A.    I'd say probably November, December, before I transitioned from Stanford to Hogue.

Q.    Okay.  And that's of 2025?

A.    Yes.

Q.    Okay.  Understood.

Can I also then assume that you have never told a patient -- but please correct me if I'm wrong -- never told a patient that -- if they've asked you about taking a GLP-1 RA, that they could develop severe constipation that could lead to a fecal impaction?

A.    I tell them they could develop constipation.  I don't talk to them about fecal impaction because what we talk about with constipation is if they were to develop symptoms of constipation, that there are things that they can do to mitigate the symptoms.  And especially if they have an

underlying con -- they already have underlying constipation, then I really make sure they have a mitigation plan.

Q.    Okay.  Understood.

Dr. Nguyen, I want to ask if you would agree with a statement that I'm going to read, if that's okay.

"Although some symptoms consistent with ileus are presently listed in the prescribing information, they are not synonymous or specific for ileus.  Healthcare providers need to be aware of the association between GLP-1 RA and ileus when these patients present to hospital facilities with clinical features consistent with ileus."

MR. PRZYMUSINSKI:  Objection to form.

You can answer.

THE WITNESS:  Can I see where you're reading that from?

QUESTIONS BY MS. PFEIFLER:

Q.    I can.  I can definitely show you.

Have you signed a protective order in this case?

MR. PRZYMUSINSKI:  Chris?  I believe that's a yes.

MR. GISMONDI:  Yes.  I'll figure...

MS. PFEIFLER:  We have a protective order, if not.

MR. PRZYMUSINSKI:  I'll let Chris check.

MS. PFEIFLER:  Okay.

MR. PRZYMUSINSKI:  I assume the answer is yes, but I'm not 100 percent sure.

MS. PFEIFLER:  Okay.  I'm going to mark -- oh, once you check.

MR. GISMONDI:  Yeah, I have a signed protective order from Linda.

MR. PRZYMUSINSKI:  Okay.

MS. PFEIFLER:  Perfect.  Amazing.

(Nguyen Exhibit 27 marked for identification.)

QUESTIONS BY MS. PFEIFLER:

Q.    All right.  I'm going to mark this as Exhibit 27.

And, Dr. Nguyen, this is the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

November 2022 pharmacovigilance review conducted by the US Food and Drug Administration related to GLP-1 RAs and the risk of intestinal obstruction.

It's kind of a lengthy document, and I know we are under time constraints, so I do not want to prevent you from reviewing the entire document because I understand that you have not seen this before based on your testimony, but I'm happy to point you to that specific quote just because that was what my question was related to.

A.    Yeah, so I'll confirm that I have not seen this document.

And if you could point me to where you are reading from?

Q.    Absolutely.

Oh, sorry.  On page 30, underneath the heading Considerations for Labeling.

And it starts with the first sentence.

A.    Okay.  So considering for labeling and starting with "although"?

Q.    Correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    Okay.  I've had a chance to read that.  What was your question?

Q.    The question was just, would you agree with that statement?

A.    So I don't agree that symptoms consistent with -- consistent with ileus is specific for ileus.

And I think even when you look at the conclusion here, that -- and this is kind of right below that in Section 5.  It says Conclusion.

It says that "Ileus was the preferred term and that the surgical cases were causally unrelated to GLP-1 RA."

So -- and it says, DVP-I and DEP -- assuming it's an I -- conclude that -- yeah, that there were no cases included -- I'm going to butch {sic} these names, exenatide and tirzepatide in our cases, which is consistent with a low market share approval.

So I guess my answer is, I read this.  I don't agree that the symptoms of ileus are synonymous with ileus.

I do agree that if someone is

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

coming in with symptoms that requires a hospitalization, the medication should be stopped.

Q.    Okay.  Understood.  Thank you.

And just to finish.  So what you were reading in the conclusion, DPV-I and DEPI-I, that's the department of pharmacovigilance and department of epidemiology just within the FDA.

But it states that they conclude that "there is sufficient evidence, including for rechallenge cases, to support an association between ileus and the use of GLP-1 RAs."

Did I read that correctly?

A.    You did read that correctly.

Again, it depends on what the -- how they defined ileus.  Was it the symptoms, or was it an actual diagnosis of ileus, which from the paragraph on top, that they were assoc -- they were equating the symptoms with the diagnosis, which is not correct.

Q.    It's not correct to equate symptoms with diagnosis?

A.    So symptoms, because they're nonspecific, does not equate to diagnosis.

Q.    Sure.  Sure.

And it definitely is important to understand what the FDA did here.

So if you go to just the -- or page 3, excuse me.  Under Section 1.1, Background, it states, "Regarding terminology, except where otherwise specified in this review, the term 'intestinal obstruction' includes the term 'ileus.'  We note that the medical dictionary for regulatory activities, MedDRA, preferred terms, intestinal obstruction and ileus are both within high-level term, gastrointestinal stenosis and obstruction, and this correlates with interchangeable use of this terminology within our case series and other data sources."

Dr. Nguyen, are you familiar with MedDRA terminology?

A.    I'm not familiar with the MedDRA terminology.

Q.    Okay.  Are you -- do you have an understanding that when adverse event

reports are reported in either clinical trials or postmarketing through FAERS, that MedDRA preferred terms are used to essentially identify what the adverse event is?

MR. PRZYMUSINSKI: Objection to form. Asked and answered.

You can go ahead.

THE WITNESS: Based on your description, I can understand the concept. I just have -- I'm -- I don't use MedDRA, and I'm not --

QUESTIONS BY MS. PFEIFLER:

Q. Understood.

It's similar to like an ICD-9 or ICD-10 code, just for a little bit -- or in a little bit different context.

So, again, this is a long document, and I have a few other things that I want to go through.

But if you go to page 4, you see Table 1, Causes of Mechanical Obstruction. You see -- do you see that, Doctor?

A. I do see that.

Q.    Okay.  You see adhesions, hernias, neoplasms, and then there's strictures/inflammatory.  And within that, seven terms within it is fecal impaction.

Do you see that?

A.    I do -- I do see that.  I disagree with some of the things on this list in terms of being strictures or inflammatory.

So, for example, irritable bowel disease is neither stricturing nor inflammatory.

Q.    Okay.  Do you disagree with fecal impaction being listed as a cause of mechanical intestinal obstruction?

A.    As I discussed earlier, fecal impaction can cause symptoms in the rectum or the colon in very specific cases.

Q.    Okay.  And then if you go right underneath Table 1, the FDA identifies a definition for nonmechanical or adynamic obstruction.

Do you see that, where I'm at?

A.    I do.

Q.    It states, "Nonmechanical or adynamic obstruction involves reduced or

absent peristalsis secondary to a disturbance of the neuromuscular transmission of the parasympathetic innervation to the intestines."

Did I read that correctly?

A.    You did read that correctly.

Q.    And then it states, "Nonmechanical obstruction can be divided into paralytic ileus, parentheses, affecting the small and large intestines, end parentheses, and colonic pseudoobstruction, parentheses, or Ogilvie syndrome, end parentheses."

Did I pronounce that correctly?

A.    And it's Ogilvie's.

Q.    Ogilvie.  Okay.  Perfect.

Do you disagree with the definition of nonmechanical or adynamic obstruction listed in this FDA pharmacovigilance review?

A.    Yes.  So this -- the nonmechanical obstruction would essentially fall into what we discussed earlier of intestinal pseudoobstruction.

Q.    So is it your opinion that

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

nonmechanical intestinal obstruction is a pseudoobstruction?

MR. PRZYMUSINSKI:  Object to form.

THE WITNESS:  A nonmechanical obstruction is essentially a pseudoobstruction, meaning that they have symptoms that are similar to mechanical obstruction but there is no obstruction there.

QUESTIONS BY MS. PFEIFLER:

Q.    So then do you disagree with the FDA that nonmechanical obstruction can be -- or paralytic ileus, excuse me, can be a nonmechanical obstruction?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes the testimony.

You can go ahead.

THE WITNESS:  The question one more time?

QUESTIONS BY MS. PFEIFLER:

Q.    I'm sorry, I'll reask that.

So right after that sentence it says, "Nonmechanical obstruction can be divided into paralytic ileus and colonic

pseudoobstruction."

Do you see that?

A.    Yes.

Q.    So do you disagree that paralytic ileus is a type of nonmechanical obstruction?

A.    So paralytic ileus is one of the causes of -- or one of the disorders within the framework of nonmechanical obstruction.

Q.    Okay.  Perfect.

Well, Dr. Nguyen, I'm going to move on from this exhibit briefly.

So I know we kind of jumped around because I didn't have the September 2023 label readily available, but do you have an understanding that in September of 2023 Novo Nordisk updated its GLP-1 RA labels to include ileus at the request of the FDA, as we just went over?

MR. PRZYMUSINSKI:  Objection to form.

You can answer.

THE WITNESS:  We looked at the 2025 one.

Linda Nguyen, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

QUESTIONS BY MS. PFEIFLER:

Q.      Uh-huh.

A.      I don't see the -- the 2022?
Was it --

(Nguyen Exhibit 28 marked for
identification.)

QUESTIONS BY MS. PFEIFLER:

Q.      Oh, the 20 -- I do have it now.

The 2023 label, I can mark that
as an exhibit if you would like to see it.

This is Exhibit 28, and this is
the September 2023 label for Ozempic.

I'm going to see if I have more
of those.

MR. PRZYMUSINSKI:  It's okay.
I know the label.

MS. PFEIFLER:  Are you sure?
Okay.

THE WITNESS:  Now that I have
the label in front of me, what was the
question?

QUESTIONS BY MS. PFEIFLER:

Q.      If you will flip to Section 6.2
again -- and they don't have page numbers, so
I'm sorry about that -- under

Gastrointestinal.

And do you see the word "ileus" in the list of gastrointestinal adverse events?

A.    Okay.  So this is Section 6.3, the post --

Q.    Section 6.3, thank you.

A.    I do see that.

Q.    Okay.  And I will represent to you that ileus was not in the labels for Novo Nordisk GLP-1 RAs in the United States prior to September of 2023.

So you have that -- the addition of ileus in September of 2023.

Are you aware that in July of 2023 -- that's right -- the FDA issued a newly identified safety signal for the risk of pulmonary aspiration during deep -- during general anesthesia and deep sedation with use of GLP-1 RAs?

A.    I would have to look at the label.  It sounds vaguely familiar.

Q.    Okay.  It is in the 2025 label. I don't have the specific change in 2024, but it is in the 2025 label.

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MR. PRZYMUSINSKI:  Are you talking about the NISS --

MS. PFEIFLER:  I'm talking about the NISS, yes.

MR. PRZYMUSINSKI:  So it's not in the label.  Right?

MS. PFEIFLER:  Sorry, sorry. You're right.

QUESTIONS BY MS. PFEIFLER:

Q.    Dr. Nguyen, we're -- you're following my train of thought, but we're not exactly there yet.

Just the NISS in general, where the FDA identified a newly identified safety signal for the risk of pulmonary aspiration during general anesthesia or deep sedation with the use of GLP-1 RAs, do you have any knowledge of the FDA issuing that newly identified safety signal?

A.    It sounds vaguely familiar, but I have not read --

Q.    Okay.  And are you aware that after the issuance of that newly identified safety signal, the FDA required a label update to include the risk of pulmonary

aspiration during general anesthesia or deep sedation with use of GLP-1 RAs in the labels?

MR. PRZYMUSINSKI:  Objection to form.  Lacks foundation.

You can answer.

THE WITNESS:  Like I said, I have not seen the label, so I can't confirm --

QUESTIONS BY MS. PFEIFLER:

Q.    Okay.

A.    -- that it is.  Like I said, I heard vaguely, but I have not read it.

Q.    Okay.  And then similarly, in April of 2025, the FDA issued a newly identified safety signal for intestinal obstruction, including fecal impaction, for use of GLP-1 RAs.  That's it.

Are you aware of that?

MR. PRZYMUSINSKI:  Same objection, please.

THE WITNESS:  Same?  Like I said, I don't follow the FDA with sort of the postmarket labeling experience.

Again, when I look at sort of the -- where the label -- within the

label, it says that these are

voluntary -- "because these reactions

are reported voluntarily from a

population of uncertain size, it's not

always possible to reliably estimate

the frequency to establish a causal

relationship."

So my interpretation of this is

that the -- these events can be

reported by anybody, and we don't know

if these diagnoses are correct in

terms of the report because they could

be patients, family members, some

physicians.

And so without a -- so with

that, yes, the -- my understanding is

the FDA can change the label, but it

does not talk about causation.

MS. PFEIFLER:  Sure.  And I'm

going to move to strike as

nonresponsive.

QUESTIONS BY MS. PFEIFLER:

Q.    My question, Dr. Nguyen, was

just, are you aware that the FDA issued a

newly identified safety signal in April

of 2025 for the risk of intestinal obstruction, including fecal impaction, with use of GLP-1 RAs?

A.    And I believe I did answer to say vaguely familiar --

Q.    Okay.

A.    -- with that.

Q.    And then do you have any understanding or awareness that as of October of 2025, Novo Nordisk GLP-1 RA labels have been updated to include intestinal obstruction, comma, severe constipation including fecal impaction, in the Section 6.2, Postmarketing -- excuse me, Postmarketing Experience?

A.    Let me just -- we just read that and, again, it says that --

Q.    No, please -- I --

MR. PRZYMUSINSKI:  Well, you got to let her finish -- you got to let her finish.  I'm sorry.

MS. PFEIFLER:  Well, I know, but if you -- if it's the same thing about postmarketing --

MR. PRZYMUSINSKI:  She's got to

be able to say whatever she wants to say.

THE WITNESS:  You asked me to look at the same area and asked me the same question, so I'm going to give you the same response, is that it does not.  I mean, "because these reactions are reported voluntarily from a population of uncertain size, it's not always possible to reliably estimate the frequency or establish a causal relationship to drug."

QUESTIONS BY MS. PFEIFLER:

Q.    Understood.

So can you turn to, in that same label, Section 5.7 titled Severe Gastrointestinal Adverse Reactions?

MR. PRZYMUSINSKI:  We're on '25 right now?  2025?

MS. PFEIFLER:  2025, yes.

QUESTIONS BY MS. PFEIFLER:

Q.    Will you let me know when you're there, Doctor?

A.    Yeah, I am there.

Q.    Okay.  Perfect.

Linda Nguyen, MD                    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

So if you see that under Severe Gastrointestinal Adverse Reactions -- and I will represent to you that this warning, Section 5.7, was not included in the September 2023 label.  And please feel free to check that if you would like.  It was added in 2025.  I'll just represent that to you.

A.    So I -- but if you do go to the label from December of 2017, in the Warnings and Precautions, under Acute Kidney Injury, it does say, "Monitor renal function patients with renal impairment reporting severe, adverse gastrointestinal reactions."

So the term -- those words, "severe adverse gastrointestinal reactions," are in the 2017 -- December 2017 label under Warnings and Precautions.

Q.    With respect to acute kidney injury.

Correct?

A.    With respect to -- yes, with respect to acute kidney injury, but it also talks about severe adverse gastrointestinal reactions.

So when I read that, what my interpretation is, is that, yes, you can get severe adverse gastrointestinal reactions. And if you have someone who has adverse gastrointestinal reactions, you need to make sure you pay attention to their kidneys.

Q.    Right.  To their kidneys.

And if you want to turn to -- because that's just the highlight section. So if you want to turn to Section 5.6, Acute Kidney Injury within that label -- I believe it's Section 5.6.  I might be wrong.  But there's a section for -- for acute kidney injury in Section 5.  Yes, 5.6.

Do you see that?

A.    I do see that.

Q.    All right.  So if you read the second -- or excuse me, the third sentence, it starts, "A majority of the reported events."

Do you see that?

A.    I do see that.

Q.    "A majority of the reported events occurred in patients who had experienced nausea, vomiting, diarrhea or

Linda Nguyen, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

dehydration.  Monitor renal function when initiating or escalating doses of Ozempic in patients reporting severe adverse gastrointestinal reactions."

          Did I read that correctly?

     A.     You did.

     Q.     Where in this warning do you see a warning for gastrointestinal motility related adverse events?

          MR. PRZYMUSINSKI:  Objection to form.

          You can answer.

          THE WITNESS:  Okay.  So you're mixing up severe adverse GI symptoms and gastrointestinal dysmotility, because we've already established that symptoms and dysmotility do -- are not correlative.

          So in terms of acute kidney injury, it's not the dysmotility that leads to the kidney injury.  It's the dehydration that is associated with severe gastrointestinal symptoms.

QUESTIONS BY MS. PFEIFLER:

     Q.     Doctor, you just testified

that -- and you testified multiple times today that symptoms and dysmotility are not correlative.

Correct?

A.   That's correct.

(Nguyen Exhibit 29 marked for identification.)

QUESTIONS BY MS. PFEIFLER:

Q.   Okay.  I'm going to mark as Exhibit 29 -- it is a publication.  And I am so sorry, I do not know how to pronounce this individual's last name.  But the title is, "Association between delayed gastric emptying and upper gastrointestinal symptoms:  a systematic review and meta-analysis."

Oh, I'm so sorry.

And, Doctor, I will represent to you that I did not see this on your materials considered list.  So if I missed it, will you please point me to it?

MR. PRZYMUSINSKI:  Sorry.  The underlining on this, is this yours?

MS. PFEIFLER:  Oh, yes, it is.

MR. PRZYMUSINSKI:  Do you want to mark one that does not have it?

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

MS. PFEIFLER:  Yes.  Yes.

Thank you.

For exhibit number --

MR. PRZYMUSINSKI:  Well, take

that one back.

MS. PFEIFLER:  I don't know.  I

am so sorry.

MR. PRZYMUSINSKI:  Doctor, you

should feel free to review this if it

is on your list.

THE WITNESS:  It's not on my

Exhibit B, materials considered for

Issue 2.

QUESTIONS BY MS. PFEIFLER:

Q.    And please feel free to take as

much time as you need.  I just want to point

you to one section of this --

A.    Okay.

Q.    -- of this article.  Or this

publication, excuse me.

MR. PRZYMUSINSKI:  Just so you

know what time we're at.

MS. PFEIFLER:  Yes, I've been

monitoring.

MR. PRZYMUSINSKI:  I know.  I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

just --

THE WITNESS:  Go ahead.

QUESTIONS BY MS. PFEIFLER:

Q.    Okay.  So if you will flip to page 807 on the bottom.  It says 807.

A.    Okay.

Q.    In the section Meta-Analysis?

A.    Yes.

Q.    So if you go all the way down, you see subsection A, B, C, D?

A.    Yes.

Q.    Okay.  So the first -- the sentence immediately above section A, it starts, "There was a significant association between gastric emptying and the following."

Do you see that?

A.    I do see that.

Q.    Okay.  And just to orient you, this is a meta-analysis of publications, excuse me, looking at optimally measured gastric emptying through scintigraphy and the kind of correlation between the delay and upper gastrointestinal symptoms.

It says, "It's a systematic review that included 92 gastric emptying

studies" -- this is on the first page -- "26 breath tests, 62 scintigraphy, one ultrasound, and three wireless motility capsule."

A.     Yes.

Q.     Okay.  So if you go back to page 807 where it says, "There was a significant association between gastric emptying and the following," do you see --

A.     I do see that.

Q.     Okay.  Perfect.

Do you see underneath that the first one listed is nausea?

A.     I do see that.

Q.     All right.  Do you see vomiting, in B?

A.     I see that.

Q.     Okay.  And then in C, abdominal pain?

A.     I do see that.

Q.     And D, bloating?

A.     So I do see what you're pointing out, and so I want to make sure that we're characterizing this meta-analysis correctly.

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Uh-huh.

A.    Because the -- two things here.

One is that when they look at the correlation, they're looking at optimal gastric emptying and suboptimal gastric emptying.

Q.    Right.

A.    And only when you do an optimal gastric emptying study is there correlation. And I have to look at this in better -- give me one second because...

I haven't had time to read all of the studies.  The one -- what I'm trying to look at, because I'm not trying to waste everyone's time here, is that they do have two groups of patients who had the gastric emptying study who have known gastroparesis and those with upper GI symptoms without gastroparesis.

So the -- what you read in terms of the association, I don't know which group that this is in.

Q.    Sure.  Sure.

And that's -- I realize we are reviewing this kind of at warp speed, so --

A.    Yeah.

Q.    And I'm definitely aware of that.

A.    But I can tell you in general, because I'm very familiar with the gastroparesis literature --

Q.    Uh-huh.

A.    -- and I have looked at studies like this -- it's been a couple of years since I've looked at this study -- is that the -- if you have someone with confirmed diagnosis of gastroparesis --

Q.    Uh-huh.

A.    -- so they have evidence of confirmed delayed gastric emptying on scintigraphy -- and this is a Mayo study, so typically it's a higher fat study.  That when you do the higher fat, higher calorie meal and they have delayed emptying, that is -- that can be associated with the symptom severity.  Typically when you're talking about treatment, that you can't use symptoms and diagnosis of gastroparesis.

So that's what I mean when I say symptoms do not correlate with gastric

emptying.  Because someone can have the exact same symptoms of nausea, vomiting, abdominal pain, and the diagnosis is not gastroparesis. But it could be cyclic vomiting syndrome.  It could be mesenteric ischemia.  It could be median arcuate ligament syndrome.

Q.    Uh-huh.

A.    It could be actually abdominal cutaneous nerve entrapment syndrome.

So this is a short list of other things that can cause the exact same symptoms that you're talking about with nausea, vomiting, abdominal pain, that has nothing to do with gastric emptying.

Q.    Sure.  Sure.

I just wanted -- and thank you for that, Doctor.  But I want to direct you where it says "discussion" on page 808.

Do you see that?

A.    I do see that.

Q.    All right.  Do you see where it vase, "This systematic review and meta-analysis demonstrates that delayed gastric emptying is associated with UGI Sx" -- and I understand that to be upper

gastrointestinal symptoms -- "parentheses, nausea, vomiting, early satiety/fullness, abdominal pain, bloating and composite symptoms, end parentheses.  This was demonstrated quantitatively using meta-analysis, parentheses, showing significant association between gastric emptying and upper gastrointestinal symptoms in 10 breath tests, in 15 scintigraphy studies with a total of 6,287 parti" -- "patients," excuse me, "end parentheses, as well as in the systematic appraisal which evaluated a larger group of studies.  This association had a large magnitude, parentheses, OR," or odds ratio, "of 2, parentheses, except perhaps for the association with abdominal pain."

Did I read that correctly?

A.     You did.  And if you continue to read, it would say, "In patients with documented gastroparesis, the association of delayed gastric emptying and symptoms is less clear."

Q.     Uh-huh.

Was there a reason why this

study was not included on your materials considered list or reviewed in forming your opinions in this case?

MR. PRZYMUSINSKI:  I'm sorry, just for clarification, are you talking about her reliance list for Issue 2 or Issue 1 and 2?

MS. PFEIFLER:  I'm talking about her reliance list for Issue 2.

MR. PRZYMUSINSKI:  Oh, okay.

THE WITNESS:  So this was not related to Issue 2 in terms of the association between delayed emptying and symptoms.

If you pull my Issue 1 report, I believe this might have been in there.

Like I said, it's been a couple of years since I've looked at the details of the study, but I'm familiar with it, and I recall having read it.

QUESTIONS BY MS. PFEIFLER:

Q.     You recall having read it prior to your Issue 1 report?  Is that what you were saying?

Linda Nguyen, MD

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A.    No.  I recall reading it prior to Issue 2.  I do not recall if I included it in Issue 1.

Q.    Okay.  So you read it, but you did not rely on it in forming your opinions?

MR. PRZYMUSINSKI:  Objection to form.  Mischaracterizes testimony at least with respect to Issue 1.

THE WITNESS:  Like I said, I don't have my Issue 1 report in front of me, and I don't have the exhibit.

I did not read this article specifically for Issue 2, which is what we're talking about here.

I am familiar with the study, though.

QUESTIONS BY MS. PFEIFLER:

Q.    Understood.  Understood.  Okay.

I know we have about three minutes.  So -- I'm going to try to short-circuit this.

Doctor, when you -- if you flip to page 13 of your report, the second to last bullet point related to your -- you state you disagree with Dr. Kessler's characterization

of the data.

Do you see that?

A.    I do see that.

Q.    And again, in the middle of that paragraph you state that the "GLP-1 RAs have a modest effect on gastric emptying. The effect typically subsides over time. Tachyphylaxis is well-known in the medical community and reflected in the product labeling and resolves after treatment cessation."

I know we had looked at the label related to severe gastrointestinal adverse reactions.  If you will go back to I believe it's 20 -- it's the 2025 label.  I can't recall which --

A.    Okay.  Okay.

Q.    If you go to Section 5.7, the Severe Gastrointestinal Adverse Reactions?

A.    Okay.

Q.    And it states, "Use of Ozempic has been associated with gastrointestinal adverse reactions, sometimes severe, brackets, see adverse reactions, parentheses 6, end bracket."

Do you see that?

A.    I do see that.

Q.    Okay.  As we talked about whenever you and I first started talking, we had gone through the regulations showing that the FDA requires that there is reasonable evidence of a causal association between a drug and an adverse event in order to be included in a Section 5 warnings and precautions section.

Do you recall that?

A.    I recall that.

Q.    Okay.  So you see this reference to adverse reactions, Section 6 within the severe gastrointestinal adverse reactions warning.

Do you see that?

A.    I do see that.

Q.    All right.  And if we go to Section 6 where we were, and it lists under Gastrointestinal, ileus, intestinal obstruction, severe constipation, including fecal impaction.

Do you see that?

MR. PRZYMUSINSKI:  Is that

Section 6 or Section 6.2?

MS. PFEIFLER:  Well, it's all Section 6.

MR. PRZYMUSINSKI:  So you want her to go to 6.2 specifically?

MS. PFEIFLER:  Yes, where we were just a minute ago.

THE WITNESS:  Okay.

QUESTIONS BY MS. PFEIFLER:

Q.    Where it lists under Gastrointestinal, ileus, intestinal obstruction, severe constipation, including fecal impaction.

And we just saw that Section 6 is referenced and incorporated into that Section 5, severe gastrointestinal adverse reactions warning.

Do you see that?

A.    I do see that.

Q.    Okay.  Well, Dr. Nguyen, it is 4:31.  I do not want to take any more of your time.

A.    I'm sorry, is there a question?

Q.    Just if you saw it.

A.    Do I see that?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q.    Yes.  Correct.

A.    So I see the gastrointestinal adverse reactions and the symptoms.  But again, in -- you had asked me this in conjunction with the bullet point disagreeing with Dr. Kessler and gastric emptying.

Again, I want to make sure that we separate symptoms from gastric emptying.

So that bullet point about the effects of GLP-1 RAs on gastric emptying is not the same as the severe symptoms here.

Q.    Sure.  And I'm sorry, I wasn't necessarily just focusing on gastric emptying with this -- with pointing out this bullet point, because I just wanted to highlight again your opinion that these effects on gastric emptying are well-known in the medical community and reflected in the product labeling.

A.    But you didn't point me to --

MR. PRZYMUSINSKI:  Linda, there's no question.  There's no question.

THE WITNESS:  Okay.

MS. PFEIFLER:  No, I'm good.

So I appreciate your time very much, Dr. Nguyen.  Thank you so much for being patient throughout this day.

MR. PRZYMUSINSKI:  No questions for defendants, so we can go off the record.

VIDEOGRAPHER:  Okay.  This concludes the video deposition of Linda Nguyen.

We are now going off the record, and the time is 4:33 p.m.

(Deposition concluded at 4:33 p.m.)

- - - - - - -

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Linda Nguyen, MD, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  April 10, 2026

Linda Nguyen, MD     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Linda Nguyen, MD    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Linda Nguyen, MD                    DATE


Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____


Notary Public

```
        - - - - - -
           ERRATA
        - - - - - -

   PAGE    LINE    CHANGE

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____

   _____   _____   _____
```

Linda Nguyen, MD   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

                  _ _ _ _ _ _ _
                  LAWYER'S NOTES
                  _ _ _ _ _ _ _

    PAGE      LINE